# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MOTOROLA SOLUTIONS, INC., ) <br> MOTOROLA SOLUTIONS ) <br> SDH. BHD ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> HYTERA COMMUNICATIONS ) <br> CORPORATION LTD., ) <br> HYTERA AMERICA, INC., and ) <br> HYTERA COMMUNICATIONS ) <br> AMERICA (WEST), INC. ) <br> ) <br> Defendants. ) <br> ) | Case No. 1:17-CV-01973 <br><br> Honorable Charles R. Norgle Sr. <br><br> Magistrate Judge Jeffrey Cole |

## DECLARATION OF JIANWEI FANG

Jianwei Fang, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

1. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration. The evidence set out in the foregoing Declaration is based on my personal knowledge. If called to testify as a witness thereto, I could do so competently under oath.

2. I am an attorney at the Shanghai Office of the Zhong Lun Law Firm in China. I received my Bachelor of Law degree from East China University of Politics & Law in 2003, and my Juris Doctor and Master of Laws degrees from Columbia University in the United States in 2010 and 2007, respectively. I am a member of both the Chinese Bar and the New York State Bar. I have been licensed to practice law in China for more than 9 years. Before that, I served as a Chinese judge in a basic-level trial court in

Zhejiang Province in China. In my current law practice, I specialize in dispute resolution, corporate compliance and government regulation. I have published several articles on China's state secrets and data protection laws and regulations.

3. I have reviewed Defendants' Memorandum In Support Of Its Request To Conduct Any Forensic Inspection of Hytera Computers In Compliance With Chinese Law (Hytera's "Brief"), as well as the declarations and exhibits attached thereto.

4. I submit this Declaration in support of Motorola's Opposition to Hytera's Brief and to respond to the Declaration of Ding Liang (the "Liang Declaration") that was submitted by Hytera with its Brief.

5. I have also reviewed Hytera's websites, public filings and other publicly available information. I have been an opposing counsel to Hytera in a litigation filed with the Beijing Intellectual Property Court since late 2017 and further gained certain understanding of Hytera's business operations.

6. I have also reviewed the proposed order and protocol for conducting the forensic inspection of the Objects Requested that Motorola proposed to Hytera on April 10, 2018 (the "Proposed Protocol"). The scope of the inspection includes the computers (or mirror images of those computers) of key Hytera witnesses, as well as Hytera network folders (collectively the "Objects Requested").

7. In my opinion, making the Objects Requested available for forensic inspection by a third-party examiner will not conflict with the Chinese law. The Proposed Protocol for the forensic inspection contains several safeguards to avoid implicating or violating the Chinese data protection laws cited by Hytera, to the extent that they present any concerns. The Chinese data protection laws cited by Hytera, including those regarding state secrets, cyber security matters, and personal data protection, do not bar the proposed forensic inspection in the above referenced case, because the laws are inapplicable to the instant case or because any concerns have been adequately addressed by the Proposed Protocol. Furthermore, Article 277 of the Chinese Civil Procedure Law is not applicable to the present case, because the proposed forensic inspection does not constitute the exercise of US judicial supremacy over Chinese territory in violation of Chinese judicial sovereignty that Article 277 intends to forbid.

Further, because the Proposed Protocol would be implemented by Chinese nationals, this is an additional reason that Article 277 is inapplicable and does not require resorting to the procedures of the Hague Convention.

### I. Safeguards of the Proposed Protocol

8. In reviewing the Proposed Protocol, I believe it contains adequate safeguards to avoid potential violation of the Chinese laws cited by Hytera. These safeguards concern the aspects of the inspection relating to (i) creation and maintenance of the forensic images, (ii) searching for relevant documents and information, and (iii) the production of documents and information to counsel for the parties.

9. For example, with respect to creation and maintenance of the forensic images, the Proposed Protocol provides that the inspection be conducted by an independent examiner with staff located within the People's Republic of China ("PRC"), and any forensic images created from the Objects Requested would be maintained within the PRC and not exported to the United States.

10. With respect to the searching for documents and information, the Proposed Protocol contains an enumerated list of search criteria that are intended to limit the scope of the inspection so that it targets information that is relevant to this case, rather than information that is unrelated to Motorola or Motorola confidential information. For example, the scope of the Proposed Protocol is to look for things such as the deletion of Motorola confidential information, the presence of Motorola confidential information, and the disposition of Motorola confidential information. To that end, the Proposed Protocol seeks to target such information and files that hit on Motorola-related search terms, are documents identified by Motorola, or contain Motorola source code, as well as the metadata for those types of information.

