## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MOTOROLA SOLUTIONS, INC., and MOTOROLA SOLUTIONS MALAYSIA SDN. BHD. | ) ) ) | Case No. 1:17-CV-01973 |
| | ) ) | Honorable Charles R. Norgle, Sr. |
| Plaintiffs | ) ) | Magistrate Judge Jeffrey Cole |
| v. | ) ) | |
| HYTERA COMMUNICATIONS CORPORATION LTD., HYTERA AMERICA, INC., and HYTERA COMMUNICATIONS AMERICA (WEST), INC. | ) ) ) ) ) ) | **AMENDED COMPLAINT** **JURY TRIAL DEMAND** |
| Defendants | ) ) ) | |
| | ) ) | |

## AMENDED COMPLAINT

Plaintiffs Motorola Solutions, Inc. ("Motorola US") and Motorola Solutions Malaysia Sdn. Bhd. ("Motorola Malaysia") (collectively "Motorola," or "Plaintiffs") allege as follows against Defendant Hytera America, Inc., Hytera Communications Corporation Ltd., and Hytera Communications America (West), Inc. (collectively "Hytera" or "Defendants"). The allegations herein are made based on personal knowledge as to Motorola with respect to its own actions, and upon information and belief as to all other matters.

## INTRODUCTION

1.      Motorola has been building its radios and its reputation for almost a century, and Hytera tried to hijack both in just a few months—and continues to do so to this day. Founded in 1928 in Chicago, Motorola has built and maintained its position as the innovation leader, at home and abroad, in radio equipment and infrastructure technologies. In particular, Motorola has invested its considerable expertise and creativity in developing cutting-edge digital two-way radio communication systems and computer programs, which it supplies to

thousands of public safety organizations, emergency response teams, transportation and logistics organizations, and numerous other customers involved in hospitality, manufacturing, education, utilities, oil and gas, and retail throughout the United States and around the world.

2.      Motorola's global leadership in this sophisticated technical field does not come cheap.  For many years, Motorola has employed thousands of engineers and software developers in Illinois, other parts of the United States, and various countries throughout the world, and spends hundreds of millions of dollars annually to research new technologies and to develop a wide range of digital radio products and solutions for feature-rich, seamless communication in rapid response networks across many industries and mission-critical applications.  Motorola's substantial investments in research and other forms of innovation require protection, and Motorola relies on its trade secrets, in addition to its copyrights, patents, and trademarks, to guard the intellectual property created by the ingenuity and industry of its employees.

3.      Hytera's story is the opposite.  Hytera's story is not one of innovation, but rather about misappropriation, misuse, copying, and intentional efforts to hide its misconduct from detection.  Unlike Motorola, Hytera has not invested the human effort and financial capital in the substantial time-consuming research required to produce truly innovative technologies and products.  Founded in 1993 in Shenzhen, China, Hytera served as a distributor for Motorola products until 2001, and since then has operated as a supplier of mostly analog radio products, although many customers require the sophisticated digital products of the kind that Motorola designs and produces.  Significantly, by the time Hytera began developing its digital two-way radio technologies, Motorola had already pioneered the field, and had established its digital two-way radio technologies as the leading communications solution for public works, industry, government, non-profit, and commercial applications.  In

fact, Motorola's success in the digital two-way radio field had rendered Hytera's outdated analog systems obsolete, providing Hytera a motive to take steps to compete through any means available. Complicating matters further for Hytera during this same time period, the United States Federal Communications Commission set a deadline that effectively required suppliers of radio products to use digital technology.

4. Knowing that its analog radio products faced extinction, and that it could not hope to develop its own digital two-way radios in time to save its ailing business, Hytera embarked on an unlawful plot to surreptitiously take and copy Motorola's confidential and proprietary trade secrets and copyrighted material, and use those trade secrets and copyrighted material to build a competing product. Indeed, as its executive team acknowledged, Hytera's main product line—analog radios—was quickly becoming "obsolete," and its digital radios had to be developed at a "very quick pace."[1] Thus, Hytera was faced with a choice: engage in time-consuming and resource-intensive development of its own digital product line, or simply take Motorola's technology, without permission, in order to get a product out to market (in Hytera's words) "at a very quick pace." Hytera chose the latter: rather than design its own digital two-way radio products to compete fairly in the marketplace, Hytera instead built its current digital two-way radio business by misappropriating Motorola's proprietary technologies and critical business strategies. This included copying Motorola's innovations— from replicating key technologies in Motorola's products, right down to copying the Motorola technical documentation describing them and even the Motorola computer programs at the heart of Motorola's products.

---

[1]  *See* https://www.youtube.com/watch?v=twxZXiWeNZQ.

5.      Hytera's plan to steal Motorola's technologies was a multi-faceted one, but included as a central pillar a plot to target Motorola from the inside, through its personnel—namely, by recruiting Motorola personnel who had substantial access to Motorola's proprietary technologies, and who downloaded thousands of confidential technical documents in the weeks prior to their departures.  Specifically, in order to break into the digital two-way radio market, beginning as early as 2008, Hytera lured away several Motorola senior radio engineers who were extensively familiar with Motorola's technologies and intellectual property.  Three Motorola senior engineers were hired by Hytera and held senior positions at Hytera: Gee Siong Kok ("G.S. Kok"), who formerly served as Senior Engineering Manager at Motorola, and at Hytera served as Senior Vice President and Terminal Chief at Hytera; Samuel Chia ("Chia"), who formerly served as Senior Engineer and Engineering Section Manager at Motorola, and now serves as the Director of Software Engineering at Hytera; and Yih Tzye Kok ("Y.T. Kok"), who formerly served as a Senior Engineer at Motorola, now serving as Sales Director at Hytera (collectively the "Hytera Employees").

6.      During their years of employment at Motorola, Motorola trusted these Hytera Employees to work extensively with Motorola's confidential information on highly sensitive and proprietary products and technology.  While at Motorola, they were privy to proprietary technical documents, design ideas, and computer programs, including software source code; they were aware of Motorola's product planning, research and development efforts; and they were intimately familiar with Motorola's digital radio development efforts, including those related to the technologies at issue in this case.  And while that knowledge alone presented incalculable value to Hytera, in the weeks prior to their resignations from Motorola (and unbeknownst to Motorola), the Hytera Employees surreptitiously downloaded and misappropriated more than 7,000 technical, marketing, sales, and legal documents related to Motorola's digital radio and

infrastructure products. Critically, many of these unlawfully-downloaded documents provided Motorola's specific technology implementations and copyrighted material, and other highly detailed technical information relating to critical technologies at issue in this case, providing an unlawfully obtained roadmap to Hytera about how to implement key features developed by Motorola over the course of many years. Hytera relied on, and continues to rely on, Motorola's trade secret and copyrighted information collected from sources including the Hytera Employees, to develop and supply its digital two-way radio products, and the ongoing sales of those products in the United States continue to perpetrate the misappropriation of Motorola's trade secrets and Hytera's infringement of Motorola's copyrighted computer programs. Egregiously, and notwithstanding its unlawful conduct, Hytera publicly touts the very innovations it took from Motorola as *its* own "innovation[s],"[2] evidencing a degree of wanton misappropriation rarely seen even in cases like these.

