1    **TRANSCRIBED FROM DIGITAL RECORDING**

2                  IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
3                       EASTERN DIVISION

4    MOTOROLA SOLUTIONS, INC., et al.,      )
                                            )
5                    Plaintiffs,            )
                                            )
6                    vs.                    ) No. 17 C 1973
                                            )
7    HYTERA COMMUNICATIONS CORPORATION      )
     LTD., et al.,                          ) Chicago, Illinois
8                                           ) November 13, 2018
                    Defendants.             ) 8:28 A.M.
9
                       TRANSCRIPT OF PROCEEDINGS – Motion
10        BEFORE THE HONORABLE JEFFREY COLE, Magistrate Judge

11   APPEARANCES:

12   For the Plaintiffs:        KIRKLAND & ELLIS LLP
                                555 California Street
13                              27th Floor
                                San Francisco, California  94101
14                              BY:  MR. ADAM R. ALPER
                                     MR. BRANDON HUGH BROWN
15
                                KIRKLAND & ELLIS LLP
16                              333 South Hope Street
                                Los Angeles, California  90071
17                              BY:  MR. JUSTIN SINGH
                                     MR. MICHAEL W. DE VRIES
18

19                    PAMELA S. WARREN, CSR, RPR
                        Official Court Reporter
20                    219 South Dearborn Street
                             Room 2342
21                    Chicago, Illinois   60604
                          (312) 408-5100
22
     **NOTE:  Please notify of correct speaker identification.**
23   **FAILURE TO SPEAK DIRECTLY INTO THE MICROPHONE MAKES PORTIONS**
     **UNINTELLIGIBLE.**
24

25

                        ** ROUGH DRAFT **

1    **APPEARANCES:  Continued**

2    For the Defendants:       STEPTOE & JOHNSON LLP
                               1330 Connecticut Ave., N.W.
3                              Washington, DC 20036
                               BY:  MR. BOYD T. CLOERN
4
                               STEPTOE & JOHNSON, LLP,
5                              115 South LaSalle Street
                               Suite 3100
6                              Chicago, Illinois  60603
                               BY:  MR. DANIEL STEVEN STRINGFIELD
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

** ROUGH DRAFT **

```
 1          (Proceedings held in open court:)
 2              THE CLERK:  17 C 1793, Motorola Solutions versus
 3  Hytera Communications.
 4              THE COURT:  Well, you got ahold of the other folks,
 5  Jan?
 6              THE CLERK:  Yes.
 7              THE COURT:  Okay.
 8              MR. ALPER:  Good morning, your Honor.  Adam Alper for
 9  Motorola.
10              MR. DE VRIES:  Good morning, your Honor.  Mike De
11  Vries for Motorola.
12              THE COURT:  Good morning.
13              MR. BROWN:  Good morning, your Honor.  Brandon Brown
14  for Motorola.
15              MR. CLOERN:  Good morning, your Honor.  Boyd Cloern
16  for Hytera.
17              THE COURT:  Did you come in from out of town?
18              MR. CLOERN:  Yes.  Yes, your Honor.
19              THE COURT:  Just for this?
20              MR. CLOERN:  Just for this.  From Washington D.C.
21              THE COURT:  Wow.
22              MR. STRINGFIELD:  Good morning, your Honor.  Daniel
23  Stringfield from Steptoe & Johnson on behalf of Hytera.
24              THE COURT:  Do you want to come up or do you want to
25  sit down?
```

** ROUGH DRAFT **

1          Come on up.

2          UNIDENTIFIED FEMALE:  Kathy (unintelligible), law

3   clerk, on behalf of Hytera.

4          THE COURT:  Good morning.

5          UNIDENTIFIED FEMALE:  Good morning.

6          THE COURT:  Well?

7          MR. CLOERN:  So, your Honor, I'm happy to start.  I

8   think we have resolved almost everything.  And it might be

9   efficient --

10          THE COURT:  I thought you resolved everything except

11  two things.

12          MR. CLOERN:  Exactly.  Exactly.

13          THE COURT:  Can you tell me then what this is?  What

14  all of this is, this probably two-foot high stack of documents.

15          MR. CLOERN:  So we did file an opposition to the

16  motion to compel for the record, noting in the opposition that

17  all the issues, except for two have been resolved, and then

18  briefing on those issues.

19          We also filed late last night our own motion to compel

20  so that it would be on the record.

21          THE COURT:  Why don't we do one thing at a time.

22  There were two matters that were left open that you hadn't

23  resolved.  Yes?

24          MR. ALPER:  Your Honor, I think that there are, I

25  believe, all told of the three things that we raised, there are

1   two that we would like to discuss today.

2          THE COURT:  Okay.  And then we'll do your motion.

3          MR. CLOERN:  Thank you, your Honor.

4          THE COURT:  Okay.

5          MR. ALPER:  And one is Mr. Chen's documents.

6          Actually three things.  One is Mr. Chen's documents.

7   The second are the interrogatory responses.  The third is where

8   we are in the source code.  And we can just dive into them in

9   that order if that's okay with your Honor.

10         THE COURT:  Whatever you want.

11         MR. ALPER:  So with Mr. Chen's documents, we have

12  conferred with Hytera's counsel over the weekend.  And I'd say

13  there is one large issue that came up.  Hytera's counsel has,

14  per your Honor's order, agreed to produce documents from

15  Mr. Chen.  However, what they have told us is they are going to

16  first -- they are first performing what they are calling

17  a -- actually counsel isn't doing this, as I understand it.

18  That someone at Hytera is performing a state secret review

19  before anyone applies relevant search terms to Mr. Chen's

20  documents.

21         THE COURT:  So we're back to the -- where what started

22  with a long time ago about Chinese law.

23         MR. ALPER:  It -- in a -- it is similar to that issue,

24  your Honor.  But here it seems much more clear to us.  We have

25  someone in China without any criteria that we're aware of

1    performing a state secret review.

2           THE COURT:  And on his sort of say so will determine

3    what they're willing to give you.

4           MR. ALPER:  Right.  What will determine the set of

5    documents that they will then apply search terms to.  And at

6    that point what Hytera says, which will be in about two or

7    three weeks, Hytera will run search terms that (unintelligible)

8    propose, decide which ones they think are too broad and which

9    ones are not broad enough, and then we can have a negotiation

10   over that, and then they'll produce from that.

11          We have a -- we have two great concerns about this,

12   your Honor.  Number one, there is absolutely no control over

13   what this person, who is not even counsel for Hytera in this

14   case, is going to pull out of the production, and we have --

15          THE COURT:  And you won't know what the basis is.

16          MR. ALPER:  What the basis is or what the documents

17   were.  And -- and by -- there is no dispute, everyone agrees,

18   that those could be relevant documents, they could be highly

19   relevant documents because they will be before they apply the

20   search terms.  So that's item number one.

21          Item Number 2 --

22          THE COURT:  Well, I would think you would do the

23   search terms first, and then worry about whether -- I'm sort of

24   a -- let me finish.

25          MR. ALPER:  I'm sorry.

** ROUGH DRAFT **

```
 1              THE COURT:  Whether or not then they apply.  I mean,
 2     if the search terms work and they don't apply, what -- why do
 3     it first?
 4              MR. ALPER:  That is exactly --
 5              THE COURT:  Why do the search first?
 6              MR. ALPER:  That's one of our --
 7              THE COURT:  Aside from the fact --
 8              MR. ALPER:  -- great concerns --
 9              THE COURT:  -- you don't know who is doing it and the
10     criteria that are being employed and his say so.  Some guy that
11     no one knows, including you, will determine what we get in an
12     American courtroom.
13              MR. ALPER:  What we -- our concern is that that --
14     that what that does is it allows Hytera, the company, who had
15     by -- per our allegations has stolen a tremendous amount of
16     material from Motorola --
17              THE COURT:  Well, let --
18              MR. ALPER:  -- putting that aside.
19              THE COURT:  Put that aside.
20              MR. ALPER:  It allows Hytera, someone out there, to
21     make calls about what comes into this case who doesn't have an
22     obligation before this Court.
23              THE COURT:  And no basis for determining how and no
24     basis for review.
25              MR. ALPER:  Absolutely.  So that's -- that's item one.
```

```
 1              THE COURT:  Well, that strikes me as curious, to say
 2    the least.
 3              MR. CLOERN:  Well, I have new information.
 4              THE COURT:  Oh.
 5              MR. CLOERN:  I'm sorry, I didn't want to interrupt.
 6              THE COURT:  No, no, no.
 7              MR. CLOERN:  But I can resolve all of this --
 8              THE COURT:  Well, good.
 9              MR. CLOERN:  -- I think.  I have new information.
10              THE COURT:  Good.  Because he's not going to work.
11              MR. CLOERN:  Understood.  So --
12              THE COURT:  At least I'm going to try to make it not
13    work.  And I --
14         (Laughter.)
15              THE COURT:  -- assume no American Judge would allow
16    that to happen.  I mean, that's just -- that's nonsensical.
17              MR. CLOERN:  So, your Honor, when we came into the
18    case, there was a protocol already set up that we're -- we had
19    to (unintelligible) on the state -- what we call the SSR
20    review, right, that state secret review.  At counsel's request
21    we inquired about the state secret review, and we found out the
22    sequencing of how the search terms were run, the state secret
23    search terms first, documents being excluded on that basis, and
24    then the case relevant search terms run on the resulting data
25    set.
```

```
 1              We asked Hytera about that, and they confirmed that
 2    was the way they were doing it.  And we have asked them to now
 3    inquire with their Chinese counselors whether that could be
 4    changed under the state secret laws of China.  They have come
 5    back to us, and they are going to change it.  They are going to
 6    go in -- so two points.  Going forward, including on Mr. Chen's
 7    documents, Hytera is going to run the case relevancy terms
 8    first, and then the state secret terms.  Okay?
 9              THE COURT:  Strikes me that's certainly the way to do
10    it.  You come up empty the first time.
11              MR. CLOERN:  I agree.  I agree.  And so if there are
12    hits on both a case relevancy term and a state secret term,
13    then we're going to have to figure out what to do about that.
14    Because if it is a Chinese state secret, then the Chinese law
15    would prohibit its export.  We don't know if that's going to
16    happen or if that's.
17              THE COURT:  If it applies.
18              MR. CLOERN:  Right, if it applies.
19              So we'll just take this in two steps.  Let's see if
20    the search terms, the case relevancy search terms, hit on any
21    state secret identified documents --
22              THE COURT:  Can I ask --
23              MR. CLOERN:  -- and then we'll --
24              THE COURT:  -- one question.
25              MR. CLOERN:  -- take it from there.
```

** ROUGH DRAFT **

```
 1          THE COURT:  Yeah, I think -- how long has this
 2   controversy, this narrow controversy, been going on between the
 3   two of you?
 4          MR. ALPER:  Your Honor, so up until right now, we did
 5   not know that Hytera was running state secret search terms on
 6   any of the productions.  So this is news to us that there has
 7   been a set of documents that has been withheld that's
 8   potentially relevant.
 9          THE COURT:  But I just want to -- this is a
10   newer -- or new controversy.
11          MR. ALPER:  Brand new.
12          MR. CLOERN:  As of this moment.
13          THE COURT:  That's fine.  Okay.  I just wanted to
14   ensure that we didn't have something that's a year and a half
15   old still lingering.
16          MR. ALPER:  In fact, prior counsel at a prior hearing
17   with us and your Honor said that Hytera had not withheld
18   documents based on any state secret review in court.  Although
19   it was never something that came up in the briefing.
20          THE COURT:  Okay.  Could I stop -- is she -- are you
21   guys ready?
22       (Discussion off the record.)
23          THE COURT:  All right.  Could I ask you to wait one
24   minute?
25          MR. CLOERN:  Certainly, your Honor.
```

** ROUGH DRAFT **

1          THE COURT:  Because I assume you'll be here for a

2    while.

3        (Whereupon the Court turned his attention to other matters

4    on his call.)

5          THE COURT:  Okay.  Come on back up here.

6          THE CLERK:  17 C 1793.

7          THE COURT:  So I'm sorry.  Where did we leave off?

8          MR. ALPER:  We left off on the state secret review.

9          THE COURT:  Right.

10          MR. ALPER:  And we had -- we were not aware until just

11    now that this is what was being done and has been done.

12          THE COURT:  Let me interrupt you for a

13    moment.  Supposing a guy writes an email and says, I'm scared

14    I'm going to go to jail.  Unclear what he meant.  Maybe he is

15    guilty of God knows what and has nothing to do with this case.

16          He writes a second email and he clarifies the first

17    and he makes it clear that his fear of going to jail is

18    intimately involved in things he's done or admitted to do in

19    connection with this case.

20          Is that the kind of thing that will fall within -- it

21    seems to me it wouldn't fall within any state secret's doctrine

22    no matter how secretive the country was.

23          MR. CLOERN:  That would not be within the state secret

24    doctrine, your Honor.

25          THE COURT:  Okay.

1    MR. CLOERN:  And, you know, there are a set of -- we

2  know what's going to hit on a state secret document because

3  there is a set of search terms.

4    THE COURT:  Well, but it may hit on a state secret

5  document -- and on a document that is simply relevant and has

6  nothing to do with it state secrets.

7    MR. CLOERN:  Agree 100 percent.  And that is exactly

8  why, as soon as we learned of it, as soon as we found out what

9  the protocol is, we talked with counsel, and then we talked

10  with the client.  And we said, can we change it?  And I think

11  there was -- some people's may have had a concern that the

12  first thing you have to do is whittle out anything that's a

13  state secret so that nothing else is done to it.  I don't know.

14    But the Chinese lawyers have determined that we can

15  honor the request.  Hytera can.  They are doing that.  And for

16  any documents for any previous custodians that were withheld on

17  the state secret review or excluded on a state secret review

18  before case relevant search terms were run, they're going to

19  run those cases relevant search terms on those documents

20  because they have been, you know, sequestered.  So it is -- if

21  -- and if there are any double hits, so to speak, that both

22  have a case relevant search term and a state secret search

23  term, we'll inform counsel and the Court and we'll -- we'll

24  work it out.

25    THE COURT:  Mr. Alper.

** ROUGH DRAFT **

1          MR. ALPER:  So I think there is two sides to this.

2     One is a system for checks on this process.  Because if people

3     are just doing things over there, it is very hard to --

4          THE COURT:  Well, I think that's not appropriate.  But

5     I got -- counsel apparently doesn't think so either.

6          If somebody --

7          MR. CLOERN:  Right, that they --

8          THE COURT:  If somebody ran random checks with no way

9     to know what the check and balance -- what the check is, well,

10    that's -- then everyone is operating in the dark, and that

11    can't be okay.

12         MR. ALPER:  Agreed, your Honor.  So that's one thing

13    that I think we'd like to come away with.

14         THE COURT:  And terms themselves, it would strike me

15    cannot offend state secret law if you knew a term X or a term

16    Y.  Doesn't tell you anything, it is a term.

17         MR. CLOERN:  There is a review, your Honor.  So if --

18         THE COURT:  No, no, I just want -- I want Mr. Alper to

19    finish.

20         Go ahead.

21         MR. ALPER:  So I think we need to -- so there is a

22    couple of things.  There is a way to have a way to verify that

23    relevant document are not just being pulled out, and what is

24    being pulled out and having a way to raise those issues to your

25    Honor, I think is one issue that we -- one thing we need to

 1    accomplish.

 2          And the second is a concern that we have that this is

 3    what is actually happening when prior counsel told your Honor

 4    in open court that they were not doing it.

 5          And so now it turns out that they all along have been

 6    performing a secret, state secret review, pulling out

 7    potentially relevant documents.  We now find out that that is

 8    the case where -- but previously, in open court, prior counsel

 9    told you that they were not withholding any documents based on

10    a state secret review.

11          And so I think this needs to be handled very -- on

12    that issue, this needs to be handled in very formal manner

13    where we have some sort of confirmation as to what is actually

14    happening in detail.

15          But putting that second issue --

16          THE COURT:  Well, let me just say this.  I said, I

17    think I said at the time, that we live in a world, not now, but

18    always, where clients doesn't always share what they should

19    share with their lawyers.  And I thought whatever was going on,

20    if that was going on, that was a case with prior counsel.  I

21    didn't for a moment think that whatever he told me wasn't

22    accurate.  And I think I said so.  I said it is conceivable

23    that you're not getting the right story from your client.

24          But that's true of you guys too.  We -- true of all of

25    us.

1    MR. ALPER:  Certainly.  And so that's -- I think

2    that's why now we're getting -- so now that -- what is

3    happening is coming out, and we want to be sure --

4         THE COURT:  Well, it strikes me that therefore one

5    can't really depend on what is being told to us by Hytera.  And

6    they shouldn't depend on what your folks are telling you that

7    you relate.  There has got to be a system of checks and

8    balances on people, and that's what the rules provide for.

9    They don't necessarily rely on lawyers.  Lawyers only know what

10   they are told.

11        MR. ALPER:  Yeah.

12        THE COURT:  That's how we function.  A guy says to us,

13   I wasn't at the -- at the robbery, and it turns out he's the

14   robber.  Well, lawyers don't know.

15        MR. ALPER:  Right.  And I think that's -- you have

16   articulated better what my point is is that we need a specific

17   way of providing checks and balances.

18        THE COURT:  But how do we do that?

19        MR. ALPER:  Okay.  So -- so -- I'm sorry, sorry, your

20   Honor.  I did not--

21        THE COURT:  No, no, keep --

22        MR. CLOERN:  I apologize.

23        MR. ALPER:  So I think a couple of things.  The one

24   thing is it would be good to know what the state secret search

25   terms are.  If -- if that can be provided to us.

1          Second, whatever is withheld, we need a confirmation

2     that the only things that are withheld are things that hit on

3     this search term list, so there isn't some other kind of exit

4     valve for documents of the production.

5          THE COURT:  That you don't know about.

6          MR. ALPER:  That we won't know about.  So then -- now

7     we have a universe of what is being withheld under a state

8     secret claim, which would be things that hit on the search

9     terms much.

10         Then I think some sort of logging procedure would be

11    appropriate.

12         Another thing, your Honor, the issue is, as I

13    understand it, is whether non-Chinese nationals can review the

14    materials.  We have Chinese lawyers actually at our firm who

15    can be subject to your Honor's protective order, who can also

16    view those documents in order to at least have a check that

17    way, to look at what's being withheld, to determine whether a

18    couple things.  One, whether it actually implicates a state

19    secret, and whether there is a lesser --

20         THE COURT:  And they don't tell you folks in effect

21    not -- not (unintelligible) but a Chinese wall is erected --

22         MR. ALPER:  We can --

23         THE COURT:  -- between your firm and them.

24         MR. ALPER:  At least until we have an order --

25         THE COURT:  Right.

** ROUGH DRAFT **

1          MR. ALPER:  -- from your Honor.

2          THE COURT:  I understand.

3          MR. ALPER:  -- permitting to us have that

4    conversation.

5          And then, secondly, we can decide whether maybe there

6    is a redaction that can be affected on this -- whatever is the

7    state secret part and --

8          THE COURT:  From the other part.

9          MR. ALPER:  From the other part.  And we have a belief

10   because -- that this actually, with the proper set of checks

11   and balances, will be something that will become -- will likely

12   be obviated, and here's why.  The likelihood that there is -- a

13   lot of relevant things that are actually state secrets we

14   believe is low, right?  Things that actually relate to Chinese

15   government state secrets that are pertinent to the facts of

16   this case, which have to do with Hytera taking things from

17   Motorola, seems -- seems to us low.  It is -- I'm speculating.

18   I'll be honest, I'm speculating right now.  But it seems low.

19          And that if we have a series of very specific checks

20   like that, and we affect them in a relatively, you know,

21   reasonably timed basis, that we can -- we can -- can we get

22   down to what the actual disputes will be, if, any at that

23   point.

24          But we really feel that we need measures like that in

25   place.  And some confirmation by U.S. counsel that they are in

1    place, so that way we know Hytera is actually doing the things

2    that they are supposed to do.

3         THE COURT:  And what kind of a response have you

4    gotten to your ideas from your counterparts?

5         MR. ALPER:  We -- so I think this is all realtime

6    right now.

7         THE COURT:  Okay.

8         MR. ALPER:  What we were told, and this is, of course,

9    (unintelligible) counsel to respond now.  But what we have been

10   told thus far is that there was a state secret review being

11   affected, but not a lot of additional detail.  And so I think

12   we're now getting more detail than we had before.

