```
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   MOTOROLA SOLUTIONS, INC., et al.,    )
                                          )
 4               Plaintiffs,              )
                                          )
 5               vs.                      )  No. 17 C 1973
                                          )
 6   HYTERA COMMUNICATIONS CORPORATION    )
     LTD., et al.,                        )  Chicago, Illinois
 7                                        )  April 4, 2019
                 Defendants.              )  8:33 A.M.
 8
                      TRANSCRIPT OF PROCEEDINGS - Motion
 9        BEFORE THE HONORABLE JEFFREY COLE, Magistrate Judge

10   APPEARANCES:

11   For the Plaintiffs:       KIRKLAND & ELLIS LLP
                               555 California Street
12                             27th Floor
                               San Francisco, California  94101
13                             BY:  MR. ADAM R. ALPER

14                             KIRKLAND & ELLIS LLP
                               333 South Hope Street
15                             Los Angeles, California  90071
                               BY:  MR. BENJAMIN A. HERBERT

16

17                   PAMELA S. WARREN, CSR, RPR
                        Official Court Reporter
18                   219 South Dearborn Street
                             Room 2342
19                   Chicago, Illinois   60604
                          (312) 408-5100
20
     NOTE:  Please notify of correct speaker identification.
21   FAILURE TO SPEAK DIRECTLY INTO THE MICROPHONE MAKES PORTIONS
     UNINTELLIGIBLE.
22
     PORTIONS OF THIS TRANSCRIPT TRANSCRIBED FROM DIGITAL RECORDING.
23

24

25
```

1  **APPEARANCES:  Continued**

2  For the Defendants:        STEPTOE & JOHNSON, LLP
                              115 South LaSalle Street
3                             Suite 3100
                              Chicago, Illinois  60603
4                             BY:  MR. DANIEL STEVEN STRINGFIELD

5                             STEPTOE & JOHNSON LLP
                              1330 Connecticut Ave., N.W.
6                             Washington, DC 20036
                              BY:  MS. KASSANDRA MICHELE OFFICER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1　　　(Proceedings held in open court:)

2　　　　　THE CLERK:  17 C 1973, Motorola Solutions, Inc. versus

3　Hytera Communications.

4　　　　　THE COURT:  Well, I'm happy to see that there aren't

5　so many that were inconvenienced.  I hope my last self-

6　indulgence of five hours didn't make people flee.

7　　　(Laughter.)

8　　　　　THE COURT:  So I just wanted to apologize to you all

9　for what I -- what I did.  I'm sorry.

10　　　　　MR. ALPER:  No, your Honor, we --

11　　　　　THE COURT:  Not the worst that could have happened.

12　　　　　MR. ALPER:  I think we would all say we're grateful

13　for your time.

14　　　　　THE COURT:  You're very nice.  You're not.  Thank you.

15　　　　　Okay.  So let me ask you that -- well, go ahead, tell

16　her -- tell us who you are first.

17　　　　　MR. ALPER:  Sure.  Adam Alper for Motorola Solutions.

18　　　　　MR. HERBERT:  Ben Herbert also for Motorola Solutions.

19　　　　　MS. OFFICER:  Kassandra Officer from Steptoe & Johnson

20　on behalf of Hytera.

21　　　　　Also Dan Stringfield from Steptoe & Johnson on behalf

22　of Hytera.

23　　　　　THE COURT:  Okay.  Please put your stuff down.  Don't

24　carry everything.

25　　　　　MS. OFFICER:  Thank you, your Honor.

1          THE COURT:  The first thing, I assume there is no

2     objection to plaintiff's motion to file under seal.

3          MR. STRINGFIELD:  No objection.

4          THE COURT:  All right.  So Number 41 (sic) is granted.

5          Okay.  Now the other one, more substantial, Mr. Alper,

6     tell me about that.

7          MR. ALPER:  So --

8          THE COURT:  I read what you wrote.  I assume there has

9     not yet been a response.  Because sometimes you guys are very

10    fast, and it gets filed but I don't see it.

11         MS. OFFICER:  No, your Honor.  We're happy to argue

12    the motion today.

13         THE COURT:  Oh, good.  Wonderful.

14         MR. ALPER:  So, your Honor, so this is a relatively

15    straightforward and discrete issue today.  It has to do with

16    the discovery of some source -- source code --

17         THE COURT:  Source code.

18         MR. STRINGFIELD:  -- and then some related financial

19    materials, a database pull.

20         So here's how this all came about.  As you know, one

21    of our central allegations is that -- and by the way, for the

22    record, this is Adam Alper.

23         One of our central allegations is that Motorola source

24    code was copied into certain products of Hytera's.  And in

25    February, about a month and some change ago, we came upon some

1    materials in the Hytera document production that showed us that

2    they're the same.

3              THE COURT:  You mean --

4              MR. ALPER:  I'm sorry?

5              THE COURT:  I actually saw page 2 that -- what -- how

6    you found the materials.

7              MR. ALPER:  Yeah, just going through --

8              THE COURT:  Right.

9              MR. ALPER:  -- a large production in the ordinary

10   course, we found a document that said -- it was an internal

11   document, an email.  We attached it to our motion.  And it has

12   engineers who are talking about how the code that we had -- we

13   are alleging came from Motorola and is in some of the Hytera

14   products is in other of the Hytera products.

15             THE COURT:  And it is referred to at page 2 as V one

16   point and so on.

17             MR. ALPER:  Right.  It is the CPA code.  They call it

18   their CPA code.

19             So they have their -- they have their software, and

20   there are various different modules in the software that we

21   have specifically identified to Hytera as copy -- as their name

22   for code that is a copy of Motorola code.  So one of the

23   modules is called CPA.

24             So we saw this document in their production where the

25   engineers are saying that this other set of products called

1  their Tetra products has CPA version -- I forgot whether it is

2  1.2 or 2.1 or something, but --

3      THE COURT:  And it says, the CPA version

4  (unintelligible) at this stage is and gives the name.  And then

5  it says, this fact was subsequently confirmed by Hytera

6  corporate witness's deposition.  And then it goes on, based on

7  this new information, Motorola promptly supplemented it and so

8  on.

9      MR. ALPER:  Correct.  So the sequencing was this, so

10  we found the document.  And then in -- within a week or some

11  change, we supplemented our interrogatory responses on February

12  15th to say, hey, we found this document, and we believe that

13  your Tetra products also use the CPA code that we previously

14  said that was taken.

15      There was a deposition shortly after that.  I think it

16  was on the 21st of February, pre-scheduled, of someone that

17  Hytera has -- had identified in their interrogatory responses

18  as knowledgeable about their source code.  We asked about this.

19  And that witness confirmed that in Hytera's Tetra products, the

20  Tetra products used the CPA code.

21      And so we -- we turned around to them and said, we'd

22  like some -- we'd like to see the source code so we can verify

23  this.  And we believed that they were in agreement to provide

24  us that code.  This is now, you know, a little more than a

25  month ago.  Not too long ago.

1    And ultimately, as you'll see by the end of this

2    story, they have -- they didn't -- they believed that they

3    didn't agree to that.  But, anyway, this is not -- not too long

4    ago.

5    So, you know, a little bit of time, a week or two

6    passes.  We figure that they are collecting the code for us.

7    As you know there is a lot of other things going on in the

8    case.  We have got lots of depositions on both sides.

9    Then on March 14th Hytera filed their motion to extend

10   the schedule with Judge Norgle.  In it they say one of the --

11   one of the main reasons they needed more time was because now

12   Tetra -- our interrogatory response has told them, as of

13   February 15th, that Tetra is part of the case and they need

14   more time to accommodate discovery on that.

15   We showed up before Judge Norgle.  The long and the

16   short of it is that we went into an attorney, you know,

17   conference room in the hall and came up with an agreement to

18   extend discovery, as you probably saw, by roughly six weeks, in

19   part to accommodate this Tetra discovery.

20   And then we wrote them a --

21   THE COURT:  So there was no claim to Judge Norgle that

22   it shouldn't be appropriate discovery and there should not be

23   an extension based on that.

24   MR. ALPER:  Correct.

25   THE COURT:  Okay.

1          MR. ALPER:  Correct.  Exactly.  In fact they never

2     objected to the -- to Tetra being in the case.  They said they

3     just need more time to accommodate it.

4          THE COURT:  Okay.

5          MR. ALPER:  So then on March 25th, a few days

6     after -- that hearing was on the 22nd.  That was a Friday.

7          The following Monday we wrote back to Hytera.  Okay,

8     we got this schedule in place.  Can you please produce the

9     code?

10          And then they wrote back to us.  This is last week

11     now.  So we're already all caught up.  They wrote back to us

12     and they say we have never agreed to produce the code or any

13     materials relating to Tetra.

14          So then the -- the final end of the story is --

15          THE COURT:  But that's -- that was, if I am

16     understanding the basis for your sort of joint -- or the

17     agreement that discovery -- (unintelligible) discovery should

18     be extended.

19          MR. ALPER:  One of them, yes.

20          THE COURT:  Yeah, one of them.

21          MR. ALPER:  Yeah.  But certainly after -- it is in

22     black and white in their motion for everyone to see.  Very

23     clearly they say, we are now going to have to deal with Tetra

24     so we need an extension on the schedule.

25          And so -- and so they told us last week over email

1    that they weren't going to produce Tetra.

2           So then we had a two-day deposition, one of the last

3    ones of their people, here in Chicago last week.  And

4    Mr. Stringfield -- actually Ms. Officer was there;

5    Mr. Stringfield wasn't.  And Mr. Cloern was there.  And I was

6    there.  And so I had an opportunity over the two days to talk

7    live in person with Mr. Cloern, and we really attempted to work

8    this out.  I mean, air our sides on this.  And we weren't able

9    to work it out.

10          We were -- I explained all this to him.  And I said,

11   basically there is a very practical reality to our request

12   here.  We have evidence that this -- and we attached it to the

13   motion.  We have evidence that this set of products is -- uses

14   the same code that we have been alleging all along has been

15   copied from Motorola.

16          And they say now even -- in fact, Mr. Cloern said it

17   at the deposition, he says, you're wrong, it doesn't have

18   it -- have the -- that's not correct.

19          And so I said, then let's just get -- this is -- we're

20   not talking about some major million dollar -- million page

21   production here, just we -- both sides have been putting source

22   code on a source code review computer very frequently for

23   months now.  Let's just get some of the code on there, and

24   we'll verify it, and we'll put it to bed.

25          If it is not in there, trust me, we have got enough

1  stuff to air to the jury, we're not going to raise an issue on

2  it.  But if it is in there, it should be fair game.  As they

3  have said to Judge Norgle, it is in the case.  And we

4  couldn't --

5        THE COURT:  Okay.  Can I ask you a question,

6  Mr. Alper?

7        MR. ALPER:  Yes.  I'm sorry.

8        THE COURT:  What did they say -- or I assume you said,

9  what did they say to the question of, well, you told Judge

10  Norgle it was in the case, and now you are saying it is not?

11        MR. ALPER:  Honestly, I don't -- I don't -- I did not

12  get a clear -- I did not get a good verbal response in that

13  part of the discussion.  They -- they had come back -- I will

14  say this in to -- when Hytera's counsel wrote back to us last

15  week, right before the deposition that we had, they told us

16  that the deponent, although she was noticed on all products

17  that they make, they said, she's not going to testify about

18  these Tetra products because that's not in the case.  So

19  that -- that was the -- the deposition was on Thursday and

20  Friday, and they wrote to us on Wednesday saying that.

21        So we wrote back and said -- we pointed them to

22  the -- what they said to Judge Norgle.  And said, you know, we

23  have a disagreement, we don't think we -- we actually gave you

24  the extension on that basis.  It was civil emails back and

25  forth --

```
 1              THE COURT:  No, I understand.

 2              MR. ALPER:  -- about not a lot of (unintelligible) --

 3              THE COURT:  No, no, I understand.

 4              MR. ALPER:  -- on the table.

 5              But we were pointing that out.  And we just --

 6    I -- and I'm sure Ms. Officer and Mr. Stringfield can address

 7    this, but we did not get a good response back.  We just simply

 8    did not get a response back on that.

 9              So that -- that is -- we don't -- I cannot answer that

10    question, your Honor, because I don't know -- I don't see how

11    that could possibly be because we were in a -- we were in a

12    conference room outside Judge Norgle's office agreeing to a

13    schedule to push all this stuff back in part on that basis.

14              So --

15              THE COURT:  And I -- I don't mean to be dense --

16              MR. ALPER:  Yeah.

17              THE COURT:  -- but you all told Judge Norgle that that

18    was part of the basis for the extension.

19              MR. ALPER:  To -- and so I want to be clear on this,

20    they told Judge Norgle in their papers that that's why they

21    wanted part -- in part --

22              THE COURT:  Yes, no, I --

23              MR. ALPER:  -- in part why they wanted the extension.

24              THE COURT:  You said that.

25              MR. ALPER:  When we went into Judge Norgle's
```

1  very -- we didn't do a lot of talking.

2          THE COURT:  I understand.  Okay.

3          MR. ALPER:  Yeah.

4          THE COURT:  But the representation was made by them --

5          MR. ALPER:  Yes.

6          THE COURT:  -- that that -- okay.

7          MR. ALPER:  Yes, absolutely.

8          And so -- and so what are we talking about here, you

9  know, when it comes to -- and so -- well, actually one other

10  point I just want to make.  This is not -- we're not talking

11  about a material expansion of the case in any way.  We're

12  talking about -- this is not like a whole new product line that

13  we're suddenly opening up a new front on.  This is simply the

14  same set of materials that we have been pointing to, just in

15  another shell, so to speak.  So it is just more

16  misappropriation of the same stuff.  It is not like now there

17  is a whole new technology.  And now you have to bring in all

18  new -- you know, there is a whole new set of technical issues

19  and so forth.

20          And so we're really just talking -- that's why I said

21  it was discrete when I started off.  We're really just talking

22  about additional instances of misappropriation.  We have

23  evidence that it is happening.  We just want some code to

24  verify it so we can resolve what appears to be a factual

25  dispute.  We see that it is there.  They have a witness who has

1    told us that it is there.  And then they tell us on break at

2    deposition that it is actually not there.

3         And so we just need the code to figure that out.  In

4    fact, we're in a slightly awkward situation because we

5    don't -- we don't want to proceed on something if it is not

6    there.  And --

7         THE COURT:  And if it is not --

8         MR. ALPER:  -- as far as --

9         THE COURT:  -- there, then there is no cost data that

10   you should have.

11        MR. ALPER:  It --

12        THE COURT:  If it is there, then that's a different

13   question.

14        MR. ALPER:  Exactly.  And so here's all we're asking

15   for.  I think we can make it very focused.  When it comes to

16   the code, this is consistent with what we have done with code

17   productions in the past, if we can just -- to vet -- get

18   through this verification phase -- and this might be everything

19   that we need -- maybe one early version, one middle version,

20   one recent version, and that's easy -- that's not a big deal

21   that --

22        THE COURT:  Well, let me say this.  If your motion is

23   granted -- we have to hear from the other side -- then I will

24   leave it to you folks to work out what you're going to get --

25        MR. ALPER:  Yeah.

```
 1                THE COURT:  -- and how you're going to get it.
 2                MR. ALPER:  And we are going to --
 3                THE COURT:  But I do think that is sort of --
 4                MR. ALPER:  -- be very reasonable.
 5                THE COURT:  I think that's kind of basically in the
 6   motion.
 7                MR. ALPER:  Yeah.
 8                THE COURT:  But --
 9                MR. ALPER:  We'll be reasonable about that.
10                And then the financial data, that's another -- that's
11   essentially, you know, a data pull, and that kind of -- as
12   the -- the reason why we asked for it at the same time, your
13   Honor, is because obviously we're closing in on the end of
14   discovery, and we didn't want to sit on our hands when it came
15   to that.  But that will go -- now that we -- we have reason to
16   believe, recent -- as of recently that the -- this additional
17   set of products is -- has our code in it, that it really isn't
18   additional technical misappropriation issues, it is just more
19   instances of the same stuff.  So it is just -- it is really a
20   damages issue, you know --
21                THE COURT:  Right.
22                MR. ALPER:  -- and a scope of injunctive relief issue.
23   And so that's why we asked for the financial and sales
24   information.
25                THE COURT:  Okay.  Thank you.
```

1          MR. ALPER:  Thank you, your Honor.

2          THE COURT:  Folks?

3          MS. OFFICER:  Good morning, your Honor.  So I do want

4     to address very briefly the timing issue.  Now we didn't, agree

5     from our perspective, to produce code for Tetra.

6          THE COURT:  Could I go back?

7          MS. OFFICER:  Yeah, yeah.

8          THE COURT:  I would like to ask you about the

9     representation to Judge Norgle issue.

10         MS. OFFICER:  Yeah.

11         THE COURT:  If you could speak to that first.

12         MS. OFFICER:  Yeah.  So we agreed to extend the case

13    based -- or extend the schedule, excuse me, based on the case

14    as it was.  We went in and asked for four months and used

15    Motorola's attempt to expand the case by adding in the Tetra

16    products as evidence of Motorola trying to expand the case.  We

17    asked for four months.

18         THE COURT:  But you didn't object to what you say is

19    Motorola's attempt to expand the case.  Your -- I want to be

20    clear.  I mean, I'll look at the docket.  I haven't done this.

