1    **TRANSCRIBED FROM DIGITAL RECORDING**

2                   IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
3                        EASTERN DIVISION

4    MOTOROLA SOLUTIONS, INC., et al.,     )
                                           )
5                  Plaintiffs,             )
                                           )
6             vs.                          )  No. 17 C 1973
                                           )
7    HYTERA COMMUNICATIONS CORPORATION     )
     LTD., et al.,                         )  Chicago, Illinois
8                                          )  May 30, 2019
                   Defendants.             )  8:40 A.M.
9
                      TRANSCRIPT OF PROCEEDINGS - Motion
10        BEFORE THE HONORABLE JEFFREY COLE, Magistrate Judge

11   APPEARANCES:

12   For the Plaintiffs:        KIRKLAND & ELLIS LLP
                                333 South Hope Street
13                              Los Angeles, California  90071
                                BY:  MR. MICHAEL W. DE VRIES
14
                                KIRKLAND & ELLIS LLP
15                              555 California Street
                                27th Floor
16                              San Francisco, California 94101
                                BY:  MR. ADAM R. ALPER
17
     For the Defendants:        STEPTOE & JOHNSON, LLP
18                              115 South LaSalle Street
                                Suite 3100
19                              Chicago, Illinois  60603
                                BY:  MR. DANIEL STEVEN STRINGFIELD
20
                       PAMELA S. WARREN, CSR, RPR
21                        Official Court Reporter
                       219 South Dearborn Street
22                             Room 2342
                        Chicago, Illinois   60604
23                          (312) 408-5100

24   **NOTE:  Please notify of correct speaker identification.**
     **FAILURE TO SPEAK DIRECTLY INTO THE MICROPHONE MAKES PORTIONS**
25   **UNINTELLIGIBLE.**

1      (Proceedings held in open court:)

2          THE CLERK:  17 C 1973, Motorola Solutions versus

3   Hytera Communications.

4          MR. DE VRIES:  Good morning, your Honor.  Mike De

5   Vries and Adam Alper for the plaintiff Motorola.

6          THE COURT:  Good morning.

7          MR. STRINGFIELD:  Good morning, your Honor.  Dan

8   Stringfield on behalf of the Hytera defendants.

9          THE COURT:  Good morning.  Okay.

10         MR. DE VRIES:  Your Honor, we're here to request the

11  Court's assistance in completing the financial discovery in

12  this case.

13         To recap a history that your Honor is no doubt

14  familiar with --

15         THE COURT:  And I understand there may be a new case

16  to be consolidated with this.  Is that right?

17         MR. DE VRIES:  Your Honor, actually let me -- let me

18  just very briefly address that.  It is not a new case.  There

19  was a subpoena that was served on one of the dealers for

20  Hytera, and that was served in the District of Connecticut

21  where the dealer is located.  There was an agreement to produce

22  certain materials, and then a dispute about whether a

23  deposition should occur.  As mandated by the Federal Rules,

24  Motorola filed a motion to compel in the District of

25  Connecticut.

1          THE COURT:  Hold on one second.

2      (Discussion off the record.)

3          THE COURT:  Sorry.  Go ahead.

4          MR. DE VRIES:  And so a motion to compel was filed in

5  the District of Connecticut where the subpoena was served on

6  the party as required by the rules.  Briefing occurred.  And

7  the parties reached an agreement asking the District of

8  Connecticut to transfer that dispute to your Honor.

9          And my understanding it took a little bit of time for

10  that to go through.  I believe that has now gone through but

11  was not originally assigned to your Honor despite that being

12  the parties's desire and intent was for you to be able to

13  consider it.

14          And so I think that the latest is that there was a

15  motion asking to reassign that discovery dispute to your Honor

16  and to Judge Norgle.  And I don't think that's been ruled on.

17          THE COURT:  And who has got the case now, Gettleman?

18          MR. DE VRIES:  You know, I -- if your Honor -- if I

19  may just look for a moment.  I think I --

20          THE COURT:  Oh, it is not that important.  I just -- I

21  thought it was a whole new case.  I was so excited.

22          MR. DE VRIES:  No, it is not a new case.

23          THE COURT:  To think of being able to start up again

24  on a -- square one with you guys.

25          MR. DE VRIES:  No.  I know it is actually --

1      THE COURT:  A dream that could only happen in

2  (unintelligible).

3      (Laughter.)

4      MR. DE VRIES:  We understand, your Honor.

5      It is actually a dispute that has been fully briefed,

6  was in the District of Connecticut for some time, and now has

7  taken a somewhat circuitous route --

8      THE COURT:  Okay.

9      MR. DE VRIES:  -- back to this court.

10      THE COURT:  Okay.  All right.  So let's deal with what

11  your situation is here.

12      MR. DE VRIES:  So it is actually pretty simple, and

13  that is that we're asking your Honor to help us, I'll say,

14  finally complete the most basic financial discovery in the case

15  that we're seeking from Hytera.

16      And so just to briefly recap, to remind your Honor of

17  what has occurred, we have been --

18      THE COURT:  And I have your motion.

19      MR. DE VRIES:  And I think -- and just in looking at

20  it there was one piece that sort of led up to where we started.

21  And your Honor may very well have this in mind, but I thought

22  it would be important to remind your Honor.

23      Hytera produced some financial summaries made for

24  litigation in December of last year.  We initially noticed

25  inconsistencies, and we asked them to produce the underlying

1   financial documents and records, not something created for

2   litigation.  And filed a motion to compel when we couldn't

3   reach agreement on January 11th.

4           After that Hytera agreed to produce the financial

5   information.  That was Docket 395.  So your Honor didn't have

6   to rule on that motion to compel.

7           There were subsequent meet and confers.  And Hytera

8   said it was looking into it.  They were talking with us about

9   what form it would take.

10          On April the 5th, having not received the information,

11  we said we're going to file another motion to compel.  We need

12  this.  They -- I'm sorry, that was on March -- the 28th.  They

13  promised to provide the information by April the 5th.

14          April the 5th came and went.  We didn't have it.  They

15  said they were going to get it soon.  They were going to try by

16  April the 17th.

17          And you'll recall that then, right as I was about to

18  depose Mr. Yuan, who is the head of Hytera's Americas here in

19  Chicago, they canceled his deposition.  And so we also asked

20  your Honor to -- and he was the 30(b)(6) on their financial

21  data.  We asked your Honor to compel his deposition.

22          We had a hearing before your Honor.  They -- by that

23  time Hytera said it was going to put up its chief financial

24  officer, a relatively new person to the company, to testify

25  about 30(b)(6) topics about their financials finally.  And we

1  -- and your Honor ordered them to do so by a date certain.

2  We also explained that given his high-ranking position

3  in the Hytera America entities that are involved here, we

4  wanted to depose Mr. Yuan, including because he had direct

5  knowledge of the financial information.

6  Mr. Stringfield objected on behalf of his client and

7  represented to your Honor that there were visa problems that

8  prohibited Mr. Yuan from being deposed in the United States.

9  Your Honor compelled three things in your order on

10  that motion to compel. One was that they produce the financial

11  information that they had agreed to produce.

12  Two was to make a 30(b)(6) witness available to be

13  deposed in Chicago on their financials.

14  And three that they make Mr. Yuan available for

15  deposition in London at our offices, even though he lives ten

16  minutes from me in California based on Mr. Stringfield's

17  representations to the Court that there were visa issues that

18  prohibited him from being deposed in California.

19  Two weeks ago I flew out to London, based on those

20  representations and your Court's order, and I deposed Mr. Yuan

21  about the financial data.

22  THE COURT: So he had to leave California to go to

23  London as did you.

24  MR. DE VRIES: Yes.

25  THE COURT: Rather than doing it in California where

1    you both live.

2           MR. DE VRIES:  Right.  And so what I thought -- what I

3    understood from what the representations that were made to your

4    Honor was that he had a visa problem that caused him to leave

5    the country.

6           As I understand it in fact he was still in the

7    country, according to his testimony, at the time those

8    representations were made to your Honor.  And I understand that

9    he himself does not have any visa issue, but there was some

10   issue that required him, he says, to be in London to file some

11   kind of an application for his -- some family members that live

12   there.

13          Regardless, that's not really the point other than a

14   massive amount of expense flying across the world to go and ask

15   him questions.

16          But what happened at that deposition was that I showed

17   him the financial summaries that had been produced pursuant to

18   your Court -- the Court's order, and he identified what looked

19   like -- he said he had doubt about them.  He said he didn't

20   prepare them.  And with his knowledge of the sales information

21   of the DMR products in the United States, which he would report

22   on an annual basis to the highest executives at Hytera that the

23   data didn't look right to him.

24          And he mentioned two issues that could be going on.

25   He said that, one, he thought that the data that we had

1  received may not reflect the sales price to customers, but

2  rather the transfer pricing between the corporate parent and

3  the subsidiaries.  And I asked him what kind of a difference

4  that could make.  And he said it could be up to 100 percent

5  different.

6       (Laughter.)

7       MR. DE VRIES:  So in other words, the -- I think that

8  the data that we have, it -- I -- there is a -- you have to go

9  from the Chinese Currency to the U.S. Currency.  I think it is

10  around $800 million.  If there was that problem, it could be

11  $1.6 billion instead.

12       He also mentioned something that we didn't know

13  before, which is that Hytera sells the products that Motorola

14  accuses of using its trade secrets and copyrighted source code

15  through two OEMs that are in the United States.  One in

16  California and one in Arizona.

17       And so then another thing he mentioned was something

18  that we have been trying to get discovery about for some time,

19  which is he explained to me that there are accessories and

20  applications that Hytera sells specifically for DMR products.

21  And he informed me that made up -- could make up up to 40

22  percent of additional revenue on the sales of these DMR

23  products.

24       And so if you were to take those two potential

25  inconsistencies -- or, three, I should say -- you could imagine

1    that the approximately 800 million U.S. Dollars revenue that

2    had been given to us could be far higher.  It could be $2

3    million.  It could be more.

4         And so as I was flying back from London the very next

5    day, we immediately raised these issues probably by the morning

6    time before I had landed, with Hytera, and asked for their

7    counsel's help in running these issues to the -- to ground.

8         And where we're at is this.  It has been over two

9    weeks since that deposition.  We still have no answer about

10   whether this is the transfer pricing amount or the sales

11   revenue amount.

12        They say that they are investigating it.  They say

13   they're looking into it.  That seems to be a very, very simple

14   issue to resolve.  It should have been resolved, frankly, by

15   order of your -- this Court a long time ago.  And it certainly

16   should not have taken 15 days to tell us what the answer to

17   that question is.  They can call the chief financial officer,

18   and he can explain what this data is.

19        And then we also asked for the documents, the

20   contemporaneous actual records -- financial records that

21   Mr. Yuan testified about.  And they are very discrete.  He said

22   he had two annual reports for 2017 and 2018 that he used to

23   report the DMR and other sales to the Hytera executives,

24   including the chairman at Hytera, and that gave sales

25   information.  And we said we would like to see those

1    contemporaneous documents.  All we have been provided still is

2    litigation summaries and some transactional data that it is not

3    clear to us what it means, and Mr. Yuan expressed doubt about

4    what it is actually showing.

5           And then Price Waterhouse, Mr. Yuan believes, in the

6    United States audited financial statements that were provided

7    by the Hytera America entities to the corporate parent.  And

8    we'd like to see those too because we have a lot of concern

9    about the financial data that's been reported.

10          And then finally, and this is the final --

11          THE COURT:  May I interrupt?

12          MR. DE VRIES:  Yes, I'm sorry.

13          THE COURT:  Is there any issue that's been raised by

14   Hytera -- I assume there hasn't been -- but the information you

15   are seeking isn't relevant?  They haven't said that.

16          MR. DE VRIES:  None of what I have talked about so

17   far.

18          THE COURT:  Because that seems awfully relevant.

19          MR. DE VRIES:  Right.  Well, actually let me -- so the

20   answer is, no, they haven't.  But when we -- when we said we'd

21   like those annual reports and the Price Waterhouse audited

22   statements --

23          THE COURT:  Uh-huh.

24          MR. DE VRIES:  -- what they told us in an email --

25   this is attached, I believe, as Exhibit 6 to the motion -- they

1    said both that they're cumulative because -- they have already

2    told us the financial data they gave us was accurate so we

3    don't need to see them.

4         THE COURT:  That's a non-answer.

5         MR. DE VRIES:  And in the same email they said, we're

6    still investigating your issues.  And if it turns -- and we'll

7    get to it when we get to it essentially.

8         THE COURT:  And it has been at least two weeks you

9    said?

10        MR. DE VRIES:  We raised this immediately after

11   Mr. Yuan's deposition on May 14th.  It is my belief it was

12   first raised on May the 15th, U.S. time.  So, yes, two weeks.

13        And so they -- and so you can see our concern when

14   they're saying -- giving us, you know, probably a cumulative

15   five or six documents that exist that show the financial data

16   that we're looking for, that are actual contemporaneous

17   records, one given to the executives, one audited by a U.S.

18   accounting firm, that they say that's cumulative because they

19   have already told us that their data is accurate.

20        THE COURT:  Well, cumulative it seems to be only if

21   you accept the first submission to you.  Then, of course, by

22   definition, it would be cumulative if you accept that as

23   accurate.

24        MR. DE VRIES:  Right.  Which -- and we are --

25        THE COURT:  But you don't.

1    MR. DE VRIES:  Well, and, you know, we are open to a

2    dialogue about it.  You know, what we expected to receive

3    actually was an explanation by May 17th, May 16th, let me tell

4    you what this revenue is.  It has been two weeks, and we don't

5    have it.  And I think if you look at this record where it is

6    almost June, and since December they have given us admittedly

7    inaccurate summaries in December --

8         THE COURT:  Admittedly, pardon?

9         MR. DE VRIES:  They admitted they are -- they are

10   admittedly inaccurate.

11        THE COURT:  Inaccurate.

12        MR. DE VRIES:  Inaccurate.

13        THE COURT:  I didn't hear the end.

14        MR. DE VRIES:  Inaccurate.

15        THE COURT:  Okay.

16        MR. DE VRIES:  The summaries they gave us, litigation-

17   generated summaries, they were wrong.  That here we are

18   and -- and we just need them to answer those questions about

19   the transfer pricing and the OEMs.  And if it is as

20   Mr. Yuan's -- as a person with knowledge, with frankly more

21   knowledge or as much knowledge as the witness they put up on

22   the 30(b)(6) topics, that if it isn't -- if it is transfer

23   pricing, give us the sales revenue, the actual sales revenue to

24   customers.  That is clearly the appropriate damages base.  And

25   then produce the annual reports and the audited financial

1    statements so that we can have verification that what we're

2    looking at is right.

3          And then there is only one other issue, your Honor.

4    And here they do dispute that we're entitled to this.  We have

5    been seeking, since March the 1st, at least, although I would

6    say that the way that they are dividing up this revenue is

7    something that at least I personally didn't understand fully

8    until recently -- is revenue -- simply revenue information.  We

9    don't need new depositions.  We just need the revenue

10   information for the DMR, digital mobile radio, accessories and

11   applications that Mr. Yuan testified could make up to an

12   additional 40 percent of revenue that they see.

13         So just to -- I'm paraphrasing what was said at the

14   deposition.  But in short --

15         THE COURT:  An additional 40 percent.

16         MR. DE VRIES:  An additional 40 percent.

17         And so what he was saying, you know, in a -- I'm

18   paraphrasing again -- was we sell these products, but we make

19   additional money by selling these different things.

20         THE COURT:  Right, right.

21         MR. DE VRIES:  And so what Hytera's primary position

22   has been is that our damages contention interrogatory doesn't

23   include those sales.  And so, therefore, they don't have to

24   provide them because they are not part of our damages case.

25         We believe that that is absolutely wrong.  It puts the

1  cart before the horse.  We want the discovery so that we can

2  evaluate whether to --

3          THE COURT:  So that damages calculation --

4          MR. DE VRIES:  -- put it in.

5          And so the idea that they deprive us of the discovery

6  that --

7          THE COURT:  No, I really do understand.

8          MR. DE VRIES:  And they have also suggested that we

9  have somehow delayed.  And that is absolutely wrong.  I mean,

10  as I have laid out for you, we have been -- we have filed

11  now -- this is the third motion to compel actually filed to

12  just get the financial data.  We threatened to file another

13  one.  They have canceled depositions, given us inaccurate

14  things, refused to answer questions.

15          And this is not complicated.  We think that an order

16  from your Honor that they do this within the next five days is

17  absolutely reasonable.  We don't -- if their position is, hey,

18  we think this ought to disrupt the schedule, we vehemently

19  disagree with that.  There is no basis for their delay in

20  providing the information to do that.

21          THE COURT:  I would think this is -- again, I don't

22  know.  But I would think since money is involved, most major

23  corporations could have this in a second.

24          MR. DE VRIES:  Right.

25          THE COURT:  If the chairman of the board or the

1  president of either of your companies demanded something,

2  somebody wouldn't say to them, I'll let you know, I'm thinking

3  about it, we'll do the best we can.  And call me in a week or

4  seven days or I'll get back to you.  I just don't think that's

5  how things work, but maybe I -- maybe I'm wrong.

6         MR. DE VRIES:  No, you're right.  It is a public -- it

7  is a public company too, your Honor.  You know, this is a

8  company that has public financial reporting requirements as

9  part of its, you know, operations for a company.  And so we are

10  confident that although from our perspective your Honor has

11  ordered them to produce this, and we are where we are, that

12  there are very specific issues that we're seeking to resolve.

