1  **TRANSCRIBED FROM DIGITAL RECORDING**

2                    IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
3                            EASTERN DIVISION

4  MOTOROLA SOLUTIONS, INC., et al.,      )
                                          )
5                   Plaintiffs,           )
                                          )
6                   vs.                   )  No. 17 C 1973
                                          )
7  HYTERA COMMUNICATIONS CORPORATION      )
   LTD., et al.,                          )  Chicago, Illinois
8                                         )  July 16, 2019
                    Defendants.           )  8:38 A.M.
9
                       TRANSCRIPT OF PROCEEDINGS - Motion
10       BEFORE THE HONORABLE JEFFREY COLE, Magistrate Judge

11
   APPEARANCES:
12
   For the Plaintiffs:          KIRKLAND & ELLIS LLP
13                              555 California Street, 27th Floor
                                San Francisco, California  94101
14                              BY:  MR. ADAM R. ALPER
                                     MR. BROWN HUGH BROWN
15
                                KIRKLAND & ELLIS LLP
16                              333 South Hope Street
                                Los Angeles, California 90071
17                              BY:  MR. MICHAEL W. DE VRIES

18 For the Defendants:          STEPTOE & JOHNSON,LLP
                                1330 Connecticut Avenue, N.W.
19                              Washington, DC  20036
                                BY:  MR. BOYD T. CLOERN
20
                       PAMELA S. WARREN, CSR, RPR
21                       Official Court Reporter
                       219 South Dearborn Street
22                            Room 2342
                        Chicago, Illinois   60604
23                         (312) 408-5100

24 **NOTE:  Please notify of correct speaker identification.
   FAILURE TO SPEAK DIRECTLY INTO THE MICROPHONE MAKES PORTIONS**
25 **UNINTELLIGIBLE.**

**APPEARANCES:  Continued**

STEPTOE & JOHNSON, LLP
115 South LaSalle Street
Suite 3100
Chicago, Illinois 60603
BY:  MR. DANIEL STEVEN STRINGFIELD

```
 1        (Proceedings held in open court:)

 2             THE CLERK:  17 C 1973, Motorola Solutions versus

 3   Hytera Communications.

 4             THE COURT:  Come on up, folks.

 5             MR. ALPER:  Thank you, your Honor.

 6             THE COURT:  Good morning.

 7             MR. ALPER:  Good morning.  Adam Alper for Motorola

 8   Solutions.

 9             MR. De VRIES:  Good morning, Judge.  Mike De Vries for

10   Motorola.

11             THE COURT:  Good morning.

12             MR. BROWN:  Good morning, your Honor.  Brandon Brown

13   for Motorola.

14             MR. CLOERN:  Good morning, your Honor.  Boyd Cloern

15   for Hytera.

16             MR. STRINGFIELD:  Good morning, your Honor.  Daniel

17   Stringfield for Hytera.

18             THE COURT:  Good morning.

19             Well, I read every word of the two volume massive

20   report.

21             MR. CLOERN:  Thank you, your Honor.

22             THE COURT:  Incredibly interesting reading.

23             So we have two motions.  The first motion is a motion

24   to file under seal, not surprisingly.

25             Is there any objection?
```

1          MR. ALPER:  No objection, your Honor.

2          THE COURT:  All right.  So the motion to file under

3     seal, which is Number 587, is granted.

4          Now we'll come to the real motion, which is Hytera's

5     motion to strike.  So I'm happy to hear from whoever wants to

6     talk about it.

7          MR. CLOERN:  Thank you, your Honor.  So I won't

8     belabor what's in the papers.

9        (Discussion off the record.)

10          THE COURT:  Okay.  Sorry.  Go ahead.

11          MR. CLOERN:  So the motion is really about fairness

12     and due process.  Rule 26 requires -- and this is from the

13     advisory notes.  We cited this in the brief -- that the report

14     state the testimony the witness is expected to present during

15     direct examination at trial.  The trial is scheduled for ten

16     days.  We have raised with Motorola a number of times that, you

17     know, is that really all you want for trial is ten days?  The

18     case seems to be pretty big.  And Motorola says, we want the

19     trial to go on November 1.  We want it to be ten days.

20          This 2000-page monster report for Dr. Wicker, Motorola

21     might get in a ten-day trial four days of direct testimony

22     time.  Split maybe four and a half.  I don't think Dr. Wicker

23     could testify about this report in four days.

24          THE COURT:  I don't think he plans to.

25          MR. CLOERN:  I --

1      THE COURT:  I shouldn't say it though.  I don't think

2  he plans to testify about that report in haec verba.  He's

3  going to testify.  And the report is for your edification, not

4  for the jurors.  It is for you.

5      MR. CLOERN:  I -- I understand that, your Honor.

6      But the rule -- what Rule 26 says is the report should

7  tell us what his trial testimony is going to be.

8      THE COURT:  And it does.  They state in their -- in

9  their rapid response that there -- you don't cite a case, and I

10  guess they say there isn't one, which says that the -- here,

11  I'll read you exactly what they say.

12      Unsurprisingly not a single case -- this is on page 1

13  -- cited by Hytera supports striking a report for being too

14  detailed; rather detail is encouraged to, quote, shorten or

15  decrease the need for expert depositions and thus conserve

16  resources.  The last part struck me as sort of comical in this

17  case.

18      But I thought basically the -- the purpose was to not

19  tell you what was going to be said at trial, but to give you a

20  forecast of what might be said and for you to decide whether or

21  not you need to take depositions.

22      I confess to you, I don't know anybody in a big time

23  case who doesn't take the deposition of the expert or experts.

24  It just doesn't happen.

25      I'm sorry.  Could you hold on a second?

1      (Discussion off the record.)

2           THE COURT:  Sorry.  Go ahead.

3           MR. CLOERN:  Thank you, your Honor.

4           THE COURT:  So I -- and I -- listen, I appreciate the

5      length.  The report was too heavy to carry out here.  I mean,

6      it is -- well, you know what it is.

7           And it is largely unintelligible except to people who

8      are sort of in the know.

9           But that's not exactly the test.  I mean, your concern

10     is that the trial is too -- too limited and too short.  And you

11     may be right, and you may not be.  But that's not -- it is none

12     of my business.  It is a matter for you all and the trial

13     judge.

14          There isn't a large case anywhere, I don't think, in

15     which a trial judge doesn't set parameters for the length of

16     the trial.  They may get changed.  But that's at least the way

17     you start.  But I can't do anything about that.

18          MR. CLOERN:  So a couple of points on that, your

19     Honor.  We are not --

20          THE COURT:  Excuse me one more second.  A thought

21     occurred to me.

22          I can't and ought not to change a report to fit the

23     trial schedule of somebody else who is going to be overseeing

24     whatever you all do.  The rule absolutely doesn't say that.

25     And there isn't a case that even suggests that I can do that or

1    should do it.  And I don't think I should do it.

2         But that doesn't say all your other arguments don't

3    have some merit maybe.  But just that one alone, the two don't

4    coalesce,

5         MR. CLOERN:  A couple responses, your Honor.  It is

6    not that the report is too detailed.  That's not Hytera's

7    concern.  Hytera's concern is that the report hides the ball.

8    And I think that your Honor does have the authority to -- and

9    to do something here because this is about discovery

10   management.  It is very -- it is the same issue that we faced

11   in fact discovery where --

12        THE COURT:  I know.  You say they're hiding the ball.

13   That's the phrase you used.

14        MR. CLOERN:  That's right, your Honor.

15        And so somewhere in the 2000 pages of the report

16   itself and the three or four thousand pages of exhibits, the

17   expert's opinion is in there somewhere.

18        THE COURT:  Right.  Did you take his deposition?

19        MR. CLOERN:  We will take his deposition, your Honor,

20   absolutely, and --

21        THE COURT:  I assume you will then find out at the

22   deposition whether he's the real McCoy or a total fraud who has

23   got a big thick two volume report that he really can't

24   explicate at all.

25        I think your sense of what he should be doing is

1  right.  But your focus on me as the person to try to get that

2  done for you is wrong.

3          MR. CLOERN:  So --

4          THE COURT:  I don't like the report either.  I think

5  the report is -- I had a lot of reactions to the report.  But

6  this is the way that Motorola has been trying the case from day

7  one.  You can be sure that when it comes time to tell the jury

8  what happened, it will be simplicity itself.  But I can't make

9  them tell you what they're going to do at the trial.  But

10  you're smart, you'll know what they're going to do.

