15

1  IN THE UNITED STATES DISTRICT COURT
   NORTHERN DISTRICT OF ILLINOIS
2  EASTERN DIVISION

3  MOTOROLA SOLUTIONS, INC., and MOTOROLA    ) No. 17 CV 1973
   SOLUTIONS MALAYSIA SDN. BHD,              )
4                                            )
                                             )
5        Plaintiffs,                         )
   vs.                                       ) Chicago, Illinois
                                             )
6  HYTERA COMMUNICATIONS CORPORATION, LTD.,  ) November 7, 2019
   HYTERA AMERICA, INC., and HYTERA          )
7  COMMUNICATIONS AMERICA (WEST), INC.,      )
                                             )
8        Defendants.                         ) 10:00 o'clock a.m.

9                      TRIAL - VOLUME 2 A
10                 TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE  CHARLES R. NORGLE, SR.
11                      and a jury

12

13 For the Plaintiffs:    KIRKLAND & ELLIS LLP
                          BY:  Mr. Adam R. Alper
14                             Mr. Brandon Hugh Brown
                          555 California Street
15                        27th Floor
                          San Francisco, California 94104
16                        (415) 439-1400

17                        KIRKLAND & ELLIS LLP
                          BY:  Mr. Michael W. De Vries
18                        333 South Hope Street
                          Los Angeles, California 90071
19                        (213) 680-8400

20

21

22 Court reporter:             BLANCA I. LARA
                          Official Court Reporter
23                        219 South Dearborn Street
                               Room 2342
24                        Chicago, Illinois 60604
                             (312) 435-5895
25                        blanca_lara@ilnd.uscourts.gov

```
 1   Appearances:   (Continued:)

 2
     For the Plaintiffs:      KIRKLAND & ELLIS LLP
 3                            BY: Ms. Megan Margaret New
                              300 North LaSalle Street
 4                            Chicago, Illinois 60654
                              (312) 862-7439
 5
                              KIRKLAND & ELLIS LLP
 6                            BY:  Ms. Leslie M. Schmidt
                              601 Lexington Avenue
 7                            New York, New York 10022
                              (212) 446-4763
 8
     Motorola Corporate Representative:   Mr. Russ Lund
 9

10
     For the Defendants:      STEPTOE & JOHNSON LLP
11                             BY: Mr. Boyd T Cloern
                                   Mr. Michael J. Allan
12                                 Ms. Jessica Ilana Rothschild
                                   Ms. Kassandra Michele Officer
13                            1330 Connecticut Avenue., Nw
                              Washington, DC 20036
14                            (202) 429-6230

15

16
     Hytera Corporate Representative:  Michele Ning
17

18

19

20

21

22

23

24

25
```

17

1          (The following proceedings were had out of the

2          presence of the prospective jurors in open

3          court:)

4          THE CLERK:  All rise.  The Court is in session.

10:00:06    5  Please be seated.

6          THE COURT:  Good morning, counsel.

7          The last juror has just arrived.

8          Mr. Fulbright, have the coffee and doughnuts arrived

9  for he jurors?

10:00:12   10          THE CLERK:  They just arrived.

11          THE COURT:  We will not pause while she has her

12  coffee.

13          Are you ready to proceed?

14          MR. ALPER:  We are.

10:00:18   15          THE COURT:  Are plaintiffs ready?

16          MR. ALPER:  We are ready, Your Honor.

17          THE COURT:  Are the defendants ready?

18          MR. CLOERN:  Your Honor, one small issue.  The

19  transcript from yesterday's proceedings did not record Your

10:00:26   20  Honor's ruling on the motions relating to the opening --

21          THE COURT:  We'll stop right now.  We have a jury

22  ready to go.  You can raise that issue during the break.

23          MR. CLOERN:  Yes, Your Honor.

24          MR. ALPER:  And, Your Honor, one very brief --

10:00:37   25          THE COURT:  No more briefs.  No more briefs.

18

1    Bring in the jury.  During the recess, we'll deal with
2  what you might call "loose ends."
3    MR. CLOERN:  Thank you, Your Honor.
4    (Brief pause.)
5    THE COURT:  The one thing we want to let the jurors
6  know is that, we will make every effort to start on time and
7  that we are concerned about that in terms of the burden it
8  places on jurors.
9    (Brief pause.)
10    THE CLERK:  All rise.
11    (The following proceedings were had in the
12    presence of the jury in open court:)
13    THE CLERK:  The Court is in session.  Please be
14  seated.
15    THE COURT:  Good morning, members of the jury.  This
16  is the opportunity for the parties to make an opening
17  statement.  We will begin with the plaintiff and then it will
18  be followed by the defendant.
19    What the attorneys say in an opening statement is not
20  the evidence.  It is what they expect the evidence to show as
21  the trial progresses.  Not everything they say, obviously, will
22  be received in evidence.  So keep that in mind.  It is not
23  evidence, it is what the attorneys believe you will hear as the
24  trial progresses.
25    The plaintiff may proceed.

10:01:04
10:02:34
10:02:49
10:03:03
10:03:22

1      MR. ALPER:  Thank you, Your Honor.

2      OPENING STATEMENT ON BEHALF OF THE PLAINTIFFS.

3      MR. ALPER:  Good morning, ladies and gentlemen.  My

4  name again is Adam Alper and I represent Motorola in this case.

5  And I wanted to start by thanking you very much for your time

6  and service yesterday and over the course of the remainder of

7  this trial.  We know that you have may things in your lives,

8  and on behalf of myself, my colleagues, and really both sides,

9  we want to say that we greatly appreciate you time and

10  attention over the course of this very important matter.

11      All right.  As His Honor noted yesterday, this case

12  involves Motorola's claims against Hytera for trade secret

13  misappropriation and copyright infringement in connection with

14  Motorola's two-way digital mobile radio technologies.

15      And over the course of my opening statement, I'm going

16  to tell you about Motorola's development of those technologies,

17  but first I'd like to show you something that Hytera said when

18  they first launched their version of the two-way digital mobile

19  radio technologies in 2010, which are the products that are

20  accused and at issue in this case.  I'm going to show you some

21  demonstratives that will come up on the screen as I walk

22  through my presentation.

23          And what we're seeing here is a Hytera brochure --

24          THE COURT:  Counsel, just a minute.

25          Are all of your units working in the jury box?

Opening statement - by Alper

20

(Jurors all answered yes.)

THE COURT:  Okay.  Please procedure.

MR. ALPER:  Yes, Your Honor.

And what we're seeing here is a Hytera product
brochure that it released in 2010 when it launched its version
of the technology at issue, the two-way digital mobile radio
technologies.

And you can see what Hytera said about its radios.  It
called them "innovative."  It called them "leading digital
technologies" and it said they were the most valuable solution
on the market.  But what Hytera didn't say is the technology
that made those Hytera radios work came from Motorola.

And, in fact, in order to make its products, as the
evidence will show, Hytera stole thousands upon thousands of
confidential and proprietary Motorola technical documents and
millions of lines of source code, put it right in their
products, and it is still selling its products with Motorola's
technologies to this very day, and that is why Motorola has
brought this lawsuit, and at the end of this, Motorola will be
asking you to find that that is wrong.

Okay.  Well, let's now start with -- go back to where
the story really starts, and that's with Motorola.  Many of you
know who Motorola is.  Motorola has been around for nearly
100 years.  Headquartered in the Chicago area over that time,
and as some of you are familiar, has been responsible over that

1    period of time for some of the world's most critical

2    technologies used my consumers, businesses, and governments all

3    around the world.

4            And one of the focal points of Motorola's research and

10:07:21    5    development over those years has been in the field of wireless

6    technologies and radios, and that's the type of technology that

7    we're going to be talking about over the course of this trial.

8            And in particular, we're going to be talking about a

9    type of technology that is referred to as a two-way digital

10:07:39    10    mobile radio or digital mobile radio technology, and that's

11    abbreviated as DMR.  You're going to hear that term quite

12    frequently over the course of this trial.  I'm going to refer

13    to DMR radios over the course of the remainder of my opening

14    statement, digital mobile radio.

10:07:55    15            And that is, as some of you know, basically

16    sophisticated walkie-talkies, and that is equipment -- I have

17    one right here, actually -- it's essentially a very

18    sophisticated two-way radio.  You'll be seeing these quite

19    frequently over the course of the trial.  You essentially press

10:08:15    20    the button on the side here, talk into it, and that

21    instantaneously broadcasts your message, whether it's voice or

22    data, to any recipient who is on your network.

23            And as some of you know, this is very important

24    equipment that's used in a very wide variety of settings.

10:08:33    25            And so let me go to my next slide.  Just showing a few

1    of those settings here.  So in some applications these radios

2    are used by police, by fire departments, by emergency services,

3    but it's also widely used in businesses, like construction, in

4    warehousing, all around the world, and security.  Security is a

10:08:57    5    major application for this.  Schools, hotels, theme parks,

6    airlines, basically any place where you need instantaneous

7    communications that are highly reliable without the need to

8    place a cell phone call.

9         And it's Motorola's technologies that have made its

10:09:20    10    two-way DMR, digital mobile radio technologies, the most

11    popular in the world.  And I'm showing you just a few logos

12    from some of the household names who have chosen Motorola to be

13    the radios that they rely on in their businesses all over the

14    world.  And these are, you know, obviously very large

10:09:40    15    companies:  United, General Motors, Disney, Amazon, Ford, and

16    so forth.

17         Now, this is a technology case.  And so let's talk

18    about that a little bit.  And where I want to begin is with

19    this:  There's a lot of technology that's built into every one

10:10:01    20    of these radios.  And so we're going to talk a little bit about

21    that.

22         The technologies in these radios really, at a very

23    high-level, divide up into two categories.  The first is what

24    they refer to as standardized technologies.  And those are

10:10:14    25    technologies that are public and ever can share them.  But most

Opening statement - by Alper

23

1   of the technologies in each of these radios is confidential and

2   proprietary Motorola technology.  And what that means is that

3   Motorola owns it, it's secret to Motorola, and it's the stuff

4   that makes Motorola's radios so special and better than all the

10:10:38   5   other ones on the market because it's Motorola's technology.

6   And, in fact, it's those parts of the technology that are

7   essentially the lifeblood of the company.  And it's those

8   confidential and proprietary technologies that Hytera stole.

9       All right.  I'd like to tell you a little bit about

10:11:04   10   the development process at Motorola for the confidential and

11   proprietary technologies.  And at Motorola, when it comes to

12   development, it all starts with the personnel, and in

13   particular the engineers.  So let me go to my next slide.

14       We're going to bring for you over the course of this

10:11:26   15   trial a number of the engineers who were responsible for

16   developing and overseeing the research and development of

17   Motorola's two-way digital mobile radio products.  And these

18   are the senior-most engineers of the company.  And as you can

19   see from my slide, they've been at Motorola for decades, and

10:11:49   20   that is when they began their work on these technologies really

21   decades ago.

22       And the gentleman on the left, Mr. Russ Lund, you saw

23   him during jury selection yesterday.  He will be back with us

24   after opening statements and he will be our first witness and

10:12:03   25   then he will be followed by these other additional engineers at

Opening statement - by Alper

24

1    Motorola who will explain to you the technologies at issue.

2        All right.  So now we have our engineers.  What

3    happens next in the development process?  Well, after scoping

4    the project in the various different ways that Mr. Lund will

10:12:23    5    explain, Motorola then begins architecting and designing the

6    technology and they do that using what is referred to as a

7    technical specification.  You're going to see a lot of these

8    types of documents over the course of the case, so I want to

9    introduce you to what they are at this point.

10:12:40    10        So I've got one here.  This is an example.  This one

11    is from December 1996.  This has to do with the two-way digital

12    mobile technology.  As I mentioned, Motorola has been

13    developing this technology for a very long time.

14        And there's a couple of things that I want to point

10:13:00    15    out about this.  I'm just showing the cover page, by the way,

16    about this technical specification.  I have a wireless pointer,

17    I'm going to try to use it and see how it works, if it pops up

18    on your screen.

19        So the first thing is the title:  Radio Operating

10:13:15    20    System, or ROS.  That refers to a particular part of the

21    software that goes on each of these radios in order to run

22    certain features, critical features on the radio.  And we'll

23    talk more over the course of the case about that particular

24    technology, but my point for now is that each of these

10:13:36    25    technical specifications regards a particular aspect of the

Opening statement - by Alper

25

1    technology, in this case a piece of the software called ROS.

2    So that's points 1.

3            Point 2 is this, right there, that I've torn out from

4    the cover page of this document, everything in this document

10:13:55    5    and the others that we'll be showing you is Motorola

6    confidential and proprietary information.  It's the information

7    that Motorola owns, that it keeps secret, and is what makes its

8    radios so special.

9            Okay.  Let me show you another example.  So this one

10:14:14    10    is called Darwin.  This is another technical specification.

11    Darwin is an internal Motorola code name, and that refers to a

12    different aspect of the software, is this case the software

13    that allows the user to interact with the device.  It has to do

14    with user interface features.  And, again, it's Motorola

10:14:36    15    confidential and proprietary.

16            And I've now taken a page out of this one.  The prior

17    one was about 128 pages, this one I've torn a page out, and I

18    just wanted to give you a sense for what we'll be seeing inside

19    of these technical specifications.

10:14:53    20            So the engineers, they're sitting down to the drawing

21    board and they're coming up with the technologies, and this is

22    what it looks like.

23            So first you see a figure down at the bottom of this

24    page that I'm showing.  And you can see there's a bunch of

10:15:04    25    boxes.  One of them says XLATE, another says EMT, the one now

Opening statement - by Alper

26

1    to the right of that says UIT, and then so forth.  And each of

2    those refer to -- or reflect different subcomponents of the

3    software from an organizational perspective, and in other

4    places in the document, it explains more about the details of

10:15:27    5    those.

6          And then you see the arrows that are connecting them

7    all up, that's Motorola's engineers' way of coming up with

8    their special way of how the architecture of the system works.

9    So how one piece of the software hooks up and feeds into the

10:15:44    10    next, feeds into the next, and how it all comes together to

11    provide the functionality that it is supposed to.

12          Then we go up to the top here, and we see there's some

13    text, and that's where the engineers are now narrating their

14    architecture for the system.  They're explaining the diagrams,

10:16:05    15    they're explaining the details of what's happening in the

16    boxes, how everything interrelates, so you have everything that

17    you need to know to build this piece of the software that is a

18    critical piece of the overall two-way radio design.

19          Okay.  Now, as you can imagine -- this one, by the

10:16:26    20    way, is 100 pages long, this one particular Darwin

21    specification.  And if we were to go through it, we would see

22    this level of technical detail, page, after page, after page,

23    engineers sitting there creating, line by line by line, diagram

24    by diagram, how just this one aspect of the software is going

10:16:46    25    to work.  As you can imagine, this type of design work doesn't

Opening statement - by Alper

27

1    happen overnight.  So I want to show you a little bit about
2    that.
3         So what I'm showing you here from that Darwin
4    specification is what is referred to as a revision history.
10:17:05    5    And these are typically found in these technical
6    specifications, and usually they're in the front page or two.
7    And what they do is, they track when this aspect of the
8    technology was first created and then when the last final
9    update was to it.
10:17:20    10   And so we can see that right here in this revision
11   history for this one Darwin specification.  The date of the
12   first draft is April 1995.  There are 5 engineers at Motorola
13   who were working on it.  And you can see, it wasn't until over
14   3 years later that Motorola had completed its work on just this
10:17:42    15   one aspect of its two-way DMR radio technology.
16        Now, I've shown you two of these specifications so
17   far, but that's just the tip of the iceberg.  In all, Motorola
18   created over 10,000 of these technical specifications and other
19   technical documents in order to create its two-way digital
10:18:12    20   mobile radio technologies.
21        All right.  So now we have the technical
22   specifications and other architecture and design documents,
23   what happens next?  So now we got to take all that design and
24   architecture and actually get it into the radio so it's
10:18:32    25   working.  And that process involves the writing of computer

Opening statement - by Alper

28

1    code, or as you'll hear, and some of you are likely familiar,
2    called source code.  So let's take a look at that.
3         So I have a little bit of the demonstrative here.
4    Source code engineers at Motorola sit down and they have the
5    technical architecture specs and other documents, and they sit
6    there and they write the source code line by line, the computer
7    code line by line.  There are functions, variables, all these
8    things that they are creating from scratch in order to capture
9    the functionalities that are on paper and putting it into a
10   form that a technology, a radio, can understand and implement.
11        And in all, there were millions and millions of lines
12   of computer code that Motorola had to create that go into these
13   radios and the associated equipment.  And then what happens is
14   that Motorola goes through a process -- the code goes through a
15   process called compilation, you'll hear a little bit about
16   that, that's when the code goes from a human readable form that
17   people are creating into a language that is essentially like
18   1's and 0's that the radio can understand.
19        And I want to point one thing out at this point, it'll
20   come up a little bit later, and that is when the code is
21   compiled, once it's in the radio humans can no longer read it.
22   You can't open up the radio and see what the code is doing.
23   Only the radio understands the functionality, and the only
24   place that you can go if you want to understand the
25   functionality of the code, the details about precisely how it

10:18:53

10:19:14

10:19:33

10:19:52

10:20:09

Opening statement - by Alper

29

1    works is to go back into the databases at Motorola, the

2    confidential databases at Motorola to find the code or to go

3    back and look at those technical specifications and other

4    technical documents.

10:20:27    5    All right.  So now we've got the code on the radio and

6    are we done yet with the design process?  No, actually not even

7    close.  Now Motorola goes through an extensive testing process

8    to make sure that what is designed works the way it should in

9    all of those different environments, whether it's urgent

10:20:48    10   communications, or otherwise.

11   And so Motorola in order to do that, creates its own

12   proprietary, again confidential and proprietary performance

13   requirements based on its years of experience developing these

14   radios and using them in the field, and tests, proprietary

10:21:07    15   tests in order to make sure that its radios are meeting all of

16   these different performance requirements.  And its not just a

17   couple, it's a large set and a large set of tests.  And that

18   took years, as you'll hear, as the evidence will show, it took

19   years just to develop that based on Motorola's experience and

10:21:28    20   the hard work of its engineers.

21   So then Motorola goes through a testing process.

22   Sometimes the radios pass, sometimes they don't.  And when they

23   don't, then Motorola has to go back to the drawing board, go

24   back to the design phase, make fixes, then rewrite the code,

10:21:43    25   then debug the code, then put it back on the radio, do another

Opening statement - by Alper

30

1    set of extensive tests, and that process is iterative and

2    iterative until Motorola has a radio that works the way it

3    should and that Motorola feels comfortable selling to its

4    customers, like police, fire, and the biggest companies in the

10:22:05    5    world, airlines, hotels, schools, all of these critical

6    applications where everyone needs the radio to work exactly the

7    way it's supposed to on demand.

8            And as you can imagine, getting there took a lot of

9    time and effort.  The two-way radio technologies that are at

10:22:28    10    issue in this case are the culmination of decades of product

11    development at Motorola, hundreds upon hundreds of Motorola

12    engineers worked on them, as I said before, over 10,000

13    technical specifications and other documents, and millions of

14    lines of source code.

10:22:54    15            Now, you remember that I said that this case is about

16    Motorola's trade secrets, and it's that confidential and

17    proprietary material that are Motorola's trade secrets.

18            And I'm going to show you, for this case we've broken

19    them up into 21 categories, where Motorola's engineers are

10:23:18    20    going to come, when they testify, and they're going to explain

21    those 21 technologies to you and provide you some information

22    about the details, and they're going to explain to you how they

23    make up all of the fundamental proprietary technologies in

24    Motorola's two-way DMR products, and that it is these

10:23:41    25    technologies that took Motorola so long to create, and it's why

1   their products are valuable to their customers.

2       Okay.  Now, when someone spends that much time and

3   effort developing something that valuable, you keep it under

4   lock and key.  And that is exactly what Motorola has done in

10:24:15   5   this case.

6       And you'll remember, I said that development all those

7   starts with the Motorola engineers.  Well, that's where

8   Motorola's efforts to keep its proprietary information, its

9   secrets begins as well.

10:24:28   10      So what I'm going to show you had next is one of the

11  Motorola employment agreements that you'll see in this case.

12  Every employee, and in particular the engineers who join

13  Motorola, has to sign a confidentiality agreement.

14      And this is one of the ones that are going to be at

10:24:45   15  issue in this case.  You can see it right here, the employee

16  agrees, he or she says:

17          "... I understand and agree to the following

18          provisions for the protection of Motorola's

19          property rights..."

10:24:56   20       You can see it down in red:

21          ".. not to use or otherwise disclose to others

22          either during or subsequent to my employment..."

23          either during or after the employment,

24          "... any confidential information of Motorola."

10:25:14   25       And I haven't highlighted it, but that next provision

Opening statement - by Alper

32

1    down below further says:

2         "... upon termination of my employment ..."

3         In other words, when an employee leaves Motorola,

4    they have an obligation to promptly deliver any proprietary or

5    confidential information that they have even if they created it

6    at Motorola themselves, they have to give it all back and not

7    take any with them.

8         And that's just one measure that Motorola takes to

9    keep its confidential information confidential.  As you'll see

10   over the course of this case and hear from Motorola witnesses,

11   there are many others, and I've just listed a few examples

12   here.  I first have the confidentiality agreements, but

13   underneath that I put "intrusion, protection, and firewalls,"

14   that's hardware and software that prevents hackers from getting

15   into Motorola's networks to steal Motorola's technology, and

16   there's extensive technology hardware and software that

17   Motorola employees for that.

18        Motorola has security guards at its campuses.

19   Motorola employees are required to wear computer-coded identity

20   badges so they can be tracked when they enter and leave the

21   building.  I've listed employee access control.  So that's a

22   technology that allows Motorola to make sure that its engineers

23   only have access to the confidential and proprietary

24   information that they have a need to be involved with, that

25   they have a need to know, so that way they can keep extra

1    special protection on this large amount of information that

2    they have been developing for so long.

3              And then lastly, I put security and ethics training.

4              Oops, I went too far.

10:26:57    5              Security and ethics training.  Motorola engages in

6    extensive training of its employees on their way in when they

7    first join, periodic refreshers as they are employees, and then

8    definitely when they're leaving to ensure that they understand

9    their obligations, that they know how to protect Motorola's

10:27:20   10   confidential information in their every day jobs, and when they

11   leave they know they have to give it all back.

12             And all of these measures are to ensure that

13   Motorola's proprietary technologies, which are the lifeblood of

14   Motorola as a company and are what make its products so

10:27:43   15   special, that all of those technologies stay with Motorola.

16   But as the evidence will show, despite all of those measures,

17   Hytera came along and just took it all.

18             And with that, I'd like to transition to the Hytera

19   part of the story.

10:28:08   20             Okay.  Hytera was founded by Mr. Qingzhou Chen in

21   1993.  It's based in Shenzhen, China.  And previously it was

22   actually a Motorola distributor.  It was a sales entity for

23   Motorola's radios.  But when Hytera saw Motorola's digital

24   mobile radio products in early 2000's, it immediately

10:28:33   25   recognized two things:  First, it wanted in on that market, and

Opening statement - by Alper

34

1     second, it wanted to be just like Motorola.

2          And I'm going to start showing you some documents that
3     we believe the evidence will show, and before I do, I want --
4     you may be familiar with how these documents -- we have these
10:28:54   5     documents, it's based on a process in the litigation called
6     discovery where the parties exchange their documents.  Motorola
7     gave our documents and our files to Hytera's counsel, and
8     Hytera gave the documents and their files to Motorola's
9     counsel.  And so I want to show you one of those documents that
10:29:12   10    we obtained in discovery from Hytera's internal files at this
11    point on that issue.

12         So this is a document from Hytera called ID Driven.
13    And in this document you can see at the top, there's a
14    declaration of manager Chen on the DMR product.  Manager Chen,
10:29:33   15    again, that's the CEO and founder of Hytera, and we believe
16    that you'll hear from him in this case.

17         And what does he say when it comes to DMR radios?  He
18    says to the company:  This is a new opportunity for us, it's
19    critical to the future development of Hytera.  And what about
10:29:55   20    when it comes to wanting to be Motorola?  He notes that
21    Motorola has already launched the first generation of DMR
22    products.

23         So what did Mr. Chen and Hytera do?  Well, at first
24    they tried to build their own.  And they actually spent
10:30:16   25    3 years, or thereabouts, attempting to develop their own

Opening statement - by Alper

35

1    two-way digital mobile radio products, but that was a failure.

2    They couldn't even build a prototype that worked the way it

3    should've.  And so Mr. Chen was stuck right there, with still

4    his two things, he wants to get in on the market and they want

10:30:41    5    to be just like Motorola.

6            So what do they do?  Do they say:  Okay, let's go back

7    to the drawing board and make a good-faith effort to try to

8    build our own products?  No, Mr. Chen goes out and hires

9    Motorola employees to come over to Hytera and bring with them

10:31:03    10    Motorola's confidential and proprietary technical documents and

11    computer code.

12           And I'm going to show you the three primary Motorola

13    engineers who came over to Hytera on this slide.  From left to

14    right, Mr. G.S. Kok.  You'll here their names quite frequently

10:31:23    15    over the course of the trial.  In the middle, Mr. Y.T. Kok, and

16    on the right Mr. Sam Chia.

17           And Mr. Chen, he hired them, as CEO at Hytera, to

18    bring over the Motorola confidential and proprietary

19    confidential and promoted them right to the top of Hytera.

10:31:41    20    They became the senior-most executes at Hytera responsible for

21    all product development.

22           And you can see, I put some of their titles down

23    below.  Mr. G.S. Kok was the general manager, that means he was

24    in charge of all product.  Mr. Y.T. Kok was the assistant GM,

10:32:06    25    and then Mr. Sam Chia was the chief product architect.

1          Now, Mr. G.S. Kok was the first that Mr. Chen at

2     Hytera brought over to bring the Motorola confidential

3     information.  And so the question that I'll pose is, what did

4     Mr. Chen do in order to convince Mr. G.S. Kok to do that?

5          And as the evidence will show, the answer is very

6     clear, it was money, and a lot of money.  So let's take a look

7     at a document on that.

8          So we also have internal e-mails that we'll be taking

9     a look at over the course of the trial.  This is an e-mail from

10    Mr. Chen, that's his e-mail address at Hytera, to G.S. Kok, and

11    you can see the subject is offer discussion.  And right down

12    here, you can see Mr. Chen says:

13             "... we're going to give you two years share

14             allocation in which you get 600,000 shares in

15             Hytera ..."

16         600,000 shares in Hytera.  And Mr. Chen says it right

17    there, this is the CEO of the company, is really a great amount

18    of money.  And how much money was it?  Well, we can see from

19    Mr. Chen himself, I put it in red:

20             "... it's so much money that Mr. Kok would not

21             need to worry much after that and just enjoy the

22             comfortable life."

23         So Mr. G.S. Kok joined.  He accepted, and then he

24    came over.  And what did he see when he came over?  Was it that

25    the product was mostly finished and he just had to do a little

Opening statement - by Alper

37

1    bit of advising around the edges?  No, we're going to see and

2    the evidence will show, it's the exact opposite of that.

3        So let's go now to another internal e-mail.  This is

4    now from Mr. G.S. Kok, this is the Hytera e-mail address there

10:34:20  5    and his Chinese name.  And then this now is -- the previous

6    e-mail, by the way, was October 2007, this e-mail now is

7    February 2008.  So now Mr. G.S. Kok is in the door, he's been

8    there for just a little bit, and he's e-mailing Mr. Chen again.

9        And what he first notes right here, he says:

10:34:40  10       "I'm pleased to hear that there's been a team

11          working on this project for the past 3 years."

12        But what have they done in that pass 3 years?  Well,

13    Mr. G.S. Kok, he says it right here, he's, however, surprised

14    to find out that they don't even have a prototype after all

10:34:57  15    that time.

16        And so what does Mr. G.S. Kok do?  Does he say:  All

17    right, well let's roll up our sleeves, gather the Hytera

18    engineers and create a product on our own based on our own

19    would?  Again, it's the exact opposite.  Look at what he says,

10:35:13  20    he says:

21          "... that's not what we need.  The team will

22          need an injection of subject matter experts ..."

23        And where do those experts need to come from?  They

24    need to come from Motorola.

10:35:30  25        So then Mr. Chen goes back and he hires Mr. Y.T. Kok

Opening statement - by Alper

38

1    and he hires Mr. Sam Chia to bring over the Motorola

2    confidential and proprietary information.

3           And how much of Motorola's proprietary and

4    confidential information did those individuals bring over?  Was

10:35:57    5    it 25 technical specifications, 50, 100, and some computer

6    code?  As the evidence will show, they took it all.

7           Over 10,000 confidential Motorola documents and

8    millions of lines of confidential Motorola computer code, that

9    is the information that Motorola took decades to develop with

10:36:32   10    hundreds of engineers, and Hytera took it just like that

11    (snapping fingers).

12           Now, it's okay to switch companies, you'll hear over

13    the course of this case, it's okay to go from Motorola to

14    another company even if it's a competitor, but as the evidence

10:36:56   15    will show, what's not okay is when you do that to take

16    thousands and thousands of confidential technical documents and

17    millions of lines of computer code to bring over to another

18    company to make a competing product.

19           And that's what they did.  So let's talk about the

10:37:17   20    evidence that shows that.  Let's get into that now.  All right.

21    Where I want to start is with Mr. Chia and Mr. Y.T. Kok as they

22    were leaving Motorola, as they were walking out the door.

23           So let me show you this here.  This is what I'm

24    showing you, you'll see this over the course of the case, is

10:37:40   25    referred to say a compass access log.  So this is something

Opening statement - by Alper

39

1       that tracks when the Motorola engineers go in and edit the

2       documents in their database which is called compass, that's

3       where they keep a large amount of the technical specifications

4       and other proprietary technical documents.  They keep the code

10:37:59    5   in a separate secure place, but this is a secured database

6       environment where they keep the technical specifications and

7       documents.

8               And what we can see is that this is Mr. Chia's access

9       log, and what we see here is unbeknownst to Motorola, as Mr.

10:38:18   10   Chia was on his way out, you can see it from the time stamps

11      back in 2008, this is when he was literally on his way over to

12      Hytera, right before he left while he still had access to the

13      compass database, he's taking document after document after

14      document, sometimes 5, 10 more per minute, minute after minute,

10:38:40   15   hour after hour, until he had downloaded thousands of Motorola

16      confidential and proprietary documents, and they also took

17      essentially all the code.

18              Okay.  So that's on their way out of Motorola, now

19      they have the stuff, now what about once they join Hytera?  Did

10:39:04   20   the Hytera engineers say:  You know what, we've got this under

21      control, we are almost done with our product and we just need a

22      little bit of help to finish it.  Again, as the evidence will

23      show, it is the exact opposite, and I want to show you an

24      example of an e-mail about that now.

10:39:21   25          So this is an internal Hytera e-mail, and it's from,

Opening statement - by Alper

40

1   up here, a Hytera engineer, and it's on June 23rd, 2008, and

2   that it's to Mr. Sam Chia up here (indicating), and this

3   June 23rd, 2008, that's when Mr. Chia first came in the door at

4   Hytera.  And you can see, the Hytera's engineers copying a

10:39:53   5   large number of other senior Hytera engineers on this.

6          And you can see, I've highlighted the subject line,

7   it's "some important technical questions about DMR protocol

8   stack," exclamation point, exclamation point, exclamation

9   point.

10:40:08   10          And I'm going to get back to the technical questions

11   in just a minute, but let's take a look at the text in the

12   first couple of paragraphs first.  This is a very important

13   e-mail, we call it the welcome e-mail, and I'll show you why

14   right here.  He says, the Hytera engineer says:

10:40:24   15          "... dear Sam, first we welcome your arrival

16          warmly.  We always hope that an expert of DMR

17          protocol can come to help us."

18          And what does he do?  Does he say we only need a

19   little bit of help?  No, let's take a look, now down that

10:40:42   20   second paragraph:

21          "... our group has been engaged in protocol

22          development for a period of time and met many

23          problems which troubled us for a long time.  So

24          if you can help us solve these problems, we will

10:40:55   25          feel very happy and excited."

