|  |  |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| 2 | NORTHERN DISTRICT OF ILLINOIS<br>EASTERN DIVISION |

| | | |
|---|---|---|
| 3 | MOTOROLA SOLUTIONS, INC., and MOTOROLA | ) No. 17 CV 1973 |
| | SOLUTIONS MALAYSIA SDN. BHD, | ) |
| 4 | | ) |
| | | ) |
| 5 | Plaintiffs, | ) |
| | vs. | ) Chicago, Illinois |
| | | ) |
| 6 | HYTERA COMMUNICATIONS CORPORATION, LTD., | ) November 12, 2019 |
| | HYTERA AMERICA, INC., and HYTERA | ) |
| 7 | COMMUNICATIONS AMERICA (WEST), INC., | ) |
| | | ) |
| 8 | Defendants. | ) 10:00 o'clock a.m. |

```
 9
10                        TRIAL - VOLUME 3 A
                      TRANSCRIPT OF PROCEEDINGS
11          BEFORE THE HONORABLE  CHARLES R. NORGLE, SR.
                           and a jury
12

13  For the Plaintiffs:   KIRKLAND & ELLIS LLP
                          BY:  Mr. Adam R. Alper
14                             Mr. Brandon Hugh Brown
                          555 California Street
15                        27th Floor
                          San Francisco, California 94104
16                        (415) 439-1400

17                        KIRKLAND & ELLIS LLP
                          BY:  Mr. Michael W. De Vries
18                        333 South Hope Street
                          Los Angeles, California 90071
19                        (213) 680-8400

20

21

22  Court reporter:           BLANCA I. LARA
                          Official Court Reporter
23                        219 South Dearborn Street
                               Room 2342
24                        Chicago, Illinois 60604
                             (312) 435-5895
25                        blanca_lara@ilnd.uscourts.gov
```

1    Appearances:   (Continued:)

2

3    For the Plaintiffs:    KIRKLAND & ELLIS LLP
                            BY: Ms. Megan Margaret New
                            300 North LaSalle Street
4                           Chicago, Illinois 60654
                            (312) 862-7439
5
                            KIRKLAND & ELLIS LLP
6                           BY:  Ms. Leslie M. Schmidt
                            601 Lexington Avenue
7                           New York, New York 10022
                            (212) 446-4763
8
     Motorola Corporate Representative:   Mr. Russ Lund
9

10

11   For the Defendants:    STEPTOE & JOHNSON LLP
                             BY: Mr. Boyd T Cloern
                                 Mr. Michael J. Allan
12                               Ms. Jessica Ilana Rothschild
                                 Ms. Kassandra Michele Officer
13                           1330 Connecticut Avenue., Nw
                             Washington, DC 20036
14                           (202) 429-6230

15

16
     Hytera Corporate Representative:  Michele Ning
17

18

19

20

21

22

23

24

25

1      (The following proceedings were had out of the

2      presence of the jury in open court:)

3      THE COURT:  Counsel, could we have a short sidebar.

4      (Proceedings heard at sidebar on the record:)

09:56:25  5      THE COURT:  Good morning, counsel.  There was a

6  sentencing scheduled and so I intended to move it to noon.  So

7  I intended to do that at noon so that we would be ready to go

8  at 1:00 o'clock and not interfere with this.  As it turns out,

9  defense counsel called and said his client is ill, so we have

09:57:10  10  to continue this.

11      And so we will go till noon then and then pick it up

12  at 1:00 o'clock.  So we have one witness here today for

13  cross-examination in the morning?  A little bit of direct --

14      MR. DE VRIES:  Yes, Your Honor.

09:57:27  15      THE COURT:  -- and then cross-examination.

16      Who is the next witness?

17      MR. DE VRIES:  Mr. Scott Shepard.

18      THE COURT:  How long will he take?

19      MR. DE VRIES:  About an hour and a half.

09:57:37  20      THE COURT:  You would rather cross-examine the next

21  day, I assume?

22      MR. CLOERN:  Well, we're prepared to do it today, Your

23  Honor, but --

24      THE COURT:  How long, do you have a rough idea of how

09:57:47  25  long your cross might be?

1    MR. CLOERN:  It could be an hour.

2    THE COURT:  So it would take us until 3:30 or

3  somewhere around there?

4    MR. ALPER:  Yes.

09:57:53  5    THE COURT:  Okay.  That sounds good enough.  I just

6  want to let you know that it will be an ordinary lunch break.

7    MR. ALPER:  Yes, Your Honor.

8    MR. ALLAN:  Thank you, Your Honor.

9    THE COURT:  Good to see you here on time.

09:58:41  10    (Proceedings resumed in open court:)

11    (Brief pause.)

12    THE CLERK:  All rise.

13    (The following proceedings were had in the

14    presence of the jury in open court:)

09:59:30  15    THE CLERK:  The court is in session.  Please be

16  seated.

17    THE COURT:  Good morning, members of the jury.  We are

18  ready to proceed.  I just want to note for the record that

19  notwithstanding the weather, all the jurors here were on time,

09:59:42  20  as were all counsel, and we are ready to move forward.

21    The witness may re-take the stand to complete his

22  direct examination.

23    (Brief pause.)

24    MR. DE VRIES:  Your Honor, just some brief

10:00:11  25  housekeeping.  Plaintiff moves to file under seal some of the

Lund - direct by DeVries

236

1    exhibits that were submitted on Thursday, PTX 1473, 1660, 1661,

2    1662 and 1663, which contains certain financial information.

3            THE COURT:  The motion is granted.  Please proceed.

4        RUSSELL LUND, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

5                DIRECT EXAMINATION (resumed)

6    BY MR. DE VRIES:

7    Q.  Good morning, Mr. Lund.

8    A.  Good morning.

9    Q.  Am I right that you have some materials in front of you,

10   two binders and a radio?

11   A.  I have two binders.  No radio.

12           MR. DE VRIES:  Your Honor, may I approach the witness

13   with this radio (indicating)?

14           THE COURT:  Indeed.

15           (Brief pause.)

16   BY MR. DE VRIES:

17   Q.  Mr. Lund, on Thursday I was asking you some questions about

18   G.S. Kok, Sam Samuel, and Y.T. Kok and their departure from

19   Motorola in 2008.  Do you call that, generally?

20   A.  Yes, I do.

21   Q.  Okay.  Did Motorola know, when they left the company in

22   2008, that thousands of confidential Motorola documents and

23   source code were stollen?

24   A.  No, we did not.

25   Q.  In 2008, after you learned that G.S. Kok moved to Hytera,

Lund - direct by DeVries

237

1    did you suspect that Motorola's trade secrets were stolen?

2    A.  No, we did not suspect any of that.

3    Q.  Now, do you know approximately when Hytera released its DMR

4    products?

10:01:45    5    A.  They released their first products in 2010.

6    Q.  Now, when Hytera released those products, did Motorola

7    notice any similarities between the MOTOTRBO products and

8    Hytera's DMR products?

9    A.  Yes, there are a few.

10:02:01    10    Q.  And what type of similarities did Motorola notice?

11    A.  There is a few features outside the standards that we

12    thought were a little bit unique.

13    Q.  Did Motorola suspect that Hytera had stolen its trade

14    secrets because of those outward similarities in the products?

10:02:19    15    A.  No, we did not.

16    Q.  Can you tell by looking at Hytera's products if they

17    contained Motorola's stolen trade secrets?

18    A.  No, you can't.

19    Q.  Would you please take a look in your binders at DTX 4565.

10:02:38    20    It should be in your second binder towards the end.

21    A.  Okay.

22    Q.  Are you familiar with this document?

23    A.  Yes, I am.

24    Q.  And what is it?

10:03:00    25    A.  It's an e-mail exchange with our IT department at Motorola.

Lund - direct by DeVries

238

1   Q.  And are you on this e-mail string?

2   A.  Yes, I am.

3   Q.  And what is the timeframe of this e-mail string?

4   A.  It was in the 2010 timeframe.

10:03:18   5   Q.  Okay.

6              MR. DE VRIES:  Your Honor, plaintiff moves the

7   admission of DTX 4565.

8              THE COURT:  The exhibit is received and may be

9   published.

10:03:27   10             (Said exhibit received in evidence.)

11   BY MR. DE VRIES:

12   Q.  If you look at page 2 of that document, towards the bottom

13   there's an e-mail from you dated June 3rd, 2010, where you say:

14             "If it is not too late, I have input from Chuck

10:03:42   15             this morning to add a specific name in the

16             e-mail trail.  His name is G.S. Kok" and then it

17             continues, "... is this possible or can you add

18             it going forward.  Thanks, Russ."

19              Do you see that?

10:03:55   20   A.  Yes, I do.

21   Q.  What does that refer to?

22   A.  It was an e-mail system.  As you know, e-mail is a two-way

23   tool.  Information can leave the company and also come in from

24   the company from not only Motorola's, but other non-Motorlans.

10:04:14   25   And so it was an exchange.  My boss had asked me to get someone

Case: 1:17-cv-01973 Document #: 784 Filed: 12/20/19 Page 8 of 197 PageID #:52117
Lund - direct by DeVries
239

1  on to this what I call a scanning tool.  It's like a

2  preventative maintenance tool to detect if there's any

3  information going out, communication external to non-Motorlan

4  employees, and he asked me to put G.S. Kok on there.

10:04:35  5  Q.  Was G.S. Kok's name the only word that you suggested adding

6  to that e-mail filter?

7  A.  In this particular instance, it was, but the IT department

8  had used me as a reference.  Because of many jobs I've had over

9  the previous years, I was familiar with a lot of internal

10:04:54  10  projects within the company.

11  And the IT team used me as source for internal

12  information about special project names or special products

13  that we were developing and they would ask me for code names to

14  see if that information was going external to the company or

10:05:10  15  coming in.

16  Q.  And do you know whether any e-mails actually hit on this

17  particular filter term that you added here, G.S. Kok?

18  A.  No, we did not have any hits from that e-mail.

19  Q.  If you look at the top of this document, exhibit PTX 4565,

10:05:28  20  there is an e-mail from somebody who identifies themselves as

21  "Van," and it says:

22  "Pat, G.S. Kok --" and then there's an

23  identifier number, "ex-V P Motorlan" and another

24  number, "He left Motorola in March 2008.  He's

10:05:47  25  now a VP at Hytera Technology, Ltd., Motorola's

1              competitor.  Russ and his team believe that Gee

2              Siong still keeps contact with many Motorolans

3              and leaks might've happened through that

4              channel.  Russ, anything you want to add.

10:05:56    5              Thanks, Van."

6                  Do you have that in front of you.

7    A.  Yes, I do.

8    Q.  This e-mail refers to leaks.  Does that mean that you

9    suspected or believed, in June of 2010, that confidential

10:06:17   10   Motorola documents had been stolen from the COMPASS system or

11   that source code had been stolen by Hytera?

12              MR. ALLAN:  Objection, Your Honor.  Leading and calls

13   for speculation.

14              THE COURT:  Overruled.  He may answer.

10:06:29   15   BY THE WITNESS:

16   A.  No.

17   MR. DE VRIES:

18   Q.  And the e-mail filter that's referenced in this, does that,

19   to your knowledge, search the COMPASS system?

10:06:39   20   A.  No.  As I indicated last Thursday, COMPASS is an internal

21   tool that only Motorlan employees have access to.  So this is

22   only searching, as I said, e-mails going in and out of the

23   company.

24   Q.  And does this e-mail filter apply to the ClearCase system

10:06:56   25   that Motorola's source code is housed in?

Lund - direct by DeVries

241

1    A.  No, it does not.  ClearCase, which stores our source code,

2    is only accessible by Motorlan employees.

3           MR. DE VRIES:  Mr. Schlaifer, we can take that down,

4    please.

10:07:12    5    BY MR. DE VRIES:

6    Q.  Now, Mr. Lund, were you ever approached about something

7    that's called a disassembly product related to Hytera's

8    products?

9    A.  Yes, I was.

10:07:20    10   Q.  Do you remember approximately when that was?

11   A.  It was roughly in the 2012 timeframe.

12   Q.  Who approached you about that project?

13   A.  One of my colleagues, Ted Kozlowski, who was at the time

14   responsible for our MOTOTRBO program, approached me.

10:07:40    15   Q.  What did Ted tell you about that at that time?

16   A.  He briefly explained that there is an incident at one of

17   our inoperability testing, and that's where we get together

18   with all the other manufacturers to do testing to test the

19   standards, and he explained that there were some concern he had

10:07:58    20   about some test results from Hytera and Motorola.

21   Q.  Were you personally involved in that inoperability testing?

22   A.  No I was not.

23   Q.  Why did Mr. Kozlowski approach you for assistance?

24          MR. CLOERN:  Objection.  Speculation, Your Honor.

10:08:15    25          THE COURT:  Rephrase the question.  Sustained.

Lund - direct by DeVries

242

BY MR. DE VRIES:

Q.  Why did Mr. Kozlowski tell you he was approaching you for assistance?

A.  He needed some help to look at this disassembly, and I had one of a strong expert on my team who could potentially do the work, and so he approached me.  And plus, he was also independent from the MOTOTRBO team.

Q.  Okay.  And who is that person?

A.  The employee on my team was Blake Mossell.

Q.  And what was the outcome of that investigation, if you know?

A.  Blake's analysis was that there was no proprietary information, there was no theft of any confidential information from that effort.

Q.  If you could please turn in your binder to PTX 1191.  That's in your first binder.

A.  Okay.

Q.  Mr. Lund, are you familiar with this exhibit PTX 1191?

A.  Yes, I am.

Q.  And what is it?

A.  It's the note from my employee back to the team indicating that he had found no evidence of proprietary information being taken.

Q.  And did you receive this e-mail?

A.  Yes, I did.

Lund - direct by DeVries

243

1  Q.  And what is the timeframe of this e-mail?

2  A.  The message was sent 2013 on July 29th.

3          MR. DE VRIES:  Your Honor, plaintiff moves the

4  admission of PTX 1191.

10:10:09  5          THE COURT:  It is received and may be published.

6          (Said exhibit received in evidence.)

7  BY MR. DE VRIES:

8  Q.  Towards the bottom of that first page, there's a note that

9  says:

10:10:23  10          "Aroon, an initial analysis has found no obvious

11          evidence of proprietary material ..."

12          and then he continues.  Does this note relate to the

13  disassembly analysis that you just described?

14  A.  Yes, it does.

10:10:34  15  Q.  Okay.  And do you recall, Mr. Lund, having any

16  conversations about this disassembly analysis after the

17  investigation concluded?

18  A.  No; once this was completed, it was put to rest and no

19  further investigation.

10:10:53  20          MR. DE VRIES:  Mr. Schlaifer, if you can take that

21  down, please.

22  BY MR. DE VRIES:

23  Q.  Now, Mr. Lund, there come a time when Motorola discovered

24  that thousands of its confidential documents had been

10:11:07  25  downloaded from the COMPASS system by former Motorola

Lund - direct by DeVries

244

1  engineers?

2  A.  Yes.

3      MR. ALLAN:  Objection, Your Honor.  Calls for facts

4  not in evidence.

10:11:15
5      THE COURT:  The answer may stand.  Your answer was

6  what?

7      THE WITNESS:  Yes.

8      THE COURT:  Please proceed.

9  BY MR. DE VRIES:

10:11:21
10 Q.  And approximately when was that?

11 A.  That was in the late 2016 timeframe.

12 Q.  And how did Motorola discover that it had happened?

13 A.  We were pursuing patent infringement in some separate, and

14 during that time period of that patent infringement some

10:11:43
15 discovery happened in that 2016 timeframe.

16 Q.  Did you personally -- were you personally involved in that

17 discovery?

18 A.  No, I was not.

19 Q.  Who at Motorola was?

10:11:54
20 A.  Members from our IT department were part of that

21 investigation.

22 Q.  Okay.  What did Motorola do after it made that discovery?

23     MR. ALLAN:  Objection.  Foundation, Your Honor.

24     THE COURT:  Overruled.  You may answer.

10:12:10
25 BY THE WITNESS:

Lund - direct by DeVries

245

1    A.  We sued Hytera in early 2017 after we discovered that.

2    BY MR. DE VRIES:

3    Q.  Did there come a time that Motorola added a copyright claim

4    to this case, if you know?

10:12:21    5    THE COURT:  Just a minute.  When you say you sued, do

6    you mean this very litigation?

7    THE WITNESS:  Yes.

8    THE COURT:  Please proceed.  The question was asked

9    for clarification only.

10:12:31    10    BY MR. DE VRIES:

11    Q.  Mr. Lund, did there come a time when Motorola added a

12    copyright claim to this case?

13    A.  Yes.

14    Q.  And why did Motorola do so?

10:12:40    15    A.  There was further discovery on both sides and more

16    information came out about other files and other confidential

17    information being taken.

18    Q.  Are you aware that Hytera claims Motorola should've

19    discovered the theft earlier?

10:12:58    20    A.  Yes, I am aware.

21    Q.  And do you agree?

22    A.  Absolutely not.

23    Q.  Why didn't Motorola search the COMPASS access logs of G.S.

24    Kok, Y.T. Kok, and Sam Chia in 2008 when they left?

10:13:15    25    A.  At the time, as I explained last week, we definitely had a

1  lot of people leaving to other companies.  We had no reason to

2  suspect any wrongdoings at all, so there was no cause for us to

3  do anything special in that area.

4  Q.  Mr. Lund, did you feel when you learned that the theft had

10:13:33   5  occurred?

6  A.  Initially I was very disappointed.  I had known G.S. Kok,

7  had become somewhat friends with him, and I was very

8  disappointed that he could do something like that.  I put a lot

9  of trust in him.

10:13:48   10           After that, I became very angry.  Obviously, as we

11  walked through all the details of our design process and all

12  the hard work of hundreds of engineers put into developing the

13  MOTOTRBO program, to learn that they had stollen that made me

14  very angry, for sure.

10:14:04   15  Q.  Has Motorola been harmed by the theft?

16  A.  Yes, we've been greatly harmed.

17  Q.  Why do you say that?

18  A.  All that information, again, you saw in those designs and

19  implementation, all that code, the long hard work that we did

10:14:19   20  to compete fairly was taken.

21  Q.  What does Motorola hope to achieve by this lawsuit?

22  A.  First of all, to have them stop selling the products.

23  They've been out there for 10 years and they continue to sell

24  them with our code there.

10:14:36   25           Secondly, is to pay for the great harm that they've

Lund - cross by Allan

247

1    caused us.

2          And third, the outcome of this should be a strong

3    message to our industry, and, for that matter, other industries

4    that if you steal, if you cheat, you will pay for the damages

10:14:54    5    that you caused.

6    Q.  Thank you, Mr. Lund.

7          MR. ALPER:  Your Honor, I have no further questions.

8    I pass the witness.

9          THE COURT:  You may cross-examine.

10:15:03    10          MR. ALLAN:  Thank you, Your Honor.

11                          CROSS EXAMINATION

12    BY MR. ALLAN:

13    Q.

14          MR. ALLAN:  Your Honor, I think Mr. Fulbright has the

10:15:23    15    switch controls of the monitors.

16          THE COURT:  You need a couple minutes before you

17    inquire?

18          MR. ALLAN:  Yes.  So long as we can get our tech to

19    have control, I think we can --

10:15:30    20          THE COURT:  I think there is at least one juror who

21    would like to have a second cup of coffee.

22          MR. ALLAN:  Okay.

23          THE COURT:  So while you do that, we'll take about a

24    ten-minute recess.

10:15:32    25          MR. ALLAN:  Thank you, Your Honor.

Lund - cross by Allan

248

1        THE COURT:  And Mr. Fulbright will attend the issue.

2        (Recess.)

3        THE CLERK:  All rise.

4        (The following proceedings were had in the

5        presence of the jury in open court:)

6        THE CLERK:  The court is in session.  Please be

7   seated.

8        THE COURT:  Counsel, would you remind the jury of your

9   name.

10       MR. ALLAN:  Yes, Your Honor.  Michael Allan.

11       THE COURT:  Please proceed.

12       MR. ALLAN:  Thank you.

13                    CROSS EXAMINATION

14  BY MR. ALLAN:

15  Q.  Good morning, Mr. Lund.

16  A.  Good morning.

17  Q.  Again, my name is Michael Allan.  We met briefly back in

18  June, right, when I took your deposition?

19  A.  Yes, we did.

20  Q.  It was a little bit warmer outside then, right?

21  A.  Yes, it was.

22  Q.  So you talked a little bit about the MOTOTRBO line of

23  products.  That's Motorola's DMR line of products, correct?

24  A.  Yes, it is.

25  Q.  Okay.  And Motorola launched that line of products in 2006,

Lund - cross by Allan

249

1    correct?

2    A.  Early 2007.

3    Q.  Well, there's a statement of uncontested facts that the

4    parties have agreed to and I can read it in.  It's:

10:24:05   5          "Motorola launched it's MOTOTRBO professional

6               digital radios in 2006 and first sold them in

7               early 2007."

8           Do you understand that?

9    A.  Yes.

10:24:15   10   Q.  Okay.  Now, you testified last week that you were

11   personally involved in developing Motorola's DMR products, do

12   you remember that?

13   A.  Yes, I do.

14   Q.  All right.  You had no involvement in working on Motorola's

10:24:31   15   DMR products until you moved to Malaysia area, correct?

16   A.  I worked on ASTRO products, and we did leverage some of

17   that.  So some of the ASTRO products were leveraged in turbo,

18   but directly, I didn't have it until I moved to Malaysia at the

19   time.

10:24:52   20   Q.  Right.  I didn't ask you about ASTRO.  I'm just talking

21   about DMR.

22          You didn't have any involvement in working on DMR

23   until you took over the Asia Pacific region in 2007, correct?

24   A.  Yes.

10:25:05   25   Q.  Okay.  And that was February 2007, right?

Lund - cross by Allan

250

1   A.  Yeah, I moved over roughly in the early 2007 timeframe.  My

2   family moved over more in the June timeframe after school was

3   over.

4   Q.  Right.  But you were there in February 2007?

10:25:24   5   A.  Yes, I was.

6   Q.  Okay.  And that was after the DMR products had launched,

7   right?

8   A.  It was roughly the same time period.

9   Q.  When you joined, the Penang facility was in trouble, right?

10:25:36   10   A.  I wouldn't say they were in trouble, no.

11   Q.  Okay.  Let me hand you Exhibit 4197.

12        MR. ALLAN:  May we approach, Your Honor?

13        THE COURT:  Yes.

14        MR. ALLAN:  Would Your Honor like a copy?

10:25:57   15        THE COURT:  Yes.

16        MR. ALLAN:  Okay.

17        THE COURT:  You are going to depict it on the screen?

18        MR. ALLAN:  We will.  If it's admitted, of course.

19        THE COURT:  I don't need a copy.  You can proceed

10:26:10   20   accordingly.

21        MR. ALLAN:  Very good.  Thank you.

22        (Said item tendered.)

23   BY MR. ALLAN:

24   Q.  All right.  Mr. Lund, I've handed you exhibit 4197, which

10:26:19   25   is a copy.  We talked about this at your deposition.  This is a

1    copy of your Penang engineering plan that you prepared,

2    correct?

3    A.  Yes, this is what I put together as I moved over to Penang.

4    Q.  Okay.

10:26:34    5         MR. ALLAN:  Offer it into evidence, Your Honor.

6         THE COURT:  Well, this is the plaintiff's

7    case-in-chief.

8         MR. ALLAN:  Yes, Your Honor.

9         MR. ALPER:  Your Honor, we have no objection.

10:26:47   10         THE COURT:  It is received.  It may be published.

11         MR. ALLAN:  Thank you, Your Honor.

12         THE COURT:  No Thank you's, counsel, please.  I

13    understand, as a matter of courtesy, but you don't say "thank

14    you" after ruling, and after an answer you don't say "okay" or

10:27:02   15    "all right."  Please proceed.

16         (Said exhibit received in evidence.)

17    BY MR. ALLAN:

18    Q.  Mr. Lund, this is your Penang engineering plan, right, that

19    we've now shown then jury?

10:27:10   20    A.  It was the initial plan when I moved to Malaysia, yes.

21    Q.  Okay.  Let's slip over to slide -- and that's your name on

22    it, right, Russ Lund?

23    A.  Yes, it is.

24         THE COURT:  Counsel, you may not be aware of it, but

10:27:20   25    after every answer you say "okay," which seems to affirm the

Lund - cross by Allan

1    answer or agree with the answer of the witness.  So if you can,

2    avoid that.

3    BY MR. ALLAN:

4    Q.  Slide 4, Mr. Lund, it's entitled "key learning plan - next

10:27:36    5    90 days" at the top, do you see that?

6    A.  Yes, I do.

7    Q.  I want to focus you on the third bullet.  Could you read

8    that for the jury, please.

9    A.  Part of my key learning plan, the third bullet was:

10:27:51    10              "Spending time learning the PCR products and

11               business.  I do not have experience in this

12               area.  I understand TETRA, APCO and Braodband."

13    Q.  And the PCR products that are referenced there, that stands

14    for Professional Commercial Radio, correct?

10:28:04    15    A.  Yes; there's more than just DMR in the PCR product like.

16    Q.  I'm just asking you, PCR relates to Professional Commercial

17    Radio, that's what the acronym stands for, yes?

18    A.  Yes, it does.

19    Q.  And did DMR is part of that, right?

10:28:18    20    A.  Correct.

21    Q.  Let's turn to the third slide if we could, page 3.

22         This slide is entitled "My Strengths and Weaknesses,"

23    do you see that?

24    A.  Yes, I do.

10:28:41    25    Q.  And this refers to your strengths and weaknesses, that's

Lund - cross by Allan

253

1  your plan?

2  A.  Yeah, this is what I was presenting to the team.

3  Q.  I'd like to focus you on the section entitled Areas of

4  Improvement, are you with me?

10:28:57  5  A.  Yes, I am.

6  Q.  The second dash line begins:

7          "Lack of PCR experience.  I do not have 20 years

8          of lessons learned in PCR market or radio

9          development."

10:29:06  10       Do you see that?

11  A.  Yes, I do.

12  Q.  And you wrote this after you moved to Penang?

13  A.  It is right at the beginning.  As I had discussed this with

14  my manager at the time, it was just areas I need to focus on,

10:29:24  15  and I then I did share this same information with the team.

16  Q.  Now, let's take a look at previously admitted PTX 1311.

17          Do you recall this, Mr. Lund?  You discussed this --

18  it's on your screen, sir.

19  A.  Okay.  I'll look it up.  I prefer to look in the book.

10:29:47  20  Q.  It was admitted in your direct examination.

21  A.  Do you know if it's in the first or second binder?

22  Q.  I don't know.  It's PTX 1311.

23          (Brief pause.)

24  BY THE WITNESS:

10:30:21  25  A.  Yeah, I found it.

BY MR. ALLAN:

Q.  You got it in front of you?

A.  Yes, I do.

Q.  Okay.  Now, you told the jury on Thursday that you were
familiar with this February 27, 2006, document because, and I
quote:

        "I was the overall leader of the Penang Design

        Center at that time."

         Do you recall that?

A.  Yes.

Q.  But you weren't the overall leader of the Penang Design
Center in February 2006, were you?

A.  This document was used throughout the 2007 and '08.  As we
said, we had distributors, so we used this information --

Q.  No, I'm just asking whether you were the head of the Penang
Design Center in February of 2006.  You were not, correct?

A.  That is correct.

Q.  Okay.  And, in fact, you weren't the head of the Penang
Design Center for another full year, right?

A.  That's correct.

Q.  Okay.  And you didn't know anything about DMR before you
went to Asia in February of 2007, correct?

A.  I was familiar with DMR because it was a big part of our
business.  So I was familiar, overall, that DMR was one of our
new standards that we were releasing into the market space.

Lund - cross by Allan

255

1  Q.  I took your deposition on June 4 of 2019, do you remember

2  that?

3  A.  Yes, I do.

4  Q.  That was under oath?  You swore to tell the truth?

5  A.  Yes.

6  Q.  Okay.  And I asked you:

7        "Okay.  And prior to moving to Malaysia and

8        taking over responsibility at the Penang

9        location, did you have any involvement working

10       on the DMR products?"

11         And you answered:

12         "No, sir."

13  A.  That's true.

14  Q.  Okay.  Now, you also told the jury on Thursday that you

15  were familiar with other Motorola DMR documents that predated

16  your time in Asia, correct?

17  A.  Yes, I did.

18  Q.  All right.  And let's take a look at PTX 1263, that's

19  another document that was introduced during your direct

20  examination.  We'll it on the screen for you.

21        Do you see this one?

22  A.  1263.  Yes, I have it in front of me.

23  Q.  And this document is dated January 2004, correct?

24  A.  Yes, that is correct.

25  Q.  3 years before you took over in Penang?

1   A.  Yes.

2   Q.  3 years before you had any involvement working on DMR,

3   right?

