429

| | |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
| | NORTHERN DISTRICT OF ILLINOIS |
| 2 | EASTERN DIVISION |

3  MOTOROLA SOLUTIONS, INC., and MOTOROLA    ) No. 17 CV 1973
   SOLUTIONS MALAYSIA SDN. BHD,              )
4                                            )
                                             )
5          Plaintiffs,                       )
   vs.                                       ) Chicago, Illinois
                                             )
6  HYTERA COMMUNICATIONS CORPORATION, LTD.,  ) November 13, 2019
   HYTERA AMERICA, INC., and HYTERA          )
7  COMMUNICATIONS AMERICA (WEST), INC.,      )
                                             )
8          Defendants.                       ) 10:00 o'clock a.m.

9
10                    TRIAL - VOLUME 4 A
                   TRANSCRIPT OF PROCEEDINGS
11        BEFORE THE HONORABLE  CHARLES R. NORGLE, SR.
                       and a jury
12

13  For the Plaintiffs:    KIRKLAND & ELLIS LLP
                           BY:  Mr. Adam R. Alper
14                              Mr. Brandon Hugh Brown
                           555 California Street
15                         27th Floor
                           San Francisco, California 94104
16                         (415) 439-1400

17                         KIRKLAND & ELLIS LLP
                           BY:  Mr. Michael W. De Vries
18                         333 South Hope Street
                           Los Angeles, California 90071
19                         (213) 680-8400

20

21
    Court reporter:            BLANCA I. LARA
22                         Official Court Reporter
                           219 South Dearborn Street
23                              Room 2342
                           Chicago, Illinois 60604
24                            (312) 435-5895
                           blanca_lara@ilnd.uscourts.gov
25

1    Appearances:  (Continued:)

2

3    For the Plaintiffs:     KIRKLAND & ELLIS LLP
                             BY: Ms. Megan Margaret New
                             300 North LaSalle Street
4                            Chicago, Illinois 60654
                             (312) 862-7439
5
                             KIRKLAND & ELLIS LLP
6                            BY:  Ms. Leslie M. Schmidt
                             601 Lexington Avenue
7                            New York, New York 10022
                             (212) 446-4763
8
     Motorola Corporate Representative:   Mr. Russ Lund
9

10

11   For the Defendants:     STEPTOE & JOHNSON LLP
                              BY: Mr. Boyd T Cloern
                                  Mr. Michael J. Allan
12                                Ms. Jessica Ilana Rothschild
                                  Ms. Kassandra Michele Officer
13                           1330 Connecticut Avenue., Nw
                             Washington, DC 20036
14                           (202) 429-6230

15

16

17   Hytera Corporate Representative:  Michele Ning

18

19

20

21

22

23

24

25

```
 1            (The following proceedings were had out of the
 2        presence of the jury in open court:)
 3            THE CLERK:  All rise.  The Court is in session.
 4   Please be seated.
 5            THE COURT:  Good morning, counsel.  Are you ready to
 6   proceed?
 7            MR. LAWLESS:  We are, Your Honor.  Initially
 8   plaintiffs moved to seal two exhibits that were used during
 9   Mr. Lund's cross-examination yesterday.  DTX 4288 and DTX 0001,
10   both contain confidential information.
11            THE COURT:  The motion is granted.
12            All right.  Please ask the jury to come in.
13            THE CLERK:  The equipment is not working.
14            THE COURT:  It's still not working?
15            You're having an equipment issue?
16            MR. ALPER:  Yeah.  I believe one of the court's
17   technology officials is looking at it.
18            THE COURT:  Okay.  Please be seated, counsel.
19            (Brief pause.)
20            THE COURT:  Okay.  Thank you very much.
21            (Brief pause.)
22            THE CLERK:  All rise.
23            (The following proceedings were had in the
24        presence of the jury in open court:)
25            THE CLERK:  The Court is in session.  Please be
```

10:16:18
10:16:34
10:16:48
10:17:48
10:18:42

Shepard - direct by Lawless

432

1    seated.

2              THE COURT:  Good morning, members of the jury.

3              Please recall the witness.

4              MR. LAWLESS:  Thank you, Your Honor.

10:18:50   5         (Brief pause.)

6              MR. LAWLESS:  May we proceed?

7              THE COURT:  Please proceed.

8         SCOTT SHEPARD, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

9                   DIRECT EXAMINATION (resumed)

10:19:12   10   BY MR. LAWLESS:

11   Q.  Mr. Shepard, yesterday we talked about rules and procedures

12   that Motorola uses to protect it's information.  I'd like to

13   move to a new topic today and talk about technology.

14              Does Motorola use technology to protect it's

10:19:31   15   confidential business information?

16   A.  Yes.

17   Q.  And are you and your group responsible for selecting,

18   managing, and using that technology?

19   A.  Yes.

10:19:37   20   Q.  What categories of technology does Motorola use to protect

21   it's information?

22   A.  So we use three categories:  Protect, detect, and respond.

23   Q.  Did you prepare some slides to help you explain those

24   technologies?

10:19:51   25   A.  Yes, I did.

Shepard - direct by Lawless

433

1    MR. LAWLESS:  Your Honor, permission to publish Mr.

2  Shepard's demonstrative PDX 3.1?

3    THE COURT:  Yes, you may proceed.

4  MR. LAWLESS:

10:20:04    5  Q.  Okay.  Mr. Shepard, I see three categories:  Protect,

6  Detect and Respond.  Could you explain what kind of technology

7  is used in the protect category?

8  A.  Sure.  Protect is the first line of defense and it's there

9  to protect our information.

10:20:17    10  Q.  How important is that type of technology?

11  A.  It's very important.  It is the first line of defense.

12  Q.  Can you explain a little bit more.

13  A.  So if you think about it, when you go to protect whether

14  it's firewalls or something else, this technology prevents

10:20:34    15  unauthorized access, it prevents breaking in remotely, or any

16  other activity into the systems.

17  Q.  Okay.  Moving to the middle category, Detect.  What kind of

18  technology is that?

19  A.  That is where you detect when some things are not going as

10:20:48    20  planned or not appropriately.  So if protection somehow is

21  evaded, the detection will typically catch that, and that

22  technology will respond, so the two work together.

23  Q.  How important is the Detect category of technology?

24  A.  It's just as important as protect.

10:21:03    25  Q.  Okay.  And finally the third category, Respond.  What kind

Shepard - direct by Lawless

434

1  of technology is that?

2  A.  So that's technology, once you detected something that went

3  wrong, the response technology kicks in to help you eradicate

4  the issue or to clean up or resolve other issues in there.

5  10:21:20        So all three work together, from protecting, to

6  detecting, to allowing us to respond to attacks or instance.

7  Q.  When you started at Motorola in 1994, did Motorola use

8  software and other technology tools to protect it's

9  information?

10 10:21:35  A.  Yes, it did.

11  Q.  How good were Motorola's security technology tools in 1994?

12  A.  They were very good at their ability.  Again, we partnered

13  with a lot of government organizations, as well as other

14  companies, large companies, and we shared information about how

15 10:21:53  they protect.

16        And what we did was, we modeled and used the same kind

17  of protections, detections, and response.  We also did

18  independent external benchmarking and assessments to verify.

19  Q.  Okay.  Moving forward in time to 2008, did Motorola

20 10:22:10  continue to use security technology to protect its confidential

21  information?

22  A.  Yes, we did.

23  Q.  Did you make a slide showing some of those technologies to

24  help you explain that concept?

25 10:22:21  A.  I did.

Shepard - direct by Lawless

435

1    MR. LAWLESS:  Your Honor, permission to publish Mr.

2    Shepard's demonstrative PDX 352.

3    THE WITNESS:  Yes.  Proceed.

4    THE ATTORNEY:

10:22:30    5    Q.  Now, at a high-level, Mr. Shepard, what are you showing

6    here?

7    A.  What we're showing here is the technologies that were in

8    place in the 2008 timeframe.  These are logs of companies.  And

9    it just shows kind of the breadth that we used in different

10:22:46   10   technologies to protect, detect, and respond to security

11   instance.

12   Q.  Okay.  Let's move through these one at a time, starting at

13   the top with Protect.  You're showing about 30 tools.  Why so

14   many?

10:22:54   15   A.  Again, it is the first line of defense, and at that

16   timeframe there were a lot more technologies around protecting

17   the environment versus the detect and respond.

18   Q.  Is there an easy-to-understand example of the protect

19   technology that you could explain?

10:23:09   20   A.  Sure.  What I would recommend -- Mr. Schlaifer, if you

21   could highlight Symantec.

22   So Symantec is an antivirus software back then, and

23   that protects your machine from viruses and other malware that

24   gets installed on that system.

10:23:26   25   Q.  Okay.  Now, moving to the middle category, Detect, you show

Shepard - direct by Lawless

436

1   about five tools there.  What is one example of a detect

2   technology?

3   A.  Sure.  Mr. Schlaifer, if you could highlight "Motorola

4   radar."

10:23:39   5   So Motorola Radar is a custom tool we used internally.

6   And in working with Symantec, if Symantec can't eradicate or

7   quarantine off the virus, then what it will do is it will work

8   in connection with Radar and Radar will create a ticket for the

9   IT employee to go out and try to clean the machine there.

10:23:58   10   So you can see where protection doesn't work, then it

11   falls into detection to take action by an individual.

12   Q.  Okay.  And then finally in the Respond category at the

13   bottom, you show four tools.  What's one example of a respond

14   technology Motorola was using in 2008?

10:24:15   15   A.  Sure.  The tool -- Mr. Schlaifer, if you could highlight

16   EnCase forensic.

17   So in following the same theme, if the virus can't be

18   eradicated on the machine and you call out IT, if IT can't seem

19   to resolve the issue, they then call on my team, the security

10:24:34   20   team, where we get involved from a response and we use EnCase

21   to actually go on to the machine, pull the file that is suspect

22   off, as well as look at the memory.

23   So, again, if you look at all three, when the first

24   evade or other issues occur, you work down the stack to

10:24:51   25   actually address and resolve the issue.

Shepard - direct by Lawless

437

1    Q.  Okay.  In 2008, how good were the security technologies?

2    Are these budget tools or state of the art?

3    A.  These are state of the art enterprises class tools.

4    Q.  Can you explain a little bit more about the quality of

10:25:06    5    those tools in 2008?

6    A.  A lot of the tools in 2008, they were again through our

7    benchmark and working with other large companies and government

8    organizations, these were the tools that a lot of the other

9    companies used.

10:25:19    10        Additionally, a lot of these tools were manual and

11    based and allowed us to kind of flow through the environment.

12    And what I mean by that is is they were good at detecting known

13    bad in the environments, but they weren't as good as detecting

14    an unknown bad.

10:25:34    15    Q.  Okay.  In 2008, were there technologies that weren't

16    available to buy on the market and so Motorola wanted to do

17    something extra?

18    A.  Yes.  You can see that there were several technologies here

19    where we created custom tools to help us improve the security

10:25:52    20    in our environment.  I --

21    Q.  Can you --

22    A.  I'm sorry.

23    Q.  I was going to ask you, can you explain that process?

24    A.  Sure.  So we would take a technology in place today -- and

10:26:03    25    I can go back to yesterday's Compass as an example -- we then

Shepard - direct by Lawless

438

1   customize Compass to be able to arrive at a response.

2          So if you look in the bottom right, there's Motorola

3   Compass.  Again, this was customized on top of the standard

4   tool that was available that allowed us additional response

10:26:20   5   capability and investigation.

6   Q.  So in 2008, with this additional customized software that

7   Motorola created, how did Motorola's information protection

8   compare to the rest of the industry?

9   A.  We were in the upper echelon --

10:26:36   10          MS. ROTHSCHILD:  Objection, Your Honor.  Speculation.

11          THE COURT:  Overruled.  You may answer.

12   BY THE WITNESS:

13   A.  I'm sorry.  Can you repeat the question?

14   BY MR. LAWLESS:

10:26:43   15   Q.  Yes.  With Motorola's custom tools that it created in 2008,

16   how was the quality of Motorola's security technology in

17   comparison to the rest of the industry?

18   A.  It was the upper echelon.  Again, we partnered with large

19   companies, as well as government organizations to assess and

10:27:01   20   employ this technology.  So it was a collective group of us

21   working together.

22   Q.  And what were just a few examples of government entities

23   that you partnered with?

24   A.  So we worked with entities, so the Department of Defense,

10:27:12   25   National Security Agency.  We also worked with other groups and

Shepard - direct by Lawless

439

1    other countries as well, so ...

2    Q.  From 2008 forward to today, did Motorola continue to add

3    new security technology as it became available?

4    A.  Yes, we did.

10:27:29    5    Q.  Did you make a slide showing some of those technologies?

6    A.  Yes, I did.

7         MR. LAWLESS:  Your Honor, permission to publish Mr.

8    Shepard's demonstrative PDX 3.2.

9         THE COURT:  Yes, you may proceed.

10:27:41    10    MR. LAWLESS:

11    Q.  Mr. Shepard, what are you showing here?

12    A.  We're showing the full breadth of technologies that we have

13    now and the technologies that we changed over time.

14         Again, the bad guys keep getting better, and so we

10:27:53    15    have to continue to make our technology stronger and more

16    creative.

17    Q.  You've added 64 technologies, approximately, to this slide.

18    How does the technology security that's available today compare

19    to what was available back in 2008?

10:28:10    20    A.  It's -- it's actually vastly different.  A lot of the

21    technology we have today implements artificial intelligence,

22    machine learning, and other cutting-edge technology that simply

23    wasn't available in 2008.

24    Q.  And how does that let you and your group do your job

10:28:27    25    differently or better today?

Shepard - direct by Lawless

440

10:28:44

1  A.  Back then I would consider the technology that if you think

2  of a haystack where that technology will let you find a set of

3  needles or items within the haystack, the technology we have

4  today allows us to kind of find the needle in the needle stack

5  within the haystack.  And so it really allows us to get much

6  better at zeroing in on potential issues.

7  Q.  Was security technology available in 2008 to automatically

8  search for security threats?

9  A.  Was technology available in 2008 to automatically search?

10:29:02

10  No, we had to manually enter those.

11  Q.  Okay.  In 2008, was there artificial intelligence software

12  to automatically process data for security threats?

13  A.  No, there was not.

14  Q.  When did those type of technologies come on the market?

10:29:13

15  A.  A lot of those technologies started in 20011, '12 and then

16  we started implementing '13 and '14.

17  Q.  All right.  Going back to the Compass system used to

18  generate those reports.  We saw it yesterday.  Was it

19  technologically possible, back in 2008, to automatically scan

10:29:30

20  the Compass system?

21  A.  No, it was not.

22  Q.  And is that even possible today?

23  A.  No, it is not.

24  Q.  Can you explain why that is?

10:29:37

25  A.  The technology itself used to scan is a response

Shepard - direct by Lawless

441

1    technology, not a detection technology.  So it allows us to

2    respond.  The server itself was built in '95, so it's a rather

3    legacy old system.  While we have done customizations and done

4    some upgrades, there is simply too much data to be able to have

10:30:01   5    it execute as a detection system.

6              We have tried over the years to move it up into a

7    detection, but we have not been able to successfully do that,

8    so we continue to use it as a response tool once something

9    that's been identified.

10:30:13   10   Q.  Okay.  Was it technologically possible --

11             THE COURT:  Counsel, let me clarify.  If the question

12   asks for possibilities, then, indeed, it calls for speculation

13   and I would sustain the objection.  But you have established by

14   your earlier questions the specialized acknowledge of this

10:30:33   15   witness, and so consistent with Rule 702, you may inquire

16   further, as you have been, but not ask any question that would

17   call for possibilities.  Please proceed.

18   BY MR. LAWLESS:

19   Q.  Mr. Shepard, are you aware of technology, back in 2008,

10:30:48   20   that would let your group monitor every employees' Compass

21   accesses?

22   A.  No.

23   Q.  And what about just departing employees, couldn't your

24   security group run Compass logs for every single departing

10:31:05   25   employee in 2008?

Shepard - direct by Lawless

442

1    MS. ROTHSCHILD:  Objection, Your Honor.

2    THE COURT:  Overruled.  You may answer consistent with

3  Rule 702.

4  BY THE WITNESS:

10:31:12    5  A.  So in 2008, we had about 200 employees leaving every month,

6  on average.  So if we ran the technology to pull on every

7  single employee, we -- first off, we'd have to know who to give

8  that information to, because again, we only do data collection

9  when requested from one of those three groups and we're

10:31:27   10  targeting in.

11    So even if we did all of that running and everything

12  else, we wouldn't generate any useful data at that timeframe.

13  BY MR. LAWLESS:

14  Q.  And what about just from a computing technology standpoint,

10:31:38   15  was it physically possible every month --

16    THE COURT:  Rephrase the question.

17    MR. LAWLESS:  Yes, Your Honor.

18  BY MR. LAWLESS:

19  Q.  Are you aware of technology, Mr. Shepard, that would let

10:31:45   20  your group run that volume of Compass logs every single month

21  back in 2008?

22  A.  There was not technology capable of doing that, because

23  again, that system was in heavily use by all the people, so we

24  had to have it up and available to be used and we would run the

10:32:01   25  same queries against the usage.  And so it would bring -- and

Shepard - direct by Lawless

443

1    probably in some cases we've had protect the queries actually

2    not complete, so it would be impractical to run that against

3    the 200 employees every month.

4    Q.  Okay.  To wrap this section up, back in 2008, in what

5    situations could your team generate download reports from the

6    Compass system?

7    A.  We could only generate it when requested by the Office of

8    Ethics and Compliance, Legal, or HR.

9    Q.  Okay.  Thank you, Mr. Schlaifer.  We can take that down.

10           All right.  Assisting gears, Mr. Shepard, I'd like to

11   the talk source code.  Now, we've been talking about the

12   Compass system.  Did Motorola use a different system to store

13   source code 2008?

14   A.  Yes, we used a system called the IBM ClearCase, which is a

15   different software.

16   Q.  And what did Motorola use that ClearCase system for?

17   A.  So it stored source code.

18   Q.  Are computer servers for the ClearCase system located in

19   the United States?

20   A.  There are computer servers located in the United States for

21   the source code system.

22   Q.  Can every Motorola employee access the ClearCase system?

23   A.  No, they cannot.  Similar to Compass, we have basic access

24   control requiring user password to even get on to the system.

25   And then similar to Compass, we do the same restrictions down

Shepard - direct by Lawless

444

1    just to the source code that you need to be able to do our job.

2    Q.  Okay.  So if a Motorola employee had access to ClearCase,

3    could they go into whatever folder or file that they wanted for

4    source code?

10:33:31    5    A.  No, they could not.

6    Q.  Which ones are they limited to?

7    A.  Only the ones that they were given access to specifically.

8    Q.  Did ClearCase have the ability to automatically detect

9    suspicious downloading in 2008?

10:33:44    10    A.  No, they did not.

11    Q.  In 2008, was there any way, even manually, to detect

12    suspicious downloads?

13    A.  No, there was not.

14    Q.  When you became involved in this investigation, did you try

10:33:55    15    to go back and see whether the ClearCase system showed source

16    code theft by Y.T. Kok or Sam Chia?

17    A.  It was not possible.

18    Q.  Why was it not possible?

19    A.  Because the way that the ClearCase system works, is that it

10:34:09    20    gives you access as an end user, but it doesn't record the

21    access the way we customized Compass.

22         We did try to customizing ClearCase but we were

23    unsuccessful at customizing ClearCase to do that.

24         ClearCase only logs anyone that modifies source code.

10:34:23    25    So not when you download it to work on your machine, but only

Case: 1:17-cv-01973 Document #: 785 Filed: 12/20/19 Page 17 of 144 PageID #:52323
Shepard - direct by Lawless
445

1    when you upload it or make changes to the source code.

2    Q.  All right.  Now, earlier when we looked at the Compass

3    download reports yesterday, we were talking about a 2016, 2017

4    investigation.  Before that, did anyone ever raise Hytera to

10:34:42    5    you earlier than that 2016 investigation?

6    A.  Yes.

7    Q.  Can you tell us when that was and what happened?

8    A.  Sure.  I received an e-mail in 2010.  There was concerns

9    about employees talking with the former employee, G.S. Kok.

10:35:00    10    And so they asked us to put G.S. Kok's Hytera e-mail address

11    into an e-mail watch list.

12            So we put it into that e-mail watch list.  And again,

13    it was really because they wanted to see what current employees

14    and who was talking to G.S. Kok.

10:35:16    15            We had -- we have no way to monitor G.S. Kok because

16    he was now a former employee.

17    Q.  Did that e-mail have anything to do with suspected trade

18    secret theft or source code theft back in 2008?

19    A.  No.

10:35:32    20    Q.  Are you aware of any alarm bells that that system sounded

21    respecting G.S. Kok's e-mail?

22    A.  So after adding G.S. Kok's Hytera e-mail address into the

23    watch list, we did not get any hits.

24    Q.  Okay.  Even if that alarm system did go off in 2010, would

10:35:50    25    that indicate that your group should go investigate trade

Shepard - direct by Lawless

446

1   secret theft and source code theft back in 2008 by Sam Chia or

2   Y.T. Kok?

3            MS. ROTHSCHILD:  Objection, Your Honor.

4            THE COURT:  The objection is overruled and you may

10:36:04
5   cross-examine eventually on these issues.

