758

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MOTOROLA SOLUTIONS, INC., and MOTOROLA SOLUTIONS MALAYSIA SDN. BHD,    ) No. 17 CV 1973

             Plaintiffs,

vs.                       ) Chicago, Illinois

HYTERA COMMUNICATIONS CORPORATION, LTD., ) November 18, 2019
HYTERA AMERICA, INC., and HYTERA
COMMUNICATIONS AMERICA (WEST), INC.,

            Defendants.      ) 10:00 o'clock a.m.

TRIAL - VOLUME 6 A
TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE  CHARLES R. NORGLE, SR.
and a jury

For the Plaintiffs:    KIRKLAND & ELLIS LLP
                   BY:  Mr. Adam R. Alper
                      Mr. Brandon Hugh Brown
                   555 California Street
                   27th Floor
                   San Francisco, California 94104
                   (415) 439-1400

                   KIRKLAND & ELLIS LLP
                   BY:  Mr. Michael W. De Vries
                   333 South Hope Street
                   Los Angeles, California 90071
                   (213) 680-8400

Court reporter:          BLANCA I. LARA
                Official Court Reporter
              219 South Dearborn Street
                 Room 2342
               Chicago, Illinois 60604
                 (312) 435-5895
             blanca_lara@ilnd.uscourts.gov

1  Appearances:  (Continued:)

2

3  For the Plaintiffs:      KIRKLAND & ELLIS LLP
                            BY: Ms. Megan Margaret New
                            300 North LaSalle Street
4                           Chicago, Illinois 60654
                            (312) 862-7439
5
                            KIRKLAND & ELLIS LLP
6                           BY:  Ms. Leslie M. Schmidt
                            601 Lexington Avenue
7                           New York, New York 10022
                            (212) 446-4763
8
   Motorola Corporate Representative:   Mr. Russ Lund
9

10

11  For the Defendants:     STEPTOE & JOHNSON LLP
                            BY: Mr. Boyd T Cloern
                                Mr. Michael J. Allan
12                              Ms. Jessica Ilana Rothschild
                                Ms. Kassandra Michele Officer
13                          1330 Connecticut Avenue., Nw
                            Washington, DC 20036
14                          (202) 429-6230

15

16
   Hytera Corporate Representative:  Michele Ning
17

18

19

20

21

22

23

24

25

Corretjer - cross by Rothschild

760

1           (The following proceedings were had out of the
2           presence of the jury in open court:)
3               THE COURT:  Good morning, counsel.
4               MR. ALPER:  Good morning, Your Honor.
09:58:38    5               MR. CLOERN:  Good morning, Your Honor.
6               THE CLERK:  This is 17 Civil 1973, Motorola Solutions
7   versus Hytera Communications.
8               THE COURT:  Is plaintiff ready?
9               MR. ALPER:  We are, Your Honor.
09:58:49   10               THE COURT:  Is defendant ready?
11               MR. CLOERN:  We are, Your Honor.
12               THE COURT:  Please ask the jurors to come in.
13           (Brief pause.)
14               THE CLERK:  All rise.
10:00:10   15           (The following proceedings were had in the
16           presence of the jury in open court:)
17               THE CLERK:  This Court is in session.  Please be
18   seated and come to order.
19               THE COURT:  Good morning, members of the jury.
10:00:34   20           Please call the witness.
21               MR. ALPER:  Yes, Your Honor.  Mr. Jesus Corretjer is
22   still on the stand and ready for cross-examination.
23               THE COURT:  Yes.
24       JESUS CORRETJER, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN
10:00:52   25                   CROSS EXAMINATION

Corretjer - cross by Rothschild

761

1    BY ROTHSCHILD:

2    Q.  Good morning.  Jessica Rothschild on behalf of the Hytera

3    defendants.

4    A.  Good morning.

10:01:00    5    Q.  Mr. Corretjer, you've been employed by Motorola for over

6    25 years, correct?

7    A.  Yes.

8    Q.  And you've never worked anywhere else other than Motorola,

9    correct?

10:01:17    10    A.  Not as a engineer.

11    Q.  And you told the jury on Thursday that you knew and worked

12    with Samuel Chia, right?

13    A.  Can you repeat the question, please?

14    Q.  You told the jury on Thursday that you knew and worked with

10:01:34    15    Samuel Chia at Motorola, right?

16    A.  Yes.

17    Q.  You also told the jury about what your confidentiality

18    agreement with Motorola means to you, right?

19    A.  Yes.

10:01:41    20    Q.  Okay.  And not the contract that you signed with your

21    employer, Motorola, right?

22    A.  Correct.

23    Q.  Sam Chia signed one with Motorola, too, right?

24    A.  I assume, so if he was a Motorola employee.

10:01:56    25    Q.  And you essentially told the jury that Mr. Chia violated

1    that contract with Motorola, right?

2    A.  Ah, yes, when he -- when he took the information outside,

3    yes.

4    Q.  And you also understand that Mr. Chia is not a defendant in

10:02:13   5    this case, don't you?

6    A.  I -- I can't speak for that.

7    Q.  Okay.  And you understand that the defendants in this case

8    are three had Hytera companies?

9    A.  I'm not -- I can't speak for that either.

10:02:27   10    Q.  Okay.  To your knowledge, Motorola has not sued Mr. Chia

11    for violating his contract with Motorola, isn't that right?

12    A.  Again, I don't know.

13    Q.  Now, I think it might've been a little unclear, so I just

14    want to clarify.  On Thursday you testified to the jury about 9

10:02:45   15    separate trademarks, isn't that right?

16    A.  Yes.

17    Q.  Okay.  And you personally came up with some work effort

18    estimates for the trade secrets that Motorola designated you on

19    during fact discovery, isn't that right?

10:02:57   20    A.  Yes.

21    Q.  You came up with those during the course of preparing for

22    your deposition earlier this year, right?

23    A.  Correct.

24    Q.  And the numbers you came up with were estimates, right?

10:03:10   25    A.  I believe a conservative estimate is the phrase I used,

Corretjer - cross by Rothschild

763

1   yeah.

2   Q.  Now, Motorola tracks information to estimate work on a

3   project, right?

4   A.  We use -- we track information when work on a project

10:03:25  5   recently.  I don't think that back then we had some mechanisms

6   in place.

7   Q.  Okay.  And when I asked you at your deposition on

8   April 15th, 2019, the same question, you were under oath, isn't

9   that right?

10:03:36  10   A.  Yes.

11          MR. ALPER:  Your Honor, if we could have the --

12          THE COURT:  Yes, the page number, line number, please.

13          MS. ROTHSCHILD:  Yes.

14          MR. ALPER:  And, Your Honor, could Mr. Corretjer be

10:03:44  15   handed his deposition transcripts?

16          THE COURT:  Not yet.

17          MR. ALPER:  May I approach, Your Honor?

18          THE COURT:  Well, just a minute.  Let's have a

19   sidebar.

10:03:57  20          (Proceedings heard at sidebar on the record:)

21          THE COURT:  If the witness concedes to the

22   inconsistency, the transcript is unnecessary to prove it up.

23   So this may be premature.

24          MR. ALPER:  Understood.

10:04:16  25          THE COURT:  Also, last week the court referred to

Corretjer - cross by Rothschild

1  essentially Rule 106 in terms of completion, but we're now at

2  the point, consistent with your objection, at least the date of

3  the deposition, page number, line number, and then the question

4  to the witness.  If he concedes the inconsistency, there's no

10:04:37  5  need for a prove-up.  If he denies it, however, then counsel

6  may use the transcript to prove it up or at least confront him

7  with it.  Is that clear enough?

8           MR. ALPER:  Yes.

9           THE COURT:  It may be erroneous, but it's clear.

10:04:55  10          (Laughter at sidebar.)

11          (Proceedings resumed in open court:)

12  BY MS. ROTHSCHILD:

13  Q.  And, Mr. Corretjer, you were deposed on April 15, 2019, and

14  you were under oath at that point in time, correct?

10:05:15  15  A.  Yes.

16  Q.  Okay.  And when I asked you whether Motorola tracks its

17  work of its employees, you didn't provide any time instruction

18  on the fact that Motorola does, in fact, track that work,

19  right?

10:05:27  20  A.  I didn't provide time.  I was referring to like recent

21  years on our agile development process.

22  Q.  Okay.  But you didn't tell me that at the deposition,

23  right?

24  A.  I don't remember you asking about that either.

10:05:38  25  Q.  And in coming up with your estimates for the trademarks

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 8 of 217 PageID #:52644
Corretjer - cross by Rothschild
765

1    that you were designated on, you didn't look at any actual work

2    estimates that Motorola had for those trade secrets, right?

3    A.  I -- I didn't -- I didn't look at any work estimates

4    because I don't think we had them.

10:05:57    5    Q.  In fact, you didn't look at any documents to come up with

6    your estimates, isn't that right?

7    A.  I looked at plenty of documents on source code in

8    preparation for those estimates, actually.

9    Q.  And you recall your deposition on June 25, 2019, when you

10:06:11    10   were under oath?

11   A.  Yes.

12   Q.  Okay.  And at page 1941, lines 5 through 8, you were asked:

13            "And you did not look at any documents to come

14            up with this estimate, correct?"

10:06:24    15           "Answer:  That's correct, yes."

16            Now, if we add up all the numbers from the estimates

17   that you --

18            THE COURT:  So the question is, is that what you said?

19            THE WITNESS:  I believe in other places of testimony I

10:06:37    20   did mention that I did look at other documents and source code

21   in preparation for those estimates.

22   BY MS. ROTHSCHILD:

23   Q.  Documents and source codes cited for the trade secrets,

24   right?

10:06:47    25   A.  Yes, to confirm my understanding of this code, but what I

Corretjer - cross by Rothschild

766

1    was estimating.

2    Q.  But not any scope of work documents or contemporaneous

3    documents around the time of the development of the trade

4    secrets estimating how much work a Motorola employee would have

10:07:01   5    to undergo to accomplish that task, right?

6    A.  Yeah, I don't think we had those documents.

7    Q.  And so if we add up all the numbers from the trade secrets

8    that you testified about on Thursday, we get 10,551 staff

9    months, does that sound about, right?

10:07:18   10   A.  I think so.

11   Q.  Okay.  If we assume that there are 100 engineers doing that

12   work, that would be 8.79 years of work; does sound about right?

13   A.  That sounds about the right.

14   Q.  And if we assume only 30 engineers, that multiplies by more

10:07:35   15   than 3 to 29.3 years of work; does that sound about, right?

16   A.  That sounds about right.  I haven't done this math in my

17   head, but, yes.

18   Q.  And you testified to the jury only about 9 of the 21 trade

19   secrets that Motorola is claiming in this case, right?

10:07:50   20   A.  Correct.

21   Q.  And your figures don't account for those other 12 trade

22   secrets, right?

23   A.  That's correct.

24   Q.  Not for the 19,000 plus staff months that Mr. Boerger

10:08:03   25   testified to the jury on Thursday for 5 of the 12 remaining

Corretjer - cross by Rothschild

1  trade secrets, right?

2  A.  Yeah.  Again, I haven't done this math, but I understand

3  what you're saying.

4  Q.  And you understand for purposes of this case that Motorola

10:08:16    5  provided some written descriptions of the trade secrets that it

6  is claiming in this case, right?

7  A.  Yes.

8  Q.  Okay.  But those descriptions did not exist in 2008, right?

9  A.  They didn't exist -- the trade secrets at issue here

10:08:32   10  existed, but the descriptions that you are talking about

11  didn't.

12  Q.  And those descriptions are what identified the combination

13  of documents and source codes that Motorola is claiming as

14  particular trade secrets, right?

10:08:44   15  A.  That's one of the aspects of the descriptions, yes.

16  Q.  And so those descriptions that put all that together didn't

17  exist in 2008, right?

18  A.  Those documents that you are referring did not exist in

19  2008.

10:08:58   20  Q.  Let's talk about trade secret, what we all refer to as

21  trade secret 111, which is the testing and benchmarking trade

22  secret.  Do you reorganize that as trade secret 111?

23  A.  Yes.

24  Q.  Now, you were not Motorola's witness who was designated to

10:09:15   25  testify during fact discovery on this trade secret, right?

Corretjer - cross by Rothschild

768

1    A.  I was not.

2    Q.  Motorola had somebody else who's based here in Schaumberg

3    testify about it, right?

4    A.  Correct.  Yes.

10:09:26    5    Q.  Okay.  Someone who Motorola did not bring to trial to

6    testify about that trade secret, right?

7    A.  My understanding is that in order for this trial to not

8    take a very long time, they stream-downed a number of witnesses

9    and they had me to speak on that trade secret.

10:09:42    10   Q.  Let's look at some of Motorola's testing procedures.

11            Motorola relies on PTX 127, and I believe you have it

12   in your binder from Thursday.

13            MS. ROTHSCHILD:  And if we could pull that up, please.

14   BY MS. ROTHSCHILD:

10:10:06    15   Q.  127.

16   A.  Yes.

17   Q.  This document is called LTD F2 Conformance Testing For

18   Radio Hardware, Portable and Mobile, right?

19   A.  Yes.

10:10:17    20   Q.  And you told the jury on Thursday that LTD was an internal

21   code name for MOTOTRBO?

22   A.  Correct.

23   Q.  And LTD stands for Low Tier Digital, right?

24   A.  Yes.

10:10:31    25   Q.  And F2 is a reference to the DMR protocol, right?

Corretjer - cross by Rothschild

769

A.  Yes.

Q.  And this document describes Motorola's testing methods, right?

A.  For the DMR mode, yes.

10:10:42    Q.  Okay.  And if we can please turn to page 2.

A.  Okay.

Q.  We see here a Section 4.1.1 that lists Normal Test Conditions, do you see that?

A.  Yes.

10:10:56    Q.  And these are from, as we see in the 4.1.1 title, from an ETSI standard, do you see that?

A.  I do, yes.

Q.  Okay.  And that's a public standard, right?

A.  Yes.

10:11:10    Q.  And if we look a little bit lower on the page, we see Section 4.2 lists Extreme Test Conditions; do you see that?

A.  Yes.

Q.  And, again, that's from an ETSI standard, correct?

A.  Yes.

10:11:25    Q.  And if we look even further down the stage, there's a Section 5.1.1, Transmit 4SSK modulation, do you see that?

A.  Yes.

Q.  And, now, that is something that's required by the DMR standard, right?

10:11:42    A.  It's our internal spec that we define for the DMR standard

Corretjer - cross by Rothschild

770

1    operation.

2    Q.  It's your position that Motorola came up with this

3    frequency deviation number?

4    A.  Yes.  And the rationale -- also, the rationale that's

10:12:03    5    mentioned in that section at how we arrived at those specs.

6    Q.  And so the 1.9444 kHz per minute proposed spec is based on

7    APCO, is that right?

8    A.  Correct.  So Motorola made a decision to reference the APCO

9    standards.

10:12:21    10    Q.  And the APCO standard that's referenced in that next line,

11    TIA-102, that's a public standard, right?

12    A.  It is.  Again, but the decision to follow it was set

13    proprietary Motorola.

14    Q.  And TIA is the Telecommunications Industry Association,

10:12:32    15    right?

16    A.  Yes.

17    Q.  If we could please turn to page 34, there's a list of

18    supporting documents for that testing document, correct?

19    A.  Yes.

10:12:50    20    Q.  Okay.  And there are 4 ETSI standards listed here; do you

21    see that?

22    A.  I see that, yes.

23    Q.  And those are all publicly available standards, right?

24    A.  Yes.

10:12:59    25    Q.  And then there are two TIA publicly available standards

Corretjer - cross by Rothschild

771

1   listed here as well, right?

2   A.  Yes.

3   Q.  And if we can turn to a different page of the document,

4   please.  Let's go to page 3.

5          We see at the top of the page --

6   A.  Excuse me.  Let me get there.

7          (Brief pause.)

8   BY THE WITNESS:

9   A.  Yes.

10  BY MS. ROTHSCHILD:

11  Q.  At the top of the page we see a description of some test

12  equipment, do you see that, VSAE89441A, right?

13  A.  Yes.

14  Q.  "VSA," that's Vector Signal Analyzer, right?

15  A.  Correct.

16  Q.  And the VSA tool that's listed here -- if we could zoom out

17  for a moment, please.

18          That tool is actually created by Hewlett-Packard,

19  correct?

20  A.  Yes.

21  Q.  And if we could turn to page 5, please.

22  A.  Yes.

23  Q.  There's a section in the middle of the page for "Method"

24  and it says "One Modulation Domain Analyzer," do you see that?

25  A.  Yes.

Corretjer - cross by Rothschild

772

1  Q.  And then below that we see there's an OSLO scope, right?

2  A.  Yes.

3  Q.  And if we could zoom out a little bit and zoom in on the

4  OSLO diagram and the label on top, that is also from

10:14:27  5  Hewlett-Packard, correct?

6  A.  Yes, this equipment is from Hewlett-Packard.

7  Q.  And those Hewlett-Packard tools that we just referenced,

8  those are both publicly available, right?

9  A.  They are, but not the method that's specified in this

10:14:41  10  section.

11  Q.  But the tools that Motorola uses to do the testing that we

12  just reviewed, those are publicly available tools, right?

13  A.  The tools, yes.

14  Q.  Now, during your direct examination, I believe your counsel

10:14:54  15  asked you about the top of this page, Section 5.1.2.  Do you

16  recall that?

17  A.  Yes.

18  Q.  And it was just a few lines there -- strike that.

19        MS. ROTHSCHILD:  Your Honor, I believe the screens for

10:15:11  20  the jury have not been turned on.

21        THE COURT:  Oh, is that right?

22        Is that right, members of the jury?

23        THE WITNESS:  Neither has mine, if that matters.  But

24  I'm looking at the document.

10:15:24  25        THE COURT:  Please turn them on.

Corretjer - cross by Rothschild

773

1         THE CLERK:  They should be on.  The green light is on.

2         A JUROR:  They were on, but just --

3         (Brief pause.)

4         THE COURT:  Counsel, to the extent that you feel it's

5    necessary or appropriate, you may return to the questions using

6    the published exits or move on.  I'll leave that up to you.

7         MS. ROTHSCHILD:  Thank you, Your Honor.

8         (Brief pause.)

9         THE COURT:  How important vision was to the jurors,

10   I'll leave in your hands.

11        MS. ROTHSCHILD:  Thank you, Your Honor.

12        (Brief pause.)

13        THE CLERK:  It's on now.

14        THE COURT:  Okay.  I thought for a moment the

15   government hadn't paid the bill.

16        (Laughter in the courtroom.)

17        THE COURT:  Please proceed, counsel.

18        MS. ROTHSCHILD:  Thank you, Your Honor.

19        Jim, if you don't mind, let's just show the cover page

20   of this document, quickly.

21   BY MS. ROTHSCHILD:

22   Q.  So this is the LTD F2 Conformance Testing For Radio,

23   Hardware, Portable and Mobile.

24        And if we could show page 2 for a moment.  We walked

25   through Sections 4.1.1 and 4.1.2, which both reference in the

Corretjer - cross by Rothschild

774

1    header the ETSI publicly available standards, right?

2    A.  Yes.

3    Q.  And we looked briefly at page 3 where it talks at the top

4    about testing equipment using the VSA piece of equipment, which

5    we discussed was a Hewlett-Packard product, correct?

6    A.  Yes.

7    Q.  And so now if we can go to page 5.

8    A.  Yes, I'm there.

9    Q.  So the top of this page is what Mr. Alper showed you during

10   your direct examination, correct?

11   A.  Yes.

12   Q.  And I think it was actually just the first part of this

13   page, the part about method, right?

14   A.  I think he asked me also about that information below the

15   spec.

16   Q.  Okay.  Now, the information that we're seeing here on this

17   page, or this section, that's not the entirety of the trade

18   secret on Motorola's testing and benchmarking, right?

19   A.  Yeah, it's just a portion.

20   Q.  And Motorola is claiming this document plus about five

21   others, right?

22   A.  Correct.

23   Q.  You also mentioned on Thursday that this document and

24   others reference standard things, meaning things from the DMR

25   ETSI standard, right, and other standards?

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 18 of 217 PageID #:52654
Corretjer - cross by Rothschild
775

1    A.   Yes.

2    Q.   Okay.  And those standard things, those things from the

3    publicly available standards, those are not Motorola's trade

4    secret, right?

10:18:54    5    A.   We consider this whole document, even when the reference is

6    to public documents, as a trade secret, because, you know, it's

7    the context.  It's hard to just extract a portion of this and

8    say it's not part of the trade secrets.  It's a combination of

9    the document, the Motorola confidential information here, and

10:19:13    10    some other public references.

11    Q.   But you haven't walked through for the jury's benefit to

12    differentiate between what is standard material and what is

13    Motorola internal-only material, right?

14    A.   I haven't done that, but the -- I mean, if I were to

10:19:28    15    compare the public references against the rest of the material,

16    I would say the public references are minimum compared to the

17    rest of the stuff.

18    Q.   But, again, you haven't walked the jury through to explain

19    what is public and what is just internal Motorola, right?

10:19:44    20    A.   I haven't done that, no.

21    Q.   Now, a company developing a DMR product, any company

22    developing a DMR product, would have similar testing methods,

23    right?

24    A.   Not necessarily.

10:19:55    25    Q.   Okay.  Now, you were not the witness who Motorola put up to

Corretjer - cross by Rothschild

776

1    talk about this trade secret, right?

2    A.  I was not, but I have ample knowledge of this topic.  I can

3    testify about it.

4    Q.  And so it's your testimony that you disapprove as

10:20:08    5    Motorola's representative who's testified that, "I would think

6    if someone was developing a DMR product, they would have

7    similar things"?

8    A.  I can't speak for him.  The way my monitor went off ....

9         MS. ROTHSCHILD:  Your Honor, I think our tech guy just

10:20:36    10    took down the documents.

11    BY THE WITNESS:

12    A.  Okay.  All right.

13    BY MS. ROTHSCHILD:

14    Q.  Now, on Thursday your counsel introduced about a few dozen

10:20:44    15    documents with your testimony, but not that many were actually

16    shown to the jury; do you remember that?

17    A.  Yes.

18         THE COURT:  Can you keep the jury out of so many

19    questions.

10:20:56    20         MS. ROTHSCHILD:  Yes, Your Honor.

21         THE COURT:  The jury understands their function here,

22    and the way those questions are put has a little tone to it.

23    So try to avoid that, unless it's truly necessary.

24    BY MS. ROTHSCHILD:

10:21:09    25    Q.  Okay.  So we're going to walk through a few of those

1  documents, starting with PTX 268, which should be in your
2  binder.
3           MS. ROTHSCHILD:  And, Jim, if you could please pull
4  that up.
10:21:21
5  BY MS. ROTHSCHILD:
6  Q.  This is a document entitled Radio Performance Measurements
7  LTD, right?
8  A.  Yes.
9  Q.  And Motorola is claiming that this document forms part of
10:21:32
10 its testing trade secret, right?
11 A.  Yes.
12 Q.  This document doesn't have a confidentiality marking of
13 kind on it, does it?
14 A.  (No response.)
10:21:45
15          MS. ROTHSCHILD:  And, Jim, if you wouldn't mind
16 turning to page 2.
17 BY THE WITNESS:
18 A.  And the fact that the document may not have one of those
19 labels doesn't mean it's not a trade secret, according to our
20 policy.
21 BY MS. ROTHSCHILD:
22 Q.  This document does not have any confidentiality marking on
23 it, right?
24 A.  I don't see one, no.
10:22:16
25          MS. ROTHSCHILD:  Jim, if we could take that down,

Corretjer - cross by Rothschild

778

1 please.

2 BY MS. ROTHSCHILD:

3 Q.  You were also testifying on Thursday about Motorola's

4 hardware for its MOTOTRBO products, right?

10:22:27 5 A.  Yes.

6 Q.  That's trade secret No. 141?

7 A.  Correct.

8 Q.  And that's another one that you weren't designated on

9 during fact discovery to testify about, correct?

10:22:35 10 A.  Yes.

11 Q.  Okay.  And, again, one of your colleagues in Schaumberg was

12 designated on that trade secret, right?

13 A.  Yes.

14 Q.  Now, Motorola's hardware trade secret involves two

10:22:53 15 integrated circuits, is that right?

16 A.  No, I think it involves more hardware than that.  It's not

17 just two integrated circuits.

18 Q.  That involves integrated circuits frequency generation

19 units and transmitter hardware, is that right?

10:23:17 20 A.  Yes.

21 Q.  Okay.  And there are two integrated circuits that fall into

22 the integrated circuit bucket, is that right?

23 A.  In the documents that were referenced, yes.

24 Q.  And those are Trident and MACO, right?

10:23:30 25 A.  Yes.

Corretjer - cross by Rothschild

779

1   Q.  And Trident functions as a synthesizer, is that right?

2   A.  That's one of its functions.

3   Q.  And you can buy synthesizer chips on over the market,

4   right?

10:23:42   5   A.  You can, but not the kind that we design and manufacture --

6   sorry, design and implemented in Trident.

7   Q.  Okay.  But you can buy chips with the synthesizer

8   functionality on the open market, right?

9   A.  You probably can.

10:23:56   10   Q.  Okay.  And Motorola used the defendant Trident integrated

11   circuit from 2008 to 2012, right?

12   A.  Ah, that sounds right, yes.

13   Q.  And there were cost savings to Motorola in using the

14   Trident chip, right?

10:24:12   15   A.  Yes.

16   Q.  About a dollar?

17   A.  I don't have that information off the top of my head right

18   now.

19   Q.  But you wouldn't disagree with the individual Motorola put

10:24:23   20   up to testify about that trade secret, right?

21   A.  I would not.

22   Q.  And in 2012, Motorola replaced that specific Trident chip,

23   correct?

24   A.  Yes.

10:24:33   25   Q.  Motorola no longer uses that chip, right?

Corretjer - cross by Rothschild

1    A.  We use it on the -- on the -- on the older radios, and the

2    technology that came from Trident, actually, was carried over

3    to the new IC.  So the trade secret material on Trident is

4    still used even though it's in a different integrated circuit.

10:24:55   5    Q.  The other chip that Motorola -- the other integrated

6    circuit chip is the MACO chip, right?

7    A.  Yes.

8    Q.  And that does power management?

9    A.  That's one of its functions.

10:25:07  10    Q.  It's an accessory interface?

11    A.  That's another one of its functions.

12    Q.  A Kodak?

13    A.  Yes.

14    Q.  Audio power amplifier?

10:25:16  15    A.  Correct.

16    Q.  Digital analog converter?

17    A.  Yes.

18    Q.  Analog to digital converter?

19    A.  Correct.

10:25:24  20    Q.  And you could also, like with the Trident integrated

21    circuit chip, you could implement some of the MACO chip

22    functions with off-the-shelf parts, right?

23    A.  You could.  It wouldn't be the same design that we had, but

24    you could do that.

10:25:38  25    Q.  And like the Trident chip, Motorola replaced the MACO chip

Corretjer - cross by Rothschild

781

1  in 2012, right?

2  A.  Yes.

3  Q.  Let's talk about Motorola's repeaters.  They have hardware,

4  right?

10:25:53    5  A.  Yes, they do.

6  Q.  Including a transmitter?

7  A.  Yes.

8  Q.  And Motorola's MOTOTRBO repeaters uses the same transmitter

9  design as the mobile product, right?

10:26:07    10  A.  It was -- it was leverage, yes.  Yes, the mobile radio was

11  leveraged on the repeater.

12  Q.  As far as the physical hardware for the repeater goes, the

13  design was two mobile bricks inside the repeater, right?

14  A.  Yes; that's oversimplifying it a little bit, but that is

10:26:27    15  true.

16  Q.  Do you recall in your testimony on Thursday where you were

17  asked:

18         "In your 26 years at Motorola, can you recall

19         any document that you worked on or your

10:26:36    20         colleagues worked on that had technical trade

21         secret information labeled as 'trade secret' or

22         "registered trade secret.'"

23  A.  Please repeated the question.

24  Q.  Sure.  You were asked:

10:26:30    25         "In your 26 years at Motorola, can you recall

Corretjer - cross by Rothschild

782

1           any document that you worked on or your

2           colleagues worked on that had technical trade

3           secret information labeled as 'trade secret' or

4           "registered trade secret'?"

10:26:48    5           Do you recall being asked that?

6    A.  Yes.

7    Q.  And you responded that you hadn't seen any, right?

8    A.  I responded I didn't have personal knowledge of that.

9    Q.  Okay.

10:27:18    10          MS. ROTHSCHILD:  Can I please get DTX 5361.

11   BY MS. ROTHSCHILD:

12   Q.  This is a Motorola document entitled Next Generation

13   Controller Configurable Radio Architecture, right?

14   A.  Yes.

10:27:45    15          MS. ROTHSCHILD:  Your Honor, I'd like to move into

16   evidence DTX 5361.

17          MR. ALPER:  No objection.

18          THE COURT:  It is received and may be published.

19          (Said exhibit received in evidence.)

10:27:55    20   BY MS. ROTHSCHILD:

21   Q.  This is a Motorola document on Configurable Radio

22   Architecture, and I can represent to you from the metadata that

23   is provided with this document that it's from mid-2010 to late

24   2019.  And at this point in time, Motorola was considering some

10:28:10    25   new hardware, potentially, for its radios, right?

Corretjer - cross by Rothschild

783

1    A.  Yes.

2    Q.  Okay.  And one of the options that Motorola was considering

3    was to implement something that's called an FPGA, right?

4    A.  Yes.

10:28:26    5    Q.  And FPGA stands for Field Programmable Gearing, right?

6    A.  Correct.

7    Q.  And that's a type of chip, right?

8    A.  It's a gates, but, yeah, you could think of it that way,

9    yes.

10:28:40    10    Q.  And we talked about how Motorola leveraged a lot of code

11    and knowledge from prior products prior to DMR, right?

12    A.  Yes.

13    Q.  Okay.  Like reusing code from ASTRO, right?

14    A.  That's correct.

10:28:58    15    Q.  So if we could please turn to page 21.

16          We see some factors being considered by Motorola in

17    modifying its hardware to include an FPGA, do you see that?

18    A.  Yes.

19    Q.  Okay.  And No. 2 says, "software reuse reused on FPGA,"

10:29:30    20    right?

21    A.  Yes.

22    Q.  And that would be software reused from Motorola's existing

23    DMR products in the event Motorola decided to incorporate a

24    FPGA, right?

10:29:39    25    A.  There were probably some elements of the DMR software

Corretjer - cross by Rothschild

784

1    considered for this.

2    Q.  Elements of the DMR software that Motorola would reuse if

3    it went with the FPGA solution, right?

4    A.  Yes.

10:29:55    5    Q.  And if I can direct your attention to the bottom of the

6    page, it says "Motorola Registered Secret," doesn't it?

7    A.  It does say that, yes.  I wasn't aware of this document

8    before, though, just for the record.

9    Q.  Okay.  Let's talk about reverse engineering.  I think you

10:30:16   10    mentioned it in your direct testimony.

11            "Reverse engineering" means taking apart a physical

12    piece of hardware and looking at the guts, is that right?

