974

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   MOTOROLA SOLUTIONS, INC.,        )
     and MOTOROLA SOLUTIONS           )
 4   MALAYSIA SDN. BHD,               )   Docket No. 17 CV 1973
                                      )
 5                 Plaintiffs,        )
                                      )
 6            vs.                     )
                                      )
 7   HYTERA COMMUNICATIONS            )
     CORPORATION, LTD.; HYTERA        )
 8   AMERICA, INC.; and HYTERA        )
     COMMUNICATIONS AMERICA           )
 9   (WEST), INC.,                    )   Chicago, Illinois
                                      )   November 19, 2019
10                 Defendants.        )   10:15 a.m.

11                     TRIAL - VOLUME 7A
                   TRANSCRIPT OF PROCEEDINGS
12      BEFORE THE HONORABLE CHARLES R. NORGLE, SR., and a jury

13   APPEARANCES:
     For the Plaintiff:        KIRKLAND & ELLIS LLP
14                             BY:  MR. ADAM R. ALPER
                                    MR. BRANDON H. BROWN
15                                  MR. REZA DOKHANCHY
                               555 California Street, 27th Floor
16                             San Francisco, California  94104

17                             KIRKLAND & ELLIS LLP
                               BY:  MR. MICHAEL W. De VRIES
18                             333 South Hope Street
                               Los Angeles, California  90071
19
                               KIRKLAND & ELLIS LLP
20                             BY:  MR. JOSHUA L. SIMMONS
                               601 Lexington Avenue
21                             New York, New York  10022

22
     Court Reporter:
23                             BLANCA I. LARA
                            Official Court Reporter
24               219 South Dearborn Street, Room 2342
                        Chicago, Illinois  60604
25                          (312)435-5895
                        blanca_lara@ilnd.uscourts.gov
```

```
 1   APPEARANCES (Continued:)

 2

 3                             KIRKLAND & ELLIS LLP
                              BY:  MS. MEGAN M. NEW
 4                            300 North LaSalle
                              Chicago, Illinois  60654
 5
                              KIRKLAND & ELLIS LLP
 6                            BY:  MS. LESLIE M. SCHMIDT
                              601 Lexington Avenue
 7                            New York, New York  10022

 8   Motorola Corporate Representative:  Mr. Russ Lund

 9
     For the Defendants:      STEPTOE & JOHNSON LLP
10                            BY:  MR. BOYD T. CLOERN
                                   MR. MICHAEL J. ALLAN
11                                 MS. JESSICA I. ROTHSCHILD
                                   MS. KASSANDRA M. OFFICER
12                            1330 Connecticut Avenue, NW
                              Washington, DC  20036
13
                              STEPTOE & JOHNSON LLP
14                            BY:  MR. DANIEL S. STRINGFIELD
                              227 W. Monroe Street, Suite 4700
15                            Chicago, Illinois  60606

16

17

18

19

20

21

22

23

24

25
```

```
 1              (Jury in at 10:12 a.m.)
 2              (Proceedings had in open court.  Jury in.)
 3                   THE COURT:  Good morning, members of the jury.
 4                   Are all the counsel ready to proceed?
 5                   MR. ALPER:  Yes, your Honor, with the redirect of
 6         Mr. Zetzl.
 7                   THE CLERK:  One more.
 8              (A juror enters the courtroom.)
 9                   THE COURT:  Good morning, members of the jury.
10                   MR. ALPER:  Good morning, your Honor.
11                   THE COURT:  Please recall the witness.
12                   MR. ALPER:  Yes.
13                   Mr. Zetzl, if you would, retake the stand.
14                   MR. SIMMONS:  Your Honor, may I proceed?
15                   THE COURT:  Please proceed.
16           DANIEL ZETZL, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN
17                        REDIRECT EXAMINATION
18         BY MR. SIMMONS:
19         Q.   Good morning, Mr. Zetzl.
20         A.   Good morning.
21         Q.   Yesterday you discussed a number of documents regarding
22         six of the trade secrets asserted in this case.
23              Do you remember that?
24         A.   Yes, I do.
25         Q.   Are those documents confidential to Motorola?
```

1    A.    Yes, they are.

2    Q.    Do they describe Motorola's trade secrets?

3    A.    Yes, they do.

4    Q.    Do they have to have a specific confidentiality label to

5    be treated as confidential?

6    A.    No.   The policy is that if it contains confidential

7    material, it's treated as confidential regardless of whether

8    it's marked with the confidentiality label.

9    Q.    And do they have to have a specific confidentiality

10   label to describe Motorola's design and implementation of its

11   trade secret technology?

12   A.    No, they don't -- well, they would normally be

13   classified by the policy "Motorola confidential proprietary"

14   and/or "Motorola Solutions confidential restricted" with the

15   new iProtect policy.

16   Q.    But they can have any kind of label?

17   A.    That is true, yeah.   I mean, based on the policy -- you

18   look at the document, and based on its contents, that's how

19   you would treat the document accordingly.

20   Q.    Now, you discussed yesterday the DMR standard.   And

21   counsel showed you images from an ETSI document that also

22   appear in Motorola's technical documents.

23         Do you remember that?

24   A.    I do in the training material for the ETSI DMR standard.

25   Q.    Is Motorola claiming in this case that the DMR standard

Case: 1:17-cv-01973 Document #: 1788 Filed: 12/20/19 Page 5 of 128 PageID #:52852
978
Betz - redirect by Summons

1  is Motorola's trade secret?

2  A.  No, we are not.

3  Q.  Is Motorola claiming that the images used in the ETSI

4  document are its trade secret?

5  A.  No, we are not.

6  Q.  Does Motorola claim its specific implementation of the

7  DMR protocol stack as a trade secret?

8        MR. ALLAN:  Objection, your Honor.  The entire

9  examination is leading.

10        THE COURT:  Overruled.

11        You may answer.

12  BY THE WITNESS:

13  A.  Yes, it's our implementation of the DMR stack that we

14  are claiming as the trade secret.

15  BY MR. SIMMONS:

16  Q.  Is there more than one way to implement the DMR

17  standard?

18  A.  Yes, there is.

19  Q.  Do you know how many?

20  A.  There is many.  As I described, it could be in hardware.

21  It could be done in software.  There is a lot of choices in

22  terms of actually how you would go about implementing it.

23  Q.  Is Motorola's approach just one of those?

24  A.  Yes.

25  Q.  Now, you also discussed XCMP.  Do you remember that?

1    A.   I do.

2    Q.   Is the fact that Motorola's DMR radios use XCMP a

3    secret?

4    A.   No.  It's not a secret that we use XCMP, but our

5    implementation of XCMP is the trade secret.

6    Q.   Now, does Motorola disclose all of the confidential

7    details of its implementation of XCMP to third-party app

8    developers?

9    A.   No, we don't.  There is a portion of the XCMP

10   specification that is only for Motorola internal use, and

11   then we license specific commands based on the application

12   developer partner's application that they are developing.  So

13   if they needed access to certain commands, we would give them

14   access to just that subset of commands.

15   Q.   And yesterday you mentioned that app developers sign

16   nondisclosure agreements.

17            What is the purpose of having them sign

18   nondisclosure agreements?

19   A.   So that they don't disclose the XCMP commands that

20   Motorola has developed since it's a proprietary protocol.

21   Q.   Now, in talking about the connectivity trade secret, you

22   discussed PTX 1270, which is the 2,000-page technical

23   requirement specification in your third volume of documents.

24            Do you remember that?

25   A.   I do.

1   Q.  And do you remember counsel asked you about the date of

2   that document?

3   A.  Yes, I do.

4           MR. SIMMONS:  Would you, Mr. Schlaifer, show that

5   document, PTX 1270, on the screen and turn to Page 14.

6   BY MR. SIMMONS:

7   Q.  Now, Mr. Zetzl, when was this document first drafted?

8   A.  It was first drafted on October 6th, 2004.

9   Q.  And is that the first line of this chart?

10  A.  Yes, it is.

11  Q.  And what is this chart?

12  A.  So this is the revision history.

13  Q.  And was the first drafting in 2004 in connection with a

14  particular version of this document?

15  A.  Within version 00.01.01.

16  Q.  Now, if we go back to the full document, was additional

17  material added to this specification in the years between

18  2004 and 2008?

19  A.  Yes, there was.

20  Q.  And is that listed in this revision history?

21  A.  Yes, it is.

22  Q.  Does this document still describe material that existed

23  during that time period?

24  A.  Yes, it does.

25          MR. SIMMONS:  We can take that down, Mr. Schlaifer.

