1731

```
  1                IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
  2                        EASTERN DIVISION

  3   MOTOROLA SOLUTIONS, INC., and MOTOROLA    ) No. 17 CV 1973
      SOLUTIONS MALAYSIA SDN. BHD,              )
  4                                             )
                                                )
  5            Plaintiffs,                       )
      vs.                                        ) Chicago, Illinois
                                                )
  6   HYTERA COMMUNICATIONS CORPORATION, LTD.,  ) November 26, 2019
      HYTERA AMERICA, INC., and HYTERA          )
  7   COMMUNICATIONS AMERICA (WEST), INC.,      )
                                                )
  8            Defendants.                       ) 10:00 o'clock a.m.

  9
                          TRIAL - VOLUME 11 A
 10                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE  CHARLES R. NORGLE, SR.
 11                          and a jury

 12

 13   For the Plaintiffs:    KIRKLAND & ELLIS LLP
                             BY:  Mr. Adam R. Alper
 14                               Mr. Brandon Hugh Brown
                                  Mr. Reza Dokhanchy
 15                               Ms. Barbara Nora Barath
                                  Mr. Kyle Calhoun
 16                          555 California Street
                             27th Floor
 17                          San Francisco, California 94104
                             (415) 439-1400
 18
                             KIRKLAND & ELLIS LLP
 19                          BY:  Mr. Michael W. De Vries
                             333 South Hope Street
 20                          Los Angeles, California 90071
                             (213) 680-8400
 21

 22
      Court reporter:             BLANCA I. LARA
 23                         Official Court Reporter
                           219 South Dearborn Street
 24                              Room 2342
                           Chicago, Illinois 60604
 25                          (312) 435-5895
                           blanca_lara@ilnd.uscourts.gov
```

1732

1   Appearances:   (Continued:)

2

3   For the Plaintiffs:    KIRKLAND & ELLIS LLP
                           BY: Ms. Megan Margaret New
                           300 North LaSalle Street
4                          Chicago, Illinois 60654
                           (312) 862-7439
5
                           KIRKLAND & ELLIS LLP
6                          BY:  Ms. Leslie M. Schmidt
                           601 Lexington Avenue
7                          New York, New York 10022
                           (212) 446-4763
8
    Motorola Corporate Representative:   Mr. Russ Lund
9

10

11  For the Defendants:    STEPTOE & JOHNSON LLP
                            BY: Mr. Boyd T Cloern
12                             Mr. Michael J. Allan
                               Ms. Jessica Ilana Rothschild
13                             Ms. Kassandra Michele Officer
                           1330 Connecticut Avenue., Nw
14                         Washington, DC 20036
                           (202) 429-6230
15

16
    Hytera Corporate Representative:  Michele Ning
17

18

19

20

21

22

23

24

25

Case: 1:17-cv-01973 Document #: 792 Filed: 12/20/19 Page 3 of 224 PageID #:53614
Wicker - redirect by Brown
1733

1          THE CLERK:  All rise.

2          (The following proceedings were had in the

3          presence of the jury in open court:)

4          THE CLERK:  The Court is in session.  Please be

5   seated.

6          THE COURT:  Good morning, members of the jury.

7          Please recall the witness.

8          MR. ALPER:  Plaintiffs recall Dr. Wicker.

9          MR. BROWN:  Good morning, Your Honor.

10         THE COURT:  Good morning.

11         MR. BROWN:  May I proceed?

12         THE COURT:  Proceed.

13         MR. BROWN:  Thank you.

14      STEPHEN B. WICKER, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

15               REDIRECT EXAMINATION (resumed)

16   BY MR. BROWN:

17   Q.  Good morning, Dr. Wicker.

18   A.  Good morning.

19   Q.  I want to start where I was leaving off last night with

20   VRIS.  This is your slide, PTX 8.233.  Just to set the stage,

21   can you explain what you are showing on this slide?

22   A.  Certainly.  This is a diagram that came from VRIS's

23   technical specification.  And what it shows is a virtual

24   source.  It's routing messages to and from a number of

25   different inputs, to a number of different higher-level or a

Wicker - redirect by Brown

1734

1    higher-layered tasks, like applications.

2    Q.  And what was the importance of this information in that you

3    find it in Hytera as well?  Why did you show that?

4    A.  Okay.  I showed that because this particular diagram only

10:04:51    5    shows up in confidential documents; in other words, in

6    Motorola's confidential documents.

7           As I mentioned yesterday, it's not in the patent.

8    It's not in the public source.  It is a figure that comes from

9    Motorola's confidential documents and it was therefore copied

10:05:07   10    from those documents into the user's manual.

11    Q.  And so the document that you're showing is coming from the

12    PTX 1255, right?

13    A.  That's correct.

14    Q.  So I have PTX 1255 here, which you showed during your

10:05:22   15    testimony.  What is this document and why is it relevant that

16    Hytera had this Motorola confidential document?

17    A.  This is the software architecture document.  And as you can

18    see, as counsel flips through it, it's quite long, and it's

19    quite detailed.  This is a great deal of confidential

10:05:39   20    information that goes to the heart of actually several of

21    Motorola's trade secrets.

22    Q.  And on this page, page 44 of PTX 1255, is that the same

23    figure that you showed a copy of Hytera's information?

24    A.  That's it.

10:05:56   25    Q.  So why is it relevant that is was copied out even if none

1   of the other text was copied out?

2   A.  What it shows is that Hytera's engineers were in possession

3   of this document.  They could read through it.  They would get

4   all of this detail regarding the software architecture in

5   general and VRIS in particular.

6   Q.  Now, during the cross-examination you were asked questions

7   about whether -- or I think you were told that Motorola has a

8   term called "VRIS" and people in the industry know that, is

9   that right?

10  A.  Yes.

11  Q.  Okay.  And so I want to show you -- why is that relevant in

12  your analysis that folks in the industry would know that VRIS

13  is a Motorola term?

14  A.  Well, first off, Hytera engineers would know that it was a

15  Motorola term.  And as I've shown you, there were several

16  Hytera documents and presentations, for example the one in

17  front of us, that say "VRIS."

18          And so when we look at a Hytera document like this and

19  see "VRIS," this would point towards having Motorola

20  confidential information.

21  Q.  I'm going to zoom in a little bit.

22          And so this is PTX 628 that you've just marked up

23  there, Dr. Wicker.  And can you refresh the jury on what this

24  document is that you're showing?

25  A.  Okay.  So this particular document talks about the

Case: 1:17-cv-01973 Document #: 792 Filed: 12/20/19 Page 6 of 224 PageID #:53617
Wicker - redirect by Brown
1736

1  ergonomic management task.  It goes into a great deal of

2  detail.  What we're seeing here is a particular piece of that

3  called an Application Cross-Reference Table.

4      And what it's showing us is, is a number of possible

10:07:28  5  inputs to that task.  And what we can see is, they come from a

6  number of sources.  But one source in particular, the common

7  layer, "ACRT" denotes "VRIS," as does the lower layer "ACRT."

8  So we can see that within this document there is reference to

9  VRIS.

10:07:48  10  Q.  And what explanation would there be, from a technical

11  perspective, for why a term that the industry knows is a

12  Motorola term would show up in a Hytera document describing

13  their RAF?

14  A.  What I've shown is that not only the reference to VRIS, but

10:08:02  15  all of this information comes from confidential Motorola

16  documents.  And what this would show to people looking at it is

17  that we see references within this document to Motorola.

18  Q.  So let's talk now about the VOX trade secret.

19      And you were asked questions about this e-mail, which

10:08:31  20  is PTX 630, discussing an SRS template.  Just refresh us, what

21  is an SRS template?

22  A.  It's Software Requirement Specification.  It describes what

23  the software is supposed to do.

24  Q.  And would you remind us of what happened in this e-mail

10:08:49  25  chain?  And I can show you the replies.

Wicker - redirect by Brown

1737

1  A.  Certainly.  There was a request for an SRS document, the

2  reply was the VOX document that we've been talking about.

3  Q.  And in particular, we focused on Mr. Zhu's possession of

4  that document, is that right?

10:09:00  5  A.  That's right.

6  Q.  And you showed this slide, which shows the document that

7  was attached.  And what was -- what was the substance of the

8  issue here with regard to this document in Mr. Zhu's

9  possession?

10:09:21  10  A.  The point is that Mr. Zhu was not one of the folks who came

11  over from Motorola.  He had a document in his possession that

12  showed through track changes that it was originally a Motorola

13  document.  It contained a lot of information, including a

14  Motorola confidential, proprietary notice.

10:09:41  15  Q.  And were you challenged on that document during your

16  cross-examination?

17  A.  Yes, I was.

18  Q.  And what was the substance of the point that counsel was

19  trying to make?

10:09:47  20  A.  Well, counsel was trying to make a point that these edits

21  that are shown through the red line happened long before this

22  exchange of material.  That really wasn't the point I was

23  making.

24        The point I was making was that if someone opens up

10:10:02  25  this document, they see it's a Motorola document.  Whenever

Wicker - redirect by Brown

1738

1  those edits occurred, doesn't matter.  My point was that when

2  these Hytera engineers who had never been to -- or were never

3  Motorolan employees opened this document, they would see that

4  it was a Motorola document.

10:10:18  5  Q.  Dr. Wicker, Mr. Zhu says he never saw the track changes,

6  how does that affect your opinion?

7  A.  That actually doesn't change it.  There's other evidence in

8  this document that it was a Motorola document.  In particular,

9  one piece that's not deleted refers to an internal Motorola

10:10:39  10  document, and that's what you see right here (indicating).

11      The references to this document are confidential

12  Motorola documents.  Here we see a reference to matrix mid-tier

13  Ergonomics (indicating).

14  Q.  But putting aside Mr. Zhu's testimony, there's another

10:11:00  15  Hytera engineer on this e-mail, right?

16  A.  That's right.

17  Q.  Who is that?

18  A.  That's Qin Jun, another Hytera engineer, also not a

19  Motorola employee.

10:11:10  20  Q.  And the document that was in his possession was PTX 573

21  that you introduced during your direct.  And what did you see

22  in PTX 573?

23  A.  Again, the Motorola logo and other information pointing to

24  Motorola that had been deleted but were visible through track

10:11:30  25  changes.

Wicker - redirect by Brown

1739

1  Q.  I'm going to show you the metadata for PTX 573.

2      What about the metadata provide an indication that

3  this was a Motorola -- this was known to be a Motorola

4  document?

10:11:42  5  A.  Well, this tells me it was in Jun Qin's custody.  It was on

6  his computer when it was produced.  And the name of the file,

7  as shown on his computer, is Motorola_VOX.doc.

8  Q.  But, Dr. Wicker, the e-mail that was sent to him was named

9  VOX.doc, what's the technical explanation for how on Mr. Qin

10:12:07  10  Jun's computer it became named Motorola_VOX.doc?

11  A.  He apparently worked with it and changed the name.

12  Q.  Now, you were shown some of your slides about documents

13  found at Hytera.  And I don't have the fancy animation that was

14  used during your cross, but I put little Post-Its on there.

10:12:38  15      Do you remember what you were told during cross about

16  these documents?

17  A.  Yes.  I was told that they were not produced.

18  Q.  Okay.  And in particular, was there a representation about

19  whether they've been previously identified?

10:12:49  20  A.  Yes, there was.

21  Q.  And what was that representation?

22  A.  That they had not been identified.

23  Q.  So I'm going to hand you -- actually, apologies.  Just one

24  second.

10:13:23  25      (Brief pause.)

Wicker - redirect by Brown

1740

BY MR. BROWN:

Q.  I'm going to come back to that.  I'm missing a document.

Let me take you to the code that we showed you earlier from Hytera's source code.  And we talked about how your book is cited here, do you remember that?

A.  Yes.

Q.  What I didn't ask was, what is the rest of the material around your book citation?  There is a mention there of a MAP-Works and a copyright, what does that indicate?

A.  Okay.  That indicates -- the copyright indicates that at least some of this information is associated with MAP-Works, and the date is 1996 to 2002.

Q.  So what does that mean about where your book -- or your work is being cited in the field?

A.  Okay.  It's showing that my work is being cited by those working in DMR in particular, and more generally in a larger context by MAP-Works.

Q.  Is your book cited in other open-source material like from MAP-Works?

A.  Yes.

Q.  And what does that mean if Hytera is using this open source code in their DMR software?

A.  What it shows is, they've got access to other content, but they are obviously using it, reading it, and incorporating it into what they're doing.

Wicker - redirect by Brown

1741

1  Q.  Now, switching gears to the reverse engineering analysis

2  that we had talked about yesterday.  You were asked some

3  questions about the reverse engineering that Motorola had

4  conducted, and let's start with that.

10:15:12  5  Can you just frame for us what it is that Motorola did

6  to investigate whether or not Hytera had been using its source

7  code?

8  A.  Certainly.  What they did was, they opened up a Hytera

9  radio, and they were able to obtain zeros and ones that were

10:15:27  10  stored on that radio.  Zeros and ones that would include the

11  actual code being run on the processor.

12  Q.  Now, you were read testimony from Darrell Stogner that said

13  they didn't convert binary code into assembly, what does that

14  mean?

10:15:42  15  A.  In other words, they weren't able to reverse the zeros and

16  ones all the way into the assembly code; in other words, they

17  couldn't get back to the software.

18  Q.  And why not?

19  A.  There are a number of reasons that would be really hard to

10:15:59  20  do.  First off, those zeros and ones could correspond to any of

21  a number of different programming languages.  And because

22  they're just zeros and ones, it would be impossible to tell

23  where one language stopped and another language began.  For

24  example, assembly C++ and C.  So that alone would be a

10:16:18  25  monumental problem.

Wicker - redirect by Brown

1742

1       Furthermore, you wouldn't know which of these zeros

2   and ones corresponded to the actual program run by the

3   processor and what was, for example, storage for an active

4   application.

10:16:29

5       There a number of reasons it would be extraordinarily

6   difficult -- well, it would be impossible to get from here to

7   here (indicating).

8       Another thing I'll mention is that, when one goes down

9   through this chain, what is initially readable has words like

10:16:46

10  "temperature control" and a comment or a variable name

11  "temperature," that's all gone by the time you get to zeros an

12  ones.  This has been optimized and that information, for

13  example my comment or the variable temperature, it's not there

14  anymore.

10:17:01

15  Q.  And so what is it, then, that Motorola could do to

16  investigate whether or not its code was found in those zeros

17  and ones that you're describing?

18  A.  They could do exactly what they did; namely, look for

19  particular parameters that would have to survive the transition

10:17:20

20  from here all the way down to here (indicating).

21      For example, here we have a threshold of 70

22  (indicating).  They could look -- that's actually a very simple

23  one, but they could look for a longer parameter that would be

24  indicative of what Motorola's code has.

10:17:37

25  Q.  And did they do that?

Wicker - redirect by Brown

1743

1 A.  They did that.

2 Q.  Okay.  Now, was that successful?

3 A.  It was -- well, they were able to do it, but what they did

4 not show copying, precisely for the reason that Sam Chia

10:17:52  5 describes in his e-mails, they had made changes.  They had

6 concealed what they had done, so that the radios would perform

7 a little differently.  Motorola's numbers were no longer there.

8 Q.  And so let's just explain that.  Why were Motorola's

9 numbers no longer there and how does what Hytera did to conceal

10:18:11 10 that fact impact that?

11 A.  Okay.  So what's on the screen is my 78 slide.  And it

12 talks about one of the problems being, if we simply use

13 Motorola's code, we'll have the same performance, and that is

14 something that would be detectable.

10:18:23 15         And so what is suggested as a possible solution,

16 change performance of the reuse algorithms.  And the term

17 "reuse," it means reusing Motorola's code.

18         And so by changing the performance, it changed the

19 parameters.  And when you look at the zeros and ones, you can't

10:18:46 20 see what you expect to see if there were copying.

21 Q.  And you were explaining that in the context of your

22 temperature control program.  What parameters would you change

23 and how would that work?

24 A.  Okay.  So I only got one apartment here, it's 70.  If I was

10:18:56 25 concerned that someone had taken my code and the only thing I

Wicker - redirect by Brown

1       had available were these zeros and ones, I'd look for the 70.

2       In other words, I'd look for the zeros and ones that would

3       represent that parameter 70.

4              It wouldn't do me any good to look for temperature, it

10:19:12   5    wouldn't do me any good to look for the name of the file,

6       they're go gone.  But what I would look for is that number, and

7       if they changed it to 69, I wouldn't find it.

8       Q.  And so in addition to changing the performance so that

9       Motorola couldn't detect the copying, what else did Mr. Chia do

10:19:30  10    that concealed Hytera's copying of Motorola source code?

11      A.  Okay.  What they did was, they changed the interface.  So

12      remember the number 2 solution, extract only what we need.  For

13      example, in VRIS, as we saw during my cross-examination, they

14      didn't use all of VRIS, they used some of it, and then changed

10:19:51  15    the interface to own interface.

16             So what they did was, they changed the interface,

17      changed the names on the files so that Motorola would not be

18      able to detect that the library was actually Motorola source

19      code.

10:20:07  20    Q.  Now, we saw this timeline earlier (indicating).  Is this

21      timeline complete?

22      A.  No.  No, it doesn't show the reverse engineering, the

23      looking at the zeros and ones, trying to detect the actual

24      parameters that one would expect in Motorola's code, that

10:20:31  25    would've happened in 2012, 2013 time period, which is the time

Case: 1:17-cv-01973 Document #: 792 Filed: 12/20/19 Page 15 of 224 PageID #:53626
Wicker - redirect by Brown
1745

1 period of the e-mails that we were looking at.

2 Q.  And what about what Hytera did caused Motorola's reverse

3 engineering in the late 2012, early 2013 timeframe to be

4 unsuccessful?

5 A.  Hytera had concealed its use of Motorola's code by changing

6 the names of interfaces, changing the performance of the

7 algorithms, so that what they had done could not be detected

8 through reverse engineer or testing.

9 Q.  Now, there's also it looks like some allegations of other

10 things that were happening between 2008 and the middle of 2010.

11       We've been talking about how Hytera's concealment

12 impacted the reverse engineering, how would the same

13 concealment that we're looking at of changing the performance

14 of the algorithms, how would that have impacted whether or not

15 these alleged anomalies or suspicions were actually found to be

16 true?

17 A.  Okay.  So, for example, Motorola did have suspicions.  It's

18 noted here.  So they conducted tests.  Not only reverse

19 engineering, but actually tested the performance of the radios.

20       And what they found were significant differences

21 between the way Hytera's radios performed and the way

22 Motorola's radios performed.

23 Q.  And can you give an example of how changing the parameters

24 in the way that Hytera changed them to conceal the theft would

25 have -- or did, actually, from the testimony you heard in court

Wicker - redirect by Brown

1746

1    -- affect some of those analyses that Motorola did?

2    A.  Yes.  For example, we talked about that -118 dBM, that's an

3    example of a particular test value that could've been arrived

4    at through a number of means, other kinds of performance; for

5    example, when it switches from digital to analog, when it's --

6    how good the voice quality is at a certain point in time.

7    Those are other things you can test for.  And the results of

8    the test that Motorola did shows that there was significant

9    difference.

10        MR. BROWN:  For the record, I'm going to mark the

11   timeline as PDX 14 as a demonstrative.

12   BY MR. BROWN:

13   Q.  Now, let me go back to what I tried to ask you a few

14   minutes ago about the documents, and I want to hand you the

15   documents that you're being asked about here.

16        MR. BROWN:  Your Honor, permission to approach?

17        THE COURT:  Yes.

18   BY MR. BROWN:

19   Q.  Now, Professor Wicker, the top document that you have

20   there, do you recognize that documentary?

21   A.  Yes, I do.

22   Q.  And what do you recognize that document to be?

23   A.  This is actually one we were looking at recently, the

24   software architecture document of Matrix.  So that would be

25   this one (indicating).

10:22:30

10:22:46

10:23:01

10:23:27

10:23:38

Wicker - redirect by Brown

1747

1   Q.  Okay.  And do you have a document labeled "trade secret

2   No. 53" in front of you?

3   A.  I do.

4   Q.  Okay.  And what is that document?

10:23:46   5   A.  This is a listing of Motorola's trade secrets with a

6   description.  I believe this is a response to an interrogatory.

7   Q.  Now, you weren't shown this document during your cross

8   testimony, were you?

9   A.  No, I was not.

10:24:01   10   Q.  What was the allegation made about what was in this

11   document in terms of document citation versus what was in your

12   slides?

13   A.  What was asserted was that I had pointed to documents, such

14   as this one and this one (indicating), that Motorola did not

10:24:14   15   say formed a basis for their trade secrets.

16   Q.  Now, if you go down to the third paragraph, and three lines

17   up from the bottom, do you see a Hytera Bates number with a

18   parenthesis "Darwin Ergonomic Platform Architecture"?

19   A.  Yes, I do.

10:24:33   20   Q.  Would you read the Bates number that's listed there?

21   A.  Hytera, HYT1973-18047866.

22   Q.  Is that the same document listed on your slide?

23   A.  It is.

24   Q.  Okay.  And is PTX 666, which I'm showing here, is this one

10:24:56   25   of the trade secret documents you relied on for trade secret

Wicker - redirect by Brown

1748

1 53?

2 A.  Yes, it is.

3 Q.  And why is this document relevant to your analysis?

4 A.  This is relevant in that it describes Darwin Ergonomic

10:25:08    5 Platform.  It involves, for example, the material several days

6 ago that we talked about on the boards where I showed how

7 messages were routed to applications, how applications could

8 send messages, and the Darwin ergonomic platform could turn on

9 an application in response.

10:25:25    10 Q.  And so was it correct that this document was not found in

11 Hytera's file?

12 A.  No.  No, it was produced by Hytera in the course of this

13 litigation, and it was one of the documents that Motorola

14 pointed to as describing its trade secret.

10:25:42    15 Q.  Okay.  Now, would you go -- if you look at the line

16 underneath that, there's a Motorola number with the parenthesis

17 "software architecture document of Matrix," do you see that?

18 A.  Yes, I do.

19 Q.  Okay.  And would you read the Bates number of that

10:26:04    20 document?

21 A.  Certainly.  It is Moto-1973-00198177.

22 Q.  The one above that, the one with the parenthesis "software

23 architecture document of Matrix."

24 A.  Oh, I'm sorry.  I was at the wrong one.

10:26:27    25 Moto-1973-00117728.

Wicker - redirect by Brown

1749

10:26:41

1    Q.  And so that's PTX 1255.  Do you recognize this document?

2    A.  Yes, that's the software architecture document of Matrix.

3    Q.  Did we show that just a few minutes ago?

4    A.  We did.

5    Q.  And why were you showing that earlier?

6    A.  In response to another point with regard to Motorola's

7    trade secrets.

8    Q.  And you've indicated on your slide that this document was

9    found at Hytera.  Was it found at Hytera?

10:26:55

10   A.  Yes, it was.

11   Q.  Okay.  Now, I'm going to show you PTX 839, which you also

12   used during your examination.

13        And you have it in front of you as well if you'd like

14   to compare.  But are these the same documents?

10:27:06

15   A.  They are.

16   Q.  Version number 0.0.2?

17   A.  That's correct, 2005.

18   Q.  I'm sorry.  Say that again.

19   A.  Yes.  2005.

10:27:16

20   Q.  Okay.  So PTX 839 is Bates labeled HYT-1973-19629596,

21   right?

22   A.  That's right.

23   Q.  Is that the same document that you cited here, PTX 839?

24   A.  Yes, it is.

10:27:38

25   Q.  Okay.  And so was it correct when you were told that this

Wicker - redirect by Brown

1750

1    document was not found in Hytera's files?

2    A.  No, that was incorrect.

3    Q.  And there was one more, this one from the Compass logs.

4    And before we get into that, you've identified the Compass logs

10:28:07    5    here, but these are documents that were not found at Hytera,

6    right?

7    A.  That's right.

8    Q.  Why is that?

9    A.  Among other reasons, Mr. Chia's laptop was lost.

10:28:17    10    Q.  And were there other evidence of deletions that you saw at

11    Hytera?

12    A.  Yes.

13    Q.  Now, was the Compass log the only way in which Motorola

14    confidential material got to Hytera -- let me withdraw that and

10:28:33    15    ask it in a better way.

16        Are the Compass logs the only indication of Motorola

17    confidential information at Hytera?

18    A.  No.

19    Q.  And why not?

10:28:41    20    A.  First off, Hytera produced documents that showed that they

21    had these documents in their possession, that was further

22    evidence.

23        Also I note that the source code that Hytera had would

24    not have shown up on the Compass log.

10:28:57    25    Q.  And the document up here that you labeled -- if I can zoom

Wicker - redirect by Brown

1751

1   in -- on your slide, it's PTX 1341.  And I want you to look at

2   the fourth paragraph in the description of trade secret, the

3   software architecture trade secret.

4   A.  Okay.

10:29:20   5   Q.  Second line from the bottom of the fourth paragraph,

6   there's a document with the parenthetical "Darwin

7   architecture."

8   A.  Yes, I see that.

9   Q.  Would you read the Bates number for that one?

10:29:31   10   A.  Moto-1973-00222024.

11   Q.  So that's PTX 1341?

12   A.  That's right.

13   Q.  Same document you identified on your slide?

14   A.  That's right.

10:29:48   15   Q.  And was it correct that this was not a document that was

16   identified as part of Motorola's trade secret?

17   A.  No, that was incorrect.

18   Q.  Now, this document is the Darwin architecture document that

19   we talked about earlier.  Can you remind us why -- would you

10:30:08   20   remind us why you showed us this document earlier in your

21   testimony?

22   A.  Yes.  This is another document that provides a great deal

23   of detail.  In particular, it has the exact figure that we

24   spent some time with.

10:30:23   25   Q.  Now, how does this figure relate to the board that you

Wicker - redirect by Brown

1752

1    showed, the big board with Hytera's logo and Hytera's radio

2    application framework?

3    A.  Okay.  What I've showed, I used this figure that we see in

4    front of us on one board and talked about how it worked.  I

10:30:39  5    then showed you that Hytera had taken this figure and simply

6    put their logo at the top and they did change the name of

7    "translate" and "C lim," but otherwise it's the same.

8    Q.  But how can you say that, Dr. Wicker, when this document

9    doesn't currently show up in Hytera's files?

10:30:57  10   A.  They clearly had it at one point.

11   Q.  Did you see any evidence of -- withdrawn.

12           Did you see any other indication that Hytera had

13   possession of this document or used other portions of this

14   document?

10:31:07  15   A.  Yes.  As I showed in my initial presentation, we went

16   through it quickly, but I showed how many of the pages in this

17   presentation showed up in a Hytera presentation, word for word.

18   Q.  Despite no longer being in Hytera's possession?

19   A.  That's correct.

10:31:28  20   Q.  Now, some of the documents that you were shown during your

21   cross-examination had different dates.  If you remember just to

22   set the stage, Mr. Chia performed certain downloads in, say,

23   March of 2008, but the document that is now in this case is

24   dated much later.  Can you explain why that is?

10:31:51  25   A.  Certainly.  What happens with a Compass database is, it

Wicker - redirect by Brown

1753

1  maintains the current version of the documents.  So as the

2  documents are updated, their modification date change.

3         So when Mr. Chia downloaded them in 2008, he got the

4  versions that were available in 2008.  Y.T. Kok, same thing.

10:32:12  5  These documents may have later been modified, and so they would

6  show later dates than the date of the download.

7  Q.  And where are the documents, the actual versions of the

8  documents that were taken by Mr. Chia to Hytera?

9  A.  Many of them have benched.  They have been copied into

10:32:35  10  other documents and so forth.  So that's how I know what

11  they've seen.  There were some that turned up on Peiyi Huang's

12  computer.

13  Q.  I'm showing PTX 806, which is an e-mail that you talked

14  about during cross between -- this part is between Huang Ni and

10:33:01  15  Huang Peiyi, do you remember this?

16  A.  Yes; indeed.

17  Q.  Can you refresh us on the conversation that's happening

18  here?

19  A.  Okay.  This was the discussion I had yesterday and talked

10:33:08  20  about earlier last week, where Peiyi Huang had sent a library,

21  in particular a Motorola library to Huang Ni.  And Huang Ni had

22  said, "something is missing.  I think I have the wrong header

23  file."

24  Q.  And you were shown PTX 1057 and you were told that this was

10:33:34  25  the header file attached to that e-mail, right?

Wicker - redirect by Brown

1754

10:33:54

10:34:10

10:34:31

10:34:49

10:35:08

1  A.  That's correct.

2  Q.  Now, this sort of captures what's going on in this header

3  file (indicating).  We talked about this earlier.  What does

4  this mean to encapsulate Motorola HPD framer library?

5  A.  Okay.  So this is an example of the concealment.

6  Motorola's high performance framer library is in the form of

7  compiled code, and the wrapping and encapsulating is changing

8  the entry names so you can't tell that what you're actually

9  getting is Motorola code.

10  Q.  And is this -- is this code that's being sent?

11  A.  Yes, it is.

12  Q.  And is this a -- is there any reason why there would be a

13  Hytera document that references a Hytera library but also

14  references a Motorola library in Hytera's files?

15  A.  Well, this is showing the use of Motorola's technology by

16  Hytera, both the combination of rebranding and concealing.

17  Q.  Now, the -- I'm going to show you the metadata for the

18  document that you were shown, PTX 1057.

19       You'll see here -- if you'll see, it says the doc I.D.

20  102496, do you see that?

21  A.  Yes, I do.

22  Q.  And that's the same document that's PTX 1057?

23  A.  That's right.

24  Q.  And then says, "begin attached 102484."  Do you see that?

25  A.  Yes, I do.

Wicker - redirect by Brown

1755

1  Q.  And that refers to the e-mail that it was attached to?

2  A.  That's right.

3  Q.  This is not that number, is it (indicating)?

4  A.  It is not.

10:35:25   5  Q.  So the e-mail that you were shown is not the e-mail that

6  attached the code that was at issue?

7  A.  That appears to the case, yes.

8  Q.  I have the e-mail that that code was actually attached to.

9          MR. BROWN:  May I approach, Your Honor?

10:35:37  10         THE COURT:  Yes.

11  BY MR. BROWN:

12  Q.  And just to prove that, you'll see "102484" here?

13  A.  Yes.

14  Q.  And if we look on the -- oh, actually let me introduce the

10:36:03  15  exhibit before I put it up there.

16          DTX 3278, is this a document provided by Hytera during

17  this litigation?

18  A.  Yes, it is.

19  Q.  And do you recognize the e-mail?

10:36:13  20  A.  Yes, I do.

21          MR. BROWN:  Your Honor, plaintiff moves to admit DTX

22  3278.

23          THE COURT:  It is received and may be published.

24          (Said exhibit received in evidence.)

10:36:23  25  BY MR. BROWN:

Wicker - redirect by Brown

1756

1   Q.  So the code was attached to this file 102484, which is the

2   same as the e-mail we're about to show; PTX 3278.

3          Now, this e-mail is a response from Huang's e-mail to

4   Huang Peiyi?

10:36:43   5   A.  That's correct.

6   Q.  And what is it that Huang Peiyi says and attaches in

7   response to Huang Ni's e-mail?

8   A.  Okay.  So here we can see framer_api_h is attached along

9   with rfhal_c55.lib.  And what Peiyi Huang is saying to Huang Ni

10:36:57   10  is:

11          "... sorry for my late reply.  The interface

12          remain unchanged of using the

13          RFHAL_syncL1timer."

14           The input parameter will be the time.

10:37:15   15  Q.  And from a technical perspective, what does that mean when

16  Ms. Peiyi is re-attaching the same file we've been talking

17  about, PTX 1057, and telling Huang Ni to use it.

18  A.  Okay.  She's saying:  Here is what you're supposed to use,

19  reattach the file.  So she, Peiyi Huang, is basically telling

10:37:37   20  Huang Ni the interface remains unchanged.

21  Q.  And the file that Huang Ni -- and remind me, did Huang Ni

22  ever work for Motorola?

23  A.  No.

24  Q.  The file that Ms. Huang Ni is being asked to use is this

10:37:51   25  file (indicating), correct?

Wicker - redirect by Brown

1757

1    A.  That's correct.

2    Q.  Now, is this an example of Peiyi Huang sending Huang Ni

3    source code?

4    A.  Yes.

10:37:58    5    Q.  I'm going to show you Huang Ni's testimony.  What was Huang

6    Ni's testimony about whether or not Peiyi Huang ever gave Huang

7    Ni source code?

8    A.  She said "no."

9    Q.  Does this source code indicate, from a technical

10:38:13    10    perspective, whether or not it was Motorola source code?

11    A.  Yes, it did.  It talked about writing and encapsulating,

12    there's an explicit reference to Motorola's high-performance

13    data framer library.

14    Q.  And how did Ms. Huang Ni respond to the question about

10:38:28    15    whether she's ever seen source code at Hytera that indicate it

16    was Motorola code?

17    A.  She said "no."

18    Q.  Does this source code indicate whether or not it's an

19    interface to one of Motorola's libraries, and how?

10:38:56    20    A.  Yes, it does.  It's a header file.  And so as a header

21    file, it provides definitions and interfaces that can be used

22    with regard to a library; for example, rfhal.h -- or RFHAL,

23    excuse me.

