1955

1    IN THE UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3    MOTOROLA SOLUTIONS, INC., and MOTOROLA    ) No. 17 CV 1973
     SOLUTIONS MALAYSIA SDN. BHD,              )
4                                              )
                                               )
5         Plaintiffs,                          )
     vs.                                       ) Chicago, Illinois
                                               )
6    HYTERA COMMUNICATIONS CORPORATION, LTD.,  ) November 27, 2019
     HYTERA AMERICA, INC., and HYTERA          )
7    COMMUNICATIONS AMERICA (WEST), INC.,      )
                                               )
8         Defendants.                          ) 10:00 o'clock a.m.

9
                    TRIAL - VOLUME 12 A
10             TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE  CHARLES R. NORGLE, SR.
11                  and a jury

12

13   For the Plaintiffs:    KIRKLAND & ELLIS LLP
                            BY:  Mr. Adam R. Alper
14                               Mr. Brandon Hugh Brown
                                 Mr. Reza Dokhanchy
15                               Ms. Barbara Nora Barath
                                 Mr. Kyle Calhoun
16                          555 California Street
                            27th Floor
17                          San Francisco, California 94104
                            (415) 439-1400
18
                            KIRKLAND & ELLIS LLP
19                          BY:  Mr. Michael W. De Vries
                            333 South Hope Street
20                          Los Angeles, California 90071
                            (213) 680-8400
21

22
     Court reporter:            BLANCA I. LARA
23                          Official Court Reporter
                            219 South Dearborn Street
24                               Room 2342
                            Chicago, Illinois 60604
25                            (312) 435-5895
                            blanca_lara@ilnd.uscourts.gov

1956

1    Appearances:  (Continued:)

2

3    For the Plaintiffs:        KIRKLAND & ELLIS LLP
                                BY: Ms. Megan Margaret New
                                300 North LaSalle Street
4                               Chicago, Illinois 60654
                                (312) 862-7439
5
                                KIRKLAND & ELLIS LLP
6                               BY:  Ms. Leslie M. Schmidt
                                601 Lexington Avenue
7                               New York, New York 10022
                                (212) 446-4763
8
     Motorola Corporate Representative:   Mr. Russ Lund
9

10

11   For the Defendants:        STEPTOE & JOHNSON LLP
                                 BY: Mr. Boyd T Cloern
                                     Mr. Michael J. Allan
12                                   Ms. Jessica Ilana Rothschild
                                     Ms. Kassandra Michele Officer
13                               1330 Connecticut Avenue., Nw
                                 Washington, DC 20036
14                               (202) 429-6230

15

16
     Hytera Corporate Representative:  Michele Ning
17

18

19

20

21

22

23

24

25

1957

1  THE CLERK:  All rise.

2  (The following proceedings were had in the

3  presence of the jury in open court:)

4  THE CLERK:  The Court is in session.  Please be

5  seated.

6  THE COURT:  Good morning, members of the jury.

7  Counsel, several of the jurors have informed the Court

8  that they have a train schedule, trains leaving at or about

9  noon.  So rather than end at noon today, we will make it 11:30

10  to accommodate the jurors.  I assume there's no objection.

11  MR. ALPER:  No objection.

12  MR. CLOERN:  No objection, Your Honor.

13  (Many in the courtroom responded "no

14  objection".)

15  (Laughter in the courtroom.)

16  THE COURT:  All right.  Please recall the witness.

17  MR. ALPER:  Yes, Your Honor.  We recall Dr. Rangan to

18  the stand.

19  MR. ALLAN:  May I proceed, Your Honor?

20  THE COURT:  Please proceed.

21  SUNDEEP RANGAN, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

22  CROSS EXAMINATION

23  BY MR. ALLAN:

24  Q.  Good morning, Dr. Rangan.

25  A.  Good morning.

10:00:45

10:01:00

10:01:07

10:01:18

10:01:38

1958

1  Q.  Michael Allan for the Hytera defendants.

2       Now, Dr. Rangan, I think you testified on direct that

3  you worked on an earlier cellular data system, is that right?

4  A.  That's right.

10:01:46  5  Q.  And the specific technology you worked on was, the acronym

6  was OFDM?

7  A.  That's right.

8  Q.  And that stands for orthogonal frequency-division

9  multiplexing?

10:01:57  10  A.  That's correct.

11  Q.  And you and some of your colleagues created Flarion

12  Technologies around 2000?

13  A.  That's right.

14  Q.  And you worked with a company called Bell Labs before that?

10:02:08  15  A.  That's correct.

16  Q.  And while you were at Flarion you continued to work on this

17  OFDM technology, yes?

18  A.  That's right.

19  Q.  And you took the information -- you relied on the

10:02:19  20  information you developed at Bell Labs to continue to work at

21  Flarion?

22  A.  That's right.

23  Q.  And in the mid 2000's a company call Qualcomm acquired

24  Flarion?

10:02:31  25  A.  That's right.

1  Q.  Primarily for the OFDM work, right?

2  A.  That's correct.

3  Q.  So the two primary companies you've been at Flarion and

4  Qualcomm?

10:02:44  5  A.  And the New York University, yes.

6  Q.  But aside from academia.

7  A.  Oh, yes.  Correct.

8  Q.  Flarion and Qualcomm.

9          And you never incorporated or tried to incorporate any

10:02:55  10  of this OFDM technology into a DMR product, right?

11  A.  No, I didn't.

12  Q.  Now, you didn't work on any DMR radios at Flarion, right?

13  You didn't do that work?

14  A.  No, I did not.

10:03:06  15  Q.  And you didn't work on any DMR radios at Qualcomm?

16  A.  No.

17  Q.  And you've never worked on DMR radios, right?

18  A.  Not commercially, no.

19  Q.  And you certainly never led any kind of development team

10:03:18  20  where you developed a DMR radio?

21  A.  No, I did not.

22  Q.  And, in fact, prior Motorola retaining you to be an expert

23  witness, you never used a DMR radio, right?

24  A.  That's correct.

10:03:30  25  Q.  Now, you're -- you're not a -- you understand there's an

1960

1   association, a DMR association?

2   A.  Yes, I do.

3   Q.  Where members who get involved in the DMR world are members

4   of, right?

10:03:41   5   A.  That's correct.

6   Q.  And you're not a member?

7   A.  I don't think individuals are generally members.

8   Q.  So you're not, right?

9   A.  I am not.

10:03:48   10   Q.  And Qualcomm is not a member?

11   A.  I do not think Qualcomm is a member.

12   Q.  Flarion certainly was not a member?

13   A.  Definitely not.

14   Q.  And before you began work for Motorola, you' never even

10:04:01   15   read the DMR standard, right?

16   A.  That's correct.

17   Q.  Now, you understand there's been some testimony in this

18   case about another digital standard called TETRA?

19   A.  That's right.

10:04:16   20   Q.  And you've never developed any TETRA radios, right?

21   A.  No, I did not.

22   Q.  And you understand that DMR and TETRA are two different

23   digital radio standards?

24   A.  That's correct.

10:04:26   25   Q.  And the DMR is a TDMA standard, right?  Time division

1961

1    multiple access?

2    A.  Yes.  That's right.

3    Q.  And you understand that TETRA is an FDMA, meaning it uses

4    frequency division multiple access?

5    A.  That's right.  It has different carriers as well.  It has

6    PDMA within each carrier, but it has different frequencies.

7    Q.  In fact, Dr. Rangan, TETRA is a TDMA standard, isn't it?

8    A.  It has a TDMA within each carrier, that's correct.

9    Q.  And APCO is another digital radio standard, right?

10   A.  That's right.

11   Q.  You've never developed any APCO radios, correct?

12   A.  Not commercially, no.

13   Q.  You agree, Dr. Rangan, that having analog radio experience

14   is helpful default digital radio development, yes?

15   A.  Yes, I do.

16   Q.  And you didn't look at any of the features of Hytera's

17   analog radios in forming your opinions in this case, correct?

18   A.  No.  I didn't think it was relevant.

19   Q.  Let's talk about some of your opinions and the bases for

20   your opinions.

21        You issued a written report in this case, yes?

22   A.  Two.

23   Q.  Two.  That's right.

24        And your report indicates that the opinions you

25   provided on your direct examination are based on various

1962

1  assumptions, right?

2  A.  That's right.

3  Q.  And you were, in fact, told to assume for purposes of your

4  opinion that Hytera had misappropriated the 21 alleged trade

10:05:51  5  secrets in this case?

6  A.  That's correct.  I would assume that they were both valid

7  and misappropriated, that was as you heard from Dr. Wicker's

8  part of the analysis.

9  Q.  And so as part of that assumption, you also assumed that

10:06:02  10  the 21 alleged trade secrets were, in fact, valid trade

11  secrets?

12  A.  That's correct.

13  Q.  And that they were -- and that Motorola took reasonable

14  steps to protect them, you had to make that assumption as well?

10:06:13  15  A.  That's right.  I didn't see anything inconsistent with

16  that, but that was the assumption in the analysis.

17  Q.  And you had to make the assumption that the 21 alleged

18  trade secrets were valuable, right?

19  A.  That's right.

10:06:24  20  Q.  And to be clear, you're assuming that G.S. and Sam and

21  Y.T., the people we've been talking about throughout the trial,

22  they misappropriated Hytera's trade secrets, right?  That's

23  part of your assumption?

24  A.  Yes.  That's consistent with the evidence I saw.

10:06:39  25  Q.  But you're also told to assume that Hytera as a company

1963

1    misappropriated the trade secrets, right?

2    A.  Yes.  That's correct.

3    Q.  All three separate Hytera entities, that's your assumption

4    into your opinion?

10:06:57    5    A.  Yes.  That's correct.

6    Q.  And I notice you didn't tell the jury about any of those

7    assumptions yesterday, did you?

8    A.  I thought I did try to distinguish between the work of Mr.

9    Wicker -- Dr. Wicker and myself.

10:07:09    10    Q.  I'm not talking about Dr. Wicker's opinion.  I'm talking

11    about the assumptions you were provided in forming your opinion

12    that you testified about.

13            You assumed the trade secret misappropriation occurred

14    by Hytera is a baseline for all of your opinions.  You didn't

10:07:24    15    tell the jury about that, did you?

16    A.  Perhaps I didn't.  I can't recall.

17    Q.  Now, you've offered an opinion that confidential

18    information was shared at Hytera; yes?

19    A.  That's correct.

10:07:35    20    Q.  And you reviewed several documents in forming your opinion?

21    A.  That's right.

22    Q.  Most of which were over 10 years old?

23    A.  Yes.  Many were.

24    Q.  Some were more.  12, 13, 14 years old?

10:07:49    25    A.  That's correct.

1  Q.  Now, you testified on direct what you thought those

2  documents said about the knowledge of Hytera's engineers at the

3  time, right?

4  A.  I don't think I want to speak about the state, I can't

5  speak for the state of mind.  I tried to give the perspective

6  more from how an engineer would interpret it.

7  Q.  Right.  So you claimed to offer an opinion from an

8  engineering perspective, that's what you did, right?

