2034

1        IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION

3   MOTOROLA SOLUTIONS, INC., and MOTOROLA    ) No. 17 CV 1973
    SOLUTIONS MALAYSIA SDN. BHD,              )
4                                             )
                                              )
5           Plaintiffs,                       )
    vs.                                       ) Chicago, Illinois
                                              )
6   HYTERA COMMUNICATIONS CORPORATION, LTD.,  ) December 2, 2019
    HYTERA AMERICA, INC., and HYTERA          )
7   COMMUNICATIONS AMERICA (WEST), INC.,      )
                                              )
8           Defendants.                       ) 10:00 o'clock a.m.

9
                    TRIAL - VOLUME 13 A
10             TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE  CHARLES R. NORGLE, SR.
11                   and a jury

12

13  For the Plaintiffs:    KIRKLAND & ELLIS LLP
                           BY:  Mr. Adam R. Alper
14                              Mr. Brandon Hugh Brown
                                Mr. Reza Dokhanchy
15                              Ms. Barbara Nora Barath
                                Mr. Kyle Calhoun
16                         555 California Street
                           27th Floor
17                         San Francisco, California 94104
                           (415) 439-1400
18
                           KIRKLAND & ELLIS LLP
19                         BY:  Mr. Michael W. De Vries
                           333 South Hope Street
20                         Los Angeles, California 90071
                           (213) 680-8400
21

22
    Court reporter:             BLANCA I. LARA
23                         Official Court Reporter
                           219 South Dearborn Street
24                              Room 2342
                           Chicago, Illinois 60604
25                          (312) 435-5895
                           blanca_lara@ilnd.uscourts.gov

1   Appearances:   (Continued:)

2

3   For the Plaintiffs:     KIRKLAND & ELLIS LLP
                            BY: Ms. Megan Margaret New
                            300 North LaSalle Street
4                           Chicago, Illinois 60654
                            (312) 862-7439
5
                            KIRKLAND & ELLIS LLP
6                           BY:  Ms. Leslie M. Schmidt
                            601 Lexington Avenue
7                           New York, New York 10022
                            (212) 446-4763
8
    Motorola Corporate Representative:   Mr. Russ Lund
9

10

11  For the Defendants:     STEPTOE & JOHNSON LLP
                             BY: Mr. Boyd T Cloern
12                               Mr. Michael J. Allan
                                 Ms. Jessica Ilana Rothschild
                                 Ms. Kassandra Michele Officer
13                          1330 Connecticut Avenue., Nw
                            Washington, DC 20036
14                          (202) 429-6230

15                          STEPTOE & JOHNSON LLP
                            BY:  Mr. Daniel Steven Stringfield
16                          227 West Monroe Street
                            Suite 4700
17                          Chicago, Illinois 60606
                            (312) 577-1267
18

19  Hytera Corporate Representative:  Michele Ning

20

21

22

23

24

25

| | |
|---|---|
| 1 | THE CLERK:  All rise. |
| 2 | (The following proceedings were had in the |
| 3 | presence of the jury in open court:) |
| 4 | THE CLERK:  The Court is in sessions.  Please be |
| 10:03:02  5 | seated. |
| 6 | THE COURT:  Good morning, members of the jury.  Good |
| 7 | morning, counsel. |
| 8 | Please call the witness. |
| 9 | MR. ALPER:  Plaintiff recalls Dr. Rangan to the stand, |
| 10:03:10  10 | continuing cross-examination. |
| 11 | THE COURT:  Yes. |
| 12 | MR. ALLAN:  May I proceed, Your Honor? |
| 13 | THE COURT:  Please. |
| 14 | SUNDEEP RANGAN, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN |
| 10:03:15  15 | CROSS EXAMINATION (resumed) |
| 16 | BY MR. ALLAN: |
| 17 | Q.  Good morning, Dr. Rangan. |
| 18 | A.  Good morning.  I'm back. |
| 19 | Q.  When we left off before the break, we were discussing some |
| 10:03:37  20 | of the pre-G.S, Sam, Y.T. Hytera development docs in the 2007, |
| 21 | 2006 timeframe.  Do you recall that? |
| 22 | A.  Yes, I do.  Thank you. |
| 23 | Q.  And before we broke, I think I was handing you document PTX |
| 24 | 1987, which has been previously admitted. |
| 10:03:57  25 | If we could pull that up. |

Rangan - cross by Allan

2037

1   A.  Yeah.  Let me see if I can just fin dit here.

2   Q.  It's on the screen.  We can certainly get you a paper copy

3   if you'd like one.

4   A.  Yes, if you can get me a paper copy of that, then we can

10:04:13   5   proceed until I get one.

6   Q.  Certainly.

7   A.  I think it's here somewhere, but ....

8           (Brief pause.)

9   BY THE WITNESS:

10:04:18   10   A.  Thank you.

11   BY MR. ALLAN:

12   Q.  This is, I believe, one of the documents you testified to

13   on direct?

14   A.  Yes.

10:04:22   15   Q.  If you could turn to page 16.  It's the first full page of

16   the English translation.

17   A.  Yes.

18   Q.  And this document is entitled "DMR Protocol Stack V40

19   specification," right?

10:04:39   20   A.  That's correct.

21   Q.  And it indicates it was prepared by Yu Yang on May 30,

22   2007?

23   A.  That's right.

24   Q.  Let's take a look at page 28 of the document.

10:04:49   25           Actually one more page, if we could.

1          This has a lot of yeses and nos of features that were

2    realized or not yet realized at the time, right?

3    A.  That's what it says, yes.

4    Q.  I'm sorry.  If we could go back to 28.

10:05:09    5          Now, the table lists in the first entry a "PATCS

6    individual call."  Do you see that?

7    A.  I do.

8    Q.  And at the time your deposition was taken, you weren't

9    quite sure what PATCS stood for, right?

10:05:26   10    A.  I think I said it was push and talk, but I forgot what "CS"

11    stood for.

12    Q.  It's actually press and talk call service, right?

13    A.  Yes.  That's correct.

14    Q.  And the same with the next acronym, OACSU, you didn't know

10:05:41   15    what that was, right?

16    A.  I think I didn't remember the exact.  I think I said "over

17    the air" and that I couldn't remember the last three letters.

18    Q.  It actually stands for Off Air Call Setup, right?

19    A.  That's correct.

10:05:51   20    Q.  Now, let's take a look at the next page.

21          And the fifth item list there is OVCM, right?

22    A.  That's right.

23    Q.  And you didn't know what "OVCM" stood for either, did you?

24    A.  I didn't recall the exact acronym, no.

10:06:06   25    Q.  It's open voice channel mode?

Rangan - cross by Allan

2039

1   A.  That's correct.

2   Q.  And you don't know how OVCM works, do you?

3   A.  No, I do believe I do.

4   Q.  I'm sorry?

10:06:15   5   A.  I do believe I do.

6   Q.  You didn't at your deposition, did you?

7   A.  I didn't remember the exact acronym.

8   Q.  Now, the chart here reports that each of these features and

9   some others were realized by Hytera as of May 30, 2007, right?

10:06:33   10   A.  That's -- that's what the chart says.

11   Q.  That's what the document says.

12   A.  The chart says that, but as I explained in my direct, it's

13   not clear what it realized.

14   Q.  So if it says it's realized, you don't believe that it's

10:06:48   15   realized?

16   A.  No.  No, I don't.

17   Q.  And again, you didn't conduct this analysis, right?  You

18   weren't there when it was not done?

19   A.  I not here when this document was written, no.

10:06:57   20   Q.  And again, the engineers who actually engaged in this

21   testing would certainly know more about what these tested and

22   whether things were realized than you would, right?

23   A.  They might have obviously some information, but I was

24   basing my analysis on what the other documents I was provided.

10:07:12   25   Q.  Now, you understand, Dr. Rangan, that Hytera conducted a

Rangan - cross by Allan

2040

1  series of additional tests between May of '07 and September of

2  '07?

3  A.  That sounds consistent with what I've read, yes.

4  Q.  And that's normal, right?  You would normally conduct a --

10:07:27  5  you don't just take one test, you do a whole bunch of tests?

6  A.  Absolutely.

7  Q.  And that -- those series of tests in the summer of '07

8  culminated in a summary report, correct?  Or were reference or

9  documented in a summary report?

10:07:42  10  A.  Which summary report specifically are you thinking of?

11  Q.  Let's take a look at PTX 1988, which is also admitted.  I

12  believe you testified to this on direct as well, about this

13  document?

14  A.  I've only seen the Chinese, but is that the DMR Moto

10:08:07  15  Interop?

16  Q.  Well, let's make sure we all go to the English page --

17  A.  Yeah.

18  Q.  -- which I think starts at page 10.

19  A.  Oh, yes.

10:08:13  20  Q.  And the title of this document is "Summary Report on

21  Interoperability Between DMR and Moto," correct?

22  A.  That's correct.

23  Q.  And it's got a reference, it was prepared by Roger Zhang?

24  A.  Yes, it does.

10:08:26  25  Q.  With a date of September 30, 2007?

Rangan - cross by Allan

2041

```
         1   A.  That's correct.

         2   Q.  And again, this says it's a summary report.  It doesn't say

         3   it's a test plan, right?

         4   A.  The name of the document is Summary Report, yes.

10:08:41 5   Q.  Let's take a look at page 12, if we could.

         6            And this document begins with a heading

         7   "Interoperability Process."  Do you see that?

         8   A.  Oh, yes.  Sorry.

         9   Q.  Just the heading --

10:08:58 10  A.  Yes.

         11  Q.  -- at Section A.

         12  A.  By the way, I might have this document in front of me, but

         13  if you --

         14  Q.  Happy to give you a paper copy.

10:09:06 15  A.  Yeah, that would be great.  Thank you.  If possible.  It

         16  might be here in this stack.  I just lost track of things.

         17           Thank you so much.  Okay.  Sorry.  Go ahead.

         18  Q.  Okay.  Just to orient you, we're at PTX 1988.12, focused on

         19  the section at the top "A:  Interoperability Process."

10:09:30 20  A.  Yes, I see that.

         21  Q.  And the first sentence of that section begins:

         22           "Since the last interoperability was carried out

         23           ..."

         24            and it goes on to explain what happened, right?

10:09:41 25  A.  That's correct.
```

Rangan - cross by Allan

2042

1    Q.  Now, is it your opinion, Doctor, that there was no

2    interoperability carried out prior to this documentation?

3    A.  There may have been other testing, but I don't believe that

4    this document, or task, or I have not seen any other evidence

10:10:03    5    of any successful interoperability either here or before this.

6    Q.  And it's your opinion that this document doesn't show that

7    there was voice communication going between the Hytera

8    prototype and the Motorola radio, correct?

9    A.  That's correct.

10:10:16    10    Q.  And you maintain that opinion even though at the end of

11    Section A there's a reference, it says:

12            "Nowadays voice and data group calls can be

13            exchanged."

14            Do you see that?

10:10:29    15    A.  I do see that, yes.

16    Q.  And in your opinion, that reference to "nowadays, voice

17    data and group calls can be exchanged" doesn't mean that at the

18    time the document was written, voice and data group calls can

19    be exchanged?

10:10:46    20    A.  That's right.  It's extremely -- to the extent which can be

21    exchanged, it's extremely limited, as I explained in my direct.

22    Q.  And again, you weren't there when these tests were

23    conducted now 12 years ago?

24    A.  No, I was not there.

10:11:01    25    Q.  And again, the engineers that actually conducted the tests

Rangan - cross by Allan

2043

1  that led to this summary report would have more information

2  about the testing and what happened, correct?

3  A.  I can't speak to what they had, but if they had more

4  information, I had not been provided it for my analysis.

10:11:17  5  Q.  Well, I'm just asking a different question.

6  The question is, you would agree that the people that

7  actually carried out these tests 12 years ago have more

8  information or know more about that testing than you do?

9  A.  They might have obviously some information, but whatever

10:11:35  10  they didn't treat and document it.  I can only go with what I

11  have, of course.

12  Q.  There's a reference here to this diagram at the bottom,

13  which I think you testified to on direct.

14  A.  I did.

10:11:46  15  Q.  And I think you testified that this depicts some sort of

16  debugging hardware platform, is that right?

17  A.  Yes, that's, in fact, what is stayed here.

18  Q.  And it shows blocks for a radio, a baseband, a DSP

19  protocol, and an AMBE+2 voice vocoder, right?

10:12:08  20  A.  That's correct.

21  Q.  With a speaker and a microphone next to the AMBE+2 vocoder?

22  A.  That's right.

23  Q.  Now, you testified that this meant that there were four

24  boards, correct?

10:12:21  25  A.  Yes.  That's correct.

Rangan - cross by Allan

2044

10:12:36

1   Q.  But you really don't know.  It could've been two boards, it

2   could've been three boards, it could been one board?

3   A.  No, but if you look at document itself, it seems to

4   indicate that there are four boards, implicitly calls them out.

5   Q.  Well, it's a schematic of what the process is that the

6   signal goes through, but it doesn't necessarily mean that

7   that's one board or four separate physical boards, does it?

8   A.  But the text actually does kind of make it clear, if it's

9   not clear from the diagram either, it's an SBGA board, and

10:13:00

10  there's a -- there's a DSP protocol stack here.

11          I have to find it again where it is, but there

12  definitely is called out here, it's the four different boards,

13  and I think I highlighted them in my direct.

14  Q.  Again, you didn't actually see this, so you don't know

10:13:18

15  whether it was one or four or three?

16  A.  Of course, I did not see this, but it would be extremely

17  irregular to describe it this way if they weren't four distinct

18  boards.  And I also didn't see any integrated -- I saw no

19  evidence that these were integrated.

10:13:38

20  Q.  And this again, just to orient you, this is in middle of

21  2007 before Sam, and G.S., and Y.T. showed up sometime in 2008,

22  the spring of 2008?

23  A.  That's correct.

24  Q.  Let's take a look at Section B, "Voice Inoperability."

10:14:08

25  A.  Yes.

Rangan - cross by Allan

2045

1  Q.  And it's your opinion, Dr. Rangan, that Hytera did not

2  achieve voice inoperability in September 2007, correct?

3  A.  That's correct.

4  Q.  Now, the first sentence of that section starts:

5          "Inoperability of voice group calls starts with

6          Moto sending and Hytera receiving."

7          Do you see that?

8  A.  Yes.

9  Q.  And let's go to the top of the next page.  The report

10 continues:

11         "The resolved voice is sent out through the

12         speaker."

13 A.  Yes.

14 Q.  And that's from Motorola's radio to Hytera speaker,

15 correct?

16 A.  That's right.  But it just simply says, I believe a sound

17 can be -- oh, maybe not on this part.  But it doesn't actually

18 describe how much voice was actually received or the actual

19 quality of the voice that was received.

20 Q.  It doesn't say anything about it.  It just says voice came

21 out of the speaker, right?

22 A.  That's exactly right, that's all it says.

23 Q.  Now let's look at the paragraph that begins "According

24 ...."  see, it's on your screen.  It's, I guess, the second

25 full paragraph.  Do you see that?

10:14:21
10:14:34
10:14:46
10:14:58
10:15:14

Rangan - cross by Allan

2046

A. Yes.

Q. It says:

"Moto receives and displays Group 1, which means
that the data we send is correctly parsed and
the sound can also be heard."

Do you see that?

A. I do.

Q. And this is confirmed on this page where it says "the resolved voice sent out through the speaker," correct?

A. Yeah, but, as I said, that's consistent with just saying that sums amount of sounds. Because it can only do a limited number of voice bursts, it's just possible that it's so small that the amount of sound is just a fraction of a second. So it would be even hard to determine the quality from that sound.

Q. But again, Dr. Rangan, you weren't there when this test was done. You didn't hear the sound come out of the speaker 12 years ago, right?

A. I was not there, no.

Q. And the report doesn't say anything about the sound being insufficient, does it?

A. No, it does not.

Q. Let's take a look at the next section, Section C on page 14.

This section is -- has a data interchange heading, right?

Rangan - cross by Allan

2047

1    A.  It does.

2    Q.  Now, your opinion is that this report does not show a data

3    interchange between Hytera and Motorola's radio, does it?

4    A.  No, it does not.

10:16:38    5    Q.  Let's take a look at Section D on page 17.

6            I want to orient you and focus you to the section that

7    begins "at present."  Do you see that?

8    A.  Oh, there.  Yes, I see it.

9    Q.  It says:

10:16:57    10           "At present, the program runs well, and no

11               problems found in repeated tests.  It can

12               realize voice and short message communication

13               with Moto group calls."

14            Do you see that?

10:17:11    15    A.  I do, yes.

16    Q.  And the analysis continues:

17               "...because there is no display on the DSP

18               board, the received Moto short message cannot be

19               displayed, but there is no problem in data

10:17:23    20               receiving and parsing."

21    A.  Yes, it does say that.

22    Q.  And so at least according to the Hytera engineers that

23    summarized these series of tests in the summer of 2007, they

24    believe that there was data going back and forth?

10:17:39    25    A.  Yeah, but -- that's right, I believe that's what it's

Rangan - cross by Allan

2048

1  saying, but I think it needs to be understood in context of

2  what exactly is being sent and what's being repeated.

3  Q.  And certainly those folks, the engineers that actually

4  conducted the tests, would have that information?

10:18:02  5  A.  I can't speak for what they have, but I can only look at

6  what's here in the test documents.

7  Q.  But you would expect that the testing engineers that

8  engaged in the test would know about the test, right?

9  A.  In general, I suppose it's possible they might have some

10:18:25  10  information I don't have, obviously.

11  Q.  Now, in terms of -- just getting back to your comment that

12  this was debugging.  I think you indicated on your direct that

13  debugging is usually something that happens early in the

14  process?

10:18:37  15  A.  No, the debugging occurs throughout a product's life cycle.

16  I don't think that's what I was trying to say.

17  Q.  Now, in conducting research and development, Dr. Rangan,

18  it's standard practice that you start with an item that's

19  larger in scale and then you begin to miniaturize it, right?

10:19:01  20  A.  That's correct.

21  Q.  And generally, once you develop your product in the larger

22  format and show it can work, that's when you try to make it

23  smaller for commercialization?

24  A.  Yes.  Correct.

10:19:11  25  Q.  I'd like to show you PTX 1983, please.

Case: 1:17-cv-01973 Document #: 794 Filed: 12/20/19 Page 16 of 176 PageID #:53930
Rangan - cross by Allan
2049

1    A.  Thank you.

2    Q.  Now, this is not yet admitted, Dr. Rangan, but I just want

3    to orient you to the English, first page of the English,

4    1983.18.  Do you see that?

5    A.  I do.

6    Q.  And you understand this is another pre-G.S, Sam, Y.T.

7    development document from the Harbin files?

8    A.  Yes.  That's correct.

9    Q.  Produced by Hytera in this case?

10   A.  Yes.

11        MR. ALLAN:  I'd offer it into evidence, please, Your

12   Honor.

13        MS. NEW:  No objection.

14        THE COURT:  It is received and may be published.

15        (Said exhibit received in evidence.)

16   BY MR. ALLAN:

17   Q.  You understand this document was from October 2007,

18   Dr. Rangan?

19   A.  That sounds correct.

20   Q.  Let's take a look at -- just take a look at the first page.

21   The title of this is Knowledge Guidance of DMR.  DMR product

22   development at Hytera, right?

23   A.  That's right.

24   Q.  And again, before Sam, before G.S., before Y.T.  showed up?

25   A.  That's correct.

Rangan - cross by Allan

2050

1    Q.  Let's move to page 30, if we could.

2         This is a slide within this presentation entitled

3    Understanding of DMR Development, correct?

4    A.  That's right.

10:20:50    5    Q.  And then there's a section entitled Validation Objectives?

6    A.  Yes.

7    Q.  And that reads:

8         "The specific method of RF+BB ...."

9          that's stands for radiofrequency and baseband?

10:21:05    10    A.  That's correct.

11    Q.  (Reading:)

12         "... has been basically finalized and achieved

13          most of the targets, and can start to enter the

14          miniaturization verification."

10:21:14    15         Do you see that?

16    A.  That's right.

17    Q.  It goes on to say:

18         "... the function of the system control method

19          has been verified, but according to the overall

10:21:21    20          demand, the method may be changed and

21          revalidated."

22    A.  That's right.

23    Q.  Now, the next section of this slide refers to existing

24    results, do you see that?

10:21:32    25    A.  Yes.

Rangan - cross by Allan

2051

Q.  An din October 2007, the Hytera engineers state in this
document that:

> "The main body function of DMR standard has been
> realized and is successfully compatible with
> Moto."

A.  I do see that, yes.

Q.  But you disagree with that statement?

A.  I just have not seen any evidence of that and that's not in
this document or any other evidence that I've seen.  So to the
extent they're saying that, perhaps they're just meaning a
different -- they have a different meaning for these terms.

Q.  Well, the engineers that wrote this and summarized this
after all the tests results we've looked at have stated that
the main body function of DMR standard has been realized and is
successfully compatible with Moto, correct?

A.  Yeah, but that's not what I've -- that's not consistent
with the actual test results, at least that I've seen.

Q.  But you would agree that the Hytera engineers that
conducted all tests think that's the case?

A.  I can't speak to what they're thinking, but this --

Q.  Well, let me withdraw that.  Let me ask you a different
question.

A.  Sure.

Q.  You would agree that the Hytera engineers wrote that the
DMR standard had been realized in this document, October 2007?

Rangan - cross by Allan

2052

A.  That is what they wrote, yes.

Q.  Now, you were here for some of the -- there was some deposition testimony from both Sam Chia and Y.T. Kok played in this trial?

10:23:02

A.  Yes.  By videotape.

Q.  You were here for that?

A.  I was.

Q.  By videotape.

And they both testified that there was a work in prototype when they arrived at the company?

10:23:12

A.  I don't recall them saying that.

Q.  You don't recall Sam Chia testifying that when he arrived at the company, there was a working prototype that they built off of?

10:23:31

A.  I don't recall that exactly, no.

Q.  Okay.  Now, when Professor Sun and Yu Yang, two of Hytera's DMR developers, testified that all this work was done in the summer of 2007, you have nothing to disagree with their testimony, correct?

10:23:54

THE COURT:  I made a ruling at the sidebar regarding this method and you must comply with it.

BY MR. CLOERN:

Q.  And, Dr. Rangan, you've never yourself developed a DMR radio, correct?

10:24:08

A.  No, I have not.

Rangan - cross by Allan

2053

1  Q.  Now, you testified a little bit last week about the SPV, do

2  you remember that?

3  A.  I did.

4  Q.  And you testified that it was contrary to normal practices

5  or atypical not to save source code in a central repository?

6  A.  That's right.

7  Q.  Do you understand Hytera didn't have an SVN until 2008?

8  A.  I don't recall that one way or the other.

9  Q.  Did you know that prior to Hytera having a SVN, the

10  engineers stored source code on their laptops individually?

11  A.  If they didn't have any version control, that would be --

12  that's certainly possible.

13  Q.  And that that was their general practice for a decade or

14  more?

15  A.  It's possible would show it to be even somewhat more

16  disorganized state of affairs.

17  Q.  Let me direct you to --

18      MR. ALLAN:  Can we pull up, Jim, PDX 979, one of your

19  demonstrative slides.

20  BY THE WITNESS:

21  A.  Yes.

22  BY MR. ALLAN:

23  Q.  Now, you talked about this slide and there was an e-mail

24  from Yu Yang, do you remember that?

25  A.  That's right.

Rangan - cross by Allan

2054

1    Q.  And you indicated that Yu Yang said requirements couldn't

2    be met and you noted that the requirements he was talking about

3    were from 2006 document?

4    A.  That's correct.

10:25:49    5    Q.  You understand that Yu Yang was deposed in this case?

6    A.  Yes, he was.

7    Q.  And you understand that he was wasn't asked any questions

8    about what he meant about those documents?

9    A.  I can't recall whether or not -- whether that was true or

10:26:07    10   not.

11   Q.  Do you understand -- you understand Andy Grimmett is an

12   expert in this case?

13   A.  I do.

14   Q.  And that he had a discussion with Yu Yang about this

10:26:16    15   document?

16   A.  Oh, that's right, I do recall that he states in his expert

17   report that he had a discussion with Mr. Yang.

18   Q.  And that's when -- that's an expert report that you have a

19   separate report responding to his -- to Mr. Grimmett's

10:26:31    20   opinions?

21   A.  Yes, that's correct.

22   Q.  And that you understand from your reading of Mr. Grimmett's

23   report that he had discussion with Yu Yang and Yu Yang

24   explained what he meant by this e-mail?

10:26:43    25   A.  I do recall that Mr. Grimmett noted a conversation, yes,

Case: 1:17-cv-01973 Document #: 794 Filed: 12/20/19 Page 22 of 176 PageID #:53936
Rangan - cross by Allan
2055

1    with Mr. Yang about this section.

2    Q.  And Yu Yang indicated that he sent this e-mail in response

3    to Sam Chia's suggestion of further involving the --

4              MS. NEW:  Objection, Your Honor.  Assumes facts.

5              THE COURT:  Well, the question that begin with "you

6    understand" become vague.  And so it's the form of the question

7    that is troubling here.

8              But, once again, what is your objection?

9              MS. NEW:  It assumes facts.  The lawyer is testifying.

10             THE COURT:  Well, it's sort of embodied in the

11   question "you understand."  So sustained.  Rephrase the

12   question.

13   BY MR. ALLAN:

14   Q.  Are you familiar with -- you responded to Andy Grimmett's

15   report?

16   A.  I did, indeed.

17   Q.  And you reviewed Andy Grimmett's report where he reflects a

18   discussion he had with Yu Yang?

19   A.  Yes.

20   Q.  In particular, he reflects and explains what Yu Yang told

21   him about this document?

22   A.  He does.

23   Q.  And you have an understanding of that discussion based on

24   your review and rebuttal to Mr. Grimmett's report, correct?

