2209

1        IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
2                 EASTERN DIVISION

3   MOTOROLA SOLUTIONS, INC., and MOTOROLA    ) No. 17 CV 1973
    SOLUTIONS MALAYSIA SDN. BHD,              )
4                                             )
                                              )
5            Plaintiffs,                      )
    vs.                                       ) Chicago, Illinois
                                              )
6   HYTERA COMMUNICATIONS CORPORATION, LTD.,  ) December 3, 2019
    HYTERA AMERICA, INC., and HYTERA          )
7   COMMUNICATIONS AMERICA (WEST), INC.,      )
                                              )
8            Defendants.                      ) 10:15 o'clock a.m.

9
                    TRIAL - VOLUME 14 A
10               TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE  CHARLES R. NORGLE, SR.
11                     and a jury

12

13  For the Plaintiffs:   KIRKLAND & ELLIS LLP
                          BY:  Mr. Adam R. Alper
14                             Mr. Brandon Hugh Brown
                               Mr. Reza Dokhanchy
15                             Ms. Barbara Nora Barath
                               Mr. Kyle Calhoun
16                        555 California Street
                          27th Floor
17                        San Francisco, California 94104
                          (415) 439-1400
18
                          KIRKLAND & ELLIS LLP
19                        BY:  Mr. Michael W. De Vries
                          333 South Hope Street
20                        Los Angeles, California 90071
                          (213) 680-8400
21

22
    Court reporter:            BLANCA I. LARA
23                         Official Court Reporter
                          219 South Dearborn Street
24                             Room 2342
                          Chicago, Illinois 60604
25                          (312) 435-5895
                          blanca_lara@ilnd.uscourts.gov

2210

1  Appearances:  (Continued:)

2

3  For the Plaintiffs:     KIRKLAND & ELLIS LLP
                          BY: Ms. Megan Margaret New
                          300 North LaSalle Street
4                         Chicago, Illinois 60654
                          (312) 862-7439
5
                          KIRKLAND & ELLIS LLP
6                         BY:  Ms. Leslie M. Schmidt
                          601 Lexington Avenue
7                         New York, New York 10022
                          (212) 446-4763
8
   Motorola Corporate Representative:   Mr. Russ Lund
9

10

11  For the Defendants:     STEPTOE & JOHNSON LLP
                           BY: Mr. Boyd T Cloern
                               Mr. Michael J. Allan
12                             Ms. Jessica Ilana Rothschild
                               Ms. Kassandra Michele Officer
13                         1330 Connecticut Avenue., Nw
                          Washington, DC 20036
14                         (202) 429-6230

15                         STEPTOE & JOHNSON LLP
                          BY:  Mr. Daniel Steven Stringfield
16                         227 West Monroe Street
                          Suite 4700
17                         Chicago, Illinois 60606
                          (312) 577-1267
18

19  Hytera Corporate Representative:  Michele Ning

20

21

22

23

24

25

2211

1       (The following proceedings were had out of the

2       presence of the jury in open court:)

3           THE COURT:  Good morning.

4           MR. CLOERN:  Good morning, Your Honor.

10:15:54    5           MR. ALPER:  Good morning, Your Honor.

6       (Brief pause.)

7           THE CLERK:  All rise.

8       (The following proceedings were had in the

9       presence of the jury in open court:)

10:16:39   10           THE CLERK:  The Court is in session.  Please be

11  seated.

12           THE COURT:  Good morning, members of the jury.

13       Please recall the witness, counsel.

14           MS. SCHMIDT:  Your Honor, we recall Mr. Malackowski to

10:16:49   15  the stand.

16           THE COURT:  Yes.

17       (Brief pause.)

18           THE COURT:  Proceed.

19           MR. SCHMIDT:  Your Honor, I just wanted to note for

10:17:02   20  the record that for some of the exhibits we admitted yesterday,

21  we'd like to seal them, and that would be PTX 2067, 2068, 2069,

22  and 2070.2 through .4 and.8.

23           THE COURT:  The motion to seal is granted.

24

10:16:52   25

Malackowski - direct by Schmidt

2212

```
 1      JAMES MALACKOWSKI, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN
 2                  DIRECT EXAMINATION (resumed)
 3    BY MS. SCHMIDT:
 4    Q.  So good morning, Mr. Malackowski.
 5    A.  Good morning.
 6    Q.  And I wanted to take care of just a few housekeeping items
 7    before we proceed with copyright damages.
 8             MR. SCHMIDT:  And so, Mr. Schlaifer, could we please
 9    get PDX 10.4.
10             (Brief pause.)
11    BY MR. SCHMIDT:
12    Q.  And, Mr. Malackowski, we discussed this slide at the
13    beginning of your direct yesterday with respect to Hytera's
14    overall revenues, but I don't believe we actually said what
15    they were.  And just so the record is clear, what are Hytera's
16    overall revenues as a company?
17    A.  For the period 2010 through 2018, the overall revenues are
18    $3,829,509,975.
19             MR. SCHMIDT:  And, Mr. Schlaifer, could we please get
20    PDX 10.30.
21             THE COURT:  Could we just step back.
22             Did you say "revenue"?
23             THE WITNESS:  Yes, sir.
24             THE COURT:  As opposed to profit, is that correct?
25             THE WITNESS:  Yes, sir.
```

10:17:21

10:17:32

10:17:45

10:18:04

10:18:13

Malackowski - direct by Schmidt

2213

1    THE COURT:  Just for clarification.

2    Please proceed.

3  BY MS. SCHMIDT:

4  Q.  And, Mr. Malackowski, we discussed your individual trade

10:18:21    5  secret analysis based on development times yesterday.  And are

6  your calculations that relate to these individual development

7  times included in your summary, PTX 2071 that we discussed

8  yesterday?

9  A.  They are.

10:18:36   10  Q.  And now -- and what opinion does that relate to?

11  A.  That relates to the disgorgement, or the unjust enrichment

12  calculation primarily.

13  Q.  And did you do a similar trade-secret by trade-secret

14  analysis for your lost profits opinion?

10:18:54   15  A.  I did a similar time-based analysis which is dependent upon

16  each of the trade secrets, yes.

17  Q.  And your summary, PTX 2067, does that include that

18  development time analysis as well?

19  A.  It does.

10:19:06   20  Q.  And now I'm sticking with lost profits.  We also discussed

21  how Motorola and Hytera sell their DMR radios.  Now, you're not

22  aware of any limitations on the DMR radios that a particular

23  dealer could sell, right?

24  A.  No.  The dealers are independent business persons.  So they

10:19:24   25  can sell whatever they feel are appropriate.

Malackowski - direct by Schmidt

1  Q.  And so since there are no such limitations, did you have to

2  adjust your market share calculation to take that into

3  account?

4  A.  There was no need for such an adjustment.

10:19:37   5  Q.  And now turning to PDX 110, which is your board.

6          Now, does your calculation of lost profits take into

7  account all of Hytera's unjust enrichment from its

8  misappropriation?

9  A.  I'm not sure I understand that question.  The lost profits

10:19:57  10  relate to the same units.  These are updated through the last

11  set of information in June of this year.  Same units, but it's

12  a distinct calculation, so you would not award both.

13  Q.  And so why is it, though, in your opinion that you would

14  award -- or why is it your opinion that Hytera's unjust

10:20:14  15  enrichment is the appropriate amount of damages in this case?

16  A.  As I explained yesterday, Motorola is entitled to the full

17  recovery, and therefore the larger of the damage calculations

18  are most appropriate, in my opinion.  And so they would be

19  entitled to the 311 million.

10:20:29  20  Q.  And so, Mr. Malackowski, now let's turn to your opinion on

21  the amount of copyright damages.

22          MS. SCHMIDT:  And, Mr. Schlaifer, could we please go

23  to PDX 10.37.

24  BY MS. SCHMIDT:

10:20:42  25  Q.  And so, Mr. Malackowski, what geographic area did you

Malackowski - direct by Schmidt

2215

1    calculate copyright damages for?

2    A.  The copyright analysis was limited to the United States.

3         MR. SCHMIDT:  And could we go to PDX 10.38, please.

4    BY MR. SCHMIDT:

10:20:54    5    Q.  And what products do you understand Motorola's copyright

6    registrations to relate to?

7    A.  They relate to the same products we've been discussing:  So

8    the radios, the repeaters, and the mobile units.

9    Q.  And if we go to PDX 10.39.

10:21:09    10        What features do Motorola's copyright registrations

11   relate to?

12   A.  Because the copyright relates to the basic software code,

13   it includes many of the same features.  I highlighted here on

14   the screen some of the more notable ones.  Again, the features

10:21:24    15   we talked about yesterday that were in demand by customers.

16   Q.  And now, Mr. Malackowski, in your smaller binder, if you

17   could please turn to PTX 2072.

18   A.  Yes.

19   Q.  Do you recognize that document?

10:21:51    20   A.  Yes.  This is a summary of my copyright analysis, including

21   adjustments to the extent that the trade secret claim is not

22   fully awarded.

23   Q.  And what information did you rely on in PTX 2072?

24   A.  This is based upon the Hytera financial records, as well as

10:22:10    25   exchange rate information, and then the period adjustments are

Malackowski - direct by Schmidt

2216

1   based upon the trade secret development time.

2   Q.  And was the information that you relied on in PTX 2072

3   available to Hytera?

4   A.  It was available to their attorneys and their experts under

5   agreement of confidentiality.

6   Q.  And would it be more convenient to review your summaries

7   than the documents you sighted?

8   A.  Much more so.

9        MS. SCHMIDT:  Your Honor, we move the admission of

10  PTX 2072.

11       MR. STRINGFIELD:  Your Honor, similar to our objection

12  yesterday, we object to the admission of this as evidence in so

13  far as this includes Mr. Malackowski's calculations and

14  characterizations of Hytera's profit margins with which Hytera

15  has a dispute.

16       THE COURT:  The objection is overruled.  You have

17  preserved it.  Proceed.

18       (Said exhibit received in evidence.)

19       MR. SCHMIDT:  Mr. Schlaifer, could we please go to

20  PDX 10.40.

21  BY MR. SCHMIDT:

22  Q.  And, Mr. Malackowski, could you please tell us how you did

23  your calculation for Hytera's profit with respect to copyright

24  infringement.

25  A.  This is essentially a calculation of Hytera's

10:22:26

10:22:34

10:22:47

10:22:58

10:23:09

Malackowski - direct by Schmidt

2217

1  profitability, very similar to what we talked about yesterday

2  for all of the products.

3       So it was based upon the sales they made, the

4  profitability from my analysis, and you can tell that that

10:23:21  5  varies by product and by year over time.

6  Q.  And, Mr. Malackowski, what is your opinion as to the amount

7  of damages that should be awarded for Hytera's infringement of

8  Motorola's copyright infringement?

9  A.  It would be shown as the total of $28,714,815.

10:23:38  10  Q.  And, Mr. Malackowski, you mentioned that in PTX 2072 you

11  also include breakdowns based on development times, is that

12  right?

13  A.  Yes, ma'am.

14       MR. SCHMIDT:  So, Mr. Schlaifer, could we please look

10:23:53  15  at both PTX 2071 and PTX 2072.  And if you could please put PTX

16  2071 on top.  And then if you could please blow up the portion

17  of PTX 2072 that includes the 36-month and 48-month development

18  times.  And then similarly -- and then for PTX 2071, the 3648-

19  in total, please.

10:24:22  20  BY MR. SCHMIDT:

21  Q.  And so, Mr. Malackowski, could you please explain how these

22  two exhibits work together?

23  A.  Yes.  The purpose of this chart or these charts is to make

24  sure, again, we don't double count.  So if the award is for the

10:24:36  25  full misappropriation of the trade secrets, since that covers

Malackowski - direct by Schmidt

2218

1   the entire time period, you would award the 311 million in

2   stock.

3          But to the extent that the jury finds that only some

4   of the trade secrets are misappropriated based upon a

10:24:51    5   time-based analysis, then you would have to add to that

6   conclusion a remnant or remaining piece for the additional

7   copyright term that would extend through the entire period.

8   This chart helps you to do that.

9          So, for example, if we look at the very bottom, and if

10:25:07   10   you find that the trade secrets have a 48-month period of

11   misappropriation, then instead of adding the full amount of

12   copyright damages at 28 million, you would only add

13   8.6 million; again, to make sure you don't double-count.

14          MR. SCHMIDT:  Mr. Schlaifer, if we could now please go

10:25:26   15   to PDX 10.4.

16   BY MR. SCHMIDT:

17   Q.  So, Mr. Malackowski, what is your opinion as to the amount

18   of damages that should be awarded for Hytera's misappropriation

19   of Motorola's trade secrets and infringement of Motorola's

10:25:41   20   copyrights?

21   A.  If all the claims are found through the period that I have

22   dated, it would be the full $311,859,953.

23   Q.  Thank you, Mr. Malackowski.

24          Mr. Schlaifer.  I pass the witness.

10:25:54   25          THE COURT:  Well, before you do that.

Malackowski - direct by Schmidt

2219

1      You submitted a 26(a)(2)(B) report in this case, did

2  you not?

3      THE WITNESS:  A Rule 26 report?  Yes, sir.

4      THE COURT:  Yes.  And do you remember when you

10:26:05  5  submitted that?

6      THE WITNESS:  That would've been early on in the

7  process.  I don't recall the date.

8      THE COURT:  And within that report, did you opine

9  existence with your testimony yesterday and today?

10:26:16  10     THE WITNESS:  Absolutely.

11     THE COURT:  All right.  You may cross examine.

12     MR. STRINGFIELD:  Good morning, Your Honor.  Daniel

13  Stringfield of Steptoe & Johnson on behalf of the Hytera

14  defendants.

10:26:45  15     THE COURT:  Good morning.

16     MR. STRINGFIELD:  May I proceed?

17     THE COURT:  You may proceed.

18                    CROSS EXAMINATION

19  BY MR. STRINGFIELD:

10:26:48  20  Q.  Good morning, Mr. Malackowski.  How are you?

21  A.  Good.  Thank you, sir.

22  Q.  Mr. Malackowski, you were retained by Motorola to determine

23  the amount of money that Hytera has to pay to Motorola in the

24  event that Hytera is found to have misappropriated trade

10:27:02  25  secrets and infringed the copyrights, is that right?

Malackowski - direct by Schmidt

2220

1   A.  More specifically, my firm, Ocean Tomo, was retained by

2   Motorola counsel, yes, sir.

3   Q.  And Mr. Malackowski, in reaching your opinions, you've

4   been told to assume that there are 21 trade secrets, is that

10:27:12   5   right?

6   A.  Yes, sir.

7   Q.  You've also been told to assume that there are 4

8   copyrights?

9   A.  Correct.

10:27:21   10   Q.  Mr. Malackowski, you've been told to assume that the 21

11   trade secrets in this case are valuable, is that right?

12   A.  No.  I've been told to assume that they are valid, legally

13   valid.

14   Q.  And, Mr. Malackowski, in order to be legally valid, they

10:27:35   15   must be valuable, isn't that right?

16   A.  That's really a legal question.  I think there can be trade

17   secrets that turn out to have no value, but I wasn't asked to

18   make that assumption.  I drew my own conclusion on that point.

19   Q.  Mr. Malackowski, you have been told to assume that the 21

10:27:50   20   trade secrets at issue have been kept secret, is that right?

21   A.  Well, it's my understanding that in order to be a valid

22   trade secret, you keep it secret at least for a period of time

23   for purposes of my analysis.

24   Q.  And that's right.  And, Mr. Malackowski, you've also been

10:28:04   25   told to assume that the 21 trade secrets at issue in this case

Malackowski - direct by Schmidt

2221

1  derived their value from being kept secret?

2  A.  All trade secrets derive their value by remaining secret.

3  Q.  Mr. Malackowski, you've been told to assume that none of

4  the 21 trade secrets that are at issue in this case are public

10:28:19  5  and known by others, isn't that right?

6  A.  I haven't been given that assumption, but clearly through

7  the period of my analysis, assuming they're valid, that would

8  be the case.

9  Q.  And, Mr. Malackowski, again, you've been told to assume

10:28:33  10  that Hytera misappropriated all 21 of trade secrets, isn't that

11  right?

12  A.  True.  I've been told to assume liability, that's where

13  damages experts always begin.

14  Q.  And likewise, you've been told to assume that Hytera

10:28:47  15  misappropriated or infringed all of the copyrights at issue,

16  isn't that right?

17  A.  Yes.

18  Q.  And, Mr. Malackowski, just to be clear, besides your

19  dispute with the value of the trade secrets, you didn't

10:28:58  20  independently verify any of these assumptions that you were

21  given, isn't that right?

22  A.  Well, I didn't verify in the sense of the legal sense.

23  Clearly, given my experience, my review of the record, which

24  was extensive, was existence with those assumptions.

10:29:12  25          Part of the damage expert responsibility is if you

Malackowski - direct by Schmidt

2222

1    find evidence that's inconsistent with the assumptions the

2    attorneys gave you, you have to point that out and take that

3    into account.  I did not find that in this case.

4    Q.  Mr. Malackowski, again my question was, you did not

5    independently verify any of the assumptions that you were

6    given, is that right?

7    A.  I understood that question.  My answer is the same.  I

8    didn't verify in a legal sense, but from a value-damage

9    perspective, my review would have included the consideration of

10   countervailing evidence.

11         For example, if I found evidence that the trade

12   secrets were made public not the fault of Hytera midway through

13   the period, I would've taken that into account and shortened my

14   damage period for at least that trade secret.

15   Q.  But you didn't find any such evidence, is that right?

16   A.  No, I didn't find any evidence that would impair the value

17   of trade secrets.

18   Q.  So again, Mr. Malackowski, you did not independently verify

19   any of the assumptions that you were given, is that right?

20   A.  I don't mean to be difficult, but if that's the same

21   question you asked me, I would give you the same answer.  I

22   didn't make a legal decision, but I made a business decision of

23   investigating and seeing nothing that would be inconsistent

24   with the assumptions that I was given.

25   Q.  So is it your opinion Mr. Malackowski, that you

Malackowski - direct by Schmidt

2223

1    investigated Hytera's misappropriation of the 121 trade secrets

2    at issue?

3    A.   Again, not from a legal perspective.  I did understand the

4    basic background of the case related to Hytera's

10:30:32   5    misappropriation because that relates to the value question:

6    For example, the incentive to get the technology in order to

7    move to digital to become public in 2011, that's a factor that

8    I considered.

9    Q.   But you didn't verify or independently attempt to determine

10:30:47   10    whether Hytera misappropriated any of the trade secrets, isn't

11    that right?

12    A.   I did not attempt to independently draw a legal conclusion,

13    ultimately that's the role of the jury.

14    Q.   Mr. Malackowski, you're being compensated in connection

10:31:02   15    with your opinions and testimony today, is that right?

16    A.   Again, my firm is being compensated on an hourly basis, as

17    I described.

18    Q.   That's right, Mr. Malackowski.  And your rate is, in fact,

19    $895 per hour, isn't it?

10:31:11   20    A.   True.

21    Q.   And, Mr. Malackowski, you billed Motorola hundreds of

22    thousands of dollars in connection with your opinions in this

23    case, isn't that true?

24    A.   So, again, my firm has billed Motorola.  It has been

10:31:21   25    significant.  This project has gone on for quite a while.  I

Malackowski - direct by Schmidt

2224

1    don't know the precise amount, but I'm fairly confident it's

2    over $100,000, likely over 200-.

3    Q.  Mr. Malackowski, you articulated multiple damages theories

4    in this case, isn't that right?

10:31:36  5    A.  I did.

6    Q.  And one of your trade secret damages theories is called

7    "unjust enrichment"?

8    A.  Yes, sir.

9    Q.  And unjust enrichment means the amount of unfair benefit

10:31:46  10    that Hytera received because of its alleged trade secret

11    misappropriation?

12    A.  I generally agree with that.  That's fair.

13    Q.  So, in essence, Mr. Malackowski, your aim was to determine

14    a fair amount that Hytera must turn over to Motorola?

10:31:59  15    A.  Consistent with what I understand the law to require, yes,

16    sir.

17    Q.  And again, Mr. Malackowski, as we've just discussed, you

18    were told to assume that Hytera misappropriated all 21 of

19    the --

10:32:10  20    THE COURT:  Well, you've asked that question about six

21    times now, counsel.  Let's move on here.

22    BY MR. STRINGFIELD:

23    Q.  Mr. Malackowski, based on your assumption that Hytera has

24    infringed the trade secrets, you concluded that Hytera must

10:32:25  25    turn over all of the profits that Hytera has ever made on the

Malackowski - direct by Schmidt

2225

1   accused DMR radios, accused DMR repeaters, and your estimation

2   of accessories that go with those radios, isn't that right?

3   A.  All of the profits after they recovery their cost of

4   manufacturing patent royalties, marketing expenses and the

5   like, yes.

10:32:44

6   Q.  That's every dollar going back to 2010, right?

7   A.  That's what the law requires.

8   Q.  And your opinion is based on Dr. Rangan's assertion that

9   Hytera could've never launched a DMR radio on its own up to

10:33:02
10  this very date?

11  A.  In part, one of my calculations, my primary calculation

12  does conform to Dr. Rangan's analysis, that without these trade

13  secrets and copyrights, Hytera could not have been in this

14  business.

10:33:13
15  Q.  And that's the same Dr. Rangan who told us yesterday that

16  it would take Hytera 23 1/2 years to develop a DMR radio?

17  A.  Well, you talked about -- I'm sorry.  Your partners talked

18  the development period.  I would leave it to Dr. Rangan to say

19  whether the --

10:33:27
20         THE COURT:  The question is, is it the same person.

21         THE WITNESS:  Oh, it is the same person.

22         THE COURT:  What is the question?

23  BY MR. STRINGFIELD:

24  Q.  Your Honor -- or excuse me.  Mr. Malackowski, you rely on

10:33:40
25  Dr. Rangan's assertion that Hytera could've never launched a

Malackowski - direct by Schmidt

2226

1    DMR radio on its own, even though Motorola itself believed in

2    2009 that other DMR competitors could've launched a DMR radio

3    in a matter of a couple of years, isn't that right?

4    A.  That's a complicated question.  I can't answer that yes or

10:34:00    5    no.

6              THE COURT:  Break it down, counsel.

7    BY MR. STRINGFIELD:

8    Q.  Mr. Malackowski, you were here yesterday when we discussed

9    the red team document.  Do you remember that document?

10:34:07    10    A.  I do.  Yes, sir.

11    Q.  And do you remember that that document was dated in 2009?

12    A.  I do.

13    Q.  And do you remember that that document discussed a plan by

14    Motorola to partner with another manufacturer to launch a DMR

10:34:19    15    radio under their own name?

16    A.  Yes.  OEC suppliers, as they call it, to supply them the

17    key components in order for them to launch.

18    Q.  And, Mr. Malackowski, according to that plan, Motorola was

19    going to provide the internal electronics for the radio to

10:34:33    20    Tait, is another DMR competitor, or potential DMR competitor?

21    A.  That's correct.

22    Q.  And Tait was going to take those electronics, they were

23    going to put their own casing on it, they were going to put

24    their name on it, and they were going to sell them to Tait DMR

10:34:49    25    radio, isn't that right?

Case: 1:17-cv-01973 Document #: 795 Filed: 12/20/19 Page 19 of 176 PageID #:54109
Malackowski - direct by Schmidt
2227

1   A.  That's my understanding.

2   Q.  And, Mr. Malackowski, wasn't the intent of that plan to

3   create another DMR competitor in the marketplace in 2009?

4   A.  Well, the intent specifically was to create a low-end

10:35:00  5   supplier to support the adoption of the standard.  Not to

6   create a competitor with all the high-end features that are at

7   issue in mid-tier and high-tier radios that are at issue in

8   this case.

9   Q.  So they wanted to create a competitor in the DMR market to

10:35:15  10   support the standard, is that what you just --

11   A.  A low-end competitor, yes.

12   Q.  And, Mr. Malackowski, Motorola wanted another competitor in

13   the DMR market because a one-company standard isn't much of a

14   standard, is it?

10:35:26  15   A.  Well, more particularly because there were several

16   standards that were being promoted by the industry and they

17   wanted to show support for multiple companies for the DMR

18   standard as opposed to the alternative standards.

19   Q.  So they wanted to give the insides of the radio to Tait for

10:35:41  20   them to put their name on it to create the illusion that Tait

21   was a DMR competitor?

22   A.  Oh, I don't know it's an illusion.  DMR did become a

23   low-end competitor, which is exactly what Motorola wanted to

24   do, but they did not want them to compete with these trade

10:35:58  25   secrets at the high-end, high-feature level.

Malackowski - direct by Schmidt

2228

1  Q.  Mr. Malackowski, in 2009, Motorola was the only DMR

2  competitor, were they not?

3  A.  True.

4  Q.  And in 2009, Motorola was concerned about another emerging

10:36:11    5  standard called dPMR, were they not?

6  A.  Among others, that's true.

7  Q.  And dPMR, in fact, was another similar standard for

8  commercial tier digital radio, correct?

9  A.  Generally.

10:36:20   10  Q.  And dPMR competed directly with DMR, did it not?

11  A.  It would, especially if it became the standard.

12  Q.  And if dPMR became the standard, Motorola didn't have a

13  dPMR radio, did they?

14  A.  I don't believe they did, but I did not fully investigate

10:36:37   15  that.  So I can't really speak to that.

16  Q.  And, Mr. Malackowski, the dPMR standard was being pushed by

17  two competing companies in Japan, do you know that?

18  A.  I do.

19  Q.  They were called Kenwood and ICOM?

10:36:49   20  A.  They are.  Or still are, yes.

21  Q.  And so then in 2009, dPMR had two companies, two suppliers,

22  and Motorola, in their DMR standard, had one company supporting

23  standard, right?

24  A.  Well, certainly that's where it started.  We talked about

10:37:05   25  the fact that Motorola helped move the industry forward with

Malackowski - direct by Schmidt

1    its work as an OEC supplier.

2    Q.  And so back to my earlier question.  In 2009, would

3    Motorola be concerned about dPMR becoming the de facto

4    standard, which is I believe what the document said, Motorola

10:37:21    5    wanted to create the illusion of another DMR competitor in the

6    market in 2009, did they not?

7    A.  I already disagreed with your word "illusion."  It was

8    substantive.  It was real.  They were helping another companies

9    as an OEM manufacturer.

10:37:37    10    It's very common for companies to say:  I'm going to

11    help others with sort of the low-feature low end and I'm going

12    to keep the premium products to myself because we both win.  We

13    get the standard we want, I get to supply those people, and

14    then I get to sell the premium products.  Very consistent with

10:37:50    15    what happened here.

16    Q.  Mr. Malackowski, if dPMR became the predominant standard,

17    is it not true that Motorola would've lost its investment in

18    its dPMR technology?

19    A.  Its investment would've been impaired if DMR did not become

10:38:07    20    the standard, sure.

21    Q.  And I believe, Mr. Malackowski, you told us yesterday that

22    just for the 21 trade secrets at issue in this case, which I

23    believe you also told us are but a small part of the overall

24    DMR technology, are worth hundreds of millions of dollars, is

10:38:18    25    that right?

