3235

1    IN THE UNITED STATES DISTRICT COURT
        NORTHERN DISTRICT OF ILLINOIS
2              EASTERN DIVISION

3    MOTOROLA SOLUTIONS, INC., and MOTOROLA    ) No. 17 CV 1973
     SOLUTIONS MALAYSIA SDN. BHD,              )
4                                              )
                                               )
5           Plaintiffs,                        )
     vs.                                       ) Chicago, Illinois
                                               )
6    HYTERA COMMUNICATIONS CORPORATION, LTD.,  ) December 17, 2019
     HYTERA AMERICA, INC., and HYTERA          )
7    COMMUNICATIONS AMERICA (WEST), INC.,      )
                                               )
8           Defendants.                        ) 10:00 o'clock a.m.

9
                    TRIAL - VOLUME 22 A
10              TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE  CHARLES R. NORGLE, SR.
11                   and a jury

12

13   For the Plaintiffs:    KIRKLAND & ELLIS LLP
                            BY:  Mr. Adam R. Alper
14                               Mr. Brandon Hugh Brown
                                 Mr. Reza Dokhanchy
15                               Ms. Barbara Nora Barath
                                 Mr. Kyle Calhoun
16                          555 California Street
                            27th Floor
17                          San Francisco, California 94104
                            (415) 439-1400
18
                            KIRKLAND & ELLIS LLP
19                          BY:  Mr. Michael W. De Vries
                            333 South Hope Street
20                          Los Angeles, California 90071
                            (213) 680-8400
21

22
     Court reporter:            BLANCA I. LARA
23                         Official Court Reporter
                           219 South Dearborn Street
24                              Room 2342
                           Chicago, Illinois 60604
25                            (312) 435-5895
                           blanca_lara@ilnd.uscourts.gov

3236

1    Appearances:  (Continued:)

2

3    For the Plaintiffs:      KIRKLAND & ELLIS LLP
                              BY: Ms. Megan Margaret New
4                             300 North LaSalle Street
                              Chicago, Illinois 60654
                              (312) 862-7439
5
                              KIRKLAND & ELLIS LLP
6                             BY:  Ms. Leslie M. Schmidt
                              601 Lexington Avenue
7                             New York, New York 10022
                              (212) 446-4763
8
     Motorola Corporate Representative:   Mr. Russ Lund
9

10

11   For the Defendants:      STEPTOE & JOHNSON LLP
                               BY: Mr. Boyd T Cloern
12                                 Mr. Michael J. Allan
                                   Ms. Jessica Ilana Rothschild
13                                 Ms. Kassandra Michele Officer
                              1330 Connecticut Avenue., Nw
14                            Washington, DC 20036
                              (202) 429-6230

15                            STEPTOE & JOHNSON LLP
                              BY:  Mr. Daniel Steven Stringfield
16                            227 West Monroe Street
                              Suite 4700
17                            Chicago, Illinois 60606
                              (312) 577-1267
18

19   Hytera Corporate Representative:  Michele Ning

20

21

22

23

24

25

Luo - redirect by Allan

3237

1          THE CLERK:  All rises.

2          (The following proceedings were had in the

3          presence of the jury in open court:)

4          THE CLERK:  This Court resumes in session.  Please be

10:00:17    5  seated.

6          THE COURT:  Good morning, members of the jury.

7          Please recall the witness.

8          (Brief pause.)

9          MR. ALLAN:  May I proceed, Your Honor?

10:01:37   10          THE COURT:  Yes.

11        LUO JUNPING, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

12              REDIRECT EXAMINATION (resumed)

13  BY MR. ALLAN:

14  Q.  Mr. Luo, on cross-examination yesterday you were shown a

10:01:43   15  number of documents you hadn't seen before, is that right?

16  BY THE WITNESS (THROUGH INTERPRETER):

17  A.  Yes.

18  Q.  Let's talk about just a few of those briefly.

19          If we could pull up PTX 22 TR.  This is the FPGA

10:02:07   20  analysis you were shown.

21          (Brief pause.)

22  BY MR. DE VRIES:

23  Q.  Do you have that, Mr. Luo?

24  BY THE WITNESS (THROUGH INTERPRETER):

10:02:18   25  A.  Yes.

Luo - redirect by Allan

3238

| | | |
|---|---|---|
| | 1 | Q.  And had you seen this before? |
| | 2 | A.  No.  Yesterday it was the first time that I saw this |
| | 3 | document. |
| | 4 | Q.  And are you an engineer? |
| 10:02:32 | 5 | A.  I studied communications engineering.  However, after I |
| | 6 | started working, I never worked as an engineer. |
| | 7 | Q.  You've never worked on FPGA chips, right? |
| | 8 | A.  No.  Never. |
| | 9 | Q.  Do you know who wrote or prepared this document? |
| 10:02:58 | 10 | A.  I do not know. |
| | 11 | Q.  Do you know whether this document was shared outside of the |
| | 12 | former Motorolans? |
| | 13 | A.  I do not know. |
| | 14 | MR. ALLAN:  Could we pull up PTX 19 previously |
| 10:03:24 | 15 | admitted. |
| | 16 | BY MR. ALLAN: |
| | 17 | Q.  Do you see this e-mail, Mr. Luo? |
| | 18 | A.  Yes. |
| | 19 | Q.  Have you ever seen this before? |
| 10:03:39 | 20 | A.  No. |
| | 21 | Q.  Do you see the attachment in the e-mail, it says, |
| | 22 | "FPGAanalysis.ppt"? |
| | 23 | A.  Yes. |
| | 24 | Q.  On the "to" and "cc" in "from" lines, is there anyone |
| 10:04:02 | 25 | listed there who is not a former Motorolan? |

Case: 1:17-cv-01973 Document #: 798 Filed: 12/20/19 Page 5 of 133 PageID #:54486
Luo - redirect by Allan
3239

1  A.  I see five people here.  According to my understanding, all

2  these five people were Motorola's former employees.

3  Q.  Now, you were asked about a lot of questions about when

4  this document was produced.  Do you remember those questions?

5  A.  Yes.

6  Q.  You were shown a letter from Finnegan Henderson with some

7  Bates numbers and you tried to match up the Bates numbers as to

8  when it was produced, right?

9  A.  Yes, I remember.

10  Q.  And you testified, I think, from those documents that it

11  looks like this was produced in December of 2017?

12  A.  Correct.

13  Q.  And it was suggested that since this was produced in

14  December 2017, Hytera should have acted faster in some fashion;

15  do you recall that?

16  A.  Yes.

17        MR. ALLAN:  Can we pull up DDX 9.1, please.

18  BY MR. ALLAN:

19  Q.  So, Mr. Luo, just orient us on this -- on this

20  demonstrative that you prepared yesterday.  Where in this

21  timeline, December 2017, fits and where Motorola's claims are

22  at that time.

23  A.  Yes.  You can see that the December 2017 timeframe is after

24  the October 2017 timeframe here.  At that time Motorola pointed

25  out that there were 8,000 documents that were their trade

Case: 1:17-cv-01973 Document #: 798 Filed: 12/20/19 Page 6 of 133 PageID #:54487
Luo - redirect by Allan
3240

10:07:20

10:08:07

10:08:42

10:08:57

10:09:22

1  secrets; however, we did not know what they were back then.

2  Q.  So this -- this was produced between the time period that

3  Motorola was alleging there were 8,000 documents that were the

4  trade secrets and 20,000 documents that were the trade secrets,

5  is that right?

6  A.  Correct.

7  Q.  Now, how long did it take Motorola to provide all of the

8  lines of alleged code after this document was produced?

9  A.  One and a half years.  About 18 months.

10  Q.  And after a year and a half after that was produced and

11  they provided the lines of the code that they were actually

12  accusing in the case, what did Hytera do?

13  A.  Correct.  Then we started the rewriting work it needed to

14  be done.

15  Q.  All right.  You were also shown PTX 100.

16      MR. ALLAN:  Can we pull that up real quick, PTX 100

17  TR.

18  BY MR. ALLAN:

19  Q.  And this document you've never seen before either, is that

20  right?

21  A.  Correct.

22  Q.  Now, there's a reference on the third page to a note from

23  Roger Leung, do you see that?

24  A.  Yes.

25  Q.  And Roger Leung asks Sam a question about this "transmit

Luo - redirect by Allan

3241

1    4FSK deviation" up at the top, do you see that?

2    A.  Yes.

3    Q.  And Motorola's lawyer didn't tell you where this came from

4    yesterday, did he?

10:09:50    5    A.  Correct.  He did not.

6    Q.  Would you agree that Roger Leung has more information about

7    where this came from than you do?

8    A.  Yes, I believe so.

9    Q.  Do you know whether Mr. Leung took this "transmit 4FSK

10:10:21    10   deviation" piece from a document that was labeled "Hytera"?

11   A.  I do not know.

12   Q.  You rely on Mr. Leung, right, Mr. Luo?

13   A.  Correct.

14   Q.  Now, let's take a look at PTX 1019, and specifically

10:10:52    15   Line 125,230.  You were shown this the yesterday.

16   A.  Correct.

17   Q.  It's going to take just a second to get there.

18          (Brief pause.)

19   BY MR. ALLAN:

10:11:17    20   Q.  Can you remind the jury, you're familiar with this

21   document?

22   A.  I would like to remind the jury that this document is the

23   listing of the listing and paths of the files that were not

24   able to be restored from Huang Peiyi's computer, which was the

10:12:05    25   one that I recovered from the warehouse of the fixed assets.

Case: 1:17-cv-01973 Document #: 798 Filed: 12/20/19 Page 8 of 133 PageID #:54489
Luo - redirect by Allan
3242

1  Q. All right. So we've got the line that you were referred

2  yesterday, 125230; do you see that?

3  A. Yes.

4  Q. And there was a suggestion yesterday that Ms. Huang Peiyi

10:12:39  5  deleted some of these files because of the lawsuit, right?

6  A. Correct.

7  Q. And I want to direct you to column J, that's the column

8  that lists the date of deletion. Do you see that?

9  A. Yes.

10:13:00  10  Q. And what's the date of the deletion of the file that you

11  were shown yesterday?

12  A. What it says here is April the 9th, 2013.

13  Q. And this case was filed in March of 2017?

14  A. Correct.

10:13:27  15  Q. So according to this, Huan Peiyi deleted this file 4 years

16  before this was filed, is that right?

17  A. Correct. That's the case.

18  Q. There were some discussion about Sam Chia's laptop as well,

19  right? Yesterday?

10:13:50  20  A. Yes.

21  Q. And you understand that at some point in his career at

22  Hytera, he had misplaced the laptop, right?

23  A. Correct.

24  Q. You don't have reason to disagree with the testimony that

10:14:20  25  was played of Sam Chia in this trial that he never deleted any

Luo - redirect by Allan

3243

1    files after the lawsuit was filed, right?

2    A.  Correct.

3    Q.  Now, you were also shown an e-mail from, I think that you

4    were on, from August of 2017, from Xiaohua Zheng, Jodie.  Do

5    you remember that?

6    A.  Yes.

7    Q.  And she was talking about in that e-mail events having

8    happened recently and the need to increase intellectual

9    property awareness in daily work, right?

10   A.  Yes.  I remember.

11   Q.  And that was several months after the case was filed?

12   A.  Correct.

13   Q.  It's no surprise that people like Jodie, in view of this

14   litigation, are thinking about those sorts of things, is it?

15   A.  That's correct.

16   Q.  In fact, you'd expect people to be thinking about those

17   kind of things, right?

18   A.  Correct.  This is the first time we are involved in a

19   litigation in the U.S., particularly a litigation for trade

20   secrets.  Our company already has some policies in place with

21   respect to intellectual property protection.  However, the fact

22   that this litigation took place reminds us that we could do

23   better.

24          As the leader of the patent department of the company,

25   I would hope that the company would attach more attention and

Luo - redirect by Allan

3244

1    more importance to the protection of intellectual property

2    rights.  Though we will continue to improve our policies and

3    work.

4    Q.  Now, you were asked a series of questions about Motorola

10:17:20    5    documents -- or Motorola references in Hytera documents,

6    right?

7    A.  Correct.

8    Q.  It's not unusual to have references to Motorola in

9    documents in Hytera's files, is it?

10:17:41   10        INTERPRETER LIN:  In the documents?

11   BY MR. ALLAN:

12   Q.  It's not unusual to have references to Motorola in files

13   that are within Hytera's possession?

14   A.  It's like this, like what I explained previously:  In the

10:18:09   15   industry it is normal to research and analyze your competitors.

16   As long as the channels for you to obtain the information are

17   legitimate and legal, it would be a legitimate action to do.

18        We not only look at Motorola, we also look at other

19   companies who are also our competitors, such as Kenwood and

10:18:51   20   HICOM.  I also provided examples to explain that there are many

21   channels and ways to obtain information regarding your

22   competitors.

23        Trade shows would be one of the methods.  Another

24   method is through patents, because patents are public.  We

10:19:28   25   would obtain some information regarding the competitors'

Luo - redirect by Allan

3245

1  patents from the Patent Office.

2  Q.  Let's talk a little bit about libraries.  You were asked a

3  few questions about library files yesterday.  Do you recall

4  that?

10:19:43  5  A.  Yes.

6  Q.  Now, in your work assisting the attorneys to collect

7  documents and materials, you came to learn that there were a

8  number of libraries within the DMR products, right?

9  A.  Yes.

10:20:08  10  Q.  And many of those libraries were provided by third-parties,

11  third-party companies like Texas Instruments, and so forth,

12  right?

13  A.  Yes.  Yesterday I explained that we have a lot of partners

14  for cooperations.  In our products we have a lot of libraries

10:20:52  15  not just from those companies, such as Texas Instruments or

16  Mentor Graphics, we also have the library files in our products

17  from many other partners for cooperation.

18       Our current products are still complicated.  According

19  to my understanding, those products still have millions -- or

10:21:24  20  more than a million lines of source code in them.  With the

21  industrial development, that's ongoing currently.  It's not

22  possible to have just one company to cover or do everything.

23  Though we would work with other companies and they would

24  complete some modules and provide those modules to us so that

10:21:59  25  we could use those modules and library files.  They would turn

Luo - redirect by Allan

3246

1  those modules into library files so that we could use them, and

2  ultimately it would become our products.

3  Q.  You understand, Mr. Luo, that sometimes third-parties when

4  they provide libraries, they just provide the library and not

10:22:23  5  the corresponding source code, right?

6  A.  Correct.

7  Q.  So when it was brought to your attention that there were

8  some libraries that were missing source code, that wasn't

9  terribly unusual, was it?

10:22:45  10  A.  That's correct.  That's something that would need further

11  investigation.  We need to check and look into all those

12  library files to see what they are about and where they come

13  from.

14          If they come from a third-party, we would have to see

10:23:25  15  if we obtained them through legitimate ways through valid

16  licensing.  So that would take a long investigation.

17          And according to results of the investigation, like

18  what I explained earlier, among those hundreds of files and

19  library files, for the majority of them we use them through

10:24:00  20  legal or legitimate valid licensing.

21          Only three library files, only for those three library

22  files we were not able to find their source until we saw or

23  discovered from the computers of Peiyi Huang and other former

24  Motorola employees that there might have been some source codes

10:24:42  25  for those already compiled library files.

Luo - redirect by Allan

3247

1    Q.  So for all the libraries that were part of the DMR project,

2    there were just the three that you couldn't locate source code

3    for, right?

4    A.  According to my understanding, yes.

10:25:07    5    Q.  Now, you were asked a few questions above G.S. Kok, Sam

6    Chia, and Y.T. Kok, right?

7    A.  Correct.

8    Q.  And they were all terminated in 2018, correct?

9    A.  Correct.

10:25:26   10    Q.  Why didn't Hytera fire them sooner?

11    A.  It's like this, when the lawsuit was filed in 2017, we

12    engaged a U.S. counsel, Finnegan, to help us conduct the

13    investigation.  They told us that we needed to have these three

14    people, G.S. Kok, Y.T. Kok, and Sam Chia stay behind in the

10:26:16   15    company to help us with the investigation.  If they work with

16    us with respect to the investigation, it would be very helpful

17    for us to understand something that happened 10 years ago.

18    Q.  Did they continue to work and assist Hytera?

19    A.  I remember that in the beginning, they were cooperative.

10:26:55   20    They handed over their computers and documents.  According to

21    what I know, they also worked with our counsel with respect to

22    the interviews and investigation.

23         However, later on, until the autumn of last year,

24    which is the autumn of 2018, it became very obvious that they

10:27:34   25    no longer wanted to cooperate with us with respect to the

Luo - redirect by Allan

3248

1    investigation.  At that time they even would not answer any of

2    our questions.  Our counsel reached out to their individual

3    attorneys.  Their individual attorneys would not respond to our

4    corporate counsel.  Though we had no way, but to fire them.

10:28:13    5    Q.  And it was your former lawyers, the Finnegan law firm, that

6    engaged in discussions with Sam, G.S., and Y.T., right?

7    A.  Correct.

8    Q.  You weren't involved in those discussions, correct?

9    A.  No, I was not.  I was not on those interviews.

10:28:41   10    Q.  You understand, Mr. Luo, that once these three folks were

11    terminated, Hytera paid them some money?

12    A.  In my understanding, yes.

13    Q.  Is it your understanding that the money that they were paid

14    on termination was due to Chinese and U.K. legal requirements?

10:29:36   15    A.  Yes.  According to my understanding, there is labor law in

16    Chinese -- in china, and there is equivalent labor law in the

17    U.K.  According to the laws, when employees are fired their

18    employer has to pay them some amount of money as their

19    compensation.

10:29:56   20    Q.  Can we go back --

21         THE COURT:  That is your understanding of the law?

22         THE WITNESS (THROUGH INTERPRETER):  That's my personal

23    understanding.  I am not an attorney, nor am I an expert on

24    law.  However, that's just my own understanding with respect to

10:30:25   25    the law, as an employee of a company, that's my basic

Case: 1:17-cv-01973 Document #: 798 Filed: 12/20/19 Page 15 of 133 PageID #:54496
Luo - redirect by Allan
3249

1    understanding.  As an employee, I have some basic understanding

2    to the rights and benefits I am entitled to as an employee.

3         MR. ALLAN:  Could we pull up DDX 9.1 again.

4    BY MR. ALLAN:

10:31:02  5    Q.  Now, we talked yesterday about the disclosures of source

6    code in September 2018.  Do you recall that?

7    A.  Yes.

8    Q.  And then you were shown on cross-examination DTX 5145.

9    This is Motorola's interrogatory response with a bunch of

10:31:25  10   source code files.  Do you see that (indicating)?

11   A.  I remembers, yes.

12   Q.  Now, before yesterday, Motorola didn't let anybody at

13   Hytera see this document, is that your understanding?

14   A.  Correct.  That's the case.

10:31:56  15   Q.  And certainly you hadn't seen this document before

16   yesterday, correct?

17   A.  Correct.  It was my first time seeing that document

18   yesterday.

