3005

1      IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3   MOTOROLA SOLUTIONS, INC., and MOTOROLA    ) No. 17 CV 1973
    SOLUTIONS MALAYSIA SDN. BHD,              )
4                                             )
                                              )
5          Plaintiffs,                        )
    vs.                                       ) Chicago, Illinois
                                              )
6   HYTERA COMMUNICATIONS CORPORATION, LTD.,  ) December 12, 2019
    HYTERA AMERICA, INC., and HYTERA          )
7   COMMUNICATIONS AMERICA (WEST), INC.,      )
                                              )
8          Defendants.                        ) 10:15 o'clock a.m.

9
                    TRIAL - VOLUME 20 A
10               TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE  CHARLES R. NORGLE, SR.
11                   and a jury

12

13  For the Plaintiffs:    KIRKLAND & ELLIS LLP
                           BY:  Mr. Adam R. Alper
14                              Mr. Brandon Hugh Brown
                                Mr. Reza Dokhanchy
15                              Ms. Barbara Nora Barath
                                Mr. Kyle Calhoun
16                         555 California Street
                           27th Floor
17                         San Francisco, California 94104
                           (415) 439-1400
18
                           KIRKLAND & ELLIS LLP
19                         BY:  Mr. Michael W. De Vries
                           333 South Hope Street
20                         Los Angeles, California 90071
                           (213) 680-8400
21

22
    Court reporter:            BLANCA I. LARA
23                         Official Court Reporter
                           219 South Dearborn Street
24                              Room 2342
                           Chicago, Illinois 60604
25                           (312) 435-5895
                           blanca_lara@ilnd.uscourts.gov

1  Appearances:   (Continued:)

2
3  For the Plaintiffs:      KIRKLAND & ELLIS LLP
                            BY: Ms. Megan Margaret New
                            300 North LaSalle Street
4                           Chicago, Illinois 60654
                            (312) 862-7439
5
                            KIRKLAND & ELLIS LLP
6                           BY:  Ms. Leslie M. Schmidt
                            601 Lexington Avenue
7                           New York, New York 10022
                            (212) 446-4763
8
   Motorola Corporate Representative:   Mr. Russ Lund
9

10
   For the Defendants:      STEPTOE & JOHNSON LLP
11                           BY: Mr. Boyd T Cloern
                             Mr. Michael J. Allan
12                           Ms. Jessica Ilana Rothschild
                             Ms. Kassandra Michele Officer
13                          1330 Connecticut Avenue., Nw
                            Washington, DC 20036
14                          (202) 429-6230

15                          STEPTOE & JOHNSON LLP
                            BY:  Mr. Daniel Steven Stringfield
16                          227 West Monroe Street
                            Suite 4700
17                          Chicago, Illinois 60606
                            (312) 577-1267
18

19  Hytera Corporate Representative:  Michele Ning

20

21

22

23

24

25

3007

1       (The following proceedings were had out of the
2       presence of the jury in open court:)
3       THE CLERK:  17 C 1973, Motorola versus Hytera.
4       THE COURT:  Good morning, counsel.
10:15:51   5       MR. ALPER:  Good morning, Your Honor.
6       MR. CLOERN:  Good morning, Your Honor.
7       THE COURT:  We need a good reader again.  Would you
8  read this note from the jury.  You have heard it before, but I
9  want it read into the record.
10:16:08  10       MR. CLOERN:  So the jury's letter, Your Honor:
11       "I have a trip out of state.  Plans starting
12       December 28th.  I will return on January 2nd.
13       Should this case continue this long, will the
14       schedule of days we are required to be present
10:16:29  15       be provided?"
16       Shall I read the juror's name?
17       THE COURT:  Yes.
18       MR. CLOERN:  "Thank you.  Jaden Richardson."
19       THE COURT:  I have also attached some form of a
10:16:41  20  calendar there and I will give it to all counsel.
21       So I have suggested on that calendar days when there
22  would be a trial and days when there would not be a trial also
23  in an effort to accommodate Mr. Richardson.  But you, no doubt,
24  have scheduled witnesses to come in and I want to give you the
10:17:08  25  opportunity to review my proposed plan for the next few weeks.

3008

1    I'm not saying you've got to do it right now, but take

2    it under advisement and let me know as soon as possible because

3    we want to let the jury know before they leave today what the

4    schedule would be for the next week or two.

10:17:29    5    So look that over, if you will.  And in just a couple

6    of minutes we will proceed with the trial.  If you want to make

7    a copy of that, you certainly can make a copy of it.

8    MR. CLOERN:  Your Honor, for defendants' purposes, we

9    would agree after the 19th to come back, I think, on

10:17:46    10    January 6th, which is, I think, what is reflected in your

11    calendar, due to the juror vacations and all the holidays the

12    week of the 23rd.

13    MR. ALPER:  And, Your Honor, may I ask a question

14    about the calendar?

10:17:58    15    THE COURT:  Yes.

16    MR. ALPER:  If I understand what you have just told

17    us, where it says "no," those are dates that --

18    THE COURT:  That means no trial.

19    MR. ALPER:  Right.  No trial.

10:18:04    20    THE COURT:  "Yes" means trial.

21    MR. ALPER:  Okay.  All right.  Great.  Thank you.  May

22    we confer for just a moment and then we can tell you -- it

23    seems like its pretty clear what --

24    THE COURT:  You don't have to take just a moment.  I'm

10:18:16    25    saying look it over and look at your witness schedule and other

1  plans, but we must let the jurors know before the end of the

2  day.

3         MR. ALPER:  Yes.

4         THE COURT:  All right.  So we'll take a breather here

10:18:25  5  and start the trial in just a few minutes then.  I don't know

6  if all the jurors are here, but we will start promptly.

7         THE CLERK:  All rise.  The Court will take a brief

8  recess.

9         (Recess.)

10:18:36  10        (The following proceedings were had out of the

11           presence of the jury in open court:)

12        THE CLERK:  All rise.  The Court is in session.

13        THE COURT:  We need another reader.  Who read the last

14  one?  This one is hot off the press.

10:22:04  15        MR. CLOERN:  And on nice stationary.

16        MR. ALPER:  Okay.  This one is dated today:

17           "Dear Judge Norgle, I'm sorry to bother you with

18           this matter again, but as the trial is moving

19           forward without a clear end in sight, I wanted

10:22:20  20           to remind you that I have a trip planned prior

21           to receiving my summons.  The dates of the trip

22           are January 4th through the 11th.  I've provided

23           the date of the hotel and flight bookings.  As

24           stated in the disclosures highlighted, these

10:22:33  25           tickets are nonfundamental.  I understand the

1      trial may not go into 2020, but I wanted to

2      bring this to your attention again for planning

3      purposes and to put my mind at ease.  Thank you.

4      Julia Mironiuk.  PS:  Sorry about the paper.

10:22:49   5      It's all I had at home."

6        (Indicating.)

7        THE COURT:  Okay.  Gives you yet another thing to

8    think about during the course of the day.  And return that, if

9    you will, to Mr. Fulbright.  He will file it for the record.

10:23:06   10        (Said item tendered.)

11        THE COURT:  But we do want to move ahead this morning

12    with the trial.

13        Please ask the jury to come in.  And give me a copy of

14    that when you get a chance, Eric.

10:23:23   15        THE CLERK:  Yes.

16        (Brief pause.)

17        THE COURT:  A number of years ago I went to trial for

18    nine weeks in the summer with 16 jurors, and at the end of the

19    nine weeks, 15 jurors remained.  I've a lot of respect for

10:24:01   20    jurors.

21        (Brief pause.)

22        THE CLERK:  All rise.

23        (The following proceedings were had in the

24        presence of the jury in open court:)

10:24:38   25        THE CLERK:  The Court is in session.  Please be

Zhang - direct by Officer

3011

1    seated.

2            THE COURT:  Good morning, members of the jury.

3            Please call the next witness.

4            MR. CLOERN:  Your Honor, Hytera Communications, Hytera

5    America and Hytera Communications America (West) call Yingzhe

6    Zhang.

7            MS. OFFICER:

8            THE CLERK:  Please raise your right hand and be sworn.

9            (Witness duly sworn.)

10           MS. OFFICER:  Good morning, Your Honor.  Kassandra

11   Officer on behalf of Hytera.

12           THE COURT:  Good morning, counsel.

13           YINGZHE ZHANG, DEFENDANTS' WITNESS, SWORN

14                   DIRECT EXAMINATION

15   BY MS. OFFICER:

16   Q.  Good morning, Mr. Zhang.  Can you please introduce

17   yourself.

18   A.  My Chinese name is Yingzhe Zhang.  Z-h-a-n-g Y-i-n-g-z-h-e.

19   My English name is Roger Zhang.  I'm a software engineer at

20   Hytera Communications.  I am responsible for the design of

21   software -- of the protocol stack, the software, as well as the

22   research into the standards, as well as the design, also the

23   relevant modifications and revisions.

24   Q.  Mr. Zhang, do you speak English?

25   A.  I speak a little.

Zhang - direct by Officer

3012

1    Q.  Do you read and write English?

2    A.  If it is needed for work, I can read and write some.

3    Q.  Would you be more comfortable testifying in Mandrin today?

4    A.  Yes, because my English listening comprehension and

10:27:23    5    speaking ability is not very good.

6    Q.  What is your educational background?

7    A.  I have a bachelor's degree in communications engineering.

8    Q.  And when did you receive your bachelor's degree?

9    A.  2002.

10:27:48    10    Q.  Do you have any additional degrees?

11    A.  Yes, I also have a master's degree in computer science.

12    Q.  When did you receive your master's degree?

13    A.  2005.

14    Q.  And when did you join Hytera?

10:28:12    15    A.  April of 2005.

16    Q.  What type of work did you do when you joined Hytera in

17    2005?

18    A.  When I just joined Hytera, I worked on the analog terminal

19    team.  And the work I primarily did was to gather and look into

10:29:00    20    information about the product, to learn the knowledge, and did

21    some testing in order to output some summary documents.

22    Q.  Did you ever research digital products and standards?

23    A.  Yes.  Around 2006, the leader of our team asked me and

24    another colleague to research into the -- the digital standards

10:29:43    25    with respect to DMR and P25 primarily.

Zhang - direct by Officer

3013

1    Q.  How long did you work on those tasks of researching digital

2    standards?

3    A.  About 6 months.

4    Q.  And then what happened after that?

10:30:02    5    A.  Later Professor Sun's team needed more people.  So he

6    approached me, contacted me, and asked me to join his team.

7    Q.  What was Professor Sun's team working on?

8    A.  The team led by Professor Sun was primarily in charge of

9    the research and development of DMR.

10:30:41    10    Q.  And why did Professor Sun's team ask you to join them?

11    A.  I believe it was because I had done research on digital

12    standards for a little while and I am familiar, I have

13    expertise with respect to the design of the DMR products and

14    standards.

10:31:13    15    Q.  What type of work did you do on Professor Sun's team?

16    A.  On Professor Sun's team I was mainly in charge of the

17    development and design of the call control layer in the

18    protocol stack.  Also, I was in charge of the research

19    modification and drafting of the digital DMR standards.

10:31:59    20    Q.  Was the protocol stack an important part of the DMR

21    development?

22    A.  Yes.  In my thinking, I believe and I think it is the most

23    important part.

24    Q.  Why do you think it's the most important part?

10:32:23    25    A.  Because the DMR standards is required by our DMR products

Zhang - direct by Officer

3014

1  and our software protocol stack is used to implement that

2  standard for that purpose.

3  Q.  What do you mean that the DMR protocol stack is used to

4  implement the DMR standard?

10:32:54  5  A.  What I mean is that the DMR standard is a universal

6  standard across the industry.  It is mainly related to the

7  rules and the process and the services of the DMR area.  And it

8  is used to -- it is used to allow different companies in the

9  industry to communicate and interoperate with each other;

10:33:51  10  therefore, we need the DMR protocol stack in order to implement

11  what is required by the standard.

12  Q.  Was Hytera able to develop a compliant DMR protocol stack

13  before G.S. Kok joined Hytera in February 2008?

14  A.  At that time we already implemented some of the major

10:34:32  15  functionalities of that standard.

16  Q.  Please turn to PTX 2040 of your binder.

17        What is the date of this document?

18  A.  August 26, 2007.

19  Q.  Can you please tell us what this document describes?

10:35:06  20        THE COURT:  Is it in evidence, counsel?

21        MS OFFICER:  It is, Your Honor.  Previously admitted.

22        THE COURT:  The number is what?

23        MS OFFICER:  PTX 2040.

24        THE COURT:  Proceed.

10:35:21  25  BY THE WITNESS (THROUGH INTERPRETER):

Case: 1:17-cv-01973 Document #: 801 Filed: 12/20/19 Page 11 of 118 PageID #:54848
Zhang - direct by Officer
3015

1   A.  This document mainly describes the functionalities that

2   have been supported and that have passed the test by our

3   protocol, previous protocol.

4   BY MS. OFFICER:

10:35:44   5   Q.  And can you please tell us how this testing that's

6   reflected in this document is described -- or was conducted?

7   A.  For this testing, I believe we used two sets of our boards

8   and test the functionalities through the wireless method.

9   Q.  And when you say "wireless method," does that mean over the

10:36:32   10  air?

11  A.  Yes.

12  Q.  Now, please turn to the previously admitted PTX 1988.

13          What is the date of this document?

14  A.  September 30th, 2007.

10:36:59   15  Q.  And can you please tell us what this document describes?

16  A.  This document mainly describes the process and the result

17  of interoperability testing between the Hytera DMR prototype

18  and Motorola's DMR radio.

19  Q.  And what did that testing show?

10:37:43   20  A.  This testing shows that our prototype can interoperate with

21  Motorola's radio mainly with respect to making voice group

22  calls, as well as sending text messages.

23  Q.  Did you author this document?

24  A.  Yes.

10:38:19   25  Q.  And can you confirm that the test that are described in

Zhang - direct by Officer

3016

1    this document actually occurred?

2    A.  Yes.  I believe I wrote this document after I did the

3    testing.

4    Q.  Did you do additional over-the-radio testing with a

5    Motorola DMR radio?

10:38:49

6    A.  Yes, my other colleagues would continue to do such work.

7    Q.  And were there any functions that you were able to realize

8    on the board-to-board testing that you were not able to realize

9    on the board-to-radio the air?

10        INTERPRETER LIN:  Counsel, do you mind repeating that?

10:39:23

11        MS. OFFICER:  Yes.

12   BY MS. OFFICER:

13   Q.  Were there any functions that you were able to realize in

14   the board-to-board testing that you were not able to realize on

15   board-to-radio testing?

10:39:31

16   A.  Yes.

17   Q.  And why was it that you were able to realize those

18   functions in the board-to-board testing but not in the

19   board-to-radio testing?

20   A.  I believe there are two reasons primarily.  The first one

10:39:55

21   is that for the definition of the DMR standards, some of them

22   are quite broad, so people may have different understanding for

23   certain functionalities.

24        Another reason or the second reason may be that

25   Motorola probably did not fully follow what was required in the

10:40:45

Zhang - direct by Officer

3017

1    standard.

2    Q.  So I'd like to discuss both of those reasons.  Your first

3    reason was that there were parts of the DMR standard that were

4    broad and vague.  Can you explain to us why that would affect

10:41:16    5    your interoperability testing with the Motorola DMR radio?

6    A.  The reason is that since some of the definitions in the DMR

7    standard are broad and vague, different companies or

8    manufacturers would have different understanding for the same

9    functionality and we may choose one method to realize and

10:42:02    10    understand it; whereas, Motorola might have chosen a different

11    method to understand and realize it, and that is why it would

12    be like the situation that I described.

13    Q.  Do you have an example you can explain for us?

14    A.  This might be difficult to explain, so I can give a more

10:42:42    15    realistic and practical example to explain this.

16            For example, for the required length and width of the

17    track of a train, perhaps it is required that it has to be

18    10 feet and one manufacturer makes it as 3 feet, whereas the

19    other one or another one makes it 5 feet.  So in this scenario,

10:43:38    20    their trains can run on their own tracks but not on the other

21    company or manufacturer's track.

22    Q.  Thank you.  In the example that you just gave, what was the

23    standard?

24    A.  Earlier when I talked about the width of the standard --

10:44:10    25    the standard width of the track, I said it has to be below

Zhang - direct by Officer

3018

1  10 feet.

2  Q.  So in your example, those manufacturers, one with 5 feet

3  width and the other with 3 feet width, were they both compliant

4  with that standard?

10:44:40  5  A.  Yes, because the standard required it to be below 10 feet.

6  So both 3 and 5 feet are below 10 feet.

7        THE COURT:  So without a standard, each railroad would

8  run its own railroad?

