3122

<pre>
 1                 IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3    MOTOROLA SOLUTIONS, INC., and MOTOROLA   ) No. 17 CV 1973
      SOLUTIONS MALAYSIA SDN. BHD,            )
 4                                             )
                                               )
 5              Plaintiffs,                     )
      vs.                                       ) Chicago, Illinois
 6                                             )
      HYTERA COMMUNICATIONS CORPORATION, LTD., ) December 16, 2019
 7    HYTERA AMERICA, INC., and HYTERA         )
      COMMUNICATIONS AMERICA (WEST), INC.,     )
 8                                             )
                Defendants.                     ) 10:00 o'clock a.m.

 9
                            TRIAL - VOLUME 21 A
10                       TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE  CHARLES R. NORGLE, SR.
11                            and a jury

12

13    For the Plaintiffs:    KIRKLAND & ELLIS LLP
                              BY:  Mr. Adam R. Alper
14                                 Mr. Brandon Hugh Brown
                                   Mr. Reza Dokhanchy
15                                 Ms. Barbara Nora Barath
                                   Mr. Kyle Calhoun
16                            555 California Street
                              27th Floor
17                            San Francisco, California 94104
                              (415) 439-1400
18
                              KIRKLAND & ELLIS LLP
19                            BY:  Mr. Michael W. De Vries
                              333 South Hope Street
20                            Los Angeles, California 90071
                              (213) 680-8400
21

22
      Court reporter:              BLANCA I. LARA
23                            Official Court Reporter
                              219 South Dearborn Street
24                                  Room 2342
                              Chicago, Illinois 60604
25                                (312) 435-5895
                              blanca_lara@ilnd.uscourts.gov
</pre>

3123

1   Appearances:   (Continued:)

2

3   For the Plaintiffs:      KIRKLAND & ELLIS LLP
                             BY: Ms. Megan Margaret New
                             300 North LaSalle Street
4                            Chicago, Illinois 60654
                             (312) 862-7439
5
                             KIRKLAND & ELLIS LLP
6                            BY:  Ms. Leslie M. Schmidt
                             601 Lexington Avenue
7                            New York, New York 10022
                             (212) 446-4763
8
    Motorola Corporate Representative:   Mr. Russ Lund
9

10

11  For the Defendants:      STEPTOE & JOHNSON LLP
                              BY: Mr. Boyd T Cloern
                                  Mr. Michael J. Allan
12                                Ms. Jessica Ilana Rothschild
                                  Ms. Kassandra Michele Officer
13                           1330 Connecticut Avenue., Nw
                             Washington, DC 20036
14                           (202) 429-6230

15                           STEPTOE & JOHNSON LLP
                             BY:  Mr. Daniel Steven Stringfield
16                           227 West Monroe Street
                             Suite 4700
17                           Chicago, Illinois 60606
                             (312) 577-1267
18

19  Hytera Corporate Representative:  Michele Ning

20

21

22

23

24

25

1    THE CLERK:  All rise.

2    (The following proceedings were had in the

3    presence of the jury in open court:)

4    THE CLERK:  This Court resumes in session.  Please be

09:55:17    5    seated.

6    THE COURT:  Good morning, members of the jury.

7    Please recall the witness.

8    (Brief pause.)

9    THE COURT:  You may proceed.

10:00:17    10    MR. ALLAN:  May I proceed, Your Honor?

11    THE COURT:  Yes.

12    LUO JUNPING, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

13    DIRECT EXAMINATION (resumed)

14    BY MR. ALLAN:

10:00:21    15    Q.  Good morning, Mr. Luo.

16    A.  Good morning.

17    Q.  On Thursday you were describing how you were a liaison or

18    coordinator for the investigation that took place in this case.

19    Do you recall that?

10:00:44    20    A.  Yes.

21    Q.  And Hytera's attorneys conducted the investigation, is that

22    right?

23    A.  Correct.

24    Q.  And as a coordinator, you collected information when the

10:01:01    25    lawyers asked you to collect information, is that correct?

Luo - direct by Allan

3125

1    A.  Correct.

2    Q.  Is that a fair assessment of your role as the liaison?

3    A.  Yes.

4    Q.  Now, when we broke on Thursday afternoon, we were

10:01:26    5    discussing the collection of Ms. Huang Peiyi's computer.  Do

6    you recall that?

7    A.  Yes.

8    Q.  You collected one computer from her on November 2017 that

9    you sent to Epiq to be forensically reviewed, right?

10:01:56   10    A.  Yes.

11    Q.  And then you learned subsequently that she had a couple of

12    different computers that were assigned to her and then you went

13    and collected those as well.  One of them was set to be

14    recycled and another one was in somebody else's possession, is

10:02:10   15    that right?

16    A.  Yes.  That's how it was.

17    Q.  And I think you were telling us about the administration

18    office within Hytera.  Could you just remind everyone what that

19    was?

10:02:40   20    A.  The administrative department that I mentioned is the

21    department that would manage other records related to the

22    company's fixed assets.  So they would also keep a record of

23    the company's computers and who those computers are assigned

24    to.

10:03:12   25    Q.  Okay.

1    MR. ALLAN:  Can we you will up PDX 8.30.

2  BY MR. ALLAN:

3  Q.  Now, Mr. Luo, this was a slide that we showed earlier in

4  the trial, but are you familiar with what that top line refers

10:03:33    5  to or comes from?

6  A.  Yes, I have seen this document before.  I remember that

7  this document was found on the computer of one of our

8  custodians.

9  Q.  Okay.  What's your understanding of -- do you see, this is

10:04:07   10  highlighted here at the right, it says, "Share in the DMR

11  software development"?

12  A.  I see it.

13  Q.  Actually, let me back up.

14       At the left there's an asset number.  Do you see that?

10:04:28   15  A.  Yes.

16  Q.  You understand that to be a reference to one of Peiyi

17  Huang's computer -- computers?

18  A.  Yes, this number reflected here is the number of the

19  computer that I was able to retrieve from the warehouse.

10:04:59   20  Q.  All right.  If you look to the right, the custodian name

21  says "Ooi Phaik Ee," do you see that?

22  A.  Yes.  That's Peiyi Huang.

23  Q.  Now to the column I was showing you earlier, it says,

24  "Current usage in the work share and DMR software development,"

10:05:28   25  do you see that?

Luo - direct by Allan

3127

1    A.  Yes.

2    Q.  Do you have an understanding of what that is intended to

3    refer to?

4    A.  My understanding is that this computer might be circulated

10:06:00    5    in the DMR software department for different people to log on

6    to and to use.

7    Q.  Did your analysis of ethics forensic evaluation reveal

8    whether in fact this computer of Peiyi's was actually shared by

9    anyone other than her?

10:06:22    10    A.  That's not the case.  After we went over the analysis

11    result of the forensic analysis with Epiq, we found that this

12    computer was only used by Peiyi.  It has never been logged on

13    to by any other one.

14    Q.  How do you know that?

10:07:06    15    A.  Epiq could conduct a forensic analysis and collect all the

16    log-in information that's recorded on this computer.  They can

17    even tell from the analysis result what account was used to log

18    in and what time the log-in was.  And based on that analysis

19    and log, they could even tell who has used that computer.

10:07:54    20         The analysis result showed that there was only one

21    account, which is Huang Peiyi's account to log on to this

22    computer.  Nobody else's account was found on this computer.

23         So our conclusion is that only Huang Peiyi herself

24    used this computer and she was the only person who could see

10:08:37    25    all the information on the computer.

Luo - direct by Allan

3128

1   Q.  Do you understand that there were certain file paths that

2   were found on one of Huang Peiyi's computers?

3   A.  Yes, I know that.

4   Q.  So at least in one of the instances with one of the

5   computers, Epiq found paths for files but the files themselves

6   were not there, is that your understanding?

7   A.  Yes, that's one of the results of the forensic analysis.

8   Their forensic analysis result report listed all the files and

9   names and paths that had been found on this computer.

10          Actually, this refers to the metadata we were talking

11  about the other day.  They have found all the metadata of the

12  information that was once on this computer regardless whether

13  the information is still on the computer or not.

14  Q.  Now, you're familiar with SVN?  Do you know what SVN is?

15  A.  Yes, SVN is a piece of software that is used to manage

16  source codes and documents.  The full name of it is Subversion,

17  S-u-b-v-e-r-s-i-o-n.

18          Hytera uses SVN to keep and store all the source codes

19  and files related to DMR and other products.  It is a very

20  popular software program.  Different companies or even

21  different individuals can use that software as well.

22  Q.  So Hytera has a central SVN that it uses for DMR and other

23  projects?

24  A.  Yes.

25  Q.  So just so we're clear, there's a DMR SVN and there might

10:09:02

10:09:48

10:10:25

10:11:27

10:11:51

Luo - direct by Allan

3129

1  be an SVN for another project, and then a separate SVN for a

2  third project, and so on?

3  A.  Yes, that's what it means.

4  Q.  And those central SVNs are shared databases that different

10:12:20  5  engineers can access?

6  A.  Yes.  However, it comes with different levels of access

7  authorizations.  Only engineers with the proper authorization

8  will be able to access the information they want to see.

9  Q.  You just said -- you just testified about engineers having

10:13:02  10  their own SVN.  What did you mean by that?

11  A.  My meaning is that SVN can also be downloaded and installed

12  on their personal computers and the engineers will able to

13  download files and source codes from that centralized SVN to

14  their computers so they can add documents or information they

10:13:48  15  download on their computer.  When I say their personal

16  computer, I mean their personal work computer.

17  Q.  Do you have understanding of whether engineers at Hytera

18  keep their own personal version of an SVN to maintain their own

19  personal files relating to a project?

10:14:12  20  A.  That is a possibility.

21  Q.  Now, when these file paths that were found on one of

22  Peiyi's computers, have you looked at the file path listings?

23  A.  I took a quick look.  I remember that the report, the

24  forensic report that contained those analysis results was a

10:15:04  25  very long report.  I simply glanced through a portion I wanted

Luo - direct by Allan

3130

1    to see.

2    Q.  And do you recall seeing some file paths on Peiyi's

3    personal laptop that began with "SVN," the letters S-V-N?

4    A.  I remember there were some.

10:15:35    5    Q.  Do you know whether those file paths that began with "SVN"

6    constitute a mirror image of the DMR SVN database?

7    A.  I am not quite sure about the translation I heard.  Do you

8    mind repeating the question?

9    Q.  Do you have an understanding of whether the specific file

10:16:17    10    paths that were on Peiyi's computer that begin with "SVN" are

11    just a copy of what was on the central DMR SVN repository?

12            MR. DE VRIES:  Objection.  Foundation.

13            THE COURT:  Overruled.  You may answer.

14    BY THE WITNESS (THROUGH INTERPRETER):

10:16:52    15    A.  I know it is not.

16    BY MR. ALLAN:

17    Q.  How?  How do you know?

18    A.  I remember after seeing the information, I went to look for

19    the administrator of the centralized SVN.  And I sat next to

10:17:27    20    the administrator to see what was on the SVN server, and we did

21    not find any files reflected in the forensic analysis report.

22    Q.  How many files did you look for?

23    A.  We did not look for all of them.  I remember we looked for

24    about 100 or even less than that.  Later on we gave the

10:18:05    25    remaining work to our counsel and experts for their analysis.

Luo - direct by Allan

3131

1    Q.  And of the 100 or so file paths that you looked at, did you

2    see any of them on the central Hytera DMR SVN?

3    A.  No, we did not see any of that on our centralized SVN,

4    including those paths.  Those paths are different from the

10:18:52    5    paths on our SVN.

6    Q.  Now, let's switch subjects, Mr. Luo.

7             Did there come a time that you learned that there was

8    some amounts of Motorola source code contained in some of

9    Hytera's DMR products?

10:19:29    10    A.  Yes, in the last recent months.  I remember it was up to

11    June of this year.

12    Q.  Mr. Luo, why didn't Hytera address this code that was in

13    some of Motorola's -- some of Hytera's DMR products when this

14    lawsuit was filed in March of 2017?

10:19:50    15    A.  At that time the reason is that we still did not know what

16    had happened and we were spending a lot of time looking into

17    this and doing our investigation.

18    Q.  When you say you still didn't know what happened, what do

19    you mean by that?

10:20:27    20    A.  At that time what we saw was just a complaint.  The

21    description in the complaint was not clear as to what problems

22    our products had.  Even though we started the investigation

23    immediately, our investigation process was still slow.

24             THE COURT:  What was your position with Hytera when

10:21:15    25    you looked at the complaint in your corporate capacity?

Luo - direct by Allan

3132

1    THE WITNESS (THROUGH INTERPRETER):  Are you asking
2  about my job position?
3    THE COURT:  Yes.
4    THE WITNESS (THROUGH INTERPRETER):  At that time I was
5  assigned to assist our counsel in the investigation into this
6  matter.  So I was the coordinator.
7    THE COURT:  What was your position within the
8  corporate structure of Hytera?  What was your title?
9    THE WITNESS (THROUGH INTERPRETER):  At that time I was
10  the vice-director of the department of the management of
11  technology, patent, pricing, and strategy of the company.
12    THE COURT:  Were you an officer or director of the
13  corporation?
14    THE WITNESS (THROUGH INTERPRETER):  No, I was simply a
15  vice-director of a department in the company.  I was not on the
16  board of directors of the company.
17    THE COURT:  Were you an officer of the corporation?
18    THE WITNESS (THROUGH INTERPRETER):  No.
19    THE COURT:  Proceed.
20  BY MR. ALLAN:
21  Q.  Mr. Luo, were you involved in any capacity in terms of the
22  company's effort to rewrite certain source code files?
23  A.  Yes.
24  Q.  What was your role?
25  A.  I was also assigned as the liaison or a coordinator between

Luo - direct by Allan

3133

1    the team of our engineers who were responsible for rewriting

2    the code and our counsel and experts.

3    Q.  You yourself do not write source code, is that right?

4    A.  That is correct.

10:23:53   5    Q.  When did the company begin the process of rewriting source

6    code?

7    A.  We started around June of this year.  We started thinking

8    about it in the spring of this year, around March or April, but

9    the time we actually started rewriting the code was June of

10:24:36   10   this year.

11   Q.  And you testified that it was -- it was difficult to begin

12   the rewrite process earlier, is that right?

13   A.  Yes.

14   Q.  And did you prepare a demonstrative to help explain this

10:24:55   15   process?

16   A.  Yes.

17        MR. ALLAN:  Could we pull up DTX 9.1.

18   BY MR. ALLAN:

19   Q.  All right.  Just remind everyone, Mr. Luo, when the

10:25:12   20   complaint was filed in this case.

21   A.  March of 2017.

22   Q.  And your testimony is that Hytera would not have begun the

23   rewrite process at this point in time, in March of 2017?

24   A.  That's correct.  Yes, I remember at that time they only

10:25:59   25   mentioned that 8,000 documents of their trade secrets were

Luo - direct by Allan

3134

1    brought over to Hytera, but at that time we did not know what

2    they were.

3    Q.  All right.  The 8,000 document reference, when was that

4    made?

10:26:16   5    A.  In October 2017.

6    Q.  All right.  And what happened next?

7    A.  Until January 2018, they amended what they claim to be

8    their trade secrets and the number reached 20,000, which was

9    more than double the original figure.

10:26:59   10   Q.  And just to be clear, Mr. Luo, neither you nor anyone at

11   Hytera could see any of these the documents, is that right?

12   A.  That is correct, because they are confidential.  None of us

13   could see the content within those documents.

14   Q.  And is your understanding that Motorola had identified any

10:27:28   15   specific trade secrets in these 20,000 documents or was it just

16   a reference to 20,000 documents?

17   A.  According to what I know, they simply mentioned or

18   referenced those documents.

19   Q.  And what's your understanding of what happened next?

10:27:57   20   A.  Next in August 2018, they added copyright allegations to

21   the complaint.

22   Q.  All right.  And what happened next?

23   A.  In September that year, they told us that they redefined

24   those trade secrets into 169 categories.  At the same time,

10:28:56   25   they also told us that they have identified 89 source code

Luo - direct by Allan

3135

10:29:21

10:29:49

10:30:36

10:31:32

10:32:05

1    files with respect to their copyright allegations to be the

2    ones that they have -- to be the ones that have been copied.

3    Q.  So that was last September, September 2018, Hytera learns

4    that there are 169 alleged categories of trade secrets, is that

5    your understanding?

6    A.  Yes.

7    Q.  And, again, Hytera couldn't see if any of what they were

8    claiming is those trade secret categories, is that right?

