```
 1                     IN THE UNITED STATES DISTRICT COURT
                          NORTHERN DISTRICT OF ILLINOIS
 2                              EASTERN DIVISION

 3    MOTOROLA SOLUTIONS, INC., and MOTOROLA      ) No. 17 CV 1973
      SOLUTIONS MALAYSIA SDN. BHD,                )
 4                                                )
                     Plaintiffs,                  )
 5    vs.                                         ) Chicago, Illinois
                                                  )
 6    HYTERA COMMUNICATIONS CORPORATION, LTD.,    ) January 23, 2020
      HYTERA AMERICA, INC., and HYTERA            )
 7    COMMUNICATIONS AMERICA (WEST), INC.,        )
                                                  )
 8                    Defendants.                 ) 10:00 o'clock a.m.

 9                        TRIAL - VOLUME 28-A
                        TRANSCRIPT OF PROCEEDINGS
10
                 BEFORE THE HONORABLE CHARLES R. NORGLE, SR.
11                               and a jury

12    APPEARANCES:

13    For the Plaintiffs:     KIRKLAND & ELLIS, LLP
                              BY:  MR. ADAM R. ALPER
14                                 MR. AKSHAY DEORAS
                                   MR. BRANDON HUGH BROWN
15                            555 California Street
                              Suite 2700
16                            San Francisco, California 94104
                              (415) 439-1400
17
                              KIRKLAND & ELLIS, LLP
18                            BY:  MR. MICHAEL W. DE VRIES
                                   MR. CHRISTOPHER M. LAWLESS
19                            333 South Hope Street
                              Suite 2900
20                            Los Angeles, California 90071
                              (213) 680-8400
21

22
      Court Reporter:        JENNIFER COSTALES, CRR, RMR
23                           Official Court Reporter
                             219 South Dearborn Street, Room 2342
24                           Chicago, Illinois 60604
                             (312) 435-5895
25                           jenny.uscra@yahoo.com
```

3985

```
 1    APPEARANCES:   (Continued)

 2    For the Plaintiffs:     KIRKLAND & ELLIS, LLP
                              BY:  MS. MEGAN MARGARET NEW
 3                            300 North LaSalle Street
                              Chicago, Illinois 60654
 4                            (312) 862-7439

 5                            KIRKLAND & ELLIS, LLP
                              BY:  MS. LESLIE M. SCHMIDT
 6                            601 Lexington Avenue
                              New York, New York 10022
 7                            (212) 446-4763

 8    For the Defendants:     STEPTOE & JOHNSON, LLP
                              BY:   MR. BOYD T. CLOERN
 9                                  MR. SCOTT M. RICHEY
                                    MR. MICHAEL J. ALLAN
10                                  MS. JESSICA ILANA ROTHSCHILD
                                    MS. KASSANDRA MICHELE OFFICER
11                            1330 Connecticut Avenue NW
                              Washington, DC 20036
12                            (202) 429-6230

13                            STEPTOE & JOHNSON, LLP
                              BY:   MR. DANIEL S. STRINGFIELD
14                            227 West Monroe Street
                              Suite 4700
15                            Chicago, Illinois 60606
                              (312) 577-1300
16

17
      ALSO PRESENT:           MR. RUSS LUND and
18                            MS. MICHELE NING

19

20

21

22

23

24

25
```

3986

1    (Proceedings heard in open court.  Jury out)

2        THE COURT:  With respect to Hytera, I just want to

3    make a point here.  Yesterday when counsel began his

4    transition and said "I want to talk to you about..." the Court

00:00:14    5    stepped in and said "Enough of that.  We're talking about

6    asking questions and getting answers."

7        One reason for that observation in this case with

8    that particular witness, it gives her the opportunity in her

9    answers as she faces the jury and voices her answers directly

00:00:38    10    to the jury to give the impression that this is more of a

11    conversation or a chat rather than a very specific question

12    demanding a very specific answer.

13        And so this kind of laxity, if the witness and the

14    jury think of it as more of a chat or talking about something,

00:01:05    15    it works against the formality of what we are doing.  And her

16    particular answers along the way were not responsive, even

17    when asked leading questions, many of them were not responsive

18    and contained a lot of narration and volunteering and would

19    include references such as, as she looked at the jury, "But we

00:01:30    20    talked about that before" or "I talked about that before."

21        So it's this idea of "we talked about," as opposed to

22    "Here is a very specific question which requires a very

23    specific answer."  And that's the reason why I showed a little

24    irritation at the end of the day.

00:01:49    25        I think the attorney conducting the examination has

1    been doing a very good job.  He's a competent, experienced

2    attorney, and all is well.  But we do not want to give the

3    impression to the jury in any way whatsoever that this is some

4    form of a conversation or we're talking about things.

5    00:02:12     Matters involved in this case are very serious and we

6    want to maintain that sense of gravitas.

7         So transitions are good, transitions are always good.

8    But in this case, with that particular witness, that sort of

9    caught my attention, and that's why I made that statement at

10   00:02:31   the end of the day.

11        Another point is this.  The witness is drinking water

12   as she is on the witness stand.  Counsel is drinking water as

13   well.  We have a rule in this courtroom that may not have been

14   articulated:  No liquids in the court.  We do not give the

15   00:02:51   jurors liquids to drink.

16        You have probably become aware in some courtrooms

17   even a judge will have coffee on the bench.  There are

18   pitchers of water.  There may be even a Gatorade or water.  It

19   becomes like a Starbucks involvement.  And that's what I'm

20   00:03:10   trying to avoid.

21        And so we are taking breaks from time to time, so

22   there is no need to say that "I have to have a bottle of water

23   in my hand."  The witness should not ordinarily have any water

24   in her hand as she testifies or he testifies, nor should an

25   00:03:25   attorney.  So this is in the form of housekeeping.

Frederiksen-Cross - direct by Richey

3988

1      All said and done, I am well pleased with the way the

2    attorneys have presented this case, and you have my

3    compliments.

4        (Whereupon the Court heard other matters on his call)

00:05:49    5        THE COURT:  Good morning again.

6        THE CLERK:  I'll see if the jurors are here.

7      (Jury in)

8        THE COURT:  Good morning, members of the jury.

9        Please recall the witness.

00:07:18    10        MR. RICHEY:  Your Honor, Hytera calls Ms. Barb

11    Frederiksen-Cross.

12        THE COURT:  Please proceed.

13       BARBARA FREDERIKSEN-CROSS, DEFENDANTS' WITNESS,

14               PREVIOUSLY SWORN

00:07:35    15           DIRECT EXAMINATION (Resumed)

16    BY MR. RICHEY:

17    Q.  Good morning.

18    A.  Good morning.

19    Q.  When we left off yesterday, do you recall you were

00:07:43    20    testifying about files that Hytera had replaced over the

21    summer?

22    A.  Yes.

23    Q.  And the files that Hytera had replaced over the summer

24    were within the 4 percent that you talked about yesterday,

00:07:53    25    right?

Frederiksen-Cross - direct by Richey

3989

1    A.  That is correct.

2    Q.  And that includes the three libraries that you talked

3    about?

4    A.  Yes, the three libraries.

00:08:01    5    Q.  And that includes additional source code files where you

6    had found some evidence of copying?

7    A.  That is correct.

8    Q.  You reviewed those replaced libraries and source code?

9    A.  I did, yes.

00:08:14    10    Q.  And Hytera began replacing those libraries and source code

11    in June, is that right?

12    A.  That's my understanding about that time frame.  I wasn't

13    directly involved, but that's my understanding based on the

14    testimony I've heard.

00:08:28    15    Q.  And is it your understanding that Hytera actually wanted

16    to start much sooner?

17    A.  My understanding is they wanted to start as soon as they

18    understood that there was some merit in those allegations.

19    Q.  And were you having trouble figuring out what the

00:08:46    20    allegations and claims were before June?

21    A.  Well, the issue was with respect to the structure of the

22    report and finding so many errors in the materials that were

23    accused, it took a while to sort through all of that.

24    Q.  And that hadn't been sorted through before June, is that

00:09:06    25    right?

Frederiksen-Cross - direct by Richey

3990

1    A.   That's correct.

2    Q.   Okay.  Hytera's code replacement, that ended or it was

3    completed by October, isn't that right?

4    A.   I think that's the approximate time frame, yes.

00:09:16    5    Q.   So it took less than 6 months to rewrite the code?

6    A.   That's correct.

7         MR. RICHEY:  Jim, can we please pull up DDX-20.58.

8    BY MR. RICHEY:

9    Q.   So this was the time estimates that you had testified

00:09:33    10   about yesterday.

11        So looking here, Hytera's time to replace the

12   allegedly copied code was actually within your time frame

13   estimates, right?

14   A.   That's correct, yes.

00:09:48    15   Q.   Okay.  So just a couple more questions.

16        MR. RICHEY:  Jim, can we please go to DDX-20.13.

17   BY MR. RICHEY:

18   Q.   All right.  Regarding the 4 percent of allegedly copied

19   code, is it your opinion that Y.T. Kok, Sam Chia and Peiyi

00:10:11    20   Huang were responsible for that code?

21   A.   That is correct, yes.

22   Q.   And is that because they created the libraries that wrote

23   the specific code in the 4 percent?

24   A.   And distributed the download, yes.

00:10:21    25        THE COURT:  There is a tendency for some of these

Frederiksen-Cross - cross by Brown

3991

1 questions to lead, counsel.  Keep that in mind.

2 BY MR. RICHEY:

3 Q.  Finally, is it your opinion that the -- does the 96

4 percent as shown represented here in the pie chart, is it your

00:10:43  5 opinion that Hytera's code is different --

6          THE COURT:  I've suggested that some of your

7 questions may be leading.

8 BY MR. RICHEY:

9 Q.  Was --

00:10:54  10          THE COURT:  You might ask "What is your opinion"

11 rather than the way you put it.

12 BY MR. RICHEY:

13 Q.  What is your opinion as to who developed the 96 percent?

14 A.  My opinion is that the 96 percent was developed by Hytera

00:11:04  15 engineers.

16          MR. RICHEY:  Thank you.  I pass the witness.

17          MR. BROWN:  Cross-examination, Your Honor.

18          THE COURT:  Proceed.

19                    CROSS-EXAMINATION

00:11:14  20 BY MR. BROWN:

21 Q.  Good morning, Ms. Frederiksen-Cross.

22 A.  Good morning.

23 Q.  I'm Brandon Brown.  I'm counsel for Motorola.

24 A.  Pleased to meet you.

00:11:33  25 Q.  Now, at a high level, what you've come -- I'm sorry.  When

Frederiksen-Cross - cross by Brown

3992

1    you are ready.

2    A.   Yeah.  I just wanted to move those things out of the way.

3    Thank you.

4    Q.   At a high level, what you've come here to testify to the

00:11:50    5    jury about is that you disagree with a number of Motorola's

6    assertions, right?

7    A.   That's correct, yes.

8    Q.   And you described over the course of your testimony what

9    many of those assertions were, right?

00:12:03    10    A.   That's correct, yes.

11    Q.   And it was important in doing so that you described those

12    assertions accurately, right?

13    A.   That's fair, yes.

14    Q.   Because it's been a while since, for example, Dr. Wicker

00:12:21    15    testified to this jury for many days about the theft that he

16    uncovered, right?

17    A.   He was on the stand for several days, yes.

18    Q.   And that was, that was almost two months ago, right?

19    A.   I think it's getting closer to three actually.  But yeah,

00:12:35    20    it was quite a considerable time ago.

21    Q.   And so when you were telling the jury what it was that

22    Dr. Wicker was saying his accusations were, you know that it

23    was important that you do so accurately so as to not mislead

24    anybody, right?

00:12:49    25    A.   Yes.  I did so to the best of my ability.

Frederiksen-Cross - cross by Brown

3993

1    Q.  So I want to talk about some of the representations you

2    made.  And I want to start with this slide, which is your

3    DDX-20.14.

4         This was a slide you put up and you titled it

5    "Overview of Accusations," right?

6    A.  Correct, yes.

7    Q.  Those are not Motorola's accusations, are they?

8    A.  In looking at the title of this slide, it would have been

9    better to say "Overview of Opinions."  These are my opinions

10   with respect to those accusations.  So apologies for that

11   misstep.

12   Q.  You also testified to the jury that these were the

13   accusations, didn't you?

14   A.  I believe my testimony, that these were my findings with

15   respect to the applications, counsel, or accusations.

16        THE COURT:  All right.  To make a good record, what

17   is the number of the exhibit being exposed?

18        MR. BROWN:  It is the witness's DDX-20.14.

19        THE COURT:  Proceed.

20        MR. BROWN:  Thank you, Your Honor.

21   BY MR. BROWN:

22   Q.  Now, to start with, there is a couple things missing from

23   this slide if it was going to reveal what the actual

24   accusations in this case are, right?

25   A.  Can you let me know what you are thinking there, counsel?

Frederiksen-Cross - cross by Brown

3994

1  Q.  So when you prepared your expert report, you wrote that

2  there were multiple ways that somebody could misappropriate a

3  trade secret, right?

4  A.  That's my understanding, yes.

00:14:19  5  Q.  They could acquire a trade secret, right?

6  A.  Okay.

7  Q.  That's what you wrote in your expert report?

8  A.  That's certainly one way they could misappropriate a trade

9  secret.

00:14:31  10        THE COURT:  Just a minute.

11        Read the question back to the witness.

12    (Question read)

13        THE COURT:  You may answer.

14  BY THE WITNESS:

00:14:39  15  A.  I believe that is in my expert report, yes, counsel.

16        THE COURT:  All right.  Please proceed.

17  BY MR. BROWN:

18  Q.  They could use a trade secret, that's another way?

19  A.  That's the guidance I've been given by counsel, yes.

00:14:50  20  Q.  And they could disclose a trade secret, right?

21  A.  That's also part of the guidance I'd been given by

22  counsel, yes.

23  Q.  So let's start with acquiring a trade secret.  You didn't

24  make any mention of Motorola's or Dr. Wicker's accusations of

00:15:05  25  what Hytera acquired of Motorola's trade secrets, did you?

Frederiksen-Cross - cross by Brown

3995

1    A.   No.   My role, as I said, was to address the similarities

2    and differences in the code with respect to the trade secrets

3    and the copyright allegations.

4    Q.   And so you understand though that if we were to do an

00:15:22    5    overview of the accusations, Hytera has acquired literally

6    thousands of Motorola source code files, right?

7    A.   There were a large number of files on Peiyi Huang's

8    computer, that is correct.

9    Q.   And so is the answer to my question:  Yes, Hytera has

00:15:40    10   acquired literally thousands of Motorola's confidential source

11   code files?

12   A.   I do not have any information that would suggest that

13   Hytera, the corporation, has acquired those.   The ex-Motorolan

14   Peiyi Huang was in possession of them.

00:15:53    15        But as I described in my testimony, I did not see any

16   evidence that that source code was transmitted or provided to

17   Hytera at large, beyond the small amount of copying that I did

18   identify.

19   Q.   We'll get into some of that.

00:16:06    20        But just to be clear, Peiyi Huang was a manager of

21   software development at Hytera, wasn't she?

22   A.   That's what the org charts show, yes.

23   Q.   And they were, these files, thousands of Motorola

24   confidential files, they were found on her Hytera laptop,

00:16:23    25   weren't they?

Frederiksen-Cross - cross by Brown

3996

A.   On her laptop at Hytera, yes, not as a part of the Hytera

code system, that is to say, not in their revision system that

maintains their production code.

Q.   Peiyi's laptop at Hytera was a Hytera owned laptop, right?

00:16:40   A.   I believe that that is correct, counsel, yes.

Q.   And so the distinction you are making is that the files

were never uploaded to Hytera's SVN, is that what you are

saying?

A.   That's part of it, yes.

00:16:52   Q.   Okay.  We'll get back to that in a minute.

        But, so you agree that one of the accusations is that

Hytera acquired thousands of source code files, fair?

A.   Again, you're making a distinction I'm not comfortable

with, counsel, because I saw no evidence that Hytera, the

00:17:19   corporation -- those were certainly in the possession of Peiyi

Huang at the time she was a Hytera employee.  But I do not see

evidence that they were shared with Hytera or incorporated

into their code.

Q.   We'll explore that a little bit.  That's going to require

00:17:35   a bit of unpacking, I think.

        But let's just start at a high level.  You also

understand that Dr. Wicker explained how thousands of

Motorola's confidential documents also were found at Hytera,

right?

00:17:49   A.   I was here for that testimony, yes, sir.

Frederiksen-Cross - cross by Brown

3997

1  Q.  Now, what you did put on this slide was that 50 out of

2  3500 source code files were accused, right?

3  A.  When I explained this slide, I was very clear to say that

4  my findings were that of the accused source files, I found

00:18:25   5  that with respect to around 50 of those, there was evidence of

6  copying.

7  Q.  Now, just to be fair to what happened in court so far,

8  Dr. Wicker accused far more than 50 source code files, right?

9  A.  He has identified roughly 10 percent, approximately 300,

00:18:44  10  between 300 and 350 files that he says contain at least one

11  line of copied code.

12  Q.  And when he says, what you are referring to here of 350

13  files, what we are talking about are literal lines of code

14  from Motorola's code that have appeared in Hytera's code,

00:19:02  15  right?

16  A.  That's part of the distinction between his analysis and

17  mine, counsel.  He identified, as I pointed out, many lines

18  that do not appear in Motorola's code but which are present in

19  Hytera's code, for instance, a reference to a library function

00:19:18  20  or a reference to a header file that are a reference to a

21  copied file but are not themselves copied lines.

22  Q.  But what we are talking about here to be clear is one way

23  that there could be code copying, meaning it can be copied

24  literally line for line.  One line from Motorola's file can be

00:19:36  25  found in one line of Hytera's file.  That's the universe of

Frederiksen-Cross - cross by Brown

3998

1    your 50 and Dr. Wicker's 350, right?

2    A.  No.  Just to be clear, in the 50 files where I found

3    copying, I didn't limit those to files that contained literal

4    copying.  But they were files where when I examined the

00:19:56    5    evidence as an expert who has been involved in many copyright

6    investigations of code, I could look at that code and say, you

7    know, this is the same data structure or this is the same

8    function.

9         There may have been some lexical changes, some

00:20:10    10    changes made to the code.  But when I evaluated those

11    assertions, I came to the agreement that there was copy code

12    in those files.

13         In the other cases, when I evaluated them using my

14    expertise, I believe there was not evidence of copying from

00:20:26    15    Motorola's code but, rather, lines that pointed to some use or

16    sometimes to third-party code.

17    Q.  My question was a little simpler.

18         THE COURT:  Well, the question was "Right?"  What is

19    your answer to "Right?"

00:20:41    20         THE WITNESS:  I disagree.

21         THE COURT:  Proceed.

22    BY MR. BROWN:

23    Q.  Now, so let's try to unpack this.  So there is Dr. Wicker

24    accused not 50 but 350 source code files.  Let's just complete

00:20:56    25    that thought.

Frederiksen-Cross - cross by Brown

3999

1        The libraries right above, you point out that there

2   are three libraries, right?

3   A.   Correct.

4   Q.   Libraries are collections of compiled source code?

00:21:05   5   A.   Correct.

6   Q.   And you've concluded with Dr. Wicker that Hytera is using

7   Motorola's source code in its RFhal library, its DMR DSP

8   library and it's RAF, it's radio application framework

9   library, right?

00:21:20   10   A.   That is correct.

11   Q.   And you didn't include the source code that was in those

12   libraries as part of the 50 or the 350 number that we just

13   talked about, did you?

14   A.   No.  It was included in my 4 percent.  But this was

00:21:36   15   talking specifically -- I called the libraries out initially

16   and then the other code files.

17   Q.   The answer to my question is "No," correct?

18   A.   That's correct.

19   Q.   And so how many source code files are there in the three

00:21:48   20   libraries that Hytera has stolen from Motorola?

21   A.   I do not as I sit here recall the exact number.  It

22   varies.  There was a specific list of object files and

23   corresponding source files that Dr. Wicker had identified in

24   his report.  I recall the number of lines, but not the number

00:22:07   25   of files.

Frederiksen-Cross - cross by Brown

4000

Q.   It's about 100 files, right?

A.   I think it's in that neighborhood, yes.

Q.   So not 350 source code files, but 450 source code files
that Dr. Wicker accused of being stolen from Motorola?

00:22:21    A.   Yes.  If you take them out of the libraries and put them
in the source code files, that would be correct.

Q.   And that would be the right thing to do because they were
being compiled at Hytera, right?  So somebody at Hytera had
those source code files?

00:22:36    A.   I think that more likely than not that is true, that Peiyi
Huang and Sam Chia had those source code files.

Q.   Just those two?

A.   As near as I have been able to determine from the
evidence, it was those two, yes.

00:22:49    Q.   So in presenting your testimony, and you showed this just
before your direct examination ended, you said that 4 percent
of the code, of Motorola's code had been copied into Hytera's
files.  And that meant the other 96 percent of Hytera's files
were all developed by Hytera, right?

00:23:21    A.   Well, some are third-party code as well.  But Hytera or
third parties, for instance, the Texas Instruments code.

Q.   So I have to modify your slide again?  Let's be clear, you
are now saying 96 percent of the code was not developed by
Hytera?

00:23:35    A.   I'm saying 96 percent of the code was not copied and was

Frederiksen-Cross - cross by Brown

4001

1     incorporated into Hytera's product by Hytera.

2     Q.   Just your slide says "Hytera code," right?

3     A.   Correct.

4     Q.   96 percent developed by Hytera, right?

00:23:51    5     A.   Correct.

6     Q.   That's not correct, is it?

7     A.   No.   There is a sliver of that code that comes from Texas

8     Instruments and Mintographics and also as we saw yesterday a

9     couple of files that come from Microsoft.

00:24:06    10    Q.   How big is that sliver?

11    A.   It's less than 2 percent total.

12    Q.   So cut that down, 94 percent now developed by Hytera?

13    A.   Okay.

14    Q.   You just put this slide up 5 minutes ago, right?   You

00:24:24    15    didn't correct the slide on direct examination?

16    A.   I did not, counsel.   That's correct.

17    Q.   So let's talk about what that means.   When you consider

18    that now 94 percent of the code was developed by Hytera, did

19    you consider instances like this:

00:24:40    20         Somebody has a document that was, say, copied from

21    Motorola.   And they've got it sitting here right next to them

22    while they're typing.   And they're typing in the code, and

23    they're looking at the document, and they're studying the

24    Motorola document, and then they're writing code.

00:24:57    25         Did you consider that that happened at Hytera?

Frederiksen-Cross - cross by Brown

4002

1    A.   With respect to those specific documents that I addressed

2    during my testimony, I considered how those documents were

3    used and what they contributed, yes.  And I saw no evidence

4    that any of the rest of the documents provided guidance for

00:25:14    5    how to write the rest of the code.

6    Q.   You saw nothing in the documents and no evidence in

7    Hytera's files that showed that any of Hytera's engineers had

8    used stolen Motorola documents to write code, fair?

9    A.   Beyond what I described in my testimony as those documents

00:25:33    10   that serve as user documentation for the code that was taken.

11   Q.   I want to start then by looking at one of the documents

12   that's already in evidence.

13        MR. BROWN:  May I approach, Your Honor?

14        THE COURT:  Yes.

00:26:01    15   BY THE WITNESS:

16   A.   Thank you.

17   BY MR. BROWN:

18   Q.   I'm handing you what has been marked as PTX-1072.  This

19   was a document that Dr. Wicker testified about.

00:26:16    20        And do you recognize this document?

21   A.   I do, counsel, yes.

22   Q.   This document is the ROSAL specification at Hytera,

23   correct?

24   A.   That is correct, yes.

00:26:26    25   Q.   ROSAL is the radio operating system abstraction layer,

Frederiksen-Cross - cross by Brown

4003

1  right?

2  A.  Correct.

3  Q.  And that's one of the components that Motorola contends

4  that Hytera has taken from it, correct?

00:26:38    5  A.  That is correct, yes.

6  Q.  Now, you testified that you saw virtually no evidence that

7  Hytera had used any of Motorola's confidential information for

8  this trade secret, right?

9  A.  That is correct, beyond just the, as I said, the user

00:26:57   10  guides or user manuals relating to the 4 percent.

11  Q.  This wasn't included in your 4 percent, was it?

12  A.  I see no evidence that they used this document in creating

13  their ROSAL.  I mean --

14  Q.  I'm sorry, was there something else you were --

00:27:15   15  A.  I just wanted to note, when you look at the scope of this

16  document, it says specifically this document does not

17  provide or will not define the ROSAL directives, but will not

18  include the realization of the design of the ROSAL.

19        In other words, this document does not teach, when I

00:27:32   20  look at it and when I examine the contents of this document as

21  well, it's consistent with that description in the document

22  that this document does not teach how to build a ROSAL.

23        It provides the names of directives, that is to say

24  the names of the plug components, if you will.  But it does

00:27:50   25  not tell you how to write them.

Frederiksen-Cross - cross by Brown

4004

1    Q.  And in presenting that opinion to the jury, you've

2    definitely looked at the ROSAL code to see if this document

3    was used, right?

4    A.  I've looked at the ROSAL code, yes.

00:28:02    5    Q.  And you've also looked at how widely this document was

6    distributed, right?

7    A.  I have looked at that, yes.

8    Q.  Okay.  So let's start at the beginning.  We're going to

9    switch to the English translation, and I'm going to go to page

00:28:19    10    1 of the English translation.  I'll put it on the screen for

11    you.

12             Who created the ROSAL specification for Hytera?

13    A.  Y.T. Kok.

14    Q.  And Y.T. Kok obviously came from Motorola?

00:28:37    15    A.  That is correct, yes.

16    Q.  And he brought confidential information with him from

17    Motorola to Hytera?

18    A.  He certainly possessed a wealth of that information, yes.

19    Q.  And he also admitted in his deposition that he stole

00:28:52    20    Motorola source code and used it in writing Hytera source

21    code, didn't he?

22    A.  I think he made some representations about his possession

23    of that code and the use of some portions of that code into

24    Hytera's software.

00:29:06    25    Q.  And the fact that he then wrote the ROSAL specification,

Frederiksen-Cross - cross by Brown

4005

```
         1    that didn't trouble you, right?

         2    A.   No.  Again, I had already accounted for the copied code.

         3    And when I examined this document, it tells you how they used

         4    the copied code.

00:29:22 5    Q.   My question is different.  My question is:  Did it concern

         6    you that one of the gentlemen who has actually admitted to

         7    using Motorola code in writing Hytera's code is the author of

         8    the specification for Hytera's radio operating system

         9    abstraction layer?

00:29:37 10   A.   Yes.  That's why I examined how the abstraction layer was

         11   written, to see whether or not it had infected the abstraction

         12   layer.

         13   Q.   And he wrote the document about a month and a half after

         14   arriving at Hytera?

00:29:50 15   A.   I think that's correct, within the first two months.  I

         16   don't remember his exact start date there.

         17   Q.   And what he wrote is that he's designing the operating

         18   system abstraction layer to provide a standard and common RTOS

         19   interface for software development, right?

00:30:19 20   A.   I see that, yes.

         21   Q.   And he gives a little background, and he mentions that "to

         22   cater for the future grow" -- growth, fair?

         23   A.   I see that, yes.

         24   Q.   "...of the two-way radio software technology and in

00:30:36 25   consideration of software reusability, a standard and common
```

Frederiksen-Cross - cross by Brown

4006

1   operating system environment is utmostly necessary to provide

2   common executive environment for software development and

3   leverage the software scope."  Do you see that?

4   A.  I see that.

00:30:51   5   Q.  So at least Mr. Kok thought this was very important to

6   Hytera that they use the radio operating system abstraction

7   layer, right?

8   A.  That's what he appears to have written here, yes.

9   Q.  Others at Hytera agreed with him, too, right?

00:31:03   10   A.  I assume that that was true.

11   Q.  So then he goes through and he describes at a high level

12   some of the details of what he's proposing, right?

13   A.  Correct.

14   Q.  And then he also goes through and he starts listing out

00:31:19   15   how the code should be written, doesn't he?

16   A.  What he lists here is what these specific functions do, in

17   other words, the information that a person who wanted to use

18   these functions would need to have to understand which

19   functions to use.

00:31:37   20   Q.  And so if somebody were writing the code for ROSAL at

21   Hytera and they had this document, it could be useful for them

22   to know what each of these functions should do that they're

23   implementing because Y.T. Kok says they need them, right?

24   A.  As you see here, there is some speculation.  He doesn't

00:32:05   25   even question, do we need this?

Frederiksen-Cross - cross by Brown

1       So I'm not sure that it would give that kind of

2  guidance to a developer of ROSAL.

3       I think a developer of Hytera's ROSAL would need to

4  look at what Hytera's specific needs are with respect to its

00:32:19    5  anticipated plans for their abstraction layer for the

6  operating system and incorporate those.

7  Q.  But Y.T. Kok is the guy who is in charge of that, isn't

8  he?

9  A.  At a high level, he's a manager, yes.

00:32:31    10  Q.  So he's the one who is supposed to be doing that thinking?

11  A.  Presumably he would involve others on his team, but he

12  would certainly have input into it, I believe.

13  Q.  And so then this document with all of its details was

14  distributed fairly widely at Hytera.  That was something you

00:32:45    15  considered, right?

16  A.  I did consider that, yes.

17  Q.  This document was found in the possession of many, many

18  Hytera engineers, right?

19  A.  I recall that that is the testimony that was presented

00:32:59    20  here.  And with respect to the distribution of the document,

21  it seemed that there was a fairly long list.

22  Q.  And did you personally review who had possession of the

23  files?

24  A.  I did at the time I reviewed this document.  I don't

00:33:14    25  recall as I sit here the list of those individuals.

Frederiksen-Cross - cross by Brown

4008

1  Q.  I'll show you a couple.

2       Okay.  Now I've handed you PTX-479, PTX-504 and

3  PTX-505.  Do you see those?

4  A.  Yes, I do.

00:34:53   5  Q.  Do you see that those are documents from Hytera's files?

6  A.  I see that, counsel.

7       MR. ALPER:  Your Honor, plaintiff moves to admit

8  PTX-479, 504 and 505.

9       MR. RICHEY:  No objection, Your Honor.

00:35:05   10      THE COURT:  They are received and may be published.

11       (PTX-479, PTX-504 and PTX-505 were received in evidence)

12  BY MR. BROWN:

13  Q.  So let's start with 479.  Same document created by Y.T.

14  Kok, right?

00:35:24   15  A.  That appears to be correct, yes.

16  Q.  And this one in the possession of an engineer at Hytera,

17  Yan Xu?

18  A.  I do not seem to have that page attached to my PTX-479.

19  Q.  Well, let me ask, rather than going through the

00:36:02   20  rigamarole, do you have any reason to disagree with me that

21  the metadata shown here is the metadata for that document?

22  A.  No.  It appears to be.

23  Q.  Okay.  So that's --

24  A.  I just wanted to point out I didn't have that page.

00:36:12   25  Q.  We'll fix that in the future documents.

Frederiksen-Cross - cross by Brown

4009

1      So he's not a Hytera -- excuse me.

2      He's not a former Motorolan, right?

3  A.  I don't believe that he is.

4  Q.  And then PTX-504 is an email between two Hytera engineers,

00:36:39   5  right?

6  A.  Correct.

7  Q.  An email from Yang Hao, who seems to go by Jacky, do you

8  see that?

9  A.  Yes, I see that.

00:36:50   10  Q.  To Haun Ni, right?

11  A.  I see that, yes.

12  Q.  Also attaching the ROSAL document we've been talking

13  about, right?

14  A.  I can't tell from this name, since I don't read Chinese,

00:37:03   15  if it's the exact same document.

16      But if you have metadata to show that and you're

17  making that representation, I'm happy to accept it.

