4813

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3   MOTOROLA SOLUTIONS, INC., and MOTOROLA    ) No. 17 CV 1973
     SOLUTIONS MALAYSIA SDN. BHD,              )
 4                                             )
              Plaintiffs,                      )
 5   vs.                                       ) Chicago, Illinois
                                               )
 6   HYTERA COMMUNICATIONS CORPORATION, LTD.,  ) February 3, 2020
     HYTERA AMERICA, INC., and HYTERA          )
 7   COMMUNICATIONS AMERICA (WEST), INC.,      )
                                               )
 8            Defendants.                      ) 9:55 a.m.

 9                   TRIAL - VOLUME 32-A
                  TRANSCRIPT OF PROCEEDINGS
10
            BEFORE THE HONORABLE CHARLES R. NORGLE, SR.
11                        and a jury

12   APPEARANCES:

13   For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                            BY:  MR. ADAM R. ALPER
14                               MR. AKSHAY DEORAS
                                 MR. BRANDON HUGH BROWN
15                          555 California Street
                            Suite 2700
16                          San Francisco, California 94104
                            (415) 439-1400
17
                            KIRKLAND & ELLIS, LLP
18                          BY:  MR. MICHAEL W. DE VRIES
                                 MR. CHRISTOPHER M. LAWLESS
19                          333 South Hope Street
                            Suite 2900
20                          Los Angeles, California 90071
                            (213) 680-8400
21

22
     Court Reporter:        JENNIFER COSTALES, CRR, RMR
23                          Official Court Reporter
                            219 South Dearborn Street, Room 2342
24                          Chicago, Illinois 60604
                            (312) 435-5895
25                          jenny.uscra@yahoo.com
```

4814

```
 1   APPEARANCES:   (Continued)

 2   For the Plaintiffs:      KIRKLAND & ELLIS, LLP
                              BY:  MS. MEGAN MARGARET NEW
 3                            300 North LaSalle Street
                              Chicago, Illinois 60654
 4                            (312) 862-7439

 5                            KIRKLAND & ELLIS, LLP
                              BY:  MS. LESLIE M. SCHMIDT
 6                            601 Lexington Avenue
                              New York, New York 10022
 7                            (212) 446-4763

 8   For the Defendants:      STEPTOE & JOHNSON, LLP
                              BY:  MR. BOYD T. CLOERN
 9                                 MR. SCOTT M. RICHEY

10                                 MR. MICHAEL J. ALLAN
                                   MS. JESSICA ILANA ROTHSCHILD
11                                 MS. KASSANDRA MICHELE OFFICER
                              1330 Connecticut Avenue NW
12                            Washington, DC 20036
                              (202) 429-6230
13
                              STEPTOE & JOHNSON, LLP
14                            BY:  MR. DANIEL S. STRINGFIELD
                              227 West Monroe Street
15                            Suite 4700
                              Chicago, Illinois 60606
16                            (312) 577-1300