11. With respect to the production of documents and information to counsel for the parties, the Proposed Protocol is structured such that any information being produced in the case would be reviewed for "State Secrets," and personal information if necessary, by independent Chinese counsel prior to production to counsel for Motorola. Any such information that is believed to constitute "State Secrets" within

the Chinese law discussed below would either be redacted before production or, if withheld, logged in a manner similar to a privilege log.

12. These safeguards are, in my opinion, sufficient to avoid conflict with the Chinese laws cited by Hytera, as further disclosed below.

## II. Chinese State Secrecy Protection Laws

13. In my opinion, because the Proposed Protocol provides a mechanism for Hytera to review any documents being produced in the case and to provide a log of documents being withheld as Chinese state secrets, there is no concern of violating Chinese state secrets laws due to the production of documents. Information that legitimately constitutes state secrets under Chinese law would not be exported outside of the PRC and produced in this litigation. Further, the conducting of a forensic inspection itself is not barred by the law, including because the examination would be conducted by Chinese nationals.

14. Regarding the scope of protection under the Chinese state secrecy protection regime, the Liang Declaration only provided a brief definition of state secret information:

> *"State secret" information is defined by Article 2 of China's Law on Protecting State Secrets. Article 2 provides that "state secrets" refers to matters that have a vital bearing on state security and national interests, being specified by legal procedures. State secrets are permitted to be disclosed only to a limited number of people during a given period of time.* Ding Decl. ¶10.

15. The Chinese State Secrets Protection Law ("State Secrets Protection Law"), as the main law governing the protection of state secrets in China, has provided further demarcation on the scope of state secret protection and a list of seven categories of state secrets:

> *Chapter II Scope and Categories of State Secrets*
>
> *Article 9 The following matters involving state security and national interests shall be determined as state secrets if the leakage of such matters is likely to prejudice the state security and national interests in the field of politics, economy, national*

*defense and foreign affairs, etc. shall be determined as state secrets:*

*(1) secrets concerning major policy decisions on state affairs;*

*(2) secrets concerning the construction of national defense and activities of the armed forces;*

*(3) secrets concerning diplomatic activities and foreign affairs as well as secrets to be maintained as commitments to foreign countries;*

*(4) secrets concerning national economic and social development;*

*(5) secrets concerning science and technology;*

*(6) secrets concerning activities for safeguarding state security and the investigation of criminal offences; and*

*(7) other matters that are categorized as state secrets by the state secret-protection department.*

*Secrets of political parties that conform to the provisions of the preceding paragraphs shall be state secrets.*

16. The State Secrets Protection Law also provides for a set of strict procedures for the handling of state secrets so that any physical media or object that contains state secrets will need to be clearly marked out as such. The relevant articles of the State Secrets Protection Law reads:

*Article 17 Organs and institutions shall mark "State secret" on the paper, optic, electromagnetic and other carries bearing state secrets (hereinafter referred to as "State secret media" and equipment and products that are state secrets.*

*The mark of State secret shall not be indicated on those that do not fall within state secrets.*

17. The Implementing Regulations of the Law of the People's Republic of China on Guarding State Secrets, which came into force on March 1, 2014, also stipulates that:

*Article 15    Labels of state secrets shall be affixed to eye-catching parts of the carriers of state secrets, and the equipment and products that are state secrets. A label of state secrets shall indicate the classification level and the confidentiality period of a state secret, and shall be promptly modified in the event of changes to the classification level or confidentiality period of the state secret.*

18. Based on the prevailing interpretation of the State Secrets Protection Law and my survey of published news and state secrets cases, a matter can constitute a state secret only if it falls under one of the above categories. For example, information regarding the operations of state organizations and state-owned enterprises may be found to constitute a state secret. While some of Hytera's customers may be Chinese governmental organizations, Hytera is not a state organization or governmental institution, nor a state-owned enterprise. Thus, the majority of information regarding Hytera's DMR development does not constitute a "State Secret." Indeed, I understand that Hytera produced over 600,000 documents thus far in this litigation and not a single one of them was withheld or redacted due to State Secrets concerns.