7.     Hytera and the newly employed Hytera Employees knew that the information they downloaded without permission was confidential, and knew that those documents were replete with Motorola trade secrets and copyrighted material. Despite this knowledge, Hytera simply copied and used these critical trade secrets and copyrighted material in its own competing products—products that bear the hallmarks of Motorola's innovation, product development, and technical and business strategies. Hytera's misappropriation was deliberate, wholesale, and systematic—not only did Hytera take and then copy Motorola's technical trade secrets, it even copied the marketing, configurations, and product manuals related to the misappropriated features as well, and copied Motorola's computer programs, including source

---

[2]     *See, e.g.,* Hytera DMR Introduction presentation, at 40 (available at: http://www.w4cll.com/Digital/TDMA/HyteraIntro.pdf).

code, ████████████████████████████████ leaving no doubt about its

unlawful scheme.

8.     The Hytera Employees—and by extension, Hytera itself—intentionally hid their

wrongful conduct from Motorola, to ensure it would not be discovered until years later.

Motorola undertakes substantial precautions to ensure that its highly confidential information is

not misused, including by restricting access to only its trusted employees that have a need for

such access.  Motorola also requires those employees not only to execute confidentiality

agreements upon commencement of their employment, but also to confirm their understanding

of their obligations at the time of their departure, and affirmatively represent to Motorola upon

their termination that they had not retained any Motorola confidential information.

9.     Motorola also employs robust technical protections in its systems to detect and

thwart unauthorized downloads and access to its confidential and sensitive information, and

that technology has improved substantially in recent years over what was available in 2008.

Due at least in part to their elevated positions with Motorola, the Hytera Employees were able

to evade Motorola's then-existing measures through a series of serious misrepresentations and

carefully planned illegal acts, all of which took advantage of Motorola's trust in its senior

product staff and the Hytera Employees' intimate knowledge of Motorola's systems.  As a

result of their illegal conduct and misrepresentations, the Hytera Employees ensured Motorola

would not become aware of the Hytera Employees' conduct, and by extension, Hytera's

misappropriation, until years after the Hytera Employees left their employment at Motorola to

go to work (unbeknownst to Motorola) at Hytera.

10.     Hytera's brazen misappropriation, theft of trade secrets, and infringement of

Motorola's copyrights leave Motorola no choice but to file this lawsuit seeking injunctive relief

and recovery of damages for the harm that has been caused by Hytera's illegal conduct.  Hytera

did not even attempt to compete fairly with Motorola; rather than develop its own digital two-way radio products, it instead took a short-cut to the marketplace by stealing Motorola's trade secrets and copying Motorola's proprietary innovations and computer programs. Such conduct makes investments in technology pointless and costly, and harms American companies and the economy in critical ways. Unless halted, Hytera's illegal actions will serve as a roadmap for other companies who have not invested in research and development themselves to steal the trade secrets of their competitors, and violate the intellectual property rights of true innovators. Simply put, Hytera's conduct must be stopped.

## THE PARTIES

11.    Motorola Solutions, Inc. is a company organized and existing under the laws of Delaware having a principal place of business at 500 W Monroe St, Chicago, IL 60661.

12.    Motorola Solutions Malaysia Sdn. Bhd. is a Malaysian corporation having its principal place of business at Level 18, The Gardens North Tower, Mid Valley City, Linkaran Syed Putra, Kuala Lumpur, Labuan 59200, Malaysia.

13.    Defendant Hytera Communications Corporation Ltd. is a company organized and existing under the laws of the People's Republic of China, with its principal place of business at Hytera Tower, Hi-Tech Industrial Park North, #9108 Beihuan Road, Nanshan District, Shenzhen, People's Republic of China.

14.    Defendant Hytera America, Inc. is a company organized and existing under the laws of Florida with its principal place of business at 3315 Commerce Pkwy, Miramar, FL 33025.

15.    Defendant Hytera Communications America (West), Inc. is a company organized and existing under the laws of California with its principal place of business at 300 Spectrum Center Dr., Suite 1120, Irvine, California 92618.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201, 2202, the trade secret laws of the United States (18 U.S.C. §§ 1836 and 1839), and the copyright laws of the United States (17 U.S.C. § 101 *et seq.*).  This Court also has supplemental jurisdiction over the asserted state law claims pursuant to 28 U.S.C. § 1367(a) because the federal and state law claims derive from a common nucleus of operative facts. This Court further has jurisdiction over the asserted state law claims pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties and an amount in controversy in excess of $75,000.

17.    This Court has personal jurisdiction over all of the Defendants.   Personal jurisdiction exists generally and specifically over all of the Defendants because they (directly and/or through their subsidiaries, divisions, groups or distributors) have sufficient minimum contacts with the Northern District of Illinois as a result of substantial business conducted within the State of Illinois.   For example, Defendants distribute their products ███████████ ████████████████████████████████████████████████████████████ ██████████████ through a number of District- and Illinois-based distributors, including Lakeland Communication Service, Ragan Communications, A Beep, and Concept Wireless Communications, Inc.   Defendants have also distributed their products ███████████ ██████████████████ to customers in this District and the State of Illinois, including the University of Illinois.[3]  As such, Defendants have demonstrated that they are ready and willing to conduct business with residents of this District and the State of Illinois, and actively do so.

---

[3]    *See* http://wiki.radioreference.com/index.php/University_of_Illinois_at_Urbana-Champaign; *see also* https://www.slideshare.net/rosebrown156/hytera-introductionfor-customers at slide 7.

18.    Defendants also employ individuals in this District and the State of Illinois, including in Chicago[4] and claim that their "Global Presence" is based, in part, in Chicago, IL.[5] Defendants have further availed themselves of contacts and business in this District and the State of Illinois by actively advertising and promoting the products ███████████ ███████████████████  For example, on November 2, 2016, G.S. Kok, Hytera's Senior Vice President delivered the keynote of Hytera's future plans in the digital radio market (which include Hytera's use of Motorola's trade secrets) at a conference held in Chicago, IL.[6]  Seven executives of Hytera attended this conference in Chicago, including Hytera America's president, Mr. Andy Zhao, in order to, among other things, increase sales in this District and the State of Illinois of products that contain Motorola's misappropriated technology.[7]

19.    Personal jurisdiction also exists specifically over all the Defendants because they have each committed acts of misappropriation and copyright infringement in this District and the State of Illinois, because they each directly and/or through their subsidiaries, divisions, groups, or distributors, advertise, market, use, offer for sale, import for sale and/or sell the products at issue in this case containing the misappropriated technology in this District and the State of Illinois, and place those products in the stream of commerce with the expectation and knowledge that they will be purchased by consumers in this district.  Further, Hytera's

---

[4]    *See* https://lautanjobs.com/logistics-coordinator-jobs-hytera-communications-america-west.b0c61a8d02aa0acb; *see also* https://www.indeed.com/cmp/Hytera-America/jobs/Logistic-Coordinator-b0c61a8d02aa0acb?q=Transport+West.