13        THE COURT:  Okay.

14        Yes, go ahead.

15        MR. CLOERN:  Okay.  So, your Honor, we have some

16   experience with this.  We had state secret review issues in

17   case before the Chinese steel industry, as well as for Wallway

18   (phonetic) in a trade secret case with T-Mobile.  All these

19   things are things that can be worked out.  I'm surprised that

20   they are not.

21        I -- when we got on, I understood that there was state

22   secret review undergoing.  I saw references to it in the

23   transcripts, in the record that I reviewed.  But all this was

24   worked out.  Apparently it is not.  This is the first we're

25   hearing of it.  This developed in the last couple days.

```
 1            We will get this worked out.  What I can tell the
 2   Court and counsel now is that -- so we have got -- we have
 3   agreed to a process now that will identify whether there is a
 4   state secret search term hit and a case relevancy search term
 5   hit.
 6            THE COURT:  So let me talk to you.  What I would like
 7   you both to do then is there is infinitely more that you will
 8   know than I don't know that you're not telling me, is you draft
 9   a joint order that I will sign.  I am not going to let you guys
10   do this sort of on who said what, and then people don't recall,
11   and they don't remember the same way.
12            I will sign an order that will incorporate what you
13   apparently have agreed on.  But I need you to draft the order
14   and send it to the proposed order minute box.
15            MR. ALPER:  We will do, that your Honor.
16            THE COURT:  All right.  Go ahead.
17            MR. CLOERN:  I think that's a great idea.  I think all
18   these things are --
19            THE COURT:  Well, I don't know whether you will all
20   agree --
21            MR. CLOERN:  Yeah.
22            THE COURT:  -- on pretty much anything.  That's the
23   problem I have.
24            MR. ALPER:  That's a problem I have too, your Honor.
25            THE COURT:  Yeah.
```

```
 1          MR. ALPER:  If you would like to --

 2          THE COURT:  And this is going to go on -- well, it

 3   won't go on forever.  But it will -- you all try to have it

 4   gone for whatever.  I -- that's not the way this case is going

 5   to work.  Despite all the papers you filed, we're really going

 6   to get this done --

 7          MR. ALPER:  We'd like to.

 8          THE COURT:  -- one way or the other.  If the defense

 9   wins, so it be, that's great.  But somebody is going to have

10   their day in court.  And it is not going to be an endless,

11   endless, endless quest for discovery.

12          MR. ALPER:  We would like that, your Honor.

13          THE COURT:  The bane of modern -- this really proves

14   how Posner was right.  Not that you needed his insight.  But

15   for goodness sakes, folks, this -- all of this over, I think,

16   almost nothing.

17          What is it that you want from -- well, where does that

18   leave you vis-a-vis the deposition of Mr. Chen?  I suppose wait

19   until you get the documents.

20          MR. ALPER:  We were originally waiting to get the

21   documents.  Based on our conversation last week, your Honor,

22   we -- we definitely want his deposition.  We were willing to

23   put that argument off until we got the documents.

24          Based on our discussion last week and the documents we

25   looked at, and guidance from your Honor, we feel that we should
```

1   definitely have the deposition of Mr. Chen, and we want it.

2         THE COURT:  Well, maybe not.  I mean, if -- if the

3   state secrets doctrine -- I suppose then that they -- it gets

4   raised on a question-by-question basis to what happened at the

5   deposition.

6         MR. ALPER:  Well, we -- we think that that would

7   be -- that there is no basis for that.  Because Mr. Chen

8   clearly has information based on the documents that we already

9   have.

10         THE COURT:  Yeah, no, I understand.  I'm just saying,

11   if you ask the wrong question, theoretically the wrong

12   question, you will get, I suppose, some sort of an

13   objection.  But the -- it doesn't preclude him from being

14   deposed.

15         MR. ALPER:  Correct, your Honor.

16         THE COURT:  Okay.

17         MR. ALPER:  Correct, your Honor.  So we would like his

18   deposition.  And we would like your Honor to order them to give

19   us a date for his deposition.  We have asked for a date in

20   January.

21         THE COURT:  Well, then you will want to do it twice.

22   After you get the documents, this allegedly -- the -- what

23   documents are you going to get or have you gotten all -- the

24   stuff from him, other than potential state secret stuff?

25         MR. ALPER:  No, so that -- I think you're right, we

** ROUGH DRAFT **

1    should close out on that, your Honor, on the documents.

2            So here's where we're at.  They have not yet produced

3    his documents.  The state --

4            THE COURT:  Any?

5            MR. ALPER:  Any.  Any of his documents.

6            The state secret review, they have told us what we

7    learned today about the state secret review, which they want to

8    perform before they produce his documents.  So what we -- what

9    we would like to do, your Honor, is the following in order to

10   move this along.  We would like to resolve the state secret

11   review protocol --

12           THE COURT:  First.

13           MR. ALPER:  -- first.  We are happy to do that right

14   here if you would like.  But we're also happy to do it offline

15   on our own time and submit something to your Honor.

16           THE COURT:  Well, I would much prefer that you do it

17   here.  I work -- I have nothing to do except service you

18   guys.  So let's -- if we can do it, we ought to do it.  Save

19   you all time.  Your clients money.  And the court time.

20           MR. ALPER:  So --

21           THE COURT:  -- if we can do it.

22           MR. ALPER:  So we -- so then what I will do on -- with

23   respect to that is I think there are about four things that we

24   would like for the protocol --

25           THE COURT:  Have you talked to your colleague on the

** ROUGH DRAFT **

```
 1    case about it?
 2           MR. ALPER:  We have not because it wasn't until just
 3    now that we had confirmation.
 4           THE COURT:  Have a seat, relax -- thanks.
 5           Oh, hold on.
 6       (Brief interruption.)
 7           THE COURT:  Can you hold one second?
 8           MR. ALPER:  Certainly.
 9       (Brief interruption.)
10           THE COURT:  Very significant the thing I just asked
11    her.  And more even than you can imagine.  It has to do with
12    her putting something on my phone that I am unable to do.
13           Go ahead.
14       (Laughter.)
15           MR. ALPER:  So then I think your Honor was going to
16    suggest that we confer.
17           THE COURT:  Right.
18           MR. ALPER:  And then -- right now.
19           THE COURT:  Why not?
20           MR. ALPER:  That sounds very good to us, and we're
21    very happy --
22           THE COURT:  Do you want to go downstairs and get
23    coffee, bring it up?  Donuts.  Whatever you want to do.  I
24    don't care how long you stand you.
25           MR. ALPER:  I think we'd like to do that.
```

```
 1          The second thing we would like, your Honor, though is
 2   a date for them to produce his documents.
 3          THE COURT:  Sure.
 4          MR. ALPER:  And then third, if -- assume that that
 5   date is within the next number of weeks --
 6          THE COURT:  I --
 7       (Laughter.)
 8          THE COURT:  I hope so.
 9          MR. ALPER:  We hope it is.  Than this should resolve
10   this document production, and maybe there will be some
11   stragglers.
12          THE COURT:  It won't resolve it, but it will get you
13   far along.
14          MR. ALPER:  Get us far along.
15          THE COURT:  Yeah.
16          MR. ALPER:  And then we'd like a date in January for
17   his deposition.
18          THE COURT:  Fine.  And maybe they will be happy to
19   (unintelligible).  But at least you have -- you'll have a
20   window of opportunity to, hopefully, will get it taken care of.
21          MR. CLOERN:  May I respond?
22          THE COURT:  Sure.
23          MR. CLOERN:  Okay.  So the first point, on sitting
24   down today to discuss the state secret review, I think that's a
25   great idea, why we're here.  How -- and there are some things
```

1    that we can resolve based on, I think, my -- at least what I

2    know about the protocols and requirements under Chinese law,

3    which isn't everything.

4            What I also know is that we can't resolve everything

5    that Mr. Alper has asked for, and I'll tell your Honor why.  So

6    it is my recollection, unless Chinese law has changed, that it

7    is acceptable to log the documents, and then to have Chinese

8    counsel -- so if -- I assume that Motorola has Chinese counsel,

9    and Kirkland may very well have Chinese lawyers over there that

10   fit the bill in their own firm.

11           THE COURT:  They probably have people sitting on

12   whatever their governing body of law is.  I mean --

13           MR. CLOERN:  That -- I have no doubt, your Honor.  I

14   have no doubt.

15           So my understand (sic) is that the docu- -- the law of

16   any state secret documents may be reviewed by Chinese lawyers

17   and -- for the party.  Whether they can review the Chinese --

18   the Chinese documents or not, I -- we need to confirm that, and

19   we need to confirm it with Chinese lawyers.  So I think what is

20   best is that we -- because we do need to make sure that this is

21   consistent with Chinese law, I think we should meet today, we

22   should discuss, we should say, here's what we want to confirm,

23   here's what we all agree on, if it can be confirmed with

24   Chinese law.  They will talk to their Chinese lawyers, and we

25   will.  We can set a time frame, two or three days, I don't

care, we just need to get that confirmation so we don't require
the parties to do something that's going to get them thrown
into Chinese prison, which is a terrifying thought to me.

So that's all we're asking for.  And that just -- we
won't be able to resolve everything today, but I think we ought
to hammer out today a proposal that we all agree to, that we
think makes sense, and then get that confirmed by Chinese
lawyers.

MR. ALPER:  Yeah, I think that's fine with us, your
Honor.

THE COURT:  Good.

MR. CLOERN:  Okay.

THE COURT:  That's fine.

MR. CLOERN:  So now if I may respond to the statements
about Mr. Chen.  So I think your Honor expressed some -- I
think your Honor expressed some surprise that Mr. Chen's
documents haven't been produced.  Well, the way this case has
gone, right, is the parties talk about custodians.  And they
respond and produce documents based on those custodians.  Both
Motorola and Hytera have thousands of employees, so we have to
decide what we're going to search.

The first time Mr. Chen's documents were asked for is
on October 10th.  So this is less than a month ago, if I am
looking -- or, no, right at a month ago if I am looking at the
date correctly.

1    So we talked about that for, I think, one meet and

2  confer for all of less than 60 seconds.

3    (Laughter.)

4    THE COURT:  Well, by definition that is not a meet and

5  confer.

6    MR. CLOERN:  But it was a meet and confer on a lot of

7  issues, and there was -- there was -- okay.  We -- it was you

8  want the -- you guys are now asking for Mr. Chen's

9  documents.  Okay.  Well, we -- you know, we object to producing

10  Mr. Chen's documents.  Okay.  We have a position.  Moved on,

11  talked about source code, and a lot of other things.

12    The next time we heard about this, you know,

13  we're -- we're here dealing with motions practice.  So we are

14  now -- have -- we're going to get Mr. Chen's documents.  We're

15  reviewing them.  We have to -- we're going to work out the

16  state secret protocol, and then we're going to get them

17  done.  I think this -- this is -- once we get the state secret

18  review done, which usually takes a week or two because we

19  do -- because those documents are in fact reviewed, they are

20  just not hitting on search terms and thrown in a bucket

21  somewhere, they actually are reviewed to make sure that that's

22  proper, then we do the relevance and review and get them

23  produced.  I think this can be done in a couple of weeks.

24    But I don't want there to be a suggestion that Hytera

25  has been sitting around not meeting its obligations.  Hytera

1  has produced way more custodians than Motorola.  Hytera has

2  produced 700,000 documents, three and a half million pages.  We

3  have produced 95 percent of the document discovery in this

4  case.  We have had about 35 or 40 thousand documents compared

5  to 700,000 for Motorola.

6       Hytera has run a broad set of search terms which picks

7  up all of the issues in this case.  Hytera -- Motorola has run

8  only search terms on a few custodians.  And you want to know

9  why they produced so few documents, only 6 percent of documents

10 in this case?  Because the only search terms they ran were

11 Hytera and the three or four or Motorola employees, their

12 names.  That's it.

13      THE COURT:  I didn't -- if I did, I'm truly sorry.  I

14 didn't want to suggest that Motorola was represented by angels

15 or that they were angels themselves.

16      (Laughter.)

17      THE COURT:  All I care about, folks, is major

18 litigation is a -- a unique entity, thing, and people don't do

19 what they should do.  It is just part of the -- it is what we

20 do.

21      All I want to do is have both sides do what they

22 should do.  Whoever wins, wins.  If they're right, so be

23 it.  If you're right, God bless you.

24      But you don't know that until each side responds.

25 There is all sorts of cases that talk about discovery being

1    more conducive to -- being more expensive than the trial

2    itself.  I just want to get done with this and have both of you

3    be equally unhappy with the production.

4         (Laughter.)

5         THE COURT:  And what it shows, it shows.  I'm not -- I

6    honestly didn't -- all I -- you weren't here.  All I said was,

7    I think Mr. Chen doesn't fit within this sort of newer thought

8    about Apex depositions based on what I saw.  I never, ever got

9    the sense -- this wasn't a guy that spills coffee on himself

10   and wants the deposition of the chairman of McDonald's.  That

11   really is not a -- what's involved here.  And that's what most

12   of those are.

13        This is the real thing.  And I didn't think it was a

14   big deal that anybody in a major case has to donate or give a

15   certain -- a few hours of his time, not here, but at home.  I

16   really believe that.  So I thought Mr. Chen should be deposed.

17        All the issues you're getting into, I never, ever

18   booked -- or thought about at all.  I don't doubt for a minute

19   that maybe you have produced more documents.  But the question

20   really is is quality, not quantity.  So I don't know if you are

21   getting quality as well as lots of stuff.

22        One of the great, you know, gimmicks in big time

23   litigation is you inundate the other side with material.  They

24   will -- Kirkland can get -- go through it.  You couldn't

25   produce enough.

```
 1          But most people can't -- they get buried, and they
 2    settle and somebody comes out who should -- a winner
 3    (unintelligible).  I just want everybody to get what they are
 4    supposed to get, nothing more, nothing less.  I'm not -- I
 5    have -- I couldn't tell you who was right or who was wrong in
 6    this case.  I have not even a glimmer of a feeling.  That's
 7    really the truth.  And it wouldn't matter anyway, even if I
 8    thought so.
 9          So don't -- I don't want you to feel that you're being
10    disadvantaged in any way.  I just want to get the thing moving.
11    That's why I said to you what I said to you.
12          MR. CLOERN:  Well, your Honor, I actually appreciate
13    that.
14          THE COURT:  And you had to bring all that stuff with
15    you for today.
16          MR. CLOERN:  Well, that --
17          THE COURT:  Oh, my.
18          MR. CLOERN:  -- actually will -- is going to --
19          THE COURT:  I mean, that really -- that really sort of
20    makes the point that I am trying to make to you.  We have a
21    simple, I think, simple discovery dispute about one guy's
22    documents.  And this is what we have to go through to get to
23    that.  I think it is kind of sad.
24          MR. CLOERN:  That's actually not about the discovery
25    dispute I'm interested in.  What this is, your Honor --
```

** ROUGH DRAFT **

```
 1            THE COURT:  Oh.  I suppose that's worse.
 2            MR. CLOERN:  This is -- this is what Motorola says is
 3    one trade secret.  This is they say, we have an improvement
 4    related to X, and then point to these documents, and we're
 5    supposed to figure it out from that.  So that's what that's
 6    about.  It is about inundating us.
 7            THE COURT:  I understand.
 8            MR. CLOERN:  So that's why --
 9            THE COURT:  I really do understand.
10            MR. CLOERN:  -- we brought those.
11            THE COURT:  I -- I get it.  I would be surprised if it
12    were otherwise.
13            MR. CLOERN:  All right.  But Mr. Chen --
14            THE COURT:  And in trade secret cases no one
15    identifies -- the plaintiff never identifies the trade secret,
16    ever.  And you spend years arguing about the trade secret.  It
17    ultimately gets resolved.  I just would like to do it sooner
18    rather than later.
19            MR. CLOERN:  And we -- so we do want to talk about
20    that a little bit.
21            THE COURT:  Sure.
22            MR. CLOERN:  To close out on Mr. Chen, we had -- there
23    have been a number of statements in Motorola's brief.  I just
24    wanted to make sure the record -- the record was clear that
25    this is a relatively new issue --
```

** ROUGH DRAFT **

1           THE COURT:  I will --

2           MR. CLOERN:  -- issue.  We are producing his

3    documents.

4           THE COURT:  You disagree with Motorola's

5    representations, and that's good enough for me.  Nobody in the

6    world --

7           MR. CLOERN:  Okay.

8           THE COURT:  -- will see this unless you guys have this

9    written up.  And then it will have no value, unless somehow you

10   think that my off the wall comment about something is somehow

11   binding on anybody, and you would be mistaken.  It is

12   not.  We're here collectively to try to wade through what we

13   have to wade through.

14          MR. CLOERN:  Well, thank you for that, your Honor.

15   And we are producing Mr. Chen's documents, and they will be

16   produced in a couple of weeks, as soon as we work out the state

17   secret protocol.

18          THE COURT:  But can you understand -- though you

19   weren't here.  Can you at least understand why I would have

20   concerns when I'm shown an email by Mr. Alper last week, and

21   Mr. Chen, who I -- certainly is a good deal more important than

22   we are, talks about his fear of going to jail.  And I thought

23   to myself, Mr. Chen could be fearful of prison for a trillion

24   reasons unconnected with this case.  But maybe it is connected

25   with this case.  So there is at least something that gives me

1    some concern.  I'm not just picking sides.

2           MR. CLOERN:  So, your Honor, just one quick

3    clarification.  The email didn't discuss Mr. Chen's fear of

4    going to jail, it was Sam Chia who was one of the Motorola

5    employees who came over to Hytera, wrote to Mr. Chen and said

6    he was fearful of going to jail.

7           THE COURT:  Oh, I'm sorry.

8           MR. CLOERN:  It wasn't Mr. Chen.

9           THE COURT:  No, you're right.  And so what did

10   Mr. Chen do about it when he got that email?

11          MR. CLOERN:  I don't think there is -- I don't know --

12          THE COURT:  It is a rhetorical question.

13          MR. CLOERN:  Right, understood.  So but that's an

14   important point because in the discussion that we did have with

15   counsel, the discussion was really focused on Mr. Chen's

16   communication with the three Motorola employees who came -- who

17   came over from Motorola, right?  And there are 700 documents

18   that were produced that are communications between those

19   individuals and Mr. Chen.

20          And so what we were pointing out is, you know, we have

21   given you those communications.  In any event, we're going to

22   look in Mr. Chen's documents to see if there is anything beyond

23   those.  So -- but those documents had about already been

24   produced.  Mr. Chen hadn't been asked for it, and now he

25   is.  Now we're looking at them.

```
 1              THE COURT:  Good.

 2              MR. CLOERN:  And it is done.

 3              THE COURT:  And maybe there is nothing there.  And

 4    thank you for pointing that out to me.  I really was under a

 5    misapprehension.  But, you know, I think my observations still

 6    obtain.  But I -- I think you're right, at least correcting me,

 7    thanks.

 8              MR. CLOERN:  Sure.  So we're -- Mr. Chen's documents

 9    are on the way, and we're going to work out the protocols.

10              MR. ALPER:  Can we have a date though?

11              THE COURT:  Yeah.  How about -- what -- at least a

12    target date --

13              MR. CLOERN:  Sure.

14              THE COURT:  -- so that it is not in the ether

15    somewhere.

16              MR. CLOERN:  What -- we can shoot for November 30

17    provided we get the state secret protocol done by -- I wish I

18    had my calendar.

19              How many weeks do we have left until November 30?

20              THE COURT:  November 30th is a Friday.

21              MR. CLOERN:  And today is -- so it --

22              THE COURT:  Today is the 13th.

23              MR. CLOERN:  Yeah.  Can we do -- can we do December

24    7th, just because I am told it takes about --

25              THE COURT:  How about the 6th?
```

```
 1              MR. CLOERN:  The 6th will work.

 2              THE COURT:  We live by symbols Holmes said, and that's

 3     a bad date to pick, December 7th.

 4              MR. CLOERN:  That's true.  It is also my wife's --

 5              THE COURT:  For you.

 6              MR. CLOERN:  -- birthday.

 7              THE COURT:  Oh, yeah.

 8         (Laughter.)

 9              THE COURT:  Then we should do it on your wife's -- but

10     I would think you would want to get it done before your wife's

11     birthday.

12              MR. CLOERN:  Absolutely, your Honor.

13              THE COURT:  Yeah.  It doesn't matter.  A week doesn't

14     make a difference.

15              What happens then, at least you'll put that in the

16     order that's the date -- that is the date.  Now it not

17     (unintelligible) looking at, that's just the date.  If it has

18     to be extended, I'm sure it will.  But I would rather have

19     certainty than looseness.

20              MR. ALPER:  And should we schedule a deposition for

21     Mr. Chen?

22              THE COURT:  Yeah.  And whether it goes on that date or

23     not, but at least we should have dates as opposed to

24     aspirational things.

25              You pick the date.  You guys together pick the date.
```

1        MR. ALPER:  Okay.  Well, we proposed a date in

2  January, and so we just need to hear back from counsel on

3  Mr. Chen's availability.

4        MR. CLOERN:  So, your Honor, if I could just respond

5  to the Chen deposition point.  We have no problem scheduling a

6  date.  And in fact we talked about that in the last meet and

7  confer.