21    But did you tell Judge Norgle that Tetra was in the case and

22    therefore some discovery expansion was needed?

23         MS. OFFICER:  We disagree that we told Judge Norgle

24    that Tetra was in the case.  I don't have the motion in front

25    of me to look at, but --

1    THE COURT:  I'll look at the docket, and I'll read it.

2  I should have, I guess, but I didn't think it was quite as

3  significant as I think it is now.

4    But go ahead.

5    MS. OFFICER:  In the parties's negotiation with

6  respect to the schedule extension, we agreed to five weeks down

7  from four months based on the case as it was before us at that

8  time.  And you can see --

9    THE COURT:  Which would involve Tetra.  I mean --

10    MS. OFFICER:  We disagree.

11    THE COURT:  -- they weren't asking for expansion

12  without the -- or you weren't asking for an expansion without

13  Tetra in the case.

14    Whose motion was it, yours?

15    MS. OFFICER:  Yes, I believe so.

16    THE COURT:  Okay.  Hold on.

17    (Brief interruption.)

18    THE COURT:  Go ahead.

19    MS. OFFICER:  And so as a preliminary matter as well,

20  I do think there is some confusion with respect to the Tetra

21  products.  Hytera does sell two different types of Tetra

22  products.  There is a pure c55 Tetra product, and there is also

23  a multimode Tetra product.  Motorola has treated these two

24  types of products very similarly, though they are very

25  different.

1          The pure c55 Tetra products are radios, and they are

2     supported by the Tetra standard.

3          The multimode Tetra products combine this Tetra radio

4     functionality with an LTE cellular functionality.  It is

5     essentially one product that has traditional radio capabilities

6     as well as cellular capabilities.

7          And nothing that counsel for Motorola has said today

8     applies to the c55 -- or excuse me -- the pure c55 Tetra

9     products.

10          THE COURT:  Well, let me, in my sort of my

11     simplistic --

12          MS. OFFICER:  Sure.

13          THE COURT:  -- overview of this, the question I would

14     think would be whether the Tetra products -- I guess they are

15     products -- utilizes -- any of them utilize the code that they

16     claim has been taken from them.  I don't know if it has or if

17     it is a trade secret.  But they're claiming that it is a secret

18     that has been taken, and your product line, the Tetra product

19     line, utilizes that code.  And I didn't -- I don't get the

20     sense that anybody, until now, ever said you -- you are

21     mistaken.  I'm really not sure what the conflict is about, at

22     least after hearing Mr. Alper's rendition.

23          MS. OFFICER:  So I can -- the c- -- the pure c55 Tetra

24     code -- first, Motorola doesn't have any evidence that it does

25     use the CPA module.  The two pieces that (unintelligible) they

1    then submit relates to the multimode Tetra products.

2              THE COURT:  No, I -- honestly, forgive me, I don't

3    mean --

4              MS. OFFICER:  No, no, I'm sorry.

5              THE COURT:  -- to keep interrupting you.

6              What I got from this morning, which is really pretty

7    much a rendition, condensation of the motion -- a condensed

8    version of the motions is that you folks, you agreed that Tetra

9    was in the case, and there had to be some dilation of the

10   discovery schedule.  The real objection or concern was how

11   much.  They wanted the moon, and you wanted, you know, the

12   local grocery store.  And somewhere in between that you all

13   agreed.

14             But there wasn't a -- an objection by you folks that

15   they were just importing something into the case that shouldn't

16   be there and had never been there before.  And if that's true,

17   and I realize that's a simplistic version of things, but if

18   that's true, it seems to me they have the right to get, I don't

19   know how much, but they have the right to get something.  And

20   isn't it sort of late in the day?

21             You know, the Seventh Circuit has said -- somewhere I

22   have it -- you ought to be careful about what you say to

23   judges -- lawyers ought to be careful about what they say to

24   judges.

25             Not you.

1    It is really true.  Judges rely on what lawyers say.

2    Holmes said, the law is made by the bench more than by the

3    bar -- or by the bar more than by the bench.  It is really

4    true.

5    So I -- that's sort of what I am focusing on.  And I

6    really don't want to take you away from your argument, but I

7    really want to know what happened before Judge Norgle.

8    MS. OFFICER:  The motion for an extension that we

9    asked for was based on a variety of things.  Forgive me, like I

10   said, I don't have the motion in front of me.  I think one of

11   them was the enormous document production.  We were looking at

12   40 million pages.

13   THE COURT:  Was Tetra mentioned before Judge Norgle in

14   the -- Jan, bring up the motion, will you?

15   MS. OFFICER:  I believe Tetra was used as evidence of

16   Motorola attempting to expand the case.  If you look at

17   Hytera's most recent interrogatory and RFP responses, we object

18   on the grounds that Tetra is not part of the case.

19   There was not, in my mind, a meeting of the minds, so

20   to speak, with respect to whether Tetra was in.

21   THE COURT:  Okay.  Go ahead.

22   MS. OFFICER:  In addition, with respect to the merits

23   of the c55 pure Tetra products, they don't contain -- or they

24   don't share a common platform architecture, the CPA that

25   Mr. Alper mentioned.  They don't share that module with

1    Hytera's pure c55 DMR products, which are part of this lawsuit.

2    The pure c55 Tetra products don't even contain a module that's

3    named CPA.

4            Further, as informed, that the pure c55 Tetra products

5    share only third-party source code modules.

6            THE COURT:  Could I -- could I read this real quickly?

7            MS. OFFICER:  Yeah, please.

8            THE COURT:  Thank you.

9        (Brief interruption.)

10           THE COURT:  So it is a joint motion.  Rather short.

11   So the motion, is it -- was there anything with the motion?

12           Jan, was there a -- I assume there wasn't a memo with

13   this.

14           THE CLERK:  No.

15           MR. ALPER:  There wasn't, your Honor.

16           THE COURT:  This is it.

17           MR. ALPER:  The Tetra part is in the Hytera motion

18   asking for the extension.  And what you probably have is the --

19           THE COURT:  I have the joint motion and proposed

20   order.

21           MR. ALPER:  You probably have what we agreed to to

22   resolve their motion.  And I have -- I don't have available

23   their brief.

24           THE COURT:  Yeah, let me interrupt you guys for a

25   moment.

1          MR. ALPER:  Yes, of course.

2      (Discussion off the record.)

3          THE COURT:  Okay.

4          MR. ALPER:  If you would like, I can read the relevant

5  passage from the Hytera motion.

6          THE COURT:  Yeah, would you mind?

7          MR. ALPER:  Yeah.

8          THE COURT:  And then counsel can respond to what

9  you're reading.

10          MR. ALPER:  I can.  So in Hytera's motion, which was

11  Docket Number 437 --

12          THE COURT:  Hold on.  437.

13          MR. ALPER:  -- at page 4.  And I don't have that in

14  front of me, but I have the relevant quote.

15          THE COURT:  No, we can get it.

16          Jan, 437.  It is a whole motion, print the motion.

17          THE CLERK:  Okay.  But 437 is the memorandum in

18  support.

19          MR. ALPER:  That's their brief.  Their brief

20  supporting --

21          THE COURT:  That's their brief.

22          MR. ALPER:  Supporting their motion.  It was a motion

23  to amend the schedule where they asked for an extension.

24          THE COURT:  Yeah.

25          All right.  So get 437 and just -- was page 4 enough?

1    MR. ALPER:  Page 4.  And then I don't have a quote
2  here of it, but I know it has -- page 4 and 5.
3         THE COURT:  Four and 5, Jan.
4         MR. ALPER:  Four and 5 should be --
5         MR. STRINGFIELD:  Yeah.
6         MR. ALPER:  -- enough.
7         THE COURT:  And then if you folks need more, we'll get
8  more.
9         MR. ALPER:  If you would -- would you like me to wait,
10  your Honor?
11        THE COURT:  Yeah, please.
12        MR. ALPER:  Okay.
13     (Brief interruption.)
14        THE COURT:  Okay.
15        MR. ALPER:  Okay.  So just briefly, your Honor --
16        THE COURT:  It is not quite -- it is not quite as
17  simplistic and as clear as I thought it might -- I thought it
18  was.  But --
19        MR. ALPER:  Well, they -- as I said that they also
20  were arguing that, as your Honor heard from the parties a week
21  or so ago, that another reason for the extension is that they
22  needed more time to address the trade secrets.  But when it
23  came to Tetra, I think there is --
24        THE COURT:  Well, that's just a -- the concept here
25  was that you were really trying to expand -- it says to expand

1    yet again the scope of this case to include an entirely

2    separate category of products, one that its counsel, you,

3    represented two months ago was not an issue in the case.

4            MR. ALPER:  So, so let me just --

5            THE COURT:  No, I don't -- I want to hear from

6    counsel.

7            MR. ALPER:  Okay.

8            THE COURT:  And then you can come back.

9            MR. ALPER:  For sure.  And I --

10           THE COURT:  But I -- it is not exactly quite as

11   pristine as I thought it might be.

12           MR. ALPER:  I can address that when I --

13           THE COURT:  Yeah, later.

14           MR. ALPER:  Thank you, your Honor.

15           THE COURT:  So come on up.  Sorry.

16           Wait.  Hold on one second.

17           Can I interrupt you again?  This will take -- if it

18   takes five minutes, it will take a long time.

19       (Discussion off the record.)

20       (Whereupon the Court turned his attention to other matters

21   on his call.)

22           THE CLERK:  17 C 1973, Motorola Solutions versus

23   Hytera Communications.

24           THE COURT:  Could you go get them, please?

25           MR. ALPER:  Yes.

1    THE COURT:  Thanks.

2        Okay.  Would you reannounce yourself for the -- really

3    for the record, please.

4        MS. OFFICER:  Kassandra Officer on behalf of Hytera.

5        THE COURT:  Okay.  I read the motion, and I think --

6    and Mr. Alper can speak to this -- it is not quite as stark or

7    as simple, I think, as at least Mr. Alper made it sound.  It is

8    almost as though you were informing Judge Norgle of sort of

9    what was happening.  And there was a kind of, not an

10   acceptance, but an almost avowing by you of the -- to the

11   inevitable.  And the inevitable is, once again, here we have

12   Motorola seeking to expand things, and it is terrible, and it

13   is awful, and they're really -- because there is a lot of bad

14   things about Motorola that are -- you know, you talk about your

15   considerable effort and how Motorola does -- yet again is doing

16   bad things.  It is what it is.  And it is not quite as stark,

17   as I say, as advertised.

18       But in the end it is sort of agreed that there is

19   going to be an expansion of the schedule because kicking and

20   screaming you have to sort of bow to the inevitable, which is

21   their inevitable attempt to expand things.  So I don't think it

22   is quite what I thought it was.

23       Just having said that, I don't think this is somehow

24   binding on you as a -- quite the way Mr. Alper has made it

25   sound.

1          But you didn't say what they're doing is wrong, and

2     we're not going to agree to it.  We're willing to extend the

3     thing to a certain extent, but we're not -- it was never a

4     statement to him that we think this is incorrect and there

5     are -- continue to attempt to expand shouldn't be allowed.

6     And, frankly, I suppose one could have said, we don't need an

7     extension because their attempt to expand the discovery is

8     illicit, and we're not going to stand for it.  It does get kind

9     of murky.

10          MS. OFFICER:  So --

11          THE COURT:  But it is not at all what I think Motorola

12     has said.

13          MS. OFFICER:  So respectfully, your Honor, I think

14     that we are dealing with the Tetra dispute now --

15          THE COURT:  Yeah, I think.

16          MS. OFFICER:  -- as a discovery dispute.

17          THE COURT:  I agree with you.

18          MS. OFFICER:  Okay.

19          THE COURT:  The dispute is not so much -- it is before

20     Judge Norgle, where it was sort of an accomplished fact, and

21     now you're coming here and you have already sort of conceded

22     the propriety of what they're doing.  I agree with you.

23          MS. OFFICER:  Okay.

24          THE COURT:  Okay.  So go ahead.

25          MS. OFFICER:  Just getting back into the merits of the

1    Tetra discovery, I just want to reiterate that the pure c55

2    Tetra products, which are radios, do not contain a module that

3    is called CPA.  My understanding is they don't share any

4    non-third party source code modules --

5              THE COURT:  But isn't -- can't I -- and, again,

6    forgive me for -- isn't it easy enough to respond to what they

7    want, as illicit as you think it may be, simply by saying what

8    you just said.  That's sort of the easy way out to say, you

9    want us to give you our green coat.  We don't own a green coat.

10   And that's the end of the matter.  Unless they want to make

11   something more out of it.

12             MS. OFFICER:  Well, your Honor, we do believe that --

13             THE COURT:  All they want --

14             MS. OFFICER:  -- this is --

15             THE COURT:  -- as I understand it is the code to be

16   put on a computer or its equivalent.  And that's the way you

17   have been dealing with code.

18             I'm not saying you have to bow to them.  But isn't it

19   easier at this late stage to say, here's the code, go take a

20   look at it.  You're bound not to do anything with it.  And we

21   don't use your alleged trade secret.

22             MS. OFFICER:  Going back to the inevitable, we believe

23   that Motorola will inevitably find a basis to bring this

24   product into the case in an effort to expand the case.  And

25   with that we would need to produce substantial amounts of

1    documents.

2          So Motorola only needs --

3          THE COURT:  You mean they would file an amended

4    complaint?

5          MS. OFFICER:  Respectfully, your Honor, if they can

6    amend an interrogatory response to include new products without

7    a fight, I mean, is an amended complaint necessary in your

8    mind.  And if it is then --

9          THE COURT:  Oh, I don't know.  I have no idea what is

10   appropriate or necessary.  I mean, I would think if they could

11   show that you're using this on another product, as well as the

12   charged products, wouldn't that just be -- well, it is kind of

13   like 404(b) evidence.  I mean, what would be illicit about

14   doing that?  And then it would be a matter of whether Judge

15   Norgle, in his informed discretion, wants to let certain other

16   evidence, uncharged evidence in.

17         Yes.

18         MR. STRINGFIELD:  Your Honor, may I -- Daniel

19   Stringfield for Hytera.

20         So, your Honor, I apologize --

21         THE COURT:  Please.

22         MR. STRINGFIELD:  -- for busting in here.

23         THE COURT:  No, no, I am -- I'll hear from both of

24   you.  That's fine.

25         MR. STRINGFIELD:  Thank you, your Honor.

1    So your Honor made me think of something when you were

2  talking about an amended complaint.  And that reminded me of

3  how this case started.  And the Court probably remembers it

4  better than I do because you have been with this case forever.

5    But this case started as a trade secret

6  misappropriation case.

7    THE COURT:  Right.

8    MR. STRINGFIELD:  Why do I mention that?  So our Tetra

9  products have been open and notorious and out and available

10 forever, just like our DMR products.  They have been on our

11 website.  We have been selling them for years.

12   THE COURT:  And the trade secret they said last time,

13 there wasn't -- I thought it was sort of said before, but the

14 trade secret they say is what was stolen, the code that was

15 stolen, allegedly, from them and brought over to Hytera.

16   MR. STRINGFIELD:  That -- well, your Honor, there is a

17 few things to that.  Yes, at our last meeting we did talk about

18 what their trade secret was.  And I think where the Court

19 landed was that their trade secret is what was taken.  And so

20 --

21   THE COURT:  No, they landed at that; I didn't.

22   MR. STRINGFIELD:  You're correct, your Honor.

23   THE COURT:  I didn't.  I would -- really the case is

24 about code, and I knew nothing about code.

25   MR. STRINGFIELD:  Well, it didn't -- well, your Honor,

1    it didn't start that way.  And that's my point is that this

2    case actually started as a trade secret dispute based on former

3    employees that left and allegedly took documents --

4           THE COURT:  And stole something.

5           MR. STRINGFIELD:  Stole something.  That's the

6    allegation.

7           THE COURT:  And they stole code.  What they stole was

8    code.

9           MR. STRINGFIELD:  That's part of, I believe, what they

10   are alleging today.  I don't recall specifically whether code

11   was originally part of what they alleged.

12          But the reason that I mention that the case started as

13   trade secrets was that they're using our software and our code

14   as a hook at the eleventh hour to bring additional products in.

15   My point is that this was a trade secret -- this started out

16   much broader and much -- you know, much sort of more, you know,

17   ethereal in that it was trade secrets.  And they said, well,

18   your DMR products are using trade secrets, so they're in.  Why

19   didn't they point to the Tetra products?  They were out there.

20   They were open and notorious.

21          Here we are at the -- near the close of discovery, and

22   they're saying, well, we found some code that might be similar.

23   And we got a deposition where somebody mentioned Tetra.  And

24   they are using that as a hook, Judge, to bring this stuff in.

25   And it is not just a matter of letting them look at our

1    computers and look at a little bit of code.

2           THE COURT:  So what you're saying, if I understand

3    you, is there -- I am not saying -- that effectively they are

4    kind of -- they were slow on the trigger.

5           MR. STRINGFIELD:  Absolutely.

6           THE COURT:  It is too late.  It is too late, the case

7    is too far gone --

8           MR. STRINGFIELD:  Absolutely.

9           THE COURT:  -- and there comes a point where, you

10   know, prudence and discretion says you can't do it.