13         If they tell us, hey, let me tell you the OEMs that

14  you think are there, here is the explanation, here is why, you

15  know, you think that you are supposed to see something based on

16  his testimony, here's the explanation for that, that's fine.

17  We -- we're willing to engage in that dialogue.  But we have

18  substantial concerns.  And, in particular, until we get real

19  not-made-for-litigation or selected-for-litigation data, then

20  we're going to have a lot of concerns on our part that we're

21  not getting the full story.

22         So we'd ask your Honor to order them to provide the

23  materials that we're seeking in our motion within a date

24  certain that is prompt, five days or seven days.  Our expert's

25  reports are due on June the 28th.  That's why we're moving as

1   promptly as we can before your Honor.

2         But, again, if they provide that information, I don't

3   anticipate any need for additional depositions or anything like

4   that.

5         THE COURT:  Well, they have had your request for a

6   couple of weeks, haven't they?

7         MR. DE VRIES:  Yes.  Yes, your Honor.

8         THE COURT:  So they -- good, bad or indifferent, I

9   mean, they haven't said, no, you -- you know, go scratch, you

10  can't have it.  They said, I'm going to consider it.  That's

11  what you say.

12        MR. DE VRIES:  Right.  Except on the accessories.  To

13  be clear, they have said you didn't put them in your damages

14  contention interrogatories, so we're not going to give them to

15  you.  So they have said no on the accessories.

16        But on the other items what Mr. Stringfield said

17  is -- and I'll just show you where this is at so you can see

18  what he wrote.  It is Exhibit 6.  And it is the very first

19  page.  This is from May 23rd.  That was a week ago.

20        And this follows a string of emails, of course.  And

21  he says to my colleague, Ms. New, thank you for your email.

22  First, we are looking into Mr. Yuan's statements regarding the

23  OEM sales and regarding the transfer pricing questions you

24  raise below.  If we determine the financials require updating

25  in any way, we will update them and advise you immediately.

1    Moreover, we're happy to set up a call on Thursday,
2    referring to this day, which is, as I understand it, the last
3    day that your Honor hears these types of motions until next
4    week, to update you on our investigation if it is not completed
5    by then.  Thus we see no issue requiring the Court's
6    intervention.
7    And since then, in the week following -- since that
8    time, we have not heard any update on that particular issue
9    that I'm aware of.
10    And this is, obviously -- you know, none of this is
11    directed to Mr. Stringfield.  I know he's doing his job, as we
12    are, as lawyers in trying to obtain this.  But given the
13    history and what we have seen here and canceling depositions
14    and refusing to allow us to depose Mr. Yuan at all for whatever
15    reason, perhaps this is it and perhaps it is something else.
16    I'm concerned deeply that without a very clear order from your
17    Honor that Hytera feels that it doesn't have to provide this
18    information or explanation.
19    Thank you, your Honor.
20    THE COURT:  Mr. Stringfield.
21    MR. STRINGFIELD:  Thank you, your Honor.  So let me
22    unpack a few of the things that my colleague said.  So there is
23    two universes of information that are implicated in their
24    motion.  The first I'll call financial data related to products
25    that are in the case.  The second universe are products that

1    are not within the case.

2            The first universe --

3            THE COURT:  The accessories.

4            MR. STRINGFIELD:  And I'll explain why, your Honor.

5    Because I think they first articulated any legal theory that

6    could possibly implicate those products, not until May 17th on

7    a phone call with opposing counsel.  And I'll explain the

8    timeline.  I think that counsel's presentation vastly

9    oversimplified how we got here, and that's the second universe

10   of products, products that are not in the case.

11           The first universe, the products that are in the case,

12   are DMR radios.  Those are the products that are accused of

13   incorporating misappropriated trade secrets.  Those are the

14   products that are accused of incorporating copied source code.

15           The second universe, the products that are not in the

16   case, are batteries.  They are cases for phones.  They are

17   software that can be used with a myriad of different products.

18           THE COURT:  Which involve also a great deal of money.

19           MR. STRINGFIELD:  I understand that they do involve

20   money, your Honor, but those are not accused in this case.

21   There is a special legal theory that you can bring in outside

22   non-accused products.  These are non-accused products that were

23   never part of any articulated legal theory until, we believe,

24   May 17th.  And I'll talk about those in a moment.

25           But I want to -- the whole timeline that Mr. De Vries

1　mentioned relating to the motions to compel and so forth, those

2　were all related to the first universe of financial data, the

3　stuff that's in the case.  And we have answers to that.  And

4　I'm happy to provide updates on those.

5　　　　　　But I do want to separate those because I think maybe

6　unintentionally Mr. De Vries is trying to muddy this up a

7　little bit and roll in this entirely new legal theory.

8　　　　　　THE COURT:  I thought it was pretty clear.

9　　　　　　MR. STRINGFIELD:  Well, maybe it was, but I think I

10　could maybe add a little bit more clarity to it.

11　　　　　　THE COURT:  Good.

12　　　　　　MR. STRINGFIELD:  So, first, regarding the set of

13　information that is already in the case, the financials related

14　to DMR radios that are in the case that are accused.  I have

15　some updates to provide.  I have -- as Mr. De Vries mentioned,

16　I have told them that I'm working with our client to get this

17　information.  It comes slowly, and I'm working --

18　　　　　　THE COURT:  It shouldn't.

19　　　　　　MR. STRINGFIELD:  -- nightly to get it.

20　　　　　　THE COURT:  It shouldn't --

21　　　　　　MR. STRINGFIELD:  But I do have some updates.

22　　　　　　THE COURT:  But it shouldn't come slowly.

23　　　　　　MR. STRINGFIELD:  We're working --

24　　　　　　THE COURT:  It is not -- listen, I -- my --

25　whatever -- however I feel about it, it is not you, it is not

1   your fault, you're just the lawyer in the case.  You're at

2   their beck and call, so to speak.  They do what they do.  You

3   can't make them do what -- more than you have tried, I'm sure.

4          MR. STRINGFIELD:  Sure, your Honor.

5          But so, again, just focusing on the first set of

6   financial data, the financial data related --

7          THE COURT:  That's the thing that they're -- well, at

8   least that's the first thing in their arguments.

9          MR. STRINGFIELD:  Well, that's the first thing in

10  their argument.  And I think that we don't really have any

11  dispute here.  And maybe if we do, it is a very a narrow one.

12         On the second universe, we have a --

13         THE COURT:  No, I don't want to go -- but I don't want

14  to do the --

15         MR. STRINGFIELD:  Okay.  Let's stick with the first.

16         THE COURT:  If there is no argument, why do they not

17  have what they want?

18         MR. STRINGFIELD:  Well, because they're

19  probably -- they're going to hear some things for the first

20  time here, and I apologize for that.  I'm just learning this

21  information.  So I'm going to up- --

22         THE COURT:  But it -- really, I'll let you -- I must

23  tell you that my reaction -- I absolutely know you're telling

24  the truth.  My reaction to what they're doing to you, and thus

25  doing to them, is really unfair.  That now for the first time

1    in response to an outcry, I think pretty prompt, now that

2    you're going to say something, whatever you had to

3    say -- pardon me -- should have been said a long time ago,

4    either together -- well, you're not together -- over the

5    telephone.  Your folks in China made them do what they have

6    done, and that's bring this motion (unintelligible) the

7    traditional motion to file under seal.

8         I really don't understand.  This is so straightforward

9    and simple.  Tell me if I am wrong.  Your folks prepared

10   something for litigation.  By definition it is potentially

11   inaccurate and thus inadmissible, maybe.

12        If they want to accept it, then that's fine.  If they

13   have evidence that maybe it is not what you're saying it is,

14   they have the right not to accept what you are advertising as

15   legit.  Your folks could come in and say, you know, we have

16   done everything we can.  Our revenues, unless they are lost

17   sales, they are probably $600,000.  Nobody would accept that,

18   and they are not required to.  All they want to know is what

19   they believe the truth is.  It may not be accurate.

20        Your folks don't want to give them anything to

21   buttress what the figures that they have said are true.

22   I -- they don't have to accept that any more than you would

23   have to accept their assertions of truthfulness -- pardon me.

24        MR. STRINGFIELD:  Sure, your Honor.  And so we -- and

25   to be clear we have provided some of the things that they have

1   asked for.

2        THE COURT:  Not all.  But even what you have provided

3   they say, and if I am wrong tell me, they say they have some

4   evidence by way of depositions that what has been provided, to

5   put it mildly, doesn't look quite right.  They say, okay, we

6   want to investigate further and determine whether what we have

7   got is accurate or inaccurate.

8        If it is inaccurate, they have the right to know for

9   two reasons, only one of which I will discuss, and that's the

10   reason they put forward.

11        Let's forget the evidentiary reason that they might

12   want this stuff.  But they want to know what the damages are.

13   I don't see what's wrong with that.

14        MR. STRINGFIELD:  Your Honor, and I agree with that.

15   And so they asked for the annual reports of Mr. Yuan.  We

16   produced those yesterday.  So that's an issue I believe that's

17   off the table.  They probably haven't had a chance to confirm

18   that.  We have --

19        THE COURT:  Mr. Stringfield, you can see though why

20   they feel put upon and why a kind of late compulsion -- a

21   response under the threat of compulsion isn't -- not that it is

22   not valid, it shouldn't be that way.

23        MR. STRINGFIELD:  And, your Honor, it is a function of

24   the time delay between us and our client.  And we only get --

25        THE COURT:  No, it is not.

1          MR. STRINGFIELD:  -- little bits of information each

2    night.

3          THE COURT:  Not two weeks's worth of delay.

4          Go ahead.

5          MR. STRINGFIELD:  So, your Honor, we have -- I believe

6    we have addressed the annual reports for Mr. Yuan.  We have

7    produced those yesterday.

8          Regarding the audited financials, we have learned that

9    there are no audited financials.

10         THE COURT:  Wait.  You have -- you produced what

11   yesterday?

12         MR. STRINGFIELD:  Mr. Yuan's annual reports.  He

13   testified that he generated annual reports.

14         THE COURT:  And it has taken two weeks to do that.

15         MR. STRINGFIELD:  We just produced them yesterday,

16   your Honor.

17         THE COURT:  No, I -- I am convinced that you gave them

18   exactly what was given to you as soon as you got it.  My

19   concern is not directed at you, honestly.  I -- if it was

20   different, I would tell you.

21         All right.  Annual reports have now been turned over.

22         Mr. H-u-a-n?

23         MR. STRINGFIELD:  Y-u-a-n.

24         THE COURT:  I'm sorry, Y --

25         MR. STRINGFIELD:  U-a-n.

1          THE COURT:  Turned over yesterday.

2          Okay.

3          MR. STRINGFIELD:  And during his deposition Mr. Yuan

4     indicated --

5          THE COURT:  Do you folks agree with that?

6          MR. DE VRIES:  Your Honor, I have not seen that.

7          THE COURT:  You don't even know yet.

8          MR. DE VRIES:  No one has ever told us that they did.

9     They produce things all of the time, and so I -- I have not

10    been able to confirm that.  I am not disputing it.  I --

11         THE COURT:  No, I understand.

12         MR. DE VRIES:  I --

13         THE COURT:  But it is not a separate standalone

14    production.  They say to you, oh, here's the stuff.  You wanted

15    it.  Take a look.

16         MR. DE VRIES:  Not that I -- not that I noticed.

17    Mr. --

18         THE COURT:  Okay.

19         MR. DE VRIES:  -- Stringfield can correct me if there

20    is some kind of a cover email that I missed.  If so, I

21    apologize.  But, no, this is the first I'm hearing that they

22    have been produced.

23         THE COURT:  Well, are things being produced sort of en

24    masse and mixed up and so you don't quite know what's being

25    produced?

1          MR. DE VRIES:  I'd say the answer is -- the accurate

2     answer is yes.  In other words, there are very frequent

3     productions that are made that don't have a -- you know, a

4     cover email or --

5          THE COURT:  An explanation.

6          MR. DE VRIES:  -- explanation.  And I'm not contending

7     that they should.  In a circumstance like this, before

8     Mr. Alper and I got on the red eye last night to fly here from

9     California, you know, this wouldn't have resolved it.  But, of

10    course, the more information they could have given us --

11         THE COURT:  Hey, Jan --

12         MR. DE VRIES:  -- the better.

13         THE COURT:  -- ask her to (unintelligible).

14         THE CLERK:  Uh-huh.

15         MR. DE VRIES:  You know, had they said something to

16    us, it would probably have at least saved some of your Honor's

17    time this morning hearing me talk about it, but --

18         MR. STRINGFIELD:  Your Honor, and just to clarify the

19    timing of the production of these things, all of our clients

20    materials have to be reviewed for state secrets.  So they

21    went -- these materials went through that review.

22         Then when we got them, we had to do a privilege

23    review.  I understand that there were redactions.  The

24    documents were entirely in Chinese.  So we had to have a

25    Chinese associate review them and make privilege redactions.

1        THE COURT:  I don't disagree with you.  I just -- I

2  just think lawyers should conduct themselves better, and I know

3  they don't.

4        MR. STRINGFIELD:  And, your Honor, I --

5        THE COURT:  All you had to do was pick up the phone

6  and say, you know, it is really difficult, but this what we're

7  doing, please be patient, we're doing it.

8        But to do nothing and sort of dump everything on -- I

9  don't think they should do it to you if it is being done.

10        What's -- it is how lawyers function.  I think it is

11  sad, frankly.

12        MR. DE VRIES:  And not only did they not tell us, your

13  Honor, they told us that they weren't.  This is

14  Mr. Stringfield's email.  And, again, I have no doubt that he's

15  just doing what his client is instructing him to do, for better

16  or worse.

17        He says, fifth, so that we can -- and this is at page

18  5 of Exhibit 6 to what we submitted.  So that we can understand

19  Motorola's request, can you please explain the relevance of the

20  annual reports requested below?  Motorola's currently stated

21  basis for seeking those reports is its belief that they reflect

22  Hytera's annual DMR sales.

23        THE COURT:  Well, that's just a gotcha.

24        Go ahead.  What's -- so what's the next category?

25        MR. STRINGFIELD:  Sure, your Honor.  So Mr. Yuan

1   mentioned during his deposition that there might be audited

2   financials for just the United States.  We have learned that

3   there are no such things.  The audited financial he's referring

4   to are the company global audited financials.  They don't audit

5   the United States separately.  And so there are global audited

6   financials, and those are rolled into our annual reports.  And

7   those annual reports were produced long ago.

8          So there is no audited financial data just for the

9   United States.  If we would have had that, we would have turned

10  it over to them, but we don't have that information, so --

11         THE COURT:  I don't think you could have -- I don't --

12  again, Mr. Stringfield, my focus is not directed to you.  But I

13  would think that information would have been known in a matter

14  of a day or two.  That's not a kind of small issue.

15         I understand if you don't audit Boise, Idaho.  But the

16  United States is a sort of a big trading partner.  It is a big

17  place.  They would know instantly.  Gee, they are -- tell those

18  people they can't have it because it doesn't exist.  Two weeks

19  and a motion until that information is forthcoming to you and

20  then to them strikes me as --

21         MR. STRINGFIELD:  Right, your Honor.

22         THE COURT:  -- inappropriate.

23         MR. STRINGFIELD:  And so the issue was a

24  misunderstanding by Mr. Yuan that we needed to investigate and

25  figure out what he was talking about.  And it turns out that he

1    was just mistaken.

2           The global people do know -- the people in the

3    headquarters do know what's audited and what's not audited.

4    But we needed or they needed, rather, to confirm with Mr. Yuan

5    to figure out what he was referring to.  And it turns out that

6    he was mistaken.

7           MR. DE VRIES:  You know, I will say -- if I may say

8    two things, your Honor.  First, what Mr. Yuan said, he was

9    the -- he's been the head of Hytera Americas for years.

10          THE COURT:  He would know everything.  He would know

11   whether or not America is included in their summaries of

12   things.  It is preposterous to suggest that the head of the

13   United States, whatever division, wouldn't know how auditing

14   for the Americas is or is not included in Hytera's

15   presentations through an audit.  I --

16          MR. DE VRIES:  And he made very -- and he testified

17   very specifically.  I mean, I can't -- if they're going to deny

18   this, I can't do anything about it.  But what he said was

19   previously the United States entities, the two entities that

20   are defendants in this case, along with the corporate entity,

21   didn't submit audited financials.

22          But that when he became the president, they started

23   working with a U.S.-based accounting firm that he believed was

24   in Florida, that he believed was Price Waterhouse, that

25   submitted for the first time, with a break from the past,

1    audited financials from the U.S. entities in particular to

2    Hytera Corporation, and that that was a change.

3         If they're going to deny that those documents exist,

4    despite that testimony, I don't really know what to do about

5    that.  But what I would ask your Honor to do, because I don't

6    agree that whatever these audited financials from Price

7    Waterhouse or whoever the accounting firm is for the world are

8    just simply subsumed within the annual reports, I believe they

9    should be ordered to produce the documents they are talking

10   about.

11        THE COURT:  Well, I had my own reaction.  But, you

12   know, the -- sort of famous Frankfurter phrase of, hear the

13   other side, strikes me all the time.  And I thought, well, gee,

14   I need to really hear what Mr. Stringfield has to say.  You

15   present a one sided presentation, and maybe it is right and

16   maybe not.

17        But the more I listen to this, the more it is -- it is

18   of concern to me that the plaintiff is not getting what it

19   should get.  You're entitled to exactly what they're entitled

20   to in a -- in a certain sense.  But they're not getting it.

21   This stuff seems so simple.  I just -- I think your client is

22   sort of playing fast and loose.  And whether somebody

23   makes -- I won't say it.  Never mind.