11          (Unintelligible) not going to fool you.

12          MR. CLOERN:  Actually, your Honor, it -- we don't have

13  any idea.  So there is two issues.  There is two issues.

14  Motorola is insisting on a November 1 trial date and a ten-day

15  trial, and that's what the schedule currently is.  And this

16  report is inappropriate within that context and should be

17  scaled back.  And we believe that your Honor has the

18  authority --

19          THE COURT:  And I --

20          MR. CLOERN:  -- to do that.

21          THE COURT:  -- do not believe I have the authority.

22  And you don't say -- and you should cite, and you do not cite,

23  a single case that is remotely suggestive of the idea that I

24  have authority to get somebody to change -- let us assume an

25  otherwise rule -- thanks, Mary Ellen -- rule appropriate report

1  to fit what Judge Norgle or some other district judge has

2  decided is the proper time limit.

3       Supposing Judge Norgle said, okay, this case is going

4  to be tried in two days.  Well, I would think you would win in

5  the Court of Appeals.  But leaving that aside, if you came to

6  me and said, we have two days to try this case, and look at

7  what we have got, I would say to you there is not a thing I can

8  do.  But they have the same two days to try the case.  I

9  understand your problem is different than theirs.

10      But I don't think I can do that.  And I don't think

11  that you presented me with a case that is so grave and drastic

12  that I have some kind of inherent power to do anything about

13  that thing that they presented.

14      Supposing he said to you, okay, each side has a day.

15  And then you get presented with this gigantic report.  Could I

16  do anything then?  I'm not so sure.  But maybe.  But that's not

17  the case.

18      Ten days is a fairly long time for, I think -- it is

19  at bottom a pretty simple case.  Did somebody steal Motorola's

20  stuff and take it to Hytera and then put it on their computers?

21  I don't think that's very hard for anybody to understand.

22      And no jury is going to understand what that guy is

23  talking about in that report.

24      But they have got this -- they have the same kind of

25  report, I assume.  They are -- their person is as -- well, I'm

1  sorry.  I'm taking your time.  I don't mean to do that.

2         MR. CLOERN:  So --

3         THE COURT:  I really do appreciate what you are

4  saying.  And I do -- I do not think Motorola has played the

5  game straight the whole way.

6         And part of the fault, I think, for allowing what has

7  happened to happen might be mine.  But I think in the long run

8  it sort of all evens out and you get to where you want to get

9  to.

10        But I can't -- I can't extend the discovery for you,

11 and I -- you have been before Judge Norgle a few times on

12 discovery scheduling matters.  I thought I was administering

13 discovery.  You all didn't think that.  You sought to ask Judge

14 Norgle to fool around with the time frame, so he did.

15        I can't do anything about the trial date.

16        MR. CLOERN:  Well, your Honor --

17        THE COURT:  If they present anything like what's in

18 that report to the jury, they're going to lose the case.

19        MR. CLOERN:  We -- I agree, your Honor.

20        THE COURT:  But you think Mr. Alper --

21        MR. CLOERN:  Which is why --

22        THE COURT:  -- knows that?

23        MR. CLOERN:  Which is why they're not going to do

24 that.  And what that means is we're entitled -- that -- the

25 whole point of discovery is to find out what the other side is

1  going to say at trial.  And this report doesn't tell us what

2  the other side is going to say at trial.  This report -- this

3  report goes through every document in the case.  It -- this

4  report it -- it hides the ball.  It doesn't tell us what is

5  going to occur at trial.  And that is the point of a report.

6          THE COURT:  Well, if you're -- if you're accurate,

7  then what he will testify to at trial won't support the case.

8          MR. CLOERN:  Well, it is -- it is in there

9  somewhere --

10          THE COURT:  Why didn't you ask for summary --

11          MR. CLOERN:  -- we just don't know where it is.

12          THE COURT:  -- judgment on what you have already got

13  now that basically is arguing that there is not a shred of

14  support, now that you have the expert report, that supports

15  what they're saying?

16          MR. CLOERN:  Well --

17          THE COURT:  That's what all the cases historically

18  have done.  People aren't satisfied that there is enough

19  evidence to show there is a trade secret or whatever, and

20  they -- or it is inadequately formulated, and they ask the

21  Judge for summary judgment.  Lots of times they get summary

22  judgment; lots of time they don't.

23          MR. CLOERN:  Well, your Honor, we will be filing

24  summary judgment motions.

25          THE COURT:  Okay.

1          MR. CLOERN:  And, you know, those will -- those will

2    probably be filed in fairly short order.

3          THE COURT:  No, keep going.

4          MR. CLOERN:  Okay.

5          THE COURT:  I'll --

6          MR. CLOERN:  So there is also a more fundamental

7    issue, your Honor, with the Wicker report.  Motorola argues in

8    its opposition that everything in the Wicker report, this

9    2000-plus page report, was disclosed in the interrogatory

10   responses of Motorola during fact discovery.  And that

11   is -- that is not correct.

12          So the Wicker report really has two big chunks, from

13   page 14 to page 1257 -- and 67 -- is the disclosure of

14   Motorola's trade secrets.  They take 1250 pages and say, here's

15   what our trade secrets are.  They go through each 29 of them.

16   And each one is about 50 to 70 pages.

17          THE COURT:  Hold on.

18       (Discussion off the record.)

19          THE COURT:  Go ahead.

20          MR. CLOERN:  Okay.  So in the Wicker report, the first

21   major section from page 14 to page 1267 --

22          THE COURT:  And tell the lawyers they're going to have

23   to come back when they're done.

24          THE CLERK:  Okay.

25          MR. CLOERN:  That's 1250 plus pages of just -- it is

```
 1   entitled -- that section is entitled background of the trade
 2   secrets.  It says, here's where our trade secrets are.  And it
 3   goes through each of the 29 or 30 trade secrets.  And there
 4   is --
 5            THE COURT:  Go -- can you figure out what the 29 are
 6   from that section?
 7            MR. CLOERN:  Well, we know that -- so --
 8            THE COURT:  You know that though already, right?
 9            MR. CLOERN:  We -- we do.  We do.  We know what the
10   20 -- what Motorola is asserting are the --
11            THE COURT:  Sets.
12            MR. CLOERN:  That's right.  Of the 29 trade secrets.
13            The issue is that the disclosure that's in this report
14   is far beyond anything that we received in fact discovery.  And
15   that is an issue for expert reports, and it is improper.
16            So, for example, if you -- Trade Secret Number 1, what
17   was disclosed in discovery is a one-page description.  It is
18   now 19 pages.
19            Trade secret Number 2 --
20            THE COURT:  Well, that -- I'm not saying that's right.
21   And I'm not even saying they're acting inappropriate -- in the
22   appropriate way.  But if it took him, I don't know -- 19 pages
23   to talk about a one-page thing, I -- isn't that -- has its own
24   value?  And I would think in your deposition you would be able
25   to discuss that with him.
```

1    But you're asking me not simply to know what you folks

2 know, but to be an expert, as great an expert as the expert, on

3 both sides.  And I should then decide what is appropriate for

4 the exegesis of that trade secret.  I can't do that and neither

5 can any Judge I know.  Except a couple who are engineers, and

6 they are few and far between in this country.

7    MR. CLOERN:  Well -- okay, your Honor.  So can we

8 address then the deposition of Dr. Wicker for a moment?

9    THE COURT:  Sure.  But I can't -- you really can't ask

10 me or anyone else to go through those 1400 pages and decide

11 what he -- which aspect of his technical discussion is

12 appropriate and not.  How in the -- that's what a trial is for.

13    MR. CLOERN:  Well, we had -- your Honor, I absolutely

14 agree that that's what a trial is for.  And the problem is is

15 there was a total of 200 pages of disclosure in fact discovery

16 on these 29 trade secrets.

17    Now there is almost 1500 pages of disclosure.  And

18 what we got in fact discovery, it was never more than a

19 paragraph of what the trade secret is.  And the rest of it was

20 just citations to source code and documents.  Now there is

21 pages and pages of description.

22    The point is we're trying to find out --

23    THE COURT:  Well, can't you -- can't you -- I'm --

24 realistically can't your experts know?  They would be able to

25 go through that as fast as you can go through a case, and I bet

1    faster.