Opening statement - by Alper

41

1        And then I told you we were going to get back to

2    those technical questions.  The Hytera engineer goes on, I've

3    underlined it in red underline to represent to Mr. Chia what

4    the main questions are.  Again, remember, Mr. Chia, who's

10:41:16    5    coming in the door with thousands of confidential Motorola

6    documents, and what are those main questions?  You can see it

7    right down below:  How did Motorola do it, how did Motorola do

8    it, how did Motorola do it, how did Motorola do it, question

9    after question, on and on.

10:41:35   10        And as the evidence is going to show, he wasn't just

11    asking about how Motorola did anything.  He was asking Mr. Chia

12    for the proprietary and confidential details about how Motorola

13    implemented this technology so that they could make a product

14    just like Motorola.

10:41:53   15        Okay.  So what did Mr. Chia do in response?  Did he

16    say:  Hold on a second, I signed a confidentiality agreement at

17    Motorola, I have an obligation to not share Motorola's

18    confidential information?  Not at all.  Mr. Chia started

19    distributing the Motorola documents, distributing the Motorola

10:42:19   20    code, and answering every question that the Hytera engineers

21    had about how Motorola implemented its proprietary two-way

22    digital mobile radio technologies.

23        And we're going to see some of that, but before I show

24    you some of that, I want to show you something else that

10:42:39   25    relates to this very e-mail here.  So if we go to the very next

Opening statement - by Alper

42

1  slide.

2  This is an e-mail now.  So this is the same e-mail,

3  but now Mr. Chia has forwarded on the same day -- remember this

4  is June 23rd, 2008 -- he's forwarded it to Mr. Y.T. Kok, that's

10:42:58  5  Mr. Y.T. Kok's Chinese name, that is his Hytera e-mail address.

6  And I'll just skip forward just because I'm throwing a lot of

7  information at you.  Y.T. Kok, he's the gentleman in the middle

8  on this slide back here who came over from Motorola and took

9  over as the assistant head of all product at Hytera.

10:43:17  10  Okay.  So I'm back on this e-mail.  And so Mr. Chia,

11  he's forwarding this e-mail to Mr. Y.T. Kok, and he says please

12  focus on a number of questions, 2, 3, 4, 5 and 7.  Now, here's

13  the thing about this:  At this time, in June 2008, Mr. Y.T. Kok

14  was a Hytera employee, but he was also still a Motorola

10:43:41  15  employee.  So he still had access to the Motorola confidential

16  database and computer code, but he was also a Hytera employee,

17  completely unbeknownst to Motorola.

18  So what Mr. Chia was actually saying was, Mr. Y.T.

19  Kok, please go get the documents out of Motorola's database

10:44:08  20  that relate to these questions so I can hand them off to the

21  Hytera engineers.

22  And how do we know that?  Well, I'll show you what we

23  found out over the course of this case.  Here, so this is

24  Mr. Y.T. Kok, this is a graph depicting Mr. Y.T. Kok's accesses

10:44:32  25  to the compass, the Motorola confidential database, and you can

Opening statement - by Alper

43

1    see, I've circled the dates, these are the dates down across

2    the bottom, and this access, the up and down access, the number

3    of documents on a given day that Mr. Y.T. Kok downloaded.  You

4    can see on June 23rd, that's the date that Mr. Y.T. Kok

10:44:54    5    received the e-mail from Mr. Chia, to please focus on these

6    questions.  And then days proceeding that, Mr. Y.T. Kok, he

7    wasn't doing any downloads, he wasn't accessing any documents,

8    but as soon as that e-mail came in, while unbeknownst to

9    Motorola, he's a Hytera engineer but also still a Motorola

10:45:11    10    employee, he started downloading the documents, the

11    confidential technical specifications to answer Hytera's

12    questions.

13            And as you can see, on that first day he took 50, two

14    days later he grabbed 83, next day 42, next day 58, next day

10:45:29    15    12, and on and on and on.  And he's handing those off to Mr.

16    Chia to give to the Hytera engineers so that they can make

17    their product just like Motorola's, and actually have a

18    product, for that matter, as the evidence will show.

19            And what did Mr. Y.T. Kok do?  Did he say:  Hold on,

10:45:51    20    this is wrong, I'm still an employee of Motorola, I actually am

21    still here, I have contractual obligations to my company?

22    Absolutely not.  He just kept on downloading the documents and

23    giving them over to the Hytera engineers so they can use them

24    to copy Motorola.

10:46:12    25            Now, how long did this go on for?  Was it just a few

1    days, as I'm showing here, where Mr. Y.T. Kok was acting on the

2    inside at Motorola?  Well, let me show you.  This is Mr. Y.T.

3    Kok's resignation letter from Motorola.  And you can see it.

4    He's deciding, he's saying to Motorola he's decided to resign

10:46:38    5    his current position.  And when was his last day?  October 3rd,

6    2008.  That's over 3 months later.  Mr. Kok, Y.T. Kok, was in

7    Motorola as a Hytera employee for all that time, just grabbing

8    documents, after documents, code, hundreds of critical pieces

9    of material and sending it on over to the Hytera engineers to

10:47:04    10   copy from.

11   Okay.  Now, how do we know that these materials made

12   it over to Hytera?  Well, we know it in a lot of different

13   ways.  This is, again, where we get back to the discovery

14   process.  And the first way is, we found them there.

10:47:23    15   So I'm showing you just three examples of highly

16   confidential, highly proprietary, critical Motorola technical

17   specifications, and we found right in Hytera's engineers' files

18   to this day.  In fact, to this day, we found over 1600

19   technical, critical, technical Motorola confidential

10:47:48    20   proprietary documents and specifications still in Hytera's

21   files.  And it's not just that they had them, but they were

22   using them and putting them into their products.

23   So let me show an example of that.  You're going to

24   see a lot more evidence of this over the course of the trial,

10:48:12    25   but I'm just going to give you some examples to familiarize you

Opening statement - by Alper

45

1  with some of the evidence that you'll be seeing.

2          So here is one example.  What I'm showing here on the

3  left side of the slide is a highly confidential Motorola

4  proprietary technical specification, this one is called

10:48:28  5  Conformance Testing For Radio Hardware Portable and Mobile, and

6  it's from December 2006.  And this has to do with that testing

7  technology that I was telling you about, which you'll hear, as

8  the evidence will show, took Motorola 5 years to create, just

9  that one aspect of the overall picture.

10:48:49  10          And what did Hytera do?  Well, they took this

11  document.  And how did they use it?  Well, they used it

12  essentially verbatim.  So there's the Hytera version, exact

13  same title, Conformance Testing For Radio Hardware Portable and

14  Mobile, and the only difference is?  They put their logo on it

10:49:08  15  and then they updated the date to April 2008.

16          And if we look inside, what we'll see is that Hytera

17  is copying the Motorola technologies down to essentially the

18  letter.  So I'm going to just going to show you one example

19  page from this technical specification.  It's about 49 pages

10:49:29  20  long.

21          You can see on the Motorola's side, I've blown up

22  Section 5.1.2, it's called Transmit 4FSK maximum deviation.  So

23  it sounds very technical.  That is an aspect of the technology,

24  has to do how the wireless signals are sent from one radio to

10:49:48  25  the next.  And this page has to do with how you test a

Opening statement - by Alper

46

1    particular aspect of that, a particular performance requirement

2    to make sure that that is happening in a very granular and

3    detailed way.  And the performance requirements are proprietary

4    to Motorola and the testing procedure is proprietary to

10:50:07    5    Motorola.  And it's right up here in this section up here is

6    where it talks about the performance requirements, and then

7    right below it the testing procedure, and then it shows a graph

8    of what the test ends up looking like when you use the

9    instrumentation, the proper instrumentation.

10:50:21    10    And as you can see on the right side, the Hytera

11    version, it's just copied verbatim:  Section 5.1.2, Transmit

12    4FSK, line by line, word by word, letter by letter, they were

13    using the exact technology that came from Motorola.

14    And what about the confidential and proprietary logos

10:50:43    15    that I showed you that are on the Motorola documents, what

16    about those?  Well, Hytera had an enhance for that, too.

17    We'll go to my next slide here.  Can you see it.  I've

18    got the Motorola confidential proprietary logo from this

19    documentary on the left.  What did Hytera do?  They took the

10:51:06    20    name "Motorola" out, they put their name, "Hytera" in, and

21    said:  This is ours now.  But it wasn't theirs, as the evidence

22    will show, it came from Motorola.

23    Okay.  Let me show you another example.  This is

24    another aspect of the technology.  This has to do with some of

10:51:30    25    the software architecture.  And, again, you can see the date,

Opening statement - by Alper

47

1    it's from June 2003, and it's, again, Motorola confidential and

2    proprietary information, Motorola's secrets kept confidential

3    in the company.  And so how did Hytera use this?  Again, the

4    same thing, essentially verbatim.

10:51:51    5    So I'm showing on the left a page from the Motorola

6    document.  You've got a figure up top and some text at the

7    bottom, and it's all just copied over wholesale by Hytera.

8    They're going to use the exact same architecture that it took

9    Motorola years and years, all of these details, page after page

10:52:08    10    after page to create.

11    And, in fact, there are really two primary differences

12    that I'll point out to you.  First one you can see on the left,

13    that Motorola logo down below the figure, well they took that

14    out.  And the other one is, Motorola -- I've highlighted it in

10:52:26    15    yellow -- Motorola calls this aspect of it's software EMT,

16    you'll hear a little bit about that from Motorola's engineers.

17    Hytera renamed it RAF, RAF Core.

18    But look at this on the left, you can see it says:

19    "...EMT's main functions are ..."

10:52:46    20    and then it lists out the main functions, the precise

21    confidential details of what Motorola's products are doing,

22    then that continues on page after page.  And when we look a the

23    Hytera's side, they changed the letters "EMT" to "RAF," but

24    they kept all the functionality, all the stuff that really

10:53:07    25    matters that Motorola developed for so long, page after page,

Opening statement - by Alper

48

1    diagram after diagram.

2        So what we will hear Hytera say about this?  Well, one

3    thing they may say is:  Okay, so we had the Motorola

4    confidential documents, but, you know what, they weren't that

10:53:27    5    important.  This was small parts of the technology,

6    insignificant parts of the technology, and it really didn't

7    matter.

8        But here's where you're going to need to go back to

9    what they said before this case was filed, before the

10:53:44   10    litigation, before they were sued, and look at what they're

11    saying in their private e-mails back at the time they were

12    actually using this.  So let's take a look at one of those we

13    obtained during the discovery process.

14        So this one is from Mr. Y.T. Kok, that is, again,

10:53:59   15    Hytera e-mail address, now it's November 2008.  So he's now a

16    senior executive at Hytera in engineering.  And he's sending

17    this e-mail to a number of key Hytera engineers, and he's

18    attaching a document called RAF Concept PDF that he's

19    attaching, and that document is the one that I just showed you

10:54:23   20    that has the Motorola confidential and proprietary information

21    in it.

22        And what did Mr. Y.T. Kok tell his engineers?  Did he

23    say:  You know what, you can just ignore this document, it's

24    not that important, let's focus on the stuff that we are

10:54:42   25    creating.

Opening statement - by Alper

49

1    It's the exact opposite.  You can see it right below
2    the attachment, he says, Mr. Y.T. Kok says:
3        " ... please study this document before you
4        even start developing the technology ... "
10:54:57    5    And that's because, as the evidence will show, the
6    Motorola technology was critical, it was fundamental, and
7    Hytera could not build a product without it, that's where you
8    start with the Motorola technology.
9        Okay.  What else might we hear Hytera say?  Well,
10:55:17    10    another thing that we believe that we'll hear them say is:
11    Fine, we had the Motorola confidential information in our
12    files, we're using it, but we didn't know it came from
13    Motorola, we had no idea.
14        But once again, this is where we have to go back to
10:55:37    15    what they said before they were sued, before the litigation,
16    and look at what they're saying in their internal
17    communications at the time that they were developing the
18    products.  So let me show you one of those.
19        So this is an e-mail.  Its between 11 Hytera
10:55:56    20    engineers, and what are they talking about?  They're talking
21    about, right here, a technology called NEO.  Now, NEO is an
22    internal Motorola code name for a critical aspect of the
23    two-way DMR products that has to do with some of the software
24    in the handsets.  And that's what this attachment is, it
10:56:18    25    contains the Motorola confidential and proprietary information

Opening statement - by Alper

50

1    concerning its NEO technology, which is central.

2          And what are the Hytera engineers saying to do with

3    this?  They're saying:  Go look in it, go take a look -- you

4    can see it right here -- they're saying "see section

10:56:36    5    Section 5.3.2 and Section 5.3.3."  And why should you go look

6    in it to all the Hytera engineers?  To figure out how did

7    Motorola do it, how did Motorola do the details of the

8    technology.

9          And how do we know that these engineers knew that this

10:56:58    10    technology came from Motorola?  Well, all you have to do is

11    click open that attachment and you can see it for yourself.

12    That is what happens when we open that attachment, it's a

13    Motorola document, with a Motorola logo, it's about the NEO

14    technology, and on the front page, in black and white, it says

10:57:22    15    this is Motorola's proprietary information which shall not be

16    used in whole or even in part without Motorola's consent.

17    Right there on the front page, that is what it says when you

18    click on that document that 11 Hytera engineers internally were

19    all studying.

10:57:43    20          And there will be a number of things that we'll be

21    talking about over the course the case, but one thing that will

22    not be in dispute is that Motorola never gave its consent of

23    any kind to Hytera to take its confidential and proprietary

24    information or use it in its products.

10:58:06    25          And you're going to see a lot of evidence like this

Opening statement - by Alper

51

1    over the course of the trial.  This is really just the tip of

2    the iceberg, but one thing that you'll never see is a single

3    Hytera engineer, not the 11 on the e-mail that I just showed

4    you, or any others say:  Hold on a second, this is Motorola's

10:58:27    5    property, these are Motorola's secrets, we shouldn't be using

6    these.  Because as the evidence will show, Hytera knew they

7    took them, they knew they were using them, in fact they

8    intended to use them because they needed it to make a two-way

9    digital mobile radio product, and they put it in their products

10:58:49    10    and they're still selling Motorola's technologies to this very

11    day.

12            Okay.  Let me show you one other example here.  So

13    this is an e-mail from Mr. Jue Liang.  He is a Hytera engineer.

14    And back in November 2008, he's sending an e-mail, this is

10:59:14    15    Mr. Chia's Chinese name at his Hytera e-mail address.  So he's

16    e-mailing Mr. Chia, again he's one of now the senior executives

17    at Hytera at this point that came from Motorola.

18            And what Mr. Liang did is, he cut and pasted into the

19    e-mail, electronically, a portion from a highly confidential

10:59:30    20    and proprietary Motorola document.  And you'll remember, when

21    we looked at the testing document I highlighted Section 5.1.2,

22    transmit for FSK, remember that section?  So what Mr. Liang has

23    done, he's responsible at Hytera for building this aspect of

24    the technology, and what he's done is he's got the Motorola

10:59:52    25    confidential document, and he goes in, he has a question about

Opening statement - by Alper

52

1    it.  He needs to ask Mr. Chia a question about something how it

2    works.  So he goes in and he cuts and pastes from that document

3    into an e-mail right here, and he sends that to Mr. Chia with a

4    question.

11:00:09    5        And you remember, we were talking a moment ago about

6    how Hytera is going to say that they never knew that the

7    information came from Motorola.  Well, how Mr. Liang know that

8    this information came from Motorola?  You can see it right

9    below the cut and paste, he says, he says he knew it came from

11:00:24   10    Motorola.  He says:

11        "...Sam, I saw this in the document entitled

12        Moto DMR conformance testing of radio hardware."

13        You may be familiar with the process called a

14    deposition.  A deposition in a case like this is when the

11:00:49   15    parties get to ask questions of each other's witnesses, and

16    they're under oath, and they give testimony and that's recorded

17    in a transcript.  And in this case, there were videos that were

18    made.

19        And we had a chance to talk to Mr. Liang about this in

11:01:04   20    a deposition, and we asked him:

21        "... is it correct that you had in your

22        possession a Motorola document entitled Moto DMR

23        conformance testing of radio hardware?"

24        And we figured this would be kind of a no-brainer,

11:01:22   25    because he said he had it.  What was his answer?  Was his

1    answer "yes"?  His answer was "no."  But how could that be true

2    when in his e-mail he said he had the document entitled

3    Motorola conformance testing, he says it right there:

4              "... I saw this in a document entitled Moto DMR

5              conformance testing of radio hardware."

6              And of course he had the document because he was

7    cutting and pasting from it, you can see it.  But he answered

8    "no."

9              And you're going to hear a number of witnesses for

10   Hytera take the stand and they're going to say that they never

11   knew, had no idea, that what they were working with was

12   mortgage confidential information.  And when you hear that

13   testimony, what you should focus on is the evidence, the actual

14   evidence like this, think about this, what they were saying at

15   the time not after they were sued.

16             Okay.  We've been talking about technical documents.

17   What about the computer code?  Well, you'll remember earlier

18   how we've been talking about how Hytera was struggling to

19   develop a product on its own.  Same thing applies to the

20   software, the computer code.  So here is an example.

21             This is a document, a Hytera document from their

22   internal files.  This is describing the state of Hytera's

23   software before they put the Motorola software into it, the

24   Motorola code into their products.  So this is what they have

25   done on their own.  And you can see, they call it -- this is

1    entitled Today's Problems and they're referring to something

2    called "Monolithic spaghetti SW" that stands for spaghetti

3    software.  And you're going to hear from engineers as to what

4    spaghetti software means, but for right now I'll tell you, it's

5    not good.

6              And we can see that if we look at the bullet points,

7    right below on the slide.  You can see what Hytera is saying

8    about its own software before they took the Motorola

9    confidential computer code.  They say it's increasingly

10   difficult to change.  They say it costs more, takes longer.

11   They say, this last bullet, hard to control quality with the

12   software.  Hard to find the defects, hard to solve the defects.

13   And this last one is really a kicker:  Even when you fix it,

14   that introduces new problems.  And you know what that is when

15   it comes to software?  That is a mess, and that is what

16   spaghetti software is, it's a mess.

17             And so what did Hytera do?  Did they say:  All right,

18   let's go back to the drawing board and take another stab at it

19   and create our own software architecture and our own computer

20   code?  The answer is, no, it was the opposite.  They took

21   millions of lines of code and put hundreds and hundreds of

22   thousands of lines of code verbatim from Motorola into their

23   products.

24             And you can see an example of this here.  So I'm

25   showing -- we're going to see some of this over the course of

Opening statement - by Alper

55

1    the trial.  You can't really see too much of it on the screen,

2    but on the left, this is a page, this is a single page of

3    computer code, source code.  You'll hear that name quite a bit

4    over the course of the trial.  This is the source code that the

5    Motorola engineers type up, line by line, they create their own

6    functions, they create their own variables, they create

7    everything from scratch, essentially, using computer language,

8    and that defines the functionalities in a way that once it's

9    compiled to 1's and 0's, the radios can understand to speak

10   their language.

11           And what do we see when we go over to the Hytera side?

12   They just copied it, line for line, line for line, function for

13   function, variable for variable.

14           And, in fact, you'll see I highlighted this word

15   "primitive" here.  So you're going to hear from an engineer, a

16   Motorola engineer.  Senior engineer, been there at Motorola for

17   26 years.  Was one of the original people working on the

18   technologies for this product.  And one of the technologies he

19   was responsible for is how you get when someone speaks into the

20   radio, how that's converted to the radio waves and then how it

21   gets converted back to voice when it comes back into the radio.

22   He's going to tell you a little bit about that technology.  And

23   he was responsible for the code to which this relates, and so

24   his name is Mr. Corretjer.  And he's going to tell you how this

25   word "primitive" was actually supposed to be the word

1    "primitive" but "tive" in that it's misspelled, it's got a

2    typo.  And he'll tell you that the typo doesn't have any effect

3    on the functionality of the radios.  It works just fine.  It

4    doesn't have any impact on how it works, but they just never

11:06:38   5    caught it at Motorola.  They never saw that and fixed it.  And

6    what we're going to see when it comes to Hytera is, they just

7    grabbed it all right down to even the typos.

8         So we had an opportunity to ask Mr. Y.T. Kok about

9    this.  And what did he say?  Well, on this, he just admitted

11:07:10   10   it.  We asked him this question:

11        "... when you created the Hytera source code,

12        were you referring to a copy of Motorola's code

13        that you had in your possession?"

14        He answered "yes."  So he's sitting there, making the

11:07:26   15   Hytera stuff, got the Motorola stuff, just putting it in.

16        So what's Hytera's answer to this?  Once again, we'll

17   likely hear them say they never knew that the code came from

18   Motorola, but that's, once again, where we have to go back

19   before they were sued, before they were in court, and see what

11:07:53   20   they said in their private internal communications back when

21   they were doing this.  And I'll show you an example.

22        So this is an e-mail from one Hytera engineer to

23   another, back in 2009, and you can see, Ms. Huang is attaching

24   two attachments, both of which have confidential Motorola code

11:08:22   25   and she's saying "please use these," essentially.  And how do

1    we know that the Hytera engineers knew that this was Motorola

2    code?  Again, all we have to do is click on one of those

3    attachments and you can see it, it says it came from Motorola.

4    This is the top of the file, the very top of the file before

11:08:42    5    you get into all those lines of computer code, it says it right

6    there, and you should think about that evidence when you hear

7    Hytera testify.

8           Okay.  So what did the Hytera engineers have to say

9    about this when we had a chance to talk to them in the course

11:09:08    10   of discovery?  Well, we had a chance to talk with the engineers

11   who were the senior-most executives in charge of product to

12   come from Motorola about these, these issues.  And what did

13   they say in response?  They pled the Fifth Amendment.

14          So let's look at this.  So this is Mr. Sam Chia.  He's

11:09:36    15   one of those individuals that I introduced to you a little bit

16   ago.  And we asked him:

17               Question:  Isn't it correct that in the months

18               leading up to your departure from Motorola you

19               downloaded documents having Motorola

11:09:51    20               confidential information to take with you to

21               Hytera?"

22           His counsel interjects with an instruction on Fifth

23   Amendment, and then Mr. Chia follows that instruction and

24   refuses to answer.

11:10:01    25          And as the evidence is going to show, what that means

Opening statement - by Alper

58

1    is Mr. Chia is saying:  I'm refusing to answer your question

2    because if I did, it could show I committed a crime.  And they

3    did it over and over and over in response to our questions.

4          So I'll show you an example.  These are just examples.

11:10:27   5    Mr. G.S. Kok, down at the bottom:

6          "Question:  When you joined Hytera, did you

7          bring with you any documents regarding

8          Motorola's products?"

9          "Answer:  I'm taking the Fifth.  I'm refusing to

11:10:42  10          answer your question."

11          If you go to the next slide, this is now Mr.

12          Y.T. Kok:

13          "Question:  Are there aspects of Hytera's DMR

14          products that were built using Motorola's

11:10:55  15          confidential information, to your knowledge?"

16          "Answer:  I'm taking the Fifth.  I'm refusing to

17          answer your question."

18          Mr. Chia again:

19          "Question:  Do you have any explanation

11:11:08  20          whatsoever for the massive amount of Motorola

21          confidential information that you took before

22          you left for Hytera?"

23          "Answer:  I'm taking the Fifth.  I'm refusing to

24          answer your question."

11:11:22  25          And the evidence is going to show more of that.

Opening statement - by Alper

59

1    We're going to be able to show you videos from these
2    depositions.
3           Okay.  So what about Mr. Chen, the CEO and founder of
4    Hytera, what did he have to say about all this?  So we had a
5    chance to talk with him in a deposition about two years after
6    the litigation was filed earlier this year.  And at that point
7    in time, through the discovery process, we've already found
8    Motorola highly confidential critical proprietary documents in
9    their files, in the Hytera files, we already found the hundreds
10   of thousands of lines of computer code in their products, and
11   so what did Mr. Chen have to say?  Did he say -- he's the CEO
12   of the company, the buck stops with him.  Did he say:  Okay,
13   this isn't -- this is wrong, I'm going to make it right, and
14   I'm going to stop selling the products with the Motorola
15   technologies in them?  No, it was the opposite.  After two
16   years, after we found all that stuff in their files, he simply
17   pled ignorance.
18          So let's look at that, that's Mr. Chen.  We asked him:
19          "Question:  Hytera's employees have used
20          information that Motorola considers to be
21          confidential in developing Hytera's products,
22          correct?"
23          And this is after we found it in their files.
24          His answer, as CEO of Hytera:
25          "Answer:  I do not know."

11:11:51

11:12:13

11:12:33

11:12:57

11:13:10

1       "Question:  Hytera has used Motorola's source

2       code in its product, correct?

3        Answer from Mr. Chen:

4        "... I do not know."

11:13:24    5       "Question:  Hytera's engineers copied Motorola's

6       source code into Hytera's products?"

7        Mr. Chen's answer:

8        "I do not know."

9        And that's what he said when we asked him those

11:13:39   10   questions, but here's where we got to go back and look at the

11   private internal conversations that Mr. Chen is having with his

12   engineers before this.  So let's take a look at that.

13       So this is an e-mail from Mr. Sam Chia, that is again

14   his Chinese name, Hytera e-mail address, to Mr. Chen, that's

11:14:05   15   Mr. Chen's e-mail, and it's in May 2017, that's about a month

16   after Motorola brought this lawsuit for trade secret theft.

17   And what are Mr. Chen and Mr. Chia saying?  Are they saying:

18   We don't know what any of this is about, we have no idea what

19   Motorola is talking about?

11:14:30   20       No, they knew exactly what Motorola was talking about,

21   and they knew that those acts, because of those acts, there was

22   a risk in going to jail, and that's what Mr. Chen and Mr. Chia

23   were talking about then.  And we know there was that risk,

24   because as the evidence will show, Hytera stole Motorola's

11:15:03   25   trade secrets and they all knew it.

Opening statement - by Alper

61

1      And then two years later, Mr. Chen sat in a

2      deposition, under oath, and he looked me in the eye and he

3      says:  I don't know if we took anything from Motorola.

4      You're going to hear a little bit over the course of

5      this case about corporate responsibility and corporations doing

6      the right thing and corporations doing the wrong thing.  And as

7      the evidence will show, the right thing to do when your

8      company's products have someone else's technologies in them,

9      proprietary technologies in them, is to stop selling them, but

10     that's not what Hytera did here.  They just kept on selling

11     them, kept on selling them to this very day.

12     And as the evidence will show, we know why, and the

13     answer is very simple, it's money, and a lot of money.  A lot

14     of money that Hytera makes every day that they are permitted to

15     continue selling products with Motorola's technology in them

16     that were created based on the hard work of Motorola's

17     engineers that it took Motorola years to create.

18     Okay.  Just a couple of additional things.  Getting

19     close.  Thank you very much for your patience so far.

20     We're going to hear a number of arguments that Hytera

21     is going to make.  I want to touch on a couple of them.  The

22     first argument that we'll hear from Hytera, or at least the

23     first one that I'll address, is Hytera's argument that Motorola

24     took too long --

25     THE COURT:  Counsel, I don't think you should

11:15:33

11:15:56

11:16:22

11:16:48

11:17:03

Opening statement - by Alper

62

1    speculate in terms of what Hytera intends to present at this

2    trial.  You may continue, however, with your informative

3    opening statement.

4            MR. ALPER:  Yes, Your Honor.

11:17:15    5            An issue may arise about how long it took Motorola to

6    bring this lawsuit, and that's something that is referred to as

7    statute of limitations.  And there's a couple of facts that the

8    evidence will show that I want to present to you on that issue.

9            The first is this, until shortly before Motorola

11:17:43    10   brought this lawsuit, it never knew that Hytera had stolen this

11   stuff.  It was all kept away from Motorola.  And the reason for

12   that is, as the evidence will show, that Hytera dutifully

13   concealed its theft for years right down to a technical

14   evidence.  So I want to show you some of the evidence that

11:18:11    15   you'll see about that.

16           So the first thing here, so this is another Hytera

17   internal document.  And this is the Hytera engineers at the

18   very outset, when they're first putting the Motorola

19   technologies into their products back in 2008, they say that --

11:18:30    20   they note that this will result in using a lot of Moto code,

21   Motorola's code, and it's a concern because they're worried

22   that Motorola might be able to see it.

23           So what do they do?  This is where the concealment

24   issue comes in.  You can see it right in their e-mails, I'm

11:18:47    25   showing you one example, we'll see more.  This is from G.S.

Opening statement - by Alper

63

1    Kok, and it's right in June of 2008, and he's e-mailing a

2    number of Hytera engineers in addition to Mr. Chia, and you can

3    see what he says.  He says that it's important -- the important

4    thing here is to protect the company from impending lawsuits.

11:19:12    5    And what he's referring to are lawsuits like this one, for

6    stealing Motorola's trade secrets -- or, actually, he's

7    referring to exactly this lawsuit, that Motorola would sue for

8    stealing trade secrets.

9         And so how does G.S. Kok propose they do that?  Does

11:19:28    10   he say:  Let's build our own software so we can steer clear of

11   any legal issues?  No; you can see it right down there at the

12   bottom, his plan is to rewrite the Motorola software to look

13   different from Motorola.  To take the Motorola software, change

14   it cosmetically and internally so that it doesn't look like

11:19:53    15   Motorola so Motorola could never figure it out.  And it

16   actually worked, as the evidence is going to show.  It actually

17   worked.

18        So in 2012, Motorola assembled a team of its top

19   engineers to take a look at Hytera's products.  And they spent

11:20:17    20   months investigating whether Hytera had stolen Motorola's

21   proprietary technologies and computer code.  And because Hytera

22   had hidden it so well, at the end of that process Motorola was

23   unable to conclude after exercising extreme diligence, months

24   and months of technical work with its top people, Motorola was

11:20:48    25   unable to conclude that Hytera had taken it's confidential and

Opening statement - by Alper

64

1    proprietary information.

2         And it wasn't until we got into this case, it wasn't

3    until we got into the discovery process, that Motorola found

4    out how much of its source code, how much of its computer code

11:21:07    5    had been taken by Hytera and put right into its products.

6         And one thing, last thing I'll note on this particular

7    issue is, you may see some documents, they may show you

8    documents about this process that Motorola undertook from the

9    2008, 2009, 2010, maybe even 2011 timeframe, and they may say

11:21:31    10    that this means that Motorola failed to act.  But that's what I

11    want you to think about this process in 2012, Motorola did act.

12    And because Hytera had concealed its theft, very much

13    intentionally, Motorola wasn't able to make a conclusion that

14    Hytera had stollen it at that point.

11:21:53    15         Okay.  Another issue that we may hear about is whether

16    Hytera -- oh, wait, I'm sorry.  I'm sorry, I have one other

17    thing.  What I showed you here is one example of Hytera's

18    concealment, I'll show you another right now.

19         So this is a document log that shows the files kind of

11:22:18    20    directory system from a laptop of one of Hytera's engineers,

21    and this is an example.  And this document log was

22    reconstructed by forensic specialists to gather what was

23    previously on this laptop that is the evidence will show Hytera

24    deleted the contents of.  So Hytera deleted the contents of

11:22:44    25    this laptop and then were able -- folks were able to

Opening statement - by Alper

65

1    reconstitute what was on it.

2            And what we're going to see when we take a look at

3    this, is you can see all of these documents on the left side --

4    just showing a sample here -- are Motorola highly confidential

11:23:01    5    and proprietary documents.  And what did the engineer that was

6    responsible for this particular laptop do, a Hytera engineer?

7    She was dumping them in the recycle bin.  She's trashing them

8    on her computer.  She's trying to -- they used them and then

9    they're trying to clean up the evidence, make it go away, but

11:23:21   10    through the discovery process, we found out about it.  You are

11    going to see a lot of evidence like that over the course of

12    this trial, covering it up.

13            Okay.  So the other issue that I was going to mention

14    has to do with whether Hytera independently developed their own

11:23:41   15    DMR technology and whether they had a working technology before

16    the Motorola technology came in the door.