4   A.  Yes.  Again, these documents are living documents.  We use

10:32:45   5   these documents --

6   Q.  Mr. Lund, I'm just asking you a simple question.  This was

7   3 years before you took over in Penang, right?

8   A.  Yes, it was.

9   Q.  Okay.  Let's go to a new document, if we could.

10:32:57   10          Actually, back to what you got in front of you.  Back

11   to your Penang engineering plan.

12          Okay.  DTX 4197.  Now, you were sent to the Penang

13   facility to facilitate turnaround in that facility, right?

14   A.  Yes, there was some high levels of attrition, which we

10:33:21   15   talked about, and that was one of the reasons that my

16   management team sent me over there is to help them correct the

17   attrition problem.

18   Q.  Let's take a look at page 6 of this engineering plan you

19   put together.

10:33:36   20          Okay.  There's a section, it's the fifth bullet down,

21   it says:

22              "Russ, I believe we are in a 'second realignment.'"

23              Do you see that?

24   A.  Yes, I do.

10:33:51   25   Q.  And then below that it says -- or you say in the document:

Case: 1:17-cv-01973 Document #: 784 Filed: 12/20/19 Page 26 of 197 PageID #:52135
Lund - cross by Allan
257

1         "Why?  In 2006, they had a difficult year on MOC

2         and quality due to large staff ramp-up.  They

3         are drifting into trouble."

4       Do you see that?

5   10:34:07  A.  Yes, I did.

6  Q.  'MOC" stands for meet our commitments, is that right?

7  A.  Yes.

8  Q.  A couple points down it says "turnaround," do you see that?

9  A.  Yes, I do.

10  10:34:21  Q.  Would you read that into the record from the jury, please.

11  A.  (Reading:)

12         "Turnaround:  They are recognized by some to be

13         in trouble.  Others downplay how much trouble

14         they are in."

15  10:34:32  Q.  And the "they" here is a reference to the Penang Design

16  Center, correct?

17  A.  Not only them, but other, you know, piers and colleagues at

18  the time.

19  Q.  Okay.  And then the next section says:

20  10:34:44         "Realignment:  They are somewhat in denial that

21         a major leadership was needed.  However, they do

22         accept that they are in trouble in MOC and

23         quality."

24       Do you see that?

25  10:34:57  A.  Yes, I that.

Lund - cross by Allan

258

1  Q.  And then finally on this page, below that:

2      "If they do not accept realignment and continue

3      to drift into trouble, then a full scale

4      turnaround will be required."

5      Right?

6  A.  Yeah, that's correct.  That's why I was sent over there, is

7  to help them not have any further issues.

8  Q.  Okay.  And you spoke with a number of folks at Motorola

9  about this, right?

10 A.  What kind of folks?

11 Q.  Supervisors, colleagues.

12 A.  Oh, about this plan?

13 Q.  Yes.

14 A.  Oh, yeah.  My managers.

15 Q.  Bob Epson, he was your manager at the time?

16 A.  Yes.

17 Q.  And Nickie Petratos, you spoke to her?

18 A.  Yes, I did.

19 Q.  She was head of PCR at the time?

20 A.  Correct.

21 Q.  Okay.  You spoke to Chris Goode?  Did I pronounce his name

22 correctly?

23 A.  It's a woman, Chris.

24 Q.  Chris.

25 A.  Chris Goode.

1   Q.  Very good.  Thank you.

2        Graeme Hobbs, you also spoke to Graeme Hobbs about

3   this?

4   A.  Yeah, he was in the U.K.  He was responsible for --

5   Q.  I didn't ask you.  I just want to know, you talked to him

6   about it, right?

7   A.  Yes, I did.

8   Q.  And same with Ted Kozlowski?

9   A.  Yes, I did.

10  Q.  Dale Rublaitus?

11  A.  I believe I talked to Dale.

12  Q.  Ramesh Rangaragan?

13  A.  I didn't think I did.

14  Q.  A number of people, right?

15  A.  About what needed to be done to help out?  Yes, I did.

16  Q.  And people on the ground at Penang also recognized the

17  issues with the Penang Design Center, right?

18  A.  I wouldn't say that broadly.  As we said, it's a big design

19  center.  A lot of the projects were going along fine.  They

20  were on time, good quality.  So it was not like the whole

21  design center was just falling apart.  There was a lot of good

22  programs.  And so I wouldn't say that all the people had a

23  consensus that --

24  Q.  Mr. Lund, several people made comments to you that were on

25  the ground at Penang Design Center that the facility was in

1    trouble and needed help, correct?

2    A.  A few people did and a few people thought things were going

3    okay.

4    Q.  Okay.  Now, one of the issues in Penang was that the

5    products weren't meeting specifications, right?

6    A.  More specifically, it was that some of the projects were a

7    little bit delayed from their delivery and that we were having

8    a few quality issues.

9    Q.  In addition to the attrition issue that we'll talk about in

10   a second.

11   A.  Correct.

12   Q.  All right.  Mr. Lund, you're familiar with the acronym

13   "SWAT," right?

14   A.  Yes, I am.

15   Q.  It stands for strengths, weaknesses, opportunities, and

16   threats, is that right?

17   A.  Yes, it does.

18   Q.  Okay.  I'm going to hand you DTX 4198.

19          MR. DE VRIES:  May we approach the witness, Your

20   Honor?

21          THE COURT:  Could we have a brief sidebar?

22          MR. ALLAN:  Yes.

23

24          (Proceedings heard at sidebar on the record.)

25          THE COURT:  Are you going to be offering evidence on

1    the plaintiffs' case-in-chief?  And if you are, I want to know

2    what it is you are going to be objecting or if you have no

3    opposition?

4              MR. ALLAN:  So we do not agree that they should go

10:38:12    5    beyond the scope of direct, and so we would object to any

6    evidence that does.

7              MR. ALLAN:  I don't plan to do that, Your Honor.

8              THE COURT:  All right.  And, by the way, I do not mean

9    to say this disrespectfully, you may not be aware of it, but

10:38:21   10    you keep on saying "okay" and "all right" after the answer.

11             MR. ALLAN:  I know.  I'm trying not to.

12             THE COURT:  It gives the impression to the jury that

13   you are --

14             MR. ALLAN:  Bad habit, sir.  Hard to kick, but I'll

10:38:35   15   work on it.

16             THE COURT:  I understand.  I'm saying this

17   respectfully.

18             MR. ALLAN:  I appreciate it.

19             THE COURT:  I think you're doing a good job.

10:38:44   20             MR. ALLAN:  Thank you so much.

21             (Proceedings resumed in open court:)

22             THE COURT:  Yes, you may approach the witness.

23             THE WITNESS:  I got it.

24             THE COURT:  Oh, you got it.

10:38:59   25             THE WITNESS:  Yes, I got it.

1    THE COURT:  Fait accompli.

2  BY MR. ALLAN:

3  Q.  All right.  You got the DTX 4198 in front of you, yes,

4  Mr. Lund?

10:39:15  5  A.  Yes, I do.

6  Q.  All right.  And this is a confidential SWAT analysis that

7  we talked about during your deposition, correct?  This came

8  from your files?

9  A.  Yes, I did.

10:39:29  10    MR. ALLAN:  I move it into evidence, Your Honor.

11    THE COURT:  It is received and it may be published.

12    MR. ALLAN:  Thank you.

13    (Said exhibit received in evidence.)

14  BY MR. ALLAN:

10:39:39  15  A.  All right.  Let's turn to slide 3, if we could, which

16  discusses the strengths, weaknesses, opportunities and threats

17  for the Penang site.

18  A.  Yeah, I'm there.

19  Q.  All right.  And so very quickly on the Strength side, there

10:39:55  20  are several things listed.   The first two are low cost and

21  co-locates with factory, do you that?

22  A.  Yes, I do.

23  Q.  It was fairly inexpensive to research and manufacture in

24  Penang, correct?

10:40:05  25  A.  Yes; as well as some of our other sites, too.

1  Q.  Okay.  Let's flip over to the Weaknesses side.  Now, the

2  first item listed there says:

3          "Attrition running at 16.8 percent annualized."

4           Do you see that?

5  A.  Yes, I do.

6  Q.  And that's a reference to employee turnover, right?

7  A.  Yes, that was specifically Motorola.  The industry average

8  was around 20 percent at the time.

9  Q.  I'm not asking you about the industry average.  I'm asking

10 you about Penang; okay.

11         So for every thousand employees, you got 170 leaving

12 each year, right?

13 A.  Yes.

14 Q.  Okay.  Now, you believe that a healthy attrition rate is

15 anywhere between 5 to 8 percent, maybe 9 percent, correct?

16 A.  Yes.  Typically, we like to keep attrition around 9 to

17 10 percent in the company.  It's a good way to bring in new

18 engineers at the lower levels, and so forth.  So,

19 transitionally, we think that's healthy, somewhere around just

20 below --

21 Q.  Mr. Lund, a "yes" is fine.  You think 5 to 8, maybe

22 9 percent is a healthy attrition rate, correct?

23         MR. DE VRIES:  I'll object, Your Honor.  Counsel

24 continues to interrupt the witness' answers.

25         THE COURT:  Sustained.

BY MR. ALLAN:

Q.  The healthy attrition rate between 5 to 8 percent, maybe 9 percent, that's -- the rate you actually had at Penang was two or three times higher than your healthy rate, correct?

A.  About double.

Q.  Yeah.  Or triple, if it was in at the 5 percent range, right?

A.  Sure.  But like I said, 8 to 9 percent was a good rate for that economy.

Q.  Now, let's keep going down the "Weaknesses" section.  And there's a note that Penang is resistant to change, do you see that?

A.  About fifth bullet point down.

Q.  Yes, sir.

A.  Yes, I see it.

Q.  Let's drop down a little further under Threats, and there's a notation that change might increase attrition, do you see that?

A.  Yes, I see that first bullet.

Q.  Okay.  And so there was a concern that if Motorola made some changes, attrition might actually increase in Penang, yes?

A.  It could go up or it could go down.

Q.  Okay.  In the next point it says, HYT/competition for talent," do you see that?

A.  Yes, I do.

1    Q.  All right.  And those were things that the company was

2    thinking about as a potential threat to Penang as well, yes?

3    A.  Yeah, we all always concerned about competitive threats.

4    Q.  Okay.  And then second from the bottom, "age 55

5    retirement," do you see that?

6    A.  Yes, I do.

7    Q.  And Motorola had a retirement requirement of 55 years of

8    age at Penang at the time, yes?

9    A.  Yeah.  Mainly driven by our factory employees, yes.

10   Q.  Okay.  And these were some of the problems that the Penang

11   facility was facing at the time, correct?

12   A.  Yes.  This analysis is done for all of our sites and every

13   site has got some challenges, yes.

14   Q.  Right.  But we focused on Penang here.

15   A.  Correct.

16   Q.  Okay.  Now, you talked a little bit on your direct

17   examination, Mr. Lund, on Thursday about one of Motorola's

18   corporate policies, the protection of proprietary information

19   policy, do you remember that?

20   A.  Yes, I do.

21   Q.  All right.  And I think it was actually on one of the

22   slides that you showed the jury, do you remember that?

23   A.  Yes, I do.

24   Q.  All right. And that policy is applicable to everybody in

25   the company, right?

1  A.  That is correct.

2  Q.  And company employees go through training on that policy,

3  yes?

4  A.  Yes, we all have mandatory training when you start at

5  Motorola and on an annual basis.

6  Q.  Okay.  Let me hand you PTX 1183, if I could.

7          MR. ALLAN:  Permission to approach, Your Honor?

8          THE COURT:  Yes.

9          (Said item tendered.)

10 BY MR. ALLAN:

11 Q.  Mr. Lund, you got in front of you PTX 1183, which is a copy

12 of the protection of proprietary information policy, do you see

13 that?

14 A.  Yes, I do.

15 Q.  All right.

16          MR. ALLAN:  I'd offer this into evidence, Your Honor.

17          MR. DE VRIES:  No objection, Your Honor.

18          THE COURT:  It is received and may be published to the

19 jury.

20          MR. ALLAN:  Thank you.

21          (Said exhibit received in evidence.).

22 BY MR. ALLAN:

23 Q.  Now, this policy was in place at Motorola going back to the

24 '90s, correct?

25 A.  Yes.  It was September of 1991.

10:43:54
10:44:13
10:44:28
10:44:38
10:44:51

Lund - cross by Allan

1  Q.  Okay.  I want to focus you, Mr. Lund, to begin with on "the

2  purpose", just on this first stage, do you see that?

3  A.  Yes, I do.

4  Q.  All right.  Could you read that for the jury, "the

5  purpose."

6  A.  (Reading:)

7       "To define a uniform Motorola-wide operating

8       procedure for the identification of proprietary

9       information and protection of the data from

10       inadvertent or unauthorized disclosure,

11       modification, or destruction."

12  Q.  And that is, in fact, the purpose, to your understanding,

13  correct?

14  A.  Yes.

15  Q.  All right.  And then the scope, I think as we just

16  mentioned, applies to all employees of Motorola.  It's right

17  below "the purpose," correct?

18  A.  That is correct.

19  Q.  All right.  Let's move over to page 3 of this document.

20  And I want to direct your attention specifically to section

21  3.4, which falls within 3.0, the policy region of the policy,

22  do you see that?

23  A.  Yes, I see that.

24  Q.  All right.  Now Section 3.4 says:

25       "All computer and network users, including

10:45:04

10:45:19

10:45:28

10:45:45

10:46:02

Lund - cross by Allan

268

1          non-Motorlans, accessing Motorola computers,

2          will be held strictly accountable for their

3          activities while using Motorola information

4          processing resources."

10:46:16   5          And then it continues:

6          "Actions, including details of files accessed,

7          will be subject to recording and subsequent

8          audit review."

9          Do you see that?

10:46:29  10   A.  Yes, I see that.

11   Q.  All right.  And Motorola did, in fact, record the details

12   of files being accessed by its employees, did it not?

13   A.  In terms of any files or -- so the question is, do we track

14   access, or, you know, who has approval to it?

10:46:55  15   Q.  Do you -- does -- the company policy states that it will --

16   that:

17          "Actions, including details of files accessed,

18          will be subject to recording and subsequent

19          audit review."

10:47:08  20          Do you see that?

21   A.  Yes, I do.

22   Q.  That happened, right?

23   A.  Yeah.  I'm not an IT expert, but I know we have -- our

24   tools do have some form of authorization.  I'm not sure all the

10:47:20  25   details around any audits, though.

Case: 1:17-cv-01973 Document #: 784 Filed: 12/20/19 Page 38 of 197 PageID #:52147
Lund - cross by Allan
269

1  Q.  Well, you testified just a few moments ago about the

2  COMPASS logs, right?

3  A.  Yes, I did.

4  Q.  And the COMPASS logs were logs of, I think you said,

5  accessed -- files that were accessed within Motorola, right?

6  A.  Yeah, I stated that people outside Motorola don't have

7  access to our COMPASS system.  So when you leave, you no longer

8  have access.

9  Q.  Okay.  So according to this policy that was applicable to

10 everybody in the company, all Motorola employees knew that

11 access to documents was being recorded, correct?

12 A.  That's what the statement says, yes.

13 Q.  All right.  Now, you spent some time on Thursday walking

14 the jury through a number of documents and pointing out the

15 fact that it said "Motorola confidential" on the bottom or at

16 the top, do you remember that?

17 A.  Yes, I do.

18 Q.  Now, the requirement at Motorola to mark documents as

19 confidential, that comes out of this policy, right?

20 A.  Yes, we're definitely instructed to mark anything

21 confidential.

22 Q.  Okay.  Let's take a look at page 5 of this document under

23 Section 6.1, which is part of the procedures.

24 A.  I see that.

25 Q.  You're with me?

10:47:33

10:47:49

10:48:07

10:48:22

10:48:40

1    A.  Yes.

2    Q.  Okay.  And this says:

3            "The follow schedule provides information with

4            respect to the treatment to be given to Motorola

5            classified documents.  It is organized by type

6            of classification.  And within each

7            classification, it is then organized by the type

8            of action and the procedures that must accompany

9            that specific action."

10          Do you see that?

11   A.  Yes, I do.

12   Q.  All right.  So let's flip over -- and, by the way, there's

13   a number of different classifications provided.  For example,

14   on the first page it says:

15           "Motorola general business information."

16           Do you see that example?

17   A.  Yes, the first one is general business information.

18   Q.  Okay.  What I'd like to do is direct you over to page 12,

19   all right.  And I'd like to highlight for you, "Motorola

20   Registered Secret Proprietary," do you see that classification?

21   A.  Yes, I do.

22   Q.  All right.  And then below that classification, to the

23   right, it says, "Procedures for managing information," it goes

24   on to list a number of things; are you with me?

25   A.  Yes, I am.

Case: 1:17-cv-01973 Document #: 784 Filed: 12/20/19 Page 40 of 197 PageID #:52149
Lund - cross by Allan
271

1   Q.  All right.  It says:

2           "Business, technical, financial, trade secret,

3           and personnel information, which is written,

4           oral, in electronic media, or physical form and

5           which is of a most sensitive nature."

6               Do you see that?

7   A.  Yes, I see that.  That's stated on all the other sections,

8   too.

9   Q.  Well, let's take a look.  Let's go back to Motorola General

10  Business Information.

11  A.  I was referring to the confidential information category.

12  Q.  Well, there's no reference to trade secret anywhere else,

13  is there?

14  A.  Yes, that was just a very high-level tier, but all the

15  other categories are also for our confidential information and

16  secret information.

17  Q.  Well, this is for your trade secret information, correct?

18  A.  This was a special category.  We had other sections.  That

19  if you look in there, "Motorola Confidential Proprietary,"

20  those are also our trade secrets.  So all of our design

21  documents in code are also categorized under that.

22  Q.  Mr. Lund, this Motorola Registered Secret Proprietary is

23  the only reference to trade secret in this policy, correct?

24  A.  Yes.

25  Q.  And, in fact, the company, when it had a real trade secret,

Lund - cross by Allan

272

1   used the designation "Motorola Registered Secret and

2   Proprietary," did it not?

3   A.  It was, again, a very high-level tier.  It does not mean

4   that the other documents aren't trade secret information.

10:51:26   5   Everything we do is confidential and proprietary.

6   Q.  You made that very clear on Thursday, sir, that's why I'm

7   directing you to the pointed section that discusses trade

8   secret classifications.

9           Let's look over at the marking point on page 13, one

10:51:45   10  page over.

11  A.  I see it.

12  Q.  And then there's requirements under the policy for marking

13  a document that is classified as Motorola Registered Secret

14  Proprietary, do you see that?

10:51:59   15  A.  Yes, I do.

16  Q.  Can you read that first paragraph into -- in for the jury,

17  please.

18  A.  Motorola Registered Secrete Proprietary?

19  Q.  Yes, sir.

10:52:11   20  A.  Keep reading the whole thing?

21  Q.  Yes.

22  A.  Okay.  Sorry.

23  Q.  That's okay.

24  A.  (Reading:)

10:52:17   25          "Motorola Registered Secret Proprietary on a

1          colored cover sheet and prominently displayed on

2          the top and bottom of each page.  The cover

3          sheet should name the individual custodian of

4          that copy and bare a registration number tracked

10:52:32  5          by the classifier.  For digital information,

6          application systems must enforce the marking in

7          all print routines and graphics displays, and

8          where practical, embedded in files."

9 Q.  And according to Motorola's policy, something that fell

10:52:47 10 within the Motorola Registered Trade Secret proprietary

11 classification and was so designated, needed to be marked on a

12 colored cover sheet prominently displaying on the top and the

13 bottom of each page, correct?

14 A.  Yeah, for that ultra-high-end, if there's something that

10:53:05 15 critical, then we would try and use that.

16 Q.  Well, for something that's a trade secret, right?

17 A.  Again, all of our code and documentation is considered

18 confidential proprietary and trade secret.

19 Q.  Well, you said it a couple of times, Mr. Lund, so let's

10:53:22 20 take a look at page 9.  Motorola Confidential Proprietary,

21 that's the label you pointed you out to the jury a number of

22 times on Thursday; do you see that?

23 A.  Yes, I do.

24 Q.  Do you see the word "trade secret" referenced anywhere in

10:53:42 25 there?

Lund - cross by Allan

274

1   A.  No, I do not.

2   Q.  Okay.  But it is, where we were just focused, under

3   Motorola registered secret proprietary, correct?

4   A.  Right.  And as I stated, if you read those, also all of our

10:53:57   5   technical and financial information is considered confidential

6   and proprietary.

7   Q.  Okay.  But trade secret, again, is only listed under

8   Motorola Registered Secret Proprietary?  Yes or no.

9   A.  That's what the document says, but, again --

10:54:11   10   Q.  That was Motorola's policy that was in place, yes?

11   A.  That's what it says for our high-end information.

12   Q.  All right.  Let's talk about innovation awards.

13       Now, you're familiar with Motorola's innovation

14   awards, correct?

10:54:27   15   A.  Yes, I am.

16   Q.  All right.  And Motorola offers award programs for

17   engineers that develop and invent intellectual property,

18   correct?

19   A.  Yes, we like to give recognition for their inventions, yes.

10:54:46   20   Q.  All right.  I'm going to hand you DTX 4549, if I could.

21       (Said item tendered.)

22   BY MR. ALLAN:

23   Q.  Now, this document, Mr. Lund, is Motorola's intellectual

24   property award plan that was effective July 1, 2004, do you see

10:55:16   25   that?

Case: 1:17-cv-01973 Document #: 784 Filed: 12/20/19 Page 44 of 197 PageID #:52153
Lund - cross by Allan
275

1    A.  Yes, I do.

2    Q.  Applicable to the whole company, right?

3    A.  Yes.

4    Q.  All right.

5    10:55:21        MR. ALLAN:  I move this into evidence, Your Honor.

6             MR. DE VRIES:  No objection.

7             THE COURT:  It is received and it may be published.

8             MR. ALLAN:  Thank you.

9             (Said exhibit received in evidence.)

10   10:55:32 BY MR. ALLAN:

11   Q.  All right.  Mr. Lund, I'd like to direct you to page 2

12   under "purpose and scope" of this intellectual property award

13   plan.

14             Are you with me?

15   10:55:47 A.  Yes, I am.

16   Q.  All right.  The second sentence under "the purpose and

17   scope" says:

18             "The Motorola intellectual property award plan,

19             abbreviated The Plan, was established to

20   10:56:06        recognize and rewarded technological innovation

21             in support and business objectives.  The plan is

22             applicable to all organizational units and

23             subsidiaries of Motorola worldwide."

24              Do you see that?

25   10:56:19 A.  Yes, I do.

Case: 1:17-cv-01973 Document #: 784 Filed: 12/20/19 Page 45 of 197 PageID #:52154
Lund - cross by Allan
276

1    Q.  And that's your understanding of the purpose of this award

2    plan, right?

3    A.  Yes.

4    Q.  And then under Section 3 it says there are 9 types of

5    intellectual property awards; do you see that?

6    A.  Yes, I do.

7    Q.  The first one is a patent application filing award, the

8    second is a patent issuance award, and the third is an

9    invention award; do you see that?

10   A.  Yes, I see that.

11   Q.  All right.  Now I want to take you over to the definition

12   at appendix A, same document.  It's on page 7 of 9.

13   A.  Okay.  I'm there.

14   Q.  All right.  And so "invention award" is defined.  It's a

15   defined term in this plan.

16   A.  Yes, it is.

17   Q.  All right.  Could you read the definition of "invention

18   award" for the jury, please.

19   A.  (Reading:)

20           "Invention award:  A cash award paid to one or

21            more employees for a substantial Motorola

22            innovation that is not patented, but instead is

23            maintained as a trade secret or a confidential

24            process."

25   Q.  So an invention award is the award that somebody gets for a

1   trade secret?

2   A.  Yes.

3   Q.  And it's the third listed award out of the 9 under "purpose

4   and scope"?

10:57:49   5   A.  Yes.  We rarely use those, but it is something where if you

6   you decide not to release it out into the public domain, we

7   still give them recognition.  It was a great idea, we just

8   decided not to register it.

9   Q.  Let's look page 4 of 9, under Section 8 -- sorry, Section

10:58:13   10   H, apologies.  There is a section in here that says, "Frivolous

11   disclosures shall not receive a disclosure award," do you see

12   that?

13   A.  Yes, I see that statement.

14   Q.  So long as a disclosure is not frivolous, the named

10:58:33   15   inventor on the patent or trade secret will receive an award,

16   right?

17   A.  Ah --

18   Q.  According to the policy?

19   A.  Well, there's other categories.  I mean, it could be

10:58:45   20   dismissed for prior art.  So if the patent is submitted and the

21   inventor just didn't realize that, it could be rejected for

22   that. It may not be frivolous, it just might be prior art in

23   the industry and it could get rejected for that.  And it's --

24   Q.  Mr. Lund, I'm not asking you to speculate on what might

10:59:03   25   happen.  All I'm asking you, is to confirm that the company's

Lund - cross by Allan

278

1 policy was that frivolous disclosures won't get -- people who

2 submit frivolous disclosures won't get a award, correct?

3 A.  Ah --

4 Q.  That's what the policy says?

10:59:17  5 A.  Yeah, if it's a bad idea and we don't recognize that.

6 Q.  Okay.  On Thursday you provided the jury with an overview

7 of patents and trademarks, trade secrets, and copyrights?

8 A.  Yes.  Those four, yes.

9 Q.  And those are different types of intellectual property,

10:59:39  10 yes?

11 A.  Yes.

12 Q.  Now, Motorola trains its employees on intellectual

13 property, correct?

14 A.  Yes, we have training procedures for that.

10:59:50  15 Q.  On things like patents?

16 A.  Yes.

17 Q.  And trade secrets?

18 A.  Yes; we have for confidential information.  We go through

19 all our POPI training, correct.

11:00:03  20 Q.  And the training is conducted in the ordinary course of

21 Motorola's business, right?

22 A.  Yes.  Again, once at employment and on an annual basis we

23 go through -- each employee goes through a training.

24 Q.  Now, this award plan that is applicable to the entire

11:00:20  25 company, employees are also provided a training on the award

Case: 1:17-cv-01973 Document #: 784 Filed: 12/20/19 Page 48 of 197 PageID #:52157
Lund - cross by Allan
279

1   plan so they understand the scope of available awards, right?

2   A.  Yes, it's common knowledge within Motorola of the award

3   structures.

4   Q.  Okay.  I'd like to hand you exhibit DTX 4721.

5               MR. ALLAN:  May we approach, Your Honor?

6               THE COURT:  Yes.

7               (Said item tendered.)

8   BY MR. ALLAN:

9   Q.  Now, Mr. Lund, this is a Motorola-produced document,

10  intellectual property awareness training, do you see that?

11  A.  Yes, I do.

12              MR. ALLAN:  I'd offer this into evidence, Your Honor.

13              MR. DE VRIES:  No objection.

14              THE COURT:  It is received and it may be published.

15              (Said exhibit received in evidence.)

16  BY MR. ALLAN:

17  Q.  And this is an intellectual property awareness training

18  that's provided by Motorola's legal department, yes?

19  A.  Yes.

20  Q.  Let's take a look, start with page 18.  This shows the

21  types of intellectual property at Motorola, many of which you

22  discussed on Thursday, right?

23  A.  Yes, it does.

24  Q.  Now, let's flip over to page 64.

25  A.  I'm there.

Lund - cross by Allan

280

1  Q.  All right.  The title of this page is "Patent Awards," do

2  you see that?

3  A.  Yes, I do.

4  Q.  Now, at the bottom -- so this is set up with type of award

5  at the top and then number of inventors.  So if you've got one

6  to three inventors, you made a certain amount of money, if

7  you've got more than four inventors you make a certain amount

8  of money?

9  A.  That's correct.

10 Q.  All right.  Now, down in the "type of award" column, the

11 last listed entry is, "Invention Award/Trade Secret," do you

12 see that?

13 A.  Yes, I do.

14 Q.  And this training document indicates to Motorola employees

15 that if there are more -- if there are between one and three

16 inventors of a particular trade secret, they'll get $1,500

17 each, correct?

18 A.  That's correct.

19 Q.  And if there are four or more inventors, then that would be

20 a prorated split of $4,500?

21 A.  Yes, that's correct.

22 Q.  Okay.  And then at the bottom there's two little stars

23 here, it says:

24         "Approximately six weeks after your disclosure

25         is reviewed, you will receive a disclosure

1      check."

2          Do you see that?

3  A.  The one with the double asterisks?

4  Q.  Yes, sir.

11:03:16   5  A.  Yes, I see that.

6  Q.  All right.  And then right to the of it, of course, is a

7  hand holding a bag of money, do you see that?

8  A.  Yes, I see that.

9  Q.  And this is to incentivize Motorola engineers to develop

11:03:31  10  technology, correct?

11  A.  We develop technology on a daily basis.  This is more to

12  recognize inventions that we want out in the public and

13  registered with the government.

14  Q.  Well, certainly don't want trade secrets out in the public,

11:03:49  15  Mr. Lund, or they wouldn't be secret anymore, right?