6   BY THE WITNESS:

7   A.  I'm sorry.  What was the question again?

8   BY MR. LAWLESS:

9   Q.  I can repeat the question.

10:36:12
10           If that system had given an alarm bell or some kind of

11  hit in 2010 regarding G.S. Kok's e-mail, would that have even

12  indicated to your group to go back and investigate trade secret

13  theft or source code theft in 2008 by Sam Chia or Y.T. Kok?

14  A.  No, it would not have.

10:36:31
15  Q.  All right.  In 2008, how many employees were leaving

16  Motorola every month?

17  A.  About 200.

18  Q.  From a security perspective, was it unusual in 2008 for

19  Motorola engineers to go to other technology companies?

10:36:48
20  A.  It was not.

21  Q.  Was there anything unusual, sitting in 2008, about Motorola

22  employees going to Hytera?

23  A.  No, it was not.

24  Q.  Was G.S. Kok, Sam Chia, or Y.T. Kok taking a job at Hytera

10:37:03
25  enough for your group to launch an investigation?

Shepard - direct by Lawless

447

1  A.  We -- we wouldn't launch an investigation.  One of the 3

2  groups that I mentioned, but they didn't ask us, so we never

3  investigated, made no -- not reasonable to do so.

4  Q.  All right.  Last topic, Mr. Shepard.  Over your entire

10:37:23   5  career at Motorola in information security, what percent of

6  security threats has your group tried to stop?

7  A.  We tried to stop every security threat.  We tried to be

8  100 percent in that.  Probably about 99.999, so five 9's

9  percent successful at stopping.  Unfortunately, every once in a

10:37:47  10  while we do those intellectual property.

11  Q.  All right.  Can you take just a minute to summarize what

12  Motorola and your group has done to try to achieve that

13  100 percent success rate.

14  A.  So we do a lot of -- a lot of, like I said earlier, we do a

10:38:01  15  lot of benchmarking both internally and externally.  We work

16  with government organizations, we work with large defense

17  contracting companies, we work with other large companies to

18  make sure we're employing the latest technology and everything

19  that we use.

10:38:16  20         We then, on top of all that, we continue to add and

21  change the technology and get better over time, but the bad

22  guys continue to get better and so do we.

23  Q.  Are you aware that in this case Hytera is arguing that

24  Motorola should've discovered Hytera's trade secret in source

10:38:34  25  code theft earlier?

Shepard - direct by Lawless

448

1    A.  I'm aware of that.

2    Q.  Do you agree with that argument?

3    A.  I do not.

4    Q.  Why?

10:38:38    5    A.  There was no reason for those three employees when they

6    left.  If there was a reason to do so, there would've been

7    investigation.  We would've done a legal hold of their machines

8    and save their machines.  So they were simply moving on to

9    another job, from my understanding.

10:38:56    10   Q.  All right.  Mr. Shepard, could you tell us why, as

11   Motorola's chief information security officer, this case is

12   important?

13   A.  This case --

14           MS. ROTHSCHILD:  Objection, Your Honor.

10:39:05    15           THE COURT:  Sustained.

16   BY MR. LAWLESS:

17   Q.  Mr. Shepard, could you tell us how trade secret theft and

18   source code theft impacts Motorola from an information security

19   standpoint?

10:39:20    20   A.  There are -- for me, personally, it affects Motorola.  I

21   mean, if you think about it, my job and my entire team's job is

22   to protect the intellectual property.  And so for us, this

23   represents the ability where in one case we did not protect,

24   and it's the lifeline.  Our innovations is basically the

10:39:44    25   lifeblood of the company that what we do.  And so this is

Case: 1:17-cv-01973 Document #: 785 Filed: 12/20/19 Page 21 of 144 PageID #:52327
Shepard - cross by Rothschild
449

1    utmost important to my team.  It's what we do 24 by 7 by 365.

2            MR. LAWLESS:  No further questions, Your Honor.  I

3    pass the witness.

4            THE COURT:  You may cross-examine, counsel, if you're

10:39:56    5    ready.

6            MS. ROTHSCHILD:  Yes, Your Honor.

7                       CROSS EXAMINATION

8            SECOND MIDDLE SPEAKER:

9            THE COURT:  Counsel, can you remind the jury of your

10:40:05    10    name.

11            MS. ROTHSCHILD:  Yes, Your Honor.

12            Mr. Fulbright, would you mind switching the monitor,

13    please.

14            THE CLERK:  I did.

10:40:12    15            MS. ROTHSCHILD:  Oh, thank you.

16            (Brief pause.)

17            MS. ROTHSCHILD:  Jessica Rothschild for the Hytera

18    defendants.

19            THE COURT:  Please proceed.

10:40:39    20            MS. ROTHSCHILD:  Thank you.

21                       CROSS EXAMINATION

22    BY MS. ROTHSCHILD:

23    Q.  Good morning.

24    A.  Good morning.

10:40:44    25    Q.  It's nice to see you again.

Shepard - cross by Rothschild

450

1          Yesterday you talked about the policies that Motorola
2    had in place.  Do you recall that testimony?
3    A.  I do.
4    Q.  And we talked about markings that go into documents, is
5    that correct?
6    A.  Yes, we did.
7    Q.  And the documents that we're actually talking about in this
8    case, those documents actually go back to the 1990's and
9    2000's, isn't that right?
10   A.  I believe so.  I don't know how far they go back, but ...
11   Q.  And the policies that was in place at that time was the
12   POPI, protection of proprietary information policy, correct?
13   A.  Correct.
14   Q.  IProtect didn't go into place until later, right?
15   A.  IProtect went in place in 2006.
16   Q.  The very end of 2006, right?
17   A.  December of 2006, correct.
18   Q.  After Motorola launched it's MOTOTRBO products, correct?
19   A.  I don't know the date that Motorola launched its MOTOTRBO
20   products.
21   Q.  That is stipulated fact in the case.  You don't disagrees
22   with that, do you?
23   A.  If you said it was launched, then yes, I agree with that.
24          THE COURT:  What is the stipulated fact?
25          MS. ROTHSCHILD:  Your Honor, I'm afraid I don't have

10:40:53
10:41:10
10:41:25
10:41:38
10:41:49

Shepard - cross by Rothschild

451

1    it in front of me, but the stipulated fact is that MOTOTRBO

2    launched in 2006 and was first sold in 2007.

3              THE COURT:  Is that the stipulation, counsel?

4              MR. LAWLESS:  That's my understanding, Your Honor.

10:42:02    5              THE COURT:  All right.  Proceed.

6              Members of the jury, you are to take stipulations as

7    true.

8              Proceed.

9    BY MS. ROTHSCHILD:

10:42:09   10    Q.  Now, you also pulled up iProtect policy yesterday and

11    showed the jury the documents that were labeled under the POPI

12    policy were not re-labeled under the later iProtect policy,

13    correct?

14    A.  That's incorrect.

10:42:23   15    Q.  That's incorrect?

16              If we could please pull up previously admitted Exhibit

17    PTX 2046 and look at page 15.  And if we could zoom in on the

18    legacy information classifications and label section, which I

19    believe you directed the jury to yesterday.

10:42:52   20              It says:

21              "Legacy information labeled 'Motorola

22              confidential restricted,' 'Motorola confidential

23              proprietary,' or 'Motorola registered secret

24              proprietary' does not need to

25              be relabeled except under the following

Case: 1:17-cv-01973 Document #: 785 Filed: 12/20/19 Page 24 of 144 PageID #:52330
Shepard - cross by Rothschild
452

1    conditions."

2        Right?

3  A.  Correct.

4  Q.  And those conditions are the information is revised or

10:43:13  5  updated, right?

6  A.  Correct.

7  Q.  Or disclosed to third-parties, right?

8  A.  Correct.

9  Q.  So long as none of those conditions were met, and these

10:43:21  10  were documents that were maintained at Motorola, those

11  documents -- the label on the document was not updated,

12  correct?

13  A.  That is correct.

14        MS. ROTHSCHILD:  You can take that down.

10:43:27  15  BY MS. ROTHSCHILD:

16  Q.  So a document that was marked "Motorola Registered Secret

17  Propriety" under the POPI policy, as long as it fell into those

18  conditions and did not need to be relabeled, would still bear

19  that marking today, correct?

10:43:49  20  A.  The document itself would still bear the marking.  In

21  Compass, it would've been changed because we had to make

22  changes to the system for the new policy.

23  Q.  Right.  Motorola overwrote some of the data in the Compass

24  system, correct?

10:44:03  25  A.  We did not overwrite the data.

Shepard - cross by Rothschild

453

1    Q.  Okay.  So you replaced data in the Compass system, correct?

2    A.  We replaced the labeling table that then was used.  So we

3    did actually replace any of the original markings for the

4    Compass documents themselves in the label.

10:44:17    5    Q.  Right.  So you would want to look at the actual physical

6    document and check the label on the document that was stored in

7    Compass, correct?

8    A.  There were over 40 million documents, so we did not look at

9    every document to recheck the label of the 40-plus million

10:44:31    10   documents.

11   Q.  But the label on the document is that operative labeling

12   for the document, correct?

13   A.  The label in the document or the label in Compass?

14   Q.  The label on the document would reflect the POPI

10:44:43    15   designation, correct, if the document predated iProtect?

16   A.  The label in the document would reflect the POPI.  We did

17   not go into the documents themselves.

18   Q.  And similarly, a document that was marked at the lower

19   level, Motorola confidential proprietary under POPI, would bear

10:44:58    20   that marking today, right?

21   A.  In the document, correct.

22   Q.  Okay.  So the relevant documents in this case were

23   designated under POPI, and those are just about 78 documents,

24   isn't that right, Mr. Shepard?

10:45:11    25   A.  I didn't at the documents, so I don't know what was in the

Shepard - cross by Rothschild

454

1    documents themselves.

2    Q.  So you don't know that the 21 trade secrets in this case

3    are contained and described in 78 documents and that's the

4    operative volume of documents that are at issue?

10:45:26    5    A.  I didn't look at the labeling of the documents through

6    preparation for this case.  I was aware that the trade secrets

7    are in those documents, but again, I don't look inside the

8    documents themselves.

9    Q.  Okay.  So we're talking about 78 documents, not hundreds or

10:45:40    10    thousands, right?

11    A.  I was never given the list of documents.  I was separated

12    from that information because I didn't need to know that

13    information.

14    Q.  Okay.  Now, Motorola has had repeated problems with the

10:45:58    15    employees adhering to its security policies, hasn't it?

16    A.  I disagree.

17    Q.  Okay.  Do you disagree with the statement that in 2007

18    Motorola recognized that the current state of our network and

19    applications does not allow us to effectively manage the risk

10:46:18    20    to our intellectual property?

21    A.  I think that document -- that statement is a broad

22    statement, and I don't agree with the entire statement.  I

23    think there were sections that had those concerns.

24         MS. ROTHSCHILD:  If I can get DTX 4199, please.

10:46:33    25    BY THE WITNESS:

Shepard - cross by Rothschild

455

1    A.  Should I set these to the side?  (Indicating).

2    BY MS. ROTHSCHILD:

3    Q.  Oh, yes.  You can keep those to the side.

4            (Said item tendered.)

10:46:51    5    BY MS. ROTHSCHILD:

6    Q.  Mr. Shepard, you have been handed DTX 4199.  It's a

7    Motorola presentation entitled Operations Review, Information

8    Protection Services, from October 29, 2007.  And you're

9    familiar with this document, aren't you?

10:47:04    10    A.  I am.

11            MS. ROTHSCHILD:  Your Honor, I'd like to move it into

12    evidence.

13            MR. LAWLESS:  No objection.

14            THE COURT:  It is received and may be published.

10:47:14    15            (Said exhibit received in evidence.)

16    BY MS. ROTHSCHILD:

17    Q.  Okay.  So we're looking at the Operations Review,

18    Information Protection Services document by Bill Boni and team.

19            Bill Boni, he was the chief information security

10:47:22    20    officer prior to you, is that correct?

21    A.  Correct.

22    Q.  And again, this is from October 29th, 2007, correct?

23    A.  Correct.

24    Q.  I'd like to direct you to page 23.

10:47:36    25            And if we could zoom in, please, on the "business

Shepard - cross by Rothschild

456

1    case" section of the slide.

2            This slide from October 29th, 2007, reports that:

3            "... Motorola has experienced multiple

4            situations where intellectual property, IP, has

10:47:54    5            leaked out of the company."

6            Correct?

7    A.  That's what it says.

8    Q.  Okay.  And then the third paragraph down says:

9            "The current state of our network and

10:48:07    10            applications does not allow us to effectively

11            manage the risk to our intellectual property."

12            Correct?

13    A.  That is correct, but it's for mobile devices.

14    Q.  This is a document -- strike that.

10:48:20    15            Motorola, Inc., was one company at that point in time,

16    correct?

17    A.  We had many divisions within Motorola.

18    Q.  Mr. Shepard --

19    A.  So Motorola, Inc., was one company, correct.

10:48:32    20            THE COURT:  Mr. Shepard, can you give your definition

21    to the jury of the term "leak."

22    BY THE WITNESS:

23    A.  Sure.  The leak is where our intellectual property is

24    outside or left the company.  So it was disclosed to

10:48:55    25    unauthorized individuals.

Shepard - cross by Rothschild

457

BY MS. ROTHSCHILD:

Q.  And so in October of 2007, Motorola's chief information

security officer was sanctioning of Motorola presentations,

talking about the fact that Motorola's network and applications

do not allow Motorola to effectively manage the risk to

intellectual property.  And, in fact, by mid 2008, the

situation had not been remedied, isn't that right?

A.  Specifically targeted mobile devices, correct.

Q.  By mid 2008, Motorola was actually recognizing an

increasing number of disturbing incidents involving critical

Motorola information, isn't that right?

A.  Specific to the mobile devices, correct.

Q.  Is it your position that there were no leaks anywhere in

the company, Mr. Shepard?

A.  No, my position is, there were significant leaks within the

mobile devices.

Q.  And elsewhere in Motorola, right?

A.  There were not significant leaks elsewhere.

        MS. ROTHSCHILD:  Can I please have DTX 4725.

        (Said item tendered.)

BY MS. ROTHSCHILD:

Q.  Mr. Shepard, you've been handed DTX 4725, which is a

Motorola e-mail with the subject, "Protecting Motorola's

critical information is everyone's job."  As you see in the

middle of the page, it's an e-mail from Bill Boni to all

Shepard - cross by Rothschild

458

```
            1    Motorola employees.  Do you see that?
            2    A.  I do.
            3            MS. ROTHSCHILD:  Your Honor, I'd like to move DTX 4725
            4    into evidence.
10:50:30    5            MR. LAWLESS:  No objection.
            6            THE COURT:  It is received and may be published.
            7            (Said exhibit received in evidence.)
            8    BY MS. ROTHSCHILD:
            9    Q.  And I'd like to focus on that original e-mail, the bottom
10:50:38   10    two-thirds of the page from Mr. Boni, the chief information
           11    security officer at Motorola.
           12            On June 30, 2008, he e-mailed the entire company,
           13    right?
           14    A.  Yes, he did.
10:50:46   15    Q.  That's not just a devices business, is it, Mr. Shepard?
           16    A.  No, it's not.
           17    Q.  And he says:
           18            "Protecting Motorola's critical information is
           19            everyone's job."
10:50:56   20             Right?
           21    A.  Yes.
           22    Q.  And the last sentence of that first paragraph says:
           23            "Unfortunately, we are seeing an increasing
           24            number of disturbing incidents involving
10:51:10   25            critical Motorola information."
```

Shepard - cross by Rothschild

459

1        Correct?

2   A.   Correct.

3   Q.   So mid-2008 there's a rise in leaks at Motorola, correct?

4   A.   There's a rise in leaks in the mobile devices business, but

10:51:26  5   why not take the opportunity to remind every employee, not just

6   mobile devices.

7   Q.   In fact, to combat a serious problem that Motorola had with

8   information leaking out of the company, Motorola created an

9   entire program called Stop The Leaks, didn't it?

10:51:40  10  A.   The Motorola program Stop The Leaks was targeted at the

11  mobile devices business.

12       MS. ROTHSCHILD:  Can I please have DTX 4514.

13       (Said item tendered.)

14  BY MS. ROTHSCHILD:

10:52:01  15  Q.   DTX 4514 is a Motorola e-mail with an attachment of the

16  Stop The Leaks PowerPoint slide, correct?

17  A.   Correct.

18       MS. ROTHSCHILD:  Your Honor, I'd like to move DTX 4514

19  into evidences.

10:52:16  20       MR. LAWLESS:  No objection.

21       THE COURT:  It is received and may be published.

22       (Said exhibit received in evidence.)

23  BY MS. ROTHSCHILD:

24  Q.   So if we can zoom in, please, on the top e-mail there from

10:52:24  25  Patrick Cunningham to Jewitt, "Subject:  Forward, Stop The

Shepard - cross by Rothschild

460

1    Leaks."

2           Mr. Cunningham, who is the director information

3    management collection and preservation at Motorola, he writes:

4           "We will be focusing a lot on this project."

10:52:40   5           Right?

6    A.   Correct.

7    Q.   And that project is Stop The Leaks, correct?

8    A.   Correct.

9    Q.   If we could please turn to page 3.  We see the cover of the

10:52:56   10   Stop The Leaks presentation, correct?

11   A.   Correct.

12   Q.   And there's a faucet on this presentation, correct?

13   A.   Correct.

14   Q.   With Motorola information leaking out, right?

10:53:04   15   A.   With cell phones, correct.

16   Q.   Well, and money leaking out, right?

17   A.   Through the mobile devices business, correct.

18   Q.   And the Motorola bat wings, right?

19   A.   Which is part of Motorola, Inc., correct.

10:53:15   20   Q.   Exactly.  Motorola, Inc., that's not limited to the device

21   business, correct?

22   A.   This program was for Motorola device business.

23   Q.   Okay.  We'll take a look at that.

24           If you could please turn to page 4.

10:53:28   25           This slide is entitled "2008 Significant Leaks,"

Shepard - cross by Rothschild

461

1    right?

2    A.   Correct.

3    Q.   And it says, "17 leaks to date."  So just in the first

4    8 months, 2008, Motorola had 17 significant leaks, correct?

10:53:44    5    A.   Of the cell phone division, correct.

6    Q.   2008, that's the year that G.S. Kok, Sam Chia, and Y.T. Kok

7    left Motorola, correct?

8    A.   Correct.

9    Q.   Now, the second sub-bullet explains that:

10:54:00    10        "3 of the significant leaks involve employees

11             sending confidential information to unauthorized

12             third-parties/competitors."

13          Correct?

14    A.   Correct.

10:54:12    15    Q.   A roadmap was sent to RIM?

16    A.   Yes, that's Research in Motion, which is a --

17    Q.   Blackberry?

18    A.   Blackberry, correct.

19    Q.   Pricing information was sent to Sony, correct?

10:54:23    20    A.   Correct.

21    Q.   And a product roadmap was sent to a headhunter, correct?

22    A.   Correct.

23    Q.   Now, please to turn to page 7.

24          This slide is entitled Sources of Disclosure Risks,

10:54:38    25    correct?

Shepard - cross by Rothschild

462

1    A.  Correct.

2    Q.  And the first source listed there is former employees,

3    right?

4    A.  Correct.

10:54:44  5    Q.  And the risk threat levels read is the highest risk threat

6    level, correct?

7    A.  Correct.

8    Q.  And Comments says, for former employees who have the

9    highest risk, that the threat was increasing by the day,

10:54:56  10    correct?

11    A.  Correct.

12    Q.  And the next entry is for current employees, right?

13    A.  Correct.

14    Q.  And they similarly have been assigned the highest risk

10:55:08  15    threat level, correct?

16    A.  Correct.

17    Q.  And the comments says, "Frustration breeds disloyalty,"

18    right?

19    A.  Correct.

10:55:17  20    Q.  Okay.  You see down towards the bottom, the third from the

21    bottom mentions "intelligence services," do you see that?

22    A.  I do.

23    Q.  Okay.  And the comment is about a Chinese spy incident

24    should be a wake-up call, do you see that?

10:55:30  25    A.  I do.

Shepard - cross by Rothschild

463

1  Q.  And you know what that is a reference to, don't you,

2  Mr. Shepard?

3  A.  Yeah, that's the reference to Hanjuan Jin.

4  Q.  And Ms. Jin left Motorola with radio documents and source

10:55:43  5  code, didn't she?

6  A.  She left with iDEN source code, not the DMR source code.

7  Q.  IDEN is a radio product, isn't it?

8  A.  IDEN is an integrated digital enhanced network, which is

9  targeted at the cellular business, not the public safety

10:55:57  10  business.

11  Q.  So if I Google "iDEN" a picture of a Motorola radio doesn't

12  show up?

13  A.  If you Google iDEN, I would assume that you would see a

14  picture of the cell phone, because we made it for Nextel, which

10:56:11  15  was a cellular cell company.

16  Q.  IDEN -- or, excuse me, TETRA is not part of iDEN?

17  A.  I don't know that.

18  Q.  Let's turn to page 11, please.

19       This is a slide for Best Practices, correct?

10:56:25  20  A.  Correct.

21  Q.  Best practices to remedy the problem with Motorola's leaks,

22  correct?

23  A.  Correct.

24  Q.  Okay.  And that first bullet says:

10:56:38  25       "Develop information protection policies and

Shepard - cross by Rothschild

464

1      procedures."

2          Right?

3  A.  It does.

4  Q.  And right under that it says:

10:56:44  5      "IProtect written and rolled out, but poorly

6      implemented."