13    A.  That's what reversing engineering, in general, means, yes.

14    Q.  Okay.  And when you take it apart, you see the hardware,

10:30:34   15    not the code, not the software, right?

16    A.  I'm sorry, can you repeat?

17    Q.  When you take apart the hardware, you don't see software,

18    you see just hardware, right?

19    A.  Yeah.  The software is not readily visible, yes.

10:30:53   20    Q.  And you understand that Motorola has taken apart Hytera

21    radios, isn't that right?

22    A.  I can't speak for that.  I'm not aware of that.

23    Q.  Let me hand you DTX 4656.

24            This is a June 2011 internal Motorola communication,

10:31:19   25    with the subject "hardware evaluation on HYT --" or Hytera --

Corretjer - cross by Rothschild

785

1    "-- MD780 mobile," do you see that?

2    A.  Yes.

3    Q.  Okay.  And if you look at the attachment, we see a slide

4    deck, a cover page, it says "Inside Hytera MD780," right?

10:31:40    5    A.  Where exactly are you reading that?

6    Q.  On page 2.

7    A.  Okay.  Yes.

8              MS. ROTHSCHILD:  Your Honor, I'd like to move DTX 4656

9    into evidence.

10:31:49    10              THE COURT:  Can you establish a date when this is

11    occurring as a foundation.

12    BY MS. ROTHSCHILD:

13    Q.  This is a Motorola internal e-mail, correct, from June 14,

14    2011?

10:32:02    15    A.  Yes.

16    Q.  And this is a Motorola attached PowerPoint describing its

17    teardown of a Hytera mobile radio, correct?

18    A.  Correct.

19    Q.  And this was completed in the regular course of business at

10:32:21    20    Motorola, right?

21    A.  Yes.

22              MS. ROTHSCHILD:  Your Honor, at this time I'd like to

23    move DTX 4656 into evidence.

24              MR. ALPER:  No objection.

10:32:28    25              THE COURT:  It is received and the document may be

Corretjer - cross by Rothschild

786

1    published.

2            (Said exhibit received in evidence.)

3            THE COURT:  Was that radio available on the open

4    market.

10:32:44    5            THE WITNESS:  I'm sorry, Your Honor.  Can you repeat

6    the question?  I was distracted here looking at the monitor.

7            THE COURT:  Well, let's challenge the court reporter.

8    Please read it back.

9            (Record read.)

10:33:02    10            THE COURT:  That particular radio.

11            THE WITNESS:  Yes, it was.

12            THE COURT:  All right.  Procedure.

13    BY MS. ROTHSCHILD:

14    Q.  So in June of 2011, Motorola has taken apart a Hytera and

10:33:10    15    put together a report, correct?

16    A.  Yes.

17    Q.  And if we could look, please, at page 2.

18    A.  Okay.

19    Q.  Okay.  We see here on the cover of the slide deck a

10:33:25    20    photograph of the Hytera mobile radio, right?

21    A.  Yes.

22    Q.  If we could please turn to page 6.

23            There are two mobiles shown here, right?

24    A.  Correct.

10:33:45    25    Q.  On the left we see a Motorola radio, right?

Corretjer - cross by Rothschild

1    A.  Yes.

2    Q.  And Hytera is on the right, right?

3    A.  Yes.

4    Q.  And we see that there are some dimensions included here,

10:33:58   5    and we see that they have different dimensions, the Motorola

6    radio and the Hytera radio, right?

7    A.  Yes.

8    Q.  So we know that their hardware isn't identical, right?

9    A.  This is just comparing the physical, you know, external

10:34:14   10   characteristics of the radio.  It doesn't say anything about

11   what's inside.

12   Q.  Now, let's turn to page 10 and look at what's inside.

13            And here we see that the casings for the Hytera mobile

14   radio has been removed and we're now looking, as the slide

10:34:29   15   says, inside the MD780, right?

16   A.  Yeah, this is a view of one of the PCP boards.

17   Q.  And if we go to page 13, we see photographs.  The

18   photograph on the left is showing the Hytera circuit board,

19   right?

10:34:49   20   A.  Yes.

21   Q.  And then if we go to page 16, we see that somebody at

22   Motorola has superimposed labels onto the photograph of the

23   Hytera mobile radio identifying individual components, right?

24   A.  Identifying individual areas of hardware, yes.

10:35:11   25   Q.  Like power and auxiliary on the upper left?

Corretjer - cross by Rothschild

788

1   A.  Yes.

2   Q.  And CPU on the bottom left, right?

3   A.  Correct.

4   Q.  And we see a label on the bottom left corner that says

10:35:25   5   "upper side," right?

6   A.  Yes.

7   Q.  And then if we turn to the next page, page 17, we see the

8   lower side of the Hytera circuit board, right?

9   A.  Yes.

10:35:37   10   Q.  Okay.  And on the bottom right-hand corner, we see the

11   circuit board portion for audio "DA," "AD" and "PA," right?

12   A.  Correct.

13   Q.  "DA" is digital to analog, right?

14   A.  Yes.

10:35:52   15   Q.  "AD" is analog to digital?

16   A.  Yes.

17   Q.  And "PA," power amplification, right?

18   A.  Yes.

19   Q.  Those are items that Motorola accomplished, for at least

10:36:02   20   its initial DMR radios, using its MACO chip, right?

21   A.  Yes.

22   Q.  That Motorola is claiming is part of the trade secret 141

23   for its hardware, right?

24   A.  Correct.

10:36:13   25   Q.  And we can see from here that Hytera doesn't use the

Corretjer - cross by Rothschild

789

1  Motorola MACO chip, right?

2  A.  I mean, I would have to zoom in here on those chips to make

3  sure, but I'm not sure just looking at this picture.

4  Q.  Sitting here today, you're not aware that Hytera used

10:36:45  5  Motorola's MACO chip, right?

6  A.  I'm sorry, can you repeat?

7  Q.  You're not aware that Hytera used Motorola's MACO chip,

8  right?

9  A.  I'm not aware that they actually used the chip itself.

10:36:58  10  MS. ROTHSCHILD:  Jim, we can take that down.

11  BY MS. ROTHSCHILD:

12  Q.  I think we talked about that there are several documents

13  that Motorola has cited as describing trade secret 141,

14  Motorola's hardware, right?

10:37:12  15  A.  Yes.

16  Q.  Okay.  If we could please pull up, which should be in your

17  binder and we'll pull it up on the screen, PTX 1258.

18  This is one of the documents that Motorola is claiming

19  as part of its hardware trade secret, right?

10:37:34  20  A.  Yes.

21  Q.  And there's no confidentiality label on this document, is

22  there?

23  A.  There isn't.

24  Q.  And just for the sake of explaining to the jury so they

10:37:47  25  don't get confused, there's a label on the bottom --

Corretjer - cross by Rothschild

790

1    THE COURT:  Rephrase the question.

2   BY MS. ROTHSCHILD:

3   Q.  So I don't get confused --

4         THE COURT:  You may rephrase that one, too.

10:37:56   5   BY MS. ROTHSCHILD:

6   Q.  There's a label on the bottom of the document that says,

7   "Confidential Subject to Protective Order," do you see that?

8   A.  I see that.

9   Q.  Okay.  Now, that's not a marking that was on the original

10:38:09   10  version of the document.  You understand that that was added by

11  the parties in the litigation and designated the document to

12  produce to the other side, is that right?

13  A.  Yes, that's right.

14  Q.  All right.  Let's look at PTX 1259.

10:38:30   15  A.  Yes.

16  Q.  This is another document that Motorola is claiming as part

17  of its hardware trade secret, right?

18  A.  Yes.

19  Q.  Okay.  And this is another document that has no

10:38:40   20  confidentiality label on it, correct?

21  A.  That's correct.

22        MS. ROTHSCHILD:  We can take that down.

23  BY MS. ROTHSCHILD:

24  Q.  Let's talk about the HAL trade secret, the Hardware

10:39:02   25  Abstraction Layer in trade secret 52.

Corretjer - cross by Rothschild

791

How many people developed trade secret 52?

A.  I believe my conservative estimate was 15 engineers, at least 15 engineers.

Q.  Okay.  But you didn't work directly on this trade secret yourself, did you?

A.  I didn't develop the trade secret directly, but my work is about interfacing directly with this technology.

Q.  A gentleman by the name of Matt Sims was the main architect of HAL, is that right?

A.  Yes.

Q.  He didn't get a bonus for inventing HAL, did he?

A.  He did not.

Q.  None of the 15 people who developed Motorola's HAL got a bonus, did they?

A.  No.

Q.  Now, the concept of a hardware abstraction layer, that's a generally known thing, right?

A.  The concept of a HAL, yes, it's known in the industry.

Q.  It's been known for decades, right?

A.  Probably.

Q.  And Motorola uses an object-oriented approach for its hardware abstraction layer, right?

A.  We do, yes.

Q.  The use of an object oriented approach and programming is a well-known concept, isn't it?

Corretjer - cross by Rothschild

1    A.  I don't think that, you know, applying object oriented to a

2    HAL is a well-known concept.  I mean, that's -- we're talking

3    about our specific design and implementation, that's

4    confidential, we don't share that.

10:40:37    5    Q.  But the use of an object oriented approach in programming,

6    in general, that's a well-known thing, right?

7    A.  Usage of an object-oriented programming, in general, that's

8    known in the industry, yes.

9    Q.  C++ is an object-oriented programming language, right?

10:40:50   10    A.  Yes, it is.

11    Q.  Okay.  An object-oriented programming, like C++, that's

12    been around for a long time, right?

13    A.  That's been around for a while, yes.

14    Q.  There's even books on it, right?

10:41:04   15    A.  Again, yes, there's books.  But, again, we're talking about

16    our design implementation of HAL.  There's a lot more to

17    calling it a trade secret here than just a language.

18    Q.  But one other things that you believe is part of the trade

19    secret is the fact that Motorola uses an object-oriented

10:41:24   20    programming language, right?

21    A.  That is part of the trade secret, yes.

22    Q.  Let me hand you a copy of this book, which is DTX 5222, and

23    it's entitled Object-Oriented Application Frameworks.

24          And if you could please turn to page 4 of the exhibit.

10:41:55   25    We see that this book was published in 1995, right?

Corretjer - cross by Rothschild

1    A.  Yes.

2    Q.  So Motorola is claiming a specific design and

3    implementation of HAL as its trade secret, is that right?

4    A.  That's right.

10:42:28    5    Q.  And on Thursday, you testified that there were three

6    components to Motorola's HAL:  Interfaces and drivers, timing

7    and execution and state machines, is that right?

8    A.  I think you missed memory management.

9    Q.  Okay.  Four things, including memory management, right?

10:42:45   10    A.  Four general aspects, yeah.

11    Q.  All hardware abstraction layers have interfaces and

12    drivers, right?

13    A.  HAL is going to have interfaces and drivers, but not our

14    specific interface and our specific drivers.

10:43:02   15    Q.  And all HAL's will have timing and execution components,

16    correct?

17    A.  Not only HAL for digital two-way radios.

18    Q.  All HAL's digital two-way radios will have timing and

19    execution components, correct?

10:43:17   20    A.  As a general area, they have to have some timing services,

21    yes.

22    Q.  And all HAL's will have state transitions, right?

23    A.  Not necessarily.  Again, we chose to implement our HAL with

24    state machines, state transition design.  You don't have to do

10:43:35   25    it that way.

Corretjer - cross by Rothschild

1    Q.  But you wouldn't be surprised to see another HAL with state

2    transitions, right?

3    A.  I mean, state machine is -- is a software methodology.  I

4    mean, they could apply it.  I don't know if I would be

10:43:49    5    surprised or not.

6    Q.  And you wouldn't be surprised by memory management in a

7    HAL, right?

8    A.  Again, same thing.  It may or may not be there.  It was in

9    ours.

10:43:59    10    Q.  Now, trade secret 52, which is HAL, covers a L1 timer,

11    right?

12    A.  Yes.

13    Q.  Okay.  It covers frame scheduler?

14    A.  Correct.

10:44:12    15    Q.  Includes framers?

16    A.  Yes.

17    Q.  And synchronizations?

18    A.  Yes.

19    Q.  And those are the components of what Motorola is claiming

10:44:22    20    as trade secret 64, right?

21    A.  Yes.  On trade secret 64, correct, yes.

22    Q.  On Thursday you showed the jury one code file that's part

23    of Motorola's HAL code, right?

24    A.  Yes.

10:44:37    25    Q.  Now, that one code file is not the entirety of Motorola's

Corretjer - cross by Rothschild

795

1   trade secret, right?

2   A.  It's not.  It's just a portion.

3   Q.  Right.  That's just one of these 957 code files that

4   compromise the code portion of the trade secret, right?

10:44:52   5   A.  Yeah.  I don't have the number of files memorized, but yes.

6   Q.  And that is just one of tens of thousands of files that

7   Motorola had as part of its MOTOTRBO DMR code, right?

8   A.  Yes.

9   Q.  Now, according to Motorola, its claimed trade secret on HAL

10:45:13  10  existed at least by 2008, right?

11  A.  That's correct.

12  Q.  Okay.  If you could please turn to PTX 1346, which I

13  believe was admitted on Thursday.

14         PTX 1346 is the HAL design handbook for LTD that

10:45:40  15  Motorola is claiming as part of its HAL trade secret, right?

16  A.  Yes.

17  Q.  Okay.  And if we look on the cover, we see the revision

18  date is January 3rd, 2009, right?

19  A.  Yes, that doesn't mean that the contents of this document

10:45:56  20  were created after 2008.  A lot of it was authored before 2008.

21  Q.  I understand that the allegations in this case are that

22  G.S. and Y.T. walked out of Motorola with these documents,

23  right?

24  A.  Yes, I understand that.

10:46:13  25  Q.  And they left in 2008, right?

Corretjer - cross by Rothschild

1    A.  I'm not exactly sure when they left.

2    Q.  Assuming they left in 2008, they didn't walk out with this

3    document, did they?

4    A.  I can' speak for that.  I'm sorry.

10:46:28    5    Q.  If we look below the date on this document, we see it says

6    "Motorola N & E Penang," right?

7    A.  Yes.

8    Q.  So this document was created in Motorola's Penang facility,

9    right?

10:46:44    10   A.  Yes, it was.

11   Q.  And, in fact, several of the documents that Motorola cites

12   for its trade secret were created in Penang and/or China, isn't

13   that right?

14   A.  They were under supervision of Plantation, lead architects.

10:47:09    15   Q.  The work effort estimate you came up for trade secret 52,

16   HAL, is 15 people for 376 staff months, is that right?

17   A.  Yes.

18   Q.  And because trade secret 64, L 1 timer, framer, frame

19   scheduler is entirely subsumed by trade secret 52 that includes

10:47:31    20   or encompasses the work effort estimate that you came up with

21   for these broader HAL trade secret, right?

22   A.  No, that's not correct.  I believe I said during my

23   deposition that I was careful to not double-count, and I

24   estimated 64 separately from 52.

10:47:45    25   Q.  Your testimony today is that you subtracted from trade

Corretjer - cross by Rothschild

797

1    secret 52, from your estimate for trade secret 52 the time that

2    you estimated for trade secret 64?

3    A.  I didn't subtract it.  They were estimated separately and

4    making sure I wasn't double-counting.

10:48:02    5    Q.  But trade secret 52, the broader trade secret, that does

6    include the time that it spent for Motorola to develop trade

7    secret 64, right?

8    A.  I don't think it does.  I think I said additional time.

9    Q.  So do you recall your deposition on April 15, 2019?

10:48:26    10    A.  In general, yes.

11    Q.  And you recall you brought to your deposition a list of

12    your work effort estimates for the various trade secrets, do

13    you recall that?

14    A.  That's correct.  And I had a head count and an effort

10:48:41    15    estimate for 64 and another one for 52.

16    Q.  And your breakdown for trade secret 52 had a couple of

17    components, including the work effort estimate you had come up

18    with for trade secret 64, right?

19    A.  Again, I was reviewing my notes and I said that it's

10:49:01    20    additional effort on top of -- I didn't -- I was careful not to

21    double-count as trade secrets when I estimated them.

22    Q.  Trade secret 52 took more time than trade secret 64 because

23    it includes other things, that's your testimony, right?

24    A.  Yes.  Just a general HAL, yes.

10:49:20    25    Q.  Right.  But it also includes 64 falls within 52, right?

Corretjer - cross by Rothschild

1   A.  Again, I was careful to estimate them separately because I

2   knew that that was called out of separate trade secret.

3   Q.  You estimated 72 staff months for trade secret 64, right?

4   A.  That sounds right.

10:49:42  5   Q.  And for trade secret 52, one of the component element,

6   numbers that you provided, was 72 plus your estimate for the

7   other non-trade secret 64 elements, right?

8   A.  Please repeat the question?

9   Q.  At your deposition on April 15, 2019, you provided a number

10:50:03  10   of work effort estimate for trade secret 64 that had several

11   components that were to be added to get to the final number,

12   right?

13   A.  I'm still not understanding the question.  Please rephrase

14   it.

10:50:17  15   Q.  For trade secret 52, you came up with some components that

16   you added up to get to the total for that work effort estimate,

17   right?

18   A.  I mean, that's how I estimated it, but again, my

19   recollection is that I was careful not to double-count as trade

10:50:38  20   secrets.

21   Q.  So you said, if we look at trade secret 52, we add up

22   elements of 72 staff months, plus other elements of trade

23   secret 52, right?

24   A.  Maybe you can, you know, reference the specific pages or

10:50:56  25   lines in the deposition.  I'm a little confused right now.  I

Corretjer - cross by Rothschild

799

1   don't think I double counted.

2   Q.  So when you told me that the 72 staff months that was part

3   of trade secret 52 came from your estimate for trade secret 64,

4   that's not right?

10:51:10   5   A.  Repeat it, please.

6   Q.  You told me that --

7              THE COURT:  It is clear that you must have a page

8   reference and line reference and then confront the witness.

9              MS. ROTHSCHILD:  Sure.

10:51:28  10  BY MS. ROTHSCHILD:

11  Q.  It's page 476, line 20 to 476, line 7.  And I asked:

12              So if we look at 52, you have 2 to 3 engineers

13              for 3 years, plus 16 staff months, plus 72 staff

14              months, plus 180 staff months, what does that

10:51:47  15              mean?

16              And you said:

17              "I think I said before, there's overlap between

18              trade secret 52 and some of the other trade

19              secrets that are HAL related.  So the 16 staff

10:52:00  20              months is from 57, you can see it on the line

21              item for trade secret 57 -- "

22              THE COURT:  Are you still reading from the transcript?

23              MS. ROTHSCHILD:  Yes.

24              THE COURT:  You are?

10:52:11  25              MS. ROTHSCHILD:  Yes.

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 43 of 217 PageID #:52679
Corretjer - cross by Rothschild
800

1      THE COURT:  All right.  It should be clear to the

2  witness.

3      Is this still the answer of the witness?

4      MS. ROTHSCHILD:  Yes.

10:52:16    5      THE COURT:  All right.  Do you understand what's

6  occurring here?

7      THE WITNESS:  Yes.

8      THE COURT:  All right.  Complete the statement.

9  BY MS. ROTHSCHILD:

10:52:19   10  Q.  And then the relevant part:

11      "The 72 is, I believe, it's for 64."

12  A.  Uh-huh.

13  Q.  "And the 180 comes from trade secret 80."

14      You recall that testimony?

10:52:29   15  A.  I recall that.  And some of those trade secrets are no

16  longer being asserted in the case.

17  Q.  Right.  But 64, where you estimated 72 staff months, is,

18  right?

19  A.  Yes.

10:52:40   20  Q.  Okay.  Let's move more into trade secret 64.

21      Does that trade secret cover synchronization?

22  A.  It does, yes.

23      THE COURT:  All right.  That's a new term.  Probably a

24  good time to have that third cup of coffee.

10:52:57   25      Members of the jury, you are excuse for a while.  The

Corretjer - cross by Rothschild

801

1    witness may step down.

2            (Recess.)

3            THE CLERK:  All rise.

4            (The following proceedings were had in the

5            presence of the jury in open court:)

6            THE CLERK:  This Court resumes in session.  Please be

7    seated and come to order.

8            THE COURT:  Please recall the witness.

9            (Brief pause.)

10           MR. ALPER:  Mr. Corretjer?

11           THE COURT:  Yes.

12           MR. ALPER:  Thank you.

13           (Brief pause.)

14   BY MS. ROTHSCHILD:

15   Q.  Before we broke, we were touching on synchronization.  And

16   synchronization means that your message that is being broadcast

17   has to match up with the timing so that it can be decoded on

18   the other end and received properly, is that a nontechnical way

19   of describing it?

20   A.  Yes.

21   Q.  And because DMR radios must abide by the TDMA standard or

22   time-division-based standard, they have to be synchronized to

23   that standard, right?

24   A.  Yes.  Any manufacturer would have to do a synchronization

25   scheme.  You don't have to do it the way we did it, though.

11:08:50

11:09:00

11:09:11

11:09:32

11:09:52

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 45 of 217 PageID #:52681
Corretjer - cross by Rothschild
802

1    Q.  Okay.  But the synchronization has to be to over-the-air

2    protocol that is set by the DMR standard, right?

3    A.  Yes.

4    Q.  And the trade secret also covers the framer, right?

11:10:08    5    A.  Yes.

6    Q.  Okay.  And that's the thing that, as the name suggests,

7    puts the frames together?

8    A.  It puts the frames together and manages the sequence of

9    execution.

11:10:20    10    Q.  And the frames also must be compliant with the DMR

11    standard, right?

12    A.  Again, the framer and the frames is a Motorola concept.  So

13    there's a different manufacturer that may not even have a

14    design that has frames.

11:10:34    15    Q.  But the frames have to be put together in a way that a

16    radio by another manufacturer could unpack them, right?

17    A.  No.  I mean, like I said, another manufacturer doesn't even

18    have to have frames.  That comes with the frames as a Motorola

19    concept.

11:10:49    20    Q.  But Motorola wants its radios to be inner-operable with

21    other manufacturers, right?

22    A.  From an over-the-air protocol standpoint, yes.

23    Q.  Now, let's look at one of the documents that Motorola has

24    cited for trade secret 64, it's O1 timer, framer, frame

11:11:12    25    scheduler, and synchronization claim trade secret, that should

Corretjer - cross by Rothschild

803

1    be in your binder, and it's PTX 729.

2         This is one of the documents that Motorola is

3    including as part of trade secret 64, right?

4    A.  Yes.

11:11:30   5    Q.  And this is a document entitled Matrix F2TDMA architecture,

6    right?

7    A.  Yes.

8    Q.  And we can see on the cover towards the bottom, it says

9    Motorola CGISS Penang, right?

11:11:49   10   A.  Correct.  Yes.

11        MS. ROTHSCHILD:  And if we can take down, please.

12   BY MS. ROTHSCHILD:

13   Q.  We also see slightly above that, it says DCN: ZMY12, do you

14   see that?

11:12:00   15   A.  Yes.

16   Q.  Okay.  "ZMY," that's a reference to Malaysia, right?

17   A.  Yes.

18   Q.  And that document control number, is that a reference to a

19   server in Penang?

11:12:11   20   A.  Are you talking about the "DCN," that acronym?

21   Q.  Yes.

22   A.  That's just a label for saying it's a requirements document

23   from Malaysia.  Again, with this document was done at the

24   supervision of the Plantation leader architects.

11:12:34   25   Q.  But it was created in Malaysia, right?

Corretjer - cross by Rothschild

804

1    A.  Yes.

2    Q.  Let's talk about the DSP category of trade secrets.

3            There are five that Motorola is claiming in this case

4    that fall within that category or umbrella, right?

11:12:53    5    A.  Yes.

6    Q.  One of those is noise suppression or trade secret 54, is

7    that right?

8    A.  Yes.

9    Q.  And one of the inventors of trade secret 54, or noise

11:13:16    10   suppression, is an individual by the name of Huang Jin who was

11   based in Motorola's Chengdu's China office, right?

12   A.  He's not one of the inventors.  I think he was involved in

13   the implementation of the algorithm.

14   Q.  He's one of the coders, right?

11:13:30    15   A.  Yes.

16   Q.  Okay.  And Jimmy Lee was also one of the inventors of noise

17   suppression, is that right?

18   A.  He was another one of the coders, yeah.

19   Q.  Okay.  And none of the inventors of trade secret 54 for

11:13:45    20   noise suppression got a bonus, right?

21   A.  You don't have to get a bonus for trade secrets.

22   Q.  None of the inventors of Motorola's trade secret 54 for

23   noise suppression got a bonus, isn't that right?

24   A.  That's correct, yes.

11:14:01    25   Q.  Noise suppression is the functionality that takes out

1  background noise on the side of the person who is speaking into

2  the radio, right?

3  A.  Yes.

4  Q.  And Motorola did not develop digital noise suppression,

11:14:12  5  right?

6  A.  I think you're referring to the fact that the noise

7  suppression is used on the radio in analog mode, but the trade

8  secret certainly involves logic for when the use between the

9  analog and digital modes of operation of the radio.

11:14:38  10  Q.  Motorola developed noise suppression for analog mode,

11  right?

12  A.  Again, that our components that also spent on the digital

13  modem of the radio.

14  Q.  And the digital mode component is if the radio is in

11:14:51  15  digital mode, turn analog noise suppression off, right?

16  A.  That's correct.

17  Q.  Okay.  And digital noise suppression is provided by AMBE,

18  which provides the vocoder that Motorola uses, right?

19  A.  Yes.

11:15:07  20  Q.  And every DMR radio uses that same AMBE+2 vocoder, right?

21  A.  It is, yes.

22  Q.  So every DMR radio has the same digital noise suppression

23  technology, right?

24  A.  They have access to it.

11:15:23  25  Q.  And it is Motorola's position, is it not, that the digital

Corretjer - cross by Rothschild

806

1   noise canceler is part of trade secret 54 noise suppression?

2   A.  Yes.  As I said before when I talked about third-party

3   software, it's all the software that we go around it, all the

4   glue integrated to the rest of our software.  You can't really,

11:15:47   5   you know, use one without the other.  So the combination of the

6   third-party where they glue around it is part of the trade

7   secret.

8   Q.  But there's analog noise suppression which Motorola wrote,

9   and digital noise suppression, which Motorola did not, right?

11:15:59   10  A.  Yes.  In that case, yes.

11  Q.  And as trade secret 54 for noise suppression, Motorola is

12  claiming both, right?

13  A.  In the context of what I said, in the combination under

14  rules to use one or the other, that's secret.

11:16:12   15  Q.  Now, analog noise suppression, that's been around for a

16  very long time, right?

17  A.  There are forms of analog noise suppression, have been

18  around for a while, yes.

19  Q.  In fact, Motorola has numerous patents on analog noise

11:16:28   20  suppression, right?

21  A.  Yeah, we have a patent on a number of noise suppressions.

22  Again, there are many low-level details like parameters and the

23  source code itself that are not disclosed in the patents.

24  Q.  And, now, when Motorola files to a patent, they actually

11:16:44   25  have to make a decision, do I want to keep something as a trade

Corretjer - cross by Rothschild

807

1    secret internal to Motorola, or do I want to put it out there

2    in a patent for the public, right?

3    A.  Yes, that's one of the choices we have to make.

4    Q.  Okay.  Because anything disclosed in the patent is no

11:16:57    5    longer a secret, right?

6    A.  Yeah.  The high-level details of an algorithm that are

7    disclosed in patents are public, yes.

8           MS. ROTHSCHILD:  Can I please get DTX 5378, 5379, and

9    5258.

11:17:31    10    BY MS. ROTHSCHILD:

11    Q.  Mr. Corretjer, you've been handed PTX 5378, 5379, and 5258,

12    do you recognize each as Motorola patents?

13    A.  I do, yes.

14           MS. ROTHSCHILD:  Your Honor, I'd like to move into

11:17:46    15    evidence DTX 5378, DTX 5379, and DTX 5258.

16           MR. ALPER:  No objection.

17           THE COURT:  They are received and may be published.

18           (Said exhibit received in evidence.)

19    BY MS. ROTHSCHILD:

11:18:03    20    Q.  If we could please pull up DTX 5378.

21           This is U.S. Patent No. 4,811,404 that was issued on

22    March 7, 1989, correct?

23    A.  Yes.

24    Q.  And the title of the patent is Noise Suppression System,

11:18:21    25    right?

Corretjer - cross by Rothschild

808

1    A.  Correct.

2    Q.  And we see that in assignee is Motorola, Inc., right?

3    A.  Yes.

4    Q.  Okay.  Let's pull up DTX 5379.

11:18:34   5         This is U.S. Patent No. 5,659,622, which was issued on

6    August 19th, 1997, correct?

7    A.  Yes.

8    Q.  And we see in the assignee that this was another patent

9    that was issued to Motorola, correct?

11:18:49   10   A.  Yes.

11   Q.  And the title of this patent is Method and Apparatus For

12   Suppressing Noise in a Communication System, right?

13   A.  Yes.

14   Q.  And now let's look at DTX 5258.

11:19:05   15        This is U.S. Patent No. 6,618,701, issued on

16   September 9, 2003, correct?

17   A.  Yes.

18   Q.  And this patent was also issued to Motorola, correct?

19   A.  Yes.

11:19:19   20   Q.  And the title of this patent is Method and System For Noise

21   Suppression Using External Noise Activity Detection, right?

22   A.  Yes.

23   Q.  And we can take that down.

24        Motorola uses an algorithm for analog noise

11:19:40   25   suppression, right?

Corretjer - cross by Rothschild

1    A.  Yes.

2    Q.  And Motorola actually put that algorithm into a public

3    standard, right?

4    A.  That's correct.

11:19:48   5    Q.  And that standard is IS127 that was issued in 1995, right?

6    A.  Yes.

7    Q.  Let's talk about squelch trade secret 55, right?

8    A.  Yes.

9    Q.  Squelch is something that un-use the speaker when there's

11:20:16   10   useful audio presence so you don't just hear noise on the

11   channel, right?

12   A.  That's correct.

13   Q.  And this is something that's on the receive side, right?

14   A.  It is on the receive side, yes.

11:20:29   15   Q.  Okay.  And this is a feature that's been present on radios

16   for decades, right?

17   A.  The feature has.  The specific technology where protecting

18   it as a trade secret has not been protected.

19   Q.  Squelch is not used in digital mode at all, right?

11:20:46   20   A.  That's right.

21   Q.  It's limited to analog squelch, right?

22   A.  Correct.

23   Q.  And squelch is an algorithm, right?

24   A.  Squelch is a technology.  I mean, there's an algorithm

11:20:59   25   that's part of the technology.

Corretjer - cross by Rothschild

810

1    Q.  And the algorithm that Motorola uses for squelch is an

2    algorithm that was invented by your colleague, Darrell Stogner,

3    right?

4    A.  Yes.

11:21:13    5    Q.  And he actually applied for and obtained a patent on that

6    algorithm, didn't he?