```
 1    BY MR. SIMMONS:
 2    Q.   Now, Mr. Zetzl, you talked about documents that Motorola
 3    provided to Hytera in this case in the litigation describing
 4    its trade secrets.
 5               Who created the trade secrets described in those
 6    documents?
 7    A.   Motorola engineers.
 8               MR. SIMMONS:  I tender the witness, your Honor.
 9               THE COURT:  Recross, Counsel.
10               MR. ALLAN:  Briefly, your Honor.
11                         RECROSS-EXAMINATION
12    BY MR. ALLAN:
13    Q.   Good morning, Mr. Zetzl.
14    A.   Good morning.
15    Q.   Let's take a look at the document you were just looking
16    at.
17               MR. ALLAN:  PTX 1270, please, Jim.
18               I think we may need to switch it.
19    BY MR. ALLAN:
20    Q.   This document is dated May 4, 2015?
21    A.   I'm sorry.  It's not up yet.
22    Q.   Oh, I'm sorry.  You don't have it yet?
23    A.   I have got the physical copy, so I could just look at
24    that.
25               MR. ALLAN:  It's not before the jury either.
```

1    BY THE WITNESS:

2    A.    Yes, May 4, 2015, is what that document shows.

3    BY MR. ALLAN:

4    Q.    Mr. Zetzl, you are one of the authors of this document,

5    correct?

6    A.    Yes, there was a couple sections that I contributed to

7    in the overall document.

8    Q.    Let's just take a quick look at 1270, Page 15 of this

9    document.  At the bottom left it says "authors."  And if you

10   flip over to the next page, we will see your name, correct --

11   A.    Yes.

12   Q.    -- once we get there?

13           I would like to show you now -- let's go to Page 18

14   of this document.  At the bottom of the page it says, "1.1.5

15   patent identification.  The follow" -- it looks like a typo,

16   following -- "disclosures are addressed by this TRS."

17           Do you see that?

18   A.    I do see that.

19   Q.    And TRS is technical requirement specification?

20   A.    Yes, that's the name of this document.

21   Q.    And the "disclosures" referenced are invention

22   disclosures, things that engineers at Motorola developed and

23   presented to the committee as inventions pursuant to Matrix,

24   correct?

25           MR. SIMMONS:  Objection, your Honor.  Beyond the

1    scope.

2            THE COURT:  Overruled.

3    BY THE WITNESS:

4    A.    Yes.  So this section would identify, like you said, any

5    inventions that took place as related to this program

6    essentially.

7    BY MR. ALLAN:

8    Q.    Related to Matrix?

9    A.    Related to the Matrix program.  That's typically what

10   was captured here.

11   Q.    Okay.  Let's take a look at Page 19, the next page.

12   This is the first page of a number of disclosures, right,

13   Mr. Zetzl?

14   A.    Yes.  I see these -- kind of the title of the

15   disclosure, and then the disposition is basically the

16   disposition of the patent committee as to whether Motorola

17   wanted to pursue getting a patent or whether they decided,

18   for whatever reason, they didn't want to do that.

19   Q.    So you have got the internal docket number on the left.

20   That's Motorola's internal docket number?

21   A.    Yeah.  I think that's their reference to the submittal

22   to the patent committee, yeah.

23   Q.    And the status is whether this potential invention has

24   been submitted?

25   A.    Submitted for review by the patent committee, yeah.

1    Q.   And then the disposition is "pursue."  To pursue it

2    means try to file a patent on that?

3    A.   That's correct.  And then it would go through the

4    various steps toward being filed with the patent office.

5    Q.   And there are pages of disclosures here?  You can look

6    at the big document if you want or you can flip through.

7         (Brief pause.)

8    BY THE WITNESS:

9    A.   Okay.

10   BY MR. ALLAN:

11   Q.   Do you agree with me?

12   A.   Yes, there are several pages of disclosures.

13   Q.   And these are the inventions that Motorola engineers

14   thought were relevant to the Matrix platform?

15   A.   These are at least inventions that we decided that we

16   thought it was worthy to put into the patent committee, yes.

17   Q.   Okay.

18        And then let me direct you to Page 20.  Sort of --

19   A.   Okay.

20   Q.   -- at the bottom there is a reference CM 10593 SX on the

21   left.  The title is "Scheme to Measure Reverse Channel

22   Position and Improve Embedded LC Decode Reliability."

23        Do you see that?

24   A.   I do see that.

25   Q.   And it says the disposition is "trade secret."

1          Do you see that?

2    A.    I do.

3    Q.    And none of the six trade secrets you discussed on your

4    examination are referenced on this list of multiple pages of

5    invention disclosures for Matrix, are they?

6    A.    Some of the ideas that were included in some of these

7    references would fall under the category of the DMR modem

8    because they are DMR modem related.

9    Q.    So some of the ideas of the trade secrets you mentioned

10   might be in the patents?

11   A.    No.  The underlying patents -- the idea of the

12   underlying patent is related to how we -- the underlying

13   patent applies to the area around the modem on the radio.

14   Q.    The six trade secrets you have testified about in this

15   case are not listed on this multipage disclosure from 2015,

16   are they?

17   A.    The six trade secrets that I disclosed, yes, are not

18   listed specifically on these pages, right.  These are

19   ideas -- patents or ideas, right.  The trade secret is the

20   design and the implementation.

21   Q.    Mr. Zetzl, these are disclosures that Motorola engineers

22   who have worked on Matrix saw fit to apply for as technology

23   that they invented related to Matrix, right?

24   A.    Yes, sir.

25   Q.    And the six trade secrets that you testified about are

1    not on here.  It's a simple question.  Right?

2    A.   That is correct.

3    Q.   And the 21 trade secrets that Motorola has alleged in

4    this case are not on here, correct?

5    A.   That's also correct.

6           MR. ALLAN:  Nothing further.

7           THE COURT:  Anything further, Counsel?

8           MR. SIMMONS:  Just briefly, your Honor.

9                  FURTHER REDIRECT EXAMINATION

10   BY MR. SIMMONS:

11   Q.   Mr. Zetzl, could you explain to us what the purpose of

12   that list of disclosures that you were just discussing is?

13   A.   Yes.  So this is just a way that we keep track of what

14   inventions are coming from what program.  So this is an easy

15   way for us to know when we go back and look at a program,

16   hey, here are all the ideas that we generated when we were

17   developing this program and then the status of how many of

18   them were actually pursued and so on for patents.

19   Q.   Do you submit everything that you have created to the

20   patent committee?

21   A.   No, we don't.

22   Q.   Why not?

23   A.   Because not all of the ideas are really patentable, to

24   be honest.  Some of them may not have the necessary -- they

25   may be prior art.  They may not be enough what we would

1    consider business value to justify the filing of a patent on

2    it.  There could be a variety of reasons why we decide to

3    deem it an idea that's not necessarily worthy of going

4    forward to get a patent.

5    Q.   If you don't seek a patent on something you have

6    created, is it still valuable?

7    A.   Yes, it could still be very valuable.

8    Q.   And how do you maintain its value?

9    A.   Well, I mean, I guess we -- one, we keep it a secret, I

10   guess.

11             MR. SIMMONS:  No more questions.

12             THE COURT:  Do you have a few questions, Counsel?

13             MR. ALLAN:  I do not, your Honor.  Thank you.

14             THE WITNESS:  I'm sorry.  I thought I was close

15   enough to the mic this time.

16             THE COURT:  Did you hear the last answer?

17             A JUROR:  I didn't.

18             THE WITNESS:  Oh, okay.

19             THE COURT:  Just a minute.

20             The court reporter will read back the last two

21   questions and the last two answers.

22        (Record read.)

23             THE COURT:  You may step down.

24        (Witness excused.)

25             THE COURT:  You may call the next witness.

1    MR. DOKHANCHY:  Your Honor, Reza Dokhanchy from

2    Motorola.

3         We call Sanjay Karpoor to the stand.

4         THE CLERK:  Please raise your right hand.

5    (Witness sworn.)

6         MR. DOKHANCHY: May I proceed?

7         THE COURT:  Yes.

8         SANJAY KARPOOR, PLAINTIFFS' WITNESS, SWORN

9                   DIRECT EXAMINATION

10   BY MR. DOKHANCHY:

11   Q.   Good morning, Mr. Karpoor.

12   A.   Good morning.

13   Q.   Could you please introduce yourself.

14        THE COURT:  Would you remind the jury of your name,

15   Counsel.

16        MR. DOKHANCHY:  Yes, your Honor.

17        Reza Dokhanchy on behalf of Motorola.

18        THE COURT:  All right.  Please proceed.

19   BY MR. DOKHANCHY:

20   Q.   Could you please introduce yourself to the jury.

21   A.   My name is Sanjay Karpoor.

22   Q.   And Mr. Karpoor, what are you here to testify about

23   today?

24   A.   I'm here to testify about Motorola trade secrets related

25   to its repeater.

1    Q.    Is the repeater that device that you have propped up

2    there in front of you?

3    A.    Yes, this is the one.

4    Q.    And we will get into the details of that device in a

5    little bit, but I want to get some background on you first.

6              Where do you work, Mr. Karpoor?

7    A.    I work at Motorola Solutions in Schaumburg, Illinois.

8    Q.    And what is your position at Motorola?

9    A.    I'm a distinguished member of the technical staff.

10   Q.    And how long have you worked at Motorola?

11   A.    I have worked at Motorola for 23 years.

12   Q.    In your 23 years at Motorola, have you worked on

13   Motorola's digital two-way radio products?

14   A.    Yes, I have for approximately the last 15 years.

15   Q.    And where do you live, Mr. Karpoor?

16   A.    I live in Buffalo Grove, Illinois.

17   Q.    Is that near Schaumburg where you work?

18   A.    It's about 15 miles from there to Motorola Schaumburg

19   office where I work.

20   Q.    Do you have a family, Mr. Karpoor?

21   A.    Yes, I have a wife and two children.

22   Q.    And going a little farther back, where did you grow up?

23   A.    I grew up in India.

24   Q.    And when you were in India growing up, how did you

25   become interested in engineering?

1   A.   Well, I grew up in a small town without a lot of

2   technology.  And I remember one day when I was a kid and I

3   saw a digital watch for the very first time.  And that was

4   the coolest thing I saw.  And I asked the person wearing the

5   watch, how could it do that, you know, tell the time in terms

6   of the numbers?  And then he said it was electronics.  And

7   the rest was kind of history.

8   Q.   So then did you attend a university to study engineering

9   after that?

10  A.   Yeah.  I attended the university in India, and I studied

11  electronics and communications engineering.

12  Q.   Did you earn any awards when you were in undergraduate

13  school?

14  A.   Yes, I graduated with the highest designation that the

15  university awards.  So the designation was called graduate

16  with distinction.

17  Q.   Did you then attend graduate school?

18  A.   Yes.  I attended graduate school and earned my master's

19  degree in digital electronics and advanced communications.

20  Q.   And how did you end up working at Motorola?

21  A.   As part of my master's program, I did an internship at

22  Motorola in India in digital signal processing.

23  Q.   What attracted you to Motorola when you were looking at

24  internships?

25  A.   I was very interested in digital signal processing

1    technology.  Motorola was the leader in that area at that

2    time and is still today.

3    Q.   How did you come to work full-time at Motorola?

4    A.   Well, my internship went very well.  They liked the work

5    I did as a part of internship.  At the end of the internship

6    they offered me a position and I accepted it.

7    Q.   And what year was that?

8    A.   That was in 1996.

9    Q.   And was that back at Motorola in India?

10   A.   Yes.

11   Q.   And when you started, what types of products and

12   technologies were you working on?

13   A.   It was all digital signal processing technology that

14   would go into Motorola digital signal processing chip sets.

15   That would eventually end up in applications like, you know,

16   cellular phones, voice-over-IP products that we see --

17              THE COURT REPORTER:  I'm sorry.  Cellular phones,

18   and then what?

19              THE WITNESS:  Voice-over-IP products that we see in

20   real life.

21   BY MR. DOKHANCHY:

22   Q.   And that was voice-over-IP?

23   A.   Voice-over-IP, yes.

24   Q.   Thank you.

25              So at some point did you come to the United States?

1   A.   Yes.  I applied for a DSP lead position in the United

2   States.

3   Q.   And was that with Motorola?

4   A.   Yes.

5   Q.   So why were you interested in the DSP lead position at

6   Motorola?

7   A.   Well, that was for a lead position for a product I

8   thought was going to be very successful in the industry and

9   technology could be very impressive.

10  Q.   And what was that product that you were so excited to

11  come to the United States and work on?

12  A.   That is the MOTOTRBO repeater.

13  Q.   What are your responsibilities as a distinguished member

14  of the technical staff?

15  A.   My responsibilities are to come up with the architecture

16  for next-generation products and also to build out the design

17  aspects of the architecture.

18  Q.   Do you manage a team of people at Motorola?

19  A.   Yes, I manage eight to ten people.

20  Q.   Do you have any issued patents on which you are an

21  inventor?

22  A.   Yes, I have eight issued patents.

23  Q.   And while working at Motorola, have you received --

24            THE COURT:  Just a minute.

25            They are issued to you personally?

1          THE WITNESS:  With the team within Motorola.  We

2     are all coinventors sometimes.  It's three people.  Sometimes

3     it's four.  It's just varies patent by patent.

4          THE COURT:  To whom has the patent that you

5     referred to been issued?

6          THE WITNESS:  We are all the inventors.

7          THE COURT:  Have you personally received a patent?

8          THE WITNESS:  It was all Motorola patents, but we

9     are on the patent.

10          THE COURT:  Have you personally received a patent?

11          THE WITNESS:  Yes.

12          THE COURT:  Do you personally hold a patent?

13          THE WITNESS:  Yes.  Yes, I have.

14          THE COURT:  Proceed.

15     BY MR. DOKHANCHY:.

16     Q.   Just to clarify, I believe you are saying that you are

17     the inventor, but the owner is --

18     A.   Owner is Motorola, correct.

19          THE COURT:  You didn't understand my question?

20          THE WITNESS:  I thought whether I received a

21     patent.  I am the inventor.  My name is on the patent, but

22     the patent --

23          THE COURT:  Now you have said the patent is held by

24     Motorola; is that right?

25          THE WITNESS:  Yes, patent is owned by Motorola.

1          THE COURT:  Please proceed.

2    BY MR. DOKHANCHY:

3    Q.   When you -- over the course of your work at Motorola,

4    have you received any internal awards from the company for

5    your work?

6    A.   Yes.  In 2012, I received an award for my work on

7    MOTOTRBO called the Moment Award.  And what that meant was it

8    was something important that the company thought was going to

9    be good for the product and the business, and they decided to

10   award me at the moment it happened instead of waiting for the

11   yearend cycle.

12          In 2013, I also received an award, which is called

13   the Technical Innovation Award, again for my work on

14   MOTOTRBO.

15   Q.   And I would like to turn now to the trade secrets at

16   issue in this case.

17          Do you have a demonstrative that identifies the

18   trade secret you are going to be discussing today?

19   A.   Yes.

20          MR. DOKHANCHY:  Your Honor, permission to publish.

21          THE COURT:  Yes.  Proceed.

22   BY MR. DOKHANCHY:

23   Q.   So what trade secret are you going to be discussing

24   today, Mr. Karpoor?

25   A.   It's a design and implementation of MOTOTRBO repeater.

1   Q.   And do you have personal knowledge of that trade secret?

2   A.   Yes, I have been personally involved in the development

3   of this trade secret.

4   Q.   And let's start with the basics.

5        What is a repeater?

6   A.   So normally two-way radios talk directly to each other,

7   but they have a certain range.  Beyond that range, they

8   cannot talk to each other because the signal doesn't reach

9   that far.

10       Now, repeater is a device that sits in the middle

11  of two devices.  It receives the signal from transmitter and

12  it relays a signal back to the listener.

13  Q.   And have you prepared a demonstrative to explain the

14  scenarios with and without a repeater?

15  A.   Yes.

16  Q.   What are we seeing here in PDX 7.2?

17  A.   Here we see two users using two-way radios without the

18  repeater.  And as you can see, if they are too far apart, the

19  signal cannot reach from the transmitter to the receiver.

20  Q.   So what is the range of the MOTOTRBO handheld devices

21  when they are directly communicating?

22  A.   It's about one to two miles.

23  Q.   And do you have a demonstrative to explain how a

24  repeater can help extend the range?

25  A.   Yes.

1    Q.   All right.  What are we seeing here in PDX 7.3?

2    A.   Here we see that the repeater sits in the middle of two

3    users.  It receives the signal from the transmitter, and it

4    extends the range so that it can reach the listener.

5    Q.   And then what is the range with the repeater involved?

6    A.   It's about 25 to 30 miles.

7    Q.   So is it right that the repeater increases the range of

8    the handhelds from one to two miles to 25 to 30 miles?

9    A.   That's right.

10   Q.   And is relaying the signal simply a matter of taking the

11   signal in one end and just putting it out the other end?

12   A.   No, it's much more complicated than that.  When repeater

13   receives a signal that needs to be relayed, it does a lot of

14   work on the signal.

15   Q.   What sort of work does the repeater do on the signal

16   that it receives?

17   A.   When it receives the signal, it first decodes the

18   signal, it cleans the signal, it corrects all the errors, and

19   it amplifies the signal making it much stronger.

20   Q.   And that was it amplifies the signal?

21   A.   Yes.

22   Q.   So how does that relate to the concept of extending the

23   range of the handheld devices?

24   A.   All those parts that are described are very particular.

25   Without the repeater doing those tasks, it would simply be

1   down relay, and it won't be able to --

2              THE COURT REPORTER:  I'm sorry.  It would simply

3   be?

4              THE WITNESS:  A down relay.

5              THE COURT REPORTER:  A Downward?

6              THE WITNESS:  Down --

7   BY MR. DOKHANCHY:

8   Q.   A down relay; is that right?

9   A.   Down relay, and it won't be able to increase the range.

10             Now, because of all that work that the repeater

11  does, it's able to make the handheld devices usable over a

12  broad range.

13  Q.   When did Motorola launch its first MOTOTRBO repeater?

14  A.   In late 2007.

15  Q.   Were you a part of the team that developed that first

16  repeater?

17  A.   Yes.

18  Q.   What was your role on that team?

19  A.   I was a design lead for this product.

20  Q.   And what does a design lead do?

21  A.   A design lead is responsible for coming up with all the

22  design of the repeater, lay out the important details of the

23  implementation, and oversee the team that's developing and

24  testing the product.

25  Q.   And did you also do some of the implementation yourself,

1    such as writing source code?

2    A.   Yes, I wrote a lot of the source code.

3    Q.   I want to go back to the trade secret in question.

4            Can you just tell us what is the design and

5    implementation of the MOTOTRBO repeater?

6    A.   So this means all of the technology that goes into the

7    repeater.  That means from architecture of it to the

8    implementation of individual component in the repeater to the

9    actual implementation, including the source code.

10   Q.   Now, is the idea of using a repeater something that

11   Motorola came up with?

12   A.   No, not the idea, but we came up with the specific way

13   of architecting and implementing the repeater, which we think

14   is the best way to do.  And that's confidential to us.

15   Q.   Did you do any research into how long it took Motorola

16   to implement -- design and implement the repeater device?

17   A.   Yes.

18   Q.   And what sort of research did you do?

19   A.   So I knew some of it based on my personal knowledge

20   based on my work involvement into the product.  I also spoke

21   to my colleagues who were working on prior Motorola products

22   from which the repeater draws some of the implementation.  I

23   removed the source code of the repeater, and I looked at the

24   staffing plan.

25   Q.   Do you have a demonstrative to help explain how much

1    work it was to design and implement the repeater?

2    A.   Yes.

3    Q.   And how much work was that?  I think we have it in PDX

4    7.4.

5    A.   It's at least 20 engineers and 3,248 staff months.

6    Q.   And at a high level, what engineering work went into

7    that number?

8    A.   At a high level, some pieces of the repeater were

9    designed and developed brand-new for the repeater, some

10   pieces were borrowed from earlier Motorola products and

11   technologies with modifications to make them work on the