24    Q.  In your technical expertise, is that something that you

10:39:16    25    know because you're an expert or is that something that

Wicker - redirect by Brown

1758

1    software engineers generally would know?

2    A.  Software engineers generally know that.

3    Q.  And how did Ms. Huang Ni respond in the deposition when

4    asked:

10:39:28    5            "Have you ever seen source code at Hytera that

6            specifically said it is an interface to one of

7            Motorola's libraries"?

8    A.  She said "no."

9    Q.  Have you seen evidence that there was additional Motorola

10:39:58    10   source code that was sent to Huang Ni in addition to that file?

11   A.  Yes.

12   Q.  Let me show you your meet PTX 197, which quotes from

13   already admitted exhibit PTX 2019, to start with framing what

14   we're looking at.  What is PTX 1019?

10:40:13    15   A.  Okay.  So this is a list of non-recovered files from Peiyi

16   Huang's laptop.  This was part of the forensic analysis that's

17   been discussed.

18   Q.  And when you say the forensic analysis that's been

19   discussed, what are you talking about?

10:40:29    20   A.  I'm talking about the fact that Peiyi Huang's laptop was

21   found.  It had been submitted for recycling.  Submitted for

22   reuse.  And so when that was found out, Hytera produced it

23   through its counsel and -- actually, I'm sorry, they did not

24   produce the laptop.  They had the laptop analyzed forensically.

10:40:51    25            So what that means is, one looks into the hard drive

Wicker - redirect by Brown

1  and looks for evidence of data that's been erased.  Even if you

2  erase something on a laptop, it can still be seen by those with

3  the right tools.

4              And so this laptop was submitted to X-Ways.  There

10:41:09  5  were some recovered files.  There was a list of non-recovered

6  files.  This is an example of a list that was found, but files

7  that weren't recovered.

8  Q.  What does it mean to be a list of non-recovered files?

9  A.  Okay.  So X-Ways was able to identify files that had been

10:41:25  10  on the laptop by name.  There's a file structure that's on the

11  computer that keeps track of files.  It has lists of what's

12  been on the computer.

13              They were able to recover that, identify that these

14  files had been on the computer, but they couldn't get the files

10:41:44  15  themselves.  That particular part of the disk was either

16  corrupted or had been written over too many times.

17  Q.  And what about the excerpt that you're showing here

18  indicated to you that whether or not Huang Ni had been sent

19  additional Motorola source code other than what we just saw?

10:42:04  20  A.  Well, for every one of these files that I'm showing, you

21  can see that part of the path is RFHAL sent to Huang Ni.  So

22  each one of these files has a path name that includes "sent to

23  Huang Ni," you see it going all the way down.

24  Q.  And were you able to investigate these files from Huang

10:42:26  25  Peiyi's laptop?

Wicker - redirect by Brown

1760

1  A.  No; the files themselves were not recovered.

2  Q.  And were they found on Huang Ni's laptop?

3  A.  No, they weren't.

4  Q.  And why -- were they -- well, withdrawn.

10:42:39
5       Did you investigate the forensic logs from Huang Ni's

6  laptop to figure out if they were ever deleted?

7  A.  Those were not made available to me.

8  Q.  What do you mean they weren't made available to you?

9  A.  In other words, I did not see a forensic log from Huang

10:42:58
10  Ni's computer.  All I saw was the image of what was currently

11  on the computer.

12  Q.  And why -- would that forensic log of one of Hytera's

13  engineer's computers, would it have helped you understand

14  whether or not these materials were actually sent to Huang Ni?

10:43:12
15  A.  Yes.  It would have shown me, for example, a forensic

16  analysis of Huang Ni's computer might have turned up examples

17  of these files that had been once been on her computer.

18  Q.  And were you able to review any other logs of any of the

19  other engineers in this case that showed whether or not they

10:43:30
20  had been deleting files at any point over the last 5 or

21  10 years?

22  A.  No.  The only forensic data that I was provided was for

23  Peiyi Huang's old laptop.

24  Q.  And are you aware of whether Hytera ever provided those

10:43:45
25  logs for any of their other engineers?

Wicker - redirect by Brown

1761

A. I don't believe they did. I haven't seen them.

Q. Now, you were asked some questions about some of the source code you showed during your direct examination, and in particular, you were asked questions about why some of the that that you relied on to show evidence of copying and trade secret misappropriations were not on Hytera's SVN but were elsewhere.

Let's start with what's an "SVN"?

A. Okay. An SVN is where Hytera keeps the actual releases of its source code. So if you want to see what's on a particular radio, you go to the particular version on the SVN.

Q. And why did you have to look in other places at Hytera in order to find the source code that's running on their radios?

A. Well, for example, as we've talked about the libraries, the libraries contain compiled code. Hytera doesn't have the code that was compiled and put into the library. So they've got libraries on their products for which they don't have the associated source code.

Furthermore, there were other files that aren't on the SVN that shows how trade secrets were used. So I had to rely on other source code in order to trace what had actually been done with all the material that had been taken from Motorola.

Q. And how do you know that the file SVC_applications.cpp is a Motorola file that's in Hytera's possession?

A. Because I can see it right here (indicating). I have a copy of what Motorola produced as its SVC_applications.cpp and

Wicker - redirect by Brown

1762

1  I can compare them as you can right here on the screen.

2  Q.  And I think you indicated on the next slide here, you were

3  asked how you knew -- how you knew that the other -- this is

4  another part of SVC applications, the SVC at Hytera?

10:45:49  5  A.  That's right.

6  Q.  How did you know that this was the file that was modified

7  to be -- the Motorola file that was modified to be used at

8  Hytera?

9  A.  Okay.  So when I compared these two, the file on the left

10:45:59  10  to the file on the right, they were essentially word for word

11  the same except for some changes.

12       So what I noted here was instead of "get buffer,"

13  "getbuff" as we see in the Motorola file, it now says

14  "ROSAL_getbuffer."  So the name had been changed.  It's an

10:46:06  15  example of changing things to make it harder to detect the

16  copying.

17       So instead of "getbuff" as we see in the Motorola

18  file, we see a change reflecting Hytera's name "ROSAL."

19  Q.  Now, I'm going to show you another excerpt from 1019, this

10:46:39  20  is the list of non-recovered files from Huang Peiyi.  And I

21  want to show you, we'll zoom in, to row 33268, and I'm

22  highlighting SVC_applications.cpp.  Do you see that?

23  A.  Yes, I do.

24  Q.  And this file shows up in the non-recovered log, so what

10:47:06  25  does that mean?

Wicker - redirect by Brown

1763

10:47:26

10:47:33

10:47:51

10:48:11

10:48:33

1    A.  They weren't able to obtain the file, but they were able to

2    get the name of the file and the pack.

3    Q.  And when you say "the pack," are you talking about this

4    right here, "SVN/CPA/RAF_core_release" and then some additional

5    text?

6    A.  Yes, I am.

7    Q.  That path says "SVN" on it?

8    A.  That's right.

9    Q.  What does that mean?

10   A.  What it's telling me is that this file

11   "SVC_applications.cpp," the Motorola file we were looking at,

12   actually was on the SVN server at some point in time.

13   Q.  What does that tell you about whether or not Motorola

14   source code was at some point on Hytera's SVN?

15   A.  It was there.

16   Q.  Are there other Motorola files that were also on Hytera's

17   SVN?

18   A.  Yes.  And the reason I can tell -- for example, here's a

19   reference to "EMT."  "Application.cpp," we've talked about.

20   "XLT," that's the translate functionality and the ergonomic

21   test.  "ACRT," that's a reference to a particular table that is

22   in the ergonomic task.  In fact, it's one we had up on the

23   screen, it's the application cross-reference table.  "EMT" user

24   interface queue -- sorry, that's user input queue.  And

25   Translate.  These are all Motorola terms, these are all

Wicker - redirect by Brown

1764

1    Motorola files that were on Hytera's SVN.

2    Q.  Now, I thought these files were not on Hytera's SVN now.

3    A.  They aren't now.

4    Q.  What does that indicate?

10:48:49    5    A.  They were deleted.

6    Q.  Is the SVN something that is a private repository that only

7    a few people at Hytera can use or is it a wide use of material?

8    A.  It's a wide use of material at Hytera.

9    Q.  Now, were you provided with a forensic log of the SVN

10:49:08    10    server itself?

11    A.  No.

12    Q.  Okay.  So why is it on Peiyi Huang's forensic log you're

13    seeing indications of what was on the SVN?  Why is that showing

14    up on her computer?

10:49:20    15    A.  She apparently had a local copy of the SVN on her machine.

16    She was the manager of all software development, so that would

17    make sense.

18    Q.  Okay.  And why -- how is the local copy get there,

19    technically?

10:49:30    20    A.  It's copied from the SVN.

21    Q.  Is that part of the SVN process?

22    A.  Yes.

23    Q.  Can you just explain at a high-level what we're talking

24    about about SVN, because I think it's a foreign concept.

10:49:40    25    A.  Okay.  So the SVN contains the release software, what's

Wicker - redirect by Brown

1765

1  going to actually go into the phones.  And so a software

2  manager would maintain the local copy of the SVN so she could

3  do her job.  So she could review code, for example, before it

4  actually goes into the latest model phone.

10:49:59  5  Q.  And how is it that people are able to access other things

6  on an SVN?  -- that's a bad question.

7        How is it that other engineers at Hytera are able to

8  access the SVN?

9  A.  They have access.  There is a central SVN that others have

10:50:17  10  access to.  It's the way they do their jobs through software

11  developers.

12  Q.  Now, at Hytera, is it only source code that's store on the

13  shared repository or is other technical material stored there

14  as well?

10:50:36  15  A.  If I remember correctly, it's mostly source code, but there

16  is other technical information.

17  Q.  I'm going to show you your slide 290, which is an excerpt

18  of PTX 818.

19        What are you showing here with regard to Motorola

10:50:53  20  materials on the shared repository at Hytera?

21  A.  Okay.  So what this is showing is that on this shared

22  repository there is a Motorola research document.  They're

23  pointing to the particular VOX.doc in this case that we looked

24  at earlier.

10:51:11  25  Q.  And so what does this indicate here about whether or not

Wicker - redirect by Brown

1766

1   there's -- what does the folder structure here indicate?

2   A.  Okay.  So what this is showing is that on the software

3   server, product standardization is information about VOX.  And

4   in particular, it shows for anyone with access to the server,

5   that it's a Motorola document.

6   Q.  Now, I'm going to show you PTX 1020, which is the other log

7   that you showed during your direct testimony, which is the list

8   of recovered files from X-Ways.  What does that mean that it

9   was recovered?

10  A.  Okay.  This means that not only did they get the name, but

11  they also got the file itself.  So it was -- they were able to

12  recover the entire file from Peiyi Huang's computer.

13  Q.  And were those some of the materials that you relied on in

14  coming to conclusions about whether or not Hytera was in

15  possession of Motorola's trade secrets?

16  A.  Yes.

17  Q.  I'm going to show you an excerpt from that log 4789, Darwin

18  Ergonomic Platform Architecture, do you recognize that file

19  name?

20  A.  Yes.  That is actually one of the documents we've looked at

21  in this case.  It's one of the documents Motorola is relying on

22  for its trade secrets.

23  Q.  Now, counsel represented during the cross that this was

24  found only on Peiyi Huang's computer.  What do you see in the

25  log file about whether or not that's true?

Wicker - redirect by Brown

1767

1    A.  What this shows me from the path name is that it actually

2    was on that central repository, the SVN.  It was available to

3    anyone with access to the SVN.

4    Q.  Now, there's a directory in the SVN called "Darwin."  What

5    does that indicate?

6    A.  That indicates that there was a lot of information about

7    Darwin and the ergonomic manager task, the architecture that

8    we've talked about in court, on this corporate server at

9    Hytera.

10   Q.  Is "Darwin" a term that has any meaning at Motorola -- I'm

11   sorry, at Hytera?

12   A.  No, it's a Motorola term.  Motorola developed it as the

13   name for its architecture.

14   Q.  What does this indicate to you about materials at Hytera

15   that relate to Motorola's trade secret?

16   A.  They were on -- all of this material was on the centrally

17   accessible server that Hytera's engineers used.

18   Q.  So the title of the file name here "Darwin Ergonomic

19   Platform Architecture," "Darwin Ergonomic Platform

20   Architecture," is this on the same doc?

21   A.  Yes, it is.

22   Q.  PTX 666?

23   A.  Yes.

24   Q.  And can you just briefly explain what this document is

25   again?

10:53:12

10:53:26

10:53:44

10:54:11

10:54:20

Wicker - redirect by Brown

1768

10:54:37

1  A.  Certainly.  It is the Ergonomic Platform Architecture, and

2  going way back, that was the policeman, the one who controlled

3  the way applications behaved, the way they received messages,

4  the way they send messages, the behavior of the radio.  It is a

5  very important document to Motorola.

6  Q.  Just one more example, Dr. Wicker.  "Darwin PPT," what are

7  you seeing here?

8  A.  That is a PowerPoint that we've looked at that describes in

9  some detail providing a number of figures, the Darwin

10:55:04

10  architecture.

11  Q.  And again, with the directory structure, what does this

12  indicate to you about what this file -- where this file was

13  stored at Hytera?

14  A.  It was stored on the central Hytera server accessible to

10:55:18

15  engineers.

16  Q.  So the directory is "SVN" and what is that?

17  A.  "SVN" is the central server.

18  Q.  And "CPA" what does that refer to?

19  A.  "Common platform architecture," that is Hytera's term for

10:55:31

20  the technology that it borrowed.

21  Q.  Borrowed?

22  A.  Stole.

23  Q.  "RAF core"?

24  A.  That's, again, a reference to the Hytera term, "radio

10:55:44

25  architecture framework."

Wicker - recross by Cloern

1769

1  Q.  And then the subdirectories there are "document/Darwin,"

2  what does that indicate?

3  A.  So what that shows me is that on their central repository,

4  SVN, they were doing development of the common platform

10:55:58    5  architecture, and within that folder they had "RAF core"

6  details about the radio architecture framework, and then an

7  entire folder with documents from Motorola that discussed

8  Darwin.

9            MR. BROWN:  No further questions, Your Honor.

10:56:15   10            THE COURT:  Good timing.

11            Members of the jury, it's time for yet another cup of

12  coffee.  You are excused for a few minutes.  The Court is

13  adjourned.

14            (Recess.)

11:17:12   15            THE CLERK:  All rise.

16            (The following proceedings were had in the

17            presence of the jury in open court:)

18            THE CLERK:  The Court is in session.  Please be

19  seated.

11:18:14   20            THE COURT:  Please proceed.

21            MR. CLOERN:  Quick housekeeping, Your Honor.  We

22  failed to admit yesterday one of the PTX's we've discussed, PTX

23  1862B.

24            THE COURT:  I thought I ruled on that.

11:18:44   25            MR. CLOERN:  It's a source code file.

Case: 1:17-cv-01973 Document #: 792 Filed: 12/20/19 Page 40 of 224 PageID #:53651
Wicker - recross by Cloern
1770

1          MR. BROWN:  No objection, Your Honor.

2          THE COURT:  If I did not previously rule on it, it is

3  now admitted and may be published.  And, indeed, it was

4  published, right?

11:18:56  5          MR. CLOERN:  It was, Your Honor.

6          THE COURT:  Very well.

7          (Said exhibit received in evidence.)

8          MR. CLOERN:  Can we bring up Dr. Wicker's PDX files,

9  8.196.

11:19:45  10 BY MR. CLOERN:

11 Q.  So these are files from Peiyi Huang's laptop, right?

12 A.  It's a list of non-recovered files, yes.

13 Q.  Exactly where I'm going.  A list of non-recovered files,

14 correct?

11:20:03  15 A.  That's right.

16 Q.  So you can't see them, right?

17 A.  I can see the names.  I can't see the files.

18 Q.  You can't see the files?

19 A.  That's right.

11:20:09  20 Q.  In fact, you didn't look at the files, did you?

21 A.  Well, I saw the files with the associated names in

22 Motorola's software releases, but I did not see the files as

23 they were stored on Huang Ni's -- excuse me, Peiyi Huang's

24 computer, because as I noted here, they weren't recovered.

11:20:27  25 Q.  Whatever information is in those files, right there on the

Wicker - recross by Cloern

1771

1         screen, you never looked at that, right?

2         A.  That's right.  The only thing recovered with regard to

3         these files was their names and their path.

4         Q.  So you didn't look at those files, I think you're answering

11:20:43  5         "yes."  "Yes," that's correct, right, you did not look at those

6         files?

7         A.  I saw Motorola's files with these names.  I did not see the

8         files that had been stored on Peiyi Huang's computer; they were

9         not recovered.

11:20:58  10        Q.  I'm hoping you can answer, just tell me whether I'm correct

11        or not in my statement.

12              Dr. Wicker, you did not look at the files that are

13        listed right here on PDX 8916, those specific files, you did

14        not look at them?

11:21:19  15        A.  I did not look at the files that were stored on Peiyi

16        Huang's computer that were not recovered.

17        Q.  Now, it is your contention that these were sent by Peiyi

18        Huang to Ms. Huang Ni, right?

19        A.  That's correct.

11:21:37  20        Q.  Did you look on Huang Ni's files to see if any of the files

21        listed here were sent to Huang Ni?

22        A.  Yes.  I was able to see what was produced from Huang Ni's

23        computer at the time the litigation started.  These files were

24        not on Huang Ni's computer, again, as produced.

11:22:00  25        Q.  Well, are you suggesting that not all the proper

Wicker - recross by Cloern

1772

1    information was produced?

2    A.  At the time of production, assuming everything was produced

3    that was available, these files were no longer on Huang Ni's

4    computer.

11:22:14    5    Q.  Do you have any basis to suggest that at the time of the --

6    that there was anything that was not produced that was supposed

7    to be?

8    A.  No.  And I don't believe I said that.  At the time of

9    production, it is my understanding that these files were no

11:22:36   10    longer on Huang Ni's computer.

11    Q.  But you don't know what's in those files, so how can you

12    say that?

13    A.  I know what these files are as far as Motorola source code.

14    There's corresponding Motorola source code with theses names on

11:22:52   15    it and I know what's in those files.

16    Q.  So there were no files with those names containing code

17    that says "Motorola" from Huang Ni's computer, right?

18    A.  That's right.

19    Q.  But there are files with those very names that say "Hytera"

11:23:05   20    at the top, aren't there?

21    A.  Yes, there are.

22    Q.  And that's because P.E. changes the Motorola code to Hytera

23    code and then sends it to Hytera engineers, right?

24    A.  There are examples of where she did that, that's right.

11:23:21   25    Q.  Uh-huh.  And files with those exact file names are in Huang

Wicker - recross by Cloern

1773

1  Ni's computer listed "Hytera" on the top, having already been
2  converted by P.E., right?
3  A.  I don't recall examples of these specific names as files
4  that showed up on Huang Ni's computer.
11:23:47  5  Q.  Okay.  Can we bring up -- I'm going to hand you PTX --
6  well, first, if you look, do you see "default_frame_list.h"?
7  A.  Yes, I do.  It's right here.
8  Q.  That's listed right there, right?
9  A.  Yes.
11:24:12  10  Q.  I'd like to hand you PTX 1862AA.
11       Now, that's a source code file produced from Huang
12  Ni's laptop, right?
13  A.  Yes, it is.
14       MR. CLOERN:  Your Honor, I would like to move that
11:24:57  15  into evidence, please.
16       MR. BROWN:  No objection, Your Honor.
17       THE COURT:  It is received and may be published.
18       (Said exhibit received in evidence.)
19  BY MR. CLOERN:
11:25:05  20  Q.  Can you tell me the title?  What is the name of that file
21  that I've just handed you?
22  A.  Ah, I see.  It's not on the code on the right, it's on the
23  metadata.  It does say "default_frame_list.h," so it is the
24  same name.
11:25:30  25  Q.  Right.  And it's the same, and you want to maybe circle it

1    on your slide there?  Can you indicate for us?

2    A.  I did.

3    Q.  Well, I think you circled it on the metadata for the source

4    code file for Huang Ni's computer.  So you can match that up.

11:25:44  5              There you go.  Thank you.

6              Now, this file, this PTX 1862AA that you were just

7    handed from Ms. Huang Ni's laptop, that's a Hytera file, right?

8    A.  It was produced by Hytera in this case, that's correct.

9    Q.  It doesn't say Motorola's source code on it, does it?

11:26:08  10   A.  No, actually it doesn't actually say anything.  It begins

11   right here, as you can see (indicating).

12   Q.  Uh-huh.  It does not say "Motorola source code copyright

13   2004," does it?

14   A.  No, it does not.

11:26:20  15   Q.  And that's what the source code says that P.E. has on her

16   computer that's from Motorola, right?

17   A.  Can you rephrase that question?

18   Q.  Uh-huh.  The source code from Motorola that P.E. had on her

19   computer, the secret stash that was found, that says "Motorola

11:26:39  20   source code copyright 2004" on the top, right?

21   A.  It is certainly the case that Peiyi Huang had source code

22   on her computer that said "Motorola confidential."

23   Q.  That's right.  And Peiyi Huang sends a file that has this

24   name on it, "default_frame_list," right?

11:27:00  25   A.  That's right.

1 Q. And we find that same file in Huang Ni's computer, right?

2 A. That's right.

3 Q. But it doesn't say "Motorola code" on it, does it?

4 A. No, it doesn't.

11:27:11

5 Q. Now, let's look at one more really interesting thing about

6 your slide that you didn't point out.  PDX 81996 --

7 THE COURT:  Just a minute.  You can stop those

8 commentaries on the evidence.  Just ask the question, and

9 preferably not compound in nature.

11:27:23

10 BY MR. CLOERN:

11 Q. Do you see on PDX 8196 where it says "with us to convert"?

12 A. Yes, I do.

13 Q. And you know that means that Peiyi Huang was converting the

14 files before she sent them out, right?

11:27:43

15 A. "With us to convert," that would be one way to interpret

16 it, yes.

17 Q. Uh-huh.  Had you not considered that before?

18 A. Yes, I had.

19 Q. But you didn't raise that in your direct, right?

11:27:56

20 A. I don't agree.  I've shown this to the jury and I've

21 answered questions on it several --

22 Q. And you've discussed it extensively, right?

23 A. Yes, I have.

24 Q. But you didn't point that out, did you?

11:28:05

25 A. I wasn't asked.

Case: 1:17-cv-01973 Document #: 792 Filed: 12/20/19 Page 46 of 224 PageID #:53657
Wicker - recross by Cloern
1776

1  Q.  Did you look in Huang Ni's computer for the files to see if

2  what she was sent was, in fact, files with this name that had

3  already been converted?

4  A.  Yes.  I was given access to the production.  I was able to

5  see what was on Huang Ni's computer at the time of production

6  so --

7  Q.  Sorry.  Go ahead.

8  A.  I'm finished.

9  Q.  So you knew that Huang Ni was sent files with these file

10  names that didn't say "Motorola" on it, right?

11  A.  I know she was sent files and I know what was on her

12  computer, the date of production looked like this (indicating),

13  it did not say "Motorola," that's correct.

14  Q.  And you keep pointing out what was in her computer on the

15  date of production.  You understand that Huang Ni's files, like

16  everybody else's from Hytera, her laptop was forensically

17  restored and anything that was deleted that could be recovered

18  was recovered just like Peiyi Huang's, you understand that,

19  right?

20  A.  No, that's not my understanding.

21  Q.  So if the Hytera witnesses come in and testify that that

22  is, in fact, the case, then you don't have anything to dispute

23  that, right?

24  A.  Well, we have a difference of opinion.  The only forensic

25  analysis I've seen was listed in recovered and non-recovered

Wicker - recross by Cloern

1777

1    files from Peiyi Huang's old laptop.  It's my understanding

2    what was made available were the contents of, for example,

3    Huang Ni's laptop at the time of discovery.

4    Q.  You understand that Jim Luo submitted a declaration in this

11:29:44    5    case attesting under oath that all of the laptops that were

6    gathered and imaged were also forensically restored before they

7    were produced, right?

8    A.  I remember something to that effect, yes.

9    Q.  You pointed out some testimony from Huang Ni.  And I

11:30:20    10    apologize about slipping.  I refer to her as Maggie, which I

11    think I've done once or twice.  You understand that's her

12    English name, right?

13    A.  Yes, I do.

14    Q.  I apologize for that.

11:30:28    15         Ms. Huang Ni, I think you pointed out some deposition

16    testimony from her?

17    A.  Yes, I did.

18    Q.  Where she answered a question:

19         Okay.  Has Peiyi Huang ever sent you source

11:30:35    20         code?"

21          And she answered, "no," right?

22    A.  Correct.

23    Q.  But clearly, Peiyi Huang has sent Huang Ni source code,

24    right?

11:30:42    25    A.  That's correct.

Case: 1:17-cv-01973 Document #: 792 Filed: 12/20/19 Page 48 of 224 PageID #:53659
Wicker - recross by Cloern
1778

1    Q.  That answer is not correct?

2    A.  That's right.

3    Q.  In fact, Peiyi Huang was the head of software under

4    Mr. Sam Chia for the DMR product, right?

5    A.  I think it was Y.T. Kok -- or G.S. Kok, actually, that she

6    was serving under.  She was in charge of development software,

7    generally.

8    Q.  For DMR?

9    A.  That's right.

10   Q.  And Huang Ni was one of Peiyi Huang's software engineers,

11   right?

12   A.  That's correct.

13   Q.  So Huang Ni writes source code all day long.  That's what

14   she does, right?  She's a software engineer, right?

15   A.  Certainly one of her major tasks.  She might read it as

16   well.

17   Q.  And Peiyi Huang's is her boss, correct?

18   A.  That's right.  Or was.

19   Q.  So you don't you think Ms. Huang Ni was confused by this

20   question when she would answer that given that Huang Ni is a

21   software engineer and her boss is also a software engineer,

22   that they've never sent each other source code?

23          THE COURT:  Rephrase the question.  Break it down.

24   It's compound in nature and argumentative.

25   BY MR. CLOERN:

Wicker - recross by Cloern

1779

1    Q.  Have you looked at Huang Ni's deposition testimony that's

2    at issue that we're discussing?

3    A.  Yes, I have.

4    Q.  And you understand that Huang Ni was asked a series of

5    questions about whether she had ever been shown Motorola code

6    by one of the former Motorlans, right?

7    A.  Yes.  Okay, I understand your question to be asking.  She

8    was asked a number of questions in series about whether she had

9    seen Motorola code, that's correct.

10   Q.  Uh-huh.  She was asked:

11           "Have Sam or Y.T. ever sent you code that

12           specifically references that it's Motorola

13           code?"

14           She was asked that, right?

15   A.  That's right.

16   Q.  And she said "no," right?

17   A.  That's right.

18   Q.  And she was asked:

19           "Did Y.T. Kok ever send you the file called

20           framer_api?"

21           And she said, "no," right?

22   A.  That's correct.

23   Q.  And, in fact, Y.T. Kok didn't send her the "framer_api" as

24   we saw in the e-mail.  That was Peiyi Huang, right?

25   A.  That's correct.

Wicker - recross by Cloern

1780

1   Q.  And she was asked:

2       "Have you ever seen a file with that name?"

3        And she said:

4       "I am not too sure."

11:33:01  5       Right?

6   A.  That's right.

7   Q.  And she was deposed 10 years after the e-mail where Peiyi

8   Huang sent her the framer_api, right?

9   A.  Yes, that's correct.  Roughly 10.

11:33:18  10  Q.  You think -- is it fair to say that Ms. Huang Ni, being a

11  software engineer, is e-mailed thousands of files every year?

12  A.  Yes.  She receives a lot of files.

13  Q.  And you looked at her files, right, that were produced in

14  this case?

11:33:39  15  A.  Yes, I have.

16  Q.  And there were thousands and thousands of her e-mails that

17  were actually produced on the source code computer in this

18  case, right?

19  A.  That's correct.

11:33:48  20  Q.  And that's because she's e-mailed thousands and thousands

21  of files, right?

22  A.  Presumably; yes.

23  Q.  So do you think it's reasonably that Ms. Huang Ni did not

24  recall one of those thousands of files from 10 years ago?

11:34:04  25  A.  She may have forgotten, that's certainly possible.

Case: 1:17-cv-01973 Document #: 792 Filed: 12/20/19 Page 51 of 224 PageID #:53662
Wicker - recross by Cloern
1781

1    THE COURT:  Members of the jury, it is for you to

2    determine the credibility of any witness.

3    Proceed.

4    BY MR. CLOERN:

5    Q.  And after -- the next question was:

6    "Has Peiyi Huang ever given you source code?"

7    And then she says, "no," right?

8    A.  That's right.

9    Q.  And then she's asked the question again:

10    "Do you recall ever seeing source code at Hytera

11    that indicates --"

12    THE COURT:  If we could have a sidebar, please.

13    MR. CLOERN:  Yes, Your Honor.

14    (Proceedings heard at sidebar on the record:)

15    THE COURT:  There's no objection to this line of the

16    questioning, and yet at some point the Court has to step in and

17    say:  As a general proposition, it is not proper to ask one

18    witness to account for the testimony of another in terms of

19    credibility.  And that's what's occurring here.  Asking this

20    witness to speculate or comment on the believability of another

21    witness, and that is being conveyed to the jury.

22    MR. CLOERN:  Your Honor, may I respond?

23    THE COURT:  Yes.

24    MR. CLOERN:  So this witness, Dr. Wicker, was asked

25    about that very question and pointing out that Ms. Huang Ni's

Case: 1:17-cv-01973 Document #: 792 Filed: 12/20/19 Page 52 of 224 PageID #:53663
Wicker - recross by Cloern
1782

1    answer was not true and incorrect and inconsistent with the

2    evidence.  And all I'm trying to point out is that that answer

3    was in the context of a number of a bunch of questions about

4    Motorola code and then one was tossed in it's not about

5    Motorola code.  He testified directly on this issue, we're just

6    trying to ask if he has considered that issue.

7         THE COURT:  It goes back to the basic point to ask one

8    witness to comment on the credibility of another.  As a general

9    proposition, it's not acceptable.

10        Now, if opposing counsel, if you did not object to

11   some of these questions when they were put to the witness

12   previously, well, then you waive that objection.  What I'm

13   saying now, this is repetitious again asking this witness to

14   give his opinion on the credibility of another witness.  And

15   your questions become argumentative, and they are compound, and

16   they also include facts not in evidence that you certainly are

17   tossing into the mix.

18        And so you got to stop it.  But since we're at a

19   sidebar here now, if you want to ask one question to kind of

20   ameliorate the effect of what I'm doing here, ask the soft

21   questions of the witness.

22        MR. CLOERN:  Yes, Your Honor.  I'll move on.  Thank

23   you.

24        (Proceedings resumed in open court:)

25   BY MR. CLOERN:

Wicker - recross by Cloern

1783

1    Q.   Okay.  Can we please bring up slide 8139, please.

2              (Brief pause.)

3              MR. CLOERN:  I'm sorry, 8193.

4              THE COURT:  Jurors, are you picking up on this?  Do

5    you see this?  Is it on your screen?

6              (Jurors responded in the affirmative.)

7              THE COURT:  Okay.  Proceed.

8    BY MR. CLOERN:

9    Q.   Motorola's counsel asked you about this e-mail on redirect,

10   correct?

11   A.   That's correct.

12   Q.   And this is an e-mail from Huang Ni back to P.E., correct?

13   A.   That's correct.

14   Q.   And it says that "there is no function in the head file, do

15   you miss something," right?

16   A.   That's right.

17   Q.   And on the right, we see an e-mail from earlier in the

18   chain, correct?

19   A.   That's right.

20   Q.   And that e-mail attaches two attachments, correct?

21   A.   Yes.

22   Q.   One of them is the rfhal_c55.lib, right?

23   A.   That's correct.

24   Q.   And that's one of the libraries that are one of the three

25   libraries we've been discussing, right?

Wicker - recross by Cloern

1784

1   A.  That's right.

2   Q.  That was built by Peiyi from Motorola code, right?

3   A.  Yes.  That's correct.

4   Q.  And the attachment, "framer_api_h," do you see that?

11:38:43   5   A.  Yes, I do.

6   Q.  And that is the attachment to this e-mail, right?

7   A.  To this one.  Yes, that's correct.

8   Q.  And that's what you're pointing out in your slide 8.193,

9   that this is the framer_api_h attachment to this e-mail that

11:39:06   10   Huang Ni is sending back to P.E., right?

11   A.  This e-mail shows that as an attachment.

12   Q.  And, in fact, if you look earlier in the chain, what

13   happened is, P.E. sent this library and the framer api header

14   interface to Huang Ni, right?

11:39:23   15   A.  That's right.

16   Q.  And then Huang Fei -- and P.E. says, "Huang Fei, please try

17   this library out, right?  That's from P.E.?

18   A.  That's correct.

19   Q.  And Huan Fei forwards it to Huang E., right?

11:39:36   20   A.  That's correct.

21   Q.  And Huang E. writes back to P.E. again, and this chain

22   attaches these two attachments, right?

23   A.  That's right.

24   Q.  And that's where you Huang E. says, essentially, there's

11:39:52   25   something wrong, there's no function here, right?

Wicker - recross by Cloern

1785

1　　A.　That's right.

2　　Q.　Okay.　Now, on redirect your counsel -- I'm sorry,

3　　Motorola's counsel showed you DTX 3278, which is the next

4　　e-mail in the chain, correct?