9  A.  Yes.  That's correct.

10 Q.  And that's how you tried to differentiate your opinion from

11 Dr. Wicker, right?

12 A.  Well, in part.

13 Q.  And Dr. Wicker is an engineer, isn't it?

14 A.  He is.

15 Q.  And he testified at length about a whole bunch of documents

16 from an engineering perspective as well, didn't he?

17 A.  Yes, he did.

18 Q.  Now, to reach your conclusions in this case, you also used

19 what you call common sense, right?

20 A.  Sure.  That's always useful.

21 Q.  And it's your testimony that you've looked at all these

22 documents and you can glean what people meant in e-mails and

23 documents over a decade ago using your common sense, right?

24 A.  "People meant" might suggest that I'm trying to read their

25 mind about their intentions.  I would say that to the extent I

10:08:01

10:08:15

10:08:28

10:08:44

10:09:08

1965

1    was discussing intentions, it's what one would interpret the

2    intentions based on the material that I saw.

3    Q.  And that's based on your -- in part, also based on your

4    experiences at Flarion and Qualcomm?  You testified to that,

10:09:27   5    right?

6    A.  Yes.  Absolutely.

7    Q.  And you based your opinion, in part, on how things were

8    done at those companies?

9    A.  That's right.

10:09:36   10   Q.  How business was conducted at Flarion?

11   A.  Yes.

12   Q.  And Qualcomm?

13   A.  Yes.

14   Q.  And you offered a number of opinions on things you thought

10:09:45   15   were reasonable to be done or not done, right?

16   A.  Absolutely.

17   Q.  And that's based on your experience at Qualcomm?

18   A.  Yes.  Among other things, yes.

19   Q.  And I think you were asked some questions about Qualcomm's

10:09:58   20   policies?

21   A.  Yes.  That's correct.

22   Q.  And you relied on Qualcomm's policies as well?

23   A.  That's right.

24   Q.  Including Qualcomm's intellectual property policies?

10:10:07   25   A.  Yes.

Q.  And you understand that Qualcomm has come under a lot of
fire for its intellectual property policies lately, right?

A.  I can't speak to that.

Q.  You cant' speak to that.  So you understand that the U.S.
Government has sued Qualcomm?

A.  Possible.

Q.  You understand that earlier this year a federal judge in
California found anti-trust violation for Qualcomm based on IP
policies?

A.  Well, that's very policy.

Q.  The policies that you relied in forming your opinion in
this case?

A.  It's possible that wouldn't really be relevant, but --

Q.  Wouldn't be relevant?

A.  No, I don't think so.

Q.  You've never been employed by Hytera, right?

A.  No, I have not.

Q.  Any Chinese company?

A.  No.

Q.  Any non-U.S. company?

A.  Ah, very briefly before I went to a Ph.D. I worked --

Q.  Fair enough.

        I'm sorry.  Go ahead?

A.  I worked in France for a couple of months.

Q.  Primarily Qualcomm and Flarion?

1967

1   A.  That's correct.

2   Q.  You testified about some Hytera documents that were

3   addressed by Dr. Wicker in his testimony, right?

4   A.  Yes, I did.

10:11:10   5   Q.  And you sat here in the courtroom.  You heard all of Dr.

6   Wicker's testimony?

7   A.  I did.

8   Q.  I want to cover some of the -- the documents real quick.

9   A.  Sure.

10:11:20   10   Q.  So we saw this e-mail where Peiyi Huang sent rfhal library

11   and a framer api header file, do you remember that?  There's

12   been a lot of testimony about that?

13   A.  We had a lot, yes.

14   Q.  And you listened to Dr. Wicker's testimony?

10:11:38   15   A.  I did.

16   Q.  And he testified that Peiyi Huang seemed to have sent that

17   framer_api.h file by mistake, right?

18         THE COURT REPORTER:  Sorry.

19         MR. ALLAN:  Sorry.

10:11:44   20   BY MR. ALLAN:

21   Q.  You realize Dr. Wicker testified that Peiyi Huang sent the

22   framer_api file by mistake?

23   A.  That's correct.

24   Q.  You also discussed this Neo_P21 document, remember that

10:11:59   25   one?

1968

1   A.  I do.

2   Q.  And you weren't here on Monday, I believe, when Dr. Wicker

3   testified that that document was not found in Sam Chia's or

4   Y.T.'s Compass log files, right?

10:12:16   5   A.  I believe that's correct.

6   Q.  And there is some discussion about Y.T. Kok's circulation

7   of an SRS template file, do you recall that?

8   A.  I do.

9   Q.  And you heard Dr. Wicker agree that he could not dispute

10:12:31   10  Zhu Deyou's testimony that he did not have track changes on it

11  when he opened that template, right?

12  A.  I can't recall that's exactly what he said.

13  Q.  Question, this is from his trial transcript:

14          "And you have no reason to dispute that Mr. Zhu

15          Deyou did not have track changes view on when he

16          opened this document, if he indeed even opened

17          it, correct?

18          Answer:  Well, he said he had no recollection.

19          I certainly can't dispute that."

10:13:04   20  A.  Sounds like what he said.

21  Q.  Nor can you?

22  A.  No, I can't know positively one way or the other whether he

23  had track changes or not.

24  Q.  So let's talk about this Roger Zhang so-called welcome

10:13:16   25  e-mail; okay?

1969

1  A.  Sure.

2  Q.  Now, you heard Roger Zhang's testimony that was played in

3  this case, yes?

4  A.  It was.

10:13:22  5  Q.  And you heard Dr. Wicker agree that Roger Zhang testified

6  that he wasn't seeking Motorola's confidential information

7  through that e-mail, right?

8  A.  Again, I can't recall his exact words.

9  Q.  That's the gist of what he said.  I can read it to you

10:13:35  10  again, if you'd like.

11  A.  Maybe that would be helpful, if you don't mind.

12  Q.  (Reading:)

13        "Question:  And Roger Zhang testified that he

14        wasn't seeking Motorola confidential

10:13:45  15        information, but he was instead trying to gain

16        an understanding about how we ourselves should

17        do it, right?  That's what he --"

18        "Answer:  That's essentially what he said, yes."

19        That was Dr. Wicker's testimony in this trial.

10:13:58  20  A.  Sounds like a good representation.

21  Q.  You discussed the Sam Chia spreadsheet, do you remember

22  that?

23  A.  I do.

24  Q.  And again, you were here for Dr. Wicker's testimony on that

10:14:09  25  same document?

A.  I was.

Q.  And he agreed that the only place that the file came --

        THE COURT:  Just a minute.

        Members of the jury, you have heard the testimony of Dr. Wicker.

        What questions you have of this witness today?

        MR. ALLAN:  You don't disagree --

        THE COURT:  Just a minute.  Ask questions of this witness, not just recounting your version of what Dr. Wicker said.  The jury has heard the testimony of Dr. Wicker.  What questions do you have of this witness?

BY MR. ALLAN:

Q.  Dr. Rangan, do you dispute any of Dr. Wicker's testimony --

        THE COURT:  If you do not comply with this order, I will end your cross-examination.

BY MR. ALLAN:

Q.  Let's pull up PDX 9.33.  This is one of the documents you discussed on your direct examination.

A.  That's correct.

Q.  I want to direct you to line 133.

        And you pointed this out yesterday, right?

A.  I did.

Q.  "Determine DSP library risk and where to store the files," do you see that?

1971

A.  I do.

Q.  Now, carrying over, you've referenced:

"Yu Yang is to talk to software configuration

manager and get the FEC and Symbol Recovery

Files stored in a specific folder."

Do you recall that?

A.  I do.

Q.  And I think you suggested that Yu Yang understood what Sam Chia was talking about with respect to restoring library files?

A.  Yes.

Q.  You understand, Dr. Rangan, that the two files that are referenced next to Yu Yang's name, "SCM" and "FEC and symbol recovery", those files are not accused by Motorola in this case?

A.  That's not my understanding.

Q.  You understand that those files are not referenced by Dr. Wicker in either Exhibit C or D, correct?

A.  My understanding is that FEC and symbol recovery are both part of the DSP.

Q.  Do you -- you didn't independently determine, that's not part of your opinion as to whether these files are accused or not, right?  You are relying on other people to make that determination?

A.  My understanding is that the trade secret, the DSP trade secret, at least one of them includes all the DSP source codes,

1    and that would include the FEC and symbol recovery.

2    Q.  Is it your understanding that Dr. Wicker explained in his

3    exhibit C and D --

4              THE COURT:  All right.  Counsel --

5              MR. ALLAN:  Sorry.  Withdrawn.

6              THE COURT:  You're warned again.

7    BY MR. ALLAN:

8    Q.  Let's talk about PDX 9.18.  Let's take a look at that.

9    A.  Sure.

10   Q.  Now, you testified yesterday -- you testified yesterday

11   that Dr. Wicker -- I'm sorry, Dr. Rangan, that it should've

12   been obvious to Huang Ni that this framer_api file was not in

13   Hytera's code because it contained a copyright notice in 1988?

14   A.  That's right.

15   Q.  Let's take a look at 9.21 if we can.

16             And this is the slide you pointed out to note that

17   it's got a copyright notice of 1988?

18   A.  Yes, that looks correct.

19   Q.  I think you testified that Hytera wasn't formed in 1988.

20   A.  That's right.  My understanding was that it was formed in

21   1993.

22   Q.  And the fact that the copyright notice had a 1988 date on

23   it shouldn't have been an indication to Huang Ni that something

24   was off?

25   A.  Yes.

1973

1   Q.  I'd like to hand you exhibit DTX 4079.

2          This is a piece of source code Bates numbered

3   HYT1973-18978066.  This is a Hytera source code file from the

4   Harbin Development.  Do you recognize that?

10:18:27   5   A.  It looks familiar, yes.

6          MR. ALLAN:  I'd offer it into evidence, please, Your

7   Honor.

8          MS. NEW:  No objection.

9          THE COURT:  It is received and may be published.

10:18:36   10         (Said exhibit received in evidence.)

11  BY MR. ALLAN:

12  Q.  You see the date on this file, Dr. Rangan, October 25,

13  2006?

14  A.  Yes, I do.

10:18:50   15  Q.  This is from the Harbin file before G.S., Sam, or Y.T. Kok

16  or anybody from Motorola came over, right?

17  A.  Yes.

18  Q.  And it's got a copyright notice of 1988 to 2007, the same

19  one we just looked at with the Huang Ni stamp, right?

10:19:13   20  A.  Yes.  But if you look at many other files in the Harbin

21  directory, they do actually have "1993" on them.  And --

22  Q.  Please continue.

23  A.  I would need to look at this file.  It's possible just by

24  the name of it that this is actually a third-party file.  I'll

10:19:25   25  take a look.

1    Q.  The author is Yu Yang, do you see that?

2    A.  Yes, but he might've taken this from some other part.

3         But I need to take a look at this.  It is true that

4    this one is labeled "1988," but there are definitely other

5    files which have 2003.

6    Q.  And there are also other files that have 1988, correct?

7    A.  I -- I don't recall.

8    Q.  You testified about Mr. Chen, Hytera's CEO?

9    A.  I did.

10   Q.  And things he supposedly knew, correct?

11   A.  Again, I don't want to claim that I could read his mind.

12   Q.  So you've said that a couple of times.  You're not an

13   expert on state of mind?