25   A.  Yes.

Rangan - cross by Allan

2056

1  Q.  And you know that Mr. Yu Yang explained what he meant.  He

2  explained what he meant by this e-mail and this documentation,

3  correct?

4  A.  I read what Mr. Grimmett said, yes, about that discussion.

5  Q.  You didn't discuss that on your direct examination,

6  correct?

7  A.  No, I didn't, but I'm happy to talk about that right now if

8  you'd like.

9  Q.  But you understood that Yu Yang had an explanation about

10  this document, but you provided a different interpretation for

11  Yu Yang?

12  A.  Yes.  That's correct.

13          THE COURT:  The jury needs foundation.  At what point

14  in time, and who is speaking to whom, under what circumstances

15  in terms of foundation.

16  BY MR. ALLAN:

17  Q.  In reviewing Mr. Grimmett's report, you understand that in

18  preparing his opinion in this case, he had a discussion with Yu

19  Yang?

20  A.  Yes, that's what's stated in the report.

21  Q.  In the last 6, 8 months or so?

22  A.  Whenever he published the report, yes, that's correct.

23          I believe, if I recall that section of Mr. Grimmett's

24  report, he states that Mr. Yang explained to him that the

25  requirements were related to head count.

Rangan - cross by Allan

2057

1    Q.  The need for additional resources?

2    A.  That's correct, if I recall that.  But that doesn't seem to

3    be entirely consistent with this document, because as I recall,

4    at the end of this document, it's not in front of me, they

5    actually state explicitly that the head count isn't an issue.

6            THE COURT:  Are you continuing to deal with this

7    exhibit that is being shown to the jury?

8            MR. ALLAN:  Pardon me?

9            THE COURT:  Are you continuing to inquire with respect

10   to the exhibit which is being shown to the jury?

11           MR. ALLAN:  No.  I'll move on, Your Honor.

12           THE COURT:  You may.  I just want to --

13           MR. ALLAN:  That whole line of questioning was,

14   indeed, based on the Exhibit.

15           THE COURT:  All right.  Please proceed.

16           MR. ALLAN:  We can take that down.

17   BY MR. ALLAN:

18   Q.  Now, we talked a little bit on Wednesday about a consultant

19   recommendation, that Hytera had retained a consultant in August

20   of 2007, on a documentation, correct?

21   A.  Oh, yes, I do remember that now.

22   Q.  And in context, the company thought that the development

23   was to the point that hiring an outside consultant to help

24   improve development and prepare for manufacturing was a

25   worthwhile investment?

10:29:17
10:29:30
10:29:40
10:29:57
10:30:11

Rangan - cross by Allan

2058

1    A.  That's right.

2    Q.  Now, you know shortly after the tests in the summer of 2007

3    that we just talked about, and the August 2007 consultant

4    report, that Hytera developed or created a DMR general macro

10:30:32    5    group; did you know that?

6    A.  A DMR general macro group?

7    Q.  Correct.  Macro general report, do you remember that?

8    A.  I don't recall it, but it's possible.

9    Q.  Let me hand you DTX 5376, please.

10:30:49    10    This is not yet admitted, Dr. Rangan.  Page 5 is where

11    the English translation comes in.

12    A.  I see that, yes.

13    Q.  And you see this is a document produced by Hytera in the

14    case?

10:31:12    15    A.  Yeah, I do.

16    MR. ALLAN:  We'd offer this into evidence, please,

17    Your Honor.

18    MS. NEW:  No objection, Your Honor.

19    THE COURT:  It is received and may be published.

10:31:26    20    (Said exhibit received in evidence.)

21    BY MR. ALLAN:

22    Q.  And you see, just to orient you, Dr. Rangan, if you look

23    quickly on page 6, it shows the date of October 13, 2007, at

24    the bottom?

10:31:38    25    A.  Yes.

Rangan - cross by Allan

2059

1   Q.  All right.  Let's go back to the first page.

2          And at the top it says "Summary of the Establishment

3   of the DMR Macro General Group," do you see that?

4   A.  Oh, yeah.  Now I recall that.

10:31:55   5   Q.  And then in the first section, general group background, it

6   begins:

7              "As one of the important projects of the

8              company's future products, the DMR project's

9              technology pre-research and development is

10:32:11  10              nearing completion."

11          Do you see that?

12  A.  I do.

13  Q.  It goes on to say:

14              "... the breakthrough of many key technologies,

10:32:17  15              the interoperability with Moto terminals, and

16              the gradual completion of compatibility testing

17              of such have enabled us to see the dawn of HYT's

18              research and development of TDMA DMR products."

19          Right?

10:32:42  20  A.  I do see that, yes.

21  Q.  And this is, again, in October of 2007?

22  A.  That's right.

23  Q.  This establishment document continues:

24              "... according to the project's schedule, it is

10:32:47  25              now necessary to start product conversion work."

Rangan - cross by Allan

2060

1    A.  I see that, yes.

2    Q.  And that refers to commercialization, right?

3    A.  Possibly, yes.

4    Q.  And then it continues, one more sentence here:

10:33:07    5        "... the previous experience in product

6            development shows that as a large scale project,

7            sufficient preparation before the start of the

8            product is absolutely necessary."

9    A.  Yes.

10:33:17   10   Q.  So Hytera is relying on its experience developing products

11   in the past, and its drawing on that experience for part of

12   this DMR macro general group, correct?

13   A.  Oh, I see.  Yes.

14   Q.  And then the next section lists some responsibilities for

10:33:36   15   the macro general group?

16   A.  Yes.

17   Q.  And they're bringing in industrial design people?

18   A.  That's right.

19   Q.  Now, industrial design is when you start to miniaturize and

10:33:47   20   you put it in a case, and figure out where the antenna is, and

21   how big the screen is, and all that kind of stuff, right?

22   A.  Exactly.

23   Q.  And there's quality assurance group that's coming in?

24   A.  That's what it says here, yes.

10:34:00   25   Q.  And marketing folks are coming in?

Rangan - cross by Allan

2061

1    A.  It does say that, yes.

2    Q.  And finance, and so on?

3    A.  Yes.

4    Q.  So they're marshaling a number of different resources in

10:34:11    5    the company, in October of 2007, as they begin to think about

6    commercializing the product?

7    A.  That's the plan.  That's indicated here, yes.

8    Q.  Let's go to the next page, page 6, and just take a quick

9    look at the summary.

10:34:32    10          And, by the way, Professor Sun is noted here under the

11    summary date.

12          MR. ALLAN:  Can we move that just a bit, Jim.

13    BY THE WITNESS:

14    A.  Yes, I do see that.

10:34:43    15    BY MR. ALLAN:

16    Q.  Now, in the summary it states:

17          "... I would like to thank all of the

18          departments of the company for their support of

19          the DMR project, selecting the best personnel of

10:34:53    20          the department to participate in such a short

21          time.  Should be the DMR's product development

22          model is being formally tested at company for

23          the first time.  It is hoped that all experts

24          will do their best to ensure the DMR products

10:35:00    25          successfully launched on market in 2008 so that

Rangan - cross by Allan

2062

1    we can share the success."

2  A.  Yes, I do see that.

3  Q.  So in October of 2007, the company thinks that they've got

4  everything set with testing with Motorola and they're moving

10:35:24  5  toward commercialization of the product to launch in 2008?

6  A.  That's what Mr. Sun is saying here, but again, it's just

7  not consistent with the evidence I've seen.

8  Q.  Well, it's certainly consistent with what the Hytera

9  engineers believed at the time?

10:35:36  10  A.  I can't speak to what they believe.

11  Q.  Well, it's certainly consistent with what they're writing

12  in all these reports?

13  A.  It is hoped that the experts will ensure that launch by

14  2008, yes, that's what's being expressed here.

10:35:56  15  Q.  And in view of all of the documents that we've looked at,

16  your opinion is still that Hytera didn't have a working

17  prototype before G.S., Sam or Y.T.  showed up?

18  A.  Absolutely.

19  Q.  And your opinion is that what Hytera developed would never

10:36:13  20  have worked?

21  A.  In any commercially reasonable time, no.

22  Q.  Now, you understand that when Sam and Y.T. joined the

23  company in June of 2008, so some whenever it is, 8, 10 months

24  after this document, right?

10:36:32  25  A.  Yes.

Rangan - cross by Allan

2063

1   Q.  That they analyzed the work that had been done?

2   A.  They did.

3   Q.  Let's -- and they concluded that the FPGA was 70 to 80

4   percent done, right?

10:36:45   5   A.  That is on one of their presentations, but again, that

6   needs to be placed in context in the rest of that presentation.

7   Q.  Well, let's take a look at that presentation.  It's PTX 22,

8   which is admitted.

9           Would you like a paper copy?

10:36:58   10   A.  Sure.  If you have one.  Thank you.

11   Q.  Let's take a look at page 7.  Again, Sam did this entire

12   analysis and he says about 70 to 80 percent of the work has

13   been completed, right?

14   A.  Yes, it says that here.  But again, you have to make sure

10:37:24   15   you understand, the FPGA is just a part of the overall DSP, and

16   it's not even clear what the 70 to 80 percent number means

17   here.

18   Q.  He also says that the L1 timer is realized, right?

19   A.  Yes.  It says "contains an L1 timer."

10:37:40   20   Q.  And he says that the 4FSK physical layer modulation and

21   demodulation realization has been completed, correct?

22   A.  Yes.  Although, it speaks about some performance issues.

23   Q.  Now, the FPGA code -- well, let me withdraw that and ask

24   you a new question.

10:37:56   25           You testified on direct that there wasn't much code in

Rangan - cross by Allan

2064

1    the early development, is that right?  Did I hear you right

2    when you testified?

3    A.  On the FPGA?

4    Q.  Yes.

10:38:08    5    A.  I forget exactly what I said, but I can try to restate my

6    general view of the code, if you'd like.

7    Q.  Well, you understand that he FPGA code is written in a

8    language called verilog?

9    A.  I do.

10:38:19    10    Q.  And that there were about 4- or 500 different verilog files

11    produced in this case?

12    A.  Yeah, that sounds about right.

13    Q.  Roughly 135,000 lines of code?

14    A.  Yeah, but I'm not sure of how many of those files I did

10:38:34    15    look at them were actually related to the FPGA functionality

16    that's cited here.  Many of those files were just little tests,

17    scripts that weren't necessarily integrated into disks.

18    Q.  Well, nowhere in either of your reports, Dr. Rangan, do you

19    do some sort of line-by-line or file-by-file analysis of the

10:38:54    20    verilog, do you?

21    A.  No, I don't think I do.

22    Q.  And getting back to the 70 to 80 percent being done, that

23    is consistent with the testimony you heard from Y.T. and Sam in

24    this case, right?

10:39:06    25    A.  I don't know which testimony you're talking about

Rangan - cross by Allan

2065

1   specifically.

2   Q.  You were here for that testimony?

3   A.  Yes, I was.

4   Q.  When Y.T. Kok testified --

5   10:39:17   THE COURT:  I said the jury has heard what those

6   witnesses said.

7   MR. ALLAN:  Withdrawn, Your Honor.

8   BY MR. ALLAN:

9   Q.  You understand that the Hytera witnesses that were asked at

10  10:39:34   deposition about the development all testified that they had a

11  prototype?

12  A.  That's not what I recall, but if you want to point me to a

13  specific line.

14  Q.  Do you recall any Hytera witnesses in the depositions that

15  10:39:49   you've read that indicated there was no prototype?

16  A.  I think they weren't -- I thought the discussion was more

17  specific than that, but we can pull up a specific line to talk

18  about it.

19  Q.  Let's flip back to something we talked just a little bit

20  10:40:09   about on Wednesday.

21  So it's your position that Hytera to this day can't --

22  could not develop its own DMR radio?

23  A.  Not a comparable one, no.

24  Q.  You understand that Hytera has a satellite business?  Did

25  10:40:25   you know that?

Rangan - cross by Allan

2066

1   A.  I don't recall that, one way or the other.

2   Q.  You're not aware that Hytera has a division that develops

3   satellite and satellite networks?

4   A.  I don't recall that one way or the other, no.

10:40:36   5   Q.  And that wouldn't change your opinion as to whether they

6   could develop the product?

7   A.  No, it would not.  I didn't see any such satellite

8   resources, for example, being used in the DMR development.

9   Q.  Let's take a look at PTX 9136.

10:40:58   10          Is this another one of the slides from your direct?

11   A.  Yes.

12   Q.  Now, we talked a little bit on Wednesday that you've got

13   gating trade secrets and dependent trade secrets?

14   A.  That's right.

10:41:18   15   Q.  So the dependent trade secrets couldn't be developed until

16   the gating trade secrets were done?

17   A.  That's right.

18   Q.  And so I think we used the example of the DSP source code

19   of 10 years and a repeater of 13.5, if you add those two

10:41:32   20   together you get the 23 points?

21   A.  That's right.

22   Q.  Now, the DMR source code referenced here, do you see that,

23   with the 10-year estimate?

24   A.  DSP source --

10:41:45   25   Q.  DSP source --

Rangan - cross by Allan

2067

1     A.   Sorry.   What do you mean "DSP source code"?

2     Q.   I'm sorry.   I'm sorry.   DMR source code, 907.

3     A.   Yes.

4     Q.   Now, the DMR source code consists of the entire source code

10:42:01   5     precluding the mobile, portable and repeater, correct?

6     A.   That's right.

7     Q.   And so the DSP source code would be a subset of the DMR

8     source code, right?

9     A.   That's right.

10:42:19   10    Q.   Yet the DSP source code, as a subset, would take almost a

11    year longer than the entire thing it's a part of?

12    A.   Yes.   That's right.

13    Q.   And the repeater at 13.5 you're saying is also part of the

14    DMR source code, yet the DMR source code only takes 9.07 years?

10:42:40   15    A.   Well, the repeater has other aspects than the source code,

16    but I'm happy to -- it does -- I'm happy to explain why the DSP

17    source code is actually less, and it speaks to actually the

18    conservatism -- sorry, the DSP source code is more than the DMR

19    radio source code, that it speaks actually to the conservatism

10:43:04   20    and the methodology that's being used here.

21    Q.   Well, let's -- just taking the 23 1/2 as it developed

22    something that had the DSP source code and the repeater, you

23    understand that Motorola itself wouldn't expect another

24    manufacturer to take that kind of time to develop a full DMR

10:43:26   25    radio, correct?

Rangan - cross by Allan

2068

1  A.  I didn't -- no, it would not be -- that would not be

2  inconsistent.  They could believe that to get to a comparable

3  product it might take another manufacturer a very long time

4  like that.

10:43:43  5  Q.  Well, you understand that Motorola actually thinks it would

6  take a whole lot less time?

7  A.  I haven't seen any evidence of that.

8  Q.  In fact, Motorola expected competitors would be able to

9  develop DMR radios in just couple of years?

10:44:03  10  A.  I'm not sure which evidence you're speaking to.

11  Q.  You haven't seen anything like that?

12  A.  No, I haven't -- I don't recall anything.

13  Q.  Let me hand you DTX 4491.

14  A.  Oops.  Sorry.

10:44:23  15  Q.  And this is a Motorola document produced in this case by

16  Motorola?

17  A.  It is.

18  Q.  Dated January 8, 2009?

19  A.  Yes.

10:44:34  20      MR. ALLAN:  I'd offer this into evidence, please, Your

21  Honor.

22      MS. NEW:  No objection, Your Honor.

23      THE COURT:  It is received and may be published.

24      (Said exhibit received in evidence.)

10:44:42  25  BY MR. ALLAN:

Rangan - cross by Allan

2069

1   Q.  Now, the title of this document, Dr. Rangan, is "Matrix OEM

2   Vendor partnerships M13 Marketing Requirements Document," do

3   you see that?

4   A.  I do.

10:44:52   5   Q.  And at the time of the date of this document, January 8,

6   2009, Motorola was the only manufacturer of DMR products?

7   A.  I believe so.  That's correct.

8   Q.  Let's take a look at if we could turn to page 7.

9         And at the very top, under Section 2.1, there's a

10:45:16   10   reference to "red team," do you see that?

11   A.  I do.

12   Q.  And it says:

13         "In mid 2005, a red team was formed to address

14         the competitive threat in professional and

10:45:28   15         commercial two-way radios."

16   A.  Yes.

17   Q.  And looking down the next second, I guess, paragraph below

18   that, it says:

19         "The team established the following

10:45:42   20         strategies ..."

21   A.  Yes.

22   Q.  I want to highlight the first three.  The first you see

23   says:

24         "Establish Motorola's ETSI DMR tier 2 protocol

10:45:53   25         as the preferred standard world-wide."

Rangan - cross by Allan

2070

1           Right?

2    A.   Yes, I do.

3    Q.   And the second bullet is:

4              "Encourage other manufacturer's to design to the

10:46:03    5              DMR protocol and sign on to the MoU."

6    A.   Yes.

7    Q.   And that's Memorandum of Understanding."

8    A.   It is.

9    Q.   The third bullet here is:

10:46:16   10              "Obtain the support of industry partners around

11              the TDMA DMR protocol."

12   A.   Yes, that's what it says.

13   Q.   Now, the next paragraph reports:

14              "This project addresses the first three bullet

10:46:29   15              points listed the strategy section above."

16               Do you see that?

17   A.   Yes.

18   Q.   (Reading:)

19              "Competition now has a competing protocol and it

10:46:36   20              is even more important that the strategy be

21              implemented."

22   A.   I do see that, yes.

23   Q.   And the competing protocol, you understand, is dPMR?

24   A.   It doesn't say that here, but that would be consistent.

10:46:47   25   Q.   Consistent with your understanding.

Rangan - cross by Allan

2071

1    A.   That's correct.

2    Q.   And that's the protocol that was advanced by companies like

3    ICOMM and Kenwood?

4    A.   I believe so.

10:46:59  5    Q.   Let's take a quick look at page 8, the line that begins

6    "Motorola intends," do you see that?

7    A.   Oh, yes.

8    Q.   (Reading:)

9              "Motorola intends to sell tier 2 DMR-compliant

10:47:22  10             radios globally and for this protocol to become

11             the digital standard around the world."

12   A.   Yes, I do see that.

13   Q.   Now let's flip over to page 9.  There's a section under

14   "Competition," do you see that?

10:47:39  15   A.   Yes.

16   Q.   And the last paragraph is where I want to direct you.  It

17   says:

18             "... Kenwood and ICOMM are actively soliciting

19             other vendors to develop products with similar

10:47:52  20             technology?"

21              Right?

22   A.   Yes, I see that.

23   Q.   (Reading:)

24             "Kenwood has also started a dPMR working group."

10:48:00  25   A.   I does say that.

Rangan - cross by Allan

2072

Q.  (Reading:)

"One clear objective they have is to develop an

alliance of partners building 6.25 kilohertz

FDMA products to compete directly with

10:48:11    Motorola."

A.  I do.

Q.  (Reading:)

"This could cause confusion in the market and

devalue the DMR standard."

10:48:16    A.  Sure.  It says that.

Q.  (Reading:)

"Like Motorola with DMR, they would like to see

their solution become the de facto standard."

A.  Yes.

10:48:31    Q.  So Motorola developed a product strategy to respond?

A.  Okay.

Q.  Let's turn to page 10.

So Motorola set out to obtain the support of other

vendors to assist in having DMR become the de facto standard.

10:48:54    And the second sentence of this document reads:

"Due to the limited resources of the other key

subscriber vendors in the market, Motorola would

like to offer substantial assistance to get

DMR-compliant products to the market as soon as

10:49:12    possible."

Rangan - cross by Allan

2073

1   A.  I do see that, yes.

2   Q.  And part of Motorola's strategy, in this '09 document, was

3   to OEM DMR products to other manufacturers; do you understand

4   that?

10:49:23   5   A.  I do understand that.

6   Q.  And OEM is original equipment manufacturer?

7   A.  That's correct.

8   Q.  And you understand that Motorola wanted to have a critical

9   mass of other manufacturers to help DMR become the de facto

10:49:39   10   standard over dPMR?

11   A.  That sounds reasonable.  I don't recall that one way or the

12   other, but that certainly sounds reasonable.

13   Q.  It goes on to say:

14          "By securing other compatible manufacturers,

10:49:59   15          Motorola's ability to meet our planned digital

16          products forecast is increased and the chance of

17          oar vendors developing to the Kenwood ICOMM

18          solution is minimized."

19   A.  I see that.

10:50:09   20   Q.  Again, more manufacturers for DMR, less likely that dPMR

21   becomes the standard?

22   A.  That sounds reasonable.

23   Q.  Now let's look at the next paragraph, it says:

24          "Motorola's plan was to offer some key

10:50:26   25          subscriber manufacturers, like Tait, radio

Rangan - cross by Allan

2074

1        components with embedded software to deliver an

2        initial DMR-compliant product to the market

3        quickly."

4    A.  I see that, yes.

10:50:41    5    Q.  And part of Motorola's plan was to limit the amount of

6    digital technology know-how and implementation expertise?

7    A.  I'm sorry, where is that?

8    Q.  We'll get that highlighted (indicating).

9        Do you see that?

10:51:01    10   A.  Yes, I do see that now.

11   Q.  And the plan in this red team -- this red team plan was for

12   the partnerships to begin in early 2009 and continue for just a

13   couple of years?

14   A.  Right.

10:51:14    15   Q.  And, in fact, continue for just a couple of years until the

16   vendors, the vendors themselves have their own designed and

17   manufactured DMR radios?

18   A.  I see that, yes.

19   Q.  So Motorola's plan in this 2009 document, in order to push

10:51:33    20   the DMR standard forward was to OEM, original equipment

21   manufacturer, DMR radios for a bunch of different radio

22   manufacturers so they got a critical mass of radios to help DMR

23   beat dPMR, right?

24   A.  Right.

10:51:49    25   Q.  And this program was going to last for just a couple of

Rangan - cross by Allan

2075

1    years, with the idea that the vendors themselves would develop

2    their own DMR products during that time?

3    A.  Oh, but I don't think that means developing them from

4    scratch.

10:52:02    5    Q.  Well, there's nothing in here that indicates Motorola is

6    giving them any of their own information, right?

7    A.  It doesn't -- it doesn't state one way or the other right

8    here, that they're giving it, but they could be actually --

9    they could be still giving them in this post-2009 part actual

10:52:30    10    parts or radio components, and that's the partnership might

11    change.  It doesn't seem to suggest that they think -- or at

12    least this sentence, reading this right now, doesn't seem to

13    suggest that the other manufacturers, like Tait, will come up

14    with their own competing DMR product to compete with Motorola,

10:52:51    15    because that would actually be somewhat counterintuitive for

16    Motorola to perform.

17    Q.  Motorola really wants DMR to beat dPMR?

18    A.  It's possible.

19    Q.  And Motorola realizes that the way to do that is to get a

10:53:09    20    critical mass of manufacturers?

21    A.  Yes.

22    Q.  So they're willing to sell Motorola DMR radios to these

23    other manufacturers, that other manufacturers can rebrand as

24    their own product so there's a critical mass of DMR radios on

10:53:26    25    the market?

Rangan - cross by Allan

2076

1  A.  Yes.  But it's very possible that this strategy is still

2  assuming that those other manufacturers for some time period

3  after 2009 would still be using Motorola parts in their

4  solution.

10:53:41   5  Q.  It doesn't say anything about that?

6  A.  It doesn't, one way or the other.

7  Q.  It says:

8          "This partnership is going to begin in early

9          2009 and continue for a couple of years until

10:53:51  10          the vendors have their own -- "-- their own

11          designed and manufactured DMR radios."

12  A.  It does say that.

13  Q.  And it also says, what we looked at earlier, was that this

14  approach minimizes the sharing of key Motorola digital

10:54:06  15  technologies, expertise and product know-how since source code

16  and key digital components would not be available to the

17  vendors.

18  A.  Yeah; but you can obviously share components without

19  sharing source code or expertise.

10:54:19  20  Q.  But the point of this is that the vendors themselves will

21  develop their own products and Motorola will cease being an OEM

22  supplier?

23  A.  It's not entirely clear from this, this document, of that

24  is the nature of the partnership post-2009.

10:54:36  25  Q.  Well, it certainly doesn't say anything about it's going to

Rangan - cross by Allan

2077

1    continue for 23 1/2 years until the vendors can get it done,

2    right?

3    A.  But these are also vendors that had experience potentially

4    with other standards that are not comparable to where Hytera

10:54:53    5    was, for example, at that time.

6    Q.  The document doesn't say it's going to take vendors 23 1/2

7    years, does it, Dr. Rangan?

8    A.  It does not mention 23.5, no.

9    Q.  It doesn't even say 10 years, does it?

10:55:04    10    A.  It does not.

11    Q.  It doesn't even say 5 years, right?

12    A.  It does not.

13    Q.  It says a couple of years?

14    A.  It does.

10:55:11    15           MR. ALLAN:  Nothing further, Your Honor.

16           THE COURT:  Redirect?

17           MS. NEW:  Yes, Your Honor.

18           THE COURT:  Just a minute.

19           Members of the jury, are you ready to proceed or do

10:55:20    20    you need a short break?  In favor of a break, raise your hands.

21           (No response.)

22           THE COURT:  Break-less.

23           I saw one hand move a little.

24           A JUROR:  No.

10:55:37    25           THE COURT:  No?  All right.  Redirect, counsel.

1      (Brief pause.)

2          MS. NEW:  May I proceed, Your Honor?

3          THE COURT:  Please proceed.

4          MS. NEW:  Thank you.

10:55:15    5                  REDIRECT EXAMINATION

6    BY MS. NEW:

7    Q.  Let's actually start, Dr. Rangan, where you just left off,

8    which is with DTX 4491.

9          MS. NEW:  And if we could about to page 10,

10:56:15   10   Mr. Schlaifer.  And, Mr. Schlaifer, could you blow up that

11   second full paragraph, starting with "Motorola is proposing."