Malackowski - direct by Schmidt

2230

1    A.  Not to the "small" part.  I explained that the 21 trade

2    secrets at issue cost 117 million to develop, but there are

3    other technologies also in the radio.

4    Q.  And, Mr. Malackowski, with the scale of that investment,

10:38:39    5    wouldn't Motorola have been gravely concerned about losing

6    hundreds of millions of dollars in investment in its DMR

7    platform that it had chosen and tried to advance?

8    A.  Of course they would.  Frankly, that's why we're here.

9    Q.  And that's also why Motorola was propping Tait up as a DMR

10:38:57    10    competitor in 2009?

11    A.  Again, it's not propping.  They weren't doing them a favor.

12    It was a business relationship that helped both companies.

13    That's not at all unusual.

14    Q.  So if this was a business relationship that was supposed to

10:39:08    15    help both companies, is it your understanding that when

16    Motorola provided the internals for the radio, that they were

17    going to provide those internals to Tait at a price where Tait

18    could thereafter sell its private-labeled radio at a profit to

19    Tait?

10:39:25    20    A.  Exactly.  Yes, sir.

21    Q.  But Hytera doesn't get to keep any of its profits, that's

22    right?

23    A.  Well, Hytera didn't enter an open relationship.  They stole

24    the trade secrets.  You don't get the benefit of an traditional

10:39:41    25    business relationship.  Plus, Hytera took the crown jewels.

Malackowski - direct by Schmidt

2231

1   They took the high-end features.  They didn't limit themselves

2   to the low-end radios.

3   Q.  So, Mr. Malackowski, back to our earlier discussion about

4   your reliance on Dr. Rangan's opinions in the context of the

10:39:56    5   red team document.

6           Do you recall that the red team document anticipated

7   that customers, or the DMR competitors that they were propping

8   up, would be able to develop their own radio in the matter of a

9   couple of years?

10:40:09    10  A.  I remember the document.  The word "propping up" was not in

11  the document, but I do remember the --

12          THE COURT:  What is the document to which you refer?

13          MR. STRINGFIELD:  Sure, Your Honor.  It is DTX 4491.

14          THE COURT:  Is it projected?

10:40:21    15          MR. STRINGFIELD:  I'm sorry, Your Honor?

16          THE COURT:  Is it projected?

17          MR. STRINGFIELD:  Mr. Montgomery, can you put -- oh,

18  I'm sorry.  I think we need to switch over to our --

19          THE COURT:  Okay.

10:40:32    20          MR. STRINGFIELD:  Your Honor, I'll come back to that

21  document.

22          THE COURT:  All right.  Very well.

23  BY MR. STRINGFIELD:

24  Q.  So, Mr. Malackowski, turning back to Dr. Rangan's opinions

10:40:41    25  that it would take Hytera 23 1/2 years to launch a DMR radio.

Malackowski - direct by Schmidt

2232

1  There are no documents to indicate any of the other dozens of

2  DMR competitors in the market today took 23 1/2 years to

3  develop a DMR radio, is that right?

4  A.  I don't agree that that was Dr. Rangan's opinion, but I

10:40:58  5  don't also believe there are any documents to say that it

6  would've taken another competitor 23 1/2 years.  I don't

7  presume that.

8  Q.  It would only take Hytera that long?

9  A.  I don't even presume it would take Hytera that long.  I

10:41:10  10  know they could not have done it within the time period that's

11  passed, i.e., 10 years, but that's far cry from 23.

12  Q.  And you reviewed Mr. Grimmett's opinion in this case?

13  A.  Of course.  Yes.

14  Q.  So you're aware that Mr. Grimmett worked at a company

10:41:27  15  called Simoco, which was another DMR competitor?

16  A.  Yes, I am.

17  Q.  And you're aware that Simoco, with a team of 30 engineers,

18  launched their own DMR radio in the matter of 3 1/2 years?

19  A.  Well, that's not exactly accurate.  It wasn't just their

10:41:39  20  engineers.  They partnered with another company for the

21  technology, and they launched a low-end product.  Not a

22  feature-rich product.  So that's consistent.

23  Q.  But they launched in 3 1/2 years, is that right?

24  A.  That's what the documents say with the partnership and the

10:41:53  25  limited features.

Malackowski - direct by Schmidt

2233

1    MR. STRINGFIELD:  Your Honor, could we have a brief

2    recess while we get the screens switched over?

3           THE COURT:  Well, let's stay in place and ask someone

4    to summon Mr. Fulbright.

10:42:07   5       MR. STRINGFIELD:  Sure.  And I'll continue on but --

6           THE COURT:  That's all right.  Take a seat for a

7    moment, counsel.

8           MR. STRINGFIELD:  Sure.  Thank you, Your Honor.

9           (Brief pause.)

10:43:00  10       THE COURT:  My kingdom for a clerk.

11          (Laugher in the courtroom.)

12          MR. STRINGFIELD:  I'll work around it, Your Honor.

13          THE COURT:  Move around it.

14   BY MR. STRINGFIELD:

10:43:19  15  Q.  Mr. Malackowski, turning back to a little bit of our

16   earlier discussion.  You're aware that Motorola calls its DMR

17   solution LTD?  Are you aware of that?

18   A.  Sure.

19   Q.  And you know what "LTD" stands for?

10:43:34  20  A.  I don't recall the exact acronym.  I think it's light

21   telecommunications something.

22   Q.  No, Mr. Malackowski.  It stands for low-tier digital,

23   doesn't it?

24   A.  LTE?

10:43:46  25  Q.  LTD.  I'm sorry.

Malackowski - direct by Schmidt

2234

1   A.  Oh, I'm sorry.  I thought it was LTE.

2   Q.  I apologize.  I said LTD.  Do you know what LTD stands for?

3   A.  Well, you just told me, low-tier digital.

4           (Laugher in the courtroom.)

10:43:54  5           THE COURT:  So your answer is "yes"?

6           THE WITNESS:  Yes.  Sorry, Your Honor.

7   BY MR. STRINGFIELD:

8   Q.  So, Mr. Malackowski, the LTD or DMR product line is slotted

9   beneath the mission-critical or life-safety product lines, is

10:44:10  10  that right?

11  A.  Yes.  They're generally not sold to firemen or emergency

12  workers.

13  Q.  And just to add a little more context to that.  We've heard

14  discussion over this trial about a standard called P 25?

10:44:22  15  A.  We did.

16  Q.  And we've also heard discussion of a standard called TETRA,

17  T-E-T-R-A?

18  A.  That's right.

19  Q.  And is it your understanding, Mr. Malackowski, that those

10:44:29  20  are both mission-critical or life-safety level standards?

21  A.  Certainly the first, I believe the second as well.  I

22  discussed that briefly in my report.

23  Q.  And then DMR and dPMR are below that in the hierarchy of

24  mission-critical or life-safety?

10:44:45  25  A.  I think that DMR can be used and is used in those

Malackowski - direct by Schmidt

2235

1    applications, but the focus is much broader than the

2    alternatives you mentioned.

3    Q.  Mr. Malackowski, when we were talking about your

4    qualifications, I believe you told us that you have an

10:45:04    5    accounting degree?

6    A.  I did.

7    Q.  And, in fact, you're a CPA, is that right?

8    A.  I am.

9    Q.  And I don't know if I heard this, but I think you told us

10:45:11    10    it's kind of like being a tax preparer?

11    A.  Well, when people think of a CPA, they either think of

12    their taxes or giving an audit.  So that's generally the

13    background, yes.

14    Q.  But, Mr. Malackowski, you're not an economist, is that

10:45:19    15    right?

16    A.  No.  The term economist generally refers to someone who has

17    a Ph.D. in economics.  And although I've studied economics in

18    school, not at that level.

19    Q.  Mr. Malackowski, you used a term yesterday.  I wanted to

10:45:38    20    talk a little bit about that.

21          I think you said the term "leapfrogging"?

22    A.  I did use the term leapfrogging referencing a specific

23    document that included those words.

24    Q.  And I think you told us that the term leapfrogging is a

10:45:54    25    term of art, is that right?

Malackowski - direct by Schmidt

2236

1    A.  I don't recall if I said that, but I don't disagree with

2    that.

3    Q.  Well, you gave it a very specific definition, didn't you?

4    A.  I gave it the definition given the context of this case,

10:46:04  5    and in response to a question of how does the theft of trade

6    secrets devalue the property of its owner.

7    Q.  I think you told us when we were talking about leapfrogging

8    that it meant that Hytera had taken research and development

9    benefit from Motorola and then used whatever money that it

10:46:27  10   saved by avoiding that research and development expense, and

11   using that money to develop enhanced features that allowed it

12   to leapfrog over Motorola.

13   A.  Certainly that was the intent, and in some cases I belive

14   that is true for select features.

10:46:39  15   Q.  Now, have you ever heard of the term "leapfrogging" used in

16   that context before?

17   A.  Sure.

18   Q.  In what context?

19   A.  Common usage, analysis of competitive competition.  It's

10:46:51  20   not exactly a new term to me.

21   Q.  Well, in fact, Mr. Malackowski, the term "leapfrogging"

22   does have a meaning in economics, do you understand that?

23   A.  I don't, because I'm not a Ph.D. economist.

24   Q.  That's right.  And so the term "leapfrogging" in the

10:47:04  25   context of economics means something totally different than how

Malackowski - direct by Schmidt

2237

1    you used it, is that right?

2    A.  I don't know.  What does it mean?

3    Q.  Mr. Malackowski, do you know what it means in the context

4    of economics?

10:47:14    5    A.  You just asked me, I said I don't.  I'm curious now.  What

6    does it mean?

7    Q.  Mr. Malackowski, you used the term that you didn't

8    understand in the context of economics?  In the context of your

9    damages analysis?

10:47:28    10    A.  Of course not.  I used the term as it was used by the

11    company at issue in this case in their own documents, and how

12    that term is used when valuing trade secrets.  There's probably

13    a lot of terms in economic textbooks that from memory I don't

14    know.  If you want to share them with me, I'll give you my

10:47:44    15    understanding.

16    Q.  Did you look at the term "leapfrog," "leapfrogging"?

17    A.  No.  I looked at it in the context of the business records

18    of this case.

19    Q.  Mr. Malackowski --

10:47:58    20        MR. STRINGFIELD:  Just one moment.

21        (Brief pause.)

22        MR. STRINGFIELD:  Mr. Montgomery, could you please put

23    up DTX 4491.

24    BY MR. STRINGFIELD.

10:48:36    25    Q.  Mr. Malackowski, do you have DTX 4491 in front of you?

Malackowski - direct by Schmidt

2238

1    MS. SCHMIDT:  One second.  If I could please have a

2    copy of that.

3        (Brief pause.)

4    BY MR. STRINGFIELD:

10:48:51  5    Q.  Mr. Malackowski, this is the red team document that we were

6    discussing earlier?

7    A.  Okay.  I'll accept your word for that.

8        Oh, yes, I see on page 7 of 18.

9    Q.  Okay.  I just wanted to show that to you.  We'll come back

10:49:07  10   to this document, but I wanted to just make sure we were

11   talking about the same document.  Were we, in fact, talking

12   about the same document, Mr. Malackowski?

13   A.  Yes, we were.

14       MR. STRINGFIELD:  Mr. Montgomery, can you please put

10:49:17  15   up PDX 1029.

16   BY MR. STRINGFIELD:

17   Q.  Mr. Malackowski, this is one of the demonstratives that you

18   discussed yesterday with counsel?

19   A.  It is.

10:49:27  20   Q.  And, Mr. Malackowski, in the upper left-hand corner here,

21   we have 532 million; do you see that?

22   A.  I do.

23   Q.  And these are all of Hytera's revenues for the accused DMR

24   radios going back to 2010, is that right?

10:49:45  25   A.  All of the hand-held.  It does not include the 111 in

Malackowski - direct by Schmidt

2239

1    mobile.

2    Q.  And, Mr. Malackowski, below that we have 91.2 million?

3    A.  Yes, sir.

4    Q.  And that is all of the accused revenue -- or excuse me.

5    All the revenue for the accused DMR repeaters going back to

6    1010, isn't that right?

7    A.  Yes, sir.

8    Q.  And both the revenue for the accused DMR radios and for the

9    accused DMR repeaters, you got that revenue from Hytera's

10   financial information produced in this case, is that right?

11   A.  Yes, sir.

12   Q.  Below that you have $53.2 million in revenue for

13   accessories, isn't that right?

14   A.  It is.

15   Q.  That number is just an estimate, isn't it?

16   A.  True.  That is an estimate of 10 percent based upon the 15

17   to 40 percent estimates of the Hytera witnesses.

18   Q.  And just to be clear -- excuse me, $53.2 million is not

19   based on any Hytera financial information that lists the

20   revenues for the accessories, is that right?

21   A.  True.  I requested those documents.  They were not

22   provided.

23   Q.  And so, Mr. Malackowski, that $53.2 million was not

24   verified based on data relating to the revenues for

25   accessories, is that right?

Malackowski - direct by Schmidt

2240

1    A.  Well, it depends how you used the phrase "verified."  It

2    was not taken from accounting documents, but as I' taught in

3    the field of forensic accounting, sometimes they don't exist,

4    so you have to look for the next best estimate, which is what I

10:51:14    5    did.

6              MR. STRINGFIELD:  Mr. Montgomery, can you please put

7    up PDX 1026.

8    BY MR. STRINGFIELD:

9    Q.  This is another slide that you discussed yesterday, Mr.

10:51:24    10    Malackowski?

11    A.  Yes, sir.

12    Q.  And, Mr. Malackowski, these are the accessories that you

13    estimate at $53 million of revenue on the slide we just looked

14    at, right?

10:51:33    15    A.  This is an example of those types of accessories.  Not

16    necessarily all of them.  They change from time to time.  They

17    vary by product.

18    Q.  And so as we see on PTX 1026, there's earpieces in the

19    left-hand quadrant?

10:51:48    20    A.  There are.

21    Q.  And there's batteries and battery charges next to those?

22    A.  Yes, sir.

23    Q.  And looks like a carrying case next to that?

24    A.  Yeah.  The leather case that was talked about at trial.

10:51:57    25    Q.  And then there's power supplies, microphones, installation

Malackowski - direct by Schmidt

2241

1    kits, do you see those?

2    A.  I do.

3    Q.  Mr. Malackowski, none of the trade secrets asserted in this

4    case cover earpieces, is that right?

10:52:08    5    A.  The trade secrets do not directly cover the accessories.

6    The accessories are there because of the economic nexus between

7    these products and the products that were misappropriated.

8    Q.  And, Mr. Malackowski, just to be clear, none of the trade

9    secrets at issue in this case cover batteries or battery

10:52:24    10   charges, is that right?

11   A.  I don't believe so.

12   Q.  And none of the trade secrets that are at issue in this

13   case cover a carrying case?

14   A.  Certainly not.

10:52:31    15   Q.  And despite that fact, that the asserted trade secrets

16   don't cover any of the accessories, you contend that Hytera has

17   to turn over $12.2 million of profit that you calculated on the

18   previous slide, based on that 53 million-dollar estimate that

19   you came up with, right?

10:52:48    20   A.  Right.  Hytera was unjustly enriched, in part, because the

21   theft of the trade secrets allowed them to sell these

22   accessories for those products but for causation.  And so from

23   my perspective, it certainly would be included.

24   Q.  Well, Mr. Malackowski, you're aware that Hytera sells other

10:53:06    25   two-way radios that are not accused of misappropriating the

Malackowski - direct by Schmidt

2242

1  trade secrets or copyrights in this case, right?

2  A.  Of course.  Which is why you use a percentage of sales

3  estimate to make sure you don't count the accessories for those

4  products.

5  Q.  And those not accused radios include analog and TETRA

6  radios?

7  A.  They do.

8  Q.  The may include PDT radios?

9  A.  I believe so.

10  Q.  And they include a whole other family of DMR radios that we

11  haven't talked about yet that Hytera makes and are not accused

12  of misappropriation in this case, right?

13  A.  The low-end radios, yes, sir.

14  Q.  And you're aware that many of the accessories that you're

15  trying to account in your economic analysis can be used for

16  radios that are not accused of misappropriation in this case?

17  A.  Well, of course, but the percentage of sales computation

18  cures that risk.

19  Q.  Your estimate of 53 million times your estimate of

20  10 percent cures that?

21  A.  Well, the 53 million is from the estimate at 10 percent.

22  And, yes, because you use a percentage of sales.  If someone

23  had testified that accessories were 500 million-dollars, I

24  wouldn't just take the number, I'd want to compare it to sales

25  of the accused products versus the non-accused products.

Malackowski - direct by Schmidt

2243

1    MR. STRINGFIELD:  Mr. Montgomery, let's please turn

2  back to PDX 1029.

3  BY MR. STRINGFIELD:

4  Q.  So let's focus, sir, or talk for a minute about the

10:54:25  5  revenues and the profits that you calculated for the accused

6  DMR radios and the accused DMR repeaters, if that's all right.

7  A.  Of course.

8  Q.  Mr. Malackowski, these are worldwide numbers, is that

9  right?

10:54:37  10  A.  Yes, sir.

11  Q.  And they include sales both in the United States and

12  outside of the United States, right?

13  A.  They do.

14    MR. STRINGFIELD:  Mr. Montgomery, can you please put

10:54:51  15  up DDX 7.2.

16  BY MR. STRINGFIELD:

17  Q.  So, Mr. Malackowski, on this slide what we've done is,

18  we've taken your report.  And in your report, Mr. Malackowski,

19  you, in fact, separate out the U.S. sales and revenues from the

10:55:10  20  rest of the world revenues, right?

21  A.  Yes.  The profits and prices vary, so I calculated each

22  specifically.

23  Q.  Okay.  And so, Mr. Malackowski, in the upper left-hand

24  corner, the same place where we found the accused DMR radio

10:55:26  25  revenue globally, we see the United States revenue broken out

Malackowski - direct by Schmidt

2244

1  from the outside of the United States revenue, right?

2  A.  We do.

3  Q.  And I just want to read these into the record.  The revenue

4  for accused DMR radios in the United States is $69,924,194.  Do

10:55:44   5  you see that?

6  A.  I do.

7  Q.  And the revenue for accused DMR radios outside of the

8  United States is $462,101,479.  Do you see that?

9  A.  I do.

10:55:57   10  Q.  And, again, these numbers were from the financial data

11  produced by Hytera in this case, right?

12  A.  In part, and then also exchange rates.  I mean, the number

13  you show at the bottom, 28.7, is exactly the U.S. number I

14  show.  So I agree with this.

10:56:12   15  Q.  Okay.  And just to be clear, Mr. Malackowski, these numbers

16  are from your report.  And we put a citation at the bottom of

17  the slide to your report, specifically appendices 8.01, 8.02,

18  8.03, 8.31 and 8.3.6.5.  Do you see that?

19  A.  I do.

10:56:30   20  Q.  And, Mr. Malackowski, below the accused DMR radio revenue,

21  we have the revenue for the accused DMR repeaters again split

22  out between United States and outside of the United States,

23  right?

24  A.  Yes, sir.

10:56:44   25  Q.  And I'll read these into the record again.  We have

Malackowski - direct by Schmidt

2245

1   $9,874,853 in accused DMR repeater sales in the United States,

2   right?

3   A.  Yes, sir.

4   Q.  And below that we have $81,292,112 in accused DMR repeater

10:57:05   5   sales outside of the United States, right?

6   A.  Sure.

7   Q.  And below that we have your, again, 10 percent estimate for

8   the accessory revenues, right?

9   A.  Yes, sir.

10:57:16   10   Q.  And so taking 10 percent of the accused DMR revenue within

11   the United States, we have for accused -- or accessory revenue

12   that you're seeking here for accessory sales in the United

13   States, it's $6,992,419, right?

14   A.  Yes, sir.

10:57:33   15   Q.  And so for accessory revenues that you're seeking to take a

16   portion of in this case outside of the United States, we have

17   $46,210 -- excuse me, $46,210,148, right?

18   A.  Yes, sir.

19   Q.  Mr. Malackowski, in the middle column here, we've separated

10:57:58   20   out the profit margins that you used.  And so for accused DMR

21   radios, I believe in your report you applied two different

22   profit margins that you derived, is that right?

23   A.  Yes.  Very specific to reaching U.S. versus outside of the

24   U.S.

10:58:15   25   Q.  And, Mr. Malackowski, for the profit margin in the United

Malackowski - direct by Schmidt

2246

1    States, you calculate 33.8 percent, right?  For accused DMR
2    radios?
3    A.  Yes, sir.
4    Q.  And then for accused DMR radios, the profit margin that you
10:58:29  5    calculate outside the United States is 35.7 percent, is that
6    right?
7    A.  It is.
8    Q.  And then below that we have the profit margins that you
9    apply for the accused DMR repeaters, right?
10:58:41  10    A.  You do.
11    Q.  And in the United States you calculate a profit margin of
12    35.7 percent, right?
13    A.  Yes, sir.
14    Q.  And outside of the United States you calculate a profit
10:58:50  15    margin of 41.6 percent, right?
16    A.  I did.
17    Q.  Now, for accessories, even though you estimated the
18    defendant revenue part, you found a Hytera document that you
19    relied on for the profit margin for the accessories, is that
10:58:59  20    right?
21    A.  Correct.  Part of the financial forensic investigation.
22    Q.  And so the profit margin from the Hytera business documents
23    related to accessories, you see a profit margin of 22.8 percent
24    both in the United States and outside the United States, right?
10:59:17  25    A.  Yes.  There was just one figure provided.

Malackowski - direct by Schmidt

2247

1   Q.  And so, Mr. Malackowski, again, the profit margins for the

2   accused DMR radios and DMR repeaters, you calculated those

3   profit margins, right?

4   A.  I did.

10:59:27   5   Q.  And those are 50 percent higher than the profit margins for

6   the accessories and that profit margin being found in the

7   Hytera business documents?

8   A.  Yeah.  Not surprisingly.  Sure.

9   Q.  So, Mr. Malackowski, applying your calculated profit margin

10:59:47   10   for the revenues of accused DMR radios in the United States,

11   you get $23,616,082 of Hytera profits in the United States that

12   you think should be turned over to Motorola?

13   A.  True.

14   Q.  And for outside of the United States, for accused DMR

11:00:09   15   radios, using your calculated profit margin, we get

16   $165,162,806 in profit outside the United States that you think

17   Hytera should turn over to Motorola?

18   A.  True.

19   Q.  For repeaters, using the profit margins that you calculated

11:00:31   20   and derived, in the United States you calculate $3,520,396 in

21   revenue in the United States for accused DMR repeaters that

22   Hytera has to turn over to Motorola?

23   A.  You misspoke.  You said "revenue," but it's profit.

24   Q.  Profit.  Excuse me.  Thank you.  Let me ask my question

11:00:50   25   again.

Malackowski - direct by Schmidt

2248

1        In the United States, based on your calculation, using

2  your calculated profit margin for accused DMR repeaters, Hytera

3  has to turn over $3,520,396 in profit in the United States to

4  Motorola, is that right?

11:01:05    5  A.  True.

6  Q.  Outside of the United States, using your calculated profit

7  margin for accused DMR repeaters, Hytera has to turn over

8  $33,806 -- let me start over.  $33,806,618 in profit outside of

9  the United States?

11:01:23   10  A.  Sure.

11  Q.  And then for accessories, just to get these numbers into

12  the record, again using your estimate of accessory revenue, but

13  using the profit margin that you found in the Hytera business

14  documents, for accessory profits in the United States you have

11:01:44   15  $1,578,337, right?

16  A.  Yes, sir.

17  Q.  And outside the United States for accessories, you have

18  $10,591,819, isn't that right?

19  A.  Yes, sir.

11:01:56   20  Q.  And at the bottom of the page on DDX 7.2, we've totalled

21  the profits that you contend Hytera must turn over to Motorola

22  in the United States at $28,714,815, right?

23  A.  Yes.  That's within the dollar of what I've shown.

24  Q.  And you, again, summing the outside of the United States

11:02:20   25  profits on DDX 7.2, we have $209,561,243 in profits outside the

Malackowski - direct by Schmidt

2249

1    United States that you contend Hytera has to turn over to

2    Motorola, is that right?

3    A.  Correct.

4    Q.  Let's talk about how you calculated your profits or your

11:02:43    5    profit margin for the accused radios and the accused repeaters.

6    Again, what you calculated not based on the business document

7    that you used for accessories.

8    A.  Well, it was ultimately based on Hytera financial records,

9    yes.

11:02:57    10        MR. STRINGFIELD:  Mr. Montgomery, can you please put

11    up DDX 7.3.

12        Excuse me.  I'm sorry.  This is also PDX 10.27.

13    BY MR. STRINGFIELD:

14    Q.  So, Mr. Malackowski, you discussed PDX 10.27 yesterday

11:03:13    15    during your direct examination, right?

16    A.  Yes, sir.

17    Q.  And so I believe you went through each of these elements of

18    costs or expense and you told us which ones that you believe

19    are deductible and which ones are not deductible, is that

11:03:28    20    right?

21    A.  True.

22    Q.  And just so I'm clear, if I have $100 in revenue, but it

23    cost me $80 to make that revenue, my profit is $20, right?

24    A.  All else being equal, yes.

11:03:40    25    Q.  And so that $80 in cost, that could include $20 in

Malackowski - direct by Schmidt

2250

1    materials, right?

2    A.  In your hypothetical, sure.

3    Q.  It could include $20 in labor, right?

4    A.  It could.

11:03:52    5    Q.  It could include $20 in marketing and sales and

6    distribution?

7    A.  Okay.

8    Q.  And it could include $20 in research and development?

9    A.  In your hypothetical.

11:04:00    10    Q.  And so adding those subs together, I get my $80 in costs,

11    and subtracting that from my $100 in revenue I get $20 in

12    profit, right?

13    A.  In your example, yes.

14    Q.  And that gives me a profit margin of 20 percent?

11:04:14    15    A.  In your example, yes.

16         MR. STRINGFIELD:  Mr. Montgomery, can you please put

17    up DDX 7.4.

18    BY MR. STRINGFIELD:

19    Q.  So, Mr. Malackowski, what we've done here is, we've taken

11:04:32    20    your PDX 10.27 and we've expanded it to show how things

21    calculate out using the deductible expenses that you allow and

22    then one nondeductible expense that you don't allow.  Do you

23    see that?

24    A.  I do.

11:04:49    25         MS. SCHMIDT:  Your Honor, we have an objection to this

Malackowski - direct by Schmidt

2251

1   slide.  It includes information that Hytera produced a week

2   ago.

3            THE COURT:  There is no foundation for its

4   admissibility at the moment.  Do you intend to lay a foundation

11:05:01   5   for it with this witness?

6            MR. STRINGFIELD:  Yes, Your Honor.

7            THE COURT:  Attempt to lay the foundation.

8   BY MR. STRINGFIELD:

9   Q.  So, Mr. Malackowski, do you recognize on the top of this

11:05:13   10  slide the revenue -- or excuse me, the profit margins --

11            THE COURT:  Well, before you get into the substance of

12   it, you lay the foundation.