19   Q.  And on direct, we talked about you getting to see one side

10:32:20  20   at -- some point you got to see in Hytera -- certain personnel

21   in Hytera got to see what Motorola was accusing in terms of

22   Hytera's code, right?

23   A.  Correct.

24   Q.  And I think on direct examination you sort of -- you

10:32:54  25   compared it to trying to look at two -- two paintings together,

Luo - redirect by Allan

3250

1    right?  You can only see one painting if you look at one side,

2    is that right?

3    A.  Yes.

4    Q.  Now, Mr. Luo, do you have an understanding that after this

10:33:16    5    was served in September of 2018, Motorola asked Hytera in

6    discovery questions about these particular source code files,

7    the Hytera files?

8    A.  Yes.

9    Q.  You understand that eventually Hytera received approval for

10:33:53    10    Motorola to send you just the right-hand side, right?  To send

11    Hytera just the right-hand side?

12    A.  Yes.

13    Q.  And then you understand that after the right-hand side was

14    received, a lot of time was spent looking at these particular

10:34:17    15    files trying to understand the source, when they were written,

16    who wrote them, those sorts of things, right?

17    A.  Yes.

18    Q.  And it's your understanding that this is the first time in

19    the case that Motorola provided this level of detail in terms

10:34:46    20    of source code?

21    A.  Yes.

22    Q.  And how long was that after the case was filed?

23    A.  That was after, one and a half years after the case was

24    filed.

10:35:13    25    Q.  So it was a year and a half before Motorola provided this

Luo - redirect by Allan

3251

1    level of detail that you eventually got to see part of it?

2    A.  Yes.

3    Q.  And just yesterday is the first time you saw this entire

4    document?

10:35:38    5    A.  That's correct.

6    Q.  Now, Motorola didn't stop changing their claims when this

7    document was served in September, did they?

8    A.  That's correct.  They were still changing them.

9    Q.  In fact, in December, a year ago, there were still 142

10:36:12   10    trade secret claims in the case, right?  142 alleged trade

11    secrets?

12    A.  Correct.

13    Q.  And then in March, they added to this, they added a number

14    of files without the lines, just more files; is that your

10:36:37   15    understanding?

16    A.  Yes.  According to my understanding, at that time they

17    added 72 source code files which they alleged to have been

18    copied, but they did not tell us what lines, specific lines

19    there were.

10:37:15   20    Q.  Do you understand, Mr. Luo, that as these claims are

21    evolving, that Hytera's experts were spending an enormous

22    amount of time trying to understand the claims and look at the

23    source code?

24    A.  Yes, we had to rely on our outside experts to conduct all

10:38:04   25    of these analyses and it is very time-consuming and it requires

Luo - redirect by Allan

3252

1   a lot of efforts.

2   Q.  Now, you were also asked a series of questions about the

3   April 2019 timeframe.  So this past spring.  Do you recall

4   those questions?

10:38:23   5   A.  Yes.

6   Q.  And you were shown a document that indicated Hytera had not

7   yet conceded that any code had been copied.  Do you remember

8   those questions?

9   A.  Yes.

10:38:52   10   Q.  And tell us, in April of 2019, had Motorola dropped its

11   trade secret claims from 142 to 29 yet?

12   A.  Not yet, no.

13   Q.  And in April of 2019, Motorola hadn't yet identified all of

14   the source code lines that they claim were copied in June,

10:39:25   15   right?

16   A.  Yes.

17   Q.  And, in fact, it wasn't until June that they identified all

18   of the lines that they claimed were copied, is that right?

19   A.  Correct.

10:40:03   20   Q.  And there was a lot of work done by the experts over the

21   summer to evaluate all of those claims?

22   A.  Yes; that's my understanding.

23   Q.  You understand that Motorola -- excuse me.

24        You understand that Hytera's experts reviewed all of

10:40:27   25   this and have addressed the small amount of code that appears

Luo - recross by DeVries

3253

1    to be in Motorola's products, right?

2              INTERPRETER LIN:  Motorola's products?

3              MR. ALLAN:  I'm sorry.  Let me re-ask the question.

4    BY MR. DE VRIES:

10:40:42    5    Q.  You understand that Hytera's experts after this June

6    disclosure, have evaluated all of this and addressed in their

7    opinions the small amount of Motorola code that is in Hytera's

8    products?

9    BY THE WITNESS (THROUGH INTERPRETER):

10:41:20    10   A.  Yes.  According to my understanding, they found several

11   thousands of lines out of several millions of lines of codes.

12   Q.  And in June of 2019, when the code was finally identified

13   by Motorola, what did Hytera do?

14   A.  We immediately started our work with respect to the

10:41:58    15   rewriting, redesigning, and modifications of the code.

16              MR. ALLAN:  Thank you.  Pass the witness.

17              THE COURT:  Counsel.

18                         RECROSS EXAMINATION

19   BY MR. DE VRIES:

10:42:11    20   Q.  Good morning, Mr. Luo.

21   A.  Good morning.

22   Q.  Is Hytera's DMR source code public?

23   A.  No.

24   Q.  When did Hytera first make its DMR source code available in

10:42:28    25   this litigation so that we could look at it?

Luo - recross by DeVries

3254

A.  I do not recall the specific time, but it was around July

of 2017.  It was probably around July or August.  However, if

you are looking for a more precise or more specific timeframe,

perhaps you can show me some documents so I can try to recall.

Q.  It was months after this case was filed, right?

A.  We provided them 3 or 4 months after the case was filed.

Q.  And you're not aware of anyone from Motorola, including its

outside lawyers, having access to Hytera's DMR source code

before then, right?

A.  I'm not aware of that.

Q.  Motorola did not know that Hytera copied its source code

until after this case was filed, right?

A.  I do not know that.

Q.  This is your slide, right (indicating)?

A.  Yes.

Q.  And that's why Motorola added a copyright allegation to

this lawsuit in 2018, right?

A.  I do not know.  Thank you for telling me.

Q.  And Hytera's employees had changed the parameters in the

code so that Motorola would not be able to figure out the

source code copying before lawsuit was filed, right?

A.  I do not agree with your question, nor do I agree with the

logic in your question.

Q.  Hytera's lawyers, in the summer of 2018, provided guidance

to Xiaohua Zheng, the same engineer we talked about yesterday,

Luo - recross by DeVries

3255

1    about how to change Hytera's products in order to deal with

2    Motorola's claims, correct?

3    A.  I do not know what our counsel told Ms. Zheng, and I also

4    do not agree with your question.  What I know is that our

10:46:27    5    counsel and experts did analysis.  Based on their analysis,

6    they told us that a small portion of our source code had

7    problems and we needed to rewrite them and repair them, and

8    that's what we have been doing from June of this year.

9    Q.  You were asked some questions about a disclosure that we

10:46:57   10    made to Hytera in September of 2018, is that right?

11   A.  Yes.

12   Q.  And you just testified that you had not seen that before

13   yesterday, right?

14   A.  Correct.

10:47:20   15   Q.  That disclosure identifies lines of Hytera's source code,

16   correct?

17   A.  That's part of the information in the document, yes.

18   Q.  And your lawyers received that document in September of

19   2018, right?

10:47:46   20   A.  I do not know.

21   Q.  And Hytera relied on its lawyers for purposes of evaluating

22   Motorola's claims and making changes to Hytera's products,

23   right?

24   A.  Yes.

10:48:05   25   Q.  Now, you testified about Motorola reducing the number of

Luo - recross by DeVries

3256

1   trade secrets at issue in this case from 142 to 21 in this

2   trial, right?

3            INTERPRETER LIN:  21, counsel?

4            MR. ALLAN:  21.

10:48:29   5   BY THE WITNESS (THROUGH INTERPRETER):

6   A.  Yes.

7   BY MR. ALLAN:

8   Q.  And you know that those 21 trade secrets include the 142

9   trade secrets, right?

10:48:53   10   A.  I do not know.  Yesterday I said that we did not know the

11   specific content of them.

12   Q.  You still don't know the specific content of Motorola's

13   trade secrets?

14   A.  That's correct.  I myself do not know.

10:49:10   15   Q.  And you yourself do not know whether the code that you said

16   was designed addresses those 21 trade secrets, right?

17   A.  That's correct.  The reason is that -- is that, like what I

18   said earlier, we totally rely on our counsel and experts.  They

19   would tell us what source code of ours has problems and we

10:49:55   20   would need to modify them.

21            As to how those codes can correspond to certain

22   Motorola's alleged trade secrets, our counsel and experts would

23   not tell us that.  But my general understanding is that the

24   results of their analysis would cover aspects related to the

10:50:37   25   trade secrets, as well as the copyright.

1        It's quite likely that the majority of the source

2    codes they are alleging would overlap with their trade secrets.

3    However, with respect to the specific contents, I truly do not

4    know.

10:51:03    5    Q.  And you know that the reason that Motorola reduced the

6    number of trade secrets at issue in this trial was to try to

7    streamline the proceeding to reduce the length of this trial,

8    correct?

9            MR. ALLAN:  Objection, Your Honor.

10:51:35   10            THE COURT:  Sustained.  You are not required to answer

11   that question.

12   BY MR. DE VRIES:

13   Q.  Have you been -

14   BY THE WITNESS (THROUGH INTERPRETER):

10:51:45   15   A.  Thank you.

16   Q.  Have you been informed why Motorola reduced the number of

17   trade secrets in this case?

18   A.  No.

19   Q.  You testified about some computers that belonged to Peiyi

10:52:07   20   Huang and Sam Chia, correct?

21   A.  Yes.

22   Q.  You collected certain computers from witnesses in November

23   of 2017, right?

24   A.  Yes.

10:52:27   25   Q.  But you did not collect all of the relevant computers at

Luo - recross by DeVries

3258

that time, correct?

A.  That's correct.  Like what I said yesterday, when I asked

Huang Peiyi to hand over all her computers, she gave us only

one computer, and she told us that she had only one computer.

10:53:07    MR. DE VRIES:  Your Honor, may I approach?

THE COURT:  Yes.

MR. DE VRIES:  Mr. Schlaifer, would you please display

previously admitted PTX 92.

BY MR. DE VRIES:

10:53:36  Q.  Mr. Luo, PTX 92 is an e-mail, from January of 2013, from

some Hytera engineers, is that right?

A.  Yes.

Q.  And you're familiar with this e-mail?

A.  Yes, we saw this e-mail yesterday.

10:54:03    MR. DE VRIES:  Mr. Schlaifer, let's please turn to

page 9 of the exhibit.  This is the English version.

BY MR. DE VRIES:

At the top, Mr. Luo, you'll see that the date is January 14th,

2013, right?

10:54:19  A.  Yes.

Q.  And the subject is "The Laptop List of Terminal PL," right?

A.  Yes.

Q.  And this contains a list of engineers in the DMR department

in 2014 and what computers they had, correct?

10:54:53  A.  Yes.

Luo - recross by DeVries

3259

1         MR. DE VRIES:  And if we go to page 14, and if we can

2  blow up, Mr. Schlaifer, row 55 and row 62.

3  BY MR. DE VRIES:

4  Q.  Those are the two computers that belonged to Huang Peiyi

5  that she did not turn over to you in November of 2017, right?

6  A.  Correct.

7  Q.  And the one on the atop is the one that contained the

8  Motorola source code and documents?

9  A.  Yes.  But I would like to emphasize again, we did find some

10  source codes and documents in that computer which contained

11  Motorola confidential identifier.  However, whether or not they

12  are truly Motorola's trade secrets, we would rely on our

13  counsel and experts to do the investigation.

14         MR. DE VRIES:  And if we go to the next page, page 16.

15  Mr. Schlaifer, if you could please blow up row 71.

16  BY MR. DE VRIES:

17  Q.  That's a laptop that belonged to Mr. Chia, right?

18  A.  Correct.

19  Q.  And that's the laptop that Mr. Chia said was lost, right?

20  A.  Yes.

21  Q.  Mr. Chia did not tell Hytera how it was lost, right?

22  A.  He told us that he had lost that computer when he was on a

23  business trip overseas.

24         THE COURT:  Where was the trip?

25         THE WITNESS (THROUGH INTERPRETER):  He did not tell

10:55:30

10:56:16

10:56:35

10:57:00

10:57:30

Luo - recross by DeVries

3260

1    us.

2    BY MR. DE VRIES:

3    Q.  You were deposed earlier this year, right?

4    A.  Yes.

10:57:49    5    Q.  At that time Mr. Chia had left the company, right?

6    A.  Correct.

7    Q.  You have not spoken to Mr. Chia since your deposition,

8    right?

9    A.  That's correct.

10:58:08    10           MR. DE VRIES:  Mr. Schlaifer, please turn to the

11   April 2019 deposition at page 145, lines 11 to 12.

12   BY MR. DE VRIES:

13   Q.  You were asked:

14           "Question:  How did Mr. Chia loss his laptop?

10:58:29    15           "Answer:  I didn't know.  He didn't tell us."

16           Was that the truth?

17           THE COURT:  Are you saying was the answer the truth?

18           MR. DE VRIES:  That's my question, yes.

19           THE COURT:  The answer the witness gave at his

10:58:47    20   deposition?

21           MR. DE VRIES:  Yes, Your Honor.

22           THE COURT:  All right.

23   BY THE WITNESS (THROUGH INTERPRETER):

24   A.  Yes.  However, later on -- yes, what I said in my

10:59:19    25   deposition at that time was the truth.  And later on we

Luo - recross by DeVries

3261

1    conducted further investigation.  And we saw from the records

2    that were kept by the administration department that it was Mr.

3    Chia's secretary who had reported that this computer was lost.

4         So I went to ask his secretary how this computer was

5    lost.  His secretary said that she had asked Mr. Chia.  Sam

6    Chia had told her that he had lost that computer on a business

7    trip he took in 2013.  I asked the secretary further questions,

8    but she told me that that was all she knew.  That was all the

9    information she provided in that record for the administration

10   department.

11   Q.  Hytera did not learn that the computer was lost until Sam

12   Chia left the company in October of 2018, correct?

13   A.  Correct.

14        THE COURT:  Let me ask a question.  Was that a desktop

15   computer or a portable computer?

16        THE WITNESS (THROUGH INTERPRETER):  It was a laptop

17   computer.  Portable.

18        THE COURT:  Proceed.

19   BY MR. DE VRIES:

20   Q.  And Hytera never asked Sam Chia what was on that computer

21   before he left the company, right?

22   A.  That's correct.  We were not aware of such information back

23   then.

24   Q.  Now, with Peiyi's Huang's computers, Ms. Huang turned in

25   one computer in November of 2017, right?

Luo - recross by DeVries

3262

1  A.  Correct.

2  Q.  But she did not turn in the two computers that we looked at

3  on that spreadsheet, right?

4  A.  That's correct.

11:02:05  5  Q.  And you didn't pay attention at that time to see if she had

6  more computers, right?

7  A.  At that time, correct.  First of all, we did a lot of work

8  back then.  We told her that she needed to turn over all of her

9  computers.  Our counsel also conducted interviews with her, and

11:02:47  10  they informed her of the obligation and the work she needed to

11  do in preserving evidence.  At that time I had no reason to

12  doubt that she would not follow our requirements of her.

13  Q.  Hytera did not check the log -- the logs of assigned

14  computers at that time to figure out if Ms. Huang had

11:03:22  15  additional computers, right?

16  A.  That's correct.  At that time when I was assigned to do the

17  work of collecting computers and as a coordinator between the

18  company and counsel, that was the first time I ever did such

19  work.  I also believe that I already did everything I could to

11:04:09  20  tell them to follow what our requirements were.  At that time I

21  had no authorization to see other records held by the

22  administration department.

23  Q.  You do admit, however, that had you called over to the

24  administration department in November of 2017, they could've

11:04:38  25  told you that Peiyi Huang had multiple computers, right?

Luo - recross by DeVries

3263

A.  Yes, I admit that.  I have always believed that there is something that we can always do better in terms of doing our work.

What's more important is, that I wanted to do my job as good as possible, as well as possible to the best of my ability and to the best of what I know.  We never hide any information.  I myself do not hide any information.  It also took me a lot of efforts and I did manage to locate the other two computers that Peiyi Huang had.

Q.  You did not figure that out for another year, until November of 2018, right?

A.  Yes.  As soon as I learned that, I took immediate actions and I was able to find those two computers.

Q.  And that was just a couple of weeks after you say you fired your last law firm, is that right?

A.  I don't recall the specific timeframe, but like what I said previously, we were not satisfied with the investigation and the work and guidance that was being done by our previous counsel.  That was one of the reasons why we fired them.

Q.  And during the year between November 2017 and November of 2018, one of Ms. Huang's two computers was reformatted, right?

A.  Yes.

Q.  And the other one, the one with the Motorola source code, you say sat in a warehouse waiting to be recycled for a year

Luo - recross by DeVries

3264

1    until you say it was found in November of 2018, right?

2    A.  Correct.

3    Q.  And you say it's pretty lucky that it wasn't recycled

4    because that's why it was sitting in that warehouses for a year

11:08:04    5    to be recycled, right?

6    A.  Yes.  And according to my understanding, about every year

7    or more than -- a little over a year or so, we would collect

8    those computers and put them together for recycle.  So that

9    timeframe was not yet the recycled time, so I was able to take

11:08:58    10    that back from the warehouse.

11    Q.  You figured out that the laptop with all of my client's

12    source code was in a warehouse just before it was about to be

13    recycled because we were at the end of the one-year period?

14    A.  I do not know when their recycled time was.  What I wanted

11:09:44    15    to say is that I already did everything I could possibly do and

16    I was able to find that computer.

17    Q.  And Hytera did not provide the contents of that computer to

18    Motorola until earlier this year, right?

19    A.  I do not know.  Like what I said earlier, I am only a

11:10:23    20    coordinator between the company and our counsel and experts.  I

21    am not responsible for producing documents.

22    Q.  You testified about the termination of Sam Chia, Y.T. Kok,

23    and G.S. Kok by Hytera, right?

24    A.  Yes.

11:10:45    25    Q.  They were terminated in October of 2018, correct?

Luo - recross by DeVries

1   A.  According to my understanding, yes.

2   Q.  And you're not aware of Hytera terminating those employees

3   for misappropriating Motorola's trade secrets, correct?

4   A.  First of all, I was not involved in the decision to fire

11:11:26   5   them.  I do not know the specific details involved.  What I

6   know is that at that time they did not want to cooperate with

7   us with respect to the investigation we were doing.

8   Q.  And you testified earlier today that Hytera paid them money

9   as part of terminating them, right?

11:11:58   10   A.  Yes.

11   Q.  And you told the jury that that was because you thought

12   maybe China law or U.K. law required that payment?

13   A.  Yes; but I also explained that that was only my general

14   understanding.  What I would like to emphasize on is that I am

11:12:34   15   not an attorney.  I was not involved in the decision to

16   terminate them.  So I have no knowledge about the specific

17   details involved.