9        THE WITNESS (THROUGH INTERPRETER):  Yes, because they

10:45:09  10  do so according to their own understanding, and that is how

11  they understand the standard, that's why they make it that way.

12        THE COURT:  So your answer is yes to my question?

13        THE WITNESS (THROUGH INTERPRETER):  Yes.

14        THE COURT:  Proceed.

10:45:28  15        MS OFFICER:  Thank you.

16  BY MS OFFICER:

17  Q.  In your example using railroad tracks, is the purpose of

18  the standard fulfilled?

19  A.  Actually no, because the purpose of a standard is to allow

10:46:04  20  different companies or manufacturers to be able to run on each

21  other's product, such as the track in this example.  So if that

22  purpose is not achieved, it would defeat the meaning and the

23  purpose of a standard.

24  Q.  So I'd like to discuss your second reason, and your second

10:46:26  25  reason was that Motorola's DMR radio may not be fully compliant

Zhang - direct by Officer

3019

1   with the DMR standard.  How is it that Motorola's DMR radio may

2   not be fully compliant with the DMR standard?

3   A.  Yes, the DMR standard is established by Motorola.  They are

4   also a major player in the DMR standard association.  They

10:47:17   5   could lead the process of drafting and formulating the DMR

6   standard.

7       Also another reason or aspect is that Motorola was the

8   only company at that time that had DMR radio products.  No

9   other company would be able to interoperate with their product

10:48:10  10   in terms of the interoperability testing and verification.  And

11   if they conducted any modifications with respect to the design

12   of their products, it will not have caused major impacts.  And

13   also what they could do is that they could submit the changes

14   of the standards and the products later after those changes

10:48:35  15   have taken place.

16   Q.  And did that ever happen?  Did Motorola change its DMR

17   radios and how they operate and then later go the DMR standard

18   -- or the DMR Association and update the DMR standard?

19   A.  Yes, it has happened before.  We identified some issues or

10:49:23  20   problems when we were conducting the interoperability testing

21   with their products.

22   Q.  Please turn to PTX 1087.  What is this document?

23   A.  This document is an e-mail I sent to Mr. Sam Chia, and it

24   also contains his reply.

10:50:05  25   Q.  Was this document produced from Hytera's files?

Zhang - direct by Officer

3020

1   A.  Yes.

2           MS OFFICER:  Your Honor, at this time we request that

3   PTX 1087 be moved into evidence.

4           MR. ALPER:  No objection.

10:50:22
5           THE COURT:  It is received and may be published.

6           (Said exhibit received in evidence.)

7   BY MS OFFICER:

8   Q.  When did you send this e-mail?

9   A.  June 23rd, 2008.

10:50:46
10  Q.  And when did Sam Chia respond?

11  A.  Also on July 23rd, 2008 -- also on June 23rd, 2008.

12  Q.  And was that shortly after Sam Chia joined Hytera?

13  A.  Yes.  Right.

14  Q.  Why did you send this e-mail to Sam Chia?

10:51:17
15  A.  I think I sent it due to two reasons.  The first reason is

16  that Sam Chia was a new leader who just joined the company.  We

17  wanted to show our welcome and respect to him, and we wanted to

18  understand him more so that we can build connections with him.

19          The second reason is that when Sam Chia joined the

10:52:25
20  company, he was introduced as an expert on DMR.  So we, as

21  technical people, we wanted to discuss technical problems with

22  him.  So I gathered some technical questions and problems from

23  the team and discussed with him.

24  Q.  What is the subject line of your e-mail?

10:52:46
25  A.  The subject says:

Zhang - direct by Officer

3021

```
              "Some important technical questions about DMR
 1
 2            protocol stack."
 3  Q.  Why do you have three exclamation points in your subject
 4  line?
 5  A.  The reason I put three exclamation marks here was to try to
 6  highlight and emphasize on this e-mail and also to attract his
 7  attention.  For him as someone who just joined the company, he
 8  might be very busy around that time and he might've overlooked
 9  this e-mail.  So I wanted to highlight the importance of this
10  e-mail so he could pay attention to it.
11  Q.  Are you saying that your questions are not actually
12  important?
13  A.  That's not what I said.  For me as a developer, it is quite
14  normal to encounter problems, and all problems or questions are
15  important for me.
16            And for me as I review this e-mail, the problems
17  identified here, as I see them or view them, they are not very
18  crucial or serious.  They are more about issues to address how
19  to improve the performance or how to add new functionalities to
20  ensure better interoperability.
21  Q.  In your e-mail, on page 2, you said that:
22            "Our group has been engaged in a protocol
23            development for a period of time and met many
24            problems which troubled us for a long time.  So
25            if you can help us solve these problems, we will
```

10:53:07

10:53:55

10:54:53

10:55:14

10:55:31

Zhang - direct by Officer

3022

1           feel very happy and excited."

2             Do you see that?

3  A.  I see it.

4  Q.  What did you mean when you said that your group "had met

10:56:00   5  many problems which troubled us for a long time"?

6  A.  It's like this, the DMR standard was released in 2005.  I

7  started researching on the standard in 2006.  Our team also

8  needed to look into the standards.  And as I mentioned earlier,

9  some of the portions in the DMR standards are written in a

10:57:02  10  board and vague way, so that is why our team was troubled.

11  Q.  Motorola claims that your e-mail to Sam Chia shows that

12  Hytera did not have a working protocol because it had many

13  problems.  Do you agree with that?

14  A.  I do not agree with that.

10:57:35  15  Q.  Why not?

16  A.  First of all, I would like to clarify on one thing.  Many

17  of the English terms I used in the e-mail were not very good

18  terms or appropriate terms.  As I mentioned earlier, my English

19  comprehension or capability is not very good.

10:58:30  20        So here you can see that I used the words "questions"

21  and "problems" and I thought they actually meant the same

22  thing.  And you can see that I used the word "questions" in the

23  subject line, whereas I use "problems" in the main body of the

24  e-mail.  I have thought those two words could be used

10:58:52  25  interchangeably.

Zhang - direct by Officer

3023

1  Q.  Are those two words interchangeable in Mandrin?

2  A.  Yes, in Chinese they mean the same meaning.

3  Q.  And are there other reasons that you disagree that this

4  e-mail shows that Hytera did not have a working DMR protocol?

10:59:20  5           INTERPRETER LIN:  Counsel, do you mind repeating that?

6  A.

7           MS. OFFICER:  Yeah.

8  BY MS. OFFICER:

9  Q.  Do you have any additional reasons why this e-mail does not

10:59:25  10  show that Hytera did not have a working DMR protocol?

11  BY THE WITNESS (THROUGH INTERPRETER):

12  A.  Yes, I was not finished with my answer earlier.  I just

13  talked about the usage of English words in my first response.

14  Another more important aspect is that, for all the questions I

11:00:27  15  asked in the e-mail, those would not be crucial or serious

16  questions or problems which would impact whether or not we had

17  a working protocol.  Those questions were more about the

18  improvement or enhancement of performance and how to improve on

19  that aspect.  Also, they were about adding new functionalities,

11:00:57  20  and to ensure the interoperability.  Those were more about the

21  performance.  And it is exactly because I asked those questions

22  that would show that we already had a working protocol;

23  otherwise, I would not have asked those questions.

24  Q.  Do you think that any of the questions in your e-mail could

11:01:17  25  not be solved by Hytera engineers?

Zhang - direct by Officer

3024

1   A.  I do not think so.  Before Sam and other Malaysian

2   engineers joined Hytera, our team had already resolved many

3   issues and we already had a protocol that could work normally.

4   Q.  So you asked Sam Chia a number of questions.  Were all 12

11:02:05   5   of these questions your questions?

6   A.  Actually, no.  Some of them are questions raised by me and

7   my team.  Some questions were collected from other teams.

8   Q.  Can you please tell us which questions came from you and

9   your team and which questions came from other teams?

11:02:36   10   A.  Questions 1 through 7 came from me and my team, whereas

11   questions 8 through 12 came from other teams.

12   Q.  And why did you collect questions to ask Sam Chia?

13   A.  I think it was because of two reasons.  The first reason is

14   that Sam Chia did not understand Chinese and all the e-mails

11:03:38   15   and correspondents had to be written in English.  And whether

16   you like it or not, all of the people on our team believed that

17   I was the one on the team whose English was the best.  So I was

18   assigned this task.

19   Another reason is that most of the questions you see

11:04:12   20   here are related to standards, and I had been looking into the

21   standard for a little -- for a long period of time.  I am

22   relatively more familiar with the standard.  So the team

23   thought that I would be a suitable person to raise these

24   questions.

11:04:31   25   THE COURT:  How many people were on your team at that

1    time?

2         THE WITNESS (THROUGH INTERPRETER):  At that time it

3    was about just three or four people.

4         THE COURT:  Proceed.

5    BY MS OFFICER:

6    Q.  And when you say your team, can you tell us exactly what

7    that team is?

8    BY THE WITNESS (THROUGH INTERPRETER):

9    A.  At that time I mainly worked on the development of the call

10   control layer of the protocol stack.  So my team also worked on

11   that.

12   Q.  Mr. Zhang, a number of the questions in your e-mail refer

13   to "Moto."  Do you see that?

14   A.  I see that.

15   Q.  Why were you asking about Motorola's DMR radios?

16   A.  I asked questions related to how Motorola's DMR product

17   worked primarily in order to interoperate with Motorola's

18   devices.

19   Q.  Why did Hytera's DMR radio need to interoperate with

20   Motorola's DMR radio?

21   A.  The reason is that DMR products have to be compliant with

22   the DMR standards, and the purpose of the DMR standards is to

23   allow different devices from different manufacturers to

24   communicate and interoperate with each other.  And at that time

25   we also have different customers who hoped that the DMR

Zhang - direct by Officer

3026

1    standards could be compliant, and the DMR products could

2    practice and follow the DMR standards so that different devices

3    from different companies could interoperate.

4            But the most important reason was that Motorola's DMR

5    product was the only product availability on the market at that

6    time.  So we had to interoperate with their products, we had no

7    other choice.

8    Q.  Couldn't you achieve interoperability simply by following

9    the DMR standard?

10   A.  I provided an example earlier.  The fact that you yourself

11   thinks that you're compliant with the standard doesn't mean

12   that you can interoperate with others.

13   Q.  And when you say that you yourself, you think you're

14   compliant with the DMR standard, are you actually compliant

15   with the DMR standard?

16   A.  We are actually compliant with the standards because we did

17   everything on our own.

18   Q.  So it was that the DMR standard was broad and vague that

19   would allow you to be compliant with it but not interoperable,

20   is that right?

21   A.  Yes.  I also provided an example earlier to address or

22   explain that scenario.

23   Q.  Are there other reasons that you couldn't achieve

24   interoperability simply by following the DMR standard?

25   A.  I also mentioned earlier another possibility or another

Zhang - direct by Officer

3027

1    reason is that Motorola probably did not implement it according

2    to what is described in the standard.

3    Q.  When you asked these questions, did you think any of them

4    required Motorola's confidential information?

11:10:06    5    A.  No.

6    Q.  Why not?

7    A.  The DMR standard is open and public, and the purpose of the

8    standard is to allow different manufacturers to communicate and

9    interoperate with each other.  And I asked those questions

11:11:04    10    regarding how Motorola's -- how Motorola did on their product

11    and how Motorola worked in order to realize the

12    interoperability and it would allow our radio to interoperate

13    and communicate with Motorola's radio.

14        So I mainly paid attention to the interoperability

11:11:28    15    aspect.  And for anything that is outside the standard, any

16    information that is outside the standard, I did not need such

17    information.

18    Q.  If a DMR manufacturer has a product that they claim is

19    compliant with the DMR standard, does that DMR manufacturer

11:11:51    20    necessarily disclose certain information about how its products

21    work?

22    A.  I believe so.  The DMR standard is an open standard.  And

23    if a manufacturer claims that their products are fully

24    compliant with the DMR standard and everything about their DMR

11:13:00    25    product is implemented under or according to DMR standard, they

Zhang - direct by Officer

3028

1  have to open or make public the information regarding their DMR

2  products.

3        Also, the DMR Association has been working on that

4  aspect as well.  They would ask different manufacturers to

11:13:21  5  provide the information regarding how they do their

6  implementations, and they would add such information into the

7  standard so that the standard could be clearer and more perfect

8  and complete.

9        Also, I would like to supplement that with the work

11:13:53  10  that is done by DMR Association as I mentioned earlier, Hytera

11  is involved in it.  Motorola is also involved in it.  We keep

12  adding and providing the information regarding our internal

13  design and implementation to the Association so that such

14  information could be added into the standard to make it more

11:14:14  15  perfect.

16  Q.  Motorola claims that as soon as Sam Chia arrived at Hytera,

17  you and the other Hytera engineers began soliciting Motorola

18  confidential information and trade secrets.  How do you respond

19  to that?

11:14:33  20  A.  Actually, I have never thought about obtaining or

21  soliciting Motorola's information.  And as I also explained

22  earlier, for all those questions that I asked, such a

23  disclosure of such information was not needed.

24  Q.  Would you have asked the questions if they required

11:15:21  25  disclosure of Motorola's confidential information trade

Zhang - direct by Officer

3029

1    secrets?

2    A.  If there have been such questions like this, I would not

3    have asked them.

4    Q.  Do any of Sam Chia's responses to your questions reveal

11:15:47    5    Motorola's confidential information?

6    A.  First of all, I do not know what Motorola's confidential

7    information is.  I have no knowledge about it.

8         Secondly, as I see the responses from Sam Chia, they

9    were quite universal and they were mainly related to standards.

11:16:28    10   Q.  So let's discuss each question response.

11        Question 1, on page 2, is about reverse channel.  Do

12   you see that?

13   A.  I see it.

14   Q.  Can you explain to us, in simple terms, what reverse

11:16:50    15   channel is?

16   A.  The reverse channel is a functionality that is defined in

17   the standard.  It means that when a device is sending signals

18   or in transmission, it could actually receive the control

19   signals that come from other devices.

11:17:26    20        THE COURT:  Simultaneously?

21        THE WITNESS (THROUGH INTERPRETER):  Yes.

22   BY MS OFFICER:

23   Q.  What is control signals -- what are control signals, excuse

24   me.

11:17:49    25   A.  The control information is also a piece of information that

Zhang - direct by Officer

3030

1   is defined, and the DMR standard is related to the interrupt of

2   a call or the power adjustment.

3   Q.  Can you give us an example of what call interrupt

4   information is used for?

11:18:15   5   A.  The functionality of a call interrupt is also defined in

6   the standard.  The main functionality of that is that when

7   there is currently a call ongoing, if there is another call

8   that is more urgent, like an emergency, then I have to

9   establish a call interrupt in order to establish that emergency

11:18:56   10  call in order to perform the call interrupt functionality.

11          THE COURT:  Does that mean that one call is put on

12  hold?

13          THE WITNESS (THROUGH INTERPRETER):  That call will be

14  ended.

11:19:14   15         THE COURT:  Terminated?

16          THE WITNESS (THROUGH INTERPRETER):  Yes.  Terminated.

17          THE COURT:  It's not interrupted.  It's terminated?

18          THE WITNESS (THROUGH INTERPRETER):  It is interrupted

19  first then terminated.

11:19:34   20         THE COURT:  Touche.

21          (Laughter in the courtroom.)

22  BY MS OFFICER:

23  Q.  Why did you ask this question to Sam Chia?

24  A.  The reason is that Sam Chia after he joined the company, he

11:20:01   25  mentioned that the DMR could not support the reverse channel

Zhang - direct by Officer

3031

1  functionality very well.  So we wanted to discuss this

2  functionality with him.

3  Q.  What did Sam Chia say about Motorola's implementation of a

4  reverse channel?

11:20:21  5  A.  He said that Motorola do -- does not support this

6  functionality at all.

7  Q.  Now, please take a look at question 2.

8       Question 2 is about hangtime.  Do you see that?

9  A.  I see it.

11:20:50  10  Q.  Can you explain to us, in simple terms, what hangtime is?

11  A.  The "hangtime" means that when there is a call that needs

12  to be established, a channel has to be assigned or distributed

13  so that people could talk.

14       If there is nobody talking and if there is no hangtime

11:21:57  15  when nobody is talking, the call will be terminated and the

16  channel will be released.  The next time when you want to speak

17  or talk, the channel has to be established and distributed

18  again.

19       If there is hangtime, the channel will be kept for a

11:22:28  20  while when nobody is talking.  And the next time you want to

21  use it, you can use that channel that is already ready.  So it

22  saves time and increases efficiency.  The scope of the hangtime

23  is also defined in the standard.