9    A.  Correct.

10   Q.  Now, there's a reference to 89 source code files then as

11   well.  Isn't that something that Hytera could've begun to

12   rewrite?

13   A.  That was the first time we ever saw specific source code

14   files, but at that time we had a lot of questions.  My

15   understanding is that both Motorola's products and our products

16   used the same public chip.  Those were chips that are procured

17   from Texas Instrument.  We also used the same operating system.

18   It seems that it is an operating system that was purchased from

19   Mentor Graphics Company.

20         Since we purchased the chips and operating system from

21   these third-parties, they would also provide us with some of

22   the source codes so that we could use their chip and software.

23   These source codes would also be in our products.

24         Later we found that among those 89 source code files,

25   a part of them was from the third-party files.  So at that time

Luo - direct by Allan

3136

1   we were still very uncertain.  We relied on our experts and

2   counsel in conducting the analysis and investigation.  So at

3   that time we were unable to start rewriting the code precisely.

4   Q.  So at that point in time, September of last year, again,

10:32:49   5   you couldn't see any Motorola files or Motorola source code or

6   Motorola documents, you just got a list of Hytera files that

7   were accused, is that right?

8   A.  Yes.  That is correct.  Yes, it was very difficult at that

9   time.  It is like when you are to compare two paintings as to

10:33:41   10   what are different -- what would be different and what would be

11   the same, but you have only one painting in your hand that you

12   can see.  It would be very difficult to compare the two

13   paintings to tell the differences.  So we could only rely on

14   our counsel and experts.  They could analyze the situation and

10:34:15   15   tell us.

16   Q.  And just to be clear, some of the source code files out of

17   this 89 you understood to be third-party source code files from

18   companies like Texas Instrument and Mentor Graphics, is that

19   right?

10:34:35   20   A.  Correct.

21   Q.  Do you have an understanding of whether those third-party

22   files are part of the case now?

23   A.  I'm not quite sure about that.

24   Q.  What happened next?

10:35:07   25   A.  Later in December 2018, they reduced the number of trade

Luo - direct by Allan

3137

1    secret categories from 169 to 142.

2    Q.  And at this point in time was Hytera allowed to see a

3    redacted description of what Motorola claimed is these 142

4    trade secrets?

10:35:56    5    A.  I remember, yes.  And there was only one sentence, and

6    there was some portion that were redacted.

7    Q.  So one sentence for each of the 142 alleged trade secrets?

8    A.  Yes.  Very vague and we were not able to understand them.

9    Q.  All right.  What happened next?

10:36:32    10    A.  Next with respect to the copyright allegations, they

11    increased the number of categories for the accused source code

12    files that have been copied from 89 to 161.  What I meant was

13    89 source code files to 161 source code files.

14          THE COURT:  Counsel, before moving to the copyrights,

10:37:14    15    we'll take a short break here.  I have been informed by a

16    reliable source that the coffee has lately arrived.  We'll take

17    a short break, members of the jury.

18          (Recess.)

19          THE CLERK:  All rise.

10:52:02    20          (The following proceedings were had in the

21          presence of the jury in open court:)

22          THE CLERK:  The Court is in session.  Please be

23    seated.

24          THE COURT:  Please proceed, counsel.

10:52:45    25          MR. ALLAN:  Could we please pull up DDX 9.1.

Luo - direct by Allan

3138

BY MR. ALLAN:

Q.  Mr. Luo, before the break I think we were on the March 2019 entry.  Could you tell us what happened then?

A.  Later in around May, they told us again the specific lines that have been accused in those 161 source code files.

Q.  So let's go back to March of 2019.

A.  Okay.

Q.  In March of 2019, Motorola described some -- or defined some additional source code files that it claimed were copied?

A.  Yes, they added 72.  So the total number was 161.

Q.  And these were files that were identified, not lines within files, is that right?

A.  That's correct.

Q.  Do you have an understanding as to whether every line of every file is accused or just some lines within files?

A.  At that time my understanding was that -- my understanding is that it should be specific lines.  However, at that time we did not know what lines were.

Q.  Okay.  What happened in May of this year?

A.  In May of 2019, they further reduced the number of categories for the trade secrets.  The number came down to 29.

Q.  All right.  And then how about in June of this year?

A.  In June of this year, they specifically identified what lines of those source code files were copied.

Q.  So going back to the trade secrets.  Do you know how many

Luo - direct by Allan

3139

1  trade secrets are being accused now in the trial?

2  A.  According to my understanding, it would be 21 categories

3  and with 78 documents in total, ultimately.

4  Q.  So 78 documents now down from 20,000 in January of last

10:56:40  5  year?

6  A.  Correct.  The number keeps changing.

7  Q.  Let's go back to June when the specific lines were

8  provided.

9  A.  Yes.

10:57:03  10  Q.  Hytera was permitted to see the specific Hytera source code

11  lines, is that right?

12  A.  Yes, the specific lines in our source code.

13  Q.  But still, no access to Motorola code or documents, is that

14  right?

10:57:35  15  A.  Correct.  We have never seen those.

16  Q.  And when did Hytera begin its design process?

17  A.  Though it was in June when we learned the specific source

18  code documents and the specific lines, we started immediately

19  the rewriting work.

10:58:16  20  Q.  And, again, your role in this process was what?

21  A.  I was the coordinator between our engineers working on the

22  rewriting and our counsel and experts.

23  Q.  And which specific files did -- or which files did the

24  company redesign?  Start to work on redesigning in June?

10:58:50  25  A.  We worked on four categories of source codes.  Four sets of

Luo - direct by Allan

3140

1    source codes.

2         The first set would involve the specific accused

3    source codes.  We reworked all of them and designed all of

4    them.

10:59:33    5         The second set involves some library documents,

6    specifically three library documents.  We were not able to find

7    their source codes.  So we rewrote and redesigned the source

8    codes that could implement the functionalities related to those

9    library files, then we replaced those library files.

11:00:15    10         The third set would involve a template for programming

11    codes, for writing the source codes.  Usually that would

12    include information, such comments.  This template was brought

13    over by someone who used to work at Motorola.  Maybe someone

14    from those people; for example, Sam Chia, Y.T. Kok, or G.S.

11:01:07    15    Kok.  Though we rewrote the template that was used to write

16    those source codes, we used a brand new template.  All our

17    source codes that used that template were all rewritten as

18    well.

19         The fourth set would involve some of the source code

11:01:47    20    files written by Y.T.  Y.T. used to work at Motorola.  He was

21    also referenced in the complaint.  Though we rewrote all the

22    codes he had written, there were some other source code that

23    would interact or communicate with the previous three sets of

24    source codes.  Due to those modifications and changes, some

11:02:35    25    later codes would have to be changed and modified in response

Luo - direct by Allan

3141

1  to that.  These would be the four sets of source code documents

2  that we rewrote.

3  Q.  And in coming up with these four sets of code that was

4  rewritten, did you rely on Hytera's experts to help guide you?

11:03:05  5  A.  Yes, we relied on our experts and we learned from our

6  experts what codes needed to be rewritten.

7  Q.  How complicated was this rewrite process?

8  A.  It was not complicated.  We spend about 3 months to

9  complete all the work related to the rewriting of those codes.

11:03:54  10  However, in the subsequent few months, we performed a lot of

11  testing on our radios.

12       However, I would like to point out and emphasize that

13  the time required for the rewriting of the code was much less

14  from the time that we took in defining what codes needed to be

11:04:24  15  rewritten.

16  Q.  How many engineers participated in this process?

17  A.  There were about more than 60 engineers who were working on

18  the work related to those four sets of codes.  Each group of

19  engineers will be responsible for a different set of code.  So

11:05:06  20  they were divided into four different groups to perform

21  corresponding work.

22  Q.  Did any of those engineers if just mentioned have any

23  access to Motorola source code or documents?

24  A.  No.

11:05:27  25  Q.  Okay.  In total, Mr. Luo, what percentage of Hytera's DMR

Luo - direct by Allan

3142

1   code was rewritten during this process?

2   A.  About 4 percent.

3   Q.  Now, has this -- has this code been released to the public?

4   A.  Yes.

11:05:55   5   Q.  Explain how that process works.

6   A.  Earlier I mentioned that we spend about 3 months rewriting

7   the codes.  Later we also spent about 3 months testing the code

8   on some of our models.  After we were done with the testing, we

9   released those documents on our official website.

11:06:41   10          We released a software upgrade package.  We told our

11   agents and customers that they could download the upgrade,

12   software upgrade patch or package from our website in order to

13   upgrade their devices.

14          However, since we have many model numbers, there are

11:07:24   15   still some model numbers that are still being tested.  We

16   expect to complete such a testing in the next month or two and

17   then we will notify our customers and agents for the upgrades

18   for those remaining models.

19   Q.  Mr. Luo, let's go back to when you joined the company in

11:07:55   20   2008; okay.

21   A.  Okay.

22   Q.  Did you engage or participate in any sort of on-boarding or

23   training as a new employee when you joined the company?

24   A.  Yes, I remember I participated in on-board training which

11:08:34   25   lasted for about 20 days.  It was targeted for new hires and

Luo - direct by Allan

3143

1    new graduates.

2    Q.  Can you tell us a little about the types of training that

3    was part of that program?

4    A.  At that time the program involved extensive content.  It

5    was about the introduction to Hytera, to Hytera's products,

6    Hytera's market, Hytera's sales, as well as Hytera's policies.

7         At that time I remember that there was a half day

8    lecture for learning.  The second half of that day involved

9    group discussions, scenario simulation and some examinations.

10   Q.  Was any part of the training that you were involved in as a

11   new employee at Hytera focused on intellectual property and

12   intellectual property rights?

13   A.  Yes.  That was a very important part of it.

14   Q.  Can you tell us a little bit about that part of the

15   training?

16   A.  At that time, yes, I remember that we were told about what

17   intellectual property rights were, including those aspects such

18   as trade secrets, patents, copyrights and trademarks.  We were

19   introduced relevant knowledge.  We also learned the regulations

20   and rules pertaining to those aspects.  Therefore, we were

21   trained to respect Hytera's intellectual property.  Also, we

22   were trained to respect other people's intellectual property

23   rights.

24   Q.  Now, has Hytera increased its intellectual property

25   policies and trainings as a result of this case?

11:09:11

11:09:54

11:10:24

11:11:13

11:11:42

Luo - direct by Allan

3144

1  A.  Yes.

2  Q.  I'd like you, if you could, Mr. Luo, to look at DTX 3164 in

3  your binder.  Tell me if you recognize that.

4  A.  Yes.

11:12:27  5  Q.  What is that?

6  A.  This is a statement on intellectual property rights for

7  those people who newly joined Hytera.

8          MR. ALLAN:  I'd offer this into evidence, Your Honor.

9          MR. DE VRIES:  No objection, Your Honor.

11:12:56  10          THE COURT:  It is received and may be published.

11          (Said exhibit received in evidence.)

12  BY MR. ALLAN:

13  Q.  This is an entry statement of intellectual property rights

14  at Hytera, is that right, Mr. Luo?

11:13:08  15  A.  Yes.

16  Q.  And when was this written?

17  A.  Your around 2017.

18  Q.  And who prepared it?

19  A.  It was prepared under my advice, together with the advice

11:13:37  20  from our internal in-house legal counsel, and it was prepared

21  by our human resources department.

22  Q.  And, Mr. Luo, what's the purpose of this entry statement?

23  A.  This new entry statement is to tell our new hires the

24  series of intellectual property rights, items or knowledge they

11:14:16  25  need to follow.

Luo - direct by Allan

3145

1    Q.  Let's highlight just this section here:

2            "From the date of signing this statement, I will

3            not violate any of the non-competition

4            obligations to my former employers."

5             What does that mean?

6    A.  This statement is to express our hope that we hope that the

7    new people who joined Hytera would have a clear understanding

8    as to the obligations they had with respect to non-competition

9    for their previous employers.

10           THE COURT:  In what languages was this entry statement

11   distributed?

12           THE WITNESS (THROUGH INTERPRETER):  We have both the

13   Chinese and English versions.

14           THE COURT:  Mandarin?

15           THE WITNESS (THROUGH INTERPRETER):  Yes.

16           THE COURT:  Any other languages?

17           THE WITNESS (THROUGH INTERPRETER):  No, we mainly use

18   Mandarin Chinese and English.

19           THE COURT:  And Chinese?

20           THE WITNESS (THROUGH INTERPRETER):  Chinese, yes.

21           THE COURT:  Please.

22   BY MR. ALLAN:

23   Q.  Let's take a look at the second paragraph.  This paragraph

24   reads:

25           "I am obligated to keep confidential the trade

Luo - direct by Allan

3146

1          secrets to my former employers or any other

2          institutions.  I undertake not to bring any

3          trade secrets involving third-parties into

4          Hytera and not to use them in Hytera."

11:16:26   5          Do you see that?

6     A.  I see it, yes.

7     Q.  And what is the purpose of that provision, Mr. Luo?

8     A.  This provision is to highlight to our new employees that

9     they should follow these obligations as to not to bring other

11:17:17   10    people's confidential information or trade secrets to Hytera,

11    nor could they use those trade secrets or information.

12          MR. ALLAN:  You can take that down, please, Jim.

13    BY MR. ALLAN:

14    Q.  Take a look, Mr. Luo, at DTX 3162 in your binder.

11:17:42   15    A.  Yes.

16    Q.  And is this a copy of Hytera's employees intellectual

17    property background checklist?

18    A.  Yes.

19          MR. ALLAN:  I'd offer this into evidence, Your Honor.

11:17:57   20          MR. DE VRIES:  No objection, Your Honor.

21          THE COURT:  It is received and may be published.

22          (Said exhibit received in evidence.)

23    BY MR. ALLAN:

24    Q.  Mr. Luo, can you tell us what we're looking at here?

11:18:09   25    A.  This is a background investigation for intellectual

Luo - direct by Allan

3147

1    property matters for those employees who newly joined Hytera.

2    Q.  And what's the purpose of this checklist?

3    A.  We hope that with this checklist, those new employees would

4    tell the truth about their background information.  And we want

11:19:07  5    to use this checklist to ensure that they will not violate the

6    non-competition obligations or limitations, and they would not

7    bring other people's trade secrets and confidential information

8    to Hytera and to be used in Hytera.

9    Q.  And when was this checklist prepared, Mr. Luo?

11:19:28  10    A.  Also in 2017.

11    Q.  Are you aware of efforts to confirm information provided by

12    new employees on these checklists?

13    A.  Yes.  Colleagues in our HR department would make a phone

14    call to these employees, former employers to check into the

11:20:12  15    information that they provided.

16    Q.  Mr. Luo, this checklist and the previous document we just

17    looked at, the entry statement, why were these prepared?

18    A.  It's because we keep enhancing our education on

19    intellectual property rights to our employees.

11:20:57  20    Actually, what we are doing is more.  We are doing

21    more work.  For example, we would invite law firms and

22    attorneys from the United States to give us lectures and

23    seminars.  We have ongoing training classes for all the

24    employees.

11:21:20  25    Q.  And is protection of intellectual property, Hytera's and

Luo - cross by DeVries

3148

1  those of other third-parties, important to the company?

2  A.  Yes, it is very important.

3         MR. ALLAN:  Pass the witness.

4         THE COURT:  Are you ready to cross, counsel?

11:21:44  5         MR. DE VRIES:  Yes, Your Honor.

6         THE COURT:  Please proceed.

7                  CROSS EXAMINATION

8  BY MR. DE VRIES:

9  Q.  Good morning, Mr. Luo.

11:22:32  10  A.  Hi.

11  Q.  Have I properly pronounced your last name?

12  A.  Very accurate.

13  Q.  My name is Mike DeVries.  I'm an attorney for Motorola

14  Solutions.

11:22:54  15         Mr. Luo, you were not personally involved in

16  developing Hytera's DMR products between 2008 and 2010,

17  correct?

18  A.  That's correct.  I was in the sales department at that

19  time.

11:23:18  20  Q.  In fact, you were in sales and marketing from the time you

21  joined Hytera in 2008 until approximately 2013, is that right?

22  A.  Correct.

23  Q.  So you did not personally see how Hytera engineers used my

24  client's source code and other trade secrets to develop

11:23:51  25  Hytera's DMR products, is that correct?

Luo - cross by DeVries

3149

A.  First of all, I would like to object to your question

because none of the engineers used the source code and trade

secret from Motorola in developing their work.  And at that

time I did work in the sales department.  I started to

understand and gain an understanding about such information

after I started working with our counsel and experts.