18  Q.  Sure.  If you look at the other document I gave you,

19  PTX-505, I'll show you the metadata.  You can see the file

00:37:26   20  name is the same?

21  A.  I see that.

22  Q.  The date last modified is the same as the date of the

23  email?

24  A.  Okay.  Thank you.

00:37:34   25  Q.  So Hytera engineers --

Frederiksen-Cross - cross by Brown

4010

```
            1        THE COURT:  Just a minute.

            2        Did you ask a question?

            3        MR. BROWN:  The meta -- yes, Your Honor.

            4        THE COURT:  So the answer was "Okay.  Thank you."
00:37:46    5   Did that answer your question?

            6        MR. BROWN:  Well, let me --

            7        THE COURT:  Well, put the question in clear words so
            8   we get a definite answer.

            9        MR. BROWN:  Yes, Your Honor.
00:37:54   10        THE COURT:  An "Okay.  Thank you" is a little
           11   confusing.

           12        MR. BROWN:  Yes, Your Honor.

           13   BY MR. BROWN:

           14   Q.  You agree with me that PTX-504 is an email in which two
00:38:03   15   Hytera engineers are exchanging the same ROSAL document that
           16   we've been looking at, right?

           17   A.  Just to clarify, counsel, this is a different document
           18   with a different title, so I can't agree with that.

           19   Q.  And if we look into the document, did you review this
00:38:19   20   document in telling the jury that 96 or 94 percent --

           21        THE COURT:  Just a minute.

           22        Have you given the appropriate document that you are
           23   inquiring of to the witness?

           24        MR. BROWN:  Yes, Your Honor.  She's looking through
00:38:30   25   it right now.
```

Frederiksen-Cross - cross by Brown

4011

1    THE COURT:  What is the document number?

2    MR. BROWN:  PTX-505, Your Honor.

3    THE COURT:  Does the witness have that document in

4  her hand there?

00:38:37    5    MR. BROWN:  Yes, Your Honor.

6    THE WITNESS:  I do.

7    THE COURT:  What is the question?

8  BY MR. BROWN:

9  Q.  Ms. Frederiksen-Cross, did you review this document before

00:38:43    10  you told the jury that Hytera developed 96 percent of its code

11  independently?

12  A.  I did, yes.

13  Q.  And this document is substantively the same as the other

14  document we were just looking at, right?

00:38:57    15  A.  Yes.  It appears to be a slightly later version or updated

16  version.

17  Q.  Now, who is Jacky?

18  A.  Jacky is a Hytera developer.

19  Q.  What did Jacky work on at Hytera?

00:39:16    20  A.  I believe, amongst other things, she worked on portions of

21  the coding that uses the ROSAL interface.

22  Q.  So Jacky was partially responsible for writing the ROSAL

23  code, right?

24  A.  For writing, writing some of the surface components that

00:39:32    25  interface to ROSAL, yes.

Frederiksen-Cross - cross by Brown

4012

1  Q.  And Jacky has possession of the document that Y.T. Kok

2  created laying out how to create ROSAL, right?

3  A.  That is correct.

4  Q.  And you know that the document that we're looking at,

00:39:49   5  PTX-505, that was created by Y.T. Kok, that was copied from

6  Motorola, right?

7  A.  There is certainly parts of this document that were copied

8  from Motorola, yes.

9  Q.  It's quite a bit of the document that's copied from

00:40:02   10  Motorola, right?

11  A.  I believe that to be correct, yes.

12       Some of it is a little ambiguous because some of it

13  looks like it could come from third-party information as well,

14  like there are quotations to things that are found in the

00:40:15   15  POSIX spec and some of the other IEEE specifications related

16  to POSIX.

17       But I don't dispute that there are at least good

18  chunks of this document that appear to be copied directly from

19  a Motorola document.

00:40:31   20  Q.  And so --

21       THE COURT:  Just a minute.

22       When you use the term "good chunks," what do you

23  mean?

24       THE WITNESS:  There are sections, paragraphs within

00:40:36   25  this document that appear to have been copied from the

Frederiksen-Cross - cross by Brown

4013

1    Motorola documentation.  There are other paragraphs that

2    looked like they were perhaps copied from the IEEE POSIX

3    specification.

4    BY MR. BROWN:

00:40:49    5    Q.   You didn't present any of that analysis during your direct

6    examination, did you?

7    A.   I did not, no.

8    Q.   Now, the engineer who was register -- let me reframe.

9         The engineer who was writing ROSAL code had

00:41:08    10   possession of the specification, but it is your testimony she

11   didn't use it while writing ROSAL code, right?

12   A.   That mischaracterizes my testimony a little bit.  I think

13   that it's reasonable to think that she did use this as a

14   guideline for, for instance, selecting which functions to

00:41:26    15   invoke because it is the documentation for those functions.

16   Q.   So if she was using material created by Y.T. Kok that was

17   stolen from Motorola, why is it okay for her to use it in

18   writing ROSAL code?

19   A.   Well, again, this doesn't go beyond the copied code.  It

00:41:46    20   doesn't go beyond that 4 percent.  This is the user guide for

21   how to use that 4 percent.

22        So from the standpoint of the benefits she would

23   gain, she could probably just have studied the code.  But it

24   doesn't add any knowledge to how to create ROSAL, rather, it

00:42:03    25   is how to interface with ROSAL.

Frederiksen-Cross - cross by Brown

4014

1   Q.  Would it change your opinion if you knew that she actually

2   used this document while creating the ROSAL code rather than

3   just using it as you are saying?

4   A.  It might.  It depends on the way in which she was using

00:42:18   5   it, counsel.

6   Q.  And you didn't consider that in presenting your opinions,

7   did you?

8   A.  I looked for evidence of use of the information in this

9   document.  And beyond just the fact that these functions were

00:42:32   10   referenced within the ROSAL or some of these functions were, I

11   didn't see any evidence that this document had informed the

12   creation of the ROSAL code that actually does the translations

13   and the functionality that a ROSAL performs.

14   Q.  Well, why don't we look at some of the ROSAL code.

00:43:05   15   A.  Thank you.

16   Q.  I'm handing you what's been previously admitted as

17   PTX-1863.  And this is the file ROSAL_msglist.cpp, Bates

18   number 8-14-1973-SC-00002500.

19       You recognize this as some of Hytera's ROSAL code,

00:43:35   20   right?

21   A.  Yes, I do.

22   Q.  And this code fell in to what you told the jury was

23   developed by Hytera, right?

24   A.  Correct.

00:43:48   25   Q.  If we look on the top here, it says "Author:  Jacky."  Do

Frederiksen-Cross - cross by Brown

4015

1    you see that?

2    A.   Correct, yes.

3    Q.   The same Jacky we've been talking about?

4    A.   As far as I can discern from this, I would assume it is.

00:44:08    5    Q.   And you reviewed this code?

6    A.   I did.

7    Q.   I want to take you to just a couple instances.

8         On line 322, do you see what that is?

9    A.   I see it.

00:44:33    10   Q.   Okay.  And actually let me take you down to -- sorry about

11   that.  If you'll turn to 251.  I'll start there first.

12        We see that there is a function on line 267 that says

13   ROSAL_TimedGetReply?

14   A.   I see that.

00:45:06    15   Q.   And that's a function that was described in the copy of

16   ROSAL specification created by Y.T. Kok, right?

17   A.   As a part of that interface code, yes.

18   Q.   And then Jacky here writes a description of the function

19   that she's going to create, right?

00:45:24    20   A.   I see there is a description, yes.

21   Q.   And the description says, "Receive only a reply type or

22   priority type message from the task's message queue if one

23   exists," right?

24   A.   I see that.

00:45:35    25   Q.   And if we look at the document that Y.T. Kok copied from

Frederiksen-Cross - cross by Brown

4016

1    Motorola for ROSAL_TimedGetReply, it says "Receive only a

2    reply type or priority type message from the task's message

3    queue if" -- I am going to turn the page if you are -- okay,

4    "if one exists."

00:45:58    5         So just with that sentence, Jacky, a

6    non-ex-Motorolan, is using a copied Motorola document and

7    copying it in to the source code that she is writing for

8    Hytera, right?

9    A.   She is copying a comment from this document into a piece

00:46:19    10   of source code that describes that interface to ROSAL, yes.

11   Q.   And she continues word for word, "If the message queue is

12   empty, the calling task will go to sleep until either a reply

13   or priority message is received or the timeout expires, which

14   ever occurs first."  Right?

00:46:37    15   A.   I see that, yes.

16   Q.   That is word for word out of the document at Hytera that

17   was copied from Motorola?

18   A.   It matches word for word, that is correct.

19   Q.   She even adds the last sentence, "This directive is a

00:46:59    20   blocking call" right?

21   A.   I see that, yes.

22   Q.   And then that's a description of the function that she is

23   setting out to create in Hytera's code, right?

24   A.   That is a description of the functions she has included in

00:47:21    25   the code here, yes.

Frederiksen-Cross - cross by Brown

4017

1  Q.  And it even describes more information, right, it says

2  "Input, the tick specified a maximum timeout period in ?? that

3  the task must be suspended while waiting for the message."  Do

4  you see that?

00:47:40  5  A.  I see that.

6  Q.  She copies that word for word into the Hytera source code?

7  A.  Except for the word "tick," yes, that is to say "duration"

8  on the code has a different word there.  But the description

9  of that function is the same.

00:47:53  10  Q.  Okay.  And then the document copied from -- the document

11  copied from Motorola says "The return value should be a

12  pointer to the message," and she says "Return the pointer to

13  the message," right?

14  A.  She's describing what that pointer is, yes.

00:48:13  15  Q.  So while Jacky is writing this code at Hytera, she has a

16  copied specification from Motorola right next to her or on her

17  screen, and she's typing it in as she's writing code, right?

18  A.  That is one possible explanation.  Many of the

19  descriptions of functions in this document also match the

00:48:42  20  corresponding POSIX functions.  So I can't be sure whether she

21  was copying from the IEEE POSIX standard or this document.

22  Q.  It's word for word from this document.

23  A.  I'm indicating --

24  THE COURT:  Is that a question?

00:48:57  25  MR. BROWN:  It wasn't, so I will rephrase it.

Frederiksen-Cross - cross by Brown

4018

1          THE COURT:  Well, so make it clear.  Put a clear

2     question to the witness.

3          MR. BROWN:  Yes, Your Honor.

4     BY MR. BROWN:

00:49:04    5     Q.  Is it your testimony that she copied word for word from

6     this document, but you are not sure -- well, withdrawn.  Let

7     me ask it differently.

8          Does this count in your mind as developed by Hytera

9     if she is sitting there copying from Motorola copied documents

00:49:32   10    into Hytera's code?  That is not developed by Hytera, is it?

11    A.  The code implementing this function does not match

12    Motorola's code.

13         The description, the comment associated with this

14    function matches Motorola's document and in some places also

00:49:57   15    matches word for word the POSIX specification.

16         So the code itself that she is writing here is not

17    code that is in this document or in Motorola's code.

18    Q.  And so just so everybody is on the same page, your

19    testimony is that if somebody is writing code at Hytera while

00:50:19   20    using stolen Motorola documents as a reference, that is still

21    code that's been independently developed by Hytera?

22    A.  This source code implementing the functionality is

23    independently developed by Hytera.

24         This code does not appear to derive from Motorola's

00:50:36   25    code.  The comments arguably may derive from this document.

Frederiksen-Cross - cross by Brown

4019

1    Q.   The comments which describe what functions she's writing,

2    what code she's writing, right?

3    A.   They describe what the function is used for, but do not

4    describe how the function is written.

00:50:58   5    Q.   And this is in the universe of how this sort of thing, of

6    somebody using a Motorola document and then writing code,

7    that's in the universe for you of this 94 percent?

8    A.   The code is within the universe of the 94 percent, yes.

9    Q.   Now, you know why the engineers at Hytera are writing the

00:51:22   10   code like this, right?

11   A.   They are writing the code like this because Y.T. Kok has

12   directed them to create a ROSAL as an abstraction over the

13   code that they already had for operating system code.

14   Q.   And so what is happening is Y.T. Kok is providing

00:51:46   15   confidential Motorola information to Hytera engineers and then

16   directing them to write code that implements what that

17   Motorola confidential information describes, right?

18   A.   He's directing them to implement a ROSAL that contains

19   these functionalities, yes.

00:52:01   20   Q.   And the reason that he's doing that is because he was

21   directed by the head of the DMR product at the time to rewrite

22   source code so that it looks different than Motorola, right?

23   A.   I don't think based on the document and what he says in

24   the document that that is his motive.  It says that he feels

00:52:28   25   that this is an important step in maturing the product.

Frederiksen-Cross - cross by Brown

4020

1      I didn't see anything in this document that says

2  "make it like Motorola's."

3  Q.  Well, hold on.  There is a couple ways here that somebody

4  could use Motorola's confidential information.  They could, as

00:52:46  5  we talked about, they could just literally copy the code,

6  right?

7  A.  Correct.

8  Q.  We've seen evidence of that at Hytera?

9  A.  At least in some instances, yes.

00:52:54  10  Q.  We've also seen evidence that the folks in charge of the

11  DMR product at Hytera were worried that if they used too much

12  of Motorola's code directly, Motorola might figure it out,

13  right?

14  A.  I recall a document where that was discussed, yes.

00:53:10  15  Q.  And so what Y.T. Kok is doing with the specification that

16  he copied from Motorola is having the Hytera engineers follow

17  the directions in the confidential document but write their

18  own code to implement that same functionality, right?

19  A.  I have a problem with that insofar as, to the extent this

00:53:36  20  document contains content copied from Motorola, it spells out

21  the specific names of the functionality they are writing; and,

22  in fact, those are the names that are used in the code.

23      So I see no effort to hide anything from the document

24  in this code.  They're writing the implementation from

00:54:00  25  scratch.

Frederiksen-Cross - cross by Brown

4021

1        But to the extent you are saying anything is copied

2   from the document, they're not obscuring, for instance, the

3   function names or anything else that would serve to obscure

4   that act.

00:54:13    5   Q.  Well, hold on.  You know that's not right, what you just

6   said, don't you?  Technically, that's incorrect?

7   A.  And if you feel there is a technical inaccuracy, can you

8   ask me about it?  Because I'm not sure where you are going

9   with that.

00:54:27   10   Q.  There is no such thing at Motorola called ROSAL.  This is

11   a Hytera name that's been used to obscure the functioning.

12   A.  I don't think that suffixing a name in and of itself to

13   identify the function of the code that that component belongs

14   to is necessarily an effort to hide.

00:54:45   15        You know, a person familiar with Motorola's

16   specification or Motorola's code would readily recognize all

17   of these functions, because all that's been done is a prefix

18   with ROSA, is to prefix them to identify what component of the

19   system they belong to.

00:55:02   20   Q.  The question was:  This is not a name of a Motorola

21   function, is it?

22   A.  Motorola does not have a function named

23   ROSAL_TimedGetReply, that is correct.

24   Q.  And the code is different than what Motorola's code line

00:55:19   25   for line implements for this function, right?

Frederiksen-Cross - cross by Brown

4022

1   A.   The code is definitely different, yes.

2   Q.   But it's been written being informed by a confidential

3   document, right?

4   A.   It would appear that that document was referenced during

00:55:31   5   the creation of this code, yes.

6   Q.   Now, that's not the only time that this has happened at

7   Hytera, is it?

8   A.   Certainly I've identified other documents in my testimony

9   where it appeared that they were using the guidelines from

00:55:48   10   documentation to provide the names of functionalities, for

11   instance, to interact with libraries or within the template.

12   Q.   And to provide descriptions of how to write the code that

13   Hytera's engineers are going to write?

14   A.   Do you have a specific example in mind, counsel?

00:56:06   15   Q.   Well, we just looked at one, didn't we?

16   A.   Yeah.  You said there were others.  And I just --

17   Q.   Well, when you testified to this jury that there was --

18   I'll put your slide up.  This is your DDX-20.11, "No added

19   benefit from Motorola documents."

00:56:26   20       Did you have in mind that Hytera engineers were using

21   Motorola confidential documents to inform how they were going

22   to write their code?

23   A.   With respect to the documents that I opined on during my

24   testimony, I am aware that the Motorola engineers had in their

00:56:43   25   possession those documents.  I evaluated the content of the

Frederiksen-Cross - cross by Brown

4023

1   document.  And, again, it is my opinion that they don't give

2   added benefit beyond the code that was already taken.

3          THE COURT:  You said "Motorola engineers."  Did you

4   mean "Hytera"?

00:56:56   5          THE WITNESS:  I'm sorry.  Yes.  Thank you so much.

6          THE COURT:  Don't apologize.  Don't apologize.  I

7   just want clarity.

8          THE WITNESS:  Yes, that is correct.

9          THE COURT:  So can you change your answer to what you

00:57:03   10  meant.

11  BY THE WITNESS:

12  A.  Yes.  I am aware that Hytera engineers had some documents

13  that had been rebranded and passed to them from the

14  ex-Motorolans, that they may have referenced those documents

00:57:13   15  in understanding how to use the code that they were being

16  provided.  And I did consider that.

17  BY MR. BROWN:

18  Q.  Okay.  Now, one of the other documents you talked about

19  was the radio application framework, right?  There was a radio

00:57:27   20  application framework document distributed at Hytera, right?

21  A.  Correct.

22  Q.  And this was a document that was also copied from

23  Motorola, correct?

24  A.  At least in large part, yes.  I don't remember if every

00:57:39   25  single word was, but that document was, appeared to be largely

Frederiksen-Cross - cross by Brown

4024

1    copied.

2              MR. BROWN:  May I approach, Your Honor?

3              THE COURT:  Yes.

4    BY MR. BROWN:

00:57:59    5    Q.  I've handed you PTX-628, which was previously admitted.

6    This is one copy of that document at Hytera, right?

7    A.  It is, yes.

8    Q.  And you only showed the cover page of the document.  But

9    you understand that the entire document and all of its

00:58:17   10    technical details describing how the radio application

11    framework works, how it's structured, all of that was copied

12    directly from Motorola, correct?

13    A.  I don't recall if, as I sit here, if the text in its

14    entirety was, but certainly the diagrams were.

00:58:39   15    Q.  You don't remember if this text was copied from Motorola?

16    A.  Some of it I recognize.  And I didn't memorize the entire

17    Motorola document, so I can't say as I sit here that every

18    word was copied.  But I know that some text was and the images

19    were.

00:58:54   20    Q.  And you also understand that this document was distributed

21    widely at Hytera, correct?

22    A.  Yes.  It was distributed to Hytera application developers.

23    Q.  Not just the Hytera application developers, was it?

24    A.  That's my recollection as I sit here.

00:59:14   25    Q.  I show you two additional documents.

Frederiksen-Cross - cross by Brown

4025

1    I've handed you what's been previously admitted as

2  PTX-627 and 637.

3    So one example, 627, an email at Hytera from somebody

4  named Deyou Zhu.  Who is Deyou Zhu?

01:00:12    5  A.  Zhu Deyou is a Hytera developer who is not a former

6  Motorolan.

7  Q.  And who are these other two engineers that he's emailing?

8  A.  Those are also Hytera developers who are not former

9  Motorolans.

01:00:30   10  Q.  And he's instructing people that they need to compile the

11  design outline and get familiarized with it, right?

12  A.  I see that, yes.

13  Q.  And so he's instructing people to get familiar with the

14  document that's been copied from Motorola?

01:00:43   15  A.  That is apparently the intent of this email, yes.

16  Q.  And the document, if you look at 637, this is another

17  document that Hytera has that's virtually identical.  You've

18  seen this document?

19  A.  I have seen this document, yes.

01:01:12   20  Q.  And the document has some changes on it, doesn't it?

21  A.  I do recall that there were some changes between 628 and

22  637, yes.

23  Q.  The document says "EMT" all over it?

24  A.  I see that, yes.

01:01:31   25  Q.  What is EMT?

Frederiksen-Cross - cross by Brown

4026

1   A.  That is the ergonomic management task.

2   Q.  And is that a Hytera functionality?

3   A.  Well, in some of the early Hytera documents such as this,

4   I see the name EMT used.  Later it appears that that was

01:01:49   5   changed to RAF, RAF_cor.

6   Q.  Because EMT is a Motorola name?

7   A.  EMT is also used in Motorola.  I can't speculate on why

8   the change was made.

9   Q.  There is --

01:02:02   10          THE COURT:  Wait just a minute.

11          Would you read the question back to the witness,

12   please.

13     (Question read)

14   BY THE WITNESS:

01:02:10   15   A.  I can confirm that --

16          THE COURT:  You may answer the question.

17   BY THE WITNESS:

18   A.  I don't know if that's why they changed it.

19          THE COURT:  All right.

01:02:19   20          MR. BROWN:  Now --

21          THE COURT:  Just a minute.

22          Please read the question back to the witness.

23     (Question read)

24   BY THE WITNESS:

01:02:35   25   A.  EMT is a Motorola name.

Frederiksen-Cross - cross by Brown

4027

| | |
|---|---|
| 1 | THE COURT: Thank you. |
| 2 | You may proceed, counsel. |
| 3 | MR. BROWN: Yes, Your Honor. |
| 4 | BY MR. BROWN: |

01:02:41

5  Q.  Now, Hytera engineers who were working on creating the

6  radio application framework library, they also used this

7  document, didn't they?

8  A.  It appears, counsel, that based on my analysis that the

9  radio application framework library was comprised largely of

01:03:08

10  Motorola modules.  So I'm not sure who you are referring to

11  when you say Hytera engineers --

12  THE COURT:  All right.  Rephrase the question.

13  BY THE WITNESS:

14  A.  -- who were working on it.

01:03:16

15  THE COURT:  Rephrase the question.  It's not clear to

16  the witness.

17  BY MR. BROWN:

18  Q.  Hytera engineers, other than those that came from

19  Motorola, also worked on the source code for the radio

01:03:27

20  application framework, correct?

21  A.  For those ancillary components, yes.

22  Q.  And for the library itself, right?

23  A.  The reference to the components for the library appears to

24  be on, the actual components used to build the library appear

01:03:47

25  to come from the ex-Motorolans' computers.

Frederiksen-Cross - cross by Brown

4028

1    And so when you say the Hyterans who were working on

2    that library, there are Hyterans who worked on programs that

3    interface with that library, but not who worked on content

4    that is incorporated directly in that library.

01:04:13    5    Q.    So your answer to my question is no?  It's your opinion

6    that the non -- excuse me.

7    The non-ex-Motorolans at Hytera did not work on the

8    code that's actually in the stolen library from Motorola,

9    right?

01:04:29    10    A.    Not in the early releases at least.  There was work later

11    in time.  You know, we've spoken of the rewrite, for instance,

12    to replace that library functionality.  So if you exclude

13    individuals who were attempting to replace the library

14    functionality, then my answer is no.

01:04:52    15    Q.    Okay.  So let's start with, do you know who Ruan Hanchun

16    is?

17    A.    I am familiar with that name from some of the evidence in

18    this case.  I've not met him personally.

19    Q.    Who is he?

01:05:07    20    A.    He's a Hytera developer.

21    Q.    And he's a Hytera developer who worked on radio

22    application framework at Hytera, right?

23    A.    I know he had some documents in his possession related to

24    that.  And I believe he did write some of the files that are

01:05:22    25    used to interface with it.

Frederiksen-Cross - cross by Brown

4029

1  Q.  And as he was writing some of the files for Hytera's radio

2  application framework, he was using Motorola materials to do

3  so, wasn't he?

4  A.  What specific materials do you -- are you referring to,

01:05:38  5  counsel?

6  Q.  Can you answer my question?

7  A.  I would have to juxtapose them in time to answer that

8  question.  I'm aware that he was in possession of some

9  Motorola materials, and that my understanding is that he

01:05:55  10  studied those materials at the request, I believe it was of

11  Y.T., and did some documentation of those materials.

12         I am not aware that he referred to those materials

13  specifically in his development, at least I don't recollect

14  that as I sit here.

01:06:13  15  Q.  So when you presented again an opinion to the jury that 96

16  percent of the code was independently developed, once again

17  you discounted the fact that another Hytera engineer was using

18  Motorola's confidential documents when writing code at Hytera?

19  A.  Again, my opinion with respect to the code and its origin

01:06:32  20  is based on the contents of the code, the actual functional

21  code.  And so that is correct, counsel.

22         MR. BROWN:  Permission to approach, Your Honor.

23         THE COURT:  Yes.

24  BY MR. BROWN:

01:06:46  25  Q.  I hand you PTX-638.

Frederiksen-Cross - cross by Brown

4030

1    PTX-638 is already admitted.  It's a document

2  entitled "Application Framework Understanding," right?

3  A.  That is correct.

4  Q.  This looks very different than the two application manager

01:07:10    5  documents we've been previously looking at, doesn't it,

6  PTX-628 and 637?

7  A.  Give me a second to orient myself to the document,

8  counsel.

9  Q.  Of course.  The English translation begins on page 28 if

01:07:22    10  that's helpful.

11  A.  I found that.  Thank you.

12    The document looks different, yes.

13  Q.  And this was created by Ruan Hanchun, right?

14  A.  That is correct.

01:08:02    15  Q.  But it wasn't really, was it?  He copied this from

16  Motorola, didn't he?

17  A.  There are similarities in the description of how the

18  application framework operates.

19  Q.  He copied this from Motorola, didn't he?

01:08:48    20    Can you answer my question?

21  A.  I'm just reviewing the contents of the document, counsel.

22  If you can give me just a minute.

23    It does not appear to be copied from the document we

24  were just discussing, but it does appear to describe similar

01:09:47    25  content with respect to the operation of the software.

Frederiksen-Cross - cross by Brown

4031

1    Q.   Your opinion to the jury is that PTX-638 was not copied

2    from the Motorola document?  I just want to get that clear.

3    A.   Was not copied from the Motorola document we were just

4    discussing.

01:10:08    5    Q.   Let me show you just one page, sort of summary page on

6    page 35 of the translation.

7    A.   Yes.

8    Q.   Start here.  He literally copied parts of this figure here

9    on 637 into the APP framework figure that he was working on,

01:10:34   10    right?  I'm sorry.

11    A.   Can you give me the page reference?  I've sort of found

12    it.

13           Again, I would not say that this is literal copying,

14    but I would say that there is similar content in this diagram.

01:10:53   15    Q.   He literally copied and pasted it, didn't he?  Look

16    AppMsgQueue, AppMsgQueue.  Same number, one, two, three, four

17    shaded boxes, one empty box, one, two shaded boxes.  Same?

18    A.   I see that that particular part of the diagram is the

19    same, counsel.

01:11:13   20    Q.   The angles of the arrows are identical.  This arrow here

21    and this arrow here, he copied and pasted this right out of

22    that figure.

23    A.   That may or may not be true.  It's clear that the labels

24    are different on the arrows.  So I don't see anything to

01:11:32   25    suggest that he necessarily copied it from the figure.

Frederiksen-Cross - cross by Brown

4032

1    They're both describing the same concept though.  I certainly

2    wouldn't dispute that similar information is being conveyed by

3    this diagram.

4    Q.  Do you see these figures, page 638, page 50, PTX-638, page

01:11:58    5    50, compared to 637, page 12.

6         You're not really going to say that those figures

7    were not copied from each other, were you?

8    A.  No.  I would say that this figure appears to be copied.

9    Q.  So he copied this document from the Motorola document?

01:12:14    10    A.  He certainly copied information that's contained in this

11    document.

12         Maybe we're quibbling over words here.  I don't see

13    that the document is a copy of, but more a paraphrase of the

14    information about what that framework does.

01:12:30    15    Q.  He copies --

16    A.  I wouldn't, I wouldn't dispute that this particular image

17    is copied.

18    Q.  And he copied and pasted material from the Motorola

19    document into his own presentation describing how the

01:12:46    20    application framework at Hytera is going to work, fair?

21    A.  It's certainly likely that he copied or that he drew

22    similar diagrams.  I can't tell you which.  I wasn't there

23    when it happened.

24    Q.  Now, as we talked about he also then worked on Hytera's

01:13:09    25    radio application framework code, right?

Frederiksen-Cross - cross by Brown

4033

1    A.  That is correct, yes.

2    Q.  In doing so he was also using copies of the Motorola's

3    source code at Hytera to do so, wasn't he?

4    A.  With respect to what files, counsel?

01:13:32    5    Q.  Any files.

6    A.  My recollection is that there was information he was

7    provided some screen captures that showed a portion of UIT

8    code, and that is a portion of code that is amongst the copied

9    code that I identified.

01:14:00    10    Q.  He was given Motorola source code to do his job, wasn't

11    he?

12    A.  That is not my understanding.  My understanding is that he

13    was given a screenshot of a small portion of Motorola code to

14    examine and to prepare documentation from.

01:14:17    15    Q.  Just a screenshot?

16    A.  That's my understanding, counsel, yes.

17    Q.  I've handed you what has been marked as PTX-651.  Do you

18    recognize 651 as an email from Hytera produced by Hytera in

19    this litigation?

01:14:46    20    A.  I do, counsel, yes.

21        MR. BROWN:  Plaintiff moves to admit PTX-651, Your

22    Honor.

23        THE COURT:  It is received and may be published.

24      (PTX-651 was received in evidence.)

01:15:00    25    BY MR. BROWN:

Frederiksen-Cross - cross by Brown

4034

1  Q.  I'll go to the English translation.  I want to start at

2  the first email in the chain, which is on the last page,

3  Ms. Frederiksen-Cross.

4        It's an email being sent here by Xiong Wei Ming.  Do

01:15:17   5  you see that?

6  A.  I see that, yes.

7  Q.  Who is that?

8  A.  It appears to be a Hytera engineer.  I'm not recognizing

9  the name.

01:15:28   10  Q.  And it's being sent to Yang Shuang Feng and Ruan Hanchun,

11  correct?

12  A.  That's correct.

13  Q.  None of those three ever worked at Motorola, right?

14  A.  To the best of my knowledge, that is correct.

01:15:44   15  Q.  And then there they're CCing, that's Y.T. Kok, correct?

16  A.  That's Y.T. Kok, yes.

17  Q.  Okay.  And they're being given two assignments.

18  "Colleague Ruan is to begin familiarization with the work of

19  the APP display part."  Do you see that?

01:16:01   20  A.  I see that.

21  Q.  That's part of what is now Hytera's radio application

22  framework, right?

23  A.  I can't be certain from this document.  It appears to be

24  related to the applications and to some of the display

01:16:15   25  management part.  So I think likely that it would be, but I

Frederiksen-Cross - cross by Brown

4035

1   can't tell with certainty because it's a vague description.

2   Q.   And then the other engineer, "Colleague Yang, she would do

3   a good job in the transplanting work."  Do you see that?

4   A.   I see that.

01:16:30   5   Q.   And you understand that the transplanting work was the

6   assignment to Hytera engineers to take Motorola source code

7   and transplant it into becoming Hytera source code, right?

8   A.   I do not have that specific understanding.  I don't know

9   what this email is referring to.

01:16:46   10   Q.   You don't know what this email refers to?

11   A.   The transplanting work, I do not know what the reference

12   there means.

13   Q.   Have you seen this email before?

14   A.   I have seen this email before, yes.

01:16:57   15   Q.   And so you were comfortable telling the jury that 96

16   percent of the code at Hytera was independently developed, but

17   you don't know what it means to transplant code here?

18   A.   I do not know what specific code they are referencing as

19   the transplanted code here, counsel.

01:17:15   20   Q.   So you must have researched it, right?  You looked into

21   this document?  You checked the revision history?  You did all

22   that, right?

23   A.   There wasn't revision history for the email, counsel, that

24   I'm aware of.

01:17:26   25   Q.   For the source code?

Frederiksen-Cross - cross by Brown

4036

A.   The source code I examined, again, the RAF components appear to have been copied in the RAF library from the Motorolan code.  I don't dispute that.  That's in my 4 percent.