17

18   ALSO PRESENT:           MR. RUSS LUND and
                             MS. MICHELE NING
19

20

21

22

23

24

25
```

4815

1    (Proceedings heard in open court.  Jury out)

2        THE COURT:  Good morning, counsel.

3        One juror has not arrived, which presents a good

4    opportunity for the motion filed by Hytera called Defendants'

00:00:13  5    Motion to Enforce the Court's January 31, 2020 Ruling.

6        Has Motorola received a copy of this?

7        MR. DE VRIES:  Your Honor, we did, about 30 minutes

8    ago.  We've taken a quick look at it.  And I think our

9    observation is that, although it's called a motion to enforce

00:00:33  10    the Court's order, it's actually a motion to reconsider the

11    Court's order.

12        THE COURT:  Do you want the opportunity to file a

13    written response?

14        MR. DE VRIES:  We do, Your Honor.

00:00:42  15    THE COURT:  All right.  The sooner the better.

16        MR. DE VRIES:  Yes, Your Honor.

17        THE COURT:  Obviously.  But we are going to continue

18    this morning with the witness that is scheduled to appear.

19        I would add that the defendants should provide a

00:00:58  20    proposed instruction that they would be asking the Court to

21    read literally to the jury and to indicate also when they

22    believe that that proposed instruction should be read during

23    the course of the trial or at the end of the trial along with

24    other instructions.

00:01:19  25    But Motorola can deal with that as well in its

Aron - direct by Stringfield

4816

1   response.  And as soon as Motorola files a response, Hytera

2   should file its reply expeditiously.

3        All right.  As soon as the last juror arrives, we

4   will proceed.  She is not yet here.

00:01:40  5        MR. DE VRIES:  Yes, Your Honor.

6        THE COURT:  Good morning.

7        MR. DE VRIES:  Good morning.

8        THE COURT:  It's a good way to start the week.

9     (Brief recess.  Jury in)

00:18:09  10        THE COURT:  Good morning, members of the jury.

11        Please call the witness.

12        MR. STRINGFIELD:  Your Honor, Hytera calls Dr. Debra

13   J. Aron.

14        THE CLERK:  Would you raise your right hand.

00:18:29  15    (Witness duly sworn)

16        THE COURT:  Please be seated.

17      DEBRA J. ARON, DEFENDANTS' WITNESS, SWORN

18           DIRECT EXAMINATION

19  BY MR. STRINGFIELD:

00:18:42  20  Q.  Good morning, Dr. Aron.

21  A.  Good morning.

22  Q.  Can you please introduce yourself to the jury.

23  A.  My name is Debra J. Aron, A-R-O-N.

24  Q.  Dr. Aron, did you prepare any slides that would assist

00:18:55  25  with your testimony today?

Case: 1:17-cv-01973 Document #: 926 Filed: 02/26/20 Page 5 of 193 PageID #:62037
Aron - direct by Stringfield
4817

1    A.  I did.

2           MR. STRINGFIELD:  Your Honor, we request permission

3    to publish those slides for the jury.

4           THE COURT:  We'll take them one at a time.

00:19:04    5           MR. STRINGFIELD:  Okay.

6           THE COURT:  Proceed.

7           MR. STRINGFIELD:  Thank you, Your Honor.

8           Can we have the first slide, Mr. Montgomery?

9    BY MR. STRINGFIELD:

00:19:11   10    Q.  Dr. Aron, where are you employed?

11    A.  I'm employed at a consulting firm called Charles River

12    Associates or CRA.

13    Q.  What is CRA?

14    A.  We're an international consulting firm.  In my practice,

00:19:24   15    we're Ph.D. economists who provide advice and expertise in a

16    variety of matters including litigation such as this.

17    Q.  And what are your duties as a vice-president as CRA?

18    A.  Well, as an economist I work with clients to assist them

19    in business strategy or regulatory matters or merger

00:19:47   20    engagements or other kinds of disputes.

21    Q.  At a high level, Dr. Aron, what is economics?

22    A.  Economics is the study of how business firms make

23    decisions in the economy, what products they choose to

24    provide, how they price them, when they enter a market or exit

00:20:08   25    the market, and also how consumers make decisions about how to

Aron - direct by Stringfield

4818

1   allocate their resources and time among the many competing

2   demands and how all of those things interact to create prices

3   and outputs in a market.

4   Q.   And what do those topics have to do with the issues in

00:20:27   5   this case?

6   A.   Well, there are a number of issues in dispute in this case

7   that require economic expertise.  And those include disputes

8   about what would happen if Hytera were to enter the production

9   of DMR products later than they actually did and how that

00:20:47   10   would affect consumer behavior and competition and also the

11   question of which products compete with each other and, in

12   particular, which products compete with DMR radios.

13          Motorola has propounded two theories of damages in

14   this case, unjust enrichment and lost profits, and both of

00:21:11   15   those require understanding the issues that I just mentioned.

16   Q.   Could you briefly describe your educational background?

17   A.   Yes.  I have a Bachelor's Degree in Economics from UCLA

18   with honors and a Ph.D. in Economics from the University of

19   Chicago.

00:21:30   20   Q.   Do you have any teaching experience?

21   A.   I do.  My first job after graduate school --

22          THE COURT:  Just a minute.  You went from a BA to a

23   Ph.D.?

24          THE WITNESS:  I did.

00:21:40   25          THE COURT:  What did you do in the interim?

Aron - direct by Stringfield

4819

THE WITNESS:  I worked on my Ph.D.

THE COURT:  But did you receive a graduate degree?

THE WITNESS:  I did not take a master's degree during the five years of my Ph.D. work.  But I went straight from undergraduate to graduate school.

THE COURT:  And obtained your Ph.D.?

THE WITNESS:  Correct.

THE COURT:  Proceed.

BY MR. STRINGFIELD:

Q.  Can you please continue describing your teaching experience, Dr. Aron.

A.  Sure.  After I obtained my Ph.D., I went straight to a teaching position on the faculty at Northwestern University in the graduate school there, the Kellogg Graduate School of Management, and I taught there for about 10 years, where I taught courses in economics.

And then when I left Northwestern to do consulting full-time, I continued to teach at Northwestern one course a year.

Q.  Can you tell us some of the courses that you taught?

A.  Sure.  The course that I was teaching until about four years ago, when I stepped back from teaching, that I taught for almost 20 years was a course in the economics and strategy in communications markets, like the one at issue in this case.

And then when I was on the full-time faculty at the

Case: 1:17-cv-01973 Document #: 926 Filed: 02/26/20 Page 8 of 193 PageID #:62040
Aron - direct by Stringfield
4820

1  business school, I taught the MBA students the basic course in

2  business economics, and I also taught a course in pricing, and

3  I taught a course in, a Ph.D. course in the economics of

4  information.

00:23:14  5  Q.  And can you tell us how some of the courses that you

6  taught might be relevant to the issues that you are

7  addressing?

8  A.  Yes.  So as I mentioned, the course that I've been

9  teaching, had been teaching for many years recently was the

00:23:28  10  course in the economics and strategy of communications

11  markets.  And the product at issue here is in a communications

12  market.  The topics in my course included the history of

13  communications markets, the regulatory structure and overlay

14  affecting the technologies in that industry.

00:23:50  15       We looked at platforms and standards.  We looked at

16  entry and exit into the market and competition.  So all of

17  those topics are topics that I've drawn upon in my work in

18  this case.

19       MR. STRINGFIELD:  DDX-22.2 please, Mr. Montgomery.

00:24:09  20  BY MR. STRINGFIELD:

21  Q.  Dr. Aron, have you won any awards for your research as an

22  economist?

23  A.  I have.  Some of them are listed here.  While I was a

24  full-time academic at Northwestern, I was a faculty research

00:24:24  25  fellow at the National Bureau of Economic Research.

Aron - direct by Stringfield

4821

00:24:39

00:24:55

00:25:21

00:25:31

00:25:38

1       I spent a year at Stanford University on a Hoover
2   National Fellowship.
3       I received grants for my research from the National
4   Science Foundation.
5       I taught when I was a graduate student at Chicago on
6   a Pew Fellowship.
7       And then, you know, all the way to my initial work at
8   University of Chicago was funded by the Milton Friedman Fund
9   Fellowship I received to finance my graduate school.
10  Q.  Dr. Aron, can you please turn to DTX-4946 in the binder,
11  please.
12  A.  Yes.
13  Q.  Can you tell us what DTX-4946 is?
14  A.  This is my curriculum vitae, it's my resume.
15  Q.  And was this provided to Motorola as part of the report
16  that you tendered in this case?
17  A.  Yes, it was.
18      MR. STRINGFIELD:  Your Honor, we request permission
19  to admit DTX-4946 and publish it to the jury.
20      MS. NEW:  No objection, Your Honor.
21      THE COURT:  It is received and may be published.
22      MR. STRINGFIELD:  Thank you.
23    (DTX-4946 was received in evidence.)
24      THE COURT:  Can you tell the jury who Milton Friedman
25  was.

Aron - direct by Stringfield

4822

1          THE WITNESS:  Milton Friedman was a Nobel Prize

2     winner in economics, who also a very influential economist

3     worldwide for his theories on the monetary system.

4     BY MR. STRINGFIELD:

00:25:56  5     Q.  Dr. Aron, let's look at some of the research that you've

6     done as an economist.

7          MR. STRINGFIELD:  Can we please have page 2 of

8     DTX-4946.

9     BY MR. STRINGFIELD:

00:26:05  10    Q.  Towards the bottom I see a couple papers that were

11    published in the American Economic Review.  Can you tell us

12    what the American Economic Review is?

13    A.  The American Economic Review is considered the premiere

14    economics journal in our profession.

00:26:22  15    Q.  And the first paper that's listed there on the bottom is

16    called "Firm Organization and the Economic Approach to

17    Personnel Management."  Can you tell us at a high level what

18    that article is about?

19    A.  That's an article about managing your labor force and

00:26:41  20    providing incentives.  It's generally part of my work that

21    involves labor, economics, wage rates and compensation.

22    Q.  And what does labor economics have to do with the issues

23    that you'll be addressing today?

24    A.  Another dispute in this case relates to the salaries and

00:27:05  25    wages that R&D, research and development personnel, have been

Aron - direct by Stringfield

4823

1    paid by Hytera and by Motorola.  I bring my knowledge and

2    experience about analyzing data around wage rates and how

3    those wage rates change over time to my work in this case.

4    Q.   The next page or the next paper listed is titled "The

00:27:33    5    Introduction of New Products."  Can you tell us at a high

6    level what that article dealt with?

7    A.   That article was about the strategy considerations that

8    companies have when they decide whether to introduce a new

9    product depending on whether they're already in the market

00:27:53    10   producing a substitute product or they're not.  And it's about

11   the timing of when those decisions are made.

12   Q.   And, Dr. Aron, have you presented any of your research?

13   A.   Oh, yes, I have.

14        MR. STRINGFIELD:  Can we please have page 3.

00:28:06    15   BY MR. STRINGFIELD:

16   Q.   Listed here are some of the presentations.

17        MR. STRINGFIELD:  And, Mr. Montgomery, if you could

18   scroll through some of those for the benefit of the jury.

19   BY MR. STRINGFIELD:

00:28:18    20   Q.   Dr. Aron, have you contributed to any books?

21   A.   I have.  I have written articles that have been published

22   as chapters in books, including articles on or including books

23   on technology development in the communications industry.  My

24   work has primarily been for the last 20 years in the

00:28:44    25   communications industry.  So that's the nature of the books in

Aron - direct by Stringfield

4824

1     which my research is published.

2           I also co-wrote the economics chapter of the American

3     Bar Association Practice Guide on Telecommunications and

4     Antitrust.  Antitrust is the study of competition.

00:29:00    5     Q.  You mentioned you presented your research.  I forgot to

6     ask you where you presented your research.  Can you tell us

7     please just some of the places you've presented?

8     A.  I've been invited to present my research at universities

9     around the country, as well as before the FCC, the Federal

00:29:18   10     Communications Commission, and state legislatures and

11     regulatory agencies.

12     Q.  Do you have any expertise in specific industries?

13     A.  I do.

14     Q.  Can you tell us what industries you are thinking of?

00:29:28   15     A.  As I suggested, I have a particular expertise in the

16     communications industry.  It's been the primary focus of my

17     work, both teaching and research over the last 20 years.

18     Q.  Can you give us examples of some communications companies

19     that you've worked for?

00:29:49   20     A.  Sure.  I've worked for many of the major communications

21     companies in the United States and some abroad, so companies

22     like AT&T, Verizon, CenturyLink, Motorola, Boeing, which makes

23     communication satellites, and some of the major companies

24     abroad as well, as well as some of the smaller wireless and

00:30:13   25     wireline companies domestically and abroad.

Aron - direct by Stringfield

4825

1    Q.   You mentioned you did work for Motorola.  Can you tell us

2    what work you did for Motorola?

3    A.   Well, a number of years ago I was retained by Motorola in

4    litigation to serve as an expert relating, in a case relating

00:30:31    5    to analog two-way radio systems and the transition to digital.

6    Q.   Have you testified as an expert economist before?

7    A.   I have, yes.

8    Q.   Can you summarize at a high level some of the instances

9    you've done that?

00:30:47    10   A.   I've testified in Federal Court such as this as well as

11   state court, arbitrations in the U.S. and abroad, and before

12   regulatory agencies on a variety of issues including antitrust

13   issues, intellectual property disputes such as this, contract

14   disputes, class actions.

00:31:12    15   Q.   And what has your communications expert work focused on?

16   Any specific technologies?

17   A.   Well, I have worked on issues related to wireline

18   telephone, wireless telephone, other wireless services,

19   broadband services, satellite services, telecommunications

00:31:35    20   infrastructure and facilities.

21   Q.   Dr. Aron, you've been here in trial virtually everyday, is

22   that right?

23   A.   Until last week, when I had to be away for another

24   hearing.

00:31:47    25   Q.   Has CRA, your company, been compensated for your work on

Aron - direct by Stringfield

4826

1    this case?

2    A.  Yes, it has.

3    Q.  And at what rate is CRA compensated for your work?

4    A.  CRA is compensated for my work on an hourly basis at $815

00:32:04   5    an hour.

6    Q.  Is your compensation or your company's compensation

7    dependent in any way on the contents of the opinions you are

8    giving here or the outcome of this case?

9    A.  No.

00:32:17   10       MR. STRINGFIELD:  Your Honor, Hytera proffers

11   Dr. Debra J. Aron as an expert witness on the topics of

12   economics, regulatory economics, competition analysis,

13   communications and labor markets, and the calculation of

14   intellectual property damages.

00:32:33   15       THE COURT:  You may proceed consistent with Federal

16   Rule of Evidence 702.

17       MR. STRINGFIELD:  Mr. Montgomery, DDX-22.3, please.

18   BY MR. STRINGFIELD:

19   Q.  Dr. Aron, what were you asked to do in this case?

00:32:45   20   A.  I was asked to do two things essentially:  One is to

21   evaluate the damages analysis provided by Motorola and the

22   other is to quantify damages taking my own approach.

23       MR. STRINGFIELD:  DDX-22.4, please.

24   BY MR. STRINGFIELD:

00:33:04   25   Q.  Can you give us an overview of your opinions?

Aron - direct by Stringfield

4827

1    A.   Yes.  So I evaluated the damages analysis provided by

2    Motorola's expert, and I had found that there are a number of

3    failings in that analysis, the first being that the analysis

4    overstates the unjust enrichment claim because it fails to

00:33:35    5    deduct research and development expenses that were incurred by

6    Hytera after the accused devices were introduced over a long

7    period of time and that wouldn't have been incurred had those

8    products not been introduced into the market.

9    Q.   And what is the next issue that you've identified?

00:33:56    10   A.   Well, in addition to failing to properly account for

11   profits by deducting R&D actual expenses, Hytera -- sorry,

12   Motorola's expert, Mr. Malackowski, incorrectly added another

13   component of unjust enrichment damages, which was to assume

14   that Hytera would incur another several tens of millions of

00:34:31    15   dollars in research and development that it didn't actually

16   do.

17        So it would incur -- it was benefited by not

18   incurring development that it would have otherwise done for

19   devices that it never actually produced anyway.  So it's sort

00:34:49    20   of a have your cake and eat it too structure that he came up

21   with that overcounts damages.

22   Q.   And you mentioned devices that Hytera would have never

23   launched a couple times in the context of those first two

24   bullets.  Can you tell us a little bit more about why that

00:35:06    25   frames the issues that you've mentioned just now?

Aron - direct by Stringfield

4828

00:35:35

1    A.  Yes.  Mr. Malackowski's analysis is based on the opinions

2    of Dr. Rangan, who you may recall as Motorola's technical

3    expert, who offered the opinion that had Hytera not had access

4    to the alleged trade secrets in this case, Hytera could never

5    up 'til today have been able to create and bring to market a

6    DMR radio.

7            And so that frames Mr. Malackowski's damages analysis

8    because his damages are based on the premise that Hytera could

9    in fact never have developed a DMR radio on its own and would

00:35:57

10   not have done so absent access to the Motorola materials that

11   are in issue.

12   Q.  Did Motorola offer any alternative damages theories where

13   Hytera could in fact launch a DMR radio?

14   A.  Yes.  Dr. Rangan offered scenarios, you may recall, where

00:36:17

15   Hytera would bring out a product, but later than it actually

16   did, so Hytera would bring out a product maybe 3 months later,

17   6 months later, up to perhaps 4 years later, and

18   Mr. Malackowski also analyzed damages under those scenarios.

19   Q.  And so what is the third issue that you've identified on

00:36:39

20   DDX-22.4?

21   A.  If you bring out a product later than you actually did,

22   you have what might be called, you got in the real world what

23   might be called a head start.  And so it's necessary to

24   consider what was the benefit to Hytera of getting that head

00:37:02

25   start in that scenario.

Aron - direct by Stringfield

4829

1          But the way he analyzed that problem overstated what

2    the benefit would be to Hytera of having that head start very

3    significantly, as I can explain if asked.

4    Q.   The first three items that you've identified, those relate

00:37:24    5    to the unjust enrichment damages theory that you introduced

6    earlier?

7    A.   That's right.

8    Q.   What is the fourth issue that you've identified?

9    A.   The fourth issue relates to the other damages theory,

00:37:36    10   which is lost profits to Motorola as opposed to unjust

11   enrichment to Hytera.

12          And in that damages theory, Mr. Malackowski has

13   incorrectly understood and applied the market shares that you

14   have to consider when you think about how much would Motorola

00:38:04    15   have gained if Hytera had not produced its products.

16   Q.   And the next major topic that you've identified is

17   quantify potential economic damages.

18          How do you at a high level quantify economic damages

19   in the context of trade secrets?

00:38:23    20   A.   Well, I did two things:  One is I corrected the analysis

21   that Mr. Malackowski provided and the other is I also

22   considered the opinion of Mr. Grimmett, who is Hytera's

23   technical expert.

24          And in his opinion, as he testified in court, if

00:38:51    25   Hytera had not had access to the alleged trade secret

Aron - direct by Stringfield

4830

1  materials, Hytera would still have been able to produce a DMR

2  radio, but with a delay of six months plus some additional R&D

3  development work.

4  So I also quantified the damages under that scenario.

00:39:14

5  Q.  And then the final issue that you've identified or the

6  final bullet on your slide, rather, is apportionment of

7  copyright damages.  What does that mean?

8  A.  Mr. Malackowski talked, testified about the amount of

9  copyright damages.  But in order to arrive at the damages

00:39:36

10  associated with the theft of the alleged trade secrets, it's

11  necessary to determine how much of the value of the devices,

12  the DMR radios at issue, is actually attributable to the

13  materials that were taken and used allegedly.

14  And that idea of figuring out how much was

00:40:03

15  actually -- how much of the value is associated with the

16  alleged trade secret, the alleged copyrighted materials,

17  that's called apportionment, and so that's what I did.

18  MR. STRINGFIELD:  DDX-22.5, please.

19  BY MR. STRINGFIELD:

00:40:20

20  Q.  Dr. Aron, have you summarized the range of trade secret

21  damages based on the technical experts' opinions?

22  A.  Yes, I did.

23  Q.  Can you tell us what you've shown on this slide?

24  A.  What I'm showing here is the first box shows the damages

00:40:35

25  under Dr. Rangan's opinion, which as I said is that Hytera

Aron - direct by Stringfield

4831

would never have been able to launch a DMR radio, even up to

today.

           And you may recall that Mr. Malackowski's testimony

was that in that scenario unjust enrichment damages were $311

00:40:54   million.  When I correct his analysis in that scenario, the

damages are in fact $158,658,279.

           And the other box here, what it says is that if

Mr. Grimmett is right, and Hytera could have developed a DMR

radio on its own without access to the trade secrets but with

00:41:24   a six-month delay and some additional development

expenditures, in that case the unjust enrichment damages are

$2,115,821.

Q.  Dr. Aron, in offering your opinions, do you decide whether

Motorola's technical experts are correct or Hytera's technical

00:41:45   experts are correct?

A.  I don't make that decision.

Q.  Did Mr. Malackowski similarly offer opinions under both

Motorola's technical expert opinions and Hytera's technical

expert opinions?

00:41:59   A.  No, he didn't.  He only considered Motorola's technical

experts.  So he only kind of gave one side of the story.

Q.  And, Dr. Aron, the first number that you have listed here,

the $158.7 million number, if it were determined that trade

secret damages outside of the United States were not available

00:42:19   prior to May 11, 2016, would that impact the calculation of

Aron - direct by Stringfield

4832

1    that first number you've listed here?

2    A.  It would, yes.

3            MR. STRINGFIELD:  DDX-22.6, please.

4    BY MR. STRINGFIELD:

00:42:31    5    Q.  Can you summarize the work that you and your staff did on

6    this case?

7    A.  Yes.  We've been working on this case for over a year.

8    And in the course of that work, I analyzed financial data,

9    both from Hytera and from Motorola, looked at a lot of

00:42:50    10   documents produced by both parties in the case, as well as

11   reviewing the transcripts of the witnesses that were deposed

12   as well as trial transcripts and third-party witnesses.

13           I reviewed a number of materials that were not

14   produced by either party but that were the product of my own

00:43:10    15   research from industry sources and academic research.

16           I studied Mr. Malackowski's expert reports and his

17   backup work papers and his exhibits, which are his tables and

18   charts.

19           I interviewed Hytera and third-party witnesses as

00:43:31    20   well, and I had an opportunity to visit Hytera's offices and

21   factory in Shenzhen.

22           I discussed their opinions with Hytera's technical

23   experts and, as I said earlier, I listened or reviewed all of

24   the trial testimony.

00:43:49    25           MR. STRINGFIELD:  You can take that down,

Aron - direct by Stringfield

4833

1   Mr. Montgomery.

2   BY MR. STRINGFIELD:

3   Q.  You mentioned earlier that Mr. Malackowski's primary

4   damages theory quantifies to about $311 million, is that

00:43:59    5   right?

6   A.  Yes.

7   Q.  And that was under unjust enrichment?

8   A.  Correct.

9   Q.  Do you have a demonstrative that would show how or help us

00:44:07   10   explain how unjust enrichment works?

11   A.  Yes.

12        MR. STRINGFIELD:  Can we have DDX-22.7, please.

13   BY MR. STRINGFIELD:

14   Q.  Can you generally describe what you've shown here and

00:44:19   15   help -- and frame how to calculate unjust enrichment damages?

16   A.  Yes.

17        THE COURT:  Before you get there, what is your

18   definition of "unjust enrichment"?

19        THE WITNESS:  Unjust enrichment is the benefit to the

00:44:34   20   defendant in the case, in this case Hytera, that it received

21   in the real world that it shouldn't have received if it hadn't

22   engaged in the alleged, in this case, intellectual property

23   infringement.

24        THE COURT:  Proceed.

00:44:52   25   BY MR. STRINGFIELD:

Aron - direct by Stringfield

4834

1  Q.   So, Dr. Aron, tell us what you've shown on DDX-22.7,

2  please.

3  A.   Yeah.  So that definition that I just gave really provides

4  the framework for what I'm showing here, because in order to

00:45:06    5  calculate unjust enrichment, you have to think about what did

6  the company, in this case Hytera, actually, how much profit

7  did they actually make.  And then you have to compare that to

8  what they would have made in the world in which those, the

9  alleged trade secret infringement actions didn't happen.

00:45:32   10       So we have to consider not just what actually

11  happened, but what would have happened in this hypothetical

12  world and then we compare the two, because when you compare

13  the profits that the company actually got to the profits that

14  it would have gotten if the -- in this case if the access to

00:45:56   15  the alleged trade secrets hadn't happened, the difference

16  isolates the damages that are caused by or the unjust

17  enrichment caused by access to the alleged trade secrets.

18       That's how you isolate the effects of in this case

19  access to the trade secrets.

00:46:19   20  Q.   It looks like Motorola and Hytera have two different views

21  of what would have happened.  Did you consider damages under

22  both of those views?

23  A.   I did.  And that's what I was referring to earlier about

24  Dr. Rangan's view and Mr. Grimmett's view.  And the difference

00:46:36   25  in the two experts' views about what would have happened in

Aron - direct by Stringfield

4835

1  this what would have happened world is really what defines the

2  difference between the damages that I calculate under Dr.

3  Rangan's opinions and that I calculate under Mr. Grimmett's

4  opinions.

00:46:56  5      So Motorola's view, as I said, is that under Dr.

6  Rangan's opinion, Hytera could never launch a DMR radio, at

7  least up until today.  And under Hytera's view, according to

8  Mr. Grimmett, Hytera could launch a DMR radio, but not in

9  March of 2010.  Rather, they would be able to launch in

00:47:17  10  September, six months later.

11      MR. STRINGFIELD:  Can we have DDX-22.8, please.

12  BY MR. STRINGFIELD:

13  Q.  Mr. Malackowski, under the Motorola view that Hytera would

14  never launch a product, quantifies damages at $311 million.

00:47:34  15  Can you help us put that number in perspective?

16  A.  Sure.  What he's saying is that Hytera's unjust enrichment

17  from having had access to the alleged trade secrets is $311

18  million over the years from 2010 to 2019.

19      But the alleged trade secrets are alleged to affect

00:48:05  20  only one piece of Hytera's business, which is the DMR

21  business, and only one piece of that.  And we've heard

22  testimony that the DMR business is only about 15 percent of

23  Hytera's revenues.

24      And yet if you look over the last, the years going

00:48:24  25  back to 2010 and look at the audited financial statements of

Aron - direct by Stringfield

4836

1   Hytera, their entire profit over all of those years comes to

2   $265 million.

3          So the $311 million that he is asking for exceeds the

4   entire profits of the entire company for all the years going

00:48:50   5   back to 2010 up to 2018.

6   Q.   And that includes the profits on all of the different

7   products that are shown on DDX-22.8, is that right?

8   A.   That's correct.  We've heard that Hytera produces not just

9   radios, but a variety of kinds of equipment outside of DMR,

00:49:10   10   including other technologies and even outside of radios.

11   Q.   And they make the drones that are sold at the Apple store?

12   A.   That's what we heard, yes.

13   Q.   But Mr. Malackowski's number would take all of those

14   profits, too, or would eclipse those profits?

00:49:24   15   A.   It would exceed all of those profits.

16          MR. STRINGFIELD:  You can take that down,

17   Mr. Montgomery.

18          Let's have DDX-22.9, please.

19   BY MR. STRINGFIELD:

00:49:37   20   Q.   I have some questions regarding the first issue that you

21   identified with Mr. Malackowski's calculation where it says

22   "overstates unjust enrichment by failing to deduct research

23   and development."

24          Why does research and development expense need to be

00:49:51   25   deducted?

Aron - direct by Stringfield

4837

00:50:13

00:50:32

00:50:53

00:51:04

00:51:32

1    A.   What we're trying to get at here is Hytera's profit.  And

2    what Mr. Malackowski showed you is that in order to get -- in

3    order to calculate profit, you start with revenue and you

4    deduct expenses.  You deduct the cost of goods sold.  You

5    deduct other expenses that are directly related to the

6    production of those radios.

7         And one of those expenses is the research and

8    development that Hytera incurred to produce those radios once

9    it got them to market.

10        Hytera, like other companies, continues to invest in

11   R&D to continue to customize and develop additional versions

12   of those products.  So that's a cost.  That's a cost that

13   would not be incurred if you weren't producing those products

14   and, therefore, it should be deducted as a cost when you

15   calculate the profits on those products.

16   Q.   Unjust enrichment is based on profits that Hytera made, is

17   that right?

18   A.   Correct.

19   Q.   And how do you at a high level determine what profit is?

20   A.   Right.  So profit is revenue minus cost.  And research and

21   development expense is a cost that is -- the research and

22   development expense that's directly for DMR radios in the

23   accused set after launch, that's expense that's directly

24   related to those radios, just like the cost of goods, the cost

25   of the plastic and the equipment and the chips and all the

Aron - direct by Stringfield

4838

1    other pieces that go into it.

2          MR. STRINGFIELD:  Can we have PDX-10.27, please.

3    BY MR. STRINGFIELD:

4    Q.   This was Mr. Malackowski's slide where he talked about

00:51:49   5    which costs that he would deduct, is that right?

6    A.   It is.

7    Q.   Which costs did Mr. Malackowski identify as costs that he

8    agreed should be deducted from revenue to arrive at profit for

9    the purposes of unjust enrichment calculation?

00:52:05   10   A.   So he deducted the ones where he put the green tick, the

11   green check mark.  Cost of goods sold, which is like the, as I

12   said, the plastic, the chips and the physical ingredients into

13   the product.

14         Patent royalties, which are fees that Hytera pays to

00:52:22   15   Motorola for use of the Motorola's patented DMR technology.

16         Cost of sales, like cost of the dealer network that

17   Hytera has.

18         And asset impairment, which has to do with

19   devaluation of physical assets that may be on the books.

00:52:44   20         So he included those as costs that could be deducted.

21   Q.   There are red Xs next to "management" and "financial

22   expense."  Does that indicate that Mr. Malackowski did not

23   deduct those?

24   A.   That's correct.

00:52:58   25   Q.   Can you tell us what management and financial expense are?

Aron - direct by Stringfield

4839

A.  Well, management is just what it sounds like, it's the CEO
and upper-level management, but it's also human resources and
accounting and those tasks that are necessary to run a
business firm.

00:53:21  Q.  And do you agree with Mr. Malackowski in this case that
those expenses shouldn't be deducted here?

A.  I agree in part that they should not be deducted, and the
reason is many of the management costs are not incremental to
the production of the accused DMR radios.  They're more of a
00:53:46  general expense.  And unless you have a good way to figure out
how much your management and financial costs would reduce if
you weren't producing these radios, I don't dispute with him
that it's okay to not deduct those expenses.

        When the company as a whole calculates its profits,
00:54:07  it brings together all of its businesses, all of the profits
associated with these first four categories and it deducts
management and financial from those.

Q.  There is a red X, excuse me, a red X next to "research and
development."  Does that also mean that Mr. Malackowski did
00:54:25  not deduct that?

A.  That's correct.

Q.  Do you agree with Mr. Malackowski that that expense should
not be deducted?

A.  No, I don't agree.  The research and development expenses
00:54:34  that are specifically associated with the accused products

Aron - direct by Stringfield

4840

1    should be deducted because they would not be incurred if those

2    products were not being produced.

3    Q.   And I think you mentioned the word "incremental."  Does

4    that mean that research and development is an incremental

00:54:51    5    expense?

6    A.   Research and development is an incremental expense to the

7    production of the accused DMR radios, meaning it wouldn't be

8    produced -- it wouldn't be incurred if those products were not

9    produced.

00:55:04    10   Q.   So research and development is more similar to the cost of

11   goods that you described, like the plastic and the housing and

12   the labor, than it is to the administration expenses that

13   shouldn't be deducted?

14   A.   Correct.

00:55:19    15   Q.   Did Mr. Malackowski contend that research and development

16   expense should not be deducted or should never be deducted?

17   A.   No, actually, he did not.

18   Q.   Then why didn't he make the deduction in this case?

19   A.   Well, his opinion as I understand it is that it's

00:55:40    20   theoretically appropriate to deduct research and development,

21   but he did not consider Hytera's data that quantified the

22   research and development expenses to be reliable enough for

23   him to rely on to deduct the expense.

24   Q.   Why did he contend that the data were not reliable?

00:56:00    25   A.   He thought that the data included research and development

Aron - direct by Stringfield

4841

1   that was not directly associated with the accused products.

2   Q.  Did Mr. Malackowski make any adjustments or estimates of

3   any portion of the R&D costs that he believed could be

4   deducted?

00:56:20   5   A.  No, he didn't.  He had access to the data.  It's quite

6   detailed.  It's on a project-by-project basis.  He identified

7   rows in the data that he thought shouldn't be there.  But he

8   didn't make any adjustment to the data to narrow down and take

9   out the parts he didn't think should be there and then apply

00:56:43   10   the rest.  He just discarded all of it.

11   Q.  Is that a reasonable approach?

12   A.  I don't think so.  I think if you have a dispute with the

13   data, and you identify aspects of it that you think should be

14   excluded, then the most responsible approach is to exclude

00:57:02   15   those, make whatever adjustments you think are most valid and

16   most appropriate, and then exclude the rest when it is

17   conceptually appropriate to exclude this category as we agree

18   it is.

19         MR. STRINGFIELD:  You can take that slide down,

00:57:20   20   Mr. Montgomery.

21   BY MR. STRINGFIELD:

22   Q.  I have some questions about Hytera's research and

23   development data.

24         Did Hytera produce research and development data in

00:57:29   25   this case?

Aron - direct by Stringfield

4842

A.   Yes.

Q.   And can you please turn to in your binder, they're all sequential, DTX-5490, DTX-5502, and DTX-5564 through and including DTX-5574.

00:57:54  A.   I see them.

Q.   And what are these, Dr. Aron?

A.   These are the R&D data that, data sets that were produced by Hytera in this case by year.

        And one of the documents is what we call a crosswalk.

00:58:40  It's a document that says for each job number what kind of cost that should be associated with, what kind of product set.

Q.   And are the exhibits in your binder, are they the entirety of the research and development spreadsheets that Hytera produced in this case?

00:58:59  A.   No.   There is just one or two pages from each voluminous data set.

Q.   Would you agree that the entirety of the data, all of these research and development spreadsheets would be very voluminous if we endeavored to try to print them all out?

00:59:14  A.   Yes.   They would be thousands of pages.

Q.   Are the versions that you just looked at of the research and development spreadsheets, are they the spreadsheets that were updated as we heard Mr. Yuan testify about back before the holiday break?

00:59:27  A.   I believe these are the updated versions of the R&D data.

Aron - direct by Stringfield

4843

1    Q.   Where did these spreadsheets come up?

2    A.   These come from Hytera's business records.  These are kept

3    in the normal course of business at Hytera.

4    Q.   Did you rely on these spreadsheets when you formed your

00:59:50    5    opinions in this case?

6    A.   I did.

7    Q.   And were these spreadsheets produced to Motorola in this

8    case?

9    A.   They were.

00:59:55    10           MR. STRINGFIELD:  Your Honor, Hytera moves to admit

11   DTX-5490, DTX-5502 and DTX-5564 through and including

12   DTX-5574.

13           MS. NEW:  No objection, Your Honor.

14           THE COURT:  They are received and may be published.

01:00:13    15           MR. STRINGFIELD:  Thank you.

16        (DTX-5490, DTX-5502 and DTX-5564 through and including

17         DTX-5574 were received in evidence.)

18   BY MR. STRINGFIELD:

19   Q.   Dr. Aron, what information did you rely on in these

01:00:17    20   spreadsheets?

21   A.   These spreadsheets contain data on the costs associated

22   with research and development personnel at Hytera as well as

23   other costs of research and development associated with DMR

24   products.

01:00:35    25           So I relied on the data for both of those things, for

Aron - direct by Stringfield

4844

1   the overall cost of research and development as well as for

2   the cost of labor specifically.

3   Q.  Did you create summaries of the information from these

4   spreadsheets that you relied on?

01:00:51   5   A.  I did.

6   Q.  Can you turn in your binder to DTX-5601 and DTX-5607.

7   A.  Okay.

8   Q.  Can you tell us what DTX-5601 is?

9   A.  This is an exhibit from my expert report that summarizes

01:01:19   10   the costs of DMR, the costs of research and development

11   associated with the accused and other DMR radios.

12   Q.  And can you tell us what DTX-5607 is?

13   A.  This is also a table that I created to summarize the costs

14   of salaries and benefits of R&D personnel working on DMR

01:01:44   15   products.

16   Q.  Would it be more convenient to refer to DTX-5601 and 5607

17   than the very voluminous spreadsheets that we just discussed?

18   A.  Yes, I think it would.

19           MR. STRINGFIELD:  Your Honor, Hytera moves to admit

01:01:58   20   the summaries pursuant to Federal Rule of Evidence 1006 and

21   they are DTX-5601 and DTX-5607.

22           MS. NEW:  No objection, Your Honor.

23           THE COURT:  They are received and may be published.

24       (DTX-5601 and DTX-5607 were received in evidence.)

01:02:11   25   BY MR. STRINGFIELD:

Aron - direct by Stringfield

4845

1  Q.  Dr. Aron, do you think Hytera's research and development

2  data is reliable and should be counted for deduction purposes?

3  A.  I do.

4  Q.  Did you evaluate Hytera's data?

01:02:23   5  A.  I did.

6  Q.  Why do you conclude that Hytera's research and development

7  data is reliable?

8  A.  Well, it is the data that comes from Hytera's business

9  records and kept in the normal course of business, kept

01:02:37  10  contemporaneously, meaning it was kept at the time that the

11  work was done and that the costs were incurred.

12        It's quite detailed.  It's got thousands of rows of

13  data with detailed descriptions of what it was incurred for.

14  And that is the sort of data that I normally would rely on in

01:03:01  15  my work as an expert.

16  Q.  I have some questions about the level of detail in the

17  Hytera research and development data.

18        MR. STRINGFIELD:  Mr. Montgomery, can you please pull

19  up already admitted DTX-5573, which is the 2018 data.

01:03:18  20  BY MR. STRINGFIELD:

21  Q.  Dr. Aron, can you tell us what DTX-5573 is?

22  A.  Yes.  So this is the first 53 rows of the 2018 file of R&D

23  data.  It's one of the tabs in that Excel file.  It's the tab

24  for remuneration, which is salary and benefits.

01:03:44  25        And this, this page goes down, it's got something

Aron - direct by Stringfield

4846

1    like 37,000 rows.

2    Q.   Is this spreadsheet typical of the other years from 2010

3    through 2019?

4    A.   It is.  They may have slight variations in formatting, but

01:04:04    5    this is typical of what the data looked like.

6         And I should say that this version that we're looking

7    at here is a translated version.  The data were produced to us

8    in Chinese.

9    Q.   Let's start with the remuneration tab.  What does that

01:04:18   10   mean?

11   A.   So remuneration, as I said, is salary and benefits.

12   Q.   And why -- well, what are some of the columns that are

13   listed here?  You know, moving from left to right, can you

14   tell us some of the more significant columns that you focused

01:04:38   15   on in analyzing the data?

16   A.   Yes.  So the first column A, that's the time period.  And

17   you see 201801, that's January.  So these rows that we're

18   looking at are all for January of 2018.

19        And then if you look at column G and column H, column

01:04:59   20   G is the project code, and you see an alphanumeric code there,

21   and that column along with column H, which is the project

22   name, is what Hytera used to determine which rows are

23   associated with accused products.

24        The data were kept by project by timekeeper.  So a

01:05:25   25   typical row has the time for a particular R&D personnel,

Aron - direct by Stringfield

4847

1   person associated with that project and that project name.

2          And if we move over to the right, column I shows how

3   much hours they worked on that product in that month.

4          Column K -- I'm sorry, column J is the rate, salary

01:05:53   5   and benefits per hour.

6          And then column K is their compensation in that month

7   for those hours on that project in Chinese Yuan.

8   Q.  Dr. Aron, what did you derive from these research and

9   development spreadsheets?  What types of information did you

01:06:14  10   take from them?

11  A.  So I was able to analyze the data in these spreadsheets to

12  create the summary that we talked about a moment ago that

13  quantifies how much research and development expenditures were

14  made on these products associated with salary and benefits of

01:06:38  15   people and also allowed me to determine how much the workers

16  were paid, so I could calculate compensation to the workers.

17  Q.  Let's go to the Other Costs tab, please.

18          What is included in Other Costs?

19  A.  What is included here are costs that are not worker --

01:07:00  20   that are not salary and benefits of workers.  So some of this

21  could be materials, but also other kinds of expenses.  Things

22  we find on here in some years might include or do include

23  tuition reimbursement, so some of those go with the workers.

24  And some of them are things that you see here, travel

01:07:21  25   expenses, sometimes there are DMR Association membership fees

Aron - direct by Stringfield

4848

and other expenses.

Q.   And were you, similar to how you described in the remuneration tab, were you able to use project codes and project names to isolate the expenses that are incremental to the accused DMR products at issue in this case?

A.   I was.  And those project codes are the same set of codes as we looked at in the earlier tab of this spreadsheet.

Q.   And you mentioned a crosswalk.  Is that sort of like a decoder ring that helped you understand this data?

A.   It is.  It's like a list of project codes and then whether they belonged to the accused products or not and whether they're shared between accused and non-accused products, which we also had to analyze.

Q.   I'm sorry.  Go ahead.

A.   Just to finish, so the cost information on this tab, some of it was added into the remuneration to get the complete estimate of what workers were paid, because some of these other costs are really part of compensation and some were not.

        But all of these costs that were associated with the accused products were included with the costs in the other tab, the remuneration tab, to get the total costs associated with the accused products by year.

Q.   Were any non-DMR projects included in the data?

A.   Yes, there were.  So we understood that one thing that Hytera could not specifically pull out of the data were R&D

Aron - direct by Stringfield

4849

associated with another technology called PDT.  And so I
performed an allocation to pull out a share of all of the
expenses in order to just isolate to the DMR radios.

01:09:35

And then in addition to that, we found out of all
these thousands of rows of data, two rows, I believe, in 2011
and one in 2018 that just shouldn't have been there that were
associated with other technologies, and I excluded those from
my analysis.

Q.   How does the level of detail in Hytera's research and

01:09:55

development data compare to the level of detail in Motorola's
research and development data?

A.   Well, I looked at the research and development data
produced by Motorola in this case, and it's nowhere near this
level of detail, and it doesn't provide any way to isolate

01:10:16

research and development associated with the accused products.
And that was also the conclusion of Mr. Winkler, who was --
whose deposition was read in court here.  He's a financial
person at Motorola who testified about the data.

Q.   But doesn't Motorola estimate how much time that it claims

01:10:41

was spent on developing the trade secrets?  How do they do
that with the data that you just described?

A.   My understanding of the testimony is they did not use the
data that was produced in this case to make those estimates,
but, rather, they relied on the interviews and analysis

01:11:05

provided by engineers thinking back to the research and

Aron - direct by Stringfield

4850

1   development efforts that were conducted in the past.

2   Q.  Motorola's expert, Mr. Malackowski, relied on those

3   estimates to calculate research and development investment

4   from Motorola, but wouldn't rely on Hytera's detailed research

01:11:26   5   and development spreadsheets to determine research and

6   development deduction for Hytera, is that right?

7   A.  Correct.

8   Q.  Besides his issue with Hytera's research and development

9   data, were there any other instances where Motorola expert

01:11:40   10  Mr. Malackowski believed that data were either insufficient or

11  missing?

12  A.  Yes.

13  Q.  Can you tell us what instance you're thinking of?

14  A.  Mr. Malackowski, as you may recall, added damages

01:11:56   15  associated with profits that Hytera earned on accessories,

16  accessories that are sold with the accused products.  And his

17  testimony was that there weren't actual data to estimate how

18  much the accessories revenues were.

19          So instead he relied on an estimate that was made by

01:12:24   20  a Hytera person in a deposition to estimate the amount of

21  revenues associated with accessories.

22  Q.  And how did he justify his treatment of the lack of data

23  in that instance?

24  A.  Well, what he said is that if you don't have perfect data,

01:12:42   25  then you rely on the best data that you have available to you.

Aron - direct by Stringfield

4851

1    And I would add to that, assuming it's adequately reliable.

2    Q.   You would agree with that premise then that you would use

3    the best data available?

4    A.   I do agree with that premise, yes.  If you don't have

01:12:58    5    perfect data, which we never do -- there is no such thing as

6    perfect data.  We spend a lot of time in our work trying to

7    clean data and ensure that it's sound and reliable.  But it's

8    never perfect.  And so I agree that when you don't have

9    perfect data, you rely on the best data available, assuming

01:13:22    10   you have concluded that it's sufficiently reliable.

11   Q.   Did Mr. Malackowski rely on the best data available to him

12   when he -- in the context of Hytera's research and development

13   expense and whether it should be deducted?

14   A.   No.  The best data available is the data that we just

01:13:38    15   looked at, the detailed Hytera R&D data kept in the normal

16   course of business during the time that the work was being

17   done timekeeper by timekeeper and item by item.

18              MR. STRINGFIELD:  Your Honor, I understand we're

19   having technical difficulties with the --

01:13:56    20             MR. CLOERN:  It's been fixed.

21              MR. STRINGFIELD:  Oh, they've been resolved.

22   BY MR. STRINGFIELD:

23   Q.   Dr. Aron, I have some questions about Hytera's research

24   and development expenditures.

01:14:05    25             MR. STRINGFIELD:  Can we please have DDX-22.10.

Aron - direct by Stringfield

4852

BY MR. STRINGFIELD:

Q.  What have you shown on DDX-22.10?

A.  This is a summary of the total research and development
expenditures that Hytera incurred on the accused products by
year for 2005 to 2009, which was the development period of the
accused products.

Q.  And just for the record, these came from your summary
which has been admitted as DTX-5601, is that right?

A.  Correct.

Q.  This is just an easier-to-read version, is that right?

A.  That's right.

Q.  Okay.

        MR. STRINGFIELD:  Can we have DDX-22.11, please.

BY MR. STRINGFIELD:

Q.  What have you shown here?

A.  This is a summary of the same kind of information.  In
other words, it's Hytera's R&D expenditures on the accused
products by year, but for the years after the launch occurred.

        So the launch occurred in the beginning of 2010.
This is the R&D expenditures by year and the sum, which is, as
you see, $79,617,777.

Q.  And this amount of research and development that was
incurred after the first accused DMR, Hytera DMR radios were
launched the beginning of 2010, is this the amount that you
contend should be deducted, but Mr. Malackowski did not

Aron - direct by Stringfield

4853

1    deduct?

2    A.   That's correct.

3         MR. STRINGFIELD:   Can we have DDX-22.12, please.

4    BY MR. STRINGFIELD:

01:15:33    5    Q.   What have you shown here, Dr. Aron?

6    A.   What I'm showing here is a timeline of the models of

7    accused products that Hytera introduced into the market after

8    its initial introduction in March of 2010, which is in the

9    yellow flag.

01:15:51    10        So what you see here and what I am trying to point

11   out is that once Hytera introduced its DMR products in March

12   of 2010, research and development didn't stop.  They kept

13   developing and putting out additional products, and they kept

14   customizing the products that they put out for their customer

01:16:16    15   base.

16   Q.   Are there any other reasons that Hytera would continue to

17   make, you know, the nearly $80 million expenditure after

18   launching the first radios?

19   A.   Sure.  As the company puts out additional models, as I

01:16:33    20   mentioned a moment ago, customers see customization of those

21   products for their specific uses, so they will come back to

22   Hytera, and the engineers will do customization on those

23   products.  So that's one thing.

24        But in addition to that, as products are sold into

01:16:52    25   new, into different countries, additional work has to be done

Aron - direct by Stringfield

4854

1  to enable those products to work on the different spectrum

2  bands in different countries.  So even for existing products,

3  expanding them to new countries requires additional work.

4         And then, of course, for any amount of work, over

01:17:10  5  time wage rates are growing.  So that also adds to the R&D

6  expenditure of dollar amounts.

7         MR. STRINGFIELD:  Can we go back to DDX-22.11,

8  please.

9  BY MR. STRINGFIELD:

01:17:21  10  Q.  What is the economic impact of Mr. Malackowski's refusal

11  to deduct these post-launch research and development expenses?

12  A.  It inflates or increases his damages amount by $79.6

13  million.  That $79.6 million is in his $311 million unjust

14  enrichment claim.

01:17:44  15         MR. STRINGFIELD:  DDX-22.13, please.

16  BY MR. STRINGFIELD:

17  Q.  I have some questions about the second issue that you

18  identified with Mr. Malackowski's analysis.  It says, "Also

19  overstates unjust enrichment by adding hypothetical research

01:17:59  20  and development."  What does that mean at a high level?

21  A.  What that means is that he's saying it would have taken

22  more money in research and development than Hytera actually

23  spent in order to replicate the information contained in the

24  trade secrets and that Hytera was unjustly benefited by not

01:18:24  25  having to spend that money, so that's an additional unjust

Aron - direct by Stringfield

4855

1    enrichment.  That's his argument.

2    Q.  And we just talked about research and development expense

3    on the order of $79 million.  Is the research and

4    development -- do you know roughly what the research and

01:18:40    5    development expense we're talking about here?

6    A.  $73.6 million.

7    Q.  So these numbers sound similar.  The concepts sound

8    similar.  Are we talking about the same thing or are they

9    different?

01:18:53    10    A.  They're completely different.  The $79.6 million that we

11    just talked about, that's money that Hytera actually spent in

12    the real world to work on actual products that it sold.

13           The $73.6 million that we're talking about now,

14    that's money that Hytera didn't spend, but that according to

01:19:12    15    Mr. Malackowski they should have spent in order to be able to

16    produce the products, which in the hypothetical world they

17    didn't actually produce though.

18    Q.  Is that why you called them hypothetical research and

19    development expenses?

01:19:27    20    A.  Well, they're hypothetical because, A, those expenses were

21    never actually incurred.  But, B, he says they would be

22    incurred in the hypothetical world where Hytera never actually

23    produces the DMR radio, but nevertheless spends $73.6 million

24    trying to do so.

01:19:51    25           MR. STRINGFIELD:  Can we go back, Mr. Montgomery, to

Aron - direct by Stringfield

4856

1    DDX-22.7.

2    BY MR. STRINGFIELD:

3    Q.  Can you explain further using this slide why the $73.6

4    million in hypothetical research and development expense

01:20:05    5    should not be added in this case?

6    A.  Yeah.  It's because it's a double dip.  And what I mean by

7    that is we're talking about the what would have happened

8    world, the hypothetical world in which Hytera could never

9    produce a DMR radio.

01:20:25    10        But the $73.6 million is what Motorola estimates it

11    would have cost Hytera to do the research to be able to

12    develop the trade secrets.  And if they spent that money and

13    developed the trade secrets, they would be able to produce a

14    radio and make profits from it.

01:20:44    15        So you can't take all the profits from the radios as

16    if you could never produce them, but then also charge them

17    with the $73.6 million that if you had spent it you could have

18    produced the radios.  It's inconsistent and it's having your

19    cake and eating it, too.  It's a double dip.

01:21:03    20    Q.  Should any hypothetical research and development expense

21    be added in Motorola's view where Hytera could never launch a

22    DMR radio?

23    A.  No.

24        MR. STRINGFIELD:  You can take that down,

01:21:16    25    Mr. Montgomery.

Aron - direct by Stringfield

4857

BY MR. STRINGFIELD:

Q.  Even though no amount of hypothetical costs should be added, did you evaluate whether Mr. Malackowski correctly calculated that $73.6 million?

01:21:29

A.  I did.

Q.  And did you find that he calculated it correctly?

A.  I did.

Q.  Did you find that he calculated it correctly or incorrectly?

01:21:37

A.  Incorrectly.  Sorry.  I thought that's what you asked me. It's an incorrect number.

Q.  How did --

        MR. STRINGFIELD:  Can we have DDX-22.14, please.

BY MR. STRINGFIELD:

01:21:48

Q.  How did Mr. Malackowski calculate the $73.6 million in hypothetical research and development costs?

A.  He's multiplied the number of hours or, sorry, the number of staff months that were estimated would be required to reproduce the alleged trade secrets.  And that number was

01:22:13

determined by Mr. Malackowski based on the technical experts from Motorola at 18,433 staff months.

        So he took that number and then he multiplied it by a wage rate that he purported to be the proper wage rate for Hytera personnel doing this work.

01:22:38

        And when you multiply the 18,433 staff months by the

Aron - direct by Stringfield

4858

1   wage rate, which he asserted to be $3,992 per staff month,

2   that's where you get the $73.6 million.  It's the product of

3   those numbers.

4   Q.   And how should this calculation be corrected?

01:22:57   5   A.   Well, first of all, $3,992 is not what it costs Hytera to

6   have R&D work done.  That's not the cost of their R&D

7   personnel.  We have the data on what R&D personnel cost at

8   Hytera, and it's about half of that number.

9         MR. STRINGFIELD:  Can we have DDX-22.15, please.

01:23:26   10   BY MR. STRINGFIELD:

11   Q.   What have you done here, Dr. Aron?

12   A.   So the actual staff cost per month for R&D staff working

13   on DMR in 2010 is $1,638.

14         And so if you just correct that number and multiply

01:23:48   15   it by the 18,433 staff months, that reduces this cost by more

16   than half.  It reduces it to $30.2 million.

17         So this number was far overstated by applying an

18   incorrect staff month cost assumption.

19         MR. STRINGFIELD:  Mr. Montgomery, can we please have

01:24:13   20   previously admitted DTX-5607.

21   BY MR. STRINGFIELD:

22   Q.   Dr. Aron, what is DTX-5607?

23   A.   This is my summary of the staff salaries and benefits

24   charged to research and development on the accused DMR, on DMR

01:24:33   25   products in 2010 through 2019 according to the data that we

Case: 1:17-cv-01973 Document #: 926 Filed: 02/26/20 Page 47 of 193 PageID #:62079
Aron - direct by Stringfield
4859

1    just looked at earlier.

2    Q.  And what have you shown in the far right-hand column?

3    A.  The far right-hand column is the final summary of all the

4    bits and pieces of the salary, benefits and additional

5    benefits that were shown on those Excel spreadsheets that we

6    looked at.  And what it shows is the average monthly salary

7    including benefits per R&D worker by year, 2010 to 2019.

8    Q.  Mr. Malackowski claims that Hytera's data on the costs of

9    engineers isn't reliable because it changes from year to year.

10   Sometimes it goes up, sometimes it goes down.

11       Do you agree that the data are unreliable?

12   A.  No, I don't.

13   Q.  Dr. Aron, have you arranged this data in any way to help

14   understand the reliability of the data?

15   A.  I did.  I plotted it over time so we could look at it and

16   so I could assess whether it appears to be unreliable because

17   of the pattern over time.

18       MR. STRINGFIELD:  May we have DDX-22.17, please.

19   BY MR. STRINGFIELD:

20   Q.  What have you shown here, Dr. Aron?

21   A.  This is a plot of the numbers that we just saw in that

22   final column of the R&D monthly average staff salary and

23   benefits for DMR workers by year.

24       So you see the $1,638 at 2010.

25   Q.  And what is this orange line you've shown here?

Aron - direct by Stringfield

4860

A.  I've calculated using standard statistical method the trend line through these points.  That's all it is, just the trend line calculated from these data points.

Q.  So to be clear, this line is calculated.  You didn't just draw this line because it makes the data look good?

A.  Right.  I calculated and then plotted the line.

Q.  And what do you - and I apologize if you already said this - but what did you find regarding the $1,638 in 2010 with respect to the trend line?

A.  Well, what I found is that, first of all, these points do go up and down relative to the trend.  But, first of all, the $1,638, it's pretty much right on the trend line.

        And the deviations that I see over time from the trend line don't disturb me as being abnormal or problematic for wage rates that are aggregated and taken as an average in a company from year to year.

Q.  And why does that not concern you?

A.  For a few reasons.  First of all, these salary and benefits numbers include bonus, which is dependent on how well the company does in each year.  And so the company is going to vary in its success from year to year and that's going to cause average wages to go up or down.  That's one thing.

        Second thing is these are averages of workers who are working on DMR drawn from a bigger pool of engineers and other R&D personnel so that in some years you are going to have more

Aron - direct by Stringfield

4861

1    hardware engineers, in some years you might have more software

2    engineers, in some years you might be using more testing

3    engineers and other personnel depending on what you are

4    working on on DMR in that year.

01:28:24    5        So there will be variability in the kinds of

6    personnel included in the average and that will contribute to

7    variability.

8        Third, this company, like all companies, is hiring

9    people and losing people from year to year.  And so if in a

01:28:42    10   given year you hire a lot of really experienced engineers,

11   that's going to drive up the average, and in other years if

12   you hire more young people right out of the Harbin Institute,

13   right out of college, that's going to tend to lower your

14   average because they're going to come in at a starting salary.

01:29:02    15       And then the final thing is in China and in this

16   region of China, generally wage rates were going up over time,

17   and so that's going to contribute to the trend and also to

18   variability as wage rates go up.

19   Q.   To confirm the reliability of the data, did you benchmark

01:29:22    20   it in any way?

21   A.   I did.

22   Q.   And how did you do that?

23   A.   Well, I'm aware as an economist that the Chinese

24   government, like the U.S. government, produces data available

01:29:34    25   publicly on its website on wage rates.

Aron - direct by Stringfield

4862

01:29:59

1    And so I looked at the data for engineering personnel
2    in Guangdong Province, which is the province in which Shenzhen
3    exists.  All of the research on DMR was done in Shenzhen.  And
4    what I found just from the government data is that the average
5    wage of engineers during the 2010 time period was well below
6    this 1638 per month.

7    So I conclude from that that the number is not
8    disturbingly off from benchmarks, nor is it inconsistent with
9    the rest of the trend of the data.

01:30:21

10   Q.   So this $1,638 for 2010 that Hytera paid its research and
11   development engineers was above average for research and
12   development engineers in the same geographic region?
13   A.   For engineers generally in the same province.
14   Q.   Mr. Malackowski points to the 2011 rate, which is nearly

01:30:45

15   $3,000, to discredit the $1,638.  Do you agree with his
16   criticism?
17   A.   No, I don't.  What I see here is that if anything, the
18   $2,963 number is an outlier.  It doesn't imply that the 2010
19   number is wrong or too low.

01:31:09

20   I might, if I were focusing on 2011, look more into
21   that number.  But I see it as normal variation given the
22   factors that I just described that cause variation in wage
23   rates.
24   Q.   Mr. Malackowski claims that you cherry-picked a wage rate

01:31:28

25   when you focus on the 2010 rate.  Do you agree with that?

Aron - direct by Stringfield

4863

01:31:53

A.   No.   We're looking at R&D that happened in and before 2010
for the development of the DMR products.   And I actually apply
this number to 2008, '9 and '10.   So it's probably an
overstatement actually, because we see and we know from other
data that wage rates were going up in China during this time.

          MR. STRINGFIELD:   Can we go back to DDX-22.15,
please.

BY MR. STRINGFIELD:

01:32:13

Q.   And so if you apply Hytera's actual labor rate from the
data that were provided, Mr. Malackowski has overstated his
hypothetical research and development expense by a factor of
more than 2, is that right?

A.   Correct.

01:32:31

Q.   That was the rate for staff month.   I have some questions
about the number of staff months.   Is there a disagreement
between the parties about the 18,433 staff months?

A.   There is.

Q.   And can you tell us what that disagreement is?

01:32:52

A.   The 18,433 staff months is based on the engineering
estimates that we heard discussed in court.

          But Mr. Grimmett testified that this number is --
that the number of staff months that it would actually take to
develop a DMR radio from the beginning of DMR development
would actually be significantly lower, and that an estimate

01:33:16

from Motorola itself can be found in a business plan document

Aron - direct by Stringfield

4864

1  for development at launch of DMR.

2  Q.  And did you use that estimate as a check against the

3  numbers here?

4  A.  I did.

01:33:29    5       MR. STRINGFIELD:  Can we have DDX-22.16, please.

6  BY MR. STRINGFIELD:

7  Q.  What have you shown here, Dr. Aron?

8  A.  So the document that I mentioned a moment ago that

9  Mr. Grimmett relied on, which is a Motorola business plan

01:33:41   10  document that estimates how many, from 2004, it estimates how

11  many staff months they think it would take to develop a DMR

12  radio to first launch, that was 7,920.

13       And so I took that 7,920 staff months identified by

14  Mr. Grimmett, multiplied it by the actual staff rate at Hytera

01:34:05   15  in Shenzhen, 1,638, and that product is the $12.97 million

16  shown in the bar.

17  Q.  Mr. Malackowski in his testimony pointed to a similar bar

18  graph comparing the 73.6 million to the 11.8 million that

19  Hytera spent on research and development in an attempt to

01:34:26   20  discredit Hytera's investment in research and development.

21       In light of the corrections that you've made to his

22  calculations, do you agree with Mr. Malackowski's criticism?

23  A.  No.  Again, I think that when you correct --

24       THE COURT:  First, do you agree with the premise of

01:34:40   25  the question?

Aron - direct by Stringfield

4865

1        THE WITNESS:  Excuse me, Your Honor?

2        THE COURT:  Do you agree with the premise contained

3    within the question?

4        THE WITNESS:  I do agree -- if by "the premise" you

01:34:48   5    mean that Mr. Malackowski pointed to --

6        THE COURT:  The lawyer's summation of what the

7    witness said.

8        THE WITNESS:  Yes, I do agree with that.

9        THE COURT:  All right.  This is a good stopping point

01:34:59  10    then.

11        Members of the jury, it is 11:31, Monday brunch.

12    Please come back at 12:30.

13        I have an unrelated matter to deal with, counsel.

14        The trial is adjourned.

01:35:12  15    (Jury out.  Recess at 11:32 a.m. to 12:30 p.m.)

16

17

18

19

20

21

22

23

24

25

4866