19. Further, because the Proposed Protocol includes specific search criteria for the forensic examiner to look for on the Objects Requested, it is unlikely that the Forensic Examiner will be collecting State Secret information for potential production in the litigation, but in any case, none will be produced due to the review safeguards in the Proposed Protocol discussed above.

20. Furthermore, I have surveyed the published news and reported cases of state secrets violations and found no case in which the State Secrets Law has been enforced against a private enterprise similar to Hytera's business and operation when offering its electronically stored information, custodial documents for inspection ordered by a foreign court. Therefore, the likelihood of enforcement of the state secrets protection laws on an organization responding to discovery orders in this litigation is low.

21. Ding Liang's declaration also supports my opinion, as it states that "it is illegal under Chinese Law to *export* (emphasis added) state secrets and state sensitive data without prior government approval, that inspection cannot occur outside of China". Ding Decl. ¶15. As a matter of fact, the proposed inspection would be conducted within China. If any documents containing state secrets are found, the Proposed Protocol includes a mechanism for Hytera to review any such documents and prevent them from being disclosed.

22. The Liang Declaration statement that the State Secret Protection Law forbids the "dissemination of state secrets to foreign governments or foreign nationals without

prior government approval" (Liang Decl. ¶14) is irrelevant because the forensic inspection, conducted in China and by a Chinese neutral third-party inspector, would not constitute the "dissemination of state secrets to foreign governments or foreign nationals," even if the Objects Requests contain state secrets. Under the Proposed Protocol, no foreigners would be receiving access to State Secret information. Additionally, the neutral third-party inspector would be explicitly approved by Hytera and is thus not a foreign agent, but rather a Chinese national working for Hytera. Thus, I disagree with Mr. Liang's conclusion that "the inspection cannot occur even if it were conducted within China." Liang Decl. ¶ 14.

23. Further, Mr. Liang also mistranslated Article 30 of State Secret Protection law, which he relies on to support his conclusion that a neutral-third party inspector cannot conduct the inspection, even if conducted within China. Liang Decl. ¶ 14. Article 30 provides that "Where an organ or organization needs to *provide* (*emphasis added*) a state secret for the benefits of contacts and co-operation with foreign countries, or **a *foreign national appointed or employed by the organ or organization*** (任用、聘用的境外人员, *emphasis added*) needs to know a state secret because of the actual work needs, the organ or organization shall report the same to the relevant competent department...." Article 30 thus refers to *foreigners*, who are employed by a company within China. Mr. Liang mistranslated the "任用、聘用的境外人员" as "foreign-appointed or foreign-employed person", which led to the incorrect interpretation of the "dissemination of state secrets to foreign governments or foreign nationals" as including dissemination to "foreign-appointed or foreign employed person". Ding Decl. ¶14. That interpretation is incorrect. Regardless, as discussed above, Article 30 is not applicable, because the forensic examination would be conducted by a Chinese national and no state secrets are being provided to foreigners.

24. In sum, it is my opinion that the proposed forensic inspection will not likely involve any state secrets and will not likely conflict with the state secrets protection regime, particularly in light of the safeguards built into the Proposed Protocol.

**III. Chinese Cyber Security and Personal Information Laws**

25. The forensic inspection does not conflict with any personal information laws of China. First, the Cyber Security Law only applies to those entities that provide Critical Information Infrastructure ("CII"). But Hytera does not constitute an operator of CII for the purpose of the determination of legality of the transfer of information stored in the Objects Requested out of China. Further, many of the regulations cited by Hytera in the Liang Declaration, such as those identified in Paragraph 11, are only in draft form and have not yet taken affect. Thus, a forensic examination would not conflict with any cyber security laws in China. Second, there are no laws that prevent a Chinese national conducting a forensic inspection by searching for relevant information, as provided for by the Proposed Protocol. And Chinese law does not prohibit the collecting of documents that contain personal information if done for purposes of resolving a dispute, such as by providing discovery. Third, as described above, the Proposed Protocol is narrowly tailored to search for information relevant to the litigation, but such information is unlikely to contain personal information. But even if personal information is incidentally found as part of searches conducted as part of the Proposed Protocol, any such personal information the Liang Declaration contends would be barred from export can be redacted or reviewed prior to production in the litigation, using the same mechanism as described above with respect to the "State Secrets" safeguards.