[5]    *See* https://tandcca.com/fm_file/tetrainchile2015hytera-pdf/ at slide 11 (titled "Hytera Global Presence", and specifically naming and pointing at Chicago as a location that is part of its "Global Presence").

[6]    *See* http://www.hytera.us/Catalogs/Contents.aspx?id=213; http://www.criticalltecommunications.net/program-day-one/.

[7]    *See*    http://urgentcomm.com/hytera/hytera-andy-zhao-outlines-companys-technology-roadmap-lte-other-next-generation-products.

misappropriations involved certain trade secrets that were invented in, stored in, or accessed from this District and the State of Illinois and computer programs likewise developed there. As such, Defendants have committed tortious acts in this District and the State of Illinois; have expressly aimed their actions at this District and the State of Illinois with the knowledge that they would cause harm and substantial injury to Motorola in the District and the State of Illinois; and Motorola's claims relate to Defendants' products containing technology misappropriated from Motorola and advertised, marketed, used, offered for sale, imported, and/or sold in this District and in the State of Illinois.

20.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b), 1400(a) because Hytera transacts business in this District, has misappropriated trade secrets in this District, has engaged in copyright infringement in this District, and is subject to personal jurisdiction in this district.  In addition, venue is proper because Motorola is headquartered in this District; has made significant investments of both equipment and engineering talent in this District; stores in or invented in this District certain of the trade secrets and copyrighted material at issue in this case; and has suffered harm in this District.

## ADDITIONAL FACTUAL ALLEGATIONS

### A.     Motorola Pioneers The Digital Two-Way Radio Technology

21.     In the United States and around the world, Motorola leads the industry in two-way digital radio products, technologies, and supporting infrastructure and systems.  Ever since the company's founding in 1928, Motorola's engineers and technicians have focused on developing the hardware, software, and systems necessary to create innovative and durable products that enable rapid and seamless communications in a variety of different organizations and environments, from construction sites to emergency dispatch systems to school bus networks.

22.     Such commitment to cutting-edge innovation in the service of customers—
whether they are enterprises, public safety organizations like police and fire departments, or
emergency medical providers—does not come cheaply.  Motorola has always invested heavily
in research and development, spending more than $3.5 billion in the last five years alone, along
with the time, dedication, and creativity of hundreds of Motorola engineers, technicians, and
other staff.

23.     Motorola's innovation and market leadership were praised by many in the
industry who recognized that Motorola "is creating a new era in data-rich public safety
communications …. Its core business is unrivaled in the United States and around the world
with a broad and loyal customer base, an outstanding record of reliability and growing reach
and scale driven by technology innovation."[8]  Others have noted that "Motorola Solutions is a
leading provider of mission-critical communication solutions and services for enterprise and
government customers.  Through leading-edge innovation and communications technology, it
is a global leader that enables its customers to be their best in the moments that matter."[9]

24.     As an industry leader in two-way radio products, Motorola has expended
considerable resources to research, design, develop, and bring to market new and innovative
technologies that have revolutionized the radio and telecommunications industries.  One such
innovation is the digital two-way radio technology which Motorola pioneered.

25.     Motorola provides its proprietary digital two-way radio technology and features
under the brand name MotoTRBO.  Motorola's digital two-way radio technology and features
are carefully tailored—based on Motorola's extensive research and testing—to meet the

_____

[8]     *See* Law360, "Silver Lake Backs Motorola Solutions With $1B Investment," (August 5, 2015)
(available at: https://www.law360.com/articles/687546/silver-lake-backs-motorola-solutions-with-
1b-investment).

[9]     *See* http://markies.eloqua.com/entrant/motorola-solutions.

11

requirements of public safety and professional organizations that need a customizable, mission-critical, private communication solution using licensed spectrum.

26.     Motorola's MotoTRBO technology is a full product platform that includes portable and mobile radio devices, repeaters and controllers, accessories, data applications, and services that provide a comprehensive two-way digital radio solution.



**Exemplary MotoTRBO system**

27.     In operation, the MotoTRBO system converts an analog signal that represents an acoustic waveform into a digital signal.  The system then performs voice encoding (vocoding) that compresses the signal to fit into a radio channel.  The encoded audio and accompanying data are then organized into frames for transmission.  The signal is then sent on a single time-slot over a two-slot TDMA 12.5 kHz channel.



**MotoTRBO Digital Radio System**

28.     As part of its industry-leading MotoTRBO digital radio technology, Motorola has developed proprietary digital voice and data innovations that offer great benefits to digital two-way radios.  These proprietary innovations include features that can provide efficiency

together with enhanced digital capabilities and provide exceptional voice quality, integrated data applications, increased capacity, and extended battery performance, among other improvements—and have made Motorola's current MotoTRBO technology the most advanced in the industry. Motorola's feature-rich MotoTRBO technology integrates proprietary innovations, implemented both in hardware and software, that relate to every aspect of Motorola's digital two-way radio systems, such as emergency features, telephony support, integrated GPS and location services, digital data applications, and enhanced voice features to allow ease of migration from analog to digital systems. The design, development, and implementation of these features in Motorola's MotoTRBO hardware and software include Motorola's confidential, proprietary, and copyrighted technology and trade secrets.

29. One example of Motorola's proprietary MotoTRBO feature is **Voice Operated Transmission ("VOX")**, which provides invaluable benefits to end users by enabling hands-free communication, *i.e.*, without any push-to-talk action. Motorola's enhanced VOX uses specialized hardware and software to monitor the device microphone for voice activity and begins transmission upon detection, allowing users to communicate while still having full use of their hands, thereby enhancing safety and efficiency.

Voice Operated Transmission (VOX) monitors the accessory microphone for voice activity. When voice is detected, the radio is keyed-up and the voice is transmitted. When voice is no longer detected at the accessory microphone, the radio is de-keyed.

**MotoTRBO System Planner at 131.**

30. Another proprietary feature developed and implemented by Motorola in its MotoTRBO line of products is **Telemetry** functionality that enables a radio to remotely control and monitor the GPIO (General Purpose I/O) pins of a target radio. This functionality enables remote controlling and monitoring of equipment, for example in industrial or agricultural environments.



*Figure 3-25  MOTOTRBO Radios in Digital Two-Slot Digital Repeater Mode with Telemetry Functions*

**MotoTRBO System Planner at 205.**

31.     As another example, Motorola developed a **Dynamic Mixed Mode Priority Scan** feature that enables a user's radio to dynamically switch between analog and digital modes depending on the type of call received.

When operating in **Dynamic Mixed Mode (DMM)**, MOTOTRBO uses a pair of physical channels configured for 12.5 kHz channel bandwidth for digital operation and 25 kHz and/or 12.5 kHz channel bandwidth for analog operation. The repeater dynamically switches between analog and digital modes based on the call it receives from radios. If an analog radio transmits, the repeater switches to analog mode to repeat the analog call. However, the repeater only repeats analog calls that are qualified by PL (DPL/TPL). If a digital radio transmits, then the repeater switches to digital mode to repeat the digital call if the call uses the right color code. While the repeater repeats one analog call at a time, it can repeat 2 digital calls at a time, one on each logical channel.