8        What Hytera's position is is -- or actually what

9  Motorola said is we'd like to make sure that we don't get some

10  answer when time for depositions come around, right when we do

11  all the depositions after everything is produced and everyone

12  is digested it all and we get our exhibits ready and so forth,

13  that, oh, Mr. Chen is so busy he has got no time in January or

14  February.  Sort of the period that we --

15        THE COURT:  He's the boss.

16        MR. CLOERN:  Right.  But we're -- we're locking down a

17  part of his schedule in the event his deposition goes forward.

18        THE COURT:  Okay.

19        MR. CLOERN:  What we would just respectfully request

20  is that once Mr. Chen's documents are produced, that Hytera

21  retains its ability to oppose a deposition of Mr. Chen in the

22  event there is nothing in his documents that is not -- that's

23  non-duplicative of what other employees have to say.  And so if

24  Mr. Chen doesn't have documents that haven't already been

25  produced by somebody else from which Motorola can --

```
 1              THE COURT:  A man -- I -- in the abstract I couldn't

 2    agree with you more.

 3              MR. CLOERN:  Okay.

 4              THE COURT:  In the concrete, I don't agree with

 5    you.  Mr. Chen gets a letter -- I won't even say it because I

 6    don't want to make the case.  Mr. Alper and his crew don't need

 7    me to do anything substantively.

 8              But with -- with your correction, I instantly thought

 9    of what I would ask if I were cross -- examining him about that

10    email with full awareness that it came from somebody else.  And

11    the fact that it came from somebody else does not rob it at all

12    -- oh, partially -- but not a lot of its intrinsic evidentiary

13    potential value that would require him to be there to be

14    deposed.  It is not the same thing.  It is a step removed, but

15    so what?

16              So I -- you know, I'm telling you now my feeling is

17    Mr. Chen should be deposed.  Now if you don't like the fact

18    that we're setting a date for his deposition, I want you to

19    understand what you do, appeal if you don't like that

20    ruling.  You can go to the district court and say, in my vast

21    discretion to administer discovery, I have made a mistake, and

22    that Chen should not be allowed under any circumstances that

23    this record exhibits to be deposed.

24              I'm happy that you do that.  I don't think you will

25    get very far on something like this.  But you're -- my view is
```

** ROUGH DRAFT **

```
1   Mr. Chen should be deposed.  A man writes to him and says, I'm
2   afraid of going to jail.  And that's all I have seen so far.  I
3   don't know -- I don't know what else is there.  I would think
4   it extraordinary not to depose the recipient of that email and
5   find out things.
6          MR. CLOERN:  I understand, your Honor, 100
7   percent.  And I don't think you're going to see any such
8   motion.  I just wanted to just point out --
9          THE COURT:  I appreciate it.
10         MR. CLOERN:  -- that we'd like to reserve the
11  possibility in the event it becomes -- in the event that it is
12  a good argument.  I -- right?  We're not going to bring some
13  foolishness in here.  So we're -- you're not going to see any
14  requests like that unless there is some issue that develops
15  that has --
16         THE COURT:  If there is --
17         MR. CLOERN:  -- merit.
18         THE COURT:  If it is a date problem and he can't do
19  something because it is his wife's birthday or their
20  anniversary, well, then change the date.
21         MR. CLOERN:  Sure.
22         THE COURT:  But short of something sort of normal or
23  he has something that comes up that he couldn't anticipate --
24  things happen.  But you guys then can agree on another date
25  very quickly in time.
```

** ROUGH DRAFT **

1    He's not the President of the United States -- it is

2    not Bill Clinton.  Clinton even got deposed over something I

3    didn't think was as significant as this.

4            MR. CLOERN:  Understood.

5            THE COURT:  Well, I guess it was as significant.

6            All right.  You sit down.  Do what you have to do.

7    Tell Jan.  She'll come get me.  We'll -- we'll do something by

8    way of an order that you both approve of and submit to me, and

9    I'll enter the order.

10           MR. ALPER:  That sounds great.  Thank you, your Honor.

11   There are a couple of other issues.

12           THE COURT:  Yeah, sure.

13           MR. ALPER:  Should we do those now before we sit down?

14           THE COURT:  No, let's do this.

15           MR. ALPER:  Sit down?

16           THE COURT:  Unless you both want to do the other

17   first, I don't care.

18           MR. ALPER:  The only reason I would say potentially do

19   the others first is that if that also requires us to include

20   that in our sit down before we come back to your Honor right

21   here today.

22           THE COURT:  Whatever you want to do.

23           MR. ALPER:  Maybe that makes sense.

24           THE COURT:  Yeah, fine.

25           MR. ALPER:  And may I say one thing very briefly?  And

** ROUGH DRAFT **

1   I fully understand this was not your point.  We, just for the

2   record, disagree with counsel's description of our

3   production.  We have actually produced more pages than Hytera.

4   We fully understand that was not your point.  And, frankly, it

5   may have been the opposite of your point.  But I wanted to just

6   say that for the record.

7           THE COURT:  Inferences from silence are perilous.  I

8   would never have inferred your silence to indicate approval or

9   even agreement --

10          MR. ALPER:  I understood.

11          THE COURT:  -- with what was being said by your

12  opponent in the case.

13          MR. ALPER:  I understand.  Thank you, your Honor.

14          THE COURT:  Okay.  So what's next?

15          MR. DE VRIES:  So, your Honor, we have two other

16  issues.  And I think I can digest them briefly.  The one is the

17  interrogatory responses.  And then the second is source code.

18  And we have made some progress, but I think that we'll need

19  your Honor's assistance in --

20          THE COURT:  Okay?

21          MR. DE VRIES:  -- on both issues.

22          So on the interrogatory responses, these are the ones

23  that we addressed last week.  Our interrogatories 16, 17, 18,

24  and 19.  Until last Thursday there was a complete refusal to

25  produce any information in response to those interrogatories.

```
 1   We discussed them last week.

 2            Now we have an agreement by Hytera to provide us with

 3   responses by this Friday, which is good news.

 4            THE COURT:  For all four.

 5            MR. DE VRIES:  For all four.

 6            THE COURT:  Okay.

 7            MR. DE VRIES:  If you read the opposition brief that

 8   they filed last night, however, they spend many pages

 9   explaining why they shouldn't need to fully respond right

10   now.  And here's -- and so I want to just very briefly, in

11   probably under a minute, explain why that is concerned and why

12   -- that concerns us and why we think your Honor should order

13   them to answer the interrogatories.

14            And I'm just going to give you two examples.  I think

15   it will show you what we're concerned about.

16            THE COURT:  No, keep talking.  I just want to see what

17   I actually have.

18            MR. DE VRIES:  Yes.

19            THE COURT:  Could you bear with me just a moment?  I

20   have a motion to compel discovery, which is 3 -- it is -- I

21   don't -- 343 maybe.

22            Then there is an index of exhibits to Hytera's motion

23   to compel, which is several inches thick.

24            Then there is an index of exhibits to the motion to

25   compel.
```

```
 1              Then -- then there is, I guess -- oh, this is the
 2      index of exhibits that is, I think, sealed.
 3              So I don't have -- and then I have a brief --
 4              Jan, get that, will you?
 5              I have a brief in support of a motion to compel
 6      which -- thanks -- which is Number 334.  Did I have this
 7      before?  I think I did.
 8              And then I have -- I don't have the document you're
 9      talking about that was filed, when?
10              MR. DE VRIES:  Last night, your Honor.
11              THE COURT:  I don't have that.
12              MR. DE VRIES:  Docket 338.  If your Honor would like,
13      I actually have a bound version that I could give to your
14      Honor.
15              THE COURT:  Fine.  Thanks.
16              MR. DE VRIES:  May I approach?
17              THE COURT:  Yeah, sure.
18              Thank you.
19              MR. DE VRIES:  Here you are, your Honor.
20              THE COURT:  Thank you.
21              MR. DE VRIES:  It also has the exhibits.
22              THE COURT:  Wait.
23              And this you filed last night?
24              MR. DE VRIES:  Hytera filed that late in the day
25      yesterday, that's correct.
```

** ROUGH DRAFT **

```
 1              THE COURT:  Oh, filed on Monday.  Okay.
 2              MR. DE VRIES:  And it is Docket 338 is the memorandum.
 3              THE COURT:  338.
 4              Thanks.  All right.  Go ahead.
 5              MR. DE VRIES:  Thank you, your Honor.  So in a
 6   nutshell, in this brief, Hytera says that the dispute is moot
 7   because they have agreed to respond to the interrogatories now.
 8   And as a reminder, discovery closes in February.
 9              THE COURT:  Uh-huh.
10              MR. DE VRIES:  We have a trial date for next year, and
11   our expert reports are due in April --
12              THE COURT:  Right.
13              MR. DE VRIES:  -- so we're short on time.
14              They spend much of that brief explaining why they
15   can't really respond to much of these requests, and they say it
16   is our fault.
17              And that argument doesn't make sense in a couple of
18   respects.  If you -- Interrogatory Number 16, which is the
19   first interrogatory at issue, it asks them to -- and I'm
20   paraphrasing -- but describe the facts and circumstances
21   concerning how and when Hytera received, copied or did some
22   other things with our copyrighted source code.  Tell us about
23   when you received and copied the source code, the facts about
24   that.
25              And they say that -- in this -- in their brief, they
```

** ROUGH DRAFT **

1   can't respond to that fully because they say that we're asking

2   for their full in -- contentions on the copyright claim, which

3   is not correct.  And then they say they can't really respond

4   because there are certain things they say that we haven't given

5   them.

6          They acknowledge in their brief, at page 8, that -- at

7   the bottom, four lines up, that we provided tens of thousands

8   of alleged examples of copying identified in response to

9   Hytera's Interrogatory Number 5.  So they acknowledge that.

10         But then flipping back to page 4, they say that we

11  haven't provided certain things in the middle of that page.

12  And they are wrong about some of what they say.  I think there

13  seems to be some disconnect between the information transfer

14  between counsel -- prior counsel and current counsel.  They

15  say, for example, we haven't produced the actual specimens of

16  code submitted to the Copyright Office.  That's incorrect.

17         They say that we haven't identified or explained why

18  there are -- we told the Copyright Office that certain parts of

19  code were excluded.  We actually did so in detail in a brief

20  that they have received in opposition to their motion to

21  dismiss.

22         And then there are some other things that they say.

23  They want some information about who the authors were.

24         And you'll see that none of what they are talking

25  about there would keep them from responding to an interrogatory

1    asking us -- asking them to say when did you receive and use

2    our source code.  That's what we're asking.

3          And so we have a concern and that is that they are

4    going to give us a non-response on Friday, and we'll be back

5    right before your Honor.

6          There is one example -- other example I would like to

7    show your Honor.  For Interrogatory Number 17, we say give us

8    your non- --

9          THE COURT:  What page is that?

10         MR. DE VRIES:  Yes, your Honor.

11         THE COURT:  Of your materials?

12         MR. DE VRIES:  It is in Exhibit 1 of our materials.

13   Those are their current interrogatory responses.

14         I'm sorry, Exhibit 3 are the responses

15   themselves.  Exhibit 1 is the -- are the original

16   interrogatories.

17         THE COURT:  So I'm looking at your brief in support of

18   the motion to compel discovery, right?

19         MR. DE VRIES:  That's correct, your Honor.

20         THE COURT:  Well -- or it is publicly -- public

21   version.  And then I look at Exhibit 3 you say?

22         MR. DE VRIES:  Exactly.

23         THE COURT:  On page 4?

24         MR. DE VRIES:  It is on page 5 is where --

25         THE COURT:  On page 5.

1      MR. DE VRIES: -- I was going to show your Honor now.

2      THE COURT: Yes. I should look at what?

3      MR. DE VRIES: Interrogatory Number 17.

4      THE COURT: Okay.

5      MR. DE VRIES: And it says, if you contend that Hytera

6  does not infringe any Motorola copyrighted works, essentially

7  say -- explain the facts and circumstances of why.

8          And what they say in their brief is that -- and I'll

9  show your Honor this at lines -- I think the best statement of

10 this is on page 9. And there is a rather lengthy discussion at

11 page 9 of their opposition brief, which is again Docket 338.

12     THE COURT: Hold on. Hold on.

13     MR. DE VRIES: Yes, your Honor.

14     THE COURT: Okay. So I have 9.

15     MR. DE VRIES: Okay. And I won't -- I won't -- I'll

16 paraphrase this. Here they say that they have looked at

17 certain examples of the tens of thousands of lines of code that

18 we identified in interrogatory response. They say that three

19 of them they don't think bear any resemblance.

20         And then they say, we -- we're not sure if maybe this

21 source code isn't copyright protectable in a nutshell.

22         And then if you look at page 10, and this is really

23 the final thing I'm going to show you, your Honor, on this

24 point, in the final paragraph of that section they say in --

25     THE COURT: In summary?

** ROUGH DRAFT **

1          MR. DE VRIES:  It is in summary.  And then in the

2    second sentence there, your Honor.

3          THE COURT:  Yes.

4          MR. DE VRIES:  -- and as explained above, Hytera

5    should not be forced to hastily comb through tens of thousands

6    of potentially erroneous or unproductible (sic) examples to

7    identify which, if any, may support a claim of copyright

8    infringement.  As the copyright infringement plaintiff, that is

9    Motorola's job.

10          And so what do we have here?  We have them saying, we

11    shouldn't have to answer this interrogatory.  You have

12    identified tens of thousands of lines of copied code.  We asked

13    an interrogatory months ago saying, tell us what your position

14    is.  And they're essentially saying that they're not going to

15    do it.

16          And they say at one point they maybe need

17    experts.  And so I suppose they think that they're going to

18    wait to provide their contentions in their expert

19    discovery.  It is a little unclear.  But that's what I am

20    reading here.

21          And so we see in large part an agreement to respond to

22    their interrogatory -- our interrogatories.  They should have

23    responded a month ago, but they didn't.

24          Now they say they are going to do it.  Provide it on

25    Friday.  But what we're reading gives us a very significant

1    fear that we're going to get their answers -- they're telling

2    us they should not be forced to do it.  And that we're going to

3    be right back before your Honor.  And so we believe that

4    your -- we would respectfully request that your Honor order

5    them to answer these interrogatories.

6           If there is something that they legitimately cannot

7    respond to, and there is a dispute later about whether they

8    can -- you know, have put forward their contentions

9    appropriately, that's an issue that I think can be resolved

10   later.  Because -- but the -- what is not okay is for them to

11   say with very few months left -- remaining in discovery, we

12   shouldn't have to do this right now.  We don't have to provide

13   you what you're looking for.  And so I don't -- I think that we

14   do have a dispute still.

15          THE COURT:  Okay.

16          MR. CLOERN:  So, your Honor, if you can look at our

17   opposition brief, and it is Exhibit 28.

18          THE COURT:  Wait.  Hold on for one second.

19          MR. CLOERN:  Again Docket 383.

20          THE COURT:  Exhibit 28 you said?

21          MR. CLOERN:  Yes, your Honor.

22          THE COURT:  I don't have it.  Well, wait a minute.

23   Just a second.

24          No, I have a 28.  Yours starts with 29.  I don't -- at

25   least there is no tab.

** ROUGH DRAFT **

1      MR. CLOERN:  Oh, maybe because it is the public

2  version.  We'll give you --

3      THE COURT:  I have the -- no, I don't have.

4      MR. CLOERN:  May I approach, your Honor?

5      THE COURT:  Yeah.  Come on, come on, come on.

6  Thanks a lot.

7      MR. CLOERN:  That's Exhibit 28.  It is the first

8  (unintelligible).

9      THE COURT:  Hold on one second.

10     MR. CLOERN:  So, your Honor, it is on Exhibit 28.  The

11 first few pages are Motorola's response, written textual

12 response to an interrogatory.  And there is exhibits just after

13 page 8.

14     And as you can see --

15     THE COURT:  Can I ask you a question?

16     MR. CLOERN:  Yes, your Honor.

17     THE COURT:  Why -- we don't -- I'm probably not -- I

18 have -- you have pages 1 and 2, for example.  It says

19 interrogatories, then Interrogatory Number 1 and there the

20 response.  Yes?

21     And then on page --

22     MR. CLOERN:  Then I gave -- I gave you the wrong

23 thing.  Yes, I did.

24     MR. DE VRIES:  Your Honor, I think he's intending to

25 refer you to --

1              MR. CLOERN:  I'm sorry.

2              MR. DE VRIES:  -- exhibit 17 of our motion, which is

3    our interrogatory response --

4              MR. CLOERN:  Yes.

5              MR. DE VRIES:  -- on copyright infringement.

6              MR. CLOERN:  Yes.

7              MR. DE VRIES:  In case that helps, I believe that --

8              THE COURT:  Can I give this back to you so I don't

9    have --

10             MR. CLOERN:  Sure thing.

11             THE COURT:  -- extra stuff?

12             Thanks a lot.

13             What should I look at then?

14             MR. DE VRIES:  Your Honor, I believe that counsel is

15   intending to refer your Honor to Exhibit 17, which is our

16   interrogatory response that goes through in painstaking detail

17   and explains --

18             THE COURT:  Wait one second.

19             MR. DE VRIES:  Yes, your Honor.

20             THE COURT:  Number 17.  I'm looking at the under seal

21   17.

22             MR. DE VRIES:  Exactly.

23             THE COURT:  Plaintiff's first supplemental objections?

24             MR. DE VRIES:  Correct.  And then you'll see there is

25   a big chart.  Most of the document is a chart where we go

                       ** ROUGH DRAFT **

 1    through source code line by source code line, and we show where

 2    in our source code and their source code they have copied our

 3    source code into their -- their code.  And that's what that

 4    chart shows and explains in detail.

 5              THE COURT:  Okay.

 6              MR. CLOERN:  So -- all right.  So, your Honor, this

 7    chart, which is 187 pages and has over a thousand rows of

 8    alleged instances -- so over a thousand rows, so a thousand

 9    separate instances of alleged copyright infringement.

10              THE COURT:  Okay.

11              MR. CLOERN:  And what Motorola is asking in

12    Interrogatory 17, for example, it says, if you contend that

13    Hytera does not infringe any Motorola copyrighted works,

14    explain the factual and legal basis for any such contentions,

15    including documents and all the people knowledgeable.

16              So what they're asking for are our full legal

17    contentions of why all thousand of these alleged instances of

18    copying are in fact why we win.  What is our defense?  Why is

19    this not copyright infringement?

20              So we have -- I have really two points on

21    that.  Number one, we have had about four weeks with the

22    Motorola code, and about three weeks with an expert.  And we

23    have -- our interrogatory response was due about -- we answered

24    our interrogatory -- this interrogatory with objections about

25    four weeks ago.

1    So in -- in four weeks they want us to provide our

2    legal basis for why we -- Hytera would contend that there is no

3    copyright infringement on over a thousand instances of alleged

4    copy.  So one, that is --

5         THE COURT:  Isn't that like a contention

6    interrogatory?

7         MR. CLOERN:  Well, your Honor, it is.  But what is

8    important is that -- I don't know about the rest of the folks

9    in this room, but I personally do not write or read source

10   code.  So whether this code is the same as this code is copied

11   is not something I know.

12        Now in -- in some of these examples, there are some

13   lines of code that are -- that are -- that say the exact same

14   thing.  Okay?  That doesn't mean that there is copyright

15   infringement.  Because any product today that -- especially in

16   products that are the same, competing products, they use tons

17   of open source.  Right?  So they go off on the internet,

18   developers will get open source modules, bring them in, use

19   them.  They are going to be the same.