11          MR. STRINGFIELD:  Absolutely.  Your Honor, they were

12   -- we were here at our last meeting, and counsel said, we need

13   to move forward.  We need to go.  We need to push this case.

14   We needed more time.  They vehemently opposed that.  We

15   couldn't understand their trade secrets.  And we put it all in

16   our paper to Judge Norgle.  We told him that we were buried

17   under the trade secrets.  We were buried under 20 million

18   documents that were being dumped on us.  We were painting Judge

19   Norgle a picture of our world.

20          We never conceded that Tetra was in this case.

21          THE COURT:  No, I agree with you the motion does

22   not -- I don't want to read the whole thing, but --

23          MR. STRINGFIELD:  Sure.

24          THE COURT:  -- just a couple of pages.  So what I read

25   certainly does not say to him, oh, yes, Tetra is in the case,

1    and, therefore, we need more time.

2         MR. STRINGFIELD:  That's right, your Honor.  And when

3    we -- and Judge Norgle sent us out into the hallway and said,

4    you guys should figure it out.

5         THE COURT:  Work it out, right.

6         MR. STRINGFIELD:  And we did.  And we, Hytera,

7    negotiated that -- a much meager, more meagered scope of

8    extension based on the scope of the case that was in front of

9    us on that day.  And on that day Tetra was absolutely not in

10   the case.  We had never conceded that.  And, in fact, as your

11   Judge -- your Honor had read in our briefing, they told us

12   Tetra wasn't in the case.

13        We were in a deposition and counsel for Motorola was

14   making objections to testimony, and they represented that Tetra

15   is not in this case, and we said okay.

16        THE COURT:  When did that occur?

17        MR. STRINGFIELD:  If it is not in our paper, your

18   Honor, we can submit a supplemental brief that provides that.

19        THE COURT:  No, I don't want you to submit anything.

20        MR. STRINGFIELD:  I don't have that fact.  It was one

21   of my colleagues who was actually taking the deposition.  But

22   my recollection was that --

23        THE COURT:  I know.  It does say that.  I just don't

24   remember the date.

25        MR. STRINGFIELD:  And we might not have put the date

1    of when they made that representation to us.

2              THE COURT:  Do you have any idea when it was?

3              MR. STRINGFIELD:  It was weeks before we had submitted

4    our paper.  I'm loosely recalling it.

5              THE COURT:  Okay.

6              MR. STRINGFIELD:  But we can -- I can find that fact

7    out --

8              THE COURT:  Okay.

9              MR. STRINGFIELD:  -- if it is dispositive.

10             But, in any event, we were represented that Tetra was

11   not in this case.  We kind of knew what the boundaries were.

12   We knew the scope of their 142 trade secrets on that day.  We

13   knew the scope of their copyright allegations on that day.

14             By the way, Judge, I want to preview this for the

15   Court.  Motorola has in our view substantially expanded the

16   scope of both their trade secret allegations and their

17   copyright allegations.  This was after we had already

18   negotiated our prior extension.  So, again, when I say that we

19   negotiated our prior extension based on the case in front of

20   us, that was before Motorola, on the next business day, Friday

21   to Monday, grossly expanded the case in our view.  They

22   disagree.

23             THE COURT:  To include Tetra?

24             MR. STRINGFIELD:  Not to include Tetra --

25             THE COURT:  Okay.

1          MR. STRINGFIELD:  -- to include numerous --

2          THE COURT:  Other things.

3          MR. STRINGFIELD:  Doubling the -- so when we were here

4    talking about -- and I don't want to get too far afield.  I

5    just want to make sure that I am -- that, you know, I am not

6    being accused of hiding the ball here.  But we are considering

7    the impact that -- what their recent actions have done, might

8    do to the schedule going forward.

9          So we did negotiate an extension.  They blew up the

10   case in our view the following Monday.  We negotiated on a

11   Friday.  On Monday they doubled the number of trade secret

12   documents.  They doubled the number -- amount of source code

13   that's accused of copyright infringement in this case.  The

14   case got twice as big over the weekend after we negotiated our

15   previous extension.

16         We're still internally deciding what we're going to do

17   about that.  We're still in negotiations with Motorola.  That

18   matter is not ripe.  It is not a matter that this Court is

19   going to decide.  I just want to preview it for everybody to

20   make sure that, you know, I'm not hiding the ball here.

21         But setting the scheduling aside, when we negotiated

22   the five weeks, it was based on the case in front of us.  There

23   was no Tetra in this case.  We never conceded that.  We thought

24   it was a dead issue.

25         They have raised it in discovery.  We objected.  We

         1    said, no, you told us it is not in the case.  Dead issue.

         2           Now it is being --

         3           THE COURT:  Well, what I am -- I really do understand,

         4    and I -- it is a bit different than Mr. Alper has presented.

         5    But what about the email that talks about Tetra products using

         6    a certain code?

         7           MR. STRINGFIELD:  Your Honor, there -- like I said,

         8    first of all, again, I think my bigger point is that this stuff

         9    should have been in the case a long time ago.  Now they're

        10    combing through.  They're trying to find a hook.  And they

        11    think they found a hook.

        12           Ms. Officer is ready to address why that hook is wrong

        13    because they have the technology wrong.  But I don't -- and if

        14    your Honor wants to go into that detail, we're happy to go

        15    through all that and explain why they're wrong.

        16           THE COURT:  I mean, you guys can proceed in whatever

        17    order.  You have as much time as you want to take.  But you're

        18    not filing a brief, thankfully.  And I'm not going to write

        19    some big long thing.  I'm going to basically decide the case.

        20           Although I must say that Mr. Singh certainly took to

        21    heart the certain points that were made in the last opinion

        22    about timeliness and delay and relevance and all that sort of

        23    thing, but good for him.  I -- it is certainly different than

        24    it has been portrayed, and that's why we have an adversary

        25    system.

1          MR. STRINGFIELD:  And, your Honor, if I may, I don't

2    -- I didn't --

3          THE COURT:  I'm just concerned about an email that

4    says -- look, if they knew this long ago and didn't do anything

5    about it, shame on them.  But if they suddenly learn through an

6    email that's produced by you guys that Tetra products use --

7    uses the code, then that's a big difference, is it not?

8          MR. STRINGFIELD:  It could be, your Honor.  And,

9    again, I think that that's a factual distinction that we're

10   prepared to address.  But I think the bigger point is one that

11   you mentioned, which is on the timing.

12          There was no excuse for -- if they believed that they

13   had claims against Tetra, and our Tetra products had been open

14   and notorious, they're (unintelligible).  We're talking about

15   digital radios.  We're talking about chocolate ice cream and

16   vanilla ice cream.  And they have had chocolate in the case

17   forever.  We're talking about ice cream.  We have been talking

18   about ice cream for years.

19          And now within weeks of the close of fact discovery

20   they say, we want vanilla in the case.  And so what -- how are

21   we going to get vanilla ice cream in the case?  Well, we're

22   going to find something in the emails, and we're going to ask

23   the witness a question where we think we can get a sound bite,

24   and then we can bring it to Judge Cole at the end of discovery.

25          Your Honor, we -- we don't even think we have enough

1    time to finish the case based on the scope of the DMR case.

2          THE COURT:  No, I understand.

3          Here's what they say on page 3 of their brief.  Hytera

4    argues Motorola's request is untimely.  And, of course,

5    Motorola disagrees.  As noted above, Motorola first learned of

6    the presence of the stolen CPA code -- pardon me -- in Hytera's

7    Tetra products in February 2019 when it came from a document in

8    Hytera's December 14th, 2018, production, a production that

9    included nearly 300,000 documents and spanned nearly three

10   million pages.

11         Motorola then immediately supplemented its

12   interrogatory response to identify Hytera's Tetra products as

13   including its copied source code and so on.

14         So they're claiming they didn't learn about it until

15   some time after mid-December of last year.

16         MR. STRINGFIELD:  Your Honor, I -- I'm not trying to

17   be --

18         THE COURT:  And I understand your point, that it is

19   open and notorious.  They could have easily -- I don't know --

20   I shouldn't say easily.  You're saying they could have found

21   out the stuff was available.  They could have reverse

22   engineered and found out what it was.

23         MR. STRINGFIELD:  And, your Honor, and I -- I'm very

24   careful with my courtroom demeanor, but I'm going to call it an

25   excuse, what you have just read.  This case started as a trade

1    secret misappropriation case.  It wasn't focused on the code.

2    And I think that they're trying to make it sound like it is

3    this -- we have to be so specific, and we have to really kind

4    of dig into things, and we have to have this silver bullet to

5    bring products in the case.

6            That was certainly not their position all along.  They

7    accused our entire DMR product line, not based on the code, but

8    based on alle- -- you know, allegations of theft by certain

9    former employees.  They didn't have to analyze our code.

10           And when they say that we got -- we, you know, gave

11   them a 300,000-page production, and they found that silver

12   bullet and they latched onto it, I suspect they were looking

13   for anything they could.  I doubt that somebody read all

14   300,000 of those pages, and as they were reading it, they said,

15   a-ha, here's -- Tetra was never on my radar.  Now all of a

16   sudden it is on my radar.

17           I suspect it was something quite different where they

18   missed their opportunity a long time ago to bring Tetra into

19   this case.  And they said, geez, we need a hook.  We need an

20   excuse.  We need a reason.  Go through those documents, find me

21   anything that mentions Tetra, anything that mentions that code,

22   anything that ties it together, and we're going to try to put a

23   bow on that, and we're going to bring it to Judge Cole on the

24   eve of the close of fact discovery.

25           THE COURT:  Well, why would they at this -- at this

1    late stage of the case -- I agree that certainly they would

2    have done that maybe early on.  Anybody would.

3           But why at this late stage would they be looking for

4    other products and then say, go back and find me something.  It

5    says here they didn't know until it came up in the production.

6    And I guess there was some email in this, right?

7           MR. STRINGFIELD:  Well, your Honor, they -- oh, I'm

8    sorry.

9           THE COURT:  No, no.  No, there was an email, and the

10   email said whatever it said and that alerted them.  And there

11   apparently had not been a prior comparable bit of information

12   that would have alerted them.  I agree with you the products

13   were out there.  They could have and should have maybe looked

14   at them, but they didn't.  At least they say they didn't.

15          MR. STRINGFIELD:  I don't know what they did, your

16   Honor.

17          THE COURT:  I don't either.

18          MR. STRINGFIELD:  But I do know that they were aware

19   of Tetra when we -- we were objecting -- we were --

20          THE COURT:  They don't say they weren't aware of

21   Tetra.

22          MR. STRINGFIELD:  Right.

23          THE COURT:  I'm sure they're aware of all of Hytera's

24   products.

25          The question though that I have, because I can't go

1  back and I can't -- I wasn't there and you weren't there -- who

2  knows what they did.

3       They're saying we didn't know about this until

4  December 14th when we saw that email.  And, wow, so now we're

5  going to do something about it they say.

6       MR. STRINGFIELD:  So -- and I don't have the brief in

7  front of me, but if it is December 14th and it is March 14th

8  today or after that today, you know, I mean, we're months down

9  the road.

10      And I know that your Honor is concerned about moving

11  this case along.  And I know that timeliness is important here.

12  So if we're talking about emails that were produced in

13  December, and now it is being brought up in April --

14      THE COURT:  Well, they were -- but production that

15  included nearly 300,000 documents and spanned nearly three

16  million pages.  I have no idea what it looked like.  I don't

17  know how they had their folks going through things.  And as

18  efficient as I am sure they and you both are, maybe it does

19  take a bit of time to go through a lot of pages to find the

20  sort of smoking gun telegram.  Maybe they found it right away.

21      But there is sort of -- January, February, March.

22  Okay.  So it took some period of time, and they are here, and

23  here we are.

24      MR. STRINGFIELD:  It took a long period of time, your

25  Honor.  And the -- when we were here -- and I don't want to go

1   tit for tat.  But we were here on discovery motions for Hytera,

2   and they were up and down denied based on how long they took

3   for us to -- between the time that the Court thought we should

4   have raised them and when we actually raised them.  And I don't

5   remember the specific windows.  We can all go back to the

6   transcript.

7         THE COURT:  I don't either.

8         MR. STRINGFIELD:  But it was, I would think, on the

9   order of or perhaps even shorter than the span of period we're

10   talking about from December to April.  We're talking about

11   months and months down the road.  And it is not minor, it is

12   adding an entire new product line.  It is adding source code.

13   It is adding financial discovery.

14         It is -- probably they're going to ask for

15   depositions, unless they are representing that all they want is

16   this very small thing.  I don't think that's where it is going

17   to stop.  I think it is going to be an expansion of discovery

18   that we do not have time for.

19         THE COURT:  Well, I wouldn't think that it should be

20   an expansion of discovery.  If there was -- and if they stop

21   with -- and I -- if they stop with a -- a turnover of

22   information relating to how much the Tetra products earned or

23   whatever their damages figures would be, that would be one

24   thing.  If they want to then keep going on and on and on,

25   that's, I agree with you, another thing.

1    MR. STRINGFIELD:  Your Honor, and I -- without getting

2    into what they're going to ask for in the future, because

3    that's not before this Court, and we can address that later, I

4    think that what we're focused on today is burden enough.  And,

5    you know, I think that the lateness of this request, coupled

6    with the burden of what they're asking for today, is sufficient

7    to deny this request.

8        It is not as simple as putting more code on the source

9    code computer.  That's burdensome for Hytera.  That's difficult

10   for Hytera.  They have been working with us trying to get our

11   source code.  They know how long it takes us to do that.  It is

12   not an easy feat for us.

13       The financial information, I'm sort of the chief in

14   charge of getting that from our client, and I will represent to

15   the Court that that is very difficult for them to collect and

16   assemble, just based on their accounting system and their --

17       THE COURT:  Well, I would think it would be very

18   difficult.

19       MR. STRINGFIELD:  And so it is not minor, Judge.  It

20   is going to take them a tremendous amount of time to get that

21   code if they're ordered to do it, and to get that software.

22   And they don't have the bandwidth for IT.  They don't have the

23   time for it.

24       We're focused on finishing this DMR case.  This has

25   always been a DMR case.  This is what we have been focused on.

1  They are trying to add an entirely new product at the 11th

2  hour.  It is going to overwhelm us.  It is going to prejudice

3  our ability to prepare our case.

4       THE COURT:  How -- I'm not -- how long more do you

5  think it would take -- it would take you if in fact they get

6  what they want to get, and assuming there is no more, how long

7  would it take you?

8       MR. STRINGFIELD:  Are we talking about an expansion of

9  the schedule?

10      THE COURT:  Oh, no --

11      MR. STRINGFIELD:  Okay.

12      THE COURT:  -- I'm saying within -- could this be done

13  within the schedule?

14      MR. STRINGFIELD:  Your Honor, I don't believe so.  I

15  don't believe -- I don't know.  I could -- all I -- you know,

16  past results are not guaranteed in a future or past results are

17  not guaranteed future outcomes.

18      THE COURT:  No, past is normally prologue.

19      MR. STRINGFIELD:  I -- exactly.  I know that working

20  with this client on similar requests, it takes a long time.  So

21  they are on the other side of the world.  I get one shot a day

22  to ask for something because I can ask them, you know, tonight,

23  and then that's their morning.  And then I go to bed, and they

24  work all day.  And then when I wake up I see if I got what I

25  asked for.

1          I usually don't.  It usually takes a few shots.  And

2     so I get one shot per day to ask for information from my

3     client.  It is a long and tortuous process.

4          THE COURT:  So you're saying that you don't think the

5     new -- the new schedule that everybody agreed to could be met

6     if the -- if Tetra was in the case?

7          MR. STRINGFIELD:  I don't believe so.  And, again,

8     we're considering whether that new schedule that we agreed to

9     can even be met under their recent expansion of just DMR.

10    We're talking -- and trade secret.  They have expanded -- they

11    have doubled the DMR code, and they have doubled the trade

12    secrets allegations as to our DMR products.

13          We're not even sure that's going to fit right now.

14    We're still trying to figure that out.

15          We can't even think about Tetra.  That's a whole other

16    dimension that isn't in this case today as we have seen it, and

17    we don't think that that's going to fit.

18          THE COURT:  Supposing Tetra had never come up, but you

19    all knew, if it is true, that Tetra used the allegedly stolen

20    code.  And let's assume that there is a trial and Motorola

21    wins.  Okay?

22          MR. STRINGFIELD:  Okay.

23          THE COURT:  What would -- what would happen to the

24    Tetra line of products?  Would it keep -- I mean, I assume the

25    injunction would cover -- you know, it would be a broad-based

1   injunction.

2          Would you then, if it used that code, would you then

3   have to stop or replace the code or what?

4          MR. STRINGFIELD:  I don't believe so, your Honor.  I

5   mean, we --

6          THE COURT:  No?

7          MR. STRINGFIELD:  We believe that the code is

8   different.  And I know --

9          THE COURT:  Oh, you do?  Okay.

10         MR. STRINGFIELD:  They disagree with that.

11         THE COURT:  Okay.

12         MR. STRINGFIELD:  I think as Ms. Officer was

13  mentioning --

14         THE COURT:  Supposing it was a (unintelligible) --

15  help me with this.  Would you then have to advise your client

16  you can't use -- you can't use Tetra products with the code

17  that has been enjoined, the use of which has been enjoined?