24        MR. STRINGFIELD:  So, your Honor, again, sticking with

25   the first category of financials, the financial materials

1    related to the DMR radios --

2           THE COURT:  Well, let me (unintelligible) another

3    thing --

4           MR. STRINGFIELD:  -- that are in the case --

5           THE COURT:  If I am -- if I grant the motion, and you

6    have complied or you can't comply, you'll answer -- you'll do

7    whatever you want.  I think it has got nothing to do though

8    with my granting or not granting the motion.

9           MR. STRINGFIELD:  Well, your Honor, I think -- like

10   I --

11          THE COURT:  Because I'm not prepared frankly to accept

12   the representations that are being made by you, when you have

13   no basis, other than what are you being told.  I'm then

14   letting, you know, Hytera run the show by saying whatever it

15   chooses to say through you.

16          I would prefer that you make -- if what they're asking

17   for is legitimate, then I think you can make the

18   representations in writing that can be used in whatever way

19   they want to use them, or not at all, that such and such

20   doesn't exist or, gee, we have given it to you yesterday.  Then

21   we go from there.  But I'm not willing to deny motions that are

22   otherwise well grounded.

23          You're -- you simply have to have a defense.  You say,

24   I have already given that to you.

25          MR. STRINGFIELD:  Sure.

1    THE COURT:  Or you'll continue to say it doesn't

2   exist, and they'll do whatever they're going to do.

3    MR. STRINGFIELD:  Sure, your Honor.

4    THE COURT:  So when I read this, I really was

5   disturbed.

6    MR. STRINGFIELD:  Understood, your Honor.  And I'm

7   here to help clarify -- hopefully clarify and alleviate that.

8    THE COURT:  You're explaining it, but you're not

9   clarifying it.

10    MR. STRINGFIELD:  I hope to get there, your Honor.

11    THE COURT:  Okay.

12    MR. STRINGFIELD:  So, again, sticking with the first

13   category of materials, we just discussed Mr. Yuan's annual

14   reports and the audited financials.  There were sales that were

15   mentioned during Mr. Yuan's deposition related to -- they are

16   actually ODM, O Delta Mary.  During his deposition he called

17   them OEM.  But, regardless, they are ODM sales.  And what these

18   are, they are radios that Hytera manufactures and then they put

19   somebody else's name on them.  And then a United States company

20   will purchase those in China and sell them under their own

21   name.

22    And so there were two companies that Mr. Yuan referred

23   to in his deposition.  One was called Discount Radio.  And the

24   second he referred to as Titan.

25    So first related to Discount Radio.  What we have

1    learned is that the ODM sales to Discount Radio were analog

2    radio sales.  They aren't DMR sales.  So those wouldn't have

3    been reflected in our financials.  So there is no missing data

4    for Discount Radio.

5            The second company that he referred to as Titan, we

6    investigated who is Titan, who are they, what company were we

7    selling to.  And we learned that there is a company called T.J.

8    Communications, apparently, that was a former name of whoever

9    is calling themselves Titan now.  And so we looked through the

10   financial data.  We did see these sales to T.J. Communications.

11   So we believe that we have closed the loop on that.

12           They're hearing this for the first time today.  I'm

13   learning it on the fly over the weekend.  I'm sharing it with

14   them in realtime.  But we believe that we have closed the loop

15   on the OEM slash ODM sales, that there are no missing digital

16   radio sales related to these ODM manufacturers or ODM

17   companies.

18           And then related to the financial data, so as your

19   Honor will recall, the -- both parties were ordered to produce

20   by April 17th transactional-level financial data, you know, on

21   a transaction-by-transaction basis of a DMR radio sales.  And

22   also the companies or the parties were ordered to produce

23   summary data.

24           And so both parties did produce their transactional-

25   level sales and their summary-level sales on those dates.  What

1   we have learned is that Hytera, we do think that there

2   were -- was an unintentional error in at least some of the

3   transactions that they might not include the full revenue that

4   the company receives.  So we're learning this information in

5   realtime.  The client is working to rectify that now, and we

6   will produce updated summaries.  We don't know it --

7          THE COURT:  When?

8          MR. STRINGFIELD:  We hope by the end of next week,

9   your Honor.

10          MR. DE VRIES:  Your Honor, I think they should be

11   ordered to do it by no later than the end of next week,

12   respectfully.

13          THE COURT:  Well, we'll come to that.

14          MR. STRINGFIELD:  Okay.  And so, your Honor, and

15   just -- not to -- you know, not to throw things around a little

16   bit, but Motorola's data that they produced on April 17th was

17   also missing data.  And they told us it was an unintentional --

18          THE COURT:  I am not -- I'm not --

19          MR. STRINGFIELD:  -- error.

20          THE COURT:  -- they're -- you're not here -- they have

21   a motion, and that's all I'm going to deal with.

22          MR. STRINGFIELD:  Understood, your Honor.  Just to add

23   a little color that both parties have had mistakes in their

24   financial data.

25          THE COURT:  I know.

```
 1          MR. STRINGFIELD:  And it hasn't been solely Hytera.

 2          THE COURT:  I have no doubt of that.

 3          MR. STRINGFIELD:  Okay.

 4          THE COURT:  This is a major, big time case and, of

 5   course, things aren't going to go smoothly.

 6          But this motion seems to be -- seems to me to be

 7   dealing with an issue that's a bit different than the normal

 8   slippage that you have in discovery.

 9          MR. STRINGFIELD:  So, your Honor, just to close the

10   loop on category one of financial data, which is financial data

11   related to the products that are at issue in this case, I think

12   the only issue that we still need to resolve is updating the

13   financial data for the sales to make sure that they reflect the

14   full revenue received by the company.  We're working diligently

15   on that.  It sounds like your Honor is --

16          THE COURT:  You have had two weeks.

17          MR. STRINGFIELD:  Yes, your Honor.

18          THE COURT:  You have got computers.  And I confess to

19   you my stupidity about certain things; hence, the concept of a

20   technical advisor.  But you don't have to know anything beyond

21   how -- generally how computers work to know that if a company

22   has access to anything, it has access to the money that it

23   makes and spends.  It may know nothing else.  It may treat its

24   customers vilely.  It may treat people who sue terribly.  But

25   they know what they're making.  It doesn't take this long.
```

1    They haven't come up with a single excuse that is

2  legitimate.  We had a breakage.  There was a flood.  There was

3  a tornado.  There was -- nothing, just we're working on it.  I

4  think that's not sufficient.

5    It wouldn't be sufficient if you -- if the shoe was

6  reversed and Motorola was claiming what it is claiming.

7    I simply do not accept that a major world player

8  doesn't know how much money it takes in.  Within a matter of a

9  day it could find out.  And you have had two -- your company --

10  not you.  Your client has had two weeks, and it is working on

11  it.  I don't think they have to have patience for that kind of

12  a stall, I don't.

13    MR. STRINGFIELD:  And, your Honor, to be clear, it is

14  not a stall.  The people that were working with us at this

15  company they are overwhelmed by the volume of materials that

16  are being exchanged in not only this case, and multiple other

17  litigations that are pending all over the global.

18    THE COURT:  Can I ask you just as a general matter,

19  how many people does Hytera employ?  I mean, you -- you

20  certainly know all this.

21    MR. STRINGFIELD:  Thousands.

22    THE COURT:  Thousands.  And what's its annual income

23  roughly based on what it reports to its public auditor?

24    MR. STRINGFIELD:  I don't have that off the top of my

25  head.

1          THE COURT:  I assume billions.

2          MR. DE VRIES:  Yes.  And they have -- I think that

3    Mr. -- I think that we were told that they have literally, I

4    think, nearly 300 financial staff.  300.

5          THE COURT:  Yeah, it -- I really don't accept their

6    sort of claim of financial difficulties.  I don't.

7          MR. STRINGFIELD:  Okay.  So, your Honor, just again to

8    close out category one, the products that are in the case, we

9    believe that the only outstanding issue is closing the loop on

10   these sales to make sure that they include all of the revenue

11   received by the company.  We're working on that, and we expect

12   to get that done by the end of next week.  So that's category

13   one.  That -- the financials --

14         THE COURT:  You expect it to be done by the end of

15   next week, which would then mean you have been working on it

16   for three weeks.

17         MR. DE VRIES:  And, your Honor, may I -- there is just

18   --

19         THE COURT:  I must say to you that is -- that is not

20   acceptable.  It doesn't take a company three -- it is a public

21   traded company, is it not?

22         MR. STRINGFIELD:  Yes, it is, your Honor.

23         THE COURT:  The idea that they can't figure out a

24   product line and what it sort of basically brings in in three

25   weeks is just unacceptable.

1          MR. DE VRIES:  And it has really been six months

2    because they produced -- we have now discovered just today that

3    they have produced inaccurate financial data in December of

4    last year, which we immediately recognized.  It was inaccurate

5    on its face.  And we couldn't reach agreement.  So we had to

6    file a motion to compel.  Then they agreed to fix it.

7          And then they didn't do it, and then your Honor

8    ordered them again to do it.  And we now learned this morning

9    that it is inaccurate again.

10          And so I just -- you know, one thing given the history

11    here, I would like to clarify about what Mr. Stringfield had

12    said, and I would ask his help, as I did in London, and have

13    since, in helping us get this information in the best way that

14    Hytera's U.S. counsel possibly can.

15          THE COURT:  He can't do more than he's doing.  And my

16    guess is that he's playing the game straight.

17          MR. DE VRIES:  Absolutely.

18          THE COURT:  And he is doing what he can do.  And

19    you're not saying anything different.

20          The problem is the recalcitrance of his client.

21          MR. DE VRIES:  And I 100 percent agree.  And the one

22    clarification I wanted to suggest was that when we're talking

23    about Hytera producing all of the revenues this time, this time

24    for real, that it -- that means all revenue received by any

25    Hytera entity anywhere in the world on the sales that we're

1    talking about.  So that there is --

2          THE COURT:  Well, is what you want -- and I'm not

3    going to let you -- is what you want set forth in the motion?

4          MR. DE VRIES:  Yes, it is, your Honor.

5          THE COURT:  Okay.  Then we -- you don't have to

6    explain it.  He's got the motion.

7          MR. DE VRIES:  Yes, your Honor.

8          THE COURT:  And I read the motion.

9          Go ahead.

10         MR. STRINGFIELD:  Your Honor, so moving now to the

11   second category of information that they seek in their motion,

12   and that is financial data related to accessories and software

13   that, again, are not accused of infringement in any way in this

14   case.  There are -- the only way that can brought in is through

15   a legal theory of convoyed sales.  And it is a complex theory

16   that you have to prove numerous factors and -- including --

17         THE COURT:  But you can do it.  Theoretically you can

18   do it.

19         MR. STRINGFIELD:  It can theoretically be proven, yes,

20   your Honor.

21         THE COURT:  Right.  And, therefore, if it can be

22   theoretically proven, and assuming they can do it, it is

23   relevant and therefore it is appropriate -- an appropriate

24   avenue for discovery.

25         MR. STRINGFIELD:  It might have been, your Honor,

1    except the timeline I think informs whether those theories are

2    in the case or not.

3              So Hytera served an interrogatory in January -- or

4    excuse me -- in December of 2018 asking Motorola to describe in

5    complete detail the factual and legal basis and supporting

6    evidence for the damages Motorola seeks in this action.

7              Motorola responded to that interrogatory on January

8    30th.  In that response Motorola --

9              THE COURT:  What number is it?

10             MR. STRINGFIELD:  It is our Interrogatory Number 20.

11             THE COURT:  Okay.

12             Go ahead.

13             MR. STRINGFIELD:  Motorola responded on January 30th

14   Motorola gave a multi-page, high-level outline sketch, I'll

15   call it, of multiple different damages theories.  None really

16   had any substance or meat on the bone, but it was a high-level

17   sketch including lost profits, disgorgement, reasonable

18   royalty, a veritable kitchen sink of damages theories that they

19   might assert in this case.

20             Conspicuously missing was any reference to any theory

21   of convoyed sales or any reference to accessories or to

22   software.  That interrogatory response on its face was related

23   only to DMR radios, which had been the only item that was

24   accused in this case and the only item that was at issue in

25   this case.

1    Motorola served document requests --

2    THE COURT:  And when was the answer?

3    MR. STRINGFIELD:  Their answer was January 30th.

4    THE COURT:  Of this year?

5    MR. STRINGFIELD:  Correct.

6    THE COURT:  Okay.

7    MR. STRINGFIELD:  Motorola served requests for

8    production in March asking for the first time for financials

9    related to accessories, batteries, and software.

10   We responded on April 1st, your Honor.  And I think if

11   your Honor will turn to Exhibit 3 of plaintiff's motion --

12   THE COURT:  Uh-huh.

13   MR. STRINGFIELD:  -- and at page 9 is where we give

14   our response.

15   THE COURT:  Okay.

16   MR. STRINGFIELD:  And, again, this is asking for the

17   first time for any sales related to accessories, software,

18   items that have never been in the case before.

19   THE COURT:  Okay.

20   MR. STRINGFIELD:  In its objection Hytera says, Hytera

21   incorporates by reference its general objections as if fully

22   set forth herein.  Hytera objects to this request in its

23   entirety as seeking information that is not relevant to the

24   issues in this case on the grounds that Motorola has not

25   asserted a claim for convoyed sales.

1          To the extent Motorola is permitted to assert any such

2    claim at this late stage, Hytera objects to this request

3    because it seeks an unreasonable amount of information that is

4    unnecessary, burdensome, and not proportional to the needs of

5    this case.  That was on March -- April 1st, your Honor.  April

6    1st.

7          Motorola goes silent for a month.  Not until May 1st

8    do they send us an email.  This is Exhibit 5 of their motion.

9    A month goes by.  They asked for the sales to the -- or the

10   financials related to con -- or accessories and batteries.

11   Again, sales that can only be brought in under a nuanced legal

12   theory of convoyed sales that they had never articulated.  They

13   asked for it on May 2nd -- or excuse me -- on May 1st.

14         On May 2nd we responded.  And this is also in Exhibit

15   2 -- or excuse me -- Exhibit 5 of their motion, page 2.  We

16   told them again, we said, as Hytera explained back on April

17   1st, and I'm paraphrasing, in our objection to that document

18   request, Motorola has not articulated any theory of convoyed

19   sales in this case.  And Hytera objected back then to producing

20   such financial data on that basis.

21         And then we --

22         THE COURT:  And the date was what?  One was April 1.

23   What's the other?

24         MR. STRINGFIELD:  So April 1 was the date of our

25   objections.

1          THE COURT:  Right.

2          MR. STRINGFIELD:  Then a month later, an entire month

3  later on May 1st, they re-raise the sales related to

4  accessories and software for the first time.

5          On May 2nd, the next day, we responded.

6          And then Motorola replied on May 3rd to our May 2nd

7  email.  And that email is actually not in the record, but I'm

8  happy to tender a copy if the Court would care to see it.

9          THE COURT:  No, tell me what you think it says.

10         What do you think it says?

11         MR. STRINGFIELD:  Well, they didn't respond, your

12  Honor.  On May --

13         THE COURT:  Oh, I see.

14         MR. STRINGFIELD:  They didn't respond to our objection

15  that convoyed sales weren't in the case.

16         The May 3rd response says nothing about convoyed

17  sales.

18         So that reaffirmed our belief that convoyed sales were

19  not part of this case.  We kept telling them, we don't think it

20  is in the case, we don't think it is in the case.

21         A month goes by they don't say anything.

22         Weeks go by they don't say anything.

23         May 2nd, we responded again telling them we don't

24  think it is in the case.

25         May 3rd, they responded to that communication, say

1  nothing about convoyed sales.

2       Then on May 9th they go forward with the 30(b)(6)

3  deposition without re-raising the convoyed sales.  They go

4  forward with the deposition --

5       THE COURT:  Hold on.  Hold on.  Hold on.

6     (Brief interruption.)

7       THE COURT:  Okay.

8       MR. STRINGFIELD:  So on May 9th they go forward with

9  the deposition.  Convoyed sales aren't in the case.  We have

10 our 30(b)(6) deposition.  Motorola doesn't say anything at that

11 deposition about convoyed sales.

12      Then they take the deposition of Mr. Yuan, a week

13 later in London, as counsel referred to.  They claim that

14 during this deposition was the first time --

15      THE COURT:  And that's May what?

16      MR. STRINGFIELD:  That was on --

17      MR. DE VRIES:  May the 14th, your Honor.

18      MR. STRINGFIELD:  Thank you, counsel.

19      THE COURT:  Okay.

20      MR. STRINGFIELD:  On May the 14th.

21      They claim that during that deposition was the first

22 time that they learned that they could possibly articulate any

23 convoyed sales theory in this case.

24      The questioning that they -- asked the questions that

25 they rely on to establish this new found knowledge about

1  convoyed sales was --

2       THE COURT:  But they asked about convoyed sales much

3  earlier.

4       MR. STRINGFIELD:  They asked us for documents related

5  to accessories without ever mentioning the words convoyed

6  sales.

7       THE COURT:  And you object.

8       MR. STRINGFIELD:  And we object.

9       THE COURT:  And then there is sort of silence, and

10  then there is -- and now this (unintelligible) raised the issue

11  again with him.

12       MR. STRINGFIELD:  Right.  And so I think that

13  there -- I think they are seizing upon this deposition as a

14  hook to bring this stuff in.  But I don't think it is a

15  sufficient hook.

16       This is similar, if your Honor will recall the issue

17  related to the Tetra discovery, where the facts that they claim

18  that they needed were already in the case for a long time.  And

19  then they relied on, you know, a new found sudden discovery to

20  bring an entirely new theory into the case.  The same thing

21  here, your Honor.