2         MR. CLOERN:  Well, that's the problem.  That's why

3    we're here, your Honor.  We have -- we have a DMR radio expert

4    and his team.  We have a source code expert and her team.  We

5    hired a whole other source code firm.  We have groups of

6    experts, more than three sets, groups of experts with teams

7    behind them.

8         We have added four or five new lawyers to the case.

9    The -- and we are having difficulty getting through this and

10   getting a response out by August the 5th.  That I

11   guess -- that's what our real problem is is this is not fair.

12        We're going to be -- we're not going to -- we can't

13   get the response done by August the 5th.  And the problem is is

14   because this report is way out of whack with this case.  And so

15   we're -- we are trying to get through it, and we're -- most of

16   it is we're seeing for the first time.

17        So, you know, for example, most of these trade

18   secrets -- all these trade secrets, what we got in discovery

19   was a paragraph or two description.  And now there is pages and

20   pages and pages.  And we have been down this road --

21        THE COURT:  Wouldn't you think it would be -- wouldn't

22   you think it would be beneficial to ask their -- if you look at

23   the -- the Court -- materials from all the Courts of Appeals,

24   they are so down on experts.  You can get an expert to say

25   anything.

1    But there is lists and scores of cases and Law Review

2   articles that you could make that expert look, in front of the

3   jury, foolish for -- they give you what, a page and a half,

4   whatever, and it takes him however many hundreds of pages?

5   Either he's not worth his salt or he is attempting to obfuscate

6   the case.

7    They're going to have to convince 12 people of the

8   value of his testimony.  And if he gives testimony in an hour

9   that took him 1400 pages of gibberish to put forth to you, do

10  you think that these 12 regular folks won't have an impression

11  about that?

12    Now I realize that does not dispose of your issues.  I

13  do know that.  But I -- I -- when I saw that report, I thought

14  that Motorola -- I thought Motorola was attempting perhaps to

15  do what it shouldn't do, but I don't know, and I'm not sure.

16  And all I can tell you is there is a schedule that cannot be

17  changed.  At least I can't change it.

18    If you have a real concern that -- and I am not

19  telling you to do this.  I'm not urging you to do this.  I'm

20  telling you what my limitations are.  I can't alter a schedule

21  that the district court has really set in stone for you folks

22  repeatedly.

23    MR. CLOERN:  I understand that, your Honor.

24    THE COURT:  And that's what I would be doing if I did

25  anything.  Even if I had -- even if I were to agree with you.

1          MR. CLOERN:  So, your Honor, we understand that.  And

2     I would like to address that in just one second.  I would like

3     to make two quick points before I do.  The situation that

4     Hytera finds itself in --

5          THE COURT:  Let me say one other thing.

6          MR. CLOERN:  Sure.

7          THE COURT:  And I don't mean to -- but as the thoughts

8     occur to me, I -- you know what you want to say, and I don't

9     have that.

10          MR. CLOERN:  Well, that's generous, your Honor, but,

11     thank you.

12          THE COURT:  No, you definitely do.  You all do.

13       (Laughter.)

14          THE COURT:  And now I forgot what I was going to say.

15          Oh, the report, at least most cases, do not admit the

16     report.  They wouldn't have the temerity of put in a 1400-page

17     report.  The jury will think they're -- I don't know what they

18     would think.

19          Reports are hearsay basically.  They are not

20     admissible.  Testimony is admissible.  So when he gets up

21     there, the question is what has he said and how are you going

22     to examine him?  The report is a vehicle for you to utilize,

23     really, you, to cross examine him.

24          Now if he gets up and tells the jury about, you know,

25     an hour or so about these various trade secrets, I would think

1    you would demonstrate to the jury what he did in this report

2    and how obfuscatory it really was.  And if the jury gets the

3    sense that Motorola is really playing fast and loose with you,

4    well, that's not very beneficial to them.

5           That doesn't answer your total arguments, I understand

6    that.  They are just thoughts that occur to me.  And maybe

7    they're wrong.

8           I -- I really -- I skimmed the report.  I don't -- I

9    couldn't read that and understand it.  And I would bet the

10   lawyers couldn't without help.

11          But I can't -- I don't know how to dictate the length

12   that a report should be.  What was it they asked Abe Lincoln,

13   how long should a man's legs be?  And he said, long enough to

14   touch the ground or something like that.

15       (Laughter.)

16          THE COURT:  I can't -- how can I say, well, his report

17   shouldn't be 1400 pages, it should be eight.  Oh, no, maybe it

18   should be six.  Well, maybe it should be 12.  There is no way I

19   can tell a guy who is opining on the most (unintelligible)

20   concept what he should be saying.

21          MR. CLOERN:  I understand that, your Honor.

22          A couple -- couple quick points.  Couple quick points.

23   Just as a practical matter, logistically, what we are faced

24   with in preparing for trial -- there is a ten-day trial between

25   voir dire and arguments and other things.  Both sides might get

1    four, four and a half days of testimony.  Right?  So Hytera is

2    going to have four, four and a half days.

3          Our experts are going to have to rebut Dr. Wicker and

4    the things that Dr. Wicker says.  We have no idea what we are

5    going to need to rebut in this 2000-page report.  I think

6    everyone is in agreement that Motorola --

7          THE COURT:  That's why you take his deposition.

8          MR. CLOERN:  And that's -- I agree, and that's exactly

9    where I'm going.  That's exactly where I'm going.

10          Our first problem is figuring out how to respond to

11    this 2000-page report by August 5th.  Ninety percent of which

12    we have never seen before.  But we'll figure that out or we'll

13    address it with Judge Norgle because it is a scheduling issue,

14    and we're set to see him on Friday.

15          The next issue though is how do we prepare for trial

16    when we have limited trial time to try to figure out what

17    Dr. Wicker's opinion, what his direct testimony really is going

18    to be?  And that is, according to Rule 26, the purpose of a

19    report so that the other side gets notice and can build its

20    case for trial.

21          Now we do --

22          THE COURT:  And decide whether or not to take a

23    deposition.

24          MR. CLOERN:  And -- exactly.

25          THE COURT:  It says that over and over --

1          MR. CLOERN:  And we will.

2          THE COURT:  -- and over.

3          MR. CLOERN:  Yes, your Honor.  And we will take his

4     deposition.

5          THE COURT:  Of course.

6          MR. CLOERN:  And so that leads me to what I asked

7     earlier, if we could talk about that for just a second.

8          So this is a 2000-plus page report with -- I think it

9     is more closer to 5000 pages with the exhibits.  We're not

10    going to get done in a day.

11         THE COURT:  Well, why don't you ask him how long it

12    took him to prepare the report?  I would think that that would

13    really (unintelligible).

14         MR. CLOERN:  Well, your Honor --

15         THE COURT:  I would like to know that.

16         MR. ALPER:  I can answer that question very simply.

17         THE COURT:  No, Mr. Alper, not yet.

18         MR. CLOERN:  Can I -- so, your Honor, that actually is

19    a very important point that is an issue I think for your

20    Honor --

21         THE COURT:  Maybe.

22         MR. CLOERN:  -- in managing discovery.

23         THE COURT:  Maybe you'll find -- no, not find -- maybe

24    you're going to find out that he had all sorts of help.  Maybe

25    he didn't prepare it even though it has got his name on it.

1    Maybe -- maybe Mr. Alper prepared part of the report.  Who

2    knows?  I don't know.

3            MR. CLOERN:  Well, your Honor --

4            THE COURT:  You will find out.

5            MR. CLOERN:  This report I guaran-- -- so in fact

6    discovery, you may recall during fact discovery, until May 10th

7    we had a one sentence description of each of the trade secrets.

8    One sentence until May 10th.

9            On May 10th, after your Honor mentioned in a minute

10   order technical advisor --

11           THE COURT:  Well, I did more than mention, but --

12           MR. CLOERN:  That's right.  I wanted to just -- I

13   didn't want to take too many liberties.

14           But what that got was -- what that got was by May

15   10th, that got us the -- a supplemental description of a few

16   pages for each trade secret.  Okay?

17           June 28th we get this 2000-page monster where we get

18   50 to 100 pages describing each trade secret.  There is no way

19   that was written from scratch after May 10th.