17            And this is where you have to, once again, go back and

18    look at what they were saying before the litigation.  Because

19    although the witnesses from Hytera may say that they had a

11:24:02   20    working prototype at the time that the Motorola technologies

21    came in the door, you got to go back and look at what the

22    evidence shows.  It says, back in the day, the internal Hytera

23    e-mails, where they say they didn't have a prototype radio

24    after 3 years of development.

11:24:20   25            And while the Hytera engineers are going to say in

 1    court that -- oops, I'm sorry.

 2            They're going to say in court that they could've done

 3    it all on their own with their own Hytera engineers in-house.

 4    You got to go back to what they were saying at the time, back

 5    in the day when they said that they needed subject-matter

 6    experts.  And where do they need to come from?  They needed it

 7    to come from Motorola.

 8            And the Hytera engineers are going to say that

 9    actually everything was working just great even before the

10    Motorola engineers came and they just needed to just do a

11    little bit of fix-it-up work.  This is when you go back to the

12    internal documents where Hytera engineers are saying:  We've

13    met many problems that have troubled us for a long while and

14    they needed the help from Motorola, they needed the Motorola

15    confidential information.

16            And the Hytera engineers are even going to say that

17    their software worked just fine, it was a perfectly good

18    software architecture.  But again, that's what they'll say in

19    court, we got to go back and look at what they said in their

20    documents back in the day before they were sued and you'll see

21    that their software was a mess, hard-to-control quality,

22    hard-to-find defects, hard to solve the defects, and even when

23    you fix things, new problems arise.

24            And lastly, another issue that we may hear about from

25    Hytera's witnesses is that Motorola should have labeled its

1    documents with the label "trade secret," and as a result,

2    Motorola didn't think it had any trade secrets, that they

3    should've affixed that label to it internally.

4              But as the evidence will show, it's not how you label

5    the documents.  It's the years and years, decades of work, and

6    the hundreds of engineers inside Motorola that went into the

7    development of the proprietary trade secret technology, and

8    it's how Motorola took extensive efforts to keep it all a

9    secret, and that's what makes it a trade secret.

10             Okay.  Almost done.  Just a couple other things.

11   First, I told you about some of the Motorola witnesses that

12   you're going to hear from.  You're going to also hear from

13   expert witnesses from our.  So I want to just briefly introduce

14   you to them.  They're sitting in the galley, but I won't take

15   up time to have them stand up right now.  I'll show you them on

16   the slide.  They're going to be sitting here throughout the

17   course of the trial and then you'll hear them testify.

18             So the first two is Dr. Steve Wicker and Dr. Sundeep

19   Rangan.  They are our technical experts.  They have decades of

20   experience.

21             Actually, Dr. Wicker and Dr. Rangan, if you could

22   stand for a moment.

23             (Standing.)

24             MR. ALPER:  Thank you very much.

25             They have decades of experience in the technologies at

1    issue in this case, wireless technologies, developing them,

2    teaching them, running companies that they started involving

3    them.  And they looked at thousands upon thousands of pieces of

4    evidence in this case and they're going to come and explain to

11:27:46    5    you exactly how the misappropriation and copyright infringement

6    occurred in this case.

7            And then you'll also hear from Mr. James Malackowski.

8    Mr. Malackowski, if you could stand up for a moment.

9            (Standing.)

11:28:02    10           MR. ALPER:  Thank you, sir.

11           He is our damages expert.  He's going to come and help

12    quantify the harm that Hytera's acts have caused to Motorola.

13           Okay.  The final thing that I want to show you are

14    what we call our bedrock facts.  These are three key facts that

11:28:23    15    will tell to you now that we believe the evidence will show.

16    We intend to prove them to you over the course of the trial and

17    then at the time for closing statements we will come back and

18    show you how we've proved them.

19           Bedrock fact No. 1:  Hytera knowingly took Motorola's

11:28:47    20    confidential information and used it to create its products.

21    That's trade secret misappropriation, that's copyright

22    infringement, and we'll be asking you to find both of those at

23    the conclusion of this trial.

24           Bedrock fact No. 2:  Hytera's products still use

11:29:09    25    Motorola's confidential information to this very day.  That's

1  intentional, willful and malicious conduct and we will be

2  asking you to find that as well.

3       Bedrock fact No. 3, Hytera is using its theft to sell

4  its products, causing great harm to Motorola.  That has to do

5  with damages.  And as the evidence will show, the harm is great

6  and we'll be asking you to award sizable damages at the

7  conclusion of this trial.

8       Once again, thank you very much for your time and

9  attention today and over the course of this trial, and we look

10 forward talking to you at the time for closing statements.

11 Thank you.

12      THE COURT:  All right.  Members of the jury, you have

13 heard what the plaintiff expects the evidence to show in this

14 case.  You will shortly hear from the defendant Hytera.

15      It is 11:30 a perfect time for brunch.  I hope that

16 one hour is enough for all of you.  And so you are to return at

17 12:30.

18      I want to continue always to tell you, you are not to

19 discuss this cause amongst yourselves or with any other

20 persons.  Do not attempt to do any form of research, directly

21 or indirectly, regarding the issues or the parties involved in

22 the case.

23      Enjoy your brunch and please return at 12:30.

24      Counsel, remain.

25      (The following proceedings were had out of the

Opening statement - by Alper

70

1      presence of the jury in open court:)

2           THE CLERK:  The Court is in session.  Please be

3      seated.

4           THE COURT:  All right.  Please be seated.

11:31:26    5      Counsel, several jurors have given written

6      communications to Mr. Fulbright, the Clerk of the Court, and

7      he, in turn, has passed them on to me.

8           I decided earlier that we should proceed with the

9      opening statements in this case before we deal with these

11:31:41   10      particular issues that are raised by the jurors.  And so I

11      intend to do the same with Hytera, that you may make your

12      opening statement.  But during this brunch period, I will give

13      you the communications to counsel to go over them so that you

14      will ultimately be prepared to determine what action, if any,

11:32:02   15      you are asking the Court to take.

16           I've only glanced at one.  I have not read them in

17      detail and so I'm certainly open-minded on all of these issues.

18      And so at 12:30 Hytera should be ready to proceed.

19           And let me give these to counsel.  You can make copies

11:32:23   20      of them, if you choose.  You can make copies of them if you

21      choose to do so, but the originals must be retained for the

22      record.

23           (Said item tendered.)

24           THE COURT:  Let me say this, I told jurors to come

11:32:39   25      back at 12:30.  Be sure you're here on time.  Thank you.

Opening statement - by Alper

1

2          (Luncheon recess taken from 11:32 o'clock p.m.

3          to 12:30 o'clock p.m.)

4

5                *      *      *      *      *      *      *      *

6

7

8    I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

9          RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

10

11   /s/Blanca I. Lara                    November 11, 2019

12

13

14

15

16

17

18

19

20

21

22

23

24

25

72

1                IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3  MOTOROLA SOLUTIONS, INC., and MOTOROLA   ) No. 17 CV 1973
    SOLUTIONS MALAYSIA SDN. BHD,         )
4                             )
            Plaintiffs,         )
5  vs.                         ) Chicago, Illinois
                           )
6  HYTERA COMMUNICATIONS CORPORATION, LTD.,  ) November 7, 2019
    HYTERA AMERICA, INC., and HYTERA      )
7  COMMUNICATIONS AMERICA (WEST), INC.,    )
                           )
8          Defendants.        ) 12:30 o'clock p.m.

9                  TRIAL - VOLUME 2-B
               TRANSCRIPT OF PROCEEDINGS
10

        BEFORE THE HONORABLE CHARLES R. NORGLE, SR.,
11                   and a jury

12  APPEARANCES:

13  For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                   BY:  MR. ADAM R. ALPER
14                    MR. BRANDON HUGH BROWN
                555 California Street
15                27th Floor
                San Francisco, California 94104
16                (415) 439-1400

17                KIRKLAND & ELLIS, LLP
                BY:  MR. MICHAEL W. DE VRIES
18                333 South Hope Street
                Los Angeles, California 90071
19                (213) 680-8400

20

21  Court Reporter:        JUDITH A. WALSH, CSR, RDR, F/CRR
                Official Court Reporter
22                219 South Dearborn Street, Room 2342
                Chicago, Illinois 60604
23                (312) 435-5895
                blanca_lara@ilnd.uscourts.gov
24

25

73

```
 1   APPEARANCES (Continued:)

 2   For the Plaintiffs:      KIRKLAND & ELLIS, LLP
                              BY:  MS. MEGAN MARGARET NEW
 3                            300 North LaSalle Street
                              Chicago, Illinois 60654
 4                            (312) 862-7439

 5                            KIRKLAND & ELLIS, LLP
                              BY:  MS. LESLIE M. SCHMIDT
 6                            601 Lexington Avenue
                              New York, New York 10022
 7                            (212) 446-4763

 8   For the Defendants:      STEPTOE & JOHNSON, LLP
                              BY:  MR. BOYD T. CLOERN
 9                                 MR. MICHAEL J. ALLAN
                                   MS. JESSICA ILANA ROTHSCHILD
10                                 MS. KASSANDRA MICHELE OFFICER

11                            STEPTOE & JOHNSON, LLP
                              BY:  MR. DANIEL S. STRINGFIELD
12                            227 West Monroe Street, Suite 4700
                              Chicago, Illinois 60606
13                            (312) 577-1300

14   ALSO PRESENT:            MR. RUSS LUND and
                              MS. MICHELE NING
15

16

17

18

19

20

21

22

23

24

25
```

1         (Proceedings heard in open court.  Jury out.)

2              THE COURT:  Good afternoon.  The jurors will be in

3    shortly.  Please be seated.

4         (Proceedings heard in open court.  Jury in.)

5              THE COURT:  Good afternoon, members of the jury.

6              Hytera may make its opening statement.

7              OPENING STATEMENT ON BEHALF OF THE DEFENDANTS

8              MR. ALLAN:  Thank you, your Honor.  If it please the

9    Court.

10             THE COURT:  Please proceed.

11             MR. ALLAN:  Thank you.

12             Good afternoon, ladies and gentlemen.  Before the

13   lunch break, you had an opportunity to hear Motorola's version

14   of the events, Motorola's version of what happened in 2008,

15   now almost 12 years ago.  And I would submit to you that

16   Motorola hasn't provided you the full story.  And we will

17   endeavor to do that.  I will endeavor to preview that for you

18   in our opening presentation.

19             And it's going to take me a little bit of time, so

20   bear with me.  And during the trial process, we will present

21   to you documents and evidence that show that you haven't heard

22   the whole story.

23             The first thing, I'd like you to think about a couple

24   of things as I present my opening presentation, things to

25   think about and things to look out for, our bedrocks, if you

1    will.  Number one, Mr. Alper left you with the impression that

2    Hytera could never have developed a DMR radio product without

3    Motorola information.  The evidence will show that is flat

4    wrong.  You'll see evidence in the case of Hytera's digital

5    development process through the entire -- through the entire

6    company.

7          Hytera developed on its own a digital radio product

8    and launched it two years before G.S. or Sam or Y.T., any of

9    these bad apples came over to Hytera.  We had launched a full

10   suite of analog radio products.  And *Forbes* magazine listed

11   Hytera -- in 2007, the year before G.S., Sam, and Y.T. came

12   over, *Forbes* listed one of Hytera's radios a top 25 innovative

13   product of that year.

14         You will not see evidence that Hytera couldn't do it.

15   Hytera had a prototype.  They were almost all the way there.

16   They were 75 percent of the way there.  I'll get into that,

17   and you'll see more about that during the trial.

18         Number two, Mr. Alper left you with the impression

19   that the sky was falling on Hytera and if it didn't get a DMR

20   radio product, the company wouldn't last.  That's not the

21   whole story.  First of all, it's not true, and it's not the

22   whole story.

23         There were a number -- and you need to sort of

24   understand in context what's going on in the industry.  We'll

25   provide you with this context during the trial.  There are a

1    number of digital platforms being developed in this time.

2    Remember, we're not talking 2019, 2018.  We're back to the

3    2008, 2007, 2006 timeframe.  The industry is in a different

4    place.  The technology is in a different place.  And lots of

5    different digital technologies are being developed.

6         Mr. Alper didn't let you know that there was a

7    competitor to the DMR technology, something called dPMR.

8    We'll talk about this in more detail, but they were basically

9    two competitor, two competitor standards.  Nobody in the

10   industry knew which standard would prevail or whether they

11   would both prevail.

12        And you'll hear evidence that at the time G.S. and

13   Sam and Y.T. were hired and at the time Hytera was in the

14   process of developing its DMR radio product, it didn't know

15   whether it was going to launch that product or its dPMR

16   product.  It had no idea.  It was a two-horse race.  No one

17   knew who would win.

18        The next piece I want you to watch out for, you need

19   to understand that G. S. Kok was hired by Hytera to do a job

20   that he couldn't do.  You need to understand the context.  He

21   was given a radio product that was 75 percent of the way

22   there.  He was asked to commercialize it.  He was asked to

23   kick it over the goal line, get it in, get it in the

24   marketplace.

25        Well, what you'll hear is, the evidence will show

1    when he came over to Hytera, he couldn't do that job.  He

2    didn't understand how Hytera had developed the radio.  It had

3    different hardware that he wasn't familiar with.  It had

4    different coding language that he didn't use.  And on top of

5    that, G.S. spoke English.  All the Hytera engineers spoke

6    Chinese.  He couldn't communicate with them.  So he says,

7    "I've got to get some of my pals, some of my buddies."  So he

8    brings a few other people from Motorola.

9            And one thing that is absolutely clear, you will

10   never hear Hytera dispute, is that those people, while they

11   were at Motorola, while they were employees of Motorola, took

12   some amount of information from Motorola that Motorola thinks

13   they shouldn't have taken.  From that point, we disagree.  But

14   nevertheless, these people came over, and they made some

15   changes.  And they required hundreds of Hytera engineers,

16   hardworking engineers, several of whom you'll hear from in

17   this trial, made them do a whole bunch of make work to redo

18   what they had already done.

19           Now, Mr. Alper showed you a number of emails, and he

20   picked a line here and a line there, and he made it seem as

21   though the entire company at Hytera knew exactly what was

22   going on.  Not true.  The evidence will show -- in fact, most

23   of what Mr. Alper showed you was between the three villains in

24   the case:  G.S., Sam, and Y.T.  He had a slide of the three of

25   them.  They kept that information close to the vest.  They did

Opening statement - defendants

1    not share massive amounts of Motorola information with Hytera

2    engineers.  In fact, he showed you what Sam Chia did, as

3    outrageous as it is, is he took a Motorola document, and he

4    put a Hytera label on it, and that's what he pushed out to the

5    Hytera engineers.

6           So when Hytera engineers are getting material, it

7    says "Hytera."  They have no knowledge it's a Motorola

8    document.  There's a number of these.  And when you look at

9    the evidence and you look closely, you're going to see that

10   most of the evidence, if not all of it, is between the three

11   who kept everything close to the vest.  Why would they go

12   through this process?  Why would they conceal and cover their

13   tracks within Hytera if everybody knew?

14          Next, we now know -- as Mr. Alper indicated to you,

15   we've gone through a discovery process to get to this trial,

16   and we now know and you'll hear from a number of Hytera's

17   experts in this case, who I'll introduce to you in a moment,

18   that a small amount of Motorola information made its way into

19   Hytera's products, a small amount of Motorola's information.

20          What Mr. Alper didn't tell you is that the trade

21   secrets in this case don't match what was taken.  In fact,

22   we'll get into it in a few moments.  Motorola doesn't even

23   think they're trade secrets.  And the little bit that was

24   taken doesn't fit what they're claiming in this case because

25   they are overreaching at every step of the way.

1          Finally, on the damages point, Mr. Alper closed with

2     the point that he would say they were going to ask you for

3     lots and lots of money.  That's what this case is about.  This

4     case is not about the protection of intellectual property, the

5     protection of what he called lifeblood.  He said it was the

6     lifeblood of Motorola two or three times.

7          The evidence will show that Motorola laid in wait.

8     They laid in wait and let Hytera's sales increase, increase,

9     increase, increase, increase, until it hit a certain point

10    where the numbers are big, then they sue.  Why?  Because

11    Motorola wanted this DMR to become the de facto standard, and

12    it needed Hytera's help to do it.

13         Ladies and gentlemen, my name is Michael Allan.  I

14    was introduced to you briefly yesterday, yesterday morning.

15    And I'd like to reintroduce to you Michele Ning, corporate

16    counsel for Hytera, and the rest of our team:  Boyd Cloern,

17    Jessica Rothschild, Kassandra Officer, and Dan Stringfield.

18    We are here today representing the three Hytera defendants

19    that have been named in this case, and we're proud to be doing

20    that.  We're proud to be representing Hytera before you in

21    this trial.  And I along with Mr. Alper would like to thank

22    you for the service that you're providing us and the close

23    attention you're going to give to this case.

24         One thing I think everyone can agree on is that there

25    are two sides to every story.  I see it every day in my work,

Opening statement - defendants

1    and I see it actually more when I go home.  I have three

2    little boys:  11, nine, and my little guy turns seven today.

3    And they manage to get themselves into a fair bit of trouble.

4    And without fail, if I ask one what happened, I ask another

5    what happened, I get two different stories.

6             Now, Motorola gets to go first.  They will present to

7    you their evidence, their documents, their witnesses.  And I

8    ask you to keep an open mind through that process until we get

9    to present our case, provide you the context, tell you the

10   full story.

11            In terms of context, everyone knows that context is

12   critically important to understand a story.  To understand

13   what happened, you need to know in context.  You can't just

14   take a line out of an email or a question and answer out of a

15   three-hour deposition.

16            In order to understand the context in this case, we

17   need to travel back in time and go to the other side of the

18   world.  We need to go back to 2007, 2008 to Penang, Malaysia,

19   and Shenzhen, China.  That's where this story takes place.

20   And in our trial presentation, we will take you there.  We

21   will explain, put the documents, the state of the industry,

22   the evidence all in context during that time because that is

23   critical for you to understand what really happened, what

24   really happened in this case.

25            It's also important to note that the three people on

1   Mr. Alper's slide -- G.S. Kok, Y.T. Kok, who are not related,

2   by the way, in case anyone was wondering, and Sam Chia, the

3   three bad guys -- they're not here.  They're not in the

4   courtroom.  You will not see them in the courtroom.  They will

5   not come live to defend their actions.  Motorola did not sue

6   them.  Mr. Alper showed you employment agreements that he

7   implied that they breached.  It doesn't matter.  They didn't

8   sue them.

9           You will, however, hear from a number of Hytera

10  witnesses, engineers who worked hard developing DMR and a

11  bunch of other digital radios and analog radios before G.S.

12  and Sam and Y.T. came over and after they left.  They're gone.

13  You will hear that these folks at Hytera, they are as upset

14  and frustrated and betrayed by what they have now learned

15  these people did as Motorola is.  You'll hear from them in

16  this case.

17          Folks, we believe there are four cornerstones to this

18  case, sort of four pillars, if you will, to sort of understand

19  everything in context, everything that happened so long ago.

20  The first is Hytera and its radio development.  Many of you or

21  perhaps all of you, none of you have ever heard of Hytera.

22  We'll tell you about Hytera.  You're going to learn about the

23  company, about the formation of the company, about the

24  background of the company, about all of the digital and analog

25  development work the company did.  You'll hear why G.S. was

1    hired, why these other folks were hired, what they were hired

2    to do and what they did. You need that. You need that

3    understanding to weigh the evidence.

4           The second thing: Motorola's trade secret and

5    copyright claims. We will provide you the detail of the scope

6    of those claims. We'll talk to you -- I'll talk to you a

7    little bit this morning -- this afternoon about what they're

8    claiming as part of their intellectual property claims; the

9    fact that back in 2008, Motorola didn't even think -- what

10    they're asserting are trade secrets, what they're going to ask

11    you to find are trade secrets, they didn't even think they

12    were trade secrets. I'll explain to you what the evidence

13    will show about the overreach of the claims they are asserting

14    and why those claims don't fit the little bit that was taken.

15           Third: Motorola's delay. And Mr. Alper referred to

16    it as a statute of limitations. And you may have heard of

17    that term before. Think about a car wreck. If you get in a

18    fender-bender on the way home, you can't sue that person ten

19    years down the road. Neither one of you may remember whether

20    the light was green or red. You probably won't even have the

21    car. You have to act quickly.

22           We will present to you the evidence showing that they

23    could have absolutely and should have brought this case a

24    long, long time ago, but they didn't do that, and they didn't

25    do it on purpose. They turned a blind eye to what was going

1    on because they needed Hytera to help them get the standard

2    they were pushing.  And had they brought this case then,

3    there's no damages, no damages at all.

4           Finally, the issue of damages.  We'll talk about that

5    a little bit at the end, but the entire culmination of

6    Motorola's presentation is the overreach into the damage and

7    what they are going to ask you to do at the very end of this

8    trial.

9           Let's start with the first cornerstone.  Hytera was

10   formed in 1993 in Shenzhen, China.  The company was formed by

11   a gentleman named Qingzhou Chen.  And you'll hear from

12   Mr. Chen.  Mr. Chen will come to the trial.  He will talk to

13   you.  He will testify before you.  And a lot of what Mr. Alper

14   told you, he's going to explain it.

15          Mr. Chen is a self-taught entrepreneur.  And you'll

16   hear him tell the story.  He was born in a small rural town in

17   China that had two industries:  Farming and, believe it or

18   not, radios.  And he started getting into the radio business

19   at a very young age.  In fact, he started selling radios or

20   little radio accessory parts when he was eight or nine years

21   old.

22          He dropped out of high school to get into the radio

23   business full-time.  He's not an engineer.  You're going to

24   hear from a lot of smart engineers in this case on both sides:

25   Motorola's engineers, Hytera's engineers.  Mr. Chen is a

1   businessman.  That's what he knows.  He knows what customers

2   want on the radio business, and he knows the radio market.

3   And in his 20s, he learned the China radio market, and he

4   understood it and he understood it really well.  And in his

5   late 20s, he decides he's going to move to a city called

6   Shenzhen, China.

7          I know many of you may never have heard of Shenzhen.

8   Shenzhen in the late '80s, early '90s was becoming the tech

9   hub of China.  And it's basically now China's version of

10  Silicon Valley.  This is a picture of it.  It's really quite

11  an impressive city.  I think it's like the tenth largest city

12  in the world, in fact.

13         So Mr. Chen moves there in his late 20s, and he

14  starts this company with three or four other people, and he

15  builds it in about a 30-year period to what it is today, which

16  is a leading provider of communications equipment:  Satellite,

17  first responder, global network, and more.

18         Let me go back to sort of the beginning.  It

19  obviously started out very small, the company.  And it was

20  China focused, China based.  And the company sold little --

21  they made little accessories.  Mr. Chen hired a couple of

22  people to make antennas, right, and battery packs and things

23  like that.  He would sell that.

24         And he knew the market.  So big companies --

25  companies like Kenwood, which is a big Japanese manufacturer

Opening statement - defendants

1   you may have heard of; another company called ICOM; a New

2   Zealand company called Tait; and Motorola -- the biggest names

3   in radio hired Mr. Chen to sell their products in China

4   because he knew the market really well.  But he was also, he

5   was also a businessman.  He understood.  He saw an opportunity

6   in China.  He'll explain all of this to you.

7          He saw that China had a bunch of inexpensive,

8   low-quality radios on the market and then good quality but

9   pretty pricey, expensive -- pretty pricey radios.  There was a

10  big gap.  And so his whole mantra was, simple and easy

11  communication.  He said, "I'm going to find a way to make a

12  radio that plugs that gap:  A good quality radio at a

13  reasonable price."

14         And he went out and he hired some engineers, some

15  people that made cordless phones.  Some of you may still have

16  them.  I have them still in my house.  It turns out that the

17  technology to make a cordless phone wasn't that different than

18  making an analog radio.

19         And so in the first year, first couple of years, he

20  launches a product called the C-160.  And he nailed that gap

21  in the market.  And that became an incredibly successful

22  product.  And the company continued to grow.  And he hired

23  more and more engineers, and they developed more and more

24  products.  They had a number of analog radio products.  And

25  during this time, most of the market is analog.  He developed,

1   the company developed a number of features of analog radios.

2   Here's some examples.  And just in context, this is years

3   before G.S., Sam, Y.T. ever become even a thought.

4           One of the features here, VOX, it's on the left side,

5   some of you I'm sure, everybody has used one of these

6   walkie-talkies.  Mr. Alper demonstrated that you push to talk.

7   You push the button to talk.  VOX is voice activated.  You

8   don't have to push the button.  You can just talk right into

9   it.  It's been around for 20-something years.  They had it.

10  Hytera had it back in the mid-'90s.  Motorola claims it's a

11  trade secret in this case.  No.

12          Another one on here, squelch, you'll hear testimony

13  in this case, squelch has been around since World War II.

14  Motorola claims it's a trade secret in this case.  Overreach.

15          So getting back to the point that Mr. Alper made a

16  couple of times that Hytera couldn't have developed this on

17  its own without Motorola information, and he made it seem as

18  though DMR was sort of the be-all, end-all of digital radio

19  products.  I want to sort of take you to a timeframe in the

20  life of Hytera where they begin digital development work.

21          And to orient you, this is the 2003 to 2006

22  timeframe.  Again, just G.S., Sam, Y.T., they all come over in

23  2008, so this is five years prior.  In 2003, Hytera begins to

24  develop its first digital radio product and in that three-year

25  period researches, develops, manufactures, launches, and sells

Opening statement - defendants

87

1    a digital radio product.  No help from Motorola, no help from

2    anybody.  They got it done.  And they had a track record of

3    getting it done.

4            Now, what else was going on during this time?

5    Mr. Chen and the company wanted to hire engineers.  And they

6    made a strategic acquisition from a company called -- of a

7    company called QH.  QH was based in Harbin, China.  And some

8    of the most -- the brightest radio minds in China were working

9    at QH.  They added 200 engineers there.  One of them is a

10   gentleman named Professor Sun.

11           And you'll hear from Professor Sun.  He's going to

12   come and talk to you during this trial.  And he's going to

13   tell you all the cool stuff that they were doing.  They were

14   working on really complex analog technologies that would make

15   calls come in faster.  And, in fact, he began working on a

16   digital version of that same technology and worked it up all

17   the way to a prototype version of it.

18           The real benefit of this strategic hire of QH,

19   however, was the fact that there was a connection between QH

20   and a big university called the Harbin Institute Of

21   Technology, HIT, which was basically China's version of

22   Massachusetts Institute of Technology, MIT.  And because of

23   the acquisition of Harbin, Hytera had a constant supply of the

24   top engineering, radio engineering talent in China joining the

25   company, working on the products, developing their technology.

Opening statement - defendants

88

1       So you heard a lot about DMR.  In 2005, Professor

2   Sun -- again, who will come and speak to you -- begins to look

3   at DMR as a technology.  And again, to orient you in context

4   what's going on, and you'll hear evidence of this, the

5   industry is trying to figure out which digital standard will

6   become the standard, will become the de facto standard.  And

7   no one really knew.

8       There were a number of different standards.

9   Professor Sun and his team are looking at DMR.  There's an

10  entirely different team at Hytera looking at a different

11  digital technology and yet a third team at Hytera looking at

12  even another potential digital technology.  The company is

13  growing incredibly fast, lots of people looking at lots of

14  different things.  No one knows what's going to win and what's

15  going to lose.

16      So I've mentioned "the standard" a couple of times.

17  I think Mr. Alper did as well.  So just to give you some

18  context, I've given you DMR and dPMR.  They are different

19  standards.  The radios won't be able to talk to each other.

20  Think of the standard as a playbook.  It's a set of rules.

21      If I make a radio with one set of rules and my

22  colleague, Mr. Cloern, makes a radio with a different set of

23  rules, they won't be able to talk.  So everybody's got to use

24  the same playbook, the same set of rules.  And that's what

25  these standards are being developed for.

Opening statement - defendants

1    Remember, anybody remember the VHS tape?  Some of you

2    do, I'm sure.  I hope.  This was the greatest thing in the

3    world when this thing came out, right.  You could buy a blank

4    tape, pop it in the VCR and record your favorite show and

5    watch it whenever you want:  Home video recording.  Now, I

6    wonder how many of you remember this guy, Betamax.

7    At the time when this technology first came out,

8    there were two.  You'll see, they don't line up.  One tape

9    doesn't fit in the other machine.  Different technology.  They

10   do the same thing.  At the time, nobody knew as between DMR

11   and dPMR which would be the VHS and which would be the

12   Betamax.  So Hytera and I'm sure other companies are looking

13   at both, right.  They don't want to be losing out if one wins

14   out and the other, the other doesn't.  So Hytera is looking to

15   develop both.

16   You'll hear from Andy Grimmett in this case.  Maybe

17   Mr. Grimmett, I think he's in the courtroom.  Perhaps he can

18   stand up just to introduce him.  Thank you, Mr. Grimmett.

19   Mr. Grimmett is the only DMR radio expert you will

20   hear in this case, you will hear from in this case.

21   THE COURT:  If the witnesses are not experts, they

22   shall not be introduced to the jury.

23   MR. ALLAN:  He's an expert, your Honor.

24   THE COURT:  Then you may proceed.

25   MR. ALLAN:  Thank you.

1          Mr. Grimmett worked for a company called Simoco which

2   made DMR radios.  He led the development.  30 engineers

3   developed a DMR radio from soup to nuts, start to finish, in

4   three years and three months.  He's the chair of the DMR

5   Association technical working group from 2013 to 2015, and

6   he's currently the company's secretary of the DMR Association.

7   So right now, if anybody wants to join the DMR Association,

8   has questions about the DMR Association and they go and send

9   an email, it goes to his laptop, and he answers it.

10          He will come and testify that back when nobody knew

11  which one was going to win, this was his example.  One of

12  these standards, DMR or dPMR, would be the VHS.  The other was

13  going to go the way of the dinosaur.

14          Now, you'll hear testimony and evidence that Motorola

15  was heavily, heavily invested in the DMR.  They wrote much of

16  the DMR playbook.  Motorola wanted DMR to be the VHS very,

17  very badly.  And Motorola witnesses, you will hear, they

18  referred to this as a war:  DMR versus dPMR.  If Motorola had

19  invested the money and the effort to develop the DMR standard

20  and they had their DMR radios on the market and it became the

21  Betamax, it would be gone.  They'd have to start over.

22          So they needed help.  And the way that the VHS

23  survived was more and more companies started making these and

24  less and less companies started making these.  And Hytera was

25  close to making a DMR radio even though they were developing

Opening statement - defendants

91

1  both.  Motorola needed Hytera to help it survive.

2       So let's talk a little bit more about the development

3  work before G.S. and Sam and Y.T. come over.  So Professor

4  Sun's team is looking at DMR.  Again, another team, completely

5  different team, is looking at dPMR.  Professor Sun is focused

6  on DMR.  And during this timeframe, he's got 100 engineers

7  working on this.  And you know what they find?  It's pretty

8  close to analog, a lot of it, and they know the technology.

9  They know how to develop it, and they start to do that.

10      And you'll hear from Professor Sun, and you'll hear

11 from his number two on the development team, a gentleman named

12 Yu Yang.  They will walk you through all of the effort and all

13 of the work that Hytera did to develop the DMR radio.

14      Now, we're going to preview some of that evidence for

15 you -- sorry.  A short delay with the slides.

16      So in 2005 and 2006, you'll see the company, Hytera,

17 is looking to develop and pick out different pieces of

18 hardware for the radio.  In December of 2006, Hytera tests its

19 DMR protocol stack.  And the test is, does it work with the

20 playbook?  And the answer is yes.

21      September 2007, Hytera's got a prototype that works

22 with a Motorola radio.  Now, why a Motorola radio?  Because

23 they're the only ones who were selling a DMR radio at the

24 time.  So they've got a prototype set up with a microphone and

25 a speaker, and it's communicating over the standard with a

Opening statement - defendants

92

1    Motorola radio.  That's where we are months and months and

2    months before G.S., Sam, Y.T. come over.  You'll hear the

3    evidence and we'll -- during the trial, we'll fill in

4    additional evidence here and present that to you during the

5    closing presentation.