16  A.  Sir, again, that trade secret was for innovations that we

17  didn't want to get out there, and those happen very, very

18  infrequently.

19  Q.  Well, let's take a look at the speakers slide.  So this the

11:04:04  20  next page, page 65.

21  A.  I see it.

22  Q.  Okay.  So this is the slide for somebody in the law

23  department who is presenting this to Motorola engineers, these

24  are the notes to walk through what's on the slide we just

11:04:20  25  talked about, right?

1   A.  Yes, I see that.

2   Q.  And it begins with:

3           "Here's the good part, where the money comes

4           in."

11:04:28   5           Do you see that?

6   A.  Yep.

7   Q.  And then the last sentence is:

8           "And lastly, the award amount for trade secret

9           is $1,500."

11:04:36   10          Do you see that?

11  A.  Yes, I see that.

12  Q.  Okay.  Now, I believe you testified on Thursday that you

13  yourself are a named inventor on a patent?

14  A.  That is correct.

11:04:56   15  Q.  Okay.  And you supervise a number of engineers.  You

16  supervise a number right now, right?

17  A.  Yes; and I was also on a patent committee, too.

18  Q.  And you were on the patent committee.  So you're familiar

19  with the invention disclosure process at Motorola?

11:05:12   20  A.  Yes, I am.

21  Q.  And you're familiar with and understand how the E

22  intelligence process works within Motorola?

23  A.  Yes.

24  Q.  The process for an engineer who thinks they may have

11:05:23   25  something they want to submit an award for, the processes that

Case: 1:17-cv-01973 Document #: 784 Filed: 12/20/19 Page 52 of 197 PageID #:52161
Lund - cross by Allan
283

1    they go through and report all the information the company

2    wants to evaluated so that people like you on the committee

3    could take a look at it, right?

4    A.  Yes, I am familiar.

11:05:36    5    Q.  All right.  Now, you testified on Thursday that there are

6    21 alleged trade secrets in this case, right?

7    A.  Yes, I said there's 21.

8    Q.  All right.  And you're not aware of anybody at the company

9    receiving a $1500 award for any of those 21 trade secrets, are

11:06:03    10    you?

11    A.  No, I'm not.

12    Q.  Okay.  And you haven't seen any invention disclosure

13    requests or applications from any engineers within the company

14    to try to get a $1500 award for any of those 21 trade secrets,

11:06:18    15    correct?

16    A.  Yes, I personally have not.  Those trade secrets are all

17    part of our code and designs and listed as confidential.

18    Q.  I'm not asking you about that, Mr. Lund.  It's a very

19    simple question:  There are 21 trade secrets Motorola is

11:06:35    20    alleging in this case, you're not aware of anybody getting a

21    $1500 award, correct?

22    A.  Not specifically under this category, no.

23    Q.  And you're not aware of anybody even submitting an

24    application on the intelligence system to get the $1500 award,

11:06:51    25    correct?  You're not aware of that?

Lund - cross by Allan

284

1   A.  As I said, they don't have the very often, and I personally

2   have not seen one in my career.

3   Q.  Okay.  Let's take a look at page 16 out of the same

4   Document.  Now, this slide is all about trade secrets, right?

11:07:23   5   A.  That's what the title says, yes.

6   Q.  Right.  And down at the second part of it says, "Protection

7   of Trade Secrets," do you see that?

8   A.  Yes, I do.

9   Q.  And then it says, "The only acceptable marking is ..." and

11:07:41  10   then in quotes "Motorola registered secret proprietary," do you

11   see that?

12   A.  Yes, I do.

13   Q.  Okay.  And the classification, Motorola Registered Secret

14   Proprietary, that's a classification we just looked in the POPI

11:07:58  15   document, right?

16   A.  Yes, it is.

17   Q.  And the law department to put this together, saw fit to

18   bold and make this classification red in this training manual

19   to employees, right?

11:08:11  20   A.  Yes, they did.

21   Q.  Okay.  And it also says, Trade secrets should be limited

22   based on a need-to-know basis," do you see that?

23   A.  Yes.  So that's, you know, information that you shouldn't

24   disclose external to the company.

11:08:28  25   Q.  It doesn't say that.  It says, "need-to-know basis."  So,

1    presumably, that's inside Motorola as well, right?

2    A.  Yes.  As I said, that's a very high-level, we marked it as

3    that designation.  If you were to use that, then it shouldn't

4    be on need-to-know.  All the other stuff is marked

5    confidential, and again, it's only for, you know, the people,

6    the engineers on the project.

7    Q.  Well, this slide just says "trade secrets," right?

8    A.  Yes.  Again, that's the very highest tier that we would

9    have in the company.  It doesn't mean that the other

10   information isn't trade secrets if it doesn't have it on there.

11   Q.  Well, the legal department is telling its employees to

12   protect trade secrets in Motorola, the only acceptable marking

13   is Motorola Registered Secret Proprietary, correct?

14   A.  Right.  But in those same documents, it also lists them as

15   confidential and proprietary are also our trade secrets.  Our

16   designs and code, and all that, is the same classification.

17   Q.  I didn't see any of that in this document, this training

18   document, Mr. Lund.

19        Let me turn you to page 70, which is the speaker note

20   for this slide.

21        Again, this is the hint for the lawyer presenting this

22   and training Motorola employees on this slide.  The only thing

23   listed, to make a point on this entire slide, is trade secrets

24   carry a POPI classification, a protection of proprietary

25   information classification of, quote, "Motorola Registered

1    Secret Proprietary," do you see that?

2    A.  Yes, I see that.

3    Q.  All right.  You can set that aside, Mr. Lund.

4         On Thursday you told the jury you were generally

11:10:11   5    familiar with the Motorola trade secrets in this case.

6    A.  Yes, I am.

7    Q.  Now, back in October 2017, you were deposed earlier in this

8    case, right?

9    A.  Yes, I was, by you.

11:10:28   10   Q.  Not by me in 2017.  You were deposed by me in 2019.

11   A.  Okay.  Sorry.

12   Q.  That's okay.

13   A.  But I was deposed, yes.

14   Q.  Yes.  All right.  Unless I'm losing my memory.

11:10:40   15   A.  It's me.

16   Q.  All right.  So when you were deposed back in October 27,

17   '17, you didn't know what the trade secrets that were being

18   asserted in this case were, did you?

19   A.  I just knew, roughly, that there were trade secrets that

11:10:57   20   were violated, yes.

21   Q.  Well, again, in October 2017, you sat for a deposition.

22   You were sworn in under oath to tell the truth, right?

23   A.  Yes, I was.

24   Q.  And you did, you did tell the truth at that time?

11:11:13   25   A.  Yes.  To the best of my knowledge, yes.

Case: 1:17-cv-01973 Document #: 784 Filed: 12/20/19 Page 56 of 197 PageID #:52165
Lund - cross by Allan
287

1   Q.  All right.  So you were asked the question:

2           "So what are Motorola's trade secrets that are

3           asserted in this case?"

4             You answered:

5           "I'm not sure what the exact trade secrets are."

6   A.  Yes, I did say that.

7   Q.  All right.  Now, when I deposed you earlier this summer

8   when it was much warmer out, you had done some work and you had

9   taken a look at the trade secrets, Motorola's trade secrets

10  that were being asserted in this case, right?

11  A.  Yes.  I mean, obviously, I'm very familiar with the design

12  and code and implementation, yes.

13  Q.  Well, when I asked you what you did to prepare to testify

14  on behalf of Motorola has to what products used the asserted

15  trade secrets, do you remember what your answer was?

16  A.  I don't recall exactly.  It was a long time ago.

17  Q.  You said:

18          "I spent many days with my attorneys going

19          through each and every trade secret."

20  A.  Yeah, as we prepared for the deposition, I worked with the

21  team to understand more of the framework around which the

22  deposition was around.

23  Q.  Well, you worked with the legal team, you didn't work with

24  any engineering team.

25  A.  Again, as part of that, I was part of the Motorola team

1   already.  So I'm very familiar with the documents and the code.

2   Q.  Right.  So you told the jury on Thursday that you were

3   familiar with APCO and a lot of the technology that you claim

4   formed the basis for the 21 asserted trade secrets in this

5   case?

6   A.  Yes, I'm familiar with APCO.

7   Q.  And during your deposition, you said you reviewed all of

8   the documents for all of the trade secrets?

9   A.  Yes, I had gone through the technical specifications, the

10  documents that you saw on Thursday, I did go through those

11  again just to refresh myself.

12  Q.  But you saw fit with all of your experience that you told

13  the jury about on Thursday, and all of your own review of all

14  those documents, that you still needed to spend many days with

15  your lawyers to discuss the trade secrets that Motorola was

16  asserting in this case, correct?

17  A.  I mean, we spent time going through copyright procedures,

18  we went through spending time on what trade secrets were.  So,

19  I mean, there is a lot of information there that we reviewed.

20  So I did spend a few days going through it with them.

21  Q.  Well, in your deposition you told me:

22          "I spent many days with my attorneys going

23          through each and every trade secret."

24  A.  Yeah.  I mean, many.  It wasn't like I spent a month with

25  them.  I spent four days, five days, I don't recall exactly.

11:12:52

11:13:09

11:13:28

11:13:45

11:14:00

1    Q.  With your lawyers?

2    A.  Yes.

3    Q.  Okay.  Now, of all the documents that you looked at, that

4    you told me you looked at all of the documents related to do

11:14:16    5    the trade secrets, not one of them had the Motorola Registered

6    Secret Proprietary classification on it, did it?

7    A.  No, but they all had confidential and proprietary.

8    Q.  But none of them were labeled the way that Motorola trains

9    its people to label trade secrets using the only acceptable

11:14:39    10    marking of Motorola Registered Secret Proprietary, correct?

11    A.  Again, that's just the highest classification.  We properly

12    label everything "confidential and proprietary" as stated in

13    our POPI documents and that still indicates that that

14    information is trade secret.  Anything that we develop is a

11:14:55    15    trade secret until we say it's not, and it doesn't have to just

16    have that label.

17    Q.  That's what the policy says, though, Mr. Lund.  That's the

18    policy we just looked at.

19    A.  The policy also states that the confidential markings also

11:15:07    20    counts for all of our technical documentation, our code, and

21    information that we hold proprietary and secret.

22    Q.  Well, when we looked at it, it didn't say "trade secret,"

23    did it?  I can show you again if you need me to.

24    A.  As I said, that trade secret is just the very high-level

11:15:23    25    classification.  All the other material we write is

1  confidential and proprietary and considered a trade secret.

2  Q.  Right.  The trade secret is what we're talking about in

3  this case.  There's 21 of them that Motorola has accused Hytera

4  misappropriated, correct?

5  A.  Correct.  And they're all properly identified as

6  confidential and proprietary.

7  Q.  Nothing you looked at when you spent the days with your

8  lawyers, and you spent all this time on your own looking at all

9  those documents, it's a very simple question, none of that

10  material had the Motorola Registered Secret Proprietary label,

11  correct?

12  A.  Not that I saw, no.

13  Q.  Okay.  Now, again, Mr. DeVries showed you a number of

14  documents and you walked through the confidential proprietary

15  label on those, right?  Do you remember that?

16  A.  Yes, I do.

17  Q.  All right.  I'll show you another example of that.

18         MR. ALLAN:  So can we bring up DTX 4288.

19         (Said item tendered.)

20  BY MR. ALLAN:

21  Q.  All right.  Mr. Lund, this is DTX 4288.  It is a Motorola

22  accessory detection standard document.  It looks a lot like

23  some of the ones you showed the jury on Thursday, correct?

24  A.  It has the standard template that we use at Motorola for

25  marking our documents, yes.

Lund - cross by Allan

291

1  Q.  Very good.

2       MR. ALLAN:  I offer it into evidence, Your Honor.

3       MR. DE VRIES:  No objection, Your Honor.

4       THE COURT:  It is received and may be published.

5       (Said exhibit received in evidence.)

6  BY MR. ALLAN:

7  Q.  All right.  So this has information about accessory

8  detection material for Motorola, correct?  That's what this

9  document relates to?

10 A.  Yes.

11 Q.  Okay.  And down at the bottom, it's got this Motorola

12 Confidential Proprietary label, do you see that?

13 A.  Yes, I do.

14 Q.  The same label you walked the jury through a number of

15 examples with on Thursday, right?

16 A.  Correct.

17 Q.  Okay.  And your understanding is that this sort of

18 document, like those other documents you showed, contain secret

19 information within Motorola, correct?

20 A.  It's information that we hold as secret until we otherwise

21 deem it that it's not has to be secret and can be published

22 outside.

23 Q.  Confidential, in your view?

24 A.  At the time of the writing it is until we decide to

25 disclose it.

11:17:05

11:17:20

11:17:32

11:17:49

11:18:05

1   Q.  All right.  Let's take a look at page 33.

2   A.  Okay.

3   Q.  And I want to focus you on Section 3.10, Security and

4   Authentication at the bottom of the page.

5            Are you with me?

6   A.  Yes, I see it.

7   Q.  All right.  So bear with me a moment.  I'm just going to

8   read part of it and it's going to flip to the second page.  It

9   says:

10               "All ADS blocks shall use the ADS block check

11               sequence.  The sequence is computed using block

12               data from the beginning of the block up to the

13               check sequence.  The check sequence is 16 bits

14               in length and is designed to deter unauthorized

15               duplication or cloning of Motorola accessories."

16            Now let's switch over to the second page.  "The ADS

17   block sequence," and that's in some sort of the brackets, do

18   you see that?

19   A.  Yes, I do.

20   Q.  It says:

21               "The ADC block check sequence is considered a

22               Motorola trade secret."

23            Do you see that?

24   A.  Yes, I see that.

25   Q.  And it says:

1       "The algorithm is deliberately withheld from

2       this document."

3          And then it goes on to make that point again:

4       "Requirements for the algorithm are deliberately

5       withheld from this document."

6          Do you see that?

7   A.  Yes, I do.

8   Q.  So when the engineers at Motorola wrote up this document

9   and they labeled it "confidential proprietary" at the bottom,

10  they withheld the actual trade secret from being included in

11  here, correct?

12  A.  Looks to me their intent, yes.

13  Q.  All right.  And the Motorola policy that we just looked at

14  required trade secrets to be labeled "Motorola Registered

15  Secret Proprietary," right?

16  A.  Yes.

17  Q.  And this document doesn't have that label.  This just says,

18  "Motorola confidential proprietary," right?

19  A.  Yes, which is still confidential information and shouldn't

20  be released to the external but Motorola.

21  Q.  But the trade secret that's specifically referenced in here

22  is not included in here, correct?

23  A.  That's what it appears.  This document --

24  Q.  Because it didn't have the classification, right?

25  A.  That's what it appears to be.

Case: 1:17-cv-01973 Document #: 784 Filed: 12/20/19 Page 63 of 197 PageID #:52172
Lund - cross by Allan
294

1  Q.  All right.

2  A.  And this document was used by all of our teams, Astro,

3  TETRA, and PCR, so it was a pretty widely distributed document

4  that was used throughout our company.  And  I'm assuming the

11:20:47  5  engineers --

6  Q.  I don't want you to assume.

7  A.  Okay.  Sorry.

8  Q.  It calls for speculation.  I'm not asking you to assume.

9  It's just a very simple question:  This document has the same

11:20:55  10  label you showed the jury over and over and over the other day,

11  but here, with the same label, the "trade secret" is not there,

12  correct?

13  A.  Yes.

14  Q.  All right.  Now, we talked about the invention disclosure

11:21:08  15  -- you can set that aside.

16        We talked about the invention disclosure process, and

17  you indicated you're very familiar with that process, the

18  intelligence system, and so on, correct?

19  A.  I'm familiar with it.  I've used it before, yes.

11:21:27  20  Q.  You've used it before, and you've been on the patent

21  committee, and you've obtained a patent yourself, and you

22  supervised a number of engineers, right?

23  A.  Correct.

24  Q.  All right.  I'm going to hand you a number of these

11:21:41  25  innovation disclosure documents.  It's going to be DTX 4776 to

Lund - cross by Allan

295

1   DTX 4816.

2           (Said items tendered.)

3   BY MR. ALLAN:

4   Q.  These are a number of different E intelligence innovation

11:22:04   5   disclosure documents within Motorola, correct?

6   A.  Do you mind if I look through them real quick?

7   Q.  Sure.  Of course.

8           (Brief pause.)

9   BY THE WITNESS:

11:22:35   10  A.  Okay.

11          MR. ALLAN:  All right.  I offer these into evidence,

12  Your Honor.

13          MR. DE VRIES:  No objection, Your Honor.

14          THE COURT:  They are received and may be published.

11:22:45   15          MR. ALLAN:  Thank you.

16          (Said exhibits received in evidence.)

17  BY MR. ALLAN:

18  Q.  Mr. Lund, please take a look at DTX 4776, which should be

19  the first document in your stack there.

11:22:58   20  A.  Yes, I see that.

21  Q.  And this is -- and, again, "E intelligence" was the

22  platform that Motorola had to allow engineers who wanted to try

23  to register something and get one of these awards to make an

24  application for that, right?

11:23:13   25  A.  Yeah; it was used company-wide.

Lund - cross by Allan

296

1  Q.  And let's take a look at this, first of all, the title.

2  The title of this is called "quality evaluation method in

3  multiband CDMA system."

4  A.  I see that.

11:23:34  5  Q.  And then "status" lists as "secret disposition," below that

6  is listed as "trade secret," right?

7  A.  Yes, I see that.

8  Q.  Now, the date this was submitted, it was February 17, 2009.

9  A.  That's what it says.

11:23:51  10  Q.  And then below, if you look under "workflow," it lists the

11  name of the first inventor and a number of different

12  co-inventors.

13  A.  I see that.

14  Q.  And then at the top, of course, there's a classification of

11:24:06  15  Motorola Registered Secret Proprietary, do you see that?

16  A.  Yes, I see that.

17  Q.  And that's labeled as such because the disposition provided

18  to this application was a trade secret, right?

19  A.  Yes, that's what it says.

11:24:28  20  Q.  Let's take a look at another example, DTX 4776.

21  A.  4776?

22  Q.  It should just be in order -- oh, sorry.  I've already done

23  that with you.  It's 4810.

24  A.  4810.  Okay, I'm there.

11:25:01  25  Q.  Okay.  This is another example of an engineer who had

Case: 1:17-cv-01973 Document #: 784 Filed: 12/20/19 Page 66 of 197 PageID #:52175
Lund - cross by Allan
297

1  applied for an innovation -- applied with an innovation

2  disclosure form and the Motorola committee decided that the

3  invention should be considered a trade secret, right?

4  A.  Yeah.  Also I'd like to note, I mean, this is part of a

11:25:25  5  different sector.  All these 30 or so are not part of our

6  sector.  As I said, each business takes, you know, some

7  liberties with how they classify things, and all these were

8  from our networks division which was more into the cellular

9  carrier business.  As I said, we didn't really do much of these

11:25:46  10  within our sector.

11  Q.  The policy we just looked at, Mr. Lund, you just told the

12  jury it was applicable worldwide -- I mean, company-wide,

13  correct?

14  A.  Yes.  It was an option you can use worldwide, yes.

11:25:56  15  Q.  It was applicable to the company worldwide.  It was an

16  invention disclosure plan that was applicable to everybody in

17  the company no matter what division was there, and it told you

18  what the different awards were.  9 different awards, right?

19  A.  Correct.

11:26:12  20  Q.  And I've just given you a stack, and can you feel free to

21  take a look at them, of a number of different invention

22  disclosures that the company decided qualified for trade secret

23  status within Motorola, correct?

24  A.  Yeah, I did look through them and none appear to be from

11:26:35  25  one of our businesses.  Most of them were from a different

Case: 1:17-cv-01973 Document #: 784 Filed: 12/20/19 Page 67 of 197 PageID #:52176
Lund - cross by Allan
298

1   sector.

2   Q.  Take a look at DTX 4814.  Here's another example of

3   something the company has decided qualifies for a trade secret

4   status within Motorola.

11:27:01   5   A.  Yeah, I see it.

6   Q.  And this relates to radio technology, doesn't it?

7   A.  It's part of our network technology group.  It's a

8   different sector than our business.

9   Q.  All right.  Nevertheless, every single document I've handed

11:27:14   10   you is something where the company has decided an engineer

11   submitted some technology to us, we think it qualifies to be

12   considered a trade secret within Motorola, right?

13   A.  Yes, they decided to use that highest category in our POPI

14   document.

11:27:34   15   Q.  Is it your testimony that this -- that no trade secrets --

16   that the company never considered there to be any trade secrets

17   within the DMR program?

18   A.  No, that's not what I'm saying.  Everything that we have is

19   trade secret.  All the design documents, the code that we have,

11:27:55   20   we consider to be trade secrets.  You don't have to mark them

21   with that special category.  Just marking them as "confidential

22   and proprietary" is an indication that it's also a trade secret

23   for us.

24   Q.  So let me just make sure I understand what you said.  You

11:28:10   25   don't have to mark them with a special category even though the

Lund - cross by Allan

299

1  policy requires you to do it and the training materials require

2  you to do it, is that your testimony?

3  A.  I'm just saying there's other categories to consider things

4  as trade secrets.  So "confidential and proprietary" still

11:28:25  5  considers it to be trade secret.

6  Q.  Even though when there's actually a trade secret in a

7  confidential proprietary document, they pull it out?

8  A.  Yes, you have the option to use that highest category if

9  you so desire.

11:28:37  10  Q.  I didn't see anything in those policies, Mr. Lund, that

11  talked about options.  It was a requirement, wasn't it?

12  A.  Again, you can list things as confidential and proprietary,

13  which we did with all of our design documents and code.

14  Q.  All right.  Let's take a look at DTX 4556.

11:28:51  15         MR. ALLAN:  May we approach, Your Honor?

16         THE COURT:  Yes.

17  BY MR. ALLAN:

18  Q.  All right.  Mr. Lund, I handed you DTX 4566.  This is an

19  e-mail that you are a recipient on from January 12, 2009.  The

11:29:28  20  subject is:

21         "Year-to-date patent performance,

22         December 2008."

23          Do you see that?

24  A.  I don't see where I'm a recipient.

11:29:39  25  Q.  You both in the "to" line and the "cc" line.  You are in

1       the "to line" sort of two or three lines from the bottom.

2       A.  Do I have the right document?

3              MR. DE VRIES:  Your Honor, I don't believe that --

4       counsel is referring to a different document than he's handed

11:29:49    5   to me and the witness.

6              MR. ALLAN:  Oh, my apologies.  Maybe I got that

7       screwed up.  DTX 4556.

8              MR. DE VRIES:  We have DTX 4566.

9              MR. ALLAN:  With the Court's indulgence for just a

11:30:14   10   moment.

11             (Brief pause.)

12             MR. ALLAN:  We may not have a paper copy, Your Honor.

13      This is just a very short e-mail.  If we might publish it to

14      the witness and counsel.

11:30:24   15          THE COURT:  Yes, go ahead.  Show it to the witness.

16             MR. ALLAN:  If we could show it to the witness and

17      counsel table.

18             (Brief pause.)

19      BY MR. ALLAN:

11:31:15   20   Q.  Let me know when you have that, Mr. Lund.

21      A.  I don't have it.

22             MR. DE VRIES:  I don't either, for the record.

23             (Brief pause.)

24             MR. ALLAN:  All right.  I've got it on my screen now.

11:31:32   25   BY THE WITNESS:

Case: 1:17-cv-01973 Document #: 784 Filed: 12/20/19 Page 70 of 197 PageID #:52179
Lund - cross by Allan
301

1    A.  I have a Northern District of Illinois symbol.

2         (Brief pause.)

3    BY THE WITNESS:

4    A.  I do see the document now.

5    BY MR. ALLAN:

11:31:49

6    Q.  You got it.  Okay.  Sorry about that.

7         Let me direct you to -- I think we got your name and

8    the "to" and "cc" line highlighted.

9    A.  Yes, I see it.

10        MR. ALLAN:  You guys see that, too?

11:32:00

11        (Brief pause.)

12   BY MR. ALLAN:

13   Q.  All right.  And this is entitled "year-to-date," this is an

14   e-mail you received on or about January 12, 2009?

15   A.  Yes, it was January 12, 2009.

11:32:13

16        MR. ALLAN:  I'd offer this into evidence, Your Honor.

17        THE COURT:  It is received.  It may be published.

18        (Said exhibit received in evidence.)

19   BY MR. ALLAN:

20   Q.  All right.  Mr. Lund, this is an organization disclosure

11:32:25

21   submission.  It says, "Nickie Petratos, organization disclosure

22   submission"  at the bottom.  I'd like to direct you to the

23   second page.

24        And, again, Nickie Petratos at the time was the head

25   of PCR?

11:32:46

Lund - cross by Allan

302

1   A.  Yes, she was, and my direct manager.

2   Q.  And again, just for clarity point, DMR is a product within

3   PCR?

4   A.  Yes, it is.

11:33:01   5   Q.  All right.  And so down on this 2008 disclosure form, the

6   top part of page 2, I'd to focus there, there's a reference to

7   "PCR matrix" right above the word "total," do you see that?

8           It should be highlighted for you now.

9   A.  Yeah, I see it.

11:33:23   10  Q.  All right.  And matrix, I think you testified to, was a

11  code name for the DMR program?

12  A.  For MOTOTRBO, yes.

13  Q.  Now, below that there's a line item for trade secret, do

14  you see that?

11:33:37   15  A.  Yes, I do.

16  Q.  And every line is zero, right?

17  A.  Correct.  We didn't use that much, correct.

18  Q.  January is a zero, February is a zero, right, no trade

19  secrets then?  March?

11:33:55   20  A.  That's referring to there is no invention rewards, which

21  could be marked trade secrets, correct.

22  Q.  Okay.  Very good.  No invention rewards marked trade secret

23  during that whole time?

24  A.  Yeah.  As I said, we didn't use it very frequently.

11:34:12   25  Q.  Okay.  Now, this is a way of tracking invention awards,

1    tracking intellectual property, right?

2    A.  Yes, we listed it by group to see who's generating

3    disclosures, correct.

4    Q.  Now, Motorola does track its intellectual property in the

11:34:37    5    ordinary course of its business, right?

6    A.  Yes, we do.

7    Q.  And with the DMR program as well.  Intellectual property,

8    it was developed in connection when that program was tracked,

9    yes?

11:34:50    10    A.  Mostly the patents.  So we tracked the patent disclosures.

11    So what you see in front of you is the patent disclosures,

12    correct, for all of our businesses, including turbo.

13    Q.  Well, what you also see in front of us is the trade secret

14    with zeros across the entire year, yes?

11:35:06    15    A.  Yes.  As I said, we don't use that very often.

16    Q.  Okay.  Let's take a look at DTX 4287.

17    A.  You want this back (indicating)?

18    Q.  No, you can put it in your growing pile there.

19    A.  Okay.

11:35:26    20         (Said item tendered.)

21    BY MR. ALLAN:

22    Q.  All right.  Mr. Lund, DTX 4287 is in front of you?

23    A.  Yes.

24    Q.  And this is a document produced by Motorola that appears to

11:35:45    25    track Motorola's Matrix related intellectual property.  And

Case: 1:17-cv-01973 Document #: 784 Filed: 12/20/19 Page 73 of 197 PageID #:52182
Lund - cross by Allan
304

1    just to sort of orient you, the bottom right-hand side is a

2    sign for Matrix patents, do you see that?

3    A.  Yes, I do.

4    Q.  And it's got a reference to the Motorola IPR docket number,

5    status of patents, patents pending, inventors, listing a number

6    of Motorola people, do you see that?

7    A.  Yes, I do.

8    Q.  And this is the type of document that Motorola would keep

9    in its ordinary course to track intellectual property, right?

10   A.  It was an Excel spreadsheet form that various departments

11   used different types, but essentially the same information,

12   yes.

13   Q.  Okay.

14          MR. ALLAN:  I move this into evidence, Your Honor.

15          MR. DE VRIES:  No objection.

16          THE COURT:  It is received and it may be published.

17          (Said exhibit received in evidence.)

18   BY MR. ALLAN:

19   Q.  So just again to orient the jury, the bottom right-hand

20   side, the first page, it says "Matrix patents," do you see

21   that?

22   A.  Sorry.  Can you --

23   Q.  Should be --

24   A.  Oh, I see it.  Sorry.

25          MR. DE VRIES:  I'm not sure what document is being

11:36:04

11:36:18

11:36:29

11:36:41

11:36:56

1    displayed on the screen.  It doesn't relate to the document

2    that we're looking at, Your Honor, and I object on that basis.

3         THE COURT:  Are you suggesting we're not all on the

4    same page, counsel?

11:37:09    5         MR. DE VRIES:  At least I am not, Your Honor.

6         MR. ALLAN:  Let me if I can clear this up a little

7    bit, Your Honor.  This was produced to us in its native Excel

8    form.  As Mr. Lund just testified, it was an Excel document.