7          Right?

8  A.  It does.

9  Q.  People weren't adhering to iProtect, they were still

10:56:53  10  following POPI, right?

11  A.  I think that was targeted at the cell phone division, not

12  other parts of business.

13  Q.  Let's look at the next slide, please, slide 12.

14      Continuation of the discussion of best practices to

10:57:11  15  stop Motorola's leaks, right?

16  A.  Correct.

17  Q.  The first dashed bullet on the page says:

18      " Current Motorola culture does not support

19      secrecy."

10:57:24  20          Right?

21  A.  That's what it says.

22  Q.  In 2008, Motorola's corporate culture did not support

23  secrecy, right?

24  A.  I disagree.

10:57:34  25  Q.  Employees didn't respect secrecy, isn't that right?

Shepard - cross by Rothschild

465

1   A.  I disagree.

2   Q.  The company didn't enforce its policies, did it?

3   A.  I disagree.

4   Q.  And you disagree while you were on leave from Motorola?

10:57:47    5   A.  While I was on leave from Motorola?  I can't tell you what

6   happened while I was on leave for Motorola.

7   Q.  And you were on leave at this time, right?

8   A.  Was this in August?  I think I left at the end of August,

9   so it was right around the same timeframe.

10:58:03    10   Q.  So we're talking about 2008 and the chief information

11   security officer at the time is sending e-mails alerts about

12   the need to protect confidential information throughout the

13   entire Motorola, Inc., company, correct?

14   A.  Correct.

10:58:18    15   Q.  And Motorola is talking about these Stop The Leaks program

16   to stop the significant leaks in the company, correct?

17   A.  I disagree with that statement.

18   Q.  And Motorola is issuing presentations that say that

19   iProtect has been written and rolled out, but is poorly

10:58:35    20   implemented, right?

21   A.  Again, I believe this is targeted at the Motorola devices

22   business that had leaks, not the other parts of the company.

23   Q.  This is study when G.S. Kok, Sam Chia and Y.T. Kok left

24   Motorola in 2008, right?

10:58:48    25   A.  This is the timeframe when they left, correct.

Shepard - cross by Rothschild

466

| | |
|---|---|
| 1 | Q. And during the same time period there are actually thefts |
| 2 | ongoing at Motorola, correct? |
| 3 | A. Of the mobile devices, yes. |
| 4 | Q. And the computers walking out of Motorola's own offices, |
| 10:59:03  5 | right? |
| 6 | A. There are computers walking out of the offices. |
| 7 | Q. In fact, in the first 8months of 2008, isn't it true that |
| 8 | Motorola had 13,066 security incidents? |
| 9 | A. I will -- yeah, I don't remember that exact number, but I |
| 10:59:20  10 | will -- we can break did down if you have the details. |
| 11 | Q. Sure. Let's take a look quickly at DTX 4651. |
| 12 | A. Can I put this one away (indicating)? |
| 13 | Q. Yes. |
| 14 | (Said item tendered.) |
| 10:59:38  15 | BY MS. ROTHSCHILD: |
| 16 | Q. DTX 4651 is a Motorola internal e-mail that we discussed at |
| 17 | your deposition, and that attached is a slide deck Loss |
| 18 | Prevention and Security. |
| 19 | Do you recognize this, Mr. Shepard? |
| 10:59:50  20 | A. Ah, I believe -- did you share this with me at the |
| 21 | deposition? |
| 22 | Q. Yes. |
| 23 | A. Okay. Then I remember somebody of this, yes. |
| 24 | MS. ROTHSCHILD: Your Honor, I'd like to move DTX 4651 |
| 11:00:04  25 | into evidence. |

Shepard - cross by Rothschild

467

1          MR. LAWLESS:  No objection.

2          THE COURT:  It is received and may be published.

3          (Said exhibit received in evidence.)

4   BY MS. ROTHSCHILD:

11:00:10  5   Q.  And if we could please turn to page 2.

6              So this is a slide deck from November of 2008:

7              "Loss Prevention and Security, their role in

8              upholding Motorola's code of business conduct."

9               Did I read that correctly?

11:00:28  10  A.  You did.

11  Q.  Okay.  And let's see what was going on at Motorola.  If we

12  could turn to page 16.

13              There's a statistics slide.  And if we start just from

14  the bottom right-hand corner, we see 13,066 incidents reported

11:00:45  15  year-to-date August 2008.  So just in the first 8 months of

16  2008, Motorola has 13,066 security incidents, correct?

17  A.  Correct.

18  Q.  And then if we look at the upper left-hand corner, there's

19  laptop theft by month in 2008, right?

11:01:07  20  A.  Correct.

21  Q.  And the first 8 months of 2008, 19 company laptops were

22  stolen, right?

23  A.  Which -- you mean in August or the first month?  Sorry.

24  Q.  In the first 8 months, so collectively, 33 plus 59 is 92,

11:01:21  25  right?

Shepard - cross by Rothschild

468

1    A.  Correct.

2    Q.  And 33 of those were stolen straight out of Motorola's own

3    offices, right?

4    A.  Correct.

11:01:33    5    Q.  And again, this is 2008 when G.S. Kok, Sam Chia, and Y.T.

6    Kok left Motorola, correct?

7    A.  Correct.

8    Q.  Now, Motorola continued to have a problem with leaks into

9    2019, isn't that correct?

11:01:47    10   A.  I don't know what happened in the mobile devices business.

11   I wasn't there.

12   Q.  Let me show you DTX 4763.

13          (Said item tendered.)

14   BY MS. ROTHSCHILD:

11:02:07    15   Q.  And this is an e-mail that was produced from your files

16   from April of 2009, and it's an internal Motorola e-mail.

17          Do you see that?

18   A.  I do.

19          MS. ROTHSCHILD:  Your Honor, I'd like to move DTX 4763

11:02:15    20   into evidence.

21          MR. LAWLESS:  No objection, Your Honor.

22          THE COURT:  It is received and may be published.

23          (Said exhibit received in evidence.)

24   BY MS. ROTHSCHILD:

11:02:24    25   Q.  So this is an e-mail being sent on April 22, 2019, and it

Shepard - cross by Rothschild

469

1    attaches a draft letter on page 3.

2         If we could turn to page 3, please.  Thank you.

3         And this is a draft letter to Motorola senior

4    leadership team and vice presidents, correct?

11:02:50    5  A.  Yes, it says "Motorola Senior Leadership Team and Vice

6    Presidents."

7    Q.  Okay.  All Motorola senior leadership teams and vice

8    presidents, right?

9    A.  Correct.

11:03:04   10  Q.  And if we look at the fourth paragraph down, it says:

11         "Our internal research shows that MCR ... "

12          Motorola Confidential Restricted, right?

13   A.  Correct.

14   Q.  (Reading:)

11:03:16   15         "... that MCR information or Motorola

16          information has been transferred regularly to

17          unauthorized locations such as personally owned,

18          home-based computers and portable storage

19          devices."

11:03:29   20         Right?

21   A.  I agree that's what it says.

22   Q.  And then it says "this must stop," right?

23   A.  Correct.

24   Q.  Because it hadn't stopped, right?

11:03:44   25  A.  Ah, again, I was not at the company.  I don't know if this

Shepard - cross by Rothschild

470

1  e-mail was ever sent.  I mean, it was draft.  Do you know if it

2  went out?  I'm sorry.

3  Q.  Do you have any reason to disagree with the fact that

4  Motorola's position in 2009, mid 2009, was that the continued

11:04:03  5  leaks needed to stop, do you?

6  A.  No, that's correct.

7  Q.  Now, Motorola knows -- you talked about general industry

8  knowledge -- Motorola keep apprised of what's going on, right?

9  A.  Correct.

11:04:18  10  Q.  And Motorola knows that it's a fairly regular thing for

11  employees to depart a company when they are ending their

12  employment with company information, isn't that right?

13  A.  No, the policy should be to return the company information.

14  Q.  But the policy aside, Motorola knows that employees leave

11:04:38  15  the company with confidential information, isn't that right?

16  A.  Correct.

17         MS. ROTHSCHILD:  Can I please have DTX 4766.

18         (Said item tendered.)

19  BY MS. ROTHSCHILD:

11:04:54  20  Q.  DTX 4766 is a Motorola data privacy strategy slide deck

21  from April 27, 2010, from your files, do you see that?

22  A.  Correct.

23         MS. ROTHSCHILD:  Your Honor, I'd like to move DTX 4766

24  into evidence.

11:05:10  25         MR. LAWLESS:  No objection.

Case: 1:17-cv-01973 Document #: 785 Filed: 12/20/19 Page 43 of 144 PageID #:52349
Shepard - cross by Rothschild
471

1    THE COURT:  It is received and may be published.
2    (Said exhibit received in evidence.)
3  BY MS. ROTHSCHILD:
4  Q.  So this is now April of 2010, and if you could please turn
5  to page 18.
6    This is a slide describing one of the top five trends
7  and data loss; do you see that?
8  A.  Correct.
9  Q.  And it talks about the risk of data loss increases --
10  underlined and highlighted in red -- as employees exit, right?
11  A.  That is correct.
12  Q.  And "exit" means leave the company and their employment,
13  correct?
14  A.  That is correct.
15  Q.  And it says:
16    "59 percent took customer lists, product
17    designs, product roadmaps, employee records,
18    nonfinancial information."
19    Right?
20  A.  That is what the industry says.
21  Q.  And it reports that:
22    "68 percent used or planned to use stolen
23    information at a new or future employer."
24    Right?
25  A.  Correct.

Shepard - cross by Rothschild

472

1    Q.  And then it lists:

2              "The most common methods used to take that

3              information, 53 percent downloaded to CD or DVD,

4              42 percent downloaded to a USB drive, 28 percent

11:06:32    5              sent to personal e-mail account."

6              Right?

7    A.  Correct.

8    Q.  And this is information that Motorola was aware of and was

9    tracking and included in its data privacy strategy meeting

11:06:43    10    presentation, correct?

11    A.  This is industry information that was included, correct.

12    Q.  Now, Motorola doesn't know how many people actually leave

13    the company with Motorola confidential information, does it?

14    A.  That is correct.

11:06:58    15    Q.  And I think you mentioned this in your testimony yesterday,

16    that when a person concludes their work at Motorola, they sign

17    an NDA, a nondisclosure agreement, right?

18    A.  When they start they sign an NDA, when they leave they're

19    reminded of the NDA through an exit process.

11:07:25    20    Q.  Okay.  But Motorola doesn't take any steps to ensure that

21    that person complies with that exit NDA, correct?

22    A.  I disagree.

23    Q.  Do you recall when you were deposed on March 27th of this

24    year?

11:07:38    25    A.  Go ahead.

Shepard - cross by Rothschild

473

1   Q.  And you were under oath at that time, correct?

2   A.  I was under oath.

3   Q.  Okay.  And I asked you:

4           "After the person concludes their employment --

5            THE COURT REPORTER:  Sorry.

6            MS. ROTHSCHILD:  Was I going too fast?

7            THE COURT REPORTER:  ".... and I asked you ..."

8   BY MS. ROTHSCHILD:

9   Q.  And I asked you:

10          " After the person concludes their employment at

11          Motorola, what, if anything, does Motorola do to

12          ensure that those people are compliant with

13          their NDA's?"

14          Answer:  Motorola doesn't.  Again, its -- its

15          vague only because -- unless requested for an

16          investigation, or something like that, Motorola

17          -- when the employee leaves, there's a trust

18          level that the employee leaves and will not

19          disclose the -- what they signed under NDA.  So

20          in terms of what we do after they've left, I

21          don't know if any action, unless there's a

22          specific investigation."

23          So Motorola just trusts its former employees, right?

24  A.  Motorola leverages and uses a policy, which is a binding

25  contract to ensure that that confidential information is not

11:08:12

11:08:29

11:08:43

Shepard - cross by Rothschild

474

1    released.

2    Q.  A binding contract with people like G.S. Kok, right?

3    A.  Correct.

4    Q.  And Sam Chia?

11:08:52    5    A.  Correct.

6    Q.  And Y.T. Kok, right?

7    A.  Correct.

8    Q.  And you understand that they are not defendants in this

9    case, correct?

11:08:58    10   A.  Correct.

11   Q.  And there's no contract action in this case, right?

12   A.  I don't know what a contract action is.

13   Q.  There's no breach of contract claim?

14          MR. LAWLESS:  Objection.  Relevance.

11:09:10    15          THE COURT:  Sustained.

16   BY MS. ROTHSCHILD:

17   Q.  Hytera is not a signatory to those contracts, is it?  None

18   of the Hytera defendants in this case are?

19   A.  A signatory?

11:09:21    20   Q.  Didn't sign for the NDA?

21   A.  Hytera -- no one at Hytera signed an NDA with Motorola?  I

22   would agree with that.

23   Q.  Okay.  And so Motorola is just trusting its employees for

24   leaving, in the 2008 time period, even though Motorola knew it

11:09:40    25   had lots of leaks of company information, correct?

Shepard - cross by Rothschild

475

1    A.  I disagree with that.

2    Q.  Motorola trusted its employees even though Motorola knows

3    that employees leave with confidential information, right?

4    A.  I disagree.  Motorola uses policies to remind employees of

11:09:54    5    what they're obligated to do.

6    Q.  And then just trusts them to abide with them, right?

7    A.  Trusts them to abide to the policies that they are required

8    to follow, correct.

9    Q.  Do you remember when we talked at your deposition about

11:10:15   10    Motorola developing an algorithm to detect people who would

11    steal information from Motorola?

12    A.  Correct.

13    Q.  Because Motorola with so security leaks at the time that it

14    needed to develop an algorithm, right?

11:10:28   15    A.  No, we were trying to drive cutting edge, because the bad

16    guys were getting better, so we wanted to be better as well.

17    Q.  And Motorola wanted to develop a technological --

18          THE COURT:  When you say "bad guys," you mean leakers?

19          THE WITNESS:  Yes, leakers.  Sorry.

11:10:40   20          THE COURT:  Nothing to be sorry about.  The question

21    was for clarification.

22    BY MS. ROTHSCHILD:

23    Q.  And Motorola wanted to figure out a technologically

24    advanced way to solve that, right?

11:10:51   25    A.  Correct.

Shepard - cross by Rothschild

476

1  Q.  And Motorola is considering whether to file for a patent or

2  keep that algorithm as a trade secret, right?

3  A.  Correct.

4  Q.  Let me show you DTX 4762.

11:11:09  5         (Said item tendered.)

6  BY MS. ROTHSCHILD:

7  Q.  This is in August 22nd, 2008, e-mail from Patrick

8  Cunningham to yourself and Bill Boni, the chief information

9  security officer at the time:

11:11:27  10        "Subject:  Cyber crime initiative, patent?"

11         You received this, correct?

12  A.  I did.

13        MS. ROTHSCHILD:  Your Honor, I'd like to move DTX 4762

14  into evidence.

11:11:38  15        MR. LAWLESS:  No objection.

16        THE COURT:  It is received and may be published.

17  BY MS. ROTHSCHILD:

18  Q.  And I'd like to zoom in on this e-mail from Mr. Cunningham.

19  Again, August 22nd, 2008:

11:11:48  20        "Cyber crime initiative.  Patent?"

21         Right?

22  A.  Correct.

23  Q.  Okay.  So Mr. Cunningham is providing his preliminary

24  thoughts on whether to patent the algorithm or keep it as a

11:12:04  25  trade secret, right?

Shepard - cross by Rothschild

477

1    A.  Correct.

2    Q.  If I can direct your attention to the third paragraph:

3            "As Maria indicated, that our best bet initially

4            is to treat this method as a trade secret."

11:12:15    5        Right?

6    A.  Correct.

7    Q.  (Reading:)

8            "We can register this in the Motorola E

9            intelligence system that is used to manage

11:12:29   10        patents and IP ..."

11           Intellectual property, right?

12   A.  Correct.

13   Q.  And then looking at the next paragraph, Mr. Cunningham

14   writes:

11:12:38   15        "She also suggested that we ensure that we

16           specifically call out this method as a trade

17           secret in any exit interview with anyone who has

18           been exposed to this project."

19           Right?

11:12:52   20   A.  Correct.

21   Q.  He says:

22           "We should ensure that we document the

23           discussion with the exiting employee and remind

24           them that they are not allowed to use this

11:13:02   25        iProtect outside of Motorola."

Shepard - cross by Rothschild

478

1          Right?

2    A.  Correct.

3    Q.  Now, none of the trade secrets that Motorola is claiming in

4    this case were specifically called out in the exit

11:13:13    5    documentation for G.S. Kok, Sam Chia, or Y.T. Kok, were they?

6    A.  Say that again?  I'm not sure I understand.

7    Q.  None of the 21 trade secrets that Motorola is claiming in

8    this case were specifically called out in the exit

9    documentation for G.S. Kok, Sam Chia, or Y.T. Kok, were they?

11:13:31   10          MR. LAWLESS:  Object.  Foundation.

11          THE COURT:  Did you say culled or called?

12          MS. ROTHSCHILD:  Called out.

13          THE COURT:  Spell that, please.

14          MR. LAWLESS:  C-a-l-l-e-d.

11:13:38   15          THE COURT:  All right.

16          MS. ROTHSCHILD:  Identified, listed.

17          THE COURT:  All right.  Do you understand the

18    question?

19          THE WITNESS:  I think I do.

11:13:44   20          THE COURT:  If you do, you may answer.

21    BY THE WITNESS:

22    A.  So none of this was called -- no, the exit interviews with

23    those employees did not call out any trade secrets.  They

24    called out general statements, which may have included the

11:13:56   25    trade secrets, but I don't know the details of it.

Shepard - cross by Rothschild

479

BY MS. ROTHSCHILD:

Q.  They don't call out any specific trade secrets, right?

A.  In reviewing, I think they called out things like Matrix
and NEO.  Again, that was a general statement for things
underneath that.  So there may be trade secrets underneath
that.

Q.  But none of the 21 individual trade secrets that are being
claimed in this case are individually identified anywhere in
any of those exit interviews or exit documentations, isn't that
right?

        MR. LAWLESS:  Object; foundation.

        THE COURT:  The documents are already in evidence, are
they not, counsel?

        MR. LAWLESS:  They are, Your Honor.

        THE COURT:  The objection is overruled.  The jury will
have an opportunity to examine them.  There has been inquiry of
various witnesses along the way and the jury will have an
opportunity to examine them to determine what they say.

BY MS. ROTHSCHILD:

Q.  Well, I believe you testified yesterday, Mr. Shepard, that
you had reviewed those documents and you were familiar with
them, correct?

A.  Correct.

        THE COURT:  What is the number of the document to
which you refer?

1      MS. ROTHSCHILD:  Yes.

2    BY MS. ROTHSCHILD:

3    Q.  If we could pull up PTX 1153 which has been previously

4    admitted.  And if we look at the NDA section on page 6 and zoom

11:15:09    5    in on the middle part of that page.

6         None of the 21 trade secrets are listed there, right?

7    A.  Again, I don't know what the trade secrets are, but if it

8    said "Compass," if there were any of those trade secrets stored

9    in Compass, then they called out Compass as a site that houses

11:15:26   10    those trade secret documents.  But verbatim, there was nothing

11    listed there exactly to the trade secret.  What is here is

12    general information what the employee had.

13    Q.  Let's look at 1155, page 6 as well, and look at the NDA for

14    Sam Chia.

11:15:44   15         Again, none of the 21 trade secrets that Motorola is

16    claiming in this case are listed or identified here, correct?

17    A.  So again, if the trade secrets are contained within the

18    project folders of Compass, but there is no specific wording

19    labeled here exactly for the trade secret, this is a grouping

11:16:01   20    of information they had.

21    Q.  This is just a general category of things listed here,

22    right?

23    A.  I don't believe it's a general category.  I think it's

24    specific to the stuff that they had.  I imagine they had a lot

11:16:13   25    of trade secrets and it would take them hundreds of pages to

Shepard - cross by Rothschild

481

1  list them out, line by line.

2  Q.  And they are not listed line by line?

3  A.  They are not listed line by line.

4  Q.  And just for the sake of completion, let's look at Y.T.

11:16:32  5  Kok.

6  A.  Sure.

7  Q.  PTX 1156, page 9.

8        And here again, there's none of the 21 trade secrets

9  specifically identified here, correct?

11:16:38  10  A.  Again, they may be underneath the Matrix, but the words for

11  the trade secrets were not specifically listed there.

12  Q.  Okay.

13        MS. ROTHSCHILD:  You can take that down.  Thank you.

14  BY MS. ROTHSCHILD:

11:16:51  15  Q.  Now, let's shift gears and talk about the Compass logs.

16  A.  Sure.

17  Q.  Motorola pulls Compass logs to investigate suspicions

18  regarding access to Motorola documents and source code, right?

19  A.  Motorola pulls Compass logs in response to an

11:17:08  20  investigation.

21  Q.  In response to what?  Sorry.

22  A.  In response to an investigation approved by one of the 3

23  groups, Legal, HR, the Office of Ethics and Compliance.

24  Q.  And you don't personally approve those requests, right?

11:17:21  25  A.  I send those over for others to approve if they come to me.

Shepard - cross by Rothschild

482

1   Q.  And Compass reports, as you testified yesterday, were

2   generally recorded as regularly conducted activity at Motorola,

3   right?

4   A.  Our Compass data is stored as generally recorded, and then

11:17:40   5   the Compass reports are pulled as part of an investigation

6   which is part of an ordinary activity.