7    A.  He did, yes.

8    Q.  Okay.

9         MS. ROTHSCHILD:  Can I please have DTX 3650.

11:21:32    10   BY MS. ROTHSCHILD:

11   Q.  DTX 3650 is Mr. Stogner's patent on squelch, correct?

12   A.  Yes.

13        MS. ROTHSCHILD:  Your Honor, I would like to move DTX

14   3650 into evidence.

11:21:42    15        MR. ALPER:  No objection, Your Honor.

16        THE COURT:  It is received and may be published.

17        (Said exhibit received in evidence.)

18   BY MS. ROTHSCHILD:

19   Q.  DTX 3650 is U.S. Patent No. 6,564,041, issued on May 13,

11:22:01    20   2003, right?

21   A.  Yes.

22   Q.  It is entitled System and Method Providing Improved FM

23   Carrier Squelch System, right?

24   A.  Yes.

11:22:10    25   Q.  And it was invented by Darrell Stogner and assigned to

Corretjer - cross by Rothschild

1    Motorola, correct?

2    A.  Yes.

3    Q.  And this is the patent for the squelch algorithm that

4    Motorola is claiming in trade secret 55 for sketch, right?

11:22:24    5    A.  It is, yes.

6    Q.  And the patent actually describes the theory behind the

7    algorithm, right?

8    A.  It describes the high-level algorithm in the formula, so

9    the theory of the formula behind the algorithm.

11:22:37    10    Q.  And it describes a theoretical design of the squelch

11    algorithm, right?

12    A.  It does.  What it doesn't disclose are the parameters that

13    we went through during my direct examination.

14    Q.  Well, if we can look at some of the contents of the patent.

11:22:54    15          If we look, for example, at page 3, we see on the

16    left-hand column, column 1, that the patent actually discloses

17    a mathematical calculation, right?

18    A.  Yes.

19    Q.  And if we look on page 4, we see more calculations, right?

11:23:19    20    A.  Correct.

21    Q.  And more on page 5, right?

22    A.  Yes.

23    Q.  Okay.  And Motorola implemented the formulas that are

24    disclosed in this patent and its code for squelch, right?

11:23:33    25    A.  We did, yes.

Corretjer - cross by Rothschild

1    Q.  Okay.  And in your testimony, you haven't distinguished

2    your claims trade secret on squelch from what is covered by

3    Motorola's squelch patent, right?

4    A.  Can you repeat the question, please?

11:23:47    5    Q.  You haven't distinguished between what Motorola is claiming

6    as trade secret 55 for squelch from what is disclosed in this

7    patent, right?

8    A.  I have, actually.  I mentioned that the implementation for

9    the 55 DSP is something that's secret, it's not published in

11:24:01    10    the patent.  I also spoke about the 15 levels of sensitivity

11    and all the parameters that go into that, which is not

12    published here.

13    Q.  You didn't show -- strike that.

14          You didn't discuss -- strike that.

11:24:19    15          You came up with the work effort estimate for this

16    trade secret, right?

17    A.  Yes.

18    Q.  Okay.  And it's based off of the patent that Darrell

19    Stogner developed, right?

11:24:33    20    A.  It's based on -- it's based on this technology, yes.

21    Q.  And you don't know how long it took Mr. Stogner to develop

22    the squelch rhythm, did you?

23    A.  No, I did.  I mean, one of the things I did that go into

24    the estimate is, I spoke to Mr. Stogner, which is in

11:24:49    25    Plantation.  We had a conversation about this.

Corretjer - cross by Rothschild

813

11:25:07

1   Q.  And when you sat through your deposition on May 31, 2019,

2   you couldn't recall how much time it took to develop that

3   squelch job rhythm, right?

4   A.  I think you're referencing the time that it took us to

5   develop it ASTRO, because this is an ASTRO technology.  What I

6   said in my deposition is that my estimate did include the time

7   that it took us to develop it in the ASTRO legacy.  I didn't

8   have the breakdown of how much was legacy versus, but the total

9   estimate included the legacy.

11:25:26

10   Q.  And, again, Motorola is claiming both the legacy

11   development for another product as part of its work estimate

12   for DMR, right?

13   A.  Because that technology was leveraged, so, yes.

14        MS. ROTHSCHILD:  Jim, could we please pull up the

11:25:47

15   squelch code file that was discussed on Thursday.

16   BY MS. ROTHSCHILD:

17   Q.  This was the squelch file that you discussed on Thursday,

18   right?

19   A.  Yes.

11:25:58

20   Q.  Okay.  Now, this document, or this piece of code, this is

21   not marked "Motorola Confidential Proprietary," is it?

22   A.  I believe the metadata information for this file does have

23   it.  It's not right here in the printout.

24   Q.  Nowhere on the face of this document does it say

11:26:19

25   "Motorola," does it?

Corretjer - cross by Rothschild

814

1    A.  It doesn't say it, no.  Not in what I'm saying, yes.

2    Q.  Nowhere in this document does it have the word

3    "confidential," right?

4    A.  I believe it's included in the metadata information, but

11:26:35    5    it's not in the file, yes.

6    Q.  Nowhere on this document does it say "proprietary," right?

7    A.  It doesn't say it.

8    Q.  And this is just one file that is part of Motorola's

9    squelch code, is that right?

11:26:55    10    A.  Yes.

11    Q.  This is not the entirety off Motorola's trade secret, is

12    it?

13    A.  It's not.

14          MS. ROTHSCHILD:  We can take that down, please.

11:27:05    15    BY MS. ROTHSCHILD:

16    Q.  Let's talk about carrier detection, which is trade secret

17    56, right.

18    A.  Yes.

19    Q.  Carrier detection is an algorithm that detects the presence

11:27:19    20    of a signal, right?

21    A.  Yes; a carrier signal.

22    Q.  And squelch, which we discussed in the last trade secret,

23    that is dependent on carrier detection, right?

24    A.  In our implementation, you don't have to do it that way,

11:27:37    25    but we will not run the squelch algorithm unless you have the

Corretjer - cross by Rothschild

815

1   presence of a carrier signal.

2   Q.  And Motorola is claiming both analog and digital carrier

3   detection, right?

4   A.  Correct.  The algorithm is used in both modes.

5   Q.  Motorola has patents on carrier detection, right?

11:27:51

6   A.  We do.  Not this particular algorithm that we're protecting

7   approximating as a secret.

8   Q.  Let's look at DTX 3657 and 3656, please.

9        Mr. Corretjer, do you recognize DTX 3657 and 3656 as

10  Motorola patents?

11:29:35

11  A.  I do, yes.

12       MS. ROTHSCHILD:  Your Honor, I'd like to move in 3657

13  and DTX 3656 into evidence.

14       MR. ALPER:  No objection, Your Honor.

15       THE COURT:  They are received and may be published.

11:29:45

16       (Said exhibits received in evidence.)

17  BY MS. ROTHSCHILD:

18  Q.  Let's start with DTX 3657.

19       This is U.S. Patent No. 8,259,858 from September 4,

20  2012, right?

11:30:01

21  A.  Yes.

22  Q.  Assigned to Motorola Solutions, right?

23  A.  Yes.

24  Q.  And the title of this patent is Carrier Detect Systems,

25  Apparatus and Methods Thereof, right?

11:30:13

Corretjer - cross by Rothschild

816

1    A.  Yes.

2    Q.  And this patent discloses the method of conducting carrier

3    detection, right?

4    A.  Yes.  It's a method.

11:30:23    5    Q.  And this is a method that covers both analog and digital

6    carrier detection, right?

7    A.  Yes, but it's not the one we use on MOTOTRBO.

8    Q.  Let's look at DTX 3656.

9            And this is U.S. Patent 8,160,528, issued April 17,

11:30:46    10    2012, right?

11    A.  Yes.

12    Q.  And this patent was also assigned to Motorola, correct?

13    A.  Yes.

14    Q.  And you're actually one of the inventors, right?

11:30:55    15    A.  I am, yes.

16    Q.  And this is a patent entitled Method and Device for

17    Detecting Presence of a Carrier Signal and a Received Signal,

18    right?

19    A.  Yes.

11:31:06    20    Q.  And these patents disclose the core algorithm for carrier

21    detection, right?

22    A.  They don't.  In my deposition, I mentioned that this

23    particular algorithm was placed on one of the IC's on the

24    Paradise platform and is actually not being used.  It's not the

11:31:34    25    one that we use in MOTOTRBO.

Corretjer - cross by Rothschild

817

| | |
|---|---|
| 1 | Q.  And so Motorola is not using the same carrier detection as |
| 2 | it did in MOTOTRBO and the Paradise platform? |
| 3 | A.  We actually -- we are in some of the radios. |
| 4 | Q.  But not all? |
| 11:31:48  5 | A.  Not all. |
| 6 | Q.  Chen YunHua and Zhong are the two individuals who developed |
| 7 | trade secret 56, is that right? |
| 8 | A.  Yes.  The decoders, yes. |
| 9 | Q.  And they're no longer with Motorola, right? |
| 11:32:13  10 | A.  That is correct. |
| 11 | Q.  And they weren't a few months back when you developed your |
| 12 | work-effort estimates, right? |
| 13 | A.  They were not with Motorola when I did the estimates. |
| 14 | Q.  And you didn't talk to them to come up with the estimate, |
| 11:32:25  15 | right? |
| 16 | A.  I didn't because they were not around.  I didn't have to. |
| 17 | I mean, I'm the chief architect of this framework.  So I know |
| 18 | the this very well. |
| 19 | THE COURT:  You were one of the inventors? |
| 11:32:39  20 | THE WITNESS:  Not of the one that's in the trade |
| 21 | secret, but I am the architect of the overall framework which |
| 22 | this is a part of. |
| 23 | THE COURT:  Well, if one is the inventor and that is |
| 24 | disclosed to the Patent Office, the patent, however, can be |
| 11:32:55  25 | given to the corporate entity, is that not correct? |

Corretjer - cross by Rothschild

818

1      THE WITNESS:  I'm sorry, can you repeat it?

2      THE COURT:  To put it another way, you did not as an

3  inventor, as you previously testified, ask that the patent be

4  issued to you personally.

11:33:10    5      THE WITNESS:  That's right.

6      THE COURT:  You disclosed that you were one of the

7  inventors.

8      THE WITNESS:  Yes, for one of the algorithms.

9      THE COURT:  And to whom was the patent issued?

11:33:17   10      THE WITNESS:  To Motorola.

11      THE COURT:  The corporation.

12      THE WITNESS:  The corporation.

13      THE COURT:  All right.

14  BY MS. ROTHSCHILD:

11:33:24   15  Q.  Let's talk about the DSP framework, which is trade secret

16  number 60, is that right?

17  A.  Yes.

18  Q.  Now, the DSP framework, that is part of the DMR code,

19  right?

11:33:37   20  A.  It was used in the DMR software, yes.

21  Q.  And the DSP framework is also part of the DSP source code,

22  right?

23  A.  Yes.

24  Q.  And the DSP framework is part of the mobile source code,

11:33:53   25  right?

Corretjer - cross by Rothschild

819

1    A.  Yes.

2    Q.  And the DSP framework is part of the repeater, right?

3    A.  Yes.

4    Q.  And those are four separate trade secrets that is listed

11:34:05  5    that Motorola is claiming in this case, right?

6    A.  I don't have the other trade secrets that were not assigned

7    to me memorized, but yeah.

8    Q.  And the DSP framework that Motorola is claiming in trade

9    secret 60, that's very broad, right?

11:34:17  10   A.  It encompasses a lot of material, yes.

11   Q.  Okay.  You testified about a components of the DSP

12   framework on Thursday, do you recall that?

13   A.  Yes.

14   Q.  Okay.  The glue or interfaces between the third-party code

11:34:35  15   that Motorola uses, right, that's part of it?

16   A.  That is part of it, yes.

17   Q.  And you talked about the specific arrangement or order of

18   the blocks in one of the diagrams, right?

19   A.  Yes.

11:34:44  20   Q.  Now, like one of the trade secrets we discussed earlier,

21   Motorola is claiming that this trade secret existed at least by

22   2008, correct?

23   A.  Yes.

24        MS. ROTHSCHILD:  Jim, would you please pull up DTX

11:35:07  25   1345.

Corretjer - cross by Rothschild

820

1    BY MS. ROTHSCHILD:

2    Q.  PTX 1345 is one of the documents that Motorola is claiming

3    contains portions of its DSP framework claimed trade secret 60,

4    right?

11:35:23    5    A.  Yes.

6    Q.  And this is a document entitled DSP Design Handbook For

7    LTD, correct?

8    A.  Correct.

9    Q.  And if we could please turn to page 2 of the document.

11:35:35    10        We see in the change history, the last item listed

11    there for Version 01.02 has a date of October 12th, 2019,

12    right?

13    A.  Yes, and that's for an update.

14    Q.  But it is this document that Motorola is saying is part of

11:35:45    15    its claim trade secret, right?

16    A.  Yes, because a lot of the material on this document was

17    created before 2008.

18    Q.  But Motorola is not claiming a pre-2009 version of this

19    document as part of the trade secret, it's claiming this

11:36:18    20    document PTX 1345, right?

21    A.  That's my understanding, yes.

22        MS. ROTHSCHILD:  We can take that down.

23    BY MS. ROTHSCHILD:

24    Q.  As part of trade secret 60, Motorola is claiming code that

11:36:48    25    is not used in DMR, right?

Corretjer - cross by Rothschild

821

1    A.  I believe referencing some of the ASTRO code that's

2    physically present in the device where it's not invoked.

3    Q.  Right.  So there's code from another product that Motorola

4    developed for that product that is not used in DMR, right?

11:37:06    5    A.  Yes.  It's invoked in DMR radio, yeah.

6    Q.  And Motorola is claiming those non-DMR files as part of its

7    DMR DSP framework trade secret, right?

8    A.  Yes, it's part of a shared library.  So we put all of it

9    together.

11:37:25    10   Q.  And you did not subtract the non-DMR effort in coming up

11   with your work-effort estimate for trade secret 60, right?

12   A.  I did not.

13   Q.  Okay.  Now, Motorola replaced the Matrix DMR platform with

14   Paradise, right?

11:37:44    15   A.  Yes.

16   Q.  And Motorola no longer uses its design and implementation

17   of its DSP framework that it used in Matrix 1.0, right?

18   A.  That's not accurate.  I think I said during my direct

19   examination that there was some refactoring when we went for

11:37:59    20   the Matrix to the platform due to a change in DSP processor and

21   language, but the core technology is still in use in Paradise.

22   Q.  Do you recall your deposition, on May 31st, 2019, line --

23   page 1668, line 18, through 1669, line 3, you were asked:

24           Motorola no longer --

11:38:23    25           MR. ALPER:  Your Honor, that's not the complete

Corretjer - cross by Rothschild

822

1    question and answer.  If counsel could read down to line 21.

2           THE COURT:  If you're using the transcript, there

3    should be an accurate verbatim recitation of each word.

4           MS. ROTHSCHILD:  Yes, Your Honor.  I believe that the

11:38:39    5    excerpt I was proposing to read was the full.

6           THE COURT:  Well, I accept your representation, but

7    for clarity, start from the beginning, if you will.

8    BY MS. ROTHSCHILD:

9    Q.   (Reading:)

11:38:48    10          "Question:  Motorola no longer uses its design

11              and implementation of its DSP framework that it

12              used in Matrix 1.0, right?"

13          "Answer:  For clarification, you mean in Paradise, in

14    the Paradise platform?"

11:39:01    15           And I responded:

16          "Right."

17           And your response:

18          "Yeah, that's correct."

19    A.   Yeah, and I believe I continued my answer down below

11:39:12    20    explaining what I said.

21    Q.   The source code that Motorola includes as part of trade

22    secret 60 is not used in Paradise, isn't that right?

23    A.   Like I said, there was some refactoring of that source

24    code.   There was -- if you keep reading the rest of my answer,

11:39:32    25    I said that there was some other reuse on the source code.

Corretjer - cross by Rothschild

823

1   Q.  Motorola is claiming specific source code files as part of

2   trade secret 60, right?

3   A.  Yes.  We're claiming source code as part of 60, yes.

4   Q.  And those source code files that are cited for trade secret

11:39:50   5   60 are not used in Paradise, right?

6   A.  Not in their exact form, yes.

7   Q.  Let's talk about the DSP code, which is the biggest

8   category of the DSP trade secrets, right?

9   A.  Yes.

11:40:07   10   Q.  And this was numbered 137, right?

11   A.  Yes.

12   Q.  Motorola is claiming every single line of code that is

13   deployed on the C55 chip for the DMR radio as part of its trade

14   secret 1 37, right?

11:40:23   15   A.  Correct.

16   Q.  And not include some third-party code, right?

17   A.  It does.

18   Q.  Includes the Nucleus operating system for Metrographics,

19   right?

11:40:35   20   A.  Yes.

21   Q.  And includes some code from Texas Instruments, the

22   manufacturer of the chip, right?

23   A.  Yes.

24   Q.  And includes some other third-party code, for example from

11:40:44   25   a company called Soft Connects, right?

Corretjer - cross by Rothschild

824

1    A.  Yes.

2    Q.  And this trade secret covers several other trade secrets

3    that Motorola is claiming in this case, right?

4    A.  Yes.

11:40:56    5    Q.  Okay.  It covers the L1 timer, framer, frame scheduler and

6    synchronization, right?

7    A.  Correct.

8    Q.  That's trade secret 64, right?

9    A.  Yes.

11:41:06    10    Q.  And it covers the HAL, the hardware abstraction layer,

11    right?

12    A.  Yes.

13    Q.  And that's trade secret 52, right?

14    A.  It covers -- yeah, it covers a part of the HAL, because

11:41:16    15    there's -- you remember that portions of the HAL are around the

16    HAL 9, this trade secret is about just the 55, the DPS.

17    Q.  And it covers noise suppression, right?

18    A.  Yes.

19    Q.  And that's trade secret 54?

11:41:30    20    A.  Yes.

21    Q.  And it covers squelch?

22    A.  Yes.

23    Q.  And that's trade secret 55?

24    A.  So, again, we're talking about only the source code.  The

11:41:39    25    trade secrets you are mentioning also have a lot of referenced

Corretjer - cross by Rothschild

1   documents, design architecture requirements document, that's

2   not a 137, but if we're talking only about the source code

3   portion of those the trade secrets.

4   Q.  And squelch is trade secret 55, right?

11:41:55   5   A.  Yes.

6   Q.  Okay.  And it covers the source code portion of carrier

7   detection, right?

8   A.  Correct.

9   Q.  Which is trade secret 56?

11:42:03   10   A.  Yes.

11   Q.  And it covers the DPS framework, right?

12   A.  Yes.

13   Q.  Trade secret 60, right?

14   A.  Yes.

11:42:09   15   Q.  And it covers other stuff, too, right?

16   A.  It covers other stuff as well, yes.

17   Q.  So I just want to make sure I understand.  We have -- I'm

18   just going to try to draw this on the screen.  We have trade

19   secret 137 is all of the DPS code, right?

11:42:30   20   A.  Yes.

21   Q.  Okay.  And then we have trade secret 60, which is the DPS

22   framework, and that's a subset, is that right?

23   A.  Which trade secret?

24   Q.  Trade secret 60, the DPS framework.

11:42:42   25   A.  Yes.

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 69 of 217 PageID #:52705
Corretjer - cross by Rothschild
826

1  Q.  And noise suppression, is that part of the DSP framework or

2  part of DPS more generally?

3  A.  That's part of the DPS framework.

4  Q.  Okay.  I'll put there.

11:42:55  5       And trade secret 55 is squelch.  Is that part of the

6  DPS framework or is that part of the DSP code more generally?

7  A.  It's part of the framework.

8  Q.  And then trade secret 56, carrier detection, is that part

9  of the DSP code more generally or part of the DSP framework?

11:43:13  10  A.  Part of the framework.

11  Q.  Okay.  Let me clear that.

12       And I think we saw one, you invented a few patents at

13  Motorola, right?

14  A.  I have, yes.

11:43:35  15  Q.  And you've received bonuses for your efforts, right?

16  A.  I received bonuses as part of the patent committee, if

17  that's what you're asking.

18  Q.  Well, you received bonuses for filing patents, right?

19  A.  Yes.

11:43:50  20  Q.  And you've also invented several trade secrets for

21  Motorola, right?

22  A.  I invented some of the trade secrets, yes.

23  Q.  And you've actually received bonuses for your trade

24  secrets, right?

11:44:02  25  A.  Ah, I wouldn't put it that way, quite that way.  What I did

Corretjer - cross by Rothschild

1    is, I submitted sort of ideas for consideration to a patent

2    committee.  The patent committee decided not to pursue it as a

3    patent and keep it as a trade secret and I just happened to

4    receive a bonus for it.  You don't have to, but I happened to

11:44:28    5    for a few of them.

6    Q.  So the committee decides whether to publish something

7    publicly as a patent or keep it a secret, right?

8    A.  The committee decides whether to pursue something as a

9    patent or keep it a secret, yes.

11:44:37    10    Q.  Okay.  And you have several submissions that you've made

11    that have been regulated to the trade secret status, right?

12    A.  I believe they're called engineering awards.

13    Q.  And you've received bonuses for those, right?

14    A.  I was fortunate enough to receive a bonus.  You don't have

11:44:56    15    to you, but, you know -- in fact, you don't have to submit

16    ideas that are trade secret to the patent committee.  I mean,

17    you cold decide ahead of time that this is more valuable to the

18    company as a trade secret and not even submit it for a patent.

19    Q.  You got your first bonus on a trade secret in 2001, didn't

11:45:08    20    you?

21    A.  I got -- I applied for a patent and I got an engineering

22    award, yes.

23    Q.  And that was for something that the company decided to

24    designate as a trade secret, right?

11:45:24    25    A.  For something the company decided to keep as a trade

Corretjer - cross by Rothschild

828

1    secret; it already was.

2    Q.  And you got another bonus for trade secret in 2002 or 2003,

3    right?

4    A.  Yes.

11:45:35    5    Q.  And another one in 2010, right?

6    A.  Yes.

7    Q.  Now, your earliest trade secret, the 2001 trade secret,

8    that was for something called FM Modulation Limiter, right?

9    A.  Yes.

11:45:51    10    Q.  That is used in DMR, right?

11    A.  Yes, it is.

12    Q.  It's actually part of the DPS framework, is it not?

13    A.  It is.

14    Q.  Motorola is not claiming your FM modulation limiter trade

11:46:05    15    secret individually as one of the trade secrets its asserting

16    in this case, right?

17    A.  Motorola is claiming, you know, it as a part of the trade

18    secret.

19    Q.  But not individually.  Your FM modulation limiter,

11:46:21    20    individually, is not being claimed as one of the trade secrets

21    in this case?

22    A.  Not individually, yes.  A part of it, yes.

23    Q.  And you submitted your algorithm for FM modulation limiter

24    to Motorola's E Intelligence SYSTEM, right?

11:46:35    25    A.  I did, for the purpose of being considered as a patent.

Corretjer - cross by Rothschild

829

1    Q.  And you submitted it.  And then the submission is reviewed

2    and you were informed of the committee's decision, right?

3    A.  Yes.

4    Q.  And for your FM modulation limiter trade secret, Motorola

11:46:52    5    told you that the company didn't want to disclose it publicly,

6    right?

7    A.  They told us that they weren't going to pursue it as a

8    patent, yes.

9    Q.  And they were keeping it as a trade secret, right?

11:47:05    10    A.  That's right.

11    Q.  You talked about nine trade secrets in your testimony on

12    Thursday and today, right?

13    A.  Yes.

14    Q.  To your knowledge, nobody got a bonus for any of those

11:47:19    15    trade secrets that have been identified in this case, right?

16    A.  Yeah, like I said, you don't have to.  I mean, there's no

17    process to submit an idea to become a trade secret.  You submit

18    for patents.  All the information, confidential information

19    that we work with is already a trade secret.

11:47:36    20    Q.  To be clear, there were no bonuses paid for any of the nine

21    trade secrets that you testified about, right?

22    A.  I'm not aware of any other bonuses.

23    Q.  And none of the documents for the nine trade secrets that

24    you've testified about were marked Motorola Registered Secret

11:47:54    25    Propriety, right?

Corretjer - cross by Rothschild

830

1   A.  Repeat the question, please.

2   Q.  None of the documents that has been included as part of the

3   claimed trade secrets, the nine claimed trade secrets that

4   you've testified about, none one of those documents is marked

11:48:08   5   Motorola Registered Secret Propriety, right?

6   A.  Yes, that's correct.

7           MS. ROTHSCHILD:  No further questions.

8           THE COURT:  Do you have redirect, counsel?

9           MR. ALPER:  Yes.

11:48:16   10          THE COURT:  How long do you think it might be?

11          MR. ALPER:  Ah --

12          THE COURT:  Best estimate.

13          MR. ALPER:  20 minutes.

14          THE COURT:  All right.

11:48:25   15          MR. ALPER:  Maybe less.

16          THE COURT:  Let's break.  We'll break for, this is not

17   exactly a brunch, not exactly a lunch.  It's 13 minutes to

18   12:00.  Come back in an hour, members of the jury, and you will

19   hear the redirect at that time.

11:48:43   20          The witness is excused.

21          In short, come back in an hour.

22          Counsel, please remain.

23          (The following proceedings were had out of the

24          presence of the jury in open court:)

11:49:09   25          THE COURT:  The Court is in section.  Please be

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 74 of 217 PageID #:52710
Corretjer - cross by Rothschild
831

1    seated.

2         THE COURT:  After this witness, do you have somebody

3    lined up for the afternoon?

4         MR. ALPER:  Yes, we do.

11:49:16   5         THE COURT:  So you'll be ready to go in the afternoon?

6         MR. ALPER:  Yes.  And then just briefly, motion to

7    seal some documents before we put them on the record, Your

8    Honor.

9         THE COURT:  All right.  Is there any objection to the

11:49:25   10   motion to seal?

11        MR. CLOERN:  No, Your Honor, there's not.

12        THE COURT:  All right.  The motion to seal is granted.

13        So you'll have a witness ready to go after this

14   witness.

11:49:32   15        MR. ALPER:  Yes.  And, Your Honor, as long as we're

16   doing it, we failed to move into evidence the exhibits that

17   Mr. Corretjer showed to the jury and testified about on

18   Thursday, there's no objection to PTX 127, so we move to submit

19   that.

11:49:45   20        THE COURT:  127?

21        MR. ALPER:  Yes.

22        THE COURT:  Is received and was published.

23        MR. ALPER:  Yes.

24        THE COURT:  By agreement, your statement is noted for

11:49:53   25   the record.  Thank you.

Corretjer - cross by Rothschild

832

1      (Said exhibit received in evidence.)

2       MR. ALPER:  Thank you.

3       THE COURT:  Come back in an hour.

4       THE CLERK:  All rise.

5      (Luncheon recess taken from 11:50 o'clock p.m.

6      to 1:00 o'clock p.m.)

7

8              *    *    *    *    *    *    *    *

9

10

11   I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

12       RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

13

14       /s/Blanca I. Lara     November 18, 2019

15

16

17

18

19

20

21

22

23

24

25

1           IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                    EASTERN DIVISION

3    MOTOROLA SOLUTIONS, INC.,        )
     and MOTOROLA SOLUTIONS           )
4    MALAYSIA SDN. BHD,               )    Docket No. 17 CV 1973
                                      )
5              Plaintiffs,            )
                                      )
6          vs.                        )
                                      )
7    HYTERA COMMUNICATIONS            )
     CORPORATION, LTD.; HYTERA        )
8    AMERICA, INC.; and HYTERA        )
     COMMUNICATIONS AMERICA           )
9    (WEST), INC.,                    )    Chicago, Illinois
                                      )    November 18, 2019
10             Defendants.            )    12:45 p.m.

11                  TRIAL - VOLUME 6B
                TRANSCRIPT OF PROCEEDINGS
12    BEFORE THE HONORABLE CHARLES R. NORGLE, SR., and a jury

13   APPEARANCES:

14   For the Plaintiff:      KIRKLAND & ELLIS LLP
                             BY:  MR. ADAM R. ALPER
15                                MR. BRANDON H. BROWN
                             555 California Street, 27th Floor
16                           San Francisco, California  94104

17                           KIRKLAND & ELLIS LLP
                             BY:  MR. MICHAEL W. De VRIES
18                           333 South Hope Street
                             Los Angeles, California  90071
19
                             KIRKLAND & ELLIS LLP
20                           BY:  MR. JOSHUA L. SIMMONS
                             601 Lexington Avenue
21                           New York, New York  10022

22
     Court Reporter:
23                             BLANCA I. LARA
                            Official Court Reporter
24               219 South Dearborn Street, Room 2342
                        Chicago, Illinois  60604
25                           (312)435-5895
                        blanca_lara@ilnd.uscourts.gov

834

1    APPEARANCES (Continued:)

2

3                              KIRKLAND & ELLIS LLP
                               BY:  MS. MEGAN M. NEW
4                              300 North LaSalle
                               Chicago, Illinois  60654
5
                               KIRKLAND & ELLIS LLP
6                              BY:  MS. LESLIE M. SCHMIDT
                               601 Lexington Avenue
7                              New York, New York  10022

8    Motorola Corporate Representative:  Mr. Russ Lund

9
     For the Defendants:       STEPTOE & JOHNSON LLP
10                             BY:  MR. BOYD T. CLOERN
                                    MR. MICHAEL J. ALLAN
11                                  MS. JESSICA I. ROTHSCHILD
                                    MS. KASSANDRA M. OFFICER
12                             1330 Connecticut Avenue, NW
                               Washington, DC  20036
13
                               STEPTOE & JOHNSON LLP
14                             BY:  MR. DANIEL S. STRINGFIELD
                               227 W. Monroe Street, Suite 4700
15                             Chicago, Illinois  60606

16

17

18

19

20

21

22

23

24

25

1          (Proceedings in open court.  Jury out.)

2               THE COURT:  Are we ready for the jury, Counsel?

3               MS. ROTHSCHILD:  Yes, your Honor.

4               THE COURT:  Please ask the jury to come in.

5          (Jury in at 12:48 p.m.)

6               THE COURT:  Good afternoon, members of the jury.

7               THE CLERK:  Please be seated and come to order.

8               THE COURT:  Please recall the witness.

9               MR. ALPER:  Yes, your Honor.

10              Mr. Corretjer, if you could please retake the

11     witness stand.

12        JESUS CORRETJER, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

13                     REDIRECT EXAMINATION

14     BY MR. ALPER:

15     Q.   Good afternoon.

16              Just a few brief questions for you.

17              First, you were shown three of the documents -- let

18     me ask you.  I counted -- you identified approximately 30

19     exemplary documents in connection with the trade secrets you

20     testified about.

21              Does that sound right?

22     A.   Yeah.

23     Q.   Okay.  So you were shown three of those on your

24     cross-examination.  I will identify them.  PTX 268, PTX 1258,

25     and PTX 1259.  These were the three that I believe you were

1    asked about whether they had a confidentiality label on them?

2  A.  Yes.

3  Q.  I believe your testimony was they did not have a

4    confidentiality label on these three documents out of the 30?

5  A.  Right.

6  Q.  Okay.  Now, where are those documents stored at

7    Motorola?

8  A.  They are stored in Compass in our technical document

9    database.