12   repeater, and some pieces were borrowed from legacy products

13   without any modification.

14   Q.   Does Motorola still use this trade secret about the

15   design and implementation of the repeater?

16   A.   Yes, very much.  Over a period of time, we have added

17   some features into the repeater, but the code design and the

18   source code is still there.  We use this trade secret until

19   this day.

20   Q.   Do you have a demonstrative to explain some of the

21   confidential and proprietary aspects of the MOTOTRBO

22   repeater?

23   A.   Yes.

24   Q.   And what of those aspects are we seeing on PDX 7.5?

25   A.   As you can see, architecture and framework, data link

1    layer between transmit and receive boards, states and state
2    transitions, timing definitions --
3              THE COURT:  Is this testimony encompassed by your
4    earlier motion to seal?
5              MR. ALPER:  Your Honor, this testimony is at a
6    higher level, so it is not.
7              THE COURT:  All right.  Thank you.
8              Proceed.
9              MR. DOKHANCHY:  I believe, your Honor, we will
10   ultimately want to seal the exhibits being used with this
11   witness, but we can do that at the end, if that's all right
12   with you.
13             THE COURT:  All right.  Proceed.
14   BY MR. DOKHANCHY:
15   Q.   We are not going to talk about all of these in detail,
16   but let's start with the architecture and framework of the
17   repeater.
18             What is that?
19   A.   So it's Motorola's particular hardware and software
20   implementation that implements the whole repeater.
21   Q.   And why is the architecture and framework important to
22   the repeater?
23   A.   It's the whole design of our system.  The quality of
24   architecture and then framework affects everything about the
25   system from the performance to the cost to the reusability

1    for future products.  So it's really everything.

2    Q.   Did Motorola write technical documentation to describe

3    the architecture and framework of the repeater?

4    A.   Yes.

5    Q.   Can you open your binder to PTX 1316.

6    A.   I see it.

7    Q.   Do you recognize that document?

8    A.   Yes, I do.

9    Q.   What is it?

10   A.   This is the Motorola technical document entitled "Cypher

11   Architecture Document."

12   Q.   What does it describe?

13   A.   So this document describes the architecture and

14   framework of MOTOTRBO repeater.

15   Q.   Who created that document?

16   A.   I created parts of it, and other Motorola engineers

17   created parts of it.

18   Q.   Was that document created in the ordinary course of

19   Motorola's business?

20   A.   Yes.

21           MR. DOKHANCHY:  Your Honor, we move to admit PTX

22   1316 into evidence.

23           THE COURT:  It is received and may be published.

24       (Said exhibit was received in evidence.)

25   BY MR. DOKHANCHY:

1  Q.  Is this that document?

2  A.  Yes, that's right.

3  Q.  Okay.  And I see here the name Cypher.  What is Cypher?

4  A.  Cypher is the internal code name for MOTOTRBO repeater.

5  Q.  And this document is the Cypher architecture document?

6  A.  That's right.

7  Q.  What is that document used for?

8  A.  This document is used to explain the engineers about the

9  architecture and framework of MOTOTRBO repeater to Motorola

10  engineers.

11  Q.  And should this document be used to explain to other

12  engineers at other companies how to create a copycat product?

13  A.  No, absolutely not.  This is our hard work.

14  Q.  Does this document contain Motorola proprietary and

15  confidential information?

16  A.  Yes, very much so.  This is highly confidential

17  material.

18  Q.  Does anything on the document indicate that?

19  A.  Yes.  If you go down, down at the bottom you will see

20  that it's "Motorola internal use only."

21  Q.  And let's get into the technology a little bit.

22        Where in the document does it describe the

23  architecture and framework of Motorola's repeaters?

24  A.  If you go to 1316.12, you will see a high level board of

25  the architecture.

1    Q.   Okay.  What are we seeing here on Page 12?

2    A.   This is the high level architecture of the repeater.

3    Q.   And so what do these terms "RX" and "TX" mean?

4    A.   As you can see in the diagram, the left part of the

5    vertical dotted line is the receive board used in the

6    repeater, and the right side of the diagram is the

7    architecture of the transmitter board in the repeater.

8    Q.   So is it right that the repeater uses a dedicated

9    receive board and a dedicated separate transmit board?

10   A.   That's right.

11   Q.   And does the handheld device also use that same

12   two-board dedicated design?

13   A.   No.  This is the architecture that we came up with for

14   the repeater, and it's not used in the handheld.

15   Q.   And I see the term "ARM" for the top half of the diagram

16   and "C55" for the bottom half.

17        Let's start with C55.  What is that?

18   A.   C55 is the DSP processor used in the repeater.  And

19   "DSP" stands for digital signal processing.  It's a

20   combination of hardware and software that performs fast

21   processing of the signal so that the signal can be

22   transmitted and received over the air.

23   Q.   What is ARM?

24   A.   ARM is another processor used in the repeater that

25   handles, you know, higher layer processes, like handling the

1    radio call, and it generally decides what to do when.  And it

2    also tells other components that are shown in the diagram

3    what to do.

4    Q.   And does this document go on to go into more detail

5    about the implementation of the ARM architecture?

6    A.   Yes, it does.

7    Q.   Is that on the next page?

8    A.   Yeah.  If you go to the next page --

9    Q.   What are we seeing here on Page 13?

10   A.   Here we are seeing the software components that handle

11   higher layer calls.

12   Q.   And are these -- these boxes, are each of these software

13   components or hardware?

14   A.   These are all software components.

15   Q.   And are there internal subcomponents for each of these,

16   or is that it?

17   A.   Each of these components have many, many subcomponents

18   into them.

19   Q.   And does the document go on to describe each of these

20   subcomponents and the functionalities of each of these

21   software modules?

22   A.   Yes.  If you skip ahead two pages, you will see the

23   software architecture for RF modem component.

24   Q.   So is that going to be more detail on this component,

25   the analog RF modem component?

1    A.    Yes.  That's the middle software component, yes.

2    Q.    So we are going to basically zoom in on just that one

3    component?

4    A.    Yes.

5    Q.    And what are we seeing here on Page 15?

6    A.    Here we are seeing the software architecture for one of

7    that component, analog RF modem.  And as you can see here,

8    just that one box we saw in the previous diagram is quite

9    complex.

10   Q.    So this is the inner workings of just that one box?

11   A.    Yes.  That's right.

12   Q.    And does the document go on to describe similar detail

13   for all of the other boxes in that figure that we looked at

14   two pages earlier?

15   A.    Yes, there is a detailed description that goes along

16   with every figure.

17   Q.    So that was with respect to the figures.

18            And are there words that accompany the figures and

19   describe the functionality in words?

20   A.    Yes.

21   Q.    I think if we look a little bit below, we see some -- a

22   brief example of that; is that right?

23   A.    Yes.  Those are the descriptions for individual boxes

24   there.

25   Q.    All right.  And your next proprietary component that you

1  listed was the data link layer between the transmit and

2  receive boards.

3         What is that?

4  A.   So when the data comes into the receiver, it needs to be

5  transferred from the RX board to the transmit board like we

6  saw in the earlier diagram and so that the data can be

7  processed, transmitted and -- processed, amplified, and then

8  transmitted out of the repeater.

9         Now, the data link layer is a software component

10  that coordinates this transfer, and it does it in such a way

11  that it happens in a timely manner and with absolutely zero

12  errors.

13  Q.   And that was with absolutely zero errors?

14  A.   That's right.

15  Q.   Thank you.

16         Your next confidential and proprietary component

17  was states and state transitions.

18         Can you explain what those are?

19  A.   States are various modes of the operation of the

20  repeater, like, you know, the repeater could be in a standby

21  mode, it could be in a receiving mode, it could be in a

22  repeating mode.

23         State transitions are the mechanisms to which the

24  repeater goes through multiple states.

25  Q.   And why are states and state transitions important?

1    A.    For many reasons.  We need to design state transitions

2    in a way that happens quickly and without any lag.  It also

3    has to make sure that there is no data lost while

4    transitioning from one state to the other.

5    Q.    And are Motorola devices the only ones on the market

6    that have states and state transitions?

7    A.    No.

8    Q.    So what is confidential and proprietary about this

9    aspect of the trade secret?

10   A.    The particular design of state and state transitions is

11   confidential to Motorola.

12   Q.    Your next item was "timing definitions."

13         What are timing definitions?

14   A.    So as I mentioned, timing is a very particular aspect of

15   the repeater.  So when the data comes into the repeater, it

16   needs to be processed, amplified, and transmitted within a

17   defined period of time.  So that means we have to set the

18   deadlines for every single step in the repeater that needs to

19   take place.

20   Q.    And did it take Motorola a long time to determine and

21   decide on those timing deadlines for each step?

22   A.    Yes, years.  Of course, timing is the most critical

23   aspect in the repeater.  Timing deadlines impact everything

24   about the system.

25         If we change one timing deadline, it has a ripple

1    effect on the entire system.  So we have to go back to the

2    architecture and recalibrate the system.

3    Q.   And the next item was "data flow."

4         Can you explain what data flow is?

5    A.   Data flow is the mechanism in which the data moves

6    within the system from component to component in a most

7    efficient way.

8    Q.   And again, are Motorola devices the only ones on the

9    market with a data flow?

10   A.   No.

11   Q.   So what is proprietary and confidential about Motorola's

12   data flow?

13   A.   It's the way we design and implement it that's

14   confidential.

15   Q.   And is that described in a public documentation?

16   A.   No, not at all.

17   Q.   The next item was the "analog repeater interface."

18         What is that?

19   A.   It's a physical interface on the device that allowed

20   somebody to connect equipment and control the operation of

21   the repeater.

22   Q.   Can you give us an example of the analog repeater

23   interface in use?

24   A.   Yeah.  Something we see in a normal day, the taxi

25   dispatchers, they talk to each other.  And a dispatcher is

1    the one who could be listening to the calls, and dispatcher

2    could cut down the communication and talk over the channel to

3    a particular taxi driver.  That's one example.

4    Q.   And your next item was "multisite functionality."

5             What is that?

6    A.   So multisite functionality, this is when repeaters talk

7    to each other in sort of just talking to the radios over the

8    air.

9    Q.   Why is it beneficial for repeaters to talk to each

10   other?

11   A.   It greatly extends the range of the subscribers.

12   Repeaters are connected over the Internet.  So someone can

13   talk to a person in a different city or maybe a different

14   country with the MOTOTRBO repeater.

15   Q.   And you mentioned the term "subscriber."  That's the

16   handheld device?

17   A.   That's the handheld device, yes.

18   Q.   Did Motorola write any other documents besides this one

19   we have been looking at to describe this trade secret?

20   A.   Yes, thousands of documents.

21   Q.   I want to point you to a few of those in your binder.

22   Can you let me know if you have them.

23             PTX 784?

24   A.   Let me look.  Yes, I see it.

25   Q.   785?

1    A.    Yes.

2    Q.    1264?

3    A.    Yes, I have it.

4    Q.    1317?

5    A.    Yeah.

6    Q.    And 1330?

7    A.    Yes.

8    Q.    Do you recognize those documents?

9    A.    Yes, I do.

10   Q.    And do you have personal knowledge of those documents?

11   A.    Yes.

12   Q.    And how is that?

13   A.    So I have seen these documents.  I have reviewed these

14   documents when they were being created and when we were

15   working on those technologies.  I wrote parts of it and

16   provided my inputs, my comments generally.

17   Q.    Who authored those documents?

18   A.    Motorola engineers.

19   Q.    And were those documents created in the ordinary course

20   of business at Motorola?

21   A.    Yes.

22             MR. DOKHANCHY:  Your Honor, we move to admit PTX

23   784, 785, 1264, 1317, and 1330 into evidence.

24             MS. ROTHSCHILD:  No objection.

25             THE COURT:  They are received and may be published.

1          (Said exhibits were received in evidence.)

2     BY MR. DOKHANCHY:

3     Q.   Do those documents describe the functionality that you

4     have been discussing in connection with the MOTOTRBO

5     repeater?

6     A.   Yes.

7     Q.   And would you expect to find any of those documents

8     anywhere else in the world besides in Motorola's files?

9     A.   No.   These are confidential documents, and they should

10    be only at Motorola files.

11    Q.   And I think you mentioned this a moment ago, but did

12    Motorola write other documents besides the half dozen or so

13    that we have been discussing today so far to describe the

14    trade secret regarding the repeater?

15    A.   Yes.   As I said, we have thousands and thousands of

16    documents.

17    Q.   Did Motorola also develop source code for their

18    repeater?

19    A.   Yes.

20    Q.   And are you familiar with that source code?

21    A.   Yes.

22    Q.   And how is that?

23    A.   I wrote a lot of the source code, and I worked with most

24    of the rest of it in one or another way.

25    Q.   And approximately how many files are in the source code

1    for the repeater?

2    A.    Thousands and thousands of files.

3    Q.    And can you estimate how many lines of code that would

4    be?

5    A.    Millions of lines.

6    Q.    Have you prepared any demonstratives regarding the

7    source code?

8    A.    Yes.

9    Q.    And what are we seeing here in PDX 7.6?

10    A.    These are the source for -- these are the folders that

11    contain the source files.

12    Q.    And does this demonstrative show all of the files in the

13    source code?

14    A.    No.  These are just the folders that would contain the

15    files, and there are many, many subfolders within each of

16    these folders.

17    Q.    So each of these folders will have many subfolders?

18    A.    Yes, multiple layers.

19    Q.    And what is this top folder, "repeater 1.0"?

20    A.    That's the folder that contains all of the source files

21    for the repeater.

22    Q.    And what are these ones listed after that?

23    A.    These are the subfolders.  They relate to certain

24    functionality.

25    Q.    And was all of the source code for the repeater designed

1      from scratch, brand-new for the repeater?

2      A.    Not all of them.  Some source code was designed

3      brand-new, but some of them they borrowed from earlier

4      Motorola legacy products and technologies.

5      Q.    And were they -- so which -- when you say legacy

6      products and earlier Motorola technologies, which products

7      and technologies are you referring to?

8      A.    I was referring to MOTOTRBO handheld devices and also

9      the ASTRO technology.

10     Q.    And how much work was it to use the software from the

11     previous Motorola technologies?

12            Was it just a matter of copying and pasting it in

13     without any changes or something different?

14     A.    Yes, there was a substantial amount of work to modify

15     that code to make it work on the repeater.

16     Q.    And why is it, at a technical level, that the repeater

17     had to change the source code from, for example, the handheld

18     so much?

19     A.    Mainly because repeater has a different functionality

20     compared to handheld, and it's also much more complex.  If we

21     look at the handheld, that's either transmitting or receiving

22     at one time.  It doesn't do both at the same time.  And it

23     also handles one call at a time.

24            But repeater is constantly receiving and constantly

25     transmitting.  It also handles multiple calls.  And an

1    important aspect of the repeater is it has to be able to

2    receive a weak signal, work on that weak signal, and then be

3    able to transmit.

4              So these are complex tasks.

5    Q.   And is that concept of receiving and interpreting a weak

6    signal, is that related to its ability to extend the range?

7    A.   Yes.  That's explained at a high level here.

8    Q.   Now, are there any directories here in 7.6 that contain

9    source code that was borrowed from an earlier technology and

10   then modified?

11   A.   Yes.  If you look at the third folder from the bottom,

12   the "patriarch directory," that contains the radio signaling

13   level source code from ASTRO.

14   Q.   And again, was that used directly or was that modified?

15   A.   That was used with the modifications.

16   Q.   And are there examples of source code directories where

17   some of it was written brand-new for the repeater?

18   A.   Yes.  Two more folders up, the folder called "LTD

19   model," that contained source code that was written

20   brand-new.  It also had source code from MOTOTRBO handheld

21   with modifications.

22   Q.   And did you include the development times for all of

23   this source code when you were coming up with your number of

24   total staff months and the work that it took to design and

25   implement the repeater that you mentioned earlier?

1    A.   Yes.

2    Q.   And why do you think it was appropriate to include the

3    development times for code from other products either that

4    were used directly or adapted in your count?

5    A.   Yes, because we needed those functionalities.  And if we

6    did not have them, we had to create those things from

7    scratch.

8              So when I'm calculating the effort required to

9    create a repeater, we kind of have to include all of that.

10   Q.   I want to switch topics and discuss Hytera.

11             Have you ever looked at Hytera's products?

12   A.   Yes.

13   Q.   And why is that?

14   A.   Well, in our industry it's very common to check out the

15   competition and compare the performance of our product or

16   devices with their devices.

17   Q.   Is there a term for that sort of analysis in your

18   industry?

19   A.   It's called competitive analysis.

20   Q.   Have you ever reviewed Hytera product documentation in

21   connection with competitive analysis?

22   A.   Yes, I did.

23   Q.   Could you open your binder to PTX 1237.

24   A.   Yes.

25   Q.   Do you recognize that document?

1    A.   Yes, I do.

2    Q.   What is it?

3    A.   This is an email chain between me and other colleagues

4    at Motorola from June 2011.

5    Q.   What is being discussed in that email?

6    A.   So in this email we are talking about some public

7    documentation from Hytera.

8    Q.   And was this email chain written in the ordinary course

9    of business at Motorola?

10   A.   Yes.

11           MR. DOKHANCHY:  Your Honor, we move to admit PTX

12   1237 into evidence.

13           MS. ROTHSCHILD:  No objection.

14           THE COURT:  It is received and may be published.

15       (Said exhibit was received in evidence.)

16   BY MR. DOKHANCHY:

17   Q.   And who wrote the original email down at the bottom

18   here?

19   A.   John Belmonte.

20   Q.   And who is John Belmonte?

21   A.   John Belmonte is a colleague of mine in Motorola.  He

22   also worked on MOTOTRBO.

23   Q.   And what is Mr. Belmonte discussing in the first email

24   at the bottom?

25   A.   So Mr. Belmonte saw some public documentation from

1    Hytera, and he was saying that he found some similar wordings

2    and similar diagrams in Hytera's public documents.  Those are

3    available in Motorola's public documents.

4    Q.    And what was Mr. Belmonte's role in the company at this

5    time?

6    A.    He was a system architect.

7    Q.    And in that role, did he engage in competitive analysis

8    issues?

9    A.    Yes.  He would go to the trade shows where Motorola also

10   goes and hands out the documents for Motorola products, and

11   the competitors also would come there and hand out their

12   documentation about their products.

13   Q.    And is that public documentation from Hytera and

14   Motorola what's being discussed in this email?

15   A.    Yes.

16   Q.    And where does Mr. Belmonte say he is discussing public

17   Hytera documentation and public Motorola documentation?

18   A.    So if we look at his email down at the bottom, he starts

19   off saying, "I am shocked that there are full sentences being

20   copied from our system planner.  As I'm reading it, I

21   recognize my own writing style."

22   Q.    And what is the system planner?

23   A.    System planner is a public document that we create, we

24   hand over to our customers who buy our products, and it helps

25   them to design their own system.