11:40:06　5　　A.　That's right.

6　　　　　　MR. CLOERN:　Can we bring that upside by side, please.

7　　BY MR. CLOERN:

8　　Q.　And can we look at the -- and that's the e-mail that you've

9　　talked about on redirect, right?

11:40:25　10　　A.　That's correct.

11　　Q.　And that's P.E.'s response, right?

12　　A.　That's right.

13　　　　　　MR. CLOERN:　Can we look at the second page, please,

14　　where it shows the attachments again.

11:40:35　15　　BY MR. CLOERN:

16　　Q.　Do you see it says -- there's the same two attachments

17　　there, right?

18　　A.　Yes.

19　　Q.　And did you -- did you understand Motorola's counsel to

11:40:48　20　　suggest that somehow those are different attachments from the

21　　earlier e-mail?

22　　A.　The attachments have the same name.

23　　Q.　In fact, it's the exact same "framer_api_h," right?

24　　A.　It's got the same names, right.

11:41:04　25　　Q.　I'm asking, they're the same, aren't they?

Wicker - recross by Cloern

1786

1    A.  I believe they are.

2    Q.  So you were -- it is not your testimony that when I asked

3    you on cross about "framer_api_h," that I asked you about

4    something of an attachment other than what's at issue in this

5    e-mail string, right?

6    A.  The attachment associated with this string would be RFHAL

7    and framer, as we've discussed.

8    Q.  Uh-huh.  And that is "framer_api_h," that's what I asked

9    you about on our earlier examination, right?

10   A.  That's correct.

11   Q.  So let's look at P.E.'s response on the first page.  P.E.

12   says:

13              "Sorry for my late reply.  The interface remain

14              unchanged of using rfhal_syncL1timer."

15           Do you see that?

16   A.  Yes, I do.

17   Q.  And you testified yesterday on cross that Peiyi Huang sent

18   out the framer_api header interface by mistake, right?

19   A.  Yes, that appeared to be the case.

20   Q.  Okay.  And what Peiyi Huang is saying in this e-mail

21   response, she's saying you need to use the rfhal_syncL1timer,

22   right?

23   A.  That's right.

24   Q.  Thank you.

25              You talked about some of the logs from Peiyi Huang's

11:41:28 (line 5)
11:41:44 (line 10)
11:42:12 (line 15)
11:42:26 (line 20)
11:42:57 (line 25)

Case: 1:17-cv-01973 Document #: 792 Filed: 12/20/19 Page 57 of 224 PageID #:53668
Wicker - recross by Cloern
1787

1  computer on your redirect?

2  A.  Yes.

3  Q.  Specifically, I think PTX 1019.  And you talked about --

4       MR. CLOERN:  Can we bring that up, please.

11:43:18  5  BY MR. CLOERN:

6  Q.  And specifically you talked about a line item for

7  SVC_applications.cpp?

8  A.  That's correct.

9  Q.  And do you -- actually I didn't follow it.

11:43:33  10      MR. BROWN:  The line number.

11      MR. CLOERN:  Yes, Mr. Brown.  Thank you.

12      MR. BROWN:  33 to --

13      MR. CLOERN:  Thank you very much.

14      Jim, would you mind calling that one up, please.

11:43:52  15  BY MR. CLOERN:

16  Q.  And at that line, what we see is a file name,

17  SVC_applications.cpp, right?

18  A.  That's correct.

19  Q.  And the path is SVN/CPA/Rap_core_release/SVC, right?

11:44:24  20  A.  That's correct.

21  Q.  Now, that's a path on to Peiyi Huang's local computer,

22  right?

23  A.  That's right.  Peiyi Huang had an image of what was on the

24  SVN server.

11:44:35  25  Q.  Uh-huh.  These files were not recovered from Peiyi Huang's

Wicker - recross by Cloern

1788

1    laptop, right?

2    A.  I think that's right.  I think this was one of those where

3    the name was there, but not the file itself.

4    Q.  So similar to the sent to Huang Ni files we looked at

11:44:59    5    earlier, correct?

6    A.  That's right.  We don't have the files.  We have the names

7    and path names.

8    Q.  So similarly, you have not looked at this particular

9    SVC_applications.cpp, right?

11:45:10    10    A.  I've not looked at the one that was on Peiyi Huang's

11    computer.  It was not recovered.

12    Q.  And so you don't know whether this is badged as Motorola

13    code or whether it's badged as Hytera code already having been

14    converted by Peiyi Huang, right?

11:45:29    15    A.  The name refers to a Motorola file, but you're right, I

16    don't know what this particular copy looked like.

17    Q.  And that's the same with the slide we looked at earlier

18    where in the path directory of files sent to Huang Ni, there

19    were Motorola file names, but it had already been scrubbed of

11:45:48    20    Motorola references, right?  We saw that in Huang Ni's

21    computer?

22    A.  There was a file on Huang Ni's computer that was a Motorola

23    file that had the top deleted, that's right.  The confidential

24    notice, et cetera, taken off.

11:46:07    25    Q.  And so just like with that, those part of P.E.'s logs for

Wicker - recross by Cloern

1789

1   unrecovered files, you don't know which -- whether this is a

2   file that had already been converted or not, right?

3   A.  That's right.  I can only recognize the name and see where

4   that came from, but the particular file it's being pointed at

11:46:30   5   no longer exists on the computer.

6   Q.  Do you -- are you familiar with SVN?

7   A.  Yes.

8   Q.  And you're pointing out -- I believe you said this is an

9   image of the SVN?

11:46:42   10   A.  That's correct.

11   Q.  And by that, do you mean of the Hytera corporate

12   centralized SVN?

13   A.  Exactly.

14   Q.  The one everybody has access to?

11:46:51   15   A.  That's right.

16   Q.  But you don't know if this is an image of that, do you?

17   A.  It's on the software manager's computer.  It's a path name

18   that begins with "SVN."  It is identical to similar path names

19   that are currently on the SVN that.  That is basis for my

11:47:09   20   conclusion.

21   Q.  Well, you understand that SVN has the capacity to allow for

22   any number of local -- local versions, right?

23   A.  SVN does allow for local versions and I believe that's what

24   we're seeing here.

11:47:25   25   Q.  Well, I want to be clear with my question.  When I say a

Wicker - recross by Cloern

1790

1   local version, I mean a local version that is not connected to

2   the central repository.  So not an image.

3   A.  You can do that, yes.

4   Q.  So when a company buys the SVN or gets a license to an SVN,

11:47:50   5   it can have an instance of it in a central server that everyone

6   has access to, right?

7   A.  That's right.

8   Q.  And then depending on how many individual licenses you

9   obtained, you could also have a separate instance of SVN on a

11:48:06   10   local machine, right?

11   A.  Right.  And that's what we're seeing here.  We're seeing an

12   instance of SVN on Peiyi Huang's computer.

13   Q.  And they can be completely separate, right?

14   A.  They could have different things.

11:48:22   15   Q.  So just because P.E. Huang had a local instance of the SVN

16   on her laptop, doesn't mean that the files listed here that she

17   stored locally in an SVN file system on her laptop were also

18   stored in a corporate SVN, right?

19   A.  Given her role as software manager and from what I've seen,

11:48:44   20   I would conclude that this is an image of what's actually on

21   the corporate server.  That would be something that in her

22   responsibility she would have to keep track of.

23   Q.  You're guessing?

24   A.  No, I'm not guessing.

11:48:58   25   Q.  You have seen no documentation that would tell you, one way

Wicker - recross by Cloern

1791

1       or the other, whether what Peiyi Huang was storing in her local

2       version of SVN was also on the corporate version of SVN, right?

3       A.  The evidence that I've seen is from her logs and from her

4       position, and this is my conclusion, namely, that that is an

11:49:24    5       image of the actual corporate SVN.

6       Q.  So just from this log, that's what you're basing your

7       opinion on?

8       A.  And her position as software manager.

9       Q.  Do you have any documentation that says all software

11:49:42   10       managers -- that software managers and companies that do

11       software aren't allowed to keep local versions of SVN with

12       different documentation on it?

13       A.  No, I don't have any documentation like that.

14       Q.  So Hytera made productions from its corporate SVN, right?

11:50:03   15       A.  Yes, it did.

16       Q.  Including logs of files requested by Motorola, right?

17       A.  That's correct.

18       Q.  In fact, in your report, you rely on logs of files from the

19       SVN?

11:50:17   20       A.  That's correct.

21       Q.  And those logs go back to 2008, right?

22       A.  Yes.  Some of them do.

23       Q.  But you haven't matched up this document showing on a local

24       version of P.E.'s computer SVN to the Hytera corporate SVN,

11:50:32   25       have you?

Wicker - recross by Cloern

1792

1    A.  That's right.  There's no longer an example of this today

2    or at the time of production on the SVN.

3    Q.  Well, I didn't ask if there was -- if there was a document

4    from Hytera's SVN.  I'm asking, you didn't match it up to the

11:50:56    5    SVN logs that go back to 2008 showing whether something has

6    been deleted or not, right?

7    A.  That's right.

8         MR. CLOERN:  Can we bring up slides 8.233, please.

9    BY MR. CLOERN:

11:51:28    10   Q.  Now, you pointed out that this was copied.  This isn't in

11   Hytera's documentation, this was copied from Motorola, right?

12   A.  That's correct.

13   Q.  And we talked about how the information in this diagram is

14   also a Motorola patent, right?

11:51:54    15   A.  We talked about how these individual names as inputs were

16   in the patent, yes.

17   Q.  And a description of virtual sources, it was all described

18   in the patent, right?

19   A.  These names were in the patent and there was a reference to

11:52:08    20   virtual sources.

21   Q.  Not just listing, right?  But there's a paragraph, a

22   description of virtual sources, including everything in those

23   boxes?

24   A.  That's right.  We walked through that on cross.

11:52:20    25   Q.  So what is undoubtedly copied here is information that one

Wicker - recross by Cloern

1793

1  could glean from the patent with the exception of it being in a

2  diagram versus a textual description, right?

3  A.  One could glean the names, the virtual sources, and that

4  they interact with higher-layered entities, that's right.

11:52:48  5  Q.  And a lay person looking at Motorola's documentation that

6  Motorola alleges are trade secrets, wouldn't know that, would

7  they?

8  A.  Well, they could compare.  So they could walk through it.

9  This is a much longer document than the patent, as I've shown,

11:53:07  10  which simply was counsel's questions.  So they could do a

11  comparison.

12  Q.  Motorola has numerous VRIS patents, right?

13  A.  It does.

14  Q.  And so one would have to analyze numerous VRIS patents

11:53:20  15  along with Motorola's VRIS technical spec to understand what

16  was public and what was proprietary, correct?

17  A.  That would certainly be one way to do it.

18  Q.  And that hasn't -- you haven't done that analysis, right?

19  A.  No.  What I've shown is that the patents -- the patent that

11:53:39  20  you brought up does not in any way cover the extent of the

21  trade secret.

22  Q.  So Sam G.S., Y.T., P.E., Ken Wong, Yu Kok and Eunice, those

23  were the six Motorlans, the primary ones that came over in the

24  2008 timeframe, right?

11:54:11  25  A.  That's right.

Wicker - recross by Cloern

1794

1    Q.  And they undoubtedly took documents, right?

2    A.  They certainly did.

3    Q.  And undoubtedly took source code, right?

4    A.  They did.

11:54:20    5    Q.  And Hytera's experts, Mr. Grimmett and Ms.

6    Frederiksen-Cross, they don't dispute that, right?

7    A.  Not that I know of.

8    Q.  And you certainly don't dispute it?

9    A.  I don't.

11:54:35    10   Q.  So the difference in your opinion and theirs is the --

11           THE COURT:  Just a minute, counsel.  The question

12   assumes facts not in evidence.  If you were to complete the

13   question, it would assume facts not in evidence.

14           MR. CLOERN:  I'll try it a different way.

11:54:58    15   BY MR. CLOERN:

16   Q.  You agree -- you reviewed Mr. Grimmett's opinion, his

17   report in coming to your opinions in this case, right?

18   A.  Yes, I did.

19   Q.  And you reviewed Ms. Frederiksen-Cross' report in coming to

11:55:12    20   your opinions in this case, right?

21   A.  Yes, I did.

22   Q.  And would you agree that there is a disagreement between

23   you and them about the level of use of that information?

24   A.  I agree with that.

11:55:27    25           THE COURT:  Is that the understatement of the year?

Wicker - recross by Cloern

1795

1        (Laughter in the courtroom).

2        MR. CLOERN:  Yes, Your Honor.

3    BY MR. CLOERN:

4    Q.  So there were a lot of Motorola documents that were found

11:55:47   5    on Peiyi Huang's computer, right?

6    A.  That's correct.

7    Q.  And a lot of Motorola source code, right?

8    A.  That's correct as well.

9    Q.  And there is probably 100 or so documents found on Sam

11:56:03   10   Chia's computer, 100, 200 Motorola documents, something like

11   that?

12   A.  At the time of production, that's correct.

13   Q.  And maybe 80 or so in Y.T. Kok's possession?

14   A.  Yes, I think that's right.

11:56:17   15   Q.  And there aren't any -- and they rebranded those documents

16   and distributed them within Hytera, right?

17   A.  Yes, they did.

18   Q.  Some of them, correct?

19   A.  Some.

11:56:33   20   Q.  Not all of them, right?

21   A.  That's right.

22   Q.  And there's only one example that we've seen at trial so

23   far that is legacy Hytera employees circulating around a

24   document that just blatantly says "Motorola" on it, right?

11:56:59   25   A.  Can you rephrase that question?

Wicker - recross by Cloern

1796

1   Q.  Sure.  Huang Ni, in 2016, circulated a Motorola testing

2   document to a number of other Hytera engineers, right?

3   A.  Yes.  That's correct.

4   Q.  And that's what we call the NEO -- it says the file name is

11:57:20   5   Neo_P21?

6   A.  That's correct.

7   Q.  But that's the only Motorola branded document that we've

8   talked about that was found in legacy Hytera employees' files,

9   right?

11:57:34   10   A.  That's my recollection, that's right.  Separating out the

11   Hytera engineers who came from Motorola.

12   Q.  Now, you did talk about two documents, one is the VOX

13   document.  We've had some discussion of it during your

14   testimony, right?

11:57:54   15   A.  That's right.

16   Q.  And that was an attempted rebranding by Peiyi Huang, right?

17   A.  That's what the metadata shows, that's right.

18   Q.  Actually, maybe I asked that incorrectly, because she

19   deleted the Motorola and the confidentiality legend in 2004,

11:58:13   20   correct?

21   A.  That's what the metadata shows.

22   Q.  So she wasn't rebranding it to Hytera, right?

23   A.  No, she simply deleted the Motorola logo confidentiality

24   notice and some other information on the front of the

11:58:27   25   document.

Wicker - recross by Cloern

1797

1    Q.  And that document was -- after years later she came to

2    Hytera, that was e-mailed to Qin Jun and Judy Yu, right?

3    A.  That's right.

4    Q.  And Qin Jun wasn't -- neither Qin Jun nor Judy Yu testified

11:58:47    5    that they saw those Motorola deletions, correct?

6    A.  That's what they said.

7    Q.  So that's one.  The other is the testing document that was

8    sent to Roger Zhang.  You remember talking about that?

9    A.  Yes, I do.

11:59:06    10    Q.  And that's the document where Roger Zhang cut and pasted a

11    portion of the document out of a Hytera document, what was

12    branded a Hytera document into his e-mail, right?

13    A.  That's right.

14    Q.  But he says the file name, he says, I saw this in the

11:59:24    15    document entitled Moto conformance testing, right?

16    A.  That's right.

17    Q.  So there was an attempting rebranding there, correct?

18    A.  That's correct.

19    Q.  And the original document was from -- the original Motorola

11:59:38    20    branded was from Sam Chia's files?

21    A.  Yes.  That's right.

22    Q.  So you understand -- is it your understanding that there

23    were about 60 million pages of paper produced in this case?

24    A.  Well, I don't know how much paper was produced.

11:59:56    25    Q.  It was a lot, right?

Wicker - recross by Cloern

1798

1   A.  It was a lot.

2   Q.  And there were 30 people from Hytera that were deposed?

3   A.  Yes.  A lot of people were deposed as well.

4   Q.  Laptops were searched?

12:00:08   5   A.  Yes.  During the production phase, there were a number of

6   laptops whose contents were produced.

7   Q.  And this was over a 10-year -- this went all the way back,

8   right, to 2008 and beyond, correct?

9   A.  Not the production phase.  The production phase reached

12:00:28   10   back in time to things that had happened earlier, but it's my

11   understanding production started a few years ago.

12   Q.  Right.  But let me clarify my question.

13       Documents from 2008 were produced, right?

14   A.  That's correct.

12:00:40   15   Q.  And 2009?

16   A.  That's right.

17   Q.  2010?

18   A.  And going --

19   Q.  All the way up to today?

12:00:45   20   A.  That's right.

21   Q.  So with millions of documents produced, over a 10-year

22   period, there was still no document badged "Motorola" found in

23   the legacy Hytera employees' files?

24   A.  That's my recollection.

12:01:13   25   Q.  You talked a little bit on redirect about Motorola's

Wicker - recross by Cloern

1799

1  investigation, right?

2  A.  That's correct.

3  Q.  In 2008.  And it's your opinion that the actions of Sam

4  Chia, Y.T., using the libraries like they did, that was

12:01:48  5  fraudulent concealment, right?

6  A.  Yes.

7  Q.  That prevented Motorola from identifying the theft of

8  Motorola code, right?

9  A.  In part, yes.

12:02:00  10  Q.  But you're aware that in 2008 Motorola employee Nickie

11  Petratos sent an e-mail regarding G.S. Kok and others going to

12  Hytera saying, make sure we have all the IP protected, right?

13  A.  That's right.

14  Q.  So she had a suspicion in 2008, right?

12:02:26  15  A.  She did.

16  Q.  And that wasn't fraudulently concealed, was it?

17  A.  No.  She was concerned that the departure of these

18  individuals for Hytera.

19  Q.  Right.  In 2010 Motorola employees became aware of a

12:02:42  20  suspicion un-muting that had occurred in the Hytera radio,

21  right?

22  A.  I had -118 dBM DVM, if memory serves.

23  Q.  Motorola was aware of that?

24  A.  Yes, they were.

12:02:54  25  Q.  And so you can't fraudulently conceal what somebody is

Wicker - recross by Cloern

1800

1    already aware of, right?  Nobody went and made the Motorola

2    people forget it?

3    A.  No.  No, it was clear.  They knew about the -118 dBM

4    un-muted.

12:03:07    5    Q.  And they began monitoring G.S. Kok's e-mails in and out of

6    Motorola, right?

7    A.  They did that as well.

8    Q.  And in 2012, there was further suspicions related to

9    inoperability testing, right?

12:03:21    10    A.  That's right.

11    Q.  And that was the alarm issue?  It was hard to turn the

12    alarm off or something?

13    A.  Exactly.  You had to -- it was a bug.  You had to re-set,

14    and that's what we've been discussing earlier today.

12:03:32    15    Q.  And that's the one where Darrell Stogner testified that

16    they never completed the reverse engineering, right?

17    A.  There was an e-mail that said they never completed the

18    reverse engineering.  I believe Ted Kozlowski testified that

19    they had, indeed, completed it.

12:03:48    20    Q.  Including notes from Darrell Stogner that they hadn't,

21    correct?

22    A.  There was notes that indicated a process was incomplete.

23    It's not clear that's associated with what you are referring to

24    because it says "infringement" at the top.  But there is --

12:04:07    25    Q.  And there was discussion -- oh, I'm sorry.

Wicker - recross by Cloern

1801

1   A.  It's all right.  I was just saying, it said "infringement"

2   at the top of the paragraph that counsel is referring to, which

3   would point to a different matter.

4   Q.  And there was discussion of hiring a company called TAEUS

5   to do the code reverse, right?

6   A.  That's right.

7   Q.  And that would've cost $5,000?

8   A.  Just for the first stage.  The second stage would've cost

9   $50,000.

10  Q.  And it was deemed that the $5,000 to reverse engineer the

11  code, that was too expensive, right?

12  A.  It was felt that they already had sufficient expertise

13  looking at the reverse engineering, and so they didn't pursue

14  it.

15  Q.  Right.  And they said the reason they didn't pursue is

16  because it's going to be too expensive, right?

17  A.  I believe it was said it wasn't worth the money, yes, given

18  what they had already done.

19  Q.  And at any time they could've taken about an hour to write

20  a query and check the Compass logs and see if any of this

21  information had been taken.  Any time between 2008 and 2012,

22  that could've been done, right?

23  A.  They could've written a script.  I don't know that it would

24  take them just an hour, but they could've written a script and

25  check the Compass logs, yes.

Case: 1:17-cv-01973 Document #: 792 Filed: 12/20/19 Page 72 of 224 PageID #:53683
Wicker - further redirect by Brown
1802

1    MR. CLOERN:  Your Honor, I have no further questions.

2    MR. BROWN:  Very briefly, your Honor.

3    THE COURT:  Yes.

4                    FURTHER REDIRECT EXAMINATION

5    BY MR. BROWN:

6    Q.  Professor Wicker, you were shown --

7    MR. BROWN:  If I could please have the Elmo, please.

8    Sorry.

9        (Brief pause.)

10   BY MR. BROWN:

11   Q.  You were shown this code file which was found on Ms. Huang

12   Ni's computer?

13   A.  That's right.

14   Q.  Very briefly.  Is this Motorola code (indicating)?

15   A.  Yes, it is.

16   Q.  And I want to note this date here (indicating), the

17   creation date and the modified date.  Do you see that?

18   A.  Yes, I do.

19   Q.  When did that happen?

20   A.  It happened in -- it looks like it was created after it was

21   modified.

22   Q.  Okay.  So around the 2014 time period?

23   A.  That's correct.  Yeah, they both say "2014."

24   Q.  How does that compare to the code that you were shown here

25   that counsel represented it was this file, the

Wicker - further redirect by Brown

1  default_frame_list sent to Huang Ni, how do those dates come

2  on?

3  A.  Okay.  As we can see, that file was created in 2009 and

4  deleted in 2013.

12:06:41  5  Q.  Do you see any indication --

6           THE COURT:  There was a trail-off of your answer.

7           MR. BROWN:  I'm sorry, Your Honor.

8           THE COURT:  Say that again.

9           THE WITNESS:  Yes.  What I was showing was that the

12:06:45  10  file that I was discussing with counsel, default_frame_list.h,

11  was created in 2009, deleted in 2013.

12  BY MR. BROWN:

13  Q.  So how can that be the file that you were shown during

14  recross?

12:07:02  15  A.  Clearly the file that is referenced here was changed before

16  it was stored in this one (indicating).  It's not the same

17  file, in other words.

18  Q.  And so does that indicate whether or not Huang Ni was the

19  one who edited the file that she was sent?

12:07:19  20  A.  That would be what this is showing me.  She had clearly

21  opened it and saved it in a different form.

22  Q.  Now, if you wanted to be absolutely certain about that and

23  know what the chain of custody was of the file that was sent

24  from Peiyi to Huang Ni and then subsequently modified, what

12:07:38  25  would you need to look at to know that?

Wicker - further redirect by Brown

1804

1    A.  I would need to see a copy of this file as it was sent, and

2    then I would compare it to the file that was produced as being

3    on Huang Ni's computer.

4    Q.  What about forensic logs from Huang Ni's computer, would

12:07:53    5    that have helped in your analysis here?

6    A.  Yes.  That would've shown, for example, that this

7    particular file was on her computer at an earlier date than the

8    creation date.

9    Q.  And where are those forensic logs?

12:08:05    10    A.  They were not produced.

11    Q.  By Hytera?

12    A.  That's correct.

13    Q.  Now, you were also asked a number of the questions about

14    the SVN.  And this is, what I'm showing here is the list of

12:08:21    15    non-recovered files?

16    A.  That's right.

17    Q.  And you were asked whether or not you were able to look at

18    the files that were on this list.  Why weren't you able to look

19    at them?

12:08:30    20    A.  They weren't covered.

21    Q.  And you were also asked whether or not you had documentary

22    evidence that these were on the SVN.  Were you ever provided by

23    Hytera a forensic analysis of Hytera's SVN server?

24    A.  No, I was not.

12:08:48    25    Q.  What would that have shown?

Wicker - further recross by Cloern

1805

1    A.  That would have shown me whether or not --

2           MR. CLOERN:  Objection, Your Honor.

3           THE COURT:  Sustained.

4    BY MR. BROWN:

12:08:54    5    Q.  In your technical experience, what would an SVN -- how

6    would a forensic log at the SVN server assist in this case?

7    A.  What it would've shown me was --

8           THE COURT:  Just a minute.  Read the question back

9    slowly to the witness.

12:09:15    10          (Question read.)

11          THE COURT:  You got that question?

12          THE WITNESS:  Yes, Your Honor.

13          THE COURT:  Answer that specific question.

14   BY THE WITNESS:

12:09:17    15   A.  It would've shown me the existence of documents on the SVN

16   that had been deleted and were no longer available.

17   BY MR. BROWN:

18   Q.  Have you seen -- has Hytera produced to you a forensic

19   analysis of their SVN server?

12:09:32    20   A.  No.

21          THE COURT:  All right.  That's enough on redirect.  A

22   few questions on recross to complete this witness.

23                  FURTHER RECROSS-EXAMINATION

24   BY MR. CLOERN:

12:09:48    25   Q.  The whole point of an SVN is to track the source code,

Wicker - further recross by Cloern

1806

1 right?

2 A.  That's right.

3 Q.  And so you can look at the files and see back to the

4 beginning of time whether anything was deleted in an SVN

12:10:00  5 environment, right?

6 A.  If it's been properly maintained and hasn't been interfered

7 with, that's correct.

8 Q.  And you've not -- you've seen no documentation that shows

9 that the SVN was, you know, altered in some way?

12:10:14  10 A.  A forensic log would show that, but you're right, that was

11 not produced.  I did not see it.

12 Q.  There are logs that have been produced from the SVN for

13 source code files that show all the changes, deletions,

14 modifications added and who did them all the way back to 2008,

12:10:29  15 right?

16 A.  Those logs were produced, yes.

17 Q.  You had those logs?

18 A.  Yes.

19          THE COURT:  All right.  Thank you, counsel.

12:10:36  20          You may step down.

21          THE WITNESS:  Thank you, Your Honor.

22          (Witness excused.)

23          THE COURT:  Members of the jury, it's ten after 12:00.

24 Please return at ten after 1:00.

12:10:48  25          This trial is adjourned while the Court deals with

Case: 1:17-cv-01973 Document #: 792 Filed: 12/20/19 Page 77 of 224 PageID #:53688
Wicker - further recross by Cloern
1807

1    another matter.

2            (The following proceedings were had out of the

3            presence of the jury in open court:)

4            MR. CLOERN:  Your Honor, there is one housekeeping

12:11:06   5    matter --

6            THE COURT:  I have to deal with, counsel.

7

8            (Luncheon recess taken from 12:11 o'clock p.m.

9            to 1:10 o'clock p.m.)

10

11                *    *    *    *    *    *    *    *

12

13

14    I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

15            RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

16

17

18    /s/Blanca I. Lara                    November 26, 2019

19

20

21

22

23

24

25

1808

```
 1                IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   MOTOROLA SOLUTIONS, INC., and MOTOROLA    ) No. 17 CV 1973
     SOLUTIONS MALAYSIA SDN. BHD,              )
 4                                             )
                Plaintiffs,                    )
 5   vs.                                       ) Chicago, Illinois
                                               )
 6   HYTERA COMMUNICATIONS CORPORATION, LTD.,  ) November 27, 2019
     HYTERA AMERICA, INC., and HYTERA          )
 7   COMMUNICATIONS AMERICA (WEST), INC.,      )
                                               )
 8                Defendants.                  ) 1:12 o'clock p.m.

 9                    TRIAL - VOLUME 11-B
                   TRANSCRIPT OF PROCEEDINGS
10
            BEFORE THE HONORABLE CHARLES R. NORGLE, SR.,
11                         and a jury

12   APPEARANCES:

13   For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                            BY:  MR. ADAM R. ALPER
14                               MR. BRANDON HUGH BROWN
                            555 California Street
15                          Suite 2700
                            San Francisco, California 94104
16                          (415) 439-1400

17                          KIRKLAND & ELLIS, LLP
                            BY:  MR. MICHAEL W. DE VRIES
18                               MR. CHRISTOPHER M. LAWLESS
                            333 South Hope Street
19                          Suite 2900
                            Los Angeles, California 90071
20                          (213) 680-8400

21

22   Court Reporter:        AMY M. SPEE, CSR, RPR, CRR
                            Official Court Reporter
23                          United States District Court
                            219 South Dearborn Street, Room 1728
24                          Chicago, Illinois  60604
                            Telephone:  (312) 818-6531
25                          amy_spee@ilnd.uscourts.gov
```

1809

1    APPEARANCES (Continued:)

2    For the Plaintiffs:      KIRKLAND & ELLIS, LLP
                              BY:  MS. MEGAN MARGARET NEW
3                             300 North LaSalle Street
                              Chicago, Illinois 60654
4                             (312) 862-7439

5                             KIRKLAND & ELLIS, LLP
                              BY:  MS. LESLIE M. SCHMIDT
6                             601 Lexington Avenue
                              New York, New York 10022
7                             (212) 446-4763

8    For the Defendants:      STEPTOE & JOHNSON, LLP
                              BY:  MR. BOYD T. CLOERN
9                                  MR. MICHAEL J. ALLAN
                                   MS. JESSICA ILANA ROTHSCHILD
10                                 MS. KASSANDRA MICHELE OFFICER
                              1330 Connecticut Avenue NW
11                            Washington, DC 20036
                              (202) 429-6230
12
                              STEPTOE & JOHNSON, LLP
13                            BY:  MR. DANIEL S. STRINGFIELD
                              227 West Monroe Street
14                            Suite 4700
                              Chicago, Illinois 60606
15                            (312) 577-1300

16

17   ALSO PRESENT:           MR. RUSS LUND and
                             MS. MICHELE NING
18

19

20

21

22

23

24

25

Rangan - direct by New

1810

 1          (Proceedings heard in open court.  Jury in.)

 2               THE COURT:  Please call the next witness.

 3               MR. ALPER:  Yes, Your Honor.

 4               Plaintiff calls Dr. Sandeep Rangan.

 5               MR. ALLAN:  Your Honor, before we get started, we've

 6     got a pending *Daubert* motion.

 7               THE COURT:  Yes, I have it before me.  You may make

 8     objections as the witness testifies, but in its broadest

 9     sense, the motion is denied.

10               MR. ALLAN:  Yes, Your Honor.

11          (Witness sworn.)

12               THE CLERK:  Please be seated.

13               MS. NEW:  Your Honor, Megan New on behalf of

14     Motorola.

15               May I proceed?

16               THE COURT:  Yes, please proceed.

17               MS. NEW:  Thank you.

18        SANDEEP RANGAN, Ph.D., PLAINTIFFS' WITNESS, DULY SWORN

19                         DIRECT EXAMINATION

20     BY MS. NEW:

21     Q.  Dr. Rangan, please introduce yourself to the jury.

22     A.  Hi.  I'm Dr. Sandeep Rangan, and I'm a professor at New

23     York University.

24     Q.  And at really high level, can you just explain to the jury

25     why you're here to testify today.

Rangan - direct by New

1811

1   A.   Sure.  You've heard Dr. Wicker go in detail about the

2   possession and use of Motorola confidential material.

3           What I wanted to do is provide an engineering

4   perspective on the sharing of that material and to the extent

5   to which engineers would have realized its confidential

6   nature.

7           And I'll also provide an analysis on the extent to

8   which Hytera could have developed the asserted trade secrets

9   independent of that material.

10          THE COURT:  Do you regard your testimony as

11  repetitious of what the previous witness testified to?

12          THE WITNESS:  No, I do not.

13          THE COURT:  Have you been in the courtroom during the

14  course of the day?

15          THE WITNESS:  Yes.

16          THE COURT:  And during the course of

17  Professor Wicker's testimony?

18          THE WITNESS:  Yes, I have, Your Honor.

19          THE COURT:  All right.  Please proceed.

20  BY MS. NEW:

21  Q.   Dr. Rangan, is it correct that you prepared a slide deck

22  to assist in your testimony today?

23  A.   Yes, I did.

24  Q.   And are those the slides in front of you in the -- on the

25  desk?

Rangan - direct by New

1812

1    A.   Yes, they are.

2            MS. NEW:   Your Honor, permission to the publish to

3    the jury PDX 09.

4            THE COURT:   Proceed.

5    BY MS. NEW:

6    Q.   Okay, Dr. Rangan.  Let's start with your background.  Can

7    you just give the jury a brief overview of your educational

8    history.

9    A.   Sure.

10           I got my Bachelor's of Applied Science in electrical

11   engineering at the University of Waterloo, and then a master's

12   and Ph.D., also in electrical engineering, at the University

13   of California at Berkeley.

14           I then did postdoctoral appointments at the

15   University of Michigan and then at Bell Labs.

16   Q.   Can you explain what it means to do postdoc work?

17   A.   Sure.

18           When you do your Ph.D., that's a substantial amount

19   of independent research in a field, and postdoctoral work is

20   further research work after that.