14   A.  I'm not a mind reader.

15   Q.  And you're not an expert on what motivates people?

16   A.  I can provide -- I don't know what that would be mean to be

17   an expert on motivation.

18   Q.  Certainly that has nothing to do with the technical

19   expertise you have working on OFDM, correct?

20   A.  It could.  Certainly if an engineering issue was present or

21   a business issue related to an engineering product and that

22   created motivation, they could be related.

23   Q.  You have offered opinions on Mr. Chen's personal

24   intentions, though, right?

25   A.  No, I wouldn't, again, say I know, again, a state of mind,

10:19:43

10:19:59

10:20:18

10:20:34

10:20:55

1     but the intentions appear as to the documents I produced.

2     Q.  You testified at a deposition a couple of months ago?

3     A.  I did.

4     Q.  About your opinions on Mr. Chen's intentions, correct?

5     A.  That was one of the topics that came up, yes.

6     Q.  And you testified that -- let me just ask you.  On page 87

7     -- you were sworn to tell the truth at your deposition, right?

8     A.  I did.

9     Q.  Page 87 of your deposition, line 12, to 87 of your

10    deposition, line 19, you were asked the following question:

11            "What about Mr. Chen's personal intentions?  Are

12            you an expert on those?"

13            "Answer:  I offer specific opinions about Mr.

14            Chen in one of the sections of my expert report,

15            I feel confident about those opinions.  If you

16            want to characterize those opinions as opinions

17            about his intentions, to that extent I feel

18            confident about that."

19    A.  Okay.  Sure.  That's fine.

20    Q.  You feel confident that you can offer the opinions on the

21    intentions of Hytera's CEO 12 to 15 years ago?

22    A.  I feel confident that from the -- that one can -- a

23    document -- I can say that -- if a person was intending

24    something, that could be reflected in a document.

25    Q.  So you started work on this case in March of 2019, right?

1    A.  That's right.

2    Q.  And you're reading documents that took place and were

3    written 2007, 2008 timeframe?

4    A.  Even earlier, yes.

10:22:42   5    Q.  Even earlier.

6    A.  That's right.

7    Q.  And from those documents that you dusted off now to look at

8    in 2019, you're opining on the intention of Mr. Chen?

9    A.  Indirectly, yes.

10:22:53   10    Q.  Now you've never met Mr. Chen, correct?

11    A.  No, I have not.

12    Q.  Or ever worked with him?

13    A.  No, I have not.

14    Q.  Never been to Hytera?

10:23:02   15    A.  No.

16    Q.  Never worked with Hytera?

17    A.  Not -- no.

18    Q.  You understand, Dr. Rangan, that not all technology

19    companies are the same?

10:23:11   20    A.  It would be a very bad world if they were.

21    Q.  And they're not organized the same?

22    A.  Luckily not.

23    Q.  They're not all run the same?

24    A.  Absolutely not.

10:23:21   25    Q.  And there are cultural differences?

1    A.  I suppose.

2    Q.  Company-wide and geographic-wide?

3    A.  Sure.

4    Q.  You testified that Mr. Chen thought the DMR project was

5    critical to the future of Hytera, right?

6    A.  Yes.

7    Q.  But in providing that testimony, you don't even know what

8    different products Mr. Chen was working on or Hytera was

9    working on?

10   A.  My understanding is that he was -- prior to this, that they

11   have been working on primarily analog products.

12   Q.  But you have no idea the number of different analog

13   products, whether he was looking at other digital products,

14   correct?

15   A.  No, I didn't analyze their portfolio.

16   Q.  And you don't know what factors Hytera considers in

17   deciding to launch a product, right?

18   A.  I can understand what factors.  I wouldn't characterize it

19   that way.

20   Q.  So you have seen documents in your review of the materials

21   that allow you to understand the factors that Hytera considered

22   12 years ago in deciding whether to launch a product?

23   A.  Yes.  In fact, that ID-driven presentation places some

24   factors and there's other factors that other business analysis

25   that I saw in my review.

10:23:37 (line 5)
10:23:48 (line 10)
10:24:02 (line 15)
10:24:20 (line 20)
10:24:37 (line 25)

1  Q.  You'd agree, Dr. Rangan, that the executives at Hytera have

2  a much better view of what factors they considered in deciding

3  to launch a product back then than you do?

4  A.  What do you mean by "better"?

10:24:55   5  Q.  They're the ones who made the decision, Dr. Rangan.  You

6  didn't, right?

7  A.  No, I understand they made the decision, but the --

8  Q.  They have a better understanding of the factors that they

9  consider, as a company, in deciding to do or not do something

10:25:08  10  than you do?

11  A.  What I can say is that I saw a lot of material which did --

12  looked at a lot of material that they had left regarding their

13  decision for pursuing what -- pursuing DMR specifically.  I

14  felt that was sufficient at least for my analysis, but I can't

10:25:36  15  -- obviously, those people may have more information as to the

16  decision process that they went through.

17  Q.  You understand, Dr. Rangan, that Hytera hired an outside

18  consulting firm after the DMR project had been under

19  development for a couple of years, correct?

10:25:55  20  A.  I don't recall that.

21  Q.  You don't consider that as part of your opinion?

22  A.  I don't recall that.

23  Q.  And the consulting firm was hired long before G.S. and Sam

24  or Y.T. came over?

10:26:12  25  A.  It's possible.

Q.  Let me hand you PTX 415.  This is a document produced by
Hytera.  Do you see that, Dr. Rangan?

A.  Yes, I do.

Q.  And it's a Meeting Summary from Hytera's files from a
meeting that took place August 13, 2007, right?

A.  That's right.

          MR. ALLAN:  I'd offer this into evidence, please, Your
Honor.

          MS. NEW:  No objection.

          THE COURT:  It is received and may be published.

          (Said exhibit received in evidence.)

BY MR. ALLAN:

Q.  So this was translated from Chinese, right?

A.  That's correct.

Q.  In fact, a number of documents you looked at were
translated from Chinese?

A.  Yes.

Q.  So let's take a look, if we could highlight the date,
August 13, 2007.

          And the "Meeting Topic," do you see that, Dr. Rangan?
It's "progress and current problems of DFSS Project"?

A.  Yes.

Q.  And you understand "DFSS" stands for design for Six Sigma?

A.  That's right.

Q.  And that's essentially a business management tool for the

1  effect of design and manufacturing of products?

2  A.  Yes.  Six Sigma is a measure of reliability, typically.

3  Q.  And under the "Meeting Content" it says "report and

4  suggestions of consultants on current problems"?

10:27:39  5  A.  Yes.

6  Q.  And then the -- so back in 2007, Hytera had hired this

7  consulting firm to evaluate the status of its DMR project that

8  had been under development since 2005?

9  A.  Okay.  I don't know that but --

10:27:57  10  Q.  And there's been -- up to this point, you do understand

11  Professor Sun and his team started the DMR project back in

12  2005?

13  A.  That's my understanding.

14  Q.  Sorry.  Were you finished?

10:28:09  15  A.  Yes.

16  Q.  And there's been a number of documents, development

17  documents that have been produced during that 2005 to early

18  2008 period before G.S. arrived at Hytera?

19  A.  That's correct.

10:28:21  20  Q.  About 17,000 documents, right?

21  A.  I wouldn't be able to remember the exact number.

22  Q.  In the first bullet here, under the "Report and Suggestions

23  of the Consultants" it indicates:

24          "... the DMR project lacks a role of a system

10:28:43  25          engineer."

1981

1       Do you see that?

2  A.  I do.

3  Q.  And then down at the bottom, it turns blue, it says:

4       "After listening to the above report, manager

5       Chen then subsequent work tasks."

6       And the first thing he says -- do you see that?

7  A.  I do.

8  Q.  The first thing he says is:

9       "DMR product manager should be full time and

10      have a strong power of execution."

11      Right?

12 A.  I do see that, yes.

13 Q.  And he goes on to say:

14      "... candidates should be decided this week to

15      make for a smooth implementation of the

16      project."

17 A.  I see that.

18 Q.  And just to orient you over the context, this is August 13,

19 2007.

20 A.  I see that.

21 Q.  And Hytera was ready for this next step in the development

22 process, that's why they hired a consultant?

23 A.  I can't speak to that, but that sounds reasonable.

24 Q.  Now, you testified yesterday on direct about a couple of

25 e-mails where G.S. Kok was e-mailing Mr. Chen?

10:28:48

10:28:57

10:29:08

10:29:20

10:29:39

1982

A.  I did.

Q.  Let's take a look at one of those slides, 9.36, if we could.

          Now, this date of this slide, this e-mail that you put here, Dr. Rangan, is June 29, 2007, right?

A.  That's correct.

Q.  And so it's a month and a half or so before that consultant report?

A.  That's right.

Q.  And this is an e-mail from G.S. to Mr. Chen?

A.  That's correct.

Q.  And G.S. Kok here is saying it took his team of Motorola engineers 4 years to do this?

A.  That's right.

Q.  And he's interested in a job here with Mr. Chen at Hytera, isn't he?

A.  That's what they're discussing, yes.

Q.  And he's indicating that it's going to take 2 years at Hytera?

A.  That's right.

Q.  And we just discussed, Hytera had already been working on the project for 3 years, back to 2005, right -- or 2 and a half years?

A.  Yes, that's right.  They were working on it prior to this.

Q.  So 2 plus 2 and a half years gets you to 4 years, right?

1  A.  (No response.)

2  Q.  Let me -- maybe I wasn't clear.

3       G.S. indicates it's going to take 2 years at Hytera?

4  A.  Yes.

5  Q.  And Hytera has already had 2 and a half years into the

6  development process?

7  A.  That's true.

8  Q.  And that would be 4 and a half years where he's telling --

9  G.S. is telling Mr. Chen it took 4 years at Hytera -- at

10 Motorola, right?

11 A.  That's right.

12 Q.  Now, Motorola's development time started back in 2003,

13 correct?

14 A.  That's correct.

15 Q.  Before the actual DMR standard was announced; yes?

16 A.  That's right.

17 Q.  And actually, the DMR standard wasn't announced until a

18 couple of years within Motorola's DMR development?

19 A.  That's my understanding, yes.

20 Q.  And Motorola was, in fact, heavily involved in actually

21 preparing and drafting the first three parts of the DMR

22 standard?

23 A.  That's absolutely correct.

24 Q.  So let's take a look at your slide, PDX 9.38.

25       Now, yesterday you highlighted this line at the

1984

1   bottom:  "A lot of things that was unknown had been resolved"?

2   A.  Yes.

3   Q.  Isn't G.S. there talking about the fact that there is now a

4   standard?  When G.S. began work at Motorola, there was no

5   standard, right?

6   A.  It doesn't state that here.

7   Q.  And then just to orient you again, the timing.  Now, this

8   e-mail is September 13 '07, so now we're on the other side of

9   the consultant report?

10  A.  That's right.

11  Q.  And G.S. is saying -- before in the last e-mail he said it

12  was going to take 4 years.  It took Motorola 4 years, right?

13  A.  That's right, in the previous --

14  Q.  Now, a month and a half later, he says it actually took

15  Motorola 5 and a half years?

16  A.  That's right.

17  Q.  So he increased Motorola's development time in the e-mail

18  by year and a half?