12   Thank you.

13   BY MS. NEW:

14   Q.  So, Dr. Rangan, you were just asked a couple of questions

10:56:28   15   about the document and Motorola's strategy for getting more

16   companies to sign on to the DMR standard.  You recall that?

17   A.  Yes, I do.

18   Q.  Okay.  Do you see here in the document where it says:

19          "Motorola is proposing to offer some key

10:56:42   20          subscriber manufacturers, (e.g. Tait

21          Electronics, et certa) radio components ...."

22          and if you skip down it says:

23          "... with embedded software to support these

24          vendors in delivering an initial DMR-compliant

10:57:01   25          product to the market quickly."

Rangan - redirect by New

2079

1    A.  I do.

2    Q.  Okay.  Under your reading of this document, is this a

3    scenario where these other manufacturers, such Tait, would be

4    manufacturing the DMR product from scratch?

10:57:18    5    A.  No, it would not be.  They'd be getting these components.

6    Q.  And that those would be the components provided by

7    Motorola?

8    A.  Yes.  That's correct.

9    Q.  And is this -- would this scenario where Motorola is

10:57:30    10    providing software, embedded software and hardware to these

11    manufacturers, is that a comparable development effort to what

12    Motorola undertook for its DMR product?

13              MR. ALLAN:  It's leading, Your Honor.

14              THE COURT:  Sustained.

10:57:45    15    BY MS. NEW:

16    Q.  Dr. Rangan, do you have an opinion, one way or the other,

17    about whether this would be comparable with Motorola's

18    development efforts?

19    A.  This would absolutely not, because in this case they would

10:57:54    20    be getting the software, that's with the bedded software,

21    already from Motorola.  Motorola, in contrast, had to

22    development all that software from scratch.

23    Q.  And do you have an opinion, one way or the other, about

24    whether this scenario that Motorola has proposed would be

10:58:10    25    comparable with Hytera's efforts to develop a DMR radio prior

Rangan - redirect by New

2080

1    to 2008?

2    A.  No.  Well, obviously Hytera also did not receive software

3    or, you know, from a -- from an established manufacturer like

4    Motorola.

10:58:28  5    Q.  And does Motorola's willingness to offer some hardware and

6    some embedded software to other manufacturers, such as Tait,

7    does that intact your opinion regarding the development times

8    for Motorola's trade secrets?

9    A.  Absolutely not.  The fact that they might share this to

10:58:49  10   make it faster for some person doesn't -- doesn't at all change

11   my view of how long it would take to build these from scratch.

12   Q.  And does Motorola's willingness to offer the hardware and

13   embedded software to other manufacturers impact your opinion

14   that Hytera could not independently develop a DMR radio in a

10:59:09  15   commercially reasonable period of time?

16   A.  No, it does not.

17   Q.  I want to go to PDX 9.136, which was the gating and

18   dependent trade secrets.

19        MS. NEW:  Thank you, Mr. Schlaifer.

10:59:23  20   BY MS. NEW:

21   Q.  On cross exam you were asked some questions about the DMR

22   radio source code trade secret and the DSP source code trade

23   secret.  Do you recall that?

24   A.  I do.

10:59:34  25   Q.  And can you explain why the DSP source code takes 10 years

Rangan - redirect by New

2081

1    while the DMR radio source code takes 9.07 years --

2    A.  Well --

3    Q.  I'm sorry.

4            -- and why that is conservative.

10:59:49   5    A.  Yes.  The DSP source code, let me just highlight them here

6    (indicating), is actually mostly contained in the DMR radio

7    source code, but the reason it takes longer is because both of

8    these estimates are extremely conservative, just that the DMR

9    radio source code is an even more conservative estimate.

11:00:11  10            If you actually look at the staff months for the DSP

11    source code, you'll see that it's about one-third of the number

12    of staff months for the DMR radio source code, and similarly

13    for the head count.  And that's roughly consistent with what

14    you would expect, because the DSP source code about that

11:00:28  15    proportion of work.

16            However, when you compute the calendar years, you get

17    the same number.  But remember, the calendar years is a very

18    conservative estimate, because it's assuming that all the

19    people in that head count can work continuously for the full

11:00:44  20    duration in parallel.

21            And that's just simply -- it's a conservative

22    assumption in both cases, but it's an even more conservative

23    exemption for the DMR radio source code, because it has so many

24    disparate parts, you couldn't actually get them to operate in

11:00:59  25    parallel like that.

Case: 1:17-cv-01973 Document #: 794 Filed: 12/20/19 Page 49 of 176 PageID #:53963
Rangan - redirect by New
2082

1  Q.  And you just mentioned that it's conservative, your

2  opinions are conservative because it assumes everyone working

3  in parallel.  In the real world how would the development of

4  trade secrets like DMR radio source code and DSP source code

5  work at a company like Motorola?

6  A.  You actually saw in the real world -- I believe it was

7  Mr. Zetzl who had spoken about these -- that both of these took

8  much more of time in reality, and that's because, of course,

9  you can't use all the team continuously.  You're using

10  fractions of the team on different parts at different times.

11  Q.  Okay.  I want to move on, Dr. Rangan.  I want to go back to

12  PDX 9.34.

13       Now, on the very beginning of your cross-examination

14  last Wednesday you were asked whether you were opining on the

15  intentions of Mr. Chen and Hytera's engineers, do you recall

16  that?

17  A.  I do.

18  Q.  Are you offering opinions about the intentions of those

19  people?

20  A.  I can't speak to their state of mind, obviously.

21  Q.  And when you put together this slide showing these 28

22  engineers, what were you trying to convey through this slide?

23  A.  In this particular slide, I was trying to show the concrete

24  examples or just a few of the examples of people, given the

25  information that they had received, that they should've been

11:01:14

11:01:35

11:01:52

11:02:02

11:02:22

Rangan - redirect by New

2083

1    aware that the nature of that material was Motorola

2    confidential and proprietary.

3    Q.  And just to reminder the jury, did you see documents and

4    materials showing that there were additional people at Hytera

11:02:38    5    who should have been aware that Motorola's confidential

6    information and source code was available during the

7    development of Hytera's DMR product?

8    A.  Yes.  This was just a smaller subset.  In fact, my analysis

9    could count at least 50 people that could be labeled with such

11:02:56    10    examples.

11    Q.  Okay.

12          MS. NEW:  Mr. Schlaifer, can we go to PDX 9.59.  Thank

13    you.

14    BY MS. NEW:

11:03:07    15    Q.  Dr. Rangan, we talked for a long time on direct, you talked

16    on cross a little bit, about Hytera's effort to develop its own

17    DMR radio prior to 2008.  You recall that, right?

18    A.  Yes, I do.

19    Q.  And one of the reasons that we talked about on direct was

11:03:25    20    that you said they couldn't -- Hytera couldn't independently

21    develop a product because they had no software architecture,

22    right?

23    A.  That's correct.

24    Q.  Okay.  And if we could go to PDX 9.61.

11:03:40    25          When you were talking about framework and

Rangan - redirect by New

2084

architecture, can you remind the jury briefly of what software

components and elements were missing from Hytera's pre-2008

efforts?

A.  So this is a picture of Motorola's architecture.  And you

11:03:57  can see on the right are both identified trade secrets,

architectural trade secrets, and elements that were missing,

for example from Hytera's pre-2008 development; for example,

the hardware extraction layer, the operating system, the Darwin

or ergonomic framework, the DSP framework, and this signal

11:04:19  interface.

Q.  And do all of these components relate to software?

A.  Yes.  Or software's interaction with hardware, correct.

        MS. NEW:  Mr. Schlaifer, could we pull up PTX 2023,

which is already in evidence.

11:04:31 BY MS. NEW:

Q.  Dr. Rangan, do you recall --

        MS. NEW:  Could we actually go to the next page.

Thank you.

BY MS. NEW:

11:04:37 Q.  Dr. Rangan, do you recall that you were shown this document

on cross-examination?

A.  Yes, I do.

Q.  And can you remind us what this document shows?

A.  This is what you would call a schematic diagram, just to

11:04:49 illustrate the components, the physical components and some of

Rangan - redirect by New

2085

1    the functions that would be planned in a potential future

2    development platform at Hytera.

3    Q.  And do you recall Hytera's counsel asked you whether this

4    document was architectural in nature?

11:05:09    5    A.  Yes, I do.

6    Q.  And does this document relate at all to software

7    architecture?

8    A.  No, it doesn't.  This is just architecture of in terms of

9    the components being selected.  It has nothing to do with the

11:05:22    10    software architecture.  That would all be the source code in

11    the DSP or ARM.

12    Q.  And you were also shown PTX 2006.

13        MS. NEW:  Mr. Schlaifer, if we could go to that

14    document.  And if we could go I believe it's page 10.

11:05:44    15        Let's keep going.  Sorry about that, Mr. Schlaifer.

16    BY MS. NEW:

17    Q.  Okay.  Now, you recall that you were shown this document on

18    cross-examination, correct?

19    A.  I do.

11:05:58    20    Q.  Okay.  And specifically, you were asked about the

21    conclusions on page 39 of this document, correct?

22    A.  Yes.  That's correct.

23    Q.  Okay.  And Hytera's counsel asked you if this document

24    showed that in February of 2007 the Hytera protocol stack works

11:06:18    25    normally and runs stably.  Do you recall that?

Rangan - redirect by New

2086

1   A.  That sounds right.

2   Q.  And just to remind us, do you agree with that conclusion?

3   A.  No, I do not.

4   Q.  And you said on cross exam that to understand those

5   conclusions, you would need to understand the test conditions.

6   So I just want to briefly take a look at that.

7        MS. NEW:  Mr. Schlaifer, could we go to page 22,

8   please.  Thank you.

9   BY MS. NEW:

10  Q.  Now, at the top -- or excuse me, in the middle of the page,

11  in that "test condition" section, it says:

12        "The test conditions needs two P C's installing

13        and running DMR virtual MMI software."

14        Do you see that?

15  A.  I do.

16  Q.  Okay.  So let me just ask you, first of all, what is

17  "virtual MMI software"?

18  A.  So "MMI" is what Hytera refers to as the man machine

19  interface, so that would be ideally the interface between, say,

20  the keyboard and the software, or anything that you're going to

21  touch or the display, but that's not built at this time, so

22  it's running virtually.  So they just have a simulation of

23  that, if you like, not on a post-computer, a PC.

24  Q.  And are there any actual radios with MMI?

25  A.  No.

Case: 1:17-cv-01973 Document #: 794 Filed: 12/20/19 Page 54 of 176 PageID #:53968
Rangan - redirect by New
2087

1   Q.  And then it goes on to say there are two DSP development

2   boards, do you see that?

3   A.  I do.

4   Q.  Two FPGA developed boards, do you see that?

11:07:43   5   A.  Yes.

6   Q.  Two RF boards?

7   A.  Yes.

8   Q.  And two serial lines?

9   A.  Yes.

11:07:48   10   Q.  Okay.  What do you understand the reference to "two serial

11   lines" to mean?

12   A.  This suggests that there are two RF boards.  The "RF"

13   stands for radiofrequency.  So it's normally the part time that

14   would transmit the signals wirelessly.

11:08:04   15        But the fact that it says "two serial lines" suggests

16   that they are, in fact, connected by wires.

17   Q.  So a wired test platform, is that fair?

18   A.  Yes.

19   Q.  And remind us, is DMR a wired or wireless technology?

11:08:16   20   A.  It's obviously wireless.

21   Q.  And so what is the significance of the testing platform

22   reflected in this document, PTX 2006 being wired?

23   A.  The significance is that you're not testing at all the full

24   variation of channels that could be experienced in the real

11:08:37   25   world.  Getting a wireless connection over wire is much

Rangan - redirect by New

2088

1    simpler.  Once you go over antennas in the real world, many,

2    many things can go wrong.

3         MS. NEW:  Let's look at Figure 1 on page 22 of this

4    document.  Thank you, Mr. Schlaifer.

11:08:50
5    BY MS. NEW:

6    Q.  Asked minutes ago, but these are not actual radios that

7    have been manufactured by Hytera, right?

8    A.  That's right.

9    Q.  Okay.  At the time that this --

11:09:02
10        THE COURT:  Just a minute.

11        What are they?

12        THE WITNESS:  This actually says "virtual."  It's not

13   clear, but it's either a picture of what they would like to

14   produce or perhaps an output again on maybe a PC screen on the

11:09:17
15   host computer.

16        THE COURT:  Proceed.

17   BY MS. NEW:

18   Q.  So no actual radios exist?

19   A.  That's right.

11:09:25
20        MS. NEW:  And so if we look at Figure 2 on PTX 2006,

21   page 23.  Thank you, Mr. Schlaifer.

22   BY MS. NEW:

23   Q.  Is this a more accurate representation of what was actually

24   being tested instead of those sort of cartoon radios we just

11:09:40
25   looked at?

Rangan - redirect by New

2089

1    A.  It's more accurate, but even this is a little bit

2    misleading.

3    Q.  Can you explain why?

4    A.  Well, as described in the text of this document, there's

11:09:49    5    actually only two platforms, so this doesn't exist.

6            And also, because of the serial lines, it's not

7    connected wirelessly.  So there's a wire here --

8            Oops.

9            -- as opposed to a -- as opposed to those antennas.

11:10:10   10    Q.  So wired instead of those antennas we saw on the end?

11    A.  That's correct.

12            MS. NEW:  Your Honor, could we just have a short

13    technical break?  We're having some issues with the screen.

14            THE COURT:  All right.  Members of the jury, we'll

11:10:29   15    take a short break.

16            MS. NEW:  Thank you, Your Honor.

17            (Recess.)

18            THE CLERK:  All rise.

19            (The following proceedings were had in the

11:34:28   20            presence of the jury in open court:)

21            THE CLERK:  The Court is in session.  Please be

22    seated.

23            THE COURT:  Please proceed.

24    BY MS. NEW:

11:34:34   25    Q.  Welcome back, Dr. Rangan.

Case: 1:17-cv-01973 Document #: 794 Filed: 12/20/19 Page 57 of 176 PageID #:53971
Rangan - redirect by New
2090

1    A.  Welcome back.

2    Q.  So right before the break, we were talking about Figure 2

3    on PTX 2006, page 23.  And you mentioned that this diagram is

4    actually incorrect because there were only two boards.

11:34:49   5          If you look at the line right above the image, it

6    says:

7              "At present, there are only two development

8              boards.  So we can only simulate two intercom

9              calls at the same time, terminal A and B."

11:35:04  10          Do you see that?

11   A.  Yes, I do.

12   Q.  Is that what you were referring to when you mentioned the

13   two boards?

14   A.  Exactly.

11:35:09  15   Q.  Okay.  And do you have an opinion about whether this figure

16   from PTX 2006 represents any sort of PC communicating with the

17   test boards?

18   A.  There's a connection here from the PC to the DSP board,

19   yes.

11:35:29  20   Q.  Okay.

21          MS. NEW:  And if we go to the next page, page 23 --

22   oh, sorry.  Yeah, same page.  Sorry, Schlaifer.

23   BY MS. NEW:

24   Q.  Under "test projects," and do you see in that second

11:35:48  25   paragraph where it says:

Rangan - redirect by New

2091

1              "Because Machao's FPGA control interface module

2              has not been fully added, it is impossible to

3              test the access control process of polite mode,

4              so there is no test for CSBK with confirmation

11:36:08    5              voice call."

6                 Do you see that?

7    A.  I do.

8    Q.  What, if anything, does this tell you about Hytera's

9    ability to develop portions of its protocol stack?

11:36:17   10    A.  This is one of several features that the document itself

11   shows that they're missing.  This is the access control, the

12   access control would happen before the transmission to detect

13   if the channel is available or not.  And they say that they're

14   unable to do that at the present time, and so they can't do

11:36:35   15   this type of confirmed voice call.

16   Q.  All right.  Let's go to PDX 9.84.

17             And so, Dr. Rangan, we were just looking at PTX 2006,

18   which was from February of 2007, is that right?

19   A.  That's correct.

11:36:54   20   Q.  Okay.  And if we look at PTX 1988, that document is from

21   September 2007, is that right?

22   A.  That's correct.

23   Q.  Okay.  And if we look at this slide, you were asked on

24   cross exam about how many boards were contained in this

11:37:12   25   debugging hardware platform.  Do you recall that?

Rangan - redirect by New

2092

1    A.  I do.

2    Q.  Okay.  And you mentioned that there were four boards, and

3    some of them are highlighted here.  We have the RF board, do

4    you see that?

11:37:19    5    A.  I do.

6    Q.  And the FPGA baseband board?

7    A.  Yes.

8    Q.  And the AMBE+2 voice board?

9    A.  Yes.

11:37:28    10    Q.  And is the fourth board this DSP protocol stack that's

11    referenced there?

12    A.  Yes, it is.

13    Q.  Okay.  So does this refresh your recollection that there

14    are, in fact, four boards?

11:37:42    15    A.  Yes, it does.  Thank you.

16    Q.  Okay.  Now, on your direct exam we talked about

17    interoperability being a formal test procedure, do you remember

18    that?

19    A.  I do.

11:37:51    20    Q.  Can you just refresh the jury on what that formal process

21    is.

22    A.  So if you recall, interoperability is about having

23    equipment from two different manufacturers in to operate.  So

24    generally, they would go to a formal certification process at

11:38:06    25    some venue -- for example, the DMR Association conducts these

1    -- and then they run through specific tests to confirm that the

2    two are able to communicate with one another.

3    Q.  Now, in your review of the documents and materials in this

4    case, have you seen anything showing that a Hytera device and a

5    Motorola device were able to complete that interoperability

6    procedure prior to 2008?

7    A.  No.

8    Q.  Okay.  And then setting aside that formal process, other

9    than this document that we're looking at here, PTX 1988, have

10   you seen any documents or material after September 2007 showing

11   that Hytera achieved full interoperability with a Motorola DMR

12   device?

13   A.  Not with anything like this platform.

14   Q.  Okay.  Have you seen Motorola -- or, excuse me, Hytera

15   achieving interoperability with a Motorola DMR device with any

16   sort of prototype?

17   A.  No, I have not.

18   Q.  And have you seen any evidence that these four boards --

19   excuse me, any documents, materials, that these four boards,

20   referenced in PTX 1988, were miniaturized and put into any sort

21   of hardware radio device?

22   A.  No, I have not.  There were some plans, but nothing ever

23   realized.

24   Q.  And if we go to Section D of this document, 1988, which is

25   page 17.

Rangan - redirect by New

2094

1     There we go.  Thank you.

2     And if we go to -- you were asked some questions about

3  this Section D on cross exam, do you recall?

4  A.  I do.

11:39:55 5  Q.  Okay.  And if we --

6     MS. NEW:  Dave, if we could blow up that second to

7  last paragraph starting with "at present."  Thank you.

8  BY MS. NEW:

9  Q.  And it says here, Dr. Rangan" that:

11:40:06 10     "At present, the program runs well and no

11     problems are found in repeated tests.  It can

12     realize voice and short message communication

13     with Moto group calls."

14  A.  Yes, I see that.

11:40:18 15  Q.  Okay.  And then it goes on to says:

16     "The received Moto short message cannot be

17     displayed, but there is no problem in data

18     receiving and parsing."

19     Do you see that?

11:40:30 20  A.  I do.

21  Q.  Okay.  Does this section of -- this paragraph in Section D

22  do anything to change your opinion about whether a Hytera

23  debugging platform could achieve interoperability with a

24  Motorola DMR radio?

11:40:47 25  A.  No, it doesn't.  Even though it says "program runs well and

Rangan - redirect by New

2095

1   no problems are found in repeated test," clearly they're

2   testing a much more limited functionality than what would be a

3   full group or data call.

4   Q.  And just to remind everyone, what is that limited

5   functionality?

6   A.  We're talking about just sending maybe a few frames on some

7   idealized condition, not in one direction.

8   Q.  And have you seen any evidence that prior to February of

9   2008, Hytera had developed its debugging hardware platform

10  beyond being able just to send those few frames?

11  A.  No, this was the sole document at least that I was --

12  available to me that discussed the interoperability.

13  Q.  Okay.  Dr. Rangan, you were also asked some questions about

14  PTX 203 and 204.

15          MS. NEW:  Dave, if we could pull up PDX 9.79.

16  BY MS. NEW:

17  Q.  And, Dr. Rangan, do you recall you were asked about this

18  document and whether it was referring to requirements other

19  than the DMR requirements?

20  A.  Yes, I do.

21  Q.  Okay.  And counsel suggested to you that the requirements

22  were actually referring to head count.  Do you recall that?

23  A.  Yes, I do.

24  Q.  And do you have an understanding of whether Hytera's expert

25  has opined on whether it refers to head count?

1   A.  He had a conversation, if I recall, with Mr. Yang, the

2   author of this document.

3   Q.  Okay.  So let's actually look at the document, PTX 204.

4           MS. NEW:  And we can go to page 55, please,

11:42:30   5   Mr. Schlaifer.

6   BY MS. NEW:

7   Q.  Now, Dr. Rangan, I believe on cross you mentioned that the

8   document says that there were no issues with head count?

9   A.  Yes.

11:42:37   10   Q.  Okay.

11           MS. NEW:  If we can pull up that first paragraph under

12   Section 2.2, Mr. Schlaifer.

13   BY MS. NEW:

14   Q.  And, Dr. Rangan, do you see where it says:

11:42:48   15           "The reasonable requirements of the project team

16           for the project are met, and the initial time we

17           defined as 24 weeks, starting with the initial

18           two individuals in place."

19   A.  That's right.

11:43:00   20   Q.  Is that what you were referring to?

21   A.  Exactly.

22   Q.  And so what does that indicate to you?

23   A.  That at least in terms of head count, does not appear by

24   this document to be the issue.  The issue is actually the

11:43:12   25   software requirements themselves.

Rangan - redirect by New

2097

1    Q.  And are those the software requirements of the DMR

2    standard?

3    A.  Yes, they are.

4    Q.  You were also asked --

11:43:21    5         MS. NEW:  Dave, we can take that down.  Thanks.

6    BY MS. NEW:

7    Q.  You were also asked some questions about when Hytera began

8    saving material or source code to its SVN.  Do you recall that?

9    A.  Yes, I do.

11:43:32   10    Q.  Okay.  And you briefly mentioned that not saving source

11   code to the SVN would make things more disorganized?

12   A.  That's correct.

13   Q.  Can you just briefly explain what you meant by that?

14   A.  So if you recall, SVN is a way to have a repository of your

11:43:48   15   source code so multiple developers can use the -- have a common

16   base for all the software.  So they would check in files and

17   check out files and make sure it's all consistent.

18         Any reasonable software practice would use such a

19   repository, SVN is one of them.  The fact, if correct, that

11:44:07   20   they were not using an SVN prior to 2008 would be an indication

21   that the team was even -- would be further indication that it

22   was disorganized.

23   Q.  And why do you say it would be a further indication?

24   A.  I say "furthers because, as I mentioned, there were several

11:44:22   25   other problems in the software that I noted the way that, for

Rangan - redirect by New

2098

1    example, it was lacking architecture, spaghetti code, and so

2    on.

3    Q.  Okay.  I'm going to switch gears a little bit.

4           MS. NEW:  Mr. Schlaifer, could you pull up PTX 433,

11:44:37    5    which is already in evidence.

6    BY MS. NEW:

7    Q.  Dr. Rangan, do you recall we discussed this document during

8    your direct examination?

9    A.  I do.

11:44:44    10    Q.  And on direct, one aspect of this document we talked about

11    were the stock options that Mr. Chen was offering G.S. Kok

12    prior to G.S. Kok joining Hytera, is that right?

13    A.  That's correct.

14    Q.  Okay.  If we go to page 5 of PTX 433.  And if we could pull

11:45:03    15    up the paragraph that says "on the other hand."

16           And do you see there, Dr. Rangan, where it says G.S.

17    Kok is being offered 600,000 shares in the first two years?

18    A.  I do.

19    Q.  Okay.  And you offered an opinion on direct about an amount

11:45:22    20    of money that those shares could be worth.  Can you remind us

21    what those would be if the shares had reached 30 RMB?

22    A.  In the U.S. dollars, that would've been approximately

23    $2.5 million.

24    Q.  And you were asked questions on cross-examination about how

11:45:37    25    much G.S. Kok actually paid for those shares.  Do you recall

Rangan - redirect by New

2099

1    that?

2    A.  Yes.

3    Q.  And you mentioned that there's typically a strike price for

4    shares?

11:45:44    5    A.  That's correct.

6    Q.  Okay.  Just to orient the jury, can you just remind

7    everyone what a strike price is?

8    A.  Sure.  As I was explained before, when you get an option,

9    you don't actually get the shares.  You have an option to buy

11:45:56    10    the shares at a price.

11           So let's say the strike price is 5 RMB.  That means if

12    finally the stock becomes 30 RMB by the time you can exercise

13    the option, then you can exercise, it's pay to 5 strike price

14    and get 25 per share.

11:46:14    15           On the other hand, as Your Honor asked correctly, if

16    the stock was $4.00 or 4 RMB, then you would just choose not to

17    exercise the option.  So you wouldn't lose a dollar, but you

18    would get nothing.

19    Q.  Okay.  If we look at PTX 433 at page 2.  In that first full

11:46:36    20    paragraph, it says "in HYT"?

21    A.  Yes.

22    Q.  So it says:

23           "In HYT, everybody needs to pay for the shares."

24           Do you see that?

11:46:46    25    A.  Yes.

1   Q.  And then Mr. Chen goes on to say:

2           "Now it's 1 RMB per share."

3           Do you see that?

4   A.  Oh, yes.

11:46:53  5   Q.  Does that 1 RMB represent the strike price that G.S. Kok

6   would pay for those 600,000 Hytera shares?