13            MR. STRINGFIELD:  Sure.

14   BY MR. STRINGFIELD:

11:05:23   15  Q.  Mr. Malackowski, you're aware -

16            MR. STRINGFIELD:  Mr. Montgomery, can you take the

17   slide down, please.

18   BY MR. STRINGFIELD:

19   Q.  Mr. Malackowski, you're aware that Hytera contends that it

11:05:30   20  should be permitted to deduct it's research and development

21   expenses, right?

22   A.  I'm aware that Hytera's expert attempts to make such a

23   deduction, yes.

24   Q.  And you're aware that Hytera has financial information in

11:05:42   25  this case that detail what Hytera's research and development

Malackowski - direct by Schmidt

2252

1   expenditures are related to the accused DMR radios and accused

2   DMR repeaters, do you understand that?

3   A.  Well, purported to be related to them.  I talked about

4   those records on my direct and their insufficiency.

11:05:57   5   Q.  And you believe that they were insufficient because, I

6   think you told us yesterday, that you believe they included

7   research and development expense related to products that

8   aren't accused in this case?

9   A.  In part.  In part, because they vary in ways that are not

11:06:12   10   explainable; in part, because the specific wage rates that

11   underlie them jumped dramatically from year to year without

12   explanation.

13   Q.  And so related to your concern about the DMR research and

14   development expenses that Hytera produced, you're aware that

11:06:31   15   Hytera had supplemented its production of those materials last

16   month, right?

17   A.  Well, Hytera has tried to fix this problem many times, and

18   I think they actually tried this weekend or maybe last Friday

19   again.  Yeah, it's still not right, but they keep trying.

11:06:50   20   Q.  Mr. Malackowski, you're aware that Hytera has produced

21   supplemental research and development expense data in this case

22   within the last month?

23       MR. SCHMIDT:  Your Honor, we object to this line of

24   questioning.

11:07:02   25       THE COURT:  Well, you're still attempting to lay the

Malackowski - direct by Schmidt

2253

1  foundation?

2          MR. STRINGFIELD:  Yes, Your Honor.

3          THE COURT:  All right.  Continue your efforts.

4  BY THE WITNESS:

5  A.  I believe they attempted to correct the errors multiple

6  times, including -- I understand but I've not seen -- records

7  as recently as like this weekend or the day before I testified.

8  BY MR. STRINGFIELD:

9  Q.  Mr. Malackowski, they were produced on November 20th, do

10  you understand that?

11  A.  I don't, but I'll accept that.

12  Q.  Okay.  And that was several weeks ago, right?

13  A.  10, 12 days ago, sure.

14  Q.  Mr. Malackowski, you're also aware that Hytera's damages

15  expert has looked at that supplemental R&D revenue and has

16  supplemented her expert report, right?

17  A.  I have not seen that.

18  Q.  It has not been provided to you?

19  A.  I have not seen it, no.

20  Q.  Were Hytera's supplemental research and development

21  expenses provided to you?

22  A.  I have not seen that.

23  Q.  So, Mr. Malackowski, if Hytera supplemented its research

24  and development expenses, it wouldn't be interesting to you to

25  see that?

Malackowski - direct by Schmidt

2254

1   A.  Well, it's interesting that they tried again.  I talked to

2   my staff who has seen them.  And again, we have the same

3   problems with the data.

4          I also understand that, frankly, it came too late.  So

11:08:05   5   it was after all the reports were in, and I didn't change my

6   analysis.

7   Q.  And if Hytera's damages expert, Dr. Aron supplemented her

8   report, that wouldn't be interesting to you either?

9   A.  Well, it depends on why she supplemented it.  But if she

11:08:19   10   tried to again present new after how many years?  New data

11   where they finally now think they know what the R&D expenses

12   are for these radios after the core business records that they

13   keep in normal course couldn't figure that out?  It doesn't

14   pass the smell test.  I don't believe it's reliable.

11:08:38   15   Q.  Mr. Malackowski, you're aware that the parties in this case

16   produced financial information for the purposes of this

17   litigation, right?

18   A.  Of course.

19   Q.  And that companies don't typically maintain their

11:08:46   20   financial --

21          THE COURT:  Are you still attempting to lay the

22   foundation for the admissibility of that particular document?

23          MR. STRINGFIELD:  I am, Your Honor.  I'll

24   short-circuit this.

11:08:55   25   BY MR. STRINGFIELD:

Malackowski - direct by Schmidt

1    Q.  So, Mr. Malackowski, parties or companies don't normally

2    keep their records in a format that would be amenable to

3    production litigation?

4    A.  I don't know about that.  I've got binders full of

11:09:08   5    documents that came right out of the accounting systems for

6    both parties.

7    Q.  And those were generated for the purpose of this

8    litigation?

9    A.  They were printed for the purposes of the litigation, but

11:09:15   10   printed out of the regular business databases.

11   Q.  That's right.  And Hytera produced regular business

12   information related to its DMR research and development

13   expenses, is that right?

14   A.  Several times.

11:09:26   15   Q.  And it's most recent production you tell us that you

16   haven't reviewed?

17   A.  I personally have not seen it.  I've discussed it with my

18   staff.  We have the same issues with it.

19   Q.  Okay.  And so, Mr. Malackowski, is there any amount of

11:09:41   20   research and development expense that you would allow Hytera to

21   deduct?

22            THE COURT:  Are you still working on the foundation?

23            MR. STRINGFIELD:  I'll move on, Your Honor.

24            THE COURT:  All right.  The objection is sustained.

11:09:52   25   No foundation.  It may well be that another witness could lay

Malackowski - direct by Schmidt

2256

1    the foundation for the admissibility of the document, but not

2    this witnesses.

3    BY MR. STRINGFIELD:

4    Q.  Mr. Malackowski, my question was, is there any amount of

11:10:08    5    research and development expenditure that you would allow

6    Hytera to deduct in this case?

7    A.  Well, it's case by case.  So if the records show through

8    the normal-course documents and the testimony of the witnesses

9    under oath expenses that should be deducted, then I would

11:10:23    10    certainly consider those.  And I did consider them at the time.

11    Q.  So, Mr. Malackowski, it's not your position that research

12    and development expenses may never be deducted when you're

13    determining profit margin, is that right?

14    A.  Correct.  That is not my position.

11:10:37    15    Q.  Mr. Malackowski, I want to talk about another aspect of

16    your unjust enrichment opinions, and that's the research and

17    development savings.

18        And we were discussing that a little bit earlier.  And

19    that's based on research and development expense that you

11:11:07    20    believe it would've -- Hytera would've been required to invest

21    to get the 21 trade secrets at issue in this case?

22    A.  The amount of money they saved by the theft of the trade

23    secrets.

24        MR. STRINGFIELD:  Mr. Montgomery, can you please put

11:11:24    25    up PDX 1023.

Malackowski - direct by Schmidt

2257

BY MR. STRINGFIELD:

Q.  Mr. Malackowski, we talked about this slide yesterday, right?

A.  I don't remember if you and I talked about it, but I certainly did.

Q.  Mr. Malackowski, I listened to you talk about this slide yesterday, is that right?

A.  I expect you did.

Q.  So, Mr. Malackowski, and again, I think your position is that if Hytera's research and development expenditures were acceptable to you, you would let them deduct the investment that they had made already in DMR research and development, is that right?

A.  If they incurred specific expenses that could be verified, I would consider R&D as well, yes.

Q.  As a deductible expense to determine the profit margin for the accused DMR radios and the DMR repeaters?

A.  Yes.

Q.  Okay.  But yet, whatever amount it was, wasn't sufficient because you say that they have to spend another $73.6 million here?

A.  Well, I'm saying they saved 73.6 million because of the theft.

Q.  Well, I think you told us that Hytera could've developed the 21 trade secrets at issue in this case by spending

Malackowski - direct by Schmidt

2258

1   $73.7 million, right?

2   A.  Well, that's a slightly different point.  I calculate the

3   amount they saved, that would assume that they had the same

4   level of efficiency as Motorola, which I understand from Dr.

11:12:55   5   Rangan is not the case.  So this is a conservative measure of

6   what they would've had to spend.

7   Q.  So you assume the same level of efficiency.  You're also

8   assuming the same level of labor rate as Motorola?

9   A.  In China, yes.  Specific to China.

11:13:12   10  Q.  And you're aware that Hytera produced its own labor rate

11  data in this case?

12  A.  I did.  I mentioned that I've looked at that data and it

13  varies in unexplainable ways on a year-by-year, hour-by-person

14  basis.

11:13:25   15  Q.  And you considered Hytera's labor rate in your earlier

16  reports, is that right?

17  A.  I did.  For example, I saw a secretary at $5 an hour, and I

18  see an engineer at less than that, and then two years later I

19  see huge differences.

11:13:38   20  Q.  And, Mr. Malackowski, you did not apply Hytera's labor rate

21  when you were calculating how much it would've cost Hytera in

22  research and development settings, right?

23  A.  No.  The Hytera R&D data is all -- "messed up" is not a

24  technical term, but it is not reliable.  I looked at it every

11:13:59   25  which way I could and I did not find it reliable for these

Malackowski - direct by Schmidt

2259

1    estimates or for the monthly wage rate.

2    Q.  Well, Mr. Malackowski, you considered in your report that

3    Hytera, its cost per staff month in 2010 was $1638, do you

4    understand that?

11:14:13    5    A.  I don't recall the specific number, but I looked at every

6    month and how it changed, yes.

7    Q.  Okay.  And so even though Hytera had produced its rate per

8    staff month, you chose instead to apply Motorola's much higher

9    rate of 3,990 per staff month?

11:14:31    10    A.  Well, I think you said at 2010.  In 2011, it went up by

11    70 percent and then it went back down.  So yes, I discarded

12    that information.  I know your expert uses it.  I disagree, I

13    don't think it's reliable.

14    Q.  And so, Mr. Malackowski, this number here, the

11:14:46    15    $73.6 million, you found that by taking 18,433 staff months,

16    which are the number of staff months that you contend it

17    would've taken to get the 7 trade secrets, and you multiply

18    that by $3,995, which is the Motorola rate?

19    A.  True.

11:15:06    20    Q.  Mr. Malackowski, if you would've multiplied that same

21    18,433 staff months, setting aside any disagreement about

22    whether that's accurate, by $16,038, which is Hytera's actual

23    rate, do you know how much that would've been?

24    A.  Well, it would've been a portion of 1600 over 3900, but

11:15:27    25    that's not their actual rate.  You cherry-picked 2010.  If you

Malackowski - direct by Schmidt

2260

1    go to 2011, 70 percent higher, which gets you very close to the

2    numbers that I, in fact, show.

3    Q.  Well, if the rates are going up, wouldn't the 2010 rate be

4    a conservative estimation for he rates between 2005 and 2010,

5    which was the period of Hytera's DMR research and development

6    before launch?

7    A.  Not necessarily.  You can't look at one year in a vacuum

8    and just say it's therefore conservative.

9         If you look at Hytera's rates on a year-by-year basis,

10   they go up and down, up and down, by large amounts.

11        MR. STRINGFIELD:  Mr. Montgomery, can you put up PDX

12   10.6, please.

13   BY MR. STRINGFIELD:

14   Q.  We looked at this slide yesterday, is that right,

15   Mr. Malackowski?

16   A.  I'm sure you did.  I certainly talked about it.

17   Q.  And, Mr. Malackowski, I think the point you were trying to

18   make with this slide was, this 117 million that Motorola

19   purportedly invested in the 21 trade secrets at issue is much

20   bigger than the 12.6 million that Hytera spent on research and

21   development before launching its products, is that fair?

22   A.  Exactly.

23   Q.  Okay.  And this 117.8 million, we find that by multiplying,

24   again, the 18,433 staff months by a Motorola rate, but this is

25   an even higher Motorola labor rate, right?

Malackowski - direct by Schmidt

2261

1    A.  Yes.  It's the blended Motorola rate.  So it would include

2    a higher U.S. cost, a lower Malaysian cost, and then an overall

3    blended rate.

4         MR. STRINGFIELD:  Mr. Montgomery, can you put up DDX

11:17:08    5    7.6, please.

6    BY MR. STRINGFIELD:

7    Q.  So here, Mr. Malackowski, I think we have captured that

8    calculation.  Is this fair?

9    A.  I think it's fair.

11:17:15   10    Q.  So, again, the 18,433 staff months that Dr. Rangan

11   estimated for the 7 trade secrets we saw in slide, right?

12   A.  Well, he estimated it for all 21, but in order to avoid

13   double counting, I just looked at the 7 rooms that comprised

14   the house and that's how you get this number, yes.

11:17:34   15    Q.  The 18,433 staff month number?

16   A.  Sure.

17   Q.  And so the higher blended Motorola rate that you just

18   discussed is $6,391 for staff month?

19   A.  It is.

11:17:46   20    Q.  And we multiply those together and that's how we get

21   117.8 million for what Motorola purportedly invested in these

22   21 trade secrets?

23   A.  Yes, sir.

24         MR. STRINGFIELD:  Mr. Montgomery, can you put up DDX

11:18:03   25    7.6 -- oh, excuse me.  DDX 7.7.  I apologize.

Malackowski - direct by Schmidt

2262

BY MR. STRINGFIELD:

Q.  Mr. Malackowski, so this is the next level of your calculation where you take that 18,433 staff months and you multiply it by a lower Motorola price per staff month, right? This is the $3,992 staff month price for Motorola in China?

A.  I agree with that.

Q.  Okay.  And, Mr. Malackowski --

MR. STRINGFIELD:  Or, Mr. Montgomery, can you please put up DDX 7.8.

BY MR. STRINGFIELD.

Q.  So if we take that same 18,433 staff months, and we multiply it by Hytera's actual price per staff month, we get $30 million, is that right?

A.  No.  That's not Hytera's cost per staff month.  That's picking the lowest year or one of the lowest years.  It's not their average and it's not a fair reflection.  You can't cherry-pick data that you like and then use it as a comparison. You have to look at all of the information.

Q.  Mr. Malackowski, Hytera's price for staff month in 2010 --

A.  In 2010 and only 2010.

Q.  Just before they launched the DMR products, right?

A.  Well, as they were launching, yes.

Q.  $1,638 per staff month?

A.  That's what shown in their reports, true.

Q.  Multiplying that by 18,433 staff months, the number of

Malackowski - direct by Schmidt

2263

1    staff months that Dr. Rangan told you it would develop every

2    trade secret in this case, $30 million, right?

3    A.  Mathematically correct.  Not meaningful, but mathematically

4    correct.

11:19:45    5    Q.  The 18,433 staff months, again that's based on Dr. Rangan,

6    right?

7    A.  We totally agree on that.

8            MR. STRINGFIELD:  Mr. Montgomery, can you put up I

9    think it was 1023 again.  The puzzle-piece slide.

11:20:05    10   BY MR. STRINGFIELD:

11   Q.  So, Mr. Malackowski, you picked these seven trade secrets,

12   right?

13   A.  In consultation with Dr. Rangan and the technical reports,

14   yes.

11:20:21    15   Q.  That's not what you said in your expert report, is it?

16   A.  I don't know.  Can you remind me?

17           MR. STRINGFIELD:  Mr. Montgomery, can you please put

18   up PTX 2070.2.  I think believe it was already admitted.

19           Can you zoom in on the footnotes, please,

11:20:48    20   Mr. Montgomery.

21   BY MR. STRINGFIELD:

22   Q.  So footnote 1, which hangs off of the heading "trade

23   secret," says:

24           "To avoid double counting, I have included only

11:21:06    25           trade secrets that are not whole or partial

Malackowski - direct by Schmidt

2264

1    subsets of other trade secrets."

2        Did I rad that correctly?

3  A.  You did.

4  Q.  You say:

11:21:12   5        "I have included trade secrets in this appendix

6        based on my review of the deposition testimony

7        of Motorola witnesses."

8  A.  True.  But Dr. Rangan's analysis starts with the testimony

9  of the Motorola witnesses and he builds upon that.

11:21:33  10  Q.  That's not what you yu said here.

11  A.  But I think this report came out the same day as Dr.

12  Rangan's report.  And so my conversations with him have been

13  ongoing since then.  I'm happy to accept this, but I did also

14  speak to Dr. Rangan.

11:21:39  15  Q.  So, Mr. Malackowski, just to be clear --

16        MR. STRINGFIELD:  Mr. Montgomery, can you put up 1023

17  again.

18  BY MR. STRINGFIELD:

19  Q.  Mr. Malackowski, you're certainly not qualified to select

11:21:56  20  which of these trade secrets are non-overlapping with other

21  trade secrets, right?

22  A.  No, I don't claim that expertise.

23  Q.  But again, you claim that these are representative of the

24  21 trade secrets that are at issue in this case, right?

11:22:13  25  A.  I don't know that I used the word "representative."  I

Malackowski - direct by Schmidt

2265

1    claimed that these represent the non-overlapping trade secrets,

2    so it's the total without concern over double counting.

3    Q.  So there's 21 trade secrets at issue in this cases.  So my

4    math, that means there's 14 that aren't shown here.  And so

11:22:32    5    those 14 are -- that's somewhere beneath the 7 on this slide,

6    right?

7    A.  Sure.  They would be like my example of the refrigerator,

8    the microwave in the kitchen, and this would present one of

9    them.

11:22:43    10   Q.  So again, if you develop these 7 trade secrets, you got all

11   21, is that fair?

12   A.  If you develop these 7 trade secrets, you capture the

13   economic value of all 21 because it's time-based how many

14   months did it require.

11:22:58    15   Q.  And Dr. Rangan's estimates that you rely on, I think you

16   just told us they were based on his interviews with the

17   Motorola engineers?

18   A.  That's where he began.  I don't know if I said

19   "interviews."  It began with the Motorola engineering work,

11:23:22    20   their testimony, their written answers to questions, their

21   depositions.

22   Q.  So, Mr. Malackowski, a few moments ago we were discussing

23   Hytera's research and development data and how it was

24   specifically delineated for the accused DMR products, do you

11:23:40    25   remember that?

Malackowski - direct by Schmidt

2266

1    A.  Well, we discussed my problems with that, yes.

2    Q.  Did you review Motorola's R&D data in this case?

3    A.  Yes.

4    Q.  And Motorola's R&D data doesn't separate out research and

11:23:54    5    development expense for the DMR products in this case, is that

6    right?

7    A.  No, not specifically.  That was the reason for the

8    analysis, which actually I requested of Motorola engineers.

9    Q.  The reason for the analysis is because Motorola's business

11:24:07    10   records don't have any record of how long it would take to

11   develop these trade secrets, right?

12   A.  That's fair.

13   Q.  So Dr. Rangan talked to the engineers?

14   A.  I'm quite certain he did.  He also reviewed their

11:24:24    15   testimony, and the written answers to questions, and the

16   underlying data.

17   Q.  And some of these trade secrets Dr. Rangan contends were

18   developed over the course of 7 or 8 years, right?

19   A.  True.

11:24:35    20   Q.  Some were developed over the course of 9 years?

21   A.  Some 10 years.

22   Q.  Some 13 1/2 year, right?

23   A.  I believe that was the longest.

24   Q.  So Dr. Rangan's task was to go talk to engineers who don't

11:24:49    25   have any records of how long they spent about what they worked

Malackowski - direct by Schmidt

2267

1    on 13 1/2 years ago?

2    A.  Well, that's a better question for Dr. Rangan.  But Dr.

3    Rangan applied his expertise in doing things exactly like this

4    at my request --

11:25:03    5    THE COURT:  You should've ended your answer with the

6    first part of it.  The jury has heard the testimony of Dr.

7    Rangan.

8    BY MR. STRINGFIELD:

9    Q.  So, Mr. Malackowski, there are no accounting documents or

11:25:20    10   financial statements that support the staff month estimates

11   from Dr. Rangan that you relied upon in generating PDX 1023,

12   the summary of the trade secrets, is that accurate?

13   A.  Not exactly.  I relied upon ultimately Dr. Rangan and then

14   the Motorola engineers and the documents that they used and

11:25:43    15   their experience.

16   There aren't nice records that say:  Here's trade

17   secret 14, here's the time of development.  Those weren't

18   needed in normal course.  But this type of analysis is exactly

19   the way you value trade secrets, and at my direction consistent

11:25:59    20   with my 30 years of doing this.

21   Q.  So I think you just said that documents reflecting the

22   historical record of how long it took to develop trade secrets

23   are not maintained in the normal course of business?

24   A.  Not specific to a given trade secret.  That was the basis

11:26:12    25   of the engineering work, the extensive engineering review,

Malackowski - direct by Schmidt

2268

1    augmented by the expert review that went into my work.

2    Q.  Motorola does, in the normal course of its business,

3    maintain records for how long it will take to develop a

4    product, right?

11:26:28    5    A.  Well, you need to be more specific.  They put together

6    capital expenditure reports which estimate here's what we're

7    going to do, here's how long we think it will take, here's what

8    we expect.

9    Q.  That's right.  They estimate how long it's going to take,

11:26:40    10    because that's an important consideration when you're going to

11    make an investment in a new product line, isn't it?

12    A.  Yeah.  That's how you estimate what your investment is

13    going to be.

14    Q.  And Motorola, I think we heard testimony earlier in this

11:26:50    15    trial, they've been making radios for hundreds of years, right?

16    A.  I don't recall hundreds of years, but long enough.

17    Q.  They're fairly experienced in making radios, is that fair?

18    A.  I think it's fair to say they're probably the most

19    experienced in the world.

11:27:03    20    Q.  They have a lot of track record developing radios?

21    A.  They do.

22    Q.  They've done it multiple times?

23    A.  They have.

24    Q.  They have a good sense for what it takes to develop a

11:27:13    25    radio, don't you think?

Malackowski - direct by Schmidt

2269

1    A.  Better question for the engineers.  I assume they believe

2    they have good sense.

3    Q.  So when Motorola would embark on a brand new product line,

4    I think we've discussed that they would endeavor to figure out

11:27:28    5    how long it was going to take to develop a new product line,

6    right?

7    A.  I don't disagree with that.

8    Q.  And based on their extensive experience developing prior

9    families of two-way radios, their estimates would be pretty

11:27:41    10   accurate, don't you think?

11   A.  It depends.  Sometimes you start new technologies, they're

12   more complicated.  A cost over-run is clearly not unheard of

13   even to Motorola.

14   Q.  You're aware that when Motorola is going to launch a new

11:27:54    15   product, they develop what's called an integrated business

16   plan?

17   A.  I don't recall that exact term, but such a thing would make

18   sense, yes.

19           MR. STRINGFIELD:  Mr. Montgomery, can you please put

11:28:06    20   up DTX -- excuse me.

21   BY MR. STRINGFIELD:

22   Q.  Let me hand you a copy of DTX 4715.  And this has already

23   been admitted.

24           MR. STRINGFIELD:  And, Mr. Montgomery, could you

11:28:17    25   please put up DTX 4715.

Malackowski - direct by Schmidt

2270

BY MR. STRINGFIELD:

Q.  You've seen this document before, Mr. Malackowski?

A.  I've seen documents that look like this.  I would have to review it to see if it refreshes my recollection.  It does speak of two-way radio products in a digital way, yes.

Q.  You reviewed the deposition testimony of many Motorola witnesses, including corporate representatives, is that right?

A.  I think it does, in total, yes.

Q.  And one of the corporate representatives whose deposition you reviewed is Mr. Randall Helm.  Do you remember that?

A.  Yes.  Absolutely.

Q.  And you reviewed the exhibits that were used at his deposition?

A.  Yes.  And I have spoken to Mr. Helm.

Q.  And so DTX 4715, if this was an exhibit at his deposition, you would've reviewed this document, right?

A.  Probably, yes.

Q.  Okay.  So DTX 4715 on its cover, it's called Integrated Business Plan.  Do you see that?

A.  I do.

Q.  And it's dated December 2004.  Do you see that?

A.  It is.

Q.  And on the cover, it says "Project Name:  Matrix platform/1.0."  Do you see that?

A.  I do.

Malackowski - direct by Schmidt

2271

1    Q.  And you understand that Matrix is or was the internal
2    Motorola code name for the MOTOTRBO DMR products that are at
3    issue in this case, right?
4    A.  Yes.  And there were sub-tiers, Matrix L and Matrix I, I
5    think, yes.
6    Q.  And "1.0," that means that this was the first release of
7    the Matrix product, right?
8    A.  I can't tell you that.  I don't recall.
9    Q.  Mr. Malackowski, I want you to turn to page 60 of DTX 4715.
10   Page 60, 6-0.
11        Let me know when you're there?
12   A.  I am.
13   Q.  So on page 60 of DTX 4715, this is a table in the
14   Integrated Business Plan.  Do you see that?
15   A.  I do.
16   Q.  And do you understand that this table includes staffing
17   estimates that would be required to launch the 1.0 Matrix
18   product that would become the MOTOTRBO radios at issue in this
19   case?
20   A.  No, I don't think that the 1.0 product becomes the
21   commercial product.  This document is the first of several.  It
22   doesn't include go forward, and it doesn't include, it says at
23   the top:  Later releases 1.1 through 1.4.  So I don't think
24   this is everything.  I think this is part.
25   Q.  Well, let's talk about what this means a little bit.

Malackowski - direct by Schmidt

2272

1    So you're aware that Motorola uses what's called an M

2    Gate process to its product development?

3    A.  I'm not familiar with that term.

4    Q.  Okay.  And so you understand that the M Gates run from, you

11:31:15  5    know, at least M-13 down to M-2?

6    A.  I actually don't.  That, too, is a bettor question for Dr.

7    Rangan or the Motorola witnesses.

8    Q.  So you reviewed this document and you don't purport to

9    understand it?

11:31:27  10    A.  Well, I don't rely upon it in my work.  Dr. Rangan may.

11    But I don't claim to be the technical expert on the trade

12    secrets.  I'm relying upon Dr. Rangan and relying upon the

13    Motorola experts.

14    Q.  You understand that Gate M-2 is the release date of the

11:31:44  15    product, right?

16    A.  I don't.

17    Q.  And so in this table on page 60 of DTX 4715, at the intent

18    stage, it says, to get to M-2, which is product launch, we have

19    a total number of staff months of 7,920 staff months.  Do you

11:32:03  20    see that?

21    A.  I mean, I can read the document and confirm what it says,

22    but this is not part of my analysis.  I'm not qualified to

23    interpret this data.  That's what Dr. Rangan did for me.

24    Q.  Mr. Helm, who is a corporate representative on topics that

11:32:18  25    impact your opinions in this case, do you agree with that?

Malackowski - direct by Schmidt

2273

1    A.  Well, it depends on the topic.  He and I talked about

2    oracle data basis and accounting things.  We didn't talk about

3    these documents.

4    Q.  This was a document that was discussed in his deposition.

11:32:31    5    A.  Okay.

6    Q.  And you didn't ask him about it?

7    A.  Nope.

8    Q.  So we have 7,920 staff months shown here.

9    A.  Again, if you read the document accurately, I will confirm

11:32:47    10   you read it accurately.  I can't help you beyond that.