18   Q.  And why did you tell the jury that you thought the payments

19   were required by China law or U.K. law?

11:12:55   20   A.  I also explained this earlier, I myself is an employee in

21   China, and I have general understanding I myself is protected

22   by the Chinese labor law.  I have general understanding about

23   the rights and benefits I am entitled to as a Chinese employee.

24   I simply told my general understanding to the jury.

11:13:47   25          I would like to emphasize again, I was not involved in

Luo - recross by DeVries

3266

1  the decision to terminate these three people.  I do not know

2  how much money the company paid them as compensation.  I also

3  do not know the specific details involved.  I think I'm being

4  very clear already.

11:14:12  5  Q.  Do you know whether Hytera consulted a lawyer about whether

6  those payments were required under China law or U.K. law?

7  A.  I already said that I was not involved in the work of

8  terminating them.  I was not involved in that decision.

9  Q.  So you don't know whether Hytera consulted with an attorney

11:14:50  10  in determining to pay money to Sam Chia, Y.T. Kok or G.S. Kok

11  when they left?

12  A.  It's like this, I know that there are a lot of meetings

13  between the company's attorney and the outside counsel of the

14  company.  I know that they have had many meetings with respect

11:15:48  15  to how to deal with these three individuals, but I would like

16  to emphasize again, I was never in any of those meetings.  So I

17  do not know the details of those meetings; nor do I know what

18  they discussed specifically.

19  Q.  You do know that Hytera required Mr. Chia and Y.T. Kok not

11:16:17  20  to disclose information about this lawsuit that would harm

21  Hytera after they left the company, right?

22  A.  I do not agree with your question.

23      MR. ALLAN:  Your Honor, may I approach --

24      I'm sorry?

11:16:50  25  BY THE WITNESS (THROUGH INTERPRETER):

Luo - recross by DeVries

3267

1   A.  I remember very clearly that throughout the process of the

2   entire case, our counsel has informed us that we are not

3   supposed to discuss confidential information related to the

4   case.  So my understanding is that that requirement was not

11:17:24   5   just for those three individuals.  It would be the same

6   requirement for each and everyone in the company.  That is the

7   request from our counsel.

8           MR. DE VRIES:  Your Honor, may I approach?

9           THE COURT:  Yes.

11:17:57   10           MR. DE VRIES:  Mr. Schlaifer, if we could please bring

11   up previously admitted PTX 491.

12   BY MR. DE VRIES:

13   Q.  Mr. Luo, you recognize PTX 491 is a termination agreement

14   and Hytera and Sam Chia as it notes at the top of the first

11:18:13   15   page there, correct?

16   A.  Yes.

17   Q.  And if we go halfway down this page, under the Section 1,

18   it says "Employer need pay to employee an amount of 525924 YUAN

19   RMB," right?

11:18:49   20   A.  Yes.

21   Q.  And that's about $75,000 United States dollars?

22   A.  Thank you for telling me that.

23   Q.  And if we go to the next page, under Section 4, it reads

24   "employee undertakes to do certain things," right?

11:19:18   25   A.  Yes.

Luo - recross by DeVries

3268

1   Q.  And:

2           "Not to disclose in any way the information

3           about ongoing litigation disputes and relevant

4           information, as well as other information that

11:19:35   5           may cause losses to Party A upon disclosure."

6           Right?

7   A.  I see that.

8   Q.  And you're not aware of Mr. Chia providing any information

9   to Motorola after this agreement was entered into, right?

11:20:24   10  A.  I'm not aware of that.  I don't know.

11  Q.  And you're not aware of Mr. Chia being willing to testify

12  at this trial after Hytera entered into this agreement, right?

13  A.  I do not know that.

14  Q.  And do you know where in the world Sam Chia is today?

11:20:48   15  A.  I do not know.

16  Q.  Do you have any reason to think he's in the United States?

17  A.  I do not know.

18  Q.  Are you aware of Y.T. Kok or G.S. Kok providing any

19  information to Motorola as part of this litigation after Hytera

11:21:13   20  entered into termination agreements with those individuals?

21  A.  I do not know.

22  Q.  And do you have any reason to think that either of those

23  individuals is in the United States currently?

24  A.  I do not know.

11:21:43   25          MR. DE VRIES:  You can take that down, please,

Luo - recross by DeVries

3269

1    Mr. Schlaifer.

2    BY MR. DE VRIES:

3    Q.  I have just a few more questions.

4         You say you were the coordinator of the investigation

11:21:53    5    at Hytera into Motorola's claims, is that right?

6    A.  Yes.

7    Q.  And are you aware of any employee of Hytera's that knows

8    more about -- strike that.  Let me start over.  Sorry.

9         Are you aware of any employee of Hytera that knows

11:22:16    10    more about that investigation than you do?

11    A.  I think so, because we have in-house counsel of the

12    company.  We also have our outside counsel and experts.

13    Q.  And as I think you confirmed, you were not aware of what

14    information Hytera learned through its interviews of witnesses

11:22:47    15    like Sam Chia, Y.T. Kok, or G.S. Kok, right?

16    A.  Can you please clarify what your question is?

17    Q.  Let me break it down.

18         You're not aware of what information Hytera learned

19    when its outside counsel interviewed Sam Chia in early 2017,

11:23:18    20    right?

21    A.  That's correct.

22    Q.  And there are a number of documents that you were shown

23    that you say you're not aware of, right?

24    A.  Correct.

11:23:50    25         MR. DE VRIES:  Mr. Schlaifer, please put up PTX 22_TR.

Luo - recross by DeVries

3270

BY MR. DE VRIES:

Q.  This is the FPGA analysis.

A.  Yes.

Q.  And please turn to page 8.

11:24:08    And there's a statement in the fifth bullet point that says:

"This will also result in using a lot of Moto
code."

Do you see that?

11:24:17 A.  Yes.

Q.  And you say you were not aware of this document when it was collected and produced by your company in this litigation two years ago, right?

A.  Yes.  And I think we also mentioned this yesterday.  This
11:24:52 is 60,000 pages out of more than 1 million pages that were produced at that time.  How is it possible that I would have seen all of the contents out of those more than 1 million pages?

Q.  But you hadn't even seen it before yesterday, right?

11:25:25 A.  That's correct.  Ultimately were produced 20 million pages of documents, and you're not asking me just one page out of those pages.  I truly have not seen it before.

Q.  And you had not seen many of the documents that I showed you yesterday until yesterday, right?

11:25:55 A.  That's correct.

Luo - recross by DeVries

3271

1   Q.  How do you think that impacted your ability to investigate

2   these issues for the company?

3   A.  This -- this is how I understand it:  We believe that this

4   was the first time we were ever exposed to litigation in the

11:26:24   5   U.S.  We would not have been able to analyze and pinpoint the

6   problems simply by relying on Hytera itself.  So we engaged

7   experts and counsel.  They would help us conduct the

8   investigation and analysis.  For me as a coordinator, I would

9   ensure that we would collect as much as we could and as many

11:27:10   10   documents as we could and hand them over to our counsel and

11   experts for analysis.

12           I also explained that this was not one jobs.  We have

13   been doing it, progressing on it, a bit -- a little by little.

14   We may collect a portion of the documents and provide them to

11:27:56   15   our counsel and experts and they would find clues among those

16   documents we provided to them and tell us that we need to

17   collect more documents and look for more documents.  And we

18   would continue to do so and give them what we find.  Though we

19   have been making efforts to do our analysis and to do what we

11:28:22   20   are required to do.

21           Also, I believe that the entire process is public.  We

22   are not hiding anything.  We are open.  We tell all the

23   information to our counsel and experts.  I myself was deposed

24   twice.  Each time I was able to tell the other party, counsel

11:29:04   25   for the other party what our progress was and where we are at

Luo - recross by DeVries

3272

11:29:43

1    in the process right now.

2          For example, I was able to find the other two

3    computers Huang Peiyi had in November 2018.  A month later I

4    participated in my first deposition, and I provided all the

5    information we knew at that time to counsel for the other

6    party.

7          I also emphasize that we would tell our attorney about

8    all the work we did.  We completely trust and believe in our

9    counsel and we believe that they would give to the other party

11:30:19

10   what they deemed is necessary.

11   Q.  What you do admit is that over 2 1/2 years ago the CEO of

12   Hytera received an e-mail from a key witness in this case

13   referring to this lawsuit and a risk in going to jail, right?

14   A.  We saw that e-mail yesterday.  It was also the first time I

11:31:00

15   saw that e-mail.

16          MR. DE VRIES:  Mr. Schlaifer, you can take this down,

17   please, and put up PTX 233_TR.

18   BY MR. DE VRIES:

19   Q.  At the top of this e-mail, Sam Chia sent this e-mail to

11:31:19

20   Mr. Chen, the CEO of the company, in May of 2017, right?

21   A.  Yes.

22   Q.  And if we go to the next page, on the first line.

23          MR. DE VRIES:  If you could blow up that first

24   paragraph, please.

11:31:40

25   BY MR. DE VRIES:

Luo - recross by DeVries

3273

1    Q.  Mr. Chia refers to himself as a key witness, right?

2    A.  I see that.

3    Q.  And he refers to this lawsuit, right?

4    A.  Yes.

11:32:02    5         MR. DE VRIES:  And if we could blow up item 4 below

6    that, Mr. Schlaifer.

7    BY MR. DE VRIES:

8    Q.  He tells the CEO of your company, "There is a risk in going

9    to jail," right?

11:32:23    10   A.  I see that.

11   Q.  But Hytera did not stop selling its DMR products, did it?

12   A.  I don't quite follow the logic of your question.  Yesterday

13   I already explained that as a company, we are doing everything

14   we can do to repair the issues.  We are also willing to solve

11:33:02    15   the problems.  But I do not know what that has to do with your

16   question.

17   Q.  I've marked up your slide to indicate that in May of 2017,

18   the CEO of your company received an e-mail that referred to a

19   risk in going to jail, right?

11:33:47    20   A.  Can you repeat the question?  I don't know what the pending

21   question is.

22   Q.  Sure.  In May of 2017, as I've indicated here, the CEO of

23   your company received an e-mail referring to a risk in going to

24   jail, right?

11:34:11    25   A.  Yes.

Luo - recross by DeVries

3274

1    Q.  But Hytera kept on selling its DMR products, right?

2    A.  Yes.

3    Q.  And in August of 2017, you know that you received an e-mail

4    referring to trade secret violation and the fact that keywords,

5    such as Moto function research and even descriptions about Moto

6    design reference appear in the software requirement documents

7    of your company many times, right?

8    A.  I received that e-mail, but I do not agree with your

9    description.  Yesterday we already discussed that what that

10   e-mail meant was that we could continue to improve our work in

11   terms of intellectual property rights protection.

12          MR. ALPER:  Mr. Schlaifer, if you could please put up

13   PTX 2275 at page 7 and blow up the first third.

14   BY MR. DE VRIES:

15   Q.  This is the e-mail you received in August of 2017, almost

16   2 1/2 years ago, right, Mr. Luo?

17   A.  Yes.

18   Q.  And the e-mail says:

19          "Many activities are very casual, which may

20          cause violations of trade secrets."

21          Right?

22   A.  Yes, I see that sentence.  But yesterday I also said that

23   this is the personal viewpoint of Ms. Zheng's.  She was not an

24   attorney.  She did not work in the company's legal department

25   or patent department.

Luo - recross by DeVries

1    Here she also talked about other things such as

2  license agreement, trademark, and otherwise.  I don't believe

3  that she truly understands the details, all the details here.

4  I simply think that she was explaining a few viewpoint of hers

11:37:22  5  and she believes that we could do our work better.

6  Q.  She certainly understood that Hytera's software

7  requirements documents contain the words "Moto" in them, right?

8  A.  Yes.  Yesterday I also said that she is not an attorney and

9  she is not someone who is familiar with legal terms.  So it's

11:38:05  10  likely that she's not familiar with the definition of trade

11  secret information versus public information.

12    I also explained that simply by the words "Moto," or

13  the fact that we have seen some Moto public documents, does not

14  mean that we infringe upon the other party's trade secrets.

11:38:35  15  Q.  But still, Hytera kept selling its DMR products, right?

16  A.  Yes.  Yesterday I explained that a part of the products or

17  even a big part of the products are not related to this --

18  these allegations at all.  It took us a lot of time for us to

19  find out what the specific problems were and we solved those

11:39:19  20  problems.

21  Q.  And, in fact, Hytera never stopped selling its DMR

22  products, not even for one day, after this lawsuit was filed up

23  until today, correct?

24  A.  First of all, I'm not the person in charge of the sales of

11:39:53  25  the company, nor am I the person in charge of the company.  I

Luo - recross by DeVries

3276

1    cannot answer with respect to the specific information.

2          But my general understanding is that there would not

3    be just one method to solve problems, like what I said

4    yesterday.  Also, I meant to say that not just one single

11:40:32    5    method would be being responsible for something.  It would not

6    take just one single method to do that.  For us, we believe

7    that we need to take many actions, and that is what we are

8    doing.

9    Q.  And the reason that Hytera never stopped selling its DMR

11:40:55   10    products, not even for one day after being sued, learning of a

11    risk in going to jail, being informed of violations of trade

12    secrets, was because of money, right?

13    A.  I do not agree with your question.  First of all, that is a

14    hypothetical question.  I do not agree with the pre-condition

11:41:42   15    stated in your question.

16          The second reason is that our products will serve the

17    domain of public safety.  A lot of our products would be used

18    for emergency uses by our customers.  According my experience

19    of working in the sales department, our customers include

11:42:23   20    security personnel who are in charge of protecting the safety

21    of campuses.  They also include the emergency services in

22    hospitals.  Also the firefighters.  They would use our two-way

23    radios.  They rely on us to provide them with our products

24    continuously.

11:43:04   25          We also hope that we could continue to provide our

Luo - further redirect - by Allan

3277

1    services to our customers.  I'm not the person in charge of the

2    sales of the company, nor am I the person in charge of the

3    company.  I would not know the specific reasons for the company

4    to decide to sell the products or to not sell the products.

11:43:36    5    But I would also like to emphasize, there will be more

6    than just one method to solve problems, certainly.  As a

7    responsible company, we should try to find out the most

8    appropriate way for us to solve problems and we should also try

9    to solve problems, that is my understanding.

11:44:06   10   Q.  And by not stopping, selling its DMR products, not even for

11   a day, Hytera made hundreds of millions of U.S. dollars since

12   this lawsuit was filed, right?

13   A.  We discussed this issue yesterday.  First of all, I am not

14   the person in charge of sales.  I do not know what the sales

11:44:49   15   figures are.  Actually, I also mentioned that this would

16   include many products and many of them are not related to this

17   case at all.

18            MR. DE VRIES:  No further questions.

19            THE COURT:  Redirect?

11:45:12   20            FURTHER REDIRECT EXAMINATION

21   BY MR. ALLAN:

22   Q.  Mr. Luo, Motorola's counsel just asked you a number of

23   questions about stopping -- not stopping selling its DMR

24   products, Hytera's DMR products, right?

11:45:39   25   A.  Correct.

Luo - further redirect - by Allan

3278

1    Q.  And I believe you just testified that there are Hytera's

2    DMR products that are not being accused by Motorola, is that

3    right?

4    A.  That is correct.

11:45:56    5    Q.  Which ones?

6    A.  We refer to those products as our low-end DMR products.

7    Q.  And how about the mobile radios, Motorola is not accusing

8    those either, right?  The DMR radios that go in cars?

9    A.  According to my understanding, that is correct.

11:46:25    10   Q.  And Motorola had originally accused all the DMR products

11   and eventually over time didn't accuse those, right?

12   A.  Yes.

13   Q.  Could we go back to slide -- I'm sorry.

14          (Brief pause.)

11:46:51    15   BY MR. ALLAN:

16   Q.  And that was another bit of evolving claims, right, Mr.

17   Luo?  Not just the trade secrets and the copyrights, but what

18   specific products were being accused, that was unclear?

19   A.  That is correct.  That is my understanding.

11:47:19    20   Q.  And Motorola's lawyer talked to you about this e-mail from

21   Sam Chia, in 2017, that you'd never seen before, right?

22   A.  Correct.

23   Q.  And he kept pointing you to the second page, to the fourth

24   paragraph in the complaint -- or in the letter that said

11:47:51    25   "fourth," do you remember that?

Case: 1:17-cv-01973 Document #: 798 Filed: 12/20/19 Page 45 of 133 PageID #:54526
Luo - further redirect - by Allan
3279

1  A.  Yes.

2  Q.  You saw there were three other points before that, before

3  he talked about the case, right?

4  A.  Yes.

5  Q.  And it talked about how he was depressed, he wasn't happy

6  in China, his family life was having problems, his work life

7  was having problems, that's what he said.  Those were the first

8  three things he talked to the CEO about?

9  A.  Thank you for telling me that.

10  Q.  Now, Sam Chia is not a named in the case.  He's not a party

11  in the case, but he was called out specifically in the

12  complaint as having taken confidential information from

13  Motorola, his former employer, right?

14  A.  Yes.  That is my understanding.

15  Q.  All in connection in a foreign proceeding, in a foreign

16  court, foreign country, right?

17  A.  That is correct.

18  Q.  It's not unreasonable for him to be scared and nervous in

19  that scenario, right?

20  A.  I do not know, but I would guess so.

21  Q.  And at that time, was anybody at Hytera allowed to talk to

22  any other people by advice of counsel?

23  A.  No, no one.  I already explained that we did not have this

24  expertise and we did not understand how to conduct the

25  investigation.  So we needed our counsel and experts to do the

Luo - further redirect - by Allan

3280

1  investigation.  So our counsel told us that if you do not know

2  something, just let them do the investigation.

3  Q.  And that was around here, that e-mail that you've never

4  seen before, long before all of these -- the evolution of the

11:51:01  5  claims, right?

6  A.  Yes.

7  Q.  You were also asked when Hytera produced its source code to

8  Motorola.  Do you recall that?

9  A.  Yes.

11:51:31  10  Q.  I think you said that was about July of 2017?

11  A.  Yes.

12  Q.  So it took Motorola 11 months to amend its complaint to add

13  a copyright claim; yes?

14  A.  Yes.

11:51:57  15  Q.  But they filed a trade secret claim of several months

16  before; do you understand that?

17  A.  Yes.

18  Q.  And virtually all of the trade secrets that Motorola is

19  asserting in this case are based on source code, right?

11:52:36  20  A.  I myself do not know, but according to the information I

21  obtained from our counsel and experts, my understanding is,

22  yes.

23  Q.  And there was also some discussion that the 142 trade

24  secrets are really still in this case, do you remember that?

11:52:56  25  He asked you that question?

Case: 1:17-cv-01973 Document #: 798 Filed: 12/20/19 Page 47 of 133 PageID #:54528
Luo - further redirect - by Allan
3281

A.  Yes.

Q.  You understand, Mr. Luo, that Hytera filed a number of motions to try to get Motorola to reveal more detail about what it was claiming as its trade secrets?