24  Q.  Your first question refers to the main function of call

11:22:56  25  hangtime and channel hangtime and how to realize those in

Zhang - direct by Officer

3032

1  Motorola.  Why did you ask this question?

2  A.  For these two types of hangtime, there are actually also

3  defined in the standard.  And the reason I asked about the

4  channel hangtime was that we wanted -- it is a functionality

11:23:59  5  related to the repeater.  So we wanted to interoperate with

6  Motorola's repeater as well.  However, we encountered some

7  problems in that aspect at that time.  So I wanted to raise

8  this question to Sam to ask him how Motorola understood it,

9  understood the functionality.

11:24:23  10  Q.  Your second question refers to the difference between data

11  hangtime and voice hangtime.  Why did you ask this question?

12  A.  The main reason is that for the call hangtime, together

13  with data and voice hangtime, they are all actually

14  functionalities defined in the standard, and we have

11:25:18  15  implemented those standards.  However, we did not quite

16  understand why there had to be more than one type of hangtime.

17  We thought that maybe just one could also work.  So we wanted

18  to raise this question and discuss with Sam whether it would

19  work with just one, one type.

11:25:38  20  Q.  So what made you think that Sam Chia would have information

21  about why the DMR standard provided the two different

22  definitions?

23  A.  The reason is that the DMR standard was drafted and

24  established by Motorola.  And Sam Chia came from Motorola.  He

11:26:32  25  used to be in charge of the DMR products.  So I had thought

Zhang - direct by Officer

3033

1    that he probably understood Motorola's information in this

2    aspect and I wanted to ask him how Motorola understood it.

3    Q.  So because Motorola wrote the DMR standard and Sam Chia

4    worked in Motorola, you thought he might have information as to

11:26:58    5    why the DMR standard provided two different hangtimes, did I

6    understand that correctly?

7    A.  Yes.  The reason is that the company that established a

8    standard would be the most knowledgeable party as to why or how

9    it is defined in this way.

11:27:47    10    THE COURT:  Counsel, I've said this before to other

11    attorneys, keep yourself out of the question.

12    MS OFFICER:  Understood.

13    THE COURT:  Please proceed.

14    BY MS OFFICER:

11:27:57    15    Q.  Please take a look at question 3.

16    In question 3 you asked for the processing details of

17    digital emergency signaling in direct mode.  Do you see that?

18    A.  I see it.

19    Q.  And can you explain to us, in simple terms, what digital

11:28:24    20    emergency signaling and direct mode is?

21    A.  Digital emergency signaling is also defined in the

22    standard.  It means that when there is an emergency situation,

23    one can send a special signaling to a pre-configured or

24    predefined receiving party.

11:29:19    25    Q.  And why did you ask this question?

Zhang - direct by Officer

3034

A.  Actually, we already implemented this functionality.
However, we encountered some problems when we were doing the
interoperability testing.  So we wanted to discuss this with
Sam.

Q.  Was this feature operable in your board-to-board test from
August 2007?

A.  In our board to board testing, this one passed.

Q.  What about in your board-to-radio testing?

A.  There were some problems when we were conducting the
board-to-radio testing involving Motorola's device.

Q.  And why did you want to discuss this question with Sam
Chia?

A.  The reason is that I know that Sam Chia came from Motorola,
then I would think that he would have a better understanding
with regards to how Motorola understood this portion of the
standard.

Q.  Please take a look at question 4.

     Question 4 is whether Moto can support FNS service.
Do you see that?

A.  I see it.

Q.  What is FNS service?

A.  The FTN is also a functionality that is defined in the DMR
standard.  The full name of it stands for "functionality not
supported."  And it means that when a service is sent to a
device, if the device does not support that service, it will

Zhang - direct by Officer

3035

1  return a service -- it will return a signaling which says that

2  the service is not supported.

3  Q.  Why did you ask this question to Sam Chia?

4  A.  At that time we already implemented this functionality.  We

11:32:58  5  only wanted to confirm if Motorola supported this

6  functionality.

7  Q.  And please take a look at Sam Chia's response.  Did he

8  reveal any Motorola confidential information?

9  A.  No, because I see that he probably did not even understand

11:33:24  10  what "FNS" stands for.

11         THE COURT:  What was his response?

12         THE WITNESS (THROUGH INTERPRETER):  He said "what is

13  FNS?"

14         THE COURT:  All right.

11:33:40  15  BY MS OFFICER:

16  Q.  Please a take look at question 5.

17         Question 5 on pages 2 to 3 is:

18         "Why the value in answer response field filled

19         by Moto is different from protocol definition in

11:35:12  20         Section 7.2.2 of 102 361-2."

21         Do you see that?

22  A.  I see it.

23  Q.  How did you determine the value of the answer response

24  field filled by Motorola?

11:34:24  25  A.  We could test and get that result by taking a Motorola's

Zhang - direct by Officer

3036

1    product and test it.

2    Q.  And did you do that?

3    A.  Yes, we were doing the testing continuously.

4    Q.  What is the answer response?

11:35:01    5    A.  The answer response is actually a signaling that is defined

6    and required in the DMR standard.  It means that a call is

7    established and there would be a signaling that is returned by

8    the receiving party to the sending party to indicate if the

9    call is accepted or not.

11:35:41    10    Q.  And why did you ask this question?

11    A.  At that time we were already able to support this

12    functionality.  However, after testing with Motorola's device,

13    we felt that we could not interoperate in that aspect or with

14    respect to that functionality.  And we also discovered that the

11:36:22    15    value from Motorola's device was different from the value that

16    was defined in the standard.  So we wanted to ask Sam about

17    this.

18    Q.  Can you please tell us about Sam Chia's response?

19    A.  Sam Chia's response was that the implementation of the code

11:37:02    20    by Motorola might have an error in it.  So the subsequent

21    implementation might be done according to what Motorola did.

22    Q.  Was this subsequent iteration updated to deal with what

23    Motorola did?

24    A.  No, it did not, because at that time when we looked into it

11:37:43    25    and checked that, we found that the updates did not follow what

Zhang - direct by Officer

3037

1 Motorola had done.  So we still implemented and did our work

2 according to what was indicated in the standard instead.

3 Q.  Were you asking for Motorola's confidential information?

4 A.  No, because all the information could be obtained from

11:38:15  5 testing.

6 Q.  Please take a look at question 6.

7       THE COURT:  I don't know if I heard the complete

8 answer.  Could you read back that answer, please.

9       (Record read.)

11:38:35  10      THE COURT:  All right.  Proceed.

11 BY MS OFFICER:

12 Q.  Question 6 is about data term narrative.  Do you see that?

13 A.  I see it.

14 Q.  What is data term narrative?

11:38:50  15      THE COURT:  Counsel, this may be a good stopping point

16 for what is a brunch once again.  A late brunch today.

17       Members of the jury, I told you I owed you

18 seven minutes, and so you may return at ten minutes until 1:00.

19 Does that work out?

11:39:14  20      (Jurors nodding.)

21       THE COURT:  All right.

22       THE CLERK:  All rise.

23       (The following proceedings were had out of the

24       presence of the jury in open court:)

11:39:23  25      THE COURT:  The witness may leave the stand.

Case: 1:17-cv-01973 Document #: 801 Filed: 12/20/19 Page 34 of 118 PageID #:54871
Zhang - direct by Officer
3038

1        The trial will adjourn.  I have another matter to deal

2   with.

3

4

5

6        (Luncheon recess taken from 11:39 o'clock p.m.

7         to 12:50 o'clock p.m.)

8

9

10                *      *      *      *      *      *      *      *

11

12

13   I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

14        RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

15

16   /s/Blanca I. Lara                    December 12, 2019

17

18

19

20

21

22

23

24

25

```
1                  IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
2                          EASTERN DIVISION

3
     MOTOROLA SOLUTIONS, INC.,      )
4    and MOTOROLA SOLUTIONS         )
     MALAYSIA SDN. BHD,             )   Docket No. 17 CV 1973
5                                   )
                  Plaintiffs,       )
6                                   )
                                    )
7              vs.                  )
                                    )
8    HYTERA COMMUNICATIONS          )
     CORPORATION, LTD.; HYTERA      )
     AMERICA, INC.; and HYTERA      )
9    COMMUNICATIONS AMERICA         )
     (WEST), INC.,                  )   Chicago, Illinois
10                                  )   December 12, 2019
                  Defendants.       )   12:54 p.m.
11
                      TRIAL - VOLUME 20B
12                 TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE CHARLES R. NORGLE, SR., and a jury
13
     APPEARANCES:
14
     For the Plaintiff:        KIRKLAND & ELLIS LLP
15                             BY:  MR. ADAM R. ALPER
                                    MR. BRANDON H. BROWN
16                             555 California Street, 27th Floor
                               San Francisco, California  94104
17
                               KIRKLAND & ELLIS LLP
18                             BY:  MR. MICHAEL W. De VRIES
                               333 South Hope Street
19                             Los Angeles, California  90071

20

21
     Court Reporter:
22
                            BLANCA I. LARA
23                       Official Court Reporter
                  219 South Dearborn Street, Room 2342
24                    Chicago, Illinois  60604
                           (312)435-5895
25                   blanca_lara@ilnd.uscourts.gov
```

```
1    APPEARANCES (Continued:)

2

3                              KIRKLAND & ELLIS LLP
                               BY:  MS. MEGAN M. NEW
4                              300 North LaSalle
                               Chicago, Illinois  60654
5
                               KIRKLAND & ELLIS LLP
6                              BY:  MS. LESLIE M. SCHMIDT
                               601 Lexington Avenue
7                              New York, New York  10022

8    Motorola Corporate Representative:  Mr. Russ Lund

9
     For the Defendants:      STEPTOE & JOHNSON LLP
10                             BY:  MR. BOYD T. CLOERN
                                    MR. MICHAEL J. ALLAN
11                                  MS. JESSICA I. ROTHSCHILD
                                    MS. KASSANDRA M. OFFICER
12                             1330 Connecticut Avenue, NW
                               Washington, DC  20036
13
                               STEPTOE & JOHNSON LLP
14                             BY:  MR. DANIEL S. STRINGFIELD
                               227 W. Monroe Street, Suite 4700
15                             Chicago, Illinois  60606

16

17   Hytera Corporate Representative:   Ms. Michele Ning

18

19

20

21

22

23

24

25
```

1     (The following proceedings were had in open court.  Jury
2     in.)
3           (Jury in at 12:53 p.m.)
4           THE COURT:  Good afternoon, members of the jury.
5           Please recall the witness.
6     YINGZHE ZHANG, DEFENDANTS' WITNESS, PREVIOUSLY SWORN
7                 DIRECT EXAMINATION - Resumed
8     BY MS. OFFICER:
9     Q.   Turning back to PTX 1087, please take a look at Question
10    5 on Pages 2 to 3.  There is a reference to Section 7.2.2 of
11    102 361-2.
12          What is that?
13    A.   That's one of the chapters -- one of the documents of
14    the DMR standard.
15    Q.   And then looking at Page 3, there is this portion here
16    that I am going to box in red (indicating).
17          Is that copied from the DMR standard?
18    A.   Yes, it is copied from that document we just talked
19    about.
20    Q.   So before lunch, we were discussing Question 6, which is
21    about data terminator.
22          What is data terminator?
23    A.   Let me introduce this concept first.  In the DMR
24    standard, it defines two kinds of services.  One is the voice
25    service and the other one is data service.  And it also

1    defines two types of terminations.  So one is voice

2    termination.  The other one is data termination.

3           For the voice termination occurs, it has to

4    indicate that the call that is being made currently is

5    ended -- is terminated.  So at the very last frame of that

6    call it would have to send a terminator signaling to indicate

7    that the current voice call has been terminated.

8           In the data service it also defines data terminator

9    service.  So actually at the end of that data block, it also

10   can indicate that the data service has ended.  That's why we

11   believe that it was not that necessary.

12   Q.  You believe that it was not necessary to send a data

13   terminator?

14   A.  That's correct.

15   Q.  So you have explained a couple times that you were

16   asking about whether certain features laid out in the DMR

17   standard were necessary.  Is that not clear from the DMR

18   standard itself?

19   A.  It's like this.  In the DMR standard, it defines a lot

20   of functionalities and services.  And for those

21   functionalities and services, some of them are optional even

22   though they can be implemented.

23          So we wanted to check with Sam to see what his idea

24   or viewpoint on those was.

25   Q.  Please take a look at Question 7.  Question 7 is about

1    IP service.

2              Do you see that?

3    A.   I see it.

4    Q.   What is IP service?

5    A.   The IP service refers to some of the functionalities

6    that are implemented or realized according to TCP/IP.

7    Q.   And what is TCP/IP?

8    A.   It is a Web or Internet protocol.

9    Q.   Why did you ask this question?

10   A.   The IP service is defined in the DMR standard, and we

11   did not quite understand what specific functionalities the IP

12   service could realize or implement.  So we wanted to ask Sam

13   about it.

14   Q.   And what was Sam Chia's response?

15   A.   Sam told us that the IP service could support services

16   such as telemetry or text messaging, services like those.

17   Q.   Was this Motorola's confidential information?

18   A.   I don't think it is confidential information because for

19   information like this, we can see such information from, for

20   example, Motorola's user manuals or their configuration

21   software.

22   Q.   So if you could get this information from Motorola's

23   user manuals or configuration software, why were you asking

24   Sam Chia?

25   A.   The reason is that we might have already obtained such

1    information.  However, since Sam was our leader at that time,

2    I would have thought that he had already had understanding of

3    this aspect.  So I think -- I thought that asking him will be

4    the highest -- the most efficient way.

5    Q.   And were Motorola's user manuals and configuration

6    software publicly available?

7    A.   Yes.

8    Q.   Now, let's discuss Questions 8 through 12.

9         You mentioned earlier that Questions 8 through 12

10   were from other teams.

11   A.   Correct.

12   Q.   Do you know why these other teams were asking these

13   questions?

14   A.   I know.

15   Q.   And what is that reason?

16   A.   I think it consists of two aspects.

17        The first one is that some of the people on those

18   teams were working on the development of repeaters.  So they

19   were asking questions, basic questions, about the work and

20   development related to repeaters.

21        Another aspect is that some of those people were

22   working on the work related to the removal of the FPGA

23   hardware.  And they were also working on the optimization

24   work.  So they were asking about -- they were asking

25   questions about the optimization.

1    Q.   And at this point when this email was sent, in June of

2    2008, had there been a formal decision to remove the FPGA

3    yet?

4    A.   Yes.

5    Q.   So I would like to discuss Sam Chia's response to

6    Question 11 on Pages 3 to 4.

7              In Question 11 you ask for suggestions about code

8    arrangement memory.

9              Do you see that?

10   A.   I see it.

11   Q.   Does this relate to removing the FPGA?

12   A.   Yes.

13   Q.   Can you explain that to us?

14   A.   At that time, Sam asked us to remove the FPGA hardware.

15   So in order to do that, we need to move the code from the

16   FPGA to the DSP chip.  And there were some problems that we

17   had with respect to the implementation and the workload and

18   the optimization.  That is why we asked this question.

19   Q.   When you said "DSP chip," did you mean DSP core of the

20   OMAP chip?

21   A.   Yes.

22   Q.   Sam Chia responds with some pretty specific numbers.

23             Do you agree?

24   A.   I agree.

25   Q.   Do you think that this is Motorola's confidential

Case: 1:17-cv-01973 Document #: 891 Filed: 12/20/19 Page 42 of 118 PageID #:54872
Zhang - direct by Cliff
3046

1  information?

2  A.  First of all, I do not know where the numbers came from.

3  I also do not know if the information is Motorola's

4  information.  However, according to my analysis, I think

5  these numbers and information were the numbers and

6  information of Hytera's products.

7  Q.  And why did you think that these were the numbers and

8  information of Hytera's product?

9  A.  It's like this.  For this question, we were asking Sam

10  to provide us with suggestions or recommendations with

11  respect to the optimization of the memory on Hytera's

12  product.  So if we are to perform optimization work for

13  Hytera's product, it has to be based on the data of Hytera's

14  product.  If it's done based on other people's data and

15  information, it will be pointless.

16      Another reason is that, since we were going to

17  remove the FPGA, we had to move the program code from the

18  FPGA to the DSP chip so that the code could run on the DSP

19  chip.  However, such code would take up a lot of space in the

20  memory.  And at that time we had limited space on the DSP

21  chip.  It seems like the total size of the memory on DSP was

22  160 K bytes.  And it seems like we already took up a lot of

23  space.  I would say that the figure or the number 159 K bytes

24  was close to what the real situation was back then.