Q.  Was that in 2017 that you began what you just described?

A.  Yes.

Q.  And so let me get this clear.  You deny that Hytera used

Motorola source code to develop its DMR products?

A.  I think you mischaracterized my testimony.  I said earlier

that it was until June of 2018, after we had conducted a large

amount of investigation, that we found that a small portion of

Motorola's code was used on our products, on part of our

products.

Q.  And so, Mr. Luo, you admit that your company, Hytera, used

client Motorola's source code to develop its DMR products,

correct?

A.  I do not agree with your question.  We admit that some of

our products had some of Motorola's codes, but I do not know if

those codes had been used to research and develop other

products.  I only know that for those problematic codes, we

already tried our very best to revise them.

Q.  We'll come back to that, Mr. Luo.

        Now, you have been involved in Hytera's investigation

Luo - cross by DeVries

3150

1   into whether and how it used Motorola's source code and

2   confidential information, correct?

3   A.  I had been assisting our counsel in conducting the

4   investigation.

11:27:47  5   Q.  Hytera began that investigation after this case was filed

6   in March of 2017, right?

7   A.  Yes.

8   Q.  And your investigation involved looking for documents and

9   electronic materials, right?

11:28:17  10   A.  Yes.

11   Q.  And also interviewing people?

12   A.  Yes.

13   Q.  You told the jury about information that you obtained by

14   talking to P.E. Huang, right?

11:28:40  15   A.  Yes.

16   Q.  Did Hytera interview members of its board of directors as

17   part of its investigation?

18   A.  I don't have a full picture of all the specific situations;

19   the reason is that many of the interviews were conducted by our

11:29:06  20   counsel.  But many of those interviews, I myself was not

21   involved.  I was not present.  But my understanding is that the

22   interviews must have involved some members of the board.

23   Q.  Did the interviews -- did Hytera interview the chief of

24   engineering, Mr. Zheng Guan Fu?

11:29:43  25   A.  Not to my knowledge.  The reason is that he had already

Luo - cross by DeVries

3151

1   left Hytera prior to the filing of this lawsuit, which was in

2   March of 2017.

3   Q. Did Hytera interview Dr. Tang?

4   A. To my knowledge, no. Dr. Tang also left Hytera at very

11:30:20   5   early timeframe prior to March of 2017.

6   Q. Do you know who Mr. Chen is?

7   A. Are you referring to our president or chairman, Mr. Chen?

8   Q. Yes, I am.

9   A. Yes.

11:30:39   10   Q. He is the CEO and chairman of Hytera currently, correct?

11   A. Correct.

12   Q. And he made the decision to hire G.S. Kok?

13   A. I don't know the specifics, but to my understanding the

14   decision to hire someone or not would be the decision of the HR

11:31:16   15   department.

16   Q. Did Hytera interview Mr. Chen as part of its investigation

17   into whether Hytera used my client's source code and trade

18   secrets?

19   A. To my knowledge, our counsel interviewed him, but I was not

11:31:46   20   included in that interview. I do not know what they talked

21   about specifically. Our counsel would not report to me. I

22   simply helped them do their work.

23   Q. Where is Mr. Chen?

24   A. What timeframe are you asking?

11:32:15   25   Q. 11/30 on Monday, December the 16th. 11:30 a.m. central.

Case: 1:17-cv-01973 Document #: 802 Filed: 12/20/19 Page 31 of 113 PageID #:54986
Luo - cross by DeVries
3152

1   A.  So now I understand what you're asking about right now.

2   According to my understanding, right now Mr. Chen should you be

3   in China.

4   Q.  Hytera did interview G.S. Kok as part of its investigation,

11:32:49   5   correct?

6   A.  To my knowledge, yes.

7   Q.  And Hytera interviewed Y.T. Kok as part of this

8   investigation; fair?

9   A.  Yes.  To my knowledge, yes.

11:33:09   10   Q.  And Hytera interviewed Sam Chia; fair?

11   A.  Yes.

12   Q.  Okay.  Now, as we just discussed, you shared certain

13   information that Hytera learned through the interviews that we

14   just discussed with the jury; fair?

11:33:30   15   A.  It's like this, I said earlier, our counsel conducted many

16   interviews and investigations.  However, for many of them, I

17   was either not present or I do not have the full picture of all

18   the information.  I could only comment on the limited content

19   that I know.

11:34:18   20   Q.  You shared certain information that you learned from your

21   interview of Peiyi Huang, as we just discussed, right?

22   A.  Yes.

23   Q.  But you did not tell the jury all of the information that

24   Hytera learned through its interviews of the individuals that I

11:34:40   25   just described, correct?

Luo - cross by DeVries

3153

A.   That's correct.  However, I would like to emphasize again

that I do not have an understanding of all the information.

The investigation is being conducted by our counsel.  I can

simply talk about what I myself know.

Q.   Did you think it might be important to learn all of the

information that Hytera, the company, knows before coming to

testify to the jury?

MR. ALLAN:  Objection, Your Honor.

THE COURT:  Sustained.  Arguing with the witness.

MR. DE VRIES:  Your Honor, may I approach?

THE COURT:  Yes.

BY MR. DE VRIES:

Q.   Mr. Luo, you should have a document PTX 233_TCR in front of

you.

A.   Yes.

Q.   This was a document that was produced out of Hytera's files

as part of this litigation, is that correct?

A.   To my knowledge, yes.

Q.   And it bears a Hytera Bates number on the first page?

A.   Yes, I see it.

Q.   And, Mr. Luo, this is an e-mail between Hytera employees

from May of 2017, is that correct?

A.   Yes.

MR. DE VRIES:  Your Honor, we move into evidence PTX

233_TR.

Case: 1:17-cv-01973 Document #: 802 Filed: 12/20/19 Page 33 of 113 PageID #:54988
Luo - cross by DeVries
3154

1    MR. ALLAN:  Your Honor, I object.

2    THE COURT:  The objection is overruled.  The motion to

3  admit is granted.  The document may be published.

4    (Said exhibit received in evidence.)

11:37:26  5  BY MR. DE VRIES:

6  Q.  Now, Mr. Luo, you have in front of you it's also on the

7  screen if it's easier.  It's PTX 233-TR.  This is an e-mail

8  that was sent by Sam Chia on May 22nd of 2017, is that right?

9  A.  Yes.

11:37:54  10 Q.  And it was sent to Mr. Chen, the chairman and CEO of

11 Hytera, is that right?

12 A.  Yes.

13 Q.  And Mr. Chen owns more than 50 percent of the company

14 Hytera, correct?

11:38:16  15    INTERPRETER LIN:  Counsel, do you mind repeating that?

16    MR. DE VRIES:  No problem.

17 BY MR. DE VRIES:

18 Q.  Mr. Chen owns more than 50 percent of the company Hytera,

19 is that right?

11:38:29  20 A.  I do not know.  I'm not on the board of directors.

21 Q.  If we go to the second page of the document, there's a

22 paragraph at the top that begins "fourth."  And Mr. Chia says

23 to Mr. Chen:

24    "Fourth major item is the company lawsuit that

11:38:57  25    started in April 2017."

Case: 1:17-cv-01973 Document #: 802 Filed: 12/20/19 Page 34 of 113 PageID #:54989
Luo - cross by DeVries
3155

1    Do you see that?

2    A.  Yes.

3    Q.  And that refers to this lawsuit, right?

4    A.  That's my understanding.

11:39:23    5    Q.  And then he goes on to say:

6        "As I am a key witness, I am feeling a lot of

7        pressure doing and saying the right thing."

8        Do you see that?

9    A.  Yes, I see it.

11:39:47    10    Q.  And then he continues, I'm going to skip a sentence, and he

11    says:

12        "Before meeting the external lawyers, I was told

13        to tell the truth about all the events that

14        happened."

11:40:08    15    A.  Yes, I see.

16    Q.  And then Mr. Chia writes:

17        "However, after this has happened, I was told

18        that I should to have said too much."

19        Right?

11:40:25    20    A.  I see that.

21    Q.  Now, you know that Sam Chia spoke with Hytera's lawyers

22    when the case came about in 2017, right?

23    A.  I do not know about that.

24    Q.  You were deposed in this case in April of this year, is

11:40:45    25    that right?

Case: 1:17-cv-01973 Document #: 802 Filed: 12/20/19 Page 35 of 113 PageID #:54990
Luo - cross by DeVries
3156

1    A.  Yes.

2    Q.  And you promised to tell the truth?

3    A.  Yes.

4    Q.  And you did tell the truth?

11:41:26  5    A.  Yes, I said and told everything that I knew.

6    Q.  At page 124 of your deposition, on April the 1st of 2019,

7    reading from lines 4 to lines 14.

8         MR. DE VRIES:  And, Mr. Schlaifer, if we can publish

9    that, please.

11:41:55  10   BY MR. DE VRIES:

11   Q.  You were asked:

12         "Question:  When did Hytera first speak with Mr.

13         Sam Chia about this litigation?

14         "Answer:  I remember it was at the time when the

11:42:11  15        case came about.

16         "Question:  And who spoke with Hytera --

17         withdrawn.  Who spoke with Mr. Sam Chia about

18         this litigation?

19         "Answer:  It was Finnegan's lawyer.

11:42:21  20        "Question:  Who at Finnegan spoke with Mr. Sam

21         Chia?

22         "Answer:  I remember it was Zhu Shao Bin from

23         Finnegan."

24          Was that your testimony?

11:43:01  25   A.  Yes.

Luo - cross by DeVries

3157

```
 1        MR. DE VRIES:  Mr. Schlaifer, if we could please go
 2   back to PTX 233_TR.
 3   BY MR. DE VRIES:
 4   Q.  And again, let's look at that fourth paragraph where
 5   Mr. Chia writes:
 6            "Before meeting the external lawyers, I was told
 7            to tell the truth of all the events that
 8            happened."
 9   A.  I see it.
10   Q.  And, Mr. Luo, you admit that Mr. Chia spoke with Hytera's
11   counsel when the case came about, right?
12   A.  Yes; it was our outside counsel.
13   Q.  Now, when he writes:
14            " However, after this has happened, I was told
15            that I should to have said too much."
16              Do you see that?
17   A.  Yes.
18   Q.  Who at Hytera told Sam Chia that he said too much when
19   talking to the lawyers?
20   A.  First of all, I do not know.  Also from here, I could not
21   tell that it had to be someone from Hytera that told him that
22   he said too much.  Perhaps it was someone outside of Hytera
23   that told him that.  For example, they had their own counsel,
24   their personal counsel representing the individuals, their
25   individual counsel.
```

11:43:17 (line 5)
11:43:33 (line 10)
11:44:00 (line 15)
11:44:16 (line 20)
11:45:02 (line 25)

Luo - cross by DeVries

3158

1  Q.  And, Mr. Luo, you know that they didn't have -- that Mr.

2  Chia didn't have counsel at the time of this e-mail in May

3  of 2017, right?

4  A.  I don't quite remember the specific time, but it was

11:45:30  5  roughly around that time.

6  Q.  After this time, Hytera hired counsel for Sam Chia, G.S.

7  Kok and Y.T. Kok, right?

8  A.  I said that I don't quite remember the specific timeframe.

9  If you have more materials or evidence to show me, perhaps I

11:46:02  10  will be able to recall.

11  Q.  Now, the Finnegan law firm that in your deposition you

12  testified that Mr. Chia spoke to, that law firm represented

13  Hytera, right?

14  A.  Yes.

11:46:22  15  Q.  And you have not told the jury what Sam Chia told Hytera's

16  law firm during that interview, right?

17          MR. ALLAN:  Objection, Your Honor.

18          THE COURT:  Sustained.  Disregard the question.

19          You have given answers to the questions that have been

11:46:50  20  asked of you by the attorneys, is that right?

21          THE WITNESS (THROUGH INTERPRETER):  That's correct.

22          THE COURT:  What is the next question?

23          MR. DE VRIES:  Your Honor, may I have a sidebar?

24          THE COURT:  Not on that point.

11:47:06  25  BY MR. DE VRIES:

Luo - cross by DeVries

3159

1    Q.  Let me ask this then:  Do you know what Mr. Chia told

2    Hytera's lawyers during that interview?

3    A.  I do not know.

4    Q.  Now, Hytera interviewed Y.T. Kok as part of its

11:47:28    5    investigation, is that right?

6    A.  Yes.

7    Q.  And do you know what information Hytera learned from that

8    interview with Mr. Kok?

9    A.  I do not know.  I was not on that interview.

11:47:50    10    Q.  Did Hytera interview G.S. Kok as part of its investigation?

11    A.  Yes.  It was done by our outside counsel.

12    Q.  And you don't know what was -- what information Hytera

13    learned during that interview?

14    A.  That's correct.  I do not know.  I was not on that

11:48:21    15    interview.

16    Q.  Based on its investigation, Hytera now admits that a Hytera

17    employee, Peiyi Huang, had possession of Motorola's source code

18    in her computer, is that fair?

19    A.  Yes.

11:48:46    20    Q.  And Peiyi Huang used to be responsible for the software

21    part of Hytera's DMR products; fair?

22    A.  Yes.

23    Q.  Peiyi Huang told Hytera that she got Motorola source code

24    from another Motorola employee, Y.T. Kok, is that right?

11:49:17    25         MR. ALLAN:  Objection, Your Honor.

Case: 1:17-cv-01973 Document #: 802 Filed: 12/20/19 Page 39 of 113 PageID #:54994
Luo - cross by DeVries
3160

1    THE COURT:  Overruled.  You may answer, if you know.

2  BY THE WITNESS (THROUGH INTERPRETER):

3  A.  It's like this, Huang Peiyi used to work in Motorola.  I

4  believe she knew people, such as Sam and Y.T., before she

5  joined Hytera.  Throughout our investigation, I learned from

6  our counsel that the source code that were residing on Peiyi's

7  computer must have been obtained from Y.T.

8  BY MR. DE VRIES:

9  Q.  You were deposed on April -- in April of this year, right,

10 that we talked about?

11 A.  Yes.

12 Q.  At page 16, Line 11 through Line 16, you were asked:

13         "Question:  How did Peiyi obtain Motorola source

14         code?

15         "Answer:  According to our understanding, Peiyi

16         told us she got it from Y.T.

17         "Question:  Y.T. Kok?

18         "Answer:  Yes."

19         Was that your testimony?

20         MR. ALLAN:  Objection.

21         THE COURT:  The objection is overruled.  The witness

22 may answer the question.

23         Let me ask him:  Do you understand the question?

24         THE WITNESS (THROUGH INTERPRETER):  Yes.

25         THE COURT:  You may answer.

Case: 1:17-cv-01973 Document #: 802 Filed: 12/20/19 Page 40 of 113 PageID #:54995
Luo - cross by DeVries
3161

1

2  BY THE WITNESS (THROUGH INTERPRETER):

3  A.  Yes, I said this.  I obtained the information from our

4  counsel.  So I provided such information when I was being

11:51:41   5  deposed.

6          MR. DE VRIES:  We can take that down, Mr. Schlaifer.

7  BY MR. DE VRIES:

8  Q.  Now, the interfaces for the Motorola source code found on

9  Peiyi Huang's computer are similar to the interfaces that

11:52:00  10  Hytera libraries use, is that correct?

11  A.  That is a technical question.  I do not have an

12  understanding about the technical details involved.

13  Q.  You were deposed in April of 2019, as we just discussed,

14  right?

11:52:29  15  A.  Yes.

16  Q.  And, again, you told the truth at that deposition?

17  A.  Yes.

18  Q.  Page 23, lines 3 to 11, you were asked:

19          "Question:  Has Hytera compared the interfaces

11:52:46  20          between the Motorola source code files found on

21          Peiyi's computer and the interfaces that its own

22          libraries use?

23          "Answer:  Based on our limited analysis, indeed,

24          we found some of the interfaces are similar."

11:53:02  25          Was that your testimony?

Luo - cross by DeVries

3162

1    A.  Yes; but I remember there were more discussions with this.

2    I provided a clarification in the subsequent part.

3            What I said was that I knew that the names of the

4    files are the same, but I do not have an understanding about

11:54:01    5    the source codes included in them.  It was reflected in detail

6    in my deposition transcript.

7    Q.  Now, you also admit that Peiyi Huang used the Motorola

8    source code on her computer to compile library files?

9    A.  Yes.

11:54:30    10    Q.  And you also admit that Motorola's source code was copied

11    into Hytera source code files, right?

12    A.  Yes.  A very small portion.

13    Q.  In fact, several of Hytera's DMR libraries were compiled

14    using Motorola source code, right?