01:17:40

Similarly, some ancillary files used to interact with the RAF, most of which were written by Y.T. Kok or Peiyi, appear to have contained copy code, and I certainly include those in my 4 percent as well.

Q.   Okay.  So let's look at the response here.  One second.

01:18:09

You just repeated your testimony that Peiyi Huang, I think, is the one who wrote the RAF library, is that right?

A.   I'd want to refer back to my exhibit of whose ID was in that library, but that's my recollection as I sit here, counsel.

01:18:26

Q.   Okay.  And I think you testified yesterday that you got there, you came to that conclusion by reviewing the revision histories of the source code, right?

A.   Who had checked that library in, yes.

Q.   Now --

01:18:41

A.   Just to be clear, the source code was not checked into Hytera's revision system.  The library, the compiled library was, and that's what I reviewed.

Q.   That's right.  And the source code for the radio application framework library that was also stolen by Hytera, that was never uploaded to the SVN in your opinion, right?

01:18:57

Frederiksen-Cross - cross by Brown

4037

1    A.  That's correct.

2    Q.  Let's look at this email.  Here is Yang Shuang Feng, he

3    was the one given the assignment of transplanting the code.

4    He responds a day later and he says, "The code has been

01:19:22    5    uploaded to the SVN."  Do you see that?

6    A.  I see that.

7    Q.  And the SVN, that's the central repository for code at

8    Hytera, right?

9    A.  I would assume that to be true, though we've seen some

01:19:39    10    evidence that some individuals like Peiyi may have had her own

11    SVN copy.

12    Q.  But he's saying:  I'm uploading the code to SVN, right?

13    A.  That's what the email says, counsel.

14    Q.  And he's identifying a number of things, a number of

01:19:53    15    files, right?

16    A.  He's identifying some RAF_ files, that's correct.

17    Q.  And then he also identifies some other files that look a

18    little different.  COR_UIT_task.cpp.

19    A.  That's right.

01:20:13    20    Q.  Does that indicate anything to you?

21    A.  I did not find the COR_UIT tasks in the -- or the COR_UIT,

22    that's not a prefix that's used in the Hytera SVN.  I did not,

23    I did not see that amongst any of the Hytera code produced.

24    But it does match Motorola file names.  And these are portions

01:20:36    25    of the code that appears in association with that RAF library.

Frederiksen-Cross - cross by Brown

4038

1    Q.  Let's make this a little clearer.  These three files here,

2    these are Motorola file names, aren't they?

3    A.  Yes.  That's what I just said or tried to say.

4    Q.  It's Motorola source code?

01:20:57    5    A.  I would agree that that is entirely likely, yes.

6    Q.  And Yang Shuang Feng is saying the code has been uploaded

7    to SVN?

8    A.  I see that.

9    Q.  And he's saying he's uploading some of these RAF files and

01:21:14    10   he's uploading some of the COR, these Motorola files, right?

11   A.  It's not clear to me, there are -- it's not clear to me

12   that these were ever uploaded to the SVN.  I do not find any

13   record in the SVN of these files.

14          So what he is saying here is a little confusing for

01:21:32    15   me since it's not consistent with the electronic evidence I've

16   reviewed.

17   Q.  So let's unpack that a little bit.

18          The electronic evidence you reviewed of the SVN is a

19   revision history or a log purportedly of everything that went

01:21:54    20   up or was downloaded from the SVN, is that right?

21   A.  That's correct, yes.

22   Q.  And it came in the form of a document, a long text file

23   that Hytera produced during this litigation, right?

24   A.  That's correct, yes.

01:22:09    25   Q.  And you reviewed that document?

Frederiksen-Cross - cross by Brown

4039

1    A.  That is correct also.

2    Q.  And in reviewing it, did you notice that there were gaps

3    in the file?

4    A.  I don't recall any specific gaps, counsel, no.  I mean,

01:22:25    5    there were time periods where there appeared to be no

6    activity, but I don't recall anything I would characterize as

7    a gap as evidence that something was missing.

8             Sometimes programmers are not working.

9    Q.  I am going to hand you an excerpt of that log.  This is

01:23:09    10    PTX-966.  This is the log that you looked at, right?

11             Let me actually caveat that, the log is five boxes

12    long, right?

13    A.  It's huge, yeah.  I looked at it electronically rather

14    than on paper.

01:23:24    15    Q.  And so we'll do that, too, we'll use the excerpts of it.

16             But do you recognize this as the log that you

17    reviewed?

18    A.  I recognize it as the format of some of the data I

19    reviewed, yes.

01:23:36    20    Q.  And this was produced from Hytera's files?

21    A.  Based on the Bates number, that's correct, yes.

22             MR. BROWN:  Plaintiff moves to admit PTX-966.

23             MR. RICHEY:  No objection.

24             THE COURT:  It is received and may be published to

01:23:48    25    the jury.

Frederiksen-Cross - cross by Brown

4040

1          (PTX-966 was received in evidence.)

2              MR. BROWN:  So, Mr. Schlaifer, can we pull up

3     PTX-966.

4     BY MR. BROWN:

01:24:01    5     Q.  Now, the email that we were just looking at is a Hytera

6     engineer saying he's uploaded a bunch of files to the SVN.

7              But if we search the SVN, you agree that none of

8     those files showed up at least in the log that Hytera

9     provided, right?

01:24:15   10     A.  I wouldn't perform that search.  I didn't memorize that

11     huge document.  And so as I sit here I can't really answer

12     that question.

13     Q.  Sure.

14     A.  But if that's a representation that you've performed that

01:24:29   15     search and they don't show up, that's fine.

16     Q.  We can just do it now.

17              MR. BROWN:  Mr. Schlaifer, will you search in this

18     file for RAF_display.cpp.

19     BY MR. BROWN:

01:24:45   20     Q.  See, can't find it, right?

21     A.  I see that.

22     Q.  The first file that the engineers are saying they're

23     working on with regard to the radio application framework, not

24     in the SVN, right?

01:24:57   25     A.  Can I ask a clarification?  Are you searching only this

Frederiksen-Cross - cross by Brown

4041

1    excerpt or are you searching the entire?

2           Okay, then I'll take your representation there, yes.

3    Q.  And I can help you --

4           MR. RICHEY:  Objection, Your Honor.

01:25:07    5       THE COURT:  All right.  Sustained.

6           I don't know.  Ask the question again.  The witness

7    said something about accepting your representation.  What is

8    the question?

9           MR. BROWN:  Yes.

01:25:21    10   BY MR. BROWN:

11   Q.  Let me direct you, you've used the software that you see

12   on the screen, Notepad++, right?

13   A.  I generally use a different text editor, but I have used

14   it in the past, yes.

01:25:30    15   Q.  And so if you look down at the very bottom here, it shows

16   you the length of the file.

17   A.  I see that, yes.

18   Q.  It's 50 million lines.

19   A.  Oh, no.  It's 1.625663 million lines.

01:25:43    20   Q.  I'm sorry.  50 million characters, 1.6 million lines?

21   A.  That's correct.

22   Q.  Not the 10 pages in front of you.  It's the entire log.

23          Do you have any reason to believe that that is not

24   the size of the entire SVN log produced by Hytera?

01:25:57    25   A.  That comports to my recollection of about how big the file

Frederiksen-Cross - cross by Brown

4042

1    was.

2    Q.  So if we search for the next file --

3          MR. BROWN:  Mr. Schlaifer, will you search for

4    RAF_display_buffer_display.cpp.

01:26:23  5          MR. RICHEY:  Objection, Your Honor.  We don't know

6    what they are searching.  We have a couple pages excerpted

7    from what they've represented this is.  But if they want to

8    give her a computer to search, that would be fine.

9          THE COURT:  What is your response to the objection?

01:26:38  10         MR. BROWN:  The document is five boxes long.  It's

11   too long to give a paper copy.

12         The witness has not disputed that this is a search of

13   a text editor that she's seen before.  This is the most

14   efficient way to proceed.

01:26:51  15         THE COURT:  Is that what the witness has said?  Ask

16   that again so it's clear as to what the witness is agreeing.

17         MR. BROWN:  Of course.

18   BY MR. BROWN:

19   Q.  Ms. Frederiksen-Cross, you've testified that you've used

01:27:01  20  Notepad++ before, right?

21   A.  I have used Notepad++ before, yes.

22   Q.  Do you have any reason --

23         THE COURT:  Could you speak up a little?

24         THE WITNESS:  Yes.  I have used that tool before,

01:27:07  25  yes.

Frederiksen-Cross - cross by Brown

4043

1        THE COURT:  It sounds like a little bit of

2    whispering.  Get close to the mic, if you will.

3        THE WITNESS:  Okay.

4    BY MR. BROWN:

01:27:11    5    Q.  Do you have any reason to dispute that the search you are

6    seeing on the screen is not a correct search of the file?

7    A.  If you are searching the entire file, then that would be

8    an appropriate search.

9        THE COURT:  All right.  Just a minute.

01:27:22   10        Read the question back to the witness so we can get a

11    clear answer.

12        Please read the question back.

13      (Question read)

14    BY THE WITNESS:

01:27:35   15    A.  Only that I don't know this content on the screen is

16    necessarily the entire file, because I haven't had a chance to

17    compare that, and I'm not familiar to the PTX name.

18        THE COURT:  You may answer the question.

19        Do you want it read back?

01:27:51   20        THE WITNESS:  Yes, please.

21        THE COURT:  Please read the question back again.

22      (Question read)

23    BY THE WITNESS:

24    A.  Only that I do not know with certainty that this is the

01:28:11   25    full file.  But beyond that, no.

Frederiksen-Cross - cross by Brown

4044

```
          1          THE COURT:  All right.  Just a minute.  Can you
          2   clarify your answer?  What is it you've just said?
          3          THE WITNESS:  This is a PTX-labeled file.
          4          THE COURT:  In response to the question, can you
01:28:26  5   clarify your answer?
          6          THE WITNESS:  Yes.
          7          THE COURT:  Do you have any reason to believe, et
          8   cetera?
          9          THE WITNESS:  I do not know that PTX-0966 is the
01:28:34 10   entire file.
         11   BY MR. BROWN:
         12   Q.  You testified just a few minutes ago that the size of the
         13   file, the 1.6 million lines, seems to be about what you
         14   remember the size of the file being, fair?
01:28:46 15   A.  Generally it was a very, very large file, yes, well in
         16   excess of a million lines.  I don't recall the specific size.
         17   If it's 1.6, 1.8, I don't recall specifically.  So that's,
         18   that's my concern, is that I do not have the direct knowledge
         19   that this is the full file.
01:29:05 20   Q.  You relied on this file in coming to your opinions in this
         21   case, didn't you?
         22   A.  I relied on a file that had a different name that had
         23   content that was similar in format to this content.
         24          And so as I sit here, I do not know that this is an
01:29:21 25   identical and complete copy of that file.  That is my concern.
```

Frederiksen-Cross - cross by Brown

4045

1   MR. BROWN:  Your Honor, I'd like to proceed.  And I

2   think it can be subject to redirect if there is something

3   wrong with the file.

4   THE COURT:  I don't quite understand what the witness

01:29:37   5   is saying in response to the last several questions.  And so

6   you may probe further so that we know exactly what the

7   witness's position is regarding what you call the file.

8   Ask a few more questions to further clarify her

9   position.

01:29:52   10   MR. BROWN:  Understood.

11   BY MR. BROWN:

12   Q.  You already testified that you did not find the files that

13   we're searching for in this log, didn't you?

14   A.  I did not find the COR_ files, which were the ones that I

01:30:11   15   recognized as Motorola names and which I searched for in this

16   log.  I did not ever find those in the Hytera log.

17   Q.  Did you search for the other documents that the individual

18   said he uploaded to SVN?

19   A.  Those did not have Motorola names.  And I don't as I sit

01:30:28   20   here recall if I searched for them or not.  My focus was

21   really on the ones that I already knew to be copied from

22   Motorola.

23   THE COURT:  Now, these several questions relate to

24   your earlier question regarding gap, is that right?

01:30:45   25   MR. BROWN:  Yes, Your Honor.

1      THE COURT:  All right.  Now with respect to gap, when

2  you use the term "gap," what do you mean, so that the witness

3  understands that?

4      MR. BROWN:  I think I was using the word app, A-P-P,

01:30:59    5  A-P-P, yes, Your Honor.

6      THE COURT:  Okay.  You didn't say "gap" with a "G"?

7      MR. BROWN:  I don't, I don't think I did.  Did I?

8  Okay.  Oh, I see, that there is a gap in the SVN log.  That's

9  right.  That was a while back.  I apologize, Your Honor.

01:31:15   10      THE COURT:  It's not a question of apology.  It's

11  clarity we are talking about.

12      MR. BROWN:  I see.

13      THE COURT:  So the word is G-A-P?

14      MR. BROWN:  Yes, Your Honor.

01:31:21   15      THE COURT:  All right.

16      MR. BROWN:  Yes, Your Honor.

17      THE COURT:  Nothing to do with clothing, right?

18      MR. BROWN:  No, Your Honor.  No.

19      THE COURT:  All right.  Please proceed.

01:31:28   20      MR. BROWN:  Thank you, Your Honor.

21  BY MR. BROWN:

22  Q.  Okay.  We've kind of gone off on a couple tangents here.

23  Let's see if we can just reframe this to what the point here

24  is.

01:31:41   25      THE COURT:  And what a better time than now to stop.

4047

1          So members of the jury and the witness will return at

2     12:30.  The Court has another matter to deal with completely

3     unrelated to this case.

4          (Jury out)

01:32:11    5          THE COURT:  The civil matter is adjourned.  The Court

6     is dealing with a criminal matter.

7          MR. CLOERN:  Your Honor, just a side post.  We have a

8     scheduling issue we'd like to raise sometime to today,

9     whenever it's convenient for Your Honor.

01:32:21   10          THE COURT:  Very well.  I'm not sure how long this

11     next thing will take, but come back a few minutes earlier.

12          MR. CLOERN:  Thank you, Your Honor.

13          THE COURT:  Okay.  I think I said 12:30, so if come

14     back at 12:20 or so we'll deal with it.

01:32:34   15          MR. CLOERN:  Thank you, Your Honor.

16          (Recess at 11:28 a.m. to 12:20 p.m.)

17

                    C E R T I F I C A T E

18

19          I, Jennifer S. Costales, do hereby certify that the
      foregoing is a complete, true, and accurate transcript of the
20     proceedings had in the above-entitled case before the
      Honorable CHARLES R. NORGLE, one of the judges of said Court,
      at Chicago, Illinois, on January 23, 2020.

21

                              */s/ Jennifer Costales, CRR, RMR*
22                            Official Court Reporter
                              United States District Court
23                            Northern District of Illinois
                              Eastern Division

24

25

4048

<pre>
 1                 IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   MOTOROLA SOLUTIONS, INC., and MOTOROLA   ) No. 17 CV 1973
     SOLUTIONS MALAYSIA SDN. BHD,             )
 4                                            )
                  Plaintiffs,                 )
 5   vs.                                      ) Chicago, Illinois
                                              )
 6   HYTERA COMMUNICATIONS CORPORATION, LTD., ) January 23, 2020
     HYTERA AMERICA, INC., and HYTERA         )
 7   COMMUNICATIONS AMERICA (WEST), INC.,     )
                                              )
 8                Defendants.                 ) 12:20 o'clock p.m.

 9                     TRIAL - VOLUME 28-B
                      TRANSCRIPT OF PROCEEDINGS
10
              BEFORE THE HONORABLE CHARLES R. NORGLE, SR.
11                          and a jury

12   APPEARANCES:

13   For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                            BY:  MR. ADAM R. ALPER
14                               MR. AKSHAY DEORAS
                                 MR. BRANDON HUGH BROWN
15                            555 California Street
                              Suite 2700
16                            San Francisco, California 94104
                              (415) 439-1400
17
                              KIRKLAND & ELLIS, LLP
18                            BY:  MR. MICHAEL W. DE VRIES
                                   MR. CHRISTOPHER M. LAWLESS
19                            333 South Hope Street
                              Suite 2900
20                            Los Angeles, California 90071
                              (213) 680-8400
21

22
     Court Reporter:        JENNIFER COSTALES, CRR, RMR
23                          Official Court Reporter
                            219 South Dearborn Street, Room 2342
24                          Chicago, Illinois 60604
                            (312) 435-5895
25                          jenny.uscra@yahoo.com
</pre>

4049

1    APPEARANCES:    (Continued)

2    For the Plaintiffs:      KIRKLAND & ELLIS, LLP
                              BY:  MS. MEGAN MARGARET NEW
3                             300 North LaSalle Street
                              Chicago, Illinois 60654
4                             (312) 862-7439

5                             KIRKLAND & ELLIS, LLP
                              BY:  MS. LESLIE M. SCHMIDT
6                             601 Lexington Avenue
                              New York, New York 10022
7                             (212) 446-4763

8    For the Defendants:      STEPTOE & JOHNSON, LLP
                              BY:  MR. BOYD T. CLOERN
9                                  MR. SCOTT M. RICHEY
                                   MR. MICHAEL J. ALLAN
10                                 MS. JESSICA ILANA ROTHSCHILD
                                   MS. KASSANDRA MICHELE OFFICER
11                            1330 Connecticut Avenue NW
                              Washington, DC 20036
12                            (202) 429-6230

13                            STEPTOE & JOHNSON, LLP
                              BY:  MR. DANIEL S. STRINGFIELD
14                            227 West Monroe Street
                              Suite 4700
15                            Chicago, Illinois 60606
                              (312) 577-1300

16

17
     ALSO PRESENT:            MR. RUSS LUND and
18                            MS. MICHELE NING

19

20

21

22

23

24

25

4050

                    (Proceedings heard in open court.  Jury in.)

1                   THE COURT:  17 C 1973, Motorola versus Hytera.

2                   Counsel, you had an issue regarding scheduling?

3                   MR. CLOERN:  Yes, Your Honor.  So Hytera will next

02:24:23    5   call Andy Grimmett, DMR radio expert, proffered expert, and he

6   should testify for a decent chunk of next week.

7                   Our final witness after that is our damages expert,

8   Debra Aron.  Dr. Aron is in California in another trial and

9   will not be back and available to testify until the 3rd.  So

02:24:48   10   that would result in Hytera probably requesting probably just

11  a one-day adjournment on the 30th.

12                  THE COURT:  What I would suggest is see if you can

13  work something out by agreement.  If you do, the Court is

14  likely to concur.  So talk, if you will, and give me a

02:25:11   15  proposed order.

16                  MR. DE VRIES:  Yes.

17                  THE COURT:  If you cannot agree, obviously, I will

18  rule accordingly.

19                  MR. DE VRIES:  Yes, Your Honor.  So we have been

02:25:19   20  talking, and I think this is something that we can resolve by

21  agreement.

22                  Motorola's concern is to obviously get the trial

23  finished as expeditiously as possible.

24                  I will alert the Court that we may or may not provide

02:25:31   25  a rebuttal case.  We're still considering that.  If we do, one

4051

1  of the two witnesses that we may call in rebuttal,

2  Mr. Malackowski, our damages expert, he has a conflict with an

3  ITC trial, an International Trade Commission trial on Tuesday

4  the 4th, Wednesday the 5th and Thursday the 6th.

02:25:52    5      I don't propose that we do anything about that now,

6  because I think there are a number of things that could happen

7  that may render that conflict moot, but we did not want to

8  surprise the Court with that.

9      I think in general we have no objection to --

02:26:05   10      THE COURT:  Well, you don't have to make a commitment

11  now.  You can try to work it out.  As I've said, if you

12  cannot, then bring it to my attention again.

13      As you well know, I've been moving along with other

14  matters on this call.  And I have a criminal case with a

02:26:21   15  Speedy Trial demand set for February 4th, which is of special

16  concern to the Court at the moment.  But somehow things work

17  out.

18      MR. DE VRIES:  Yes, sir.

19      THE COURT:  So see what you can do by agreement.  If

02:26:33   20  not, let me know and you may be heard again.

21      All right.  But for now, as soon as the jury is

22  together, we'll proceed with the witness.

23      MR. DE VRIES:  Yes, Your Honor.

24      MR. CLOERN:  Thank you, Your Honor.

02:26:42   25      THE COURT:  Okay.  Thank you.

4052

                         12:30, I said?  All right.  12:30.

                    (Brief recess.  Jury out)

                         THE COURT:  Did you want to see me before the jury

          came in?

02:32:53         MR. CLOERN:  Yes, Your Honor.  Just a quick proffer

          for the record regarding the patent and copyright issue

          related to Ms. Frederiksen-Cross's testimony.

                         I'll just note Ms. Frederiksen-Cross is here.  So I

          just ask permission to go, if it's okay, to go forward with

02:33:08     her here.

                         THE COURT:  Go right ahead.

                         MR. CLOERN:  Okay.  So Ms. Frederiksen-Cross would

          have testified as to comparing public disclosures to the code,

          the source code that she analyzed.  And so PTX-3701 is a

02:33:22     Motorola patent on VRIS.  It's a public disclosure of how VRIS

          works.  And Ms. Frederiksen-Cross would have talked about how

          much of the source code she analyzed is disclosed in that

          public patent filing.

                         Similarly, for PTX-4940 and 4941, those are samples

02:33:43     of source code that were deposited with the Copyright Office.

          And so our public disclosures and Ms. Frederiksen-Cross's

          testimony would just be to say what one of skill in the art

          would be able to determine from the source code that was on

          file with the Copyright Office.

02:34:04              So it's not about patent laws, rules, regulations or

4053

1    copyright laws, rules or regulations, just what is -- what

2    about the source code is disclosed in those publicly filed

3    documents, and that this is something that

4    Ms. Frederiksen-Cross has extensive experience doing, because

02:34:24    5    it really is just saying whether the code is disclosed in a

6    document, the fact that it's in a patent or source code file

7    with the Copyright Office isn't really the relevant point.

8           THE COURT:  All right.  The Court has a gatekeeping

9    function under *Daubert* and *Kumho Tire*.  I have no reason to

02:34:47    10    change the prior ruling.  The Court understands your proffer

11    and it is rejected.  And so we will move on.

12           If there is another expert that may be qualified in

13    terms of *Daubert*, *Kumho Tire* or its progeny to testify on

14    these issues, you might raise that issue.  Confer with

02:35:10    15    opposing counsel, see if depositions of that proposed witness

16    might be appropriate and pretrial issues to determine who that

17    individual might be and what he or she might say.  You can try

18    to work it out.  I doubt that at this late juncture you would

19    be able to do that.

02:35:29    20           But if you had somebody in the wings, so to speak,

21    who might have the expertise necessary to deal with these

22    issues, you have the opportunity to pursue it.  It's a little

23    late in the game.

24           This matter has been before the Court since 2017.

02:35:50    25    And there are experts in the area of copyright and experts,

Frederiksen-Cross - cross by Brown

4054

1    probably hundreds within walking distance of this building.

2    In this area we have IPLAC, Intellectual Property Lawyers

3    Association, for example, routinely has meetings in this area,

4    and there are numerous experts in the area of copyright and

02:36:18    5    patent who would be readily available and would have been

6    readily available going back to 2017, but not this witness.

7             And so the ruling stands.  The proffer is rejected.

8             Is the jury all here?

9             THE CLERK:  Yes.

02:37:30    10        (Jury in)

11             THE COURT:  Good afternoon, members of the jury.

12             Please proceed with the witness.

13        BARBARA FREDERIKSEN-CROSS, DEFENDANTS' WITNESS,

14                     PREVIOUSLY SWORN

02:37:37    15             CROSS-EXAMINATION (Resumed)

16    BY MR. BROWN:

17    Q.  So welcome back, Ms. Frederiksen-Cross.

18    A.  Thank you.

19    Q.  When we were last speaking, we were talking about the SVN

02:37:52    20    or --

21             THE COURT:  We weren't talking about it.  You were

22    asking questions and you were getting answers.

23             MR. BROWN:  Yes.  Yes, Your Honor.

24             THE COURT:  All right.  Please proceed.

02:37:58    25    BY MR. BROWN:

Frederiksen-Cross - cross by Brown

4055

1   Q.  I was asking questions about the SVN.  And where we left

2   it, correct me if I have this wrong, is that you searched the

3   logs for Hytera's SVN to see if these Motorola files here were

4   uploaded to it, right?

02:38:14   5   A.  Correct.

6   Q.  And when you searched those logs, you found that there was

7   no indication in those records that these Motorola files were

8   uploaded to the SVN, right?

9   A.  Those that start with COR_, that's correct.

02:38:31   10   Q.  These here (indicating), the Motorola ones?

11   A.  Correct.

12   Q.  And that is despite the fact that a Hytera engineer, who

13   never worked at Motorola, is indicating that he's uploading

14   code to the SVN, right?

02:38:44   15   A.  To an SVN, yes.

16   Q.  And those logs, did you go and -- well, withdrawn.

17       You have expertise in doing forensic analysis of

18   databases and servers, right?

19   A.  I do, yes.

02:38:56   20   Q.  And did you actually do your own investigation of those

21   SVNs, the SVN server at Hytera?

22   A.  No.  I received the extracted log from the SVN server,

23   just as Motorola did as a part of the production.

24   Q.  So somebody at Hytera gave it to you?

02:39:14   25   A.  Counsel gave it to me.  But presumably they got it from

Frederiksen-Cross - cross by Brown

4056

1    Hytera.

2    Q.   And represented that that was it, that was the entire SVN

3    log?

4    A.   That this is the extraction, yes.

02:39:25    5    Q.   And somehow though you agree with me --

6         THE COURT:  Wait just a minute.

7         You said "entire."  The witness said "extraction."

8    Is that clear?

9         MR. BROWN:  It could be clearer, Your Honor.

02:39:38   10         THE COURT:  Well, clarify it.

11         MR. BROWN:  Yes, Your Honor.

12    BY MR. BROWN:

13    Q.   What you are saying is that you were told that what you

14    saw as a record of everything that happened on the SVN server

02:39:50   15    at Hytera was accurate, right?

16    A.   That that SVN server log was complete, and I did verify

17    that it, you know, starts at the first number and proceeds

18    sequentially to the last number with no gaps.  But I did not

19    independently extract that.  That was already in the evidence

02:40:09   20    when I got involved in this case.

21    Q.   And -- well, withdrawn.

22         You are saying that there were no gaps, even though

23    there are indications that Hytera engineers are uploading

24    Motorola files to the SVN?

02:40:23   25    A.   With all due respect, counsel, this email indicates that

Frederiksen-Cross - cross by Brown

4057

02:40:44

1    someone said they uploaded something to an SVN.  It doesn't

2    specify the name of the SVN -- excuse me.  And that SVN is a

3    term for a publicly available revision control system that

4    anyone can license and run on their own computers or on a

5    corporate server.

6              So I cannot tell from this specific email what SVN is

7    being referenced.

8              I take the email on its face.  Somebody uploaded

9    something somewhere.  But it does not appear to have been the

02:41:01

10   SVN, that history that I was provided from Hytera.

11             That history precedes -- SVN entries have a unique

12   identifying number that starts and is incremented by 1 each

13   time the SVN is updated.  I found no gaps in those numbers.

14   So from that standpoint, when you ask -- that's why I was

02:41:24

15   confused when you asked were there gaps, because it didn't

16   make sense to me.  No, there weren't.  The numbers ran

17   contiguously from first to last.

18   Q.  I see.  So what you are saying is -- well, hold on.

19             You are saying, you are suggesting that this might

02:41:38

20   indicate that the Hytera engineers uploaded Hytera and

21   Motorola code to a different SVN?

22   A.  I honestly have no idea what this reference is to.  It's

23   inconsistent with the evidence that the SVN that was provided

24   to me.

02:41:54

25   Q.  How many SVN servers -- well, let's maybe set the stage

Frederiksen-Cross - cross by Brown

4058

1    technically first.

2        When we talk about SVN, we are talking about a

3    computer, a sort of heavyweight computer that's at Hytera and

4    stores a bunch of files for their engineers to all access,

02:42:10    5    right?

6    A.   Hytera uses an SVN to store its source code.  I see some

7    evidence that Peiyi Huang, for instance, may have

8    independently had an SVN on her laptop based on the fact that

9    there are things in the metadata from the forensic report that

02:42:27    10   do not occur anywhere in the production Hytera SVN.

11       So I do not know specifically what her laptop SVN

12   references refer to.  They do not appear to refer to the

13   Hytera SVN that is used for their production code.

14       And I have no idea what SVN is being referenced in

02:42:49    15   this email.

16   Q.   So there could be another server or SVN at Hytera that

17   these engineers, three of whom never worked at Motorola and

18   one who did, are uploading Motorola and Hytera source code

19   files to?

02:43:05    20   A.   I have no idea where that SVN would be.  Was it found

21   amongst the productions that were made here?  So I can't

22   explain this email for you, counsel.  I'm sorry.  It's not

23   consistent with Hytera's production SVN, which is what I

24   received to analyze for Hytera's code.  I do not know what is

02:43:24    25   being referenced in this email.

Frederiksen-Cross - cross by Brown

4059

1  Q.  Did you ask anybody at Hytera where they're uploading

2  these files to?

3  A.  No.  I asked counsel whether there were any other SVNs,

4  because I wanted to make sure that the code production I had

02:43:36  5  was complete.

6       And I was assured that Hytera had produced all of its

7  code that could be located.  You know, there were some things

8  that may have existed at some point in time that aren't a part

9  of the existing record.  You know, this was, what, 12 years

02:43:57  10  ago now.  But that Hytera had produced all code in its

11  possession.  That's what the representation that was made to

12  me.

13  Q.  And you didn't independently verify that by investigating

14  the computers that were at Hytera, right?

02:44:11  15  A.  I was not given access to their computers directly, that's

16  correct.

17  Q.  You just had to take that representation?

18  A.  That's normal in a case like this.  I get the evidence

19  from counsel and they work with the client on the production.

02:44:22  20  Q.  And so sitting here right now, you can't actually answer

21  whether or not Motorola source code was uploaded to an SVN at

22  Hytera that Hytera engineers could access, because you can't

23  explain what's happening here?

24  A.  It is correct that I cannot explain this email.  There is

02:44:40  25  no evidence that I have been provided that would allow me to

Frederiksen-Cross - cross by Brown

4060

```
          1   interpret this that doesn't contradict what's in this email.
          2   Q.  So --
          3   A.  So either the email is wrong or there is another
          4   explanation that I don't have.
02:44:53  5   Q.  There is other evidence supporting that what happened in
          6   this email did actually happen though, isn't there?
          7   A.  What evidence are you referring to, counsel?
          8          MR. BROWN:  May I approach, Your Honor?
          9          THE COURT:  Yes.
02:45:15 10   BY MR. BROWN:
         11   Q.  I handed you what has been marked as PTX-653.  Do you
         12   recognize this as an email and an attachment from Hytera's
         13   files?
         14   A.  I do recognize the English translation, yes.
02:45:32 15          MR. BROWN:  Plaintiff moves to admit PTX-653, Your
         16   Honor.
         17          MR. RICHEY:  No objection.
         18          THE COURT:  Please read the question back to the
         19   witness.
02:45:59 20      (Question read)
         21          THE COURT:  And the answer was?
         22      (Answer read)
         23   BY THE WITNESS:
         24   A.  Of the email and attachment.  I was provided the English
02:46:07 25   translation to review.  I recognize those.
```

Frederiksen-Cross - cross by Brown

4061

1    THE COURT:  Are you satisfied with that answer?

2    MR. BROWN:  I think it is sufficient to admit the

3  document, Your Honor.

4    THE COURT:  It is received and may be published.

02:46:17    5    MR. BROWN:  Okay.

6    (PTX-653 was received in evidence.)