```
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   MOTOROLA SOLUTIONS, INC., and MOTOROLA    ) No. 17 CV 1973
     SOLUTIONS MALAYSIA SDN. BHD,              )
 4                                             )
                 Plaintiffs,                   )
 5   vs.                                       ) Chicago, Illinois
                                               )
 6   HYTERA COMMUNICATIONS CORPORATION, LTD.,  ) February 3, 2020
     HYTERA AMERICA, INC., and HYTERA          )
 7   COMMUNICATIONS AMERICA (WEST), INC.,      )
                                               )
 8               Defendants.                   ) 12:35 p.m.

 9                     TRIAL - VOLUME 32-B
                    TRANSCRIPT OF PROCEEDINGS
10
             BEFORE THE HONORABLE CHARLES R. NORGLE, SR.
11                          and a jury

12   APPEARANCES:

13   For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                            BY:  MR. ADAM R. ALPER
14                               MR. AKSHAY DEORAS
                                 MR. BRANDON HUGH BROWN
15                          555 California Street
                            Suite 2700
16                          San Francisco, California 94104
                            (415) 439-1400
17
                            KIRKLAND & ELLIS, LLP
18                          BY:  MR. MICHAEL W. DE VRIES
                                 MR. CHRISTOPHER M. LAWLESS
19                          333 South Hope Street
                            Suite 2900
20                          Los Angeles, California 90071
                            (213) 680-8400
21