26. According to Article 76 of Chinese Cyber Security Law ("Cyber Security Law"), Network operators shall refer to the owners and managers of networks and the network service providers. For example, China Mobile Communication (similar to Verizon in the U.S.) and Baidu Corporation (similar to Google in the U.S.) are often regarded as typical network operators. However, Hytera is a manufacturer of devices that are used in telecommunications networks and Hytera itself is not an operator of those telecommunication networks.

27. According to Article 31 of Cyber Security Law, CII refers to the infrastructure in public communication and information services, energy, transportation, water conservancy, finance, public services, e-government and other important industries and fields, as well as other critical information infrastructure, the destruction, loss of

function or which or whose data leak may cause serious damage to the interests of national security, national economy and people's livelihood and public interests. However, the Cyber Security Law does not offer a clear demarcation of the scope of CII. The Cyber Security Law only authorizes the State Council to formulate the scope of CII (see Art. 31 of Cyber Security Law). Definitions of CII can be found in the Guidelines of National Network Security Inspection (国家网络安全检查操作指南) ("Inspection Guidelines") promulgated by the Cyber Security Coordination Bureau of the Chinese Government, in June 2016 and the Draft Ordinance on the Security and Protection of Critical Information Infrastructure (关键信息基础设施安全保护条例(征求意见稿)) circulated by the Cyberspace Administration of China in July 2017. These two regulatory definitions largely overlap.

28. According to the Inspection Guidelines, CII includes any information system or industrial control system which provides support to or sustains the functionality of critical businesses, facilities, or operations in critical sectors economy or realms of public administration, including but not limited to sectors providing information to the general public and public utilities, whose failure, malfunctioning or data leakage could cause severe damages to national and public security and welfare.

29. The Inspection Guidelines offers a three-step analysis of whether the information system or industrial control system falls into the definition of CII. First, the system has to be part of a critical business in a critical sector. Second, the information system or industrial control system has to be critical to the functionality of the business or operation. Third, the system's failure or malfunctioning could cause severe damages to national interests. Therefore, operating critical business is a precondition to be recognized as a CII operator according to the Inspection Guidelines. The Inspection Guidelines also enumerates the types of businesses that are considered critical for the purpose of CII within the manufacturing industries. They include those businesses related to the enterprise management, intelligent manufacturing system (e.g. Internet of Things, intelligent devices), dangerous chemical, and operation and control of high-risk industrial facilities.

30. Hytera is a manufacturer of telecommunication devices. Based on my

knowledge of Hytera's business, operations, and products, I cannot identify any part of its business that could falls into the enumerated categories of critical businesses in the manufacturing industries, or in any other critical industries for the purpose of CII. Therefore, I disagree with Ding Liang's claim that *"Hytera would probably be considered by the Chinese government to be a Key Information Infrastructure Operator."* Ding Decl. ¶11.

31. Additionally, the Cyber Security Law came into force in June 2017 and for lack of implementation rules and guidelines the Cyber Security Law are not yet enforced. Specifically, the implementation guidelines governing the legality of the transfer of information stored in CII, the Measures for Evaluating the Security of Transmitting Personal Information and Important Data Overseas (Draft for Comment) ("Measures") are still in draft form, have not come into force yet, and are not enforceable. Thus, even if Hytera qualified as a provider of CII, the Cyber Security Law would still not apply to a forensic inspection.

32. Even if that Hytera is deemed a network operator and the regulation was enforced, authorities will not likely order a security evaluation unless the transfer of personal information involves a very large quantity of personal information. The relevant article of the Measures provides:

*"Article 9. Where the data to be transmitted overseas falls under any of the following circumstances, network operators shall inform the competent authority or regulator of the industry in order security evaluation to be carried out: 1. Where the data involves or totally involves the personal information of over 500,000 individuals; 2. Where the data volume exceeds 1,000GB..."*

33. Based on my understanding of scope of discovery, the Objects Requested only contains a limited number of computers and devices of Hytera's employees. It is my opinion that the currently-effective cybersecurity regime will not prevent inspection and discovery ordered by the court in this proceeding.