**MotoTRBO System Planner at 15.**

32.     Motorola has also developed **location based services** that rely on integrated GPS functionality in its MotoTRBO devices.  Motorola's location services enable, for

example, a dispatcher to determine the current location of a radio on a display map, along with other information such as speed and direction.



*Figure 2-9  Location Services*

**MotoTRBO System Planner at 51.**

33.    One specific proprietary feature within MotoTRBO's location services innovations is the **GPS Revert Channel** feature, which removes location data from a selected channel into a dedicated channel, thus freeing the selected channel to accommodate increased voice traffic.

## GPS Revert Channel

The GPS Revert Channel feature allows system operators a configurable option to off load radio transmitted location updates onto a programmed digital channel that differs from the digital Selected Channel. This feature effectively removes Location Update traffic from the Selected Channel in order to free up that channel to accommodate increased voice loads and/or to enhance the user experience by reducing the number of channel busies during voice call requests. This feature also allows a large group to communicate on a single voice channel while sending location updates on multiple GPS Revert Channels to accommodate larger Location Update loads. This increases the Location Update throughput associated with radios belonging to a single group.

**MotoTRBO System Planner at 54.**

34. Motorola's MotoTRBO technology also includes a **Digital Telephone Patch (DTP)** feature that enables direct communication between radio devices and telephone devices, in both an individual call mode and talkgroup mode that enables communication between a phone user and a group of radio users through a half-duplex voice communication.

## Digital Telephone Patch (DTP)

The MOTOTRBO Digital Telephone Patch is a Motorola proprietary feature introduced in software version R01.08.00 supporting two types of phone patch calls:

- **Individual Phone Patch Call –** This allows a half-duplex voice communication between a radio user and a phone user. This communication can be initiated from either party.
- **Talkgroup Phone Patch Call –** This allows a half-duplex voice communication between a phone user and a group of radio users. This type of communication can be initiated only by the phone user.

**MotoTRBO System Planner at 138.**

35. Another set of proprietary features supported in Motorola's MotoTRBO technology are emergency features that enable a user in distress to send an emergency alarm message that contains the individual radio identification of the user. Such emergency features include, for example, a proprietary implementation of the **emergency "Lone Worker"** feature to enhance safety for users who work remotely from others, including those operating machinery and on security patrols. The Lone Worker feature is able to detect when a user's activity has stopped and, based on a pre-determined activity timer, initiate an emergency signal. Another example is the **emergency "Man-Down"** feature which detects when the radio, and by extension its user, is in a horizontal orientation and initiates an emergency signal.

### 2.3.4    Digital Emergency

MOTOTRBO offers a variety of emergency handling strategies that will fit the customer's organizational needs. In its basic form, MOTOTRBO provides the ability for a radio user in distress to send a confirmed emergency alarm message, and emergency voice to a user on a supervisory radio. The emergency alarm message contains the individual radio ID of the initiator. Upon reception of an emergency alarm, the supervisor receives audible and visual indications of the emergency and the initiating radio ID is displayed. Depending on configuration, emergency voice may follow between the initiator and the supervisor. Once the supervisor handles the emergency situation (i.e. solves the problem), he clears the emergency on the supervisor radio. Once the initiator clears his emergency on the initiator radio, the emergency is considered over.

16

## 2.12    Lone Worker

For a radio user who is operating machinery, carrying out a security patrol or working in a plant alone, the Lone Worker feature provides a way to remotely monitor, if a user has stopped activity.

The Lone Worker feature is a predefined timer reset with user activity. For example, if the activity timer is set for 10 minutes and the user has no interaction with the radio during this time, the inactivity timer expires and a pre-warning tone sounds immediately after 10 minutes. If the user fails to reset the timer by an interaction with the radio (such as a button press, PTT, volume knob turn, etc.), the radio initiates Emergency. For more information, see section 2.3.4 "Digital Emergency".

The Lone Worker feature is available for both the portable and mobile radios, and in analog and digital modes.

**MotoTRBO System Planner at 34, 132.**

36.     These exemplary proprietary features demonstrate just some of Motorola's substantial and sustained investment in its MotoTRBO technology.  Underlying these technologies are significant technical know-how and other carefully guarded trade secrets that Motorola has developed over the course of many years.  These efforts resulted in substantial trade secrets that, together with other Motorola intellectual property, have made Motorola's current MotoTRBO technology the most advanced in the industry.  For these reasons and others, Motorola's MotoTRBO technology and the secret implementation details of its proprietary features and processes are some of Motorola's most valuable assets.

### B.    Motorola Protects Its Trade Secret and Copyrighted Material

37.     As a leader in the digital radio industry, Motorola has expended considerable resources in R&D, which resulted in volumes of confidential trade secrets and copyrighted material.  For example, in 2015, Motorola invested $620 million in R&D, which represents 10.9% of its sales during the same year.  Between 2011 and 2014, Motorola invested R&D amounts that range between $681-790 million annually.  As a result of its substantial investments and decades-long dedication to innovation, Motorola has been awarded approximately  5,000 patents covering, among other things, its digital two-way radio technology.  In addition, significant aspects of Motorola's products are highly confidential, and

17

are maintained by Motorola in strict confidence as trade secrets to protect their value and the substantial investments Motorola has made to develop them.  Indeed, this confidential information derives considerable value from not being publicly known outside of Motorola.

38.     Motorola protects its trade secrets in numerous ways, including by restricting access to confidential information only to select individuals, and even then, only subject to strict confidentiality and non-disclosure agreements.  For example, as a condition of their employment and as part of their employment agreement, Motorola's employees—including the Hytera Employees—sign confidentiality agreements pursuant to which they agree, among other things, to not make improper use of any of Motorola's confidential information or trade secrets.

> "In consideration of my employment, or continued employment by Motorola, Inc. or its subsidiaries (referred to separately or jointly as "Motorola") and the salary or wages paid to me, I understand and agree to the following provisions for the protection of Motorola property rights:
>
> …
>
> 2. Not to use, or to publish, ***or to otherwise disclose to others, either during or subsequent to my employment by Motorola, any confidential information of Motorola*** or its customers, except as my Motorola duties may require.
>
> 3. Upon termination of my employment by Motorola, to ***promptly deliver to a designated Motorola representative all documents and other records which relate to the business activities of Motorola***, or any other materials which belong to Motorola."

**Motorola Employment Agreement (emphasis added).**

39.     Consistent with this practice, the Hytera Employees also entered into employment agreements with Motorola in which they "agree[d] to [certain] provisions for the protection of Motorola's property rights."  For example, on or around May 15, 1997, Y.T. Kok and Motorola entered into an Employment Agreement in which Y.T. Kok acknowledged that

he had read and understood the requirements of Motorola's Standard Operating Procedure (SOP) E-62 form regarding the "Appropriate Use of Computer Resources," which states that "[i]t is the policy of Motorola to protect confidential, sensitive or critical information owned by Motorola or in Motorola custody, and also to protect specific information as required by applicable law." Motorola's Standard Operating Procedures expressly forbid "[d]isclosing confidential or sensitive information which is owned by or entrusted to Motorola to unauthorized recipients." Motorola's Standard Operating Procedures further prohibited "[a]ccessing confidential or sensitive information on computer resources without authorization."