20        In addition, in addition, both products here use Texas

21   Instruments chips that are very similar.  And there has got to

22   be all this software that interacts with that Texas Instruments

23   hardware, and it's -- most of it comes from Texas Instruments.

24        So and in fact in our code, they -- they initially

25   were focused on a number of modules from us.  And then we then

1    told them, well, this is actually source code we get directly

2    from Texas Instruments, and so they are not interested in it

3    anymore.

4           Well, the point is is just because code is identical

5    doesn't mean it is infringed or that -- or even that it is

6    Motorola's.  Open source or it could be from a supplier.

7    Happens all the time.  In fact, it happens every time.  There

8    is no product where that is not the case.  Unless people make

9    their own chips, and no electronic device maker does.  So

10   that's point one.

11          Point two, where -- there is a number of examples, and

12   we have put them in our brief, where we have no idea why the

13   two pieces of code are matched up.  And it even appears to

14   maybe be a mistake.  And there is a whole -- so that's the two

15   polar ends.

16          And there is a lot of stuff in the middle where some

17   words are used.  Some routines are used.  In some cases they

18   point to timer routines.  Well, it is not crazy that in source

19   code there would be timer routines.

20          So in order -- and all this we're getting from our

21   experts.  I don't come up with any of these arguments.

22          THE COURT:  I understand.

23          MR. CLOERN:  These are arguments we get from our

24   experts.  And in order to -- this is -- and there are tons of

25   cases.  We're happy to cite them.  And they are in fact cited

54

1    in our brief.

2         The way in which the copyright infringement defense

3    works is you have got to -- you have got to prove that the

4    copyright is ownership and validity.  Right?  You have got to

5    prove copying, which there is two buckets.  It is either

6    direct, so it is identical or it is indirect, meaning maybe

7    there is some suggestion that there is some similarities and

8    one was derived from the other but then changed some.

9         And then, finally, the biggest part is the originality

10   protectability.  So that Motorola's code is actually

11   protectable IP.  It is actually copyrighted.  It is not open

12   source.  That it is not from TI or ARM or whatever other

13   suppliers.  And that it is not just commodity generic code

14   doing basic things that everybody does.  Right?  So there is

15   some kind of a copyrightable expression there.  And in their

16   registrations, they tick the box that you only tick, and when

17   you tick it, it means that appreciable portions are not claimed

18   as copyright.

19        So in Motorola's copyright, the version that they

20   produced to us on their source code computer, from what we have

21   seen of their registration, they have informed the Copyright

22   Office that, quote unquote, appreciable portions -- that's the

23   statutory language -- are not claimed.  Okay?  Are unclaimable.

24        So one thing we have asked is that this -- all of this

25   code, these 10,000 lines they cite, is all that something that

1    they are even claiming a copyright on.  Because there is tons

2    of cases that say, if the plaintiff doesn't even claim to own

3    the copyright, doesn't even claim it is protectable expressible

4    material, then there is no point to respond to infringement on

5    it.

6            THE COURT:  Well, it is irrelevant.

7            MR. CLOERN:  Exactly.  But they won't even tell us

8    that.  We have asked them numerous times on meet and confers,

9    and they won't say it.  Maybe today they'll represent that all

10   of this is.

11           But even if they do, that's still -- that still

12   doesn't mean that we can turn around and magically provide all

13   of our defenses tomorrow.  Because experts have to analyze all

14   this code.  And when they do, what they run is what's called

15   this abstraction filtration process.  And what they have to

16   look at is they have to say, who wrote each module -- every

17   module has to be -- every piece of code, every instance on

18   here, will have to be looked at independently as a separate

19   infringement issue.  Who wrote it?  What function does that

20   code perform.  Is that a standard function?  Is it a function

21   used in the industry?  Is it a function that is patented by one

22   of Motorola's 200-plus patents on DMR technology?  Is it a

23   function that is called for by the DMR standard?  Right?  It is

24   like 4G or WiFi standard or whatever.  Right?  That's a public

25   -- most all these radios operate on technology, on a base

1    backbone of technology, that is public.  So they can all inter-

2    operate.  Hytera radios can talk to Motorola radios and so

3    forth.  Right?  So there is tons of stuff that is -- that is

4    public.

5            We'll have to go and compare it to all of Motorola's

6    patents.  Let's compare every one of these to the DMR standard

7    and see what's public.

8            We have to look and see even -- even if they are not

9    public in those areas, are they basic building blocks that all

10   programmers use?  And there is tons of cases that point this

11   out, just basic commodity operations that are not, you know,

12   expressions that are protectable by copyright.

13           This is -- this will take a long time for each one of

14   these.  There is no way -- we have got multiple experts, and we

15   have been looking at this and working on this.  And I have a

16   number of examples, and that's why I can talk to you about it

17   today and why I can tell you about the legal analysis.

18           This legal analysis takes months in any copyright

19   case.  And I have never seen one like this where they identify

20   over a thousand instances of copying and won't even confirm

21   that they have a legitimate copyright in any of this, other

22   than to point to their registration and say there is a

23   presumption that they do.  Okay?

24           So I doubt, your Honor, in their expert report that

25   they are going to spend the million dollars it is going to take

1  to analyze every one of these through the abstraction

2  filtration process, which is a very detailed analysis, and we

3  have written that up in our briefs, that requires actually

4  deposing the author of each one of these to ask -- to inquire

5  about whether what that author did was expressive,

6  non-commonitized, and subject to copyright protection.

7          So let's just say, let's just say, that we get -- even

8  let's say there is a half an hour on each one of these in a

9  deposition.  Okay?  We're talking 500 deposition hours.  So is

10  it Motorola's contention that we're going to do that?  How long

11  is the trial going to be, six months just on this.  Right?

12          This is not -- it is not practical.  And the

13  suggestion that in a couple weeks we can do this, when it would

14  take months of depositions just to get the information that we

15  need because we have to depose somebody on each one of these --

16          MR. DE VRIES:  But we actually --

17          THE COURT:  Let him --

18          MR. DE VRIES:  Oh, I'm sorry.  I'm sorry.  I thought

19  he was done.

20          MR. CLOERN:  I am not.  So if your Honor -- what we

21  can do right now, and what we have agreed to do, is to say

22  essentially what I have represented in court, that our

23  experts's initial preliminary spot check of these over one

24  thousand instances of alleged copying, that it appears that --

25  to these experts Motorola's code -- I'm sorry -- Hytera's code

** ROUGH DRAFT **

1  is independently developed, and any similarities are the result

2  of either using open source or from code from --

3  THE COURT:  Well, you won't know that unless you

4  analyze each one --

5  MR. CLOERN:  We don't know that.

6  THE COURT:  -- separately.  So you couldn't make that

7  claim in good -- you couldn't legitimately make that claim, it

8  seems --

9  MR. CLOERN:  That's right.  All we can say, your

10  Honor, is that these are the things that we are looking

11  into.  Whether -- whether it is a result of any similarities or

12  the result of TI code, whether the similarities are just

13  through -- because they are using similar functions that all

14  programmers use.

15  THE COURT:  And how many did you say, 10,000 or ten

16  million?

17  MR. CLOERN:  There are over a thousand rows here of

18  alleged copied code that result in over 10,000 lines of code.

19  So if your Honor ordered us to provide these

20  contentions, we don't know the -- I'm not (unintelligible)

21  anything.  We don't know the answers.

22  And when we get to our motion to compel -- we also

23  have a motion to compel saying this is abusive.  We can't

24  respond to all this.  And there is no reason to because we

25  can't do all this at trial.  They are never going to contend

** ROUGH DRAFT **

1  all this.  They have to decide what they want to allege is

2  copied and move forward on that.  They can't go through a

3  thousand separate instances at trial -- and, you know, unless,

4  for some reason, they are going to show me (unintelligible)

5  that says they are allowed to make allegations for which we're

6  not entitled to depose someone, then the copyright laws says,

7  you got to talk to the author of each piece of code to find out

8  if it is expressly copyright protectable or not.  Where did

9  they get it?  Did they pull it from open source?  Did they get

10  it from TI?

11      We'll find that out in the deposition.  I have done

12  tons of software cases.  I was just in Asia taking software

13  depositions, source code depositions for weeks.  That's where

14  you learn the answers to these things.  There is only so much

15  you learn from the code.

16      The person who wrote it tells you what they did, what

17  the function is, how this -- these hundred lines or whatever

18  fits into the tens of thousands of lines of the overall code.

19      THE COURT:  Well, they have an expert, I assume, that

20  will do that as will you.

21      MR. CLOERN:  We will.  But that expert will base its

22  opinion on --

23      THE COURT:  And (unintelligible) --

24      MR. CLOERN:  -- (unintelligible) deposition.

25      So, I mean, I don't think --

1   THE COURT:  Well, and their own review of things, I

2   suppose.  Not just what someone else has said, that wouldn't

3   be --

4   MR. CLOERN:  That's right, your Honor.  Well, they

5   will -- so typically how it works is.

6   THE COURT:  Your guys deny -- let's say deny

7   everything.  And you have an expert.  And if the expert simply

8   accepted their word, you would not be much of an expert.

9   Right?

10   MR. DE VRIES:  They have actually pled the Fifth is

11   the truth.

12   (Laughter.)

13   THE COURT:  Oh.  The expert?

14   MR. DE VRIES:  So actually I --

15   THE COURT:  Wait.  No, no.  Hold on.

16   MR. DE VRIES:  Oh, I'm sorry.

17   THE COURT:  Their expert has pled the Fifth?

18   MR. DE VRIES:  No.  When I asked -- when I confronted

19   Y.T. Kok, the --

20   MR. CLOERN:  That would be a tough situation, your

21   Honor.

22   THE COURT:  You can't do (unintelligible).

23   MR. CLOERN:  If my expert pleads the Fifth, I'm

24   probably just going to move on off the case.

25   THE COURT:  Yeah, I think so.

** ROUGH DRAFT **

```
 1              MR. DE VRIES:  When Y.T. Kok, who left Motorola, and

 2     while he was still working at Motorola was also working at

 3     Hytera --

 4              THE COURT:  Yeah.

 5              MR. DE VRIES:  -- and fielding requests for our

 6     confidential information, when I showed him source code that he

 7     wrote that was clearly copied from the Motorola code and asked

 8     him --

 9              THE COURT:  He took the Fifth.

10              MR. DE VRIES:  -- the circumstances, he pled the

11     Fifth.

12              THE COURT:  Well, that's better than the expert.

13              MR. DE VRIES:  It is just --

14              THE COURT:  (Unintelligible).

15              MR. DE VRIES:  WHAT it actually shows, your Honor, is

16     that this idea that we're somehow going to be deposing and

17     getting all this information from Hytera employees about what

18     they were doing here, it is not going to happen.  They are all

19     --

20              THE COURT:  Well, it is theoretically possible.  You

21     wouldn't do it, but -- but they have to do the work.  Whether

22     you follow up on it is quite aside the point from their

23     arguments.

24              MR. DE VRIES:  I guess, there is one other.

25              MR. CLOERN:  Our presentation --
```

** ROUGH DRAFT **

1              MR. DE VRIES:  Oh, I'm sorry.

2              MR. CLOERN:  -- you kind of jumped in there --

3              THE COURT:  He got so excited about the --

4              MR. CLOERN:  I understand.  So, your Honor, Hytera,

5    me, I will sit down or Mr. Stringfield, and we'll depose a

6    Motorola engineer.  So they have got the issue

7    backwards.  We'll depose a Motorola engineer.  The Motorola who

8    authored the code.

9              The issue is is Motorola's code subject to a

10   copyright?  That's the issue.  Does it --

11             THE COURT:  It is only half the issue.

12             MR. CLOERN:  It is.  That's half the issue.  But to do

13   that, we will have to depose the authors of this code or a

14   30(b)(6) notice who has gotten up to speed by talking to the

15   authors of all this code, which they won't even tell us who the

16   authors are because they cut that off of what they produced to

17   us.  So that's fine.

18             But we'll have to go through and take the

19   depositions --

20             THE COURT:  Well, if they have to do it, why shouldn't

21   you have to do it?

22             MR. CLOERN:  So --

23             THE COURT:  What's sauce for the goose is sauce for

24   the gander.

25             MR. CLOERN:  We -- what our position is is that it is

** ROUGH DRAFT **

1  absolutely crazy for the parties to take depo- -- for us to

2  take a deposition on a thousand -- on all thousand of these for

3  a month of Sundays in a row.  I mean, talk about an extension

4  for discovery --

5            THE COURT:  Forever.

6            MR. CLOERN:  -- there will be one.  There is not

7  enough time to do this, nor is it necessary because we can't do

8  it at trial.

9            And as far as the taking the Fifth, I do just want to

10  address that for a minute.  It does not mean that Y.T. Kok

11  stole source code.

12            THE COURT:  Maybe.

13            MR. CLOERN:  It -- the --

14            THE COURT:  Well, it is not for you to determine, it

15  is for the jury to determine what --

16            MR. CLOERN:  I agree.

17            THE COURT:  -- what the assertion of the Fifth -- what

18  value, if any, it has.

19            MR. CLOERN:  Exactly.  I agree one --

20            THE COURT:  And that's pretty -- that's pretty

21  compelling evidence to lay people.

22            MR. CLOERN:  I understand, and that's something that

23  we'll --

24            THE COURT:  You will deal with.

25            MR. CLOERN:  -- have to address at trial.

1          THE COURT:  Right.

2          MR. CLOERN:  That's a hurdle for us to overcome,

3     absolutely.

4          But it does not mean that they walked out the door

5     with a hard drive or a suitcase full of source code.  And in

6     fact that -- we haven't found that.  If we did, they would know

7     about it, and we'd produce it.

8          We went to China for a week.  We poked around.  We

9     talked to everybody.

10         THE COURT:  But that is all evidentiary.  And it

11    really isn't for me, and it should not, I would think, impact

12    on the contours of what you can and -- or they can and

13    shouldn't be allowed to do.

14         MR. CLOERN:  I agree with that, your Honor.  And I

15    think what I am -- what I have done is really addressed t he

16    point that they have made that I haven't pointed out, which is

17    what we hear, what we have heard in meet and confers is, well,

18    it is not our problem that your clients stole so much source

19    code.  Right?  Because when we say this is too much, they say,

20    well, too bad, he shouldn't have taken so much.

21         THE COURT:  He shouldn't taken so much.

22         MR. CLOERN:  Right?  And our response to that is we --

23    we --

24         THE COURT:  You didn't take any.

25         MR. CLOERN:  Right, exactly.  Exactly.

1          And in our brief, and I'll -- and we brought some

2     examples of source code today.  If you want to look at it --

3          THE COURT:  No.

4          MR. CLOERN:  -- we're happy to -- I don't like looking

5     at source code either, so I don't blame you.

6          THE COURT:  I can read source code less than you

7     can.  You can do infinitely more than I have.  I would just be

8     a lot of whatever --

9          MR. DE VRIES:  I actually think you'd see quite a bit.

10    I think you actually -- you can recognize that the --

11         THE COURT:  I would be would be -- if anybody is

12    ill-equipped -- not just me as a human being, me as an entity,

13    with no training, no nothing, I wouldn't know what I was

14    seeing.  And what seemed to me hugely significant, would have

15    maybe no significance.

16         MR. CLOERN:  So --

17         THE COURT:  I couldn't testify as a witness, I

18    wouldn't qualify.  I wouldn't have any expertise or knowledge

19    or background or training or anything, so --

20         MR. CLOERN:  Well, your Honor, I can wrap up now and

21    just say, there is -- there is really, at a broad level, two --

22         THE COURT:  So is your argument essentially a

23    relevancy argument or burden argument or both?

24         MR. CLOERN:  It is both, your Honor.  It is definitely

25    both.

1    So number one, the burden.  There is over a thousand
2    instances of alleged copying.  And there is two -- there is two
3    aspects to the burden.  One timing --
4    THE COURT:  How many people -- may I ask you?  How
5    many people are involved in the alleged copying or can't you
6    tell from what you are looking at?
7    MR. CLOERN:  So the 10,000 lines of code that are
8    represented by this chart --
9    THE COURT:  Right.
10   MR. CLOERN:  -- we don't know how many Motorola
11   authors there are.  We have asked that.  And our interrogatory
12   that is outstanding that is due on November 30th, it is our
13   Interrogatory Number 7, asks -- there are subparts A through N.
14   And this was taken directly from the copyright case law that
15   says, this is the information that you have to know in order to
16   determine whether or not the code is protectable.  Right?  This
17   is taken directly from the case law.  Who is the author?
18   What's the function of --
19   THE COURT:  Right.
20   MR. CLOERN:  -- the code?  What did it do?  Blah,
21   blah, blah.  That's all this stuff.
22   So until we get this information, we don't have what
23   the cases say is necessary to actually make our legal
24   contention because we don't have that information.
25   And even if we had, it is still going to take us

1    months to come up and run this analysis on all thousand -- on

2    all thousand line items here of buckets of code, which we're

3    not even going to know until we get the deposition.

4          So now -- and I also -- so the -- so there is a burden

5    in terms of timing.  We can't get you an answer or them an

6    answer in a couple of weeks.  It is just not possible.  It is

7    like asking me to go out and build the Sears Tower by

8    Christmas.  I can't do it.  It is not possible.  There is too

9    much work.

10         And, number two, it is not necessary.  It is

11   burdensome, because we're never going to do all this at

12   trial.  And if we do, we are entitled to deposition on each

13   copying allegation, and that's going to take --

14         THE COURT:  Let me ask this.  Are they going to do it?

15         MR. DE VRIES:  Yes, your Honor, because --

16         THE COURT:  Well, wait a second.  Just a minute.

17         MR. DE VRIES:  Okay.

18         THE COURT:  So if they do it, and you don't, you lose.

19         MR. CLOERN:  So they don't -- I don't -- they don't

20   have to depose their own engineers.

21         THE COURT:  Of course not.

22         MR. CLOERN:  So, no, that -- but -- I mean, I

23   suppose --

24         THE COURT:  They have got the burden of proof.  So

25   they're going to have to show the very things (unintelligible)

1    a lot with you that you say are difficult, burdensome, maybe

2    not require -- whatever.  They are going to have to, in effect,

3    do it one way or the other.  Right?

4         MR. CLOERN:  Well, that -- your Honor makes a very

5    great point because that should be what they need to do.  They

6    have the burden.  And all they have done is say, here's our

7    code, here's some code from Hytera that is somewhat

8    similar.  They haven't done all the things they need to do to

9    have a full infringement --

10        THE court:  So if that is all that they show -- and I

11   am really asking because I don't know -- and all that they show

12   -- and you then demonstrate that that really is not enough, you

13   win by default almost because they haven't proven their case.

14        MR. CLOERN:  So let's say, for example, your Honor --

15        THE COURT:  I mean, they showed that somebody, I

16   assume, stole code, some code when they left.  That strikes me

17   that they will be able to do superficially, at least.

18        And then I assume that they will have to show that

19   what was taken is protectable.  And then what was protectable

20   is in your code, in order to even get close to winning.

21        MR. CLOERN:  So, your Honor, here's what they are

22   going to do.  They're going to say, we don't have any evidence,

23   any direct evidence, that Sam Chia, G.S. Kok or Y.T. Kok walked

24   out the door with a hard drive (unintelligible) --

25        THE COURT:  They have circumstantial evidence.

1          MR. CLOERN:  That's right.  They're going to say, we

2    have -- the evidence is --

3          THE COURT:  Circumstantial evidence is legally every

4    bit as good, and in many cases, far more compelling than direct

5    evidence.

6          MR. CLOERN:  I'm not disputing that at all.

7          THE COURT:  Okay.

8          MR. CLOERN:  What I am saying is that that's exactly

9    where they're going to go.  And they're going to say in -- so

10   they are going to prove it by comparing the code.

11         And, for example, they will point here, and they will

12   say, the ten lines here are --

13         THE COURT:  (Unintelligible).

14         MR. CLOERN:  -- to the 10 lines here.  And for us to

15   come back and address that, we have --

16         THE COURT:  No, no.

17         MR. CLOERN:  -- to (unintelligible) --

18         THE COURT:  But what -- I am just -- honestly, so you

19   say to the district -- that's what they prove.