18         MR. STRINGFIELD:  Your Honor, I'm not in -- as in the

19  weeds on the technology.  I know that there is two different

20  flavors of Tetra, and Ms. Officer can talk about that.

21         They are focused on one flavor that they think that

22  they have found some similarities.  And, you know, we could

23  talk about those.  But there is a whole other flavor that, at

24  least based -- I'm a mechanical engineer, I'm not a software

25  guy.  My understanding is that's -- that's night and day, and

1    so I -- you know, that one I know is probably out.

2           I don't know about the other one.  I -- I suspect that

3    we would -- we would consider whatever scope of injunction was

4    issued, and we would, of course, obey it.  But I don't think

5    that they are identical certainly, and I don't know how similar

6    they are.

7           THE COURT:  I understand.

8           MR. STRINGFIELD:  So, your Honor, if -- if that's the

9    concern, you know, they could always bring another case to

10   accuse Tetra if they believe that that's something that they

11   want to pursue.  That's just not this case.  This case is a DMR

12   case.  It has always been a DMR case, and we should finish our

13   case.

14          THE COURT:  Can I go back to one thing?  Can you tell

15   me roughly when Motorola conceded that Tetra was not in the

16   case and how and who did it?  Do you remember?

17          MR. STRINGFIELD:  I -- I don't know the -- when

18   specifically.  It was obviously before our brief because we

19   mention it in our brief.  My understanding --

20          THE COURT:  Before or after the motion?

21          MR. STRINGFIELD:  Before.

22          The scheduling motion?

23          THE COURT:  Yes.

24          MR. STRINGFIELD:  Before.  Because we mention it in

25   our scheduling motion.

1      THE COURT:  Okay.

2      MR. STRINGFIELD:  It was before -- my recollection, it

3  was the deposition of a gentleman at Motorola named Spaeth,

4  S-p-a-e-t-h, I'm recalling.  Jeff Spaeth.

5      One of my colleagues, Jessica Rothschild, was taking

6  the deposition.  The defending attorney was Justin Singh.  And

7  my -- and I can -- we could submit a paper, and I can get these

8  facts 100 percent straight for you.  But my understanding,

9  based on hearsay, was that Mr. Singh had made objections to

10  questions that Jessica was asking, or maybe it was a sidebar,

11  about whether --

12      THE COURT:  Oh, and he said --

13      MR. STRINGFIELD:  -- Tetra was in or out.

14      THE COURT: -- as a basis for the objections, that's

15  not in the case.

16      MR. STRINGFIELD:  I am not 100 percent sure.  I know

17  that Tetra was discussed.  I know that Jess- -- Ms. Rothschild

18  certainly left with the impression that Tetra was not in the

19  case based on what Mr. Singh told her.  And either she forewent

20  future questioning or stopped a line of questioning based on

21  that representation, that's why --

22      THE COURT:  I guess what I would like you to do is to

23  submit -- it can be a page.  You don't have to have a big, long

24  brief.  I would like you to submit something to me that in haec

25  verba relates what actually happened at the deposition and the

1    exchange and when it occurred and so on.  That's a page or two

2    I would think, that's all it would be.

3            MR. STRINGFIELD:  And, your Honor, and we're happy to

4    do that.  But I think that -- I think that the Court can deny

5    this motion even without that.  And we're happy to do that if

6    that's going to be dispositive to the Court.  But I don't know

7    that we need to go there.  I feel very comfortable with those

8    facts.  And we're happy to put those in.  But I think that with

9    that sort of pinning the tail on Mr. Singh, which I don't think

10   would be fair, I think that the Court could deny --

11           THE COURT:  I'm not pinning the tail.  I think

12   Mr. Singh is spectacular.

13           MR. STRINGFIELD:  Oh, I agree.

14           THE COURT:  I'm not pinning the tail on anybody.  But,

15   you know, clients are bound by what their lawyers say.  So

16   without the mention of anybody, it is simply a -- it is helpful

17   to me to know whether Motorola, not Mr. Singh -- I think

18   Mr. Singh is one of the best lawyers I have ever seen.  Maybe

19   the best.  All of his written work is, I think, lustrous.  Not

20   right all the time, but I think it is lustrous and wonderfully,

21   wonderfully done.  And they are lucky to have him, Motorola is.

22           But I do think if somebody says, this is not in the

23   case, and then later on there is a concern about is it in the

24   case, I think it is important for me to know.

25           MR. STRINGFIELD:  I agree, your Honor.  But I -- again

1   I think that the bigger picture is that if this stuff was going

2   to be in the case, it should have been in a long time ago.  And

3   I think it is much simpler than any of the specific -- nuances

4   of whether there was a concession or whether there was a

5   represen- --

6            THE COURT:  And I don't -- respectfully I don't --

7            MR. STRINGFIELD:  Okay.

8            THE COURT:  -- at least at this point agree with you.

9            MR. STRINGFIELD:  Okay.  Thank you, your Honor.

10           THE COURT:  It is a bit easy to say that it is too

11  much, too late.  But I sort of think the facts do govern what

12  we do.  This is uniquely fact bound.  And I would kind of like

13  to know what happened, especially in light of Motorola's

14  written and oral presentation.

15           And you make a very different presentation, and it is

16  very compelling.  So I'm sort of a little up in the air about

17  what really happened.  Not the concepts.  They are pretty

18  simple.  But, you know.

19           Anyway, I -- that's what I would like -- so I would

20  like you to present to me whatever I have just told you I would

21  like presented.

22           MR. STRINGFIELD:  Thank you, your Honor.

23           And when would -- and so just on a timing matter,

24  Ms. Rothschild is actually in a deposition today.  She's one of

25  our hardest workers and so --

1      THE COURT:  Whenever you -- when you can do it.  I
2  would like it as quickly as you can, but I want -- I don't want
3  to stop anybody from saying whatever they want to say.  And I
4  want to hear what Mr. Alper says.  But I don't want to
5  interrupt either of you folks.  So please go -- continue.
6      MR. STRINGFIELD:  Your Honor, I think at this point,
7  again, I think it -- you know, our position is that it is too
8  much --
9      THE COURT:  Too much, too late.
10      MR. STRINGFIELD:  -- it's too late.
11      That's right, your Honor.  And we're -- and if you
12  would like to get into the nitty-gritty of why we think the
13  code is different or why we think there is two different
14  flavors --
15      THE COURT:  Well, I don't think -- I don't think your
16  representation about the code would have any significance to
17  me, and I'll tell you why.  One, I wouldn't have nor would
18  anybody in this building, except maybe one person, have a real
19  understanding of what the concept -- about the specifics of the
20  code work.
21      Second, you -- generally, at least, lawyers tell
22  judges what their clients tell them.  They don't have
23  independent information.  We are conduits for information.  So
24  I'm -- don't take it you're speaking of your own knowledge.
25  You're effectively saying what your folks are telling you.

1    Whether Tetra uses the code or doesn't use the code is

2    a different issue, I think.  And I'm going to go based on

3    whatever people did and said, not what is being said to me now

4    or representations that are made.

5        The Seventh Circuit says, saying so doesn't make it

6    so.  I -- I have always subscribed to that.  And statements by

7    layers in briefs, Judge Posner tells us, factual statements

8    really don't count if they are the lawyer's representations of

9    what occurred, because we don't know.  So I understand what

10   you're saying.

11       And it is of concern that there is now this seeming

12   expansion of the case.  And the question of timing is very,

13   very significant.  I don't think it is as much a question of

14   relevance as of timing.

15       MR. STRINGFIELD:  And we agree, your Honor.  We are

16   likewise extremely concerned about the scope of this case and

17   about the timing.  And we have --

18       THE COURT:  Do you --

19       MR. STRINGFIELD:  We have rang that alarm bell many

20   times, and I don't need to rehash --

21       THE COURT:  No, no, no, I --

22       MR. STRINGFIELD:  -- all that.

23       THE COURT:  And it is their case.  They should want to

24   get to -- to the matter.  And if Tetra is sort of the tail

25   wagging the dog, and they have it, as they have said, enormous

1  amounts of proof of your client's perseity, well, maybe we

2  don't need Tetra in the case.  I -- but I certainly understand

3  the reason for their wanting Tetra to be in the case.

4      But at some point one has to stop.  Discovery is not a

5  never-ending ticket --

6      MR. STRINGFIELD:  We agree, your Honor.

7      THE COURT:  -- to whatever smart lawyers think about.

8      MR. STRINGFIELD:  We agree.  Thank you, your Honor.

9      THE COURT:  All right.  So do you have anything else

10  you want to say?  I don't mean to interrupt you at all.

11      MS. OFFICER:  Could I just state one thing, your

12  Honor?

13      THE COURT:  You can say ten things.

14      MS. OFFICER:  Okay.  Thank you very much.

15      The one thing that I do want to note is that right now

16  Motorola is requesting the source code and the sales data.

17  That is all Motorola needs to establish its case, its trade

18  secret case and its copyright case.

19      Hytera, on the other hand, needs documents.  We need

20  to establish independent development of the Tetra products.  We

21  need to go back to China to investigate the Tetra business, to

22  figure out relevant custodians, and to put together the

23  independent development of its products.

24      THE COURT:  Well, you're then -- I guess, you're

25  assuming an argument about expansion as well.  And that is to

1    say, granting the motion doesn't end the inquiry because you

2    have the right to then in effect respond and call people and do

3    things, and so we go on endlessly.  Discovery shouldn't be the

4    tail wagging the dog.

5         Okay.

6         MS. OFFICER:  That's all I have.

7         THE COURT:  Thank you very much.

8         MS. OFFICER:  Thank you, your Honor.

9         THE COURT:  Mr. Alper.

10        MR. ALPER:  Yes.  Thank you, your Honor.

11        I think -- I just have a couple of points, your Honor.

12   I would like to first address the timing issue.  It seems to be

13   an important one.  And then --

14        THE COURT:  It is a critical one.

15        MR. ALPER:  Critical one.  And then talk about

16   expansion of the case, and then briefly circle back to the

17   briefing before Judge Norgle.

18        So the question that was -- has been posed is why

19   didn't we point to the Tetra products earlier and why is this

20   coming up now.  And the answer is multi-fold, but ultimately

21   very simple.  And that is we just couldn't.  We didn't have the

22   information to allow us to make that allegation.

23        So what we're pointing to now is an indicator that the

24   code, which is compiled and confidential and in a lockbox to

25   the public if it -- if it wasn't in a lockbox to the public,

1   then we wouldn't be fighting about a trade secret involving

2   code.

3           So this is stuff that we can't just go take a look at

4   their product, open up, and see that it is Motorola code in

5   there.  It required, in this instance, for us to have discovery

6   into it.  And so -- it is secret.  And so, therefore, having

7   the fact that Tetra products are out there and, of course, we

8   know that they have Tetra products, but that fact isn't enough.

9           And so it wasn't until in February --

10          THE COURT:  Well, I would think -- I have no idea --

11  but I would think that if somebody bought a Tetra product,

12  (unintelligible) to the store, however you buy these things --

13          MR. ALPER:  Yeah.

14          THE COURT:  -- that your incredibly smart engineers

15  could have determined the code or whether Tetra was using --

16  I'm not saying they should have done this -- was using -- was

17  in fact using the stolen code.

18          MR. ALPER:  I don't think that that is in, at least in

19  this instance, something that is kind of -- a reasonable thing

20  to do because of the way that source code works, at least as I

21  understand it.  So you have source code.  You can see it.  When

22  it gets compiled into ones and zeros, it is not something that

23  is kind of reasonably -- you can pull it apart to the point

24  where you would need to be -- you could tell -- you might

25  even -- I don't know this, so take this as one of those lawyer

1    representations, but --

2         THE COURT:  Right.

3         MR. ALPER:  -- you might even be able to pull it apart

4    to the point you can see general functionalities, but you can't

5    see -- or I don't think -- I don't think you can see that line

6    by line what it was in order to do a comparison the way that --

7         THE COURT:  Yeah, you're right.  And I don't know.

8    And maybe it was difficult but doable and maybe it wasn't

9    doable.

10         MR. ALPER:  Yeah.

11         THE COURT:  And that's really not before me.  I just

12   don't --

13         MR. ALPER:  Yeah, I don't think that's been an

14   issue --

15         THE COURT:  It has not.

16         MR. ALPER:  -- in this discussion and in this case so

17   far that we should have been reverse engineering their code.

18   And otherwise we wouldn't need the -- really need the source

19   code discovery that the parties have been doing for months now.

20   And they wouldn't either.

21         But, but the reality of it is that as you read from

22   our brief, that in December they produced three million pages.

23   We discovered this document in February.

24         And we then turned around essentially immediately and

25   put it in our interrogatory response that this was something

1    that we found.  That their Tetra product, this document

2    indicate -- or that we found evidence that their Tetra products

3    include the same code that -- or some of the same code, I

4    should say, that we have been alleging has been copied from

5    Motorola.  And we identified it specifically.  It is the CPA

6    code.

7            And so then the question is, all right, well, did

8    that -- did it take -- was it on us that it took us until

9    February to realize that?  And the answer is we don't think so.

10   And we put this in our brief, but I think it is worth touching

11   on, your Honor.  And that is, for a very long time.  And I want

12   to give you the dates on this.  We have interrogatories to them

13   that have said, for everything that we have told you, you have

14   copied from Motorola, tell us all the products and all the uses

15   for that.

16            THE COURT:  And what's the date of that interrogatory?

17            MR. ALPER:  So we served the interrogatories in

18   January 2018.  Now those weren't specific to Tetra, but they

19   were kind of broad.  Sort of tell us everything -- every use --

20            THE COURT:  Interrogatory, in what state?

21            MR. ALPER:  January 2018.

22            And then on September 24th, 2018, that --

23            THE COURT:  Wait, wait.  Wait.  Hold on.  Hold on.

24            MR. ALPER:  Yeah, sorry.

25            THE COURT:  So what products the stolen code was used

1    in?

2            MR. ALPER:  Yeah, we just said, give us all of the

3    uses.  We had actually several interrogatories that came at

4    this from different ways, in different ways.  We have quoted a

5    a few in the -- excuse me -- in the briefing.  But -- but in

6    general that was saying, tell us all of the uses of our trade

7    secrets.

8            Now let me just be --

9            THE COURT:  The uses.  Sorry.  Okay.

10           MR. ALPER:  The uses of our trade secret material.

11           Now let me be 100 percent clear, in January 2018, at

12   that point they could have figured this out by way of their own

13   investigation.  But in January 2018 we had not disclosed to

14   them what in their products we said that -- what code in their

15   products we said was copied.  We hadn't done that yet.  It

16   wasn't until -- it was just, over the course of discovery, as

17   you remember, we had a couple -- we had different phases of

18   discovery in this case.

19           In September 2018 we provided an interrogatory

20   response.  It was in response to their Interrogatory 5 where we

21   provided line by line information, file by file, as to exactly

22   what in their products we were saying was copied.  And we

23   showed them, and here's the Motorola code side by side so you

24   can see it is a direct copy or near direct copy.  That was in

25   September 2018.

1          Now of course they have an ongoing duty to supplement

2     their interrogatories.  At that point they know what we're

3     pointing at.  And if they had anything else to say to us, they

4     would have -- they would be under a duty to supplement.  Say,

5     hey, there is this other stuff.

6          So they didn't, and we relied on that.  And now you

7     fast forward to their December production, and then really

8     ultimately in February when we're going through this 3 million

9     page production, and we find this document almost -- frankly, I

10    believe -- I would call it a needle in a haystack, although I

11    will admit I don't know -- I don't personally know exactly how

12    many similar documents there were in the production, but this

13    is the one we found.  And it says that their Tetra products

14    used the CPA code.

15         So we're not -- I'm not pointing a finger at them

16    where this is this -- you'll see, if we made -- we made the

17    argument deeper in the brief.  We didn't make this all about,

18    you know, a -- we didn't -- you know, they should have told us

19    earlier and so forth.

20         THE COURT:  No, I understand.  I got it.

21         MR. ALPER:  But it was they -- it is their facts.  If

22    anyone should have been bringing this to the table, it is them.

23    It shouldn't be up to us to filter through a multi-million page

24    production in order to find the material.

25         And I think that's -- that's really critically

1  important.  So it is very surprising when counsel -- again, no

2  point of -- you know, finger pointing.  But when counsel says

3  that we were -- it was up to us to reverse engineer their

4  source code to find out that the Motorola code was copied,

5  something that I believe is not reasonably possible, when they

6  had this on their own.  And when you look at that email, your

7  Honor, there like a big group of engineers, including

8  deponents in this case, who they are clearly in contact with

9  who are talking about the Tetra products having the CPA code.

10        And so this is not something that was unknown to

11 Hytera.  And it was within -- it was easily accessible.  And

12 yet to this day they haven't said that they -- they haven't

13 supplemented.

14        And so we came upon this document.  It was by our own

15 work through their production.  Not untimely, when you consider

16 the volume of the production.  And then we -- and here's the

17 thing, your Honor, we were diligent after that.  We immediately

18 raised it to them.  And in February 15 -- on February 15th,

19 that's not that long ago, we asked for the code.