22       At that May 14th deposition of Mr. Yuan, they relied

23  on an Exhibit 17.  And I'm happy to tender a copy of that if

24  the Court would like.  But this document, Exhibit 17, was

25  produced in the case in November of 2017, near the beginning of

1    the case, almost a year and a half ago.

2          So for them -- so for Motorola to assert that it just

3    learned that it could assert a convoyed sales argument based on

4    questioning related to a document that Hytera produced back in

5    November of 2017 we think defies credibility.

6          Your Honor, similar to Tetra, this is not a simple

7    matter of Hytera just updating its financial to stick more

8    dollars into the case.

9          THE COURT:  No, it is a new theory.

10         MR. STRINGFIELD:  It is a new theory in the case.  And

11   we're entitled to develop defenses that we don't have time to

12   develop in the next two weeks.

13         THE COURT:  No, I understand.

14         MR. STRINGFIELD:  We're allowed to -- you know, at a

15   high level, we need to understand which of these accessories

16   can be used with DMR products, which are used with other

17   non-DMR products.  We need to understand our costs.  We're

18   entitled to deduct our costs from any reasonable royalty that

19   they would get related to these products.

20         The research and development, just under covering what

21   our research and development expenses were related to complex

22   software packages -- these are software packages that you would

23   install on a computer, and they relate to how these radios

24   communicate with each other.  Again, not accused in this case,

25   but very complex.

1    We would have to spend an inordinate amount of time

2   investigating these software packages to determine what our

3   research and development costs are just to deduct those.

4        We also would probably need third-party discovery to

5   understand what third party sell accessories to Hytera DMR

6   radios.  Again, this is all part of the nexus requirement.

7        There is a substantial amount of additional defensive

8   discovery that Hytera would be -- would require to take if

9   Motorola were allowed to insert this convoyed sales theory at

10   this late juncture, and we don't think that that's fair or

11   appropriate.

12        THE COURT:  Thank you.

13        MR. DE VRIES:  We strongly disagree with the

14   recitation of what occurred here and observe that the standard

15   with which they suggest we need to respond to things that they

16   are saying in discovery, which is incomplete, I would like to

17   clarify that for your Honor, is completely at odds with the way

18   that they have responded to the information about the very

19   financial information that we're seeking.  This is nothing like

20   Tetra.  This is all about trying to get only financial

21   information that we requested and have been very, very

22   diligently requesting for the last six months.

23        At the time that we --

24        THE COURT:  Let me --

25        MR. DE VRIES:  Yes.

1    THE COURT:  If you have been trying to get this for

2  six months -- pardon me -- what did you wait for --

3    MR. DE VRIES:  We --

4    THE COURT:  -- I mean to come in now and try to get?

5    MR. DE VRIES:  So, your Honor, let me -- I would like

6  to walk through the same -- there is nothing that is required,

7  except for requiring them to produce the financial data

8  associated with these accessories.  They know what they are.

9  They account for them.

10    THE COURT:  Well, I -- but let's say you're right, and

11  they are just terrible --

12    MR. DE VRIES:  It is --

13    THE COURT:  -- and what they have done is willful and

14  purposeful and obstructive and everything else.  My question to

15  you is why did you -- you folks are not shy and certainly are

16  not wanting for funds.  Why would you have waited six months to

17  come in because in and of itself that is a legitimate defense

18  to a late request for discovery, as well as -- as meritorious

19  as the request may be.

20    MR. DE VRIES:  We did -- we did not delay.  And

21  finding that we did would require -- would reward them for

22  their recalcitrance.  So to --

23    THE COURT:  That's true in every case where the

24  defense is raised and the motion is denied because you didn't

25  act quickly enough.  In case after case after case says that it

1     is within the Court's discretion not to grant that which you

2     otherwise might have gotten because you waited too long.

3               MR. DE VRIES:  Right.  But --

4               THE COURT:  I'm not saying why.  If it was so obvious.

5     Why did you wait all of this time?

6               MR. DE VRIES:  So, your Honor, let me please remind

7     your Honor, the only financial data we got was a summary.  No

8     -- no -- not created for litigation summary in December of last

9     year.

10              THE COURT:  Because they didn't think that the

11    convoyed sales were in the case, and they told you that.  No?

12              MR. DE VRIES:  No, no, no, not at that time, your

13    Honor.

14              THE COURT:  Later.

15              MR. DE VRIES:  Not at that time.

16              THE COURT:  No, but later they told you.

17              MR. DE VRIES:  And so we moved to compel.

18              On April the 1st, before we received any not made for

19    this litigation financial data, we still had not, despite

20    filing a motion to compel in January and your Honor ordering

21    them pursuant to our agreement in Docket 395, they still hadn't

22    produced it.  We served, as your Honor noted, Request Number

23    135 where we very clearly asked for, on March the 1st, services

24    and accessories.

25              Then on the April the 1st they object and they say,

1    subject to and to the extent Motorola's permitted to assert any

2    claim, Hytera will meet and confer with Motorola to discuss the

3    provision of a reasonable and proportionate amount of

4    information regarding sales of services and accessories.

5            Four days --

6            THE COURT:  What was the date?

7            MR. DE VRIES:  That was April the 1st.  That's page 9

8    of Exhibit 3.

9            Four days later was when they were supposed to finally

10   give us the first financial data that we ever received.  And

11   what happened then was they didn't do it, and they said they

12   were going to produce it weeks later.

13           We still don't have any financial data.  Then they

14   unilaterally canceled the only deposition that we have had

15   about 30(b)(6) topics related to financials.  So we immediately

16   come before your Honor --

17           THE COURT:  Can I -- but on April 1st Hytera -- did

18   Hytera not object that convoyed damages were not in the case

19   and thus they were irrelevant?

20           MR. DE VRIES:  They did.  But they offered to meet and

21   confer.  And they are telling us -- we don't even know what

22   financial data they're going to produce at this point.  They

23   then --

24           THE COURT:  Well, it is not going to include, at least

25   according to the objection, it is not going to include convoyed

1  sales.  Right or wrong?

2          MR. DE VRIES:  So -- but they say that they'll meet

3  and confer with us about it.  We engage --

4          THE COURT:  And what happened then?

5          MR. DE VRIES:  -- in several --

6          THE COURT:  And what happens then?

7          MR. DE VRIES:  -- meet and confers.

8          THE COURT:  And did you talk about the -- or write

9  about the -- about convoyed sales?

10          MR. DE VRIES:  After the sequence that involved filing

11  a motion to compel, coming before your Honor, having this order

12  come down, and in advance of the subsequently rescheduled

13  depositions approximately three weeks later, yes, we met and

14  conferred with them about this issue.  I believe the date that

15  Mr. Stringfield has said was May the 1st.

16          THE COURT:  Right.

17          MR. DE VRIES:  And so the idea that we somehow delayed

18  from April the 1st to May the 1st, and that that precludes 40

19  percent of the revenue in the case, we don't think is

20  appropriate, particularly whereas here this is not an issue

21  like Tetra.  We're seeking financial data from them concerning

22  the accessories.  This information is fully within their

23  control, and they account for it.  And that's not an

24  accusation.  I'm not saying that in an accusatory way.  They

25  know what they are talking about because this is one way we

1    have now learned from Mr. Yuan that they apparently seek to get

2    40 percent revenues due.

3          MR. STRINGFIELD:  So, your Honor, a few brief

4    responses.  So counsel referred to the December 2018 summaries

5    that we produced.  Those summaries both had a high-level

6    summary, but they also summarized on a product by-product basis

7    what numbers were rolled up into those summary financials.

8          To be clear, unambiguously those numbers referred to

9    only DMR radios.  There was no mistaken belief that accessories

10   were included in those revenues.  They --

11         THE COURT:  Did it say that on its face?

12         MR. STRINGFIELD:  They --

13         THE COURT:  And you look at that and see that it

14   wasn't limited to DMR radios?

15         MR. STRINGFIELD:  Yes, they just list the DMR radio

16   model numbers.  They don't list any accessories.

17         THE COURT:  And then was there a request or a

18   conference about your under reporting and -- because convoyed

19   sales are not included.

20         MR. STRINGFIELD:  Not at all, your Honor.  The first

21   time we heard any request for accessories was not for months

22   later on March 1st, and that was after they had served their

23   January response to our interrogatory where there was no

24   convoyed sales.  Not even a whiff of convoyed sales was

25   mentioned in that.  They were only focused on DMR radios.

1    January 20th -- or I believe -- January 20th they

2    responded to our interrogatory.  No mention.

3    March 1st, for the first time they ask for

4    accessories.  Again no mention of that legal theory.  And we

5    wrote -- and we responded in our objection.  We said, this

6    legal theory isn't in the case.  Tell us what's going on.  And

7    we did invite a meet and confer.

8    There was no meet and confer.  Not a -- not until May

9    1st did they re-raise this.  A whole month went by and silence

10   on the issue of convoyed sales.

11   That May 1st email they said, hey, we want to circle

12   back to this convoyed sales issue.

13   We responded on May 2nd.  Said, guys, you have been

14   telling us, you know, implicitly -- they haven't explicitly

15   said this -- but our impression was convoyed sales aren't in

16   this case.  We keep telling you they are not in the case, you

17   keep not responding to us so we assume they are not in the

18   case.

19   As I mentioned earlier, your Honor, it is not just a

20   one-sided thing of us giving them the dollars.  It is us

21   investigating our defenses.

22   We don't have the luxury of investing in discovery

23   that's related to issues that aren't in the case.  We needed

24   them to tell us they were in the case.  They never supplemented

25   that interrogatory response.  I believe not even until

1    today -- not even today have they supplemented that

2    interrogatory response to mention convoyed sales.

3            So we -- so when we told them on May 2nd, in response

4    to that May 1st request, guys, we don't think convoyed sales

5    are in the case, here's why, we'll walk you through the

6    timeline.  Here's our interrogatory response.  Here's -- here's

7    our -- and silence for a month.

8            On May 3rd they responded to our May 2nd

9    communication.  They didn't say anything about convoyed sales.

10           Silence is deafening.  This Court has said that many

11   times.  For us we took that silence as a tacit admission or

12   that there were no convoyed sales theory in this case.  They

13   didn't articulate it to us.  We didn't develop our defenses to

14   it because we didn't think we were required to.

15           Now with two weeks left in fact discovery, they file

16   this motion to insert a brand new legal theory into this case,

17   and we don't think that's fair.

18           THE COURT:  Go ahead.

19           MR. DE VRIES:  Your Honor, we disagree.  We have been

20   trying to get the financial picture, the real financial

21   picture, of what's going on at Hytera.  Until Mr. Yuan

22   explained, as he was trying, I believe, to make sense of what

23   we now know is, again, inaccurate data despite the Court's

24   order, that there is a 40 percent flow of additional revenue

25   that they are bringing in on the DMR products, as I understand

1    his testimony, related to these issues.

2          We have been asking for it.  We met and conferred

3    about it.  The idea that we should be precluded from getting

4    more discovery on this, based on this timeline, is, we think,

5    not appropriate (unintelligible).

6          THE COURT:  What -- is the discovery ending date now

7    at long last?

8          MR. DE VRIES:  June the 20th.

9          And we seek nothing more than the financial data on

10   the accessories and the --

11         THE COURT:  It is now May 30th.

12         MR. DE VRIES:  Correct.

13         THE COURT:  So you would have -- they would

14   have -- they and you would have 20 days.

15         MR. DE VRIES:  All we -- all we are seeking is the

16   financial data.

17         MR. STRINGFIELD:  Your Honor, and we disagree.  We

18   think they are --

19         THE COURT:  Yeah.

20         MR. STRINGFIELD:  -- seeking to insert a brand new

21   defensive case theory -- or excuse me -- a brand new damages

22   case theory into this case that we have not been afforded an

23   opportunity to develop defenses for.

24         It is not just a matter of us producing the financial

25   data, it is a matter of us conducting discovery related to,

1    again, whether these accessories can be used with other

2    products, including third-party products, including other

3    non-accused Hytera products.  It is -- we need to get

4    information on how these products are marketed, both by Hytera

5    and its dealers.  Hytera's dealers are third parties, not

6    within its control, so we would need to seek discovery from

7    them.  Information about whether these accessories are sold as

8    part of an integrated solution or just individual products.

9    Information about the scope of any third party peripheral

10   accessory market.  If third parties are selling accessories

11   that can be used with Hytera radios, that informs the nexus

12   inquiry.  This is all discovery that we need to take to develop

13   defenses --

14            THE COURT:  To defend.

15            MR. STRINGFIELD:  -- to this brand new damages theory

16   that they want to insert.  And we have told them that it wasn't

17   in the case.

18            THE COURT:  Forget the time, do you agree with at

19   least the substantive evaluation of what's necessary to defend?

20   Not that there is a defense.  Maybe there is not.

21            But, I mean, they are saying they need to do things,

22   and they think they have a defense, and maybe they do and maybe

23   they don't.

24            MR. DE VRIES:  The answer is, no, I disagree

25   that -- and I -- and I believe that the suggestion that in

1    order to --

2            THE COURT:  Can I -- let me stop you for one second.

3            MR. DE VRIES:  Yes.

4            THE COURT:  I have a speaking engagement in

5    the -- isn't it at 10:00, Jan?

6            THE CLERK:  Let me double check.

7            THE COURT:  In the ceremonial courtroom.  I can't -- I

8    would love not to go.

9            THE CLERK:  At 10:00.

10           THE COURT:  At 10:00?

11           THE CLERK:  Yeah.

12           THE COURT:  Yeah.

13           THE CLERK:  It shows 9:55.

14           THE COURT:  Right.

15           So can you wait just -- I won't be more than -- at

16   most a half an hour.

17           MR. DE VRIES:  Yes, of course, your Honor.

18           THE COURT:  I will try and get through certain --

19   faster, but I can't blow the Chief Judge off.

20           All right.  Thanks a lot.

21           Have a seat.  Talk to each other.

22           By the way, I don't suppose there is any value in

23   talking now, but maybe.  But see what everybody's view is.  But

24   I think I kind of understand where you're both coming from, at

25   least on this issue.

1    But I'll be right back.

2        MR. DE VRIES:  Thank you, your Honor.

3        MR. STRINGFIELD:  Thanks, your Honor.

4        THE COURT:  Thanks.

5    (Brief recess.)

6        MR. DE VRIES:  No problem, your Honor.

7        THE COURT:  Okay.  All right.  Who was -- I think you

8    were -- or you were both talking.

9        MR. DE VRIES:  Yes, your Honor.  This is Mike De Vries

10   again, of course.  And I was in -- I was just talking to your

11   Honor about our perspective on the --

12       THE COURT:  Yes, let me ask you --

13       MR. DE VRIES:  -- interaction --

14       THE COURT:  -- a question.

15       MR. DE VRIES:  Yes.

16       THE COURT:  It would strike me or seem to me that the

17   question of convoyed sales would have occurred to sophisticated

18   or unsophisticated people really from the beginning if you

19   thought that there was anything there.  I mean, that's just

20   sort of the natural flow of thought.

21       MR. DE VRIES:  So, your Honor, I did a poor job of

22   relating the background.

23       THE COURT:  I do not accept that at all.

24       MR. DE VRIES:  Well, I did actually.  And so -- and so

25   I have an answer to that question, and that is that for

1    the -- that what they're characterizing as convoyed sales --

2            THE COURT:  It is your term.

3            MR. DE VRIES:  -- is a --

4            THE COURT:  No, it is your term I thought.

5            MR. DE VRIES:  This was a term that that they used in

6    their objections.  They characterized as a -- convoyed sales as

7    a --

8            THE COURT:  Oh, okay.

9            MR. DE VRIES:  -- as a theory that hadn't been

10   accepted in the case.

11           We believe and have been looking for information for

12   many months about the sales base to be used in the disgorgement

13   reasonable royalty and lost profits to the extent that they are

14   reflective of Motorola's lost profits calculations that are in

15   our contention interrogatories.  And I -- and in terms of

16   seeking that information --

17           THE COURT:  Could you show me --

18           MR. DE VRIES:  -- about the sales base --

19           THE COURT:  I don't mean to interrupt.  Could you show

20   me where you think the issue that we're talking about now was

21   first raised in whatever form?

22           MR. DE VRIES:  Yes.  Yes, and that was actually just

23   what I was going to do.

24           So if you look at our Exhibit 2 --

25           THE COURT:  All right.  Hold on.  Hold on.

1    Yes.

2         MR. DE VRIES:  Exhibit 2 is defendants's responses, so

3    Hytera's responses, to our fourth set of requests for

4    production.  This is from October of 2018.

5         These are excerpted so as not to inundate the Court

6    with unnecessary paper.  Page 32 of Exhibit 2, which isn't

7    actually page 32 of the exhibit.

8         THE COURT:  No, I understand.

9         MR. DE VRIES:  Yes.  Page 6 of the exhibit actually --

10        THE COURT:  Right.

11        MR. DE VRIES:  -- has a request.  The Request Number

12   122 asks for all documents and communications relating to

13   pricing for any Hytera products or services relating to DMR --

14        THE COURT:  Right.

15        MR. DE VRIES:  -- including, but not limited to, price

16   lists, sales, correspondence, bidding documents, price

17   quotations, and price volume analyses.

18        THE COURT:  Okay.

19        MR. DE VRIES:  There is a series of boilerplate

20   objections, including the objection that says Hytera objects to

21   this request as overbroad and --

22        THE COURT:  No forgot -- those don't count.  They are

23   worthless.

24      (Telephone ringing.)