20           THE COURT:  Why don't --

21           MR. CLOERN:  All --

22           THE COURT:  Why don't you find out.

23           MR. CLOERN:  We do --

24           THE COURT:  I'm not disagreeing with anything you're

25   saying.

```
 1          MR. CLOERN:  The point is they had it in discovery.

 2          THE COURT:  Well, why don't --

 3          MR. CLOERN:  They didn't give it to us, and they

 4  should have.

 5          THE COURT:  Can you -- if you find that out, and you

 6  can prove that, what you can do with that, that could really

 7  turn the whole case around, maybe.

 8          But I'm not the lawyer.  You guys are so wonderfully

 9  skilled.  You know what to do.  But I would think that the idea

10  that this should be or anything should be just a kind of dry

11  technical exposition of what the guy thinks, what you're

12  telling me now doesn't seem to square with that.

13          Now I'm sure Mr. Alper has an explanation.  It doesn't

14  matter what he says or what you say.  Find out what the witness

15  has to say.  On the question you ask depends the answer you

16  get.  Ask the right questions.

17          MR. CLOERN:  We will, your Honor.  So that brings us

18  to the deposition.

19          THE COURT:  Okay.

20          MR. CLOERN:  We -- we would like to request at least

21  five days for this 2000-page report.  I don't see how we get

22  through it.  I mean, each trade secret is described in 100

23  pages, 50 to 100 pages.  There is 29 of them. --

24          THE COURT:  And you multiply that of how long is --

25  how long would the testimony then be?
```

```
 1              MR. CLOERN:  The testimony?

 2              THE COURT:  Yeah.  Obviously --

 3              MR. CLOERN:  I actually -- actually --

 4              THE COURT:  Obviously not that long.

 5              MR. CLOERN:  For the deposition or trial?

 6              Yeah, so what I had -- if we spend 30 minutes per

 7    trade secret cross examining --

 8              THE COURT:  That's pretty -- that's pretty reasonable,

 9    I think.

10              MR. CLOERN:  Thirty minutes --

11              THE COURT:  Thirty minutes per trade secret?  Sure.

12              MR. CLOERN:  Well, I mean, that covers 50 to 100 pages

13    of the report.

14              THE COURT:  I -- forget his report.  I'm just saying

15    that the time per trade secret in the abstract is very

16    reasonable.

17              MR. CLOERN:  So there is -- there is what the trade

18    secret is.

19              THE COURT:  Yeah.

20              MR. CLOERN:  Right?  That's one issue.

21              THE COURT:  Right.

22              MR. CLOERN:  And then the other issue is the --

23              THE COURT:  Why is there -- why is it violative of --

24              MR. CLOERN:  -- Hytera's --

25              THE COURT:  -- Motorola's trade secrets?
```

1          MR. CLOERN:  That's right.  That's how to -- what's

2    Hytera's --

3          THE COURT:  Exactly.

4          MR. CLOERN:  -- what's their contention on Hytera's

5    product?

6          THE COURT:  Right.

7          MR. CLOERN:  And whether Hytera's product

8    misappropriates it.

9          THE COURT:  Right.

10         MR. CLOERN:  Right?

11         THE COURT:  Yeah.

12         MR. CLOERN:  So I would think probably an hour per

13   trade secret would be about the best that we could do to cover

14   those two issues.

15         And there is more issues than just that because this

16   expert goes through and talks about a lot of things that we

17   think experts on technical issues shouldn't talk about.  For

18   example, he goes through and says, well, the CEO of Hytera,

19   Mr. Chen, had to know what was going on because I see Motorola

20   documents here and there and the other place.

21         THE COURT:  Well, did --

22         MR. CLOERN:  And the --

23         THE COURT:  But isn't that what he concludes is the

24   basis for his ultimate conclusion?

25         MR. CLOERN:  Well, and he gives --

1          THE COURT:  Part.

2          MR. CLOERN:  He says opinion.  He says, I have been in

3   technology companies before --

4          THE COURT:  And I know how they work.

5          MR. CLOERN:  -- and I know how they work.  And

6   everybody in Hytera knew about it.  Everybody in Hytera was

7   guilty.  And everybody --

8          THE COURT:  Well, that's not an appropriate expert

9   opinion.

10          MR. CLOERN:  I -- we agree.

11          THE COURT:  Yeah.

12          MR. CLOERN:  But it is still something that --

13          THE COURT:  But we're not -- I know, but we're not

14   going to go through chapter and verse.  Again it says that and

15   (unintelligible) that.

16          But they are what they are.  And the admissibility of

17   that kind of material will be for -- ultimately for Judge

18   Norgle.  But I understand yours is a time problem.

19          MR. CLOERN:  If we did an hour a trade secret --

20          THE COURT:  Right.

21          MR. CLOERN:  -- that's 29 hours.  That would be about

22   four days.  Plus then the copyright issues we could cover in a

23   day.  So we think five days would be appropriate.

24          THE COURT:  Okay.  Well, he's sort of the key guy.

25          MR. CLOERN:  He is.

```
 1              THE COURT:  Or a key guy.
 2              MR. CLOERN:  Well, it's -- there is three
 3   expert -- you're exactly right.  He's the key technical guy.
 4   Then there is a damages expert as well.
 5              THE COURT:  Well --
 6              MR. CLOERN:  And they have a third expert --
 7              THE COURT:  You don't get the damages unless he makes
 8   the case.
 9              MR. CLOERN:  Agreed.
10              THE COURT:  Or someone makes the case.
11              MR. CLOERN:  Agreed.
12              THE COURT:  Okay.  So you want five days.
13              MR. CLOERN:  Yes, your Honor.
14              THE COURT:  Mr. Alper?
15              MR. ALPER:  May I just very briefly respond to some of
16   the --
17              THE COURT:  Sure.
18              MR. ALPER:  -- other pieces of this?
19              THE COURT:  Sure.
20              MR. ALPER:  I mean, we obviously agree with the
21   direction that your Honor is heading in with respect to the
22   motion to strike.
23              I will just comment on a couple of things just for the
24   sake of, you know, filling the record because we disagree with
25   a few of the statements that Mr. Cloern made.
```

He said that -- a couple of things.  He said that 90
percent of what's in the report they haven't seen before.  This
we categorically disagree with that.  Every contention,
you -- every document, every opinion or every allegation or
fact was in our interrogatory responses.  Those total hundreds
and hundreds and hundreds of pages of detailed narration which
were disclosed throughout the course of this case.

And when it comes to the scope of this case -- and
you -- we didn't see in their briefing -- they didn't raise a
single document, a single allegation, a single trade secret, a
single contention that hadn't been disclosed in the discovery
period.  Just absent from their briefing entirely.  Because we
tried to stay within the four corners of what had previously
been disclosed in the case.

On top of that, a very critical point in this case is
-- was in May, as Mr. Cloern said, when in order to resolve the
Motorola -- one of the Hytera's motion to compel additional
deposition time, we got together and we had a real meet and
confer over the scope of the case, your Honor, that culminated
in the order, Docket Number 520, that -- that covered the scope
of the case and how we were going to disclose our case going
forward for purposes of discovery.

And in that -- in that stipulated order we came down
to 29 trade secrets, and that was not unilaterally dictated by
us, your Honor, that was a real conference where, in fact,

1    Mr. Cloern and Mr. Allen, his colleague, told us, here are

2    trade secrets we want you to drop because we think they are too

3    broad, and we did that.  So it was a discussion.  We ended up

4    with the current 29 trade secrets.  That's in this order.

5           We then -- we then in terms of how they were going to

6    be disclosed for purposes of discovery, we specified in the

7    order exactly how that was going to be done.  And then behind

8    the scenes, just to be sure that this wouldn't lead to another

9    dispute, we actually sent them samples of our disclosures that

10   ultimately ended up in the interrogatories.

11          He says there is one page.  If you go to their motion

12   before Judge Norgle to extend the discovery date, they say as a

13   reason to extend the trial date that our interrogatory

14   responses on that issue were 18 pages of -- up to 18 pages of

15   trade secret.

16          So these were detailed interrogatory responses that we

17   sent them drafts of before we entered into this order.  They

18   came back, they said, you know what, this is good, but we want

19   more here.  This is too many documents.  Reduce the number of

20   documents.  Reduce the number of source code.  But give us more

21   detail per file on the source code.  And they would send us

22   back comments.  And then we got together and -- I'll never

23   forget.  I was at a hotel where we finally reached agreement on

24   the form of this disclosure.  We then went together at

25   breakneck pace, got those disclosures.  We put the order in.

1    And if you look at the order, the order actually says, Motorola

2    will significantly reduce the number of documents that are

3    cited.  By way of example, and then it goes through examples of

4    the types of documents that we can cite.