6             Now, Mr. Alper showed you, I think twice, an email --

7    and I wrote it down -- that said G.S. said there's no

8    prototype.  And I think he used that as one of the arguments

9    to suggest that there was no -- this was junk.  They couldn't

10   get anything done without Motorola information.  And he did

11   just what I told you they've been doing, which is cherry

12   picking.  And I want to give you the context.

13            And Mr. Montgomery, can you pull up this slide PDX

14   1.2?  We're having technical difficulty.  There we go.  Thank

15   you.

16            He says, look, G.S. even says there's no prototype.

17   I don't have the fancy pointer, so you'll have to bear with

18   me.  Right before he says that, he says, "I've looked at all

19   your materials, and you've got 1100 parts, and that's too many

20   parts."  If there's 1100 parts, parts of what if there's no

21   prototype?  Clearly, they had a prototype.  Professor Sun, Yu

22   Yang, others will come and tell you they all worked with it.

23   Overreach.  Context.

24            So let's go to our next slide, please.

25            I've introduced you to Mr. Grimmett.  I'd also like

Opening statement - defendants

93

1   to introduce you to John Peck.  If you don't mind standing up,

2   Mr. Peck.

3          Mr. Peck and Mr. Grimmett will present evidence in

4   this case describing all of the work that the Hytera engineers

5   had done, all of the work that they had done before G.S., Sam,

6   and Y.T. come over.

7          Now, another thing Mr. Alper talked about is he said,

8   well, they had a lot of problems.  Hytera had a whole bunch of

9   problems, as if that's unusual in research and development.

10  Anybody researching and developing anything will have bumps in

11  the road.  That's totally normal.  You'll hear from Mr. Peck

12  and Mr. Grimmett on that.

13         The fact that we had a bump or two in the road,

14  that's research and development.  That's what engineers do.

15  They're hired to solve problems.  If they're looking at

16  something and they can't figure out the problem, you go and

17  you try something else, and maybe the next thing works.  The

18  fact that that's documented is completely normal.

19         It's also important to keep in mind during this time

20  that while DMR is being developed -- again, I just want to

21  make sure that the context is clear.  DMR is one of many

22  digital platforms the company is considering.  Hytera has

23  already got launched a huge portfolio of analog products, and

24  it's branching out into different areas.  This is not DMR or

25  bust.

1          To recap in this section, before G.S., Sam, Y.T. ever

2     left Motorola, Hytera launched, developed, sold its own

3     digital radio, had a full working DMR prototype, had a full

4     working digital prototype on another standard it decided not

5     to pursue, and was actively working and researching dPMR.

6     Does this sound like a company that didn't know radios and

7     couldn't develop a radio?  No.

8          But don't take my word from it.  You'll hear from

9     Professor Sun.  You'll hear from Yu Yang.  You'll hear from

10    some other engineers.  You know who else thought Motorola --

11    thought Hytera was ready to launch a DMR radio?  Motorola.

12    Motorola had a very in-depth competitive intelligence group.

13    And if you were potentially a competitor of Motorola, they

14    figured out exactly what you were doing and where you were.

15    They wanted to keep tabs on other companies that were entering

16    the industry.  And they knew that Hytera was on the path to

17    developing a DMR radio.  They knew that, and they knew that

18    that would help them become the VCR, not the Betamax.

19          Let's go to the September 2007 to spring 2008

20    timeframe, right during the time before and right around the

21    time that these folks from Motorola come over.  They continue,

22    Hytera continues to work on the development.  They continue to

23    finalize the product.  And they get to about 75 percent of the

24    way there when G.S. is hired.  Hytera engineers will come.

25    They'll testify.  They'll tell you that they were close.  And

1    they'll tell you that they were absolutely confident that they

2    would have finished it if nobody came over.  They'd done it.

3    They'd done it time and time again.

4           Let's talk about G.S. and G.S. entering the picture.

5    So back in 2006 -- and I'll let Mr. Chen tell you this

6    story -- Mr. Chen gets introduced to G.S. through a mutual

7    friend.  Totally normal, nothing unusual.  People from Hytera

8    network all the time.  They go to trade shows.  They go to

9    conferences.  They meet people in the industry.  People at

10   Motorola, the same exact thing.  There's constant discussion.

11          In fact, while Hytera and Motorola are working on

12   DMR, they're talking regularly.  Their engineers are talking.

13   Their executives are talking.  There's constant communication

14   between the companies.

15          G.S. was at Motorola.  It turns out he wasn't very

16   happy there.  And he wasn't the only one who wasn't very happy

17   there.  He was based in Motorola Penang where much of the

18   engineering work was done for Motorola's DMR product.  And

19   Motorola's Penang division had all sorts of problems.  You'll

20   hear evidence of this.  Mr. Lund, the corporate representative

21   who I guess will be the first witness, he was sent by Motorola

22   there to fix the problems.

23          And Motorola had to -- he had to retire at 55 there.

24   At the time G.S. was 50 years old.  He had a five-year window

25   left to work at Motorola.  There were compensation issues, all

1   sorts of issues.  So what does he see?  He sees Hytera.  He

2   sees an incredibly fast growing, young company, vibrant.  He

3   can be a big fish in a small pond.  So he talks to Mr. Chen.

4   Mr. Chen likes the idea.  G.S. speaks English.  G.S. is

5   experienced.  G.S. is from the UK.  The DMR Association is

6   based in Europe.  In fact, I think it's based in the UK.

7   There's a lot of natural fits between them.

8           And at the time you'll see evidence that Hytera had

9   consultants telling Mr. Chen and telling the company, "You're

10  at the point on DMR where you need a product manager."

11  Professor Sun's great, and you'll hear from him, but he's a

12  researcher and developer.  He's not a product manager.

13  He's not -- he doesn't commercialize products.  He's done this

14  time and time again at Hytera where he gets things to a

15  certain point.  G.S. with his experience, the ties to the UK

16  seems like a logical choice.  So he's hired to take a radio

17  that's 75 percent of the way done and finish it and get it on

18  the market.

19          Now, you heard a lot about these negotiations.

20  Mr. Alper left you with the impression that G.S. was paid an

21  enormous amount of money to come to Hytera.  The evidence will

22  show that that is absolutely not true, absolutely not true.

23  You will hear from G.S. -- sorry.  You will hear from

24  Mr. Chen.  You won't hear from G.S. because he wasn't sued.

25  You'll hear from Mr. Chen.  You'll see some documents.

1    Absolutely false.

2           It's also important, folks, and this is actually

3    really important to understand that during this time period --

4    sorry.  I'm a walker.  I'm sorry about that.

5           During this time period, the company, Hytera, is

6    hiring a ton of engineers.  Between '04 and '08, they don't

7    just double or triple, they quadruple the number of engineers.

8    They are hiring on average two to three engineers every single

9    week.  G.S. is one, one guy.  Nobody paid that much attention

10   to him.  He was put in charge of a product line that they may

11   never even have launched.  I'll tell you one thing and you'll

12   hear this, they wished they had paid more attention to him.

13          So what happens?  G.S. comes over, and he realizes

14   pretty quick he can't do what he was hired to do.  He can't

15   commercialize the product.  The company has set -- Hytera has

16   developed its DMR radio product in a different way than he was

17   used to.  It's got a chip he doesn't know how it works.  It's

18   got -- it's run by code he can't write.  He can't really

19   communicate with the engineers.

20          And so what does he do?  You'll see, he trashes the

21   work.  He trashes the product.  He says it's terrible, they

22   did a terrible job.  You see this word, spaghetti code

23   Mr. Alper showed you.  That's the Motorolans coming over

24   trashing Hytera's work.

25          You have to realize, Hytera and Motorola, the

1    evidence is going to show they're two totally -- they're

2    different companies the way they approach things.  Motorola,

3    you'll hear evidence of this from Motorola's engineers, they

4    over-engineer.  There are layers and layers and layers of

5    processes.  Hytera's growing so fast, they hire these

6    engineers to solve the problem.  They write the code.  It's

7    done.  You'll hear from our experts who will talk about this

8    spaghetti code and tell you it's absolutely fine, totally

9    normal.

10        One thing you will not hear any dispute from -- I

11   said this earlier, from Hytera on is that the evidence will

12   show that G.S. and Sam and Y.T. took material they should not

13   have taken.  They took material they should not have taken.

14   But did the management know?  No.  You will hear them come and

15   tell you.  Did the engineers know?  Absolutely not.  These

16   people kept it to the vest, close to the vest.

17        Mr. Montgomery, could you pull up slide 27?  I made

18   another note here from Mr. Alper's presentation I want to show

19   you.

20        So you remember this document.  He said there was

21   three Motorola files all found in Hytera's files.  These were

22   found in the Motorolans' files.  Mr. Alper and Motorola want

23   you to group all of the Hytera engineers under one umbrella

24   when really what the evidence will show is that there were the

25   Motorolans and all the other Hytera engineers.  The Motorolans

1    kept to themselves.  They kept documents to themselves.  What

2    they did, they kept to themselves.

3          The first two documents here, they weren't found on

4    Hytera's server that everybody accessed.  They were found on a

5    laptop.  We found it.  Hytera found them and gave them to

6    Motorola on one of the Motorolan's laptops.  And the last

7    document -- they were all actually found on Motorolans'

8    laptops.

9          The last document that Mr. Alper showed you, he

10   switched out, he went to this big thing and said we took

11   Motorola off and put Hytera on, that's the document that got

12   pushed out to the engineers, the Hytera engineers by the

13   Motorolans.  That's what these folks did to hide their tracks,

14   to prove their worth.  You will not see evidence that these

15   documents were shared outside of the bad apples, the people

16   that -- who came from Motorola that Hytera hired.  You will

17   not see evidence in this case that these were shared outside.

18         I also want to address a couple of other things

19   Mr. Alper pointed out.  He said, remember, he showed you these

20   Compass logs.  We'll talk about that in a little bit.  And he

21   said, look, here's all the detail, so and so, either Sam or

22   G.S. or Y.T. accessing all these documents.  He said they were

23   all downloaded.  No evidence that they were downloaded, first

24   of all.  They were accessed documents.

25         And he said, all of this just got handed off to the

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 86 of 217 PageID #:51978
Opening statement - defendants
100

1  Hytera engineers.  He said it two or three times.  There is

2  zero evidence of this.  You will not see evidence of that in

3  this case, none.

4           I also want to address another point Mr. Alper made.

5  He showed you this email from a gentleman named Roger Zhang,

6  and he said, look, here's proof.  Here's proof they all knew

7  what they were doing.  He said --

8           THE COURT:  Counsel, there's a tendency for you to

9  slip into argument --

10          MR. ALLAN:  Fair enough, your Honor.

11          THE COURT:  -- which you can save for a later time.

12  And by all means, continue with your informative statement of

13  what Hytera's evidence will show.

14          MR. ALLAN:  Thank you, your Honor.  The --

15          THE COURT:  No thank-you's necessary after a ruling.

16  That applies to all counsel.

17          MR. ALLAN:  Very good.

18          The Roger Zhang email, the evidence -- Roger Zhang

19  will come and talk to you.  He will testify.  And Mr. Grimmett

20  has also looked at all this material.  The information that

21  Mr. Zhang asked about when these folks first came over was not

22  asking for proprietary information, was not asking for

23  confidential information.  And he didn't receive any

24  confidential information.

25          I also want to point out another piece of evidence

1    that Mr. Alper raised with you.  He said there was a gentleman

2    named Mr. Liang.  And I apologize.  These names will probably

3    become more familiar during the trial.  But he said, look, he

4    cut out a big piece of material from one -- from a Motorola

5    file and put it in an email to somebody.  The evidence will

6    show that Mr. Liang didn't know that was a Motorola document

7    because they had rebranded it "Hytera."  He thought he was

8    looking at a Hytera document, not a Motorola document.  I

9    can't get into all the things that he pointed out, but I want

10   you to keep an open mind until you get to hear our

11   presentation.

12          Finally, he mentioned, he showed this picture of a

13   trash can and a recycling bin.  So Hytera engineers, he said,

14   deleted material.  The evidence will not show that.  The

15   evidence will show that a former Motorolan did it.  A former

16   Motorolan took material off of her laptop, not company

17   servers.

18          One thing I do agree with with Mr. Alper, he said

19   it's okay to hire people from other companies.  It happens.

20   We do it all the time.  You hire people because they're

21   talented.  You hire people because they have experience.

22   Motorola, the evidence will show, has hired a number of people

23   from Hytera.

24          Let's go back quickly to the timeline.  So you'll see

25   that the engineers Hytera hired from Motorola again were from

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 88 of 217 PageID #:51980
Opening statement - defendants
102

1    Penang.  The evidence will show that they kept to themselves.

2    And after they were hired, the product launched in 2010, and

3    Hytera continues to develop radios the whole time.

4            Let's flip over to the second cornerstone, if we

5    could, the trade secret and the copyright claims.  So Motorola

6    has asserted 21 trade secrets in this case and some copyrights

7    as well.  And the trade secrets, a benchmark of a trade secret

8    is secret.  Is it secret?  Is it a trade secret?  Is it

9    valuable?  Is it protected?

10           I think the best way to look at this is to see what

11   Motorola thought about these 21 trade secrets that they're now

12   claiming exists and that Hytera misappropriated.  I want

13   you to -- we'll preview some of this evidence for you here in

14   the case.  And again, like I did before, we will fill this

15   slide and provide you additional evidence at the closing

16   argument.

17           Motorola has a policy, and it requires that trade

18   secrets be labeled "Motorola registered secret proprietary."

19   It actually goes a step further than that.  It says, the

20   evidence is going to show, that you've got to have a colored

21   piece of paper on top of the document that contains the

22   alleged trade secret.  It makes sense, right, if it's --

23   there's a real trade secret, the evidence is to show that

24   you're going to let people know.  Of all the documents that

25   they're going to rely on for their trade secrets, the evidence

1    will show that exactly zero have this label, not one.

2           Again, Mr. Alper talked about the lifeblood of the

3    company:  Intellectual property.  And what the evidence will

4    show is that Motorola had a process, a program, an awards

5    program actually, an incentive program for its engineers to

6    develop technology and to get that technology registered

7    within the company.  Motorola has a policy, and they pay their

8    engineers $1500 for every trade secret that gets registered.

9           And you'll see, the evidence will show that they give

10   you $1500 so long as your application is not frivolous.  You

11   can't apply for frivolous intellectual property.  1500 bucks.

12   It goes up to $4500 if there are four more engineers who've

13   applied.

14          Of the 21 trade secrets in this case, the evidence

15   will show that exactly zero dollars were paid to engineers,

16   not one dollar.  Not one Motorola engineer even applied.  Not

17   even one applied to get a trade secret, yet they want you to

18   believe these are trade secrets.

19          You'll also see that they have a registry of trade

20   secrets and that none -- registry of trade secrets for DMR.

21   None of the 21 trade secrets that you folks will get evidence

22   on in this case are listed, not one.

23          Trade secrets also have to be valuable.  This

24   technology is old.  One of the slides Mr. Alper showed you, I

25   wrote it down, talked about it being developed in 1995.  Some

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 90 of 217 PageID #:51982
Opening statement - defendants
104

1   of it's even earlier than that.  1990, folks, as scary as it

2   is, is almost 30 years ago.  It will be in a couple months,

3   right?  This is old technology.  And nowhere, you won't see

4   any evidence in Motorola's records that they have provided any

5   value on any of these trade secrets, none, not even the $1500.

6           The evidence is going to show that when they were

7   pressed to come up with a value that they sort of tried to

8   figure out how long it took to develop these trade secrets.

9   And Mr. Alper talked about some of these numbers in his

10  presentation.  The total number, you'll hear, they claim it

11  took 23.5 years to develop the trade -- just the 21 trade

12  secrets that they're claiming in here.  23.5 years.

13          You'll hear Mr. Grimmett tell you he went start to

14  finish with 30 engineers to develop a DMR radio in three and a

15  half -- 3.3 years.  3.3 years, not even 3-1/2.  There are, I

16  think, eight different DMR manufacturers on the market right

17  now.  23-1/2 years?

18          Finally, the material has to be kept secret.  That's

19  part of the reason they have this policy that didn't apply to

20  any of these trade secrets.  But you'll see the evidence will

21  show that they didn't take steps to keep this material secret.

22  And I think the best way to exemplify that or show you what

23  the evidence will show is using Mr. Alper's example of Y.T.

24  Remember, he said Y.T. worked for Hytera and he worked for

25  Motorola.  How did that happen?  He made a big deal out of

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 91 of 217 PageID #:51983
Opening statement - defendants
105

1    that.

2           Y.T., what he didn't tell you is that Y.T. told

3    Motorola his last day of work was June 4 before he went to

4    Hytera.  And you'll hear from his manager who reassigned all

5    of his work.  So in Motorola's mind, he's gone.  His last day

6    of work is June 4.  All of his work's been reassigned.  And

7    Motorola already knows that G.S. is gone.  They know G.S. is

8    gone before he even leaves.  And they know Sam's gone.

9           And they know his last day of -- they knew Y.T.'s

10   last day of work is June 4, yet they let this man access

11   document after document after document for weeks and months

12   all the while saying it's the most important technological

13   development in the company?  You will see, the evidence will

14   show they did not protect these trade secrets.  They did not

15   think they were trade secrets.

16          An analogy, if you don't mind, to show you what the

17   trade secret claims are in this case, I've got this house --

18          THE COURT:  The analogy may be more of an argument

19   that you can save for later.  You may continue to inform the

20   jury of what you expect the evidence to show on behalf of

21   Hytera.

22          MR. ALLAN:  Very good.

23          THE COURT:  And you don't have to affirm my rulings,

24   counsel --

25          MR. ALLAN:  Thank you.

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 92 of 217 PageID #:51984
Opening statement - defendants
106

1          THE COURT:  -- and say "thank you" as well.  Just

2    comply.

3          MR. ALLAN:  All right.  Think about trade secrets

4    nested.  That's what these are.  They may claim a piece of a

5    radio here and a piece of a radio there is a trade secret, and

6    then they're going to claim the entire piece that that fits in

7    is also a trade secret, right.  And then they'll do that on a

8    different part of the radio.  A small little piece, a small

9    little piece, a small little piece, they'll wrap it all up.

10          Then whatever module that fits into the code, they'll

11   say, well, the whole module is a trade secret.  And then if

12   that module fits in with another module -- it's like Russian

13   nesting dolls.  And then on top of that, for good measure,

14   they slap a copyright label on it.  They'll say, "The whole

15   thing is a trade secret, and then we're going to copyright

16   it."  And they want money on all of that.  Overreach:  Double,

17   triple, quadruple.

18          THE COURT:  Okay.  Stop arguing.  You may continue to

19   inform the jury of what you expect your evidence to show, but

20   save your argument for later.

21          MR. ALLAN:  On the copyright claim, let me briefly

22   advise you what the evidence will show there.  And for that,

23   I'd like to introduce Barbara Frederiksen-Cross.  She's our

24   source code expert.  She's got more than 40 years of software

25   development experience.  She's done some really cool things

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 93 of 217 PageID #:51985
Opening statement - defendants
107

1   for investigating computer hacking and working for the FBI.

2   She investigated and researched Motorola's code.  And she did

3   the same thing with Hytera's code.

4          And she'll provide you the tools to understand the

5   differences and the similarities.  And it's Ms. Frederiksen-

6   Cross who will tell you that there is a sliver of material

7   that is the same.  She will explain that to you -- where it

8   fits in, whether it's valuable, and what it does -- so you can

9   make a decision.

10         Let's go to cornerstone three, please.

11         Now, the events in question here, folks, you'll see

12  and the evidence will show all took place back in 2008.  And

13  you'll see that Motorola could have and should have brought

14  this case sooner, but you'll see that the evidence will show

15  that they turned a blind eye.  They intentionally failed to do

16  so because it benefited their interest.

17         Let's talk a little bit about what the evidence will

18  show Motorola knew.  And in order to do that, we've got to

19  take a little trip back to Penang in 2008 as Penang is sort of

20  the epicenter of what happened here and to G.S., Sam, and Y.T.

21  They're all Malaysian.  They all spent time there.  That's

22  where they took the information.

23         Penang Motorola had 1,000 engineers.  And you'll see,

24  the evidence will show, that they had big problems.  They had

25  a turnover rate of 17 percent.  So for the 1,000 engineers,

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 94 of 217 PageID #:51986
Opening statement - defendants
108

1    they had 170 people leave each year.  And they had substantial

2    leaks of information.  They developed a program, Motorola did,

3    to try to rein in all the leaking information called "Stop the

4    leaks" complete with a picture of a leaking faucet

5         We'll show you that evidence.  I've got another

6    evidence preview slide, so I'll give you some examples here

7    and then again, we'll fill that in during the trial and

8    provide you the additional information during the closing

9    argument.

10        In February 2010, Motorola recognizes suspicious

11   similarities.  Back in 2010, they see suspicious similarities.

12   And then also in 2010, Motorola believes that G.S. is the

13   source of leaked information.  And you'll see, the evidence

14   will show that Motorola issued an order to their security

15   department to track emails to and from G.S.'s Hytera email

16   address.  They knew back then in 2010.  You'll hear about that

17   from Mr. Lund.  He issued the order.

18        And the whole time -- I want to talk about the

19   Compass logs that Mr. Alper showed you.  And Mr. Alper advised

20   that the evidence will show, and I agree, that they had a

21   system that allowed Motorola to track when their engineers

22   looked at documents.  And it's essentially, it's akin to a

23   security camera.  And they could -- they knew -- at any time,

24   they could pull the logs to see what somebody was looking at.

25        The evidence is going to show that that was running

1  24 hours a day, seven days a week, 365 days a year going back

2  to the '90s.  And the evidence will also show that during this

3  time period, during the 2008 time period and before and after,

4  Motorola time and time and time again looked at the Compass

5  logs to determine if one of its employees was doing something

6  they shouldn't do.  Time and time again, the evidence is going

7  to show that.

8        Why didn't they do that here?  Well, the evidence --

9  well, first of all, we don't really know.  The evidence will

10  show that they -- in 2015, they changed their system, so we'll

11  never know really whether Motorola looked at those logs back

12  in 2008, 2009, 2010 when they had a whole bunch of suspicions.

13  But let me tell you why they did it.  And what the evidence

14  will show was that they needed Hytera to help with this.  They

15  needed Hytera to help to push their DMR standard over the

16  line.

17        The evidence is going to show that the trade secrets

18  they're claiming in this case, they didn't even think were

19  trade secrets.  The evidence will also show at that time,

20  Hytera was not a threat to them in DMR.  The evidence will

21  show Hytera had no sales.  There was no big pot of money to

22  sue.  So they waited.

23        There are a number of suspicions, you'll see in this

24  case, that Motorola has.  These are Motorola's suspicions,

25  some of which I showed you on the slide, I previewed.  The

1    rest we'll put in front of you during the trial.  Mr. --

2    Mr. Alper raised this, and he said, "Well, there's no way we

3    could have known before that."  These are -- the evidence will

4    show these were their suspicions.  They knew these suspicions

5    in '08, '09, in '10.  And all the while, all they had to do

6    was look at that log, the log that Mr. Alper showed you two or

7    three times.  All they had to do is take a peek.

8           Let's go to the next cornerstone:  Damages.  The

9    evidence will show that Motorola is overreaching on its

10   damages claim.  Again, you'll see the 21 trade secrets that

11   they're claiming in this case, Motorola doesn't even think

12   they're trade secrets.  They weren't labeled.  Nobody was paid

13   on them through the incentive program.  They overlap with the

14   copyright claims.  That's what the evidence will show.  Even

15   with the very small amount of information that was taken that

16   you'll learn about in this case, they overreached on their

17   claims.

18          One thing I do want to mention because Mr. Alper did

19   mention this, too, he said a couple of times Hytera is still

20   selling this product, Hytera is still selling it.  What he

21   didn't tell you is that -- and you will hear a gentleman named

22   Jim Luo come and testify about this, that the claims they have

23   made have been very hard to understand because of the

24   overlapping trade secrets and what they're actually claiming

25   in the case.

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 97 of 217 PageID #:51989
Opening statement - defendants
111

1          Mr. Luo was put in charge of identifying and figuring

2     out what happened when Motorola sued the case.  He was put in

3     charge of trying to investigate and figure out what happened.

4     And he had a heck of a time, he's going to tell you, because

5     where would you logically go?  G.S., Sam, Y.T.  Well, when

6     this happened, those three lawyered up.  They got their own

7     lawyers.  They got their own lawyers.  And you'll see, Jim Luo

8     will testify, they stopped answering questions.  They stopped

9     answering questions.  They stopped cooperating.  They were

10    terminated from Hytera.

11         So Hytera was left to sort of pick up the pieces and

12    figure out what it is they had done.  And it's Hytera that

13    found material in the discovery process on laptops and

14    provided to Motorola.  It's Hytera that located all these

15    documents and came clean and provided them to Motorola.  And

16    you'll see that Hytera has been desperately trying to figure

17    out what it is the fraction that's been taken and how do we

18    address it and has addressed it.  And Jim Luo will come and

19    talk to you about that.

20         You will hear from, on our economics case, Dr. Debra

21    Aron.  I think she's in the courtroom.  Dr. Aron is an

22    economist here in Chicago.  She will come and talk to you and

23    put the scope of their claims in context, provide you the

24    detail that you need to understand the economics of the case.

25    And as she will explain to you, what they're asking for in

1  terms of, they want every single dollar that Hytera has ever

2  earned on the sale of every DMR radio sold anywhere in the

3  world going back to 2010.  And they want more on top of that

4  and more on top of that and more on top of that.

5        All the while when the evidence will show they knew

6  that their employees were bad apples and had done something

7  they shouldn't have done.  And all the while, they could have

8  addressed this a long time ago instead of waiting until

9  Hytera's sales starting going up and up and up and up and up

10  and then sue ten years later.

11        Let's go back where I started and just quickly recap

12  the cornerstones, back to Hytera and its radio development.

13  The evidence will show that Hytera had a team of highly

14  qualified technical engineers working very hard to develop

15  this DMR radio.  And they got a prototype working, and they

16  were 75 percent of the way there, and they were convinced,

17  they'll come and tell you they would have gotten all the way

18  there.  They didn't need any help from Motorola.

19        These folks from Motorola's bad apples, they came in.

20  They had taken information with them, and they cut a corner

21  here and there and they hid their tracks at Hytera.  No one at

22  Hytera was the wiser.

23        The trade secret and copyright claims:  Overreach.

24  You'll see.  The evidence is going to show there's a trade

25  secret piece and a trade secret piece and a trade secret piece

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 99 of 217 PageID #:51991
Opening statement - defendants
113

1    that's in a bigger trade secret piece that's in a module

2    that's also in a module.  It's all wrapped in a copyright.

3    You'll see that Motorola is overreaching on its claims.

4           And then the delay that we've talked about, again,

5    the evidence is going to show that Motorola knew.  They had

6    these suspicions back in 2008, 2009, 2010 that they could have

7    and should have addressed this much earlier, but they needed

8    Hytera's help.  That's what the evidence will show.  And the

9    evidence will show that had they done something when they

10   should have, there's no payday.  That's the reason for the

11   delay.

12          And finally, the damages overreach.

13          In sum, I'd like to thank you very much for your

14   patience in listening to our opening presentation.  I'd again

15   like to thank you for carefully paying attention through the

16   trial, keeping an open mind as you hear Motorola's evidence,

17   Motorola's documents, Motorola's witnesses, and wait until

18   Hytera gets to present to you its case, its documents, its

19   evidence.

20          And I thank you for -- we all thank you for your

21   service.  We thank you for keeping an open mind.  And we thank

22   you for looking at all the evidence.  We appreciate it.

23          THE COURT:  Members of the jury, please step out for

24   a few minutes, and counsel remain.

25          (Proceedings heard in open court.  Jury out.)

1          THE COURT:  Please be seated.

2          Counsel, you have had an opportunity to go over these

3     communications from the jurors.  Have you reached any

4     agreement?

5          MR. DeVRIES:  Good afternoon, your Honor.  Mike

6     DeVries.  We have not reached an agreement, although I

7     don't -- I'm not certain that there is disagreement here

8     either.  So if it would be helpful to your Honor, we can

9     sum --

10         THE COURT:  Well, it won't be helpful if you put it

11    that way.  So let's look at the letter of Julia Mironiuk.  She

12    has a vacation planned essentially for January 4th to the

13    11th.  We would expect the trial would be over by then, would

14    we not?

15         MR. DeVRIES:  Yes, your Honor.

16         THE COURT:  All right.  So she will stay on the jury.

17         MR. CLOERN:  Yes, your Honor.  Yes, we agree.

18         THE COURT:  And as to Ms. Cotter, she is talking

19    about going to Texas on the Wednesday before Thanksgiving.

20    Certainly, Thanksgiving is a holiday.  And the Friday after

21    Thanksgiving here in the Dirksen building is treated as a

22    holiday.  So for us to end a little early on Wednesday, I

23    think would deal with the issue.  Now, if there's a timing

24    aspect of her flight, we'll have to look into that.  And

25    perhaps we could have her come in just to resolve the Cotter

1    plan.

2          And then there is Julie Fox who speaks of

3    difficulties in getting to and from public transportation.

4    What is Motorola's position regarding the Fox letter?

5          MR. DeVRIES:  You know, your Honor, we are

6    sympathetic to Ms. Fox.  I'm not sure if there's some way that

7    we could talk with her to make the arrangements easier

8    somehow, although in honesty, I can't think of one.  She's

9    saying it's quite difficult to walk that -- what she needs to

10   walk to get to the court.

11         And so we are sympathetic to the concerns she has.

12   And our only question is whether there's any use to talk with

13   her to see if there's a way that we can make things easier.

14         THE COURT:  What is your response, counsel?

15         MR. CLOERN:  Your Honor, I think her ability to walk

16   to the court is probably not the biggest issue.  Reading on in

17   the letter, she says that her condition requires therapy three

18   times a week and some sort of hot water and not getting that,

19   she will revert and get worse.

20         THE COURT:  Do you remember that she told counsel

21   anything about that or the Court about that?

22         MR. CLOERN:  She didn't, your Honor.  I know.  But I

23   think Mr. DeVries' suggestion is a good one, if we just find

24   out how big of a problem is this.

25         THE COURT:  Well, it speaks for itself.  I don't

1    think we need to inquire further.  So let's pin it down.

2          Is Motorola taking the position that she should

3    remain on the jury?

4          MR. DeVRIES:  No, your Honor.

5          THE COURT:  Are you saying that she remain on the

6    jury?

7          MR. CLOERN:  No, your Honor.

8          THE COURT:  Okay.  Then she will be excused.

9          THE CLERK:  Which one is that?

10          THE COURT:  That is Fox.  And we will have to ask

11    Cotter in terms of her flight.

12          Now, getting on to Rossi, what is Motorola's position

13    regarding Rossi's submission?

14          MR. DeVRIES:  Given the number of issues that

15    Ms. Rossi raises in the submission, we have no objection to

16    her being removed from the jury.

17          THE COURT:  Counsel?

18          MR. CLOERN:  Same, your Honor.

19          THE COURT:  The Court agrees.  She, too, will be

20    excused.

21          Mr. Fulbright, please ask Juror Cotter to step in

22    just for a moment or two.

23          MR. DeVRIES:  Your Honor, there was one more, and you

24    may have been planning to get to that.

25          THE COURT:  Which one is that?

1      MR. DeVRIES:  Ms. Friske.  I believe that what she

2  essentially says is that she has a vacation planned --

3      THE COURT:  I don't think I have a Briske.

4      THE CLERK:  Friske.

5      MR. DeVRIES:  I could pass it up if that would be

6  helpful.

7      THE CLERK:  It's handwritten.

8      THE COURT:  Let me see that.  We'll have to get her a

9  new pen.

10     What do you claim it says?

11     MR. DeVRIES:  What I understand, your Honor, is that

12 Ms. Friske is saying that she has a vacation that begins over

13 the Thanksgiving holiday and extends into the next week, I

14 think through the Friday, December the 6th.  It is not

15 something I recall coming up yesterday.  And, you know, that's

16 something where missing an entire week of the trial at that

17 time, I think, would delay things quite a bit.