9         THE COURT:  By all means, clarify.

11:37:23    10   BY MR. ALLAN:

11   Q.  All right.  There's a reference to Motorola IPR docket

12   number at the top, do you see that?

13   A.  Yes, I do.

14   Q.  All right.  And that's an internal docket number for

11:37:36    15   various patents that Motorola had on its Matrix product, yes?

16   A.  Yes.

17   Q.  All right.  I want to flip over to there's a section that

18   talks about trade secrets.  In the filing reference column

19   you'll see three references to trade secrets, do you see that?

11:38:02    20   A.  Yes, I do.

21   Q.  And then next to that there is a reference to the Motorola

22   IPR docket number, which is an internal number for these

23   particular trade secrets, correct?

24   A.  Yes.

11:38:12    25   Q.  And then this document, this IP tracking document from

Lund - cross by Allan

306

1    Motorola, lists the titles for three separate trade secrets,

2    correct?

3    A.  Yes, I see that.

4    Q.  And then, finally, there is a reference to the inventors of

5    these three different trade secrets?

6    A.  Yes, I see that.

7    Q.  Now, these are trade secrets that Motorola has determined

8    are trade secrets within the DMR product development, correct?

9    A.  Yes, they wanted to take these and keep them in special

10   category for trade secret, correct.

11   Q.  And none of the 21 alleged trade secrets that Motorola is

12   claiming in this case are shown on this page, are there?

13   A.  No, you don't have to have them in this page.  We just mark

14   them as confidential and proprietary.

15   Q.  Mr. Lund, very simple question:  Motorola is asserting 21

16   trade secrets in this case, none of them are shown on this

17   page, isn't that right?

18   A.  That's correct.

19   Q.  All right.  Now, you believe that Motorola's trade secrets

20   are valuable?

21   A.  Absolutely.

22   Q.  And you think they have an economic value?

23   A.  Yes.  There's definitely a value behind them, yes.

24   Q.  But you don't know what that is, right?

25   A.  It depends on how much and how much are calculated in

11:38:31

11:38:54

11:39:14

11:39:31

11:39:46

Lund - cross by Allan

307

1    there, but there's a way to calculate it, yeah.

2    Q.  But you don't know what the number is, right?

3    A.  Can you restate your question?

4    Q.  Well, again, let's go back to the deposition when it was a

11:40:03    5    lot warmer back in June.  Again, you were under oath and I

6    asked you --

7            MR. DE VRIES:  Objection, Your Honor.  This is

8    impeachment, but he hasn't answered the question yet.

9            MR. ALLAN:  He has, Your Honor.  He said he thought

11:40:17    10    there was value.

11            THE COURT:  Well, are you asking the witness to give

12    his estimate of damages if the plaintiff were to establish

13    liability, is that what you're asking the witness?

14            MR. ALLAN:  No, Your Honor, I'm just asking him --

11:40:28    15            THE COURT:  Well, then, rephrase the question.

16    Rephrase the question for clarity.

17    BY MR. ALLAN:

18    Q.  In Motorola's view, do any of the alleged 21 trade secrets

19    it's asserting in this case have an economic value?

11:40:41    20    A.  Yes, of course, they have value.

21    Q.  You don't know what that value is, correct?

22            THE COURT:  Are you asking the witness to estimate

23    what the damages would be if the plaintiff were to establish

24    liability?

11:40:55    25            MR. ALLAN:  No, Your Honor.

Lund - cross by Allan

308

1    THE COURT:  It may be confusing.  So rephrase the

2  question.    Or do you want just off-the-cuff for him to

3  speculate on the value?

4    MR. CLOERN:  No, not interested for speculation.

11:41:11    5    THE COURT:  Then rephrase the question.

6  BY MR. ALLAN:

7  Q.  Do you believe there is any value in these trade secrets,

8  the 21 that have been alleged?

9    THE COURT:  It's just demeaning to the witness.  Let's

11:41:25  10  move on here.

11  BY MR. ALLAN:

12  Q.  All right.  You talked about copyrights on your direct

13  examination.  You introduced four separate copyrights?

14  A.  Yes, I did.

11:41:39  15  Q.  You're familiar with Motorola's copyrights?

16  A.  Around MOTOTRBO or in general?

17  Q.  MOTOTRBO.

18  A.  Yes, I am.

19  Q.  Do you know how many copyrights Motorola has asserted

11:41:53  20  against Hytera in this case?

21  A.  Yes, I do.

22  Q.  How many?

23  A.  Four.

24  Q.  When I talked to you back in June, you didn't know the

11:42:04  25  number, did you?

1  A.  Yeah, back in June I thought you were referring to the

2  copyrights that we have on all of our files and documents of

3  which there's thousands.

4  Q.  When I asked you how many copyrights are involved, do you

11:42:30  5  remember what answer you provided to me?

6  A.  I don't recall exactly.

7  Q.  Do you know what you thought you would have to do to try to

8  determine that?

9  A.  How many copyrights?

11:42:40  10  Q.  Uh-huh.  Were asserted against Hytera in this case.

11  A.  Yeah, again, at the time I thought you were referring to

12  how much -- how much documentation we had copyrighted.  Today

13  it's very clear, I understand your question now.  There's four

14  copyrights involved with this litigation.

11:42:58  15  Q.  You told me that in order to try to figure out how many

16  copyrights were asserted, you'd have to look  at the details

17  that would be listed in each of the trade secrets, do you

18  remember that?

19  A.  Yes, the trade secrets do have copyrighted information in

11:43:15  20  them.

21  Q.  Does the copyrighted information also have trade secrets?

22  A.  Does the copyright information -- the source code is part

23  of the copyrights of which I showed you an example on that blue

24  piece of paper.  It's copyright material, and there is

11:43:33  25  confidential information, and that is also part of the trade

Lund - cross by Allan

310

1  secrets.  So the source code is part of the trade secrets also.

2  Q.  So I just want to make sure I understand this.  The source

3  code was copyrighted by Motorola, Motorola also thinks that

4  source code that is subject to the copyright contains trade

5  secrets, correct?

6  A.  So, again, our definition of trade secrets, any of our code

7  and documentation is considered to be a trade secret and

8  confidential.

9  Q.  All right.  And you testified on Thursday about the process

10  of the Copyright Office and you introduced some of those --

11  some of those copyright registration certificates, do you

12  recall that?

13  A.  Yes, I do.

14  Q.  All right.  And you understand that in order to obtain a

15  copyright registration, Motorola has got to submit materials to

16  the Copyright Office, to the federal government?

17  A.  Yes, the first 50 pages of a portion of the source code.

18  Q.  And that's called a deposit, right?

19  A.  I think so.

20  Q.  And that material becomes public, right?

21  A.  The information is registered with the Copyright Office,

22  yes.

23  Q.  All right.  Let's take a look at PTX 1527, which I believe

24  was introduced.  You discussed this on your direct examination.

25          And this is the copyright certificate of registration

11:43:50
11:44:06
11:44:27
11:44:48
11:45:12

1    for the MOTOTRBO mobile subscriber firmware package, right?

2    A.  Yes, it is.

3    Q.  Okay.  Now I'd like to hand you PTX 1525, which I believe

4    is the deposit copy for that registration.

5         (Said item tendered.)

6    BY MR. ALLAN:

7    Q.  Do you see that, Mr. Lund?

8    A.  Yes, I do.

9         MR. ALLAN:  I'd offer this into evidence, Your Honor.

10         MR. DE VRIES:  No objection.

11         THE COURT:  This is already in, is it not?

12         MR. ALLAN:  The deposit copy is not as the certificate

13    is, Your Honor.

14         THE COURT:  Well, one of the ingredients to obtain a

15    registration would include that document, would it not?

16         MR. ALLAN: It would, indeed, Your Honor.

17         THE COURT:  So it a larger sense, it's in evidence,

18    but since there's no objection specifically, it is received.

19         (Said exhibit received in evidence.)

20    BY MR. ALLAN:

21    Q.  I'd like to first direct you, this is the cover paper to

22    the deposit copy, correct, Mr. Lund, that's being shown on the

23    monitor?

24    A.  Yes, it is.

25    Q.  I'd like to turn to the next page, the top of page 2.

Lund - cross by Allan

1  A.  Okay.

2  Q.  Again, this is the deposit copy that gets submitted to the

3  Copyright Office and becomes public, correct?

4  A.  Yes.

11:46:56  5  Q.  Yet, Motorola has a Motorola confidential proprietary

6  designation at the top, right?

7  A.  Yeah, that's our standard template we use for all of our

8  source code.

9  Q.  Standard template, but this, clearly, is no longer

11:47:12  10  confidential or proprietary as it became part of the public

11  domain, right?

12  A.  Again, we just put it as part of our sample template for

13  disclosure.

14  Q.  Okay.  Let's talk about a new document, DTX 4939.  I'd like

11:47:30  15  to show you another registration.

16        (Said item tendered.)

17  BY MR. ALLAN:

18  Q.  Now, Mr. Lund, you just talked about four copyright

19  certificates registrations that were asserted against Hytera in

11:47:51  20  this case.  Motorola has other copyright registrations for its

21  MOTOTRBO products that are not asserted against Hytera,

22  correct?

23  A.  Yeah, we have many copyrights throughout the company,

24  correct.

11:48:02  25  Q.  And what I've handed you is a summary or a registration

Lund - cross by Allan

313

1    certificate from the United States Copyright Office related to

2    a MOTOTRBO copyright registration of Motorola that is not

3    asserted against Hytera, do you see that?

4    A.  It's a subsequent release.  We typically will do copyrights

11:48:27    5    on incremental versions of our software as we go forward.

6           MR. ALLAN:  I'd offer this into evidence, Your Honor.

7           MR. DE VRIES:  No objection.

8           THE COURT:  It is received and may be published.

9           (Said exhibit received in evidence.)

11:48:43    10   BY MR. ALLAN:

11   Q.  I'd like to refer you, Mr. Lund, to the registration

12   number.  It's TX number with a number of digits after it,

13   8406545.

14   A.  Yes, I see that.

11:48:57    15   Q.  And you understand that's how the Copyright Office tracks

16   copyrights, they assign these numbers, right?

17   A.  I'm not an expert at copyright, but yes.

18   Q.  Let me hand you two documents, DTX 4940 and DTX 4941.

19          (Said exhbits received in evidence.)

11:49:23    20   BY MR. ALLAN:

21   Q.  These are copies of the deposits submitted by Motorola in

22   connection with this recommendation certificate that we've just

23   been looking at.  And you can cross-reference the registration

24   number 8406545 against both of the certificates; do you see

11:49:45    25   that?

1    A.  Yeah, I see that.

2           MR. ALLAN:  Offer these into evidences, Your Honor.

3           MR. DE VRIES:  No objection.

4           THE COURT:  They are received and may be published.

11:49:55    5           (Said exhbits received in evidence.)

6    BY MR. ALLAN:

7    Q.  So just to orient the jury, the registration number,

8    Mr. Lund, 8406545 on the certificate is the same as the

9    recommendation number on both deposit copies, do you see that?

11:50:20   10    A.  Yes, they are.

11    Q.  And just taking a quick look at the deposit copy, we'll

12    look at 4940, that also has the Motorola confidential

13    proprietary designation at the top?

14           Are you with me?

11:50:37   15    A.  Yes.  Again, that's our standard template, yes.

16    Q.  And the same goes for DTX 4941, same standard template,

17    Motorola confidential propriety?

18    A.  Yes; although something seems out of order on the first

19    page, but, yeah.

11:50:56   20    Q.  Just based on the layout of the page?

21    A.  Yeah.

22    Q.  But you have no reason to doubt that this is not a Motorola

23    document?

24    A.  No, it's definitely a Motorola document.

11:51:08   25    Q.  Now, do you understand -- you understand, Mr. Lund, that

Lund - cross by Allan

315

1    the United States Copyright Office provides guidance to

2    companies like Motorola when they seek to registry computer

3    programs as copyrights, right?

4    A.  I'm vaguely familiar, yes.

11:51:28    5    Q.  Could we bring up DTX 4938.

6            (Said item tendered.)

7    BY MR. ALLAN:

8    Q.  And this is a copyright registration circular from the

9    United States Copyright Office that provides some guidance to

11:51:58    10    companies looking to register computer programs as copyrights,

11    do you see that?

12    A.  Yes, I do.

13            MR. ALLAN:  Offer this into evidence, Your Honor.

14            MR. DE VRIES:  Objection, Your Honor.  This is a

11:52:09    15    statement of the law from the Copyright Office.

16            THE COURT:  Overruled.  It's a public document.

17            (Said exhibit received in evidence.)

18            MR. CLOERN:  May we publish, Your Honor?

19            THE COURT:  Yes.

11:52:21    20    BY MR. ALLAN:

21    Q.  Now, within the document, the Copyright Office provides

22    some guidance, as I said.  Let's start with just what to send.

23    It's sort of in the middle, discusses sending a completed

24    application form, a non-refundable filing fee, one copy of the

11:52:42    25    material.  And you mail it all to the Library of Congress,

Lund - cross by Allan

316

1   Copyright Office in Washington, D.C., do you see that?

2   A.  Yes, I do.

3   Q.  Now, I want to direct your attention to the second page.

4   And the government, through the Copyright Office, provides some

11:53:12   5   guidance to companies trying to register computer programs that

6   contain trade secrets.  Are you with me, on the right-hand side

7   of the page, in the middle?

8   A.  Yes, I see that.

9   Q.  And it says:

11:53:27   10          "Where a computer program contains trade secret

11          material, include a cover letter stating that

12          the claim contains trade secrets, along with the

13          page containing the copy notice, if any, plus

14          one of the following ..."

11:53:45   15          Do you see that?

16   A.  Yes, I do.

17   Q.  And then it lists some things.  For example:

18          "If you can provide the first 25 pages and the

19          last 25 pages of source code, with portions

11:53:56   20          containing trade secrets blocked out."

21          Do you see that?

22   A.  Yes, I do.

23   Q.  You're not aware of Motorola ever submitting a cover letter

24   to the Copyright Office indicating that any of the code

11:54:16   25   associated with the works at issue in this case contain trade

Lund - cross by Allan

317

1    secrets, correct?

2    A.  The ones we reviewed, it didn't list trade secrets on

3    there.

4    Q.  And from what we reviewed -- you can go back and take a

5    look if you'd like, the specimens I just submitted to you --

6    nothing is blocked out either, is there?

7    A.  I didn't read through all the 50 pages, but do you want me

8    to look?

9    Q.  You can take a look.

10         THE COURT:  Starting with page 1?

11         MR. ALLAN:  Well, I think it's a quick flip, Your

12   Honor.  I'll represent that there is nothing, there is nothing

13   blocked out.

14         (Brief pause.) .

15   BY THE WITNESS:

16   A.  No, I don't see anything blacked out.

17   BY MR. ALLAN:

18   Q.  So the Copyright Office tells companies like Motorola, if

19   you've got trade secrets in your code, you need to:  A, tell

20   us, and if you submit the materials, you got to block that

21   material out, right?

22   A.  Again, that's their recommendation, yes.

23   Q.  Motorola didn't do that here, did they?

24   A.  Again, all of our information is confidential and

25   proprietary that we submit.

1  Q.  Motorola didn't do that here, did they?

2  A.  We didn't have to.

3  Q.  Copyright Office tells you you have to.  I just read it to

4  you.

11:55:59  5  A.  Correct.

6  Q.  All right.  Let's switch gears.  I want to refer you back

7  to some exhibits that you showed the jury on Thursday that

8  should be in one of your white binders.  You got this in front

9  of you, Mr. Lund, (indicating)?

11:56:25  10  A.  Yes, I do.

11  Q.  Let me make sure I give you the right binder.  I think it's

12  the small one.

13         So just generally, I'll orient you what we're going to

14  talk about so you can find it.  So it's PTX 1473, 1661, 1662,

11:56:43  15  1663 and 1660.  These are the documents that you showed the

16  jury about head count costs at Motorola, do you remember all

17  that?

18  A.  Yes, those documents were referring to how we calculate our

19  cost per engineer at the sites.

11:57:02  20  Q.  Cost per engineer.  Very good.

21         So over the weekend, I just put together a document

22  that I think summarizes some of the key information that's in

23  here that I'd like to show you.

24         MR. ALLAN:  Can we bring up DTX 0001.

11:57:24  25         MR. ALLAN:  May we approach, Your Honor?

```
 1              MR. DE VRIES:  No objection, Your Honor.

 2              THE COURT:  Are you aware of what counsel is talking

 3       about?

 4              MR. DE VRIES:  Yes.

 5              THE COURT:  You have no objection?

 6              MR. DE VRIES:  No objection.

 7              THE COURT:  You certainly may approach.

 8              (Said item tendered.)

 9       BY MR. ALLAN:

10       Q.  This is --

11              THE COURT:  Now, Mr. Allan, when you say "you put

12       together," you mean "you" personally put that together?

13              MR. ALLAN:  We just put it together.  I didn't do it

14       myself, Your Honor.

15              THE COURT:  All right.  Well, it comes across to the

16       jury that you did it.

17              MR. ALLAN:  Very good.

18              THE COURT:  So rephrase the question.

19       BY MR. ALLAN:

20       Q.  So the documents that we just talked about, 1473, 1661,

21       1663, 1663 and 1660 all have data points from different years

22       about Motorola's cost --

23              THE COURT:  So who put it together?

24              MR. ALLAN:  A paralegal of mine, Your Honor.  It's

25       just takes the data points here and submitted it.
```

1    THE COURT:  Okay.  A little bit of foundation wouldn't

2   hurt.  So that's how it was assembled and put together.

3    MR. ALLAN:  Correct.  I can walk through and provide

4   an example.

11:58:23    5    THE COURT:  All right.  There's no objection.

6   Proceed.

7    MR. DE VRIES:  No objection.

8    MR. ALLAN:  Thank you, Your Honor.

9   BY MR. ALLAN:

11:58:33   10   Q.  This takes the data points from these different documents

11   and just sort of puts them into one snapshot so we can take a

12   look at it altogether.  Do you see that in front of you?

13   A.  Yes, I do.

14    MR. ALLAN:  I'm not sure it's been admitted, Your

11:58:48   15   Honor, but we'd offer it.

16    THE COURT:  It is received.  There was no objection.

17    MR. ALLAN:  Very good.

18    (Said exhibit received in evidence.)

19   BY MR. ALLAN:

11:58:53   20   Q.  So what you see in front of you, Mr. Lund, is sort of a

21   summary of the data points that you've shown in these documents

22   you showed to the jury on Thursday.

23    And just to orient everyone, 1473 was dated

24   January 2008 and provided salary and benefits numbers per

11:59:12   25   engineers for different locations, we moved in Schaumburg,

Case: 1:17-cv-01973 Document #: 784 Filed: 12/20/19 Page 90 of 197 PageID #:52199
Lund - cross by Allan
321

1  China and Penang, do you see that?

2  A.  Yes.

3  Q.  And then the documents go down, increased in years with

4  2014, '15, '16, '17 and '18, all the same data points are

11:59:30  5  included in this summary document?

6  A.  And just for clarity, it doesn't include the material,

7  depreciation expenses, it's just the pure payroll.

8  Q.  Salary and benefits.

9  A.  Okay.

11:59:38  10  Q.  So the cost per engineer is much cheaper in Penang than it

11  is in Schaumburg, correct?

12  A.  Yes.

13  Q.  And it's approximately $100,000 per engineer cheaper in

14  Penang than Schaumberg?

12:00:02  15  A.  It depends on what you earn.  Obviously, currency

16  fluctuations have a big play in this over time, too.

17  Q.  Roughly, though.  You can see January 2008, Schaumberg is

18  144,000, Penang is 48,000?

19  A.  Roughly.

12:00:18  20  Q.  And the cost of an engineer in Penang is also cheaper than

21  the cost of an engineer in China, right?

22  A.  Yes, the China value went up over years, that's true.

23  Q.  And in 2018, the cost of an engineer in Penang is just

24  about half of what it is in China, right?

12:00:46  25  A.  Yes.  Again, currency fluctuations had a big part of that.

Case: 1:17-cv-01973 Document #: 784 Filed: 12/20/19 Page 91 of 197 PageID #:52200
Lund - cross by Allan
322

1  Q.  And the cost of an engineer in Schaumburg and China are

2  increasing over the last 10 years, but the cost of an engineer

3  in Penang actually decreases, correct?

4  A.  Correct.  You can see similar trends in our design center,

5  too.  Those are part of those design sheets, too.

6  Q.  Okay.  You can set that aside, Mr. Lund.

7           You talked to the jury on Thursday about G.S. Kok, Sam

8  Chia, and Y.T. Kok, and you put, I think, put their personnel

9  files in front of the jury, do you recall that?

10          THE COURT:  This may be a good stopping point, it is

11 high noon.  Members of the jury, is one hour sufficient for you

12 for lunch?

13          (All jurors nodded.)

14          THE COURT:  All are in agreement.  You may leave,

15 return at 1:00 o'clock.  Counsel, please remain.  The witness

16 may leave the stand.

17          (The following proceedings were had out of the

18          presence of the jury in open court:)

19          THE COURT:  Okay.  The court is in session.

20          How much longer do you think you're going to need for

21 cross-examination, counsel?  5 minutes, 10?

22          MR. ALLAN:  Your Honor, probably 45.  I'm trying to

23 get there as quick as I can.  He covered a lot of ground.

24          THE COURT:  Will there be any redirect?

25          MR. DE VRIES:  There will, Your Honor, yes.

Case: 1:17-cv-01973 Document #: 784 Filed: 12/20/19 Page 92 of 197 PageID #:52201
Lund - cross by Allan
323

1        THE COURT:  5 minutes, 10?

2        MR. DE VRIES:  It would be along those lines at this

3    point.

4        THE COURT:  All right.  I think we should reach an

5    understanding that the next witness -- well, whose name is what

6    again?

7        MR. CLOERN:  MR. Shepherd.

8        THE COURT:  Mr. Shepherd.  That we do only his direct

9    this afternoon.  Thank you.

10        THE CLERK:  The court is adjourned.

11        (Luncheon recess taken from 12:02 o'clock p.m.

12        to 1:00 o'clock p.m.)

13

14            *    *    *    *    *    *    *    *

15

16

17    I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

18        RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

19

20    /s/Blanca I. Lara                    November 12, 2019

21

22

23

24

25

12:02:24 (line 5)
12:02:38 (line 10)

324

1           IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3   MOTOROLA SOLUTIONS, INC., and MOTOROLA    ) No. 17 CV 1973
    SOLUTIONS MALAYSIA SDN. BHD,              )
4                                             )
                Plaintiffs,                   )
5   vs.                                       ) Chicago, Illinois
                                              )
6   HYTERA COMMUNICATIONS CORPORATION, LTD.,  ) November 12, 2019
    HYTERA AMERICA, INC., and HYTERA          )
7   COMMUNICATIONS AMERICA (WEST), INC.,      )
                                              )
8                Defendants.                  ) 1:00 o'clock p.m.

9                   TRIAL - VOLUME 3-B
               TRANSCRIPT OF PROCEEDINGS
10
          BEFORE THE HONORABLE CHARLES R. NORGLE, SR.,
11                      and a jury

12  APPEARANCES:

13  For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                           BY:  MR. ADAM R. ALPER
14                              MR. BRANDON HUGH BROWN
                           555 California Street
15                         27th Floor
                           San Francisco, California 94104
16                         (415) 439-1400

17                         KIRKLAND & ELLIS, LLP
                           BY:  MR. MICHAEL W. DE VRIES
18                              MR. CHRISTOPHER M. LAWLESS
                           333 South Hope Street
19                         Los Angeles, California 90071
                           (213) 680-8400
20

21

22  Court Reporter:        JUDITH A. WALSH, CSR, RDR, F/CRR
                           Official Court Reporter
23                         219 South Dearborn Street, Room 2342
                           Chicago, Illinois 60604
24                         (312) 435-5895
                           blanca_lara@ilnd.uscourts.gov
25

```
 1   APPEARANCES (Continued:)

 2   For the Plaintiffs:      KIRKLAND & ELLIS, LLP
                              BY:  MS. MEGAN MARGARET NEW
 3                            300 North LaSalle Street
                              Chicago, Illinois 60654
 4                            (312) 862-7439

 5                            KIRKLAND & ELLIS, LLP
                              BY:  MS. LESLIE M. SCHMIDT
 6                            601 Lexington Avenue
                              New York, New York 10022
 7                            (212) 446-4763

 8   For the Defendants:      STEPTOE & JOHNSON, LLP
                              BY:  MR. BOYD T. CLOERN
 9                                 MR. MICHAEL J. ALLAN
                                   MS. JESSICA ILANA ROTHSCHILD
10                                 MS. KASSANDRA MICHELE OFFICER
                              1330 Connecticut Avenue NW
11                            Washington, DC 20036
                              (202) 429-6230
12
                              STEPTOE & JOHNSON, LLP
13                            BY:  MR. DANIEL S. STRINGFIELD
                              227 West Monroe Street, Suite 4700
14                            Chicago, Illinois 60606
                              (312) 577-1300
15

16   ALSO PRESENT:            MR. RUSS LUND and
                              MS. MICHELE NING
17

18

19

20

21

22

23

24

25
```

Lund - cross by Allan

326

1          (Proceedings heard in open court.  Jury in.)

2              THE COURT:  Good afternoon.  The witness may retake

3     the stand.

4              Please proceed.

5          RUSS LUND, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

6              CROSS-EXAMINATION (Resumed)

7     BY MR. ALLAN:

8     Q.  Good afternoon, Mr. Lund.

9     A.  Good afternoon.

10    Q.  I'd like to show you PTX 1157 which was admitted into

11    evidence on Thursday.  It's Y.T. Kok's personnel file.  You're

12    familiar with this, yes?

13    A.  Do you want me to bring it up in the documents?

14    Q.  As you wish.

15    A.  Yes.

16    Q.  Mr. Kok originally started working at Motorola in 1997;

17    isn't that right?

18    A.  That's what his employment records show.

19    Q.  And Mr. Kok worked at Motorola, left, and then he came

20    back, correct?

21    A.  Yes.  I understood that he did that.

22    Q.  I'd like to turn, direct your attention to Page 51.  This

23    is the employee qualification information, do you see that,

24    from Mr. Kok's files?

25    A.  Yes, that's what it says.

Lund - cross by Allan

327

1   Q.   I want to direct your attention to the middle of the

2   screen, "Previous employment," that section of the document.

3   A.   Yes.

4   Q.   It states that Y.T. worked at Motorola from May 15, 1997,

5   through November 16, 2000.  Do you see that?

6   A.   November 16, 2000, yes.

7   Q.   And right above that, that entry, is the entry for another

8   company that Mr. Kok worked at called Altera which became

9   Intel, correct?

10  A.   Yes.  They were located on the island, too.

11  Q.   And this Motorola employee qualification information says

12  that Y.T. Kok worked at Altera from October 30, 2000, through

13  September 30, 2002.  Do you see that?

14  A.   Yes, I do.

15  Q.   So this Motorola document indicates Mr. Y.T. Kok worked at

16  both Motorola and Altera from October 30, 2000, to November

17  16, 2000.  Do you see that?

18  A.   Yes.

19  Q.   And he disclosed this overlap in work to Motorola as part

20  of his employment history files, correct?

21  A.   That's what's in his document, yes.

22  Q.   And Motorola knew that information, knew that he worked

23  for a completely different company overlapping with Motorola

24  when it rehired him at Motorola a second time, didn't they?

25  A.   I am not aware of the details around that situation.

Lund - cross by Allan

328

1   Q.  Well, that's what his -- that's what his employment

2   history files are that you introduced to the jury on Thursday?

3   That's what that says, right?

4   A.  That's what it does say on there.

5   Q.  Now, I want to show you PTX 1156.  It was also admitted on

6   Thursday.  This is Y.T.'s departure file from Motorola,

7   correct?

8   A.  It's the multiple documents around his resignation, yes.

9   Q.  Let's take a look at the first page of the document.  We

10  see that Y.T.'s last day was -- last day of work was June 4,

11  2008.  Do you see that?

12  A.  Yes, I see that.

13  Q.  And you understand that his boss, Lokang Kwai Sin,

14  indicated that he had -- Y.T. had no more responsibilities

15  after his last day of work on June 4, 2008, right?

16  A.  Right.  He was out ill.

17  Q.  His last day of work was June 4, 2008.  He wasn't out ill,

18  he was done with work, Mr. Lund?

19  A.  It also says October 3rd is his official last day at

20  Motorola.

21  Q.  No, it says his last day of service is October 3.  His

22  last day of work is listed on this document as June 4, 2008,

23  correct?

24  A.  Right, and --

25  Q.  And his boss had reassigned all of his work to other

Lund - cross by Allan

1   people in the company, correct?

2   A.  Yes.  We do that.  When you have sick days accrual and so

3   forth that you sometimes -- there's deltas between the actual

4   last day of work and the last day of service.