7   Q.  But Compass reports, your testimony from yesterday is

8   inaccurate, that Compass reports are generally recorded as a

9   regularly conducted activity at Motorola?

11:17:53   10   A.  No, I said that the data is stored within Compass, and then

11   for an investigation we pull the Compass access report as part

12   of the normal activity.

13   Q.  And Motorola has pulled that data, hasn't it?

14   A.  Correct.

11:18:07   15   Q.  Let's talk about some examples of when Motorola pulls

16   Compass logs.

17   A.  Sure.

18   Q.  In March 2007, Motorola pulled Compass logs after customs

19   informed Motorola that it had stopped a Motorola employee

11:18:26   20   trying to leave the country with Motorola confidential

21   documents and source code, correct?

22   A.  Correct.

23   Q.  And that, again, was March 2007, before G.S. Kok, Sam Chia,

24   or Y.T. Kok left Motorola, correct?

11:18:39   25   A.  That was for 2007.

Shepard - cross by Rothschild

483

1    Q.  And those logs were pulled for a woman who was on leave,

2    wasn't working, yet still had full access to Motorola

3    confidential information and source code, right?

4    A.  No, the employee was back in the office, and then the

11:18:59    5    employee left, and so as part of the investigation we pulled

6    the Compass logs.

7    Q.  And it's not your understanding that while she was on

8    leave, she was accessing Motorola documents and information?

9    A.  I believe she was accessing those documents while she was

11:19:11    10    on leave.

11    Q.  Can I please have DTX 4756.

12         THE COURT:  Would she fit your definition of leaker?

13         THE WITNESS:  Correct.

14    BY MS. ROTHSCHILD:

11:19:32    15    Q.  DTX 4756 is Motorola's Incident Summary Report issued by

16    the Motorola security operations center for the incident that

17    we have been discussing that involved Hanjuan Jin.  She left

18    Motorola with confidential --

19         THE COURT:  Could you spell her name, please.

11:19:45    20         MS. ROTHSCHILD:  Sure.  H-a-n-j-u-a-n, last name Jin,

21    J-i-n.

22         THE COURT:  Thank you.

23    BY MS. ROTHSCHILD:

24    Q.  And this is Motorola's incident summary report for that

11:20:00    25    event, correct?

Shepard - cross by Rothschild

484

1   A.  This is the semi-final working draft.

2          MS. ROTHSCHILD:  Your Honor, I'd like to move DTX 4756

3   into evidence.

4          MR. LAWLESS:  No objection.

11:20:09    5          THE COURT:  It is received and may be published.

6          (Said exhibit received in evidence.)

7   BY MS. ROTHSCHILD:

8   Q.  Let's take a look, please, at page 6 of the report.

9          It's describing the data examined for subjects 1, 2

11:20:34   10   and 3.  There were three subjects examined as part of this

11   investigation, correct?

12   A.  Correct.

13   Q.  For subject 1, the last sentence of that first paragraph

14   says:

11:20:44   15          "The Motorola digital investigations team also

16          collected MVP remote access data, server-side

17          e-mails, and Compass access records during the

18          course of the investigation."

19           Correct?

11:20:59   20   A.  Correct.

21   Q.  Okay.  And then for subjects 2 and 3, if we look at the

22   second to the last sentence there, the very end of that second

23   to the last line it says that:

24          "Motorola also pulled Compass access records for

11:21:12   25          subjects 2 and 3."

Case: 1:17-cv-01973 Document #: 785 Filed: 12/20/19 Page 57 of 144 PageID #:52363
Shepard - cross by Rothschild
485

1          Correct?

2    A.   Correct.

3    Q.   Now, those Compass access logs that Motorola pulled in 2007

4    as part of this investigation, those are the Compass access

11:21:29    5    records similar to the ones that were provided for the 3

6    individuals for this case as of January 2017, correct?

7    A.   For the January, as well March of 2017 pulls, correct.

8    Q.   The logs in this case were pulled in March of 2017?

9    A.   No, you said into similar from here.

11:21:48    10   Q.   So the logs pulled in March of 2007 were similar to --

11   strike that.

12          The logs that were pulled in March of 2007 for Ms. Jin

13   and the other subjects, were similar to the ones that were

14   pulled in January of 2017 for G.S. Kok, Sam Chia, and Y.T. Kok,

11:22:07    15   correct?

16   A.   I don't know that for sure, because I don't know what the

17   program was.  The program does change over time.

18   Q.   And you recall when you were deposed on March 27th of 2019,

19   correct?

11:22:19    20   A.   Correct.

21   Q.   And at that time I asked you:

22          "The Compass access records, those were Compass

23           access logs, right?"

24            And you said:

11:22:27    25          "Those are the Compass access records similar to

Shepard - cross by Rothschild

486

1           the ones that were provided where the 3

2           individuals for this case as of January 2017."

3   A.  Correct.

4   Q.  Let's go look at page 8, please.

11:22:48    5           And if we look at what was initially noon part of the

6   page, we see that Ms. Jin was on medical leave between June and

7   September of 2005, and again from February 2006 until

8   February 2007, right?

9   A.  Correct.

11:23:09   10   Q.  And she did not have any work assignments at that time,

11  correct, during her leave?

12  A.  I do not believe so.

13  Q.  And so she should not have access to Motorola confidential

14  information, should she?

11:23:24   15   A.  Correct.

16  Q.  And if we look at the bottom paragraph on this page in the

17  investigations finding section, we see in the last paragraph

18  there:

19          "Although her second leave of absence began on

11:23:49   20          February 15, 2019, MVP remote access records

21          show over 40 connections to Motorola during that

22          year."

23          Right?

24  A.  Correct.

11:23:57   25   Q.  You can take that down.

Shepard - cross by Rothschild

487

1      Now, in response to media -- because there was media

2  about this incident, correct?

3  A.  Correct.

4  Q.  Okay.  In response to that media, Motorola's head of

5  security at the time, Bill Boni, wanted Motorola to implement

6  some measures to be able to protect, detect, respond -- I think

7  those were your words from your presentation -- better, faster,

8  to this precise exact scenario, right?

9  A.  Correct.

10 Q.  And if we could please have DTX 4473.

11      THE COURT:  This might be a good stopping point,

12 counsel.

13      Members of the jury, once again, it's brunch time, and

14 I'm going to give you extra five minutes today.  It's 11:25,

15 you may return at 12:30.  You are excused.

16      You may step down, sir.

17      I have another matter to deal with.

18      (The following proceedings were had out of the

19      presence of the jury in open court:)

20      THE COURT:  All right.  The trial will adjourn.

21      THE CLERK:  This court is in session.  Please be

22 seated.

23      THE COURT:  This trial is adjourned.

24      THE CLERK:  This trial is adjourned.

25      THE COURT:  If you look at the court call, counsel,

Shepard - cross by Rothschild

488

1  all of this will become clear.

2          MR. ALPER:  Thank you, Your Honor.

3

4

5          (Luncheon recess taken from 11:30 o'clock p.m.

6          to 12:30 o'clock p.m.)

7

8                  *    *    *    *    *    *    *    *

9

10

11  I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

12          RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

13

14          /s/Blanca I. Lara            November 13, 2019

15

16

17

18

19

20

21

22

23

24

25

489

1              IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3   MOTOROLA SOLUTIONS, INC., and MOTOROLA    ) No. 17 CV 1973
    SOLUTIONS MALAYSIA SDN. BHD,              )
4                                             )
              Plaintiffs,                     )
5   vs.                                       ) Chicago, Illinois
                                              )
6   HYTERA COMMUNICATIONS CORPORATION, LTD.,  ) November 13, 2019
    HYTERA AMERICA, INC., and HYTERA          )
7   COMMUNICATIONS AMERICA (WEST), INC.,      )
                                              )
8             Defendants.                     ) 12:31 o'clock p.m.

9                     TRIAL - VOLUME 4-B
                   TRANSCRIPT OF PROCEEDINGS
10
           BEFORE THE HONORABLE CHARLES R. NORGLE, SR.,
11                        and a jury

12  APPEARANCES:

13  For the Plaintiffs:     KIRKLAND & ELLIS, LLP
                            BY:  MR. ADAM R. ALPER
14                               MR. BRANDON HUGH BROWN
                            555 California Street
15                          Suite 2700
                            San Francisco, California 94104
16                          (415) 439-1400

17                          KIRKLAND & ELLIS, LLP
                            BY:  MR. MICHAEL W. DE VRIES
18                               MR. CHRISTOPHER M. LAWLESS
                            333 South Hope Street
19                          Suite 2900
                            Los Angeles, California 90071
20                          (213) 680-8400

21

22  Court Reporter:         AMY M. SPEE, CSR, RPR, CRR
                            Official Court Reporter
23                          United States District Court
                            219 South Dearborn Street, Room 1728
24                          Chicago, Illinois  60604
                            Telephone:  (312) 818-6531
25                          amy_spee@ilnd.uscourts.gov

490

```
 1   APPEARANCES (Continued:)

 2   For the Plaintiffs:      KIRKLAND & ELLIS, LLP
                              BY:  MS. MEGAN MARGARET NEW
 3                            300 North LaSalle Street
                              Chicago, Illinois 60654
 4                            (312) 862-7439

 5                            KIRKLAND & ELLIS, LLP
                              BY:  MS. LESLIE M. SCHMIDT
 6                            601 Lexington Avenue
                              New York, New York 10022
 7                            (212) 446-4763

 8   For the Defendants:      STEPTOE & JOHNSON, LLP
                              BY:  MR. BOYD T. CLOERN
 9                                 MR. MICHAEL J. ALLAN
                                   MS. JESSICA ILANA ROTHSCHILD
10                                 MS. KASSANDRA MICHELE OFFICER
                              1330 Connecticut Avenue NW
11                            Washington, DC 20036
                              (202) 429-6230
12
                              STEPTOE & JOHNSON, LLP
13                            BY:  MR. DANIEL S. STRINGFIELD
                              227 West Monroe Street
14                            Suite 4700
                              Chicago, Illinois 60606
15                            (312) 577-1300

16

17   ALSO PRESENT:            MR. RUSS LUND and
                              MS. MICHELE NING
18

19

20

21

22

23

24

25
```

Shepard - cross by Rothschild

491

1          (Proceedings heard in open court.  Jury in.)

2               THE CLERK:  Court is in session.  Please be seated.

3               THE COURT:  Good afternoon, members of the jury.

4               Please proceed with the witness.

5          SCOTT SHEPARD, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

6                    CROSS-EXAMINATION (CONT'D)

7     BY MS. ROTHSCHILD:

8     Q.  Hi, Mr. Shepard.

9     A.  Hello.

10              MS. ROTHSCHILD:  Jim, if you don't mind, if you could

11    pull back up DTX 4651, and if we could go again to Page 16.

12    BY MS. ROTHSCHILD:

13    Q.  And, Mr. Shepard, I wanted to direct you again to the

14    bottom right-hand corner where it talks about the 1366

15    incidents reported year to date in August of 2008.  Do you see

16    that?

17    A.  I do.

18    Q.  Okay.  And previously you were stating that all of the

19    incidents were in the mobile devices group; is that right?

20    A.  I was stating that the instance with the leaks were in the

21    mobile devices group, not all of the incidents.  These are

22    loss prevention, so this is not actually my group.

23    Q.  Okay.  But we see that there are 311 incidents in the

24    first eight months of 2008 in BMS and 111 in corporate, right?

25    A.  Correct.

Shepard - cross by Rothschild

492

1   Q.  And those are not the mobile devices group, correct?

2   A.  Correct.

3   Q.  So there were security issues that went well beyond the

4   mobile devices group, correct?

5   A.  These are physical security issues, not cybersecurity

6   issues.

7   Q.  But there was theft of information, theft of laptops,

8   laptops containing Motorola information that were walking out

9   of the company in 2008, right?

10   A.  There were laptops walking out of the company in 2008.

11        THE COURT:  Can you give the jury some perspective of

12   the number of employees that Motorola had at that time.

13        THE WITNESS:  I believe it was about 65,000 employees

14   globally.

15        THE COURT:  All right.  Please proceed.

16   BY MS. ROTHSCHILD:

17   Q.  Mr. Shepard, before we broke for lunch, I believe you were

18   handed DTX 4473.  Do you have that in front of you?

19   A.  I do.

20   Q.  And this is an internal Motorola e-mail from July 8th,

21   2008, and you are one of the recipients, correct?

22   A.  Correct.

23        MS. ROTHSCHILD:  Your Honor, I'd like to move DTX

24   4473 into evidence, please.

25        MR. LAWLESS:  No objection.

Shepard - cross by Rothschild

493

1          THE COURT:  It is received.  It may be published.

2          (DTX Exhibit No. 4473 was received in

3       evidence.)

4    BY MS. ROTHSCHILD:

5    Q.   And if we could just zoom in quickly on the header of the

6    e-mail.  We see this is from July 8th, 2008, and the subject

7    is, "On the recent news story on espionage," right?

8    A.   Correct.

9    Q.   And I'd like to direct your attention to the first e-mail

10   in the chain that starts on the bottom of Page 5.  This is an

11   e-mail on July 2nd, 2008, from Bill Boni to yourself and some

12   of your colleagues.  Do you see that?

13   A.   I do.

14   Q.   And, again, Bill Boni was the chief information security

15   officer at Motorola at the time, correct?

16   A.   Correct.

17   Q.   And he writes on the second paragraph, "I think we need a

18   list of 10 to 12 things we must do or are doing different to

19   be able to prevent, detect, respond better/faster to this

20   precise/exact scenario," correct?

21   A.   Correct.

22   Q.   And he says, "I suggest we can start with these," right?

23   A.   Correct.

24   Q.   No. 1, "We need Compass log data NOW."  All caps "now,"

25   right?

Shepard - cross by Rothschild

494

1    A.   Correct.

2    Q.   "And a daily/weekly report of anyone downloading 600 or

3    more documents in a 24-hour period to SOC (or me?) every day

4    or within two hours of that total two hours?"  Right?

5    A.   Correct.

6    Q.   And I think you testified yesterday, Mr. Chia had access

7    to 600 documents in a day, correct?

8    A.   Correct.

9    Q.   And in No. 3, Mr. Boni writes, "We need policy change to

10   PROHIBIT anyone on medical leave of absence from MVP/VAN

11   remote access to moto network," right?

12   A.   Correct.

13   Q.   Now, let's take a look at Mr. Cunningham's response that

14   starts on Page 4 and carries over to Page 5.  And I'd like to

15   direct your attention first to the first line of his e-mail on

16   Page 4.

17        It says, "Compass logging . . . seems to me a lower

18   threshold for downloads would be appropriate.  I'd suggest 100

19   per 24 hours," right?

20   A.   Correct.

21   Q.   And then if we look down to the fourth paragraph, he

22   writes, "With regard to leaves, I would suggest that we

23   completely pull the plug when someone is on any leave, except

24   PTO.  That means the employee turns in everything that is

25   company-issued, including their ID, until they are back,"

1   right?

2   A.   Correct.

3   Q.   That means they couldn't remotely access Motorola's

4   network, right?

5   A.   That is the suggestion made by Patrick, correct.

6   Q.   So someone like Y.T. Kok who was on leave from Motorola

7   wouldn't be able to remotely access Motorola information,

8   right?

9   A.   Correct.

10  Q.   And then if I can direct your attention to the paragraph

11  that starts on the bottom of Page 4 and carries over to

12  Page 5.  And it's talking about Motorola's security and the

13  physical security that is in place at Motorola facilities.

14       Do you see that?

15  A.   Yes.

16  Q.   He says, starting on that last line on the bottom of

17  Page 4, "I'm not advocating a system of airport-style security

18  scams" -- excuse me.  "I'm not advocating a system of

19  airport-style scans and searches, but I have had a harder time

20  getting into the Sears Tower than getting into any of our

21  facilities," right?

22  A.   That is his opinion.

23  Q.   And this was July of 2008, the same year that G.S. Kok,

24  Sam Chia, and Y.T. Kok left Motorola, correct?

25  A.   That is the same year.

1   Q.   Okay.  So if Motorola had gone ahead and implemented the

2   Compass high-access logging checks as suggested in this

3   e-mail, Motorola would have caught access that was over a

4   hundred documents in a 24-hour period, correct?

5   A.   We did implement it.  It took time to actually get it

6   implemented.

7   Q.   Right.  It took more than two years, didn't it?

8   A.   Yes, about 2010.  So it was hard to customize that part.

9   Q.   Okay.  We'll get to that.

10  A.   Okay.

11  Q.   Let's talk about some other examples of instances and

12  circumstances in which Motorola pulls Compass logs and how

13  Motorola used Compass data back in the day.

14          MS. ROTHSCHILD:  If I could please have DTX 4504.

15  BY MS. ROTHSCHILD:

16  Q.   Mr. Shepard, DTX 4504 is an internal Motorola e-mail.  The

17  subject is, "Rules of engagement for computer forensic

18  examinations."  And it was produced out of your files.

19          Do you see that?

20  A.   Correct.

21          MS. ROTHSCHILD:  Okay.  I would like to admit DTX

22  4504.

23          MR. LAWLESS:  No objection.

24          THE COURT:  It is received.  It may be published.

25       (DTX Exhibit No. 4504 was received in

Shepard - cross by Rothschild

497

1          evidence.)

2     BY MS. ROTHSCHILD:

3     Q.  So if we look at this e-mail, it starts with an e-mail

4     from Mr. Cunningham on the bottom of the first page and it

5     carries over to the second page.  And I would like to zoom in,

6     please, on the Paragraph No. 3 on the second page.

7              It says, "Compass activity.  From time to time, we

8     may examine the Compass log to determine the Compass activity

9     of a specific employee in connection with an examination of

10    the individual's behavior," right?

11    A.  That's what he wrote, yes.

12    Q.  And this is his statements from December 9th, 2009,

13    correct?

14    A.  Correct, his statements.

15    Q.  Okay.  At the end of the paragraph, he writes, "In

16    general, this review" -- review of Compass -- "does not

17    directly yield a forensic investigation specifically until an

18    OEC case has been opened," right?

19    A.  That's what he wrote, correct.

20    Q.  So review Compass first, then open an OEC investigation,

21    right?

22    A.  I think that was his suggestions at the time.

23             MS. ROTHSCHILD:  If I can please have a couple of

24    exhibits to do at once, 4505, 4510, 4511, 4512, 4764, and

25    4771.

Shepard - cross by Rothschild

498

1    BY MS. ROTHSCHILD:

2    Q.  Mr. Shepard, you've been handed a collection of six

3    exhibits.  These are Motorola internal e-mails, several of

4    which are attaching Compass access logs from the 2009 and 2010

5    time period, correct?

6    A.  Correct.

7           MS. ROTHSCHILD:  Your Honor, I'd like to move into

8    evidence DTX 4505, 4510, 4511, 4512, 4764, and 4771.

9           MR. LAWLESS:  No objection.

10          THE COURT:  All six are received, and all six may be

11   published.

12       (DTX Exhibit Nos. 4505, 4510, 4511, 4512, 4764, and 4771

13        were received in evidence.)

14   BY MS. ROTHSCHILD:

15   Q.  Now I'd like to direct your attention to DTX 4512.

16          This is an e-mail from --

17   A.  4512?

18   Q.  4512.  They should be in numerical order.

19   A.  It was at the bottom.

20          Sorry.  Go ahead.  Go ahead.

21   Q.  DTX 4512 is an e-mail from June of 2009.  The subject is

22   "Help with contractor," and there's an incident number.

23          Do you see that?

24   A.  I do.

25   Q.  Okay.  So if I can have you direct your attention, please,

Shepard - cross by Rothschild

1   to Page 2.  There's an e-mail at the top from a Marc Kauffman

2   that is summarizing a request saying we would appreciate your

3   help in accessing monitoring data showing what our contractor

4   has accessed over the past few weeks, right?

5   A.  Yeah, I haven't seen this one, though, so . . .

6        Which part again?

7   Q.  In that top of the e-mail.  Yes, you see it on your

8   screen?

9   A.  Okay.

10   Q.  Okay.  And later on in that paragraph, it says, "However,

11   our management team would like to be confident he hasn't been

12   accessing information on the network that goes beyond his

13   assignment," right?

14   A.  That is what Marc wrote, right.

15   Q.  So then if we look at the first page, at the top, we see

16   the response from Ian Menzies from Motorola.

17        And he says, "As agreed, I've taken a look at the

18   subject's laptop, Compass access, browsing history, and

19   e-mail," right?

20   A.  That is correct.

21   Q.  And then if we move down a little bit on the page, we see

22   attached is the Compass access list.  "Please review and let

23   me know if we need to investigate further," right?

24   A.  That is what he wrote.

25   Q.  And in the attachment line of the e-mail, we see an

Shepard - cross by Rothschild

500

1    employee ID number/Compass history Excel file name listed on

2    the first page.

3    A.   I'm sorry.  Where is that?

4    Q.   In the attachment line.

5    A.   Oh, yes.

6    Q.   Okay.

7    A.   Wait.  The company -- yes, the CORE ID/Compass history

8    XLS, correct.

9    Q.   And the CORE ID, that's an employee identification number,

10   correct?

11   A.   Yeah, that is the user ID.

12         MS. ROTHSCHILD:  Okay.  If we could pull up the

13   Compass access log that's attached here.  It was the Excel

14   file.

15   BY MS. ROTHSCHILD:

16   Q.   And we'll put that on your screen, Mr. Shepard.

17         And I'm going to shift over here.  And what we see

18   here is we see that a Compass -- this is -- or -- strike that.