10 Q.  Are the materials in Compass confidential?

11 A.  Yes, they are.

12 Q.  Can people from the public get access to Compass?

13 A.  No.

14 Q.  Do people at Motorola just publish freely the materials

15   that are kept in Compass?

16 A.  They don't.

17 Q.  Do you have to have special confidential access to go in

18   and see these three documents?

19 A.  You do.

20 Q.  Okay.  And are the contents of those three documents,

21   PTX 268, 1258, and 1259, are the contents of those documents

22   confidential and proprietary to Motorola?

23 A.  Yes, they are.

24 Q.  Are you aware of any instance in which the contents of

25   those documents has been made public?

1    A.    Not on purpose.

2    Q.    And are you aware of any evidence that these documents

3    have been released to the public?

4    A.    No.

5    Q.    Now, do you need to label a document as a trade secret

6    or confidential or proprietary -- does that make it a trade

7    secret?

8    A.    It does not.

9          In fact, our policy says that even unmarked

10   documents that are supposed to be secret are supposed to be

11   treated as confidential and proprietary.

12   Q.    Does the fact that these three documents are not labeled

13   confidential and proprietary mean that Motorola just doesn't

14   think that they include trade secrets?

15   A.    We don't think that.  We think of them as trade secrets.

16   Q.    Would it be harmful to Motorola if these three documents

17   fell into the hands of a competitor?

18   A.    Yes, it would be.

19   Q.    Why is that?

20   A.    These documents include the outcome of years of

21   experience and iterative work; in many cases, testing and

22   tweaking.  It's valuable to us.  So that's why it would be

23   harmful.

24   Q.    What about the label "Registered Trade Secret"?

25         Let me ask you, first of all, under the policy --

838

1    the current policy of -- the confidentiality policy, which is

2    the policy -- well, let me ask it a different way.

3              Under the policy that was in effect,

4    confidentiality policy in effect in 2008, is there a labeling

5    "Registered Trade Secret"?

6    A.    There is.

7    Q.    Under the 2008 policy or under the prior policies?

8    A.    Under the prior policies.

9    Q.    Okay.  Do you know when that changed?

10   A.    I don't have the date memorized.

11   Q.    Okay.  And how does -- do you need to label something as

12   a registered trade secret for it to be a trade secret at

13   Motorola?

14   A.    No, you don't.

15   Q.    Okay.  And are there other labels, in your experience,

16   your 26 years of working there, that are appropriate for

17   labeling something as a trade secret?

18   A.    Absolutely.  The labels we have been discussing here,

19   like "Motorola Confidential Proprietary," "Motorola Internal

20   Use," those are also perfectly appropriate to label trade

21   secret material.

22   Q.    And for the work that you did, your sphere of work in

23   Plantation in your 26 years, in the course of your own work,

24   have you seen a document labeled as a registered trade

25   secret, to your recollection?

```
1   A.   Not in my 26 years of work except for the one that I was
2        shown here.
3   Q.   Now, one of the things, I belive -- well, I know you
4        testified on a number of times that you are the architect of
5        the digital signal processing technology in Motorola's
6        two-way radios?
7   A.   Yes.
8   Q.   Okay.  And how important is that in order -- to the
9        two-way radios?
10  A.   It's very important.  I mean, when I define what digital
11       signal processing is, I describe it as a key component of
12       wireless technology.  Without DSP, the radios just don't
13       work.  So being the architect of the DSP framework, I think,
14       is critical for the radios.
15  Q.   And are the details of that technology and the source
16       code, is that confidential information to Motorola?
17  A.   Absolutely.
18  Q.   And what would happen if a competitor -- if that
19       information fell into a competitor's hands?
20  A.   It would be harmful to us in many ways.  It would --
21       they could basically take advantage of it, use it to compete
22       against us.  It could hurt us in a lot of ways.
23  Q.   Okay.  In your work on that key component or aspect of
24       the two-way radios, can you recall ever having labeled or
25       having a colleague tell you that you should label or having
```

1    one of your colleagues label any of that confidential

2    material as a trade secret or registered secret?

3    A.    No, I don't recall that ever happening.

4    Q.    So doesn't that mean that you don't have any trade

5    secrets?

6    A.    It does not mean that.  All the other labels that we

7    have been using to label all this material, documents and

8    source code, are perfectly valid in Motorola to classify

9    something as a trade secret.

10   Q.    You were asked a little bit about patent bonus -- the

11   patent bonus system.

12            Do you recall that?

13   A.    Yeah.

14   Q.    And there is a system at Motorola to submit to have

15   something be patented; is that right?

16   A.    Correct.

17   Q.    In your 26 years at Motorola, have you heard anyone say

18   that you need to apply for a bonus in order for material to

19   be considered a trade secret?

20   A.    I have never heard that.

21   Q.    Okay.  And is there such a thing as a bonus for --

22   specifically for a trade secret outside of the patent

23   program?

24   A.    There isn't a specific bonus for a trade secret.

25            What happens, when we apply for a patent, if the

1    committee decides not to pursue the idea as a patent,

2    sometimes -- it's not required -- you may get a bonus.  We

3    call it an engineering award, recognizing the innovative

4    efforts.

5    Q.   Why didn't Motorola submit the trade secret technologies

6    that are at issue in this case to be patented?

7    A.   Because we deemed them to be more valuable to us keeping

8    them secret than as a patent.

9    Q.   And in connection -- again, on the bonus issue, have the

10   technologies that are -- the trade secret technologies that

11   are at issue here, have they been praised within Motorola?

12   A.   They have been internally and in a variety of ways.  We

13   have maybe an internal mention, a special -- you know, a

14   mention by your manager, promotions.  There is all kinds of

15   ways of recognizing innovative work.

16   Q.   Have you received promotions and pay increases based on

17   your work on the trade secret technologies that are at issue

18   here?

19   A.   I have, yes.  Indirectly, yes.

20   Q.   And have others that you worked with received promotions

21   and pay raises in connection with the work that they have

22   been doing on the technologies that are at issue?

23   A.   Absolutely.

24   Q.   Let's talk about hardware very briefly.

25             I am going to show you on the ELMO.  You were asked

1  about this exhibit, DTX 4656.  And this was an email -- a

2  Motorola email from 2011 that had an attachment concerning a

3  Hytera radio?

4  A.   Yeah.

5  Q.   Okay.  Are you on this email, by the way?

6  A.   I'm not on the email.

7  Q.   Okay.

8        Now, the first thing that I want to ask you about

9  is this.  And I asked you about it during your direct, but I

10  just want to confirm it.

11       Do you have access to any Hytera confidential

12  information about their radios?

13 A.   I do not.

14 Q.   Okay.  Now --

15       THE COURT:  Are you asking that question personally

16 or to the corporate plaintiff?

17       MR. ALPER:  I was asking him in his personal

18 capacity.

19       THE COURT:  Did you understand the question that

20 way?

21       THE WITNESS:  Yes.

22       THE COURT:  Please proceed.

23       MR. ALPER:  Yes, your Honor.

24 BY MR. ALPER:

25 Q.   I am going to show you a couple pages that you were

1    shown here.  So this is Page DTX 4656.  I believe you

2    testified about how this page here is showing the height in

3    millimeters of the Hytera radio?

4    A.    Yes.

5    Q.    Is Motorola claiming as any trade secret the height of

6    its radios?

7    A.    No.  As a matter of fact, we are not claiming any of the

8    external and visible hardware in our radios.

9    Q.    Let's talk about the internal stuff.

10             If we now go to the other page you were shown, DTX

11   4656 at 17, this was a board -- this is what you --

12   withdrawn.

13             This is what you see when you take the top off of

14   the radio and you look inside?

15   A.    Yes.

16   Q.    Is Motorola claiming as its trade secrets anything that

17   you can see when you open up the inside of the radio or, for

18   that matter, take the caps off of any of these chips here?

19   A.    No.  I believe I said during my direct examination that

20   the hardware components that we are claiming is a secret here

21   are things that are not visible to the human eye.  You know,

22   you have to use special tools, have access to special

23   material to be able to interpret it.

24   Q.    Okay.  Now, I am going to show you one of the documents

25   that you did testify about with respect to the trade secrets.

1    This is the PTX 1381, the Trident IC specification?

2    A.    Yes.

3    Q.    Okay.  And is there information in this document and the

4    other documents relating to the DMR hardware trade secret

5    that is confidential, in other words, stuff that you can't

6    just see by opening up the lid on one of the products?

7    A.    That's right.

8    Q.    Okay.  And if I was just to turn through here -- I will

9    just show you on the screen.  Just as a -- I didn't do this

10   out of the interest of time the first time around, but I will

11   show you just as one example Page 32 of this document.  We

12   see a section about interface definition and then various

13   diagrams there and then more on the next page.

14             Are those -- what are we seeing there?

15   A.    These are some design diagrams showing how some of the

16   internal blocks of the IC are connected.

17   Q.    And is this stuff that you can see from the outside?

18   A.    No.

19   Q.    Is this material confidential to Motorola?

20   A.    Yes.

21   Q.    You were asked a question about -- some questions about

22   the dates on some of the documents.

23             Do you recall that?

24   A.    Yes.

25   Q.    I am going to show you one of the ones that you were

1    shown.  This is PTX 1346.

2            Do you recall that?

3    A.   Yeah.

4    Q.   This document has to do with the HAL trade secret?

5    A.   Yes.

6    Q.   Was this the only document that you identified in

7    connection with HAL?

8    A.   No, it's not.

9    Q.   Okay.  We see on the front here it says, "Revision date:

10   January 3rd, 2009."

11   A.   Correct.

12   Q.   Okay.  And just for the record, this is labeled,

13   "Motorola Confidential Restricted"?

14   A.   Yes.

15   Q.   Okay.  Now, if we go to the second page and we see a

16   change history, when was this document created?

17           Was it before 2008 or after 2008?

18   A.   Before 2008.

19   Q.   What's the date?

20   A.   May 6th of 2007.

21   Q.   Okay.  Now, there is a revision on March 1st, 2009?

22   A.   Yes.

23   Q.   Okay.  And there is some comments about that revision.

24   Do you see that?

25   A.   Yes.

```
 1    Q.   I would like to direct you to the sentence here,
 2    "Updated after feedback from R1.4.  Lesson learned."
 3              What is R1.4?
 4    A.   It's one of the post-releases we did after 1.0.
 5    Q.   Okay.  What does that tell you about the material that
 6    was completed as of May 6th, 2007?
 7    A.   It tells me that the updates that were done in 2009 were
 8    done after the initial creation.  It had to do with some
 9    feedback from, like, a postmortem review.
10    Q.   Okay.  Can you tell from that -- or based on what you
11    know, how much of the material for HAL was created before
12    2008?
13    A.   I would say most of the material on this document was
14    created before 2008.  The other is just a minor revision.
15    Q.   Thank you.
16              You were shown a number of patents during
17    cross-examination.  Do you recall that?
18    A.   Yes.
19    Q.   Just one simple question.
20              Are the confidential details of the trade secrets
21    that you testified about shown in any of those patents?
22    A.   It's not.
23    Q.   Is the source code, the thousands upon thousands upon
24    thousands of lines of source code disclosed in any of those
25    patents?
```

1    A.    It's not.  We never publish source code with patents.

2    Q.    You were asked some questions about changes that were

3    made from Matrix to Paradise.

4              Do you recall that?

5    A.    Yes.

6    Q.    Let's do a little bit of just laying some foundation,

7    because we talked about this a little bit on Thursday, but

8    let's just briefly revisit it.

9              What is Paradise?

10   A.    Paradise is the second generation platform of MOTOTRBO.

11   The first one is Matrix.  The second is Paradise.

12   Q.    Okay.  And were the trade secret technologies in the

13   Matrix platform kept in Paradise?

14   A.    Yeah.  The core technology was kept.

15   Q.    Okay.  You were shown or read some deposition testimony

16   about -- on that issue.

17             Do you recall that?

18   A.    Yes.

19   Q.    And I believe you testified that counsel did not read

20   your complete answer?

21   A.    Correct.

22   Q.    I have the complete answer.

23             MR. ALPER:  May I show him the testimony on the

24   ELMO?

25             THE COURT:  Proceed.

1    MR. ALPER:  Thank you, your Honor.

2    BY MR. ALPER:

3    Q.   Okay.  This is what you were read, and this is what you

4    were not read (indicating).  Let me read it and then ask you

5    a question about it.

6         The question was -- this is at 1668, Line 23.  The

7    entire answer goes onto 1669, Line 21.  The part that you

8    were read is here.

9         "Q.  You mean in Paradise, in the Paradise

10   platform?"

11        I'm sorry.  I should start with Line 18 -- 1668,

12   starting with Line 18.

13        "Q.  Motorola no longer uses its design and

14   implementation of its DSP framework that it used in Matrix

15   1.1, right?"

16        And then you say, "You mean in Paradise, in the

17   Paradise platform?"

18        "Right."

19        And then you say, "Yeah, that's correct."

20        And then you say, "Now, let me -- let me say

21   something else.  We don't use this code as is like this.

22   However, all the -- we said that there was some rewriting,

23   some rewriting.  We went to SSP.

24        "All of that rewriting used this stuff as a

25   baseline -- the GCP framework, all these algorithms to the

1    C67, which is a new DSP.  And that's when we created these

2    core elements for SSP.  So there is a significant amount of

3    reuse of the algorithm and even the code, because C and C++

4    are -- they have a lot of similarities.  They are compatible.

5    C++ is an extension of C.  Okay.

6             "So when we ported this over to SSP, there was a

7    significant amount of reuse of all this framework and lineup

8    entities."

9             Was that your complete testimony?

10   A.   Yes.

11   Q.   And what did you mean by giving that answer?

12   A.   I meant that the core technologies and algorithms were

13   still carried over and reused in Paradise.  What underwent

14   the source code was some refactoring because of the reasons I

15   mentioned there, the change in DSP processor and the change

16   of the programming language from a C++ to C.

17   Q.   And just for the record, what is SSP?

18   A.   It stands for shared software platform.

19   Q.   And how does that relate to Matrix and Paradise?

20   A.   SSP is the platform that we used in Paradise.

21   Q.   All right.  Last thing.  I believe the last thing.

22            So you were asked a question about a circle that

23   was drawn -- a couple circles that were drawn on the screen?

24   A.   Yes.

25   Q.   And the large circle was supposed to represent the DSP

1    source code.

2          Do you recall that?

3    A.   Yes.

4    Q.   Okay.  Does the -- first of all, starting with that

5    large circle, how much technology does that circle represent?

6    Small amount?  Large amount?  How much is in there?

7    A.   It's a huge amount.  It not only covers the effort that

8    went into MOTOTRBO, but I said that we leveraged prior

9    technology from ASTRO.  So if you put it together, it's a lot

10   of technology.

11   Q.   Okay.  Now, that's the source code circle.

12         Does the source code circle include any of the

13   confidential documents that you testified about?

14   A.   In some form, and there is other forms in which it is

15   not.  And there is implementation information on the

16   documents that is carried over to the source code, but there

17   is also other details on the documents that is not.

18   Q.   Okay.  And those details in the documents that are not

19   in the source code, does that include information for HAL?

20   A.   Yes.

21   Q.   Does it include information for the DSP framework?

22   A.   Yes.

23   Q.   Does that include information for squelch?

24   A.   Yes.

25   Q.   Include noise suppression?

1    A.    Yes.

2    Q.    Include testing?

3    A.    Yes.

4    Q.    Hardware?

5    A.    Yes.

6    Q.    All of the trade secrets are their confidential

7    documents that are not covered by that DSP source code

8    circle?

9    A.    That's correct.

10              MR. ALPER:  Okay.  Nothing further, your Honor.

11              THE COURT:  Recross.

12              MS. ROTHSCHILD:  Briefly, your Honor.

13                       RECROSS-EXAMINATION

14   BY MS. ROTHSCHILD:

15   Q.    Hello.

16   A.    Hi.

17   Q.    Mr. Corretjer, are you or are you not claiming the

18   specific design and implementation from Matrix 1.0 as your

19   DSP framework trade secret?

20   A.    Yes, that's part of what we are claiming.

21   Q.    Are you or are you not claiming the specific design and

22   implementation from Matrix 1.0 as your DSP framework trade

23   secret 60?

24   A.    Repeat the question, please.

25   Q.    Are you or are you not claiming as your trade secret 60

```
 1    DSP framework the specific design and implementation from
 2    Matrix 1.0?
 3    A.    Yes.
 4    Q.    And that is different from the design and implementation
 5    in Motorola's Paradise platform, right?
 6    A.    I have already explained there are differences, but the
 7    core technology was reused.
 8    Q.    You just testified that patents don't disclose the
 9    actual source code, right?
10    A.    Correct.
11    Q.    But patents must disclose enough information to enable
12    somebody skilled in the art to make and use the invention,
13    right?
14    A.    The invention, but if you are to write an implementation
15    from a patent, you are not going to end up with the same
16    exact implementation in our source code.
17    Q.    But the patent must disclose enough information such
18    that somebody skilled in the art can make and use the
19    invention, such as the squelch algorithm, right?
20    A.    The invention, yes.
21    Q.    Now, if we can pull up PTX 1346 for a moment.
22          This is the document dated January 3rd, 2009, that
23    Motorola is claiming is part of trade secret 52, right?
24    A.    Yes.
25    Q.    And Motorola is, in fact, claiming the entirety of this
```

1    document as part of trade secret 52, right?

2    A.    Yes.

3    Q.    And this document was last modified in January of 2009,

4    after G.S., Sam, and Y.T. left Motorola in 2008, right?

5    A.    Yeah.  I don't know for a fact when they left Motorola,

6    but the last revision was in 2009.

7    Q.    You talked for a bit about patents versus trade secrets.

8          And if we could please pull up previously admitted

9    DTX 4721.

10         This is Motorola's intellectual property awareness

11    training from the CGISS law department from July of 2004.

12         Do you see that?

13    A.    Yeah.

14    Q.    If we could please go to Page 69.  We see on the bottom

15    half of the page that the protection required for Motorola

16    trade secret materials, the only acceptable marking is

17    "Motorola registered secret proprietary," right?

18    A.    It says that.

19         Now, if you go to the last page of this, there is a

20    definition for a trade secret that -- I mean, can we show it

21    here?

22    Q.    It says the only acceptable marking is "Motorola

23    registered secret proprietary," correct?

24    A.    That's what it says here, but there is a definition on

25    the last page that I think is relevant.

 1  Q.   If we look at Page 64, we see a list of awards, right?

 2  A.   Yes.

 3  Q.   And the last award listed there is invention award/trade

 4  secret, right?

 5  A.   Yes.

 6  Q.   And that amount is $1500, right?

 7  A.   That's what it says.

 8  Q.   And that's the exact same amount that Motorola awards

 9  its engineers for a patent filing, right?

10  A.   Back then, yes.

11  Q.   Now, you talked briefly about the policies that were in

12  place for marking documents at Motorola, right?

13  A.   Yes.

14  Q.   And the applicable policy prior to 2008 was a policy

15  called POPI, protection of proprietary information, right?

16  A.   Yes.

17  Q.   And that is the policy that had the category "Motorola

18  registered secret propriety," right?

19  A.   Yes, among other categories as well.

20  Q.   Right.

21       And you also testified about documents stored in

22  Compass, right?

23  A.   Yes.

24  Q.   And is it your testimony that every document stored in

25  Compass is confidential to Motorola?

1    A.    Compass has -- it's restricted access.  Maybe we put a

2    public document in there, but all the material that we are

3    discussing here is definitely stored there in the capacity of

4    confidential and proprietary.

5    Q.    But everything stored in Compass is not confidential and

6    proprietary, and it doesn't even all belong to Motorola, does

7    it?

8    A.    We may put a public document there, but there is still

9    restricted access to it.

10   Q.    If you went into Compass, you could find third-party

11   documents about competitor radios, right?

12   A.    I haven't seen any of those documents myself, so I

13   cannot say.

14   Q.    You might find in Compass that teardown of the Hytera

15   radio, right?

16   A.    Again, I wasn't familiar with that document, so I can't

17   say.

18   Q.    There are also photographs in Compass, right, of the

19   Motorola employees?

20   A.    I don't know.

21   Q.    Those wouldn't be confidential and proprietary and

22   Motorola trade secrets, right?

23   A.    Motorola actually treats personal information of their

24   employees as confidential.  That may include some pictures

25   and photos.

1    Q.    Motorola wouldn't consider pictures of employees to be
2    trade secrets, right?
3    A.    It depends on the context.
4    Q.    So if there is a picture in Compass of a group of
5    employees, that's a Motorola trade secret?
6    A.    If it's just a picture of employees, probably not.
7              MS. ROTHSCHILD:  No further questions.
8              MR. ALPER:  Your Honor, may I ask one very brief
9    follow-up?
10             THE COURT:  Yes.
11             MR. ALPER:  Thank you, your Honor.
12             If I may have the ELMO here further.
13                  FURTHER REDIRECT EXAMINATION
14   BY MR. ALPER:
15   Q.    So you were just shown, Mr. Corretjer, DTX 4721, the
16   intellectual property awareness training?
17   A.    Yes.
18   Q.    And you referenced the last page?
19   A.    That's correct.
20   Q.    I am going to go to that last page.
21             This is Page 83 of 83.  Is there -- what were you
22   referencing?
23   A.    I was referencing to the definition of a trade secret in
24   the middle where it says, "It protects any commercially
25   valuable information that's kept secret."

1    And I believe all the material we have been

2    referencing here -- source code and documents -- fall into

3    that category.  And to me, that means that the other labels

4    that we used to label the source code and documents perfectly

5    fit that definition as well.

6    Q.    And in this presentation "trade secret" is defined as,

7    "protects any commercially valuable information that's kept

8    secret"?

9    A.    Yes.

10   Q.    And is the information that you testified to about HAL,

11   DSP, testing, DMR hardware, all of the trade secrets that we

12   are dealing with in this case, is that commercially valuable

13   information that Motorola kept secret?

14   A.    That's correct.  It is valuable to us as a secret.

15   Q.    Thank you.

16         MR. ALPER:  No other questions.

17         MS. ROTHSCHILD:  One question?

18         THE COURT:  Certainly.

19         MS. ROTHSCHILD:  Can we switch it back, please.

20                    FURTHER RECROSS-EXAMINATION

21   BY MS. ROTHSCHILD:

22   Q.    If we could just briefly pull up DTX 4721 and go back to

23   Page 69.

24         In the same training that defines trade secrets,

25   the document says -- yes or no -- the only acceptable marking

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 101 of 217 PageID #:52737
Zetzl - direct by Rothschild
858

1    for trade secrets is, "Motorola registered secret

2    proprietary," right?

3    A.   That's what it says.

4              MS. ROTHSCHILD:   Thank you.

5              THE COURT:   All right.  You may step down.

6         (Witness excused.)

7              THE COURT:   Members of the jury, as I have

8    repeatedly said, you will receive copies of these exhibits

9    when you go in to deliberate in their entirety.

10             If you are ready for the next witness, please call

11   the next witness.

12             MR. ALPER:   Your Honor, plaintiff calls Dan Zetzl

13   to the stand.

14             THE COURT:   Is he immediately available?

15             MR. ALPER:   He is probably right outside the door.

16             THE COURT:   Very well.

17             THE CLERK:   Can I ask you to raise your right hand,

18   please.

19        (Witness sworn.)

20             MR. SIMMONS:   Your Honor, my name is Joshua

21   Simmons.  I'm counsel for Motorola.

22             THE COURT:   Yes.

23             MR. SIMMONS:   May I proceed?

24             THE COURT:   Yes.

25

| 1 | DANIEL ZETZL, PLAINTIFFS' WITNESS, SWORN |
| 2 | DIRECT EXAMINATION |
| 3 | BY MR. SIMMONS: |

1       DANIEL ZETZL, PLAINTIFFS' WITNESS, SWORN

2                   DIRECT EXAMINATION

3    BY MR. SIMMONS:

4    Q.   Good afternoon, sir.

5         What is your name?

6    A.   Hi.  My name is Daniel Zetzl.

7    Q.   What is your title?

8    A.   I'm a distinguished member of the technical staff at

9    Motorola Solutions.

10   Q.   What's your role at Motorola?

11   A.   I lead the devices' professional and commercial radio

12   organization as an architect.

13   Q.   Are the MOTOTRBO products part of that organization?

14   A.   Yes, they are.

15   Q.   What are your responsibilities at Motorola?

16   A.   So I have the technical oversight responsibility for all

17   of the professional and commercial radio devices that

18   Motorola Solutions has.

19   Q.   Now, stepping back, did you go to school for

20   engineering?

21   A.   I did.  I went to Purdue University.

22   Q.   What was your first job after graduating?

23   A.   I joined Motorola.

24   Q.   When was that?

25   A.   In 1997.

1    Q.   Did you have any title when you started at Motorola?

2    A.   I was a software engineer.

3    Q.   And did that change over time?

4    A.   It did, yes.  So I went from a software engineer to a

5    senior software engineer to a lead engineer to a principal

6    staff engineer and finally to a distinguished member of the

7    technical staff.

8    Q.   How has your role changed since you joined Motorola?

9    A.   So it's expanded greatly really.  So when I first

10   started, I was just working as one of many engineers on a

11   particular component within the radio.  Eventually I owned

12   part of a system within a radio and then a whole radio and

13   then a product line, and now I have several product lines

14   underneath me.

15   Q.   Have you earned any honors or awards at Motorola?

16   A.   I have.  I was named Science Advisory Board Associate

17   and then a Dan Noble fellow.

18   Q.   What's the Science Advisory Board?

19   A.   So the Science Advisory Board is an organization that

20   advises Motorola senior management, customers, and fellow

21   colleagues on technology-related matters.  And we are also

22   consulted to help set kind of an invasion road map for the

23   corporation.

24   Q.   What percentage of engineers at Motorola are members of

25   the Science Advisory Board?

1    A.   Less than 2 percent.

2    Q.   When did you become a member?

3    A.   In 2010.

4    Q.   Mr. Zetzl, have you prepared any demonstratives to

5    assist you with your testimony today?

6    A.   Yes, I have.

7         MR. SIMMONS:  Your Honor, may I display Mr. Zetzl's

8    demonstratives, which are PDX 6?

9         MR. ALLAN:  No objection, your Honor.

10        THE COURT:  Yes.  Proceed.

11        MR. SIMMONS:  Can we display PDX 6.1.

12        Your Honor, I am being told we have to switch over

13   control to Motorola's side of the courtroom.

14   BY MR. SIMMONS:

15   Q.   Mr. Zetzl, what is pictured here?

16   A.   This is me receiving my Dan Noble fellow award from the

17   executive committee.

18   Q.   What is a Dan Noble fellow?

19   A.   So a Dan Noble fellow is kind of the highest recognition

20   for a technical member at Motorola.  It's really for

21   contributions not just within the technical domain, but

22   really across the corporation.  It's a pure recognition

23   award.  So that was really meaningful to me that, among my

24   peers, that they all felt like I was worthy of it.

25   Q.   How many Dan Noble fellows does Motorola currently have?

1   A.   Less than 20.

2   Q.   Now, switching gears, Mr. Zetzl, you mentioned that you

3   currently have responsibility for MOTOTRBO.

4        When did you first start working on that program?

5   A.   Yes, I started working on MOTOTRBO in late 2003.

6   Q.   What was your role in the project?

7   A.   So I was initially the architect of what we refer to as

8   the provisioning software.  So that's the software that

9   actually configures the radio for the customer's unique

10  settings.

11  Q.   Did your role change over time?

12  A.   It did.  In late 2004, I became the cochief software

13  architect of the project along with a colleague from Penang,

14  Malaysia, H.W. Khoo.

15  Q.   How much time have you personally spent working on

16  Motorola's MOTOTRBO radios?

17  A.   More than ten years.

18  Q.   Did you create any part of the MOTOTRBO program?

19  A.   I did.  When the product first launched, I had software

20  that was running in the portable mobile radio, the repeater,

21  and in the provisioning software.

22  Q.   Is the MOTOTRBO program creative?

23  A.   Yes, it is.

24  Q.   Why is that?

25  A.   I think it solves a lot of pretty challenging technical

1    problems in a pretty elegant way.

2    Q.   Was it difficult to write?

3    A.   Yes, it was.

4    Q.   And why do you say that?

5    A.   Both because of the complexity involved -- so it's

6    realtime embedded firmware.  So it has to be very precise and

7    very accurate, and it's split across multiple processors in

8    the product.  It also has to work on a device that's powered

9    by a removable battery.  So it has to be power last tolerant.

10   So it was just a number of technical challenges that build

11   upon one another.

12   Q.   Did Motorola ever have to rewrite MOTOTRBO source code

13   as part of the process of creating it?

14   A.   Yes, we did, for a couple of reasons.

15        One is, sometimes for certain subsystems, you want

16   to get it functional first.  And then what you are going to

17   do is you are going to iteratively kind of tune it to get a

18   better battery life and better performance out of it.

19        In other cases, it was the design approach that we

20   initially outlined and we thought would work.  As we kind of

21   went down the path of implementing it, we realized, okay,

22   this isn't going to work.  So we had to back up and take a

23   direction change to ultimately get it to function the way

24   that we intended.

25   Q.   How many ways were there to write the code for MOTOTRBO?

1    A.    I think there was almost an infinite number of ways, to

2    be honest.  Early in the architecture phase what we ended up

3    doing is deciding what's going to be done in hardware and

4    what's going to be done in software.  And then as we proceed

5    down the development path, we have to decide what software is

6    going to run on which processors within the radio.

7          So it becomes a series of seemingly never-ending

8    choices for a while until you kind of get everything

9    outlined.

10   Q.    Let's switch gears again.

11         Mr. Zetzl, are you here to testify about Motorola's

12   trade secrets?

13   A.    Yes, I am.

14   Q.    Let's go to PDX 6.4.

15         What are the trade secrets that you are going to

16   testify about today?

17   A.    So I'm going to testify about six secrets today:  The

18   ergonomic layer, the application layer, the VOX application,

19   the DMR protocol stack, the connectivity functions, and the

20   XCMP protocol.

21   Q.    Let's start with the ergonomic layer.  What is that?

22   A.    So the ergonomic layer is really how people interact

23   with the radio itself.  So it's kind of the user interface of

24   the product.  It's the display, it's the buttons, the

25   indicators, and those aspects of the device.

 1   Q.   Is the ergonomic layer important?

 2   A.   Yes, it is.  I mean, I think all of us would agree that

 3   how usable a product is is very important and how useful it

 4   is really.

 5   Q.   At a high level, what are the components of the

 6   ergonomic layer?

 7   A.   So there is Darwin Core and then there is the

 8   connectivity to the actual applications that run on the

 9   radio.

10   Q.   Let's go to PDX 6.5.

11        What is the Darwin Core?

12   A.   So the Darwin Core is kind of like the traffic cop of

13   the radio.  So when there is multiple applications that are

14   running on a radio, it's the one that decides, okay, this

15   application gets to go.  This one has to wait.

16        This is kind of an area where radio is a little

17   different than consumer devices that you may have used.  So

18   if I was busy typing a text message on my phone and I

19   received an incoming phone call, my phone would say, Do you

20   want to accept the phone call, or do you want to decline the

21   phone call and keep typing the text message?