```
 1    Q.   And who wrote that system planner?

 2    A.   Mr. Belmonte did.

 3    Q.   And so what did you say in response to Mr. Belmonte's

 4    email?

 5    A.   So I told him that I agree that Hytera had some similar

 6    features like ours did, and that's based on looking at their

 7    public document.

 8    Q.   What sort of features did you see as being similar

 9    between the two products?

10    A.   Some similar features like their peer is capable of

11    supporting 15 peers like ours did.

12    Q.   And then in this first numbered item you say, "If we can

13    capture their IP stream using Wireshark, we will know it

14    better."

15            Let's start off, what is Wireshark?

16    A.   Wireshark is a public tool that monitors the data over

17    the Internet.

18    Q.   And what is an IP stream?

19    A.   That's an Internet protocol stream.

20    Q.   And just to be clear, does "IP" here mean intellectual

21    property?

22    A.   No.  It's an Internet protocol.

23    Q.   Why did you mention here capturing Hytera's IP stream

24    using Wireshark?

25    A.   It's something we could do to get a better idea about
```

1   their products, whether they perform better or worse than

2   ours.  It's a competitive analysis.  You can look at their

3   features and compare it to our features.

4   Q.   And when you connect Wireshark to a product, does it

5   tell you anything about the source code for that product?

6   A.   No.  Wireshark won't be able to provide any information

7   about the source code or any interworking of the devices.

8   Q.   And when you connect Wireshark to a product, does it

9   tell you whether or not that product was created using stolen

10  source code?

11  A.   No.  Again, Wireshark just gives you bits, ones and

12  zeros.  And it won't be able to tell anything about the

13  documents being used to create the product.

14  Q.   And are those the ones and zeros transferred in and out

15  of the device, not inside the device?

16  A.   That's right.  Yes.

17  Q.   Does Wireshark tell you anything about the inside of the

18  device?

19  A.   No.

20  Q.   And similarly, does Wireshark tell you whether a product

21  was designed based on stolen confidential technical

22  documentation?

23  A.   No, it won't be able to tell anything about the

24  technical documentation.

25  Q.   I see here in the second bullet you say, "HYT supports

1    15 peer system, like we do."

2              What did you mean by that?

3    A.   Here I meant their public document said that their peer

4    also supports 15 peer systems like ours.

5    Q.   And then you say, "which tells us that they have similar

6    architecture/code and hardware in the repeater that we have."

7              What did you mean by that?

8    A.   So by that, what I meant is their peer is also capable

9    of supporting connections to 15 other peers.

10   Q.   Why did you mention architecture and code?

11   A.   So we both supported 15 peer connection limit.  That

12   means that there is a capping to the number of connections

13   that the repeater can support.  And that limiting is an

14   architecture choice and the choice being implemented in the

15   product in terms of the code.  You will see it.

16   Q.   And was it strange that a competitor would try to match

17   the number of peers that a Motorola device could support?

18   A.   No, it doesn't surprise me because this is all public

19   information that's available and competitors can look at the

20   public information and try to match with the capability.

21   Q.   And at that time was Hytera a competitor that might be

22   interested in that?

23   A.   Yes.

24   Q.   Did your observations here in this email lead you to

25   believe that Hytera had stolen Motorola's source code and

 1   confidential documents?

 2   A.   No.   There are a number of ways you can write the source

 3   code to get to the capability of 15.   That doesn't tell us

 4   anything that they stole the code or documents.

 5   Q.   And did you have access to any Hytera confidential

 6   source code or documents when you wrote this email?

 7   A.   No.

 8   Q.   Have you ever had access to any Hytera confidential

 9   information?

10   A.   No.

11   Q.   So did you have any way of knowing whether Hytera had

12   copied Motorola's confidential information?

13   A.   No.

14   Q.   Do you know if at some later point in time unconnected

15   to this email anyone at Motorola looked into whether Hytera's

16   products had copied Motorola confidential information?

17   A.   Yes.   I know that there was a formal investigation into

18   Hytera products.

19   Q.   Were you personally involved in that investigation?

20   A.   No.

21   Q.   And do you know what the results of the investigation

22   into whether Hytera copied was?

23   A.   I know that the Motorola team was unable to conclude.

24            MS. ROTHSCHILD:  Objection, your Honor.  Lack of

25   foundation.