21   Q.   Can you describe your industry experience after your

22   postdoc work.

23   A.   Sure.

24           I started, my first job in industry was at Bell Labs,

25   which is one of the premier wireless research centers.

Rangan - direct by New

1813

1     That work spun off to a startup called Flarion

2   Technologies, which -- where I was a co-founder.  That was the

3   year of 2000.

4     That got acquired by Qualcomm Technologies in 2006,

5   where I was a director of engineering.

6     And then in 2010, I returned back to academia, where

7   I am a professor today.

8   Q.  All right.  Let's start with Flarion.

9     Can you tell the jury about what type of products you

10  worked on while you were at Flarion.

11  A.  Sure.

12    That was a really interesting experience.  This was

13  in the year of 2000.  At that time, the Internet was just

14  starting up and it was actually very hard to get cellular data

15  that made, say, surfing the Internet on your smartphone.  You

16  probably take that for granted, but that was actually very

17  difficult to do that -- to do at that time.

18    What we had done was develop really one of the first

19  commercial technologies to enable smartphones to be able to

20  surf the Internet.  That would become a precursor for a lot of

21  4G technology that you probably have in your phone today.

22  Q.  Now, did the technology that you developed at Flarion, did

23  that involve base stations and mobile devices like what we've

24  been talking about with Motorola and Hytera's DMR products?

25  A.  Yes, they did.

Rangan - direct by New

1814

1  Q.  Can you just briefly explain what those are.

2  A.  Sure.

3      A mobile device in a cellular context is a device

4  like your smartphone; anything that you would carry around

5  with you.  And if you've ever seen those large towers that

6  your phone might connect to, that's -- that and all the

7  equipment below it is the base station.

8  Q.  And is that what we've commonly become -- we've commonly

9  started calling a cell tower?

10  A.  Yes, that's correct.

11  Q.  Okay.  And what was your role in development of the

12  cellular system at Flarion?

13  A.  Well, as a co-founder and since we were building that

14  entire system from scratch, I was involved in really every

15  aspect of the engineering.  So that was your initial system

16  design, the initial algorithm studies, a lot of the firmware,

17  the software, the DSP that you've maybe heard before.

18      I also supervised hardware teams, test teams, field

19  support, working with business development, and so on.

20  Q.  How many people did you supervise in that role as a

21  director at Flarion?

22  A.  About 150 engineering staff at its peak.

23  Q.  And would you consider yourself to have been in a project

24  management role?

25  A.  Yeah, that's also a very important part of my role.  And

Rangan - direct by New

1815

1   that would involve, for example, all the staffing plans

2   initially, all of the product scheduling; and then, as the

3   project progressed, trying to keep track of it, as well as the

4   budgeting and so on.

5   Q.   Now, you mentioned that Flarion was sold to Qualcomm in

6   2006; is that right?

7   A.   That's right.

8   Q.   Okay.  And did you then go work at Qualcomm?

9   A.   Yes.  At Qualcomm I was a director of engineering,

10  responsible for infrastructure products there.

11  Q.   And what does that mean, "infrastructure products"?

12  A.   Well, more specifically, I was -- two of the larger

13  projects that I worked on.  The first was a very large-scale

14  microchip development for UNB, which was their version of 4G

15  at the time.

16          And then after that, I worked on another large chip

17  for a 4G, what was called femtocell.  That's a small base

18  station that could be deployed, say, in a public space, like

19  an airport or a hotel lobby or something like that.

20  Q.   And what was your -- what was your title at Qualcomm?

21  A.   I was a director of engineering.

22  Q.   And as the director of engineering, what was your role on

23  those two projects that you just mentioned?

24  A.   Yeah, so, again, there I had systems teams working with

25  the algorithm development, a lot of the firmware, the DSP,

Rangan - direct by New

1816

1    software, hardware teams, and also task teams as well.

2    Q.  How many people did you supervise on those teams?

3    A.  About 70 people in each project.

4    Q.  And did you also have project management responsibilities

5    at Qualcomm?

6    A.  Absolutely.  Those -- both of those projects, I was really

7    seeing from the beginning.  So that was all the initial

8    staffing estimates, the initial costing estimates, and then

9    trying to do revisions of those as the project progressed.

10   Q.  Were the engineering teams at Qualcomm and Flarion

11   structured in a similar manner?

12   A.  Yes, they were.

13   Q.  Okay.  And if we look at the next slide, can you just

14   briefly explain the organization of the engineering teams that

15   you staffed and worked on at Flarion and at Qualcomm.

16   A.  Sure.  So on this demonstrative, I've tried to put out an

17   organization of the way that you would see teams at Qualcomm

18   or Flarion structured.

19        You would have the systems engineers, who would do

20   things like the specifications, the initial design,

21   simulation, and so on.

22        There would be hardware engineers.  They would

23   develop things like the integrated circuits and the FPGAs that

24   you might have heard about earlier; the DSPs, you've heard a

25   lot about that, the DSP engineers.

Rangan - direct by New

1817

1    There would be software engineers writing all the

2    upper-level code, as well as test engineers.  You saw the

3    importance of that right from Mr. Lund's presentation at the

4    beginning.

5         And then there's also a lot of other important staff

6    for project management, field test, and then helping

7    application engineers working with the customers.

8    Q.  Were the technologies that you worked on at Qualcomm and

9    at Flarion similar to the DMR technology at issue in this

10   case?

11   A.  Yes, they were.

12        MS. NEW:  Okay.  If we could go to the next slide.

13        Thank you.

14   BY MS. NEW:

15   Q.  Can you just explain the overlap and the similarities

16   between your work at Flarion and Qualcomm and the DMR

17   technology here.

18   A.  Sure.

19        So to do that, I have to put this table here to try

20   to help that out.

21        First of all, you have to understand they're all

22   wireless communication technologies, and so the basic

23   principles of communication apply to all of them.

24        And in particular, they both have mobile devices and

25   as well as fixed infrastructure, like repeaters or base

Rangan - direct by New

1818

1   stations.

2           In addition, they all work with standards.  And in

3   fact, the standard for LTE, that maybe you are using on your

4   phone today, is also produced by the same organization, ETSI,

5   that does the DMR standard in this case.

6           They have a similar internal structure, having DSPs,

7   FPGAs, ASICs, and RF, radiofrequency components.

8           And in particular with the DSPs, they all have DSPs.

9   And the Flarion DSP, incidentally, is the same DSP, that C55

10  that you might remember that you saw in the Motorola products.

11  Q.  During your time at Qualcomm and Flarion, did you develop

12  any technology that was considered a trade secret?

13  A.  Absolutely.  Everything that we developed would be

14  considered trade secrets.  That's all the software, the

15  hardware designs, the design documents.  Those are the crown

16  jewels for any wireless communications company, and those

17  would be trade secrets.

18  Q.  Now that we've covered your industry experience, can you

19  tell the jury a little bit about your teaching experience.

20  A.  Sure.

21          I love teaching.  Today I lead, really, one of the

22  leading 5G labs.  Actually, our lab was -- we did a lot of

23  pioneering work in 5G.

24          And, actually, Chicago happens to be one of the first

25  test cities for 5G, so about four or five years after I got

Rangan - direct by New

1819

1  it, you can now try out some of the technology that came

2  partly from our lab.

3          I'm also a professor, of course, in wireless

4  technology and digital signal processing.  So I teach classes

5  in wireless communications, digital signal processing, and

6  related fields.

7  Q.  And do you do research and write articles as well in your

8  role as a professor at NYU?

9  A.  Absolutely.  I continue to do research in that area very

10  actively.

11  Q.  Okay.  And you -- you mentioned that your lab is one of

12  the foremost labs in the world on wireless technology.

13          Can you explain a little bit about the work that you

14  do through that lab.

15  A.  Oh, yeah, sure.

16          In addition to all the work in 5G, we have about 18

17  professors, but we also collaborate extensively with the

18  industry.  We actually have one of the largest industry

19  academic partnerships, 18 companies, across not just wireless

20  communication, but I think almost any engineering discipline

21  in the U.S.

22          So some of those companies are companies like OPPO,

23  one of the largest handset makers in China, and many of the

24  names that you might have heard of that you might be using

25  products today.

Rangan - direct by New

1820

1    Q.  And have you written any articles that have been

2    published?

3    A.  Yes.  I have about at least 150 publications in scientific

4    journals and conferences.

5    Q.  And do those articles relate to wireless communications

6    technology?

7    A.  Yes, they're either all on wireless communications

8    technology directly or in related fields like signal

9    processing.

10   Q.  And are you also the named inventor on any patents?

11   A.  Yes.  About 50 patents, again, all of which are --

12   virtually every one of which is in wireless communications.

13   Q.  Dr. Rangan, are you being paid for your work and your

14   testimony here today?

15   A.  Yes, I am.

16   Q.  Does your compensation depend at all on the outcome of

17   this litigation?

18   A.  Absolutely not.

19   Q.  And have you served as an expert witness before?

20   A.  Yes, I have, a handful of times.

21   Q.  And did any of those cases relate to the DMR technology at

22   issue in this case?

23            THE COURT:  How many cases are in "a handful"?

24            THE WITNESS:  I think four prior to this one,

25   Your Honor.

Rangan - direct by New

1821

1    THE COURT:  Proceed.

2  BY MS. NEW:

3  Q.  Did any of those cases relate to the DMR technology at

4  issue in this case?

5  A.  Yes.  Two of those cases, previous cases, were

6  specifically on DMR.

7  Q.  And have you been accepted by the Court in any of those

8  cases as an expert?

9  A.  Yes.  In both cases.

10    MS. NEW:  Your Honor, at this time Motorola tenders

11  Dr. Sandeep Rangan as an expert in wireless network

12  communications, signal processing, and engineering and

13  development of wireless communications products.

14    THE COURT:  The witness may testify consistent with

15  Federal Rule of Evidence 702.

16  BY MS. NEW:

17  Q.  Dr. Rangan, what were you asked to do in this case?

18  A.  So, as I said, you heard from Dr. Wicker that -- who had

19  testified in detail about the possession and use of Motorola

20  trade secrets.  And what I wanted to get from an engineering

21  perspective is really at two things:  Look at the spread of

22  that information and assess to the extent which an engineer

23  would perceive it as confidential or not.

24    And second, also try to independently analyze the

25  extent to which Hytera could have developed these asserted

Rangan - direct by New

1822

1   trade secrets had they not received that information.

2   Q.  What materials did you consider in forming your opinions?

3   A.  So I really used a large volume of material.  I've tried

4   to put it up on this slide in sort of four categories.

5         The first is what you could call internal technical

6   material.  These would be the initial requirements,

7   specifications, and maybe design documents, as well as maybe

8   schematics for circuits, source code, and also internal

9   communications amongst the engineers.

10        So looked at publicly -- public domain documents.

11   These are things like the product documentation, marketing

12   material, standards, and patents, for example.

13        I also tried to review the case documents of this, so

14   the number of witnesses who were deposed.  I looked at the

15   other experts' expert reports, various filings, and so on.

16        And then, as I said, I have a large amount of

17   industry experience myself, and I tried to bring that to the

18   case as much as I can as well.

19   Q.  Why did you look at this voluminous amount of materials?

20   A.  It was a lot of material, but I really wanted to give a

21   very accurate assessment for my analysis.

22   Q.  After reviewing the material, did you reach any opinions

23   in this case?

24   A.  Yes, I did.

25   Q.  Okay.  And if we could pull up the next slide, can you

Rangan - direct by New

1823

1    tell the jury what those opinions are.

2    A.  Sure.

3         So I think at a high level, you could think of it as

4    three opinions that I have.

5         The first, from my analysis, was that not only was

6    Motorola confidential and proprietary information widely

7    shared amongst the Hytera employees, but shared in a manner

8    that it should have been apparent to those recipients that it

9    was indeed confidential and proprietary.

10        The second is that from my analysis, that Hytera

11   really did not and could not have developed a comparable DMR

12   product in -- without having these misappropriated trade

13   secrets in any commercially reasonable amount of time.

14        And then, finally, on a trade-secret-to-trade-secret

15   basis, I also believe they could not have conceived of or

16   developed those trade secrets in a commercially reasonable

17   time, or at least the amount of time that it took Motorola.

18   Q.  So let's start with your first opinion, which is that

19   Motorola's confidential and proprietary information was widely

20   shared at Hytera.

21        What specifically did you find with respect to the

22   sharing of that information within Hytera?

23   A.  Sure.

24        So for that, I believe -- I found that, first of all,

25   that the Motorola confidential and proprietary information was

Rangan - direct by New

1824

1    indeed widely shared amongst Hytera.  But not only that;

2    because the nature of the material, it should have been

3    apparent to large portions of the engineering staff that it

4    was confidential in nature.

5            Finally, going to the very management of the company,

6    it should have been apparent to at least Mr. Chen, who was the

7    CEO, that it was -- that the sharing of this confidential

8    information was ongoing.

9    Q.   Okay.  Dr. Rangan, were you here for opening statements?

10   A.   Yes, I was.

11   Q.   And what is your understanding of Hytera's position --

12           THE COURT:  Opening statements are -- sustained.

13           MS. NEW:  Thank you, Your Honor.

14           THE COURT:  No "thank you."  It's after the ruling.

15   BY MS. NEW:

16   Q.   Dr. Rangan, what is -- generally speaking, what is your

17   understanding of Hytera's position with --

18           THE COURT:  I just ruled on the objection, Counsel.

19   Ask another question.

20           MS. NEW:  Sure.

21           THE COURT:  And not a "sure."  Just another question.

22   BY MS. NEW:

23   Q.   Dr. Rangan, have you seen evidence in this case --

24           THE COURT:  I have already sustained objections with

25   respect to the use of the word "evidence."  Rephrase the

Rangan - direct by New

1825

 1    question.

 2            You've been here for the last several days, have you

 3    not?

 4            MS. NEW:  I have, Your Honor.

 5            Slip of the tongue.  It won't happen again.

 6            THE COURT:  I didn't want you to necessarily say

 7    that, but please rephrase the question.

 8    BY MS. NEW:

 9    Q.  Dr. Rangan, in your review of materials, documents, and

10    deposition testimony in this case, have you seen evidence that

11    G.S. Kok, Y.T. Kok, and Sam Chia did not keep Motorola's

12    confidential information close to the vest?

13            MR. ALLAN:  Objection, Your Honor.

14            THE COURT:  Overruled.  The witness may answer.

15            And you'll tie this up in your next series of

16    questions?

17            MS. NEW:  Yes, Your Honor.

18            THE COURT:  Okay.  You may answer.

19    BY THE WITNESS:

20    A.  Yes, I've seen extensive evidence of that.

21    BY MS. NEW:

22    Q.  Okay.  So let's take a look at some of the documents in

23    this case.

24            If you can turn to Slide 18 in the binder in front of

25    you, we'll look at PTX 806 and 1863, which are already in

Rangan - direct by New

1826

1    evidence.

2            MR. ALLAN:  Objection, Your Honor.  This is -- the

3    next several slides are duplicative of several Dr. Wicker

4    slides, which extensive expert testimony has been covered over

5    the last several days.

6            THE COURT:  What's your response to that objection?

7            MS. NEW:  While there may be a handful, four or five

8    documents, that will also be used by Dr. Rangan, Dr. Rangan is

9    offering a separate and different opinion than those offered

10   by Dr. Wicker, but it is important for the jury to see the

11   documents to --

12           THE COURT:  So repetition will be minimized.

13           MS. NEW:  Correct, Your Honor.

14           THE COURT:  All right.  Overruled.

15           You may proceed.

16   BY MS. NEW:

17   Q.  So let's look at PTX 806 and 1863, which are in evidence.

18           Did you consider these documents in reaching your

19   opinion?

20   A.  Yes, I did.

21   Q.  Okay.  And you recall that PTX 806 is an e-mail chain

22   between Wang Fei, Peiyi Huang, and Huang Ni, correct?

23   A.  That's correct.

24   Q.  Okay.  And what is PTX 1863?

25   A.  It's one of the attachments, framer_api, within that

Rangan - direct by New

1827

1    e-mail chain.

2    Q.   Okay.  Now, we've talked a lot about the library files.

3           Let me ask you, was the underlying source code for

4    the rfhal_c55 library file contained in this e-mail, PTX 806,

5    when it was sent to Huang Ni and Wang Fei?

6    A.   No, it was not.

7    Q.   Did Hytera ever produce the underlying source code for the

8    rfhal_c55 library file attached to Peiyi Huang's e-mail?

9           MR. ALLAN:   Objection, Your Honor. This is exactly

10   the same testimony.

11          THE COURT:   All right.  Overruled.

12          You may answer.

13          THE WITNESS:   I'm sorry.  Could you repeat the

14   question?  I just --

15   BY MS. NEW:

16   Q.   Sure.

17          Did Hytera ever produce the underlying source code

18   for the rfhal_c55 library file attached to Peiyi Huang's

19   e-mail represented in PTX 806?

20   A.   No, they did not.  My understanding is that it was lost.

21   Q.   Would Peiyi Huang have needed to have the underlying

22   source code files to create the library file?

23   A.   Absolutely.  You can't create the library files without

24   the source code.

25   Q.   Now, Dr. Rangan, do most companies keep the underlying

Rangan - direct by New

1828

1    source code files that are used to create their library files?

2    A.  Absolutely.  It's unimaginable to not have the underlying

3    source code files, particularly for critical functionality

4    like your DSP.

5    Q.  And from an engineering perspective, why would a company

6    want to keep those underlying source code files?

7    A.  Because you -- any time you want to make any modifications

8    to that -- to that functionality, or even if you want to use

9    it as references, and you may need to make modifications

10   because the parts change or you have customer requests or you

11   find bugs, all of those reasons, you would need to keep the

12   underlying source code to continue to use that functionality.

13   Q.  And would it be sufficient just to have the library files?

14   A.  No.  If you -- once you have the library files, you can't

15   do any of those things:  modifications, references, and so on.

16   Q.  And is it your understanding that the source code that was

17   contained in the library file rfhal_c55 is currently being

18   used in Hytera's products?

19   A.  That's my understanding, yes.

20   Q.  And in your experience, would -- does a company typically

21   keep the underlying source code files for the products it's

22   currently selling?

23   A.  Of course.  Even more so if you're currently selling the

24   products.  In using that code, you would absolutely need to

25   keep the source code.

Rangan - direct by New

1829

1   Q.  Let's go to Slide 21, which relates to the header file

2   PTX 1863.

3         And just remind the jury, what's the original source

4   of this header file?

5   A.  This is, as you heard, from Motorola.  The original source

6   is from Motorola.

7   Q.  Now, there's a description -- well, let me ask you this

8   first:  At the top, there's a copyright notice that says:

9   "Copyright 1988 to 2008, HYT Tech. Co. Limited.  All Rights

10   Reserved."

11         Would that change your opinion that this is a header

12   file from Motorola?

13   A.  Absolutely not.

14   Q.  And why not?

15   A.  Well, for one thing, you see the date.  It says 1988 to

16   2008, but Hytera wasn't even in existence in 1988.  But

17   Motorola was.

18   Q.  And what is the purpose of the "Description" field in the

19   header file?

20   A.  So the "Description" field in this file and other files

21   would tell you essentially what this file does in the

22   software.

23   Q.  Is it -- if you were going to use the header file, would

24   you need to read the "Description" field?

25   A.  Absolutely.  And in particular in this case, where

Rangan - direct by New

1830

1    Ms. Huang Ni had looked at the file in detail, there's no way

2    she could have missed this.

3    Q.   And would it be obvious to a typical software engineer

4    looking at this header file, PTX 1863, that it came from

5    Motorola?

6    A.   Absolutely.  There's no way that a software engineer could

7    miss this.

8    Q.   Now, during Dr. Wicker's testimony, you've heard that this

9    header file may not -- may not have been the right file to be

10   used to access the rfhal_c55 library.

11        Do you recall that?

12   A.   Yes, I do.

13   Q.   Okay.  An the fact that this is the wrong header file, may

14   be the wrong header file for the rfhal_c55 library, does that

15   change your opinion at all?

16   A.   No, it actually reinforces it, because this would mean

17   that Huang Ni, who had to look at this file, would have looked

18   very carefully, and even further suggests that she could not

19   have missed that this was indeed a Motorola file.

20   Q.   Based on your experience, would you expect to see a header

21   file for Motorola source code being passed around via e-mail

22   by Hytera engineers?

23   A.   Absolutely not.

24   Q.   And from your experience, is it -- is it abnormal for

25   source code to be sent around via e-mail?

1    A.   Yes.  It's extremely irregular.

2    Q.   And why is that?

3    A.   So most companies, including Hytera at this time -- if you

4    recall, there was a discussion about SVN.  That's the source

5    code repository where the source code stays.

6            And normally software developers check in and out

7    software from that repository.  That ensures that the data is

8    always consistent.  This is highly irregular to pass large

9    library files in a parallel path and avoid that.

10   Q.   And would the fact that the e-mail -- that the library

11   files were being e-mailed, for a typical engineer, would that

12   raise some red flags about why the library file is being

13   e-mailed around?

14   A.   Yes.  That would be extremely irregular, and it would

15   already cause any software engineer to wonder what the reason

16   is.

17   Q.   So, Dr. Rangan, let me ask you this:  We've been talking a

18   lot about Peiyi Huang sending this library file.

19           Were you ever able to review any deposition testimony

20   from Peiyi Huang?

21   A.   No, I was not.

22   Q.   And do you have an understanding of why not?

23   A.   My understanding is that Motorola had requested to depose

24   her, but she was unavailable for a very long period, and then

25   she departed the company before she could be deposed.

Rangan - direct by New

1832

1  Q.  So what do PTX 806 and 1863 tell you about the sharing of

2  Motorola source code within Hytera?

3  A.  So this is the first of many examples of code where you

4  see Motorola confidential information being shared amongst

5  Hytera employees in a manner that those recipients of that

6  information should be aware that this was indeed confidential

7  and proprietary information.

8        MS. NEW:  Mr. Schlaifer, if we could turn to

9  Slide 28.

10 BY MS. NEW:

11 Q.  And, Doctor, if you could turn to that in your binder.

12       Slides 28 and 29 reflect PTX 530 and 532, which have

13 also already been admitted.

14       Did you rely on these documents in reaching your

15 opinion?

16 A.  Yes, I did.

17 Q.  All right.  Let's look at Page 6 of PTX 530.

18       And, Dr. Rangan, what is reflected in this e-mail?

19 A.  So this is an e-mail from Zhao Guo to Huang Ni, or

20 "Maggie" in the previous document that we were looking at, and

21 in this e-mail, he asked how a certain feature is supported in

22 Motorola and then refers to a section of this document.

23 Q.  And what is the name of the document that's attached here

24 to PTX 530?

25 A.  This is Neo_12m_p21.doc.

Rangan - direct by New

1833

Q.  And just as a reminder, where does the name "Neo" come

from?

A.  "Neo" is a -- the Motorola code name for their portables.

So this is already an indication that this is a Motorola

document.

Q.  And are there a number of -- there are a number of people

copied on this e-mail, correct?

A.  That's right.  Yes.

Q.  And -- I'm sorry.

     Did those people also receive the Neo document?

A.  Yes, they did.

Q.  Okay.  And Guo Zhao, did he ever work at Motorola?

     MR. ALLAN:  Objection, Your Honor.  It's repetitive.

     THE COURT:  There has to be some overlapping in order

for the witness to express his opinions that otherwise testify

in this case.  It's not abusive.

     The objection is overruled.

BY MS. NEW:

Q.  Would you like me to reask the question?

A.  Yes, please.

Q.  Sure.

     Did Guo Zhao ever work at Motorola?

A.  No, he did not.

Q.  Okay.  And we already talked about the "Neo" name of the

file, but how else do you know that the attachment, PTX 532,

Rangan - direct by New

1834

1  which is on the next slide, how do you know that that's a

2  Motorola document?

3  A.  Well, first of all, you can directly see it has the

4  Motorola logo right on the top of it.  And it -- I've

5  highlighted here that it is indeed proprietary to Motorola,

6  Incorporated.

7  Q.  And have you reviewed the contents of this document in

8  reaching your opinions, Dr. Rangan?

9  A.  Yes, I have.

10  Q.  And is the -- from the substance of the document, can you

11  tell that it contains Motorola's confidential and proprietary

12  information?

13  A.  Yes.  It's, first of all, very obviously confidential-type

14  of information.  It's details of test results, test

15  procedures, and so on, which is absolutely confidential.

16          But there's even references to Motorola-specific

17  items within that -- within that document.  So even -- even if

18  somehow an engineer missed this branding at the front, they

19  would absolutely know it's a Motorola document.

20  Q.  Dr. Rangan, what do PTX 530 and 532 tell you about the

21  sharing of Motorola's confidential information within Hytera?

22  A.  Again, this is another indication of Motorola information

23  being shared within Hytera in a manner that the recipients

24  should be -- should be aware that it's confidential and

25  proprietary.

Rangan - direct by New

1835

1  Q.  So now let's turn to Slides 30 and 31 in your binder,

2  which reflect PTX 630 and PTX 861, which are also admitted.

3        Did you consider these documents in reaching your

4  opinion?

5  A.  Yes, I did.

6  Q.  Okay.  And what is PTX 630?

7  A.  PTX 630 is an e-mail from Roy Luo to Y.T. Kok, and in this

8  e-mail he asked him to send an SRS template as per a

9  discussion they had yesterday.

10 Q.  And can you just remind everyone what "SRS" stands for?

11 A.  Oh, yes.  Sorry.  That's software requirement

12 specification.

13 Q.  Okay.  And Roy Luo, did he ever work for Motorola?

14 A.  No, he did not.

15 Q.  Okay.  And that statement in the e-mail, "Please send the

16 SRS template to me as discussion yesterday," do you see that?

17 A.  Yes, I did.

18 Q.  What does that indicate to you?

19 A.  So it indicates that they already are aware, or Mr. Luo,

20 from discussions or -- or in conversation, was already aware

21 that Y.T. Kok is in possession of this type of document.

22 Q.  And if we go to Page 3 of PTX 630, what does Y.T. Kok do

23 in response to Mr. Luo's e-mail?

24 A.  He responds back with this document VOX.doc, which is then

25 forwarded several other Hytera engineers.

Rangan - direct by New

1836

1   Q.  And that goes to three other Hytera engineers, right?

2   A.  Yes, that's correct.

3   Q.  And did any of those people ever work for Motorola?

4   A.  No, they did not.

5   Q.  And the jury has seen this document several times, so just

6   very briefly, is PTX 861 the document that was attached to PTX

7   630?

8   A.  Yes, it was.

9   Q.  Okay.  And do you know which party provided the document

10  that was attached, Dr. Rangan, which party produced it?

11  A.  Oh, produced it.  This is -- was produced by Hytera.

12  Q.  Okay.

13  A.  Sorry.

14  Q.  And what do PTX 630 and 861 tell you about whether

15  Motorola's confidential information was shared at Hytera?

16  A.  This is even a little bit more egregious than the previous

17  examples, because in this case you have an understanding that

18  Y.T. Kok was in possession of these documents, and at least

19  one engineer knew to go to -- or it appears from the e-mail to

20  have known to have gone to Mr. Kok for this document and then

21  felt it was -- that he could freely redistribute that to other

22  Hytera engineers.

23  Q.  Let's turn to Slide 33, which is -- reflects PTX 633,

24  which is in evidence.

25          Did you consider this document in reaching your

Rangan - direct by New

1837

1  opinion?

2  A.  Yes, I did.

3  Q.  Okay.  What is PTX 263?

4  A.  This is a task list that was done in the middle of 2008 by

5  Mr. Sam Chia.

6  Q.  Okay.  So if we look at the top, Dr. Rangan, in this first

7  gv row, Row -- in Row 38, it says, "Reuse entire GCISS

8  subscriber library."

9          What does that reference mean to you?

10  A.  So as you heard from Dr. Wicker discuss, this is

11  referring -- that's a typo.  It should be "CGISS," which is a

12  Motorola division, and it's to reuse the entire subscriber

13  library; that is, the entire library of source code in that

14  case.

15  Q.  And is that Motorola source code?

16  A.  Yes, it is.

17  Q.  And if we look at Row 68, it says -- you've underlined

18  "Study signaling stack from Mot (Go through a couple of

19  examples like Group Call, Call Alert, Find out the exact bit

20  information used in the LC, CSBK)."

21          What does that mean to you, Dr. Rangan?

22  A.  This is one of two examples on just these few tasks here,

23  where the -- where this task list is explicitly to study the

24  signaling stack that is the protocol stack from Motorola.

25          And you'll also see that in the bottom here, which

Rangan - direct by New

1838

1   I'll try to circle.  Oops, not as good as Mr. -- Dr. Wicker.

2   Okay.  Sorry.

3           Okay.  Here we go.

4           You also see stacks similarly here on the bottom task

5   in 141 to explicitly look up a number of features in that

6   stack.

7   Q.  And so does Row 141 also indicate to you that Hytera

8   engineers are being told in this task list to study Motorola's

9   implementation of DMR features?

10  A.  Exactly.  Exactly.

11  Q.  Okay.  Let's go back up to Row 92.  And if you look over

12  on the right-hand side under "Comments," you've underlined

13  "There is a NEO ramp profile in the Mot folder."

14          So I want to ask you two questions about that.

15          First of all, what do you understand a Neo ramp

16  profile to be?

17  A.  So this is explicitly -- it's one of the components in

18  that Neo document.  It's the ramping profile, one of the ways

19  the power ramps up.  So that's exactly what it's talking about

20  here.

21  Q.  And then there's the second reference to "in the Mot

22  folder."

23  A.  Yeah.

24  Q.  What does that indicate to you?

25  A.  Sorry.

Case: 1:17-cv-01973 Document #: 792 Filed: 12/20/19 Page 109 of 224 PageID #:53720
Rangan - direct by New
1839

1    What that indicates is that this is particularly

2    egregious here, to suggest that there's a folder which will be

3    a repository, if you like, for Motorola confidential

4    information.

5    And it's important to recall -- recognize this is a

6    task list.  And so the task list that is generally shared to

7    the engineers explicitly calls out of having a folder where

8    these engineers can obtain this confidential information.

9    Q.   In Row 33, I want to look at both the "Task" and the

10   "Comments" section.

11   So in the "Task" side, in the "Task" column, you've

12   underlined "Determine DSP Library risk and where to store the

13   files."

14   What does that mean to you, Dr. Rangan?

15   A.   This is also quite egregious here.  First of all, the

16   "Determine DSP Library risk," the risk that is being talked

17   about here is the risk for a detection by another party, such

18   as Motorola.  So that is just one of the tasks on -- for the

19   engineers here at Hytera.

20   Q.   And if we go to the "Comments" field on the far right-hand

21   side, it looks like there's been a resolution to how to do

22   that.

23   Can you explain to the jury what it says there.

24   A.   Yeah.  So in the task part on the left of 133, part of

25   that way to determine the risk is where to store the files,

Rangan - direct by New

1840

1    where to hide the files.

2              And then one engineer, Yu Yang, is explicitly tasked

3    out to talk to the software configuration manager to find a

4    folder.

5    Q.   And who is -- what is your understanding of You Yang's

6    role within the software engineering group at Hytera?

7    A.   Actually, Yu Yang was at the -- at -- at the project from

8    a -- from the beginning, back prior to the arrival -- I think

9    since 2006 at least -- prior to the arrival of G.S. Kok,

10   Y.T. Kok, and Sam Chia, and I believe at this point he is

11   still a group leader within the software -- or the DSP team.

12   Q.   What does PTX 263 tell you about the sharing of Motorola's

13   confidential information outside of G.S. Kok, Y.T. Kok, and

14   Sam Chia?

15   A.   That's a good question.

16             I think to put that in context, you have to think

17   this is a task spreadsheet.  I've written many of these tasks

18   spreadsheets myself.  And this really walks step by step of

19   what a DSP team is to do.

20             And many items on this task spreadsheet are

21   explicitly calling out instructions for use and concealment of

22   Motorola confidential information.  I've simply never seen

23   anything like this.

24             Using -- for example, the task here is to reuse the

25   entire CGISS library.  Not only does it mean that the

1 possessor of this spreadsheet would be part of this plan; the

2 whole execution of the task involved explicitly the DSP team

3 to conduct this. There is no way to reuse the CGISS library

4 or any of these other options without the cooperation of the

5 DSP team.

6 Q. And so, Dr. Rangan, we've just reviewed a handful of

7 documents. And based on those documents, at least how many

8 people at Hytera besides G.S. Kok, Y.T. Kok, and Sam Chia had

9 access to or saw Motorola confidential information within

10 Hytera?

11 A. That would be just in a few examples, we can identify

12 explicitly the names of at least 28 Hytera engineers beyond

13 G.S. Kok, Y.T. Kok, and Sam Chia.

14         Those names would include the few examples I've

15 presented. Plus, due to time, we skipped a couple of others,

16 the LTD conformance and the welcome e-mail that you'll talk

17 about later. But just those two examples, it's already 28

18 engineers.

19 Q. And now let's look at PTX 1018, which has already been

20 admitted. Did you consider this document in reaching your

21 opinions?

22 A. Yes, I did.

23 Q. Okay. And can you just remind everyone what this document

24 is.