19  A.  That's right.

20  Q.  Because he wanted a job?

21  A.  That's not stated here.

22          Incidentally, just the production of the standard

23  wouldn't necessarily speed up the design that much.

24  Q.  Well, Dr. Rangan, if you're designing something to achieve

25  a standard, you need to have the standard before you can design

10:32:29
10:32:44
10:32:55
10:33:03
10:33:21

1985

1  the product to meet that standard?

2  A.  That's true.

3  Q.  So this e-mail, September 11, 2007, this is about a month

4  after Mr. Chen, the consultants told him he needed a project

10:33:43  5  manager for DMR?

6  A.  That's correct.

7  Q.  And you would agree that the regular process of hiring

8  someone involves a compensation, salary, and negotiation?

9  A.  Absolutely.

10:33:53  10  Q.  Now, you showed G.S. Kok's e-mail discussing his salary and

11  the benefits to Mr. Chen.  That was slide PDX 9.39.  Let's take

12  a look at that.

13       Again, this is a month after that consultant report

14  made that recommendation, right?

10:34:15  15  A.  That's right.

16  Q.  Now, Dr. Rangan, and you were here for Mr. Lund's

17  testimony; yes?

18  A.  Yes, I was.

19  Q.  And could we pull up DSX01, which was admitted during his

10:34:28  20  testimony.

21       Do you recall this exhibit, Dr. Rangan?

22  A.  It looks familiar, yes.

23  Q.  This is a summary of some of the documents that were used

24  in Mr. Lund's direct examination about costs of an engineer in

10:34:44  25  these various location?

1986

A.  Yes.  That's correct.

Q.  And the cost of an engineer in Penyang, Malaysia in 2018 is almost double -- in China, it's less than half the price of a China engineer, right?

10:34:58    A.  That's right.

Q.  So people in China typically make more money than people in Malaysia?

A.  Yes; at least at this part -- at least at this level, sorry.

10:35:07    Q.  Now let's take a look at your PDX 9.50, another slide we showed yesterday.  Do you recall this slide?

A.  Yes.

Q.  And your slide on for G.S. Kok in 2008 shows an annual salary of 240,000 RMB, right?

10:35:26    A.  Oh, in 2008, yes.

Q.  2008.  That's Chinese currency?

A.  That's correct.

Q.  So in U.S. dollars, that's about $34,000?

A.  That sounds correct.

10:35:38    Q.  And looking back down to 2017, the number goes up.  It's about 970,000 RMB, which equates to about $140,000 U.S., right?

A.  Yes.

Q.  Now, let's flip back to your slide, PDX 9.39, if we could.

         Let's take a look at what G.S. is being offered.  You

10:36:10    testified about this?

1   A.  Yes.

2   Q.  You understand, Dr. Rangan, that G.S. was requesting a

3   stock option from Hytera to cover the stock option he would be

4   giving up at Motorola?

10:36:21   5   A.  It doesn't mention them giving up the stock at Motorola,

6   but there is an offer here.

7   Q.  Let's take a look.  So this is a snippet from PTX 433.

8   Let's pull the whole document up, if we could.  This has

9   already been admitted.  And go to page 7, if we could.

10:36:41   10          Now, this is an e-mail chain, right?  You've reviewed

11   this documentary?

12   A.  That's right.

13   Q.  And this is the beginning of an e-mail from G.S. to Mr.

14   Chen?

10:36:53   15   A.  Yes.  That's correct.

16   Q.  I want to focus you on the first point.  He says:

17          "My request for 500,000 HYT stocks.  At present

18          I've been given Motorola stocks that are worth

19          more than 80,000 U.S. when traded now."

10:37:09   20   A.  Okay.  Yes.

21   Q.  And he says:

22          "These cannot be traded now because there is an

23          vesting, which means that the share is in my

24          name, but it would be another year or two before

10:37:19   25          I can cash out of these stocks."

1988

1    A.  That's what it says, yes.

2    Q.  So if I walk out now, he means walking out of Motorola,

3    I'll have to give all that up?

4    A.  That's right.

10:37:24  5    Q.  (Reading:)

6        "That's a lot of money to throw away and it will

7        force me to stay back."

8        Do you see that?

9    A.  I do.

10:37:34  10   Q.  And this is a common negotiation amongst somebody leaving

11   one company that might leave stock on the table.

12   A.  Absolutely.

13   Q.  Now, Dr. Rangan, you don't know what stock packages were

14   typically offered at Hytera, do you?

10:37:49  15   A.  No, I don't.

16   Q.  You testified on direct that Hytera was offering G.S. Kok

17   $2.5 million in stock options?

18   A.  That's correct.

19   Q.  But Hytera gave G.S. the option to actually purchase Hytera

10:38:03  20   stock, right?

21   A.  That's right.  It comes with some strike price.  Probably

22   the Motorola stock also has the strike price associated with

23   it.

24       THE COURT:  When you use the term "stock price," what

10:38:16  25   do you mean?

1989

1    THE WITNESS:  Pardon me?

2    THE COURT:  You use the term "strike price", please

3    tell the jury what you mean.

4    THE WITNESS:  Oh, yes.  Sorry.  Thank you, Your Honor.

10:38:21    5    When you have a stock option, what usually happens is,

6    you don't have the stock itself.  You have a right to purchase

7    the stock.

8    So let's say the stock price is $5, but it's selling

9    now for $30.  You could exercise that option, purchase it for

10:38:41   10    $5, and that would be called strike price, is my understanding,

11    and then you would get $25 in your pocket.

12    THE COURT:  What if it was selling for $4?

13    THE WITNESS:  Then your option would be not valuable

14    at all.

10:38:54   15   BY MR. ALLAN:

16   Q.  Now, Dr. Rangan, you understand G.S. was given the option

17   to purchase 300,000 Hytera shares?

18   A.  Yes, that's what it looks like.

19   Q.  And at the time that Hytera went public, the shares price

10:39:13   20   was 3.18 RMB?

21   A.  That sounds, ah, possible.

22   Q.  I'm sorry, sounds possible or impossible?

23   A.  Possible.  Sorry.

24   Q.  Thank you.  It wasn't --

10:39:23   25    THE COURT:  Just a minute.  Do you know?

1   THE WITNESS:  I can't confirm one way or the other.

2   THE COURT:  You say you don't know.

3   THE WITNESS:  Oh, I do not know.  Sorry.

4   THE COURT:  You don't know?

10:39:32   5   THE WITNESS:  I do not know.

6   THE COURT:  All right.

7   BY MR. ALLAN:

8   Q.  It wouldn't -- that's publicly known, right?

9   A.  Yes.  It wouldn't surprise me at all.  And it wouldn't be

10:39:44   10   inconsistent with my analysis either.

11   Q.  Well, your analysis was based on 30 RMB stock price, right?

12   A.  Yes, but that is what Mr. Kok would have believed he

13   would've gotten even if later it turned out that wasn't the

14   case when he was making the decision.  Or at least at the time

10:40:03   15   of the e-mail, he was offered that 30 RMB price.

16   Q.  Well, Dr. Rangan, that's what anybody at Hytera would have

17   thought if they had 300,000 shares, right?  Not just G.S. Kok?

18   A.  Yeah.  Absolutely.

19   Q.  Anybody who thought that they would make a lot of money

10:40:20   20   when the company went public?

21   A.  That's correct.

22   Q.  The stock was really only worth about $137,000 when U.S.

23   went public, right?

24   A.  Possibly -- yes, that sounds right.

10:40:35   25   Q.  G.S. didn't make anywhere near $2 1/2 million?

1991

10:40:58

A. I can't confirm that because my understanding is that the stock price did end up going up after that point. But had he exercised the stock, had the stock actually been 3.17 RMB and exercised at that point, yes, he would have only made that amount of money.

Q. It never went anywhere near 30 to this day, right?

A. I don't think it ever went near 30, but I think it went up to somewhere over 10 certainly, maybe even as high at 15.

Q. It's 8 today, right?

10:41:12

A. It's possible. I can't confirm or deny that.

THE COURT: Just a minute.

You don't know, do you?

THE WITNESS: I'm sorry. Sorry, Your Honor. Yes, I do not know.

10:41:21

BY MR. ALLAN:

Q. You suggested that Mr. Chen was deeply involved in the development of DMR?

A. Yes, I did.

Q. You understand that Mr. Chen is not an engineer?

10:41:31

A. That's correct.

Q. And he didn't graduate from college, did you know that?

A. That is correct. That's my understanding.

Q. And he also didn't graduate from high school, did you know that?

10:41:42

A. I believe that's what he testified in his deposition.

1  Q.  And you have discussed some technical e-mails that G.S. Kok

2  may have sent to Mr. Chen, correct?

3  A.  Yes.

4  Q.  And those technical e-mails were sent soon after G.S.

10:41:58  5  joined Hytera; yes?

6  A.  That's right.  Some of them were.

7  Q.  You haven't seen in your review of the materials Mr. Chen

8  being copied or involved in a lot of highly technical details

9  throughout the development of the DMR project, right?

10:42:14  10  A.  I saw some e-mails, but, of course, the majority of the

11  e-mails in discussion that I saw was amongst the engineers, as

12  we would expect.

13  Q.  And the e-mails that you did see with Mr. Chen were right

14  when G.S. joined the company?

10:42:30  15  A.  I can't recall right now any technical e-mails sent between

16  Mr. G.S. Kok and Mr. Chen later on, no.

17  Q.  And you don't have any information that Mr. Chen actually

18  read any of those e-mails?

19  A.  I believe he was asked in some of these depositions about

10:42:57  20  some of the e-mails and I believe he said he had read some of

21  them.

22  Q.  Well, many of them are written in English, right?

23  A.  That's right.

24  Q.  You understand Mr. Chen doesn't speak English?

10:43:07  25  A.  I understand that that's what he stated in his deposition.

1993

1  Q.  Let's take a look at your PTX 9.43.  This is a document you

2  showed yesterday.  It's an April 12, 2010, e-mail -- I'm sorry,

3  August 2010 e-mail.  And you noted the fact that Hytera and

4  Motorola are in competition?

5  A.  That's right.

6  Q.  And they have been for years?

7  A.  Absolutely.

8  Q.  And Motorola recognizes that as well, right?

9  A.  I assume so.

10  Q.  And has for years?

11  A.  Absolutely.

12  Q.  I'd like to hand you DTX 4152.

13       This is an internal Motorola e-mail from June 2009

14  produced by Motorola; do you see that?

15  A.  I do.

16       MR. ALLAN:  We offer this into evidence, please, Your

17  Honor.

18       MS. NEW:  No objection.

19       THE COURT:  It is received and may be punished.

20       (Said exhibit received in evidence.)

21  BY MR. ALLAN:

22  Q.  I'd like to orient you to the bottom half of the e-mail,

23  and the date is June 26, '09.  Do you see that?

24  A.  Yes, I do.

25  Q.  And it's from a gentleman named Jeff Spaeth?

10:43:30
10:43:37
10:44:00
10:44:12
10:44:21

1994

1    A.  Yes.

2    Q.  And Mr. Spaeth is senior executive at Motorola based in the

3    U.K.?

4    A.  I do not know that myself, but --

10:44:32    5    Q.  Have you heard his name before in this case?