7   A.  Yes, it would.

8   Q.  And do you have an opinion about whether that is a low

9   price to pay for shares that could ultimately be worth

11:47:09  10   2.5 million?

11           MR. ALLAN:  Objection.  Foundation.  Speculation

12   outside his report.

13           THE COURT:  Overruled.  You may answer.

14   BY THE WITNESS:

11:47:16  15   A.  What I think is relevant here is that independent of

16   whether this is reasonable or not, the amount that he would

17   gain --

18           THE COURT:  Let me rephrase the question.  Are you

19   saying it would be advantageous to pay $5 for shares worth 30?

11:47:30  20           THE WITNESS:  Yes.

21           THE COURT:  What is the next question?

22   BY MS. NEW:

23   Q.  So you were also asked questions about the actual values of

24   the Hytera shares after Hytera went public.  Do you recall

11:47:40  25   that?

Rangan - redirect by New

2101

1  A.  Yes.

2  Q.  And he represented to you that when Hytera went public, the

3  stock was worth about 3 RMB, do you remember that?

4  A.  I do.

11:47:49  5  Q.  And eventually the stock went up to about 8 RMB -- or I

6  think he said it's 8 RMB today?

7  A.  That's correct, if I recall.

8  Q.  Okay.  Were those actual share prices relevant to your

9  opinion in this case?

11:48:00  10  A.  No.  As I was explaining at that time, what's relevant is

11  at the time of the offer, regardless of the possibility of

12  going up to 30 RMB, whether or not that actually happened or

13  not, that would be an incentive, that possible price, that

14  would be an incentive to join.

11:48:24  15  Q.  Okay.  On your direct exam we also talked about PTX 426 and

16  429, which were e-mails discussing the amount of time it would

17  take Hytera to develop a DMR radio if Mr. Kok joined the

18  company; do you remember that?

19  A.  I do.

11:48:46  20       MS. NEW:  Mr. Schlaifer, can we pull up slide 9.38.

21  BY MS. NEW:

22  Q.  And just to remind everyone, Dr. Rangan, how long did G.S.

23  Kok tell Mr. Chen that it took Motorola to develop a DMR

24  product?

11:48:57  25  A.  5.5 years.

Rangan - redirect by New

2102

11:49:12

1  Q.  And how long did Mr. Kok say it would take Hytera?

2  A.  He's suggesting 2 years.

3  Q.  And on cross exam Hytera's counsel asked you whether you

4  could take those two years that Mr. Kok is promising and add it

5  to the 2 1.2 years of development that had been done previous

6  to 2008.  Do you recall that?

7  A.  That's right.

8  Q.  Okay.  Do you agree that Hytera can count their development

9  effort prior to 2008 towards their total development time for

10  their DMR radio that they ultimately released into the market?

11:49:26

11  A.  No, I don't.

12  Q.  Why not?

13  A.  Well, as I said, if you look at the actual state of the

14  development, it was in a very haphazard in extremely limited

15  form.  So it wouldn't have actually assisted going forward.

11:49:33

16       But what's relevant also in this e-mail here, you note

17  that Mr. Kok says the 2 years under the assumption that his

18  team is here.  There's no mention in this e-mail about

19  leveraging the work from Hytera.  This is clearly about

20  leveraging work that was done, that the expertise that they

21  would be able to get from Motorola.

11:49:56

22       MS. NEW:  And, Dave, could we go to PTX 22, please.

23  BY MS. NEW:

24  Q.  Now, you were also asked some questions about this document

25  on cross and on direct.  Do you recall that, Dr. Rangan?

11:50:20

Rangan - redirect by New

2103

1   A.  I do.

2   Q.  Okay.  And if we go to page 7, you were asked about this

3   top bullet that says:

4           For FPGA, about 70 to 80 percent of the work has

11:50:46  5           been completed."

6            Do you recall that?

7   A.  I do.

8   Q.  Okay.  You mentioned that you have to consider that

9   percentage in context?

11:50:51  10  A.  I do.

11  Q.  Can you explain what you meant by that?

12  A.  So, first of all, you have to understand that the FPGA, at

13  least in this design, is only doing one part of the DSP code.

14  It's doing -- there are several other parts of the DSP code,

11:51:05  15  DSP which are not done in the FPGA.

16          So even having an FPGA, if it were completed to 70 to

17  80 percent, would be a much smaller percentage of the overall

18  DSP.

19          But also, they point out in just this page and

11:51:19  20  elsewhere, that there are a number of performance issues even

21  in this component here.

22          So even this is not clear exactly what is meant by 70

23  to 80 percent.  Maybe just that they've started the work or

24  have some structure for the work for 70 to 80 percent of the

11:51:36  25  components.

Rangan - redirect by New

2104

1  Q.  And is the FPGA a small or a large component of the

2  functionality of a DMR radio?

3  A.  In this particular design, it's a relatively smaller

4  component, because it's doing just a few of the modules, but

11:51:53  5  the hard ones, particularly in terms of development time, are

6  not outside the FPGA.

7       MS. NEW:  And, Dave, if we could go to page 8.

8  Q.  Now, you were asked some questions on cross exam as well

9  about the volume of verilog code that Hytera had previous to

11:52:12  10  2008.  Do you recall that?

11  A.  I do.

12  Q.  And if you can just remind us what the verilog code is?

13  A.  The verilog code is the code that you use to program the

14  FPGA.

11:52:18  15  Q.  And could you -- did Hytera ultimately -- the product that

16  it ultimately released, does that product use an FPGA?

17  A.  No, it doesn't.

18  Q.  Okay.  And so if we look at the fifth bullet on PTX 22, it

19  says:

11:52:35  20       "This will also result in using a lot of Moto

21       code and is a concern."

22       Do you see that?

23  A.  I do.

24  Q.  And it says:

11:52:43  25       "Moto will be able to see that there is no FPGA

Rangan - redirect by New

2105

1          and will wander how they can realize all those

2          algorithms in software."

3           Do you see that?

4   A.  Yes.

5   Q.  And so because Hytera ultimately ended up not using the

6   FPGA, what did it do instead?

7   A.  It used the Motorola DSP code.

8   Q.  And so does the volume of the verilog code that existed

9   prior to 2008 impact your opinion about whether Hytera could

10  independently develop a DMR radio?

11  A.  No.  Since they took a route that doesn't use the FPGA

12  anyway, that code wasn't used.

13  Q.  All right.

14          MS. NEW:  Let's go to DTX 5376.  Dave, if we go to

15  page 5, please.  Thank you.

16  BY MS. NEW:

17  Q.  Dr. Rangan, you recall you were asked questions about this

18  document on cross exam?

19  A.  I do.

20  Q.  Okay.  And if we look at that first section at the very

21  top:

22          "General group background ....."

23           it says there in the first sentence that.

24           "One of the important projects of the company's

25           future products, the DMR project's technology

Rangan - redirect by New

2106

1          pre-research and development is nearing

2          completion."

3            Do you see that?

4    A.  I do.

11:54:01    5    Q.  Now, do you recall -- you were here for Mr. Lund's

6    testimony at the very beginning of the trial?

7    A.  Yes, I do.

8    Q.  And you saw that large board that he put up showing the

9    process of product development?

11:54:10   10    A.  Yes.

11    Q.  Where would "pre-research and planning" fall on that?

12    A.  It would likely fall just at the very begin phase, when

13    you're just trying to develop the requirements, understand the

14    market, and maybe have some feasibility understanding.

11:54:28   15    Q.  And at that point in the product development cycle, is

16    there still work to be done?

17    A.  Enormous amount of work.  This is just making the business

18    case that it's possible to explore.

19    Q.  And what are some of the steps that have to happen after

11:54:43   20    that pre-research and development, just at kind of a

21    high-level?

22    A.  At high-level you would have to then go through the process

23    of having high-level design, and then start to having the

24    high-level architecture in place, and then start going through

11:54:56   25    there to go in more detailed hardware and software, and then

Rangan - redirect by New

2107

1    testing it, and so on.  So it's a lot of work left to be done.

2    Q.  And so this document, PTX 5376, does this reflect complete

3    development of a product or the beginning of the development

4    process?

11:55:11    5    A.  This is still very much at the beginning.

6              MS. NEW:  And if we look on page 6 and highlight that

7    summary section, please, Mr. Schlaifer.

8    BY MS. NEW:

9    Q.  Right in the middle there it says:

11:55:27    10          "The DMR's product development model is being

11               formally tested at the company for the first

12               time."

13           Do you see that?

14    A.  I do.

11:55:37    15    Q.  Is a product development model a prototype?

16    A.  No, it is not.

17    Q.  And counsel asked you about miniaturizing, Hytera's efforts

18    to miniaturize the work that had been done on the debugging or

19    the development boards.  Do you recall that?

11:55:52    20    A.  I do.

21    Q.  Have you ever seen a miniaturized prototype of a Hytera DMR

22    radio that existed prior to 2008?

23    A.  No, I did not.

24    Q.  Okay.  I want to switch gears a little bit.  Towards the

11:56:05    25    beginning of your cross exam you were asked some questions

Rangan - redirect by New

2108

1    about Hytera's analog products.  Do you recall that?

2    A.  I do.

3    Q.  And specifically you were asked whether or not you

4    considered Hytera's analog products when determining whether

11:56:19    5    Hytera could develop a DMR product.  Do you recall that?

6    A.  I do.

7    Q.  Now, first of all, you weren't asked whether you saw any of

8    Hytera's source code for its analog products, right?

9    A.  I was not asked that.

11:56:31    10    Q.  Were you able to inspect any of Hytera's analog radio

11    source code in this case?

12    A.  It was not provided, no.

13    Q.  And you mentioned that even though analog development is

14    helpful to digital radio development, it's only one step.  Do

11:56:47    15    you recall that?

16    A.  I do.

17    Q.  Okay.  Can you please explain why analog development would

18    only be one step in the development of a digital radio?

19    A.  Because analog is much, much simpler.  So even if you had

11:56:57    20    developed an analog radio, it would definitely help, but it

21    would only be a small part of building a digital radio.  And it

22    also doesn't speak to all the other components about the -- in

23    addition to the radio itself, like the ergonomic layer, and so

24    on.

11:57:10    25    Q.  And just give the jury a sense, what is the additional work

Rangan - redirect by New

2109

1   or experience that would be needed for a digital product above

2   and beyond an analog product?

3   A.   It's enormous.   Analog radios have existed much earlier.

4   Digital two-way radios were much more recent and it's

11:57:28   5   considerably more sophisticated.

6   Q.   And did you see any documents or materials or deposition

7   testimony in this case that Hytera's engineers at the time, in

8   the relevant time period of 2008, had the experience or the

9   know-how to complete all of those aspects of digital radio

11:57:45   10   development?

11   A.   I did not.

12   Q.   Okay.   Last thing, Dr. Rangan.   So you recall that you were

13   shown an internal Motorola e-mail and Hytera product roadmap on

14   cross-examination?

11:58:00   15   A.   I do.

16   Q.   And counsel for Hytera asked you if the document contains

17   confidential Hytera information.

18   A.   Oh, yes.   I recall that.

19   Q.   Okay.   Let's look at DTX 4657, which is that document,

11:58:12   20   which is admitted.

21        Do you recall this document, Dr. Rangan?

22   A.   I do.

23   Q.   And you were also shown the attached product roadmap.   Do

24   you remember that?

11:58:22   25   A.   Yes.

Rangan - redirect by New

2110

1    MS. NEW:  We could just pull that up very briefly.

2  Thank you, Mr. Schlaifer.

3  BY MS. NEW:

4  Q.  Dr. Rangan, do you see any confidentiality markings on this

11:58:34  5  document?

6  A.  No, I do not.

7  Q.  Do you see that this document or the e-mail that it's

8  attached to, does it contain any Hytera source code for its DMR

9  radios?

11:58:44  10  A.  No I do not.

11  Q.  Does the document or the e-mail contain any proprietary

12  Hytera design information for its DMR radios?

13    MR. CLOERN:  Objection.  Foundation and leading.

14    THE COURT:  Overruled.  You may answer.

11:58:56  15    And you may return to this issue on cross if you

16  decide to do so.

17    You may answer.

18  BY THE WITNESS:

19  A.  I'm sorry.  Could you repeat the question, please?

11:59:04  20  BY MS. NEW:

21  Q.  Of course.  Does the document or e-mail contain any

22  proprietary Hytera design information for its DMR radios?

23  A.  No, I do not see any.

24  Q.  And does the document or e-mail contain any proprietary

11:59:16  25  Hytera implementation information for its DMR radios?

Rangan - redirect by New

2111

1  A.  No, I did not see any.

2       THE COURT:  What is the date of the exhibit and who

3  prepared it?

4       THE WITNESS:  It says an attachment to an e-mail and

11:59:28  5  the date of the e-mail is earlier.

6       THE COURT:  What is the date if you can tell from the

7  document?

8       THE WITNESS:  The date of the e-mail is October 2009,

9  but I don't have the document in front of me, so I don't know

11:59:42  10  if that has a separate date that is separate from the e-mail.

11       THE COURT:  And who was the author of the e-mail?

12       THE WITNESS:  The author is Patti Martensen and she

13  works at Motorola.

14       THE COURT:  Proceed.

11:59:57  15       MS. NEW:  And if we could go back to that Excel sheet,

16  please, Dave.  Thank you.

17  BY MS. NEW:

18  Q.  Does anything in this document resemble the source code or

19  confidential documents that Hytera took and used from Motorola?

12:00:09  20  A.  No, absolutely not.  This is a completely different

21  category.

22  Q.  And do you know whether Hytera has sued Motorola for being

23  in possession of this document for trade secret

24  misappropriation?

12:00:20  25  A.  If they have, I'm not aware of it.

Case: 1:17-cv-01973 Document #: 794 Filed: 12/20/19 Page 79 of 176 PageID #:53993
Rangan - redirect by New
2112

1    MS. NEW:  Pass the witness, Your Honor.

2    THE COURT:  Recross.

3    MR. ALLAN:  If we could switch technology, Your Honor.

4    THE COURT:  Is that something that --

5    MR. ALLAN:  If Mr. Fulbright --

6    THE COURT:  Mr. Schlaifer seems to do everything here,

7    and we also have the approacher, maybe she can help us.

8    (Brief pause.)

9    (Mr. Fulbright entered the courtroom.)

10   THE COURT:  Oh, here he is.

11                   RECROSS EXAMINATION

12   BY MR. ALLAN:

13   Q.  Dr. Rangan, you were shown DTX 4491 on redirect, we covered

14   it on cross-examination as well.  This is the red team

15   document?

16   A.  Yes, it is.

17   Q.  Let's turn to page 10.  And you were just -- you were shown

18   this second paragraph:

19        "Motorola is proposing to offer some key

20        subscriber manufacturers."

21   A.  That's correct.

22   Q.  (Reading:)

23        "e.g., Tate Electronics, radio components, at

24        the subassembly or Tanapa level"?

25   A.  Yes.

Rangan - redirect by New

2113

1    Q.   And then it goes on to say "with embedded software," right?

2    A.   That's correct.

3    Q.   (Reading:)

4             "... to support these vendors in delivering an

5             initial DMR-compliant product to the market

6             quickly."

7             Right?

8    A.   That's right.  It says that.

9    Q.   That's the OEM product that Motorola was going to provide

10   so that they got to the market quickly?

11   A.   That's what it appears like, yes.

12   Q.   And then if we go to the second paragraph underneath it, it

13   indicates that, in the middle of the paragraph:

14            "... this approach minimizes the sharing of key

15            Motorola digital technology expertise and

16            product know-how since source code and key

17            digital components would not be available to the

18            vendors."

19   A.   That's correct.

20   Q.   They're providing products with the expectation that the

21   folks are going to develop all the software on their own?

22   A.   It's not providing source code, that's correct.

23   Q.   And again, the conclusion of this document is that, on this

24   page:

25            "These partnerships expected to begin in early

Rangan - redirect by New

2114

1              2009 and continue for a couple of years until

2              the vendors have their own designed and

3              manufactured DMR radios."

4          Right?

12:03:12   5   A.  That's what it says here, yes.

6   Q.  Now, you talked a little bit about architecture.

7              Can we pull up 979.

8              This is a document we talked about on cross and you

9   just talked about on redirect, right?

12:03:30  10   A.  That's correct.

11   Q.  This is a Hytera document?

12   A.  It is.

13   Q.  And under the three stars there, do you see the first

14   sentence:

12:03:37  15          "Unified software process are

16          architecture-centric."

17   A.  It does say that, yes.

18   Q.  Do you see that?

19   A.  I does.  Yes.

12:03:52  20   Q.  Let's go to PTX 2006, which you were asked about.  Let's go

21   to page 23.

22              Do you remember this diagram?

23   A.  I do.

24   Q.  You testified that these boards were all wired together, is

12:04:11  25   that right?

Rangan - redirect by New

2115

1  A.  I did.

2  Q.  Let's go one to page 22 under "Test Conditions."  And

3  counsel for Motorola highlighted some of this, but not all.  It

4  says:

12:04:34  5      "It needs two PC's installing and running DMR

6          virtual MMI software."

7          Right?

8  A.  That's right.

9  Q.  So the man machine interface wasn't on the board, it was

12:04:44  10  -- they were using a computer for that?

11  A.  That's right.  Yes.

12  Q.  Which is certainly not unusual, correct?

13  A.  That could be an early stage, sure.

14  Q.  Then it goes on to say:

12:04:52  15      "Two DSP development boards."

16  A.  Yes.

17  Q.  And again, not highlighted earlier:

18          "Running DMR protocol stack software and

19          realizing voice coding and decoding."

12:05:04  20          Right?

21  A.  I think that's the purpose of the board, yes.

22  Q.  Well, it says "realizing," doesn't it?

23  A.  It says that, yes.

24  Q.  And then it says:

12:05:09  25      "Two FPGA development boards, again realizing

Rangan - redirect by New

2116

1          DMR syndication and baseband modulation and

2          demodulation."

3             Do you see that?

4    A.  It does say that, yes.

12:05:19  5    Q.  Realizing DMR sync and baseband modulation and

6    demodulation, right?

7    A.  Yes.

8    Q.  And "modulation" is the process of converting ones and

9    zeros to be sent as a message over the air?

12:05:31  10   A.  That's correct.

11   Q.  And "demodulation" is the process of grabbing that packet

12   over the air and converting it back into ones and zeros?

13   A.  That's right.  But in this case, it was a smaller component

14   of that, but yes.

12:05:43  15   Q.  Then it says "two RF boards realizing radiofrequency

16   modulation and demodulation" again, right?

17   A.  Yes.

18   Q.  And two serial lines.

19          So there's two sets of boards that are talking to each

12:05:55  20   other?

21   A.  That's correct.

22   Q.  Three boards each?

23   A.  That's right.

24   Q.  Not four?

12:06:00  25   A.  Oh, wait.  Can you go back a bit?

Rangan - redirect by New

2117

1  Q.  Let's just flip over to the diagram, 2006-23.

2  A.  Oh, yes, FPGA, DSP.

3  Q.  Right?

4  A.  But I think it's shown here just as one picture, but

12:06:27  5  there's no indication here that the FPGA and the RF board are

6  actually integrated on the same board.  Not that it would

7  change my opinion, but ...

8  Q.  Okay.  Let's go back to 2006.22.  I want to direct you to

9  another section here.

12:06:42  10       Under the Section A, "purpose and significance of

11  Testing," do you see that?

12  A.  Yes.

13  Q.  It says:

14       "In the process of testing, all kinds of key

12:06:50  15       strokes and input operations of the

16       walkie-talkie are realized by the main machine

17       computer, and then sent to the protocol stack of

18       the DSP for processing."

19        Do you see that?

12:07:01  20  A.  I do.

21  Q.  (Reading:)

22       "The protocol stack is encapsulated, processed,

23       and sent to the FPGA for modulation and

24       transmission."

12:07:08  25  A.  That's the purpose of testing, that's correct.

Rangan - redirect by New

2118

1    Q.  Well, let's look at modulation again.  It's the ones and

2    zeros get converted so they can be sent over the air?

3    A.  That's right.

4    Q.  And if you look back at page 23, the next page with the

12:07:27    5    diagram, it's got the two sets of three here talking over the

6    air, right?  There's an image of a cloud.  Do you see that?

7    A.  The picture is this way, but like I said, you have to look

8    at the text.

9    Q.  Well, the text is talking about realizing modulation, which

12:07:44    10   is an over-the-air transmission.

11   A.  Not necessarily.  You can absolutely modulate to an RF

12   signal that goes over a wire.  There's no necessity to have

13   that wirelessly.

14   Q.  Well, Dr. Rangan, there is an image of an antenna and a

12:08:00    15   cloud between these two sets of boards, right?

16   A.  They're am image, that's right, but --

17   Q.  Where the boards are connected, they're connected by lines,

18   right?

19   A.  That's true.  That's the way it's drawn here.

12:08:07    20   Q.  Right.  And that's the way the report is indicated, too?

21   A.  No, because the report says, quite clearly, "serial lines."

22   It's a very common process early in the development to

23   disconnect the antenna and then run a cable, like an SMA cable,

24   between the two boards.  You're still modulating the signal but

12:08:27    25   you're making it much easier to remove the impairments that

Rangan - redirect by New

2119

1    would happen on an RF.

2    Q.  Dr. Rangan, the serial lines connect each set of boards

3    that are being tested.  They don't connect the boards together,

4    correct?

12:08:40    5    A.  It's possible, but it's possible here that the serial lines

6    -- it's not explained here, but a serial line, my reading, the

7    most likely reading of that is that it's an SMA-type cable, or

8    something like that, between the two boards.

9    Q.  Well, your reading isn't supported by the diagram, which

12:09:01    10    indicates there's antennas in the messages sent over the air?

11    A.  It's not consistent with the diagram, that's correct, but

12    nor is the bottom, the existence of the third terminal, and we

13    know that's not there.

14    Q.  Under Section C, Motorola's counsel directed you to the

12:09:16    15    section about the protocol stack.  Do you remember this?

16    A.  Yes.

17    Q.  The last part was not read, however, the last sentence:

18            "But the protocol stack has realized this part

19            of the service and can be tested at any time

12:09:31    20            after the control interface module is added."

21            Right?

22    A.  It does say that, yes.

23    Q.  You called that, I think, the access control, right?

24    A.  That's correct.

12:09:38    25    Q.  So what the engineers at Hytera are saying at the time is,

Rangan - redirect by New

2120

1  the protocol stack has been realized and it just can be tested

2  once you add that access control?

3  A.  That's what it says, but obviously, it hasn't been tested

4  at this point, to the extent that it's there.

12:09:57    5  Q.  But again, you don't really know what was tested because

6  you weren't there when they did the testing?

7  A.  I was not there during the testing, no.

8  Q.  You talked a little bit about the concept of

9  interoperability and formal interoperability?

12:10:11    10  A.  Yes.

11  Q.  You mentioned that there's interoperability using the --

12  through the DMR association?

13  A.  That's correct.

14  Q.  That's when there are finished products being tested

12:10:21    15  against each other in a formal setting, right?

16  A.  That's right.

17  Q.  You certainly understand, Dr. Rangan, that a lot of

18  companies before they get to the final product stage do a lot

19  of testing on their own?

12:10:33    20  A.  They would.

21  Q.  You might call that informal testing?

22  A.  Sure.  That's a good name.

23  Q.  And that's what we're looking at here, right?  We're not

24  looking at formal interoperability testing, we're looking at

12:10:44    25  informal company testing?

Rangan - redirect by New

2121

1  A.  To whatever extent you want to call it, the actual fact of

2  the matter is if you look at what's done here, it's still

3  extremely far from not only formal, but you would imagine much

4  more development needs to happen before you can get to the

12:10:59  5  interoperability testing.

6  Q.  Well, the Hytera engineers don't agree with that, do they?

7  A.  I -- I can only -- I can say what is here in the document.

8  And if you look at the details instead of focusing on one set,

9  but if you look at the details the way that it's described in

12:11:18  10  the test, you can see that extremely limited amounts were

11  actually accomplished at that time.

12  Q.  Let's pull up DTX 5376, which you were just asked about.

13  A.  Sure.

14  Q.  This is the DMR macro general group document.  Do you

12:11:33  15  recall that?

16  A.  Yes.

17  Q.  And you testified that pre-research and development is

18  almost at a nascent stage, right?  That's what you said?

19  A.  That's right.

12:11:43  20  Q.  You compared it to this chart on the -- on the -- through

21  Mr. Lund's testimony?

22  A.  Yes.  The one that was sitting over there (indicating).

23  Q.  Right.  But you don't know whether Hytera develops that way

24  or not, do you?

12:11:55  25  A.  It could be in a different -- it could mean something

Rangan - redirect by New

2122

1    different, but we do know what was available, at least from

2    these documents at this time.

3    Q.  But pre-search and development at Hytera may mean something

4    completely different than pre-research and development in

12:12:13    5    another company, right?

6    A.  I suppose it could have a slightly different meaning,

7    but --

8    Q.  Well, we talked last week that companies operate

9    differently and you said it's a good thing that they do that,

12:12:19    10   right?

11   A.  That's true.

12   Q.  And in here, there's nothing in this document that

13   indicates that they are at the nascent stage, is it?

14   A.  This document doesn't provide much details one way or the

12:12:36    15   other about what they have achieved.

16   Q.  Well, it certainly says "the breakthrough" right after the

17   pre-search thing that you pointed out says:

18             "The breakthrough of many key technologies, the

19             interoperability with Moto terminals, and the

12:12:49    20             gradual completion of compatibility testing of

21             such have enabled us to see the dawn of HYT's

22             complete independent research and development of

23             TDMA DMR products."

24             Right?

25   A.  I do see that.

Rangan - redirect by New

2123

1   Q.  And then it goes on to say:

2           "According to the project schedule, it's not

3           necessary to start product conversion work."

4   A.  Yes.

12:13:09   5   Q.  They're starting to commercialize?