11   Q.  The Motorola business plan for the release of the Matrix

12   products, which were MOTOTRBO, estimates 7,920 staff months to

13   launch the product, is that right?

14   A.  No, it says at the top, this is only release 1.0, staffing

11:33:01    15   for later releases is 1.1 through 1.4 is in a separate table.

16   I defer to Dr. Rangan and I defer to the Motorola witnesses.

17   This is a technical review that's outside my scope.

18   Q.  You understand that releases 1.1 and 1.4 were later models

19   of the radio that include different features, right?

11:33:20    20   A.  Exactly.  And it's all of those features and trade secrets

21   that were included in Dr. Rangan's analysis of what was stolen.

22   So I would not expect the numbers that he gave me to match

23   what's in this document.

24   Q.  For the 1.0 release, it says 7,920 staff months, right?

11:33:36    25   A.  Dr. Rangan didn't provide a 1.0 number versus a 1.1, versus

Malackowski - direct by Schmidt

2274

1   a 1.2.  He provided the total.  You're not going to be able to

2   compare that to this document, because this is just part.

3           MR. STRINGFIELD:  Mr. Montgomery, can you please put

4   up DDX 7.8 again.

11:33:50   5   BY MR. STRINGFIELD:

6   Q.  We talked about this slide a few moments ago, right?

7   A.  Of course.

8   Q.  The $12.6 million on the right-hand side, that was Hytera's

9   1.0 release of its DMR radios, right?

11:34:10   10  A.  I don't recall if they described it as 1.0.  That was all

11  of the R&D that was generally associated with DMR prior to

12  their first sale.

13  Q.  Their first sale of a DMR radio?

14  A.  That's my understanding.

11:34:27   15  Q.  Which would have been their 1.0 release?

16  A.  But it doesn't mean that this research was limited to only

17  what was necessary for the first sale.  It might've included

18  work for the one that came right after that, also in 2010 or

19  2011, we don't know.

11:34:41   20          MR. STRINGFIELD:  Mr. Montgomery, can you please put

21  up DDX 7.9.

22  BY MR. STRINGFIELD:

23  Q.  Mr. Malackowski, if we take 7,920 staff months from the

24  Motorola business plan document, DTX 4715, to launch the radio,

11:35:03   25  the 1.0 release, and we multiply that by Hytera's 2010 price

Malackowski - direct by Schmidt

2275

1    per staff months, we take 7,920 staff months times $1,638, we

2    get $12.97 million, is that right?

3    A.  I mean, mathematically, I'm going to accept your

4    calculator, but it's a meaningless number.  The cost for staff

11:35:29   5    month is wrong, and the man months don't include all of the

6    trade secrets.  So it is what it is.

7    Q.  It's Motorola's allegation that these trade secrets were

8    misappropriated in 2008, is that right?

9    A.  I believe that's true.

11:35:43   10   Q.  So if a 2010 launch, if we compare these numbers for the

11   Hytera DMR radio, it's almost the same as the Motorola rate?

12   A.  But you showed me a document that was, what, 2004, that was

13   only 1.0?  So you're not counting everything else that happened

14   that was estimated in at least those next 4 years.  So, again,

11:36:09   15   I accept your math.  I don't think it's a meaningful

16   conclusion, and it certainly doesn't change my opinion.

17         MR. STRINGFIELD:  Mr. Montgomery, can you put up 1023

18   again, please.

19   BY MR. STRINGFIELD:

11:36:28   20   Q.  So these, again, are the 7 non-trade secrets that add up to

21   the 14,000 staff months that you used earlier, right?

22   A.  Generally, yes.

23   Q.  You don't know whether any of these trade secrets

24   themselves are overlapping with each other, right?

11:36:52   25   A.  I understand they are not.

Malackowski - direct by Schmidt

2276

1  Q.  Okay.  So you don't know whether software, for example,
2  includes the DMR protocol stack, do you?
3  A.  It's my understanding that as these were defined by Dr.
4  Rangan, they do not.
11:37:08  5  Q.  Okay.  And you don't understand that the repeater
6  functionality in the bottom right corner, the repeater
7  necessarily has to have the DMR protocol stack which is shown
8  on the left, right?
9  A.  Again, it's my understanding that these do not overlap
11:37:21  10  based upon Dr. Rangan's work.
11  Q.  And you don't know whether XCMP is included within the
12  software?
13  A.  Same answer, same recommendation to ask Dr. Rangan.
14  Q.  Okay.  The DMR protocol stack, which you have valued at
11:37:40  15  $6 million, you were here when Zetzl testified about that?
16  A.  I was.
17  Q.  Mr. Zetzl testified that you can buy a DMR protocol stack,
18  right?
19  A.  I don't recall him specifically saying that, but I do know,
11:38:03  20  generally, that would make sense, yes.
21  Q.  He talked about how you can buy the entire DMR protocol
22  stack in software from a company called Etherstack, do you
23  remember that?
24  A.  Again, not specifically, but he said what he said and I
11:38:19  25  don't doubt that.

Malackowski - direct by Schmidt

2277

1   Q.  And Mr. Zetzl also mentioned that there are chips, hardware

2   chips that you can purchase that have the entire DMR protocol

3   stack in them?

4   A.  Yes.  Not with all the features that Motorola provides, but

11:38:36   5   you can buy such things generically, yes.

6   Q.  And the ability to purchase the whole DMR protocol stack

7   didn't impact your valuation of that trade secret?

8   A.  Well, no, because it's not a substitute for the technology

9   that was taken by Hytera.  You can go buy a generic product off

11:38:52   10  the market, but you're not going to get the features and

11  benefits that were critical to selling $500 million worth of

12  radios and becoming No. 2 in the market.

13          MR. STRINGFIELD:  Mr. Montgomery, can you please put

14  up PDX 1017.

11:39:10   15  BY MR. STRINGFIELD:

16  Q.  This is your cartoon from yesterday?

17  A.  It was.

18  Q.  This is the -- it looks like, I think you told us, they

19  took the secret recipe and they were able to make cookies

11:39:25   20  because they took the recipe?

21  A.  Not just any cookies.  Really good ones, yes.

22  Q.  But what if they could just buy the recipe?

23  A.  That's why I said "really good ones."  They couldn't buy

24  the recipes for good ones.  They could go buy generic.

11:39:44   25          But, again, it's a simple illustration.  It's a

Malackowski - direct by Schmidt

2278

1    cartoon, if you will, but it makes the point clear.  There was

2    time spent on a recipe that was kept confidential because it

3    was regarded as having high value.  When it went over to the

4    other side, they didn't have to replicate those expenses,

11:39:59    5    that's why you add the R&D savings to the profit numbers.

6    Q.  So you keep saying "really good ones."  I think we heard

7    earlier in this case how Motorola contends that it couldn't

8    look at a Hytera radio and tell that it had the trade secrets

9    in it.  Do you recall that testimony?

11:40:16   10    A.  Generally, I know there has been discussions about when

11    Motorola discovered the theft as part of one of the patent

12    infringement investigations.

13    Q.  Motorola contends that for over a decade of investigating

14    Hytera's DMR radios, it couldn't tell that any of these 21

11:40:39   15    trade secrets were the radios.  Do you understand that?

16    A.  That's outside my scope.

17    Q.  Were you here for that testimony?

18    A.  Well, I was here for it.  It's actually a much more nuance

19    discussion as to when they learned, and why just because there

11:40:50   20    was a radio in the market that had some similar features they

21    didn't think that that was worthy of investigation.

22         In fact, they actually tried to hire G.S. Kok back in

23    2011.  And they clearly didn't know by then or they wouldn't

24    have tried to hire him back.  So they didn't discover it until,

11:41:07   25    I think, end of 2012, or some point along those lines, but

Malackowski - direct by Schmidt

2279

1    that's outside my scope.

2    Q.  Do you think they Ann and Beth here could've figured out if

3    their secret cookie recipe was being used?

4    A.  I don't know.  In this example, they could not.

11:41:22    5    Q.  If the cookies were so good that one bite you could tell it

6    was their secret recipe?

7    A.  You know, I mean, that's a fair question.  There's some

8    products you can reverse engineer and immediately tell, there

9    are others that are extraordinary difficult.

11:41:32    10        I got to tell you, Pepsi would love to know what's in

11    Coca-Cola.  Popeye's would love to know the seven secret spices

12    of kFC.  They don't.  It's secret.  Same thing applies here.

13        MR. STRINGFIELD:  You can take that down, Mr.

14    Montgomery.

11:41:48    15    BY MR. STRINGFIELD:

16    Q.  Mr. Malackowski, you issued your original report in this

17    case in June 28, 2019?

18    A.  I believe so.  There are three reports in total.  That

19    sounds about right.

11:42:02    20    Q.  When you issued your original report, Motorola was

21    asserting 29 trade secrets in this case, isn't that right?

22    A.  Yes.  The process of a litigation you narrow it to focus

23    on, in part, to make sure you're not conducting overlap.  But,

24    yeah, they did get narrowed.

11:42:18    25    Q.  And in that June 28 report referring to 29 trade secrets,

Malackowski - direct by Schmidt

2280

1    you contended in that report that Hytera had to turn over

2    100 percent of its profits, is that right?

3    A.   True.

4    Q.   And today with only 21 trade secrets at issue, you contend

5    that Hytera has to turn over all of its profits?

6    A.   If there are only 7 trade secrets left, the 7 that make up

7    the rooms they have to turn over all of their profits, that's

8    why it's important to make sure you don't double count.

9    Q.   You understand that just as recently as this past May,

10   Motorola is asserting 142 trade secrets against Hytera?

11   A.   Yeah, I was just going to mention that.  They start with a

12   number and then as the litigation goes you focus on what

13   ultimately is non-overlapping, frankly easy to explain and

14   present.

15   Q.   And as recently as a year ago, Motorola was asserting 169

16   trade secrets against Hytera, do you understand that?

17   A.   I do.

18   Q.   And your opinion that Hytera would have to turn over

19   100 percent of its revenue -- excuse me, 100 percent of its

20   profits, would be the same whether there were 169 trade

21   secrets, right?

22   A.   As long as you keep the 7 that are in the public chart,

23   yes.

24   Q.   Same if there's 142 trade secrets?

25   A.   True.

11:42:34

11:42:57

11:43:10

11:43:25

11:43:36

Malackowski - direct by Schmidt

2281

1    Q.  Same if there's 29?

2    A.  Same if there's 7.

3    Q.  Same as there's 21?

4    A.  Yes.

11:43:42   5    Q.  And Motorola dropping over 100 trade secrets didn't impact

6    your opinion at all?

7    A.  Well, it did.  It made it a lot easier to do my

8    calculations, but it didn't change the total.

9    Q.  You were here in court earlier during Mr. Lund's testimony?

11:44:05   10   A.  Yes, sir.

11   Q.  We were discussing the 3 DMR trade secrets that Motorola's

12   engineers actually registered.  Do you remember that?

13   A.  Generally.

14   Q.  And Motorola not asserting those 3 registered trade secrets

11:44:18   15   in this case, that doesn't impact your opinion on Hytera's

16   liability -- or Hytera's amount that it has to turn over to

17   Motorola?

18   A.  No.  I mean, if you look at this process, I don't know if I

19   get the credit or the blame, but when I was asked to value

11:44:31   20   these trade secrets, it was a huge list.  And I kept trying to

21   get the engineers, and frankly the lawyers, to focus on what

22   was really important so I could get these calculations.  So the

23   fact that it narrowed, that happens in all of these cases.

24   There's nothing unusual about that.  There's nothing nefarious

11:44:47   25   about that.  It's part of the process.

Malackowski - direct by Schmidt

2282

1   Q.  What about the fact that no Motorola engineer registered

2   any of the 21 trade secrets that are being asserted, that

3   doesn't impact your damages opinion?

4   A.  No.  If anything, it shows that they are hypersensitive to

11:45:00   5   them, and don't disclose them largely to many people even

6   within the business.  Proper trade secret management often

7   requires that you divide a trade secret and only certain people

8   know a part of it, other people know part of it, but that's one

9   method of protecting it.

11:45:15   10        You file a disclosure, and it's a small risk, but

11   people need to know the whole thing.  The lawyers need to know,

12   and that creates risk, and if there's no benefit, don't do it.

13   Q.  You were here, Mr. Malackowski, during Mr. Zetzl's

14   testimony when we were discussing all of the Motorola patents

11:45:33   15   that it has related to DMR technology, right?

16   A.  Yes, sir.

17   Q.  And the fact that none of those Motorola patents for DMR

18   technology are asserted in this case doesn't impact your

19   opinion, is that right?

11:45:44   20   A.  No.  I talked about the fact that most products, complex

21   products, will have patent coverage, copyright coverage, trade

22   secret coverage in trademarks, and they each serve a different

23   purpose in protecting the research value of an organization.

24   Q.  Mr. Malackowski, you're aware that Motorola licenses

11:46:08   25   patents to Hytera related to DMR technology, right?

Malackowski - direct by Schmidt

2283

A.   Yes.  I believe Motorola has made a commitment to the

industry to license certain standard essential patents to all

commerce.

Q.   That's right.  They don't license to Hytera, they license

to the whole DMR industry, right?

A.   Yes.  As do others.  There's certain baseline of technology

that companies agree to support a standard.  They all make

commitments to share certain patent rights, sometimes with

compensation, sometimes without.  And then they keep other

things to differentiate their products secret or they file

other patents on them, depending upon the area of the

technology.

Q.   And the patents that Motorola licenses to Hytera are

patents that Motorola deems to be essential to practicing the

DMR standard, is that right?

A.   That's what I just said, standard essential patents.

They're called SEP's.

Q.   Mr. Malackowski, I'll hand you DTX 3608.

        (Brief pause.)

BY MR. STRINGFIELD.

Q.   Mr. Malackowski, have you seen DTX 3608 before?

A.   Yes.

Q.   Do you understand that DTX 3608 is the patent license that

we were just discussing between Hytera and Motorola?

A.   Well, we weren't specifically discussing.  This is a

Malackowski - direct by Schmidt

2284

1    cross-license, but generally discussing it, yes.

2    Q.  And this was produced by Hytera in this litigation?

3    A.  It was.  There's a Hytera Bates stamp.

4    Q.  And on page 14, you see that it bares signatures from

11:47:48    5    Motorola representatives and Hytera representatives?

6    A.  I do.  It does.

7          MR. STRINGFIELD:  Your Honor, at this time we wish to

8    move DTX 3608 into evidence.

9          MS. SCHMIDT:  No objection.

11:47:59    10          THE COURT:  It is received and may be published.

11          (Said exhibit received in evidence.)

12          MR. STRINGFIELD:  Mr. Montgomery, can you put it up,

13    please.  Thank you.

14    BY MR. STRINGFIELD:

11:48:09    15    Q.  So, again, DTX 3606, this is the license from Motorola to

16    Hytera so that Hytera can use Motorola patents that Motorola

17    has deemed to be essential to practicing the DMR standard,

18    right?

19    A.  Yes.  As part of its commitment to the industry to support

11:48:28    20    the standard.

21    Q.  And you understand under this license that Hytera pays

22    royalties to Motorola, right?

23    A.  Yes, that is part of the cost deduction I described in my

24    chart.  Patents is one of the cost items.

11:48:44    25    Q.  And, in fact, Hytera pays to Motorola $3 per accused DMR

Malackowski - direct by Schmidt

2285

1    radio, right?

2    A.  Well, the financial terms are complex with set-offs and the

3    like.  I don't recall if the net effect of that is $3.

4    Q.  You considered --

11:49:12    5    THE COURT:  Do you, in that exhibit before you, see $3

6    depicted in any way?

7    THE WITNESS:  (No response.)

8    THE COURT:  In other words, where does it show $3, if

9    it does?

11:49:30    10    THE WITNESS:  I don't see $3, Your Honor.  I see more

11    complicated terms.

12    THE COURT:  So you have answered the question.

13    What is the next question.

14    BY MR. STRINGFIELD:

11:49:46    15    Q.  Mr. Malackowski, you considered DTX 3608 in forming your

16    opinions today, didn't you?

17    A.  Well, I was aware of it.  So to that extent, I considered

18    it.  It was not, aside from an understanding of a part of the

19    patent cost expense, specifically referenced in my report.

11:50:09    20    Q.  And did you consider the payment terms of DTX 3608 when you

21    were forming your opinions?

22    A.  Not uniquely.  I considered the overall payment terms that

23    Hytera has for all patents to third-parties as part of my cost

24    deduction.

11:50:25    25    Q.  And you're aware that Hytera has paid millions of dollars

Malackowski - direct by Schmidt

2286

1   to Motorola under this license, right?

2   A.  Given their 500 million in infringing sales, yes, I would

3   expect that any royalty would total millions of dollars.

4   Q.  And you're aware that in the red team document we were

5   discussing earlier, Motorola was also going to provide a

6   license to its DMR technology to Tait, right?

7   A.  Certainly as represented by the subcomponents they supply,

8   they would be considered license.  Just like when you buy an

9   Apple phone, Apple gives a license to the technology.

10  Q.  So in the context of a Tait license, the red team document

11  that we were talking about, Tait was going to get access to --

12  or Tait was going to be able to use the Motorola DMR

13  technology, not just the patents, but the chips and the

14  software that were required to practice the DMR standard,

15  right?

16  A.  Existence with the lower-end radios made effective by the

17  chips they supplied or the parts they supplied.

18  Q.  And I think we discussed earlier that the expectation of

19  the red team that was making this proposal to license this

20  technology to Tait was that that was going to be for a couple

21  of years; do you remember that?

22  A.  Yeah.  A defined period of time at which point it would be

23  hoped that those companies could supply their own low-end

24  product.

25  Q.  And I think we agreed earlier talking about the red team

11:51:08

11:51:26

11:51:46

11:52:06

11:52:19

Malackowski - direct by Schmidt

2287

1  proposal, that those radios insides were going to be provided

2  to Tait at a price where Tait could make a profit on its

3  radios; do you remember that?

4  A.  I do.  You and I talked about that already.

11:52:41  5       MR. STRINGFIELD:  Let's put up, Mr. Montgomery,

6  DTX 4491, please.

7  BY MR. STRINGFIELD:

8  Q.  And again, this is the red team document that we were

9  discussing earlier, right?

11:52:56  10  A.  Yes, sir.

11  Q.  And I think we agreed that the thrust of this document was,

12  Motorola was concerned about the possible --

13       THE COURT:  Rephrase the question.  Try to eliminate

14  the persona as to "we."  What you, as the attorney, agree to.

11:53:22  15  So rephrase the question.

16  BY MR. STRINGFIELD:

17  Q.  Mr. Malackowski, you understand the red team proposal was

18  in the context of Motorola's concern that dPMR might become the

19  de facto standard?

11:53:58  20  A.  Yes, sir.

21  Q.  And as discussed earlier, when you were talking about this

22  document, Motorola understood that there needed to be multiple

23  DMR competitors to make a DMR market and to make DMR the

24  standard, right?

11:54:19  25  A.  Generally, yes, sir.

Malackowski - direct by Schmidt

2288

1   Q.  I'm going to hand you DTX 4578.

2           Mr. Malackowski, have you seen DTX 4578 before?

3   A.  I, frankly, don't recall.  I've seen --

4   Q.  This is --

11:55:02   5   A.  -- a lot of e-mails.

6   Q.  I'm sorry.  I didn't mean to cut you off.  Are you

7   finished?

8   A.  Yes.

9   Q.  So 4578 is an internal Motorola e-mail?

11:55:09   10   A.  It appears to be, yes.

11   Q.  And this was produced by Motorola in this case?

12   A.  And it has a Moto Bates stamp, yes.

13           MR. STRINGFIELD:  Your Honor, we wish to admit DTX

14   4578 into evidence.

11:55:21   15           MS. SCHMIDT:  No objection, Your Honor.

16           THE COURT:  It is received and may be published.

17           (Said exhibit received in evidence.)

18   BY MR. STRINGFIELD:

19   Q.  So on the bottom of the first -- or I guess in the middle

11:55:32   20   of the first page of 4578, this is an internal Motorola

21   competitive intelligence alert.  Do you see that?

22   A.  I do.

23   Q.  And it's dated January 30, 2008?

24   A.  It is.

11:55:48   25   Q.  And on the second page of this document, under the

Malackowski - direct by Schmidt

2289

1 comments, there's a note:

2           "On the positive side, addition of HYT to DMR

3           will constitute additional backing for Motorola

4           DMR standard position against dPMR MoU."

11:56:14   5            Do you see that?

6  A.  I do.

7  Q.  And MoU, that's a momentum of understanding?

8  A.  It is.

9  Q.  And dPMR is the competing standard that was competing

11:56:24  10  against DMR that we were discussing earlier, right?

11  A.  One of them.

12  Q.  And so this document dated January 30, 2008, at that time

13  Motorola saw it as a positive that Hytera might be considering

14  and entering the DMR market, right?

15  A.  Well, in part, yes.  But in part, this speaks directly to

16  the leapfrogging concept.  Under the threats to Motorola, it

17  means their development that Tier 3 will become a reality,

18  Hytera gains the upper hand, i.e., first to the market.  This

19  is exactly what I was speaking to yesterday in verification of

11:56:58  20  that.

21  Q.  Mr. Malackowski, I'm going to hand you DTX 4678.

22           Mr. Malackowski, DTX 4678, this is an internal

23  Motorola e-mail?

24  A.  It appears to be and bears a Motorola Bates stamp.

11:57:25  25  Q.  It bears a Motorola Bates stamp.  So it was produced in

Case: 1:17-cv-01973 Document #: 795 Filed: 12/20/19 Page 82 of 176 PageID #:54172
Malackowski - direct by Schmidt
2290

1    this litigation?

2    A.  That would be my understanding.

3           MR. STRINGFIELD:  Your Honor, we wish to move DTX 4678

4    into evidence.

5           MS. SCHMIDT:  No objection, Your Honor.

6           THE COURT:  It is received and may be published.

7           (Said exhibit received in evidence.)

8           MR. STRINGFIELD:  So Mr. Montgomery, if you could go

9    to the third page; page 3 of 4 of DTX 4768 -- or excuse me,

10   4678.

11   BY MR. STRINGFIELD:

12   Q.  Mr. Malackowski, let me know when you're there.  The third

13   page.

14   A.  Yes, sir.

15   Q.  So this is another competitive intelligence alert.  This

16   one is about a year later than the last one we looked at.  It's

17   dated February 3, 2009.  Do you see that?

18   A.  I do.

19   Q.  And this alert says:

20           "ETSI recognizes dPMR standard --"

21             Excuse me.  Let me start over.

22           "ETSI recognizes dPMR licensed conventional and

23           trunked radio."

24             Do you see that?

25   A.  I do.

Malackowski - direct by Schmidt

2291

1    Q.  It says:

2            "Kenwood adopt ECO label for own dPMR product."

3            Do you see that?

4    A.  Yes, sir.

11:58:30    5    Q.  Do you understand that ETSI is a -- or is the governing

6    body that governs the DMR standard?

7    A.  Yes.  It's the European technology telecommunications

8    standard industry, or something similar to that.

9    Q.  And so in this February 2009 alert, it says that now ETSI

11:58:44   10   is recognizing the competing dPMR standard, right?

11   A.  Yes, sir.

12   Q.  If you turn to page 4 of DTX 4678.

13           There's a "Comments" section in the middle of the page

14   there.  Do you see that?

11:59:02   15   A.  I do.

16   Q.  The first bullet says:

17           "DPMR expected to gain momentum by existing

18           3multi-supplier initiatives and now thanks to

19           ETSI approval."

11:59:18   20           Do you see that?

21   A.  Yes, sir.

22   Q.  So Motorola in this competitive intelligence alert is

23   concerned that because the competing dPMR standard has been

24   approved by ETSI, that the dPMR standard will gain momentum?

11:59:30   25   A.  Sure.  This is what led to their selling parts to people

Malackowski - direct by Schmidt

2292

1   like Tait.  It says that right at the bottom.  I'm familiar

2   with this.

3   Q.  And then the fourth bullet under Comments, which looks like

4   it's a little arrow or dart, says:

5          " MOTOTRBO DMR solution under attack."

6          Do you see that?

7   A.  I do.

8   Q.  And the bullet under that says:

9          "Kenwood/ICOM positioning dPMR as MutL-source

10         in DMR as Moto only."

11          Do you see that?

12  A.  I do.

13  Q.  And then it goes on:

14         "Danger MOTOTRBO could be perceived as

15         proprietary despite being ETSI standard."

16          Do you see that

17  A.  You read it correctly.

18  Q.  And so this is the concern that the one company standard

19  isn't much of a standard, right?

20  A.  Well, one company's standard is not an industry standard,

21  and this is why they began to supply low-function products to

22  third-parties.

23  Q.  Mr. Malackowski, you agree that purchasers of radio

24  products, it's desirable for them to buy a product that's part

25  of a standard, right?

Malackowski - direct by Schmidt

2293

1    A.  Yes, I would agree with that.

2    Q.  And the reason it's desirable is because under a standard,

3    radios from multiple manufacturers could talk to each other,

4    right?

5    A.  Interoperability is one benefit.

6    Q.  And the benefit of that is if today I bought a Motorola

7    radio and I bought a whole Motorola radio system, tomorrow if I

8    wanted to expand it, I could buy a Kenwood radio to work with

9    my Motorola system, right?

10   A.  To at least have some basic functionality, yes.

11   Q.  But if the standard was Motorola only, I wouldn't be able

12   to buy a radio later from another manufacturer to add to my

13   system, right?

14   A.  Not necessarily.  Not unless there was some dual

15   capability, but generally not.

16   Q.  And so it's more valuable than for a standard to have

17   multiple participants at least from the perspective of a

18   posture purchaser of the radios, would you agree with that?

19   A.  Sure.  As long as they abide by the rules, buy the

20   components and don't steal your trade secrets.

21   Q.  And so this bullet that -- this bullet we just read on the

22   page that says "Kenwood/ICOM positioning dPMR as MutL-source,"

23   that means that there are multiple participants in the dPMR

24   standard.  And then it goes on, DMR MOTO only, that means that

25   there's only one participant in the DMR standard, right?

Malackowski - direct by Schmidt

2294

1   A.  Right.  With dPMR there are two, Kenwood and ICOM, with

2   Motorola, as of this point there's only Moto.  If you go down

3   to the bottom of the page, the second bullet from the end, they

4   talk about encouraging the formation of multiple sourcing

5   manufacturing group, i.e., taking others in DMR.  So they

6   responded to this threat in the way that we talked about at

7   length.

8   Q.  They needed more companies to sign on to the DMR standard,

9   right?

10  A.  Yes.  By providing them low-end technology and helping them

11  get to market in a way that would still allow Motorola to offer

12  premium products.

13  Q.  Mr. Malackowski, I'll hand you DTX 4517.

14          Mr. Malackowski, does this appear to be an internal

15  Motorola presentation?

16  A.  It does.  And it bears a Moto Bates number.

17  Q.  And that means that this document was produced in this

18  litigation?