11:53:19   A.  According to my understanding, yes.

Q.  And that the reduction down to 29 was the result of all of that process, right?

A.  I myself do not know, but according to my understanding, yes.

11:53:54   Q.  Now, you've never been able to see any of the trade secrets.  You've been able to see redacted one-line, very generic descriptions, right, when they were 142?

A.  Yes.

Q.  You know they had one that was generally related to option
11:54:24   boards, and there's no option board trade secrets left, right?

A.  That's correct.

Q.  And there were maybe 30 or so trade secrets that related to business and marketing issues, and none of them are in this case, right?

11:55:07   A.  According to my understanding, yes.

Q.  Now, back to your collection of Peiyi's laptops.  When you asked her, in November 2017, she told you she had one laptop, right?

A.  According to my memory, yes.

11:55:27   Q.  You had no reason to think that she wasn't telling you the

Luo - further redirect - by Allan

3282

1　truth, did you?

2　A.　That's correct.

3　Q.　And you had no reason to dig up the 2013 e-mail that

4　Motorola's lawyers just showed you on recross to say, "well,

11:55:42　5　there is a chart that said she had two more," is that right?

6　A.　That is correct.

7　Q.　And ultimately all three of the laptops were sent to Epiq

8　for full forensic evaluation, correct?

9　A.　Yes.

11:56:13　10　Q.　And in the deleted files that Motorola's lawyers showed

11　you, those were deleted in 2013, 4 years before this case was

12　filed, is that right?

13　A.　Correct.

14　Q.　Are you aware of any -- in this case, Motorola producing

11:56:38　15　any laptop from G.S. or Sam or Y.T. while they were at

16　Motorola?

17　A.　I do not know that.

18　　　　MR. ALLAN:　Now, could we pull up PTX 491.

19　BY MR. ALLAN:

11:57:19　20　Q.　You were asked questions about this, Mr. Luo, do you

21　remember?

22　A.　Yes.

23　Q.　And you said your general understanding, being an employee

24　in China, was that payment needed to be made to employees when

11:57:31　25　they left?

Luo - further redirect - by Allan

3283

1  A.  My expression is that as an employee in China, I am aware

2  that I would receive a certain amount of compensation money

3  when I am fired by my employer.

4  Q.  So let me direct you to this section.  Mr. DeVries pointed

11:58:11  5  out the 525924 YUAN number.  After the date, December 15, 2008,

6  it states:

7          In the foregoing amount, includes all statutory

8          remuneration and all compensation due to

9          employee in accordance with the articles of

11:58:46  10          employment contract during his/her employment

11          with the employer."

12       Do you see that?

13  A.  Yes.

14       MR. ALLAN:  Could we go to the next page in Section 4.

11:58:58  15  BY MR. ALLAN:

16  Q.  Now, there was a section highlighted on your recross here,

17  but not all of it was highlighted.

18       It states:

19       "Employ undertakes to abide by the professional

11:59:23  20          ethics after leaving the company, and not to

21          conduct business in the name of the employer,

22          not to damage the image and interests of the

23          employer, and not to disclose in any way the

24          information" -- and this was left out -- "about

11:59:39  25          party A's trade secrets and business contacts."

Luo - further redirect - by Allan

3284

1    Do you see that?

2  A.  Yes.

3  Q.  And then it goes on to state that:

4        "... ongoing litigation disputes and relevant

12:00:12  5        information that may bring benefits to Party A

6        or may cause losses to Party A upon disclosure."

7          Do you see that?

8  A.  Yes.

9  Q.  And it was suggested that something in this paper would

12:00:38 10  prevent Sam, G.S. and Y.T.  from testifying today.  Do you hear

11  that?

12  A.  Yes.

13  Q.  You understand, Mr. Luo, that the reason Sam, G.S., and

14  Y.T. are not here testifying is because Motorola didn't sue

12:01:09 15  them, right?

16  A.  That is my understanding.

17        MR. ALLAN:  Pass the witness.

18        THE COURT:  Counsel?

19        MR. DE VRIES:  No further questions, Your Honor.

12:01:26 20        THE COURT:  All right.  You may step down.

21        (Witness excused.)

22        THE COURT:  It's noon.  Please return at 1:00 o'clock,

23  members of the jury.

24        Once again, good timing.

12:01:53 25        THE CLERK:  All rise.  The court will be in recess.

Luo - further redirect - by Allan

3285

1    (Luncheon recess taken from 12:01 o'clock p.m.

2    to 1:00 o'clock p.m.)

3

4     *  *  *  *  *  *  *  *

5

6 I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

7   RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

8

9

10 /s/Blanca I. Lara      December 17, 2019

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   MOTOROLA SOLUTIONS, INC., and MOTOROLA    ) No. 17 CV 1973
     SOLUTIONS MALAYSIA SDN. BHD,              )
 4                                             )
                 Plaintiffs,                   )
 5   vs.                                       ) Chicago, Illinois
                                               )
 6   HYTERA COMMUNICATIONS CORPORATION, LTD.,  ) December 17, 2019
     HYTERA AMERICA, INC., and HYTERA          )
 7   COMMUNICATIONS AMERICA (WEST), INC.,      )
                                               )
 8                 Defendants.                 ) 1:01 o'clock p.m.

 9                      TRIAL - VOLUME 22-B
                     TRANSCRIPT OF PROCEEDINGS
10
            BEFORE THE HONORABLE CHARLES R. NORGLE, SR.,
11                         and a jury

12   APPEARANCES:

13   For the Plaintiffs:     KIRKLAND & ELLIS, LLP
                             BY:  MR. ADAM R. ALPER
14                                MR. BRANDON HUGH BROWN
                             555 California Street
15                           Suite 2700
                             San Francisco, California 94104
16                           (415) 439-1400

17                           KIRKLAND & ELLIS, LLP
                             BY:  MR. MICHAEL W. DE VRIES
18                                MR. CHRISTOPHER M. LAWLESS
                             333 South Hope Street
19                           Suite 2900
                             Los Angeles, California 90071
20                           (213) 680-8400

21

22   Court Reporter:         AMY M. SPEE, CSR, RPR, CRR
                             Official Court Reporter
23                           United States District Court
                             219 South Dearborn Street, Room 1728
24                           Chicago, Illinois  60604
                             Telephone:  (312) 818-6531
25                           amy_spee@ilnd.uscourts.gov
```

```
 1   APPEARANCES (Continued:)

 2   For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                            BY:  MS. MEGAN MARGARET NEW
 3                          300 North LaSalle Street
                            Chicago, Illinois 60654
 4                          (312) 862-7439

 5                          KIRKLAND & ELLIS, LLP
                            BY:  MS. LESLIE M. SCHMIDT
 6                          601 Lexington Avenue
                            New York, New York 10022
 7                          (212) 446-4763

 8   For the Defendants:    STEPTOE & JOHNSON, LLP
                            BY:  MR. BOYD T. CLOERN
 9                               MR. MICHAEL J. ALLAN
                                 MS. JESSICA ILANA ROTHSCHILD
10                               MS. KASSANDRA MICHELE OFFICER
                            1330 Connecticut Avenue NW
11                          Washington, DC 20036
                            (202) 429-6230
12
                            STEPTOE & JOHNSON, LLP
13                          BY:  MR. DANIEL S. STRINGFIELD
                            227 West Monroe Street
14                          Suite 4700
                            Chicago, Illinois 60606
15                          (312) 577-1300