25      At that time we had to do a lot of optimization

1    work in order to reduce the size of the memory that is
2    occupied.
3    Q.   And the total capacity of the DSP core of the OMAP chip
4    is 160 kilobytes; is that right?
5    A.   Yes, that's what the user manual of the chip says.
6    Q.   And the DSP core of the OMAP is also known as the C55?
7    A.   Yes.
8    Q.   Please turn to PTX 0484.
9         What is this document?
10   A.   This is an email I sent to Sam and his response.
11   Q.   What is the date of the first email in this chain?
12   A.   November 3rd, 2008.
13   Q.   And is this an email that was produced from Hytera's
14   files?
15   A.   Yes.
16        MS. OFFICER:  Your Honor, we request that PTX 0484
17   be moved into evidence.
18        MR. ALPER:  No objection.
19        THE COURT:  It is received and may be published.
20        (Said exhibit was received in evidence.)
21   BY MS. OFFICER:
22   Q.   What is the subject of this email?
23   A.   The subject says, "Some questions about DMR protocol
24   stack implementation."
25   Q.   Motorola claims that this email shows that you

1  perpetually sought Motorola's confidential information and

2  trade secrets from Sam Chia.

3          How do you respond to that?

4  A.   I total disagree with that.

5  Q.   Why is that?

6  A.   Because if you look at the questions that I asked, for

7  those questions I asked, in responding to those questions,

8  one does not need confidential information from Motorola.

9          Also, if you look at Sam's response, I don't

10 believe he involved Motorola's confidential information when

11 responding to these questions.

12 Q.   Can you explain what you are asking for in your email

13 starting with Questions 1 and 2?

14 A.   For Questions 1 and 2, those were related to our testing

15 that we performed for testing the functionalities of

16 Motorola's radio.  We obtained some data from the testing.

17 We wanted to confirm this data with Sam.

18 Q.   What about the third question?

19 A.   The third question relates to a definition in the

20 standard, and we wanted to ask Sam what value we should look

21 for or look to in the definition so we could use it.

22 Q.   Did you ask anything about Motorola?

23 A.   No.

24 Q.   What does Sam say in response to your question?

25 A.   He said that Motorola did not support that feature.

1    Q.   And what about the fourth question on Page 3?

2    A.   The fourth question relates to Hytera's internal design,

3    and Sam's response to this was quite universal -- was

4    standard practice in the industry.  It is also related to

5    standard.

6    Q.   What about the last question on pseudo trunking?  What

7    are you asking for there?

8    A.   I was also asking about questions related to Hytera's

9    internal design, and those questions were not related to

10   Motorola at all.

11   Q.   Could all the questions in both of your emails be solved

12   by the Hytera Chinese engineers?

13   A.   Yes.

14            MS. OFFICER:  I have no further questions.

15            THE COURT:  Did you ever meet with Sam

16   face-to-face?

17            THE WITNESS:  Specifically what time frame?  The

18   time frame I asked those questions in the emails?

19            THE COURT:  When, if ever, did you meet

20   face-to-face with Sam?

21            THE WITNESS:  Yes.

22            THE COURT:  When?

23            THE WITNESS:  I don't remember the specific time,

24   but I think it was shortly after he came over to Hytera.

25            THE COURT:  How many times did you meet with Sam

```
 1    face-to-face?
 2            THE WITNESS:  I don't remember the specific number
 3    of times, but I think it was many times.
 4            THE COURT:  Cross?
 5            MR. ALPER:  Yes.
 6                       CROSS-EXAMINATION
 7    BY MR. ALPER:
 8    Q.   Good afternoon, Mr. Zhang.  I'm Adam Alper.  It's good
 9    to see you again.
10            MR. ALPER:  May I proceed?
11            THE COURT:  Yes.
12    BY MR. ALPER:
13    Q.   You testified -- I am going to show you PTX 542.  It's
14    already been admitted.  This is a different -- slightly
15    different version.  This is the original version of the email
16    that you sent to Mr. Chia, your email welcoming Mr. Chia.
17            Do you see that?
18    A.   I see the document.
19    Q.   And you spent some time testifying about that this
20    morning and a little bit this afternoon, right?
21    A.   Correct.
22    Q.   And whatever you meant when you wrote these various
23    things in this email, you do not deny that Hytera is using
24    Motorola source code in its products, correct?
25    A.    It's like this.  I did not know about such information
```

Case: 1:17-cv-01973 Document #: 801 Filed: 12/20/19 Page 47 of 118 PageID #:54864
Zhang - cross - by Pause
3051

1    until this trial.  So I know there is a thing, but I do not

2    know the specifics.  I do not know what was used.

3    Q.   You know that Motorola source code was used in Hytera's

4    products, correct?

5    A.   Yes.

6    Q.   And whatever you meant by this email (indicating), you

7    know that Hytera is currently in possession of confidential

8    Motorola documents, right?

9    A.   I'm not too clear about the confidential documents that

10   you are talking about.

11   Q.   You can't say whether Hytera is even in possession of a

12   single one of Motorola's confidential documents?

13   A.   Somebody might have mentioned that some confidential

14   documents were involved in this case, but I do not know what

15   specific documents they were referring to.

16   Q.   You testified about -- when you were testifying about

17   this email, the welcome email, PTX 542, you were testifying,

18   generally speaking, about wanting to know information about

19   whether Motorola complied with the DMR standard.

20            Do you recall that testimony?

21   A.   Yes.

22   Q.   And you know that whether or not Motorola complied with

23   the DMR standards in 2008 or really at any point in time,

24   that doesn't allow Hytera to use Motorola's code -- source

25   code, right?

1  A.   When I asked those questions, I was not aware if there

2  was anything from Motorola in our code.  I was not clear

3  about that.

4  Q.   I understand, but whether or not Motorola complies with

5  the DMR standard, you would agree that does not allow Hytera

6  -- that is not an excuse for Hytera to use Motorola's source

7  code in its products, right?

8  A.   That's correct.

9  Q.   And you showed this document.  This is PTX 1988.  It had

10  to do with the prototype you were working on.

11       Do you recall that?

12  A.   I remember.

13  Q.   And you would agree that whether or not Hytera had a

14  working prototype before 2008, that does not allow Hytera to

15  use Motorola's trade secrets, right?

16  A.   Yes.

17  Q.   Let me go back to your email.

18       You did provide testimony about this email, right?

19  A.   Correct.

20  Q.   But you are not here to explain the actions of G.S. Kok,

21  Sam Chia, or Y.T. Kok, who are your bosses at Hytera, right?

22  A.   I'm here to offer explanations for things that I know.

23  I am not aware if I am here to offer explanations on other

24  people's behavior.

25  Q.   You are not here to testify about whether there are 1600

1    Motorola confidential documents still in Hytera's possession
2    today, right?
3    A.   First of all, I am not aware of what you just told me.
4          Secondly, I know that I am here today to testify on
5    the facts that I know.
6    Q.   And you are not here to testify about whether the
7    entirety of Motorola's source code was found on Mr. Chia's
8    computer at Hytera?
9    A.   I'm not aware of that.  I'm not clear about it.
10   Q.   And you are not here to testify about whether Peiyi
11   Huang of Hytera sent to Huang Ni --
12         THE COURT:  That's enough.
13         MR. ALPER:  Okay.
14         THE COURT:  That's arguing with the witness.  The
15   witness must understand that he is here to give truthful
16   answers to the questions put to him by counsel.
17         Say that to the witness, please.
18         Do you understand that that's why you are here, to
19   give truthful answers to the questions put to you by the
20   attorneys?
21         THE WITNESS:  Correct.
22         THE COURT:  That's why you are here.
23         Ask a question of the witness.
24         MR. ALPER:  I will.  I will rephrase.
25         MR. CLOERN:  May we for one second?

1          (The following proceedings were had at sidebar:)

2          MR. CLOERN:  I apologize, your Honor.

3          I'm not sure the part that was translated -- my

4    worry is the only part that got translated was, you are here

5    to give truthful answers.  And I'm concerned that may confuse

6    the witness because it may not have been translated, the

7    first part, which was:  That's enough.  You are arguing with

8    the witness.

9          THE COURT:  No, no.  Those three -- I stopped

10   counsel when he was asking the fourth time.  There were no

11   objections to the first, second, or third.  If you had

12   objected, I would have sustained the objection the first time

13   you made it, but you did not.  I am fulfilling my function as

14   the Judge.  When an unfair question was being put to the

15   witness for the fourth time, I stepped in.

16         So what I'm saying to the witness -- and I think he

17   understands that, and he agrees with it -- his function is

18   simply to answer truthfully the questions put to him by

19   counsel.  I don't think it needs any more than that.

20         MR. CLOERN:  Thank you, your Honor.

21         THE COURT:  Okay.  Thank you, Counsel.

22         (End of sidebar proceedings.)

23         THE COURT:  Proceed.

24         MR. ALPER:  Yes, your Honor.

25

1    BY MR. ALPER:

2    Q.   Do you know whether Peiyi Huang sent Huang Ni Motorola

3    source code?

4          THE INTERPRETER:   Counsel, can you mention the

5    second name again.

6          MR. ALPER:   Huang Ni.

7    BY THE WITNESS:

8    A.   I do not know.

9    BY MR. ALPER:

10   Q.   Do you know whether Qin Jun and Deyou Zhu are in

11   possession of Motorola confidential documents?

12   A.   I do not know.

13   Q.   Do you know whether Julie Yang is in possession of a

14   Motorola confidential document about testing?

15   A.   I don't know who that person is.

16   Q.   Do you know whether Chairman Chen was responsible for

17   hiring Mr. Chia, Mr. G.S. Kok, and Mr. Y.T. Kok?

18   A.   I do not know who hired them.

19   Q.   You have been an employee of Hytera for nearly 15 years,

20   correct?

21   A.   Yes.

22   Q.   And you know there are certain obligations you have as a

23   Hytera employee, correct?

24   A.   Correct.

25   Q.   For instance, you have to show up to work on time,

Case: 1:17-cv-01973 Document #: 801 Filed: 12/20/19 Page 52 of 118 PageID #:54868
Zhang - cross - by Alper
3036

1  right?

2  A.   Yes.

3  Q.   You have to try to do a good job?

4  A.   Yes.

5  Q.   But one of the things that you are not obligated to do

6  by Hytera is to avoid stealing another company's trade

7  secrets, correct?

8  A.   For this part, I do not remember if it has ever been

9  required.

10 Q.   You cannot recall any obligations that you have as an

11 employee of Hytera to ensure that you do not use another

12 company's confidential information in developing Hytera's

13 products, correct?

14 A.   That is correct.

15 Q.   And that's why you and your colleagues were comfortable

16 repeatedly asking Motorola -- withdrawn.

17         That's why you and your colleagues were comfortable

18 repeatedly asking for Motorola's information over and over

19 and over again, right -- Motorola's confidential information?

20 A.   First of all, I did not ask about Motorola's

21 confidential information in this email.  I simply referenced

22 MOTO.

23 Q.   We will come back to that.

24         In this email, in order to gain an understanding of

25 how Hytera should implement DMR, you asked Mr. Chia many

1   questions about Motorola's DMR products, right?

2   A.   I did not ask how Hytera should implement that because

3   we had already implemented it.  I simply asked Sam Chia

4   regarding how we could interoperate with Motorola.

5   Q.   You remember having your deposition taken in this case,

6   correct?

7   A.   Correct.

8   Q.   And obviously you were attempting to be as accurate as

9   you could have at that deposition, right?

10  A.   Correct.

11  Q.   I am going to read you Page 52, Lines 9 through 12 of

12  your deposition.

13        MS. OFFICER:  Objection, your Honor.  Putting up

14  the testimony prior to being impeached.

15        THE COURT:  Do you have a page?

16        MR. ALPER:  I did.  It's Page 52, Lines 9 through

17  12.  And I already asked the question that I am going to

18  impeach him with, with this testimony.

19        THE COURT:  You are laying the foundation for

20  impeachment on a prior inconsistent statement.

21        MR. ALPER:  Yes.  Exactly.

22        THE COURT:  Proceed.

23  BY MR. ALPER:

24  Q.   You were asked, "In order to gain an understanding of

25  how Hytera should implement DMR, you asked Mr. Chia many

1  questions about Motorola's DMR products, correct?"

2  And your answer was, "Yes."

3  Was that your testimony?

4  A.  That's correct.

5  Q.  Now, today you testified that what you were asking about

6  was for purposes of interoperability, right?

7  A.  Correct.

8  Q.  But back in 2008, before Hytera was sued, the reason you

9  were asking the questions was to figure out how Hytera should

10  implement DMR, correct?

11  A.  That's correct.  However, I would like to add one more

12  thing.  Since this question was asking about how Hytera could

13  do its implementation, in order to operate -- interoperate

14  with Motorola, that would be part of the implementation

15  Hytera was working on.

16  Q.  Let's come back to that in a second.  We will come back

17  to that.

18  The questions that you asked Mr. Chia about

19  Motorola's DMR products regard information that you did not

20  have at Hytera before Mr. Chia, Mr. Kok, and Mr. Kok, the

21  Motorola engineers, joined, correct?

22  A.  Not entirely so.  For some pieces of information, we

23  already knew about it, and we already had such information.

24  We simply wanted to confirm the information.

25  Q.  I am going to show you Page 52, Lines 14 through 18 of

Case: 1:17-cv-01973 Document #: 801 Filed: 12/20/19 Page 55 of 118 PageID #:54802
Zhang - cross - by Alper
3059

1    your deposition.

2          You were asked, "The questions that you asked

3    Mr. Chia about Motorola's DMR products regard information

4    that you did not have before the Motorola engineers joined,

5    correct?"

6          Your answer was, "That's correct."

7          Was that your testimony?

8    A.    That's correct.  However, this means -- or what I was

9    trying to say here was that we were not certain if the

10   information we already had would be the information as

11   understood or held by those Motorola engineers -- former

12   Motorola engineers.  So we simply wanted to confirm the

13   information with them.

14   Q.    And we were talking about how you can't recall any

15   obligations at Hytera to not use another company's

16   confidential information.

17         You can't recall ever having told Mr. Chia not to

18   provide confidential Motorola information, correct?

19   A.    That's correct.

20   Q.    I think you testified about this on direct.  You said

21   you didn't come up with these questions on your own.  You

22   collected them from other engineers at Hytera, right?

23   A.    That's correct.

24   Q.    And you can't recall any instance where the other

25   engineers at Hytera who were feeding you these questions told

1  you that Sam Chia should not provide Motorola confidential

2  information, right?

3  A.   That's correct.

4  Q.   In fact, you are not aware of anyone at Hytera doing

5  anything to assess whether the information that Mr. Chia gave

6  to you about how Motorola's DMR products were implemented is

7  confidential to Motorola?

8  A.   That is correct.

9  Q.   And as far as the lack of any obligations to not use

10  someone else's confidential information at Hytera goes, you

11  can't recall any instance where someone at Hytera instructed

12  you not to use Motorola's confidential information in

13  developing Hytera's products, correct?

14  A.   That is correct.

15  Q.   That's just the way you do business at Hytera, right?

16  A.   No.   I simply said I do not remember.   It doesn't mean

17  that the company does not have such a requirement.

18  Q.   But you would agree that it is wrong to use another

19  company's confidential information without permission, right?

20  A.   Yes.

21  Q.   If we go to the email -- we have seen this email a few

22  times, so I'm not going to -- I'm going to skip over a few

23  things.

24        First, you testified that you were welcoming

25  Mr. Chia, and everyone was very excited about his arrival,

1    right?

2    A.    Yes.

3    Q.    And then you go down here and you talk about how, "Our

4    group has been engaged in protocol development for a period

5    of time and met many problems which troubled us for a long

6    time."  Right?

7    A.    I see it.

8    Q.    And I believe your testimony was that the "many

9    problems" that you were referring to had to do with a problem

10   with interoperating with Motorola's products?

11   A.    I could only say that there were problems related to

12   interoperating with Motorola's devices, but I will not say

13   many.

14   Q.    And when you say "many problems" here, you are not

15   talking about problems with interoperating with Motorola at

16   all.  What you are talking about is having problems with

17   producing a DMR terminal at Hytera, correct?

18   A.    Can you please repeat the question.

19   Q.    Yeah.

20            What you are talking about when you say "many

21   problems" is having many problems with producing a DMR

22   terminal at Hytera?

23   A.    Actually I offered my explanation for this email

24   earlier.  A lot of words that I used in this email were not

25   accurate or precise.  Actually the problem here with the

1    questions, it simply meant that we had a lot of questions

2    regarding the work that we did on our products.  It doesn't

3    mean that we had many problems with our products.

4    Q.    I am going to show you your deposition at Page 36, Line

5    23 to Page 37, Line 3.

6              Here you were asked, "If we use your understanding

7    of the word 'many' in the context of having many problems,

8    isn't it correct that at the time that Motorola engineers

9    joined Hytera, Hytera was having many problems with producing

10   a DMR terminal?

11             "A.  Yes, there were many problems."