11:55:33    15    A.  It should be put in this way:  I myself do not have

16    knowledge about this.  We only know that some of the library

17    files are missing the source code.  And we have found similar

18    source codes on Peiyi's computer.  However, whether or not

19    those source code which contain Motorola designation or

11:55:55    20    labeling could fully respond to the source code that we have,

21    we fully rely on our experts to do such an analysis.

22    Q.  And as part of your investigation, you found the documents

23    with Motorola confidentiality identifiers were found on Hytera

24    engineer computers, right?

11:56:39    25    A.  Yes.  For example, the agreement with Motorola that we

Luo - cross by DeVries

3163

1    looked at earlier also bears such confidential identifier.  We

2    have found some similar documents of that sort.

3    Q.  And I guess as another example, hundreds of Motorola

4    confidential documents on the possession -- in the possession

11:57:00    5    of the leaders of Hytera's DMR group were also found, right?

6    A.  Yes, we admit that some of the documents found on Peiyi's

7    computer bear the Motorola confidential designation.  However,

8    I also explained that Peiyi was hiding that information from us

9    with no reasons.  And according to my understanding, other

11:58:10    10    engineers and other Chinese engineers knew nothing about it.

11    Q.  In fact, 100 or so documents were found on Sam Chia's

12    computer as well, right?

13    A.  Yes.

14    Q.  And 80 or so were found in Y.T. Kok's possession as well,

11:58:38    15    right?

16              INTERPRETER LIN:  Counsel, "8"?

17    BY MR. DE VRIES:

18    Q.  I'm sorry.  80, 8-0, or so, were found in the possession of

19    Y.T. Kok as well, right?

11:58:48    20    A.  I don't have the specific number.

21    Q.  You know that there were Motorola confidential documents

22    found in Y.T. Kok's possession, you just don't know how many;

23    is that fair?

24    A.  I only know that some documents bearing Motorola were found

11:59:33    25    on his computer; however, I do not know if those could be

Luo - cross by DeVries

3164

1    regarded as confidential documents or if they are actually

2    confidential documents.  And also for the specific number, I

3    also do not know sitting here today.

4    Q.  Documents marked as Motorola confidential documents were

11:59:52  5    found on G.S. Kok's computer, right?

6    A.  According to my memory and understanding, there might have

7    been some documents that contained the word "Motorola" in them.

8    Q.  And you know that Motorola documents were found in the

9    possession of Yu Kok Hoong, Hytera employee, right?

12:00:30  10    A.  Yes.

11    Q.  And you also know that Motorola confidential documents were

12    found in the possession of Vivian Pan, correct?

13           INTERPRETER LIN:  Would you repeat that name, please?

14           MR. DE VRIES:  Yes.  Vivian Pan.

12:00:46  15    BY THE WITNESS (THROUGH INTERPRETER):

16    A.  I do not know about this.  It seems that I was not the

17    person who collected the documents from this custodian.  It

18    seems that another colleague in our U.S. subsidiary collected

19    the documents from this colleague who worked in our U.S.

12:01:26  20    subsidiary.

21    BY MR. DE VRIES:

22    Q.  And as part of its investigation, Hytera learned that its

23    employees concealed their use of Motorola's source code and

24    confidential documents by changing interface names and

12:01:52  25    rebranding those documents, correct?

Luo - cross by DeVries

3165

A.  I do not know.

MR. DE VRIES:  Your Honor, I'm going to move on to a new line of questioning, I wanted to note, because I know it's a couple of minutes past noon.

THE COURT:  Good timing.

Members of the jury, please return at 1:00 o'clock. The witness will return at 1:00 o'clock.  The Court is adjourned.

THE CLERK:  All rise.  The Court is adjourned.


(Luncheon recess taken from 12:02 o'clock p.m.
to 1:00 o'clock p.m.)


*    *    *    *    *    *    *    *


I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE
RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

/s/Blanca I. Lara                    December 16, 2019

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3   MOTOROLA SOLUTIONS, INC., and MOTOROLA   ) No. 17 CV 1973
     SOLUTIONS MALAYSIA SDN. BHD,             )
 4                                            )
                  Plaintiffs,                 )
 5   vs.                                      ) Chicago, Illinois
                                              )
 6   HYTERA COMMUNICATIONS CORPORATION, LTD., ) December 16, 2019
     HYTERA AMERICA, INC., and HYTERA         )
 7   COMMUNICATIONS AMERICA (WEST), INC.,     )
                                              )
 8                  Defendants.               ) 1:01 o'clock p.m.

 9                     TRIAL - VOLUME 21-B
                    TRANSCRIPT OF PROCEEDINGS
10
            BEFORE THE HONORABLE CHARLES R. NORGLE, SR.,
11                         and a jury

12   APPEARANCES:

13   For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                            BY:  MR. ADAM R. ALPER
14                               MR. BRANDON HUGH BROWN
                            555 California Street
15                          Suite 2700
                            San Francisco, California 94104
16                          (415) 439-1400

17                          KIRKLAND & ELLIS, LLP
                            BY:  MR. MICHAEL W. DE VRIES
18                               MR. CHRISTOPHER M. LAWLESS
                            333 South Hope Street
19                          Suite 2900
                            Los Angeles, California 90071
20                          (213) 680-8400

21

22   Court Reporter:        AMY M. SPEE, CSR, RPR, CRR
                            Official Court Reporter
23                          United States District Court
                            219 South Dearborn Street, Room 1728
24                          Chicago, Illinois  60604
                            Telephone:  (312) 818-6531
25                          amy_spee@ilnd.uscourts.gov
```

```
 1    APPEARANCES (Continued:)

 2    For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                             BY:  MS. MEGAN MARGARET NEW
 3                           300 North LaSalle Street
                             Chicago, Illinois 60654
 4                           (312) 862-7439

 5                           KIRKLAND & ELLIS, LLP
                             BY:  MS. LESLIE M. SCHMIDT
 6                           601 Lexington Avenue
                             New York, New York 10022
 7                           (212) 446-4763

 8    For the Defendants:    STEPTOE & JOHNSON, LLP
                             BY:  MR. BOYD T. CLOERN
 9                                MR. MICHAEL J. ALLAN
                                  MS. JESSICA ILANA ROTHSCHILD
10                                MS. KASSANDRA MICHELE OFFICER
                             1330 Connecticut Avenue NW
11                           Washington, DC 20036
                             (202) 429-6230
12
                             STEPTOE & JOHNSON, LLP
13                           BY:  MR. DANIEL S. STRINGFIELD
                             227 West Monroe Street
14                           Suite 4700
                             Chicago, Illinois 60606
15                           (312) 577-1300