7  BY MR. BROWN:

8  Q.  Now, I'm going to put page 12 up, which is the translation

9  of the email, the email that attaches this document.  I want

02:46:29   10  to walk through it.

11    The email that we were looking at earlier that you

12  testified you couldn't explain, which was for the record

13  PTX-651, was sent on December 4th, 2008, right?

14  A.  I see that, yes.

02:46:48   15  Q.  And it was from Yang Shuang Feng to Xiong Wei Ming, Y.T.

16  Kok and Ruan Hanchun, right?

17  A.  Correct.

18  Q.  Three of those four never worked at Motorola?

19  A.  To the best of my knowledge, that's correct.

02:47:03   20  Q.  The email that I just handed you, PTX-653, is dated

21  December 9th, so about five days later.  Do you see that?

22  A.  I do.

23  Q.  It includes the exact same individuals, right?

24  A.  It does.

02:47:20   25  Q.  And it attaches a document called UIT_sorted.doc.  Do you

Frederiksen-Cross - cross by Brown

4062

1    see that?

2    A.  I see that, yes.

3    Q.  What is UIT?

4    A.  UIT in this context is one of the tasks that is associated

02:47:38   5    with the RAF library.  It's a task that deals with the user

6    indicators, so, for instance, LEDs or tones, these that can be

7    used to give a user an indication by an application in the

8    radio.

9    Q.  And is UIT a term that Hytera came up with or is that a

02:48:01   10   term from Motorola's documents?

11   A.  I don't know who came up with it.  I've seen it in

12   Motorola's documents.  I've seen it in Hytera's.  And also

13   I've seen it in contexts outside this case and outside these

14   code bodies for user interface indicator type functions.  It's

02:48:21   15   not an unknown term in the industry.

16   Q.  Did it exist at Hytera prior to Y.T. Kok, Sam Chia and

17   G.S. Kok arriving?

18   A.  I do not know the answer to that.

19   Q.  And the UIT functionality is something that's in the RAF

02:48:40   20   library that was stolen from Motorola, right, the radio

21   application framework library?

22   A.  That is correct.  The UIT component is a part of that RAF

23   library.

24   Q.  And so these four engineers are working on that library,

02:49:00   25   aren't they?

Frederiksen-Cross - cross by Brown

4063

1    A.   Let me just orient to the email for a moment, counsel.

2         It appears that at least that is amongst what they

3    were working on, yes.

4    Q.   You told this jury that Peiyi Huang was the one working on

02:49:41    5    that library.  Does this change your opinion?

6    A.   Without looking at the specific files here that they're

7    working on, the files that I have seen from Hanchun and the

8    other individuals here with respect to the source code are

9    ancillary files that interact with that library.

02:50:04   10         I am not able to inspect the files inside the library

11    beyond the identification, as I did and as Dr. Wicker did, of

12    looking at what can be seen from looking at the compiled code

13    because I do not have that source code.

14         So as far as I know, these individuals were working

02:50:23   15    on the components that interact with the library and all

16    indications are that Peiyi was the one building and

17    maintaining the code for the library.

18         So if there is other evidence that you have, I'm

19    happy to consider it.  But the evidence that I've been

02:50:38   20    presented that I found, at least, does not indicate that they

21    were working on the internals of the library --

22    Q.   Let me just unpack --

23    A.   Rather than the parts that interact with those internals.

24    Q.   -- let me just unpack that.

02:50:50   25         THE COURT:  Just a minute.

Frederiksen-Cross - cross by Brown

4064

1          The question was:  Does this change your opinion?

2     You may answer the question.

3          THE WITNESS:  No, it does not.

4          THE COURT:  Proceed.

02:51:00  5  BY MR. BROWN:

6     Q.  Your explanation is that you actually can't see what

7     source code went into the stolen library at Hytera because

8     somebody at Hytera deleted that source code, right?

9     A.  You're presuming that it was on Hytera's server to start

02:51:17  10  with.  There is no evidence from the SVN log that I've seen

11    that it was.

12         It appears only to have been on Peiyi's laptop.

13    Q.  Somebody at Hytera deleted the source code for the

14    library, right?

02:51:31  15  A.  I do not know who specifically deleted it, counsel.  I

16    wasn't there when it happened.  And there is nothing I've seen

17    that indicates it.  I can tell you that that source code

18    appears to have been at least in part on Peiyi's laptop.

19         I can tell you that there were deletions in about

02:51:49  20  2014, 2013 to 2014 from that laptop, and I can tell you that

21    those files are no longer there.

22         I cannot tell you who did that or whether it was a

23    Hytera employee or someone else who had access to that laptop.

24    There is no way I can ascertain that from the evidence.

02:52:07  25  Q.  So either somebody at Hytera deleted it or are you saying

Frederiksen-Cross - cross by Brown

4065

1   somebody else broke into Hytera and deleted their files?

2   A.  I'm not postulating that.  The only user log into that

3   laptop appears to be Peiyi.  So presumably it was Peiyi.

4         I'm just telling you I wasn't there.  I don't have

02:52:31  5   direct evidence of whose hands were on the keyboard, so I do

6   not know.

7   Q.  Now, what you are saying though in addition to that is

8   that it was never uploaded to the SVN, right?  None of the

9   source code or the stolen library, none of the Motorola source

02:52:49  10   code was ever uploaded to the SVN?

11   A.  To the Hytera SVN that was provided to me as the record of

12   their source code, that is correct.

13   Q.  Are you now saying that maybe it was uploaded to a

14   different Hytera SVN that hasn't been provided in this

02:53:04  15   litigation?

16   A.  I am pointing out, counsel, that this email is

17   inconsistent with the technical evidence that was provided to

18   me.

19         What this email means or where it was uploaded, I

02:53:15  20   cannot answer.  I have seen no evidence that would allow me to

21   answer that question.  So I don't know.

22         All I know is that I've examined the revision history

23   for Hytera's SVN.  I've confirmed that there are no gaps in

24   terms of how the records are entered automatically into the

02:53:35  25   log by the revision control system and that these COR_ files

Frederiksen-Cross - cross by Brown

4066

1    do not appear in that SVN.  That's what I know.  Anything else

2    at this point would be speculation.

3    Q.  Now, you did review the document that's attached to this

4    email, didn't you?

02:53:54    5    A.  Yes, I did.

6    Q.  Because you know that in this Hytera document, being sent

7    by somebody who never worked at Motorola to multiple other

8    people who never worked at Motorola, there are literal

9    screenshots of Motorola source code, right?

02:54:17    10    A.  Yes, I'm aware of those.

11    Q.  And if we flip through, we see a bunch of these COR_UIT

12    files, right?

13    A.  You see some of the header files, yes.

14    Q.  And COR_UIT refers to Motorola files, right?

02:54:37    15    A.  That is correct.  All of the COR_UIT file names that I

16    have seen are on the Motorola system.

17    Q.  Not just Hytera -- not just header files though, right?

18    There is source code files as well in here, right?  There is

19    source code file, source code file, other header files.  I'm

02:54:57    20    on page 17 of PTX-653.

21    A.  I can -- any file that I have seen that starts with the

22    name "COR_" has been a Motorola file.

23        THE COURT:  All right.  The question goes to page 17.

24    You may answer.

02:55:14    25        THE WITNESS:  Yes.  The three specific ones that you

Frederiksen-Cross - cross by Brown

4067

1    noted -- four specific ones you noted on page 17 there that

2    you put marks by those are files I recognize from Motorola

3    file names.

4    BY MR. BROWN:

02:55:25    5    Q.   There is a lot more than what I've just marked, right?  A

6    lot of Motorola file names in this document are being created

7    by somebody who never worked at Motorola, right?

8    A.   I doubt that they are being created by, but, rather, are

9    referenced in this document.

02:55:43    10   Q.   The document was created by somebody who never worked at

11   Motorola, this document, the one we're looking at?

12   A.   Based on the title of the document, that would be correct,

13   yes.

14   Q.   Let me point to the title including the date here of

02:56:12    15   2008-12/9, Yang Shuang Feng, right?  You see that?

16   A.   I see the date, yes.

17   Q.   And what he's saying is he's transplanting and sorting out

18   files from UIT, right?

19   A.   It says "transplanted and sorted out from UIT," yes.

02:56:32    20   Q.   We've seen the word "transplanting" before.  He's

21   referring to taking Motorola source code and transplanting it

22   to be Hytera source code, isn't he?

23   A.   Give me a moment to review what's here, counsel.

24        The contents of this document, counsel, suggest that

02:57:56    25   he is documenting rather than transplanting code.

Frederiksen-Cross - cross by Brown

4068

1    Q.  He is studying Motorola's code, which he's screenshoting

2    into the file, right?

3    A.  I do not know who created the screenshots.  There are

4    screenshots in the file.

02:58:17   5    Q.  And then he's saying that the task he's doing is

6    transplanting -- transplanted and sorted out from UIT, right?

7    A.  But if you look at what he's doing with those --

8                THE COURT:  Just a minute.

9                Are you quoting from the document in your question?

02:58:34  10                MR. BROWN:  Yes, Your Honor, I am.

11                THE COURT:  All right.  Do you understand the

12    question the way it is put to you?

13                THE WITNESS:  I understand that he's asking about --

14                THE COURT:  Do you understand the question?

02:58:40  15                THE WITNESS:  I understand the question.

16                THE COURT:  Counsel is quoting from a document.

17                THE WITNESS:  Correct.

18                THE COURT:  All right.  You may respond to the

19    question.

02:58:45  20    BY THE WITNESS:

21    A.  That is the title of the document, counsel.

22    BY MR. BROWN:

23    Q.  That's what he wrote about his analysis in this document?

24    A.  I see that.  It does not seem to agree with the contents

02:58:54  25    of the document, but I see that that is what he wrote.

Frederiksen-Cross - cross by Brown

4069

1    Q.   And he somehow got access to either these screenshots or

2    to the files, because he seems to know all the file names of a

3    bunch of Motorola confidential source code, doesn't he?

4    A.   I see that this document does list those file names, yes.

02:59:23    5    Q.   And he got these files from Hytera's SVN, didn't he?

6    A.   I do not believe that to be true if you and I are saying

7    Hytera's SVN, referring to the same electronic repository.

8         I have examined the contents of Hytera's SVN, and

9    there are no COR_ files in that SVN, nor is there any evidence

02:59:52    10   that there ever was a COR_ file name checked into that

11   library, deleted from that library or modified within that

12   library.

13   Q.   No evidence at all that Motorola's files were on the SVN?

14   That's what you just said?

03:00:08    15   A.   In the SVN that I was provided, that is correct, sir.

16   Q.   My question is different.  Is there any evidence at all

17   that Motorola source code was on an SVN that was accessible to

18   Hytera engineers?

19   A.   This document suggests that there may have been some SVN.

03:00:33    20   What I'm saying is that it is not the SVN that I was provided

21   for review.  And I do not have any evidence that would allow

22   me to reconcile what this document says with the evidence that

23   I was provided.

24   Q.   In fact, there are screenshots of the SVN in this very

03:00:54    25   document, aren't there?

Frederiksen-Cross - cross by Brown

4070

A.   These are screenshots of a directory structure, that is to
say a series of directories.

        I'll need to look at the English translation, because
I don't read Chinese to see what this is exactly a screenshot
03:01:23   of.

Q.   The English translation is on page 14.

        And if we look at the directory structure --

        THE COURT:  No.  There is a question pending.

        MR. BROWN:  Okay.

03:01:48   BY THE WITNESS:

A.   Would you mind reading back the question?

        MR. BROWN:  Would you mind?

        THE COURT:  Just a minute.

        Repeat the question.

03:01:53        MR. BROWN:  Repeat, sure.

BY MR. BROWN:

Q.   There is a screenshot of Hytera's SVN in this document,
correct?

A.   I cannot confirm that, counsel.  There is nothing that I
03:02:12   have in the English translation that will let me confirm that
this is a screenshot of an SVN as opposed to just a set of
directories.

Q.   And what those directories at least are, /UIT, right?  You
see that?

03:02:35   A.   I see that.

Frederiksen-Cross - cross by Brown

4071

1    Q.   And /UIT, do you see that?

2    A.   I see that.

3    Q.   Those refer to directories that at the time contained

4    Motorola source code, don't they?

03:02:45    5    A.   I cannot tell from this display specifically what those

6    directories would have contained, counsel.  I would be

7    speculating, just as I would be speculating to say that raPIS

8    necessarily contained some other set of code.

9         I can't tell from looking at the name of a directory

03:03:04    10    what it contained at a particular point in time.  And that's

11    the question you've asked me.

12    Q.   You've been in the computer science space for a very long

13    time, right?

14    A.   Comparatively long, yeah.

03:03:16    15    Q.   You've got a lot of experience in this?

16    A.   Yes.

17    Q.   In the directory latest/library/ROSAL, what do you think

18    that directory might contain at Hytera?

19    A.   If I were to speculate based on the name of this

03:03:40    20    particular directory, I would speculate that it contained a

21    release of some library function related to ROSAL.

22         I would not form an opinion on that without trying to

23    confirm what it actually contained and even what point in time

24    this particular screenshot represented, because, of course,

03:04:01    25    things can be moved in and out of a directory.

Frederiksen-Cross - cross by Brown

4072

1        So in and of itself it's interesting, it's not

2   dispositive.  I don't have an answer for what it contains.

3   Q.  We know the time frame, right?  The time frame is 2008

4   December, right?

03:04:24    5   A.  We know this document was produced in 2008 of December.  I

6   do not know when these screenshots were taken that contain

7   that information.

8        You know, if I was given the data in its native form

9   I might be able to determine when those screenshots were

03:04:41   10   inserted.  It still doesn't answer when they were taken.

11        So you're asking me to assume that this document was

12   created on or around December 9, 2008.  And I'm telling you

13   that there is just not enough information in this for me to

14   give you an affirmative answer to the questions you're asking.

03:04:59   15   Q.  In your expert opinion you are unable to answer the

16   question of whether this document, which was emailed out on

17   12/9/2008, was created on 12/9/2008, when the author says it

18   was created, you don't have enough information to come to a

19   conclusion?

03:05:20   20   A.  No, no, I'm not disputing that.  And the metadata for this

21   document would probably show that or a date around it.

22        What I'm saying is I can't tell you what was in these

23   directories that were screenshoted or when the screenshots

24   themselves were taken or even from what system they were

03:05:34   25   taken, because there is nothing here that gives me that

Frederiksen-Cross - cross by Brown

4073

1    information.  I would be speculating about that.

2    Q.  Okay.  So then you can't say for sure that Motorola's

3    source code was not uploaded to the SVN?

4    A.  I can say for certain that it was not uploaded to the SVN

03:05:55    5    that I was provided.  I am certain of that.

6    Q.  But you can't say for certain whether or not there was

7    apparently other servers that Hytera engineers had access to

8    upon which Motorola source code was uploaded but just never

9    provided to you?  Did I get that right?

03:06:11    10    A.  Yeah.  For most of these screenshots, I can't even tell if

11    they were taken at Hytera or at Motorola.

12    Q.  Can you answer my question?

13    A.  You are correct, I cannot tell that.

14    Q.  But you know that, well, Y.T. Kok, Y.T. Kok right here

03:06:44    15    (indicating), he's probably the one who gave the Motorola

16    source code to these engineers, right, or the screenshots of

17    the Motorola source code?

18    A.  More likely than not, I think that would be true, yes.

19    Q.  I'm sorry, I didn't hear.

03:06:57    20    A.  I think more likely than not that could be true, yes.

21    Q.  And you know that Y.T. Kok would have an interest in

22    deleting evidence of any possible crime that he might have

23    committed by stealing Motorola source code, right?

24    A.  Presumably I could follow along with that hypothetical,

03:07:19    25    yeah.

Frederiksen-Cross - cross by Brown

4074

1    Q.  And you didn't remember this yesterday, but you know that

2    Mr. Kok was deposed in this case and his testimony was played

3    to the jury, right?

4    A.  Yes.  I went back and reviewed that last night.  So I do

03:07:35    5    recall that his testimony was played.

6    Q.  You reviewed it last night?

7    A.  I didn't review the testimony.  I went back to look at the

8    list of what deponents had been played, because I kind of

9    remembered his little face picture.  But I wasn't positive, so

03:07:47    10    I went back and looked at that.

11    Q.  And you know that to this jury his testimony was played

12    where he was asked:

13          "Question:  Did you destroy evidence of taking

14    Motorola's confidential source code and information to Hytera

03:08:07    15    so that it couldn't be discovered later?"

16          And he refused to answer the question under fear of

17    being incriminated, correct?

18    A.  I remember he took the Fifth to a great many of your

19    questions, yes.

03:08:20    20    Q.  And then he was asked subsequently:

21          "Have you destroyed information since this litigation

22    began relating to your actions in taking Motorola's

23    confidential information to Hytera?"

24          And he pled the Fifth again?

03:08:33    25    A.  I recall that, yes.

Frederiksen-Cross - cross by Brown

4075

1    Q.  And you didn't have that testimony in mind when you were

2    telling the jury yesterday that Motorola source code had not

3    been uploaded to anywhere that Hytera engineers could access

4    it, right?

03:08:46    5    A.  I read the entirety of Y.T.'s deposition when it was

6    provided to me initially.  I couldn't remember which specific

7    parts were played here in court, because it was repetitious of

8    what I had already read.

9         I do recall -- I don't recall him specifically saying

03:09:09    10   he had the code.  I recall him pleading the Fifth over and

11   over and over on almost every question he was asked after:

12   What is your name?  Where do you work?

13        So if you have code -- if you have a piece of

14   transcript you can show me where he admitted he took the code,

03:09:25    15   I'm happy to refresh my recollection of that.

16        What I recall is that he took the Fifth over and over

17   and over when asked anything.

18   Q.  You asked me to show you the testimony where Mr. Kok said

19   he took the code?

03:09:44    20   A.  He actually took it, yes.  I just don't remember that

21   specific testimony.

22   Q.  Okay.  Page 247:

23        "There's more, but I think that's enough for asking

24   my next set of questions.  When you created the file that's

03:09:59    25   been marked as Exhibit 10, the Hytera source code, in November

Frederiksen-Cross - cross by Brown

4076

1    of 2008, were you referring to a copy of Motorola source code

2    that you had in your possession?

3            "Answer:  Yes."

4    A.  Okay.  Thank you, counsel.  I appreciate that refresher.

03:10:10    5    Q.  The same guy who is on these emails working with Hytera

6    engineers showing them Motorola source code and developing the

7    radio application framework library, right?

8    A.  Correct.

9    Q.  And so when you testified yesterday that it was Peiyi

03:10:28    10   Huang who created that library, only Peiyi Huang, that was

11   incorrect, wasn't it?

12   A.  She assembled the library and shipped the library out.  If

13   somebody else worked on the code and provided it to her, I

14   would not have a way of seeing that.

03:10:42    15   Q.  When was the RAF library first created at Hytera?

16   A.  Comparatively early on.  I do not remember the specific

17   date.  It was towards the end of 2008, I believe.  I just

18   don't remember the exact date.

19   Q.  So let me put this in order here.

03:11:02    20          So Hytera engineers working in December 4th, December

21   9th on the library.  Here is PTX-966.  It's an excerpt.  We

22   have a date of 12/29/2008.  Do you see that?

23   A.  I see that, yes.

24   Q.  And we go down to the bottom here.  We've got the RAF

03:11:27    25   library.  That's the RAF library that steals code from

Frederiksen-Cross - cross by Brown

4077

1    Motorola, right?

2    A.   That is the RAF library that contains Motorola code, yes.

3    And that would be associated with that date of December --

4         THE COURT:  Can you raise your voice a little?

03:11:37    5    BY THE WITNESS:

6    A.   Yes.  December 29 of 2008.  Sorry.

7         THE COURT:  It comes across as whispering.

8         THE WITNESS:  Okay.

9         THE COURT:  So raise your voice or try to get closer

03:11:46    10   to the microphone so every juror can hear what you say.

11        THE WITNESS:  Yes, Your Honor.

12   BY THE WITNESS:

13   A.   Yes.  So that is an entry associated on December 29, 2008

14   with that RAF library.

03:11:59    15   BY MR. BROWN:

16   Q.   And so just a few weeks after these Hytera engineers are

17   looking at Motorola source code, the RAF library gets uploaded

18   to their SVN, fair?

19   A.   That's a fair characterization of that comment, yes.

03:12:14    20   Q.   And you know that Peiyi Huang, Motorola, ex-Motorola

21   engineer, she had nothing to do with this, did she?

22   A.   I don't see anything on these documents to indicate that

23   she did.  I think she actually came on the scene a little bit

24   later.

03:12:29    25   Q.   Can you say what --

Frederiksen-Cross - cross by Brown

4078

1    A.  I think she came on the scene a little bit later.  I don't

2    remember her exact start date, but I think it was a little bit

3    after this.

4    Q.  That's right.  She wasn't even at the company at this

03:12:39    5    time, was she?

6    A.  I believe that to be correct, counsel, based on my

7    recollection of when she started.

8    Q.  But you told the jury yesterday Peiyi Huang was

9    responsible for this library.

03:12:48    10   A.  She's the one who built and distributed the library that

11   was used in the Hytera code and which is -- in the first

12   release of the Hytera code.  That is the version of the

13   library that I received and that I was able to examine.

14       If someone had built an earlier version, if Y.T. had

03:13:07    15   built an earlier version, I don't have that version.

16   Q.  You never told the jury about any of these other Hytera

17   engineers who were working on this Motorola source code, did

18   you?

19   A.  Well, again, parts of this are the ancillary components

03:13:22    20   that go with the library.  And I did not, as we spoke

21   yesterday, talk about Y.T.'s participation.

22   Q.  But you said that the work on this library, which was

23   copied from Motorola, was done only by Sam, Y.T. and Peiyi,

24   didn't you?

03:13:37    25   A.  That was my best recollection, as I testified yesterday,

Frederiksen-Cross - cross by Brown

4079

1  counsel.  You showed me some documents to refresh my

2  recollection, and I see that Y.T. also worked on this.

3  Q.  And so did Yang Shuang Feng, Xiong Wei Ming and Ruan

4  Hanchun, correct?

03:13:54  5  A.  They at least worked on files that are related to the

6  library.  It is not clear from this document which of those

7  individuals worked on which files.

8       Some of the documents on this list are related to the

9  library, that is to say related to its use, like header files,

03:14:11  10  external files.  Some are part of the library itself.

11       I cannot tell from this document who worked on which

12  components.

13  Q.  Whichever components they worked on, they were all looking

14  at Motorola source code when they were working on it, weren't

03:14:24  15  they?

16  A.  I do not recall that this document transmits more source

17  code than what is in the actual attachment, those small

18  screenshots.  I would say that anyone who had this document

19  did have those screenshots available to them.

03:14:55  20  Q.  And when you said that the only people responsible for

21  copying Motorola's trade secrets were Y.T., Sam, and Peiyi,

22  that was incorrect, because these three guys were getting to

23  look at some of them, too, while they're working on stuff at

24  Hytera, right?

03:15:11  25  A.  It is not clear to me from this document whether they made

Frederiksen-Cross - cross by Brown

4080

1   use of that or incorporated into their work.  I don't have

2   evidence one way or the other.

3           They have this doc.  I don't dispute that from the

4   email.  Whether they opened it, whether they didn't, I

03:15:26   5   certainly accept that they were in possession of this

6   document.

7           What I cannot tell from this doc, again, is whether

8   they used any of that information and incorporated it into

9   their own work.

03:15:41   10   Q.  And because you couldn't come to that conclusion, their

11   work ended up in your 96 percent of work that was

12   independently developed by Hytera, right?

13   A.  That's not entirely true.  Where I saw evidence of

14   copying, I put it in the 4 percent bucket.  Where I looked at

03:16:02   15   code that appeared to have any derivation from the Motorola

16   code, it went into that 4 percent bucket.

17   Q.  So let's talk about that 4 percent -- sorry.  I want to

18   switch gears to that 4 percent bucket.

19           You put up a slide yesterday DSX-0003.  Do you

03:16:33   20   remember this?

21   A.  I do.

22   Q.  You referred to this quite a bit, right?

23   A.  I did.

24   Q.  Now, there is two columns.  The column on the left is what

03:16:44   25   you've said are the files that Motorola has claimed are part

Frederiksen-Cross - cross by Brown

4081

1    of each of its trade secrets, right?

2    A.   Based on the evidence presented at this trial and the

3    Motorola expert's screens, the paths that they identified,

4    yes.

03:16:58    5    Q.   Is the answer to my question "yes" or does it need all of

6    those caveats?

7    A.   It needs the caveats, because Motorola has claimed what

8    they identify as the files containing its trade secrets two

9    different ways.  They're claimed one way in Wicker's report

03:17:14    10   and then here at trial they've come up with a different set of

11   directories.

12            And so they're saying on the one hand, well, this

13   stuff has our trade secret.  And now they're pointing at often

14   something completely different, as we saw with the case with

03:17:27    15   repeater or partially different and saying, well, this stuff

16   is our trade secret.

17            And that's been a problem throughout this case,

18   counsel.  The ground, the target keeps shifting.  Where do we

19   find your trade secrets?

03:17:39    20   Q.   So let's try to answer the question first and then we'll

21   try to get into what you are talking about.

22            This is a list of what you told the jury were the

23   files cited by Motorola for its trade secret, right?

24   A.   Specifically the source code files cited by Motorola in

03:17:56    25   those directories that were shown here at trial, that is

Frederiksen-Cross - cross by Brown

4082

1    correct.

2    Q.   And then on the right, the middle column here is a list of

3    files that were alleged -- that Motorola says were allegedly

4    copied, right?

03:18:10   5    A.   Files copied from those directories as identified by

6    Professor Wicker in his Exhibit C and D specifically as I

7    testified.

8    Q.   Only in his Exhibit C and D?

9    A.   That is correct.

03:18:23   10   Q.   Which is where he put a line for line copying, right?

11   A.   The line for line and block for block, correct.

12   Q.   He also had 2500 other pages of analysis where he showed

13   things like the ROSAL specification, which was copied whole

14   set by Hytera, didn't he?

03:18:37   15   A.   Right.  These are specific to the source code comparison.

16   Q.   It's limited, right?

17   A.   Limited to the source code comparison, yes.

18   Q.   And then what you did here is you said, well, because

19   Hytera only copied, say, 16 files of the what you say are 269

03:18:58   20   files cited by Motorola, well, then they've only copied about

21   6 percent, right?

22   A.   Yeah.  The computation is based strictly on the files

23   identified and the files identified as having been copied from

24   with respect to source code files.

03:19:17   25   Q.   To start with, this column here, do you know how many

Frederiksen-Cross - cross by Brown

4083

1     files this sums up to?

2     A.   I could do the math, but I didn't totally count it.  I

3     mean, I just don't recall.

4          If you add the three -- because there is overlap

03:19:33   5     here.  I mean, when you say "sum," there is 376 total in 134.

6     But there is more than 376 if you take the sum of those parts.

7     Q.   Okay.  So you think there is about 376 unique files

8     identified in here?

9     A.   That would be an approximation.  I think there are a few

03:19:51   10     more because of that external use directories that are in the

11     noise supp directory, where that one was much bigger than

12     trade secret that subsumed it.  And I think that occurs in

13     lesser extent in a couple other places.

14     Q.   So let's say it's 376 being conservative.  Is that fair?

03:20:17   15     A.   Okay.

16     Q.   You'd agree with me that's 376 files too many that Hytera

17     should have copied from Motorola, right?

18     A.   I will agree with that, yes.

19     Q.   And so the fact that Motorola has more source code files

03:20:36   20     at its company as part of its work, that doesn't make it okay

21     for Hytera to come in and copy 376 of those files, right?

22     A.   I would agree with that.

23     Q.   But these numbers, they're not correct, are they?

24     A.   What are you disputing about them?  They are counting the

03:21:06   25     source code file types in the directories that were identified

Frederiksen-Cross - cross by Brown

4084

1    here at trial as the directories that contained Motorola's

2    trade secrets.

3    Q.   When you prepared your expert report in this case and did

4    the bulk of your analysis, you looked at Dr. Wicker's expert

03:21:23    5    report, right?

6    A.   Amongst other things, yes.

7    Q.   And you looked at Motorola's interrogatory responses,

8    right?

9    A.   I did.

03:21:28    10   Q.   And that included Motorola's description of the trade

11   secrets in this case?

12   A.   I believe that both of those, there was a set of

13   interrogatories that identified it and Dr. Wicker's.

14   Q.   And so Dr. Wicker's report and those descriptions of the

03:21:45    15   trade secrets, they identified specific Motorola files that

16   Motorola explained in this case were part of its trade

17   secrets, didn't they?

18   A.   There were a small amount of specific files.  But they

19   were not articulated as being solely the practice of the trade

03:22:05    20   secret.  Motorola identified a series of directories,

21   subdirectories and sometimes individual files as here is where

22   Motorola's trade secret is practiced.

23         With respect to the specific files, I have no major

24   complaint other than that it seems they claimed what they're

03:22:23    25   claiming as their trade secret has changed since trial

1    started.

2         With respect to the rest of it, the problem has

3    always been that the same directories are claimed for multiple

4    trade secrets, often disjunct trade secrets, and there is no

03:22:39    5    easy way to tell what they are claiming pertains to a

6    particular trade secret.

7    Q.   The documents that you looked at in preparing your

8    opinions in this case identified specific source code files

9    that were relevant to each trade secret, isn't that correct?

03:22:58    10    A.   Of Motorola source code files, a small number, yes, as

11    well as much broader blanket citations.

12    Q.   And it would list the directory where you could find the

13    source code files and then it would specifically delineate

14    which of the source code files were the ones relevant to the

03:23:14    15    trade secret, right?

16    A.   For some trade secrets there were specific files

17    identified in addition to more broad blanket citations, yes.

18    Q.   And let's take carrier detection.  You said Motorola cited

19    269 different files.  And you got there because when

03:23:36    20    Mr. Corretjer testified, he put up a slide with some source

21    code directories and he said:  You can find the specific files

22    in these directories, right?

23    A.   He said those were the directories that contained the

24    trade secret is my recollection of his testimony.

03:23:51    25    Q.   And then instead of counting the specific files that

Frederiksen-Cross - cross by Brown

4086

1    Motorola has identified as being part of the trade secret in

2    those directories, you just counted up all of the files in

3    each of those directories, right?

4    A.   Motorola didn't identify specific files for every trade

03:24:06    5    secret or for every directory.

6    Q.   What about the one we are talking about,

7    carrier detection?

8            THE COURT:  Just a minute.  Did you get an answer to

9    your question?

03:24:12    10           MR. BROWN:  I didn't, Your Honor.

11           THE COURT:  All right.

12           THE WITNESS:  Could you reask, please?

13           THE COURT:  Just a minute.  Do you want to change

14   your answer?

03:24:18    15           THE WITNESS:  No.  I would like to hear the question

16   again.  I thought I was answering it, but if I --

17           THE COURT:  You thought you were answering it?

18           THE WITNESS:  Yeah.  If I misheard it, I didn't --

19   I'll answer the question.

03:24:26    20           THE COURT:  If you don't understand the question,

21   just say "I don't understand the question."

22           THE WITNESS:  Okay.

23           THE COURT:  But you are obligated to give a

24   responsive answer.

03:24:33    25           All right.  Read the question back to the witness.

Frederiksen-Cross - cross by Brown

4087

1    Read two.

2        (Record read)

3            THE COURT:  You may answer.

4            THE WITNESS:  That is correct.

03:25:03   5    BY MR. BROWN:

6    Q.  And so when we look at something like carrier detection,

7    because there are 269 files in those directories, the

8    percentage seems very low, doesn't it?

9    A.  It's 5.95 percent.

03:25:21   10   Q.  But if you were to count the files that Motorola

11   specifically identified for that trade secret rather than just

12   count all the files in a directory, how many would that be?