22
     Court Reporter:        AMY M. SPEE, CSR, RPR, CRR
23                          Official Court Reporter
                            United States District Court
24                          219 South Dearborn Street, Room 2318A
                            Chicago, Illinois  60604
25                          Telephone:  (312) 818-6531
                            amy_spee@ilnd.uscourts.gov
```

4867

APPEARANCES:   (Continued)

For the Plaintiffs:      KIRKLAND & ELLIS, LLP
                        BY:  MS. MEGAN MARGARET NEW
                        300 North LaSalle Street
                        Chicago, Illinois 60654
                        (312) 862-7439

                        KIRKLAND & ELLIS, LLP
                        BY:  MS. LESLIE M. SCHMIDT
                        601 Lexington Avenue
                        New York, New York 10022
                        (212) 446-4763

For the Defendants:     STEPTOE & JOHNSON, LLP
                        BY:  MR. BOYD T. CLOERN
                             MR. MICHAEL J. ALLAN
                             MS. JESSICA ILANA ROTHSCHILD
                             MS. KASSANDRA MICHELE OFFICER
                             MR. SCOTT M. RICHEY
                        1330 Connecticut Avenue NW
                        Washington, DC 20036
                        (202) 429-6230

                        STEPTOE & JOHNSON, LLP
                        BY:  MR. DANIEL S. STRINGFIELD
                        227 West Monroe Street
                        Suite 4700
                        Chicago, Illinois 60606
                        (312) 577-1300

ALSO PRESENT:           MR. RUSS LUND and
                        MS. MICHELE NING

Aron - direct by Stringfield

4868

1          (Proceedings heard in open court.  Jury in.)

2              THE COURT:  Good afternoon, members of the jury.

3              I'll ask the court reporter to read back the last

4    question.

02:38:35    5          (Record read)

6              MR. STRINGFIELD:  Thank you, Your Honor.

7              Can we have DDX-22.16 back, please, Mr. Montgomery.

8          DEBRA ARON, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

9                  DIRECT EXAMINATION (Resumed)

02:38:36   10   BY MR. STRINGFIELD:

11   Q.  Welcome back, Dr. Aron.

12   A.  Thank you.

13              THE COURT:  She was just gone for lunch, Counsel.

14   BY MR. STRINGFIELD:

02:38:53   15   Q.  Dr. Aron, just before the lunch break we were discussing

16   DDX-22.6.  Do you recall that?

17   A.  Yes, I do.

18   Q.  And Mr. Malackowski, in his testimony, had pointed to a

19   bar graph similar to this one shown here, where he compared

02:39:10   20   the 73.6 million that he contended Motorola spent on

21   alleged -- or on research and development towards the trade

22   secrets and compared that to Hytera's research and development

23   investment from 2005 to 2009.  Do you remember that?

24   A.  I do.

02:39:23   25   Q.  And do you remember Mr. Malackowski criticizing

Aron - direct by Stringfield

4869

1    Hytera's -- the amount of Hytera's investment in research and

2    development by making that comparison?

3    A.  I do.

4    Q.  And as you did before the lunch break, you applied various

02:39:38    5    corrections to Mr. Malackowski's calculation to bring his

6    $73.6 million down to 12.97.  Do I recall that correctly?

7    A.  That's right.

8    Q.  Okay.  And so in light of the corrections that you made

9    before the lunch break, do you agree with the criticism that

02:39:54    10   Mr. Malackowski made of Hytera's prelaunch research and

11   development investment?

12   A.  No, I don't.

13        MR. STRINGFIELD:  Mr. Montgomery, can we have

14   DDX-22.4, please.

02:40:09    15   BY MR. STRINGFIELD:

16   Q.  Before the lunch break, you addressed the first two issues

17   that you identified with Mr. Malackowski's calculation; is

18   that right?

19   A.  That's right.

02:40:17    20   Q.  And those first two issues are in the context of unjust

21   enrichment damages where, under Dr. Rangan's theory, Hytera

22   never launches a DMR radio; is that right?

23   A.  Right.

24        MR. STRINGFIELD:  Can we have DDX-22.18, please,

02:40:36    25   Mr. Montgomery.

Aron - direct by Stringfield

4870

BY MR. STRINGFIELD:

Q.  I have questions about the combined effect of the two errors that you've already discussed this morning with respect to Mr. Malackowski's calculation.

02:40:43   Dr. Aron, what have you shown on DDX-22.18?

A.  This is Mr. Malackowski's slide.  And what I'm showing is -- I'm just showing his slide which summarizes his opinion of unjust enrichment for trade secret misappropriation, assuming that, for Dr. Rangan, Hytera would never be able to
02:41:09  produce a DMR radio up to at least today.

Q.  Okay.  And the first error that you described was his failure to deduct the $79.6 million in research and development that Hytera actually invested after it launched its DMR radio in 2010; is that right?

02:41:26  A.  Correct.  These --

Q.  And what is the impact of that?

A.  So if you subtract the $79.6 million from the $238.3 million, that arithmetic leads to $158,658,279.  So that's the profit -- it's really the incremental profit that
02:41:55  Hytera earned on the misappropriate -- on the accused devices as unjust enrichment for trade secret misappropriation if you just make that one correction to the R&D investment that should have been deducted in order to come to an incremental profit number.

02:42:15  Q.  And that is, again, not deducting the management expense

Aron - direct by Stringfield

4871

and the finance expense that could have been deducted but you

elected not to; is that correct?

A.   Right.   This is why I'm calling it an incremental profit.

We're not deducting any expenses associated with those

02:42:33   management and finance categories, although at least some of

them probably could justifiably be deducted.   And certainly

when you calculate the company's bottom-line profit, they are

deducted.

Q.   And then underneath the X here was the $73.6 million in

02:42:53   hypothetical research and development costs that you

identified in the second error that you discussed; is that

right?

A.   Correct.

Q.   And here you've crossed that out because you don't believe

02:43:01   that that should be added?

A.   That's right.   That number should not be added to taking

away all of Hytera's profits on the accused devices that it

actually sold because that would be double-counting.

Q.   And so the $158,658,279 number that you've derived after

02:43:24   calculating Mr. Malackowski's calculations, that is the

largest that trade secret damages could be in the case; is

that correct?

A.   Can you just -- I didn't hear some -- one of the words you

said.   Try it again, please.

02:43:39   Q.   So this number, again, is under the assumption that Hytera

Aron - direct by Stringfield

4872

1    could never launch a DMR radio; is that right?

2    A.   Correct.

3    Q.   And after calc- -- or after correcting Mr. Malackowski's

4    calculations, you took his $311 million under that scenario

02:43:53    5    down to $158.7 million; is that right?

6    A.   That's the corrected number, yes.

7    Q.   And is this the highest that trade secret damages could be

8    under that corrected calculation in this case?

9    A.   That's right.  This would be the highest the damages could

02:44:09    10    be for unjust enrichment because it assumes that Hytera could

11    never produce a DMR radio.

12         MR. STRINGFIELD:  Take that down, Mr. Montgomery.

13    BY MR. STRINGFIELD:

14    Q.   Dr. Aron, have you read the complaint in this case?

02:44:21    15    A.   Yes, I have.

16    Q.   And a complaint is a summary of Motorola's claims and

17    allegations; is that fair?

18    A.   Yes.

19    Q.   Are you aware generally that Motorola is seeking trade

02:44:33    20    secret damages under two statutes, the Illinois Trade Secret

21    Act, called I-T-S-A, or ITSA, and the Federal Trade Secret

22    Act, which we call the D-T-S-A, or DTSA.  Are you aware of

23    that?

24    A.   I read that in the complaint.

02:44:47    25    Q.   If it were determined that trade secret damages outside of

Aron - direct by Stringfield

4873

1  the United States were not available prior to the May 11,

2  2016, enactment of the federal DTSA, would that impact the

3  calculation of damages in this case?

4  A.  Yes, it would.

02:45:06  5  Q.  Have you prepared a demonstrative that shows how damages

6  would be impacted?

7  A.  Yes, I did that arithmetic and put it on a demonstrative.

8      MR. STRINGFIELD:  Mr. Montgomery, can we have

9  DDX-2.20 [*sic*], please.

02:45:20  10  BY MR. STRINGFIELD:

11  Q.  Here again, Ms. Aron, it looks like you've again

12  reproduced Mr. Malackowski's slide from his testimony?

13  A.  Correct.

14  Q.  And the $73.6 million, which is the hypothetical research

02:45:32  15  and development costs, you discussed before lunch why that's

16  incorrect, right?

17  A.  I did.

18  Q.  And you've crossed it out again here?

19  A.  I did.

02:45:38  20  Q.  Is it correct -- incorrect to add that hypothetical

21  research and development cost here in the scenario that I just

22  described?  Is it correct for the same reasons that you

23  discussed this morning, all those economic reasons?

24  A.  It is.

02:45:52  25  Q.  And where does Hytera conduct its research and development

Aron - direct by Stringfield

4874

1    for the accused DMR products?

2    A.   That research and development is all conducted in China.

3    Q.   Was that true in 2008 when G.S. Kok, Sam Chia, and Y.T.

4    Kok arrived at Hytera?

02:46:13    5    A.   Yes.

6    Q.   And was that also true in 2010 when Hytera launched the

7    first DMR products that are accused in this case of including

8    the Motorola copyrights and Motorola trade secrets?

9    A.   Yes, that was true then too.

02:46:29    10    Q.   And is that, in fact, true today, that all of Hytera's

11    research and development related to DMR is conducted in China?

12    A.   It is.

13    Q.   Is there any other reason that you would deduct this

14    $73.6 million under the scenario that I've described where

02:46:47    15    economic damages are not available prior to 2016 outside of

16    the United States under the -- prior to the May 11th, 2016,

17    enactment of the DTSA?

18    A.   Well, we know that the R&D associated with that

19    hypothetical development would be conducted in China.  That's

02:47:08    20    where all of the DMR R&D is conducted.  And there's been no

21    evidence as to when that would be conducted, would it all be

22    conducted during the original development period or over some

23    other time period.  So based on that, I conclude that there's

24    no evidence available to me to include any of it.

02:47:32    25            THE COURT:  What is your definition of "conducted"?

Aron - direct by Stringfield

4875

THE WITNESS:  My definition of "conducted" is that

the R&D personnel would be performing work and billing time to

engage in the activities for developing and customizing and

improving the DMR radios that are accused.

02:48:01  BY MR. STRINGFIELD:

Q.  Dr. Aron, the 70- --

MR. STRINGFIELD:  I'm sorry.

THE COURT:  Proceed.

BY MR. STRINGFIELD:

02:48:05  Q.  And, Dr. Aron, the 73.6 million that should not be

included here, that's hypothetical, that never occurred at any

place and time; is that right?

A.  That's right.  We can't put a time or place -- I mean, we

can -- we know what would happen in China, but we can't put a

02:48:21  time on it because it's hypothetical.

Q.  And how would you further correct the calculation that we

discussed earlier in light of the scenario that I presented to

you where trade secret damages outside of the United States

were not available prior to the May 11th, 2016, enactment of

02:48:42  DTSA?

A.  First I took the 238 million number and I divided it up

between U.S. and outside the U.S.  And that can be done with

the data that we have on where sales happened, where the

customers were.  And so the numbers split out as shown here.

02:49:10  Q.  Is there --

Aron - direct by Stringfield

4876

A.   These numbers agree with Mr. Malackowski's numbers.  He

also reported these numbers.

Q.   And just for the record, the split is $28,714,814 in the

United States.  And that's profits according to Motorola.  And

02:49:26   then outside of the United States are Hytera's profits

according to Motorola of $209,561,242.

          Did I read those correctly?

A.   You did.

Q.   And why do you call these profits per Motorola?

02:49:42   A.   Per Motorola, by that I mean according to Motorola for the

reasons that I talked about before, which is these are really

incremental profits that don't deduct management or finance or

R&D yet.

Q.   And so that was the first error that you discussed this

02:50:01   morning, which was Mr. Malackowski's failure to deduct the

$79.6 million of research and development overall for all of

the accused products; is that right?

A.   The $79.6 million that Hytera actually incurred post

launch of its first DMR products to continue to customize and

02:50:24   develop the additional models.

Q.   So those should be deducted here in the scenario that I've

presented for the same reasons as you discussed this morning?

A.   Correct.

Q.   And have you shown that calculation?  You know what, I

02:50:38   skipped a step, and I'm sorry.

Aron - direct by Stringfield

4877

1    You did a step before what we just discussed.  And

2    can you please explain what you've done here with the

3    subtraction that says "pre-May 2016 profits."

4    A.   Yes.  The data provide the profits by year, by U.S. versus

02:50:55    5    outside the U.S.  So I simply summed up the profits outside of

6    the United States for the years before May of 2016.  For May

7    of 2016, I simply took a percentage of the year.  And that

8    amount that should be excluded, because it's before May of

9    2016, comes to $107,050,312.  So that's the adjustment that

02:51:26    10   you asked me to conduct.

11   Q.   And then after making that adjustment, the Hytera profits

12   per Motorola that are remaining for activity outside of the

13   United States after May 2016 is $102,510,930; is that correct?

14   A.   Correct.

02:51:43    15   Q.   And then now, Dr. Aron, do you do the research and

16   development deduction for the actual R&D expense that Hytera

17   incurred for the reasons you discussed this morning?

18   A.   I did.  And now because we're dividing things up by inside

19   the U.S. and outside the U.S., and different time periods, I

02:52:03    20   took that $79.6 million and I allocated it to those time

21   periods outside the U.S., and I allocated part of it to inside

22   the United States proportional to the number of units sold in

23   those time periods and places.

24   Q.   So the corrected profits inside the United States on

02:52:27    25   Hytera accused DMR radios from 2010 through 2019 is

Aron - direct by Stringfield

4878

1    $16,531,546?

2    A.   In the U.S.

3    Q.   And then the corrected profits for Hytera accused DMR

4    sales from May 2016 through 2019 outside of the United States

02:52:50    5    is $79,777,853?

6    A.   That's the number I calculate, yes.

7    Q.   And then to get to those numbers -- I want to read in the

8    research and development numbers that you deducted into the

9    record.  So the inside of the United States research and

02:53:09    10    development numbers that you deducted to arrive at that

11    corrected profit are $12,183,268; is that right?

12    A.   It is.

13    Q.   And then the amount outside of the United States for the

14    post-May 2016 research and development that you deducted are

02:53:25    15    $22,733,078; is that right?

16    A.   It is.

17    Q.   And so have you added together the resulting amounts of

18    inside the United States profit and outside of the United

19    States profit?

02:53:39    20    A.   Yes.  If you add them together, the result is $96,309,399.

21         MR. STRINGFIELD:  You can take that down,

22    Mr. Montgomery.

23         Let's go to 22.22.

24    BY MR. STRINGFIELD:

02:54:04    25    Q.   The first two issues that you addressed, again, were in

Aron - direct by Stringfield

4879

1  the context of the assumption that Hytera never launches a DMR

2  radio; is that right?

3  A.  Right.

4  Q.  And just to be clear, the calculation that you discussed

02:54:14  5  with me under the post-May 2016 scenario, that was also in the

6  context of the scenario where Hytera could never launch a DMR

7  radio; is that right?

8  A.  That's right.

9  Q.  What's the third issue that you've -- excuse me

02:54:27  10  -- identified on DDX-22.22?

11  A.  This addresses the scenarios that I mentioned at the start

12  identified by Mr. -- by Dr. Rangan that -- in which Hytera

13  could develop a DMR radio but with a delay for additional

14  development time.

02:54:50  15  Q.  And I think you've marked on this slide and I think you

16  referred to it earlier as a head start.  What do you mean by a

17  head start?

18  A.  So that period during which Hytera actually in the real

19  world got to launch a DMR radio, but in the as-if world would

02:55:13  20  not have been able to for, let's say, three months or six

21  months or two years, that's a head start that Hytera got in

22  the real world that it would not have gotten under that theory

23  absent access to the alleged trade secrets.  So we can think

24  of that time period and it's often referred to as a head

02:55:37  25  start.

Aron - direct by Stringfield

4880

1 Q.   Does Motorola offer multiple different options for head

2 start periods?

3 A.   Yes.

4 Q.   And what are those, if you recall?

02:55:44 5 A.   Three months, six months, one year, two years, three

6 years, and four years.

7 Q.   And Mr. Malackowski calculated what he contended to be

8 head start damages during those various periods; is that

9 right?

02:55:58 10 A.   Associated with those various head start scenarios.

11 Q.   And do you agree with his calculations?

12 A.   No.

13 Q.   Does economics provide a framework for evaluating the

14 effect of a company's profits on entering a market earlier

02:56:16 15 than it otherwise would have?

16 A.   It does.

17 Q.   Can you tell us a little bit more about that.

18 A.   Sure.

19      The way that one thinks about the effects on a

02:56:27 20 business's profits of entering sooner or later in a market

21 depends on the effects of that timing on the supply and demand

22 that are relevant to that company.

23      So you would consider whether a delay would cause

24 that company to lose sales -- lose all the sales it would have

02:56:54 25 lost during that time period.  It may lose all of those sales.

Aron - direct by Stringfield

4881

1  It may not because some of those might -- customers may choose

2  to wait and shift them to a later sale.  It may lose more

3  sales if the late or delayed entry would have affected its

4  ability to build its demand up.

02:57:17  5      So in economics, we look at the factors that would

6  play a role in whether there's any reason to think that if you

7  don't operate during, let's say, a one-year period but enter

8  the next year, that that would have any effect other than

9  losing the sales that you really made during that year.

02:57:42  10  Q.  Can you perhaps give us an example to illustrate what --

11  the concepts that you've just described?

12  A.  Sure.  So if you think about an interstate highway and you

13  imagine you open a gas station on that interstate highway.

14  And in 2010, a hundred cars drive by the gas station on

02:58:04  15  average per day.  Not a lot of traffic.  And so on average per

16  day, ten cars stop and buy gasoline from you.

17      Now 2011 comes and there's more traffic on the

18  highway.  The population has grown, the cities have grown.

19  Now 200 cars a day drive by your gas station.  And so on

02:58:29  20  average, 20 cars stop and buy gas from you.

21      The next year the demand -- the traffic grows, you

22  sell more gasoline similarly.

23      Well, what would happen if instead of opening your

24  gas station in 2010, you open it in 2011?  What would happen

02:58:54  25  is, you wouldn't make any of those sales that you made in

Aron - direct by Stringfield

4882

1   2010.  You lose all of those sales, ten cars a day.  But in

2   2011, 200 cars are still going by your gas station.  That's

3   determined by the population and the population of the

4   relevant cities connect that -- that your highway connects.

02:59:17   5   So in 2011, you would make -- you would sell to 20

6   cars.  And in 2012, maybe the traffic is 300 and you sell to

7   30 cars a day and so forth.  So what you lose are the sales to

8   ten cars a day.  That's the effect on your profits of that

9   head start that you would have gotten could you have entered

02:59:44   10   in 2010.

11   Q.  Are you aware of a concept called the head start doctrine

12   in the context of trade secret damages?

13   A.  I am.

14   Q.  Can you tell us what your understanding of that doctrine

02:59:53   15   is.

16   A.  In the head start doctrine in trade secret damages, the

17   idea is related.  And it says, if a defendant in a case, such

18   as Hytera in this one, could have reproduced the alleged

19   misappropriated trade secrets on its own effort through

03:00:16   20   reverse engineering or through independent development in some

21   period of time, then the head start doctrine says the general

22   rule or the default rule is the damages start when you

23   actually started receiving benefits, when you actually, in our

24   case, entered use of the real DMR phone.  And they stop -- you

03:00:42   25   stop assessing damages at the time when the company could have

Aron - direct by Stringfield

4883

1    developed the trade secrets on its own.

2          So what we've been talking about here is, if there's

3    a six-month delay or a six-month head start, Hytera started

4    receiving benefits in March of 2010, but it could have,

03:01:04    5    according to Mr. Grimmett, developed those trade secrets on

6    its own independent development by September of 2010.

7          So in that delay or head start scenario, the damages

8    would be confined to the sales that actually occurred during

9    those six months.

03:01:21   10          MR. STRINGFIELD:  Can we have DDX-22.23, please, Mr.

11    Montgomery.

12    BY MR. STRINGFIELD:

13    Q.  Does this summarize what you just described for us about

14    the application of the head start program?

03:01:32   15    A.  It does.  It says you start the -- your calculation of

16    damages when the actual benefits begin and you end when the

17    independent development could have been completed.

18    Q.  Dr. Aron, are you aware of any literature or articles that

19    discuss the head start doctrine?

03:01:49   20    A.  I am.

21    Q.  And can you tell us what article you're thinking of?

22    A.  It's an article by the -- or published by the Sedona

23    Conference journal.  And it's about the determination of trade

24    secret damages in the context of head start delays.

03:02:10   25    Q.  And can you tell us who or what the Sedona Conference is.

Aron - direct by Stringfield

4884

A.   The Sedona Conference is an educational institution.  It's
a nonprofit that is for the purpose of providing dialogue and
a journal among expert economists and lawyers and judges and
other interested parties in the issue of -- in a variety of
03:02:45   policy and legal issues, including intellectual property.  And
they publish a journal in which articles on these issues by
thought leaders are presented.
Q.   And the discussion of the head start period in that
article, did that align with your understanding and discussion
03:03:04   of the head start period, as you've just discussed today?
A.   It aligns with my economic view of how one properly
assesses the damages associated with a head start.
Q.   And did you refer to or reference that article in forming
your opinions today?
03:03:19   A.   I did.  Both Mr. Malackowski and I cited to that article.
Q.   And is that article freely available online for download?
A.   Yes, it is.
     MR. STRINGFIELD:  Your Honor, at this time Hytera --
well, let me back up.
03:03:31   BY MR. STRINGFIELD:
Q.   Dr. Aron, can you pull to DTX-4909 in your binder, please.
A.   I'm there.
Q.   Is this the article that you were just referring to?
A.   It is.
03:03:47   MR. STRINGFIELD:  Your Honor, at this time Hytera

Aron - direct by Stringfield

4885

1    moves DTX-4909 into evidence and wishes to publish it to the

2    jury.

3         MS. NEW:  No objection, Your Honor.

4         THE COURT:  It is received and may be published.

03:04:02    5    (Exhibit No. DTX-4909 was received in evidence.)

6         THE COURT:  Just getting back to your gasoline

7    discussion, suppose you open a gas station in 2009, premature,

8    what effect would that have?

9         THE WITNESS:  That's a good question.

03:04:12   10         So in 2009, are you assuming that there was no

11   traffic at all?

12         THE COURT:  Well, I'm just saying, if you open the

13   gas station in 2009 -- you said the traffic began in 2010.

14         THE WITNESS:  I said the -- did you say I said the

03:04:28   15   traffic began in 2010?

16         THE COURT:  Well, I think you said ten cars in 2010.

17   Did you not?

18         THE WITNESS:  I said assume that a hundred cars go by

19   on average per day in 2010.  I did not mean to imply that

03:04:42   20   there was no traffic before that.  But my hypothetical is,

21   suppose that you open a gas station on this highway in 2010

22   and that happens to be the traffic.

23         THE COURT:  My question is:  Suppose you open the gas

24   station in 2009, prematurely, would that have any effect

03:04:58   25   ultimately on profits?

4886

1        THE WITNESS:  Well, if by "prematurely" you mean

2   that --

3        THE COURT:  Well, let's make it 2006 --

4        THE WITNESS:  So --

03:05:12   5        THE COURT:  -- Professor.

6        THE WITNESS:  -- the way I think about it is, if what

7   you're suggesting is that at some point in 2006 or 2008 there

8   was no traffic yet and you opened the gas station anyway, then

9   you would incur fixed costs, if any, associated with having

03:05:30  10   opened and, perhaps, hired people to run that business.  I

11   don't --

12        THE COURT:  And -- go ahead.  You've given me an

13   answer to my question.

14        Suppose the gas stations had no gasoline to sell.

03:05:48  15        THE WITNESS:  Then you couldn't sell anything.

16        THE COURT:  Proceed.

17        MR. STRINGFIELD:  Let's turn, please, to Page 16 of

18   DTX-4909.  And the second paragraph, please, if we could pull

19   that up.

03:06:05  20   BY MR. STRINGFIELD:

21   Q.  What does the Sedona Conference article tell us about the

22   general rule for applying the head start doctrine?

23   A.  Well, I'll read it.

24        "The general rule is that the accounting of unjust

03:06:20  25   enrichment damages commences at the moment that use of the

Aron - direct by Stringfield

4887

1    misappropriated trade secret confers a benefit on the

2    defendant.  Damages then accrue until such time, if ever, that

3    the defendant would have acquired knowledge of the trade

4    secret through legitimate means, such as public disclosure,

03:06:36    5    reverse engineering, or independent development."

6            THE COURT:  Does the article that you're referring to

7    give any examples, such as your gasoline example?

8            THE WITNESS:  Your Honor, this article focuses more

9    on a compilation of the way that the head start doctrine has

03:07:07    10   been applied in a variety of head start cases.  My analysis is

11   based on my economic understanding of how one would apply the

12   concept of a head start to a business.  And I'm observing that

13   the economic kind of default general rule conforms with what's

14   being discussed in this article.

03:07:36    15           THE COURT:  The point of my question is:  So if there

16   is an example within the article, it might be well for the

17   jury to know of that example so they can better understand the

18   concepts that you are so competently discussing.

19           But move on, Counsel.

03:07:56    20           MR. STRINGFIELD:  Sure.

21           Your Honor, I believe there is an example that might

22   be helpful, if I may --

23           THE COURT:  You may inquire.

24           MR. STRINGFIELD:  -- inquire of the witness.  Thank

03:08:04    25   you.

Aron - direct by Stringfield

4888

BY MR. STRINGFIELD:

Q.  Dr. Aron, on Page 681 of the article, the second bullet

discusses a new car consulting situation.  And the general

premise of it is that the misappropriation was an automotive

03:08:19  dealer client list.

Do you recall reading this when you read the article?

A.  I do.

Q.  And in that case, there was the conclusion that --

THE COURT:  You may inquire of the witness.

03:08:30  MR. STRINGFIELD:  Sure.

BY MR. STRINGFIELD:

Q.  What's your --

MR. STRINGFIELD:  Thank you, Your Honor.

BY MR. STRINGFIELD:

03:08:31  Q.  What's your recollection of this scenario that was posed

in the article?

MS. NEW:  Objection, Your Honor.  The witness is

instruct -- going to end up instructing the jury on the law on

this issue and interpreting case law.

03:08:44  THE COURT:  What is your question, Counsel?

MR. STRINGFIELD:  I can move on, Your Honor.

THE COURT:  Well -- all right.  Move on, if you will.

BY MR. STRINGFIELD:

Q.  Let's go to DDX-22.24, please.

03:09:06  What have you shown here, Dr. Aron?

Aron - direct by Stringfield

4889

1  A.  Oh.  This is a bar chart of the profits to Hytera by year

2  for the accused devices according to -- actually, according to

3  Mr. Malackowski's calculations, but these are the profits by

4  year.

03:09:32  5  Q.  And why do you say according to Mr. Malackowski's

6  calculations?

7  A.  They don't deduct the R&D that I said should be deducted.

8  Q.  Why is the 2019 bar relatively small compared to the

9  others?

03:09:43  10  A.  Because in 2019, the parties only exchanged half a year of

11  data.  So this is actually -- it looks small, but it's only

12  half a year.

13  Q.  Using DDX-22.24 and the touch screen, if you wish, can you

14  illustrate how you would calculate damages under the head

03:10:03  15  start period and, perhaps, the six-month period as an example?

16  A.  If you don't mind, I'll show for a year.  It's just

17  easier --

18  Q.  Sure.

19  A.  -- to explain.

03:10:16  20  Q.  Sure.

21  A.  So if instead of entering in 2010, a company enters in

22  2011, Hytera produces a product in 2011 instead of 2010, so

23  there's a year delay or, put differently, Hytera got a year

24  head start, then the profits that we as a base case assume

03:10:39  25  Hytera would lose in the world in which they didn't get to

Aron - direct by Stringfield

4890

1    enter in 2010, that would be these profits in 2010.

2    Q.   Is that like your gas station analogy, where you missed

3    the first year's worth of traffic?

4    A.   That's right.  And you miss the first year.  The traffic

03:10:59    5    is gone.  But you come in in 2011, the traffic is there.  It's

6    a bigger amount of traffic.  It's a metaphor for saying the

7    market has grown.  There are more people that want to buy your

8    product, and your profits in that year are going to reflect

9    the demand in that year.  And so the loss that you incur are

03:11:21    10    the profits in the year that you missed.

11    Q.   Is that how Mr. Malackowski applied the head start

12    doctrine?

13    A.   No, it isn't.

14    Q.   Can you use your gas station example to illustrate how

03:11:35    15    Mr. Malackowski applied the head start doctrine?

16    A.   So the way he applied it is he said, okay, in 2010, you

17    don't get profits.  In 2011, instead of 200 cars going by your

18    gas station, which there are in the real world, only a hundred

19    go by because that's what happened in 2010.

03:11:59    20         And so in 2011, you only get the profits associated

21    with the traffic that occurred in 2010 or the profits on ten

22    cars a day.

23         And then in 2012, instead of, let's say, 300 cars

24    going by a day, we pretend it's only 200 because that's what

03:12:21    25    happened in the previous year.  And we get the profits only

Aron - direct by Stringfield

4891

1   associated with the 200 cars that actually went by in the

2   previous year and not the 300 that actually go by in the

3   current year.  And he does that for every single year all the

4   way out to the end of the data.

03:12:46   5   Q.  Do you agree that that's an appropriate application of the

6   head start doctrine?

7   A.  No, it's -- it's not consistent with a reasonable way to

8   look at how the effect of a delay would affect a business.

9   It's very, very aggressive.  It causes the effects of that,

03:13:11   10   let's say, one-year delay to not only multiply by the number

11   of years, but actually by -- but to grow by far more than

12   that.  It propagates throughout the time period as demand

13   grows.

14   Q.  I have some questions in a few minutes about the economic

03:13:29   15   impact of Mr. Malackowski's application.  But before I get

16   there, you mentioned a general rule or you discussed the

17   general rule for the application of the head start doctrine.

18        Are there exceptions to that general rule that would

19   allow you to consider damages outside of the head start

03:13:45   20   period?

21   A.  Yes, of course.  So there may be economic reasons that a

22   delay of six months or a year, for example, would have effects

23   beyond that year.  Not every market is like a gas station on

24   the highway.

03:14:02   25        And so if, for example, you enter a year later and

Aron - direct by Stringfield

4892

1    you only start a year later to build a distribution network or

2    people -- when you -- whether you enter in 2010 or 2011,

3    that's going to be the first time people have ever heard of

4    your product or your brand, well, that could cause there to be

03:14:22    5    a delay in how demand wraps up for you.

6          So under circumstances like that, it would be

7    appropriate to conduct an analysis, a real analysis, a data

8    analysis looking at the available information and applying

9    appropriate statistical and economic methodology and figure

03:14:47    10    out how big is that effect, if any.

11          It could also go the other way.  It could be, you

12    know, if you're delaying the introduction of your iPhone by

13    six months, you're not going to lose every sale that you would

14    have made during that six months because there are some people

03:15:02    15    that will just give up and buy a Samsung and there are some

16    people that will wait until the iPhone comes out and they'll

17    just buy later instead of when they were originally intending

18    to.

19          So depending on the market characteristics, if one

03:15:17    20    analyzes the market and finds that there are good reasons to

21    deviate from the kind of first order general rule, then you

22    conduct that analysis and you reach a reasoned

23    discipline-based, by which I mean economics-based, conclusion.

24    Q.   And did you consider whether any of those circumstances

03:15:38    25    apply here that would justify deviating from the general rule?

Aron - direct by Stringfield

4893

1    A.  I did consider them, of course.  Yes.

2    Q.  And what did you conclude?

3    A.  Well, the factors that I just talked about, a distribution

4    network.  Well, Hytera already had a distribution network in

03:15:54    5    place.  Hytera was already selling analog products and it was

6    already selling digital products through its dealer network

7    worldwide.

8    Q.  And just for time frame, you're talking about in 2010 when

9    Hytera first launched the accused DMR radios in this case?

03:16:10    10    A.  Yes.  Thank you for the clarification.

11        And Hytera also was a brand name that was known to

12    customers that buy these products.  Because, again, it had a

13    small market share, but it did have a presence in the market.

14    And it -- as I said, it was selling analog and digital

03:16:31    15    products.  So customers knew -- this wouldn't be the first

16    time that customers had heard the name Hytera.  And, third,

17    DMR was already in the market.  DMR had been in the market by

18    Motorola since 2007.

19        So by 2010, it wasn't that no one had heard of this

03:16:49    20    product and it required an additional ramp-up because Hytera

21    had gotten into the market.

22        So I thought about the factors that the economic

23    literature tells us we should consider.  I also didn't think

24    that there was reason to believe that customers would have

03:17:06    25    waited necessarily and delayed purchase.  So I didn't feel it

Aron - direct by Stringfield

4894

1   was necessary to deviate from the standard assumption.

2   Q.   And I believe you mentioned that if you are going to

3   deviate from the standard assumption, you have to do some sort

4   of analysis.  Did I hear you correctly?

03:17:22    5   A.   That's my view, yes.

6   Q.   Can you tell us a little bit about what type of analysis

7   you would do if you concluded that there were justification to

8   go outside of the general default rule of the head start

9   doctrine?

03:17:36   10   A.   Economists have methodologies for estimating demand on the

11   basis of data.  And in the process of that analysis, assessing

12   the extent to which past years of sales affect current sales,

13   for example.  Also, you would look at supply and whether, as

14   the judge suggested, there might be a problem getting supply

03:18:05   15   if you delay your entry.

16         The way one goes about assessing an effect like this

17   is not necessarily simple, and there's not a formulaic way to

18   do it.  And the approach one applies will depend on the data

19   available and the market analysis you do and the circumstance,

03:18:26   20   but that's the starting point where you would launch an

21   analysis.

22   Q.   Did Mr. Malackowski do any such analysis to justify his

23   application of the head start doctrine, as you've demonstrated

24   for us?

03:18:40   25   A.   No, he didn't.

Aron - direct by Stringfield

4895

Q.  Did he think that such an -- you could do such an
analysis?

A.  He responded that he didn't think a study or survey was
possible.

03:18:52

        THE COURT:  You mean this particular witness could do
it?

        THE WITNESS:  No, my understanding of the question
that he was asked and the answer he gave was whether one could
do such an analysis.

03:19:05

BY MR. STRINGFIELD:

Q.  And he concluded it was impossible.  Is that what you've
just said?

A.  He said it was impossible to perform a survey or study, is
how I understood his testimony.  He said it was impossible.

03:19:17

Q.  Do you agree that it's impossible?

A.  Well, as I just described, no, I think if one conducts an
analysis of the market and concludes that it is necessary to
quantify an effect outside the damages period or the head
start period, then there are many tools one would draw on to

03:19:41

attempt to perform that analysis.

        We don't know if the analysis -- anytime we conduct a
data analysis, if it will work, if it will be successful and
achieve reliable results, but we do our best to try to design
and conduct an analysis, and then we assess whether the

03:20:00

results are reliable.

Aron - direct by Stringfield

4896

1    Q.   Did you do that analysis?

2    A.   No, I didn't.

3    Q.   Why not?

4    A.   Because as I just said, I considered the factors of the

03:20:09    5    market that would drive one to embark on such an analysis,

6    which is complex, and I concluded that I did not see a

7    compelling reason that it was necessary to deviate from the

8    standard rule.

9    Q.   So you applied the general rule?

03:20:26    10   A.   I did.

11   Q.   And then you didn't have to do the analysis to justify

12   going outside the general rule; is that right?

13   A.   Correct.

14   Q.   If Mr. Malackowski didn't do the analysis, what should he

03:20:39    15   have done?

16   A.   He should have applied the general standard rule, in my

17   opinion.

18        MR. STRINGFIELD:   You can take that down,

19   Mr. Montgomery.

03:20:50    20   BY MR. STRINGFIELD:

21   Q.   Mr. Malackowski pointed to March 2010 as a critical time

22   period for Hytera to get into the DMR market as justification

23   for his delay period approach.

24        Do you recall him offering that justification?

03:21:07    25   A.   I do.

Aron - direct by Stringfield

4897

1    Q.  Do you agree with his justification?

2    A.  No, I don't.

3    Q.  What was the justification that he offered?

4    A.  Well, he -- his view was -- is that 2010 was a critical