34. Further, Chinese law also allows the processing of personal information without the consent of the owner of the personal information. Specifically, the following circumstances constitute exceptions to the requirement of information

owner's consent: criminal investigation, filing of a complaint with a court, trial or sentencing; the protection of any person's life, property, or other important lawful interests and the consent of the information owner is hard to obtain. The proposed forensic inspection serves the purpose of the protection of Motorola's important lawful interests, therefore falls within the exceptions to the requirement of personal consent.

35. Finally, even if information produced pursuant to the Proposed Protocol were subject to the Cyber Security Law or any other personal information laws, such documents and information could be logged and/or redacted using the same safeguards as discussed with respect to "State Secrets" law.

**IV. Article 277 of Chinese Civil Procedure Law**

36. Article 277 of the Chinese Civil Procedure Law does not prohibit the proposed forensic inspection as laid out in the Proposed Protocol and does not require that it go through the Hague Convention procedures. Article 277 provides:

*Chapter 27: Judicial Assistance*

*Article 277 The request for the providing of judicial assistance shall be effected through channels provided in the international treaties concluded or acceded to by the People's Republic of China; in the absence of such treaties, they shall be effected through diplomatic channels.*

*A foreign embassy or consulate accredited to the People's Republic of China may serve documents on its citizens and make investigations and collect evidence (调查取证) among them, provided that the laws of the People's Republic of China are not violated and no compulsory measures are taken.*

*Except for the conditions provided in the preceding paragraph, no foreign organization or individual may, without the consent of the competent authorities of the People's Republic of China, serve documents or make investigations and collect evidence (调查取证) within the territory of the People's Republic of China.*

37. The purpose of the last two paragraphs of Article 277 is mainly to ensure that the Chinese judicial sovereignty over its subjects within the Chinese territory is not

violated by any foreign party in contravention of Chinese and international laws and conventions.

38. It is clear from the context that the act of "making investigation and collecting evidence" (调查取证) within the meaning of Article 277 refers mainly to the exercise of investigative power reserved for the Chinese judicial and executive authorities, which could include, for example, such acts as the deposing of a witness, the viewing and examining of a party's medical records, and the raiding of a corporate office, for the purpose of a judicial or administrative proceedings. The act of "making investigation and collecting evidence" under Article 277 does not include voluntary production of documents or voluntary disclosure of information by one party to another party or a third-party investigator for the purpose of resolving a dispute in or out of court because these acts do not encroach on the supremacy of Chinese judicial or executive authorities. Thus, the hiring of a discovery vendor to search for and produce information in a company's own files would not implicate Article 277.

39. I am not aware of any Chinese law or regulation that generally forbids the litigant opening up "access" of foreign individuals or organizations to documents, information, or objects that might be used in a judicial proceeding in a foreign country.

40. The defendant's suggestion that the discovery requests should be conducted through the Hague Convention is not a viable option for obtaining the requested discovery. According to Article 3 of *The Convention on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Convention")*, a requesting party (i.e. the Plaintiff) shall make a Letter of Request specifying the nature of the evidence and all the information in regard to the evidence. According to Article 26 of the *Provisions of the Supreme People's Court on Requesting Judicial Assistance in Service of Judicial Documents and Taking Evidence in Civil and Commercial Cases in Accordance with the International Convention and Bilateral Judicial Treaty*, the requesting party shall submit the Letter of Request as requested in the Hague Convention. However, the Chinese judicial authorities are not experienced with a request of the type under consideration. Thus, it is unlikely that the Chinese authorities could effectively interpret and handle the request, and it would likely be indefinitely delayed for reasons

relating to its administration, as opposed to its merits.

41. I am also not aware of any cases or instances in which a Chinese party's voluntarily offering of information for evidence in a foreign judicial proceeding has been deemed illegal or led to prosecution. From my knowledge about the protocol of the proposed forensic inspection, I do not think the forensic inspection to be conducted by a neutral third-party inspector will trigger Article 277 or in any way require the express consent of the Chinese authorities.

**V. Conclusion**

42. Therefore, based on my review and analysis of the relevant law and facts, I am of opinion that Chinese law does not bar the forensic inspection proposed by Motorola, and that the safeguards proposed by Motorola effectively mitigate any concerns over Chinese law raised by Hytera in the Liang Declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to my knowledge. Executed on Monday, April 30, 2018.

Jianwei Fang