40.     Chia entered into a similar employment agreement with Motorola on August 23, 1999, in which Chia acknowledged that he had read and understood the requirements of Motorola's Standard Operating Procedure (SOP) E-62 form regarding the "Appropriate Use of Computer Resources," which states, *inter alia*, that "[i]t is the policy of Motorola to protect confidential, sensitive or critical information owned by Motorola or in Motorola custody."

41.     In their respective Employment Agreements, each Hytera Employee expressly agreed "[n]ot to use, or to publish, or to otherwise disclose to others, either during or subsequent to [his] employment by Motorola, any confidential information of Motorola or its customers, except as [his] Motorola duties may require." The Hytera Employees further agreed that "[u]pon termination of [their] employment by Motorola, [they would] promptly deliver to a designated Motorola representative all documents and other records which relate to the business activities of Motorola, or any other materials which belong to Motorola."

42.     In their respective Employment Agreements, each Hytera Employee further expressly agreed "[t]o assign and [] [t]hereby assign[ed] to Motorola as its exclusive property, the entire right, title and interest in all [his] inventions, innovations, or ideas developed or

conceived by [him] solely, or jointly with others, at any time during the term of [his] employment and which inventions, innovations, or ideas relate to the actual or anticipated business activities of Motorola, or result from, or are suggested by, work which [he] do[es] for Motorola."

43.     On or around January 8, 2008, in connection with his resignation from Motorola, G.S. Kok executed an agreement entitled "Non-Disclosure of Motorola Proprietary and Confidential Information." Chia and Y.T. Kok signed similar Non-Disclosure agreements in connection with their resignation from Motorola, on or around May 20, 2008 and October 3, 2008, respectively (collectively the "Resignation NDAs").

44.     In the Resignation NDAs, each Hytera Employee acknowledged that he had access to Motorola's confidential information, and further acknowledged his continuing obligations under the terms of his Employment Agreement. By the Resignation NDAs, each Hytera Employee agreed that he had been "informed that Motorola felt that any assignment relating to Portable and Paging Radio products and the information listed above might by nature of the assignment require the disclosure of Motorola proprietary and confidential information, and that [he] should also advise [his] new employer or others." Upon resigning, each Hytera Employee was asked: "What orgnisation [sic] will you be working for after Motorola?" None of the Hytera Employees informed Motorola that he was taking on an assignment relating to Portable and Paging Radio products at Hytera.

45.     In the Resignation NDAs, each Hytera Employee acknowledged that he was "to collect all Motorola property and confidential information including documents, drawings, reports, specifications, samples, etc., which [he had] in his possession from all Motorola and non-Motorola locations and to have them reviewed by Motorola management." Each Hytera

Employee further "[a]cknowledge[d] that all such property and confidential information has been returned from [his] possession to Motorola."

46.     Motorola reasonably relied on the Hytera Employees' representations and agreements as contained in their Resignation NDAs, as well as otherwise described herein. Through subsequent investigation, however, Motorola later learned that the Hytera Employees' statements and representations were false, and that they hid their unauthorized downloading of massive amounts of Motorola's confidential trade secrets in the weeks leading up to (and in some cases after) their departures to Hytera (a fact that was also hidden).

47.     Each of the Hytera Employees acknowledged and agreed to protect and treat as confidential all Motorola trade secrets and/or confidential information.

48.     Motorola also protects its intellectual property through copyright.  For example, the Digital Mobile Radio ("DMR") computer program in Motorola's MotoTrbo product lines ("DMR Program") was duly registered with the U.S. Copyright Office, including, for example, Registration Nos. TXu 1-578-438 and TXu 1-578-439.  True and correct copies of Motorola's Certificates of Registration, issued by the U.S. Copyright Office, for the DMR Program are attached hereto as Exhibit A.  As discussed in more detail below, Hytera copied the code from the DMR Program ████████████████████████████  Motorola's DMR Program includes creative expression, including, for example, proprietary source code, command expressions, organization and command hierarchies, comments, definitions, and corresponding user interfaces.

49.     The DMR Program is an original, creative work and copyrightable subject matter under the laws of the United States.  Motorola's DMR Program, including its unique source code and structure, has required many years of creative development efforts by Motorola.  For example, when developing software for DMR radios, a software developer may implement any

of a wide range of options for structuring the organization and appearance of the user interface, the names, structures, and purposes of libraries, commands, and prompts, and the algorithms facilitating the program's functionality. Motorola's DMR Program represents the culmination of numerous creative choices made by Motorola and Motorola's original expression of a particular way to create such a program, and has required Motorola to invest tens of thousands of employee-hours to develop its unique DMR Program. In sum, the uniquely expressed structure, architecture, modules, algorithms, data structures, control instructions, and source code contained in the DMR Program are the product of Motorola's engineering discretion and substantial skills, resources, and creative energies.

### C.   Hytera Is Late To Enter The Digital Two-Way Radio Market

50.     Whereas Motorola introduced its MotoTRBO technology in 2006, Hytera did not begin developing digital two-way radio products until years later, and did not introduce a digital two-way radio product until 2010. By the time Hytera began developing its digital two-way radio products, Motorola had already pioneered the field, and had established its digital two-way radio products as the leading communications solution for public works and numerous private commercial applications. Moreover, Motorola's success had rendered Hytera's outdated analog systems obsolete.

51.     Complicating matters further for Hytera, during this same time period, the United States Federal Communications Commission (FCC) set a deadline that required licensees that had traditionally employed systems that operate on channel bandwidths of 25 kHz to implement equipment designed to operate on channel bandwidths of 12.5 kHz or less to meet specific efficiency standards (hereinafter the "Mandatory Narrowbanding"). The Mandatory Narrowbanding effectively urged providers of radio products toward the use of digital technology. Both the Hytera Employees and Hytera were acutely aware of these

regulations requiring the rapid move to digital two-way radio technology like DMR (Digital Mobile Radio).

52.     For example, in a presentation prepared on or around April 8, 2009, for Hytera, Chia recognized a decline in the analog market and a need to move towards digital due to the impending FCC deadline:



53.     Hytera knew that its analog radio products faced extinction, and that it could not hope to develop its own digital two-way radios in time to save its ailing business.  Indeed, G.S. Kok, in his new role as an executive at Hytera, publicly acknowledged that Hytera's main product line—analog radios—were quickly becoming "obsolete" and that its digital DMR radios had to be developed at a "very quick pace":

> "[Hytera's] recently launched DMR radios . . . were **developed at a very quick pace** … **it had to be fast** because 2016 is coming up around the bend.  And, this is the time where China already announced in 2010 that they're going to obsolete all [ ] analog radio so **we have only this small amount of time to make it happen**." (emphasis added)

23



**May 29, 2014 "Interview with Gee Siong Kok, Senior VP of Hytera"** [10]

54.     Thus, Hytera was faced with a choice:  engage in time-consuming and resource-intensive development of its own digital product line, or simply take Motorola's technology, illegally and without permission, in order to get a product out to market "at a very quick pace." Hytera chose the latter.