20         You make the pitch to the district court that you just

21   made to me, and it is supported by case law, which I assume it

22   is.  Do you then not get a directed verdict at the close of the

23   plaintiff's case because they haven't proven -- they have

24   proved a similarity or a seeming identity, and that isn't

25   enough I think you're telling me.  I'm just -- honestly I'm

1    just asking.  I'm not --

2           MR. CLOERN:  So, your Honor, that is -- that is the --

3           THE COURT:  -- your view anyway.

4           MR. CLOERN:  That would be our view.

5           THE COURT:  Right.

6           MR. CLOERN:  But I don't think -- look, I don't -- I

7    would not sleep any night between now and trial if I was going

8    to just go into court and say, well, we don't really have any

9    evidence of our own, they are going to put on expert on --

10          THE COURT:  Well, no, you'll have -- you'll have lots

11   of --

12          MR. CLOERN:  We didn't meet their -- they didn't meet

13   their burden --

14          THE COURT:  I'll have all sorts of evidence.  I'm not

15   disputing that.  Whatever -- you simply say, oh, this is great,

16   we're not going to put on our treasure trove of information

17   because they have done nothing.

18          And the district court says, you know what, I think

19   you're right.  You never have to get to all the stuff I know

20   you have got.

21          I'm just sort of thinking out loud with you.  It seems

22   to me they would lose.

23          MR. CLOERN:  As a matter of trial, I think you're

24   absolutely right, your Honor.  But what we're talking about

25   today is Motorola wants us to provide our real contentions

** ROUGH DRAFT **

1   about whether every single one of that's rose represents legal

2   infringement or not.

3          And in order to do that, even where there is identical

4   code, we have to go and say, is that open source?  Is it TI?

5          THE COURT:  Well, I --

6          MR. DE VRIES:  Et cetera.  It is just -- it is months

7   of work.

8          THE COURT:  Go ahead.

9          MR. DE VRIES:  I think I can very simply get us to a

10  resolution here.  And I think I just need to make two points to

11  do it, Judge.  Two brief points.

12         The one is the characterization that counsel is making

13  of this code and our contentions about it is not a correct way

14  to look at it at all.  And I want to explain -- well, I

15  actually wish I had an a novel because it would kind of look

16  better.

17         But if you had a thousand page novel like this, which

18  would be like our source code, and you looked at a novel that

19  his client put together and you said, see that line?  It is

20  identical to that line.

21         And see that line, it is identical.

22         And that one, there.

23         And then they add a couple of words, but then see that

24  one, it is identical to that.

25         So we're not making 10,000 copyright contentions.

** ROUGH DRAFT **

1    We're saying, see this thing, we're going to very specifically

2    show you where the text is identical.  They stole this.  They

3    walked out the door with this.  They put it in their products.

4    They're telling the Court they don't know what we're talking

5    about in the motion to dismiss that's being fought.  But that's

6    what we're talking about.

7           Not 10,000 copyright claims.  It is a copyright claim

8    for stealing this.  And we're telling them exactly this.  See,

9    here's a line, that's -- there is a line.  There is a line.

10   There is a line.  There is a line.  So we have done that.

11          And what is the only other point I want to make?  It

12   is that are they going to provide their contentions in fact

13   discovery or aren't they?  I feel like that I have litigated

14   this issue in many different contexts, you know, in many

15   different courts, and I often hear defendants say, we shouldn't

16   have to do it now.  We should wait until experts.  We don't

17   need to provide it.

18          What we think is they ought to be compelled to provide

19   whatever evidence they have, whatever contentions they know

20   about right now.  If they have a proper basis to supplement

21   later, they can.  The rules permit that.  But we shouldn't have

22   to wait indefinitely for that.

23          And I think that the final thing I'll say is, what

24   they tell your Honor in the opposition brief is that this is

25   moot.  That they are going to provide a response on Friday,

** ROUGH DRAFT **

```
 1    right, to these interrogatories, including this one.  What I
 2    think we now hear is exactly, as I feared, we're not going to
 3    get a response.  In fact, they don't want to ever give a
 4    response.
 5            THE COURT:  What's going to come on Friday?
 6            MR. CLOERN:  So, your Honor, we believe that Friday
 7    will be helpful, and here's why.  So all we can say right now
 8    is essentially what I have discussed in court, is that the
 9    defenses we are looking into are the ownership and validity,
10    whether it is direct or indirect allegation, and the
11    protectability under this abstract filtration test.  And then
12    there is sort of two aspects to that, the -- it is a French
13    term.
14            How do you say it again?
15        (Discussion off the record.)
16            MR. CLOERN:  Sine faire (phonetic).  I keep saying it
17    wrong.  I'm from Kentucky, I apologize.
18            Sine faire (phonetic) and the merger test.  And that's
19    the analysis we're running.
20            Now what they won't -- and that's all we can say right
21    now because we're not done with it.  And for all the reasons I
22    have said, it is going to take a very long time.
23            So what they will get out of it is they are not going
24    to see fact-based defenses there, like there is an implied
25    license.  They're not going to see that.  Right?
```

```
 1          Fair use, they're not going to see that.  That's a
 2   major defense.  It is a huge part of the whole big job of
 3   copyright case that went back and forth, up and down the
 4   appellate courts for years.  Our fair use defense.  They are
 5   not going to see that.  That should make them feel pretty good.
 6          We don't have that -- we're not -- we're not
 7   contending that defense right now.  Might something come up in
 8   discovery that tells us there is one?  Sure.  But right now we
 9   don't have one.  So they will at least know that.
10          They will know the analysis that we are
11   undergoing.  They won't know the answer because we don't know
12   it.  I can't give what I don't know.  And as your Honor said,
13   if I tried to guess and speculate, well, it looks like it is
14   probably -- you know, any similarities are the result of
15   responding to the same APIs or responding to the same TI
16   hardware or ARM hardware or something, but we're not sure
17   yet.  I don't know that that's valuable.  Happy to say it
18   because that's what we think.  But we have done that analysis.
19          THE COURT:  What are your experts going to do
20   vis-a-vis what is asked for?  Not the interrogatory itself, but
21   basically what they're looking for and what you're looking for.
22          Aren't -- isn't all this going to be explored in
23   the -- in the expert disclosures and reports?
24          MR. CLOERN:  That's exactly right, your Honor.  And so
25   what I asked them at the least meet and confer, I said, what
```

1    are you guys -- I explained all this in great detail.  And I --
2    everything I have said today, I have told him in the prior
3    meet and confers.
4         And I said, tell us what you want.  And I told them, I
5    said, here's what I can give you.  Here's what I can
6    explain.  But as it -- beyond that, if you want the actual
7    answer to the abstract filtration test, that's only once our
8    experts is done with it.
9         And, you know, what do you want short of a full expert
10   report on all thousand of these instances, which I said I'm not
11   giving you because it is not fair.  There is a reason expert
12   dates are due in March or April, whatever it is.
13        THE COURT:  Contention interrogatories don't always
14   await experts.
15        MR. CLOERN:  That's right.  It is something less.  And
16   what I asked is I said, what -- short of an expert report --
17   what do you want?  And they said, Mr. Brown said, that's your
18   problem.  I'm not telling you.
19        They refuse -- what they want is to run us to
20   death.  They want to make my experts rich.  And they want us to
21   do all this work and make us look like we're not doing
22   something or not responding to discovery when in fact we have
23   absolutely are.  And I have represented that all we can do --
24   and I would leave to hear from them if they think there is
25   something else that they would like to hear short of an answer

** ROUGH DRAFT **

1  on the abstract -- on the abstraction filtration test that we

2  cannot -- that it will take months to provided.

3           And I would also like to hear from them, how we're

4  going to get Motorola depositions on all thousand instances of

5  this code --

6           THE COURT:  Are your expert reports going to address

7  every aspect or specification of what been taken from you

8  by -- according to you, your guys?

9           MR. DE VRIES:  Yes, absolutely.  Absolutely.

10           THE COURT:  Okay.

11           MR. DE VRIES:  And there are -- and I guess I want.

12  This is an important point.  And I think that we actually

13  talked about this when we were talking about whether they had

14  to answer their trade secret misappropriation

15  contentions.  That was a fight that we had some time ago.

16           There are facts here.  Counsel can go talk the

17  engineers who wrote this code.  And they can say, here's what I

18  would do, if it was my client.

19           See about 3000 lines of code that look identical, they

20  are exactly the same, and they have laid it out in 30 or 40

21  pages here.  Why is it identical?  Please tell me, Mr. X or

22  Ms. Y?  And then there is only going to be two things that

23  happen.  One, which is which for Hart, but not all of the trade

24  contentions, they -- they saw they won't answer because of fear

25  of criminal prosecution on Fifth Amendment grounds or something

1    like that.  I think what they specifically said was, we haven't

2    heard back from them yet.  And then your Honor had us enter an

3    order, and then they responded that they couldn't get

4    information from certain employees.

5            Or the employees --

6            THE COURT:  Well, did the corporation take the Fifth?

7            MR. DE VRIES:  No, they can't.  And that's right.

8            And so then -- but what if the engineers say to them,

9    counsel, let me tell you, this is the TI code from -- we don't

10   any of that is the case, but we disagree with those

11   contentions.  But the engineer says, let me tell you, I got

12   this from an open source.  We don't think that's true.  But

13   then they can come and tell us as a factual matter,

14   investigating this matter on behalf of the company --

15           THE COURT:  But did they have to go through --

16           MR. DE VRIES:  -- here is (unintelligible).

17           THE COURT:  -- have to go through ten thousand lines

18   of code.

19           MR. DE VRIES:  But it is -- oh, but it is literally

20   like saying, it is the source code, and we're showing.  Just

21   like in a book.  Here's this line.  It is the same.  This line

22   it is the same.

23           What you do is you say --

24           THE COURT:  But I am just saying 10,000 strikes me as

25   a number as a lot.

** ROUGH DRAFT **

1    MR. DE VRIES:  It is the number of lines that are in

2  the code that it is going to be our obligation to show the

3  jury, we're absolutely going to show the jury, because it is

4  not --

5    THE COURT:  As to all 10,000?

6    MR. DE VRIES:  Yes, absolutely.  And -- and expert

7  testimony, just like in any other instance of large volumes of

8  data, is -- is useful and a reasonable way to present that to

9  the jury.

10    And what you will -- what you would see, your Honor,

11  if you looked at this code is it is not as if you're going

12  through and looking at one and then looking -- thinking about

13  it in isolation.  What you see is, hey, all this code that was

14  written by this one engineer, there are pages and pages and

15  pages of it that are identical in large part.

16    So I'm going to ask her -- her, in this circumstance,

17  why is it that all this code is identical?  And either she's

18  say, I won't talk to you because I have a criminal defense

19  attorney and I can't or here is the answer.  I copied it from

20  Motorola's code that Y.T. Kok brought with him on a hard drive

21  when he joined our firm or we got it from TI or it is open

22  source.

23    There are facts here that they can provide.  And if

24  they don't want to provide those facts, then they should be

25  precluded from doing it later.

1          What we are concerned about is a circumstance where we

2     put on our proof, we provide our expert testimony, and then,

3     finally, either at trial or in their expert reports in the

4     summer of next year they say, guess what, it was actually taken

5     from open source code.  Here is an engineer.  She's telling us

6     now that all these lines that she put into these source -- you

7     know, five or six source code files, she took them from open

8     source.  Those are facts.  And we believe that we should be

9     permitted to get them now.

10          We have provided -- we have done -- we have gone above

11     and beyond to say, here's exactly what we're talking about.

12     They said they didn't know.  They said, we don't know what you

13     are mean copy- -- what do you mean copying?

14          And we said, look, all of these lines are the

15     same.  It is impossible that they were randomly the same.  It

16     is obvious, from our perspective, that the circumstantial

17     evidence shows you simply walked out the door with it.

18          But there is an appropriate part for experts.  But

19     they asked us a contention interrogatory for our

20     positions.  Right?  That's why we're providing this.  So why is

21     it is that we should have to come forward, provide our case,

22     the facts supporting our case, and they should get to put off

23     indefinitely --

24          THE COURT:  They shouldn't.  And you asked them a

25     contention interrogatory -- well, that's what this is.

** ROUGH DRAFT **

1    MR. DE VRIES:  It is.  I mean, we have asked them some

2  very basic ones.  Like they characterized Interrogatory 16 as a

3  contention interrogatory.  It actually says, when did you

4  receive and copy our code, and how and tell us the facts.

5  Those are -- that's purely facts.

6        Seventeen is definitely a contention.  But we're

7  asking for no more than they have asked for from us and that we

8  have provided.

9        Tell us the facts.  If there is something to

10  supplement with later, and it is appropriate, they can do that.

11        MR. CLOERN:  Well, I think I'll agree with something

12  you said, and later provide it if you want me to -- before we

13  all forget it.  I just want to --

14        MR. DE VRIES:  Then let's pick a date --

15        MR. CLOERN:  I'll even (unintelligible) agree.

16        MR. DE VRIES:  -- and let's.  And if you need more

17  time than Friday, then we'll do -- let's do it.

18        MR. CLOERN:  So I think what I just heard him say is,

19  not for the Motorola side, right, because we have -- we're

20  going to have legal contentions about whether all the Motorola

21  code is protectable or copyrightable --

22        THE COURT:  Right.

23        MR. CLOERN:  But on these --

24        THE COURT:  No, he wants to know about --

25        MR. CLOERN:  He wants to know about the Hytera side.

** ROUGH DRAFT **

```
 1              THE COURT:  Right.

 2              MR. CLOERN:  Right?  He wants to --

 3              THE COURT:  I think.

 4              MR. DE VRIES:  That's right.

 5              MR. CLOERN:  He just --

 6              MR. DE VRIES:  It asks for what your infringe -- your

 7    contentions on your infringement of the code.

 8              THE COURT:  Right, not the left side of the page.

 9              MR. DE VRIES:  Not every single one of issues.

10              MR. CLOERN:  No, no, he asked for the legal basis for

11    our non-infringement contentions.  And our non-infringement

12    contentions have a whole lot to do with their code.  And it is

13    all expert and all legal.  But if that's not -- if what they

14    are willing to accept is something factual that we can do right

15    now, we can go and we can say, okay, you know, who authored

16    this code and, you know, where did it come -- is it open source

17    or whatever?

18              THE COURT:  Well, everybody wants --

19              MR. CLOERN:  Okay.  That we can do.

20              THE COURT:  I think.

21              MR. CLOERN:  I have asked that --

22              MR. DE VRIES:  Yes.

23              MR. CLOERN:  I have asked that for weeks.  Never heard

24    it until just now.  But you know what, that we can do.

25              I do want to preview one thing though.  I want to
```

** ROUGH DRAFT **

 1  preview one thing, that this -- this code was written in 2008,

 2  '9 and '10, that's when it was developed.  It was first

 3  released in 2010.

 4           THE COURT:  And people aren't there.

 5           MR. CLOERN:  A lot of them aren't there anymore.  So

 6  we will -- we will investigate as to all these instances and

 7  see if there is somebody -- a lot of this is going to be Y.T.

 8  Kok, who is taking the Fifth.  And we'll see if other people

 9  may know.  All right?  So we'll investigate every one of these

10  to see what we can find out.

11           But I do want to address one thing on Y.T. Kok taking

12  the Fifth.

13           THE COURT:  On every single thing they have asked for?

14           MR. CLOERN:  We think that's burden -- so we think --

15  the burden -- that is -- so there is two issues.

16           THE COURT:  It is definitely burdensome.  Is it overly

17  burdensome?

18           MR. CLOERN:  I think --

19           THE COURT:  Not probably in a case like this.

20           MR. CLOERN:  So, your Honor --

21           THE COURT:  But burdensome for sure.

22           MR. CLOERN:  So there is two issues.  One, what is

23  even possible to do beyond some number of months in the future.

24  And providing our legal basis, based on expert or things that

25  are required at this point isn't.

```
 1            This factual inquiry is something that at least we can
 2   do in the very near term.  Now we do think is it is burdensome,
 3   and we think there is a ton of fluff in here, and that's in our
 4   brief.  We pulled out three files and showed the comparisons
 5   that they have nothing to do with each other.  So we think
 6   there is a lot of code here that we absolutely should not be
 7   having to look into, especially when they won't even say that
 8   they own this stuff.
 9            MR. DE VRIES:  Well, actually --
10            MR. CLOERN:  Right?
11            MR. DE VRIES:  -- did -- let me say it.  We have
12   actually said it in our briefs.  I just want to correct it
13   again.  I did it earlier, but you said it multiple times, so I
14   need to correct it.
15            Yes, we own it.  We have explained why in our
16   opposition to the motion to dismiss.
17            THE COURT:  You know, I don't think there is anything
18   in their presentation ever they didn't own -- they didn't claim
19   ownership.  I don't know who owns what.  But they are at least
20   claiming you're the -- you the people who are infringing, and
21   they own -- otherwise you couldn't have infringement or they
22   wouldn't be the right party.
23            MR. DE VRIES:  That's right.
24            MR. CLOERN:  That's a sleight of hand.  So --
25            THE COURT:  Really?  He's awfully good at it.
```

** ROUGH DRAFT **

```
 1            MR. CLOERN:  There is -- yes, total sleight of hand.

 2            There are two separate issues.  Ownership is one

 3  issue --

 4            THE COURT:  Well, they -- here.

 5            MR. CLOERN:  -- and --

 6            THE COURT:  Ownership they claim.

 7            MR. CLOERN:  Yep.

 8            THE COURT:  Without question.

 9            What's the second one?  I don't see any sleight of

10  hand.

11            MR. CLOERN:  Whether it is protectable by copyright.

12            THE COURT:  Well, they say --

13            MR. CLOERN:  And that is a whole separate issue.

14            THE COURT:  They say it is.

15            MR. DE VRIES:  Yes, we have explained it in our

16  opposition brief, and in -- with -- in particular reference to

17  this issue, which he -- they keep bringing up.  They say, you

18  say that there were certain aspects of the code that you know

19  may have been developed by third parties.  I'm paraphrasing

20  what they were saying.  They're referring to a certain part of

21  the copyright explanation -- application.  We explained in our

22  opposition brief exactly what our position is about that, about

23  why we own it, about why it is protectable.  And we cited the

24  case law about it.  But none of this is really the point.  I

25  mean --
```

** ROUGH DRAFT **

```
 1          THE COURT:  Look, if they say it is protectable, and
 2   they say they own it, and they say they have the appropriate
 3   statutory interest, they have to prove it at trial.  That's
 4   sort of the end matter for our purposes, unless you're going to
 5   claim before the district court or I -- like maybe here -- that
 6   they don't.  But that's -- I can't resolve that
 7   (unintelligible).  I have to -- we take what they say as true
 8   for purposes of discovery pretty much.  Otherwise nobody who is
 9   a plaintiff would ever get past first base.
10          MR. CLOERN:  Well, that's -- that is true as a general
11   matter because discovery is about providing information --
12          THE COURT:  I know.
13          MR. CLOERN:  -- and not about proving agrees.  Agree
14   with that totally.
15          THE COURT:  Right.
16          MR. CLOERN:  But in the context of infringement
17   contentions on which they have the burden, they have to tell us
18   why they think they have -- if they want a contention from us,
19   they have to give their contention.  They have only shown what
20   they think is copied either directly or indirectly.  They
21   haven't shown that this think this is all protectable.
22          THE COURT:  Well, it would strike me then that's
23   strictly a matter for the district court to say their complaint
24   is deficient as buttressed by their -- their discovery
25   requests.  They haven't alleged the minimal amount necessary to
```

```
 1    get past a motion to dismiss, I think.

 2           If they can't say they own something -- what if I

 3    owned the code?  It was all mine.  And they are going to accuse

 4    you of stealing the code that I own.  They don't even a case

 5    against you.  I mean, they have to have something in the brief

 6    -- sorry -- in the complaint which gets them past the first

 7    hurdle.  And ownership of the code, I would think, is the

 8    prerequisite to this kind of a case.  But you tell me if I am

 9    wrong.

10           MR. CLOERN:  Well, the -- no, your Honor, we agree

11    with that.  And all I'm saying is if they haven't given us

12    their contention on why their code is original and protectable,

13    we shouldn't have to give our contention on why it is not.

14           THE COURT:  Oh, I think there are two different

15    things.

16           MR. DE VRIES:  Yeah.  Oh, we have --

17           THE COURT:  I do think there are two different things.

18    Otherwise we -- we're pretty well along in terms of discovery.

19    And if you guys -- not you -- but if your side hasn't done that

20    as the very first thing, I would be flabbergasted that that was

21    an omission.

22           I mean, whatever reason, you're past that.  And they

23    simply want to know what they want to know.  It does strike me

24    that however many lines of code is a lot.  And doing things

25    line by line is a lot.  But it is not that they are not
```

```
 1    entitled to the information.  You have said they are.

 2             MR. CLOERN:  Your Honor --

 3             THE COURT:  The question is how do you get it.  There

 4    is a lot of contention cases that say -- and they go varying

 5    ways -- you have to wait until expert discovery.  It is too

 6    soon.  They are not very well reasoned.

 7             Others they say, well, contention interrogatories,

 8    that sort of anticipate what the discovery -- what the experts

 9    are going to say is permissible.  It is sort of a -- a toss up.

10             And how are we even doing it here?  I don't think they

11    have to wait for you indefinitely.  And they get to prove their

12    case through discovery.  You can't pick and choose how they go

13    about doing it, anymore than they can do -- do the same to you.

14    They can't.

15             So question is how are you going to answer what's

16    being asked?  And there should be some accommodation.  I know

17    that sounds terrible.  But it does -- you do make it clear that

18    there is a huge amount of work to do.  If somebody takes the

19    Fifth or you can't answer because you can't find somebody,

20    well, that's your answer.  And they will be tickled to death

21    with that answer.

22             MR. CLOERN:  I'm sure they will, your Honor.

23             THE COURT:  They'll love it.

24             MR. CLOERN:  So, you know, on --

25             THE COURT:  So you tell me how you think you can
```

** ROUGH DRAFT **

88

1   answer this with the least muss and fuss possible if it will

2   give them the answers?  Because I think they're entitled to

3   them.  In exactly the same way that you're entitled to know

4   what their -- you guys have been claiming all along, I think,

5   that they haven't told you what their trade secret is.  Well,

6   maybe that's burdensome or hard.  I think it is sort of the

7   most indispensable thing in a trade secret case to tell

8   somebody your trade secret.  I think normally it is pretty

9   easy.  Here it is a little hard because none of us -- you guys

10   -- I mean, an exception to you guys, but few people can do

11   this.  You say you can't read code.  But you know almost

12   everything there is short of that.  I mean, you have been

13   involved in scores and scores of cases.