20        The reason for the discussion about the March -- I

21 want to get back to the -- to Judge Norgle because I feel -- I

22 definitely want to address your concerns about my comments

23 earlier, but I want to put that aside for just a moment.  I'm

24 going to circle back to it because it -- personally I want to

25 address your concerns about my comments earlier.  We have been

1   in this for a while, and I want to just -- I want to make you

2   comfortable about that.

3           But putting that aside for a moment, we -- let's say

4   that as of February -- you know, February 15th when we turned

5   around, we took --

6           THE COURT:  Can I ask you?

7           MR. ALPER:  Yeah.

8           THE COURT:  The concession, if it was that, at a

9   deposition that Tetra --

10          MR. ALPER:  Yes.

11          THE COURT:  -- was not in the case --

12          MR. ALPER:  Yes.

13          THE COURT:  -- came before the --

14          MR. ALPER:  We knew --

15          THE COURT:  -- more recent thing before Judge Norgle.

16          MR. ALPER:  Exactly.  So the concession -- so we have

17  a little -- we have a dispute over what was concede -- over the

18  concession.  Mr. Stringfield doesn't have at his fingertips

19  exactly what happened.  We disagree that we represented that

20  Tetra wasn't in the case.

21          But the reality is is it doesn't --

22          THE COURT:  Well, he's going -- they're going to

23  provide --

24          MR. ALPER:  They're going to provide --

25          THE COURT:  -- whatever they provide.

1          MR. ALPER:  The -- it -- we believe there was

2     a -- there was a 30 (b)(6) deposition, and there was an

3     objection that Mr. Singh made that a question was like one of

4     those putting in the record beyond the scope.  The question was

5     --

6          THE COURT:  Yeah.

7          MR. ALPER:  -- beyond the scope of the noticed topics

8     for that deposition.  But I don't believe, and they will put in

9     a brief, and correct me if I am wrong on this, I -- and so

10    please don't take this as a confirmed fact, I don't believe

11    Mr. Singh instructed the witness not to answer anything, told

12    the other side that they couldn't take discovery on this.  I

13    think he just lodged his scope objection.  And that, of course,

14    people do all the time.  They are preserving an objection.  But

15    never said Tetra isn't part of this.

16         But it is all irrelevant, because here's the thing, at

17    that time, in January, we hadn't come across the document yet.

18    We didn't have a -- we didn't have a basis to say that it had

19    the code.  We didn't have a basis to move your Honor to compel.

20    We could have walked in here and say, your Honor, we want to --

21    here and say, your Honor, we want to -- the Tetra code.  They

22    said they are massively expanding the case without any basis in

23    the world to do it.  And we would have said, your Honor, I

24    don't -- I have nothing to say to that.

25         So the fact that Mr. -- whatever Mr. Singh said at

1   this deposition -- and, again, we disagree that he did what

2   they say he did, but whatever he said, it was before we

3   discovered the document.  So it really doesn't matter.

4           THE COURT:  No, I understand.

5           MR. ALPER:  Yeah.

6           THE COURT:  I understand.

7           MR. ALPER:  So then we found the document, and then we

8   were diligent.  We turned around, we asked for the discovery.

9           Now at that point, what I am perceiving from the email

10  correspondence that we had on Wednesday before the deposition

11  and then, of course, today, is that we then had a -- we didn't

12  have a meeting of the minds.  We thought they were going to

13  produce this stuff.  We thought that they were saying that it

14  was in the case.  We thought we were giving them an extension

15  to accommodate the discovery.  And they clearly, from what

16  Mr. Stringfield is representing today, did not think that.

17          But that -- all that means is that that -- all that

18  means is that there was a misalignment at that point.  We were

19  still being diligent.  We were still proceeding under the

20  impression that we were getting the code.  And as soon as we

21  realized that that -- we were out of alignment on that, which

22  was last week, we met and conferred live, lead counsel for two

23  days because we think this is a very discrete issue.  We tried

24  very hard to resolve it and explain, produce the code, we'll

25  know it is in and we'll know it is out, and we'll be -- we'll

move on.  It is not this big blow up.  And then promptly
brought this -- literally over the weekend we put, what
hopefully you perceived as a focused piece of paper, and
brought it your Honor's attention.

And so my point is that before February I don't think
you can reasonably charge us with knowledge that Tetra products
had it -- were accusable, and, therefore, that it would be
proportionate for us to ask for discovery on the Tetra
products.  Or I should say that different -- differently.  That
it would have been --

THE COURT:  (Unintelligible).

MR. ALPER:  -- something that we should have moved to
compel, your Honor, is the way to put it.  And then because
we -- number one, they had an ongoing obligation to supplement.
They have got all these engineers who are on this email talking
about it.  And presumably the response to that is, well, we
don't think that the code is in the Tetra products anyway.
Fine.  But that still doesn't mean that we should have done
this at any point sooner in time.

So then that leaves it -- right?  So that's our
position, and we believe that we were diligent since then.

That then -- that if we were earlier in the discovery
period, I believe that would be kind of an open and shut, let's
move forward, give us this -- you know, we'd want to assess
whether what we're asking for is proportionate.  But assuming

1   it was, we'd move forward, get the discovery, and just, you

2   know, figure if those things are in and out.

3       As your Honor has very justifiably raised, we're not

4   at the beginning of discovery.  We are kind of in this -- you

5   know, we're in the final run here leading up to a trial in

6   November.

7       And the question is what do we do with that?  And our

8   -- I'll give you our position.  And this is where I get to, is

9   this an expansion of the case?  And the answer, your Honor, is

10  it is not an expansion of the case, and here's why.  We are

11  talking about the very same set of code that we have said from

12  the beginning is at issue.  And so we're not -- this is like --

13  imagine, you know, you have DMR and Tetra, right?  Let's call

14  them widget -- you have Widget A -- or you have this -- the

15  code is the CPA.  It is in Widget A.  And now we are just

16  looking for the same in Widget B.  It is just a different shell

17  for what's really at issue.  And so it is not like we're now

18  going down -- opening an all new front.  Now they say that they

19  feel that they need to do an investigation, and maybe they do,

20  but that's where this Judge Norgle order comes in, your Honor.

21      And I do want to address it because I -- like I said,

22  we have been appearing for a long time, and I feel like I

23  really want to make sure that -- I want to be very clear about

24  what's there, and I did not mean to be unclear about what's

25  there so -- what's in the order.

1    There is no doubt that they were expressing what they

2    expressed here today and what they expressed to your Honor at

3    our Wednesday hearing before the time we appeared before Judge

4    Norgle, that they are frustrated because they feel that this

5    case is too much for them to handle in the remaining period of

6    time.  They're very clear in the briefing to you about that.

7    They were very clear in the briefing to Judge Norgle.  That has

8    certainly been out there.

9    And part of the reason that they feel that way is the

10   trade secrets, right?  They have -- that's what we discussed

11   for so much time.  But they did raise -- they put it in the

12   brief -- I believe they put in the brief before you.  But they

13   certainly put it in the brief before Judge Norgle.  They said

14   two things.  One thing they said -- as part of their general

15   theme that they are very concerned about the scope of this

16   case, getting everything done.  And in one thing that they said

17   was, they said, in January we told them that -- January 2019 we

18   told them that Tetra wasn't in the case, and we just talked

19   about that.  But then what they said, and I'll quote it, they

20   said, Motorola's February 15th, 2019, supplements to Hytera's

21   Interrogatories Number 6(k) and 8(n) identify for the first

22   time an entirely new category of products now accused of

23   misappropriation or infringement; namely, the Tetra products.

24   Now accused of misappropriation.

25   And then we went into an attorney conference room.

```
 1    The next thing that happens was we went into an attorney

 2    conference room.  We worked out a schedule, an extension of the

 3    discovery period.  And this is just pure facts.  An extension

 4    of the discovery period.  They didn't say, except for Tetra

 5    because we are going to reserve our right to object to that

 6    being part of the case.  And then we went back into Judge

 7    Norgle.  We told him we had reached a resolution.  He said,

 8    please submit a -- you know, a stipulation.

 9              THE COURT:  That's all he cared about.

10              MR. ALPER:  And then he issued in Document Number 474,

11    very simple thing, he said, the motion to amend the scheduling

12    order, Document Number 436, is moot.

13              THE COURT:  Oh, is moot.

14              MR. ALPER:  Is moot.

15              THE COURT:  What was --

16              MR. ALPER:  In light of the parties --

17              THE COURT:  What was he -- what is the docket number

18    of his order?

19              MR. ALPER:  474.

20              THE COURT:  Sorry.  474.

21              MR. ALPER:  And he said -- I don't have it -- that

22    part is a quote.  Motion to amend scheduling order 436 is moot.

23              And he said because of -- and he put --

24              THE COURT:  The agreement.

25              MR. ALPER:  -- the agreed order.
```

1    THE COURT:  Right.

2    MR. ALPER:  And so, your Honor, I -- this is the part

3  that I very much take to heart, and I truly apologize if I

4  should -- what I should have said is -- reminded everyone in

5  the courtroom that they were frustrated, that they felt the

6  case was expanding, and so forth.  But the fact remains that

7  they said in their motion that the Tetra products are

8  now -- I'm quoting -- now accused of misappropriation or

9  infringement.  And as -- and that's in our February 15th, 2019,

10  interrogatories.  We went out in the hall --

11    THE COURT:  What are you reading from?

12    MR. ALPER:  I'm reading from page 4 --

13    THE COURT:  What number?

14    MR. ALPER:  Page 4 -- page 4 of Docket 470 -- 437, I'm

15  sorry.

16    THE COURT:  Okay.  Yeah.  Hold on a second.

17    MR. ALPER:  It is right above where the --

18    THE COURT:  Yeah, hold on.  Page 4.

19    All right.  Now where are you reading from?

20    MR. ALPER:  It is the -- I actually don't have it in

21  front of me.  It is the first full paragraph.

22    THE COURT:  Finally, it appears Motorola tends to

23  expand yet again the scope of its case to include an entirely

24  separate category of products, one that its counsel represented

25  just two months ago was not in the case.

1          And that you say is the deposition, right?

2          MR. ALPER:  That was the January deposition before we

3   found the document, yes, your Honor.

4          THE COURT:  Okay.  Hold on.

5          MR. ALPER:  And then they go on to say -- I don't -- I

6   only have the quote.  I don't have the document.  But

7   Motorola's February 15th, 2019, supplements -- do you see that,

8   your Honor?

9          THE COURT:  Right.  I do.

10         MR. ALPER:  -- to Hytera's interrogatory Number 6(k)

11  and 8(n) identify for the first time an entirely new category

12  of products now accused of misappropriation or infringement;

13  namely, Tetra products.

14         So they say that that is now accused.

15         THE COURT:  Well, you are accused.  Are you accusing

16  them?

17         MR. ALPER:  We are accusing them.

18         THE COURT:  Right.

19         MR. ALPER:  Exactly.

20         And so then they -- if you go down that page, down to

21  the bottom of the page, they --

22         THE COURT:  They didn't say they were named anywhere,

23  they said they were accused.

24         MR. ALPER:  We accused them.

25         THE COURT:  That's right.

1          MR. ALPER:  Then you go down to the bottom of the

2    page, they -- I don't have this verbatim.  But they say

3    something like, each of these issues that -- I think the

4    sentence starts with, each of these various issues,

5    obviously --

6          THE COURT:  Well, hold on.  Hold on.  I'm trying to

7    find -- same page?

8          MR. ALPER:  Same page.  I think it is the first -- the

9    last paragraph.

10          Yeah, the next paragraph.  It says each of these

11    issues which Motorola created significantly hinders Hytera's

12    ability to prepare its defense in the short time remaining.

13          THE COURT:  Oh, it is the next paragraph.

14          MR. ALPER:  In the very next paragraph.

15          THE COURT:  Right.

16          MR. STRINGFIELD:  They say, each of these hinders

17    their ability to prepare their defense in the short time

18    remaining.  And then ultimately -- I'll just generally

19    paraphrase, the upshot is they ask for more time.  That was

20    their request to remedy that.

21          And we went in to the -- to Judge Norgle.  We

22    ultimately went out into the hallway, and we gave them more

23    time.  And so -- and so from --

24          THE COURT:  So you're -- I understand your point.

25          MR. ALPER:  You understand.

1      THE COURT:  Yeah, yeah, it is kind of a -- I guess in

2  sort of an implied acceptance, representation, call it what you

3  will, but I understand the import of what you think their

4  conduct and their representations meant.

5      MR. ALPER:  Yeah.  So I think -- yes.  And so I think

6  there is two takeaways.  One, we were not being -- we were not

7  being non-diligent during that period because we had a

8  reasonable belief that this was going to be swept in and taken

9  care of.

10      And then, number two, we believed that -- and we still

11  believe that the -- I think we have until -- when does -- do

12  you know when discovery cuts off?  I think it is May.

13      MR. STRINGFIELD:  May 20th.

14      MR. ALPER:  May 20th, 24, something like that, in that

15  range.  That that's, you know -- since this came up, it was six

16  or seven weeks now.  It is five or six weeks, something like

17  that -- that that's enough time to put code on these computers.

18      And let me tell you something, the parties are doing

19  this all the time right now.

20      THE COURT:  Let's say that it is not quite -- and the

21  question of burden is of not particular concern to me only

22  because if you go back and look at my many thousands of other

23  cases, burden requires something more than a lawyer saying,

24  gee, it is hard.

25      MR. ALPER:  Uh-huh.

1           THE COURT:  Everything is too hard for everybody.

2           MR. ALPER:  Yes.

3           THE COURT:  Always.  So I'm not concerned, at least at

4    this juncture, about the burden of it.  And all it is is

5    transporting code onto a -- some kind of a server, and that to

6    me isn't burdensome in the sense that it would obviate the need

7    to do it if it is otherwise required.

8           Let's say they do that, and let's say it comes

9    up -- if it comes up negative, then it is the -- the inquiry is

10   over.  If it comes up though the way you think it is going to

11   come up, what then do you do?  What's your next step?

12          MR. ALPER:  So from our perspective this is --

13          THE COURT:  Because I think, in my opinion, you have

14   got what you need and what you are entitled to.  And let's

15   leave aside the damage issue.

16          MR. ALPER:  Yes.

17          THE COURT:  I would want to know from you that that

18   would be the end for discovery purposes of the inquiry.

19          Now what Judge Norgle does with that is up to Judge

20   Norgle.

21          MR. ALPER:  The -- we right now do not see the need

22   for any further discovery, including depositions.  This would

23   be a matter of -- as you said this is, from our perspective,

24   additional instances of the same misappropriation.  And so --

25          THE COURT:  I think it is simplicity itself.

1          MR. ALPER:  Very simple.  So we are not thinking we

2   need any -- I don't see any evidentiary issues.  It is their

3   code.  They're not going to object to --

4          THE COURT:  I don't know --

5          MR. ALPER:  -- authentication.

6          THE COURT:  I don't know what they're going to do.

7          MR. ALPER:  Right.

8          THE COURT:  But that's not -- that's not a discovery

9   issue, it is a --

10         MR. ALPER:  Evidentiary.

11         THE COURT:  -- an evidentiary issue for the Court --

12         MR. ALPER:  Agreed, your Honor.

13         THE COURT:  -- whatever (unintelligible) it wants to

14  deal with it.

15         MR. ALPER:  Yeah.

16         So then it comes down to -- so -- exactly.  So I don't

17  see a --

18         THE COURT:  I mean, there is various -- you can -- not

19  force, but you can ask people to stipulate.  There is all sorts

20  of things that could be done to --

21         MR. ALPER:  Absolutely.

22         THE COURT:  -- streamline a trial.

23         MR. ALPER:  Absolutely, your Honor.

24         So I -- we don't think there is anything more to do

25  than what we're asking for now.  And it is a very simple and

1    streamlined thing as a result.

2          THE COURT:  Well, you're the -- you're sort of the

3    master of your own destiny.

4          MR. ALPER:  Yes.

5          THE COURT:  I mean, I wouldn't want -- and I'm not

6    saying this is dispositive at all.  Please.  But I would

7    certainly want to hear from you that if in fact this is done,

8    and if it pans out the way you think it is going to pan out,

9    that it is simply a matching endeavor, that there is no further

10   discovery that will be undertaken.

11         MR. ALPER:  I'll be crystal clear, I -- we agree, your

12   Honor.

13         THE COURT:  All right.

14         MR. ALPER:  And then -- and then it only comes down to

15   the sales data.

16         THE COURT:  Well, hold on.

17         MR. ALPER:  Yeah.  Yeah, sure.  Of course.

18         THE COURT:  I'm talking about in the source code.

19         MR. ALPER:  Yes.

20         THE COURT:  Okay.  Now what about the damage inquiry?

21   What do you want -- you want them to produce -- I would think

22   that that's kind of a difficult task, and one that you couldn't

23   very well say, okay, well, we'll just take the figures and

24   we'll go.  Or maybe it is.

25         MR. ALPER:  So, your Honor, I obviously don't work

1    directly with Hytera's financial accounting people so I don't

2    really know.  But here's what we're asking for for the -- the

3    other damages discovery has gone deeper than this.  But for

4    purposes of this, we are -- for the reasons that we all know

5    about here because of this stage and so forth, we are willing

6    to go narrow.  And so what we're asking for when it comes to

7    Tetra is very simply a financial data pull -- I don't know,

8    this is probably too informal of a name.  But the types of

9    things that Hytera's executives probably get on a weekly basis

10   to tell them what their sales are and related -- you know, I --

11   I can't say that we wouldn't need cost information because I

12   think that goes into the damages inquiry.