25        MR. DE VRIES:  And then --

1        THE COURT:  Yes, go ahead.

2        MR. DE VRIES:  And then if you look at -- and this is

3    the critical part.  If you look at the next page, there is

4    their answer.  Their response.  And the response states, at

5    page 33 of Exhibit 2, subject to and without waiving the

6    foregoing general and specific objections, Hytera has produced

7    and/or will produce non-privilege responsive documents in its

8    possession, custody or control located after a reasonable

9    search.

10        And, of course, under FRCP 34(b)(2)(C), after the 2015

11    amendment, it is clear that any objection must state whether

12    any responsive materials are being withheld on the basis of

13    that objection.

14        So in this request we're asking for --

15        THE COURT:  Hold on.  Hold on.  Hold on.

16        MR. DE VRIES:  Yes.

17    (Brief interruption.)

18        THE COURT:  Yes.  But if we go back to Request 22, it

19    is quite clear that you -- what you are looking for are things

20    relating to pricing.  And then here's the operative phrase,

21    relating to DMR.  And then you go on to say what it is that you

22    want.

23        MR. DE VRIES:  Right.

24        THE COURT:  But the operative phrase to me is -- I

25    would read this as relating to DMR.

1          MR. DE VRIES:  And I want to be clear about something,

2     because that's something else that I thought about at the break

3     that I wasn't being clear about.  We are only seeking the

4     accessories and applications that are sold with the DMR

5     products.  Nothing else.

6          And to be very precise about that, there are, for

7     example, antenna that are sold for the DMR radios.  There is a

8     wall-mounting bracket.

9          THE COURT:  Is there -- then we go on.  I didn't read

10    the next part.  Including, but not limited, which everybody

11    uses.  And then you read what you are talking about are price

12    list, sales, correspondence, (unintelligible) documents, price

13    quotations, and price volume analyses.

14          I wouldn't -- not being an expert though, and I

15    wouldn't necessarily think this related to -- I mean, it says

16    relating, which is a word that everyone uses and is sort of

17    rather broad.  But I am not sure that I would read this and

18    think this related to or involved anything other than DMR sort

19    of directly.

20          MR. DE VRIES:  Yeah, and I want to be -- so two points

21    because I want to give the rest of the history because it is

22    important.  If we're going to preclude Motorola from getting

23    the pricing information for the DMR specific products and

24    accessories, I want --

25          THE COURT:  Again, let me think out loud here.

1          MR. DE VRIES:  Yes.

2          THE COURT:  It would strike me -- and, again, I think,

3    as I told you before, you guys are -- all of you are sort of

4    hoisted in the petard of your own quite extraordinary

5    excellence.

6          I would think somebody would draft -- in drafting

7    this, and you're responsible, wouldn't have used such an

8    incredibly broad uninformed phrase as relating to.  I know that

9    you want to incorporate anything you can and be as extensive as

10   you can.  But I would think you would have said specifically,

11   including, but not limited to.  At some point I would think you

12   would have asked for what you want, not left it to somebody to

13   kind of try to divine what you meant.

14         MR. DE VRIES:  And so let me -- let me put -- let me

15   show -- I understand.  And I think I can show you how this then

16   went.

17         THE COURT:  Okay.

18         MR. DE VRIES:  So two months later --

19         THE COURT:  All I'm saying to you is --

20         MR. DE VRIES:  Yes.

21         THE COURT:  Maybe you -- usually (unintelligible)

22   chance.  Lawyers are silly.

23         MR. DE VRIES:  And we tried not to.  And that's what I

24   want to show, your Honor.

25         THE COURT:  All right.  So go ahead.

1          MR. DE VRIES:  So two months later --

2          THE COURT:  But I would not read Request Number 22 as

3  necessarily being as inclusive of what you're looking for as

4  you say now.

5          MR. DE VRIES:  Right.

6          THE COURT:  Maybe you are.

7          MR. DE VRIES:  So -- and, your Honor, and I have an

8  answer to that, which is so we served a more precise request --

9          THE COURT:  When?

10         MR. DE VRIES:  Later.  On March 1st.

11         THE COURT:  Well, this one -- what's the date of this

12  one?

13         MR. DE VRIES:  This is --

14         THE COURT:  5-20 --

15         MR. DE VRIES:  This was responded to in October.

16         THE COURT:  No, what was the date of the request, 122?

17         MR. DE VRIES:  I believe it was September the 16th of

18  2018.

19         THE COURT:  So --

20         MR. DE VRIES:  I could be off by a few days --

21         THE COURT:  No, it doesn't matter.  That doesn't

22  matter.

23         MR. DE VRIES:  -- or there may have been an extension.

24         THE COURT:  2018.

25         So then what happens?

1    MR. DE VRIES:  Then two months later we had still not

2    received any of the financial documents.

3         THE COURT:  Of any kind.

4         MR. DE VRIES:  Of any kind unless they were

5    incidentally grabbed, not in the targeted search way --

6         THE COURT:  Right.

7         MR. DE VRIES:  -- through like email custodians.

8         THE COURT:  Okay.

9         MR. DE VRIES:  And so what we had received was a

10   summary that we could tell on its face was inaccurate.

11        THE COURT:  Okay.

12        MR. DE VRIES:  So January 11th we moved to compel the

13   financial documents and summaries.

14        THE COURT:  Well, that's not what you asked for

15   though.  You didn't ask for summaries.

16        MR. DE VRIES:  I --

17        THE COURT:  You didn't ask for their summaries.

18        MR. DE VRIES:  Correct.  We asked for the documents.

19   They had provided summaries.

20        When we moved to compel in January, we asked for

21   corrected summaries and the financial documents.

22        They agreed to provide them, and -- and we did not

23   receive that production until by order of this Court April.

24        In the meantime, and this is what I wanted to show you

25   because I did -- I actually did a very poor job, and I'm not

1  just saying that, of describing what happens next.

2          In Exhibit 3 -- because there is a key part that I

3  didn't highlight for your Honor.

4          THE COURT:  Okay.

5          MR. DE VRIES:  And I won't try to take credit.

6  Mr. Alper helped me in thinking through this at the break.

7  Exhibit 3 is the response to our March 1st request.  And so if

8  you look in Exhibit 3 at page 8 --

9          THE COURT:  Responses to plaintiffs's March 1st --

10         MR. DE VRIES:  Yes, your Honor.

11         And this response that we're looking at was served

12 April the 1st.

13         THE COURT:  Okay.

14         MR. DE VRIES:  So last month.

15         THE COURT:  Yeah.

16         MR. DE VRIES:  And the Request Number 135 --

17         THE COURT:  Okay.

18         MR. DE VRIES:  -- requests documents sufficient to

19 show for each year of the 2005 to 2019 period, and separately

20 for each product or product line identified in -- I'm

21 paraphrasing -- our supplemental interrogatory responses, the

22 total sales volume of services and accessories in the United

23 States and worldwide relating to the product, referring to

24 those products that are identified specifically.

25         THE COURT:  Right.

1          MR. DE VRIES:  The DMR products there.

2          And then this is the part that I -- so on April the

3  1st there is the response on the next page, page 9.  They

4  object, and they say --

5          THE COURT:  All right.  Well, hold on.  Hold on.

6          MR. DE VRIES:  I'm sorry.

7     (Brief interruption.)

8          THE COURT:  Okay.

9          MR. DE VRIES:  Then they object.  And they say, Hytera

10  objects to this request as seeking information that is not

11  relevant in this case on the grounds that Motorola has not

12  asserted a claim for convoyed sales.

13          THE COURT:  All right.  Hold on.

14          I see.  Okay.

15          MR. DE VRIES:  Before that time --

16          THE COURT:  Had --

17          MR. DE VRIES:  I'm sorry.

18          THE COURT:  Had that phrase been used by you?  I

19  don't -- in your request, no?

20          MR. DE VRIES:  No, no, no.  That was a

21  characterization of what we were saying when we said services

22  and accessories for the DMR products.

23          And I want to come back to exactly what that means

24  because I think it is far less expansive than it may sound.

25          But, in any event, so they then say, look, you're

1    seeking convoyed sales.  This is April the 1st.  They have not
2    before April the 1st, before last month, objected in a specific
3    way to providing this information.

4        I understand, your Honor, that the earlier request,
5    which until even as of this date we hadn't received the
6    financial documents, that your Honor is believing that it had
7    some ambiguity associated with it.  I hear that.  And so on
8    March the 1st we served a very specific request for the
9    products and -- I'm sorry -- the services and accessories for
10   the DMR products only.

11       They objected.  But then this is the key part, your
12   Honor.  At the -- at the bottom of this response, page 9,
13   line -- you know, middle of the page.  Subject to and without
14   waiving the foregoing general and specific objections, and to
15   the extent Motorola is permitted to assert any such claim at
16   this late stage, Hytera will meet and confer with Motorola to
17   discuss the provision of a reasonable and proportionate amount
18   of information regarding sales of services and accessories of
19   the DMR products at issue in this case.

20       They did not stand on their objections and say, we
21   refuse to produce anything.  They certainly preserved their
22   objections.  I don't -- I'm not trying to say that they didn't.
23   But they said they would meet and confer with us.

24       THE COURT:  Okay.  So --

25       MR. DE VRIES:  Very -- I'm sorry.

1      THE COURT:  So did they meet -- let me ask.

2      MR. DE VRIES:  Sorry.

3      THE COURT:  Did they meet -- this is April 1.

4      MR. DE VRIES:  Right.  So --

5      THE COURT:  Then what happened?

6      MR. DE VRIES:  So what happened next is -- and this

7  was -- I also did a poor job of describing this.  The next

8  three weeks were Hytera shutting down essentially all of the

9  financial discovery that was happening.  They unilaterally

10  canceled the 30(b)(6) deposition.  They failed to follow

11  through with their production of the financial documents on

12  April the 5th.  And we were forced to file another motion to

13  compel with your Honor that led to the hearing before your

14  Honor in the middle of last month.

15      Then your Honor ordered the production of these

16  materials.  They were produced by April the 19th.  It now turns

17  out that those productions were still inaccurate.

18      Within 11 days after that, we raised with them this

19  request to meet and confer about convoyed sales.  And they

20  informed us, I believe, at -- if I am understanding right,

21  Mr. Stringfield said on May the 2nd that they were not going to

22  provide these.  That they were going to stand on these

23  objections.

24      And --

25      THE COURT:  So you never had the --

```
 1              MR. DE VRIES:  Yes.

 2              THE COURT:  -- a meeting about the --

 3              MR. DE VRIES:  I don't think --

 4              THE COURT:  -- convoyed sales.

 5              MR. DE VRIES:  I think that that was -- I was not

 6    participating.  So Mr. Stringfield will correct me if I am

 7    wrong.  I believe that after that May 2nd date there was a meet

 8    and confer on the telephone with Mr. Singh and Ms. New where

 9    this was discussed.  And it was confirmed that --

10              THE COURT:  So I --

11              MR. DE VRIES:  -- no agreement --

12              THE COURT:  Again I just --

13              MR. DE VRIES:  -- could be reached.

14              THE COURT:  I just -- it is just -- it strikes me so

15    late in the game for you folks to be arguing about what you say

16    is 40 percent of the damages.

17              MR. DE VRIES:  We didn't -- I had not heard that

18    figure, your Honor, until I was taking Mr. Yuan's deposition in

19    London two weeks ago because they had said he wasn't available.

20    And so we have been trying to get a picture.  I mean, even at

21    the time of this objection on April the 1st --

22              THE COURT:  All right.  Hold on.

23         (Discussion off the record.)

24              THE COURT:  It is 40 percent or 30 percent?

25              MR. DE VRIES:  He said -- he said, I believe it
```

1   was -- I'm paraphrasing -- up to 40 percent.

2          THE COURT:  So if you took all the damages you think

3   you might be entitled to, not counting this, you would add,

4   whatever the number is, 40 percent of the number on the top?

5          MR. DE VRIES:  That's what I understood his testimony

6   to mean.  And as of this time, I mean, to put in perspective,

7   your Honor, whatever it was that they understood they were

8   agreeing to produce in October in response to our request for

9   information about pricing for products and services relating to

10  DMR, we still didn't have those financial documents even as of

11  April the 1st or April the 5th.  And so we had to come back to

12  your Honor, file another motion to compel, and we didn't get

13  any of those documents until later that month by order of the

14  Court.

15         And so I can very sincerely say to your Honor that we

16  were trying to very diligently -- this is now our third motion

17  to compel on financial documents -- get a -- from January

18  through to this year -- get an understanding of what the

19  financial picture looks like.  We knew from the outset that

20  they had a very good idea in their mind of where they're making

21  their money on the DMR products.  We were trying to understand

22  what that is.  Show us the documents.  Give us the testimony.

23         Instead we had to file two motions to compel before we

24  got any of those documents.  We had to file a motion to compel

25  before we got that testimony.  And we had to get -- over their

1    objection -- to talk to the guy who actually knew to find out

2    this morning that that data was wrong still.

3         And so I can say unequivocally that we have been

4    trying to, consistent with the obligations we have and take

5    very seriously, to confer with counsel, to give an opportunity

6    to try to resolve these things cooperatively without bothering

7    the Court.  We know how much time your Honor has spent on this

8    case.  We appreciate it, both of --

9         THE COURT:  That's what I get paid to do.  I don't

10   care.

11        MR. DE VRIES:  -- both parties.  But we -- you know,

12   so we have tried to do that.  But despite that desire have

13   needed to file now three motions to compel.

14        And on this particular point, we don't have the

15   information that they have about where they're making the

16   money.

17        And so then the final thing I'll say is, just again to

18   reiterate, we are not looking for every accessory or service or

19   application that they sell.  There are specific accessories,

20   like batteries, like a wall-mounted bracket for a DMR repeater

21   that is made for that, an application that is made to go on

22   their DMR radios that they are accounting for as providing

23   additional revenues to them only for the DMR products.  And all

24   we are seeking is the financial data around that.

25        You know, I think that the way that the current state

1  of the record stands, they have produced some information.  The

2  only information they have produced is the person who would

3  know, saying that it is a 40 percent premium.  And I suppose

4  our damages expert could simply say, look, they didn't produce

5  any information.  The most reliable information we have is it

6  is a 40 percent premium.  And so they have given us 1.5

7  billion, and I'm going to add 40 percent.

8       I would like to get the real data in documents that

9  they have.  Maybe he was wrong.  Maybe it was 50 percent.

10  Maybe it was 38 percent.  We want to have this in a form that

11  is most accurate.

12       And I don't think that we unduly delayed.  I mean, I

13  think when we -- when I look at the record, we tried to be

14  precise, we tried to be specific.

15       THE COURT:  Is the March 1st, Request Number 135, the

16  first time you guys asked for sales volume relating to

17  accessories involving a -- products?

18       MR. DE VRIES:  So I -- here's -- my answer to that is,

19  although I understand, and I'm not intending to disagree with

20  your Honor, that you believe that --

21       THE COURT:  Oh, I'm asking -- all I'm asking -- it is

22  really a question.

23       MR. DE VRIES:  We could have been more precise.  In

24  Request Number 22 when we say --

25       THE COURT:  Well, hold on.  Hold on.  Hold on.

1          MR. DE VRIES:  I'm sorry.

2          THE COURT:  Is that Exhibit 3 or is that another

3    exhibit?

4          MR. DE VRIES:  Exhibit 2, page 32.

5          THE COURT:  Exhibit 2.  Okay.  Hold on.

6          MR. DE VRIES:  What --

7          THE COURT:  All right.  Hold on.  Hold on.  Hold on.

8          MR. DE VRIES:  Oh, I'm sorry.

9          THE COURT:  Let me get to it.

10         MR. DE VRIES:  Oh, I'm sorry.

11         THE COURT:  Page -- what is it now, page what?

12         MR. DE VRIES:  Page 6 of the exhibit, Exhibit 2, and

13   it is at the bottom.

14         THE COURT:  It is Request 120 -- no, I have that.  I'm

15   sorry.

16         MR. DE VRIES:  Yes.

17         THE COURT:  And this was September 16th.

18         MR. DE VRIES:  Approximately.

19         THE COURT:  Approximately.

20         MR. DE VRIES:  I could be off by a --

21         THE COURT:  It doesn't matter.

22         MR. DE VRIES:  -- couple of weeks.

23         THE COURT:  September -- let's say September 2018,

24   right?

25         MR. DE VRIES:  That's my best recollection.  You know,

1  if they had some additional extension I'm forgetting, it could

2  have even been earlier, but it was presumably no later than 30

3  days before this.

4          THE COURT:  Relating to DMR.

5          MR. DE VRIES:  Right.  And I --

6          THE COURT:  And you say --

7          MR. DE VRIES:  Uh-huh.

8          THE COURT:  I want to be clear.  Your view is that the

9  relating to DMR is sufficient to embrace accessories, right?

10         MR. DE VRIES:  Well, here -- here's how I would answer

11 that question.  And it is not to not answer it directly.

12 It -- when they say that they thought all we ever wanted was

13 the DMR radios, there is no --

14         THE COURT:  Well, I don't care what they say.

15         MR. DE VRIES:  Right.

16         THE COURT:  The question is what you say.

17         MR. DE VRIES:  Right.

18         THE COURT:  What you wanted.

19         MR. DE VRIES:  When we say Hytera products or services

20 relating to DMR, clearly that's not limited to the DMR radios.

21 It is from our perspective any products or services for the DMR

22 products in the United States.  And they agreed to produce the

23 documents.

24         THE COURT:  Hold on.

25         MR. DE VRIES:  Now --

1     THE COURT:  Wait just a second.

2         (Brief interruption.)

3     THE COURT:  And so my question though is, as I read

4 this, what you are looking for -- I mean, you're looking for

5 things that you name that relate to DMR.  And then you say,

6 included but not limited to.