5            Then it says, Motorola will further reduce the volume

6    of cited source code.  And it talks about that.

7            And then it talk -- it says, Motorola will identify

8    the specific feature or functionality that is claimed in the

9    trade secret and identify documents and individual pages where

10   the feature or functionality in reference, and reference the

11   applicable lowest level source code, subdirectories, et cetera.

12           So it goes through in great detail, and that's because

13   they have -- we were actually passing back and forth drafts of

14   the actual disclosures.

15           We then entered this order.  We then provided the

16   disclosures to them.  And then they took 270 hours of

17   depositions, your Honor, on those disclosures.

18           There is nothing in Dr. Wicker's report from a

19   substantive perspective that goes beyond the scope of that

20   disclosure that they agreed to.  That's in the disclosures.

21           And not only agreed to, we had a real meet and confer

22   over this, and they agreed that was sufficient for discovery.

23           I will tell you at the very end of this order it says,

24   they don't -- they reserve all rights at some later point and

25   so forth, of course.  But we had a -- that wasn't just a hand

1    waving, we actually got together about all of this stuff.

2          And Dr. Wicker stays within that. And when it comes

3    to the number of pages, your Honor is absolutely right, that's

4    not what the relevant question is. It is whether did -- is

5    what he -- is what he's doing new? It is not. It's all -- it

6    was a part of the scope -- it is within the scope of what he

7    had proposed. What we had disclosed before that he had been

8    involved with, in fact. You'll find that out. And then they

9    depose him, and -- in the many hundreds of pages that we had

10   already provided.

11         So when they say -- when Mr. Cloern says, 90 percent

12   of this we haven't seen before, 100 percent they have seen

13   before.

14         Now Dr. Wicker, as he's entitled to do as an expert,

15   he puts it in his words and he narrates a little bit. But in

16   terms of the total number of pages, your Honor, it is

17   absolutely quite similar.

18         When they first wrote us, we can have -- after we

19   serve the report they say, we think the volume is too great.

20   We sent them what we thought would be a helpful tool. So we

21   sent a -- a consolidated version of the Wicker report over to

22   them where we did two things, your Honor, we took -- there were

23   certain code analyses that were -- that are common to the trade

24   secrets that were essentially repeated throughout the report.

25   They didn't need to be because they are the same code analyses,

1    and so we consolidated those.

2           And then we had put in screenshots for ease of

3    readability, to help, and -- but this -- so we took those out.

4    Kept the cites, kept the pin cites, but took the, like, very

5    large screenshots out.

6           And that took the report down from 2000 pages or -- or

7    a little bit over 2000 pages to 975.  And that is around the

8    length of the interrogatory responses that we had provided

9    during discovery.

10          And so page count -- it is not about page counting, it

11   is about substance.  And we had very much gone to great lengths

12   to provide them these disclosures.

13          In terms of what Dr. Wicker is doing and the

14   allegation that he's hiding the ball, if you look at the

15   report, and if you were an engineer or an expert like

16   Dr. Wicker, what you would see is that he's -- he's not -- this

17   is a situation where he's like string -- making a conclusion

18   and string citing a bunch of documents in these -- and then

19   he's going to like pull one out later at trial and potentially

20   rely on it.

21          He's going through, just as we did in our

22   interrogatory responses, the evidence showing the fact and

23   explaining where in a document you can find the fact, just like

24   we did in our interrogatories.  We did it just that way,

25   providing a very long narrative of the trade secrets and the

1   evidence before discovery closed.

2           And then Mr. Cloern, he starts talking about how it

3   is -- well, now it is not 2000 pages, it is 5000 pages.  What

4   he's referring to are exhibits that show line by line code

5   copy, which were disclosed back -- disclosed to Hytera

6   beginning in October 2018, your Honor, and then supplemented in

7   March.  And then supplemented again, but this -- the core

8   substance was in October and then a supplement in March.  And

9   it is an attachment.

10          The only difference, your Honor, between the

11  attachments to Dr. Wicker's report and the attachment to our

12  interrogatory responses way back then is that in the

13  interrogatory responses it has citations to the lines of code.

14  In Dr. Wicker's report it has citations to lines of code, and

15  then the screenshots of that code.  Substantively exactly the

16  same.

17          So for them to say that it wasn't disclosed is to us

18  -- it is hard for us to believe or understand, particularly

19  when they agreed to the scope of this case.  And we

20  were -- this was very important to us, because we heard your

21  Honor loud and clear at that point.  We said we wanted to avoid

22  this issue from happening, so we put a lot of effort into

23  making that happen.

24          In addition, of course Dr. Wicker covers things.  Has

25  -- now he has 270 hours of deposition testimony that he's

1    incorporating in his analysis.  And if you look at his report,

2    in addition to the documents and all that analysis that was

3    provided and the interrogatory responses, he addresses that as

4    well, which as is his right to do.

5          As your Honor recognized, there isn't an authority in

6    the Federal Rules, there isn't a single case, there isn't an

7    order of this Court that Dr. Wicker violated.  And in fact at

8    the time that they were coming up with this -- with this

9    agreement as to the scope of the case, they knew all the

10   documents.  The documents haven't changed.  They knew all the

11   code citations.  They could have -- and they agreed to the

12   schedule going forward, including the expert schedule, which

13   gave them an extraordinary amount of time.  You know, usually

14   you get about four weeks to put in an opposition -- opposing

15   authority, they got more than five.  What they didn't do is

16   say, and we want these page limits on the expert reports

17   because we need to make sure that we have enough time to

18   respond to them.

19         And they can't now, after the fact, after they have

20   agreed to the scope, after Judge Norgle has told them in

21   listening to -- they raised every one of the things I'm talking

22   about, your Honor, in terms of the scope of this case to Judge

23   Norgle.  And he very clearly on the record, he said, I have

24   read the pleading -- we quoted this in our brief.  We have read

25   the pleadings.  I understand your position.  Your motion is

1    denied.  When it comes to the pretrial deadlines, go back and

2    talk about them.  But one thing is clear, they can't move the

3    trial date.  And all of that was presented to Judge Norgle, and

4    it is all the same stuff that we're talking about here.

5          So that -- when it comes to -- when it comes to the

6    volume of this, they had months and months to evaluate it.  And

7    this is not something that our -- and it is very -- from our

8    perspective, a very fair translation of what was at issue in

9    the case all along to Dr. Wicker's opinions.

10         On the trial date, one thing -- I'm going to conclude

11    and then move to the number of deposition days, your Honor,

12    very brief -- very quickly.  But on the trial date, Mr. Cloern

13    says there is a trial date that's set.  We have not put in our

14    pretrial order yet, so I am not -- I did not know that there is

15    a trial date that has been set.

16         But regardless, we absolutely agree with you, your

17    Honor.  We think that this case can be tried in a couple of

18    weeks.

19         THE COURT:  Is there a -- because I --

20         MR. ALPER:  I don't think --

21         THE COURT:  -- didn't -- yeah, I know you say --

22         MR. ALPER:  I'm sorry, there is a trial date.  I

23    apologize.  There is a trial date that's set, and Judge Norgle

24    has confirmed that that's not moving.

25         In terms of the number of days for trial, we were not

1    aware that he had set that yet.  But that -- regardless, you're

2    absolutely right, your Honor, if the issue is they need more

3    time at trial to put on their case, then that is something that

4    we need to get through expert discovery, and then we can have a

5    discussion about that with --

6         THE COURT:  And I would think that at the time that

7    you're before him at -- actually on trial, you would be

8    discussing whether more time is needed.  And he would be -- he

9    would respond in an appropriate way at the time given the

10   circumstances.

11        MR. ALPER:  Absolutely, your Honor.  And here's the

12   thing, we would want some more information before coming to a

13   full conclusion on that.  For instance, we'd like to see their

14   expert reports.

15        At this point they have sort of generally denied

16   everything.  You may have seen in our papers.  They won't admit

17   that there is a single line of code copy, even though we can

18   show thousands of lines that are verbatim.  Right?

19        And so we need to see what are they going to actually

20   challenge.  I mean, they make it like they need to -- that

21   they're ready to go through every line of Dr. Wicker's report

22   and then put in their response to everything.  That's

23   not -- and you know that's not how this is going to go.  They

24   can't.  They can't.  They stole this code.  So they need to

25   come up with other defenses that's likely going to triangulate

1  around statute of limitations, which has been the thrust of

2  their defenses so far all along.  But whatever it is, we'll

3  find out in their expert reports.