18     So I don't know if there's a way for -- it sounds

19 like Ms. Friske could attend part of that vacation over the

20 Thanksgiving week and then perhaps come back early.

21     THE COURT:  Well, we don't want to lead the lives for

22 these people.  So you are, as I understand it then, taking the

23 position that she should remain on the jury?

24     MR. DeVRIES:  Yes, your Honor.

25     THE COURT:  And what is the position of Hytera?

1          MR. CLOERN:  The same, your Honor.

2          THE COURT:  I agree.  And so these are problems that

3   the prospective -- that the jurors must deal with.  So much

4   the better if they had advised the Court and counsel.  I

5   recall specifically saying, "Is there any reason that you know

6   of why you should not participate as a juror in this case?"

7   The jurors had their opportunities.  Counsel inquired, left

8   many openings, and they chose not to raise the details they

9   have raised here.

10          And so we do need Cotter to come in.  So please ask

11  Cotter to come in.

12          Before Cotter comes in, so Julie Mironiuk is on.

13  Julie Fox is on.  Rossi is off.  And Friske is on.

14      (Juror Cotter enters open court.)

15          THE COURT:  Okay.  You can stop right there.  What is

16  your name, please?

17          JUROR COTTER:  Wendi Cotter.

18          THE COURT:  You have travel plans for the Wednesday

19  before Thanksgiving.  What time is your flight?

20          JUROR COTTER:  Boy, I don't know.  It's probably in

21  the morning.

22          THE COURT:  Did you tell the Court about this

23  earlier?

24          JUROR COTTER:  I didn't know that it was going to be

25  weeks on end either.

1        THE COURT:  Well, you're talking about Thanksgiving,
2    right?
3        JUROR COTTER:  Right.
4        THE COURT:  The Wednesday before Thanksgiving?
5        JUROR COTTER:  Right.
6        THE COURT:  Okay.  Is this something you can change?
7        JUROR COTTER:  Well, I don't know.  But I was going
8    to -- I didn't know what was happening here so...
9        THE COURT:  You didn't know what was happening here?
10       JUROR COTTER:  I mean, I knew what was happening.  I
11   didn't know it was going to go this long perhaps.
12       THE COURT:  You thought it would be over by
13   Thanksgiving?
14       JUROR COTTER:  I did not know.  I mean, a lot of
15   people thought it was going to be one or two days, so I had no
16   idea, truthfully.
17       THE COURT:  You thought it would be over in one or
18   two days?
19       JUROR COTTER:  No.  Other people said that they
20   thought it would be over in one or two days.  I had no idea --
21       THE COURT:  Who told you that?
22       JUROR COTTER:  Other people.
23       THE COURT:  Who?
24       JUROR COTTER:  Other jurors.
25       THE COURT:  They told you it would be over in one or

1    two days?

2              JUROR COTTER:  No, they thought it would be over in

3    one or two --

4              THE COURT:  You discussed the case with them?

5              JUROR COTTER:  No.

6              THE COURT:  Are you saying you can make change,

7    change this, or not?

8              JUROR COTTER:  I'm hoping so, yeah.

9              THE COURT:  Could you book your flight later in the

10   day on Wednesday?

11             JUROR COTTER:  I'm hoping so, yeah.

12             THE COURT:  All right.  Well --

13             JUROR COTTE:  I don't know.  I don't really know how

14   to do that, but I'm sure I probably can.

15             THE COURT:  All right.  We're saying that we would

16   like to work at least the morning of the Wednesday before

17   Thanksgiving, and then you won't have to come in on

18   Thanksgiving or Friday --

19             JUROR COTTER:  Okay.

20             THE COURT:  -- and you would return on Sunday.

21             JUROR COTTER:  Correct.

22             THE COURT:  So you make the plans to change your

23   flight time to the afternoon on Wednesday or the evening, and

24   all will be well.

25             JUROR COTTER:  Okay.  And are you saying you'll be

1    here until 5:00 the Wednesday before or until a certain time?

2              THE COURT:  You make the plans --

3              JUROR COTTER:  Okay.

4              THE COURT:  -- to change so that you're going to be

5    in the courtroom on the morning of the Wednesday before

6    Thanksgiving.

7              JUROR COTTER:  Okay.

8              THE COURT:  From that point on, you would then return

9    the following Monday.

10             JUROR COTTER:  Correct.

11             THE COURT:  All right.  It's up to you then.  Thank

12   you.

13             JUROR COTTER:  Okay.  I mean, I'll try to change

14   it --

15             THE COURT:  Well, you will not only try to, you must

16   do this.

17             JUROR COTTER:  Well, if I can't do it, then I won't

18   be able to go.

19             THE COURT:  Then I might impose a sanction.

20             JUROR COTTER:  I just won't go.

21             THE COURT:  Like the sanction could be the payment of

22   a fine or being held in contempt of court or something even

23   greater.

24             JUROR COTTER:  No, I would just stay -- come to the

25   court.  I would not not go to court.  I am wondering when we

1   were going to get -- if we were going to get out for the

2   holidays at all so I could try to rearrange my travel.

3           THE COURT:  Have I cleared that up?

4           JUROR COTTER:  I think so, except I'm not sure

5   exactly when on that day before Thanksgiving that you --

6           THE COURT:  You must be in this courtroom on the

7   Wednesday morning before Thanksgiving.

8           JUROR COTTER:  Okay.  I understand that.

9           THE COURT:  You are ordered to be here.

10          JUROR COTTER:  I understand that.

11          THE COURT:  Thank you.

12      (Juror Cotter exits open court.)

13          THE COURT:  And so when Mr. Fulbright returns, I'll

14  tell him to have the others come in so they can be informed.

15          MR. DeVRIES:  Your Honor, if I may inquire, I believe

16  you said that Ms. Fox was off.  Did I get that right, your

17  Honor?

18          THE COURT:  Let me look again here.  Do you have a

19  copy of her letter?

20          MR. DeVRIES:  Yes, your Honor.

21          THE COURT:  Julia Fox is on.  She is the one who

22  wrote considering the issues from the Union Station.

23          MR. DeVRIES:  Yes, your Honor.

24          THE COURT:  Okay.  So Mr. Fulbright, ask Julie

25  Mironiuk to come in.

1      MR. CLOERN:  I'm sorry, your Honor.  I thought Julia

2  Fox, she's the woman that had the knee problems.  And we

3  agreed, I think everyone agreed she would be --

4      THE CLERK:  Fox.

5      MR. CLOERN:  Fox and Rossi are off.

6      THE COURT:  Friske is on.  Fox is off.  Julia is the

7  person with the planned vacation in January.  That is not an

8  issue, so she will be on.

9      MR. CLOERN:  Correct.

10      THE COURT:  And as to Julia Fox, difficulties getting

11  to and from public transportation for the various reasons that

12  she has indicated.  She will be on.  And we have just dealt

13  with Cotter.

14      MR. CLOERN:  Your Honor, I'm sorry.  I apologize.

15  I'm -- earlier, I think we all agreed, and we may have been

16  mistaken, that Julia Fox due to medical --

17      THE CLERK:  Jill.  Jill Fox.

18      MR. CLOERN:  Jill Fox, due to medical conditions with

19  her knees and her ability to sit in the courtroom, would be

20  excused.

21      THE COURT:  Is that your agreement?

22      MR. DeVRIES:  We did not object.  Your Honor asked if

23  we objected to that, and we said no, we do not object to her

24  being excused.

25      THE COURT:  All right.  So Julie Fox then would be

1   off.

2           MR. CLOERN:  Thank you, your Honor.

3           THE COURT:  That's your agreement?

4           MR. DeVRIES:  Yes.

5           THE COURT:  You don't oppose it.  And that's your --

6           MR. CLOERN:  Yes.

7           THE COURT:  -- motion.

8           MR. DeVRIES:  Yes, your Honor.

9           THE COURT:  So Fox is off.  Julia Mironiuk is on.

10  Rossi is off.  And Friske is on.  And as I say, we have dealt

11  with Cotter.

12          MR. CLOERN:  Yes, your Honor.

13          MR. DeVRIES:  Yes, your Honor.

14          THE COURT:  So Mr. Fulbright, please ask Fox to come

15  in so that she may be excused, and ask Rossi to come in so

16  that she may be excused.

17      (Pause.)

18      (Jurors Fox and Rossi enter open court.)

19          THE COURT:  Are you Julie Fox?

20          JUROR FOX:  Jill Fox.

21          THE COURT:  Is that Jill?

22          JUROR FOX:  Uh-huh.

23          THE COURT:  Okay.  Ms. Fox.  You are excused.

24          And your name is?

25          JUROR ROSSI:  Jennifer Rossi.

```
 1              THE COURT:  Ms. Rossi, you are excused.  Thank you.
 2              JUROR ROSSI:  Thank you so much.
 3         (Jurors Fox and Rossi exit open court.)
 4              THE COURT:  Counsel, you probably need about a
 5    ten-minute break, right?
 6              MR. DeVRIES:  Yes, please, your Honor.
 7              MR. CLOERN:  Yes, your Honor.
 8              THE COURT:  Who is your next witness?
 9              MR. DeVRIES:  We will be calling Mr. Russ Lund.
10              THE COURT:  Indeed, you may call him.  I have a few
11    things to deal with regarding tomorrow's call, but they are
12    essentially dealt with.  And so in ten minutes, you may call
13    the witness.
14              MR. DeVRIES:  Yes, your Honor.
15              MR. CLOERN:  Your Honor, may we address one very
16    quick issue about the transcript from yesterday?  I just think
17    one thing got left off.
18              THE COURT:  I have nothing to do with transcripts.
19    You've got to talk to the court reporter about transcripts.
20              MR. CLOERN:  Yes, your Honor.
21              THE COURT:  Thank you.
22         (Recess from 2:03 p.m. to 2:15 p.m.)
23         (A change of court reporters was had.)
24
25
```

1       THE COURT:  Mr. Fulbright, be sure that you talk to

2  the jury director and the Clerk to make sure that the juror,

3  Ms. Cotter, receives a copy of the standard letter that is

4  issued to jurors to let employers and other individuals become

5  aware that they are serving as jurors here in the federal

6  court, which she can use for multiple purposes.

7       Will you do that, Mr. Fulbright?

8       THE CLERK:  Yes.

9       THE COURT:  Thank you.

10       Please ask the jury to come in.

11       And the witness may take the stand.

12     (Jury in at 2:15 p.m.)

13       THE COURT:  And then there were eight.

14       Members of the jury, let me perhaps brighten your day

15  to say that you are not required to be here tomorrow.  Take

16  Monday off as well.  But you are to return Tuesday morning at

17  10 a.m.

18       You may inquire of the witness.

19       Swear the witness.

20       THE CLERK:  Please raise your hand.

21     (Witness sworn.)

22       MR. De VRIES:  Your Honor, may I pass up some exhibit

23  binders to the witness?

24       THE COURT:  Yes.

25       (Documents tendered.)

Lund - direct by De Vries

127

1       THE COURT:  Please proceed.

2       MR. De VRIES:  Thank you, your Honor.

3           RUSSELL LUND, PLAINTIFFS' WITNESS, SWORN

4                   DIRECT EXAMINATION

5   BY MR. De VRIES:

6   Q.  Good afternoon.

7   A.  Good afternoon.

8   Q.  What is your name?

9   A.  My name is Russell Lund.

10  Q.  Mr. Lund, where do you work?

11  A.  I work at Motorola Solutions.

12  Q.  And how long have you worked at Motorola Solutions,

13  Mr. Lund?

14  A.  I just recently celebrated my 30th anniversary.  So it's

15  been over 30 years.

16  Q.  And where is your office located with Motorola Solutions?

17  A.  I work right here in the Chicagoland area in Schaumburg,

18  Illinois.

19  Q.  Mr. Lund, what is your current role or position at

20  Motorola?

21  A.  I'm the vice president of product and engineering for our

22  professional and commercial radios.

23  Q.  Now, I would like to ask you a little bit about your

24  background, Mr. Lund.

25          Did you attend school after high school?

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 114 of 217 PageID #:52006
Lund - direct by De Vries
128

1   A.   Yes, I did.

2   Q.   And where did you?

3   A.   I went to Marquette University in Milwaukee, Wisconsin,

4   just north of the border.

5   Q.   And did you receive a degree at Marquette?

6   A.   Yes, I did.

7   Q.   What was your degree?

8   A.   A computer science degree.

9   Q.   And what year did you receive your degree in computer

10   science from Marquette?

11   A.   It was 1985.

12   Q.   Mr. Lund, did you receive any additional degrees?

13   A.   Yes, I did.

14   Q.   And what are you referring to?

15   A.   I went on to get my MBA.

16   Q.   Okay.  And where did you get your MBA from?

17   A.   Right here in Chicago at DePaul University.

18   Q.   And what is an MBA?

19   A.   An MBA is a master's of business administration.

20   Q.   Now, Mr. Lund, what was your first job out of college?

21   A.   My first job out of college -- I moved to Philadelphia,

22   Pennsylvania, and I worked at General Instruments.  We made

23   set-top boxes for your cable TV.  So where you received your

24   cable into the TV, my first job was to help make those boxes

25   for General Instruments.

Lund - direct by De Vries

1   Q.  And what was your general position at General Instruments

2   in Pennsylvania?

3   A.  I was a software engineer.

4   Q.  Now, Mr. Lund, when did you first start working for

5   Motorola?

6   A.  So after Philadelphia, my wife had a great job offer to go

7   work in her family business.  And so we decided to pack up out

8   of Philadelphia and move back to the Chicagoland area.  She

9   started working in her family business, and I was fortunate

10  enough to get a job at Motorola.

11  Q.  And what year was that?

12  A.  That was 1989.

13  Q.  Mr. Lund, what was your first job when you started working

14  for Motorola in 1989?

15  A.  I was a senior software engineer working on a

16  computer-aided dispatch program.  It was for the New York City

17  Transit Authority.  At that time they had in the trains and

18  buses two-way radios so that they could communicate back to

19  dispatchers to give them notifications about their next routes

20  and also if there is any emergencies.  And I worked on that

21  computer-aided dispatch center.

22  Q.  Mr. Lund, did you work on any other projects as a software

23  engineer for Motorola in the 1990s?

24  A.  Yes, I did.

25  Q.  What are you referring to?

1    A.   After that project -- I worked on that at Motorola for two

2    years, and then I went into our public safety division and

3    worked on two-way radio communication systems, specifically on

4    the systems bay station side.

5    Q.   And was there a name of the systems that you were working

6    on at that time?

7    A.   Yes, they are called the ASTRO systems.

8    Q.   Now, Mr. Lund, did there come a time when you took on a

9    management role at Motorola?

10   A.   Yes.   Somewhere in the mid '90s I decided to leave the

11   technical path and become a manager at Motorola.

12   Q.   And what did you work on as a manager at that time?

13   A.   I continued to work on the ASTRO digital programs as a

14   manager.   I worked on the network management controllers, the

15   call processing controllers, and continued in the Schaumburg

16   area.

17   Q.   Now, what did you do next in connection with your job at

18   Motorola?

19   A.   After that, one of the senior leaders in the company,

20   after some growth out in the regions in Asia, one of my senior

21   leaders had some problems out there.   And he asked if I would

22   be willing to go out to London to work on a project over

23   there.

24   Q.   And what was your position in London at that time?

25   A.   So obviously a big move for my family.   This time I had a

Lund - direct by De Vries

1  family counsel and said, you know, are we really willing to

2  move out of the Chicagoland area and over to London?  So we

3  took a family vote, my wife and three boys, and made the

4  decision we were going to move over there.

5           And in doing so, I was responsible for our TETRA

6  project on the system side.  And TETRA was a standard in

7  Europe and Asia for public safety.

8  Q.  And how long did you work in that position at Motorola in

9  the United Kingdom?

10  A.  I stayed in that position for, roughly, two years.

11  Q.  And what did you do next?

12  A.  After that project, they asked me to continue on in the

13  U.K. to work on our subscribers, our devices.  I worked first

14  on the system side, the bay stations and that.  And then they

15  asked me to help lead the radio division for TETRA.  And I

16  remained another two years in London.

17  Q.  What did you do next, Mr. Lund?

18  A.  After that, my family and I moved back to the Chicagoland

19  area, and I was leading our broadband engineering team back in

20  Schaumburg again.

21  Q.  And when was it that you moved back to Illinois in

22  connection with your job at that time?

23  A.  It was 2004.

24  Q.  Now, what did you do next at Motorola, Mr. Lund?

25  A.  I worked on the broadband for approximately three years.

Lund - direct by De Vries

132

1   And from there, I think maybe they saw that I was willing to

2   travel.  They had asked me to again help them out in a

3   situation.  My leader talked to me about moving out to Asia.

4        So in 2007, we had another family discussion, and we

5   agreed that it would be worth going out there again.  They had

6   a good experience on the first one.  And so I took a position

7   in Penang, Malaysia.

8   Q.   Mr. Lund, where is Penang, Malaysia located?

9   A.   It's roughly 10,000 miles from here.  And it's -- Penang

10  is an island, part of the country of Malaysia.  I explain it

11  to people best, it's south of China and it's north of

12  Australia, just north of the equator.  So coming from Chicago,

13  it's definitely very hot there and humid.

14  Q.   Was there a name of the Motorola facility in Penang that

15  you were going to work at?

16  A.   Yes.  It was called the Motorola Penang Design Center.

17  Q.   And what is the Motorola Penang Design Center?

18  A.   So we had a large site of engineers that worked in Penang,

19  and they were responsible for working on our two-way radio

20  communication systems.  They were groups of engineers that

21  were hardware- and software-based.

22  Q.   Now, when approximately did Motorola found its Penang

23  Design Center?

24  A.   Penang had been in existence for, roughly, 45 years ago,

25  1974.

1  Q.  And, Mr. Lund, what was your position at Motorola's Penang

2  Design Center when you joined in 2007?

3  A.  I was the director of engineering responsible for the

4  whole engineering site.

5  Q.  Now, Mr. Lund, did you prepare demonstratives to assist

6  you in providing your testimony to the jury today?

7  A.  Yes.  I directed the team in putting together some

8  examples.

9          MR. De VRIES:  Your Honor, may I have permission to

10  publish one of Mr. Lund's demonstratives?

11          THE COURT:  Are you doing that electronically?

12          MR. De VRIES:  Yes, your Honor.

13          THE COURT:  Please proceed.

14          MR. De VRIES:  If we may please display PDX 2 and

15  2.1, in particular, for the record.

16  BY MR. De VRIES:

17  Q.  Mr. Lund, can you see that on your screen?

18  A.  Yes, I can.

19  Q.  What are you showing on this slide?

20  A.  If you can't tell, I'm the one in the middle.  That is my

21  team in the Penang Design Center.  It is my direct leadership

22  team at the time that I lived there.

23          And as you can tell, we were required by policy to

24  wear all the same shirts, both in engineering and in the

25  factory.  And as you can tell, we wore those shirts every day.

1    It's a little hard to see, but there is literally Motorola bat

2    wings in those orange and green circles.  So pretty much

3    anyone in that country knew that you worked for Motorola.

4              MR. De VRIES:  We can take that down please,

5    Mr. Schlaifer.

6    BY MR. De VRIES:

7    Q.  Now, you have a binder of exhibits.  You have two.  And I

8    would like to ask you to please take a look first at an

9    exhibit, PTX 2056.  And that's in your second smaller binder,

10   Mr. Lund.

11   A.  Yes, I see this.

12   Q.  I have a few questions about this exhibit.

13             First, Mr. Lund, are you familiar with PTX 2056?

14   A.  Yes, I am.

15   Q.  And how are you familiar with this exhibit?

16   A.  This is my organizational chart that I put together while

17   I was working in the Penang Design Center.

18   Q.  And approximately when did you put together this document

19   as part of that role?

20   A.  In October of 2007, the year that I arrived there.

21   Q.  And what was the purpose of putting together this

22   document?

23   A.  It was a standard practice at Motorola, and I'm assuming

24   other companies.  You put together an organization chart so

25   it's very clear who's on your team, what their roles are on

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 121 of 217 PageID #:52013
Lund - direct by De Vries
135

1    the team.  And you use that to communicate not only to our

2    team but to other teams so they know who to contact within the

3    organization.

4    Q.  And, Mr. Lund, did you put this document together as part

5    of Motorola's regular business practices?

6    A.  Yes, I did.

7    Q.  And was it your or Motorola's regular practice to put

8    together documents like this as part of that business

9    practice?

10   A.  It was a regular practice of mine, and it was also part of

11   the Motorola culture to put that together.

12          MR. De VRIES:  Your Honor, plaintiff moves admission

13   into evidence of PTX 2056.

14          THE COURT:  It is received as a business record.

15       (Said exhibit was received in evidence.)

16          MR. De VRIES:  Your Honor, may we publish it to the

17   jury?

18          THE COURT:  Yes.

19   BY MR. De VRIES:

20   Q.  Can you see on your screen in front of you, Mr. Lund, the

21   document PTX 2056?

22   A.  Yes, I can.

23   Q.  Could you please point out where you are located on this

24   organization chart?

25   A.  I'm at the top right there.

Lund - direct by De Vries

136

1   Q.   And at the top it says, "Penang Design Center

2   Organization."

3            What does that refer to?

4   A.   That is the engineering center in Penang that I was

5   responsible for.

6            MR. De VRIES:   Now, Mr. Schlaifer, we can take that

7   down for now, please.

8   BY MR. De VRIES:

9   Q.   Approximately how many engineers worked for you at

10  Motorola's Penang Design Center when you had your position of

11  leadership there in 2007?

12  A.   There was, roughly, 850 engineers.

13  Q.   And, Mr. Lund, what type of work did the engineers who

14  reported to you in the Penang Design Center do?

15  A.   They worked on our two-way radio communication systems.

16  There was multiple disciplines.  We had hardware engineers, we

17  had software engineers, we had test engineers in that

18  organization.

19  Q.   And how, if at all, did you personally interact with the

20  engineers at the Penang Design Center in Malaysia when you

21  were leading that at that time?

22  A.   Obviously there is a lot of people there.  I wasn't able

23  to interact on a daily basis with all of them individually.

24  But I did interact with my direct reports on a regular basis.

25  I was also conducting regular program reviews and quality

Lund - direct by De Vries

137

1    reviews on a monthly basis.

2         So I would see not only my direct staff but also the

3    project leaders in the organization.  And that was more from

4    an operational perspective.

5         On a quarterly basis, we would have what we call town

6    halls.  That was an opportunity for me to get together with

7    the large departments or people from the site and really

8    communicate with them, what's happening at the site, what's

9    happening with the businesses, how are the projects doing?

10   And just, you know, social events, too.  If there is something

11   good coming up, we would make them aware of that.

12        So that's the chance really I had to interact with

13   large amounts of people at that time.

14        THE COURT:  What languages do you speak?

15        THE WITNESS:  I speak English and a little bit of

16   other languages, but just --

17        THE COURT:  What are the others?

18        THE WITNESS:  I know a little bit of Spanish, a

19   little bit of German, and a little bit of Chinese.

20        THE COURT:  Please proceed.

21   BY MR. De VRIES:

22   Q.   Now, Mr. Lund, how long did you lead the Penang Design

23   Center for Motorola after taking on that position in 2007?

24   A.   I worked there for two years.

25   Q.   Okay.  Until approximately 2009?

Lund - direct by De Vries

138

1    A.   Until 2009.

2    Q.   What was your next role at Motorola?

3    A.   After my family and I returned back home, I returned again

4    to the Chicagoland area and worked in Schaumburg.  I was

5    responsible for our core platform development at Motorola.

6    Having now worked on ASTRO, TETRA, public safety, and now our

7    DMR products, I came back and I worked in a common platform

8    role.

9    Q.   Now, what is your role at Motorola today?  I know you gave

10   us your position earlier, but could you tell us what your role

11   is today?

12   A.   Today I am responsible for our two-way radio systems for

13   our commercial markets, specifically our MOTOTRBO product

14   line, and I'm responsible for the engineering and product

15   management.

16   Q.   Are you responsible for the engineering and product

17   management of the Motorola products that are at issue in this

18   lawsuit?

19   A.   Yes, I am.

20   Q.   And when did you take on your current role?

21   A.   This current role I started back in January of 2018.

22   Q.   Mr. Lund, how many people approximately report to you

23   today as part of the role you just described?

24   A.   I have around 500 people.

25   Q.   Okay.  I would like to ask you a little bit more about

Lund - direct by De Vries

139

1    your employer.

2           MR. De VRIES:  Your Honor, may I publish the next

3    demonstrative slide?

4           THE COURT:  Yes.  Please proceed.

5           MR. De VRIES:  Thank you.

6    BY MR. De VRIES:

7    Q.  PDX 2.2 is up on the monitors.  Is that on your monitor as

8    well, Mr. Lund?

9    A.  Yes, it is.

10   Q.  Okay.  I will assume that going forward unless you tell me

11   you can't see it, please.

12          First, please tell the jury what Motorola Solutions

13   is?

14   A.  Motorola Solutions works on two-way radio communication

15   solutions.  I often try and explain it to friends and family

16   when they ask me what I do.  I always use an example of, you

17   know, God forbid you are ever in an emergency situation, but

18   the first thing most people do is call 911.

19          Motorola Solutions today is responsible for those

20   first calls.  So your first call into the 911 center, we work

21   on the software solutions that enable that quick transaction

22   so that we can quickly then dispatch somebody to the scene to

23   the incident.

24          So it starts with 911.  We then have -- we are

25   responsible for the dispatch solutions and computer-aided

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 126 of 217 PageID #:52018
Lund - direct by De Vries
140

1    dispatch solutions.

2         And then we communicate those messages over the

3    airwaves to our remote first responders.  So whether it be a

4    fireman, a policeman, or even an ambulance, they carry our

5    two-way radios.  So they are the first ones on the scene to

6    help you in that emergency situation, and they stay with you

7    throughout that whole cycle.

8         So it's not just the radios anymore.  We continue to

9    work on solutions that provide end to end to help people out

10   in moments that matter.

11        I would also like to note -- and I know I get this

12   all the time.  Many people still think that we do the cell

13   phones.  So when you hear Motorola, you think of the Motorola

14   cell phones.

15        Today we are just responsible, Motorola Solutions,

16   for the two-way radio communication systems.  There is --

17   Motorola Mobility is responsible for the cell phones.

18        MR. De VRIES:  Mr. Schlaifer, please display PDX 2.3.

19   BY MR. De VRIES:

20   Q.  Mr. Lund, would you please explain where Motorola is

21   located.

22   A.  Motorola is headquartered right here in Chicago, Illinois.

23   Q.  Does Motorola have any other locations?

24   A.  Yes.  We have multiple locations in the U.S., and we also

25   have locations throughout the world.

1   Q.  And how many employees does Motorola currently have?

2   A.  We have, roughly, 17,000 employees today.

3         MR. De VRIES:  Mr. Schlaifer if you could please

4   display PDX 2.4.

5   BY MR. De VRIES:

6   Q.  Mr. Lund, what are you showing here?

7   A.  These are two pictures of our locations here in Illinois.

8   The one I work in is on the left.  That's in Schaumburg,

9   Illinois.  That's where a lot of the engineers are residing.

10   We do have engineers to the right in Chicago.  That's our new

11   corporate headquarters located right over on 500 Monroe

12   Street.

13         MR. De VRIES:  We can please take that down,

14   Mr. Schlaifer.

15   BY MR. De VRIES:

16   Q.  I would like to ask you a little bit about the history of

17   Motorola.

18         When and where was Motorola founded, Mr. Lund?

19   A.  Motorola was founded right here in the Chicagoland area

20   back in 1928.

21         MR. De VRIES:  Mr. Schlaifer, please display PDX 2.5.

22   BY MR. De VRIES:

23   Q.  Is this a timeline that you had prepared, Mr. Lund?

24   A.  Yes, it is.

25   Q.  And could you, with reference to this timeline, please

1    explain what some of the first products that Motorola sold

2    were?

3    A.   So the founders of our company are the Galvin brothers.

4    They started in 1928 in Franklin Park.  And their first

5    project that they worked on was called a battery eliminator.

6    So for your radios back in the day in the home, they started

7    that.

8              Due to the recession, they didn't fair too well.  So

9    they quickly came up with their next invention, which was the

10   automobile radio.  So as simple as it sounds today, back then

11   it was the ability -- as cars were really starting to grow at

12   that time, it was the first ability to take the radio that was

13   in the home and put it into the automobile.  So that was the

14   first invention they came up.  And as you can imagine, the

15   rest is history.  And they have done quite well on that since

16   then.

17   Q.   Next on your timeline it says 1940.  What are you

18   displaying there?

19   A.   So again, necessity is the mother of invention.

20             In the '40s, as you recall, we went to war in World

21   War II.  At the time there was no means of communication on

22   the frontline.  As odd as that seems today, that was quite a

23   disadvantage if you were on the front lines.  Communication

24   was done with carrier pigeons and literally people trying to

25   run out to get information.  And you can imagine what a

1    difference it would make to have communications out there.

2         Motorola was asked to put together a solution for

3    that.  And we invented the two-way handy talky, or the

4    walkie-talkie as you know today, to get the frontline troops

5    instant communication so that they can report back on what's

6    happening on the frontline and make decisions and also for the

7    command to give orders out to the frontline without any delay.

8    Q.  Was that technology important to the war effort?

9    A.  Absolutely.  If you have read any of the quotes, it was a

10   game changer for the people on the frontline.

11   Q.  Now, next you display 1969.

12        What involvement, if any, did Motorola have in the

13   United States space program?

14   A.  So at the time, in the '60s, everyone is very aware of the

15   race to be the first on the moon.  And it's still unimaginable

16   how many inventions and how much risk was taken by people all

17   the way around to get people up onto the moon and have Neil

18   Armstrong walk.

19        We were fortunate, the Galvins were the inventors of

20   the communication systems to the moon.  So all the information

21   you saw, the data going back to NASA so that they can make

22   decisions, the videos, the audio that you saw and heard, that

23   was invented by Motorola.  I mean, I can't imagine what it

24   would be like to just basically blasting off and then waiting

25   until the very end to see if they returned.  They were able to

Lund - direct by De Vries

144

1    have instant communication all the way through that journey.

2    It's just amazing, not only that invention but all those

3    inventions.

4    Q.   The next item on your timeline says 1983 cell phone.

5    Could you please explain what that refers to?

6    A.   I'm sure everyone today knows what a cell phone is, but

7    back in the '70s there were no cell phones.  So Motorola had

8    worked with the FCC and the government agencies to put a

9    proposal together to create the ability to not only talk while

10   you were walking but talk while you were mobile in many

11   different locations.

12           If you recall back at that time, you used to have to

13   have a dime to put it in a pay phone and be able to

14   communicate back.

15           It took us ten years.  We started working on it in

16   1973.  And the first cell phone, which was the invention of

17   Motorola, came out in 1983, ten years later.  And the first

18   cell phone was made at that point.  And as I said, the rest is

19   history from there.

20   Q.   The next item on your timeline says 1991, the first ASTRO

21   digital radio.  What are you referring to there, Mr. Lund?

22   A.   So ASTRO was our public safety communication system -- so

23   police, fire, military.  This was the first digital radio that

24   was used in the industry, and that allowed us to have enhanced

25   security features for our police forces, our military teams,

1    to have communications back and forth to command centers.  So

2    this was the first time following our course that we released

3    products into the ASTRO digital market.

4    Q.  And then at the end of your timeline it says 2007,

5    MOTOTRBO.  What does that refer to?

6    A.  The other major business we have at Motorola is our

7    commercial.  So our first -- our number one business is our

8    public safety.  And they received a lot of good benefits by

9    moving to digital.

10           In the 2007 time frame, we released the first digital

11   radio in DMR in 2007.  And again, we wanted to have our

12   customers to have a lot of the same benefits that our public

13   safety customers were using in the commercial markets.

14   Q.  Mr. Lund, is innovation important to Motorola?

15   A.  Absolutely.  As you can see, innovation has been the

16   lifeline of Motorola.