5   Q.  All my point is, Mr. Lund, is that as of June 4, 2008, all

6   of Y.T.'s work at Motorola was assigned to somebody else; he

7   effectively didn't work there, correct?

8   A.  His work was reassigned, but he still was a full-time

9   employee at Motorola.

10  Q.  He never came in, Mr. Lund.  His last day of work was June

11  4, 2008.

12  A.  They come in for their last day to hand over all their

13  information, their PCs, credit cards, and so forth.  So they

14  still come in the very last day.

15  Q.  So even though his last day of work was June 4, 2008,

16  Motorola gave him unfettered access to all of Motorola's

17  confidential information, correct, after that time?

18  A.  That's standard policy, is to the last day of work, which

19  was October 3rd, and the same with any other employees, we

20  keep -- all their records, all their information, their PCs,

21  they keep that to the very last day.

22  Q.  You said his last day of work was October, but this says

23  his last day of work was June 4, 2008, right?

24  A.  Last day of service.

25  Q.  Okay.  Certainly, there's no need for somebody who's no

Lund - cross by Allan

1   longer working at the company, whose tasks have all been

2   reassigned, to have any access to Motorola confidential

3   information, correct?

4   A.   If there's questions that we have regarding someone's

5   work, he may still need information to help the new person

6   that's taken on the task to come up to speed.  So although,

7   you know, they may be out of the office, they still are there

8   for reference to help bring people up to speed.

9   Q.   And it's not out of the office.  He's had his last day of

10  work.  He's had his last day of work in June 4 of 2008.

11  Motorola gave him complete access to all of the materials

12  unrestricted, all of the stuff that you said was confidential,

13  correct?

14  A.   If you read the other documents, he did come in for a last

15  day at Motorola to go through and turn in all of his

16  information.  So in the subsequent pages, it does show him

17  coming in to work.

18  Q.   He came in to sign a form that said he was done, right?

19  A.   And to return all of his laptops and credit cards and cell

20  phones and anything he has that's Motorola property.

21  Q.   All right.  I want to bring up 1191, PTX 1191 which was

22  just admitted this morning.

23  A.   Go back to the document?

24  Q.   Pardon me?

25  A.   Go back in that pile?

Lund - cross by Allan

331

1   Q.  You can or it's right here.  It's just a one-page email on

2   your screen.

3   A.  Oh, okay.

4   Q.  Now, you testified about this document this morning, but

5   you said you had no personal involvement in this analysis,

6   correct?

7   A.  That's what I said.  It was my employee.

8   Q.  Now, clearly, Motorola had some suspicions to -- before

9   this happened to actually try to take a look at a Hytera

10  radio, correct?

11  A.  Yes.  That's why I said there was some incident that

12  happened that someone came to me.  Ted Kozlowski came to me

13  and asked for some assistance.

14  Q.  Okay.  So some suspicion, some suspicions arose in the

15  company that ultimately led to the work that was done here,

16  right?

17  A.  Yes.  And they were dismissed.

18  Q.  To the initial analysis.  This is an initial analysis,

19  right?  They found no obvious evidence of proprietary

20  material, correct?

21  A.  Yes, that's correct.

22  Q.  I noticed that when you testified this morning, you left

23  out the word "obvious," yet it is bolded and underlined in the

24  document.  Do you see that?

25  A.  Yes.

Lund - cross by Allan

332

Q. And you testified this morning, you told the jury that
this analysis meant that there was no theft of information
that was determined as a result of that, but nothing in this
document says that, does it?

A. That's the analysis from my employee Blake saying that
there is no obvious evidence that there's any kind of theft in
that.

Q. So there's -- it says that there's no obvious evidence of
proprietary material, and "obvious" is highlighted and
underlined, right?

A. Correct.

Q. Leading one to believe that it was an unresolved issue,
correct, Mr. Lund?

A. It didn't lead me to believe that --

Q. Oh, okay.

A. -- especially with the following sentences that said
there's no further analysis required.

Q. Even though this was an initial analysis, whatever the
problem was wasn't resolved, was it?

A. It was from the statements that you read within the
document that there was no further investigation required,
that there was nothing found.

Q. But you don't -- you don't know what generated this other
than the fact that Mr. Kozlowski came to talk to you about it,
right?

Case: 1:17-cv-01973 Document #: 784 Filed: 12/20/19 Page 102 of 197 PageID #:52211
Lund - cross by Allan
333

1   A.   Yes.   I'm just copied on this.

2   Q.   So you don't really know whether there was any dissembly,

3   you didn't do any of this work, right?

4   A.   No.   I trust my employee did the work.

5   Q.   Okay.   All right.   Now, you also testified this morning

6   about the genesis of this lawsuit being some patent

7   infringement analysis that went on in 2016.   Do you recall

8   that?

9   A.   Yes, I do recall that.

10  Q.   Okay.   And when that patent analysis was done in 2016, the

11  decision that led to that was triggered by three different

12  factors, right:   Number one, Hytera's recent growth in the

13  U.S. market; number two, its intended acquisitions of major

14  competitors such as Sepura; and number three, Hytera's

15  expansion of its product portfolio away from mere low tier

16  competitors and into higher tier handheld radio products.

17  A.   Yes.   That's the genesis of what led to the patent review.

18            MR. ALLAN:   Okay.   All right.   Let's break that down.

19  I'd like to show you Exhibit 4364, please.

20            May we approach, your Honor?

21            THE COURT:   Yes.

22  BY MR. ALLAN:

23  Q.   Mr. Lund, this is a Motorola email.   And I direct you to

24  the middle of the page.   There's an email from Chris Clark to

25  you, you and some other folks, Bruce Brda, Claudia Rodriguez

Lund - cross by Allan

334

1 dated March 31, 2016.  Do you see that?

2 A.  From Chris Clark on March 31st?

3 Q.  Uh-huh.

4 A.  Yes, I see that.

5 Q.  And the subject of the email is, well, "Competitive news

6 alert.  Hytera reports 27 percent growth in sales and 485

7 percent growth in profit."  Do you see that?

8 A.  Yes, I see that on the page.

9        MR. ALLAN:  Offer this into evidence, please, your

10 Honor.

11        MR. DeVRIES:  No objection.

12        THE COURT:  It is received.  It may be published.

13    (Exhibit 4364 received in evidence.)

14 BY MR. ALLAN:

15 Q.  Again, the subject here is, "Hytera reports 27 percent

16 growth, 485 percent growth in profit," right?

17 A.  That's what the subject says, yes.

18 Q.  And Bruce Brda is -- at least at the time was the head of

19 all products at Motorola, right?

20 A.  Yes, he was.

21 Q.  Now, I want to turn to the second page under the section

22 that says, "Hytera strategy" and in particular, the last

23 sentence.  It says, "There is a working team working on a

24 demand gen and to win against Hytera.  Ideas welcome."

25        Do you see that?

Lund - cross by Allan

335

1   A.  Yes, I see that.

2   Q.  And this email is a concern about Hytera's growth in the

3   marketplace in 2016; is that right?

4   A.  Yes, that's what it states.

5   Q.  And I want to direct you to the top email there.  It says,

6   "FYI, just making sure you saw this.  This is our challenge to

7   help shut down the Hytera growth."  Do you see that at the

8   top?

9   A.  Yes, I see that statement.

10  Q.  March 2016, correct?

11  A.  From Mike Petersen --

12  Q.  Right.

13  A.  -- to Viv and Tim, yes.

14  Q.  Now, you're familiar with Vertex, Mr. Lund, aren't you?

15  A.  Yes, I am.

16  Q.  And Vertex is a business within Motorola?

17  A.  Yes, it is.

18  Q.  And you've had occasion to work on Vertex-related business

19  issues, yes?

20  A.  It was an older business that no longer exists, correct.

21  Q.  Okay.  I'd like to show you Exhibit 4362, if I may.  And

22  this is a May 24th Vertex business review agenda, and you're

23  listed along with several other folks as the audience for

24  this.  Do you see that, Mr. Lund?

25  A.  Yes, I do.

1    Q.  This is a type of agenda that you would regularly receive

2    in your line of work at Motorola?

3    A.  It was one of many agendas for many meetings at Motorola.

4         MR. ALLAN:  Offer it into evidence, please, your

5    Honor.

6         MR. DeVRIES:  No objection.

7         THE COURT:  It is received.  It may be published.

8       (Exhibit 4362 received in evidence.)

9    BY MR. ALLAN:

10   Q.  And while the agenda does not have a date May 24, I will

11   represent that the metadata on the document says it was

12   created on April 29, 2016.  You recall being at a Vertex

13   business review agenda in around April, May 2016?

14   A.  Not specifically, but I'm sure if my name is on there, I

15   must have been in the meeting, yes.

16   Q.  I want to direct your attention to the second-to-last

17   bullet.

18   A.  On the second page?

19   Q.  Just on the first page.  It reads in caps, "The status quo

20   doesn't work anymore."  Do you see that?

21   A.  Yes, I see that.

22   Q.  "We have to play unfair, go harder at the low end,

23   business as usual results in growing Hytera.  If there are

24   opportunities to erode MSI business, it's better that it's

25   Vertex versus a competitor."

Lund - cross by Allan

337

1          Do you see that?

2   A.  Yes, I see that.

3   Q.  So in May of 2016, Motorola decides to start playing

4   unfair against Hytera, correct?

5   A.  I didn't write that, so I'm not sure what he was implying

6   by "unfair."  I'm sure it wasn't unethical, but I'm not sure

7   what he meant by "unfair."

8   Q.  Okay.  So September -- Sepura is a U.S. -- UK-based radio

9   manufacturer, correct?

10  A.  On 2016, yes, I believe they were still independent.

11  Q.  And Sepura was a competitor of Motorola?

12  A.  Yes.  In our Tetra business, Sepura was one of our main

13  competitors in the TETRA business.

14  Q.  And Hytera acquired Sepura, correct?

15  A.  Yes, they did, at some point.

16  Q.  And that acquisition made Hytera a bigger competitor to

17  Motorola?

18  A.  Yes.  By the sheer size, now it's twice as big, yes.

19  Q.  Let me show you DTX 4352.  This is an email from you,

20  Mr. Lund, to Mark Shahaf and Claudia Rodriguez, December 2016.

21  Do you see that?

22  A.  Yes, I do.

23          MR. ALLAN:  I would offer this into evidence, your

24  Honor.

25          MR. DeVRIES:  No objection.

1           THE COURT:  It is received.  It may be published.

2           (Defendant's Exhibit 4352 received in evidence.)

3    BY MR. ALLAN:

4    Q.  This is an email concerning Hytera's acquisition of

5    Sepura, correct?

6    A.  Yes.  That's what was forwarded by Ricardo, correct.

7    Q.  And your -- you forwarded this to a couple of folks and

8    say, "Wow, sad day.  Russ."  Do you see that?

9    A.  Yes.  Sepura had been a big competitor of mine for many

10   years when I lived in London.

11   Q.  So you were -- you found it to be a sad day that Hytera

12   had acquired Sepura, correct?

13   A.  No, I wouldn't say it that way.  I was more sad --

14   Q.  That's what you said in the email, Mr. --

15           MR. DeVRIES:  Your Honor, can I object that he --

16           THE COURT:  You may complete your answer.

17           THE WITNESS:  Yes, it was a sad day because I

18   competed heavily when I lived in London with Sepura, and I was

19   more sad that they were being bought out by somebody and not

20   necessarily that it was Hytera.  It was just, I enjoyed

21   competing with them.  They were a very strong competitor.

22   That was what I meant by it.

23   BY MR. ALLAN:

24   Q.  Yet we just talked about a few moments ago, one of the

25   reasons that led to the genesis of the lawsuit was Hytera's

Case: 1:17-cv-01973 Document #: 784 Filed: 12/20/19 Page 108 of 197 PageID #:52217
Lund - cross by Allan
339

1    acquisition of lead competitors including Sepura, correct?

2    A.  Yes.

3    Q.  Let's talk a little about Hytera's product expansion.

4    That was the third factor that Motorola considered bringing

5    this case.  Motorola monitors Hytera's products, correct?

6    A.  I'm sorry.  Can you repeat the question?

7    Q.  Sure.  Motorola monitors, does competitive intelligence on

8    Hytera and its products, correct?

9    A.  Yes.  We do that for all companies, yes.

10   Q.  Let me show you DTX 4825.  This is an email chain,

11   Mr. Lund, from March of 2017.  I believe your email address is

12   listed midway through on the left-hand side as

13   CRLOO8@motorolasolutions.com.  Is that you?

14   A.  I can't find it, but if it's CRLOO8, it's me.

15           MR. ALLAN:  Okay.  I'd move it into evidence, please,

16   your Honor.

17           MR. DeVRIES:  No objection.

18           THE COURT:  It is received.  It may be published.

19       (Defendant's Exhibit 4825 received in evidence.)

20   BY MR. ALLAN:

21   Q.  On the bottom of the first page, there's a note that the

22   email is reporting that, quote, "Earlier today, we announced

23   legal action against Hytera."  Do you see that?

24   A.  Yes, I see that.

25   Q.  And this was the same day the lawsuit was filed, correct?

Lund - cross by Allan

340

1    A.  Yes, it is.

2    Q.  Let's turn to the second page, please.  There are customer

3    talking points provided to people within the company if they

4    get questioned about the lawsuit.  Do you see that?

5    A.  Yes.  There's about ten or so bullets.

6    Q.  I'd like to direct you to the top bullet on the third

7    page, please.  And that reads, "Members of both our sales

8    force and product development teams noticed striking

9    similarities between Hytera products and marketing materials

10   and those of Motorola Solutions'."  Do you see that?

11   A.  Yes, I do.

12   Q.  And this is also the time that Motorola saw Hytera's

13   growth substantially on the rise, a 485 percent increase in

14   profits, right?

15   A.  That's what the previous document said, yes.

16   Q.  And also acquisitions of Sepura, right?

17   A.  Yes.  That's what it said, yes.

18   Q.  And this document doesn't talk about any substantial

19   similarities that were noticed by the company back in 2009,

20   does it?

21   A.  There's no date reference on it.  It's just a general

22   statement.

23   Q.  Right.  And there's nothing in there about substantial

24   similarities that were notified -- noticed by the company back

25   in 2010 either, right?

1    A.  I wouldn't use the word "substantial," but there's no

2    similarities detected then.

3    Q.  There's nothing -- well, the document doesn't say there

4    was anything about substantial similarities noticed by the

5    company in 20' -- 2009, 2010, or 2011, right?

6    A.  Sorry.  I was just using your word "substantial."  Sorry.

7    Q.  Okay.  All right.  Let's focus back on the end of 2007.

8    Now, by the end of that year, you knew that G.S. Kok was

9    planning to leave Motorola, didn't you?

10   A.  At the end of 2007, yes.  He started having discussions

11   that he had got an offer from somebody and asked -- said he

12   was going to leave, and I tried to convince him to stay.

13   Q.  And he was around 50 years old at the time with a

14   mandatory retirement of 55, right?

15   A.  Yes.  We did make exceptions to that 55 if you were in

16   engineering as part of our policies.

17   Q.  Let's take a look at DTX 4241, please.  Now, this is an

18   email chain that you're on, Mr. Lund, concerning G.S.'s

19   resignation from Motorola.  Do you see that?

20   A.  Yes.

21            MR. ALLAN:  I'd offer it into evidence, please, your

22   Honor.

23            THE COURT:  It is received.  It may be published.

24       (Defendant's Exhibit 4241 received in evidence.)

25   BY MR. ALLAN:

Lund - cross by Allan

342

1   Q.  So just to orient you, Mr. Lund, starting at the bottom,

2   the email is from G.S. to P.B. Teo, December 31, 2007, and

3   he's offering his resignation.  Do you see that?

4   A.  Yes, I see that.

5   Q.  And then up above, you sent an email to some folks, and

6   you say, "Not good.  The chances of keeping him did not look

7   good, and now it's official."  Do you see that?

8   A.  Yes.  The attempts I tried to convince him to stay didn't

9   work.

10  Q.  And he joined Hytera, started Hytera February 18 of 2008,

11  correct?

12  A.  I don't know the exact date he started.

13  Q.  Well, the parties have again agreed to certain uncontested

14  facts, and that is one of them, that G.S. Kok joined Hytera on

15  February 18, 2008.

16  A.  Okay.

17  Q.  And Motorola knew that G.S. was going to Hytera before

18  February 18, before he even started there, right?

19  A.  I did not.

20  Q.  You did not?

21  A.  And I don't recall anyone else knowing either.

22          THE COURT:  Mr. Allan, you've got about another 20

23  minutes to complete your cross-examination.

24          MR. ALLAN:  Okay.  Thank you.

25          Let me turn to Exhibit 12 --

1      THE COURT:  Do you intend to turn to the other two

2  individuals who left Motorola?

3      MR. ALLAN:  No, your Honor.

4      THE COURT:  All right.  Then please move on.

5  BY MR. ALLAN:

6  Q.  This is a lifecycle management summit, 12-13 February

7  2008, Asia update.  Do you see that, Mr. Lund?

8  A.  Yes, I can see that.

9  Q.  And is this regularly kept -- this is something that would

10  be kept in the ordinary course of business?

11  A.  We do have summits.  Sometimes they're every six months or

12  annual, so it's not like a monthly thing that I'm aware of.

13      MR. ALLAN:  Offer it into evidence, please, your

14  Honor.

15      THE COURT:  What does it purport to be?

16      MR. ALLAN:  It's a Motorola document that is an

17  update of various activities going on in the Asia-Pacific

18  region when Mr. Lund was in charge of that.

19      THE COURT:  It's a little too broad for purposes of

20  cross-examination in light of the direct examination.

21      MR. ALLAN:  Let me introduce to you --

22      THE COURT:  I'm not barring you from going into it in

23  your own case in chief if you determine that it is appropriate

24  to do so, but for purposes of cross-examination, it's too

25  generalized, too vague.

1        MR. ALLAN:  I'll move on, your Honor.

2        THE COURT:  Yes.

3        MR. ALLAN:  PTX 1354, please.

4   BY MR. ALLAN:

5   Q.  Mr. Lund, this is an email chain that you are on and

6   Nickie Petratos, Ted Kozlowski, and some other folks in

7   January of -- January 31, 2008.  Do you see that?

8   A.  Yes, I do.

9   Q.  And it's concerning an intelligence alert, Hytera

10  reportedly developing DMR trunking Tier 3 solution?

11  A.  Yes, I do.

12        MR. ALLAN:  I'd offer this into evidence, please,

13  your Honor.

14        MR. DeVRIES:  No objection, your Honor.

15        THE COURT:  It is received.  It may be published.

16      (Plaintiff's Exhibit 1354 received in evidence.)

17  BY MR. ALLAN:

18  Q.  I'd like to direct your attention to the bottom of the

19  email, Mr. Lund.  It says, "Hytera is reportedly developing a

20  DMR trunking Tier 3 solution."  Do you see that?

21  A.  Yes, I do.

22  Q.  And yesterday, you testified that you were surprised in

23  2010 when -- Thursday, rather, you were surprised when you

24  learned that Hytera was developing a DMR, a digital product --

25  A.  Yes.

1    Q.   -- do you recall that?

2            This is indicating here in this email chain you're on

3    that Hytera is developing a DMR digital product, correct?

4    A.   Yes.  And I was surprised, yes.

5    Q.   You were surprised in 2010.  This is in 28 -- 2008.

6    A.   Yes.

7    Q.   I want to turn your attention to Page 2.  There's a

8    reference to the DMR standard.  On Thursday, you testified

9    that ETSI developed the DMR standard.  Do you recall that?

10   A.   ETSI is the overall body, yes.

11   Q.   This document indicates, "recall Motorola has actively

12   contributed to the DMR standard."

13   A.   Yes.  Multiple manufacturers contributed to the standard

14   definition.  ETSI's just the host.

15   Q.   Motorola wrote the first, second, and third portions of

16   the standard, right?

17   A.   We contributed to the standards.

18   Q.   Well, Motorola wrote the first three parts, yes?

19   A.   With the help of other manufacturers, I believe.

20   Q.   And then on the same page right below that, it says, "On

21   the positive side, the addition of HYT, Hytera, to DMR will

22   constitute additional backing for Motorola's DMR 'standard'

23   position against the dPMR MoU."  Do you see that?

24   A.   Yes, I do.

25   Q.   And I want to go to the very top of this email.  It reads,

1    "Engineering needs to make sure" -- this is Nickie Petratos to

2    you and Ted Kozlowski:  "Engineering needs to make sure we

3    have plenty of IP to cover all intended releases of MOTOTRBO

4    and to ensure that any confidential knowledge that employees

5    took with them to Hytera is protected."

6           Do you see that?

7    A.  Yes, I see that statement.

8    Q.  And G.S. had resigned in January of this year, correct?

9    A.  Yes, he did.

10   Q.  And Motorola knows that he's going to Hytera at the time

11   that Ms. Petratos says "to ensure that any confidential

12   knowledge taken to Hytera is protected," correct?

13   A.  I don't remember the exact days, but after he left

14   Motorola, we eventually found out that he was going to Hytera.

15   Q.  Let's take a look at DTX 4249.  And you're on this email,

16   Mr. Lund.  In the middle, Nickie Petratos sends an email to

17   Solomon Lorthu, P.B. Teo, and you.  Do you see that?

18   A.  Yes, I do.

19   Q.  It's concerning people that are going to Hytera, correct?

20   A.  It's concerning Tod Gong who left to Hytera.

21          MR. ALLAN:  I'd offer this into evidence, please,

22   your Honor.

23          MR. DeVRIES:  No objection.

24          THE COURT:  It is received.  It may be published.

25      (Defendant's Exhibit 4249 received in evidence.)

Lund - cross by Allan

347

BY MR. ALLAN:

Q.   So just to orient you, the email we just looked at was the end of January 2008.  This is May of 2008, and the company is learning that more people are attending -- or are leaving Motorola to go to Hytera, correct?

A.   Yes.  It's stating Tod Gong has left, and there was verbal confirmation joining G.S., the other two, Sam Chia and Wong.

Q.   And Hytera -- and Ms. Petratos at the top email says, "Hytera is taking our Penang guys.  I have warned Stone."  Do you see that?

A.   Yes, I see that.

Q.   And Sam Chia did join Hytera on June 16, 2008, correct?

A.   Yes, I believe that's the right date.

Q.   Now, when people leave Motorola, they have an exit interview, right?

A.   Yes.  That's our standard procedure.  When you leave, you go through a standard review with your HR and departing manager, yes.

Q.   And employees don't need to tell Motorola where they're going, right?  It's not obligatory?

A.   That is correct.  We just ask them out of courtesy to give information.  If they so desire to give it to us or not, it's up to them.

Q.   All right.  DTX 4351, please -- actually, if we could put up admitted exhibit -- put that to one side.  We're almost

Lund - cross by Allan

348

1   done.

2            Mr. Lund, DTX 4565 is the document you introduced

3   this morning.  This is a document where you were instructing

4   your intellectual technology, your IT team, to check G.S.

5   Kok's Hytera email for incoming/outgoing emails to see if he

6   was, in fact, the source of the leak, correct?

7   A.  Yes, to see if any information was going out regarding,

8   you know, maybe there's an upcoming show and someone

9   accidentally shared something with him or if he was sending

10  some request employees maybe about employment.  So it was kind

11  of a preventive way of just checking.

12  Q.  And your boss told you to do that monitoring and you did

13  that, right?

14  A.  My boss had responsibility for all the engineering, and it

15  was part of my work description to help the IT team to collect

16  information about emails or about maybe confidential project

17  names or kind of new products coming out, correct.

18  Q.  And that was back in 2010?

19  A.  Yes, after I returned from Penang.

20  Q.  So I think you've got now 4351 in front of you?

21  A.  Yes, I do.

22  Q.  And this is --

23  A.  It just disappeared.

24  Q.  Let's see if we can -- actually, it wasn't admitted yet.

25  This is an email from you to a number of people in December of

Case: 1:17-cv-01973 Document #: 784 Filed: 12/20/19 Page 118 of 197 PageID #:52227
Lund - cross by Allan
349

1   2016.  The subject is, "Actions from Molloy meeting."  Do you

2   see that?  I think it was just handed to you in paper,

3   Mr. Lund?

4   A.  Oh, sorry.

5   Q.  That's okay.

6   A.  12/16 of 2016?

7   Q.  Yes, sir.

8   A.  Okay.  Yes, I see it.

9   Q.  And this is your email?  You recognize this, right?

10  A.  Yes.

11          MR. ALLAN:  Offer it into evidence, please, your

12  Honor.

13          MR. DeVRIES:  No objection.

14          THE COURT:  It is received.  It may be published.

15      (Defendant's Exhibit 4351 received in evidence.)

16  BY MR. ALLAN:

17  Q.  The bottom of the email concerns -- is an email from Bruce

18  Brda, do you see that, related to a meeting he had with Jack

19  Molloy?  Bruce Brda, we said, was the head of all products,

20  right?

21  A.  And Jack was the head of all sales at the time.

22  Q.  Let's look at Page 4 very quickly, Mr. Lund.  There's a

23  reference to "Leaks, there are concerns."  Do you see that?

24  A.  Yes, I do.

25  Q.  It says, we have -- "There are concerns that we have an

Lund - cross by Allan

350

1   intelligence leak going to Sepura and possibly Hytera.  Any

2   possible action we can take here?"

3   A.  Yes, I see that.

4   Q.  And this is 2016, correct?

5   A.  At the end of 2016, yes.

6   Q.  Six years later after you've had -- instructed people to

7   run G.S.'s email?

8   A.  2010.  Yes, six years.

9   Q.  The last document, Mr. Lund, DTX 4353.  This is an email

10  chain you're on, Mr. Lund.  At the top, it's Andres Lacambra

11  to you and some other folks, October 2016.  The subject is

12  "Hytera BD series intro."  Do you see that?

13  A.  Yes, I see that.

14          MR. ALLAN:  Offer this into evidence, please, your

15  Honor.

16          MR. DeVRIES:  No objection.

17          THE COURT:  It is received.  It may be published.

18       (Defendant's Exhibit 4353 received in evidence.)

19  BY MR. ALLAN:

20  Q.  Now, the email below the very sort of main subject of the

21  email is from Andres Lacambra to a number of folks.  He says,

22  "Hi, Claudia and team."  Do you see that?

23  A.  Yes, I see that.

24  Q.  In his first bullet he writes:

25          "We are reliving the same situation we experienced

Lund - cross by Allan

1    back at the end of 2012. We had launched our new

2    Paradise radios and six months later, Hytera was

3    launching theirs and creating future parity in key areas.

4    We have always been concerned about them gaining

5    visibility to our roadmaps well ahead of announcements.

6    We need to continue stressing the need to secure our

7    confidential information."

8         Did I read that correctly?

9  A. Yes, you read that correctly.

10  Q. And needing to secure Motorola's confidential information

11  from Hytera is precisely what the head of DMR, Nickie

12  Petratos, warned you about in January 31 of 2008 before G.S.,

13  Sam, or Y.T. even started there, right?

14  A. Yes, that's correct. We were always trying to be

15  preventive in making sure information doesn't escape out of

16  Motorola, yes.

17  Q. So that warning's been in place for years and years and

18  years related specifically to Hytera and specifically to G.S.,

19  Sam, and Y.T., correct?

20  A. Yes. It's something we're always trying to look for, is

21  making sure information isn't escaping out of Motorola

22  Solutions.

23  Q. And you never once looked at those Compass logs, did you?

24  A. Didn't have any reason to believe that thousands of

25  documents of code had been taken out of Motorola, no.

Lund - redirect by DeVries

352

1    Q.  You didn't have any reason to believe when Nickie Petratos
2    is telling you in June -- in January 2008, "We've got to make
3    sure Hytera engineers who are going over -- Motorola engineers
4    who are going to Hytera don't take any information," and then
5    people go over and over and over?  No need to check the log,
6    just take a quick look?
7    A.  So again, we had our procedures in place to ensure that
8    information wasn't taken, that they retained all the
9    information and left it with them before they left, and then
10   went through and reiterated the fact of confidential
11   information, yes.
12           MR. ALLAN:  Nothing further.  Thank you, Mr. Lund.
13           THE COURT:  Do you have a brief redirect?
14           MR. DeVRIES:  I do, your Honor.
15           THE COURT:  All right.  Please proceed.
16           Members of the jury, for scheduling purposes, after
17   this brief redirect, another witness will be called this
18   afternoon.  And he will do direct examination, but his
19   cross-examination will go into tomorrow.
20           And while I'm speaking to you, I should add that
21   because of the press of other matters, this case will not go
22   forward on Friday.  In short, you'll have Friday off.  Some of
23   us, however, will continue to work on unrelated matters.
24           Please proceed.
25                        REDIRECT EXAMINATION

1    BY MR. DeVRIES:

2    Q.  Mr. Lund, I know you were asked a number of questions, and

3    I'm going to do my best to briefly ask you about just a few of

4    them.  If we could, please put up PTX 1354.  It was a document

5    that you were just asked about, Mr. Lund, the January 2008

6    email from Nickie Petratos to you and others.