19         This is a Compass access log, correct?

20   A.   It is similar, but it looks like it was generated from a

21   different program than the one that we generated.

22   Q.   This has the same information that was pulled for G.S.

23   Kok, Sam Chia, and Y.T. Kok, right?  It has data ID, right?

24   A.   It's a larger set than what was pulled, so it was a

25   different program that pulled it.

Shepard - cross by Rothschild

1    Q.  So it's even more comprehensive than the data that

2    Motorola pulled in January of 2017 for G.S. Kok, Sam Chia, and

3    Y.T. Kok, correct?

4    A.  I disagree with it being more comprehensive.  There is

5    different data in here based on what was requested for the

6    pull.

7    Q.  And there's more data here, right?

8    A.  There is more data.

9    Q.  So there's data ID, right?

10   A.  Yes, data ID.

11   Q.  Name?

12   A.  Correct.

13   Q.  Okay.  There's a POPI folder?

14   A.  Correct.

15   Q.  Or column.

16          And last access?

17   A.  Correct.

18   Q.  Count?

19   A.  Correct.

20   Q.  And accessor, right?

21   A.  That was not included in the underline, I believe.

22   Q.  But the accessor was the information that was used to pull

23   the data.  That's the CORE ID, correct?

24   A.  Let me check that.

25          Correct.

Shepard - cross by Rothschild

502

1          MS. ROTHSCHILD:  You can take that down.

2     BY MS. ROTHSCHILD:

3     Q.  Please take a look at DTX 4764, which should be in that

4     stack in front of you, Mr. Shepard.

5     A.  Okay.

6     Q.  And this is an April 2010 Motorola e-mail.  The subject is

7     "MDB procurement employee resigns and goes to Apple," right?

8     A.  Correct.

9          MS. ROTHSCHILD:  Jim, would you mind putting this one

10    up?  4764.

11    BY MS. ROTHSCHILD:

12    Q.  And I'd like to direct your attention to the e-mail that's

13    on the bottom of the page and carries over to the second page.

14    This is an e-mail from a John Clark at Motorola, right?

15    A.  Yeah, John Clark worked in the mobile devices business.

16    Q.  And if we could zoom in on John Clark's signature block on

17    the second page.  It says, "John G. Clark, Trade Secrets

18    Protection, Director Information Technology," right?

19    A.  Correct.

20    Q.  And the employer is Motorola, Inc., right?

21    A.  Correct, in the rebuild, which is mobile devices.

22    Q.  If we go back to the bottom of Page 1, Mr. Clark writes

23    that a Motorola employee was resigning and going to work at

24    competitor Apple, right?

25    A.  Which --

Shepard - cross by Rothschild

1  Q.  In the all caps.

2  A.  Correct.

3  Q.  Okay.

4  A.  Actually, I'm sorry, it says MDB, which is Motorola device

5  business, employee resigns.

6  Q.  Okay.  And, again, Motorola devices is part of Motorola,

7  Inc., at this time, right?

8  A.  Correct.

9  Q.  And in No. 2, it says, "The major concerns from MDB" --

10  mobile device business -- "perspective is that this person had

11  significant knowledge of our volume plans," right?

12  A.  Correct, that's what was written by John.

13  Q.  And people not in the devices business, say, for example,

14  in the radio business, they also have similar positions with

15  access to volume plans, for example, right?

16  A.  I don't know if they do.

17  Q.  Okay.  And if we look on Page 2, we see in Point 3, John

18  Clark of trade secrets protection at Motorola is reporting

19  that the employee's account has been disabled and that her

20  supervisor has taken over her laptop, correct?

21  A.  Correct.

22  Q.  And the next point says this is a standard process, right?

23  A.  That's what Michael said.  Which Michael is that?

24      I don't know which Michael you're referring to.

25  Q.  But Mr. Clark, the trade secrets protection individual at

Shepard - cross by Rothschild

504

1    Motorola, Inc., is writing in his e-mail that this was a

2    standard process, right?

3    A.  He's saying that Michael indicated this was a standard

4    process, but I don't know which Michael you're referring to.

5    But, yes, he said Michael indicated this is a standard

6    process.  Correct.

7    Q.  And Mr. Clark is not disagreeing with that, right?

8    A.  Mr. Clark wrote it, so I don't know why he would disagree

9    with his own --

10   Q.  Right.  Okay.  And if you could look at DTX 4505.

11       MS. ROTHSCHILD:  And if we could put that up, please.

12   BY MS. ROTHSCHILD:

13   Q.  So we see at the top of this e-mail that Mr. Clark is also

14   on this e-mail, correct?

15   A.  Correct.

16   Q.  And this is from May 28th, 2010.  And it's a Motorola

17   discussion of a questionable user, correct?

18   A.  That's what the subject line says, correct.

19   Q.  If I can direct you to the bottom of Page 1, there's an

20   e-mail that starts from Richard Rushing, an individual in the

21   security division at Motorola, correct, at the time?

22   A.  Yes.  Correct.

23   Q.  Okay.  And he writes on the bottom of Page 1, "Downloading

24   content to prepare a presentation is not how things are done

25   when someone is leaving," right?

Shepard - cross by Rothschild

1   A.   I'm sorry.  Which --

2   Q.   The bottom of Page 1.

3   A.   I've got it.  Downloading content -- correct.

4   Q.   Okay.  And if we turn to Page 2, we see that Mr. Rushing

5   requests that forensics take an image of the system, right?

6   A.   That is what Mr. Rushing has requested.

7   Q.   And then he says, "Also, if he is going to a competitor,

8   we need to make sure the competitor understands this," right?

9   A.   That is what he said.

10  Q.   He continues, "This is not the first time this has

11  happened," right?

12  A.   Correct, that's what he wrote.

13  Q.   "But I do not think we should give him a LAPTOP," all in

14  caps, right?

15  A.   Correct.

16  Q.   "Put him on a desktop or something he can't walk out the

17  door with," right?

18  A.   Correct.

19  Q.   And then he comments, "He has not created anything in

20  Compass or modified like you would be doing for cleanup before

21  you leaved," correct?

22  A.   That is what Mr. Rushing wrote, correct.

23  Q.   So Mr. Rushing has already reviewed his Compass access

24  history, right?

25  A.   I don't know if he did review it or not there.  That is

Shepard - cross by Rothschild

1    speculation.

2    Q.   Okay.  Do you think he's commenting on the employee's

3    Compass usage without having reviewed the log?

4    A.   I am not sure why he's commenting.  I don't know Richard.

5    Q.   If we look on the first page, we see at the top

6    Mr. Cunningham asking for authorization to conduct a forensic

7    inspection of the computer, correct?

8    A.   Correct.

9    Q.   And to open an OEC case, right?

10   A.   Correct.

11   Q.   OEC being the Office of Ethics and Compliance, right?

12   A.   Correct.

13   Q.   Okay.  So in the last two exhibits that we just looked at,

14   Motorola reviewed Compass logs for employees who were about to

15   leave Motorola, right?

16   A.   I don't know if Richard reviewed the logs there.  Let me

17   look at the one before.

18        Which exhibit was that one?

19   Q.   The one before was 4764.

20   A.   Yeah, John didn't indicate if he had approval on the one

21   before, so --

22   Q.   But they're talking about doing some investigation of the

23   employee before they depart their employment at Motorola,

24   correct?

25   A.   I don't think that's what that says.  I disagree.  I don't

Shepard - cross by Rothschild

1    know what Richard was saying there.

2    Q.   You don't think that downloading content to prepare a

3    presentation is not how things are done when someone is

4    leaving -- doesn't mean that the employee was leaving the

5    company?

6    A.   No, I don't know if he pulled the Compass logs.  This was

7    what Richard Rushing's actions were.

8    Q.   Okay.  And in one of these exhibits, one of the employees

9    was known to be leaving for a competitor, that being Apple,

10   correct?

11   A.   That was the first exhibit, right, that you showed me?

12   Q.   Yes.  For the record, that was DTX 4764.

13        So let me give you DTX 4440.

14   A.   Okay.  Is this a new one?

15   Q.   Yes.

16   A.   Are you done with these?

17   Q.   Yes.

18   A.   Okay.  Thank you.

19   Q.   DTX 4440 is an internal Motorola e-mail on March 23rd,

20   2012.  And you are the first person on the cc list there,

21   correct?

22   A.   Yes.

23        MS. ROTHSCHILD:  Your Honor, I'd like to move DTX

24   4440 into evidence.

25        MR. LAWLESS:  No objection.

Shepard - cross by Rothschild

508

1           THE COURT:  It is received and may be published.

2           (DTX Exhibit No. 4440 was received in

3           evidence.)

4    BY MS. ROTHSCHILD:

5    Q.   Now, I'd like to start with the e-mail that is on the

6    bottom of Page 1 and carries over to Page 2.

7           This is an e-mail on March 22nd, 2012, from Jim

8    Heyland to yourself, "Subject:  Confidential question."

9    Marked with high importance, correct?

10   A.   Correct.

11   Q.   Okay.  And he writes, "A key employee from engineering in

12   Penang may be leaving Motorola Solutions," right?

13   A.   That is what Jim wrote.

14   Q.   "He is seeking work at other companies would be expected,

15   but is a concern," right?

16   A.   That is what Jim wrote.

17           THE COURT:  Just for a point of clarification, have

18   you moved from the United States to Penang?

19           MS. ROTHSCHILD:  I was going to draw that, yes, sir.

20           THE COURT:  So now we're in Penang?

21           MS. ROTHSCHILD:  The individual that is being

22   discussed in the e-mail is in Penang and the --

23           THE COURT:  The others were not?

24           MS. ROTHSCHILD:  Your Honor, I'm actually not certain

25   where the other individuals were located.

Shepard - cross by Rothschild

509

1      THE COURT:  All right.  But right now you're drawing

2  the attention of the jury to an event in Penang?

3      MS. ROTHSCHILD:  Yes, sir.

4      THE COURT:  Proceed.

5  BY MS. ROTHSCHILD:

6  Q.  And so you were being asked about Motorola's capabilities

7  with respect to an employee who is departing Penang, right?

8  A.  Jim Heyland asked me is there a way to monitor his

9  downloads, e-mails, *et cetera*.

10  Q.  And him being somebody who was in Penang, correct?

11  A.  From Jim's e-mail, a key employee from engineering in

12  Penang, correct.

13  Q.  And you were here in the United States, correct?

14  A.  I was here in the United States.

15  Q.  And then the next sentence, he says, "If he goes to a

16  competitor like Hytera, it could be harmful to us," right?

17  A.  That is what he says.

18  Q.  Okay.  And one of the capabilities that Motorola had was

19  to pull Compass access logs, right?

20  A.  Correct.

21  Q.  Okay.  And if we look on Page 1, we see Patrick

22  Cunningham's response in the middle of the page.  And he says

23  we have the capability, right?

24  A.  Correct.

25      MS. ROTHSCHILD:  We can take that down.

Shepard - cross by Rothschild

510

1   BY MS. ROTHSCHILD:

2   Q.  Now, Mr. Shepard, earlier today you testified that you

3   had, in fact, heard of G.S. Kok before late 2016; is that

4   correct?

5   A.  I did.

6   Q.  Okay.  Yet when you were asked that same question or a

7   similar question at your deposition on October 6th, 2017, your

8   answer was very different, wasn't it?

9   A.  It was.  I didn't actually learn about that e-mail until

10  after that time frame.

11  Q.  So in October of 2017, a few months after Motorola filed

12  the lawsuit, it was your testimony under oath that you did not

13  recall ever having heard of G.S. Kok previously, right?

14  A.  Correct.

15  Q.  And now, two years later, you've made the connection

16  between G.S. Kok and some monitoring that Motorola did of him

17  in 2010; is that right?

18  A.  I didn't make the connection.  The legal team said that

19  there was an e-mail.  I get thousands of e-mails a day.  So

20  they made the connection for me.  I did not recall learning

21  about G.S. Kok until then.

22  Q.  Okay.  So you don't have any independent recollection of

23  G.S. Kok and Motorola monitoring his e-mail in June of 2010;

24  is that right?

25  A.  I do as part of this case now have that because the e-mail

Shepard - cross by Rothschild

511

1   was shown to me, but at the time of my depositions, I had no

2   recollection at that time.

3   Q.   So your last deposition was in March of 2019, and you

4   still didn't know, right?

5   A.   I did not know the -- I had two depositions in March.  I

6   did not know the first day of deposition.  I found out about

7   that e-mail the second day of deposition.

8   Q.   Now, it's your testimony that a Compass log can only be

9   pulled if one of three entities authorizes it; is that right?

10  A.   My testimony is an investigation requires one of three

11  groups, Office of Ethics and Compliance, legal, and HR to

12  approve it.

13  Q.   Okay.  And now both you and the Office of Ethics and

14  Compliance were involved in monitoring G.S. Kok back in 2010,

15  weren't you?

16  A.   We loaded G.S. Kok's e-mail into the e-mail monitoring

17  system, not to monitor G.S. Kok, but to monitor employees that

18  may be talking to G.S. Kok.

19  Q.   Okay.

20  A.   So it was not G.S. Kok-related.

21  Q.   Well, it was based on a suspicion that information had

22  been leaked to Hytera via G.S. Kok, right?

23  A.   It was an e-mail address added to a watch list trying to

24  determine if there would be an issue, so --

25  Q.   Well, let's pull it up --

Shepard - cross by Rothschild

512

1   A.   Sure.

2   Q.   -- so that we're all on the same page.  It's a previously

3   admitted exhibit DTX 4565.  And so if we can actually zoom in

4   on the top e-mail from To Chuong, who goes by Van.  We see

5   that he is being added to Motorola's watch list because Russ

6   and his team believe that G.S. still keeps contact with many

7   Motorolans and leaks might have happened through that channel,

8   right?

9   A.   That is what Russ said.

10  Q.   And so Motorola was suspicious in June of 2010 that

11  information confidential to Motorola was in Hytera's

12  possession through G.S. Kok, right?

13  A.   No.  Motorola was in suspicion about Motorola employees.

14  We don't know who was talking to G.S. Kok, so we added that

15  e-mail address to see who was talking to G.S. Kok.

16  Q.   But the suspicion was that G.S. Kok was the one with

17  Motorola information, right?

18  A.   No, it was the employees were talking to him.  The

19  suspicion was on the current employees.  We had no way to

20  monitor G.S. Kok.  He had left the company.

21  Q.   Well, you could have pulled his Compass logs, right?

22  A.   We had no reason to pull his Compass logs.  He was not the

23  person in suspicion; it was the current employees.

24  Q.   And you put G.S. Kok's e-mail on this monitoring filter

25  and no results came up, right?

Shepard - cross by Rothschild

1  A.  We added G.S. Kok's Hytera e-mail to the list and there

2  were no hits.

3  Q.  And so Motorola never got to the bottom of the suspicions

4  of leaks?

5  A.  There was nothing to look at.  No one was talking to him

6  from within the company.

7  Q.  If I can direct your attention to the second page of this

8  e-mail.  Towards the bottom there's an e-mail from Van on

9  June 3rd, 2010, at 8:21 a.m.

10         MS. ROTHSCHILD:  If we could zoom in on that, please.

11  BY MS. ROTHSCHILD:

12  Q.  And Van writes that there were five people in Motorola's

13  employee directory at the time with the last name of Kok, like

14  G.S. and Y.T., right?

15  A.  Correct.

16  Q.  That last name was still there, Yee Loon.  And there's a

17  parentheses, ZMY12.  That means in Malaysia, right?

18  A.  Yes, that's a Malaysia location code.

19  Q.  And Yee Loon Kok is Y.T. Kok; isn't he?

20  A.  Correct.

21  Q.  And Motorola didn't institute a filter on Yee Loon Kok's

22  e-mail, did it?

23  A.  What do you mean by "filter"?

24  Q.  The same filter that was applied to G.S. Kok.

25         Motorola didn't institute one in June of 2010 on Yee

Shepard - cross by Rothschild

514

1    Loon Kok, did it?

2    A.   The one for G.S. Kok was the e-mail address of Hytera's --

3    his Hytera e-mail address, and it was a pattern matching, not

4    a filter.  So I'm not sure what you mean by "filter" here.

5    Q.   In June of 2010, did Motorola institute any type of filter

6    or matching or any technological measure to monitor Yee Loon

7    Kok's communications?

8    A.   I believe that we did add his -- I think a combination of

9    his with G.S. Kok to that list.

10   Q.   You're guessing?

11   A.   I don't know the exact details of what was added to the

12   pattern matching.

13   Q.   At this point in time Motorola knew that Yee Loon's

14   brother Y.T. was at Hytera, correct?

15   A.   I don't know when Motorola knew that.

16   Q.   Okay.

17   A.   I know that we --

18   Q.   You wouldn't disagree with Mr. Lund who testified that

19   Motorola knew that in 2008, right?

20   A.   I wouldn't disagree with Mr. Lund.

21   Q.   So this is 2010, Motorola knows that Y.T. Kok is at

22   Hytera.  Motorola doesn't institute the same filter or pattern

23   matching on Y.T. Kok's e-mail as it did with G.S. Kok's,

24   correct?

25   A.   Well, it can't be the same pattern because Yee Loon is an

Case: 1:17-cv-01973 Document #: 785 Filed: 12/20/19 Page 87 of 144 PageID #:52393
Shepard - cross by Rothschild
515

1    employee, and so we can't add a different e-mail address.

2              I'm sorry.  Go ahead.

3    Q.  I think we're talking past each other.

4    A.  I'm sorry.

5    Q.  I'm asking did Motorola institute that same type of filter

6    on Y.T. Kok's Hytera e-mail as it did on G.S. Kok's?

7    A.  Oh, on Y.T. Kok's.  I apologize.

8              I don't believe we instituted a Y.T. Kok e-mail

9    monitoring.  We only did it for G.S. Kok.

10   Q.  And the concern was about information getting into

11   Hytera's hands.  And as of this time, Motorola also knew that

12   Sam Chia was at Hytera, and Motorola didn't put any type of

13   filter or search for Sam Chia at this time, correct?

14   A.  We were only asked to put a monitoring of an e-mail

15   address for G.S. Kok.

16   Q.  Well, let's switch gears a little bit.

17   A.  Sure.

18   Q.  In 2008, Motorola did not use Compass to proactively

19   monitor file access, right?

20   A.  Proactively?

21   Q.  Yes.

22   A.  We did not have automated tools.  It had to be manual.

23   But it was still proactive manually done, if I understand it.

24   Yes, it was manually done.

25   Q.  Okay.  And remember we looked at that e-mail from Bill

Shepard - cross by Rothschild

516

1    Boni, the former chief information security officer at

2    Motorola.  And in 2008, he was suggesting that Motorola

3    institute a high-access report from Compass, right?

4    A.  Correct.

5    Q.  Okay.  Now, in 2009, Motorola performed a review of the

6    Compass system; isn't that right?

7    A.  Correct.

8    Q.  Okay.  If I can hand you DTX 4468.

9    A.  Thank you.

10   Q.  DTX 4468 is a May 27th, 2009, e-mail between Motorola and

11   KPMG that was found in your files with an attached audit

12   report, correct?

13   A.  Correct.

14        MS. ROTHSCHILD:  Your Honor, I'd like to move DTX

15   4468 into evidence.

16        MR. LAWLESS:  No objection.

17        THE COURT:  It is received and may be published.

18      (DTX Exhibit No. 4468 was received in

19      evidence.)

20   BY MS. ROTHSCHILD:

21   Q.  And the subject of this e-mail is "IP Leakage Compass

22   Controls - Final Audit Report," right?

23   A.  Correct.

24   Q.  If we turn to Page 3 of the exhibit, we see a significant

25   finding section in the middle.

Shepard - cross by Rothschild

517

1    A.   Okay.

2    Q.   And the third bullet point here is "Proactive monitoring

3    of user activity in the Compass environment is currently not

4    occurring.  Therefore, suspicious/questionable user activity

5    may go undetected," right?

6    A.   Correct.

7    Q.   And if we look at Page 5 of the exhibit, there's a

8    findings and management actions section.  And I'd like to

9    direct your attention to the last bullet on the page.

10          It says, "A process for proactively analyzing users'

11   activity on the Compass system does not exist.  User activity

12   is currently captured, however, there is no proactive process

13   to identify user misuse of the Compass system," right?

14   A.   Correct.

15   Q.   Actually, I'll keep going.

16          "The reports provided by the Compass and security

17   operations center (SOC) team are currently utilized only on an

18   *ad hoc* basis.  By creating a proactive process for identifying

19   misuse, MAPS may be able to identify and stop activities that

20   would otherwise result in IP leakage," right?

21   A.   Correct.

22   Q.   And what is MAPS?  What does it stand for?

23   A.   Sorry, that is the organization that Bill Boni led after

24   it included the loss prevention in 2009 when I wasn't there.

25   If you look at the top of the page, it stands for Motorola

Shepard - cross by Rothschild

518

1  Asset Protection Services.

2  Q.  Asset protection, like IP, right?

3  A.  Correct.

4  Q.  Okay.  And if you could turn, please, to Page 7 of the

5  exhibit.  I'd like to direct your attention to Item 3.  This

6  is the point about proactive monitoring.  And the required

7  action is to establish a process to proactively monitor

8  Compass users' activity on a regular basis, right?

9  A.  Correct.

10  Q.  And the owner is Richard Rushing, right?

11  A.  Correct.

12  Q.  And this audit was issued on May 27th, 2009, and the due

13  date is July 1st, 2009, right?