22        It's really important for our users to have us make

23   those decisions in the radio because they really need to be

24   focused on their job.  So what we try to do in the radio is

25   sort of make predetermined choices about what's more

1    important in the radio so that they can focus on their task.

2    Q.   Did Motorola come up with the idea of an ergonomic

3    layer?

4    A.   No, we are not claiming that we came up with the idea of

5    an ergonomic layer.

6    Q.   What did Motorola create?

7    A.   What we created was really a customized version of how

8    ergonomic was going to work on our radio.  So it's really

9    highly tailored to the actual radio applications and how

10   people interact with our devices.

11   Q.   Let's go to PDX 6.6.

12        How long did it take to develop the ergonomic layer

13   trade secret?

14   A.   We estimate that it took 20 engineers 1,584 staff

15   months.

16   Q.   And how did you make that determination?

17   A.   So for this particular trade secret, we had a subject

18   matter expert David Lei, who was involved in the creation of

19   the ergonomics layer.  So Dave went back and looked at both

20   the project planning documents that we had for the creation

21   of this piece of software and also on the historical memory

22   to come up with this estimate.

23   Q.   Do you know whether any of the time that Motorola

24   estimates includes work from before the MOTOTRBO project

25   began?

1    A.    Yes, it does.  We estimate about 80 percent of it was

2    from the platform that we adopted on MOTOTRBO and about 20

3    percent was new for MOTOTRBO.

4    Q.    Are there Motorola documents or source code describing

5    the ergonomic layer trade secret?

6    A.    Yes, there are.  There is architecture and design

7    documents, there is requirement and specifications, and

8    source code as well.

9    Q.    In front of you there should be a series of binders.  I

10   am going to ask you to look in those binders at a few

11   documents.

12          In your first binder there should be a document

13   numbered PTX 667.

14          (Documents tendered.)

15   BY MR. SIMMONS:

16   Q.    Mr. Zetzl, do you have three binders in front of you?

17   A.    I do, and one of them is a little unwieldy.

18          THE COURT:  Only one?

19          THE WITNESS:  One that's much larger than the

20   others so I couldn't stack them.  Sorry about that.

21   BY MR. SIMMONS:

22   Q.    That's fine.

23          If you turn to Volume 1 --

24   A.    Okay.

25   Q.    If you look in that binder at PTX 667.

1    A.    Okay.

2    Q.    Do you see it?

3    A.    I do.

4    Q.    And if you look in your second binder at PTX 802.

5    A.    Okay.  802 you said.  Okay.  I see it.

6    Q.    Are you familiar with these two documents?

7    A.    Yes, I am.

8    Q.    Were they created in the normal course of Motorola's

9    business?

10   A.    Yes, they were.

11   Q.    Do they describe the ergonomic layer?

12   A.    Yes, they do.

13             MR. SIMMONS:  Your Honor, I move the admission of

14   PTX 667 and PTX 802 into evidence.

15             THE COURT:  Both are received and may be published.

16         (Said exhibits were received in evidence.)

17   BY MR. SIMMONS:

18   Q.    Mr. Zetzl, I would like to have you look at a few other

19   previously admitted exhibits.

20             So in your first volume again, could you look at

21   PTX 666, which is the Darwin ergonomic platform architecture.

22   A.    Okay.

23   Q.    And then back in Volume 2, PTX 1255, software

24   architecture document of Matrix.

25   A.    Okay.

Case: 1:17-cv-01973 Document #: 797 Filed: 12/20/19 Page 112 of 217 PageID #:52748
Zetzl - direct by Summons
869

1    Q.   And PTX 1341, the Darwin architecture presentation.

2    A.   Okay.

3    Q.   Do these documents describe the ergonomic layer trade

4    secret?

5    A.   Yes, they do.

6    Q.   How do the documents you have reviewed describe that

7    trade secret?

8    A.   There is a variety of information.  It shows kind of

9    block level decompositions in the Darwin layer.  It shows how

10   the various layers interact with one another.  And then there

11   is also requirements and supporting text just sort of

12   explaining how everything works.

13   Q.   Mr. Zetzl, let's talk about one other ergonomic layer

14   document.

15        Would you turn to PTX 1261, which is also in your

16   Volume 2 binder.

17   A.   Okay.

18   Q.   And you may need to get closer to the microphone for

19   everyone to hear.

20        What is this document?

21   A.   So this is the Darwin application and strategy document

22   for the MOTOTRBO.  So this was kind of an upfront planning

23   document where we knew that we wanted to use Darwin, and we

24   were just trying to set about how we were going to do that

25   for the product.

1    Q.    Are you familiar with it?

2    A.    Yes, I am.

3    Q.    Was it created in the normal course of Motorola's

4    business?

5    A.    Yes, it was.

6    Q.    And does it describe the ergonomic layer?

7    A.    Yes, it does.

8              MR. SIMMONS:  Your Honor, I move the admission of

9    PTX 1261 into evidence.

10             THE COURT:  The exhibit is received and may be

11   published.

12         (Said exhibit was received in evidence.)

13   BY MR. SIMMONS:

14   Q.    Mr. Zetzl, are you familiar with the source code drive

15   that was previously admitted in this case as PTX 1865?

16   A.    Yes, I am.

17   Q.    Are you familiar with the source code from Motorola's

18   ergonomic layer trade secret?

19   A.    Yes, I am.

20   Q.    Is that source code contained on the drive?

21   A.    Yes, it is.

22   Q.    Let's go to PDX 6.7.

23             Where is the source code for -- the ergonomic layer

24   trade secret located on the drive?

25   A.    So it's in their directories that are highlighted here

Case: 1:17-cv-01973 Document #: 797 Filed: 12/20/19 Page 114 of 217 PageID #:52750
Zetzl - direct by Simmons
871

1  on the slide.

2  Q.   Now, let's turn in your second volume binder to PTX

3  1701.

4  A.   Okay.

5  Q.   What is this document?

6  A.   This is a source code file from the Darwin Core section

7  of the ergonomic layer.

8  Q.   And which file is it?

9  A.   It's core_EMT_user_defines.h.

10  Q.   What's the purpose of this file?

11  A.   So this provides the interface between the ergonomic

12  management tasks that we refer to as EMT and the radio

13  signaling layer.

14  Q.   Are you familiar with this code file?

15  A.   Yes, I am.

16  Q.   Is it used in MOTOTRBO?

17  A.   Yes, it is.

18        MR. SIMMONS:   Your Honor, I move the admission of

19  PTX 1701 into evidence.

20        THE COURT:   It is received and may be published.

21     (Said exhibit was received in evidence.)

22        MR. SIMMONS:   Let's show the first page of that

23  document.

24  BY MR. SIMMONS:

25  Q.   Now, Mr. Zetzl, is this file confidential?

1    A.    Yeah.  All our source code is confidential.  So this one
2    is confidential.
3    Q.    I'm sorry.  You are going to have to be closer to the
4    microphone.
5    A.    Yes, all of our source code is confidential.  So, yes,
6    this file is confidential.
7    Q.    Does this file bear a Motorola copyright notice?
8    A.    Yes, it does, on Line 4.
9    Q.    Now, let's turn to Page 2 of the document, if you would.
10          If you turn to Page 2, when was this file first
11   created?
12   A.    It was created on October 24th, 1995.
13   Q.    Did it change over time?
14   A.    Yes, it did.
15   Q.    And the section of the file that you are reading from
16   has stars along the left-hand column.
17          What does that signify?
18   A.    So that's just really for the readability of people that
19   are looking at the file.  This is a larger block of comment.
20   So we just use stars on the left-hand column to indicate that
21   it's a continuation of a comment.
22   Q.    Are the comments part of the file?
23   A.    Yes, they are.
24   Q.    Are they important?
25   A.    Yeah, absolutely.  I think, one, it helps kind of

 1    explain what's in the file, and it also gives you an idea of
 2    why they did certain things.  So I think it's a great
 3    starting point, especially if you haven't been involved in a
 4    piece of source code before, to kind of look over the
 5    comments and help guide you to how things are working.
 6    Q.   Who wrote the code in this file?
 7    A.   So Motorola engineers wrote the code in this file.
 8         MR. SIMMONS:  Mr. Schlaifer, you can take that
 9    down.
10    BY MR. SIMMONS:
11    Q.   Mr. Zetzl, before we leave this document, I just want
12    you to turn to Pages 3 and 4 and specifically to Lines 170
13    through 193.
14         Can you just describe what you find there?
15    A.   Yeah.  From Lines 170 to 173 we just see a comment that
16    is describing the data structure to follow.  And it talks
17    about it being the interaction class specification.  And then
18    starting on Row 175 we see "type def enum."
19         THE COURT REPORTER:  I'm sorry.  You see what?
20         THE WITNESS:  Oh, I'm sorry.  Type def, t-y-p-e
21    d-e-f, and then the keyword enum, e-n-u-m.
22    BY MR. SIMMONS:
23    Q.   What's the name of the type def?
24    A.   It's interactionclass_t.
25    Q.   Did Motorola have to call it that?

1    A.    No.

2    Q.    Why not?

3    A.    So the programming language is pretty broad about what

4    types of names you can use for a variable.  There are a

5    couple restrictions, but generally we just try to pick a

6    descriptive name for it.

7    Q.    Is that true of all of Motorola's MOTOTRBO code?

8    A.    Yes, it is.

9    Q.    And the _t at the end, is that something that Motorola

10    had to use?

11    A.    No.  Again, that's just the conviction that the

12    programmer is using to indicate that it's a type define.

13    Q.    In computer programming, does _t always mean a type def?

14    A.    Not necessarily.  It could mean a template.  It could

15    mean a token.  You really need to look at the definition to

16    understand why somebody is using an _t.

17    Q.    Now, earlier you mentioned that this document contains a

18    copyright notice.

19            Are you familiar with Motorola's copyright

20    registrations for the MOTOTRBO program?

21    A.    Yes, I am.

22    Q.    Let's go to PDX 6.2.

23            Do you know which registrations are at issue in

24    this case?

25    A.    Yes, I do.  The assertions here are for MOTOTRBO

1    portable subscriber firmware package R.01.00.01; MOTOTRBO

2    mobile subscriber firmware package R.01.00.01; MOTOTRBO

3    cypher R.01.00.01, which is the repeater; and MOTOTRBO

4    portable R.01.03.

5    Q.   Did you have a role in registering the MOTOTRBO program?

6    A.   I did.  I provided some information to our intellectual

7    property team to support them in filing the copyright

8    registration.

9    Q.   Are you familiar with the overall code for the MOTOTRBO

10   program?

11   A.   Yes, I am.

12   Q.   Are you familiar with the directories for that software?

13   A.   Yes, I am.

14   Q.   Are those directories stored on the source code drive we

15   discussed earlier?

16   A.   Yes, they are.

17   Q.   And have you prepared a demonstrative to assist you in

18   identifying the source code directories for the registered

19   MOTOTRBO program?

20   A.   Yes, I did.

21   Q.   Let's go to PDX 6.3.

22          Where is the code for the registered MOTOTRBO

23   program located on the source code drive?

24   A.   Sure.  So for the MOTOTRBO portable subscriber firmware

25   package R.01.00.01, it's in the highlighted directories.  And

1   for the MOTOTRBO mobile subscriber firmware package
2   R.01.00.01, it's also in the highlighted directories.  And
3   then for MOTOTRBO cypher R.01.00.01, it's everything
4   underneath the top-level directory MOTOTRBO repeater
5   R.01.00.01.  And the same is true for the MOTOTRBO portable
6   R.01.03.  It's everything underneath the Matrix 1.3 folder.
7   Q.   So it's basically the folders under each of the titles
8   of the copyright registrations?
9   A.   Yes.
10  Q.   All right.  Let's turn back to the trade secrets.  Let's
11  go to PDX 6.4.
12       Mr. Zetzl, what is the application layer trade
13  secret?
14  A.   So the application layer trade secret is really how
15  Motorola has created applications for its radios.
16  Q.   And what are applications in the context of a radio?
17  A.   So applications in the context of a radio could be like
18  a private calling feature where you can do a one-to-one
19  individual call, a group calling feature where you can do a
20  one-to-many call, text messaging application where you can
21  send a text message to another user, those types of things.
22  Q.   Do all radios have both an ergonomic layer and an
23  application layer?
24  A.   No.
25  Q.   Did Motorola come up with the idea of an application

1    layer?

2    A.    No, we are not claiming that we came up with the idea of

3    an application layer.  We are just -- what we are asserting

4    here is basically our unique approach to how we did

5    applications.

6    Q.    And does Motorola treat its approach to the application

7    layer as confidential?

8    A.    Yes, we do.

9    Q.    Let's go to PDX 6.9.

10         How long did it take to develop the application

11   layer trade secret?

12   A.    We estimate that it took 40 engineers 2,700 staff

13   months.

14   Q.    And how did you make that determination?

15   A.    So I spoke with the engineering manager who was

16   responsible during MOTOTRBO 1.0 for managing the team that

17   developed the applications, and he went both based on his

18   historical memory as well as the project planning documents

19   from that time to come up with the estimate.

20   Q.    Does that amount of time include work that started

21   before the MOTOTRBO project began?

22   A.    Yes, it does.

23   Q.    How much time?

24   A.    We estimate about 50 percent of the project was reused

25   from the older radio and about 50 percent was (inaudible.)

1   Q.   Are there Motorola documents or source code describing

2   this trade secret?

3   A.   Yes, there are.

4   Q.   What kind of documents?

5   A.   So again, there is architecture and design documents and

6   requirement and specification documents and then, of course,

7   the source code.

8   Q.   Now, earlier we reviewed PTX 666, which was the Darwin

9   ergonomic platform architecture; PTX 802, which was the LTD

10  virtual radio PC platform presentation; PTX 1255, the

11  software architecture document of Matrix; and PTX 1341, the

12  Darwin architecture presentation.

13          Do those documents also describe the application

14  layer trade secret?

15  A.   Yes, they do.

16  Q.   How do they describe it?

17  A.   So again, it really gives you a lot of supporting text

18  and requirements as well as breakdown of the detailed design

19  and how things interact with one another.

20  Q.   Are you familiar with the source code for Motorola's

21  application layer trade secret?

22  A.   Yes, I am.

23  Q.   Is it contained on the source code drive?

24  A.   Yes, it is.

25  Q.   Let's go to PDX 6.10.

1           Where is the source code for the application layer

2   trade secret located on the Motorola source code drive that

3   was admitted in this case?

4   A.   In the directories that are highlighted on this slide.

5   Q.   Let's talk about another application.

6           If you could, turn to PDX 6.11.

7           What is VOX?

8   A.   So VOX stands for voice-operated transmit.  And this is

9   a feature that's really kind of important to our users

10  because it allows them to transmit with the radio without

11  actually pressing a button.

12          So if we think of, like, a construction worker, for

13  example, that's going to be busy using his hands, he still

14  may have the need to communicate with others on a worksite.

15  So the VOX feature is what's going to allow him to be able to

16  communicate with others without necessarily needing to use

17  his hands.

18  Q.   Did Motorola come up with the idea of hands-free control

19  of radios?

20  A.   You know, I don't know if Motorola came up with the

21  idea, but that's not what we are really asserting here.  What

22  we are asserting is our unique approach to doing VOX in a

23  digital radio.

24  Q.   Is Motorola's approach to VOX generally known in the

25  field of two-way radio communications?

1   A.   No.

2   Q.   Let's go to PDX 6.12.

3            How long did it take to develop the VOX trade

4   secret?

5   A.   Yes.  So I estimated that it took four engineers 36

6   staff months to develop this feature.

7   Q.   And how did you make that determination?

8   A.   I went back to the project planning documents, and I

9   also went based on my experience leading a team through the

10  project development to come up with this estimate.

11  Q.   Does Motorola have any technical documents or source

12  code describing this trade secret?

13  A.   Yes.  We have architecture design, requirement and

14  specification documents, and the source code as well.

15  Q.   Let's turn to a few more exhibits in your binders.

16           If you could, turn to PTX 734, which I believe is

17  in your first volume.

18  A.   Okay.

19  Q.   And PTX 750, which I believe is also in your first

20  volume.

21  A.   Okay.

22  Q.   And PTX 762.

23  A.   Okay.

24  Q.   PTX 768.

25  A.   Okay.

1    Q.    PTX 776.

2    A.    Okay.

3    Q.    PTX 861.

4    A.    Okay.

5    Q.    Are you familiar with these documents?

6    A.    Yes, I am.

7    Q.    Were they created in the normal course of Motorola's

8    business?

9    A.    Yes.

10   Q.    Do they describe the VOX trade secret?

11   A.    Yes, they do.

12         MR. SIMMONS:  Your Honor, I move the admission of

13   PTX 734, 750, 762, 768, 776, and 861 into evidence.

14         THE COURT:  They are received and may be published.

15         (Said exhibits were received in evidence.)

16   BY MR. SIMMONS:

17   Q.    Mr. Zetzl, how do these documents describe the VOX trade

18   secret?

19   A.    Again, they kind of go over the high-level architecture,

20   the detail design, how the components actually interact with

21   one another in the radio, and then importantly also they

22   cover sort of the why of what we are doing.  So it kind of

23   lays out the rationale for why we are doing what we are

24   doing.

25   Q.    Are you familiar with the source code for Motorola's VOX

1    trade secret?

2    A.   Yes, I am.

3    Q.   Is that code contained on the Motorola source code

4    drive?

5    A.   Yes, it is.

6    Q.   Let's go to PDX 6.13.

7              Where is that source code located on the drive?

8    A.   So it's really in the folders that are highlighted here.

9    And in the case where there is a specific file highlighted,

10   like on the bottom four folders, then it's just those

11   specific files.  But for sort of the top five directories,

12   it's all the contents within those directories.

13   Q.   Let's go back to PDX 6.4.

14             Mr. Zetzl, what is the next trade secret that you

15   will be discussing today?

16   A.   The DMR protocol stack.

17   Q.   Let's go to PDX 6.14.

18             What is Motorola's DMR protocol stack?

19   A.   So our protocol stack is kind of like the cable modem or

20   DSL modem that you might have at home or a set-top box.  So

21   really what it's designed to do is to be able to send voice

22   data and control messages from one radio to another through

23   the modem.

24   Q.   Why is this trade secret called the DMR protocol stack?

25   A.   It implements the European Telecommunications Standards

1    Institute, or ETSI, DMR Tier 2 standard.

2    Q.   Did the DMR standard dictate how Motorola designed or

3    implemented it's DMR protocol stack?

4    A.   No, it did not.

5    Q.   Did you have to write the MOTOTRBO program in a

6    particular way because of the DMR standard?

7    A.   No, we did not.

8    Q.   Let's go to PDX 6.15.

9         How long did it take to develop the DMR protocol

10   stack trade secret?

11   A.   We estimate that it took 42 engineers 1,512 staff months

12   to develop the DMR protocol stack.

13   Q.   How did you come up with these numbers?

14   A.   So I consulted with one of my colleagues, and I also

15   went based on my own historical recollections.

16        So essentially we both kind of looked at project

17   planning documents and went back in time and sort of

18   remembered this period of time he was working on it, and then

19   we essentially reconciled our estimates and came up with this

20   final estimate.

21   Q.   Do these numbers include time spent before the MOTOTRBO

22   project began?

23   A.   Yes, they do.

24   Q.   And how much time was that?

25   A.   We estimated about 50 percent of the work in the DMR

```
 1    protocol stack we leveraged from the product that we picked
 2    it up from and then 50 percent was new specific to DMR.
 3    Q.   Are there any Motorola documents or source code
 4    describing the DMR protocol stack trade secret?
 5    A.   Yes, there is training documentation, there is
 6    architecture and design requirements specification, and the
 7    source code as well.
 8    Q.   I am going to ask you to go back to Volume 1 and look at
 9    PTX 328, which I believe is the first document.
10    A.   Okay.
11    Q.   And then in Volume 2 can you look at PTX 1260.
12    A.   Okay.
13    Q.   And PTX 1350.
14    A.   Okay.
15    Q.   Are you familiar with these documents?
16    A.   Yes, I am.
17    Q.   Were they created in the normal course of Motorola's
18    business?
19    A.   Yes, they were.
20    Q.   Do they describe the DMR protocol stack?
21    A.   Yes, they do.
22              MR. SIMMONS:  Your Honor, I move the admission of
23    PTX 328, 1260, and 1350 into evidence.
24              THE COURT:  They are received and may be published.
25              (Said exhibits were received in evidence.)
```

Case: 1:17-cv-01973 Document #: 797 Filed: 12/20/19 Page 128 of 217 PageID #:52764
Zetzl - direct by Simmons
885

1    BY MR. SIMMONS:

2    Q.    Now, Mr. Zetzl, would you turn to previously admitted

3    PTX 754, 754.

4    A.    Okay.

5    Q.    Does that document also describe the DMR protocol trade

6    secret?

7    A.    Yes, it does.

8    Q.    And earlier, in connection with the application layer

9    and ergonomic layer trade secrets, we reviewed PTX 1255,

10   which was the software architecture document of Matrix.

11        Does it describe the DMR protocol stack trade

12   secret?

13   A.    Yes, it does.

14   Q.    How do these documents describe the DMR protocol stack?

15   A.    So again, they give kind of the overall architecture,

16   the high- and low-level design of it, the requirements and

17   the specifications.

18   Q.    Are you familiar with the source code for Motorola's DMR

19   protocol stack trade secret?

20   A.    Yes, I am.

21   Q.    Is it contained on the Motorola source code drive?

22   A.    Yes, it is.

23   Q.    Let's turn to PDX 6.16.

24        Mr. Zetzl, where on the drive is the source code

25   for the DMR protocol stack trade secret located?

1    A.    It's in the directory.  It's in the highlighted folders
2    on this slide.
3    Q.    Let's go to PDX 6.4.
4          And what is the next trade secret that you are
5    going to testify about today?
6    A.    The connectivity framework for the radio.
7    Q.    And what is the connectivity trade secret?
8    A.    So it's really how Motorola's radio connects to
9    everything that's not the radio modem.
10   Q.    Can you turn to PDX 6.17.
11         Can you provide examples how connectivity works in
12   Motorola's radios?
13   A.    Sure.  So our radio has the GPS receiver built in.  So
14   one of the things that it can do is it can send its location
15   of the radio user over the DMR modem so that you know where
16   your coworker is at or a dispatcher knows where a group of
17   workers is at.
18         Text messaging is, again, something that can be
19   done.  So I could text message from a dispatcher or from a
20   phone, and it will route through the Internet and ultimately
21   show up on the radio user's radio.
22         So really what connectivity is doing is just taking
23   these various services and allowing you to route information
24   back and forth through the radio.
25   Q.    Did Motorola create the protocols listed in this

1  demonstrative?

2  A.   We created some of the protocols.  Others are standard,

3  like TC/IP or USB.  But our approach for how we integrated

4  those into the radio is unique.  So that part of it, although

5  we didn't obviously invent those protocols, is part of what

6  we claim.

7  Q.   Did Motorola come up with the idea of connectivity

8  modules and/or functions?

9  A.   No.  Again, we are not claiming that we came up with the

10  idea, but the way that we actually have it work within the

11  radio is what we are claiming here.

12  Q.   Is Motorola's approach to connectivity generally known

13  in the field of two-way radio communications?

14  A.   No.

15  Q.   Let's go to PDX 6.18.

16       How long did it take Motorola to develop the

17  connectivity trade secret?

18  A.   It took four engineers 65 staff months.

19  Q.   I'm sorry.  How many staff months?

20  A.   Four engineers 65 staff months.

21  Q.   And how did you make that determination?

22  A.   So I spoke with the architecture lead for connectivity

23  on the MOTOTRBO program, and he relied on his memory of the

24  development to come up with this estimate.

25  Q.   Are there any Motorola documents or source code that

```
 1    describe the connectivity trade secret?

 2    A.   Yes, there are.  There is architecture and design

 3    documents, requirement and specification documents, and the

 4    source code itself.

 5    Q.   Let's go back to the binders.

 6              If you could, look at PTX 709.

 7    A.   Okay.

 8    Q.   And PTX 711.

 9    A.   Okay.

10    Q.   PTX 726.

11    A.   Okay.

12    Q.   PTX 731.

13    A.   All right.

14    Q.   And then in Volume 3 is PTX 1270.

15    A.   Okay.

16    Q.   And then back to Volume 2, let's look at PTX 1309.

17    A.   Okay.

18    Q.   PTX 1310.

19    A.   Okay.

20    Q.   And PTX 1331.

21    A.   Okay.

22    Q.   Are you familiar with these documents?

23    A.   Yes, I am.

24    Q.   Were they created in the normal course of Motorola's

25    business?
```

Case: 1:17-cv-01973 Document #: 297 Filed: 12/20/19 Page 132 of 217 PageID #:52768
Zetzl - direct - by Simmons
889

1   A.   Yes, they were.

2   Q.   Do they describe Motorola's connectivity trade secret?

3   A.   Yes, they do.

4           MR. SIMMONS:  Your Honor, I move the admission of

5   PTX 709, 711, 726, 731, 1270, 1309, 1310, and 1331 into

6   evidence.

7           THE COURT:  They are received and may be published.

8           (Said exhibits were received in evidence.)

9   BY MR. SIMMONS:

10  Q.   Now, Mr. Zetzl, I know you were looking at Volume 3 over

11  there, which is PTX 1270.  How many pages is that document?

12  A.   It's over 2,000.

13  Q.   And why is it so long?

14  A.   It's kind of the detailed design of our system approach

15  for MOTOTRBO.  There is a significant amount of detail in it,

16  but it's based on really how the whole product as a system

17  works.

18          So there is a ton of decisions that needed to be

19  made.  And the decisions are outlined along with the

20  supporting information that helps you understand why things

21  were done the way that they were done.

22  Q.   How do the documents that we just reviewed describe the

23  connectivity trade secret?

24  A.   So again, it kind of provides the outline of the

25  high-level design and the low-level design.  It provides you

1    kind of the supporting text, both with requirements and just

2    description, for why things work the way that they work and

3    so that a new engineer that would be joining or somebody that

4    was trying to understand why something worked the way that it

5    did could refer to that documentation and get that insight.

6    Q.   Are you familiar with the source code for Motorola's

7    connectivity trade secret?

8    A.   Yes, I am.

9    Q.   Is it contained on the Motorola source code drive that

10   was previously admitted in this case?

11   A.   Yes.

12   Q.   Let's turn to PDX 6.19.

13            Where on the drive is the source code for the

14   connectivity trade secret located?

15   A.   So it's in the directories and folders highlighted on

16   this slide.

17   Q.   Let's turn to PDX 6.20.

18            What does "XCMP" stand for?

19   A.   It's the extended configuration and management protocol.

20   Q.   And what is Motorola's XCMP trade secret?

21   A.   So XCMP is a proprietary protocol that we created.  One

22   of the things that it allows is for multiple devices to

23   control the same radio.

24            So what you see pictured here with the fire truck

25   is that, in some cases, like with a fire truck, you may have

1    a person in the front of the cab, right, and also a person at

2    the rear.  And both of them need to be able to hear radio

3    calls, and both of them potentially need to be able to make

4    radio calls.

5           So one of the things that was an advancement with

6    XCMP or some of our legacy radio control protocols was that

7    you could actually have multiple connections to the same

8    radio.  Whereas, with some of our legacy protocols it was a

9    one-to-one connection only, and you couldn't have multiple

10   things controlling the same radio.

11   Q.   Does XCMP have a security protocol?

12   A.   It does.

13   Q.   Why did Motorola choose to provide security for XCMP?

14   A.   So we recognized this is a pretty powerful thing to be

15   able to control the radio remotely, and we wanted to ensure

16   that that was being done correctly and not maliciously.

17   Q.   Are you aware of anyone attempting to figure out XCMP's

18   signaling protocols?

19   A.   So I'm aware that an individual created a tool that

20   could capture an XCMP packet and display its contents.

21   Q.   Was that individual able to determine Motorola's design

22   and implementation of the XCMP trade secret?

23   A.   No.  It was really alleged that at least all it could do

24   was really print out the contents of the packet.  It doesn't

25   really show how XCMP works as a protocol within the radio and

1    how it's structured.

2    Q.   Is the XCMP trade secret related to Motorola's

3    connectivity trade secret?

4    A.   So within connectivity, there is something called an

5    XCMP handler.  And really what it does is it forwards the

6    XCMP packet to XCMP.

7         So there is a small piece within the connectivity

8    trade secret that we talked about, but it's really just for

9    the purposes of routing packets up to the XCMP portion of the

10   trade secret for processing.

11   Q.   Is Motorola's design and implementation for XCMP

12   generally known in the field of two-way radio communications?

13   A.   No.

14   Q.   Let's go to PDX 6.21.

15        How long did it take to develop the XCMP trade

16   secret?

17   A.   I estimated that it took 15 engineers 720 staff months

18   to develop this trade secret.

19   Q.   How did you make that determination?

20   A.   So both based on my knowledge of the project and then

21   also looking back at the project planning documentation as

22   well for resource estimates.

23   Q.   Does that amount of time include time spent prior to the

24   MOTOTRBO project began?

25   A.   Yes.  There was a protocol that XCMP built on that was

Zetz - direct by Summons

1    called RCMP.  And I estimate that about one-third of the 720

2    staff months were spent on RCMP with the remaining two-thirds

3    for the XCMP portion.

4    Q.   Are there any documents with source code that Motorola

5    has created describing this trade secret?

6    A.   Yes.  There is specification and design documents,

7    requirement documents, and the source code itself.

8    Q.   Let's go back to the binders.

9            If you could, look at PTX 690.

10   A.   Okay.

11   Q.   And PTX 691.

12   A.   Okay.

13   Q.   And then in the other binder PTX 1313.

14   A.   Okay.

15   Q.   1314.

16   A.   Okay.

17   Q.   And 1315.

18   A.   Okay.

19   Q.   Are you familiar with these documents?

20   A.   Yes, I am.

21   Q.   Were they created in the normal course of Motorola's

22   business?

23   A.   Yes, they were.

24   Q.   Do they describe Motorola's XCMP trade secret?

25   A.   Yes, they do.

Case: 1:17-cv-01973 Document #: 797 Filed: 12/20/19 Page 137 of 217 PageID #:52773
Zetzl - direct by Simmons
894

1        MR. SIMMONS:  Your Honor, I move the admission of

2   PTX 690, 691, 1313, 1314, and 1315 into evidence.

3        THE COURT:  They are received and may be published.

4        (Said exhibits were received in evidence.)

5   BY MR. SIMMONS:

6   Q.   Mr. Zetzl, how do these documents describe the XCMP

7   trade secret?

8   A.   They give the high-level and the low-level design of the

9   protocol, and they explain how the protocol is actually

10  handled, so the descriptive text as well as the actual

11  requirements for how things need to be handled within the

12  radio for XCMP.