```
 1            THE COURT:  Sustained.
 2   BY MR. DOKHANCHY:
 3   Q.   Were you sent an email summarizing the findings of that
 4   investigation?
 5   A.   Yeah.  One of the persons on this email, Mr. Ted
 6   Kozlowski, sent -- forwarded an email to us and others on
 7   this chain confirming that that was the final result.
 8   Q.   And what did the email from Mr. Ted Kozlowski to you say
 9   about the results of the investigation?
10            MS. ROTHSCHILD:  Objection, your Honor.  Hearsay.
11            THE COURT:  Sustained.
12   BY MR. DOKHANCHY:
13   Q.   All right.  Well, let's talk about another look at
14   Hytera's products.
15            Can you open your binder to --
16            THE COURT:  No.  Just a minute.
17            What do you include in your definition or
18   understanding of "public information"?
19            THE WITNESS:  These are the documents those are
20   available to the public that the company hands over.  You
21   know, when you buy the product, something like a product
22   brochure, user manual, these are all the public information.
23            THE COURT:  Anything more than that?
24            THE WITNESS:  They may have some documents to help
25   configure their devices, for example.
```

1        MR. DOKHANCHY:  May I approach, your Honor?

2        THE COURT:  Yes.

3     (Document tendered.)

4        MS. ROTHSCHILD:  Can we get a copy, please?

5        MR. DOKHANCHY:  Yes.  I'm not sure if we have it.

6  It was Exhibit 35 to his deposition that you took,

7  Ms. Rothschild.

8        THE COURT:  Is it already being depicted?

9        MR. DOKHANCHY:  It is not being depicted currently,

10 but it is an email that the witness received.

11       THE COURT:  All right.  Do you have a physical

12 copy?

13       MR. DOKHANCHY:  I'm not sure if we have a copy.  We

14 can -- I suppose we can deal with it on redirect, your Honor.

15       MS. ROTHSCHILD:  Your Honor, I would like to object

16 to the foundation.  At his deposition he stated he didn't

17 know this document.

18       THE COURT:  What document?

19       MS. ROTHSCHILD:  Exhibit 35 to his deposition.

20       THE COURT:  Are you going to attempt to lay a

21 foundation for the admissibility of that document with this

22 witness?

23       MR. DOKHANCHY:  I will do so on redirect when we

24 can get the hard copies ready.

25 BY MR. DOKHANCHY:

1  Q.  All right.  Let's move on to another look at Hytera's

2  products.

3            Could you turn to DTX 4279, please.

4  A.  Yes.

5  Q.  Do you recognize this exhibit?

6  A.  Yes.

7            THE COURT:  This is No. 45?

8            MR. DOKHANCHY:  I'm sorry, your Honor?

9            THE COURT:  45, you said?

10            MR. DOKHANCHY:  This is DTX 4279.

11            THE COURT:  Do you have a copy of that, Counsel?

12            MS. ROTHSCHILD:  Yes, your Honor.

13            THE COURT:  Please proceed.

14  BY MR. DOKHANCHY:

15  Q.  And what is that document?

16  A.  This is the presentation material we put together,

17  myself and Tom Bohn, on the competitive analysis --

18  competitive performance analysis.

19  Q.  And who is Tom Bohn?

20  A.  Tom Bohn is my colleague at Motorola.  He also worked on

21  MOTOTRBO repeater.

22  Q.  And when was this presentation created?

23  A.  This was in late 2010.

24  Q.  Was this presentation created in the ordinary course of

25  Motorola's business?

1    A.    Yes.

2              MR. DOKHANCHY:  Your Honor, we move to admit DTX

3    4279 into evidence.

4              THE COURT:  It is received and may be published.

5         (Said exhibit was received in evidence.)

6    BY MR. DOKHANCHY:

7    Q.    What was the purpose of this presentation?

8    A.    This was basically to do the competitive analysis of our

9    products with products like Kenwood and Hytera.

10   Q.    And why did you do that comparison?

11   A.    We saw some claims from Kenwood and Hytera that their

12   product performed better than our products.

13   Q.    Did you test the Hytera radio's performance against the

14   Motorola radio's performance?

15   A.    Yes, I did.

16   Q.    And when you were doing that test, did you have any

17   access to confidential Hytera information or just the radio?

18   A.    Just the radio by itself.

19   Q.    So when you tested the Hytera radio, what was the result

20   of the comparison with the Motorola radio?

21   A.    If you turn to Page 4 on this, at the bottom of the page

22   we concluded that the range performance of Hytera radios

23   almost the same as Motorola radio except that Hytera radio

24   exhibited more audio artifacts.

25   Q.    So this was a range analysis; is that right?

1    A.    That's right.  Yeah.

2    Q.    And when it says "almost the same," it's talking about

3    the range?

4    A.    That's right.

5    Q.    And then what are audio artifacts?

6    A.    Audio artifacts are some anomalies like noise or errors

7    in the audio.

8    Q.    And what audio artifacts did you find in the Hytera

9    device?

10   A.    What we observed is Hytera device was dropping some

11   audio by receiving.

12   Q.    And when you say dropping audio, are you talking about

13   voice?

14   A.    It's voice, yeah.

15   Q.    How did you test for dropping a voice?

16   A.    We used an audio file that is transmitted over the air,

17   and that audio file contained person Y's counting numbers

18   from one to ten.

19   Q.    And what was the result of the test with the Hytera

20   device?

21   A.    When we were listening to the Hytera radios, we found

22   that Hytera radio dropped some numbers.  Like instead of

23   receiving one, two, three, four up to ten, we heard one,

24   three, five, something like that.  And even in the counts of

25   the numbers we heard, the audio was not very clear.

1    Q.   And how did the Motorola device perform under the same

2    test of the voice counting one to ten?

3    A.   Motorola devices did not drop the audio, and audio

4    was -- audio quality was good.

5    Q.   So did the Hytera device have more or less noise and

6    errors than the Motorola device?

7    A.   Hytera radios had more noise and errors compared to

8    Motorola radios.

9    Q.   And so did the similarities in the range that you saw

10   indicate to you that Hytera had copied Motorola documents and

11   source code?

12   A.   No, not at all.  You could get to that one performance

13   number in many different ways.  That doesn't mean that there

14   was single implementation to Motorola's implementation.

15   Q.   And did anything about your results indicate that at

16   that time actually you believed Hytera was doing something

17   different from what Motorola was doing?

18   A.   Yes.  As you can see here, there are many differences

19   compared to Motorola.  That indicated to me that they are

20   doing something different than us.

21   Q.   Thank you.

22        MR. DOKHANCHY:   I pass the witness.

23        THE COURT:   What was the date of the testing?

24        THE WITNESS:   This was in late 2010.

25        THE COURT:   Thank you.

1          All right.  Cross.

2               MS. ROTHSCHILD:  Yes, your Honor.

3               Mr. Fulbright, if you wouldn't mind switching the

4     technology.

5                        CROSS-EXAMINATION

6     BY MS. ROTHSCHILD:

7     Q.   Good morning.

8     A.   Good morning.

9     Q.   Jessica Rothschild for the Hytera defendants.

10               Nice to see you again, Mr. Karpoor.

11    A.   Yes.

12    Q.   You testified that you never had any Hytera confidential

13    documents in your possession; is that correct?

14    A.   That's right.

15    Q.   Let me hand you DTX 4263.

16               (Document tendered.)

17    BY MS. ROTHSCHILD:

18    Q.   DTX 4263 is an October 29, 2013, email from Ted

19    Kozlowski, who was then the head of the division that

20    included DMR.  And you are one of the recipients, right?

21    A.   That's right.  I can see here.

22               MS. ROTHSCHILD:  Your Honor, I would like to move

23    DTX 4263 into evidence.

24               THE COURT:  What was your answer?

25               THE WITNESS:  That's right.  I was on the email.

1       THE COURT:  It is received and may be published.

2           (Said exhibit was received in evidence.)

3   BY MS. ROTHSCHILD:

4   Q.   And if we could zoom in, please, on the top of this

5   email, we see the subject of this email is, "FWD:

6   Competitive Information," right?

7   A.   Yes.

8   Q.   This is part of Motorola's competitive intelligence

9   efforts, right?

10  A.   Yes.  Competitive performance, yeah.

11  Q.   And this is competitive intelligence gathering about

12  Hytera, correct?

13  A.   Yes.

14  Q.   And if we actually can look at the second email in the

15  chain below from Andres Lacambra?

16  A.   Yes.  Let me go through it quickly.

17  Q.   It's right there on that first page as well in the

18  middle.

19          He says that Hytera is making some bold claims

20  regarding battery life, et cetera, on their new platform,

21  right?

22  A.   Yes.

23  Q.   There is also some detail on the new small repeater,

24  right?

25  A.   Is it on the next page?

1    Q.   No.  Same email in the middle of that first page.

2    A.   Yeah.

3    Q.   And then he says, "We need to watch this closely and do

4    the proper engineering analysis."  Right?

5    A.   Where is that?

6    Q.   Still that same email, sir.

7            And if it helps, I believe we have highlighted it

8    on your screen and zoomed in on it.

9    A.   Yeah.  I can see that, yes.

10   Q.   Okay.  Now, I would like to direct your attention to the

11   lower email in the chain, which is actually the first email

12   in the chain, which is from an individual named Tim Clark.

13           Do you see that?

14   A.   Yes.

15   Q.   And if we look on the second page of the document, we

16   see that Tim Clark is based out of Motorola Solutions U.K.,

17   right?

18   A.   Yes.

19   Q.   And at the bottom of the first page he starts by

20   commenting on Hytera's pricing information, right?

21   A.   That's right.

22   Q.   And on Page 2 he has a number of additional points,

23   right?

24           Do you see it goes all the way to No. 11?

25   A.   I am going through it, yes.

Karpoor - cross by Roth - Shiflaa                    1031

1    Q.    For example, No. 11 he says, "Hytera call their repeater
2    management software RDAC" -- R-D-A-C.   "Is there nothing we
3    can do about this?"   Right?
4    A.    Yes, I can see that.
5    Q.    And in No. 4 he writes, "I notice Hytera have analog
6    signaling HDC 1200, which I assume to be their version of MDC
7    1200.   Do we still have IPR (intellectual property rights) in
8    MDC?   Has anyone checked whether we can make a claim for
9    infringement against them?"   Right?
10   A.    Yes, I can see that.
11   Q.    Now I would like you to turn and let's start looking at
12   the attachments to that email chain that originally came from
13   Mr. Clark in the United Kingdom.
14              If we look on Page 4, we see a document entitled
15   "Digital Migration Radio PD 505," which is a Hytera DMR
16   radio, right?
17   A.    Yes.
18   Q.    And if we look at Page 5, on the bottom of Page 5 in the
19   lower left-hand corner there is a designation by Hytera, and
20   it says, "Hytera confidential," right?
21   A.    Yes, I see that.
22   Q.    Let's look at the next attachment.   It starts on Page
23   22.   This is another Hytera document.   This one is entitled
24   "Digital Migration Radio PD 605/PD 605G."
25              Do you see that?

1  A.  Yes.

2  Q.  And if we look at the next page of that attachment, Page

3  23, on the bottom left-hand corner we see another "Hytera

4  confidential" designation, right?

5  A.  Yes.

6  Q.  And let's look at the next attachment.  That's on Page

7  42.  This one is entitled "Digital Migration Repeater RD625."

8          Do you see that?

9  A.  What is the page here?

10 Q.  42.

11 A.  42.  Okay.  Yeah.

12 Q.  And again, if we look at the second page of the

13 attachment -- so Page 43 of the exhibit -- on the bottom

14 left-hand corner we see a confidentiality designation that

15 reads "Hytera company confidential," right?

16 A.  Yes.

17 Q.  Now, if I can direct your attention back to the first

18 page of the exhibit and we look at the email at the top of

19 the page, we see that Mr. Kozlowski has sent an email with

20 several Hytera confidential documents to 15 -- to you and 15

21 of your colleagues, right?

22 A.  Yes.

23 Q.  And that includes colleagues in the United States, like

24 yourself, right?

25 A.  Yeah.

1   Q.   As well as colleagues in Malaysia, like Solomon Lorthu,

2   right?

3   A.   Yeah.

4   Q.   And if we move slightly down the page, we see that

5   Mr. Kozlowski was forwarding the email from Mr. Lacambra, who

6   had sent that iteration of the email to eight other

7   Motorolans, right?

8   A.   Yeah.

9   Q.   And this email had originated from Mr. Tim Clark in the

10  United Kingdom, right?

11  A.   Yes.

12  Q.   So Motorola was circulating this email all over the

13  world, right?

14  A.   Yes, I can see that.

15  Q.   You can put that document down.

16          In your testimony you mentioned having received two

17  awards from Motorola, right?

18  A.   Yes.

19  Q.   Neither of those were for what Motorola is claiming as

20  trade secret 142 in this case, right?

21  A.   Well, those were -- I mean, one of it was the invention

22  about and the other one for my work that enabled the business

23  and the products, correct.

24  Q.   Now, you have been involved in interoperability testing

25  for Motorola on a number of occasions, correct?

1   A.   Correct.

2   Q.   Interoperability is testing to ensure that radio systems

3   from different manufacturers are able to communicate with

4   each other, right?

5   A.   Correct.

6   Q.   On a certain set of agreed features and parameters,

7   right?

8   A.   Correct.

9   Q.   Motorola conducted its first DMR interoperability

10  testing in the spring of 2010, right?

11  A.   Oh, Motorola the company, that's right.  Correct.

12  Q.   Because prior to that time there were no other DMR

13  manufacturers on the market, right?

14  A.   Absolutely, yes.

15  Q.   Let me hand you DTX 4274.

16       (Document tendered.)

17  BY MS. ROTHSCHILD:

18  Q.   This is an email that you sent on May 4th, 2010,

19  correct?

20  A.   That's right.

21       MS. ROTHSCHILD:  Your Honor, I would like to move

22  DTX 4274 into evidence.

23       THE COURT:  It is received and may be published.

24       (Said exhibit was received in evidence.)

25  BY MS. ROTHSCHILD:

1   Q.   So we see at the top that this is an email from you on
2   May 4th, 2010, to some of your colleagues at Motorola.  And
3   the subject is "First DMR IOP Test Session Completed."  It
4   looks like the L is missing.
5   A.   Sure.  Yeah.
6   Q.   And "IOP," that's interoperability, right?
7   A.   That's correct.
8   Q.   Okay.  Let's look at the email that you had forwarded,
9   which is an email from Tom Mockridge.
10          Do you see that?
11  A.   Yes.
12  Q.   And the first DMR interoperability testing that was
13  completed was done with a company called Selex, right?
14  A.   That's right.
15  Q.   And this was an interoperability test not of radios but
16  of repeaters, right?
17  A.   Correct.  Motorola radios and Selex's repeaters, yes.
18  Q.   Because as of this time, Motorola and Hytera were the
19  only two manufacturers on the market with radios, right --
20  DMR radios?
21  A.   I can talk about Motorola.  I don't know exactly when
22  Hytera released their products, but yes.
23  Q.   And the original email here is from Tom Mockridge, who
24  was the chair of the DMR Association technical working group
25  at the time, right?

1    A.    That's correct.

2    Q.    I would like to direct your attention to the third

3    paragraph of his email.

4    A.    Yeah.

5    Q.    The second sentence he writes, "We are also being asked

6    for a quick second interoperability session with Radio

7    Activity, which can be used for more publicity."  Right?

8    A.    Yes.

9    Q.    Because Motorola wanted publicity for other

10   manufacturers developing DMR as opposed to dPMR, right?

11   A.    Sure.

12   Q.    And Radio Activity was another company that made DMR

13   repeaters, right?

14   A.    Yes.  Correct.

15   Q.    And then Mr. Mockridge writes, "Hytera" -- HYT, right?

16   A.    Yeah.

17   Q.    "Hytera are also likely push for IOP testing quickly,

18   which will be good for marketing the standard, if something

19   of a double-edged sword for us."  Right?

20   A.    I can see that.

21   Q.    Because interoperability testing with another DMR radio

22   manufacturer would be good for promoting the DMR standard,

23   right?

24   A.    Right.

25   Q.    But it's a double-edged sword because it would also lend

 1   legitimacy to Hytera and its products, right?

 2   A.   That I don't know what Tom was referring to, but I can

 3   see it here.

 4   Q.   Okay.  Let me hand you DTX 4273.

 5        (Document tendered.)

 6   BY MS. ROTHSCHILD:

 7   Q.   And Motorola moved forward and did interoperability

 8   testing with Radio Activity on its repeaters, right?

 9   A.   That's right.

10   Q.   Okay.  And DTX 4273 is an email that you received

11   regarding that interoperability testing, correct?

12   A.   That's right.

13        MS. ROTHSCHILD:  Your Honor, I would like to move

14   DTX 4273 into evidence.

15        THE COURT:  It is received and may be published.

16        (Said exhibit was received in evidence.)

17   BY MS. ROTHSCHILD:

18   Q.   So on this email I would like to start on the bottom of

19   Page 1.  There is an email from a woman named Nancy

20   Koutropoulos at Motorola, correct?

21   A.   That's right.

22   Q.   And she is emailing Tom Mockridge, and you are copied.

23   And the subject is "Radio Activity Interoperability Testing."

24   Right?

25   A.   That's right.

1    Q.   And she writes, "Hi, Tom.  Can you explain again why we

2    want to do interop testing with Radio Activity?  I thought it

3    had something to do with Hytera and stuff but can't

4    remember."  Right?

5    A.   Sure.  I can see that.

6    Q.   And then she writes that she has approval to send you

7    specifically to do the testing, right?

8    A.   Yeah.  This is about me going to Europe and then doing a

9    test with Radio Activity.

10   Q.   Right.

11              And then at the top Tom Mockridge responds, and you

12   are still copied on this email?

13   A.   Yes.

14   Q.   And he explains, "We want to do the interop testing with

15   Radio Activity as, A, they currently sell a solution with our

16   radios.  So anything we can do to promote this is good for

17   sales."  Right?

18   A.   Yes.

19   Q.   "B, for DMR PR it will be good to talk about a second

20   interop session."  Right?

21   A.   Yes.

22   Q.   And "PR" is public relations?

23   A.   Maybe, yeah.

24   Q.   "And C, we don't want HYTERA" -- all caps -- "to interop

25   test with them and us not."  Right?

1    A.   I can see that.

2    Q.   Now, if Motorola conducted interoperability testing with

3    Radio Activity, Motorola wouldn't want Hytera to have those

4    test results, would it?

5    A.   That's not my capacity.  That's something for the

6    business.  I am just the technical guy to test it out.

7    Q.   So you test, and you are the interoperability person for

8    Motorola, right?

9    A.   From a testing perspective, yes.

10   Q.   So if you go and do a private test with Radio Activity,

11   would you want those results to remain private?

12   A.   This is not a private test.  It's officially announced

13   for interoperability, and we go and test it out.  And the

14   results are published on the DMR Web page.

15   Q.   So you never got Hytera's confidential testing results?

16   A.   What do you mean by Hytera confidential test results?

17   Q.   Well, let me show you.

18        MS. ROTHSCHILD:  Can I please have DTX 4272.

19        (Document tendered.)

20   BY MS. ROTHSCHILD:

21   Q.   DTX 4272 is a June 18th, 2010, email that you received,

22   correct?

23   A.   Yes.

24        MS. ROTHSCHILD:  Your Honor, I would like to move

25   DTX 4272 into evidence.