25 A. If I recall, this is the spreadsheet of the recovered

Rangan - direct by New

1842

1    files from Ms. Peiyi Huang's laptop.

2    Q.  So Mr. Schlaifer is just going to run a search within this

3    Excel sheet.

4          MS. NEW:  Mr. Schlaifer, can you just run a search

5    for the phrase "team training."

6          Just make that a little bigger so everyone can read

7    it.

8    BY MS. NEW:

9    Q.  Okay.  So, Dr. Rangan, if you look down on the far

10   left-hand corner of that window that Mr. Schlaifer just

11   opened, how many files do we find if we just searched "team

12   training"?

13   A.  I tried to circle it for you if you can't see, but that's

14   2544, more than 2500 such files.

15   Q.  And in your experience working at software companies and

16   leading teams of engineers, what does "team training" mean to

17   you?

18   A.  So team training is very important.  In any software team,

19   you have team training material.  And this is a folder

20   explicitly for team training material that would be used.

21   Q.  And just on the screen we see here, do you see any files

22   here in the team training folder that relate to Motorola

23   confidential information or source code?

24   A.  Yes.  I'll just give you a few examples.

25          For example, you can see here the release 1.4 Matrix.

1    "Matrix" is a Motorola internal name.  There's actually a few

2    files just like this.  Here's just -- this is just one tiny

3    section of this folder.

4    Q.  And if we look at the very top of this list, do you see

5    where it says "LTD Code" in a row for the first several

6    entries?

7    A.  Oh, yes.  Exactly there, too.  LTD, again, is a Motorola

8    name.  That's the Motorola code name for their DMR system.

9    And you see the code in several files here.

10   Q.  Okay.  And if we scroll through, will we see other

11   examples of Motorola confidential information or source code

12   within the team training file?

13   A.  Countless numbers, yes.

14   Q.  Okay.  And what does the large volume of documents in the

15   team training folder -- I think you said 2,554 -- what does

16   that mean to you?

17   A.  It means that not just the source code, but the training,

18   which is a vital part of the development, has -- using

19   significant amounts of Motorola confidential information.

20        MS. NEW:  Now, Mr. Schlaifer, could we go back to

21   Slide 34.

22        Thank you.

23   BY MS. NEW:

24   Q.  So, Dr. Rangan, in addition to the people who we've

25   identified in the individual documents and the people who

Rangan - direct by New

1844

1  would have access to the team training folder, did you review

2  other documents in reaching your opinions that show that

3  Motorola's confidential information was widely shared at

4  Hytera?

5  A.  Yes.  Just taking the one -- a few examples in my

6  analysis, I could determine that there were at least 50

7  engineers explicitly ended up receiving Motorola confidential

8  and proprietary information, beyond G.S. Kok, Y.T. Kok, and

9  Sam Chia.

10 Q.  And to this day, do you know how many confidential

11 Motorola technical documents and specifications are still in

12 Hytera's files?

13 A.  There is at least 1600 such files, from my understanding.

14 Q.  Okay.  And we obviously couldn't present all of those here

15 today.

16       And so you said you've seen at least 50 engineers

17 with access.  Are there any other broad groups of people

18 within Hytera who you understand to have access to Motorola's

19 confidential information?

20 A.  Sure.  Indeed, from my analysis of the way that the

21 software team is structured, virtually every software engineer

22 on this team should have been aware of the confidential and

23 proprietary nature of the material that they were receiving.

24 Q.  And why is that?

25 A.  Well, there's a number of reasons.

Rangan - direct by New

1845

1    You saw, for example, in the previous presentation

2    that Peiyi -- Ms. Peiyi Huang had actually uploaded the

3    Motorola source code into the SVN repository.

4        Remember, the SVN repository was -- is the central

5    repository where code is checked out by all the engineers on

6    that team, so they would have all seen Motorola code directly.

7        But there's a more basic point, despite whatever

8    camouflaging was going on.  As I'll discuss, prior to 2008,

9    prior to the arrival of G.S. Kok, Y.T. Kok, and Sam Chia,

10   Hytera had very minimal code themselves.  What they would have

11   seen, what a software engineer would have seen --

12       THE COURT:  Well, just a minute.

13       What is the question to the witness?

14       MS. NEW:  Sure, Your Honor.

15   BY MS. NEW:

16   Q.  So, Dr. Rangan, I asked you why the software engineers

17   would know that they had access to Motorola's code.

18       Can you explain how they would know that based on the

19   code that existed prior to the arrival of G.S. Kok, Y.T. Kok,

20   and Sam Chia?

21   A.  Okay.  Sorry.  Sorry.

22       So, as I said, prior to the arrival of those three

23   individuals, the code was in a very primitive state.  What

24   they would have seen upon the arrival of these three

25   individuals is a vast trove of software code; code not just

Rangan - direct by New

1846

1  for the DSP, not just for the protocol stack, but all sorts of

2  layers, like the application layer, the ergonomic layer, which

3  they didn't even conceive of before.

4       To imagine them -- seeing this code appear is like

5  seeing a magician pull a rabbit from the hat.  There's simply

6  no way that they could have thought that this code came from

7  those developers during their time at Hytera.

8  Q.  And would that time have been a very short time?

9  A.  That would have just been -- basically came in the few

10 months.

11 Q.  Okay.  Now, you have -- we've also heard throughout this

12 trial references to Motorola-branded code or Motorola-branded

13 documents and Hytera-branded code or Hytera-branded documents.

14      Do you recall that testimony?

15 A.  Yes, I do.

16 Q.  Okay.  Based on your experience, does it matter whether

17 the code was branded with Motorola's name or Hytera's name in

18 order for the software engineers to know that they were using

19 or seeing Motorola source code and documents?

20 A.  Absolutely not, when all these discussions about

21 Motorola-branded versus Hytera-branded have been relatively

22 cosmetic changes, perhaps at the tops of the files.

23      The files themselves are still replete with

24 references to Motorola acronyms that would have been

25 identifying in themselves, plus all the other mechanisms by

Case: 1:17-cv-01973 Document #: 792 Filed: 12/20/19 Page 117 of 224 PageID #:53728
Rangan - direct by New
1847

1    which this software team was operating:  the team task list,

2    which specifically calls out the task of engineers to

3    redesign, reuse code; the existence of the team training

4    folder; and, of course, just the vast volume of code that came

5    in over a very short period of time.

6    Q.  So, Dr. Rangan, at your time at Flarion and Qualcomm, did

7    those companies have policies that would require employees to

8    report if they saw or they came into possession of a

9    competitor's confidential information or source code?

10   A.  Absolutely.

11   Q.  And under those policies, what was required to be done

12   when someone comes into possession of a competitor's source

13   code or confidential information?

14   A.  That's a very serious event.  What you would try to do is

15   quarantine that in some way and then report it to the legal

16   department.

17   Q.  And -- so we've looked at this slide set 34.  We've talked

18   about the software engineers and the other people who you saw

19   through documents had access to or saw Motorola confidential

20   information.

21        Based on your review of all the materials in this

22   case, have you seen any indication that any of those people

23   who possessed or saw that Motorola information ever reported

24   to anyone at Hytera that they had that Motorola confidential

25   information?

Rangan - direct by New

1848

1    A.   Remarkably, I didn't see a single such instance.

2    Q.   Okay, Dr. Rangan.  We've just looked at some examples of

3    Motorola's information being spread among engineers.  I want

4    to shift a little and talk about Hytera management.

5         What is your understanding of the CEO, Mr. Chen's,

6    involvement in DMR development at Hytera?

7    A.   So he was really involved from the beginning.  He

8    identified DMR as the key road map for the company.  He was

9    involved in hiring G.S. Kok, Y.T. Kok, and Sam Chia, and then

10   maintained a detailed overview, if you like, of the project.

11   And is still involved in it today.

12   Q.   All right.  Let's look at some examples.

13        MS. NEW:  Let's go to Slide 35.

14        Thank you, Mr. Schlaifer.

15   BY MS. NEW:

16   Q.   And this shows PTX 416, which is already in evidence.

17        Did you rely on this document in reaching your

18   opinions?

19        MR. ALLAN:  Your Honor, may I have a continuing

20   objection to this line?

21        THE COURT:  Yes.

22        You may answer it.

23        THE WITNESS:  Oh.  Sorry.

24   BY THE WITNESS:

25   A.   Sorry.  Could you repeat the question?  I'm sorry.

Rangan - direct by New

1    BY MS. NEW:

2    Q.  Sure.

3            Can you just remind us what PTX 416 is.

4    A.  Oh, sure.  This is a presentation called "ID Driven" given

5    at Hytera.

6    Q.  Okay.  And this document contains a declaration from

7    Mr. Chen.  Do you see that?

8    A.  Yes, I do.

9    Q.  And what does Mr. Chen say in that declaration?

10   A.  So I want to walk you through a few of the points that --

11   here.

12           The first point, the first highlighted point -- let

13   me see if this works -- "DMR project is a new opportunity and

14   entry point . . ."

15           And it's ". . . critical to the future development of

16   the company."

17           So this is from Mr. Chen, and he is recognizing that

18   DMR is critical to the company.

19           He then says he wants to develop the next generation,

20   or the second generation of products, and he recognizes in the

21   final point that defeating Motorola is critical; that Motorola

22   is the key competitor, at least in the middle and high-tier

23   market.

24   Q.  Now, there's that reference to "developing the second

25   generation of products."  Can you explain what that refers to.

Rangan - direct by New

1850

1    A.   Sure.   This is actually important.

2           So the first part of that sentence here is that

3    Motorola has launched the first generation.   So Motorola had

4    been the first one to come out with DMR.   And this concept --

5    and this concept will come up again -- this whole idea is

6    really leapfrogging, building the second generation after

7    Motorola.

8    Q.   And what is the significance of this document, PTX 416, to

9    your opinions, Dr. Rangan?

10   A.   This recognizes at least that Mr. Chen has identified DMR

11   as critical and has recognized Motorola as a key competitor in

12   that segment of the market and wants to leapfrog Motorola.

13   Q.   Let's turn to PTX 429 and 426, but just -- please just

14   turn to them in your binder.

15          Okay.   So what are -- what are PTX 429 and 426?

16   A.   These are two e-mails from G.S. -- between G.S. Kok and

17   Sam Chia in 2007.

18   Q.   Okay.   So let's go to 429, which is already in evidence,

19   on the next slide.

20          What is discussed in this e-mail from G.S. Kok to

21   Mr. Chen?

22   A.   So this is in the end of June in 2007, and Mr. Kok is

23   still not an employee yet at Hytera -- at that Hytera.

24          And he writes -- Mr. Kok writes to Mr. Chen the

25   following e-mail.   I want to point out a few things.

1     He first says what I've highlighted here in blue:

2 that his team, his team at Motorola, had nearly 400 engineers,

3 and it took about four years to realize the DMR protocol.  All

4 right.  So that's what that says.

5     But, remarkably, what I've highlighted here in red,

6 he tells Mr. Chen that he could do it with at least -- with

7 just two years, half the time that Motorola took.

8 Q.   And just as a reminder, at this point in time, had Hytera

9 ever developed from scratch a digital two-way radio product?

10 A.   No, they had not.

11 Q.   Okay.  Let's look at PTX 426, and look at 4 -- the Pages 1

12 and 2.

13     What is discussed in the highlighted portion here,

14 Dr. Rangan?

15 A.   So this is an e-mail where Mr. Kok -- Mr. Chen replies

16 back to Mr. Kok and says, "for your position in Hytera" -- so

17 it's an offering of his position after he hears that he can do

18 it in two years' time -- that he would appoint him to the

19 chief head of the DMR group.

20 Q.   And if we go to the first page of PTX 426, what does

21 Mr. Kok say here to Mr. Chen?

22 A.   He says, in this case -- this is Mr. Kok talking to

23 Mr. Chen -- says, "I know that I mentioned two years earlier,

24 but that was under the assumption that I had my team."  "My

25 team" meaning the team from Motorola.

Rangan - direct by New

1852

1       But -- he says two interesting things here. The next

2 part, first of all, he says that actually it took 5.5 years to

3 develop the DMR product, and again he reiterates that it was

4 400 engineers at Motorola.

5       But he also says here that a lot -- that he can still

6 do it in two years because "a lot of things that were unknown

7 have been resolved."

8 Q.  And what does that mean to you, that "a lot of things that

9 are unknown have been resolved"?

10 A.  This, to me, is a suggestion that they are going to --

11 that he is suggesting to reuse the Motorola code to complete

12 this.

13 Q.  Okay.  So, just to do a level set here, at the time that

14 Motorola was developing its DMR radio, did Motorola have a lot

15 of experience with digital two-way radios?

16 A.  Yes.  Even before the DMR project, as you heard the

17 engineers speak, did work extensively, for example, in the

18 Astro project before this, and they had literally decades of

19 experience.

20 Q.  And did Motorola have a significant number of engineers

21 who were skilled or experienced in the areas that would be

22 needed to develop a DMR radio?

23 A.  Yes.  They were the absolute leaders in this space with

24 huge teams.  You've seen Mr. Kok point out at least 400 to 500

25 such engineers.

Rangan - direct by New

1853

1  Q.  And based on the materials that you've reviewed in this

2  case, would it have been obvious to Mr. Chen that Motorola is

3  really the market leader in developing digital two-way radios?

4  A.  Absolutely.  And that's what he identifies in assets in

5  that time frame.

6          THE COURT:  Who would be their nearest competitor?

7          THE WITNESS:  After Motorola?

8          THE COURT:  Yes.

9          THE WITNESS:  At that time, I do not know, actually.

10  I think there were -- I don't know if there were anyone at

11  that point in 2008.

12          THE COURT:  They were the leaders of unknown

13  corporations?

14          THE WITNESS:  Oh, I'm sorry.  They were the -- they

15  were the absolute leaders in the DMR at the time.

16          THE COURT:  Who was the nearest competitor?

17          THE WITNESS:  I think at that point there was not any

18  other competitor who had yet produced a DMR.

19          THE COURT:  So there was a leader in a field of one.

20          THE WITNESS:  I suppose.  The first one.

21          THE COURT:  Proceed.

22          MS. NEW:  Maybe I'll ask a different question.

23  BY MS. NEW:

24  Q.  Dr. Rangan, in -- in two-way radio communications, sort of

25  setting aside DMR, had Motorola been a market leader?

Rangan - direct by New

1854

1    A.   Yes, they had.

2    Q.   Okay.  Now, based on your review of 426, PTX 426 and

3    PTX 429, and your knowledge of Motorola's position in the

4    radio market, does it seem reasonable that G.S. Kok is

5    promising Mr. Chen that Hytera could develop a DMR product in

6    only two years when it took Motorola five and a half years and

7    400 engineers?

8    A.   Absolutely not.

9         Remember, Motorola is the market leader in this space

10   in digital two-way radios.  It has an enormous amount of

11   experience.  You would expect that any other company would

12   take at least as long as Motorola, not half the time.

13   Q.   And in your review of the evidence in this case and in

14   preparing your opinions, have you seen any documents or

15   e-mails where Mr. Chen questions G.S. Kok's estimate that it

16   would only take two years to develop a DMR product at Hytera?

17   A.   No, I did not.

18   Q.   Let's look at PTX 433, which is reflected on Slide 39.

19        Did you rely on this document in reaching your

20   opinion?

21   A.   Yes, I did.

22   Q.   Okay.  Dr. Rangan, what is this document?

23   A.   This is an e-mail dated in October of 2007, so shortly

24   after the ones that we just saw here.  And Mr. Chen writes an

25   offer discussion, basically providing the details of the offer

Rangan - direct by New

1855

1   that he will offer Mr. Kok should he come.

2           So he was trying to persuade, if you like -- at

3   least, from this e-mail it appears he is trying to persuade

4   Mr. Kok to come.  And in this, he offers Mr. Kok a very

5   generous package, if you like.

6           He offers him -- it was either 300,000 Hytera stocks

7   that would be worth some 10 million RMB for one year, and he

8   would get two years' such allocation, which is, of course, a

9   great deal of money.  That works out into U.S. dollars about

10  almost two and a half million U.S. dollars in stock options

11  for this.

12  Q.  Okay.  So let me just unpack that a little bit.

13          So there are two offers for shares in this e-mail,

14  right:  One for 300,000 for one year and 600,000 for two

15  years; is that correct?

16  A.  That's correct.

17  Q.  Okay.  And what does -- and Mr. Chen, what does he say the

18  value of those shares could be?

19  A.  30 RMB each.

20  Q.  Okay.  And you mentioned $2.5 million.  What amounts to

21  $2.5 million?

22  A.  Sorry.  If you take the 300,000 shares for two years and

23  each valued at 30 RMB -- that's the Chinese currency -- and

24  then you convert it to U.S. dollars, that amount would be

25  2.5 million U.S. dollars.

Rangan - direct by New

1856

1    Q.  Now, on top of the shares, is Mr. Chen also offering

2    G.S. Kok a salary?

3    A.  Yes, he is.  If you look at the bottom, it says, "Hytera

4    may offer you more wages than Motorola."

5           So in addition to this very generous stock offering,

6    he is offering Mr. Chen -- Mr. Kok an even higher salary.

7    Q.  And did -- was this e-mail sent after G.S. Kok had told

8    Mr. Chen he could develop a DMR product in only two years?

9    A.  Exactly.

10   Q.  So let's look at PTX 410 in your slides.

11          Did you consider this document in reaching your

12   opinion?

13          MS. NEW:  Let's take that down for a moment.

14          Thank you.

15   BY THE WITNESS:

16   A.  Yes, I did.

17   BY MS. NEW:

18   Q.  Okay.  And what is PTX 410?

19   A.  PTX 410 is an e-mail from Mr. G.S. Kok with -- in Hytera

20   around the end of July of 2009.

21   Q.  And is there any indication on PTX 410 that this is a

22   document that was provided from Hytera's files?

23   A.  Yes, it is.  In addition to it being a Hytera e-mail, it

24   also has Hytera Bates numbers on it.

25          MS. NEW:  Your Honor, Plaintiff moves to admit

Case: 1:17-cv-01973 Document #: 792 Filed: 12/20/19 Page 127 of 224 PageID #:53738
Rangan - direct by New
1857

1    PTX 410 into evidence.

2              THE COURT:  It is received and may be published.

3         (Exhibit No. PTX 410 was received in  evidence.)

4              MS. NEW:  Okay.  We can go to that next slide, Dave.

5              Thank you.

6    BY MS. NEW:

7    Q.  Can you explain what PTX 410 reflects, Dr. Rangan?

8    A.  Sure.

9              So at this point Mr. Kok has arrived at Hytera, and

10   he is informing the staff that he's now managing about one of

11   Mr. Chen's requests, if you'd like.

12             And one -- he informs them that Mr. Chen wants to --

13   has requested that all new products under his development will

14   require his personal approval before we can ship samples to

15   selected customers.

16   Q.  And what does PTX 410 indicate to you about Mr. Chen's

17   involvement in the DMR project?

18   A.  This e-mail suggests that Mr. Chen is deeply involved in

19   the product, at least to the point where he's doing approvals

20   on individual samples.  That means he would have to understand

21   the purchase orders, the customers, and perhaps the features

22   for these samples.

23   Q.  Okay.  Let's look at PTX 72 in your slides.

24             What is PTX 72, Dr. Rangan?

25   A.  This is an April 2010 e-mail with -- at Hytera with

Case: 1:17-cv-01973 Document #: 792 Filed: 12/20/19 Page 128 of 224 PageID #:53739
Rangan - direct by New
1858

1  meeting minutes.

2  Q.  Did you consider this document in reaching your opinions?

3  A.  Yes, I did.

4  Q.  And is there any indication on the document that it came

5  from Hytera's files?

6  A.  Yes.  You can see that it's a number of Hytera recipients

7  in the e-mail, and there's also a Hytera Bates number.

8        MS. NEW:  Your Honor, Plaintiff moves to admit PTX 72

9  into evidence.

10       THE COURT:  Was this exhibit produced by Hytera?

11       THE WITNESS:  Yes, it was, Your Honor.

12       THE COURT:  It is received and may be published.

13     (Exhibit No. PTX 72 was received in evidence.)

14       MS. NEW:  Okay.  So let's look at Page 5 of PTX 72.

15  BY MS. NEW:

16  Q.  What do these meeting minutes show regarding Mr. Chen's

17  role in the meeting?

18  A.  Sure.

19       There is a number of people at this meeting, and

20  Mr. Chen was one of several of those.

21       MS. NEW:  Okay.  Let's look at Page 7.

22  BY MS. NEW:

23  Q.  What is shown here, Dr. Rangan?

24  A.  Here, there's a number of points that I summarized for the

25  meeting.

1  I also highlighted this one, point 5, that Mr. Chen

2  requires that all of the project status and information of the

3  product should be notified to the senior management without

4  concealment; and if not, major punishments will be made.

5  Q.  And in your experience, Dr. Rangan, do company CEOs

6  typically get so involved in the product development or

7  product release that they threaten punishment to employees?

8  A.  No.  CEOs can get involved, but this obviously indicates

9  here that Mr. Chen wants to be so deeply involved that he is

10  willing to mete out punishment for -- if any information is

11  not disclosed to him.

12  Q.  Let's look at Slide 43, which reflects PTX 413.

13       MS. NEW:  Although, Dave, let's take that down for a

14  minute.

15       Thanks.

16  BY MS. NEW:

17  Q.  Did you consider PTX 413 in reaching your opinion?

18  A.  Yes, I did.

19  Q.  And what is PTX 413?

20  A.  This is another Hytera e-mail; in this case, dated August

21  of 2010.

22  Q.  And is there any indication on the document that it was

23  produced by Hytera from Hytera's files?

24  A.  Yes.  There's a Hytera Bates number, and it's also all

25  Hytera recipients in the e-mail.

Rangan - direct by New

1860

1    MS. NEW:  Your Honor, Plaintiff moves to admit

2  PTX 413 into evidence.

3    THE COURT:  It is received and may be published.

4    (Exhibit No. PTX 413 was received in evidence.)

5    THE COURT:  Do you know what languages Mr. Chen

6  speaks?

7    THE WITNESS:  According to his deposition, he said

8  that he both reads and writes English -- I mean -- sorry --

9  it's Chinese.

10    THE COURT:  So only Chinese?

11    THE WITNESS:  That's -- he was asked, I understand,

12  explicitly whether he --

13    MR. ALLAN:  I'll just object for the record,

14  Your Honor.  I think he said he speaks Chinese only.

15    THE WITNESS:  Yeah, sorry.

16    MR. ALLAN:  I want the record clear.

17    THE WITNESS:  In his deposition, to be clear -- in

18  his deposition, he had stated -- he was asked --

19    THE COURT:  Well, I'll just put it, is there a

20  stipulation that Mr. Chen speaks only Chinese?  Is that a

21  stipulation?

22    MS. NEW:  No, it is not, Your Honor.

23    THE COURT:  All right.  It's a challenged issue.

24    You may proceed.

25    MS. NEW:  So we move to admit PTX 413, Your Honor.

Rangan - direct by New

1861

1     THE COURT:  The reason I bring it up is:  With

2  respect to the minutes of the board of directors meeting, was

3  that a translated version?  It was -- the meeting was

4  conducted in Chinese and then there's some translation into

5  English, which is contained within the exhibit?

6     MS. NEW:  This may be a translated document.  We can

7  check very quickly, Your Honor.

8     I can also maybe clear this up by asking the witness

9  another question.

10     THE COURT:  Well, my concern is use of the word

11  "punishment" in English may have some Chinese connotation

12  different.  But I'll leave that to capable counsel to deal

13  with.

14     MS. NEW:  Sure.

15  BY MS. NEW:

16  Q.  Dr. Rangan, I immediately want to ask you this:  The

17  document that we were looking at related to punishment, which

18  I believe was PTX 72, were these meeting minutes written by

19  Mr. Chen or were they written by somebody else?

20  A.  I believe these were written by someone else.

21  Q.  Okay.  All right.  So let's go to PTX 413, which is

22  Slide 43.

23     MS. NEW:  And, Your Honor, very quickly, for the

24  record, PTX 413 was a translated document.

25     THE COURT:  Yes.

Rangan - direct by New

1862

```
 1              Proceed.
 2              MS. NEW:  Or is a translated document.
 3    BY MS. NEW:
 4    Q.   Okay.  So, Dr. Rangan, did Mr. Chen receive this e-mail,
 5    PTX 413?
 6    A.   Yes, he did.
 7    Q.   Okay.  Let's look at Page 5.
 8              What does this show?
 9    A.   I'll point out a few things here.
10              In the first part of this e-mail, it states here that
11    Mr. Chen had a telephone conference with one of the U.S. --
12    with the U.S. office.
13              It then goes on to say here that he had made two
14    requests to the U.S. office about advertisement expenditures.
15              And then in the third part, he discusses the
16    competition with MOTOTRBO products on a bid.
17              And then, finally, that he is communicating with
18    Mr. Y.T. Kok regarding some DMR issues.
19    Q.   And what does this document, PTX 413, tell you about
20    Mr. Chen's involvement in the DMR product at Hytera?
21    A.   Again, this is indication that Mr. Chen is deeply involved
22    in the DMR project, so much so that he is, for example,
23    contacting individually the international offices; he is
24    overseeing the advertisement expenditures; tracking
25    competition, and even speaking to the engineering staff.
```

Rangan - direct by New

1863

1  Q.  Let's go to the next slide and look at PTX 404, which is

2  already admitted.

3         Did you consider this document in reaching your

4  opinion?

5  A.  Yes, I did.

6  Q.  And can you explain what this document is.

7  A.  So Mr. -- this is an e-mail from a Hytera employee,

8  Mr. Sam Guan, in 2015, and Mr. Guan has just joined Hytera.

9         He's gone on, you could say, an orientation for two

10 weeks, and after this, he writes Mr. Chen personally and

11 attaches a summary of his experiences.

12 Q.  And if we go to Page 10 of PTX 404, what does Sam Guan say

13 specifically here?

14 A.  So this is his summary, if you like, of -- after his

15 two-week orientation.  He says here that he was invited to

16 meet Mr. Chen personally, and Mr. Chen had told him, according

17 to this, that he suggested -- remember, Mr. Guan is coming

18 from Motorola -- that he suggested to keep observing,

19 listening, studying, and putting forward my suggestions for

20 Hytera, based on his experience gained in Motorola.

21 Q.  And does Mr. Guan actually put forward some suggestions

22 based on his experience at Motorola?

23 A.  Yes, he does.

24         MS. NEW:  All right.  Let's go to the next slide.

25 Let's take a look at that.

Rangan - direct by New

1864

BY MS. NEW:

Q.　All right.　Dr. Rangan, can you explain what Mr. Guan is sharing here about Motorola.

A.　Sure.

So what he does is he goes on to describe a feature that is under development at Motorola.　This is this over-the-air update.　He provides some technical details about that feature, and then even further suggests that he is willing to talk to technical engineers about Hytera -- at Hytera to provide more details.

Q.　And in your experience, Dr. Rangan, are features or products that are under development at a company typically kept confidential?

A.　Absolutely.

Q.　And in your experience, does the chairman or the CEO of a company typically ask new hires to share information regarding ongoing R&D being done by a competitor?

A.　No.　Of course, that would be extremely inappropriate.

Q.　So what does PTX 404 tell you about Mr. Chen's involvement with Hytera's DMR product?

A.　What it shows here is that Mr. Chen is openly encouraging the new employees from Motorola -- remember, this is already much later, 2015 -- and at that point still openly encouraging the employees to share their experiences at Motorola, and at least this employee feels free to reveal confidential

Rangan - direct by New

1    information about features under development.

2    Q.   Now, Dr. Rangan, do you understand that Hytera's -- one of

3    Hytera's positions in this case is that G.S. Kok, Y.T. Kok,

4    and Sam Chia were fired because they wouldn't cooperate with

5    Hytera or talk to anyone at Hytera after the litigation began?

6    A.   Yes.

7    Q.   And have you seen evidence to contradict that?

8    A.   Yes, I have.

9    Q.   Let's look at PTX 233, which is also in evidence.

10            And, Dr. Rangan, did you consider this -- did you

11   consider this document in reaching your opinions?

12   A.   Yes, I did.

13            MS. NEW:   Okay.  If we could go to the next slide,

14   Dave.

15            Thank you.

16   BY MS. NEW:

17   Q.   So can you explain what PTX 233 is.

18   A.   This is much later.  This is May 2017.  And in this

19   e-mail, Mr. Chia writes directly to Mr. Chen an e-mail titled

20   "Summary of my disappointments," and he emphasizes that he

21   wants this e-mail to be private.

22   Q.   Now, the document is -- excuse me -- the e-mail is dated

23   May 2017.  Can you give a little context about that timing

24   vis-à-vis the filing of the lawsuit.

25   A.   This was just one to two months after this lawsuit that

1   you're here today was filed.

2   Q.   And -- now, Mr. Chia titles the e-mail "Summary of my

3   disappointments."

4        Does he explain to Mr. Chen why he is disappointed?

5   A.   Yes, he does.  He gives a number of reasons, but I really

6   want to walk you through slowly the fourth reason, which I

7   think is revealing.

8        He says here -- he references that this lawsuit has

9   begun just one month prior, and he's been identified as a key

10  witness, feeling a lot of pressure.

11       Now, he doesn't go on to deny the accusations that

12  are placed him in this e-mail.

13            THE COURT:  Are you referring to an exhibit that

14  you're looking at as you make this statement?

15            THE WITNESS:  Yes, I am.  I'm reading from here.

16            THE COURT:  You're reading?

17            THE WITNESS:  For the first sentence, yes.  Fourth

18  major item is the company --

19            MR. ALLAN:  We'd object, Your Honor.  First of all,

20  there's no technical information in this at all, and he is

21  editorializing.

22            THE COURT:  It's improper narration.  Sustained.

23  BY MS. NEW:

24  Q.   Dr. Rangan, so in this first line -- or -- excuse me -- in

25  this second section you've -- you have underlined, it says --

Rangan - direct by New

1   Mr. Chia says that he had approached G.S. three times

2   requesting to align their stories.

3           Based on your review of the material in this case,

4   what does that mean to you?

5   A.  First of all, based on the -- this e-mail itself, the

6   three indicate here -- refers to Mr. Y.T. Kok, G.S. Kok, and

7   Sam Chia.

8           And in this case here, it's saying not to align our

9   stories, in this case, relative to this particular -- the

10  allegations in this lawsuit.

11  Q.  And he also -- Mr. Chia also says that he --

12          THE COURT:  What specifically in the exhibit that

13  you're looking at -- are you referring to when you make that

14  statement?

15          THE WITNESS:  Well, just --

16          THE COURT:  Looking at the exhibit.

17          THE WITNESS:  Yes.  Sorry, Your Honor.

18          The beginning of the exhibits, it refers to a

19  companywide lawsuit.  And the aligning the stories, then,

20  naturally would be related -- and -- sorry -- and Mr. Chia has

21  been identified as a witness in that lawsuit.  That's the

22  first line of this.  And then the aligning of the stories,

23  then, by implication would be the stories related to his

24  witness as that, as a member in that lawsuit.

25          MR. ALLAN:  I object, Your Honor.  This line of

Rangan - direct by New

1868

1    questioning is not technical.

2            THE COURT:  The answer may stand, and of course you

3    may cross-examine with respect to it.

4            Please proceed.

5    BY MS. NEW:

6    Q.  Okay.  And then the next thing Mr. Chia says is -- if you

7    go to the last sentence of that first paragraph, he says that

8    he doesn't feel that the risk to reward when deciding to join

9    this company was not properly balanced.

10           What does that mean to you?

11   A.  It would mean to me that there was a risk and reward at

12   the time of joining the company, and because of the -- that

13   this is appearing in this particular paragraph, that the risk

14   and reward is associated, at least, in some manner with the

15   items in the lawsuit.

16   Q.  And those items in the lawsuit, does that mean the

17   Motorola confidential information and source code?

18   A.  Yes, because those are the items in the lawsuit.  Correct.

19   Q.  Okay.  And then he also --

20           MR. ALLAN:  I object, Your Honor.  Speculation.

21           THE COURT:  Leading.

22           MR. ALLAN:  Leading and speculation.

23           THE COURT:  Sustained.

24   BY MS. NEW:

25   Q.  Dr. Rangan --

Rangan - direct by New

1869

1    THE COURT:  Some of these questions have a tendency

2  to lead, Counsel.

3  BY MS. NEW:

4  Q.  Dr. Rangan, you see where it says -- Mr. Chia says that he

5  believes there is a risk in going to jail.

6    Do you see that?

7  A.  Yes, I do.

8  Q.  Okay.  In your experience in the industry working at

9  technology companies, is there typically a risk -- does an

10  employee typically face a risk of going to jail when leaving

11  one company to join a competitor?

12    MR. ALLAN:  Leading, Your Honor.

13    THE COURT:  Sustained.  Rephrase the question.

14  BY MS. NEW:

15  Q.  Dr. Rangan, there is a reference here to Mr. Chia feeling

16  that there's a risk in going to jail.  Does that seem abnormal

17  for you, based on your work in the industry?

18    MR. ALLAN:  Objection.

19    THE COURT:  Sustained.

20  BY MS. NEW:

21  Q.  Dr. Rangan, what do you interpret the words "a risk in

22  going to jail" to mean?