6    A.  I can't recall the name right now.

7    Q.  Do you know if he was deposed?

8    A.  I don't recall that.  Wouldn't be inconsistent, though.

9    Q.  He starts his e-mail on the bottom of the first page:

10:44:47    10        "As I have discussed with --"

11            And he sent it to several folks, right?

12   A.  Yes.  That's correct.

13   Q.  He says:

14        "As I have discussed with each of you, I think

10:44:56    15        we need to have a more clearly defined global

16        strategy versus HYT."

17   A.  I see that.

18   Q.  And this was the spring of 2009?

19   A.  Yes.  That's correct.

10:45:07    20   Q.  And Motorola was anticipating Hytera DMR product launch,

21   right?

22   A.  I would assume so.  That's what it appears like from this

23   e-mail, yes.

24   Q.  I'd like to hand you DTX 4363, 4359 and 4357.

10:45:30    25        These are also Motorola internal e-mails produced by

1995

1  Motorola in this case?

2  A.  Yes, that's what it appears to be.

3       MR. ALLAN:  I offer them into evidence, please, Your

4  Honor.

10:45:43
5       MS. NEW:  Your Honor, this appears to be outside the

6  scope of the direct testimony.

7       THE COURT:  If scope is the objection, it is

8  overruled.  The exhibits received and may be published.

9       (Said exhibits were received in evidence.)

10:45:54
10  BY MR. ALLAN:

11  Q.  Let's take a look at DTX 4363.

12       And this is -- let's look in the middle of this

13  e-mail.  There's an e-mail in the middle here that says:

14       "I set up a meeting on Tuesday to discuss the

10:46:16
15       plan to launch VZ-30 and SSA."

16       Do you see that?

17  A.  I do.

18  Q.  And the e-mail continues -- well, to orient you, this

19  amongst a number of Motorola folks, right?

10:46:30
20  A.  Yes, that's what it appears.

21  Q.  The e-mail continues:

22       "... it's not just a marketing play -- it's the

23       whole enchilada on beating Hytera and MSI has

24       yes to help us win."

10:46:45
25  A.  That's what it says, yes.

1996

1  Q.  And MSI is Motorola Solutions, right?

2  A.  Yes.  That's correct.

3  Q.  Let's take a quick look at DTX 4359.

4       This is another internal Motorola e-mail, Dr. Rangan?

10:46:59  5  A.  Yes, that's what it appears to be.

6  Q.  And in the middle of the page, there's an e-mail with a

7  couple of bullet points?

8  A.  Yes, I see that.

9  Q.  And the second one talks about Hytera.  It says:

10:47:12  10       "Somewhere in the coming days, I think it would

11       be good to get a competitive update.  When I

12       look at trade shows and the booths, Hytera is

13       now at the same level of floor space, impact,

14       presentation, as Motorola and some of our

15       closest traditional competitors."

16        Do you see that?

17  A.  I do.

18  Q.  It continues:

19       "I think everyone needs to be aware of their

20       growth and what we really need to do to fight

21       this."

22  A.  I see that.

23  Q.  Let's look at DTX 4357.

24       This is an e-mail about Hytera's low end device

10:47:50  25  launch?

1997

1    A.  Yes, I see that in the subject.

2    Q.  At the bottom of the page, a VP of Channel Sales and

3    Operations at Motorola forwards Hytera a low end device launch

4    presentation, right?

10:48:09    5    A.  Oh, yes.  I see that.

6    Q.  And then there's a comment:

7                "In terms of risk I believe it's significant, it

8                will be a volume drive through the channel and

9                we will need a tactical plan in place to hit

10               them prior to launch."

11   A.  I see that.

12   Q.  And in the middle of the page, Bruce Brda, who is the head

13   of sales, responds:

14               "Please ensure that your team engages on a

15               counter punch for this move."

16                Right?

17   A.  That's what it looks like.

18   Q.  And Motorola filed this case a few weeks after this e-mail,

19   right?

10:48:34    20   A.  Yeah, I think that is consistent with the timeline.  I

21   thought it was filed in May 2017, a few months after that.

22   Q.  March, right?

23   A.  Oh, sorry, March.  You're correct.

24   Q.  Shift focus a little bit.  You talked about a document from

10:48:57    25   a gentleman named Sam Guan?

1998

1    A.  Yes, I did.

2    Q.  And Mr. Guan, not too long ago, in the last couple of

3    years, left Motorola and joined Hytera, one of the U.S.

4    companies, right?

5    A.  That's correct.

6    Q.  And let's take a look at PTX 404, which I think is the

7    document -- you took a snippet of this and input it in a slide,

8    right?

9    A.  Yes, I did.

10   Q.  Let's take a look at the first line on page 10.  And this

11   is a summary of his training.  So he got hired at Hytera and he

12   went to Shenzhen for a week-long training session?

13   A.  A week or two weeks, yes, that's correct.  Maybe it was a

14   week.

15   Q.  And so this document is prepared after he's a Hytera

16   employee?

17   A.  That's right.

18   Q.  And he's going through and he's documenting what he did

19   during that week of training?

20   A.  That's right.

21   Q.  So let's look at the second paragraph -- actually, it's

22   technically the third paragraph:

23          "I was invited to have a meeting with Mr. Chen

24           in the afternoon."

25           Do you see that?

1999

1   A.  I do.

2   Q.  And he goes on to say:

3           "... the last time I was at the IWCE in Las

4           Vegas, I was lucky enough to talk to him in a

5           hotel."

10:50:27

6            Do you see that?

7   A.  I do.

8   Q.  And he's talking -- he's now talking about a discussion he

9   had before he joined?

10:50:30

10  A.  That's correct.

11  Q.  And he says:

12          "I was determined to join Hytera after the

13          talk."

14  A.  That's right.

10:50:34

15  Q.  And now he flips back and now he's saying "as a new joiner

16  at Hytera --" so now he's employed " -- I met with Mr. Chen

17  again," right?

18  A.  That's what it says, yes.

19  Q.  And he says:

10:50:48

20          "He firstly offered an in-depth explanation on

21          the overall industry in the development of

22          Hytera with specific instances in data."

23  A.  That's right.

24  Q.  And this discussion about the in-depth explanation on the

10:51:01

25  overall industry, that's once he's at Hytera, right?

2000

1    A.  That's correct.

2    Q.  And then he continues:

3              "I was sure it was a right choice for me to join

4              Hytera!"

10:51:10    5    A.  Yes.

6    Q.  Further confirming that this is all a conversation he had

7    once he was at Hytera.

8    A.  That's right.

9    Q.  And then he says:

10:51:16    10             "Mr. Chen suggested I keep observing, listening

11             and studying and putting forward my suggestion

12             for Hytera based on my experience gained at

13             Motorola."

14              Right?

10:51:28    15    A.  That's right.

16    Q.  And that's a normal thing to do?

17    A.  Depends on what's meant by "experience gained."

18    Q.  Well, you testified that you carry your experiences over to

19    new jobs all the time.  That's why people are hired.

10:51:37    20    A.  Absolutely.

21    Q.  Now, you also talked about another piece of this document,

22    and you said there was some indication that Sam Guan was

23    providing confidential Motorola information, right?

24    A.  That's correct.

10:51:56    25    Q.  And that related to an over-the-air update.

2001

1    A.  That's right.

2         MR. ALLAN:  And can we pull that up, that second page.

3    BY MR. ALLAN:

4    Q.  It says Motorola is now developing a new function, namely,

10:52:17    5    over-the-air update, right?

6    A.  It does.

7    Q.  There's no design or implication information in this

8    summary, is there?

9    A.  There is some.

10:52:23    10    Q.  Where?

11    A.  For example, it says here:

12         "Simply speaking, the firmware to be upgraded

13         will be divided into multiple small data

14         packets, 10 bytes per package of which 10

10:52:39    15         packages ..."

16         and so on.  But it does give some details.

17    Q.  But that's just detail he would know from his experience,

18    right?

19    A.  Yes.

10:52:45    20    Q.  He's not providing technical documentation on this.

21    A.  There is no technical documentation, but this is the type

22    of experience that, in my view, would be improper to provide.

23    Q.  You understand that Motorola had a patent on over-the-air

24    updates that was public?

10:53:02    25    A.  It's possible.

1   Q.  This was no secret, Dr. Rangan, was it?

2   A.  That they had the over-the-update feature?

3   Q.  Correct.

4   A.  It may not be, but what's happening here is that there is

10:53:13    5   some details.  And even if those details were not disclosed,

6   there's a reference that he would talk to other technical

7   people later on.

8   Q.  But you have nothing -- you have no information to suggest

9   he either had a discussion or disclosed anything?

10:53:26   10   A.  I can't confirm whether he spoke later or not with other

11   technical engineers, no.

12   Q.  Cell phones do over-the-air updates all the time.

13   A.  Absolutely.

14   Q.  And can TETRA radios do it?

10:53:39   15   A.  I do not know one way or the other.  It's possible.  I

16   would surprise if they can't.

17   Q.  Do you know whether an over-the-air update is part of the

18   TETRA standard?

19   A.  I do not know, no.

10:53:54   20          Over-the-air update is a well-known feature, in

21   general.  I mean, that's when your phone gets a -- you know, it

22   tells you to update the software.  So that happens all the

23   time.  But at this period, it looks like it was still working

24   on internal in DMR.

10:54:13   25   Q.  So I want to make sure I understand your testimony.  Your

1    concern is that Mr. Guan talking about 10 bytes per package,

2    your concern is that that's some piece of confidential

3    information that shouldn't have been disclosed?

4    A.  It may have been disclosed, but it is getting into some

10:54:30    5    technical information here.  There's also about 10,000, it says

6    here, 10,000 small packages in firmware, that's generally not

7    something that would be disclosed as part of the over-the-air

8    updates.

9    Q.  Let's pull up DTX 4657, which has been admitted.

10:54:46   10         Do you see this e-mail?  This was admitted.  I think

11   you were in the courtroom for this, Dr. Rangan.  This is the

12   Patti Mortensen e-mail to several folks, a Hytera product

13   report.

14   A.  Yes.

10:55:07   15   Q.  (Reading:)

16         "Please be careful with this information, do not

17          forward."

18          Do you see that?

19   A.  I do.

10:55:12   20   Q.  Let's take a look at the actual document.

21          And you see all this Hytera roadmap information:

22   First Release, Second Release, Third Release, Fourth Release

23   that's in the files of Motorola?

24   A.  I do.

10:55:32   25   Q.  That shouldn't be there, should it?

2004

1    A.  Why should it not be there?

2    Q.  You don't think that's confidential Hytera information?

3    A.  They perhaps released this publicly.

4    Q.  Perhaps?  You have no information that they released it

10:55:47    5    publicly, do you?

6    A.  I can't speak to how Ms. Martensen received this

7    information, no.

8    Q.  In fact, product roadmaps are some of the most sensitive

9    information that a business has?

10:55:59    10   A.  Sometimes.  Sometimes they're released publicly to provide

11   customers an idea of what roadmap they'll get, that's very

12   common.