6   A.  Well, I'm not sure what they're meaning by this term,

7   because if we actually look at the actual evidence, unless

8   there's some body of evidence that I've just not been able to

9   see that was never documented or in documents that were not

12:13:21   10  provided to me.

11          What we can actually see them able to achieve at this

12  point is extremely limited, and that's what's relevant, however

13  you want to call it, and that's existence with, say,

14  pre-research.

12:13:35   15  Q.  Well, Dr. Rangan, the company in October 2007 is getting

16  industrial design involved, right?

17  A.  Yes.

18  Q.  Finance involved, marketing?

19          Yes?

12:13:45   20  A.  Yes.

21  Q.  Quality assurance?

22          Yes?

23  A.  Yes.

24  Q.  A whole bunch of different facets of an organization that

12:13:51   25  would start working on commercialization of a project, right?

Rangan - redirect by New

2124

1    A.   Those would be necessary, yes.

2    Q.   And they wouldn't be necessary in the nascent stage, they'd

3    be necessary at the commercialization stage, right?

4    A.   Yes, some of them would be, but you would also need to

12:14:07    5    identify those even at an earlier stage.

6    Q.   And in the summary, again we've looked at this earlier,

7    Professor Sun himself is saying that they're looking to market,

8    launch this product in 2008.  This is the end of 2007, this

9    document comes out?

12:14:20    10    A.   Right.

11    Q.   So the Hytera engineers think it's way farther along than a

12    predevelopment nascent stage, right?

13    A.   I can't, again, speak to what they might think and what

14    they might hope to achieve within one year from where they are,

12:14:37    15    but just on the evidence of what they actually achieved, it's

16    extremely, at an extremely early stage.

17    Q.   Not according to this, right?

18    A.   It does say they hope to ensure DMR products in 2008.

19    Q.   He says they're commercializing?

12:14:56    20    A.   It's does say that.

21    Q.   So let's talk about G.S. Kok.  You mentioned some

22    information about his shares?

23    A.   I did.

24    Q.   Now, he was not provided options, right?  He was given

12:15:07    25    shares to buy, correct?

Rangan - redirect by New

2125

1  A.  That's possible.  I can't recall.

2  Q.  And with an option, you don't pay for those shapes up

3  front, do you?

4  A.  No, you don't.

12:15:19  5  Q.  And when you exercise options, you get the difference

6  between the strike price and the market at the time of

7  exercising an option, right?

8  A.  That's right.

9  Q.  Now, he bought them up front and he could sell them at any

12:15:34  10  time he wanted, right?

11  A.  If he did, yes, buy them up front, that's correct.

12  Q.  Now, you suggested, again, he would've gotten 2 1.2 million

13  dollars, right?

14  A.  That's right.

12:15:42  15  Q.  But the price didn't go from 1 RMB to 15 or 30 RMB, right?

16  A.  No, I don't know whether it did or not.

17  Q.  Well, we talked a bout -- you said I think 3 RMB was a

18  reasonable number that you understood?

19  A.  I believe at one point it did go to 3.

12:16:00  20  Q.  So he made about $100,000?

21  A.  If he exercised them and if -- I think "3" was one price,

22  it could've also gone higher than 3 at some point as well.

23  Q.  And he left stock on the table when he left Motorola,

24  right?

12:16:14  25  A.  It's possible.  I don't know.

Rangan - redirect by New

2126

1    Q.  You don't know that.  You don't know whether it was about

2    the price of $100,000?

3    A.  I do not know what time he left the stock.

4    Q.  And stocks go up and down, right?  We all know that.

5    A.  They do.

6    Q.  And in 2007, 2008 timeframe, it was a very different

7    economic world, right?

8    A.  It was.

9    Q.  And no one is guaranteed to get millions of dollars, are

10   they, in the stock market?

11   A.  There's no guarantees in the stock market.

12           MR. ALLAN:  Can we pull up 938.

13   BY MR. ALLAN:

14   Q.  I think you testified about this document, Dr. Rangan, on

15   your redirect.

16   A.  I did.

17   Q.  Right.  And you said -- when counsel for Motorola asked you

18   if you could add in the 2 1.2 or so years of development time

19   that Hytera had already done, right, you said you couldn't do

20   that?

21   A.  That's right.

22   Q.  Because you said it was the state of the development was in

23   a haphazard form?

24   A.  That's correct.

25   Q.  But we looked at the consultant report from August 2007, it

1  didn't say anything about the state of Hytera's development

2  being in haphazard form, did it?

3  A.  I don't recall whether it did or not, but that may not have

4  been his task.

5  Q.  Well, he was a consultant.  It was a consulting firm to

6  consult on the development of DMR?

7  A.  But one thing if I recall that consultant statements did

8  say is they do need a lead engineer to manage this, and that

9  would be an indication that whatever leadership was there at

10  the present wasn't sufficient.

11  Q.  Well, that was the genesis behind G.S. ultimately being

12  hired, right?

13  A.  It does seem like that, yes.

14  Q.  And that's hiring a product manager is totally normal,

15  right?

16  A.  Absolutely.

17  Q.  All right.  So the consulting document doesn't talk about

18  haphazard state of affairs, right?

19  A.  I can't recall if it does or not.

20  Q.  The DMR macro group document we just talked about from

21  Professor Sun doesn't say anything about its in a hardship

22  state of affairs, right?

23  A.  I don't believe it used the word "haphazard," no.

24  Q.  And we looked at the whole bunch of development documents

25  that I understand you don't agree with the conclusions of these

Rangan - redirect by New

2128

1   engineers, but none of those said everything is in a haphazard

2   state, did it?

3   A.  They don't use the word "haphazard," no.

4   Q.  Now, you were asked some questions at the very end about

5   documents found in Ms. Patti Matteson's files that told not to

6   -- she said don't forward this to anybody, right?

7   A.  That's correct.

8   Q.  Roadmap information, things like that?

9   A.  Yes.

10  Q.  And you were asked several questions about whether that

11  information was confidential to Hytera, right?

12  A.  Yes.

13  Q.  You have absolutely no idea whether that information is

14  confidential, proprietary, do you?

15  A.  No, I wouldn't say that.

16  Q.  How could you possibly, Dr. Rangan, have a clue about what

17  would confidential to Hytera?

18  A.  Well, I can say that the nature of that material is often

19  distributed, unlike source code, for example, which is very,

20  very rarely distributed.

21          So that type of material, that is completely

22  reasonable that they could have caught it.  Of course, I don't

23  know anything about the specifics of that document, but product

24  roadmap, in general, is something that often is public.

25  Q.  You understand that earlier in this case Motorola itself

Rangan - redirect by New

2129

1   had asserted product roadmap trade secrets against Hytera and

2   dropped them?

3   A.  I do not know one way or the other.

4   Q.  You don't know that?

12:19:52   5   A.  I can't recall one way or the other.

6   Q.  You don't know that product roadmap information, if it gets

7   into the hands of a competitor, it could be competitively

8   devastating?

9   A.  It can be confidential, absolutely.

12:20:04   10   Q.  But in any event, you have no idea whether Hytera treated

11   that as confidential or not, correct?

12   A.  I don't know specifically where Ms. Martensen got that

13   information from, so, no, in that sense.  But as I said, it's

14   information that I definitely seen other companies get

12:20:21   15   publicly.

16   Q.  The people at Hytera would know whether that's to be

17   treated as confidential, right?

18   A.  I can't speak one way or the other.

19   Q.  You would expect that the people at Hytera that developed

12:20:31   20   that information would have a better sense of whether they

21   thought it should be confidential than you; yes?

22   A.  I suppose it depends on what their role is and so on, sure.

23   Q.  So you think you might have a better sense of whether

24   Hytera's information should be confidential or not?

12:20:48   25   A.  As I said, the only information I have is the nature of

Rangan - redirect by New

2130

1    that material.  So in that sense, anybody who would have more

2    information about the source of that document would be able to

3    shed other light on that.

4    Q.  Certainly the people at Hytera, correct?

12:20:59    5    A.  Possibly.

6         MR. ALLAN:  Nothing further.

7         THE COURT:  Redirect?

8         MS. NEW:  No, Your Honor.

9         THE COURT:  Members of the jury, please come back at

12:21:08    10    1:20.

11         THE CLERK:  All rise.  The Court is adjourned.

12         THE COURT:  Counsel, please remain.

13         (The following proceedings were had out of the

14         presence of the jury in open court:)

12:21:27    15         THE COURT:  The jury has left the room.  The Court is

16    in session.

17         I have received a written statement from one of the

18    jurors.  I think I asked Motorola to read the last one, so

19    Hytera, would you read this, please, into the record.

12:21:41    20         MR. CLOERN:  Certainly, Your Honor.

21         THE COURT:  If you can.

22         Please be seated.

23         MR. CLOERN:  (Reading:)

24         "Your Honor, I have a trip out of state plan

25

Case: 1:17-cv-01973 Document #: 794 Filed: 12/20/19 Page 98 of 176 PageID #:54012
Rangan - redirect by New
2131

1       starting December 28th.  I will return on

2       January 2nd.  Should this case continue this

3       long, will a schedule of days we are required to

4       be present be provided.  Thank you.  Jaden

12:22:13   5       Richardson."

6        THE COURT:  All right.  It's something to think about.

7        And, Mr. Fulbright, please file that for the record.

8        1:20, counsel.

9       (Luncheon recess taken from 12:22 o'clock p.m.

12:22:27  10      to 1:20 o'clock p.m.)

11

12              *     *     *     *     *     *     *     *

13

14  I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

15      RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

16          /s/Blanca I. Lara       December 2, 2019.

17

18

19

20

21

22

23

24

25

2132

```
 1               IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   MOTOROLA SOLUTIONS, INC., and MOTOROLA    ) No. 17 CV 1973
     SOLUTIONS MALAYSIA SDN. BHD,              )
 4                                             )
                Plaintiffs,                    )
 5   vs.                                       ) Chicago, Illinois
                                               )
 6   HYTERA COMMUNICATIONS CORPORATION, LTD.,  ) December 2nd, 2019
     HYTERA AMERICA, INC., and HYTERA          )
 7   COMMUNICATIONS AMERICA (WEST), INC.,      )
                                               )
 8                Defendants.                  ) 1:22 o'clock p.m.

 9                    TRIAL - VOLUME 13-B
                  TRANSCRIPT OF PROCEEDINGS
10
           BEFORE THE HONORABLE CHARLES R. NORGLE, SR.,
11                        and a jury

12   APPEARANCES:

13   For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                            BY:  MR. ADAM R. ALPER
14                               MR. BRANDON HUGH BROWN
                            555 California Street
15                          Suite 2700
                            San Francisco, California 94104
16                          (415) 439-1400

17                          KIRKLAND & ELLIS, LLP
                            BY:  MR. MICHAEL W. DE VRIES
18                               MR. CHRISTOPHER M. LAWLESS
                            333 South Hope Street
19                          Suite 2900
                            Los Angeles, California 90071
20                          (213) 680-8400

21

22   Court Reporter:        AMY M. SPEE, CSR, RPR, CRR
                            Official Court Reporter
23                          United States District Court
                            219 South Dearborn Street, Room 1728
24                          Chicago, Illinois  60604
                            Telephone:  (312) 818-6531
25                          amy_spee@ilnd.uscourts.gov
```

2133

```
 1   APPEARANCES (Continued:)

 2   For the Plaintiffs:      KIRKLAND & ELLIS, LLP
                              BY:  MS. MEGAN MARGARET NEW
 3                            300 North LaSalle Street
                              Chicago, Illinois 60654
 4                            (312) 862-7439

 5                            KIRKLAND & ELLIS, LLP
                              BY:  MS. LESLIE M. SCHMIDT
 6                            601 Lexington Avenue
                              New York, New York 10022
 7                            (212) 446-4763

 8   For the Defendants:      STEPTOE & JOHNSON, LLP
                              BY:  MR. BOYD T. CLOERN
 9                                 MR. MICHAEL J. ALLAN
                                   MS. JESSICA ILANA ROTHSCHILD
10                                 MS. KASSANDRA MICHELE OFFICER
                              1330 Connecticut Avenue NW
11                            Washington, DC 20036
                              (202) 429-6230
12
                              STEPTOE & JOHNSON, LLP
13                            BY:  MR. DANIEL S. STRINGFIELD
                              227 West Monroe Street
14                            Suite 4700
                              Chicago, Illinois 60606
15                            (312) 577-1300

16

17   ALSO PRESENT:           MR. RUSS LUND and
                              MS. MICHELE NING
18

19

20

21

22

23

24

25
```

1     (Proceedings heard in open court.  Jury in.)

2          THE COURT:  Good afternoon, members of the jury.

3          Please call the next witness.

4          MR. ALPER:  Yes, Your Honor.

5          We have a little more video testimony before our

6     final expert.  So --

7          THE COURT:  Proceed.

8          MR. ALPER:  -- we will call -- plaintiff calls Andrew

9     Yuan by video deposition.

10          THE COURT:  Yes.

11     (Videotaped deposition of An Yuan played in open court.)

12          MR. CLOERN:  Objection, Your Honor.

13          Your Honor, I believe -- this deposition is from

14     Mr. Yuan's deposition in a completely different case.

15          MR. DE VRIES:  Your Honor, although the vast majority

16     of this testimony is from depositions that were not in that

17     other case -- that other case is an Ohio case -- there was a

18     stipulation signed by counsel for Hytera in this case that

19     says the parties also stipulate and agree that any of the

20     materials that have been or will be produced in connection

21     with this case may be used in the other litigations, which is

22     defined to include this case.

23          And then it goes on to say, "For avoidance of doubt,

24     such materials include, but are not necessarily limited to,

25     transcripts from depositions."

Case: 1:17-cv-01973 Document #: 794 Filed: 12/20/19 Page 102 of 176 PageID #:54016
Videotaped deposition played - An Yuan
2135

1          And I'm prepared to hand that stipulation up to

2     Your Honor if you would like.

3          MR. CLOERN:  Your Honor, that's not a stipulation in

4     this case, and this counsel did not sign it.  This counsel

5     refused to sign it.  That's separate counsel in the Ohio

6     patent case.  And in that Ohio patent case, separate counsel

7     made the decision that everything from this case could be used

8     over there.  We expressly did not agree to that because we

9     didn't want to be guessing at what documents were going to be

10    played and what wasn't.

11         MR. DE VRIES:  Yes, Your Honor.  Dan Stringfield --

12         THE COURT:  Well, first of all, the jury has heard

13    considerable testimony involving this person.

14         Mr. Yuan?

15         MR. DE VRIES:  Yes, Your Honor.

16         THE COURT:  And so both sides, both counsel have

17    referred to things that he has said along the way and

18    documents that he authored.

19         And so I will accept your representation that there

20    is a stipulation that binds Hytera in this case based upon the

21    stipulation entered into in that case.  You have preserved the

22    objection for the record.

23         Proceed.

24       (Videotaped deposition of An Yuan played in open court.)

25         MR. ALPER:  Your Honor, in connection with that video

Videotaped deposition played - Steven Cragg

2136

1    that we just saw, plaintiff moves to admit PTX 2083, which was

2    Deposition Exhibit 12; PTX 10- -- 1007, which is Deposition

3    Exhibit 22; and then PTX 0576, which was Deposition 23.

4            MR. CLOERN:  Your Honor, subject to our objection for

5    documents that were never produced in this case.

6            THE COURT:  You have preserved your objections.

7            They are received and have been published.

8            Is that correct?

9            MR. ALPER:  Yes, Your Honor.

10           THE COURT:  They have all already been published?

11           MR. ALPER:  Yes, Your Honor.

12           THE COURT:  All right.  So ordered.

13        (Exhibit No. PTX 2083, PTX 1007, and PTX 0576 were

14          received in evidence.)

15           MR. ALPER:  Okay.  Well, plaintiff next calls by

16   video deposition Steven Cragg.

17           MR. CLOERN:  And, Your Honor, just for the record,

18   Mr. Cragg was not produced in this case and has never

19   testified in this case at all, so we also would like to have

20   an objection on the record to Mr. Cragg.

21           THE COURT:  The objection is overruled.

22           Present the evidence.

23        (Videotaped deposition of Steven Cragg played in open

24   court.)

25           MR. ALPER:  Your Honor, plaintiff moves to admit PT-

Case: 1:17-cv-01973 Document #: 794 Filed: 12/20/19 Page 104 of 176 PageID #:54018
Videotaped deposition played - Nuo Xu
2137

1    -- along with that video, PTX 2101, which was Deposition

2    Exhibit 5.

3              THE COURT:  That is received and has been published.

4              MR. ALPER:  Yes, Your Honor.

5         (Exhibit No. PTX 2102 was received in evidence.)

6              MR. ALPER:  And then finally, our final video is from

7    Mr. Nuo Xu.

8         (Videotaped deposition of Nuo Xu played in open court.)

9              THE COURT:  Could you stop for a minute?  Could you

10   play that back a couple seconds?  What was the answer to whom

11   he reported?  To one person?  I didn't quite hear the answer.

12             MR. ALPER:  Should we replay it, Your Honor?

13             THE COURT:  Yes, just about 30 seconds.

14        (Videotaped deposition of Nuo Xu played in open court.)

15             THE COURT:  Mr. Chen only?

16             MR. ALPER:  Yes, Your Honor.

17             THE COURT:  All right.  Proceed.

18        (Videotaped deposition of Nuo Xu played in open court.)

19             MR. ALPER:  Your Honor, there are no exhibits with

20   Mr. Xu's deposition.

21             I did neglect to mention that with Mr. Cragg's

22   deposition testimony, his Deposition Exhibit 23 relates to

23   already admitted Exhibit PTX 2083.  So I'm just mentioning

24   that for the record.

25             THE COURT:  Your statement is noted for the record.

Videotaped deposition played - Nuo Xu

2138

1          MR. ALPER:  And that concludes our testimony.  We are

2   ready to move on to our last expert.

3          THE COURT:  All right.  I think it's the appropriate

4   time to take a short break.

5          Members of the jury, please step out.

6          THE CLERK:  All rise.  The court will take a brief

7   recess.

8      (Brief recess had.)

9      (Change of reporter.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2139

1          (Jury in.)

2              THE COURT:  Please call the witness.

3              MR. ALPER:  Your Honor, Motorola calls as its last

4    witness Mr. James Malackowski.

5              THE COURT:  Yes.

6              MR. STRINGFIELD:  Your Honor, Daniel Stringfield for the

7    Hytera defendants.

8              Mr. Malackowski's expected testimony is subject to two

9    pending motions that Hytera filed, one is docket 758, which

10   pertains to sales outside of the United States, the other is

11   docket 640, which is a Daubert motion pertaining to various

12   aspects of Mr. Malackowski's expected testimony.

13             THE COURT:  Members of the jury, please step out.

14         (Jury out.)

15             THE COURT:  All right.  The jury has left the room.

16   Please be seated.

17             When did you file the motion?

18             MR. STRINGFIELD:  Your Honor, 758 was filed early this

19   morning.

20             THE COURT:  At 2:00 o'clock in the morning?

21             MR. STRINGFIELD:  Approximately, Your Honor.

22             THE COURT:  Okay.  Have you had an opportunity to see

23   it, counsel?

24             MR. ALPER:  My colleague, Ms. Leslie Schmidt, is going

25   to respond.

1          THE COURT:  Well, the point is, this case has been

2    before the Court now for several years, and only at 2:00 o'clock

3    in the morning, without notice or presentation, counsel files a

4    motion and places the burden on the Court.

5          The Court hasn't even had an opportunity to do any

6    research on the matter.  I have the motion before me.  It is an

7    extremely heavy motion.  And we have a witness in the wings ready

8    to go.

9          So what was the reason for the delay in filing this

10   motion?

11         MR. STRINGFIELD:  Your Honor --

12         THE COURT:  After several years?

13         MR. STRINGFIELD:  Your Honor, we did not intend to delay

14   filing this motion, Your Honor.  We were --

15         THE COURT:  I don't know what your intention was.  But

16   why did you delay?

17         MR. STRINGFIELD:  Your Honor, we were weighing the

18   applicability of the Federal and State Trade Secret Acts to the

19   damages case.

20         THE COURT:  Okay.  This is a very heavy motion, isn't

21   it?

22         MR. STRINGFIELD:  We agree, Your Honor.

23         THE COURT:  All right.  Should we send the jury home --

24         MR. STRINGFIELD:  No, Your Honor.

25         THE COURT:  -- and give counsel an opportunity to file

1   his responsive brief and then give you a responsive reply, time

2   for a reply?

3           MR. STRINGFIELD:  If the Court wishes, Your Honor.

4           THE COURT:  Well, what are you asking me to do?

5           MR. STRINGFIELD:  Well, Your Honor, we are prepared to

6   argue --

7           THE COURT:  You jumped up in front of the jury to raise

8   the issue.  So I am asking you what are you asking the Court to

9   do?

10          MR. STRINGFIELD:  Well, Your Honor, it's our position

11  that --

12          THE COURT:  What are you asking the Court to do?

13          MR. STRINGFIELD:  To preclude any argument --

14          THE COURT:  What are you asking me to do at the moment?

15  To send the jury home?

16          MR. STRINGFIELD:  If, Your Honor, if the Court --

17          THE COURT:  I don't want an "if."  I'm asking what are

18  you asking me to do?

19          MR. STRINGFIELD:  Your Honor, we would ask that the

20  Court exclude any reference to damages --

21          THE COURT:  What are you asking me to do with the jury?

22          MR. STRINGFIELD:  The jury can hear the presentation of

23  the witness subject to a ruling that we would ask the Court for

24  that would preclude any presentation by Mr. Malackowski regarding

25  sales outside of the United States, because neither the

1  Federal --

2          THE COURT:  So you want the jury to hear this evidence,

3  and then if I were to grant your motion, to tell them to

4  disregard it?

5          MR. STRINGFIELD:  Well, no, Your Honor.  We would ask

6  Mr. Malackowski to limit his presentation to only numbers

7  regarding sales within the United States.  He has delineated

8  those within his report.  He is equipped to divide the US sales

9  from the outside US sales.

10          THE COURT:  All right.  And all this at 2:00 o'clock in

11  the morning, right?

12          MR. STRINGFIELD:  Yes, Your Honor.

13          THE COURT:  Okay.  What is the reason for waiting so

14  long to file this motion?

15          MR. STRINGFIELD:  Your Honor, again, we were trying to

16  get our heads around the applicability of the statutes.

17          THE COURT:  I don't know what you mean when you say get

18  your heads around something.

19          What is the reason for the delay?  The case was filed in

20  2017.  It was before the magistrate judge for a couple of years.

21  And you raise this issue at 2:00 o'clock in the morning in the

22  middle of the trial.

23          MR. CLOERN:  Your Honor, if I may, I can provide the

24  thinking.  This is a matter to which we as counsel would simply

25  have objected to as outside the scope of what is available under

1    -- the trade secret laws at issue here is not something that we

2    moved for summary judgment on.  There was a dispute about the

3    available number of summary judgment issues.  That one we did not

4    move for summary judgment on.

5         We also did not move for Daubert.  We did not think that

6    we are required to.  We were going to object.

7         The very short motion, which I think is maybe two and a

8    half pages, is really meant to alert the Court to the issue --

9         THE COURT:  Well, the guillotine is small, too.

10        MR. CLOERN:  I understand, and very powerful.

11        It is there really to preserve our objection for the

12   record so that we - and I'm sorry we are going down this road -

13   so we didn't have to take a lot of the Court's time about the

14   objection.

15        THE COURT:  Well, we have heard testimony from one of

16   the witnesses with respect to activities in the United States.

17   That is certain.  That is in the evidence.

18        There were other aspects of evidence that may deal with

19   the issue of the applicability of damages beyond the United

20   States, keeping in mind what you are suggesting here is no

21   damages, global damages, that damages, if any, would be

22   restricted to the United States, or under the Illinois statute,

23   to the state of Illinois.  Is that it in a nutshell?

24        MR. CLOERN:  Yes, Your Honor.

25        THE COURT:  Okay, all right.  I will accept your

Malackowski - direct by Schmidt                    2144

1   position that the jury can hear this and we'll deal with the

2   ruling later.

3           So ask the jury to return and call the witness.

4           (Jury in.)

5           THE CLERK:  Please raise your right hand.

6           (Witness duly sworn.)

7           THE COURT:  Proceed, counsel.

8               JAMES MALACKOWSKI, PLAINTIFFS' WITNESS, SWORN

9                        DIRECT EXAMINATION

10  BY MS. SCHMIDT:

11  Q   Good afternoon.  And my name is Leslie Schmidt on behalf of

12  Motorola, just for the record.

13          Good afternoon, Mr. Malackowski.

14  A   Good afternoon.

15  Q   Could you please introduce yourself to the jury.

16  A   Yes.  My name is Jim Malackowski.  I'm from Indiana, about 90

17  minutes from here.  And currently I live in Chicago with my

18  family.  We have two children, a son in college and a daughter in

19  high school.

20  Q   And where do you work?

21  A   I work at Ocean Tomo LLC.

22  Q   And where is Ocean Tomo?

23  A   We're headquartered here in Chicago just down the street.

24  Q   What are you here to talk to us about today?

25  A   So I am asked to provide an expert opinion as to the amount

Malackowski - direct by Schmidt                    2145

1  of damages that the jury finds that Hytera misappropriated the

2  trade secrets at issue or infringed the copyrights at issue.

3  Q    And did you prepare slides to assist with your testimony

4  today?

5  A    I did.

6  Q    And are they in the small white binder that's on the small

7  table there?

8  A    They are.

9          MS SCHMIDT:  Your Honor, permission to publish

10  Mr. Malackowski's demonstratives.

11          THE COURT:  Proceed.

12  BY MS. SCHMIDT:

13  Q    And so, Mr. Malackowski, we'll get your analysis soon, but

14  right now we're looking at PDX 10.2.