19  A.  That is my understanding.

20          MR. STRINGFIELD:  Your Honor, we'd like to move DTX

21  4517 into evidence.

22          MS. SCHMIDT:  No objection.

23          THE COURT:  It is received and may be published.

24          And we will deal with it at 1:00 o'clock, members of

25  the jury.

Malackowski - direct by Schmidt

2295

1          (Said exhibit received in evidence.)

2          THE COURT:  The witness shall return at 1:00 o'clock.

3    The Court is adjourned.

4          THE CLERK:  All rise.  The Court is adjourned.

12:03:40    5

6

7          (Luncheon recess taken from 12:00 o'clock p.m.

8          to 1:00 o'clock p.m.)

9

12:03:59   10

11          *     *     *     *     *     *     *     *

12

13

14   I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

15          RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

16

17

18                    /s/Blanca I. Lara.     December 3, 2019.

19

12:04:00   20

21

22

23

24

25

2296

1              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                     EASTERN DIVISION

3   MOTOROLA SOLUTIONS, INC., and MOTOROLA    ) No. 17 CV 1973
    SOLUTIONS MALAYSIA SDN. BHD,              )
4                                             )
              Plaintiffs,                     )
5   vs.                                       ) Chicago, Illinois
                                              )
6   HYTERA COMMUNICATIONS CORPORATION, LTD.,  ) December 3, 2019
    HYTERA AMERICA, INC., and HYTERA          )
7   COMMUNICATIONS AMERICA (WEST), INC.,      )
                                              )
8           Defendants.                       ) 1:00 o'clock p.m.

9                   TRIAL - VOLUME 14B
                 TRANSCRIPT OF PROCEEDINGS
10
            BEFORE THE HONORABLE CHARLES R. NORGLE, SR.,
11                        and a jury

12   APPEARANCES:

13   For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                            BY:  MR. ADAM R. ALPER
14                               MR. BRANDON HUGH BROWN
                                 MR. AKSHAY DEORAS
15                          555 California Street
                            Suite 2700
16                          San Francisco, California 94104
                            (415) 439-1400
17
                            KIRKLAND & ELLIS, LLP
18                          BY:  MR. MICHAEL W. DE VRIES
                                 MR. CHRISTOPHER M. LAWLESS
19                          333 South Hope Street
                            Suite 2900
20                          Los Angeles, California 90071
                            (213) 680-8400
21

22
     Court Reporter:        JUDITH A. WALSH, CSR, RDR, F/CRR
23                          Official Court Reporter
                            219 South Dearborn Street, Room 2342
24                          Chicago, Illinois 60604
                            (312) 435-5895
25                          blanca_lara@ilnd.uscourts.gov

2297

```
 1   APPEARANCES (Continued:)

 2   For the Plaintiffs:        KIRKLAND & ELLIS, LLP
                                BY:   MS. MEGAN MARGARET NEW
 3                              300 North LaSalle Street
                                Chicago, Illinois 60654
 4                              (312) 862-7439

 5                              KIRKLAND & ELLIS, LLP
                                BY:   MS. LESLIE M. SCHMIDT
 6                              601 Lexington Avenue
                                New York, New York 10022
 7                              (212) 446-4763

 8   For the Defendants:        STEPTOE & JOHNSON, LLP
                                BY:   MR. BOYD T. CLOERN
 9                                    MR. MICHAEL J. ALLAN
                                      MS. JESSICA ILANA ROTHSCHILD
10                                    MS. KASSANDRA MICHELE OFFICER
                                1330 Connecticut Avenue NW
11                              Washington, DC 20036
                                (202) 429-6230
12
                                STEPTOE & JOHNSON, LLP
13                              BY:   MR. DANIEL S. STRINGFIELD
                                227 West Monroe Street
14                              Suite 4700
                                Chicago, Illinois 60606
15                              (312) 577-1300

16

17   ALSO PRESENT:              MR. RUSS LUND and
                                MS. MICHELE NING
18

19

20

21

22

23

24

25
```

Malackowski - cross by Stringfield

2298

1          (Proceedings heard in open court.  Jury in.)

2               THE COURT:  Good afternoon, members of the jury.

3               Please re-call the witness.

4               MR. STRINGFIELD:  May I proceed, your Honor?

5               THE COURT:  Yes.

6       JAMES MALACKOWSKI, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

7                    CROSS-EXAMINATION (Resumed)

8    BY MR. STRINGFIELD:

9    Q.  Welcome back, Mr. Malackowski.

10   A.  Thank you, sir.

11   Q.  Mr. Malackowski, before the break, we were about to talk

12   about DTX 4517.  I think -- so DTX 4517, this is an internal

13   Motorola presentation, right?

14   A.  It appears to be, and it does have a Motorola Bates stamp.

15               MR. STRINGFIELD:  Okay.  And I believe we moved this

16   into evidence.

17               MS. SCHMIDT:  That's right.  That's my understanding

18   as well, your Honor.  We did not object.

19               THE COURT:  It is received and may be published.

20               MR. STRINGFIELD:  Better safe than sorry, your Honor.

21               THE COURT:  Indeed.

22          (Defendant's Exhibit 4517 received in evidence.)

23   BY MR. STRINGFIELD:

24   Q.  DTX 4517 on its face, it's called the -- it's called, "DMR

25   IPR strategy."  Do you see that?

Malackowski - cross by Stringfield

2299

1  A.  I do.

2  Q.  So we've been talking about DMR, and we know what that

3  means.  What is IPR, Mr. Malackowski?

4  A.  Intellectual property rights.

5  Q.  And so included in "intellectual property rights" would be

6  patents, right?

7  A.  It would.

8  Q.  And trade secrets could potentially be an intellectual

9  property right?

10 A.  They are.

11 Q.  If you go to Page 2 of 4517, this slide is entitled "DMR

12 IPR strategies, licensees/targets.  The strategy," it says,

13 "Build momentum and support for the DMR standard via proactive

14 product sales; i.e., faster time-to-market, closed paren, and

15 licensees; i.e., second sources of equipment."

16         Do you see that?

17 A.  I do.

18 Q.  And then the second heading is "Licensees," and you see

19 Tait, right?

20 A.  Yes, sir.

21 Q.  And we talked about Tait this morning, right?

22 A.  We did.

23 Q.  And the next heading is "Targets."  Do you see that?

24 A.  I do.

25 Q.  And the fourth target over is "Hytera," right?

Malackowski - cross by Stringfield

2300

1    A.  Yes, sir.

2    Q.  If you turn to Page 3 of DTX 4517, the fourth bullet down

3    says "HYT," and you understand that means Hytera, right?

4    A.  It does.

5    Q.  It says, "Hytera is in negotiations, seeking reduced

6    royalties in exchange for standards support within the PRC,

7    partnerships with SRT and EADS."  Do you see that?

8    A.  I do.

9    Q.  PRC, do you understand that's the People's Republic of

10   China?

11   A.  That would be my presumption.

12   Q.  And do you understand that in 2008 when this document was

13   generated that Hytera was the largest two-way radio

14   manufacturer in China?

15   A.  Generally, yes.

16   Q.  And do you understand that they're still today the largest

17   two-way radio manufacturer in China?

18   A.  Yes, of all radio types.

19   Q.  And the next two bullets under the bullet I just read, it

20   says, "ICOM, supports dPMR, no plans to approach, and Kenwood,

21   supports dPMR, no plans to approach."  Do you see that?

22   A.  I do.

23   Q.  So Page 4 of DTX 4517, again in this DMR intellectual

24   property rights strategy presentation, is an entire slide

25   dedicated to China, right?

Malackowski - cross by Stringfield

2301

1    A.  Yes, sir.

2    Q.  The first bullet says, "Motorola focused on time-to-market

3    versus adoption of DMR standard within PRC.  Priority on

4    building product momentum."  Do you see that?

5    A.  I do.

6    Q.  And as we just discussed, Hytera is the largest two-way

7    radio manufacturer in China.  Do you also understand that in

8    2008 and 2009 at least that China was the fastest growing

9    economy in the world?

10   A.  Generally speaking, I believe that is true.

11   Q.  The next bullet says, "ETSI."  That's the standards body

12   we just talked about, right?

13   A.  It is.

14   Q.  "Being pressured by China to make DMR an open standard."

15   Do you see that?

16   A.  Yes, sir.

17   Q.  And China was threatening to create its own standard and

18   lock out competition.  Do you see that in that bullet?

19   A.  I do.

20   Q.  And the next bullet talks about Hytera seeking reduced

21   royalties in exchange for DMR standard support within the

22   PRC."  Do you see that?

23   A.  You read it correctly.

24   Q.  So this slide is telling us that Motorola, recognizing the

25   importance of China, dedicating a whole slide in its

Malackowski - cross by Stringfield

2302

1   intellectual property rights strategy presentation to China

2   needs Hytera, the largest two-way radio manufacturer in China,

3   to be part of the DMR standard, does it not?

4   A.  Well, clearly, if they'd adopt and support the standard,

5   that would be helpful.  And this was part of the patent

6   license negotiation that we talked about before lunch.

7   Q.  Mr. Malackowski, this morning we were talking about

8   Motorola's research and development data and Hytera's research

9   and development data.  Do you remember that?

10  A.  Yes, sir.

11  Q.  And when we were talking about expenses that can be

12  deducted, I think you told us that at least conceptually,

13  research and development data could be deducted from

14  determining what your profit margin is, right?

15  A.  I did tell you that.

16  Q.  And you're aware that Hytera produced research and

17  development data in this case, right?

18  A.  Yes.  We've discussed that.

19  Q.  And you've looked at Hytera's research and development

20  data, right?

21  A.  At length.

22  Q.  And you understand that it's thousands and thousands and

23  thousands of rows in Excel spreadsheets, right?

24  A.  Many of which I reviewed, yes.

25  Q.  And they track their research and development expense at a

Malackowski - cross by Stringfield

2303

1   very high level of granularity.  Would you agree with that?

2   A.  Generally, yes.

3   Q.  And they track their research and development, R&D,

4   expenses using project codes.  Do you understand that?

5   A.  Yes.  I discussed some of those in my report.

6   Q.  And you're aware that Hytera isolated the DMR-related

7   project codes in its research and development data to generate

8   the research and development data that it would produce in

9   this case.  Do you understand that?

10  A.  But it was in error.  That's what they attempted to do,

11  yes.

12  Q.  Well, that's your characterization of it, right?

13  A.  My investigation showed that there were non-DMR products

14  specifically included in those thousands of lines, and it was

15  not representative of what they intended it to be.

16  Q.  So then would Hytera going back and removing the non-DMR

17  project codes from its research and development data cure your

18  concern with the research and development data?

19  A.  Not necessarily.  We still have the problems of the

20  varying wage rates where they jump from, you know, up 20

21  percent, minus 70, up 60 percent year after year, and we have

22  the problem where the engineers are recorded, software coding

23  engineer labor rates less than secretaries.  No offense to

24  secretaries, but that's inconsistent with what you would

25  expect as an accounting expert.

Malackowski - cross by Stringfield

2304

1   Q.  Well, Mr. Malackowski, I think it's fair to say that you

2   don't run a business in China; is that right?

3   A.  Well, actually, we do have a division in China but --

4   Q.  Okay.

5   A.  -- not relevant to this.

6   Q.  I agree.  Would you agree with me that your -- you don't

7   have any business in running a manufacturing or research and

8   development operation in China?

9   A.  Not related to radio products, clearly.

10  Q.  Okay.  And whereas -- let me step back.  So whereas Hytera

11  has detailed research and development data where it was able

12  to isolate the costs or the expenses related to DMR, Motorola

13  is completely unable to do that, right?

14  A.  No.  First, Hytera was not able to do that.  They tried

15  and failed.  And second, Motorola was.  They used a different

16  approach.  They used the engineer accounting hours approach as

17  opposed to something else, but it was an acceptable method.

18  Q.  So Motorola was unable to use its financial data that it

19  keeps in the ordinary course of business to calculate R&D

20  expense in this case, right?

21  A.  You asked me that earlier and I explained, they did rely

22  upon their financial experience, but they didn't have

23  accounting records they could just print out.  And so they

24  recorded it one way.  I tested it.  I found it to be reliable.

25  Hytera records it a different way.  I tested it.  I found it

Malackowski - cross by Stringfield

2305

1     not to be reliable.

2     Q.   I want to -- so you said that Motorola records it.  What

3     do you mean by "records it"?  It sounds like you're referring

4     to contemporaneous records over the past 13-1/2 years.  That's

5     not what you mean, is it?

6     A.   No, I do.  Motorola records its research and development

7     expense, just not at the level of granularity that I could

8     rely upon for this case.

9     Q.   And so you didn't rely on it?

10    A.   No.  I used the engineering estimates and Dr. Rangan,

11    which is a common approach under forensic accounting.

12    Q.   Mr. Malackowski, I think we're talking about two different

13    things.  Talking about Motorola's financial records, you did

14    not use those to calculate the R&D investment that you purport

15    Motorola made in the 21 trade secrets, right?

16    A.   No, I did.  Specifically, I used their financial records

17    to determine the engineering cost per month.  We talked about

18    how it varies by geographic location.  So that was part of the

19    analysis for sure.

20    Q.   You didn't use it to determine how many months they spent,

21    though, right?

22    A.   No.  That was Dr. Rangan and the engineers.

23    Q.   Okay.

24    A.   I think that's very clear.

25    Q.   And you couldn't use Motorola's R&D data to determine the

Malackowski - cross by Stringfield

2306

1  number of months because Motorola tracks its R&D level at a

2  very, very high level of -- or it includes analog products and

3  other digital products that have no bearing on this case,

4  right?

5  A.  I agree with that.

6  Q.  Okay.  So unable to rely on Motorola's financial data, you

7  interviewed engineers about what they did 13-1/2 years ago?

8  A.  For that part of the calculation, yes, and then also

9  relied upon Dr. Rangan to test their work and to provide his

10 input.

11 Q.  So for the cost per staff month, you purport to rely on

12 financial data, but for the number of staff months, the 18,400

13 staff months, that's not from the financial data; that's from

14 the interviews of the engineers about work they did 10, 13

15 years ago, right?

16 A.  Yes.  I think that's very clear.

17 Q.  And that methodology relying on memories from 13 years ago

18 is more reliable than the Hytera financial information that's

19 tracked in realtime?  That's your opinion?

20 A.  Well, they're an apple and an orange.  They're different.

21 It's not simply relying on memories.  They went back and

22 refreshed.  They spoke to their team.  They looked at the

23 information that they had, but their conclusion as an accepted

24 method of calculating the cost of R&D is, in fact, reliable

25 and tested and verifiable.

Case: 1:17-cv-01973 Document #: 795 Filed: 12/20/19 Page 99 of 176 PageID #:54189
Malackowski - cross by Stringfield
2307

1    The Hytera data is not.  Had Hytera replicated that

2  analysis with their expert team, that would have been

3  something that they could have used instead of what they

4  produced.

5  Q.   If Hytera had gone and verified its R&D data with

6  engineers, that would be acceptable to you?

7  A.   If they had presented it in a level of detail, I certainly

8  would have considered it.  And conceptually, it would have --

9  if they did it the same way Dr. Rangan and his team did, then

10  yes, of course, I would accept it.  It would be the same.

11  Q.   Okay.  Mr. Malackowski, your opinion that Motorola gets

12  all of Hytera's profits going back to 2010 is based on the

13  premise that Hytera would never release a DMR radio --

14  A.   Well, certainly --

15  Q.   -- correct?

16  A.   -- not through the period I studied.

17  Q.   And again, that's because they couldn't, in Dr. Rangan's

18  opinion, develop a DMR radio without the 21 trade secrets,

19  right?

20  A.   In part, and in part because their profits actually did

21  benefit from use of the trade secrets.  And I'm trying to

22  measure what actually happened.  So truth in fact, they didn't

23  come out with an alternative.  Truth in fact, they sold $500

24  million worth of infringing product, and the end result of

25  that is profits of 311.8 million.

Malackowski - cross by Stringfield

2308

1   Q.   So if Dr. Rangan is incorrect that Motorola -- or excuse

2   me, that Hytera misappropriated all 21 trade secrets, then

3   your opinion that Motorola is entitled to 100 percent of

4   Hytera's profits is also not valid, right?

5   A.   It would depend upon how Dr. Rangan was found to be

6   incorrect.  If it includes, and he was correct, on the seven

7   core trade secrets, the seven rooms in the house, the number

8   doesn't change.

9   Q.   Right.  And so as a fallback, you have this delay period

10  that you talked about, right?

11  A.   Yes.  As a fallback, if less than the seven primary trade

12  secrets are found to infringe, then we look to Dr. Rangan's

13  estimates of how long it took to develop the ones that did

14  infringe.  Say they took 48 months, then we would just look to

15  the profit for 48 months.

16          MR. STRINGFIELD:  Jim, can we have PTX 1030, please?

17  BY MR. STRINGFIELD:

18  Q.   So I think this is what you were just talking about,

19  Mr. Malackowski.  These are the delay periods based on the

20  different trade secrets that might be misappropriated?

21  A.   Yes, sir.

22  Q.   Okay.  And again, this is entirely based on Dr. Rangan's

23  interviews with the engineers about work they did years and

24  years ago, right?

25  A.   Well, and his experience and his testing.  It's based upon

Malackowski - cross by Stringfield

2309

1    his testimony and the work of the engineers and their

2    testimony at my request.

3    Q.   And your analysis of these delay periods, that's based on

4    a concept called the head start period, right?

5    A.   Accelerated development, head start, some people use those

6    terms.

7    Q.   And the head start period is based on an article that you

8    relied on in your report, right?

9    A.   No.  The head start analysis or accelerated development is

10   a long tried and true method of assessing the apportion of

11   profit that relates to the trade secret.  Now, to your point,

12   I do cite in my report various third party articles, one of

13   which, the Sedona article, I believe, does talk about the head

14   start specifically.

15   Q.   Well, in fact, the head start -- excuse me.  The Sedona

16   article is the only support that you cite for your application

17   of the head start period in your report; is that not true?

18   A.   Not true.  If you go to my report, in particular my second

19   report, I cite half a dozen or a dozen legal cases where my

20   methodology was used and accepted.

21   Q.   In your original report, you only cite the Sedona article;

22   is that not true?

23   A.   In my original report, I think that's true.  Your question

24   wasn't so specific.

25   Q.   And you understand that the head start period is defined

Malackowski - cross by Stringfield

2310

1    based on when an alleged misappropriater would have figured

2    out the trade secrets on their own, right?

3    A.  And been able to implement them and recover fully from

4    where they otherwise would have been.

5    Q.  And I think one of the examples that's given in the

6    article is a customer list for a car dealership or something

7    along those lines.  And I think the article says that if

8    you -- you know, the other car dealership would have figured

9    out the customer list eventually, and so the trade secret

10   damages are cut off at that point.  Do you remember that from

11   the article?

12   A.  I actually don't, but that could be the case.

13   Q.  But the thrust of the head start period is that damages

14   are cut off at the point where the alleged misappropriater,

15   here Hytera, would have figured out the trade secrets, right?

16   A.  No.  And this is discussed at length in my report.  If

17   they would have recovered it and discovered it, say, four

18   years later, you could cut it off then if the facts suggest

19   that they could immediately catch up.

20        But if there would be a delay and even if they found

21   out in four years, it would take them another year to build

22   product and get into market and get back to where they were,

23   then you would also take that year into account as well.

24   Q.  And Mr. Malackowski, you mentioned this impact of a delay.

25   And I think you just used four years, right, as your example?

Malackowski - cross by Stringfield

2311

1    A.   I did.

2    Q.   Now, you have delays as short as three months or six

3    months in your opinion as shown on PTX 1030, right?

4    A.   More specifically, I have trade secrets that could have or

5    were, in fact, developed in as short as three months.

6    Q.   And I believe it's your opinion that under a delay as

7    short as three months that Hytera's sales would always be

8    behind perpetually and forever by three months?

9    A.   Well, more particularly in this market because Hytera was

10   moving as fast as it could, what the facts showed is that had

11   they caught up in -- or had they discovered the trade secrets

12   in 24 months or three months or 48 months, they could not

13   catch up within the period of time I studied.  They would

14   constantly be that far behind for a period of time.

15   Q.   You don't have any basis for that assertion that they'd

16   never catch up, do you, Mr. Malackowski?

17   A.   Of course I do.  I cite it in my report.  I specifically

18   talk about the Hytera records where they note that they have

19   to get customer feedback in order to modify the product and so

20   that's -- it's like an accordion.  Once you compress it, you

21   can't just immediately extend it again.

22   Q.   Mr. Malackowski, we talked a little bit earlier about your

23   credentials and that you're not an economist, right?

24   A.   I do not have a Ph.D. in economics.

25   Q.   And so you couldn't as an economist devise an analysis and

Malackowski - cross by Stringfield
2312

1    perform an econometric analysis to assess the impact of any

2    delay, right?

3    A.  Well, I don't know that that's true.  I would have to see

4    what the economist suggested.  I can certainly, and I have,

5    rebutted economists several times.  It depends upon the

6    sophistication and application of their theories.

7    Q.  Did you do that in this case, Mr. Malackowski?

8    A.  I did.  Hytera's expert, Dr. Aron, I believe, is an

9    economist.  She presented rebuttal to my report, and I found

10   quite readily the ability to address her concerns.

11   Q.  But Mr. Malackowski, you didn't perform any analysis that

12   would substantiate your claims of perpetual delay, right?

13   A.  I disagree.  I cited to you one example from the Hytera

14   records, and I believe that the Motorola witnesses and

15   Dr. Rangan in particular explained, in this market for these

16   products, Hytera was running as fast as it could.  And had it

17   automatically discovered trade secrets four years after they

18   stole them, they wouldn't be able to snap back into the market

19   and pick up where they left off.  It would take time.  It

20   would take more time than has been spent so far.

21   Q.  I think you said that you looked at one Motorola -- or

22   excuse me, one Hytera document that talked about the need for

23   customer feedback, right?

24   A.  I cite one document or testimony in my report, yes.

25   Q.  An econometric analysis means taking data and applying

Case: 1:17-cv-01973 Document #: 795 Filed: 12/20/19 Page 105 of 176 PageID #:54195
Malackowski - cross by Stringfield
2313

1   statistical methods to measure it, right?

2   A.  It can mean that, yes.

3   Q.  You didn't do that here, did you?

4   A.  No.  The data is not available to do that.

5   Q.  And you did not seek to get that data?

6   A.  Well, from common sense, you know it's not available.

7   Hytera did not all of a sudden magically discover these trade

8   secrets from some other source and go into the market.  Had

9   they done that, then you would have data to show how long it

10  took them to catch up.  We don't have that.

11  Q.  And you didn't perform any study or survey to determine

12  whether Hytera would be perpetually delayed by even a

13  three-month period forever until the end of time, right?

14  A.  Again, it's not possible to do a survey when the fact

15  pattern you're inquiring about hasn't occurred.  I can't go

16  and ask Hytera through written questions or otherwise, "How

17  long did it take you to catch up" because they didn't catch up

18  because they didn't stop using.  They're still using the trade

19  secrets.

20  Q.  So that's "no," you didn't perform any survey,

21  Mr. Malackowski?

22  A.  It's, I could not.  No one can.

23  Q.  And again, you didn't perform any application of

24  statistical analysis to any data to test your assumption that

25  there would be a perpetual delay?

Malackowski - cross by Stringfield

2314

1    A.  I did not.  Not possible.

2           MR. STRINGFIELD:  Jim, can we please put up DDX 7.17,

3    please?

4    BY MR. STRINGFIELD:

5    Q.  So Mr. Malackowski, as we did earlier with your theory

6    that Motorola would recover 100 percent of Hytera's profits,

7    we separated out the -- again, these totals are your numbers,

8    but we separated out the U.S. portion from the rest of the

9    world.  Do you see that?

10   A.  I -- I have never seen this chart before, but it seems to

11   be what you're doing because the first number, 28,714,814, is

12   exactly the number that I show for U.S. profits.

13   Q.  Right.  So Mr. Malackowski, and I'll just read --

14          THE COURT:  Just a point here.  When you say "the

15   rest of the world," how many countries are you actually

16   talking about?

17          THE WITNESS:  Your Honor, we talked a little bit

18   about that yesterday.  I don't know a precise count because

19   the records made available to me do not show on a customer

20   basis because of distributors or even the distributors.

21          THE COURT:  So when the term "the rest of the world"

22   is being used during the course of the trial, what is your

23   understanding of "the rest of the world"?

24          THE WITNESS:  It's total reported sales minus U.S.

25   sales.

Malackowski - cross by Stringfield

2315

1          THE COURT:  Okay.  Are the countries in which the

2    sales are taking place not otherwise disclosed within the

3    records; for example, England, France, Germany --

4          THE WITNESS:  What's --

5          THE COURT:  -- even Nigeria?

6          THE WITNESS:  I haven't seen Nigeria.

7          THE COURT:  Is that part of the world?

8          THE WITNESS:  It's referred to in E -- is it EMEA,

9    eastern -- Middle East, eastern Europe.  They refer generally

10   to the regions, your Honor, but they don't provide geographic-

11   specific evidence of each of the customers.  That was not

12   produced.

13         THE COURT:  All right.  Proceed.

14   BY MR. STRINGFIELD:

15   Q.  So Mr. Malackowski, here for your 108-month delay period,

16   we've separated out the portion of Hytera's profits that are

17   in the U.S. versus the rest of the world besides the U.S.,

18   right?

19   A.  Yes, sir.

20   Q.  And we've been referring to that as "outside the U.S."?

21   A.  Yes, sir.

22   Q.  And we abbreviate it here as "OUS."  Do you understand

23   that to be every other country but the U.S.?

24   A.  That's how it's used in the documents, yes, sir.

25   Q.  And here for the U.S. portion, we have for the 108-month

Malackowski - cross by Stringfield

2316

1    delay period $28,714,814, right?

2    A.  Yes, sir.

3    Q.  And for the rest of the world, we have $209,561,242,

4    right?

5    A.  Yes, sir.

6    Q.  And then bear with me as we read these into the record.

7    For the 48-month period, we have in the United States, the

8    portion is $20,036,573, right?

9    A.  Yes.  If you want to just read them all --

10   Q.  Okay.

11   A.  -- that would be easier.

12   Q.  Sure.  Outside the U.S. for the 48-month period, we have

13   159,759 -- let me start over.  159,759,620 for the 48-month

14   period outside the U.S., right?

15   A.  Yes.

16   Q.  And then for the 36-month period inside the U.S., we have

17   15,963 -- 15,963,206, right?

18   A.  Yes.

19   Q.  For outside the U.S., we have 135,758,265, right?

20   A.  Yes.

21   Q.  For 24 months we have 11,422,300 in the U.S.?

22   A.  Yes.

23   Q.  And outside the U.S., we have 93,729,074?

24   A.  Yes.

25   Q.  Inside the U.S. for the 12-month delay period, we have

Malackowski - cross by Stringfield

2317

1    5,371,879?

2    A.  Yes.

3    Q.  Outside the U.S. for the 12-month period, we have

4    56,513,822?