16

17   ALSO PRESENT:          MR. RUSS LUND and
                            MS. MICHELE NING
18

19

20

21

22

23

24

25
```

1           (Proceedings heard in open court.  Jury in.)

2               THE COURT:  Good afternoon, members of the jury.

3               Please call the next witness.

4               MR. CLOERN:  Your Honor, Hytera Corporation of China

5     and the two Hytera America entities call Mr. Xu Hailin.

6           (Witness sworn.)

7               MS. OFFICER:  May I proceed?

8               THE COURT:  Proceed.

9                XU HAILIN, DEFENDANTS' WITNESS, DULY SWORN

10                         DIRECT EXAMINATION

11    BY MS. OFFICER:

12    Q.  Good afternoon.

13          Could you please introduce yourself.

14    A.  Good afternoon, everyone.

15          I come from Hytera, and I -- my name is Xu Hailin.  I

16    have worked on the development of commercial DMR terminals.

17    Q.  Mr. Xu, do you speak English?

18    A.  A little bit.

19    Q.  Do you read and write English?

20    A.  A little bit.  Sometimes I will use it to handle

21    work-related e-mails.

22    Q.  Would you be more comfortable testifying in Mandarin

23    today?

24    A.  Yes.

25    Q.  What is your educational background?

1    A.  I graduated from the undergraduate college in 1998.  I

2    studied in computer applications.  I graduated from

3    undergraduate in 2005, and I started in computer science and

4    technology.

5    Q.  When did you join Hytera?

6    A.  2008.

7    Q.  And what type of work did you do before you joined Hytera

8    in 2008?

9    A.  Prior to 2008, I worked in several companies and I worked

10   on the development of cordless phones, analog radios, and

11   mobile phones.

12   Q.  Mr. Xu, Motorola contends that Hytera could not have

13   developed a DMR product without using Motorola's trade secrets

14   and confidential information.  Do you agree with that?

15   A.  I do not agree with that.

16   Q.  Why do you not agree with that?

17   A.  The reason is that an independent DMR product that I

18   developed did not use Motorola's trade secret and source

19   codes.

20   Q.  And what DMR products were those?

21   A.  We referred to them as commercial DMR, including PD3, PD4,

22   BDM and MD6 series.

23   Q.  Are the commercial DMR products accused of containing

24   Motorola's trade secrets and source code?

25   A.  No.

1    Q.  And do the commercial DMR products contain Motorola's

2    trade secrets and source code?

3    A.  No.

4    Q.  Are you generally aware of what Hytera DMR products are

5    accused of containing Motorola's trade secrets and source

6    code?

7    A.  I do not know all the details.  My understanding is that

8    the DMR that we usually refer to as the industry DMR or part

9    of them used Motorola's trade secret and source codes.

10   Q.  Are the industry DMR also called professional DMR?

11   A.  Yes.

12   Q.  Are the commercial DMR products that you and your team

13   developed fully compliant with the DMR standard?

14   A.  Yes.

15   Q.  Are the commercial DMR products interoperable with

16   Motorola DMR products and other manufacturer's DMR products?

17   A.  Yes.

18   Q.  And how do the commercial DMR products differ from the

19   professional DMR products?

20   A.  The commercial DMR products that we offer have basic --

21   some basic functionalities that are consistent with those

22   found on the industry DMRs, including GPS and Bluetooth.

23        What can distinguish a commercial DMR from an

24   industry DMR is trunking.  Commercial DMRs do not have the

25   trunking functionality.

1    Q.  And why did Hytera decide to develop a DMR product line

2    that does not support trunking?

3               INTERPRETER LIN:  Does not support?

4               MS. OFFICER:  Trunking.

5    BY THE WITNESS:

6    A.  Because some of our customers do not want this trunking

7    functionality.  They do not want to pay for the trunking

8    functionality.  That's why we provide a series of commercial

9    DMR products which have the DMR functionality support --

10   DMR -- supported DMR technology but does not have the trunking

11   functionality.  The commercial DMR products adopt the low-cost

12   solution.

13   BY MS. OFFICER:

14   Q.  And what was your role in the development of Hytera's

15   commercial DMR products?

16   A.  Software leader.

17   Q.  And what were your responsibilities as a software leader?

18   A.  I managed the software team.  I provide them with the

19   technical guidance and the direction for the research.

20   Q.  Was there also a hardware team leader?

21   A.  Yes.

22   Q.  And who was that?

23   A.  His name is Tu Fay (phonetic).

24   Q.  About how long did it take the commercial DMR team to

25   develop a commercial DMR product?

1    A.   We started the development work in April 2013, and we were

2    able to launch the first DM- -- commercial DMR terminal in

3    June of 2014.   It was about a year and two months.

4    Q.   And about how many engineers were working on the

5    development of Hytera's commercial DMR products?

6    A.   30 people, and 20 of them were on the hardware team,

7    whereas the other ten were on the software team.

8    Q.   And how is it possible to develop a commercial DMR product

9    in a little less than a year with just 30 engineers?

10   A.   It's because we adopted or used a chip provided by a

11   company called Sicomm, S-i-c-o-n [*sic*].

12          INTERPRETER LIN:   Phonetic spelling provided by the

13   interpreter.

14   BY THE WITNESS:

15   A.   That chip included all the protocol stacks of DMR.

16          Also, we transplanted from TC580 the analog model, a

17   lot of software from that model or the chip, and it provided

18   us with a lot of software functionalities.

19   BY MS. OFFICER:

20   Q.   Please take a look at DTX-3177, 3178, 3185, 3186, 3199,

21   3201, 3202, and 5019 in your binder.

22   A.   I see those.

23   Q.   Do you recognize those documents?

24   A.   These documents provide information regarding the

25   marketing of our company's DMR products, including the market

1    information and the marketing information of those products.

2    Q.  And those products are the commercial DMR products?

3    A.  Correct.

4    Q.  Were these documents produced from Hytera's files?

5    A.  Yes.

6         MS. OFFICER:  Your Honor, at this time we request

7    that DTX-3177, 3178, 3185, 3186, 3199, 3201, 3202, and 5019 be

8    moved into evidence.

9         MS. NEW:  No objection, Your Honor.

10         THE COURT:  Will these documents purport to identify

11    the products you're talking about?

12         MS. OFFICER:  Yes, Your Honor.

13         THE COURT:  They are received and may be published.

14      (Exhibit Nos. DTX-3177, 3178, 3185, 3186, 3199, 3201,

15        3202, and 5019 were received in evidence.)

16         MS. OFFICER:  Jim, can you please pull up Page 2 of

17    DTX-3177.

18    BY MS. OFFICER:

19    Q.  Mr. Xu, the page is on your screen.  Can you tell us what

20    this is?

21    A.  This is the marketing information of our mobile unit,

22    MD61.

23         MS. OFFICER:  Jim, can you please pull up Page 2 of

24    DTX-3186.

25    BY THE WITNESS:

1   A.  I see it.

2   BY MS. OFFICER:

3   Q.  Can you tell us what it is?

4   A.  This is our PD41 commercial DMR product.  It has the

5   patrol functionality.

6           MS. OFFICER:  And, Jim, can you please pull up

7   Pages 2 and 3 of DTX-3201.

8   BY THE WITNESS:

9   A.  I see it.

10  BY MS. OFFICER:

11  Q.  And, Mr. Xu, can you tell us what this is?

12  A.  This is our first ever commercial DMR product.

13  Q.  And this is the PD355?

14  A.  PD355.

15  Q.  How did Hytera's commercial DMR development begin?

16  A.  In April 2013, our team was assigned a task which is to

17  develop DMR -- commercial DMR digital product.

18  Q.  And which team were you on?

19  A.  Analog team.

20  Q.  So the commercial DMR team was formed out of the analog

21  team; is that right?

22  A.  It came from the analog team.

23  Q.  The commercial DMR team was not formed out of the

24  professional DMR team; is that right?

25  A.  That is correct.

1    Q.  Why did Hytera form the commercial DMR team from the

2    analog team rather than from the professional DMR team?

3    A.  The reason is that in 2013, we could easily find a chip

4    that would have the DMR protocol stack on it so it would be

5    easy to develop a DMR product.  It would be just as easy as

6    the development of the analog product.  We do not need people

7    with experience with DMR to work on the development.

8    Q.  Were the former Motorolans involved in the development of

9    Hytera's commercial DMR products?

10   A.  That is correct.  Irrelevant.

11   Q.  Were the former Motorolans involved in any way in the

12   development of Hytera's commercial DMR products?

13   A.  We were an independent team.  Sam, G.S. Kok, Peiyi Huang,

14   they were only involved in the management aspect.  I would

15   notify them with respect to the progress of the DMR project.

16        I remember that Sam Chia participated in the

17   discussion with respect to the sourcing of that Sicomm chip

18   negotiation.  However, they were not involved in any actual

19   development work with respect to the commercial DMR product.

20   Q.  Now let's discuss the process of developing Hytera's

21   commercial DMR products.  When you started to pursue a

22   commercial DMR in April of 2013, what were your first steps?

23   A.  The first step that we took was to research on information

24   related to DMR, DMR protocols and DMR standards.  We also

25   selected the Sicomm chip.  So we also learned the information

1    related to the Sicomm chip and their API interfaces.

2    Q.  So let's discuss the Sicomm chip that you just mentioned.

3    What was it called?

4    A.  SCT3928.

5    Q.  Now, please take a look at DTX-5549, 5550, 5551, 5552,

6    5553, and 5557 in your binder.

7    A.  I see those.

8    Q.  Do you recognize these documents?

9    A.  These documents pertain to the chip information that was

10   supplied to us by the Sicomm company when we were working on

11   our development of our commercial DMR products.

12   Q.  Were these documents produced from Hytera's files?

13   A.  Yes.

14           MS. OFFICER:  Your Honor, at this time, we request

15   that DTX-5549, 5550, 5551, 5552, 5553, and 5557 be moved into

16   evidence.

17           MS. NEW:  No objection, Your Honor.

18           THE COURT:  They are received and may be published.

19       (Exhibit Nos. DTX-5549, 5550, 5551, 5552, 5553, and 5557

20         was received in evidence.)

21   BY MS. OFFICER:

22   Q.  At this time, was it common to use chips manufactured by

23   other companies?

24   A.  It was very common at that time.  And up until today,

25   there are still several companies that would provide DMR chip

 1    information.  At that time there was a company named Zhejiang

 2    Hongrui that would provide the DMR chip that would contain DMR

 3    protocol stacks on it.

 4            INTERPRETER LIN:  Z-h-e-j-i-a-n-g H-o-n-g-r-u-i.

 5    Phonetic spelling provided by the interpreter.

 6    BY THE WITNESS:

 7    A.  The name of the chip is HRC5000.

 8    BY MS. OFFICER:

 9    Q.  And when did Hongrui first offer the HRC5000 chip that

10    included all aspects of the DMR protocol stack?

11    A.  As early as 2011.

12    Q.  And why did you choose the Sicomm chip over the Hongrui

13    chip?

14    A.  Sicomm's chip is more flexible.  It actually makes it

15    publicly available, the source code of the call control layer.

16    And we can use those source codes to do the development, and

17    the development will be done according to our needs.

18    Q.  And why didn't you just use the OMAP chip that Hytera had

19    already developed for the professional DMR products?

20    A.  There are several reasons.  The first one is it is too

21    expensive.  The second reason is that its power consumption is

22    rather high.  Also, our team was not familiar with the OMAP

23    chip.  That would have taken us a very long time to learn

24    about that chip.

25    Q.  Does the Sicomm chip have a DSP processor?

1  A.  Yes.

2  Q.  And do the commercial DMR products have any other

3  processors?

4  A.  We also have an ARM chip, but the DSP processor is inside

5  the Sicomm chip.

6  Q.  And do the commercial DMR products have any other DSP

7  processors?

8  A.  No.

9  Q.  Did Hytera need to develop the DSP source code to run in

10  the Sicomm chip?

11  A.  No need.  All of the source codes were provided by the

12  Sicomm company.

13  Q.  And when you speak into the microphone of a commercial DMR

14  radio, what processes the voice and transmits the signal out

15  over the air?

16  A.  It is processed by the Sicomm DSP.

17  Q.  And on a receiving commercial DMR radio, what processes

18  those over-the-air signals back into voice and plays them out

19  over the speaker?

20        INTERPRETER LIN:  Counsel, do you mind repeating

21  that?

22        MS. OFFICER:  Yeah, of course.

23  BY MS. OFFICER:

24  Q.  On a receiving commercial DMR radio, what processes those

25  over-the-air signals back into voice and plays them out over

1  the speaker?

2  A.  That is still processed by Sicomm, the DSP on Sicomm chip.

3  Q.  And you mentioned earlier that the Sicomm chip includes

4  the entire protocol stack.

5  A.  Yes.

6  Q.  What physical layer functionality does the Sicomm chip

7  include?

8  A.  It provides all the functionalities of the physical layer.

9  It also provides the L1 timer.  It also includes the

10  functionality of 4FSK modulation and demodulation.

11  Q.  And how about the data link layer of the DMR protocol

12  stack?  What data link layer functionality does a Sicomm chip

13  include?

14  A.  It provides all the functionalities of the data link

15  layer.  It also includes framer and free schedule.

16  Q.  And how about the call control layer of the DMR protocol

17  stack?  What call control layer functionality is included in

18  the Sicomm chip?

19  A.  It provides all the functionalities of the call control

20  layer.  A part of the source code of that layer would be on

21  the DSP core of the Sicomm chip.

22         Another part would be on the ARM chip, and we will

23  perform our development work and the modification of the

24  source code in the ARM depending on our needs.

25  Q.  Does the Sicomm chip include an AMBE+2 vocoder?

1          THE INTERPRETER:  Did you say vocoder, Counsel?

2          MS. OFFICER:  I'm sorry?

3          INTERPRETER LIN:  AMBE+2?

4          MS. OFFICER:  Yeah, AMBE+2 vocoder.

5   BY THE WITNESS:

6   A.  Yes, it is included.

7   BY MS. OFFICER:

8   Q.  And what functionality is provided by the AMBE+2 vocoder

9   in the commercial DMR radios?

10  A.  Coding -- in coding and decoding of speech and noise

11  suppression functionality.

12  Q.  Are Hytera's commercial DMR radios able to perform carrier

13  detect?

14  A.  Yes.

15  Q.  And does a Sicomm chip include any other features?

16  A.  The adjustment of noise, noise suppression or squelching.

17  Q.  Did Hytera ever talk with Sicomm about the possibility of

18  modifying its chips to expand the features?

19  A.  Yes.

20  Q.  And did Sicomm add those features?

21  A.  We have discussed several functionalities, and later on

22  they added those functionalities.

23  Q.  And do you know about how long it took Sicomm to add those

24  functionalities?

25  A.  Depending on the size of the functionality, usually it

1  would take about one to three months to add the functionality.

2  Q.  And do you know about how many software engineers Sicomm

3  had working on adding those functionalities?

4  A.  Usually it would be one to two.

5  Q.  And why didn't Hytera just have its own software engineers

6  add those functionalities?

7  A.  Because it would be cheaper.  It saves more cost if Sicomm

8  is to add those functionalities.

9  Q.  Were the Hytera software engineers capable of adding those

10  functionalities?

11  A.  Yes, they are capable of doing it.

12  Q.  And if Hytera wanted to use the Sicomm chip in its

13  professional DMR radios, could Hytera request that Sicomm add

14  trunking to the chip set?

15  A.  It has this capability.  We discussed that before.  But

16  later we decided not to use the trunking functionality on our

17  commercial DMR terminals.

18  Q.  Do you know about how long it would take Sicomm to add the

19  trunking functionality to the chip?

20  A.  According to my experience of working with them, it would

21  take them about a year or even less than that to develop that

22  functionality.

23  Q.  And how much did the Sicomm chip cost in 2013 during the

24  development of Hytera's commercial DMR radios?

25  A.  Around RMB 23.  And that price is still valid until today.

1   Q.   And do you know about how much 23 RMB is in U.S. dollars?

2   A.   Around 3.26.

3   Q.   Is Sicomm related to Motorola in any way?

4   A.   No.

5   Q.   Was Sicomm ever related to Motorola?

6   A.   No.

7   Q.   Please turn to PTX-0843 and PTX-0844.

8   A.   I see those.

9   Q.   Do you recognize these documents?

10  A.   I do.

11  Q.   What are they?

12  A.   These are two e-mails.  One of the documents is an e-mail

13  that was sent to me by Zhao Quo, Z-h-a-o, Q-u-o.  The other

14  one would be this attachment.

15  Q.   And what is the attachment?

16  A.   The attachment is a document related to the production,

17  debugging and testing.

18  Q.   Were these documents produced from Hytera's files?

19  A.   Yes.

20       MS. OFFICER:  Your Honor, at this time, we request

21  that PTX-0843 and PTX-0844 be moved into evidence.

22       MS. NEW:  They may already be admitted, Your Honor,

23  but we have no objection.

24       THE COURT:  If not, they are received and may be

25  published.

1       (Exhibit Nos. PTX-0843 and PTX-0844 were received in

2       evidence.)

3       MS. OFFICER:  Jim, can you please show PTX-0844.

4  BY MS. OFFICER:

5  Q.  Did you use this Motorola testing specification in the

6  development of Hytera's commercial DMR products?

7  A.  It was not used because the company, Sicomm, who provided

8  the chip, they also provided the debugging and testing

9  documents with respect to the manufacturing.

10  Q.  PTX-0844 is labeled "Motorola - Internal Use Only."  Do

11  you see that?

12  A.  I see it.

13  Q.  Does it surprise you that you were sent a document that is

14  labeled "Motorola - Internal Use Only"?

15  A.  I would not be surprised.  The reason is that sometimes I

16  would try to look for information on the Internet and

17  sometimes I would come across information that would have

18  other companies' names on it.  And those documents would also

19  contain the words "for internal use only."

20       Sometimes for our company's documents, they would

21  also carry the words such as "internal use only."  But

22  sometimes such documents would be distributed to our

23  distributors.

24  Q.  Are documents about other manufacturers that you get from

25  the Internet and through competitive intelligence sources

1    actually confidential?

2    A.  They are shared information.

3    Q.  When developing Hytera's commercial DMR products, did you

4    consider any kind of software architecture?

5    A.  We considered using software architecture on the ARM chip.

6    Q.  And what is software architecture?

7    A.  A software architecture would be the structure and the --

8    structure and organization of software elements.  We would

9    usually divide the software elements into many layers.

10         By dividing them into different layers, that would

11   allow engineers to do their development work on the various

12   layers.  That would facilitate job allocation and cooperation.

13   It is also beneficial to the maintenance of software.

14   Q.  And can you tell us about the software architecture used

15   in Hytera's commercial DMR products?

16   A.  We decided to use the software architecture of TC580 in

17   our commercial DMR products.  TC580 is an analog product.

18   Q.  Did the TC580 have a layered architecture?

19   A.  Yes.

20   Q.  And what were some of the layers of the TC580 software

21   architecture?

22   A.  It includes the application layer, the intermediary layer,

23   the operating system layer, and the driver layer.  The driver

24   layer also includes the hardware abstraction layer.

25   Q.  About how long did it take you to create the software

1    architecture for Hytera's commercial DMR products?

2    A.   It took two months for the time of three people, for us,

3    to transplant such software architecture, to transfer it over,

4    move it over.

5    Q.   In addition to the TC580 software architecture, did you

6    incorporate any other software or features from the TC580 into

7    Hytera's commercial DMR products?

8    A.   We also transplanted some functionalities, including VOX,

9    channel scanning, and some scanning functionalities.

10   Q.   And you mentioned an application layer earlier in relation

11   to the TC580 software architecture.  Do Hytera's commercial

12   DMR products include an application layer?

13   A.   Yes.

14   Q.   And what is an application layer?

15   A.   An application layer is a place where you use to place the

16   applications -- application programs on it that also includes

17   the application framework layer.  The application framework

18   acts like traffic police.  It would send or distribute

19   whatever comes from the lower or the bottom layer to where it

20   should go.

21   Q.   Who read the application framework?

22   A.   I wrote it.

23   Q.   Who wrote the applications?

24   A.   A part of that came from TC580.  A part of that was

25   written by the engineers on our team.

1  Q.  And you mentioned a hardware abstraction layer earlier in

2  relation to the TC580 architecture.  Do Hytera's commercial

3  DMR products include a hardware abstraction layer?

4  A.  Yes, it is included.  However, it is included in our

5  products PD3 and PD4, but it's not included in our BD product

6  series.

7  Q.  And what's the difference between the PD series and the BD

8  series of products?

9  A.  The PD products have a more powerful processor.  It has

10  more memory.  It will allow the products to be able to carry

11  or take on the source codes for the operating system and the

12  hardware abstraction layer.

13  Q.  Do Hytera's commercial DMR radios include an operating

14  system?

15  A.  PD3 and PD4 include an operating system, whereas the BD

16  series does not include an operating system.

17  Q.  So Hytera sells commercial DMR radios that do not include

18  an operating system?

19  A.  Yes.

20  Q.  How is that so?

21  A.  The reason we considered removing the operating system

22  when we were developing those products was because of the size

23  or the capacity of the memory.  And for us, the operating

24  system was not one of the essential parts for the products.

25  Q.  And for the commercial DMR radios with an operating

1  system, do they include an operating system abstraction layer?

2  A.  No.

3  Q.  Why not?

4  A.  The abstraction layer of an operating system is beneficial

5  to the transplant of the operating system.  But with respect

6  to the functionality or functionalitywise, it is not

7  necessary.  It will not affect the software development of DMR

8  products.

9  Q.  Would a radio user notice that the radio did not have an

10 operating system or abstraction layers?

11 A.  They would only pay attention to the DMR functionalities.

12 They will not care if those things are on the products.

13 Q.  Do abstraction layers or operating systems effect the

14 performance of the products?

15 A.  No.

16 Q.  Did Hytera's analog products include abstraction layers,

17 such as for hardware or operating systems?