12             Was that your testimony?

13   A.    Yes.

14   Q.    And when you gave that answer, you didn't say anything

15   about interoperability, right?

16   A.    That is correct.

17   Q.    In fact, you can see right below that you couldn't

18   recall any of the problems at the time.  That's what you said

19   there, right?

20   A.    I need to read this in detail in its entirety because I

21   am not quite understanding what was being talked about here.

22   Q.    And isn't it correct that in your email, PTX 542, the

23   word "interoperability" never comes up once?

24   A.    That's correct.

25   Q.    And when you were deposed, you were deposed for at least

Case: 1:17-cv-01973 Document #: 801 Filed: 12/20/19 Page 59 of 118 PageID #:54896
Zhang - cross - by Pauper
3063

1  seven hours, right?

2  A.   That's correct.

3  Q.   And not once during your deposition did you say that the

4  reason for the many problems was because you were having

5  problems interoperating with Motorola's products, correct?

6  A.   That is correct.  However, these questions that we asked

7  were about the standards as well as the implementation done

8  by Motorola.  And since Motorola's implementation equals to

9  the implementation of the standard, the fact that we asked

10  those questions regarding the standard would also be

11  considered as questions related to interoperability.

12  Q.   At your deposition you couldn't remember what the

13  problems were about at all, right?

14  A.   I am not clear or sure as to what portion you are asking

15  or referring to when you said I don't recall problems or I

16  don't recall the questions.

17  Q.   I will show you Page 37, Lines 4 through 7 of your

18  deposition.  You were asked:

19           "Q.   And what were those problems?

20           "A.   I do not recall.

21           "Q.   Can you recall any of them?

22           "A.   I don't recall the specifics."

23           Was that your testimony?

24  A.   I remember this.  However, since I saw it just at my

25  deposition, for many of the things I could not recall at my

1    deposition.

2    Q.   But here at trial you have -- you say that these

3    questions had to do with the standards?

4    A.   That's correct.

5    Q.   And at your deposition you said it had to do with

6    producing a DMR terminal, right?

7    A.   Yes.

8    Q.   In your email -- in your email you say that the reason

9    that you hoped to learn more from Mr. Chia is to improve your

10   ability in the protocol stack and DSP immediately, right?

11   A.   Yes.

12   Q.   You gave testimony about how you never thought about

13   asking for Motorola confidential information because, for

14   what you asked, Motorola's confidential information was not

15   needed; is that right?

16   A.   Yes.

17   Q.   I just want to take a look at a couple of these.

18            You testified about Item 2.  Item 2 in your

19   email -- I'm not going to go through all of them.  But Item 2

20   in your email is about hangtime?

21            Yes?  It's about hangtime?

22   A.   Yes.

23   Q.   And isn't it correct that, after looking, when you sent

24   this email in June 2008, you had not found any publicly

25   available information concerning the details of how Motorola

1   realized its hangtime features?

2           Let me withdraw that question.

3           Just for some context, in your question, you are

4   asking how Motorola realized hangtime, right.

5   A.   Correct.

6   Q.   And by "realize" you mean, how did Motorola implement

7   it?

8   A.   I also offered my explanation earlier, but many of the

9   words used in this email, they were not so precise or

10  accurate.

11          I actually meant to ask about Motorola's

12  understanding with respect to the implementation of the

13  standard.  It might not be so clear.  Maybe in Chinese it

14  refers to another meaning.  However, the English term here --

15  used here is not very precise.

16  Q.   It's your testimony that you wanted to know how Motorola

17  implemented the standard.  That's what your testimony is?

18  A.   I was asking about how they would understood the content

19  of the implementation of standards.

20  Q.   Okay.  So let me -- I will re-ask my question in a

21  different way.

22          What you meant by this question was to ask Sam Chia

23  his understanding of the DMR standard with respect to

24  hangtime?

25  A.   Yes.

1    Q.    But what you actually asked him was how to realize

2    hangtime in MOTO, right?

3    A.    Correct.

4    Q.    And at the time you sent this email, in June 2008, you

5    had not found any publicly available information concerning

6    the details of how Motorola realized its hangtime features,

7    correct?

8    A.    I have searched it on the Internet, but I did not look

9    into it in detail.  However, we could obtain such information

10   by testing.

11   Q.    I am going to show you your deposition at 62, Lines 16

12   through 21.  You were asked:

13            "Q.  At the time you sent your email to Mr. Chia in

14   2008, you were not aware of any publicly available

15   information concerning the details of how Motorola realized

16   its hangtime features, correct?

17            "A.  I did not find any."

18            Is that your testimony?

19   A.    Correct.

20   Q.    Let's take a look at Item 7.  You say here, "How did

21   MOTO realize related IP service?"

22            Do you see that?

23   A.    I see it.

24   Q.    And this question regards the processing details of the

25   IP service, right?

1    A.    Yes.

2    Q.    And here you were asking how Motorola implemented the IP

3    service -- or IP services, correct?

4    A.    It was not about whether or not it can be realized.  It

5    was simply about what service or services could be supported.

6    Q.    But in your email you asked how Motorola realized

7    related IP services, correct?

8    A.    Yes, but still it's the same explanation, that the

9    English phrases or expressions that I used may not be so

10   accurate.  It was about realizing some kind of service.

11   However, the English syntax or the phrases that I used might

12   not be able to accurately convey what I actually wanted to

13   ask.

14   Q.    And you testified on direct that you didn't think that

15   this this related to confidential information because Hytera

16   might have already obtained such information.

17            Was that your testimony?

18   A.    Correct.

19   Q.    But at the time you sent this email to Mr. Chia, you had

20   not found any publicly available information concerning the

21   details of how Motorola realized its IP service, correct?

22   A.    I would like to explain here.  The fact that I said that

23   I did not find any, it means that I did not find any on the

24   searches that I performed on the Internet.  I didn't say that

25   I did not find any on other channels.  I did not say that.

1   Q.   Let me show you your deposition at Page 63, Lines 13

2   through 18.  You were asked:

3            "Q.   And at the time you sent your email to

4   Mr. Chia, you were not aware of any publicly available

5   information concerning the details of how Motorola realized

6   its IP service, correct?

7            "A.   I did not find it."

8            Was that your testimony?

9   A.   Yes, because at that time the only thing that came to my

10  mind might have been just the searches I performed on the

11  Internet.  I did not think of or memorize or recall any other

12  channels of source -- of information.

13  Q.   Item 10 -- in Item 10 here -- Question 10, you ask about

14  what the best way is to realize the DSP bootloader.

15           Do you see that?

16  A.   I see it.

17  Q.   And here you were asking about how Motorola realized its

18  DSP bootloader, right?

19  A.   No.

20  Q.   Well, the three questions beforehand all are asking

21  about Motorola, right?

22  A.   Yes.

23  Q.   And the question after is asking about Motorola, right?

24  A.   Correct.

25  Q.   And Mr. Chia, when you sent this email, he had just come

1    from Motorola, right?

2    A.   Correct.

3    Q.   But it's your testimony that this one question here

4    (indicating), that's not about Motorola?

5    A.   Correct.

6    Q.   And you had testified that the questions had to do

7    generally with standards, right?

8    A.   Correct.

9    Q.   But the DSP bootloader, that's not in the standards,

10   right?

11   A.   That's correct.

12   Q.   And you asked Mr. Chia to give you some suggestions

13   about this feature, right?

14   A.   Yes.

15   Q.   And I am going to now go to PTX 112.  This is Mr. Chia's

16   response.  It's already been admitted.

17              And you showed this exhibit, his response, during

18   your testimony?

19   A.   What do you mean by direct examination or direct

20   testimony?

21   Q.   You discussed this email, Mr. Chia's response, when

22   Ms. Officer was asking you questions?

23   A.   Yes.

24              THE COURT:  Before lunch.

25              THE WITNESS:  I understand.

Case: 1:17-cv-01973 Document #: 801 Filed: 12/20/19 Page 66 of 118 PageID #:54003
Zhang - cross by Alper
3070

1        THE COURT:  Proceed.

2        MR. ALPER:  Yes, your Honor.

3  BY MR. ALPER:

4  Q.   And Mr. Chia here, he says, "Thanks for the welcome.

5  You sure have lots of questions."  Right?

6  A.   I see it.

7  Q.   And he says, "Please see the answers in your email"?

8  A.   I see it.

9  Q.   And that's because Mr. Chia had embedded answers to your

10  questions in your email, right?

11  A.   Correct.

12  Q.   But those answers weren't --

13        THE COURT:  Counsel, what is the date of this

14  exhibit?

15        MR. ALPER:  The date of this -- may I ask the

16  question?

17        THE COURT:  The number of the exhibit and then the

18  date of the exhibit, yes.

19        MR. ALPER:  Yes.

20  BY MR. ALPER:

21  Q.   So what is the date of Mr. Chia's response in PTX 112?

22  A.   June 23rd, 2008.

23  Q.   And that's later in the same day that you sent your

24  email that we were looking at before?

25  A.   Correct.

1    Q.   Okay.  And the answers that Mr. Chia typed into the

2    email in response to your email below, that wasn't the full

3    extent of the answers he was going to give you, correct?

4              THE INTERPRETER:  Counsel, did you say was or

5    wasn't?

6              MR. ALPER:  Was not.

7    BY THE WITNESS:

8    A.   I do not know about it.  I would feel that he had

9    provided the ultimate or the final answers that he could

10   give.

11   BY MR. ALPER:

12   Q.   He says right here in the email, "Please feel free to

13   drop by and discuss about some of these issues.  Some of them

14   need some discussion rather than just a one-time response via

15   email."  Correct?

16   A.   I see it.

17   Q.   Let's go to the DSP bootloader question.  Here is

18   Question 7 on Page 112.3, where you asked about how MOTO

19   realized -- I'm sorry.  Not Question 7.  Let me withdraw that

20   and start again.

21             Question 10, where you asked, "What's the best way

22   to realize the DSP bootloader?"

23             And Mr. Chia provides some information about that

24   regarding how you should use an ARM bootloader, which will

25   take a copy of the DSP from flash to the SDRAM, map the SDRAM

1    to -- oops.  Thank you.

2              Let me start that again.  Sorry.

3              You asked about what the best way to realize the

4    DSP bootloader is.

5              Mr. Chia responds here with information about how

6    to use the ARM bootloader and how that will copy the DSP from

7    flash to the SDRAM and map the SDRAM to the C55 memory space.

8    Then it will start the C55 from that start vector.

9              Do you see that?

10   A.   I see it.

11   Q.   And that's pretty technical information there, right?

12   A.   I would think this is common sense instead of being very

13   technical because that's how bootloader is realized

14   universally.

15   Q.   Now, you didn't ask any of your colleagues on this email

16   how to realize the DSP bootloader.  You saved that one for

17   Mr. Chia, who had just come in from Motorola, right?

18   A.   That's correct.

19   Q.   And Mr. Chia, he didn't know how to answer you.  He had

20   to go ask Y.T. Kok, correct?

21   A.   I don't know what it means.  It simply writes "Y.T."

22   there.  I do not know if he actually went to ask Y.T.

23   Q.   Just a couple more.

24             So you talked about -- let me ask you Question 8.

25   This here, you are asking the "working process of the MOTO

1    repeater," right?

2    A.   Correct.

3    Q.   And that's because you wanted to know how things worked

4    inside of the Motorola repeater, right?

5    A.   No.

6    Q.   Well, here you ask about how the repeater needs to

7    analysis, or analyze, the content of the physical layer frame

8    or just repeat the frame transparently, right?

9    A.   I see it.

10   Q.   And Mr. Chia, he responds about how the repeater needs

11   to decode some information.

12           Do you see that?

13   A.   I see it.

14   Q.   And decoding, that happens inside the repeater after the

15   data comes in, right?

16   A.   I do not know if the decoding --

17           THE INTERPRETER:   Interpreter re-rendition.

18   BY THE WITNESS:

19   A.   I am not quite sure what decoding -- what information is

20   being decoded here or what process or what stage of the

21   decoding this refers to.

22   BY MR. ALPER:

23   Q.   But the decoding with respect to a repeater, the

24   repeater does the decoding after the information, the data,

25   or the voice comes into the repeater, correct?

1   A.   That's how it usually works.

2   Q.   And then Mr. Chia goes on to talk about how all packets

3   will need to go through the LMAC decode and the LMAC encode.

4        Do you see that?

5   A.   I see it.

6   Q.   And that's happening after the data comes into the

7   repeater, within the repeater, right?

8   A.   Yes.

9   Q.   And then in Question 11 you asked about how much memory

10  occupied by the code section and data section separately of

11  the DMR protocol stack in MOTO, right?

12  A.   I see it.

13  Q.   And if we look at Mr. Chia's answer, I believe you did

14  testify that there was a fair amount of technical detail that

15  was provided here, correct -- testified earlier before lunch?

16  A.   I could only say not the data.  He provides a lot of

17  data here with respect to the numbers that we see here, but I

18  would not say it's technical.  Numbers or data would not be

19  considered as technical.

20  Q.   And you said you thought that this information actually

21  was about Hytera, not Motorola, right?

22  A.   I said that it was based on my analysis.

23       First of all, I do not know where those numbers

24  came from.  I could only say that it is Hytera information

25  after I did my analysis.

1    Q.   So you asked for -- your testimony is that you asked for
2    Motorola information and you got Hytera information.  That's
3    your testimony?
4    A.   Yes.
5    Q.   And you know that this information here that Mr. Chia
6    provided you, that's not publicly available, right?
7    A.   I do not know if the information listed here is public
8    or not.
9            THE COURT:  Would it be available in a user's
10   manual?
11           THE WITNESS:  The overall information, meaning how
12   many of them, can be seen or found in user manuals.
13   BY MR. ALPER:
14   Q.   That's your testimony, that the information that
15   Mr. Chia provided can be seen or found in public user
16   manuals?
17   A.   I did not say that.  That's not what I said.
18           I simply said that the overall information can be
19   seen in user manuals, but I still do not know where the
20   information he listed here came from or what information it
21   is.
22   Q.   And it would be reasonable to infer that, since you
23   asked for Motorola information, that this nonpublicly
24   available information that he responded with comes from
25   Motorola, right?

1    A.    I don't think it is reasonable.  This question actually

2    can be broken down into three aspects.  The third aspect

3    would be the most important one for us.

4          In that aspect, we wanted to ask about the

5    distribution or allocation of the memory on Hytera's product.

6    We believe that that was the most crucial one, and we wanted

7    to ask him about it.

8    Q.    The last one I want to go to is -- you said one of the

9    aspects about the memory that was crucial?

10   A.    Yes.

11   Q.    Okay.  The last one I want to go to is this answer and

12   response field.

13         It was your testimony that you wanted to -- this

14   was a question about determining what the value was in

15   Motorola for the answer and response field, correct?  Correct

16   me if I'm wrong on that.

17   A.    I'm sorry.  I didn't quite get the question.

18   Q.    I'm sorry.  Here is the original email, PTX 542.  You

19   ask in Question 5 why the value in the "Answer Response"

20   field filled by Motorola is different from protocol

21   definition in Section 7.2.2 of the ETSI standard, right?

22   A.    That's correct.

23   Q.    And you said that you weren't asking for Motorola's

24   confidential information because all of the information that

25   you were talking about here could be obtained by testing,

1  right?

2  A.    Yes.

3  Q.    And Mr. Chia, he answers you on this one.  He -- well,

4  withdrawn.

5        You knew at that point what the DMR standard had

6  for a value for the "Answer Response" field, right?

7  A.    Yes.

8  Q.    And you also knew what Motorola had in its "Answer

9  Response" field, right?

10  A.    That's correct.

11  Q.    And if you wanted to interoperate within Motorola on the

12  "Answer Response" field, you already knew what the data was

13  for that, right?

14  A.    Correct.

15  Q.    But the question that you had was, why was Motorola

16  different, right?

17  A.    Correct.

18  Q.    And that's only information that Motorola knows inside

19  of Motorola, right?

20  A.    Actually we could obtain such information by doing

21  analysis, and the answer or the analysis could be two

22  scenarios only.  One scenario is that Motorola did something

23  wrong.  The other scenario or possibility was that Motorola

24  simply filled in a wrong value.

25  Q.    And Mr. Chia, he told you which one of those it was.  He

1    said that it was due to errors in the Motorola DMR code,

2    right?

3    A.   Correct.

4    Q.   And he is talking about the source code, right?

5    A.   Correct.

6    Q.   And that's stuff that only Motorola knows about, right?

7    A.   The source code is something that only Motorola knows,

8    but we know the result.

9    Q.   In your testimony generally you said that the

10   information that you were asking for was not confidential,

11   and the information that you received was not confidential

12   Motorola information, right?

13   A.   Correct.

14   Q.   But isn't it correct that -- withdrawn.

15        That's what you are saying here, but isn't it

16   correct that at the time you weren't able to judge -- you

17   were unable to make a judgment call as to whether something

18   is confidential or not at all, right?