16

17    ALSO PRESENT:          MR. RUSS LUND and
                             MS. MICHELE NING
18

19

20

21

22

23

24

25
```

1          (Proceedings heard in open court.  Jury out.)

2              THE COURT:  We need a reader from the Hytera counsel.

3              MR. CLOERN:  Thank you, Your Honor.

4              THE COURT:  Thank you.  It's a note from a juror.

5     Please read it into the record.

6              MR. CLOERN:  "Your Honor, I'm asking for a release

7     from court at 4:30 p.m. today so that I can catch the 5:03

8     train at Ogilvie.  My children and I have taekwondo testing

9     tonight at 6:45.  Alla Shegelsky."

10             THE COURT:  Is there any objection to stopping at

11    about 4:30?

12             MR. ALPER:  No, Your Honor.

13             THE COURT:  Thank you, Counsel.

14             Mr. Fulbright, please file the note.

15             It had an Oriental connotation, so I wasn't quite

16    sure what your position might be.

17             MR. ALPER:  Absolutely no objection.

18             THE COURT:  You agree, Counsel?

19             MR. CLOERN:  We do, Your Honor.

20             THE COURT:  All right.  Please ask the jury to come

21    in.

22         (Jury in.)

23             THE CLERK:  Court is in session.

24             THE COURT:  Good afternoon, members of the jury.

25             THE CLERK:  Please be seated.

Luo - cross by De Vries

3169

1    THE COURT:  The Court has conferred with counsel, and

2    we will be stopping at some point before 4:30.

3        Please recall the witness.

4        JUNPING LUO, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

5                    CROSS-EXAMINATION

6    BY MR. DE VRIES:

7    Q.  Good afternoon, Mr. Luo.

8    A.  Hi.

9    Q.  Before lunch, you testified that Hytera admits that some

10   of its DMR source code includes some Motorola source code,

11   correct?

12   A.  Yes.  That was what we found recently in some of our model

13   numbers.

14   Q.  And you also testified that Hytera admits that some of its

15   employees had Motorola documents in their possession, correct?

16   A.  I would like to make a clarification.  What we admit to is

17   that those documents have the word "Motorola" in them.

18   Q.  And the word, for example, "confidential"?

19   A.  Yes.

20   Q.  Now, Hytera admits that using another company's

21   confidential source code and information is wrong, right?

22   A.  Yes.

23   Q.  If a competitor's documents or source code are

24   confidential, as a company, you believe they should not be

25   used, right?

Luo - cross by De Vries

3170

1    A.   Yes.

2    Q.   Hytera believes in corporate responsibility, right?

3    A.   I believe so.

4    Q.   It believes in taking responsibility for the actions of

5    its employees, correct?

6    A.   Yes.

7    Q.   Hytera admits that stealing source code and trade

8    secrets -- other trade secrets harms the innovation that fuels

9    the economy, right?

10   A.   I do not agree with your question.  We still don't know

11   yet where exactly these source code came from.  I believe

12   that's part of the investigation being conducted by our

13   counsel and experts.

14   Q.   And I mean, generally, Hytera admits that in general

15   stealing source code and other trade secrets harms innovation;

16   is that fair?

17   A.   Yes.

18   Q.   And Hytera agrees that stealing another company's trade

19   secrets can cause job losses, fair?

20   A.   I do not understand the logic of your question.

21   Q.   Let me try to explain.

22   A.   Okay.

23   Q.   If a company has a number of employees that work hard to

24   create trade secrets, and then another company comes along and

25   simply steals them, that can cause the company whose trade

Luo - cross by De Vries

3171

1  secrets were stolen to lose -- to have job loss, fair?

2          MR. ALLAN:  Objection, Your Honor.

3          THE COURT:  Do you understand the question the way it

4  is put to you?

5          THE WITNESS (through the interpreter):  I don't quite

6  understand it.

7          THE COURT:  Rephrase the question.  Sustained.

8  BY MR. DE VRIES:

9  Q.  Hytera agrees it is important to take action against

10 companies who steal other company's trade secrets; is that

11 fair?

12 A.  Yes.

13 Q.  And Hytera agrees that if a company takes something

14 without permission, it should have to pay for it, right?

15 A.  Yes.

16 Q.  And Hytera agrees that if a company is proven to have

17 stolen another company's trade secrets, it should be punished,

18 right?

19         MR. ALLAN:  Objection.  Objection, Your Honor.

20         THE COURT:  Do you understand the question the way it

21 is put to you?

22         THE WITNESS (through the interpreter):  I don't quite

23 understand it.  It might involve some legal terms or logic.

24         THE COURT:  Rephrase the question.

25 BY MR. DE VRIES:

Luo - cross by De Vries

3172

1    Q.  Let me ask this:  Before this trial, your company, Hytera,

2    denied using any of Motorola's source code, right?

3    A.  I don't think that is the correct statement.  As I

4    mentioned earlier, we admit that a part of the source code

5    found on some of our products was Motorola's source code.  We

6    found that several months ago.

7    Q.  But before this trial, your company denied that, right?

8    A.  I do not know.

9            MR. DE VRIES:  Your Honor, may I approach?

10           THE COURT:  We touched on this issue at a sidebar.

11   If you can be consistent with that earlier ruling, then you

12   may proceed.

13           MR. DE VRIES:  I believe I understand what Your Honor

14   is referring to, and that this is consistent with that.

15           THE COURT:  Proceed.

16   BY MR. DE VRIES:

17   Q.  I've handed you a document that's been marked as PTX-1737.

18   Do you see that?

19   A.  Yes.

20   Q.  And the title of the document is "Defendants' Responses to

21   Plaintiffs' Second Set of Requests for Admissions," Nos. 25 to

22   50; is that right?

23   A.  Yes.

24   Q.  And this is a document that your company supplied as part

25   of this lawsuit?

Case: 1:17-cv-01973 Document #: 802 Filed: 12/20/19 Page 52 of 113 PageID #:55007
Luo - cross by De Vries
3173

1   A.  I do not know.  This is the first time I am seeing this

2   document.

3   Q.  If you look at Page 27, please.

4   A.  Yes.

5   Q.  This document was dated April 12th of 2019; is that fair?

6   A.  Yes, that's what it says here.

7   Q.  And it was submitted by Hytera's attorneys sitting behind

8   me?

9   A.  I see some names of the attorneys who are representing

10  Hytera.  Their names are indicated here.

11          MR. DE VRIES:  Your Honor, we move the admission of

12  PTX-1737.

13          THE COURT:  It is received and may be published.

14      (Exhibit No. PTX-1737 was received in evidence.)

15  BY MR. DE VRIES:

16  Q.  Please turn to Pages 16 and 17.  We'll start with Page 16.

17  There is a request at the top of Page 16.

18          Are you there, Mr. Luo?

19  A.  Yes.

20  Q.  And in that request, Motorola asked Hytera to admit that

21  Hytera's DMR products include or have included at least one

22  line of Motorola's proprietary source code.  Do you see that?

23  A.  Yes.

24  Q.  And then after some objection, at the bottom of that page,

25  it says, "Subject to and without waiving the foregoing General

Luo - cross by De Vries

3174

1    and Specific Objections, Hytera denies this request on the

2    grounds that Hytera's low-end DMR products do not contain any

3    Motorola source code."

4            Do you see that?

5    A.  Yes, I see it.

6    Q.  And then it continues, "Hytera further states that it is

7    investigating Motorola's claims against Hytera's high-end DMR

8    products, including the origin of Hytera source code that

9    Motorola alleges is copied (which does not appear in Hytera's

10   low-end products), and that investigation is ongoing, and

11   presently, Hytera lacks sufficient information to admit or

12   deny the request, and on that basis denies the request."

13           Do you see that?

14   A.  I see this paragraph.

15           MR. DE VRIES:  Can you take that down, Mr. Schlaifer.

16   BY MR. DE VRIES:

17   Q.  And earlier this year, in April of 2019, you personally

18   denied having any idea that Hytera copied even a single line

19   of Motorola's source code, right?

20   A.  First of all, I do not know.  Also, according to this

21   document, we know that -- and as I mentioned earlier, after

22   the investigation we conducted, we learned that some of our

23   model numbers have a small part of Motorola's code in them.

24           In our low-end DMR products, they do not have any

25   Motorola source code in them.  For the other model numbers,

Luo - cross by De Vries

3175

1    we're still looking into them.  That's what this document from

2    April was showing.  That is also consistent with my

3    understanding.

4    Q.  My question was a little different, so let me please try

5    to explain.

6             In April of 2019, earlier this year, you personally

7    denied knowing that even a single line of Hytera's source code

8    was copied from Motorola, fair?

9    A.  That's correct.  I have no knowledge about it.

10   Q.  And earlier this year on behalf of the company, you denied

11   knowing whether there was Motorola source code in any of

12   Hytera's products, right?

13   A.  Correct.

14   Q.  And you personally denied knowing if Sam Chia brought any

15   Motorola confidential information or source code with him to

16   Hytera, right?

17   A.  Correct, I do not know it.

18   Q.  And you earlier this year personally denied knowing if

19   Y.T. Kok, G.S. Kok, or anyone else brought any Motorola

20   confidential information to Hytera; is that fair?

21   A.  Correct.

22   Q.  And you denied knowing on behalf of the company about any

23   files at Hytera that used to be marked "Motorola Confidential"

24   but somebody deleted Motorola's logo and put Hytera's logo on

25   it, right?

1    A.  First of all, I cannot speak for the company.  Also, I

2    personally do not know it.

3    Q.  And -- well, strike that.

4        You are here to provide -- strike that.  Let me start

5    over.

6        Did you know in April of 2019 that there were

7    references to Motorola in Hytera's internal software

8    requirements documents?

9    A.  I do not remember.

10   Q.  You don't remember one way or the other?

11   A.  That is correct.  There have been many documents.  And

12   like what I said earlier, I helped collect it -- I helped

13   collect many documents, hundreds of them.

14       With respect to the software requirements document

15   you mentioned, I do not recall the number -- the quantity of

16   them, nor do I remember if they have been collected.  I also

17   do not remember if they contained the word "Motorola" in them.

18       The figure I said earlier for the documents I helped

19   collect was millions of them.

20   Q.  Mr. Luo, you're not aware of Hytera ever admitting any of

21   Motorola's claims before this trial started on the 6th of

22   November, last month; is that correct?

23   A.  That's correct.  I myself do not know that.

24   Q.  Now, you are aware, however, that Hytera received numerous

25   clear indications that something was seriously wrong with its

Luo - cross by De Vries

3177

1    DMR development process before this trial started, right?

2    A.  Yes, with respect to a broad scope concept, I am aware of

3    it.

4    Q.  If you could please turn back to PTX-233_TR, Sam Chia's

5    May 2017 e-mail to Mr. Chen.  And if we look at that second

6    page, at Item 4, Mr. Chia writes to Mr. Chen:

7            "4) Stress going through a lawsuit process.  I do not

8    feel protected at all.  Knowing that there is a risk in going

9    to jail and destroying my life while the company only risk

10   losing money is worrying me."

11   A.  I see it.

12   Q.  And you're not aware of Hytera admitting any of Motorola's

13   claims for years after this e-mail, fair?

14   A.  I do not know that.  This is the first time I am seeing

15   this e-mail.  Also, I am not the attorney for the company, so

16   I do not know the specific situation.  I simply help the

17   attorneys do their work.

18   Q.  You're saying that this morning is the first time you saw

19   this e-mail to Mr. Chen where Sam Chia writes that there is a

20   risk in going to jail?

21   A.  Correct.  This is the first time I see this document.

22   Q.  Now, you were personally aware in August of 2017, more

23   than two years before this trial began, that Hytera's DMR

24   group seriously lacked intellectual property protection

25   awareness in its daily work which may cause violations of

Luo - cross by De Vries

3178

1    trade secrets, weren't you?

2    A.   I do not agree with that.

3         MR. DE VRIES:   Your Honor, may I approach?

4         THE COURT:   Yes.

5    BY MR. DE VRIES:

6    Q.   Mr. Lu -- Luo -- I'm sorry -- I've handed you a document

7    marked PTX-2275.   Do you have that document in front of you?

8    A.   Yes.

9    Q.   And PTX-2275 was a set of e-mails produced from Hytera's

10   files.   Do you agree?

11   A.   Yes.

12   Q.   And, Mr. Luo, there are e-mails -- I'm sorry.   PTX-2275

13   bears a Hytera Bates number in the lower right-hand corners of

14   each page.   Do you agree?

15   A.   Yes.

16   Q.   And if you look, for example, at the first page of

17   PTX-2275, there are e-mails that are sent between Hytera

18   employees from August of 2017.   Do you agree?

19   A.   Yes.

20   Q.   And you are one of the employees of Hytera that received

21   this e-mail at the top of the first page on August 6th of

22   2017, correct?

23   A.   Yes.

24   Q.   And Sam Chia also received this e-mail, fair?

25   A.   Yes.

Luo - cross by De Vries

3179

1    Q.  Sorry, Mr. Luo.

2         And Peiyi Huang also received this e-mail on

3    August 6th, 2017?

4    A.  Yes.

5         MR. DE VRIES:  Your Honor, plaintiff moves the

6    admission of PTX-2275.

7         MR. CLOERN:  No objection.

8         THE COURT:  It is received and may be published.

9         (Exhibit No. PTX-2275 was received in evidence.)

10   BY MR. DE VRIES:

11   Q.  Now, Mr. Luo, this document is in Mandarin.  There is also

12   an English translation.  You're welcome to look at either.

13        But if we go first to Page 6 of the PTX number, so

14   2275.6, there is an e-mail towards the bottom of that page

15   that's written by Xiaohou Zheng.  Do you see that?

16   A.  Yes.

17   Q.  And it was sent on August the 4th of 2017; is that right?

18   A.  Yes.

19   Q.  And the subject line is "Intensify Intellectual Property

20   Protection in Daily Work of DMR Terminal Product Line."

21        Do you see that?

22   A.  I see it, yes.

23   Q.  And if you look at the next page of the document, Page 7,

24   at the top, Ms. Zheng writes, "As an international company,

25   events happened recently show that we are seriously lack of

Luo - cross by De Vries

3180

1    intellectual property protection awareness in our daily work."

2            Do you see that?

3    A.  Yes.

4    Q.  And then Ms. Zheng writes:  "Many activities are very

5    casual, which may cause violations of license agreements,

6    trade secrets, trademark and otherwise," right?

7    A.  Yes.

8    Q.  Then a few lines below there, it refers to something that

9    she calls "incorrect case."

10   A.  Yes.

11   Q.  And you know Ms. Zheng, right?

12   A.  Yes, I know her.

13   Q.  And Ms. Zheng writes:  "Keywords, such as MOTO function

14   research and even descriptions about 'MOTO design reference'

15   appear in the software requirement documents many times."

16           Do you see that?

17   A.  Yes, I see that.

18   Q.  And if we now go back to the page that we started with at

19   Page 5 of the document, Yelin Zheng forwards that e-mail to

20   you, Sam Chia, Peiyi Huang, and others on August the 6th of

21   2017, right?

22   A.  Yes.

23   Q.  And Yelin Zheng writes:  "In fact, it is the issue about

24   the company research and development, not only about your

25   department.  Please deal with your own bugs, and collect sound

Luo - cross by De Vries

3181

1    experience and understanding and then send them to Song Bo.

2    Unified awareness and procedures must be developed in our

3    whole research and development system," right?

4    A.  Yes.

5    Q.  Turning back now to Page 7, I'd like to come back to the

6    question I asked you before I showed this document.

7    A.  Please repeat that question.

8    Q.  Certainly.

9         In August of 2017, you were told that, "As an

10   international company, events happened recently show that we

11   are seriously lack of intellectual property protection

12   awareness in our daily work," fair?

13   A.  First of all, I would like to say that this e-mail

14   represents only Ms. Zheng's personal viewpoint.  And this

15   e-mail of hers was actually not sent to me.  It was simply

16   forwarded in another e-mail.  I can roughly understand in

17   general what she was trying to say.  She meant that we could

18   further improve upon our work.

19        As everybody knows, you can always do a better job

20   with your work.  That is also why we improve -- made

21   improvements to our policies and procedures.

22   Q.  One way you can improve is by not stealing other company's

23   trade secrets anymore?

24            MR. ALLAN:  Objection, Your Honor.

25            THE COURT:  Sustained.  Form of the question.

Luo - cross by De Vries

3182

1   Rephrase the question.

2   BY MR. DE VRIES:

3   Q.  Let me ask this:  You received the text that we're looking

4   at, right?

5   A.  Yes, it was in one of the e-mails I have received.

6   Q.  And if we look down just a few more words at the language

7   that refers to "incorrect case," you received in August of

8   2017 Ms. Zheng's opinion that, "Keywords, such as MOTO

9   function research and even descriptions about 'MOTO design

10  reference,' appear in the software requirement documents many

11  times," right?

12  A.  I see that sentence.

13  Q.  And you're not aware of Hytera ever admitting any of

14  Motorola's claims for the more than two years between when you

15  received this e-mail in August of 2017 and when this trial

16  began last month; is that correct?

17  A.  That's correct.  Also, I would like to emphasize again,

18  first of all, this is Ms. Zheng's personal viewpoint.  I don't

19  even agree when it says "incorrect case."  I don't agree with

20  that part.  The reason is that it's quite normal for us in the

21  industry to analyze our competitors.  Motorola researches on

22  us, too.

23          Also, Motorola is a leader in the industry -- in this

24  industry.  So it's quite normal that we buy their products and

25  to study them and learn from them.

Luo - cross by De Vries

3183

1    Q.  She writes this five lines after referencing specifically

2    violations of trade secrets.  Do you agree?

3    A.  Yes.

4           MR. DE VRIES:  You can take that down, please,

5    Mr. Schlaifer.

6    BY MR. DE VRIES:

7    Q.  You know that Y.T. Kok, Sam Chia, and G.S. Kok were

8    deposed in Hong Kong in September of 2017, fair?

9    A.  Yes.

10   Q.  And Hytera's counsel was present at those depositions.

11   You're aware of that?

12   A.  Are you -- it was our U.S. outside counsel.

13   Q.  And you're aware that they were present at those

14   depositions, fair?

15   A.  According to my understanding, yes.

16   Q.  And they were all Hytera employees at the time, right?

17   A.  Those people were the outside counsel we had engaged.

18   They were attorneys with Finnegan and Henderson.

19   Q.  I'm sorry, Mr. Luo.  That was a problem with my question.

20   Let me clarify.

21          Y.T. Kok, Sam Chia, and G.S. Kok were employees of

22   Hytera when they testified in Hong Kong in September of 2017,

23   right?

24   A.  Correct.

25   Q.  And they were employees of Hytera for more than another

Luo - cross by De Vries

3184

1 year after those depositions occurred, right?

2 A.  Correct.

3 Q.  And are you aware that at Y.T. Kok's deposition, he

4 admitted that he referred to a copy of Motorola's source code

5 in his possession when he created Hytera source code?

6 A.  I'm not aware as to what he said.

7 Q.  And are you aware that Y.T. Kok was shown at his

8 deposition in September of 2017 Hytera source code that had

9 identical lines to Motorola source code that he was shown?

10 A.  I'm not aware of that.

11 Q.  You're also not aware of Hytera admitting any of

12 Motorola's claims between those depositions in September of

13 2017 and the start of this trial last month, fair?