13   A.  I would need to look back to those documents we just

14   discussed.

03:25:46   15           MR. BROWN:  Permission to approach, Your Honor.

16           THE COURT:  Proceed.

17   BY MR. BROWN:

18   Q.  So I've handed you one of the descriptions that we just

19   talked about.  You recognize this as Motorola's description of

03:26:12   20   trade secret documents, right?

21   A.  I do see that, yes.

22   Q.  Okay.  And if you go to page 77, that's where the carrier

23   detect trade secret is.

24   A.  Counsel, my document seems to be out of order somewhat.

03:26:37   25   Are you giving me the Bates number or the number by the Bates

Frederiksen-Cross - cross by Brown

4088

1    number or the page number on the bottom of the page?

2    Q.   Page number.   Page 77 of 241.

3    A.   Okay.   Just to be clear, that's trade secret 56.   Got it.

4    Q.   And so if you'll just read and maybe count up the number

03:26:56   5    of files specifically identified there in the trade secret

6    disclosure, and then I'll ask my question again when you are

7    ready.

8    A.   Okay.   There appear to be 16 files here.

9    Q.   So if we identify the files specifically identified by

03:27:46   10    Motorola, there is 16, correct?

11    A.   There are on this trade secret, yes.

12    Q.   And I don't want to make you do math on the fly, but 16

13    over 16, how much of that trade secret would be copied if that

14    were the case?

03:28:05   15    A.   That's an easy one.   That's 100 percent.

16    Q.   So let's talk through some of the DSP source code that you

17    showed.

18    A.   Okay.

19    Q.   You have a file -- do you have your folders up there?   Or

03:28:31   20    I can give you another copy.

21    A.   I have a lot of folders.   If you give me a little guidance

22    as to which one you want.

23         Thank you.

24    Q.   This is PTX-1862LLL.   This was one of the files you used

03:29:02   25    during your direct examination, right?

Frederiksen-Cross - cross by Brown

4089

1    A.  I believe so, yes.

2    Q.  And this is a file that you said was independently

3    developed by Hytera, correct?

4    A.  Correct.

03:29:20    5    Q.  Now, you've analyzed this file?

6    A.  I have.

7    Q.  You've analyzed all of the --

8           THE COURT:  Counsel, it's not being shown to the

9    jury.

03:29:30    10          MR. BROWN:  I'm sorry.

11          THE COURT:  Press the button.

12   BY MR. BROWN:

13   Q.  And in doing so, you looked to see all of the functions

14   that are used in implementing this functionality, right?

03:29:54    15          You know what, let me withdraw that and maybe do a

16   little bit more exposition.

17          What does this file do?

18   A.  This file does some of the processing for the analog and

19   digital on the DSP side according to the comments.

03:30:09    20          I would need to look through it really quickly to

21   refresh my recollection, but that's my recollection as well,

22   that it's the DPS public process has a lot of the

23   implementation functions related to the digital signal

24   processing.

03:30:25    25   Q.  So it's part of the DSP functionality at Hytera, correct?

A.  Correct.

Q.  And you understand though that in writing this file, the Hytera engineer who wrote it had to rely on stolen Motorola functionality, doesn't he?

03:30:45

A.  This file does interact with those libraries, yes.

Q.  So in order to make the functionality that the author here is describing in the code, he had to use functionality stolen from Motorola in that DSP library that we talked about, right?

A.  Certainly for the time period before Hytera rewrote the

03:31:11

functionality of those libraries, that would be true.

Q.  And so from the time frame -- and we'll talk about, we'll have -- I'll ask you a question about the redesign a little bit later.  But for the time frame between November 2008, when this file was written, all the way up to, I think you

03:31:28

testified, roughly October 2019, this library for DSP functionality had to rely on stolen Motorola functionality to work, right?

A.  Just with a carve-out that the carrier detect functionality was replaced for most functions in 2012.  In

03:31:49

some instances it was still used by Hytera, and I would need to see if those instances occur in this file.  But with that carve-out, what you say is generally correct, yes.

Q.  And so you didn't mention that to the jury when you put the document up, this code up and said this was independently

03:32:07

developed by Hytera, did you?

Frederiksen-Cross - cross by Brown

4091

A.   This code was independently written.  I see no evidence

that this code was copied.  I do not deny and I never denied

that Hytera used those three libraries.

Q.   But this code wouldn't work but for the Motorola code that

03:32:26   was stolen, right?

A.   The system use of libraries and unless those libraries

were replaced, the code would not work, that is correct.

Q.   Now, we also heard yesterday about, I think you testified

about the DSP framework and the DMR standard.  And in

03:32:51   particular you discussed the vocoder in the Hytera products,

didn't you?

A.   The voice encoder, yes.

Q.   Yeah.  What is a vocoder?  Just to remind the jury.

A.   It's functionality that encodes, decodes voice signals.

03:33:08   So it's invoked in the translation of voice to a signal type

or a signal back to voice.

Q.   You need that in order to have a working DMR radio, right?

A.   You need some form of vocoder, that is correct.

Q.   And the vocoder that is used by Hytera, that's third-party

03:33:30   code, right?

A.   I believe that is true, yes.

Q.   So they didn't independently develop that?

A.   Certainly for their digital, it's with a certain vocoder

is required, so they did not independently develop that.

03:33:47   Q.   But they did also steal that from Motorola, didn't they?

Frederiksen-Cross - cross by Brown

4092

```
 1   A.  For the analog portion of the system, the voice -- what

 2   are you talking about specifically?  What specific file?

 3   Q.  Hytera's --

 4            THE COURT:  Just a minute.

 5            You did not understand the question?

 6            THE WITNESS:  I'm not sure what he's saying, no.

 7            THE COURT:  All right.  Do you understand the

 8   question?

 9            THE WITNESS:  No, I don't understand your question.

10            THE COURT:  You don't understand the question?

11            THE WITNESS:  I don't understand the question.

12            THE COURT:  All right.  Rephrase the question.

13   BY MR. BROWN:

14   Q.  The vocoder that Hytera uses is the AMBE++ vocoder.  Does

15   that sound familiar?

16   A.  Yes.  Thank you.

17   Q.  And that's a third party who made that, right?

18   A.  Correct.

19   Q.  They're supposed to pay for that, right?

20   A.  I'm assuming that.  I've not looked into the licensing of

21   AMBE.

22   Q.  And this is one of those things that we'd have to carve

23   out from that 96 percent independently developed by Hytera

24   slide that you put on, right?

25   A.  Correct.
```

03:34:01
03:34:07
03:34:17
03:34:23
03:34:36

Frederiksen-Cross - cross by Brown

4093

1  Q.  Now, you know that Hytera did not want to pay for that

2  vocoder, right?

3  A.  I don't have that information specifically, counsel.

4  Q.  It was known at Hytera that that vocoder was stolen from

03:34:47  5  Motorola, wasn't it?

6  A.  I have not seen that evidence, counsel.

7         MR. BROWN:  May I approach, Your Honor?

8         THE COURT:  Yes.

9  BY MR. BROWN:

03:35:14  10  Q.  I've handed you PTX-211.  Do you see the Bates number on

11  the bottom of the page indicating that this was produced from

12  Hytera's files?

13  A.  I do, sir.

14         MR. BROWN:  Plaintiff move moves to admit PTX-211,

03:35:27  15  Your Honor.

16         MR. RICHEY:  No objection, Your Honor.

17         THE COURT:  It is received and may be published.

18      (PTX-211 was received in evidence.)

19  BY MR. BROWN:

03:35:33  20  Q.  PTX-211, the Chinese -- or the English translation,

21  Ms. Frederiksen-Cross, begins on page 15, if that helps.

22         It's a Hytera document entitled "Major work report in

23  the first half year of 2008."  Do you see that?

24  A.  I do.

03:35:53  25  Q.  It's dated August 26, 2008, right?

Frederiksen-Cross - cross by Brown

4094

1   A.  I see that.

2   Q.  Now, if we go to just the first page of that document,

3  it's talking about working on the DMR program.  Do you see

4  that right there?

03:36:17  5   A.  I see that.

6   Q.  The point that I want to draw your attention to is that

7  last bullet point in that last box.  Do you see that?

8   A.  The bullet point 14, yes.

9   Q.  No.  I'm sorry, the one right underneath that, the lib

03:36:33  10  file.

11   A.  Can you point to that on the screen?  I'm not sure where

12  you are.  Oh, the lib file, yes.

13   Q.  So a lib file, it's a library file, right?

14   A.  I see that, yes.

03:36:42  15   Q.  "The library file provided by the engineers of Penang,"

16  the engineers of Penang, those are the ex-Motorolans who came

17  over from Motorola's Penang facility, right?

18   A.  Former Motorolans, yes.

19   Q.  "The lib file provided by engineers of Penang make us

03:37:02  20  avoid to buy AMBE++ LIC from DVSI before mass production."  Do

21  you see that?

22   A.  I see that, yes.

23   Q.  And they know it reduces the research risk and shortens

24  the develop project -- developing period, right?

03:37:14  25   A.  I see that, yes.

Frederiksen-Cross - cross by Brown

4095

Q.   So what it's saying is the engineers at Motorola brought over this library file so that Hytera could use it before they went into mass production, right?

A.   I see that on this document, counsel.

Q.   And Hytera is happy about that in this document because it says they get to avoid buying it.

A.   I see that observation.  I don't know if they were happy or unhappy about it.  I see that observation.

Q.   So Hytera didn't even -- withdrawn.

People at Hytera knew that the engineers of Motorola came over with source code and libraries that they weren't supposed to have, correct?

A.   When you say "people at Hytera," who were the recipients of this document?  I don't know who it was directed to or how widely it was circulated.

Obviously the person who wrote it knew that.  And probably at least some of the recipients knew that.  I don't know who they were.

Q.   And when you were providing your testimony to the jury yesterday saying that the only code copying was restricted to those three Motorolan engineers, you weren't considering this document, were you?

A.   No.  I was considering only, first of all, Motorola code, because that's what is at issue in this case.  And I do not recall actually seeing this document before.

Frederiksen-Cross - cross by Brown

4096

1    Q.   It wasn't provided to you by counsel?

2    A.   No.  I just don't specifically recall.  I don't recall the

3    document.  It may have been, but I do not recall it.

4    Q.   Now, let's switch gears to the connectivity trade secret.

03:39:08    5    A.   Okay.

6    Q.   What is the connectivity trade secret?

7    A.   Again, that is the connectivity of the Hytera DMR radio or

8    its ability to connect to -- let me back up.  That's a bad

9    answer.  Scratch that.

03:39:28    10            Motorola's connectivity trade secret relates to the

11    ability of the Motorola radios to connect to external devices

12    such as USB or other external interfaces.

13            So it is the way that they connect typically through

14    third-party shims, if you will, that provide the interaction

03:39:50    15    with those various USB or ethernet type connectivities.

16    Q.   And who were the engineers at Hytera who were responsible

17    for creating the connectivity source code?

18    A.   I do not as I sit here recall specifically who created

19    connectivity.  I would need to look at a couple of the files.

03:40:14    20    Q.   I'll give you a couple of files.  Let me start with these

21    two.

22            I've handed you PTX-451.  Do you recognize this

23    document as one of the documents that you showed during

24    your -- well, withdrawn.

03:41:24    25            Do you recognize this document as a Hytera document

Frederiksen-Cross - cross by Brown

4097

1    produced from Hytera's files?

2    A.  Yes, I do.

3              MR. BROWN:  Plaintiff moves to admit PTX-451.

4              MR. RICHEY:  No objection.

03:41:35   5              THE COURT:  It is received and may be published.

6         (PTX-451 was received in evidence.)

7    BY MR. BROWN:

8    Q.  You presented a different copy of this document, and I

9    will explain why I want to use this one in a second.

03:41:46  10              This is a document you put forward during your direct

11   testimony.  And you said that this document provides only a

12   high level overview of connectivity, right?

13   A.  That's correct, yes.

14   Q.  And you showed I think one page.  I don't know which.  I

03:42:02  15   think you just showed the cover and the back page, right?

16   A.  I think there may have been one other page we showed.  I

17   don't recall specifically.  I think we showed one or two pages

18   out of this document.

19   Q.  And you didn't go through and discuss what it's describing

03:42:17  20   in this document, right?

21   A.  I didn't describe its contents in detail.  I just gave you

22   the summary of what I had formed as an opinion after review of

23   the document.

24   Q.  And Dr. Wicker did describe the contents of the document,

03:42:31  25   right?

Frederiksen-Cross - cross by Brown

4098

1   A.   This one or one with very similar contents.  I don't

2   remember if it was specifically this same document.

3   Q.   And this document was copied from a Motorola connectivity

4   document, right?

03:42:47   5   A.   I recall that at least portions of it were.  I don't

6   recall if it was the entire document or portions of it.

7   Q.   I'll hand you that one.

8   A.   Thank you.

9   Q.   So I've handed you PTX-1309, which has already been

03:43:20   10   admitted.  This is a Motorola document, right?

11   A.   I see that, yes.

12   Q.   And this is a Motorola document that Dr. Wicker alleged

13   was stolen by Hytera and then copied into Hytera's documents,

14   right?

03:43:35   15   A.   I recall that, yes.

16   Q.   And there are a lot of similarities here, right?

17   A.   There are a number of similarities between these two

18   documents, yes.

19   Q.   Right.  So, for instance, the text here is identical,

03:43:50   20   except that Hytera has changed the name from LTD connectivity

21   framework, which is Motorola's name for its product, to DCI,

22   data connectivity interface, right?

23   A.   It's making that substitution throughout.

24   Q.   And it continues on, the Motorola document continues on

03:44:13   25   and the Hytera document continues on talking about the

Frederiksen-Cross - cross by Brown

4099

1  protocol handlers, right?  Hytera's -- sorry, I should pause

2  there.

3       The Hytera document talks about the description of

4  protocol handlers for its connectivity system, right?

03:44:31  5  A.  I see that, yes.

6  Q.  And that was copied right out of the Motorola document

7  word for word?

8  A.  Almost word for word.  There is one or two substitutions

9  in there, but they're trivial.

03:44:51  10  Q.  Nothing, nothing of substance?  Nothing of substance was

11  changed when it was copied over, right?

12  A.  In terms of the content and what it conveys, that's

13  correct.

14  Q.  We don't need to belabor the point, but it goes on and on

03:45:06  15  and on and provides a description to anybody who is reading it

16  on how to create the architecture, Hytera's CPA data

17  connectivity framework, correct?

18  A.  It does not provide detailed or implementation details

19  that would allow one to create the exact same architecture.

03:45:29  20       But at a high level conceptual level, it does provide

21  details that would inform one about data connectivity

22  architecture.

23  Q.  Now, that's what you are saying now that we are here in

24  court.  But you know that Hytera's engineers believed that

03:45:48  25  this did describe the architecture of Hytera's connectivity

Frederiksen-Cross - cross by Brown

4100

1  system, right?

2  A.  The architecture overall at a high level, but not the

3  implementation details.

4  Q.  And you understand that when somebody wanted to try to

03:46:04  5  understand how to create the connectivity architecture at

6  Hytera or how to understand the connectivity layer at Hytera,

7  they would read this document to understand how Hytera's

8  connectivity system worked, right?

9  A.  You're making that representation, counsel.  I don't have

03:46:21  10  specific knowledge about what Hytera engineers researched, did

11  or researched when they wanted to understand connectivity.

12  Q.  But you again testified that 96 percent of Hytera's code

13  was independently developed.  But they're using a Motorola

14  document to describe how to create the connectivity system?

03:46:42  15  A.  This document is at such a high level that it would

16  describe almost any connectivity system that used those same

17  interfaces.

18      So this document is at the 60,000-foot level or maybe

19  the 50,000-foot level.  It's not down at the level that

03:47:00  20  describes connectivity details.

21  Q.  And so you disagree with what Hytera engineers said about

22  this document?

23  A.  I don't know what testimony you're talking about what the

24  Hytera engineers said, counsel.  I'm not sure what you are

03:47:14  25  referring to.  So I can't tell you if I agree or disagree.

Frederiksen-Cross - cross by Brown

4101

1    Q.  I've handed you two documents.  We'll start with PTX --

2    well, both of those documents contain Hytera Bates numbers on

3    them, correct?

4    A.  That is correct, counsel.

03:47:55    5    Q.  Indicating that they were produced from Hytera's files?

6    A.  That is correct.

7            MR. BROWN:  Plaintiff moves to admit PTX-2356 and

8    PTX-2374, Your Honor.

9            MR. RICHEY:  No objection.

03:48:05    10           THE COURT:  Both are received and may be published.

11       (PTX-2356 and PTX-2374 were received in evidence.)

12   BY MR. BROWN:

13   Q.  So here is PTX-2356.  I am going to go to the first page

14   in the chain, which starts on page 2.

03:48:22    15          It's an email from Shen Juan.  Do you see that?  Shen

16   Juan.

17   A.  Shen Juan.  I see that, yes.

18   Q.  And do you know who that is?

19   A.  Shen Juan is a software engineer at Hytera.  Beyond that I

03:48:40    20   don't believe I've met Shen Juan, at least not introduced with

21   that name.  I may have been introduced with an English name.

22   But beyond that, I don't know that Hytera engineer.

23   Q.  And this Hytera engineer was one of the engineers

24   primarily responsible for Hytera's connectivity system, right?

03:48:57    25   A.  I recall that they did at least some work in the

Frederiksen-Cross - cross by Brown

4102

1 connectivity system.  I don't recall the specific files they

2 worked on.

3 Q.  And you were here for Mr. Luo's testimony, right?

4 A.  I was.

03:49:14 5 Q.  You know that Ms. Juan refused to testify in this case,

6 right?

7 A.  That is my understanding, yes.

8 Q.  She refused to sit for a deposition, even though we asked

9 her to?

03:49:26 10 A.  I don't know about that specifically.  I just know that

11 she wasn't here at trial.

12 Q.  Even for -- you know that she wouldn't even sit for a

13 deposition in this case, correct?

14 A.  I do not recall seeing any deposition from her.  What the

03:49:41 15 circumstances surrounding that were I'm not aware of.

16 Q.  And so what she says is in an email to Viktor Gerhardt.

17 Do you see that?

18 A.  I see that, yes.

19 Q.  She emails Viktor Gerhardt, who is also not a former

03:50:06 20 Motorolan engineer, right?

21 A.  As best I know, that is true, yes.

22 Q.  And she says, "There is a ppt..." a PowerPoint file,

23 right?

24 A.  Correct.

03:50:18 25 Q.  "...written by Y.T. about CPA connectivity framework.  It

Frederiksen-Cross - cross by Brown

4103

1    may not fully implemented in current platform, yet the whole

2    architecture is the same."  Do you see that?

3    A.  I see that.

4    Q.  And she attaches a file called

03:50:35    5    CPADataConnectivityArchitecture.pptx.sdcsw, right?

6    A.  I see that, yes.

7    Q.  And I handed you the metadata for PTX-451 so you can check

8    this.  But that's the file that we were just looking at that

9    was copied?

03:51:00    10    A.  Just a second.  Let me locate that metadata, if I may.

11    Q.  It's 451.

12    A.  That was attached to the back of 451?

13    Q.  I gave it to you separately I think.  It was 451-MD.

14    A.  Thank you.  I see it here.

03:51:11    15    Q.  So you can see the file that we were looking at came from

16    that same person, Shen Juan, and is titled

17    CPADataConnectivityArchitecture.pptx.sdcsw.  Do you see that?

18    A.  I do see that, yes.

19    Q.  So at least one of the engineers responsible for Hytera's

03:51:34    20    connectivity architecture thinks that this document from

21    Motorola describes how Hytera is now doing their connectivity,

22    right?

23    A.  Or at least how they planned to.  It appears that they're

24    saying in the email that the Hytera architecture is not yet

03:51:53    25    fully developed, but this is where it's headed.

Frederiksen-Cross - cross by Brown

4104

1   Q.  And if you'll turn to PTX-2374, which is the other

2   document I gave you.  Did you find it?

3   A.  PTX-2374, I have that, yes.

4   Q.  This is a spreadsheet at Hytera that starts off with a

03:52:32   5   description of the Data Connectivity Roadmap.  Do you see

6   that?

7   A.  I do see that, yes.

8   Q.  And it's describing the way in which they're going to

9   develop the source code for their connectivity system, right?

03:52:51   10   A.  It looks like a timeline principally with respect to the

11   anticipated development.  And the reason I say "anticipated"

12   is it looks like this document was last updated 2010/07/30,

13   and it appears to go forward in time from there.

14   Q.  So let's just -- the date is a good point.  So the

03:53:31   15   document here at least says release 1, targeting July 30th,

16   2010, right, correct?

17   A.  I see that, yes.

18   Q.  It's just two months after Y.T. created a presentation at

19   Hytera that copied from Motorola's confidential connectivity

03:53:54   20   document, right?

21   A.  That appears to be correct based on my understandings of

22   the dates, yes.

23   Q.  If we go forward a little bit, there is a page here, I'm

24   on page 7, if you can see that, if you want to follow along.

03:54:15   25   A.  Okay.

Frederiksen-Cross - cross by Brown

4105

1    Q.   And there is some descriptions of various documents here,

2    right?

3    A.   That appears to be the case, yes.

4    Q.   If we go to this row under "Architecture," it says "Data

03:54:39    5    Connectivity Framework Architecture," that's the same name, a

6    file copied from Motorola, right?

7    A.   I'm not sure that it's the entire name, but it certainly

8    has some of the same words in the name.

9    Q.   It says, there is a comment here, it says, "Y.T. had

03:55:11    10   support a architecture, the

11   CPADataConnectivityArchitecture.pptx."

12   A.   Okay.

13   Q.   Which is in CPA_conn/branch/development/document/design.

14   Do you see that?

03:55:25    15   A.   I see that.

16   Q.   That's the document that was copied from Motorola, right?

17   A.   I don't have that metadata right under my hand here.  But

18   I believe that matches, yes, if you want to put it back up

19   again.  Okay.

03:55:40    20   Q.   Did you find it or --

21   A.   I am not -- I have too many documents.  My apologies.

22   Q.   It's on the screen right now, Ms. Frederiksen.

23   A.   CPADataConnectivityArchitecture.  Okay.  Thank you.  Yes,

24   the name matches.

03:55:53    25   Q.   And so this document was copied from Motorola, from

Frederiksen-Cross - cross by Brown

4106

1    Motorola's confidential files about connectivity, is being --

2    is listed here as an architecture document for Hytera's data

3    connectivity framework, right?

4    A.  I see that.

03:56:09    5    Q.  And then it also says that it's available here, right?

6    A.  I see that.

7    Q.  What is that?

8    A.  That is, appears to be a partial path name.  So it is a

9    directory, subdirectory, subdirectory, subdirectory,

03:56:28    10    subdirectory.

11    Q.  That's a directory on Hytera's SVN, isn't it?

12    A.  I believe that CPA_conn is on the Hytera's SVN.  I didn't

13    memorize the entire list, so I'd want to check it, but I

14    believe that to be correct as I sit here.

03:56:48    15    Q.  Well, let me -- we can make sure you feel confident.

16         Here is a copy of the SVN log from, it looks like

17    June 2010.  Here is a directory CPA/CPA_conn/branch, et

18    cetera, that corresponds to the directory -- oh, sorry, you

19    can't see that -- corresponds to the directory in Hytera's

03:57:15    20    work plan for how to create connectivity, right?

21    A.  Yes.  And I see that this document is being added to that

22    path.  Thank you.

23    Q.  So Hytera, Hytera's SVN has a copy of a document

24    describing Motorola's confidential connectivity architecture

03:57:35    25    on -- well, withdrawn.

Frederiksen-Cross - cross by Brown

4107

1        Hytera's SVN has a copy of Motorola's -- of a

2   document that copies from Motorola's confidential connectivity

3   documents, right?

4   A.   That is correct.  I see nothing here that would allow

03:57:49   5   someone who wasn't familiar with Motorola's documents to

6   identify that.  But I see that they do have a copy of this

7   document in their SVN.

8   Q.   And at least the one engineer working on connectivity

9   believes that it's a good description of now Hytera's

03:58:04   10   connectivity length, right?

11   A.   I don't recall any judgment about good, bad or otherwise.

12   It was just something here is something that Y.T. did.  It may

13   not be fully implemented, yet the architecture is the same.

14   So it's being passed along as informational at least.

03:58:21   15   Q.   And it's being passed along as informational in the sense

16   that it, despite being a copy from a Motorola document, now

17   describes Hytera's architecture, right?

18   A.   At least the -- again, as appears to be the plan, because

19   the sender says it may not be fully implemented in the current

03:58:41   20   platform.  But it appears to be at least a direction, a

21   roadmap.

22   Q.   And Hytera engineers in this work plan document that we're

23   looking at are being told that they can go get this document

24   from the SVN, right?

03:58:56   25   A.   Well, it's identifying where it is.  So presumably it's

Case: 1:17-cv-01973 Document #: 922 Filed: 02/26/20 Page 125 of 207 PageID #:61327
Frederiksen-Cross - cross by Brown
4108

1    doing that for the reason of allowing them to access it.  I

2    don't see any explicit direction, but I see that it's listed

3    there.

4    Q.  And so, once again, Hytera engineers in creating now the

03:59:13    5    connectivity architecture at Hytera are able to use Motorola

6    confidential information in order to create that architecture,

7    right?

8    A.  Again, as I point out, based on my review of this

9    document, it doesn't convey a lot of -- it's a very high

03:59:30    10    level, abstract document that doesn't provide implementation

11    detail.

12         But I will agree that this document is being made

13    available to them.

14    Q.  So let's switch gears.  We've now talked about ROSAL, RAF,

03:59:56    15    the DSP, connectivity.  Those are all aspects of what Hytera

16    calls its CPA, right?

17    A.  I'm sorry, give me that list again if you would.

18    Q.  ROS, ROSAL -- sorry, ROS, RAF, DSP, connectivity, those

19    are all components of Hytera's CPA system, right?

04:00:21    20    A.  There is an edge of CPA that overlaps with the DSP.  But

21    DSP is generally kind of a separate entity into itself because

22    it's the digital signal processing.

23         And I think you said ROS, but ROS is a term that

24    refers to Motorola's, as I understand it, proprietary radio

04:00:38    25    operating system.  And Hytera doesn't use Motorola's

Frederiksen-Cross - cross by Brown

4109

1    proprietary operating system as I understand that term to be

2    defined.

3    Q.   I should say ROSAL.  That's the name for what Hytera

4    copied from Motorola, right?

04:00:52    5    A.   ROSAL is the name for Hytera's interface to its operating

6    system, its operating system abstraction layer.

7    Q.   And so ROSAL is part of Hytera's CPA, right?

8    A.   Generally speaking, I believe that to be true.

9    Q.   The radio application framework or RAF, that's part of

04:01:14    10   CPA, right?

11   A.   Again, they typically draw it in a different layer when

12   they're talking about their architecture.  And I don't recall

13   specifically where that subdirectory lies.  But it's certainly

14   a common functionality in the sense that it's used by many,

04:01:32    15   many different apps.

16   Q.   And connectivity is also part of CPA, right?

17   A.   Again, it's connectivity more so, yes, because that is

18   more of a common service that would be used from anywhere.

19   Q.   And the CPA, what does that stand for?

04:01:49    20   A.   Just common platform, common platform architecture

21   specifically.

22           So it references those components which -- Hytera

23   uses that term to reference components that are packaged in a

24   certain set of subdirectories and are used in both their

04:02:06    25   subscriber and repeater technologies.  So they're common in

Frederiksen-Cross - cross by Brown

4110

1    the sense that it's code that's used in multiple places.

2    Q.  It's not just multiple DMR radios, right?

3    A.  It's the DMR radios and the repeater technologies, as I

4    just said, I thought I just said.

04:02:25    5    Q.  The CPA architecture or the CPA, that didn't exist at

6    Hytera until Y.T. Kok brought it over, right?

7    A.  Parts of the protocol stack did, that they were brought

8    forward from earlier implementations.  And then the -- it

9    appears that the idea to reorganize the code in order to

04:02:57    10    create this more layered architecture probably came with Y.T.

11           But it appears that some of the architectural

12    components were then just rearranged and put in those layers.

13           So I'm not, given that background, I'm not sure

14    exactly how to answer your question.  I think that Y.T.

04:03:14    15    brought the concept or enforced the concept that we want to

16    make layers.

17    Q.  Okay.  Let me hand you PTX-607.  PTX-607 is already

18    admitted.

19           You recognize this document, right?

04:03:38    20    A.  I do.

21    Q.  It's a document from Y.T. Kok that says, it's titled

22    "Hytera Common Platform Architecture," right?

23    A.  I see that, yes.

24    Q.  That's July 2008?

04:03:51    25    A.  Correct.

Frederiksen-Cross - cross by Brown

4111

1    Q.   That's about two weeks after he joined Hytera?

2    A.   It's very early on in his employment with Hytera.

3    Q.   Somehow in just the first two weeks of joining Hytera he

4    came up with an entire architecture, right?

04:04:06    5    A.   What is propounded in this document is a fairly high level

6    architectural plan that says put it in layers.  You know, if

7    you look at PTX-607-13, for instance, you see the high level

8    layers, and you see a little bit of breakdown on what goes

9    into the various layers below that.

04:04:22    10    But there is not anything here that is a high -- what

11    I would consider a highly detailed architectural document from

12    the standpoint of how to do it.

13    This is more here is an abstract of what we might use

14    as an architecture.  So he did provide that abstract early on.

04:04:39    15    But it's at a fairly high level conceptual concept rather than

16    detail, if you will.

17    Q.   So the answer to my question is just simply no, you don't

18    agree, right?

19    A.   I don't agree that this is a design for an entire

04:04:53    20    architecture, no.

21    Q.   But what he did was he said that there is a problem at

22    Hytera, right?  He said that it's a monolithic spaghetti

23    system, right?

24    A.   Yes.

04:05:05    25    Q.   He didn't say, You guys already have this, right?

Frederiksen-Cross - cross by Brown

4112

A.   Clearly he felt that the architecture they had was not the
architecture he wanted to take forward.

Q.   And he then lays out at a high level the layer model that
you just discussed, right?

04:05:27   A.   Correct.

Q.   I'm on page 13.

But he goes into some detail.  He starts to lay out
the different services, right?

A.   Yeah.  I wouldn't characterize this as a particular level
04:05:41   of detail, being very familiar with these kinds of documents
in my work.

This is still at quite a high level of detail or high
level of concept.  It's an abstraction of an architecture, not
an architecture.

04:05:54   Q.   Okay.  The next slide adds more detail, specifically now
calling out where very specific features, like the audio
manager, the power manager, TCP/IP, all of these
functionalities, where he's going to put all these, right?

A.   Well, he's putting the services in the typical place you
04:06:14   would put services in a service layer.  He's just enumerating
some services here like TCP/IP or power management.  It would
typically go into those kind of layers.  It's very similar in
cellphones and other devices as well.

Q.   And then he keeps going, on page 18, laying out how user
04:06:33   input/output is going to work, right?

Frederiksen-Cross - cross by Brown

4113

1   A.  I see that here.

2   Q.  He continues on to device interfaces and lays out how that

3   will be laid out in the system, right?

4   A.  I see that here.

04:06:50   5   Q.  It goes on to name something called raPIS, right?

6   A.  I see that.  He's, yeah, beginning his description of the

7   radio platform interface.

8   Q.  It's a name that didn't exist at Hytera prior to Y.T. Kok,

9   right?

04:07:08   10   A.  I do not believe so.

11   Q.  Lays out how the signaling call services are going to

12   work, right?

13   A.  I see that.

14   Q.  And he continues.

04:07:21   15          And your opinion is that there is not much detail in

16   this document, right?