03:21:20    5    year, and if you miss 2010, if you don't get in the market,

6    you miss the boat and that has ramifications for the entire

7    future of your business in DMR.

8           And what he referred to were regulatory

9    pronouncements by the Federal Communications Commission

03:21:42    10   related to transitioning to a radio systems from analog to

11   digital.  And what he indicated was that it was a critical

12   period to start selling DMR because everyone had to transition

13   to digital because of the FCC's new orders.

14   Q.  And you disagree with that?

03:22:05    15   A.  I do.

16          MR. STRINGFIELD:  Could we have DDX-22.27, please.

17   BY MR. STRINGFIELD:

18   Q.  What have you shown here, Dr. Aron?

19   A.  What I'm showing here is the actual transition from -- of

03:22:24    20   sales of digital and analog two-way radios broken out by

21   analog and digital.

22          So the yellow is digital in 2010 and the blue is

23   analog.  And so just looking at the first bar here, what this

24   is saying is, of all of the two-way radio systems sold

03:22:49    25   worldwide in 2010, over 70 percent of them were analog, the

1    rest were digital.  And that's all digital.  Not just DMR, but

2    TETRA and P25 and PDT and XD and all these other digital

3    technologies.

4            In 2011, we see that digital is growing and analog is

03:23:17    5    shrinking its share of the market, but it's shrinking slowly

6    and there's plenty of sales of analog in the market.  And, in

7    fact, if you look across the bars here, you see that the sale

8    of analog systems exceeded 50 percent all the way to 2014.

9    2015 was the first year that analog fell below 50 percent of

03:23:41    10   all of the sales of two-way radios in the market.

11   Q.   And, again, in 2015, the balance of that yellow bar, the

12   all-digital technology, that's not just DMR; is that right?

13   A.   That's right.  DMR is just a piece of what's in there.

14   Q.   Does Motorola still sell analog radios today?

03:24:05    15   A.   Yes.  The testimony we heard is that Motorola still sells

16   analog, and it suits the needs of some of its customers well

17   today.

18            MR. STRINGFIELD:  DDX-22.25, please, Mr. Montgomery.

19   BY MR. STRINGFIELD:

03:24:26    20   Q.   What have you shown here, Dr. Aron?

21   A.   What I'm showing here is the effect of Mr. Malackowski's

22   approach to the -- quantifying the effect of having a head

23   start.  And so if you look, for example, at the six-month row

24   here, just to talk about that, the head start period is that

03:24:54    25   Hytera got a head start because instead of launching in March

Aron - direct by Stringfield

4899

1    of 2010, it would have launched in September of 2010.  That's

2    the six months.

3            Under Mr. Malackowski's calculations, that caused

4    unjust enrichment to Hytera of almost $31 million, but the

03:25:19    5    profits that actually occurred in that six months was

6    $844,000.

7            So it's not like, well, you know, there was $844,000

8    in the first six months, and then you kind of multiply them

9    out for every year.  It actually has an effect on the damages

03:25:42    10   that is much bigger even than that.

11           It -- his assessment, his quantification of the

12   damages associated with a six-month head start is almost 4,000

13   times -- 4,000 -- sorry -- 4,000 percent, it's almost 36 times

14   the damages just in that period, the unjust enrichment just in

03:26:11    15   the head start period.  So it has a huge inflating effect on

16   the calculation of unjust enrichment.

17   Q.  And that's because of the unending rippling effect of

18   Mr. Malackowski's application?

19   A.  Right.  It never goes away within the period of our data

03:26:30    20   up through second -- up through the first half of 2019.

21   Q.  And just to read your -- and so these actual head start

22   profits in the fourth column over, these are the profits that

23   occur within the various head start periods; is that right?

24   A.  Correct.  That's this column that you just referred to

03:26:53    25   called actual head start profits.

1    Q.  And so just for the record, I'm going to read these.  I

2    think Mr. Malackowski has already put his values into the

3    record.  I will read the corrected values into the record.

4         For the three-month head start period, the profits

03:27:06  5    within that period are $422,031; for the six-month period,

6    they are $844,062; for the one-year period, $1,688,123; for

7    the two-year head start period, $8,857,294; for the three-year

8    period, 22,774,762; and for the four-year period, $43,998,692.

9         Did I read those numbers correctly, Dr. Aron?

03:27:43  10   A.  You did.

11   Q.  There are various proposed head start periods that are

12   offered here; is that right?

13   A.  Yes.  There are six of them.

14   Q.  Did either side's technical experts isolate any of these

03:27:58  15   head start periods in particular as most appropriate?

16   A.  Dr. Rangan, I don't believe he did, but Mr. Grimmett did.

17   Mr. Grimmett testified that, as I said before, if Hytera had

18   not had access to the alleged trade secret materials, it would

19   have been able to produce a DMR radio, but with a six-month

03:28:24  20   delay.  And so he focused on this six-month period.

21        He also testified that in 2011, the Sicomm chip came

22   out.  This chip that could be used to develop a DMR radio.

23   And that that would -- if Hytera had chosen to use the Sicomm

24   chip, it could have produced a radio in two years.  So the

03:28:50  25   chip comes out in 2011, and there's another year of

Aron - direct by Stringfield

4901

1    development time, so you come out with a radio in 2012 or a

2    two-year delay.

3    Q.   And I have some questions about Mr. Grimmett's opinions or

4    your quantification of his opinions in just a moment.  But

03:29:07    5    first, earlier you testified how damages would be impacted if

6    it were determined that trade secret damages outside of the

7    United States were not available prior to the May 11th, 2016,

8    enactment of the DTSA.  Do you recall that?

9    A.   I do.

03:29:22    10    Q.   And that was in the scenario under Dr. Rangan's opinion

11    that Hytera could never launch a DMR radio; is that right?

12    A.   At least up until today, yes.

13    Q.   Would the damages that you've shown here on DDX-22.25 also

14    be impacted if, again, it were determined that trade secret

03:29:42    15    damages outside of the United States were not available prior

16    to the May 11, 2016, enactment of the DTSA?

17    A.   Yes, they would.  Some of these are in the U.S. and some

18    are out of the U.S., so they would be affected, yes.

19    Q.   And have you prepared a demonstrative that shows the

03:30:00    20    impact?

21    A.   I have.

22         MR. STRINGFIELD:  Can we have DDX-22.26, please.

23         THE COURT:  How long has this chart been available,

24    Counsel?

03:30:11    25         MR. STRINGFIELD:  This chart, Your Honor?  This chart

Aron - direct by Stringfield

4902

1    was created recently.

2         THE COURT:  How recently?

3         MR. STRINGFIELD:  Over the weekend.

4         THE COURT:  Is there any objection to its

03:30:23    5    admissibility?

6         MS. NEW:  I'm sorry?  Any objection to what?

7         THE COURT:  Its admissibility.  I mean, have you seen

8    it?

9         MS. NEW:  Yes, we have seen it.

03:30:30    10        THE COURT:  All right.  Do you have any objection?

11        MS. NEW:  We do not.

12        THE COURT:  Okay.  It is received in evidence and may

13   be published to the jury.

14        (Exhibit No. DDX-22.26 was received in evidence.)

03:30:38    15        MR. STRINGFIELD:  Thank you, Your Honor.

16   BY MR. STRINGFIELD:

17   Q.  Dr. Aron, what have you shown here on DDX-22.26?

18   A.  For purposes of the exercise I was asked to conduct, to

19   break out the damages into U.S. and outside the U.S., and then

03:30:51    20   for the post-May 2016 period, first, I noted that -- all of

21   the head start periods and before 2016.

22        So under the scenario I was given to calculate, there

23   would be no damages outside the U.S. because none of these

24   head start periods fall into the post-May 2016 period.

03:31:19    25        So I just calculated the head start damages for the

Aron - direct by Stringfield

4903

U.S. only, and that's what's shown on this chart.

Q.   And the third column over, which is Motorola's flawed head start profits, how did you determine that?

A.   Those were reported by Mr. Malackowski.

03:31:44

Q.   Those were the U.S. portion of his numbers in his report and opinion?

A.   Correct.  He provided a U.S. breakout.

Q.   And how did you determine the actual head start profits that you've shown in the fourth column of DDX-22.26?

03:31:59

A.   As I described earlier, it was the same methodology, but just focusing on the U.S. data alone.  And so for the -- let's say the one-year period, I actually looked at his analysis and I just isolated the damages for the one year that was the delay period.  And similarly for the other scenarios, I pulled

03:32:27

them from his data and analysis.

Q.   And just for the record, I'm going to read these into the record.

These are Motorola's or Mr. Malackowski's head start calculations that you disagree with for the various periods

03:32:44

under the scenario where the DTSA, the federal act, prevents any trade secret damages outside the United States prior to the May 11, 2016, enactment.  For the three-month period, Motorola has $1,342,970.  For the six-month period, $2,685,940.  For the one-year period, $5,371,879.  For the

03:33:17

two-year period, $11,422,300.  For the three-year period,

Aron - direct by Stringfield

4904

1   $15,963,206.  For the four-year period, $20,036,573.

2        Did I read those numbers correctly?

3   A.  Yes, you did.

4   Q.  And then for the record, the actual head start profits

03:33:43   5   that occur within the head start periods that you've

6   determined are appropriate, again, for the various scenarios,

7   under the situation where trade secret damages are not

8   available prior to the May 11, 2016, enactment of the federal

9   DTSA outside of the United States.

03:34:00   10       The numbers are as follows:  For the three-month

11  period, $114,643.  For the six-month period, $229,286.  For

12  the one-year period, $458,572.  For the two-year period,

13  $1,308,848.  For the three-year period, $3,530,237.  For the

14  four-year period, 5 million -- excuse me -- $5,456,552.

03:34:38   15       Did I read those numbers correctly, Dr. Aron?

16  A.  You did.

17  Q.  Thank you.

18       MR. STRINGFIELD:  You could take that down,

19  Mr. Montgomery.

03:34:47   20  BY MR. STRINGFIELD:

21  Q.  Now I have questions about how you quantified

22  Mr. Grimmett's opinion that -- of what would have happened in

23  a six-month delay.

24       Did Mr. Grimmett give -- or can you summarize for us

03:35:01   25  what his opinions were of the benefits that Hytera gained in

Aron - direct by Stringfield

4905

1    the six-month head start, if it received one?

2    A.  Yes.  So Mr. Grimmett's opinion was that access to the

3    alleged trade secret materials afforded Hytera up to or at

4    most a six-month head start in being able to develop and

03:35:33    5    launch its DMR product, and also that it saved Hytera 650

6    staff months spread out over the development period in R&D

7    expenditure -- 650 staff months of R&D expenditure that was

8    saved.

9    Q.  And did you quantify the economic impact of those benefits

03:35:58    10    that Mr. Grimmett determined would have happened in a

11    six-month head start?

12    A.  I did.

13            MR. STRINGFIELD:  Can we have DDX-22.36, please.

14    BY MR. STRINGFIELD:

03:36:15    15    Q.  Dr. Aron, what have you done here in this first

16    calculation that you've shown?

17    A.  Well, there are two components of the damages, and I just

18    said what they are.  There's the saved R&D expenditure, and

19    then there's also the unjust enrichment on sales that we

03:36:32    20    talked about a moment ago during the head start period.

21            So the first box here, I calculated the unjust

22    enrichment on R&D savings by taking the 650 staff months and

23    multiplying by Hytera's labor rate per staff month that we

24    talked about earlier, $1,638.  And that multiplication gives

03:36:56    25    you the $1,064,661.  That would be the unjust enrichment that

Case: 1:17-cv-01973 Document #: 926 Filed: 02/26/20 Page 94 of 193 PageID #:62126
Aron - direct by Stringfield
4906

1    Hytera obtained by being able to save 650 staff months.

2    Q.  And then what's -- I think you told us already, but how

3    did you quantify the second component of unjust enrichment

4    under this six-month head start?

03:37:16    5    A.  This is a slightly different number than

6    Mr. Malackowski's, but we're going for the same thing, which

7    is the amount of profits that Hytera earned in six months in

8    2010.  That's this number.

9    Q.  And you mentioned that it was slightly different from

03:37:37    10    Mr. Malackowski's number, which I believe for six months

11    was -- or the actual -- let's go back, Mr. Montgomery, just

12    briefly to DDX-22.25.

13        And so I think you were referring to this $844,062

14    number is slightly different than the 1,051,000 that you had

03:38:04    15    just shown?

16    A.  Correct.

17    Q.  And, again, the number on DDX-22.25, these were the

18    numbers that were within the head start period.  And how

19    specifically were these head start -- the dollars within these

03:38:15    20    head start periods determined?  Was it based on calendar year

21    or was it based on some other determination?

22    A.  So these numbers were Mr. Malackowski's numbers, and there

23    are a couple of differences that lead to the difference that

24    we see here.  One of them is that Mr. Malackowski's numbers

03:38:37    25    include accessories and mine don't, but the other is that

Aron - direct by Stringfield

4907

1  Mr. Malackowski calculated the six months as half a year, and

2  I calculate it as two-thirds of a year because Motorola didn't

3  actually launch the product until March.  So six months isn't

4  really half of the revenue.  It's more than half of the

03:38:58  5  revenue, and that's why I get a bigger number.  It's a minor

6  difference.

7  Q.  And you said "Motorola."  Did you mean Hytera when that --

8  who launched in March of 2010?

9  A.  Pardon me.  Yes.  If I misspoke, I apologize.

03:39:10  10  MR. STRINGFIELD:  Can we go back to DDX-22.36,

11  please.

12  BY MR. STRINGFIELD:

13  Q.  And so, again, just to close the loop on that, you are --

14  you have $1,051,160, which is larger than the $860,000 number

03:39:25  15  we looked at earlier?

16  A.  Correct.

17  Q.  And so, just for the record, I'll read in what you've

18  quantified here.  For the unjust enrichment on R&D savings for

19  Mr. Grimmett's six-month head start opinion, you've quantified

03:39:39  20  $1,064,661; is that right?

21  A.  On the R&D savings, yes.

22  Q.  And then for the component, that is the unjust enrichment

23  on the sales from the six-month head start period, you've

24  calculated $1,051,160; is that right?

03:39:57  25  A.  It is.

Aron - direct by Stringfield

4908

1   Q.  And when you total this together, it looks like you get

2   $2,115,821; is that right?

3   A.  It is.

4           MR. STRINGFIELD:  Let's go to DDX-22.38, please.

03:40:12   5   BY MR. STRINGFIELD:

6   Q.  This was the chart that -- or another version of the chart

7   that we discussed both before and after lunch; is that right?

8   A.  Correct.

9   Q.  And, Dr. Aron, for the -- if you took the research and

03:40:28   10   development savings component of Mr. -- the quantification of

11   Mr. Grimmett's opinion, which, again, was $1,064,661, and

12   added that here, which I see you've done on DDX-22.39, what

13   does that take the number -- the Hytera DMR research and

14   development number to?

03:40:47   15   A.  So when you add those together, the total R&D development

16   dollars for Hytera would come to $12,820,000, approximately,

17   which is, as you see, very close to my adjusted version of

18   Mr. Malackowski's bar chart of what the Motorola R&D

19   assessment was.

03:41:19   20   Q.  You call this an apples-to-apples research and development

21   comparison.  Why is that?

22   A.  My understanding of Mr. Grimmett's testimony is that the

23   7,920 staff months that came from the Motorola business plan

24   document as an estimate of how long it would take Motorola to

03:41:39   25   build a DMR radio excludes all of the prior development of

Aron - direct by Stringfield

4909

1    analog products.  And that's also true of Hytera's estimate

2    of -- or of Hytera's calculation of the R&D expenditures that

3    it actually made, the data that I used.

4            So it's apples-to-apples in the sense that as I

03:42:05    5    understand what the 7920 represents, both numbers on this

6    chart reflect developing a DMR radio, excluding all of the

7    analog development and prior to DMR development that Motorola

8    had built into the dollars that generated the $73.6 million

9    number.

03:42:36   10    Q.  And is it also true that this $12.82 million number that

11   you have here for Hytera, does that exclude Hytera's history

12   of analog and digital radio development going back over a

13   decade?

14   A.  It does.  It's only the R&D expenditures associated with

03:42:56   15   the accused products, as I described in my testimony earlier.

16           And so both bars reflect exclusion of the work that

17   both companies independently did to develop analog radios and

18   just focuses on DMR.

19   Q.  Hence the apples-to-apples comparison?

03:43:20   20   A.  That's the point of the title, yes.

21           MR. STRINGFIELD:  You can take that down,

22   Mr. Montgomery.

23   BY MR. STRINGFIELD:

24   Q.  Dr. Aron, you addressed the effect on Hytera if Hytera's

03:43:31   25   entry into DMR were delayed.  As an economist, would you

Aron - direct by Stringfield

4910

1    expect there to be any effect on Motorola's success in DMR if

2    Hytera's introduction of DMR were delayed?

3    A.   Yes, I would expect so.

4    Q.   Can you explain, please.

03:43:45    5    A.   DMR is a standard.  And from an economic standpoint,

6    having a standard in the market is more valuable if there's

7    more than one company selling the products under that

8    standard.  A single supplier standard is more limited in its

9    ability to gain traction in the market and capture a good

03:44:14    10    share of the market.

11    Q.   Is a standard with more -- or why is a standard with more

12    than one company more valuable?

13    A.   Because from -- think of it from the customer's

14    perspective.  If you're trying to decide which standard to buy

03:44:31    15    your system in, DMR, dPMR, something else, and there's only

16    one company that's supplying the standard that you're

17    considering, then once you buy that standard, you're kind of

18    locked into it.  Other standards aren't compatible with it.

19         So once you buy from one company, now every time you

03:44:52    20    want to upgrade and augment your system, you have to buy from

21    that same company.  And that company knows you're locked in

22    and has the opportunity to raise the price.  And so you're

23    vulnerable to kind of price exploitation when there's a single

24    company.

03:45:08    25         And that might seem like a great thing from the

Aron - direct by Stringfield

4911

1    supplier standpoint, it gets to lock you in and be a

2    monopolist, but it's actually not because customers know that

3    and they're reluctant to buy into a standard where they know

4    they're going to potentially get locked in and not have a

03:45:27    5    choice later.

6    Q.   It sounds like it's bad for customers and bad for the

7    suppliers; is that right?

8    A.   It is.  It's bad for the suppliers.  It's bad for

9    customers.  And that's why the supplier wants other companies

03:45:40    10    to adopt the standard as well.  It creates competition, and

11    that creates more interest on the part of consumers.  So it

12    creates a bigger market for the product.

13    Q.   What happens -- and maybe you were starting to touch on

14    this, but what happens when additional competitors begin

03:46:00    15    entering that market?

16    A.   When additional competitors enter the market, it has an

17    effect on both the suppliers and the consumers because from

18    the consumer side or the customer side, now they see there's a

19    choice and they both are more confident that this standard is

03:46:14    20    going to survive, and so there's less risk into buying into

21    it.  There's also less risk of price exploitation.

22         And from the supplier side, if you are a supplier and

23    you're trying to figure out which standard to adopt and you're

24    kind of waiting on the sidelines, well, once someone else

03:46:32    25    adopts, let's say, DMR, now you know that there's a better

Aron - direct by Stringfield

4912

1    chance that it's going to become a viable standard and it's

2    worth making an additional investment and developing it

3    yourself.  So it has kind of a snowball effect on both the

4    supply side and the demand side to increase the value and

03:46:51    5    viability of that standard.

6    Q.   Was DMR ever a one-competitor standard?

7    A.   Yes, it was, from 2007 when Motorola introduced it until

8    Hytera entered in 2010.

9    Q.   Did that fact, that DMR was a one-competitor standard,

03:47:07    10    concern Motorola at all?

11    A.   Yes, according to the documents that we've seen at trial,

12    it did.

13    Q.   Was there a competing standard?

14    A.   Yes.  In particular, the standard you might remember

03:47:22    15    hearing about dPMR was also being developed around the same

16    time as DMR.  And two companies, two Japanese companies,

17    Kenwood and Icom, launched their dPMR product during the time

18    when Motorola was still a one-standard -- a one-company

19    standard in DMR.  That was of concern and, you know, a threat

03:47:51    20    to Motorola for the reasons that I just described.  And that's

21    what we see in Motorola's documents.

22    Q.   Besides the concerns expressed in the documents, from your

23    background and expertise in the communications industry, are

24    you aware of any additional reasons or atmospherics that

03:48:10    25    might -- Motorola might be especially concerned about the

Aron - direct by Stringfield

4913

1    failure of its chosen standard?

2    A.   Sure.  I mean, this was a time period when, first of all,

3    Motorola was incurring some financial stress in general.

4    Q.   Are you talking about the -- just -- can you tell us the

03:48:27    5    time frame you're referring to?

6    A.   I'm talking about 2006 to 2010.

7    Q.   Thank you.

8    A.   And -- but in particular also, Motorola, not unlike other

9    companies, had experience with failed standards.  Motorola had

03:48:44    10   two standards that it had and was investing in that ultimately

11   failed.  And it's not surprising to me to see that in the 2009

12   time frame, Motorola would be really worried that it doesn't

13   want to invest in a standard that's going to fail.  It wants

14   to make sure that DMR doesn't become a failed standard.

03:49:07    15   Q.   Can you tell us a little about those standards that you're

16   thinking of?

17   A.   Oh, one is called, iDEN, i-D-E-N.  That was a standard

18   developed by Motorola for cell phones.  And it was only

19   adopted in the U.S. by one company, Nextel.  Ultimately that

03:49:25    20   technology failed.  And when Sprint bought Nextel in 2005, by

21   2008, it had to write down almost all of its investment in

22   that network and it shut down iDEN by, I think, 2013.

23        The other standard was called WiMAX, which was a

24   broadband wireless technology.  Motorola didn't invent it, but

03:49:48    25   it was a big proponent of WiMAX and it had set itself up to be

Aron - direct by Stringfield

4914

1    a -- you know, an early major supplier of WiMAX.

2         And that was a technology that by around 2009, the

3    market had started to move away from it towards LTE, which is

4    the broadband wireless technology that's on all of our cell

03:50:14    5    phones today.

6    Q.   So Motorola was backing the technology that LTE won out

7    over?

8    A.   Right.  I mean, look, you know, there's -- it's a risky

9    business.  And no criticism that a company would back their

03:50:27    10   own horse, but that happens, and it happened to Motorola and

11   it happened a couple of times right in this time frame.  So

12   I'm not surprised that they would be worried about --

13        THE COURT:  Are you saying that the radio in question

14   is the wrong horse?

03:50:40    15        THE WITNESS:  No, I'm saying that --

16        THE COURT:  Well, we're talking about two radios

17   here, right?

18        THE WITNESS:  IDEN -- sorry.  DMR --

19        THE COURT:  The Motorola radio and the Hytera radio

03:50:51    20   that were launched by the parties here.  Are you saying

21   Motorola somehow backed the wrong horse?

22        THE WITNESS:  No.  Let me clarify, Your Honor.  Thank

23   you.

24        THE COURT:  Yes.  Yes.

03:51:02    25        THE WITNESS:  What I'm saying is that Motorola was

Case: 1:17-cv-01973 Document #: 926 Filed: 02/26/20 Page 103 of 193 PageID #:62135
Aron - direct by Stringfield
4915

1  backing the DMR standard, and competitors had come out backing

2  a competing standard called dPMR.  And the concern that

3  Motorola would face and, according to the documents, did

4  express is that dPMR would turn out to be the successful

03:51:29  5  standard and Motorola's investment in DMR would turn out to

6  have been backing the wrong horse, just like its investment in

7  iDEN turned out not to be the right standard or WiMAX against

8  LTE.

9          THE COURT:  Please proceed.

03:51:47  10  BY MR. STRINGFIELD:

11  Q.  Dr. Aron, what is the opinion that you've just expressed

12  based on?

13  A.  Well, it's based on my 20-plus years of research in the

14  communications industry, my teaching on the history and

03:52:02  15  standards in the communications industry at Northwestern over

16  those years, and my consulting work with a variety of

17  companies in the industry on these and related issues.

18  Q.  Dr. Aron, do you have any experience in measuring the harm

19  resulting from exclusion of competitors from the marketplace?

03:52:24  20  A.  Yes, I do.

21  Q.  Can you tell us a little bit about that.

22  A.  Economics -- this question of what happens to competition

23  and what happens to consumers if you exclude a competitor from

24  the marketplace, that's a standard economic question because

03:52:41  25  it's the question you have to face when you assess what would

Aron - direct by Stringfield

4916

1  happen in a merger.  And the antitrust authorities analyze

2  mergers just that way to see is this going to be a bad thing

3  for the economy if we let two companies merge and essentially

4  eliminate one of the competitors from the market.

03:53:01  5  Q.  You understand that in this case Motorola wants to stop

6  Hytera from selling accused DMR radios; is that right?

7      MS. NEW:  Objection, Your Honor.

8      THE COURT:  Overruled.  You may answer it.

9  BY THE WITNESS:

03:53:12  10  A.  Yes, I heard that in the testimony.

11      MR. STRINGFIELD:  Let's have DDX-22.29, please.

12  BY MR. STRINGFIELD:

13  Q.  And why don't you tell us what you've described here?

14  A.  Sure.  What this is is a pie chart of the market shares of

03:53:33  15  Motorola, Kenwood, Hytera, Icom, and other suppliers of radio

16  products, radio products being DMR, dPMR, analog, and other

17  related technologies, not TETRA, not the high-end products in

18  North America.

19      THE COURT:  As of what date?

03:53:58  20      THE WITNESS:  2016, Your Honor.

21      THE COURT:  Proceed.

22  BY THE WITNESS:

23  A.  This is -- just to clarify, this is the most recent data

24  available, and this came from a Motorola document.

03:54:06  25      THE COURT:  So it is contemporary?  Today?

Aron - direct by Stringfield

4917

1    THE WITNESS:  I believe it is the most contemporary

2    available information.

3    THE COURT:  All right.  Well, lay a better foundation

4    so the jury understands the application of this exhibit.

03:54:18    5    MR. STRINGFIELD:  Understood, Your Honor.

6    BY MR. STRINGFIELD:

7    Q.  Dr. Aron, in your opinion, would there be any economic

8    consequences in the United States if Hytera were excluding

9    from -- or excluded from being able to offer its accused DMR

03:54:32   10    products?

11    MR. STRINGFIELD:  And we could take this pie chart

12    down.

13    BY THE WITNESS:

14    A.  I do.

03:54:38   15    MR. STRINGFIELD:  One second.

16    Mr. Montgomery, please take 22.29 down, please.

17    BY MR. STRINGFIELD:

18    Q.  And you said you do?

19    A.  I do.

03:54:43   20    Q.  Can you tell us why?

21    A.  Because when you remove a competitor from a market that's

22    already a concentrated market, meaning there isn't a lot of

23    competition already, then when you remove a competitor, that

24    has a pronounced effect reducing the remaining competition.

03:55:05   25    And when you reduce the vigor of competition, prices go up and

Case: 1:17-cv-01973 Document #: 926 Filed: 02/26/20 Page 106 of 193 PageID #:62138
Aron - direct by Stringfield
4918

1    consumers suffer.

2    Q.  And, Dr. Aron, regarding the 2016 data that you were

3    looking at earlier, I believe you testified that this was the

4    most recent data available; is that right?

03:55:21    5    A.  I did.  And -- but both Mr. Malackowski and I relied on

6    the most recent 2016 data available to assess 2017 and '18 for

7    the kind of information we're looking at in that chart.

8    Q.  And as an economist with this data being the best that was

9    available to you, were you comfortable in its reliability and

03:55:46    10    relying on it for the purposes of the opinions that you're

11    expressing today?

12    A.  I am.  I have not seen anything that would make me believe

13    that there was such a material change in market shares since

14    2016 that it would undermine the validity of my conclusions.

03:56:04    15         MR. STRINGFIELD:  May I republish DDX-22.29,

16    Your Honor?

17         MS. NEW:  Your Honor, we continue to believe this

18    isn't relevant, but no objection to the demonstrative.

19         THE COURT:  All right.  It is received and may be

03:56:13    20    published to the jury.

21         MR. STRINGFIELD:  Thank you, Your Honor.

22         THE COURT:  And may be, if necessary, the subject of

23    cross-examination.

24         (Exhibit No. DDX-22.29 was received in evidence.)

03:56:18    25    BY MR. STRINGFIELD:

Case: 1:17-cv-01973 Document #: 926 Filed: 02/26/20 Page 107 of 193 PageID #:62139
Aron - direct by Stringfield
4919

1   Q.  So, Dr. Aron, the green slice of the pie here that

2   represents Hytera, that looks like a pretty small piece of the

3   pie.  Is there a way to know if excluding Hytera's accused

4   products from the market would have a meaningful effect on the

03:56:36   5   market?

6   A.  Yes, we do have a quantitative methodology for that.  It's

7   the methodology advocated by the U.S. antitrust authorities.

8   And it's called -- the -- I'm sorry to say this, the

9   Hirschman-Herfindahl [*sic*] Index methodology.  It's a way to

03:56:58   10   quantify in numbers how concentrated a market is and how much

11   more concentrated it would be if you removed either a company

12   or the products -- some of the products of a company.  And

13   then the agencies provide benchmarks for whether the increase

14   in concentration is something that we need to worry about.

03:57:19   15          MR. STRINGFIELD:  DDX-22.28, please.

16   BY MR. STRINGFIELD:

17   Q.  What are you showing here, Dr. Aron?

18   A.  This is the scale provided by the Department of Justice

19   and Federal Trade Commission, the U.S. antitrust agencies.

03:57:35   20   And what it shows is that if this Herfindahl-Hirschman Index

21   that you calculate from the market shares falls below 1500,

22   it's not considered a concentrated market.  And if it falls

23   above 2500, it's a highly concentrated market.

24          And just to say again, concentrated means that

03:57:56   25   there's few competitors and not a lot of competition.  So the

Aron - direct by Stringfield

4920

1 fewer competitors there are, the more concentrated the market

2 is, roughly speak.

3 Q.  And what is the concentration of the radio products

4 market?

03:58:07  5 A.  So I calculated the concentration, and it's over 5,600.

6 So it definitely falls squarely within the highly concentrated

7 market category, according to the agency's benchmarks.

8 Q.  And what's the significance when a market reaches this

9 highly concentrated state?

03:58:27  10 A.  It says that if by removing an additional competitor or

11 the products of a competitor the concentration goes up by an

12 additional 100 to 200 points, you have to worry about it, and

13 200 or more points, it creates an inference that there would

14 be anticompetitive or, I should say, price-increasing effects

03:58:52  15 in the market.

16 Q.  And did you calculate the change in the HHI Index that

17 would result from excluding the Hytera accused products from

18 the U.S. market?

19 A.  Yes, I excluded just the accused products and found that

03:59:03  20 the HHI, the Herfindahl—Hirschman Index, it turns out by 200

21 points.  So it creates an inference of a concern that that

22 change will harm customers by causing prices to go up.

23           MR. STRINGFIELD:  DDX-22.30, please.

24 BY MR. STRINGFIELD:

03:59:22  25 Q.  Who would be affected?

Case: 1:17-cv-01973 Document #: 926 Filed: 02/26/20 Page 109 of 193 PageID #:62141
Aron - direct by Stringfield
4921

03:59:41

1   A.  Well, the first group that would be affected would be

2   Hytera's own customers.  In the U.S. today, those include some

3   federal customers.  I've shown some here on this slide.  The

4   National Gallery of Art, the National Archives are Hytera

5   customers.

6          And then nonfederal customers:  hospitals,

7   universities, you know, educational institutions, sports

8   arenas.  There are a variety of nonfederal customers in the

9   U.S.  And they would be expected to be adversely affected by

04:00:06

10  excluding the accused devices from the market.

11  Q.  Would exclusion of Hytera affect some customers more than

12  others?

13  A.  It would typically affect more customers that are more

14  price-sensitive.  So those would tend to be schools,

04:00:23

15  hospitals, customers that, you know, don't have a big budget.

16         It would also affect non-Hytera customers, because

17  once you remove some competition from the market, everyone

18  else can raise their price.  That's why there's an adverse

19  effect.  So other suppliers would also have the opportunity to

04:00:46

20  increase price, and that would affect their customers as well.

21         MR. STRINGFIELD:  DDX-22.31, please.

22  BY MR. STRINGFIELD:

23  Q.  Up until this point, Dr. Aron, you have been addressing

24  the Motorola unjust enrichment theories; is that right?

04:01:02

25  A.  Right.

Aron - direct by Stringfield

4922

1  Q.  What is the fourth bullet that you've identified here?

2  A.  Well, as I said earlier, Motorola has two damages

3  theories.  One is unjust enrichment, meaning the amount that

4  Hytera made that it shouldn't have made if the allegations of

04:01:21   5  trade secret misappropriation are true.  And the other is

6  profits that were lost to Motorola that it would otherwise

7  have made if Hytera had not been able to produce its product

8  according to Motorola's theory.

9  Q.  Can Motorola recover both lost profits and unjust

04:01:46  10  enrichment?

11  A.  No, I agree with Mr. Malackowski that you're not allowed

12  to recover both on the same units of sale.  So you would

13  recover either lost profits or unjust enrichment, not both.

14  Q.  How do you calculate lost profits?

04:02:05  15      And maybe if we go back to DDX-22.7, it might help

16  illustrate that.

17  A.  Again, it's the same idea that you have to figure out what

18  would have happened if the allegations of trade secret

19  misappropriation are true, and then you compare that to what

04:02:26  20  happened in the real world.

21      So in this case you would look at what would

22  Motorola's profits have been if Hytera had either, in

23  Motorola's view, never been able to launch a DMR radio or, in

24  Hytera's view, had to launch that radio six months later than

04:02:46  25  it did, how would that have affected Motorola's profits and

Aron - direct by Stringfield

4923

1    the difference between that and what the profits were that

2    they actually made.  That's the lost profits to Motorola.

3    Q.  Did you hear Mr. Malackowski testify again in this

4    Motorola view that Hytera could never launch a DMR radio, that

04:03:11    5    Motorola's lost profits would be $153,991,517?

6    A.  I do.

7    Q.  Do you agree with that?

8    A.  No.

9    Q.  Why don't you agree with that?

04:03:21    10    A.  In order to assess lost profits, what you have to think

11    about is, if Hytera hadn't sold these radios, who would have

12    sold them, if anyone.  And so you have to think about what

13    competes with those radios.  Where would that demand have

14    gone, you might say, if Hytera hadn't made those sales.

04:03:44    15            And to figure out who would have sold those radios

16    and what technology would have been sold instead, you have to

17    understand the competition in the market.  So you have to

18    understand the competitive structure in the market.

19            And what Mr. Malackowski did was he misunderstood and

04:04:11    20    misapplied the market shares that were provided that we

21    actually just looked at in conducting his analysis by

22    overstating the amount of Hytera DMR radios that would have

23    gone to instead Motorola's MOTOTRBO DMR radios.

24    Q.  And I'll ask some questions in a few minutes about

04:04:33    25    Mr. Malackowski's application of those market shares that you

Aron - direct by Stringfield

4924

1  just discussed.  But at trial, did you hear Mr. Malackowski

2  testify that DMR competes in a two-supplier market?

3  A.  Yes, I did.

4  Q.  Do you agree with that?

04:04:45  5  A.  No.

6  Q.  Why don't you agree with that?

7  A.  Because DMR competes with other technologies.  It competes

8  with analog.  It competes with dPMR.  It competes with other

9  what are called professional tier or mid tier or commercial

04:05:13  10  tier digital radios.

11       DMR competes with a lot of things.  It doesn't

12  compete just with DMR.  And that's clear in the -- in various

13  ways of looking at the market and documents around the market.

14  Q.  Why does it matter if the market is a two-supplier market

04:05:33  15  or not?

16  A.  If it's a two-supplier market, then every sale that Hytera

17  made, if it didn't make that sale, that sale wouldn't be made

18  by anyone or it would be made by Motorola.  So all of the

19  sales that Hytera wouldn't have made in the but-for world

04:05:54  20  would have been made by Motorola, but that's not true because

21  there are a lot of competing technologies and other suppliers

22  that also would have made some of those sales.

23       THE COURT:  What percentage?

24       THE WITNESS:  I'm actually going to show you

04:06:11  25  momentarily if asked, Your Honor.

Case: 1:17-cv-01973 Document #: 926 Filed: 02/26/20 Page 113 of 193 PageID #:62145
Aron - direct by Stringfield
4925

1    THE COURT:  All right.  Take a break then.  It's 2:00

2    o'clock.  About 15 minutes.

3        (Recess.  Jury in).

4        THE COURT:  Members of the jury, I am fulfilling my

04:23:42   5    commitment to see to it that we have afternoon breaks, as you

6    suggested last week.

7        A JUROR:  Thank you.

8        THE COURT:  Please proceed, counsel.

9        THE WITNESS:  I appreciate it as well.

04:23:56  10  BY MR. STRINGFIELD:

11  Q.   Dr. Aron, just before the break we were talking about

12  Mr. Malackowski's statement about it being a two-supplier

13  market.  Do you remember that?

14  A.   I do.

04:24:05  15  Q.   In his actual lost profits analysis, does Mr. Malackowski

16  apply the understanding that DMR radios compete in a

17  two-supplier market?

18  A.   No.  He doesn't assume that every radio that was actually