   **D.     Hytera Misappropriates Motorola's Trade Secrets and Copies Motorola's Copyrighted Material**

55.     By the time Hytera began working on a digital two-way radio line of products, Motorola already had fully developed proprietary digital two-way radio technologies and products.  In an unlawful attempt to overcome its late entry to the market, Hytera recruited senior Motorola engineers to initiate and boost its digital two-way radio product line.  Three of those former Motorola engineers, Samuel Chia, Y.T. Kok, and G.S. Kok, were directly

---

[10]    *Available at* https://www.youtube.com/watch?v=twxZXiWeNZQ.

24

involved in developing Motorola's MotoTRBO technology, and were intimately knowledgeable about the implementation of Motorola's proprietary features.

56.　For example, Samuel Chia served as an Engineering Section Manager for Motorola.  During the time of his employment at Motorola, he held several other key engineering positions, including Senior Software Engineer.  His responsibilities at Motorola included coding, documentation, testing, and release of software used to run Motorola's MotoTRBO technology.  In 2008, Chia was hired by Hytera and he currently serves as a Director of Software Engineering at Hytera.

57.　Similarly, Y.T. Kok served as a Senior Software Engineer at Motorola.  His responsibilities at Motorola included design, development, and release of software used to run Motorola's MotoTRBO technology.  In 2008, Y.T. Kok was hired by Hytera and he currently serves as Sales Director at Hytera.

58.　G.S. Kok served as a Senior Engineering Manager for Motorola.  His responsibilities at Motorola included design, development, and release of software used to run Motorola's MotoTRBO and related technology.  In 2008, G.S. Kok was hired by Hytera and he served as Senior Vice President and Terminal Chief at Hytera.

59.　Each of the Hytera Employees were lured to Hytera and accepted employment at Hytera as part of Hytera's unlawful scheme to take Motorola's confidential trade secrets and copy Motorola's copyrighted code.  In their new positions at Hytera, the Hytera Employees work on the same technologies as they did at Motorola.  For example, G.S. Kok was a Senior Vice President responsible for migrating Hytera's analog technology to digital, including without limitation, the same digital two-way radio technology that comprises Motorola's trade secrets.  Similarly, Y.T. Kok is a Sales Director at Hytera where he oversees sales strategies and product marketing.  Given these overlapping technical fields and responsibilities together

with their surreptitious theft of Motorola's trade secrets and copyrighted material (which they went on to hide), G.S. Kok and Y.T. Kok used and disclosed Motorola's trade secrets and copyrighted material in the performance of their job duties for Hytera.

60.     Further, Chia is Software Engineering Director at Hytera and is involved with Hytera's development of two-way digital radio technology that directly misappropriates Motorola's trade secrets and copies Motorola's code.  For instance, Chia is the named inventor on U.S. Pat. No. 8,982,736 (the "'736 Patent") entitled "Method for implementing radiophone based conference call and dynamic grouping," which is assigned to Hytera Communications Corp. Ltd.  The '736 Patent is directed to "[a] method for implementing radiophone based conference call and dynamic grouping," and according to the '736 patent, it could be "based upon a specific protocol, e.g., a protocol stack of a radiophone based *Digital Mobile Radio (DMR)*." (emphasis added).  '736 Patent at Title, 7:50-53.  The international application that led to the '736 Patent was filed on December 12, 2008, approximately seven months after Chia resigned from Motorola.  Thus, Chia was engaged in development of two-way digital radio technology at Hytera shortly after he was hired from Motorola, and even purported to patent technologies he was exposed to as a Motorola employee.  Chia had and still has similar responsibilities with Hytera which, together with his surreptitious theft of Motorola's trade secrets and copyrighted material (which he went on to hide), has involved using and disclosing Motorola's trade secrets and copyrighted code in the performance of his job duties for Hytera, and will continue to do so.

61.     In 2008, unbeknownst to Motorola at the time due to their surreptitious activities and misrepresentations, just weeks before leaving Motorola for Hytera, the Hytera Employees downloaded over 7,000 technical, marketing, sales, and legal documents, related to at least Motorola's MotoTRBO proprietary technology.

62.     These highly confidential and sensitive documents, some of which include very detailed technical specifications and schematics related to Motorola's proprietary MotoTRBO technology, include highly sensitive and proprietary Motorola trade secrets. These documents include highly confidential information about the implementation, marketing, legal protection, and other confidential details regarding the proprietary MotoTRBO related features discussed above.

63.     For example, through its investigation, and despite the Hytera Employees' affirmative attempts to deceive and mislead Motorola, Motorola learned that the Hytera Employees accessed and downloaded the MotoTRBO "System Technical Requirements Specification (TRS)," which specifies the detailed technical requirements for Motorola's MotoTRBO technology. Further, the Hytera Employees accessed and downloaded the MotoTRBO "Marketing Requirements Document (MRD)," which specifies the marketing requirements for Motorola's MotoTRBO technology. Similarly, the Hytera Employees accessed and downloaded MotoTRBO "Integrated Business Plan" as well as other sensitive documents containing Motorola's confidential information and trade secrets, including marketing, packaging and pricing strategies, and a list of deliverables. These documents all contain detailed disclosures of Motorola's sensitive trade secrets.

64.     Additionally, some of the MotoTRBO related confidential documents that were accessed and downloaded by the Hytera Employees include:

- MotoTRBO Marketing Requirements Document;

- MotoTRBO Digital Growth Strategies Presentation;

- MotoTRBO Software Strategy Overview;

- MotoTRBO Technology Roadmap;

- MotoTRBO Technical Requirements Document;

- MotoTRBO Technical Requirements Specification;

- MotoTRBO Technical Requirements Integrated Business Plan;

- MotoTRBO Feature Prioritization;

- MotoTRBO Digital Presentation;

- MotoTRBO System White Paper;

- Portable Receiver Architectures for MotoTRBO System;

- MotoTRBO LoneWorker Technical Scope Document;

- MotoTRBO Emergency Operation;

- MotoTRBO Emergency Clarifications Document;

- MotoTRBO Software GPS White Paper;

- MotoTRBO Revert Architecture Document;

- MotoTRBO GPS Revert Operational Scenarios;

- MotoTRBO Digital Telephone Interconnect Document;

- MotoTRBO Performance Analysis For Mixed-Mode Scan;

- MotoTRBO Scan - Software Architecture and Design Challenges;

- MotoTRBO Scanning Architecture;

- MotoTRBO Telemetry Technical Requirement Specification;

- MotoTRBO Telemetry User Requirements;

- MotoTRBO Enhanced VOX White Paper;

- MotoTRBO VOX Feature Impact Analysis; and

- MotoTRBO VOX Technical Scope.

65.    Moreover, Motorola's investigation revealed that the Hytera Employees improperly accessed and retained files containing highly confidential information about Motorola's Intellectual Property, including sensitive (and in some cases privileged) information regarding patent submissions and licensing and legal strategy.  For example, the

28

Hytera Employees downloaded sensitive documents that list many of the patent submissions and unpublished patent applications related to Motorola's MotoTRBO technology. Further, the Hytera Employees downloaded documents that include legal analysis and strategy with respect to technology standardization efforts and licensing operations.