14        So you tell me how you're going about -- you're going

15   to go about giving them the information.  If it gets amplified

16   or repeated in the experts's reports, where I think most of

17   that did stuff will lie, so be it.  But you have got to be able

18   to tell them something --

19        MR. CLOERN:  So I have --

20        THE COURT:  -- in a general kind of way.

21        MR. CLOERN:  Sorry.  I have an idea.

22        THE COURT:  Okay.

23        MR. CLOERN:  I have had an idea I would like everyone

24   to consider.  So I think what we can provide and would be fair

25   to provide, I totally get it, I guys don't want to show up at

1   trial and you don't want to hear, hey, guess what, we found the

2   person who wrote this code.  And they are going to tell you why

3   they didn't get it from Motorola.  Right?  That's what you

4   don't want to be surprised by.

5        THE COURT:  I don't think that will happen.  A judge

6   wouldn't let somebody testify.

7        MR. DE VRIES:  Right.  That's one thing that we are

8   interested in.

9        MR. CLOERN:  So we -- we can --

10       THE COURT:  Well, that would be -- I wouldn't let you

11  testify.

12       MR. CLOERN:  We can say -- we -- they have -- they're

13  entitled to notice.  If we are going to take a position, right,

14  that we have witness or --

15       THE COURT:  No, no, that's not true.  They are

16  entitled -- and I understand where you're going.  That's really

17  nice, but that's not what we're here about.

18       They have asked you know, who made this coffee

19  cup.  And they have a claim that somebody on your end

20  manufactured coffee cups that infringe their, let's say,

21  patent -- it is not patent -- but their trademark.  They have

22  the right to know certain things.  And you have the obligation,

23  as hard as it may be in may be in major league discovery in the

24  federal courts, to respond.  If you don't like what they have

25  asked for and you think it is terrible -- I'm sorry, it is the

 1    life we have chosen.

 2           MR. CLOERN:  So -- but, your Honor, I think we're in

 3    the same place, because what I was saying is that we will

 4    investigate the -- and have been investigating --

 5           THE COURT:  Well, how long have these interrogatories

 6    been outstanding?

 7           MR. DE VRIES:  Two months.  Two months.

 8           And to be clear, we would like all of their

 9    contentions that -- you know, I think that where counsel is

10    going is some very narrow scope here.  We'd like to know if

11    their witness has that information.  But if they have other

12    contentions that they reasonably can make now and they don't

13    need to, you know, do some -- further investigation to

14    supplement, we'd like to know them now, just like in a patent

15    case.

16           THE COURT:  I think that's right.  If your contention

17    is, as you explained to me, this is -- I'm sure I'm not saying

18    it right.  But in the public domain.  It has been used

19    before.  It is being used by -- it was used long before

20    Motorola was even on the scene, which I know isn't true.  Well,

21    I don't see that is so hard to say it.

22           To me I couldn't get through one line of that code.

23    But somebody who is an expert -- I don't mean expert.  But

24    somebody in your shop who really knows what code is could do

25    this not easily, but with relatively simplicity.  I think they

1    are entitled to it.

2           MR. CLOERN:  Thousands of hours, your Honor, is what

3    we have been told by our experts it would take to go on the

4    internet and search all the open source, all the other TI.

5    We'll have to get third-party discovery of TI.  That's fine.

6    But it will take thousands of hours.  And so we can't -- there

7    is no way we can answer whether this -- whether the

8    Motorola -- whether our legal contention on whether all this

9    code is legally protectable under the abstraction and

10   filtration process --

11          THE COURT:  Oh, they are not asking -- I don't think

12   they are asking for it legally.  That's -- that you shouldn't

13   have to answer.

14          But where you got the stuff -- I don't think that they

15   are entitled to know your case in that sense.  Although

16   contention interrogatories can embrace and they -- clearly by

17   the rule, they can embrace legal concepts and -- but I think

18   they're entitled to know.  You know, if you know who did it, if

19   it was -- if the guy had it and he had nothing to do with them,

20   why aren't they entitled to know that?

21          MR. CLOERN:  So, your Honor, their interrogatory asks

22   for the legal basis, the legal contentions.  And that's what I

23   am saying will take thousands of hours.  They are entitled to

24   know whether or not, you know -- whether we know who wrote this

25   code and whether they got it --

                       ** ROUGH DRAFT **

```
 1              THE COURT:  And where did it come from?
 2              MR. CLOERN:  Absolutely.  They are entitled to know
 3    that.
 4              THE COURT:  And I think --
 5              MR. CLOERN:  We have no problem.
 6              THE COURT:  -- whatever legal contentions there are,
 7    ultimate contentions, will appear in the expert reports.  If
 8    not, they are not going to get it.  It is just a question of
 9    timing now.
10              MR. CLOERN:  Agreed.
11              THE COURT:  Why is that not acceptable?
12              MR. DE VRIES:  Your question is for me, your Honor?
13              THE COURT:  Yes.
14              MR. DE VRIES:  If they provide the facts about where
15    they got the code --
16              THE COURT:  Right, facts.
17              MR. DE VRIES:  -- whether this is the industry
18    standard --
19              THE COURT:  Facts.  Not legal contentions.
20              MR. DE VRIES:  Right.  I mean, there is -- just to be
21    clear about our position, you know, in every case in
22    intellectual property matters where they are asking for our
23    contentions, that's what he's holding, our legal contentions of
24    copyright infringement, we believe that we should get what
25    their legal positions are in a fact -- from a fact evidence
```

1  perspective.  If they think these are industry standard.  If

2  they are open source --

3         THE COURT:  Can I ask you, will you not get that

4  through the expert reports?

5         MR. DE VRIES:  We should -- as your Honor said, we can

6  get amplification of that.  But in every case that I am

7  familiar with around the country where we -- where we're

8  talking about damages contentions, infringement contentions,

9  validity contentions, copyright infringement contentions, to

10  have the parties's positions out there during fact discovery is

11  important so that we can conduct fact discovery about them.

12         So am I saying that there is -- our position is that

13  there is no room for expert discovery?  Absolutely not.  It is

14  perfectly appropriate to do expert analysis and opinion.  But

15  there are facts.  Almost everything that counsel has talked

16  about --

17         THE COURT:  Well, but facts are not legal contentions,

18  by nomenclature.

19         MR. DE VRIES:  Right.

20         THE COURT:  If you want the facts of who did a

21  particular line of code, for example, and where they got the

22  code and what their contention is regarding the legitimacy of

23  what they did --

24         MR. DE VRIES:  Right.

25         THE COURT:  -- why wouldn't that suffice for now?  And

** ROUGH DRAFT **

1   then you get whatever legal conclusion that there is in

2   the -- in the expert disclosure.

3           MR. DE VRIES:  I think that with the understanding of

4   the --

5           THE COURT:  (Unintelligible).

6           MR. DE VRIES:  Sorry.

7           THE COURT:  No.  And then I was thinking of

8   something -- oh, go ahead.

9           MR. DE VRIES:  No, I'm sorry, I didn't mean to cut you

10  off, your Honor.

11          THE COURT:  No.

12          MR. DE VRIES:  It is the legitimacy of what we did.

13  And I -- and so I have litigated a number of these cases as

14  well, and so I know what the issues are.

15          On the fact side, what we don't want to see is an

16  expert report that for the first time says something like, oh,

17  this code, this is all standard in the industry.  Other people

18  are using it.  And here is our positions.  Because at that

19  point, an expert -- if their expert report says that for the

20  first time, we have no ability to go out and take any fact

21  discovery at that point.  Or we're going to have to tell Judge

22  Norgle, we can no longer keep your trial date because although

23  we are asked for these kinds of contentions or facts --

24          THE COURT:  There was amplification and new things

25  that -- but I understand your concern about what happens if he

** ROUGH DRAFT **

1    doesn't buy that.  You do.

2          MR. DE VRIES:  Well, and then it is just -- it is what

3    the legitimacy of what they did is.  I mean, there is one thing

4    to have an expert sit down and do various kinds of tests or

5    analyses.  We're not saying that all of that has to be done

6    right now.  But everything that we're talking --

7          THE COURT:  Well, this is not the kind of case that

8    would call for tests.

9          MR. DE VRIES:  Well, there are certain types of tests

10   that you can run in order to show copying.  But whether or not

11   we need do that.  They could -- if they wanted to present

12   something like that, that's perfectly appropriate for experts.

13         But what we're talking about here are facts relating

14   to the legitimacy of what they did.  And as your Honor framed

15   it, if they provide the facts concerning the legitimacy of what

16   they did so that we know them now, not in expert discovery,

17   that's all we're looking for.

18         Is this code, all of these thousands of lines of

19   copied code, is it really from an open source?  Is that out

20   there?  We don't think so.  But if they want to say that, they

21   can say it.

22         Is it industry standard?  Is it something you have to

23   write it this way in order to use an API?  These are factual

24   things.

25         THE COURT:  Yes, they are.

** ROUGH DRAFT **

1          MR. DE VRIES:  Whether you put a label on it, sends a

2    fair -- fair use, whatever that legal label is, we're less

3    interested in that.  What we are interested in is knowing the

4    factual bases of why they think it is legitimate, if they do.

5    That's really where we are at.

6          THE COURT:  Okay.  So one more thing.  I really don't

7    need to keep you --

8          MR. CLOERN:  Understood.

9          THE COURT:  So it is my fault.

10          MR. CLOERN:  So, your Honor, just one -- just one more

11    -- just one point.  Because we agreed the factual question --

12    those factual questions are questions that we can definitely --

13          THE COURT:  But that's --

14          MR. CLOERN:  -- answer and look into.

15          THE COURT:  But that sure isn't the way it has been

16    sort of argued to me and pitched to them.  I mean --

17          MR. CLOERN:  Well --

18          THE COURT:  -- it has kind of been stonewalling.

19          MR. CLOERN:  Oh, no.  Not at all, your Honor.  What we

20    have been -- what they asked us is for our -- the legal basis

21    for non-infringement.

22          THE COURT:  Well, I don't --

23          MR. CLOERN:  And we can give them the factual basis.

24          THE COURT:  My sense of the thing is, I don't think

25    they have to -- or I have the ability to say to them, no, you

** ROUGH DRAFT **

1   don't have to give a legal exegesis of why you think it is okay

2   that you're doing what you're doing.  I don't think that's

3   proper in the context given where we are.

4        But I do think you're absolutely entitled to a legal

5   assessment.  I don't think you have to make the case one way or

6   the other now.

7        MR. DE VRIES:  All right.  We're not looking for a

8   brief.  We're looking for their contentions about, you know,

9   factually why it is legitimate.  Is it industry standard?  Do

10  you have to write it this way to interface with something?

11       THE COURT:  Right.

12       MR. DE VRIES:  Is it -- you know, is it open source?

13  Is it from TI's code?

14       THE COURT:  Well --

15       MR. CLOERN:  It is all expert, your Honor.

16       THE COURT:  No, no, no.  I mean -- no, it is not.  The

17  fact that there is an overlap doesn't mean it is not

18  appropriate.  So a guy says, well, I looked it up, and there it

19  was a book from 1832, and I thought it was great, and it

20  anticipated computers and everything (unintelligible) and I

21  used that because it was readily available and I knew it was so

22  old it was fine.

23       MR. CLOERN:  Yeah.

24       THE COURT:  I don't see that that's a legal contention

25  so much as these are.  This is what I did.  What the

1   consequences are, was it okay?  I don't know.  I thought it

2   was.  Somebody else has to say what the consequences are.

3           And as I have said to you, most of the -- a lot of the

4   cases I have written have really delved into interrogatory as

5   contention interrogatories before expert discovery.  I think

6   that is essentially a dodge.

7           This case though seems to be a blend of two things,

8   what are the facts and what are the legal arguments about

9   why.  And I don't -- I'm -- I'm not going to make you do the

10  second, but I do think the first is a viable thing.  And if we

11  tick off how many lines of code there are, it does sound

12  horribly daunting.  But I don't think that that's the way

13  people who do this kind of stuff look at code.  And code by its

14  nature involves millions of lines.

15          MR. DE VRIES:  Can't exactly.

16          THE COURT:  It is never a line.  Code --

17          MR. DE VRIES:  Okay.

18          THE COURT:  -- drafters just -- I don't know, they do

19  it.

20          MR. DE VRIES:  That's right.

21          MR. CLOERN:  So we -- your Honor, we agreed to do

22  that.  These perfectly fine.  And --

23          THE COURT:  Then what's the argument about?

24          MR. CLOERN:  Well, the argument was about until five

25  minutes ago they wanted our full legal basis and our expert

** ROUGH DRAFT **

1  analysis, which will take thousands of hours that we can't

2  do.  But we can do this, we can absolutely find out from Hytera

3  who wrote these -- these code pieces.

4  THE COURT:  And where did it comes from.

5  MR. CLOERN:  And where did it come from?  Did they

6  independently develop them?  Did they take them from open

7  source or they -- you know, writing it, according to some

8  vendor or industry standard.  That we can -- we can absolutely

9  do that.  We think it is too much, and we shouldn't have to do

10  it, but we'll do.

11  THE COURT:  No, I don't think -- I don't know if it is

12  too much.

13  MR. CLOERN:  We'll do it.

14  MR. DE VRIES:  It is a lot better than what we have,

15  Judge.  We served this interrogatory two months ago.  We have

16  zero.  The only response we have right now is just a stonewall,

17  as you said.

18  THE COURT:  Discovery, like -- the course of

19  discovery, like true love, never runs smoothly.

20  (Laughter.)

21  MR. DE VRIES:  And I think there is a -- I think there

22  is a back stop here, which is if they bring up in their expert

23  reports facts about open source and industry standard and

24  needed to write it this way, that they didn't disclose here, we

25  have a remedy, we'll move to strike if it is going to --

1    THE COURT:  That's a totally different question.

2    MR. DE VRIES:  Exactly.

3    THE COURT:  And you shouldn't anticipate the worst.  I

4  mean, you hopefully -- although you all know the -- all the

5  case law that says an expert can be found to say almost

6  anything.  And then it goes on to say terrible things about --

7  lots of cases, lots of law there.

8    It is what it is.  You'll have your bought and paid

9  for person.  They will have their equally biased person.  And

10  the truth will come out.

11    But I do think -- and I am so sorry that it took so

12  long to listen to this.  But for me to -- I do think you have

13  to answer the questions on a factual basis, and await the

14  discovery -- expert discovery.  And if the expert discovery is

15  not good enough, which I guarantee you will think, both of you,

16  there is something you can do about that.  And if you think you

17  need more time, I suppose you could ask Judge Norgle now and

18  tell him that -- but I'm not urging you to do that.  I think

19  you'll get -- you won't like the result you get.

20    MR. DE VRIES:  Right.  We just want to get their

21  factual contentions about why they are (unintelligible).

22    THE COURT:  Okay.

23    MR. DE VRIES:  So that if we need to do follow-up

24  discovery, we can do it now.  We're trying very hard to move

25  this case forward.  They asked for our contentions.  We have

1  provided all of them.  And so it seems like it time for them to

2  provide theirs.

3          THE COURT:  I agree.

4          MR. DE VRIES:  And if this Friday is not going to

5  work, then, well, maybe it is the 30th -- or we can talk about

6  that.  We put this in the order, but we --

7          THE COURT:  I want you to put it in the order.

8          MR. DE VRIES:  -- we think there needs to be a date

9  certain.

10          THE COURT:  I don't want there to be any -- any

11  uncertainty about times or dates or obligations.  And if you

12  want to put in, if it is appropriate, and I leave it to you

13  guys sort of in fairness, that no extensions of these dates

14  would be given, which of course doesn't mean anything.  Of

15  course they -- but I do think you should -- you can put that in

16  so that if somebody comes in and says, oh, we can't do it,

17  can't do it, I'm at least, and you're at least, both of you, in

18  a position to say, well, no, you said that this is the end of

19  it.

20          Where you go from there I don't know.

21          MR. DE VRIES:  Yes, your Honor.

22          MR. CLOERN:  So, your Honor, just one thing on that.

23          THE COURT:  Yeah.

24          MR. CLOERN:  We are being asked to investigate where a

25  thousand different pieces of code came that were --

```
 1          THE COURT:  So am I.

 2          MR. CLOERN:  -- written -- well, I understand, but --

 3          THE COURT:  So am I.

 4          MR. CLOERN:  But I just want to be practical.  It is

 5    ten years ago, and so it is going to take us --

 6          THE COURT:  I understand.  You're going to --

 7          MR. CLOERN:  -- some time to -- we can't do it by this

 8    Friday.

 9          THE COURT:  You're going to do the best you can.

10          MR. CLOERN:  Thank you.

11          THE COURT:  And you have to tell your client that

12    there is some urgency to this --

13          MR. CLOERN:  Well, I will --

14          THE COURT:  -- in the same way that I would tell

15    Motorola.  The problem, I suppose, is in (unintelligible)

16    Motorola has had more -- a lot of time to get its case ready.

17    But the defense always is in the position you're in.

18          MR. CLOERN:  Uh-huh.

19          THE COURT:  And the plaintiffs always want, you know,

20    yesterday to be the operative date.  You want the 12th of

21    never.  Somewhere you have to blend the two.

22          So I leave it to you guys to work out, with the

23    understanding people should not be unreasonable.  But, you

24    know, if -- if people are taking the Fifth, that's pretty icky.

25          MR. DE VRIES:  I'm confident we can agree to a date.
```

** ROUGH DRAFT **

1    And that is actually why we were -- what we didn't want, your

2    Honor, was a non-response this Friday.  I'm sure we can find a

3    date, as long as it is reasonably prompt --

4            THE COURT:  Right.

5            MR. DE VRIES:  -- along the same time frame as

6    Mr. Chen.

7            THE COURT:  Would you all mind sitting together and

8    talking, just because you're here?

9            MR. DE VRIES:  Yes.

10           THE COURT:  If you leave and go your separate ways --

11           MR. CLOERN:  Sure.

12           THE COURT:  -- things are not going to get done as

13    quickly.

14           MR. CLOERN:  But, by the way, your Honor, the reason

15    Y.T. Is taking the Fifth is because Motorola pursued the DOJ,

16    and the DOJ opened an investigation.  And when that happened,

17    everybody took the Fifth.