13            THE COURT:  It does.

14            MR. ALPER:  But basically that sphere of financial

15   data that they pulled from their systems.  And -- and unless

16   Hytera operates in a manner that is different from basically

17   from every other client that I have ever represented -- you

18   know, that basically every -- I don't want to say represented,

19   on both sides, been adverse to and represented, they have

20   financial systems that they're -- when their CEO wants to know

21   what was our sales or their head of marketing or head of sales

22   says, give us --

23            THE COURT:  And what was our profit?

24            MR. ALPER:  And what's our profit.  I can guarantee

25   you they can turn that around in a very short period of time.

1    And it is that -- that data is what we're looking for, and so I

2    don't think --

3            THE COURT:  You're looking for the data in effect that

4    would be given to the CEO, assuming a request were made for

5    that information.

6            MR. ALPER:  Right.  We'd like it to be in --

7            THE COURT:  Because it would be --

8            MR. ALPER:  -- a reasonable level of granularity.  But

9    both attendant to the timing of things right now --

10           THE COURT:  Your trial date is what, Mr. Alper?

11           MR. ALPER:  November 1st.  And we definitely don't

12   want to extend past that.

13           THE COURT:  Today is?  April.  April, May June, July.

14   Okay.

15           MR. ALPER:  And so -- so that's -- you know,

16   that's -- so that's that.  That's why this isn't an expansion.

17           THE COURT:  Has discovery ended?  I can't remember.

18           MR. ALPER:  Discovery has -- well, the -- it depends

19   -- which one?

20           THE COURT:  Oh, yeah, the -- you have got the date

21   from Norgle of what?

22           MR. ALPER:  It is -- I'm sorry?

23           May 20th.  Mr. Stringfield says it is May 20th.

24           THE COURT:  That's fine.

25           MR. ALPER:  Yeah.

1      And then we have a couple weeks, and then we do our

2  expert reports.

3      They have rebuttal expert reports.  We do our

4  responsive expert reports.

5      And then we have a pretrial filing due.  And then

6  November 1st is the trial date.

7          THE COURT:  Okay.

8          MR. ALPER:  And we -- and to be very clear, we -- we

9  have been clear about this with them all along, we -- we don't

10  want to jeopardize that trial date.  And for all the reasons

11  that you were saying earlier, your Honor, we want to -- we want

12  to move on with the case and move it to trial.  We have been

13  doing this for a while.

14      But as --

15          THE COURT:  I will tell you, and I'm -- you know, past

16  may be prologue and may not be.  And I'm not a seer.  But I

17  would think your chances of getting Judge Norgle to move that

18  trial date are very, very, very slim.  And I know nothing more

19  than you know.

20          MR. ALPER:  Uh-huh.

21          THE COURT:  You know more than I because you have been

22  before him.

23          MR. ALPER:  Yeah.

24          THE COURT:  I haven't talked to him about anything,

25  ever.

1          MR. ALPER:  We are firmly in that camp, and we are

2     planning on that trial date.  And we will -- we will attempt to

3     do everything in our power to hold that trial date.

4          There is, you know, some stuff I don't think is

5     directly relevant to the specific issue here, and that has to

6     do with other supplementation.

7          THE COURT:  I don't -- then I don't want to deal with

8     it.

9          MR. ALPER:  So we disagree with that characterization.

10    But as we have spoken about many times, silence, as I know for

11    your Honor is not an admission.  So it -- we --

12         THE COURT:  Well, it can be.  That -- then you didn't

13    read what I wrote.

14         MR. ALPER:  Yeah.  Well, then --

15         THE COURT:  I think silence -- I think silence is

16    gravid with meaning sometimes.

17         MR. ALPER:  Yeah.

18         THE COURT:  Not always.

19         MR. ALPER:  In this instance, your Honor, we disagree.

20         THE COURT:  And, of course, inferences from silence

21    are perilous.

22         MR. ALPER:  I apologize.  I didn't mean to

23    impute -- you know, suggest anything.

24         THE COURT:  No, no, no, I -- it depends on the

25    circumstances.  Sometimes it has no meaning and sometimes it

1   has -- it's pregnant with meaning.

2         MR. ALPER:  Here we disagree that we have expanded the

3   scope of the case, and so -- but that's a different issue

4   that's not specific to this.

5         And so -- and so I think then that's where

6   that -- that -- I think that's it.

7         And, again, I do want to say for me as a person who

8   has appeared before you many times personally, I should have

9   said, they are very frustrated about -- it is their position

10  that the case is expanding.  We disagree with that.  But

11  ultimately --

12        THE COURT:  Well, it is expanding.

13        MR. ALPER:  It -- well, ultimately -- what we're

14  asking for Tetra --

15        THE COURT:  Not necessarily incorrectly or improperly.

16        MR. ALPER:  Right.

17        THE COURT:  Cases expand as you get more discovery.  I

18  --

19        MR. ALPER:  But --

20        THE COURT:  No case ever ends up the way it starts.

21        MR. ALPER:  Agreed, your Honor.  And -- but my purpose

22  for referencing the March 14th submission was to focus on the

23  fact that we -- whatever dis- -- lack of meeting of the minds

24  we're having about Tetra at that point in time --

25        THE COURT:  At that point it was clear what --

1    MR. ALPER:  -- we believed we were striking a deal to

2 have this move along, Tetra discovery move along, very -- in a

3 simplistic fashion like we were talking about here.  They now

4 disagree with that.  But that was not us not being diligent

5 about this issue.  We believe we have heeded your Honor's

6 comments about diligence, taken that to heart, and so it was

7 very important to us once we found that document that we really

8 stay on it, and I think -- and we think we have.

9    THE COURT:  Okay.  Yes.

10    MR. STRINGFIELD:  May I respond, your Honor?

11    THE COURT:  Sure.

12    MR. STRINGFIELD:  So I -- I want to start with the

13 burden because I -- you know, I was a little bit incorrectly

14 focusing on my personal burden.  I'm a little bit selfish in

15 that regard.  So I was thinking about collecting the financial

16 data and collecting the code.  And to be sure, that's onerous

17 and that will be a huge --

18    THE COURT:  Yeah, I agree with you.

19    MR. STRINGFIELD:  -- pain in my life.

20    But I -- I think the bigger picture is the point that

21 my colleague Ms. Officer made, is that it is not just one side

22 of the coin.  My colleague, Mr. Cloern, I'm sure you remember

23 him, he's very -- he fills a room.  He leaves an impression.

24    THE COURT:  He is tall.

25    MR. STRINGFIELD:  And I -- and so what did -- he's

1    tall.

2            THE COURT:  He's very tall.  I hate tall people.

3        (Laughter.)

4            MR. STRINGFIELD:  I will absolutely convey that, your

5    Honor.

6            THE COURT:  No, don't tell him.

7            MR. STRINGFIELD:  And so --

8            THE COURT:  He is an exception to my antipathy towards

9    (unintelligible).

10            MR. STRINGFIELD:  He will be thrilled to hear.

11            MR. HERBERT:  (Unintelligible).

12        (Laughter.)

13            THE COURT:  No.  No, I think he's taller than you are.

14            MR HERBERT:  I think he is.

15            THE COURT:  He appears taller because you -- you are

16    seated more.

17            MR. STRINGFIELD:  So the reason I mention Mr. Cloern

18    is that we sent him to China for six weeks, and the -- part of

19    the reason --

20            THE COURT:  He told me.

21            MR. STRINGFIELD:  I recall that.  And --

22            THE COURT:  He hated the food.

23            MR. STRINGFIELD:  And if your Honor puts Tetra in the

24    case, he's got to go back to China, and I'll tell you why.

25            THE COURT:  Then the motion should be denied simply

1   based on that.

2          MR. STRINGFIELD:  I agree.  But it is not as cute as

3   I'm making it sound.

4          So the reason is that it is not just getting

5   Motorola's proof of infringement into the case, which they

6   believe is very simple.  They can look at the code.  They can

7   draw some arrows.  They say, a-ha, we got you.

8          Hytera's defense is much more sophisticated and much

9   more nuanced than that.  We made this stuff and --

10         THE COURT:  But your defense, just -- if your

11  defense -- your defense wouldn't just be to the Hytera

12  products, it would be to everything in the -- in the mix.  And,

13  therefore -- I'm not saying this is right.  Simply adding

14  Hytera based on that wouldn't broaden the case particularly in

15  terms of expansion of your defense.  Your defense is for Hytera

16  as it is for any other product line.

17         MR. STRINGFIELD:  It absolutely does expand, your

18  Honor, and I'll tell you why.

19         THE COURT:  Okay.  It does expand?

20         MR. STRINGFIELD:  It does.

21         THE COURT:  Oh.

22         MR. STRINGFIELD:  It greatly expands our defense.

23  Because, your Honor, our defense is that we made this stuff.

24  Their accusation is that we stole and we built it off their

25  backs.  We have uncovered in Mr. Cloern's six weeks in China

```
 1   our own independent development for way before these bad actors
 2   came over.  We made the stuff in --
 3            THE COURT:  But that's the same --
 4            MR. STRINGFIELD:  No.
 5            THE COURT:  -- basically, is it not?
 6            MR. STRINGFIELD:  No.  It is different.  Different
 7   products.  That's our problem.
 8            THE COURT:  Oh, so Hytera -- the Hytera line of
 9   products may have a different --
10            MR. STRINGFIELD:  Tetra, you mean, your Honor.
11            THE COURT:  I mean, Tetra.  -- a line of defense sort
12   of then all the other whatever there is.
13            MR. STRINGFIELD:  Absolutely different.  Different
14   product, different product groups, different defenses,
15   different independent development story.
16            It took us six weeks of investigation, boots on the
17   ground, in Shenzen, China, to figure that out for one product
18   line, DMR.
19            We're expanding it tremendously by adding Tetra.  We
20   have to go back and we have to forensically create going back
21   -- Tetra goes back to 2010 we released the product.  Our
22   development goes back earlier than that.  We have to go back
23   over a decade digging through servers, digging up old files,
24   digging -- finding people that will -- that still have
25   knowledge to develop our defense, your Honor.
```

1          I'm worried about us.  I'm worried about defending our

2     case, painting our picture, telling our story.  Hytera's story

3     -- Hytera's an innovative company.  They came up with these

4     radios.  They didn't take it from Motorola.  I know that they

5     disagree with me, and we'll have that day.

6          THE COURT:  No, no, but just -- if in fact their

7     motion were granted, and if in fact the code is the same as

8     what was, they say, as -- what was taken, that it is what it

9     is.  I'm not saying it is good, bad or indifferent.  But why

10    would there be such a tremendous expansion?

11         MR. STRINGFIELD:  Your Honor, because it is -- it is

12    not just the code.  The products are huge.  Let's -- and let's

13    just say that it turns out that there is a few lines of the

14    code that are the same, the product has millions of lines of

15    code that we independently developed.  It has hardware.  It is

16    other features that we independently developed.

17         We have to -- we have to paint that picture.  We need

18    to develop that record.  We need to develop those facts.  We

19    need to paint this holistic picture of our time, energy,

20    effort, and investment in coming up with a product.  They want

21    it to be as simple as we found a couple lines of code that are

22    the same.  This whole thing is ours.  And that's going to

23    be -- I'm oversimplifying their trial presentation, but that's

24    going to be a big part of it, I think, is that they're going to

25    tell the jury that there is this that's the same, and there is

1    this that's the same.  And we'll have defenses to that, and

2    we'll have disagreements to that.  But the bigger part of our

3    defense is going to be, we came up with this stuff, we

4    developed it, this is our product, and we need time to

5    investigate that.  And it will not fit within this discovery

6    period, not even the expanded one, because we will have to go

7    back to China and we'll have to investigate.  And we will be

8    coming back and asking Judge Norgle for schedule relief if this

9    Tetra stuff comes in because we do not have time to develop the

10   defenses that we need to develop within this current period.

11        If we want to keep this trial date -- this case has

12   always been a DMR case.  I want to talk about the timeline that

13   Mr. Alper has mentioned.  I want to go back to March 2017, and

14   I'm going to mention a few things:  man down, VOX, lone worker,

15   GPS.  You have probably heard these phrases before.  This was

16   the foundation --

17        THE COURT:  No, actually I haven't.

18        MR. STRINGFIELD:  So these -- so this is trade secret

19   misappropriation.  They were pointing to broad brush features

20   in the DMR products.  They are saying, well, they have got VOX,

21   and -- and they had some people come over, so they must have

22   taken that.

23        And they -- there is a man down feature in their

24   radios, so they must have taken that.

25        And that was kind of -- and they put more meat on that

1  bone.  But at a high level, they were pointing at seven

2  features, and they said that these seven features led us to

3  believe that there was misappropriation of trade secrets based

4  on bad actors that came over.

5  Judge, the DMR products had those.  They pointed to

6  those.  So too do the Tetra products.  The silence was

7  stunning.  Tetra was not in the case.  They did not point to

8  VOX, man down, all these features that were in Tetra.  Tetra

9  was -- this has been a DMR case from the beginning.

10  They said that they -- they gave us an interrogatory

11  in -- answer in September where they pointed to code.  And they

12  said that we should have looked at their code allegations.

13  There were a thousand lines of code across about a hundred

14  files.  They said that we should have picked this one CPA thing

15  and we should have said, well, a-ha, that must -- let's

16  investigate and see if that's in their other products.  Again,

17  DMR -- or excuse me -- Tetra was never in this case.  Nobody

18  was talking about Tetra.  The word Tetra didn't cross anybody's

19  lips.

20  And in fact there is CPA code that was in the DMR

21  multimode product.  And Ms. Officer talked a little bit about

22  multimode.  They weren't even talking about the DMR multimode.

23  How are we supposed to be thinking about the Tetra multimode?

24  And so, your Honor, the point is is that they pointed

25  out a thousand lines of code, and they expected us to, you

know, somehow extrapolate when this was a DMR case focused
initially on high-level DMR features, the same features that
existed in Tetra, by the way, and then it is funneled into this
source code debate. But Tetra was never put in until February.
This is the first time they mention it.

And that's a big part of our problem with this is is
it is just too much, too late. It is not just us putting more
code on the computer. I think we could probably make that
happen in the next five weeks. We can't develop our defenses,
and that's prejudicial to us, and that's depriving us of our
due process right to develop a defense to this case. You
cannot add a whole other product line into this aging case at
this late stage and expect us to meaningfully develop our
defenses. And we will have to come -- absolutely come back for
schedule relief if Tetra comes in. That -- it is just not that
simple.

(End of transcription from digital recording.)

And, your Honor, the page 4 of Docket 437, they are
pointing, the language now accused. You know, and I know your
Judge likes to talk about ties. And I know your Honor likes
red ties, so I wore a red tie today.

Your Honor can accuse me --

THE COURT: I hate -- I hate red ties.

MR. STRINGFIELD: Oh. Well --

THE COURT: I never -- I try not to wear a red tie for

```
 1    a variety of reasons.
 2              MR. STRINGFIELD:  Well, I --
 3              THE COURT:  But thank you for your miscalculation.  I
 4    appreciate it.
 5              MR. STRINGFIELD:  I'm trying, your Honor.
 6              THE COURT:  I am actually wearing a gray tie.  I
 7    thought it -- I thought of the tie to wear today for you guys
 8    --
 9              MR. STRINGFIELD:  I thought of you this morning when I
10    was picking my tie, your Honor.
11              THE COURT:  And I had -- no, no, I had -- I my
12    Churchill tie picked out.  I thought that wasn't good.  Then
13    I had a tie with cows on it, which to me were very symbolic.
14    And then I thought, well, no, I'll just wear a plain gray tie
15    because it will match my pants, so --
16              MR. STRINGFIELD:  All right.
17              THE COURT:  No, I -- red is not the color.
18              MR. STRINGFIELD:  Well, your Honor, then --
19              THE COURT:  But it was very nice of you to think about
20    it.
21              MR. STRINGFIELD:  I was thinking about your Honor.
22              But my point is that --
23              THE COURT:  It is the thought that counts.
24              MR. STRINGFIELD:  Well, I think so too.
25              THE COURT:  Yeah.
```

1        MR. STRINGFIELD:  And, your Honor -- but, your Honor,

2  you could accuse -- you know, now accuse -- you could accuse me

3  of wearing a blue tie.  That's nothing.  So, you know, they

4  accused us of something, so we said now accuse -- but in that

5  same paragraph we talk about how they told us it wasn't in the

6  case.  So that -- I just wanted to -- I -- it is kind of a

7  minor point.  But this now accused language, I don't read that

8  as a concession.  Maybe they are -- they say they read it that

9  way.  That's certainly not what we intended when we wrote it,

10  and when we also wrote in the same paragraph that they told us

11  Tetra wasn't in the case --

12        THE COURT:  Well, accused is sort of a word of art, I

13  guess, and I -- and think -- particularly to focus on the word.

14  But they're saying they're not saying that they had the word --

15  used the word accused and used a broader and more expansive

16  concept, it would have been the same thing.  I don't think

17  accused is meaningful other than in the general kind of sense

18  the way they used it.