7         So if I were reading this, I would maybe kind of

8 wonder, well, what relating to DMR means.  But the average

9 run-of-the-mill person would think, well, does that include

10 accessories or does it not?  I don't know.

11     MR. DE VRIES:  So --

12     THE COURT:  You don't exactly say.

13     MR. DE VRIES:  And so to -- you know, and so keep in

14 mind, we still didn't have any documents in March 1st or April

15 1st or April 15th.  So it is all a little bit hypothetical.

16 They had agreed to produce --

17     THE COURT:  No, but you don't say --

18     MR. DE VRIES:  -- something --

19     THE COURT:  -- relating to DMR, including -- okay.  I

20 understand what relating is was -- is that you say was designed

21 to mean.

22     MR. DE VRIES:  I just want to be accurate in answering

23 your question.  And what I am not shying away from though, your

24 Honor, is we made a more specific request on March the 1st.

25 And so -- and so whatever --

1      THE COURT:  And we start out with --

2      MR. DE VRIES:  Yes.

3      THE COURT: -- Request 22, which is September of 2018.

4      MR. DE VRIES:  Approximately.

5      THE COURT:  And I -- forget the date.

6      MR. DE VRIES:  Okay.

7      THE COURT:  Then the next -- the next thing that

8  occurs is in March.

9      MR. DE VRIES:  Correct.  Well, there is a lot that's

10  occurred in between --

11      THE COURT:  No, no, in terms of --

12      MR. DE VRIES:  -- about us moving to compel, but --

13      THE COURT:  -- what I have written before me.

14      MR. DE VRIES:  Correct.  It's --

15      THE COURT:  Request Number 135, right?

16      MR. DE VRIES:  Correct.  That was served on March --

17      THE COURT:  Wait.  Hold on.  Hold on.

18      MR. DE VRIES:  -- the 1st.

19      THE COURT:  Hold on.

20      (Brief interruption.)

21      THE COURT:  And this is right, March 1st?  And this is

22  September -- September -- January, February, March.  Okay.

23      MR. DE VRIES:  And then on April --

24      THE COURT:  So that's -- three month go by.

25      MR. DE VRIES:  And then on April the 1st --

1          THE COURT:  Hold on, hold on.

2          MR. DE VRIES:  Oh, I'm sorry.

3          THE COURT:  And this one says, (unintelligible) of

4    services and accessories relating to the product.  So, again,

5    the word -- oh, here you say the product.

6          MR. DE VRIES:  Referring back to each product -- I had

7    paraphrased this earlier -- at line 2 of Request Number 135.

8    Each product or product line identified in Motorola's February

9    15th, 2019, supplemental responses to Interrogatory Numbers 6k

10   and --

11         THE COURT:  And did that identify access- --

12         MR. DE VRIES:  -- 8n --

13         THE COURT:  -- the kind of accessories you're talking

14   about?

15         MR. DE VRIES:  Those -- those documents -- those

16   products were -- referred to the DMR radios and repeaters and

17   DMR equipment.  It did not list the accessory numbers.  That's

18   why this request asks for services in and accessories relating

19   to that.

20         And they understood what we meant in responding and

21   objecting, but then offering to meet and confer when they say

22   that they will meet and confer with Motorola to discuss the

23   provision.

24         THE COURT:  And that's on page 9.

25         MR. DE VRIES:  Yeah.  Of a reasonable and

1    proportionate amount of information regarding sales of services
2    and accessories of the DMR products at issue in this case.
3            THE COURT:  But it also says, and to the extent
4    Motorola is permitted to assert --
5            MR. DE VRIES:  I --
6            THE COURT:  Let me finish.
7            MR. DE VRIES:  Yes.  Sorry.
8            THE COURT:  -- any such claim at this late stage.  In
9    other words, if you win, well, then they'll meet and confer
10   with you, but not -- you got to win.
11           MR. DE VRIES:  Well, I --
12           THE COURT:  And that's clear as a bell, I think.
13           MR. DE VRIES:  Your Honor --
14           THE COURT:  To the extent Motorola is permitted.  It
15   is kind of like when you guys had that -- when Judge Norgle
16   sent you out to meet about the request for an extension of
17   time, was it going to be four months or two weeks, whatever,
18   then we had that big argument over what happened, what was
19   meant, and so on.
20           I mean, the idea that you agreed to five weeks didn't
21   mean that -- didn't mean what you thought it meant.
22           MR. DE VRIES:  Well, and we're -- I don't think we
23   need to get there, your Honor.  We're not trying to argue about
24   what they intended, what we intended.  At the time of this
25   response, we still had no financial documents.

1     THE COURT:  And you have already, in my opinion, won

2  on that issue.

3     We're now dealing with the convoyed issue, convoyed

4  sales issue.

5     MR. DE VRIES:  For lack of a better way to put it,

6  your Honor, the thought that -- when they're offering to meet

7  and confer at a time when we don't have any of the financial

8  documents, and we had to after this time come before your

9  Honor, ask you to compel them to provide a deposition, two of

10 them, and the documents, and then they didn't until later in

11 that month, and that we somehow unduly delayed by waiting to

12 meet and confer until May the 1st and that we should therefore

13 not be able to obtain the sales data for the accessories and

14 services that they clearly know what we're talking about based

15 on this response, it doesn't --

16     THE COURT:  I don't know if they knew what you are

17 talking about.  You guys are -- I think you -- I -- many years

18 ago I tried a case -- I -- yes, I did.  And I -- we -- I

19 think -- I can't remember, we must have lost.  And I went up to

20 the Court of Appeals, and Joel Flaum, who I have known all my

21 life, was sitting in the court, and he absolutely did not

22 believe that I -- when I professed ignorance, and it really was

23 that, I truly didn't know, he just thought that was

24 preposterous, that he had some exalted opinion of what I knew.

25 I didn't know anything about the issue.  I was -- the -- I was

1    involved in, and I lost only because of his wrong assessment of

2    what I thought.

3         I'm just looking -- you guys are just too smart to let

4    anything go by.  And I understand what they say on page 9 in

5    the response to 135.  But they say, they'll meet with you, but

6    only to the extent you're permitted.  In other words, if you

7    can do that.

8         This is sort of is like the issue that you guys

9    (unintelligible) about the extension.  If you are permitted to

10   assert such claims at this late stage they still are talking

11   about, then they'll meet and confer with you to discuss, well,

12   I think that that offer is sort of, you know, not meaningful.

13        But I do have a problem.  It is inconceivable to me

14   that people like you didn't know from the day you got into this

15   case about convoyed sales.  You may not have known the 40

16   percent or some large percentage of -- of the moneys that came

17   in are attributable to convoyed sales, but you folks certainly

18   knew, and Motorola certainly knew.  They're even greater

19   experts than you about what people were doing in the

20   marketplace.  And they may have had no information other than

21   we know -- we think it is a lot of money.  And then all

22   these -- this time goes by, and there is not a specific

23   articulable request for something strikes me as -- as I have

24   said to you before, you're sort of hoisted on your own petard

25   of excellence.

1      I just am unwilling to believe that it sort of passed

2  everybody.  Passed you guys by.

3           MR. DE VRIES:  So, your Honor, I disagree --

4           THE COURT:  I know.

5           MR. DE VRIES:  So I will simply state this --

6           THE COURT:  No, you disagree.

7           MR. DE VRIES:  -- because it is clear that I don't

8  think that --

9           THE COURT:  I understand it.

10           MR. DE VRIES:  -- I'm going to be able to persuade

11  your Honor to allow us to get this sales data.

12           THE COURT:  You might.

13           MR. DE VRIES:  So I disagree --

14           THE COURT:  You're here.  You should --

15           MR. DE VRIES:  -- that we let it go by.

16           THE COURT:  -- keep (unintelligible).

17           MR. DE VRIES:  No, I -- I just -- I don't think

18  it -- I don't want to waste your Honor's time.  It is -- we

19  don't agree that we let it go by.  We don't agree that we

20  didn't ask for it.  We don't agree that we didn't promptly file

21  a motion.  We needed to meet and confer before filing it.  But

22  I don't -- I obviously have a tremendous amount of respect for

23  your Honor.  I don't want to waste your time by trying to --

24           THE COURT:  You are -- don't be silly.

25           MR. DE VRIES:  -- persuade you.

1      THE COURT:  Your meet and confers have been largely

2 sort of pro forma exercises, as everybody's is.  I don't mean

3 to be disparaging.  What -- those things should be valuable.

4 They almost never are.

5      So I don't think the fact -- I'm not saying that they

6 were Johnny-on-the-spot in getting things to you.  But I think

7 you only have to give out what people really ask for.  And if

8 you don't ask in the right way or you don't ask with sufficient

9 articulation, it counts now.

10      If we had years to go, maybe that might be different.

11 But we have a trial date.  You have a trial date.  And there is

12 the discovery cutoff of -- when?

13      MR. DE VRIES:  June the 20th.

14      Right?

15      MR. STRINGFIELD:  I believe the 19th, but --

16      THE COURT:  Okay.  That's in 20 days.

17      MR. DE VRIES:  Correct, your Honor.

18      THE COURT:  I would think -- here, let me just think

19 out loud with you.

20      To start requiring that they -- and I realize this is

21 sort of inconsistent -- that they produce sufficient

22 documentation is never going to be accomplished in the time

23 frame that we have left for discovery.  They are -- Judge

24 Norgle, not me, has set, and that you guys have agreed to.  I'm

25 not going to do anything unless I absolutely had to that is

 1   going to extend those dates.

 2        Having said that, because to produce the actual

 3   documentation, I would think, would be pretty massive.  And for

 4   you to review it, even with the skilled people you all have,

 5   both in and outside of the company, is going to be

 6   extraordinarily time consuming.

 7        I would think -- let me say this.  I would think that

 8   you would maybe be entitled to find out how much is

 9   attributable.  And I realize that then, of course, you would

10   have -- you would have the right to follow up and find out

11   whether what you're being told is true.  But at least you would

12   have the right for them to find out from them how much

13   information, how much -- what is the -- what's the dollar

14   amount that is attributable, in effect, to convoyed sales and

15   that --

16        MR. DE VRIES:  And the --

17        THE COURT:  -- they could put -- giving you the

18   documentation --

19        MR. DE VRIES:  Yes.

20        THE COURT:  -- is something quite different.

21        MR. DE VRIES:  And we don't want the documentation.

22   I want to be very clear because this is laid out in our motion

23   at page 1, line --

24        THE COURT:  Hold on.

25        MR. DE VRIES:  -- 7.  We are not asking for that

```
 1   documentation.

 2           THE COURT:  Let me see.  Hold on.

 3           One, two, three, four, five, six, seven.

 4           MR. DE VRIES:  We are asking --

 5           THE COURT:  You are on page 1 of your --

 6           MR. DE VRIES:  Yes, your Honor.

 7           THE COURT:  -- of 541?

 8           MR. DE VRIES:  Yes, your Honor.

 9           THE COURT:  All right.  Hold on.

10      (Brief interruption.)

11           THE COURT:  Well, it is -- one, two, three, four,

12   five, six, seven.

13           MR. DE VRIES:  And there is a --

14           THE COURT:  You want all revenues --

15           MR. DE VRIES:  Right.

16           THE COURT:  -- made from the sales to users and

17   through original equipment and manufacturers, all revenues

18   made -- made by Hytera from the sale of DMR accessories sold

19   for its DMR products.

20           But you want -- you want documentation, you don't want

21   numbers.

22           MR. DE VRIES:  Just revenues.  In the same fashion

23   that they're going to provide --

24           THE COURT:  But they have the right, do they not, to

25   be able to say, okay, yes, we made a billion dollars.  But,
```

1   gee, it cost us $2 billion to make it.  What a terrible loss it

2   was.

3          There isn't sufficient time, and I -- given this case

4   and given the astonishing, really, excellence of the lawyers --

5   you know, Justice Frankfurter said on the question you ask

6   depends the answer you get.  You -- you ask a question that is

7   so broad based, I'm just thinking out loud, relating --

8   relating is a word that has utterly multiple meanings depending

9   on who is doing the reading of the word.  If you wanted

10  something, you guys should have asked for it.

11         MR. DE VRIES:  And to be clear, our request in the

12  motion doesn't use the word relating.  It is just all revenues

13  made by Hytera from the sales of DMR accessories.

14         THE COURT:  Well, here, here's what I -- what it says.

15  I'm looking at Request 132 on page 32.  Exhibit 1 -- 2.  Sorry.

16         All documents and communications relating to pricing

17  for any Hytera products or services relating to DMR.

18         Now I have no idea what that -- I shouldn't say that.

19  I think that is sufficiently flexible and vague and imprecise

20  that somebody can legitimately, although I don't normally

21  entertain it, objections (unintelligible) say, I don't know

22  what you mean.  And I would think that if -- convoyed sales is

23  sufficiently different and distinct from other DMR-related

24  expenses and income that one wouldn't necessarily know for sure

25  and would want to at least find out what did you mean.

1           Then if we go, as you say, to page 9, Hytera says, you

2    have not asserted a claim for convoyed sales.  Information is

3    not relevant to issues in this case on the grounds.  It is not

4    relevant because you haven't raised that issue.  Okay.  I mean,

5    that is a legitimate statement, if it is true.

6           Then they then say, okay, if you are allowed to assert

7    the claim, we'll talk to you about it.  I think the hedge is,

8    we're not agreeing that it is in the case.  But if some dope

9    (unintelligible) Cole says it is, we'll talk to you about it.

10   It is a hedge on their part, but it is pretty specific as to

11   what they're objecting to.

12          But I do think -- I understand what you are saying.

13   And if you say to me it is 40 percent of the potential damages,

14   I think that's a lot.  And I don't think you should be

15   disentitled from finding that information out.

16          But I do think for them to produce all of the

17   documentation, because I would think -- wouldn't that include

18   sales receipts and everything?  Not just numbers.

19          MR. DE VRIES:  We don't need that.  We -- and we are

20   not asking for it --

21          THE COURT:  I would --

22          MR. DE VRIES:  -- just to be -- we -- in the same form

23   that they're going to be producing their updated financials for

24   the --

25          THE COURT:  I think that --

1        MR. DE VRIES:  -- first issue we just

2   (unintelligible).

3        THE COURT:  I think that's not quite what you asked

4   for, but I think that wouldn't be nearly as objectionable only

5   because I think Hytera -- if I call them major companies -- can

6   know almost to the penny where its income is.  It may not --

7   might not know how it spent the money, but they know about

8   money coming in.

9        And I think -- so what -- here is what I want to do

10  rather than -- the motion to compel (unintelligible) to

11  complete financial documents is granted except that Request

12  Number 122 or the objection to Request 122 is sustained.

13       However, Hytera must produce -- I don't want the

14  documents -- financial -- well, how do you want to say it?

15       MR. DE VRIES:  Financial.

16       THE COURT:  Not the --

17       MR. DE VRIES:  -- information sufficient to show the

18  revenues and the sale of accessories.

19       THE COURT:  All right.  Financial -- well, no, but

20  that includes -- that would include (unintelligible) --

21       MR. DE VRIES:  The -- I think just --

22       THE COURT:  Well, how (unintelligible).  Financial

23  information sufficient to show the amount of income --

24       MR. DE VRIES:  I would say revenues.

25       THE COURT:  -- of net revenues.

1     MR. DE VRIES:  Yes, please.

2     THE COURT:  Net revenues.

3     MR. DE VRIES:  Yes.

4     THE COURT:  Pertaining to convoyed sales.

5     MR. STRINGFIELD:  Your Honor, may I respond briefly --

6     THE COURT:  Yes, please.

7     MR. STRINGFIELD:  -- before you finish entering your

8  order?

9     THE COURT:  But I'm just trying to think out loud.

10     MR. STRINGFIELD:  Well, understood, your Honor.  But I

11  want to bring the Court back to a couple really important

12  points.

13     Of course Motorola doesn't want our documents because

14  they don't want us to put our defenses in.  Your Honor, we have

15  to come back to they're trying to insert an entirely new legal

16  theory.  They only want their side of it.  All they need are

17  the numbers.  They don't -- they don't have to prove anything

18  if we don't have any defenses in the case.  And that's exactly

19  what this order is set up to do right now.

20     If just our numbers go in, and we're not entitled to

21  fair and full opportunity to develop our defenses, which will

22  include third-party discovery --

23     THE COURT:  This doesn't deal with your defenses at

24  all.  It deals with what they are entitled to get.  If

25  you -- let me finish.

1        You have (unintelligible) on any defense, and they

2  then have a number.

3        If you have a defense, and that is, for example, that

4  let's say there is a billion dollars that is somehow

5  attributable to convoyed sales.  But your position is that from

6  that billion it really isn't a billion dollars, it is zero

7  because of various expenses that we have or other things.  It

8  strikes me that you're entitled to say whatever you want to

9  say.  I realize that this isn't getting to the undergirding of

10  the truth the way in normal discovery you would.  But they are

11  entitled to that.

12        But, yes, you're entitled to say that number must be

13  offset by -- and you have a number.

14        And then where we go from there I really don't know.

15  But I'm not going to do something at this late date that is

16  going to set the trial back.

17        You're free to argue to Judge Norgle exactly what

18  you're arguing to me, that the -- what they want to put in is

19  not truly indicative of income, and it is misleading because --

20  and he can say, no, I'm not going to let you do it.  But I

21  think they're entitled at least to know what the dollar figure

22  is.  You are entitled to say whatever you claim the offset will

23  be.