4       And then -- and then we'll see how that's -- if that's

5  a surprise to us.  But whatever it is, then we'll have a sense

6  for the scope of the case and what the actual defenses are and

7  how much we're going to have to put on for Dr. Wicker.

8       I mean, how do we know that we should skimp on

9  anything at this point until we -- it would be a mistake for us

10 to leave out aspects of our interrogatory responses and then

11 have them accuse us of a failure of proof when they literally

12 said we're going to -- that's their defense, we deny

13 everything.  We're going to put you to your proof.

14      So, in any event, when it -- the trial date issue is

15 definitively an issue that should be handled later, your Honor.

16 So we 100 percent agree with you on that.

17      And then when it comes to the number of deposition

18 days, we want to be reasonable in that regard.  This is not

19 something that we need to -- this -- this wasn't the focus,

20 obviously, of their motion.

21      THE COURT:  Mr. Alper, if they say they need five

22 days, I'm not in a position -- and you say, oh, there

23 (unintelligible) no, four plus two, well, I'm not in a position

24 to make an informed judgment about that.  I would be simply

25 picking a number.  I'm not going to do that.

```
1          If they say they need five days, I think they should

2     have five days.  A few hours here or there don't matter at all.

3          MR. ALPER:  Yeah.  The --

4          THE COURT:  You will have the same time.

5          MR. ALPER:  The reality --

6          THE COURT:  If you want it.

7          MR. ALPER:  You know, your Honor, the reality is, you

8     know, you're right, there is no way that we can in this context

9     explain here is why this set of technology only needs two days.

10         The only thing I would say is, of course, we have a

11    lengthy --

12         THE COURT:  So you'll have a trial within a trial

13    almost to determine the number of days of a deposition --

14       (Laughter.)

15         THE COURT:  -- and we can't do that.

16         MR. ALPER:  Yeah.  So -- so I -- you know, you need

17    five days in, at least my practice is -- I have never had a

18    five-day expert deposition --

19         THE COURT:  Why not?

20         MR. ALPER:  -- (unintelligible) experts.

21    I'm sorry?

22         THE COURT:  Why not?

23         MR. ALPER:  Because --

24         THE COURT:  What's wrong with five days?

25         MR. ALPER:  Because usually the issue -- when you have
```

1 a report, particularly one that goes through, you know, chapter

2 and verse like this one does --

3    THE COURT:  Yeah.

4    MR. ALPER:  -- there isn't a lot left to ask about

5 because it is very much in the report.

6    THE COURT:  If they say -- I'm not a seer, and neither

7 are you.  If they say they need that much time and they take

8 that much time and it is unproductive, your client, at this

9 point, the costs are zero almost.  What could be better for you

10 than to have them asking these ridiculous, unproductive

11 questions while you sit there smiling internally at their

12 foolishness?

13    MR. ALPER:  Yeah.  The -- we -- for that, you know, we

14 can't disagree with you about that, your Honor.  And as long as

15 we figure out how to -- you put that -- fit that in within the

16 current schedule, which I'm certain that we could do in one way

17 or another, then --

18    THE COURT:  How many people do you all have working

19 this?  Because it is an -- I'm not asking really.  But, my

20 goodness, you have scores of people in teams working on this

21 case to help you.  You're not just -- you're not the only part

22 of the program.  So I -- if he tells me he wants five days and

23 you're getting the balance of what you really want, which is

24 not getting the relief that Hytera wants, I don't understand

25 (unintelligible) at all.

1       MR. ALPER:  Understood, your Honor.

2       THE COURT:  So go ahead.

3       MR. CLOERN:  Thank you, your Honor.  We disagree with

4  most of what Mr. Alper said in his description of the issues.

5  I won't belabor it.  But just for -- for the record, I'll make

6  three quick points.

7       THE COURT:  Okay.

8       MR. CLOERN:  The 270 hours of depositions, most of

9  those were before your Honor made his order that I might

10 appoint a technical advisor because we were in here saying,

11 Motorola had given us one sentence description of the trade

12 secrets and said, well, our responses will explain.

13      We took hours and hours and hours of depositions, and

14 the witnesses could not explain the trade secrets.  And that's

15 what resulted ultimately in the deal where we did get some

16 narration on May 10th.  Right?  So saying that there has been

17 270 hours and Hytera knows exactly what Motorola's case is,

18 that is a bad misrepresentation.

19      We have been here in front of you -- believe me, I

20 have a family, I don't want to fly out to Chicago repeatedly,

21 bother the Court --

22      THE COURT:  Well, it is not bother.  It is so much fun

23 for me when you guys come in.

24      MR. CLOERN:  I'm sure it is.

25      THE COURT:  But it is terrible.  I don't

1    (unintelligible) the five of you.  I --

2           MR. CLOERN:  We --

3           THE COURT:  I wouldn't want to be in a plane --

4           MR. CLOERN:  We have been -- we have been trying for

5    months and months, more than six months, to figure out what

6    Motorola's case is.

7           It has been 169 trade secrets.  It has been 141.  And

8    we finally got it down to 29.  And they said, is that

9    sufficient?  We said, no, but it is better than 141 so we'll

10   take what we can get right now.  And then we'll see.

11          And we specifically reserved in that document

12   Mr. Alper was waving around and selectively quoting, we

13   specifically reserved.  We said, when we see your disclosures,

14   right, then we'll tell you whether that's sufficient.

15          This was all done before they provided the

16   disclosures.  And what they provided in response to this deal

17   to narrow the trade secrets to 29, they provided 234 pages of

18   disclosures about the trade secrets.  Each trade secret was

19   somewhere between two or three pages or some 18 pages of text.

20   But all those had one or two paragraphs about what the trade

21   secret is.  And then just pages and pages and pages of

22   citations to source code files.  So we --

23          THE COURT:  That's, I take it, the proof of what the

24   few pages sort of summarized.

25          MR. ALPER:  Well, it -- but what it really is is sort

1    of burying what the real proof is.  But that's fine.  We went

2    through it.  We could get through 200 pages of it.

3         What we had no idea is that between May 10th and June

4    28th that 200 pages would balloon to over 2000 pages.  Right?

5    Where almost over 1200 of them was the direct equivalent to

6    those 200, just describing what the trade secret is, which they

7    undoubtedly had at the time, that we had to pull teeth to get.

8         THE COURT:  Yeah, I don't -- that just doesn't strike

9    me as so terrible.

10        MR. CLOERN:  The point -- your Honor, our --

11        THE COURT:  It is a huge, big, sophisticated case.

12        MR. CLOERN:  I understand.  And our only point in all

13   this is that -- and I just want to make this clear from the

14   record, Hytera was not made aware of everything that's -- of

15   all of what's in that report.  We are seeing most of it for the

16   first time when we got the report and started to read it.

17        THE COURT:  Mr. Alper says that's not so.

18        MR. CLOERN:  And we'll agree to disagree.  I just

19   wanted to make sure that the record was --

20        THE COURT:  And there is no way on earth for me to

21   resolve that dispute between the two of you.

22        MR. CLOERN:  Understood, your Honor.  But I just

23   wanted to make that clear for -- for the record that Hytera

24   believes this report is in fact hiding the ball.  And what

25   we're caught between on this is we come to your -- you know,

1  the parties are in front of your Honor, the magistrate, for

2  managing discovery issues.  But in front of the Article III

3  Judge Norgle for scheduling issues.  And so we're sort of

4  caught in between where we have got this --

5      THE COURT:  You are before him for scheduling.  That's

6  just relating to the trial, not scheduling issues.  That's not

7  the way I understood what he said.

8      MR. CLOERN:  That's correct.  But the problem that we

9  found ourselves in is that discovery, fact discovery, was

10  originally set to close in February.  And Motorola's right,

11  there have been four fact discovery extensions.  But all of

12  those extensions are because -- were because we have said, when

13  are you going to narrow your trade secrets from 140 down?  And

14  when are you going to disclose them?

15      And we got one, two, three, and finally four.  And

16  this document Mr. Alper waved around extended discovery till

17  June 19th because we didn't get their disclosures until May

18  10th.  That's why they were fact discovery extensions, because

19  Motorola waited until the last minute to give us any

20  disclosures.  Not because Hytera wanted them.  Hytera wanted to

21  be done with discovery a long time ago.

22      And what that did is it then jammed us so that there

23  is no additional time.  I would love -- we were -- and we do

24  request more time to respond to this report from August 5th.