17           MR. De VRIES:  Mr. Schlaifer, we can take that down,

18   please.

19   BY MR. De VRIES:

20   Q.  Mr. Lund, does Motorola invest in researching and

21   developing new technologies?

22   A.  Yes, we do.

23   Q.  And how much money approximately does Motorola invest

24   every year to create new technologies?

25   A.  We roughly invest over $600 million a year on research and

1    development for new technologies and current products.

2    Q.  Now, Mr. Lund, where does Motorola conduct research and

3    development of the kind you just described?

4    A.  We conduct it right here in Chicago, Illinois, other sites

5    in the U.S., and also abroad.

6            MR. De VRIES:  Mr. Schlaifer, please display PDX 2.6.

7    BY MR. De VRIES:

8    Q.  Mr. Lund, has Motorola received any awards for its

9    innovations?

10   A.  Yes, we have.

11   Q.  What are you showing on this slide?

12   A.  This is a proud moment in Motorola history where we were

13   offered the National Medal of Technology and Innovation.  It's

14   bestowed by the president upon a company for recognizing their

15   innovation over the years.

16           I would also note we received this as a company, but

17   the son of the founder is Bob Galvin, also personally received

18   one from the president himself.

19   Q.  Mr. Lund, are there any other awards that Motorola --

20           THE COURT:  Can you identify the President on the

21   picture.

22           THE WITNESS:  Mr. Bush.

23           THE COURT:  More than that.

24           THE WITNESS:  Mr. George Bush.

25           THE COURT:  Please proceed.

Lund - direct by De Vries

147

1    BY MR. De VRIES:

2    Q.   And who's with President Bush, Mr. Lund, in that picture?

3    A.   That is our chief technology officer, Padmasree Warrior.

4    Q.   Now, Mr. Lund, are there any other awards that Motorola

5    received that you are particularly proud of?

6    A.   Yes, we did have one other award.  It was the first of its

7    kind in the late 1980s.  It was called the Malcolm Baldrige

8    award.  That was for recognition, again, by the President for

9    quality and process.  I am very proud of that one because we

10   do take quality and process very seriously.

11   Q.   And when you say "the President," who are you referring

12   to?  The President of the United States?

13   A.   The President of the United States.

14   Q.   I have one more question about Motorola that relates to

15   something that you talked about earlier.

16           Was there a corporate split that took place at

17   Motorola in 2011?

18   A.   Yes, there was.

19   Q.   And could you please explain?

20   A.   I explained it a little bit earlier.  Sometimes people

21   still think of us as the cell phone maker.  All that time

22   along we used to be one company called Motorola.  At that time

23   frame we split.  Our division split apart.  The cell phones,

24   which you are still familiar with, they became Motorola

25   Mobility.  We retained the name Motorola, and they did, too.

1   And then we split into our two-way radio communications.  And

2   it's called Motorola Solutions.

3   Q.  Now, I would like to shift gears and ask you a little more

4   about the Motorola products that are at issue in this case.

5         Let me start by making sure.  Do you have a radio in

6   front of you that's parked PDX 12?

7   A.  Yes, I do.

8   Q.  Okay.  Let me ask you, Mr. Lund, what is a two-way radio?

9   A.  So a two-way radio -- it would be best to start off with

10   the "two-way" portion.

11         So earlier I gave you an example of a one-way radio.

12   So a one-way radio was our example of the radio in the car.  I

13   think all of us have them today.  You have AM and FM.  That's

14   an example of one way.  There is a broadcasting station that

15   broadcasts out to a receiver, which is in your car and your

16   home.  That's a one-way radio.

17         A two-way radio is this radio where you can now talk

18   back.  So I receive information over the airwaves, and then I

19   can also respond.  So that's an example of a two-way radio in

20   its simplest form.

21         MR. De VRIES:  Mr. Schlaifer, please display PDX 2.7.

22   BY MR. De VRIES:

23   Q.  Mr. Lund, with reference to your slide here, would you

24   please explain whether there are different types of two-way

25   radios and at a high level how those interact with one

Lund - direct by De Vries

149

1    another.

2    A.  So you can see from your picture on the far left and far

3    right an example of what we call a portable radio, which is

4    what I'm also holding up here, too.  That's a portable radio.

5         We also make mobile radios.  So the one in the middle

6    in the representation of the ambulance is an example of a

7    mobile.  And that's installed in the dash mounts of the car or

8    fire truck or a police car.

9         And then at the very top you will see an example of

10   the repeater.  It's oftentimes hard to explain those, but I'm

11   sure you have seen around your neighborhoods or on the

12   highways large cell towers.  Those cell towers are used to

13   repeat the information out to the radios that are out in the

14   field.

15        The basic form of communication is myself and this

16   radio, portable radio, talking to that radio.  And that's done

17   without the aid of any cell towers.  This antenna communicates

18   directly to that antenna.  And that's what we called our basic

19   direct mode operation.

20        And based on the power of these radios -- and as you

21   know, in your car if you start to go out of range, you start

22   to hear static on your station.  It's the same thing on that's

23   radios.  At some point -- if he walked out miles away, at some

24   point he won't be able to hear me anymore.

25        So how we solve that problem is we then insert a

Lund - direct by De Vries

1    repeater in the middle of that.  And what that does is it

2    allows me to talk to the repeater, which then can talk to the

3    second radio over there.  And that gives you much greater

4    distance in range.  So it's not just radio to radio.  We use

5    that to allow you to have broader and broader geographic

6    areas.  Similar to your cell phones, you know when you are

7    handing over from a cell tower to another, you may hear a

8    little crackle, or at least you did in the old days.  It's the

9    same type of concept.

10        So you have the ability to talk one to one with each

11   other -- and maybe that's done in a building where you don't

12   have good reception -- or you can talk over large geographical

13   areas.

14   Q.   Now, Mr. Lund, are Motorola's two-way radios simple

15   devices?

16   A.   No, they are not.

17   Q.   And why do you say that?

18   A.   As I explained in that information to you, there is a lot

19   that goes into these radios, the communication portion of

20   being able to talk to the radio itself through many different

21   circumstances and geographical areas.  They are also very

22   rugged phones.  Unlike your cell phone, you may have had

23   examples where you drop and it breaks.  We can drop these,

24   throw them against the wall, they don't break.  And that's,

25   again, because of the types of users we make these radios for.

Lund - direct by De Vries

151

1          So there is a lot that goes into these radios to

2     insure high quality, guaranteed service over and over again.

3     Q.  You mentioned types of users.

4          What types of users does Motorola make these kinds of

5     radios for?

6     A.  So there is basically two users at the very top.  One is

7     the is first one I explained to you was public safety.

8     Police, fire, ambulance, military, people that are first

9     responders in the industry, those are rugged radios that we

10    make for those user groups.

11         We also have the same technology, maybe not as secure

12    of features in that, for our commercial users.  And those

13    might be a hospitality, a hotel, a retail outfit,

14    manufacturing, oil and mining and gas.  So those types of

15    users use these types of rugged phones to do their daily jobs

16    and communication within those systems.

17    Q.  Why do people -- the people that you just described -- not

18    just use cell phones to communicate?

19    A.  So there is a few reasons.

20         As I explained the most simplest one, as you may

21    know, the direct mode communication that I spoke about.  If

22    you have a friend that has an Apple and you have a Samsung and

23    there is no cell service, you can't talk between each other.

24    You need the Verizons, the AT&Ts.  Without that service, you

25    can't talk.

1          So, first of all and foremost, is these radios can

2     talk without any type of infrastructure around them.  That's

3     very important if you are in desperate situations, in a fire

4     and, for whatever reason, the cell towers aren't available or

5     whatever, those firemen can still talk in those situations.

6          The second one is basically the reliability.  In

7     circumstances -- if you have ever been, say, in a stadium or a

8     large venue and you ever tried to get a text message out or a

9     phone call out, you know that there is definitely delays going

10    on.  There is thousands and thousands of people all trying to

11    access that cell tower.

12         Can you imagine if you were trying to get in with an

13    emergency service using that same cell tower and

14    communications, you would not have the ability to get to the

15    situation where someone may be in trouble.

16         So we use private systems to insure that whenever

17    those systems are needed, they are there dedicated for our

18    first responders.

19         And finally, I talked a little bit about the

20    resiliency.  As I mentioned before, if you have ever dropped a

21    cell phone, you have had the broken glass and so forth.  These

22    are meant to be resilient.  Our users are very rugged.  They

23    are police.  They are fire.  They are out in the weather, the

24    rain and so forth.  These radios are meant to last.

25    Q.  Now, Mr. Lund, is there a certain type of two-way radio

1    that is involved in this case?

2    A.   Yes there is.

3    Q.   And what is it?

4    A.   It's our DMR products, MOTOTRBO.

5    Q.   What are DMR -- what does DMR refer to?

6    A.   DMR is a standard digital mobile radio.

7    Q.   First, what does "digital" mean?

8    A.   So digital -- in the simplest sense, I can compare analog

9    and digital.

10            Analog -- when I spoke earlier, when you are talking

11   into a radio or a broadcast, you can hear going over the

12   airwaves is your actual voice.

13            When you convert something to digital, you are

14   literally turning it into bits and bytes, zeros and ones.  So

15   if you ever had a scanner or something -- you probably heard

16   in the old days people would use scanners to listen to police

17   officers' conversations.  They are literally listening to the

18   analog voice going across from the bay station to the radios.

19            Now, with digital, it's literally zeros and ones.

20   And if you ever tried to listen to that, you would not

21   understand it.  It's basically computer talk.  So that's the

22   basic concept.

23            I think another example would be the old days of

24   records.  Record players used analog technology.  Today

25   everything is done with CDs, right?  So it's all the same

1  thing.  It's digitized.  It's zeros and ones and bits and

2  bytes.

3  Q.  Now, why did Motorola develop digital two-way radio

4  technology?

5  A.  There was a lot of benefits to going to digital technology

6  over analog.

7  Q.  Could you please explain some of those benefits?

8  A.  Some of the benefits of that are better audio quality.

9  You can do more with the audio.  You also receive better

10  battery life.  So your batteries will last a lot longer, or

11  you can use smaller batteries in there.

12       There is also enhanced security features, so you can

13  have more enhanced security.  And then in general, there is

14  just more features you can do in digital that you just can't

15  do in analog mode.

16  Q.  Now, you referred to a moment ago the DMR standard.

17       What is the DMR standard?

18  A.  The DMR standard was invented by the ETSI.  It's the

19  European Telecommunications Standards Institute.  It was based

20  out of Europe, obviously, by the Europeans.  And they were

21  responsible for developing a worldwide standard for commercial

22  digital radio communications.

23  Q.  Just in general, at a high level, what is a standard?

24  A.  So standards are put in place usually to help the end

25  customers -- whether it's police or commercial users -- to

Lund - direct by De Vries

155

1    give them a very simple, cost-effective, and interoperable --

2    and what I mean by "interoperable" is the ability for other

3    radio manufacturers to work together in their environment.

4          I will use an example again.  You may be on Verizon

5    or AT&T, but you know that your Apple radio, your Apple cell

6    phone or your Samsung cell phone can all talk to each other.

7    That's because of a standard called LTE for cellular

8    communications.  If it wasn't for that standard, you would

9    have to have dedicated systems for your Apple phones or for

10    your Samsung phones.

11          And what this does is allow you to have a fair

12    practice and have a common standard so that manufacturers can

13    develop to that standard and have basic communications.  So

14    it's really defining, what are the basic communications to

15    allow those radios to talk together?

16          It doesn't mean, though, that you can't invent new

17    features.  If you guys see the advertising for Apple and

18    Samsung, they are all trying to outdo the other with special

19    features.  But the base common denominator is they can

20    interoperate with each other.

21    Q.  And going back again to Motorola's DMR radios, what is the

22    name of those radios?

23    A.  MOTOTRBO.

24    Q.  Does the DMR standard describe all the technology that's

25    needed to build Motorola's MOTOTRBO radios?

Lund - direct by De Vries

156

1      MR. ALLAN:  Objection, your Honor.  Leading.

2      THE COURT:  Overruled.  You may answer.

3  BY THE WITNESS:

4  A.  No, it does not.

5  BY MR. De VRIES:

6  Q.  Why do you say that?

7  A.  Similar to that other example, the standard defines the

8  basic talk and listen and other features so that you can have

9  multiple manufacturers in one system similar to the cell

10  phones.

11      So it defines the basic talk and listen so you can do

12  messaging, but it doesn't tell you you have to develop all the

13  unique features.  Again, similar to Apple and Samsung is being

14  able to put your own value into a product.

15  Q.  Now let me ask you about the development of Motorola's

16  MOTOTRBO products.

17      Are you familiar with that development process?

18  A.  Yes, I am.

19  Q.  How, if at all, were you personally involved in developing

20  Motorola's MOTOTRBO products?

21  A.  I led the engineering teams that were in Penang, Malaysia

22  at the time.

23  Q.  And were the engineering teams that you led in Penang,

24  Malaysia at that time working on development of the MOTOTRBO

25  products?

Lund - direct by De Vries

1  A.  Yes, they were.

2  Q.  When did Motorola begin developing its MOTOTRBO products?

3  A.  We first began in the 2003 time frame.

4  Q.  Did the MOTOTRBO project build on any earlier Motorola

5  technologies?

6  A.  Yes, it did.

7  Q.  What are you referring to?

8  A.  So we built upon the ASTRO platform, which, as I explained

9  to you earlier, was our public safety radios, which were

10  released in the '90s.

11  Q.  And when did Motorola begin developing its ASTRO radios?

12  A.  We began development of our ASTRO roughly in the late 1988

13  time frame.

14  Q.  And approximately how many people at Motorola worked on

15  developing the ASTRO radios?

16  A.  There was hundreds of engineers responsible for that.

17  Q.  And where were the engineers who worked on ASTRO located?

18  A.  As I explained earlier, there is a radio portion of ASTRO,

19  which was the actual radio.  Predominantly those engineers

20  were located in Plantation, Florida, just close to Ft.

21  Lauderdale, if you are familiar with the East Coast.

22       And the other portion was the system side.  So the

23  bay station repeaters, that engineering team was predominantly

24  located in the Schaumburg, Illinois facility.

25  Q.  You may have just said this.  I apologize if I missed it.

Lund - direct by De Vries

158

1           But when were the ASTRO products released?

2   A.   They were released in 1994.

3   Q.   And are those ASTRO products still sold and used today?

4   A.   Yes, they are.

5   Q.   Now, moving back to the MOTOTRBO products, what was the

6   first company to release a DMR product?

7   A.   Motorola Solutions.

8   Q.   And when did Motorola release the first DMR product?

9   A.   In 2007.

10  Q.   What types of customers use Motorola's MOTOTRBO products?

11  A.   So, again, the turbo products are mostly for commercial

12  markets.  So, again, the manufacturing, hotels, hospitality,

13  retail, mining, oil, those types of customers.

14          Again, very rugged customers.  They have very rugged

15  needs in terms of doing their day-to-day jobs out in the

16  environment.

17  Q.   And are there particular circumstances where those

18  customers used the MOTOTRBO products?

19  A.   Yes.  There is an example -- I mean, you may be familiar

20  today.  Obviously a lot going on in the public safety and

21  concerns around schools.  A lot of our schools will use our

22  TRBO radios.  They use them for communication sometimes just

23  for maintenance, but security guards may carry them, even some

24  teachers.

25          So we have initiatives today called the Safer Schools

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 145 of 217 PageID #:52037
Lund - direct by De Vries
159

1    Initiative.  And we are working with all the technology at

2    Motorola that we have with video cameras doing video

3    surveillance at the schools, having the ability to be able to

4    detect a situation at the school, and then give communications

5    directly to the people carrying these -- so the people in the

6    school that are doing security or teachers -- and give them

7    updates immediately that maybe something is going on -- a

8    group is gathering around a location they shouldn't be or

9    someone came in through a video detection and said they

10   shouldn't be in there.  It gives security and teachers the

11   alertness to quickly respond to that situation.

12          So those are some of the examples that, again, as you

13   know, are key needs today.  We are trying to figure out how

14   technology can help them do their jobs better.

15   Q.   Mr. Lund, does MOTOTRBO have any other names inside of

16   Motorola?

17   A.   Yes.  For a lot of our projects we do use internal code

18   names.  So you may hear today terms like Matrix.  And yes, it

19   was about the movie Matrix.  So we have used Matrix before,

20   and we have also used LTD, which is low-tier digital.

21   Q.   Now, approximately how many engineers at Motorola worked

22   on the MOTOTRBO product in particular?

23   A.   There were hundreds of engineers.

24   Q.   If Motorola had not leveraged technology that it had

25   developed earlier, would it have taken Motorola longer to

1    develop MOTOTRBO?

2    A.  Yes, it would.  I gave you that example for the cellular

3    phones.  We literally started in 1973.  It took us about ten

4    years.  Our ASTRO programs took us about eight years to

5    develop.  We were able to develop the MOTOTRBO in about four

6    years, and that was thanks to the leverage we were able to use

7    from these other product lines.

8    Q.  Mr. Lund, I am going to ask you to please take a look in

9    your binder again.  This time it's in the second binder still.

10   Please take a look at PTX 1311, 1311.  I think it's the first

11   document in your binder.

12   A.  Okay.

13   Q.  Are you familiar with this document?

14   A.  Yes, I am.

15   Q.  And how are you familiar with this document, Mr. Lund?

16   A.  It's a document that we use for our distribution channels

17   for our digital mobile radio products.

18   Q.  Okay.  And are you familiar with this exhibit or this

19   document in connection with your work at Motorola?

20   A.  Yes, I am.

21   Q.  What is the purpose of this document?

22   A.  So unlike our public safety where we have direct sales

23   force working with municipalities, in our commercial business

24   we use what are called distributors or retailers.  So we don't

25   ultimately see our end customers.  We work through

1    distributors and retailers to sell our products.

2          So we use documentation like this, communications, to

3    help educate our distributors so that then they can turn

4    around and help sell the benefits and the products that we

5    make.

6    Q.  Mr. Lund, there is a date on the front page.  What date is

7    that?

8    A.  February 27th of 2006.

9    Q.  Was this document created at or near the time of that date

10   with respect to the matters that are contained in the

11   document?

12         MR. ALLAN:  Objection, your Honor.  Foundation.

13         THE COURT:  You are laying the foundation; are you

14   not?

15         MR. De VRIES:  Yes, your Honor.

16         THE COURT:  The objection is premature.

17   BY THE WITNESS:

18   A.  Can you please repeat the question.

19   BY MR. De VRIES:

20   Q.  Sure.

21         Was this document created at or near the time of the

22   date on the cover to describe the matters that are found

23   within the document?

24   A.  Yes.

25   Q.  And was this type of a document or this document in

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 148 of 217 PageID #:52040
Lund - direct by De Vries
162

1   particular created as part of the regular business activities

2   of Motorola?

3   A.  Yes, it was.

4   Q.  And what types of business activities are you referring

5   to?

6   A.  The sale and distribution of our products through our end

7   customers through our distributors and partners.

8   Q.  Again, what is your position, if any, or role, if any,

9   with respect to the products that are described in this

10  presentation?

11  A.  I was the overall leader of the Penang Design Center at

12  that time.

13  Q.  And what about today?

14  A.  I am now responsible for all the product lines, all the

15  engineering worldwide, and all the product managers worldwide

16  today.

17  Q.  And was this kind of document, PTX 1311, was it part of

18  Motorola's regular practice to create documents like this?

19  A.  Yes, it was.

20          MR. De VRIES:  Your Honor, plaintiff moves the

21  admission of PTX 1311.

22          THE COURT:  It is received.  It may be published to

23  the jury.

24      (Said exhibit was received in evidence.)

25          MR. De VRIES:  Thank you, your Honor.

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 149 of 217 PageID #:52041
Lund - direct by De Vries
163

1      THE COURT:  Could we have a brief sidebar.  Counsel,

2  please step over.

3       (The following proceedings were had at sidebar:)

4      THE COURT:  I just want to get some rough idea of

5  when you are going to finish your direct.

6      MR. De VRIES:  Definitely by the end of the day at

7  the latest.

8      THE COURT:  That answers my question.

9      So you would want to do your cross the next day,

10  right?

11      MR. ALLAN:  Tuesday would be fine.

12      THE COURT:  Tuesday.

13      And you are ordering the transcripts in any event;

14  are you not?

15      MR. ALLAN:  Yes, your Honor.

16      THE COURT:  That would be helpful to you --

17      MR. ALLAN:  It would.

18      THE COURT:  -- to have those few days to work with

19  it.

20      MR. ALLAN:  That wouldn't be bad.

21      THE COURT:  All right.  So that's the way we will do

22  it.

23      MR. De VRIES:  Yes, your Honor.

24      MR. ALLAN:  Thank you.

25       (End of sidebar proceedings.)

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 150 of 217 PageID #:52042
Lund - direct by De Vries
164

1          THE COURT:  Please proceed.

2    BY MR. De VRIES:

3    Q.  Mr. Lund, if you would, please turn to Page 66 in the

4    exhibit marked as PTX 1311.

5    A.  Okay.

6    Q.  Could you please explain what's shown there?

7    A.  These are pictures of the products that we first released

8    in our MOTOTRBO portfolio in the 2007 time frame.  Again, an

9    example of a portable radio, which I explained to you earlier

10   is in the upper left corner.

11          We had multiple versions of those radios.  You can

12   see on the far left a very simple one -- no display, no

13   keypad.  That was the very simplest form of talk and listen

14   communication.

15          To the right of it was a little bit higher tier

16   radio, which offered a display and keypad so you can do

17   messaging and other types of things.

18          To the far right are our mobiles.  Again, those were

19   installed in vehicles.

20          And then the far left bottom corner is our repeater.

21   As I explained to you earlier, the repeater is kind of that

22   centralized site where you can have -- you would have a cell

23   tower communicating out to the various radios.

24          And then finally in the bottom right corner we

25   released accessories with those products.  And if you have

Lund - direct by De Vries

165

1   seen on TV, you often see police officers or users, they wear

2   the radio down here on their belt, and they will have a little

3   cable with what we call a speaker mic up to their shoulder.

4   And it's just for ease of use.  And you may see them talk.

5   They lean over and they will talk, or they will have a speaker

6   and listen.

7           So we make a range of accessories for our portables

8   and our mobiles.

9           MR. De VRIES:  Mr. Schlaifer, we can take that down,

10  please.

11  BY MR. De VRIES:

12  Q.  Mr. Lund, are MOTOTRBO products sold today?

13  A.  Yes, they are.

14  Q.  Have MOTOTRBO products been successful in the market?

15  A.  Yes, they have been very successful.

16  Q.  And why do you say that?

17  A.  We were the first people out or the first manufacturer out

18  in the industry.  And we continue to invest in the portfolio

19  of radios since 2007.  As the users' needs expand, we continue

20  to invest in the technology to offer the best services and

21  products to our customers.

22  Q.  Are MOTOTRBO products important to Motorola's business

23  today?

24  A.  Yes, they are.

25  Q.  And why do you say that, Mr. Lund?

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 152 of 217 PageID #:52044
Lund - direct by De Vries
166

1    A.   Right now, behind our public safety business, this is the

2    second largest business we have at Motorola.   It serves a very

3    important market of our commercial users.

4    Q.   Now, I would like to ask you just a little bit more about

5    the development process for MOTOTRBO.

6              Was there a particular development process that

7    Motorola followed in developing its MOTOTRBO products?

8    A.   Yes, there was.

9    Q.   And have you created a demonstrative board to assist you

10   in explaining that to the jury?

11   A.   Yes, I did.

12             MR. De VRIES:   Your Honor, may I have permission to

13   put up that board for Mr. Lund?

14             THE COURT:   Proceed.

15   BY MR. De VRIES:

16   Q.   Mr. Lund, is that the board that you were talking about?

17   A.   Yes, that's the demonstrative that we put together.

18   Q.   Okay.  Could you please describe at a high level the

19   process that you are showing here?

20   A.   This process is typically called in our industry a

21   waterfall process because it's sort of like a waterfall and it

22   goes down.  I will explain it to you.

23             It's very similar, just to put it in terms of maybe

24   building a -- constructing a house.  Typically you don't just

25   start bringing in brick and mortar and electric pipes and

1   wiring.  You start with an architect and you put together a

2   plan.

3           So that's what this is depicting is kind of that

4   high-level plan.  And I might add it's not a simple house.  I

5   mean, this product line I would associate more with a large

6   building complex.  So it is rather complex.  And you typically

7   use a design process and more complicated types of programs.

8   Q.  I would like to ask you a little bit more about the steps

9   you are showing one by one.  We will summarize some for

10  purposes of going through this quickly.

11          But could you please describe the planning step?

12  A.  Yes.  So the planning step is obviously the first thing

13  you do, as I discussed, even as you are doing construction.

14  It's where you put together a business plan.  You know there

15  is needs out there in the market.  You work with your teams to

16  figure out, can we have -- can we make money for this?  Is it

17  going to satisfy our customers by the time we are finished

18  with that?

19          So it's the basics of putting together a business

20  plan, understanding the research and development that's

21  required.  Is there going to be new innovation required to

22  make this happen?  Do we have enough engineers?  At the end of

23  the day, will we be able to afford to do this business?  Is

24  there enough money at the end to be made by putting this

25  together?

Lund - direct by De Vries

168

1          So we start out in the first phase with planning.

2  Q.  Mr. Lund, does Motorola create confidential documents as

3  part of this planning step?

4  A.  Yes, we do.

5  Q.  And why does it keep those documents confidential?

6  A.  As I said, it has secret information there about our

7  business plans, what markets we are going to go after, how

8  much things are going to cost, and the basic designs of the

9  program.

10  Q.  Please take a look in your binder to DTX 4715.  That's in

11  your second binder.  I think it's at the end.

12  A.  Yes, I see that.

13  Q.  Are you familiar with this Exhibit DTX 4715?

14  A.  Yes, I am.

15  Q.  And how are you familiar with this document?

16  A.  It's a standard integration business plan that we use at

17  Motorola.

18  Q.  On the front it says project name:  Matrix.  Do you see

19  that?

20  A.  Yes, I do.

21  Q.  What does "Matrix" refer to?

22  A.  So the Matrix platform 1.0, as I said, was our internal

23  name for the program for our MOTOTRBO products.

24  Q.  And are you familiar with this document in connection with

25  your work at Motorola?

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 155 of 217 PageID #:52047
Lund - direct by De Vries
169

1    A.   Yes, I am.

2    Q.   And again, what is your current position with respect to

3    the MOTOTRBO products?

4    A.   I'm responsible for the products worldwide, both

5    engineering and the product management business side.

6    Q.   Who at Motorola created this document?

7    A.   It was created by Motorola Solutions business partners and

8    engineering leaders.

9    Q.   What is the purpose of a document like this?

10   A.   As I explained earlier, it's to go through the overall

11   financials of the program before you get started to make sure

12   that we have the right financials lined up, the right

13   marketplaces, and then also an understanding of the

14   engineering resources.

15   Q.   There is a date on the front.

16         Let me ask you this:  Was this document created at or

17   near the time of the date indicated by engineers at Motorola

18   with knowledge of what's described within it?

19   A.   Yes, it is.

20   Q.   And is this document or was this document created as part

21   of a regular business activity at Motorola?

22   A.   Yes.  We typically use these integrated business plans in

23   our large programs.

24   Q.   And was it Motorola's regular practice to create this

25   exhibit or this kind of exhibit?

Lund - direct by De Vries

170

1    A.  Yes, it was.

2           MR. De VRIES:  Your Honor, plaintiff moves the

3    admission of DTX 4715.

4           THE COURT:  It is received.  It may be published.

5        (Said exhibit was received in evidence.)

6    BY MR. De VRIES:

7    Q.  Now, could you please explain again what the title of this

8    document is with reference to what we are seeing on the

9    screen, Mr. Lund?

10   A.  It is called the Integrated Business Plan For Matrix

11   Platform 1.0.

12   Q.  Does Motorola consider this particular document to be

13   confidential?

14   A.  Yes, it does.

15   Q.  And are there any markings on the document to indicate

16   that?

17   A.  Yes.  You can see on the bottom of the front page it says,

18   "Motorola Confidential Proprietary."  And every subsequent

19   page in this document has the same markings.

20   Q.  And why does Motorola keep this document confidential?

21   A.  Because it has a lot of the secrets we put together in

22   terms of the project.  And if that information had leaked out,

23   it would be -- give our competition unfair advantage.

24          MR. De VRIES:  We can take that down, Mr. Schlaifer.

25

1    BY MR. De VRIES:

2    Q.   Now, I would like to ask you next about the "requirement"

3    step that's on your board.  Could you please explain that?

4    A.   So the next step -- once we have gotten past the planning

5    stage, you can imagine we got approval.  There is a good

6    business case.  We think we can make products in the time

7    frame to meet the needs of the customers.

8            What we do is kind of then go down that waterfall to

9    the next stage, and we do marketing requirements.  We go out

10   to the end customers, our distributors and customers to

11   understand, what is it they would like to see in this product?

12   What are the features they would need to make this successful?

13   And we try and get an understanding so we could start listing

14   in a document what are those critical features to them?  We

15   will ask them about the priorities, the importance.  Is it

16   really mandatory for these types of systems?

17           So we will put that together with our marketing team.

18   We work with our sales.  And we even have engineers involved

19   to go out to the field so that they can get an understanding

20   as to what our customers are asking for.

21   Q.   Mr. Lund, does Motorola create confidential documents as

22   part of this step?

23   A.   Yes, we do.

24   Q.   What types of documents?

25   A.   We call this our MRD or marketing requirements document.

Lund - direct by De Vries

172

1    Q.   Does Motorola keep those documents, the marketing

2    requirements documents you just talked about, confidential?

3    A.   Yes, we do.

4    Q.   And why?

5    A.   As I just listed, there is a lot of information that we

6    spent time and resources to gather from our customer base.

7    It's really the insights as to what this product will look

8    like when we eventually launch it.

9    Q.   Mr. Lund, let's move on to the next step, "architecture

10   and high-level design."  What is involved in that step?

11   A.   So now that we have completed and have a good idea of what

12   our customers are looking for, we now pull in more of our

13   architects in the system to start to decompose or take the

14   marketing requirements and start to put them into more

15   technical explanations so that at later stages you have a

16   rough idea what this is going to look like.  We start to

17   understand the radio communications, the bay station

18   communications.  So we start to map out that high-level

19   architecture so that we can work in more detail at a later

20   stage.

21   Q.   Did Motorola create confidential documents as part of this

22   step?

23   A.   Yes, we did.

24   Q.   And why does Motorola keep those documents confidential?

25   A.   It has the inner workings of how we are designing our

Lund - direct by De Vries

173

1  products, and that information is confidential.

2  Q.  Please take a look in your binder at PTX 862.  That should

3  be in your first binder toward the beginning.

4  A.  Okay.

5  Q.  Are you familiar with this document, Mr. Lund?

6  A.  Yes, I am.

7  Q.  And how are you familiar with this document?

8  A.  These are the type of documents that we do at this stage

9  of the process, is to put together technical requirement

10 specifications.

11 Q.  What stage are you referring to again?

12 A.  The requirements phase and the architecture phase.

13 Q.  Okay.  This document refers on its face to Matrix.  What

14 does that refer to?

15 A.  So again, Matrix was our internal code name for our

16 MOTOTRBO products.

17 Q.  And what was the purpose of this document?

18 A.  It was to take the marketing requirements document and

19 start to break it down into technical requirement

20 specifications.

21 Q.  And who at Motorola created this document?

22 A.  The Motorola solutions architects and engineers had put

23 this document together.

24 Q.  There is a date on the front.

25      Was this document created at or near the time of that

1    date with respect to the matters that are contained within it?

2    A.  Yes, it was.

3    Q.  And was this exhibit kept in the ordinary course of

4    Motorola's business?

5    A.  Yes, it is.

6    Q.  And was it the regular practice of Motorola to create

7    documents like this technical requirement specification?

8    A.  Yes.  For programs like this, we created technical

9    requirement specifications for large projects, yes.

10          MR. De VRIES:  Your Honor, plaintiff moves the

11   admission of PTX 862.