7            And Mr. Schlaifer, if we could please display that.

8            Let's take a look at the top there.  You were just

9    asked some questions about this, Mr. Lund.  And to remind you,

10   the subject line says, "Hytera reportedly developing DMR

11   trunking."

12           Mr. Lund, did the fact that Hytera was developing DMR

13   products in 2008 cause Motorola to believe that Hytera had

14   stolen its source code and trade secrets?

15   A.  No, it did not.

16   Q.  It says here that, in that second sentence, "and to ensure

17   that any confidential knowledge that employees took with them

18   to Hytera is protected."  Do you see that?

19   A.  Yes, I do.

20   Q.  The fact that certain employees went to Hytera in 2008,

21   did that cause Motorola to believe that Hytera had stolen its

22   MOTOTRBO source code and confidential trade secret documents?

23   A.  No, it did not.  We had a lot of people leaving at that

24   time, and we had no suspicion of that at all.

25   Q.  And when Ms. Petratos refers to "confidential knowledge,"

Lund - redirect by DeVries

354

1    does that refer to source code and stolen Compass documents?

2         MR. ALLAN:  Objection, your Honor.  Speculation.

3         THE COURT:  Overruled.  You may respond.

4    BY THE WITNESS:

5    A.  Just reply -- it refers to information they know about the

6    products.  Obviously, they worked there for many years and

7    have tribal knowledge about the actual product, source code,

8    and designs.

9    BY MR. DeVRIES:

10   Q.  Let's please take a look at DTX 4565 that you were just

11   asked a moment ago.  This is an email from June of 2010, if we

12   could scroll in on the top.  This is with respect to the email

13   filter.  I know I asked you questions about it previously, so

14   I'll just refer to what you were just asked about.

15        When you refer to in this last sentence, "leaks might

16   have happened through that channel," what are you referring

17   to?

18   A.  So again, this was Van.  We were talking about, referring

19   about leaks could be information about, say, a product that

20   might be released at a trade show.  We had concerns about

21   information about certain products.  But obviously, you can't

22   fit that -- you can't fit source code in that size of an

23   email.  So it was more about information about just what might

24   be happening within Motorola.

25   Q.  And does that refer to stolen source code or a stolen

Lund - redirect by DeVries

355

1   trove of confidential technical documents concerning MOTOTRBO?

2   A.   No.   That was not the original intent of that email audit.

3   Q.   And did you or, to your knowledge, Motorola suspect that

4   Hytera had stolen millions of lines of source code or

5   thousands of confidential MOTOTRBO technical documents at the

6   time of this exhibit?

7   A.   No, not in 2010.

8   Q.   Okay.   Let's please take a look at DTX 4353.   You were

9   just shown this.   This is from October of 2016.

10  A.   Yes.

11  Q.   If we look at the second bullet point here that you were

12  read by counsel, it says, "We are reliving the same

13  situation."   In the third sentence there it says, "We have

14  always been concerned about them gaining visibility to our

15  roadmaps well ahead of announcements."

16         What are roadmaps?

17  A.   So roadmaps are a document or a communication that will

18  highlight future product releases, whether hardware or new

19  products or new software features coming out.   It's usually on

20  a single page.   It's information about the next year or two.

21  Q.   Does "roadmaps" refer to source code?

22  A.   No, they do not.

23  Q.   Does "roadmaps" refer to internal confidential technical

24  specifications?

25  A.   No, they do not.

Lund - redirect by DeVries

1    Q.  And this date of this email, October of 2016, how does

2    that date relate to the investigation that Motorola conducted

3    that led to it filing this lawsuit?

4    A.  It was roughly the time that we were pursuing the patent

5    infringement at the end of 2016.

6    Q.  Okay.  Was it shortly after this email that the massive

7    downloads of confidential technical materials taken to Hytera

8    was discovered?

9    A.  Yes.  Our IT team discovered that shortly after.

10   Q.  Okay.  And if we now look at DTX 4351, another document

11   you were just shown, this was an email from you from December

12   of 2016, and you say, "There is certainly a possibility that

13   there are active leaks with Chengdu leaving.  However, they do

14   not have a lot of the detailed future roadmap."

15          Is that the same kind of roadmap that you were just

16   describing?

17   A.  Yes, about future products coming in in the next year or

18   two.

19   Q.  Okay.  And what is Chengdu?

20   A.  Chengdu is an engineering site that we used in Motorola

21   for software development, Chengdu, China.  It was about a team

22   of 500 engineers there.

23   Q.  And does your email there when you describe active leaks

24   have anything to do with the source code theft and theft of

25   thousands of confidential technical documents by Hytera years

1    earlier?

2    A.  No, it does not.

3    Q.  And how does the timing of this email relate to the

4    investigation and discovery that led to this lawsuit?

5    A.  It was right around the timeframe that we went forward

6    with the lawsuit, end of 2016.

7    Q.  Okay.  You were asked some questions and shown some

8    documents -- in the interest of time, I'll describe them at a

9    high level -- that showed in 2016 that Hytera's sales and

10   profits were growing.  Do you recall that generally?

11   A.  Yes, I do generally.

12   Q.  Okay.  And you were shown a document about Hytera

13   acquiring Sepura.  Do you recall that?

14   A.  Yes, I recall that.

15   Q.  Did Motorola sue Hytera for increasing its sales?

16   A.  No, it did not.

17   Q.  Did Motorola sue Hytera for acquiring Sepura?

18   A.  No, it did not.

19   Q.  Mr. Lund, why did Motorola file this lawsuit?

20           THE COURT:  You need not answer that question.

21           Is there an objection to it?

22           MR. ALLAN:  Yes.  Objection, your Honor.

23           THE COURT:  Sustained.

24   BY MR. DeVRIES:

25   Q.  You were asked about Y.T. Kok's last day of work at

Lund - redirect by DeVries

358

1    Motorola.  Do you recall that generally?

2    A.  Yes, I do.

3    Q.  If we could please display PTX 1156.3.  It's from Y.T.

4    Kok's termination file.

5    A.  I see it.

6    Q.  If we can zoom in on that, when does Y.T. Kok tell

7    Motorola his last day will be?

8    A.  October 3rd.

9    Q.  Of what year?

10   A.  2008.

11   Q.  Okay.  You were asked a number of questions about whether

12   Motorola believes that the source code and internal

13   confidential technical documents that are at issue in this

14   case are really trade secrets.  Do you recall that generally?

15   A.  Yes, I do.

16   Q.  Does Motorola believe that other companies can steal its

17   source code?

18   A.  No, we do not believe that.

19   Q.  Does Motorola believe that other companies can steal

20   thousands of confidential technical documents that its

21   engineers created to implement and design and plan the

22   MOTOTRBO products?

23           MR. ALLAN:  Objection, your Honor.

24           THE COURT:  You may answer.

25   BY THE WITNESS:

Lund - redirect by DeVries

359

1    A.  No, we do not believe that.

2    BY MR. DeVRIES:

3    Q.  Does Motorola consider -- well, actually, let me ask you

4    this:  Do you know approximately how many lines of source code

5    are in the MOTOTRBO products?

6    A.  Approximately, as I said the other day, in the order of

7    millions of lines of code.

8    Q.  And does Motorola consider that source code a trade

9    secret?

10   A.  Yes, we do.

11   Q.  And does Motorola consider the internal technical design

12   documents that describe how to build and implement its

13   MOTOTRBO products trade secrets?

14   A.  Yes, we do.

15   Q.  You were asked a number of questions about the phrase

16   "Motorola registered secret proprietary."  Do you remember

17   that?

18   A.  Yes, I do.

19   Q.  Do Motorola documents have to be labeled "Motorola

20   registered secret proprietary" in order to qualify as a trade

21   secret?

22   A.  No, they do not.

23   Q.  If we could please turn to a document you were shown, DTX

24   4729 -- '21.  That was some IP training from -- do you see the

25   date July 2004?

Lund - redirect by DeVries

360

1    A.  Yes, I do.

2    Q.  Okay.  If we could please turn to Page 69, at the top

3    under the phrase "Trade secrets," there's a sentence.  Could

4    you please read that?

5    A.  "Valuable, confidential, proprietary information that is

6    properly marked and is kept secret."

7    Q.  Okay.  And do the Motorola trade secrets that are at issue

8    in this case qualify for that definition?

9    A.  Yes.  They were valuable, confidential, and proprietary.

10   Q.  Okay.  Now, if we could please take a look at the PTX 1183

11   document you were shown.  This was a protection of proprietary

12   information policy.  Do you recall that?

13   A.  Yes, I do.

14   Q.  And what was the date of this policy?

15   A.  It was effective September 1st, 1991.

16   Q.  Okay.  And what was the date of the particular version of

17   the policy that we're looking at here?

18   A.  Current date is August 19, 1997.

19   Q.  Okay.  And do you know whether -- well, actually, let me

20   do this.

21         MR. DeVRIES:  Your Honor, may I hand up an exhibit?

22         THE COURT:  Yes.

23   BY MR. DeVRIES:

24   Q.  Mr. Lund, I've handed you a document that's been marked as

25   PTX 1643.  Are you familiar with this document?

Lund - redirect by DeVries

361

1   A.   Yes.  It's our POPI document.

2   Q.   Okay.  And if you look at the revision date on the front

3   page, what is that date?

4   A.   October 16th, 2000.

5        MR. DeVRIES:  Okay.  Your Honor, we offer into

6   evidence PTX 1643.

7        MR. ALLAN:  No objection.

8        THE COURT:  It is received.  It may be published.

9        (Plaintiff's Exhibit 1643 received in evidence.)

10  BY MR. DeVRIES:

11  Q.   Okay.  Mr. Lund, is this policy, PTX 1643, a newer version

12  of the policy than the one that Mr. Allan showed you during

13  his cross-examination?

14  A.   Yes, it is.

15  Q.   Okay.  Please turn to Page 13.

16       THE COURT:  How many pages is it?

17       THE WITNESS:  It is approximately 24 pages.

18       THE COURT:  All right.  Proceed.

19  BY MR. DeVRIES:

20  Q.   At the top of that page it says, "Unmarked proprietary

21  information must be protected as if it did have the proper

22  classification marked on it."  What does that mean?

23  A.   Basically, we had a simple statement at work is,

24  everything is considered confidential and proprietary as long

25  as we say so until we say so.  So even if some reason,

Lund - redirect by DeVries

362

1  something wasn't marked with "proprietary" or "confidential,"

2  we should still treat it as confidential and proprietary.

3           MR. DeVRIES:  Your Honor, may I pass up just one more

4  document?

5           THE COURT:  Yes.

6  BY MR. DeVRIES:

7  Q.  Mr. Lund, you've been handed a document marked PTX 2046.

8  Do you recognize that document?

9  A.  Yes, I do.

10 Q.  What is it?

11 A.  It's our information protection policy.

12 Q.  Okay.  There's a release date that's on the front page

13 next to Version 3.  What is it?

14 A.  December 1st, 2010.

15          MR. DeVRIES:  Okay.  Your Honor, we move the

16 admission of PTX 2046.

17          THE COURT:  How many pages?

18          THE WITNESS:  Roughly 99 to 100.

19          THE COURT:  The document is received and may be

20 published.

21     (Plaintiff's Exhibit 2046 received in evidence.)

22          MR. DeVRIES:  If we turn to Page 97 --

23          THE COURT:  Well, that's a good beginning.  Page 97.

24 Proceed.

25          THE WITNESS:  Yes.

Lund - redirect by DeVries

363

BY MR. DeVRIES:

Q.   There's a revision history there.  Do you see this?

A.   Yes, I do.

Q.   When was this policy adopted according to the revision history?

A.   The first version was December 12th, 2006.

Q.   Okay.  And does that line there indicate that it replaced earlier policies?

A.   Yes.  It states it replaces 60, 62, 68, and 69.

Q.   Okay.  Please turn to Page 15.  It's dot 15.

A.   Okay.

Q.   Mr. Lund, did Mr. Allan show you this document during your cross-examination?

A.   There was a different version.

Q.   Okay.  If you take a look at, right here it says, "Legacy information classifications and labels."  Do you see that?

A.   Yes, I see that.

Q.   And it says, "Legacy labels should not be used on new documents."  Do you see that?

A.   Yes, I do see that.

Q.   Okay.  And it says, "Legacy information labeled 'Motorola confidential restricted,' 'Motorola confidential proprietary,' or 'Motorola registered secret proprietary' does not need to be relabeled 'Motorola Solutions confidential restricted' except under the following conditions."

Lund - redirect by DeVries

364

1           Do you see that?

2    A.  Yes, I do.

3    Q.  And it says, "Equivalence of legacy labels."  Do you see

4    that?

5    A.  Yes, I do.

6    Q.  And then in the bottom point there it says, "Motorola

7    restricted secret proprietary must be treated as Motorola

8    Solutions confidential restricted."  Do you see that?

9    A.  Yes, I see that.

10   Q.  Does this document indicate that in 2006, Motorola's

11   policy made a decision no longer to use the legacy labels you

12   were shown on direct?

13   A.  Yes, that's what it states here.

14   Q.  Okay.  You were asked -- I'm sorry.  Let me just do one

15   more.  Mr. Schlaifer, please display PTX 862.1.

16         And it's in your binder, but I'll also show you the

17   part that I'm interested in.  If -- so this is a document,

18   "Matrix Volume II technical requirements specification."  Do

19   you recall that you testified about this on direct

20   examination?

21   A.  Yes, on Thursday.

22   Q.  Okay.  And if we could -- exactly, please, Mr. Schlaifer.

23         Okay.  And what does this document state, if you

24   could please read the first two sentences there?

25   A.      "This document and the information contained in it is

1   confidential information of Motorola and shall not be

2   used or published or disclosed or disseminated outside of

3   Motorola in whole or in part without Motorola's consent.

4   This document contains trade secrets of Motorola.

5   Reverse engineering of any or all of the information in

6   this document is prohibited."

7 Q. Does Motorola believe that only documents that are labeled

8 "Motorola registered secret proprietary" are trade secrets?

9 A. Sorry. Can you repeat the question?

10 Q. Yes. Does Motorola believe that trade secrets must be

11 labeled "Motorola registered secret proprietary" in order to

12 qualify as a trade secret?

13 A. No.

14 Q. Now, you were asked about invention awards. Do you

15 remember those?

16 A. Yes, I do.

17 Q. Okay. And must something be given an invention award in

18 order to qualify as a trade secret at Motorola?

19 A. No, it does not.

20 Q. Okay. If we could please turn back to DTX 4721 that you

21 were shown, and let's please first go back to the Page 69 that

22 we were just looking at. Under "Protection of trade secrets,"

23 there's a second bullet there, and it says, "Registration is

24 not required, but employees have an obligation to keep

25 information secret."

1    What does it mean when it says "registration is not

2  required"?

3  A.   As I explained, out of the four intellectual properties,

4  the trade secrets was the one that you do not have to register

5  unlike trademarks or patents or copyrights.

6  Q.   Okay.  Now, if we turn to Page 64 where you -- which you

7  were shown, at the top it says, "Patent awards."  Do you see

8  that?

9  A.   Yes, I do.

10  Q.   Why are these called patent awards?

11  A.   They're awards given for creative engineering ideas or

12  ideas at the company, and there's a reward and recognition

13  given for those ideas.

14  Q.   And who are those applications given to at Motorola, what

15  kind of a committee?

16  A.   We -- across the company, we have patent committees of

17  usually our advanced or architects in the organization.

18  Q.   And were you a member of the patent committee?

19  A.   Yes.  At one time in my career, I was.

20  Q.   Okay.  And must trade secrets -- let me see if I can state

21  that in a more clear way.  I'll take that back.

22    At Motorola, is the belief that you must submit

23  something to a patent committee in order to have trade secret

24  protection?

25  A.   No, that's not our belief, and that's not what we

Case: 1:17-cv-01973 Document #: 784 Filed: 12/20/19 Page 136 of 197 PageID #:52245
Lund - redirect by DeVries
367

1   practiced in our patent committees at the time.

2   Q.  Okay.  And do you recall that you were shown certain

3   documents that said "disposition trade secrets"?

4   A.  Yes, I do.

5   Q.  And that those documents were provided by the patent

6   committees or patent committee?

7   A.  Yes.  They were reviewed at a patent committee.

8   Q.  And what does it mean when a patent committee decides

9   "disposition trade secret"?

10  A.  That means it was a good idea, and they decided not to put

11  it out in the public and because there's no easy way of

12  detecting it, and so they give it that status in the patent

13  committee.

14  Q.  If we could please put up DTX 4556 which you were asked

15  about.

16          THE COURT:  Are you coming to a stopping point?

17          MR. DeVRIES:  I am, your Honor.  I think I can do it

18  in approximately five to six minutes.

19          THE COURT:  Take seven.

20          MR. DeVRIES:  Thank you.

21  BY MR. DeVRIES:

22  Q.  Okay.  So this is an email that you were shown.  What is

23  the subject line of this email?

24  A.  It's "Year-to-date patent performance, December 2008."

25  Q.  Okay.  And then below that, there's some text.  What kind

Lund - redirect by DeVries

368

1   of performance is referred to in that text?

2   A.  It's our patent performance at the timeframe.

3   Q.  Okay.  And then you were shown, I believe it's the next

4   page.  And there was a row that you were shown by Mr. Allan of

5   zeros next to "trade secrets."  Do you recall that?

6   A.  Yes, I do.

7   Q.  Okay.  And above that, there are different columns and

8   there are some additional numbers, but let me ask you about

9   this.  The zeros that are next to the trade secret row there,

10  do those zeros mean that Motorola didn't have any trade

11  secrets in its source code or confidential technical documents

12  in 2008 at the time of this document?

13  A.  No, it did not mean that.

14  Q.  Okay.  And do you know whether what this meant is that

15  ideas that had been submitted for patent applications had been

16  given that trade secret disposition that you just described?

17  A.  Right.  And that's where I said we didn't use that

18  category at all, at all or very infrequently.

19  Q.  We can take that down, Mr. Schlaifer.

20          You were shown a document that had a list of certain

21  trade secrets.  Do you remember that?

22  A.  Yes, I do.

23  Q.  And you were asked whether the trade secrets in this case

24  were on that particular document.

25  A.  Correct.

Lund - redirect by DeVries

1   Q.   Okay.  And is there a requirement at Motorola for trade

2   secret protection, for the trade secret to be listed on the

3   document that you were shown?

4   A.   No, there's no requirement.

5   Q.   Okay.  And do the trade secrets at issue in this case

6   involve some number of confidential technical documents and

7   source code that you considered to be trade secrets?

8   A.   Yes, it does.

9   Q.   Okay.  You were asked about copyrights.  Do you remember

10  that?

11  A.   Yes, I do.

12  Q.   And you were shown something called a deposit copy?

13  A.   Yes, I recall that.

14  Q.   And I think you said that deposit copy included something

15  like 50 pages of source code.  Do you remember that?

16  A.   Yes, I recall that.

17  Q.   And remind us again how many lines of source code there

18  are in Motorola's MOTOTRBO source code.

19  A.   Millions and millions of lines of code.

20  Q.   Did the deposit copy include all of the source code for

21  the MOTOTRBO products?

22  A.   No.  You're only required to give a very small sample of

23  that code.

24  Q.   Okay.  And could a competitor use the small sample of code

25  that you just described to build a competing product like

1    Hytera did here?

2            MR. ALLAN:  Objection, your Honor.  Speculation.

3            THE COURT:  Sustained, form of the question.

4    BY MR. DeVRIES:

5    Q.  Okay.  Let me try it a different way.  Could -- could

6    Motorola, to your knowledge, use just those 50 lines of source

7    code in the deposit copy to build its MOTOTRBO products?

8    A.  No, very doubtful.  It's a very small sampling of code.

9    Q.  Okay.  And then if I could show you DTX 4941 which was one

10   of the deposit copies you were shown, and on the second page,

11   there's some Motorola source code, and it has the words

12   "Motorola confidential proprietary" on the top.  Do you see

13   that?

14   A.  Yes, I do.

15   Q.  Do you know whether Motorola would have been permitted to

16   alter its source code as part of providing its deposit copy to

17   the copyright office?

18           MR. ALLAN:  Objection, your Honor.

19           THE COURT:  Sustained.  Calls for speculation.

20   BY MR. DeVRIES:

21   Q.  And finally, you've been asked about certain DMR-related

22   documents that predated the time that you worked in Penang.

23   Do you remember that?

24   A.  Yes, I do.

25   Q.  Okay.  And approximately how many years ago did you begin

1    working on DMR products?

2    A.   When I was -- in 2007 when I started in Penang, my team

3    was working on DMR products.  However, you know, as we said,

4    we've leveraged some of the source code that I had worked on

5    previously at ASTRO before that.

6    Q.   Okay.  And what is your current role again, responsibility

7    for DMR products, if any?

8    A.   Yes.  Today, I'm responsible for all the Motorola --

9    MOTOTRBO products worldwide.

10   Q.   Okay.  And how, if at all, are you familiar with DMR

11   documents that predated the 2007 date 12 years ago when you

12   started working on DMR products?

13   A.   As I showed you in that process waterfall flow, we still

14   use those documents as far as the existing and previous

15   designs and code.  We continually modify older documents and

16   design and go back.  If we have to make a design change, we'll

17   go back to those original documents.  So we keep that as a

18   living, breathing document for the entirety of the MOTOTRBO

19   product line.

20             MR. DeVRIES:  Thank you, Mr. Lund.

21             Your Honor, no further questions.

22             THE COURT:  All right.  You may step down.

23         (Witness excused.)

24             THE COURT:  Do you have another witness ready to go?

25             MR. ALPER:  We do, your Honor.

1          THE COURT:  Members of the jury, let's take a seventh

2     inning stretch although it's not the seventh inning.

3          All right.  We don't want to overdo it.  Thank you.

4          Let's call the witness.

5          MR. ALPER:  Plaintiff calls Scott Shepard to the

6     stand, your Honor.

7          THE COURT:  Members of the jury, you have heard the

8     Court rule on the admissibility of documents.  And when you go

9     in to deliberate, I want to tell you once again that you will

10     have copies of all of the exhibits that have been received in

11     evidence.  And you will receive them in their entirety as they

12     were admitted into evidence.

13          MR. LAWLESS:  Your Honor, may the witness take the

14     stand?

15          THE COURT:  Yes, please.

16          THE CLERK:  Please raise your right hand.

17     (Witness sworn.)

18          THE WITNESS:  I do.

19          THE COURT:  Please be seated.

20          MR. LAWLESS:  Your Honor, Chris Lawless on behalf of

21     Motorola.

22          THE COURT:  Proceed, counsel.

23          MR. LAWLESS:  Your Honor, the parties conferred, and

24     we've got notebooks for the jurors in case your Honor would

25     permit them to take notes.  We can pass them out if the

Shepard - direct by Lawless

373

1      Court --

2              THE COURT:  Well, it's a little late now to be

3      talking about note taking.  So any agreement or consent with

4      respect to note taking at this juncture is denied.

5              MR. LAWLESS:  May I proceed, your Honor?

6              THE COURT:  Please proceed.

7              SCOTT SHEPARD, PLAINTIFFS' WITNESS, SWORN

8                        DIRECT EXAMINATION

9      BY MR. LAWLESS:

10     Q.  Good afternoon, sir.

11     A.  Good afternoon.

12     Q.  Please introduce yourself.

13     A.  Hello.  I'm Scott Shepard.

14     Q.  Where do you work?

15     A.  I work at Motorola Solutions.

16     Q.  What is your job title today at Motorola?

17     A.  Today, I am the chief information security officer.

18     Q.  Okay.  High level, what do you do at Motorola?

19     A.  At a high level, my job is to protect our intellectual

20     property and safeguard our computer resources.

21     Q.  How long have you worked at Motorola?

22     A.  I have worked at Motorola 25-plus years.

23     Q.  Where is your job at Motorola based today?

24     A.  Today, my job is based in Chicago, Illinois.

25     Q.  Has your job at Motorola always been in Chicago?

Shepard - direct by Lawless

374

1    A.   No, it has not.  It started in Phoenix.

2    Q.   How did you get out to Chicago and work here today?

3    A.   Sure.  I started in Phoenix in 1994.  In 2001, I moved to

4    Motorola for a promotion to work underneath Bill Boni who was

5    the chief information security officer at the time.  The nice

6    thing about the promotion is not only professionally I was

7    able to move, my family, my wife is from Minnesota, and so she

8    got to move closer to be near her family as well.

9            Since then -- well, we have four kids.  Two go to

10   college, one in Minnesota at St. Mary's and then one in

11   Peoria, Illinois, at Bradley.  And the other two kids are in

12   grade school -- well, junior high and high school.

13   Q.   Do you have any college degrees?

14   A.   Yes, I do.  I have a master's degree that I got in 2000

15   from Arizona State University, and that's a master's in

16   computer science.  I have a bachelor's degree of engineering

17   in computer science from Northern Arizona University that I

18   received in 1994.

19   Q.   What inspired you to join Motorola?

20   A.   It really started a long time ago.  Originally, I was born

21   in San Diego.  My dad, who moved to Phoenix in the early '70s,

22   joined Motorola at that time, so I'm a second generation

23   Motorolan.  Growing up, I got to go to the "Bring your child

24   to work day."  I got to see all the innovation and everything

25   that Motorola did.  So that was just kind of a natural thing.

Shepard - direct by Lawless

375

1    What was interesting is my dad has a couple patents.

2              THE COURT:  All right.  That's enough of an answer.

3    Let's move on here, counsel.

4              THE WITNESS:  Sorry.

5    BY MR. LAWLESS:

6    Q.  Mr. Shepard, what was your job when you joined Motorola in

7    1994?

8    A.  My job in 1994 was to -- part of the concurrent

9    engineering training program where engineers all came in.

10   Then for three months, we went through and understood the

11   different kinds of policies and how to collaborate and develop

12   as one team, and then I joined the IT organization.

13   Q.  At a high level, what did that IT organization do?

14   A.  The IT organization ran the information technology systems

15   of that organization.  There was also an information security

16   organization which at a high level protected intellectual

17   property and safeguarded our computer resources.

18   Q.  Okay.  Moving forward to 2008, what was your job at

19   Motorola?

20   A.  In 2008, I was the deputy chief information security

21   officer reporting to Bill Boni.

22   Q.  Okay.  In your current job as Motorola's chief information

23   security officer, do you work in a particular group?

24   A.  Yes.  I am part of the information security group as well

25   as the IT infrastructure group.

Shepard - direct by Lawless

1   Q.   Who's the leader of that group?

2   A.   I lead both the information security group and the IT

3   infrastructure group.

4   Q.   Do you have any professional training in that industry?

5   A.   Yes.  I have two security certifications.  The first one

6   is the certified information systems security professional.

7   The second certification is the certified information security

8   manager.  Both of these are nationally recognized

9   certifications for information security.

10  Q.   Okay.  As the chief information security officer, simple

11  terms, what is your job today?

12  A.   My job in simple terms again is to protect the

13  intellectual property of our company and safeguard our

14  computer resources.

15  Q.   What kind of information is your group responsible for

16  protecting?

17  A.   All the internal information that we produce in the

18  development of our products, the sale of that product as well

19  as marketing of it, so everything from trade secrets to source

20  code to design documents, marketing documents; pretty much

21  everything that we do to run the business including the

22  financial systems.

23  Q.   How sensitive is that data?

24  A.   It is very sensitive.

25  Q.   Is it important to Motorola to protect that data?

Shepard - direct by Lawless

377

1    A.  Yes, it is.

2    Q.  Why?

3    A.  Well, it is all of our innovation.  If you look back at

4    Motorola's history, we've spent billions of dollars in

5    research and development of the products that we have.  So

6    it's my job to ensure that that research is protected and so

7    we can take it to market.

8    Q.  Okay.  Who or what are you protecting that information

9    against, Mr. Shepard?

10   A.  I'm protecting that information from both external threats

11   as well as internal threats.

12   Q.  Okay.  Let's focus on external threats to start.  What is

13   an external security threat?

14   A.  An external security threat is any threat where that --

15   from outside the company tries to come inside the company.

16   And that can range from cyber criminals that want to cause

17   fraud or install malware.  It also could range up to nation

18   states and foreign governments that are trying to break in to

19   steal the IP.

20   Q.  How sophisticated can those external threats be?

21   A.  These external threats are very sophisticated.  Again,

22   they are backed by nations, and they have almost unlimited

23   amount of budget to try to break into the company.

24   Q.  Okay.  Let's talk about the internal security threats.

25   What are those?

Shepard - direct by Lawless

378

A.   Internal security threats are threats from people within

the company or they're inside the company.  They can be from

people that inadvertently share information outside that they

shouldn't or through malicious intent, take information with

them.

Q.   Do the external threats and the internal threats ever

overlap?

A.   They do overlap.  In some cases, the external threat will

try to recruit or hire an internal threat to steal

intellectual property.