14  A.  Correct.

15  Q.  Okay.  So just about a month to implement, right?

16  A.  I wasn't at the company, but I guess that's what Richard

17  said he would do.

18  Q.  Now, to your knowledge, and I think you might have stated

19  this before, Motorola did not implement this recommendation

20  for another year, not until June of 2010, correct?

21  A.  My earliest knowledge was a high Compass access report in

22  June of 2010.

23  Q.  Okay.  If we could please pull up the demonstrative that

24  you used in your direct examination.  PDX, I think it's 3.3.

25          And so we are talking about G.S. Kok, Sam Chia, and

Shepard - cross by Rothschild

519

1    Y.T. Kok who left Motorola in 2008, right?

2    A.  Correct.

3    Q.  Okay.  And the items on the right-hand side of the screen

4    were not in place in 2008, right?

5    A.  Correct.

6    Q.  Okay.  So I'm going to mark through those, and we're going

7    to focus on the left-hand side.

8            And you have Compass listed here in the respond

9    section, correct?

10   A.  Correct.

11   Q.  And we're talking about, in this audit and Mr. Boni's 2008

12   e-mail, using Compass to protect and detect, aren't we?

13   A.  To detect, not to protect.

14   Q.  Okay.  To detect.  Okay.  And another thing that Motorola

15   could have used in 2008 was that algorithm it had been

16   developing, right?

17   A.  There was the idea.  It actually never turned into

18   anything.

19   Q.  And all of the access of G.S. Kok, Sam Chia, and Y.T. Kok,

20   that was recorded in Compass as of 2008 when the protection

21   measures and detection measures and response measures on the

22   left-hand side of this demonstrative were in place, right?

23   A.  Incorrect.  The access is recorded into the system when

24   the user makes that access.  So it was recorded from the time

25   that we installed it in 2003.  Every time they accessed the

Shepard - cross by Rothschild

1  file, that's what's recorded in this system.  We then had to

2  write a Compass access report to pull the data out of the

3  system.

4  Q.  I think you might have misunderstood my question.

5  A.  Oh, I'm sorry.

6  Q.  The Compass access data that Motorola pulled for G.S. Kok,

7  Sam Chia, and Y.T. Kok, all of that existed as of 2008 when

8  the measures on the left-hand side of this demonstrative were

9  in place, correct?

10 A.  Yes, the data existed in the system.

11 Q.  And so Motorola could have used Compass to detect access

12 to high volumes of data but did not in 2008, right?

13 A.  That's incorrect.  As you notice from the audit and other

14 activity, Bill was trying to get it as a detect tool.  We were

15 not able to get it as a detect tool until 2000 -- well, after

16 2009 when the audit was done -- I don't know the exact date --

17 until June of 2010 when I saw the first Compass access report.

18 Q.  This is a measure that Motorola could have put in place in

19 2008, isn't it, Mr. Shepard?

20 A.  Could have?  It would have been possible to create the

21 Compass high-access report.  I don't know if it would have

22 been possible in 2008.  So -- I mean, technically maybe, but

23 it did take two years or possibly more than that to -- well,

24 not more than that.  It could have taken longer than expected

25 to try to get it after Bill wanted it.

Shepard - cross by Rothschild

521

1   Q.  With all of Motorola's software engineers, your testimony

2   is that it took Motorola more than two years to implement a

3   fix that the audit said should only take a month, if that, to

4   implement?

5   A.  The audit didn't say that.  Richard Rushing said that.

6   And it wasn't all of the engineers at the company.  It was a

7   small group of security engineers that were trying to figure

8   out how to do it.

9   Q.  So you didn't leverage your talent in your software

10  engineers; is that right?

11  A.  The talent in the software engineers is focused on

12  developing product.

13          MS. ROTHSCHILD:  All right.  We can take this down.

14  BY MS. ROTHSCHILD:

15  Q.  Now, this morning you were testifying about ClearCase.  Do

16  you recall that?

17  A.  I do.

18  Q.  Okay.  And ClearCase is the repository where Motorola

19  engineers develop the software, the code; is that correct?

20  A.  It is the source code depository.

21  Q.  Now, access was given to everybody, wasn't it?

22  A.  No, it was not.

23  Q.  Okay.  You recall your deposition on March 27th, 2019,

24  correct?

25  A.  Sure.  I --

Shepard - cross by Rothschild

1   Q.  And I asked you, "If somebody just wanted to have access,

2   who could authorize that?"

3           And you said, "Access was given to everybody.  There

4   was no controlling of access other than you had a legitimate

5   login ID to access the system.  We didn't control it, access,

6   at the VOB level.  Everyone had access.  Writing was

7   controlled based on the group."

8           That was your testimony on March 27th, 2019?

9   A.  That was in relation -- I'm sorry.  That was in relation

10  to the ability to pull the access, not in relation to the

11  access itself.  If you recall -- for example, I didn't have

12  access to the Compass system.  You have to get approval from

13  the legitimate person.

14  Q.  The question I asked you, if somebody just wanted to have

15  access, somebody requested access, if somebody just wanted to

16  have access, who could authorize that?  And your --

17          MR. LAWLESS:  Your Honor, objection to reading of

18  deposition testimony without identifying the page and line

19  numbers.

20          THE COURT:  This may be a 106 issue in terms of

21  preceding questions following questions, preceding answers

22  following answers.  It may have been taken out of context.

23  And so I'll sustain the objection.

24          Lay a better foundation for what it is you're

25  attempting to impeach the witness on, what he said now in

Shepard - cross by Rothschild

523

1    terms of your view of the impeachment.

2              MS. ROTHSCHILD:  Sure.

3    BY MS. ROTHSCHILD:

4    Q.  At your deposition we talked about access to ClearCase,

5    and you explained to me there's Level 1 access and Level 2

6    access, right?

7              THE COURT:  Are you looking at the transcript?

8              MS. ROTHSCHILD:  Right now?  No, Your Honor.

9              THE COURT:  Well, that's the point.

10             MS. ROTHSCHILD:  Oh, I --

11             THE COURT:  If you just lift out a sentence and lift

12   out an answer, it's not helpful.

13   BY MS. ROTHSCHILD:

14   Q.  At your deposition we talked about who could get access to

15   Motorola's ClearCase repository, correct?

16             THE COURT:  Well, you didn't talk about it.  You

17   asked questions and the witness gave answers.

18   BY MS. ROTHSCHILD:

19   Q.  Mr. Shepard, at your deposition I asked if somebody just

20   wanted to have access to ClearCase, who could authorize that,

21   right?

22             MR. LAWLESS:  I object, Your Honor, to reading of

23   deposition testimony without identifying the page and line

24   number.

25             THE COURT:  Well, if indeed this is impeachment on a

Shepard - cross by Rothschild

524

1   prior inconsistent statement, there is an insufficient

2   foundation.  The objection is sustained on that grounds.

3           So let's move on here.

4   BY MS. ROTHSCHILD:

5   Q.  Motorola doesn't retain records of who has access to its

6   ClearCase repository, does it?

7   A.  Motorola doesn't retain records?  The -- would it be

8   helpful if I just explained how it worked?  I'm -- because I

9   think we're getting confused here.

10          Go ahead.  I'm sorry.  Ask the question.

11  Q.  There's no list of records from 2008 of the accounts for

12  individuals at Motorola who could access ClearCase, correct?

13  A.  There is no list of records for the individuals who could

14  access ClearCase in 2008.

15  Q.  And you said the only records are of modifications to

16  files, correct?

17  A.  In -- yes.  Correct.  You can only -- when you modify or

18  upload a file, there is a record of that in ClearCase.

19  Q.  Okay.  But if someone just goes in and views a file,

20  there's no record of that, correct?

21  A.  If an employee that has access to do so goes in and views

22  a file, we have no record of that employee viewing the file.

23  Q.  Okay.  And so Motorola has no records of G.S. Kok, Sam

24  Chia, or Y.T. Kok accessing files in ClearCase in 2008,

25  correct?

Shepard - cross by Rothschild

525

1   A.   The Compass -- the ClearCase system cannot record who has

2   accessed files in ClearCase, so Motorola does not have any

3   records of G.S. Kok, Y.T. Kok, and -- you said Sam Chia as

4   well? -- accessing or what they accessed in ClearCase.

5   Q.   Now, let's talk about G.S. Kok, Sam Chia, and Y.T. Kok's

6   Compass access.  Now, none of those employees had access to

7   the actual Compass access records, correct?

8   A.   Correct.

9   Q.   Okay.  And to your knowledge, G.S. Kok did not do anything

10  to try to hide his file access in Compass, correct?

11  A.   Correct.

12  Q.   Okay.  Sam Chia didn't either, right?

13  A.   To my knowledge, correct.

14  Q.   Y.T. Kok didn't either, right?

15  A.   Correct.

16  Q.   You're not aware of G.S. Kok, Sam Chia, or Y.T. Kok

17  evading any technical measures at Motorola, correct?

18  A.   I'm not aware of any three of those employees evading

19  technical measures, correct.

20  Q.   And the logs that you pulled or Motorola pulled for G.S.

21  Kok, Sam Chia, and Y.T. Kok, those were pulled in early 2017;

22  is that right?

23  A.   Correct.

24  Q.   Okay.  And now those logs are access reports that show

25  files accessed while each person was still at Motorola,

Shepard - cross by Rothschild

526

1    correct?

2    A.  Slightly correct.  When we say "accessed," it's actually

3    downloaded to their machine.

4    Q.  Well, it's interesting that your testimony is that today,

5    Mr. Shepard, because -- do you recall your deposition on

6    October 6th, 2017, when you were under oath?

7    A.  I don't recall everything I said, but go ahead.

8    Q.  And you were asked, "How many documents did G.S. Kok

9    allegedly download?"

10            Do you recall that?

11           MR. LAWLESS:  Your Honor, I object to the reading of

12   deposition testimony without identifying page and line

13   numbers.  I also don't believe the witness has a copy of his

14   deposition that's being referenced.

15           THE COURT:  Well, you have a point.  If you have a

16   deposition, you should identify it more precisely in terms of

17   page and line.

18           MS. ROTHSCHILD:  Yes, Your Honor.

19   BY MS. ROTHSCHILD:

20   Q.  Mr. Shepard's October 6th, 2017, deposition, Page 97,

21   Lines 2 through 6.

22           "QUESTION:  So how many documents did G.S. Kok

23   allegedly download?

24           "ANSWER:  I did not count.  I could count those.

25   It's in the access report.  And it's accessed, not

Case: 1:17-cv-01973 Document #: 785 Filed: 12/20/19 Page 99 of 144 PageID #:52405
Shepard - cross by Rothschild
527

1    downloaded."

2    A.  Is that the question?

3    Q.  I was reading your deposition testimony.

4    A.  I'm sorry.

5           THE COURT:  What was the question and what was the

6    answer?

7    BY MS. ROTHSCHILD:

8    Q.  The question was, "How many documents did G.S. Kok

9    allegedly download?"

10          And the answer was, "It's accessed, not downloaded."

11          THE COURT:  Okay.  And you're quoting from the

12   exhibit?

13          MS. ROTHSCHILD:  From his deposition.

14          THE COURT:  All right.  You've quoted it?

15          MS. ROTHSCHILD:  Yes, Your Honor.

16          THE COURT:  All right.

17          You may answer.

18   BY THE WITNESS:

19   A.  Okay.  So I think there's confusion with access and

20   download.  And I can explain how that works, if that would

21   help the Court.

22   BY MS. ROTHSCHILD:

23   Q.  I think I understand.  Thank you, sir.

24          If you had checked the logs when Sam and Y.T. had

25   left, you would have seen their access logs, the same

Shepard - cross by Rothschild

1    information that you saw in January of 2017, correct?

2    A.   If we would have investigated and pulled the logs,

3    correct.

4    Q.   And if you had pulled logs as part of Motorola's exit

5    procedures in 2008 when these three individuals left, Motorola

6    would have seen their Compass reports, correct?

7    A.   If we would have pulled logs as part of the exit

8    procedures, correct.

9    Q.   Okay.  Now, you told the jury yesterday that you think

10   that Sam Chia installed a piece of software on his computer to

11   initiate mass downloads.  Do you recall that?

12   A.   I do.

13   Q.   You don't have any physical evidence of that, right?

14   A.   I do not.

15   Q.   Okay.  And you don't know whether he took anything to

16   Hytera, right?

17   A.   Correct.  I only know that he downloaded it to his

18   machine.

19          THE COURT:  Can you tell the jury what you mean when

20   you say "he downloaded it to his machine."  What does that

21   mean?

22   BY THE WITNESS:

23   A.   So the way that Compass works is it's a Web-based system,

24   and when you connect to a Web-based system, it has to pull the

25   data to show it local on your machine.  In some cases, in

Shepard - cross by Rothschild

529

1    2008, the Web browser could not render it like a picture

2    could.  So it could show a picture in the Web browser and it

3    would download it to the cache.  If it was a PowerPoint file,

4    an Excel file, or different document, there was no way the Web

5    browser at that time could actually show it on the Web browser

6    itself, so it downloaded it to the local machine.

7            In both cases, the access was actually downloading

8    the data to the local machine either for view in the Web

9    browser or to save to disk.

10           THE COURT:  What is a local machine?

11           THE WITNESS:  The employee's computer.  So in this

12   case, Sam Chia's local computer.

13   BY MS. ROTHSCHILD:

14   Q.  The only thing that you investigated for this case was

15   pulling those Compass logs for G.S. Kok, Sam Chia, and Y.T.

16   Kok, correct?

17   A.  We pulled the company logs for those three individuals,

18   correct.

19   Q.  It's quite possible that Motorola pulled Compass logs for

20   G.S. Kok, Sam Chia, and/or Y.T. Kok before then, isn't it?

21   A.  We wouldn't have a reason to pull them until the

22   investigation started.

23   Q.  It is possible that Motorola pulled Compass logs for G.S.

24   Kok, Sam Chia, and Y.T. Kok before January of 2017, isn't it?

25   A.  It is possible to write a program to pull those logs.  The

Shepard - cross by Rothschild

530

1   data existed in the system.

2   Q.  And before 2015, when someone at Motorola made a Compass

3   log access request, Motorola kept those requests, right?

4   A.  Correct.

5   Q.  And those requests were stored electronically in a system

6   called REMEDI, right?

7   A.  The ticketing system was the system that did it, but there

8   are also other records.  There would have been an e-mail as

9   well.

10  Q.  And the ticketing system in REMEDI reflected the

11  parameters of the Compass search requests that were made,

12  right?

13  A.  It did reflect the parameters, but not necessarily the

14  results.

15  Q.  Okay.  But Motorola got rid of those records in 2015,

16  didn't it?

17  A.  Motorola upgraded the REMEDI system, the service now, and

18  so the system itself didn't have the records; however, once a

19  Compass report was completed, it was e-mailed back.  So there

20  would have been a record of the e-mail back to the person

21  that's investigating.  So the e-mail system would have had the

22  record even though REMEDI did not.

23  Q.  Okay.  Motorola did not retain the records from the REMEDI

24  system, correct?

25  A.  We did not retain the records from the REMEDI system.

Shepard - cross by Rothschild

531

1   Q.   Okay.  And sitting here today, you don't know if an access

2   report was requested in 2008 for Sam Chia, do you?

3   A.   I believe there would be an e-mail of that.  So -- I'm

4   sorry.  That's --

5   Q.   Sitting here today, you, chief information security

6   officer at Motorola, don't know whether a Compass access

7   report was requested in 2008 for Sam Chia, correct?

8   A.   So sitting here today, I do not have any e-mail record

9   of -- because we provide the Compass access reports through

10  e-mail back as a record, and I do not have any record of those

11  access reports for those three individuals.

12  Q.   Okay.  So you have no records of access reports being

13  pulled in 2008 for Sam Chia, Y.T. Kok, or G.S. Kok, right?

14  A.   I do not.

15  Q.   Even though that data existed in Compass since their last

16  access dates in 2008, correct?

17  A.   Correct.

18  Q.   And you don't know if an access report was requested in

19  2010 for G.S. Kok, right?

20  A.   There would have been an e-mail record of it had it been

21  requested.  And I don't believe there's an e-mail record, so I

22  don't believe there was a request.

23        MS. ROTHSCHILD:  Can we pull DTX 4565 back up,

24  please.

25  BY MS. ROTHSCHILD:

Shepard - cross by Rothschild

532

1  Q.  This is the June 2010 e-mail.  And if I can direct you to

2  the bottom of that first page, which is the e-mail from you

3  where you write in the middle of the sentence, "We need to go

4  through OEC" to conduct this filter on G.S. Kok, right?

5  A.  It's not a filter, but it's a pattern, correct.

6  Q.  The pattern?

7  A.  Yeah, sorry.

8  Q.  And OEC, that was one of the three organizations that you

9  said needed to authorize the pulling of a Compass log, right?

10  A.  Correct.

11  Q.  All right.  So let's recap briefly.  There was a company

12  problem with leaks that extended from 2007 till at least 2009,

13  correct?

14  A.  There was a problem within mobile devices, not an entire

15  company problem.

16  Q.  There was theft outside of mobile devices, right?

17  A.  There was loss of a laptop, yes.

18  Q.  And there were other issues?  These issues weren't limited

19  to mobile devices, were they?

20  A.  Those issues were not cybersecurity issues, correct.

21  Q.  And there was an issue with departing employees Motorola

22  knew and put into its presentations that employees tend to

23  leave the company with company confidential information,

24  right?

25  A.  There was -- yes.  Correct.

Shepard - cross by Rothschild

533

1   Q.  And in Motorola's Penang facility, there were about 150

2   people leaving on an annual basis, right?

3   A.  I do not know the number specifically.  In the facility, I

4   know there are about 200 a month leaving in that time frame.

5   Q.  And you wouldn't disagree that the vast majority of those

6   were leaving a year -- or -- strike that.

7           You said 200 --

8   A.  A month.

9   Q.  A month.  Okay.  And you wouldn't dispute that there were

10  well over a hundred people leaving the Penang facility in the

11  2008 time period?

12  A.  I do not know how many people left in that time period.

13  Q.  And Motorola is aware that G.S., Sam, and Y.T. went to a

14  competitor, Hytera, right?

15  A.  In what time period?

16  Q.  In 2008.

17  A.  I don't know if we knew that in 2008.

18  Q.  And are you aware that the head of --

19          THE COURT:  What was the question?  Whether you knew

20  it or the fact of them leaving?

21          Clarify the question.  I don't think the witness

22  understood it the way it's put.

23          MS. ROTHSCHILD:  Sure.

24  BY MS. ROTHSCHILD:

25  Q.  Maybe I'll state it a different way.

Shepard - cross by Rothschild

534

1    A.   Sure.

2    Q.   You don't disagree with Mr. Lund's testimony that Motorola

3    knew in 2008 that G.S. Kok, Sam Chia, and -- strike that.

4         You don't disagree with Mr. Lund's testimony that in

5    2008 Motorola knew that G.S. Kok, Sam Chia, and Y.T. Kok had

6    gone to competitor Hytera, correct?

7    A.   Correct, I don't disagree with Mr. Lund's testimony.

8    Q.   And are you aware that in January of 2008, the then head

9    of PCR Nickie Petratos sent an e-mail warning people about

10   Hytera having confidential knowledge of Motorola?

11   A.   I believe you shared that with me during that deposition.

12   Q.   So with all of this knowledge, Motorola never took an hour

13   or so to check the logs for G.S. Kok, Sam Chia, and Y.T. Kok

14   until January of 2017.  Is that your testimony?

15   A.   My testimony is that we were not asked.  And we support

16   the investigation of legal, HR, and the Office of Ethics and

17   Compliance.  I can't comment on what those three groups did

18   during that discussion.  And they were trained to do that.  So

19   I was not aware nor asked to pull those access.

20   Q.   Okay.  And that's the same Office of Ethics and Compliance

21   that was involved in the pattern matching with G.S. Kok's

22   e-mail in June of 2010, right?

23   A.   Correct.

24        MS. ROTHSCHILD:  No further questions.

25        THE COURT:  Do you need a couple minutes, or are you

Shepard - redirect by Lawless

535

1    ready to go, Counsel?

2              MR. LAWLESS:  I'm ready to go.

3              THE COURT:  Proceed.

4              Members of the jury, if you need a break, raise your

5    hand.

6              No hands have gone up.  Please proceed.

7              MR. LAWLESS:  We're ready, Your Honor.  Could we have

8    the technology switched back to Motorola, please?

9              THE COURT:  That's a very profound statement.

10                     REDIRECT EXAMINATION

11   BY MR. LAWLESS:

12   Q.  All right.  Mr. Shepard, is it Motorola's fault that Sam

13   Chia and Y.T. Kok stole Motorola Compass documents and

14   Motorola source code?

15             MS. ROTHSCHILD:  Objection, Your Honor.

16             THE COURT:  Wait just a minute.

17             Could you read that question back, please?

18             MR. LAWLESS:  Certainly, Your Honor.

19             THE COURT:  I was distracted by the appearance of

20   Mr. Fulbright.

21   BY MR. LAWLESS:

22   Q.  Mr. Shepard, is it Motorola's fault that Sam Chia and Y.T.

23   Kok mass downloaded Motorola's Compass documents in source

24   code?

25             THE COURT:  The objection is overruled.  You may

Shepard - redirect by Lawless

536

1    answer it.