13  Q.   Are you familiar with the source code for Motorola's

14  XCMP trade secret?

15  A.   Yes, I am.

16  Q.   Is it contained on the Motorola source code drive?

17  A.   Yes, it is.

18  Q.   Let's look at PDX 6.22.

19        Where on the drive is that code located?

20  A.   In the directories that are highlighted on the slide.

21        MR. SIMMONS:  Your Honor, I move to seal the

22  exhibits that we discussed with Mr. Zetzl today.

23        THE COURT:  The motion to seal is granted.

24  BY MR. SIMMONS:

25  Q.   Now, Mr. Zetzl, shifting gears a little bit, are you

1    familiar with the phrase "competitive intelligence"?

2    A.    Yes, I am.

3    Q.    And what does that mean to you?

4    A.    So that's really how we monitor how our competitors are

5    doing in the marketplace.  So we do that by attending trade

6    shows, looking at what they publish on their website.

7    Occasionally we will purchase one of their products and do an

8    analysis on it to see how our product compares to theirs from

9    a benchmarking standpoint.

10   Q.    In that process, has Motorola ever noticed similarities

11   between its radios and its competitors' radios?

12   A.    Yeah.  That's pretty common actually.

13   Q.    Does that indicate that trade secret misappropriation

14   has occurred?

15   A.    No, it does not.

16   Q.    And why not?

17   A.    Well, our competitors and Motorola, right, we serve the

18   same customer base.  And a lot of the features that we add to

19   our radios are based on customer demand.  So we would assume

20   that they are getting a lot of the same feedback that we are

21   in terms of desired features from the market.

22          A lot of us adhere to the same standards, right.

23   So as standards change, obviously we all need to adapt to

24   those standard changes.

25          And we really look at ourselves as a market leader.

1    So it's not uncommon for people to try to mimic some of the

2    functionality that we have on our radios to just try to kind

3    of close the feature gap that we believe that we have with

4    them.

5    Q.    Had Motorola ever noticed similarities between its

6    products and Hytera's products?

7    A.    Yes, we did.

8    Q.    And was that unusual?

9    A.    Not really, no.  Again, we kind of see similarities with

10   others in the marketplace for the reasons I outlined.

11   Q.    Are you aware of a Motorola investigation of Hytera's

12   radios?

13   A.    I am.

14   Q.    When did that occur?

15   A.    In late 2012.

16   Q.    Do you know why that investigation was started?

17   A.    I don't really know what precipitated the investigation.

18   Q.    Do you know what was generally involved?

19   A.    I do.  So we had acquired a Hytera radio.  We basically

20   removed their program from the Hytera radio and performed

21   some searches on the Hytera radio to see if we believed that

22   any Motorola code was included in the Hytera program.

23   Q.    Now, when you say "program," just so I'm clear, what

24   exactly do you mean by that?

25   A.    The executable is what I'm referring to as the program.

1    So some of the source code that we looked at is human

2    readable.  When we go to create an executable, we go through

3    a process called compilation and linking.  And that turns it

4    from something that's more human readable to something that

5    only the processor can understand, and that's the

6    instructions -- essentially machine instructions that will

7    execute.

8    Q.   Was the executable that was extracted from Hytera's

9    radio human readable?

10   A.   No, it was not.

11   Q.   What was your role in the investigation?

12   A.   I provided some search terms based on my knowledge of

13   the code that I believe that it presently may show that

14   Motorola's code was being used in the Hytera executable.

15   Q.   Now, if the executable can't be read by humans, how

16   would you run searches across it?

17   A.   Kind of similar to how a virus scanner searches files on

18   a computer.  You can search the executable for a series of

19   binary digits that would kind of give you a fingerprint that,

20   yes, there is something in this code.  And so that's what we

21   did.

22             We were looking for something called DSP filter

23   coefficients, which are kind of long strings of numeric

24   values.  And we felt like it was unlikely that such a long

25   string of numeric values would show up in exactly the same

1    order in their executable.  If they did, that that might be

2    indicative that perhaps they were using some of our DSP code

3    in their program.

4    Q.   When you say "binary digits," what do you mean by that?

5    A.   When you go through this compilation process, again, it

6    sort of turns the code from human readable to machine

7    executable.  So as part of that, it turns this into this

8    executable binary zero and one type of representation of the

9    data.

10   Q.   Did you personally analyze Hytera's radios?

11   A.   I did not.

12   Q.   Why not?

13   A.   Because I work on a product that directly competes with

14   them in the marketplace, I didn't want to be exposed to any

15   of their intellectual property.

16   Q.   Now, let's turn in your binder to DTX 4452, which I

17   believe is in the beginning of Volume 1.

18   A.   I'm sorry.  Could you just give me that number one more

19   time.

20   Q.   DTX 4452.

21        A JUROR:  Your Honor, we are having a really hard

22   time hearing the witness.

23        THE WITNESS:  Oh, I'm sorry.  Let me move closer.

24        MR. SIMMONS:  Maybe if you could bring the

25   microphone closer to you.

```
 1            THE WITNESS:  I'm sorry about that.
 2            THE COURT:  And you, too, can move closer.
 3   Seriously if you want to get closer, it's up to you.  Or even
 4   more.
 5            Do you want some answer re-read?
 6            A JUROR:  No.  I got it, but I'm just, like,
 7   straining.
 8            THE WITNESS:  Okay.  I'm sorry about that.
 9            A JUROR:  That's okay.
10   BY MR. SIMMONS:
11   Q.   Were you able to find DTX 4452 in your binder?
12   A.   So you are saying D as in "David"?
13   Q.   Yes.
14            THE COURT:  Could you speak up a little.
15            THE WITNESS:  I see the P as in "Paul" exhibits.
16   I'm not seeing a D as in "David."
17            MR. SIMMONS:  Your Honor, may I approach the
18   witness with a copy of DTX 4452?
19            THE COURT:  Yes.
20        (Document tendered.)
21   BY MR. SIMMONS:
22   Q.   Mr. Zetzl, what is that document?
23   A.   So this is an instant message conversation between
24   myself and a colleague, Darrell Stogner.
25   Q.   And who is Darrell Stogner?
```

1    A.    So Darryl led the DSP development on the MOTOTRBO 1.0

2    program.

3    Q.    And what is the date of this document?

4    A.    This is from October 9th, 2012.

5              MR. SIMMONS:  Your Honor, I move the admission of

6    DTX 4452.

7              THE COURT:  It is received and may be published.

8              (Said exhibit was received in evidence.)

9              MR. SIMMONS:  Let's bring that up, Mr. Schlaifer.

10   BY MR. SIMMONS:

11   Q.    What are you discussing with Mr. Stogner in this instant

12   message chain?

13   A.    So the content of this instant message is really around

14   Darryl's asking to -- Darryl is intending to try to remove

15   this executable from the Hytera radio, and he is asking me

16   for support to do that.

17   Q.    Did you gain an understanding of why he would want to do

18   that?

19   A.    Yeah.  So what he says here is, "I wanted to prove they

20   stole our code."  I don't think that I would have probably

21   put it that way.

22              I think what we were really looking to do here is

23   to get evidence one way or the other.  Do we really feel like

24   some of our code is in the Hytera executable, or do we feel

25   like it's not?

1    So I think essentially what he is saying is, hey, I

2    want to get this executable out for the purposes of figuring

3    out --

4    MR. ALLAN:  Your Honor, I object to the

5    characterization of a witness who is not testifying.

6    THE COURT:  The witness is giving his understanding

7    of what the words mean to him.  And for that limited purpose,

8    he may complete his answer.  If the question is that, then he

9    may answer.

10   BY MR. SIMMONS:

11   Q.   Mr. Zetzl, would you finish explaining what you were

12   discussing with Mr. Stogner and your understanding of why he

13   wanted to remove the executable from the radio?

14   A.   Yes.  So my understanding from the instant message

15   conversation or my takeaway from it was that he wanted to,

16   again, search the executable to see if it had any telltale

17   signs that Motorola's code was included in the executable.

18   Q.   Did Motorola run the search terms you provided?

19   A.   Yes, they did.

20   Q.   And did Motorola review the executable as part of that

21   investigation?

22   A.   No, they did not.

23   Q.   Why not?

24   A.   Again, we didn't want to be exposed to Hytera's

25   intellectual property.  So we didn't want to actually open

1   the executable and try to understand how it worked.  We
2   simply wanted to search it to see if we felt any fingerprints
3   from the Motorola code were present in the Hytera executable.
4   Q.   After you provided the search terms, did you continue to
5   participate with the investigation?
6   A.   I received occasional updates on the investigation.
7   Q.   Let's look at DTX 4398, which I suspect is not in your
8   binder.
9            MR. SIMMONS:  Your Honor, may I approach the
10  witness with a copy?
11           THE COURT:  Yes.
12           (Document tendered.)
13  BY MR. SIMMONS:
14  Q.   Now, Mr. Zetzl, what is that document?
15  A.   This is an email that was forwarded to me from my
16  colleague Darrell Stogner.  And it's really just on the
17  completion of the investigation.
18  Q.   What's the date of that document?
19  A.   This is July 30th, 2013.
20  Q.   How long after you were contacted about the manual was
21  that?
22  A.   Approximately nine months.
23           MR. SIMMONS:  Your Honor, I move admission of DTX
24  4398 into evidence.
25           THE COURT:  It is received and may be published.

```
 1              (Said exhibit was received in evidence.)
 2    BY MR. SIMMONS:
 3    Q.   Mr. Zetzl, what was the result of running the search
 4    terms that you provided?
 5    A.   No matches were found.
 6    Q.   And how many people received the original email on this
 7    email thread?
 8    A.   Five.
 9    Q.   What is the seniority of those email recipients?
10    A.   They are senior managers within Motorola.
11    Q.   What did the results of the investigation indicate to
12    Motorola?
13    A.   That there was no evidence that our source code was
14    included in the Hytera program.
15    Q.   What did Motorola do then?
16    A.   We concluded the investigation.
17    Q.   Did there come a time that Motorola believed its trade
18    secrets had been misappropriated by Hytera?
19    A.   Yes.
20    Q.   What did Motorola do?
21    A.   We filed this lawsuit.
22              MR. SIMMONS:  Your Honor, I tender the witness.
23              THE COURT:  Are you ready for cross, Counsel?
24              MR. ALLAN:  Yes, sir.
25              THE COURT:  All right.
```

1          Members of the jury, let's stand up for a minute or

2     two.

3          (Brief pause.)

4               THE COURT:  Please be seated.

5                         CROSS-EXAMINATION

6     BY MR. ALLAN:

7     Q.   Good afternoon, Mr. Zetzl.

8     A.   Good afternoon, Counsel.

9     Q.   Michael Allan.  We met back in the summer when I took

10    your deposition.

11         How are you?

12    A.   I'm doing fine.

13         How are you doing today?

14    Q.   Good.  Thank you.

15         Now, Mr. Zetzl, you joined Motorola's DMR project

16    in 2003, correct?

17    A.   That's correct.

18    Q.   And you lived in Penang for a year, right?

19    A.   I did, yeah, approximately a year.

20    Q.   To be closer to the teams in Asia?

21    A.   Yeah.  At that time there was a lot of decisions that

22    were being made kind of rapid fire.  So it was difficult just

23    with conference calls and late nights to really be able to be

24    there as they were actually getting the program.

25    Q.   There were a lot of people working on the DMR project

1    based in Asia, right?

2    A.    Yeah.  It was a worldwide project.

3    Q.    So it was easier for you to be there physically?

4    A.    It was.  Again, what I didn't want to do is I didn't

5    want the team to have to wait 12 hours or something to be

6    able to contact me if they had a question.  So it was just

7    better for the project as a whole and for me to be able to be

8    there as opposed to trying to overlap early mornings and late

9    evenings.

10   Q.    All right.  Mr. Zetzl, I just want to make sure we got

11   this right.

12          There were six trade secrets that were covered:

13   VOX, XCMP, connectivity, protocol stack, application layer,

14   and ergonomic layer, correct?

15   A.    That is correct.

16   Q.    And your lawyer showed you all these big binders with a

17   whole bunch of documents, right?

18   A.    That's correct.

19   Q.    I don't know that I saw any of them introduced to the

20   jury, though.

21          Did you explain any of the documents to the jury on

22   your direct examination?

23   A.    I don't specifically -- minus the one source code file,

24   I don't specifically recall introducing any of them.  I would

25   be happy to, if you would like me to.

1    Q.   And you contend that -- I think for a number of the

2    trade secrets you mentioned that the trade secrets were

3    not -- you are not claiming what's generally known.  You are

4    claiming whatever Motorola's unique aspect is, right?

5    A.   Yeah.  We are claiming how we tailored it for our radio

6    and the approach that we have taken.

7    Q.   And you are saying that's somewhere in those big

8    binders, right?

9    A.   Yes.  The outlines are designed in architecture

10   approach.

11   Q.   But you didn't explain where any of those are in the big

12   binders, right?

13   A.   Yeah.  During the direct examination I did not

14   specifically go through the files.

15   Q.   Now, I looked through each of the documents as they were

16   being introduced and being read in, because I have a big

17   binder set over there myself.  And I didn't see any documents

18   that were --

19                THE COURT:  Counsel, that's improper.

20   BY MR. ALLAN:

21   Q.   I didn't see any documents --

22                THE COURT:  That's improper.

23   BY MR. ALLAN:

24   Q.   Do you see any documents in your binders, Mr. Zetzl,

25   that are labeled --

1          THE COURT:  Let's clarify this point.

2          The entirety of the three binders has been received

3   in evidence.

4          MR. ALLAN:  It has, your Honor.

5          THE COURT:  It is not necessary for the witness to

6   read each and every word from the binders.  The binders will

7   be given to the jury when they go in to deliberate.

8          You have heard the direct examination of the

9   witness regarding certain aspects of the contents of the

10  binders.  Now counsel has the opportunity to cross-examine

11  the witness within the scope of everything he has said on

12  direct examination.

13  BY MR. ALLAN:

14  Q.   Mr. Zetzl, are any of the documents that have been

15  introduced during your direct examination labeled "Motorola

16  registered secret proprietary"?

17  A.   No, they are not labeled that way.  They are labeled

18  "Motorola confidential proprietary."

19  Q.   And some of the exhibits that were introduced don't have

20  any confidentiality label, correct?

21  A.   You know, I don't specifically recall looking at all of

22  them.  I believe that some of them, like some of the training

23  presentations, may not have the "Motorola confidential

24  proprietary" labeled on every sheet of paper.  But we take

25  annual training that helps us recognize when there is

1    something confidential, and we treat it as confidential

2    regardless of whether it's labeled.

3    Q.   Just a very simple question, Mr. Zetzl.

4         Not every document that's in those binders has a

5    confidentiality designation, correct?

6    A.   I believe that that is true.  I believe at least one of

7    the training presentations does not have a confidentiality

8    thing.  I know one of the training presentations it does on

9    the cover sheet but not on every slide within it.  I believe

10   one of the other training presentations also does not have a

11   confidentiality clause on it; but, again, based on the

12   information, it would be treated as such.

13   Q.   Let's take a look at PTX 1309, if we could, which I

14   think was just admitted.

15   A.   Okay.

16   Q.   This document, I don't believe, has a confidentiality

17   designation, does it, Mr. Zetzl?

18   A.   I do not see one on the cover sheet, no.

19   Q.   Let's take a look at one more.  PTX 1309, which was just

20   admitted.

21        Oh, sorry.  PTX 1313.  Nothing designated here,

22   correct, Mr. Zetzl?

23   A.   That is correct, yes.

24   Q.   And nobody at Motorola received any innovation or

25   invention awards for any of the six trade secrets that you

1   are discussing today, correct?

2   A.   I don't specifically -- we don't specifically reward

3   people on that aspect.  It's based on their contributions.

4   Q.   This is a very simple question, Mr. Zetzl.

5              No awards were given on the six trade secrets you

6   talked about today, correct?

7   A.   That's correct.  It wouldn't -- we wouldn't normally

8   give an award on a trade secret basis like that based on the

9   project completion, the contribution to the team.

10  Q.   Is the answer no?

11  A.   No, Mr. Allan.

12  Q.   So we talked about VOX or you talked about VOX.

13             That's where, instead of pressing the button on the

14  phone, you can just speak into it?

15  A.   That's correct.

16  Q.   And it stands for voice-operated transmission?

17  A.   Yes, that's what its meaning is.

18  Q.   VOX is -- strike that.

19             Motorola has had VOX in its analog products,

20  correct?

21  A.   Yeah.  We took a hardware approach with the analog

22  products for how it would determine when to transmit and not.

23  Q.   And you would agree that VOX has been around as a

24  concept for quite a while, right?

25  A.   Yes.  VOX has been around for a while as a concept.  But

1    I think what was different in our digital radio is that we

2    fit it in a DSP, and that provided us a lot of additional

3    capabilities.

4            So one of the things that makes VOX -- one of the

5    ways you evaluate whether VOX is good or not is how often it

6    does something that we call falsing.

7            So what that really means is, when does it transmit

8    in the presence of noise but not human speech?  So it's

9    transmitting when it shouldn't.  Or when does it stop

10   transmitting when there is still human voice present?

11           With the older implementations of VOX, that was

12   something that was really kind of --

13   Q.   Mr. Zetzl, I just asked if VOX has been around for quite

14   a while.  Your lawyer can come back on redirect and ask you

15   all the questions you like.

16   A.   Okay.

17           THE COURT REPORTER:  There is a problem with the

18   sound system.

19           THE CLERK:  I am trying to reboot it.

20           THE COURT:  I think we should take a break to make

21   these adjustments.

22           The jury can step out.

23       (A brief recess was taken at 2:17 p.m.)

24       (A change in court reporters was had.)F

25

Zetzl - cross by Allan
911

1          (Proceedings heard in open court.  Jury in.)

2               THE COURT:  The witness may retake the stand.

3               THE CLERK:  This court resumes in session.  Please be

4     seated and come to order.

5               THE COURT:  Counsel, some of this may not have been

6     picked up, so if you want to go back three or four questions,

7     you certainly may do that.

8               MR. ALLAN:  Just, I'll go one question back, your

9     Honor.

10    BY MR. ALLAN:

11    Q.  Mr. Zetzl, VOX has been around a long time, correct?

12    A.  Yes, that's correct.

13              MR. ALLAN:  I'd like to hand you DTX 4349 if I could.

14              If we may approach, your Honor.

15              THE COURT:  Yes.

16    BY MR. ALLAN:

17    Q.  Now, Mr. Zetzl, I've handed you a Motorola patent from

18    1988.  Do you see this?

19    A.  I do.

20              MR. ALLAN:  And I'd offer to move it into evidence,

21    please, your Honor.

22              MR. SIMMONS:  No objection.

23              THE COURT:  It is received and may be published.

24         (Defendant's Exhibit 4349 received in evidence.)

25    BY MR. ALLAN:

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 155 of 217 PageID #:52791
Zetzl - cross by Allan
912

1    Q.  Again, the date of this patent is June 14, 1988, assigned

2    to Motorola.  And the title of this patent is, "VOX remote

3    unit control in a cellular system."  Do you see that,

4    Mr. Zetzl?

5    A.  I do see that.

6    Q.  Now, is VOX a valuable feature, in your view?

7    A.  I think for a segment of our users, it's very valuable.

8    Again, you have people that need to work with their hands,

9    right, on the portable units and I think on the mobile units

10   as well.  It allows them to meet the requirements for

11   hands-free operation in the vehicle.  So a lot of times,

12   you'll see in a vehicular setting that they have a microphone

13   on the visor of the vehicle, right, to pick up the VOX that

14   again allows them to use that.

15               MR. ALLAN:  Okay.  Let me hand you Exhibit 4971.

16               May we approach, your Honor?

17               THE COURT:  Yes.

18   BY MR. ALLAN:

19   Q.  Now, Mr. Zetzl, this is an email chain.  You'll see your

20   name at the top of the document in the "to" line.

21   A.  Yes, I see that.

22   Q.  This is actually a chain, as I mentioned.  I want to take

23   you back to sort of the last page, Page 5 of 5.

24   A.  Okay.

25   Q.  Actually, if we can just go back to Page 4 of 5, just

Zetzl - cross by Allan

913

1    orient you to the date.  This is an email that you sent on

2    June 29 of 2007.

3    A.  Okay.  I see that.

4    Q.  All right.  And then in the end at the last page, Page 5

5    of 5, I want to direct you to the last paragraph.

6    A.  Okay.

7    Q.  And you say, "In the end" --

8            MR. ALLAN:  I'm sorry.  I don't think I've moved this

9    into evidence, your Honor, if I may.

10           THE COURT:  It is received.  It may be published.

11       (Defendant's Exhibit 4971 received in evidence.)

12   BY MR. ALLAN:

13   Q.  So again, just to orient you on the date of the email

14   we're referencing, June 29, 2007, from yourself to a number of

15   folks.  And then on the last page, 5 of 5, you say:

16           "In the end, this is a business team decision, but

17        given the current backlog of feature requests for Matrix

18        and the lack of customer requests for VOX support since

19        Matrix launched, I think we need to careful consider the

20        amount of effort we spend on providing a VOX solution."

21           Do you see that, sir?

22   A.  I do, yeah, this timeframe being shortly after the product

23   launch itself.

24   Q.  Right.  And during this timeframe, you're essentially

25   questioning whether there's enough value to invest in the VOX

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 157 of 217 PageID #:52793
Zetzl - cross by Allan
914

1    feature in Matrix, correct?

2    A.  No, that's not correct.  What I'm saying here is that

3    we've got a demand of features that we need to work on, and

4    we're just trying to prioritize what order that we do them in.

5    And so because this is shortly after the product launch, we've

6    got a funnel of features that we need to get through for -- to

7    gain market traction.

8         And I'm simply saying, you know, how much do we want

9    to invest in VOX at this time before it's really starting to

10   get uptake in the market versus, hey, we've got all these

11   other features.  And I'm deferring to the business team

12   saying, hey, they've got to make a priority call based on, you

13   know, how much demand they think in the marketplace there is

14   for the various features and how much revenue is essentially

15   tied to it.

16   Q.  But you're noting in the email, Mr. Zetzl, that there were

17   a lack of customer requests for VOX which is why VOX sort of

18   moved down the totem pole in order of relevance for you,

19   correct?

20   A.  That's correct.  Again, I think normally when we launch a

21   product, the uptake doesn't spike right away.  It's something

22   that people try for a little bit, and then that's when they'll

23   start to invest in larger fleet purchases of it.  So at this

24   time, it wouldn't surprise me that there wasn't a lot of

25   demand for VOX because it was just starting its journey in the

Zetzl - cross by Allan

915

1   marketplace.

2   Q.  Well, we just covered, it's been around for a long time,

3   right?

4   A.  VOX as a feature has, but MOTOTRBO as a specific radio

5   family was just launching in this timeframe.

6   Q.  So VOX as a feature was well-known --

7   A.  Yes.

8   Q.  -- yes?  Been around for a long time?

9   A.  Agreed.

10  Q.  Been along in analog -- been around in Motorola's analog

11  products?

12  A.  That's correct.

13  Q.  And not everything that are in the VOX documents that you

14  pointed out are trade secrets, are they?

15  A.  No.  I think everything in our documents are trade secrets

16  until such time as we deem them to not be trade secrets.

17  Q.  So every single thing that's in your document, in any of

18  those documents whether it's public or not, your position is

19  that's a trade secret?

20  A.  So again, you know, until such time as we decide that

21  we're going to not make it a trade secret, then it would be a

22  trade secret.  You threw in the world "public" there, so

23  obviously, if it's been publicly disclosed, at that point it

24  is no longer a trade secret.

25  Q.  Even -- even if it comes from the public initially and

Zetzl - cross by Allan

916

1    makes its way into your document, Motorola claims that that's

2    a trade secret because everything in the document is a trade

3    secret, right?

4    A.   So again, what's included in our documentation today is

5    how -- what our approach was for integrating those.  So if --

6    do you have a specific example you'd like to cite?

7    Q.   Well, what I'm struggling with, Mr. Zetzl, is you say that

8    VOX has been around for a long time.  You're not claiming the

9    general concept of a VOX.  You're claiming Motorola's specific

10   way of doing the VOX.  Then you point to these documents.

11          But how are we to know what part of those documents

12   talk about your specific way to do VOX?

13   A.   Again, I'm representing that all of those documents are

14   important for how we do VOX, right.  It's our architecture.

15   It's our requirements.  It's our specification.  It describes

16   how the software actually works inside our radio.

17          VOX has been around for a long time.  And I know I

18   touched on this point before, but the legacy implementations

19   are all done in hardware.  This is a software implementation

20   of the VOX feature.

21   Q.   Let's talk about protocol stack.  That was another one of

22   the trade secrets you mentioned.

23   A.   Okay.

24   Q.   I wrote down that you said DMR protocol stack is not

25   dictated by ETSI.  Did I get that right?

Zetzl - cross by Allan

917

1  A.   That's correct.  It doesn't dictate how you implement the

2  protocol stack.

3  Q.   Now, there are dozens of DMR manufacturers on the market,

4  right?

5  A.   There's a large number of DMR manufacturers, that's

6  correct.

7  Q.   And they each have to subscribe to the ETSI standard,

8  correct?

9  A.   So there's a DMR Manufacturers Association that you would

10  typically join because that gives you the standard's essential

11  patents that you need to license in order to sell the product

12  and then again, obviously, you need to adhere to the actual

13  ETSI standard as well.

14  Q.   Right.  The ETSI standard's been described so far as sort

15  of a language, if you will.  And if radios want to be able to

16  talk to each other on the standard, they have to be able to

17  speak the same language.  Would that be a fair

18  characterization?

19  A.   Yes.  It describes the protocol itself and the messages

20  that need to be sent and received, but it doesn't necessarily

21  describe how you go about doing that.

22  Q.   So every DMR manufacturer -- well, let me back up.  Every

23  manufacturer that makes a DMR radio has to have its radio be

24  able to speak that ETSI language, right?

25  A.   Presumably, if they would want interoperability with other

Zetzl - cross by Allan

1    manufacturers, yes, they would need to adhere to the DMR

2    standard.

3    Q.  And so every manufacturer that makes a DMR radio has a

4    protocol stack so that there can be a -- they can use the ETSI

5    standard, right?

6    A.  Yes.  And that embodiment could be in hardware.  It could

7    be in software.  There are chips at manufacturers that create

8    hardware versions of the protocol stack.  The approach that we

9    took was to develop the protocol stack in software.

10   Q.  So I think you just answered my next question.  You can

11   buy a protocol stack from a third party manufacturer, right?

12   A.  Yes.  There's, Etherstack makes a software version of the

13   DMR stack.  And there are chips at manufacturers that create

14   hardware implementations.  And it's kind of where I had

15   highlighted that one of the very first things in architecture

16   that we have to decide is what are we going to do in hardware

17   and what are we going to do in software.

18   Q.  So let me show you one of the documents that was put into

19   evidence in your direct examination, PTX 328.

20   A.  Okay.

21   Q.  All right.  So Motorola claims that this document is --

22   contains something about Motorola's protocol stack trade

23   secret, correct?

24   A.  It does, yes.

25   Q.  Could we turn to Page 32, please?

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 162 of 217 PageID #:52798
Zetzl - cross by Allan
919

1      Now, this slide, Mr. Zetzl, at the top reads, "ETSI

2   standardization."  Do you see that?

3   A.  Yes, I see that.

4   Q.  And again, ETSI is the board that manages and maintains

5   the DMR standard that all DMR radio manufacturers must adhere

6   to?

7   A.  It's the standards body, yes.

8   Q.  If we look down, I guess one, two, three, four, five, six,

9   seven -- eight, "Current Matrix relevant ETSI standards," that

10  bullet, do you see that?

11  A.  I see that, yes.

12  Q.  And then it references Version 1.1.1 approved April 2005.

13  A.  I see that.

14  Q.  Do you see that as well?

15      Now, let's flip over to, if we could just highlight

16  that real quick, Jim, V1 -- yes.

17      Let's go to Page 2 of this document, Mr. Zetzl.

18  There's an image I'd like to show you.  You've seen this

19  before, Mr. Zetzl?

20  A.  Yes, I'm familiar with this.  This is showing basically

21  what the burst looks like within the over-the-air protocol.

22  Q.  And this, because it's part of this document, Motorola

23  claims this is part of its trade secret, correct?

24  A.  So again, this is a portion of how the protocol works,

25  right.  It's distilled from the ETSI standard.  This is a

Zetzl - cross by Allan

920

1    Motorola work product, and we do consider this to be a portion

2    of our trade secret.  There's other, you know, there's --

3    again, this is, yes, we would say that because it's included

4    in this presentation and we've distilled this information out

5    for training to our engineers, that's part of it.

6              MR. ALLAN:  Let's take a look at, I'm going to hand

7    you DTX 3556.

8              If we may approach, your Honor?

9              THE COURT:  Yes.

10             THE WITNESS:  Thank you.

11   BY MR. ALLAN:

12   Q.  Are you familiar with this document, Mr. Zetzl, as the

13   April 2005 Version 1.1.1 SE standard?

14   A.  You know, based on the -- it's been a while since I've

15   looked at the protocol spec but yes, it appears based on the

16   cover sheet that that's what it is.

17             MR. ALLAN:  I'd offer this into evidence, your Honor.

18             THE COURT:  It is received and may be published.

19        (Defendant's Exhibit 3556 received in evidence.)

20   BY MR. ALLAN:

21   Q.  So this is the ETSI DMR standard again, April 2005, the

22   same version we just talked to -- talked about, Version 1.1.1.

23   I'd like to turn to Page 18 of the ETSI standard, DTX 3556.

24   A.  Sure.

25   Q.  And we've got it -- Jim is one step ahead of me.  We've

Zetzl - cross by Allan

921

1    got them side by side.

2         The image here at the bottom of Page 18 in Figure 4.5

3    of the standard is the same image that's in Motorola's PTX 328

4    that it contends is a trade secret; is that correct?

5    A.   So again, the document that we created is a training

6    presentation.  It is referencing -- obviously, it's a training

7    on the standard itself, and so there are going to be overlaps

8    between the standard and the training presentation.  But the

9    content in the training presentation, the order that it's in,

10   some of the other aspects of the training presentation

11   actually go into things in terms of how we want to handle

12   aspects of the standard.  That's why we consider that document

13   to be trade secret.

14   Q.   And again, it's in the Motorola documentation because

15   Motorola has to follow the standard in order to have a DMR

16   radio, yes?

17   A.   All the DMR manufacturers would adhere to the standard,

18   presumably, to be interoperable.

19   Q.   Everybody?

20   A.   Correct.

21   Q.   Let's take a look at Page 25 of PTX 328.  We can get rid

22   of both of those, if we could.  So we'll go back to the

23   Motorola alleged trade secret document, PTX 328, Page 25,

24   please.

25        And this, the title of this slide is "Data

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 165 of 217 PageID #:52801
Zetzl - cross by Allan
922

1    transmissions." Do you see that, Mr. Zetzl?

2    A.   I do.

3    Q.   And at the bottom, there's three separate images, do you

4    see that:  "Unconfirmed header, confirmed header, and response

5    header"?

6    A.   I do see that, yes.

7    Q.   Now, let's take a look back at the ETSI standard, DTX 3556

8    on Page 66.  Those images come out of the standard again,

9    don't they, Mr. Zetzl?