```
 1           THE COURT:  It is received and may be published.
 2           (Said exhibit was received in evidence.)
 3   BY MS. ROTHSCHILD:
 4   Q.   On June 18, 2010, you received this email from one of
 5   your colleagues.  It was sent to you and some of your other
 6   colleagues as well -- Tom Bohn, Tom Mockridge, and Nancy
 7   Koutropoulos, who we just saw in the last email?
 8   A.   Yes.
 9   Q.   The subject is "Interop Testing Between MOT and Hytera
10   Subscribers - Confidential."  Right?
11   A.   Yeah.  That's a subject, yes.
12   Q.   And then the email reports, "A pair of months ago, Radio
13   Activity has got a visit by some Hytera people, and they
14   informally tested some functionalities between our radios,
15   Hytera radios, and Radio Activity infrastructure."  Right?
16   A.   Sure.  Radio Activity might have done it.
17   Q.   And then it says, "Radio Activity guys gave in
18   confidence to Sanjay" -- that's you, right?
19   A.   Yes.
20   Q.   -- "to Sanjay and me the results of these tests."
21   Right?
22   A.   Sure.
23   Q.   So in this one page of the email that says
24   "confidential" in the subject and "in confidence" in the
25   body, right?
```

1   A.   I mean, that's just the word he used.  I don't know if
2   it's confidential actually or not, but sure, I can read that.
3   Q.   So let's move --
4   A.   Do we have the results?
5   Q.   They are attached to the email.  They are a part of the
6   exhibit you have been handed.
7           I would like to move on a few weeks forward to June
8   30th, 2010.  And if I could hand you DTX 4270.
9   A.   Can I look at the results in a minute?
10  Q.   I am going to move on.  The results are not what I am
11  asking about right now.
12  A.   Because --
13  Q.   There is no question pending.
14  A.   Okay.
15          THE COURT:  You have stole my thunder.
16          There is no question pending.
17      (Document tendered.)
18  BY MS. ROTHSCHILD:
19  Q.   DTX 4270 is a June 30th, 2010, email that you received,
20  correct?
21  A.   Yes.
22          MS. ROTHSCHILD:  Your Honor, I would like to move
23  DTX 4270 into evidence.
24          THE COURT:  It is received and may be published.
25      (Said exhibit was received in evidence.)

1    BY MS. ROTHSCHILD:

2    Q.   This is a June 30th, 2010, email from Nancy Koutropoulos

3    to Tom Mockridge, Tom Bohn, and yourself.  And the subject is

4    "Selex Inviting Hytera For IOP Testing."  Right?

5    A.   Yes.

6    Q.   And she asks, "Hi, Tom.  Should we be concerned that

7    Selex is inviting Hytera for IOP testing?  Do we need to

8    change any of our 'strategy'?"  Right?

9    A.   I can read it, yes.

10   Q.   That strategy was not to do interoperability testing

11   with Hytera, right?

12   A.   That I wouldn't say.  I don't know what that strategy

13   was.

14   Q.   But Motorola didn't change its course and invite Hytera

15   to conduct interoperability testing in June of 2010, did it?

16   A.   Motorola doing the test with Hytera?

17   Q.   Motorola did not invite Hytera to do interoperability

18   testing in June of 2010, right?

19   A.   I think when we published the interoperability, we just

20   sent out.

21   Q.   Motorola did not invite Hytera to do interoperability

22   testing in June of 2010, right?

23   A.   I can't comment.  I don't know.  It's basically an

24   announcement that goes out.  Whoever plans to join, they can

25   join.

1    Q.   At this time, in June of 2010, Hytera was the only other

2    DMR radio manufacturer, right?

3    A.   Devices, but there was an infrastructure available from

4    Radio Activity and Selex.

5    Q.   Right, which you invited to do interoperability testing

6    with, right?

7    A.   I couldn't get the question.

8         I think we did interoperability with Selex and

9    Radio Activity.  Those were the manufacturers.  They called

10   for interoperability, and then we went to interoperate on

11   their infrastructure on our devices.  That's the arrangement.

12   We did not call for interoperability in 2010.

13   Q.   Aside from conducting interoperability testing with

14   other DMR equipment manufacturers, you conducted testing

15   internally at Motorola using other manufacturers' equipment,

16   right?

17   A.   Are you referring to interoperability?

18   Q.   Nonofficial interoperability testing, testing that

19   Motorola did internally at Motorola.

20   A.   With respect to some performance tests, yes, I have done

21   performance tests.

22   Q.   For example, in the fall of 2010, you conducted an

23   analysis of Hytera's DMR radios and Kenwood's dPMR radios and

24   compared those to Motorola's DMR radios, right?

25   A.   I did tests with Kenwood.  I think their protocol was

1    called NEXEDGE.  I don't actually recall --

2              THE COURT REPORTER:  I'm sorry.  Called what?

3              THE WITNESS:  NEXEDGE.

4    BY MS. ROTHSCHILD:

5    Q.   And you were testing the audio limitations of the

6    various radios, right?

7    A.   That was the way it was tested.  I was looking for range

8    differences between Kenwood and Motorola radios.  That was a

9    starting point.

10   Q.   And let's put back up a document that was admitted in

11   your direct examination.  It's DTX 4279.  And this is the

12   TRBO versus competitors performance analysis that you wrote

13   up from 2010, correct?

14   A.   That's right.

15   Q.   And if we could please turn to Page 4.

16   A.   Yes.

17   Q.   This is the slide that describes an issue that you

18   discovered with Motorola's code as you did this testing,

19   right?

20   A.   That's not an issue.  That's just the performance

21   number.

22   Q.   Okay.  It says, "RX performance unmute issue."  Right?

23   A.   Sure, it says that, but it's the competitive analysis.

24   Q.   And the "unmute issue" means that the radio stopped

25   unmuting or stopped receiving messages at a certain decibel

1   level, right?  How loud it was?

2   A.   Correct.

3   Q.   And during your testing, as indicated at the bottom,

4   which is italicized and in all red font, and there is no

5   other red type on this page, correct?

6   A.   That was my choice of indicating the conclusion of the

7   test.

8   Q.   And your conclusion was that the performance of Hytera

9   radio is "almost" the same as MOTOTRBO, right?

10   A.   Sure, but there were so many audio artifacts found in

11   the same test that I did that were just one performance

12   number.

13   Q.   So you found the same artifact and some additional ones,

14   right?

15   A.   Audio artifacts were the major things, and unmute level

16   was one performance number that was compared.

17   Q.   So a moment ago you said that there was not actually a

18   problem with Motorola's code.  So let's look at Page 5 of the

19   document where it looks like you resolved the issue that

20   Motorola had in its code --

21   A.   I did not say --

22   Q.   -- since Release 1.1.

23   A.   I did not say that there was a problem with the code at

24   that time.  It was the performance.  It was the audio drop.

25   I remember it was the audio drop that we were talking about.

1    Q.    Okay.  Let's see what the words you put in your document

2    in 2010 say.

3              So we see, "MOTOTRBO receiver range analysis."

4    Right?

5    A.    Yes.

6    Q.    And it's a receiver performance issue since Release 1.0,

7    right?

8    A.    Yes.

9    Q.    At the bottom there is a bullet.  Do you see that?

10   A.    Yes.

11   Q.    It says, "In the receiver lineup, the waveform

12   correlator, soft symbol slicer, and the symbol recovery

13   algorithm are using P25 peak symbol deviation (1.8

14   kilohertz.)"  Right?

15   A.    Correct.

16   Q.    "Instead of the DMR peak symbol deviation of 1.944

17   kilohertz."  Right?

18   A.    Correct.

19   Q.    So Motorola had coded the wrong value in its code.  And

20   as it says, this traces back to Release 1.0 in both repeater

21   and subscriber, right?

22   A.    This was the code that was borrowed from earlier

23   perhaps, and we missed one change in that.

24   Q.    Right.  And this was an issue that dated back to Release

25   1.0 of Motorola's MOTOTRBO code for both its subscriber and

1    repeater products, correct?

2    A.    That's correct.

3    Q.    And Release 1.0 code is the first release of the DMR

4    code at Motorola, right?

5    A.    Correct.  That's right.

6    Q.    And that is the same code that Sam Chia worked on at

7    Motorola, right?

8    A.    He was part of the development team, yes.

9    Q.    And it was suspicious, wasn't it, that Hytera's radio

10   had the same deviation?

11   A.    That is not true, because that was the performance

12   number.  I never said it's a deviation.  It's the unmute

13   performance.  Deviation is the internal finding that we did

14   on MOTOTRBO radio.  All that I had to compare the performance

15   was the radio in my hand.  And to find the deviation within

16   the MOTOTRBO radio, we had the MOTOTRBO implementation.  I

17   never had any access to Hytera's implementation.

18   Q.    Your colleagues thought this was a very suspicious

19   issue, didn't they?

20   A.    My findings are all based on the performance analysis.

21   Nothing was suspicious to me.

22   Q.    You didn't discuss this?

23   A.    I report -- I even produced the comparison summary.  And

24   that was a presentation that I put together.

25   Q.    Let me hand you DTX 4206.

1          (Document tendered.)

2     BY MS. ROTHSCHILD:

3     Q.    This is an internal Motorola email from the fall of 2010

4     discussing the ATR range comparison report analysis that you

5     were conducting, right?

6     A.    I am not on the top email here.

7     Q.    Please turn to the second page.

8     A.    Let me see.

9     Q.    And you see in the middle there you sent an email?

10    A.    Yeah.  I am on the parts of the email.  I can see that.

11    Q.    And this is discussing that analysis that you conducted

12    of the range issues in the Motorola, Hytera, and Kenwood

13    radios, right?

14    A.    Correct.

15          MS. ROTHSCHILD:  Your Honor, I would like to move

16    DTX 4206 into evidence.

17          THE COURT:  It is received and may be published.

18          (Said exhibit was received in evidence.)

19    BY MS. ROTHSCHILD:

20    Q.    So if we go to Page 2 and we look at the second email on

21    the page there, the email from you, this is from August 23rd,

22    2010?

23    A.    Yes.

24    Q.    And you were reporting that you've read the test report

25    from ATR.  That's a division at Motorola?

1    A.    That's right.

2    Q.    And you created a document that lists the next steps for

3    PCR Engineering, right?

4    A.    Let me see.  That's right.

5    Q.    And if we move up to the email at the top of the page,

6    which is an email from Ramesh Rangarajan, he was your boss?

7    A.    He was my boss' boss.  Yeah, he was my boss.

8    Q.    And he's sending this email to Ted Kozlowski, who was

9    the head of PCR, which includes DMR, right?

10   A.    That's right.

11   Q.    And in and in No. 1 he writes, "First, the team

12   confirmed that we and (suspiciously) Hytera stop unmuting

13   around minus 118 decibels; whereas, Kenwood is able to unmute

14   up to minus 120 decibels."  Right?

15   A.    I don't know what he meant by "suspicious."  I can't

16   speculate on that one.  But I had done all the comparisons.

17   My performances analysis was published.  I never had any

18   suspicion about the implementation.  That was all based on my

19   performance comparison.

20   Q.    I'm asking you to confirm that your boss' boss reported

21   to his boss on September 17th, 2010, that, "The team

22   confirmed that we" -- Motorola -- "and (suspiciously) Hytera

23   stop unmuting around minus 118 decibels; whereas, Kenwood is

24   able to unmute up to minus 120 decibels."  That's what he

25   reported, right?

1  A.   That's what he write, but I don't know what he meant by
2  "suspicious."
3  Q.   And No. 2 he writes, "Through some excellent debugging,
4  the team identified the root cause that the receiver decode
5  software in the DSP was not handling the correct deviation
6  for DMR (1.94 kilohertz)"?
7  A.   Correct.  That's in our radio.
8  Q.   "The code was adopted from ASTRO, which had a different
9  deviation (1.8 kilohertz), and it was wrongly carried over."
10 Right?
11 A.   That's right.
12 Q.   And this is from Release 1.0, right?
13 A.   Correct.
14 Q.   And if we move down in the email, the second-to-last
15 paragraph of the email, the second sentence starts, "The
16 other interesting lead is, of course, is how is it that
17 Hytera also has the same issue," two exclamation points.
18 Right?
19 A.   That was his interpretation, I think.
20 Q.   And then he writes, "I think we should keep the solution
21 very confidential."  Right?
22 A.   Of course.  Our implementation is always confidential to
23 us.
24 Q.   And the idea was to keep the solution confidential from
25 Hytera, right?

1    A.   Of course.  That's our implementation.  It's always

2    confidential.

3    Q.   Because the problem was a legacy problem from

4    Release 1.0 code that Sam Chia, who was now at Hytera, had

5    worked on at Motorola, right?

6    A.   Sam Chia was in Motorola at that time, but when I did

7    the test I don't know.  I don't know when he left Motorola,

8    but he was on the repeater team when I was there at that

9    time, but I don't know when he left Motorola.

10   Q.   Well, the parties have stipulated -- and I can represent

11   this to you -- that Mr. Chia left Motorola in 2008.

12   A.   Okay.

13   Q.   So let me show you DTX 4269.

14        (Document tendered.)

15   BY MS. ROTHSCHILD:

16   Q.   This is an email that you received on January 5th, 2011,

17   from Tom Bohn, right?

18   A.   That's right.

19        MS. ROTHSCHILD:  Your Honor, I would like to move

20   DTX 4269 into evidence.

21        THE COURT:  It is received and may be published.

22        (Said exhibit was received in evidence.)

23   BY MS. ROTHSCHILD:

24   Q.   So I would like to start with the first email in the

25   chain that's Pages 2 and carries over to Page 3.  And we see

 1    that this is an email from Sam Chia.  And if we look on the

 2    third page, we see his signature block, and it says, "Samuel

 3    Chia, Hytera Communication Corp., Limited, software

 4    engineering director."  Right?

 5    A.   Yes.

 6    Q.   And then if we go to the first page, we see an email in

 7    the middle of the page from Ramesh Rangarajan to yourself,

 8    Tom Bohn, copying Ted Kozlowski, right?

 9    A.   Yes.

10    Q.   And this is your boss' boss, Ramesh?

11    A.   Yes.

12    Q.   So your boss' boss is emailing you, Tom Bohn, and his

13    boss, Ted Kozlowski, right?

14    A.   Yes.

15    Q.   He writes, "BTW" -- by the way, right?

16    A.   Yes.

17    Q.   "The Hytera software engineering director who sent this

18    email (Sam Chia) was the DSP manager for Matrix R1.0,"

19    exclamation point.  Right?

20    A.   Yes, I can see that.

21    Q.   That's the same Matrix R, Release, 1.0 code that had the

22    unmute bug in the DSP portion of the code, right?

23    A.   Yes.

24    Q.   If we look at the top of the page, there is an email

25    from Tom Bohn.

1     Do you see that?

2  A.  Yeah.

3  Q.  The second paragraph, the fourth sentence, Mr. Bohn

4  writes, "We could ask Hytera to perform an official IOP" --

5  interoperability test -- "but this does not seem the avenue

6  the business team wants to go down."  Right?

7  A.  I can see that.

8  Q.  And then he writes, "They believe it lends credibility

9  to Hytera."  Right?

10  A.  Yes.  I can't comment on that.  I don't know what he

11  means by that.

12  Q.  But he wrote that was his understanding, right?

13  A.  Yes.

14  Q.  Now, Motorola continued to put off conducting

15  interoperability testing with Hytera, didn't it?

16  A.  Yes, we did interoperability tests with Hytera.

17  Q.  But Motorola continued to put it off, right?

18  A.  What is "put it off"?  We did the test.

19  Q.  You did the test in January of 2012, right?

20  A.  Right.

21  Q.  Okay.  Let's look at DTX 4275, please.

22     (Document tendered.)

23  BY MS. ROTHSCHILD:

24  Q.  This is a July 7th, 2011, email that you received,

25  correct?

1    A.    Yes.

2              MS. ROTHSCHILD:  Your Honor, I would like to move

3    DTX 4275 into evidence.

4              THE COURT:  It is received and may be published.

5          (Said exhibit was received in evidence.)

6    BY MS. ROTHSCHILD:

7    Q.    So this is a July 7th, 2011, email, subject "Review of

8    Vertex IOP Results," right?

9    A.    Yes.

10   Q.    And this was the first interoperability session that

11   Motorola conducted with other manufacturers' DMR radios,

12   right?

13   A.    Correct.

14   Q.    And I would like to direct your attention to the last

15   paragraph of Chris Lyons' email.  Chris writes, "As you know,

16   the only reason for this IOP session was to be able to point

17   to a non-Hytera manufacturer having a successful

18   interoperability with Motorola radios."  Right?

19   A.    That's what I can read, yes.

20   Q.    Now, eventually Motorola did conduct interoperability

21   testing with Hytera in January of 2012, right?

22   A.    Yes.

23   Q.    And this exhibit was admitted, I believe, yesterday, DTX

24   4963.  If we could put that up.

25              This is the official interoperability test report

 1    from the DMR Association, correct?

 2    A.   Yes.

 3    Q.   For testing that occurred on January 9th and 10th, 2012,

 4    right?

 5    A.   Yes.

 6    Q.   And on behalf of Motorola, you conducted that testing,

 7    right?

 8    A.   Correct.

 9    Q.   And this was about two years after Hytera launched its

10    DMR radios, right?

11    A.   Did the launch in 2010?

12    Q.   They launched the first quarter of 2010.  That is a

13    stipulated fact.

14    A.   Okay.

15    Q.   And we see at the bottom of the page that the test

16    involved Motorola's XPR 6550 product, right?

17    A.   Yes.

18    Q.   And Hytera's PD782 product, right?

19    A.   Correct.

20    Q.   At this testing you didn't observe anything out of the

21    ordinary in terms of behavior; is that right?

22    A.   This was the interoperability test.  In fact, we expect

23    the similar features.  That's the intent of the

24    interoperability.

25    Q.   You didn't observe anything out of the ordinary at this

1  testing, did you?

2  A.   No, not at all.

3  Q.   But you did notice that both Hytera and Motorola radios

4  exited emergency alarm in the same manner with the engineer

5  having to pull off the battery, right?

6  A.   I mean, there are many ways one can stop the emergency

7  alarm, and it was a choice of an engineer to pull the battery

8  and then say, okay, let's stop the alarm.  Any electronics

9  would stop the alarm when you pull the radio -- when you pull

10  the battery.

11  Q.   But you thought this was strange, and you reported it to

12  your boss, Dan Zetzl, right?

13  A.   I report all of the interoperability tests results,

14  including the behaviors.  One of the aspects of

15  interoperability is to report all the results.  Also, there

16  is a behavioral aspect to it, which you observe during the

17  interoperability.  So we come back and then summarize

18  everything that went into interoperability.

19  Q.   So there was no issue, but you went and reported an

20  issue to Mr. Zetzl; is that right?

21  A.   There was no issue.  We summarized all the

22  interoperability tests.  So that was just reporting how the

23  interoperability tests went and what are the results of

24  interoperability.

25  Q.   You also reported the issue with the emergency alarm to

1    Tom Bohn; is that right?

2    A.   That was not an issue.  That's how it worked.  That was

3    how the test was designed to work.

4    Q.   So you reported your observation to Tom Bohn as well,

5    right?

6    A.   I summarized my observations, yeah.

7    Q.   And you never discussed the issue with anyone in

8    Motorola's Plantation office, like Darrell Stogner, right?

9    A.   I told Dan Zetzl and Tom Bohn.

10   Q.   And you have no idea whether anyone at Motorola followed

11   up on your report with any analysis, right?

12   A.   On the emergency alarm issue, I have no idea.

13   Q.   Let me hand you a combination of exhibits -- PTX 1245,

14   1246 and 1247.

15        (Documents tendered.)

16   BY MS. ROTHSCHILD:

17   Q.   This is a June 1st, 2011, email with two attachments

18   that was sent by Ted Kozlowski to yourself and some of your

19   colleagues, correct?

20   A.   Yes.

21        MS. ROTHSCHILD:  Your Honor, I would like to move

22   PTX 1245, 1246, and 1247 into evidence.

23        THE COURT:  It is received -- they all are received

24   and may be published.

25        (Said exhibits were received in evidence.)

1    BY THE WITNESS:

2    A.    I think I saw only one email, 1245, which is I'm copied.

3    And on 1246, I am not copied.

4    BY MS. ROTHSCHILD:

5    Q.    That's the attachment, sir.

6          To orient you, 1245 is the June 1st, 2011, email

7    that you received from Mr. Kozlowski, the subject is, "FWD:

8    IP Site Connect."  And if you look at the "attachments" line,

9    it says, "IP site connect."

10         And then if you turn to 1246, you see that there is

11   an email from Nancy Campana of that same date.  And the

12   subject there is "IP Site Connect."  And there is an

13   attachment listed there, and that is what has been handed to

14   you as Exhibit 1247.

15         Do you see that?

16   A.    Yeah.

17   Q.    Okay.

18   A.    But again -- okay.

19   Q.    So I would like to direct your attention first to PTX

20   1246, which is the email that was attached to the email that

21   you received.  And this is the email from Nancy Campana.

22         And she writes, "Attached is a file I discovered

23   written by Hytera on how they do IP site connections for

24   digital conventional.  I was wondering if someone could look

25   it over and provide feedback on any competitive issues."

1    Right?

2    A.   Yes.  Again, this is based on comparing the documents.

3    Q.   So if we can please look at PTX 1247, we see that she

4    has attached a document entitled "Hytera DMR Conventional

5    Series IP Multi-Site Connect Application Notes."  Right?

6    A.   I am not sure how this was attached, but how do I know

7    that PTX 1246 has this as an attachment?

8    Q.   The file names match.

9    A.   File names --

10   Q.   And the way it was produced in this litigation matches.

11         But let me direct your attention to an exhibit that

12   was used during your direct examination that may help you put

13   this all together.  You talked about PTX 1237.  If we could

14   put that up.

15         And PTX 1237, the subject of this email is "IP Site

16   Connect," and it's dated June 2nd, 2011, so one day after you

17   were sent that Hytera document to analyze, right?

18   A.   I guess I am still not sure if this is an attachment,

19   but --

20   Q.   This is the document that you analyzed, isn't it, PTX

21   1247, the Hytera document?  That's what you analyzed for the

22   IP site connect analysis that you discussed during your

23   direct testimony, right?

24   A.   Site connect, okay.  System planner, sure.

25   Q.   Okay.  So looking at your email on June 2nd, 2011, you

1  start your email, "I see a lot of similarity with TRBO IP

2  site connect, including the terminology."  Right?

3  A.   Yes.  Again, based on the public document.

4  Q.   You were reporting that it wasn't just the terminology

5  that you found similarities with.  It was also the

6  capabilities of Hytera's IP site connect, right?

7  A.   Again, the capabilities as listed in the document, which

8  is a public document.

9  Q.   And you were reporting that it wasn't just the

10 terminology that you found similarities with.  It was also

11 the capabilities, right?

12 A.   From the public document.  Yes, reading the public

13 document.

14 Q.   The first item you listed is "voice/data/CSBK transport

15 over IP.  Hytera uses serialization like we do.  If we can

16 capture their IP stream using Wireshark, we will know it

17 better."

18          Did I read that correctly?

19 A.   Yes.

20 Q.   And you talked on your direct examination about what

21 Wireshark is, right?

22 A.   Yes.

23 Q.   You never actually did this analysis, right?

24 A.   I don't have to do, because Wireshark doesn't give any

25 permission.  And the only information we have is the public

1     documentation.  So you would not know what Hytera's

2     implementation is.  So capturing the Wireshark doesn't give

3     me any information about what the capabilities are or how the

4     product is designed.

5     Q.   So that was a no, you never actually did the Wireshark

6     analysis, correct?

7     A.   Correct.  There are no need, and I didn't do that.

8     Q.   Your second similarity is the number of peers supported,

9     right?

10    A.   Right.  Again, as listed in this document.

11    Q.   Sir, I would appreciate it if you would just answer the

12    question that I am asking you.  Thank you.

13         THE COURT:  Counsel, I will direct instructions to

14    the witnesses, not you.

15    BY MS. ROTHSCHILD:

16    Q.   It says --

17         THE COURT:  That's a good stopping point for lunch.

18         It is precisely high noon, members of the jury.

19    Please return at 1:00 o'clock.

20         Counsel, return at 1:00 o'clock.

21         The witness may leave the stand.

22         (Jury out at 12:00 p.m.)

23         (A luncheon recess was taken at 12:02 p.m.)

24

25

1                              *    *    *    *    *

2       I certify that the foregoing is a correct transcript from the
        record of proceedings in the above-entitled matter.
3

4       /s/ Frances Ward_____November 20, 2019.
        Official Court Reporter
5       F

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                                1062

 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   MOTOROLA SOLUTIONS, INC., and MOTOROLA    ) No. 17 CV 1973
     SOLUTIONS MALAYSIA SDN. BHD,              )
 4                                             )
               Plaintiffs,                     )
 5   vs.                                       ) Chicago, Illinois
                                               )
 6   HYTERA COMMUNICATIONS CORPORATION, LTD.,  ) November 19, 2019
     HYTERA AMERICA, INC., and HYTERA          )
 7   COMMUNICATIONS AMERICA (WEST), INC.,      )
                                               )
 8             Defendants.                     ) 12:58 o'clock p.m.

 9                     TRIAL - VOLUME 7-B
                    TRANSCRIPT OF PROCEEDINGS
10
           BEFORE THE HONORABLE CHARLES R. NORGLE, SR.,
11                        and a jury

12   APPEARANCES:

13   For the Plaintiffs:     KIRKLAND & ELLIS, LLP
                             BY:  MR. ADAM R. ALPER
14                                MR. BRANDON HUGH BROWN
                             555 California Street
15                           Suite 2700
                             San Francisco, California 94104
16                           (415) 439-1400

17                           KIRKLAND & ELLIS, LLP
                             BY:  MR. MICHAEL W. DE VRIES
18                                MR. CHRISTOPHER M. LAWLESS
                             333 South Hope Street
19                           Suite 2900
                             Los Angeles, California 90071
20                           (213) 680-8400

21

22   Court Reporter:         AMY M. SPEE, CSR, RPR, CRR
                             Official Court Reporter
23                           United States District Court
                             219 South Dearborn Street, Room 1728
24                           Chicago, Illinois  60604
                             Telephone:  (312) 818-6531
25                           amy_spee@ilnd.uscourts.gov

1063