23  A.  My interpretation is that for whatever actions he has done

24  in coming to Hytera, that he is now feeling a risk, because of

25  this lawsuit, to go to jail.

Rangan - direct by New

1   Q.  And based on your experience, is that an atypical concern

2   from simply going from one company to another?

3               MR. ALLAN:  Objection.

4               THE COURT:  Sustained.  Leading.

5               Just a minute.

6   BY MS. NEW:

7   Q.  No, Dr. Rangan.  That's fine.

8               Now, in this e-mail, does Mr. Chia provide any --

9               THE COURT:  I'm not preventing you from going into

10  the area.  It's just the form of the question.

11  BY MS. NEW:

12  Q.  In this e-mail, does Mr. Chia provide any information

13  about why he is concerned about going to jail?

14              MR. ALLAN:  Objection, Your Honor.

15              THE COURT:  Overruled.

16              You may answer.

17  BY THE WITNESS:

18  A.  I'm sorry.  Can you repeat the question?

19  BY MS. NEW:

20  Q.  Sure.

21              Does Mr. Chen provide -- or -- excuse me.  Does

22  Mr. Chia provide any information to Mr. Chen about why he is

23  concerned about the risk of going to jail?

24  A.  No, I did not read any such information.

25  Q.  Okay.  And does Mr. Chia make any reference at all to why

Rangan - direct by New

1871

1    he feels he would be implicated or could go to jail?

2    A.  No, he does not.

3    Q.  And does he provide any detail to Mr. Chen regarding why

4    he needs to align stories with G.S. Kok and Y.T. Kok?

5              MR. ALLAN:  Leading, Your Honor.

6              THE COURT:  Sustained.

7    BY MS. NEW:

8    Q.  Dr. Rangan, does Mr. -- does Mr. Chia provide any

9    context --

10             THE COURT:  Instead of saying "does," if you said

11   "what does," it might help a little.

12   BY MS. NEW:

13   Q.  Dr. Rangan, what does Mr. Chia provide in terms of detail

14   to Mr. Chen about his concern about his risk of going to jail?

15   A.  There's very minimal context that I could read in this

16   e-mail.  There isn't much detail about his particular concern

17   for going to jail, for example, in this.

18   Q.  And what do Mr. Chia's statements in this e-mail to

19   Mr. Chen indicate to you?

20   A.  The fact -- one thing about this is that -- the fact that

21   Mr. Chia did not need, or at least in this e-mail, to provide

22   much context about the nature of his concerns suggests to me

23   that someone reading this e-mail would not need to understand

24   that context to understand the concerns about a lawsuit that

25   is involving Motorola confidential and proprietary information

Rangan - direct by New

1872

1    being at Hytera.

2    Q.   Now, we just looked at PTX 233.  Have you seen any other

3    evidence that contradicts the claim that G.S. Kok, Y.T. Kok,

4    and Sam Chia wouldn't talk to or cooperate with Hytera after

5    this lawsuit was filed?

6              MR. ALLAN:  Objection.

7              THE COURT:  Sustained.  Form of the question.

8              Members of the -- members of the jury, we'll take a

9    little break here, about ten minutes or so.

10             The witness may leave the stand.

11             Counsel, please remain.

12      (Jury out.)

13             THE COURT:  Court is in session.  Please be seated.

14             On this issue of jail, is this a preliminary touching

15    on the issue of the assertion of the Fifth Amendment?

16             MR. ALPER:  It is not, Your Honor.

17             THE COURT:  Well, I expect that somewhere along the

18    way there will be an instruction to the jury on the assertion

19    of the Fifth Amendment by Mr. Chia and others.

20             MR. ALPER:  Yes, Your Honor.

21             THE COURT:  All right.  But you're not reaching that

22    point by this inquiry?

23             MR. ALPER:  Exactly.  This inquiry does not -- will

24    not touch on that particular issue, but there will be an

25    instruction on that issue.

Rangan - direct by New

1873

1       THE COURT:  All right.  Do you want to say anything

2   about that, Counsel?

3       MR. ALLAN:  Well, if we're going to talk about the

4   testimony, I'd ask the witness to leave the room, Your Honor.

5       THE COURT:  Where is he?

6       Would you step out, please.

7   (Witness exited the courtroom.)

8       MR. ALLAN:  Your Honor, I think --

9       THE COURT:  You've satisfied my inquiry.  I just

10  wanted to see where we were headed with this.

11      There is nothing wrong with what counsel has been

12  touching on, at least insofar as I have not -- not sustained

13  objections and so on.

14      But on the issue of the assertion of the Fifth

15  Amendment, we will in due course have to deal with that and

16  the instruction ultimately to be given to the jury.

17      MR. ALLAN:  Yes, Your Honor.

18      I'd just renew our objection, though, to this line of

19  testimony with this witness.  This is not a technical

20  document.  It's a document related to the man's depression.

21  There's absolutely zero technical analysis.  Anybody could go

22  up and editorialize like this witness is doing, and I think

23  it's improper.  It's not proper expert testimony for him to be

24  doing this.

25      And we would -- we would ask that this line of

Case: 1:17-cv-01973 Document #: 792 Filed: 12/20/19 Page 144 of 224 PageID #:53755
Rangan - direct by New
1874

1    questioning stop and a curative instruction be provided.

2         THE COURT:  The -- I don't think a curative

3    instruction is necessary.  The objection is overruled.

4         And you can go into these areas on cross-examination,

5    and ultimately there will be an instruction to the jury in

6    terms of dealing with the credibility of 702 witnesses.

7         All right.  You have reserved the issue for purposes

8    of the appeal, if one were to be made in this case, which is

9    essentially inconceivable.

10        (Laughter.)

11             THE COURT:  Thank you, Counsel.

12             MR. CLOERN:  Thank you, Your Honor.

13             MR. ALLAN:  Thank you, Your Honor.

14        (Change of reporter.)

15

16

17

18

19

20

21

22

23

24

25

Rangan - direct by New

1875

1     (Proceedings heard in open court.  Jury in.)

2          THE COURT:  Please proceed.

3     BY MS. NEW:

4     Q.  Welcome back, Dr. Rangan.  Before the break, we were

5     talking about PTX 233, and I just want to ask you:  Do you

6     have an opinion on whether Sam Chia writing to his boss and

7     saying he's worried about going to jail is either typical or

8     atypical in your industry?

9     A.  That's completely atypical.  I've never heard of such a

10    scenario before.

11    Q.  And why is that?  Why is it atypical?

12    A.  This -- typically, engineers do not typically face a risk

13    of going to jail for the actions that they -- normal actions

14    that they provide.

15    Q.  Did you see any other evidence that contradicts -- excuse

16    me.  Have you seen any other materials or documents in this

17    case that contradict the idea that G.S. Kok, Y.T. Kok, and Sam

18    Chia wouldn't cooperate with Hytera after this litigation was

19    filed?

20    A.  Yes.  The way in which the three of them were terminated.

21    Q.  How did Hytera handle the termination of G.S. Kok, Y.T.

22    Kok, and Sam Chia?

23    A.  At least around --

24          THE COURT:  Is there some foundation, foundation for

25    the answer of the witness on that point?

Rangan - direct by New

1876

1    MS. NEW:  Sure, your Honor.  We were going to get to

2    some documents, but we'd be happy to put them up now.

3    THE COURT:  All right.  So you will tie this up with

4    documents?

5    MS. NEW:  Absolutely, your Honor.

6    THE COURT:  All right.  Proceed subject to tying it

7    up.

8    BY MS. NEW:

9    Q.  How did Hytera handle the termination of G.S. Kok, Y.T.

10   Kok, and Sam Chia?

11   A.  The three individuals remained in employment of Hytera

12   approximately one and a half years after the lawsuit was

13   filed.

14   Q.  And as the founder of a company and a person who's held

15   roles at the director level at an engineering company, what

16   would you expect a corporate officer in Mr. Chen's position to

17   do after receiving this email, PTX 233?

18   A.  This is a very, very serious occurrence, such a lawsuit.

19   You would imagine if the three individuals were implicated,

20   they would be terminated immediately, and the company would

21   try to vigorously root out the core problem.

22   Q.  What is your understanding of the circumstances under

23   which G.S. Kok, Y.T. Kok, and Sam Chia were eventually fired

24   from Hytera?

25   A.  It's my understanding that they were fired eventually for

Rangan - direct by New

1877

1   not cooperating with the investigation, not specifically for

2   stealing the material underlying the original cause.

3   Q.  And that material, is that Motorola's confidential

4   information?

5   A.  Yes, it is.

6   Q.  All right.  Let's look at PTX -- and if you could just

7   turn to the slide on your own, Dr. Rangan.  Let's look -- and

8   I apologize.  Let's look at PTX 487, 489, and 491 which are in

9   evidence.

10          MS. NEW:  So Dave, we can go to the next slide.

11   BY MS. NEW:

12   Q.  Did you consider these documents in reaching your opinion?

13   A.  Yes, I did.

14   Q.  Okay.  Can you explain what PTX 487, 489, and 491 are?

15   A.  Yes.  These are the termination agreements for -- from

16   Hytera for Sam Chia, Y.T. Kok, and G.S. Kok.

17   Q.  And according to the termination agreements reflected

18   here, when were these three individuals fired from Hytera?

19   A.  October 23rd, 2018, about 18 months after this litigation

20   began.

21   Q.  Were G.S. Kok, Y.T. Kok, and Sam Chia paid a salary for

22   the year and a half between when Motorola filed its complaint

23   in this case and the date they were fired in October of 2018?

24   A.  Yes, they were.

25   Q.  And were they also given a severance package at the time

Rangan - direct by New

1878

1    they were terminated?

2    A.  Yes, they were.

3    Q.  All right.  Let's look at DTX 5037.  Dr. Rangan, did you

4    rely on this document in reaching your opinion?

5    A.  Yes, I did.

6    Q.  What is DTX 5037?

7    A.  This is an interrogatory response from Hytera, so this is

8    a court filing from Hytera which discusses the compensation of

9    G.S. Kok, Sam Chia, Y.T. Kok, and others.

10            MS. NEW:  And your Honor, at this time, plaintiff

11   moves to admit DTX 5037 into evidence.

12            THE COURT:  It is received and may be published.

13       (Defendant's Exhibit 5037 received in evidence.)

14            MS. NEW:  Okay.  Let's go ahead and pull up that

15   slide, Dave.  Thank you.

16   BY MS. NEW:

17   Q.  What Dr. Rangan, what does DTX 5037 show?

18   A.  This shows the compensation for these three individuals of

19   various types.

20   Q.  Okay.  Let's just kind of go column by column.  Okay.  So

21   for all three employees, we see their names down the left.

22   What is -- what is in that "annual salary" column?

23   A.  That's the annual salary for each of the employees.

24   Q.  Okay.  And what does the designation "RMB" at the top of

25   the interrogatory response indicate?

Rangan - direct by New

1879

1   A.  This is the salary converted to the Chinese currency, RMB.

2   Q.  And for what years were G.S. Kok, Y.T. Kok, and Sam Chia

3   paid a salary after the lawsuit began?

4   A.  G.S. Kok, they were both -- they were all paid salaries

5   for the one and a half years.  That's for 2017 and 2018.

6   Q.  Now, we don't see a salary here for G.S. Kok for 2018.  Do

7   you know why that is?

8   A.  My understanding is that he was transferred to a different

9   business unit, but that business unit is still in Hytera, so

10  that number should have been available.

11  Q.  And then there's an "annual bonus" column.  Can you

12  explain what that means to you?

13  A.  This is an annual bonus in addition to the salary that's

14  given to each of the employees.

15  Q.  Now we go, if we go all the way to right it says,

16  "compensation after departure."  What does that mean to you?

17  A.  This is various further money they were received after

18  they were -- after their employment was terminated.

19  Q.  What is reflected in the "Dismissal" column?

20  A.  This is essentially a severance bonus, if you like, for

21  each of the employees.

22  Q.  Then there's also an "other" column.  What's reflected

23  there in the "other" column?

24  A.  This was a further amount of money given under the

25  contractual obligations of the -- of the termination

Rangan - direct by New

1880

1  agreement.

2  Q.  Okay.  And it says under each of the amounts, "Total for

3  12 months."  Do you know what -- do you know what is the

4  source of that 12 months?

5  A.  This is the -- this is the 12 months after they were

6  terminated.

7  Q.  And are you -- do you know whether G.S. Kok, Y.T. Kok, and

8  Sam Chia had to sign any agreements that would bind them to

9  the company for 12 months?

10 A.  Yes.  Sorry.  It's from that agreement that -- this

11 binding agreement for them to receive this money.

12 Q.  Is that a noncompete clause?

13 A.  Yes, sorry.  A noncompete clause.

14 Q.  So these amounts here are in RMB and pounds.  Did you do a

15 conversion of these numbers from RMB and pounds to U.S.

16 dollars?

17 A.  Yes, I did.

18 Q.  Okay.  And if we go to the next slide, Dr. Rangan, after

19 this lawsuit was filed, how much money were G.S. Kok, Sam

20 Chia, and Y.T. Kok paid by Hytera?

21 A.  So if you sum up those three items that I mentioned -- the

22 salary, the bonus, the severance package and the noncompete

23 clause money -- I've shown the total amounts in the right.

24 G.S. Kok -- I'll read them into the record -- received at

25 least $303,507.  For him, remember, we are not including the

1  2018 salary or bonus.

2          For Sam Chia, $331,141; and for Mr. Y.T. Kok,

3  $184,799.

4  Q.  And Dr. Rangan, do you have an opinion on whether

5  engineers who are being fired, being paid this amount of money

6  is typical or atypical?

7  A.  This is completely atypical, specific -- especially given

8  the nature of which they -- the reasons for which they should

9  have been fired.

10 Q.  And what are those reasons?

11 A.  For stealing Motorola confidential and proprietary

12 information.

13 Q.  Now, if we go to the next slide, these are -- this is

14 reflected here on the slide as PTX 491 and 489.  And they look

15 to be identical.  Can you just read from Sam Chia the language

16 that you've highlighted here?

17 A.  Sure.  So this is the agreement, part of their termination

18 agreement.  And here it says, "Employee undertakes not to

19 damage the interests and interest of employer" -- that's

20 Hytera in this case -- "not to disclose in any way the

21 information about Party A's trade secrets and business

22 contracts -- contacts, ongoing litigation disputes, as well as

23 other information that may cause losses to Party A upon

24 disclosure."  Party A in this case is Hytera.

25 Q.  And what does this portion of the termination agreements

Rangan - direct by New

1882

1    mean to you?

2    A.   This suggests to me that they are being contractually

3    obligated, as it says here, to not cooperate with ongoing

4    litigation disputes.  And that would, my reading, include

5    litigation disputes like this one.

6    Q.   Okay.  Dr. Rangan, I want to turn to your second opinion

7    which is that Hytera could not have independently developed a

8    DMR product without accessing or using Motorola's trade

9    secrets.

10            Dr. Rangan, what is your -- to kind of set the stage

11   here, what is your understanding of the basis of Hytera's

12   claim that it could have independently developed a DMR radio

13   without Motorola's trade secrets?

14   A.   So my understanding of their claim is the following:  That

15   prior to the arrival of G.S. Kok, Y.T. Kok, and Sam Chia in

16   2008, they had a prototype which you could consider, say, a 75

17   percent complete prototype.  And from that prototype, there

18   are two potential scenarios where you can go to a commercial

19   project -- product.

20   Q.   And can you explain those two scenarios, please?

21   A.   Sure.  In the first scenario, the prototype had an FPGA,

22   and you would continue with that design including the FPGA and

23   then launch a commercial project -- product in March 2010.

24   Remarkably, that's the same date that they actually released

25   their first product, so in no loss of time even though they

Rangan - direct by New

1    are not using the Motorola appropriated trade secrets.

2         In the second scenario, they would modify the

3    prototype to remove the FPGA.  This is actually what did --

4    the real final system did not have an FPGA.  And then in this

5    case because of the modifications, they would launch

6    approximately six months later, in September 2010.

7    Q.   Based on your experience and your review of all of the

8    material and information in this case, do you think either

9    scenario is possible?

10   A.   No, I do not.

11   Q.   Why not?

12   A.   Because both scenarios are predicated on the concept that

13   there's a 75 percent complete prototype in 2008, and I simply

14   did not see in my analysis any evidence of that.

15   Q.   Okay.  So you've used the term "prototype."  I think we've

16   heard it before from a couple other witnesses.  Can you

17   explain what a prototype is?

18   A.   Sure.  Typically, when you're developing a project --

19   product, a prototype is an earlier version that has most of

20   the functionality that you expect in the final version but

21   still needs perhaps to be miniaturized or perhaps more

22   testing.

23   Q.   Okay.  And just to make sure it's clear, what is your

24   understanding of Hytera's position on whether it had a

25   prototype prior to the arrival of G.S. Kok in February of

Rangan - direct by New

1   2008?

2   A.  It's my understanding that they believed they had what

3   they call, characterized as a 75 percent complete prototype.

4   Q.  Okay.  And have you seen this alleged prototype?

5   A.  No, I have not.

6   Q.  Do you -- we've heard a little bit about Hytera's expert,

7   Mr. Grimmett.  Are you aware of whether Mr. Grimmett has seen

8   this prototype?

9   A.  He has not either.

10   Q.  Have you seen pictures of this prototype?

11   A.  No, I have not seen physical or -- versions or pictures of

12   the prototype.

13   Q.  Were you able to go to Hytera and inspect the prototype?

14   A.  No, I was not either able to go to Hytera or its counsel's

15   office to actually inspect one.

16   Q.  And were you ever able to do any tests on any prototype?

17   A.  Since it didn't physically exist, I could not do any test.

18   Q.  And given that the prototype was allegedly 75 percent

19   complete, would you expect Hytera to be able to produce and --

20   to find it and produce it in this case?

21   A.  Absolutely.

22   Q.  What is your understanding of what companies typically do

23   with a prototype that is -- would be that far along?

24   A.  Given -- had they actually completed a prototype that was

25   75 percent complete, that's quite a significant

Rangan - direct by New

1885

1    accomplishment, and you would expect the company to keep it at

2    least as a souvenir of that accomplishment because it would

3    have been so significant.

4    Q.   Now, it's been 11, almost 12 years since 2008.  Would you

5    expect Hytera to have kept the prototype for that long?

6    A.   Yes.  For example, at Flarion, we had developed prototypes

7    dating back even to 2002, and they're still in the display

8    case at Qualcomm that ended up acquiring us.

9    Q.   All right.  Let's take a look at PTX 421 on your next

10   slide.  Did you rely on this document in reaching your

11   opinion, Dr. Rangan?

12   A.   Yes, I did.

13   Q.   Okay.  And what is PTX 421?

14   A.   This is an email in February 2008 sent to Mr. Chen, a

15   Hytera email.

16   Q.   Okay.  And is there any indication that PTX 421 is a

17   Hytera document produced from Hytera's files?

18   A.   Yes.  It has -- it has Hytera email recipients as well it

19   has a Hytera Bates number.

20        MS. NEW:  Plaintiff moves to admit PTX 421 into

21   evidence.

22        THE COURT:  It is received and may be published.

23      (Plaintiff's Exhibit 421 received in evidence.)

24   BY MS. NEW:

25   Q.   Let's go to this next slide.  Thank you.

Rangan - direct by New

1886

1       Dr. Rangan, what does G.S. Kok say to Mr. Chen in

2   this email?

3   A.  So this is about, to put it in context, about two weeks

4   prior to Mr. -- after Mr. Kok has arrived at Hytera.  And at

5   that time, he would have had an opportunity to look at the

6   work that had been done prior to his arrival, and this email

7   was discussing that.

8       He says here, I'll first go to the red highlighted

9   part:  "I'm surprised also to find out that we do not have a

10  prototype after three years.  In addition, that each circuit

11  block needs to be merged and a new board layout."

12      He also states here that, "In my first review, the

13  radio part count was greater than 1100 parts."  That's the

14  radio part count of a board that they are planning on

15  building.

16      Finally, at the end here, he instructs the team a

17  number of instructions.  And I want to highlight the sixth one

18  here, which is that the team will need an injection of subject

19  matter experts, and he suggests getting them here from

20  Motorola.

21  Q.  Based on your review of this email, Dr. Rangan, is there

22  any indication that G.S. Kok did not understand how Hytera had

23  developed its alleged prototype?

24  A.  No.  In fact, there's some technical details in the email

25  and further emails that confirm that he did understand it.

Rangan - direct by New

1  Q.  Do you see any mention from Mr. Kok about any problems

2  communicating with the team due to language barriers?

3  A.  No.  In fact, you see that he's, in fact, communicating

4  with the team.

5  Q.  And did you see any indication in this email that G.S. Kok

6  does not understand the hardware that Hytera was using at the

7  time?

8  A.  No, I do not.

9  Q.  And there's a -- the reference here to the part count

10 being greater than 1100, what, if anything, does that

11 reference indicate to you about whether Hytera had a prototype

12 in February 2008?

13 A.  This case, based on my other analysis, this is related to

14 a part count for a board that they're potentially planning on

15 building, not for one that's in existence right now.

16 Q.  Do you under -- do you have an understanding of why Hytera

17 decided not to commercialize the prototype that was allegedly

18 75 percent complete in February of 2008?

19 A.  My understanding was that Mr. G.S. Kok and then later

20 Mr. Chia's suggestion to abandon that work and then basically

21 start from scratch.

22 Q.  Now, based on your engineering management and overall

23 business experience, if a company invested three years

24 developing a prototype and it was 75 percent complete, is it

25 typical or is it atypical for all of that work to be

Rangan - direct by New

1888

abandoned?

A.   That would be extremely atypical.  Had they actually

achieved 75 percent functionality, that would be an enormous

amount of development time and cost that would have been sunk

into this that would be basically thrown out.  You just simply

cannot undertake that decision easily.

In addition, you would expect there to be significant

discussion amongst the engineering management as well as the

business management maybe up to the Board given the importance

of this company before you would discard such an amount of

progress.

Q.   Now, given that you haven't seen the prototype that Hytera

says it had, what evidence did Hytera -- excuse me, what

documents did Hytera actually provide to support its

contention that it had a prototype?

A.   So since there was no physical prototype to actually

inspect or test, all of my analysis is based on the documents,

the paper versions of what was actually available.

Q.   And based on your review of those documents, would Hytera

have been able to independently develop a DMR product without

using or accessing Motorola's trade secrets?

A.   No.  That's my conclusion.

Q.   Okay.  And what are the reasons for that?

A.   Sure.  So there's really -- I've tried to categorize it

into four high-level reasons.  The first is that there's no

Rangan - direct by New

1  architecture or framework for this.  That's the overall way

2  that the whole product would have been architected.

3         The protocol stack was not complete.  In fact, it was

4  extremely limited.  There was no demonstration of

5  interoperability.  And the source code, the way it was

6  structured, was fundamentally flawed and would prevent any

7  further progress.

8  Q.  All right.  So let's go to that first reason which is that

9  there was no architecture or framework.  Can you explain what

10  you mean by "no architecture or framework"?

11  A.  Yes.  So you may recall Mr. Lund's presentation where he

12  describes architecture or framework in the context of a large

13  commercial office building.  And when you build a large

14  building, of course, you would have blueprints.  You would lay

15  a foundation and then put all the structural framework as well

16  as plumbing, electrical, and so on.

17         Large pieces of complex software like a DMR radio are

18  similar.  They need that framework to basically assemble all

19  the complex modules that will go into that software.

20  Q.  Let's look at PTX 1261 on the next slide.  And this

21  document has already been admitted.  And we're looking at Page

22  9.  What are the components of architecture or framework that

23  we can see here in this document?

24  A.  This is a high-level block diagram of one of the

25  components of the DMR system.  Each block in this represents

Rangan - direct by New

1    in itself a large complex software module.  And the framework

2    is a part that structures this all together.

3           I wanted to point out that several of the trade

4    secrets at issue in this case are these structural framework

5    aspects; for example, the HAL, the hardware abstraction layer;

6    the operating system; Darwin; the DSP framework; and that

7    virtual radio interface standard.

8    Q.  And just to be clear, I'm not sure I caught that you said

9    this.  This is a Motorola document, correct?

10   A.  Oh, I'm sorry.  Yes, this is Motorola's architecture.

11   Q.  Okay.  And would you -- if Hytera had a prototype that was

12   75 percent complete, would you or would you not have expected

13   to see some of these components present in the documents

14   provided by Hytera?

15   A.  Absolutely.  Different designers can choose different

16   types of architecture, but some architecture with at least

17   some of these types of components you would expect in any

18   product that's going towards commercialization.

19   Q.  And did you see any evidence of any of these components,

20   any components of framework or architecture in the documents

21   or materials related to Hytera's development efforts before

22   February 2008?

23   A.  Remarkably, no.  That was really one of the shocking

24   things to find when I first started looking at this material,

25   that complete absence of that -- of those architectural

Rangan - direct by New

1891

1 framework components.

2 Q.  Now, one of the components you mentioned is an operating

3 system.  Can you just explain why an operating system would be

4 necessary to any product that would be commercialized?

5 A.  Sure.  You heard several of the other witnesses testify

6 about an operating system.  Your smartphone, for example, has

7 an operating system on it.  It manages multiple applications.

8 So, for example, you can surf the web while getting a call.

9           And on a DMR system, similarly you could be, for

10 example, communicating on the radio while getting an emergency

11 alarm.  Any time you need to manage multiple tasks or

12 applications, the operating system is essential.

13 Q.  And if a prototype for a DMR radio was 75 percent

14 complete, would you expect to see an operating system?

15 A.  Absolutely.  You can't -- you would have to come in very

16 early in the development before continuing.

17 Q.  Okay.  And can you explain how you know that Hytera's

18 pre-2008 DMR development did not include an operating system?

19 A.  So my understanding is the only evidence they produced of

20 an operating system were a number of files, but those files

21 were just third party files that were downloaded for an

22 operating system but they had never actually been integrated

23 into the code or at least the code that I saw.

24 Q.  And so to your knowledge, what was done with those files?

25 A.  So you can think of them just as sitting in a separate

1    location and not really being used.

2    Q.  And without an architecture framework or operating system,

3    would any company be able to develop a DMR radio?

4    A.  Absolutely not.  That's just inconceivable to develop any

5    complex piece of software without that.

6    Q.  All right.  So the second reason you said that Hytera

7    could not independently develop a DMR product without

8    accessing or using Motorola's trade secrets is that Hytera did

9    not have a complete protocol stack.  Can you just remind the

10   jury what a protocol stack is?

11   A.  Sure.  The protocol, among other things, really defines

12   the sequence of operations that the transmitter or receiver

13   would have to do to communicate.  There's a protocol stack on

14   each end of the communication.  Typically, the protocol stack

15   is defined -- divided into layers.  For example, in the DMR,

16   there's a physical layer, a data link layer, and a control

17   layer.  And it's called a protocol stack because these layers

18   are stacked, if you like, one on top of the other.

19   Q.  And if we go to the next slide, can you -- you put

20   together this demonstrative to explain how communications

21   between two radios would work if they have a complete protocol

22   stack.  Can you walk the jury through that process?

23   A.  Sure.  Suppose you want to send a -- something like a

24   short message saying, "Meet us on the 23rd floor," where we

25   are right now.  Between two DMR radios, if you were to do

Rangan - direct by New

1893

1 this, you would have a number of steps. The first is that you

2 might have to try to access the channel before you can even

3 communicate. You might have to exchange some other

4 information, identifying information, to initiate the call.

5 Sometimes that's called handshaking. That's what I've

6 illustrated in step one.

7        At that point, you would have to have some interface

8 with your keypad, convert that into digital information, and

9 then that information would then need to be transmitted,

10 typically divided into a number of small frames, and each of

11 these frames being modulated over the air.

12        The receiver side would reverse this process, would

13 demodulate it, reassemble the frames, and then display the

14 message on your phone -- sorry, on your -- on the other radio.

15 So there's a lot of steps even for something apparently simple

16 like a short message.

17 Q.  Have you seen any documents or materials in this case

18 showing that Hytera could perform these steps prior to

19 February 2008?

20 A.  Not at all.

21 Q.  Okay.  If you could turn to DTX 32'9 on your next slide,

22 do you recognize this document?

23 A.  Yes, I do.

24 Q.  What is the document?

25 A.  This is an internal Hytera document dated in 2006 titled

Rangan - direct by New

1894

1    "DMR data service program testing."

2    Q.  Did you consider this document in reaching your opinions?

3    A.  Yes, I did.

4    Q.  Is there any indication on the document that it comes

5    from -- it came from Hytera's files?

6    A.  Yes.  It's a Hytera branded document, and it also has a

7    Hytera Bates number.

8              MS. NEW:  Your Honor, plaintiff moves to admit DTX

9    3219 into evidence.

10             THE COURT:  It is received and may be published.

11        (Defendant's Exhibit 3219 received in evidence.)

12   BY MS. NEW:

13   Q.  So Dr. Rangan, based on your understanding, what does

14   Hytera claim that this document shows?

15   A.  This, they claim that it shows certain types of basic data

16   service.

17   Q.  And can you explain what data service is?

18   A.  So usually, they -- one distinguishes data service from

19   voice service.  Data service is, say, sending a short message

20   and voice, of course, is a voice conversation.

21   Q.  Is a text message an easy way to think about data service?

22   A.  Yes, that's a good one.

23   Q.  Does sending a data service message represent full DMR

24   capability?

25   A.  No, because, of course, DMR would need voice on top of

Rangan - direct by New

1895

1    data.

2    Q.  Does this document show that Hytera was able to send a

3    group call, short message, or data service message?

4    A.  No, it does not.

5    Q.  Okay.  Let's look at Page 54 of this document.  Okay.

6    Dr. Rangan, can you explain what this shows?

7    A.  In this document if you were to open it up, it describes

8    several tasks.  And in each one there's an output to a screen.

9    And I've shown that, one of these outputs here on the right.

10   And at the end, you get a message which is printed out saying,

11   in this case, "The whole message has been sent to the PL," PL

12   meaning physical layer.

13   Q.  Okay.  If we go back to your slide showing what's supposed

14   to happen with a complete protocol stack, can you explain what

15   Hytera is actually doing in terms of what's represented in PTX

16   3219?

17   A.  Yes.  So what I've shown here is what you would expect to

18   happen when one device sends a short message to a second

19   device, but what actually happened was a tiny subset of that,

20   just this.  Now, what you see here is a lot missing.  So let

21   me walk you through that.

22           First of all, there's only one device here involved.

23   There's no second device.  So this is not even a useful

24   communication because it's only one device by itself.  On top

25   of that, it's really an internal test within that device, and

Rangan - direct by New

1896

1    that device doesn't have any, what they call in the document

2    the man/machine interface.  So it has no keypad or no display

3    on the other side, and so that whole part is missing.

4    Instead, there's some fixed pattern which is then transmitted,

5    and it can only transmit a limited number of frames of that

6    pattern.

7            Now, also remember it said it's connected to the

8    physical -- sorry, is transmitted to the physical layer.  The

9    physical layer is also not present here, so even the

10   modulation of this data is not being performed.  So in

11   summary, you're seeing just a small fraction of a part of the

12   processing on one end of the device.

13   Q.  So just to make sure we understand, does DTX 3219 show

14   a -- that a whole data message could be sent between two

15   radios?

16   A.  Absolutely not.

17   Q.  Does the test reflected in DTX 3219 show that Hytera had

18   proven that a DMR protocol stack worked as of December 2006,

19   the date of this document?

20   A.  Of course not.

21   Q.  Is this the type of protocol stack testing you would

22   expect to see from a company that has a 75 percent complete

23   prototype?

24   A.  No.  This is very far away from that.

25   Q.  Now, you mentioned earlier in your last sort of

1    sub-opinion that Hytera does not -- did not have any

2    architecture, framework, or operating system.  Would the

3    absence of those components impact Hytera's ability to develop

4    a protocol stack?

5    A.  Yes.  One of the aspects here is that it can only transmit

6    a limited number of these frames and then the program would

7    stop.  And that's partly coming out of the fact that it's

8    missing an operating system.  If you wanted to continuously

9    transmit frames, you need an operating system to be able to

10   transmit the frames while still doing the other processing

11   like processing tasks, the keyboard input and so on, but

12   that's missing here.

13   Q.  So DTX 3219, I think you said, is from 2006.  Have you

14   seen any other documents related to Hytera's effort to develop

15   a protocol stack after the date of this document?

16   A.  Yes, I have.

17   Q.  All right.  Let's look at PTX 1984 on your next slide.  Do

18   you recognize this document?

19   A.  Yes, I do.

20   Q.  What is this document?

21   A.  This document is a Hytera document dated later in 2006

22   titled, "DMR protocol stack software, DSP running test."

23   Q.  Did you consider this document in reaching your opinions?

24   A.  Yes, I did.

25   Q.  Is there any indication on the document that it was

Case: 1:17-cv-01973 Document #: 792 Filed: 12/20/19 Page 168 of 224 PageID #:53779
Rangan - direct by New
1898

1    produced from Hytera's files?

2    A.  Yes.  It's a Hytera branded document and again, it has a

3    Hytera Bates number.

4            MS. NEW:  Your Honor, plaintiff moves to admit PTX

5    1984 into evidence.

6            THE COURT:  It is received and may be published.

7        (Plaintiff's Exhibit 1984 received in evidence.)