13   Q.  Product roadmaps tell competitors exactly what the company

14   is planning to do, right, Dr. Rangan?

10:56:14    15   A.  It does, but it often accompanies -- we release product

16   roadmaps all the time when we talk with customers.  It's very

17   common.  Because if they want to commit to a technology at

18   Hytera or Motorola, sometimes the customer would like to know

19   the feature map that they would get going forward.

10:56:29    20   Q.  Well, this particular roadmap came from what Motorola calls

21   the Hytera insider, right?

22   A.  I can't speak to that.

23   Q.  Well, you can speak to the fact that Ms. Martensen said in

24   the cover e-mail we just looked at "don't forward it"?

10:56:40    25   A.  But her saying simply not to forward it doesn't necessarily

1    mean that it was confidential information.

2    Q.  You discussed an e-mail that Sam Chia sent to Mr. Chen,

3    remember that?

4    A.  Yes, I did.

10:56:56    5    Q.  And you are an expert in OFDM?  You're a technical expert?

6    A.  That's correct.

7    Q.  And there was nothing technical in that e-mail, correct?

8    A.  There was in the sense that the way that you would write

9    those -- the circumstances had bearing, because it was related

10:57:17    10    to confidential information in an engineering product.

11    Q.  You testified, Dr. Rangan, that Mr. Chen didn't have any

12    context for that e-mail, do you remember that?

13    A.  That's right.

14    Q.  But, in fact, that e-mail was sent after Motorola filed its

10:57:31    15    complaint in this case?

16    A.  That's correct.

17    Q.  And you've seen the complaint in this case?

18    A.  I believe I have, yes.

19    Q.  And it's a very long, detailed narrative, right?

10:57:41    20    A.  There were a number of filings, yes.

21    Q.  And it names Sam Chia.  It doesn't name him as a defendant,

22    but he's mentioned specifically in the complaint, right?

23    A.  I don't recall, but that would certainly be consistent.

24    Q.  So Mr. Chen certainly had context when he received the

10:57:57    25    e-mail?

2006

1    A.  To some degree.

2    Q.  Now, in that e-mail, Mr. Chia was talking about -- I think

3    he actually titled this as "summary of his disappointments"?

4    A.  That's right.

10:58:12    5    Q.  And he had a number of things he was complaining about?

6    A.  That's right.  I only spoke about the fourth one.

7    Q.  He complained about issues with his family, he complained

8    about issues with coworkers?

9    A.  Right.

10:58:23    10    Q.  He said his life was not meaningful in China?

11    A.  That's correct.

12    Q.  He covered a whole bunch of different things?

13    A.  Yes, he did.

14    Q.  Big, long, rambling e-mail?

10:58:34    15    A.  I'll leave "rambling" --

16    Q.  Big, long e-mail?

17    A.  Long e-mail, yes.

18    Q.  The fourth thing he talked about was this case?

19    A.  That's right.

10:58:40    20    Q.  Let's take a look at PDX 9.50.

21           Now, you testified about this yesterday, Dr. Rangan,

22    that Hytera continued to pay G.S. Kok and Sam Chia at Y.T. Kok

23    for a year and a half after this lawsuit was filed?

24    A.  That's right.

10:59:02    25    Q.  And they were paid their salaries?

2007

1   A.  That's right.

2   Q.  And you understand that they weren't terminated immediately

3   because they contested the allegations from Motorola, right?

4   A.  I didn't see any evidence of that.  For example, in the

10:59:19   5   e-mail that we saw, I didn't see any evidence which Mr. Chia is

6   contesting it in that e-mail in particular.

7   Q.  Do you know -- you're not -- you know that the company,

8   Hytera, launched a big investigation?  Are you aware of that?

9   A.  I can't speak to that one way or the other.

10:59:45   10   Q.  Let me ask you a different question.

11         You certainly know that in this case the parties have

12   exchanged discovery.  There's documents produced that you've

13   looked at, depositions, and so on?

14   A.  Exactly.  Yes.

10:59:54   15   Q.  That's taken a fair amount of time?

16   A.  That it has, indeed.

17   Q.  And there's discussion in here of money paid to these folks

18   when they left, right?

19   A.  Yes.

11:00:12   20   Q.  You testified about that?

21   A.  That's correct.

22   Q.  Now, you're not a lawyer, correct?

23   A.  I am not.

24   Q.  Not a lawyer in the U.S.?

11:00:18   25   A.  Not a lawyer in any country.

2008

1  Q.  China?

2  A.  Not at all.

3  Q.  Okay.  You aren't an expert on Chinese law?

4  A.  No, I'm not.

11:00:26  5  Q.  You're not an expert on human resources requirements in

6  China?

7  A.  Only I've -- we have had HR products in cases where there

8  was some part of the staff that was working from Asia, but

9  other than that, no.

11:00:51  10  Q.  And you certainly don't understand what Hytera's

11  obligations were, legally, to pay these folks when they left?

12  You have no expertise on that?

13  A.  If there was a law, no, I would not be -- no, I would not

14  be aware of that.

11:01:11  15  Q.  Now, Dr. Rangan, you've served as an expert four times

16  before, correct, I think you said?

17  A.  That's correct.

18  Q.  This is your third case for Kirkland & Ellis?

19  A.  That's right.

11:01:21  20  Q.  And your third case for Motorola?

21  A.  That's right.

22  Q.  And you charge $450 an hour for your time?

23  A.  I do.

24  Q.  And it's fair to say, you've spent a considerable amount of

11:01:33  25  time?

1   A.  Very long for this trial.

2   Q.  And you testified about work effort estimates and all the

3   work you did to review documents and source code and materials

4   that have been produced in this case?

11:01:44   5   A.  That's right.

6   Q.  And that took you a lot of time?

7   A.  A lot of time, yes.

8   Q.  Hundreds of hours?

9   A.  Absolutely.

11:01:51   10   Q.  Thousands of hours?

11   A.  No, not that long.

12   Q.  All since March of this year?

13   A.  That's correct.

14   Q.  And if you spent, say, 400 hours, you've made about

11:02:05   15   $180,000?

16   A.  Without the map, but that sounds correct.

17   Q.  More than G.S. Kok made in his last year in Hytera?

18   A.  I have to look again at that spreadsheet.  I thought with

19   his salary and bonus, it's possible.

11:02:21   20   Q.  Let's talk about your work-effort estimate opinion.

21   A.  Sure.

22   Q.  Now, you offered some testimony about how long it would

23   take to develop the 21 alleged trade secrets in this case?

24   A.  I did.

11:02:36   25   Q.  And you wrote down -- or you testified yesterday, I wrote

1    it down, you referred to them as "my estimates" a few different

2    times.  You said "my estimates."

3    A.  I did.

4    Q.  But you didn't come up with the numbers on your own, right?

11:02:51    5    A.  Well, I had the engineers' estimates from the starting

6    point, that's correct.

7    Q.  Right.  And you had the engineers' estimates as a starting

8    point.  And you don't come up with your own numbers, you just

9    basically have concluded that those numbers are conservative?

11:03:08    10    A.  I guess I would say that my numbers -- I did an analysis

11    and then -- I didn't have any numbers that were different than

12    the engineers -- well, it's different in the sense that my

13    analysis said that these numbers are conservative estimates for

14    each of the trade secrets.

11:03:29    15    Q.  Right.  So you didn't change any of the -- well, let me

16    back up.

17        You were here, there were a number of Motorola

18    witnesses that talked about the estimates that they provided?

19    A.  That's correct.

11:03:38    20    Q.  Mark Boerger, Jesus Corretjer, those folks, right?

21    A.  Absolutely.

22    Q.  And they were asked a number of questions about how they

23    came up with those numbers?

24    A.  That's right.

11:03:52    25    Q.  And you adopted those numbers?

A.  As a starting point, yes.

Q.  And you adopted those numbers because that was another assumption you were given in the case?

A.  Actually I wasn't given that as an assumption.  They provided me those numbers and that was the starting point for my analysis.

Q.  The lawyers provided you those numbers, right?

A.  I got them through the lawyers, but the lawyers had got them from the engineers.

Q.  But you didn't change a single one of those estimates?

A.  I took those numbers as a starting point, that's correct.

Q.  Right.  But you didn't change any of the numbers.  You didn't say, for example:  Mark Boerger said it would take 15 engineers 30 staff months for trade secret X.  You didn't say: No, I think it would be 20 engineers for 400 staff?

A.  No, I didn't.  The final numbers I had ended up -- my conclusion was that all the numbers they had supplied were conservative, that's correct.

Q.  You understand, Dr. Rangan, that these estimates that you took were all developed in June of this year?

A.  That sounds correct.

Q.  For development work that went back -- for the MOTOTRBO DMR project, back to 2003?

A.  And even earlier, in fact.

Q.  And even earlier.  Because information from ASTRO and other

1  products were also used?

2  A.  That's correct.

3  Q.  And I think there was even testimony that some of them went

4  back even to the '80s?

11:05:21  5  A.  That's right, to 1988.

6  Q.  And so those numbers that were put together that you looked

7  at as your starting point, if you will, were all generated in

8  2019?

9  A.  That sounds correct.

11:05:37  10  Q.  Now, how Motorola derived those estimates was not a part of

11  your analysis, right?

12  A.  No, I started from a starting point, but I did question

13  them vigorously to understand the process.

14  Q.  Now, you've reviewed some trade secret descriptions in this

11:05:57  15  case?

16  A.  I did.

17  Q.  And you reviewed a bunch of deposition testimony?

18  A.  I did.

19  Q.  Including the deposition testimony of Jack Wong, Motorola's

11:06:09  20  corporate witness on several of these trade secrets?

21  A.  Yes, I did.

22  Q.  You understand he testified that Kirkland & Ellis prepared

23  those descriptions?

24  A.  He might've stated that.

11:06:19  25  Q.  Now, when you started your work on this case in March

|          |    |                                                          |
|----------|----|----------------------------------------------------------|
|          | 1  | of 2019, the descriptions of the trade secrets you had were |
|          | 2  | quite different, right?  In other words, they changed    |
|          | 3  | substantially?                                           |
|          | 4  | A.  It's possible.  I can't recall.                      |
| 11:06:39 | 5  | Q.  And you reviewed the documents that are supposedly   |
|          | 6  | referenced.  Those trade secrets are 78 of those documents, |
|          | 7  | right?                                                    |
|          | 8  | A.  I didn't count, but that sounds possible.  You mean 78 |
|          | 9  | documents throughout all the 21 trade secrets?          |
| 11:07:00 | 10 | Q.  Yes.  Yes, sir.                                       |
|          | 11 | A.  .that sounds possible.                                |
|          | 12 | Q.  Now, you've heard testimony in this case that those  |
|          | 13 | technical documents, some of them are public, some of the |
|          | 14 | information there is public, some of it is not?          |
| 11:07:10 | 15 | A.  My understanding is, all the documents are completely |
|          | 16 | confidential.                                            |
|          | 17 | Q.  We're not talking about confidentiality or labels.  I'm |
|          | 18 | just saying what's in there.  There are some documents have |
|          | 19 | pieces of the SE standard, for example?                  |
| 11:07:23 | 20 | A.  That's right.  That's very common.  You would put a piece |
|          | 21 | of standard --                                           |
|          | 22 | Q.  And some pieces of the documents might have information |
|          | 23 | that's revealed in a Motorola patent?                   |
|          | 24 | A.  It could, yes.                                        |
| 11:07:34 | 25 | Q.  And like the other public information that just finds its |

2014

1   way into the document?