15          Could you please tell the jury a little bit about your

16  educational background.

17  A    Yes.  So I was the first in my family to go to college.  I

18  went to the University of Notre Dame, a short distance away, and

19  I studied accounting and also majored in philosophy.

20  Q    And what did you do after graduation?

21  A    So after graduation I moved to Chicago and I went to work for

22  an accounting firm that does dispute analysis, mostly related to

23  your utility bills or the like.

24          But I happened to volunteer for the first patent

25  infringement dispute and basically spent my career there, three

Malackowski - direct by Schmidt                    2146

1  years, working on intellectual property matters, litigation just

2  like this.

3  Q   And after those three years, where did you go?

4  A   So when I was there three years, a client asked me to value a

5  piece of intellectual property outside of litigation.

6          THE COURT:  The question is:  Where did you go?

7  BY THE WITNESS:

8  A   And I went to start my own firm, Your Honor.  The firm is

9  called IPC Group.

10          THE COURT:  All right.  Just a minute.  All right.  Just

11  a minute.  All right.  Just respond to the questions, if you

12  will.

13          THE WITNESS:  Yes, sir.

14          THE COURT:  Proceed.

15          MS. SCHMIDT:  Sure.

16  BY MS. SCHMIDT:

17  Q   And what was the firm called?

18  A   It was called Intellectual Property Consulting Group or IPC

19  Group.

20  Q   And was this a company that you started?

21  A   It is, I and four others.

22  Q   Okay.  And what did you do at IPC Group?

23  A   So we basically valued intellectual property for disputes or

24  for transactions such as buying or selling a patent or investing

25  in a company.

Malackowski - direct by Schmidt                    2147

1  Q   And what types of IP did you value there?

2  A   It would have been all types:  Patents, trademarks, trade

3  secrets, copyrights, virtually any form of intellectual property.

4  Q   And how long were you at IPC?

5  A   So I was at IPC for the duration, just over 10 years.  We

6  sold that business in the late 1990s.

7  Q   And how many folks were working at IPC when you sold it?

8  A   We had just under 300 by the time we grew and sold the

9  business.

10 Q   And after you sold IPC --

11         THE COURT:  Just a minute.

12         When you say "we," to whom are you referring?

13         THE WITNESS:  It was my four partners when I started the

14 firm, and we grew to 300 people.  We sold it to a private equity

15 group.

16         THE COURT:  So who is "we"?  Who sold it?

17         THE WITNESS:  I and my four partners were the owners.

18         THE COURT:  You and your four partners?

19         THE WITNESS:  Yes.

20         THE COURT:  Sold the business?

21         THE WITNESS:  We did.

22         THE COURT:  All right.  Please proceed.

23 BY MS. SCHMIDT:

24 Q   So after you sold the business, Mr. Malackowski, where did

25 you go?

Malackowski - direct by Schmidt                    2148

1  A   I then went to work in the investment industry looking at

2  transactions involving intellectual property.  I did that for

3  three years.

4  Q   All right.  And then after you did that, what did you do?

5  A   And then I started my current firm, Ocean Tomo, in 2003.

6  Q   And you've been there ever since?

7  A   I've been there ever since.

8  Q   All right.  Now, can you please give us some examples of

9  intellectual property that you valued over your 30-plus year

10 career?

11 A   It's virtually every industry, for example, children's toys,

12 telecommunications, military defense equipment, pharmaceuticals.

13 Q   And in performing those valuation, do you ever consider the

14 interplay between different types of intellectual property?

15 A   In every case you considered the role that each form of

16 intellectual property plays in a valuation, from patents to trade

17 secrets to trademarks to copyrights.

18 Q   And does the public or confidential nature of the

19 intellectual property ever factor into the valuation work that

20 you do?

21 A   Always.  The terms or the value of intellectual property

22 varies.  For example, a patent lasts 20 years.  A trade secret or

23 a trademark can be indefinite.  So it directly affects the

24 valuation and the accounting.

25 Q   And in your experience, have you had to value different types

Malackowski - direct by Schmidt                    2149

1  of intellectual property that relate to the same product?

2  A   Yes.  Many complex products, most complex products are

3  covered by various forms of IP, patents, trade secrets,

4  copyrights, a brand.  And so those are valued separately, because

5  they each serve a distinct purpose for protecting the innovation.

6  Q   Now, Mr. Malackowski, if you turn back to PDX 10.2, some

7  certifications are listed there.  What certifications do you

8  have?

9  A   So there are three.  The first is CPA, a Certified Public

10 Accountant, the type of accountant used to prepare your taxes or

11 financial statements.

12         The second is a CLP, Certified Licensing Professional.

13 That's an expertise in helping to transfer technology from an

14 owner to a user or buyer.

15         And the third is Financial Forensics, that's a specialty

16 within accounting that has to deal with recreating financial

17 statements or financial information that was destroyed, lost or

18 never documented in the first place.

19 Q   What did you have to do to get those certifications?

20 A   Well, in all three cases it's based upon an examination, a

21 degree of training or experience and academic credentials.

22 Q   Have you negotiated license agreements related to

23 intellectual property?

24 A   Many times, both for my own firm as well as on behalf of

25 clients.

Malackowski - direct by Schmidt                    2150

1  Q   Have you taught any classes related to intellectual property

2  valuation?

3  A   Yes, ma'am.  Including my firm and teaching legal for

4  lawyers, most of my teaching is focused at graduate schools.  So

5  I taught at the University of Notre Dame, where I went, but here

6  in Chicago the University of Chicago, Northwestern University.

7  Q   Now, in this case we've been talking about radios and

8  repeaters.  Do you have experience valuing technology along those

9  lines?

10 A   Absolutely.  In telecommunications broadly, I've worked on

11 countless matters.  I also am an inventor or patent owner.  I

12 have more than 10 patents in telephony space.  So I'm very

13 familiar with this area of technology.

14 Q   And do you have any other credentials that are relevant to

15 your analysis in this case?

16 A   Well, the ones that I think would be relevant relate to

17 transferring technology or use of technology by one company

18 versus another.  And in that regard the two things would be my

19 work with Lurie Children's Hospital, where I chair the Tech

20 Transfer Committee for their research center, and my work with

21 the University of Chicago, where I am on the Molecular

22 Engineering Advisory Board helping them to set up a technology

23 transfer function.

24 Q   Now, with respect to the work that you've done in this case,

25 are you being compensated?

Malackowski - direct by Schmidt                    2151

1   A   My firm is compensated on an hourly basis at rates ranging

2   from $175 up to $895 an hour.

3   Q   And does your compensation depend in any way on the outcome

4   of this case?

5   A   No.  Like all experts, we're paid hourly as an independent

6   expert.  It doesn't matter what ultimately the jury decides or

7   the amount of the award.

8        MS. SCHMIDT:  Your Honor, Motorola offers Jim

9   Malackowski as an expert in the valuation of intellectual

10  property and the calculation of trade secret and copyright

11  damages.

12       THE COURT:  The witness may testify within the

13  conditions of Rule 702.

14       MS. SCHMIDT:  Now, Mr. Schlaifer, could we please get

15  PDX 10.3.

16  BY MS. SCHMIDT:

17  Q   So, Mr. Malackowski, what types of information did you

18  consider in performing your analysis in this case?

19  A   They're generally referred to on the screen, but first and

20  foremost, I start with the documents of the parties.  So I was

21  able to see the Motorola financial and business information.  I

22  also signed an agreement of confidentiality that allowed me to

23  see the Hytera documents as well.

24       The second category is the testimony.  So I've been here

25  through the beginning -- from the beginning of the trial.  I also

Malackowski - direct by Schmidt                    2152

1    had the opportunity to read the depositions, the ones that we saw

2    played in court plus several others.

3           And then finally, as an expert I had access to the legal

4    documents, so the complaint, the answer, written answers to

5    questions by both parties, and finally publicly available

6    information.

7    Q   And now you mentioned that you listened to and read

8    testimony.  Did you speak with anybody at Motorola in preparing

9    your opinions in this case?

10   A   Yes.  As part of my work I had the opportunity to interview

11   Motorola engineering personnel or accounting or product

12   management personnel.

13   Q   And did you have an opportunity to speak with any of the

14   experts that we've heard from so far?

15   A   Yes.  I spoke at length with both of the experts that we

16   heard, Dr. Wicker and Dr. Rangan.

17   Q   And did you speak with anybody at Hytera or any of Hytera's

18   experts?

19   A   No.  As an expert engaged on behalf of Motorola's attorneys,

20   I don't get to actually interview Hytera.  But what I can do is

21   submit written questions for the lawyers to ask through

22   deposition or otherwise, and that would be part of my process.

23   Q   All right.  So, Mr. Malackowski, where did you start your

24   investigation of Hytera for this case?

25   A   So I started by looking at the publicly available information

Malackowski - direct by Schmidt                    2153

1    and the overall company information for Hytera to get a sense of

2    the type of business from a business perspective.

3              MS. SCHMIDT:  So, Mr. Schlaifer, can we please go to PDX

4    10.4.

5    BY MS. SCHMIDT:

6    Q    And so, Mr. Malackowski, is this some of the financial

7    information related to Hytera that you looked at?

8    A    Yes.  This is the first two data points that I looked for.

9    The first is Hytera's overall company revenue for the period I

10   studied, 2010 through 2018, and then the second was the revenue

11   for the products that are at issue in this case, again, for the

12   same period of time.

13   Q    And how does this information relate to your analysis in this

14   case?

15   A    Well, as a CPA, the first thing that I look to is the size

16   and reporting of the company.  So Hytera is now a public company

17   of significant scale.  And so that informs me as to the type of

18   information that I would expect to see in their files that I

19   could use in my work.

20   Q    And now other than the -- now, with respect to Hytera's size

21   overall, now what about with respect to how the DMR revenue fits

22   into the company, company picture?

23   A    So my question there was whether or not the DMR would be a

24   significant portion of their revenue, an important product.  And,

25   again, that tells me what information I should expect to see.

Malackowski - direct by Schmidt          2154

1  And here we find that it's about 15 percent of the total company,

2  so in my view a material, important part of the business.

3  Q   Now, other than revenues, did you get other financial

4  information from Hytera?

5  A   Extensively.  But the third thing that I looked to

6  specifically was research and development expense for many of the

7  reasons we've heard about at trial.

8          THE COURT:  Counsel, what was the foundation?  What is

9  the date to which these figures apply?

10          MS. SCHMIDT:  Certainly.

11 BY MS. SCHMIDT:

12 Q   Mr. Malackowski?

13          THE WITNESS:  Your Honor, these figures relate to the

14 period 2010 through 2018.

15          THE COURT:  Proceed.

16 BY MS. SCHMIDT:

17 Q   And, Mr. Malackowski, you mentioned the next item you looked

18 at was R&D expenditures for Hytera.  Why did you look at those?

19 A   The R&D that was expended by both parties you'll see is a key

20 element to my damages determination.  And obviously it relates to

21 the core issues of this case, which is the theft of the trade

22 secrets and the copyrights to accelerate Hytera's R&D efforts.

23          MS. SCHMIDT:  Mr. Schlaifer, could we go to PDX 10.5,

24 please.

25 BY MS. SCHMIDT:

Malackowski - direct by Schmidt                    2155

1  Q   So, Mr. Malackowski, how much did Hytera spend in R&D for its

2  DMR products?

3  A   What I found in -- the time period is different here.  This

4  is only looking at the R&D up through 2009 or before the launch

5  of the first Hytera product.

6          I wanted to understand the investment that they made in

7  order to get that radio to market.  And so what this shows is

8  $12,600,000 in investment.

9  Q   And did you have any information about how much Motorola

10 spent on R&D for its MOTOTRBO products?

11 A   Yes.  So my first use of this data was to actually compare

12 what Hytera spent to launch the product to what Motorola spent

13 just for the trade secrets that are at issue in this case.  And

14 there is a chart that compares those.

15 Q   Sure.  So before we get to the chart, how did you determine

16 how much Motorola invested in R&D for these asserted trade

17 secrets?

18 A   That was based upon much of the work that we heard here at

19 trial, first starting with the Motorola engineers who estimated

20 the R&D efforts, the labor that was required on a trade secret

21 basis; and then second, the work of Dr. Rangan, who converted

22 that into calendar months; and then finally I applied the

23 business records of cost from the accounting statements to those

24 figures.

25          MS. SCHMIDT:  So if we could go to PDX 10.6.

Malackowski - direct by Schmidt                    2156

1    BY MS. SCHMIDT:

2    Q    And, Mr. Malackowski, what did you find as between what

3    Motorola spent in R&D for the asserted trade secrets and what

4    Hytera spent?

5    A    A significant difference.  So as the chart shows, in

6    comparison to the 12.6 million that Hytera spent to launch their

7    first product completely, Motorola spent over $117 million just

8    related to the trade secrets at issue in this case.  So more than

9    10 times the amount of expense.

10   Q    And how does the amount that Motorola spent just on the

11   asserted trade secrets compare to what Motorola spent overall for

12   its MOTOTRBO products?

13   A    This is a small portion of their overall research.  So it

14   clearly is not the total.

15   Q    And now based on your analysis of Motorola's and Hytera's R&D

16   spending, did you draw any conclusions?

17   A    Well, I was looking here for the nexus of my damage claim,

18   which is basically whether or not there was a relationship

19   between the trade secrets and copyright at issue and the profits

20   that I seek for both companies.

21         And so in my opinion, this confirms what I've heard at

22   trial, which is that Hytera benefited from use of the Motorola

23   trade secrets and copyrights, and they were able to reduce their

24   own R&D expense accordingly.

25   Q    Now, has Hytera's misappropriation of Motorola's trade

1  secrets impacted the value of Motorola's R&D investment?

2  A   It does.  Whenever your innovations are used by another

3  company without payment, it devalues those innovations in the

4  marketplace because they're available to others without the cost.

5       It also has a secondary effect of disincentivizing

6  companies to innovate, because if they don't feel they can

7  protect it, they won't get their return on investment.

8  Q   And are there any other effects of misappropriation on the

9  value of R&D investments?

10  A   Well, when you take that difference to the marketplace, the

11  last secondary effect is what is called leapfrogging.  So

12  essentially the misappropriator, the one who takes the

13  intellectual property without payment can then use whatever money

14  they have, not to catch up, but to actually try to get ahead, to

15  develop something that will differentiate themselves and leap

16  ahead of the innovator.

17       So the innovator often gets a one-two punch.  They get

18  their R&D taken away and then they have to confront something

19  that they didn't have the resources to develop themselves.

20  Q   All right.  And have you seen any information in this case

21  that relates to that concept?

22  A   I've seen exactly that through the correspondence at Hytera.

23  Q   So, Mr. Malackowski, I know you have quite a few binders up

24  there, I think it's one of the smaller binders, if you could turn

25  to PTX 421, please.

Malackowski - direct by Schmidt                2158

1   A    Yes, I have it.

2   Q    All right.  And, Mr. Malackowski, do you recognize this

3   document?

4   A    I do.

5   Q    And what is it?

6   A    This is a Hytera email from 2008 that is an email that starts

7   to Mr. Chen, Chairman Chen.

8   Q    And does this email come from Hytera's files?

9   A    It did.

10        MS. SCHMIDT:  Your Honor, we move the admission of PTX

11   421.

12        THE COURT:  You've heard me ask this question before,

13   was it produced by Hytera?

14        THE WITNESS:  It was, Your Honor.  It bears a Hytera

15   Bates number.

16        THE COURT:  It is received and may be published.

17            (Said exhibit was received in evidence.)

18        MS. SCHMIDT:  Thank you, Mr. Schlaifer.  If we could,

19   anywhere on PTX 421.1, and if you could please, Mr. Schlaifer,

20   blow up the text number next to the number 6 towards the bottom.

21   BY MS. SCHMIDT:

22   Q    Now, Mr. Malackowski, is this portion of PTX 426 that we're

23   looking at, is this what you were referring to?

24   A    Yes.  Specifically this is an email from Mr. G.S. Kok to

25   Mr. Chen.  And he talks in point six that the team, the Hytera

Malackowski - direct by Schmidt                    2159

1   team, will need an injection of subject matter expert from

2   Motorola Penang and Motorola Chengdu.  That's the Malaysia and

3   Chinese plants.  This will be most important if we want to

4   leapfrog onto the DMR business.  So this is exactly the point

5   that I was talking about a moment ago.

6            MS. SCHMIDT:  Thank you, Mr. Schlaifer.  We can take

7   that down.

8   BY MS. SCHMIDT:

9   Q   Now, Mr. Malackowski, we've been talking a lot about DMR

10  products.  Did you consider the DMR market as part of your

11  analysis?

12  A   Yes, ma'am.

13           MS. SCHMIDT:  Mr. Schlaifer, could we please get PDX

14  10.9.

15  BY MS. SCHMIDT:

16  Q   And, Mr. Malackowski, could you explain to us how you looked

17  at the DMR market?

18  A   Yes.  So it's common in my work, once I get a chance to

19  review the business records, the first thing I do is arrange them

20  chronologically to understand how this market developed.

21           And so what this chart shows is the period of 2004

22  starting with the FCC announcement regarding DMR all the way

23  through 2011, which is the implementation of the FCC announcement

24  and the Hytera IPO.

25  Q   All right.  So starting in 2004, what FCC regulations are you

Malackowski - direct by Schmidt                        2160

1  referring to?

2  A    Specifically the regulation that announced that companies or

3  users are going to have to move away from analog products to

4  digital only products.  And we heard testimony that that occurred

5  in the United States.  But that also occurred in many countries

6  around the world, that there was this transition to digital

7  radios.  You could only sell digital radios.

8  Q    And how did that impact your analysis?

9  A    So that obviously provided a business incentive for everyone

10 to get into the market and to get into the market quickly so they

11 could develop a radio before that regulation actually took effect

12 or they would be left out.

13 Q    Now, did you review any information regarding whether or not

14 Hytera recognized that opportunity?

15 A    Yes, I did.

16 Q    All right.

17        MS. SCHMIDT:  And could we please go to PDX 10.10.  And

18 this includes admitted exhibit PTX 1129.

19 BY MS. SCHMIDT:

20 Q    Mr. Malackowski, can you please explain to us how this

21 relates to your analysis?

22 A    Yes.  This is a Hytera presentation, and it explains in their

23 own reasoning why they pursued the digital mobile radio market.

24 And point one talks about that, basically to create new business,

25 to churn analog-based systems, meaning as the analog radios were

Malackowski - direct by Schmidt                    2161

1  being replaced, they needed to have something to substitute for

2  it, very much in line with the FCC mandate.

3  Q   Now, if we could go back to PDX 10.9, back to your timeline,

4  when did Hytera enter the DMR market compared to Motorola?

5  A   So Motorola actually entered or began development before the

6  FCC announcement, so in anticipation of the new technology.

7        Hytera responded shortly after the announcement in 2004,

8  they began their work on DMR.

9  Q   And then what year did Hytera enter the DMR market?

10 A   So Hytera actually did not enter the market until 2010, so

11 four years after Motorola entered the market in 2006, 2007.

12 Q   And now did the timing of Hytera's entry into the DMR market

13 provide any information about the value of Motorola's trade

14 secrets and copyrights to Hytera?

15 A   It did.  In my opinion, my work showed that the access to the

16 copyrights and the trade secrets allowed Hytera to accelerate

17 their entry into the market, to get there sooner than they

18 otherwise would have.

19        THE COURT:  Just a minute.  Can you explain to the jury

20 your use of the term "enter the market"?  What does that mean?

21        THE WITNESS:  Your Honor, specifically that means

22 allowing Hytera to sell a DMR product globally.

23        THE COURT:  Proceed.

24 BY MS. SCHMIDT:

25 Q   And now, Mr. Malackowski, you mentioned a few times about

Malackowski - direct by Schmidt                    2162

1   expediting entry into the market, Hytera expediting entry into

2   the market.  Is there anything on your timeline that relates to

3   that concept?

4   A   Well, there are two points.  But in particular, starting in

5   2007, with the declaration of Chairman Chen about the importance

6   of getting into the market in a hurry.

7              MS. SCHMIDT:  And so if we could go to PTX 10.7 -- I'm

8   sorry, PDX.  Thank you.

9   BY MS. SCHMIDT:

10  Q   And, Mr. Malackowski, is this the declaration of Chairman

11  Chen that you referenced on your timeline?

12  A   This is the English translation of that, of a portion of that

13  declaration, yes, ma'am.

14  Q   And so could you please explain how this declaration fits

15  into your analysis?

16  A   So we're now in 2007, after the FCC announcement, at a time

17  when there was some discussion of Hytera having a product ready.

18  But what Mr. Chen declares is that is an important and critical

19  product, and Motorola has already launched the first generation.

20  We need to develop the second generation of products, and we must

21  succeed in one try.

22             He talks about the fact that defeating Motorola will be

23  in the middle and high end of the market.

24             So this presents information that I can then use to help

25  to construct my damages model.

Malackowski - direct by Schmidt                    2163

1  Q   And now from a finance perspective, does the timing of a

2  product's entry into the market impact its value?

3  A   It does.  There is advantage to being early.  There is

4  advantage to being first.  There is also significant advantage to

5  be the second mover right after the introduction of the product

6  into the market.

7  Q   And now other than the declaration of Chairman Chen, did you

8  see any other information that Hytera provided related to its

9  desire to enter the DMR market quickly?

10 A   Yes.  There are other emails that talk specifically about the

11 benefit of early entry.

12 Q   And if you could please go to PTX 428 in your binder.  I

13 think it's right there.

14 A   Yes.

15 Q   Do you recognize PTX 428?

16 A   Yes.  This is a Hytera email produced in the litigation by

17 Hytera from 2007.

18      MS. SCHMIDT:  Your Honor, Motorola moves PTX 428 into

19 evidence.

20      THE COURT:  It is received and may be published.

21           (Said exhibit was received in evidence.)

22      MS. SCHMIDT:  Thank you.

23      Mr. Schlaifer, could we get PTX 428.  And if you could

24 please blow up the text.

25 BY MS. SCHMIDT:

1  Q    And now, Mr. Malackowski, who was this an email between?

2  A    So this is another email from G.S. Kok to Chairman Chen.

3  Q    And what portion of PTX 428 relates to your analysis in this

4  case?

5  A    So if you look to the middle of the document with the

6  sentence that starts "I had taken off today," he talks about the

7  fact, G.S. Kok talks about the fact that he took the day off to

8  work on the Hytera radio, and he hopes it to materialize fast.

9  Time is ticking fast.

10         He then explains that, well, it took nearly 400

11 engineers to develop the radio at Motorola, he estimates that

12 with the right team he can get to the market in two years with

13 Hytera.  And then he also talks about the importance of the

14 repeater as a key to the marketplace.

15         MS. SCHMIDT:  All right.  Mr. Schlaifer, could we now

16 please take a look at PTX 426, which has been admitted.

17 BY MS. SCHMIDT:

18 Q    Mr. Malackowski, there is two emails here.  And I would like

19 to start with the email at the bottom of this first page.

20         Could you tell us who this is an email between?

21 A    So at the bottom of the first page we see an email that is a

22 document sent from Mr. Chen's secretary to Mr. Chen.  That's

23 because she does some of the translation for him.  And you can

24 see it's actually an email from or to G.S. Kok.

25         MS. SCHMIDT:  And now if we could go to PTX 426.2,

Malackowski - direct by Schmidt                    2165

1  please, Mr. Schlaifer.

2  BY MS. SCHMIDT:

3  Q   And, Mr. Malackowski, is there anything on this portion of

4  the email from Mr. Chen to G.S. Kok that relates to your analysis

5  in this case?

6  A   Yes.  So here again they're talking about the benefits of

7  getting to market and getting to market early.  He talks about

8  communicating directly with Mr. Chen on that matter.

9        So if you start at the top, they're talking about

10  meeting in person and they're going to meet at a hotel in

11  Malaysia.  And they would pick a place that would be convenient,

12  but not a place where there was anybody from Motorola.

13  Q   And, Mr. Malackowski, I just want to clarify something.  You

14  mentioned this was G.S. Kok.  But this email that we're looking

15  at, who was this email from again?

16  A   This is an email to G.S. Kok from Mr. Chen.

17  Q   And so we looked at the part where they're planning to meet.

18        MS. SCHMIDT:  Now, Mr. Schlaifer, if we could please go

19  to the second paragraph.

20  BY MS. SCHMIDT:

21  Q   Mr. Malackowski, could you tell us how this paragraph relates

22  to your analysis, specifically with respect to expediting the

23  entry of Hytera into the DMR market?

24  A   Yes.  They're talking about the fact that they're going to

25  set up a DMR group, and that they would expect to invest money to

Malackowski - direct by Schmidt                    2166

1   do that, and that there will be an R&D center in Malaysia in

2   about two to three days, with about 10 to 30 people.  But, again,

3   they want to put it in a place that does not have direct

4   competition with Motorola.

5   Q   And now G.S. Kok, does he respond to this email?

6   A   He does.

7           MS. SCHMIDT:  Okay.  So, Mr. Schlaifer, if we could

8   please go to PTX 426.1.

9   BY MS. SCHMIDT:

10  Q   And so does G.S. Kok respond to Mr. Chen with respect to

11  setting up a meeting?

12  A   He does.  He explains first in the first paragraph, first

13  full paragraph that he made a reservation at a hotel in Malaysia

14  that was an isolated hotel so they could talk privately.

15  Q   All right.  And then what about with respect to the DMR

16  program, was that something that Mr. Kok also referenced?

17  A   Yes.  In the second sentence after that, "I would like to

18  understand more about you and your plan for Hytera."  So here Mr.

19  Kok was talking very specifically about communicating with

20  Chairman Chen about what Chairman Chen personally wanted to do

21  with this program.