5    A.  Yes.

6    Q.  For the six-month period inside the U.S., we have

7    2,685,940?

8    A.  Yes.

9    Q.  Outside the U.S. for the six-month delay period, we have

10   28,256,911?

11   A.  Yes.

12   Q.  And for the three-month delay period inside the U.S., we

13   have 1,342,970, right?

14   A.  Yes.

15   Q.  And outside the U.S., we have 14,128,455?

16   A.  Yes.

17   Q.  And again, Mr. Malackowski, your opinion is that under,

18   for example, the six-month delay, instead of looking at the

19   amount of sales that Hytera would have made in the first six

20   months of 2010 when it began selling products, you look to the

21   end of the accounting period which in this case includes half

22   of 2019, and you look there for where the six-month profits

23   should come from?

24   A.  I don't know that that's correct.  I don't believe that's

25   correct.

Malackowski - cross by Stringfield

2318

1  Q.  You do look to the end of the accounting period for where

2  your damages should come from, right?

3  A.  Well, I look to the totality of the sales and

4  apportionment by period.  I don't believe it comes at the end.

5  Q.  Well, how about under the 24-month period in the middle

6  there?  You have 105,151,374, right?

7  A.  Yes, sir.

8  Q.  And Hytera did not, in fact, sell $105 million worth of

9  DMR radios in the first two years, right?

10  A.  I would have to go back and look at the schedules.  I

11  don't recall these numbers from memory at that level of detail.

12         MR. STRINGFIELD:  Jim, can you put up, please, DDX

13  7.18?

14  BY MR. STRINGFIELD:

15  Q.  So Mr. Malackowski, what's shown here are a modification

16  of your delay period theory.  And the values that are shown

17  here are the Hytera sales that were made within the various

18  delay periods.  For example, under the three-month delay,

19  what's shown here at a total of $422,031 are the actual sales

20  that Hytera would have made in the first three months.  Do you

21  see that?

22  A.  I see what's written here.  I think the concern is that

23  you're taking the numbers that I prepared for the copyright

24  analysis which these metrics are for the residual after the

25  trade secret period.  So in that case, they do come at the end

Malackowski - cross by Stringfield

2319

1   because if the trade secrets were only lasting 36 months, then

2   we'd look at the end period for the copyright and add to it.

3   So I think that's why you're seeing the difference in this

4   analysis.

5   Q.  So Mr. Malackowski, these numbers that are shown on DDX

6   7.18, these are numbers from Hytera's financial data.  These

7   are their actual sales in the first three months, the first

8   six months, the first 12 months, and so on of selling radios.

9   These didn't come from that copyright analysis that you just

10  mentioned.

11  A.  Okay.  This is not my chart.  I have not seen this before,

12  so I'll accept that.

13  Q.  Okay.  So Mr. Malackowski, you know, we were talking on

14  the previous slide about the 24-month period --

15              THE COURT:  Is this exhibit in evidence?

16              MS. SCHMIDT:  No, it is not, your Honor.

17              MR. STRINGFIELD:  Your Honor, it's a demonstrative.

18  I was trying to illustrate the difference between the 24 --

19  what Hytera sold in the first 24 months versus --

20              THE COURT:  Did you put that kind of inquiry to the

21  witness before you asked him the questions?

22              MR. STRINGFIELD:  Your Honor, I was inquiring of the

23  witness if he knew what Hytera actually sold in the first --

24              THE COURT:  I mean, the reference to the foundation

25  from where the exhibit came and who's responsible for its

Malackowski - cross by Stringfield

2320

1    preparation?

2         MR. STRINGFIELD:  I'm sorry, your Honor?

3         THE COURT:  Well, it's just suddenly thrust at the

4    witness.  It's not in evidence.  What is it?

5         MR. STRINGFIELD:  Your Honor, this is a demonstrative

6    that --

7         THE COURT:  Well, can you inquire or make that point

8    with the witness so that he understands?

9         MR. STRINGFIELD:  Mr. Malackowski --

10         MS. SCHMIDT:  Your Honor, this is, this demonstrative

11   references an exhibit that is not in evidence.

12         THE COURT:  That's my point.

13         MS. SCHMIDT:  This is not just simply a

14   demonstrative.

15         THE COURT:  Before the witness should be questioned

16   with respect to it, it should somehow be identified from

17   whence it came, what's the origin, some fundamental

18   disclosure.

19         Have you ever seen this before, sir?

20         THE WITNESS:  No, never seen this before.

21         THE COURT:  What do you recognize it to be?

22         THE WITNESS:  All I can read is what it's supposed to

23   be.  I don't know if that's the --

24         THE COURT:  That makes the point.  Proceed.

25         MR. STRINGFIELD:  Thank you, your Honor.

Malackowski - cross by Stringfield

2321

1    BY MR. STRINGFIELD:

2    Q.  So Mr. Malackowski, this chart summarizes what Hytera

3    actually sold or its actual profits during the various delay

4    periods, correct?

5            THE COURT:  Who says that?

6            MR. STRINGFIELD:  I'm sorry, your Honor?

7            THE COURT:  Who says that?

8            MR. STRINGFIELD:  Your Honor --

9            THE COURT:  You made an assertion.  I'm saying,

10   what's the source of the assertion?  What's the evidentiary

11   source of your assertion?

12           MR. STRINGFIELD:  I understand, your Honor.  I

13   thought you were -- I misunderstood.

14           THE COURT:  I'm saying, what's the evidentiary source

15   of your assertion to the witness?

16           MR. STRINGFIELD:  Your Honor, and this citation is

17   actually not correct.  I don't have the citation --

18           THE COURT:  Rephrase the question.

19           MR. STRINGFIELD:  Sure.  Your Honor, if I may, I can

20   move on because --

21           THE COURT:  Yes, if you wish.  Go ahead.

22           MR. STRINGFIELD:  Sure.  Take that down, Jim.

23           And I withdraw the last question.

24   BY MR. STRINGFIELD:

25   Q.  Mr. Malackowski, you did a lost profits analysis in this

Malackowski - cross by Stringfield

2322

1   case, right?

2   A.  I did.

3   Q.  And part of doing a lost profits analysis is to do a

4   market share construction?

5   A.  It is.

6   Q.  And part of doing a market share analysis is you have to

7   have a thorough understanding of how the products are sold,

8   right?

9   A.  Well, it depends upon how you define "thorough."  Most

10  important to the expert is to look to see how the businesses

11  actually define the market in normal course.

12  Q.  And Mr. Malackowski, you considered how Motorola defines

13  the market in this case, right?

14  A.  Of course.

15  Q.  And, in fact, Motorola's business documents made for

16  planning purposes to find the relevant market in which the DMR

17  products could be -- to be something called radio products,

18  right?

19  A.  Yes.  It's a broader category than just DMR.

20  Q.  Right.  And the radio products category includes, for

21  example, analog radios?

22  A.  Yes, sir.

23  Q.  And it includes other digital technologies that are not at

24  issue in this case?

25  A.  It does.

Malackowski - cross by Stringfield

2323

1   Q.  It includes another variant of DMR called low-end DMR that

2   you didn't include in your damages analysis in this case --

3   A.  It does.

4   Q.  -- right?

5           And Mr. Malackowski, I think earlier in your

6   testimony yesterday, you were talking about, it sounded like

7   you were limiting the relevant market to just high and

8   mid-tier DMR.

9   A.  My calculation of lost profits is based upon high and

10  mid-tier DMR radios.

11  Q.  And do you consider the other constituents of the radio

12  products market to be competitors for the DMR radios when

13  you're constructing your market analysis?

14  A.  Well, it depends upon how you consider that.  If you

15  looked at the documentary evidence, they would not be.  It's a

16  two-party market according to Hytera, and Motorola and Hytera

17  had 90 percent of the market.  But I used a much more

18  conservative estimate because I took into account perhaps

19  those customers wouldn't necessarily buy a Motorola radio or

20  any radio at all, and so I used about 50 percent.  That's

21  taking into account those other technologies and forms of

22  radios.

23  Q.  So your opinion is that Motorola -- and I think you said

24  this multiple times yesterday that but for Hytera selling

25  radios, Motorola would have captured 100 percent of every sale

Malackowski - cross by Stringfield

2324

1    that Hytera made, right?

2    A.   I believe that what would have happened in reality, they

3    would have captured 100 percent or 90-some percent.

4    Q.   But to be conservative, you cut that in half?

5    A.   Not exactly.  Approximately in half based upon the

6    documents, yes.

7    Q.   Based upon Motorola's own market studies, right?

8    A.   Yes, sir.  The market pulse reports.

9    Q.   Mr. Malackowski, and I don't know that we had a hard copy

10   of this, but PTX 155.  We probably don't but it's -- do you

11   remember that the internal marketing documents that you

12   considered were called the market pulse report documents?

13   A.   I just said that, yes.

14   Q.   Thank you.  And again, Motorola includes within its

15   definition of radio products -- and I think you just mentioned

16   this -- other technologies such as analog and business light?

17   A.   Yes.  They're generally looking at the radio business

18   holistically.

19   Q.   And in the internal Motorola planning documents, I think

20   you mentioned this also, that Motorola has a little over 50

21   percent market share?

22   A.   If you look at everything combined, yes.

23   Q.   And so you applied that market share to your lost profits

24   analysis, right?

25   A.   Generally, yes.

Malackowski - cross by Stringfield

2325

Q.   Okay.  And the Court asked you yesterday about how Hytera
radios are sold, right?

A.   Yes, sir.

Q.   And I think you said that 70 percent of Hytera radios are
sold through dealers, right?

A.   That was my estimate of this marketplace generally based
upon the documents, not a statistical analysis.

Q.   That was a guess, right?

A.   Well, it was based upon my best memory to answer the
Court's question from what I reviewed.  That's not part of my
specific report analysis.

Q.   Well, in fact, 100 percent of Hytera's radios are sold
from dealers.  Do you understand that?

A.   So I was referring to the market generally.  I can accept
that.  I know when you go to their website, they refer you
always to a dealer, but my understanding is there are also
some direct accounts, but perhaps those haven't been
successful.

Q.   And I believe you also told the Court that Hytera's radios
are sold at Costco; is that right?

A.   I know that -- in Chicago, I was looking for common
customers.  I believe they're sold at -- not sold.  Costco
purchased them.  Abt Electronics purchased them.  So those are
examples of lost customers.

Q.   But you understand that Hytera radios have never been sold

Malackowski - cross by Stringfield

2326

1    at a Costco, right?

2    A.   No.  Costco is a customer of Hytera's.

3    Q.   Well, 100 percent, you understand that 100 percent of

4    Hytera's radios are sold through dealers and they're not sold

5    through retail channels at all?

6    A.   I'll accept that.

7    Q.   That's not what you told the Court yesterday, right?

8    A.   My answer, best recollection is that in this market

9    generally, most of the sales are through dealers,

10   approximately 70 percent.  That isn't specific to Hytera.

11   That's this market generally including Motorola, including

12   ICON, including Kenwood.

13   Q.   And earlier, I think you talked a little bit about

14   Motorola dealers.

15   A.   Yes, sir.

16   Q.   Motorola dealers, the majority of them, are exclusive

17   dealers, right?

18   A.   I think I said that specifically yesterday.

19   Q.   Okay.  And so an exclusive Motorola dealer by definition

20   only sells Motorola radios, right?

21   A.   By definition.

22   Q.   And, therefore, a Motorola exclusive dealer doesn't sell a

23   Kenwood radio as an offering?

24   A.   No.

25   Q.   And a Motorola exclusive dealer doesn't sell a Hytera

Malackowski - cross by Stringfield

2327

1    radio as an alternative?

2    A.   They would not.

3    Q.   And you understand that Hytera's dealers are primarily

4    nonexclusive; they sell multiple product lines?

5    A.   I said that yesterday, too.

6    Q.   Mr. Malackowski, just a couple more brief points.  Your

7    copyright theory, you also claim under copyright that Motorola

8    is entitled to 100 percent of Hytera's profits in the United

9    States for all time going back to 2010?

10   A.   Yes.  Allowing them to recover their cost for the product

11   material, patent royalties, and the like, yes.

12   Q.   And you understand that -- or I think you agree that it's

13   important -- it's proper to do an apportionment of damages in

14   a copyright damages analysis, right?

15   A.   It is.  And I provided figures on apportionment based upon

16   the timeline:  Three months, 24 months, 48.  That would be a

17   measure of apportionment representing if or how much of the

18   value is associated with the accelerated development of the

19   copyright as opposed to something else.

20   Q.   Because the reason that you do an apportionment is you

21   have to match the scope of the damages to the scope of the

22   infringement, fair?

23   A.   Fair.  From an economic perspective, what impact did it

24   have on the business.

25   Q.   And you understand that Hytera is not accused of copying

Malackowski - cross by Stringfield

2328

1  100 percent of the Motorola source code, right?

2  A.  I do understand that.

3  Q.  You understand that Hytera is not accused of copying 50

4  percent of the Motorola source code?

5  A.  I don't have a defined percentage.  I don't believe there

6  is one.  My understanding is that the source code that was

7  copied is enabling, meaning if they didn't have it, the radios

8  couldn't be sold.

9  Q.  Wasn't it true for any piece of source code, even if you

10  get one character wrong in a piece of source code, the whole

11  thing doesn't work?

12  A.  No.  It may mean that a feature doesn't work or a light

13  doesn't light or a bell doesn't chime.  It doesn't mean that

14  the whole radio won't work.

15  Q.  And Mr. Malackowski, you understand that Hytera is only

16  accused of misappropriating about 5 percent or less than 5

17  percent of the total Motorola source code, right?

18  A.  I heard that figure presented with the technical experts,

19  but that's not a relevant percentage to an accounting analysis

20  because even that 5 percent is enabling.  Without it, these

21  radios would not work.

22  Q.  And that's true even if it were a completely different 5

23  percent of the code?

24  A.  I don't know.  The technical experts didn't study that

25  code.

Malackowski - redirect by Schmidt

2329

1   Q.  You didn't independently consider that, right?

2   A.  That wouldn't be relevant to the calculation.  My

3   calculation was specific to the code that was stolen.

4           MR. STRINGFIELD:  All right.  I'll pass the witness,

5   your Honor.

6           THE COURT:  Redirect, counsel?

7           MS. SCHMIDT:  Yes, your Honor.

8           Good afternoon, Mr. Malackowski.

9           May I proceed, your Honor?

10          THE COURT:  Yes.

11                       REDIRECT EXAMINATION

12  BY MS. SCHMIDT:

13  Q.  So Mr. Malackowski, you were asked about whether your

14  opinion as to the amount of damages changed based on the

15  number of trade secrets that were asserted in this case.  Do

16  you remember that?

17  A.  Many times.

18  Q.  And now, and you testified that your opinion essentially

19  remained the same; is that right?

20  A.  It depends upon which trade secrets are found to infringe.

21  If the primary trade secrets are infringed, then the total

22  number would not change.

23  Q.  And why is that?

24  A.  Because those trade secrets required the entire

25  development period, so we have to look to the entire period of

Malackowski - redirect by Schmidt

2330

1   profitability.  They're the most significant trade secrets.

2   It would be the ones shown on the bar for 108 months.

3   Q.  And Mr. Malackowski, do you have an understanding of how

4   important those trade secrets and, in fact, all of the

5   asserted trade secrets are to the products in this case?

6   A.  As I described, they're enabling.  They're critical.

7   Without them, the product would not work.

8   Q.  And turning to a new topic, Mr. Malackowski, you were also

9   asked about -- several questions about research and

10  development costs.  Do you recall that?

11  A.  Of course.

12  Q.  And did you as part of your analysis consider how

13  Motorola's overall R&D spend for its MOTOTRBO projects

14  compared to its -- to its R&D for just the asserted trade

15  secrets?

16  A.  Yes.  I talked about the fact that its overall R&D was

17  significantly greater than what I presented for the trade

18  secrets.

19  Q.  And did that inform at all your analysis or your valuation

20  of the asserted trade secrets?

21  A.  In two ways.  One, it showed that what I included was

22  conservative and, two, by comparison, it showed the still

23  unexplainable gap in the Hytera research and development, how

24  was it possible that they could launch these products as

25  quickly as they did for as little as they reportedly spent.

Malackowski - redirect by Schmidt

2331

1    Q.   And Mr. Malackowski, did Motorola start the MOTOTRBO

2    project from scratch?

3    A.   No.  As the technical experts and the Motorola engineers

4    described, Motorola was leveraging its history including going

5    back to ASTRO and other previous generations of product.  So

6    they had actually a head start themselves in getting this code

7    developed.

8              MS. SCHMIDT:  And if I could get the ELMO, please.

9              THE CLERK:  You have it.

10             MS. SCHMIDT:  Thank you very much.

11   BY MS. SCHMIDT:

12   Q.   And so Mr. Malackowski, you had looked at on direct DTX

13   4751.  Do you recall that?  And it's this document.  And I'm

14   going to zoom out.

15   A.   I think you mean on cross, but yes.

16   Q.   On cross, yes.  I apologize.

17             And you were shown this document, DTX 4751, and you

18   were asked about how the total staff months compared in this

19   document compared to the total staff months you used.  Do you

20   remember that?

21   A.   I do.

22   Q.   And do the total staff months in this document include all

23   of the legacy work that you considered as part of your

24   analysis?

25   A.   It does not.  And it does not include the feature

Malackowski - redirect by Schmidt

2332

1   releases.

2   Q.  And so in your opinion, would it be more reliable or less

3   reliable to use the information provided by the Motorola

4   engineers and Dr. Rangan to arrive at the R&D spend for the

5   asserted trade secrets in this case?

6   A.  This document is incomplete.  It is much more reliable to

7   rely upon the work that was done by the engineers and tested

8   by Dr. Rangan.

9   Q.  And now, Mr. Malackowski, you were also asked about a

10  license that Hytera has to certain Motorola patents.  Do you

11  remember that?

12  A.  I do.

13  Q.  And there were also some questions about IPR and what that

14  means.  Do you remember that?

15  A.  I do.

16  Q.  In particular, the patents that are licensed relate to a

17  standard promulgated by ETSI.  Do you remember that?

18  A.  Yes, ma'am.

19  Q.  Do you know what ETSI is?

20  A.  The European Telecommunications Standards Institute, I

21  think.

22  Q.  And are you familiar with ETSI's IPR policy?

23  A.  To some extent.  I've worked on projects involving that

24  before, yes.

25          MS. SCHMIDT:  Your Honor, may I approach the witness?

Malackowski - redirect by Schmidt

2333

1           THE COURT:  Yes.

2    BY MS. SCHMIDT:

3    Q.  And this is Exhibit -- this is an excerpt from DTX 4977,

4    and we've marked it 4977-A.

5           So Mr. Malackowski, what is this document?

6    A.  This is part of the rules of procedure describing the ETSI

7    IPR policy.

8    Q.  And have you reviewed this document --

9    A.  Yes.

10   Q.  -- as part of your prior work?

11   A.  I have seen these rules before, yes.

12          MS. SCHMIDT:  Your Honor, we would move DTX 4977-A

13   into evidence.

14          THE COURT:  It is received and may be published.

15      (Defendant's Exhibit 4977-A received in evidence.)

16   BY MS. SCHMIDT:

17   Q.  Now, Mr. Malackowski, if we turn to the page at the top

18   that says 44, you'll see that there's a section called

19   "Definitions."  Do you see that?

20   A.  I do.

21   Q.  And if you turn the page, there's actually a definition

22   No. 7 of IPR.  Could you read that, please?

23   A.  "IPR shall mean any intellectual property right conferred

24   by statute law including applications therefor other than

25   trademarks.  For the avoidance of doubt, rights related to

Malackowski - redirect by Schmidt

2334

1    get-up, confidential information, trade secrets, or the like

2    are excluded from the definition of IPR."

3    Q.  And so Mr. Malackowski, when we're talking about IPR in

4    the context of ETSI or a license to patents declared to ETSI,

5    would that license also include trade secrets?

6    A.  No.  The purpose of the standard IPR procedure is to

7    assure that anyone has a patent and they contribute to the

8    standard, that they disclose that to the committee because a

9    patent is a blocking right.  If you help to develop a standard

10   and you keep the patent hidden, then people come to market and

11   you sue them for patent infringement.  That's not fair if you

12   encourage them to develop that standard.  So that's why ETSI

13   and other organizations have the same policy.

14   Q.  And so but trade secrets, are they part of that policy as

15   well?

16   A.  No.  You're entitled to keep your trade secrets because

17   that's not exclusionary.  If someone else happened to develop

18   something similar, you can't stop them unless they

19   misappropriated your trade secrets.

20   Q.  And now, Mr. Malackowski, the license that we discussed,

21   did you consider that license in performing your calculations

22   in this case?

23   A.  I mean, I was aware of the license.  I considered the

24   expense of Hytera for such a license, so at that level, yes.

25   Q.  And did you give Hytera credit for that?

Malackowski - redirect by Schmidt

2335

1    A.   Yes.  I made a deduction so Hytera would not have to

2    double-pay.

3    Q.   And now, but just because Hytera has a license to

4    Motorola's patents, does that also give Hytera the right to

5    Motorola's trade secrets?

6    A.   Definitely not.

7    Q.   And now, before -- before this lawsuit, did Hytera ever

8    tell Motorola that it stole its trade secrets?

9    A.   Of course not, no.

10   Q.   And has Hytera paid Motorola a single penny for any of the

11   trade secrets or copyrights it has stolen?

12   A.   No, they have not.

13   Q.   And finally, Mr. Malackowski, you were asked several

14   questions about Hytera's United States sales and outside the

15   United States sales.  Do you remember that?

16   A.   I do.

17   Q.   And you included both in your calculation of trade secret

18   misappropriation damages; is that right?

19   A.   Yes.

20   Q.   And so, Mr. Malackowski, how do Hytera's sales, whether

21   they are in the U.S. or outside the United States, harm

22   Motorola right here in Illinois?

23   A.   Well, regardless of where the end sale is actually made,

24   to the extent that it's utilizing the misappropriated trade

25   secrets, it's taking away business from Motorola located in

Malackowski - recross by Stringfield

2336

1    the suburbs of Chicago.  It all flows back to MSI.  And that's

2    where the trade secrets originated.  That's where the harm

3    occurs.

4    Q.  And for the trade secrets that Hytera stole and the

5    copyrights that it infringed, what amount would appropriately

6    compensate Motorola?

7    A.  $311.8 million.

8            MS. SCHMIDT:  Thank you, Mr. Malackowski.

9            I pass the witness.

10           THE COURT:  Recross?

11                       RECROSS-EXAMINATION

12   BY MR. STRINGFIELD:

13   Q.  A couple brief points, Mr. Malackowski.  Counsel asked if

14   Hytera had ever paid Motorola for any of the trade secrets.

15   Do you remember that?

16   A.  Of course.

17   Q.  And do you understand that it's Hytera's position that

18   Hytera didn't know that it had misappropriated any trade

19   secrets until this lawsuit was filed, right?

20   A.  Is that Hytera's legal position?  That may be true.

21   Obviously, I spent a lot of time talking about what Mr. Chen

22   knew at the time.  So I'm not drawing an opinion as to what

23   they knew or they didn't knew -- know other than the memos I

24   showed and the knowledge at the chairman level.

25   Q.  You understand that it's Hytera's position they didn't

Malackowski - recross by Stringfield

2337

1  know that there was any trade secret misappropriation prior to

2  this lawsuit; yes or no?

3  A.  That may be the -- I don't see how that's possible, but if

4  that's their position, that's what it is.

5  Q.  And you also understand that Motorola -- and you've heard

6  about this -- has Compass logs where they could have checked

7  in a matter of minutes to see the activity that allegedly led

8  to the misappropriation, right?

9  A.  There was a witness that talked about that functionality,

10  yes.

11  Q.  And Motorola's position is that it didn't check those

12  Compass logs for the past decade, right?

13  A.  Well, until they had belief that the trade secrets were

14  misappropriated which occurred in late 2013, I think.

15  Q.  Mr. Malackowski, I want to show you this ETSI standard

16  that you just discussed with counsel.

17          MR. STRINGFIELD:  If I could have the ELMO, please.

18          THE COURT:  Yes.

19          THE CLERK:  You want to use the --

20          MR. STRINGFIELD:  The ELMO, please.  I'm sorry.

21  BY MR. STRINGFIELD:

22  Q.  Mr. Malackowski, you were discussing the definition of

23  IPR, intellectual property rights?

24  A.  Yes.

25  Q.  And you'll note here that, and I think you went through

Malackowski - recross by Stringfield

2338

1    the categories, this definition defines confidential

2    information separately from trade secrets, right?

3    A.  Well, confidential information is not a defined term in

4    clause 11; i.e., it's not capitalized.  There is a section on

5    confidentiality, Section 10.  There is a definition of

6    confidential information in 15.3 that refers specifically to

7    15.10 policy, not IPR.

8    Q.  Mr. Malackowski, I apologize.  I was referring to Exhibit

9    4977-A.  It's the ETSI standard that counsel handed you during

10   cross-examination.

11   A.  I'm looking at the same document.

12   Q.  Okay.  And so I'm looking at the definition of IPR on Page

13   45 of the document.  And I think this was the definition you

14   were discussing with counsel.

15   A.  The definition of IPR, not the definition of confidential

16   information.

17   Q.  Okay.  Sorry.  So we're on the same page then.  The

18   definition of IPR lists what it defines as IPR, and it

19   includes confidential information and trade secrets, right?

20   A.  No.  Those are excluded from the definition of IPR if you

21   see the last four, five words.

22   Q.  You are absolutely correct, Mr. Malackowski.  My point is

23   that it defines or it lists -- I was using the wrong word.  It

24   lists "confidential information" and "trade secrets" as two

25   distinct things.  Do you see that?

Malackowski - recross by Stringfield

2339

1   A.  It does list those words separately, yes.

2   Q.  And you understand that there's a legal test for what is

3   or is not a trade secret, right?

4   A.  Okay.  I accept that.  Yes, I think that's true.

5   Q.  And just because something is confidential information

6   doesn't necessarily mean that it's a trade secret, right?

7   A.  I defer to the lawyers on that.  I don't think it's an

8   absolute requirement, but I don't have an opinion.

9   Q.  And just a couple points on DTX 4715 that you discussed

10  with counsel on cross.  It's the business plan document for

11  the Matrix 1.0 release.  Do you have that in front of you?

12  A.  Go ahead -- oh, yes.  4517?

13  Q.  No.  I'm sorry.  4715, DTX 4-7-1-5.

14  A.  I'm sure I have it.

15  Q.  I can --

16  A.  It's a little messy, but go ahead.

17          MR. STRINGFIELD:  Let me ask Mr. Montgomery to put up

18  Page 60 of the document on the screen for you.

19          Can we have the computer control back?

20          THE WITNESS:  I have it.

21          MR. STRINGFIELD:  Okay.

22          THE CLERK:  You want the computer?

23          MR. STRINGFIELD:  Please.  Thank you.

24  BY MR. STRINGFIELD:

25  Q.  Do you have this document in front of you,

Malackowski - recross by Stringfield

2340

1    Mr. Malackowski?

2    A.   Now I do.

3    Q.   Okay.  And so we talked about this 7920 staff month

4    number, and this was the amount of staff months that this

5    document says it took to get to the release of the 1.0

6    MOTOTRBO radio, right?

7    A.   Again, we talked about this earlier.  I don't know that

8    that's what it said.  I defer to Dr. Rangan.  The heading

9    talks about total M-10 staffing to M-2-SM, whatever that is.