18 A.  Yes.

19 Q.  Were any of those abstraction layers written in the C

20 programming language?

21 A.  Yes, using the C language.

22 Q.  So I'd like to discuss Hytera's development time.  You

23 mentioned that you began developing Hytera's commercial DMR

24 radios in April 2013.  When did Hytera have its first working

25 prototype of a commercial DMR radio?

1    A.   October 2013.

2    Q.   And what did that prototype look like?

3    A.   It is a board that had all the wires soldered to it.   It

4    has the circuitry and the wires soldered onto the board.

5    Q.   Was the prototype in a radio housing?

6    A.   That prototype did not have an external housing or casing

7    because we only used it to verify the DMR protocol stack, to

8    verify the calling function and interoperability.

9         The reason we did not have a housing for it was that

10   we were actually very experienced in doing the housing, so we

11   believed that we could have a housing for it if we needed to.

12   Q.   And do you recall about how many commercial DMR prototypes

13   you developed?

14   A.   Ten.

15   Q.   Does Hytera still have those prototypes?

16   A.   We did not keep those prototypes because we do not have

17   this habit of keeping the prototypes.   The reason is that the

18   prototypes do not have value anymore.

19   Q.   Did you test whether the commercial DMR prototype could

20   interoperate with another DMR radio?

21   A.   Yes, we tested that.   We would test the interoperability

22   with the industry DMR, as well as Motorola's DMR.   And it is

23   important for us to be able to interoperate with Motorola's

24   DMR.

25   Q.   Was the interoperability testing successful?

1   A.  It was successful.

2   Q.  And what was the next stage after you had achieved a

3   prototype?

4   A.  The next would be the commercialization of the product.

5   Q.  And what is commercialization?

6   A.  It means that we will make it into a product that can be

7   sold.  We would -- we would have a complete software

8   functionality in it.  We would provide user interfaces.  We

9   would also do the industrial design, meaning to give it an

10  outer casing.  We would also put the hardware circuit board to

11  the product.

12  Q.  Who was in charge of the commercialization process?

13  A.  Our team.

14  Q.  And were any of the commercialization tasks that you just

15  mentioned particularly difficult or complicated?

16  A.  The most challenging one would be to verify the

17  interoperability between products.  And the subsequent

18  commercialization was something we were familiar and

19  experienced with, so we did not encounter any problems during

20  the commercialization process.

21  Q.  Did Hytera successfully turn the prototype into a

22  commercial product?

23  A.  Yes.

24  Q.  And when did Hytera launch its first commercial DMR radio?

25  A.  In June of 2014.

1    Q.   And what radios did you launch in June of 2014?

2    A.   PD350 and PD360.

3    Q.   Did Hytera launch additional commercial DMR radios?

4         THE COURT:  Before you move to that point, in what

5    countries did you launch?

6         THE WITNESS (through the interpreter):  The first one

7    was in China.

8         THE COURT:  And?

9         THE WITNESS (through the interpreter):  Later it was

10   launched globally.

11        THE COURT:  Into what countries?

12        THE WITNESS (through the interpreter):  United

13   States.  And also it would include the markets in North

14   America and South America, including the United States, and

15   also Europe, Southeast Asia, *et cetera*.

16        THE COURT:  Proceed.

17   BY MS. OFFICER:

18   Q.   Do you know when Hytera launched its first commercial DMR

19   radio globally?

20   A.   Please repeat.

21   Q.   Do you know when Hytera launched its first commercial DMR

22   radio globally, outside of China?

23   A.   You're talking about the time frame when the first

24   commercial DMR is launched globally, right?

25   Q.   That's right.

1  A.  About three months later.  Three months later than June of

2  2014, which would be in September of that year.

3  Q.  Did Hytera launch additional commercial DMR radios other

4  than the PD350 and PD360?

5  A.  We also launched PD3, PD4, and MD6.

6  Q.  And do you know about when those were launched?

7  A.  In 2015 we launched the PD4 series.  In 2016, we launched

8  the BD series.  In 2017, we launched MD6.

9  Q.  Did you sell the commercial DMR products to the same

10  dealers and distributors as the professional DMR products?

11  A.  They overlap.

12  Q.  And did the fact that you did not launch the commercial

13  DMR products until 2014 impede the growth of those products?

14         INTERPRETER LIN:  Counsel, do you mind repeating

15  that?

16         MS. OFFICER:  Of course.

17  BY MS. OFFICER:

18  Q.  Did the fact that you did not launch the commercial DMR

19  products until 2014 impede the growth of those products?

20  A.  No.  Every year the market for our commercial DMR is

21  growing, so is the sales.

22         MS. OFFICER:  I have no further questions.

23         THE COURT:  Where were the products manufactured?

24         THE WITNESS (through the interpreter):  The majority

25  of them was manufactured in Shenzhen, China.

Hailin - cross by New

3312

1         THE COURT:  Cross.

2         MS. NEW:  May I proceed, Your Honor?

3         THE COURT:  Yes.

4                        CROSS-EXAMINATION

5    BY MS. NEW:

6    Q.  Good afternoon, Mr. Xu.

7         My name is Megan New, and I represent Motorola in

8    this case.

9    A.  Hi.

10   Q.  So Hytera launched -- you just testified, launched their

11   first commercial or low-end DMR product in 2014, correct?

12   A.  Yes.

13   Q.  And the first commercial product that was launched was the

14   -- I believe you said the PD36; is that right?

15        And actually, let me correct myself.  The PD35,

16   right?

17   A.  Yes.

18   Q.  And the PD35 was not the first DMR product that had been

19   released by Hytera, correct?

20   A.  It was the first commercial DMR product.  I probably did

21   not pay attention to the inaccuracy in my expression.

22   Q.  But there were other what you refer to as the professional

23   DMR products that were launched between 2010 and 2014, right?

24   A.  Yes.

25   Q.  And that would include the PD5, the PD6, the PD7, the

Hailin - cross by New

3313

1    PD780, the PD790, the X1P and the X1E, correct?

2    A.  Yes.

3    Q.  And Hytera had also sold repeater products prior to 2014,

4    correct?

5    A.  I do not recall the time frame.

6    Q.  But when Hytera released its first low-end or commercial

7    DMR, the PD35, in 2014, Hytera already had some knowledge of

8    how to develop DMR radios, correct?

9    A.  Are you asking if we already had a certain degree of

10   knowledge regarding the development of DMR?

11   Q.  I am.

12   A.  Yes.

13   Q.  And so the R&D that was done on the commercial DMR

14   products at least benefited in part from the work that had

15   been done on the professional DMR products, right?

16   A.  No, it's not like that.

17   Q.  Is it your testimony today that the Hytera engineers who

18   worked on the commercial DMR products didn't glean any

19   knowledge or learn any information from any person who had

20   worked on the professional DMR products?

21   A.  What information or knowledge are you talking about?

22   Q.  Any information or knowledge about how to develop these

23   products.

24   A.  Please be more specific as to what information you're

25   referring to so it would be easy for me to answer your

1    question.

2    Q.  Okay.  Well, let's put a pin in it, and we'll come back to

3    it in a minute.

4            Okay.  So you testified on direct about the Sicomm

5    chip that Hytera purchases for use in its commercial DMR

6    products, right?

7    A.  Yes, I talked about the Sicomm chip.

8    Q.  And that Sicomm chip is used in all of Hytera's commercial

9    DMR products; is that right?

10   A.  Yes.

11   Q.  And you testified that that chip that you -- that Hytera

12   buys from Sicomm comes with the protocol, the DMR protocol

13   stack, embedded in the chip, correct?

14   A.  Yes.

15   Q.  And that chip, that specific chip that Hytera now uses in

16   its commercial DMR products, that chip was not available in

17   2008, correct?

18   A.  In 2008 it was not available.

19   Q.  And it also was not available in 2009, right?

20   A.  Or 2009, no.

21   Q.  And it was not available in 2010 either, correct?

22   A.  It was launched in 2011.

23   Q.  And you said that there was also another third-party chip

24   that was launched in 2011, correct?

25   A.  Yes.

Hailin - cross by New

3315

1  Q.  And can you remind us the name of that third party.

2  A.  Hongrui, H-o-n-g-r-u-i.

3  Q.  And that chip also wasn't available in 2008, 2009, or

4  2010, correct?

5  A.  I would like to remind counsel that it would take a long

6  time to do the research and development of a chip; however, it

7  would be faster for the development of software they already

8  told us that information.  And until they were able to

9  successfully launch the chip, they told us about the

10  information of the chip.

11        However, it is a very fast process for the software,

12  but it would be a very long development cycle for the chips.

13  They already developed and -- their software.  They only

14  needed a piece of hardware for the verification.

15  Q.  And the Sicomm and this third-party chip from Hongrui,

16  neither of those are used by Hytera in the DMR products, the

17  professional products, that are accused in this case, correct?

18  A.  I already said earlier in my testimony that the industry

19  DMR could also use the Sicomm chip.  If it wants to use the

20  Sicomm chip, it can be provided.

21  Q.  But my question is that Hytera is not using the Sicomm or

22  the Hongrui chip in the products that have been accused in

23  this case, right?

24  A.  My apologies.  That is correct.

25  Q.  So you testified earlier to a bunch of features and

Hailin - cross by New

3316

1    capabilities that came on the Sicomm chip.  And I just want to

2    make sure that I understand what all of those are, so I'm

3    going to run through those briefly for you.

4            THE COURT:  Can you eliminate the personal aspect of

5    the question.

6    BY THE WITNESS:

7    A.  Okay.

8    BY MS. NEW:

9    Q.  So your testimony was that the Sicomm chip comes with the

10   entire physical layer of the protocol stack, correct?

11   A.  Yes.

12   Q.  And it comes with the entire data link layer, correct?

13   A.  Yes.

14   Q.  And the entire call control layer, right?

15   A.  Probably I was not being clear earlier.  What I said was

16   that it provided some of the codes for the third layer on the

17   DSP chip, whereas the other part was on the ARM chip.

18   Q.  Okay.  It also comes with the -- the Sicomm chip also

19   comes with the L1 timer functionality?

20   A.  L1 timer.

21   Q.  Is that a "yes"?

22   A.  Yes.

23   Q.  It comes -- the Sicomm chip comes with a 4FSK

24   modulation/demodulation functionality, correct?

25   A.  Yes.

1   Q.  And it comes with the free scheduler?

2   A.  Yes.

3   Q.  And it comes with the AMBE vocoder, correct?

4   A.  AMBE vocoder, yes.

5   Q.  And it comes with carrier detection?

6   A.  Yes.

7   Q.  And it comes with the squelch feature, correct?

8   A.  Yes.  Squelching, yes.

9   Q.  And so all of those are features or functionalities of the

10  DMR radio that did not have to be developed by Hytera for its

11  commercial DMR products, correct?

12  A.  Correct.

13  Q.  Now, earlier you testified about the number of people who

14  are -- who were working on the commercial DMR products.  And I

15  believe you said that there were about 30 people, ten working

16  on software and 20 working on hardware; is that correct?

17  A.  Correct.

18          THE COURT:  When were they working?

19          THE WITNESS (through the interpreter):  In April of

20  2013.  We had more people in 2014.

21          THE COURT:  So let me ask the question again.

22          With respect to the question, how many people were

23  working at what point in time?

24          THE WITNESS (through the interpreter):  Some people

25  left and some people came on board along the process.  I

Case: 1:17-cv-01973 Document #: 798 Filed: 12/20/19 Page 84 of 133 PageID #:54565
Hailin - cross by New
3318

1 cannot pinpoint specifically how many people we had at a given

2 time point. However, I could say that in the very beginning

3 we had ten people.

4        THE COURT:  And at the end, how many did you have, on

5 the launch date?

6        THE WITNESS (through the interpreter):  About 14 to

7 15 people, according to my recollection.

8        THE COURT:  Please proceed, Counsel.

9 BY MS. NEW:

10 Q.  And does that 40 to 50 people include both the software

11 and the hardware teams?

12 A.  Just the software team.

13        THE COURT:  Did you say 40 to 50 or --

14        INTERPRETER LIN:  1-4, 1-5.

15        THE COURT:  14 to 15?

16        INTERPRETER LIN:  Yes.

17        THE COURT:  Is that right?

18        THE WITNESS (through the interpreter):  Yes.

19        THE COURT:  So you went from ten to 14 to 15?

20        THE WITNESS (through the interpreter):  Correct.

21        THE COURT:  And you were the boss the team?

22        THE WITNESS (through the interpreter):  I was the

23 leader of the team.

24        THE COURT:  Is that different from being the boss?

25        THE WITNESS (through the interpreter):  There is some

 1  difference.

 2          THE COURT:  It depends on your point of view, doesn't

 3  it?

 4          THE WITNESS (through the interpreter):  Yes.

 5          THE COURT:  Please proceed, Counsel.

 6          MS. NEW:  May I approach, Your Honor?

 7          THE COURT:  Yes.

 8          MS. NEW:  Thank you.

 9  BY MS. NEW:

10  Q.  Mr. Xu, I've handed you a document that's been marked as

11  PTX-1743.  And do you see at the top there, the title, it

12  says, "Defendants' Supplemental Responses to Plaintiffs' First

13  and Fourth Sets of Interrogatories, Nos. 1 through 3, 10, and

14  17"?

15  A.  This document has too much content in English.  Can you

16  provide me with a Chinese version, please?

17  Q.  We do not have a Chinese version, but I think it would be

18  simple enough for the translator to translate it for you.

19  A.  Okay.

20  Q.  If you go to Page 1743.81.

21  A.  I see it.

22  Q.  And do you see that it's dated June 13th, 2019?

23  A.  June 13th, 2019, right?

24  Q.  Yes.

25  A.  I see it.

1   Q.  And you see it's signed here by your counsel and counsel

2   for Hytera, correct?

3   A.  Are you referring to Boit (phonetic)?

4   Q.  Yes.  It lists Mr. Cloern.  It also lists Ms. Officer, who

5   was conducting your direct examination.  Do you see that?

6   A.  I see that.

7           MS. NEW:  Your Honor, plaintiff moves for the

8   admission of PTX-1743.

9           THE COURT:  Well, is this a document produced by

10  Hytera?  It's hard for the witness to know looking at this

11  version.

12          MS. NEW:  If he looks at the title, it says,

13  "Defendants' Supplemental Responses to Plaintiffs' First and

14  Fourth Set of Interrogatories."

15          MS. OFFICER:  Your Honor, we would like to lodge an

16  objection.  The document is in English.  He can't read it.

17          THE COURT:  Can you conduct the examination without

18  reference to the document?

19          MS. NEW:  I can try, Your Honor, although we would

20  like to be able to show parts of the document to the jury for

21  their understanding.

22          THE COURT:  Well, it puts the witness at a

23  disadvantage.  So if along the way the witness does not

24  understand the question, all he has to say is, "I do not

25  understand the question."

1          THE WITNESS (through the interpreter):  I do not

2   understand.  I do not understand this.

3   BY MS. NEW:

4   Q.  Mr. Xu, your counsel showed you documents that were

5   entirely in English, correct?

6   A.  There were some, yes.

7   Q.  And you were able to testify about those documents, right?

8   A.  Yes.

9          MS. NEW:  So, Your Honor, we would like to move for

10  the admission.  I'd like to be able to ask the witness

11  questions --

12         THE COURT:  Well --

13         MS. NEW:  -- and if he doesn't know --

14         THE COURT:  -- you may ask questions without

15  reference to the document.  The witness says he does not

16  understand the document.

17  BY MS. NEW:

18  Q.  Mr. Xu, did you provide --

19         THE COURT:  The document may be admissible by way of

20  another witness or some other foundation, but not by way of

21  this witness.

22         MS. NEW:  Understood, Your Honor.  We'll try it

23  without the document.

24  BY MS. NEW:

25  Q.  Mr. Xu, did you provide information to your counsel about

1  development of the commercial DMR products?

2  A.  Information related to the development of commercial DMR?

3  What information are you talking about?

4  Q.  Well, specifically did you provide information about the

5  location of the research design and development of the

6  commercial DMR products?

7  A.  I told counsel that the location for the research and

8  development was in Shenzhen.

9  Q.  And did you know that your counsel identified you as a

10  person knowledgeable about the research, conception, design,

11  development, and engineering of the commercial DMR products?

12  A.  Are you asking how many people we have for the R&D?

13  Q.  I haven't asked that yet, but that was going to be my next

14  question.

15       Why don't we -- why don't you answer my first

16  question, which is:  Are you aware that your counsel has

17  identified you as a person knowledgeable about the research,

18  design, conception, and development of commercial DMR

19  products?

20  A.  A person who has knowledge about the development of

21  commercial DMR?

22  Q.  Yes, including conception, research, design, development,

23  and engineering.

24  A.  Are you asking if we had people who had experience with

25  DMR development before?

Hailin - cross by New

3323

1  Q.  I am not.  Maybe we should try this another way.

2      As the software team leader for commercial DMR at

3  Hytera, you're aware of how many people worked on the

4  development of those products, correct?

5  A.  Yes.

6  Q.  And I believe you just told the judge that -- and the

7  court that there were at one point ten people working on

8  software for those products, and then eventually 14 or 15

9  people working on software design for those products, correct?

10 A.  That was from a memory.  I'm not very sure that we did

11 had -- we did have 14 to 15 people at the end, but that's what

12 my memory tells me.

13     As you know, this is something that happened in 2014

14 or prior to that.

15 Q.  And at any point in time did you have 70, 7-0, people

16 working on the research and design of the DMR commercial

17 products?

18 A.  You said around 70 people, right?

19 Q.  Correct.  7-0.

20 A.  More or less so, I believe.

21 Q.  At what point in time was that?

22 A.  I think it was in 2017 or 2018.

23 Q.  So that would be three or four years after the development

24 and the launch of Hytera's commercial -- at least some of

25 Hytera's commercial DMR products, right?

1    A.   Yes.

2    Q.   And specifically it would be around the time that you were

3    developing the MD6 product, correct?

4    A.   Yes.

5    Q.   And that would be after the launch of the PD3, the PD4,

6    and the BD series products, correct?

7    A.   Yes.  According to my recollection, yes.

8    Q.   And even though Hytera purchased the chip from Sicomm for

9    its commercial DMR products, Hytera still had to do a little

10   bit of work on those products, right?

11   A.   Yes.

12   Q.   And Hytera had some difficulties with that development,

13   correct?

14   A.   The reason I said we encountered some difficulties in the

15   development process was that we had a situation with the

16   development of the prototype.

17        For the other difficulties, they could all be

18   resolved.  The difficulty I talked about earlier specifically

19   was the most challenging one.

20        MS. NEW:  Your Honor, may I approach?

21        THE COURT:  Yes.

22   BY MS. NEW:

23   Q.   Okay, Mr. Xu, I've handed you a document that's been

24   marked PTX-2263.  And if you flip through it, it is an e-mail

25   chain in the 2013 time frame.  And if you go to Page 2263.4,

Case: 1:17-cv-01973 Document #: 798 Filed: 12/20/19 Page 91 of 133 PageID #:54572
Hailin - cross by New
3325

1    you'll see that you're copied on this e-mail.

2    A.  I see that.

3    Q.  And on this e-mail, your name is Charles Hsu, which I

4    assume is an alias you use sometimes?

5    A.  Yes.

6    Q.  And you'll see that the document on the bottom right-hand

7    corner has the Bates -- has a Bates number showing that this

8    document came from Hytera's files.  Do you see that?

9    A.  I see it.

10          MS. NEW:  Your Honor, plaintiff moves to admit.

11          THE COURT:  It is received and may be published.

12       (Exhibit No. PTX-2263 was received in evidence.)

13   BY MS. NEW:

14   Q.  Mr. Xu, there is both a Chinese version of this document

15   and an English -- oh, actually -- I'm sorry.  Part of this

16   document is in Chinese and part of this document is in

17   English.  Do you see that?

18   A.  I see it.

19   Q.  And there are portions of this e-mail written by you that

20   were written in English, correct?

21   A.  Yes.

22   Q.  Okay.  So, Mr. Xu, this is an e-mail between Hytera -- it

23   starts with an e-mail between Hytera and Sicomm, correct?

24   A.  Let me take a look first.

25   Q.  And for your reference, we're specifically looking at

Hailin - cross by New

3326

1    Page 2263.4.

2    A.  Okay.

3    Q.  This is an e-mail from Henry Huang at Hytera.  And you're

4    copied right here where I've highlighted it, correct?

5    A.  Yes.

6    Q.  And Mr. Huang says here that Sicomm currently only has

7    voice operation in direct mode and repeater mode.  Do you see

8    that?

9    A.  That's what he said.

10   Q.  And he also says, "The customer also wants the message

11   function which fit the DMR standard but not the MOTO

12   standard."  Do you see that?

13   A.  Yes, I see it.

14   Q.  And then he also says that we need to add those, and

15   supplementary services to the product like remote monitor,

16   radio check, call alert, and enable/disable, correct?

17   A.  I see it.

18   Q.  And he also says that Hytera is making this request

19   because sellers and dealers have made this suggestion, right?

20   A.  Yes, they suggested this functionality.

21   Q.  And Hytera says we think that there are several important

22   demands that we must consider to optimize our products which

23   we are developing now.  Do you see that?

24   A.  I see that.

25   Q.  And if you go up one e-mail, you see that Mr. Ye from

1    Sicomm responds and says, "Please see in line comments below."
2    Do you see that?
3    A.  Yes, I see that.
4    Q.  And one of the things that Mr. Ye says in request to
5    that -- in response to that request we just looked at was that
6    Sicomm had an understanding that the Hytera radio under
7    development is a displayless model, which will not be able to
8    support messaging functions at the UI level.  Do you see that?
9    A.  I see it.
10   Q.  And Sicomm goes on to say that it's okay to add the data
11   service on their side, but Hytera may need to -- may need more
12   software work at the layer three level to implement those
13   features.  Do you see that?
14   A.  I see that.
15   Q.  And am I right that layer three is the call control layer
16   of the DMR protocol stack?
17   A.  Yes.