19   A.   What time frame are you referring to when you say I was

20   not able?

21   Q.   When you wrote your email to Mr. Chia.

22   A.   When I was writing this, I do not remember whether or

23   not I was able to make that judgment.  However, I would think

24   that I would have been able to.  Since I can do so now, I

25   would be able to do so as well back then.

1    Q.   I will show you Page 133.

2         So it's your testimony now you can make a judgment

3    call as to whether the information in your email is

4    confidential or not or is asking for Motorola confidential

5    information?

6    A.   Please repeat the question.

7    Q.   It's your belief that you are able now to make a

8    judgment call as to whether something is confidential or not?

9    A.   Right now I can only judge or make a judgment call as to

10   what is not confidential, but as to what is, I still cannot

11   judge.

12   Q.   I am going to show you Page 133, Lines 20 through 21.

13   You were asked:

14        "Q.   And it's your belief that you are unable to

15   make a judgment call as to whether information is

16   confidential or not?"

17        Your answer is, "That's correct."

18        Was that your testimony?

19   A.   Correct, but this question was asking about Hytera's

20   confidential information.

21   Q.   And when it comes to Motorola's confidential

22   information -- the information that you were asking for in

23   your email, when it comes to Motorola's confidential

24   information, you would not be able to judge whether something

25   contains Motorola confidential information or not, right?

1    A.   I could only determine or judge that the questions that

2    I asked would not have to be answered by involving Motorola's

3    confidential information.

4    Q.   This is Page 73, Lines 8 through 13.  You were asked:

5         "If you were provided with something that looked

6    like it was Motorola confidential information, would it have

7    been okay for you to use it?

8         "A.   I would not be able to judge whether that

9    information is confidential or not. "

10        Was that your testimony?

11   A.   Correct.  Yes.

12   Q.   And that was your mindset when you sent this email to

13   Mr. Chia, right?

14   A.   The answer is no.  For that question you just cited from

15   my deposition, that question was quite abstract.  It simply

16   asked about something that looks like confidential

17   information.  However, for the questions I asked in my email,

18   those were very specific questions.  So the information that

19   was sent back or responded back would happen very specific as

20   well.

21   Q.   It was fair today -- earlier today you were able to tell

22   in your email what was confidential Motorola information and

23   what was not, correct?

24        THE INTERPRETER:  Counsel, do you mind repeating

25   that?

1           MR. ALPER:  Sure.

2    BY MR. ALPER:

3    Q.    It's fair to say that before lunch, when you were giving

4    your testimony, you were able to tell what was Motorola

5    confidential information and what was not?

6    A.    That is an incorrect statement.  I am able to determine

7    and judge that it is not Motorola's confidential information,

8    but I won't be able to determine if a certain piece of

9    information is Motorola's confidential information.

10   Q.    Thank you, Mr. Zhang.

11          MR. ALPER:  I pass the witness.

12          THE COURT:  Before we go back to redirect, I asked

13   a question earlier about a purchaser's manual.  I want to add

14   to it a repair manual.

15          Did Motorola, in conjunction with the sale of its

16   products, make available a user's manual and a repair manual?

17          THE WITNESS:  I believe they are provided.

18   However, I'm not quite sure about it.  But I have seen such

19   manuals being provided together with Motorola's products.

20          THE COURT:  And how about Hytera?

21          THE WITNESS:  Hytera should also have a set of

22   information like this.

23          THE COURT:  A user's manual and a repair manual?

24          THE WITNESS:  I'm sure about the user manual, but

25   I'm not so sure about the repair manual.

 1           THE COURT:  All right.  Let's take a short break

 2   before redirect.

 3           You can step down for a few minutes, sir.

 4       (Jury out at 2:36 p.m.)

 5           THE COURT:  I want to return to these

 6   communications from the jurors.

 7           Have you had an opportunity to discuss these

 8   matters?

 9           MR. ALPER:  We had an opportunity to discuss them,

10   your Honor.  We haven't had an opportunity to confer as

11   parties, but we are happy to give you our thoughts now, if

12   you would like, your Honor.

13           THE COURT:  Do you happen to have a calendar in

14   front of you?

15           MR. CLOERN:  I do, your Honor.

16           THE COURT:  Does it require translation?

17           MR. CLOERN:  I don't think so.

18           THE COURT:  I'm looking at the calendar.  I left a

19   question mark on December 23rd, which is a Monday.

20           So what is your agreement in terms of whether we

21   should have a trial on Monday, December 23?

22           MR. ALPER:  We defer to your Honor.  We did confer

23   on that.  We defer to your Honor.  But if that's going to be

24   the only day that people would come in that week, we would be

25   fine with not having trial that day.

1            THE COURT:  Making that a no.

2            MR. ALPER:  That makes that a no.

3            THE COURT:  So 23, no.  24, no.  25, no.

4            And then we will work into Mr. Richardson's issue.

5    So we would say 26, no.  27 is a Friday.  That would be a no

6    in any event.  And then Mr. Richardson has an issue with

7    respect to the 30th and 31st.  So the 30th would be a no.

8    The 31st would be a no.

9            That takes us to Wednesday, New Year's on my

10   calendar.  That's a no.  And to round out the week, then,

11   January 2nd, Thursday, would be a no.  And routinely, Friday

12   would be a no in any event.

13           Saturday -- the 4th is Saturday.  The 5th is

14   Sunday.

15           The 6th -- January 6th, then, would be -- what are

16   you saying about January 6th?

17           MR. ALPER:  Your Honor, January 6th through the

18   10th is another juror's vacation.  That was the second note

19   this morning.

20           THE COURT:  That's right.

21           Now, as to the second note, before I speak, I want

22   to give you an opportunity to speak.

23           What is your position regarding -- I think it's

24   Julia -- with all respect, Julia -- I forgot her last name.

25   She wants to be away from the 6th -- through that week of the

1   6th.

2           MR. ALPER:  Yes.  Yes, your Honor.

3           THE COURT:  What is your response to that?

4           MR. ALPER:  Our response is as follows:  Although,

5   generally speaking, we would like to move the trial along as

6   expeditiously as possible and use as many available trial

7   days as we can, we were having a hard time seeing how we

8   could give -- I think it's Mr. Richardson, his vacation and

9   not Ms. Mironiuk.  And so where we were coming out is,

10  because of that, that we would not be able to have court that

11  week due to her vacation.

12          THE COURT:  What is your position?

13          MR. CLOERN:  We agree, your Honor.  Coming back on

14  the 13th seems to make sense.  I don't think three weeks is a

15  lot different than two.  A large break is a large break.

16          THE COURT:  All right.  This is civil litigation.

17  It is your case.  Unlike many other cases before the Court,

18  especially criminal cases where we have detained defendants,

19  et cetera, the Court should give substantial weight to the

20  position taken by the parties to the case.  And where there

21  is agreement, as a general proposition, the Court should not

22  interfere with that agreement, especially if it is reasonable

23  and rational based upon the case being tried.

24          There is also an issue here with respect to how you

25  will let your various witnesses know when and where to

1    appear.  So I will respect your agreed position.

2              Now, I will tell the jury this before we end for

3    the day.

4              So the second juror's problems will also be

5    satisfied.  That is, the week of January 6th there will be no

6    trial.  Is that right?

7              MR. ALPER:  Yes, your Honor.

8              And our assumption -- I think it's a fair one based

9    on the information that we have -- is that there aren't any

10   other vacations over the following weeks in January and that

11   those will be trial days.  So that seems to be what it looks

12   like right now.

13             MR. CLOERN:  Correct.

14             THE COURT:  I will say no more.

15        (Laughter.)

16             THE COURT:  Okay.  Take a break.

17             MR. CLOERN:  Thank you, your Honor.

18        (A brief recess was taken at 2:42 p.m.)

19        (A change of court reporters was had.)

20

21

22

23

24

25

Zhang - redirect by Officer

3086

1    (Proceedings heard in open court.  Jury in.)

2         THE CLERK:  Court is in session.  Please be seated.

3         THE COURT:  Please re-call the witness.

4  BY MS. OFFICER:

5  Q.  So I'd like to take a look back at PTX 1087, and in

6  particular question 5 on Pages 2 to 3.  And this question

7  deals with answer response.  Do you recall that?

8  A.  Yes.

9  Q.  And the reason you asked Sam Chia this question is because

10 you tested a Motorola DMR radio and determined that the answer

11 response value of that Motorola radio did not match that of

12 the DMR standard; is that right?

13 A.  That is correct.

14 Q.  And so this was a situation in which you needed to know

15 whether to follow the DMR standard as written or to deviate

16 from it to interoperate with Motorola; is that right?

17 A.  Yes, that is correct.  Usually when this happens, we have

18 to make a decision whether or not we should fully follow what

19 is done in the standard or we should do it in order to

20 interoperate with Motorola's devices.  That was the decision

21 we had to make.

22 Q.  And your question did concern interoperability with

23 Motorola?

24         INTERPRETER LIN:  I'm sorry, counsel?

25 BY MS. OFFICER:

Zhang - redirect by Officer

1    Q.   Your question did concern interoperability with Motorola?

2    A.   That is correct.

3    Q.   And that's the case even though you don't use the term

4    "interoperability"?

5    A.   Correct.

6    Q.   And in Sam's answer to question No. 5 on Page 3, he

7    states, "Can you please check whether you are using the latest

8    protocol document?  There are some changes to the protocol in

9    Q2 2007 which were due to errors in the Motorola DMR code

10   which might result in the differences that you were

11   observing."

12   A.   I see this paragraph.

13   Q.   Does Sam Chia tell you what those errors in the Motorola

14   DMR code were?

15   A.   No.

16   Q.   And could you go to the DMR Association and ask if this

17   was an error in Motorola's code?

18   A.   No.

19   Q.   Is the fact that there were errors in Motorola's code

20   itself a confidential piece of information?

21   A.   I think it is not.

22   Q.   In fact, you could tell the value of the answer response

23   of the Motorola radio from the testing that you had done on

24   that radio; is that right?

25   A.   Correct.

Zhang - redirect by Officer

3088

1  Q.  I'd like to take a look at Question 2 on Page 2.  And this

2  one is about hangtime, do you agree?

3  A.  I agree.

4  Q.  And you asked for the main function of call hangtime and

5  channel hangtime and how to realize these in Moto.  Do you see

6  that?

7  A.  Correct.

8  Q.  And counsel for Motorola focused on the term "realized."

9  Do you remember that?

10 A.  I remember.

11 Q.  Is hangtime defined by the DMR standard?

12 A.  Yes.

13 Q.  And do you need to understand how Motorola has interpreted

14 the DMR standard so that Hytera's hangtime feature can

15 interoperate with Motorola's DMR radios?

16 A.  Yes.

17 Q.  And counsel also asked you about "realize" in question

18 No. 7 on Page 3.  Is your answer for question 7 the same as

19 question 2?

20 A.  I don't quite understand what you are asking.

21 Q.  For question No. 7, did you need to know what features

22 Motorola used IP service to support in order to interoperate

23 with Motorola?

24 A.  It's not needed.

25 Q.  Did G.S. Kok, Y.T. Kok, Sam Chia, or Huang Peiyi ever give

Zhang - redirect by Officer

3089

1    you any Motorola source code?

2    A.   No.

3    Q.   And did you ever see any Motorola source code?

4    A.   First of all, I do not know what would be Motorola source

5    code, so I don't believe I have seen it before.

6    Q.   Have you ever seen any source code that is labeled as

7    Motorola source code?

8    A.   No.

9    Q.   And do you understand that Motorola is accusing you in

10   this trial of soliciting Motorola's confidential information?

11          THE COURT:  Counsel, do you mean that question to go

12   personally to the witness or the business entities who make up

13   the defendants?

14          MS. OFFICER:  I mean that personally to the witness.

15          THE COURT:  You may answer.

16          THE WITNESS (through interpreter):  What does that

17   mean, are you asking about?  Are they accusing me personally

18   of doing that?

19   BY MS. OFFICER:

20   Q.   Motorola contends that you were soliciting Motorola's

21   confidential information in your email to Sam Chia.

22   A.   Are you saying that that is Motorola's contention?  I'm

23   not quite sure what their contention is.

24   Q.   Motorola is saying that in your email, you were soliciting

25   Motorola's confidential information from Sam Chia.  Do you

Zhang - redirect by Officer

3090

1   understand that?

2   A.  I understand.

3   Q.  And that's why you came here to testify today; is that

4   right?

5   A.  Yes.

6   Q.  And you're not here today to explain the actions of G.S.

7   Kok, Y.T. Kok, Sam Chia, or Huang Peiyi; is that right?

8   A.  That is correct.

9        THE COURT:  Are you here to answer the questions that

10  are put to you by the attorneys?

11       THE WITNESS (through interpreter):  Yes.

12  BY MS. OFFICER:

13  Q.  Were you seeking Motorola's confidential information from

14  Sam Chia?

15  A.  No.

16  Q.  Were you asking for how Motorola implemented the DMR

17  standard for defined and required features?

18  A.  I simply wanted to ask how Motorola understood the

19  implementation of standards.

20  Q.  And these were fair questions, in your mind?

21  A.  Correct.

22  Q.  Because you needed to know how Motorola had interpreted

23  the DMR standard so Hytera's DMR radios could interoperate

24  with Motorola's DMR radios?

25  A.  Correct.

Zhang - redirect by Officer

3091

1   Q.  And you expected that Sam Chia would know where to draw

2   the line, if there was any line needed to be drawn, as to what

3   was Motorola's confidential information and what was not?

4   A.  The reason is not only Sam himself would be clear or

5   knowledgeable as to what was confidential information and what

6   was not confidential information of Motorola's.

7   Q.  And why is that?

8   A.  He was an employee that came from Motorola.

9   Q.  Have you ever worked at Motorola?

10  A.  No.

11  Q.  Do you know what Motorola considers to be confidential?

12  A.  I do not know.

13  Q.  Have you ever found Motorola documents on the internet

14  that are labeled as "Motorola confidential"?

15  A.  I have come across many documents that -- on the internet

16  that have been labeled as confidential, but I am not quite

17  sure if they have been labeled as "Motorola confidential

18  documents."

19  Q.  Have you ever received documents from your dealers or

20  distributors or sales channels that are labeled as

21  confidential?

22  A.  I do not remember the specifics.  However, with respect to

23  external information like this, we mainly obtain such

24  information from these channels you mentioned.

25  Q.  And Sam Chia didn't send you any Motorola confidential

Case: 1:17-cv-01973 Document #: 801 Filed: 12/20/19 Page 88 of 118 PageID #:54925
Zhang - redirect by Officer
3092

1  information in response to your questions?

2  A.  Correct.

3  Q.  And you know that it's wrong to use another company's

4  confidential information at Hytera?

5  A.  I know it.

6  Q.  Has that always been your understanding?

7  A.  Yes.

8  Q.  So in PTX 1078 on Page 1, Sam Chia says that, "Please feel

9  free to drop by and discuss at some point about these issues.

10  Some of them needs" -- 1087.  Excuse me.

11       "Please feel free to drop by and discuss about some

12  of these issues.  Some of them needs some discussion rather

13  than just a one-time response via email."  Do you see that?

14  A.  I see it.

15  Q.  Do you recall whether you dropped by to discuss these

16  issues with Sam Chia?

17  A.  I discussed questions with Sam before, but I do not recall

18  if these are the questions that were discussed.  Also, I would

19  like to add that my English speaking and listening

20  capabilities are not very good, so there would not have been

21  very meaningful results if I had discussed things with him.

22  That's what I -- that's what I want to add.

23       THE COURT:  If you had discussed with him, would it

24  be one-on-one, or would your team accompany you to the

25  meeting?

Case: 1:17-cv-01973 Document #: 801 Filed: 12/20/19 Page 89 of 118 PageID #:54926
Zhang - redirect by Officer
3093

1          THE WITNESS (through interpreter):  Both scenarios

2    would have happened.

3          THE COURT:  And you were most fluent in English

4    within your four-person team; is that right?

5          THE WITNESS (through interpreter):  That's what they

6    thought.

7          THE COURT:  And when you did confer with Mr. Chia,

8    was he accompanied by anyone?

9          THE WITNESS (through interpreter):  Sometimes yes,

10   sometimes no.

11         THE COURT:  Proceed.

12   BY MS. OFFICER:

13   Q.   How long did you work with Sam Chia?

14   A.   I do not remember the specific timeframe.  I also do not

15   recall when he left the company, but I would think it was

16   about four or five years.

17   Q.   Was Sam Chia your boss for over four to five years?

18   A.   What do you mean by "boss"?

19   Q.   Was Sam Chia ranked higher than you in the company?  Did

20   you report to him directly or indirectly?