14 A.  I'm not aware of that.

15        MR. DE VRIES:  Your Honor, may I approach?

16        THE COURT:  Yes.

17 BY MR. DE VRIES:

18 Q.  Mr. Luo, do you have PTX-22_TR in front of you?

19 A.  Yes.

20 Q.  PTX-22_TR is a document produced out of Hytera's files,

21 right?

22 A.  According to my understanding, yes.

23 Q.  And it bears Hytera Bates numbers on the lower right-hand

24 corner of each page, right?

25 A.  Yes.

1   Q.  And it is a PowerPoint presentation entitled "FPGA

2   Analysis," correct?

3   A.  Yes.

4        MR. DE VRIES:  Your Honor, we move the admission of

5   PTX-22_TR.

6        THE COURT:  It is received and may be published.

7        (Exhibit No. PTX-22_TR was received in evidence.)

8   BY MR. DE VRIES:

9   Q.  You know this document, right, Mr. Luo?

10  A.  This is the first time I see this document.

11  Q.  As part of Hytera's -- I'm sorry.  Strike that.

12        As part of your involvement in Hytera's investigation

13  into Motorola's claims in this case, you did not review this

14  FPGA analysis document?

15  A.  That is correct.  I was not assigned to analyze documents.

16  That's the work our counsel and experts would do.  And among

17  those millions of documents I have collected, I don't recall

18  ever seeing this document.

19  Q.  You were involved in collecting and causing to be produced

20  certain Hytera documents, right?

21  A.  That's partially right and partially incorrect.  I helped

22  collect all the documents that were needed to be collected.

23  We handed those documents to our counsel and experts for their

24  analysis.  My understanding is that the decision as to what

25  documents should be produced and what documents will be

Luo - cross by De Vries

3186

1   relevant to the case would be the decision made by our counsel

2   and experts.

3   Q.  You didn't notice this document as you were collecting

4   documents for the company?

5   A.  That's correct.  I do not analyze specifically each and

6   every document.

7   Q.  I thought you were trying to get an understanding of

8   Motorola's claims so that your company could redesign its

9   products.

10  A.  That's correct.  As I said many times, we would not have

11  been able to do that on our own, so we relied on our counsel

12  and experts to tell us which should be -- what should be

13  redesigned and what should be modified.

14  Q.  And which counsel specifically did you rely upon for what

15  you just told the jury about?

16  A.  Actually, there are two law firms.  In the beginning, it

17  was Finnegan Henderson.  Their work was progressing very

18  slowly.  We were eager to know what happened, and we wanted to

19  resolve them to -- we wanted to move things along faster.  So

20  we were very unsatisfied with Finnegan and Henderson.  So we

21  replaced counsel, and that law firm, the new law firm, was

22  Steptoe & Johnson, which is representing us right now.  Those

23  were the counsel we relied upon.

24  Q.  When you told the jury about Finnegan and Henderson's work

25  proceeding slowly, were you referring to their work on an

Case: 1:17-cv-01973 Document #: 802 Filed: 12/20/19 Page 66 of 113 PageID #:55021
Luo - cross by De Vries
3187

1   investigation into Motorola's claims?

2   A.  Yes, including the analysis into the claims, as well as

3   the entire investigation process and the interviews with

4   witnesses.  We believe that it was -- all of that was going

5   very slowly.

6   Q.  Now, if you please turn to Page 8 of the document I handed

7   you, Mr. Luo, PTX-22_TR.

8   A.  Yes.

9   Q.  It's titled "If FPGA is Removed."  Do you see that?

10  A.  Yes.

11  Q.  And you know that --

12          MR. ALLAN:  Your Honor, I object to the lack of

13  foundation on this exhibit with the witness.

14          THE COURT:  Lay a better foundation.  Sustained.

15          MR. DE VRIES:  Okay.

16  BY MR. DE VRIES:

17  Q.  You see that there is a sentence that is in the fifth

18  paragraph of this slide.  Do you see that?

19          MR. ALLAN:  The same objection.  The witness

20  testified he was not familiar with the document.

21          THE COURT:  Without going into the contents of the

22  document, you may continue to -- your reference to lay the

23  foundation for its admissibility.

24          MR. DE VRIES:  I believe it's already been admitted,

25  Your Honor.  I think the objection is to my question about

Case: 1:17-cv-01973 Document #: 802 Filed: 12/20/19 Page 67 of 113 PageID #:55022
Luo - cross by De Vries
3188

1    what the document says --

2              THE COURT:  Is that right?

3              MR. DE VRIES:  -- that I'm showing on the screen.

4              MR. ALLAN:  The document is admitted, Your Honor.

5    The question -- the objection is this witness has never seen

6    the document.

7              THE COURT:  Well, that may be his answer.  All right.

8    The objection is overruled.

9    BY MR. DE VRIES:

10   Q.  Mr. Luo, do you see where this document states:  "This

11   will also result in using a lot of MOTO code and is a

12   concern"?

13   A.  Yes.

14   Q.  And you know that your company produced this document to

15   Motorola in litigation two years ago, in December of 2017,

16   right?

17   A.  I know that our counsel has produced documents, but I do

18   not know which time frame specifically this document was

19   produced.

20             MR. DE VRIES:  Your Honor, may I approach?

21             THE COURT:  Yes.

22   BY MR. DE VRIES:

23   Q.  Mr. Luo, I've handed you a document that's been marked

24   PTX-2234.  Do you see that?

25   A.  Yes.

1  Q.  It's a letter dated December 1st, 2017, correct?

2  A.  Yes.

3  Q.  It's a letter sent by the law firm of Finnegan and

4  Henderson that you just mentioned now and that you also

5  mentioned when your counsel was asking you questions; is that

6  right?

7  A.  I'm not familiar with this document.  I do not see where

8  it says where the sender is -- who the sender is.

9  Q.  Do you see at the top of the first page, it has the name

10  of the law firm that you've testified about called Finnegan,

11  Henderson, Farabow, Garrett & Dunner?

12  A.  Yes.

13  Q.  And that the sender is a Gail Selburn, litigation legal

14  assistant?

15  A.  Yes, I see it.

16  Q.  And at the top of the right -- top of the right-hand side

17  of the first page, it says that Ms. Selburn's e-mail address

18  is Gail.Selburn@Finnegan.com?

19  A.  I see it.  Thank you for the reminder.  I do not know this

20  Gail person, but right now I know.  Now I know it's a letter

21  sent from Finnegan.

22  Q.  On December 1st, 2017?

23  A.  Yes, that's my understanding.

24  Q.  And it includes the Bates number of certain documents that

25  were sent along with this letter, right?

1    A.  What portion are you referencing?

2    Q.  The third line of the letter where it says "Bates-numbered

3    documents."

4    A.  Yes, I see those words.

5         MR. DE VRIES:  Your Honor, we'd move the admission of

6    PTX-2234.

7         THE COURT:  It is received and may be published.

8         (Exhibit No. PTX-2234 was received in evidence.)

9    BY MR. DE VRIES:

10   Q.  Now, the letter from December of 2017 states:  "Dear

11   Counsel, at the request of Erik Puknys, I enclose one

12   Hardware-encrypted USB drive containing Hytera Communications

13   Corporation Limited's production volume HYT1973-7 with

14   Bates-numbered documents HYT1973-00007901 through

15   HYT1973-01381534."

16        Do you see that?

17   A.  Yes.

18   Q.  And do you see that the Bates number of the FPGA analysis

19   document is within the Bates range of documents sent by

20   Hytera's counsel to us on December of 2017?  Right?

21   A.  It seems that it is not a complicated calculation.  It

22   looks like about a million pages were produced or provided at

23   that time, and it looks like this document falls around 60

24   hundred -- 60,000 pages within them.  I do not know if my

25   understanding is correct.

Luo - cross by De Vries

3191

1   Q.  And you're not aware of Hytera ever admitting, between the

2   time it sent us this document in December of 2017 and when

3   this trial began last month, any aspect of Motorola's claims,

4   fair?

5   A.  That's correct.  That's correct, I do not know.

6           MR. DE VRIES:  Mr. Schlaifer, you could take that

7   now.

8   BY MR. DE VRIES:

9   Q.  Now, you told the jury that Motorola didn't identify

10  specific lines of Hytera's source code that were copied out of

11  Motorola's source code until June of 2019, right?

12  A.  Correct.

13          MR. DE VRIES:  Your Honor, may I approach?

14          THE COURT:  Yes.

15  BY MR. DE VRIES:

16  Q.  Mr. Luo, you've been handed a document numbered DTX-5145.

17  Do you see that?

18  A.  Yes.

19  Q.  And it's titled "Plaintiffs' Objections and Responses to

20  Hytera's Third Set of Interrogatories."  Do you see that?

21  A.  Yes.

22  Q.  And on Page 10 of the document, it's dated September 24th,

23  2018.  Do you see that?

24  A.  Yes.

25  Q.  And there's an Attachment A.  Do you see that?

Luo - cross by De Vries

3192

1    A.  Yes.

2    Q.  And starting at Page 13 through Page 178, there is a

3    comparison of Motorola's code to file names and line numbers

4    of Hytera's source code, right?

5    A.  Yes.

6            MR. DE VRIES:  Your Honor, we move the admission of

7    DTX-5145.

8            THE COURT:  It is received and may be published.

9        (Exhibit No. DTX-5145 was received in evidence.)

10   BY MR. DE VRIES:

11   Q.  So this is something that you didn't talk about during

12   your direct -- during the time when your lawyer asked you

13   questions; am I right about that?

14           MR. ALLAN:  Your Honor, I -- we have an objection to

15   the document.  It's plaintiffs' objection --

16           THE COURT:  You have an objection to the form of the

17   question?

18           MR. ALLAN:  Just to the admissibility of the

19   document.  It's hearsay.

20           THE COURT:  Do you have an objection to the form of

21   the question?

22           MR. ALLAN:  Yes, Your Honor.

23           THE COURT:  Sustained.

24           Rephrase the question.

25           MR. DE VRIES:  Let me rephrase, Your Honor.

Luo - cross by De Vries

3193

1   BY MR. DE VRIES:

2   Q.  If you turn to Page 5 -- actually, let me take a step

3   back.

4           You have testified about certain discovery that

5   Motorola provided to Hytera concerning Hytera's copying of

6   Motorola source code, right?

7   A.  Yes.

8   Q.  And you have told the jury that Motorola did not identify

9   the specific lines of code in Hytera's source code that were

10  copied until June of 2019, right?

11          MR. ALLAN:  Objection, Your Honor.

12          May we have a very brief sidebar on this?

13          THE COURT:  Overruled.  The witness may answer.

14  BY THE WITNESS:

15  A.  That's incorrect.  You mischaracterizes -- you

16  mischaracterized my testimony.  What I said earlier was that

17  in September of 2018, Motorola told us that 89 source code

18  files might have been copied.  They also referenced some lines

19  of the codes, but at that time we said that some of those

20  lines might come from third parties.

21          The third parties I mentioned earlier was -- were TI

22  and Mentor Graphics.  But of course we would not have been

23  able to compare those lines specifically.  I learned that they

24  did come from third parties until we had the specific lines

25  for comparison.

Luo - cross by De Vries

3194

1        At that time we did know a little bit about it, but

2   the allegations keep changing.  So it's like what I said

3   earlier, it's until June of this year that we finally knew

4   about those 161 source code files, that they have been copied,

5   and it was around that time that we learned the specific lines

6   of those source code files that had been copied.

7        That is what I meant by they keep changing their

8   allegations.

9   BY MR. DE VRIES:

10  Q.  Please look at Page 13 of DTX-5145.

11  A.  Yes.

12  Q.  It's called Hytera's files named "RAF_APP.h copied

13  Motorola's copyrighted source code," right?

14  A.  Yes.

15  Q.  And it identifies Motorola source code by line number on

16  the left, for example, in the top row, right?

17          MR. ALLAN:  Objection.  Your Honor, Motorola never

18  let the witness see this document.  Now he's being examined on

19  it.

20          MR. CLOERN:  Or anyone at Hytera.  They said it's

21  confidential.  They would not anyone at Hytera see this.  We

22  were not allowed to share it with anyone at Hytera, and now

23  they're going to just show a Hytera witness.

24          MR. DE VRIES:  Your Honor, he testified about this

25  document to the jury in a way that we believe is inaccurate.

Luo - cross by De Vries

3195

1          MR. ALLAN:  Not true.

2          THE COURT:  All right.  The objection is overruled.

3     The witness may answer the question as he sees fit.

4          Do you understand the question?

5          His --

6          THE WITNESS (through the interpreter):  Yes.

7          THE COURT:  -- answer may encompass your objection.

8          You may answer the question.

9     BY THE WITNESS:

10    A.  Looking at this document for the first time sitting here

11    today, I do see that on the left-hand side of this page it

12    reference Motorola's source code, source code files, source

13    code names, and source code paths, together with some

14    numbers -- number information and the line information.

15    BY MR. DE VRIES:

16    Q.  And you see on the right it references specific Hytera

17    source code files by line number, for example, in the first

18    row, right?

19    A.  Yes, that's my understanding.

20    Q.  And you said that you relied on your lawyers, including

21    your outside lawyers, and experts in redesigning Hytera's

22    source code, right?

23    A.  Correct.

24          MR. DE VRIES:  You can take that down, Mr. Schlaifer.

25    BY MR. DE VRIES:

Luo - cross by De Vries

3196

1    Q.  You said that you had trouble figuring out what Motorola's

2    claims are, right?

3    A.  Yes.

4    Q.  You know Motorola claims that Hytera stole its source

5    code, right?

6    A.  Your statement is very vague.  I don't quite understand

7    it.

8    Q.  And you know that Motorola claims that Hytera stole its

9    confidential documents, right?

10   A.  Yes.

11   Q.  And Hytera's investigation has shown those claims to be

12   true, right?

13   A.  I object to your question.  I can simply express and

14   convey what I myself understand.

15   Q.  Let me switch gears.

16         You said --

17         THE COURT:  Before we switch gears, I wanted to let

18   the witness add anything to -- that he sees fit to his answer.

19   BY THE WITNESS:

20   A.  I would like to add that, by our investigation, what we

21   found is that on Huang Peiyi's computer, as well as the

22   computers of some former Motorola employees, there were some

23   documents that contained the words "Motorola" and "Motorola

24   confidential" documents.

25         The part that I did not know is whether or not those

Case: 1:17-cv-01973 Document #: 802 Filed: 12/20/19 Page 76 of 113 PageID #:55031
Luo - cross by De Vries
3197

1    documents were indeed Motorola's confidential documents and

2    how they were brought over to Hytera.  That's the part I do

3    not know.

4    BY MR. DE VRIES:

5    Q.  And you do not know, for example, what Sam Chia told

6    Hytera's lawyers shortly after this case was filed, fair?

7    A.  That's correct.  I do not know.

8    Q.  Now, Hytera did not begin this investigation until after

9    this case was filed, right?

10   A.  Yes, that's my understanding.

11   Q.  Before this lawsuit was filed, are you aware of anyone at

12   Hytera ever reporting any concerns that Hytera might be using

13   Motorola confidential source code in documents in developing

14   its DMR products?

15   A.  I do not know.

16   Q.  You're not aware of any?

17   A.  That's correct.  I'm not aware of any.

18        MR. DE VRIES:  Your Honor, may I approach?

19        THE COURT:  Yes.

20   BY MR. DE VRIES:

21   Q.  Mr. Luo, I've handed you PTX-100_TR.  Do you see that?

22   A.  Yes.

23   Q.  It's a document from Hytera's files, right?

24   A.  This is the first time I see this document, but according

25   to my understanding, yes.

1  Q.  And it has Hytera Bates numbers on it, right?

2  A.  Yes.

3  Q.  And it's -- it consists of e-mails between Hytera

4  employees, right?

5  A.  Yes.

6  Q.  And it's from November of 2008?

7  A.  Yes.

8          MR. DE VRIES:  Your Honor, we move the admission of

9  PTX-100_TR.

10         THE COURT:  It is received and may be published.

11     (Exhibit No. PTX-110_TR was received in evidence.)

12  BY MR. DE VRIES:

13  Q.  There's a series of e-mails here.  If we turn to Page 2 of

14  the exhibit, there's an e-mail from Jue Liang to Sam Chia,

15  copying Pan Zheng, right?

16  A.  Yes.

17  Q.  And Jue Liang is not, as you just said, a former

18  Motorolan, right?

19  A.  According to my understanding, this person was not a

20  former Motorola employee.

21  Q.  And Jue Liang was interviewed as part of the investigation

22  that you've testified about, right?

23  A.  According to my understanding, yes.

24  Q.  And on the next page, Page 3, Mr. Liang writes, "Sam, I

25  saw this in the document of MOTO DMR conformance testing of

Luo - cross by De Vries

3199

1    radio hardware."  Do you see that?

2    A.  Yes.

3    Q.  You're not aware of Mr. Liang ever reporting a concern

4    before this lawsuit was filed that he was referring to a

5    document called MOTO DMR conformance testing of radio hardware

6    in an e-mail to Sam Chia from 2008?

7    A.  That's correct.  I'm not aware of that.

8              MR. DE VRIES:  Your Honor, may I approach?

9              THE COURT:  Yes.

10   BY MR. DE VRIES:

11   Q.  I've handed you PTX-544.  Do you have that document in

12   front of you?

13   A.  Yes.

14   Q.  It's a document from Hytera's files?

15   A.  This is the first time I see this document, but according

16   to my understanding, yes.

17             MR. DE VRIES:  Your Honor, this has been previously

18   admitted.  Do I have permission to publish?

19             THE COURT:  Yes.

20   BY MR. DE VRIES:

21   Q.  This e-mail was written by Yu Yang in August of 2008.  Do

22   you see that?

23   A.  Yes.

24   Q.  And it attaches a task sheet for the DMR project; is that

25   right?

Luo - cross by De Vries

3200

1   A.  Can you please repeat your question?  I don't quite

2   understand it.

3   Q.  Sure.

4         If you look at the attachments section at the

5   front -- at the top of that first page, it refers to a

6   Schedule_DSPTeam_WIP.  Do you see that?

7   A.  Yes.

8   Q.  And then if you go to Page 3 of the exhibit, there is a --

9   an Excel sheet with certain tasks if you look at Column A.

10  A.  Yes.

11  Q.  And if we go to Page 4 of this task -- or -- I'm sorry --

12  of this Excel spreadsheet, there is a Line 16.

13  A.  Yes.

14  Q.  And it's called "Frame Sync."  Do you see that?

15  A.  Yes.

16  Q.  And "Responsibility:  Yang Fan"?

17  A.  Yes.

18  Q.  And under Column G, about halfway down, it says, "Need to

19  investigate reuse as the current solution will not work in

20  weak and fading signal conditions."  Do you see that?

21  A.  Yes.

22  Q.  And then it says, "Note:  Mot uses Coarse Frame sync for

23  initial sync recovery and then Fine Frame sync for timing

24  recovery for the Symbol recovery to start."

25  A.  Yes.

Luo - cross by De Vries

3201

1   Q.  You're not aware of Yu Yang or anyone else who received

2   this e-mail expressing a concern that they were being asked to

3   investigate reuse, and then told about what Mot did in 2008,

4   before this was lawsuit was filed?

5   A.  I'm not aware of that; however, I would like to provide

6   some clarification on this document.

7           As I said earlier, it's quite normal for us to look

8   into and study our competitors.  We would buy Motorola's

9   products and devices from the public market and do some

10  testing.  I feel that we could also learn how Motorola does

11  their work by doing the testing, but that's, of course, my own

12  understanding.  As to what specific issues were being

13  reflected in this document, I do not know.

14  Q.  Testing doesn't involve reusing Motorola source code, does

15  it?

16  A.  I object to your question.  What I said was that through

17  testing, we can get a general understanding as to how Motorola

18  does their work.

19          And as I read this paragraph, I believe that it says

20  that our current products are not -- still not as good as