17   A.  Not really.  For instance, of the one you've got up on the

18   screen, he's documenting what Hytera is already doing with

19   respect to TETRA, dPMR APCO, which are not a part of the DMR

04:07:38   20   standard.  And he's sort of, you know, adding some boxes to

21   show where DMR fits in alongside those other components.

22          But I don't see here that he is designing any of

23   these services or giving you any particular detail.  He's just

24   really sort of saying, you know, we'll put these things at

04:07:53   25   this layer and these things at this layer.

Frederiksen-Cross - cross by Brown

4114

1   And the layers that he's choosing are quite typical

2 for where I would see the kinds of functionality, for

3 instance, on the previous doc, where the drivers fall or where

4 RNDIS falls, some of the third-party components.

04:08:10 5 Q. Hytera didn't have anything for APCO, did it?  You just --

6 A. I don't recall specifically if they had an APCO product or

7 not.

8 Q. Motorola had one.

9 A. I believe that Motorola did have one.  I don't recall if

04:08:22 10 Hytera did or did not.

11 Q. And so in less than two weeks at Hytera, he's figured out

12 what he is going to do with the architecture, he's laid it

13 out, and as you've said, he's figured out what Hytera is

14 already doing in some circumstances, right?

04:08:37 15 A. I believe so, yes, because otherwise he couldn't form some

16 of the opinions he expresses early on in the doc.

17 Q. And he somehow fit that in on top of all of the ostensibly

18 training he would have had to go through when he joined the

19 company?  You know, how to use the phone, how to log onto the

04:08:54 20 email system.  A bunch of training he would have had to do,

21 right?

22 A. I presume they have some form of onboarding.  I don't know

23 specifically what it is.

24 Q. So he was able to pull this together with all that going

04:09:03 25 on, new job at a new company, pretty quick, fair?

Case: 1:17-cv-01973 Document #: 922 Filed: 02/26/20 Page 132 of 207 PageID #:61334
Frederiksen-Cross - cross by Brown
4115

1    A.   This document was produced a fairly short time after he

2    joined, that's correct.

3    Q.   And he went on to become the chief architect of Hytera's

4    CPA platform, right?

04:09:19    5    A.   I believe that is correct, yes.

6    Q.   And as we saw in his deposition, in his role as chief

7    architect of the CPA platform, he admitted to copying Motorola

8    code while working on Hytera code, right?

9    A.   He did admit that he had at least some code in his

04:09:38    10    possession, yes.

11          THE COURT:  Can you raise your voice a little.

12          THE WITNESS:  He admitted that he had at least some

13    code in his possession, yes.

14          THE COURT:  When you say "code in his possession,"

04:09:49    15    can you explain that better?

16          THE WITNESS:  Yeah.  He asked if he admitted he had

17    code.  And he admitted he had at least some.  I didn't see

18    anything that said how much, but he had code.  He had Motorola

19    code in his possession.

04:10:01    20          THE COURT:  But when you -- what in your mind is

21    "code in possession"?

22          THE WITNESS:  He admitted that he possessed a copy of

23    some Motorola code.

24          THE COURT:  In what sense possessed?

04:10:13    25          THE WITNESS:  He had it in some form.  I don't recall

Case: 1:17-cv-01973 Document #: 922 Filed: 02/26/20 Page 133 of 207 PageID #:61335
Frederiksen-Cross - cross by Brown
4116

1    that he said if it was printed or electronic or what.  I don't

2    recall what form he said.

3              THE COURT:  Did he use the word "possessed"?

4              THE WITNESS:  I didn't memorize his transcript.  I'm

04:10:26   5    sorry.

6              THE COURT:  You used the word "possessed."  You used

7    the word "possessed," right?

8              THE WITNESS:  Yes.  He had code.

9              THE COURT:  Did you see somewhere where he used the

04:10:33   10   word "possessed"?

11             THE WITNESS:  I don't remember.

12             THE COURT:  All right.  Please proceed.

13   BY MR. BROWN:

14   Q.  Now, despite that admission from Mr. Kok and despite the

04:10:48   15   fact that he did copy Motorola code into CPA architecture that

16   he was working on, you've concluded that there was minimal

17   benefit from the Motorola code that was stolen, right?

18   A.  From the standpoint of how long it would take to

19   re-architect that code or what it contributes to the overall

04:11:07   20   functionality, yes.

21   Q.  And that's despite the fact that multiple engineers in

22   this case who were implicated by this theft pled the Fifth

23   Amendment out of fear of being prosecuted for stealing that

24   code, right?

04:11:26   25   A.  That is correct.

1  Q.  They were worried enough about the theft and thought it

2  was important enough that they had to take the Fifth

3  Amendment, right?

4  A.  Well, obviously they knew what they had done.  They had

04:11:37  5  taken something.  And I don't know that the issue is how

6  important it was so much as the fact that they knew they were

7  caught dead to rights for something.

8  Q.  And so they were worried.  And Hytera, Hytera's own

9  engineers and other leadership, they thought that the code

04:12:00  10  that was being taken from Motorola was pretty beneficial, too,

11  right?

12  A.  They used the code.  I don't know, you're asking me to

13  make a value judgment of what someone else would have valued

14  the code at and what their opinion was with respect to whether

04:12:19  15  it was beneficial or not.  I'm not sure I've seen the evidence

16  that would allow me to even speculate on that.

17          THE COURT:  You claim to have expertise in this area,

18  do you not?

19          THE WITNESS:  I do.

04:12:28  20          THE COURT:  Do you have an opinion on the point?

21          THE WITNESS:  I think that --

22          THE COURT:  We'll take a break to give you an

23  opportunity to work it through.

24          Members of the jury, we'll take a short break here.

04:12:38  25      (Recess.  Jury in)

Frederiksen-Cross - cross by Brown

4118

1    THE COURT:  The Court will withdraw the question and

2  leave it in your capable hands, counsel.

3    MR. BROWN:  Thank you, Your Honor.

4  BY MR. BROWN:

04:31:04  5  Q.  When we were breaking, just before we broke, we were

6  talking about Hytera's common platform architecture, right?

7  A.  Correct.

8  Q.  And that's the architecture that Y.T. Kok, who admitted

9  taking code from Motorola, was the chief architect of, right?

04:31:19  10  A.  That appears to be true, yes.

11  Q.  And we were discussing how you've concluded that, despite

12  this, Hytera only obtained minimal benefit from Hytera -- from

13  Motorola's code, right?

14  A.  Correct.  They've characterized it as about a sixth-month

04:31:36  15  benefit in my quantifications.

16  Q.  And you understand though that even Hytera's own employees

17  and executives, they all thought the common platform

18  architecture was very important to Hytera, right?

19  A.  I see certainly that Y.T. thought it was very important.

04:31:55  20  I do not recall specific documents of other Hytera management.

21  But I'm happy to look at them if you have them to show me.

22  Q.  You mean -- I'm sorry.

23  A.  I just want to say I'm not saying that it was trivial.  I

24  am not saying they didn't give benefit.  I'm just saying I

04:32:12  25  don't recall specific documents where they characterized how

Frederiksen-Cross - cross by Brown

4119

1    important it was.

2    Q.  So when you were coming to doing your investigation to

3    determine whether or not there was benefit from the stolen

4    code of materials, you didn't consider materials from Hytera

04:32:27   5    executives who might have said that the stolen code was

6    valuable?

7    A.  I just don't recall those documents, counsel, as I sit

8    here.

9               MR. BROWN:  May I approach, Your Honor?

04:32:38   10              THE COURT:  Yes.

11              BY THE WITNESS:  Thank you.

12   BY MR. BROWN:

13   Q.  PTX-2205 is what I've handed you.  Do you see the Bates

14   number on the bottom indicating that this came from Hytera's

04:32:58   15   files?

16   A.  I do, sir.

17              MR. BROWN:  Plaintiff moves to admit PTX-2205.

18              THE COURT:  It is received and may be published.

19        (PTX-2205 was received in evidence.)

04:33:06   20   BY MR. BROWN:

21   Q.  PTX-2205 is an email chain between Hytera employees.

22              And feel free to review whatever you'd like, but I'd

23   like to focus in on the most recent email in the chain.

24              And do you see this email sent September 18, 2009,

04:33:26   25   from Sun Pengfei?

Frederiksen-Cross - cross by Brown

4120

1    A.  I see that.

2    Q.  That's Professor Sun, right?

3    A.  I believe so, yes.

4    Q.  It's the first witness that Hytera brought to testify at

04:33:35    5    this trial?

6    A.  That is correct, yes.

7    Q.  He's Hytera's vice-president of research and development?

8    A.  At the time he was, yes.

9    Q.  He is right now.

04:33:47    10   A.  I don't recall his specific title at this point in time,

11   counsel.  But if that's your representation, I'm happy to

12   accept it.

13   Q.  You don't know Professor Sun's current title at Hytera?

14   A.  No.  I know that he's in management of R&D.  I just don't

04:34:02    15   remember if it's vice-president or president or director or

16   what his specific title is.

17   Q.  He's sending an email to Lian Quanbin.  Do you see that?

18   A.  I see that.

19   Q.  Who is that?

04:34:18    20   A.  I do not remember the English translation for that name.

21   It was one of the other Hytera engineers or Hytera personnel

22   obviously who was involved in this email chain.

23   Q.  And he CCs Y.T. and G.S. Kok.  Those are their Chinese

24   names, right?

04:34:41    25   A.  Correct.

Frederiksen-Cross - cross by Brown

4121

1    Q.   Right here, "CPA is very important to the standardization

2    of Hytera's future products."  Do you see that?

3    A.   I see that.

4    Q.   So Professor Sun, who worked on the early DMR radios at

04:34:59    5    Hytera before they had a CPA, right?

6    A.   Correct.

7    Q.   Now, after Y.T., Sam, G.S., Peiyi, Yu Kok, Hun and all of

8    the other folks came from Motorola with confidential

9    documents, now he's saying this CPA thing, it's very

04:35:14    10   important, right?

11   A.   I see that word, those words here, yes.

12   Q.   And so do you disagree with Professor Sun, the

13   vice-president of research and development at Hytera, about

14   whether or not there was -- whether or not the stolen

04:35:34    15   technology was very important?

16   A.   I don't have any reason to believe that Professor Sun knew

17   the technology was stolen.  I think here he is saying that

18   having a common platform architecture is important.  And I

19   don't have any reason to dispute that.

04:35:51    20         But you had put it in terms of the stolen technology

21   as if everyone knew about that, and that was the problem I was

22   having in your valuation question.

23   Q.   You're saying Professor Sun might not have known when he

24   sent this email that material in the common platform

04:36:23    25   architecture at Hytera was stolen from Motorola, right?

Frederiksen-Cross - cross by Brown

4122

A.   Yes.   I see nothing to suggest he had any knowledge of

that.

Q.   In fact, he testified to that on the stand a month and a

half ago, right?

04:36:33   A.   That's correct.

Q.   He actually said that if it was his choice, he would have

immediately stopped selling Hytera's products as soon as he

learned that, right?

A.   That's correct.

04:36:44   Q.   And my question isn't about who knew what or who was doing

what.   My question is just whether or not what was stolen was

important.   And Doctor -- Professor Sun here is saying that

the stolen CPA is very important, isn't he?

A.   He's saying that the CPA architecture, the common platform

04:37:04   architecture, is very important, I agree with you that he's

saying that.

Q.   And that was part of what was stolen from Motorola when

Y.T. became the chief architect of the common platform

architecture at Hytera?

04:37:16   A.   A part of the CPA was taken from Motorola, I will agree

with that.

Q.   So -- well, withdrawn.   Let me switch gears now to your

slide DDX 20.58.   This is a slide that you put on to estimate

how long it would take Hytera to redesign its source code to

04:38:00   remove some aspect of the material that you said was copied

Frederiksen-Cross - cross by Brown

4123

1    from Motorola, right?

2    A.   Actually, these were estimates for how much time that

3    Hytera gained as a benefit of having had those materials.  So

4    this wasn't directed to the redesign per se but rather to my

04:38:19    5    estimate of how Hytera benefited, you know, how much time they

6    saved by having those materials.  But it would also apply to

7    the redesign because, in essence, it's the same quantification

8    of materials.

9    Q.   Okay.  Let's unpack that a little bit.  To begin with,

04:38:41    10    what you've done here is you've counted up a number of lines

11    of code in the library, a little over 32.5 thousand lines of

12    code, right?

13    A.   Correct.

14    Q.   And you've also counted out 18,000 source code, 18.5

04:38:57    15    thousand code lines, right?

16    A.   That were in the files that I felt had contained copied

17    code, yes.

18    Q.   And so that's not all the files that Motorola alleges are

19    contaminated, as you say, by Hytera's use of Motorola's trade

04:39:11    20    secrets, right?

21    A.   That's correct.  As I explained in my testimony, had they

22    been written fresh those files that used a library function,

23    for instance, would not have used a contaminated function, so

24    I did not include those uses here, but this is the ones where

04:39:26    25    I believed there was actually at least some copying.

Frederiksen-Cross - cross by Brown

4124

1    Q.  It doesn't include the ROS code we looked at this morning,

2    does it?

3    A.  Not that specific file, no.

4    Q.  The file, that specific file that had copies of Motorola's

04:39:39    5    text in the comments?

6    A.  Correct.

7    Q.  That wasn't included?

8    A.  Right.

9    Q.  And what you did was you took these two gentlemen's --

04:39:55    10    gentlemen's?  Both of them are gentlemen?

11    A.  They are.

12    Q.  You took these two gentlemen's estimates on how many lines

13    of code a programmer can write in a month, right?

14    A.  Right.  These estimates were estimates that they published

04:40:09    15    based on their studies of various source code development

16    projects.

17    Q.  And it's all based on the number of lines of code that

18    somebody can write, right?

19    A.  These particular estimates are, yes.

04:40:23    20    Q.  And, in fact, a lot of your analysis including the 4

21    percent of code being copied, that's based on the number of

22    lines?  4 percent is a calculation you've made on the number

23    of lines of code that are alleged to be copied, right?

24    A.  Correct.

04:40:39    25    Q.  It's not a -- you haven't done a valuation of whether or

Frederiksen-Cross - cross by Brown

4125

1   not the 4 percent that you say was copied was more valuable

2   than the other 96 percent, right?

3   A.  That's correct.

4   Q.  You just based it entirely on the pure number of lines?

04:40:54   5   A.  That is correct.

6   Q.  And then you used these industry -- is it fair to say that

7   Capers Jones is an industry expert in this field?

8   A.  Both he and Fred Brooks are regarded as industry experts

9   in the field, that's correct.

04:41:12   10   Q.  Their materials are the type of things that experts would

11   normally rely on, according to you?

12   A.  That is correct.

13   Q.  And they publish books describing this methodology, right?

14   A.  This and other methodologies.  Over time, there have been

04:41:28   15   a number of books as they -- as their understanding of the

16   issues of software development estimation evolve.

17   Q.  So I have one here.  Do you recognize this book by Capers

18   Jones?

19   A.  I am familiar with that book, yes.

04:41:43   20   Q.  And this is the same Capers Jones that you were relying on

21   in coming to the material you presented to the jury?

22   A.  Yes.  I believe that book came a little bit later in time

23   when he had shifted to function point analysis.

24   Q.  Let me hand you a copy of it.

04:42:12   25   A.  Thank you.

Case: 1:17-cv-01973 Document #: 922 Filed: 02/26/20 Page 143 of 207 PageID #:61345
Frederiksen-Cross - cross by Brown
4126

1  Q.  And so this is, Capers Jones is one of the individuals

2  that you relied on in coming to your conclusions, correct?

3  A.  Well, I relied on some metrics he had developed through

4  study, yes.

04:42:23  5        MR. BROWN:  Your Honor, plaintiff moves to admit PTX

6  2370.

7        THE COURT:  Are some metrics at issue contained

8  within the book?

9  BY MR. BROWN:

04:42:30  10  Q.  The metrics are contained within the book?

11  A.  That is my recollection, that he has them in this book as

12  well as in his other publications.

13        THE COURT:  Well, the witness testified earlier that

14  she was dealing with something that went back to the '70s.

04:42:41  15  Can you develop that or clarify the issue here?

16        MR. BROWN:  I actually can in the book, your Honor.

17        THE COURT:  All right.  Proceed.

18        MR. BROWN:  So if you --

19        THE COURT:  In other words, to begin with, what is

04:42:50  20  the edition?

21        MR. BROWN:  So PTX --

22        THE COURT:  If we were looking at something published

23  by the American Psychiatric Association going back 30 or 40 or

24  50 years in relationship to 2020, there might be some

04:43:02  25  disparities.

Case: 1:17-cv-01973 Document #: 922 Filed: 02/26/20 Page 144 of 207 PageID #:61346
Frederiksen-Cross - cross by Brown
4127

BY MR. BROWN:

Q.  So if we look on -- I think you found the copyright date, didn't you?

A.  Yes.  2010.

04:43:13
Q.  So 23 -- PX 2370 was published in 2010, right?

A.  Correct.

Q.  And if you go to Page 540, which is in the chapter titled "Programming and code development," do you see there the description -- and this is about two-thirds of the way down

04:43:38
the page.  The paragraph begins with, "The latter"?  Do you see that?

A.  "The latter, delivered productivity," yes, I see that.

Q.  And you see the last two sentences of that paragraph refer to the material that you've put in your slide here,

04:43:58
approximately estimating 325 lines of code or 300 lines of code here and 750 lines of code as a sort of low and high-end range of what a programmer can develop?

A.  In these specific languages, yes.

MR. BROWN:  So, your Honor, we'd move to admit this.

04:44:16
THE COURT:  Conceptually, a learned treatise under the federal rules?

MR. BROWN:  Yes, your Honor.

THE COURT:  It is received --

MR. BROWN:  Thank you, your Honor.

04:44:22
THE COURT:  -- and may be published.

Frederiksen-Cross - cross by Brown

4128

1     (Plaintiff's Exhibit 2370 received in evidence.)

2  BY MR. BROWN:

3  Q.  Now, the metrics that are described here that you were

4  relying on, as you testified about, come back from the 1970s,

04:44:37  5  right?

6  A.  '70s and '80s.  There were a series of studies over time

7  as new languages came into common use that attempted to

8  characterize productivity for different languages.

9  Q.  And so the language that made it into your slides is here

04:45:05  10  on Page 540.  If we go back a page, we see that this is a

11  metric from 1970, correct?

12  A.  Correct.

13  Q.  Now, a lot of things have changed in software development

14  since 1970, haven't they?

04:45:22  15  A.  There have been many new languages, new tools, that is

16  correct.

17  Q.  And the idea of valuing lines of code -- or withdrawn.

18     The idea of valuating software the way you have in

19  your presentation by saying that only 4 percent of the code

04:45:42  20  was copied using lines of code to get there, that is no longer

21  an acceptable methodology for evaluating code, is it?

22  A.  Not for mixed code bases.  If you're talking about a

23  single language, in my experience, it is still used, but in

24  multiple -- where the development is being done in multiple

04:46:03  25  languages, it's typically not used anymore in favor of

Frederiksen-Cross - cross by Brown

4129

1    function point analysis or other models that require more

2    sophisticated tools.

3    Q.  So if a company is using multiple languages, you shouldn't

4    use a lines of code analysis?

04:46:19    5    A.  If the development that you're talking about is in

6    multiple languages, it becomes more difficult to assess

7    because, for instance, productivity in a low-level language

8    like Assembly will be towards the high-end lines of code

9    because you have to write many detailed lines to accomplish

04:46:40    10    the same purpose, whereas programming in a more advanced

11    language by like C++ will tend -- you tend to use the lower

12    number because in those languages, you have a lot of built-in

13    functionality in the language.

14           So to accomplish the same unit of work, a programmer

04:46:58    15    needs to do less actual code writing because of that ability

16    to leverage the language.

17    Q.  The code in this case is in multiple languages, isn't it?

18    A.  The code to be rewritten in this case was on C++.

19    Q.  But the code that makes up that 4 percent that you looked

04:47:18    20    at and the code that was stolen from Motorola and brought over

21    to Hytera is in multiple languages, isn't it?

22    A.  It's principally in C++.  There was a smattering of C in

23    there.

24    Q.  And also --

04:47:30    25           THE COURT:  Just a minute.

                 1          You may answer the question.

                 2          THE WITNESS:  Principally in one language.  There

                 3    were a very few number of files in C.

                 4    BY MR. BROWN:

04:47:40         5    Q.  C?

                 6          THE COURT:  Just a minute.

                 7          MR. BROWN:  Sorry.

                 8          THE COURT:  Please read the question back to the

                 9    witness.

04:48:00        10       (Record read.)

                11          THE COURT:  Do you understand that question?

                12          THE WITNESS:  The code --

                13          THE COURT:  Do you understand that question?

                14          THE WITNESS:  Yes, I do.

04:48:06        15          THE COURT:  If you understand that question, you may

                16    answer that question.

                17    BY THE WITNESS:

                18    A.  Yes.

                19    BY MR. BROWN:

04:48:11        20    Q.  The code is in C and C++, correct?

                21    A.  Yes.

                22    Q.  Those are different languages?

                23    A.  Yes.

                24    Q.  One of them is object oriented, one of them is not?

04:48:24        25    A.  Correct.

Frederiksen-Cross - cross by Brown

4131

1    Q.   There's also Assembly, right?

2    A.   A small amount, yes.

3    Q.   Assembly is a very different language, right?

4    A.   Very different, yes.

04:48:34    5    Q.   You were here for Mr. Corretjer's testimony?

6    A.   I was.

7    Q.   And he testified that he actually had to write some of the

8    DSP functionality for Motorola in Assembly in order to make it

9    work really optimally, right?

04:48:48    10   A.   Correct.

11   Q.   And Assembly is very hard to write, isn't it?

12   A.   It's a difficult question for me to answer because it is

13   the first language I learned, and I've been writing in it for

14   45 years.  But it is harder, I would say, for someone to pick

04:49:04    15   up and begin writing than C++, for instance.

16   Q.   And so the code in question here comprises multiple

17   different languages, correct?

18   A.   The code to be rewritten, that is correct.

19   Q.   And that is an area in which even Capers Jones says you

04:49:25    20   shouldn't be using a lot of code metric for the reasons that

21   you just spent time describing to the jury, right?

22   A.   That you can't use a single metric, that's correct.

23   Q.   But he said more than that in his book, didn't he?  If we

24   look on Page 546, he switches now to lines of code circa 1990.

04:49:50    25   Do you see that?

Frederiksen-Cross - cross by Brown

4132

A.   I see that.

Q.   So he's sort of telling a history of the metric that you used in the bulk of your presentation to the jury?

A.   That's correct.

04:49:59  Q.   And he says, I'm on Page 547, "In 1994, a controlled study was done that used both line of code metrics" -- that's what LOC means, right?

A.   Correct.

Q.   -- "and function points for ten versions of the same
04:50:15  application written in ten different programming languages, including four object-oriented languages," right?

A.   Correct.

Q.   And then he describes what the results of this was.  He says, "The study was published in *American Programmer* in
04:50:27  1994."  Do you see that?

A.   Yes.

Q.   Are you a subscriber to *American Programmer*?

A.   I was at that time.  I'm not anymore, but I was at that time.

04:50:34  Q.   So you saw this study in 1994?

A.   I have seen that study and seen republishments of the table that was contained in that study numerous times.

Q.   And it says, "The study found that line of code metrics violated the basic concepts of economic productivity and
04:50:51  penalized high-level and object oriented languages" -- that's

Frederiksen-Cross - cross by Brown

4133

1    what OO is, right?

2    A.   Correct.

3    Q.   -- "due to the fixed costs of requirements, design, and

4    other noncoding activities."  Do you see that?

04:51:03    5    A.   I see that.

6    Q.   Then it goes on to say, "This was the first published

7    study to state that line of code metrics" -- the ones that you

8    used -- "constituted professional malpractice if used for

9    economic studies where more than one programming language was

04:51:19    10   involved."

11          Do you see that?

12   A.   I see that.

13   Q.   And object oriented languages and other high-level

14   languages are involved in the code that you valued here,

04:51:29    15   right?

16   A.   They are the principal code involved, that's correct.

17   Q.   It then goes on and analyzes it from the perspective of

18   2000 on Page 548 of PTX 2370.  Do you see that?

19   A.   I see that.

04:51:54    20   Q.   And he notes in 2000, and now I'm quoting, "Although LOC

21   metrics continue to be used, they continue to have such major

22   errors that they constitute professional malpractice for

23   economic and quality studies where more than one language is

24   involved" -- and then there's something different here -- "or

04:52:15    25   where noncoding issues are significant."

Frederiksen-Cross - cross by Brown

4134

1          Do you see that?

2     A.   I see that.

3     Q.   Non-coding issues as he's referring to refer to things

4     like developing specifications, right?

04:52:26   5     A.   Specification, design, testing, yes.

6     Q.   In some ways, that's the waterfall method that Mr. Lund

7     testified about on the board on the first days of this trial,

8     right?

9     A.   Or those steps that are involved in the iteration in

04:52:39  10     Agile.

11     Q.   And that's right.  And in Agile programming which is what

12     you said Hytera uses, there's also steps of documenting and

13     writing specifications, right?

14     A.   Yes.

04:52:49  15     Q.   And in this case, in addition to all the source code that

16     was copied, Motorola and Dr. Wicker have shown that Hytera has

17     also taken and used Motorola's confidential documents, right?

18     A.   That is correct.

19     Q.   And those are not part of any of the analysis if you're

04:53:07  20     just doing a line of code analysis like you did, right?

21     A.   They are a part of the line of code analysis.  They're why

22     the metrics are so small, but the problem with them is that if

23     you are comparing disparate languages where the specifications

24     need to be more or less detailed, that fixed cost of

04:53:30  25     developing those specifications is not directly accounted for,

Frederiksen-Cross - cross by Brown

4135

1    and that's why the high end and low end of the productivity

2    numbers are so disparate.

3    Q.  And in coming to the conclusions about 4 percent of the

4    code, you didn't do any analysis of, say, lines of

04:53:48    5    specification that were taken and copied, right?

6    A.  I did not because that specification would have been

7    developed as a part of that development of the code had it

8    been developed independently and so would have been factored

9    in with the choice of the line of code metric to use.

04:54:05    10    Q.  And Capers Jones, the expert that you relied on for this

11    analysis, says, "There's also a psychological problem."  Do

12    you see that, the last paragraph there?

13    A.  I see that.

14    Q.  "LOC usage tends to fixate attention on coding and make

04:54:20    15    the other kinds of software work invisible," right?

16    A.  I see where it says that, yes.

17    Q.  "For large software products, there may be many more

18    non-code workers than programmers."

19    A.  I see that.

04:54:31    20    Q.  "There will be architects, designers, database

21    administrators, quality assurance, technical writers, project

22    managers, and many other occupations.  But since none of these

23    can be measured using line of code metrics, the line of code

24    literature ignores them."  That's --

04:54:49    25    A.  That's a correct reading, yes.

Frederiksen-Cross - cross by Brown

4136

1   Q.  So he's saying that it's actually being ignored if you use

2   a line of code metric, right?

3   A.  It says to the extent those activities are carried out by

4   those other than coders, they would be ignored, so you're only

04:55:05    5   measuring the coders' productivity.

6          Now, my understanding of the Hytera development group

7   is that they were also the ones designing and going through

8   all of these steps themselves, that there wasn't a separate

9   department, for instance, doing the detailed design work.

04:55:23    10  Q.  And you know at Motorola where a lot of the material,

11  where the material that was stolen came from, they have a lot

12  of individuals who are doing this non-code work in order to

13  enable all of the IP that they're creating, right?

14  A.  I don't have specific knowledge about Motorola's code

04:55:43    15  development structure or how their -- how their staffing is

16  structured with respect to the proportionate roles of

17  designers to coders, for instance, or technical writers for

18  documentation.

19  Q.  I wasn't asking for numbers.  You've been here for the

04:55:58    20  entire trial.  There's been a lot of testimony about all of

21  the employees and engineers at Hytera -- or excuse me, at

22  Motorola, correct?

23  A.  There has been, yes.

24  Q.  And all of the various roles that they have to fill,

04:56:10    25  right?

Frederiksen-Cross - cross by Brown

4137

1    A.  I have heard some testimony about that, yes.

2    Q.  And all the work, staff months that went into creating the

3    technology that was stolen by Hytera, right?

4    A.  I saw those estimates presented, yes.

04:56:23   5    Q.  Now, Capers Jones goes on with his conclusion, now fast

6    forwarding.  He says, "The history of lines of code metrics is

7    a cautionary tale for all people who work in software," right?

8    A.  I see that, yes.

9    Q.  I'm on Page 552.  "The line of code metric started out

04:56:48   10   well and was fairly effective when there was only one

11   programming language and coding was so difficult that it

12   constituted 90 percent of the total effort for putting

13   software on a computer."

14       Do you see that?

04:56:58   15   A.  I see that.

16   Q.  He's talking about 1970, isn't he?

17   A.  He didn't give a specific date there, but I think he's

18   talking about the continuum as languages continued to develop.

19   Q.  Go down here.  "As a result, line of code metrics became

04:57:18   20   less and less useful until sometime around 1985, they started

21   to become actually harmful."

22       Do you see that?

23   A.  I see that.

24   Q.  And he continues to say again that it can be viewed as

04:57:36   25   professional malpractice, right?

Frederiksen-Cross - cross by Brown

4138

1    A.   In many situations, yes.

2    Q.   And --

3              THE COURT:  Just a minute.  Are you quoting?

4              MR. BROWN:  I was quoting "professional malpractice."

04:57:48    5              THE COURT:  All right.  Were you quoting in your

6    answer?

7              THE WITNESS:  Yes, I was.

8              THE COURT:  All right.  Complete the sentence then.

9              MR. BROWN:  Yes, your Honor.

04:57:53   10   BY MR. BROWN:

11   Q.   So the sentence afterwards reads, "Given the errors and

12   misunderstandings that LOC metrics bring to economic,

13   productivity, and quality studies, it is fair to say that in

14   many situations, usage of line of code metrics can be viewed

04:58:09   15   as professional malpractice if more than one programming

16   language is part of the study or if the study seeks to measure

17   real economic productivity."

18             THE COURT:  Period?

19             MR. BROWN:  Period.

04:58:22   20             THE COURT:  All right.  That's what it says?

21             MR. BROWN:  That's what it says, your Honor.

22             THE COURT:  Is that right?

23             THE WITNESS:  That is correct, yes.

24   BY MR. BROWN:

04:58:28   25   Q.   And when you presented your opinions to the jury that only

Frederiksen-Cross - cross by Brown

4139

1       4 percent of the lines of code were copied or that only a

2       small percentage of files from Motorola were copied, you

3       didn't tell the jury that the expert that you were relying on

4       actually said that it was professional malpractice to do what

04:58:53    5   you were suggesting, did you?

6       A.   In that specific --

7               MR. RICHEY:   Objection.

8               THE WITNESS:   -- context, that is correct.

9               THE COURT:   Sustained.   Disregard the question.

04:59:04    10  Disregard the answer.

11      BY MR. BROWN:

12      Q.   In -- despite the -- despite the concerns and problems

13      that the expert you're relying on is saying applies to the

14      metrics you used, you still presented your testimony to the

04:59:25    15  jury, fair?

16      A.   That is correct, yes.

17      Q.   I want to switch gears now to discussion about the

18      redesign that you've mentioned.   Do you know what I'm talking

19      about?

04:59:56    20  A.   I do.

21      Q.   And so just to set the stage, sometime in October of 2019,

22      you're saying that Hytera finished removing Motorola's source

23      code from its products, right?

24      A.   The last version of the code that I reviewed was shortly

05:00:14    25  before the beginning of this litigation, so I'm thinking the

Frederiksen-Cross - cross by Brown

4140

1    early October timeframe was approximately -- possibly late

2    September, but in that timeframe.

3    Q.   And I believe you said that they started that process in

4    June of 2019?

05:00:30    5    A.   That is correct, yes.