19  sold by Hytera would have been sold by Motorola.

04:24:25  20  Q.   What does he do instead?

21  A.   Instead he applies a market share approach so that only

22  some of the accused products that were sold by Hytera would

23  have been sold by Motorola.  So he just counts from 100

24  percent to a lesser number.

04:24:44  25  Q.   And the market share that he applied, do you agree that it

Aron - direct by Stringfield

4926

1    was a correct market share?

2    A.   No, I don't.

3    Q.   And why do you disagree with that?

4    A.   Because the market share that he applied was the market

04:24:55    5    share for Motorola, but not for Motorola's DMR MOTOTRBO

6    products.  And yet he calculates the lost profits as if every

7    single product that Motorola sold instead of the Hytera

8    accused products had the margins and profits as if it were a

9    MOTOTRBO product, and that's not a correct way to look at the

04:25:31    10   market share that he applied.  It's not the right market

11   share.

12          Lots of products compete with the accused DMR

13   product, not just MOTOTRBO and not just DMR.

14   Q.   And what was the result of the incorrect market share that

04:25:49    15   Mr. Malackowski applied?

16   A.   It overstates the number of and profits from products that

17   Motorola would have sold, that Hytera wouldn't have sold, in

18   the world in which Hytera is either delayed or never produces

19   a DMR product as accused.

04:26:14    20   Q.   Why do you say that Mr. Malackowski applied the wrong

21   market share?

22   A.   Because he failed to recognize and failed to understand

23   that the market share that he was actually applying wasn't a

24   DMR market share.  It's a market share for companies, not

04:26:34    25   products.  And he pretended that it was a DMR market share and

Aron - direct by Stringfield

4927

1  that Motorola's share was MOTOTRBO.  And that's just not what

2  the market share was that he was using, and that's not the

3  market that Motorola MOTOTRBO or Hytera DMR operate in.

4  Q.  Have you or did you consider or review any materials that

04:27:00  5  told you the conclusion you stated earlier, that DMR competes

6  with other companies and other technologies?

7  A.  Yes, I did.

8  Q.  Can you tell us the types of documents that you are

9  thinking of?

04:27:10  10  A.  Sure.  I reviewed industry analyst reports that look at

11  the competitive nature of the market and what competes with

12  what.  I looked at Motorola internal strategy documents that

13  identify Motorola's view of what its products compete with.

14  And I also saw documents in the record about specific, at

04:27:36  15  least a specific sales situation that Motorola was involved in

16  and how it viewed its competition in that case.

17  Q.  Let's start with the industry reports that you referred

18  to.  What industry report are you talking about?

19  A.  There is an industry analyst called his.  And this is a

04:27:56  20  company that performs competitive analysis and data, provides

21  data on, among other things, the two-way radio market, which

22  is the product, you know, the bigger set of products at issue

23  here.

24  So there were a number of reports from this analyst

04:28:15  25  that were produced in this case, and I reviewed those.

Aron - direct by Stringfield

4928

1  Q.  Can you please turn in your binder to DTX-3167.

2  A.  Okay.

3  Q.  And is this the industry report that you were referring

4  to?

04:28:37   5  A.  This is one of them, yes.  This is the one for 2017.

6  Q.  And did you consider DTX-3167 in forming your opinions

7  today?

8  A.  I did.

9  Q.  And was DTX-3167 produced to Motorola in this case?

04:28:51  10  A.  Yes, it was.

11       MR. STRINGFIELD:  Your Honor, Hytera moves to admit

12  and publish DTX-3167.

13       MS. NEW:  No objection, Your Honor.

14       THE COURT:  The exhibit is received and may be

04:29:02  15  published.

16     (DTX-3167 was received in evidence.)

17  BY MR. STRINGFIELD:

18  Q.  And, again, you said this was the 2017 version?

19  A.  That's right.

04:29:09  20  Q.  Okay.  Let's go to page 18 of the document.  What is

21  described in the last sentence of this page?  Page 18 is the

22  introduction, and so what's on the last page of the

23  introduction?

24  A.  So this is the introduction.  This is a very large

04:29:28  25  document.  You can see it's got 403 pages.  It's a big

Aron - direct by Stringfield

4929

1    analysis of the market.  And what they are saying is in this

2    report, his Markit -- that's their cute spelling of their

3    report brand -- has grouped DMR, dPMR, PDT and competing

4    technologies as "cost optimized digital" technologies.

04:29:54    5        So what they're saying, we view this set of products

6    of technologies as competing with each other.

7    Q.  Please turn to page 33.  This page is called Technology

8    Review.  And this is the introduction, it appears, of the

9    Technology Review section.  What is described here?

04:30:14    10   A.  So as it says, this chapter reviews the key themes and

11   technologies aligned with the cost optimized digital

12   technologies.  And these technologies that they consider are:

13   DTMA and FDMA, DMR, dPMR and NXDN, which is another kind of

14   dPMR, and PDT.

04:30:41    15       So, again, they're defining their competitive

16   framework as including this set of technologies and they

17   compete with each other.

18   Q.  Page 34, please.

19       This section is 2.1, Migration from Analog to

04:31:03    20  Digital.

21       What does the first sentence say there?

22   A.  "The analog licensed mobile radio market has reached the

23   practical limits of its innovative life and is currently

24   entering a phase of decline as users migrate to digital

04:31:21    25  technologies."

Aron - direct by Stringfield

4930

1  Q.  And "entering a phase of decline," and you said this

2  document was a 2017 document?

3  A.  Right.  So what they're saying is it's already 2017 and

4  analog is just beginning to enter its phase of decline.

04:31:39   5          MR. STRINGFIELD:  And DDX-22.7, please.

6  BY MR. STRINGFIELD:

7  Q.  Is that statement we just read consistent with the data

8  that you analyzed and discussed earlier?

9  A.  It is.  As we talked about here, analog has been declining

04:32:04   10 overall worldwide over time, but it continues -- continued to

11 be robust and continued to comprise a material share of

12 two-way radio sales worldwide as far as 2016 and my chart,

13 which is the last set of data I have for this.

14          And, you know, the point is the ship on digital

04:32:32   15 didn't sail in 2010.  If you missed 2010, you can still

16 operate and succeed in the DMR market.

17 Q.  Turning back to our, this was a little deviation, but

18 turning back to our discussion regarding the market shares,

19 did you review any Motorola documents -- and I apologize if

04:32:52   20 you already said you did -- but did you review Motorola

21 documents that discussed how Motorola views the competitive

22 market for its DMR radios?

23 A.  Yes, I did.

24 Q.  Can you tell us what document you are thinking of?

04:33:04   25 A.  Yes.  Motorola has produced a series of internal documents

Aron - direct by Stringfield

4931

1   that are its strategy team documents, where they analyze their

2   competitive situation and they analyze how they're doing in

3   the marketplace and what competes with what that they produce.

4          And these are very relevant documents for conducting

04:33:29   5   a market analysis because, as the antitrust authorities in the

6   United States say, if you are doing a market analysis and you

7   are trying to determine what competes with what, good evidence

8   is how the company sees its own competitive situation in its

9   own internal strategy documents.

04:33:50   10  Q.  And you reviewed a document that fit with that definition

11  you just described?

12  A.  I did.  I reviewed a number of documents.  These reports

13  are called Pulse Reports.  There are other reports as well,

14  but those are the ones that appear to be routinely produced

04:34:05   15  internally.

16  Q.  Can you please turn to PTX-1559 in your binder.

17         And is this one of the documents that you were

18  referring to?

19  A.  It is.

04:34:24   20  Q.  And did you rely on PTX-1559 in forming your opinions in

21  this case?

22  A.  I did.

23  Q.  And this document was produced by Motorola in this case,

24  is that right?

04:34:34   25  A.  It was.

Case: 1:17-cv-01973 Document #: 926 Filed: 02/26/20 Page 120 of 193 PageID #:62152
Aron - direct by Stringfield
4932

1     MR. STRINGFIELD:  Your Honor, we move to admit and

2     publish PTX-1559.

3          MS. NEW:  No objection, Your Honor.

4          THE COURT:  It is received and may be published.

04:34:38  5     (PTX-1559 was received in evidence.)

6     BY MR. STRINGFIELD:

7     Q.  And you touched on this already, but just briefly, what is

8     the purpose of these Motorola Market Pulse Reports?

9     A.  Well, as I read them and as I read the testimony, the

04:34:58  10    deposition testimony about them, these are reports that

11    Motorola's corporate strategy and analytics team inside the

12    company creates for their internal strategy assessments to

13    figure out how they're doing in the marketplace and to think

14    about what they should be doing next.

04:35:20  15    Q.  These are used by Motorola's competitive business

16    decision-makers, is that fair?

17    A.  Yes.

18    Q.  Let's turn to page 8 of the document.

19         What is shown here?

04:35:33  20    A.  So this is a typical type of analysis that you see in

21    these pulse reports.  And the thing to notice on this page is

22    that the way Motorola divides up the marketplace is into three

23    categories.  And this is routine in these reports.  They

24    divide into P25, into TETRA and into radio products.  And

04:36:02  25    radio products includes analog, it includes DMR, it includes

Case: 1:17-cv-01973 Document #: 926 Filed: 02/26/20 Page 121 of 193 PageID #:62153
Aron - direct by Stringfield
4933

1    dPMR as provided by other companies, and it includes this

2    product called Business Light that Motorola produces, which is

3    not a DMR product, but it's a, I would say, commercial tier

4    two-way radio product.

04:36:28   5         So all of those products and potentially others are

6    included in this category that Motorola analyzes as a

7    competitive group.

8    Q.  And, again, this is Motorola's internal business

9    decision-makers dividing the two-way radio market into three

04:36:47  10    buckets:  P25, TETRA, and then other radios including DMR,

11    dPMR, analog and others, is that right?

12    A.  Yes.

13    Q.  Let's turn to page 20.

14         What is shown here?

04:37:08  15    A.  This is a market share diagram for, on this particular

16    page, so this is the radio products' market shares of

17    companies.  So this is Motorola, here is Hytera, ICOM and

18    Kenwood and so forth.  And these are worldwide.

19         There are other pages in some reports that provide

04:37:36  20    market share diagrams like this regionally.  But what we are

21    showing here, what is being shown here is the market shares

22    for the sales of radio products by these different competitors

23    in the market, and they're selling analog, and they're selling

24    DMR and they're selling dPMR and so forth.

04:38:00  25    Q.  So the analog, the dPMR, the DMR, and other offerings from

Aron - direct by Stringfield

4934

1    these variety of competitors are all included in one

2    competitive assessment by Motorola's internal competitive

3    strategy deciders?

4    A.   Correct.

04:38:18   5    Q.   Have you --

6             MR. STRINGFIELD:   You can take that down,

7    Mr. Montgomery.

8    BY MR. STRINGFIELD:

9    Q.   Dr. Aron, have you evaluated any, and I recall you

04:38:28   10   mentioning this, Motorola documents that discuss an actual

11   sales situation for the Motorola MOTOTRBO DMR radios?

12   A.   Yes.   There was a document produced by Motorola in the

13   case that describes a bidding situation where Motorola was

14   considering entering a bid in a competitive bid situation for

04:38:56   15   a customer, which happened to be a city in Canada that was

16   issuing a call for bids.   And Motorola in this document was

17   talking about who the potential competitors are.

18   Q.   Can you please turn to DTX-4407 in your binder.

19             And this is already admitted, so we can publish this.

04:39:17   20   I apologize.

21             What is DTX-4407?

22   A.   So this is, as I said, an email and a discussion about

23   who's entering bids in this RFP, which is a request for

24   proposal, so it's a call for bids by the city of Brampton,

04:39:45   25   which is a city in Canada, for a two-way radio solution.

Aron - direct by Stringfield

4935

Q.   Let's turn to page 3 of the document.

On the top of the page, there is a heading "Competitive Environment," if we can enlarge that.

What does this passage tell you about the competitive environment into which the Motorola MOTOTRBO DMR radios were competing?

A.   What it says is, this is Motorola's assessment of who's apparently interested in offering bids on this request for proposals.

And it says, "Extremely competitive 29 RFP downloads," 29 people have downloaded this opportunity to bid on this.

And who do they include?  They include Bell, Telus and Rogers, those were the three major cellphone companies in Canada; also Hytera, also Power Trunk, which we learned later is actually a TETRA product; ICOM and other names that have come up many times in this trial.

They say strongest competitive threat is considered to be Kenwood.  Secondary threats are Tait and Hytera and possibly TETRA.

So what they are saying is, look, there are a lot of competitors, there are a lot of technologies, and they're all competing with each other and competing with us.

Q.   So the MOTOTRBO radios do not compete in fact in a two-supplier market, is that right?

Aron - direct by Stringfield

4936

1    A.   Correct.

2    Q.   And the Motorola MOTOTRBO radios do not just compete

3    against even just DMR radios, is that right?

4    A.   Right.  That's not the right way to look at the market.

04:41:36    5         MR. STRINGFIELD:  You can take that down,

6    Mr. Montgomery.

7    BY MR. STRINGFIELD:

8    Q.   Does Mr. Malackowski's market definition that he applies

9    in his lost profits analysis match Motorola's internal

04:41:47   10    understanding of the market in its business documents?

11    A.   No, it doesn't.

12    Q.   What's the misalignment?

13    A.   Market definition means what do we include in as the

14    competitors with each other, the competitive products and

04:42:03   15    companies.

16         And the way he approaches his lost profits analysis

17    is he says DMR only competes with DMR.  And Hytera's accused

18    products, if Hytera had not sold them, would only be sold by

19    other DMR suppliers including Motorola MOTOTRBO.

04:42:29   20    Q.   But that's not how Motorola outside of the context of this

21    litigation views the competitive environment for its MOTOTRBO

22    radios, is that right?

23    A.   Correct.  It's not how Motorola views it.  It's not how

24    the industry analysts view it.

04:42:43   25    Q.   Just Mr. Malackowski views it that way?

Aron - direct by Stringfield

4937

A.  Of what I've seen, yes.

Q.  What is the impact of Mr. Malackowski's incorrect market

share definition?

A.  Well, it's quite significant, and I've prepared a slide to

04:43:06   show the impact.

MR. STRINGFIELD:  Can we have DDX-22.32, please.

BY MR. STRINGFIELD:

Q.  What do you show here, Dr. Aron?

A.  What I'm showing here are the, in red, what

04:43:23   Mr. Malackowski applies as the MOTOTRBO DMR market share.

Those are the red and you see they're in the 69 to 73 percent

range.

But the actual market shares for MOTOTRBO are these

blue ones.  So they ranged back in 2010 from 5.8 percent up to

04:43:48   26.3 percent in 2018.

So the red, which are the shares that Mr. Malackowski

applies, vastly overstates the MOTOTRBO actual market share.

Q.  And have you quantified the economic impact of

Mr. Malackowski's misapplication of the market share?

04:44:09   A.  I have.

MR. STRINGFIELD:  Can we have DDX-22.33, please.

BY MR. STRINGFIELD:

Q.  So tell us what you've shown here.

A.  The $153,991,517, that's what Mr. Malackowski calculated

04:44:25   as Motorola's lost profits.  And that assumes that every

Aron - direct by Stringfield

4938

1    Hytera accused product that would have otherwise been sold by

2    Motorola would have been a MOTOTRBO DMR product, and then

3    divided that up as I was instructed for the reasons you heard

4    earlier into inside the U.S. and outside the U.S., so that was

04:44:51  5    the first step.

6           And I believe that Mr. Malackowski and I would agree

7    on those numbers.

8    Q.  And, in fact, let me just read the numbers into the

9    record.  The division of Motorola's asserted lost profits

04:45:04  10    inside the United States is $43,668,657, is that right?

11    A.  Yes.

12    Q.  And then outside of the United States is $110,322,861, is

13    that right?

14    A.  It is.

04:45:20  15    Q.  And these numbers came from where?

16    A.  These came from Mr. Malackowski's report.

17    Q.  He divided them out already?

18    A.  He did.

19    Q.  What was the next step that you did in evaluating and

04:45:32  20    correcting, if necessary, Mr. Malackowski's lost profits

21    analysis?

22    A.  Did you ask me what I did or what he did?

23    Q.  What did you do?

24    A.  Okay.  I corrected the market share.

04:45:46  25           Just to explain what I'm talking about here, when you

think about how much of Hytera's sales would have gone to

Motorola instead in the world where Hytera wasn't selling

those products, the standard way of doing that is to apportion

them by market share.  And so our dispute is only about what's

the market share that should be going to MOTOTRBO.

And so I corrected that according to the market

shares that we saw in the previous bar chart with the blue and

the red, and what I find is that in the U.S., almost $32

million that Mr. Malackowski assigns to MOTOTRBO and

quantifies as MOTOTRBO profits in the as-if world shouldn't be

there, and almost $68 million in profits that Mr. Malackowski

calculates as if those would have been profits on MOTOTRBO

shouldn't be there.  Those wouldn't go to MOTOTRBO.

Q.  So these two red numbers that you are subtracting here,

these are the result of Mr. Malackowski's overstated market

share, is that right?

A.  For MOTOTRBO, yes.

Q.  And I'll read these into the record.  In the United

States, the overstatement that you calculated is $31,960,948,

is that right?

A.  It is.

Q.  And when you subtract that value from what Malackowski had

determined were the lost profits inside of the United States,

the result is $11,707,709, is that right?

A.  Yes.

Case: 1:17-cv-01973 Document #: 926 Filed: 02/26/20 Page 128 of 193 PageID #:62160
Aron - direct by Stringfield
4940

1    Q.   And that would be the corrected inside the United States

2    lost profits for MOTOTRBO?

3    A.   Right.   Again, this is in a scenario where Motorola -- I'm

4    sorry, where Hytera would never be able to produce a DMR radio

04:47:49    5    per Dr. Rangan's opinion.

6    Q.   And then the market share correction that you did for

7    sales outside of the United States I'll read into the record.

8    You deducted $67,960,175, is that right?

9    A.   Yes.

04:48:02    10   Q.   And when you deduct that amount, the remainder is

11   $42,362,686, is that right?

12   A.   It is.

13   Q.   And that is the corrected outside of the United States

14   market share for MOTOTRBO under the scenario where Hytera

04:48:21    15   never sells a DMR radio from 2010 to 2019, is that right?

16   A.   It's the corrected lost profits on MOTOTRBO products to

17   Motorola.

18   Q.   And have you summed these together on DDX-22.33?

19   A.   Yes.

04:48:37    20   Q.   And when you sum those values together, you get

21   $54,070,395, is that right?

22   A.   Yes.

23   Q.   The lost profits analysis, as we've said multiple times

24   that we've discussed so far, is where Hytera never launches a

04:48:57    25   DMR radio, right?

Aron - direct by Stringfield

4941

A.  Correct.

Q.  Did Mr. Malackowski offer opinions for lost profits under scenarios where Hytera is able to launch a radio, but its launch is delayed by the delay periods?

04:49:14  A.  He did not offer those numbers at trial.

Q.  If he had, would the issues that you identified with respect to his delay period analysis that you discussed in the context of unjust enrichment, would those apply equally to his delay period analysis in the context of lost profits?

04:49:34  A.  Yes.  He applies the same analysis where a delay in one period perpetuates forever throughout the entire period of the data.  So the same problem would apply, yes.

Q.  And the issues that you identified with his lost profits analysis, and specifically the market share in the context of the no Hytera radio ever scenario, would those issues also carry over into delay scenarios under lost profits had Mr. Malackowski offered those numbers at trial?

04:50:00

A.  Yes.  The same, he conducted the same analysis, and so it has the same defect.

04:50:21  Q.  And, Dr. Aron, one more time, if trade secret damages in this case were limited outside of the United States prior to the May 11, 2016 enactment of the DTSA, would that affect the lost profits calculation that you had just shown on the screen?

04:50:44  A.  It would, yes.

Aron - direct by Stringfield

4942

Q.   And have you prepared a demonstrative that shows the
impact of that?

A.   Yes.  I did the calculation, and it's on a demonstrative.

        MR. STRINGFIELD:  May we have DDX-22.34, please.

04:51:00   BY MR. STRINGFIELD:

Q.   And so, again, you start with the same -- I'll save your
voice, I am going to read your numbers into the record.  You
start with the same lost profits number that Mr. Malackowski
had, which was $153,991,517, is that right?

04:51:15   A.   Yes.

Q.   And you used his same division that Mr. Malackowski
applies as between inside the United States and outside the
United States, with inside the United States being $43,668,657
and outside the United States being $110,322,861, is that

04:51:36   right?

A.   It's right.

Q.   And what would the next step be to accommodate the
scenario that I just described where trade secret damages
outside of the United States are not available prior to the

04:51:47   May 11, 2016 enactment of the Federal Trade Secret Act?

A.   So the next step would be to remove the profits for the
excluded time period, so the pre-May 2016 profits.  And again
I do that just by looking at the year-by-year profits and
summing them and taking them out and making a proportional

04:52:08   adjustment for 2016 itself, because it's a mid-year exclusion,

Aron - direct by Stringfield

4943

1  and that comes to the lost profits that are excluded of

2  $61,657,904.

3  Q.  And those are outside of the United States lost profits

4  prior to the May 11, 2016 enactment of the Federal Trade

04:52:33  5  Secret Act?

6  A.  Correct.

7  Q.  And when you subtract those off, that leaves $48,664,957,

8  is that right?

9  A.  That's right.

04:52:42  10  Q.  And then when you combine those together, what do you

11  have?

12  A.  So first --

13  Q.  I apologize, Dr. Aron.  I got ahead of you.  What did you

14  do next?

04:52:55  15  A.  The next thing to do is to correct the market shares in

16  the same way that I described earlier, and that's what is

17  shown here.  It's just corrected separately for inside the

18  United States and outside the United States and using the

19  relevant market shares inside and outside the United States.

04:53:15  20  Q.  And so, and I'll save your voice and I'll read these into

21  the record, the market share correction you applied for inside

22  the United States is the same as before, which is removing

23  $31,960,948, is that right?

24  A.  It is.

04:53:30  25  Q.  And that leaves the inside the United States lost profits

Aron - direct by Stringfield

4944

1    as $11,707,709?

2    A.   Correct.

3    Q.   And then the market share correction that you apply

4    outside the United States to the post-May 11, 2016 lost

04:53:47    5    profits is $24,288,894, is that right?

6    A.   It is.

7    Q.   And that leaves $24,376,063 of lost profits outside the

8    United States, corrected for market share post the May 11,

9    2016 enactment of the Federal Trade Secret Act, is that right?

04:54:11    10    A.   Yes, that's right.

11    Q.   Have you added these numbers together?

12    A.   Yes, yes, I've added them together, and they add up to

13    $36,083,772.

14         MR. STRINGFIELD:  Your Honor, Hytera wishes to move

04:54:27    15    DDX-22.34 into evidence.

16         THE COURT:  It is received and may be published.

17         (DDX-22.34 was received in evidence.)

18         MR. STRINGFIELD:  Can we have DDX-22.21 please,

19    Mr. Montgomery.

04:54:56    20    BY MR. STRINGFIELD:

21    Q.   And, Dr. Aron, we discussed this slide earlier.  This was

22    your correction of the unjust enrichment calculation, but

23    again to reflect the scenario where outside the United States

24    trade secret damages are not available prior to the May 11,

04:55:14    25    2016 enactment of the DTSA, is that right?

Aron - direct by Stringfield

4945

A.  That's right.

          MR. STRINGFIELD:  Your Honor, Hytera moves DDX-22.21

into the record.

          MS. NEW:  No objection.

04:55:25    THE COURT:  It is received and may be published.

          (DDX-22.21 was received in evidence.)

BY MR. STRINGFIELD:

Q.  I have some questions, Dr. Aron, about Motorola's

copyright damages theories.

04:55:31  A.  Okay.

          MR. STRINGFIELD:  Can we have DDX-22.41, please.

BY MR. STRINGFIELD:

Q.  You previewed this earlier, but can you remind us what you

mean by apportionment of copyright damages?

04:55:51  A.  Yes.  Apportionment means that you start with the total

value, you might say, of the products that are accused to have

incorporated copyrighted material.  But then you have to take

into account that the whole value of those products isn't

determined or driven or caused by just the copied material.

04:56:18        So, again, in the products at issue here, part of

what determines the value is, you know, the distribution

network and all the people that are putting the product

together and the advertising and all of the different

components of making a product, not just the software that

04:56:45  makes it valuable.

Aron - direct by Stringfield

4946

And apportionment means we have to narrow down or
identify just the part of the value that is reasonably
considered to be attributable to the copyrighted part -- I
mean to the copied part.

04:57:00    Q.    Motorola asserts that copyright damages in this case are
$28,714,815.  Do you agree with that?

A.    I agree that that's their allegation, but I don't agree
with the number.

Q.    And do you know how Motorola arrived at that $28.7 million

04:57:21    number?

A.    I do.

Q.    And how did they arrive at that?

A.    They calculated, Mr. Malackowski calculated that as the
total incremental profits associated with the accused devices

04:57:31    between 2010 and the end of the data in the United States
only.

Q.    Do you agree that that $28.7 million is in fact the total
incremental profit of accused Hytera radios inside the United
States?

04:57:47    A.    Well, I talked earlier about that it doesn't deduct the
research and development costs.  So on that ground I disagree
with that.

Q.    What would you do with, just starting with that $28.7
million that Mr. Malackowski applied -- again, you are

04:58:13    responding to his opinion, is that right?

Aron - direct by Stringfield

4947

1    A.   That's right.

2    Q.   How would you apportion that number?

3         MR. STRINGFIELD:  And can we have the next slide,

4    please.

04:58:20   5    BY THE WITNESS:

6    A.   Well, the way I went about this is I said we've heard from

7    Hytera's technical experts that the portion of the source code

8    that is accused of being copied was about 4 percent of the

9    total lines of Hytera's source code.  So about 4 percent of

04:58:46   10   the lines in the radios are accused of -- are copied is what

11   Ms. Frederiksen-Cross found.

12        So one approach to apportionment was I multiplied

13   Mr. Malackowski's base here, the 28.7 million, by 4 percent

14   and that isolates the component or the part of the copyrighted

04:59:18   15   material, the source code that is associated with the part

16   that was copied.

17   BY MR. STRINGFIELD:

18   Q.   And what have you done on the right side of DDX-22.42?

19   A.   Mr. Wicker -- or Dr. Wicker, pardon me, testified that by

04:59:34   20   his calculation, 10 percent of the files in the source code

21   contained copyrighted copied material.

22        So looking at it from his perspective, adopting his

23   number, I multiplied the same base, the 28 million, by the 10

24   percent that Dr. Wicker testified to, and that gives

05:00:01   25   $2,871,481.

Aron - direct by Stringfield

4948

Q.  And, Dr. Aron, again, do you choose which technical expert is right, one over the other?

A.  I don't, no.  I'm trying to offer an assessment based on both sides' technical experts.

05:00:20

Q.  So do we add these numbers together, or what are these two numbers that you've calculated here?

A.  No, you don't add them together.  I'm offering these as alternatives depending on which technical expert the jury chooses to credit.

05:00:36

Q.  And, Dr. Aron, by apportioning damages based on relative volumes of copied to non-copied source code, are you supposing that the entire value of Hytera's U.S. profits are owed to source code?

A.  I'm not conducting any further apportionment to address

05:01:02

the fact that, as I said a moment ago, the entire value of these products is not driven by the source code.  It's driven by that plus the hardware and other factors that are accused of copyright infringement.

So one could conduct further apportionment for those

05:01:24

other factors.  I have not done so.

MR. STRINGFIELD:  Let's go to the next slide, please, DDX-22.41.  And let's go one more slide.  Next slide, please.

BY MR. STRINGFIELD:

Q.  So, Dr. Aron, can you give us a summary of what you've

05:01:54

told us today?

Aron - direct by Stringfield

4949

A.  Sure.

          THE COURT:  That's quite an undertaking.

          MR. STRINGFIELD:  May I try it another way, Your
Honor?

05:02:02          THE COURT:  Are you ready for that question?

          THE WITNESS:  I was going to only summarize the
bottom line numbers.

          THE COURT:  All right.  You may answer the question.
BY MR. STRINGFIELD:

05:02:10  Q.  Dr. Aron, will you please summarize for us what you've
described here on DDX-22.44?

A.  Yes.  What I'm showing here are the numbers that I've
arrived at for trade secret damages and to copyright damages.

          And the first bullet, the first box, what it's saying
05:02:31  is in the scenario where Hytera could launch DMR in six
additional months, as Mr. Grimmett opined and testified, the
trade secret damages would be $2,115,821.

          In the case that Dr. Rangan opined, that Hytera could
never launch a DMR radio even through today, the unjust
05:03:00  enrichment damages would be 158,658,279.  And so as I said
before, that is the maximum that damages could be, because
that's the most extreme assumption that one could make about
what would happen in the world in which Hytera had not had
access to the alleged trade secrets.

05:03:26          And then for copyright damages, I just explained that

Case: 1:17-cv-01973 Document #: 926 Filed: 02/26/20 Page 138 of 193 PageID #:62170
Aron - direct by Stringfield
4950

1  once the damages figure is apportioned to account for the part

2  of the source code that was alleged to be copied, the damages

3  range from $1,148,593 to $2,871,481.

4  Q.  And, Dr. Aron, we discussed earlier how this $158,658,279

05:03:58  5  number would be affected if trade secret damages outside of

6  the United States were limited to only damages after the May

7  11, 2016 enactment of the Federal Trade Secret Act.  Have you

8  shown how that effect would play out on this slide?

9  A.  Yes.  I've put the revised number here.

05:04:17  10      And I'm sure the jury recalls that it reduces the

11  never exceed damages for our trade secret unjust enrichment by

12  over $50,000 to 96 million -- I mean million, $50 million, to

13  $96,309,399.

14      MR. STRINGFIELD:  Your Honor, Hytera moves DDX-22.44

05:04:42  15  into evidence.

16      MS. NEW:  No objection, Your Honor.

17      THE COURT:  The exhibit is received and may be

18  published.

19      (DDX-22.44 was received in evidence.)

05:04:47  20      MR. STRINGFIELD:  Thank you, Dr. Aron.

21      Hytera passes the witness.

22      THE COURT:  Are you ready for cross-examination,

23  counsel?

24      MS. NEW:  We are.  We would need Mr. Fulbright to

05:04:57  25  come switch --

Case: 1:17-cv-01973 Document #: 926 Filed: 02/26/20 Page 139 of 193 PageID #:62171
Aron - cross by New
4951

1          THE COURT:  Do you need a couple minutes?  Do you

2     need a couple minutes?

3          MS. NEW:  I think so.  We need to go find him to

4     switch it.

05:05:06    5          THE COURT:  All right.  Members of the jury will step

6     out for a few minutes, and the witness may leave the stand for

7     a few minutes.

8          (Recess.  Jury in)

9          THE COURT:  You may cross-examine.

05:17:38   10          MS. NEW:  Before we begin, may I hand a calculator to

11     the witness?

12          THE COURT:  Certainly.

13          MS. NEW:  Thank you.

14          THE WITNESS:  Thank you.  I didn't bring it, so thank

05:17:50   15     you.

16          THE COURT:  Do you have an abacus?

17          MS. NEW:  I do not.  I left it at home.

18          THE COURT:  Proceed.

19          MS. NEW:  Thank you.

05:18:00   20                    CROSS-EXAMINATION

21     BY MS. NEW:

22     Q.  Dr. Aron, my name is Megan New.  I represent Motorola in

23     this case.

24          I want to start with your damages opinion that is

05:18:09   25     based on Mr. Grimmett's estimation that it would only take

Aron - cross by New

4952

1   Hytera an additional six months from March 2010 to get to

2   market with its, I believe what you've called its but for

3   product, okay.

4   A.  Well, I called it the as if or what would have happened

05:18:28   5   world.  But the product as I understand it would have been the

6   same from consumers' standpoint.

7   Q.  Okay.  And I believe at your deposition you were calling

8   that the counter-factual world, is that fair?

9   A.  That could be, yes.

05:18:41  10   Q.  Okay.  And that opinion is based on the technical opinions

11  of Hytera's technical expert, Mr. Grimmett, who we heard from

12  last week, correct?

13  A.  That's right.

14  Q.  And Mr. Grimmett's opinion was that Hytera could have

05:18:57  15   developed all on their own from scratch the trade secret

16  material that was stolen from Motorola, correct?

17  A.  I think Mr. Grimmett doesn't believe that it was trade

18  secret material.  But he does believe that the material that

19  was used could have been replicated, or probably more

05:19:24  20   accurately, that a DMR phone that was equivalent from consumer

21  standpoint to the one that was actually sold could have been

22  developed and launched from scratch by Hytera with an

23  additional six months.

24  Q.  Okay.  And just so we're all on the same page,

05:19:45  25   Mr. Grimmett's exact testimony last week, he was asked right

Aron - cross by New

4953

1   here, "And your other opinion is that Hytera could have

2   developed all on their own from scratch the material that, the

3   trade secret material, any additional trade secret material

4   from Motorola, they could have done that on their own in 15

05:20:09   5   months?"

6          And he answered:  "The materials that I believe they

7   used or they're accused of using, yes."  Correct?

8   A.  I see what you're reading from the transcript.  But I

9   don't know the context of what came before and after or which

05:20:29   10  scenario he was talking about because, as I recall from his --

11  from reading the transcript that he spoke about two different

12  scenarios.

13  Q.  Sure.  Well, to set the stage he was asked right here,

14  "One of your opinions is that Hytera could have commercialized

05:20:47   15  Professor Sun's prototype in 16 months?"

16          "Yes, from February 2008."

17          And then the other opinion is what we just talked

18  about.  Does that provide the context you need?

19          MR. STRINGFIELD:  Megan, could we have a page number?

05:21:14   20  I'm sorry.

21          MS. NEW:  Sure.  It's page 4723 of the trial

22  transcript.

23          THE COURT:  And the lines at issue, counsel?

24          MS. NEW:  Of course.  Lines 14 to 22.

05:21:31   25  BY THE WITNESS:

Aron - cross by New

4954

1    A.  I see what he says here.

2    BY MS. NEW:

3    Q.  Okay.  And you would agree that this scenario that

4    Mr. Grimmett testified about, that Hytera could commercialize

05:21:42    5    the product by September of 2010, that's a hypothetical

6    scenario, right?

7    A.  It's a scenario of what would have happened in his opinion

8    had the alleged trade secrets not been available and used by

9    Hytera.

05:22:04    10    Q.  Okay.

11    A.  That's my understanding of what we're talking about here.

12    And so it's hypothetical in that sense.

13    Q.  Okay.  And as Mr. Grimmett acknowledged, he says they're

14    hypothetical, it's not what really happened in the real world,

05:22:21    15    right?

16    A.  I actually can't see the bottom of the page.  I'm sorry.

17    Q.  I'm sorry.  There you go.

18    A.  That's what he says, yes.

19    Q.  And he was also asked, "And so when you were offering

05:22:39    20    these opinions, it's a could have done it but didn't actually

21    do it, right?"  And he answered "Yes."  Is that fair?

22    A.  Yes.  We're talking about a world that didn't exist.  So

23    as I said at the beginning, you have to think about what's the

24    best assessment of what would have happened in that scenario,

05:23:00    25    in that world.

Aron - cross by New

4955

1    Q.  And in that scenario, your opinion is that Hytera only

2    owes Motorola $2.1 million in damages, correct?

3    A.  Approximately, yes.

4    Q.  Okay.  So I want to talk about -- so that's based on

05:23:26    5    Mr. Grimmett's hypothetical world, and I want to ask you some

6    questions about what actually happened in the real world.

7            What actually happened in the real world is that

8    Hytera used Motorola's stolen source code and trade secrets

9    and confidential documents to create their DMR products and

05:23:44    10   then sold those products from 2010 to today, correct?

11   A.  I'm not offering an opinion here at all on whether the

12   allegations made by Motorola are true.

13           So what I'm doing here is saying if Mr. -- if Dr.

14   Rangan's opinion is correct about what happened and what would

05:24:07    15   have happened if it hadn't happened, I will quantify the

16   effects of that, and same for Mr. Grimmett.  He analyzed what

17   the allegations are and whether they're correct or not,

18   whether they're true or not.

19           I'm not offering an opinion on whether he's right

05:24:25    20   either.  What I'm doing here is saying if he's right about

21   what happened and what would have happened, I'm quantifying

22   what the effect would be on Hytera and Motorola.

23   Q.  And I understand that.  But for purposes of your damages

24   opinions in this case, you are assuming misappropriation,

05:24:45    25   correct?

Aron - cross by New

4956

1   A.   I'm assuming that in the case of analyzing Mr. Grimmett's

2   opinion that his assessment of what would have happened is

3   true, and in the case of assessing what the damages are if Dr.

4   Rangan is right, I'm assuming that his opinion is true.  And

05:25:08   5   I'm not offering an independent opinion.

6   Q.   And you've been sitting here throughout the trial other

7   than last week, is that fair?

8   A.   That's fair.

9   Q.   Okay.  And --

05:25:17   10   THE COURT:  Just a minute.  Is it only last week?

11   When did you start listening to all the testimony?

12   THE WITNESS:  I started listening to all the

13   testimony on the very first day.  I missed part of one

14   morning.

05:25:29   15   THE COURT:  Going back to November?

16   THE WITNESS:  Yes, sir.

17   THE COURT:  All right.  Proceed.

18   BY MS. NEW:

19   Q.   And you were here when Junping Luo testified, right?

05:25:40   20   A.   I was.

21   Q.   And you were here when one of Hytera's technical experts