66. Since its employees acquired these documents, Hytera has perfected the misappropriation and copyright infringement by incorporating Motorola's digital two-way radio technologies and related features ████████████████████████████████ ████, which are in whole or part derived from Motorola's trade secrets and copyrighted material. For example, Hytera implemented Motorola's digital two-way radio features as implemented in Motorola's proprietary MotoTRBO products, often using the exact same feature names. For instance, Hytera has incorporated the "VOX," "Telemetry," "Lone Worker," "Man Down," Mixed Mode Scanning," "Phone Feature," and "GPS Revert Channel" features, that are in whole or part derived from and/or comprise Motorola's trade secrets.

67. Additionally, Hytera has infringed Motorola's DMR Program by unlawfully copying Motorola's DMR Program, including source code, ████████████████████ ████████████ In doing so, Hytera has ████████████████████████████ ████████████████████████████████████████████ ████████ Of particular note is the ████████████████████████ ████████████████████████████████████████████ ████████████████████████████

68. Further, the Hytera Employees were actively familiar with Motorola's proprietary information regarding the MotoTRBO features while at Motorola, and had access to Motorola's copyrighted material. By way of example, Chia authored an "Enhanced VOX White Paper" on or around February 6, 2004, while at Motorola. The Enhanced VOX White

Paper, which was unlawfully downloaded and retrieved by the Hytera Employees, describes the operation of Motorola's VOX feature and includes detailed information such as algorithms and simulations required for implementing and operating Motorola's confidential and proprietary technology.

69.     Further, by way of example, Y.T. Kok served as the Feature Manager for Motorola's VOX technology implementation. Y.T. Kok had access to confidential details regarding the implementation of Motorola's VOX technology including major development milestones, development timelines, risk analyses, product and feature analyses, and issues with development and how they were being addressed. Y.T. Kok also worked on DMR software development at Motorola, and through this work had access to Motorola's DMR Program, including its source code, for example.

70.     At all relevant times, Hytera knew that the Hytera Employees had previously been employed by Motorola as well as the nature of their work and responsibilities as Motorola employees. Hytera knew that the Hytera Employees had access to Motorola's trade secrets, confidential information, and copyrighted information. Yet Hytera acquired, used, and/or disclosed Motorola's trade secrets and copyrighted information by instructing and allowing the Hytera Employees to incorporate Motorola's trade secrets, confidential information, and copyrighted information into, among other things, ███████████ and business strategies. Indeed, upon their termination at Motorola, each Hytera Employee acknowledged in his respective Resignation NDA that he would "advise [his] new employer" that "any assignment relating to Portable and Paging Radio products . . . might by nature of the assignment require the disclosure of Motorola proprietary and confidential information."

## COUNT I

**Trade Secret Misappropriation Under the Defend Trade Secrets Act**

**(18 U.S.C. §§ 1836(b), 1839 *et seq.*)**

71.     Motorola incorporates and re-alleges each and every allegation above as if fully set forth herein.

72.     Motorola is the owner of certain valuable trade secrets contained in and relating to digital mobile radio, including as described herein.  These trade secrets are related to Motorola's products and services that are used in or intended for use in interstate and foreign commerce.  These confidential and proprietary trade secrets are of substantial economic value and have conferred a competitive advantage on Motorola.

73.     As stated above, Motorola sells its products throughout the United States.  For example, Motorola's digital two way radio technology and solutions are sold and used throughout the United States.

74.     The Hytera Employees gained access to Motorola's trade secrets in the course of an employee-employer relationship between Motorola and the Hytera Employees.  The Hytera Employees improperly acquired and retained Motorola's trade secrets upon termination of their employment.

75.     The Hytera Employees subsequently used and disclosed to Hytera Motorola's trade secrets.  Accordingly, Hytera is in possession of the foregoing Motorola trade secrets, which are subject to confidentiality agreements in which the Hytera Employees expressly acknowledged and confirmed the confidential nature of these secrets.

76.     Hytera improperly acquired Motorola's trade secrets from the Hytera Employees and has since improperly used and disclosed those Motorola trade secrets, including by incorporating them into products Hytera markets and sells as its own.

77.     Hytera has misappropriated Motorola's trade secrets by acquiring, using, and/or disclosing the information described above, including by manufacturing, marketing, offering, and/or selling in the United States products that comprise, embody, and/or incorporate the trade secrets described herein.

78.     Hytera willfully and maliciously misappropriated Motorola's trade secrets in order to gain economic value from that information.

79.     Motorola has taken reasonable steps to maintain the secrecy of its trade secrets, including by requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Motorola's trade secrets.

80.     As a direct and proximate result of Defendants' current and continued misappropriation of Motorola's trade secrets, Motorola will suffer imminent and irreparable harm.

81.     Unless enjoined by this Court, Defendants' acts of misappropriation will continue and Motorola will continue to suffer irreparable harm.

82.     Motorola has no adequate remedy at law.

## COUNT II

**Trade Secret Misappropriation Under Illinois Trade Secret Act**

**(765 ILCS 1065 *et seq.*)**

83.     Motorola incorporates and re-alleges each and every allegation above as if fully set forth herein.

84.     Motorola is the owner of certain valuable trade secrets contained in and relating to digital mobile radio and as described herein.  These confidential and proprietary trade secrets are of substantial economic value and have conferred a competitive advantage on Motorola.

85.     The Hytera Employees gained access to Motorola's trade secrets in the course of an employee-employer relationship between Motorola and the Hytera Employees. The Hytera Employees improperly acquired and retained Motorola's trade secrets upon termination of their employment.

86.     The Hytera Employees subsequently used and disclosed to Hytera Motorola's trade secrets. Accordingly, Hytera is in possession of the foregoing Motorola trade secrets, which are subject to confidentiality agreements in which the Hytera Employees expressly acknowledged and confirmed the confidential nature of these secrets.

87.     Hytera improperly acquired Motorola's trade secrets from the Hytera Employees and has since improperly used and disclosed those Motorola trade secrets, including by incorporating them into products Hytera markets and sells as its own.

88.     Hytera willfully and maliciously misappropriated Motorola's trade secrets in order to gain economic value from that information.

89.     Motorola has taken reasonable steps to maintain the secrecy of its trade secrets, including by requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Motorola's trade secrets.

90.     As a direct and proximate result of Defendants' current and continued misappropriation of Motorola's trade secrets, Motorola will suffer imminent and irreparable harm.

91.     Unless enjoined by this Court, Defendants' acts of misappropriation will continue and Motorola will continue to suffer irreparable harm.

92.     Motorola has no adequate remedy at law.

## COUNT III

### Copyright Infringement

### (17 U.S.C. §§ 106, 501 *et seq.*)

93.     Motorola incorporates and re-alleges each and every allegation above as if fully set forth herein.

94.     Motorola's DMR Program is an original, creative work and copyrightable subject matter under the copyright laws of the United States.

95.     Motorola is the owner of valid copyrights in the DMR Program, and the Register of Copyrights has issued valid Certificates of Registration as indicated in Exhibit A.

96.     Motorola has complied in all respects with 17 U.S.C. §§ 101 *et seq.*, and has the exclusive rights and privileges in and to the copyrights in its DMR Program.