18           Before that they weren't.  So they're Chinese, they're

19    worried, the DOJ.  Look at what's going on in American

20    politics.  I just don't think that --

21           THE COURT:  Listen, I may --

22           MR. CLOERN:  -- -- read anything --

23           THE COURT:  No, no, I'm not making any inferences.  It

24    is simply the inference that the law may or not allow a jury to

25    take.  You will argue that there are reasons.  And the Fifth --

                        ** ROUGH DRAFT **

```
 1    the inferential information should be available to the jury or
 2    the inference should be available.
 3            I don't have anything to do with that.  Just sort of
 4    the reality is as us being Americans is, wow, that sounds odd.
 5            Is there any lawyer alive who wouldn't tell their
 6    client in a case like this where the DOJ is involved not to
 7    take the Fifth?  I don't know any.
 8            MR. DE VRIES:  Your Honor, we disagree.  Actually
 9    there is some inaccuracies in what was just said.  But --
10            THE COURT:  Who cares?
11            MR. DE VRIES:  -- I don't think it is not -- I don't
12    think it is pertinent.
13            THE COURT:  It is not significant.
14            MR. DE VRIES:  Your Honor, there was one other -- one
15    --
16            THE COURT:  I will assume you both disagree with each
17    other on 90 percent of what's said.
18            MR. DE VRIES:  Yes, your Honor.
19            THE COURT:  So what?
20            MR. DE VRIES:  There was a final issue, and it
21    actually is very discrete.  And I wondered if you would like to
22    hear that now or --
23            THE COURT:  I --
24            MR. DE VRIES:  -- take a break.
25            THE COURT:  -- my time is your time.  It is up to you
```

```
1   guys.

2           MR. DE VRIES:  So it is source code.  And let me take

3   you -- we have made some progress.  And tell me just tell you

4   what the three --

5           MR. CLOERN:  I'm sorry, are we -- we had just one

6   final issue before we leave, before we leave this.

7           THE COURT:  Okay.

8           MR. CLOERN:  I promise it will be very brief.

9           THE COURT:  No, no, take as much time as you want.

10          MR. CLOERN:  We don't have to resolve it today, but --

11          THE COURT:  I would like to resolve more than once --

12          MR. CLOERN:  Okay.

13          THE COURT:  -- yeah.

14          MR. CLOERN:  So this is going to come up.  If there

15  are -- if Motorola is going to contend 1000 instances of

16  copying, then we're -- then we have to know in order to do the

17  legal analysis --

18          THE COURT:  I assume illicit copying.

19          MR. CLOERN:  Yeah.  So we have to know who the authors

20  are, where their code came from, et cetera.  It will be a

21  deposition.  I don't know how we do a deposition on all of

22  this.  I mean, it would be days or weeks long deposition on all

23  this stuff.

24          THE COURT:  Has the information of the basis of their

25  claim not been aired at this point?
```

1        MR. CLOERN:  No, your Honor, it has not been.  So we

2  -- this is all we have, and this is just one part of the

3  copyright claim.  So it is not an -- it is not a contention of

4  infringement.  It is just this code is a little bit similar to

5  this code, not any reason about why it might be similar, about

6  where their code came from, not even who wrote it do we know

7  yet?  So they have not done anything near what they need to do

8  to --

9        THE COURT:  Well, are you saying --

10       MR. CLOERN:  -- provide it or even the facts.

11       THE COURT:  Are you saying their complaint doesn't

12  allege that the owners of a whole bunch of copyrighted stuff?

13  They have copyrights.

14       MR. CLOERN:  It doesn't say who wrote the code.  It

15  doesn't say who the authors of the code are.

16       THE COURT:  Well, the author could be Jeff Cole, but

17  who cares if they -- theoretically if they own the copyright,

18  and I -- then who wrote the code theoretically doesn't matter.

19       MR. DE VRIES:  Right, that's right.

20       MR. CLOERN:  Oh, no, it does --

21       MR. DE VRIES:  That's actually incorrect under U.S.

22  Copyright law.

23       MR. CLOERN:  So the author of the code does matter

24  because, again, in order to be protectable code, we're entitled

25  to talk to the author of the code and get the same facts and --

1    THE COURT:  Well, let's say the author is dead or has

2    disappeared.  That wouldn't affect their claim, would it?

3    MR. DE VRIES:  No.

4    MR. CLOERN:  Well, so Motorola -- I'm sorry?

5    So Motorola would have to put up --

6    MR. DE VRIES:  I'm sorry for answering, your Honor.

7    MR. CLOERN:  Motorola would have to put up a 30(b)(6)

8    witness that says, here's where -- so the same question they

9    want an answer from Hytera, Motorola has to say, here's where

10   we got the code.  It is not part of the industry standard.  It

11   is not from TI.  It is not from open source.  The person who

12   wrote it --

13   THE COURT:  Right, they have to prove they own the

14   copyright.

15   MR. CLOERN:  Well, they own it, and then it is

16   their --

17   THE COURT:  Trademark.

18   MR. CLOERN:  -- that is protectable under

19   copyright.  And so they haven't answered any of those facts

20   yet.  We need the same facts.  And when we depose somebody, I

21   don't know how we depose somebody about that issue on a

22   thousand different instances.  And so that deposition is going

23   to take many, many, many, many days.

24   THE COURT:  Well, one --

25   MR. CLOERN:  And --

1      THE COURT:  I wouldn't think you would walk into the

2  deposition not knowing the answers to the basic questions you

3  have just raised.

4      MR. CLOERN:  They haven't given us any of that

5  discovery yet, and that's part of our motion to compel.

6      THE COURT:  Well, then tell me about that.

7      MR. DE VRIES:  Yeah, this is -- this is not

8  any -- what I -- I will tell your Honor quite candidly, what I

9  am hearing is just a very vigorous attempt to not provide us

10  the information.  I don't know why we're even talking about

11  this, but I --

12      THE COURT:  Oh, no, no, they are getting -- they are

13  going to provide --

14      MR. DE VRIES:  Okay.

15      THE COURT:  You're going to -- you guys are going to

16  draft an order --

17      MR. DE VRIES:  Great.

18      THE COURT:  -- that will deal with that.

19      But sort of as an ancillary point, he says, well, wait

20  a minute --

21      MR. DE VRIES:  Right.

22      THE COURT:  -- what about you?

23      MR. DE VRIES:  So here's -- right.  And so the what

24  about you point.

25      So counsel misunderstands United States Copyright

law.  The author of The code under United States Copyright law
is Motorola.  We have identified that.  We have also identified
Motorola as the owner of the code.  They asked us an
interrogatory that is due at the end of the month that said
identify --

        THE COURT:  And that's certainly to get by complaint
under --

        MR. DE VRIES:  It's --

        THE COURT:  -- current case law.

        MR. DE VRIES:  Absolutely.

        Then they said identify people involved in -- in
writing the code.

        THE COURT:  Right.

        MR. DE VRIES:  We -- our response to that is due at
the end of the month.  We're providing that information.

        THE COURT:  Okay.

        MR. DE VRIES:  There is nothing that is going to be
unduly burdensome about asking these few individuals, hey, is
this open source?  No, I wrote it myself when Motorola invested
billions of dollars.

        THE COURT:  So you're going to give the answers to the
questions he is concerned about.

        MR. DE VRIES:  Absolutely.

        THE COURT:  There you go.

        MR. DE VRIES:  That's all we need to know.

1          MR. CLOERN:  So when will -- so we'll talk about that

2     at our break when we break.

3          THE COURT:  And then maybe -- maybe you can include in

4     a -- this comprehensive order the issue that's a non-issue.

5          MR. DE VRIES:  Right.  Sounds fine to us.  I mean, it

6     is not due yet, and so that's why --

7          THE COURT:  So what?

8          MR. DE VRIES:  -- we have had for a month a

9     non-answer.  But we want to provide all --

10          THE COURT:  If you --

11          MR. DE VRIES:  -- the information we can.

12          THE COURT:  -- put the -- a date in the future when it

13     is due -- well, you just anticipated the -- a problem or the

14     answer to a problem.

15          MR. DE VRIES:  That's great from our protective.  We

16     just want information to be exchanged, your Honor.

17          THE COURT:  That's all I would want too is information

18     to be exchanged.

19          MR. DE VRIES:  So may I -- just to address the open

20     source code issues.

21          THE COURT:  Sure.

22          MR. DE VRIES:  So there are three discrete issues that

23     have not been resolved.

24          THE COURT:  You know --

25          MR. DE VRIES:  We have resolved some.

** ROUGH DRAFT **

1    THE COURT:  -- you should really be sit down.  I

2  didn't mean for you to just stand.  I thought maybe you should

3  come up and you could talk with all of us.

4    But sit down.  My goodness, you have been so polite.

5  Thanks.

6    It's okay.  Go ahead.

7    MR. DE VRIES:  Okay.  So there are just three discrete

8  issues.  Your Honor ordered them to produce Version 1.0, and

9  they say that they will make it available this week.

10    So there is three issues.  What other versions will be

11  produced, will they provide a 30(b)(6) deposition about where

12  the missing source code went, and then should they give us --

13    THE COURT:  What do you mean -- help me with this.

14  What do you mean the missing source code?

15    MR. DE VRIES:  They say that they have done

16  investigation.  The counsel went to China I think a couple of

17  weeks ago, and they have determined that it is gone.

18    THE COURT:  What's gone?

19    MR. DE VRIES:  Certain parts of the source code that

20  other indicators show us were copied from Motorola's code into

21  their code.

22    THE COURT:  Okay.

23    MR. DE VRIES:  So then the third issue is whether they

24  should give us a directory listing of their source code so that

25  we can see the hierarchical structure of their system so that

1   we can see where did that code go, why isn't it under that

2   hierarchical thing.

3           So on the versions we'd ask for, you will remember,

4   Versions 2, 3, 4, 5, 6, and 7, what we were calling the

5   intermediate major versions.  As I understand the agreement,

6   counsel has said that they -- that they are not sure that there

7   is a point zero -- 2.0 as opposed to 2.1 or a 3.0 as opposed to

8   3.2.  I don't know why they don't know the answer to that yet.

9   But I understand that they are willing to produce each of those

10  major releases, at least one version, within each of the

11  numerical portions.  And we would just ask that we include in

12  this order a date certain by which that production will happen.

13  So that's issue one.

14          Issue --

15          THE COURT:  So include in the order -- in the order a

16  date you all have agreed on.

17          MR. DE VRIES:  Okay.  We will, your Honor.

18          Issue two is --

19          THE COURT:  Hopefully the order that you're both going

20  to draft will deal with dates, at least, for all the stuff that

21  we have on the table.

22          MR. DE VRIES:  Yes, your Honor, we will.

23          THE COURT:  Okay.

24          MR. DE VRIES:  The second issue is they refused to

25  provide a 30(b)(6) witness to testify -- to answer our

1    questions about where the missing source code that was copied

2    from Motorola we allege went.

3         THE COURT:  Right.

4         MR. DE VRIES:  And their only answer -- their only --

5         THE COURT:  Now tell me -- I don't know -- what do you

6    mean went?

7         MR. DE VRIES:  So their -- where is it now?  Why isn't

8    it in the repository?  Who had it last?  What is the

9    information available to the company about why it used to be

10   there and is no longer there?

11        THE COURT:  Is it really some kind of piece of paper?

12        MR. DE VRIES:  It is in -- well, the way that it works

13   is there is a source code repository.  It is a computer system

14   that keeps source code.

15        THE COURT:  Oh.  Oh, okay.

16        MR. DE VRIES:  And so that should -- and in fact

17   there was testimony that it does contain all of the source code

18   for the products.

19        Now after counsel's trip to China, we're being told

20   that, no, it is missing.  And so what we'd like to do is ask

21   about the circumstances.  And we served a 30(b)(6) notice

22   almost two months ago asking about this because two months ago,

23   as we were having this discussion, there was a suggestion maybe

24   we can't find this all.

25        The only argument they're raising is they say that we

1    had a single topic that needed the word source code in it in a

2    prior 30(b)(6) notice that related to technical issues during

3    the statute of limitations period.  And they say for that

4    reason we shouldn't be able to get a 30(b)(6) witness to

5    testify about this new issue that's arisen, which is the

6    missing source code.

7         We think that that's wrong.  I don't -- I can't

8    imagine a valid basis for not allowing us to question the

9    company about where the source code went.  It is critical to

10   the case.

11        THE COURT:  Well, the source code is part of your

12   complaint.

13        MR. DE VRIES:  Absolutely.  And they say that they

14   have investigated, and it is gone.  We should get to understand

15   the facts around that.

16        THE COURT:  Okay.  Well, they can't -- all lawyers can

17   do -- I don't mean to be repetitive.  All lawyers do is they

18   transmit information to everybody else.  To you, to me.  They

19   are not -- they are not vouching for anything.  Well, sort of

20   are, but not really.

21        I think you should, as they, should be able to have a

22   person who has the capacity to testify about something, whether

23   it is gone, whether it is there, whether it is partially

24   there.  And that should be the end of the matter.  I don't see

25   why there is a dispute between you guys, the four of you, six

```
 1    of you.  It is -- but somebody can testify to something --
 2              MR. DE VRIES:  Right.  And that's all we want.
 3              You know, at trial --
 4              THE COURT:  Let's say it is gone.
 5              MR. DE VRIES:  Uh-huh.
 6              THE COURT:  So somebody with knowledge, much more than
 7    I could even think of, looks at the computer, looks at the
 8    source code, talks to whoever they talk to, and they say, wow,
 9    it vanished.  It can't -- it is not explicable.  I can't
10    possibly explain it.  It should have been -- it should have
11    been in the computer.  And it should have been number five in
12    the lines of -- it is gone.  I can't fathom.  And that's the
13    best you're going to get, and it will be -- it will resonate
14    with a jury.  Amidst this wealth of incomprehensible facts,
15    they'll get that.
16              MR. DE VRIES:  And that's all we want because we can't
17    -- of course -- I know counsel has represented that he's -- I
18    think he means him personally -- traveled to China to do an
19    investigation.  And we're obviously not proposing to you, nor
20    would we want to, put counsel on the stand at the trial to
21    testify --
22              THE COURT:  Well, he's not --
23              MR. DE VRIES:  -- about that so we want a witness.
24              THE COURT:  He's not saying that.
25              MR. DE VRIES:  Right.
```

```
 1          THE COURT:  So if you get to the bottom line, lawyers

 2   vouch for clients all the time.

 3          MR. DE VRIES:  Right.

 4          THE COURT:  And they get burned occasionally.  He's

 5   simply telling you what he's been told.

 6          MR. DE VRIES:  Right.  And all we were looking for is

 7   testimony from the company about --

 8          THE COURT:  Right.

 9          MR. DE VRIES:  -- that.

10          THE COURT:  So what's the problem?

11          MR. DE VRIES:  And so what they say is that it

12   is -- and so they say, no, there was a topic before that had

13   the word source code in it.  You asked this witness in February

14   about do you keep source code in this repository.

15          THE COURT:  And where is the witness going to testify,

16   in China?

17          MR. DE VRIES:  I assume so.  I assume that none of

18   them are willing to come to the U.S.

19          THE COURT:  Well, I just --

20          MR. DE VRIES:  Although maybe we'll be surprised.

21          THE COURT:  -- want to be sure it is China; it is not

22   here.

23          MR. DE VRIES:  It is in Hong Kong.

24          THE COURT:  So you guys are going to have to go to

25   Asia.
```

```
1            MR. DE VRIES:  Correct.  And we're willing to do that.
2            THE COURT:  And the person who will testify lives
3    there.
4            MR. DE VRIES:  You know, the answer is I don't know.
5    It is a little -- we don't know who they're going to put up
6    yet.  And they do have witnesses that are here in California
7    and Florida but, I think --
8            THE COURT:  Well, if they have witnesses in
9    California, and it is an appropriate 30(b)(6) witness, you'll
10   only have to go to California.
11           MR. DE VRIES:  Yeah.
12           THE COURT:  If it is somebody who lives there, there
13   is no real burden.
14           MR. DE VRIES:  Right.  We'll go to Hong Kong.
15           THE COURT:  It is a burden of life.  You'll go to Hong
16   Kong.
17           MR. DE VRIES:  That's not a problem.  We just need
18   testimony from the company about an issue that arose after this
19   February deposition --
20           THE COURT:  Okay.
21           MR. DE VRIES:  -- which is, where is the source code
22   because we're going to have an -- unless something changes,
23   we're going to have to go to trial and say, we see that all the
24   names were copied and here's some emails that talk about
25   copying this, but we don't have that code, and they say it is
```

```
 1   missing, and here's their explanation why.
 2           MR. CLOERN:  May I respond, your Honor?
 3           THE COURT:  Yeah, I don't see that there should be any
 4   kind of issue between the two -- the five of you, six of you,
 5   seven of us.
 6           MR. CLOERN:  Because they are not telling you all the
 7   facts.  So the issue --
 8       (Laughter.)
 9           MR. CLOERN:  -- is this.
10           THE COURT:  Okay.
11           MR. CLOERN:  The issue is this.
12           THE COURT:  Well, can I ask you?  Can I ask you?  As I
13   have articulated the facts and that -- as they have been
14   described to me, would you not agree that a 30(b)(6) witness
15   would be appropriate?
16           MR. CLOERN:  I absolutely 100 percent agree, and we
17   never told them that they can't get a 30(b)(6) witness.
18           THE COURT:  Okay.  So what's the problem?
19           MR. CLOERN:  So here's the issue.  What they want is a
20   30(b)(6) witness like next week to testify about the source
21   code.  And then they want to go to China and fly
22   (unintelligible) to do that.  And then they want to
23   testify -- then they want another 30(b)(6) about the source
24   code again, in January, February, when the depositions occur in
25   the normal course.
```

1          And they say the reason they want that is because they

2    don't really understand the overall organization --

3          THE COURT:  You know, they don't get two bites at the

4    apple.  I don't believe that they are asking --

5          MR. CLOERN:  They have already had it.  They already

6    had -- we gave them already an early deposition of our source

7    code person at Hytera, Xiaohua Zheng, so they could ask her how

8    many versions are there, what -- you know, what -- where do you

9    keep it?  Blah, blah, blah, so they would know how to structure

10   their discovery.

11         They want a second early deposition.  And now

12   they -- then they want to do it again later.

13         THE COURT:  That's a different person, I assume.

14         MR. CLOERN:  No, same person, to ask the same

15   questions --

16         THE COURT:  Can you --

17         MR. CLOERN:  -- how is the code organized.

18         THE COURT:  Did you know at the time -- this is

19   getting -- borders on silly.  I mean, everybody does this, and

20   I don't understand why.  I mean, I do, but I -- when you went

21   there, could you not have asked the questions you would like to

22   ask now?

23         MR. DE VRIES:  We could not, no.

24         THE COURT:  Okay.  Then that's the answer.

25         MR. CLOERN:  Your Honor, that's not true.

** ROUGH DRAFT **

120

```
 1              THE COURT:  Okay.
 2              MR. CLOERN:  That's not true.
 3              THE COURT:  There isn't any way on earth that
 4    I -- that anybody -- I don't care what they tell you -- can
 5    officially -- can officiate something that only you guys live
 6    through and know.  You say it is, they say they want to ask a
 7    few questions.
 8              I would think if you're talking about why source code
 9    is missing, you don't have to go to Hong Kong.  I would think
10    you could do it by videoconference so nobody --
11              MR. DE VRIES:  We're happy to go to Hong Kong.  It
12    is -- it is better to do it live, especially with some of the
13    language issues.
14              THE COURT:  Okay.
15              MR. DE VRIES:  But, yeah, we need --
16              THE COURT:  The person who is being deposed, will it
17    be a different person than the person who I'm told is
18    being -- was deposed?
19              MR. CLOERN:  Your Honor, could I put some meat on the
20    bones?  I think there is some -- some -- just one piece of
21    confusion, because there is not missing code.  So
22    what -- here's what happened.  We produced a couple of versions
23    to them, and they had it, right?  And what they see is
24    that -- you know, when source code goes -- you have source
25    code.  And the source code is something that more or less a
```

1  human can read.  It says, here is the timer, it is 15 seconds,

2  do this, go get this variable, look at that constant, divide

3  them, so forth.

4          A machine called a compiler takes that source code,

5  which a human can read and write, takes a compiler and turns it

6  into what's called object code.  And these are just a bunch of

7  symbols that computer chips understand.

8          So for seven files out of the tens of thousands of

9  lines of code, and the thousands of files, for seven of them

10 there is no source code, but there is the object code.  So

11 somebody -- the source code was lost somewhere along the lines.