19        MR. STRINGFIELD:  Right, your Honor.  And so I guess

20  my point is that, you know, I think a more fair reading of page

21  4 of Docket 437 is that we do not believe that Tetra was in the

22  case.  And in fact we said that they told us it wasn't in the

23  case.  So I just wanted to mention this.  Mr. Alper talked

24  about the now accused language, and I read it very differently.

25        THE COURT:  I think -- I'm telling you, line product

1   is now accused, accused of misappropriation of infringement,

2   Tetra. But accused by whom? Accused by them because that's

3   their belief.

4              MR. STRINGFIELD: That's their belief. But that

5   wasn't a --

6              THE COURT: That is how I think of it.

7              MR. STRINGFIELD: Absolutely, your Honor. But that

8   wasn't a concession that Hytera believed it was in the case.

9   It is different for them to accuse things. It is a whole

10  different thing for us to agree that that's part of the scope

11  of this DMR case that's been going on for over two years.

12             And, so, your Honor, I guess, again, you know, my

13  earlier point, and I'll say it one more time because I think it

14  is important, it is too much, it is too late. It is not just

15  source code. It is not just financial data. It is developing

16  our story and --

17             THE COURT: Can I -- and I'm -- I really want to

18  underscore this. This -- you should not infer anything from

19  the questions I'm asking you, honest to goodness.

20             MR. STRINGFIELD: I don't at all, your Honor. And I

21  just want to make clear that --

22             THE COURT: But I want -- no, I do understand. I

23  understand the setting in which this arose, and I really do

24  understand the -- what you were all up against given the trial

25  date.

1    But why not say to him, we do need the time, we want

2    the time, we're -- but we're not agreeing that Tetra is in this

3    case, but we still need the time.

4        MR. STRINGFIELD:  And we believe that's what we said.

5    And if you're talking about the -- our brief, we were painting

6    -- our primary concern, your Honor, in that brief was the

7    ambiguous nature of their trade secret allegations.

8        THE COURT:  Well, here is what you said.

9        MR. STRINGFIELD:  Sure.

10       THE COURT:  And I'm not trying to put you on the spot.

11   Honestly I'm not.  And I understand the urgency with which

12   things are written.  And I'm not trying to sort of hoist you on

13   your own petard.

14       Finally, it appears Motorola intends to expand, yet

15   again, the scope of its case to include Tetra.  And then you

16   say an entirely new category of products.  That its counsel

17   represented just two months ago was not an issue in the case.

18   And Mr. Alper has explained why that representation was made.

19   And they didn't know about it at the time.  And so the promise

20   or the statement doesn't count in his view.

21       You go on.  Motorola's February 15th, 2019,

22   supplements to Hytera's Interrogatories 6(k) and 8(n) identify

23   for the first time an entirely new category of products now

24   accused -- I read that by them -- claimed might have been a

25   better word -- claimed -- now claimed by them to be infringing.

1    Yet at a 30(b)(6) deposition, one month earlier, Motorola's

2    counsel represented again, I guess, that Tetra was outside the

3    scope of the case.  With four weeks left there is no time to

4    investigate and discover Motorola's contention as to this late

5    addition to the case.

6              MR. STRINGFIELD:  Your Honor --

7              THE COURT:  Hold on.

8              MR. STRINGFIELD:  Sorry.

9              THE COURT:  If -- if Tetra was not in the case --

10   sorry -- if Tetra was not thought by Motorola to be in the

11   case, rightly or wrongly, would the motion have been made to

12   amend the scheduling order?

13             MR. STRINGFIELD:  Absolutely, your Honor, because --

14   you'll notice how far down in the --

15             THE COURT:  Well, it is on page 4.

16             MR. STRINGFIELD:  Well, it -- but we start, you know,

17   with grievances much higher than that.  And they are in order,

18   I think, approximately of what they were.  And it was primarily

19   the ambiguous nature of the trade secrets.  And your Honor is

20   familiar with our issues with that.

21             But also it was 20 million pages of documents that

22   were dumped on us within the weeks leading into this.  So

23   Mr. Alper was telling us how they found this silver bullet

24   email in a collection of 3 million documents.

25             Do you remember that, your Honor?

1        THE COURT:  Yes, I do.

2        MR. STRINGFIELD:  And it took them three months to go

3    through 3 million pages.  Right?  That's the math that I did in

4    my head, so a million pages a month.

5        They dumped 20 million pages on us in three weeks, and

6    with just four weeks left of discovery.  That's 20 months if

7    we're reviewing it as fast as Motorola -- as fast as their

8    lawyers are.  And I don't think we are nearly as big and as

9    fast as they are.

10       And so the 20 million pages was a huge burden on us.

11   That was -- those were the bases for the extension.  It was the

12   ambiguous trade secrets.  It was the 20 million pages.  We

13   couldn't get through a million pages a month and, you know, get

14   through --

15       THE COURT:  No, I --

16       MR. STRINGFIELD:  -- 20 million.

17       THE COURT:  I am --

18       MR. STRINGFIELD:  And so those were our grievance,

19   your Honor.

20       THE COURT:  Let me go to the last page -- the last

21   sentence of that paragraph.  With four weeks left in discovery,

22   there is no time to invest -- and prior to this, of course, is

23   the discussion about Tetra in part.

24       With four weeks left in discovery there is no time to

25   investigate and discover Motorola's conventions as to this late

1    addition to the case, meaning Tetra.

2         MR. STRINGFIELD:  That's right, your Honor.  And I

3    agree with that.  With four weeks left there wasn't time to

4    investigate their contentions.  We didn't even mention our

5    defenses.

6         THE COURT:  Wasn't the argument really Tetra shouldn't

7    be in the case at all for this and this and this reasons, part

8    of which would have been the lateness of the thing, and your

9    contention about them knowing and they should have reverse

10   engineered and so on, could have all been made in the context

11   of you can't add Tetra this late in the game.

12        MR. STRINGFIELD:  This -- but, your Honor, the context

13   of this motion, this was a -- this was a schedule modification

14   motion.

15        THE COURT:  No, but you're explaining to him why.

16        MR. STRINGFIELD:  We're painting a picture.

17        THE COURT:  And implicit in -- I understand.

18        But implicit in what -- in the reasons and the

19   necessity for the expansion of the schedule, which I understand

20   -- I agree and understand -- is because of what Motorola is

21   doing now at this very late date, which you think is

22   inappropriate and improper.  And I understand that, and you may

23   be right.

24        But I would think -- I suppose the decision seems to

25   have been, well, rather than say to Norgle, they're trying to

1   expand this, and we -- or to me -- we don't want that -- this

2   to come into the case because, one, it is improper; two, it

3   will expand the schedule, you sort of acquiesce to what they

4   wanted to do.  And on the basis of what they were seeking to do

5   or wanted very much to do, you were asking him to expand the

6   schedule.  And implicit in that is without that expansion we

7   can't accommodate them.

8           MR. STRINGFIELD:  And, your Honor --

9           THE COURT:  And I'm not saying that's where -- but

10  that's kind of what -- it was sort of a tactical way of how to

11  deal with this looming deadline.  And maybe the wrong choice

12  was made.

13          And I understand what you are saying, that you didn't

14  mean what it sort of sounds like you were saying.

15          MR. STRINGFIELD:  Your Honor, I dis- -- you know, I

16  read it differently.  I don't read this as a concession.  Your

17  Honor may be reading this concession.

18          THE COURT:  I did not -- I didn't use the word

19  concession.  And I'm not saying it is a concession.  It is sort

20  of a way of which to get the -- I mean, if your argument -- let

21  me go one step further.

22          You get the concession from the Court that you need

23  and that you want.  Why not at that point say, you know, we

24  have thought about this, and wisdom comes slowly, so we think

25  you have no right to have this in the case, the Tetra issues.

1    You could have gone, and they were out -- out on the -- people

2    reverse engineer all the time.  I think that's more often than

3    not how people find out how something is being used when it

4    shouldn't have been used.

5            But we're going to object before Cole, if you force

6    us, to your injection of Tetra products into the case.  It is

7    too much, too late.

8            MR. STRINGFIELD:  And we made those objections here.

9    They gave us discovery requests, and we objected to them.  And

10   we said -- I don't have them in front of me, and I didn't

11   memorize them, but I'm certain we said something very similar,

12   that we disagree these are in the case.

13           THE COURT:  Well, that's why they have got a motion.

14           MR. STRINGFIELD:  Today, but not back when we

15   objected.

16           THE COURT:  When did you object?

17           MR. STRINGFIELD:  I would assume within 30 days of

18   whenever the discovery was served.

19           THE COURT:  I know, but can you remember when?

20           MR. STRINGFIELD:  I don't have that, your Honor.

21           MR. ALPER:  And is your Honor asking when they

22   specifically objected to Tetra?

23           THE COURT:  Yes.

24           MR. ALPER:  About a week ago.

25           It was after we raised this issue in our meeting and

1   conferring about it, they raised -- they, for the first time,

2   objected that Tetra was in the case.

3           MR. STRINGFIELD:  We never objected in written -- I

4   don't know.  Never in written discovery you don't think we --

5           MR. ALPER:  It was in a -- all I have seen is a

6   supplement, that you did a supplement to which I think was

7   about a week ago that --

8           MR. HERBERT:  Your Honor, it is Exhibit 6 to our

9   motion on page --

10          MR. ALPER:  Exhibit 6, page 7, third supplemental

11  response.

12          THE COURT:  What's the date?

13          MR. ALPER:  The date is March 28, 2019.  Third

14  supplemental response on page 7.

15          THE COURT:  Exhibit 6.  Hold on.

16          MR. ALPER:  Exhibit 6 to our motion.

17          THE COURT:  Exhibit 6, page 7.

18          MR. ALPER:  Yes.  You'll see headings that say, third

19  supplemental response to Interrogatory Number 1.

20          THE COURT:  Just a second.

21          Where am I to look?

22          MR. ALPER:  If you look at the heading that says,

23  third supplemental response, the second sentence, Hytera

24  objects to this interrogatory as overly broad, unduly

25  burdensome, and neither relevant nor likely to lead to the

1    discovery of admissible evidence, to the extent it includes

2    Hytera's Tetra products, which are not involved in the pending

3    action.  And --

4              THE COURT:  And this you say was the first objection.

5              MR. ALPER:  Well, let me be 100 percent clear.  It is

6    the first objection in the interrogatories.

7              On March 26th, two days before that, Hytera responded

8    to our emails, post Judge Norgle email, reasking about the code

9    and said we have never agreed to give you the code.

10             THE COURT:  And it was an email -- is that an exhibit?

11             MR. ALPER:  It is not, your Honor.

12             THE COURT:  That's okay.  Email --

13             MR. ALPER:  It was a March 26th email.

14             THE COURT:  Hold on.  From Hytera.  March 26 stating

15   Hytera's not in the case.

16             MR. ALPER:  Yes.  And then on the 27th that's when

17   Hytera -- so on the 27th Hytera's counsel wrote us in advance

18   of the deposition, corporate deposition, happening on the 28th

19   and 29th of one of their corporate deponents that our corporate

20   designee is not going to, as a corporate matter, testify about

21   Tetra.  And so that --

22             THE COURT:  In an email.

23             MR. ALPER:  In an email.  So we have an email on the

24   26th saying, we never agreed to give you the documents.

25             On the 27th that said, our corporate deponent is not

1   going to give you the testimony.  And literally -- the email

2   literally says because Tetra is not accused in this case.

3           THE COURT:  All right.  Hold on.

4           MR. ALPER:  That's -- they didn't say because they --

5   the original email that they sent didn't say, not because it is

6   not in the case, they said, because it is not accused in the

7   case, which, of course, is the opposite of what they said to

8   Judge Norgle.

9           And then we met and conferred on the 28th and 29th.

10  And on the 28th --

11          THE COURT:  Hold on.

12          MR. ALPER:  -- during the deposition we got --

13          THE COURT:  One second.

14          MR. ALPER:  Yeah, sorry.

15      (Brief interruption.)

16          THE COURT:  Okay.

17          MR. ALPER:  And in the -- I think the important thing

18  that --

19          THE COURT:  No, I got it.  Let him finish.

20          MR. STRINGFIELD:  Sure, your Honor.  And I -- candidly

21  I'm not bothered by any of these dates, and I'll tell you why

22  I'm not.

23          So, your Honor, Motorola supplemented an

24  interrogatory -- interrogatory response in February of 2019.

25  In March we told them we disagree.  Okay?  And so, you know,

1    they brought it in February.  We told them wrong in March.

2          I think what -- I think that what they're trying to

3    point at here is that, you know, we put in our March motion to

4    Judge Norgle, we mention that they were trying to bring Tetra

5    in as part of the parade of horribles.  Judge Norgle, you know,

6    I am sure he considered the motion fully, but he didn't, at

7    least as far as we can tell, rule at all based on Tetra.  I

8    don't think anybody mentioned Tetra.  He sent us out into

9    the hallway.  He said, you guys figure it out.  Right?

10          THE COURT:  I have no idea -- I have no idea what he

11    was thinking.

12          MR. STRINGFIELD:  So --

13          THE COURT:  But I tend to agree with you that his

14    focus was on getting you to agree.

15          MR. STRINGFIELD:  So --

16          THE COURT:  But the mere fact you agreed would have

17    suggested to him that what you were asking for and what he was

18    to do was because of a set of facts, part of which was the

19    inclusion of Tetra into the mix, as opposed -- and thus it was

20    necessary to put it off -- as opposed to, well, I'll put it

21    off, but Tetra is really not going to be very important.  Tetra

22    was the reason for the expansion.

23          MR. STRINGFIELD:  So, again, the -- I think we

24    disagree that Tetra was the reason for the expansion.  It was

25    the trade secrets.  Primarily the trade secrets and the 20

```
 1   million documents.

 2          But, in any event, when we went out and negotiated

 3   with it, there was clearly not a meeting of the minds.  It

 4   sounds like the Motorola lawyers thought that Tetra was in.  I

 5   know that the Hytera lawyers did not think that Tetra was in.

 6          And when we moved Judge Norgle, we were asking for

 7   four months based upon this parade of horribles.  What we

 8   negotiated was five weeks.  Again, Hytera was under the

 9   impression that Tetra was not in the case.

10          THE COURT:  If you felt Tetra wasn't in the case, you,

11   by any stretch of the imagination, wouldn't have made it four

12   months, would you?

13          MR. STRINGFIELD:  We would have.  And --

14          THE COURT:  Oh.

15          MR. STRINGFIELD:  -- the reason is because to develop

16   our defense.  And my point is that we negotiated five weeks

17   because we didn't need to go back to China and discover a Tetra

18   development story.  We wouldn't have accepted five weeks if we

19   would have thought that Tetra was in this case.  There's no

20   way.

21          And that's why I was saying earlier that we would

22   absolutely --

23          THE COURT:  So regardless of Tetra being in or out,

24   you needed the time.

25          MR. STRINGFIELD:  We needed the time.  And we
```

1   negotiated five weeks based, again, as I said earlier, based on

2   the case that was -- that we saw in front of us.  And the case

3   that we saw in front of us was the case of DMR.  It had been a

4   DMR case for all these years.  It had been a DMR only case.

5   Tetra has been out there.  Nobody was talking about it.  Nobody

6   had any reason to believe that Tetra would pop up some day, and

7   we'd have to go back and recreate our -- or not recreate but --

8           THE COURT:  And, again, please forgive me, I'm not

9   trying to be disputatious, but I don't understand how you can

10  say that.  To say you had no idea Tetra was in the case, I

11  think, sort of blinks reality.  Tetra was -- when I say in the

12  case, I won't -- I don't mean in the case.  Tetra was clearly

13  in the mix, in the mind of -- or certainly in the forefront of

14  Motorola's thinking.  That's partly what all this was about.

15          MR. STRINGFIELD:  Not until February, your Honor.  So

16  I was talking -- I have been talking about from March of 2017

17  to February 2019 nobody was talking about Tetra.

18          And so in February 2019 it was too late.  And that was

19  our position then, and it is our position today.  It was too

20  late in February, it is too late in April.

21          Even with this modest extension that we got, again,

22  based on the case that was then in front of us, of only five

23  weeks, there is no room for Tetra.  It has been a DMR case.  If

24  they wanted Tetra in the case, they could have made the same

25  trade secret misappropriation allegations as against Tetra.

1    THE COURT:  Will you agree with -- I'm putting it

2    wrong.

3    At least as I read this, it would have strike -- it

4    strikes me that that is -- the argument you're making here

5    should have been made to Judge Norgle and said, we need time

6    whether -- not whether.  Tetra is not in the case.  What they

7    are doing will expand it forever, not -- for far more than

8    anybody wants.

9    But -- even with Tetra not being in the case, we need

10   more time.

11   MR. STRINGFIELD:  Your Honor, I think whether Tetra is

12   in or out of the case, as we understood, it is an issue for

13   this Court and because it is a discovery dispute.  Judge Norgle

14   was overseeing the scheduling.  And Tetra was -- you know, the

15   threat of the Tetra coming in -- and, again, we did not think

16   that Tetra was in, was informing our decision to ask for a

17   four-month extension, again primarily based on the trade

18   secrets and the 20 million documents.

19   THE COURT:  That's certainly not what was conveyed to

20   the district court.  And my only observation is for next time

21   sort of be careful.  What one says to judges really counts,

22   according to our Court of Appeals and every Court of Appeals.