24        MR. STRINGFIELD:  So, your Honor, just a few points.

25  So nowhere in their motion have they moved to insert this new

```
 1   theory of convoyed sales.  And they still have not supplemented
 2   their interrogatory response to include a theory of convoyed
 3   sales.
 4           So as far as we're concerned --
 5           THE COURT:  Well, I would think -- I would think that
 6   it does include -- I mean, I think the term relating to DMR
 7   is -- could be better --
 8           MR. STRINGFIELD:  I --
 9           THE COURT:  -- but --
10           MR. STRINGFIELD:  Well, okay.  Let's talk about that
11   phrasing because I don't think it means quite what counsel
12   maybe is interpreting as today.
13           It says -- I'm looking, your Honor, at Exhibit 2, page
14   32, Request 122.
15           THE COURT:  Right.
16           MR. STRINGFIELD:  It says, all documents and
17   communications relating to the pricing for any Hytera products
18   or services relating to DMR.  This is an Oxford comma issue if
19   there ever was one.
20           Hytera products is defined in the definitions.
21   Motorola didn't give us their request.  I don't -- standing
22   here today I don't know how they defined Hytera products in
23   their request.  But I don't believe that it included
24   accessories.  So there -- this request is related to Hytera
25   products or services --
```

1        THE COURT:  Right.

2        MR. STRINGFIELD:  -- relating to DMR.

3        THE COURT:  Right.

4        MR. STRINGFIELD:  So Hytera products, your Honor, if

5    my recollection --

6        THE COURT:  But I'm not saying that.  This is what

7    they asked for.  They -- you don't -- they're not entitled to

8    get what they don't ask for.

9        MR. STRINGFIELD:  And, your Honor, we don't think they

10   asked for accessories back then.  But I don't even think that's

11   important.  I think the timeline, your Honor, for this dispute

12   is laid out on page -- it is in Exhibit 6.  Page 1 of Exhibit

13   6.

14       And I know we talked a lot about the timeline.  I

15   think that page 1 of Exhibit 6 succinctly summarizes the

16   timeline and how we got here and how Motorola has led us to

17   believe that convoyed sales have not been a part of this case

18   until they told us so on the afternoon of May 21st during a

19   phone call.

20       So, your Honor, starting at the middle of page 1 of

21   Exhibit 6 to their motion, it says, fourth, regarding

22   Motorola's request --

23       THE COURT:  Hold on.  Hold on.

24       MR. STRINGFIELD:  Sure.

25       THE COURT:  Exhibit 6.

1          Now what page?  I have got it -- What page?

2          MR. STRINGFIELD:  Sure, your Honor.  It is page 1 of

3    their Exhibit 6.

4          THE COURT:  Yeah.  Okay.  I got it.

5          MR. STRINGFIELD:  Sure.  So it is an email from me to

6    Ms. New, who is counsel for Motorola in this case.

7          THE COURT:  Right.

8          MR. STRINGFIELD:  And I write, fourth, regarding

9    Motorola's request for financials relating to Hytera's

10   accessories, as we discussed on our call yesterday, Motorola

11   has never previously articulated any convoyed sales theory.

12   This, notwithstanding Hytera's December 21st, 2018,

13   Interrogatory Number 20, which requested that Motorola describe

14   in complete detail the factual and legal basis of supporting

15   evidence from the damages Motorola seeks in this action.

16         Motorola's January 30 response to that interrogatory

17   nowhere mentioned any theory of convoyed calls nor mentioned

18   any demand for damages related to any accessories.

19         Thus, at least as early as Hytera's April 1st, 2019,

20   objections to Motorola's Request For Production 135 and 136,

21   Hytera objected to Motorola's request for discovery related to

22   the sales and accessories on that basis stating Hytera objects

23   to this request in its entirety as seeking information that is

24   not relevant to the issues in this case on the grounds that

25   Motorola has not asserted a claim for convoyed sales.

1          And I go on.  I say, and as we explained in our email

2     of May 20, which for the Court is page 2 of Exhibit 5 to

3     plaintiff's motion.  Even after -- even a month after Hytera

4     made that objection, Motorola had still not asserted any claim

5     for convoyed sales.  And Hytera repeated its understanding that

6     accessories were not part of this case.

7          On May 2 we told them again, we don't -- you haven't

8     told us that convoyed sales or accessories are part of this

9     case.

10          Motorola responded on May 3.  I continue on page 1 of

11     Exhibit 6.  I go on to say, Motorola's May 3 response to our

12     May 2 email did not respond to, and therefore, reconfirmed that

13     understanding.

14          And Motorola went forward on May 9th with a Rule

15     30(b)(6) deposition of a Hytera on financial topics without

16     responding to Hytera's understanding that accessories were not

17     part of this case.

18          I go on.  It was not until --

19          THE COURT:  And the 30(b)(6) deposition was of whom?

20          MR. STRINGFIELD:  That was of Xu Nuo.

21          THE COURT:  Now and what was --

22          MR. STRINGFIELD:  Of Hytera.

23          THE COURT:  Yes.  But what was that person's role?

24          MR. STRINGFIELD:  The CFO of the company.  And he was

25     put --

1    THE COURT:  And there were no questions asked about
2 what is being sought now.

3    MR. STRINGFIELD:  Correct, your Honor.

4    Then I go on --

5    THE COURT:  Hold on.  Hold on.  Hold on.

6    MR. STRINGFIELD:  It was not until another three weeks
7 later on our call yesterday afternoon, that would be May 21,
8 that Motorola first asserted that it was making a claim for
9 convoyed sales in this case.  Your Honor, they -- they're
10 talking about this October request for production.  I don't
11 think backing the timeline up further makes their case any
12 better.  They have still been delaying unreasonably.

13    Even if you read that October request as requesting
14 information related to accessories, our December summary
15 financial data served a couple months after that request
16 clearly did not reflect accessories.  If there was a problem
17 then, if they thought that accessories were in this case, they
18 should have raised it back in December.  They didn't.

19    We're here in May with two weeks left of fact
20 discovery.  We -- this theory is not in the case.  They're
21 trying to ramrod this theory in.  They should not be allowed
22 just to insert our revenue and not allow us a full and fair
23 opportunity to develop our defenses, which will include
24 substantial third-party discovery.

25    We need to understand the marketplace for accessories.

1   Again, we need to understand whether our accessories are --
2   that we sell can be used for other products.  People may be
3   buying these batteries and doing I don't know what with them.
4   We need to understand where this stuff is going.
5          Likewise with our software, I know that our software
6   is used for many other non-accused Hytera products.  We're also
7   entitled to know whether and to what extent third parties are
8   selling accessories for Hytera radios.
9          We haven't taken any of that discovery because we have
10  been asking them for months, tell us whether convoyed sales is
11  a theory in this case, and they would not tell us.  They
12  ignored us.  They went dark.  And then on May 21 they file and
13  said, yeah, convoyed sales are in the case.  And we're going to
14  Judge Cole next week, and we're going to tell him they're in
15  the case, and we're going to get your revenue.  And that's
16  what's happening right now, your Honor.  We don't think that's
17  fair.
18          THE COURT:  All right.
19          MR. STRINGFIELD:  We're entitled to develop
20  defenses --
21          THE COURT:  All right.  Can you -- let me just -- I'm
22  looking at just one thing.
23      (Brief interruption.)
24          MR. STRINGFIELD:  And so, your Honor, if -- if the
25  Court --

1          THE COURT:  Wait.  Just give me one second.

2          MR. STRINGFIELD:  Sure.  And I have one more point.

3      (Brief interruption.)

4          THE COURT:  So what happened after you wrote the email

5   of May 1st -- May 23rd?  Sorry.

6          MR. STRINGFIELD:  I'm sorry, your Honor, maybe you

7   mean the email of --

8          THE COURT:  I'm looking at Exhibit 6.

9          MR. STRINGFIELD:  Yes, your Honor.

10         THE COURT:  That's an email dated May 23rd.  Right?

11         MR. STRINGFIELD:  What happened after this Thursday,

12  May -- this was last Thursday.  What happened after this was on

13  Friday they filed --

14         THE COURT:  I see --

15         MR. STRINGFIELD:  -- this motion.

16         THE COURT:  I see.  Okay.  Friday.

17     (Brief interruption.)

18         MR. STRINGFIELD:  And, your Honor, my final point is

19  if the Court is --

20         THE COURT:  Wait, wait.  Just one second.  One second.

21         MR. STRINGFIELD:  Sure.

22         THE COURT:  Well, your -- I'm not -- I'm just trying

23  to think of -- you guys have a wonderful -- a grasp of the

24  dates.

25         On May 23rd you wrote the email.  And then if you go

1    back on April 1st that was when the objection arose to the

2    Request Number 135.

3            MR. STRINGFIELD:  That's correct, your Honor.

4            THE COURT:  And then you say --

5            MR. STRINGFIELD:  And then there was silence for a

6    month.  Silence until May 1st on this issue.

7            THE COURT:  And on May 1st what happened?

8            MR. STRINGFIELD:  They sent us an email saying, hey,

9    we want the accessories sales.  And we said, no, we don't

10   believe they are in the case.

11           Your January 20th interrogatory response, which we

12   asked you to provide all factual and legal basis for your

13   damages theory, that response served on January 30th nowhere

14   mentioned a theory of convoyed sales, nowhere mentioned any

15   request for accessories or software of any of the stuff we're

16   talking about today.

17           THE COURT:  So the number, even if you -- I

18   understand.  Even if they had the number, the wrong number of

19   convoyed sales, it wouldn't really mean anything unless you

20   could somehow have dealt with -- had time to deal with what it

21   means, and maybe it has no meaning at all.

22           MR. STRINGFIELD:  It is not that it wouldn't have any

23   meaning, your Honor.  It would be manifestly unfair.  It would

24   be a --

25           THE COURT:  Well, that's what I mean.

1    MR. STRINGFIELD:  -- due process deprivation.  We

2    wouldn't have a chance to develop defenses to it.

3    THE COURT:  Well, no, I understand.  But also the raw

4    number wouldn't necessarily convey anything because of a

5    variety of things you might unearth.

6    MR. DE VRIES:  And if it is unfairly inserted into

7    this case --

8    THE COURT:  Yeah, no, I --

9    MR. STRINGFIELD:  -- without context, then we're stuck

10   with our pants down.

11   THE COURT:  Yeah, no, I understand.

12   MR. DE VRIES:  Your Honor, we're seeking discovery.

13   We're seeking very specific information.  At page 9 of Exhibit

14   3 they acknowledge they know what it is.  Sales of services and

15   accessories of the DMR products at issue in this case, that's

16   their -- that is a quote from their response.  We're seeking

17   that revenue information.  It is not unduly burdensome to

18   provide it.  If they don't, then the only --

19   THE COURT:  Page 9 of Exhibit 3.

20   MR. DE VRIES:  Three.  And this is --

21   THE COURT:  And -- hold on.  Hold on.

22   MR. DE VRIES:  Yes.

23   THE COURT:  And this is --

24   MR. DE VRIES:  Their response.

25   THE COURT:  -- March 1.

1          MR. DE VRIES:  This is April the 1st.

2          THE COURT:  Sorry, April -- yes, April 1st.  I had

3     that.  Okay.

4          MR. DE VRIES:  And --

5          THE COURT:  And then -- hold on.  Hold on.

6        (Brief interruption.)

7          THE COURT:  Yeah.  Go ahead.

8          MR. DE VRIES:  And then they say at the end of their

9     response that Hytera will meet and confer with Motorola to

10    discuss the provision of a reasonable and proportionate amount

11    of information regarding sales of services --

12         THE COURT:  No, they don't say that.

13         MR. DE VRIES:  -- and accessories.

14         THE COURT:  They say to the extent Motorola

15    permitted --

16         MR. DE VRIES:  But to the -- but, your Honor, I'm

17    actually making a different point if I may.  I am not

18    contesting that they made that objection.  And I am saying we

19    have a very different view that -- of what happened in April,

20    and that the thought that us not ask -- you know, raising this

21    until May 1 should preclude us from getting this information.

22    But I don't want to belabor that because I don't -- I don't

23    think we actually have to get there.  We are making a request.

24    It is for information, and it is for revenue information, not

25    the documentation.

1    And they are -- they tack acknowledging at the end of

2    this that they know what we're talking about, services and

3    accessories of the DMR products at issue.  And so they know

4    what they're talking about.  We're asking for revenue.  They

5    can make any substantive argument --

6          THE COURT:  No, but he is saying.

7          MR. DE VRIES:  -- they want in the case.

8          THE COURT:  -- he's saying effectively because of the

9    cutoff they can't.

10         MR. DE VRIES:  We disagree.

11         THE COURT:  That's the concern they have.  That your

12   raw number or the raw number you would be given may well not

13   have, not only any meaning, but may distort the thinking and

14   the analysis of the jury.

15         MR. DE VRIES:  That is a Daubert or motion in limine

16   issue.

17         THE COURT:  Oh, I don't --

18         MR. DE VRIES:  For us to be requesting --

19         THE COURT:  I don't think so at all.  I mean, yes, it

20   is, but it is not -- it doesn't preclude me from doing

21   something now.

22         And I'm just concerned, as I told you before, in

23   April, and that's before the May 23rd letter, the April -- so

24   April -- so two months go by, and then there is a request and

25   there is a letter from Mr. Stringfield that is Exhibit 6.  But

1   in April he says, to the extent Motorola is permitted to assert

2   any such claim.  But nobody -- when -- the claim comes I think

3   pretty late, and nobody does anything.

4           MR. DE VRIES:  Well, your Honor --

5           THE COURT:  And I just don't see how incredibly

6   skilled lawyers don't know something so basic as what the issue

7   is relating to this issue.

8           MR. STRINGFIELD:  Your Honor, that's why we asked --

9           MR. DE VRIES:  Your Honor --

10          MR. STRINGFIELD:  I'm sorry.

11          MR. DE VRIES:  Your Honor, we disagree.  But I don't

12  want to waste any more of the Court's time.  If your Honor is

13  going to deny this, then I understand.  We disagree with the

14  recitation of what happened here.  I don't think that requiring

15  them to provide more information --

16          THE COURT:  No, I'm agreeing with -- I'm agreeing with

17  the recitation of what happened.  I don't dispute the documents

18  you have given me.  And I don't dispute -- all that you have

19  done is told me what you have said, and what they have said,

20  and you have helped me with the chronology.

21          But the first the absolute -- the request itself was

22  made March 1.

23          MR. DE VRIES:  That request was made March 1, yes.

24  There was an earlier request made in October that they said

25  they would respond to by producing documents.  They didn't do

1    it at any point before April.

2              But I understand your Honor believes --

3              THE COURT:  When do you think they -- they

4    didn't fulfill their promise?

5              MR. DE VRIES:  They never produced the documents.

6    When, you know, the --

7              THE COURT:  When were they due according to you?

8              MR. DE VRIES:  By late December we certainly expected

9    them.  When we didn't get them --

10             THE COURT:  So in your view -- in your view their non-

11   compliance with discovery relating to this issue, this narrow

12   issue, of convoyed sales, call it what you will, goes back to

13   December of 2018.

14             MR. DE VRIES:  To our -- to our -- looking for their

15   financial documents related to DMR, which we filed a motion to

16   compel on January 11th.  To be sure, we have submitted a more

17   specific request on March the 1st.

18             They responded to it on April the 1st.

19             And then in the weeks -- in the week that followed

20   shut down all financial discovery requiring us to file another

21   motion to compel, which your Honor granted again.

22             And I just -- you know, I just don't see how we did

23   not act diligently.  But I understand if your Honor has a

24   different view.  And I don't want to suggest that I am not

25   listening to your Honor or not being responsive to what your

1  Honor is saying.

2      MR. STRINGFIELD:  Your Honor, again, and our position

3  is that this is seeking to insert an entirely new theory into

4  the case --

5      THE COURT:  I understand.

6      MR. STRINGFIELD:  -- too late.

7      THE COURT:  I understand.

8      When you drafted the complaint, the concept of

9  convoyed sales is a well understood concept in what we're doing

10  here?

11      MR. DE VRIES:  Well, it is actually -- the truth is we

12  disagreed that it is not in our contention interrogatory

13  response.  It is actually a mandated --

14      THE COURT:  Oh, it is in the complaint?

15      MR. DE VRIES:  -- part of -- yes, because it is a

16  fundamental part of doing the damages analyses underlying the

17  damages that we sought in the complaint that we provided in

18  our -- and so, for example --

19      THE COURT:  Did your -- just a second.

20      MR. DE VRIES:  I'm sorry.

21      THE COURT:  Did your -- hold on.

22      How -- in your initial disclosures, what did you claim

23  the damages were?

24      MR. DE VRIES:  I don't recall, your Honor.  I would

25  have to look.

1    THE COURT:  Well, but did that amount include a guess

2    as to what the convoyed sales were?

3    MR. STRINGFIELD:  I don't recall.  I don't have the

4    document in front of me.

5    What I can tell you is as part of the legal --

6    THE COURT:  It would strike me that it would have to.

7    If -- maybe you wouldn't know the amount, but you would -- it

8    would seem to me when you disclose what you disclose, you would

9    have said, and convoyed sales in the amount of which we do not

10   know.

11   MR. STRINGFIELD:  It is a matter of characterization,

12   your Honor.  As part of the damage -- so the way that the

13   damages work, and you may know this far better than me.  I

14   don't mean to presume.

15   THE COURT:  I don't.

16   MR. DE VRIES:  In a trade secret misappropriation

17   case, and also a copyright infringement, there are a variety of

18   damage theories.  Disgorgement is one.  Reasonable royalty is

19   another.  Lost profits is another.