25  But the trial is -- trial ready is November 1, and we're

1    already going to be pushed.  So, you know, that will --

2          THE COURT:  So if I extended that time for expert

3    involvement, say, you guys will go back to Judge Norgle and

4    you'll say, oh, my gosh, discovery isn't done.  How can we be

5    ready on whatever the date is to try this case?  And thus we

6    need more time.

7          Now if you were to tell me that nobody is going to go

8    back to him, I suppose that's a different issue.  But that's

9    not what I -- what I understand to be the case.

10         MR. CLOERN:  Your Honor, I will represent, I will

11   poke -- poke my hand and write it in blood if you would like,

12   we will not go -- I will represent it on the record, waive

13   whatever it is, we will not go back to Judge Norgle and ask to

14   extend the November 1 trial date.  Judge Norgle says we're

15   going to trial on November 1, and we --

16         THE COURT:  You really should -- you should bet the

17   farm on that.

18         MR. CLOERN:  I'm sorry?

19         THE COURT:  You should bet the farm on that, as the

20   expression goes.

21      (Laughter.)

22         THE COURT:  And I haven't talked to him ever.  I can't

23   remember the last -- I only talked to him in the -- where the

24   parked cars are.  He doesn't talk to people.

25         MR. CLOERN:  If we could have --

```
 1              THE COURT:  So -- but I'm just telling you, you guys,

 2    if you can work out an agreement, it is -- I'm happy to have

 3    you.  You can take discovery up to the day of the trial if you

 4    will both -- all of you -- five of you were in agreement so

 5    long as you understood that you couldn't go anywhere to get

 6    anything done if there was a dispute.

 7              But I can't do that because you'll then use the one to

 8    try to manipulate the other and extend the other.  I can't --

 9    so I can't do it.

10              MR. CLOERN:  Well, this -- for this issue, our report

11    is due on August the 5th.  We would ask for two weeks, two

12    additional weeks.  And then the expert discovery schedule

13    slides two weeks.

14              We're already doing all of our pretrial disclosures,

15    all pretrial orders and stuff.

16              THE COURT:  Well, Mr. Alper, what's your view of that?

17              MR. ALPER:  So I think we need to chance to talk about

18    the order.

19              THE COURT:  Sit down.  You're here.

20              MR. ALPER:  We could do that.  We'd like --

21              THE COURT:  I mean, you're here.  You sit down.  I

22    actually have something to do that will take a little time.

23              If you guys are in agreement about the length of the

24    schedule, the expert discovery schedule, and that neither side

25    will make any application to Judge Norgle, I'm happy to do
```

1    anything you want to do.  Anything.

2         But the order is going to provide in representations

3    by both sides there will be no application -- because he will

4    look at that -- not that he would care what I did anyway, but

5    he will actually deny the order of extension.

6         So but if you can work it out so that you're

7    all -- five of you are happy, I'm happy to do whatever you want

8    to do.

9         So go across the hall or go into my -- go into my

10   office.  Out here to the left and then -- oh, there is no --

11        The government is not here?

12      (Discussion off the record.)

13        THE COURT:  Oh, okay.  Well, sit down here or go in my

14   office.

15        MR. ALPER:  We can go down to the cafeteria.

16        THE COURT:  Oh, go down to the cafeteria.  That's

17   fine.

18        Come up and tell me whatever you want to do.

19        MR. ALPER:  Okay.  We'll do that.  Thank you.

20        THE COURT:  I'll wait for you.  Thanks.

21        MR. CLOERN:  Thank you, your Honor.

22        MR. STRINGFIELD:  Thank you, your Honor.

23      (Brief recess.)

24        THE COURT:  Okay, folks.

25        Okay.

```
1           MR. ALPER:  Good morning, your Honor.

2           THE COURT:  (Unintelligible) so long.

3           MR. ALPER:  We have an agreement.

4           THE COURT:  Okay.

5           MR. ALPER:  And on the schedule, which should resolve

6    things for today.  With the understanding that Hytera will

7    never attempt to move the trial date again, we have agreed to

8    extend what you said.

9           MR. CLOERN:  That's right.  I was just --

10          MR. ALPER:  We --

11          THE COURT:  It just sounded (unintelligible).

12          MR. CLOERN:  It sounds so, we'll never again --

13          MR. ALPER:  It is the way you said it.

14          I think it is what counsel said.

15          MR. CLOERN:  I did it.  We --

16          THE COURT:  Okay.  So we (unintelligible).  The trial

17   date shall stand.  Nobody will ask that it be changed.

18          MR. ALPER:  Yes.

19          THE COURT:  Right?

20          MR. CLOERN:  Correct.  Yes, your Honor.

21          THE COURT:  Okay.

22          MR. ALPER:  And then we have a series of dates that we

23   agreed to.  We worked through the entire pretrial schedule.

24          THE COURT:  Well, hold on.  (Unintelligible).

25          Okay.
```

1          MR. ALPER:  And -- oops.

2          And I -- the top level is that we provided -- we

3     agreed to an extension on the amount of time that Hytera has to

4     respond to our opening expert reports.  And I can give you -- I

5     can walk through the dates if you would like, your Honor.

6          THE COURT:  Yeah, I -- it is up to you.  Do you want

7     them in an order or you do you want to trust each other?

8          MR. De VRIES:  Your Honor, I think that -- so there is

9     a conference before Judge Norgle this Friday.  He -- Judge

10    Norgle had originally set a conference for the purpose of

11    ensuring that the parties reached an agreement as to the -- a

12    pretrial date.

13         THE COURT:  (Unintelligible).

14         MR. DeVRIES:  And so it seems that we -- one way we

15    could do is to submit to the Court a -- this agreed-upon

16    schedule.  That should also resolve Friday's conference and

17    render it unnecessary.

18         THE COURT:  No, I would prefer to -- I'll enter the

19    order, and then you folks call his courtroom -- great guy.

20    Tell him you have got a thing (unintelligible) that has been

21    issued on the docket, and (unintelligible).

22         MR. De VRIES:  Yes, your Honor.

23         THE COURT:  Okay.  How -- well, then let's go through

24    the dates.

25         MR. ALPER:  Yeah.

1         THE COURT: And, Jan, you'll take the dates down?

2         MR. ALPER: Yeah.

3         THE COURT: They agreed-on dates.

4         MR. ALPER: So here are the agreed-on dates.

5         THE COURT: With the trial remaining in place.

6         MR. ALPER: Yes.

7         THE COURT: And does he have a schedule for pretrial

8 conferences and so on?

9         MR. ALPER: We have a deadline for the pretrial order,

10 when that's due to --

11         THE COURT: So that's all done.

12         MR. ALPER: And that -- there were not -- this does

13 not move that date.

14         THE COURT: Right. (Unintelligible).

15         MR. ALPER: So this leads up to the date that we

16 submit the pretrial order.

17         THE COURT: So these are dates up to the pretrial

18 order. And the submission then stands, right?

19         MR. ALPER: Yes.

20         THE COURT: Okay.

21         MR. CLOERN: Yes, your Honor.

22         THE COURT: Okay. All right. So what are the dates?

23         MR. ALPER: Okay. So August 13th, 2019, is rebuttal

24 expert -- Hytera's rebuttal expert reports.