12          THE COURT:  The exhibit is received.  It may be

13   published.

14       (Said exhibit was received in evidence.)

15   BY MR. De VRIES:

16   Q.  Okay.  We are looking on the screen at the first page of

17   the exhibit.  It says "Matrix" there at the top.

18          Is this a confidential document, Mr. Lund?

19   A.  Yes, it is.

20   Q.  And are there any markings on the document to indicate

21   that?

22   A.  Yes.  You could see at the bottom of the page the

23   "confidential proprietary" markings, and they are on the front

24   page and all subsequent pages.

25   Q.  And why does Motorola keep this document confidential?

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 161 of 217 PageID #:52053
Lund - direct by De Vries
175

1   A.   These are the detailed designs of our products that we

2   release into the marketplace.

3   Q.   Okay.

4        MR. De VRIES:   We can please take that down,

5   Mr. Schlaifer.

6   BY MR. De VRIES:

7   Q.   If you would please turn to PTX 1263.   It's the last

8   document in your first binder.

9   A.   Okay.

10  Q.   Mr. Lund, are you familiar with this document?

11  A.   Yes, I am.

12  Q.   And how are you familiar with this document?

13  A.   This is our technical requirements document.   It's part of

14  our normal process of decomposing our technical specifications

15  into the next level.

16  Q.   And the title says "Low-Tier Digital Platform."   What does

17  that refer to?

18  A.   So again, that was another internal name that we use for

19  our MOTOTRBO product line.

20  Q.   How, if at all, does this document relate to the

21  engineering business that you currently lead?

22  A.   It's an output of what our engineers -- what my engineers

23  help put together.

24  Q.   And what was the purpose, at a high level, of this

25  document?

1  A.  So the purpose is, once again, to -- now that you have a

2  high-level architecture of your system, is we start to break

3  them down into components and features.  Just as you can

4  imagine in a large construction building, you start to break

5  down the designs into maybe the plumbing, architecture, and

6  the electrical, and computer systems, and obviously all the

7  mechanics, we do the same thing.  We start to break down to

8  subsystems within the radio.  The user interface, which is a

9  screen, the keyboard manipulation, all these are subsystems

10  that comprise this radio.

11          So at this stage we are taking that information and

12  we are creating details about each of those little subsystems

13  in there.

14  Q.  Mr. Lund, there is a date on the front of the document.

15  Do you see that?

16  A.  Yes, I do.

17  Q.  And was this document created by the engineers that you

18  just described at or near the time of the matters that are

19  recorded within it?

20  A.  Yes, it was.

21  Q.  And was this document kept as part of the regularly

22  conducted activities of Motorola?

23  A.  Yes, it is.

24  Q.  And was it part of Motorola's regular practice to maintain

25  or keep technical requirements documents like this document?

1   A.  Yes, it is part of our regular practice.

2              MR. De VRIES:  Your Honor, plaintiff moves the

3   admission of PTX 1263.

4              THE COURT:  The exhibit is received.  It may be

5   published.

6          (Said exhibit was received in evidence.)

7   BY MR. De VRIES:

8   Q.  So on the cover there it says, "low-tier digital

9   platform."  Again, please remind us what that refers to.

10  A.  Again, that's the internal name of our MOTOTRBO products.

11  Q.  And is this a confidential document?

12  A.  Yes, it is.

13  Q.  And are there any markings on the document to indicate

14  that it's confidential?

15  A.  Yes.  You can see at the bottom of the page it's marked

16  "company confidential," and all the subsequent pages in this

17  document have "company confidential."

18  Q.  Mr. Lund, why is this document confidential?

19  A.  As I was saying, there is -- a lot of our detail designs

20  about how we build this radio are built into this document.

21             MR. De VRIES:  We can take that down, Mr. Schlaifer.

22  BY MR. De VRIES:

23  Q.  Now, let's talk about the next step, "design."  What is

24  involved in that next step in the process?

25  A.  So at this stage of the process we have those subsystems

Lund - direct by De Vries

178

1   defined about the architecture of the radio.  And what we do

2   from there -- and I kind of use the example of maybe the

3   plumbing.  What we do is then have a detail design for the

4   plumbers.  How are they going to lay this out across the

5   buildings, the different floors, et cetera?

6            So this is where each the subsystem teams put their

7   own detail design together before they start developing the

8   hardware or start developing the actual software code.  So

9   literally the last stage before they go into the

10  implementation stage.

11  Q.  Does Motorola create confidential documents as part of

12  this design step?

13  A.  Yes, we do.

14  Q.  And why does Motorola keep those documents confidential?

15  A.  As I stated, it has all the detailed information about how

16  we are actually going to put all these subsystems together.

17  Q.  Please turn in your binder to PTX 1255.  It's toward the

18  end of your first binder.

19  A.  Okay.

20  Q.  Are you familiar with this document?

21  A.  Yes, I am.

22  Q.  And how are you familiar with it, Mr. Lund?

23  A.  This is a document we use at our design stage in this part

24  of the process.

25  Q.  Okay.  It refers to "Matrix" on the front.  What does that

Lund - direct by De Vries

1   refer to again?

2   A.   So again, Matrix is our internal code name for our

3   MOTOTRBO products.

4   Q.   And how, if at all, does this document relate to the part

5   of the business that you currently lead?

6   A.   It is part of the design and implementation of the

7   products that I'm responsible for today.

8   Q.   And what's the purpose of this document?

9   A.   Again, this document is used for our detail design before

10  going into our implementation stage.

11  Q.   There is again a date that's on the front.  Do you see

12  that?

13  A.   Yes, I do.

14  Q.   And was this document created at or near the date

15  indicated on it by employees of the company who were recording

16  matters from that time period?

17  A.   Yes, it is.

18  Q.   And then is this exhibit kept in the ordinary course of --

19  well, actually let me ask it this way:  Is this document part

20  of a regular business activity of Motorola's?

21  A.   Yes, it is.  It's part of our standard development

22  process.

23  Q.   And was it Motorola's regular practice to keep documents

24  like this in its business?

25  A.   Yes, it is.

Lund - direct by De Vries

180

1    MR. De VRIES:  Your Honor, we move the admission of
2    PTX 1255.
3    THE COURT:  It is received, and it may be published.
4    (Said exhibit was received in evidence.)
5    BY MR. De VRIES:
6    Q.  So we are looking at the first page.  Does this document
7    relate to the MOTOTRBO products?
8    A.  Yes, it does.
9    Q.  And is this document confidential?
10   A.  Yes, it is confidential.
11   Q.  And are there any markings on this document to indicate
12   that it's confidential?
13   A.  Yes.  If you could see at the lower part of the page, it
14   says "confidential" -- "Motorola confidential proprietary."
15   And all the subsequent pages of this document have the same
16   markings.
17   Q.  And, Mr. Lund, why does Motorola keep this document
18   confidential?
19   A.  Because this contains all the information about our
20   detailed designs of all of our subsystems within the radio
21   products.
22   MR. De VRIES:  We can take that down, Mr. Schlaifer.
23   BY MR. De VRIES:
24   Q.  So at the very bottom of the V there it says "coding."
25   What's involved in the coding step?

Lund - direct by De Vries

181

1    A.   So now that we have all the designs, we understand the

2    market requirements, we are now actually at a point of

3    implementing the hardware and then also writing the software

4    that will go into the end radio products.

5    Q.   Are you familiar with something called source code?

6    A.   Yes, I am.

7    Q.   What is source code?

8    A.   Source code is basically a language that you use to write

9    to interface to a computer.  You may have heard some languages

10   like C, C++, or Java.  Similar to Spanish or Italian or

11   whatever, there is languages on the ability to communicate.

12            Those languages are written in a fashion that are

13   easy for us to read and to understand.  They have logic

14   control, and they allow us to interoperate with the actual

15   computer or microprocessor.

16            That code then -- that source code is then, using a

17   compiler, turned into machine code.  So you can imagine the

18   machine or the computer is really dealing with zeros and ones,

19   bits and bytes.  If you were ever to see an executable program

20   that goes in there, I mean, it's just billions of lines of

21   zeros and ones.  It's something you or I just cannot read.

22            So we use source files to use as a higher level

23   language that then gets translated through a compiler and then

24   translated into machine code.

25   Q.   Is Motorola source code confidential?

1    A.   Yes, it absolutely is.

2    Q.   And do you know approximately how much source code

3    Motorola wrote for the MOTOTRBO products?

4    A.   Millions of lines of code.

5    Q.   And do you know how long it took to write the source code

6    for MOTOTRBO products?

7    A.   Yes, roughly four years.

8    Q.   Now, please take a look in your binder at PTX 1866A.

9    That's in your second smaller binder.

10   A.   Okay.

11   Q.   Are you familiar with this document?

12   A.   Yes, I am.

13   Q.   And how are you familiar with it?

14   A.   It's a standard template of our source code at Motorola

15   with the standard confidentiality, the name of the inventor,

16   the originating date, and then the purpose of the source code.

17   Q.   And are you familiar with this source code file as part of

18   your work at Motorola related to MOTOTRBO?

19   A.   Yes, I am.

20   Q.   Okay.  And was this source code file created by Motorola

21   engineers at or near the times indicated in the revision

22   history on the front?

23   A.   Yes, it was.

24   Q.   And was creating this source code file -- was the source

25   code file created in connection with a regular business

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 169 of 217 PageID #:52061
Lund - direct by De Vries
183

1   activity of Motorola's?

2   A.  Yes, it was.

3   Q.  And was it Motorola's regular practice to keep source code

4   files like this?

5   A.  Yes, it was.

6           MR. De VRIES:  Your Honor, plaintiff moves the

7   admission of PTX 1866A.

8           THE COURT:  It is received and may be published.

9       (Said exhibit was received in evidence.)

10          THE COURT:  However, it is 3:28.

11          Members of the jury, probably a second cup of coffee

12  wouldn't hurt at this point.  You are excused for about ten

13  minutes.

14      (A brief recess was taken at 3:28 p.m.)

15      (Jury in at 3:40 p.m.)

16          THE COURT:  Please proceed.

17  BY MR. De VRIES:

18  Q.  Mr. Lund, before we took a break, you should have been

19  looking at PTX 1866A.  It should be a blue document.

20  A.  Yes.

21  Q.  Is that still in front of you, sir?

22  A.  Yes, it is.

23  Q.  Okay.  And I believe you explained before the break that

24  this is a source code file for Motorola; is that right?

25  A.  Yes, this is a source code file that we generated.

1    Q.   Okay.  And how do you know it's a Motorola file?

2    A.   It has our standard template markings on there.  You can

3    see it's from Motorola confidential proprietary.  It has the

4    name of the module.  It has the originator, the date of

5    origin, and then revision history.  These are standard

6    templates we use in our development.

7    Q.   What do you mean by a standard template that you use in

8    your development?

9    A.   For coding, for writing software modules we try to have

10   standard templates that the engineers use so that they can

11   follow the practices and people will understand them.

12   Q.   Mr. Lund, is this source code file confidential?

13   A.   Yes, it is.

14   Q.   And why does Motorola keep it confidential?

15   A.   We keep it confidential so that people outside of Motorola

16   don't have -- can't get access to it or shouldn't have access

17   to it.

18         MR. De VRIES:  We can please take that down,

19   Mr. Schlaifer.

20   BY MR. De VRIES:

21   Q.   We had just been talking about the coding step of the

22   development process.

23         What are the next steps in the development process?

24   A.   So this part of the process will get a little faster.

25         The testing is part of our process.  I won't go

Lund - direct by De Vries

185

1   through all the details of each step, but basically at each

2   level we try and do testing of the different levels.  You can

3   see a dotted line going across.  At each level we are testing

4   the functionality.

5          The coding, we use unit testing to test each and

6   every source code file, every module.  And then we go up to

7   the next levels of integrating, putting those subsystems

8   together, testing the subsystems first, then putting them

9   together and testing all the units of the products.  And then

10  we get it out to alpha/beta customers to get information

11  before we finally release at the top.

12         And you can see where at each stage we are testing

13  the requirements that were developed early on in the waterfall

14  process.

15  Q.   Does Motorola create confidential documents as part of

16  these testing steps?

17  A.   Yes, we do.

18  Q.   And why does Motorola keep those documents confidential?

19  A.   There is a lot of lessons learned throughout the years

20  that we collect from customer feedback out in the field, and

21  those test practices help us to make the products better.

22         At each stage of the development we want to make sure

23  that we are developing the highest quality products, they are

24  meeting all the requirements that we set out to create.

25         So these test documents have a lot of information

1      about specifications, how to do the testing, how to collect

2      the information, how to feed that back into the product.

3      Q.   Would you please turn to PTX 126 in your binder.

4      A.   PTX 126?

5      Q.   Yes.  And it should be toward the beginning of your big

6      binder -- your bigger binder, Volume 1.

7      A.   Yes, I see that.

8      Q.   Are you familiar with this Exhibit PTX 126?

9      A.   Yes, I am.

10     Q.   And how are you familiar with this exhibit?

11     A.   This is one of the test conformance documents that we use

12     throughout our development cycle and testing process.

13     Q.   And it refers to "LTD" on the first page.  Please explain

14     what that refers to.

15     A.   Again, LTD was one of our internal code names we use for

16     our MOTOTRBO products.

17     Q.   And how, if at all, does this document relate to the

18     business that you currently lead at Motorola?

19     A.   These test procedures are used as part of our engineers as

20     we continue to develop the MOTOTRBO products.

21     Q.   And who at Motorola created this document?

22     A.   Engineers, test engineers at Motorola Solutions.

23     Q.   There is a date on the front of 2006.

24          Was this document created at or near the time of the

25     date that's indicated there by Motorola engineers who were

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 173 of 217 PageID #:52065
Lund - direct by De Vries
187

1    recording things that were happening at or near the time that

2    they were recording them?

3    A.   Yes, it was.

4    Q.   And was this document kept as part of a regularly

5    conducted activity at Motorola?

6    A.   Yes, it was.

7    Q.   And was it Motorola's regular practice to keep documents

8    like this as part of that business activity?

9    A.   Yes, it was.

10            MR. De VRIES:   Your Honor, plaintiff moves the

11   admission of PTX 126.

12            THE COURT:   The exhibit is received and may be

13   published.

14       (Said exhibit was received in evidence.)

15   BY MR. De VRIES:

16   Q.   So on the screen there, there is the title "LTD F2

17   Conformance Testing for Radio Hardware, Portable and Mobile."

18            Please explain again what "LTD" refers to.

19   A.   LTD is our internal name for our MOTOTRBO product line.

20   Q.   Mr. Lund, is this a confidential document?

21   A.   Yes, it is.

22   Q.   And does Motorola include any markings on the document to

23   indicate that?

24   A.   Yes.  You could see at the bottom of the page it's marked

25   "Motorola confidential proprietary," and every subsequent page

Lund - direct by De Vries

188

1    is also marked that way.

2    Q.   Okay.  And why does Motorola keep this document

3    confidential?

4    A.   So that we do not -- this information will not be used

5    external to our company.

6    Q.   I have a few final questions about the MOTOTRBO

7    development process.

8            MR. De VRIES:  Your Honor, may I take down that

9    board?

10           THE COURT:  Yes.

11       (Brief pause.)

12           MR. De VRIES:  For the record, Motorola intends to

13   move the admission -- move that those documents that were

14   admitted be under seal, but we will make that motion at the

15   appropriate time.

16           THE COURT:  We will consider it made now.  The motion

17   is granted.

18           MR. De VRIES:  Thank you, your Honor.

19   BY MR. De VRIES:

20   Q.   Was it expensive to develop the MOTOTRBO products?

21   A.   Yes, it was.

22           MR. De VRIES:  Mr. Schlaifer, please display PDX 2.9.

23   BY MR. De VRIES:

24   Q.   Is this a slide that you had prepared to help to aid you

25   in testifying to the jury?

Lund - direct by De Vries

189

1    A.   Yes, it was.

2    Q.   Okay.  How many engineers worked on the development of

3    MOTOTRBO in 2006?

4    A.   We roughly had 280 engineers.

5    Q.   And approximately by number where were those engineers

6    located?

7    A.   The largest team we had was located here in the United

8    States.  It was split between our -- mostly in our Schaumburg

9    facility, but we also had some engineers and architects in our

10   Plantation, Florida facility.

11   Q.   It indicates there that there are certain engineers that

12   were in Malaysia and China; is that right?

13   A.   Yes, that's correct.

14   Q.   And how, if at all, did the Motorola engineers in Penang

15   and China interact with engineers at Motorola in the United

16   States as part of developing MOTOTRBO?

17   A.   So our core leadership team was located in Schaumburg,

18   Illinois.  So as I explained, in our process diagram we have

19   hardware engineers, software engineers.

20        In Schaumburg we had the leader of our overall

21   hardware organization.  And hardware was done in multiple

22   sites, but there was ultimately one hardware leader.

23        There was also one software leader.  As you can tell

24   by the slide, we also had software design centers in multiple

25   locations.  But again, there is always one software leader for

1    our MOTOTRBO products.

2           Also we had our head of our business was located in

3    the Schaumburg area.  So the engineers at the different sites,

4    especially in Malaysia and in China, would take direction

5    ultimately from those large -- from the software leader, the

6    hardware leader, and the business leader.

7           Likewise, we had -- as you saw from the complexity of

8    the designs, we had a lot of architects.  So the architects

9    technically will lead a subsystem or portions of the overall

10   architecture.  They would reside in Malaysia, Plantation, or

11   in Schaumburg.  And the engineers at other sites would take

12   direction from them.

13          MR. De VRIES:  Mr. Schlaifer, you can take that down,

14   please.

15   BY MR. De VRIES:

16   Q.  I have a few more documents in this section to show you.

17          If you could, please turn to PTX 1473 in your second

18   smaller binder.

19   A.  Yes.

20   Q.  Are you familiar with that document, Mr. Lund?

21   A.  Yes, I am.

22   Q.  And how are you familiar with it?

23   A.  It's a document or tool we use with finance to track the

24   development engineering cost at the various different design

25   centers by technologies.

1   Q.   Okay.  And who creates this document at Motorola?

2   A.   Usually our finance team and program management office

3   works together to create these types of documents, and then we

4   use them.

5   Q.   Okay.  And what is the purpose of these documents?

6   A.   To understand the allocation of engineers to a program at

7   the various different sites.

8   Q.   And was this document kept as part of a regular business

9   activity at Motorola?

10  A.   Yes.  We use documents like this to help us understand

11  where our assets are allocated, our engineers are allocated to

12  programs at sites.

13  Q.   And was it part of Motorola's regular business practice to

14  keep these kinds of documents?

15  A.   Yes, it was.

16          MR. De VRIES:  Your Honor, plaintiff moves the

17  admission of PTX 1473.

18          THE COURT:  The exhibit is received and may be

19  published.

20        (Said exhibit was received in evidence.)

21  BY MR. De VRIES:

22  Q.   Mr. Lund, please take a look at PTX 1660.

23  A.   Yes, I see it.

24  Q.   Please also take a look at PTX 1661.

25  A.   Okay.

Lund - direct by De Vries

192

1    Q.   And please take a look at PTX 1662.

2    A.   Okay.

3    Q.   And please take a look at PTX 1663.

4    A.   Okay.

5    Q.   Are you familiar with these documents?

6    A.   Yes, I am.

7    Q.   And how are you familiar with them?

8    A.   These are cost per head or cost per engineer at all of our

9    different design centers throughout the world.

10   Q.   And who at Motorola creates these documents?

11   A.   These are created typically annually by our finance

12   department.  They set out the rates at the beginning of the

13   year.  Sometimes they will modify in the middle of the year.

14   But the finance team creates them and then sends them to the

15   various department heads so they have the basis for how much

16   an engineer at each site costs.

17   Q.   And were these documents created as part of a regular

18   business activity of Motorola's?

19   A.   Yes, it was.

20   Q.   And was it Motorola's regular practice to keep these

21   documents?

22   A.   Yes, it was.

23            MR. De VRIES:  Your Honor, plaintiff moves the

24   admission of PTX 1660, 1661, 1662, and 1663.

25            THE COURT:  They are received and may be published.

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 179 of 217 PageID #:52071
Lund - direct by De Vries
193

1      (Said exhibits were received in evidence.)

2            MR. De VRIES:  Mr. Schlaifer, let's please put up PTX

3      1662 at Page 2.

4      BY MR. De VRIES:

5      Q.  Mr. Lund, there are certain locations that are indicated

6      here starting with Poland.  What are those?

7      A.  Those are a list of all the sites at Motorola Solutions

8      that we had engineers at.

9      Q.  And then there is some cost-per-head numbers located at

10     the bottom.  What do those reflect?

11     A.  So those are the total cost of an engineer in U.S. dollars

12     per each of those sites.  Obviously each of the sites have

13     currency in their own country's denomination.  We convert

14     those to U.S. dollars.  And it's the sum of their payroll plus

15     expenses and materials that they use throughout the year.

16            MR. De VRIES:  You can take that down, Mr. Schlaifer.

17     BY MR. De VRIES:

18     Q.  Just a couple more questions on the development process.

19            What is a staff month?

20     A.  A staff month is a measure that we use, and I'm sure

21     others in the industry do, too.  It's the measurement -- the

22     basic measurement for an output of work.  So it's how much

23     work a hardware engineer or software engineer can get done in

24     a calendar month.

25     Q.  Can you give us some examples of how ten staff months

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 180 of 217 PageID #:52072
Lund - direct by De Vries
194

1    could be delivered in the real world?

2    A.  Yes.  For example, just looking at this radio, you can say

3    that this antenna takes 10 months to make, and you could have

4    one engineer antenna expert that works for the whole 10

5    months -- so January all the way up until November -- and

6    working on this antenna, and they finish this product in 10

7    months.

8    Q.  All right.  I would like to switch gears.

9         Are you familiar with intellectual property?

10   A.  Yes, I am.

11   Q.  What is intellectual property?

12   A.  Intellectual property at Motorola Solutions, we have a

13   basic four pillars.

14        The first pillar of intellectual property is a

15   trademark.  A trademark is, as you are aware, is something we

16   use for our products.  Like MOTOTRBO has a registered

17   trademark.  You may be familiar with examples like Apple.  So

18   an apple is not a trademark, but the way that Apple company

19   uses it and depicts it, that is a trademark.

20        The second thing is copyrights.  So copyrights are

21   registered, and they are used as an example for your code and

22   your design.  Examples for that may be also like an Apple

23   iPhone from that perspective.

24        The third one are patents.  And I'm sure you probably

25   heard patents come up many times in the news and that.

Lund - direct by De Vries

1    Patents are used for inventions.  So engineers or other people

2    at work or even people not at work can file for a patent.

3    It's basically protecting their invention or their idea.

4            And then lastly is trade secrets.

5            Those first three that I mentioned to you are all

6    registered.  You do something to register them with the

7    government.

8            The last one is trade secrets.  You do not register

9    them.  Trade secrets are all the design and implementation,

10   the code that I explained to you in those last processes.

11   Those are our trade secrets.  And then, again, that's

12   something you don't have to register, which is why at Motorola

13   we do a lot by labeling our documentation as confidential and

14   so forth to make sure that that information is protected

15   within the walls of Motorola and does not get outside the

16   walls of Motorola.

17   Q.   Is intellectual property important to Motorola?

18   A.   It's absolutely important to Motorola.

19   Q.   Why is intellectual property important to Motorola?

20   A.   You saw all the detail process we go through and the

21   documentation and coding and all the design.  All that hard

22   work and that -- if that information were to get outside the

23   walls of Motorola or to a competitor, it would obviously be a

24   big disadvantage to us.

25   Q.   Have you personally been involved with intellectual

Lund - direct by De Vries

196

1    property at Motorola?

2    A.  Yes, I have.

3    Q.  In what ways?

4    A.  Back when I was an engineer, I was responsible for

5    processes we had at Motorola for patents.  We had patent

6    committees, and I was one of the patent committee members.

7              So I was familiar with the process of reviewing

8    ideas, determining if they are able to go on for patents or if

9    they were not capable of that.

10             I also personally have one patent in my name.

11   Q.  Now, what types of Motorola intellectual property are

12   involved in this case?

13   A.  So out of the four that I mentioned, trade secrets and

14   copyrights.

15   Q.  Let me first ask you about trade secrets.

16             Does Motorola consider any of its technology to be

17   confidential?

18   A.  Yes.

19   Q.  And why does Motorola keep that technology confidential?

20   A.  Again, so that information will not leak outside of the

21   company, the four walls, and not get to people outside of

22   Motorola Solutions.

23   Q.  Are trade secrets important to Motorola?

24   A.  Yes, they are very important to us.

25   Q.  Are you involved in Motorola's process for protecting its

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 183 of 217 PageID #:52075
Lund - direct by De Vries
197

1    trade secrets?

2         MR. ALLAN:  Your Honor, leading.

3         THE COURT:  Overruled.  You may answer.

4    BY THE WITNESS:

5    A.  Yes, I am.

6         MR. De VRIES:  Mr. Schlaifer, if you could, please

7    display PDX 2.10.

8    BY MR. De VRIES:

9    Q.  Is that a slide that you had prepared at your direction to

10   aid you in providing your testimony to the jury?

11   A.  Yes, it is.

12   Q.  Mr. Lund, could you please explain some of the ways that

13   Motorola protects its trade secrets?

14   A.  Yes.  As I explained, out of those four, this one there is

15   no registration process.  So for us, it's very important that

16   we have policies and procedures at Motorola to ensure that

17   that information is kept confidential.

18        This information is -- obviously these policies are

19   created at the corporate level, and it starts from the first

20   day of employment.  So again, I'm responsible for employing a

21   lot of engineers at Motorola.  And we have processes in place

22   to go through and review the confidential policies of

23   Motorola.

24        We also have regular training at Motorola.  You can

25   see we have training programs.  To reiterate, it's a mandatory

Lund - direct by De Vries

198

1  class that we have our employees take annually at Motorola.

2  You literally have to take a test.  If you don't pass the

3  test, you take the test over again until you pass it.

4          And if you don't follow those rules, they are subject

5  to violation of our policies at Motorola.

6          And then we go all the way through.  If you leave

7  Motorola, we remind you of your obligations of signing your

8  contracts and keeping information confidential.

9          And we also take physical security measures to ensure

10  things are kept confidential on property.

11  Q.  When you say "physical security measures," what is an

12  example of what you are referring to?

13  A.  For example, when I was living in Penang, Malaysia, we

14  literally had security guards at all the entrances to our

15  buildings.  We had metal detectors.  So every day I went to

16  work, I had to go through a metal detector, and I also left

17  through a metal detector.

18          Anything physical, like a radio or a laptop, had to

19  have a security pass in there that was authorizing you to

20  leave the premises.  So we insured physically that you are not

21  taking any proprietary physical information outside the

22  building.

23  Q.  Mr. Lund, are you generally familiar with the Motorola

24  trade secrets at issue in this case?

25  A.  Yes, I am.

Lund - direct by De Vries

199

1  Q.  Do you have detailed technical knowledge of each of the

2  individual trade secrets that are involved?

3  A.  No.  I don't know all the details down to the level of all

4  the code and design documents that I showed you.

5  Q.  Do you have an understanding whether there will be other

6  engineers from Motorola that will testify about that at this

7  trial?

8  A.  Yes.  You will see some of my colleagues come in on

9  subsequent days to explain some more details to you.

10         MR. De VRIES:  Mr. Schlaifer, if you could, please

11  display PDX 2.11.

12  BY MR. De VRIES:

13  Q.  Is this a slide that was prepared at your direction to aid

14  you in providing your testimony to the jury?

15  A.  Yes, it was.

16  Q.  Mr. Lund, generally what do the trade secrets in this case

17  relate to?

18  A.  There's 21 trade secrets.  The majority of them are in the

19  top section there, which is our software and source code,

20  which explains some of the detailed subsystems that I gave you

21  an example of previously, and it contains our source code.

22         It also contains the testing that I explained to you

23  on that model.

24         And then finally, it's also the hardware, the

25  repeater hardware that we also make at Motorola.

Lund - direct by De Vries

200

1   Q.  And who owns these trade secrets?

2   A.  Motorola Solutions does.

3   Q.  Now, let me --

4            MR. De VRIES:  You can please take that down,

5   Mr. Schlaifer.

6   BY MR. De VRIES:

7   Q.  Let me ask you about copyrights.

8            Does Motorola own copyrights on the software its

9   engineers create?

10  A.  Yes, we do.

11  Q.  And does Motorola own copyrights on the software for the

12  MOTOTRBO products that you are the engineering lead for?

13  A.  Yes, we do.

14  Q.  Are Motorola's copyrights on that software important to

15  the company?

16  A.  Yes, they are very important to us.

17  Q.  And why do you say that?

18  A.  That's all the detailed information that I explained to

19  you in that model.  All the design and implementation, the

20  software source code is all part of that, and it's very

21  important to us.

22  Q.  Did Motorola register its copyrights in the MOTOTRBO

23  software with the United States Government?

24  A.  Yes, we did.

25  Q.  Would you please turn in your binder to PTX 1528.  That's

Lund - direct by De Vries

201

1  in your second smaller one.

2  A.  Okay.

3  Q.  Are you familiar with this document?

4  A.  Yes, I am.

5  Q.  What is it?

6  A.  It's a certificate from the copyright office of the United

7  States of America.

8          MR. De VRIES:  Your Honor, plaintiff moves the

9  admission of PTX 1528.

10         THE COURT:  It is received and may be published.

11     (Said exhibit was received in evidence.)

12  BY MR. De VRIES:

13  Q.  If we take a look at the first page, what do we see here?

14  A.  This is a certificate from the copyright office of the

15  United States of America.

16  Q.  Okay.  Now, if we go to the second page, there is a

17  section toward the top called "Title"?

18  A.  Yes, I see that.

19  Q.  And the title says, "MOTOTRBO Portable Subscriber FW

20  Package R01.00.01."

21          What is that?

22  A.  That's our portable radio firmware package, our first

23  release, Release 1.1, for MOTOTRBO.

24  Q.  And who owns the copyright for this registered work?

25  A.  Motorola Solutions.

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 188 of 217 PageID #:52080
Lund - direct by De Vries
202

1   Q.   If we take a look at the top of that page, there is a seal

2   and a signature.   What is that?

3   A.   That's a seal of the United States copyright office, and

4   it's signed by the acting United States Register of

5   Copyrights.

6   Q.   If you would please take a look at, in your binder again,

7   PTX 1645.

8   A.   Yes, I see it.

9   Q.   And PTX 1527.

10  A.   Yes, I see that.

11  Q.   And also PTX 1659.

12  A.   Okay.   I see that.

13  Q.   Mr. Lund, are you familiar with those documents?

14  A.   Yes, I am.

15  Q.   What are they?

16          MR. ALLAN:   Objection, your Honor.   Two of these

17  documents are subject to a pending motion.

18          May we have a brief sidebar?

19          THE COURT:   The objection is overruled.   The witness

20  may answer the question.

21  BY THE WITNESS:

22  A.   These are certificates from the copyright office of the

23  United States of America.

24          THE COURT:   Are those public records?

25          THE WITNESS:   Yes, they are.

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 189 of 217 PageID #:52081
Lund - direct by De Vries
203

1          THE COURT:  Anyone in the public can send in a check

2    and get a copy of that?

3          THE WITNESS:  You can get a copy of these

4    certificates.

5          THE COURT:  Do you have to pay for it?

6          THE WITNESS:  There might be a small fee.

7          THE COURT:  How much would that be?

8          THE WITNESS:  $75.

9          THE COURT:  Thank you.

10          You may proceed.

11          MR. De VRIES:  Your Honor, plaintiff moves the

12   admission of PTX 1645, PTX 1527, and PTX 1659.

13          THE COURT:  Are you offering them as public records?

14          MR. De VRIES:  Yes, your Honor.

15          THE COURT:  They are received on that basis and may

16   be published.

17       (Said exhibits were received in evidence.)

18   BY MR. De VRIES:

19   Q.  Mr. Lund, who owns the copyrights that are covered by

20   these registrations?

21   A.  Motorola Solutions.

22   Q.  And in general, what do these registrations relate to,

23   these copyright registrations?