Q.   Is there a name or a term in your industry that you use to

refer to those types of threats?

A.   Yes.  We refer to it as industrial espionage.

Q.   Okay.  Has a person or group ever improperly taken

Motorola's confidential information?

A.   Yes, they have.

Q.   And how did you react to that?

A.   It's difficult.  We work very hard in putting the right

kinds of proactive security measures in place to protect.  And

when they do get through, very seldom, but when they do get

through, I feel like we've lost all that intellectual property

and all the innovation that we do.

Q.   How hard does -- your group and you, how hard do you work

to protect against that happening?

A.   So it's a 24 by 7 by 365 job.  A lot of the threats that

Shepard - direct by Lawless

379

1   we face tend to work during holidays within the U.S. so that

2   they can target us when we're probably at our most vulnerable

3   spot and we can't react.

4   Q.  I'd like to turn to your involvement in this case in your

5   job as chief information security officer.  Were you involved

6   in investigating a company called Hytera?

7   A.  Yes, I am.

8   Q.  When was that?

9   A.  I first became involved at the end of 2016.

10  Q.  What did that investigation focus on?

11  A.  That investigation focused on the potential patent

12  infringement by Hytera.

13  Q.  Okay.  What was your role in the investigation?

14  A.  So my role in the investigation was to collect data, the

15  information data that you see in our systems, and provide it

16  back to Legal.

17  Q.  Did the investigation focus on any specific people?

18  A.  It focused on three employees or at the time, they were --

19  well, former employees in 2016.  So the three employees were

20  G.S. Kok, Y.T. Kok, and Samuel Chia.

21  Q.  Okay.  And did your group actually do something to help

22  that investigation along?

23  A.  Yes.  We pulled access reports from the Compass system.

24  Q.  Okay.  What is a Compass access report?

25  A.  A Compass access report is a download of information in a

Shepard - direct by Lawless

1   Compass repository.

2   Q.   What is the Compass repository?

3   A.   I think of the Compass repository as a file sharing system

4   where engineers can push documents up to it, collaborate, and

5   then pull documents down.

6   Q.   When did Motorola first start using the Compass system?

7   A.   We first started using the Compass system in 1995.

8   Q.   And can you explain just at a high level, simple terms,

9   how Motorolans use the Compass system?

10  A.   Sure.  So if there -- we have engineers all over the

11  world.  And so an engineer, say, in Illinois was to update a

12  document, they would push it up to the Compass system, and

13  then an engineer maybe in Israel or Malaysia would pull that

14  document down.  They would edit that document and then push

15  the document back up for the engineer in Illinois to work.

16          So it allows us to work kind of on a 24 by 7, if you

17  will, and collaborate to create the products we make.

18  Q.   Where are the computer servers for the Compass system

19  located?

20  A.   The computer servers for the Compass system are located in

21  the United States.

22  Q.   Okay.  What Motorola employees actually get access to the

23  Compass system?

24  A.   Only employees that need access to the Compass system.

25  There are controls based on the user ID and password that

Shepard - direct by Lawless

381

1    restrict down to just those that need access to Compass

2    itself.

3    Q.   And for the Motorola employees who can access this system,

4    can they just go to any file or folder that they want to?

5    A.   No, they cannot.  Even within, once you have access to the

6    system, there's further access control restrictions that will

7    allow you to only access what you need.  And it allows other

8    individuals to restrict it down just to what you need to do

9    the work.

10   Q.   What type of files are stored in the Compass system,

11   Mr. Shepard?

12   A.   The type of files that we store in there are like design

13   documents, research documents.  We do store some source code

14   but it's not our primary system to store source code.  We

15   store roadmaps, billing information, pricing, so everything

16   that we do to kind of run the business, if you will.

17   Q.   How sensitive are those documents?

18   A.   They're very sensitive.

19   Q.   In 2008, how much data was stored in the Compass system?

20   A.   In 2008, there were roughly 82 terabytes of data stored in

21   the Compass system.

22   Q.   Okay.  What's a terabyte for those of us who aren't in the

23   IT industry?

24   A.   Sure.  A terabyte, if you were to take all those documents

25   and print them out and lay them down on the ground, a terabyte

Shepard - direct by Lawless

382

1   would be -- or 82 terabytes would range from, say, Chicago all

2   the way to Los Angeles if you laid them out.  So that gives

3   you kind of a visual of it, if you will.

4   Q.   Does the Compass system have any security features?

5   A.   Yes, it does.  The Compass system has multiple security

6   features around access control.

7   Q.   And what does that mean?

8   A.   Restricting access just to users that need to use that

9   information both at the system level and then inside the

10  system at the different hierarchical folder structures.

11  Q.   Okay.  Can you also use the Compass system as part of an

12  investigation?

13  A.   Yes, we can.

14  Q.   And how do you do that just at a very high level?

15  A.   At a high level, we made a couple customizations to

16  Compass that allowed us to determine who was accessing what

17  documents in the Compass system, and then it records it into

18  the system itself.  So it's kind of kept so we know who's

19  accessing what.

20  Q.   Now, you referred to that as a customization.  Why did you

21  say that?

22  A.   The underlying product did not have that feature, so we

23  then customize it so we could include additional security

24  beyond the security that came with the product.

25  Q.   Okay.  If we looked at a Compass report, what would that

Shepard - direct by Lawless

383

1  show?

2  A.  A Compass report would show a user's access with a date

3  stamp when they accessed a particular item or document within

4  Compass.

5  Q.  All right.  Now, you've been saying "access."  Is there

6  another word that the general public uses to describe what

7  that means?

8  A.  Sure.  So when you access the Compass system, it is a web

9  system, and it then pulls the system down or pulls the

10  document that you accessed down to your machine.  So it's also

11  referred to as downloading.  So you're downloading data from

12  the Compass system to your local machine.

13  Q.  All right.  Quickly, I'd like to talk about how your team

14  generates these Compass reports.  What is the first step?

15  A.  Before running the Compass access report tool, we need

16  approval to do so because it only can be done under an

17  investigation in response to that investigation.

18  Q.  Who do you need approval from before you can generate a

19  Compass report?

20  A.  There are three groups that require approval.  It's legal,

21  HR, and the office of ethics and compliance.

22  Q.  All right.  We'll come back to those groups.  Let's go to

23  the second step.  What's the second step to generate a Compass

24  report?

25  A.  The second step is beyond the approval, we need any

Shepard - direct by Lawless

1   details from who we want to run the Compass report on.  We

2   also need to know both a start date and an end date or a span

3   of time in which the report should be generated.

4   Q.  Then what does your group do with that information?

5   A.  We write a customized program that will input that data

6   and then go into the Compass system and pull the data that is

7   already in the system out into the form of a report that meets

8   those variables.

9   Q.  Okay.  Start to finish, how long does it take to generate

10  a Compass report?

11  A.  It varies greatly.  It could be as little as a couple

12  hours up to, we've had Compass reports take multiple days

13  because of the time to run it.

14  Q.  Okay.  I'd like to turn to Compass reports that are

15  related to this case.  At some point, did your team get a

16  request to generate Compass logs for former Motorola employees

17  Sam Chia and Y.T. Kok?

18  A.  Yes, we did.

19  Q.  When did you get that request?

20  A.  We got that request at the beginning of 2017.

21  Q.  And who did that request come from?

22  A.  That request came from Legal.

23  Q.  Okay.  Do you know why the legal department was requesting

24  your team to pull Compass logs?

25  A.  Most of the time when they make that request, it's for

Shepard - direct by Lawless

385

1  their legal investigation, and so we're supporting them in

2  that pull.

3  Q.  And for this particular investigation, are you aware of

4  what that reason was?  Was that --

5  A.  Yes.  When I talked to the lawyers at the end of '16, they

6  referred to a product released that they had seen by Hytera in

7  2015, and they wanted us to then pull those Compass reports at

8  early 2017 for those individuals.

9  Q.  And what did that separate investigation relate to?

10  A.  That related to potential patent infringement for the

11  products that we make.

12  Q.  Okay.  Did your team ultimately generate Compass logs for

13  Sam Chia and Y.T. Kok?

14  A.  Yes, we did.

15  Q.  And are Compass reports generally recorded as a regularly

16  conducted activity at Motorola?

17  A.  Yes, they are.

18  Q.  Now, you've got some binders, I believe, in front of you.

19  Are those up there?

20  A.  I actually do not have any binders in front of me.

21          MR. LAWLESS:  Your Honor, may we approach?

22          THE COURT:  Yes.

23          THE WITNESS:  Thank you.

24  BY MR. LAWLESS:

25  Q.  All right.  Mr. Shepard, if you could turn to PTX 1416 in

Shepard - direct by Lawless

386

1    the larger Compass log binder.  1416.  Are you there, sir?

2    A.  I am.

3    Q.  All right.  Do you recognize that document?

4    A.  Yes.  This is the Compass access report for Samuel Chia.

5    Q.  How do you know that?

6    A.  At the top of the document, there's an indication of a

7    user ID, CSC082, which is Samuel Chia's user ID.

8    Q.  Is this the Compass report that your team pulled and

9    provided to Legal?

10   A.  Yes, it is.

11          MR. LAWLESS:  Your Honor, permission to -- or

12   withdrawn.  Your Honor, Motorola moves for PTX 1416 to be

13   admitted into evidence.

14          THE COURT:  The exhibit is received.  It may be

15   published.

16      (Plaintiff's Exhibit 1416 received in evidence.)

17   BY MR. LAWLESS:

18   Q.  All right.  Mr. Shepard, do you see that on your screen?

19   A.  I do.

20   Q.  Where is Mr. Chia's user ID?

21   A.  If you look at the top of the document, you will see that

22   the user ID says "CSC082."  That is the user ID for Samuel

23   Chia.

24   Q.  And how do you know that?

25   A.  We have another system that tracks every user ID to an

Shepard - direct by Lawless

387

1  employee name, and that is his user ID.

2  Q.  All right.  Mr. Schlaifer, if you could blow up, please,

3  the column headers and maybe row two as well.

4       Mr. Shepard, I'd like to just walk through, and let's

5  orient us what we're looking at here.  Column A is labeled

6  "Data ID."  What does that mean?

7  A.  The data ID is a unique number for every item that is in

8  Compass.  You can think of it as a serial number.

9  Q.  Column B is labeled "Name."  What is that?

10 A.  That is the name of the item stored in Compass.

11 Q.  Column C -- and I'd like to spend a little bit of time on

12 this one -- this is labeled "Last access."  What does that

13 mean?

14 A.  That is the most recent time that, in this case, Samuel

15 Chia accessed the item that is identified in Column B.

16 Q.  And what do you mean by "the last time"?

17 A.  The report itself is run, and so it will record the last

18 time or the most recent time that Sam -- in this case, Samuel

19 Chia accessed the item.

20 Q.  Okay.  We'll keep this column in mind.  Let's look at

21 Column D, "Count."  What is that column?

22 A.  "Count" is the number of times that the employee, in this

23 case, Samuel Chia, accessed the item.  So over the span of the

24 report, which was many years, from 2003 until after his

25 employment, he accessed the item "broadband" only once, and

Shepard - direct by Lawless

388

1    the last time or the most recent time that he accessed it was

2    May 21st of 2008 at 2321.  It's military time, so at 11:21

3    p.m.

4    Q.   Okay.  Now, for someone who is normally working on a

5    document, what do you see in the "count" column?

6    A.   When you normally work on a document as I mentioned

7    explaining the Compass system, you will see multiple counts.

8    It can be anywhere from 50 to 100.  Think of engineers that

9    upload documents, pull down documents, work on the documents,

10   re-upload them, re-pull them down.

11          So as you work and collaborate, you'll see a much

12   higher number than 1.  1 is simply the only time that Samuel

13   Chia accessed this document.

14   Q.   And then if we read the column D, "Count," with Column C,

15   "Last access," reading those two together, what does that tell

16   us?

17   A.   That tells us that in this case, Samuel Chia accessed the

18   broadband only once, and that was the last time that Samuel

19   Chia accessed that document.

20   Q.   All right.  Column E, the last column, is labeled "POPI,

21   confidentiality level."  What does that mean?

22   A.   That represents the marking that we did on the internal

23   Compass system.

24          I will add that we did another customization to

25   Compass.  We added in a marking for the documents itself.  So

Shepard - direct by Lawless

389

1   when you uploaded the document, you could select what the

2   confidentiality level is allowing the engineer to classify the

3   document within the system, which is outside the document

4   itself.

5   Q.   Okay.  If we read down this column E, would we ever see

6   the words "trade secret"?

7   A.   No, you wouldn't.

8   Q.   Would we ever see the words "patented"?

9   A.   You would not.

10  Q.   Would we ever see the words "copyrighted"?

11  A.   You would not.

12  Q.   Would we ever see the words "trademarked"?

13  A.   You would not.

14  Q.   Can you explain why that is?

15  A.   We -- our classification levels at this time were three

16  levels, which is "general purpose," "internal use only," and

17  "Motorola Solutions confidential restricted."  So those are

18  the labels that we have for the documents in the system.

19  Q.   Okay.  When your team is doing an investigation is, do you

20  focus on the confidentiality column?

21  A.   We do not.

22  Q.   Why is that?

23  A.   It is our job to generate the data and then provide the

24  data back for the investigative team to investigate.

25  Q.   Okay.  Before we get into some specific examples, I want

Shepard - direct by Lawless

1    to do one more thing to orient us.  Mr. Schlaifer, could you

2    please blow up row 25?

3           And you see, Mr. Shepard, the count is listed as 154.

4    Could you explain what that means?

5    A.  So 154 means that Samuel Chia accessed the item

6    "Engineering and technical domain, dash, LTD" 154 times during

7    his career at Motorola.  And if you look, the last time or the

8    most recent access was on May 14th, 2008, at 10:38 p.m.

9    Q.  Okay.  We can take that down, Mr. Schlaifer, please.

10          Mr. Shepard, what does it mean in the Compass report

11   if you observe a count of 1 row after row after row?

12   A.  If you observe a count of 1 row after row, what that is

13   showing to me is that you are simply downloading the

14   information.  So the access report shows the downloads of

15   multiple documents.  We refer to that internally as a mass

16   download, so multiple documents coming down once with no other

17   counts or anything else tied.

18   Q.  And if we combine the count column and the last access

19   column, and the last access column for a single minute shows

20   row after row with a count of 1, what does that indicate to

21   you?

22   A.  That indicates to me that the individual is downloading

23   multiple documents within that one minute.  And because the

24   count is 1, they're simply downloading these documents.

25   They're not actually working on them and re-uploading them.

Shepard - direct by Lawless

1    Q.  Mr. Shepard, do you know when Sam Chia's last month of

2    work was at Motorola?

3    A.  Yes.  He put his resignation in on May 8th.

4    Q.  All right.  Let's look at some examples in May 2008 for

5    Mr. Chia's Compass log.  So Mr. Schlaifer, could we have Page

6    3 and specifically, Rows 83 to 111?

7            Do you see those, Mr. Shepard?

8    A.  I do.

9    Q.  All right.  Starting at the bottom of the blowup here,

10   could you walk us through what you observe looking at the last

11   access time and the count column?

12   A.  So if you were to look at the -- at 1:45 a.m.

13   specifically, you would see that Samuel Chia accessed 12

14   documents -- I'm sorry, 13 documents only once all within a

15   minute.

16   Q.  And if we go to the next minute, what happened?

17   A.  The next minute, it looks like he downloaded another 13

18   documents all within that minute as well, and he only

19   downloaded them once.

20   Q.  What do you call that?

21   A.  They call that mass downloading.

22   Q.  How sensitive are these documents?

23   A.  They are all sensitive.  The employees that uploaded them,

24   some marked them as "Motorola Solutions internal."  Some

25   marked them as "Motorola Solutions confidential restricted."

Shepard - direct by Lawless

392

1    But all of that data is sensitive for us.

2    Q.   Let's stay on May 7th and look at a different example, if

3    you could turn to Page 8, sir.  And Mr. Schlaifer, could you

4    please blow up rows 513 through 569?

5         Do you see that blowup, Mr. Shepard?

6    A.   I do.

7    Q.   All right.  Again, starting at the bottom of the callout

8    looking at the last access and the count column, can you

9    explain what you observe?

10   A.   So on 5/7 at 000, if you were to take that minute, it

11   looks like there were 28 documents that were downloaded only

12   once during the single minute on 5/7/2008 by Samuel Chia.

13   Q.   What happened the next minute?

14   A.   Looking at the next minute, 24, another 17 documents were

15   downloaded the next minute and only once by Samuel Chia.

16   Q.   What happened the next minute?

17   A.   Looking at the top, it looks like another 11 documents

18   were downloaded once and only once by Samuel Chia.

19   Q.   And looking at Column E, how sensitive were those

20   documents, Mr. Shepard?

21   A.   The engineers in here labeled every one of these documents

22   "Motorola Solutions confidential restricted."

23   Q.   Okay.  Now, just flipping through the log yourself,

24   focusing on May 7th, 2008, do you see other instances of mass

25   download?

Shepard - direct by Lawless

1    A.   Yes, I do.

2    Q.   Okay.  Mr. Schlaifer, you can take that down, please.

3              Mr. Shepard, can you explain how Mr. Chia could

4    accomplish this mass downloading?  If we picture him sitting

5    at his computer, can you explain what he would have to do to

6    mass download?

7    A.   Well, there are too many documents to be able to click on

8    every document and download them from a web browser, so he

9    installed a piece of software that then connected to Compass

10   and did the multiple downloads over that period of time.

11   Q.   All right.  That was May 7th.  Let's go one day earlier

12   and look at May 6th, 2008.  Could you please turn to Page 9 in

13   your binder?

14             And Mr. Schlaifer, if I could ask you to blow up rows

15   630 through 684.

16             Do you see that, Mr. Shepard?

17   A.   I do.

18   Q.   All right.  And we'll pick up some steam here, but

19   starting at the bottom again, combining the last access and

20   the count, can you explain what you observe.

21   A.   It says on 5/6/2008 at 11:50 p.m., Sam Chia downloaded

22   four documents only once.

23   Q.   What happened the next minute?

24   A.   Another five documents only once the next minute.

25   Q.   And if you look in the log for yourself, do you see other

Shepard - direct by Lawless

394

1   instances of mass download on May 6th, 2008, by Mr. Chia?

2   A.  I do.

3   Q.  How sensitive or confidential are those files?

4   A.  All of these documents are sensitive.  Some of these are

5   "Motorola Solutions internal," and some of these are labeled

6   as "Motorola Solutions confidential restricted."

7   Q.  All right.  One more day, Mr. Shepard.  Let's go to May

8   5th, 2008, if you could turn to Page 20.

9        And Mr. Schlaifer, let's blow up rows 1598 through

10  1630.

11       All right.  Same exercise, Mr. Shepard.  Can you tell

12  us what you observe?

13  A.  Sure.  1598 through -- so again, over a two-minute period,

14  so if you look at the first minute around 1630 through 1611,

15  so there are 20 -- sorry, 30 documents downloaded within one

16  minute at -- on May 5th, 2008, at 7:12 p.m.

17  Q.  And what do you call that?

18  A.  I call that a mass download.

19  Q.  And looking in the log for yourself on May 5th, do you see

20  other instances of mass download by Mr. Chia?

21  A.  I do.

22  Q.  Okay.  Mr. Shepard, how many pages of this log does it

23  take to record what Mr. Chia was downloading just on May 5th,

24  2008?

25  A.  One, two, three -- there are eight pages here.

Shepard - direct by Lawless

1   Q.  And approximately -- I'm not going to ask you to count

2   them all, but approximately how many files was that on May

3   5th, 2008?

4   A.  It looks to be about 600 files on the one day.

5   Q.  Okay.  Let's go to the next day, May 6th.  How many pages

6   of this log does it take to show Mr. Chia's activity on that

7   day?

8   A.  There are seven files -- or seven pages.

9   Q.  And approximately how many files?

10  A.  It looks to me just over 500 files.

11  Q.  Okay.  And one last time, go to the next day, May 7th,

12  2008.  How many pages of the log does it take to capture

13  Mr. Chia's downloading?

14  A.  There are seven pages as well.

15  Q.  And approximately how many files?

16  A.  It looks to be 500 files.

17  Q.  Okay.  As Motorola's chief information security officer,

18  is it your observation that this is normal downloading

19  activity?

20  A.  This is not normal downloading activity.

21  Q.  Okay.  So we just looked at May 5th, 6th, and 7th, 2008.

22  What did Mr. Chia do the next day, Mr. Shepard?

23  A.  On May 8th, he submitted his resignation.

24  Q.  Is there a reason from an information security standpoint

25  that someone would commit mass downloading and then turn in

Shepard - direct by Lawless

396

1    their resignation?

2    A.   The only -- the only reason we have through other --

3    assisting with other investigations is Samuel Chia wanted to

4    collect this information to take it on to his next career.

5    Q.   All right.  One last point on this log, Mr. Shepard.  I'd

6    like to compare Mr. Chia's downloading in his last month at

7    work to earlier when he was at Motorola, so if you could turn

8    to Page 156.

9    A.   Okay.

10   Q.   What is the date that is -- what is the earliest date in

11   Mr. Chia's Compass log?

12   A.   The last line is August 12th of 2003.

13   Q.   Okay.  And on this single page in Mr. Chia's Compass

14   report, what length of time of activity is captured?

15   A.   Let me look at the top one, if you could pull that,

16   Mr. Schlaifer.

17        So what that covers in one single page is basically

18   four years of downloading.

19   Q.   Thank you, Mr. Schlaifer.  We can take that down.

20        So Mr. Shepard, high-level observations, what did you

21   observe from reviewing Mr. Chia's Compass report?

22   A.   I observed that toward the end of his career at Motorola

23   while an employee and having access to this data, he

24   downloaded 1600-plus files and then turned his resignation in

25   the day afterwards.

Shepard - direct by Lawless

Q.   And how did that compare to his download activity at the beginning of his career?

A.   Compared to the one page over four years, I would say that he was not mass downloading when he started but at the end of his career at Motorola Solutions.

Q.   Is that a serious matter from an information protection perspective?

A.   Absolutely.

Q.   Why?

A.   Because all of this is our innovative work and our intellectual property, and he was simply collecting it to take it with him.

Q.   Okay.  So let's be very clear about something.  Can you tell from the Compass log whether Mr. Chia ever took those files off of his Motorola computer?

A.   I cannot.  These logs show that he accessed the system and pulled them down to his local machine.

Q.   All right.  Is there anything that would show you that extra step of whether files were transferred off of Mr. Chia's computer?

A.   No, there's not in 2008.

Q.   Okay.  And can you explain that?

A.   Yeah.  We have technology that's been implemented after then that allows us to look at USB writes as well as other movement of data.  That technology didn't exist in the version

Shepard - direct by Lawless

398

1   of Symantec that we were running, our antivirus software.  So

2   we didn't have the technology to know what happened with the

3   data after it was downloaded to his machine.

4   Q.  Okay.  Let's pick up some steam here, Mr. Shepard.  I'd

5   ask you to flip to PTX 1417 in your binder.

6   A.  Sure.

7   Q.  Do you recognize that document?

8   A.  I do.

9   Q.  What is it?

10   A.  It is -- I'm sorry.

11   Q.  I'm sorry.  What is it?

12   A.  This is the Compass access report for Y.T. Kok.

13   Q.  And how do you know that?

14   A.  His core ID or user ID is FJD476.

15   Q.  Is this the report that your team generated and provided

16   back to the legal department?

17   A.  Yes, it is.

18        MR. LAWLESS:  Your Honor, Motorola moves admission of

19   PTX 1417.

20        THE COURT:  The exhibit received and may be

21   published.

22    (Plaintiff's Exhibit 1417 received in evidence.)

23   BY MR. LAWLESS:

24   Q.  All right.  Mr. Shepard, where is Y.T. Kok's user ID?

25   A.  If you look at the top of the Compass access report, you

Shepard - direct by Lawless

1    will see the title of the document, and it says, "FJD476."

2    That is Y.T. Kok's user ID.

3    Q.   Okay.  Does this Compass report for Y.T. Kok have the same

4    column headings as the report we just saw for Mr. Sam Chia?

5    A.   Yes, it does.

6    Q.   What time period does this Compass report cover?

7    A.   I have to look at the back.  This covers -- this report

8    runs from 8/29 of 2007 until August 5th of 2008, which is his

9    employment at Motorola Solutions.

10   Q.   Okay.  Let's look at June 28th, 2008.  And Mr. Schlaifer,

11   could you please blow up rows 29 through 68?

12           Okay.  Mr. Shepard, same exercise as the last time.

13   Looking at the last access column combined with the count

14   column, can you tell us what you see?

15   A.   Yes.  Y.T. Kok downloaded four documents -- sorry, three

16   documents on -- at 11:08 p.m. on June 28th only once.

17   Q.   And the next minute?

18   A.   The next minute, he downloaded four documents only once.

19   Q.   The next minute?

20   A.   He downloaded five documents, four of those only once.

21   The other document, he did download three times.

22   Q.   Okay.  And if we repeated this minute after minute after

23   minute, what would you observe?

24   A.   I would observe that except for the two documents listed

25   in this set here, he downloaded all these documents only once

Shepard - direct by Lawless

400

1    over a seven-minute period.

2    Q.   And what do you call that?

3    A.   I call that mass downloading.

4    Q.   How sensitive are these documents?

5    A.   The POPI labels both say "internal use only" and "Motorola

6    Solutions confidential restricted," which means they are very

7    sensitive for us.

8    Q.   Okay.  If you page through Mr. Y.T. Kok's Compass report,

9    do you see other instances of mass download?

10   A.   I do.

11   Q.   All right.  Let's just do one more day.  Let's do June

12   23rd, 2008, if you could turn to Page 4, please.

13          And Mr. Schlaifer, if I could have you blow up rows

14   201 through row 248.

15          And then Mr. Shepard, do you see that?

16   A.   I do.

17   Q.   And just going very quickly again, could you go minute by

18   minute and tell us what you observe?

19   A.   So the first minute there at 7:17, he downloaded three

20   documents.  Then the next two minutes, he downloaded one each

21   minute.  And then the next, at 7:22 he downloaded three

22   documents.  At 7:24, he downloaded two documents.  At 7:25, he

23   downloaded three documents.  At 7:27, he downloaded two

24   documents.

25   Q.   Okay.  Mr. Shepard, and if you look at Y.T. Kok's Compass

Shepard - direct by Lawless

1   report as a whole, what is your overall observation?

2   A.   My overall observation is that he is downloading

3   information.   Unlike Samuel Chia that used an application, I

4   believe he's actually clicking on documents and pulling these

5   down.   So he's kind of searching and looking for the documents

6   to pull down.

7   Q.   Okay.   And is that a typical practice at Motorola of mass

8   downloading?

9   A.   It is.

10  Q.   I'm sorry.   I just want to be clear about that.   Maybe I

11  asked a poorly phrased question.   Is -- the download activity

12  that you observed in Y.T. Kok's Compass log, is that normal,

13  acceptable activity at Motorola?

14  A.   That is not normal acceptable activity.

15  Q.   Okay.   Thank you, Mr. Schlaifer.   We can take that down.

16           Let's change topics, Mr. Shepard.   I'd like to ask

17  you about some policies and rules at Motorola.   First of all,

18  does Motorola use rules or have rules that tell employees how

19  they have to treat confidential material?

20  A.   Yes, we do.

21  Q.   And at a high level, what are those rules called?

22  A.   The -- they're basically our policies.   And they are the

23  rules that kind of govern what we need to do with the

24  protection of intellectual property.

25  Q.   When you joined Motorola in 1994, did Motorola have those

Shepard - direct by Lawless

402

1   types of rules or policies?

2   A.  Yes, it did.

3   Q.  Okay.  If we fast forward to 2008, what information

4   security policies were in place at Motorola?

5   A.  In 2008, the information security policy in place was

6   called iProtect.

7   Q.  Who wrote that policy?

8   A.  My team wrote that policy.

9   Q.  And did your team have responsibility for updating that

10  policy as time went on?

11  A.  Yes, it does.

12  Q.  Could you turn in your binder, sir, to PTX 2046?

13  A.  Is that the small binder?  You said 2046?

14  Q.  Yes, sir.  And it will be in your other binder.

15  A.  I'm there.

16  Q.  Do you recognize the document?

17  A.  Yes, I do.

18  Q.  What is it?

19  A.  This is the iProtect policy that I referred to just a

20  minute ago.

21          MR. LAWLESS:  Your Honor, PTX 2046 is admitted.

22  Permission to publish?

23          THE COURT:  Yes.  Proceed.

24  BY MR. LAWLESS:

25  Q.  All right.  Mr. Shepard, what version of the iProtect

Shepard - direct by Lawless

403

1  policy is this?

2  A.  This is Version 3 which was released on December 1st of

3  2010.

4  Q.  Okay.  Were revisions made to this policy over time?

5  A.  Yes, they were.

6  Q.  How does this policy correlate to what was in effect in

7  2008?