2    BY THE WITNESS:

3    A.  No.

4    BY MR. LAWLESS:

5    Q.  Can you explain why?

6    A.  We have no reason to believe those employees had taken

7    anything with them.  They had done their exit interview and

8    they left just like any other employee who worked for other

9    companies.

10   Q.  Okay.  In your career at Motorola, how sophisticated and

11   well-funded are the security attacks that have been lobbied

12   against your company?

13   A.  Very sophisticated.  I mentioned that they were at the

14   foreign government level.

15   Q.  And at the highest level there, the most sophisticated

16   attacks, how well-funded are those?

17   A.  They have, I would say, unlimited funding to go after

18   their target.

19   Q.  And what kind of technology do those attackers have to go

20   after Motorola?

21   A.  Oh, they have a lot of technology and malware.  They also

22   have the ability to recruit individuals and conduct industrial

23   espionage.

24   Q.  And yesterday when you talked about foreign countries and

25   other competitors recruiting individuals, what did you call

Shepard - redirect by Lawless

537

1   that?

2   A.   Industrial espionage.

3   Q.   When you have a case of industrial espionage, are there

4   additional risks to your company and aspects of that threat

5   that make it hard to detect?

6   A.   Yes, there are.

7   Q.   What are those?

8   A.   Well, if you go through industrial espionage, this is an

9   insider, so the foreign government or competitor has hired the

10  insider to -- with access to collect the data and take it with

11  them.

12          I mentioned with Sam Chia and the other three, that

13  they -- they didn't evade anything.  They were given access to

14  what they should have.

15  Q.   So what can Motorola do -- withdrawn.

16          What does Motorola do to defend against those type of

17  attackers?

18  A.   In what time frame?

19  Q.   In 2008.

20  A.   In 2008 we didn't have a way to defend against that.  We

21  had the ability to protect it up-front through access control,

22  but when you are given access to something and you sign

23  agreements and policies, then you don't -- then we give you

24  that access.

25  Q.   And then in view of what the industry's standards were in

Shepard - redirect by Lawless

1    terms of technology and policies, what did Motorola do in 2008

2    to prevent industrial espionage?

3    A.   So we partnered and we deployed like monitoring tools,

4    like for e-mail that you saw as well, in the environment.

5    Q.   Now has Moto- --

6    A.   I'm sorry.  Go ahead.

7    Q.   I'm sorry.  Are you finished?

8    A.   Go ahead.

9    Q.   Was Motorola the only company that experiences these types

10   of attacks?

11   A.   No, it was not.

12   Q.   How big of a problem is this to American tech companies?

13   A.   Well, I think he --

14            MS. ROTHSCHILD:  Objection, Your Honor.  Speculation.

15            THE COURT:  Well, you can broaden the question to

16   include a global inquiry.  I've said that this witness may

17   qualify under Rule 702 with specialized knowledge, which

18   permits more liberality in terms of what he can testify to in

19   the form of an opinion or otherwise applying Rule 702.

20            So your objection is overruled.

21            You may answer.

22   BY MR. LAWLESS:

23   Q.   Mr. Shepard, let me take one step backwards.  Do you

24   participate in industry security groups?

25   A.   I do.

Shepard - redirect by Lawless

1    Q.   Do you communicate with peers in information security at

2    other companies?

3    A.   I do.

4    Q.   Do you communicate with industry peers and experts at the

5    government level about information security?

6    A.   I do.

7    Q.   Is industrial espionage, competitors hacking systems in

8    state level attacks, a unique problem that only Motorola

9    faces?

10   A.   No, it's not.

11   Q.   Who else faces this problem?

12   A.   Every -- every company that I talk to, as well as

13   governments.

14   Q.   And how big of a problem is that as you've seen for

15   American tech companies?

16   A.   It is a big problem across all companies and even the

17   government.

18   Q.   Is it possible for Motorola to stop every single attack?

19   A.   No, it's not.

20   Q.   Are you aware of any company that can stop every single

21   attack?

22   A.   I've never been aware of any company that has been able to

23   stop.  There actually is a quote by a general who says that

24   you know you've been hacked or you don't know you've been

25   hacked, but in both cases, you've been hacked.  And that's a

Case: 1:17-cv-01973 Document #: 785 Filed: 12/20/19 Page 112 of 144 PageID #:52418
Shepard - redirect by Lawless
540

1  pretty fair statement from a very high-level general.

2  Q.  All right.  Hytera's lawyers raised a specific occurrence

3  regarding Hanjuan Jin.  Do you recall that?

4  A.  I do.

5  Q.  Was that a case of industrial espionage carried out

6  against Motorola?

7  A.  Yes, it was.

8  Q.  Now, did the FBI even know that Hanjuan Jin stole

9  Motorola's confidential information before she was stopped at

10 the airport?

11         MS. ROTHSCHILD:  Objection, Your Honor.

12         THE COURT:  Sustained.

13         I think the jury has heard enough about the Jin

14 incident in relationship to the issues involved in this case.

15 Move on to another point, Counsel.

16 BY MR. LAWLESS:

17 Q.  Let's talk about some e-mails, Mr. Shepard.  Hytera's

18 lawyers presented a number of e-mails regarding prior security

19 incidents at Motorola.  Do you recall that?

20 A.  I do.

21 Q.  And in particular, did you see -- or Mot- -- or -- excuse

22 me -- Hytera's lawyers showed you e-mails from your prior

23 boss, Mr. Boni.  Do you recall that?

24 A.  I do.

25 Q.  Were Mr. Boni's instructions to all Motorolans a sign that

Shepard - redirect by Lawless

541

1    Motorola doesn't care about security?

2    A.   No.

3    Q.   What were Mr. Boni's e-mails to all Motorola employees

4    about?

5    A.   They were a reminder to protect our intellectual property

6    and a good reminder for all employees.

7    Q.   And beyond sending e-mails, what else -- under Mr. Boni's

8    leadership in 2008, what else did your group do to protect

9    Motorola confidential information?

10   A.   So we started to implement some of the activities that

11   Boni suggested in that e-mail.  We had to work through that.

12   Q.   All right.  Hytera's lawyers also showed you some e-mails

13   regarding incidents where current Motorola employees were

14   investigated.  Do you recall those examples?

15   A.   Current or current at the time --

16   Q.   Sorry.  Current at the time.

17   A.   Yeah, I saw e-mails from employees.  Now former employees

18   but current at the time.

19   Q.   Okay.  In those situations, were the investigations

20   triggered by certain facts that the department of ethics, HR,

21   or legal deemed to merit an investigation?

22   A.   Yes.

23   Q.   Are you aware of any facts that warranted an investigation

24   into G.S. Kok, Y.T. Kok, or Sam Chia while they were still

25   employed at Motorola?

Shepard - redirect by Lawless

542

1   A.   There was no investigation.

2   Q.   Now, did you ever testify, Mr. Shepard, that your group

3   could never do an investigation on current employees?

4   A.   Did I ever testify that I couldn't?  We always require the

5   Office of Ethics and Compliance, legal, or HR.  And I

6   mentioned that I have the ability to look at my boss's e-mails

7   or something.  And so we have to get the appropriate approval

8   because of the access that we have.

9   Q.   Okay.  And did you ever testify that it was impossible in

10  2008 to pull Compass logs for Sam Chia or Y.T. Kok?

11          MS. ROTHSCHILD:  Objection, Your Honor.

12          THE COURT:  All right.  Sustained.

13          Are you saying statements at a deposition or

14  testimony in formal litigation?

15          MR. LAWLESS:  Testimony in court here, Your Honor.

16          THE COURT:  Here today in court?

17          MR. LAWLESS:  Today and yesterday, Your Honor.

18          THE COURT:  All right.  Do you understand the

19  question the way it's put to you?

20          THE WITNESS:  I guess.

21          THE COURT:  Or would you prefer to have it rephrased?

22          THE WITNESS:  Please rephrase it, if you could.

23          THE COURT:  Rephrase the question.

24  BY MR. LAWLESS:

25  Q.   Either yesterday or today, did you ever take the position

1    that it was impossible for Motorola to pull Compass logs in

2    2008?

3    A.  No, I did not.

4    Q.  Was your group aware of anything in 2008 justifying a

5    computer forensic inspection or Compass pull for G.S. Kok,

6    Y.T. Kok, or Sam Chia?

7    A.  No.

8    Q.  Okay.  Moving to trade secrets, Hytera's lawyers asked you

9    some questions regarding whether certain Compass documents

10   were trade secrets.  Do you recall those questions?

11   A.  I do.

12         MR. LAWLESS:  And if -- Mr. Schlaifer, if we could go

13   back to the exit interviews and publish PTX 1155.6.

14   BY MR. LAWLESS:

15   Q.  Do you recall this exhibit, Mr. Shepard?

16   A.  I do.

17         MR. LAWLESS:  Mr. Schlaifer, if you could blow up the

18   paragraph in the middle beginning with "Motorola proprietary"

19   and continuing down.  Exactly.

20   BY MR. LAWLESS:

21   Q.  Mr. Shepard, what is the purpose of this paragraph as used

22   in the exit interviews at Motorola?

23   A.  The purpose of this paragraph is for the employee to

24   acknowledge the access they had during employment at Motorola.

25   Q.  And what did this employee list as the confidential

1    information that they had access to while they're at Motorola

2    in subparagraph B?

3    A.   In Paragraph B, this employee had access to LTD documents

4    located in Compass and the project folders, source code

5    located in the VOBs.

6    Q.   Is it your understanding that by identifying those

7    documents, the employee acknowledged that they are

8    proprietary?

9    A.   Yes.

10   Q.   Is it reasonable, Mr. Shepard, from an information

11   security standpoint for you to expect and for Motorola to

12   expect that departing employees will follow the law?

13   A.   Yes.

14          MR. LAWLESS:  We can take that down, Mr. Schlaifer.

15   BY MR. LAWLESS:

16   Q.   Does -- the fact that Sam Chia and Y.T. Kok didn't list

17   out individual trade secrets in their exit interview, does

18   that mean that they can take them?

19   A.   No.

20          MS. ROTHSCHILD:  Objection, Your Honor.  Leading.

21          THE COURT:  The answer may stand.

22   BY MR. LAWLESS:

23   Q.   All right.  Let's talk more about the Compass logs,

24   Mr. Shepard.  Hytera's lawyer asked you some questions

25   implying that Motorola should check every Compass log for

1    every employee.  Do you recall those questions?

2    A.  I do.

3    Q.  Every time in the past when Motorola has generated a

4    Compass log, was that in response to an investigation?

5    A.  Yes.

6    Q.  Now, remind us why you need to go through those steps

7    before you can pull that kind of information.

8    A.  To remind you again, because of the access that we have,

9    we need approval from one of those three groups, the Office of

10   Ethics and Compliance, legal, or HR to investigate employees,

11   including supporting in that investigation by pulling Compass

12   logs.

13   Q.  How many employees did Motorola have in 2008, roughly?

14   A.  Roughly -- I believe I said earlier it was about 65,000.

15   Q.  That's 65,000 employees worldwide?

16   A.  65,000 employees worldwide.

17   Q.  Okay.  Just so we have this clear, did the technology

18   exist in 2008 to monitor Compass logs for 65,000 people around

19   the world?

20   A.  It did not.

21   Q.  We saw an e-mail that Hytera's lawyers raised from your

22   boss Bill Boni expressing a desire to further customize the

23   Compass system in 2008.  Do you generally recall that?

24   A.  I do.

25   Q.  Now, could you explain -- well, let's take a big step

Shepard - redirect by Lawless

546

back.   Who makes the Compass system?

A.   The Compass system is a product by a company at the time

called OpenText -- I'm sorry -- yeah, OpenText, and the

product is called LiveLeak.

Q.   Okay.  So Motorola took that software, and what did

Motorola do extra with it?

A.   So beyond the security and the way the software works, we

added additional customizations to create the access reports,

as well as the POPI classification labeling when you upload

the documents.

Q.   Okay.  Is taking software that's available on the market

from a reputable software company and making it even better

yourself, is that exceeding industry standards or just doing

the average?

A.   I would say exceeding industry standards.

Q.   Okay.  And so when Mr. Boni, your boss, in 2008 wanted to

add additional functionality, would that type of action be

going above and beyond industry standards or just doing the

average?

A.   Above and beyond.

Q.   Has the software company that makes the Compass system,

have they ever been able to modify their own software to

provide automatic monitoring?

MS. ROTHSCHILD:  Objection, Your Honor.

THE COURT:  Sustained.  Foundation.

Shepard - redirect by Lawless

547

BY MR. LAWLESS:

Q.  Mr. Shepard, are you aware of or has the software company
that makes Compass offered to Motorola any enhancement to
their software where it can automatically monitor Compass
reports?

A.  They never made that offer.

Q.  Now, why not just take all of Motorola's radio engineers
and devote them to IT security?

A.  Because then they couldn't develop product.  I mean, I'm
sorry.  That's . . .

Q.  Do you recall Hytera's lawyers asking you about a Compass
high-user list?

A.  I do.

Q.  And just to be clear, is that something that your group
ultimately implemented?

A.  Yes.

Q.  How useful was the high-user list for the Compass system?

A.  It was not very useful.

Q.  Why?

A.  There are many people in Compass that move data around
called Compass champions, and so a majority of the high-access
report was simply people that were part of their job to move
data around in Compass.  They had high access, so --

Q.  And let's be really clear, why were those special users
allowed to move so much data around?

Shepard - redirect by Lawless

1    A.   Because they were designated to move sections of data.  So

2    they could move thousands of files at a time from one area of

3    Compass to another area of Compass under their

4    responsibilities.

5    Q.   Okay.  If Motorola somehow was able to create that

6    functionality back in 2008, would Sam Chia or Y.T. Kok even

7    appear on the high-user list?

8    A.   I don't think that it would have.  I think the Compass

9    access was too high for that time period.  I know that there

10   were suggestions in here that Patrick Cunningham would like it

11   to be lower; but, again, that was before we even implemented

12   it.  And those are goals, but not necessarily deliverables.

13   Q.   Okay.  And speaking about goals, why did Motorola engage a

14   third-party consultant to audit their use of the Compass

15   system?

16   A.   It's going to do independent external assessments on how

17   you control and manage access to such an important system.

18   Q.   Did anyone tell Motorola that they had to hire a

19   third-party auditor to do that?

20   A.   No.

21   Q.   Was that a part of Motorola's efforts to go above and

22   beyond?

23   A.   It was a part of their efforts to go above and beyond.

24        MR. LAWLESS:  Okay.  Let's bring up, Mr. Schlaifer,

25   please, DTX 4468.  And if we could go to the next page.

Shepard - redirect by Lawless

549

1   BY MR. LAWLESS:

2   Q.  Do you recall this is the Compass audit that Hytera's

3   lawyers were showing you?

4   A.  I do.

5         MR. LAWLESS:  And could we go to Page 5, please,

6   Mr. Schlaifer.

7         And, Mr. Schlaifer, could you blow up that last

8   paragraph, the last bullet.

9   BY MR. LAWLESS:

10  Q.  Mr. Shepard, this paragraph begins by acknowledging that a

11  process for proactively analyzing users' activity on the

12  Compass system does not exist.  Do you see that?

13  A.  I do.

14  Q.  Was that Motorola's fault that there was no way to

15  proactively use Compass in 2008?

16  A.  No, it was not.

17  Q.  Was that some software feature that Motorola just decided

18  it didn't want to buy?

19  A.  No.

20  Q.  How would you describe the conclusion of this paragraph?

21  A.  I would describe it as something that we could improve and

22  raise the bar even more if we implement it, and so we set out

23  to do that as part of this.

24  Q.  And is that an instance yet again of just being average or

25  going above and beyond?

Shepard - redirect by Lawless

1   A.   That's an instance of going above and beyond.

2          MR. LAWLESS:  All right.  We can take that down,

3   Mr. Schlaifer.  And let's bring up DTX 4514.

4          And go to the next page, please.  And the next page.

5   There we go.

6   BY MR. LAWLESS:

7   Q.   Mr. Shepard, do you recall a number of questions by

8   Hytera's lawyers about the Stop the Leaks program?

9   A.   I do.

10  Q.   Do you agree with the characterization of Motorola leaking

11  confidential information from its radio business?

12  A.   I do not.

13  Q.   What type of products was the Stop the Leaks program

14  about?

15  A.   It was about the mobile devices business or the cell

16  phones that we produced at the time.

17  Q.   And just to be crystal clear, did that business unit make

18  digital mobile radios?

19  A.   No.

20  Q.   In 2008, when the Stop the Leaks program was going on,

21  where was Motorola's cell phone business located?

22  A.   Libertyville, Illinois.  That was their headquarters.

23  Q.   And where was -- well, let me ask it this way:  Is that

24  where Motorola's digital mobile radio business unit was

25  located?

Shepard - redirect by Lawless

1    A.   No.

2    Q.   Different physical buildings?

3    A.   Yes.

4    Q.   Okay.  Did the cell phone business have the same

5    leadership as the DMR business?

6    A.   No.

7    Q.   How did it differ?

8    A.   We were preparing to split the companies, and so we

9    actually had co-CEOs in 2008.  So they had a CEO named Sanjay

10   who was leading the mobile devices or the cell phone business,

11   and we had a CEO Greg Brown who was leading the other

12   business.

13   Q.   Okay.  So different CEOs at the time for cell phones and

14   radios, correct?

15   A.   Correct.

16   Q.   Was the culture around confidentiality the same at

17   Motorola within the cell phone business and the radio

18   business?

19            MS. ROTHSCHILD:  Objection, Your Honor.

20            THE COURT:  Do you understand the question the way

21   it's put to you?

22            THE WITNESS:  I do.

23            THE COURT:  You may answer it.

24            Your objection is overruled.

25            THE WITNESS:  Can you restate it, please?

Shepard - redirect by Lawless

552

1   BY MR. LAWLESS:

2   Q.  Yes.

3           Was the culture around confidentiality and how

4   Motorola protects confidential information, was the culture

5   and attitude the same in the cell phone business as compared

6   to the radio business?

7   A.  It was not.

8   Q.  Can you explain why?

9   A.  Sure.  So the radio side of the business, I can start when

10  I was in Phoenix, we worked on projects for the government.

11  We worked on other stuff.  We had a lot more controls.  We had

12  signs that said "No talking in the halls."  We were very

13  secure about it.

14          In 2001, when I moved up and I was part again of the

15  mobile device -- not mobile device, of the radio business, we

16  continued that.  We have parts in Schaumberg that are actually

17  classified because we do a lot of government work.  And so we

18  treat security very seriously in those parts due to our

19  contracts, as well as our need to protect that intellectual

20  property.

21  Q.  Do people in the radio side of the business need security

22  clearances to work on those government contracts?

23  A.  Yes, they do.

24  Q.  Do you have a security clearance?

25  A.  I do.

Shepard - redirect by Lawless

1    Q.   Regarding the Compass system now, did the cell phone

2    business store its documents in the same folders as the radio

3    business on Compass?

4    A.   It did not.  There were two different structures, one so

5    that they were separate.

6    Q.   Did the cell phone business store source code in the same

7    folders as Motorola's digital radio business in the ClearCase

8    system?

9    A.   No.

10        MR. LAWLESS:  All right.  We can take that down,

11   Mr. Schlaifer, please.

12   BY MR. LAWLESS:

13   Q.   Now, at the time in 2008 when Sam Chia and Y.T. Kok mass

14   downloaded the Compass documents, had the POPI confidentiality

15   labels already been updated in the Compass system?

16   A.   I believe so, yes.

17        MR. LAWLESS:  Mr. Schlaifer, could we bring up PTX

18   1183, please.

19   BY MR. LAWLESS:

20   Q.   Remind us, Mr. Shepard, what POPI policy this was.

21   A.   This was the original POPI policy created in 1991.

22   Q.   I'm sorry.  Created when?

23   A.   September 1st, 1991.

24   Q.   All right.  So this is the old policy?

25   A.   This is the old policy.

Shepard - redirect by Lawless

554

1         MR. LAWLESS:  Okay.  If we go to Page 6, please,

2  Mr. Schlaifer.  Could you please highlight "Motorola internal

3  use only" on the left-hand side.

4  BY MR. LAWLESS:

5  Q.  Is that a confidentiality rating that was used at the

6  time, Mr. Shepard?

7  A.  That is a confidentiality label, yes.

8         MR. LAWLESS:  All right.  And then, Mr. Schlaifer, if

9  you could highlight the text on the bottom right beginning

10  with "business, technical, financial."

11  BY MR. LAWLESS:

12  Q.  Mr. Shepard, could you read into the record how Motorola

13  defined documents to be labeled internal use only?

14  A.  Sure.  So those are business --

15         MS. ROTHSCHILD:  Your Honor, I object.  This is

16  outside the scope of his cross-examination.

17         THE COURT:  The objection is overruled.  And after

18  this redirect, I will give you some additional opportunity to

19  recross.

20  BY MR. LAWLESS:

21  Q.  So, Mr. Shepard, could you read, please, how Motorola

22  described what would be Motorola internal use only documents.

23  A.  Sure.

24        "Business, technical, financial, and personal

25  information, which is written, oral, or in electronic media or

Shepard - redirect by Lawless

1   physical form and which, if communicated outside Motorola,

2   could benefit competitors."

3   Q.  Based on your understanding of how Motorola classifies

4   things, would that constitute a trade secret?