10   A.   Again, yes.  This is a training presentation on the actual

11   standard, and so there's text from the standard as to outline

12   the aspects that the training presentation is covering.  I do

13   see that, yes.

14   Q.   And if we go back to the cover page of PTX 328, just to

15   orient you to the date, this is dated December 8, 2005,

16   correct?

17   A.   Yes, it is.

18   Q.   And the standard document we just looked at was in April

19   of 2005, so this document that pulls information from the ETSI

20   standard came after the ETSI standard?

21   A.   It came after this version of the standard was published,

22   you know, kind of as outlined in the prior slide where we said

23   this is the version at this time MOTOTRBO was compliant with.

24   Q.   Let's talk a little bit about XCMP.

25   A.   Okay.

Zetzl - cross by Allan

923

1  Q.   So XCMP routes information between a radio and an

2  accessory; is that fair?

3  A.   That's one of the functions it can perform.  It can route

4  information between a radio, an option board.  There's -- it

5  provides really a mechanism for connecting point to point or

6  point to multipoint.

7  Q.   So if I've got a radio on my hip and I want to have a fist

8  microphone, the fist microphone knowing how -- it needs to use

9  XCMP to be able to work with a Motorola radio, correct?

10 A.   Not necessarily.  There's an interface for that particular

11 thing that we refer to as the global core accessory interface.

12 It could use XCMP if it's what we refer to as a smart

13 accessory, or it could just be an electrical interface if it's

14 just a very simple microphone, speaker type of accessory.

15 Q.   The concept of attaching some sort of an accessory to a

16 radio is not unique to Motorola, right?

17 A.   No.  We're not claiming the concept of attaching an

18 accessory to a radio.  I think that's been around for a while.

19 I think what we're talking about is how XCMP actually

20 communicates and can control a radio.

21 Q.   Motorola makes accessories for its radios, yes?

22 A.   Yes, we do.

23 Q.   And third parties do as well?

24 A.   That's also correct.

25 Q.   And Motorola competitors, to your knowledge, also make

1   accessories for their radios?

2   A.  Yes.  I believe our -- most of our competitors have some

3   level of accessory support.

4   Q.  And some of those competitor accessories may be made by

5   the competitors themselves or they may have third party make

6   them -- third parties make them as well?

7   A.  Yes.  There's third party accessory vendors that make

8   accessories for a variety of radio manufacturers.

9   Q.  Now, Motorola has an entire program devoted toward

10   allowing third party manufacturers to make these accessories,

11   right?

12   A.  So yeah, we have an accessory program.  And --

13   Q.  It's called ADP?

14   A.  So ADP is a little bit different.  Those are our

15   application development partners.  So they would be creating

16   applications and not necessarily physical accessories that

17   people would use, so like a text messaging application, a work

18   ticketing application, a mapping application, those types of

19   solutions typically.

20   Q.  Those would be third party solutions as well --

21   A.  That's correct.

22   Q.  -- that might use XCMP?

23   A.  Yes.  That would be an approach that they could take to

24   get that information.

25   Q.  And there are around 300 companies that are part of that

Zetzl - cross by Allan

925

1    program right now for Motorola, correct?

2    A.   You know, sitting here today, I can't tell you exactly how

3    many.  I know that, you know, there's many.

4    Q.   If Dale Rublaitus -- do you know Dale Rublaitus?

5    A.   I know Dale, yes.

6    Q.   If Dale testified that it was about 300, would you have a

7    reason to disagree with him?

8    A.   No, I wouldn't.  I just -- I don't specifically have a

9    number in my mind other than knowing that it's many so...

10   Q.   Now, Motorola's got to give those application partners

11   information about its system so that they can develop

12   applications or accessories or whatever they're making to be

13   able to work with Motorola radios, right?

14   A.   And so there's a licensing process that we go through with

15   the application developer partner.  So we enter into a

16   nondisclosure agreement with them.  And there's other vetting

17   processes that happen there.

18        And ultimately, provided that we make it through that

19   entire process, we would provide them what we'd refer to as an

20   XNL key, and that's what allows them to actually connect to

21   the radio.  And based on the XNL key, that also allows us to

22   know what XCMP commands they're allowed to send to the radio

23   and which ones are restricted.

24   Q.   And that, you mentioned it was a licensing program, but

25   there's no charge for that licensing program, right?  Motorola

Zetzl - cross by Allan

926

1   wants these third parties to develop accessories and

2   applications for its radios?

3   A.   Yeah.  I don't know the specific structure around the

4   program but yes, we would like to have people creating

5   value-added applications.  We recognize that we can't create

6   every application for every customer need, and so these

7   partners help kind of fill in the rest of that ecosystem.

8   Q.   And Motorola's got to give these 300 or so companies that

9   engage in this program information about XCMP so that the

10  applications and other things that connect with the radio will

11  work, right?

12  A.   So again, you know, we license them the use of XCMP

13  commands with a nondisclosure agreement, but yes, they need to

14  be aware based on the type of application that they're

15  creating.  So that's where we have a discussion with them and

16  say, "Well, what are you trying to build?  Okay, here's the

17  commands that will be of use to you."

18  Q.   So that was a "yes"?

19  A.   Yes.  I guess when you use the word "give," all I'm saying

20  is that it's licensed, right, and it's through a nondisclosure

21  agreement such that it's not disclosed.

22  Q.   Mr. Zetzl, I'd like to hand you Exhibit 5286, DTX 5286.

23       Mr. Zetzl, this is a U.S. Patent No. 8,855,054.  And

24  it's assigned to a company called Teldio.  Do you see that?

25  A.   I do see this, yes.

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 170 of 217 PageID #:52806
Zetzl - cross by Allan
927

1    MR. ALLAN:  I'd offer this into evidence, please,

2  your Honor.

3    MR. SIMMONS:  No objection.

4    THE COURT:  It is received and may be published.

5    (Defendant's Exhibit 5286 received in evidence.)

6  BY MR. ALLAN:

7  Q.  And the title here is "Two-way radio-based unified

8  communication system."  Do you see that?

9  A.  Yes, I see that.

10 Q.  Now, I'd like to direct your attention, Mr. Zetzl, to Page

11 11 of 20; in particular, the bottom half of Column 3 starting

12 around Page -- Line 48 or so.  Are you with me?

13 A.  Yes, I can see that.

14 Q.  Now, it reads:

15    "In one exemplary embodiment, each radio incorporates

16    a MOTOTRBO option board manufactured by Motorola or by a

17    third party to Motorola specifications.  Option boards

18    within each radio communicate with the main circuitry of

19    the radio using extended command and management

20    protocol," and then in parens, "XCMP."

21    Do you see that?

22 A.  I see that, yes.

23 Q.  "Control and data messages encapsulated within XCMP

24 network layer."  Do you see all that?

25 A.  I do see that, yes.

Zetzl - cross by Allan

928

1   Q.  I want to drop down to, it looks like beginning at Line

2   59.  It says, "Additional details of the XCMP protocol may be

3   found in publicly available documents such as," and then it

4   goes to list a number of different documents.  Do you see

5   that?

6   A.  Yes, I see that.

7   Q.  And this patent, talking about XCMP and the XEM protocol

8   and where you might find XCMP protocol information in public

9   documents isn't even a Motorola patent, is it?

10  A.  No.  Teldio is one of our application developer partners

11  but again, there's really no detailed XCMP provided here.

12  It's just mentioning a name.

13  Q.  So this is from one of the 300 or so companies that makes

14  product for Motorola radios that gets access to XCMP?

15  A.  This is a licensed ADP partner of -- on our MOTOTRBO

16  program.  They have different applications that they support.

17  Q.  Let's turn to the connectivity trade secret.

18  A.  Okay.

19  Q.  Now, when I took your deposition this summer, you were not

20  the Motorola corporate designee on connectivity; is that

21  right?

22  A.  That is correct.

23  Q.  And that was a gentleman named Mr. Jack Wong, right?

24  A.  That's correct.

25  Q.  And you know Mr. Wong?

Zetzl - cross by Allan

929

1  A.  I do know Mr. Wong, yes.

2  Q.  Motorola uses third party code as part of its

3  connectivity, what it's claiming as its connectivity trade

4  secret, right?

5  A.  That is correct, yeah.  We support the USB soft connect

6  stack, so the USB stack, and then the TCP/IP stack is from a

7  company called U.S. Net.

8  Q.  So those were some of the -- you hit my next two

9  questions, Mr. Zetzl.  Those were a couple of the points that

10  you had on your connectivity slide.  You mentioned in there

11  USB stack, that's made by a third party, right?

12  A.  That's correct.  We entered into a software license

13  distribution agreement with them and included their software

14  and in our software.

15  Q.  And the TCP/IP stack, that comes from U.S. Net?

16  A.  That's correct.  That's the company, again, we've entered

17  into a software license distribution agreement with them, and

18  that's the code that we've included in our firmware as well.

19  Q.  And RNDS, that's another third party application?

20  A.  So RNDS is a specification by Microsoft.  The actual

21  implementation of the RNDS protocol is Motorola-specific, so

22  we developed that code ourself.

23  Q.  But the RNDS protocol is a Microsoft specification

24  protocol?

25  A.  Correct.  Microsoft specifies how RNDS works, and it's

1  really when you plug the radio into a computer, how it shows

2  up in Windows as a device is, Microsoft tells you how you need

3  to do that.  So we adhere to their specification.

4  Q.  Let's turn to PTX 1260, which I believe was admitted.  I

5  can pull it up, or you're welcome to find it in the binder.

6  A.  Okay.  It's right here.

7  Q.  In particular, this is one of the documents that you

8  testified about --

9  A.  Okay.

10 Q.  -- on direct?  Yes?

11 A.  Yes.

12 Q.  So I'd like to direct your attention to Page 21.

13 Specifically, there's a Section 2.2.2.2.1.

14 A.  Okay.

15 Q.  That says, "Reuse analysis."

16 A.  Okay.

17 Q.  And the second bullet says, "The connectivity stack can be

18 bought off the shelf together with commercial OS" -- which

19 means operating system, right?

20 A.  Yes.  The operating system running on it.

21 Q.  "At extra cost."  Do you see that?

22 A.  I see that, yes.

23 Q.  Now, let's turn to another document you looked at on your

24 direct.  I think it's the big one, PTX 1270.

25 A.  Okay.

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 174 of 217 PageID #:52810
Zetzl - cross by Allan
931

1   Q.  I'll try to make it easy for you and pull it up on the

2   screen if you'd like.

3   A.  Thank you.  Yes, I appreciate that.

4   Q.  So this is an admitted exhibit, and the cover page of the

5   document indicates that this is from May 2015; is that right?

6   A.  That's correct.

7   Q.  And May 2015 is about seven years after G.S. Kok, Sam

8   Chia, and Y.T. Kok left Motorola, right?

9   A.  Yeah.  I don't know the specific date but if that's what

10  you're attesting to --

11  Q.  Well, you understand they left long before 2015?

12  A.  Correct, yes.  In terms of the number of years, that

13  sounds...

14  Q.  And they couldn't have accessed this document before

15  they -- before they left because it wasn't created, right?

16  A.  Yeah.  I don't know how the documentation moved from

17  Hytera to Motorola but clearly, they were no longer at

18  Motorola at that time.

19  Q.  Now, you understand that there are descriptions of what

20  Motorola claims is its trade secrets that were provided in the

21  case, correct?

22  A.  Yes.  I understand that we provided a response to you on

23  the trade secret description.

24  Q.  And you've reviewed those descriptions in connection with

25  your deposition?

Zetzl - cross by Allan

1   A.   Correct.  And then I reviewed the one for connectivity

2   that Mr. Wong had represented ahead of today.

3   Q.   And Mr. Corretjer just testified.  He testified that those

4   descriptions didn't exist back in 2008; they were prepared for

5   the litigation, correct?

6   A.   That's correct.  And my understanding is that those were

7   again to try to frame up the alleged infringement.

8   Q.   And so you've reviewed the description for what we'll call

9   trade secret 79 which is what we referred to in discovery, in

10  the discovery period, that's connectivity, correct?

11  A.   Yeah.  I don't specifically remember the number but 79 --

12  if 79 is connectivity, yes, I've reviewed the response on 79.

13  Q.   And are you aware that Mr. Wong testified about the

14  description of the trade secret?

15  A.   I did read Mr. Wong's deposition transcript around that

16  portion of the trade secret.  So yes, I have read his

17  deposition transcript.

18  Q.   It's your understanding that he testified that Kirkland &

19  Ellis prepared those descriptions?

20  A.   Yeah, I believe that that was -- that's what he said.

21  Q.   And that's consistent with your understanding, right?

22  A.   So, yeah.  My understanding is that, you know, we spoke

23  with Kirkland & Ellis.  I believe that they're the ones that

24  actually did the writeup, but Motorola definitely participated

25  in phone calls and other things with them to help write -- to

Zetzl - cross by Allan

933

1    prepare, I guess, their understanding of the trade secret.

2    Q.   But you have no reason to disagree with Mr. Wong's

3    testimony that Kirkland & Ellis prepared the description?

4    A.   I believe the final writeup was written up by the lawyers,

5    yeah.

6    Q.   Now, the XCMP that we talked about is part of the -- what

7    Motorola is claiming as the connectivity trade secret,

8    correct?

9    A.   Only the XCMP handler portion, so essentially the portion

10   that forwards the XCMP packet to XCMP.

11   Q.   So your testimony is that only part of the XCMP fits

12   within the connectivity trade secret?

13   A.   Yeah.  My testimony is that only this -- only the portion

14   that receives the packet and forwards it to XCMP is part of

15   the connectivity trade secret.  The rest of it starting at XNL

16   and up is part of the XCMP trade secret.

17   Q.   And again, Mr. Wong was the corporate designee on the

18   connectivity trade secret.  You just testified you're familiar

19   with his deposition testimony on that?

20   A.   I did read his deposition testimony, yes.

21   Q.   And he was asked, is the XCMP --

22            MR. SIMMONS:  Objection, your Honor.

23            THE COURT:  Sustained.

24   BY MR. ALLAN:

25   Q.   Do you have any reason to doubt Mr. --

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 177 of 217 PageID #:52813
Zetzl - cross by Allan
934

1          THE COURT:  Sustained.

2     BY MR. ALLAN:

3     Q.   Let's talk about trade secret 50 and 67.

4     A.   Okay.

5     Q.   And that's Motorola's applications and the Darwin core you

6     testified about.

7     A.   That's correct.

8     Q.   And those two Motorola alleged trade secrets overlap to

9     some degree, correct?

10    A.   Yeah.  There's a portion of the applications that have to

11    register with the ergonomics engine, so the portion where the

12    applications are registering with the ergonomics engine is

13    overlapping between the two.

14    Q.   And you noticed that overlap while you were preparing for

15    your deposition, correct?

16    A.   Yeah, I noticed it.

17    Q.   And you thought it was a little strange?

18    A.   You know, I think during the deposition itself, it took me

19    a moment to reorient myself on the difference between the two

20    trade secrets but ultimately, yeah, I realized, okay, this is

21    just essentially the applications registering with the

22    ergonomics engine.

23    Q.   Well, in fact, even preparing for your deposition you

24    thought it was strange, and you asked your lawyers about it?

25    A.   Yeah, I don't know if I would say "strange," but I did ask

Zetzl - cross by Allan

935

1  and say, hey, I see that we're citing source code, right, for

2  the applications here in the Darwin Core and then I was, like,

3  oh, okay, wait a minute.  I get it.  It's because the

4  applications have to register with the ergonomic engine, and

5  that registration portion is within the application.

6  Q.  You wanted to make sure, though, that that was an

7  intentional overlap?

8  A.  Yeah.  I just wanted to understand why it was being cited

9  in two different places and it was like, okay, I get it.

10 Either the same source file has the code that registers with

11 the ergonomic engine as well as the actual application code.

12 Q.  And you didn't -- you didn't ask any of the engineers who

13 worked on these trade secrets, right?  You went to the lawyers

14 to ask if the overlap was intentional?

15 A.  That is correct, yeah.

16 Q.  Because your lawyers wrote the descriptions?

17 A.  Again, so the -- when I noticed it, I was meeting with the

18 lawyers.  They were there but, you know, ultimately, my

19 understanding is, while we spoke to the lawyers, they wrote

20 the final draft of the interrogatory response that he sent

21 back to you.

22 Q.  So the -- let's talk about Darwin Core.  I think you -- if

23 I wrote this correctly, on your direct examination, you

24 likened Darwin Core to the traffic cop?

25 A.  Yes, that's correct.

Zetzl - cross by Allan

936

1    Q.   And that was your demonstrative with the traffic cop on

2    the slide?

3    A.   That's correct, yes.

4    Q.   Now, other systems have application frameworks like

5    Motorola's application framework, right?

6    A.   Yes.  I don't know that anybody else has an application

7    framework quite like ours.  I'm aware that application

8    frameworks exist on other devices, but as to how it would

9    compare to ours, you know, it would be conjecture on my part.

10   Q.   Application frameworks are not unique to Motorola?

11   A.   Correct.  And again, we're not claiming the concept of

12   application framework is at issue here.  We're saying that our

13   specific implementation of an application framework as it

14   relates to our product.

15   Q.   And so the concept of having inputs received by the radio

16   and figuring out what to do with those inputs, that's --

17   again, that's not anything unique to Motorola?

18   A.   I think it's the approach that we've taken, right.  So,

19   for example, we have the UIQ, right, which buffers up inputs.

20   We have XLATE which translates it from a physical input to a

21   logical input.  It's just the way that we route it through the

22   approach that would be taken to segment our applications in

23   our ergonomics engine, I think, is unique, right.

24   Q.   But the concept of queueing messages and routing them to

25   where they need to go, that is a -- is not unique to Motorola?

Zetzl - cross by Allan

937

A.  I agree, you know, that that is something that's known in
the industry, but the approach that we've taken for how we're
doing it on our products, that is what is our trade secret.

Q.  Now, on direct, you -- on your direct examination,
Mr. Zetzl, you testified that you supplied some information in
connection with Motorola's applications to register
copyrights.

A.  That is correct.

Q.  I'd like to hand you DTX 4482, if I may.

        Now, Mr. Zetzl, this is an email chain that you're on
with some other folks at Motorola with the subject of "Help on
software copyright disclosure form."  Do you see that?

A.  I do see that.

        MR. ALLAN:  I'd offer this into evidence, your Honor.

        MR. SIMMONS:  No objection.

        THE COURT:  It is received.  It may be published.

     (Defendant's Exhibit 4482 received in evidence.)

BY MR. ALLAN:

Q.  Now, let's start at the first email.  There's two emails.
Let's start with the first in the chain, the one dated October
25, 2011, from Meng Tuck Chong.

A.  Yes.

Q.  That's Mr. Chong?

A.  That's Mr. Chong.

Q.  Mr. Chong.  Okay.  And Mr. Chong sends you and a couple of

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 181 of 217 PageID #:52817
Zetzl - cross by Allan
938

1   other folks an email, Steve Engel and Rob Pienkowski, if I

2   pronounced his name correctly?

3   A.  Yeah, you have.

4   Q.  And he says, "Hi, folks.  I am filling up the copyright

5   disclosure form for M3 but I'm finding it a bit difficult.  Do

6   you know anyone who have fill in before and could help with a

7   sample and some questions?"

8           So he's looking for some information about help with

9   the copyright registrations?

10  A.  That's correct.

11  Q.  And he says, "In particular, do we file as a new SW" --

12  software?

13  A.  Yeah.

14  Q.  -- "or changed version of work?  I would expect changed

15  version since we are based on Matrix."  And, of course, Matrix

16  is the code name for DMR.

17  A.  For MOTOTRBO.

18  Q.  MOTOTRBO.

19          Then he says in the second point, "We are suppose to

20  send the first 25 pages and the last 25 pages without trade

21  secret portions.  Any idea which code to select and send?"

22  And then he has a question mark, and then after that in

23  parenthesis, "More for Dan."

24          Do you see that?

25  A.  I do see that, yes.

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 182 of 217 PageID #:52818
Zetzl - cross by Allan
939

1  Q.  And that, you understood that to be, that question was

2  directed more to you than the other two people?

3  A.  That's -- that was how I interpreted it.

4  Q.  And then if we move up, we see what is your response.  And

5  you say, "Hi, Tuck.  For question two" -- again, he's directed

6  you to look at two, and here's your response on two, right?

7  A.  That's correct.

8  Q.  And you say, "Here are some areas that do not contain any

9  proprietary information."  Do you see that?

10 A.  I do see that.

11 Q.  And specifically on two, he's telling you that, "we're

12 supposed to send the first 25 and last 25 without trade secret

13 portions."  Do you see that?

14 A.  Yes, I see that.

15 Q.  And you know why that is, because the deposit copy will

16 become part of the public record, right?

17 A.  That is correct, once it's at the copyright office, yes.

18 Q.  And if a deposit copy becomes part of the public record,

19 whatever was in there that is a trade secret ceases to be

20 secret, right?

21 A.  For that portion of the source code, it would but, I mean,

22 the trade secret is much broader than that, right.  It's the

23 architecture, the design, the requirements, the

24 specifications.  And again, you know, 25 pages out of --

25 Q.  I just asked you a simple question, Mr. Zetzl.

Zetzl - cross by Allan

940

1   A.   Sure.  Okay.

2   Q.   So for question number two, you begin to answer:  "Here

3   are some areas that do not contain any proprietary

4   information."  First you say, "OSAL."  Do you see that?  And

5   then below that, "Generic ergo code," and in paren, "Darwin

6   Core, menu, etcetera."  Do you see that?

7   A.   Yes.

8   Q.   And you've capitalized Darwin Core, capital D, capital C,

9   correct?

10  A.   I did, yes.

11  Q.   So you're telling Mr. Chong in this email, he's asking you

12  specifically, "What can we send to the copyright office that

13  won't have trade secret portions," and you tell him, among

14  other things, Darwin Core, correct?

15  A.   So what I was going for here is, here's areas that you can

16  go look for stuff that doesn't contain proprietary

17  information.  You know, I wouldn't say that -- the wording of

18  my email could have been better, but really what I was

19  directing him to things like the menu is portions of the code

20  that would be usable -- user observable just by purchasing the

21  product.

22         So obviously, people could scroll through the menu.

23  They could see it.  So that would be containing code that

24  would be less proprietary, right.  And then I followed on, on

25  that last line to say, "definitely avoid releasing signaling,

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 184 of 217 PageID #:52820
Zetzl - cross by Allan
941

1    ergo with signaling rules, behavior, Hal, connectivity, and

2    the DSP."

3              And so what I'm trying to do at the top of the email

4    is direct him towards portions of the source code that I

5    believe, hey, here's good places to look to find 25 pages

6    because these are areas that are relatively large, and you

7    should be able to find 25 pages in here somewhere that would

8    be of lesser concern.  But, I mean, all of our code --

9    Q.  Well, it's 50 pages, right?

10   A.  50 total.

11   Q.  It's 25 at the beginning --

12   A.  25 at the front and 25 at the back, that's correct.

13   Q.  And you direct him to Darwin Core which you testified on

14   direct was the traffic cop which was on the screen that you

15   showed the jury to explain the ergonomic layer tracing?

16   A.  I'm directing him towards Darwin Core in general, right,

17   which includes -- again, and I'm directing him to something

18   like the menu application of Darwin, right, where it would be

19   publicly visible on the radio such that, okay, if somebody

20   scrolls through the menu, they're going to see the menu

21   choices anyway and so --

22   Q.  Well, Mr. Zetzl --

23   A.  -- that was the intent of my email.

24   Q.  There's nothing limiting what you're directing him to

25   here.  You say Darwin Core, capital D, capital C, correct?

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 185 of 217 PageID #:52821
Zetzl - cross by Allan
942

1   A.  I do see that, yes.

2   Q.  Okay.

3   A.  And again, you know, Darwin Core and the apps as a whole,

4   right, that's probably thousands of source code pages, right.

5   So what I'm saying is go look in this area and find 25 pages

6   that don't contain proprietary information.

7   Q.  Again, I -- your email doesn't have any of those

8   limitations, Mr. Zetzl.  Your email doesn't have any

9   directives to tell Mr. Chong, "Go through Darwin Core and pick

10  out 25 that are good that don't have any trade secrets."

11          It says Darwin Core doesn't have any proprietary

12  information, correct?  That's what the email says?  That's

13  what you wrote back in 2011?

14  A.  So counselor, what I said was, here are some areas to go

15  look, right.

16  Q.  No, you don't say that.  You say --

17  A.  It says there are --

18  Q.  -- here are some areas that do not contain any proprietary

19  information:  Darwin Core.  That's what the email says,

20  Mr. Zetzl, doesn't it?

21  A.  So, yes, correct, I understand --

22  Q.  Thank you.

23  A.  -- what you're saying, but it's not intended to be

24  prescriptive, right.  It's intended to be, go look in these

25  areas so...

Zetzl - cross by Allan

943

1    Q.  Well, I don't think it says that, Mr. Zetzl.  I think the

2    document speaks for itself.

3           I want to show you DTX 4480.

4           MR. ALLAN:  May we approach, your Honor?

5           THE COURT:  Yes.

6    BY MR. ALLAN:

7    Q.  You mentioned Darrell Stogner in your direct examination?

8    A.  Yes, I did, yes.

9    Q.  This is an email between you and Darrell Stogner in June

10   of 2008.  Do you see that?

11   A.  I do see that, yes.

12          MR. ALLAN:  I'd offer this into evidence, please,

13   your Honor.

14          MR. SIMMONS:  No objection.

15          THE COURT:  It is received and may be published.

16      (Defendant's Exhibit 4480 received in evidence.)

17          THE COURT:  I'd like to just step back for a moment.

18   Who is Mr. Chong?

19          THE WITNESS:  Oh, it's a colleague that I've worked

20   for for a very long time.  At that period of time, he was the

21   software release manager for MOTOTRBO in Penang.

22          THE COURT:  Please proceed.

23   BY MR. ALLAN:

24   Q.  All right.  Mr. Zetzl, you're forwarding an article to

25   Mr. Stogner from June of 2008 about someone accused of taking

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 187 of 217 PageID #:52823
Zetzl - cross by Allan
944

1  information for Motorola.  Do you see that?

2  A.  I do see this, yes.

3  Q.  This was an incident that the jury has heard a little bit

4  about from really the Hanjuan Jin, correct?

5  A.  Yeah.  I don't recall her specific name, but sure.

6  Q.  You can see the name on the second line of the article.

7  A.  It's kind of blown up at this point, so I --

8  Q.  Oh, sorry.

9  A.  Oh, I'm sorry.  I do actually have a copy of it.  Okay.

10  Got it.

11  Q.  And this is an incident you remember?  There was some

12  press on this incident?

13  A.  Yes.  In the Chicagoland area, it definitely made the

14  news.

15  Q.  And I want to direct you to the bottom paragraph starting,

16  "When Jin returned."  Do you see that?

17  A.  Yes, I see that.

18  Q.  It says, "When Jin returned to Motorola from medical leave

19  in February 2007, authorities say, she did just that:

20  Downloading hundreds of confidential documents from the

21  company's supposedly secure internal network."

22          Do you see that?

23  A.  I do see that, yes.

24  Q.  And then you forward this email that was, it looks like it

25  was on the ABC local page, to Mr. Stogner, right?

Zetzl - cross by Allan

945

1   A.   Yes, that's correct.

2   Q.   And so Mr. Stogner was somebody you worked with regularly?

3   A.   Yes.  Yeah, he's located in our Plantation, Florida, site.

4   Q.   And Mr. Stogner's response to learning about this incident

5   at Motorola was, "Yeah, I had seen that.  Classic.  'My boss

6   gave me a lot of work,'" in quotes.  Do you see that?

7   A.   Yes, I do see that.

8   Q.   And his response to this was to make light of the

9   situation and not take it seriously, right?

10  A.   No, I don't think that was the purpose at all.  Later on

11  in that article, the explanation that the lady that was

12  accused of doing this gave was that her boss had given her a

13  lot of work, and so she was taking all the documents with her

14  to be able to do work while she was over in China.  So I think

15  that's what he's highlighting as being hard to believe.

16  Q.   Well, he didn't say it was hard to believe this incident

17  happened; he made a joke about it, right?  I mean, that's --

18  we can agree on that?

19  A.   I think he's, again, pointing out that, you know, this

20  explanation doesn't really seem to be justified given what

21  she's accused of taking, right, so sure.

22  Q.   You discussed the concept of competitive intelligence on

23  your direct examination.

24  A.   I did.

25  Q.   And you understand that Motorola engages in competitive

Zetzl - cross by Allan

946

1   intelligence?

2   A.  We do.

3   Q.  Motorola's got a full department that looks at competitive

4   intelligence?

5   A.  We have a team that does, yeah.

6   Q.  And it wouldn't surprise you to know that there are

7   documents in Motorola's files from Hytera that are labeled

8   "confidential," would it?

9   A.  Yeah, I wouldn't -- I guess I don't say that I would be

10  surprised.  It depends on the -- I would have to see the

11  actual document and understand the nature of it, right.

12  Q.  But you've seen competitive intelligence reports from

13  Motorola, yes?

14  A.  Sure.  I've seen teardowns of radios so that we can

15  determine, you know, how much we believe it cost, who is

16  supplying parts, those kind of things, so typical activities

17  that probably most companies engage in to keep tabs on where

18  they feel like they fit versus the competition.

19  Q.  And you know that Hytera -- or that, strike that, that

20  Motorola has former Hytera people that work at Motorola?

21  A.  I'm not aware of that, no.

22  Q.  No?  You didn't know that Motorola's got somebody they

23  refer to internally as "the Hytera insider"?

24  A.  No, I have not heard that term.

25  Q.  Would that surprise you?

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 190 of 217 PageID #:52826
Zetzl - cross by Allan
947

1    A.  Again, you know, I -- that would not -- I guess, let's put

2    it this way, I'm not aware that that occurred.

3    Q.  But would it surprise you?

4    A.  It wouldn't -- I mean, within the two-way radio industry,

5    yes, people move between companies.  So it's a relatively

6    small pool of companies that develop radio equipment so that

7    people move around from one company to another, is not

8    uncommon.

9    Q.  It's a very direct question, Mr. Zetzl.  Would it surprise

10   you to know that Motorola employs a former Hytera salesperson,

11   and they refer to that person internally as "the Hytera

12   insider"?  Would that surprise you to know that?

13        THE COURT:  The question assumes a fact not in

14   evidence.  Rephrase the question.

15        MR. ALLAN:  Withdrawn, your Honor.

16   BY MR. ALLAN:

17   Q.  You talked about -- well, let me back up.

18        In early 2012, Motorola did some testing with Hytera

19   radios, right?

20   A.  We periodically did interoperability testing.  I don't

21   know the specific timeframes in my mind of when

22   interoperability testing occurred but so -- but there's IOP

23   test reports, for example, that can help us establish that if

24   you've got an IOP test report.

25   Q.  And the IOP test report is an interoperability test?

Zetzl - cross by Allan

948

1   A.   Yes.  I'm sorry for using acronyms.  It is, the DMR

2   manufacturers periodically test to make sure that their radios

3   work with one another through interoperability testing.