```
 1    APPEARANCES (Continued:)

 2    For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                             BY:  MS. MEGAN MARGARET NEW
 3                           300 North LaSalle Street
                             Chicago, Illinois 60654
 4                           (312) 862-7439

 5                           KIRKLAND & ELLIS, LLP
                             BY:  MS. LESLIE M. SCHMIDT
 6                           601 Lexington Avenue
                             New York, New York 10022
 7                           (212) 446-4763

 8    For the Defendants:    STEPTOE & JOHNSON, LLP
                             BY:  MR. BOYD T. CLOERN
 9                                MR. MICHAEL J. ALLAN
                                  MS. JESSICA ILANA ROTHSCHILD
10                                MS. KASSANDRA MICHELE OFFICER
                             1330 Connecticut Avenue NW
11                           Washington, DC 20036
                             (202) 429-6230
12
                             STEPTOE & JOHNSON, LLP
13                           BY:  MR. DANIEL S. STRINGFIELD
                             227 West Monroe Street
14                           Suite 4700
                             Chicago, Illinois 60606
15                           (312) 577-1300

16

17    ALSO PRESENT:          MR. RUSS LUND and
                             MS. MICHELE NING
18

19

20

21

22

23

24

25
```

Karpoor - cross by Rothschild

1064

1       (Proceedings heard in open court.  Jury in.)

2           THE COURT:  Good afternoon, members of the jury.

3           Please recall the witness.

4       SANJAY KARPOOR, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

5                       CROSS-EXAMINATION

6   BY MS. ROTHSCHILD:

7   Q.  Good afternoon.

8   A.  Good afternoon.

9   Q.  Before we broke, I believe we were looking at PTX 1237,

10  and we were talking about the e-mail on the top of that page.

11  And we were talking about -- it's also on your screen.  I

12  believe it was in your direct binder.

13  A.  Yeah.

14  Q.  We were talking about No. 2, the number of peers

15  supported.  "Hytera supports 15 peer system like we do, like

16  Motorola does," right?

17  A.  Again, from the document, public document, yes.

18  Q.  "It is an all site light up system like ours," also like

19  Motorola's, right?

20  A.  Again, reading from the public document, yes.

21  Q.  "The restriction of 15 peers comes from the processing

22  limitation," right?

23  A.  That's an architectural choice.

24  Q.  Right.  "Which tells us that they have similar

25  architecture/code," right?  Those are your words?

Case: 1:17-cv-01973 Document #: 788 Filed: 12/20/19 Page 93 of 128 PageID #:52946
Karpoor - cross by Rothschild
1065

1  A.  That's what I was saying, is basically this is the limit

2  that the repeater supports.  And any time you put a limit on

3  the capability, that will be an architectural choice, and that

4  choice would be reflected in the code.

5  Q.  So Hytera has a similar architecture/code and hardware in

6  the repeater that we, Motorola, have, right?

7  A.  And again that's what I was referring to, is that's the

8  choice that if you want to limit it, you have your own

9  architecture, your own implementation, and then your own

10  design.

11  Q.  There's a third similarity listed.

12       "3:  Similar/same peer-to-peer protocol."

13       That's what you wrote, right?

14  A.  Again, from the same document, yes.

15  Q.  No. 4, "They have a similar RDAC concept," right?

16  A.  That's the name of the tool that is referring to the

17  system planner.

18  Q.  Well, they have a similar concept, including the use of

19  the same name, right?  The name is the terminology you

20  reference?

21  A.  The name is the terminology and the concept is, what is

22  done with RDAC is you do more diagnostics, allowance, control,

23  and that's the concept.  How Hytera implemented or how

24  Motorola implemented is their own implementations.

25  Q.  No. 5, "Configuration of repeater and radios is almost the

Case: 1:17-cv-01973 Document #: 788 Filed: 12/20/19 Page 94 of 128 PageID #:52947
Karpoor - cross by Rothschild
1066

1    same as ours," meaning as Motorola's, right?

2    A.   No.  No.  Again that is based on a handful of

3    configuration items listed in the document, and those are just

4    the configuration parameters listed in the document, not

5    referring to the configuration, actual configuration on the

6    radios or the repeaters.

7    Q.   You can't identify any differences between the

8    configuration of Hytera and Motorola's radios and repeaters,

9    right?

10   A.   That's based on the document because I was looking at the

11   similarities, and those are the handful of similarities.  I

12   wasn't looking for any differences.

13   Q.   So let me make sure I understand.  In 2010, you realize

14   that release 1.0 had an unmute issue in its code that was

15   discovered in 2010.  And at that same time, Motorola

16   discovered that Hytera suspiciously had the same problem.

17   Right?

18   A.   I never suspected it.  There was a performance analysis.

19   And as a part of the performance analysis, we know that is one

20   parameter that matched, but that only means that's a way

21   Hytera had implemented, we have implemented and performance

22   match, but there is significant differences that told me that

23   there is no similarity in those parts.

24   Q.   Your boss's boss reported to your boss's boss's boss that

25   these similarities were suspicious and that Motorola should

Case: 1:17-cv-01973 Document #: 788 Filed: 12/20/19 Page 95 of 128 PageID #:52948
Karpoor - cross by Rothschild
1067

 1   keep its solution confidential from Hytera, right?

 2   A.  And, again, as I said earlier, I don't know what he meant

 3   by "suspicious."  I cannot speculate on that word.

 4   Q.  But my recitation of the events, that was correct, right?

 5   A.  What do you mean by "recitation"?

 6        I did all the operations.  I summarized all of it.

 7   There is nothing more to do for me there.

 8   Q.  In 2010, your boss's boss reported to your boss's boss's

 9   boss that there were suspicious similarities in Hytera's

10   performance and that Motorola should keep its solution

11   confidential from Hytera, right?

12   A.  And, again, I answered that I don't know what he meant by

13   "suspicious."  I won't -- I wouldn't like to speculate on it.

14   Q.  In 2011, you noticed five substantive similarities between

15   Hytera's IP site connect and Motorola's, right?

16        THE COURT:  Counsel, this is repetitious.  You went

17   through this once before.

18        MS. ROTHSCHILD:  Yes, sir.  I was summarizing.

19        THE COURT:  Well, let's move on to another area.

20   BY MS. ROTHSCHILD:

21   Q.  Motorola did not bring its lawsuit against Hytera within

22   five years of these suspicions, did it?

23   A.  There was no suspicion in my eyes.  As I said, I did the

24   test, I summarized it, and that was a performance analysis.  I

25   had no access to Hytera technology or implementation.  It was

1  all based on a public document that is here, the system

2  planner, and me doing the test with Hytera radios alone, and

3  that was a performance analysis, repeater analysis.

4  Q.  Motorola did not sue Hytera within five years of your

5  boss's boss --

6        THE COURT:  Just a minute, we'll have a sidebar on

7  this issue.

8        (Proceedings heard at sidebar on the record.)

9        THE COURT:  It is not a fair question to put to this

10  particular witness given his limitations and what he does for

11  Motorola.  The decision to file a lawsuit is certainly beyond

12  his scope of his authority or his comprehensibility of the

13  issues when we think it would be a board of directors'

14  decision with the advice of counsel.  So the question is not

15  fairly put to this witness.

16        (Sidebar ended.)

17        THE COURT:  Disregard the unanswered question.

18  BY MS. ROTHSCHILD:

19  Q.  Mr. Karpoor, you testified about one of the trade secrets

20  that Motorola is asserting in this case, a trade secret about

21  Motorola's repeater; is that right?

22  A.  Gave a different impression of the repeater, yes.

23  Q.  And Motorola is claiming as its trade secrets the specific

24  design and implementation of the repeater, the object sitting

25  there, right?

Case: 1:17-cv-01973 Document #: 788 Filed: 12/20/19 Page 97 of 128 PageID #:52950
Karpoor - cross by Rothschild
1069

1   A.   Yes.

2   Q.   Now, Motorola's trade secret 142 -- is that the number for

3   the repeater?

4   A.   That's right.

5        THE COURT:  Has anyone moved the admissibility of the

6   repeater?

7        MS. ROTHSCHILD:  I believe it's a demonstrative,

8   Your Honor.

9        MR. DOKHANCHY:  That's correct, Your Honor.  It's a

10  demonstrative.

11       THE COURT:  It's demonstrative?  Of what?

12       MR. DOKHANCHY:  Of what --

13       THE COURT:  Of its persona?  Its existence?

14       So what is your agreement in terms of that object

15  right there?  What is your understanding -- what is your

16  agreement?  What does the jury have to infer from its presence

17  right there?  What is it?

18       MR. DOKHANCHY:  It was only a demonstrative for the

19  direct testimony of Mr. Karpoor.

20       THE COURT:  Demonstrative of what?

21       MR. DOKHANCHY:  Of its size and its nature and --

22       THE COURT:  Of what?

23       MR. DOKHANCHY:  Of the repeater.  Oh.  Sorry.  I

24  thought that was --

25       THE COURT:  Is that right?  Is that what it is?

Karpoor - cross by Rothschild

1070

1    MS. ROTHSCHILD:  Yes, sir.

2    THE COURT:  Demonstrative of the repeater.

3    MS. ROTHSCHILD:  Yes.

4    THE COURT:  And how many repeaters are there out in

5    the world?

6    MS. ROTHSCHILD:  I would ask the witness.

7    THE COURT:  You may, if he knows.

8    BY MS. ROTHSCHILD:

9    Q.  Do you know how many repeaters there are out there in the

10   world?

11   A.  Does the number or the -- I mean, there are other --

12   THE COURT:  You see the object to your left.

13   THE WITNESS:  Yeah.

14   THE COURT:  How many of those are out in the public

15   domain?

16   THE WITNESS:  Motorola has sold many to the

17   customers.

18   THE COURT:  How many?

19   THE WITNESS:  I don't know the number.  Many, many.

20   THE COURT:  Many, many?

21   THE WITNESS:  Yeah.

22   THE COURT:  How many?

23   THE WITNESS:  Thousands.

24   THE COURT:  And that's an example of what it is,

25   right?

Case: 1:17-cv-01973 Document #: 788 Filed: 12/20/19 Page 99 of 128 PageID #:52952
Karpoor - cross by Rothschild
1071

1    MR. DOKHANCHY:  Correct.

2    THE COURT:  Okay.  You've got that, members of the

3  jury?

4    THE JURY: (Nonverbal response.)

5    THE COURT:  All right.  Please proceed.

6  BY MS. ROTHSCHILD:

7  Q.   And as part of this trade secret on Motorola's repeater,

8  Motorola is not claiming the design and implementation of its

9  subscribers, right?

10  A.   This 142 is the repeater trade secret.

11  Q.   And just for clarification, the subscribers, that means

12  the portable handheld radios and the mobiles that go into a

13  car, for example, right?

14  A.   Yeah, this trade secret is specifically to the repeater.

15  Q.   Okay.  But you're also claiming that a whole bunch -- or

16  Motorola is also claiming that several of the other trade

17  secrets in this case are part of trade secret 142 related to

18  the repeater, right?

19  A.   There can be overlap in terms of technology, the software

20  that went into the repeater.

21  Q.   Right.  The repeater includes an application layer, right?

22  A.   Repeater has an application layer.

23  Q.   Okay.  And it includes the radio operating system?

24  A.   It has some parts from the legacy.

25  Q.   And it includes the hardware abstraction layer?

Karpoor - cross by Rothschild

1072

1   A.   It has.

2   Q.   And it includes the software operation architecture?

3   A.   What do you mean the software architecture?

4   Q.   Is one of the trade secrets that Motorola is claiming in

5   this case trade secret 53, the software operation

6   architecture?  Is that part of what Motorola is claiming, is

7   trade secret 142 for its repeater?

8   A.   I don't know what's in there.  There is an operating

9   system in this repeater.

10  Q.   Trade secret 142 for Motorola's repeater, that also

11  includes carrier detection, right?

12  A.   There is a carrier detection, yes.

13  Q.   And it includes the virtual radio interface standard,

14  VRIS?

15  A.   It has that portion, yes.

16  Q.   It includes the DSP framework?

17  A.   It has it, yes.

18  Q.   It includes the L1 timer, framer, frame --

19  A.   Yes.

20  Q.   -- scheduler and synchronization?

21  A.   Yes.

22  Q.   It includes connectivity modules?

23  A.   Yes.

24  Q.   It includes testing?

25  A.   This product is tested, yes.

Karpoor - cross by Rothschild
1073

1  Q.  And it includes the physical layer, ARM, DSP frame works,

2  and signaling?

3  A.  Yes.

4  Q.  It includes the protocol stack?

5  A.  It does, yeah.

6  Q.  It includes the DSP code?

7  A.  Yes.

8  Q.  And you need every single thing that we just covered to

9  have a repeater, right?

10  A.  Correct, you need those components.

11  Q.  And the repeater trade secret is also a subset of some of

12  the other trade secrets that Motorola is claiming in this

13  case, for example, the trade secret with respect to all

14  Motorola code, right?

15  A.  Well, the repeater borrowed some of the code from the

16  legacy.  The repeater also loses some of the code from the

17  handheld, but it all came with the modifications.

18  Q.  But Motorola has a separate trade secret that's for all of

19  the code, for mobile, portable, and repeater, right?

20  A.  Maybe, yes.

21  Q.  Okay.  And the repeater, part of the trade secret is the

22  hardware, right?

23  A.  It includes hardware.  It does software as well.

24  Q.  And Motorola has a separate trade secret for all of its

25  DMR hardware for mobile, portable, and repeater, right?

Karpoor - cross by Rothschild

1074

1   A.   Maybe.  I'm aware of this 142, yeah.

2   Q.   Now, according to Motorola, this trade secret existed at

3   least by 2008, correct?

4   A.   Yes.

5   Q.   And when you say "by 2008," you mean by January 1st, 2008,

6   right?

7   A.   Correct.

8   Q.   Now, the specific code that is being claimed as part of

9   trade secret 142 is the release 1.0 code, right?

10  A.   We agreed according to release 1.0, it started at that

11  point, yes.  It's a trade secret from then.

12  Q.   And Motorola's only claiming the code in release 1.0, as

13  you showed in your demonstrative PDX 7.6.

14          MS. ROTHSCHILD:  If we could put that up.

15  BY MS. ROTHSCHILD:

16  Q.   Right, these are all repeater release 1.0 code

17  directories, right?

18  A.   Correct.

19  Q.   Okay.  Now, if we could put up PDX 7.5.  You described to

20  the jury that one of the elements of the repeater trade secret

21  that you're claiming is multisite functionality, right?

22  A.   That's correct.

23  Q.   And that is peer-to-peer or repeater-to-repeater

24  connections, right?

25  A.   It's more than that.

Karpoor - cross by Rothschild

1075

1  Q.  Motorola didn't have the peer-to-peer,

2  repeater-to-repeater connections until release 1.4, right?

3  A.  No, I don't agree with that.

4  Q.  It's your testimony today that Motorola implemented

5  repeater-to-repeater connections before release 1.4?

6  A.  Yes.

7  Q.  I would like to refer to your deposition testimony,

8  Page 103, Lines 17 to 22.

9       "QUESTION:  And you mentioned that this was in the

10  context of release 1.4.  Was it different prior to 1.4?

11       "ANSWER:  Prior to 1.4, there was no connection

12  between the repeaters.  It was all conventional repeater."

13  A.  That's what I meant, basically.  There was an extra code

14  required to connect these repeaters on the Internet, but all

15  of the hardware and all of the software platform that is

16  required in the repeater to be able to hook it up later was --

17  existed in 1.0.  Without those parts, without the repeater

18  platform being there, we would not have enabled it to be

19  connected.  And that's all required to do the multisite

20  functionality.

21  Q.  So Motorola had the capabilities and just didn't roll it

22  out until -- not release 1.0, not release 1.2, not release

23  1.3, but not until release 1.4, right?

24  A.  We were not able until then because -- but all of the

25  ingredients to support the connection was always there.  It

Case: 1:17-cv-01973 Document #: 788 Filed: 12/20/19 Page 104 of 128 PageID #:52957
Karpoor - cross by Rothschild
1076

1  was just a choice of getting it in a particular release.

2  Q.  And this peer-to-peer repeater connection or

3  repeater-to-repeater connection, that was released in March

4  of 2009, right?

5  A.  In 1.4.  I don't know the exact date, but the release name

6  was 1.4.

7  Q.  Well, let me show you quickly.

8       MS. ROTHSCHILD:  If I could have PTX 1440.

9  BY MS. ROTHSCHILD:

10 Q.  And PTX 1440 is Motorola's MOTOTRBO system release notes

11 for version 1.4.

12 A.  Let me check for sure.

13 Q.  Right?

14 A.  Let me take a look.  It says system enhancement is 1.4.

15 Let me see what it included.

16      Yeah, I can see here it says repeater 1.4.

17      MS. ROTHSCHILD:  Your Honor, I'd like to move PTX

18 1440 into evidence.

19      THE COURT:  It is received and may be published.

20      (Exhibit PTX 1440 was received in

21       evidence.)

22 BY MS. ROTHSCHILD:

23 Q.  And if we look here on the cover page, it says, MOTOTRBO

24 System Release Notes, Version 1.4.4, date March 6th, 2009,

25 System Enhancement Release 1.4, right?

1    A.  Yes, that's a system -- that's a release note for the

2    system release note.

3    Q.  And if we look on Page 4 of the document, it says, "What's

4    new in this release?  Software:  IP site connect," right?

5    A.  Correct, that's the enablement software.

6    Q.  Right.

7    A.  That was the next piece of software that is required to

8    connect the repeaters, yes.

9    Q.  And that was first released in 1.4, right?

10   A.  Yes, that is the first release that enabled the

11   connection, yes.

12          MS. ROTHSCHILD:  We can take that down.

13   BY MS. ROTHSCHILD:

14   Q.  You testified in your direct examination that Motorola has

15   thousands of documents related to its repeaters, right?

16   A.  Yes.

17   Q.  Okay.  Motorola is not accusing thousands of documents as

18   part of trade secret 142 for its repeater, is it?

19   A.  Motorola has all these documents created.  Those are all

20   internal documents.

21   Q.  Motorola is not accusing or including each of those

22   thousands of documents -- or alleging that Hytera

23   misappropriated thousands of documents with respect to the

24   repeater, right?

25   A.  Well, those are all the confidential documents.  I don't

Case: 1:17-cv-01973 Document #: 788 Filed: 12/20/19 Page 106 of 128 PageID #:52959
Karpoor - cross by Rothschild
1078

1    know how many documents Motorola is alleging, but those are

2    all the trade secrets that we have.

3    Q.  And in your examination, you only introduced a handful of

4    documents related to the repeater, right?

5    A.  Yeah, those are the exhibits here, but there are thousands

6    of documents.

7    Q.  And one of those documents, if we could pull it up,

8    please, is PTX 1316.  And if we look at the bottom of this

9    page, the cypher architecture document, we see a marking on

10   the bottom, and it says "Motorola Internal Use Only," right?

11   A.  Yes.

12   Q.  And that is a designation that was required by Motorola's

13   POPI, or protection of proprietary information, policy, right?

14   A.  It's not a requirement.  I mean, it's a label that says --

15   if there is a label like this, it says it's definitely

16   proprietary material.  But, you know, there are other labels

17   or you may or may not have a label, as long as the content is

18   confidential, it's proprietary to us.

19          MS. ROTHSCHILD:  Jim, can we please pull up PTX 1183,

20   which is previously admitted, and it is that protection of

21   proprietary policy.  And if we could please go to Page 6,

22   which describes the Motorola internal use only category.

23          And if we could look at the next page, please.

24   BY MS. ROTHSCHILD:

25   Q.  We see in the "Access," "Even though a document is marked

Case: 1:17-cv-01973 Document #: 788 Filed: 12/20/19 Page 107 of 128 PageID #:52960
Karpoor - cross by Rothschild
1079

1    'Motorola internal use only,' access can be had by all

2    Motorolans and non-Motorolans having a need for this

3    information," right?

4    A.   But only specific information needed.  I think access is

5    one part, but there is protection information that says any

6    time it's confidential and secured, that's a trade secret, and

7    that's supposed to be confidential, that's all internal.  We

8    don't make that information public.

9    Q.   Now, in this policy, there are four different

10   confidentiality designations.  And, in fact, there are two

11   designations that are higher than what this document is

12   marked.

13            MS. ROTHSCHILD:  If we could please turn in 1183.  If

14   we could look at the next page, please.

15            One more page, please.

16   BY MS. ROTHSCHILD:

17   Q.   And you see there is a next higher level, is Motorola

18   confidential priority, correct?

19   A.   I can see that here.

20   Q.   If we could please turn a few more pages, we'll see

21   Motorola registered secret proprietary as two levels higher

22   than PTX 1316, which is marked Motorola internal use.

23            And if we look on the right side of this page, this

24   is the only category that includes trade secret, right?

25   A.   I wouldn't agree with that.  Motorola registered secret

Karpoor - cross by Rothschild

1    proprietary is the highest level; that means any document

2    that's labeled with this is definitely a trade secret, but

3    that doesn't mean that other labels are, even the material

4    that did not have any label, but as long as it has a

5    confidential information that we protect, it is a trade secret

6    for us, and that's what we follow.

7              MS. ROTHSCHILD:  And if we could pull up 4721

8    previously admitted and go to Page 69.  Well, let's pull up

9    the cover briefly.

10   BY MS. ROTHSCHILD:

11   Q.  This is the intellectual property awareness training that

12   was issued by the law department to the DMR group.

13             MS. ROTHSCHILD:  And if we could please turn to

14   Page 69.

15   BY MS. ROTHSCHILD:

16   Q.  We see for protection of trade secrets, the instructions

17   given are the only acceptable marking is "Motorola registered

18   secret proprietary," correct?

19   A.  I would -- I mean, this is -- this is the labeling.  I

20   wouldn't say that's a definition.  I mean, this is a good

21   practice to do, but it doesn't mean that if we don't label it,

22   all of the hard work is erased just because there is no

23   labeling.

24             MS. ROTHSCHILD:  We can take this down.

25             If we could please pull up PTX 1330, which I believe

Case: 1:17-cv-01973 Document #: 788 Filed: 12/20/19 Page 109 of 128 PageID #:52962
Karpoor - cross by Rothschild
1081

1  you admitted -- or was admitted during your direct

2  examination.

3  BY MS. ROTHSCHILD:

4  Q.  This is a document entitled "ARM9 High Level Architecture

5  Overview," correct?

6  A.  Correct.

7  Q.  This document doesn't contain any confidentiality

8  designation, does it?

9  A.  Again, as I said, you know, there is nothing in the label.

10  It's all in the content.  As long as we believe this content

11  is confidential and it is secured in Motorola, that's

12  sufficient for us.

13  Q.  And that was a no, there is no confidentiality designation

14  on this document, correct?

15  A.  They're not a signature, but it is a trade secret for us.

16          MS. ROTHSCHILD:  I pass the witness.

17          THE COURT:  Redirect?

18          MR. DOKHANCHY:  No redirect, Your Honor.

19          THE COURT:  You may step down, sir.

20      (Witness excused.)

21          THE COURT:  What about the repeater?

22          Yes?

23          MR. ALPER:  Your Honor, our next set of witnesses are

24  Hytera witnesses by video deposition once again.

25          THE COURT:  All right.  Begin with the first.

Case: 1:17-cv-01973 Document #: 788 Filed: 12/20/19 Page 110 of 128 PageID #:52963
Videotaped deposition of Jue Liang
1082

1    MR. ALPER:  The first is we'll be calling by video