8    BY MS. NEW:

9    Q.  Dr. Rangan, does PTX 1984 show that Hytera tested its DMR

10   protocol stack and proved that it worked?

11   A.  No.  I would characterize this document more as just a

12   test plan.

13   Q.  Okay.  And if we go to Page 27 of PTX 1984, does this show

14   that Hytera had a complete protocol stack?

15   A.  No.  I just -- one deficiency I've highlighted here says

16   here that, "The DMR protocol is not connected to the physical

17   layer" -- that's PL -- "part at present."  So the physical

18   layer is not there.

19   Q.  And if we go to Pages 49 and 50 of this document, under

20   "Problems and summary," can you explain what is shown here?

21   A.  Yes, sure.  Actually, before we go on, though, remember

22   the physical layer is the key part that modulates the data

23   over the air.  Without that, you can't have any communication

24   and, hence, no protocol stack.

25           Now, sorry, on to this part here, at the end of the

Case: 1:17-cv-01973 Document #: 792 Filed: 12/20/19 Page 169 of 224 PageID #:53780
Rangan - direct by New
1899

1  document, it discusses further problems that they're having.

2  And it's just talking about very early problems about

3  compiling into the correct compiling environment.

4         And I point out two problems here at the bottom in

5  point six.  First, that the protocol stack is larger than the

6  DSP on-chip RAM.  That means they're having trouble fitting it

7  into the memory as well and that because the protocol --

8  physical layer, sorry, is not connecting, connected, they're

9  having troubles with the exception handling, exception

10  handling meaning the way you process error events.

11  Q.  And what do these problems tell you about Hytera's ability

12  to develop a protocol stack?

13  A.  So all these problems together still suggest that they're

14  extremely far from developing anywhere near a 75 percent

15  complete protocol stack.

16  Q.  Let's look at PTX 1987 on the next slide.  Do you

17  recognize that document, Dr. Rangan?

18  A.  Yes, I do.

19  Q.  And do you consider that document in reaching your

20  opinion?

21  A.  Yes, I do.

22  Q.  Is there any indication that this document is a Hytera

23  document produced from Hytera's files?

24  A.  Yes.  Again, this is a Hytera branded document, and it has

25  a Hytera Bates number.

Rangan - direct by New

1    MS. NEW:  Your Honor, plaintiff moves to admit PTX

2    1987 into evidence.

3    THE COURT:  It is received and may be published.

4    (Plaintiff's Exhibit 1987 received in evidence.)

5    BY MS. NEW:

6    Q.  All right.  Let's look at Pages 29 and 30 of PTX 1987.

7    Dr. Rangan, what is shown here on this slide?

8    A.  Sorry.  Do you want -- yes, thank you.  So this document

9    is the DMR protocol stack specification.  And at the end of

10   this document is a table.  And that table has a number of --

11   describes a number of features and whether those features are

12   realized or not.

13   Q.  Are all of these features that are listed here the

14   features you would expect to see in a DMR radio?

15   A.  Yes.

16   Q.  Okay.  Now, there is this column that says, "Is it

17   realized?"  Do you know what "is it realized" means?

18   A.  That actually, the document doesn't clarify what exactly

19   it means for it to be -- when it says, for each feature,

20   whether it's realized or not, and it also doesn't describe to

21   what extent any of these features are realized even if they

22   claim that they are.

23   Q.  Now, are there features on here that Hytera has listed as

24   not being realized?

25   A.  Yes.  So there are some, the features which are listed as

1   "yes," but there -- even the document itself admits that there

2   are large numbers of features which are indicated as not yet

3   implemented.  I've highlighted these in yellow here.

4   Q.   Now, if Hytera was able to develop a protocol stack, would

5   you expect to see this many "no's" on this document?

6   A.   No, you wouldn't, not for something especially that would

7   be considered a 75 percent complete protocol stack.

8   Q.   And are there important DMR functions that are actually

9   missing from this chart?

10  A.   Yes.  For example, one key feature that's not even on the

11  chart is emergency call.

12  Q.   And would an emergency call be an important feature that

13  customers would expect to see in a DMR radio?

14  A.   Yes.  Of course, for any type of mission-critical

15  application, emergency call is really essential --

16  Q.   So --

17  A.   -- of course.

18  Q.   I apologize.  What does PTX 1987 tell you about Hytera's

19  ability to develop a protocol stack?

20  A.   So this document is one more piece of evidence that

21  Hytera, prior to 2008, was still very far from coming close to

22  a 75 percent complete protocol stack.

23  Q.   All right.  Let's turn next to PTX 1085 which is already

24  admitted.  Did you consider this document in reaching your

25  opinion, Dr. Rangan?

Rangan - direct by New

1902

1   A.  Yes, I did.

2   Q.  And just to remind the jury, what have we been calling

3   this document?

4   A.  This is the welcome email that you've now seen.

5   Q.  Okay.  And why did you consider this document, PTX 1085,

6   in reaching your opinion?

7   A.  I wanted -- I know you've seen this document previously,

8   but I wanted to talk about it specifically in the context of

9   the protocol stack.

10  Q.  And what does it tell you about Hytera's protocol stack

11  development efforts?

12  A.  It still shows here that the protocol stack was very early

13  in development.  So if you look at the very title of this

14  document, it's "Important technical questions about the DMR

15  protocol stack."

16  Q.  And who sent this email, Dr. Rangan?

17  A.  This is Roger Zhang.

18  Q.  And what was Roger Zhang's role at Hytera?

19  A.  He was actually involved in the work prior to 2008, and

20  then after the arrival of G.S. Kok, Y.T. Kok, and Sam Chia, he

21  continued to have, I believe, either a group leader or

22  technical leader role.

23  Q.  And did Mr. Zhang ever work at Motorola?

24  A.  No, he did not.

25  Q.  Okay.  So specific to the protocol stack, what does

Rangan - direct by New

1903

1　Mr. Zhang say to Mr. Chia in this welcome email?

2　A.　So he asks Mr. Chia a number of questions.　And what I

3　wanted to -- well, sorry.　He says here, "Our group has been

4　engaged in protocol development for a period of time."　This

5　is about the three-year development that they had prior to the

6　arrival of G.S. Kok, Y.T. Kok, and Sam Chia.

7　　　　　And he says they've been -- "met many problems which

8　have troubled us for a long time."　So he's admitting in this

9　email here that the protocol stack development is having

10　troubles.　He then goes on to ask, he hopes to learn about the

11　protocol stack from Mr. Chia and then asks him a number of

12　questions.

13　Q.　Okay.　And so a minute ago, we were looking at PTX 1987

14　which was that table of yes, no's related to the features.　Is

15　there anything in Mr. Zhang's email here in PTX 1085 that

16　conflicts with PTX 1987?

17　A.　Yes.　One of the questions that Mr. Zhang asks is here at

18　the bottom, "Would you please tell us about processing details

19　for digital emergency signalling?"　However, if you recall

20　back, the 2007 document had indicated that emergency

21　signalling was realized.　Here, that's "yes" here.

22　　　　　So what this suggests is that even going back to that

23　spreadsheet or that table, even the items that were listed

24　"yes" are still unlikely to have been really realized.

25　Q.　And what does the fact that Mr. Zhang is asking questions

Rangan - direct by New

1904

1  of Sam Chia about protocol stack development tell you about

2  Hytera's ability to develop a protocol stack?

3  A.  If you look at those questions, you see they're all very

4  basic fundamental questions about the protocol stack; that if

5  they were to actually have been anywhere close to a 75 percent

6  complete prototype, they would not need to have been asking

7  all those questions.

8  Q.  All right.  Let's look at slides 78 and 79 which reflect

9  PTX 203 and 204.  Do you recognize these documents,

10  Dr. Rangan?

11  A.  Yes, I do.

12  Q.  And what are PTX 203 and 204?

13  A.  PTX 203 is a Hytera document, "DMR protocol stack software

14  development plan" and is dated July of 2008 and -- oh, I'm

15  sorry, and an accompanying email to that document.  I'm sorry.

16  203 is the email, sorry, and 204 is the document attached to

17  that email.

18  Q.  And did you consider both the email and the attachment in

19  reaching your opinions?

20  A.  Yes, I did.

21  Q.  Is there any indication that PTX 203 and 204 are Hytera

22  documents produced from Hytera's files?

23  A.  Yes, they are.  They are Hytera emails as well as there's

24  Hytera Bates numbers on the documents.

25          MS. NEW:  Your Honor, plaintiff moves to admit PTX

Rangan - direct by New

1905

1   203 and 204 into evidence.

2           THE COURT:  Both are received and may be published.

3        (Plaintiff's Exhibits 203 and 204 received in evidence.)

4   BY MS. NEW:

5   Q.  All right.  Let's look at PTX 203 first.  So Dr. Rangan, I

6   first want to ask you, who is Yu Yang who is identified here?

7   A.  Yu Yang is an engineer that was originally in the Harbin

8   team which had been doing the development prior to the arrival

9   of G.S. Kok, Y.T. Kok, and Sam Chia.  He was one of the

10  leaders there.  And then after the arrival of those three

11  individuals, he continued to be either a group leader or a

12  technical lead in the software team at Hytera.

13  Q.  And what does Mr. Yang say about Hytera's protocol stack

14  in this email to Mr. Chia?

15  A.  Sure.  So he says in this email, "When we were doing the

16  work" -- this is referencing the work done prior to their

17  arrival -- "most of the requirements cannot be met."  And "the

18  requirements" here is referring to the requirements in the

19  attached document.  He then goes on to say that the project

20  has grown up in an unhealthy situation.

21  Q.  And that attached document is PTX 204, so let's look at

22  Pages 45 and 46.

23          Now, what is discussed on these pages about the

24  requirements, Dr. Rangan?

25  A.  So this document actually dates back to 2006 which was the

Rangan - direct by New

1906

1   development prior to the arrival of the three individuals.

2   And it shows here that the requirements are specifically

3   related to requirements for the protocol stack.  There's a

4   requirement here about a unified software process, and then

5   this discussion here about the software is for protocol stack

6   communication.  There's also a requirement about high

7   stability, and there's also a discussion about the

8   requirements for developers.

9   Q.  And just to make sure the record is clear, that's for DMR

10  protocol stack development, right?

11  A.  Yes, that's correct.

12  Q.  And based on your experience, what does this email and the

13  attachment from Mr. Yang to Mr. Chia tell you about Hytera's

14  ability to develop a DMR protocol stack?

15  A.  So this is further evidence that Hytera was still very far

16  away from a complete protocol stack because it was, in this

17  case, missing a number of requirements.

18  Q.  So Dr. Rangan, after looking at all those documents we

19  just reviewed, what are your conclusions with respect to

20  whether Hytera could develop a protocol -- a DMR protocol

21  stack independent of Motorola's trade secrets?

22  A.  So we see at least four key reasons why they could not

23  have developed such a protocol stack.  What they had prior to

24  2008, they were missing basic architecture and framework which

25  is necessary for any piece of complex software.  They were not

Rangan - direct by New

1907

1   able to communicate or send messages between two radios.  They

2   were unable to develop the basic functionality that you'd

3   expect in a DMR protocol stack.  And the requirements that

4   they had set out to meet were not being met.

5   Q.  Dr. Rangan, let's move on to the third reason you

6   identified to support your conclusion that Hytera could not

7   independently develop a DMR radio.  Can you remind us what

8   that third reason is?

9   A.  That is that they did not demonstrate interoperability.

10  Q.  Now, we're heard the term "interoperability" here and

11  there over the last couple weeks.  Can you remind us what

12  interoperability means?

13  A.  Sure.  Interoperability simply means the ability of a

14  device from one manufacturer to communicate to the device of

15  another manufacturer.  It's generally a formal process where

16  manufacturers, for example, in DMR would go to, say, the DMR

17  Association which will then, they will meet together and

18  certify that they can produce -- perform or interoperate.

19  Q.  Is interoperability important in a wireless communication

20  system like a DMR radio?

21  A.  Sure.  It's absolutely essential.  So, for example, in a

22  cellular system, you want your Samsung or maybe Apple

23  smartphone to be able to communicate to the radio equipment of

24  your provider which could be purchased from another

25  manufacturer, or you also might want your Apple phone to be

Rangan - direct by New

1908

1    able to talk to other devices that are not Apple phones.

2         Similarly, in DMR, you may have, say, a scenario

3    where the -- a person on, say, a construction site might need

4    to communicate to another person on the construction site that

5    maybe has a radio from a different manufacturer.

6    Q.  All right.  Let's look at PTX 1988, which is already

7    admitted.  Do you recognize this document, Dr. Rangan?

8    A.  Yes, I do.

9    Q.  Okay.  And what is this document?

10   A.  This is a Hytera document dated around September of 2007

11   entitled, "The summary report on interoperability between DMR

12   and MOTO."

13   Q.  Did you consider this document in reaching your opinions

14   in this case?

15   A.  Yes, I did.

16   Q.  And why did you consider this one specifically?

17   A.  This is really the sole document that Hytera relies on to

18   demonstrate interoperability.

19   Q.  And what does Hytera contend that this document shows?

20   A.  They contend that it shows a group call from Motorola

21   device to a Hytera device.

22   Q.  What is a group call?

23   A.  Sure.  A group call is just simply a call that will go out

24   to multiple users, say, for example, multiple people on a

25   construction site.

1   Q.   Does PTX 1988 show that Hytera had the ability to

2   create -- or to complete a group call?

3   A.   No, it does not.

4   Q.   Let's look at Page 12 of PTX 1988.  What does this

5   document -- what does this page of this document show about

6   Hytera's inability to perform a group call?

7   A.   Yes.  Before we go on, it's first important to recognize

8   that this document itself does not describe what's being

9   tested as a prototype.  Instead, it refers to it as a

10  debugging hardware platform.

11  Q.   And just so everyone understands, what would be the

12  difference between a prototype and a debugging hardware

13  platform?

14  A.   A debugging hardware platform would be a version of the

15  system that's in a much earlier stage of development where

16  you're still trying to build up basic features.

17  Q.   And what is represented here on Page 12 of PTX 1988?

18  A.   So you can see here the figure of what they're trying to

19  do in the test, which is a communication between a Motorola

20  device and this debugging hardware platform.  Now, the

21  Motorola device is that radio shown here on the left.  And

22  that is what a final commercial product is like, something

23  like a handheld like this.

24       What it's communicating to, though, is this debugging

25  hardware platform which I've outlined in here in red.  That

1 debugging hardware platform in this case is not something like

2 this but rather has these four boards connected by wires.

3 There's a board for the radio, a board with the DSP for the

4 baseband.  There's the protocol -- sorry, a board with the

5 radio, a board with the baseband with the FPGA, the DSP board,

6 and then a final board for that voice coding.

7 Q.  And is there anything missing from this debugging hardware

8 platform that you would also expect to see if this was a true

9 prototype?

10 A.  Yes.  You can see here on the right, this is outside that

11 platform because this debugging platform doesn't have that

12 man/machine interface, the interface between the keypad and

13 the screen.  So that's being simulated here on this PC

14 computer which connects into the debugging hardware platform.

15 Q.  Let's go to Page 13 of this document.  Can you explain why

16 the debugging hardware platform that we just looked at had

17 limited functionality?

18 A.  Yes.  So there's -- in this interop test, there's actually

19 two parts.  There's a transmit part and a receive part.  I

20 will talk about the transmit part, but the other part is

21 similar.

22        So in the transmit part, they give the technical

23 description of what happened up here in the highlighted

24 region.  Let me read it out into the record:  "According to

25 the received control information" -- that's the received

Rangan - direct by New

1911

1    information from the Motorola device -- "we encapsulate the

2    voice frame header in the same format and send it to MOTO.

3    Then we control AMBE+2 chip" -- that's the vocoder chip -- "to

4    generate compressed voice."  And then on the other end it said

5    a sound can also be heard.

6          Now, that's a lot, so let me try to tell you a little

7    bit exactly what happened in this test.  And for that purpose,

8    I've created this diagram at the bottom.  So imagine, let's go

9    back to our construction site case, and you wanted a

10   construction worker to send a message, a voice call to another

11   construction worker or maybe a group call.

12         So maybe that construction worker would say on one of

13   these devices, say, "Where are you?"  And they would expect

14   the other person to say, "I am here."  But that's not what

15   happens here.  What happens is on one end is this Motorola

16   device that this construction worker is holding, and then it

17   goes here to this debugging hardware platform which I've shown

18   on the right.

19         Now, the first thing is that, as I said, this

20   debugging hardware platform doesn't have a man/machine

21   interface, so there's no way a person can actually interact

22   with this.  So there's no person there.  All right.

23         Now, the second thing is when it comes in here, the

24   transmitted voice, it receives, "Where are you," but it can't

25   actually send back new information.  It has to just repeat

Rangan - direct by New

1912

1   what it -- echo back what it said.  So instead of sending

2   back, "I am here," it can just repeat back, "Where are you?"

3   So it can only just echo back what's being said.

4          But the problem is worse than that.  Remember, if you

5   recall --

6          MR. ALLAN:  Objection, your Honor.  This is just a

7   narrative.

8          THE COURT:  Sustained.  What is the next question?

9   BY MS. NEW:

10  Q.  Dr. Rangan, so you just said that it would echo back.  And

11  you reference here on slide 85 that a sound can be heard.  So

12  if there's the echo back, what sound is being heard on the

13  other end?

14  A.  Okay.  So there's two things in this.  The echo back part

15  comes -- oh, sorry.  The sound that can be heard, remember

16  earlier and in my analysis of the code, the device, the

17  debugging hardware platform can only transmit a limited number

18  of frames at a time.  So what this would suggest in this case

19  is that it can only transmit back a small portion of that

20  voice.  So that might just be a fraction of a second.

21          Now, in addition, it just here says here only that

22  the sound can be heard.  The sound can be heard, just meaning

23  that it doesn't actually tell you anything about the quality

24  of that sound, just instead maybe some -- perhaps some audible

25  noise that was received, not actually the -- not even a

Rangan - direct by New

1913

1   portion of that, like a "wh" or something like that.

2   Q.   And does that -- excuse me.  Does this -- I guess, would

3   that qualify as a -- as completing a group call for

4   interoperability purposes?

5   A.   Absolutely not.  We just have a portion of the sound, and

6   it's just echoing back.

7   Q.   So let's turn to PTX 1988 at 17 and 18.  What does this

8   document, this portion of the document tell you about Hytera's

9   ability to perform DMR functions apart from the group call?

10  A.   Sure.  So in this part of the document, it has a follow-up

11  work section, and it lists a number of features that are still

12  not yet implemented.

13  Q.   Okay.  So there are two sections here.  You have mandatory

14  features and expected features.  Can you first tell us what

15  the mandatory features are?

16  A.   These first three features are features that would be

17  considered mandatory for interop at least by, for example, the

18  DMR Association.  They are an individual voice call, an

19  individual data call, and what's called "all call."

20  Q.   And so would those mandatory features have to be present

21  to achieve interoperability?

22  A.   Yes, they would.

23  Q.   Okay.  And then you also have seven features here that are

24  listed as expected features.  What do you mean by that?

25  A.   So these are features that are not necessarily mandatory

Rangan - direct by New

1914

1    in interoperability but would generally be expected for most

2    of the commercial radios at that time.

3    Q.  And based on this document, has Hytera been able to

4    achieve any of the features listed in 1 through 10 at the time

5    this document was created?

6    A.  No.  These are all listed in the follow-up work section.

7    Q.  Let's look at PTX 1032.  Do you recognize this document?

8    A.  Yes, I do.

9    Q.  What is this document?

10   A.  This is an email dated March 13th of 2008, an internal

11   Hytera email.

12   Q.  Did you consider PTX 1032 in reaching your opinions?

13   A.  Yes, I did.

14   Q.  You just mentioned it's an internal Hytera email, but are

15   there any other indications that this document came from

16   Hytera files?

17   A.  Yes.  There's a Hytera Bates number.

18        MS. NEW:  Your Honor, plaintiffs move to admit PTX

19   1032 into evidence.

20        THE COURT:  It is received and may be published.

21      (Plaintiff's Exhibit 1032 received in evidence.)

22   BY MS. NEW:

23   Q.  And if we go to the slide -- thank you -- what aspects of

24   this document did you consider in reaching your opinion?

25   A.  So the title of this document is called the "Discussion

Rangan - direct by New

1915

1    records on the two-point modulation problem."  And what it

2    goes on to say here, it identifies what's here that the

3    receiver is experiencing a frame loss when receiving.  It then

4    discusses this frame loss phenomenon in various parts of this

5    record.

6    Q.   And really high level, can you just explain what frame

7    loss means or what a frame loss phenomenon is?

8    A.   Sure.  So any voice or data in DMR is divided into small

9    frames.  And frame loss simply means that those frames are not

10   received and, hence, if it was voice, you would not hear that

11   voice.

12   Q.   So does frame loss affect interoperability?

13   A.   Yes.  Of course, if the frames are lost, you cannot

14   interoperate.

15   Q.   And in order to achieve interoperability, would the person

16   or the persons on the receiving end of the message have to be

17   able to receive those frames?

18   A.   Yes, exactly.

19   Q.   So after reviewing the evidence we -- or the documents we

20   just looked at, can you tell us your conclusion as to whether

21   Hytera would be able to develop a DMR product that could

22   achieve interoperability without using Motorola 's trade

23   secrets?

24   A.   No, they had no -- seen no evidence in either of these

25   cases of interoperability.

Rangan - direct by New

1916

1  Q.   Okay.  Let's go on to the fourth reason that you said that

2  Hytera could not independently develop a DMR radio.  Can you

3  remind the jury what that fourth reason is?

4  A.   This is really that the source code was fundamentally

5  flawed.

6  Q.   Now, did you review Hytera's source code as it existed

7  prior to G.S. Kok's arrival in February 2008?

8  A.   Yes.  Hytera produced several directories of what they

9  called the historical development code, and I was able to

10 review those directories.

11 Q.   And what did you find when you reviewed those directories?

12 A.   So what I found really that there were two fundamental

13 flaws in the way that the source code was written in a manner

14 that would prevent the developers from continuing development.

15 First of all, the source code files were unfinished but also

16 what you would say that the code was monolithic spaghetti

17 code.

18 Q.   All right.  Let's talk first about the unfinished files.

19 On your slides, please turn to PTX 2031 and 2025.  Do you

20 recognize those documents, Dr. Rangan?

21 A.   Yes, I do.

22 Q.   Okay.  What are they?

23 A.   These are two of the files from the historical development

24 directories.  The first is DMRmain.cpp and

25 CallControlLayer.cpp.

Rangan - direct by New

1917

1   Q.  And just so the record is clear, the DMRmain.cpp is PTX

2   2031, and CallControlLayer.cpp is 2025.  Is that right?

3   A.  That's right.

4   Q.  Okay.  And did you consider these specific source code

5   files in reaching your opinions?

6   A.  I did.

7   Q.  And is there any indication that these documents were

8   produced or these code files were produced from Hytera?

9   A.  These are branded at the top as Hytera files, and they

10  also had Hytera Bates numbers.

11          MS. NEW:  Your Honor, plaintiff moves to admit PTX

12  2025 and 2031.

13          THE COURT:  Both are received and may be published.

14      (Plaintiff's Exhibits 2025 and 2031 received in evidence.)

15  BY MS. NEW:

16  Q.  Dr. Rangan, how important are the DMRmain and

17  CallControlLayer.cpp files to a DMR product?

18  A.  These are both very essential in this part of the code.

19  The DMRmain, as you would expect, is the main file, so it's

20  the first entry point for the software.  It performs all the

21  initialization and then steps through the test, all the test

22  code.  The call control layer, sorry, is equally important.

23  It's one of -- one of the key layers in this protocol software

24  stack.

25  Q.  Now, we can see here on Slide 91 of PDX 9 that for both

Rangan - direct by New

1    files, you've highlighted the word "unfinished" so -- next to

2    "status."  Can you explain what that means?

3    A.   That's just -- this is the header, very top of the file,

4    and it's stating here that the file is actually unfinished as

5    it states.

6    Q.   And did you ever see any versions of the DMRmain or

7    CallControlLayer.cpp files that were completed by Hytera prior

8    to G.S. Kok's arrival in February of 2008?

9    A.   No.  All the versions I saw remained unfinished.

10   Q.   And did you see any complete versions prior to the arrival

11   of Sam Chia or Y.T. Kok?

12   A.   The same.

13   Q.   So beyond what it says in the header about the files being

14   unfinished, are there other reasons that you think this source

15   code was unfinished?

16   A.   Yes.  Each one of these files actually has multiple

17   functions.  Several of those functions are labeled as

18   "unfinished," and you also see that some of the functions,

19   just looking at the code, remain incomplete.

20   Q.   And we've heard a little bit about an ARM or an A-R-M

21   processor.  Did you see any code for Hytera's product for an

22   ARM processor in your review?

23   A.   No.  Although they -- I saw plans to put in an ARM

24   processor, all the code I saw and all the evidence of any

25   physical debugging platform were all based solely on the DSP,

Rangan - direct by New

1   not the DSP and ARM.

2   Q.  And based on Hytera's design of its product at that time

3   in 2008, would you have expected to see code for the ARM

4   processor?

5   A.  Yes.  That was an integral part of their plan, to

6   eventually have an ARM processor either as a separate chip or

7   what was to -- what was called an OMAP, but that had not been

8   done at this point.

9   Q.  Okay.  Now, the other reason you mentioned the code was

10   flawed is because they had, Hytera had monolithic spaghetti

11   code.  Let's look at PTX 607 which is already admitted.  Did

12   you rely on this document in reaching your opinion?

13   A.  Yes, I did.

14   Q.  And can you remind us what PTX 607 is?

15   A.  This is an internal Hytera presentation given by Mr. Y.T.

16   Kok in July of 2008 called, "Hytera common platform

17   architecture."

18   Q.  All right.  So we go to Page 6.  What does Y.T. Kok say

19   here about Hytera's software development for its DMR product?

20   A.  So in this presentation, he is commenting on the current

21   software, and he describes it as a monolithic spaghetti

22   system.

23   Q.  And that's the code as it existed in July of 2008; is that

24   fair?

25   A.  That's correct.

Rangan - direct by New

1    Q.   Okay.  Now, what does it mean for source code to be

2    monolithic?

3    A.   So source code, when it's well organized, has large --

4    when you divide it into smaller, more manageable modules and

5    then have limited ways in which these modules can communicate

6    with one another.  Monolithic is the exact opposite.  It has

7    no structure into -- and it just appears as one large piece of

8    code.

9    Q.   And what is a spaghetti system?

10   A.   Spaghetti system, it refers -- is a highly problematic way

11   of software and refers to the following, that any one part of

12   the code can affect other parts of the code.  So when you're

13   trying to analyze the code, looking how one part of the code

14   affects another is like trying to find two ends of a strand of

15   spaghetti in a big bowl of pasta.

16   Q.   So we've also heard the term "spaghetti code" a little bit

17   over the last couple weeks.  Is that a common phrase that's

18   used in the software development industry?

19   A.   Yes.  Mr. Y.T. Kok did not develop it.  It's also not a

20   trade secret at issue in this case.  It's a common term

21   referring to exactly this phenomena.

22   Q.   And what type of software engineer would develop spaghetti

23   code?

24   A.   Generally, that's a highly novice software engineer who's

25   not had proper training.  I teach software a lot to students,

Rangan - direct by New

1921

1    and this is one of the things we try to get them to avoid.

2    Q.  Can having a monolithic spaghetti system create problems

3    for a product and product development?

4    A.  Absolutely.

5    Q.  And can you explain what some of those problems are?

6    A.  So Y.T. Kok on his presentation itself identifies two of

7    the problems in this slide.  He says, first of all, it's

8    difficult to isolate components and reuse them.  That's

9    because they're completely intertwined with one another and --

10    Q.  Dr. Rangan, let me just ask you just to slow down just a

11    little bit because the court reporter is trying to take you

12    down.  I know you get excited about software development, but

13    maybe just start over so she can catch everything.

14    A.  I'm sorry about that.

15    Q.  Thanks.

16    A.  So the first problem about spaghetti code, a monolithic

17    spaghetti code is that it's difficult to isolate various

18    components because they have a very complicated and difficult-

19    to-trace relationship between each other.

20          The second part about it is that it's poorly

21    portable.  So if you want to take one piece of software out

22    and use it in another piece of software or in another hardware

23    platform, it becomes very, very difficult to do that.

24    Q.  Let's go to the next slide which reflects PTX 607 at Page

25    7.  What are the other problems that are discussed here with a

Rangan - direct by New

1922

1    monolithic spaghetti code?

2    A.  This is another key problem, is that once you get

3    spaghetti code, it becomes harder to change and the

4    development becomes more and more laborious.  It costs more

5    and it takes longer.  But also what's very important is the

6    problem of debugging or fixing errors.  It's very hard to

7    trace errors because of the spaghetti problem.  And any time

8    you try to fix one part of the code, you generally introduce

9    bugs in other parts of the code.

10   Q.  So would it be possible that Hytera could have fixed its

11   monolithic spaghetti code and then later used that code to

12   develop a DMR product?

13   A.  No.  That's really the curse of spaghetti code.  It

14   becomes so unmanageable that you really have to scrap it at

15   some point and start over.

16          THE COURT:  Well, an answer that includes the word

17   "curse" may be appropriate in terms of an improper question

18   which calls for possibilities.  Disregard the answer of the

19   witness.

20   BY MS. NEW:

21   Q.  Dr. Rangan, having looked at the code as it existed in

22   2008 at Hytera, could that code have been fixed?

23   A.  No, it could not.

24   Q.  All right.  At the beginning of your testimony, you told

25   us that Hytera identified two scenarios in which Hytera could

Rangan - direct by New

1923

1  independently develop a DMR product.  Can you remind us what

2  those two scenarios are?

3  A.  So in -- both the scenarios are predicated on the idea

4  that there's a 75 percent complete prototype in 2008, and from

5  there, there's two possible paths to get to a commercial

6  product.

7  Q.  And remind us what those two are.

8  A.  In one scenario, you maintain the FPGA which was present

9  in the prototype and then you come to a commercial real --

10  product in March 2010.  And in the second one, you remove the

11  FPGA, modify the code, and this takes a little longer and

12  comes to a commercial product in September 2010.

13  Q.  Now, did Hytera's development efforts for DMR prior to

14  February 2008 utilize this FPGA processor?

15  A.  Yes, it did.

16  Q.  And do you believe that Hytera could have developed a

17  commercial DMR product using that FPGA processor?

18  A.  No, for all the reasons I just stated.

19  Q.  Is it generally possible to develop a DMR product that

20  doesn't use an FPGA --

21       THE COURT:  Eliminate the word "possible" from your

22  questions.

23       MS. NEW:  Of course, yes.

24  BY MS. NEW:

25  Q.  Are there other DMR products that have been developed that

Rangan - direct by New

1924

1    do not use an FPGA processor?

2    A.   Yes, it's -- absolutely.  In fact, the Motorola's product

3    as well as what Hytera finally did commercialize, neither of

4    those use an FPGA.

5    Q.   Now, the product that Hytera did ultimately commercialize,

6    what did they use instead of an FPGA processor?

7    A.   They put all the functionality that was on the FPGA into

8    the DSP.

9    Q.   Does Hytera's decision -- so we just kind of talked about

10   all your criticisms of Hytera's independent development

11   efforts.  Does the decision to remove the FPGA processor

12   affect those opinions at all?

13   A.   No.  It's really a nonissue whether they kept the FPGA or

14   not kept the FPGA.  Both paths were not possible simply

15   because the starting point with whatever chip selection they

16   had was still so far behind in this case.

17   Q.   Let's look at PTX 22 which is already in evidence.  And if

18   we go to Page 8, Dr. Rangan, what does this slide show about

19   Hytera's ability to independently develop a DMR product using

20   either the FPGA or the DSP processor?

21   A.   This really demonstrates my point and shows the

22   difficulties in either path.  On the one hand, if they did

23   continue with the FPGA development, they would have been

24   lacking the expertise to get a high quality FPGA development.

25   So recruiting and talent is one of other issues that they

Rangan - direct by New

1925

1   would be facing.

2          On the other hand, if they were to use the DSP by

3   itself as they indicate here, that will result in a lot of

4   Moto code, that's reuse of Moto code, and this would be a

5   concern.

6   Q.   Did Hytera ever release a DMR product based on its

7   pre-February 2008 development efforts?

8   A.   No, it did not.

9   Q.   What did Hytera do instead?

10  A.   It abandoned those efforts and ended up following a

11  development path based on Motorola misappropriated code.

12  Q.   And when did Motorola file this lawsuit, Dr. Rangan?

13  A.   In March of 2017.

14  Q.   How much time has passed between then and your testimony

15  today?

16  A.   2' -- two and a half years.  Sorry.

17  Q.   And in those two and a half years, have you seen any

18  documents or materials indicating that Hytera has sold any

19  products based on its pre-February 2008 development efforts?

20  A.   No.  Two and a half years since this lawsuit has began,

21  they have -- sorry, Hytera continues to use Motorola

22  confidential and proprietary information for its development.

23  Q.   What does this indicate to you about Hytera's ability to

24  independently develop a DMR product?

25  A.   This indicates that Hytera is still not possible to

Rangan - direct by New

1  independently develop DMR product without Motorola

2  confidential and proprietary information.