2   A.  Yeah.  But putting it into context, but yes.

3   Q.  And when you reviewed those documents to try to figure out

4   how long it would've taken to develop these trade secrets, you

5   didn't parse out what was public and what wasn't public, did

6   you?

7   A.  Absolutely not.  There'd be no reason to.  It would be

8   illogical.

9   Q.  Same with the source code.  You understand that there's a

10  lot of source code, Motorola source code in this case and

11  Hytera source code?

12  A.  That's correct.

13  Q.  And in trying to form your opinion in terms of how long it

14  would take to develop these alleged trade secrets, you reviewed

15  some of the source code?

16  A.  Yes, I did.  A lot of --

17  Q.  And you --

18       I'm sorry.  Go ahead.

19  A.  A lot of source code.

20  Q.  You understand that within Motorola's source code, there is

21  a lot of third-party source code not developed by Motorola?

22  A.  Yeah.  Motorola had third-party source codes, yes.

23  Q.  Like Texas Instruments?

24  A.  Yes.  Possibly.

25  Q.  And Mentor Graphics that makes the operating system?

2015

A.  Yeah, the Nucleus operating system.  They modified it, but yes.

Q.  Now, when you went through the code to try to figure out how long it would take to do all this, you didn't parse out what was third-party code or what wasn't, right?

A.  Again, that wouldn't make sense to do that.

Q.  Well, if wanted to try to figure out what Hytera -- what the Motorola engineers had actually developed, it would?

A.  No, it wouldn't, because let's take the case of the documents, that might be easier to understand.  Even the act of taking parts from public domain material, it's putting it in context, that has value, that takes time.

Q.  So if a document is 90 percent public and 10 percent developed by Motorola, versus 10 percent public and 90 percent developed by Motorola, it wouldn't matter to you in terms of trying to figure out how much time the Motorola engineer spent on that document?

A.  The documents we're talking about are not 90 percent public.  For example, let's take the testing document as an example.  It might have -- I say that just because the jury has seen some of those things -- it might have, for example, part can be SE standard, it might say some operating conditions, it might also have some requirements, but it's placing it in a context.  It's linking up which conditions of which tests, and then goes on to talk about how to, you know, create test

1   procedures, and also maybe change those requirements

2   internally.  So you absolutely can't separate these two.

3   Q.  So your testimony is that the Motorola's estimates that

4   were provided to you, they're conservative?

11:10:04    5   A.  That's correct.

6   Q.  And just to be clear, you didn't quantify how conservative

7   they are.  You didn't provide your own numbers?

8   A.  Yes, I said they were conservative.  I didn't give a

9   specific percentage in increase.

11:10:16   10   Q.  Now, you also talked about this concept of gating.

11   A.  I did.

12   Q.  And you had -- maybe we can pull that slide, 9136.

13          I think you testified that the trade secrets that are

14   listed on the left would have to be developed before the trade

11:10:40   15   secrets on the right?

16   A.  That's correct.

17   Q.  I think the example you gave yesterday was, if you take the

18   DSP source code gating trade secret at 10 years and add it to

19   the testing and benchmark trade secret, it would be a 15-year

11:10:57   20   development time?

21   A.  That's right.

22   Q.  Now, obviously, if you took the DSP source code gating

23   trademark at 10 years and you added it to the repeater trade

24   secret, you're at 23 1/2 years?

11:11:07   25   A.  That's right.

2017

1  Q.  So to develop those two trade secrets it would take 23 1/2

2  years?

3  A.  That's correct.  At least that time.

4  Q.  Now, there is some overlap between where the gating stops

11:11:21   5  and the dependent starts, correct?

6  A.  That's right.

7  Q.  And you were asked some questions about methodology that

8  accounted for that overlap?

9  A.  That's right, I was.

11:11:34   10  Q.  But you actually don't have any methodology that would

11  account for overlap, do you?

12  A.  I think I was talking about two particular trade secrets in

13  that case that are not at issue in this case anymore.

14  Q.  So you concede that when you were asked questions at the

11:11:50   15  deposition about two of them, you didn't have any methodology?

16  A.  In that particular case, I think I said that I did not have

17  the precise methodology and that I didn't offer a specific

18  number, which I did not.  And that was about those two specific

19  trade secrets of which one of them is no longer an issue, I

11:12:10   20  believe.

21  Q.  Well, you testified that you didn't have a methodology to

22  perform the calculation.

23  A.  For that -- for those two particular trade secrets.  And

24  it's true, that I did not give a specific number in that case.

11:12:22   25  Q.  Well, you don't -- there's no methodology for any of the

2018

1    trade secrets?

2    A.  As I said, the methodology is that while there is overlap,

3    because it's relatively small, it can be accounted for the fact

4    that both of the trade secrets estimate are very conservative.

5    Q.  Well, you were asked at the deposition, page 282, line 17,

6    to 283, line 9:

7              "Question:  So there's a lot of overlap between

8              trade secrets 132 and 152 -- sorry, "-- 130 and

9              142, how would we account to assess the proper

10             development time for those trade secrets

11             combined?"

12             "Answer:  Let me look at the trade secrets

13             actually for a second for those particular ones.

14             So 132 is a physical layer ARM DSP framework and

15             radio signaling architecture and --"

16             "Question:  130."

17              Your answer:

18             "... yes.  Sorry.  130, 142 was repeater

19             functionality.  So I -- I don't provide a

20             methodology here to exactly perform that

21             calculation.  And I agree that some amount in

22             certain cases may need to be discounted, but I

23             don't provide a method, precise methodology for

24             that."

25              Correct?

2019

1    A.  That's what the deposition says, yes.

2    Q.  Now, you looked at a number of materials to come up with

3    your opinion, right?

4    A.  I did.  A lot.

11:13:42    5    Q.  You looked at the documents, source code?

6    A.  Both.

7    Q.  Talked to some folks?

8    A.  Yes, I did.

9    Q.  But your report -- neither of the reports that you issued

11:13:58    10    in this case has any sort of a schedule explaining precisely

11    what you did with each of these documents and why you simply

12    feel that these numbers that Motorola came up with are

13    conservative?

14    A.  I'm sorry.  I thought both of the reports had quite a bit

11:14:15    15    of detail on my methodology.

16    Q.  There's no -- you had to look at an enormous amount of

17    source code and documentation?

18    A.  That's right.

19    Q.  You don't provide any sort of schedule as to what you

11:14:26    20    considered about a particular document, how much value you

21    assigned to it, why you thought that that document was a

22    conservative estimate, how much time you gave to a particular

23    document?  None of that is in there?

24    A.  Sorry, I don't -

11:14:42    25             MS. NEW:  Objection.  Compound.

1        MR. ALLAN:  Let me withdraw it.

2        THE COURT:  Sustained.

3   BY MR. ALLAN:

4   Q.  You looked at 78 different documents --

11:14:51    5   A.  Yes.

6   Q.  -- and hundreds of source code files?

7   A.  Oh, easily, yes.

8   Q.  Thousands?

9   A.  Possibly that number.

11:14:59    10  Q.  And you don't provide document-by-document accounting in

11  your report?

12  A.  Oh, I see.  No, my methodology was not to provide a month

13  estimate for each document.  That wouldn't make any sense to do

14  it that way.

11:15:17    15  Q.  Right.  Or a file-by-file analysis, how long it would take

16  to develop a particular code file?

17  A.  Yeah, that would be also a nonsensical approach.

18  Q.  Now, you testified that Hytera could not conceive of or

19  develop the trade secrets in a commercially reasonable time,

11:15:30    20  right?

21  A.  That's right.

22  Q.  But you haven't defined what a commercially reasonable time

23  is?

24  A.  I thought I did that in my direct testimony.  I said that

11:15:43    25  it is at least -- well, we know for a fact that since it

1  launched the product in 2010 to currently approximately

2  10 years, they've not been able to develop a product

3  independently.  So a commercially reasonable time would be at

4  least 10 years.

11:15:56   5  Q.  Somewhere in that 10-year timeframe will be commercially

6  reasonable?

7  A.  At least 10 years.

8  Q.  And your testimony is that Hytera, to this day, couldn't

9  develop its own DMR radio?

11:16:07  10  A.  That's correct.  Comparable one, that's right.

11  Q.  Now, as part of your opinion, you claim that it's unlikely

12  that Hytera would've been able to recruit engineers with

13  sufficient experience to form a team on the par with Motorola,

14  right?

11:16:32  15  A.  That's correct.

16  Q.  And you don't have an in-depth understanding of Hytera,

17  right?  You never worked at Hytera?

18  A.  I did not work at Hytera.

19  Q.  And you've never worked with Hytera?

11:16:50  20  A.  No, I have not.

21  Q.  And you've never interviewed any of the Hytera development

22  teams?

23  A.  No, I was basing it on the work product that I saw prior to

24  2008, among other things.

11:17:00  25  Q.  And you didn't consider Hytera's development capabilities?

1   A.  I absolutely considered their development capabilities.

2   Q.  You didn't consider any of the analogs suite of products

3   that they had?

4   A.  I did not consider the analog, no.

11:17:14   5   Q.  And that's relevant to their development capabilities,

6   right?

7   A.  I didn't see any use of their analog experience.  Even to

8   the extent that they had analog experience, you would need so

9   much more skill for digital DMR radio.

11:17:36   10   Q.  Is it your testimony then that analog development is

11   irrelevant to DMR digital development?

12   A.  It's absolutely helpful, but it's certainly only one step.

13   Q.  Absolutely helpful, but you didn't consider it here?

14   A.  To the extent that they had analog experience, even if they

11:17:52   15   had a lot of analog experience, I do understand that they were

16   developing analog products, that wouldn't have been -- they

17   would need so much more experience to get digital DMR.

18   Q.  And you didn't consider the fact that Hytera over this

19   mid-2000 timeframe was growing incredibly fast, adding

11:18:14   20   engineers on a constant basis, right?

21   A.  You mean after 2008?

22   Q.  No.  Before.

23   A.  The number of engineers I saw that were -- at least in the

24   material that I could see prior to 2008, that was the Harbin

11:18:32   25   team, and that was relatively small.

2023

1  Q.  The Harbin team came over in 2003, right?

2  A.  Oh, I'm sorry.  The team based in -- but it was still based

3  in Harbin, my undertaking at least.

4  Q.  But during this -- maybe we're talking fast.  It's probably

11:18:48  5  my fault.

6          Between '03 and '08, did you consider the fact that

7  Hytera had grown substantially by adding a number of engineers

8  during that time period?

9  A.  What I specifically saw was the team that was working prior

11:19:04  10  to 2008, and that was maybe in the order of -- I don't recall

11  the exact number, but under 30 engineers.