22  Q   And now, Mr. Malackowski, the two emails that we just looked

23  at, how did those factor into your analysis of the value of

24  Motorola's trade secrets and copyrights to Hytera?

25  A   Well, it elevates the value to the company because it's being

Malackowski - direct by Schmidt                    2167

1  dealt with at the very senior most level, and it's confirming of

2  the importance to get to the market quickly.

3          And lastly, it confirms the direct competition or at

4  this point anticipated competition between Motorola and Hytera

5  again at the highest levels.

6  Q   And now when we were looking at your timeline --

7          MS. SCHMIDT:  Thank you, Mr. Schlaifer.  We can take

8  that down.

9  BY MS. SCHMIDT:

10 Q   When we were looking at your timeline, we saw that Hytera

11 entered the market in 2010.  And in doing that, did Hytera

12 achieve its goal of being second to market in the DMR market?

13 A   Yes, ma'am.  We saw that in the testimony in this case.

14 Q   And did you review any information about whether Hytera

15 benefited from being second to market?

16 A   Yes.  Again, through the record of the depositions.

17         MS. SCHMIDT:  Okay.  If we could please go to PDX 10.12.

18 BY MS. SCHMIDT:

19 Q   And, Mr. Malackowski, is this the testimony that you were

20 referring to?

21 A   Yes.  This is an example.  This is the testimony of Mr.

22 Cragg, Hytera's sales director.  And he was asked directly:

23         Was Hytera's ability to enter the DMR market as early as

24 it did a significant competitive advantage?

25         Answer:  Yes.

Malackowski - direct by Schmidt                2168

1      He also explains that being late to the market is

2  difficult because your competitors have a lead on you, and they

3  can tend to continue that lead, so you're always playing catchup.

4      So even if you are not first to market, this confirms

5  there is real benefit to being second, especially a fast second.

6  Q   And does that impact impact your analysis as to the value of

7  Motorola's trade secrets and copyrights to Hytera?

8  A   It does.  And we'll see that plays out when we talk about the

9  profits that were lost by Motorola as a result of this

10 competition.

11     MS. SCHMIDT:  And now, Mr. Schlaifer, if we could please

12 go back to PDX 10.7.

13 BY MS. SCHMIDT:

14 Q   Mr. Malackowski, in the second bullet, the last line

15 references that "The success of Hytera's DMR will mean defeating

16 Motorola in the middle and high-end market."

17     Did Hytera end up releasing products in the middle and

18 high-end market?

19 A   They did.  As I mentioned, this helped to inform my analysis

20 by focusing on those specific product categories.

21     MS. SCHMIDT:  If we could go to PDX 10.8.

22 BY MS. SCHMIDT:

23 Q   Mr. Malackowski, what are we looking at here?

24 A   So this is a chart I prepared where I began by looking at the

25 Motorola products in those two specific segments, the mid and

Malackowski - direct by Schmidt                    2169

1   high end of the market.  You see those listed at the top half of

2   the screen.

3          I then went to look to see if Hytera had directly

4   competing products in both segments.  And as shown on the chart,

5   I found they did and I displayed them.

6   Q    And now how do products compete in mid-tier and professional

7   markets?

8   A    Well, they actually compete in two ways.  Logically mid-tier

9   radios compete against mid-tier radios and high-tier against

10  high-tier.  But sometimes they also compete across.  So you may

11  also have a situation where a mid-tier radio is competing with a

12  high-tier and vice versa.  And that largely has to do with how

13  important trunking is to a customer.

14  Q    And now did you as part of your analysis review any marketing

15  materials from Hytera related to its DMR radios?

16  A    I reviewed for both companies, but specifically yes for

17  Hytera to see what they were promoting to customers.

18  Q    Could you please turn to PTX 5 in your binder.  Are you

19  there?

20  A    If these are in order, my first PTX is 0394, unless there is

21  another binder.

22  Q    No, it should be in that one.

23          MS. SCHMIDT:  May I approach the witness, Your Honor?

24          THE COURT:  Yes.

25          MS. SCHMIDT:  Thank you.

Malackowski - direct by Schmidt          2170

1  BY MS. SCHMIDT:

2  Q   It seems we omitted PTX 5 from that binder.

3  A   Okay.

4  Q   Mr. Malackowski, have you found PTX 5?

5  A   I have.  This is one of the Hytera marketing documents

6  produced by Hytera bearing their Bates stamp.

7         MS. SCHMIDT:  Your Honor, we move the admission of PTX

8  5.

9         THE COURT:  It is received and may be published.

10             (Said exhibit was received in evidence.)

11  BY MS. SCHMIDT:

12  Q   And now, Mr. Malackowski, what information from PTX 5 did you

13  consider as part of your analysis?

14  A   Well, I consider the entire document.  What are they

15  presenting to customers?  What do they describe is the foundation

16  of their technology?  And then how do they see that fitting in

17  with competitors?  And so I was able to review and extract that

18  from their marketing materials.

19         MS SCHMIDT:  Mr. Schlaifer, can we go to PDX 10.21,

20  please.

21  BY MS. SCHMIDT:

22  Q   And now, Mr. Malackowski, is this an excerpt of PTX 5?

23  A   Yes.  This is a chart that I created that pulled out some of

24  the points that are made in the marketing documents.  And here we

25  can see some of that leapfrogging in that Hytera is claiming that

Malackowski - direct by Schmidt                    2171

1  their radios, which are based upon the Motorola trade secrets and

2  copyrights, are actually the ones that are innovative and the

3  leading digital technologies and the most valuable solutions.

4         So they're not competing that they're just as good at or

5  comparable to.  They're actually saying they're better.

6         MS. SCHMIDT:  And now, Mr. Schlaifer, if we could please

7  go back to PDX 10.9, which is the timeline.

8  BY MS. SCHMIDT:

9  Q   Mr. Malackowski, we didn't quite get to 2011 yet.  So could

10  you please tell us what happened in 2011?

11  A   Well, there are two things that happened in 2011.  They're

12  actually related.  The first one is the FCC regulations begin to

13  go into effect prohibiting the use or the sale of analog radios.

14  And then also that year we see the IPO of Hytera and we

15  understand that the digital radios were core to that IPO.

16  Q   And what is an IPO?

17  A   An initial public offering.  That's when a private company

18  starts to trade on a stock market and public shareholders can buy

19  their stock and invest in the company.

20  Q   And are there benefits to going public?

21  A   Significant benefits.  A company that goes public, first of

22  all, it's a cash-out day.  So a lot of the founders get to get a

23  big check.  But the company also gets money through the offering

24  as well.  So they can use that money for other business

25  activities.

Malackowski - direct by Schmidt                    2172

1  Q   And now you mentioned that you had seen information that the

2  DMR radios were important to Hytera's IPO.

3        MS. SCHMIDT:  And so, Mr. Schlaifer, can we please get

4  PTX 426 again.  And if we go to the last full paragraph, please.

5  BY MS. SCHMIDT:

6  Q   Mr. Malackowski, is this the information that you had

7  referred to with respect to the importance of Hytera's DMR

8  products to its IPO?

9  A   This is one example.  This is again an email from G.S. Kok to

10 Chairman Chen.  And Mr. Kok says, "I don't want to elaborate any

11 more as I need your vision and ensure that ours are aligned.  I

12 already know one of yours is to get Hytera listed on NASDAQ,"

13 meaning the IPO.

14        He goes on, "It will be quite difficult to get a good

15 listing price if the auditor check and find that most of our

16 equipments are analog and also our major market share is in

17 China.  So I need to further understand how you plan to overcome

18 this negative factor to ensure that the venture and cost to get

19 Hytera listed in NASDAQ will be a winning and rewarding one."

20        So as early as 2007, the plan was to go public, and the

21 understanding was we need to have a digital product in order for

22 that to be a winning opportunity.

23 Q   Now, does the fact that having a DMR product was critical to

24 Hytera's IPO impact your opinion as to the value of Motorola's

25 trade secrets and copyrights?

Malackowski - direct by Schmidt                    2173

1  A   It's confirming of the conclusions that I found that these

2  trade secrets and copyrights are very important, very valuable to

3  Hytera.

4  Q   And since Hytera's IPO, what has happened to the value of

5  Hytera as a company?

6  A   Well, we heard testimony about the fact that price goes up

7  and down.  But in the first five years after the IPO, the company

8  value increased over 500 percent, so a significant and successful

9  offering.

10  Q   And now, Mr. Malackowski, we looked earlier at some summary

11  information about Hytera's financial data.  Did you look in

12  detail at Hytera's financial data as well?

13  A   Extensively, yes, ma'am.

14  Q   And so now, Mr. Malackowski, I'm going to ask you to turn to

15  a few exhibits.  I think they're some of the larger ones

16  potentially on the floor.  It's DTX 4056, 4057, and PTX 394, PTX

17  1024 and PTX 1025.

18  A   Okay.  I know what those are.

19  Q   Okay.  You have them in front of you?

20  A   I have them.

21  Q   Okay.  What are those documents?

22  A   These are the Hytera financial documents that I relied upon

23  that show their manufacturing cost and their operating expenses.

24  They're extremely detailed and voluminous.

25  Q   Do they also include sales information as well?

Malackowski - direct by Schmidt                2174

1  A    Yeah.  They start with the unit sales, the revenue and then

2  they go into all the costs associated with the products.

3  Q    And did Hytera produce them to Motorola in this case?

4  A    Yes, as part of this litigation.

5         MS. SCHMIDT:  Your Honor, Motorola moves the admission

6  of DTX 4056, DTX 4057, PTX 394, PTX 1024 and PTX 1025.

7         THE COURT:  They are received and may be published.

8               (Said exhibits were received in evidence.)

9  BY MS. SCHMIDT:

10 Q   And now, Mr. Malackowski, I know those documents are very

11 big, do you have a slide that summarizes some of that

12 information?

13 A    I have many.  But the first one I start with is the

14 information on the unit sales for Hytera.

15        MS. SCHMIDT:  So if we could go to PDX 10.13, please,

16 Mr. Schlaifer.

17 BY MS. SCHMIDT:

18 Q   And so these are, you mentioned these are the unit slides for

19 Hytera.  And so how does this information factor into your

20 analysis?

21 A    So the first accounting data I looked to after the overall

22 corporate that we saw is what were Hytera's worldwide unit sales

23 of the accused products.  And those are presented on this chart.

24 And as an accounting expert, there is actually significant

25 information just in looking at a bar chart like this.

Malackowski - direct by Schmidt                    2175

1  Q   And now the sales that we're looking at here on the slide of

2  Hytera's products with Motorola's trade secrets and copyrights in

3  them, has that impacted Motorola?

4  A   Yes.  As we heard from the testimony, this is essentially a

5  two-supplier market according to Hytera and, therefore, every

6  sale that Hytera made is a sale that Motorola lost.

7  Q   And when you say -- so I want to break that apart a little

8  bit.

9        If we could go to PDX 10.14.  You mentioned testimony

10  about a two-player market.  Is that what we are looking at here?

11  A   Yes.  We saw this on the video.  Here is an excerpt of Mr.

12  Cragg's deposition where he was asked:

13        Who are the major competitors, if any, in the US DMR

14  market?

15        And his answer was:  It's a two-player market.  It's

16  Motorola and Hytera.

17  Q   And what does that mean, a two-player market?

18  A   Well, as an accounting expert, that's almost a term of art.

19  So when you have a two-player market, it literally means that you

20  can expect that for every sale that one company made the other

21  company lost and vice versa.

22  Q   And if we just go back to PDX 10.13.  And so then what

23  specifically are you saying with respect to how the two-player

24  market impacts Motorola with respect to Hytera sales?

25  A   Specifically for this time period, every sale that's shown on

Malackowski - direct by Schmidt                    2176

1  this chart is a sale that in a two-supplier market would have

2  otherwise been made by Motorola of the products at issue.

3  Q   And when you say "Motorola," which Motorola entity are you

4  referring to?

5  A   The one that's headquartered here in Illinois, Motorola

6  Solutions Inc. or MSI as they're referred to.

7  Q   And so these sales on this slide, they're worldwide sales.

8  Are you saying that Motorola is losing sales not just in the US

9  but worldwide due to this misappropriation?

10 A   Yes, ma'am.  That's my conclusion.

11 Q   And now when was this lawsuit filed, Mr. Malackowski?

12 A   March of 2017, if my memory is right.

13 Q   And now since this lawsuit was filed, has Motorola -- or

14 strike that.

15        Has Hytera continued selling products with Motorola's

16 trade secrets and copyrights in them?

17        MR. STRINGFIELD:  Objection, leading, Your Honor.

18        THE COURT:  Rephrase the question.  Sustained.

19 BY MS. SCHMIDT:

20 Q   So since the lawsuit was filed in March 2017, what did you

21 observe with respect to Hytera's sales of the products at issue

22 in this case?

23 A   Two things, one from the accounting data and one from the

24 testimony.

25        From the accounting data, you can look at 2018, that's

Malackowski - direct by Schmidt                2177

1  the first reporting period after the lawsuit was filed, first

2  full reporting period, and it actually shows a decline in

3  worldwide sales.

4       But when I looked to the testimony, we heard some of

5  that right before I came up, the sales didn't actually decline

6  according to the witnesses.  They were actually continued to be

7  robust or even increase.  So that was my first issue to

8  investigate, how could that be?

9       And then second thing was, well, what is continuing to

10  happen almost on a daily basis?  And what I found is that when

11  you look at these numbers, Motorola continues to lose or Hytera

12  continues to make almost $200,000 in sales each day, 7 days a

13  week, 365 days a year.

14  Q   And now so, Mr. Malackowski, I'd like to turn now to your

15  opinions on the quantification of damages.

16       THE COURT:  Before you move on, can you tell the jury

17  how a sale actually takes place?

18       THE WITNESS:  Yes, Your Honor.  The sales in this

19  industry happen in two ways, either direct from the company to

20  big customers, like, for example, Hytera sells at Costco, so they

21  can either sell directly to a Costco or they can sell through a

22  distributor, who often will carry a couple of different lines of

23  products.

24       THE COURT:  And in Nigeria, how does a sale take place?

25       THE WITNESS:  In Nigeria?

Malackowski - direct by Schmidt                    2178

1           THE COURT:  Yes.

2           THE WITNESS:  Your Honor, the sales strategy is the same

3  globally.  But I suspect in Nigeria there are no distributors,

4  but I don't know that.

5           THE COURT:  And how about France?

6           THE WITNESS:  France, there would be distributors or

7  distributors at least service France and Europe.

8           THE COURT:  Are all the sales of Hytera through

9  distributors?

10          THE WITNESS:  Not all of them, but most of them, I

11 understand.  There are some significant big accounts that go

12 direct.

13          THE COURT:  Direct from the company itself?

14          THE WITNESS:  From the company itself.

15          THE COURT:  All right.  Now, in terms of making a

16 purchase, can you go online and purchase the product?

17          THE WITNESS:  They do describe the products online, but

18 they will refer you to a dealer to make the actual purchase.

19          THE COURT:  And what percentage of the sales are through

20 dealers as opposed to direct from the headquarters?

21          THE WITNESS:  It varies over time.  I don't recall the

22 numbers off the top of my head, but most of the sales, 70 plus

23 percent, my recollection, are through dealers.

24          THE COURT:  You can develop that point if you choose to.

25          MS. SCHMIDT:  Certainly, Your Honor, potentially when we

Malackowski - direct by Schmidt                    2179

1  get to the quantification portion.

2          THE COURT:  Well, you are ready to get there.

3          MS. SCHMIDT:  I am.

4  BY MS. SCHMIDT:

5  Q   And so before we get to the quantification, Mr. Malackowski,

6  do you have a board that can help guide that analysis?

7  A   I do.

8          MS SCHMIDT:  All right.  Your Honor, may I approach the

9  board --

10          THE COURT:  Yes.

11          MS SCHMIDT:  -- and display it?

12          THE COURT:  Yes.

13  BY MS. SCHMIDT:

14  Q   All right.  So, Mr. Malackowski, we're looking at PDX 11 --

15  or 110.

16          Could you please explain what we're looking at on the

17  board?

18  A   Yes.  In many ways this is the bottom line of what are the

19  potential measures of damage if the jury finds trade secret

20  misappropriation and/or copyright infringement.

21          And there are three measures shown on the board, two

22  measures of trade secret misappropriation depending upon which

23  method is selected and one measure of copyright infringement

24  damage if the copyrights are found to infringe.

25  Q   And so, Mr. Malackowski, when we're talking about unjust

Malackowski - direct by Schmidt                    2180

1  enrichment and lost profits, what types of damages are those,

2  just at a high level?

3  A   At a very high level, it's actually pretty simple.  Unjust

4  enrichment represents the profits that Hytera made or the costs

5  they saved by the theft of the intellectual property.  And lost

6  profits, as the name implies, represents the harm that Motorola

7  directly incurred as a result of the theft.

8  Q   And now, Mr. Malackowski, although punitive damages are at

9  issue in this case, are you offering an opinion on that?

10  A   No.  These damages are what's known as compensatory damages.

11  To the extent that punitive damages are awarded by the jury, that

12  would be added to the compensatory damages.

13  Q   And now you gave a brief explanation of unjust enrichment and

14  lost profits.  But could we look at some of your demonstratives

15  to talk about that a little bit more?

16  A   Sure.

17        MS. SCHMIDT:  All right.  Mr. Schlaifer, could we please

18  get PDX 10.15.

19  BY MS. SCHMIDT:

20  Q   And so, Mr. Malackowski, what are we illustrating here?

21  A   We're using some of the examples that I would use when I

22  teach these concepts.

23        And I tend to use these almost cartoonish examples to

24  make two points:  One is to explain method, but two, to emphasize

25  that this is actually pretty simple from a methodology point.

Malackowski - direct by Schmidt                    2181

1  It's really common sense.  I want to hammer that home through

2  simple illustrations.

3        So we start with a company.  This happens to be A&B

4  Cookies.  They have three employees.  And they make delicious

5  chocolate chip cookies with their recipe.

6  Q   Okay.  And what kind of recipe is it?

7  A   It turns out it's a secret recipe, trade secret recipe in my

8  example.

9        MS. SCHMIDT:  All right.  And if we could go to PDX

10  10.16, please, Mr. Schlaifer.

11  BY MS. SCHMIDT:

12  Q   So what's happening here?

13  A   So the hypothetical that we set up is one of the employees

14  leaves, and they go to another cookie stand and they sell

15  competing cookies.  And so what can we learn from that that we

16  can apply to the much more complicated calculations of this case?

17  Q   Sure.  And so in this example, who is losing the profits?

18  A   So again, it's very simple, A&B is losing profits.  So any

19  damage related to them would be measured by lost profits.

20  Q   And who is being unjustly enriched in this example?

21  A   In this case it would be Cookies R Us.  So the numbers with

22  respect to Cookies R Us that we are discussing are their benefit

23  or their gain, which comes in the form of the profits they make

24  by selling cookies too as well as we'll see in the cost they

25  saved.

Malackowski - direct by Schmidt                    2182

1  Q   And now other than the profits that are made, are there other

2  ways that Cookies R Us in this example was unjustly enriched by

3  the misappropriation?

4  A   Yes.  As the next slide shows, it's because they saved the

5  research costs.  So on the left side of the chart we have Ann and

6  Beth who are buying product, experimenting, developing their

7  secret recipe.

8       On the right side of the chart we have the employee who

9  left who took it with him.

10      And, importantly, the simple concept is they didn't have

11  to incur those costs.  And so those costs are actually an unjust

12  enrichment element in addition to the profits from the sales.

13  Q   And now, Mr. Malackowski, turning back to your board, how do

14  the different types of damages that you've calculated fit

15  together?

16  A   So it's important that they are selectively chosen to not

17  double count, to not overcompensate Motorola.

18      So if trade secret misappropriation is found, either the

19  jury would award the Hytera unjust enrichment or the Motorola

20  lost profits.  But they would not add them together if all of the

21  trade secrets were misappropriated.

22      If all of the trade secrets are misappropriated, then

23  the copyright damages would be included, so they would not be

24  added either.  You would just pick one number.

25      In the event that only copyright damages were found,

Malackowski - direct by Schmidt                    2183

1   then it would be the lower number on the bottom.

2   Q   And now, Mr. Malackowski, you mentioned no double counting,

3   which is the last item on that slide.

4           And if we could go to PDX 10.18, could you explain how

5   your analysis addressed the issue of double counting?

6   A   Yes.  This is another very simple illustration, but I think

7   it makes the point.

8           So let's assume in our hypothetical that there are trade

9   secrets related to the design of the whole house.  But there are

10  also trade secrets related to each of the rooms and even trade

11  secrets related to the lamp, the microwave and the refrigerator.

12          Well, if you find that everything is misappropriated,

13  and you take the profits from the entire house, you wouldn't add

14  more profits for a room or separately profits for the

15  refrigerator.

16          Likewise, if you found that the living room was

17  misappropriated and the kitchen was misappropriated, you would

18  add those two together, but you wouldn't again add a sofa and a

19  microwave.  You only take the broadest measure of actual harm.

20  And I was careful to do that in my work.

21  Q   And so, Mr. --

22          THE COURT:  Does that mean the whole versus the sum of

23  the parts?

24          THE WITNESS:  In a way it's exactly right, Your Honor.

25  BY MS. SCHMIDT:

Malackowski - direct by Schmidt                    2184

1  Q   And now, Mr. Malackowski, now the trade secrets that you

2  count in some of your opinions, in some of your opinions, does

3  that mean that those trade secrets in particular are more

4  important than others?

5  A   No.  It's not a matter of which one is more important.  It's

6  just an accounting exercise to make sure you don't have an

7  overlap.

8  Q   So now let's look at specifically the trade secret damages.

9        MS. SCHMIDT:  And if we could please go to PDX 10.19.

10 BY MS. SCHMIDT:

11 Q   So, Mr. Malackowski, what geographic area did you calculate

12 trade secret damages for?

13 A   I included all sales globally in my trade secret analysis, so

14 every sale that Hytera made regardless of country.

15 Q   And now if we go to PDX 10.20, which trade secrets did you

16 calculate damages for?

17 A   All the trade secrets that are asserted in this litigation,

18 there are 21 of them, and I show them by the features they

19 represent on this chart.

20 Q   And now if we start with your first opinion on the board, PDX

21 10, which is unjust enrichment, how did you calculate that?

22 A   Again, in two parts.  So the first thing that I looked to was

23 the cost savings, that recipe that was taken from one cookie

24 stand to the other.

25 Q   So let's start with the cost savings on PDX 10.22.  Could you

Malackowski - direct by Schmidt                    2185

1  please explain how you did this calculation?

2  A   Yes.  Again, the good news is it's a fairly straightforward

3  calculation from a theory standpoint.

4        So I simply looked at the monthly engineering cost for

5  Hytera that was estimated by my accounting work times the staff

6  months that were required to develop each of the trade secrets.

7  When you multiply those together on a trade secret by trade

8  secret basis you can determine what was the research and

9  development that was saved, and then you can total it for the

10  final numbers.

11  Q   And now, Mr. Malackowski, if you go to your sort of smaller

12  white binder, and if you could please turn to PTX 2070.2 through

13  .4, PTX 2070.8, and then PTX 2077.

14        Once you're there, if you could let us know if you

15  recognize those documents.

16  A   I do.  These are attachments to my report.  They represent my

17  work product.

18  Q   And what specifically are they?

19  A   These documents show my calculation of cost savings on a

20  trade secret by trade secret basis.

21  Q   And what information do you rely on in those exhibits?

22  A   So I rely upon the Motorola witnesses at trial that talked

23  about the time to develop each trade secret; Dr. Rangan, who

24  converts that into calendar period; and then also the Motorola

25  records that show the R&D cost per month in China.

Malackowski - direct by Schmidt                    2186

1  Q   And the information you rely on in those exhibits, was that

2  available through Hytera?

3  A   It was.

4  Q   And would it be more convenient to look at the exhibits we've

5  been talking about than the underlying documents?

6  A   Much more.

7       MS. SCHMIDT:  Your Honor, we move the admission of PTX

8  2070.2 through .4, 2070.8 and 2077 into evidence.

9       MR. STRINGFIELD:  Your Honor, the witness has testified

10  that these exhibits are appendices straight from his expert

11  report and, therefore, it's improper and they're not points in

12  this case.

13       THE COURT:  The objection is overruled.  Under 402, the

14  witness may rely on documents themselves that would not otherwise

15  even be admissible.  There is a solid basis for this witness's

16  testimony within the parameters of 702.  The objection is

17  overruled.

18            (Said exhibits were received in evidence.)

19  BY MS. SCHMIDT:

20  Q   So, Mr. Malackowski, if we turn back to PDX 10.22 and start

21  with the estimated monthly engineer cost, could you tell us how

22  you made that determination?

23  A   Yes.  I first looked to Hytera's records to see if I could

24  determine their actual monthly R&D expense.  But those records

25  were incomplete and in my view inaccurate for a number of

Malackowski - direct by Schmidt                    2187

1    reasons.  The numbers jumped all around.

2            And so with that, I turned to Motorola's records to use

3    as an estimate.  But Motorola has engineers all over the world,

4    and so I made sure that I looked to their engineering expense in

5    China, because it's a competitive market it would represent the

6    same cost as Hytera.

7            MS. SCHMIDT:  Mr. Schlaifer, could we please get PTX

8    2070.8.

9            THE COURT:  Before you move on, where are Hytera's

10   engineers located?

11           THE WITNESS:  They are also in China, Your Honor, which

12   is the basis of my comparison.

13           THE COURT:  Anywhere else?

14           THE WITNESS:  Substantially, no.  There was testimony,

15   if you're asking if they were, for example, in the United States,

16   and the answer is no.

17           THE COURT:  All right.  So the Hytera engineers function

18   only in China?

19           THE WITNESS:  Substantially.  I can't say that every

20   single one of them, Your Honor.  But from the depositions and the

21   documents I read, I actually believe it was every single one.