10            MR. STRINGFIELD:   Okay.  Mr. Montgomery, can you

11   please put back up DDX 7.9?

12   BY MR. STRINGFIELD:

13   Q.   And we talked about this slide related to Exhibit DTX

14   4715, right?

15   A.   We did.

16   Q.   Okay.  And you understand then that this bar on the left,

17   7920 staff months is for the 1.0 release of the MOTOTRBO

18   radio, right?

19   A.   I disagree.  It's only part of the manufacturing process.

20   If you read the paragraph before the chart and the paragraph

21   after the chart, it's full of exclusions of what's not

22   included.  So this is not an apples to apples comparison.

23   Q.   Well, that's the point I want to make.  I want to see if

24   we can make it apples to apples.  So I think when you were

25   talking about this 7920 number on cross -- or excuse me, on

Malackowski - recross by Stringfield

1    redirect, I think that you said it excludes legacy

2    development, right?

3    A.   It says in the chart or in the bottom of the chart in the

4    footnote, "Note that the table includes not only data for

5    staffing going forward but also comparison against data for

6    the M-13 estimates.  It does not include past data."

7    Q.   Okay.  And so then back to DDX 7.9, for the Hytera bar for

8    the research and development from 2005 to 2009, do you

9    understand that that doesn't include any Hytera legacy

10   development either?

11   A.   It includes data back to 2005.  My understanding is it

12   would not include things outside of what they categorized as

13   DMR, but it includes other digital programs.

14   Q.   That's right.  It wouldn't include Hytera's decade or more

15   of analog product development.  They didn't include that in

16   their R&D expense that's shown on DDX 7.9, did they?

17   A.   I don't believe it includes data before 2005, correct.

18   Q.   And the 12.6 million that's shown here for the Hytera

19   launch in 2010, that's also Hytera's version 1.0 radio, right?

20   A.   We talked about that.  It would certainly include that

21   because that radio launched, but it would also include

22   features that came for the radio right behind it.

23            MR. STRINGFIELD:  No further questions, your Honor.

24            MS. SCHMIDT:  Nothing further, your Honor.

25            THE COURT:  All right.  You may step down.  Thank

1    you.

2              THE WITNESS:  Thank you, your Honor.

3         (Witness excused.)

4              THE COURT:  Please call the next witness.

5              MR. ALPER:  Your Honor, before we finish up here,

6    we've moved to seal a short number of exhibits following this

7    witness.

8              THE COURT:  Proceed.

9              MR. ALPER:  DTX 4401, DTX 4582, DTX 5515, PTX 0586,

10   PTX 0628, PTX 0637, PTX 0638, PTX 1057, PTX 1862, PTX 1862-AA,

11   and PTX 2100.

12             THE COURT:  The motion to seal is granted.

13             MR. ALPER:  Thank you, your Honor.

14             With that, Motorola rests its case.

15             THE COURT:  All right.  Members of the jury, please

16   step out for a few minutes.  It may well be that this will be

17   the end of the day for you or it may not.  We shall see.

18        (Proceedings heard in open court.  Jury out.)

19             THE COURT:  All right.  Court is in session.  Please

20   be seated.

21             All right.  The plaintiff has rested.

22             MR. CLOERN:  Your Honor, I believe we have filed or

23   are probably in the process of filing some Rule 50 directed

24   verdict motions, if I could make those for the record.

25             THE COURT:  Go right ahead.

1    MR. CLOERN:  Your Honor, the Hytera entities move for

2    a directed verdict on the trade secret claims because they are

3    barred by the statute of limitations.  As a matter of law, the

4    claims are barred.

5         There were testimony of suspicions in 2008, 2010, and

6    2012, and also the ability to check the Compass logs at that

7    time which wasn't done, would have taken less than an hour or

8    so.  Their fraudulent concealment is irrelevant because the

9    suspicions were had and in the minds of numerous Motorola

10   employees at the time.  So we believe the clock began running

11   well before five years prior to the date the complaint was

12   filed.

13        THE COURT:  What is your response, counsel?

14        MR. ALPER:  Your Honor, my colleague, Mr. Deoras,

15   will respond to the verbal 50(a) motion.

16        MR. DEORAS:  Good afternoon, your Honor.

17        THE COURT:  Good afternoon.

18        MR. DEORAS:  Motorola opposes Hytera's Rule 50(a)

19   motions on the statute of limitations for a number of reasons.

20   One is, Hytera has not proven and has not shown that any of

21   the incidents to which they refer to created any suspicion for

22   Motorola to recognize that Hytera had stolen its trade secrets

23   or source code.  Hytera's --

24        THE COURT:  Well, what is your definition of

25   "suspicion"?

2344

1          MR. DEORAS:  Any -- anything that would cause

2     Motorola to suspect or to have a reasonable belief that Hytera

3     had taken its trade secrets.

4          THE COURT:  Is a hunch enough?

5          MR. DEORAS:  I would say no.  I would say -- I don't

6     think there is any evidence of a hunch, but I also would say

7     no, I don't think that's -- I don't think that's correct under

8     the law.

9          But to add to that, I think what Hytera's counsel

10    failed to mention is that Hytera also fraudulently concealed

11    its theft of the trade secrets and the source code.  We heard

12    evidence of that from Dr. Wicker, Motorola's expert, that

13    Hytera went into the source code and made changes specifically

14    for the purpose of making it harder for a third party like

15    Motorola to detect that its source code and other trade

16    secrets had been stolen.  And that fraudulent concealment

17    would have prevented any detection in the 2' -- pre-2012

18    timeframe when Hytera is alleging that we had suspicions of

19    determining that Hytera had actually stolen its trade secrets

20    and source code.

21          The other last point to make is that Motorola did do

22    an investigation in late 2012, was unable to determine that

23    Hytera had stolen its trade secrets.  That investigation was

24    discussed by Dr. Wicker on the stand and by other Motorola

25    fact witnesses.  That investigation was reasonable.

1    It was actually, several engineers participated in

2  the investigation and were unable to determine with any --

3  with any reasonable belief that Hytera had taken these trade

4  secrets, and that more than satisfies Motorola's duty to

5  investigate at that point.  In any case, Motorola filed suit

6  within five years of that investigation.

7        THE COURT:  The final word.

8        MR. CLOERN:  Thank you, your Honor.  Your Honor, in

9  the record it's clear, in 2008 Nickie Petratos had an actual

10  suspicion when she sent out her email about making sure that,

11  because G.S. Kok has left, that Motorola protects itself.  And

12  due to these suspicions, Motorola began monitoring employee

13  emails in June of 2010 to and from G.S. Kok.

14        Later in 2010, Motorola had an actual real suspicion

15  when its employees discovered Hytera's radios stopped unmuting

16  at specifically 118 decibels, exactly the same flaw and bug

17  that was in the Motorola radio.  And in early 2012, Motorola

18  had suspicions when its employees performed interoperability

19  testing on Hytera radios and noticed the ergonomics for

20  canceling the emergency alarm were the same.  So you had to do

21  the same crazy procedure in both; again, sort of an oddity

22  that wouldn't be there otherwise.

23        So those were not fraudulently concealed.  They were

24  actually their suspicions in the minds of folks at Motorola.

25  And all Motorola had to do was check those Compass logs which

1    it did not do until 2017.  Had Motorola done so and informed

2    the folks at Hytera, Hytera could have developed a separate

3    dPMR technology, and none of us would be here today.

4         So any fraudulent concealment, which Hytera disputes,

5    is irrelevant, and we think the law is clear that any attempts

6    to fraudulently conceal doesn't matter if the plaintiff still

7    nevertheless had the suspicions, which Motorola clearly did as

8    numerous witnesses have testified.

9         THE COURT:  The Rule 50 motion is denied --

10        MR. CLOERN:  Thank you, your Honor.

11        THE COURT:  -- which is alleged violation of statute

12   of limitations.

13        What is your next Rule 50 argument, if any?

14        MR. CLOERN:  Yes, your Honor.  We have a couple more.

15   First of all, Motorola has not articulated a trade secret.

16   Motorola's witnesses on the stand testified that their -- with

17   their testimony, all they're able to do is to give a general

18   description of the technology and that that is not their trade

19   secret.  The trade secret is the specific implementation that

20   is at some detailed level beyond what is disclosed in public

21   documentation and in their hundreds of patent filings on the

22   DMR technology.

23        And also, the Motorola witnesses have admitted on

24   cross-examination that the five or six documents they pointed

25   to for each trade secret are chock full of public materials,

2347

 1    materials from the standard.

 2          So it is not at all clear exactly what is proprietary

 3    and what is not and is an alleged trade secret.  And so it is

 4    not possible for the jury to determine on the present record

 5    exactly what is trade secret material that may have been used

 6    and what is public material and is entirely fair game.

 7          THE COURT:  What is your response?

 8          MR. DEORAS:  So Motorola opposes Hytera's Rule 50(a)

 9    motion on whether Motorola has shown existence and validity of

10    a trade secret.  I think the only ground Hytera's counsel

11    raised just now was that we hadn't identified what was

12    proprietary about the trade secrets, but that is incorrect.

13    Motorola's fact witnesses did identify the numerous

14    proprietary documents and source code that relate to each of

15    the individual 21 trade secrets that have been asserted in the

16    action.

17          Hytera did not identify that any of those trade

18    secrets had been publicly disclosed, and none of Motorola's

19    witnesses testified that any of the trade secrets had been

20    publicly disclosed.

21          Also, the law is not -- does not support Hytera's

22    position.  The trade secret documents themselves may contain

23    public information or information from third parties, but the

24    actual trade secret itself is a confidential trade secret to

25    Motorola, and that's what Motorola's witnesses testified to.

2348

1          THE COURT:  All right.  Reply?

2          MR. CLOERN:  Thank you, your Honor.  The law

3    absolutely does support Hytera's argument.  The law is --

4    there are, cases are legion out there that says if you come in

5    and you articulate some big, broad generic thing and call it a

6    trade secret, then it's easier to find that that thing was

7    used, right.  You're claiming broader territory.

8          But what you have to be careful to do, and this is

9    just like a patent analysis, the more you claim, the bigger

10   the thing you claim as your trade secret, the more likely it

11   is that that's going to cover lots of public material, and if

12   you do, you've got to separate it out.  You've got to say,

13   "This is what my trade secret is.  This is what's proprietary

14   and what can't be used by others versus what is in patents or

15   versus what is otherwise publicly known such as in the

16   standard."

17         For every single trade secret, for all the documents,

18   the witnesses have admitted there is patented material.

19   There's patented material discussed in the documents that are

20   claimed to be a trade secret.  So that's public.  There's lots

21   of stuff from the standards that are discussed in the

22   documents that are claimed to be a trade secret, so that is

23   public.

24         And at no point has Motorola pointed out through its

25   witnesses exactly what its trade secret is, and that is

1   because we complained throughout this case for two years that

2   we don't know what the trade secrets are.  They're articulated

3   quite generically, quite broadly.

4          For example, the entire hardware abstraction layer

5   which is hundreds of thousands of lines of code that has all

6   kinds of stuff in it that has to do with pushing the button

7   "4" and making button "4" come up on the screen, all kinds of

8   things that there's nothing trade secret about it, and there's

9   nothing valuable about it.

10         And so they have to ferret those things out to a

11  particular process or something that was proprietary and

12  secret and valuable as a result of that, and they failed to do

13  so, your Honor.

14         THE COURT:  There is enough evidence before the

15  Court, looking at the totality of what the Court and jury have

16  heard, to say that a reasonable jury on this evidence could

17  enter a verdict in favor of Motorola.  The Rule 50 motion is

18  denied.

19         MR. CLOERN:  Thank you, your Honor.  May I proceed

20  with --

21         THE COURT:  Yes.

22         MR. CLOERN:  There were no reasonable confidentiality

23  measures taken.  No jury could find that Motorola maintained

24  reasonable confidentiality measures for the alleged trade

25  secrets in the case.  As we saw with the "Stop the leaks"

1    program, Motorola's own failure to protect its Compass -- or

2    to check its Compass logs or also to set up any kind of

3    procedure, which it ultimately did at a later point, to send

4    some sort of notification for this, I think they called it,

5    bulk downloading.

6         So it would have been a few lines of code to create

7    essentially an alarm bell where if someone did go in and

8    download a bunch, you know, more than 100 documents, that the

9    alarm would have gone off and alerted someone that there was

10   some sort of suspicious activity going on.  And that actually

11   was recommended.  It wasn't followed up on.  And had it been

12   implemented as it was suggested by folks at Motorola, this

13   case would have never happened.  The activity would have been

14   detected and presumably, Motorola would have done something

15   about it.

16        So that combined with all the material in the "Stop

17   the leaks" program and the evidence and documents that were

18   talked about and the knowledge of what was going on in Penang

19   that Motorola's corporate witness was sent there to deal with,

20   all of the laptops that were walking out the doors, all of the

21   employees that were going to competitors and taking

22   information in that 2008 timeframe, 2007 timeframe that

23   Motorola was aware of, we believe, your Honor, that they

24   don't -- Motorola has not met the standard for reasonable

25   security measures including not limiting access to the Compass

2351

1    logs.  Thank you.

2          THE COURT:  Response?

3          MR. DEORAS:  Your Honor, Motorola opposes Hytera's

4    50(a) motions on the reasonable security measures.  Evidence,

5    more than sufficient evidence was presented during Motorola's

6    case in chief that Motorola did, in fact, put in place more

7    than reasonable security measures.

8          Motorola had physical security measures as

9    Mr. Shepard testified to prevent employees from taking

10   materials out of Motorola and going to other competitors, to

11   leave materials out inside Motorola internally to make sure

12   that others who did not have a need to know did not access the

13   information.  Motorola had significant electronic security

14   measures to prevent outsiders from retrieving information at

15   Motorola and from making sure that internal Motorolans didn't

16   transfer information improperly outside of Motorola.

17         Motorola also had significant contractual security

18   measures put in place for each employee to sign a

19   confidentiality agreement on arrival and to be reminded of

20   that confidentiality agreement when they left Motorola as each

21   of the individuals who left Motorola did.

22         The evidence also demonstrated that the employees who

23   left Motorola and went to Hytera concealed the information

24   about where they were going, when they were going, and in some

25   cases worked at the same time for Hytera and Motorola.

2352

1      And I think all of the other instances that

2  Mr. Cloern, counsel for Hytera, identified, none relate to

3  whether or not Motorola actually had specific reasonable

4  security measures in place.  They relate to other concerns or

5  other issues that Hytera hasn't demonstrated are relevant to

6  any of the specific trade secrets that are at issue in this

7  case.

8      THE COURT:  Your reply?

9      MR. CLOERN:  Yes, your Honor, just a quick reply on

10  the exit interviews I think that counsel referred to.  I think

11  they make the point.  The exit interviews, the documentation

12  says the employees ask, for example, Y.T. Kok is asked, "Did

13  you access anything from Compass?  Have you turned everything

14  in?"  And all the employee has to say is, check a box "yes."

15  No one checks.  No one confirms.  Motorola has the peace of

16  mind to ask, but they don't -- in the words of Ronald Reagan,

17  "trust but verify."  They trusted.  There was no verify.

18      So then they go to Motorola -- then they go to

19  Hytera, and what happens?  Hytera trusts them, too.  People

20  are coming in, supposedly subject matter experts in DMR.  They

21  come in.  Hytera trusts them.  And so Hytera, however, had no

22  means to find out because the former Motorolans who came over

23  to Hytera kept what they did secret.  They concealed it from

24  everybody at Hytera; rebranded documents, secretly used source

25  code, that sort of thing.

1          The problem with it is that Motorola is the one that

2    was in the position to stop this.  Had they simply verified

3    whether what the employees said in those interviews was true,

4    did they, in fact, not misuse Compass, did they turn

5    everything in, then again, we wouldn't be here today.  And

6    that's the problem with the security measures, your Honor.

7          THE COURT:  All right.  The Rule 50 motion is denied.

8    There is enough evidence to support a jury's determination

9    with respect to liability in favor of Motorola on these issues.

10         MR. CLOERN:  Thank you, your Honor.  So there are

11   three Hytera defendants in this case:  Hytera Communications

12   Corporation, Limited, which is the Chinese entity, as well as

13   Hytera America, Inc., and Hytera Communications America West,

14   Inc.

15         So those second two are United States Hytera

16   entities.  And we would move for a directed verdict dismissing

17   those entities because there's been no evidence against them.

18   All of the evidence in this case has been against what Hytera

19   Communications Corporation, Ltd., in China has allegedly done.

20         So that is the company that hired G.S., Sam, Y.T.,

21   and the other former Motorolans.  That's the company in

22   Shenzhen, China, that all the Motorolans left Penang and went

23   to.  It's where they worked.  It's where the R&D was done.

24         You've heard the testimony and I think your Honor

25   even asked one of the witnesses a question, "Is any R&D done

1    in the U.S.?  Is there any product development done in the

2    U.S.?"  And the answer was, "No."

3            That is the undisputed testimony, undisputed evidence

4    in this case.  All the U.S. entities have done -- they are

5    separate entities, separate companies.  They act as

6    distributors.  They sold product that they purchased from

7    this -- from Hytera China.  So there's just nothing to tie

8    them to any of the allegations in this case.

9            THE COURT:  What is your response, counsel?

10           MR. DEORAS:  So Motorola opposes Hytera's 50(a)

11   motion.  On the other entities, Hytera America, Inc., and

12   Hytera America West, Inc., as Hytera's counsel just admitted,

13   those entities sell and distribute the products that

14   incorporate Motorola's confidential trade secrets and source

15   code and copyrighted source code in the United States.  We

16   have heard --

17           THE COURT:  Was there testimony of a witness on that

18   particular point by way of video?

19           MR. DEORAS:  Yes, there was, your Honor.  Mr. Andrew

20   Yuan who was the president of Hytera North and South America

21   and was the president of Hytera America; the testimony of

22   Steve Cragg who we heard from yesterday, all testified about

23   the sales from Hytera America entities -- Hytera America and

24   Hytera America West -- in the United States.

25           THE COURT:  Reply?

2355

1          MR. CLOERN:  Thank you, your Honor.  Your Honor,

2     specifically for trade secrets, there is a knowledge

3     requirement.  So trade secrets is misappropriation of trade

4     secrets.  And under both the Illinois statute and the Defend

5     Trade Secrets Act, the federal statute, in both cases you

6     either have to know or reasonably should have known that

7     you're misappropriating trade secrets or you're getting

8     something from someone who misappropriated the trade secrets.

9          And there's no evidence that anyone at the Hytera

10     America, the two Hytera America entities knew that there was

11     any problems with the products they were selling.  So there's

12     no one -- we do not dispute that Hytera America and Hytera

13     America West were selling Hytera, accused Hytera DMR radios,

14     but there has been no evidence that anyone at Hytera America

15     at all had any knowledge or should have known that there was

16     any misappropriation, anything that was alleged to have

17     occurred at Hytera China, that there was any issue with those

18     products that are no different than any other distributor.

19          THE COURT:  Is there willful avoidance of

20     information?

21          MR. CLOERN:  I think that would probably fall --

22     under the legal standard, that would fall into the "knew or

23     should have known," but there's no evidence that anyone at

24     Hytera America willfully avoided any kind of information.

25          So Hytera America has nothing to do with the

2356

1    development, nothing to do with the R&D.  They actually

2    purchase the radios from Hytera China.  They're shipped over,

3    and then they sell them for a profit like other dealers.  So

4    they don't have anything to do with the insides or how they

5    were developed or anything like that.  There's no development,

6    no engineers, nothing.  These are pure sales arms.

7              THE COURT:  There is enough evidence to support a

8    jury verdict in favor of Motorola on these issues.  The Rule

9    50 motion is denied.

10             MR. CLOERN:  Your Honor, we would also make a

11   directed verdict motion on extraterritoriality.  The trade

12   secret statute at issue cannot be applied to conduct abroad.

13   So there's two sort of aspects to this, one just in terms of

14   liability --

15             THE COURT:  Let me stop you on that point.  The

16   motion that was filed yesterday at 2:00 in the morning has

17   been discussed, but Motorola has not filed any written

18   response to that motion of which I'm aware.  Is that correct?

19             MS. SCHMIDT:  Not yet, your Honor.  That's correct.

20             THE COURT:  You intend to do so?

21             MS. SCHMIDT:  If your Honor would like us to do so,

22   we will.

23             THE COURT:  It's not a question of my preference.

24   What do you intend to do?

25             MR. ALPER:  Your Honor -- sorry.  Go ahead.

1          Our impression was that you had denied that motion

2     but if you haven't, then we'll be happy to respond to it.

3          THE COURT:  What I said was that we would proceed,

4     that the jury would hear the testimony of the witness, as

5     indeed it has, and that if the Court were to grant the motion,

6     the alternative would be to tell the jury to disregard what

7     they have just heard.  And so that's where we stand.

8          But I think it would be to your advantage certainly

9     at this and maybe some future level to file a written response

10    to the motion.  It is indeed a significant ruling in the case.

11    And so the sooner, the better that you may file a written

12    response.  So we'll take under advisement on that issue the

13    Rule 50 motion.

14          MR. ALPER:  We will file that response.  Yes, your

15    Honor.

16          THE COURT:  All right.  So are you ready then for

17    return of the jury?  Do you have a witness ready?

18          MR. CLOERN:  I'm at the end of my list, your Honor,

19    but there's just a couple more points.  If I --

20          THE COURT:  Now, if I decide the remaining points,

21    would you then be ready to call a witness today?

22          MR. CLOERN:  Yes, your Honor.  If you -- if that

23    works for everybody, we're ready.

24          THE COURT:  Well, my concern is always with the

25    witness.  I want to maximize their use of time, so if you will

1    go ahead with the remaining issues on Rule 50.

2            MR. CLOERN:  Thank you, your Honor.  We would move

3    under Rule 50, your Honor, for no punitive damages.  No jury

4    could find willfulness and malice at least under the facts

5    that have been entered so far.  So the legal standard for --

6    and I believe they're called exemplary damages under the trade

7    secret statute, is that there must be something beyond just

8    competition, right.  So there's got to be something beyond

9    just mere trade secret misappropriation.

10           Trade secrets are misappropriated.  There's a bunch

11   of cases.  Employees move from one company.  They move to

12   another company.  They -- there's accusations and then the

13   question is, is that just done for competitive means or

14   essentially, is it mean spirited?  Is there some malice to it?

15           Are the employees just trying to be competitive and

16   get ahead in the market, or are they trying to actually with

17   malice do some harm to the other company beyond just

18   competitive harm?  And we don't think that there's any

19   evidence of that in this case.

20           THE COURT:  Your response?

21           MR. ALPER:  Yes, your Honor.  On the issue of

22   punitive damages, they are absolutely appropriate in this

23   case.  The senior-most engineers, the people in charge of

24   research and development at Hytera absolutely knew that they

25   stole -- or they stole the trade secrets.  They did it

1    intentionally and maliciously and in massive amounts.

2            They took the Fifth when they were questioned.  That

3    is -- there's an adverse inference that arise from those

4    questions that is imputable to Hytera.  The evidence also

5    shows that Hytera and the senior-most engineers fraudulently

6    concealed the theft which also shows intentionality and

7    extreme malice in their conduct.

8            The evidence also shows that others at the company

9    knew about the theft or were willfully and intentionally

10   blinding themselves.  We saw specific documents that were

11   Motorola confidential documents that were in the possession of

12   other engineers and senior executives at the company.  Their

13   answer to those were simply to outright deny that they knew

14   what they were, that they had them in their possession even

15   though the evidence concretely showed that fact.

16           Since the filing of this case, a simple investigation

17   had shown that the misappropriation occurred.  Hytera has

18   conceded that in court in their opening statement and

19   throughout the cross-examinations, yet they are continuing to

20   sell the products to this very day.  And you heard the

21   evidence from Mr. Malackowski.  They are profiting greatly by

22   every day that goes by.

23           In addition, there's evidence that Hytera has

24   destroyed since, over the course of this litigation, key

25   information showing the theft; that the IT department during,

1    while they were under a notice to preserve information

2    including senior executives, destroyed key information that

3    shows the theft.  It also creates an adverse inference.  And

4    that is the hallmark of intentional and malicious conduct.

5         THE COURT:  Does your argument also include any

6    communications or behavior on the part of Mr. Chen?

7         MR. ALPER:  Yes, it does, your Honor.  There is

8    evidence that Mr. Chen was involved from the outset, that he

9    knew that his product group -- he knew that it was critical,

10   the evidence explicitly shows that it was critical for them to

11   get into the DMR market.

12        He knew that his research and development work was a

13   failure, that there were many problems, that he needed to beat

14   the FCC and related Chinese regulations in order to keep his

15   company alive because that would have killed the entire analog

16   product group.  And he went out, he paid an inordinate,

17   unreasonable amount of money to bring in G.S. Kok and Motorola

18   engineers in order to have them come in and bring over the

19   trade secrets to Hytera, so absolutely, your Honor.

20        THE COURT:  Did he meet from time to time with

21   persons outside of the business environment?

22        MR. ALPER:  He met with G.S. Kok outside the business

23   environment.  The evidence showed that he did that in secret,

24   that they wanted to go to a hotel where there would be no

25   Motorolans so that he could see them.

2361

1          THE COURT:  Is that supported by documentation?

2          MR. ALPER:  It is absolutely supported by

3    documentation.  We saw exhibits.  Those were in the record.

4    Those are admitted, your Honor.

5          THE COURT:  Your reply?

6          MR. CLOERN:  Your Honor, I'll address the last point

7    first.  Your Honor asked a very specific question, and counsel

8    responded with one point about one document.  It's important

9    to understand what that document is.  That document is an

10   email between Mr. Chen, the CEO of the company, and G.S. Kok,

11   the main guy at Motorola who convinced a couple other guys to

12   come over and take stuff.

13          That email was in, I believe, September of 2007.  And

14   that's when G.S. Kok had been emailing Mr. Chen for probably

15   six months saying he had great ideas, he could help out,

16   asking for a job.  Mr. Chen agreed to meet him, and Mr. Chen

17   agreed to -- they had met once before in Shenzhen, and

18   Mr. Chen was going to go to Malaysia.

19          And there was a discussion about where they should

20   meet.  And that discussion said -- it doesn't say "secret."

21   Nowhere it says "secret."  It says, "Let's meet at a hotel on

22   the other side of the island where Motorola people don't

23   frequent."

24          Now, that's the remarkable proposition that when

25   you're recruiting someone from a competitor, maybe it doesn't

2362

1   make sense to pick them up in the lobby of the Motorola

2   building, right.  Maybe G.S. Kok isn't going to take the job.