18   Q.  And so at some point in time, Hytera -- or at least Sicomm
19   understood that Hytera was only going to offer commercial DMR
20   product that offered voice services, right?
21        MS. OFFICER:  Your Honor, we need to cross off all of
22   Paragraph 1 and be read to the witness in Mandarin.
23        THE COURT:  Are you having difficulty in responding
24   to the questions because of the language factor?
25        THE WITNESS (through the interpreter):  I had

1  difficulties in the later portion, but with respect to the

2  sentences that counsel walked me through, I saw them.

3  However, this e-mail was not presented to me in its entirety.

4  I would need to see it in its entirety to prevent

5  misunderstanding.

6          THE COURT:  Well, we're about to take a break now,

7  and so you can take a few minutes to look at it.  But if at

8  any point along the way you want the question rephrased or you

9  say, "I do not understand the question," please let the judge

10  know.

11          We'll take a short recess.

12     (Recess had.)

13          THE COURT:  Proceed with the witness.

14  BY MS. NEW:

15  Q.  Mr. Xu, before the break, we were talking about PTX-2263.

16  And I just want to ask you really briefly, so this name right

17  here, Charles Hsu.  That's you, correct?

18  A.  Yes.

19  Q.  Okay.  And this is later in the e-mail chain that we were

20  just looking at.  You were just looking at this.  And then

21  later in the chain, you provide a response in English,

22  correct?

23  A.  Yes.

24  Q.  And you're responding to -- and we'll get back to that

25  e-mail in a minute, but you were responding to this e-mail

1  from Sam Chia, correct?

2  A.  I was responding to his e-mail.

3  Q.  Okay.  And you didn't ask for a translation into Mandarin

4  in order to provide your response in English, right?

5  A.  That's correct.

6  Q.  Okay.  So in English, Mr. Chia says to you, "Looks like we

7  missed out the need to create our own layer three stack for

8  the data and supplementary services."  Do you see that?

9  A.  I see it.

10  Q.  And then he says, "You will need to take up this stack

11  creation work and determine what it takes to get in the

12  functions."  Do you see that?

13  A.  I see it.

14  Q.  And in order to do that, he tells you, "Go talk to Yu Yang

15  and discuss with him how can the DMR stack team help."  Do you

16  see that?

17  A.  I see it.

18  Q.  And Yu Yang is also a Hytera engineer who testified in

19  this trial just last week, right?

20  A.  I know that.

21  Q.  And Yu Yang is the head of the DSP team for the

22  professional DMR products, right?

23  A.  Correct.  That's correct.

24  Q.  And Mr. Yu Yang is the same person who was working with

25  Motorola's stolen DSP libraries in the development of the

1  professional DMR products, right?

2  A.  I don't believe it was stolen.  The rules and regulations

3  of -- and the law of our company do not permit us to steal

4  from other people.  Also, our company also tells us that you

5  need to file an application if you want to use source codes

6  from third parties, and we will then purchase the source codes

7  for you.

8         So the fact that you said it was stolen is against

9  our company's policy and situation.  The fact that you said it

10  was stolen would involve a very complicated situation.  I

11  object to your question.

12  Q.  But you are aware that Hytera has admitted that Motorola's

13  stolen source code is present in its professional DMR

14  products, right?

15  A.  Hytera never admitted that it stole Motorola's source

16  code.  It is like the situation where somebody's wallet got

17  stolen by a thief and the wallet was placed on someone else,

18  on another person, and that person whose wallet was stolen

19  would allege that the person who has the wallet, that that

20  person stole his wallet.  I feel that it is a similar

21  situation.

22         The reason -- the reason I am here to testify today

23  is to prove that we have the capability to do so and we do not

24  need to steal from other people.

25  Q.  Okay.  So as you're developing the products that you're

1    here to talk about, the commercial DMR products, you've been

2    instructed now by Sam Chia to go talk to Yu Yang about

3    protocol stack development.  And in this next e-mail, that's

4    what you do, right?

5    A.  Yes.

6    Q.  And, in fact, you ask him to provide relating DMR protocol

7    stack document on layer three for PD3 to communicate with all

8    PD products, correct?

9    A.  Yes, I wrote that.

10   Q.  And in addition to Mr. Chia being on this e-mail chain,

11   G.S. Kok is also involved in this discussion about development

12   for the commercial DMR products, right?

13   A.  Yes, he was involved.

14   Q.  And so earlier on direct you were talking about the

15   differences between the commercial and the professional DMR

16   products.  Do you recall that?

17   A.  Yes.

18   Q.  And the only distinguishing factor that you identified is

19   the trunking feature, correct?

20   A.  Yes.

21   Q.  But there are several other features --

22   A.  May I hear the question again?

23   Q.  Of course.

24        When you were being asked about the differences

25   between the commercial and the professional DMR products on

1    your direct examination, the only feature you identified that

2    is different between the two is trunking, correct?

3    A.  I did not say that was the only distinction.  I said it

4    was a major distinction.

5    Q.  But that was the only distinction you told the jury about,

6    right?

7    A.  What I wanted to say was that that was the greatest

8    distinction, the largest difference.  I do not know if my

9    testimony was being mistranslated.  However, right now, I am

10    trying -- I am going to say that it is the major distinction.

11          MS. NEW:  Your Honor, may I approach?

12          THE COURT:  Yes.

13    BY MS. NEW:

14    Q.  Okay.  Mr. Xu, I've handed you a document that's been

15    marked as PTX-2265.  And do you see that it is a document

16    titled Hytera BD300/BD500 Series.

17    A.  I see it.

18    Q.  And it has the Hytera logo on it in the top right-hand

19    corner, correct?

20    A.  Yes.

21    Q.  And it has a Hytera Bates number indicating it was

22    produced from Hytera's files, right?

23    A.  I see it.

24          MS. NEW:  Okay.  Your Honor, plaintiff moves for the

25    admission of PTX-2265.

1      THE COURT:  It is received and may be published.

2      (Exhibit No. PTX-2265 was received in evidence.)

3  BY MS. NEW:

4  Q.  Okay.  So, Mr. Xu, if you go to Page 2265.15, you'll see

5  that across the top there's a title that says "Hytera DMR

6  Portfolio," and it identifies the different tiers of Hytera's

7  DMR products, including On-Site, Commercial Tier, Mid Tier,

8  Professional Tier, and Specialty.

9      Do you see that?

10 A.  I see it.

11 Q.  And we've mostly been talking about the commercial tier,

12 right?  That's the PD3 and the PD4.

13 A.  Yes.

14 Q.  And then there's also this on-site, which are the BD

15 series products you've talked about, correct?

16 A.  Yes.

17 Q.  Okay.  And then the mid tier are the PD5, PD6, and then

18 professional is PD7, X1, PD9, right?

19 A.  I see that.

20 Q.  Okay.  And you understand that the PD5, PD6, PD7, X1, and

21 PD9 have all been accused in this case by Motorola, right?

22 A.  I understand.

23 Q.  Okay.  So on the bottom there are different boxes that

24 identify the primary features that are available in each of

25 these different tiers of DMR radios, right?

Hailin - cross by New

3334

1   A.  That is incorrect.  This document is only for planning

2   purpose.  Our main features would include much more, and those

3   are not listed here.

4   Q.  But it's true, right, that the commercial tier include --

5   includes voice and data, right?

6   A.  Yes.

7   Q.  And you'll see that from mid tier and professional tier,

8   listed is also the signaling feature, right?

9   A.  I see it.

10  Q.  And the on-site and commercial tier products don't have

11  signaling, correct?

12  A.  This document is from earlier days.  Later on we did have

13  the signaling function.

14  Q.  And when did you add the signaling function?

15  A.  I remember that it was in 2014 or 2015 that we added

16  functionalities such as DTF or HTC200 to PD3.

17  Q.  And for mid tier and professional tier, there is also --

18  also listed here is XPT trunking, which means extended pseudo

19  trunking, right?

20  A.  Yes.

21  Q.  And the on-site and commercial tier products do not have

22  extended pseudo trunking, correct?

23  A.  Later on we added the XPT trunking functionality to them.

24  We simply did not have DMR trunking.

25  Q.  And that's what's listed there for the professional tier,

Hailin - cross by New

3335

1  right, it's the DMR trunking feature under the professional

2  tier?

3  A.  Yes.

4  Q.  And as we discussed, the on-site and the commercial tier

5  products do not offer the DMR trunking, right?

6  A.  That's correct.

7  Q.  And the DMR trunking features, what you've identified as

8  the most important feature, that's the difference between the

9  on-site and commercial products and the professional products,

10  right?

11  A.  Yes.

12       MS. NEW:  May I approach, Your Honor?

13       THE COURT:  Yes.

14  BY MS. NEW:

15  Q.  Mr. Xu, I just apologized to the translators, but I

16  apologize to you, too, about the size of these spreadsheets.

17  Hopefully they're manageable.

18       So I want to talk about a couple of the specific

19  features there are available in the different DMR product

20  tiers.  Okay?

21  A.  Okay.

22  Q.  And you'll see on PTX-2266 that there's a Hytera Bates

23  number on the bottom right-hand corner on the document or the

24  page that says this document was produced natively, right?

25  A.  I see it.

1  Q.  And if you look at Page PTX-2266.2, you'll see at the very

2  top it says "Hytera DMR Comparison Chart."  Do you see that?

3  A.  I see it.

4       MS. NEW:  And, Your Honor, at this time plaintiff

5  would like to move to admit PTX-2266 into evidence.

6       THE COURT:  It is received and may be published.

7       (Exhibit No. PTX-2266 was received in evidence.)

8  BY MS. NEW:

9  Q.  Now, Mr. Xu, you'll see that this document -- do you see

10  where it says "PRODUCED custodian"?

11  A.  I see it.

12  Q.  And it says "Y.T. Kok"?

13  A.  I see it.

14  Q.  And then below that, it says, "Produced file name."  And

15  then it says, "Hytera DMR subscribers comparison chart V,"

16  which I think means version, "February 15th, 2017."  Do you

17  see that?

18  A.  I see it.

19  Q.  Okay.  So we're going to switch over.  I think it will be

20  easier for us to look at this on the screen.

21       So along the left-hand side of the document, Mr. Xu,

22  you'll see that it has -- it lists several features for

23  Hytera's DMR products.  Do you see that?

24  A.  I see it.

25  Q.  And then if you scroll to the right, it shows different

1  models of Hytera's DMR products, including the commercial tier

2  and then into the professional tier.  Do you see that?

3  A.  I see it.

4  Q.  And the point of this document is to compare or to show

5  the various features and compare whether they're present in

6  specific DMR models, right?

7        THE INTERPRETER:  Whether they are present, Counsel?

8  Present?

9        MS. NEW:  Present, yes.

10       THE WITNESS (through the interpreter):  That's

11 correct.  Yes.

12       MS. NEW:  Okay.  So I just want to look through some

13 of the individual features.  Mr. Schlaifer, if we could look

14 at Row 96.

15 BY MS. NEW:

16 Q.  This is the DMR Tier 3 trunking feature.  Do you see that?

17 A.  I see it.

18 Q.  Okay.  And you'll see it says NA, as in not applicable,

19 for BD3, BD5, PD3, PD4, PD5.  Do you see that?

20 A.  Yes.

21 Q.  And then that feature does become available when you get

22 to the PD6, the PD7 series, X1, PD9, right?

23 A.  Yes.

24 Q.  And it's not available in the mobile MD6, but it is

25 available in the mobile MD7 model, correct?

1    A.   That is correct.

2    Q.   And so if there is a Hytera customer who wants the DMR

3    Tier 3 trunking feature, the commercial and on-site products

4    would not be able to provide that feature, correct?

5    A.   That's correct.

6    Q.   And let's go up one -- just one row to Row 95.  That's the

7    extended pseudo trunking.  According to this document, the

8    BD3, BD5, PD3, PD4 do not support the extended pseudo trunking

9    feature, correct?

10   A.   That is what the document says.

11   Q.   And then if you scroll over to the PD5, PD6, PD7, it is

12   either supported or an optional feature, right?

13   A.   Yes.

14   Q.   And so customers who are interested in the extended pseudo

15   trunking feature would not be interested in buying the

16   commercial products because they don't offer that feature,

17   right?

18   A.   I need to explain here.  I would need to explain here.

19        With respect to the XPT trunking functionality, on

20   our commercial terminal, it actually came from the pseudo

21   trunking that we talked about earlier.

22        On our mainstream products, we would not provide this

23   XPT trunking function which came from the pseudo trunking.

24   However, if some customers would not like to customize the

25   products, we would then provide such a functionality, but

Hailin - cross by New

3339

1    usually we will not have this functionality listed in our

2    feature list.

3    Q.  Let's go to Row 24, which is the IP rating.  And the IP

4    rating of a radio refers to how much the radio can withstand

5    dust and water, right?

6    A.  Yes.

7    Q.  And the higher the rating, the more dust and water it can

8    withstand; is that right?

9    A.  Yes.

10   Q.  So for the on-site and commercial tier product, the IP

11   rating is only 54, but if we scroll over to the professional

12   products, it's 67, correct?

13   A.  Yes.

14   Q.  So if you're a customer who needs the higher IP rating,

15   for example, in forestry or in factories, you would be more

16   inclined to buy -- those customers would want to buy the

17   professional DMR products and not the commercial DMR products,

18   right?

19   A.  For this we would do our work or customization depending

20   on the market demands.  For some customers, when they want to

21   customize the DMR product they want to buy, perhaps they do

22   not require such a high IP rating in their low-end product and

23   they will not want to pay for that because they do not need

24   that functionality or rating.

25   Q.  But if they do require that higher rating, then they would

Hailin - cross by New

3340

1   not buy the commercial DMR products, right?

2   A.  Please repeat the question.

3   Q.  Sure.

4        If a customer did require the higher IP rating, like

5   the IP 67, then they would not consider buying the commercial

6   tier, which is only rated at IP 54, right?

7   A.  We did have such a setting or distinction because we would

8   have to take care of the needs of the customers.

9   Q.  I think that didn't quite answer my question.

10        My question is:  If a customer requires the higher IP

11   rating, like the IP 67, then they would not consider buying

12   the commercial tier product, which only has a rating of IP 54,

13   right?

14        MS. OFFICER:  Objection, Your Honor.  It calls for

15   speculation.

16        THE COURT:  Sustained.

17   BY MS. NEW:

18   Q.  Let's look at Row 13.  So Row 13 is a dedicated emergency

19   button, so this allows the radio to be programable.  So in

20   only one touch, a user can contact emergency services, right?

21   A.  This is the emergency button, yes.

22   Q.  Okay.  And the commercial products do not have the

23   emergency button feature, but the professional products do,

24   right?

25        MS. OFFICER:  Objection, Your Honor.  (Inaudible.)

1          THE COURT:  The objection is overruled.  The witness

2    may answer the question if he understands it.

3          THE WITNESS:  Please repeat the question.

4    BY MS. NEW:

5    Q.  Sure.

6          The on-site and commercial DMR products do not

7    support the dedicated emergency button, but some of the

8    professional tier, like the PD7 product, do support that

9    feature, correct?

10   A.  That's what the document writes.

11   Q.  And if a customer was interested in getting the dedicated

12   emergency button, they would not be able to get that on the

13   commercial tier products, right?

14   A.  Emergency button --

15         THE COURT:  What the witness is saying there is no

16   foundation for the question and it asks him to speculate.

17         Rephrase the question.  It's an unidentified person

18   under circumstances not clear.  No foundation.  It leads to

19   speculation by the witness.

20   BY MS. NEW:

21   Q.  Well, the question is -- Mr. Xu, is:  If a customer was

22   interested in that feature --

23         THE COURT:  Which customer?  Bill Gates?  Elon Musk?

24         MS. NEW:  I can rephrase, Your Honor.

25   BY MS. NEW:

1   Q.  The dedicated emergency button isn't available on the

2   commercial tier products, correct?

3   A.  According to this document, that's correct, it does not

4   have that.

5          MS. NEW:  Let's go to Row 29, which is GPS.

6   BY MS. NEW:

7   Q.  And that's a location monitoring service, right?

8   A.  Yes.

9   Q.  And that feature is not available on the commercial

10  products or the on-site products, correct?

11  A.  In our PD580, TD580, and our BD products we do provide

12  such functionality, GPS and Bluetooth.  It's just not -- that

13  it's not reflected in this document.  This document is

14  incomplete.

15  Q.  But the feature is not available in the PD3 or the PD4; is

16  that right?

17  A.  It's not available on PD3 and PD4.

18         MS. NEW:  And, Mr. Schlaifer, could you scroll over

19  to the right a little bit.

20  BY MS. NEW:

21  Q.  That feature is available in some of the commercial tier

22  products, right -- or -- excuse me -- the professional tier

23  products?

24  A.  Yes.

25  Q.  And if we go down to Row 34, which is telemetry, this

Case: 1:17-cv-01973 Document #: 798 Filed: 12/20/19 Page 109 of 133 PageID #:54590
Hailin - cross by New
3343

1   feature is used to remotely control or monitor the radios,

2   right?

3   A.  Yes.

4   Q.  This feature is not supported in the commercial tier

5   products, correct?

6   A.  That is correct.

7   Q.  But it is supported in the professional tier products,

8   right?

9   A.  Yes.

10  Q.  And if we go to Row 31, which is Mandown, this feature

11  enables the radio to enter emergency road -- mode if the radio

12  leans in a specific degree, right?

13  A.  I very much understand where you're going to by asking

14  these questions.  For these functionalities you are asking

15  about, they actually derive or extend from the trunking

16  functionality.  So I pretty much understand -- pretty much

17  very understand that you are -- where you are going.  And I

18  just want to say that they all did right or extend from the

19  trunking functionality.  And I do not want to answer the

20  subsequent questions regarding those features the way you are

21  going.

22          I would like to offer my explanation to the jury.

23  For these functionalities which will involve reporting to the

24  police or sending alerts, it requires the trunking capacity.

25  For the users, for commercial users such as stores or in

1    hotels, they rarely use this functionality to -- in order to

2    send or transmit the alerts or reporting to the police in

3    the -- with respect to the trunking functionality.  It

4    requires sending the signals or alerts on a dedicated channel.

5    So we do not provide such a functionality on commercial

6    products.  We only provide such a functionality on the

7    professional product.  And there is a strategic thinking

8    involved.

9            What I meant to say earlier in my earlier testimony

10   was that there would be some functionalities that would have

11   the same or similar features with those on the professional

12   terminals, but I did not say that it would be all, including

13   GPS and Bluetooth.

14           Counsel may continue with questions like this, but I

15   will feel that it would be a bit unnecessary or redundant from

16   the prospective of the timing.

17   Q.  So I was asking you about telemetry.  That feature is not

18   supported in the commercial tier products, correct?

19           MS. NEW:  Mr. Schlaifer, could you scroll up a little

20   bit.

21   BY THE WITNESS:

22   A.  That is correct.

23   BY MS. NEW:

24   Q.  But they are supported in the professional tier products,

25   right?

Case: 1:17-cv-01973 Document #: 798 Filed: 12/20/19 Page 111 of 133 PageID #:54592
Hailin - cross by New
3345

1    A.  Yes.

2    Q.  And the Mandown feature which allows the radio to enter

3    emergency mode, that is also -- excuse me -- Lone Worker,

4    which is Row 76 --

5            MS. NEW:  I apologize, Mr. Schlaifer.  There you go.

6    BY MS. NEW:

7    Q.  -- that initiates emergency if the user does not respond

8    to alerts in a preset time, right?

9    A.  That's correct.

10   Q.  But they are supported in the professional tier products,

11   right?

12   A.  Right.

13           MS. NEW:  And, Mr. Schlaifer, if you can go to

14   Row 32.

15   BY MS. NEW:

16   Q.  That's the vibration feature.  That allows the radio to

17   make vibration alert for private calls, group calls, text

18   messages, and alert calls, right?

19   A.  Yes.

20   Q.  And, again, that feature is not supported in the

21   commercial tier products, but it is supported in the

22   professional tier products, right?

23   A.  Correct.

24   Q.  And I believe you said a minute ago that many of the

25   low-tier features -- excuse me -- the commercial products are

1  used in things -- in places like shopping malls and hotels,

2  right?

3  A.  Yes.

4  Q.  And professional tier products are used in those settings

5  but also in factories, in the forestry, in manufacturing

6  facilities, for public safety workers, things like that,

7  right?

8  A.  It would be related or it would be locations related to

9  public safety.  Not just saying that, forestry would

10  definitely be related to public safety.  However, it would be

11  related generally to public safety.  I agree with that part.

12          For public safety, it is primarily used by the police

13  or government departments.  For forestry or for places such as

14  hotels, they would not be part of the scope of public safety.

15  Or maybe I should say that they are outside the scope of

16  public safety.  However, it all depends on how customers

17  position their products and the requirements for their

18  products.

19  Q.  And is it fair to say that different customers have

20  different needs for the features on their products?

21  A.  It is fair.

22  Q.  And that's regardless of the industry in which the

23  products are used?

24  A.  Please repeat.

25  Q.  Sure.

Case: 1:17-cv-01973 Document #: 798 Filed: 12/20/19 Page 113 of 133 PageID #:54594
Hailin - cross by New
3347

1      Regardless of the industry in which the customer is

2  going to use the product, different customers in different

3  industries have different needs, right?

4  A.  I don't quite agree with that.  Part of your statement is

5  true.

6  Q.  Which part?

7  A.  Different industries would have different needs.  That

8  part is correct.

9  Q.  And different customers have different needs, right?

10  A.  It's also possible, I believe, that different customers

11  would have the same needs.

12  Q.  But they could also have different needs, right?

13  A.  They can have different needs.  They can also have the

14  same needs.

15  Q.  Okay.  I want to --