21   A.   I only reported to my supervisor.  I did not need to

22   report to Sam Chia.

23   Q.   But it's reasonable that in the period of time of four to

24   five years that you would have many conversations with Sam

25   Chia?

Case: 1:17-cv-01973 Document #: 801 Filed: 12/20/19 Page 90 of 118 PageID #:54927
Zhang - redirect by Officer
3094

1  A.  Yes.

2  Q.  Counsel for Motorola pointed you to your deposition, the

3  question at Page 52, Line 20 to 23.  And in that question, you

4  were asked:

5          "The information you were asking Sam Chia to provide

6      was not information that was available to you from a

7      public source, correct?

8          "Answer:  I am not certain about that."

9          Do you recall that?

10  A.  I don't recall.  I don't quite recall.

11  Q.  Do you see the testimony here at Page 52, Line 20 to 23?

12  A.  I see it.

13  Q.  Was information about how Motorola had interpreted the DMR

14  standard information that would have been available to you

15  from a public source?

16  A.  Are you asking me if I am seeing this in the transcript?

17  Q.  No.  I didn't mean to confuse you.  What I was asking is

18  that --

19          THE COURT:  Let me say this, counsel.  You have used

20  the exhibit to refresh the recollection of the witness.

21          Would you take a look at that?

22          Is your memory now refreshed as to what you said at

23  the deposition?

24          THE WITNESS (through interpreter):  Now I'm seeing

25  this, I remember what I said --

Zhang - redirect by Officer

3095

1        THE COURT:  All right.

2        THE WITNESS (through interpreter):  -- but earlier,

3   counsel had --

4        THE COURT:  Just a minute.  That's a good foundation.

5        What is the question to the witness?

6   BY MS. OFFICER:

7   Q.   The question is:  Was how Motorola had interpreted the DMR

8   standard information that was available to you from a public

9   source?

10  A.   Yes.

11  Q.   And what was that public source?

12  A.   I don't quite understand what you mean by "source."

13  Q.   I'm asking whether or not how Motorola interpreted the DMR

14  standard was something that you at Hytera would know in parts

15  where the DMR standard was broad and vague.

16  A.   I believe that we could obtain the results by doing

17  testing.

18  Q.   But from those results, you would still have to understand

19  whether to -- strike that.

20        And that information, how Motorola was interpreting

21  the DMR standard, that's information you at Hytera are

22  entitled to so that you can achieve interoperability with

23  Motorola's DMR radios; is that right?

24  A.   Correct.

25        MS. OFFICER:  No further questions.

Case: 1:17-cv-01973 Document #: 801 Filed: 12/20/19 Page 92 of 118 PageID #:54929
Zhang - recross by Alper
3096

1          THE COURT:  Recross?

2          MR. ALPER:  Very briefly.  Very briefly.

3                    RECROSS-EXAMINATION

4   BY MR. ALPER:

5   Q.  Is it your belief that this case is about Motorola

6   documents that Hytera received -- Hytera received from its

7   distributors or customers?

8   A.  I don't quite understand what is the connection or

9   relationship between this case or the -- and the Motorola

10  documents that you stated in your question.

11  Q.  Thank you.  That answers my question.  Let me ask you one

12  other.

13          Is it your testimony that Hytera was entitled to the

14  information that you asked from Mr. Chia?

15  A.  It depends on what information you are talking about.

16  Q.  The information that you asked Mr. Chia about in your

17  email where you were welcoming him to the company.  I think

18  it's PTX 542.

19  A.  All the information here was about us trying to know or

20  understand how Motorola understood the standard.  We believe

21  that it should be public information, and we had the right to

22  know about it.

23  Q.  But isn't it correct that you asked -- the many questions

24  that you asked Mr. Chia about Motorola's DMR products were in

25  order to gain an understanding of how Hytera should implement

1    DMR, correct?

2    A.   That is incorrect.  For the implementation and

3    realization, it would consist of many parts, and the

4    interoperability would be one of the parts related to the

5    implementation.

6    Q.   And I'm going to read from Page 52, Lines 9 through 12 of

7    your deposition.  You were asked:

8         "Question:  In order to gain an understanding of how

9         Hytera should implement DMR, you asked Mr. Chia many

10        questions about Motorola's DMR products, correct?

11        "Answer:  Yes."

12        That was your testimony, right?

13   A.   Yes.  And as I stated earlier, implementing DMR would

14   include implementing the interoperability with Moto's device.

15   Q.   And the information that you asked Mr. Chia about was

16   information that you did not have before the Motorola

17   engineers joined Hytera, correct?

18   A.   We had all the information already.

19   Q.   I'm going to read you Page 52, Lines 14 through 18 of your

20   deposition:

21        "Question:  The questions that you asked Mr. Chia

22        about Motorola's DMR products regard information that you

23        did not have before the Motorola engineers joined,

24        correct?

25        "Answer:  That's correct."

Zhang - recross by Alper

3098

1          Was that your testimony?

2   A.   The answer is yes.  However, as I also stated earlier, for

3   the information or the channel of the source of the

4   information, at that time I simply thought or had in mind that

5   the information that was found on the internet would follow --

6   would fall under this category that as asked in my deposition.

7   I did not think of any other channel just now.

8   Q.   And, in fact, you're not aware of anyone at Hytera doing

9   anything to assess whether the information that Mr. Chia had

10  provided to you was about how Motorola's DMR products were

11  implemented is confidential to Motorola?

12  A.   That is incorrect.  I do not know if anyone has done such

13  an assessment, but even if they had, they would not have told

14  me.

15  Q.   I'm going to show you Page 73, Lines 19 through Page 74,

16  Line 2 of your deposition:

17          "Question:  Are you aware of anyone at Hytera doing

18      anything to assess whether the information that Mr. Chia

19      had provided to you -- provided you about how Motorola's

20      DMR products were implemented is confidential to

21      Motorola?

22          "Answer:  I'm not clear.

23          "Question:  You're not aware of anyone having done

24      that, correct?

25          "Answer:  That's correct."

Zhang - redirect by Officer

3099

1          Was that your testimony?

2          INTERPRETER LIN:  Counsel, can you flip back to it?

3          MR. ALPER:  Ah, yes.

4          INTERPRETER LIN:  Thank you.

5   BY THE WITNESS (through interpreter):

6   A.  Yes.

7   BY MR. ALPER:

8   Q.  But today you're here to say that the email that you sent

9   doesn't ask for confidential information and Mr. Chia didn't

10  provide confidential information, right?

11  A.  Correct.

12  Q.  And that's here in court after Hytera was sued, right?

13  A.  Correct.

14          MR. ALPER:  Nothing further, your Honor.

15          THE COURT:  Redirect, counsel, if any?

16                    REDIRECT EXAMINATION

17  BY MS. OFFICER:

18  Q.  So you just testified that you were not aware of anyone at

19  Hytera doing anything to assess whether the information that

20  Mr. Chia had provided you about how Motorola's products were

21  implemented is confidential to Motorola.

22          You testified that you were not clear as to whether

23  anyone at Hytera had done that assessment; is that right?

24  A.  That is correct.

25  Q.  But were you asking for Motorola's confidential

Case: 1:17-cv-01973 Document #: 801 Filed: 12/20/19 Page 96 of 118 PageID #:54933
Zhang - redirect by Officer
3100

1    information?

2    A.   No.

3    Q.   So why would you need someone to assess whether the

4    information that Sam Chia provided was Motorola confidential?

5    A.   I do not know about that.  I do not know if anyone had

6    accessed it.

7    Q.   But there would be no reason to assess Sam Chia's

8    responses because you weren't asking for Motorola's

9    confidential information; is that correct?

10   A.   That is correct.  And also, I said that I did not access

11   the information, but I do not know if anyone else had done so.

12   Q.   And when you say "access," do you mean "assess"?

13              INTERPRETER LIN:  "Assessed."

14              MS. OFFICER:  Thank you.  No further questions.

15              MR. ALPER:  Nothing further, your Honor.

16              THE COURT:  Okay.  Have we concluded entirely with

17   this witness?

18              MR. ALPER:  Yes, your Honor.

19              MR. CLOERN:  I believe so, your Honor, yes.

20              THE COURT:  We wish you a safe and healthy return to

21   China.  You are excused.

22              THE WITNESS (through interpreter):  Thank you.

23              THE COURT:  You may leave.

24          (Witness excused.)

25              THE COURT:  Do you have another witness lined up for

1    today?

2           MR. CLOERN:  Yes, your Honor.

3           THE COURT:  All right.  Let's give the jury some news

4    here while you gather up your witness.

5           MR. CLOERN:  Certainly, your Honor.

6           THE COURT:  Members of the jury, some of you have

7    asked about our schedule here.  And let me tell you this.

8    Next week, the week of the 16th, you will be here Monday,

9    Tuesday, Wednesday, and Thursday and not here on Friday.  And

10   the week of the 23rd, not here on the 23rd, not here on the

11   24th, not here on the 25th, not here on the 26th, not here on

12   the 27th, which is a Friday.

13          We would add to that you are not to be here on the

14   30th of December and not to be here on the 31st, which would

15   be New Year's Eve.  You are not required to be here on New

16   Year's Day, and you are not required to be here on Thursday,

17   January 2nd.  January 3rd is a Friday, and you will not be

18   here on Friday.

19          That takes us well into January.  And so the week of

20   January 6th, you will not be here on Monday, Tuesday,

21   Wednesday, or Thursday, and you will not be here on Friday

22   because we have routinely said not on Friday.

23          I have confered with the attorneys in this case, and

24   they have agreed to this schedule.  The Court has approved of

25   their agreement.  The attorneys and all of the parties are

Case: 1:17-cv-01973 Document #: 801 Filed: 12/20/19 Page 98 of 118 PageID #:54935
Luo - direct by Allan
3102

1   most appreciative of your doing your duties as jurors in this

2   matter.  This is quite an accommodation.  We hope that you do

3   well during this time period when you will be off.  And I

4   think I've said enough.  You, however, will remain here for

5   the rest of the day, and then you will return Monday at 10:00

6   o'clock.  Return Monday, December 16th, after we adjourn for

7   the day today.

8           And so do you have that witness ready to go, or do

9   you need time?

10          MR. CLOERN:  We're ready, your Honor.

11          THE COURT:  Call the witness.

12          MR. CLOERN:  Hytera Communications, Hytera America,

13  and Hytera America West call Mr. Luo Junping.

14          THE CLERK:  Please raise your right hand.

15       (Witness sworn through interpreter.)

16          THE WITNESS (through interpreter):  Yes.

17          MR. ALLAN:  May I proceed, your Honor?

18          THE COURT:  Yes, please.

19              JUNPING LUO, DEFENDANTS' WITNESS, SWORN

20                      DIRECT EXAMINATION

21  BY MR. ALLAN:

22  Q.  Good afternoon.  Could you please introduce yourself?

23  A.  Good afternoon, everyone.  My name is Luo Junping.  L-u-o,

24  family name, J-u-n-p-i-n-g, first name.  My colleagues refer

25  to me as "Jim."  I work in Hytera.  My current position and

Luo - direct by Allan

3103

1   title is the director of the department of management of

2   technology, strategy, and patents.

3   Q.  Mr. Luo, do you speak English?

4   A.  Yes, but it is not my mother tongue.

5   Q.  Is your native language Mandarin Chinese?

6   A.  Correct.

7   Q.  Do you feel more comfortable today to testify in Mandarin?

8   A.  Yes.  I think it is very important to understand the

9   questions accurately and answer the questions accurately, so I

10   would feel that I would be more comfortable testifying in

11   Mandarin Chinese.

12   Q.  Mr. Luo, tell us a little bit about what you currently do

13   at Hytera.

14   A.  Currently, I am mainly responsible for the management work

15   of the management of the company's strategies, prices, and

16   patents.

17   Q.  All right.  And when did you join the company?

18   A.  In 2008 when I obtained my first master's degree.

19   Q.  And what was your educational training?  What did you

20   study in school?

21   A.  I obtained my bachelor's degree in 2005.  I obtained my

22   master's degree in 2008.  For these two degrees, I studied

23   communications engineering.  At that time, the focus of my

24   research and study was to study or look into how to make the

25   radio work better with the radio network.  That is also why I

Case: 1:17-cv-01973 Document #: 801 Filed: 12/20/19 Page 100 of 118 PageID #:54937
Luo - direct by Allan
3104

1    joined Hytera after I graduated.  After I started working, I

2    then went on to obtaining my second master's degree which was

3    business administration.

4    Q.   Now, Mr. Luo, have you been working in Hytera's patent

5    department and strategy, corporate strategy-related issues

6    since you joined in 2008?

7    A.   No.  I myself prefer changes so that I can learn a lot of

8    new things.  So I had held different positions within Hytera's

9    various departments.  Those departments would include

10   departments such as sales and marketing.  I have been working

11   at Hytera for 10 years.  I was promoted from the very basic

12   level of the job position all the way to the director position

13   as I am holding today.

14   Q.   Now, Mr. Luo, you understand that this lawsuit was filed

15   in March of 2017; is that right?

16   A.   Yes.

17   Q.   And were you asked to assist Hytera in responding to this

18   lawsuit?

19   A.   Yes.

20   Q.   What were you asked to do?

21   A.    I was assigned as the contact window between the company

22   and our counsel as a coordinator.

23   Q.   Can you tell us a little bit about what you do in that

24   coordinator role?

25   A.   This was also a new attempt for me.  At that time, our

Case: 1:17-cv-01973 Document #: 801 Filed: 12/20/19 Page 101 of 118 PageID #:54938
Luo - direct by Allan
3105

1  counsel helped us look into and conduct our investigation.  My

2  role was to assist our counsel in collecting all the

3  documents, information, and data.

4  Q.  In the course of your role as that coordinator, did you

5  come across any information about Motorola ever contacting

6  Hytera about the claims made in this lawsuit before the

7  lawsuit was filed?

8  A.  No.

9  Q.  Have you seen any letters or correspondence --

10        THE COURT:  Just a minute.  Can we have a sidebar?

11     (Proceedings heard at sidebar:)

12        THE COURT:  As a general rule of evidence, offers to

13  settle a case are, generally speaking, not relevant once the

14  lawsuit is filed and the matter goes forward.  So where are

15  you going?

16        MR. ALLAN:  This is not related to settlement, your

17  Honor.  It's simply to establish that the lawsuit was filed

18  without any warning, without any letters, without any notice.

19        THE COURT:  It's not relevant.

20        MR. ALLAN:  Okay.  We'll move on.

21     (Proceedings heard in open court:)

22  BY MR. ALLAN:

23  Q.  Mr. Luo, in your capacity as head of the patent

24  department, have you come across any licensing agreements

25  between Motorola and Hytera?

1    A.   Yes.  I learned that -- I am aware that around the year of

2    2010, we had a licensing agreement with Motorola with respect

3    to standard essential patents related to DMR standards.

4    Q.   And you came to learn that in your role as the head of the

5    patent department at Hytera?

6    A.   Correct.  That was part of my work.

7    Q.   Could I direct you to DTX 3058?  It should be in your

8    binder, Mr. Luo.

9    A.   Yes.

10   Q.   Is this a copy of a patent license agreement between

11   Motorola and Hytera?

12   A.   Yes.

13        MR. ALLAN:  I'd offer this into evidence, please,

14   your Honor.

15        MR. DeVRIES:  No objection, your Honor.

16        THE COURT:  It is received and may be published.

17      (Defendant's Exhibit 3058 received in evidence.)

18   BY MR. ALLAN:

19   Q.   Now, what is the date of this agreement, Mr. Luo?

20   A.   The effective date is February 1st, 2010.

21   Q.   All right.  And what's your understanding of the purpose

22   of this agreement?

23   A.   The purpose of this agreement is for Hytera to seek to

24   take the license from Motorola to use the standard essential

25   patents related to the DMR standard from Motorola.

Luo - direct by Allan

3107

Q.   Is it your understanding that anybody that makes a DMR radio needs to license these patents from Motorola?

A.   According to my understanding, yes.

Q.   So is Hytera obligated to pay money to Motorola under the terms of this agreement?

A.   Yes.

Q.   And let's take a look at Section 4.2 on Page 6.

A.   Yes.

Q.   Are you familiar with what this particular provision requires in terms of payment from Hytera to Motorola?

A.   Yes.  It indicates that we have to pay $3 for every terminal unit that we sell for license -- for taking the license from Motorola.

Q.   Is that $3 in the United -- for every radio sold in the U.S., or is that throughout the world?

A.   Around the world.

Q.   Is there a requirement in this agreement that Hytera needs to pay Motorola some amount of money for the sale of each repeater that is sold?