21  Motorola's products.  So we would hope that we could test

22  their devices to see how capable they are, then we will come

23  back and look on our own products to do our research as to how

24  we can improve our codes.  Then we will put the codes that we

25  ourselves write into our devices, and then we will then

Luo - cross by De Vries

3202

1    compare if our products can then be as good as Motorola's

2    products.  That's my general understanding.

3           I also would like to emphasize again that this is the

4    first time I am seeing this document.  As to what specific

5    issues were being discussed in this document, I do not know.

6    Q.  Are you aware of any Hytera engineer reporting a concern

7    before this lawsuit was filed that the company developed an

8    entire new DMR architecture within just a couple of weeks

9    after Sam Chia and Y.T. Kok joined the company?

10          MR. ALLAN:  Objection, Your Honor.  It assumes facts

11   and argumentative.

12          THE COURT:  Overruled.

13          You may answer the question.

14   BY THE WITNESS:

15   A.  I also object to that question.  According to my

16   understanding, we started developing our own DMR products from

17   2015.  I have never heard of any engineers raise any concerns

18   to me.  I myself have not heard that.

19   BY MR. DE VRIES:

20   Q.  And before this lawsuit was filed, are you aware of any

21   Hytera engineer ever reporting a concern that Hytera's

22   internal technical documents had Motorola's name, the name of

23   Motorola engineers, or Motorola code names inside them?

24   A.  I have not heard such reports of that sort from them.  I

25   also mentioned that it's very normal for us to mention the

Luo - cross by De Vries

3203

1    name of Motorola or the name of Motorola's products in our

2    documents because it's public information.

3    Q.  And you're not aware of any Hytera engineer reporting a

4    concern before this lawsuit was filed that source code for the

5    key libraries in Hytera's DMR products was missing from the

6    SVN server for years?

7    A.  No, but I would like to elaborate further on the source

8    code issue you just talked about.

9         This morning we talked about the SVN, the centralized

10   SVN server that Hytera uses to store all the codes related to

11   DMR.  All the codes, source codes, that would go into our

12   products would have to be stored on the SVN server.  However,

13   among those source codes, some of them were referred to as

14   library files.  Those library files are part of the compiled

15   files.  In our products, there are quite a few of such library

16   files that came from different places.

17        Earlier I referenced an example with respect to the

18   chips that we buy from Texas Instrument and the source codes

19   they provide us.  They will not provide our engineers with the

20   source codes the engineers could read, which would be in C or

21   CPP language.

22        On the contrary, what they provide us with would be

23   the library file, which is already compiled and can be used.

24   So we use those library files directly.  According to my

25   understanding, there should be about more than a hundred to

Luo - cross by De Vries

3204

1    even hundreds of such library files in our products.

2         According to the investigation we have been doing in

3    the last two years, we found that the majority portion of

4    those source codes would be the source code files or the files

5    that were given to us by third parties.

6         Only three library files were the files that we were

7    not able to find the source codes associated with them, and we

8    also could not find a source of those three library files.  It

9    took us a lot of effort in the investigation to have reached

10   that conclusion.

11        Let's go back to the time frame when the litigation

12   was just filed.  My understanding is that for our engineers,

13   it's quite normal to see some library files appearing in our

14   products.  I have -- that's why I have not heard them raise

15   any concerns on this aspect.

16   Q.  Now, you say that the employee -- or -- strike that.  Let

17   me start over.

18        The Hytera employees on whose machines you found

19   Motorola source code and information, you've called them the

20   former Motorolans, right?

21   A.  Yes, they -- those people used to work at Motorola, and

22   their nationality is Malaysian.  And they left Motorola to

23   come to work for Hytera around 2008.

24   Q.  Whatever their nationality, they were Hytera employees

25   when they developed DMR products.  Do you agree?

Luo - cross by De Vries

1  A.  Yes, and I did not intentionally try to reference or

2  mention their nationality.  What I wanted to say was that when

3  they just joined Hytera, they were not familiar in

4  communicating in Chinese.

5  Q.  They were the leaders of Hytera's DMR product department

6  when Hytera developed DMR between 2008 and 2010, right?

7  A.  Yes.

8  Q.  G.S. Kok was a member of Hytera's board of directors at

9  one point, right?

10  A.  Yes.  It was a very long time after that, around 2016.

11  Q.  And Mr. Chen personally appointed G.S. Kok as the chief

12  head of Hytera's DMR group, right?

13  A.  I'm not aware of that.  Usually by appointing someone

14  that's the person in charge of a department or a manager of a

15  department, specifically one would appoint such a person to be

16  the director or the person in charge of that department.

17       What I mean to say is that usually to assign someone

18  to be in charge of a department, that would be the work that

19  would be done by the director or the vice president, usually

20  the leader of such a department.  Usually Mr. Chen would not

21  be involved in such work in appointing a person who would work

22  under him -- under the level.

23  Q.  It would be unusual for Mr. Chen to appoint someone as the

24  chief head of the DMR group?

25  A.  No, that's not what I meant.  What I said was that

1    Mr. Chen has to deal with a lot of work.  He would not be

2    involved in matters as detailed or trivial as this.

3            For the job position you just talked about, it's

4    impossible for that person on that position to report directly

5    to Mr. Chen.  According to my understanding, there would be

6    about two or three levels of leadership on that reporting

7    line.

8            So I feel that it's quite impossible for Mr. Chen to

9    assign or appoint someone for the position that were -- that

10   was two or three levels below him, but I do not know the

11   specifics.

12           MR. DE VRIES:  Your Honor, may I approach?

13           THE COURT:  Yes.

14   BY MR. DE VRIES:

15   Q.  Mr. Luo, PTX-431 is some e-mails between some Hytera

16   employees and others that were produced from Hytera's files;

17   is that right?

18   A.  Correct.

19   Q.  This document has Hytera Bates numbers indicating that it

20   was produced by Hytera in this litigation; is that right?

21   A.  Correct.

22   Q.  And the first e-mail in this e-mail string is an e-mail

23   between Iris Zhang, a Hytera employee, and Mr. Chen, also the

24   CEO of Hytera, from September of 2007; is that right?

25   A.  Yes.

Luo - cross by De Vries

3207

1          MR. DE VRIES:  Your Honor, we move to admit PTX-431.

2          THE COURT:  It is received and may be published.

3          (Exhibit No. PTX-431 was received in evidence.)

4    BY MR. DE VRIES:

5    Q.  So let's go to -- let's start with Page 5 of the exhibit.

6    And I'm going to be reading from the translation.  You're

7    also, of course, welcome to look at the original.

8          There's an e-mail at the bottom from Iris Zhang to

9    Samcoe@hotmail.com, with the subject line:  "Letter from HYT

10   Chen."  Do you see that?

11   A.  Yes.

12   Q.  And below that, it says, "Dear G.S. Kok."  Do you see

13   that?

14   A.  Yes.

15   Q.  And the e-mail is dated September 11th, 2007, right?

16   A.  Yes.

17   Q.  And if you go to the next page, Page 6, this is signed by

18   Mr. Chen, the CEO, right?

19   A.  This is the first time I see this document.  And I see

20   Mr. Chen Qingzhou's name here.  However this e-mail was sent

21   from the e-mail address of another colleague, Iris Zhang.

22   Q.  And she was Mr. Chen's assistant, right?

23   A.  I do not know.

24   Q.  At the bottom of Page 5 --

25          MR. DE VRIES:  Mr. Schlaifer, if we could put up both

Luo - cross by De Vries

3208

1    pages, 5 and 6.

2    BY MR. DE VRIES:

3    Q.   The e-mail to G.S. Kok states, "For your position in HYT,

4    I have considered it before.  I hope you could come to work in

5    Shenzhen for two to three years.  You could come here yourself

6    or your family, which depends on you.  If you agreed, I would

7    appoint you as the chief head of DMR group."  Do you see that?

8    A.   I see it.

9    Q.   And then it is signed at the bottom, "Yours sincerely,

10   Chen Qingzhou."

11   A.   Yes.  But I also mentioned earlier that, first of all, the

12   sender of this e-mail is not Mr. Chen Qingzhou.  I had more

13   communication or interaction with Mr. Chen when I was working

14   on sales and marketing.  According to my understanding, he

15   himself will not use English.  He even does not have a

16   thorough understanding about even some simple terms in

17   English.

18          So I do not know if this was Mr. Chen's e-mail, his

19   personal e-mail that he wrote personally or -- or -- nor do I

20   know that if this truly reflected what he wanted to convey.

21          MR. DE VRIES:  Your Honor, may I approach?

22          THE COURT:  Yes.

23   BY MR. DE VRIES:

24   Q.   Mr. Luo, I've handed you a document that's PTX-77.

25   A.   Yes.

1   Q.  It is an announcement from Hytera's files, correct?

2   A.  Yes.

3   Q.  And it bears a Hytera Bates number?

4   A.  Yes.

5       MR. DE VRIES:  Your Honor, we move the admission of

6   PTX-77.

7       THE COURT:  It is received and may be published.

8       (Exhibit No. PTX-77 was received in evidence.)

9   BY MR. DE VRIES:

10  Q.  I'm going to look at the English translation, Mr. Luo.

11      The title of this document at the top is "Appoint of

12  Cadres (Central Research Department)."

13      Do you see that?

14  A.  Yes.

15  Q.  And then it reads:  "According to the decision made by the

16  Company's Operations Management Committee, we hereby appoint

17  the following cadres of the Central Research Department."

18      Do you see that?

19  A.  Yes.

20  Q.  And cadres means leaders?

21  A.  Yes.

22  Q.  And G.S. Kok is appointed director, right?

23  A.  Yes.

24  Q.  And Y.T. Kok is appointed deputy director?

25  A.  Yes.

Luo - cross by De Vries

3210

1  Q.  And Y.T. Kok is also appointed department of architecture

2  right below that?

3  A.  Yes.

4  Q.  And Sam Chia is appointed DSP and speech technology

5  research department manager?

6  A.  Correct.

7  Q.  And the date of this document is February 20th of 2009?

8  A.  Yes.

9  Q.  And immediately below that, it says, "Approved By:  Chen

10 Qingzhou," right?

11 A.  Yes.

12 Q.  And that's Mr. Chen?

13 A.  Yes.

14 Q.  The CEO of the company?

15 A.  Yes.

16 Q.  I was going to switch gears to a new topic.

17 A.  I would like to supplement something for this document.

18       THE COURT:  Proceed.

19 BY THE WITNESS:

20 A.  There is another name before the name of Mr. Chen's,

21 Dr. Tang, T-a-n-g.  Actually, for this document, it was

22 reviewed and approved by Dr. Tang.  As to why Mr. Chen would

23 provide his approval here was because this was a company

24 document.  It means that as a formal document of the company,

25 before it is released to everyone in the company, Mr. Chen

Case: 1:17-cv-01973 Document #: 802 Filed: 12/20/19 Page 90 of 113 PageID #:55045
Luo - cross by De Vries
3211

1   will have to provide his consent and agreement as to the

2   release of this document to every employee of the company.

3           So what I mean to say is that what is -- what

4   Mr. Chen is approving here is the release of this document to

5   every employee to the company.

6           MR. DE VRIES:  Your Honor, may I proceed?

7           THE COURT:  This might be a good time to take a

8   little standup break here.

9           Members of the jury, does anyone need an actual

10  break?

11          All right.  You've got it.

12      (Recess had.)

13      (Change of reporter.)

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury in at 3:01 p.m.)

2              MR. DeVRIES:  Your Honor, may I proceed?

3              THE COURT:  No.

4          (Laughter.)

5              THE COURT:  We need at least one more lawyer here,

6   right?

7              MR. ALLAN:  We can proceed.

8              THE COURT:  We are good to go.

9              Please proceed, Counsel.

10  BY MR. DeVRIES:

11  Q.  Mr. Luo, as part of Hytera's investigation, it learned

12  that its employees had deleted or hidden certain electronic

13  data or documents; is that right?

14  A.  I'm sorry.  I don't know what specifically you are talking

15  about.

16  Q.  The laptop that Hytera issued to Sam Chia in 2008 was

17  lost, right?

18  A.  Yes, that's what I know.

19  Q.  And the HR files for Sam Chia, Y.T. Kok, and G.S. Kok from

20  when they joined Hytera, those were also lost, right?

21  A.  That's correct.  According to what I know, those files

22  back then were only hard copy paper documents.  There were no

23  electronic documents.

24              In 2008, which is 10 or 11 years ago, for those paper

25  documents, we only kept them for several years.

Case: 1:17-cv-01973 Document #: 802 Filed: 12/20/19 Page 92 of 113 PageID #:55047
Luo - cross by DeVries
3213

1  Q.  Hytera's earlier DMR prototype was lost?

2  A.  Yes.  And based on what I remember, the prototype might

3  have been even earlier, perhaps 11 or 12 years ago.  A

4  prototype or something like that would not be kept for a very

5  long time.  Not just a DMR prototype.  The prototypes of our

6  other products will not be kept for so long.

7  Q.  On Sam Chia's computer that was not lost, the data volume

8  of files deleted by Mr. Chia was very large, right?

9  A.  That is a hypothetical question.  I have never seen that

10  laptop he has lost.  I do not know.

11  Q.  Let me be more clear.

12        There was a laptop from after Sam Chia developed

13  Hytera's DMR products that was not lost, correct?

14  A.  That's correct.  My apologies.  I might have misunderstood

15  your earlier question.

16  Q.  I apologize if it was confusing.

17        And on that computer, the data volume of files

18  deleted by Mr. Chia was very large, right?

19  A.  I do not agree with your question.  I know that we can

20  know the listing of all the documents through the forensic

21  analysis done by our discovery company.  A part of that would

22  include the files that had been deleted.  They would also be

23  located as well.  But I do not recall what the specific

24  quantity or number was.

25  Q.  In addition to being deposed earlier this year, you were

Luo - cross by DeVries

3214

1    also deposed in December of last year, right?

2    A.  Yes.

3    Q.  And you promised to tell the truth during that deposition?

4    A.  Correct.

5    Q.  And did you tell the truth?

6    A.  Yes.

7    Q.  If we could, please, turn to Page 89, Lines 7 through 19

8    of the December 2018 deposition.

9            You were asked the question:

10           "In searching these individuals' hard drives, did you

11   search for deleted files?

12           "A.  So according to my understanding for the -- to

13   restore the deleted files is one of the steps taken by our

14   data vendor, so my understanding would be yes.

15           "Q.  And what files were found deleted by Mr. Chia?

16           "A.  Can you please repeat the person's name.

17           "Q.  Chia, Sam Chia.

18           "A.  The data volume is very large, and I cannot be

19   certain, and this is stored in the database of our data

20   vendor."

21           Was that your testimony?

22   A.  Yes, I remember this.  There were two meanings when I said

23   "the data volume is very large."  The first one was the total

24   volume of the data that I processed was very large.  The

25   second meaning was that the number of documents restored from

1    the computer of Sam Chia was also large, many documents.  So

2    it was a very thick report when we got the report from the

3    data company with respect to the forensic analysis.  Many of

4    them would include the documents that would be automatically

5    deleted or updated by the computer systems.

6              So it would also require analysis and investigation

7    as to what documents or files were deleted by Sam Chia

8    himself.  I remember I explained on that relevant matter in my

9    deposition.

10   Q.  And even with the help of the forensic professional tools

11   that you just mentioned, there is no guarantee that 100

12   percent of the files can be recovered, right?

13   A.  I'm no expert in this.  I do not know the specifics.

14   However, I believe and trust that Epic and our company already

15   did all they could do in order to retrieve all the information

16   that was on the computers.

17   Q.  In April of this year you were deposed.  At Page 113,

18   Lines 10 through 19, you were asked:

19             "Q.  Were there deleted files on the 109495 computer

20   that Epic was unable to restore?

21             "A.  I don't know.

22             "Q.  Did you ask?

23             "A.  I didn't ask specifically about this computer.

24   However, I asked similar questions, and they told me that they

25   used professional tools.  Even with the help of the

Luo - cross by DeVries

3216

1    professional tools, there is no guarantee that 100 percent of

2    the files can be recovered."

3            Was that your testimony?

4    A.  Yes.  That's what I said, yes.  And it is like what I said

5    earlier.  I am no expert in this.  This is only my

6    understanding.  I trust that they have already done everything

7    they could do to retrieve all the information in it.

8    Q.  And like Sam Chia, Peiyi Huang also deleted files on her

9    computer, right?

10   A.  Perhaps, but similarly, I am no expert in this.  I cannot

11   provide accurate answer with respect to the exact number or

12   what the specific situation was.

13   Q.  In April of this year you were deposed.  At Page 77 from

14   Lines 2 through 8 you were asked:

15           "Q.  When Epic processed Ms. Huang's 153209 laptop,

16   did it perform in an attempt to recover deleted files from

17   that laptop?

18           "A.  Yes.

19           "Q.  Were any deleted files found on Ms. Huang's

20   153209 laptop?

21           "A.  Yes."

22           Was that your testimony?

23   A.  Yes, this is what I said.

24           Now I remember the specific scenario.  At that time I

25   saw those restored files that contained Motorola confidential

Luo - cross by DeVries

3217

1    identifier with respect to their source codes -- Motorola

2    source codes.  I saw some source codes that contained

3    Motorola's confidential identifier in them.

4           MR. DeVRIES:  Mr. Schlaifer, you can take that down.

5           Please pull up previously admitted PTX 1019.

6    BY MR. DeVRIES:

7    Q.  You understand that PTX 1019 is a log, a spreadsheet of

8    files that were deleted from Peiyi Huang's computer but not

9    recovered by your vendor, Epic, right?

10   A.  Perhaps, yes.  I see that this is a very large document,

11   and what you are referring to might be the 120,000th line of

12   it.

13   Q.  And you know that your vendor, Epic, generated logs of

14   deleted files that it was not able to recover, right?

15   A.  Correct.

16   Q.  And this log for Peiyi Huang's computers contains tens of

17   thousands of lines of files -- their names, right?

18   A.  I do not agree with your question.  I said that there are

19   indeed many lines in this listing -- in this document, but

20   there are also many lines in this document that refer to

21   pointless or meaningless system-generated documents.  For

22   example, the first ten rows or so that are being shown on my

23   screen, according to my understanding, these would be

24   documents not are generated by the system.  Similar documents

25   appear across different places everywhere in this document.

Luo - cross by DeVries

1 So therefore, there is no way for me to know which was deleted

2 by Peiyi Huang and which was generated by the system or

3 deleted by the system.

4 Q. Whoever deleted these files, they were not able to be