6    Q.   Now, this case started in March of 2017, right?

7    A.   I believe that is correct, yes.

8    Q.   When were you retained?

9    A.   Towards the end of 2018, I believe.

05:00:50    10   Q.   And I believe you said that it's been very difficult to

11   determine what it was that was copied from Motorola, right?

12   A.   What was alleged to be copied and to separate the

13   allegations from my understanding of what was actually copied,

14   yes.

05:01:13    15   Q.   And that your belief is that waiting until June of 2019 to

16   begin trying to remove Motorola's source code from its

17   products was justified, right?

18   A.   In my opinion, given the vagueness of this -- with the

19   understanding of the scope of what was alleged and the fact

05:01:31    20   that things were being added to that allegation, those

21   allegations, yes.

22           THE COURT:  So when you use the word "allegations,"

23   are you referring to allegations contained within the

24   complaint?

05:01:42    25          THE WITNESS:  Within the complaint and the subsequent

Frederiksen-Cross - cross by Brown

4141

1    interrogatory responses and then ultimately within

2    Dr. Wicker's report, so the spectrum of the material I was

3    provided.

4          THE COURT:  That's your definition of the -- and use

05:01:53    5    of the word "allegation"?

6          THE WITNESS:  In this context, yes, sir.

7    BY MR. BROWN:

8    Q.  Now, at some point in this case, Hytera and its experts

9    and lawyers -- well, actually Hytera's experts and lawyers

05:02:14   10    would have had access to Motorola's source code and Hytera's

11    source code, right?

12    A.  That's correct, yes.

13    Q.  And there are a lot of instances, as you've noted in your

14    slide here, where there's files that are pretty plainly

05:02:30   15    contaminated by Motorola's source code once you get to look at

16    both the source codes, right?

17    A.  If you can look at both those source codes, that's

18    correct, yes.

19    Q.  And that's something you were able to do, right?

05:02:41   20    A.  That's correct, yes.

21    Q.  Something Hytera's lawyers were able to do?

22    A.  I don't know their skills with respect to that, whether

23    they looked at it themselves or whether they had other experts

24    looking at it as well.

05:02:50   25    Q.  And do you remember when Y.T. Kok was deposed in this

Frederiksen-Cross - cross by Brown

4142

1    case?

2    A.   I don't remember the date.

3    Q.   It was September 24th, 2017?

4    A.   Okay.

05:03:01    5    Q.   So that's a year and a half before Hytera started trying

6    to remove Motorola's source code from its products, right?  Is

7    my math right?

8    A.   I think -- September 2017 to June 2018.  I don't --

9    Q.   Over a year and a half, right?  20- -- hold on.

05:03:26   10    A.   June 2019.  You're right.  You're right.  It's a year and

11   a half, over a year and a half.

12   Q.   Okay.  So from Y.T. Kok's deposition to when Hytera first

13   started trying to remove source code from its products, it

14   took over a year and a half, right?

05:03:39   15   A.   I -- yes.

16   Q.   In Y.T. Kok's deposition, though, he was shown Motorola's

17   source code and Hytera's source code, right?

18   A.   Some samples of that code, yes.

19   Q.   And he admitted that he had copied the Hytera source code

05:03:55   20   that he wrote from the Motorola source code he was being

21   shown, right?

22   A.   In those specific files, that's correct.

23   Q.   And Hytera's lawyer was present during the deposition,

24   right?

05:04:06   25   A.   Yes, there would have been a lawyer from Hytera present.

Case: 1:17-cv-01973 Document #: 922 Filed: 02/26/20 Page 160 of 207 PageID #:61362
Frederiksen-Cross - cross by Brown
4143

1   Q.  And Hytera had also hired for Mr. Kok a criminal defense

2   attorney who was also there, right?

3   A.  My recollection is that there were multiple attorneys

4   there during that deposition, yes.  I wasn't there personally,

05:04:23   5   but the record shows there were at least a couple.

6   Q.  And so as of at least September 2017, Hytera knew that at

7   least with some detail what source code for Motorola was in

8   its product?

9   A.  For some specific files that were discussed at that

05:04:39   10   deposition, yes.

11   Q.  So then did Hytera immediately take that code out of its

12   products, or did it wait over a year and a half before it

13   started trying to do so?

14   A.  I was not involved in this litigation at that point in

05:04:51   15   time.  My understanding is that their effort to replace the

16   code began in June of 2019.  So if there was anything that

17   happened before that, I'm not aware of it.

18   Q.  And you've reviewed the revisions of Hytera's source code

19   throughout this litigation, right?

05:05:07   20   A.  I've reviewed the revision -- or the versions that were

21   produced in the context of the litigation and also a couple

22   versions of the rewrite code that were made available to me

23   starting in about, I think, August of last year, either July

24   or early August.

05:05:23   25   Q.  August of 2019 is what you --

Frederiksen-Cross - cross by Brown

4144

1    A.   Correct.

2    Q.   And in reviewing all the source code up until August 2019,

3    did you see any indication that Hytera was removing the source

4    code that its chief architect had admitted he stole from

05:05:38    5    Motorola?

6    A.   I saw evidence that certain functions, for instance, the

7    detect carrier, had been replaced in part as early as 2012, so

8    before this litigation.  There was some continued changes and

9    some code was rewritten in the later parts of that timeframe

05:05:56    10   prior to this -- or around the beginning of this litigation,

11   around 2017.  I don't remember the exact date.

12        So there were some other components being written at

13   that time related to library functionality, but I don't have

14   the history as to whether those were responsive to the

05:06:13    15   litigation or responsive to some other factor.

16   Q.   And at some point in the litigation, it became clear to

17   both parties that there was far more source code than what

18   just Y.T. Kok had copied, that had been copied from Motorola's

19   source code into Hytera's, right?

05:06:37    20   A.   I'm not sure what you're alluding to.

21   Q.   Well, so some source code was shown to Y.T. Kok as

22   available at the time, and he admitted he had copied it.  And

23   then at some point as litigation progressed, the parties

24   realized there was even more source code copying than Y.T. Kok

05:06:54    25   had admitted to, right?

Case: 1:17-cv-01973 Document #: 922 Filed: 02/26/20 Page 162 of 207 PageID #:61364
Frederiksen-Cross - cross by Brown
4145

A.   Certainly, the libraries windows came to light.  That was
an issue, yes.

Q.   I've handed you DTX 5145 which is already in evidence.
You've reviewed this material, right?

A.   I have, yes.

Q.   And so this is a response from Motorola to --

          MR. RICHEY:  Objection, your Honor.  This is not an
exhibit.  It's the parties' interrogatories.  It's not
admitted.

          THE COURT:  Are you offering it?

          MR. BROWN:  I believe it's already admitted, your
Honor, but I would offer it to be safe.

          MR. CLOERN:  Your Honor, it's not admitted, and I
don't think a party can offer its own interrogatory.  It's not
allowed.

          THE COURT:  It's not the interrogatories, it's the
answers to the interrogatory.

          MR. CLOERN:  Right.

          THE COURT:  And in order to understand the answer,
you have to have an interrogatory.

          MR. CLOERN:  Right.

          MR. BROWN:  Your Honor, I can clarify that -- I'm
sorry.

          THE COURT:  Make your representation.

          MR. BROWN:  It was admitted during the

Case: 1:17-cv-01973 Document #: 922 Filed: 02/26/20 Page 163 of 207 PageID #:61365
Frederiksen-Cross - cross by Brown
4146

cross-examination of Mr. Luo.

THE COURT:  So it is already in evidence?

MR. BROWN:  It's already in evidence, your Honor.

THE COURT:  All right.  Proceed.

05:08:27    MR. BROWN:  And -- excuse me.

THE COURT:  Just to remind the jury, who is he?

MR. BROWN:  Right.

THE COURT:  If the witness knows, you may ask.

BY MR. BROWN:

05:08:35    Q.  Mr. Luo was one of the Hytera employees who looked into

some of the allegations of source code copying, right?

A.  Yes.  He testified about the rewrite effort.

Q.  And he said the same thing you just did, that Hytera

didn't know what was copied and couldn't really figure it out

05:08:59    until June of 2019, right?

A.  That's my recollection of his testimony, yes.

Q.  So if we look at this document which is plaintiffs', it's

Motorola's response to interrogatories from Hytera, you know

what that is, right?

05:09:16    A.  Yes.

Q.  Interrogatories are when a party asks for information

during the litigation and you provide it, right?

A.  Right.  The other party then responds with -- to those

questions.

05:09:27    Q.  And the specific request that Hytera sent in 2018 was,

Frederiksen-Cross - cross by Brown

4147

1    tell us -- I'll read it:

2        "Identify with specificity each line or lines of

3        source code in the DMR program as defined in Motorola's

4        amended complaint and the corresponding line or lines of

05:09:49    5    Hytera's source code that Motorola contends, A, has been

6        copied 'verbatim' and/or, B, is 'substantially similar'

7        to Motorola's DMR program as alleged in Motorola's

8        amended complaint."

9        Right?

05:10:02    10   A.  I see that, yes.

11   Q.  And so then Motorola responded and identified a number of

12   source code files, right?

13   A.  Yes, they did.

14   Q.  These are source code files that are Hytera's source code

05:10:19    15   files, right?

16   A.  That is correct, yes.

17   Q.  That goes on.  And now on Page 6 of DTX 5145, it goes on

18   and on, on to Page 7 and on to Page 8, right?

19   A.  Correct.

05:10:42    20   Q.  And so in at least -- at least September 2018 which is

21   about nine months before Hytera even started redesigning its

22   code, Motorola told Hytera where the copying, what files at

23   least the copying had existed, right?

24   A.  They list those files here in their interrogatory answer,

05:11:21    25   yes.

Frederiksen-Cross - cross by Brown

4148

1    Q.   But that's not all that was provided to Hytera, was it?

2    A.   That's correct.  There is an attachment that identifies

3    specific file pairings.

4    Q.   What the attachment does is it lists on the left side

05:11:41    5    Motorola's source code and on the right side Hytera's source

6    code, right?

7    A.   That's correct.

8    Q.   And it lists the file name.  So this is

9    Cor_Emt_Usr_defines.h.  Do you see that?

05:11:58    10   A.   I see that, yes.

11   Q.   And then it says, "at L67."  Do you see that?

12   A.   Right.

13   Q.   That refers to a line in Motorola's source code, right?

14   A.   Correct.

05:12:06    15   Q.   And then pointed out where in Hytera's file that same line

16   existed, right?

17   A.   Correct.

18   Q.   And it does this for 178 pages.

19   A.   Just to be clear, the very end of it has a few libraries,

05:12:20    20   so they're not -- they're not line numbers associated with

21   libraries.  But generally, your statement is correct.

22   Q.   So let me -- let's clarify that.  So for the specific

23   files, like the specific Hytera files that were still --

24   withdrawn.

05:12:34    25            For the specific source code files that are in Hytera

Frederiksen-Cross - cross by Brown

4149

1    's product and still at Hytera, meaning they hadn't been

2    deleted, Motorola identified specific lines of code, right?

3    A.  That's correct.

4    Q.  That had been copied from Motorola?

05:12:50    5    A.  Correct, that they alleged were copied.

6    Q.  And then with the library files, the library files had to

7    be different, didn't they?

8    A.  Yes, because libraries don't have lines that would

9    correspond directly to code.

05:13:19   10    Q.  Well, and because Hytera no longer had the source code for

11    its own products, right?

12    A.  That's correct, they did not have the source code for

13    those libraries.

14    Q.  So in those instances --

05:13:30   15          THE COURT:  I didn't hear the last part of the

16    answer.

17          THE WITNESS:  They did not have the source code for

18    these libraries.

19          THE COURT:  Proceed.

05:13:36   20    BY MR. BROWN:

21    Q.  Despite them still being used on their products, right?

22    A.  Correct.

23    Q.  And so what happened there is Motorola identified Motorola

24    file names, right, on the left side?

05:13:51   25    A.  Correct.

Frederiksen-Cross - cross by Brown

4150

1  Q.  And then they looked at that kind of garbley text that we

2  saw and you put on and Dr. Wicker put on to show that

3  Motorola's files were used in creating Hytera's libraries,

4  right?

05:14:04  5  A.  At least to show that there were objects with the same

6  names in Hytera's libraries.

7          THE COURT:  Was there a squiggly as opposed to

8  garbley?

9          MR. BROWN:  Oh, sure, yes.  Squiggly, yes.

05:14:21  10          THE COURT:  There was a specific reference to a

11  document which had some kind of a squiggly mark.

12          MR. BROWN:  That was allowed, yes.

13          THE COURT:  All right.  So I want to make sure that

14  we're on the same page.

05:14:31  15          MR. BROWN:  Yes, your Honor.

16          THE COURT:  Is that how you understood the question?

17          THE WITNESS:  Yes, it was, your Honor.

18          THE COURT:  The squiggly marks?

19          THE WITNESS:  The squiggly marks.  When he said "the

05:14:38  20  object files," I knew right away what he meant.

21          THE COURT:  You knew what he meant?

22          THE WITNESS:  I knew what he meant.  Thank you.

23          THE COURT:  All right.  Proceed.

24  BY MR. BROWN:

05:14:45  25  Q.  So as of at least September of 2018, Hytera knew at least

Frederiksen-Cross - cross by Brown

4151

1    that these files, Motorola alleged that these files had been

2    copied from Motorola's source code into Hytera's source code,

3    right?

4    A.   They understood that that was the charge, yes.

05:15:00    5    Q.   And continued to sell products in October 2018 and

6    November 2018 and all the way up until just before this trial

7    still having Motorola source code in it, right?

8    A.   I believe that to be correct, yes.

9    Q.   So then just before trial, Hytera contended that it had

05:15:25   10    redesigned its code to remove all of the source code that

11    Motorola contended was inside of it, right?

12    A.   Correct.

13    Q.   And they didn't remove, say, for instance, instances where

14    somebody had been looking at a specification and typing code,

05:15:42   15    right?  That was not part of the removal process?

16    A.   If the name of a library function changed, then in the

17    final version of the code that I saw, that function would have

18    been removed, but up until that point in time, I think your

19    characterization is correct.

05:15:59   20    Q.   I'm going to hand you some examples of that purported

21    redesign.  So to orient you, these are all already admitted.

22    The blue file is a Motorola source code file, PTX 1866 at MOTO

23    1973-SC-00025406.  Do you have that one?

24    A.   I do.

05:17:02   25    Q.   Okay.

Frederiksen-Cross - cross by Brown

4152

1    A.   That's the blue one.

2    Q.   That's the blue one.  And then the next one is PTX 18 --

3    this is the file labeled RAF_app.h on the top.  For the

4    record, this is PTX 1863 at HYT 1973-SC-0000499.  And we'll

05:17:27   5    start there.

6            Do you have that one, too?

7    A.   I do.

8    Q.   So the Motorola file, the blue, is SbcApplications.h,

9    right?

05:17:43   10   A.   Correct.

11   Q.   And the Hytera file is RAF_App.h, right?

12   A.   A-p-p dot H, yes.

13   Q.   App.h.  And what was pointed out during Dr. Wicker's

14   testimony is that Motorola -- excuse me, that Hytera had

05:18:06   15   copied lines of code from the Motorola file to the Hytera

16   file, right?

17   A.   Correct.

18   Q.   And you don't contest that?  You agree that this indicated

19   that there was copying, right?  And we can walk through it

05:18:25   20   if --

21   A.   Just give me a moment to orient to the code, if you would.

22   Q.   I'm going to focus on just this for now.

23   A.   Thank you.

24        (Pause.)

05:18:44   25            THE COURT:  Is there a question pending?

Frederiksen-Cross - cross by Brown

4153

1      MR. BROWN:  I'm just giving her a second to -- there

2   is, though, your Honor.

3      THE WITNESS:  Okay.  I see the code you're looking

4   at, counsel.

05:18:54   5   BY MR. BROWN:

6   Q.   Okay.  And so the question was:  You don't contest, you

7   agree this was copied code?

8   A.   I think it likely that it was copied code, yes.

9   Q.   And so just so we're oriented, if we look at, say, Line 95

05:19:11   10   of the Motorola -- well, 93, function prototypes with the

11   slash and star and a bunch of dashes, the same thing, function

12   prototypes.  It goes on to finish the line on both sides.

13      That's a pretty strong indication that somebody has

14   the Motorola file when they're writing the Hytera file, right?

05:19:31   15   A.   Those were in the template, so it would be an indication

16   possibly of the template use or possibly that they had a

17   Motorola file.

18   Q.   Either way, it's an indication that somebody has something

19   that came from Motorola source code, right?

05:19:45   20   A.   I've seen these kind of annotations in other code, so I

21   don't know specifically here where the origin of that style

22   came from, but I will agree that the lines appear to match.

23   Q.   And then if we look into the substance here, Line 95 of

24   the Motorola code is void, and then it says,

05:20:07   25   ParmSvcEntPesGetAdb; Hytera changes that line to void

Case: 1:17-cv-01973 Document #: 922 Filed: 02/26/20 Page 171 of 207 PageID #:61373
Frederiksen-Cross - cross by Brown
4154

1    RAF_GetAdb instead of the SvcEnt, right?

2    A.  I see that, yes.

3    Q.  And then the function has the same inputs, an app ID type

4    called AppID, and then you add called buff size, right?

05:20:28    5    A.  Just to be clear, you said AppID type.  That AppID_t is a

6    data type indicator.  It's not the name of something that is a

7    parameter but rather an indicator of the type of the app ID.

8    So it says that that's -- that app ID is formatted as whatever

9    AppID_t is defined to be.

05:20:49    10    Q.  And it was copied from Motorola?

11    A.  It is the same as the Motorola line.

12        THE COURT:  Can you speak up a little, please?

13        THE WITNESS:  It is the same as the Motorola line.

14    BY MR. BROWN:

05:21:01    15    Q.  And it continues, Line 96 to 385, FreeAdb with the same

16    input, same type of input, right?

17    A.  Correct.

18    Q.  Line 97, GetAppMessDataBuffer, same thing in the Hytera

19    code with the same input, right?

05:21:15    20    A.  Yes.  They have the same parameters.

21    Q.  And it goes on for a bit more, right?

22    A.  Correct, to the end of that statement.

23    Q.  So then the other file I gave you is what Hytera purported

24    to be its first attempt to redesign this code.  And that is

05:21:38    25    1863, PTX 1863 at HYT 1973-SC-00096909.  Do you have that one?

Frederiksen-Cross - cross by Brown

4155

1    A.   I do.

2    Q.   Now, this is a file that has now been -- the name has been

3    changed.  So the file that was accused of being copied from

4    Motorola was called RAF_app.h, and the new purportedly

05:22:09    5    redesigned file was called AFP_app.h, right?

6    A.   I see that, yes.

7    Q.   And what Hytera did to redesign this was not much, right?

8         I'll withdraw the question and ask a better one.  The

9    accused code said RAF, the new code now, AFP, right?

05:22:44    10   A.   On that line, yes.

11   Q.   So and that's what Hytera said was its first redesign,

12   right?

13   A.   This was a part of the code in that first redesign.  I

14   believe that this particular program had been rewritten in an

05:23:02    15   earlier version because the transition to AFP, I think, came

16   about Version 9 of the Hytera code.  So it was before the

17   rewrite effort began, but this is a part of the first version

18   of the rewrite code that was provided to me.

19   Q.   And in your expert report, you opined on this first

05:23:22    20   redesign, didn't you?

21   A.   I did.

22   Q.   And you said that this was redesigned to remove Motorola's

23   code?

24   A.   And that that redesign was still in progress, yes.

05:23:33    25   Q.   But you didn't -- you said that this particular file had

Frederiksen-Cross - cross by Brown

4156

1   been redesigned so it no longer used Motorola's confidential

2   source code, right?

3   A.  I don't recall if I mentioned this specific file in that

4   initial report.

05:23:46   5   Q.  Okay.  In your -- well, let me hand you a copy of your

6   expert report.

7   A.  Okay.

8   Q.  Would that help?

9   A.  Yes, that would help.  Thank you.

05:24:16   10   Q.  And if you turn to Paragraph 1392 --

11          THE COURT:  Do you have a number for that document,

12   counsel?

13          MR. BROWN:  It is her expert report.  It doesn't have

14   an exhibit number.  So but I should -- I can note it for the

05:24:43   15   record.

16   BY MR. BROWN:

17   Q.  We are looking at the opening -- your rebuttal expert

18   report, correct?

19   A.  That is correct, yes.

05:24:56   20   Q.  And at Paragraph --

21          THE COURT:  Does it have a date?

22          MR. RICHEY:  Can we get a copy?

23          MR. BROWN:  Yes.

24   BY MR. BROWN:

05:25:08   25   Q.  And so this was your expert report served on August 13th,

Frederiksen-Cross - cross by Brown

4157

1    2019, correct?

2    A.   Correct.

3    Q.   The official title is, "Expert reports of Barbara

4    Frederiksen-Cross"?

05:25:22    5    A.   That's correct.

6    Q.   On Paragraph 1392, you wrote that you understand that

7    Hytera has completed an initial rewrite effort for 44 of the

8    48 files discussed in the section of your report that alleged

9    by Dr. Wicker to contain portions of code copied from

05:25:44    10   Motorola, right?

11   A.   Correct.

12   Q.   And you did say that, like you just said, that the rewrite

13   was still ongoing, right?

14   A.   Correct.

05:25:52    15   Q.   Then you identified header files -- there you go.  "I have

16   reviewed Hytera's completed rewrite for the following files

17   shown below," and you wrote, "header files for interfacing

18   with libraries, RAF_App."

19       Do you see that?

05:26:05    20   A.   I do.

21   Q.   And that was the file that we were just looking at?

22   A.   Correct.

23   Q.   You then wrote in your expert opinion, "None of the

24   accused portions of code are still present in these rewritten

05:26:22    25   files.  Moreover, the rewritten portions of the identified

Frederiksen-Cross - cross by Brown

4158

1  files reflect substantially different ways of expressing

2  functionality relative to the functionality in the versions of

3  the files identified as examples of copied code," right?

4  A.  I see that, yes.

05:26:37  5  Q.  You would agree with me that these do not represent

6  substantially different ways of expressing what was taken from

7  Motorola, do they?

8  A.  These are the function prototypes.  The underlying code

9  was substantially different.  These prototypes were not

05:26:56  10  different or not terribly different, not substantially

11  different.

12  Q.  And so putting aside what you put in your expert report,

13  this indicates something about Hytera's redesign efforts,

14  doesn't it?

05:27:12  15  A.  It indicates to me that they started with the core

16  functionality that was accused and were working their way out

17  in layers so that they could address the accusations.  As I

18  say, when I look at the underlying implementations in these

19  functions, they're different but the -- they had not -- as I

05:27:34  20  note in my report, the rewrite was still in progress at this

21  time.

22  Q.  And we'll look at the most recent rewrite as well, but

23  doesn't this indicate to you that what Hytera is doing to

24  redesign its source code is look at the existing source code

05:27:52  25  which was copied from Motorola and then just change some

Frederiksen-Cross - cross by Brown

4159

1   things so that it might look a little different?

2   A.  I don't have specific knowledge of what their rewrite

3   process was, whether they looked at source code or whether

4   perhaps they were given a list of function names that needed

05:28:10   5   to be rewritten.  I don't have that knowledge because I wasn't

6   a part of that.

7           They -- this would suggest they were looking at

8   something related to the Hytera code, but it may have been

9   something as simple as, rewrite these functions and a list of

05:28:25   10  function names, and you would still get this kind of result.

11  So it's difficult for me to tell.

12  Q.  You know what a clean room is, right?

13  A.  I do.

14  Q.  A clean room is a procedure by which a company attempts to

05:28:38   15  avoid using somebody else's intellectual property, right?

16  A.  Correct.

17  Q.  And what it is, is you try -- you use people who are

18  isolated from seeing material that they're not supposed to

19  see, right?

05:28:51   20  A.  Amongst other things, yes.  It's a pretty rigorous

21  protocol.

22  Q.  So, for instance, if Hytera were to use a clean room to

23  redesign its code here, it would use engineers who hadn't seen

24  the materials that had been taken from Motorola, right?

05:29:05   25  A.  That would be part of a proper clean room procedure, yes.

Frederiksen-Cross - cross by Brown

4160

1    Q.  And that would ensure that whatever Hytera puts out next

2    would be completely uncontaminated from Hytera's source

3    code -- or excuse me, from Motorola's source code, right?

4    A.  That in addition to other precautions that must be taken.

05:29:23  5    Q.  And putting aside the other precautions, that's not what

6    Hytera did here?

7    A.  I don't know who participated in the rewrite.

8    Q.  Well, you're an -- you've done analysis of rewritten

9    source code before, haven't you?

05:29:36  10   A.  I have.

11   Q.  You know that the person who wrote this source code in the

12   rewrite definitely saw this source code in the original copied

13   code, right?

14   A.  Or a list of the same function names and their

05:29:51  15   corresponding parameters, one or the other.  It wouldn't

16   necessarily have to be the code.  They could have been given,

17   write a function with this name that does X with these

18   parameters.

19         So I don't know what they saw, but I would not expect

05:30:04  20   this kind of similarity from a clean room development effort.

21   Q.  Right.  The odds of somebody coming up with this and then

22   independently coming up with this, pretty astronomical, right?

23   A.  I -- I would agree with that.

24   Q.  In fact, all they've really done is the exact same thing

05:30:24  25   that Y.T. did when he first copied the code, just changing a

Frederiksen-Cross - cross by Brown

4161

1  few letters here and there, changed -- sorry.  Changed

2  SvcEmtDS to RAF a bunch of times.

3        It's pretty much all the next redesign did, was to

4  change RAF this time to AFP, right?

05:30:44  5  A.  Again, with respect to the changes made to these specific

6  function names and the signatures associated with them, yes.

7  The underlying code is a separate issue.

8  Q.  And you were -- you testified just now that you don't know

9  what the people who were working on this knew or saw, right?

05:31:05  10  A.  That's correct.

11  Q.  You were here for Mr. Luo's testimony, though, right?

12  A.  I was.

13  Q.  And he said that the people who were working on the

14  redesign are the same people who had been working on the

05:31:15  15  Hytera code all the time?

16  A.  I believe that he identified that there was at least some

17  overlap, yes.

18  Q.  Let me show you one more file.  This file is also already

19  admitted.  It is identified as PTX 1863 at HYT 1973-SC-

05:31:48  20  00098395.

21        Do you recognize this file?

22  A.  Yes.  I believe this is from the most recent version of

23  the rewrite code that I was provided.

24  Q.  Right.  And so we see at the top, AFP App.h, right?

05:32:09  25  A.  Correct.

Frederiksen-Cross - cross by Brown

4162

1  Q.  And this was -- this is the product that Hytera is trying

2  to finalize so it can put it into products that it's going to

3  put on sale, right?

4  A.  Correct.  This is the latest version of the rewrite that

05:32:22    5  I've seen.

6  Q.  But as Mr. Luo said, there's still a bunch of Hytera

7  products that still are using Motorola source code being sold

8  even today, right?

9  A.  I believe that's correct.  They have posted an update for

05:32:38   10  people to download to update their radios but not -- they're

11  still working their way through that process.

12          THE COURT:  Where are they being sold?

13          THE WITNESS:  I don't have specific knowledge about

14  where they're being sold, your Honor.

05:32:50   15          THE COURT:  You have no -- you have no specific

16  knowledge or no knowledge?

17          THE WITNESS:  I have no knowledge.

18          THE COURT:  No knowledge of where these Hytera

19  products are being sold?

05:32:57   20          THE WITNESS:  The new ones with the new --

21          THE COURT:  How do you know they're being sold?

22          THE WITNESS:  Only through Mr. Luo's testimony, sir.

23          THE COURT:  Okay.  But you don't know where they're

24  being sold?

05:33:06   25          THE WITNESS:  I don't specifically.  I assume that

Case: 1:17-cv-01973 Document #: 922 Filed: 02/26/20 Page 180 of 207 PageID #:61382
Frederiksen-Cross - cross by Brown
4163

1      it's --

2              THE COURT:  I'm not saying specifically.  Not even by

3      country or continent?

4              THE WITNESS:  I haven't been provided that

05:33:14    5      information, no.

6              THE COURT:  So you don't know?

7              THE WITNESS:  I do not know.

8              THE COURT:  All right.  Proceed.

9      BY MR. BROWN:

05:33:19   10      Q.  And here, the lines of code in the most recent redesign

11      that we're looking at start on Page 194 -- sorry, Line 194.

12      And you'll see it's now become void AFP_ GetApplicationBuffer

13      with the same type and application and the size, right?

14      A.  I see that.

05:33:44   15      Q.  And that is Hytera's most recent attempt to take out

16      Motorola's source code that looks like this, right?

17      A.  That's correct.

18      Q.  Now, again, you'd agree the person who wrote this

19      functionality still has access to at least functionality in

05:34:17   20      the most recent attempt to redesign, right?

21      A.  I don't know that that is necessarily true.  Again, I

22      could also see that this person may have been given a list of

23      functions to write.  There's differences in the naming of the

24      functions.  In things like getting a buffer and freeing a

05:34:44   25      buffer, you typically just have these kind of parameters,

Frederiksen-Cross - cross by Brown

4164

1    what's the name or the pointer to the buffer and how big you

2    need the buffers to vary in memory.

3         So I wouldn't expect to see many other parameters

4    here, so it's difficult just from this sample alone for me to

05:35:01    5    say that there was any copying.

6    Q.   So the code over here, "get ADB," that refers to "get

7    application data buffer," right?

8    A.   That's correct, yes.

9    Q.   And now they've changed it to just "get application

05:35:13    10    buffer"?

11    A.   Yes.

12    Q.   The same with free ADB, free application buffer, correct?

13    A.   Yes.  "Get" and "free" are operations you do against a

14    memory area like a buffer.

05:35:23    15    Q.   And then the previous code said Uint16_tAppID,

16    Uint16_tBuffSize, now all they've changed it to is AppID,

17    that's application, buff size?

18    A.   I see that.

19    Q.   So people are still contaminated by Motorola confidential

05:35:41    20    information in even the latest redesign, aren't they?

21    A.   Well, I think in this particular instance, throughout my

22    career, I myself have written programs that get an application

23    buffer and then have functions with very similar names and

24    very similar parameters, and I've never seen Motorola code

05:36:02    25    before one earlier litigation that I was involved in.

Frederiksen-Cross - cross by Brown

4165

05:36:22

1    So I can't say looking at this line in and of itself

2    that that's probative of any copying.  This is a -- this is a

3    purely descriptive name of what a function is doing, and it

4    has the two predictable types of parameters that you would

5    have:  Who you're getting it for and how big is it.

6    And there's not many other ways to write this code.

7    This is really constrained code.  So these lines alone really

8    don't tell me much about whether they were looking at the

9    Motorola code or the Hytera code or any other code.

05:36:37

10    It's, if I told somebody to write a couple functions

11    to get and free a buffer, they might come up with something

12    very similar to these two lines.  For the signature of those

13    functions, you'd have to look at the underlying functions to

14    know if there was anything being copied.

05:36:53

15    Q.  So some of the same engineers who are working on the

16    purported redesign have already seen Motorola's confidential

17    information in Hytera's other source code, right?

18    A.  They've seen Hytera's source code before, and they would

19    be familiar with the naming conventions and things, certainly.

05:37:08

20    Q.  And that contained, Hytera's current source code contains

21    Motorola confidential information, right?

22    A.  Some of it does, yes.

23    Q.  And so at least some of the engineers who are purporting

24    to work on this are really unable to create a redesign that

05:37:21

25    removes Motorola's intellectual property because they're

Frederiksen-Cross - cross by Brown

4166

1   contaminated, right?