22   Barbara Frederiksen-Cross testified, correct?

23   A.   I missed the last day of her testimony.

24   Q.   Okay.  Did you review that transcript?

05:25:49   25   A.   I did.

1  Q.  Okay.  And so you're aware based on that testimony that

2  Hytera admits and its expert admits that Hytera has been

3  selling products using Motorola's stolen trade secrets and

4  source code from 2010 to today, right?

05:26:06

5          MR. STRINGFIELD:  Your Honor, we object to the extent

6  that mischaracterizes --

7          THE COURT:  Overruled.

8          The witness may answer.

9  BY THE WITNESS:

05:26:14

10  A.  It's not exactly my understanding of the testimony.  My

11  understanding of the testimony is that there have been --

12  there has been activity rewriting the source code to replace

13  the copyrighted materials that were ultimately identified by

14  Motorola as being copied and that that updated source code has

05:26:37

15  been rolled out, but I believe not yet entirely to every

16  product or perhaps every model, but that there are now

17  products out in the field today that have been -- had the

18  source code replaced with the clean source code.

19  BY MS. NEW:

05:26:57

20  Q.  Okay.  So you're aware, this is the testimony of Barbara

21  Frederiksen-Cross, page 4162, line 6 to 9, and he was asked --

22  she was asked, excuse me, "As Mr. Luo said, there's still a

23  bunch of Hytera products that still are using Motorola source

24  code being sold even today, right?"

05:27:22

25          Answer:  "I believe that's correct."

Aron - cross by New

4958

1      Did I read that correctly?

2  A.  Yes.  And I think that's also what I just said.

3  Q.  Okay.  And you understand, you mentioned there may be a

4  redesign of some of the source code, is that fair?

05:27:33  5  A.  Or a rewrite.  I don't want to characterize the

6  terminology.  I'm not a technical expert.

7  Q.  Okay.  But you've been sitting here.  You know there is a

8  dispute about whether that's really a true rewrite or redesign

9  of the code, right?

05:27:47  10  A.  With respect to rewriting the copyrighted parts that

11  Motorola alleges are copyrighted, I don't know that.

12  Q.  Okay.  And you as a damages expert know that Motorola is

13  entitled to be compensated for the benefit that Hytera

14  received as a result of its theft and use of Motorola's trade

05:28:18  15  secrets, right?

16  A.  That's generally my understanding of the law, yes.

17  Q.  And that benefit can be measured by the increased profit

18  or increased net revenues that Hytera would not have otherwise

19  received but for its theft of Motorola's trade secrets, fair?

05:28:35  20  A.  For trade secrets we're talking about now, not copyright?

21  Q.  Trade secrets, yes.

22  A.  Yes, I agree with that.

23  Q.  Okay.  And you and Mr. Malackowski, we've seen a lot of

24  numbers today, so just to kind of level set, you and

05:28:53  25  Mr. Malackowski agree on the revenue numbers for Hytera's

Aron - cross by New

4959

1    sales of the accused products, right?

2    A.  I think that's right, yes.

3    Q.  Okay.  So, and that's based on Mr. Malackowski's figure 46

4    from his, both his June and October expert reports, correct?

05:29:17    5    A.  I don't recall figure 46.  But we both are drawing from

6    the same ultimate data source, from Hytera, and we came to the

7    same numbers.

8    Q.  Okay.  So I'm putting up here on the screen a

9    demonstrative that I've marked as PDX-19.1.  And this reflects

05:29:37    10   Hytera's annual revenue for sale of the accused products from

11   2010 through the first half of 2019, correct?

12   A.  If you want to show me where he says what exactly these

13   revenues are, the chart doesn't say that it's the accused

14   products.  I think you're right.  I just don't recall that.

05:30:04    15   Q.  Well, you can see that the citation there is to

16   Mr. Malackowski's figure 46, right?

17   A.  I do see that, yes.

18   Q.  And you used the same revenues to calculate the profit

19   number that you gave to the jury on direct examination, right?

05:30:17    20   A.  I used the same numbers that he used.  But I didn't

21   memorize them, so if you want to show me what 46 says it is, I

22   can confirm that.

23   Q.  Sure.

24          MR. STRINGFIELD:  Your Honor, we object to the lack

05:30:32    25   of foundation on that exhibit.

Aron - cross by New

4960

1    THE COURT:  Is that exhibit in evidence, counsel?

2    MS. NEW:  I'm sorry, Your Honor?

3    THE COURT:  Is that exhibit you previously showed in

4    evidence?

05:30:40    5    MS. NEW:  That is a demonstrative summarizing the

6    revenue number that is in evidence.

7    THE COURT:  All right.  But specifically is that

8    exhibit in evidence?

9    MS. NEW:  That is not an exhibit, Your Honor.  That's

05:30:48    10    a demonstrative based on, based on information that is in

11    evidence.

12    THE COURT:  Well, there is many kinds of evidence.

13    All right.  So is that demonstrative exhibit in evidence?

14    MS. NEW:  It is not.  It is a demonstrative.

05:31:00    15    THE COURT:  Are you moving its admissibility?

16    MS. NEW:  I can lay a little more foundation and then

17    we'll move, we'll move it in.

18    THE COURT:  All right.  If you will, go ahead.

19    MS. NEW:  Sure.

05:31:29    20    BY MS. NEW:

21    Q.  Okay.  And you reviewed the report of Mr. Malackowski in

22    this case, right?

23    A.  I did.

24    Q.  Okay.  And we just established you relied on the same

05:31:38    25    revenue numbers as he did, correct?

Case: 1:17-cv-01973 Document #: 926 Filed: 02/26/20 Page 149 of 193 PageID #:62181
Aron - cross by New
4961

1    A.   We relied on the same revenue numbers which came from the

2    same data.

3    Q.   Okay.  So I'm going to show you the updated figure 46 we

4    just discussed.

05:31:47    5         MR. STRINGFIELD:  Your Honor, we'd request that

6    Dr. Aron be given a copy of this report that she's being asked

7    to review.

8         MS. NEW:  Sure.

9         May I approach, Your Honor?

05:31:59    10         THE COURT:  Whose report is that?

11         MS. NEW:  It is Mr. Malackowski's, which Dr. Aron

12    said she relied on.

13         THE COURT:  Okay.  So are you going to be asking her

14    about the contents of that report?

05:32:07    15         MS. NEW:  About one figure, Your Honor.

16         THE COURT:  About one figure.  Which page?

17         MS. NEW:  It's going to be on page 20 of the report.

18         THE COURT:  All right.  You may show the page to the

19    witness.

05:32:16    20         MS. NEW:  Okay.

21         THE WITNESS:  Thank you.

22    BY MS. NEW:

23    Q.   Dr. Aron, does your review --

24         THE COURT:  You are also going to publish that page

05:32:38    25    to the jury?

Aron - cross by New

4962

1          MS. NEW:  I am not.  I am going to refresh the

2    witness's recollection, Your Honor.

3          THE COURT:  All right.  Proceed.

4    BY MS. NEW:

05:32:44   5    Q.  Dr. Aron, the updated figure 46 that I've just shown you,

6    you see that it's Hytera revenue from accused product sales

7    2010 to June 2019 in millions.  Do you see that?

8    A.  Yes, I do.

9    Q.  Okay.  And does that refresh your recollection that those

05:32:59  10   are the revenue numbers for Hytera's accused devices and

11   repeaters in the U.S., outside the U.S. and globally?

12   A.  Yes.

13   Q.  Okay.  And so with that, if I put back up PDX-19.1.

14         THE COURT:  You may collect the exhibit.

05:33:28  15         MS. NEW:  Thank you, Your Honor.  May I actually

16   leave it up there just in case we need to show it to her

17   again?

18         THE COURT:  That's what you are asking for, right?

19         MR. STRINGFIELD:  No objection, Your Honor.

05:33:38  20         THE COURT:  That's what you are requesting?

21         MR. STRINGFIELD:  Yes, Your Honor.

22         THE COURT:  All right.  You may do so.

23         MS. NEW:  Happy to do so, Your Honor.

24   BY MS. NEW:

05:33:43  25   Q.  Okay.  So I'm going to put back up PDX-19.1.  And you'll

Aron - cross by New

4963

1  agree now that we've looked at updated figure 46 that these

2  are Hytera's annual revenues for the accused devices and

3  repeaters from 2010 to the first half of 2019, correct?

4  A.  The numbers aren't given in this table summed the way they

05:34:10  5  are shown in the demonstrative that you are showing me.  And

6  the numbers aren't given here with enough digits to confirm

7  the numbers that you are showing me on the demonstrative.

8        So just looking, you know, kind of adding in my head

9  across the different rows that you've shown me in his report,

05:34:29  10  they look approximately right.

11  Q.  Okay.  And so approximately --

12  A.  I can't, I can't confirm the numbers from memory beyond

13  that.

14  Q.  Okay.  But you do have the numbers in front of you, and I

05:34:40  15  gave you a calculator.  So if you needed to, you could perform

16  the addition and confirm the numbers are correct, right?

17  A.  No, because the numbers that you've shown on the

18  demonstrative have all the digits.  And the numbers in the

19  table are truncated, they're rounded, in other words, just to

05:35:01  20  one digit after the decimal in millions.

21        So no, I can't confirm them.  But as I said, they

22  look to be about the right order of magnitude.

23  Q.  Okay.  And in --

24        MR. STRINGFIELD:  Your Honor, we renew our objection

05:35:13  25  to the lack of foundation for this document.  But this

Aron - cross by New

4964

1   document has never had a sponsoring witness.  Dr. Aron is

2   unable to confirm the veracity of these numbers given the

3   materials provided to her by counsel.

4           THE COURT:  Have you completed your efforts to lay

05:35:25   5   the foundation?

6           MS. NEW:  I have not.  I have one more question for

7   the witness, Your Honor.

8           THE COURT:  Your objection is premature.

9   BY MS. NEW:

05:35:30   10   Q.  Dr. Aron, if you look at the total on the far right of

11   figure 46, you can see that the total is in millions and it's

12   $532 million, correct?

13   A.  For devices only.

14   Q.  Correct.  And then for repeaters it's 91.2 million,

05:35:45   15   correct?

16   A.  Correct.

17   Q.  And if you add those two numbers together, that's

18   approximately $623.1 million, right?

19   A.  You sum the numbers in the table and you get 623.2

05:36:11   20   million.

21   Q.  Okay.  And so as I mentioned, that only included the

22   devices and repeaters.  It didn't include the mobile devices,

23   correct?

24   A.  That's correct.

05:36:22   25   Q.  Okay.  And the 2019 data isn't complete.  It's only for

Aron - cross by New

4965

1   the first half of 2019, is that fair?

2   A.   Correct.

3   Q.   And we don't yet have the rest of the data for Hytera's

4   sales of the accused products in 2019, right?

05:36:38   5   A.   Right.

6   Q.   But you'd agree that it's likely that they have made

7   additional sales since June of 2019 of the accused products,

8   fair?

9   A.   Yes, I would expect so.

05:36:48   10   Q.   Okay.  So I want to ask you a couple questions about the

11   mobile devices.  And I am going to hand up two exhibits.

12          MS. NEW:  If I may approach, Your Honor?

13          THE COURT:  Yes.

14   BY MS. NEW:

05:37:41   15   Q.   Okay.  Dr. Aron, I've handed you two exhibits.  I've

16   handed you PTX-2226 and PTX-2075.  Do you see that?

17   A.   I do.

18   Q.   Okay.  And PTX-2226 is a document summarizing Hytera's

19   revenue, costs of goods sold and gross profit margin for its

05:38:05   20   DMR products, right?

21   A.   Yes.

22   Q.   Okay.  And I should have told you, I apologize, the first

23   half of the document is in Chinese and the second half is a

24   translation in English.

05:38:35   25          And this is a document that has a Bates, a Hytera

Aron - cross by New

4966

1    Bates number and is produced by Hytera in this litigation,

2    correct?

3    A.  It does.

4    Q.  Okay.  And you received and reviewed this document in

05:38:46    5    connection with your expert reports in this case, correct?

6    A.  We received the electronic version, yes.

7    Q.  Okay.

8         MS. NEW:  Your Honor, at this time plaintiff moves to

9    admit PTX-2226 into evidence.

05:39:01   10         MR. STRINGFIELD:  No objection, Your Honor.

11         THE COURT:  It is received and may be published.

12      (PTX-2226 was received in evidence.)

13   BY MS. NEW:

14   Q.  And PTX-2075 is appendix 12 from Mr. Malackowski's October

05:39:10   15   30, 2019 report, correct?

16   A.  What was the date that you gave me?

17   Q.  October 30, 2019.

18   A.  Yes, that's right.

19   Q.  Okay.  And this is a summary of the U.S. dollar to Chinese

05:39:32   20   Yuan exchange rate from 2008 to June 2019, right?

21   A.  Right.

22   Q.  And you reviewed this document in reviewing

23   Mr. Malackowski's report in reaching your opinions, correct?

24   A.  Correct.

05:39:42   25   Q.  Okay.

Aron - cross by New

4967

|         |    |                                                                          |
|---------|----|--------------------------------------------------------------------------|
|         | 1  | MS. NEW:  Plaintiff moves to admit PTX-2075, Your                        |
|         | 2  | Honor.                                                                    |
|         | 3  | THE COURT:  The exhibit is received.  It may be                          |
|         | 4  | published.                                                               |
| 05:39:45 | 5  | (PTX-2075 was received in evidence.)                                     |
|         | 6  | BY MS. NEW:                                                              |
|         | 7  | Q.  So if we go to PTX-2226.7, it says here on the top this is           |
|         | 8  | the U.S. update, correct?                                                |
|         | 9  | A.  It does.                                                             |
| 05:40:10 | 10 | Q.  Okay.  And along the left-hand column there, there are              |
|         | 11 | different Hytera DMR products listed by model number, fair?             |
|         | 12 | A.  Yes.                                                                 |
|         | 13 | Q.  Okay.  And right here I have highlighted some rows for the          |
|         | 14 | MD650 and the MD780.  Do you see that?                                   |
| 05:40:36 | 15 | A.  I see that you've highlighted them, yes.                            |
|         | 16 | Q.  Okay.  And looking specifically at the sales revenue line           |
|         | 17 | for the MD650, you can see that the total, if you look at the           |
|         | 18 | far right column, the total is ¥7,092,530 Yuan, correct?               |
|         | 19 | A.  Yes.                                                                 |
| 05:40:58 | 20 | Q.  Okay.  And then for the MD780, the sales revenue is                 |
|         | 21 | ¥101,117,366 Yuan, correct?                                             |
|         | 22 | A.  Correct.                                                             |
|         | 23 | Q.  Okay.  And if we go to page 2266.9, then we've got the             |
|         | 24 | revenue numbers for the same models, this time for the rest of          |
| 05:41:30 | 25 | the world, right?                                                        |

Aron - cross by New

4968

1   A.   That's right.

2   Q.   Okay.  And the revenue for the rest of the world for the

3   MD650 is 18,768,217.  Did I read that correctly?

4   A.   Yes.

05:41:54   5   Q.   Okay.  And for the MD780 the sales revenues are

6   ¥624,130,645 Yuan, correct?

7   A.   That's right.

8   Q.   Okay.  So I gave you the calculator.  I'm going to ask you

9   to just add those numbers up and tell me what number you get.

05:42:14   10   A.   I get 642,898,862.

11   Q.   And I'm sorry, let's include the U.S. as well.

12   A.   If I did this right I have 751,108,758.

13   Q.   And that's in RMB or Yuan, which is the Chinese currency,

14   correct?

05:43:28   15   A.   That's right.

16   Q.   Okay.  So to convert it to U.S. dollars, I'm going to put

17   up PTX-2075.

18       And you and Mr. Malackowski used the same sources for

19   converting RMB to dollars, right?

05:43:48   20   A.   I believe that's right.  I think he rounded them in a way

21   that made the conversion a little bit inaccurate.  But I think

22   we did rely on the same ultimate source.

23   Q.   Okay.  And you can see that the conversion rate swings

24   from 6.15 to 6. --  6.15 at the lowest, 6.78 at the highest,

05:44:08   25   right?

Aron - cross by New

4969

1    A.   Correct.

2    Q.   Okay.  So if we, to be conservative, if we just use an

3    exchange rate of 7, can you just divide the number in RMB you

4    just gave me, the 751,108,758, if you could divide that by 7

05:44:23   5    and tell me what number you get in dollars?

6    A.   107,301,251.14.

7    Q.   Okay.  So we'll say just for conservatism, we'll say $107

8    million.

9    A.   Okay.

05:44:43   10   Q.   Okay.  And if we add that to the revenue number we just

11   looked at for the devices and repeaters, that's $730 million

12   in revenue for Hytera, right?

13   A.   You want me to add this to the numbers we talked about

14   before, is that --

05:45:06   15   Q.   Right, yep.  That's right.

16   A.   What was that number you gave me, you asked me?

17   Q.   The 107 million or the 623 million?

18   A.   The sum that you represented.

19   Q.   Yeah.  What is -- is the sum of those two 730 million?

05:45:40   20   A.   .5, yes.

21   Q.   Okay.  And so your damages numbers we just established

22   based on Mr. Grimmett's six-month delay period is $2.1 million

23   owed to Motorola for Hytera's misappropriation, correct?

24   A.   That's right.

05:46:00   25   Q.   Okay.  And if we just compare that to Hytera's revenue on

Aron - cross by New

4970

1   the accused devices and repeaters, you would agree this is a

2   fair comparison of the actual numbers?

3   A.   I mean, you are comparing apples and oranges.  You are

4   comparing revenues to profits.

05:46:32   5   Q.   I understand that.  But my question is, this is a fair

6   representation of the revenues that Hytera has made on the

7   accused products versus your damages opinion based on

8   Mr. Grimmett's six-month head start period, correct?

9   A.   I mean, with the caveat that these are completely

05:46:59   10  noncomparable numbers.  They don't mean anything on the same

11  chart.  The numbers that you've shown in the two bars appear

12  to be the numbers that we've talked about.

13  Q.   Okay.  And you would agree, Dr. Aron, that if the jury

14  does not agree with Mr. Grimmett that in the hypothetical

05:47:19   15  world that Hytera could have commercialized a DMR, a

16  comparable DMR product without Motorola's trade secrets by

17  September of 2010, they can disregard your $2.1 million

18  damages number, correct?

19  A.   No.  It depends on what the jury does think is the right

05:47:38   20  but for world.  So if the jury decides that maybe six months

21  isn't right, but maybe eight months is right, then I think a

22  good starting point would be to look at my damages estimate

23  based on Mr. Grimmett's six-month opinion.

24  Q.   And you recall you were deposed in this case, Dr. Aron?

05:48:05   25  A.   Yes.

Aron - cross by New

4971

Q.   And at that deposition you were under oath?

A.   Yes.

Q.   And you gave truthful and accurate answers?

A.   I did.

05:48:11
Q.   And I was there, I asked you questions and you gave me

answers?

A.   Correct.

Q.   Okay.  I'm going to refer you to page 117 of your

deposition.  I asked you at line 9:

05:48:33
         "If the jury finds that Hytera would not have been

able to independently develop DMR radios without access to

Motorola's trade secrets ever, then the numbers you put

forward for Motorola's -- excuse me, Exhibit 4.1 for

Motorola's lost profits for scenario 1 and scenario 2 should

05:48:52
not be considered?"

         And you said, "Well, I think these damages

calculations are based on Mr. Grimmett's scenarios.  And if

the jury were to find that it believes Dr. Rangan's primary

theory, that Hytera would have never been able to produce a

05:49:06
product, a DMR product, then these are not relevant numbers to

look at."

         And then I asked you, "Is the same true for the

unjust enrichment on incremental sales for scenario 1 and

scenario 2?"

05:49:16
         And you said, "Yes, that's right."

Aron - cross by New

4972

1        Did I read that correctly?

2   A.  You did.  And that's completely consistent with my

3   previous answer.

4   Q.  So I want to ask you some questions about Mr. -- excuse

05:49:33   5   me, Dr. Rangan's opinion, because you talked about it quite a

6   bit on your direct examination.  Do you recall that?

7   A.  Yes.

8   Q.  Now, you told the jury during your direct examination that

9   Dr. Rangan's opinion, you had on your slides that Dr. Rangan's

05:49:53   10  opinion is that Hytera could have never developed a DMR

11  product, is that right?

12  A.  At least up until today, that's correct.

13  Q.  Okay.  But that's not what you said on your slides or on

14  your direct examination, right?

05:50:04   15  A.  No.  That is what I said.

16  Q.  Well, let's look at your slide.

17          This is DDX-22.5.  And that top heading there is

18  "Hytera could never launch DMR based on Dr. Rangan."  Did I

19  read that slide correctly?

05:50:23   20  A.  You did.

21  Q.  Okay.  And this is your slide?

22  A.  That's correct.

23  Q.  You made this slide?

24  A.  Right.

05:50:29   25  Q.  And it has your company's logo on the bottom?

Aron - cross by New

4973

A.  It does.

Q.  Okay.  Now, this is actually a misrepresentation of Dr. Rangan's opinion, correct?

A.  No.  Realistically, no, I don't think it is, because I think what Dr. Rangan said is that you couldn't produce a DMR product in a commercial period, and if that means you couldn't produce a DMR product even through today, I think that's equivalent, and from a damages perspective, it is equivalent to saying never.

Q.  But that's not what Dr. Rangan said, right?  He said that they couldn't create a comparable DMR product in a commercial reasonable period of time.

And your slide says Hytera could never launch DMR, right?

A.  That's correct.  And what does a "commercially reasonable time" mean?  As an economist it means in a time during which a company could offer the product and make money on it.  That's what "commercially reasonable" means.

So if you could launch it after a period of time when there is no demand for it anywhere anymore, it's equivalent to never.

Q.  And your slide here says "could never launch DMR," right?

A.  Correct.

Q.  But you understand that Mr. Grimmett's opinion is that Hytera could launch a comparable DMR product to what it

Aron - cross by New

4974

1  launched in the real world using Motorola's trade secrets,

2  right?

3       Well, just using -- you agree with me that just

4  saying DMR there, there are different versions of DMR.  There

05:52:11  5  is professional tier, mid-tier, commercial tier, right?

6  A.   I agree with that, that there are different tiers of DMR.

7  Q.   Okay.  And the products at issue in this case are the

8  professional and mid-tier products, correct?

9  A.   Some of them, yes.

05:52:25  10  Q.   Okay.  And Mr. Grimmett, you again reviewed his testimony,

11  correct?

12  A.   Correct.

13  Q.   And you're aware that he testified that Hytera could have

14  developed a product that was functionally equivalent or

05:52:40  15  identical to what they launched using Motorola's trade

16  secrets, right?

17  A.   That was his testimony.  In particular from my

18  perspective, his testimony was that the product that Hytera

19  could have launched would have been equivalent in the eyes of

05:52:58  20  consumers.

21  Q.   And what you told the jury was it would also be equivalent

22  in terms of functionality and appearance, right?

23  A.   Yes, I believe that's right.

24  Q.   Okay.  And so this slide isn't actually accurate, because

05:53:13  25  Dr. Rangan didn't say that Hytera could never launch any DMR

Aron - cross by New

4975

1    product, right?

2    A.  Oh, I disagree.  I just explained why I think that's a

3    fair characterization of his opinion.

4    Q.  Okay.  So we've got --

05:53:24    5           THE COURT:  Just a minute.

6           Read that question back to the witness.

7       (Question read)

8    BY THE WITNESS:

9    A.  I give the same answer.

05:53:45    10          THE COURT:  What is your answer?

11          THE WITNESS:  My answer is that I disagreed because

12   from an economic standpoint, the opinion that Hytera could

13   never launch a DMR product in a commercially reasonable time

14   period is the same from a damages standpoint of never being

05:54:03    15   able to launch DMR product.

16          THE COURT:  Did he ever use the word "never"?

17          THE WITNESS:  I can't say that he did, no.

18   BY MS. NEW:

19   Q.  I can show you Dr. Rangan's testimony.  This is from the

05:54:18    20   trial transcript at page 2021, lines 8 to 10.  And on

21   cross-examination, Hytera's counsel asked Dr. Rangan:

22          "And your testimony is that Hytera, to this day,

23   couldn't develop its own DMR radio?"

24          Answer:  "That's correct, comparable one, that's

05:54:41    25   right."

Aron - cross by New

4976

1        Fair?

2    A.  Yes, I see that.

3    Q.  And so we're not talking about any DMR product.  We're

4    talking about something comparable to what Motorola -- excuse

05:54:52    5    me, what Hytera actually launched in the real world using

6    Motorola's trade secrets?

7    A.  That's what the testimony you just showed me said, yes.  I

8    can't speak to everything that he said --

9    Q.  Okay.

05:55:05    10   A.  -- throughout his testimony.

11   Q.  And you know that Mr. Malackowski's damages calculations

12   did not depend on Hytera never independently developing a DMR

13   product, right?

14   A.  Which damages calculations are you asking me about?  He

05:55:37    15   performed a number of different analyses that we've talked

16   about today.

17   Q.  His unjust enrichment calculation.

18   A.  Which ones?

19   Q.  Well, my question goes to the whole calculation.

05:55:49    20       You told the jury that Mr. Malackowski calculated

21   damages based on Hytera never being able to develop a

22   comparable DMR product, right?

23   A.  One of his unjust enrichment analyses, the one that comes

24   to $311 million is based on Hytera never being able to produce

05:56:11    25   a DMR product all the way up 'til today.

Aron - cross by New

4977

1  Q.  And but you know that he actually, what he actually did

2  was he calculated damages based on the time it would take

3  Hytera to develop the trade secrets at issue in this case,

4  right?

05:56:27  5  A.  That's where the basis for his assumptions came from.  But

6  the result was what I said, that Hytera would not be able to

7  produce a DMR product up through today.

8  Q.  And you know that Mr. Malackowski gave the jury different

9  damages numbers based on the development time for different

05:57:01  10  trade secrets, correct?

11  A.  That's right.  And I talked about those today.

12  Q.  Okay.  And you know that the longest development time that

13  was offered by the Motorola engineers and Dr. Rangan were for

14  the DMR source code and the DSP framework source code, right?

05:57:19  15  A.  I don't recall that those were the trade secrets that

16  generated the longest delay period.

17  Q.  Okay.  But if they were, you agree that Mr. Malackowski

18  showed the jury this demonstrative, which is PDX-10.31.  And

19  he calculated damages based on 3 months, 6 months, 1 year, 2

05:57:47  20  year, 3 year, 4 year, and then the entire 9 year period that

21  Hytera has been selling the accused products, right?

22  A.  Agree.

23  Q.  Okay.  And so the jury can look at these numbers based on

24  which trade secrets it finds to be misappropriated and award

05:58:05  25  damages based on these calculations, correct?

Aron - cross by New

4978

A.   That's my understanding of the way he has, Mr. Malackowski

has structured his damages analysis.

Q.   And so the jury doesn't necessarily have to find that

Hytera could never develop a comparable DMR product in order

05:58:22   to be able to award the full amount of profits that

Mr. Malackowski says is $238 million, right?

A.   I don't follow your logic, so I don't understand the

question.

Q.   Sure.  Well, we've just established that Mr. Malackowski

05:58:44   calculated the amount of profits associated with the

development times of the trade secrets, right?

A.   You mean as shown on this exhibit?

Q.   Yes.

A.   That's right.

05:58:55   Q.   And so your view of the damages case in this that you've

presented to the jury is that they would only award

Mr. Malackowski's $311 million if they find that Hytera could

never develop a comparable DMR product.  But they could award

that if they find that the longest trade secrets like all of

05:59:19   the source code were misappropriated, fair?

A.   I don't think that's consistent with what we're seeing

here.  I think that if only the trade secrets that are

associated with 108 months' delay, and it's really 108 months

or more is the way it's written in Mr. Malackowski's report,

05:59:48   that would be equivalent to not being able to produce a DMR

Case: 1:17-cv-01973 Document #: 926 Filed: 02/26/20 Page 167 of 193 PageID #:62199
Aron - cross by New
4979

1    radio all the way until today.

2    Q.   Because is that -- and are you saying that because the

3    source code is important to the development of a DMR radio?

4    A.   No.  I'm saying that because that's what I thought you

06:00:08    5    were posing as the scenario that the Judge would -- that the

6    jury would be considering.

7    Q.   Okay.  So let's look at Mr. Malackowski's testimony.  And

8    this is page 2199 of the trial transcript.

9         And he was asked, if we look at PDX-10.31, which is

06:00:28    10    the slide we were just looking at, he was asked, "How would

11    that impact your analysis?"

12         His answer was, "So the 108 months represents the

13    entire time period I studied.  So that's the 238 million we

14    just saw, the total Hytera profits."

06:00:50    15         Did I read that correctly?

16    A.   You read it correctly.

17    Q.   And then he goes on to say, "So if one of the trade

18    secrets for there was found and one of the trade secrets for

19    the next row, a shorter period, you wouldn't double count.

06:01:05    20    Motorola is entitled to its full recovery."

21         Do you see that?

22    A.   I see that.

23    Q.   And did I read that correctly?

24    A.   Yes.

06:01:11    25    Q.   And now you also talked on direct about the delay periods

Aron - cross by New

4980

06:01:58

06:02:21

06:02:34

06:03:09

06:03:34

1 that Mr. Malackowski testified about.  Do you remember that?

2 A.  I do.

3 Q.  Okay.  And what I believe you said was that

4 Mr. Malackowski only relied on FCC regulations to determine

5 that 2010 was a critical time to transition from analog to

6 DMR.  Do you recall that?

7 A.  That was the only issue that I was asked about.

8 Q.  You didn't tell the jury about anything else, right?

9 A.  Correct.  I don't think so.

10 Q.  So I want to talk a little, I want to ask you some

11 questions about how important Motorola's trade secrets were to

12 Hytera being able to get into the market.

13         MS. NEW:  Your Honor, may I approach the witness with

14 the exhibit?

15         THE COURT:  Yes.

16 BY MS. NEW:

17 Q.  Okay.  Dr. Aron, I've handed you a document that's been

18 marked as DTX-3104.  Do you see that?

19 A.  I do.

20 Q.  And this is a June 2007 email from Kenneth Qiu to Chairman

21 Chen forwarding an email that Mr. Qiu received from G.S. Kok,

22 correct?

23 A.  Yes, I think that's right.

24 Q.  And the time frame for these emails is June of 2007, fair?

25 A.  Yes.

Aron - cross by New

4981

1   Q.   And DTX-3104 was produced by Hytera in this litigation and

2   has a Hytera Bates number, correct?

3   A.   It does.

4   Q.   Okay.

06:03:47   5        MS. NEW:  Your Honor, plaintiff moves to admit

6   DTX-3104.

7        MR. STRINGFIELD:  No objection.

8        THE COURT:  It is received and may be published.

9     (DTX-3104 was received in evidence.)

06:03:54   10        MS. NEW:  Thank you.

11  BY MS. NEW:

12  Q.   Okay.  Dr. Aron, you can see that I've highlighted some

13  portions of this email.  And this is an email again that you

14  are aware that G.S. Kok is one of the central figures in this

06:04:15   15  case, correct?

16  A.   I am.

17  Q.   He is one of the people who has stolen Motorola's trade

18  secrets, right?

19  A.   I mean, I'm not going to offer an opinion on that.  I've

06:04:23   20  heard the testimony.

21  Q.   Okay.  And he first tells Mr. Qiu in this email that the

22  6.25 ruling is not so distant a future as 2011, is only 3.5

23  years out.  So after that Europe and U.S. market will close.

24  Do you see that?

06:04:45   25  A.   I do.

Aron - cross by New

4982

1  Q.  And that 6.25 ruling that he's referring to is this FCC

2  narrow banding requirement that we've been talking about

3  throughout this case, right?

4  A.  There was a 6.25 narrow banding ruling.  I don't know if

06:05:05  5  he was talking about the U.S. ruling.

6  Q.  Okay.  And that FCC narrow banding requirement prohibits

7  the manufacture and import of analog devices, right?

8  A.  No.  That's not correct.

9  Q.  Okay.  And but the reason that people were switching from

06:05:24  10  analog to digital was because there were going to be less --

11  no more licences given out for analog products, correct?

12  A.  What the data show is that people were not switching from

13  analog in massive numbers, that I showed the data that showed

14  that there has been a gradual transition from analog towards

06:05:46  15  digital, but that analog has been very much the predominant

16  technology in the radio products market, in fact, in the whole

17  two-way radio market for many years after the issuance of this

18  email.

19  Q.  And, Dr. Aron, you understand that my question was not

06:06:09  20  about what the data shows.  My question was about the FCC

21  ruling.  Did you understand that?

22  A.  No.  I think your question was -- well, maybe could I hear

23  the question back, please?

24  Q.  Sure.  You understand that -- let me ask it a different

06:06:22  25  way.

Aron - cross by New

4983

1    You understand that the FCC set an interim deadline

2    of January 1st, 2011 after which the FCC prohibited the

3    manufacture and import of devices operable only on 25

4    kilohertz channels and stopped granting new applications for

06:06:41   5    the modification of existing stations operating on 25

6    kilohertz channels, right?

7    A.   My recollection is that actually did not happen, that the

8    FCC issued subsequent rulings and modified its restrictions,

9    and that's partly why we see continued sales of analog

06:07:04   10   products in the U.S. and continuing to today.

11   Q.   Okay.  So Mr. Kok though is saying that, is telling Mr.

12   Qiu that "The old analog world is shrinking fast, so the

13   longer HYT stays there, the bigger the exposure and time is

14   ticking away."  Did I read that correctly?

06:07:33   15   A.   Almost.  He says, "So the longer Hytera stays here."

16   Q.   Thank you.

17        And then he goes on to say, he says above that, "If

18   Hytera wants to list in 2 to 3 years, then it need a strong

19   portfolio to convince NSDAD."  Do you see that?

06:07:54   20   A.   I do.

21   Q.   Do you agree that NSDAD likely means NASDAQ?

22   A.   I would expect that is probably right.

23   Q.   Okay.

24        THE COURT:  And that is the stock exchange?

06:08:04   25        MS. NEW:  That is a stock exchange, yes, Your Honor.

Aron - cross by New

4984

BY MS. NEW:

Q.  Dr. Aron, you understand that the NASDAQ is a stock exchange, right?

A.  I do.

Q.  Okay.  And he also says, "It will be an uphill battle if it does not have a strong portfolio," right?

A.  That's what he said.

Q.  And then the email as we saw above is forwarded from Mr. Qiu to Chairman Chen, right?

A.  And his assistant, yes.

Q.  And Kenneth asks Iris, Mr. Chen's assistant, to translate the email for Mr. Chen, fair?

A.  Correct.

Q.  So then let's look at PTX-428, which it's already been admitted.  If you want a copy, Dr. Aron, just let me know and I'm happy to hand you one.

        THE COURT:  Getting back to the NASDAQ, does this email - and you may inquire - precede the IPO?

BY MS. NEW:

Q.  Dr. Aron, you understand that Hytera IPOed in 2011, correct?

A.  I do.

Q.  And so the discussion about NASDAQ in 2007 would precede that, right?

A.  It would.

Aron - cross by New

4985

1    Q.   Okay.  So here is PTX-428, as I mentioned already

2    admitted.  And this is an email from G.S. Kok's personal email

3    address to Mr. Qiu and Chairman Chen, right?

4    A.   Yes.  But I would appreciate having a copy because I can't

06:09:45    5    see the whole thing on the screen.

6    Q.   Of course.

7            MS. NEW:  Your Honor, may I approach?

8            THE COURT:  Yes.

9            MR. STRINGFIELD:  Can we have a copy, too, Megan?

06:09:55    10    BY MS. NEW:

11    Q.   Okay.  So, Dr. Aron, this is just a few days later than

12    the email we just looked at, right?  It's June 27, 2007?

13    A.   Right.

14    Q.   Okay.  And in this email, Mr. Kok explains that -- and you

06:10:32    15    understand at this point in time G.S. Kok and Mr. Chen are

16    talking about G.S. Kok joining Hytera from Motorola, right?

17    A.   That's consistent with my recollection, yes.

18    Q.   Okay.  And Mr. Kok tells Mr. Chen that at Motorola, it

19    took his team of 400 engineers globally 4 years to release

06:10:59    20    6.25e protocol or F2.  Do you see that?

21    A.   I see what's written there, yes.

22    Q.   And do you understand that to be referring to DMR?

23    A.   It could be.  DMR isn't the only 6.25 protocol.

24    Q.   But you understand at the time that Mr. Chen was trying to

06:11:28    25    hire G.S. Kok away from Motorola, they were in discussions

Aron - cross by New

4986

1   about G.S. Kok's ability to develop a DMR product for Hytera,

2   right?

3   A.   I mean, I think that's generally true. But I definitely

4   can't offer an opinion on how all these different threads of

06:11:46   5   discussion piece together with respect to whether this email

6   is about DMR.

7   Q.   Okay. And then you see down at the bottom, Mr. Kok says

8   to Mr. Chen, "So going forward, I see a big future in F2 and

9   6.25e and I'm afraid if HYT don't jump on the bandwagon you

06:12:10   10   will be left far behind." Do you see that?

11   A.   I do.

12   Q.   Okay. Did I read that correctly?

13   A.   I believe so, yes.

14   Q.   And if we look at -- I'm going to also put up another

06:12:25   15   admitted exhibit. Would you like a copy of this one as well?

16   A.   What is it?

17   Q.   It is PTX-426.

18   A.   I don't know what that is.

19   Q.   Okay. Would you like a copy?

06:12:34   20   A.   Sure. Thank you.

21   Q.   (Tendering document)

22   A.   Thank you.

23   Q.   Okay. So PTX-426 has been admitted. And it's a September

24   2007 email chain between G.S. Kok and Mr. Chen and then it's

06:13:12   25   forwarded to Iris at the top. Do you see that?

Aron - cross by New

4987

1    A.   That's what it looks like, yes.

2    Q.   Okay.  And if we look, so in this email from G.S. right

3    here, you can see in the third paragraph, I've highlighted

4    some more of the language, and G.S. says to Mr. Chen, "I need

06:14:11    5    to see your vision and ensure that ours are aligned.  I

6    already know one of yours, which is to get HYT listed on

7    NASDAQ."  Do you see that?

8    A.   I do.

9    Q.   Okay.  That's consistent with what we saw in the previous

06:14:23    10   email about Hytera wanting to get listed on the NASDAQ stock

11   exchange, right?

12   A.   The previous email also just represented G.S. Kok's

13   opinion that Hytera wanted to get listed on the NASDAQ.  I

14   don't think it represented Hytera's opinion.

06:14:40    15   Q.   And it goes on to say, G.S. goes on to say, "It will be

16   quite difficult to get a good listing price if the auditor

17   check and find most of our equipments are analog and also our

18   major market share is in China."  Do you see that?

19   A.   I see that.

06:14:59    20   Q.   And did I read that correctly?

21   A.   Yes.

22   Q.   Okay.  And then at the same time internally at Hytera,

23   Mr. Chen is also telling employees how important DMR is to the

24   future of Hytera, right?

06:15:15    25   A.   Why don't you show me the document you are referring to.

Aron - cross by New

4988