97.     By its actions, alleged above, Hytera has infringed and will continue to infringe Motorola's DMR Program by reproducing and distributing Motorola's code, as well as creating derivative works of the DMR Program for Hytera's two-way digital radios.  As explained above, Hytera's source code contains ███████████████████████████████████

███    In other instances, Hytera's source code contains █████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Hytera's copying included █████████████████████████████████

█████████████ despite the availability of other ways to achieve the same functionality without using ███████████████████████████  ██████████████████████████

████████████████████████████████████████████████████████

[REDACTED]

[REDACTED]

98.     As also averred above, the Hytera Employees had access to and, upon information and belief, copied Motorola's DMR Program. For example, while the Hytera Employees worked for Motorola, they were privy to copyrighted material including, for example, Motorola's DMR Program, including source code. Further, in the weeks and months prior to their resignations from Motorola (and unbeknownst to Motorola), the Hytera Employees surreptitiously downloaded thousands of confidential Motorola documents. Hytera also surreptitiously obtained a copy of Motorola's DMR Program, including source code. The Hytera Employees then brought that material to Hytera, and [REDACTED]

99.     Knowing the illegality of their conduct, the Hytera Employees [REDACTED]

[REDACTED]

[REDACTED] —both before and after Motorola's original Complaint was filed— [REDACTED]

[REDACTED] . For example, in June 2008, Hytera employees [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] *See, e.g.*, Exs. B (HYT1973-00061160 at 161) and C (HYT1973-02180813) at row 38.

100.    Through its conduct as averred herein, Hytera has infringed Motorola's copyrights in its works without authorization in violation of Sections 106 *et seq.* and Section 501

of the Copyright Act. 17 U.S.C. §§ 106 *et seq.*, and 501. For example, as averred above, Hytera has copied Motorola's code into at least Hytera's DMR subscriber and repeater products.

101. Each infringement, including each use, reproduction, distribution, and sale, by Hytera of Motorola's copyrighted works constitutes a separate and distinct act of infringement.

102. Hytera's acts of infringement were and are willful, in disregard of and with indifference to the rights of Motorola.

103. As a direct and proximate result of Hytera's current and continued infringement of Motorola's DMR Program, including source code, Motorola will suffer imminent and irreparable harm.

104. Unless enjoined by this Court, Hytera's acts of infringement will continue and Motorola will continue to suffer irreparable harm.

105. As a direct and proximate result of the infringements by Hytera, Motorola is entitled to damages and Hytera's profits in amounts to be proven at trial which are not currently ascertainable.

106. Alternatively, Motorola is entitled to the maximum statutory damages in the amount of $150,000 with respect to each work infringed, or for such other amounts as may be proper under 17 U.S.C. § 504.

## **JURY DEMAND**

Motorola requests trial by jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Motorola demands judgment against Hytera as follows:

1. Award a temporary restraining order, preliminary injunction, and/or permanent injunction prohibiting Hytera from unfairly competing with Motorola by using Motorola's trade secrets and directly or indirectly infringing Motorola's copyrights, including without

limitation reproducing, distributing, or creating derivative works based upon Motorola's computer programs.

2.      Award a temporary restraining order, preliminary injunction, and/or a permanent injunction restraining and enjoining Hytera from altering, destroying, or disposing of any evidence, in any form, relating to this action, including without limitation emails and paper and electronic documents, including current or archived electronic logs, metadata, and directories.

3.      Declare valid and enforceable the provisions of Motorola's Employment Agreements and Resignation NDAs with the Hytera Employees requiring them not to use or disclose Motorola's trade secrets and other confidential information to Hytera or to anyone else and to return all Motorola confidential and proprietary information retained after their respective period(s) of employment ended.

4.      Declare that Hytera has no rights or privileges to use Motorola's trade secrets or copyrighted works.

5.      Award Motorola restitution in an amount to be determined at trial.

6.      Award Motorola compensatory damages in an amount to be determined at trial, including without limitation, Motorola's lost revenues and profits.

7.      Award Motorola actual damages in an amount to be determined at trial.

8.      Award Motorola disgorgement of Hytera's profits in an amount to be determined at trial.

9.      Award Motorola punitive damages in an amount to be determined at trial, including those pursuant to 18 U.S.C. § 1836 *et seq.* and 765 ILCS 1065/1 *et seq.*

10.     Award Motorola attorneys' fees and costs, including those pursuant to 18 U.S.C. § 1836 *et seq.*, 765 ILCS 1065/1 *et seq.*, and 17 U.S.C. § 501 *et seq.*

11.      Award Motorola statutory damages, pursuant to 17 U.S.C. § 501 *et seq*.

12.      Award Motorola any such other relief as the Court deems appropriate.

DATED: August 2, 2018             Respectfully submitted,

*/s/ Adam Alper*                     

Adam Alper (*admitted pro hac vice*)
adam.alper@kirkland.com
Brandon H. Brown (IL Bar No. 266347 CA)
brandon.brown@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

Michael W. De Vries (*admitted pro hac vice*)
michael.devries@kirkland.com
Justin Singh (*admitted pro hac vice*)
justin.singh@kirkland.com
Christopher Lawless (*admitted pro hac vice*)
christopher.lawless@kirkland.com
Ali-Reza Boloori (*admitted pro hac vice*)
ali-reza.boloori@kirkland.com
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, California 90071
Telephone: (213) 680-8400
Facsimile: (213) 680-8500

David Rokach (IL SBN: 6279703)
david.rokach@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Attorneys for Plaintiffs*
*Motorola Solutions, Inc. and Motorola*
*Solutions Malaysia SDN. BHD.*

38

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 2, 2018, a true and correct copy of the foregoing:

## AMENDED COMPLAINT

was served as follows:

⊠ **[E-Mail]** By causing the above documents to be sent via electronic mail to the parties at the email addresses listed below. I am aware that service is presumed invalid if the email transmission is returned as undeliverable.

Erik R. Puknys
(admitted *pro hac vice*)
Finnegan, Henderson, Farabow,
   Garrett & Dunner, L.L.P.
3300 Hillview Avenue
Palo Alto, CA 94304-1203
Telephone: 650 849 6600
E-mail: erik.puknys@finnegan.com

Of Counsel:

John T. Schriver
Duane Morris LLP
190 S. LaSalle St. – Suite 3700
Chicago, IL 60603
Telephone: 312-499-6785
E-mail: jtschriver@duanemorris.com

E. Robert Yoches
(admitted *pro hac vice*)
Finnegan Henderson Farabow
   Garret & Dunner LLP
901 New York Ave., N.W.
Washington, D.C. 20001-4413
Telephone: 202-408-4000
E-mail: bob.yoches@finnegan.com

Todd R. Tucker
Joshua M. Ryland (pro hac vice)
Calfee, Halter & Griswold LLP
The Calfee Building
1405 East Sixth Street
Cleveland, OH 44114
Telephone: (216) 622-8200
E-mail: ttucker@calfee.com
E-mail: jryland@calfee.com

DATED: August 2, 2018

/s/ Adam Alper
Adam Alper

1