12         We just produced version 1.0 to them which shows that,

13 you know, all the way back in Version 1.0, those same seven

14 files in our main source code server don't have the

15 under -- the source code from which the object code was

16 created.

17         For seven files.  So what we have told them is that --

18 is that we're looking for it.  When we find it, we'll give it

19 to you.  We haven't found it yet.  For some reason it is not

20 stored where all the other source code is.  We haven't found

21 it.  So all of the 30(b) -- and what they want is they say they

22 want a 30(b)(6) witness --

23         THE COURT:  You have been looking for a while.

24         MR. CLOERN:  Yeah.

25         THE COURT:  That would suggest to me it is gone.

** ROUGH DRAFT **

```
 1          MR. CLOERN:  Yeah, it may be gone.  And right now it
 2   is gone.  All -- it --
 3          THE COURT:  Well, they can't wait endlessly while you
 4   look.  You have been looking for a long time.
 5          MR. CLOERN:  Yeah, I know.  And it is -- it is gone.
 6   But, you know, not --
 7          THE COURT:  That's -- I would think that's -- if you
 8   find it, you will then supplement with, oh, my goodness, here
 9   it is.
10          MR. CLOERN:  Absolutely.
11          THE COURT:  And do they get to take another 30(b)(6)
12   deposition?  No.
13          So if they had effectively two shots at it in the, and
14   the case does not turn on this one thing.
15          MR. CLOERN:  So what -- all we're suggesting, your
16   Honor -- and we're not saying they can't -- certainly they can
17   ask about this.  I would never say they couldn't.  That's
18   crazy.  This is source code.
19          THE COURT:  Right.
20          MR. CLOERN:  This is object code for which there is
21   missing source code.
22          THE COURT:  Right.
23          MR. CLOERN:  Sure they can ask about that.
24          THE COURT:  Okay.
25          MR. CLOERN:  But all we're saying is they can ask
```

** ROUGH DRAFT **

```
 1    about that in January when -- when we all go and we do all the

 2    depositions in the case and in their normal course.

 3            THE COURT:  Oh, I see, you're going to be there any

 4    way in January, and you don't want to do it (unintelligible)

 5    December.

 6            MR. CLOERN:  Right, especially for --

 7            THE COURT:  Well, that seems reasonable.

 8            MR. CLOERN:  -- what will be a 15-minute deposition

 9    because --

10            THE COURT:  Well, maybe not.

11            MR. CLOERN:  -- what the witness is going to say is --

12            THE COURT:  Stop.  I think --

13            MR. CLOERN:  Sorry.

14            THE COURT:  (Unintelligible) reasonable you don't make

15    two trips.

16            MR. CLOERN:  Thank you, your Honor.

17            MR. DE VRIES:  You know, your Honor, we have made

18    multiple trips out there to take these depositions.  We think

19    that the --

20            THE COURT:  I know, but it cost as lot of money.

21            MR. DE VRIES:  Your Honor, this is a very, very

22    important matter to our -- to our client.

23            THE COURT:  And you tell me --

24            MR. DE VRIES:  -- whose technology is.

25            THE COURT:  -- your case isn't going to be over.  I
```

** ROUGH DRAFT **

1   understand.  Every case Motorola has is important.

2        I just don't think that waiting a few weeks to take a

3   deposition at -- unless somebody is going to die -- counts for

4   anything --

5        MR. DE VRIES:  Here --

6        THE COURT:  -- in the calculus of reasonableness.

7        MR. DE VRIES:  Here's the issue.  And, your Honor, if

8   you tell us you have to go in January, then I will go on the

9   very first possible day that they will make someone

10  available --

11       THE COURT:  Okay.

12       MR. DE VRIES:  -- because I am concerned about

13  something that was just said.

14       THE COURT:  All right.

15       MR. DE VRIES:  Two things really.  The first is that

16  although counsel said it would be crazy to suggest that no

17  deposition occur, what they actually wrote to your Honor in the

18  brief last night at page 13 is, at the very bottom, as such, it

19  would be wasteful and burdensome to hold another deposition on

20  this issue.

21       THE COURT:  Well, he's using a shorthand non-legal

22  kind of equity term.

23       MR. DE VRIES:  Right.  But what he's saying is, I

24  think now that, okay, although they told you last night that a

25  deposition shouldn't occur, now they are saying a deposition

```
 1    can occur, but it just should occur later.

 2            Now -- and here's the issue.  Please just let me

 3    finish.

 4            That what counsel said is the code is gone now.  Maybe

 5    it will show up later.

 6            I will tell you, I have done these cases a number of

 7    times in trade secret matters for plaintiff.  A frequent thing

 8    that happens is people can't find things, and then --

 9            THE COURT:  And in simpler cases that's the claim

10    also.

11            MR. DE VRIES:  Right.  And then -- and then they find

12    them later.  But the reason they find them later is because we

13    get to learn facts about, okay, wait a minute, when this

14    investigation was done, when counsel went to China -- and I'm

15    not asking about what counsel did.  But I want to know the

16    facts that they were looking at because I think, from my

17    experience, that if I knew exactly what had happened here, we

18    would find this code or know a lot more about it before we get

19    to these depositions that are going to be happening later in

20    February -- January and February.

21            So if it is that the witness is unavailable --

22            THE COURT:  But it strikes me that's a reason for

23    putting it off, not doing it sooner.

24            MR. DE VRIES:  Well, we're actually looking for the

25    facts and the truth.  I mean -- is.
```

```
1              THE COURT:  Right.

2              MR. DE VRIES:  And we're not looking for a

3    circumstance where the trial date gets moved.  They find the

4    code on the last day of fact discovery, even though we were

5    here three months earlier.  And I believe that if I was asking

6    this witness --

7              THE COURT:  Judge Norgle will never let them do

8    that.  To be -- I mean, really, there is a -- there is a

9    certain reality to life.  You don't find things in big time

10   litigation with a huge brilliant lawyers in the case on the eve

11   of trial.  It is absurd, absurd even to suggest that.

12             Yeah, we are told by the Supreme Court over and over

13   and over and over again that experience and common sense count

14   in litigation.  Now do you think anybody is going to, buy,

15   especially a jury, but a Judge won't buy, oh, we went over

16   there, we did this, we did that, we have been asking for six

17   months, we just found the information.  If they would have

18   tried to do that, that would be madness.

19             MR. DE VRIES:  There is another issue though too, and

20   it is the other reason for the timeliness.  So their key --

21             THE COURT:  Well, excuse me.

22             MR. DE VRIES:  Yeah, I'm sorry.

23             THE COURT:  Seems to me that your argument makes the

24   argument for doing it in January, not in December.

25             MR. DE VRIES:  Well, here's the other concern.  So we
```

1  have another case against them in Ohio.  And in that case we 4

2  for the deposition of Sam Chia, who is the author of the email

3  that your Honor was talking about earlier.

4          THE COURT:  Right.

5          MR. DE VRIES:  What we were told in response was that

6  Sam Chia no longer works at the company.  I don't know the

7  circumstances there.  I know that Y.T. Kok, the gentleman who

8  pled the Fifth in response to the source code copying

9  questions, is still there.  But I am very, very concerned, your

10  Honor, that by the time we get around to talking to Ms. Zheng

11  or whomever it is going to be, that even more people with

12  knowledge of the facts are gone.  And so I think very strongly

13  that -- I couldn't tell you how much I believe this, that the

14  sooner we're able to get this information, the better.

15          Now does that mean it has to be next week or December

16  1st, you know?  No, we can work with them to be

17  reasonable.  But we don't want it to be --

18          THE COURT:  Is the person you would want to depose or

19  who is going to be offered to you -- you don't even know, are

20  they still employed there?

21          MR. DE VRIES:  The answer is they have not identified

22  a witness because, as recently as last night, they told your

23  Honor that they wouldn't provide a deposition, but --

24          THE COURT:  Well, it doesn't matter what they said.

25          MR. DE VRIES:  But what they're --

** ROUGH DRAFT **

1        THE COURT:  They are going to do it.

2        MR. DE VRIES:  Right.  And so right now --

3        THE COURT:  The only question is when.

4        MR. DE VRIES:  Right.

5        THE COURT:  And, by the way, if they're getting rid of

6 people lickety split, it doesn't matter what date they have.

7 The person will be gone.

8        MR. DE VRIES:  Right.

9        THE COURT:  But that is -- you know, so I don't

10 think -- I don't -- I understand your logic, and your logic

11 makes sense, except in the real world with -- in which we live,

12 I just don't think that's the way things function --

13        MR. DE VRIES:  Well --

14        THE COURT:  -- so it doesn't make any difference.

15        And nothing could be, in a generalized sense, better

16 for you than that the guy suddenly disappeared right before his

17 deposition was to occur.

18        MR. DE VRIES:  Right.  Understood, your Honor.  And as

19 I said, if your Honor would like us to do it in January, that's

20 when we'll do it --

21        THE COURT:  Well, I'm torn.

22        MR. DE VRIES:  -- our interest is --

23        THE COURT:  You can't get to it.  Today is the

24 13th.  You couldn't get to it until December.

25        MR. DE VRIES:  Right.  I'm just worried -- it is a

129

1   February fact discovery close.  This is a very important issue.

2   We still don't have all the source code.  They -- we don't have

3   a date certain when we're going to get most of it.  So I'm

4   very, very, very concerned.  And so that we're trying to do our

5   best to move things alone.

6          We will come to them.  We will do it at our

7   expense.  You know, but if your Honor says you need do it in

8   January, we'll do it in January.

9          MR. CLOERN:  Your Honor, we -- we have produced four

10  versions, four full versions, of source code, all the code we

11  have, except for those seven files where there is a piece of

12  the source code missing, but not the object code.  Right?

13  Which they are actually -- I know they are decompiling to sort

14  of turn it back into source code.  They are doing that.  So

15  they know what it says.

16         There is nothing we haven't given them.  There is

17  nothing missing.  The code we have, we gave it to them.  They

18  have got four versions of it.

19         We're giving them three more versions so they have

20  every single version in the last three years, because that's

21  the copyright relevant period.

22         THE COURT:  I think the concern is what's not there

23  and why.

24         MR. CLOERN:  Sure, sure, sure.  So they are going to

25  get a 30(b)(6) witness.  We're all going to go at the end of

```
 1    discovery, in either January or February, and we're going to do

 2    a bunch of depositions in China, a bunch of Hytera depositions.

 3    That's when we're going to go do those.

 4            And they are going to get a 30(b)(6) deposition on

 5    Hytera source code.  And that deponent is Xiaohua Zheng.  They

 6    have already had one --

 7            THE COURT:  Pardon me.  What's your trial date?

 8            MR. CLOERN:  Our trial date is November, your Honor.

 9    Next November.

10            THE COURT:  Next November.

11            MR. CLOERN:  A year from now.

12            MR. DE VRIES:  Yeah.  In fact, discovery cutoff is

13    February.  And it sounds like we're now talking about pushing

14    the deposition to February, which would be a three-month delay.

15            MR. CLOERN:  No, no, no, we're -- all I'm saying is --

16            THE COURT:  I'm not suggesting you pit it off.  I

17    thought you were going in January.

18            MR. DE VRIES:  No, I think he was -- what counsel is

19    now saying is we're going to do a bunch of depositions at the

20    very end of discovery, and he wants to do this deposition then.

21            THE COURT:  Oh, I don't think -- I don't think so.  I

22    only thought that you were going there in December -- in

23    January.

24            MR. DE VRIES:  We have no plans to do that.

25            MR. CLOERN:  Your Honor, let me --
```

** ROUGH DRAFT **

1    THE COURT:  I'm not putting it off till February.

2    MR. CLOERN:  Okay.  No, no, no, I just want to

3  clarify.  This is a limited 30(b)(6) deposition.

4    THE COURT:  I don't know the importance of the

5  deposition.  I'm told and just hearing it strikes me as

6  something that has significance and something that might be

7  significant and something the poor jury is going to be

8  inundated with very technical material will understand.

9    MR. CLOERN:  Sure.  Well, your Honor, they're going

10  to -- so --

11    THE COURT:  Okay.

12    MR. CLOERN:  So in January is when both parties have

13  discussed going to China to do the Hytera depositions on source

14  code, on damages issues, on all --

15    THE COURT:  No, I understand.  I don't mean to

16  interrupt you.  But I'm being told now that that is not

17  something that they are willing to do, if possible, and they

18  would rather accelerate that limited thing now.  And they want

19  to do it now.  The other stuff, I guess, you have agreed to.

20    MR. CLOERN:  So -- they're having -- what they want to

21  do is they want to one topic out of their 30(b)(6) source code

22  deposition and make a trip to China to do that, you know --

23    THE COURT:  Wait.  Sorry.  No, go ahead.

24    MR. CLOERN:  So what they want to do is they want to

25  take one topic out of their 30(b)(6) deposition on source code,

1   and then they want to go and do that early.

2   THE COURT:  But they -- they -- look, gosh, we're

3   arguing over nothing.  They tell me that they think this

4   deposition is meaningful.  In the normal course of things,

5   without a trial date looming, I would tend to agree with you

6   and they should be able to put it off.  But they tell me that

7   it is very significant.  I'm going to accept their word.

8   If you told me something was significant, I would take

9   your word for it.  I think you -- this -- if they think this is

10  significant, then go there in December.  I don't think you

11  should wait until the end of discovery.  There is going to be

12  so much happening, and you guys have to decide whether or not

13  -- discovery is closing when?

14  MR. CLOERN:  It closes, your Honor --

15  MR. DE VRIES:  End of February.

16  MR. CLOERN:  -- in February.  And so I just want to

17  clarify --

18  THE COURT:  So wait.  Hold on.  And Judge Norgle set

19  that date.  I can't do anything about that.

20  MR. DE VRIES:  That is correct that Judge Norgle set

21  that date.  And then expert reports are due in April, our

22  expert reports.

23  THE COURT:  Well, if you don't look at what's going

24  on, and you look at the dates in the abstract, they work.

25  MR. CLOERN:  They do work.  What we're going to -- so

```
 1   what your Honor --
 2           THE COURT:  In the abstract they work.
 3           MR. CLOERN:  Well, right.
 4           THE COURT:  I mean, it doesn't matter --
 5           MR. CLOERN:  What your Honor would be ordering is a
 6   30(b)(6) deposition on one source code issue in December, and
 7   then they go back a few week later in January and do the
 8   30(b)(6) source code deposition on all the other issue, if you
 9   have -- when we do all the other depos.
10           THE COURT:  But they --
11           MR. CLOERN:  Why don't we all fly out to China three
12   weeks early?
13           THE COURT:  -- have explained -- they have explained
14   why they think it is significant.  And I just can't endlessly
15   go on.  A decision right or wrong is better than no decision,
16   so I'm just telling you.
17           MR. CLOERN:  Your Honor --
18           THE COURT:  If you can persuade them to put off the
19   deposition we have talked about today for a time in advance, I
20   mean, later, I don't care.  But I think -- I'm going to say
21   I -- my discretion tells me that if they want to do it sooner,
22   they can do it sooner.
23           MR. CLOERN:  Well, your Honor, if I could make one
24   final --
25           THE COURT:  It is just -- it is just a -- never mind.
```

** ROUGH DRAFT **

1    Go ahead.

2    MR. CLOERN:  Well, your Honor, what they haven't

3    explained is why doing it three weeks early makes any

4    difference.

5    THE COURT:  They have.  I think -- they think the

6    fellow is going to be spirited away.

7    MR. CLOERN:  So the witness, I'm telling you, is

8    Xiaohua Zheng.  It is who they already deposed once on source

9    code.  They are asking for a second source code deposition.

10   And they want a third one in January.  That person is at the

11   company and is going nowhere.  It is.  Xiaohua Zheng.  They

12   already deposed her once.  They want a second early one --

13   THE COURT:  Well, they --

14   MR. CLOERN:  -- and then a third on all the merits

15   issues.

16   THE COURT:  Folks, really, I mean, we are arguing over

17   how many angels can exist on the head of a pin.  Maybe that's

18   what discovery has come to, but nobody ever dreamed that it

19   would be that.  We're arguing about a date for a deposition.

20   MR. DE VRIES:  We agree.

21   THE COURT:  Every -- each side --

22   MR. DE VRIES:  Right.

23   THE COURT:  -- has sort of equivalent arguments.  It

24   is a -- you might as well flip a coin.

25   MR. DE VRIES:  Your Honor, as of last night they said

1    they wouldn't even give us one.

2            MR. CLOERN:  That's not true.  We didn't say that.

3            MR. DE VRIES:  In --

4            THE COURT:  I wasn't there.  I can't -- I can't

5    (unintelligible) who is --

6            MR. DE VRIES:  It is in your -- it is in the brief to

7    you, your Honor.

8            THE COURT:  That doesn't make it true.  I can't

9    officiate who is telling the truth about what.  If you want to

10   take the deposition, when I told you in an early December --

11   you should -- if you have real concerns.

12           If you don't have those concerns, you should wait.

13           As far as Judge Norgle is concerned, I'm not advising

14   you to do anything.

15           MR. DE VRIES:  Yeah.

16           THE COURT:  You folks, if you think there is an issue,

17   you have the tools available to do something.

18           MR. DE VRIES:  Thank you, your Honor.  And we'll work

19   to find a mutually agreeable date in December.

20           THE COURT:  Yeah.  Whether he likes it or he doesn't

21   like the date you pick, is really a matter for Judge Norgle.

22           MR. DE VRIES:  Yeah.

23           Then there is only one final issue, and I think it is

24   an easy one, and it is that we have asked for the hierarchical

25   structure of their source code repository.  It is just a file

** ROUGH DRAFT **

1   listing.

2        Their position in their brief to you last night, which

3   is, by the way, what I was referring to your Honor, not our

4   brief, their brief to you when they said they wouldn't give a

5   deposition --

6        THE COURT:  Yeah.

7        MR. DE VRIES:  -- in that brief at page 13, at the

8   top, the full sentence, it reads:  Motorola seeks a full

9   listing of Hytera's source code directories and files.  Hytera

10  is investigating Motorola's request and will provide an update

11  to Motorola by November 19th, 2018, next Monday.

12       This is clearly relevant.  We need a date certain by

13  which it will be produced.  We think it should be this Friday.

14       THE COURT:  They said just by next Monday.

15       MR. DE VRIES:  No, they said they are going to tell us

16  their position by next Monday.

17       MR. CLOERN:  We can produce it, your Honor.  I got

18  that position this morning.

19       THE COURT:  Okay.  Good.  So November 19 -- whatever

20  the date is on Monday is the date for production.

21       MR. DE VRIES:  Thank you, your Honor.  Those are all

22  the issues we have, and we very much appreciate the Court's

23  time.

24       THE COURT:  And I will very much appreciate the four

25  of you -- excuse me one second.  The four of you agreeing on an

** ROUGH DRAFT **

```
 1    order that encompasses all that we talked about, with nobody

 2    trying to get the edge over the other side.  Just flat out it

 3    is what it is, and then we'll talk.

 4            Yes?

 5            MR. CLOERN:  So --

 6            THE COURT:  No, your --

 7            MR. CLOERN:  I would be happy to say what he wanted.

 8            THE COURT:  Oh.

 9            MR. CLOERN:  So, your Honor, we still need to address

10    the trade secret issue so we would like to do that if --

11            THE COURT:  I'll tell you what.

12            MR. CLOERN:  -- (unintelligible) we would like a

13    break --

14            THE COURT:  You guys can sit down and go into my

15    office so I can take care of the other people who are

16    waiting.  Talk about what you need to talk about.  And then

17    I'll come in there or you'll come out there.

18            So come with me and I'll show you where to you.

19            MR. CLOERN:  Thank you.

20            THE COURT:  Okay.

21            MR. CLOERN:  Do we need to move all of our stuff in

22    there?

23            THE COURT:  No.  Don't worry about your stuff.

24            MR. CLOERN:  Okay.  Thank you.

25            THE COURT:  They can work around your stuff.
```

** ROUGH DRAFT **

138

1          (Which concluded the proceedings.)

2                      CERTIFICATE

3       I certify that the foregoing is a correct transcript

4  from the digital recording of proceedings in the above-entitled

5  matter to the best of my ability, given the limitation of using

6  a digital-recording system.

7

8

9  /s/Pamela S. Warren              November 15, 2018
   Official Court Reporter                 Date
10 United States District Court
   Northern District of Illinois
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    ** ROUGH DRAFT **