23   Judges don't know anything more about a case, at least

24   factually, than what they are told by the lawyers.

25   MR. STRINGFIELD:  And I agree with that, your Honor.

1   And I guess we didn't -- we didn't believe then, and we don't

2   believe today, that that's what we told Judge Norgle.  We did

3   not tell him that we thought Tetra was in the case, and then

4   that was the basis for our extension.

5           My recollection, and I think a fair reading of these

6   papers, is that we were focused on the ambiguous trade secrets,

7   the 20 million documents, and we're mentioning Tetra as part of

8   the parade of horribles, the reality we were facing, just

9   everything blowing up and coming at us at once.  And we said,

10  Judge, we need help.  And he said, you guys go figure it out.

11  And we negotiated it based on the cases we saw, which was a DMR

12  case.

13          THE COURT:  Well, in your discussions, since we're

14  going into what happened outside of court, in your discussions

15  with Judge Norgle -- sorry -- with Mr. Alper and his colleagues

16  out in the hall, wasn't Tetra mentioned?

17          MR. STRINGFIELD:  Absolutely not.  Absolutely not.

18          MR. ALPER:  It was, but only to this extent.  I asked

19  Mr. Cloern, I said, we would like to talk to you about, you

20  know, some -- getting some of the Tetra code.  And we said,

21  we'll talk, and then we left.  We didn't make any resolution

22  about it.  But he did not say, no way, that we just made a deal

23  that this is not part of the case.

24          MR. STRINGFIELD:  I don't think --

25          THE COURT:  And no way you did -- I'm saying you did

1    not make a deal that it was not part of the case.

2         MR. ALPER:  Exactly.  There was no rebuff of that.

3    And, frankly, when we -- there was no rebuffing of that.

4         I hesitate to get into too much off the record detail

5    because I don't -- the one thing that is -- I am a hundred

6    percent confident of, and I think Mr. Stringfield would agree,

7    no one said in that room, now we're making this deal but Tetra

8    is not in the case.

9         THE COURT:  Was there any discussion in that room

10   about Tetra?

11        MR. STRINGFIELD:  I --

12        MR. ALPER:  I asked Mr. -- I told Mr. Cloern that we

13   needed to talk about the production, come up with a -- like

14   what we were talking about at the beginning, what is it that

15   they're going to produce.  And that issue was deferred for --

16   we all need to leave and get back into Judge Norgle to put an

17   agreement on the record.  And so I -- my recollection --

18        THE COURT:  Well, how would you calculate the time

19   that was needed for you to agree on if you didn't include it in

20   your respective thinking, the Tetra product?  Because

21   these -- that partly or wholly what the motion -- partly what

22   the motion for extension encompassed.

23        MR. ALPER:  From our perspective, it was -- there

24   was -- for us it was very minimal.  And so from our

25   perspective, it -- there was certainly enough time to

1  accommodate the very selective discovery that we're talking

2  about, which we had -- had been out there.

3         THE COURT:  So Tetra basically was not really

4  discussed in your off-the-record conference outside Judge

5  Norgle's courtroom.

6         MR. ALPER:  Yeah, I would say it was raised as a thing

7  that we needed to work together on moving through, as we would

8  in the ordinary course of discovery.  It was not discussed in

9  terms of is it in or out of the case, which left us with the

10 impression that it was accused and that we do discovery on it,

11 and that was the point of the extension.

12        THE COURT:  And nobody -- okay.

13        MR. ALPER:  Do you see what I am --

14        THE COURT:  Yes.  I understand you fully.

15        MR. ALPER:  It's -- basically I think it is the same

16 as with -- I'm sorry.  I didn't mean to cut you off.

17        THE COURT:  No, you go ahead.

18        MR. ALPER:  -- did the papers say that they have a

19 concern about timing based on Tetra.  We went outside.  We

20 agreed to a -- some new schedule, and that left us with the

21 impression that that issue was -- that concern was moot.

22        MR. STRINGFIELD:  And --

23        THE COURT:  By the extension.

24        MR. ALPER:  By the extension, your Honor, yes.

25        MR. STRINGFIELD:  And, your Honor, and I don't think

1    Mr. Alper would agree with me and I think --

2           THE COURT:  Mr. Alper, please sit down.

3           MR. STRINGFIELD:  Oh, sorry.

4           I don't think -- I think Mr. Alper is right, there was

5    no discussion whether Tetra was in or out of the case.  And I

6    think I -- you know, he -- it was mentioned, as Mr. Alper

7    characterized it.  I don't recall if it -- I'll accept his

8    representation that it was mentioned in passing, like, hey, we

9    need to --

10          THE COURT:  So we really go back and the -- the

11   out-of-court conference has no meaning.  It has no significance

12   here.  To the extent one wants to look at what was in people's

13   minds, we go back then to the motion.

14          MR. STRINGFIELD:  And, your Honor --

15          THE COURT:  I'm not saying it is dispositive.  It may

16   not be.  And it is probably not.

17          But I do think it has some significance because it

18   bore on Judge Norgle's thinking that he was going to give you

19   some time, but preferably, of course, you guys should agree.

20   And of course in that sense he was right.

21          But what led him to do what he did is that there was

22   something before him that he read and that, you know, governed

23   his thinking and his willingness to do what you want him to do,

24   which was to get more time.

25          MR. STRINGFIELD:  And, your Honor --

1    THE COURT:  I'm not saying it is dispositive.  But I

2  do think, as I thought at the beginning, I think it has some

3  significance in the larger picture.

4    MR. STRINGFIELD:  Absolutely, your Honor.  And that's

5  why I want to answer it.  And, again, it -- you know, Hytera

6  was not making a concession, and Hytera -- oh, excuse me --

7  that Tetra was in this case.  We were, again, just referencing

8  it as part of what was coming at us at that time, and it was

9  not that, you know, the extension, we thought, was based on

10  Tetra.

11    We thought it was based on the ambiguous trade secret

12  identification, the 20 million documents that had been just

13  dumped on us.  And we negotiated a much shorter extension based

14  on the cases then in front of us, which was a DMR case, based

15  on their December 7th iteration of their response to

16  Interrogatory Number 1, which identified the documents and some

17  other trade secrets.  Again, as I mentioned earlier, that has

18  expanded by a factor of two since we agreed to that extension.

19  So that is -- that is an issue that we were still scheduling,

20  the impact on the scheduling, but --

21    THE COURT:  Let me go back for a second.

22    Mr. Alper, as I remember -- no, sit down.

23    As I remember reading various things that you have

24  written, Mr. Singh has written, and that had been said in the

25  case and representations made in briefs, you have -- I don't

1    want to overstate it -- a lot of it -- I won't say a mountain

2    -- but a lot of evidence of culpability of -- you said so, over

3    and over and over, about how compelling the case is that you

4    have and the quantum of evidence that you already have.  And

5    some of that I have quoted in opinions.

6             So that although Mr. Singh has tried to hit every note

7    of concern that I had in the last opinion about proportionality

8    and timing and so on, you really don't need, in your view, the

9    Tetra stuff, the Tetra line of products to prove your case.  It

10   really is a question of damages.

11            MR. ALPER:  May I --

12            THE COURT:  Yeah.

13            MR. ALPER:  May I --

14            THE COURT:  You don't have to.  You can sit down.

15            MR. ALPER:  I think --

16            THE COURT:  Whatever you --

17            MR. ALPER:  Thank you.  I'm slightly more comfortable

18   standing --

19            THE COURT:  Okay.

20            MR. ALPER:  -- if that's all right.

21            So, your Honor, we agree this is really just a

22   question of the scope of the misappropriation and scope of

23   damages and ultimately a question of injunctive relief.

24   However, the one thing I would add so --

25            THE COURT:  Well, injunctive relief really doesn't

1  count in the sense that if you get the appropriate injunction,

2  if you win, and you get the appropriate injunction that you

3  want, which I'm certain you will because they are pretty

4  commonplace and standard, Hytera, if you are right about Tetra,

5  Hytera then couldn't continue with Tetra as it is without

6  running afoul of the injunction.

7  MR. ALPER:  So that's -- we agree, but let me raise a

8  little bit of a practical --

9  THE COURT:  And presumably they wouldn't, and that's

10 why I -- certainly was told today.  So it really ultimately

11 winds up to be not a question of proof, but a question -- of

12 proof of liability, but a question of proof of damages.

13 MR. ALPER:  That is the way we see it.  However, let

14 me introduce one issue that is directly relevant to that.

15 THE COURT:  Okay.

16 MR. ALPER:  So let's say that we don't have the code.

17 We have evidence now that some number or all --

18 THE COURT:  All.

19 MR. ALPER:  -- all of their Tetra products -- right

20 now the email suggests all.  But at least some number, if not

21 all, of their Tetra products are using Motorola code.

22 Presumably at trial, if they don't give us the code, they are

23 not going to be able to say, well, look, jury, the code

24 actually shows something different because they wouldn't have

25 produced it to us.

1      But we won't know, no one will know, they will say, it

2  is their position now, they are saying it in court, they have

3  said it, you know, in a meet and confer, that actually we're

4  wrong.  That at least some, if not all, of the Tetra products

5  do not have the Motorola code in them.  That's their position.

6  They said it here today.

7      And so we're in this awkward position where they have

8  a contention that the code will elucidate this issue.  We have

9  evidence that shows otherwise.  And we all want to just get it

10  right.

11      And so where does that leave us when it comes to the

12  injunction question that your Honor is raising?  Are the Tetra

13  products in or out?  Presumably they will be in the scope of

14  the injunction.  They will at that point say, well, we don't

15  have sufficient proof, I suppose, that the products are using

16  the same code and --

17      THE COURT:  Oh, I wouldn't think that at all.  The

18  burden of proof -- the sort of the -- the unofficial burden of

19  proof gets to be theirs.  They are the ones that were violating

20  -- would be violating the injunction.

21      You, of course, if you wanted to come in and say that

22  -- we have to prove that in fact they were, that the -- Tetra

23  used your code.  But that's a very different question.

24      MR. ALPER:  Right.  And so if we're going to do that,

25  right now it is -- I just -- I feel like it is a little bit --

1    I can't foresee exactly how that's going to play out as we go

2    to the jury with this document and we say, here, look, look at

3    this document.  I believe they should be precluded from

4    contesting that because they are refusing to give us the code,

5    but I don't know exactly how that would play out in a liability

6    -- from a liability perspective.

7              THE COURT:  I don't think -- if I were to rule, and it

8    -- and it were to stand, nobody would do anything about it,

9    that for whatever reason, as a matter of discretion, because

10   that's what it really is, not a -- that I don't think at this

11   late stage that Tetra should be in the case wouldn't change

12   what you would want as the scope of your injunction.  And it

13   wouldn't change at all Hytera's obligation to obey that

14   injunction vis-a-vis Hytera products -- Tetra products or any

15   other line of products.

16             And you are sort of back at square one to see, well,

17   has there been an injunction?  It would be your responsibility.

18   But they have got the burden in their own minds of compliance.

19   And I don't think they are going to just, I wouldn't think,

20   willy-nilly ignore that.

21             You can reverse engineer the Tetra line of products

22   and -- I don't think it takes very long, especially when you

23   know what you are looking for.

24             MR. ALPER:  Again, I'm --

25             THE COURT:  So I'm concerned -- I'm concerned not

1    about the scope of the injunction because it will not affect it

2    in the slightest.  I'm concerned with all the arguments that

3    have been made here today and ultimately with the -- I don't

4    want to say it -- and with the effect on the trial date that

5    really is sort of fixed.  I don't want to try to present Judge

6    Norgle with a fait accompli that's going to require him to,

7    again, even though he may not want to, reset the trial date.

8              How long has he given you folks to try this case?

9              MR. ALPER:  I don't think that -- I don't think we

10   have -- I don't think we have talked about that.

11             THE COURT:  No?  How long do you think it will take to

12   try?

13             MR. ALPER:  We think it is --

14             THE COURT:  A week?  Two weeks?

15             MR. ALPER:  Two weeks maybe.

16             THE COURT:  Okay.

17             MR. STRINGFIELD:  Your Honor, and we see it very

18   differently -- and we had briefed this before your Honor based

19   on the complexity of the trade secrets.

20             And I'll just add a little bit of color to that.  And

21   I know this is really far afield.  We're -- we started the

22   30(b)(6) depositions on the trade secrets.  And we have a

23   gentleman who is actually under deposition now.  He started

24   yesterday.  He was to cover five trade secrets out of 142.  In

25   one seven-hour day we got through two.  So three and a half

1    hours per trade secret times 142 just to take the facts.

2            And we -- we rang that bell in one of our briefs, and

3    we're -- again, we are considering the scope of this case.  But

4    we disagree that based on the scope of their case that they are

5    moving forward with that ten trial days is even remotely

6    realistic.  We're looking at a trial of months and months to

7    put on 142 trade secrets.  But --

8            THE COURT:  Don't count on months and months.

9            MR. STRINGFIELD:  I don't think we should, your Honor.

10   And that's our --

11           THE COURT:  Nothing takes months and months.

12           MR. STRINGFIELD:  That is our concern, your Honor.

13           MR. ALPER:  This case is a -- I understand Hytera's

14   desire to not get to trial and to make it sound like this is an

15   impossible case to try, but --

16           THE COURT:  It is not, it's a --

17           MR. ALPER:  -- it is ultimately very simple.

18           THE COURT:  It is really a very simple trade secrets

19   case.  It is not different than lots of others.  And they get

20   done.  It takes a week.  It takes two.  Whatever it takes, it

21   is not going to be months and months.

22           MR. ALPER:  It is about whether they took our --

23           THE COURT:  Right.

24           MR. ALPER:  -- stuff and --

25           THE COURT:  And whether they are using it.

1          MR. ALPER:  Yes.  And it is that.  It is really that

2     simple.

3          And so to get back to your Honor's question --

4          THE COURT:  Because your experts are not going to be

5     on the stand for weeks on end.  If you make that terrible

6     mistake, either of you, you will absolutely lose the jury.

7          MR. ALPER:  We agree.

8          THE COURT:  They won't have a clue.  And they will

9     shut off their hearing, and they will look very much askance at

10    whoever is forcing them to stay for their protracted -- they

11    are not engineers.  This may be a trial that engineers would

12    love and be excited about.  But 12, ten or eight people who are

13    just drawn off the street, you know, who don't know what you

14    guys know --

15         MR. ALPER:  We agree, your Honor.  And so to get back

16    to your original -- to your point, we don't have a disagreement

17    with what you're saying.  My point is, that especially with

18    respect to ultimately it is going to be their burden in the

19    post-trial setting to explain why they get to keep selling any

20    of the products.  But what -- all I'm saying is that when it

21    comes back to the decision of the discovery, because we're

22    looking at this as a very narrow set of discovery, it just

23    makes it a lot cleaner because then we know what -- we all know

24    is it in the code or not for a much --

25         THE COURT:  Maybe, and I -- I apologize to you.  Maybe

1    it is not all that easy.  Just because they give you the code,

2    you say, well, that's the code, maybe that's not the end of the

3    inquiry.  I really don't know.

4          MR. ALPER:  Maybe that's true.  But it also is

5    possible that it is a very simple inquiry and will be in a

6    less -- we'll be in a -- I think a better position in terms of

7    trial in terms of trial readiness --

8          THE COURT:  Yes, you will.

9          MR. ALPER:  -- having that.  That's all my point is.

10         MR. STRINGFIELD:  And, your Honor, and, again, my

11   concern is that there is no such thing as Tetra light.  There

12   is no such thing as bringing Tetra into the case only to the

13   extent that it is whether Motorola can prove liability.  It is

14   not just whether they meet their burden.  Hytera is entitled to

15   develop its defense, and its defense is independent

16   development.  And so it is not just a matter of whether they

17   get to come in and point to code and say that they got it.  We

18   argue about that, and that's a small capsulized thing.

19         Hytera is entitled to develop its entire independent

20   development defense, which there is not time for, and we would

21   be deprived of our due process rights to develop a defense on

22   this product line if it is brought in at this late juncture,

23   and that's our position.

24         THE COURT:  Okay.

25         MR. STRINGFIELD:  Tetra has got to be in or out, your

1     Honor, it can't just be their side of the --

2            THE COURT:  No, I agree completely with you.

3            All right.  You folks are going to get me what I -- I

4     forget even what I asked for.  But you're going to get me

5     whatever you're -- I have asked for.  And it doesn't have to be

6     long, just, you know, so it is complete.

7            All right.  Well, thank you very, very much, and it

8     has been very helpful.

9            MR. STRINGFIELD:  Thank you, your Honor.

10           MR. ALPER:  Thank you, your Honor, for taking the time

11    with us this morning.

12           THE COURT:  No, thanks a lot.  Sorry you had to fly

13    in.

14           MR. ALPER:  No, it is quite all right, your Honor.

15        (Which concluded the proceedings:)

16                         CERTIFICATE

17           I HEREBY CERTIFY that the foregoing is a true, correct

18    and complete transcript of the proceedings had at the hearing

19    of the aforementioned cause on the day and date hereof.

20

21    */s/Pamela S. Warren*                March 5, 2019
      Official Court Reporter                  Date
22    United States District Court
      Northern District of Illinois
23    Eastern Division

24

25