20   And we have sought damages.  We have invoked those

21   theories.  And as part of the legal requirements, for example,

22   of --

23   THE COURT:  No, disgorgement would require a knowledge

24   of how much money you seek to disclose.

25   MR. DE VRIES:  Right, and that's what we have been

seeking.  And even as of this morning we found out we still
don't have it.

And so just -- it is subsumed -- it is subsumed within
our claims.  The law says, as you're considering, for example,
a reasonable royalty, you must consider these things.

And so if we're left without any additional
information, what we are left with is his statement that it is
40 percent.  He's the head of sales.  And so we -- the best
information we will have at that point, if we get -- once we
finally get the corrected financial information, if that's
correct, and aligns with the audited financial statements and
the annual reports, if we're left with, for example, $1.5
billion dollars, we're put in a position of needing to say,
well, we have -- our best information is that 40 percent more
comes in through these things.

And we are trying to seek additional information so
that if they then in response say, well, that's not good enough
information, you really needed to have our actual revenues,
that there can't be a suggestion that we didn't try our utmost
to get those.

MR. STRINGFIELD:  And, your Honor, a couple points.
So the 40 percent -- first of all, the witness gave a range of
15 to 40 percent.  And he said it depended on the accessories.
Some accessories were more expensive than others.

THE COURT:  He really didn't --

1         MR. STRINGFIELD:  Sorry?

2         THE COURT:  He didn't really -- couldn't really say

3  with specificity.

4         MR. STRINGFIELD:  No, and I -- and I really don't

5  think it is all that material to what we're talking about

6  today.  Because I think what I am hearing from Mr. De Vries is

7  that they're still going to pursue this new convoyed sales

8  theory, and they're just going to try to use a rough 40 percent

9  multiplier on top of --

10        THE COURT:  Well, they have some evidence from a

11  knowledgeable fellow of what the amount is.  Maybe that's not

12  right.  Maybe it is overstated.  The question would be then,

13  well, is that (unintelligible) let's move on.  That's not for

14  me.

15        MR. STRINGFIELD:  Your Honor, that would presume that

16  they're entitled to insert this brand new legal theory of

17  convoyed sales.  And maybe that's -- that's not an issue before

18  this Court, but --

19        THE COURT:  Yeah, it is not.

20        MR. STRINGFIELD:  Okay.

21        THE COURT:  It is not.

22        MR. DE VRIES:  And maybe it is in the underlying -- I

23  mean, I don't -- we're getting those annual reports.  I'd

24  actually be pretty surprised if they didn't speak to this

25  issue.  We didn't know we got -- that we got them yesterday

1  until this morning when Mr. Stringfield asked.  So maybe there

2  is even more than his testimony.

3         We think that the best way that -- and it is very easy

4  for them to provide -- is give us the same kind of revenue data

5  for the accessories as you are for the radios.  If they're

6  unwilling to do it, then we have --

7         THE COURT:  No, but here's the problem.  And I confess

8  to you I really don't know.  If they gave you a raw figure of X

9  dollars, whether that is even a remotely fair figure or whether

10  it is an accounting matter, you would necessarily have to go

11  figure out gross income or -- I guess you'd have to deduct

12  various things which he hadn't done.

13         You simply asked him for a figure, a total

14  approximation of what they took in.  Now nobody asked him,

15  well, from that, you know 40 percent, how much really is not

16  attributable to income?  And he didn't say.  And I wouldn't

17  have any idea.

18         MR. DE VRIES:  We actually have a tremendous amount of

19  information about their gross margins.  He spoke to me in

20  detail about their gross margins, speaking across their

21  business.  So this is not the only data point that we have.  We

22  have a number of data points.

23         THE COURT:  Well, then it is -- and I don't want to

24  keep going on -- I mean, I'm happy to sit here all day, but it

25  is not helping you guys.  I guess -- let me rethink what I

said.

I can't imagine why the -- this wouldn't have been in the case somewhat specifically, especially given the fact that it is a fairly large number. And you folks would have or should have known that in cases like this convoyed sales are -- it is not an unusual item, it is -- it is there. So maybe let me rethink.

You have a number. The admissibility of that or non admissibility of that is not for me. And they are not asking to take any more discovery relating to whatever he said. And so Judge Norgle will determine what you do with that number.

The question is, I -- I think to bring the case -- let me just change my -- to bring the matter to me at this late date given the complexity of what's involved -- it is not just 50 bucks or $10,000 -- is not really fair to the other side. And I think that, you know -- I have the discretion to say when enough is enough. And I do think after hearing some more and looking at the documents, I don't think they really do support exactly what you are saying.

So let me just change my (unintelligible). I think the motion to compel Hytera to produce complete financial documents is granted, except that the request to produce data and -- or documents relating to convoyed sales is denied. So where that leaves you (unintelligible). And certainly feel free to take it to Judge Norgle and let him figure out whether

1    I'm right or wrong.

2         MR. STRINGFIELD:  Thank you, your Honor.

3         THE COURT:  And I'm sorry, I just think that if this

4    was -- because this is such a significant issue, if it was all

5    that important, one ought not to wait till the end.  There is

6    case after case after case that allow denials of discovery

7    because people waited too long.  And I think this should have

8    been a stark issue in the case from day one.

9         MR. DE VRIES:  Your Honor, we understand your

10   perspective.  And, frankly, since we're sitting here in June,

11   and despite the Court entering multiple orders that they

12   provide us with accurate financial information even on the

13   accused products --

14        THE COURT:  But not --

15        MR. DE VRIES:  -- and they haven't --

16        THE COURT:  Not as to the very narrow and precise

17   issue.  If you want to talk to me about how they haven't

18   complied with other things, I am happy to listen to that.

19        MR. DE VRIES:  And I'm not trying to argue with your

20   Honor.  What I was actually going to say is since we don't even

21   have the accurate financial information for the radios, and

22   from our perspective Hytera has not respected the Court's

23   orders in terms of giving us financial information, I suppose

24   if we can get, at least that, we're in a better spot than we

25   are currently.

1    THE COURT:  Let's do this, do you have a

2  particular -- particular content that you would like me to put

3  in an order?

4    MR. STRINGFIELD:  I thought what your Honor just

5  recited was fine.

6    THE COURT:  No, I'm sure you did.

7    MR. DE VRIES:  Yeah.  I mean the --

8    THE COURT:  But I am concerned not about -- not about

9  what I have just told maybe they were too late on.  But what

10  your folks are obligated to provide that they say they haven't

11  gotten yet.

12    MR. DE VRIES:  Your Honor, the -- what we believe is

13  that -- we learned something interesting last week, and that is

14  that Motorola has been sued in Shenzen court two months ago by

15  Hytera.  And they are asking the Court there to enjoin this

16  Court in their proceedings, in all proceedings around the

17  world, that where Motorola is seeking to enforce its IP rights.

18    Simultaneously we believe that Hytera has

19  disregarded --

20    THE COURT:  Well, let's --

21    MR. DE VRIES:  -- the Court's orders --

22    THE COURT:  Okay.  Let's assume they win.  I

23  would -- I wouldn't think that order would have any

24  significance to Judge Norgle.

25    MR. DE VRIES:  And --

1          THE COURT:  Do you think?

2          MR. DE VRIES:  I won't try to speculate about that.

3          But at the same time we don't believe that Hytera has

4    sufficiently respected this Court's orders in this regard.  And

5    there was a time, and so we have been very sensitive about

6    this, when they have canceled the first round of depositions,

7    and we asked for costs.  We understand that the Court denied

8    those.  We didn't take issue with that.

9          But we think that some kind of a message to Hytera

10   that it needs to comply with this Court's orders and take it

11   seriously would be appropriate.

12         THE COURT:  Well, you should file -- you can file

13   whatever you want.  I won't do anything in this case without

14   something.  And I think it can be brief.  It doesn't have to be

15   a big, long, lengthy tome accompanied by another motion to

16   seal, which I understand why Mr. Singh does that.

17         And I have no problem issuing sanctions.  If you think

18   they're warranted, you should file something in a day.  You

19   guys can get out a massive document in a day or two.  Do it.

20         And, frankly, if you think that you should have waited

21   this long, one shouldn't wait.  I think lawyers who wait are

22   self-destructive.  Delay is fatal to the administration of

23   justice.  Don't delay.

24         If you think they're -- and also, you know, I don't

25   know what Judge Norgle's view of the thing is, but there are

1    plenty of -- there are enough cases around in which judges have

2    allowed certain kind of evidence in, where there has been a

3    manipulation of discovery to show consciousness of guilt and to

4    show -- because it bears on intent.

5           That's really up to you and up to them and up to him.

6    It doesn't -- is it warranted here?  Would he even do it?  It

7    sort of side tracks, but it is done.  But I don't think you

8    should sit -- you don't have to be anybody's stalking horse.

9    Just do it, and I'll rule on it.  And I think that people

10   should do things.  I think that the discovery in this case has

11   been very slow.

12          On the other hand, you guys have been unwilling, they

13   say, to identify the trade secret until just quite recently.  I

14   have always expressed to you my view that if you can't tell me,

15   then there is something wrong.  And I never ruled for a minute

16   you couldn't tell me or tell the jury.

17          Their request -- there was one request they wanted to

18   know what you were going to tell the jury.  Well, of course, I

19   didn't grant that.

20          But you're entitled to -- they're entitled to know

21   what the trade secret is.  You have made it very difficult for

22   them.

23          But I understand your point.  And I think people who

24   don't abide by the discovery rules should be sanctioned.

25          MR. STRINGFIELD:  Your Honor, may I note just -- since

1    this is an open record, may I note Hytera's objection to

2    what --

3            THE COURT:  Of course.

4            MR. STRINGFIELD:  -- Mr. De Vries said on the

5    record --

6            THE COURT:  Of course.

7            MR. STRINGFIELD:  -- and that we disagree with the

8    characterization?

9            THE COURT:  And you know what that means?  Zero.  It

10   means no more than what he said.

11           MR. STRINGFIELD:  I just --

12           THE COURT:  But I -- you know, people want to talk and

13   express themselves.  The question is, do something about it,

14   not just vent your ill feelings.

15           MR. DE VRIES:  We understand, your Honor.  We

16   appreciate that.  Thank you.  We obviously disagree about -- on

17   the trade secrets, but I won't belabor that.

18           THE COURT:  No, no, no, we're long, long, long past

19   that.

20           MR. DE VRIES:  And I believe so.

21           THE COURT:  If you want something, Mr. Singh is quite

22   prolific or whoever is doing the work.  He signs this stuff.

23   Do something about it.  It doesn't have to be accompanied with

24   so many exhibits that it becomes really difficult to keep the

25   chronology in mind.

1    And you guys know this (unintelligible).  So I will

2    await to hear from you.  I don't think it is okay when people

3    aren't abiding by things.  If that's true, you should

4    never -- you should never wait.  And don't worry about

5    bothering a judge.  That's what -- what else do they have to

6    do?

7            MR. DE VRIES:  Yes, your Honor.

8            THE COURT:  They are not doing anything of value.

9    They are not deciding the fate of the world.

10           MR. DE VRIES:  We disagree.  We actually think that

11   this case is very much about the fate of the world --

12           THE COURT:  Okay.

13           MR. DE VRIES:  -- but --

14           THE COURT:  I don't agree with you.  But that's okay.

15   It is a big time case.  And if you really believed that, then

16   all the more reason to act with expedition.

17           MR. DE VRIES:  Yes, your Honor.

18           THE COURT:  And not see how things turn out and sort

19   of governed by innuendo.

20           MR. DE VRIES:  Yes, your Honor.

21           THE COURT:  Do something.  And that applies to you,

22   Mr. Stringfield.

23           MR. STRINGFIELD:  Thank you, your Honor.

24           THE COURT:  So I'm sorry about it.  I just think the

25   more you have expressed it to me, that it is so late in the

1    game to start all this all over again.  I'm not going to do

2    that.

3              MR. DE VRIES:  And that's not our --

4              THE COURT:  So if you want to draft a draft order that

5    you think will be better and more comprehensive than my simple

6    order, and you both can agree and get it to me, that's fine,

7    I'll enter it.  But I want -- I wanted to -- what's your plane

8    out of here?  What time?

9              MR. ALPER:  Unclear at this point.

10             THE COURT:  I see.  Well, if you can do it, do it.

11   Otherwise I'm going to enter a relatively simple order.  But

12   I'm happy to have whatever motions you want for sanctions.

13             MR. DE VRIES:  Yes, your Honor.

14             MR. STRINGFIELD:  So, your Honor, regarding the joint

15   motion, I don't have a lot of encouragement that we'll reach a

16   joint order.  And maybe the language that the Court articulated

17   earlier was sufficient, but I guess --

18             THE COURT:  If I enter something and you don't like it

19   and you think that it doesn't convey what I (unintelligible)

20   that you generally will like, pick up the phone and call me,

21   both -- all three of you.

22             MR. DE VRIES:  Yes, your Honor.

23             THE COURT:  And I'll try and change it so that it

24   purports better with what you think it should be.

25             MR. DE VRIES:  Yes, your Honor.

1          MR. STRINGFIELD:  Thank you, your Honor.

2          THE COURT:  Okay.  Well, I'm sorry that somebody had

3  to lose.  But I think you should go to trial.  And they're

4  really trying to enjoin you from proceeding with all

5  (unintelligible).

6          MR. DE VRIES:  Yes, your Honor.

7          THE COURT:  That will go over like a lead balloon with

8  Charlie Norgle, I think.

9          MR. DE VRIES:  Again, I won't speculate about these

10  things.  But it was obviously of note to us.

11          THE COURT:  Well, what's the -- can you tell me now

12  what's the basis for the request?

13          MR. DE VRIES:  So it is a very broad request.  It

14  seeks to enjoin all intellectual property --

15          THE COURT:  I know, but --

16          MR. DE VRIES:  -- litigation.  And it is based on a

17  claim that has been rejected by the International Trade

18  Commission that one of the patents of the seven that were

19  asserted in that case they say is an essential to the DMR

20  standard.  They have lost that issue.  In the international

21  trade commission.

22          That patent case is now before Judge Blakey.  It

23  is -- he has -- Judge Blakey has indicated he is going to go

24  forward with that trial in March.  However, Hytera has filed

25  essentially jurisdictional objections to that case to slow it

1    down for a couple of months.

2           In the meantime, we just found this out actually two

3    months after the fact, yesterday -- last week --

4           THE COURT:  And you're in that case also?

5           MR. DE VRIES:  Well, there will be counsel from China.

6    But Motorola, although it hasn't been properly served in that

7    case, has become aware that it was filed two months ago, and it

8    seeks to enjoin all intellectual property litigation, as I

9    understand it, from the translation, based on an allegation

10   that one of the seven patents in the International Trade

11   Commission is essential to a standard.  And that was an

12   argument rejected by the ITC.

13          That's the essential argument.

14          THE COURT:  Well, okay.  So if they want to be

15   (unintelligible) -- it will take forever.  They can resolve

16   that issue.

17          MR. DE VRIES:  Well, I assume that what their plan is

18   is while delaying the proceedings here --

19          THE COURT:  Yeah.

20          MR. DE VRIES:  -- that they're trying to push that

21   case forward as fast as they possibly can.  That's my

22   speculation.

23          THE COURT:  Well, what jurisdiction do they have here?

24   Or is it that you -- you are not there.

25          MR. DE VRIES:  Right.

1     THE COURT:  Is Motorola there, I guess?

2     MR. DE VRIES:  Motorola has some operations in China.

3  They are somewhat limited at this point.

4     THE COURT:  So they could order Motorola not to go

5  forward with anything, maybe.

6     MR. DE VRIES:  I cannot speculate as to what they're

7  actually --

8     THE COURT:  But that's what they would want.

9     MR. DE VRIES:  My understanding of what they're

10  requesting in the complaint from the translation is that.

11     THE COURT:  Wow.  Well, maybe we're not near the end

12  of discovery.

13     Okay.  Well, thank you very much.

14     MR. DE VRIES:  Thank you for your time today, your

15  Honor.

16     THE COURT:  Thank you very much.  I'm sorry I had to

17  make you wait.

18     (Brief interruption.)

19     THE COURT:  You shouldn't -- if you think I'm wrong,

20  which I know you do, don't hesitate to go before Norgle.  I

21  mean, really, take the matter and say, you know, he's just a

22  dope, he got it wrong, and you should do something about it.

23     MR. DE VRIES:  Your Honor, thank you.  We appreciate

24  that.  Obviously Hytera has availed itself of that.

25     THE COURT:  Yes.

1    MR. DE VRIES:  With respect to your Honor, we -- we

2  have a tremendous amount of respect for the time that you have

3  taken, and we understand that you have discretion in these

4  regards.  And we would not take such a matter very lightly, and

5  so --

6    THE COURT:  I understand that.  But I'm not -- really,

7  I'm not urging you to do that.

8    MR. DE VRIES:  Understood.

9    THE COURT:  I don't want you to go and say, Cole told

10  us to do an appeal.

11    But if you really feel aggrieved and it is really

12  significant, that's what he's there for.

13    MR. DE VRIES:  Yes, your Honor.

14    THE COURT:  All right.  Thank you all very much.

15    MR. DE VRIES:  Thank you.

16    MR. STRINGFIELD:  Thank you, your Honor.

17    (Which concluded the proceedings.)

18                        CERTIFICATE

19    I certify that the foregoing is a correct transcript

20  from the digital recording of proceedings in the above-entitled

21  matter to the best of my ability, given the limitation of using

22  a digital-recording system.

23  */s/Pamela S. Warren*                    June 5, 2019
    Official Court Reporter                  Date
24  United States District Court
    Northern District of Illinois
25  Eastern Division