25         THE COURT: Okay.

```
 1              MR. ALPER:  August 30th, 2019, are --

 2              THE COURT:  30, yeah.

 3              MR. ALPER:  -- Motorola's reply, expert reports.

 4              THE COURT:  Motorola reply expert reports.  Okay.

 5              MR. ALPER:  August 26th, 2019, is -- Motorola serves

 6  trial exhibit lists and trial deposition designations.

 7              THE COURT:  And trial what?

 8              MR. ALPER:  Deposition designations.

 9              And on that date --

10              THE COURT:  Okay.

11              MR. ALPER:  -- both sides exchange their trial witness

12  lists.

13              THE COURT:  Okay.

14              MR. ALPER:  Then September 4th Hytera serves its trial

15  exhibits and deposition designations.

16              It then provides --

17              THE COURT:  Trial exhibits and?

18              MR. ALPER:  And deposition designations.

19              THE COURT:  Designation?

20              MR. ALPER:  Deposition designations.

21              THE COURT:  Oh, deposition.

22              MR. ALPER:  And then it also serves its objections to

23  Motorola's witness list, exhibit lists.

24              THE COURT:  Hold on.

25              MR. ALPER:  Okay.
```

```
 1              THE COURT:  Motorola list, witness list?

 2              MR. ALPER:  Correct, yes.

 3              THE COURT:  And?

 4              MR. ALPER:  Exhibit list.  So they are going to object

 5    to our witness list.

 6              THE COURT:  And?

 7              MR. ALPER:  Our exhibit list and deposition

 8    designations.

 9         (Discussion off the record.)

10              MR. ALPER:  And Hytera will also provide on that date

11    its counter designations.  So counter designations to our

12    deposition designations.

13              And one more thing on that --

14              THE COURT:  Hold on.  Hold on.

15              MR. ALPER:  Yes.

16              THE COURT:  I'm sorry.  Let me show you.

17              Hytera will provide objections, to what?

18              MR. ALPER:  Objections to exhibit lists or -- I'm

19    sorry.  Motorola's exhibit list, Motorola's deposition

20    designations or -- I'm sorry.  Let me say that better because

21    that's -- Hytera will provide objections to Motorola's exhibit

22    list and deposition designations.

23              Hytera will also provide its counter designations.

24              And then one other thing.

25              MR. CLOERN:  Did we actually do objections to witness
```

1  lists?

2  　　　　MR. ALPER:  No, we're going to do it right then.

3  　　　　THE COURT:  And provide --

4  　　　　MR. ALPER:  Okay.

5  　　　　THE COURT:  After deposition, what comes next?

6  　　　　MR. ALPER:  And then after -- in addition to Hytera

7  providing their counter designations, so they object to witness

8  -- exhibit list and deposition designations.  And then they

9  provide their counter designations.

10  　　　　THE COURT:  Oh, provide counter designations.

11  　　　　MR. ALPER:  Yes.

12  　　　　MR. CLOERN:  Your Honor, by the way, I think it is

13  good to go through all this on the record, but we're happy to

14  submit a chart.

15  　　　　THE COURT:  Oh, good.  Would you do that?  That would

16  be --

17  　　　　MR. CLOERN:  Absolutely.  Yeah.

18  　　　　THE COURT:  You can trust us --

19  　　　　MR. ALPER:  We can certainly do that.

20  　　　　THE COURT:  Oh, good.  So let's do this.

21  　　　　MR. CLOERN:  We will get that to you -- I think we can

22  work that out and get that -- email that over to the Court

23  today.

24  　　　　MR. ALPER:  Yeah, for sure.  We already were -- we

25  spent time downstairs.

```
 1            THE COURT:  Wonderful.  That's -- that would be
 2   terrific.
 3            All right.  So I'll just -- I will enter the
 4   appropriate order and say that the scheduling list will follow.
 5   As soon as we get it, call and tell Jan you have actually sent
 6   it so we don't overlook it.
 7            And then I'll quote it in -- or she'll put it in the
 8   other, agreement as to -- part of the record --
 9            MR. CLOERN:  Thank you.
10            THE COURT:  -- in the -- you know.  Thank you very
11   much.
12            What an exciting trial.  It is not going to settle?
13            MR. ALPER:  Not -- no, not right now.  Right now it
14   is --
15            THE COURT:  Can I ask you a question?
16            MR. ALPER:  Certainly.
17            THE COURT:  Assuming you were to win, what is your
18   calculation?  Just -- I'm curious, and I'll tell you why in a
19   minute.
20            Let's go off the record.
21        (Discussion off the record.)
22            THE COURT:  I'm asking the wrong question.  Assuming
23   Hytera were to -- what's -- no.
24            Assuming Motorola wins, what's your calculations?
25   (Unintelligible).  I'm --
```

```
1              MR. ALPER:  So in terms of the damages that --

2              THE COURT:  Yeah.

3              MR. ALPER:  So we now have an expert report on

4   damages.

5              THE COURT:  What does he think?

6              MR. ALPER:  His conclusion is in the multiple hundreds

7   of millions for compensatory damages.

8              THE COURT:  Multiple hundreds of millions?

9              MR. ALPER:  Yes.

10             THE COURT:  How many?

11             MR. ALPER:  It depends on -- you know, there is

12  various different calculations.  But I would say in the $300

13  million range.

14             THE COURT:  There was -- some people came in the other

15  day -- did I tell you this story?

16             MR. ALPER:  And that's the compensatory component.

17  Obviously there is a punitive component.

18             THE COURT:  And what's that?

19             MR. ALPER:  Ummm --

20             THE COURT:  And --

21             MR. ALPER:  So that's not the subject of expert.  You

22  know, that hasn't really been the focus --

23             THE COURT:  What would (unintelligible) the jury --

24             MR. ALPER:  The jury can -- the jury will have that

25  issue, and they can come up with a number that can be
```

1   obviously, as you know, it could be a couple orders in

2   magnitude of over the compensatory damages.

3           THE COURT:  It is a really large case.

4           MR. ALPER:  It is a large number.

5           MR. CLOERN:  Hytera for its part, your Honor,

6   is -- we'd like to have a settlement conference.  Has raised

7   settlement and proposed structure, but we haven't really heard

8   back yet.

9           THE COURT:  Some folks came in the other day.  If I

10  told you this (unintelligible) if I told you this, I'll stop.

11          And the lawyer was from a very large firm.  Not as big

12  as Kirkland, but pretty big.  And she (unintelligible) the

13  pretending.  And I don't remember what the other side

14  (unintelligible).  The plaintiffs were too hard or not.  They

15  might, but I -- I don't know.

16          So they walked out.  And the plaintiffs have -- the

17  defendant had gotten three of the four counts dismissed on

18  motion.  And they couldn't lose the last count.  And it went to

19  trial, and the verdict was for half a billion dollars.  Not

20  (unintelligible) have been, you know, 30 million or so.

21          The day after the verdict, the Judge called them in

22  and tried to resolve their case in light of what the jury

23  (unintelligible).  The defense lawyer was very, very lovely and

24  said, (unintelligible) can't lose in the Court of Appeal.  And

25  then the Judge said something that the defense -- the defense

1   lawyers said, I object.  I resent that you're saying that.

2   (Unintelligible) you're saying that.

3           And the Judge who has a lifetime job said, that is my

4   job.  I (unintelligible) why shouldn't I (unintelligible).

5           And the day after, the new businessman who was in

6   charge of the defendant company settled the case for a lot of

7   -- a lot of money.  So you guys should think about it.  If you

8   can -- I would be flabbergasted if you settled this case.

9           MR. ALPER:  Yeah.  Motorola -- so there is a history

10  of settlement discussions.  Motorola is a mature company.

11  They, you know, are very willing to engage.  And we, as

12  counsel, have had -- we have been talking.  So just -- when you

13  ask will the case settle, right now there is no settlement on

14  the horizon.  But Motorola is open to --

15          THE COURT:  Well, if you go to trial, it would be

16  really interesting to see what happens.

17          Okay.  Well, you will let me know (unintelligible).

18  We'll look for your order and put it on the docket.  And that

19  will be the order for the case.  And then you'll do whatever

20  you're going to do.

21          Okay.  So I probably won't (unintelligible) be back.

22  You won't be back (unintelligible) trial.

23          MR. ALPER:  I would imagine not.

24          MR. CLOERN:  I would not -- yeah, I would imagine we

25  won't be back.

1　　　　　THE COURT:  But thank you for a wonderfully

2　entertaining and educational (unintelligible) sessions.  I'll

3　look forward to seeing it in (unintelligible) reports.

4　　　　　MR. ALPER:  Yeah.  Thank you, your Honor --

5　　　　　MR. CLOERN:  Thank you, your Honor.

6　　　　　MR. ALPER:  -- for your tremendous effort helping us.

7　　　　　THE COURT:  Well, I just listened to what you all have

8　to say.

9　　　　　All right.  Thank you.

10　　　　　MR. CLOERN:  Thank you, your Honor.

11　　　　　MR. ALPER:  Thank you, your Honor.

12　　　　(Which concluded the proceedings.)

13　　　　　　　　　　CERTIFICATE

14　　　　　I certify that the foregoing is a correct transcript

15　from the digital recording of proceedings in the above-entitled

16　matter to the best of my ability, given the limitation of using

17　a digital-recording system.

18

19

20　*/s/Pamela S. Warren*　　　　　　　July 17, 2019
　　Official Court Reporter　　　　　　　　　Date
21　United States District Court
　　Northern District of Illinois
22　Eastern Division

23

24

25