24   A.  They relate to the firmware and hardware that we developed

25   at Motorola Solutions for the MOTOTRBO platforms -- the

Lund - direct by De Vries

204

1  portables, the mobiles, and the repeaters, and the software,

2  too.

3  Q.  You can put that away.

4          I would like to shift gears again.

5          THE COURT:  Excuse me.  Can you give the jury a

6  perspective on what dates do they bear?

7          THE WITNESS:  Three of them were, roughly, in the

8  2007 time frame, and the fourth one was in the 2018 time frame

9  for the Release 3 of MOTOTRBO.

10          THE COURT:  You may proceed.

11  BY MR. De VRIES:

12  Q.  Are you familiar with a company named Hytera?

13  A.  Yes, I am.

14  Q.  What is Hytera?

15  A.  Hytera is a manufacturer of two-way radio systems.  They

16  are located in China.

17  Q.  Does Hytera sell DMR products, to your knowledge?

18  A.  Yes, they do.

19  Q.  Do you know when Hytera started selling DMR products?

20  A.  Yes.  They started in 2010.

21  Q.  Mr. Lund, when is the first time that you recall hearing

22  about Hytera?

23  A.  The first time I recall hearing about them, when I was

24  living in Malaysia in the 2008 time frame.

25  Q.  Now, in connection with your current job, are you familiar

Lund - direct by De Vries

205

1    with whether Hytera was ever a distributor of Motorola

2    products?

3    A.   Yes, I do understand that they were a distributor at one

4    point in time.

5    Q.   Okay.  And do you know approximately when that was?

6    A.   It was in the 1990s.

7    Q.   Now, before Hytera released its DMR products in 2010, do

8    you know whether Hytera was selling other types of products?

9    A.   Yes, I do.

10   Q.   Okay.  And what's an example of a type of product that you

11   understand they were selling before then?

12   A.   Like many other manufacturers at the time -- as I

13   explained earlier, analog radios were the popular radio for

14   our commercial users, and Hytera was selling analog radios

15   along with many other manufacturers at that time.

16   Q.   Was Motorola surprised to see Hytera release a digital DMR

17   radio product?

18   A.   Yes, we were.

19   Q.   Why do you say that?

20   A.   As I said, there was a lot of manufacturers of analog

21   radios at the time.  A lot.  And we were surprised to see them

22   come out as a digital provider.

23   Q.   Now, by the time Hytera released its DMR products in 2010,

24   how were Motorola's DMR MOTOTRBO products doing in the market?

25   A.   We were doing very well in North America and all the

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 192 of 217 PageID #:52084
Lund - direct by De Vries
206

1   different regions, Asia, Europe.

2   Q.   Does Hytera compete with Motorola in the DMR market today?

3   A.   Yes, they do.

4   Q.   Now, Mr. Lund, are you aware of any Motorola engineers who

5   worked on developing MOTOTRBO products who later went to work

6   for Hytera?

7   A.   Yes, I am.

8   Q.   And who are you referring to?

9   A.   I'm referring to G.S. Kok, Sam Chia, and Y.T. Kok.

10  Q.   And where did they work for Motorola?

11  A.   They worked in the Penang Design Center in Malaysia.

12  Q.   And approximately when did they work there?

13  A.   They worked in the early 2000 through 2008.

14  Q.   And what was your position, if any, at the time that G.S.

15  Kok, Sam Chia, and Y.T. Kok worked at Motorola's Penang Design

16  Center?

17  A.   I was the engineering leader.

18  Q.   Do you know whether Hytera released its first DMR product

19  before or after those individuals went to work for Hytera?

20  A.   I'm sorry.  Can you repeat the question.

21  Q.   Sure.

22          Do you know whether Hytera released its first DMR

23  product before or after G.S. Kok, Sam Chia, and Y.T. Kok left

24  Motorola and joined Hytera?

25  A.   They released their first product after they left

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 193 of 217 PageID #:52085
Lund - direct by De Vries
207

1    Motorola.  So they left Motorola in 2008, and they released

2    their first product in 2010.

3    Q.   Now, at the time that you were the head of the Motorola

4    Penang Design Center in 2007 through 2009, was it unusual for

5    employees of Motorola at that design center to leave to go to

6    work for another company?

7    A.   At the time I arrived there, it was a very interesting

8    dynamic.  It was -- a lot of multinational companies were

9    moving into Malaysia.  So companies like Intel and others were

10   very popular there.  So at the time we had engineers leaving

11   to other companies as new ones were starting.

12         So at that time we had, roughly, 100 engineers

13   leaving a year, which is a lot.

14   Q.   And what types of companies were those, roughly, 100

15   engineers a year leaving to go work for?

16   A.   They were local companies, other multinationals, like my

17   example, Intel.  Bose was also there.  So a lot of names you

18   would hear were hiring engineers on the island.

19   Q.   Now, did G.S. Kok, Sam Chia, or Y.T. Kok work on

20   developing MOTOTRBO products when you led Motorola's Penang

21   Design Center?

22   A.   Yes, they did.

23   Q.   Okay.  And could you please tell us more about that?

24   A.   So G.S. Kok was responsible for the hardware development

25   of the portable.  So he was an electrical engineer.  He had a

1  team of engineers reporting directly to him.  He was

2  responsible for releasing the first hardware product for

3  MOTOTRBO.

4        The other two engineers were on the software side.

5  They were responsible for our lower level development, and

6  they were part of the software organization of MOTOTRBO.

7  Q.  Now, Mr. Lund, did you personally interact with G.S. Kok,

8  Sam Chia, or Y.T. Kok when you led the Penang Design Center

9  for Motorola?

10  A.  I mostly interacted with G.S. Kok.  He was the second

11  layer down from me.  As I said before, I conducted a lot of

12  program reviews, quality reviews.  So I definitely had an

13  opportunity to work with G.S. Kok more frequently than the

14  others.

15        Sam Chia and Y.T. Kok were probably three or four

16  layers down in the organization.  So I really didn't have that

17  much of an opportunity to interact with them on a regular

18  basis.

19  Q.  Let's put previously admitted exhibit PTX 2056 back up.

20  It's also in your binder if you would like to look at the hard

21  copy.

22        Is this the organization chart that you prepared in

23  2007 for the design center?

24  A.  Yes, it is.

25  Q.  Okay.  And again, where are you located on this document?

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 195 of 217 PageID #:52087
Lund - direct by De Vries
209

1    A.   I'm located up there at the top.

2    Q.   Okay.  And is G.S. Kok on this document -- on this chart?

3    A.   Yes.  If you look in the upper left-hand corner, G.S. Kok

4    is right there.

5    Q.   Okay.  And if we zoom in on that, please, what does it say

6    that G.S. Kok is responsible for there?

7    A.   So he was the senior engineering manager.  He was

8    responsible for Matrix, which is our internal name for

9    MOTOTRBO.  He was responsible for all the global portable

10   radios, the hardware development, at Motorola Solutions.

11            MR. De VRIES:  We could please zoom back out,

12   Mr. Schlaifer.

13   BY MR. De VRIES:

14   Q.   Are Sam Chia or Y.T. Kok listed on this chart that you

15   created?

16   A.   No, they are not.

17   Q.   And why not, Mr. Lund?

18   A.   As I explained earlier, they are located under Lokang,

19   who's under the software organization Michael Song on the far

20   right.  They were the next levels down in the organization and

21   the software team under Lokang.

22   Q.   Now, how, if at all, did these particular engineers

23   interact with Motorola's U.S.-based engineers in developing

24   the DMR products?

25   A.   So as I explained earlier, the hardware leaders were

1    located in the Schaumburg facility and also some of the

2    architects were in Schaumburg and Plantation.  So G.S. Kok

3    would work with that -- directly with that hardware leader

4    overall on the portable portion.  As I said before, there was

5    repeaters and mobiles.  So G.S. would interact with the U.S.

6    team, the hardware leader there.

7           Lokang, who you see on the right highlighted in red,

8    he was the software leader in Penang for the MOTOTRBO software

9    line.  And he would work with the leader in Schaumburg who was

10   responsible for all the software development for MOTOTRBO, and

11   they would interact on a regular basis.

12          MR. De VRIES:  Mr. Schlaifer, you can please take

13   that down.

14   BY MR. De VRIES:

15   Q.   Now, Mr. Lund, did G.S. Kok, Sam Chia, or Y.T. Kok have

16   access to confidential Motorola materials as part of their

17   work when you were leading the Penang Design Center?

18   A.   Yes, it was part of their job.

19   Q.   What types of confidential materials -- Motorola

20   confidential materials did they have access to?

21   A.   They had access to, on that model I showed you, from the

22   high-level designs all the way down to the implementation, and

23   they needed that work to do their jobs effectively.

24   Q.   Now, were those Motorola confidential materials kept in

25   repositories with a particular name?

1    A.   Yes, they were.

2    Q.   And could you please tell us what that name or those names

3    are?

4    A.   So we had multiple repositories.

5         COMPASS was the name of a tool that we kept a lot of

6    the design documents, and it was access-controlled.

7         We also had a tool -- an industry standard tool

8    called ClearCase where we kept our software or source files in

9    there.  And again, it was assigned rights of who could see

10   that.

11        And then on the hardware side, we used tools like

12   Cadence for computer-aided design schematics and all that.

13        So we had a repository that was access-controlled and

14   stored all of our confidential information.

15   Q.   Mr. Lund, you may have said this earlier.  I apologize if

16   you did.

17        What year did G.S. Kok, Sam Chia, and Y.T. Kok leave

18   Motorola's employment in Penang?

19   A.   They left in 2008.

20   Q.   Did they all leave on the same day or at the same time?

21   A.   No, they did not.

22   Q.   And was there a sequence at which they left in relation to

23   one another?

24   A.   G.S. Kok left in the early part of 2008; Sam Chia left in

25   the middle of 2008; and then Y.T. Kok, later in the year.

Lund - direct by De Vries

212

1  Q.  Did there come a time that you learned that they had gone

2  to Hytera?

3  A.  Yes, I learned that they went to Hytera after they left

4  Motorola.

5  Q.  Do you remember approximately what year it was when you

6  learned that they went to Hytera?

7  A.  In 2008.

8  Q.  Now, are you personally familiar with Motorola's human

9  resources policies and procedures?

10  A.  Yes, I am.

11  Q.  Okay.  And in what -- how do you interact with the

12  Motorola human resources policies and procedures?

13  A.  Being an engineering leader at Motorola, a manager of

14  people, we are first trained on what are the policies and

15  procedures that you do as a manager and leader of employees.

16  And then they go through all the policies about hiring

17  engineers, maintaining engineers, and what the various

18  activities are responsibilities of a manager.

19  Q.  And are you familiar with Motorola's human resources

20  policies and procedures in Penang at the time you led that

21  design center between 2007 and 2009?

22  A.  Yes, I am.

23  Q.  And how were you familiar with those policies and

24  procedures at that time?

25  A.  I was a manager in the Penang Design Center, so I had the

Lund - direct by De Vries

213

1    same obligations of managing teams of employees.

2    Q.   And did you have access to human resources' files and

3    other materials as part of your work leading the Penang Design

4    Center between 2007 and 2009?

5    A.   Yes, I would work with my colleagues in HR to gain access

6    to files of employees that reported directly to me.

7    Q.   Now, is there a typical process that a Motorola engineer

8    goes through when joining the company?

9    A.   Yes, there is.

10   Q.   And have you personally been involved in that process?

11   A.   Yes, I have hired people in Penang and here.

12   Q.   Okay.  At a very high level, what does that process

13   involve?

14   A.   So as you can imagine starting any job, there is basic

15   procedures you go through.  Some of them are related around

16   payroll, benefits, signing up for insurance.  I think a lot of

17   us go through that.  We had the same procedures there.  So you

18   go through those.

19        You are also given engineering equipment, whether

20   it's computer-aided design tools, computers, laptops.  All

21   that information and policies around computers and how to

22   maintain computers are given to you on those first days.

23        We also -- we take very importantly our code of

24   conduct.  How to behave at Motorola.  What are the

25   expectations?  What is the culture around Motorolans?

1    So our HR team goes through those policies.  There is

2    training classes you take before you even start.  You go

3    through those.

4         And then finally we have contract agreements.  It

5    goes through and states obvious things about, you won't steal,

6    you won't take confidential information, you won't share that

7    information external to the company.

8         And they have a contract you actually sign, as I'm

9    sure other companies do, too.

10   Q.  Now, Mr. Lund, is there a typical process that a Motorola

11   engineer goes through when leaving the company?

12   A.  Yes, there is.

13   Q.  And have you personally been involved in that process?

14   A.  Yes, I have, here and in Malaysia.

15   Q.  Okay.  And again at a high level, what is involved in that

16   exit process?

17   A.  First of all, similarly to the procedure of leaving, you

18   have to terminate your, you know, the financial aspects,

19   making sure your last day of payroll is clear.  You have to

20   return any equipment that you have, any PCs or telephones or

21   credit cards that you were given as an employee.  Those are

22   kind of the housekeeping basics.

23        But we also go through an exit interview.  One is to

24   understand, how was your time at Motorola?  Is there things we

25   can make better?  Was your manager not so good?  Is there

Lund - direct by De Vries

215

1  lessons learned?  We conduct that through our HR department

2  independent of the manager because sometimes the managers, you

3  know, they wouldn't tell the truth potentially.  So our HR

4  asks them questions.  Why are you leaving and so forth.

5       And then we also walk through a procedure reminding

6  them of their obligations of confidentiality.  We go through

7  that procedure with them.  The manager sits down, collects any

8  confidential information, physical or soft, and collects that

9  information before they leave Motorola.

10  Q.  And do you know whether Motorola went through that process

11  for G.S. Kok, Sam Chia, and Y.T. Kok when they left the

12  company in 2008?

13  A.  Yes, I do.

14  Q.  And did they?

15  A.  Yes, they did.

16  Q.  Now let me ask you in a little bit more detail about each

17  of G.S. Kok, Sam Chia, and Y.T. Kok.

18       Are you familiar with Motorola's human resources

19  files for them?

20  A.  Yes, I am.

21  Q.  And how are you familiar with those files?

22  A.  It's a standard file that our HR department keeps about

23  all the records from employment until termination and has

24  information about things they do.  Successes, promotions,

25  things like that are all kept in a personnel file.

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 202 of 217 PageID #:52094
Lund - direct by De Vries
216

1   Q.   Would you please turn to PTX 1154 in your binder.

2   A.   Yes.

3   Q.   Are you familiar with this exhibit?

4   A.   Yes, I am.

5   Q.   And how are you familiar with this exhibit?

6   A.   This is an HR file that our HR department maintains about

7   employees.

8   Q.   And are you familiar with this particular exhibit in

9   connection with your work at Motorola?

10  A.   Yes, I am.

11  Q.   Okay.  And what is the purpose of a file like this?

12  A.   Again, it's to keep all the records of your employment

13  from the day you start to the day you leave.  There is

14  positive things there.  Mostly they are positive, but

15  sometimes there may be a disciplinary action that will be kept

16  in your records.  But it's information and contracts that are

17  stored from the time you start work until the time you leave.

18  Q.   You mentioned this was a personnel file.

19       Who is this a personnel file for?

20  A.   This specific one is for G.S. Kok.

21  Q.   And who maintains this file?

22  A.   Our human resources department at Motorola.

23  Q.   Okay.  And is it your understanding that this file was

24  maintained and created by the human resources department at

25  Motorola at or near the time of the events that are recorded

1    within it?

2    A.  Yes, I am.

3    Q.  And then was this file created as part of Motorola's

4    regular business activities?

5    A.  Yes, it was.

6    Q.  Okay.  And then was it Motorola's regular practice to keep

7    personnel files like this as part of its regular business?

8    A.  Yes, it is our regular practice.

9           MR. De VRIES:  Your Honor, plaintiff moves the

10   admission of PTX 1154.

11          THE COURT:  Do you expect to ask the same preliminary

12   questions of the witness and get the same answers with respect

13   to each of the three files?

14          MR. De VRIES:  I do, your Honor.

15          THE COURT:  Are you moving the admissibility of the

16   three?  And if you are, identify them for the record --

17          MR. De VRIES:  Yes, your Honor.

18          THE COURT:  -- just to move matters along a little.

19          MR. De VRIES:  Yes, that would save time.

20          THE COURT:  Yes.  Proceed.

21   BY MR. De VRIES:

22   Q.  If you would, please turn to PTX 1153.

23   A.  Yes.

24   Q.  Are you familiar with PTX 1153?

25          THE COURT:  I have already said they are admissible.

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 204 of 217 PageID #:52096
Lund - direct by De Vries
218

1    All I'm asking you to do is identify them for the record, and

2    then they may be published.

3            MR. De VRIES:  Yes, your Honor.  Okay.  I will do

4    that.

5            PTX 1153, PTX 1178, PTX 1155, PTX 1157, and PTX 1156.

6    Your Honor, we move the admission of those personnel files for

7    G.S. Kok, Y.T. Kok, and Sam Chia.

8            THE COURT:  Each one is received in evidence and may

9    be published to the jury.

10        (Said exhibits were received in evidence.)

11   BY MR. De VRIES:

12   Q.  I have just a few questions about these files.

13           If you would, please turn in the first exhibit that

14   we were looking at, 1154, to Page 34 of that document.

15   A.  Page 34?

16   Q.  Yes, of PTX 1154.

17   A.  Yes.  I'm there.

18   Q.  What is that document?

19   A.  It's the employment agreement for G.S. Kok.

20   Q.  And did he sign the agreement?

21   A.  Yes, at the bottom he signed it.

22   Q.  Okay.  And it says "witness" there.  What does that

23   indicate?

24   A.  Our HR representative, Has Li, witnessed that he signed

25   it.

Lund - direct by De Vries

219

1  Q.  Let me ask you just about two provisions in this

2  agreement.

3        There is a second provision amongst the things that

4  Mr. Kok is agreeing not to do.  Would you please read that?

5  A.  No. 2 is not to use or to publish or to otherwise disclose

6  to others, either during or subsequent to my employment by

7  Motorola, any confidential information of Motorola or its

8  customers except as my Motorola duties may require.

9  Q.  Okay.  And the third provision, what does that provision

10 say Mr. Kok has agreed not to do?

11 A.  Upon termination of my employment by Motorola, to promptly

12 deliver to a designated Motorola representative all documents

13 and other records which relate to the business activities of

14 Motorola or any other materials which belong to Motorola.

15 Q.  Mr. Lund, why does Motorola include these provisions in

16 its employment agreement?

17 A.  It's important to us to reiterate and make sure they

18 understand that the information that's created at Motorola

19 stays at Motorola.

20 Q.  Please go to Page 29 of this file.  It says, "Standard

21 operating procedure (SOP) E62, appropriate use of computer

22 resources."

23        What is this document?

24 A.  This is a standard operating procedure that we have at

25 Motorola that gives you the proper conduct of use of computer

Lund - direct by De Vries

220

1    resources.

2    Q.   If you go to the next page, there is a Section 3.4.  What

3    does that portion of the policy state?

4    A.   It is the policy of Motorola to protect confidential,

5    sensitive, or critical information owned by Motorola or in

6    Motorola custody and also to protect specific information as

7    required by applicable law.  Sensitive information must be

8    properly classified and protected according to SOP, standard

9    operating procedure, E60, protection of proprietary

10   information, POPI.

11   Q.   Now, if you go two pages after that, Page 32, did G.S. Kok

12   sign this document?

13   A.   Yes, at the bottom of the page he signed it.

14   Q.   Okay.

15        MR. De VRIES:  Mr. Schlaifer, we can take that down.

16   BY MR. De VRIES:

17   Q.   Please look in your binder at PTX 1493.  It's in your

18   second binder.

19   A.   Okay.

20   Q.   Do you recognize that document?

21   A.   Yes, I do.

22   Q.   What is it?

23   A.   It was a farewell letter from G.S. Kok to his colleagues

24   at Motorola.

25   Q.   And what is the date?

Lund - direct by De Vries

221

A.  It was January 15th, 2008.

Q.  And did you receive this email?

A.  Yes, I did.

MR. De VRIES:  Okay.  Your Honor, we move the admission of PTX 1493.

THE COURT:  It is received, and it may be published to the jury.

(Said exhibit was received in evidence.)

BY MR. De VRIES:

Q.  Let's go to Page 2, Mr. Lund.  There is some text there that begins, "Hello, all.  Today will be the last day I have access to Motorola email system.  Returning my laptop."

In general, what did Mr. Kok say in this email about his departure?

A.  Basically that he will be returning his equipment.  He has made a decision to move on.  Regarding his kids, he would like to provide for them in school in England.  He is thanking them for everyone being so kind to him for the past years; and, in general, apologies for letting anyone down by this decision to leave Motorola.

MR. De VRIES:  We can take that down, Mr. Schlaifer.

BY MR. De VRIES:

Q.  Now, you testified previously that G.S. Kok went through the exit process at Motorola when he left.

If we take a look at PTX 1153, which has been

Lund - direct by De Vries

222

1    admitted, and look at the first page.

2    A.   Yes, I see that.

3    Q.   What is this document?

4    A.   This is an acknowledgment letter from our human resources

5    personnel to G.S. acknowledging his resignation and specifying

6    his last day.

7    Q.   And according to this letter, when was G.S. Kok's last day

8    of service at Motorola?

9    A.   February 11th, 2008.

10   Q.   Now, if we go to Page 4 of this exhibit, there is

11   something that says, "Exit interview confidential."  What is

12   this?

13   A.   So this is part of that standard process I explained

14   earlier that our HR, human resources, personnel went through

15   with the departing employee.  And they walk them through some

16   questions.

17   Q.   Okay.  The first question there says, "What organization

18   will you be working for after Motorola?"

19          What does this document say was the answer?

20   A.   It just says, "Local China company."

21   Q.   Does this document reflect that G.S. Kok disclosed in his

22   exit interview that he accepted a job offer from Hytera?

23   A.   No, it does not.

24   Q.   Okay.  Now, if we look at Page 6 of this exhibit, there is

25   something that says, "Nondisclosure of Motorola Proprietary

1    and Confidential Information."

2         What is this?

3    A.   So this is a document I explained in the process where the

4    manager sits down with the employee before they leave and

5    reminds them of their obligations that they signed as a

6    contract in joining the company about not sharing confidential

7    information and making sure that they are returning all

8    confidential materials that they have in their possession

9    before they leave.

10   Q.   Okay.  There is a first paragraph on that page that

11   begins, "As you are resigning from Motorola."

12        What does that state?

13   A.   "As you are resigning from Motorola, we would like to take

14   this opportunity to remind you of your obligations under the

15   employment agreement which you signed when you joined

16   Motorola."

17   Q.   Okay.  Then there is a section a little bit down from

18   there that says, "Motorola proprietary and confidential

19   information acknowledgment."  And then it goes on to say, "The

20   following items and information relating thereto are

21   considered proprietary by Motorola.  As relating to Motorola's

22   past, present, or future business, products or technology to

23   which you acknowledge that you had access during your

24   employment at Motorola."

25        What items are listed there for G.S. Kok?

Lund - direct by De Vries

224

1    A.   There is two items there, a repository for our detailed

2    file systems, DFS, specifically for the Matrix Neo project,

3    which Neo -- again, back to that Matrix analogy, Neo was the

4    character.  That was the name of our portable that we called

5    it internally.

6            The second one was the COMPASS site.  So COMPASS was

7    the tool I explained earlier that has all those confidential

8    documents that I explained in the process.

9    Q.   Did the COMPASS system have confidential Motorola

10   documents regarding the MOTOTRBO products?

11   A.   Yes, it did.

12   Q.   And then on this document there is a Section 5 that

13   extends from this page over to the next page?

14   A.   Yes.

15   Q.   What does that state?

16   A.   "In addition, you are requested to collect all Motorola

17   property and confidential information, including documents,

18   drawings, reports, specifications, samples, et cetera, which

19   you have in your possession from all Motorola and non-Motorola

20   locations and to have them reviewed by Motorola management."

21   Q.   And then there is a Section 6 on that Page 7.

22           What does that indicate or state?

23   A.   "Acknowledge that all such property and confidential

24   information has been returned from your possession to

25   Motorola -- originals, copies, or portions of copies of all

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 211 of 217 PageID #:52103
Lund - direct by De Vries
225

1  Motorola confidential information in whatever form or media

2  (paper, magnetic disk, magnetic tape, or any other media) from

3  your possession to Motorola management."

4  Q.  And what does the "Approval" section at the bottom of this

5  page indicate?

6  A.  P.B. Teo was his direct manager and walked him through

7  this exit process, and he approved that G.S. had acknowledged

8  all that and returned the information.

9  Q.  Okay.  And did you work with P.B. Teo at the time?

10  A.  Yes, I did.  He was my direct report.

11  Q.  Okay.  Now I would like to ask you just a couple of

12  questions about Sam Chia and Y.T. Kok's files much more

13  quickly than I just did.

14       If you would, please look at PTX 1178 at Page 62.

15  A.  Okay.

16  Q.  What is that?

17  A.  It's the employment agreement for Sam Chia.

18  Q.  And did he sign it?

19  A.  Yes, he did.

20  Q.  Okay.  And does it contain the same kind of

21  confidentiality obligations that G.S. Kok's agreement did?

22  A.  Yes, it does.

23  Q.  Okay.  If you would, now please take a look at PTX 1163.

24  A.  Okay.

25  Q.  Are you familiar with that document?

Lund - direct by De Vries

226

1    A.   Yes, I am.

2    Q.   What is it?

3    A.   It's also a farewell letter from Sam Chia to his

4    colleagues at Motorola.  It's something that a lot of them did

5    to just say goodbye and maybe give a forwarding email address.

6    Q.   And what is the date of that email?

7    A.   It's May 23rd, 2008.

8              MR. De VRIES:  Your Honor, we move the admission of

9    PTX 1163.

10             THE COURT:  It is received and may be published.

11         (Said exhibit was received in evidence.)

12   BY MR. De VRIES:

13   Q.   Just at a high level, what does Mr. Chia say in his

14   goodbye email, PTX 1163?

15   A.   Basically he is sad for leaving Motorola for over nine

16   years.  He felt that it was time to move on, setting different

17   goals, and basically just thanking everybody for the time and

18   experience he had together.  And then he is listing at the

19   bottom, as you can see, his personal email address if people

20   want to stay in contact.

21   Q.   Now, if we take a look at previously admitted PTX 1155.

22   A.   Okay.

23   Q.   Mr. Lund, please turn to Page 4.

24   A.   Yes.

25   Q.   It says "exit interview"?

Lund - direct by De Vries

227

1   A.   Yes.

2   Q.   And is this the exit interview form for Sam Chia?

3   A.   Yes, it is.

4   Q.   Okay.  The first question states, "What organization will

5   you be working for after Motorola?"

6           And according to the document, what was the answer?

7   A.   He is still in the progress of securing a job somewhere.

8   Q.   Now, please turn to Page 6.

9   A.   Yes.

10  Q.   At Page 6 there is the Nondisclosure of Motorola

11  Proprietary and Confidential Information form.  Do you see

12  that?

13  A.   Yes, I do.

14  Q.   And does this form indicate that the same confidentiality

15  reminders were given to Sam Chia when he left the company?

16  A.   Yes.

17  Q.   And there is an "Approval" section at the end.  What does

18  that indicate?

19  A.   It acknowledges that Sam Chia has approved this process

20  and returned all the information.

21  Q.   If we go back to the first page of this document, so Page

22  6 of the exhibit, there is that list of Motorola proprietary

23  and confidential information.

24          What does Sam Chia list under Item B?

25  A.   He lists LTD, which again is our internal name for our

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 214 of 217 PageID #:52106
Lund - direct by De Vries
228

1   MOTOTRBO product line.  "LTD documents located in COMPASS and

2   the project folders.  Source code located in the VOBs."  And

3   VOBs is a term for our ClearCase repository.

4   Q.  All right.  Finally for Y.T. Kok, please look at PTX 1157.

5   A.  Okay.

6   Q.  Mr. Lund, please turn to Page 81.

7   A.  Okay.

8   Q.  What is that?

9   A.  It's the employment agreement from Y.T. Kok.

10  Q.  And did he sign it?

11  A.  Yes, he did at the bottom.

12  Q.  And does it contain the same kind of confidentiality

13  restrictions that the other employment agreements that we

14  looked at contained?

15  A.  Yes, it does.

16  Q.  Now, please take a look at PTX 1156.  And if you look at

17  Page 3 --

18  A.  Yes.

19  Q.  -- what is that?

20  A.  Again, it's a note from Y.T. Kok to his manager, Lokang,

21  informing of him leaving -- resigning from Motorola due to a

22  personal issue.

23  Q.  Okay.  And when does he say his last day will be at

24  Motorola?

25  A.  October 3rd, 2008.

Lund - direct by De Vries

229

1   Q.   And what does he give as the reason for his departure?

2   A.   In the beginning he states that he is leaving due to a

3   personal issue.

4   Q.   And does this letter state anything about going to work

5   for Hytera?

6   A.   No, it does not.

7   Q.   Please turn to Page 5 of this exhibit.  It says "exit

8   interview"?

9   A.   Yes.

10  Q.   Is this the exit interview notes for Y.T. Kok?

11  A.   Yes.

12  Q.   And there is a question there that says, "What

13  organization will you be working for after Motorola?"

14       What does this document indicate the answer was?

15  A.   "MNC," which stands for multinational company.

16  Q.   And anywhere on this exit interview form does it indicate

17  that Y.T. Kok disclosed he would be leaving Motorola to work

18  for Hytera?

19  A.   No, it does not.

20  Q.   And if you turn to Pages 9 and 10 of this file, there is

21  another of the Nondisclosure of Motorola Proprietary and

22  Confidential Information forms.

23       Does this form indicate that Y.T. Kok was given the

24  same kind of confidentiality reminders as G.S. Kok and Sam

25  Chia when he left the company?

Case: 1:17-cv-01973 Document #: 783 Filed: 12/20/19 Page 216 of 217 PageID #:52108
Lund - direct by De Vries
230

1   A.   Yes.

2   Q.   And what does the "Approval" section at the end of this

3   document indicate?

4   A.   It indicates that Y.T. Kok had approved that he has

5   returned everything.

6   Q.   And then going back to the page just right earlier, what

7   does it indicate that Y.T. Kok listed as confidential Motorola

8   materials that he had access to as part of his employment with

9   Motorola?

10   A.   Matrix, which was our internal name for MOTOTRBO; the MRD,

11   which is the marketing requirements documents; and the TRD,

12   which is our technical requirements documents.

13   Q.   And are those documents confidential?

14   A.   Yes, they are.

15   Q.   Okay.

16         All right.  I have just a few more questions for you.

17         THE COURT:  We are going to end it for the day.  The

18   witness has been on the stand for close to two hours.

19         Members of the jury, you are going to receive these

20   exhibits when you go in to deliberate.  You will see them and

21   have an opportunity to examine them.  Therefore, it isn't

22   necessary to read each and every word of them.

23         You have heard the testimony of the witness regarding

24   them.

25         I want you to understand you will get copies of all

1   of this as part of your deliberations at the end of the case.

2          So we will pick it up Tuesday morning at 10 o'clock,

3   the last couple of questions you might have, followed by the

4   extensive cross-examination of Hytera.  That's the

5   understanding.

6          When you leave, you are not to discuss this case

7   amongst yourselves.  Do not do any kind of an examination or

8   research directly or indirectly.  As I have said, your

9   decision must be based upon the evidence that you see and hear

10  in this courtroom.

11         Please be here on time at 10 o'clock, and we will try

12  to move this case forward.

13         We are adjourned.

14      (Jury out at 4:42 p.m.)

15      (An adjournment was taken at 4:45 p.m.)F

16                    *    *    *    *    *

17  We certify that the foregoing is a correct transcript from the
    record of proceedings in the above-entitled matter.

18

19
    /s/ Judy Walsh, CSR, RMR, RDR, F/CRR, CCP  November 8, 2019.
20  Official Court Reporter

21
    /s/ Frances Ward CSR, RPR, FCRR_____November 8, 2019.
22  Official Court Reporter

23

24

25