8  A.  There were minor changes between 2008 and 2010.  All

9  changes are tracked within this policy and its appendicis.

10 Q.  Okay.  Let's go on the first page.  And Mr. Schlaifer, if

11 you could please blow up the paragraph "Scope."

12         Mr. Shepard, what does this paragraph tell you about

13 who this policy applies to?

14 A.  This policy applies to all Motorola Solutions employees,

15 third party contractors, consultants, service providers, and

16 any other third parties worldwide who have access to or

17 otherwise use information assets and information resources.

18 So in short, it applies to every employee worldwide.

19 Q.  Did Motorola take any steps to make sure that its

20 worldwide employees understood and followed the rules in this

21 policy?

22 A.  Yes.  This policy also has a section which requires my

23 organization to create and train employees on this policy.

24 Q.  Okay.  Let's turn to Page 7.  And you'll see there's a

25 paragraph labeled, "Information protection training."

Shepard - direct by Lawless

1          Could you blow that up please, Mr. Schlaifer?

2          Mr. Shepard, could you explain what this paragraph

3     requires regarding training to take place at Motorola?

4     A.   Sure.  Mr. Schlaifer, if you could highlight the end of

5     the first sentence there.  It starts on the third line with

6     "information protection awareness training briefings at least

7     every two years."

8          So every two years, we're required to train people on

9     this policy.

10    Q.   And why is that?

11    A.   It's important that we protect our intellectual property.

12    Q.   What about when employees start at Motorola?  Is any

13    training required?

14    A.   Sure.  Mr. Schlaifer, if you could blow up the first

15    sentence of the second paragraph.

16         And what it says is, "An introductory information

17    protection briefing must be viewed and acknowledged by all new

18    hires, Motorola Solutions, and third party consultants prior

19    to granting access to information resources and information

20    assets."

21    Q.   Why does Motorola require that training before employees

22    get access to files and systems?

23    A.   To protect our intellectual property, and they need to be

24    aware and made aware of the rules before they get access to

25    that information.

Shepard - direct by Lawless

1   Q.   Now, what are some examples of the training that Motorola

2   uses?

3   A.   We use computer-based training.  The training is typically

4   a 45- to 60-minute video.  It covers the policies,

5   specifically sections around protection of intellectual

6   property, protection or appropriate use of computer resources.

7           And then at the end of that training, you're required

8   to take a quiz.  So you don't just sit through the training.

9   You actually have to comprehend and understand the

10  requirements.

11  Q.   And what happens if an employee fails the quiz?

12  A.   They get to retake the training.

13  Q.   What happens if an employee refuses to take the quiz or

14  additional training?

15  A.   Then they will not be provided our intellectual property.

16  Q.   Okay.  Does this policy establish rules about how to

17  protect paper printouts of confidential information?

18  A.   Yes, it does.

19  Q.   Okay.  Can we go to Page 15, please?

20          And you'll see a paragraph there labeled "Storing

21  information in hard copy form."  Do you see that?

22  A.   I do.

23  Q.   Could you explain, Mr. Shepard, how this requires

24  Motorolans to treat paper printouts?

25  A.   Sure.  Mr. Schlaifer, if you would just highlight maybe

Shepard - direct by Lawless

406

1  the second line there.

2          It says that confidential Solutions restricted must

3  be stored in a locked room, locked filing cabinet, or a locked

4  desk drawer that's only accessible to authorized individuals.

5  Q.  Okay.  Is that sort of a little bit of overkill, requiring

6  employees to lock up papers within a Motorola facility?

7  A.  Not when you're protecting our innovative work, I do not

8  think so.

9  Q.  Okay.  Does the iProtect policy give examples of what

10 employees are not allowed to do with Motorola confidential

11 information?

12 A.  Yes, it does.

13 Q.  Let's turn to Page 18, please, sir.  And you'll see a

14 paragraph labeled "Appropriate use of information resources."

15 That goes on to the next page.  Could you explain how this

16 tells employees what they can and cannot do with Motorola

17 confidential information?

18 A.  Yes.  This is appropriate use of information resources.

19 So Mr. Schlaifer, if you could highlight the second sentence

20 starting with, "Motorola Solutions information resources."

21          "Motorola Solutions information resources must be

22      used in a professional manner and such use must comply

23      with all applicable policies and procedures, including,

24      without limitation, the code of business conduct, human

25      resource policies, employee handbooks, nondisclosure

Shepard - direct by Lawless

407

1      agreements, and applicable laws and regulations."

2  Q.  What is that code of conduct?

3  A.  It's the professional code of conduct for how we do our

4  work so that we have a safe workplace.

5  Q.  Okay.  Are there examples of what employees are not

6  allowed to do with Motorola's information?

7  A.  Yes.  There's over a page of examples of what you

8  shouldn't do with our information assets.

9  Q.  Okay.  Is there an important example or two that you think

10  are critical to Motorola protecting its information?

11  A.  Sure.  Mr. Schlaifer, if you could highlight the very

12  first bullet under the section you have there.

13      It says, "Disclosing information that is owned by

14  Motorola Solutions or entrusted by a third party to Motorola

15  Solutions to unauthorized recipients."  So again, using your

16  computer, you should not share information to anyone that is

17  not authorized to see it.

18  Q.  Okay.  Why is it necessary for Motorola to put a rule like

19  that in its policy book?

20  A.  It's important to continue to remind employees that there

21  is -- you have to protect our intellectual property.

22  Q.  Okay.  Are there any other examples that you think are

23  important and reflect how Motorola treats confidential

24  information?

25  A.  Yes.  Mr. Schlaifer, if you could highlight the second

Shepard - direct by Lawless

408

1   bullet that starts, "Misusing intellectual property."

2          So that one says, "Misusing intellectual property,

3   trademarks, copyrights, or patents of Motorola Solutions or a

4   third party."

5   Q.   And what is that intended to capture?

6   A.   That means that you can't use the resources we give you or

7   the IP that we give you for anyone that -- to break the law or

8   anyone that's not part of the third party.

9   Q.   Okay.  We can take that down, Mr. Schlaifer.

10         Mr. Shepard, does the iProtect policy use

11   nondisclosure agreements to protect confidential information?

12   A.   Yes, it does.

13   Q.   What is a nondisclosure agreement?

14   A.   A nondisclosure agreement is a binding contract between

15   the employee and the company to protect our intellectual

16   property.

17   Q.   Is there a nickname for that?

18   A.   We call those NDAs.

19   Q.   NDA?

20   A.   NDA, nondisclosure agreement.

21   Q.   Okay.  Let's turn to Page 17, please.  And then there's

22   two paragraphs.  One is labeled "Nondisclosure agreements."

23   The one below that is labeled "Situations when nondisclosure

24   agreements must be revisited."  Do you see those, sir?

25   A.   I do.

Shepard - direct by Lawless

409

1  Q.  What does that first paragraph tell us about how Motorola

2  uses NDAs?

3  A.  Sure.  Mr. Schlaifer, if you could highlight the second

4  sentence.

5      It says, "The individual must sign an agreement prior

6  to being granted access to Motorola Solutions information

7  assets and information resources."

8  Q.  And then generally, what does the employee agree to in

9  that NDA as a condition of getting access to Motorola

10 confidential information?

11 A.  They agree to protect that intellectual property and not

12 disclose it to anyone that shouldn't have it.

13 Q.  Okay.  In the situation where an employee leaves Motorola,

14 does Motorola do anything regarding NDAs?

15 A.  Yes, we do.

16 Q.  Okay.  And does the policy explain what Motorola does?

17 A.  Yes.  If you look at the next section, it's kind of the --

18 after the -- well, it's one sentence but after the

19 confidential cypher, if you could just highlight it,

20 "Particularly, when employees are due to leave."

21      What this is doing is reminding the employee of their

22 obligation to protect our confidential information.

23 Q.  And can you walk us through very briefly what that process

24 is of reviewing NDAs with exiting employees?

25 A.  There's an exit NDA that you work through with an exiting

Shepard - direct by Lawless

410

1   employee.

2   Q.  And why does Motorola use that process?

3   A.  We use the process to again remind the employee of their

4   binding agreement to protect the confidential information

5   we've given them.

6   Q.  And as part of its information protection plan, does

7   Motorola rely on what an exiting employee tells Motorola?

8   A.  Yes, it does.

9   Q.  Is that reasonable from a security protection standpoint?

10   A.  Yes, it is.

11   Q.  Okay.  Did you have access to and review Sam Chia's exit

12   interview review?

13   A.  I did.

14   Q.  Did Sam Chia acknowledge his obligations to Motorola?

15   A.  Yes, he did.

16   Q.  How do you know that?

17   A.  He approved the documents.  So after he completed the

18   conversation, he approved and acknowledged his obligation to

19   Motorola.

20   Q.  Okay.  Similarly for Mr. Y.T. Kok, did you have access to

21   and review Y.T. Kok's exit interview NDA acknowledgement?

22   A.  Yes, I did.

23   Q.  And did Y.T. Kok acknowledge his obligations to Motorola?

24   A.  Yes, he did.

25   Q.  How do you know that?

Shepard - direct by Lawless

411

A.  He also signed that he reviewed when he completed the exit

NDA process.

Q.  Okay.  Let's talk about classification levels.  Does the

iProtect policy provide different ways that employees can put

a label on confidential information?

A.  Yes, it does.

Q.  If we turn to Page 11, there's a paragraph at the bottom

that's labeled "Classification levels."  Do you see that?

A.  On Page 11?  Yes, I do.

Q.  How many classification levels for confidential

information did Motorola use in this iProtect policy?

A.  In 2008, there were three levels:  Public, Motorola

Solutions internal, and Motorola Solutions confidential

restricted.

Q.  Okay.  And over time, did -- Motorola's policies regarding

what specific labels could be used, did that change over time?

A.  Yes.  We introduced iProtect in 2006.  Beforehand, the

policy was called SOPE 60, or "Protecting our proprietary

information."  We referred to it internally as POPI.  So in

2006, we replaced the POPI data classification rules and moved

to these three.

Q.  And can you describe the move to the new policy in general

terms?

A.  In general terms, it was to simplify the classifications.

We had four in the POPI policy, and we wanted to reduce it

Shepard - direct by Lawless

412

1    down and simplify it for the engineers.

2    Q.   Okay.  Under the iProtect policy, does information at

3    Motorola have to have a special particular label to be

4    protected?

5    A.   No, it does not.

6    Q.   And is it only special types of information that receive

7    protection?

8    A.   No, it's not.

9    Q.   All right.  Staying on this point, let's turn to Page 10.

10   And there's a paragraph labeled "Information protection

11   classifications."  If you could, blow that up, Mr. Schlaifer.

12            All right.  Mr. Shepard, do you see the word

13   "information asset" under the definition section?

14   A.   I do.

15   Q.   Okay.  We'll come back to that definition, but I want to

16   go a paragraph higher.  And my question is:  Does the policy

17   explain how information assets are to be treated at Motorola?

18   A.   Yes, it does.

19   Q.   And what does it say?

20   A.   If you could, highlight the second sentence,

21   Mr. Schlaifer.

22            It says, "Information assets may only be disclosed to

23   authorized" -- I'm sorry -- "disclosed to persons authorized

24   to have access and who are under obligation to maintain the

25   confidentiality of the information assets."

Shepard - direct by Lawless

413

Q.   Okay.  And if we go down to the definitions now for
"information asset," could you explain to the jury whether
Motorola information has to have a certain label to be an
information asset?

A.   Yes.  It doesn't have to have the certain label.  It
actually specifies that in the section.

         Mr. Schlaifer, if you could, highlight the last part
of the last sentence that starts with "regardless of
classification or value."

Q.   And can you explain in simple terms what that means,
Mr. Shepard?

A.   That means that even if the employee fails to label the
document, if the document has value -- and our sensitive
information does regardless of whether it's classified or not
as determined by the employee -- that value is valuable to us,
and it's information that must be protected.

Q.   Are there commonsense reasons why Motorola policies are
that way?

A.   Yeah.  We know that employees may not classify the
documents the way they should.  They may not have the right
information.  And so this is the common sense that illustrates
that regardless of the classification value, what we produce
and the intellectual property we produce is sensitive to our
company.

Q.   Okay.  Just a few more questions on this document.  Let's

Shepard - direct by Lawless

414

1    go to Page 15.  And there's a section there labeled "Legacy

2    information classifications and labels."  Do you see that,

3    sir?

4    A.  I do.

5    Q.  Could you blow that up, Mr. Schlaifer, please?  Thank you.

6           All right.  Do you see at the very top, Mr. Shepard,

7    it says, "Legacy labels should not be used on new documents"?

8    A.  I do see that.

9    Q.  Could you explain what that means in terms of the update

10   of the policies to this iProtect policy?

11   A.  So when we moved from the POPI policy or "Protecting our

12   intellectual property" to the iProtect policy, we changed our

13   data classification labels, and we put guidance in there that

14   you -- legacy labels or the old POPI labels should not be used

15   on new documents when they're created.

16   Q.  And could you explain how the old labels relate to the new

17   labels under this iProtect policy?

18   A.  Sure.  If you go down to the equivalence of the legacy

19   label section, and then again, under the old policy, there

20   were four labels:  "General business information" should be

21   treated as Motorola Solutions internal; "Motorola use" --

22   "internal use only" should be treated as "Motorola Solutions

23   internal;" "Motorola confidential proprietary" should be

24   treated as "Motorola Solutions confidential restricted;" and

25   then "Motorola registered secret proprietary" must be treated

Shepard - direct by Lawless

415

1    as "Motorola Solutions confidential restricted."

2            So once again, we went from four labels in the old

3    policy to three labels with the new policy.

4    Q.   Okay.  Thank you, Mr. Schlaifer.  We can take that down.

5            Mr. Shepard, can you explain for the Compass reports

6    we just looked at, how did -- the confidentiality labels, how

7    are they impacted by the changes in policy over time?

8    A.   So over time, when we talked about it, when you upload a

9    document into Compass, you select from a dropdown menu what

10   label you want to give that document.  And because we went

11   from the old policy to the new policy, we had to update that

12   upload page to change it to the new labels.  And so by doing

13   so, as you started working with the new labels, the old ones

14   were phased out.

15   Q.   Okay.  So if you printed -- actually, let's just be very

16   specific.  For the Compass logs for Sam Chia and Y.T. Kok that

17   you showed us earlier, for the POPI confidentiality labels

18   listed in those Compass reports, how are those labels related

19   to old labels that are no longer in effect?

20   A.   Those labels as part of the metadata or the data that goes

21   with the document, that was all updated to reflect the new

22   labels in the dropdown menu that we had there.  So all the old

23   labels were replaced.

24   Q.   Okay.  Could I direct you to PTX 1392 in your binder?

25   A.   Sure.  Okay.

Shepard - direct by Lawless

416

1   Q.   Before we get into that document, let me ask you:  Does

2   Motorola provide training guides to employees respecting how

3   to treat confidential information?

4   A.   Yes, we do.

5   Q.   Okay.  Do you recognize PTX 1392 in your binder?

6   A.   I do.

7   Q.   What is it?

8   A.   This is a guide that basically says what you should be

9   doing to safeguard our information or safeguard information.

10  Q.   Did your group have responsibility for the content of this

11  document?

12  A.   Yes, it does.

13  Q.   Was it the regular practice of your group to create

14  training guides like this one under the iProtect policy?

15  A.   Yes, it is.

16          MR. LAWLESS:  Your Honor, Motorola or moves PTX

17  1392 -- 1392 into evidence.

18          THE COURT:  It is received and may be published.

19      (Plaintiff's Exhibit 1392 received in evidence.)

20  BY MR. LAWLESS:

21  Q.   All right.  Mr. Shepard, very quickly, how is this guide

22  used at Motorola?

23  A.   This guide is used to guide employees on what they should

24  do to safeguard our information.

25  Q.   And who is it distributed to at Motorola?

Shepard - direct by Lawless

417

1  A.  It's distributed to all employees.

2  Q.  Okay.  Why don't you look at just one point in this

3  document, if you could turn to Page 3, please.

4  A.  Sure.

5  Q.  At the top left, do you see the heading, "How do you

6  safeguard information?"

7  A.  I do.

8  Q.  What is the point of this page in the guide?

9  A.  This provides guidance on how to safeguard information.

10  Q.  Okay.  And then Mr. Schlaifer, if you'd blow up the last

11  bullet which reads, "If information is not labeled but appears

12  to be MSCR, confirm the classification with the information

13  owner."

14          Do you see that, Mr. Shepard?

15  A.  I do.

16  Q.  First of all, what is MSCR?

17  A.  Motorola Solutions confidential restricted.

18  Q.  Okay.  What was your group teaching other Motorolans with

19  this bullet point?

20  A.  This bullet point basically explains to an engineer that

21  if they come across something they believe should be

22  classified but was not classified, to go ahead and talk with

23  the owner and ensure the right classification is applied.

24  Q.  All right.  For this particular guide, when was this

25  distributed at Motorola?

Shepard - direct by Lawless

418

1    A.   2011.

2    Q.   And did Motorola use similar guides both before and after

3    2011?

4    A.   Yes.

5    Q.   Okay.  We can take that down, Mr. Schlaifer.

6         Mr. Shepard, I'd like to go earlier in time.  So was

7    there an information protection policy in place before the

8    iProtect policy that we were just looking at?

9    A.   Yes.  We had other policies in place.

10   Q.   What was the immediately preceding policy?

11   A.   The immediately preceding policy was SOP E60, "Protecting

12   our proprietary information" which means standards of

13   operating -- our standard operating procedures, E60, and then

14   it was, POPI was the common name for it.

15   Q.   Okay.  Could you turn to PTX 1643 in your binder, please?

16   A.   Sure.

17   Q.   Do you have that in front of you, sir?

18   A.   I do.

19   Q.   Do you recognize it?

20   A.   I do.

21   Q.   What is it?

22   A.   This is "Protecting our proprietary information," or the

23   POPI policy.

24   Q.   Was your group involved in establishing and updating this

25   policy?

Shepard - direct by Lawless

419

1    A.  Yes.

2    Q.  Was it the regular business practice of your group to

3    create updates to the POPI policy?

4    A.  Yes.

5           MR. LAWLESS:  Your Honor, PTX 1643 is already

6    admitted.  Permission to publish.

7           THE COURT:  Yes.  Proceed.

8    BY MR. LAWLESS:

9    Q.  Mr. Shepard, what time period does this POPI policy cover?

10   A.  It covers the period before 2006.

11   Q.  And give us --

12   A.  I'm sorry.  Go ahead.

13   Q.  Sorry.  Give us the full range, please, Mr. Shepard.

14   A.  I'm sorry.  It says here, revised on October 16th of 2000,

15   and it was in place until it was replaced by iProtect in 2006.

16   Q.  What Motorola employees did this POPI policy apply to?

17   A.  All employees worldwide.

18   Q.  Really just one point on this document, Mr. Shepard, if

19   you could turn to Page 16, please.

20          And Mr. Schlaifer, if you could blow up the entire

21   chart there.

22          Okay.  Mr. Shepard, high level, what does this chart

23   show?

24   A.  This shows the four classifications that were part of the

25   POPI policy.

Shepard - direct by Lawless

420

1    Q.   And could you just briefly describe each of them?

2    A.   Sure.  The lowest classification was "Motorola general

3    business."

4    Q.   What was the next highest classification?

5    A.   "Motorola internal use only."

6    Q.   What was the next highest classification?

7    A.   "Motorola confidential proprietary."

8    Q.   And what was the highest level of classification?

9    A.   "Motorola registered secret proprietary."

10   Q.   Okay.  For these confidential categories, at a minimum,

11   was the document not to be disclosed outside of Motorola?

12   A.   Yes.

13   Q.   Based on your understanding of how Motorola treats trade

14   secrets, can Motorola have a trade secret even if one of these

15   particular labels was not used on a document?

16   A.   Yes.

17   Q.   Under this policy, did a document have to have a

18   particular special label to receive protection at Motorola?

19   A.   No.

20   Q.   Okay.  Let's turn to Page 12 in the document.  And there's

21   a paragraph 4.0, "Glossary."  And about halfway down, it says,

22   "Proprietary information."  Do you see that, sir?

23   A.   I'm sorry.  Which page?

24   Q.   Sure.  It's Page 12.

25   A.   Yes, I see it.

Shepard - direct by Lawless

421

Q.   All right.  Do you see where it says, "Proprietary

information"?

A.   Yes, I do.

Q.   Okay.  How did the POPI policy in place from 2000 to 2006

define proprietary information?

A.   Well, it's defined as information used in the business

which the first is, "Motorola keeps confidential to establish

legal rights, that is, property rights and, if required, marks

with an appropriate identifying legend."

         The second one is, "is not generally known outside

unless subject to a nondisclosure agreement or the terms of a

contractual agreement or is protected under U.S. government

regulatory practices."

Q.   And what's the last point there?

A.   "Gives the company a competitive advantage if it is used

in the business and, therefore, has economic value and benefit

to the company."

Q.   All right.  Then there's a sentence, sir, at the bottom of

that page that begins, "Proprietary information includes

technical and personnel information; sensitive business

information such as plans, strategies, financial data; and

trade secrets such as techniques, processes, compilations,

formulas, and patterns."

         Do you see that?

A.   I do.

Shepard - direct by Lawless

1   Q.  Okay.  So could you explain in your own words and your

2   understanding of the POPI policy what proprietary information

3   includes?

4   A.  In my own words, it includes things that are listed here,

5   but it's all of the information that we create that we want to

6   keep secrets and protect it to give us a competitive advantage

7   in the market.

8   Q.  And then to be crystal clear, does proprietary information

9   at Motorola include trade secrets?

10  A.  Yes, it does.

11  Q.  Okay.  If we turn to the next page, and Mr. Schlaifer,

12  could you blow up just that first paragraph.

13          Mr. Shepard, could you read the first sentence there?

14  A.  I can.  "Unmarked proprietary information must be

15  protected as if it did have the proper classification marked

16  on it."

17  Q.  So under the earlier POPI policy in place from 2000 to

18  2006, did a trade secret have to have any special label to

19  receive protection and be considered a trade secret?

20  A.  No, it did not.

21  Q.  All right.  We can take that down, Mr. Schlaifer.

22          Moving back in time for the last time, I think,

23  Mr. Shepard.

24  A.  Sure.

25  Q.  Was there a policy in place before the 2000 year POPI

Shepard - direct by Lawless

423

1    policy?

2    A.   Before 2000's POPI policy?  Yes, there was a, 1991 was the

3    original draft of the POPI policy.

4    Q.   All right.  And if you could turn to PTX 1183 in your

5    binder, sir.

6    A.   1183?

7    Q.   Yes, sir.

8    A.   Sorry.  Okay.

9    Q.   You're there?

10   A.   Yes, I am.

11   Q.   Do you recognize 1183?

12   A.   Yeah.  This is the original protection of proprietary

13   information, or POPI policy.

14           MR. LAWLESS:  Your Honor, PTX 1183 is already

15   admitted.  Permission to publish?

16           THE COURT:  Yes.  Proceed.

17   BY MR. LAWLESS:

18   Q.   All right.  Mr. Shepard, what time period was this POPI

19   policy in place and governing?

20   A.   The effective date was September 1st of 1991.

21   Q.   And how familiar are you with this policy?

22   A.   I'm very familiar with this policy.

23   Q.   Okay.  Did this version of the POPI policy use the same

24   confidentiality buckets as the later version that we just

25   looked at?

Shepard - direct by Lawless

424

1    A.  Yes, it did.

2    Q.  Based on your understanding of how Motorola treats trade

3    secrets, can Motorola have a trade secret even if it didn't

4    use a particular label on the document?

5    A.  Yes, it can.

6    Q.  And can you explain very briefly again why?

7    A.  Well, it's our proprietary information, our intellectual

8    property, and that information must be protected.  It doesn't

9    necessarily have to be labeled "trade secret" to be something

10   that we have within our company.  And we keep this information

11   secret, and it must be protected.

12   Q.  And even under this policy, did information at Motorola

13   have to have some special label to be protected?

14   A.  No, it did not.

15   Q.  Mr. Schlaifer, we can take that down.

16          Just a few more modules, Mr. Shepard.  I'd like to

17   shift gears and talk about reporting misconduct at Motorola.

18   A.  Okay.

19   Q.  If a Motorola employee actually suspected that another

20   employee is violating a policy, is there a way for the

21   employee to report that?

22   A.  Yes.  There are three groups they can report that to.

23   Q.  What are the three groups?

24   A.  The three groups are legal, the office of ethics and

25   compliance, or HR.

Shepard - direct by Lawless

425

1   Q.   Okay.  High level, what does HR investigate?

2   A.   HR is human resources, and they investigate employee or

3   people issues.

4   Q.   At a high level, what does the office of ethics

5   investigate?

6   A.   The office of ethics investigates both people and other

7   issues, but they usually provide anonymous, so you can give an

8   anonymous tip and they will take -- and they will start to

9   investigate off that.

10  Q.   And then finally, what type of issues does legal

11  investigate?

12  A.   Legal issues.  Sorry.  Patent infringement, other types of

13  issues that affect legal.  Sorry.

14  Q.   What is the process for an employee to report suspected

15  misconduct?

16  A.   They would contact one of those three departments, and

17  they would then address the process with the individual.

18  Q.   Is there anything special about those three departments

19  that makes them the appropriate body to investigate things at

20  Motorola?

21  A.   All three of those departments are trained in their

22  specific area to investigate.  For example, if you're in human

23  resources, they're trained in how to investigate people and

24  understand the dynamics of people.

25          If it's legal, they're trained in patent

Shepard - direct by Lawless

1   infringements and other issues related to legality.  So they

2   have training where other folks don't.

3   Q.  And are there various laws that restrict how companies can

4   investigate even its own employees?

5   A.  Yes, there are.

6   Q.  Okay.  Who can authorize your group to do an

7   investigation?

8   A.  One of those three groups can.

9   Q.  And is there a written policy at Motorola stating that

10   only HR, the department of ethics, or legal can authorize your

11   group to do any sort of investigation?

12   A.  Yes.

13   Q.  And what is that policy?

14   A.  It's within the iProtect policy.

15   Q.  Are there any good reasons, even commonsense reasons, why

16   your group in particular needs authorization from HR,

17   department of ethics, or legal before you go investigating

18   anything?

19   A.  We have access to people's systems.  We have access to

20   their data.  So as an example, I could actually pull the data

21   on my boss.  So there has to be a check and balance that

22   approval to investigate before we do.  We simply just can't --

23   can't go investigate whoever we want.

24   Q.  And to be really specific, what kind of data could you go

25   look into if there was no oversight?

Shepard - direct by Lawless

427

1    A.   I can look at anything that they do on the internet.  I

2    can look at anything that's stored on their machine.  I can

3    look at their downloads from Compass.  So pretty much all of

4    the systems that come together give us that ability to kind of

5    look for an investigation.

6    Q.   Okay.  I'd like to switch topics and talk about security

7    technology that your group uses.

8              THE COURT:  Counsel, this may be a good stopping

9    point.

10             Members of the jury, as we listen to the evidence, it

11   is very demanding.  And I don't think it would hurt if we

12   adjourned a little early today.  And tomorrow morning, we will

13   finish with the direct examination followed by what I expect

14   to be once again extensive cross-examination.

15             Because of the press of other matters, I will ask you

16   to come in tomorrow morning at 10:15.  10:15.  10:15.  All

17   right.  And we will do a full day, but you are excused for the

18   day.  The witness may step down.

19             Counsel, please remain.

20        (Proceedings heard in open court.  Jury out.)

21             THE COURT:  Court is in session.

22             You are still ordering transcripts, are you not,

23   counsel?

24             MR. CLOERN:  I'm sorry, your Honor?

25             THE COURT:  You are still ordering transcripts?

1          MR. CLOERN:  Yes, your Honor.

2          THE COURT:  Okay.  Did you get that?  Okay.

3          Please be seated.

4          The reason for the 10:15 start tomorrow is I have

5     four matters here set for 10:00 o'clock.  And also, there is

6     an issue involving supervised release and a sentencing set for

7     11:30, so it's a full day.  So counsel, please come in at

8     10:15.

9          And I will attempt to do the supervised release and

10    the sentencing during the lunch hour.  And so we will then

11    work our way into the afternoon.  So once again, 10:15.

12    10:15.  Thank you, counsel.

13         (Proceedings adjourned from 3:15 p.m. to 10:15 a.m.)

14                        *  *  *  *  *  *  *

15                      C E R T I F I C A T E

16         I, Judith A. Walsh, do hereby certify that the

17    foregoing is a complete, true, and accurate transcript of the

18    proceedings had in the above-entitled case before the

19    Honorable CHARLES R. NORGLE, SR., one of the judges of said

20    Court, at Chicago, Illinois, on November 12, 2019.

21    */s/ Judith A. Walsh, CSR, RDR, F/CRR*_____  November 13, 2019

22    Official Court Reporter

23    United States District Court

24    Northern District of Illinois

25    Eastern Division