5   A.  Yes, it would.

6           MR. LAWLESS:  Mr. Schlaifer, could we go, please, to

7   Page 9.  And could you please highlight "Motorola confidential

8   proprietary."

9   BY MR. LAWLESS:

10  Q.  Is that another bucket of confidential labeling under the

11  old POPI policy?

12  A.  Yes, it is.

13          MR. LAWLESS:  And, Mr. Schlaifer, if you could

14  highlight the paragraph "business, technical" -- exactly.

15  BY MR. LAWLESS:

16  Q.  Mr. Shepard, could you please read that into the record.

17  A.  Sure.

18          "Business, technical, financial, and personal

19  information, which is written, oral, in electronic media or in

20  physical form, and which has significant value to the company.

21  It should be limited to persons with a need to know."

22  Q.  Based on your understanding, is that -- withdrawn.

23          Based on your understanding, would trade secrets fit

24  into that bucket as well?

25  A.  Yes, it would.

Case: 1:17-cv-01973 Document #: 785 Filed: 12/20/19 Page 128 of 144 PageID #:52434
Shepard - redirect by Lawless
556

1        MR. LAWLESS:  All right.  The last page,

2   Mr. Schlaifer.  Page 12, please.  And could you highlight

3   "Motorola registered secret proprietary."  I think we're going

4   to need the next page, 13, as well.  On Page 12 could you

5   highlight "business, technical" -- and you're ahead of me,

6   that's great.

7   BY MR. LAWLESS:

8   Q.  Mr. Shepard, could you please read how Motorola describes

9   Motorola registered secret proprietary documents.

10  A.  Sure.

11        "Business technical, financial, trade secret, and

12  personal information which is written, oral, in electronic

13  media or physical form and which is of a most sensitive

14  nature."

15  Q.  And would that also qualify as a bucket for Motorola trade

16  secrets?

17  A.  Yes, it would.

18        MR. LAWLESS:  We can take that down, please,

19  Mr. Schlaifer.

20  BY MR. LAWLESS:

21  Q.   Okay.  Mr. Shepard, in view of all of the documents that

22  Hytera's lawyers showed you, the Stop the Leaks program, the

23  Hanjuan Jin, and any other security episode you can think of,

24  as Motorola's chief information security officer, did Motorola

25  act reasonably in 2008 to protect its confidential

Shepard - redirect by Lawless

557

1    information?

2    A.  Yes, it did.

3    Q.  And tell us why, please.

4    A.  We talked about it.  We went through --

5         THE COURT:  That question would take us back to the

6    beginning.  Rephrase the question.

7    BY MR. LAWLESS:

8    Q.  Mr. Shepard --

9         THE COURT:  Keeping in mind that this is redirect.

10   BY MR. LAWLESS:

11   Q.  Mr. Shepard, despite the Stop the Leaks programs and the

12   other security instance that you've seen, did that change your

13   direct testimony that Motorola acted reasonably to protect its

14   confidential information?

15   A.  It did not change the testimony.  We acted with

16   reasonable -- I forgot the part -- reasonable confirmation,

17   you said?

18   Q.  Did you act reasonably in 2008?

19   A.  We acted reasonably in 2008.  Thank you.

20        MR. LAWLESS:  May I confer with my colleagues

21   quickly?

22        THE COURT:  Not quickly.  Yes, you may.

23      (Counsel conferring.)

24        MR. LAWLESS:  Thank you.  We pass the witness.

25        THE COURT:  If you have a few questions on recross,

1   you may proceed.

2         MS. ROTHSCHILD:  Thank you, Your Honor.

3                    RECROSS-EXAMINATION

4   BY MS. ROTHSCHILD:

5   Q.  Mr. Shepard, there is only one Compass system, right?

6   A.  There is one Compass system.

7   Q.  Okay.  And there's one ClearCase system.  That's separate,

8   right?

9   A.  ClearCase is a separate system.

10  Q.  And until 2011, Motorola, Inc., covered all of Motorola's

11  business units, right?  Mobile devices and radio, correct?

12  A.  Correct.

13        MS. ROTHSCHILD:  Okay.  Can we please pull up, if

14  it's been passed over to us, PTX 1183.

15  BY MS. ROTHSCHILD:

16  Q.  Okay.  You just testified that this was the old policy,

17  right?

18  A.  Correct.

19  Q.  Okay.  And this is the policy, I believe it's on Page 12,

20  that requires marking trade secrets MRSP, Motorola registered

21  secret proprietary, right?

22  A.  I guess I don't understand the question.

23  Q.  If you look --

24        MS. ROTHSCHILD:  If we could zoom in on the bottom

25  half, please, Jim.

Shepard - recross by Rothschild

1    BY MS. ROTHSCHILD:

2    Q.   This is the category for Motorola registered secret

3    proprietary.  And on the right side, this is the only category

4    in this policy that explicitly lists trade secrets, correct?

5    A.   That is incorrect.  I just testified that all three of

6    those can have trade secrets.

7    Q.   This says trade secret in the definition here, correct?

8    A.   This is the only one that has the words "trade secret,"

9    but it is not all -- all categories could be trade secret.

10   Q.   This is the only one that specifically calls out trade

11   secrets to be marked Motorola registered secret proprietary,

12   right?

13   A.   This is the only one that calls out the word "trade

14   secret."

15   Q.   And then --

16        MS. ROTHSCHILD:  Jim, you could take that down,

17   please.

18   BY MS. ROTHSCHILD:

19   Q.   And then in 2000, it was updated.  The POPI policy was

20   updated, right?

21   A.   I believe -- it was updated over time.  I believe it was

22   updated in 2000, correct.

23   Q.   And that still had the Motorola registered secret

24   proprietary category, right?

25   A.   Correct.

1  Q.  Okay.  And if we could please pull up previously admitted

2  Exhibit DTX 4721.  This is legal training that Motorola

3  provided to its employees about intellectual property.  And if

4  we look at the date here, this is from July of 2004, correct?

5  A.  Correct.

6  Q.  Okay.  If we go, please, to Page 69.  We see on the bottom

7  half of the page "Protection of trade secrets, the only

8  acceptable marking is" -- and this is bold and in red --

9  "'Motorola registered secret proprietary,'" correct?

10  A.  That is what it says.

11  Q.  Okay.  And if we even look at the speaker notes on

12  Page 70, the next page, it reiterates that information, "Trade

13  secrets carry a POPI classification of 'Motorola registered

14  secret proprietary.'"  Did I read that correctly?

15  A.  You did.

16  Q.  Okay.  And then it's your testimony that Motorola rolled

17  out the next policy, iProtect, at the end of 2006, correct?

18  A.  Correct.

19        MS. ROTHSCHILD:  And if we could please pull up DTX

20  4514.  And if we could please go to the next page.  And one

21  more.  Thank you.

22  BY MS. ROTHSCHILD:

23  Q.  This is the Stop the Leaks presentation that we discussed,

24  correct?

25  A.  Correct.

Case: 1:17-cv-01973 Document #: 785 Filed: 12/20/19 Page 133 of 144 PageID #:52439
Shepard - recross by Rothschild
561

1        MS. ROTHSCHILD:  And if we could go to Page 11,

2   please.

3   BY MS. ROTHSCHILD:

4   Q.  We see here iProtect written and rolled out, but poorly

5   implemented, right?

6   A.  I see it's written there, correct.

7   Q.  And then I'd like to direct your attention to one last

8   document.  It's a previously admitted document, DTX 4776.

9        MS. ROTHSCHILD:  And if we could zoom in on the top

10  part of this page.

11  BY MS. ROTHSCHILD:

12  Q.  We see here at the -- well, let's start with the date.

13  The review date is May 19th, 2009.  Do you see that?

14  A.  I do.

15  Q.  And the marking at the top of this 2009 document is

16  Motorola registered secret proprietary, correct?

17  A.  That is the marking at the top of the document.

18       MS. ROTHSCHILD:  No further questions.

19       THE COURT:  All right.  You may step down, sir.

20       I think the jury has heard enough from this witness.

21       You are excused.

22    (Witness excused.)

23       THE COURT:  Members of the jury, there will be a

24  short recess and we'll start the direct testimony of the next

25  available witness.

Proceedings

1          THE CLERK:  All rise.

2          THE COURT:  Counsel, please remain.

3       (Jury out.)

4          THE COURT:  Okay, please be seated.

5          Who is the next witness, Counsel?

6          MR. DE VRIES:  Your Honor, the next witness is by

7    video designation.  Actually, the next three witnesses are by

8    video designation.

9          THE COURT:  All right.  You're --

10         MR. DE VRIES:  And they are ready to be played.

11         THE COURT:  They are ready to be played?

12         MR. DE VRIES:  Yes.

13         MR. CLOERN:  I'm sorry.  We have an objection to

14    these witnesses.  There is over an hour of videotaped

15    deposition of these witnesses taking the Fifth on about 150

16    questions for which there's no probative value.  It's a 403

17    issue.  It's only going to prejudice.

18         THE COURT:  Well, it's -- the -- with respect to

19    taking the Fifth Amendment in a civil case, negative

20    inferences can be drawn.  That is essentially the law.  I

21    don't think we need anything further than that.  And when you

22    make your closing arguments, if you stay within that

23    framework, you can advise the jury or argue the reasonable

24    inference to draw on from the exercising of that

25    constitutional right.

Proceedings

563

1    Now, keeping in mind that this is a civil case, not a

2  criminal case, I think the law is clear.  And in terms of

3  ruling on 403, the probative value is not substantially

4  outweighed by the danger of unfair prejudice if the jury

5  learns and views the taking of the Fifth Amendment.

6    And so the objection to playing that portion of the

7  videotaped depositions is overruled.

8    It is better, as I view the matter, for the jury to

9  see the entirety rather than cut out sections of it and play

10  it to them piecemeal.

11    You have preserved that issue, certainly, for the

12  appeal.  The objection is overruled.

13    MR. CLOERN:  Your Honor, may we have a continuing

14  objection to --

15    THE COURT:  Yes, indeed.  I understand that, and it

16  will remain of record.

17    MR. CLOERN:  Thank you, Your Honor.

18    And one final --

19    THE COURT:  And you have articulated your position

20  well in your written submissions.

21    MR. CLOERN:  There have been some changes to that.

22  May I ask one final question?

23    THE COURT:  Yes.

24    MR. CLOERN:  Your Honor pointed out noting that

25  the -- you know, not seeing it piecemeal.  There have been

Proceedings

564

1    some recent changes in the last, I think, 24 hours where there

2    have been changes.  And we don't see actually the entirety of

3    the Fifth Amendment.  And we haven't had a chance to react to

4    that.

5            And so one of the issues is, what happened at the

6    depositions, they just started asking anything about the Fifth

7    Amendment because the Chinese government was involved.  There

8    is a lot of questions:  Did you take this on a thumb drive?

9    Did you take it on a hard drive?

10           Some of those are gone.  And the problem with that

11   is, is it shows that the overall questioning, the Fifth

12   Amendment is unreliable because there were all these different

13   questions that were asked that get a little bit strange, like

14   wide-ranging government conspiracy.  And those have now been

15   taken out at the last minute, so the jury isn't actually

16   getting a full picture of what this questioning was all about.

17           MR. DE VRIES:  Your Honor, we --

18           THE COURT:  Go ahead.

19           MR. DE VRIES:  We took these out at their specific

20   objection.  We have met and conferred with them for days over

21   this.

22           THE COURT:  Here's the point:  They are to get the

23   entirety of the depositions as now modified by the agreement

24   of counsel.  It's a modified version of the entirety.

25           MR. DE VRIES:  Well, it is a -- these depositions

Proceedings

1   were eight hours long each, approximately seven hours or so.

2   They have been through the designations and

3   counterdesignations of the parties.  They are at 30 minutes

4   for G.S. Kok, 30 minutes for Sam Chia, and 40 minutes for Y.T.

5   Kok.  We have included every designation that they wanted to

6   include.

7           The only thing that has happened over the last

8   24 hours -- and, frankly, this was before, I think, 24 hours

9   ago, was that they had specifically objected to certain of our

10  designations about whether the Chinese government had had a

11  role in this, and they said that it violated their mill.  And

12  so in an effort to reach agreement, we removed only those

13  designations.

14          These are ready to go, to be played for the jury.

15  It's the appropriate time, from our perspective, to play them.

16          MR. CLOERN:  There were additional changes that were

17  made, Your Honor.

18          THE COURT:  Well, if you have agreed to changes, then

19  the changed version shall be played.  If there remains some

20  kind of heavy issues, I could rule as they are being played

21  and to tell the jury to ignore certain things, but I think

22  you're underestimating the ability of jurors to give

23  appropriate weight to these answers.  They can recognize

24  absurdities.  They can recognize truth.  They can recognize

25  misstatements.

Proceedings

1      This is strictly within the purview of the jury as

2  they listen to what these witnesses have said and as they, in

3  this matter, view them.  And so it is maybe more of a matter

4  of weight that the jurors will give rather than barring their

5  admissibility.

6      So I would rather place that faith in the ability of

7  the eight people on this jury in unanimity to determine the

8  value of what these statements are.

9      To a large extent, the defendant has agreed that the

10  three individuals left Motorola and joined their organization

11  and with them took a long -- a large amount of information.

12  At some point, obviously, there's disagreement.  But on those

13  fundamentals, the jury has already heard that in an opening

14  statement.

15      All right.  So all said and done, you have preserved

16  your objections to certain portions of these depositions, but

17  they must begin, the trial must go forward.  And if you're

18  saying -- in their totality, there are hours and hours of

19  them; is that right?

20      MR. DE VRIES:  What we are prepared to play is two

21  hours and ten minutes.  If we were to play the entirety, it

22  would be approximately 21 hours, I believe.

23      THE COURT:  Okay.  Well, you can certainly play the

24  two hours and ten minutes today, and then we'll see where we

25  go from there.

Proceedings

567

1      MR. DE VRIES:  Yes, Your Honor.  We understand.

2      THE COURT:  Okay.  It's a difficult thing for me to

3  rule on.  I have not seen or heard all of those hours.  They

4  were before the magistrate judge for a considerable period of

5  time.  But the fundamental is, as I see it, it is better for

6  the jury to hear more than less.  And so in a few minutes, you

7  may make the setup, whatever it is you have to do, and be

8  ready to project it.

9      It might also be a good idea to have your strongest

10 colleagues move that large screen over there that nobody has

11 seen in three days now and to move it over here so that the

12 spectators and the jurors can see it better.

13      THE CLERK:  You mean this screen?

14      THE COURT:  That one right there.

15      MR. DE VRIES:  Right there, Your Honor.

16      THE COURT:  Nobody has seen it in three days, except

17 for myself.

18      MR. DE VRIES:  We will investigate that, Your Honor,

19 I'm not sure if it's technically feasible, but we will

20 investigate it.

21      THE COURT:  Get your strongest colleagues.

22      THE CLERK:  All rise.  Court is adjourned.

23   (Recess had.)

24   (Change of reporter.)

25

Case: 1:17-cv-01973 Document #: 785 Filed: 12/20/19 Page 140 of 144 PageID #:52446
Videotaped deposition played - G.S. Kok
568

1

2

3          (Proceedings heard in open court.  Jury out.)

4               THE COURT:  Are you ready to proceed, counsel?

5               MR. ALPER:  We are, your Honor.

6               THE COURT:  Please ask the jury to come in.

7          (Proceedings heard in open court.  Jury in.)

8               THE COURT:  Please be seated.

9               Counsel?

10              MR. ALPER:  Yes, your Honor.  We, plaintiff Motorola

11   now calls Mr. G.S. Kok by video deposition.

12              THE COURT:  You may proceed.

13              MR. ALPER:  Thank you, your Honor.

14              THE COURT:  Excuse me.  Is this thing shown on every

15   screen now?  Is it on the screens?

16              Okay.  Very good.

17              MR. ALPER:  Thank you.

18         (Videotaped deposition of G.S. Kok played in open court.)

19              MR. ALPER:  Your Honor, for the record, during

20   Mr. Kok's video deposition, he referenced PTX 1153 which has

21   already been admitted.  He also referenced PTX 1154 which we

22   would move -- request to move into evidence.

23              THE COURT:  It is received.

24              MR. ALPER:  Thank you, your Honor.

25              THE COURT:  It may be published.

1      (Plaintiff's Exhibit 1154 received in evidence.)

2           MR. ALPER:  Thank you.  The next video is of Mr. Sam

3      Chia, so we call Mr. Sam Chia by video deposition.

4           THE COURT:  Al right.  Members of the jury, let's

5      stand up for a minute or two.

6      (Pause.)

7           THE COURT:  Please be seated.

8           Present the next witness.

9           MR. ALPER:  Thank you, your Honor.  This will be the

10     video deposition of Mr. Sam Chia.

11          THE COURT:  Yes.

12     (Videotaped deposition of Sam Chia played in open court.)

13          MR. ALPER:  Your Honor, there's some exhibits that

14     were mentioned in Mr. Chia's deposition.  For the record,

15     Mr. Chia's Deposition Exhibit 2 is PTX 1155 which was already

16     admitted.

17          There were some that have not been admitted.  I'll

18     read them now.  Mr. Chia's Deposition Exhibit No. 10 is PTX

19     1129.  Deposition Exhibit 11 is PTX 1165.  Deposition Exhibit

20     12 is PTX 1164.  And Deposition Exhibit 14 is PTX 1150.  And

21     we request to move those into evidence, your Honor.

22          THE COURT:  They are received and may be published.

23          MR. ALPER:  Thank you, your Honor.

24     (Plaintiff's Exhibits 1129, 1150, 1164, and 1165 received

25       in evidence.)

Case: 1:17-cv-01973 Document #: 785 Filed: 12/20/19 Page 142 of 144 PageID #:52448
Videotaped deposition played - Y.T. Kok
570

1          MR. ALPER:  And just for the record, for Mr. G.S.

2    Kok's deposition, his Exhibit 1 was PTX 1154, and his Exhibit

3    2 was PTX 1153.

4          THE COURT:  And they are already in evidence.

5          MR. ALPER:  Yes.

6          THE COURT:  And have been published.

7          MR. ALPER:  Yes.

8          THE COURT:  All right.

9          MR. ALPER:  If we may proceed, your Honor, we would

10   next call by video deposition Mr. Y.T. Kok.

11         THE COURT.  Yes.  Members of the jury, once again,

12   please...

13      (Pause.)

14         A JUROR:  Can we take a two-minute break?

15         THE COURT:  Indeed.  Two hands go up, all hands go

16   up.

17         About ten minutes, counsel.

18      (Recess from 3:22 p.m. to 3:32 p.m.)

19         THE COURT:  Present the witness.

20         MR. ALPER:  Yes, your Honor.  Motorola calls Y.T. Kok

21   by video deposition.

22         THE COURT:  Please proceed.

23      (Videotaped deposition of Y.T. Kok played in open court.)

24         MR. ALPER:  We have just a few exhibits to read for

25   the record.

571

1          THE COURT:  Yes.

2          MR. ALPER:  Y.T. Kok's exhibit Deposition Exhibit 2

3   was PTX 1156 which has already been admitted.

4          And then the following exhibits have not yet been

5   admitted:  Deposition Exhibit 3 is PTX 1072.  Deposition

6   Exhibit 10 is PTX 1113.  Deposition Exhibit 12 is PTX 1159.

7   Deposition Exhibit 13 is PTX 1765.  Deposition Exhibit 15 is

8   PTX 1152.  And we request to move those into evidence.

9          THE COURT:  They are received and may be published or

10  have been published.

11         MR. ALPER:  Thank you, your Honor.

12      (Plaintiff's Exhibits 1072, 1113, 1152, 1159, and 1765

13         received in evidence.)

14         THE COURT:  Is that the end of the tapes?

15         MR. ALPER:  That is the end of the tapes for today.

16  And our next witness is a live witness, and we're prepared --

17         THE COURT:  Who is the next live witness?

18         MR. ALPER:  Our next witness is Mr. Mark Boerger, and

19  he's here.

20         THE COURT:  Okay.  Members of the jury, it is

21  approximately 4:15.  You are to return tomorrow morning once

22  again at 10:15.  I have some unrelated matters to deal with.

23  You are excused for the day.

24         Counsel, please remain.

25      (Proceedings heard in open court.  Jury out.)

1    THE COURT:  Here is a copy of the call sheet so you

2  know exactly what we will be doing.  The jury will be here at

3  10:15.  Counsel shall return at 10:15.  I have matters set

4  earlier that I will try to dispose of before you arrive.  And

5  at some point along the way, I have a sentencing which I can

6  probably do during the lunch hour.  So tomorrow will be much

7  like today or yesterday.  So 10:15.  Have your witness ready

8  to go.

9    MR. ALPER:  Thank you, your Honor.

10    THE COURT:  Okay.  Thank you, counsel.

11    (Proceedings adjourned from 4:15 p.m. to 10:15 a.m.)

12    * * * * * * *

13    C E R T I F I C A T E

14    We, Amy Spee and Judith A. Walsh, do hereby certify

15  that the foregoing is a complete, true, and accurate

16  transcript of the proceedings had in the above-entitled case

17  before the Honorable CHARLES R. NORGLE, SR., one of the judges

18  of said court, at Chicago, Illinois, on November 13, 2019.

19  /s/*Amy Spee, Official Court Reporter*_      November 14, 2019

20  /s/*Judith A. Walsh, Official Court Reporter* November 14, 2019

21  Official Court Reporters

22  United States District Court

23  Northern District of Illinois

24  Eastern Division

25