4   Q.   And Motorola engaged in an IOP, an interoperability test,

5   with a Hytera radio in 2012 and noticed a weird anomaly with

6   the emergency alarm, right?

7   A.   Yeah.  Again, the timeframe sort of escapes me.  I know

8   that we did do testing with the Hytera radio, and we noticed

9   that the ergonomics for cancelling the emergency alarm was

10  similar to ours.  But again, that's something that if you use

11  the manual of the radio, if you just use the radio itself,

12  that's pretty easily mimicked.

13  Q.   So Motorola -- Motorola itself and its radios had this

14  weird glitch that when the emergency alarm went off, you had

15  to reset the radio, right?

16  A.   Well, that would be the quickest way.  And really, just to

17  give a little -- a brief background if I may, counselor, the

18  reason that you don't want the emergency alarm to be easily

19  canceled is because when somebody's actually in distress in an

20  emergency, you don't want them to accidentally cancel the

21  emergency.

22       So it is possible, without resetting the radio, to

23  cancel the emergency alarm, but it takes a number of steps.

24  And so sometimes it's faster just to reset the radio than to

25  go through those steps.

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 192 of 217 PageID #:52828
Zetzl - cross by Allan
949

1  Q.  And when Motorola was doing interoperability testing with

2  a Hytera radio, it noticed that the Hytera radio had the same

3  weird emergency alarm glitch, right?

4  A.  We -- I believe that the observation -- and I wasn't the

5  one at the IOP test, but the observation report is that they

6  used the same thing.  They reset the radio to cancel the

7  emergency alarm.  Again, you know, not surprising in the sense

8  that you don't normally want the emergency alarm to be easily

9  canceled because you don't want somebody to accidentally

10 cancel it in a real emergency.

11           MR. ALLAN:  Let me hand you one of these

12 interoperability test reports.  DTX 4693, please.

13           May we approach, your Honor?

14           THE COURT:  Yes.

15 BY MR. ALLAN:

16 Q.  Mr. Zetzl, I've handed you an interoperability test.  This

17 one happened to be conducted by Sanjay Karpoor using a Hytera

18 radio.  This was January 2' -- January 9 and 10, 2012, were

19 the date of the tests.  Do you see that?

20 A.  I do see that, yes, sir.

21           MR. ALLAN:  I offer this into evidence, please, your

22 Honor.

23           MR. SIMMONS:  No objection.

24           THE COURT:  It is received and may be published.

25      (Defendant's Exhibit 4693 received in evidence.)

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 193 of 217 PageID #:52829
Zetzl - cross by Allan
950

1  BY MR. ALLAN:

2  Q.  You know Mr. Karpoor?

3  A.  I do.

4  Q.  Yes, Mr. Zetzl.  You do.  Okay.  And you understand that

5  he was responsible, he was the Motorola person at this

6  particular interoperability test?

7  A.  That's correct.

8  Q.  And you understand that it was this interoperability test

9  that led to this sort of alarm, emergency alarm issue that we

10 just talked about?

11 A.  Yes.  I don't specifically recall what led to that

12 observation, so I can't say that it was this specific

13 interoperability test but...

14 Q.  Okay.  Let's look down at the bottom of this first page.

15 It shows, it says there's a section, "Mobile stations tested."

16 Do you see that?

17 A.  I do, yes.

18 Q.  And under "Hytera," there's a reference, three references

19 to PD782.

20 A.  I see that.

21 Q.  And that's a Hytera radio model.  That's your

22 understanding, correct?

23 A.  Yeah.  That's one of their handheld models, I believe.

24 Q.  Now, I want to direct your attention to Tab 8 -- sorry,

25 DTX 4452 which you introduced on your direct examination.  I

Zetzl - cross by Allan

951

1    think we can put that up.

2         This is this chat conversation with Darrell Stogner

3    who we just talked about?

4    A.   Yes.

5    Q.   So Mr. Stogner -- and just to orient you, the date of this

6    is October of 2012 --

7    A.   Okay.

8    Q.   -- right?

9         And I think you were asked on direct examination how

10   long it took between the test and the analysis to start, and

11   you said nine months?

12   A.   No, no, not the analysis to start.  It was the email that

13   concluded that the activity was over.

14   Q.   Okay.  We'll get to that.  But this is -- this is about

15   nine months or so after this interoperability test, right, the

16   beginning of January, the same year?

17   A.   Sure.

18   Q.   Okay.  So you've got -- I want to start with you at the

19   top of this conversation with Mr. Stogner.  And this is just

20   some sort of informal chat, like an instant message kind of

21   thing?

22   A.   Yes.  This is an instant message type of application.

23   Q.   Now, Darrell Stogner starts out asking you, "What are the

24   odds we can get a Hytera PD782 manual?"  Do you see that?

25   A.   I see that, yes.

Zetzl - cross by Allan

1    Q.  And that's the same product number that was tested in this

2    interoperability test, PD782.  Do you see that?

3    A.  Yeah, I see that.

4    Q.  You respond, "We should have some.  Let me check.  Not

5    sure if it's hard or soft copy."

6           And then Darrell Stogner responded, "Oh, goody.  I

7    want to know if the thing I'm looking at is for a JTAG.  I

8    think it is."

9           And then you have some more discussion about the

10   manual.  And then at 4:35 p.m., Mr. Stogner writes, "It's for

11   a good cause.  I want to prove that they stole our code.  Oh,

12   goody."  Do you see that?

13   A.  Yes.

14   Q.  Now, you testified on direct that your understanding of

15   what he meant had something to do with search executable.

16   That's what I wrote down.

17   A.  Yes.  So my understanding of what he was talking about

18   here was that -- or at least my takeaway from what he wrote

19   here was that he wanted to look at the executable again to

20   see, do we see fingerprints of Motorola's intellectual

21   property in their executable.

22   Q.  But he doesn't say that, Mr. Zetzl.  He says, "I want to

23   prove they stole our code.  Oh, goody."  That's what he says,

24   right?

25   A.  Yes, I see what he wrote.  Again, I'm just -- I'm saying

Zetzl - cross by Allan

953

1   that was my interpretation of it.  And like you said, this was

2   an informal conversation type of chatting software, so I'm

3   interpreting it as I would interpret other instant messages

4   that I might receive from Darrell.

5   Q.  And just so we're all clear, Darrell Stogner was the same

6   gentleman who in response to this email about this Hanjuan Jin

7   incident said, "Yeah, classic. 'My boss gave me a lot of

8   work.'"

9        This is the same Darrell Stogner?

10  A.  This is the same Darrell Stogner.

11  Q.  Your response to, "I want to prove they stole our code,

12  oh, goody," is a little smiley face.

13  A.  Yes, I see that.

14  Q.  Now, let's turn to the second page of this chat.  You and

15  Mr. Stogner continue in your discussion, and Darrell asks you,

16  "Do you know what radio Sanjay found those defects in?  Is it

17  the same one I have?"

18        Do you see that?

19  A.  I do see that, yes.

20  Q.  And that's Sanjay Karpoor?

21  A.  That's correct.

22  Q.  And then you write back, "Let me check with him.  Give me

23  a minute."  And you called -- you must have called

24  Mr. Karpoor, and then you try to call Darrell Stogner back.

25  Do you see that?

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 197 of 217 PageID #:52833
Zetzl - cross by Allan
954

1   A.  Yes, I see that.

2   Q.  And then you write back to Mr. Stogner, "I did confirm it

3   was the PD782.  Sanjay can walk you through his findings on

4   carrier detect where he observed similar issues," right?

5   A.  Yes.

6   Q.  That's a different issue than the emergency alarm issue,

7   correct?

8   A.  That's correct.  That's a second observation of a feature

9   where the Hytera radio is performing in a similar manner to

10  the Motorola radio.

11  Q.  And that was back in 2010?

12  A.  I don't really know when the carrier-type observation

13  occurred in that timeframe.  It's just been too long.

14  Q.  So do you remember asking Sanjay Karpoor when you've

15  called him during this chat?

16  A.  Again, this is several years ago.  I don't -- I don't

17  specifically recall the details of my conversation with him at

18  that time.  Again, it's been too long.

19  Q.  So you were asked some questions about an analysis that

20  was done --

21  A.  Yes.

22  Q.  -- on your direct.

23  A.  Uh-huh.

24  Q.  And I think you testified you didn't really have anything

25  to do with it other than coming up with some keywords?

Zetzl - cross by Allan

1    A.   That's correct.  I identified the search terms, and that's

2    what I contributed from that analysis.

3    Q.   And you understand that Mr. Stogner actually did the

4    analysis?

5    A.   I know Darrell was involved in doing the analysis.  I

6    believe there were other people involved as well.

7    Q.   And that was the only code teardown Darrell Stogner ever

8    worked on, right?

9    A.   Yeah, I can't really speak for Darrell on that point.

10   Q.   Let me -- let me withdraw it and ask you a different

11   question.  Are you aware of any other code teardowns Darrell

12   Stogner's ever done other than that one?

13   A.   I'm not specifically aware of what he's worked on or not

14   worked on in that area.

15   Q.   So let's look at DTX 4398 which was admitted.  We can pull

16   it up on your screen.  So just to orient you, we looked at the

17   interoperability test from January of 2012, right?

18   A.   Yes.  You showed me that exhibit.

19   Q.   Then we looked at your chat with Mr. Stogner from October

20   of 2012?

21   A.   Yes, that's correct.

22   Q.   Where he wants service manuals and the like for the PD782,

23   correct?

24   A.   Yeah, I did -- yes, that's what we looked at.

25   Q.   And now we've got this email that you talked about in your

1    direct examination.  This is July 30, 2013.

2            THE COURT:  I want to ask a question for

3    clarification.  What is a service manual?

4            THE WITNESS:  So a service manual allows you to

5    service the product.  So periodically, you may need to retune

6    the radio and things like that, and that's what the service

7    manual tells you how to do.

8            THE COURT:  When the product is sold, is it

9    accompanied by a service manual?

10           THE WITNESS:  Typically not.  Typically, you go to a

11   professional dealer who has the equipment necessary to perform

12   the tuning.

13           THE COURT:  When you sell a radio, is it accompanied

14   by anything in writing?

15           THE WITNESS:  Yeah.  And so --

16           THE COURT:  What do you call that which is contained

17   within the box when you buy the radio?

18           THE WITNESS:  The user manual.  So --

19           THE COURT:  Is there a distinction between the two?

20           THE WITNESS:  Yes, there is.  And so the user manual

21   teaches the end user how to operate the radio, whereas the

22   service manual would be provided to somebody who's familiar

23   with servicing the radio equipment for them to retune the

24   radio or perform other, you know, servicing of the radio.

25           THE COURT:  If a person buys the radio and gets the

Zetzl - cross by Allan

957

1    operator's manual, can that person in turn get a copy of the

2    service manual?

3              THE WITNESS:  I don't know.  I mean, they can --

4              THE COURT:  If I buy a grass cutter and I get an

5    operator's manual, can I not get a copy of the service manual?

6              THE WITNESS:  Presumably, yes.  And I would assume

7    that if you purchased a radio from a -- a reseller dealer, you

8    could ask them for --

9              THE COURT:  Based upon your 25 years of experience,

10   do you know whether the purchaser of the radio who gets the

11   operator's manual, can that person obtain a copy of the

12   service manual?

13             THE WITNESS:  Presumably, they should be able to --

14             THE COURT:  Well, 25 years of experience.

15             THE WITNESS:  Yeah, I --

16             THE COURT:  What is your answer?

17             THE WITNESS:  I guess my clear answer to you is, I

18   don't know but I --

19             THE COURT:  Well, who would know that?

20             THE WITNESS:  I think somebody in the -- more in the

21   sales side of it.  I just don't know what part numbers we list

22   for purchase and which ones we don't.  We certainly have the

23   manual.  We certainly sell it to our -- or provide it to our

24   dealer network.

25             I would presume that, you know, if somebody asked the

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 201 of 217 PageID #:52837
Zetzl - cross by Allan
958

1    dealer for the service manual that they could provide them

2    one, but I don't know that factually for sure.

3              THE COURT:  All right.  You may proceed.

4    BY MR. ALLAN:

5    Q.   Doesn't Motorola want dealers to hold service manuals to

6    themselves and not distribute them to the public?

7    A.   You know, so again, my understanding is that typically,

8    because to service your radio, you need the accompanying

9    equipment that you would need to perform, test, and tune and

10   other operations that it's typically done at a dealership, but

11   I don't know what our specific -- I don't know that Motorola

12   provides any specific guidance on whether the service manual

13   for the radio can be distributed out to an end customer, for

14   example.

15   Q.   Mr. Zetzl, you've testified on direct that you -- you

16   didn't know what precipitated this investigation.

17   A.   That is correct.

18   Q.   But we just determined that you knew about this emergency

19   alarm issue, yes?

20   A.   Yes.  I was aware that, again, that they had the same

21   approach to canceling their emergency alarm at least during

22   the interoperability testing.

23   Q.   And you also knew about the unmute issue that we just

24   talked about which is a separate issue?

25   A.   The carrier detect issue.

1   Q.   Carrier detect.

2   A.   Yes, I was aware that their carrier detect text algorithm

3   performed in a similar manner to our carrier detect algorithm.

4   Q.   And there may be other things that other people suspected

5   that you're just not aware of, correct?

6   A.   Sure.  That is possible.

7   Q.   Because you didn't know what precipitated this?

8   A.   I didn't.  You know, again, my involvement was, "Hey, you

9   know DMR radios really well.  You're involved throughout the

10  MOTOTRBO program.  What types of search terms do you believe

11  would be good search terms to consider when we're -- for us to

12  search the executable?"

13  Q.   So you came up with a list of search terms to search even

14  though you didn't know what was the precipitating event that

15  led to this analysis?

16  A.   Again, that was what the request to me was, was, "Hey,

17  we're going to build this -- we're going to analyze this

18  executable.  What are things that would -- that may show up in

19  the executable had they misappropriated our IPR" because when

20  the human readable version of the source code gets turned into

21  the actual machine executable, there's a lot of information

22  that's reordered.

23          And so things like searching for a particular section

24  of logic would basically not be something you could do.  So

25  that's why we went with the strategy of looking for these

Zetzl - cross by Allan

960

1    specific filter coefficients.

2    Q.  So you had never done this before, right?

3    A.  I have not personally done this before, no, but I do have

4    25 years of experience in radios.  I --

5    Q.  So you've not done this before; you don't know what

6    precipitated the cause for this, right?

7    A.  I do not know what kicked off the investigation, no.

8    Q.  There was no kind of written work plan for this, right?

9    A.  That's correct, I'm not aware of any.

10   Q.  No statement of work, no description of a project, no

11   analysis of what you were looking for, right?

12   A.  No, I think -- again, so my understanding was they reached

13   out to me.  They said, "Hey, you know MOTOTRBO as well as

14   anybody in the company.  What are some search terms that you

15   think would actually be present in the executable if the

16   source code was used?"  And that was the extent of the

17   involvement that they had included me in.

18   Q.  But I just -- what I'm trying to make clear is that

19   there's no documentation that says, "Okay.  This is what we're

20   going to do.  This is who 's going to do it.  This is what

21   we're looking for."  You haven't seen anything like that?

22   A.  I'm not aware of any of that documentation, no.

23   Q.  And you don't know what tools the team used to carry out

24   this analysis, do you?

25   A.  I did not perform the specific searching, so you are

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 204 of 217 PageID #:52840
Zetzl - cross by Allan
961

1    correct, I'm not aware.

2    Q.  The team -- I'm sorry.  I didn't mean to cut you off.

3    A.  I'm not specifically aware.  I didn't perform the search

4    myself.

5    Q.  And the team didn't search for any algorithms, did they?

6    A.  Not that I'm aware of.  Again, I identified search terms

7    to them that were DSP filter coefficients essentially which

8    are long strings of numbers that if all of those numbers were

9    present would seem to be more than a coincidence.

10   Q.  Now, you testified that you didn't do the analysis

11   yourself because you didn't want to be exposed to Hytera

12   intellectual property?

13   A.  That is correct.

14   Q.  But it didn't matter that Darrell Stogner would be exposed

15   to Hytera intellectual property?

16   A.  No, I think, you know, even in the case of whoever did the

17   analysis, they only did a search of the executable.  They

18   never actually opened the executable or tried to understand

19   what logic it performed.

20        I believe that they were also equally concerned with

21   saying, "We don't want to be exposed to Hytera's intellectual

22   property" and took the necessary precautions.

23   Q.  So the analysis actually wasn't done?

24   A.  No, the search was performed.  That was the analysis.  And

25   there was no matches found.

Zetzl - cross by Allan

1    Q.  So Motorola considered hiring outside experts to do this

2    work, right?

3    A.  Again, you know, that's not something that I was

4    specifically aware of.  I think --

5    Q.  You didn't know that?

6    A.  That's something that you had said in the deposition, but

7    that's not something I'm specifically aware of.

8    Q.  So Motorola opted to have its own engineers take a stab at

9    this even though none of them had ever done this type of

10   analysis before?

11   A.  I would think Motorola identified experienced engineers

12   that have created two-way radio products for more than 20

13   years and are very familiar with the radio environment,

14   embedded programming and the like.

15   Q.  And on the page here, it says -- this is an email at the

16   bottom, Blake Moselle to Aroon Tungare.  It says, "Aroon, in

17   initial analysis has found no obvious evidence of proprietary

18   material."  Do you see that?

19   A.  I do see that, yes.

20   Q.  And again, "obvious" is bolded and underlined, right?

21   A.  Yes, in this email.

22   Q.  And when you described what this email was, I noticed that

23   you left that word out as well.

24   A.  Okay.  Yeah, I mean --

25              THE COURT:  Counsel, when you put these questions to

Zetzl - cross by Allan

963

1    the witness, just eliminate the persona.

2    BY MR. ALLAN:

3    Q.  You do see the word --

4         THE COURT:  Which is to say, the "I" word.

5    BY MR. ALLAN:

6    Q.  You see the word "obvious"?

7         THE COURT:  Because the question becomes improper

8    when you put it that way.

9         MR. ALLAN:  Yes, your Honor.

10   BY THE WITNESS:

11   A.  I do see the word "obvious" in the email, counsel.

12   BY MR. ALLAN:

13   Q.  And you see the word -- the phrase "initial analysis" at

14   the beginning, yes?

15   A.  I see that as well.

16   Q.  And Motorola never completed this analysis, did it?

17   A.  No.  In our minds, we did complete it, right.  We ran the

18   search term.  There was no search -- there was no matches to

19   the search term.  And, you know, as the email concludes,

20   right, it says, "We don't recommend making further investment

21   in investigations," right.

22        So I think that was the definitive conclusion:  Hey,

23   we searched for the search strings.  None of them matched in

24   the executable.  And at that point, we concluded it and went

25   on with business as usual, right.

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 207 of 217 PageID #:52843
Zetzl - cross by Allan
964

1    Q.   So Mr. Zetzl, you know Bryan Potratz, yes?

2    A.   I know the name.

3    Q.   Manager in the intellectual property department?

4    A.   Yes.

5    Q.   I'd like to hand you Exhibit 4597.  And I'll represent to

6    you, Mr. Zetzl, that these are notes from Mr. Potratz's file

7    related to Darrell Stogner's code teardown.

8             THE COURT:   Just disregard that statement.

9             MR. ALLAN:   I'll -- withdrawn.

10            THE COURT:   Members of the jury, disregard that

11   statement.

12            You may inquire of the witness to lay a foundation

13   for the admissibility of the document.

14            MR. ALLAN:   May I represent what the metadata says?

15            THE COURT:   No.  You may attempt to lay a foundation

16   for the admissibility of the document.

17   BY MR. ALLAN:

18   Q.   Mr. Zetzl, do you recognize this document?

19   A.   I do not.

20   Q.   Do you know who Mr. Potratz is?

21   A.   You know, I recognize the name.

22   Q.   You understand he's a Motorola employee?

23   A.   I -- yeah, that's where I recognize the name from but I --

24   if I've had interactions with him, it's been very limited.

25   Q.   And he -- do you understand he works in the intellectual

Case: 1:17-cv-01973 Document #: 787 Filed: 12/20/19 Page 208 of 217 PageID #:52844
Zetzl - cross by Allan
965

1  property department at Motorola?

2  A.  Very possibly that could be where I know him from.  Again,

3  I just don't -- the name is familiar to me.  Exactly what his

4  role and position within the company is, I couldn't tell you

5  on the stand.

6  Q.  Do you have an understanding that materials from his files

7  were produced in this case?

8  A.  No.  I don't know necessarily everybody's -- who all's

9  equipment was -- went through discovery.

10 Q.  Do you have an understanding that your files were produced

11 in this case?

12 A.  I do know that, yes.

13 Q.  And you certainly understand that other people at Motorola

14 had their materials collected and produced in this case?

15 A.  I know a number of individuals, yeah, had their emails and

16 other things produced as part of this case.

17 Q.  Could you take a look and read this to yourself?

18     (Pause.)

19 A.  Okay.  I've read it.

20 Q.  Let me also direct you to the bottom right-hand side of

21 the page.  Do you see there's a MOTO1973 --

22          THE COURT:  Just a minute.  Have you completed the

23 foundation for the admissibility of the document?

24          MR. ALLAN:  Last question, your Honor.

25          THE COURT:  If not, then you may not refer to what it

Zetzl - cross by Allan

966

1    says.

2              MR. ALLAN:  I'm just referring --

3              THE COURT:  Rephrase the question.  Continue with

4    your effort to lay the foundation for the admissibility of the

5    document.

6              MR. ALLAN:  One more question on that, your Honor.

7              There's a Bates number at the bottom right.  I'm not

8    asking you to read --

9              THE COURT:  No, just a minute.  Have you completed

10   your efforts to lay the foundation for the admissibility of

11   the document?

12             MR. ALLAN:  This is the last question on foundation,

13   your Honor.

14             THE COURT:  All right.  Avoid anything that refers to

15   what is displayed or depicted in the document you're holding

16   in your hand.

17   BY MR. ALLAN:

18   Q.  Do you understand that documents that have been produced

19   in this case have a designation from the producing party?

20   A.  Yes, I do.

21   Q.  Do you understand that there's a designation --

22             MR. SIMMONS:  Objection, your Honor.

23             THE COURT:  Okay.  Is Motorola objecting to the

24   admissibility of the document?

25             MR. SIMMONS:  Yes, sir.

1          THE COURT:  Sustained.

2          MR. ALLAN:  I won't admit it, your Honor.

3          THE COURT:  It's not admitted because the objection

4   has been sustained.

5          MR. ALLAN:  May I ask a question --

6          THE COURT:  The objection has been sustained.  Move

7   on to another document.  You certainly have a few more.

8   BY MR. ALLAN:

9   Q.   Mr. Zetzl, did you -- do you understand that back in

10  January 2008, Nickie Petratos warned people within Motorola

11  that information needed to be protected from Hytera?

12         MR. SIMMONS:  Objection.  Assumes facts not in

13  evidence.

14         THE COURT:  Sustained.  Foundation.

15         MR. ALLAN:  It's a fact admitted, your Honor.

16  There's already been testimony on it.

17         THE COURT:  Is it a fact admitted?

18         MR. ALLAN:  Yes.  The email --

19         THE COURT:  I'm asking opposing counsel.

20         MR. SIMMONS:  Your Honor, this witness hasn't --

21         THE COURT:  Is it a fact admitted between counsel, a

22  stipulation?

23         MR. ALLAN:  It is not a stipulation, your Honor.

24         THE COURT:  Is it a fact admitted, counsel?

25         MR. SIMMONS:  No, your Honor.  I do not believe it's

Zetzl - cross by Allan

968

1   a stipulation.

2            THE COURT:  All right.  Then sustained.

3   BY MR. ALLAN:

4   Q.  Mr. Zetzl, we talked about the emergency alarm.

5   A.  Yes, sir.

6   Q.  We talked about the carrier detect issue?

7   A.  Yes, counsel.

8   Q.  And there was no report from this analysis, right?

9   A.  I'm not aware of any report.

10  Q.  No statement of work?

11  A.  I'm not aware of a statement of work.

12  Q.  No written analysis other than the one that we just looked

13  at?

14  A.  Again, I'm not aware of a written analysis on it beyond

15  the email that just said, hey, we didn't find any obvious

16  signs, right, because none of the search terms matched and,

17  therefore, we concluded that -- the investigation.

18  Q.  And that email, that short email said "an initial

19  investigation," correct?

20  A.  That was the phrasing that was used in the email.

21  Q.  Done by people who had not experience in this before?

22  A.  Again, I would just, where I would disagree with you --

23  Q.  Let me redraw the question.  Not done by people who have

24  experienced in source code teardowns?

25  A.  Not people that are -- have experience in source code

1    teardowns but certainly experienced in two-way radio

2    development.

3              MR. ALLAN:  Nothing further, your Honor.

4              THE COURT:  By ruling on those objections, I did not

5    mean to curtail your cross-examination.  And if you have a few

6    more questions, you may proceed.

7              MR. ALLAN:  I'm done, your Honor.  Thank you.

8              THE COURT:  All right.  Redirect, if any?

9              MR. SIMMONS:  I'm sorry?

10             THE COURT:  Redirect, if any?  Go ahead.

11             MR. SIMMONS:  Mr. Zetzl, I want to start at the

12   beginning of opposing counsel's cross-examination --

13             THE COURT:  Let me ask you this:  How much time do

14   you think you're going to need on redirect?

15             MR. SIMMONS:  Oh, 15 minutes, your Honor.

16             THE COURT:  Maybe twice that?

17             MR. SIMMONS:  Hard to know.

18             THE COURT:  All right.  Members of the jury -- the

19   witness may step down.  It's been a long day.  And so you are

20   excused until tomorrow morning.  And the good news for you is

21   that you are to be here at 10:15 and not 10:00 o'clock, not

22   10:00 o'clock.  You are excused.

23             Counsel, please remain.

24         (Proceedings heard in open court.  Jury out.)

25             THE COURT:  Court is in session.  Please be seated.

1          Who is the next witness, counsel?

2          MR. ALPER:  The next witness is Mr. Sanjay Karpoor.

3          THE COURT:  And he has been referred to in the

4     examination of this witness?

5          MR. ALPER:  He was, yes, your Honor.

6          THE COURT:  Okay.  All right.  So we'll pick up

7     tomorrow with redirect and some recross if necessary.  The

8     reason for the 10:15 is I have seven matters set for 10:00

9     o'clock.  If you look at the agenda, you'll understand.  So be

10    here, if you will, at 10:15 ready to finish with this witness.

11         MR. ALPER:  Yes, your Honor.

12         MR. CLOERN:  Your Honor, may we raise one quick

13    housekeeping issue for tomorrow?  Motorola plans to play a

14    number of deposition designations.  And under the parties'

15    agreement, which I believe was entered by the Court, those

16    designations had to be provided five days ahead of time.

17         They've sent changes to them every day including two

18    or three changes yesterday.  The current designations look

19    nothing like the designations that were served on time.

20    They're very different.  And we would object to those being

21    played.  I just wanted to see if we wanted to discuss that

22    today before the --

23         THE COURT:  What is your response?

24         MR. ALPER:  Your Honor, in view -- so we did send

25    them to them last week at some point many days ago.  In view

1    of the testimony, we've narrowed the scope of those

2    designations.

3              THE COURT:  You have narrowed it?

4              MR. ALPER:  We've narrowed them.

5              MR. CLOERN:  Your Honor, they've --

6              THE COURT:  You're objecting to a narrowing?

7              MR. CLOERN:  No, your Honor.  And --

8              THE COURT:  Just a minute.  Counsel says they've been

9    narrowed.

10             MR. ALPER:  We've narrowed them substantially.

11             MR. CLOERN:  They have added to their designations.

12             THE COURT:  They have been embellished?

13             MR. CLOERN:  Yes, your Honor.

14             THE COURT:  They have?

15             MR. ALPER:  We've added some material but in the

16   context of narrowing the overall set by --

17             THE COURT:  I will entertain objections as they are

18   being played.

19             MR. ALPER:  Yes, your Honor.

20             MR. CLOERN:  Thank you, your Honor.  We also have

21   objections to a number of the documents for --

22             THE COURT:  Well, you can make them as they're being

23   offered.  That was the understanding when we began this case,

24   that there were numerous issues undecided when the matters

25   were before the magistrate judge or they were not clear.  And

1    the idea was to present them during the course of the trial,

2    and the Court would entertain objections as we proceed.  And

3    there was a demonstration of that this afternoon.

4         All right.  So you can make those objections during

5    the course of the trial, and I will give counsel an

6    opportunity to respond.  If necessary, you may be heard at a

7    sidebar, but I don't intend to stop the presentation of the

8    evidence with these eight people on the jury here as we do

9    what you suggest here.

10        And so make your objections as the evidence is being

11   presented.  I will rule expeditiously if I can and also give

12   you an opportunity to be heard at a sidebar and if they are

13   really heavy issues, to stop the trial to deal with them.  But

14   we must move the trial forward.

15        You may recall that there was one, one specific juror

16   who originally brought to the attention of counsel that she

17   had made vacation plans beginning November 29th that would

18   take her through December 6th.  That's an issue we will have

19   to deal with.  And it may well be that the juror will once

20   again bring that to our attention.  But the point is, we want

21   to move this case to a resolution on its merits and keep as

22   many jurors as we possibly can.

23        I think I've said enough.  All I'm saying is, when

24   you have objections, make them.  I will give you an

25   opportunity, perhaps brief, but I will rule on the objections

1    as they are made.

2              MR. CLOERN:  Thank you, your Honor.

3              MR. ALPER:  Understood, your Honor.

4              MR. CLOERN:  During the video as played, we can stand

5    up and make objections?

6              THE COURT:  That's right.

7              MR. CLOERN:  Thank you.

8              THE COURT:  You make your objections, and I will rule

9    and instruct the jury accordingly.

10             MR. ALPER:  Yes, your Honor.  Understood.

11             THE COURT:  For example, "Ignore that last statement"

12   if there's an embellishment that you object to which is not

13   designated.  If it gets to that point, I will instruct the

14   jury that they may hear or may not hear or to give appropriate

15   weight.  I will give an appropriate instruction to the jury

16   consistent with the ruling that I make.

17             Okay.  Thank you, counsel.

18             MR. CLOERN:  Thank you, your Honor.

19             MR. ALPER:  Yes, your Honor.

20        (Proceedings adjourned from 3:50 p.m. to 10:15 a.m.)

21

22

23

24

25

C E R T I F I C A T E

We, Frances Ward and Judith A. Walsh, do hereby certify that the foregoing is a complete, true, and accurate transcript of the proceedings had in the above-entitled case before the Honorable CHARLES R. NORGLE, SR., one of the judges of said court, and a jury, at Chicago, Illinois, on November 18, 2019.

/s/ *Frances Ward, CSR, RMR, FCRR*_____        November 19, 2019

/s/ *Judith A. Walsh, CSR, RDR, F/CRR*_____        November 19, 2019

Official Court Reporters

United States District Court

Northern District of Illinois

Eastern Division