2    deposition Mr. Jue Liang.

3        THE COURT:  All right.  Please do so.

4        MR. CLOERN:  Your Honor, we only have, I think, one

5    remaining objection, but -- could we --

6        THE COURT:  Do you recall what I said yesterday?

7        MR. CLOERN:  Yes, Your Honor.

8        THE COURT:  It still stands today.

9        MR. CLOERN:  Yes, Your Honor.

10       THE COURT:  When you've reached a point of objection,

11   make it.

12       MR. CLOERN:  Yes, Your Honor.

13       THE COURT:  Members of the jury, is all of this on

14   your screen?

15       THE JURY:  Yes.

16       THE COURT:  Okay.  There is another screen to your

17   left over there as well.

18       All right.  Please proceed.

19   (Videotaped deposition of Jue Liang played in open

20   court.)

21       MR. CLOERN:  Objection, Your Honor.

22       The video -- the questions were asked in English and

23   then translated.  The video does not show that.  And we just

24   would like to make clear that the witness had the question

25   translated for him and he is not understanding the English.

Case: 1:17-cv-01973 Document #: 788 Filed: 12/20/19 Page 111 of 128 PageID #:52964
Videotaped deposition of Jue Liang
1083

1       MR. ALPER:  We agree with that.  That's what
2  happened.
3       THE COURT:  All right.  I'll ask the court reporter
4  to read that back again slowly so the jury understands what
5  your agreement is.
6       Would you please read that back.
7     (The record was read as requested.)
8       THE COURT:  And that is your agreement?
9       MR. ALPER:  We agree that he had the question
10  translated back to him.  We do not agree he didn't understand
11  the English, but he did actually have the question translated
12  back.
13       THE COURT:  All right.  Is that your agreement?
14       MR. CLOERN:  Well, it was -- he required a translator
15  and was provided one, yes.
16       THE COURT:  I think it's obvious from the film
17  itself, is it not?
18       MR. ALPER:  Yes.
19       THE COURT:  There was a translator being used here.
20       MR. ALPER:  Yes, Your Honor.
21       MR. CLOERN:  We want to make sure that the questions
22  were translated as well.
23       THE COURT:  And that's your stipulation?
24       MR. ALPER:  Yes.  Yes, Your Honor.
25       THE COURT:  All right.  Please proceed.

1       Just have a short sidebar on another point here

2       (Proceedings heard at sidebar on the record.)

3       THE COURT:  In criminal cases, we routinely have a

4   transcript, the translated transcript into the English

5   language, and we tell the jury that the transcript itself is

6   not the evidence, but it may be used by the jury as they

7   listen to the evidence in the case.

8       Do you have a transcript of this?  And would you then

9   agree, let the jury have a transcript that they can look to as

10  they listen to the testimony while being instructed that the

11  testimony is that obviously of the witness being depicted and

12  that the transcript is only to be used by them if they feel

13  it's necessary in the understanding of the witness?

14      MR. ALPER:  So I'm not sure it's necessary to give

15  them a transcript, but if Your Honor has a preference --

16      THE COURT:  No, I'm just saying that's what we

17  routinely do in criminal cases when there is a language issue,

18  but I don't want to force you into something.  I'm just saying

19  it is a tool available.  It is a technique available.

20      And maybe I've just caught you by surprise by

21  mentioning this.  But in any event, nobody at this point is

22  suggesting that the transcript be made available to the jury,

23  as I have mentioned.

24      MR. ALPER:  Yes, sir.  And if we may consider that --

25      THE COURT:  Well, it may be a little bit -- we can't

Case: 1:17-cv-01973 Document #: 788 Filed: 12/20/19 Page 113 of 128 PageID #:52966
Videotaped deposition of Jue Liang
1085

1   wait too long.

2           MR. ALPER:  Right.  I understand.

3           THE COURT:  That's part of the problem.

4           All right.  So let's leave it this way.  You have not

5   asked the Court to use that technique, right?

6           MR. ALPER:  Correct.

7           THE COURT:  All right.  Thank you, Counsel.

8       (Sidebar ended.)

9           THE COURT:  Okay.  Please proceed.

10      (Videotaped deposition resumed.)

11          MR. CLOERN:  Objection, Your Honor.

12          THE COURT:  Show a sidebar.

13      (Proceedings heard at sidebar on the record.)

14          MR. CLOERN:  Your Honor --

15          THE COURT:  What will the answer be?

16          MR. CLOERN:  The answer is that he doesn't remember

17  initially this is a document about visa interviews in 2011.

18  It has nothing to do with this case.  It is about Hytera hired

19  a Washington, D.C., consultant or something, and they told him

20  -- gave him some advice on how to get through U.S. visa

21  interviews.  And there are nine pages of testimony on this.

22          THE COURT:  This is what he would say?

23          MR. CLOERN:  Yes, this goes on for nine pages,

24  questioning about an entirely irrelevant document which we

25  think is a 608(b) problem.

Case: 1:17-cv-01973 Document #: 788 Filed: 12/20/19 Page 114 of 128 PageID #:52967
Videotaped deposition of Jue Liang
1086

1    THE COURT:  What is your response to the objection?

2    MR. ALPER:  So, Your Honor, this is a document that

3  this witness --

4    THE COURT REPORTER:  Can you talk in the mic, please?

5    MR. ALPER:  Yes.  Sorry.

6    It is one of the witnesses on this document.  It is a

7  corporate policy to be dishonest, and he admits that.  He

8  says it two ways.  He says this is a policy about dishonesty

9  in two ways.  Under 608 both (a) and (b), it goes to the

10  untruthfulness of -- it brings the character for

11  untruthfulness.  They put this in their opening.

12    THE COURT:  Your objection is overruled.  The witness

13  may answer.

14    MR. CLOERN:  Your Honor, we disagree with everything

15  that he says.

16    THE COURT:  I understand.  You have a fundamental and

17  basic objection to this inquiry and the answer -- the

18  objection is overruled.

19    MR. CLOERN:  Thank you.

20    (Sidebar ended.)

21    THE COURT:  Continue, please.

22    (Videotaped deposition resumed.)

23    MR. CLOERN:  Objection, Your Honor.

24    THE COURT:  Sidebar.

25    (Proceedings heard at sidebar on the record.)

Case: 1:17-cv-01973 Document #: 788 Filed: 12/20/19 Page 115 of 128 PageID #:52968
Videotaped deposition of Jue Liang
1087

1   MR. CLOERN:  Your Honor, the snippet that is in the

2   e-mail that they point to, that was cut out of a Hytera

3   document.  And what they're showing is they're now showing a

4   Motorola document that is suggesting it was cut out of that.

5   And it wasn't cut of a Motorola document.  It was

6   cut-and-pasted -- they're suggesting Jue Liang is taking

7   things from Motorola documents, and he was not.  He

8   cut-and-pasted that section out of the Hytera document.  And

9   that's what they've shown in the screen before.  Now they've

10  up a Motorola document that says Motorola confidential

11  proprietary.  This is a complete misrepresentation, and it's

12  false.

13         MR. ALPER:  So we disagree with the factual

14  representations, but I have a proposal to move forward.  When

15  we read the rest of this designation and take the stuff off

16  the screen so --

17         MR. CLOERN:  I think that the jury should be

18  instructed.  Because they have put up and made it look like

19  what was cut-and-pasted into that e-mail was from a Hytera --

20  it was from a Motorola document.  And if you look at the

21  e-mail, it -- what is attached to it is a Hytera document.

22         THE COURT:  Here's what we should be doing.

23      (Indiscernible crosstalk.)

24         MR. CLOERN:  -- depositions and repeatedly, and it's

25  not fair and it's not right.

Videotaped deposition of Jue Liang

1088

1    MR. ALPER:  I disagree with the --

2    THE COURT:  The jury should see the deposition

3  without reference to any other documentation.  That's the rule

4  here.

5    So whatever occurred at his deposition will be shown

6  to the jury without showing any other exhibits.

7    MR. ALPER:  And so I will attempt to ask them to take

8  that down.  If not, we'll just read the rest of it.

9    THE COURT:  Take it down if it, in fact, is there.

10  And I will tell the jury when we return to the jury that they

11  must listen closely as they view what is being depicted on the

12  screens before them.

13    MR. ALPER:  Thank you, Your Honor.

14    (Sidebar ended.)

15    THE COURT:  Members of the jury, you are to look at

16  what is being depicted on the screen there, the testimony of

17  the Hytera executive just as if he were on the witness stand.

18  Listen closely to what he is saying.  You also have an

19  opportunity to judge his demeanor and when he testifies, but

20  take it in that context if he were here today on the witness

21  stand.  That's the way you are to view what you are seeing on

22  the large screen and the screens in front of you.

23    Any other documentation you may have seen along the

24  way as he has testified, you should ignore.  Your

25  concentration must be on what you see on that screen, what you

Videotaped deposition of Jue Liang

1089

 1    see and hear from that witness.

 2              Once again, just as if he were right here on the

 3    witness stand.

 4              Please proceed.

 5              MR. ALPER:  Yes, Your Honor.

 6              May I have just one minute while we recalibrate that

 7    video?

 8              THE COURT:  Yes.

 9         (Brief pause.)

10              MR. ALPER:  We're ready to proceed.

11              THE COURT:  All right.  Start it.

12         (Videotaped deposition resumed.)

13              MR. CLOERN:  Objection, Your Honor.

14              THE COURT:  The objection is overruled.

15              Once again, members of the jury, look at the witness.

16    Listen to what he is saying.  And it's up to you to judge his

17    credibility within the context of the entirety of the evidence

18    in the case.

19              Please proceed.

20         (Videotaped deposition resumed.)

21              MR. ALPER:  That completes the video for Liang,

22    Your Honor.

23              THE COURT:  All right.  Are you ready for the next

24    witness?

25              MR. ALPER:  Yes.  Our next witness is Mr. Yingzhe

Case: 1:17-cv-01973 Document #: 788 Filed: 12/20/19 Page 118 of 128 PageID #:52971
Videotaped deposition of Yingzhe Zhang
1090

1   Zhang.

2              THE COURT:  In the same format?

3              MR. ALPER:  In the same format, video.

4              THE COURT:  Proceed.

5         (The videotaped deposition of Yingzhe Zhang was played in

6   open court.)

7              THE COURT:  Just a minute, has the witness -- have

8   the witnesses been sworn before giving their depositions?

9              MR. ALPER:  They were, yes, Your Honor.

10             THE COURT:  Is that correct?

11             MR. CLOERN:  That is correct, Your Honor.  In Hong

12  Kong.

13             THE COURT:  Okay.  Proceed.

14             MR. ALPER:  Yes, Your Honor.

15        (Videotaped deposition resumed.)

16             MR. CLOERN:  Your Honor, just objection.  I still

17  have a question about --

18             THE COURT:  Just a minute.  Is there any reason why

19  the deponent isn't being depicted --

20             MR. ALPER:  I'm sorry?

21             THE COURT:  Is there any reason why the deponent

22  isn't being depicted in large screen?

23             MR. ALPER:  He's on the upper left in order to make

24  room for the document that he's looking at.

25             THE COURT:  Okay.  But -- do you disagree that that

Videotaped deposition of Yingzhe Zhang

1   is the document he's looking at?

2        MR. CLOERN:  At this point, Your Honor, we don't

3   disagree on this document, but there are other documents that

4   are issues.  And they're also publishing documents that the

5   jury --

6        THE COURT:  All right.  Once again, if indeed the

7   witness is being shown -- we have to concentrate on the

8   witness, what he is saying in reference to what he is being

9   handed.  And there is an objection to enlarging the exhibit

10  being shown to the witness, and I will sustain that objection.

11       So whatever is being depicted is what will be shown

12  to the jury without any embellishment in terms of the larger

13  submission to them on the side of the screen.  It's hard to

14  make a good record on this point.

15       All right.  So whatever occurred at the deposition

16  which is picked up by the camera and also by the microphones

17  is something the jury can take into account, but without

18  further embellishment here today in the room, by showing you a

19  larger exhibit of what he purportedly had in his hands when he

20  answered the question.

21       Now, that's perfectly clear, I'm sure.  Okay.  But

22  your focus and attention and the weight that you give to this

23  testimony be based upon what you see on this screen, which was

24  there at the time, unembellished by submission here in court

25  today.

Videotaped deposition of Yingzhe Zhang

1092

1    So in that sense, the objection is sustained.

2    MR. ALPER:  Yes, Your Honor.

3    Should we continue playing --

4    THE COURT:  Yes.

5    MR. ALPER:  -- as we saw it on the screen?

6    THE COURT:  Yes, without any depiction of larger

7  exhibits --

8    MR. ALPER:  Okay.  So if we may have a moment to take

9  that --

10    THE COURT:  To do that?

11    MR. ALPER:  Yes.

12    THE COURT:  All right.  And while you're doing that,

13  the jury can stand up and . . .

14    (Brief pause.)

15    THE COURT:  Have you already made the adjustment?

16    MR. ALPER:  It is being made now, Your Honor.

17    May I ask a follow-up question?

18    Those exhibits that are being shown are the ones that

19  the witness is actually looking at.  I'm trying to think of a

20  way to display that --

21    THE COURT:  Well, you should have thought of that

22  when you took the deposition, but we're not going to correct

23  it or add to it or embellish it here in court today.

24    MR. ALPER:  Understood, Your Honor.

25    (Brief pause.)

Videotaped deposition of Yingzhe Zhang

1093

1   THE COURT:  Please be seated.

2   Ready?

3   MR. ALPER:  30 seconds, Your Honor.

4   THE COURT:  While that's going on, we'll have a

5   sidebar here.

6   (Proceedings heard at sidebar on the record.)

7   THE COURT:  Got the powerhouse here?

8   Are the documents being shown to the deponent already

9   in evidence or will they be offered in evidence?

10  MR. ALPER:  They will be offered.

11  THE COURT:  All right.

12  MR. DE VRIES:  And I believe there's an agreement

13  that they can; is that right?

14  MR. CLOERN:  Assuming you guys dropped out the ones.

15  I think there's one document left, but I -- it's not -- it's

16  really unclear if you guys dropped the attachment to the Jody

17  e-mail.

18  MR. ALPER:  Other than that --

19  MR. CLOERN:  Other than that, we don't have an

20  objection.

21  THE COURT:  All right.  So the point I'm trying to

22  make is, although the jury may have difficulty seeing them on

23  the screen, they ultimately will have them in their hands when

24  they go in to deliberate.

25  MR. ALPER:  Yes, Your Honor.  The one question that I

Videotaped deposition of Yingzhe Zhang

1094

1    had was, since these are the actual exhibits coming into

2    evidence just as if the witness was on the stand, video, we

3    were trying to display them so, you know, like they would

4    do -- the text would do, but we could have them read and then

5    just --

6         THE COURT:  Why don't you just make copies of them.

7    The Federal Rules of Evidence permit copies to be introduced.

8    So long as there's a representation that these are copies of

9    the originals, they will be given to the jury.

10        MR. ALPER:  And they are.  So I'm wondering if for

11   the next video we could do what we were doing, just display

12   the actual exhibits -- unobjected exhibits that are in front

13   of the witness while the video is playing.

14        THE COURT:  Well, there's an objection to that.

15        MR. CLOERN:  I think we've already made the change,

16   and it's not necessarily what the witness is looking at and

17   they're being called out.  And they're only playing part of

18   the transcript.  We tried to narrow it.

19        For example, about that visa document, there was all

20   kind of stuff in that visa document that says tell the truth,

21   don't lie.  They've completely misrepresented it.  This is a

22   major problem.

23        THE COURT:  I don't want to keep on repeating myself,

24   so we'll leave it this way:  As I've already told the jury,

25   they will make their decision on what they see and hear.  And

Videotaped deposition of Yingzhe Zhang

1095

1  to the extent that they cannot see the documents, ultimately

2  they will get copies of those documents, not necessarily the

3  originals, but copies of the originals, and I can tell the

4  jury that.  All right.

5       (Sidebar ended.)

6            THE COURT:  All right.  Members of the jury, when you

7  go in to deliberate, you will receive copies of the exhibits

8  that are being used in this deposition.  You cannot see them

9  because they are small, obviously, but by agreement, they will

10 go into evidence.  And so when you go to deliberate, you will

11 have the ability to look at those very documents that the

12 deponent is testifying about, which he is being shown.  He has

13 them in his hands.  You will ultimately get copies of those

14 exhibits, although we understand that you cannot see them as

15 the deposition goes forward.

16           Please proceed.

17           MR. ALPER:  Yes, Your Honor.

18           THE COURT:  Okay.

19      (Videotaped deposition resumed.)

20           MR. ALPER:  Your Honor, that completes that

21 deposition.  We can go on to the next.  But before I do, just

22 as a formality, may I move the exhibits that have been shown

23 to -- or discussed into evidence?

24           For Mr. Liang, Deposition Exhibit 2 is PTX 1057,

25 Deposition Exhibit 5 is PTX 100, Deposition Exhibit 6 is PTX

Videotaped deposition of Yingzhe Zhang

1096

1    107, and Deposition Exhibit 13 is PTX 30.

2              So we move those into evidence, Your Honor.

3              MR. CLOERN:  Your Honor, we object to Exhibit No. 2

4    for reasons stated, as well as Rule 403, and a lot of it is

5    speculation and hypotheticals.

6              THE COURT:  The objections are overruled.  All of

7    those documents to which you have referred are received in

8    evidence and may be published.

9         (Exhibit No. 2, PTX 1057; Exhibit No. 5, PTX 100; Exhibit

10   No. 6, PTX 107; and Exhibit No. 13, PTX 30 were received in

11   evidence.)

12             THE COURT:  Members of the jury, as I've said before,

13   when you go in to deliberate, you will receive copies of these

14   various exhibits that have been very adequately identified

15   within the record, so you will know what the two persons being

16   deposed had in their hands as they were being asked the

17   questions and as they gave their answers.

18             There is an objection.  The objection is overruled.

19   You may call the next witness.

20             MR. ALPER:  And, Your Honor, with Mr. Zhang, that's

21   the second video, his exhibits were -- Deposition Exhibit 1

22   was PTX 99, Deposition Exhibit 3 is PTX 542, Deposition

23   Exhibit 4 is PTX 112, and Deposition Exhibit 7 is PTX 535.

24   And we move to admit those exhibits.

25             MR. CLOERN:  No objection.

Case: 1:17-cv-01973 Document #: 788 Filed: 12/20/19 Page 125 of 128 PageID #:52978
Videotaped deposition of Yu Kok Hoong
1097

1        THE COURT:  The group is received.

2        (Exhibit No. 1, PTX 99; Exhibit No. 3, PTX 542; Exhibit

3   No. 4, PTX 112; Exhibit No. 7, PTX 535, were received in

4   evidence.)

5        THE COURT:  And once again, members of the jury, you

6   will have a greater opportunity to review all of those

7   documents when you go in to deliberate.  And it is up to you

8   to judge the credibility of the witnesses and the weight to

9   give to their testimony within the context of all of the

10  evidence in the case.

11       Do you have another witness?

12       MR. ALPER:  We do, by video deposition, Mr. Yu Hoong.

13       THE COURT:  He will be the last of the day?

14       MR. ALPER:  Yes, Your Honor.

15       THE COURT:  Call the witness.

16       (The videotaped deposition of Yu Kok Hoong played in open

17  court.)

18       MR. ALPER:  And, Your Honor, in connection with

19  Mr. Hoong's deposition, his Deposition Exhibit 3 is PTX 474,

20  Deposition Exhibit 4 is PTX 459, and Deposition Exhibit 5 is

21  PTX 97.  We'd move to admit those exhibits.

22       MR. CLOERN:  No objection, Your Honor.

23       THE COURT:  They are received and may be published.

24       (Exhibit No. 3, PTX 474; Exhibit No. 4, PTX 459; Exhibit

25  No. 5, PTX 97 were received in evidence.)

1       THE COURT:  And once again, members of the jury, you

2  will have an opportunity to examine them when you go in to

3  deliberate.

4       Would your next witness be a live witness?

5       MR. ALPER:  It's another video deposition.

6       THE COURT:  Yet another one?

7       MR. ALPER:  Yes.

8       THE COURT:  How long is it?

9       MR. ALPER:  It is 37 minutes.

10      THE COURT:  Members of the jury, I am going to excuse

11  you for the day.  It has been a long day and this is difficult

12  testimony to listen to given the nature of it.  And so I think

13  it would be better if you come in in the morning fresh of mind

14  and well rested to give appropriate consideration to the next

15  exhibit.

16      And I should add to that, I do have a few matters on

17  the call tomorrow morning.  And so once again, you may come in

18  at 10:15.

19      You are excused for the day.

20      Counsel, please remain for a few minutes.

21      Or one other thing I want to add, as time goes on,

22  some of you may need further verification or certification of

23  your being here on this jury.  And so if you need a document

24  to establish that for any reason, you can discuss that with

25  Mr. Fulbright, and he will see to it that you get some form of

Proceedings

1099

1     our standard form to show that you are indeed continuing on as

2     a juror in the case.

3          So if you do need that, you can catch Mr. Fulbright

4     along the way, and that can be tomorrow morning.  But for now,

5     you are excused.

6       (Jury out.)

7          THE COURT:  All right.  The jurors have left the

8     room.

9          Please be seated.

10         I have a number of matters on the call for tomorrow

11    morning.  When you see the court's agenda, you will know.  So

12    we'll pick it up with that next exhibit followed by a live

13    witness then?

14         MR. ALPER:  Your Honor, there is some short

15    additional deposition designations.  We were planning just to

16    read with Your Honor's permission --

17         THE COURT:  Yes.

18         MR. ALPER:  -- without video.  And we can do this

19    however you'd like, but we thought we'd put the lawyer in the

20    witness stand and lawyer at the desk and have them read it.

21         THE COURT:  Yes, that's the way it's routinely done.

22    Yes.

23         MR. ALPER:  Yes.  And we expect all four of those

24    will take 20 minutes total, and then we'll be calling the next

25    live witness.

Proceedings

1100

1    THE COURT:  And who is the next live witness?

2    MR. ALPER:  Dr. Stephen Wicker, our expert, technical

3    expert on misappropriation.

4    THE COURT:  All right.  That's very acceptable to do

5    it that way.

6    By the way, when you have a reader on the stand, the

7    reader is not to take on some kind of Hollywood attitude

8    towards things; just to read it straight as it is.

9    You agree, Counsel?

10   MR. CLOERN:  We agree, Your Honor.

11   THE COURT:  Okay.  10:15.

12   MR. ALPER:  10:15, Your Honor.

13   THE COURT:  Thank you.

14   THE CLERK:  All rise.  Court is adjourned.

15   (Court adjourned at 2:58 p.m.)

16

17                    *   *   *   *   *   *

18                        CERTIFICATE

19   I certify that the foregoing is a correct transcript from

20   the record of proceedings in the above-entitled matter.

21

22   /s/ *Amy Spee*                        11/20/2019
     _____        _____
23   Amy Spee, CSR, RPR, CRR                    Date
     Official Court Reporter

24

25