3  Q.  All right.  Let's talk about your third and final opinion,

4  which is that Hytera could not conceive of or develop the

5  trade secrets in a commercially reasonable time.  Can you

6  explain to the jury the analysis that you did to determine the

7  development times for Motorola's trade secrets as a starting

8  point?

9  A.  Sure.  So you've heard from these four Motorola engineers.

10  These engineers are engineers with over 20 years of experience

11  that were deeply involved in the DMR development.  They first

12  produced estimates that you've heard both in terms of the head

13  count and staff months for each asserted trade secrets.  My

14  first part was to discuss those with those engineers, their

15  methodology and how they arrived at this -- at these

16  estimates.

17  Q.  And did you -- do you understand whether the engineers

18  were also deposed in this case?

19  A.  Oh, sorry.  They were also -- I also looked at their

20  depositions as well.

21  Q.  And after you did that, did you also consider Motorola's

22  confidential technical documents and source code?

23  A.  Yes.  To provide an independent analysis, I also looked at

24  the source code and all the design documents as well for the

25  asserted trade secrets to try to assess the development effort

Rangan - direct by New

1927

1   for each one of them.

2   Q.   And did you also rely on your experience in reaching this

3   opinion?

4   A.   Yes.  I've also led software and hardware teams that are

5   very closely related to these trade secrets, so I applied my

6   own experience in trying to assess the development time.

7   Q.   And after going through that methodology, what is your

8   conclusion about the amount of time that it took Motorola to

9   develop the trade secrets?

10  A.   It's my belief that even for Motorola, the estimates they

11  gave would be conservative, meaning that it would take more

12  time than they had actually represented.

13  Q.   And those engineers provided the development times during

14  their testimony.  Do you recall that?

15  A.   Yes, I do.

16  Q.   And are you simply, through this opinion, simply

17  rubberstamping those estimates?

18  A.   Absolutely not.  I really tried to give an independent

19  analysis based on my review of -- discussing with them but

20  also review of all the source code, the design documents, and

21  my own experience.

22  Q.   What measure of time was used to estimate Motorola's

23  development efforts for the asserted trade secrets?

24  A.   You've seen this before, but the time was quantified in

25  staff months.  One staff month is really one midlevel engineer

Rangan - direct by New

1928

1    working for one month.

2          MS. NEW:  Dave, can we go to the next slide?  Thanks.

3    BY MS. NEW:

4    Q.  Can you just explain that a little bit more, Dr. Rangan?

5    A.  Yes.  So if you see something saying 100 staff months, you

6    can think of that as one engineer working continuously for 100

7    months or, say, two engineers working together for 50 months.

8    Q.  Now, why did you use staff months as a measurement of

9    development effort?

10   A.  Staff months is a very common way to do engineering

11   project management.  Among other things, it allows you to

12   estimate, say, the total payroll involved in realizing some

13   project.

14   Q.  Did you eventually convert staff months into calendar

15   years for the trade secrets?

16   A.  Yes.  What I did was looked at the -- took the staff

17   months and the head count.  And when you divide, take the

18   staff months and you divide it by the head count and then

19   divide by 12, you get the calendar years, an estimate for the

20   calendar years it would take to implement that trade secret.

21         I want to point out here, this is an extremely

22   conservative way to estimate the amount of time because that

23   assumes that all the engineers that are allocated to that task

24   can continuously work.  In reality, of course, that's not

25   always possible and in reality, most of these trade secrets

1    took much more time.

2           MR. ALLAN:  Objection, your Honor, narrative, and

3    he's reciting fact testimony and argument that didn't happen

4    in the case.

5           THE COURT:  The answer may stand.

6    BY MS. NEW:

7    Q.  So Dr. Rangan, just briefly, why did you convert the staff

8    months to calendar years?

9    A.  Just to provide an estimate of the development time that

10   it would take to implement, realize the trade secret.

11   Q.  And how do these calendar years compare to the actual time

12   that it took Motorola to develop the trade secrets?

13   A.  These estimates would generally be much shorter than the

14   actual time, and the reason for that is that, as I was saying,

15   the -- when you estimate the calendar years in this way,

16   you're assuming that all the engineers on that trade secret

17   can work continuously but, of course, that's not generally the

18   case.

19   Q.  All right.  So let's talk about the first sort of bucket

20   of trade secrets which relate to software architecture.  Which

21   trade secrets fall into this category?

22   A.  There are several of the asserted trade secrets on this

23   very important feature of architecture.  I'll read them into

24   the record:  The application software layer; the ROS, OSAL,

25   and LOSAL; the HAL; the DMR software architecture; VRIS; the

Rangan - direct by New

1  L1 timer; the ergonomic or Darwin layer; the connectivity

2  modules; and then finally, the whole DMR protocol stack.

3  Q.  And why did you group these trade secrets together for

4  purposes of determining development effort?

5  A.  These are all related to both framework and architectural

6  components that underlie the software to be built.

7  Q.  Based on the amount of material that you reviewed and your

8  experience, what did you conclude with respect to the

9  development time for these trade secrets?

10  A.  So what I've shown here on the second and third column are

11  the Motorola estimates for both the engineering head count and

12  staff months, and then you can convert that to calendar years.

13  And then it's my opinion looking at the estimate that these

14  would be conservative estimates for any company comparable to

15  Motorola.

16  Q.  So Dr. Rangan, just so the record is clear, would you mind

17  just reading in the calendar years' effort for each of these

18  trade secrets?

19  A.  Sure.  For application software layer, it's 5.6 years.

20  For ROS, OSAL, and LOSAL, 4.9 years.  For HAL, 2.08 years.

21  DMR software architecture, 5.7.  VRIS, 2.94.  L1 timer, .75.

22  Ergonomic layer, 6.6.  Connectivity modules, 1.35.  And DMR

23  protocol stack, 3.

24  Q.  And you kind of dropped it at the end there, but those are

25  all in years, right?

Rangan - direct by New

1931

1  A.  Yes, they are.

2  Q.  Okay.  Now, some of these development times are a little

3  bit long.  Can you explain why that is?

4  A.  Yes.  You have to, these are -- for one thing, they

5  represent an incredible volume of work.  For example, the DMR

6  protocol stack would constitute by itself millions of lines of

7  code as well as just thousands of pages of documents.  So this

8  is an enormous, vast undertaking to do this.  You heard Mark

9  Boerger talk about all the work that had gone into this, for

10  example.

11         Now, the second aspect of this is that since these

12  are architectural components, they represent the kind of work

13  that's foundational work that you're going to build all the

14  software on top of.  And that means it has to be thought of

15  very carefully before you can start to implement it because

16  these codes might exist for 10, 20 years in this case, and it

17  has to be designed well into the future where you can't

18  anticipate everything.

19         Finally, the code really was based extensively off of

20  work for ASTRO.  So even though the DMR project started in

21  2003, it had leverage work much, much earlier, back to the

22  late '80s.

23  Q.  Dr. Rangan, did you consider any documents to assess the

24  development times or the development efforts for these

25  software architecture trade secrets?

Rangan - direct by New

1932

1    A.   Yes, I did.

2    Q.   Okay.  Let's go to the next slide.  And just so it's in

3    the record, reflected here are PTX 686, 666, 727, 1255, and

4    738, all of which are in evidence.

5         Dr. Rangan, why did you consider these documents in

6    reaching your opinion?

7    A.   So I actually considered a large volume of documents for

8    these trade secrets.  I wanted to just display these five of

9    them here because they're illustrations of the volume of work

10   that's involved.  Each of these documents go into considerable

11   level of detail, of detail design and functionality for each

12   of these trade secrets.

13        I also wanted to point out the dates.  And you can

14   see the kind of work developed, working from 1996 all the way

15   up to 2007.  So just these design documents themselves span 10

16   to 11 years of work.

17   Q.   Let's look at PTX 1261 which is already in evidence and go

18   to Page 9.

19        Why did you also consider this document, Dr. Rangan?

20   A.   This is a document that you've seen before, the Darwin

21   application strategy for Matrix.  This is just one page of a

22   very detailed design, and it reflects the -- a level of

23   planning and design that needed to be done.  They were able to

24   identify all of these modules.  Each one of these modules

25   would involve a considerable amount of work to develop and

Rangan - direct by New

1933

1    think about how they are structured together.

2    Q.   And did you review other documents related to the software

3    architecture trade secrets in reaching your conclusions?

4    A.   Yes.   I reviewed many documents in this area along with

5    millions of lines of code.

6    Q.   After considering the documents, did you apply your own

7    experience when assessing the development efforts for

8    Motorola's trade secrets?

9    A.   Yes.   I -- since I had worked in a project management role

10   at very early stages of projects, the architecture was

11   something we had to consider from the beginning.

12          Just to give you three examples, I had worked at, for

13   example, on the operating system at Flarion.   That, we

14   actually did scope out of work to see how much work it would

15   take to build an operating system.   It was so much work, we

16   just ended up acquiring a third party operating system in that

17   case.

18          I also worked at both Qualcomm and Flarion, and both

19   of these had a lot of hardware, so we had to think carefully

20   about the way that the software would interact with the

21   hardware in a communication context.   So that amounted to

22   determining, developing circuit interfaces and also the timing

23   and framing.

24   Q.   All right.   Let's talk about the next bucket of trade

25   secrets which relate to the DSP and DSP framework.   Can you

Rangan - direct by New

1934

1    tell the jury which trade secrets fall into this category?

2    A.   These are the VOX, noise suppression, squelch, carrier

3    detection, the DSP framework, and the DSP source code.

4    Q.   And why did you group these trade secrets together?

5    A.   These are all related to DSP functionality, meaning the

6    functionality to transmit and receive wireless signals as well

7    as the audio processing.

8    Q.   What did you conclude with respect to the development

9    times for these trade secrets?

10   A.   Again, it was my opinion after the independent analysis

11   that the Motorola estimates were conservative.  I'll read

12   those numbers into the record.

13            For VOX, that would be .75 calendar years.  For noise

14   suppression, .29 years.  Squelch, .41 years.  Carrier

15   detection, .33 years.  DSP framework, 3 years.  And DSP source

16   code, 10 years.

17   Q.   Now, the DSP source code development time is 10 years.

18   Can you explain why that is?

19   A.   Yes.  That might sound like a lot of time, but if you

20   actually consider what needed to be done, it's not -- it's

21   actually conservative and the reason is, first of all, when

22   you think of the DSP source code specifically, it represents

23   every single line of the DSP code.  So this is an enormous

24   undertaking.  It represents all the functionality for all the

25   wireless communication.  So that's all the modulation and

Rangan - direct by New

1935

1    demodulation of signals going out over the air.  It also

2    includes all the audio processing.

3           Now, the DSP is one layer, so it also has to

4    communicate with all the other layers of the code.  And that's

5    another big aspect of the design of that system.  Moreover,

6    DSP code is particularly complex to write.  It's not routine

7    software because it needs to be highly optimized to run in --

8    on a limited processor very quickly.

9           And finally, like the other trade secrets, it also

10   leveraged extensively from the work in ASTRO.

11   Q.   Okay.  And did you also consider documents related to

12   these trade secrets?

13   A.   Yes, I did.

14   Q.   Let's look at PTX 789 which relates to the DSP framework.

15   For the record, PTX 789 is already in evidence.

16          Dr. Rangan, what is shown here on this slide?

17   A.   This is a PowerPoint presentation introducing the DSP

18   framework.  And I've just taken one picture from that to

19   describe the DSP framework to show you the level of complexity

20   of this.  The DSP has to manage multiple layers.  It has to

21   interact with the operating system and handle events.  And

22   this type of work is what really contributes to the amount of

23   development time that was invested in the Motorola case.

24   Q.   Now, this is just one document related to DSP framework,

25   but did you review additional documents related to these trade

Rangan - direct by New

1936

1   secrets in the DSP framework and DSP bucket?

2   A.  Yes, I did.  I reviewed a large number of documents as

3   well as the source code.

4   Q.  And do those documents support your opinion with respect

5   to the development efforts for these trade secrets?

6   A.  Yes.  They all confirmed my belief that these estimates

7   were indeed conservative.

8   Q.  And so after looking at the code and looking at the

9   documents, did you again also apply your experience to

10  assessing the development efforts in these trade secrets?

11  A.  Yes, I did.

12  Q.  And can you explain just -- explain that just a little

13  bit?

14  A.  Sure.  I had -- actually, DSP was a very key part of my

15  own work at both Flarion and Qualcomm, so I had led the DSP

16  teams in both of those companies.  So I have a lot of

17  experience with this.  At Qualcomm, we also had the benefit of

18  having legacy code from previous projects.  So I understand

19  the benefit and work involved in leveraging legacy code.

20          I had also worked specifically, for example, on

21  development of the DSP code for the LTE modem which is quite a

22  significant body of work.  The teams were kind of similar to

23  what was at Hytera -- I'm sorry, at Motorola:  About 10 to 15

24  what you would call firmware engineers along with 10 to 15

25  systems engineers.  I still love the subject of DSP, and I

Rangan - direct by New

1937

1    teach that still at NYU.

2    Q.  All right.  Let's turn to the next trade secret, which is

3    the repeater.  We spent a lot of time talking about the

4    repeater, so we'll go fast on this one.  What did you conclude

5    with respect to the development time for the repeater?

6    A.  In the repeater trade secret, it was my belief that it

7    would take at least 13.5 years.

8    Q.  Now, that's also a lot of time.  Can you explain why that

9    development effort would take so long?

10   A.  Yes.  Remember, this trade secret is really the incomplete

11   repeater functionality, so that's all the software, hardware,

12   and so on.  Also, the repeater is typically more complex than

13   the subscriber code because it has to typically manage

14   multiple connections at the same time.

15        It's also -- generally, the architecture and code is

16   often separate because it's doing a different side of the

17   protocol stack than the subscriber unit.  Indeed, you heard

18   Mr. Karpoor testify that he has a separate team at Motorola

19   which is distinct from the teams that would be working on the

20   subscriber code.

21   Q.  And did you review documents related to the repeater in

22   assessing development time?

23   A.  Yes, I did.

24   Q.  All right.  Let's go to the next slide, which for the

25   record shows PTX 1264, 1316, and 1330, all of which are in

Rangan - direct by New

1    evidence.

2         Just very briefly, Dr. Rangan, can you explain what

3    these documents show about development time for this trade

4    secret?

5    A.   So all of these documents show again the complexity of the

6    work involved in developing the repeater code, some of the

7    software architecture parts on the top right, and the

8    hardware, other parts of the ARM or host code on the bottom

9    right.  I also point out that the development time just for

10   one of these documents you can see spanning several years,

11   from 2004 to 2006.

12   Q.   And did you review other documents in the course of your

13   work in this case that support your opinion with respect to

14   the development time of this trade secret?

15   A.   Yes, I did.  I looked at, again, all the repeater code and

16   the documents.

17   Q.   Okay.  Let's go to the next trade secret, which is DMR

18   mobile source code and all source code.  Can we go to Slide

19   122, Dave -- excuse me, 123.

20        What did you conclude with respect to the development

21   time for these trade secrets?

22   A.   In this case, the DMR source code would take at least 9.07

23   years, and the mobile radio source code, 3.75 years.

24   Q.   And what type of work would go into developing the DMR

25   radio and mobile source code trade secrets?

Rangan - direct by New

1939

A.   The DMR source code is the entire source code, so it's

including the mobile, portable, and repeater source code.  It

has the protocol stack, the DSP code, as well as all the

architectural code.  So this is really the entire source code

that Motorola had developed.

It has again a considerable amount of framework to

manage such a complex piece of code across multiple platforms

and had been in development since the ASTRO times.

Q.   Did you look at source code and source code revision

histories to assess the development time for these two trade

secrets?

A.   Yes, I did.

Q.   Okay.  In the slides in front of you, turn to the slide

that reflects PTX 2100.

A.   Yes.

Q.   Did you review PTX 2100 in reaching your opinion?

A.   Yes, I did.

Q.   What is PTX 2100?

A.   This is a ClearCase log for one of the files in the

Motorola source code.

Q.   And was that document produced by Motorola?

A.   Yes, it was.

MS. NEW:  Okay.  Your Honor, plaintiff moves to admit

PTX 2100 into evidence.

THE COURT:  It is received and may be published.

Rangan - direct by New

1          (Plaintiff's Exhibit 2100 received in evidence.)

2    BY MS. NEW:

3    Q.  So what did the source code revision histories tell you

4    about development for the DMR radio source code trade secret?

5    A.  This is not the source code itself but just the revision

6    history of that in the, what's ClearCase which is a

7    repository.  And you can see that this one individual file was

8    in development from about ten years, just this one of many,

9    many files to be developed.

10   Q.  Now, we -- just to orient, we talked a lot about source

11   code repositories in this case and how people can check in and

12   check out code.  Do the ClearCase histories reflect that work?

13   A.  Yes.  ClearCase is one type of repository that Motorola

14   worked with.

15   Q.  And what does this source code revision history tell you

16   about the amount of time to develop the DMR radio and mobile

17   source code trade secrets?

18   A.  So in this one particular file here, you see at least ten

19   years of work.  And this is just one, as I said, of many

20   files.

21   Q.  All right.  And let's go to the next slide.  And what is

22   reflected here on this slide?

23   A.  This is one of the files from the mobile radio source

24   code.  And this one, too, you see eight to nine years of work

25   just for one of many, many files that were in development.

Rangan - direct by New

1941

1  Q.  And when you say "one of many, many files," what do you

2  mean by that?

3  A.  There were thousands of source code files that comprised

4  the DMR source code.  It's a vast volume of code, and I'm just

5  pointing out two examples in this case.

6  Q.  And again, did you rely on your experience in assessing

7  these trade secrets?

8  A.  Yes.  At both -- I had led software teams at both Qualcomm

9  and Flarion.  I wanted to point out here that I've also had

10  considerable DSP code experience.  And what's interesting was

11  that the Flarion DSP is exactly the same as the one that was

12  used by Motorola, this case, the C55.

13  Q.  So let's talk next about the testing and benchmarking

14  trade secret.  What did you conclude with respect to the

15  development time for this trade secret?

16  A.  In this case, the testing and benchmarking would take at

17  least five years.

18  Q.  Did you consider documents to assess the development time

19  for the testing and benchmarking trade secret?

20  A.  Yes, I did.

21  Q.  Let's look at PTX 532 and 127 which are already in

22  evidence.  Dr. Rangan, can you explain what these two

23  documents show?

24  A.  These are two of many testing documents in this trade

25  secret.  You've seen them both but in both cases, they have

Rangan - direct by New

1942

1  several details of very specific confidential and proprietary

2  tasks with very detailed simulation results, test procedures,

3  and so on.

4  Q.  And did you review other documents related to this trade

5  secret that support your opinion on development time?

6  A.  Yes, I did.  There were numerous documents in this case.

7  Q.  And did you also rely on your experience?

8  A.  Yes.  Testing, as you remember from Mr. Lund's initial

9  presentation, is extremely vital towards getting reliable

10  commercial products, and that was my experience at both

11  Flarion and Qualcomm.  So I had supervised and recruited test

12  teams at both companies.

13          It's important here to recognize that you also

14  separately had -- had separate test teams for subscriber and

15  base station products as well.  And just, for example, the

16  testing work on the base station at Flarion was at least about

17  four years.

18  Q.  All right.  Let's turn to the XCMP trade secret.  What did

19  you conclude with respect to development time for this trade

20  secret?

21  A.  In this case, my estimate is that it would take at least

22  four years.

23  Q.  And did you review documents that support that development

24  time?

25  A.  Yes, I did.

Rangan - direct by New

1943

1  Q.  All right.  Let's go to PTX 1315 which is already in

2  evidence.  What does this tell you about development time for

3  XCMP?

4  A.  This is a -- one of the PowerPoint presentations on XCMP.

5  And I just took out one of the pages of this here to show you

6  the complexity of the work involved.  This is representing one

7  of the classes or objects in that piece of software.  And you

8  can see all the parts that you have to actually develop for

9  just this one object.

10  Q.  Now, there are a bunch of blue lines here that look kind

11  of like bullet points with maybe the source code directories

12  next to it or source code information.  Do each and every one

13  of those items have to be developed as part of this trade

14  secret?

15  A.  Yes.  Each one of those blue and the purple dots and then

16  all the messaging between them.

17  Q.  All right.  And let's go to the hardware trade secret.

18  What did you conclude with respect to development time for

19  this trade secret?

20  A.  This time here, it's my estimate that again, it would take

21  at least three years of work.

22  Q.  And did you review documents related to this trade secret?

23  A.  Yes.  There were a number of documents in this case, and I

24  looked at all of them carefully.

25  Q.  Let's look at a couple examples of that:  PTX 793, 459,

Rangan - direct by New

1944

1    and 1381, all of which are in evidence.  Very briefly,

2    Dr. Rangan, can you just explain what these show?

3    A.  The document on the left is a technical specification for

4    the MAKO IC.  And this represents just the design of the MAKO

5    IC, and there's also on the right a Trident IC and then a

6    frequency generation unit.  Each of these documents have

7    worked out very significant, detailed designs for all the

8    parts and the expected performance of those different

9    components.

10        I just wanted to point out that this document, for

11   example, on the left, the MAKO IC, it itself just takes about

12   three years of work.

13   Q.  And by "it itself," do you mean just the document?

14   A.  Just the document, yes.

15   Q.  And did you consider your experience in assessing the

16   hardware trade secret?

17   A.  Yes.  I have a lot of experience with software at --

18   hardware, sorry, at Flarion.  We taped out three versions of

19   our chip.  And Qualcomm is one of the world's largest

20   semiconductor manufacturers.  So I've worked with an interface

21   with hardware teams in both companies looking both at digital,

22   analog, and RF circuits.

23        THE COURT:  Did you become more efficient and

24   productive over the years?

25        THE WITNESS:  I did.  I hope so.

1       THE COURT:  Do engineers within recent years run

2  faster and jump higher?

3       THE WITNESS:  I think they do, but they have a lot

4  better help now.

5       THE COURT:  So your comparison goes back 10, 20

6  years, right?

7       THE WITNESS:  It did.  Actually --

8       THE COURT:  What I'm saying, is there no accounting

9  for improvement in education, efficiency, productivity, and

10  incentives as part of your calculations?

11       THE WITNESS:  Oh, that's a good question, your Honor.

12  I've tried to give my estimates for the duration here, which

13  is from 2008 to 2018.  A lot of this experience I have is in

14  that timeframe because I actually was supervising teams in

15  that 2008 period, for example.

16       THE COURT:  Part of my question is the idea that

17  professors such as you and graduate students have become more

18  productive, more efficient over the years, have they not?

19       THE WITNESS:  Yes, they have.

20       THE COURT:  So in reaching your calculations of time,

21  do you make some adjustments for, by way of that example,

22  inflation?

23       THE WITNESS:  That's a good question.  I think all --

24  my estimates do account for that, but the reality is that the

25  development time has not necessarily improved so much.  What's

Rangan - direct by New

1946

1    improved has been the capability of what can be developed.

2              THE COURT:  The iceberg moves a little faster?

3              THE WITNESS:  Maybe the better -- maybe that's a good

4    way to think about it.

5              THE COURT:  Maybe it's not a good way.

6              You may proceed, counsel.

7    BY MS. NEW:

8    Q.  So Dr. Rangan, we were just talking about development

9    estimates for the individual trade secrets, and you mentioned

10   a couple times that those were conservative.  Would that

11   conservative -- conservatism also account for the issue that

12   Judge Norgle just raised which is that there may have been

13   advancements in engineering over time?

14   A.  Yes, it would easily.

15   Q.  Okay.  So --

16             THE COURT:  That was a great question which

17   summarized my point.  All right.  Please proceed.

18   BY MS. NEW:

19   Q.  Now, so we also were talking about individual trade secret

20   development time.  Do you also account for the longest

21   development time if you think about combinations of trade

22   secrets?

23   A.  Yes, I do.

24   Q.  Okay.  So on your slide here you have two columns:  Gating

25   trade secrets and dependent trade secrets.  Can you explain

Rangan - direct by New

1947

1  what each of those columns mean?

2  A.  Yes.  To try to account for combinations of trade secrets,

3  I've divided all the trade secrets into two categories:

4  Dependent and gating.  The concept is that for any of the

5  dependent trade secrets, the gating trade secrets would need

6  to be substantially complete before the dependent trade

7  secrets can begin.

8  Q.  And if -- so if the jury, for example, found a gating

9  trade secret and a dependent trade secret to be

10  misappropriated, how would they account for the full

11  development time of those trade secrets?

12  A.  Okay.  That's a good question.  So let's take a specific

13  example.  Suppose you wanted to know the time it would take to

14  do the DSP source code secret and the testing and benchmarking

15  trade secret.  The concept is that the testing and

16  benchmarking -- the DSP, sorry, the DSP source code would need

17  to be substantially complete before you can start testing it.

18         Since the DSP source code would take ten years, at

19  least ten years, and the testing and benchmarking taking at

20  least five years, the total would be more than 15 years.

21  Q.  Now, what if there -- the jury finds that there's

22  misappropriation of multiple gating trade secrets?  How would

23  you account for the full development time?

24  A.  Sure.  In that case, let's do another example.  Suppose it

25  was the DSP source code and the DSP framework.  Obviously, if

Rangan - direct by New

1948

1  you had to complete both of these, the minimum amount of time

2  would be at least as long as the single longest individual

3  one.

4          So in this case, if one takes three and the other

5  takes ten, it would take at least ten years to complete these

6  two.  Of course, this would be conservative because some of

7  the DSP framework would need to be completed before the DSP

8  source code could begin, so it's actually probably in reality

9  longer than that, but it's definitely at least ten.

10  Q.  Now, did your methodology account for some overlap either

11  in terms of source code between the trade secrets or time

12  between the trade secrets?

13  A.  Yes.  There is some overlap between the -- in source code

14  mostly between the dependent trade secrets and the gating

15  trade secrets but in general, this is minimal.  And since each

16  of these estimates are very conservative, that suffices to

17  account for any of the overlap.

18  Q.  Now, Dr. Rangan, you've said a few times that it's your

19  opinion that the estimates, the development estimates for

20  Motorola trade secrets are conservative for a company

21  comparable to Motorola; is that right?

22  A.  That's right.

23  Q.  Okay.  Can you explain why that is?

24  A.  Remember that the Motorola engineers, when they were first

25  providing these estimates, wanted to be conservative in the

Rangan - direct by New

1  first place.  They also, for example, in some cases didn't

2  account for the ASTRO code.  They also -- sorry.  One of the

3  other -- and one of the other issues is that when I computed

4  the calendar years for the trade secrets based on their

5  estimates, it was extremely conservative because it assumed

6  that all the engineers could work in parallel for the duration

7  of that trade secret but, of course, in reality that can't --

8  doesn't occur, and in reality, the actual elapsed time for the

9  trade secrets was much longer.

10 Q.  And Dr. Rangan, did development of Motorola's trade

11 secrets involve any specialized skill or engineering training?

12 A.  Yes.  This is not at all a routine software task.  You see

13 a lot of specialized skill.  For example, the DSP code

14 requires specialized DSP skills.  You see a lot of specialized

15 skills needed in networking and protocols for all those

16 components of this as well as there's specialized hardware and

17 test, testing skills that are needed, specialized equipment,

18 for example.

19      And since this was really a large-scale software

20 development, you also have to have senior software people to

21 know how to architect complex pieces of software.

22 Q.  Now, back in 2008 when -- prior to the arrival of G.S.

23 Kok, Y.T. Kok, and Sam Chia at Hytera, would you consider

24 Hytera to be a company that's comparable to Motorola?

25 A.  Absolutely not.

Rangan - direct by New

1950

1  Q.  Why not?

2  A.  Well, first of all, it did not have the experience in

3  digital two-way radio that Motorola did which was a leading

4  company in that time.  It also didn't have anywhere near the

5  recruiting of talent.  In fact, you saw that recruiting was

6  one of the issues that was continuously mentioned.

7  Q.  Have you seen any evidence or any documents or materials

8  in this case that Hytera had the ability to recruit or hire

9  engineers with the requisite skill or experience to develop a

10  DMR product from scratch?

11  A.  No.  In fact, we saw the opposite, that in many cases,

12  they were noting the lack of skills.

13  Q.  And based on that, what is your opinion as to Hytera's

14  ability to develop the asserted trade secrets without access

15  to Motorola's confidential information?

16  A.  It's my view that they would actually have never conceived

17  of these or implemented these trade secrets in any

18  commercially reasonable period of time, but even if they were

19  to, the time for Motorola took to develop these trade secrets

20  would be an absolute minimum or baseline for that time.

21  Q.  And you mentioned a commercially reasonable period of

22  time, Dr. Rangan.  What do you mean when you say that Hytera

23  could not have conceived of or implemented the trade secrets

24  in a commercially reasonable period of time?

25  A.  Well, Hytera released its first products in the early part

Case: 1:17-cv-01973 Document #: 792 Filed: 12/20/19 Page 221 of 224 PageID #:53832
Rangan - direct by New
1951

1    of 2010, and we're now in November of 2019, almost ten years

2    later than that first release.  So it's my belief that at

3    least even ten years from the date -- sorry, and from ten

4    years from the date that they released their products, they

5    are still using the Motorola asserted products to this day.

6    So it would take at least ten years of time for them to

7    develop these asserted trade secrets.

8              MS. NEW:  Thank you, Dr. Rangan.

9              I pass the witness.

10             THE COURT:  All right.  We'll do cross-examination

11   tomorrow at 10:00 o'clock.  The witness is excused until

12   10:00.

13             Members of the jury, 10:00 o'clock tomorrow.  And

14   keep in mind, members of the jury, that we will stop at noon

15   tomorrow.

16        (Proceedings heard in open court.  Jury out.)

17             THE COURT:  Court is adjourned.  10:00 o'clock.

18             MR. ALPER:  Your Honor, a small housekeeping item.

19   You had previously granted our motions to seal.  By agreement,

20   the parties have provided the court reporter with a list of

21   the exhibits to be sealed so that way, we don't have to take

22   up the time to read them in court.

23             THE COURT:  By all means, I accept your agreement,

24   and sealing should go forward.

25             MR. ALPER:  Yes, your Honor.

1952

1          THE COURT:  All right.  Thank you.

2          (Upon agreement of counsel, the following exhibits are

3      designated as sealed:  DTX-4279; PTX-0100; PTX-0107;

4      PTX-0147; PTX-0229; PTX-0474; PTX-0480; PTX-0520;

5      PTX-0521; PTX-0525; PTX-0531; PTX-0573; PTX-0631;

6      PTX-0641; PTX-0654; PTX-0784; PTX-0785; PTX-1018;

7      PTX-1019; PTX-1020; PTX-1237; PTX-1264; PTX-1316;

8      PTX-1317; PTX-1330; PTX-1740; PTX-1863; PTX-2090;

9      PTX-2091.)

10          MS. ROTHSCHILD:  Your Honor, one more brief

11  housekeeping matter, please.  When we played -- or when

12  counsel for Motorola played the deposition videos, our counsel

13  objected, and we wanted to state for the record the objections

14  to match up for the testimony.

15          THE COURT:  Are they in writing?

16          MS. ROTHSCHILD:  I can write them up better.

17          THE COURT:  Do you want to stop now and argue them?

18          MS. ROTHSCHILD:  No, no.  I just wanted to match

19  up counsel's --

20          THE COURT:  I don't know what you mean when you say

21  "match up."

22          MS. ROTHSCHILD:  Sorry?

23          THE COURT:  Match up what?

24          MS. ROTHSCHILD:  To the trial transcript.  The court

25  reporter did make a request that I do it on the record.

1953

1    THE COURT:  Do you think I have the trial transcript?

2    MS. ROTHSCHILD:  No, sir.  I have the references,

3    though, of the --

4    THE COURT:  Do you understand what is being argued

5    here?

6    MR. ALPER:  I think this is just a matter of noting

7    where in the trial transcript the --

8    THE COURT:  Well, can you reach an agreement?

9    MR. ALPER:  Yes.  Maybe we can submit them to the

10   court reporter and then they can be --

11   THE COURT:  Well, I don't how we get the court

12   reporter involved here, as good as she is, one of the best,

13   actually.  But see if you can reach an agreement and if I, as

14   the judge, have to get involved in it, by all means, we'll do

15   it tomorrow.

16   MR. ALPER:  Absolutely.  And we'll reach -- there

17   will be no disagreement on this issue.

18   THE COURT:  Very well.

19   MS. ROTHSCHILD:  Thank you, your Honor.

20   THE COURT:  Thank you, counsel.

21   THE CLERK:  All rise.  Court is adjourned.

22   (Proceedings adjourned from 4:26 p.m. to 10:00 a.m.)

23

24

25

1                    * * * * * * *

2             C E R T I F I C A T E

3        We, Amy Spee and Judith A. Walsh, do hereby certify

4  that the foregoing is a complete, true, and accurate

5  transcript of the proceedings had in the above-entitled case

6  before the Honorable CHARLES R. NORGLE, SR., one of the judges

7  of said court, at Chicago, Illinois, on November 26, 2019.

8  /s/ *Amy Spee, CSR, RPR, CRR*_____          November 27, 2019

9  /s/ *Judith A. Walsh, CSR, RDR, F/CRR*_____     November 27, 2019

10 Official Court Reporters

11 United States District Court

12 Northern District of Illinois, Eastern Division