12  Q.  That was -- so you focused on the team that was working on

13  DMR?

14  A.  That's right.

11:19:13  15  Q.  You didn't look at any of the other development teams that

16  Hytera had working on different projects?

17  A.  No, I did not.

18  Q.  You understand the DMR standard came out in 2005?

19  A.  That sounds correct.

11:19:28  20  Q.  And if it would take somebody 23 1/2 years to develop a

21  radio, you wouldn't have another DMR radio on the market until

22  2029?

23  A.  No, because, again, as I spoke, the Motorola's DMR

24  development had leveraged significant amount of work from

11:19:48  25  ASTRO.

1  Q.  But you certainly understand, Dr. Rangan, that there are a
2  number of DMR manufacturers on the market today?
3  A.  Yes, I do.
4  Q.  Kenwood is one?
11:19:58  5  A.  That's correct.
6  Q.  ICOMM is one?
7  A.  That's another.
8  Q.  Tait?
9  A.  That's right.
11:20:02  10  Q.  Simoco?
11  A.  That's right.
12  Q.  You understand that Andy Grimmett -- you've read his
13  report?
14  A.  I did.
11:20:08  15  Q.  And you respond to his report, right, in part?
16  A.  I do.
17  Q.  And you understand he led Simoco's DMR development team?
18  A.  That's my understanding, yes.
19  Q.  And in 3 years and 3 months he went from start to finish
11:20:23  20  with a DMR product on market?
21  A.  I'm not sure if it went into market at the end of that.
22  Q.  But even if he was real close, that's 3 years and 3 months,
23  not 23 1/2 years, right?
24  A.  It's not 23 1/2 years, but to compare it, you would have to
11:20:45  25  understand exactly how much he would develop versus the

1  third-party, and actually all the features.  Because we're

2  talking about a comparable DMR product.  Motorola product is

3  really a market-leading product.  As you heard, it was in the

4  high-end category.  So we're talking about a high-end product

5  in this case.

11:21:04

6  Q.  Now, Dr. Rangan, you offered some opinions about Hytera's

7  development efforts before G.S. Kok and Sam Chia and Y.T.

8  went --

9  A.  That's right.

10 Q.  And in doing so, you looked at some of those development

11:21:15

11 documents?

12 A.  There were many development documents.

13 Q.  And again, there were 17,000 or so development documents

14 between the time that Hytera started its CMR development in

15 2005 and the time that G.S. Kok arrived in February of 2008?

11:21:34

16 A.  I didn't count, but that's possible.

17 Q.  There were a whole lot?

18 A.  There were a whole lot, yes.

19 Q.  And you certainly understand that Hytera had a long history

20 of developing a number of analog radios leading up to that

21 point?

11:21:48

22 A.  I can't comment about the number, but yes, I do understand

23 it was developing analog radios.

24 Q.  Do you understand, Dr. Rangan, that Hytera developed

25 certain DMR radio features before Motorola?

11:22:10

1  A.  You mean after 2008?

2  Q.  Yes.

3  A.  Yes, that's possible.  It wouldn't change my analysis at

4  all.

11:22:21  5  Q.  So the fact that Motorola saw what Hytera was doing on its

6  own DMR products and copied them wouldn't change your analysis?

7  A.  Sure.  If Motorola -- sorry.  If Hytera had in possession

8  Motorola's code that built upon that other features that for

9  perhaps a business reason Motorola doesn't pursue, how does

11:22:44  10  that change my analysis?

11  Q.  Maybe my question probably wasn't clear.  I apologize

12  again.

13          If Hytera developed a really thin radio before

14  Motorola did and then Motorola followed Hytera, doesn't that

11:22:58  15  indicate to you that Hytera had its own solid development

16  capabilities?

17  A.  No, not at all.  If it was a DMR and it was after 2008,

18  that means anything that they're developing is based upon

19  Motorola confidential --

11:23:12  20  Q.  So absolutely nothing that Hytera could've done in

21  developing DMR, regardless of whether it had anything to do

22  with what is accused in this cases, you just automatically

23  discounted it and didn't consider it at all?

24  A.  I think that's -- maybe I'll put it this way:  I didn't see

11:23:36  25  any evidence of other development skills post-2008 that would

1    change my opinion.

2    Q.  Let's take a look.  You pointed out some documents on your

3    direct examination.

4    A.  I did.

11:23:54    5    Q.  Several of them were in the 2006 timeframe?

6    A.  That's correct.

7    Q.  And in the 2006 timeframe was obviously just within a year

8    or so after Hytera began its development efforts?

9    A.  That's right.

11:24:06    10    Q.  And so as a developer yourself, that's not unusual that

11    they wouldn't have a finished product at that time?

12    A.  Absolutely.

13    Q.  And that's part of the development process, you start and

14    solve problems, you move on to the next problem, you solve

11:24:20    15    that, and so on.

16    A.  Yes.  Correct.

17    Q.  So it's not surprising that in 2006 they didn't have a

18    finished product?

19    A.  Yeah, that's right.

11:24:25    20    Q.  And that they still had problems that they were working on?

21    A.  Yeah, I would expect that any team would have not a

22    finished product in one year.

23    Q.  Can I hand you exhibit PTX 2023.

24          This is a document produced by Hytera in this case,

11:24:56    25    Dr. Rangan?

1   A.  Yes, it looks familiar.

2   Q.  One of these pre-G.S. DMR development documents?

3   A.  That's right.  I don't recall the exact date, but I do

4   remember this diagram.

5           MR. ALLAN:  I offer it into evidence, please, Your

6   Honor.

7           MS. NEW:  No objection.

8           THE COURT:  It is received and may be punished.

9           (Said exhibit received in evidence.)

10          MR. ALLAN:  Could we pull up the metadata for this.

11  BY MR. ALLAN:

12  Q.  You see the custodian is Harbin?

13  A.  Yes.  That's correct.

14  Q.  And the dated created is October 23, 2006?

15  A.  Yes.  That's correct.

16  Q.  Okay.  Let's go back to the document.

17          And this is a DMR Baseband Circuit Block Diagram, do

18  you see that?

19  A.  That's the title of the document, yes.

20  Q.  And, again, October 2006?

21  A.  That's right.

22  Q.  About a year or so after they started development?

23  A.  That's right.

24  Q.  And I want to focus on this dotted line, sort of right in

25  the middle.

2029

1  A.  Yes.

2  Q.  So there's the DSP block and there's an ARM block, do you

3  see that?

4  A.  I do.

11:26:07    5  Q.  And then there's a reference to OMAP, right?

6  A.  Yes, there is.

7  Q.  So Hytera was considering using an OMAP even back in

8  October 2006?

9  A.  Yes, they absolutely were considering it.  I did see a lot

11:26:17    10  of evidence of that.

11  Q.  Long before G.S. and YT joined?

12  A.  Yes.

13  Q.  And you'd agree with me, this is architectural in nature,

14  right, a circuit diagram?

11:26:27    15  A.  Yeah.  Circuit diagram, sure.

16         What do you mean by architectural?  Did you mean

17  anything other than just a circuit diagram?

18  Q.  That is architect because it's a circuit diagram, is it

19  not?

11:26:40    20  A.  It's a circuit diagram, yes.

21  Q.  Let me hand you PTX 2006.

22         This is another one of those pre-G.S. development

23  documents?

24  A.  Yes, it is.

11:26:59    25  Q.  Produced by Hytera in this case?

1  A.  Yes, it is.

2          MR. ALLAN:  I'd offer it into evidence, please, Your

3  Honor.

4          MS. NEW:  No objection, Your Honor.

5          THE COURT:  It is received and may be published.

6          (Said exhibit received in evidence.)

7  BY MR. ALLAN:

8  Q.  Again, this is a Chinese document that was translated?

9  A.  Yes.  Thankfully.

10  Q.  For both of us.

11  A.  Thank you.

12  Q.  Could you please turn to page 21.

13  A.  Sure.

14  Q.  All right.  This is a February -- sorry.  Yeah,

15  February 11, 2007, DMR Protocol Stack Debugging Test Report.

16  A.  Yes, I remember this document.

17  Q.  And it indicates that it is, in fact, a test report?

18  A.  That's correct.

19  Q.  Now, let's take a look at the conclusions on page 39.

20          Do you see under "E" where it says "test conclusions"?

21  A.  Yes.

22  Q.  It says:

23          "According to the above tests --"

24           Again, this is February '07:

25          "According to the above tests, we can see that

1          the protocol stack software works normally and

2          runs stably and has realized the most basic

3          voice call and data services.  During the

4          testing process, all the problems found in the

5          earlier stage were solved as follows ..."

6              And then the document goes on to note that, right?

7    That's what it says, yes, but --

8    Q.  You disagree with what's written on the page?

9    A.  Yes.  Absolutely.  And I'm happy to walk you through this

10   document and show you why.

11   Q.  Well, you would agree with me, Dr. Rangan, that the people

12   that ran these tests and wrote this report in February of 2007

13   have far more information about those tests and those results

14   than you do, correct?

15   A.  They might have other information than -- of course, they

16   might have other information, but I can only look at the

17   evidence in this document.  And from what's in this document, I

18   do not see anything near what would be considered a protocol

19   stack software.

20   Q.  So a year before G.S. comes over at Hytera, the Hytera

21   engineers are saying "according to the tests, we can see that

22   the protocol stack works normally and runs stably," but you

23   disagree with that?

24   A.  Yes, I do.  At least I think it's not -- I don't want to

25   contend that they're lying, but I think that what's being

1    understood here needs to be clarified in the context of what
2    actually happened in the test.
3    Q.  But you have no idea what actually happened, because you
4    weren't there?
11:29:19  5    A.  But I can read the test report.
6    Q.  The test report says the protocol stack runs normally and
7    runs stably, that's the conclusion, Dr. Rangan.
8    A.  Yes, but you need -- it's a test document.  You need to
9    look at what actually happened in the test.  And I'm happy to
11:29:34  10   walk you through that, if you want.
11   Q.  Well, when the Hytera engineers come and explain that, you
12   won't have any reason to disagree with what they did, because
13   they're the ones who actually did the testing.
14   A.  I can only look --
11:29:48  15          THE COURT:  Did you understand that question?
16          THE WITNESS:  Not exactly, no.
17          THE COURT:  Rephrase the question.
18          MR. ALLAN:  Yes, Your Honor.
19   BY MR. ALLAN:
11:29:55  20   Q.  Is it fair to say that the people who actually ran the
21   tests and have first-hand knowledge of what was tested know
22   more about this than you do?
23   A.  Obviously they have -- might have some other information
24   that I don't, and I can't speak to that.  My analysis is based
11:30:15  25   on what I saw in this test report.

2033

1    Q.  Let's take a look at PTX 1987, which I believe is admitted.

2          THE COURT:  All right.  Members of the jury, it is

3    precisely 11:30.  You are excused until Monday morning at

4    10:00 a.m.  The Court will adjourn until that time.

11:30:44    5          THE CLERK:  All rise.

6          THE COURT:  The witness will return also Monday at

7    10:00 o'clock.

8

9          (Adjournment taken from 11:30 o'clock p.m. to

10          10:00 o'clock a.m. on December 2, 2019.)

11

12          *     *     *     *     *     *     *     *

13

14

15   I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

16       RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

17

18   /s/Blanca I. Lara                    December 2, 2019

19

20

21

22

23

24

25