22           THE COURT:  All right.  Proceed.

23           MS. SCHMIDT:  Thank you, Mr. Schlaifer.  And then if you

24   could please blow up just the calculation up there on top.

25   BY MS. SCHMIDT:

1  Q    So, Mr. Malackowski, could you just explain what we're

2  looking at here?

3  A    Yes.  This is the summary data showing the Motorola monthly

4  payroll cost per head on the last line for engineers in the

5  United States, China, Malaysia and then overall average.

6  Q    And that average, is that a simple average or a weighted

7  average?

8  A    No, that would be a weighted average for Motorola taking into

9  account where each engineer is actually located.

10  Q    And which of these numbers did you use for the estimated

11  Hytera cost per engineer?

12  A    I used the Chengdu, China figures, which at the bottom are

13  $3,992 per month per engineer.

14  Q    Thank you.

15        MS. SCHMIDT:  And, Mr. Schlaifer, could we please get

16  PDX 10.22 back.

17  BY MS. SCHMIDT:

18  Q    And now, Mr. Malackowski, in step two of your analysis, where

19  did you get the staff months to develop from?

20  A    From Dr. Rangan, the testimony that we heard over the last

21  few days.

22  Q    And how did you determine which trade secrets to include in

23  your calculation?

24  A    So I looked at all 21, but in order to deal with the overlap

25  issue, I focused on 7 primary trade secrets.

Malackowski - direct by Schmidt                    2189

1  Q    And how did you gain an understanding of any overlap issue?

2  A    Through the technical expert reports and the Motorola

3  testimony.

4       MS. SCHMIDT:  And if we could go to PDX 10.23, please.

5  BY MS. SCHMIDT:

6  Q    And, Mr. Malackowski, are these the seven trade secrets on

7  this slide, is that what you included in the total amount of

8  avoided R&D that you calculated?

9  A    Yes.  These seven trade secrets:  Connectivity, XCMP,

10 software, MMR protocol stack, hardware, testing and benchmarking

11 and repeater functionality, you can think of these as like the

12 seven rooms in the house.  So we can add them all together and

13 no, we're not double counting.  And when you add them all

14 together, it shows the savings that Hytera realized of $73.5

15 million.

16 Q    And now by including these seven trade secrets in your

17 calculation, are you saying that these trade secrets are more

18 important than the others?

19 A    No, they are not more important.  The others are simply

20 subcomponents or a subset, parts of the whole as described.

21 Q    So now let's turn to the second part of your unjust

22 enrichment calculation, which is Hytera's profits.

23      MS. SCHMIDT:  And, Mr. Schlaifer, could we please get

24 PDX 10.24.

25 BY MS. SCHMIDT:

Malackowski - direct by Schmidt                          2190

1  Q   And so, Mr. Malackowski, how did you perform this analysis?

2  A   This analysis was largely based on Hytera data.  So it was

3  looking at Hytera's actual revenues for the products that are

4  accused, what did they sell these radios or repeaters for,

5  multiplied by their profit margin, the margin that would be

6  appropriate for a damage calculation, and the total is the

7  profits made from the misappropriation.

8  Q   If you could please turn to PTX 2071 in your binder.

9  A   Yes, I have it.

10 Q   Do you recognize this document?

11 A   Yes.  This is a spreadsheet or schedule summary that I

12 prepared from my reports similar to before that shows Hytera's

13 profits, the result of this calculation for devices, repeaters

14 and accessories.

15 Q   What information did you rely on in PTX 2071?

16 A   This information is taken wholly from Hytera's records

17 produced in this litigation and then translated into dollars

18 using publicly available exchange rates.

19 Q   And now is it more convenient to review the information in

20 your summary than it would be to review the underlying documents?

21 A   Significantly.

22 Q   And were those underlying documents available to Hytera?

23 A   They came from Hytera.

24        MS. SCHMIDT:  Your Honor, Motorola moves PTX 2071 into

25 evidence.

Malackowski - direct by Schmidt                    2191

1            THE COURT:  Is this 1006?

2            MS SCHMIDT:  I'm sorry?

3            THE COURT:  Voluminous records?

4            MS. SCHMIDT:  Oh, yes, yes.  I was thinking it was a

5    different exhibit number.  But yes, under Rule 1006.

6            THE COURT:  Yes, it is received.

7                 (Said exhibit was received in evidence.)

8            THE COURT:  You have already established that the

9    underlying data has been available to opposing counsel, is that

10   right?

11           MS. SCHMIDT:  Yes, Your Honor.

12           THE COURT:  Okay.  Proceed.

13   BY MS. SCHMIDT:

14   Q   All right.  So, Mr. Malackowski, let's talk about both pieces

15   of your calculation starting with revenues.  How did you

16   determine what Hytera's revenues were for the accused products?

17   A   That was a fairly simple accounting exercise.  Went to all

18   the detailed schedules and simply added up the products that were

19   accused in this litigation on an annual basis.

20           MS. SCHMIDT:  If we could go to PDX 10.25, please,

21   Mr. Schlaifer.

22   BY MS. SCHMIDT:

23   Q   And so, Mr. Malackowski, what revenues did you have for the

24   accused products?

25   A   I started looking at the radios.  And so you can see the

Malackowski - direct by Schmidt                    2192

1    radios in the first box.  So there was $532 million worth of

2    radios that were sold at this time.  That does not include the

3    mobile radios that you would install in a truck.  That would be

4    another 111 million.

5    Q   And how about for repeaters?

6    A   So repeaters came from the same documents, the same analysis.

7    And the repeater revenue totals $91.1 million.

8    Q   And in PTX 10.25 which we're looking at also includes

9    accessories.  Why did you consider accessories as part of your

10   analysis?

11   A   Well, I think we're all familiar with the fact that when you

12   buy, for example, a cellphone, you don't get out of the store

13   without thinking or buying extra batteries and headphones and the

14   like.

15            And it's actually the same experience with DMR.  I found

16   that through the testimony and the records of this case.  So I

17   therefore included the accessories as having a direct nexus to

18   the trade secret misappropriation and the copyright infringement.

19   Q   If we go to PDX 10.26, this has an excerpt of PTX 5, which we

20   looked at earlier, are these examples of accessories that Hytera

21   sells with its radios and repeaters?

22   A   Yes.  And this is consistent with the testimony we heard

23   earlier today.

24   Q   And did the spreadsheets you looked at from Hytera, did those

25   include revenues from accessories?

Malackowski - direct by Schmidt                    2193

1  A   They did not.

2  Q   All right.  So how did you determine what Hytera's accessory

3  revenues were?

4  A   So this is where the financial forensic work comes into play,

5  which is going back to recreate or estimate the documents.  And

6  as is typical, when the accounting records aren't there, you

7  often look to the documents like emails or the testimony.

8         And we heard the testimony of Hytera just before I got

9  on the stand that accessories ranged from 15 to 40 percent of

10 sales or from 15 to 20 percent of certain mid-tier radios, and so

11 I started with that estimate.  I actually reduced it to 10

12 percent to make sure I wasn't overcounting and used that in my

13 calculations.

14         MS SCHMIDT:  So, Mr. Schlaifer, if we could please go

15 back to PDX 10.25.

16 BY MS. SCHMIDT:

17 Q   And so what revenues did you arrive at for Hytera's

18 accessories?

19         MR. STRINGFIELD:  Your Honor, I just renew our Daubert

20 objection to the admissibility of accessory evidence, which I

21 don't believe the Court ruled upon, our pending Daubert motion.

22         Also, we disagree that these, this exhibit, Exhibit 2071

23 is a summary.  These reflect Mr. Malackowski's calculations,

24 which include assumptions about what goes into Hytera's

25 overall profitability --

Malackowski - direct by Schmidt                2194

1           THE COURT:  Which Daubert motion are you talking about?

2           MR. STRINGFIELD:  Your Honor, it is our pending Daubert

3    motion docket 640.  One of the aspects of the Daubert motion --

4           THE COURT:  When did you file that motion?

5           MR. STRINGFIELD:  Many months ago.

6           THE COURT:  And the Court ruled several days ago on that

7    motion.

8           MR. STRINGFIELD:  Not this specific one, Your Honor.

9           THE COURT:  Yes, I did.  All right.  If you are raising

10   it again, on reconsideration, the Court affirms its ruling

11   denying your motion.

12          MR. STRINGFIELD:  Your Honor, then --

13          MR. CLOERN:  We didn't receive a ruling, Your Honor.  I

14   apologize, but we didn't receive any rulings.

15          THE COURT:  You may not have received it.  My

16   recollection is I ruled on it overruling your objection.  And to

17   the extent that you are asking me to consider, on reconsideration

18   the Court affirms its ruling --

19          MR. CLOERN:  Okay.

20          THE COURT:  -- which is to deny your Daubert objection.

21          MR. CLOERN:  Understood.

22          MR. STRINGFIELD:  And, Your Honor, again, the second

23   part of my objection is to the admissibility of this exhibit as a

24   summary.  It contains Mr. Malackowski's calculations and

25   assumptions about what goes into Hytera's profitability.  And

Malackowski - direct by Schmidt                    2195

1   there is a dispute between the parties as to what components of

2   cost should be deducted when determining Hytera's profitability.

3           THE COURT:  I have already ruled on its admissibility

4   under 1006.  The underlying data has been made available to you.

5   The objections that you are raising are overruled.  You may go

6   into it on cross-examination.

7   BY MS. SCHMIDT:

8   Q   All right.  So, Mr. Malackowski, so if you could just tell us

9   just again what amount of accessory revenues did you arrive at?

10  A   Yes.  I used 10 percent.  So if you look at the chart you can

11  see accessories of 53 million.  That's 10 percent of the 532

12  million that you see in the top box.

13  Q   And so, Mr. Malackowski, let's turn now to your profit margin

14  determination.  How did you determine what Hytera's profit

15  margins were?

16  A   By reviewing the Hytera business records as well as the other

17  evidence of the case to determine which cost would change or did

18  change as a result of these additional sales.

19          MS. SCHMIDT:  So if we could please go to PDX 10.27,

20  Mr. Schlaifer.

21  BY MS. SCHMIDT:

22  Q   So what types of costs did Hytera have?

23  A   So basically costs to manufacture and then sell the product.

24  And I've summarized the categories of cost on the screen.  There

25  are many more detailed line items to each of these.

Malackowski - direct by Schmidt                    2196

1        But as you can see, some of the cost I considered

2   properly deductible, that's the green check mark, and some of

3   them I did not view would change or the documents were not

4   reliable to deduct, and those are the ones with the red X.

5   Q   And so how did you decide which items to deduct and which

6   items not to deduct?

7   A   So on an item-by-item basis I considered whether or not the

8   cost would be incremental or changed with the additional

9   production.  So cost of goods sold represents the actual

10  manufacturing of the product, the labor, the material.  Obviously

11  that's going to change if you make more radios.

12       The second is patent royalty.  That's paid on each and

13  every radio, and it is directly variable with sales.  So I

14  deducted it.

15       The next cost labeled sales is really the sales

16  department function.  And in my experience, very often the case,

17  and to be conservative, yeah, they would include additional sales

18  commission, additional sales reps, additional communication with

19  distributors.

20       Asset impairment talks about assets that are actually

21  consumed in the process.  And so if it's consumed, it should be

22  deducted.

23       Those are straightforward.

24       The next three are a little more in-depth.  Management

25  relates to executive salaries, Mr. Chen's salary or the cost of

1   the administrative building.  Those don't change with a 15

2   percent increase in volume that these radios represent of the

3   total company.  So they would not be deducted.

4           The financial cost relate to things like either the

5   going public or the legal fees.  Those should not be deducted

6   when calculating ongoing profits.

7           And then research and development was the one I spent

8   the most time on, because I can understand why perhaps there

9   would be some R&D, but I found that the data that was produced

10  was not specific to these products and was not correlated or

11  related to the introduction of these products in a way that they

12  should be deducted.

13  Q   So if we go to PDX 10.28, could you please explain the

14  analysis that you did to decide whether or not to deduct Hytera's

15  R&D?

16  A   Yes.  As I said, I looked at this very carefully.  This is

17  just another level summary of the data that I saw.

18          And so what I did is for each and every year I showed

19  the R&D that Hytera reported as potentially being relevant to DMR

20  on the top line.  And then I showed the number of accused radio

21  models that were introduced each and every year.

22          And so let's just take a couple examples.  2014, they

23  introduced four radio models and in doing so they incurred almost

24  $6 million in R&D.

25          Then let's look alternatively at 2016, just two years

Malackowski - direct by Schmidt                    2198

1   later.  They introduced one model, it's their second-to-last

2   model.  Yet the accounting records showed that they incurred $17

3   million, two and a half times more R&D for that model.

4          Intuitively that doesn't make sense.  And when I dug

5   into the documents, what I found is that we looked through the

6   spreadsheets, it's because the R&D relates to other products and,

7   therefore, in my opinion there wasn't a sufficient basis for a

8   deduction.

9   Q   And so if we go to PDX 10.29, based on your analysis, what

10  profits margin percentages did you arrive at for the accused

11  products?

12  A   The profit margins varied by year based upon the product

13  category.  And so as we see on the screen here they ranged from a

14  low of 22.8 percent for accessories to a high of 41.6 percent for

15  repeaters.  Most often we see profit margins in the rate of 33 to

16  35 percent.  For example, for the mobile radios I referenced,

17  they would be that 33 percent.

18         And when you do all the math, multiply the rows together

19  and total them, then you get the total Hytera profits of 238.2

20  million.

21  Q   And now, Mr. Malackowski, did you perform an alternative

22  calculation related to Hytera's profits?

23  A   Yes.  I understand that it's possible the jury won't find all

24  of the trade secrets misappropriated.  So I had to have a way to

25  allow people to adjust for that, and so that was part of my

Malackowski - direct by Schmidt                    2199

1  alternative calculations.

2  Q   Now, if we go to PDX 10.30, could you please explain the

3  analysis you undertook on a trade secret by trade secret basis?

4  A   Yes.  Dr. Rangan spent a lot of time explaining the

5  development cost in months for each and every one of the trade

6  secrets.  He did that at my request, I asked him to do that,

7  because it allows me to then look at each of the trade secrets

8  based upon its period of development, and you can see that some

9  were shorter than others.

10         I can then attach the development or the profits

11  associated with each of those.  So if only certain trade secrets

12  are found to infringe and not others, the jury could use my chart

13  to select the unjust enrichment profit amount.

14  Q   And so if we go to PDX 10.31 and do an example here with the

15  different trade secrets, now, if a trade secret that took 108

16  months to develop and a trade secret that took 48 months to

17  develop were misappropriated, how would that impact your

18  analysis?

19  A   So the 108 months represents the entire time period I

20  studied.  So that's the 238 million we just saw, the total Hytera

21  profits.

22         So if one of the trade secrets for there was found and

23  one of the trade secrets for the next row, a shorter period, you

24  wouldn't double count.  Basically Motorola is entitled to its

25  full recovery.  So as soon as you find one trade secret in a row,

Malackowski - direct by Schmidt                    2200

1  you stopped and look to the end of the row.  You don't need to go

2  any further.

3          If the first trade secret you found and the only one you

4  found was in the 48 months, then you would use the 179 million.

5  Q   And now, Mr. Malackowski, if we go to PDX 10.32, what is your

6  conclusion as to the amount of unjust enrichment damages for

7  Hytera's misappropriation of Motorola's trade secrets?

8  A   It's as shown on the large board.  It's the total of the

9  unjust enrichment profits plus the unjust enrichment R&D cost

10 savings.  And so the bottom line, bottom line is $311,859,953.

11 So that's the most important number.

12 Q   And now looking at your board, which is PDX 110, what is the

13 next category of damages that you calculated?

14 A   I also considered Motorola's lost profits, which are the

15 profit they would have earned had the misappropriation not

16 occurred.

17 Q   All right.  Mr. Malackowski, could you please turn to PTX

18 2067, 2068 and 2069.  And once you're there, if you could please

19 tell us what those documents are.

20 A   Yes.  These are my calculations, my summaries attached to my

21 report that represent the Motorola lost profits.

22 Q   And what information from Hytera did you rely on in those

23 summaries?

24 A   This information relates to Motorola's accounting records and

25 Hytera's unit sales to get the actual calculation.

Malackowski - direct by Schmidt                    2201

1  Q   And now with respect to the Hytera unit information that you

2  relied on, have we talked about that already?

3  A   Yes.  That's the same units we've shown and talked about at

4  some length.

5  Q   And now with respect to the Motorola information, what

6  Motorola financial information did you rely on?

7  A   The Motorola accounting records for the DMR products,

8  specifically the mid-tier and high-tier radios over the same time

9  period.

10  Q   And where did that Motorola financial information come from?

11  A   Well, it came from Motorola generally.  More specifically it

12  resides on their Oracle database system and is maintained in the

13  ordinary course of business.

14  Q   And now did you also rely on other Motorola information

15  related to its market share in these summaries?

16  A   Ultimately, yes.  The reason these numbers are different than

17  unjust enrichment relates to market share.  And I looked to the

18  Motorola internal documents that track that information.

19  Q   Okay.  How did Motorola store those documents that you relied

20  on?

21  A   They also store them within a database.  They're produced on

22  a routine basis, and they're part of their normal business

23  records.

24  Q   And all of the information that you relied on in PTX 2067,

25  2068 and 2069, has it been made available to Hytera?

Malackowski - direct by Schmidt                    2202

1  A    It's been made available to their attorneys and their

2  experts.

3  Q    And would it be more convenient to look at these exhibits

4  instead of the underlying documents?

5  A    Much more so.

6         MS SCHMIDT:  Your Honor, we move the admission of PTX

7  2067, PTX 2068 and PTX 2069.

8         THE COURT:  They are received and may be published.

9              (Said exhibits were received in evidence.)

10 BY MS. SCHMIDT:

11 Q    And now so, Mr. Malackowski, let's look at at a high level

12 your calculation for lost profits.  If we go to PDX 10.33.

13         Could you please walk us through the steps that you

14 took?

15 A    Yes.  This is also pretty straightforward, but it has two

16 more steps than we've seen before.  So first I start with the

17 number of Hytera accused units.  So that's the data we've seen.

18         Second though I multiply that by Motorola's market

19 share, recognizing that Motorola might not sell every one of the

20 units themselves.

21         Once I know the units that Motorola would sell, I

22 multiply it by Motorola's price, what is called the average

23 revenue per unit, ARPU.  And then once you know the revenue, you

24 multiply it by a profit margin to get the total.

25 Q    And so, Mr. Malackowski, I want to focus on the market share

Malackowski - direct by Schmidt                    2203

1  portion.  Why didn't you give Motorola credit for all of Hytera's

2  sales?

3  A   This is actually the unit -- the topic I spent as much time

4  on as R&D, because I was trying to reconcile what I saw in the

5  testimony versus what I saw in the business records.

6        And in the testimony I saw a two-party market, a

7  one-to-one correlation high market share.  But in Motorola's

8  records I saw lower figures.  So in order to be conservative, I

9  decided to use the lower figures for calculating my lost profits

10 numbers.

11 Q   And if we go to PDX 10.34, is this some of the testimony that

12 you reviewed in performing your market share analysis?

13 A   It is.  This is just a small section of the video we heard

14 right before I came to testify.  It's Mr. Yuan.  And he was asked

15 by the end of 2018:

16        "Do you have any knowledge of the respective market

17 shares in the DMR market in the US?"

18        Answer:  "I think apart from Hytera and Motorola, if we

19 put everybody together in the DMR market, I think their DMR

20 market share would be less than 10 percent."

21        Meaning Motorola and Hytera had 90 percent or more of

22 the sales.

23        He's asking if that would be true --

24        THE COURT:  Is that in the United States?

25        THE WITNESS:  This is in the United States, Your Honor.

Malackowski - direct by Schmidt                    2204

1              THE COURT:  That's what he said?

2              THE WITNESS:  That's what he said.

3              THE COURT:  Proceed.

4   BY MS. SCHMIDT:

5   Q   Mr. Malackowski, did you use 90 percent for your market share

6   figure?

7   A   I considered it, but I ultimately did not.  I used a lower

8   percentage to be conservative.

9   Q   If we go to PDX 10.35, could you please explain what market

10  share percentage you did use?

11  A   Yes.  So this chart, if you look to the top of the light red

12  or pink bars, it's the same chart we saw before, the total Hytera

13  sales worldwide by year.

14             What I show in the solid dark red is the portion of the

15  sales that I actually included in my lost profits calculation.

16  And obviously it's substantially less.  It's not 90 percent.

17  It's approximately 50 percent.

18             But this way I was able to account for potential third

19  parties or even the fact that some customers just might not buy

20  from Motorola at all.

21  Q   And, Mr. Malackowski, in --

22             THE COURT:  Just a second.

23             Or they might not buy from anyone?

24             THE WITNESS:  Exactly, Your Honor, they might not buy

25  from anyone.

Malackowski - direct by Schmidt                    2205

1           THE COURT:  Proceed.

2   BY MS. SCHMIDT:

3   Q   Mr. Malackowski, in doing this analysis, did you also

4   consider the channels through which Motorola and Hytera sell

5   their products, for example, through dealers and distributors?

6   A   I did.  And they sell through substantially similar channels,

7   largely through distributors, but also direct sales, the one

8   distinction being that Motorola dealers are exclusive, they only

9   sell Motorola products, where Hytera dealers may sell other

10  products.

11  Q   And now, Mr. Malackowski, using the calculation that we

12  looked at on PDX 10.33, what amount of lost profits did you

13  arrive at?

14  A   So if you --

15  Q   And you can look at your report.

16  A   Yeah.  So if you crank through all the numbers looking by

17  year for mid-tier and high-tier, looking at the difference in

18  price for the United States versus outside the United States and

19  go through all the products, the total lost profits figure is

20  $153.9 million.

21          And the reason it's so much less than the 311 largely is

22  because of, one, that market share adjustment and, two, because

23  the prices were slightly different, three, the profits were

24  slightly different.

25  Q   And now with respect to the unjust enrichment that you

Malackowski - direct by Schmidt                    2206

1  calculated and Motorola's lost profits, are those two numbers to

2  be added together?

3  A    No.  If the jury finds that all the trade secrets are

4  misappropriated, Motorola would be entitled to its full measure

5  of recovery and should be awarded the 311 million.

6  Q    So let's turn to your opinion about copyright damages.  And

7  if we go to PDX 10 --

8          THE COURT:  This may be a good stopping point for the

9  day.

10         Members of the jury, please come back tomorrow at 10:15.

11         The witness will return at 10:15.

12         Counsel remain for a few minutes, please.

13         (Jury out.)

14         THE COURT:  You may step down.

15         THE WITNESS:  Thank you.

16         THE COURT:  Please be seated.

17         There was a note from a juror consistent with what I was

18  going to say anyway, she has a personal matter to deal with, and

19  she asked if we could start tomorrow at 10:15 instead of 10:00

20  o'clock tomorrow.

21         As you have just heard, I have granted her request.  But

22  I also have a couple of matters on the call in any event.

23         On this issue of ruling on the Daubert issue, my

24  recollection was that when we dealt with this in the very

25  beginning of the trial, the Court took the position that I would

Malackowski - direct by Schmidt                    2207

1   rule as the matter progressed.  I think that was Motorola's

2   position, to forge ahead without any further delay; a written

3   opinion on the Daubert issue of that, as objections were raised,

4   the Court would deal with them.

5          So I think I said in a larger sense the Daubert motion

6   is denied, but we will deal with them in greater detail as the

7   trial progresses.  That's my recollection.

8          So if it's different, you have ordered the transcript, I

9   haven't seen it, so if I am wrong on that issue, you can advise

10  me.

11         MR. ALPER:  That's our recollection also, Your Honor.

12  And I believe that at one point in the trial, we'll have to go

13  back and look, that you did deny the Dauberts.  I think it came

14  up once after that and our recollection is that you denied them.

15  But we'll recheck the transcript.

16         THE COURT:  All right.

17         MR. CLOERN:  Your Honor, it is also our recollection, I

18  think we're all on the same page, at the beginning of the trial

19  Your Honor said:  We'll take them up as they come.

20         And then I believe the Dauberts were denied with respect

21  to Drs. Wicker and Rangan for sure.  We weren't sure about

22  Mr. Malackowski.  But if they're denied, they're denied.

23         Just for the record, I think if we could have continuing

24  objections to what Mr. Stringfield raised on the accessories,

25  then we won't have to get up again about that.

1          THE COURT:  Yes.  Indeed, I think I've said you had a

2     continuing objection.  You need not jump up and raise it in front

3     of the jury.

4          MR. CLOERN:  Thank you, Your Honor.

5          THE COURT:  So you have been ordering the transcript.

6     If I am substantially wrong on any of this, you certainly may

7     bring it to my attention at any time.

8          MR. ALPER:  We believe you denied the Dauberts.  I think

9     that's confirmed today.

10          THE COURT:  All right.  Well, the transcript will be of

11     assistance if necessary.

12          Otherwise it's been a full day and return tomorrow at

13     10:15.

14          MR. ALPER:  Yes, Your Honor.

15          THE COURT:  Thank you, counsel.

16     (Adjournment at 4:22 p.m. until 10:15 a.m., December 3,

17     2019.)

18

19

20

21

22

23

24

25

1                          * * * * * * *

2                    C E R T I F I C A T E

3          We, Amy Spee and Jennifer Costales, do hereby certify

4    that the foregoing is a complete, true, and accurate transcript

5    of the proceedings had in the above-entitled case before the

6    Honorable CHARLES R. NORGLE, SR., one of the judges of said

7    court, at Chicago, Illinois, on December 2nd, 2019.

8    /s/*Amy Spee, Official Court Reporter*__      December 3rd, 2019

9    /s/*Jennifer Costales, Contract Court Reporter* December 3rd, 2019

10   United States District Court

11   Northern District of Illinois

12   Eastern Division