3   Maybe he doesn't want to know -- his current boss to know that

4   he's actually thinking about jumping ship and going to a

5   competitor.

6          At my law firm, we recruit partners from other firms

7   all the time.  And I generally don't go and pick them up from

8   the lobby of their current firm.  You usually don't want

9   people to know that, not because you're stealing but because

10  it's just common sense, right.

11         There is nothing else in that email, absolutely

12  nothing other than, "Let's meet at a hotel that's not right

13  next door to Motorola."

14         THE COURT:  I don't mean to suggest by asking that

15  question that that is overwhelming evidence to support giving

16  punitive damages, exemplary damages to the jury.  It is yet

17  one additional factor to take into account along with the many

18  that are clear in the record.

19         And so the motion, Rule 50 motion that would preclude

20  giving the issue of punitive damages to the jury is denied.

21         MR. CLOERN:  Thank you, your Honor.

22         THE COURT:  I think what I'm going to do, counsel, is

23  to bring in the jury and send them home and let you go on with

24  your arguments.  And I will tell the jury that the plaintiff

25  has rested and that they will pick up on the case tomorrow.

1           MR. CLOERN:  Thank you, your Honor.

2           THE COURT:  All right.  Mr. Fulbright, please ask the

3    jury to come in.

4           We will then go on with the rest of your arguments.

5           MR. CLOERN:  Thank you, your Honor.

6        (Proceedings heard in open court.  Jury in.)

7           THE COURT:  Good afternoon, members of the jury.  As

8    you have heard, the plaintiff has rested its case in chief.

9    And tomorrow, the defendant will put on their case in chief.

10   There are a few matters that the Court must deal with that do

11   not require your being present here.  And so I hope you have

12   no opposition to leaving now at 2:27.  You are to return,

13   however, tomorrow morning at 10:00 o'clock.  You are excused.

14          We'll take a short recess and then return to these

15   issues.

16       (Recess from 2:28 p.m. to 2:39 p.m.)

17       (Proceedings heard in open court.  Jury out.)

18          THE COURT:  The jury has left for the day.  Proceed

19   with your argument.

20          MR. CLOERN:  Thank you, your Honor.  And I know your

21   Honor denied the prior motion.  Obviously, just for the

22   record, Hytera disputes that there's any spoliation or anyone

23   took any actions or that the Fifth Amendment assertions, any

24   adverse inference from that would -- imputed to Hytera would

25   be improper.

1    Okay.  So the next argument, your Honor, is a due

2  process argument.  And it relates back to the vagueness of the

3  trade secrets.  And I won't restate them but just incorporate

4  for the record the earlier trade secret argument I made

5  related to the failure to sort of ferret out what is public

6  versus what is proprietary and, therefore, the trade secret.

7    And that creates problems about adequate notice of

8  what the trade secret is.  And it relates to a number of

9  things that counsel said about, you know, Hytera's ability to

10  redesign the timeframe of redesigning, what all that means to

11  the jury.

12    So, for example, there were 169 trade secrets as of

13  September, about a year ago.  Then that became 142, and that

14  carried through May.  And at that point, each of the over 100

15  trade secrets was described with a single sentence.

16    In May, we got a couple paragraphs each, and then in

17  June there was an expert report with 100 pages on each.  And

18  then that has been cut back then to 21 over sort of a few days

19  before trial, but the point is --

20    THE COURT:  So how have you in that regard been

21  denied due process?  You ended up with 21.

22    MR. CLOERN:  Understood, your Honor.

23    THE COURT:  And perhaps even seven.

24    MR. CLOERN:  Perhaps even seven, although that's not

25  clear, but perhaps even seven.  The point is, is that the

2365

1  issue, and I think the issue that's going to be raised is

2  Hytera's, the time of Hytera addressing the allegations.

3          So the case went on for a year and a half.  Under the

4  statute of limitations, general discovery was stayed, and so

5  it wasn't until just a year ago that the trade secrets were

6  identified for the first time.  And like I said, it went from

7  169 to 142 to 29 and again, defined with a single sentence.

8          So it wasn't until this summer that there started to

9  be some clarity.  And for the reasons that I have argued here

10 today, we believe there's still not clarity about exactly

11 what -- what's on one side of the line or the other, what's

12 secret in a trade secret versus what is public in this

13 documentation that is pointed to.

14         So ability to redesign, when redesigns can be

15 undertaken, all that's going to be considered by the jury for

16 purposes of punitive damages.  And so that's why there is, we

17 think, a significant due process issue to the vagueness of the

18 trade secrets and how they're going to be used and argued for

19 the purposes of punitive damages to the jury.

20         THE COURT:  Does Motorola want to file a -- or

21 respond?

22         MR. ALPER:  Yes, your Honor.  On the issue of, I

23 guess, that Hytera was denied due process over the course of

24 the discovery period, they were not.  Hytera was provided at

25 multiple junctures --

2366

1          THE COURT:  Is it substantive due process or

2   procedural due process?

3          MR. ALPER:  They were not denied either.  I don't

4   know what the basis, which one is serving as the basis of

5   their motion.

6          THE COURT:  You're saying both?

7          MR. ALPER:  Both are satisfied easily here.  We

8   provided them disclosures over the course of this case of

9   exactly what documents and code served as the basis for our

10  trade secret allegations.

11         The only motion to compel that they made that was

12  ruled on by Judge Cole for more specificity on the trade

13  secrets was denied, your Honor.  And even after that, by

14  agreement we provided them exactly what they wanted in terms

15  of the documents that were then presented in court here by

16  Dr. Wicker and the specific source code on a trade-secret-by-

17  trade-secret basis.

18         At their request, we streamlined the case for

19  purposes of making this a case that would be presentable to a

20  jury at their request and by agreement.  And then on top of

21  all that, they took an inordinate number of deposition -- days

22  of deposition.

23         For instance, your Honor, Mr. Corretjer who we saw

24  testify was deposed for six days on the trade secrets that he

25  was responsible for.  And that is just one of many, many

2367

1  witnesses.  So they've had absolutely clear notice of what the

2  trade secrets are in every possible way including with the

3  lengthy testimony here in court provided by Dr. Wicker where

4  both the -- actually, preceded by the Motorola witnesses who

5  presented the trade secrets, the concrete documents that were

6  presented, the source code that was presented, and then

7  Dr. Wicker's expert analysis.

8           THE COURT:  I cannot say as a matter of law that

9  the -- Hytera and the other two defendants have been denied

10 due process of law, substantive or procedural, after the years

11 of litigation here, the extensive pleadings, discovery, and

12 agreements amongst counsel.  The Rule 50 motion based upon

13 violation of due process is denied.

14          MR. ALPER:  Your Honor -- and was part of your 50(a)

15 motion have to do with spoliation?  Do I need to respond to

16 that, or was that something separate that you were -- I'm

17 sorry, your Honor.  I thought I heard something about--

18          THE COURT:  I think I encompassed that in the denial

19 of the earlier Rule 50(a) motion.

20          MR. ALPER:  That's what I thought.  Yes, your Honor.

21 Thank you.

22          MR. CLOERN:  Yes.  Just for the record, we did move

23 50(a) spoliation, and the motion is denied.

24          THE COURT:  That's right.

25          MR. CLOERN:  That's what I thought.  Thank you.

2368

1          And just before we move to the next one, your Honor,

2    for the record, we filed multiple motions, and Judge Cole re-

3    ordered that all of the witnesses be re-deposed because they

4    had no idea what the trade secrets are and then threatened to

5    appoint a technical advisor.  And it was only at that point

6    that Motorola went from 142 down to 29 and actually gave us

7    some disclosures, so just to clarify the record on that.

8    So --

9          THE COURT:  I don't know what you -- you call a

10   technical advisor.  You mean a special master --

11         MR. CLOERN:  Yes, your Honor.

12         THE COURT:  -- which is available under the Federal

13   Rules of Civil Procedure?

14         MR. CLOERN:  Yes, your Honor.

15         THE COURT:  That's not a threat.  It's an

16   availability.

17         MR. CLOERN:  Well, Magistrate Cole issued a minute

18   order in which Magistrate Cole basically said that he would

19   appoint a technical advisor if the trade secrets weren't

20   clarified because he would need to step in and do it.

21         So that was -- there has been a significant issue

22   over the months.  We filed motion after motion after motion,

23   and it was all that motion practice that did result in the --

24   narrowing the number of trade secrets, but the vagueness of

25   them were not ever narrowed, and there was a significant

2369

1    issue.

2           And it was only after Judge Cole issued the minute

3    order saying he was considering appointing the technical

4    advisor that the trade secrets were narrowed, we got a

5    disclosure, and then all of the witnesses were ordered

6    re-deposed based on this new disclosure to avoid having a

7    special master come in, and then who knows what that would

8    have done to the schedule.  So I just wanted --

9           THE COURT:  I don't think --

10          MR. CLOERN:  -- to clarify the record on that.

11          THE COURT:  Your statement is noted for the record,

12   but it does not change the ruling that you have not been

13   denied any form of procedural due process or substantive due

14   process.

15          MR. CLOERN:  Understood.

16          THE COURT:  Okay.  Do you have any -- proceed.

17          MR. CLOERN:  Sure.  Turning to the copyright claims,

18   your Honor, Motorola has not proven that what's copied is

19   protectable.  And so Dr. Wicker issued a report in this case.

20   Exhibit C and D identifies the lines that he specifically

21   claims are copied.  Hytera's expert finds that to be about 4

22   percent; you know, the lines he's identified versus the total

23   lines in the code.

24          THE COURT:  Well, that's what he will eventually say,

25   right?

1      MR. CLOERN:  Yes.  And Dr. Wicker agreed.  They have

2  a dispute about how to count the lines, but they don't dispute

3  the files.  If you just look at the number of files, it's

4  about 10 percent.  But the point is, so the first point is

5  that it is a subset of what's alleged to be copied, not the

6  whole thing, a relatively small percentage.

7      Number two is that that -- those, what Dr. Wicker has

8  identified in lines C and D, he's not provided an opinion

9  or -- and he certainly didn't testify in court as to what it

10  is about that copyright -- or I'm sorry, about those lines

11  that is protectable under the copyright statute; you know,

12  what kind of expression that it is, that it's not scènes à

13  faire, any of those kinds of things that you have to prove.

14      He hasn't proven the elements of the copyright claim.

15  They never came out of his mouth, right, not that they were

16  creative, not how they were creative or anything, nothing

17  about any one line of code.  He did identify that some things

18  were copied, and we've conceded that but not that anything

19  that was copied is protectable under copyright.

20      THE COURT:  He even said, cut and pasted.

21      MR. CLOERN:  That's right, cut and paste.  And some

22  of it appears to have been pretty much cut and pasted and,

23  again, by certain former Motorolans unknown to the broader

24  company.  Hytera doesn't dispute that.  But the point of the

25  copyright --

1              THE COURT:  You mean former Motorolans.

2              MR. CLOERN:  Correct.  Folks who came -- four or five

3    folks who came from Motorola over to Hytera were involved in

4    that.  Hytera's position is that no one else was aware of what

5    they were up to.

6              But the point for the copyright issue is that while

7    there is, whether it's 5 percent, 10 percent of the code that

8    was directly copied, there's been no evidence that any of that

9    code is protectable under copyright so that it is some sort of

10   form of creative expression or something.  And what there is

11   evidence of, however, is that much of what has been identified

12   as copied is, in fact, not protectable.

13             So there was some discussion at trial about what is

14   called the ergonomic layer.  And the ergonomic layer of the

15   code is the part of the code where you -- Bob -- you hold the

16   radio in your hand.  You punch a 4 on the keypad, and so a 4

17   comes up on the screen or you turn the volume knob up and the

18   volume goes up.  Basic functionality, right, stuff that you

19   would have on a calculator or an old radio.

20             So those things aren't trade secrets.  And there is

21   admission that those things aren't trade secrets.  There is

22   admission that those things are basic, standard, benign

23   functionality that every electronic device has, and so that

24   means it's not creative expression.  It's not copyrightable.

25             So a lot of the code that's been identified, there

1    has been testimony that it's not creative, not copyrightable.

2    There has been no testimony on any particular line or file

3    that it is creative, much less why it is.

4              THE COURT:  You may respond.

5              MR. DEORAS:  Your Honor, Motorola opposes this 50(a)

6    motion on the copyrightability.  Actually, a number of

7    witnesses testified as to the copyrightability and the

8    protectability of Motorola's source code.  Mr. Boerger,

9    Mr. Corretjer, Mr. Zetzl, Mr. Karpoor, and Dr. Wicker all

10   testified that the content was original, it was creative, and

11   it was copyrightable subject matter.

12             And they explained -- I actually specifically recall

13   talking to Mr. Boerger about how the example that Hytera's

14   counsel just gave of the punching of the number 4, hitting the

15   volume knob was not simple basic functionality but there were

16   a number of ways that engineers could write that

17   functionality.  And Mr. Boerger explained specifically how

18   Motorola's engineers implemented it.

19             Dr. Wicker also explicitly walked through the source

20   code that Motorola's engineers had written and explained that

21   there were a number of ways to do it and that the way that

22   Motorola's engineers wrote the source code was original and

23   creative and deserving of copyright protection.  I think that

24   was -- I think that was everything that counsel identified.

25             THE COURT:  All right.  Your reply?

1          MR. CLOERN:  Sure, your Honor.  I just want to

2     address the punching the number 4 point.  So there is this

3     doctrine in copyright law.  And I hope I get this right.  It's

4     scènes à faire.  The idea is, and the way I've always seen it

5     in articles and textbooks is that you see an old western.  And

6     you can copyright script for an old western, right, but in old

7     westerns, there's always this dusty old town and one of those,

8     what do you call them, tumbleweeds rolls by.  It's in every

9     scene of an old western.  You can't copyright that.

10          THE COURT:  Was that "Shane" or "High Noon"?

11          MR. CLOERN:  It's both.  It's both because the

12     tumbleweed always rolls by in the old western whether it's

13     "Shane" or "High Noon."  And that's what can't be copyrighted

14     because it's not creative expression.  It's basic and

15     everybody does it just like punching the number 4.

16          And there has been -- there was no testimony that

17     punching a number 4 is some kind of super secret, very

18     creative expressive code.  It's not.  You do it on calculators

19     back in the '60s.  And there was no testimony like that.

20     There was some suggestion that turning up the volume, which

21     every device does and has done for 50 years, was somehow

22     create -- important or hard to do, but that's simply not

23     credible.

24          THE COURT:  Did some units have voice activation?

25          MR. CLOERN:  There is discussion of voice activation.

1    That's called VOX.  VOX is --

2              THE COURT:  How about sound suppression?

3              MR. CLOERN:  And there is discussion of sound

4    suppression.  However, the discussion of sound suppression

5    that was provided was not of a Motorola -- was not of a DMR

6    radio.  That was of a P25 radio that has nothing to do with

7    this case.  It has dual microphones, one extra microphone

8    specifically to block out noise from other places.  So --

9              THE COURT:  Was that the exhibit with the airplane in

10   the background?

11             MR. CLOERN:  It was, your Honor.  It was.  So and the

12   voice activation actually is not even accused.  That's not

13   copied.  It's not even accused.  We are -- I'm happy to bring

14   up Dr. Wicker's report and show, but if you look at the slides

15   they put up to say what their VOX implementation is, it

16   doesn't even accuse -- it doesn't even include the voice

17   activation part, but even if it did, that's a standard feature

18   on every single radio that's -- every DMR radio that's out

19   there, every one.

20             THE COURT:  The Court cannot say as a matter of law

21   that Hytera should prevail on the 50(a) motion.  There is

22   enough given the totality of the evidence presented to the

23   jury for them to reach a verdict on that issue in favor of

24   Motorola.

25             MR. CLOERN:  Okay.  Thank you, your Honor.  My last

2375

1    two points.

2          Motorola has not proven that, which alleged copying

3    is associated with which of the four works in the case.  So

4    there's four copyrighted works that are asserted:  Two in the

5    complaint and then two that were added, I think, in the last

6    couple month, but I'm not positive when, but they're certainly

7    not mentioned in the complaint.

8          We have a separate summary judgment motion on those

9    late added two copyright for which -- the registrations for

10   which the complaint --

11         THE COURT:  Were they added in the sense of an

12   amended complaint?

13         MR. CLOERN:  They were not, your Honor.  The

14   complaint was never amended.  So, you know, those are

15   additional -- they should be additional counts in the

16   complaint.  That's pretty basic copyright law.  You can't just

17   toss them in.  The complaint was never amended, and it should

18   be.  And we have a summary judgment motion on that.  And we

19   would renew a rule 50(a) motion on that.

20         But in addition, whether it's two or four, the code

21   hasn't been tied specifically to those copyright registrations

22   which is important because that's what's infringed.  So we

23   don't know which ones are infringed by which code.

24         THE COURT:  With respect to the motion for summary

25   judgment, it will remain under advisement.  But on the last

1    part of the 50(a) motion, what is your response?

2          MR. DEORAS:  So we oppose the last part of the 50(a)

3    motion as well.  And I took that to mean that we had not tied

4    the copying by Hytera of -- to the actual copyrighted works,

5    but that is simply not true.  Dr. Wicker went through and

6    identified for each of the copyright, the copyrighted works,

7    which it's one work.  It's the DMR source code that has four

8    registrations associated with it.  Dr. Wicker went through

9    each of those and identified --

10         THE COURT:  Four registrations, you mean in the

11   patent office?

12         MR. DEORAS:  In the copyright office, yes, your

13   Honor.

14         THE COURT:  Excuse me.  The copyright office?

15         MR. DEORAS:  Yes, your Honor.  And so Dr. Wicker did

16   actually go through and identify which of those copied works

17   had been copied by Hytera, and he walked through

18   extensively --

19         THE COURT:  Did he also walk through it in his 26

20   report?

21         MR. DEORAS:  He did, your Honor, in thousands of

22   pages of detailed, detailed descriptions of which source code

23   and what lines of source code Hytera had copied from Motorola.

24         THE COURT:  And was his testimony on the stand

25   consistent with his report?

2377

1          MR. DEORAS:  Yes, it was, your Honor.

2          THE COURT:  And subject to zealous cross-examination?

3          MR. DEORAS:  Yes, it was, your Honor.

4          MR. CLOERN:  May I have a short reply --

5          THE COURT:  Yes.

6          MR. CLOERN:  -- just to correct the record?

7          Professor Wicker's report was, I think, about over

8     2,000 pages.  And there were 15 pages on copyright.  He

9     absolutely did not go through and identify what code applies

10    to what copyright.  He didn't do it in his report, and he

11    didn't do it at trial.  And he tried to do it at trial and he

12    couldn't because he didn't do it in his report.

13          And, in fact, it is not true that all four works are

14    the same.  If it was true, they wouldn't have added -- they

15    wouldn't have four works.  They'd have one.  They apply to

16    different parts of the code.

17          So there's one work for the repeater, there's one

18    work for the mobile devices -- which, by the way, aren't even

19    accused in this case -- and there's one work for what's called

20    the subscribers.  So the subscribers you hold in your hand.

21    The mobiles go in cars.  And the repeaters are that big black

22    thing that Mr. Karpoor had up there.

23          THE COURT:  It was gray.

24          MR. CLOERN:  It was gray.  Okay.  Gray.  I'll -- good

25    enough.  But the code hasn't been matched up to those

2378

1   different copyrights which absolutely covered different

2   things, 100 percent.  And, in fact, one of them is related to

3   the mobile which isn't even accused in this case.

4           THE COURT:  Is there any further response?

5           MR. DEORAS:  Yes.  Yes, your Honor, just briefly.  I

6   think the larger point counsel raises about the four different

7   copyright registrations was already briefed in front of

8   Magistrate Cole who denied the motion and found all four

9   registrations to be within the scope of the case.

10          Also, I'd like to correct the record.  Dr. Wicker had

11  literally thousands of pages of exhibits to his expert report

12  where he detailed the copying by Hytera of Motorola's source

13  code.  And I think the only other thing, I think we disagree

14  on the scope of what's accused but otherwise, I think that's

15  our response.

16          THE COURT:  There is enough before the jury for them

17  to reach a favor -- a verdict favorable to Motorola in this

18  case.  The Court cannot grant the motion as a matter of law.

19  There is such a wealth of evidence before the jury by way of

20  hundreds of documents, cross-examination, very extensive

21  zealous redirect.  And looking at the totality of evidence,

22  there is enough from which a reasonable jury could reach a

23  verdict in favor of Motorola.

24          The Court cannot say as a matter of law that Hytera

25  should succeed on the Rule 50(a) motion, and it is denied.

2379

1          MR. CLOERN:  Last one, your Honor.  Almost done.  The

2     final one applies to copyright.  The copyright claim is

3     limited to three years before the amended complaint.  So

4     there's not really a statute of limitations.

5          THE COURT:  Did you tell me there was not an amended

6     complaint?

7          MR. CLOERN:  So there is an amended complaint.  So

8     the original complaint was just trade secrets.  There was an

9     amended complaint about a year ago, August 2018, that added

10    the copyright claim, but they only put in two copyrighted

11    works.  The complaint was never amended a second time to add

12    the additional two works that Motorola is now asserting.

13         THE COURT:  As a general rule, the filing of an

14    amended complaint would make the first complaint *functus*

15    *officio*.  It would cease to exist unless you are somehow

16    saying the original complaint survived the filing of an

17    amended complaint.

18         MR. CLOERN:  No, your Honor, we're not saying that at

19    all.  All we're saying is that in the amended complaint, there

20    was a copy -- it asserts a copyright claim for two copyrighted

21    works.  Motorola is now asserting four works, so two works

22    that aren't in its complaint.  That's like -- that's like

23    bringing a patent case and asserting three patents in your

24    complaint and then getting to trial and asserting five

25    patents.  Generally, you just can't add them without amending

2380

1   the complaint.  And that's clear in patent and it's generally

2   clear in copyright.

3            THE COURT:  Well, you can make an amendment to comply

4   with the proofs.

5            MR. CLOERN:  They haven't done that.

6            THE COURT:  Not yet.

7            But what is your reply?

8            MR. ALPER:  Your Honor, we -- on that issue, on the

9   amended complaint issue, we wholly disagree.  They actually

10  raised this issue to your Honor in moving to dismiss our

11  amended complaint.  You rejected the argument then.  They

12  raised the issue to Judge Cole, and as a discovery matter, he

13  rejected the argument.  And in any event, the law is very

14  clear that basic -- and we provided these other registrations

15  over the course of discovery.  We -- Dr. Wicker included them

16  in his expert report.  He testified to them on the stand.

17           So there's really no basis for their motion.  It's

18  also the subject, I think, of the pending summary judgment

19  motion --

20           MR. CLOERN:  It is.

21           MR. ALPER:  -- which your Honor already said that you

22  are taking under advisement.  So I'm not sure --

23           MR. CLOERN:  It is in the summary judgment motion,

24  your Honor, but this was not raised in the -- we did move to

25  dismiss the amended complaint, the copyright claim, but that

2381

1 was the first two works.  We couldn't have -- that was in

2 August of 2018.  They didn't bring in the other two works

3 until June of, like, 2019, so we couldn't have done that

4 unless we had a time machine.

5    The second two works which were never in the

6 complaint were certainly not part of the motion to dismiss the

7 amended complaint.

8    THE COURT:  Well, first, we're talking about the

9 summary judgment motion as brought pursuant to Rule 56, and

10 we're talking about a 50(a) motion.  Two different standards

11 apply.  So what I'm saying today is the motion for summary

12 judgment remains under advisement.

13    The 56(a) motion, the Court cannot say as a matter of

14 law that the movant should prevail.  There is enough before

15 the jury for them to reach a judgment in favor of the

16 plaintiff; that a reasonable jury based upon the totality of

17 what they have heard over these ten or more days of trial

18 considering the hundreds of documents and zealous direct and

19 cross-examination could reach a verdict in favor of Motorola,

20 and so the motion of Hytera under 50(a) is denied.

21    MR. CLOERN:  Your Honor, the final -- then the final

22 point then is just the damages period for the copyright claim.

23 And the damages period, we think under the statute and the

24 case law is clear, is three years from the time the copyright

25 case is filed, you can only go back three years.  And Motorola

2382

1    is going back ten years in the damages.

2              MR. DEORAS:  We oppose this motion as well, your

3    Honor.  There are multiple Seventh Circuit cases that provide

4    going back further than three years for copyright

5    infringement.  *Taylor v. Meirick* -- it's 712 F.2d 1112, it's a

6    1983 case from the Seventh Circuit -- lays out the continuing

7    violation doctrine which sets forth that an infringer that

8    continues to violate someone's copyright can be held liable

9    for the entirety of the violation period because each use of

10   the copyrighted information is its own -- is its own wrong.

11             There's another reason we should be entitled to

12   damages beyond the three-year period.  That's the discovery

13   rule.  And that's the *Panoramic Stock Images* case from the

14   Seventh Circuit.  That's 2015 Westlaw 393381.  That case was

15   January 27th, 2015.  The discovery rule allows a copyright

16   owner to recover infringement damages regardless of when they

17   occurred, and we think that applies here as well.

18             THE COURT:  I accept your argument on the point.  The

19   Rule 50(a) motion is denied.  The law does not support the

20   movant's position.  The Court rules in favor of Motorola.  The

21   final and last 50(a) motion is denied.  That leaves still the

22   summary judgment motion.

23             Tomorrow at 10:00, you'll be ready to call a witness?

24             MR. CLOERN:  Yes, your Honor, absolutely.

25             THE COURT:  And who will that be?

1          MR. CLOERN:  It will be Professor Sun Pengfei.

2          MR. ALPER:  And, your Honor, just so we can -- as

3     long as we're here, we might as well talk about this.  So this

4     is a Chinese-speaking witness.  Counsel, we've conferred over

5     how to have interpreters for the witness.  So if I may

6     describe that for you, you can tell us if that sounds good to

7     you.

8          So the plan is to have Hytera's interpreter and then

9     our interpreter sit right there in front of the witness; that

10    we're going to put a small table so they can take notes while

11    the witness is testifying.  And then they'll have wireless

12    microphones that they can then do their interpretation into if

13    that's acceptable to your Honor.

14         THE COURT:  That's not an unusual procedure.  Do you

15    agree?

16         MR. CLOERN:  I agree.

17         THE COURT:  And so it is.  Thank you, counsel.

18         MR. CLOERN:  Thank you, your Honor.

19         MR. ALPER:  Thank you.

20       (Proceedings adjourned from 3:07 p.m. to 10:00 a.m.)

21

22

23

24

25

1                    C E R T I F I C A T E

2          I, Judith A. Walsh, do hereby certify that the

3    foregoing is a complete, true, and accurate transcript of the

4    proceedings had in the above-entitled case before the

5    Honorable CHARLES R. NORGLE, SR., one of the judges of said

6    Court, at Chicago, Illinois, on December 3, 2019.

7

8    /s/ *Judith A. Walsh, CSR, RDR, F/CRR*_____December 4, 2019

9    Official Court Reporter

10   United States District Court

11   Northern District of Illinois

12   Eastern Division

13

14

15

16

17

18

19

20

21

22

23

24

25