16      THE COURT:  And idiosyncrasies; is that right?

17  Idiosyncrasies?  That's a challenge.

18      THE WITNESS (through the interpreter):  No,

19  Your Honor.

20      THE COURT:  I think the jury has got the point here.

21  Let's move on.

22      MS. NEW:  I do, too.

23  BY MS. NEW:

24  Q.  Okay.  I want to move on.

25      On your direct exam you talked about a couple

1   documents -- or an e-mail and a document that you received in

2   2013, PTX-843.  Do you recall that?

3   A.  I remember.

4   Q.  And before we jump into this document, Mr. Xu, I want to

5   ask you, when did you learn that you were going to testify at

6   this trial?

7           MS. OFFICER:  Objection, Your Honor.

8           THE COURT:  Overruled.

9           You may answer.

10  BY THE WITNESS:

11  A.  I remember it was in 2018.  It was in last year.

12  BY MS. NEW:

13  Q.  And you're aware that many of the witnesses who testified

14  at this trial were deposed, right?

15  A.  I know.

16  Q.  But you were never deposed, right?

17  A.  I was notified that I would be deposed; however,

18  Motorola's counsel dropped my deposition.

19  Q.  Your understanding is that Motorola's counsel dropped the

20  deposition?

21  A.  That's my understanding.

22  Q.  And you were not willing to come to the United States

23  for -- to sit for a deposition, correct?

24          MS. OFFICER:  Objection, Your Honor.

25          THE COURT:  You may answer.

1  BY THE WITNESS:

2  A.  I never said that I was unwilling to participate in

3  depositions.  I have been in the United States since October,

4  around the end of October or the beginning of November.

5  BY MS. NEW:

6  Q.  So you could have been deposed sometime between -- when

7  you arrived in the United States and now, right?

8  A.  I have always prepared for that; however, Motorola's

9  counsel did not approach me for that.

10  Q.  And you were told that by your counsel?

11  A.  It's not that my counsel told me that; it's my

12  understanding.  I have heard that my deposition would be

13  conducted in the United States.  Our colleagues in our legal

14  department have told me about that.

15  Q.  Okay.  So you were a recipient of this e-mail, PTX-843, in

16  September of 2013, right?  This is your name right here.

17  A.  Yes.

18  Q.  And you've never worked for Motorola, correct, Mr. Xu?

19  A.  Never.

20  Q.  And this e-mail is from a gentleman named Zhao Guo,

21  correct?

22  A.  Yes.

23  Q.  And he never worked for Motorola, right?

24  A.  That's correct.

25  Q.  And the other three people on this e-mail, they also never

Hailin - cross by New

3350

1    worked for Motorola, right?

2    A.  Correct.

3    Q.  Okay.  And this was the NEO document that's referenced and

4    that's attached to PTX-843.  And, for the record, on the ELMO

5    right now is PTX-844.

6         This is the document that you received, right?

7    A.  Yes.

8    Q.  And this is a document -- you don't dispute that this

9    document says "Internal Use Only," right?

10   A.  I see it.

11   Q.  And, in fact, it says that on every page of this document,

12   right?

13   A.  Yes.

14   Q.  And it says that right below the Motorola logo, correct?

15   A.  Yes.

16   Q.  And on the first page, it also has this disclaimer at the

17   bottom that says the "Document is proprietary to Motorola,"

18   and "shall not be reproduced or used in whole or in part

19   without Motorola's written consent."

20        Do you see that?

21   A.  I see it.

22   Q.  And you testified on your direct examination that in the

23   past, you had found other companies' information on the

24   Internet, and sometimes that material would be marked

25   confidential, right?

Hailin - cross by New

1    A.  There have been situations like that.

2    Q.  But you did not find this document on the Internet,

3    correct?

4    A.  That's correct.

5    Q.  And you also testified on direct that sometimes Hytera

6    would get materials from other companies through its

7    distributors and sometimes those documents would be marked

8    confidential, correct?

9    A.  Yes.

10   Q.  And you did not receive this document from a distributor,

11   correct?

12   A.  That's correct.

13   Q.  And, in fact, the only way you have this document is

14   because Zhao Guo sent you this document in September of 2013,

15   right?

16   A.  Yes.

17   Q.  And you received this document at the time that Hytera was

18   developing it's commercial DMR products, right?

19   A.  Yes.

20   Q.  And even though this document is marked "Motorola -

21   Internal Use Only," and it specifically says at the bottom

22   that the document shall not be used in whole or in part

23   without Motorola's consent, you didn't report to anybody at

24   Hytera that you had this document in your possession, did you?

25   A.  I did not -- I did not report that.  And according to my

1    recollection of the situation of 2013, I would need to offer

2    some explanation.

3           This e-mail -- this document was sent to me by

4    Mr. Zhao Guo, but at that time we already had the information

5    regarding Sicomm's chip which was provided to us by Sicomm.

6           According to my recollection, I did not even open

7    this document.  You can check this and look into my computer

8    to see that.  I didn't even open this document.  And like I

9    said, my English is not very good.  Even though for the

10   documents that you just showed me, it contains words such as

11   "confidential information" or "Motorola," I would think or

12   assume that I either did not see those words or I did not

13   understand what those words mean.

14          And according to my recollection, I did not even open

15   this document.  Even if I had opened this document, I would

16   not have understood the gravity or the seriousness of these

17   wording.

18          It's like when I watch a movie, even though I notice

19   that there are texts that would say, for example, "FBI

20   Warning," I would not pay attention to how serious it would be

21   or might be, even though I could listen and understand some,

22   but it would all be related to the English language used in my

23   academic area.

24          With respect to terms used in the legal field, for

25   many of them, I would not be able to recognize and understand

Case: 1:17-cv-01973 Document #: 798 Filed: 12/20/19 Page 119 of 133 PageID #:54600
Hailin - redirect by Officer
3353

1    them.  For all the terms that -- English terms that I use in

2    my e-mails, they were all used within a very limited or

3    certain extent of the scope of my English knowledge.

4            So even though I had -- even if I had opened this

5    document at that time, it would be like what I said earlier, I

6    would not have been this sensitive to those words you showed

7    me.  Even though I had opened this -- even if I had opened

8    this document, I would have only paid attention to the

9    parameters indicated in the document.

10   Q.  And when you received this e-mail, it said right here

11   "MOTO DMR," right?

12   A.  Yes.

13   Q.  And just so the jury can see the English translation, what

14   it says is, "Please refer to the MOTO DMR production

15   commissioning document," correct?

16   A.  Yes.

17   Q.  And despite receiving this e-mail and a document marked

18   "Motorola - Internal Use Only," you never reported to anyone

19   at Hytera that you were in position -- in possession of this

20   document, correct?

21   A.  That's correct.

22          MS. NEW:  No more questions, Your Honor.  I pass the

23   witness.

24                       REDIRECT EXAMINATION

25   BY MS. OFFICER:

Hailin - redirect by Officer

1    Q.  So I'd like to start with the spreadsheet, PTX-2266.  You

2    were asked a number of questions about this.  Do you recall

3    that?

4    A.  I remember.

5    Q.  In fact, you were asked about 30 minutes of questions

6    about the features that were the same or different from the BD

7    series and the PD3 series and the PD4 series known as the

8    commercial DMR radios that were different from the

9    professional DMR radios.  Do you recall that?

10   A.  But I see that this document is incomplete.  We also have

11   some other products, such as the TD580, and it's not listed

12   here.

13   Q.  And it's always been the case that there are features in

14   the commercial DMR radios that -- or excuse me.  I'll take

15   that back.

16        It's always been the case that there are features in

17   the professional DMR radios that are not in the commercial DMR

18   radios; is that right?

19   A.  It's not like that.  For some of the features, even our

20   industry or professional DMRs do not have them.  We once had a

21   functionality related to GPS which would allow you to search

22   people nearby.  It's not that our professional or industry

23   DMRs would be higher or have more functionalities than our

24   commercial DMRs.  We have our unique way to do our

25   development, and we would develop the products depending on

Hailin - redirect by Officer

3355

1    the needs of the customers.

2          What I'm trying to say is that for some of our

3    customers, they could not even cover the aspects required or

4    needed for the professional terminals; however, we were able

5    to cover those aspects.

6    Q.   And the primary difference between the commercial DMR

7    radios and the professional DMR radios is that the

8    professional DMR radios support trunking and trunking-related

9    features.  Would you agree with that?

10   A.   I disagree.

11   Q.   And that's not in dispute.  Do you agree with that?

12   A.   That's right.  That would be the primary or the main

13   distinction.

14   Q.   In fact, all of the features you were asked about during

15   cross-examination are not in dispute?  They are not alleged by

16   Motorola to be trade secrets in this case?

17   A.   Correct.

18   Q.   But the commercial DMR products do include a variety of

19   features that Motorola alleges are trade secrets; is that

20   right?

21          INTERPRETER LIN:  Counsel, can you repeat that,

22   please.

23   BY MS. OFFICER:

24   Q.   The commercial DMR products do include a lot of features

25   that Motorola contends are trade secrets or are asserted to be

Hailin - redirect by Officer

3356

1    trade secrets?

2    A.  Please repeat.

3    Q.  The commercial DMR products include a variety of features

4    that Motorola contends are their trade secrets?

5    A.  Can you break down the question?  It's quite long.  The

6    fact that I hear the later part would let me forget the

7    previous -- the beginning part.  So can you break it down?

8    Q.  So the commercial DMR products, do you agree that they

9    include VOX, for example?

10   A.  Yes.

11   Q.  And the VOX feature in the commercial DMR products was

12   migrated over from analog; is that right?

13   A.  Yes.

14   Q.  And the commercial DMR products include an application

15   layer?

16   A.  Yes.

17   Q.  And you wrote the application framework?

18   A.  Yes.

19   Q.  And they include noise suppression?

20   A.  Yes.

21   Q.  Squelch?

22   A.  Yes.

23   Q.  Carrier cut?

24   A.  Yes.

25   Q.  L1 timer?

Hailin - redirect by Officer

1   A.  Yes.

2   Q.  DSP source code?

3   A.  The Sicomm chip includes the DSP source code.

4   Q.  So that was available by 2011 for purchase from Sicomm?

5   A.  Yes.

6   Q.  I'd like to discuss PTX-2263.  If you can pull that out.

7        And so counsel directed you to this Paragraph 1 in

8   the response.

9   A.  Yes.

10  Q.  In this e-mail from Henry Huang to Mr. Ye, he states that

11  the "Sicomm IC currently only have voice operation in direct

12  mode and repeater mode.  The customer also want the message

13  function."  Do you see that?

14  A.  I see it.

15  Q.  And Mr. Ye writes back, and he states, "There is some

16  misunderstandings and confusions on the capability of Sicomm's

17  SCT3928 chip and the scope of Hytera projects."  Do you see

18  that?

19  A.  I see it.

20  Q.  And Mr. Ye -- or, yes, Mr. Ye's responses are in line

21  here.  Do you agree with that?  Or do you see that?

22  A.  I agree.

23  Q.  And he states that the Sicomm SCT3928 chip does, in fact,

24  support voice and data communication.  Do you agree?

25  A.  I agree.  From those features that we saw in the feature

Hailin - redirect by Officer

3358

1    list, they were actually -- they actually have to be supported

2    by what Mr. Ye stated here, so his statement was correct.

3    Q.  And that's that the Sicomm chip does support both voice

4    and data?

5    A.  Supports voice and data, correct.

6    Q.  And then I want to take a look here at this statement:

7    "Up until last week we had an understanding that the radio

8    under development is a displaysless model, which will not be

9    able to support messaging functions at the UI level."

10          Do you see that?

11   A.  I see it.

12   Q.  Do the commercial DMR radios include displays?

13   A.  Part of the models do.

14   Q.  And then it goes on for the rest of that paragraph and

15   says, "The emphasis of both the Hytera software team and

16   Sicomm supporting team are on the voice communications.  If

17   the requirement changes, it is okay on our side, as SCT3928

18   already supports the new functions.  However, Hytera may need

19   software work at the layer three level to implement those

20   functions.  Sicomm will support that effort from our side."

21          INTERPRETER LIN:  Counsel, can you not move that,

22   please.

23          MS. OFFICER:  I'm sorry.  I forget that you are

24   reading it, too.

25   BY THE WITNESS:

Hailin - redirect by Officer

3359

1    A.  I see this.

2    BY MS. OFFICER:

3    Q.  Did Sicomm develop the entire level three call control

4    layer of the protocol stack?

5    A.  The Sicomm chip provides part of the functionality or the

6    code of the call control layer.  What we did or worked on was

7    on the ARM chip where we provided some code modification in

8    order to support the features; for example, the features

9    mentioned in this e-mail.

10   Q.  Did Sicomm provide source code for the ARM chip for the

11   call control layer?

12   A.  Please repeat.

13   Q.  Did Sicomm provide source code for the ARM chip for the

14   call control layer portion that resides on the ARM chip?

15   A.  Yes.

16   Q.  And so this is your e-mail on PTX-2263.3.  And you write

17   to Yu Yang, and you say that "We need to develop some new

18   features . . . so please provide DMR protocol stack document

19   on layer three for PD3 to communicate with all PD products to

20   each other."

21        Do you see that?

22   A.  I see it.

23   Q.  Did anyone give you the DMR protocol stack document on

24   layer three?

25   A.  No.

1  Q.  Why not?

2  A.  It says here that the protocol stack documents could be

3  downloaded from the Internet because it is part of the ETSI,

4  E-T-S-I, document.  There is no need to ask him for the

5  provision -- or to provide these documents.

6       As you can also see from the e-mail, that this person

7  did not send me or attach any documents in the e-mail to me.

8  Q.  Did you ever have any discussions with Yu Yang about the

9  layer three of the protocol stack?

10 A.  We discussed that, and he told me that you can just

11 download it on your own.

12 Q.  Did you adopt any source code for layer three of the

13 protocol stack from the professional DMR team?

14 A.  No, because the software architecture was different.

15 Also, we were an independent team.  We did our own work.  We

16 would not ask them for anything.

17      We did have the capability to develop the protocol

18 stack.  Even though we were not -- or might not be so

19 experienced with DMR, we could totally do so by relying on our

20 past experience or by referring and learning from the contents

21 of the documents.  We were totally capable of doing it.

22      I said in my earlier testimony that I have worked on

23 software related to mobile phones.  My previous employer in

24 relation to the mobile phone business did the conversion from

25 the voice analog based on an XP to the digital products.  And

1    those -- that work was related to the protocol stack of mobile

2    phones, and I was part of that effort.

3            So for me, to work on the DMR digital products and

4    digital radios, it's just another way of thinking about

5    things, but the basic theory and working principle is similar.

6            So the DMR protocol stack is not that mysterious and

7    it is not something that only Motorola could do.  For example,

8    there are some small companies within China, for example,

9    Kolizin (phonetic).  They are a very small company with about

10   only 30 people, but they were able to work on and develop DMR

11   protocol stack.

12           MS. OFFICER:  So, Jim, can you please pull up

13   DTX-0843 aside DTX-0844.

14   BY MS. OFFICER:

15   Q.  And, Mr. Xu, Motorola's lawyers asked you about these

16   documents on cross.  Do you remember that?

17   A.  I remember.

18   Q.  And you understand that Motorola does not allege that

19   PTX-0844 is a document that was accessed, downloaded, and

20   stolen by G.S. Kok, Y.T. Kok, or Sam Chia, right?

21   A.  Correct.

22   Q.  And there's no document, e-mail, or anything suggesting

23   that this document on the right-hand side, PTX-0844, was

24   obtained improperly.  Do you agree?

25   A.  Correct.

Hailin - redirect by Officer

3362

1   Q.  And you have no reason to believe that Zhao Guo got this

2   document from any improper sources?

3           INTERPRETER LIN:  From?

4   BY MS. OFFICER:

5   Q.  From any improper sources?

6   A.  That's correct.

7   Q.  I want to take a quick look at PTX-2265.

8           And you were shown this slide.  Do you recall that?

9   A.  Yes.

10  Q.  And you testified that signaling was later added to the

11  commercial DMR products?

12  A.  Yes.

13  Q.  The same with XPT trunking?

14  A.  That was only for the use of the customization by some

15  customers.  We did not promote or tell about that

16  functionality to all of our customers.

17  Q.  But you did, in fact -- so XPT trunking is pseudo

18  trunking; is that right?

19  A.  Yes, XPT trunking.

20  Q.  And you did, in fact, talk with Sicomm about adding this

21  feature to the commercial DMR products for those customers

22  that wanted it?

23  A.  We talked about DMR trunking.

24  Q.  And Sicomm added that capability to its chip?

25  A.  The pseudo trunking was later added by Sicomm to the

Case: 1:17-cv-01973 Document #: 798 Filed: 12/20/19 Page 129 of 133 PageID #:54610
Hailin - redirect by Officer
3363

1    Sicomm chip.  It relates to our company's patents, so we

2    provided them with relevant information so they could add this

3    functionality to their chip.

4    Q.  Do you know about --

5    A.  So you only need to develop the XPT trunking on the ARM

6    chip.

7    Q.  And do you know about how long it took Sicomm to add the

8    functionality?

9    A.  For the pseudo trunking, I remember it took about a month.

10   Q.  About how many engineers, if you know?

11   A.  Two engineers.

12           THE COURT:  You said one or two before?

13           THE WITNESS (through the interpreter):  Yes.

14           THE COURT:  One or two engineers, one month?

15           THE WITNESS (through the interpreter):  It would

16   depend on the various functionalities.  For this

17   functionality, it took one month.  For other functionalities,

18   it may take two or three months.

19   BY MS. OFFICER:

20   Q.  And Motorola's lawyer asked you about whether or not you

21   were deposed in this case.  Do you recall that?

22   A.  I remember.

23   Q.  And we offered your deposition in Hong Kong in early June.

24   Do you recall that?

25   A.  I remember.

Hailin - redirect by Officer

1   Q.  And virtually all of the Hytera witnesses in this case

2   were deposed in Hong Kong; is that right?

3   A.  According to my recollection, yes.

4   Q.  And Motorola refused to take your deposition.  Is that

5   your understanding?

6   A.  I was notified.  However, I never took part in a

7   deposition, so that would be my understanding.

8   Q.  Your understanding is that Motorola didn't want to take

9   your deposition?

10  A.  I feel that it is the case, yes.

11          MS. OFFICER:  No further questions.

12          THE COURT:  Anything further, Counsel?

13          MS. NEW:  Nothing further, Your Honor.

14          THE COURT:  Okay.  Is there any reason why this

15  gentleman might be recalled?

16          MS. OFFICER:  None for us, Your Honor.

17          MR. ALPER:  Nothing for us, Your Honor.

18          THE COURT:  You are excused.

19          Have a safe trip back to China.  Thank you.

20          You have been here since October, right?

21          THE WITNESS (through the interpreter):  I remember I

22  got here around the end of October or early November.  I don't

23  quite recall.  Thank you for being concerned, Your Honor.

24          THE COURT:  Are you anxious to return to China?

25          THE WITNESS (through the interpreter):  I do have a

1    lot to do.  I also want to see my family.

2              THE COURT:  Have a safe trip.  Thank you.

3              THE WITNESS (through the interpreter):  Thanks,

4    everyone.

5              THE COURT:  But you are excused.

6              Members of the jury --

7              INTERPRETER LIN:  The witness said thank you to

8    everyone.

9         (Witness excused.)

10             THE COURT:  Members of the jury, you are to return

11   tomorrow morning at 10:15.  I have a few unrelated matters to

12   deal with.

13             You are excused.

14             Counsel, 10:15.

15             MR. ALPER:  Yes, Your Honor.

16             THE COURT:  Remain for a minute.

17        (Jury out.)

18             THE COURT:  Mr. Fulbright is relentless.

19             That was meant to be humorous.

20             All right.  Who is the next witness?

21             MS. OFFICER:  Your Honor, Andrew Yuan is the next

22   witness.

23             THE COURT:  Is there a language issue?

24             MR. CLOERN:  So, actually, very excellent question.

25   Mr. Yuan is going to attempt to testify in English.  We would

1    like the translators to be here, though, in case there is a

2    word or a phrase that he is unable to handle that could be

3    sort of translated *ad hoc*.

4            THE COURT:  That certainly is a reasonable request.

5    And the interpreters will be here once again.

6            INTERPRETER LIN:  Yes, Your Honor.

7            THE COURT:  So, Counsel, 10:15.  Thank you.

8            MR. CLOERN:  May we, for the record, seal DTX-5549,

9    5550, 5551, 5552, 5553, and 5557?

10           MR. ALPER:  No objection to that.

11           And we'd like to seal DTX-5145, if we may,

12   Your Honor.

13           THE COURT:  Both motions to seal are granted.

14           MR. ALPER:  And I'm going to just mark this was used

15   during Mr. Luo's cross-examination.  It was this chart.  We

16   will provide a copy to counsel.  It was PDX-23.

17           THE COURT:  Your statement is noted for the record.

18   Thank you, Counsel.

19           MR. CLOERN:  Thank you, Your Honor.

20           MR. ALPER:  Thank you, Your Honor.

21           THE CLERK:  All rise.  Court is adjourned.

22       (Court adjourned at 4:35 p.m.)

23

24

25

1                          *   *   *   *   *   *

2                              CERTIFICATE

3          I certify that the foregoing is a correct transcript from

4     the record of proceedings in the above-entitled matter.

5

6     /s/ *Amy Spee*                          12/18/2019
      _____          _____
7     Amy Spee, CSR, RPR, CRR                    Date
      Official Court Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25