A.   Yes.  For every unit of the repeater that we sell, we have to pay 15 U.S. dollars to Motorola, 1-5.

Q.   And is that shown here in Section 4.3 of the agreement?

A.   Yes.

Q.   This agreement's been in place since February 1, 2010?

A.   Yes.

Luo - direct by Allan

1  Q.  So for almost the last ten years, Hytera's paid Motorola

2  $3 for every radio that's sold everywhere around the world and

3  $15 for every repeater that's sold everywhere around the

4  world?

5  A.  Correct.

6          MR. ALLAN:  Let's take that down if we could, Jim.

7  If you could look -- just keep the document up, please.

8          THE COURT:  Just as a follow-up question, does the

9  document determine who sets the sale price of the product

10  being sold?

11          THE WITNESS (through interpreter):  No.

12          THE COURT:  So when Hytera sells the product, it

13  determines the sale price?

14          THE WITNESS (through interpreter):  Correct.

15          THE COURT:  And regardless of the sales price, the

16  licensing fee must be paid as you have testified?

17          THE WITNESS (through interpreter):  Correct.  That's

18  how it works.

19          THE COURT:  Proceed.

20  BY MR. ALLAN:

21  Q.  As the head of the patent department at Hytera, do you

22  have an understanding of how these sorts of agreements are --

23  come to be?

24          INTERPRETER LIN:  "The source"?

25  BY MR. ALLAN:

1  Q.  How they -- how they're finalized.

2  A.  Yes.  According to my understanding, Motorola would send

3  this agreement to us, and we will conduct back and forth

4  negotiations and communication.

5  Q.  So let's --

6          THE COURT:  Just a minute.  Your question was in the

7  plural.  I think the answer is restricted to this particular

8  agreement.

9          THE WITNESS (through interpreter):  Yes.  That is my

10  understanding as well.

11          THE COURT:  As to this specific agreement?

12          THE WITNESS (through interpreter):  Yes, for this

13  specific agreement.

14          THE COURT:  Yes.

15  BY MR. ALLAN:

16  Q.  Mr. Luo, I'd like to direct you to, there's a legend at

17  the top of this document.  It says, "Motorola confidential

18  restricted."  Do you see that?

19  A.  I see it.

20  Q.  And this was on the document that Motorola sent to Hytera,

21  this agreement?

22  A.  Correct, that is my understanding.

23  Q.  Do you have an understanding of what "Motorola

24  confidential restricted" refers to?

25  A.  My understanding is that this should be a confidential

Case: 1:17-cv-01973 Document #: 801 Filed: 12/20/19 Page 106 of 118 PageID #:54943
Luo - direct by Allan
3110

1    Motorola document with restricted access.  It cannot be

2    accessed or viewed by anyone outside of Motorola.

3    Q.  But your understanding is Motorola sent it to Hytera,

4    right?

5    A.  Yes, they sent it to us.  Both parties were engaged in

6    back and forth negotiations in order -- and also both parties

7    signed on this document ultimately.

8    Q.  So this is an agreement that Hytera has in its file in the

9    ordinary course of doing business with Motorola?

10   A.  Correct.

11   Q.  Is there anything in here that you would expect to be

12   confidential in your experience as the head of the patent

13   department?

14   A.  I do not think so.

15          MR. ALLAN:  We can take that down.

16   BY MR. ALLAN:

17   Q.  Now, let's go back to 2017 when this lawsuit was filed.

18   Tell us a little bit about what Hytera did when the case got

19   filed.

20   A.  I remember it was the first time that Hytera was involved

21   in a U.S. litigation, so we engaged a U.S. law firm, Finnegan

22   & Henderson, to facilitate us with the investigation.  We

23   started to do our internal investigation together with

24   counsel.  We very much hoped that we could do whatever we

25   could do in order to discover what had gone wrong.

Luo - direct by Allan

3111

1    Q.   Now, Mr. Luo, what was your role in helping to collect

2    documentation material for this case?

3    A.   At that time, our counsel was conducting the

4    investigation, and I was helping counsel in collection -- in

5    collecting those documents and material.  First of all, we

6    needed to identify people who might have knowledge about what

7    had happened, but it was very difficult, as you know.  The

8    reason is that what was described in the complaint was

9    something that happened about ten years ago.  Some people

10   might have changed their roles already.  Some even have left

11   Hytera.

12   Q.   Tell us a little bit about the document collection effort

13   that you helped with.

14   A.   Ultimately, yes, we were able to identify some people.  We

15   referred to them as custodians.  We collected documents from

16   their computers, from their email in box, and some other

17   relevant materials.  We also collected their computers.

18        I'm sorry.  I didn't mean to say in box, just in box.

19   I was referring to the entirety of what was in their email.

20   Q.   So you just mentioned the term "custodian" which we've

21   heard a little bit about.  Could you just explain what your

22   understanding is of a custodian?

23   A.   The way I understand custodian to mean would be someone

24   who owns or in possession -- or is in possession of a certain

25   document.

Case: 1:17-cv-01973 Document #: 801 Filed: 12/20/19 Page 108 of 118 PageID #:54945
Luo - direct by Allan
3112

1      For example, if there is a document or a file in my
2  computer, I will be the custodian of that file.  If I copied
3  that file to your computer, you then will also become the
4  custodian of that file.  Another example can be reflected in
5  emails.  I sent you an email, then both you and I will be the
6  custodian of that email.
7  Q.  Did Hytera collect and process all of this information on
8  its own, or did it have outside help?
9  A.  Yes.  At that time since the work related to the
10  collection and handling of information was complicated, so we
11  hired a professional company who had expertise in this area to
12  help us.  The company was Epiq.
13  Q.  And what did Epiq do?
14  A.  I collected all the computers and information and emails
15  and handed over to Epiq.  Epiq would then perform mirroring
16  and forensic analysis on the information.  Usually we refer to
17  mirroring as imaging.
18  Q.  And in the course of that process in working with Epiq,
19  did you come to understand what the term "metadata" meant?
20  A.  Yes, I have some understanding.
21      THE COURT:  How do you spell meta?
22      THE WITNESS (through interpreter):  M-e-t-a-d-a-t-a.
23  BY MR. ALLAN:
24  Q.  Could you tell us a little bit about what metadata is?
25  A.  It is data that describes data.  If I am to explain

Case: 1:17-cv-01973 Document #: 801 Filed: 12/20/19 Page 109 of 118 PageID #:54946
Luo - direct by Allan
3113

1    further on that, I think it is similar to your passport.  It

2    records the author of this document, when the document is

3    created, and when the document is modified.  It's like when

4    you travel abroad, your passport will always be with you.

5         It's the same as the relationship between the

6    metadata and the associated document.  The metadata will

7    always go with the document.  The earlier example I gave you

8    was that when I copied my document or file over to you, that

9    metadata associated with that file will also be copied to you.

10   So if we look at the metadata of the two documents, we can

11   roughly see that it is the same.

12        It's the same with emails.  For the emails, email or

13   emails that I sent you, the metadata of the email in my

14   computer will be the same as the metadata of the email on your

15   computer.

16   Q.  A couple of follow-up questions on that.  So metadata is

17   not created by a person; is that your understanding?  Metadata

18   is created when the document is created?

19   A.  Yes.  It's automatically generated.

20   Q.  And all electronic documents have some form of metadata,

21   right?  It's not just Hytera or Motorola, everybody's got

22   that?

23   A.  Yes, that is my understanding.

24   Q.  Last metadata question:  Metadata has nothing to do with

25   databases or storage of documentation, right?

Luo - direct by Allan

3114

A.   That is correct, according to my understanding.

Q.   Did there come a time, Mr. Luo, that you began to collect computers and laptops from Hytera employees?

A.   Yes.  Ever since we defined the first group of custodians, that has been something we have always been doing.

Q.   So did that collection process happen all at once or over time?

A.   That is an ongoing process.  It's not possible to have it done just once because you have to know that ultimately, we were able to produce and provide 20 million pages of documents, about millions, several millions of them.  So it was not possible to have it done and completed in just one go.

Q.   So how many different laptops did the company collect for purposes of this case?

A.   I remember -- I remember it was more than 30 laptops.  And in the beginning, we collected a batch of the laptops.  We handed those laptops over to Epiq for them to perform the forensic analysis.  Then Epiq provided the result of the analysis to our counsel so that counsel could further look into the information.

     And later, counsel told us that there was more information and there were more custodians.  So when we went on to collecting more laptops, based on what I remember, we collected about 30 to 40 laptops.  It was a rolling, ongoing process.

Case: 1:17-cv-01973 Document #: 801 Filed: 12/20/19 Page 111 of 118 PageID #:54948
Luo - direct by Allan
3115

1    Q.  And all those were sent to Epiq for forensic evaluation?

2    A.  Correct.

3    Q.  We've heard some testimony --

4          THE COURT:  Before we move on, are you saying, can

5    you distinguish between a laptop and a desktop?  Did some

6    engineers have both?

7          THE WITNESS (through interpreter):  Yes.  It's

8    possible that they used either a laptop or a desktop.

9          THE COURT:  Or both?

10          THE WITNESS (through interpreter):  According to what

11    I remember, it's rare that somebody would have both.

12          THE COURT:  But you took only the laptops?

13          THE WITNESS (through interpreter):  No, that's not

14    like this.  If we are talking about collecting information

15    from desktops, Epiq will take out the hard drive and perform

16    imaging on the hard drive that was in the desktop.  If we are

17    talking about laptops, they take all -- the entirety of the

18    laptop and perform imaging on the laptop.

19          THE COURT:  So some of the testing was in place and

20    others was in a laboratory?

21          THE WITNESS (through interpreter):  It's a little bit

22    different.  Ultimately, it was all done in the lab.  However,

23    some of the desktops are big and not easy to move, so they are

24    fixed there.  There was no need for us to take the boards or

25    modules, for example, the power management or the power source

Luo - direct by Allan

3116

1  module from those big desktops.  What we need to take was only

2  the hard drive that contained data.

3           THE COURT:  Back to you, counsel.

4  BY MR. ALLAN:

5  Q.  Just a point of clarification.  Did -- I probably should

6  have used "computer."  Did Hytera distinguish between laptops

7  and desktops in its collection of materials related to

8  relevant custodians?

9  A.  We collected information from both.

10  Q.  Do you know someone named Peiyi Huang?

11  A.  Yes.

12  Q.  Now, did there come a time when you collected computers

13  from Peiyi Huang?

14  A.  Yes.  She was later identified as one of our custodians.

15  Q.  Do you remember when you collected the first computer from

16  Peiyi?

17  A.  I remember it was in November 2017.

18  Q.  And that computer was sent to Epiq for processing like all

19  the others?

20  A.  Correct.

21  Q.  By the way, once Epiq forensically restores and pulls

22  information off those laptops, that was all sent to your

23  counsel, correct?

24  A.  Correct.

25  Q.  Now, back to Peiyi Huang.  You collected a laptop in

Luo - direct by Allan

3117

1 November 2017. Did you learn at some point later that she had

2 additional computers?

3 A. Yes. At that time, she told us that she had only one

4 laptop. However, as time went on, as the investigation

5 progressed, we learned that she actually had another two

6 laptops in her possession.

7 Q. When you -- in your answer, you said "at that time, we

8 learned she had one laptop." Was that in November 2017?

9 A. Yes.

10 Q. How did you come to learn that she had two additional

11 laptops?

12 A. I was helping counsel with the investigation at that time.

13 We found that she had modified some of the source codes.

14 However, the changes and modifications she made to the source

15 code were not found on the computer she gave us, so we later

16 thought that it's possible that she might have had additional

17 computers.

18      I went to and approached our administration

19 department and asked them to help me check if Huang Peiyi had

20 additional computers.

21 Q. So in the process of trying to collect source code for the

22 case, you came to realize she might have had some source code?

23 A. Correct.

24 Q. Did you double-check the laptop that she had given you in

25 2017?

Luo - direct by Allan

3118

1    A.   Yes.

2    Q.   And was there any on that laptop?

3    A.   We did not find the source codes that we were looking for

4    on that computer.

5    Q.   Did you ask -- did you talk to Peiyi about whether she had

6    any other computers?

7    A.   I'm sorry.  I would like to ask what timeframe you are

8    talking about.

9    Q.   Well, when you realized there might have been a couple --

10   there might have been more than one computer -- well, let me

11   withdraw that.

12          When was it you learned there might have been another

13   computer of Peiyi's?

14   A.   Yes.  It was a year later, around October or November

15   2018.

16   Q.   So about a little more than a year ago from now?

17   A.   Correct.

18   Q.   Did you ask Peiyi whether she had the source code or had

19   other computers?

20   A.   I tried to contact her but later, I realized that she had

21   already left Hytera in July 2018.

22   Q.   So you mentioned, a moment ago you mentioned the

23   administrative office.  What is that?

24   A.   The administration department would keep a record of all

25   the fixed assets the company has.  Our computers are part of

Luo - direct by Allan

3119

1 the fixed assets, so they would have a record as to what

2 computers the company has and who was given what computer.

3 They would have such a record.

4 Q.  Did you learn any new information about computer,

5 additional computers that Ms. Peiyi Huang had?

6 A.  Yes.  We discovered that she had two other laptops that

7 she did not give us.  According to the record, I started

8 looking for those computers.  I remember -- I remember that

9 one of the two computers were -- was given to another employee

10 whose name was Vhang Bin, V-h-a-n-g, B-i-n.  So I took that

11 computer back from our new employee, Mr. Vhang, and sent it to

12 Epiq for forensic analysis.

13 Q.  How did you -- I'm sorry.  Go ahead.

14 A.  For the other computer, according to what I saw in the

15 record, I found that it was already placed in the fixed asset

16 warehouse in order to be recycled, waiting to be recycled.  As

17 soon as I learned that information, I went immediately to the

18 warehouse of our fixed assets and retrieved that computer.  I

19 then handed over that computer to Epiq for forensic analysis.

20 Q.  So you located both of the additional laptops the

21 administration office said she had, right?

22 A.  Correct.

23 Q.  And one of them you collected from the facility where it

24 was set to be recycled?

25 A.  Yes.  It was lucky that it had not yet been recycled and

Case: 1:17-cv-01973 Document #: 801 Filed: 12/20/19 Page 116 of 118 PageID #:54953
Luo - direct by Allan
3120

1    that I found it.

2    Q.   And was -- both computers were sent to Epiq for forensic

3    imaging and inspection?

4    A.   Correct.

5    Q.   What was located on those two computers?  Let's start with

6    the one that you pulled from the recycling bin.

7    A.   We were shocked to have found that some of the source code

8    on that computer had Motorola confidential labeling or

9    designation on it.

10   Q.   And what about the other, her other computer?

11   A.   For the other computer, the result of the analysis showed

12   that there was not much that was related to the document or

13   confidential source code or information.

14   Q.   So information relevant to this case, is that what you

15   mean?

16            INTERPRETER LIN:  I'm sorry?

17   BY MR. ALLAN:

18   Q.   Information relevant to this case?

19   A.   Correct.  And that was not found on that computer that was

20   given to that other employee.

21   Q.   And when you spoke to Peiyi Huang in November of 2017, she

22   told you she just had the one computer, right?

23   A.   Yes.  I sent her an email and asked her to turn over all

24   the computers she had to us for forensic imaging and analysis.

25   She gave us only one computer.

Luo - direct by Allan

3121

1    Q.  The computer that was -- the third computer, I guess we'll

2    call it, that was assigned to a new employee, did you do

3    anything to further evaluate that other than sending it to

4    Epiq?

5    A.  No.  We all relied on Epiq to conduct the professional

6    analysis and the expert investigation.

7            MR. ALLAN:  Can we pull up PDX 8.30?

8            THE COURT:  Counsel, this may be a good stopping

9    point.  It's about 4:30.  So the witness will return Monday.

10   Members of the jury, please return Monday.

11           Be here Monday.

12           Be here Monday.

13           Be here Monday.

14           A JUROR:  10:00 o'clock?

15           THE COURT:  10:00 o'clock.  10:00 o'clock.  10:00

16   o'clock.

17      (Proceedings adjourned from 4:30 p.m. to Monday, December

18      16, 2019, at 10:00 a.m.)

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2          We, Frances Ward and Judith A. Walsh, do hereby

3    certify that the foregoing is a complete, true, and accurate

4    transcript of the proceedings had in the above-entitled case

5    before the Honorable CHARLES R. NORGLE, SR., one of the judges

6    of said court, at Chicago, Illinois, on December 12, 2019.

7

8    /s/ *Frances Ward, CSR, RMR, CRR*_____        December 13, 2019

9    /s/ *Judith A. Walsh, CSR, RDR, F/CRR*_____        December 13, 2019

10   Official Court Reporters

11   United States District Court

12   Northern District of Illinois

13   Eastern Division