5 recovered through your forensic process, right?

6 A. That's correct.

7 Q. And Hytera did not produce to Motorola in this litigation

8 any forensic reports for any computers belonging to anyone

9 other than Peiyi Huang, right?

10 A. I do not know. I'm not in charge of reviewing or

11 producing documents.

12 Q. You are not aware of Hytera producing a log like this for

13 Sam Chia, Y.T. Kok, G.S. Kok, or Mr. Chen's computers, right?

14 A. I'm not aware of that. I'm not responsible for document

15 reviews and productions. What I know is that our data vendor,

16 Epic, performed forensic analysis on each and every computer

17 we had.

18   As to if Epic generated reports or if they provided

19 such reports to our counsel or if those reports have been

20 produced to Motorola, I do not know.

21 Q. So if they're deleted files that could not be recovered

22 from Sam Chia, Y.T. Kok, G.S. Kok, or Mr. Chen's computers,

23 you are not aware of any way that Motorola would be able to

24 know that in this litigation, right?

25 A. I object to your question. What I would like to say and

Luo - cross by DeVries

3219

1    emphasize again is that I was in charge of collecting these

2    documents and computers and make sure that our data vendor,

3    Epic, performed analysis on all of them.  But I truly do not

4    know if those documents were analyzed or produced.

5            MR. DeVRIES:  Mr. Schlaifer, you can take that down,

6    please.

7            Could you please put up PDX 8.30.

8    BY MR. DeVRIES:

9    Q.  Mr. Luo, you testified about this slide earlier today; is

10   that right?

11   A.  Correct.

12   Q.  And the computer that is listed here ending in 495, that's

13   the computer assigned to Peiyi Huang where Motorola source

14   code and documents were found, right?

15   A.  Yes, I found that on this computer there were source codes

16   that contained Motorola identifier.

17   Q.  And this document that's referenced here, PTX 92, says

18   that the current usage in the work is, "Share in the DMR

19   software development," right?

20           MR. ALLAN:  Objection.

21           THE COURT:  The objection is overruled.  The answer

22   may stand.

23   BY THE WITNESS:

24   A.  Yes.

25

Luo - cross by DeVries

3220

1  BY MR. DeVRIES:

2  Q.  Now, you said that you reviewed an access log from your

3  vendor, Epic, and that access log told you that the only

4  person who accessed this computer was Peiyi Huang?

5  A.  Yes.

6  Q.  And Hytera did not produce that access log to Motorola in

7  this litigation that you are aware of, right?

8  A.  I object to that question.  Similarly with respect to what

9  we found on this computer, we already provided the information

10  that we know as well as the information that Epic knew to our

11  counsel through the method of emails or reports.  For all the

12  emails and reports that we found, we would send them all to

13  our counsel.

14        I was not the person who would review or decide what

15  documents to produce.  I was not that person.

16        So my answer to your question is, I do not know.

17  Q.  And how do you know that Peiyi Huang didn't give her

18  password to that machine to other people in the DMR software

19  department so they could log on using her access to that

20  computer?

21  A.  It's like this.  In the documents that we circulate and

22  release in the company, we stipulate clearly that everyone in

23  the company could only use their own account and password to

24  log on to their own computer or to log on to the company's

25  computer and system.  We have a domain server that would allow

1  you to access and log on to the company's server by using that

2  single account and user name and password.

3         The user can only know their user name and password

4  for that domain server.  So for me, it's impossible for Huang

5  Peiyi to have provided her domain user name and password

6  information to other colleagues.

7         If you have that domain user name, login, and

8  password, it's equal to being associated with, for example,

9  your emails.  So I believe that it's impossible for her to

10  make public that information or to release that information.

11  Q.  You don't know, do you?

12  A.  That's correct.  For the specific situation, only her

13  herself would know.

14         But I remember having communications with some of the

15  engineers in the DMR software development department.  I

16  remember asking them if they have recollections as to ever

17  seeing Huang Peiyi's, any of her computers or any of her

18  account information.  The answers I have received were all

19  "never."

20  Q.  And did you receive those answers that you were just

21  telling the jury about as part of the investigation that you

22  have been testifying about?

23  A.  Yes.

24  Q.  I would like to ask you a few final questions about what

25  Hytera did in response to Motorola's claims.

Case: 1:17-cv-01973 Document #: 802 Filed: 12/20/19 Page 101 of 113 PageID #:55056
Luo - cross by DeVries
3222

1    Are you aware of Hytera ever telling its customers

2    that it has been selling them products with Motorola's source

3    code in them for years?

4    A.  No, I do not know that.  After this litigation took place,

5    I no longer work in the sales department, and I no longer

6    faced with customers.  So I do not know.

7    Q.  Are you aware of Hytera ever telling the market that it

8    apologizes to Motorola for using its source code for years?

9          THE COURT:  Is there an objection, Counsel?

10         MR. ALLAN:  Yes.  Objection, your Honor.

11         THE COURT:  Is there a good faith basis for that

12   question?

13         MR. DeVRIES:  Yes, your Honor, there is.

14         THE COURT:  I will accept your representation.  The

15   objection is overruled.  You may proceed.

16   BY THE WITNESS:

17   A.  I don't know that either.  After this litigation took

18   place, I no longer worked in the marketing department.  So for

19   this question, my answer is, I do not know.

20   BY MR. DeVRIES:

21   Q.  You testified that Hytera redesigned its software?

22   A.  Yes.

23   Q.  And that that redesigned software has been released for

24   certain model numbers but not others?

25   A.  Yes.  And we are working on right now to hope that we will

Luo - cross by DeVries

3223

1  be able to release it for all the model numbers in the next

2  month or two.

3  Q.  And when did Hytera release the redesigned -- what you are

4  calling the redesigned code for the models that it finished

5  testing for?

6  A.  I remember it was last month, November.

7  Q.  It was during this trial?

8  A.  I think it was before that.

9  Q.  You believe it was in November of 2019?

10  A.  Yes, in the first few days, around the beginning of that

11  month.

12  Q.  Now, you don't have a background in software development

13  or source code development, right?

14  A.  That's correct.

15  Q.  And to evaluate whether what you are calling redesigned

16  code actually removes all of Motorola's source code and trade

17  secrets, you have to rely on experts; is that right?

18  A.  Correct.

19  Q.  You said approximately 60 Hytera engineers worked on that;

20  is that right?

21  A.  Correct.

22  Q.  And were any of those engineers familiar with the Hytera

23  code, source code, that they were rewriting?

24  A.  I'm sorry.  I do not quite understand your question.

25  Q.  Before they were working on the redesign, did any of the

1   60 engineers that you testified about know anything about the

2   Hytera source code?

3   A.  Yes.

4   Q.  And those engineers worked with the Hytera source code

5   before the redesign effort began, right?

6   A.  Yes.

7   Q.  And that's the Hytera source code that contained Motorola

8   source code, right?

9   A.  Yes.  However, I would like to emphasize that up until

10  today, the portion of the Motorola code that Motorola

11  identified as to have been copied in our products, the ratio

12  or the percentage is very small.  Our engineers were

13  developing their own source codes.  They never saw Motorola's

14  source codes.  Nor were they the authors who wrote the accused

15  codes.

16  Q.  Was Xiaohua Zheng one of the 60 or so engineers who worked

17  on the redesign?

18          THE INTERPRETER:  Counsel, can you repeat that name.

19          MR. DeVRIES:  Xiaohua Zheng.

20  BY THE WITNESS:

21  A.  No.

22  BY MR. DeVRIES:

23  Q.  And was Sheng Juan one of the 60 or so engineers who

24  worked on the redesign?

25  A.  Yes.

1  Q.  And Sheng Juan had been exposed to Motorola code.  You

2  know that, right?

3  A.  I do not agree with your statement.

4  Q.  You showed Sheng Juan Motorola code found on Peiyi Huang's

5  laptop, right?

6  A.  It's like this.  I mentioned that in my deposition.  After

7  I found Huang Peiyi's computer, we gave it to Epic for data

8  processing.  In the results of the data processing I saw that

9  some source codes had Motorola's identifier.  Since I myself

10 do not understand source codes, I wanted to ask a colleague

11 who might have an understanding about source codes to help me

12 look at the results.

13       What I showed to this colleague was the beginning of

14 just several header files, the very beginning portion, the

15 very first portion of those header files.  Actually in the

16 very first portion of this source code header files, it

17 contains very simple disclaimer information.  For example, who

18 is the author of this source code and when this source code is

19 written or how many modifications have been done.  Very basic

20 information like this.

21       Sheng Juan taught me that.  She simply look at one or

22 two pieces of such information.  She pointed out to me that it

23 contained Motorola's confidential identifier in there.  And

24 then I closed all the files and provided those results to our

25 counsel and experts for their further analysis.

Luo - cross by DeVries

3226

1          What I want to say or express is that both Sheng Juan

2     and I never saw the specific content of those source codes.

3     What we saw was just the very beginning part at the top of the

4     documents of those files.  Also we only look at one or two

5     files.

6     Q.  We weren't able to ask Sheng Juan because she refused to

7     sit for deposition in this case, right?

8          THE INTERPRETER:  I'm sorry, Counsel.

9     BY MR. DeVRIES:

10    Q.  We never got to ask Sheng Juan about that because she

11    refused to sit for deposition in this case, right?

12    A.  It's like this.  The reason Sheng Juan refused to be

13    deposed was due to her personal reason.  For her personal

14    reason, she refused to leave Mainland China to be deposed.

15    She said she's never left China.  And she did not want to

16    accept the testimony proceeding that happens outside of the

17    place she lives in.

18         But at the same time, she was very cooperative with

19    our investigation.  She handed over all her computer and

20    documents for us to perform data processing.  According to my

21    own understanding, she was also very cooperative when

22    interviews of her were being conducted by our counsel, and our

23    counsel actually flew over to China to interview her.

24    Q.  After Motorola filed this case in March of 2017, Hytera

25    never stopped selling its DMR products, right?

Luo - cross by DeVries

3227

1    A.  That's correct.  We continued to sell our DMR products.

2    We are selling them.  And the reason is that a part of the DMR

3    model numbers was not on the accused list of DMR models.  Even

4    for the accused model numbers, we wait a very long time after

5    the start of the litigation.  We did not know what the

6    problems were with those model numbers.  It was until June

7    that we had a clear understanding of what the issues were that

8    we took actions immediately to deal with and resolve it.  We

9    started to release software upgrade patch or packages for the

10   new software so that our customers can upgrade the DMR devices

11   they have.

12   Q.  After the lawsuit was filed in March of 2017, up until

13   when Hytera says it released redesigned products last month,

14   Hytera sold over a quarter billion U.S. dollars of the accused

15   model numbers, right?

16           THE INTERPRETER:  Counsel, did you say quarter

17   billion or million?

18           MR. DeVRIES:  Billion with a B.

19   BY THE WITNESS:

20   A.  First of all, I'm not the person in charge of the sales

21   department.  I do not know if that figure is accurate.  Also

22   like what I said, for those DMR products, a part of them were

23   not accused in this case.  There were no problems with those

24   DMR products.

25

1    BY MR. DeVRIES:

2    Q.  Hytera did not stop selling its products as a result of

3    Motorola's claims while it says it attempted to figure out

4    what those claims were about.  Is that fair?

5    A.  That's correct.

6              And what I would like to say is that we know it is

7    wrong to sell infringing products intentionally.  It would be

8    wrong if Hytera did not do anything.  But that's not the case.

9    That's not the truth.  We have been hoping very much to

10   understand what was wrong.  We did a lot of -- a large amount

11   of investigation.  We even replaced our law firms and counsel

12   and experts.  We tried our very best to try to identify and

13   discover what the problems were.  We have been always working

14   on moving things along faster.  We hope to resolve it.

15   Q.  Do you agree that the responsible thing to do would have

16   been to stop selling the products until Hytera could be

17   assured that they did not include stolen Motorola source code

18   and confidential materials?

19   A.  I do not agree with your question.  There are many ways to

20   resolve problems.  It's just not one method that would be --

21   only one method that would be responsible.  I believe Hytera

22   is a responsible company.  That's why we have been spending so

23   much effort in trying to identify the problems and to solve

24   them.

25              MR. DeVRIES:  No further questions, your Honor.

Case: 1:17-cv-01973 Document #: 802 Filed: 12/20/19 Page 108 of 113 PageID #:55063
Luo - redirect by Allan
3229

1      THE COURT:  Redirect.

2      MR. ALLAN:  May I proceed, your Honor?

3      THE COURT:  Proceed.

4                  REDIRECT EXAMINATION

5  BY MR. ALLAN:

6  Q.  Mr. Luo, you were asked a number of questions on

7  cross-examination related to Hytera's investigation.

8         Do you recall those questions?

9  A.  Yes.

10  Q.  Can you remind us of what your role was in connection with

11  the investigation?

12  A.  Yes.  After the start of the litigation, I was assigned to

13  be the liaison and coordinator between our company and our

14  counsel and experts.

15  Q.  And is that because you were the head of the patent

16  department?

17  A.  Yes.

18  Q.  Are you an investigator?

19  A.  No.

20  Q.  Are you a lawyer?

21  A.  No.

22  Q.  Do you have detailed knowledge of every single aspect of

23  Hytera's investigation?

24  A.  No.  I myself did not get involved in the specific details

25  of each and every investigation.  Our counsel does not report

Luo - redirect by Allan

3230

1    to me either.  So I will not have an understanding about all

2    the details involved.

3    Q.  Now, you were shown a number of documents on

4    cross-examination.

5           Do you remember that?

6    A.  Yes.

7    Q.  How many pages of paper or documentation has Hytera

8    produced in this case?

9    A.  According to my understanding, what we have produced would

10   be documents containing more than 20 million pages.

11   Q.  Are you familiar with every single one of those pages,

12   Mr. Luo?

13   A.  It's impossible to do that.

14          THE COURT:  Did you turn over the haystack rather

15   than the needles?

16          THE WITNESS:  That's correct.

17   BY MR. ALLAN:

18   Q.  You were asked some questions about a Hytera employee

19   named Vivian Pan.

20          Do you remember those questions?

21   A.  That's correct.  Yes.

22   Q.  And I don't believe Motorola's counsel showed you any

23   documents from her files, but you indicated that there were

24   some Motorola documents in her files.

25          Do you recall that?

Luo - redirect by Allan

3231

1  A.  That's correct.  I was not shown those documents.

2  Q.  Do you understand that Ms. Pan is a marketing and a

3  salesperson based here in the U.S.?

4  A.  I know that.

5  Q.  Would you expect someone in her role to have competitive

6  intelligence related to competitors like Motorola and Kenwood

7  and HICOM and others?

8  A.  Yes, because for many exhibitions and trade shows, all of

9  those companies would attend.  The more famous one, which is

10  in the U.S., is called IWCE.  Such a show would be hosted or

11  held around February or March every year.  All the companies

12  would attend.

13       In such a trade show or exhibition, all the

14  companies, such as Motorola, Kenwood, HICOM, or Hytera, would

15  distribute information about their companies, including their

16  products as well.

17       So I'm not surprised at all that Vivian Pan would

18  have access to such information about competitors.  The reason

19  is that she was one of the people who would assist in hosting

20  trade shows like this or even attend the trade shows.

21  Q.  To your knowledge, Ms. Pan had nothing to do with the

22  development of the DMR products, correct?

23  A.  That's correct.

24  Q.  In fact, there has been no development -- R and D or

25  technical development -- of any DMR products in the United

Luo - redirect by Allan

1    States, correct?

2    A.  That's correct.  None.  All of that is done in China.

3    Q.  Do you have an understanding, Mr. Luo, as to whether any

4    of the 21 alleged trade secrets that are currently in the case

5    relate to marketing or sales at all?

6    A.  No, I do not know.

7    Q.  And are you aware of whether any of the 78 documents that

8    Motorola now contends comprise these 21 trade secrets, whether

9    any of those 78 documents were found in Ms. Pan's files?

10   A.  I do not know.

11   Q.  Going back to the documents that have been produced in

12   this case, do you have an understanding that Motorola has

13   produced over 40 million pages in this case?

14   A.  I'm not aware of that.

15   Q.  Are you aware of whether the bulk of Motorola's document

16   production in this case was made in the last year?

17   A.  I only have a rough understanding about it.  It's like

18   what I said earlier.  In the first year after the case was

19   filed, everything was moving very slowly.  So we were kind of

20   like looking like we were in a hurry to do something.  So it

21   looks like we will be more concerned or anxious than Motorola.

22   What I mean is that we would hope more that we could find what

23   the problems were than them.

24   Q.  Well, you understand, Mr. Luo, that the parties agreed to

25   produce documents that hit on certain search terms, right?

1  A.  Yes.

2  Q.  So Hytera produced documents that Motorola asked for and

3  Motorola produced documents that Hytera asked for, right?

4  A.  Correct.

5       THE COURT:  Motorola had a bigger haystack?

6       THE WITNESS:  That's my understanding.  That's part

7  of the investigation.  If you are to look into something that

8  happened more than ten years ago, in retrospect, you would

9  have to do something that is like looking for a needle in the

10  haystack.

11       THE COURT:  In order to meet our commitment to the

12  jurors, I am going to ask you to stop for the day.  You can

13  continue tomorrow morning at 10:00.

14       Members of the jury, we told you before that you

15  could leave in order to meet your commitments.  So you are

16  excused for the day.

17       Return tomorrow at 10:00 o'clock.

18     (Jury out at 4:00 p.m.)

19       THE COURT:  Court is in session.  Please be seated.

20       Do you have another witness lined up after this one

21  for tomorrow?

22       MR. ALLAN:  Yes, your Honor.

23       MR. CLOERN:  Yes.

24       THE COURT:  That answers that question.

25       All right.  10:00 o'clock tomorrow.

1          Thank you, counsel.

2          MR. ALLAN:  Thank you.

3     (An adjournment was taken at 4:00 p.m.)

4                    *    *    *    *    *

5  We certify that the foregoing is a correct transcript from the
   record of proceedings in the above-entitled matter.

6

7  /s/ Frances Ward_____December 17, 2019.
   Official Court Reporter

8  /s/Amy Spee, _____December 17, 2019.

9  Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25