2   A.   If you were doing a clean room rewrite, you would not use

3   engineers who were familiar with the old code, even the old

4   Hytera code.

05:37:36   5   Q.   And have you told Hytera that that's what they should do?

6   A.   I have not been asked to discuss clean room with Hytera.

7   That's -- counsel's advice to Hytera with respect to the

8   rewrite is something I have not at all been involved in.

9   Q.   But you have years of experience in clean room

05:37:55   10   development, don't you?

11   A.   I do.

12   Q.   They just never asked you how to redesign this properly?

13   A.   I'm assuming that whatever they have done has -- I know it

14   has not involved me or my team.   I don't know --

05:38:06   15            MR. RICHEY:  Objection.

16            THE WITNESS:  -- anything else about the process.

17            THE COURT:  Are you moving to strike the answer?

18            MR. RICHEY:  Yes.  Move to strike.

19            THE COURT:  All right.  Disregard the answer, members

05:38:14   20   of the jury.

21   BY MR. BROWN:

22   Q.   You are not advising Hytera on how to create a clean room,

23   correct?

24   A.   That is correct.

05:38:19   25            MR. RICHEY:  Objection.

Frederiksen-Cross - redirect by Richey

4167

1        THE COURT:  Sustained.  Disregard the question.

2   Disregard the answer.

3   BY MR. BROWN:

4   Q.  In your opinion as somebody who has supervised the

05:38:36    5   creation, development of clean rooms for many years, it's

6   correct, Hytera is not using a clean room methodology, right?

7   A.  Again, I have no specific knowledge.  I see indications

8   here that suggest they probably are not.  And based on

9   Mr. Luo's testimony that some of the same engineers were

05:39:01   10   involved, that would make me think that they are not, or if

11   they're using a clean room protocol, it's a weak clean room

12   protocol.  But again, I have no specific knowledge.

13        MR. BROWN:  Pass the witness, your Honor.

14        THE COURT:  Redirect.

05:40:30   15                  REDIRECT EXAMINATION

16   BY MR. RICHEY:

17   Q.  Ms. Frederiksen-Cross, you've discussed code related to 19

18   of Motorola's 21 alleged trade secrets, right?

19   A.  That is correct, counsel.

05:40:41   20   Q.  And you came to the conclusion that at most, Motorola has

21   claimed that 4 percent of its alleged trade secrets are at

22   issue, that they were copied?

23   A.  I came to the opinion that 4 percent of the code at most

24   was copied.  You said "trade secrets."  I'm not sure if that's

05:41:04   25   what you meant to say.

Frederiksen-Cross - redirect by Richey

4168

1    Q.   The -- thank you.  So your opinion is that at most,

2    Motorola claims that 4 percent of its code has been copied?

3    A.   That is correct, yes.

4    Q.   And Motorola's attorneys questioned you for most of the

05:41:20    5    day here.  And have they changed anything in your opinion, or

6    has your opinion changed in any way that Motorola, more than 4

7    percent of Motorola's code was copied?

8    A.   No.  My opinion on that has not changed.

9    Q.   And, in fact, they didn't really do anything to dispute

05:41:39    10   the 4 percent today, right?

11   A.   Not really, no.

12   Q.   Now, they showed you some code today, not much, but they

13   brought up some code this morning by Jacky related to ROSAL,

14   right?

05:42:18    15   A.   I recall that, yes.

16   Q.   Do you recall this?

17          And they focused on a comment from a ROSAL spec.

18   Now, ROSAL is Hytera's abstraction layer, right?

19   A.   Specifically, the operating system, abstraction layer.

05:42:38    20   Q.   Operating system, abstraction layer in Hytera's products.

21   Now, operating systems are old; they're well-known, right?

22   A.   Correct.

23   Q.   And abstraction layers for operating systems have been

24   around forever, right?

05:42:53    25   A.   Correct.

Frederiksen-Cross - redirect by Richey

4169

1   Q.   There's nothing difficult in creating an abstraction layer

2   for an operating system?

3   A.   No.   You're really just remapping functions of the

4   operating system.

05:43:04    5   Q.   And the ROSAL spec, specification, was PTX 479.   PTX 479,

6   right?   Do you recall talking about this specification?

7   A.   Yes, I do.

8   Q.   And what Motorola's counsel had pointed to was a comment

9   in the specification on Page 20 of that specification.

05:43:44   10   A.   That is consistent with my recollection, yes.

11        MR. RICHEY:   Now, that comment -- do we have -- yes,

12   I just noticed that.   Sorry.   We'll bring up the document

13   electronically.

14        Jim, can you please bring up PTX 47 -- 479 next to --

05:44:17   15   can you bring up the source code?   We can't do it side by

16   side?   Jim, can you please go to Page 20, the top of Page 20?

17   BY MR. RICHEY:

18   Q.   And this is what was pointed out.   This was copied into

19   some source code by Jacky, right?   And the source code

05:45:09   20   specifically where it was copied was a comment at the top of a

21   function.   Does that sound right?

22   A.   Correct.

23   Q.   Now, what's copied here, that is a comment, right?

24   A.   Correct.

05:45:26   25   Q.   That's not functional code?

Frederiksen-Cross - redirect by Richey

4170

1    A.   Correct.   Comments are removed --

2    Q.   Is that --

3    A.   -- when the code is compiled.

4    Q.   Okay.   And this comment which is removed when the code is

05:45:37    5    compiled, does that tell you anything about how to implement

6    the function that's described below?

7    A.   No.   This is describing what the function does, the

8    function below does, but it doesn't give you the

9    implementation details about how to do it.

05:45:56   10    Q.   It says what -- what this function does, right?   It

11    doesn't tell you how to write any of the code that's in the

12    function?

13    A.   Correct.

14    Q.   And the code that's in the function is not copied from

05:46:10   15    Motorola; is that right?

16    A.   That is correct.

17         MR. RICHEY:   Jim, can we go to 479, Page 19?

18    BY MR. RICHEY:

19    Q.   So going back to the specification, what is copied is only

05:46:41   20    the name, right?

21    A.   I think --

22    Q.   That --

23    A.   -- possibly the name and the -- a portion of the parameter

24    list.

05:46:52   25    Q.   And the parameter lists are not the "do it" code as you've

Frederiksen-Cross - redirect by Richey

4171

1  described?

2  A.  No.  That's just the name of the data that is being passed

3  to that function.

4  Q.  So that's not the code that was -- yes, right?

05:47:09  5  A.  Correct.

6  Q.  Hytera would have written that code?

7  A.  Correct.

8  Q.  And that code appears nowhere in Motorola's files, right?

9  A.  That is correct.

05:47:17  10  Q.  In its code?

11  A.  I have not been able to locate it anywhere in Motorola's

12  files.

13  Q.  And counsel for Motorola didn't show you any code from

14  Motorola showing this code, did they?

05:47:27  15  A.  That is correct.

16  Q.  So let's go to DSX 3.  And I'd like to focus on VOX, 39.

17  Now, you -- you got these numbers, 50, from Motorola's

18  witnesses during trial, right?

19  A.  I got them from counting the code files in the directories

05:48:40  20  Motorola's witnesses identified.

21          MR. RICHEY:  And Jim, can you put up PDX 6.13 next

22  to -- next to, yes, DSX 3?  Thank you.  Great.

23  BY MR. RICHEY:

24  Q.  So this wasn't -- this was a demonstrative of Mr. Zetzl,

05:49:12  25  Dan Zetzl, one of Motorola's witnesses, right?

Frederiksen-Cross - redirect by Richey

4172

A.  That's correct.

Q.  And he was discussing trade secret claim 39, what Motorola

alleges is its VOX trade secret?

A.  That is correct, yes.

05:49:27    5    MR. RICHEY:  And Jim, can you please put up the

testimony related to this demonstrative?  It's trial

transcript 881, Lines 25 through Page 882, Line 12.

BY MR. RICHEY:

Q.  So this is the testimony associated with -- there we go.

05:50:06    10    This is the testimony associated with the PDX that we

just saw where Motorola is explaining the files that are part

of its trade secret, the mega VOX 39.  And Mr. Zetzl here, you

see, is saying, "Are you familiar with source code for

Motorola's VOX trade secret?"  Do you see that?

05:50:33    15    A.  I see that at the top, yes.

Q.  It says, "Yes, I am."

And Motorola's counsel says, "Let's go to PDX

6.13" -- that's what we just had up on the screen -- and

asked, "Where is the source code located on the drive?"

05:50:53    20    And do you see Mr. Zetzl's response?

A.  Yes, I do.

Q.  What was Mr. Zetzl's response for where the source code is

located for alleged trade secret 39?

A.  Well, that it's in the folders he highlighted, and then he

05:51:10    25    called out that if he identified a specific file, it was just

Frederiksen-Cross - redirect by Richey

4173

1    that file, but for the rest of the top five directories, it's

2    all of the contents within those directories.

3    Q.   Right.   So he's saying, "It's everything in those folders,

4    and if it's a specific file, I've highlighted the file

05:51:31    5    separately"?

6    A.   Right.   And otherwise, I would take this to mean it's

7    everything in those folders.

8            MR. RICHEY:   Jim, can we go back to PDX 6.13, please?

9    BY MR. RICHEY:

05:51:53    10    Q.   And can you tell us here on PDX 6.13 how many files are

11    listed?

12    A.   Well, you can see at the bottom of the screen, he lists a

13    couple specific files where you see the dot H or the dot CPP.

14    That's a specific file.   For the rest of these five, he's just

05:52:18    15    listing the entire directory.

16    Q.   And his testimony at trial was that it's the -- Motorola's

17    implementation for its alleged trade secret 39 is everything

18    that's shown here?

19    A.   That was my understanding of his testimony, yes.

05:52:52    20            MR. RICHEY:   Jim, let's go back to DSX 3, please.

21    BY MR. RICHEY:

22    Q.   And you went to those folders and you counted up the files

23    in the folders, and you counted up the files shown by

24    Mr. Zetzl during his testimony, and that came to 50 files,

05:53:07    25    right?

Frederiksen-Cross - redirect by Richey

4174

1    A.   Correct.

2    Q.   And from those 50 files, Motorola has only made

3    allegations of copying related to 10 of those files, right?

4    A.   In Dr. Wicker's Exhibits C and D, that is correct.

05:53:34   5    Q.   So let's -- so for alleged trade secret 39, do you know

6    how many files Motorola claimed in its interrogatories?

7    A.   In its interrogatories, I would want to go back and

8    refresh my recollection.

9    Q.   Do you still have the interrogatories that were handed to

05:54:34   10   you earlier?

11   A.   I do here.  That would be Interrogatory 5?

12   Q.   I'm sorry?

13   A.   Interrogatory 5?

14   Q.   I'm looking at Interrogatory No. 1.

05:54:55   15   A.   If you have a spare copy, it might be faster if you hand

16   it to me.  I'm in kind of a flurry of papers here.

17   Q.   Do you have DTX -- do you have it?  It's DTX 5147.

18   A.   I do.  Okay.  I found it.

19   Q.   And this was Motorola's description of its alleged trade

05:55:28   20   secrets back in May, right?

21   A.   Right.  I just have to find the VOX section.

22   Q.   So I think it starts on Page 16 of 241.

23   A.   Okay.  There's one specific file identified and one, two,

24   three, four -- and ten directories.

05:56:20   25   Q.   So that's what Motorola identified in May is 50 files, is

Frederiksen-Cross - redirect by Richey

4175

1    that right, in its interrogatory?

2    A.   It identified 50 files here at trial through the

3    identification of specific file paths and in some cases

4    specific files.  Back in May, they identified, they just

05:56:54    5    identified this collection of file paths and one specific

6    file.

7    Q.   So what they identified in their interrogatories was

8    different from what they identified -- what Mr. Zetzl

9    identified for alleged trade secret 39, is that --

05:57:11    10   A.   That is correct.

11        MR. RICHEY:   Okay.  Jim, can you pull up, please, PDX

12   4.5 alongside trial transcript 592, Lines 23 through 593, Line

13   19?

14   BY MR. RICHEY:

05:57:55    15   Q.   Mr. Boerger testified about trade secret number 134,

16   alleged trade secret 134.  That's all of the DMR code, right?

17   A.   I believe he did, yes.

18   Q.   And when describing that trade, alleged trade secret, he

19   used PDX 4.5 which is on the left.  Do you see that?

05:58:13    20   A.   It's obscured right now, but I recall that he had a slide

21   for it.

22   Q.   And that's how he described the code for Motorola's

23   claimed trade secret No. 134, right?

24   A.   Correct.

05:58:36    25   Q.   So the code that's in these files?

Frederiksen-Cross - redirect by Richey

4176

A.   That's correct.

Q.   And you identified --

          MR. RICHEY:   Jim, can we go back to DSX 3?

BY MR. RICHEY:

Q.   You identified within those files or those directories
41,003 files?

A.   That is correct, code files specifically.

Q.   The source code files?

A.   Source code files, the types of files that Professor
Wicker identified as source code files in his Exhibits C and
D.

Q.   Mr. Boerger also testified about the mobile code, the
alleged trade secret 136; is that right?

A.   That's correct, yes.

          MR. RICHEY:   Jim, would you please bring up the PDX
4.7 next to Mr. Boerger's testimony, trial transcript 596,
Line 3 through 597, Line 1?

BY MR. RICHEY:

Q.   And this is where Mr. Boerger testified that the source
code for alleged trade secret 136 was located, right, in PDX
4.7?

A.   That's correct.

Q.   And you looked in each of these folders, right?

A.   That's correct.

Q.   And you counted up in each of those folders how many files

Frederiksen-Cross - redirect by Richey

4177

1    Motorola had described as implementing this trade secret,

2    right?

3    A.   Specifically for the file types that are code files.

4    Q.   Mr. Boerger also testified about alleged trade secret

06:01:23   5    No. 53, and that's the software architecture?

6    A.   Correct.

7              MR. RICHEY:   Jim, would you please bring up PDX 4.11

8    through 4.14?  Let's bring up PDX 4.11 first.

9    BY MR. RICHEY:

06:01:44  10    Q.   This is one of the demonstrative pages, one of the slides

11    when Mr. Boerger identified code that Motorola alleges makes

12    up its alleged trade secret 53; is that right?

13    A.   That's correct, yes.

14    Q.   And there's one, two, three, four, five, six, seven,

06:02:04  15    eight, nine -- ten folders just on this first slide?

16    A.   That is correct, though I would note that, for instance,

17    the first one is a subfolder of the second one.  So there's

18    overlap in those folders.

19    Q.   So this one goes in that one?

06:02:26  20    A.   Yes.  And I think we actually see that one show up again,

21    I believe, down here as well.  So it comes up a couple times.

22    Q.   So was Mr. Boerger just trying to make the trade secret

23    look larger by including the same -- the same thing?  If we

24    just delete that, that's duplicative, right?  These two would

06:02:52  25    be the same?

Case: 1:17-cv-01973 Document #: 922 Filed: 02/26/20 Page 195 of 207 PageID #:61397
Frederiksen-Cross - redirect by Richey
4178

1        THE COURT:  You may answer all three questions.

2   BY THE WITNESS:

3   A.  These two would be the same.  This one would be a subset

4   of one or the other of those.

06:03:07    5        MR. RICHEY:  Thank you.

6        Jim, would you please go to PDX 4.12?

7        THE WITNESS:  And just to note, there are other

8   duplications on these slides as well.  So I did not count them

9   twice if he listed them twice.  I only counted them once when

06:03:20   10   I was preparing my counts.

11  BY MR. RICHEY:

12  Q.  So this is another slide where Mr. Boerger identified

13  source code in Motorola's files that Motorola alleges

14  implement its alleged trade secret No. 1 -- excuse me,

06:03:37   15  software architecture, alleged trade secret No. 53, right?

16  A.  Correct.  There were a couple slides for that.

17  Q.  So more.  All of these still were in alleged trade secret

18  53?

19  A.  Correct.

06:03:51   20  Q.  And you went to each of these directories and counted up

21  the files that Motorola contends make up its alleged trade

22  secret, right?

23  A.  The code type files within those directories, yes.

24        MR. RICHEY:  Jim, can you go, please, to PDX 4.13?

06:04:12   25  BY MR. RICHEY:

Frederiksen-Cross - redirect by Richey

4179

1    Q.   This is yet another set of folders that Mr. Boerger

2    identified for implementing Motorola's alleged trade secret

3    No. 53, right?

4    A.   Correct.

06:04:25    5            MR. RICHEY:   Jim, 4.14, please.

6    BY MR. RICHEY:

7    Q.   And finally, there's another slide where Mr. Boerger is

8    identifying here at trial the source code for Motorola's

9    alleged trade secret 53?

06:04:40   10    A.   Correct.

11    Q.   And again, you went to these folders and counted them up,

12    removing duplicates?

13    A.   I only removed -- I didn't count a folder twice if it was

14    listed twice.  I didn't do anything else beyond just selecting

06:04:54   15    the code type files.

16    Q.   So can we go back to DSX 3, please?

17            And the counting up the files from Mr. Boerger's

18    testimony, you found that there were 9,870 files in those

19    folders?

06:05:17   20    A.   Source code file types --

21    Q.   Source code files.

22    A.   -- specifically.

23    Q.   And you didn't make any judgment calls, you just counted

24    up the numbers of files that Motorola had identified?

06:05:32   25    A.   For the second column, yes.  For the first column, I made

Frederiksen-Cross - redirect by Richey

4180

1    that one judgment call of saying these are the source code

2    files Dr. Wicker accuses, and so I selected only those file

3    types.

4    Q.  So source code file types, is that what you mean?

06:05:51    5    A.  Right.  If a file type appeared in Exhibit C where he

6    identified his source code copying allegations or Exhibit D, I

7    included all files of that type in my count.

8              So if -- for instance, if it was a dot C or a dot CPP

9    or a dot LCF, whatever, without judgment on whether it was

06:06:12    10   truly a source code file or not, if he included that file type

11   amongst his code allegations, I included it when I counted the

12   total Motorola files in the directory.

13   Q.  So there were actually more files within those directories

14   than what you counted?

06:06:27    15   A.  I think in some of them, there were.  I can't say for all

16   of them there were necessarily.

17   Q.  But the file types you counted were all of the source

18   code?

19   A.  All of the types that he had identified as in his source

06:06:38    20   code allegations, yes.

21   Q.  And then the column to the right, 220, those are what

22   Professor Wicker had alleged in his Exhibits C and D that came

23   from what Motorola had identified as its alleged trade secret

24   53; is that right?

06:06:57    25   A.  Yes.  Any of the files that came out of that set of

Case: 1:17-cv-01973 Document #: 922 Filed: 02/26/20 Page 198 of 207 PageID #:61400
Frederiksen-Cross - redirect by Richey
4181

1    directories that showed up in C and D, I counted there.

2              MR. RICHEY:  Jim, can you bring up PDX 5.5, please?

3    And I want to also bring up Mr. Corretjer's testimony on Page

4    722, Lines 11 to 15.

06:07:35    5    BY MR. RICHEY:

6    Q.  You recall Mr. Corretjer testified about the DSP-related

7    trade secret claims?

8    A.  Yes.

9    Q.  And he testified about alleged trade secrets 54, 55, 56,

06:07:47    10    and 60?

11    A.  Correct, yes.

12    Q.  And Mr. Corretjer identified code for DSP framework, code

13    for noise suppression, code for carrier detect, DSP, and

14    squelch on PDX 5.5; is that right?

06:08:15    15    A.  Right.  Five trade secrets, yes.

16    Q.  So and that testimony is shown right here on the right at

17    Lines 11 to 15 on Page 722?

18    A.  Correct.

19    Q.  So what you did again in each case was count up how many

06:08:36    20    files are in the folders listed in each box?

21    A.  Right.  And I counted them up individually for each of the

22    respective trade secrets without any consideration of what

23    overlaps between boxes.  So if something showed up -- if you

24    recall, some of the directories like this one show up in a

06:08:58    25    couple different places.  I counted everything in it in

Case: 1:17-cv-01973 Document #: 922 Filed: 02/26/20 Page 199 of 207 PageID #:61401
Frederiksen-Cross - redirect by Richey
4182

1    counting for this trade secret, everything in it in counting

2    for this trade secret, etcetera, so that I didn't do any

3    de-duplication across trade secrets, just to be clear.

4         MR. RICHEY:  Thank you.  Jim, let's go back to DSX 3,

06:09:19    5    please.

6    BY MR. RICHEY:

7    Q.  So for the first one, noise suppression, alleged trade

8    secret No. 54, we've got 9,527, right?

9    A.  Correct.

06:09:33    10    Q.  Now, how many files -- well, let me take that back.  I'll

11    ask a different question.

12         Of those 9,500 or so, only nine appear in Professor

13    Wicker's Exhibits C and D, right?

14    A.  Correct.

06:09:49    15    Q.  How many files did Motorola identify in its DTX 5147

16    exhibit?  And I'll direct you to Page 73 of 241.

17    A.  Thank you.

18        (Pause.)

19    Q.  So there's dozens and dozens and -- at least 115.  Does

06:11:26    20    that look about right?

21    A.  There are a lot of files, and then there's some additional

22    libraries and a few that appear possibly to be directory

23    sites, but the way the lines are broken, I would need a little

24    bit more time with them.  But there are a large quantum of

06:11:43    25    files here.

Frederiksen-Cross - redirect by Richey

4183

1   Q.   Okay.  So a large quantum of files plus libraries.

2   There's directories, too, are there not?

3   A.   Yes, that's what I was saying.  There are some

4   directories.  For instance, external library and LE assembly

06:11:58   5   build and -- are provided without any citations to specific

6   files within those directories.

7   Q.   Okay.  So for 54, it's way more than nine files, right?

8   A.   Totally agree.

9   Q.   Okay.  Now, for 55, alleged trade secret 55, you

06:12:24   10  identified -- thank you, Jim -- almost 700 files.  And that

11  again is adding up what Motorola had identified as its source

12  code here in trial; is that right?

13  A.   Correct.

14  Q.   And there's 15 files that Professor Wicker has asserted

06:12:47   15  based -- or from those 700 files?

16  A.   In his Exhibits C and D, that is correct.

17  Q.   Okay.  And if you go to Page 76 of 241 of Exhibit 5147,

18  how many files did Motorola claim made up its alleged trade

19  secret 55 -- well, let me ask this.

06:13:20   20       I think the number of specific files is 14, if you

21  could just confirm that first.

22  A.   I believe that to -- oops.  No, there's a couple more on

23  the next page.  It looks like around 30 so far.

24  Q.   Okay.  And there are some directories as well?

06:13:51   25  A.   That is correct.  There are some directories as well.

Case: 1:17-cv-01973 Document #: 922 Filed: 02/26/20 Page 201 of 207 PageID #:61403
Frederiksen-Cross - redirect by Richey
4184

1  Q.  So presumably, the directories -- well, you're the source

2  code expert.  You can tell me.  Do the directories contain

3  files, additional files?

4  A.  Yes, they did.

06:14:03  5  Q.  So it would be way more than the 15 files that Professor

6  Wicker has included in his Exhibits C and D, right?

7  A.  That would be correct, yes.

8  Q.  Now, let's go to alleged trade secret No. 60, the DSP

9  framework.  Mr. Corretjer also testified about that one, and

06:14:49  10  he identified -- he identified over 4500 files that allegedly

11  make up Motorola's implementation; is that right?

12  A.  He identified some folders that contain over 4500 code

13  files, just to be clear for the record.

14  Q.  And can you tell me about how many -- or tell me how many

06:15:13  15  files were identified by Motorola in its interrogatories for

16  alleged trade secret No. 60?  And we can start with specific

17  files.  Let me know if you find any specific files.

18     (Pause.)

19        Have you been able to find any specific files?

06:16:26  20  A.  I have not found any of those so far.  Thank you.  I'm

21  still looking.  It goes on for a few pages.

22  Q.  Sure.  I think the answer is no, but I'll give you a

23  moment to confirm.

24  A.  I think you're correct.

06:16:51  25  Q.  Okay.  So in its interrogatory responses, Motorola

Case: 1:17-cv-01973 Document #: 922 Filed: 02/26/20 Page 202 of 207 PageID #:61404
Frederiksen-Cross - redirect by Richey
4185

1    identified zero files, zero specific files for DSP framework,

2    its alleged trade secret No. 60; is that right?

3    A.   Right.  It did identify a number of directories but not

4    discrete files.

06:17:11   5    Q.   Directories, did they identify the exact same directories

6    that Mr. Corretjer had identified, are you able to tell that?

7    A.   My recollection is that they did not.  This was another

8    case where they changed.

9    Q.   Okay.  So it changed between their interrogatories and

06:17:26   10    trial?

11    A.   Correct.

12         THE COURT:  On what date were the interrogatories

13    answered?

14         MR. RICHEY:  Your Honor --

06:17:37   15         THE COURT:  I'm asking the witness.

16         Do you have the interrogatories and the answers in

17    your hand there?

18         THE WITNESS:  I don't have the date page.  My

19    recollection is that it was --

06:17:44   20         THE COURT:  Well, your recollection is not what I'm

21    looking for.  I'm looking for specificity.  On what date were

22    the interrogatories answered?

23         MR. RICHEY:  So, your Honor, if I may, what was given

24    to the witness was an excerpt of the interrogatories.

06:17:57   25         THE COURT:  It's just a simple question.  On what

Frederiksen-Cross - redirect by Richey

4186

1  date were the interrogatories answered?

2          MR. RICHEY:  It was a range of May 8th to May 9th, I

3  believe, of last year.

4          THE COURT:  Is that right?

06:18:07  5          MR. RICHEY:  Is it 8th and 9th?  8th through the

6  10th?  8th and 10th.  May 8th and May 10th of 2019.

7          THE COURT:  All right.  Proceed.

8          MR. RICHEY:  Thank you.  Okay.  Let's look now at

9  alleged trade secret No. 64, testing and framing and -- excuse

06:19:15  10  me.  Let's look at alleged trade secret No. 51, the radio

11  operating system, OSAL, and LOSAL.

12          Jim, would you please bring up Mr. Boerger's

13  testimony, Lines 632 -- excuse me, Page 632, Lines 14 through

14  23 as well as PDX 4.18.

06:19:32  15  BY MR. RICHEY:

16  Q.  So you recall Mr. Boerger testifying about ROS, OSAL,

17  LOSAL which is what Motorola claims as its alleged trade

18  secret No. 51?

19  A.  Yes.  There's an oddness in the transcript where he's

06:19:55  20  being asked about DMR operating system -- okay.  Operating

21  trade secrets.  Okay.  But yes, I recall that testimony.

22  Q.  And Mr. Boerger identified all of the directories in PDX

23  4.18 as source code for Motorola's implementation of its

24  alleged trade secret; is that right?

06:20:19  25  A.  Correct.

Frederiksen-Cross - redirect by Richey

4187

1  Q.  And you counted up the files in each of these directories

2  that were the file types and source code types that Professor

3  Wicker had identified in his Exhibits C and D?

4  A.  Correct.

06:20:34  5       MR. RICHEY:  So let's go back to DSX 3, please, Jim.

6  BY MR. RICHEY:

7  Q.  So Motorola had identified just by count almost 1800

8  files?

9  A.  Correct.

06:21:00  10  Q.  And only one file from this set appeared in Professor

11  Wicker's Exhibits C and D?

12  A.  Correct.

13  Q.  And how many files were identified by Motorola in its May

14  2019 interrogatories for alleged trade secret No. 51?  And

06:21:29  15  I'll direct you to DTX 5147, Page 34 of 241.

16  A.  Thank you.

17     (Pause.)

18  Q.  So I'll represent that it's about 829 total files in the

19  interrogatories.  Do you agree with that?

06:22:51  20  A.  It will take me a while to count that high.  I'm only up

21  to about 100 so far.  But there are many files here.  Do you

22  want me -- do you need me to count them all?

23  Q.  You've gotten up to 100 so far?

24  A.  Yes.  And then there are some -- also some directories

06:23:08  25  that are cited without specific file identification.

Frederiksen-Cross - redirect by Richey

4188

1    Q.   Okay.  So there's at least 100 files, 100 files plus

2    several directories?

3    A.   I think it's on that order, counsel.  I've lost track of

4    my count now, but I think I was right around 100 when you

06:23:29   5    asked the second question.

6    Q.   And again, Professor Wicker only points to one, one out of

7    the total?

8    A.   That's correct.

9         MR. RICHEY:  All right.  Let's look at alleged trade

06:23:56  10    secret No. 58 which Mr. Boerger also testified about.

11         And Jim, can you please bring up PDX 4.22 next to

12    trial transcript Page 638, Lines 4 through 10?

13    BY MR. RICHEY:

14    Q.   Ms. Frederiksen-Cross, do you recall Mr. Boerger

06:24:25  15    testifying that the directories here are what Motorola claims

16    as its implementation of alleged trade secret No. 58?

17    A.   Correct.

18    Q.   And how many lines in total did you count from those

19    files?

06:24:45  20    A.   For 58, 2,085 files.  You asked lines.  I'm not sure

21    that's what you meant to ask.

22    Q.   Files.  You're right.  Thank you.

23    A.   2,085 code-type files.

24    Q.   Almost 2100 files in those directories.  And how many

06:25:05  25    files did Motorola include in its interrogatory response for

4189

1    alleged trade secret No. 58?

2    A.  Can I ask you to give me that page number, also?

3         THE COURT:  We'll come to a stopping point at 4:30,

4    and then the witness may be re-called when we resume on

06:25:38   5    Monday.

6         MR. RICHEY:  Thank you, your Honor.

7         THE COURT:  Are you simply going to be asking this

8    witness to affirm what the other witness said?

9         MR. RICHEY:  I just have a couple more of these, and

06:25:48  10    then I have a stack of documents.  I'm going to address all

11    the documents that were --

12         THE COURT:  I'm saying, if that is all you are doing,

13    is to ask this witness to affirm what she heard another

14    witness say?

06:25:58  15         MR. RICHEY:  No, your Honor.  I was just about to

16    wrap up this, and I was going --

17         THE COURT:  You can wrap up if you want to but I'm

18    saying, if you intend to go on with this, then we would call

19    the witness again on Monday at which you can complete it at a

06:26:12  20    more leisurely pace with cross-examination to follow by

21    Motorola on Monday.

22         MR. RICHEY:  Yes.  Thank you, your Honor.

23         THE COURT:  Let's end it here then.  All right.  The

24    witness is ordered to return on Monday at 10:00 o'clock.

06:26:29  25         Members of the jury, 10:00 o'clock.

4190

1    (Proceedings heard in open court.  Jury out.)

2         THE COURT:  Okay.  Court is adjourned.  Monday at

3    10:00.

4         Who is the next witness?

06:26:55    5         MR. CLOERN:  Your Honor, the next witness will be

6    Mr. Andy Grimmett.  So once Ms. Frederiksen-Cross is done,

7    we'll call Mr. Grimmett, and then our final witness will be

8    Dr. Debra Aron.

9         THE COURT:  And you're still working on the schedule?

06:27:09    10         MR. CLOERN:  We are still working on that.

11         THE COURT:  Thank you, counsel.  Monday.

12    (Adjournment 4:23 p.m. to 10:00 a.m., January 27, 2020)

13

14              C E R T I F I C A T E

15         We, Jennifer Costales and Judith A. Walsh, do hereby

16    certify that the foregoing is a complete, true, and accurate

17    transcript of the proceedings had in the above-entitled case

18    before the Honorable CHARLES R. NORGLE, one of the judges of

19    said court, at Chicago, Illinois, on January 23, 2020.

20

21    /s/ Jennifer Costales              January 24, 2020
      /s/ Judith A. Walsh               January 24, 2020
22
      Official Court Reporters
23    United States District Court
      Northern District of Illinois
24    Eastern Division

25