```
              1       MS. NEW:  Your Honor, may I approach the witness?

              2       THE COURT:  Yes.

              3  BY THE WITNESS:

              4  A.  Thank you.

06:15:36      5  BY MS. NEW:

              6  Q.  Okay.  Dr. Aron, I've handed you PTX-416, which has been

              7  admitted.  And it is the ID-Driven presentation.  Do you see

              8  that?

              9  A.  I do.

06:15:56     10  Q.  We've looked at this document before during the trial,

             11  right?

             12  A.  Yes, we have.

             13  Q.  Okay.  And I want to go to page PTX-426 -- 416.29, excuse

             14  me.

06:16:20     15       And this is the declaration of Chairman Chen that

             16  we've seen before, right?

             17  A.  Correct.

             18  Q.  Okay.  And I don't want to belabor it because we have seen

             19  this document several times.  But in this document Chairman

06:16:36     20  Chen is making a declaration, right?

             21  A.  Correct.

             22  Q.  And he's saying the DMR project is characterized by a high

             23  degree of importance and is critical to the future development

             24  of the company.

06:16:55     25       Do you see that?
```

Aron - cross by New

4989

A.  I see he says that, yes.

Q.  Okay.  And then he talks about how Motorola has launched the first generation of DMR products, right?

A.  Correct.

06:17:04
Q.  And he says, "We need to directly develop the second generation of products," fair?

A.  That's what it says.

Q.  And he says, "The success of DMR will mean defeating Motorola in the middle and high end market," right?

06:17:20
A.  That's what he says.

Q.  Okay.  And then shortly after these documents we've been looking at in 2007, G.S. Kok, Y.T. Kok and Sam Chia join Hytera in 2008, right?

A.  They join in 2008.

06:17:41
Q.  And then Hytera launched its accused DMR products in 2010?

A.  That's correct.

Q.  Okay.  And you were here when the deposition testimony of Andrew Yuan was played to the jury, right?

A.  I was.

06:17:53
Q.  Okay.  And Mr. Yuan is a vice-president of sales at Hytera as well as the president of north and south America, right?

A.  That's consistent with my memory.  I don't recall his title.

THE COURT:  You mean the subsidiaries, right?

06:18:14
MS. NEW:  I do, Your Honor, yes.

Aron - cross by New

4990

06:18:29

06:18:36

06:18:58

06:19:18

06:19:45

1    THE COURT:  Otherwise he'd be the president of what?

2    MS. NEW:  You're right, not of North and South

3 America, not the continents, Your Honor.  You're correct.

4    THE COURT:  Just for clarification.

5    MS. NEW:  Yes.  Thank you, Your Honor.

6 BY MS. NEW:

7 Q.  So you were here when Mr. Yuan's deposition testimony was

8 played and you were also here when he testified, right?

9 A.  Right.

10 Q.  Okay.  And Mr. Yuan testified in his deposition that was

11 played to the jury, I am just going to show you right here.

12 And he was asked, "In 2010, was the DMR market in a phase of

13 rapid adoption?"  Do you see that?

14 A.  I do.

15 Q.  Okay.  And one part of his answer is, "So to answer your

16 question, I believe in 2010 it is true that more and more

17 customers, they choose DMR," fair?

18 A.  That's what it says, yes.

19 Q.  And then he also testified, "I believe in 2010 that was a

20 very important time point for customers to switch from analog

21 to digital and they only have three or four options," right?

22 A.  He says that, yes.

23 Q.  Okay.  And you know that part of Mr. Malackowski's opinion

24 in this case is that because Hytera got to the market in 2010,

25 they had what Mr. Malackowski characterized as a first mover

Case: 1:17-cv-01973 Document #: 926 Filed: 02/26/20 Page 179 of 193 PageID #:62211
Aron - cross by New
4991

advantage, right?

A.   Hytera had a first mover advantage?  Is that what you

asked me?

Q.   I did.

A.   No.   That's not what he said.  And Hytera wasn't a first

mover.  Motorola was the first mover.

Q.   So Hytera would be the second mover?

A.   Correct.

Q.   Okay.  And you were also here when the deposition

testimony of Mr. Steve Cragg was played to the jury, right?

A.   Yes, that's right.

Q.   And Mr. Cragg is the director of sales in the U.S. for

Hytera, right?

A.   Correct.

Q.   And Mr. Cragg was asked, "Was Hytera's ability to enter

the DMR market as early as it did a significant competitive

advantage to Hytera?"  And he answered, "My opinion, yes."  Do

you see that?

A.   I do.

Q.   And then he was asked, "Is that opinion based on your

experience selling DMR radios in the United States?"  Fair?

It's right here (indicating).

A.   I see that, yes.

Q.   Okay.  And part of what he says is, "So DMR and other

radios, we had the same issue with P25 with Tait.  Being late

Aron - cross by New

4992

1    to the market is difficult because your competitors, you know,

2    they have a lead on you and they tend to continue that lead,

3    so you're always playing catch-up."  Do you see that?

4    A.   I see what he said, yes.

06:21:43    5    Q.   Okay.  And you know that Mr. Malackowski relied on all of

6    this testimony and these documents for his opinion that Hytera

7    did have an advantage by getting into the market in 2010,

8    right?

9    A.   He did.  He didn't rely on any analysis.  He relied on

06:22:00   10    this testimony that in my opinion does not support his

11    approach.

12    Q.   Okay.  But that's witnesses from Hytera executives and

13    employees, right?

14    A.   It is testimony from those individuals, yes.

06:22:14   15    Q.   And we saw documents with the chairman of the company,

16    correct?

17    A.   Yes.  And we heard testimony about that from Hytera

18    explaining that that's the chairman giving a rah-rah speech to

19    his team and getting them enthusiastic about working hard to

06:22:37   20    produce a new product.

21    Q.   And so then, as Judge Norgle asked a few moments ago, in

22    2011, Hytera went through an IPO or an initial public

23    offering, right?

24    A.   They did.

06:22:50   25    Q.   And when a company goes through an IPO it's common for

Aron - cross by New

4993

1 them to publish a prospectus that's available to the public

2 and to potential investors, right?

3 A. That's right.

4 Q. Okay. So we have a copy of that. It's large. It's

06:23:05 5 already admitted, but I can hand it to you if you would like

6 to see it?

7 A. Okay. Thank you.

8 Q. That's PTX-2380 for the record.

9    MS. NEW: May I approach, Your Honor?

06:23:33 10    THE COURT: Yes.

11    THE WITNESS: Thank you.

12 BY MS. NEW:

13 Q. Okay. And so PTX-2380, it is in Chinese, but there is a

14 translation in the back.

06:24:05 15    And I am specifically - here is the cover - and I

16 specifically want to ask you about page PTX-2380.526.

17 A. Okay.

18 Q. Okay. And, again, we just established the prospectus is

19 given to the public and to potential investors, right, or is

06:24:41 20 available to them?

21 A. It's available to them, yes.

22 Q. Okay. And the title of this section on page 2380.526 is

23 that "Digital products will become the company's new business

24 growth point." Do you see that?

06:24:56 25 A. I do.

Aron - cross by New

4994

1  Q.   Okay.  And the prospectus says, right here, "The company's

2  digital products have obvious competitive advantages such as

3  leading technology, high cost performance, and fast

4  customization."  Do you see that?

06:25:17   5  A.   Do you mind if I read this page before we talk about it?

6  Q.   Go ahead.

7  A.   Okay.

8  Q.   And so you see that sentence I just read that says, "The

9  company's digital products have obvious competitive advantages

06:26:17  10  such as leading technology, high cost performance, and fast

11  customization."  Did I read that correctly?

12  A.   Yes, referring back to three different digital

13  technologies.

14  Q.   And then it says "The issuer" -- and the issuer is Hytera,

06:26:38  15  right?

16  A.   I would expect so, yes.

17  Q.   "They have had a head start in technical research and

18  product development in the PDT and DMR fields, leading the

19  technology."  Do you see that?

06:26:53  20  A.   I do.

21  Q.   And in the next highlighted sentence it says, "The first

22  manufacturer in the world to launch PDT products and the

23  second manufacturer in the world to launch DMR terminal

24  products."  Do you see that?

06:27:05  25  A.   I do.

1    Q.   Okay.  And obviously the first to launch DMR was Motorola,

2    right?

3    A.   Correct.

4    Q.   And here Hytera is touting to the public and to potential

06:27:17    5    investors the fact that it was the second company to launch a

6    DMR product in the world, right?

7    A.   It's stating that, yes.

8    Q.   And then Hytera did go public, right?

9    A.   It did.

06:27:32    10   Q.   And do you know what Hytera's market cap is as of today?

11            THE COURT:  That's a very dangerous question given

12   current events.  Ignore that question.

13   BY MS. NEW:

14   Q.   You understand, Dr. Aron, that as of February 1st, 2020,

06:27:56    15   Hytera had a market cap of about $2.61 billion, right?

16   A.   Do you have something to show me that documents that?  I

17   don't know that off the top of my head.

18            MS. NEW:  Your Honor, may I approach?

19            THE COURT:  Well, if you don't know, just simply say

06:28:12    20   "I don't know."

21   BY THE WITNESS:

22   A.   I don't know.

23            THE COURT:  All right.  Yes, you may approach.

24            MS. NEW:  Thank you.

06:28:34    25            THE COURT:  The question went to what date, counsel?

Aron - cross by New

4996

1      MS. NEW:  As of February 1st, 2020.

2      THE COURT:  Can we have a short sidebar.

3      (Discussion at sidebar on the record)

4      THE COURT:  With the coronavirus and other events

06:29:06   5   going on globally, asking questions about the valuation of

6   companies or stock prices is dangerous.  The Dow last week at

7   some point was down 660 points.  Standard & Poor's was down

8   about 58 points.

9      So questions about valuations of companies or stock

06:29:30   10  prices leads to a dangerous inquiry.  Where are you going with

11  this?

12     MS. NEW:  Well, on direct exam, Your Honor, counsel

13  for Hytera asked about the profits for Hytera.  And we are

14  trying to establish that the company is actually quite

06:29:47   15  valuable, and part of that value according to their IPO

16  prospectus is the DMR product that's at issue in this case.

17     THE COURT:  What do you have to say about that?

18     MR. STRINGFIELD:  Your Honor, we share your concerns

19  about the current economic, political and economic climate.

06:30:04   20  But provided that counsel doesn't intend to inadvertently, I

21  would assume, prejudice or paint them in a bad light, I don't

22  see the harm in it.

23     THE COURT:  All right.  So there are no strenuous

24  objections, right?  Okay.

06:30:19   25     MS. NEW:  I will not, I will not allude to any

1    potential global pandemics.

2            THE COURT:  Well, at the moment we don't know what's

3    happening in the stock market on the NASDAQ or otherwise.

4            MS. NEW:  Right.

06:30:29    5            THE COURT:  It's a danger zone.

6            MS. NEW:  It's simply to establish the number, Your

7    Honor.

8            THE COURT:  All right.  Just keep that perspective,

9    counsel.

06:30:33    10            MS. NEW:  Thank you, Your Honor.

11          (End of discussion at sidebar)

12            THE COURT:  Repeat or rephrase the question.

13            MS. NEW:  Sure.

14    BY MS. NEW:

06:30:49    15    Q.  I have handed you, Dr. Aron, PTX-2404.  Do you see that?

16    A.  I do.

17    Q.  Okay.  And this is a printout you can see on the bottom

18    left from the MorningStar website.  Do you see that?

19    A.  Yes.

06:31:05    20    Q.  Okay.  And the date at the very top is February 1st, 2020.

21    Do you see that?

22    A.  I do see that.  The date of the data appears to be January

23    31st, 2020.

24    Q.  That was my next question.  Thank you.

06:31:22    25            So this was for Hytera Communications Corp Limited,

Case: 1:17-cv-01973 Document #: 926 Filed: 02/26/20 Page 186 of 193 PageID #:62218
Aron - cross by New
4998

1    right?

2    A.   It is.

3    Q.   And the rating, it is their rating as of January 31st,

4    2020?

06:31:35    5    A.   That's what it says.  It also says "Last close prices

6    updated as of January 23rd, 2020."  So I'm not really sure

7    what the date of the data are.

8    Q.   Okay.  And MorningStar is a source that economists use and

9    other financial services firms use to evaluate the value and

06:31:59    10    the stock price of companies, right?

11    A.   It's a commonly used data source.

12    Q.   Okay.

13         MS. NEW:  Your Honor, at this time plaintiff moves to

14    admit PTX-2404.

06:32:11    15         MR. STRINGFIELD:  No objection.

16         THE COURT:  It is received and may be published.

17       (PTX-2404 was received in evidence.)

18         MS. NEW:  Okay.

19    BY MS. NEW:

06:32:15    20    Q.   I just have a couple very quick questions about this,

21    Dr. Aron.

22         You'll see here that I have highlighted the market

23    cap.  Do you see that?

24    A.   I do.

06:32:25    25    Q.   Okay.  And is it fair in sort of layman's terms to define

Aron - cross by New

4999

1  the market cap as the value of outstanding stock for Hytera?

2  A.  At the current market price.

3  Q.  Okay.  And let's go as conservatively as possible and say

4  January 23, 2020, the market cap is ¥15.12 billion Yuan,

06:32:48  5  right?

6  A.  I don't know if that's conservative or not.  I don't know

7  if the price has been going up or down.  This says that it's

8  been going down.

9         THE COURT:  All right.  Your question goes to January

06:32:59  10  23rd?  That question goes to January 23rd?

11         MS. NEW:  Why don't we do it as of the rating on

12  January 31st, 2020.

13  BY MS. NEW:

14  Q.  And as of that date, the market cap is ¥15.12 billion

06:33:12  15  Yuan, right?

16  A.  I think what this is saying is that that was the market

17  cap as of January 23rd, 2020.

18  Q.  Okay.  And if it's ¥15.12 billion Yuan, that's about $2.1

19  billion U.S. dollars, right?

06:33:37  20         MR. STRINGFIELD:  Your Honor, we object.  Hytera's

21  overall market cap is not relevant to this case.

22         THE COURT:  The objection is overruled.

23         You may answer if you know.

24  BY THE WITNESS:

06:33:45  25  A.  I don't know the current exchange rate.

Aron - cross by New

5000

BY MS. NEW:

Q.  Well, a minute ago we were doing the exchange rate for the mobile products.  We used 7, right?

A.  Right, as an approximation.  But I don't know what the current exchange rate is.  The chart we were looking at didn't go past the first half of 2019.

Q.  Well, why don't we just use the 7 and we can agree it's an approximation.

A.  I can do the arithmetic, but I really don't know to what extent the exchange rate has changed since the second half of 2019.  That was six months ago.

Q.  Okay.  Why don't we just apply the 7 to ¥15.12 billion Yuan.

A.  If you divide 15.1213 by 7, you get 2.16.

        But just to reiterate, I really don't know what that means because I don't know what the current exchange rate is or whether 7 is a realistic or relevant number.

Q.  And you reviewed the deposition of Chairman Chen in this case, right?

A.  Yes, I did.

Q.  And you're aware that he owns more than 50 percent of Hytera stock?

A.  I don't recall that.

Q.  Okay.  But you did consider his deposition, correct?

A.  I did review it.  I don't recall it being relevant to my

Aron - cross by New

5001

1    analysis, which was focused on data.

2    Q.  Do you have any reason to dispute that Mr. Chen owns more

3    than 50 percent of the Hytera stock?

4    A.  I don't have any reason to agree or disagree.  I really

06:35:45    5    don't know.

6    Q.  And so we just looked at several documents and testimony

7    related to what Hytera employees perceived to be an advantage

8    by getting into the market after Motorola.  And so I want to

9    ask you some questions about one of your criticisms of

06:36:21    10    Mr. Malackowski and his opinions.

11          And one of those criticisms was that if you applied

12    the head start period, you criticize him because you say the

13    delay is persistent.  Is that a fair characterization?

14    A.  Yes, it is.

06:36:52    15          THE COURT:  Counsel, do you expect that redirect

16    might be significant with respect to this witness?

17          MR. STRINGFIELD:  Yes, Your Honor.

18          THE COURT:  All right.  I think we'll stop then for

19    the day.  Clearly the witness will complete her testimony

06:37:03    20    tomorrow.

21          You are excused until tomorrow morning at 10:00

22    o'clock, Doctor.

23          THE WITNESS:  Thank you, Your Honor.

24          THE COURT:  Members of the jury, 10:00 o'clock

06:37:15    25    tomorrow.

1          Counsel, please remain.

2       (Jury out)

3          THE COURT:  Please be seated.

4          The witness may step down.  The witness is excused

06:37:34    5   until tomorrow at 10:00 o'clock.

6       (Witness excused)

7          THE COURT:  I think just for purposes of the record,

8   these references to what we talked about at the sidebar is the

9   coronavirus and matters collateral to it.  But we'll leave

06:37:48   10   that to some Court of Appeals to be aware of at some future

11   time.  But that was the Court's reference.  With all that

12   going on, it's difficult in this kind of volatile market to

13   get to these issues.  And counsel are sensitive to that

14   problem.

06:38:04   15          You advised the clerk that you wanted to be heard on

16   a scheduling problem, counsel?

17          MR. CLOERN:  Yes, Your Honor.  So it's our

18   understanding that the plaintiffs will offer Dr. Wicker

19   tomorrow, and then after that they'll seek an adjournment

06:38:21   20   until Mr. Malackowski can be here on next Monday.  And Hytera

21   has no problem with that.  We're fine with it.

22          What we would -- what we're hoping to find out is

23   whether Mr. Malackowski plans to update his numbers in light

24   of the Court's order, because we need to know whether Dr. Aron

06:38:39   25   will be excused after she finishes up tomorrow morning or

1  whether Dr. Aron needs to be potentially called for

2  surrebuttal in case she needs to respond to things that would

3  be brand-new that Mr. Malackowski would put out.

4          THE COURT:  What is your response, counsel?

06:38:56    5          MR. DE VRIES:  So, Your Honor, on a scheduling point,

6  we agree.  Just to make sure it's clear, Mr. Malackowski is

7  currently in an International Trade Commission trial.  We had

8  alerted the Court to this a couple of weeks ago, and so he

9  cannot be here.

06:39:11   10          We would expect Mr. --

11          THE COURT:  Until when?

12          MR. DE VRIES:  Until next Monday, the 10th.

13          We would expect I think that Dr. Wicker, who is our

14  next witness, will finish sometime during the day on Wednesday

06:39:22   15  or so.  And so that would involve an adjournment, you know, of

16  Thursday, the jury would be off on Thursday, and then we would

17  come back on Monday the 10th for our final witness in the

18  rebuttal.

19          We understand from counsel for Hytera that Hytera

06:39:39   20  agrees that that is agreeable, of course, subject to Your

21  Honor's approval.

22          THE COURT:  Do you agree, counsel?

23          MR. CLOERN:  Yes, absolutely, Your Honor.

24          THE COURT:  So in short, tomorrow or the next day we

06:39:50   25  would tell the jurors that they are not required to be here on

5004

1    Thursday or Friday and that they would return on Monday?

2           MR. DE VRIES:  Yes, Your Honor, very similar to last

3    week.

4           THE COURT:  All right.  That's good enough.  I don't

06:40:01    5    want to confuse the issue about what we did last week.

6           MR. DE VRIES:  Yes, sir.

7           THE COURT:  All right.  So your agreement is that

8    Malackowski will be called when?

9           MR. CLOERN:  Next Monday, Your Honor.

06:40:12    10           THE COURT:  Okay.

11           MR. DE VRIES:  And that will be our final witness of

12    the trial.

13           THE COURT:  That is 2/10.  Monday is the 10th, right?

14           MR. DE VRIES:  Yes, sir.

06:40:20    15           THE COURT:  Malackowski, 2/10.  The jurors will not

16    be here Thursday and Friday.

17           MR. DE VRIES:  Correct.

18           THE COURT:  I accept your agreement.

19           MR. DE VRIES:  Thank you, Your Honor.

06:40:29    20           THE COURT:  All right.  Thank you, counsel.  Court is

21    adjourned.

22         (Adjournment 4:37 p.m. to 10:00 a.m., February 4, 2020)

23

24

25

0

1                        C E R T I F I C A T E

2

3          We do hereby certify that the foregoing is a

4    complete, true, and accurate transcript of the proceedings had

5    in the above-entitled case before the Honorable CHARLES R.

6    NORGLE, one of the judges of said Court, at Chicago, Illinois,

7    on February 3, 2020.

8

9                              */s/ Jennifer Costales, CRR, RMR*

10                             */s/ Amy Spee, RPR, CRR*

11                             Official Court Reporters

12                             United States District Court

13                             Northern District of Illinois

14                             Eastern Division

01:35:44   15

16

17

18

19

20

21

22

23

24

25