5005

1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3  MOTOROLA SOLUTIONS, INC., and MOTOROLA      ) No. 17 CV 1973
   SOLUTIONS MALAYSIA SDN. BHD,                )
4                                              )
              Plaintiffs,                      )
5  vs.                                         ) Chicago, Illinois
                                               )
6  HYTERA COMMUNICATIONS CORPORATION, LTD.,    ) February 4, 2020
   HYTERA AMERICA, INC., and HYTERA            )
7  COMMUNICATIONS AMERICA (WEST), INC.,        )
                                               )
8              Defendants.                     ) 9:55 a.m.

9                   TRIAL - VOLUME 33-A
                TRANSCRIPT OF PROCEEDINGS
10
         BEFORE THE HONORABLE CHARLES R. NORGLE, SR.
11                        and a jury

12  APPEARANCES:

13  For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                           BY:  MR. ADAM R. ALPER
14                              MR. AKSHAY DEORAS
                                MR. BRANDON HUGH BROWN
15                         555 California Street
                           Suite 2700
16                         San Francisco, California 94104
                           (415) 439-1400
17
                           KIRKLAND & ELLIS, LLP
18                         BY:  MR. MICHAEL W. DE VRIES
                                MR. CHRISTOPHER M. LAWLESS
19                         333 South Hope Street
                           Suite 2900
20                         Los Angeles, California 90071
                           (213) 680-8400
21

22
    Court Reporter:        JENNIFER COSTALES, CRR, RMR
23                         Official Court Reporter
                           219 South Dearborn Street, Room 2342
24                         Chicago, Illinois 60604
                           (312) 435-5895
25                         jenny.uscra@yahoo.com

5006

```
 1    APPEARANCES:   (Continued)

 2    For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                             BY:  MS. MEGAN MARGARET NEW
 3                           300 North LaSalle Street
                             Chicago, Illinois 60654
 4                           (312) 862-7439

 5                           KIRKLAND & ELLIS, LLP
                             BY:  MS. LESLIE M. SCHMIDT
 6                           601 Lexington Avenue
                             New York, New York 10022
 7                           (212) 446-4763

 8    For the Defendants:    STEPTOE & JOHNSON, LLP
                             BY:  MR. BOYD T. CLOERN
 9                                MR. SCOTT M. RICHEY

10                                MR. MICHAEL J. ALLAN
                                  MS. JESSICA ILANA ROTHSCHILD
11                                MS. KASSANDRA MICHELE OFFICER
                             1330 Connecticut Avenue NW
12                           Washington, DC 20036
                             (202) 429-6230
13
                             STEPTOE & JOHNSON, LLP
14                           BY:  MR. DANIEL S. STRINGFIELD
                             227 West Monroe Street
15                           Suite 4700
                             Chicago, Illinois 60606
16                           (312) 577-1300

17

18    ALSO PRESENT:          MR. RUSS LUND and
                             MS. MICHELE NING
19

20

21

22

23

24

25
```

5007

```
 1              (Proceedings heard in open court.  Jury out)
 2                   THE COURT:  Good morning, counsel.
 3                   MR. DE VRIES:  Good morning Your Honor.
 4                   THE COURT:  A note from a juror.  We need a reader,
 5       someone with very good eyes.
 6                   You again, Mr. Alper?
 7                   MR. ALPER:  Yes.
 8                   THE CLERK:  You have experience.
 9                   MR. ALPER:  Once again, without the name of the
10       juror?
11                   THE COURT:  Yes.
12                   MR. ALPER:  Okay.  "Your Honor, I would like the
13       Court to be aware that I rescheduled my trip from December 2nd
14       through the 6th to February 17th through the 21st.
15       Unfortunately, I am unable to reschedule if I miss this
16       opportunity.  If possible, please consider this situation when
17       scheduling the coming weeks.  It appears this trial is coming
18       to a close.  I wanted to let the Court know about my trip in
19       case flexibility permits.
20                   "Kind regards," the juror.
21                   THE COURT:  We'll take the matter under advisement
22       and respond, if necessary, in due course.
23                   Please file the exhibit for the record.
24                   THE CLERK:  Thank you.
25              (Jury in)
```

09:55:21 (line 5)
09:55:39 (line 10)
09:55:51 (line 15)
09:56:08 (line 20)
09:57:07 (line 25)

Aron - cross by New

5008

1       THE COURT:  All right.  Good morning, members of the

2   jury.

3       Unrelated to the note that you have sent to the Court

4   this morning, by agreement of the attorneys, the trial will

09:58:26   5   not go forward on Thursday.  So when you leave Wednesday, your

6   next appearance would be the following Monday.

7       But this is completely unrelated to the note that was

8   sent to the Judge this morning.  But I tell you this now so

9   that you can make your plans accordingly.

09:58:46   10      All said and done, once again, good morning.

11      Please recall the witness.

12      MR. STRINGFIELD:  Hytera recalls Dr. Debra J. Aron.

13      DEBRA J. ARON, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

14              CROSS-EXAMINATION (Resumed)

09:59:27   15  BY MS. NEW:

16  Q.  Good morning, Dr. Aron.

17  A.  Good morning.

18  Q.  So just to go back to what you were talking about on

19  direct examination yesterday, I want to talk about --

09:59:39   20      THE COURT:  Just let's ask questions and not just

21  talk about, counsel.

22      MS. NEW:  Of course.

23  BY MS. NEW:

24  Q.  I want to ask you a couple of questions about a few of

09:59:46   25  your opinions here on your slide, which was DDX-22.4, is that

Aron - cross by New

5009

1  correct?

2  A.  Yes.

3  Q.  Okay.  And I specifically just want to ask you about these

4  three opinions since we touched on most of your other opinions

10:00:07  5  yesterday, okay?

6  A.  Okay.  I don't remember if we touched on the rest of my

7  opinions, but I'm happy to talk about these.

8  Q.  Okay.  So one of your opinions, this first opinion here,

9  is that Mr. Malackowski overstates unjust enrichment by

10:00:28  10  failing to deduct R&D, fair?

11  A.  Correct.

12  Q.  Okay.  And you disagree that Mr. Malackowski should not

13  have deducted R&D costs from Hytera's revenue numbers for the

14  accused products, right?

10:00:42  15  A.  That's right.

16  Q.  And you told the jury that he didn't deduct those costs

17  because he felt that some of the R&D was not associated with

18  the accused products, correct?

19  A.  No, that's not what I said.

10:00:53  20  Q.  Okay.  So let's look at the trial transcript from

21  yesterday.

22       You were asked by your counsel, and this is page 4840

23  of the trial transcript, you were asked:

24       "Why did he contend that the data were not reliable?"

10:01:22  25       And you answered, "He thought that the data included

1   research and development that was not associated, directly

2   associated with the accused products."  Right?

3   A.   Right.  He thought the data were unreliable.

4   Q.   Okay.  And he thought that the data was unreliable for

10:01:41   5   reasons other than the fact that it didn't -- that it included

6   unaccused products, right?

7   A.   With respect to the wage rate data, which, as I testified

8   yesterday, he thought it was unreliable because it varied

9   around a lot.  And I showed the chart of the actual wage rate

10:02:10   10   data and my assessment of its variability.

11   Q.   And you were here when Mr. Malackowski testified in court,

12   right?

13   A.   Yes.

14   Q.   Okay.  So let's look at that trial transcript.  And this

10:02:28   15   is page 2197 of the trial transcript.

16          THE COURT:  On what date, counsel?

17          MS. NEW:  Mr. Malackowski took the stand I believe on

18   December 2nd, 2019.

19          THE COURT:  Proceed.

10:02:42   20          MS. NEW:  Thank you.

21   BY MS. NEW:

22   Q.   And one of the things he said was, "So in 2014, Hytera

23   introduced four radio models and in doing so they incurred

24   almost 6 million in R&D."

10:03:01   25          "And then if we look at 2016, just two years later,

Aron - cross by New

5011

1   they introduced one model in their second-to-last model.  Yet

2   the accounting records showed that they incurred 17 million,

3   two and a half times more R&D for that model?"

4        And he said, "Intuitively that doesn't make sense.

10:03:22  5   When I dug into the documents what I found is that we looked

6   through the spreadsheets, it's because the R&D relates to

7   other products and, therefore, my opinion wasn't a sufficient

8   basis for deduction."

9        And so in addition to saying it included unaccused

10:03:36  10  products, he also said it didn't make sense because the R&D

11  was doubling from when Hytera was releasing more products 'til

12  it was releasing less products, right?

13  A.   What you just read, he said that he thought it didn't make

14  sense because he thought it wasn't related to the accused

10:03:51  15  products.

16  Q.   But he also said that it doubled from years when they were

17  releasing more products to years when they were releasing less

18  products, right?

19  A.   Right.  And then he explained why he thought that didn't

10:04:05  20  make sense.

21  Q.   So yesterday you presented to the jury your conclusions

22  about Hytera's R&D expenditures, right?

23  A.   Yes.

24  Q.   Okay.  And that was based on R&D data produced by Hytera,

10:04:19  25  correct?

Aron - cross by New

5012

1    A.   Correct.

2    Q.   And the data that you relied on in the opinions that you

3    gave to the jury yesterday is data that was produced in

4    November of 2019 and December of 2019, correct?

10:04:34    5    A.   Correct.

6    Q.   And November 2019 and December 2019 were in the middle of

7    this trial, right?

8    A.   During this trial, yes.

9    Q.   But that's not the original data that was produced by

10:04:46    10   Hytera, right?

11   A.   It's a filtering down of the data that was originally

12   produced.  It's the same data, but it's a subset of it.

13   Q.   And so you issued an expert report in August of 2019,

14   right?

10:05:01    15   A.   Right.

16   Q.   And that was in response to Mr. Malackowski's June 2019

17   report, correct?

18   A.   Yes.

19   Q.   And at that time you both had this original set of R&D

10:05:12    20   data that was produced sometime before Mr. Malackowski's June

21   2019 report, fair?

22   A.   Correct.

23   Q.   And in your August report, you used that R&D data to

24   calculate Hytera's R&D expenditures, fair?

10:05:29    25   A.   That's right.

Aron - cross by New

5013

1   Q.  And then Mr. Malackowski in September of 2019 criticized

2   that data, right?

3   A.  He did.

4   Q.  And in his report he provided several reasons why it was,

10:05:42   5   what he said was illogical and unreliable, right?

6   A.  What was the first word?

7   Q.  Illogical.

8   A.  Yes.

9   Q.  And unreliable?

10:05:52   10   A.  Yes.

11   Q.  And one of the reasons he identified is that Hytera

12   incurred 60 percent of its R&D costs associated with the

13   accused products after 2015, even though 12 of the 14 accused

14   products launched before 2015, right?

10:06:11   15   A.  I don't remember if that's exactly what he said, but

16   that's the spirit of what he said, yes.

17   Q.  And he also said that 41 percent of the R&D costs were

18   incurred after the lawsuit was filed, right?

19   A.  Again, I don't recall him exactly saying that, but that

10:06:33   20   could very well be.

21   Q.  And you recall that he did opine that it was about $60

22   million that was spent in R&D after this lawsuit was filed,

23   right?

24   A.  I don't recall if that was the number.

10:07:02   25   Q.  Let's look at his report.

Aron - cross by New

5014

1          MS. NEW:  May I approach to refresh the witness's

2   recollection?

3          THE COURT:  Yes.

4   BY MS. NEW:

10:08:03    5   Q.  There you go.

6   A.  Thank you.

7          MS. NEW:  So I've handed the witness

8   Mr. Malackowski's September 3, 2019 report and pointed her to

9   page 29.

10:08:13   10   BY MS. NEW:

11   Q.  Dr. Aron, if you could read that middle paragraph to

12   yourself starting with "According to Hytera's R&D costs" and

13   let me know when you are finished.

14   A.  I've read it.

10:08:38   15   Q.  Okay.  So does that refresh your recollection that

16   Mr. Malackowski's conclusion that Hytera also purportedly

17   incurred 41 percent of its total R&D costs associated with the

18   accused products after Motorola filed its original complaint

19   in this litigation?

10:08:55   20   A.  That's what he says.  I don't think that's what you asked

21   me earlier though.

22   Q.  And if you look at figure 3 at the top, if you could

23   refresh yourself on that.

24   A.  Do you mean figure 5?

10:09:07   25   Q.  I do, yes.  Thank you.

Aron - cross by New

5015

1    A.  Okay.

2    Q.  Okay.  And you can see that in 2017, according to the data

3    produced by Hytera before the expert reports, Hytera

4    included -- incurred $26.9 million in R&D expenses in 2017,

10:09:27    5    right?

6    A.  Right.

7    Q.  And 25.5 in expenses in 2018, right?

8    A.  Right.

9    Q.  And both of those -- most of those expenses were incurred

10:09:37   10    after the lawsuit was filed?

11   A.  I don't recall the date of the lawsuit, but 2018 certainly

12   was.

13   Q.  And you've been here in court, so you know that the

14   complaint was filed in March of 2017, right?

10:09:49   15   A.  You've refreshed my recollection.  As I said, I didn't

16   recall what month.

17   Q.  Okay.  And so after Mr. Malackowski -- and actually, let

18   me take that.

19          MS. NEW:  May I approach again, Your Honor, just to

10:10:01   20   take that back?

21          THE COURT:  Yes.

22          MS. NEW:  Thank you.

23   BY MS. NEW:

24   Q.  And so then after Mr. Malackowski issued his September 3rd

10:10:15   25   report, you were deposed on September 20th, 2019, right?

Aron - cross by New

5016

A.   That sounds right, yep.

Q.   And between Mr. Malackowski's report and your deposition, you didn't change your R&D calculations, right?

A.   Correct.

10:10:30   Q.   But you did issue an errata on September 20th, 2019, right?

A.   Correct.

Q.   And an errata is a document that you use to correct errors or mistakes in your report, correct?

10:10:45   A.   Correct.

Q.   And in your deposition when I deposed you, you still relied on the old set of R&D data, correct?

A.   That's the data we all had, yes.

Q.   And then Mr. Malackowski was also deposed using that same

10:11:00   data, right?

A.   Correct.

Q.   And then as we just discussed in the middle of trial, on November 21st, Hytera produced this new updated R&D data, right?

10:11:11   A.   Did you say November 21st?

Q.   I did.

A.   That's my recollection, yes.

Q.   And then shortly after that, you issued a new expert report also in the middle of trial on November 26th, right?

10:11:23   A.   Updating with respect to the new data, yes.

Aron - cross by New

5017

1    Q.  And then on December 11th, Hytera again produced a new set

2    of R&D data, right?

3    A.  Correct.

4    Q.  And on December 23rd, two days before Christmas, you

10:11:40    5    issued another errata, right?

6    A.  It was an update to reflect the new data, yes.

7    Q.  Right.  But it was an errata.  And you also included an

8    updated schedule of your R&D calculations, right?

9    A.  Yes.  All the changes related to the new data.

10:11:56   10    Q.  And you mentioned that Mr. Malackowski didn't consider

11    that new data in reaching his opinions, right?

12    A.  That was his testimony in court.

13    Q.  And that's because the data, some of the data was produced

14    just a few days before he testified on December 2nd, right?

10:12:13   15    A.  I think you said it was produced November 21st?

16    Q.  I did.

17    A.  So that wouldn't be a few days before his testimony.

18    Q.  About two weeks.

19    A.  Yes, he had two weeks.

10:12:30   20    Q.  Okay.  And then the other set of data that you rely on,

21    the December 11th data, that was produced after he testified,

22    right?

23    A.  Right, because his testimony affected the filtering of the

24    data.

10:12:48   25    Q.  And so you agree that the November 21st and the December

Aron - cross by New

5018

1    11th data, the data produced after the start of this trial, is

2    different than the data that you and Mr. Malackowski relied on

3    for your expert reports and at your depositions, fair?

4    A.   Correct.  It's refined to take out products that are no

10:13:09   5    longer accused by Motorola.

6    Q.   And you agree that at this point in time, neither you nor

7    Mr. Malackowski are relying on that original set of data for

8    your expert opinions in this case, right?

9    A.   We're relying on or at least I'm relying on a filtered

10:13:29   10   subset of the original data, filtered to reflect the current

11   set of accused products in this case.

12   Q.   Okay.  So I want to move on to your next opinion, which is

13   that, it's this one, which is that Mr. Malackowski overstates

14   unjust enrichment by adding hypothetical R&D.  Is that fair?

10:14:01   15   A.   Yes.

16   Q.   Okay.  And so it's your opinion that in calculating the

17   R&D cost savings component of Mr. Malackowski's damages

18   number, that he used an incorrect number of staff months to

19   calculate the R&D savings, right?

10:14:39   20   A.   He used a number that is inconsistent with numbers in a

21   Motorola business plan that are a more appropriate measure of

22   staff months according to Hytera's technical expert,

23   Mr. Grimmett.

24   Q.   Okay.  And just to refresh the jury, Mr. Malackowski's

10:15:04   25   opinion is that Motorola is entitled to this 73.6 million,

Aron - cross by New

5019

1    right?

2    A.  It is.

3    Q.  And you've adjusted it down to 12.97 million, right?

4    A.  Well, to be clear, it's not my opinion that 12.97 million

10:15:21    5    in hypothetical R&D expenditures are something that Motorola

6    is entitled to.

7           My opinion as I expressed is that Motorola is not

8    entitled to any hypothetical R&D expenditures in the scenario

9    where Hytera is not up 'til this day assumed to be able to --

10:15:45    10   haven't been able to produce a DMR radio.

11          THE COURT:  Just a minute.  Just a minute.

12          You may answer the question as it was put to you by

13   counsel.  If you don't recall it, I'll ask the court reporter

14   to read it back.  Do you recall the question?

10:15:58    15          THE WITNESS:  I'll hear it again, please.

16          THE COURT:  All right.  Read the question back,

17   please.

18          You must respond to the question.

19      (Question read)

10:16:18    20          THE WITNESS:  May I ask, what is the "it" to which

21   you are referring?

22          THE COURT:  Just a minute.  Are you saying you do not

23   understand that question?

24          THE WITNESS:  I am.

10:16:25    25          THE COURT:  You do not understand that question?

Aron - cross by New

5020

```
 1        THE WITNESS:  Correct, because I'm not sure what "it"
 2    refers to.
 3        THE COURT:  All right.  Just a minute.
 4        The witness says she doesn't understand that
 5    question.
 6        MS. NEW:  I'm happy to rephrase, Your Honor.
 7        THE COURT:  Rephrase the question.
 8    BY MS. NEW:
 9    Q.  So Mr. Malackowski, to reset, Mr. Malackowski has said
10    that Motorola is entitled to 73.6 million in R&D cost savings,
11    correct?
12    A.  Correct.
13    Q.  And he says that that's the amount of money that Hytera
14    was unjustly enriched through its theft of Motorola's trade
15    secrets, right?
16    A.  He does.
17    Q.  Okay.  And you've changed the calculation that he used to
18    arrive at that $73.6 million?
19    A.  I did.
20    Q.  Okay.  And you changed it in two ways.  One way is you
21    changed the number of staff months that went into that input,
22    right?
23    A.  Correct.
24    Q.  And the second way is you've changed the wage rate that
25    was used?
```

10:16:31

10:16:39

10:16:51

10:17:01

10:17:12

Aron - cross by New

5021

1    A.  That's right.

2    Q.  Okay.  And for the staff months, you rely on a Motorola

3    document, right?

4    A.  Yeah.  Well, I rely on Mr. Grimmett's testimony about the

10:17:28    5    document.

6    Q.  About the 2004 Motorola document?

7    A.  Correct.

8    Q.  Okay.  And you know that that's a document from 2004 that

9    estimates how many staff months Motorola thought it would take

10:17:44    10    to develop a DMR radio to first launch, correct?

11    A.  Yes.  That's my understanding.

12    Q.  Okay.  And you were here -- well, let me ask you this.

13        You and Mr. Grimmett contend that that 2004 document

14    contains the staff month estimates before the MOTOTRBO project

10:18:11    15    was complete, right?

16    A.  Correct.  It was an estimate.

17    Q.  And that MOTOTRBO project completed and the product

18    launched in 2007, right?

19    A.  That's right.

10:18:20    20    Q.  Okay.  And Mr. Malackowski, on the other hand, he

21    considered the testimony of the Motorola engineers who were

22    actually involved with the development of the trade secrets in

23    the real world, right?

24    A.  That's what he relied on, yes.

10:18:36    25    Q.  And then with respect to the wage rate -- let me ask you

Aron - cross by New

5022

1    this, just to make sure we're clear.  The staff estimates that

2    you used is from a 2004 document before MOTOTRBO project was

3    complete, correct?

4    A.   Motorola business plan document, yes.

10:18:59    5    Q.   And Mr. Malackowski relies on the estimates that were

6    provided after the fact by the engineers who actually worked

7    on the MOTOTRBO project, fair?

8    A.   Many years after the fact, yes.

9    Q.   And then with respect to the wage rates, you used Hytera's

10:19:19    10    2010 wage rate in China, right?

11    A.   Correct.

12    Q.   Okay.

13    A.   In Shenzhen.

14    Q.   In Shenzhen, thank you.

10:19:27    15         And using that wage rate, you calculated, so you used

16    the 7,920 staff months and the $1,639 wage rate to come up

17    with this $12.97 million, right?

18    A.   I think you slightly misstated the staff month rate.

19    $1,638.

10:19:51    20    Q.   I think I said 39, right?

21    A.   I'm not sure.

22    Q.   Okay.  Let's just, just so we have a clear record, let me

23    just ask it again.

24         You adjusted Motorola's expenditures by using the

10:20:04    25    7,920 staff months and multiplying that by $1,638, which was

Aron - cross by New

5023

1    the Shenzhen wage rate in 2010, right?

2    A.  Yes.  It was the Shenzhen wage rate for R&D personnel

3    working on DMR in Shenzhen.

4    Q.  And you know that at the time that Motorola was developing

10:20:27    5    DMR, that was a new technology for Motorola?

6    A.  I expect so, yes.

7    Q.  And it was a new technology for Hytera, right?

8    A.  Yes, to my knowledge.

9    Q.  And in reaching your opinions in this case, you relied on

10:20:48    10    the deposition testimony of Ted Kozlowski, correct?

11    A.  I reviewed it.  I don't recall what in there I relied on.

12    But I did review it.

13    Q.  And Mr. Kozlowski was a senior engineer at Motorola during

14    the MOTOTRBO project, right?

10:21:10    15    A.  That's my recollection.

16    Q.  And at his deposition, he was asked, "And how much did

17    Motorola invest in 2006 on R&D for MOTOTRBO"?

18           THE COURT:  Just a minute.  There is an objection

19    pending.

10:21:22    20           MR. STRINGFIELD:  This is a hearsay objection, Your

21    Honor.

22           THE COURT:  The objection is overruled.

23           You may proceed.

24    BY MS. NEW:

10:21:28    25    Q.  So Mr. Kozlowski was asked, "And how much did Motorola

Aron - cross by New

5024

1    invest in 2006 on R&D for MOTOTRBO?"  And he said "75

2    million."  Do you see that?

3    A.  I do.

4    Q.  And then down here he was asked, "How much in 2005?"

10:21:45    5        And he says he doesn't "...recall that exact number.

6    But the total program was 200 million -- 201 million for the

7    first release."  Right?

8    A.  That's what he says.

9    Q.  And that's the first release of the MOTOTRBO project in

10:22:07    10    2007, right?

11   A.  Could you show me that again, please?

12   Q.  Of course.  So he says, "The total program was 201 million

13   for the first release."  Do you see that?

14   A.  I do.

10:22:35    15   Q.  And that would be referring to the first release of the

16   MOTOTRBO product?

17   A.  I would interpret it that way.

18   Q.  Okay.  And then he also says that to get to that number,

19   he relies on "Final financial information from the final

10:22:48    20   program charts."  Did I read that correctly?

21   A.  Not quite.

22   Q.  He was asked, "Where did you get that number from?"  And

23   said, "From our financial information from the final program

24   charts," right?

10:23:00    25   A.  Now that's right, yes.

Aron - cross by New

5025

1  Q.  Okay.  So I want to just ask you a few more questions on

2  your last opinion -- not your last opinion, but the last one

3  we are going to talk about -- that Mr. Malackowski improperly

4  calculates damages under the head start scenarios.  And that's

10:23:35    5  one of your opinions, right?

6  A.  It is.

7  Q.  And so you, we've established this, but just remind

8  everyone, you rely on Andy Grimmett to calculate damages for

9  the hypothetical world where Hytera launches a product

10:23:55   10  comparable to the accused products but without using

11  Motorola's trade secrets within 6 months from the actual

12  launch, right?

13  A.  Correct, with additional staff work.

14  Q.  And your opinion with respect to this head start period is

10:24:12   15  that under that scenario, Hytera should keep the profits on

16  any sales that it made after September 2010, right?

17  A.  Correct, because that's when it would have reproduced the

18  trade secrets.

19  Q.  Okay.  And so if we are thinking about that 6 month

10:24:32   20  window, so from March 2010 to September 2010, when

21  Mr. Grimmett says Hytera could launch an independently

22  developed product, Motorola gets those profits, right?

23  A.  Correct.

24  Q.  But anything after September 2010 up until today, any

10:24:48   25  money that Hytera has made Hytera gets to keep?

Aron - cross by New

5026

A.   Correct.

Q.   And you base that opinion on your understanding of the
application of what you called yesterday the head start
doctrine, right?

10:25:06   A.   I base it on the economics of the effect of timing of
entry into a market, which I understand to be consistent with
what I described as the head start doctrine in intellectual
property disputes.

Q.   Okay.  And when you talked about the head start doctrine
10:25:27   yesterday, you said that the concept of only assessing damages
from the time when the defendant starts receiving benefits, so
in this case March 2010, until the time that it could have
developed the trade secrets on its own, so in your and
Mr. Grimmett's scenario September 2010, that's just really
10:25:47   the, that's the general rule, right?

A.   That's the general rule, right.

Q.   Okay.  But there are exceptions to that rule, what you
mentioned yesterday, right?

A.   Yes, as I discussed yesterday.

10:26:00   Q.   And you're not opining on or offering an opinion on the
head start doctrine as a lawyer because you're not a lawyer,
right?

A.   That's correct.

Q.   And you are not instructing the jury on the law about the
10:26:12   application of the head start doctrine, right?

Aron - cross by New

5027

1    A.   Only from an economic standpoint, not from a legal one.

2    Q.   And you would agree that by the time this jury is talking

3    about the amount of money to award to Motorola, Hytera would

4    have been found liable for trade secret misappropriation,

10:26:33    5    correct?

6    A.   If the jury finds Hytera liable for trade secret

7    misappropriation, that's when they would address the question

8    of damages, yes.

9    Q.   And so if Hytera is now liable for trade secret

10:26:48   10   misappropriation, that means that all of its sales of its

11   accused products are using, using Motorola trade secrets,

12   right?

13   A.   I don't know that that follows.  I think then the jury has

14   to consider the subsequent question, which is at what point

10:27:11   15   could Hytera have created the trade secret information on its

16   own through its own independent development.

17   Q.   And maybe let me ask it a different way.  In order to

18   reach the question of damages, the jury would have to decide

19   that Hytera has misappropriated Motorola's trade secrets,

10:27:31   20   right?

21   A.   Agreed.

22   Q.   And the accused products in this case have been sold from

23   2010 until at least the first half of 2019, right?

24   A.   That's right.

10:27:40   25   Q.   And so if trade secret misappropriation is found, that

Aron - cross by New

5028

1   would apply to all the products sold in that 9 year time

2   period, fair?

3   A.   From a technical standpoint, I don't have an opinion on

4   that.   From a damages standpoint, the answer is what I gave

10:28:01   5   you earlier, it depends on when Hytera could have

6   independently developed the trade secrets.

7   Q.   But we're not talking about independent development.   I'm

8   just asking you a basic question, which is there are several

9   accused products that have been sold over time from 2010 to

10:28:19   10   into 2019, right?

11   A.   Yes.

12   Q.   And so if the jury finds misappropriation, that would

13   apply to those products?

14   A.   Again, I'm not offering a technical opinion.   I'm

10:28:33   15   explaining how one calculates damages assuming that the jury

16   reaches that opinion, which means they have found that there

17   is trade secret misappropriation.

18   Q.   Okay.   And so in your opinion, Doctor, and this is your

19   slide from yesterday, DDX-22.24, under the six-month head

10:28:58   20   start scenario and your $2.1 million damages calculation, if

21   Hytera is found liable for trade secret misappropriation, they

22   get to keep all of those profits, right?

23   A.   That's correct.   And that's because they would have made

24   all of those profits anyway, because they would have developed

10:29:21   25   the trade secrets by this time.

Aron - redirect by Stringfield

5029

1  Q.  But my question is simpler than that.  In your opinion,

2  Hytera gets to keep all those profits, right?

3  A.  Correct, for the reason I just said.

4          MS. NEW:  I pass the witness, Your Honor.

10:29:36    5          MR. STRINGFIELD:  Redirect, Your Honor?

6                   REDIRECT EXAMINATION

7  BY MR. STRINGFIELD:

8  Q.  Good morning, Dr. Aron.

9  A.  Good morning.

10:30:10   10  Q.  Daniel Stringfield on behalf of Hytera.

11          Dr. Aron, I have some questions about topics that you

12  just covered with counsel for Motorola this morning.  I'll

13  start with those and then I have some questions about topics

14  that you covered with counsel yesterday, if that's all right.

10:30:28   15  A.  Okay.

16  Q.  Counsel's first line of questioning was about

17  Mr. Malackowski's critique of the Hytera research and

18  development data.  Do you remember that?

19  A.  I do.

10:30:41   20  Q.  And Mr. Malackowski was criticizing an old set of research

21  and development data, right?

22  A.  A broader set.  The set that I ultimately relied on was a

23  refined version of that data.

24  Q.  And Mr. Malackowski's criticisms related to the older,

10:31:03   25  unrefined set of data, is that right?

Aron - redirect by Stringfield

5030

1    A.   That's right.

2    Q.   And then counsel referred to the instances where the

3    research and development data were updated and you

4    supplemented your report to reflect the updated data, is that

10:31:18   5    right?

6    A.   I did.

7    Q.   And is that in fact what happened, that the data were

8    updated and then you updated your reports?

9    A.   Correct.

10:31:26   10   Q.   The data that you testified about yesterday, which set of

11   data was that?

12   A.   The most recent set of data that was produced on December

13   11th.

14            THE COURT:  Of what year?

10:31:43   15            THE WITNESS:  2019, Your Honor.

16   BY MR. STRINGFIELD:

17   Q.   And you summarized that data in demonstratives that you

18   discussed yesterday?

19   A.   I did.

10:31:51   20   Q.   I show you DDX-22.11.  Is that one of the demonstratives

21   that you discussed yesterday?

22   A.   Yes.

23   Q.   What is shown on the, just can you remind us what is shown

24   on this demonstrative?

10:32:14   25   A.   Sure.  This is the research and development expenditures

Aron - redirect by Stringfield

5031

1    by Hytera on the accused products summed up by each year from

2    2010, which was the year of launch by Hytera of DMR, through

3    the end of the data, which covered the first half of 2019.

4    Q.   And one of Mr. Malackowski's criticisms that counsel

10:32:41    5    directed you to was his criticism of the prior data, that 41

6    percent of the research and development occurred after the

7    start of this trial in 2017.   Do you remember that?

8    A.   Yes.

9    Q.   Looking at the updated data that you testified upon

10:32:55    10    yesterday, is that criticism still valid?

11    A.   No.   As we saw in the chart in Mr. Malackowski's report,

12    the amount of R&D went up really quickly towards the end of

13    2017 and '18.   That's not true in the refined data, and that's

14    because products that are no longer accused that were

10:33:23    15    introduced in the end of the time period were removed.   The

16    R&D related to those products was removed.

17    Q.   And another of Mr. Malackowski's criticisms that you were

18    asked about was the fact that 25 and a half million dollars of

19    R&D happened in 2018.   Is that criticism valid any longer in

10:33:42    20    light of the updated data that you testified about?

21    A.   It's not.

22    Q.   I have some questions now about counsel's cross of you on

23    the hypothetical research and development portion of your

24    affirmative testimony or of your testimony yesterday.

10:34:03    25        On cross-examination, counsel showed you a

Aron - redirect by Stringfield

5032

1    demonstrative that you discussed yesterday in your direct

2    testimony.

3    A.   We discussed a number of demonstratives.

4    Q.   Was one of them DDX-22.16?

10:34:24    5    A.   Yes.

6    Q.   Dr. Aron, can you remind us what the intent of your

7    correction of Mr. Malackowski's calculation, first of the

8    staff rate month, which you did on DDX-22.15?

9    A.   The most accurate and appropriate wage rate to use when

10:34:50   10    assessing what it would have cost Hytera to develop products

11    in 2008 to 2010 were the actual wage rates that Hytera

12    incurred for engineers doing that work in that place at that

13    time.  And that's what I applied.

14         The wage rates applied by Mr. Malackowski were not

10:35:14   15    that and they were, therefore, inapplicable, so made that

16    correction.

17    Q.   And do you contend, even after correcting this

18    hypothetical research and development data, that any

19    hypothetical research and development data should be added in

10:35:32   20    the situation that Mr. Malackowski also sought to add the

21    hypothetical research and development data?

22         MS. NEW:  Objection, leading.

23         THE COURT:  Overruled.

24         You may answer.

10:35:41   25    BY THE WITNESS:

Aron - redirect by Stringfield

5033

10:36:05

A.  No.  As I explained, the reason that the R&D after launch
-- or sorry, the reason that the R&D that in this hypothetical
world should not be added at all is because it's in a scenario
where the assumption is that Hytera never produces a DMR radio
through the entire time period that we're talking about.

And so if they never produce a DMR radio in that
hypothetical world, they also wouldn't have incurred $80
million or $30 million or 12 and a half million dollars of
development costs that would have gotten them to the point
where they could produce those products.

10:36:25

BY MR. STRINGFIELD:

Q.  So none of this hypothetical research and development data
should be added on to the unjust enrichment?

A.  Correct.

10:36:36

Q.  Counsel showed you DDX-22.16.  Can you remind us the
intent of this slide and what you did here?

A.  Sure.  The intent was to respond to Mr. Malackowski's
assertions that the $73.6 million that it should have taken
Hytera to develop the trade secrets as compared to the $11.8

10:37:08

million that it took Hytera to actually develop the entire DMR
radio makes the $11.8 million not a credible figure.

And the intent of my analysis was to demonstrate that
once you make the corrections, it's actually a very comparable
figure to when you look at the actual R&D costs of people to

10:37:32

Hytera and China and the number of hours that Motorola

Aron - redirect by Stringfield

5034

1    estimated it actually would take from the beginning of DMR

2    development to launch.

3    Q.   Counsel asked you questions on cross-examination about the

4    head start periods.  Do you remember that?

10:37:54    5    A.   Yes.

6    Q.   And can you remind us what your understanding is of how

7    the head start period should be applied as an economist?

8    A.   As a general rule, you start with the assumption that you

9    lose -- you start to not receive the benefits of the product

10:38:20    10    at the point where you wouldn't have been producing it.

11          So in my hypothetical, my example, my metaphor that I

12    talked about yesterday, if you didn't open your gas station in

13    2010, then you wouldn't be getting benefits, you wouldn't be

14    selling gasoline from the beginning of 2010 until the time

10:38:38    15    that you actually opened your gas station, which in my example

16    was beginning of 2011.

17          So you lose all of those sales during that time

18    period.  But once you open the gas station, then you not only

19    start to receive benefits, but you receive the benefits in

10:38:54    20    that hypothetical world that you received in the real world.

21    That's the default scenario.  That's the base case.

22          And if you analyze the market and conclude that there

23    is a compelling reason to deviate from that, then you perform

24    a disciplined analysis to quantify the extent to which you

10:39:14    25    deviate.

Aron - redirect by Stringfield

5035

1    Q.  And counsel was asking you questions about what the jury

2    may find and has compared that to what you calculated under

3    Mr. Grimmett's head start period.

4            Can you remind us just how economic damages are

10:39:30    5    calculated and where the consideration of liability falls into

6    the consideration of economic damages?

7    A.  The way that damages are calculated is you look at what --

8    so for unjust enrichment damages, which is what we're talking

9    about, how much did Hytera actually earn?

10:39:54    10           And then you have to compare that to what would they

11   have earned if the bad acts, if the alleged bad acts hadn't

12   happened.

13           So here the alleged bad acts are misappropriation of

14   trade secrets that we're talking about.  And so then you'd

10:40:11    15   have to conduct a thought experiment about what would have

16   happened.  If you assume that Hytera had had access to those

17   trade secrets and used them, how would that world have been

18   different?

19           You figure that out.  You compare the profits in that

10:40:34    20   world to what really happened.  And the difference are the

21   unjust enrichment, the benefits that Hytera got that it

22   wouldn't have gotten had it not had access to and used the

23   trade secrets.

24           So that assumes access and use of the trade secrets,

10:40:51    25   which you have to find before, which one was to find before

Aron - redirect by Stringfield

5036

1    reaching that question.

2           But there is a difference of opinion by the technical

3    experts here about what would have happened in that world

4    where Hytera did have access to and used the trade secrets.

10:41:06    5           Mr. Grimmett says it would have delayed Hytera, but

6    it would have delayed Hytera by six months plus some

7    additional staff work.

8           And Dr. Rangan says it would have precluded Hytera

9    from producing a DMR radio all the way through today.

10:41:26   10           My job is just to assess, to quantify what the

11    difference is in the profits between today and between those

12    two different hypothetical worlds, and that's what I did.

13    Q.   Yesterday during cross-examination, counsel showed you bar

14    graphs.  One compared -- we weren't provided a copy of the

10:41:50   15    demonstratives, but my recollection was that one showed all of

16    Hytera's DMR revenue --

17           THE COURT:  They were projected to the jury, were

18    they not?

19           MR. STRINGFIELD:  They were published to the jury.

10:42:00   20           THE COURT:  Proceed.

21    BY MR. STRINGFIELD:

22    Q.   One showed all of Hytera's DMR accused revenue over the

23    past 9 and a half years; is that your recollection?

24    A.   I remember that one bar was revenue and one bar was

10:42:13   25    profit.  And I commented that they're not -- you can't put

Aron - redirect by Stringfield

5037

1    them on the same chart.  But I don't remember the parameters

2    of each.

3    Q.  Sure.  Let me see if I can help you recall.  I have in my

4    notes that the big bar on the left --

10:42:26    5        THE COURT:  All right.  Just a minute.  Rephrase the

6    question.

7            MR. STRINGFIELD:  Sure.

8            Counsel, can I have a copy of the demonstrative from

9    yesterday?

10:42:33    10       MS. NEW:  I'm sorry, I don't have it.

11   BY MR. STRINGFIELD:

12   Q.  Okay.  So it compared revenue to $2.1 million, which is

13   what you calculated under Mr. Grimmett's scenario, is that

14   right?

10:42:42    15   A.  Yes, that's my recollection.

16   Q.  And it was a big bar, because it was all of Hytera's DMR

17   revenue going back 9 and a half years, is that right?

18   A.  Going back some time period.  I don't recall the period.

19   Q.  Well, I think you already said, but can you tell us if

10:42:57    20   that's a fair comparison or not fair comparison?

21   A.  It's not really a comparison at all.  I mean, one thing is

22   revenues and the other thing is profits.  And profits deduct

23   costs, profits are revenues minus costs.

24           So, you know, for a company like Hytera, which I

10:43:22    25   think I talked about, I think I testified to yesterday,

Aron - redirect by Stringfield

5038

1    Hytera's entire profits as a company going back to 2010 were

2    $265 million total for all of its products.  It's a small

3    component of total revenue.  So you can't compare revenues on

4    the one chart to profits on the other.

10:43:49    5    Q.  And can you remind us how you - and this is DDX-22.37, a

6    demonstrative you discussed with the jury yesterday - can you

7    remind us how you calculated or quantified Mr. Grimmett's 6

8    month head start opinion?

9    A.  Sure.  The first box there, Unjust Enrichment on R&D

10:44:11    10    Savings, that's because Mr. Grimmett explained that it would

11    take an additional 650 staff months by Hytera to produce a DMR

12    product without access and use of the trade secrets.

13          So I took the 650 and multiplied it by Hytera's costs

14    of R&D staff working on DMR during that time frame, 2008 to

10:44:34    15    2010.

16          And the other box, Unjust Enrichment on Sales, that's

17    the profit that Hytera earned during the 6 months that it sold

18    the DMR product that it wouldn't have sold and wouldn't have

19    been entitled to during that 6 months that it would otherwise

10:44:57    20    have been still developing the product.

21    Q.  So if the second part of the quantification of

22    Mr. Grimmett's head start opinion is evaluation of Hytera's

23    profits earned during the head start period, would a more fair

24    bar chart compare the profits that Hytera earned during those

10:45:17    25    6 months to what you quantified as Mr. Grimmett's head start

Aron - redirect by Stringfield

5039

opinion?

A.   May I hear the question again?

Q.   Sure.  Would it be more -- if unjust enrichment damages,

which you quantified for Mr. Grimmett's head start opinion

considers profit, would a more fair apples-to-apples

comparison be to compare it to a bar graph showing Hytera's

profits during that same 6 month period?

A.   That would be apples to apples, yes.

Q.   So I've prepared a demonstrative that shows that

comparison.  And can you remind us, and so on the left, what

we show is what Hytera's accused --

          THE COURT:  What's the number on the exhibit for the

record?

          MR. STRINGFIELD:  Yes, Your Honor.  DDX-22.45.

BY MR. STRINGFIELD:

Q.   And so on the left what we've shown is what Hytera earned

in profit on the accused DMR radios.  And we calculated

$1,051,160.  Does that number sound right to you, Dr. Aron?

A.   Yes.

Q.   And on the right is that $2,115,821 in unjust enrichment

damages that you quantified for Mr. Grimmett's 6 month head

start period?

A.   Yes.  And the difference is that Hytera also had to incur

additional R&D expenses, those 650 staff hours.

Q.   You testified on direct regarding Dr. Rangan's opinions in

Aron - redirect by Stringfield

5040

1    this case, is that right?

2    A.  I did.

3    Q.  And the part of Dr. Rangan's or one part of Dr. Rangan's

4    opinions that you referred to is that Hytera could never

10:47:08    5    launch a DMR radio up to today, is that right?

6    A.  At least up to today, yes.

7    Q.  And you were criticized yesterday on cross-examination for

8    relying on that.  Do you recall that?

9    A.  I think I was criticized for my characterization of it,

10:47:22    10    not for relying on it.

11    Q.  And part of your assignment in this case was to respond to

12    Mr. Malackowski's opinions?

13    A.  Correct.

14    Q.  And you responded to his opinions when you testified

10:47:34    15    yesterday?

16    A.  I did.

17    Q.  And can you remind us what Mr. Malackowski's primary

18    unjust enrichment theory is?

19    A.  Mr. Malackowski's primary unjust enrichment theory is

10:47:51    20    based on the premise that up through today, Hytera never would

21    have been able to produce a DMR radio without access to the

22    alleged trade secrets.

23    Q.  And I've put -- and I apologize, Dr. Aron, I've put

24    DDX-22.7 back up if that helps you explain the concept.

10:48:13    25    A.  I think that explains the concept, what I said.

Aron - redirect by Stringfield

5041

Q.  And so why, what is the relevance of Dr. Rangan's opinion
to Mr. Malackowski's unjust enrichment number?  And I think
you just mentioned it, but I just wanted to talk about it in
the context of DDX-22.7.

A.  It's the basis of his unjust enrichment calculation,
because he relies on the technical expert for Motorola for
what technically would have happened had Hytera not had access
to the alleged trade secrets, just as I relied on both in one
scenario Dr. Rangan's analysis and in the other Mr. Grimmett's
analysis.

Q.  And --

A.  Except he didn't rely on Mr. Grimmett.  He only relied on
Dr. Rangan.

Q.  And you were here when Mr. Malackowski testified about his
opinions in this case?

A.  Yes.

Q.  This is page 22 -- or excuse me, 2224 through 2225 from
Mr. Malackowski's direct -- or excuse me, cross-examination.

          Mr. Malackowski was asked:

          "Mr. Malackowski, based on your assumption that
Hytera has infringed the trade secrets, you concluded that
Hytera must turn over all of the profits that Hytera has ever
made on the accused DMR radios, accused DMR repeaters and your
estimation of accessories that go with those radios, isn't
that right?"

Aron - redirect by Stringfield

5042

1      And he answered:  "All of the profits after they

2  recover their cost of manufacturing, patent royalties,

3  marketing expenses and the like, yes."

4      He was asked, "And that's every dollar going back to

10:49:57   5  2010, right?"

6      And he answered, "That's what the law requires."

7      And he was asked, "In your opinion" -- "And your

8  opinion is based on Dr. Rangan's assertion that Hytera

9  could've never launched a DMR radio on its own up to this very

10:50:12  10  date?"

11      And he responded, "In part one of my calculations, my

12  primary calculation does conform to Dr. Rangan's analysis,

13  that without these trade secrets and copyrights, Hytera could

14  not have been in this business."

10:50:21  15      Is that your understanding of Mr. Malackowski's

16  positions?

17  A.  It is, and it's very consistent with the way he has

18  conducted his analysis and updated for additional data for

19  2019.  When additional data came in, he didn't modify his

10:50:38  20  assumption that Hytera still could never be in this market.

21  Q.  Dr. Aron, you were given a calculator yesterday.  Do you

22  remember that?

23  A.  Yes.  I still have it.

24  Q.  And you were given a table of numbers?

10:50:50  25  A.  Correct.

Aron - redirect by Stringfield

5043

1    Q.   And you were asked to do a number of calculations?

2    A.   I was.

3    Q.   And I think at one point you were converting Chinese

4    currency to U.S. dollars?

10:51:01    5    A.   A rough approximation.

6    Q.   Do you recall what products that counsel was asking you to

7    add up and quantify?

8    A.   I do not.

9    Q.   Okay.  We'll come back to that one.  I don't have it in my

10:51:34   10    pile of papers here.

11         And, Dr. Aron, you were asked several questions

12    yesterday about the importance of 2010 and Hytera's entry into

13    the DMR market in 2010.  Do you recall that?

14    A.   Yes.

10:51:50   15    Q.   And can you remind us what you told us on direct about

16    your opinion on the importance of Hytera's entrance in 2010 to

17    the DMR market?

18    A.   Based on my analysis of the documents and the data, there

19    was nothing special about 2010 that would mean that if you

10:52:16   20    didn't enter in 2010, you would have somehow missed the boat,

21    and there would have been ripple effects indefinitely of

22    having failed to enter in that year.

23         And in particular, Mr. Malackowski's testimony that

24    it was especially a critical year because it was the year that

10:52:38   25    customers had to or were migrating from or switching from

Aron - redirect by Stringfield

5044

1    analog to digital because of FCC regulations, that the data

2    just don't bear that out and the facts don't bear that out.

3         Analog has continued to be and does continue to be a

4    used technology and was a dominant -- a predominant technology

10:53:02   5    for many years.  There was a gradual transition, and there was

6    not a ban on analog technology in the U.S.

7         THE COURT:  Do you claim expertise in terms of what

8    you have just said?

9         THE WITNESS:  Yes, Your Honor.

10:53:15   10        THE COURT:  Proceed.

11   BY MR. STRINGFIELD:

12   Q.  One of the topics that counsel covered with you yesterday

13   about the importance of 2010 or Motorola's contention about

14   the importance of 2010 was Mr. Steve Cragg's testimony about a

10:53:29   15   second mover advantage.  Do you recall that?

16   A.  I do.

17   Q.  First, do you know who Steve Cragg is?

18   A.  Yes.  He's a salesperson for Hytera in the U.S.

19   Q.  Is Mr. Cragg an economist?

10:53:41   20   A.  No.

21   Q.  As an economist, can you tell us what the second mover

22   advantage means?

23   A.  Well, in economics it refers to, really it refers to the

24   potential benefits of being in the market after someone else

10:54:06   25   has entered the market, after someone else has broken into the

Aron - redirect by Stringfield

5045

1   market, and that it essentially applies whether you are

2   second, third or fourth.  But the idea is that once someone

3   has gotten into the market and committed to a technology or

4   demonstrated that there is some demand in the market, the

10:54:29   5   followers then can position themselves in a way that best

6   positions them relative to the first entrant.

7   Q.   And with respect to DMR, who was the first seller of DMR

8   radios?

9   A.   Motorola.

10:54:43   10   Q.   And that was in about 2007, 2008?

11   A.   2007.

12   Q.   And who was the second seller of DMR radios?

13   A.   For DMR devices it was Hytera.

14   Q.   Is there any dispute in this case as to whether Hytera

10:54:58   15   would have eclipsed Motorola as the first seller of DMR

16   radios?

17   A.   No.  I have not heard any dispute on that.  Hytera would

18   not have been first into the market.

19   Q.   And do you know when the second seller of DMR radios

10:55:13   20   entered the market?

21        THE COURT:  Just a minute.

22        What is your basis for that assertion?  What factors

23   did you take into account in reaching the answer you just

24   gave?

10:55:22   25        THE WITNESS:  I've not seen any assertions that

Aron - redirect by Stringfield

5046

1    Hytera had engaged in any efforts that would have put it in a

2    position to produce a DMR radio before 2007.  I've not seen

3    anyone on either side claim that that would be the case.  And

4    nothing in the R&D data that I reviewed would suggest that

10:55:46    5    that could be the case.

6            MR. STRINGFIELD:  May I proceed, Your Honor?

7            THE COURT:  Yes.

8    BY MR. STRINGFIELD:

9    Q.  Dr. Aron, who was the -- if Motorola was first and Hytera

10:55:58    10    was second, when did the third seller of DMR radios begin

11    selling DMR radios, if you know?

12    A.  There were entrants in 2012 were the next entrants

13    producing devices.

14            MR. STRINGFIELD:  May I approach, Your Honor?

10:56:19    15            THE COURT:  Yes.

16    BY MR. STRINGFIELD:

17    Q.  Dr. Aron, I've just handed you DTX-4135.  Can you tell us

18    what this document is?

19    A.  There is a cover email and an attachment, which is a

10:56:57    20    PowerPoint presentation titled "RP&A Operations Review - March

21    3, 2014," authored by Jeff Spaeth.

22    Q.  And Jeff Spaeth is someone at Motorola?

23    A.  Yes.

24    Q.  And was this document, DTX-4135, produced by Motorola in

10:57:16    25    this litigation?

Aron - redirect by Stringfield

5047

A.  Yes.

          MR. STRINGFIELD:  Your Honor, we request to admit and
publish DTX-4135.

          MS. NEW:  No objection.

10:57:27     THE COURT:  It is received and may be published.

          (DTX-4135 was received in evidence.)

BY MR. STRINGFIELD:

Q.  So, Dr. Aron, as you indicated, the cover of the document
it's an internal Motorola email, is that right?

10:57:41  A.  It is.

Q.  And then this is the cover page of the presentation
attached in DTX-4135.  This is a Motorola presentation by Jeff
Spaeth at Motorola?

A.  That's what it says.

10:58:03  Q.  I'll turn to page 9 of the document DTX-4135.

          Can you tell us, and I know this is not a document
that you may have seen before, but can you tell us what is
summarized on page 9 of DTX-4135?

A.  Thank you.  I can't quite see the top.  There we go.

10:58:31     This appears to be a summary by Mr. Spaeth of
companies offering DMR compatible equipment by year.

Q.  And so in 2008, the first and only company offering DMR
compatible equipment, is that Motorola?

A.  Correct.

10:58:50  Q.  And then by 2010, there is now two competitors in DMR,

Case: 1:17-cv-01973 Document #: 927 Filed: 02/26/20 Page 44 of 200 PageID #:62269
Aron - redirect by Stringfield
5048

1    they are Motorola and Hytera.  Do you see that?

2    A.  That's correct.

3    Q.  And does that comport with your understanding of how the

4    timeline of DMR sellers entering the market played out?

10:59:03    5    A.  Yes.

6    Q.  And then in 2012, Harris has now entered the DMR market.

7    Do you see that?

8    A.  That's correct.

9    Q.  And so that is consistent with what you just told us a

10:59:13   10    moment ago, that after Hytera entered, it was another two

11    years before somebody else entered DMR, is that right?

12    A.  Correct.  And that's consistent with my independent

13    research in the market.

14    Q.  And then another two years later, 2014, there are multiple

10:59:27   15    more entrants into the DMR market after Hytera entered?

16    A.  Correct.

17    Q.  So related to your delay scenarios that you discussed in

18    the context of DDX-22.26, if Hytera were delayed by 3 months,

19    would Hytera have still been the second entrant or the second

10:59:58   20    competitor selling DMR radios?

21          THE COURT:  Can you hold your answer to that

22    question, please.

23          Members of the jury, we'll take a short break.  There

24    is a matter the Court must deal with.  About 10 minutes.

11:00:11   25       (Jury out)

Aron - redirect by Stringfield

5049

|       |    |                                                                              |
|-------|----|------------------------------------------------------------------------------|
|       | 1  | THE COURT:  The trial is adjourned for a few minutes.                         |
|       | 2  | (Recess.  Jury in)                                                            |
|       | 3  | MR. STRINGFIELD:  May I proceed, Your Honor?                                  |
|       | 4  | THE COURT:  Yes, please proceed.                                              |
| 11:23:25 | 5 | BY MR. STRINGFIELD:                                                           |
|       | 6  | Q.  Welcome back, Dr. Aron.                                                   |

1    THE COURT:  The trial is adjourned for a few minutes.

2    (Recess.  Jury in)

3    MR. STRINGFIELD:  May I proceed, Your Honor?

4    THE COURT:  Yes, please proceed.

11:23:25    5  BY MR. STRINGFIELD:

6  Q.  Welcome back, Dr. Aron.

7    I want to finish talking about what we were just

8  discussing before the break.  But first I want to circle back

9  to something I wanted to ask you earlier, but I couldn't find

11:23:37   10  my paper and now I found my paper.

11    So, Dr. Aron, earlier, just taking you back, we were

12  talking about your cross-examination yesterday, when you were

13  given a calculator, tables of numbers and you were asked to do

14  calculations and conversions of currency and all kinds of good

11:23:54   15  things.  Do you remember that?

16  A.  I do.

17  Q.  I'll show you PTX-2226, which was the table of numbers

18  that you were given yesterday.  And I've marked here on page

19  226.7 the numbers that you were asked to calculate.  I

11:24:35   20  apologize.

21    Dr. Aron, can you see the model numbers?  I know it's

22  small print, but can you see the model numbers?

23  A.  I can.

24  Q.  And do you recall being asked to sum values related to

11:25:03   25  these models?

Aron - redirect by Stringfield

5050

1    A.  I do.

2    Q.  And so for the record they're MD650 and MD780.  Did I read

3    those right?

4    A.  You did.

11:25:10    5    Q.  Do you know what the MD products are at Hytera?

6    A.  They're mobile products, mobile DMR.

7    Q.  And how do you know they are mobiles based on the model

8    numbers?

9    A.  They start with M.

11:25:22   10    Q.  And did you include the mobile products in your damages

11    analysis?

12    A.  No.  They were ultimately determined at trial to not be

13    accused.

14    Q.  And did Mr. Malackowski include the mobile numbers in his

11:25:37   15    report or testimony?

16    A.  He did not.

17    Q.  Are the mobile radios relevant at all to your damages

18    opinion or Mr. Malackowski's damages opinion?

19    A.  They are not.

11:25:49   20    Q.  You were asked yesterday on cross some questions about

21    market capitalization.  Do you recall that?

22    A.  I do.

23    Q.  At a high level, what is your understanding of how market

24    capitalization is calculated?

11:26:08   25    A.  It's the value of the price of the stock at a point in

Aron - redirect by Stringfield

5051

1   time times the number of shares of that stock outstanding.

2   Q.   That's it?

3   A.   That's it.

4   Q.   And the price of stock goes up and the price of stock goes

11:26:22   5   down, is that right?

6   A.   It changes from day to day and from hour to hour.

7   Q.   And the document you were shown yesterday reflected a

8   market cap in about January by Hytera of around $2 billion

9   U.S. dollars.  Do you recall that?

11:26:38   10   A.   Yes, that's right.

11   Q.   And would it surprise you to learn that since that time

12   Hytera's stock has gone up and gone down?

13   A.   I would be surprised if it hadn't gone up and gone down.

14   Q.   Would it surprise you to learn that Hytera's stock has in

11:26:50   15   fact gone down 10 percent since then, and now Hytera's market

16   cap is $1.8 billion approximately?

17   A.   Considering what's happening in China, no, that would not

18   surprise me.

19   Q.   Would it surprise you that Motorola's market cap was

11:27:07   20   around $30 billion yesterday?

21   A.   What was the figure you gave?

22   Q.   About $30 billion U.S.

23   A.   Billion, did you say?

24   Q.   Billion?

11:27:15   25   A.   Yes, that wouldn't surprise me.

Aron - redirect by Stringfield

5052

1   Q.   In this case you analyzed economic damages under unjust

2   enrichment and lost profits, is that right?

3   A.   Yes.

4   Q.   And, again, those are both based on profit numbers, is

11:27:30   5   that right?

6   A.   They're based on incremental profit numbers as we

7   discussed.

8   Q.   As an economist, you wouldn't use market cap to calculate

9   Hytera's profits, would you?

11:27:42   10   A.   No, no.  Market cap is not something you could start with

11   even to figure out a company's profits.

12   Q.   And the discussion you gave yesterday about Hytera's total

13   profits over the last 10 years, that has nothing to do with

14   Hytera's market cap, is that right?

11:28:01   15   A.   From a mathematical standpoint, no.  You couldn't

16   determine the past profits from the current market cap, no.

17   You couldn't make that relationship.

18   Q.   Okay.  I want to continue our discussion from right before

19   the break regarding DTX-4135.  And this was in the context of

11:28:31   20   questions you were asked yesterday on cross-examination about

21   the importance of entering the market in 2010.  Do you recall

22   that?

23   A.   Yes, I remember that.

24   Q.   And the Court asked you a question about, you know, after

11:28:49   25   I asked a question about whether there was any dispute in this

Aron - redirect by Stringfield

5053

1    case whether Hytera would be the first DMR entrant over

2    Motorola, do you recall me asking that question?

3    A.   I do.

4    Q.   And then the Court asked you a question afterwards about

11:29:04    5    the data that you relied on.  And I want to focus on your

6    answer just to be clear about something.

7         You don't contend that Hytera had not started

8    research and development at some point before it launched its

9    radios in 2010?  That's not your contention that Hytera wasn't

11:29:21    10    doing research and development for years before 2010?

11    A.   If you are asking me was Hytera doing research and

12    development for years before 2010, the answer is yes, that's

13    my understanding it was.

14    Q.   And, in fact, yesterday you showed DDX-22.10 that showed

11:29:40    15    Hytera was doing research and development going back to 2005

16    on towards launching its first DMR product, is that right?

17    A.   That's correct.

18    Q.   So back to our discussion of the importance of 2010 or

19    lack thereof, perhaps, so Hytera entered in 2010 and then

11:30:03    20    other entrants entered in 2012.  Is that what is shown on

21    DDX-4135?

22    A.   DDX-4135 shows one additional entrant in 2012.

23    Q.   And then many more entrants another two years later in

24    2014?

11:30:23    25    A.   In 2014, yes.

Aron - redirect by Stringfield

5054

1    Q.   And so back to your discussion of the various delay

2    periods, Hytera actually launched in March of 2010?

3    A.   Correct.

4    Q.   So if Hytera were delayed 3 months to June 2010, would

11:30:37    5    Hytera have still been the second seller of DMR products?

6    A.   Yes.

7    Q.   If Hytera were delayed 6 months to September of 2010,

8    would Hytera still have been the second seller of DMR

9    products?

11:30:50    10    A.   Yes.

11    Q.   And if Hytera were delayed a whole year to March 2011,

12    would Hytera still have been the second seller of DMR

13    products?

14    A.   Yes.

11:31:02    15    Q.   Another set of documents that you were asked about

16    yesterday on cross were a series of emails from G.S. Kok in

17    about the 2007 time frame.  Do you recall those?

18    A.   I do.

19    Q.   And a couple of those emails related to FCC regulations.

11:31:24    20    Do you remember that?

21    A.   Yes.

22    Q.   And do you know who G.S. Kok is?

23    A.   Yes.

24    Q.   And do you know approximately when he started at Hytera,

11:31:42    25    the year?

Aron - redirect by Stringfield

5055

1    A.   2008, I believe.

2    Q.   2008.  The emails that you were shown yesterday, all three

3    of them were dated in 2007?

4    A.   Correct.

11:31:52    5    Q.   And so that was during the period that G.S. Kok was trying

6    to get a job at Hytera?

7    A.   That's right.

8    Q.   You were read G.S. Kok's statements about the FCC

9    regulations?

11:32:02    10   A.   Yes, I read them.

11   Q.   Did you think that his statements and characterizations of

12   the regulations were accurate?

13   A.   No.  I think they reflected his perception, but perhaps

14   his interest in getting a job leading DMR at Hytera.

11:32:24    15   Q.   As an economist, you wouldn't rely on offhanded remarks

16   about -- that included inaccurate statements about a

17   regulation in forming your economic opinions in this case, is

18   that right?

19   A.   No.  I reviewed the actual regulations and the FCC

11:32:44    20   commentary and the Department of Homeland Security

21   explanations of the narrow banding regulations as they evolved

22   over time.

23   Q.   And, in fact, yesterday you talked about some industry

24   reports that reflected the broader industry opinion about what

11:33:04    25   the state of the transition from analog to digital was.  Do

Case: 1:17-cv-01973 Document #: 927 Filed: 02/26/20 Page 52 of 200 PageID #:62277
Aron - redirect by Stringfield
5056

1    you recall that?

2    A.   Yes.  Those reports were primarily about the actual effect

3    and the observed transition of actual customers from digital,

4    from analog to digital over time.

11:33:21    5    Q.   One of the industry reports by an independent third party

6    you discussed yesterday was DTX-3167.  Do you recall

7    discussing this?

8    A.   Yes, the his report.

9    Q.   And this document was dated in August 2017?

11:33:36    10    A.   This one was, yes.

11    Q.   And then I'll hold a page for you.

12         Do you recall the portion of the document that talked

13    about the gradual transition as the document characterized it

14    in 2017?

11:34:17    15    A.   Yes.  I think the piece we read talked about in 2017 the

16    market was just, the analog market was just starting to reach

17    the end of its useful life, something along those lines.

18    Q.   And also during your direct testimony yesterday you

19    discussed actual data that you analyzed about the analog to

11:34:42    20    digital transition.  And you summarized that on DDX-22.27, is

21    that right?

22    A.   That's right.

23    Q.   And remind us again what this data that you analyzed

24    summarized?

11:34:52    25    A.   It shows all two-way radio sales worldwide broken down

Case: 1:17-cv-01973 Document #: 927 Filed: 02/26/20 Page 53 of 200 PageID #:62278
Aron - redirect by Stringfield
5057

1    between analog and digital.  And the digital, the yellow part,

2    includes all digital technologies, not just DMR and not just

3    DMR and dPMR, but it includes TETRA, P25, PDT and other

4    digital technologies.

11:35:15    5            And what it shows is that analog was still a majority

6    of the market, well over that in 2010, and then it has

7    gradually declined since that time, falling below 50 percent

8    of sales and shipments in 2015.

9            THE COURT:  This represents global sales, is that

11:35:37    10    correct?

11            THE WITNESS:  It does.

12            THE COURT:  What percentage of the global sales occur

13    in the United States applying it to your chart?

14            THE WITNESS:  We don't have good data year by year of

11:35:48    15    the digital-analog breakdown in the United States alone.  But

16    the total sales I believe are approximately 20 percent and

17    from --

18            THE COURT:  So your answer is 20 percent?

19            THE WITNESS:  Of the total sales.

11:36:03    20            THE COURT:  Okay.

21    BY MR. STRINGFIELD:

22    Q.  Dr. Aron, as an economist, do you believe that data and

23    industry reports are more reliable or less reliable than

24    anecdotes and mischaracterizations in emails?

11:36:19    25    A.  In my work, I rely on data and I rely on industry reports

Aron - redirect by Stringfield

5058

1    from analysts that I have determined to be reliable.

2         I also rely on commentary from reliable sources, as I

3    said, such as the FCC, Department of Homeland Security.

4         I also rely on internal documents as we talked about,

11:36:47    5    as I testified to yesterday, such as Motorola's actual

6    strategy documents that it produces in the normal course of

7    business for its own strategy work.

8         But commentary in an email from someone who is trying

9    to get a job to lead up a product that it would be good for

11:37:09    10   him for that product to be important doesn't enter -- doesn't

11   bear weight in my analysis.

12   Q.  And another topic that you were asked about in the context

13   of the contended importance of 2010 was Hytera's IPO.  Do you

14   recall that?

11:37:28    15   A.  I do.

16   Q.  You're aware that Hytera went public in 2011?

17   A.  Correct.

18   Q.  Do you know what stock exchange that Hytera went public

19   on?

11:37:37    20   A.  It wasn't the NASDAQ.  It was a Chinese stock exchange.

21   Q.  And you were here when Mr. Yuan testified before the

22   holiday break, is that right?

23   A.  I was.

24            THE COURT:  What Chinese stock exchange?

11:37:49    25            THE WITNESS:  It's on this document, Your Honor.

Aron - redirect by Stringfield

5059

1    It's called the Shenzhen Stock Exchange.

2           THE COURT:  Proceed.

3    BY MR. STRINGFIELD:

4    Q.  And, Mr. Yuan, he testified here as an officer of the

11:38:03    5    company?

6    A.  Yes, he did.

7    Q.  And Mr. Yuan was in fact at Hytera in 2010/2011 when

8    Hytera was going public, is that right?

9    A.  That was his testimony, yes.

11:38:15    10    Q.  And Mr. Yuan was asked about the IPO.  And this is on

11    3384, I'll start, and the excerpt I have here continues to

12    page 3386.

13           He was asked, "Was there any urgency to Hytera going

14    public in 2011?"

11:38:33    15           He responded "No."

16           And then he was asked the purpose of Hytera going

17    public, and he gave responses to that.

18           And then at line 24 on page 3384, Mr. Yuan was asked,

19    "Mr. Yuan, did Hytera have to get any kind of approval to go

11:38:53    20    public or have an IPO to be listed on the Shenzhen exchange?"

21           And he answered "Yes."  And that continues on to page

22    3385.

23           Do you recall Mr. Yuan giving those questions and

24    answers?

11:39:05    25    A.  Yes, I do.

Aron - redirect by Stringfield

5060

11:39:23

1    Q.  And then he was asked to provide the -- what information

2    he had to provide to the authority for permission to go

3    public.  And he listed three things.  On lines 8, he explained

4    that he had to -- or excuse me, lines 5, 6 and 7.  He said

5    that he had, Hytera -- "one thing is the last three years of

6    financial report and another thing is the prospectus for the

7    future."

8            Do you see that?

9    A.  Correct.

11:39:34

10   Q.  And then at line 15, he was asked about the three years of

11   financial information that Hytera was required to give to the

12   authority to go public.

13           And he said that, in 2011, going back three years,

14   that financial information would be 2010, 2009 and 2008.

11:39:52

15           Do you recall him testifying to that?

16   A.  I do.

17   Q.  And then he was asked at line 22, in that time frame, the

18   three year look-back that they had to provide to the Shenzhen

19   Stock Exchange, what the majority of Hytera's sales were at

11:40:06

20   that time.

21           And he responded, "Because Hytera hadn't launched DMR

22   until the beginning of 2010, if you look at those years, the

23   majority of sales come from analog."

24           Do you recall him testifying to that?

11:40:20

25   A.  Yes.

Aron - redirect by Stringfield

5061

1    Q.  And Mr. Yuan was asked about the prospectus, and I think

2    you were also asked some questions about the prospectus

3    yesterday also.  Do you recall that?

4    A.  I do.

11:40:31   5    Q.  And he was asked, you know, whether DMR was given any

6    special emphasis in the prospectus.  And he was asked the

7    question:

8            "Mr. Yuan, it sounds like DMR was mentioned among one

9    of many technologies in one of three portions of the

11:40:49   10   prospectus, is that right?"

11           And he responded, "That's right."

12           And he was asked, "Was DMR emphasized or highlighted

13   in any particular way in the prospectus?"

14           And he answered "No."

11:41:00   15           Do you recall him testifying to that?

16   A.  I do.

17   Q.  I'll show you PTX-2380, which was the prospectus that

18   counsel discussed with you during cross.

19   A.  I have it here still.

11:41:16   20   Q.  And counsel directed you to a single page.  Would you

21   agree that this is a voluminous document, Dr. Aron?

22   A.  It is.

23           THE COURT:  I've already ruled the entire prospectus

24   is in evidence.  It has been published to the jury and they

11:41:44   25   will have an opportunity when they go in to deliberate to

5062

1    consider it in its entirety along with all of the other

2    evidence in the case.

3    BY MR. STRINGFIELD:

4    Q.  And, Dr. Aron, I'll direct you to page 526, 2380.526.

11:41:58    5    And yesterday during cross counsel directed you to

6    just this single page.  Do you recall that?

7    A.  Correct.

8    Q.  And I believe counsel pointed to instances where, you

9    know, DMR was mentioned in the document.  Do you recall that?

11:42:11    10    A.  I do.

11    Q.  But in each instance where DMR is referenced, it's

12    mentioned along with other products that Hytera sells.  I've

13    highlighted a line on that page that says, "The company has

14    launched PDT, DMR, TETRA terminal products and plans to launch

11:42:34    15    a single-station PDT trunking system and a multi-station PDT

16    trunking system in 2011."  Do you see that?

17    A.  That's right.

18    Q.  And they talk about "The issue has had a head start in

19    technical research..." counsel discussed that sentence with

11:42:48    20    you "...and product development in the PDT and DMR fields

21    leading the technology."

22    And then they highlight, "Hytera is the first

23    manufacturer in the world to launch PDT products, the second

24    to launch DMR products and the first domestic company to

11:43:04    25    launch self-developed TETRA terminal products."

Aron - redirect by Stringfield

5063

1          Do you see that?

2    A.  I do.

3    Q.  I'll show you page 423 of the prospectus, page 423.

4    A.  Okay.

11:43:50    5    Q.  And counsel didn't discuss this page with you yesterday,

6    is that right?

7    A.  That's right.

8    Q.  Hytera highlights that they have a complete range of

9    product lines and can provide full range of products from

11:44:02    10    analog to digital, from terminals to systems, from voice to

11    data, as well as customized overall solutions which can

12    effectively meet differentiated needs of professional wireless

13    communication in different application areas and cover most of

14    the market segments.

11:44:16    15          And, again, they highlight the company's variety of

16    products here.  It lists the company's products include analog

17    conventional terminals, analog trunk terminals, DMR digital

18    terminals, TETRA digital trunk terminals, PDT digital trunk

19    terminals, MPT analog trunk systems, analog simulcast systems,

11:44:39    20    PDT digital trunk systems, as well as mobile video systems.

21          Do you see the variety of technologies that Hytera

22    highlighted in its prospectus as part of its attempt to go

23    public in 2011?

24    A.  Right, under the category Product Advantages.

11:44:55    25    Q.  Turn to page 512 of the prospectus.

Aron - redirect by Stringfield

5064

A.    Okay.

Q.    Are you there, Dr. Aron?

A.    I'm there.

Q.    I'm sorry.  One sentence in particular in the prospectus,

11:45:41    they highlight, "In 2011, the digital upgrade of the

professional wireless communication industry is a smooth and

gradual process."  Do you see that?

A.    I do.  It's consistent with the sentence above it under 2,

"The advantages of analog products determine the digital

11:45:57    upgrade of the industry is a long-term process."

Q.    Does that sentence tell you that Hytera was in a panic

about the impending transition from analog to digital?

A.    No.  I think they're characterizing it fairly as a

long-term process of digital migration.

11:46:18    Q.    And in this document Hytera was telling potential

investors that same thing, is that right?

A.    That's what we're talking about here, that this is the

prospectus to potential investors.

Q.    Page 531.

11:46:54    A.    Okay.

Q.    Under the heading Remarkable Research and Development

Results, Hytera says, "Our company has achieved outstanding

research and development results through 17 year efforts" --

that's 17 years back from 2011, do you understand that?

11:47:10    A.    That's right.  This is a 2011 document.

Aron - redirect by Stringfield

5065

1    Q.   "The analog technique has reached the same level of

2    international leading enterprises.  We created Hytera unique

3    digital signalling HDC1200/2400 based on good command of

4    various analog product signaling (such as DTMF, 2Tone, 5Tone,

11:47:33    5    MDC1200, LTR and MPT1327)."

6         Do you see that?

7    A.   I see that.

8    Q.   They go on to mention that they, at Hytera, "...as one of

9    few manufacturers who master core technologies of digital

11:47:46    10   communication standards at the same time, such as TETRA, DMR,

11   PDT, DMR.  We have gained great achievements in digital

12   communication standard and actively participated in

13   international communication standard organization work with a

14   number of proposals accepted and published by the European

11:48:05    15   Telecommunications Standards Institute, ETSI."

16        Do you see that?

17   A.   Yes, except I think you misread a few lines up, it's

18   TETRA, DMR, PDT and dPMR.

19   Q.   Excuse me.  Thank you.

11:48:28    20        Page 539 of the prospectus.  Again, this is Hytera's

21   2011 statement to potential investors.

22   A.   Okay.

23   Q.   They highlight TETRA digital terminal products.  The

24   document says, "The company is the first Chinese company to

11:48:47    25   launch TETRA terminal products with independent intellectual

Aron - recross by New

5066

1   property rights, including portable radios, mobile radios and

2   modem equipment."

3           Do you see that?

4   A.   Yes.  And it's the first digital technology they list

11:49:01   5   under their section above called Digital Terminal Products.

6   Q.   Thank you, Dr. Aron.

7           MR. STRINGFIELD:  I pass the witness.

8           MS. NEW:  I have a very brief recross, Your Honor.

9           THE COURT:  I think you should ask some questions to

11:49:30   10   clarify considering the testimony the jury heard yesterday

11   about what exchange Hytera is functioning.

12           MS. NEW:  I'm sorry, Your Honor, about the exchange

13   rate?

14           THE COURT:  Stock exchange.

11:49:50   15           MS. NEW:  Okay.

16                    RECROSS-EXAMINATION

17   BY MS. NEW:

18   Q.   Dr. Aron, yesterday we looked at an exhibit about Hytera's

19   market cap.  You recall that?

11:49:57   20   A.   That's correct.

21   Q.   Okay.  And that's for the Shenzhen Stock Market, correct?

22   A.   Stock Exchange, yes.

23   Q.   And that's different than NASDAQ or the NY, New York Stock

24   Exchange, right?

11:50:11   25   A.   Yes.  The documents you showed me yesterday were touting a

Aron - recross by New

5067

1    potential IPO on the NASDAQ.  But that's not what happened.

2    Q.  And that wasn't quite my question though.

3          The document I showed you about the market cap was

4    for the value of the stock on the Shenzhen Stock Exchange,

11:50:30    5    right?

6    A.  That's right.

7    Q.  And the date of that market cap was as of January 23rd,

8    2019, right?

9    A.  That's how I read the document, yes.

11:50:44    10    Q.  Okay.

11          THE COURT:  Has Hytera ever been listed on the

12    NASDAQ?

13          BY THE WITNESS:  Not to my knowledge, Your Honor.

14          THE COURT:  Proceed.

11:50:53    15    BY MS. NEW:

16    Q.  So, Dr. Aron, I want to go back to the R&D data that we

17    talked about on cross-examination, you just discussed again

18    with your counsel.  And that relates to whether or not

19    Mr. Malackowski should deduct R&D expenses from Hytera's

11:51:07    20    revenues for the accused products.  Do you understand that?

21    A.  Yes.

22    Q.  Okay.  And you said, we talked on cross about several sets

23    of data.  There was the data produced before the trial and

24    then there were the two sets of data produced during the

11:51:23    25    trial, right?

5068

1    A.   Correct.

2    Q.   Okay.  And your testimony about the two sets of data

3    produced in the middle of the trial is that the only change

4    was the filtering to remove unaccused products, correct?

11:51:37    5    A.   The only change was the filtering, and the filtering

6    removed unaccused products.  It also removed some stray other

7    rows that shouldn't have been there that were corrected.

8    Q.   Okay.  And that's your testimony about the only changes?

9    A.   To the data, that's my recollection.

11:52:01   10    Q.   Okay.  And you stand by that testimony?

11    A.   That's my recollection, yes.

12              MS. NEW:  Pass the witness, Your Honor.

13              THE COURT:  Anything further, counsel?

14              MR. STRINGFIELD:  Your Honor, we have no further

11:52:13   15    questions today.  But we would reserve the right to recall

16    Dr. Aron after Mr. Malackowski's rebuttal testimony.

17              THE COURT:  No.  You finish with this witness today.

18              MR. STRINGFIELD:  For today, yes, Your Honor.

19              THE COURT:  Now, you can do that at 1:00.

11:52:31   20              Members of the jury, we'll break for a one hour and 7

21    minute lunch.  So 1:00 o'clock.

22         (Recess at 11:53 a.m. to 1:00 p.m.)

23

24

25

5069

1               IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
2                   EASTERN DIVISION

3  MOTOROLA SOLUTIONS, INC., and MOTOROLA   ) No. 17 CV 1973
   SOLUTIONS MALAYSIA SDN. BHD,         )
4                              )
           Plaintiffs,        )
5  vs.                        ) Chicago, Illinois
                              )
6  HYTERA COMMUNICATIONS CORPORATION, LTD., ) February 4, 2020
   HYTERA AMERICA, INC., and HYTERA      )
7  COMMUNICATIONS AMERICA (WEST), INC.,   )
                              )
8          Defendants.        ) 1:03 p.m.

9                TRIAL - VOLUME 33-B
              TRANSCRIPT OF PROCEEDINGS
10

        BEFORE THE HONORABLE CHARLES R. NORGLE, SR.
11                 and a jury

12  APPEARANCES:

13  For the Plaintiffs:   KIRKLAND & ELLIS, LLP
                     BY:  MR. ADAM R. ALPER
14                       MR. AKSHAY DEORAS
                       MR. BRANDON HUGH BROWN
15                 555 California Street
                 Suite 2700
16                 San Francisco, California 94104
                 (415) 439-1400
17

                 KIRKLAND & ELLIS, LLP
18                 BY:  MR. MICHAEL W. DE VRIES
                     MR. CHRISTOPHER M. LAWLESS
19                 333 South Hope Street
                 Suite 2900
20                 Los Angeles, California 90071
                 (213) 680-8400
21

22

   Court Reporter:       JENNIFER COSTALES, CRR, RMR
23                 Official Court Reporter
                 219 South Dearborn Street, Room 2342
24                 Chicago, Illinois 60604
                 (312) 435-5895
25                 jenny.uscra@yahoo.com

5070

```
1    APPEARANCES:    (Continued)

2    For the Plaintiffs:       KIRKLAND & ELLIS, LLP
                               BY:   MS. MEGAN MARGARET NEW
3                              300 North LaSalle Street
                               Chicago, Illinois 60654
4                              (312) 862-7439

5                              KIRKLAND & ELLIS, LLP
                               BY:   MS. LESLIE M. SCHMIDT
6                              601 Lexington Avenue
                               New York, New York 10022
7                              (212) 446-4763

8    For the Defendants:       STEPTOE & JOHNSON, LLP
                               BY:   MR. BOYD T. CLOERN
9                                    MR. SCOTT M. RICHEY

10                                   MR. MICHAEL J. ALLAN
                                     MS. JESSICA ILANA ROTHSCHILD
11                                   MS. KASSANDRA MICHELE OFFICER
                               1330 Connecticut Avenue NW
12                             Washington, DC 20036
                               (202) 429-6230
13
                               STEPTOE & JOHNSON, LLP
14                             BY:   MR. DANIEL S. STRINGFIELD
                               227 West Monroe Street
15                             Suite 4700
                               Chicago, Illinois 60606
16                             (312) 577-1300

17

18   ALSO PRESENT:             MR. RUSS LUND and
                               MS. MICHELE NING
19

20

21

22

23

24

25
```

5071

1          (Proceedings in open court.  Jury in)

2               THE COURT:  Good afternoon, members of the jury.

3               If Hytera has any further questions of the witness,

4     you may recall her.

01:03:41    5               MR. CLOERN:  Your Honor, Hytera does not.

6               And Hytera at this time rests its case.  Hytera plans

7     to renew Rule 50 motions.  But in light of the jury's presence

8     and in an effort to get Dr. Wicker on and off by the end of

9     tomorrow, Hytera would like to defer that until the close of

01:03:59   10     all evidence after Motorola's rebuttal case.

11               THE COURT:  Okay.  So you are resting?

12               MR. CLOERN:  Yes, Your Honor.

13               THE COURT:  Okay.  Is Motorola prepared to go

14     forward?

01:04:08   15               MR. ALPER:  Yes, Your Honor.  Motorola has a very

16     short rebuttal with --

17               THE COURT:  Call the witness.

18               MR. ALPER:  Yes.  We have two final --

19               THE COURT:  I'm not saying it has to be short.  I'm

01:04:18   20     simply saying call the witness.

21               MR. ALPER:  Brief testimony from our two final

22     witnesses, beginning with Dr. Stephen Wicker, Your Honor, who

23     we'll come up to the stand with your permission.

24               THE COURT:  Yes.  And then you have a witness

01:04:27   25     scheduled for Monday?

Wicker - direct by Brown

5072

| | | |
|---|---|---|
| | 1 | MR. ALPER:  Yes, Your Honor. |
| | 2 | THE COURT:  All right.  Proceed. |
| | 3 | MR. ALPER:  Thank you, Your Honor. |
| | 4 | THE CLERK:  Raise your right hand. |
| 01:04:50 | 5 | (Witness duly sworn) |
| | 6 | STEPHEN WICKER, PLAINTIFFS' REBUTTAL WITNESS, SWORN |
| | 7 | DIRECT EXAMINATION |
| | 8 | BY MR. BROWN: |
| | 9 | Q.  Welcome back, Dr. Wicker. |
| 01:05:05 | 10 | A.  Thank you. |
| | 11 | Q.  Now, it's been a while since you testified. |
| | 12 | THE COURT:  There is no special significance to the |
| | 13 | second oath.  We just wanted to make sure that the witness was |
| | 14 | previously sworn. |
| 01:05:14 | 15 | MR. BROWN:  Yes, Your Honor. |
| | 16 | THE COURT:  All right.  Please proceed. |
| | 17 | BY MR. BROWN: |
| | 18 | Q.  It's been a while since you testified, and you were on the |
| | 19 | stand for a long time.  I'm not going to keep you there nearly |
| 01:05:21 | 20 | as long this time, okay? |
| | 21 | A.  Thank you. |
| | 22 | Q.  Okay.  I just want to spend a little bit of time asking |
| | 23 | you questions about some of the other testimony that we heard |
| | 24 | over the last couple months of trial. |
| 01:05:31 | 25 | In particular, did you hear the testimony from |

Wicker - direct by Brown

5073

1    Ms. Frederiksen-Cross, Mr. Grimmett and Dr. Aron?

2    A.  Yes, I did.

3    Q.  And did you hear that they had a number of

4    characterizations about what you say Hytera has done to use

01:05:44    5    Motorola's trade secrets?

6    A.  Yes, they did.

7    Q.  So let's walk through some of that.  I'm going to start

8    with DDX-20.14, which was Ms. Frederiksen-Cross's

9    demonstrative.

01:06:02    10        Ms. Frederiksen-Cross put up a demonstrative that

11    says that one of the accusations in this case is that 50 out

12    of 3500 source code files are contaminated by Motorola's trade

13    secrets.  Do you remember that?

14    A.  Yes, I do.

01:06:17    15    Q.  Do you agree with that?

16    A.  No, I don't.

17    Q.  What's wrong with that?

18    A.  What this number does is it doesn't take into account the

19    fact that those 3500 files were developed with Motorola source

01:06:25    20    code available.  People were looking at source code from

21    Motorola while they wrote the allegedly independent Hytera

22    source code.

23        In my opinion, all 3500 of those source code files

24    are contaminated or were developed with knowledge and

01:06:39    25    availability of Motorola source code.

Wicker - direct by Brown

5074

1    Q.   Now, in fairness to Ms. Frederiksen-Cross, she then later

2    said that about 4 percent of Hytera source code was what you

3    actually accused.  Is that number correct?

4    A.   No, it's not.

01:06:51    5    Q.   And just yesterday - I'm showing DDX-22.42 - Dr. Aron said

6    that 10 percent of -- that you said that 10 percent of

7    Hytera's source code was contaminated by Motorola's trade

8    secrets.  Is that number correct?

9    A.   No, it's not.

01:07:10    10   Q.   So putting aside what you just said about using all of

11   Motorola's trade secrets, where is the disconnect happening in

12   these numbers?  What is it that Hytera's experts are counting

13   to get to these numbers?

14   A.   Well, what they're doing is they're counting lines.

01:07:23    15   They're literally looking at Motorola code and Hytera code and

16   counting lines that I have identified as being copied.

17           And what that does is it fails to take into account

18   the importance of the source code, how the source code is

19   used.  It's simply counting.  And that does not accurately

01:07:42    20   reflect what has happened in this case.

21   Q.   Now, you've prepared some demonstratives for your rebuttal

22   testimony?

23   A.   Yes.

24   Q.   I'm going to put up PDX-20.5, which is one of your

01:07:53    25   demonstratives.  Can you explain what it is that -- let me set

Wicker - direct by Brown

5075

1    the stage first.

2            There are three libraries that Hytera acknowledges

3    were taken from Motorola, fair?

4    A.   That's right.

01:08:01    5    Q.   And can you just very at a high level explain to us what

6    those libraries are?

7    A.   Okay.  First off, the libraries are collections of code.

8    They provide capabilities to other source code.  And there are

9    three particular libraries that have been discussed a lot here

01:08:16    10   in court.

11           There is a DSP library.  This provides functionality

12   that allows you to turn wave forms, signals going through

13   space into voice and vice versa.  It's at the core of creating

14   the functionality of a radio over which people are going to

01:08:34    15   talk and send data.

16           There is also the radio application framework

17   library.  This is the library that handles interactions

18   between applications and gives the radio its ability to have

19   different applications going at the same time, moving messages

01:08:50    20   between applications and so forth.

21           And the third library that we've been discussing is

22   the radio hardware abstraction layer.  The way I talked about

23   this last time I was here was to talk about a conductor

24   organizing all the events at the lower layers.  That's what

01:09:08    25   happens here, even to the point of creating a timer that

Wicker - direct by Brown

5076

1  ensures that all the events happen at exactly the right time.

2        Now, all three of these libraries were taken from

3  Motorola and are in extensive use in Hytera's radios.

4  Q.  I want to come back to the extensive use point.

01:09:25  5        But are these radios important to the functionality

6  of Hytera's radios?

7  A.  They lie at the core of that functionality.  Numerous

8  files that go way beyond simple copying make use of these

9  libraries to achieve the functioning of the radio.

01:09:40  10  Q.  What would happen to Hytera's radios if these libraries

11  weren't available?

12  A.  They wouldn't work.  They simply would not function.

13  Q.  Now, in your PDX-20, what are you showing here?

14  A.  Okay.  So this is an example of something that a library

01:10:00  15  would provide, in fact, a particular library.  This has to do

16  with logging and entry in application message queue.

17        So what happens is when a message arrives for an

18  application or a group of applications, it is put into a queue

19  and is logged in so that it is known that it is there and it

01:10:20  20  is subsequently processed.

21        So it's actually a relatively short piece of code.

22  It's 44 lines.  But it's 44 lines that are used throughout

23  Hytera's software.

24  Q.  So let me put on PTX-586 at page 5, which is already

01:10:35  25  admitted.  This was the figure that you had up on a board for

Wicker - direct by Brown

5077

1    a while, Professor Wicker.

2         Where does this functionality that's in the 44 lines

3    of code that are identified here, where does that come in in

4    the architecture that Hytera took from Motorola?

01:10:48   5    A.  Okay.  So what we see are a number of different things.

6    But let's focus first, here we have a couple applications.  We

7    have three applications that are interacting somehow.  And we

8    have information coming down from the application as well as

9    information coming up from lower layers.

01:11:05   10        Now, what happens is that messages can come from a

11   number of different places, and they are put into this

12   AppMsgQueue.

13        Now, that little bit of code, those 44 lines that I

14   showed you on the previous slide, they're what control the

01:11:23   15   input of messages to this particular queue, this queue here.

16   And subsequently the message is processed.  It can cause an

17   application to be turned on.  It can cause lots of different

18   things.

19   Q.  And so on the slide here on PDX-6, you've got a few

01:11:39   20   examples of things on the right, scan application, emergency

21   application and so on.  What are you indicating there about

22   the importance of stolen code?

23   A.  Okay.  So these are just five examples of code that uses

24   these 44 lines, scan application, emergency application.

01:11:59   25   These are various applications that make use of login chain at

1    AppMsgQueue, this fundamental piece of code.  And raPIS as

2    well, raPIS is the interface specification, the tools that are

3    made available at lower layers.  This is also making use of

4    this particular 44 lines of code.

01:12:21    5    Q.  And did you do an analysis of how many times throughout

6    Hytera's code in just one version references this one

7    function?

8    A.  I did.  It was 1300 times.  Basically this little chunk of

9    code is referenced 1300 times throughout all of Hytera's

01:12:39    10   source code.

11   Q.  Now, when Ms. Frederiksen-Cross was here testifying about

12   the source code, she said, she was asked:  "You haven't done a

13   valuation of whether or not the 4 percent that you say was

14   copied was more valuable than the other 96 percent, right?

01:12:56    15          "Answer:  That's correct.

16          "Question:  You just based it entirely on the pure

17   number of lines?

18          "Answer:  That is correct."

19          This is page 4124 and 4125 of the trial transcript.

01:13:07    20          What is the risk of that approach when you are

21   looking at your analysis here on how often this code is relied

22   on?

23   A.  Well, what it does, if we just looked at those lines,

24   those 44 lines and said, well, that's .001 percent of Hytera's

01:13:22    25   source code, it can't be that important; you'd be missing the

Wicker - direct by Brown

5079

1    fact that so much of the other code relies on those 44 lines.

2         If we took those 44 lines out, the code on the right

3    wouldn't work.  And so that's a very important point.  You

4    have to know what the software is doing in order to talk about

01:13:40   5    how important it is, whether its misappropriation and use is a

6    big problem or a small one.

7    Q.   So is the use of just a pure line of code metric an

8    appropriate way to figure out how important something that's

9    stolen was?

01:13:57  10    A.   No, no.  In fact, there was discussion in court earlier,

11    reference to a particular book in fact that made the point

12    that by not taking into account the importance of the code, by

13    just counting lines, you are making a fundamental mistake.

14    Q.   That was one of the libraries.  Which library was that

01:14:19  15    that we were speaking about?

16    A.   Let's see, we were just talking about this one, the

17    application framework.  So we were talking about how messages

18    are logged into the application message queue.

19    Q.   And let's switch now to the DSP library.  The DSP library

01:14:37  20    is responsible for what again?

21    A.   Okay.  The DSP library, it's digital signal processing,

22    it's literally taking signals and digitizing them or vice

23    versa, manipulating the fundamental signals so that we hear

24    voice after receiving radio waves.

01:14:54  25    Q.   And, again, without that functionality, can a radio even

Wicker - direct by Brown

5080

1   function as a radio?

2   A.  It wouldn't be a radio.

3   Q.  Now, Mr. Grimmett put up slide DDX-21.35.  And what he

4   testified about was that the only material that was from the

01:15:10   5   DSP in the slide that was contaminated by Motorola's code was

6   the one he has grayed out with the Malaysian team reference

7   there.  Do you see that?

8   A.  Yes, I do.

9   Q.  And he said that the rest of the code on here was done by

01:15:24   10   Hytera coders and wasn't accused.  Do you remember that?

11   A.  I do remember that.

12   Q.  Is that correct?

13   A.  No, it's not.

14   Q.  Why not?

01:15:30   15   A.  Because what he did not take into account again is what is

16   actually happening in this other code.  We can go through it

17   all if you wish, but basically what we see is that this other

18   code is calling on Motorola's library, in this case the DSP

19   library for its functionality.

01:15:45   20       And so even though we look at a piece, particular

21   piece of code, and it was done by someone other than what he

22   refers to as the Malaysian team, it's still making use of

23   Motorola's code.

24   Q.  So let me show you your PDX-20.10.  And you've got, for

01:16:03   25   example, dps_a_pl control.  That's one of the files that

Wicker - direct by Brown

5081

1    Mr. Grimmett referred to you have on the slide here.  What are

2    you indicating on PDX-20.10?

3    A.   Okay.  So this is again an example of code.  You can see

4    its name right there.  DPS is digital protocol stack.

01:16:23    5            What this code is doing to function is calling on the

6    DSP library in order to do its functionality.  In other words,

7    it needs to use code from those libraries in order to do what

8    it's supposed to do, in this case provide control for the

9    digital protocol stack.

01:16:42   10    Q.   And so what does it mean that code calls on other code?

11   From a layman's perspective, can you explain what that means?

12   A.   Yes.  So what happens in code is you have a number of

13   different ways of causing things to happen.  One thing you can

14   do is call a function.  A function might say add this to that.

01:17:00   15           Well, in order to know how to do the adding, you have

16   to go to another piece of code which will actually tell the

17   first piece of code how to do its job.

18           So what we see in source code as complicated as this

19   is there is a lot of calling on functions and objects and

01:17:16   20   other things that are found in other code.

21           So in this particular example, dps_control.cpp, this

22   is calling on code which depends on code in the DSP library.

23   Q.   So how could that, how could it be that if this code was

24   independently written before any of the Motorola code got to

01:17:36   25   Hytera, how could it then be relying on the Motorola code that

Wicker - direct by Brown

5082

1    didn't exist there at the time?

2    A.  Well, that's problematic, because it actually is relying

3    on the Motorola code, which tells me that this code was

4    written with the Motorola code in mind.

01:17:56    5    Q.  And one more library, the RFhal library.  That's for the

6    timing and I think you said the coordination functionality?

7    A.  That's right.

8    Q.  Let me show you the testimony from Ms. Frederiksen-Cross

9    on page 3948.  Ms. Frederiksen-Cross was asked:

01:18:16    10           "So Hytera had protocol stack before they hired the

11    Motorolans, is that correct" -- or "is that right?"

12           "Answer:  That is correct."  Right?

13    A.  Yes, that's what she said.

14    Q.  Now, what did you see in the protocol stack code that is

01:18:29    15    currently at Hytera in their devices?  And I'm pointing you to

16    PDX-20.13.

17    A.  Okay.  What I saw was that, for example, in this piece of

18    code it's the lineup manager code.

19           What it does, it actually relies on the abstraction

01:18:45    20    layer code.  It relies on the hardware abstraction layer to

21    cause certain functions to occur.

22    Q.  And so how does that relate to the use of the Motorola

23    stolen libraries?

24    A.  So basically it is actually using those libraries.  It's

01:18:59    25    not independent.  It's depending on these libraries and it

Wicker - direct by Brown

5083

1    wouldn't function without it.

2    Q.   When you say it's not independent, it's dependent, can you

3    explain that a little bit more?

4    A.   Yes.  I'm sorry.  So you could not call this

01:19:10    5    independently written, because what it's done, the way it's

6    been written is in such a way that it depends on Motorola's

7    code.

8         So the person who wrote this code knew about

9    Motorola's code, had it next to them and was able to invoke

01:19:25   10    functions to make things happen, functions that literally

11    called on the library that Motorola provided, that was taken

12    from Motorola.

13    Q.   And in order to call on a library that was taken from

14    Motorola and used in Hytera radios from a technical

01:19:43   15    perspective, what would an engineer from Hytera have to know?

16    A.   He'd have to know about the library.  He'd have to know

17    what functions were available from that library.

18    Q.   And I'm showing your slide PDX-20.14.

19         What else in Hytera's radios relies on just this one

01:20:04   20    stolen Motorola library?

21    A.   Well, here we have five different functionalities that

22    call on this particular stolen library.

23         The Radio Powerup, what happens when you first turn

24    on the radio and start looking for radio signals.

01:20:21   25         Transmission and Reception, this is fundamental to

Wicker - direct by Brown

5084

1    what the radio does.

2            The transmission of signals and the reception of

3    signals depends on the use of this stolen library.

4            Time slot synchronization.

01:20:34    5            We haven't talked about TDMA in quite a while, but it

6    basically depends on dividing the channel up in time into two

7    different slots.  Figuring out what slot you are in is again

8    dependent on material in the stolen library.

9            And I could go on.

01:20:50    10           Switching time slots, peripheral device action

11    control, more things that depend on this library.

12    Q.  Now, without the RFhal library, how would Hytera's radio

13    have been -- how would it have functioned?

14    A.  Well, it would not have functioned.  If you took the

01:21:10    15    library out, it wouldn't work.

16    Q.  Now, you've seen some -- you've seen that Hytera is

17    attempting to remove or rewrite the stolen code, at least

18    during this litigation.

19            What about that analysis shows you whether or not

01:21:22    20    Hytera would have been able to develop this technology on

21    their own?

22    A.  Okay.  So what I've been able to do is look at the code

23    that's been rewritten or modified over time.  There has

24    actually been two iterations that I've seen, a few dozen

01:21:37    25    files.

Wicker - direct by Brown

5085

                    And what I've seen is the names have been changed,

1

2    occasionally some structure is changed.  But overall the code

3    still works the same way.  The code that's been allegedly

4    rewritten is still heavily dependent on Motorola's code.

01:21:52    5    Q.  So is it using the same ideas as Motorola's code and the

6    architecture that we've talked about?

7    A.  Exactly.

8    Q.  Now, how long has it taken them to come up with the

9    versions that you've seen of a redesign?

01:22:04    10    A.  It's been, let's see, I think they were first aware of the

11    need of a redesign several years ago.  The redesign process

12    has been going on for about a year.

13    Q.  And so even in a year, with knowing how Motorola's trade

14    secrets work, how does that affect your opinion that they

01:22:19    15    still haven't finished coming up with anything that looks like

16    a clean slate?

17    A.  They have not been able to get away from Motorola's ideas.

18    They -- all of their code to date, even the modifications

19    remains essentially polluted by Motorola's code.  It tells me

01:22:35    20    that they're not able to get away from what they've learned

21    from Motorola.

22    Q.  How does that impact your opinion about whether or not

23    Hytera could have independently, without even having seen any

24    of this information, come up with the trade secret information

01:22:47    25    within the 6 months that Mr. Grimmett says?

Wicker - direct by Brown

5086

A.   They could not have done that.

Q.   Now, we've talked now where I've been asking you questions about these three libraries at issue.  Is there also evidence that there is more widespread theft at Hytera?

01:23:02    A.   Yes.

Q.   So Ms. Frederiksen-Cross put up this slide.  It's DDX-20.13.  She alleged that 4 percent of the code at Hytera was stolen by Motorola with reference to the libraries we just talked about and 96 percent was developed by Hytera.

01:23:20        Do you agree?

A.   No, I don't.

Q.   Let's start with your slide 20.15.

Why is it that you don't agree that 96 percent of Hytera's code was independently developed?

01:23:35    A.   Okay.  So the first thing to note is the extent of the theft.  When we're looking at source code files, we've got over a thousand files that were taken.  But we also need to look at the documents, the documents that describe how things work.

01:23:50        When I looked through this evidence, I noted there was over 1600 documents that had been taken.  So this is a vast amount of information, and it's information that's been made available to Hytera engineers as they've developed their code.

01:24:06        So, again, I don't think I can call it -- I can't

Wicker - direct by Brown

5087

1   call it independently developed code, because it's code that

2   was written with all this information available.

3   Q.   So starting with the source code, you said over 1,000

4   Motorola source codes are still in Hytera's files.  Just to

01:24:21   5   begin with, where did that source code come from, other than

6   obviously Motorola?

7   A.   It came from the ClearCase system.  In other words, it was

8   taken from Motorola's files and brought over to Hytera.

9   Q.   And where is ClearCase, the ClearCase system?

01:24:35   10   A.   That's in Illinois.  It's a database system that you

11   can -- that is based in Illinois and can be accessed remotely.

12   Q.   So I'm putting on PDX-20.16, which has a clip of

13   PTX-1103.3, the organization, one of the organizational charts

14   in this case.

01:24:53   15          Where did the material, the source code that was

16   stolen, where did that start at Hytera?

17   A.   Okay.  So the thing to note here is that we've got three

18   people who brought over material from Motorola.  And we've

19   heard the names many times.  G.S. Kok, he's at the top.  Y.T.

01:25:12   20   Kok, he's just underneath G.S. Kok.

21          Samuel Chia has been referred to many times.  He is

22   at a relatively high level, the director of DSP and voice

23   technology.

24          And I should note that Y.T. Kok is also the director

01:25:29   25   of overall architecture.

1    So these three people who brought over a substantial

2    amount of material from Motorola, a very large amount of

3    material, they're at the top.  They are basically in charge of

4    the development of DMR radios.

01:25:46   5   Q.  And were they the ones that had that stolen material

6    initially from Motorola?

7    A.  Yes.

8    Q.  And so what happened with all of that material after they

9    stole it and went to Hytera?  What did they do next with it?

01:25:58   10   A.  Okay.  A number of things happened.  They tried to modify

11   it and conceal what they had done while at the same time

12   showing this material to other engineers at Hytera who would

13   in turn develop additional code.

14   Q.  Let me show you your slide PDX-20.20, which includes a

01:26:19   15   clip of already admitted PTX-19.2.  What do you mean by they

16   sought to conceal this copying effort?

17         MR. CLOERN:  Your Honor, we'd just ask for a

18   continuing objection.  This is all, that is improper rebuttal.

19   This is all the same stuff, the slides, all the documents, it

01:26:35   20   was talked about on his direct testimony.  It's been an issue

21   in expert reports.  Nothing is actually new.

22         THE COURT:  All right.  The objection is overruled.

23   You may proceed.

24   BY MR. BROWN:

01:26:45   25   Q.  Do you remember the question?

Wicker - direct by Brown

5089

A.   Would you please repeat it?

Q.   No problem.

        What is it that you saw about -- why is it that you

say that these gentlemen took an effort to conceal their theft

01:26:56    while using the Motorola source code and trade secrets?

A.   Okay.  This is one example.  This is an email from G.S.

Kok to Samuel Chia.  And what Mr. Kok is saying is that -- and

he's responding to a number of things, but he's saying we want

to protect the company from impending lawsuits, and to do

01:27:15    this, one thing we need to do is to rewrite software so it

looks different from Motorola.

        In other words, we want to make it harder for

Motorola and others to see what we've done.

        THE COURT:  What is the date of the exhibit?

01:27:27        THE WITNESS:  The date, Your Honor, is, it is June

25, 2008.

        THE COURT:  Proceed.

BY MR. BROWN:

Q.   And what is it that they ultimately ended up doing in

01:27:43    order to rewrite the software to look different than Motorola

but still use Motorola trade secrets?

A.   Okay.  So what they did was they had engineers looking at

Motorola software.

        Excuse me, I've circled the wrong thing.

01:27:58        They had engineers looking at Motorola software while

Wicker - direct by Brown

5090

1    writing what we're calling Hytera software.

2    Q.  Let's start with your PDX-20.14, which includes clips of

3    already admitted PTX-654 at page 9 and 651 at page 3.

4        Can you explain using this slide an example of how

01:28:19    5    the Hytera engineers were using Motorola source code to write

6    Hytera source code?

7    A.  Yes.  This is a message from Yang Shuang Feng to another

8    engineer and he's CCing Y.T. Kok and yet another Hytera

9    engineer whose name we've heard, Ruan Hanchun.

01:28:38    10    And what he's saying is interesting.  He's saying,

11    first off, the code has been uploaded to SVN.  So he's saying

12    that this Motorola code has been uploaded to the SVN, and here

13    is what we want to do.  The instructions are as follows:

14    We're going to change the C file into a C++ extension file.

01:28:59    15    And we are going to perform a file split on the API.

16    So he's telling them how to divide things up and

17    change them.

18    He goes on to say all changes and masks are annotated

19    with "YSF."  I'm going to mark the places that I've changed by

01:29:16    20    putting my initials there.

21    So this is describing a process by which Motorola's

22    code has been put on a server and people are taking it off,

23    modifying it and putting it back over time.

24    Q.  Now, here in PTX-654 he says he's transplanting and

01:29:36    25    sorting the code out from UIT.  What does that mean?

Wicker - direct by Brown

5091

1    A.   Okay.  So transplant is literally transplanting the code,

2    taking it from Motorola's environment and changing it so it

3    fits into Hytera's.

4         MR. CLOERN:   Objection, Your Honor.  That's

01:29:48    5    speculation.  There is nothing like that in this document.

6    There has been testimony on this.  There is no evidence that

7    that is what transplanting means.

8         THE COURT:   The objection is overruled.

9    BY MR. BROWN:

01:29:59    10   Q.   And why don't we address that.  The document here that

11   he's talking about, that only has screenshots of Motorola's

12   code, Dr. Wicker, doesn't it?

13   A.   That's correct.

14   Q.   Now, you heard Mr. Grimmett actually spoke with the author

01:30:14    15   of this document in Hytera, at Hytera, right?  And that wasn't

16   recorded and there were no notes of that conversation, right?

17   A.   That's correct.

18   Q.   But Mr. Shuang Feng said, he specifically asked what code

19   he got and he said, and this is Mr. Grimmett speaking, he

01:30:32    20   said, "He told me," referring to Yang Shuang Feng, "that he

21   was only sent screenshots.  And he was a new engineer and he'd

22   been asked by Y.T. to produce a document, a kind of previous

23   learning for part of his learning exercise."

24        Do you see that?

01:30:46    25   A.   Yes, I do.

Wicker - direct by Brown

5092

1    Q.  Now, he also later testified on direct while being led by

2    his counsel, and this is --

3            MR. CLOERN:  Objection, Your Honor.

4            THE COURT:  Sustained.

01:30:56   5    BY MR. BROWN:

6    Q.  He testified on direct --

7            THE COURT:  Rephrase the question.

8            MR. BROWN:  Yes, Your Honor.

9    BY MR. BROWN:

01:30:59   10   Q.  At page 4387:

11           "And your understanding is that that is a screenshot

12   of code that Yang Shuang Feng received from Y.T.?

13           "Answer:  Yes.  It's a screenshot in a Word document.

14   And he told me he only ever had the screenshot to review."

01:31:18   15           Were you here for that testimony, too?

16   A.  Yes.

17   Q.  Is that correct?

18   A.  No.

19   Q.  Why not?

01:31:21   20   A.  Because when we looked at the evidence, what I saw was

21   that there are actual places with this YSF annotation.  That

22   showed me that Mr. Shuang Feng Yang actually had the code in

23   front of him and was changing it as he went along.

24           He wasn't working with screenshots.  He was working

01:31:40   25   with the actual code and editing it over time.

Wicker - direct by Brown

5093

1    Q.  I'm going to show you already admitted PTX-1863 at

2    HYT-00736446.

3            Is this -- this is the RAF_display.cpp file.  What do

4    you see here that shows you that Mr. Yang Shuang Feng actually

01:32:04    5    received Motorola code and was editing it at Hytera?

6    A.  Okay.  As I noted on that previous email, in places where

7    he made changes, he put his initials "YSF" there.  So he's

8    saying I've changed this.

9            And you can tell that it's changed because it's now

01:32:20   10    referring to RAF, which is the Hytera designation as opposed

11    to the Motorola designation.

12            We can see other changes as well.  Here he's deleted

13    out an error log.  As he changes the files, what he's doing is

14    he's trying to make sure it still works, and so he runs an

01:32:40   15    error log to basically debug as he goes along.

16            And so here we see that he is actively editing the

17    file.  I think those are the two examples I see here.

18            MR. CLOERN:  Your Honor, we would just ask for a copy

19    of this file.  I'm not sure it was identified.  I may have

01:32:56   20    just missed it.

21            MR. BROWN:  Sure.  It's in your binder.

22            THE COURT:  All right.  What is the number of the

23    exhibit if you have it?

24            MR. BROWN:  It's 1863.  It might be listed under HYT

01:33:05   25    1973-SC-00021309.

Wicker - direct by Brown

5094

1    MR. CLOERN:  Which binder?  Your Honor, 1863 is an

2    exhibit of about 74 million pages.  So it's kind of hard to

3    find.

4         THE COURT:  I'm tempted to drop in a little humor,

01:33:25  5    but I won't.

6         The objection is overruled.  Try to provide the

7    information to counsel.

8         MR. BROWN:  Yes.  Binder 2.

9         MR. CLOERN:  The Bates number is?

01:33:49  10    (Discussion off the record)

11    BY MR. BROWN:

12    Q.  So let's set the stage a little bit just to make this all

13    clear.  The file we're looking at is RAF_display.cpp, right?

14    A.  That's correct.

01:34:12  15    Q.  Now, how do you know that this file is Motorola or was

16    originally from Motorola?

17    A.  Okay.  So I can see references to Motorola material in

18    looking at this file.  Just the first one I'll note is in the

19    first line.  It's a reference to the user interface task.

01:34:30  20    That again was on that board that I had over here sometime

21    back and was talking about how applications deal with

22    messages.

23         That's a Motorola term.  It's not a Hytera term.  So

24    that tells me we're looking at something that originated from

01:34:44  25    Motorola.

Wicker - direct by Brown

5095

1    Q.   And what about the SVC function reference, what does that

2    indicate to?

3    A.   That's another example.  SVC is a Motorola name.  It is

4    not a Hytera term.

01:34:56    5    Q.   And does this code match code that you looked at from

6    Motorola originally?

7    A.   Yes.

8    Q.   So you mentioned that Mr. Yang Shuang Feng is initialing

9    things and you pointed here (indicating), right?

01:35:10    10    A.   Let's see.  I think I pointed -- well, that's an example.

11    I'm not sure that's the one I pointed to.  But that is a good

12    example.  And what he's done is he's commented out the SVC,

13    which would indicate that it's a Motorola function call and

14    put in something else.

01:35:25    15    Q.   So let's unpack that.  You are saying he's commenting out

16    the SVC?

17    A.   That's right.

18    Q.   So it says here "IndReqBuf equals" and then there is a

19    Motorola function in there?

01:35:38    20    A.   That's right.

21    Q.   And what does it mean that there is these comments here,

22    the slash slash?

23    A.   Okay.  So we talked about how code is compiled, how it's

24    reduced to the Os and 1s that are actually fed into a

01:35:50    25    microprocessor.

Wicker - direct by Brown

5096

1      We write code in a source code form so that

2  relatively normal human beings can read it and write it and

3  make things happen.

4      Now, one of the things that's important to the coding

01:36:04  5  process is putting in comments.  So if I read one of my

6  student's pieces of code, for example, I want comments so I

7  can know what the student was thinking and what their design

8  process was.

9      Well, comments don't make it down to the 0s and 1s

01:36:20  10  that are put in the radio.  They are deleted.

11      So a comment is something that is not going to be

12  compiled.

13      We talk about commenting out code by putting this

14  slash slash.  What this does is it means the compiler is not

01:36:35  15  going to look at that.  This is no longer part of what will be

16  reduced to the 0s and 1s that go in the radio.

17  Q.  And so what happens on line 1159 is it's commented out.

18      And then what happens on line 1160?  Is this a line

19  that he added?

01:36:51  20  A.  Yes.  So what we see is actual editing, the kind of thing

21  that went on to transplant Motorola code into the Hytera

22  environment.  We see the deletion through commenting of

23  Motorola code and the insertion of Hytera code.

24  Q.  And so, for instance, there is the function in here, this

01:37:11  25  is a Motorola function GetIndicatorRequestBuff, right?

Wicker - direct by Brown

5097

1    A.   That's right.

2    Q.   And then he changes it to what?

3    A.   RAF_GetIndicatorRequestBuff.

4         So the SVC becomes RAF.

01:37:26    5    Q.   And so that's changing from the Motorola name to the

6    Hytera name in Motorola's original code?

7    A.   Exactly.

8    Q.   And then what does he do here?

9    A.   Once again, he says I made a change here, so he puts his

01:37:38    10   initials there so that folks reviewing this code will know

11   where he's made the change.

12   Q.   So he's signing his work here?

13   A.   Essentially, yes.

14   Q.   What is it that he's being tasked to do if he's going into

01:37:51    15   this code that came from -- well, let me ask first.  Do you

16   know where this code came from?

17   A.   Motorola.

18   Q.   And do you know who at Hytera had it?

19   A.   I believe this code was actually in the possession of Y.T.

01:38:02    20   Kok.

21   Q.   So can you explain what situation he was put in?  He was

22   given code from Y.T. Kok --

23   A.   Right.

24   Q.   -- that has calls to a function that didn't exist in

01:38:11    25   Hytera.  Then what is he told to do?

Wicker - direct by Brown

5098

1    A.  He is being told -- he's been told to transplant it,

2    basically to translate it from the Motorola code into a Hytera

3    version so it's not as obvious that it's Motorola code.

4    Q.  And what does that indicate to you about your

01:38:35    5    demonstrative PDX-20.23 about what Hytera engineers are doing

6    with all of the Motorola code that Y.T. Kok and Sam and Peiyi

7    Huang brought over to Hytera?

8    A.  They're literally using it by studying it, learning from

9    it and then writing their own code based on what they've

01:38:53   10    learned.

11    Q.  And what does that tell you about Mr. Grimmett's testimony

12    that we saw earlier about whether or not Mr. Yang Shuang Feng

13    had ever been given more than just mere screenshots?

14    A.  Well, it's clearly not the case.  He's been given a lot

01:39:12   15    more than screenshots because he's actively editing the file

16    and putting his initials in there as he goes along.  You can't

17    do that with screenshots, at least not in the way he's done

18    it.

19    Q.  And if we look through this entire file, just this one

01:39:26   20    example, was that the only example of YSF screenshots or YSF

21    fingerprints or did you see it in more places?

22    A.  They're here in a number of places.  You can see them,

23    yeah.

24    Q.  And what are these?

01:39:45   25    A.  There is even more.  These are places where he's modified

Case: 1:17-cv-01973 Document #: 927 Filed: 02/26/20 Page 95 of 200 PageID #:62320
Wicker - direct by Brown
5099

1    the file.

2    Q.   Now, let's switch gears and talk about another way in

3    which Motorola source code was used.

4         Ms. Frederiksen-Cross put up demonstrative DDX-20.26.

01:40:06  5    Do you remember this?

6    A.   Yes, I do.

7    Q.   And do you remember what Ms. Frederiksen-Cross said about

8    her demonstrative here?

9    A.   Yes.  She noted yes, there were similarities.  I believe

01:40:14  10   she agreed there may have been some copying.  But then she

11   noted my ellipses, actually there is ellipses in both places,

12   but she noted my ellipses and said, well, there is more code

13   over here on the left.

14   Q.   And then the next slide that Ms. Frederiksen-Cross put up

01:40:30  15   was DDX-20.27.  Zoom in a little bit more.

16        And what was the point that Ms. Frederiksen-Cross was

17   making on this slide?

18   A.   I believe the point she was trying to make was that I

19   hadn't shown you everything and that not everything had been

01:40:45  20   copied.

21   Q.   Now, what happened here?  It looks like in Hytera's code

22   only a few lines of code from Motorola's XCMP source code file

23   was copied.  What does that indicate to you?

24   A.   Okay.  So what's happened here -- these are various reply

01:41:04  25   codes, okay.  This is, by the way, XCMP is one of the trade

Wicker - direct by Brown

5100

1   secrets.  It deals with external control and management

2   protocol.

3         So these are a number of different replies that this

4   protocol can handle.

01:41:19

5         And so what this shows me is that the Hytera

6   engineers looked at this.  They saw the full capability of the

7   system.  In other words, they saw all these different ways of

8   dealing with XCMP and they chose a smaller number.

9         So they didn't use them all.  But they were able to

01:41:36

10   look at the ones that were here, study them, learn from them,

11   know what the capability of the technology is and then make

12   their selections accordingly.

13   Q.  Well, so if Hytera looks at Motorola source code, studies

14   it and then decides to only use bits and pieces of it, is that

01:41:52

15   still misappropriation?

16   A.  Yes, it is.  They're still using it.  Someone looking at

17   all of this information would learn what the capability of the

18   technology is, what this can do in a fully fleshed out

19   powerful DMR radio, and then they can make choices, not having

01:42:10

20   to had to go through all the trouble of generating this list

21   in the first place.

22   Q.  So if Hytera chooses to use a simpler version of code that

23   it stole from Motorola, does that affect your opinion at all?

24   A.  No, no.  They're still using it.  They're still learning

01:42:24

25   from it.  And they're making informed choices based on the

Wicker - direct by Brown

5101

1    Motorola code that's been taken.

2    Q.  Now, in using the Motorola code, we've seen that Sam Chia

3    and G.S. Kok were sensitive to being detected from Motorola.

4    And I'm showing you PDX-20.2, which has excerpts of PTX-18.6

5    and PTX-22.9.

6        What is it that you are showing with this?

7    A.  Okay.  This was from a presentation that dealt with an

8    FPGA being removed.  The suggestion early on by Sam Chia was

9    that this FPGA be removed and a newer system be put in its

10   place.

11       And so what is being said here is that our approach

12   is going to involve using a lot of Motorola code.  And this is

13   a problem because we may have the same performance as

14   Motorola.  This will be detectible.  So we need to change the

15   performance of the reuse algorithms so that it's not as

16   detectible.

17   Q.  And so what technology is this presentation talking about

18   when it's talking about changing the performance?

19   A.  This is talking about the FPGA working with DSP

20   technology.

21   Q.  And did Hytera change the performance so that it wouldn't

22   be detected by Motorola?

23   A.  They did.

24   Q.  And where did you see that?

25   A.  I saw it a number of places.  But also in the

Wicker - direct by Brown

5102

1  communication between these two, the changing of parameters,

2  et cetera.

3  Q.   Now, were there also other places where Mr. Chia, Mr. Kok

4  and Mr. Kok employed this methodology in order to conceal its

01:44:03   5  theft?

6  A.   Yes.

7  Q.   If you'll turn in your binder, Professor, to PTX-1385.

8  A.   Okay.  I've got it.

9  Q.   Is PTX-1385 a document that you relied on in coming to

01:44:30   10  your opinions in this case?

11  A.   Yes, it is.

12  Q.   And is it a document produced by Motorola in this

13  litigation?

14  A.   Yes, it is.

01:44:36   15          MR. BROWN:  Plaintiff moves to admit 1385.

16          THE COURT:  It is received and may be published.

17      (PTX-1385 was received in evidence.)

18  BY MR. BROWN:

19  Q.   What is PTX-1385, Professor?

01:44:46   20  A.   Okay.  So this is a slide deck.  Let's see, there is

21  about -- I can tell you exactly.  There is roughly 31 pages in

22  this slide deck.  It's a comparison of Hytera and Motorola's

23  IP Site Connect Solution.

24          Basically it is a comparison of how Motorola and

01:45:06   25  Hytera glue together sites using the Internet protocol to

Wicker - direct by Brown

5103

1    allow for greater range for their communication systems.

2              THE COURT:  Who is the author according to the

3    document and when was it published?

4              THE WITNESS:  Yes, Your Honor.  John Belmonte was the

01:45:21    5    author and it was published June 27, 2011.

6    BY MR. BROWN:

7    Q.  And Mr. Grimmett testified that Motorola was aware of

8    similarities between its IP Site Connect functionality and

9    Hytera's IP Site Connect functionality.  Do you remember that?

01:45:37    10   A.  Yes, I do.

11   Q.  And in particular, there was indications that some of

12   Motorola's public materials had been copied into Hytera's

13   public materials?

14   A.  That's right.

01:45:49    15   Q.  Does that indicate trade secret theft?

16   A.  No, no.  This is a publicly available diagram.  And so one

17   looking at this would conclude that, well, Hytera is, you

18   know, taking ideas from a public document.

19   Q.  But we were talking about parameter changes and

01:46:07    20   performance changes.  I'll show you PTX-1385 at page 23.

21              Did Hytera change the functionality of its IP Site

22   Connect feature in order to conceal its theft?

23   A.  Yes.

24   Q.  And what are you showing here on this or what is

01:46:24    25   Mr. Belmonte showing on this slide?

Wicker - direct by Brown

5104

A.   Okay.  In this slide what we see is a number of places in

which Hytera's approach to IP Site Connect is different.  For

example, Hytera allows Jitter Buffer provisioning.  It gives

some options that Motorola's approach does not.

01:46:41

          Hytera does not have a messaging delay.  It does not

have an RSSI, that's radio signal strength indication

threshold value for checking FCC.  And it goes on and on.

          Basically what it's saying is there are some basic

differences that cause the IP Site Connect in Hytera's system

01:47:01   to work differently than the one in Motorola's.

Q.   And what would that cause somebody -- from a technical

perspective, what would that look like to somebody

investigating from the outside whether or not there is trade

secret theft in 2011?

01:47:14   A.   Well, what they would have -- the conclusion they came to

was that when we look at the diagrams, they've clearly copied

Motorola's diagrams from public documents.

          But when it comes to the inside, the functionality,

which would not have been available from public documents,

01:47:29   they see differences.  And so that would indicate that, okay,

they've taken the public documents and copied them, but we're

not seeing evidence of anything worse.

Q.   Now, did you see indications that other of the source code

files than those that we've already talked about, I'm showing

01:47:52   PDX-20.25, were also contaminated by engineers who were

Wicker - direct by Brown

5105

1    looking at Motorola source code and typing the Hytera source

2    code?

3    A.   Yes.

4    Q.   And what are you showing on this slide?

01:48:02    5    A.   Okay.  So what this slide shows is six different Hytera

6    engineers, none of whom are former Motorolans to the best of

7    my knowledge.  And they've written different kinds of code.

8         And when I looked at the code, let's take for example

9    the first one is Chen Ming Jun was writing code

01:48:25   10    dsp_hal_rfdeck.cpp.  When I look through that code I see the

11    use of the DSP library.

12    Q.   And what does this indicate to you about how widespread or

13    not Hytera's use of the Motorola code was?

14    A.   It shows that it's widespread, because what we see in

01:48:38   15    these six examples are six different engineers writing code.

16    All of this code calls on one or more of the Motorola

17    libraries.

18         They had to have that information in front of them in

19    order to write the code, in order to know how to use the

01:48:52   20    libraries.

21    Q.   And there was some testimony from Ms. Frederiksen-Cross

22    about application templates.  Very briefly, can you remind us

23    what that is?

24    A.   Okay.  The application template is, it is a format that

01:49:09   25    contains information about how Motorola's application layer is

Case: 1:17-cv-01973 Document #: 927 Filed: 02/26/20 Page 102 of 200 PageID #:62327
Wicker - direct by Brown
5106

1    built.  In other words, it has information on how to write

2    code to call on different aspects of the application layer

3    library.

4    Q.  And Ms. Frederiksen-Cross testified that the application

01:49:27    5    template code wasn't that valuable.  Do you agree?

6    A.  I very much disagree.

7    Q.  Why?

8    A.  Because what this application template did was it told the

9    engineers:  Here are the things you can call on.  Here is the

01:49:41    10    list of tools that you can use when you are writing an

11    application.

12         Basically it enabled the writing of the code, the

13    application code by Hytera's engineers.  They didn't have to

14    worry about writing code for all those different things that

01:49:55    15    were in the library.  It was made available to them through

16    the template.

17    Q.  The fact that Hytera engineers had to use a template to

18    write the application, what does that tell you about the state

19    of their engineering capability?

01:50:07    20    A.  Well, what it said was they weren't very far along in

21    developing their own application hierarchy.

22    Q.  Now, Ms. Frederiksen-Cross also testified that the

23    applications only had copies of the application template in

24    it, but that no other application code had been copied.  Did I

01:50:26    25    get that right?

Wicker - direct by Brown

5107

1    A.  Yes, I believe you did.

2    Q.  And was that a correct statement?

3    A.  No.

4    Q.  Why not?

01:50:31    5         And I'm showing your PDX-20.27, which includes a

6    side-by-side of Motorola's app_powerup.c and Hytera's

7    app_powerup.c.

8    A.  Okay.  So, again, app_powerup.c, it's code that's executed

9    when you powerup an application.  And here we see Hytera's

01:50:52    10   version.  It has both material from the template, I am showing

11   where the template has been used.  But it also shows actual

12   Motorola code from this particular file that's been copied

13   over, code that's not in the template.

14   Q.  And what does that tell you about whether Hytera's

01:51:08    15   engineers are developing their applications from scratch but

16   only using a template.  Is that correct?

17   A.  No, it's not.  Clearly when the code on the right was

18   written, the template was available, but so was the original

19   Motorola code, because this isn't in the template and yet it

01:51:23    20   found its way into Hytera's powerup.cpp.

21   Q.  So let's switch gears now.  We talked about code.

22        Did Hytera's engineers also use Motorola confidential

23   documents that were taken in developing the Hytera software?

24   A.  Yes, they did.

01:51:42    25   Q.  Now, I'm going to show your slides PDX-20.29 and 30.

Wicker - direct by Brown

5108

1    What are you showing on these slides for each of the

2  trade secrets?

3  A.   What I'm doing here is I'm summarizing the various

4  documents that have been identified as constituting the

01:52:00   5  individual trade secrets.  And this is in all of them.  This

6  is nine of the trade secrets.

7  Q.   And here is PDX-20.3.

8  A.   And here are some more.

9  Q.   And what do these documents -- I mean, there were

01:52:14  10  thousands or tens of thousands of documents taken.  What do

11  these documents represent?

12  A.   These are documents that were selected to represent the

13  trade secret, in other words, that have the information that

14  constitutes the trade secret between them.

01:52:26  15  Q.   And you were here for the testimony of the Motorola

16  engineers many, many months ago at this point?

17  A.   Yes.

18  Q.   And what did they testify about these documents out of all

19  the documents that were stolen?

01:52:35  20  A.   Okay.  What they testified about these particular

21  documents was that they were important and that they reflected

22  the trade secrets themselves.  In other words, to understand

23  trade secret number 139, these would be the documents that you

24  would look at.

01:52:49  25  Q.   And what is it that was your basis - I'm showing you

Wicker - direct by Brown

5109

1    PDX-20.28 - for saying that Hytera's engineers were looking at

2    these confidential documents while writing their source code?

3    A.   Okay.  What I found was evidence that material from the

4    documents had actually made its way into the source code in

01:53:08    5    the form of comments.

6    Q.   Now, did Hytera's experts consider any of that evidence in

7    concluding that only 4 percent of the code was copied and 96

8    percent of it was independently developed?

9    A.   No.

01:53:20    10    Q.   And let me show you PTX-1072.

11         Was this a document that you relied on in coming to

12    the opinion you just pointed out?

13    A.   Yes.

14    Q.   Why?

01:53:30    15    A.   This is the ROSAL specification, radio operating system

16    abstraction layer.  This was a document that I found had been

17    used extensively.

18    Q.   And where was the source of this document?  What was the

19    source of the technical information in this document?

01:53:50    20    A.   The source of the document is a Motorola operating system

21    document.

22    Q.   Showing PTX-451.  What about this document?

23    A.   Okay.  This document, this is a data connectivity

24    document.  This is also a document that contains a great deal

01:54:01    25    of Motorola information.

Wicker - direct by Brown

5110

01:54:16

01:54:28

01:54:40

01:54:55

01:55:10

1   Q.   And PTX-861, what about this document?

2   A.   That's one we've seen several times.  This is the VOX

3   document, voice operated transmission.  It contains a great

4   deal of Motorola information.  In fact, it is a Motorola

5   document.

6   Q.   And PTX-654?

7   A.   This is the Raf_CoreUserInterface.  This also contains a

8   great deal of Motorola information.

9   Q.   PTX-607?

10  A.   Same answer.  We've looked at this one.  This has copied

11  extensively from Motorola documents.

12  Q.   PTX-638?

13  A.   Again, extensive copying from Motorola documents.

14  Q.   PTX-532?

15  A.   Extensive copying from Motorola documents.

16  Q.   What about PTX-586?

17  A.   There is a diagram that we've seen before.  This is an

18  example of a diagram being literally lifted from a Motorola

19  document and put into a Hytera document.

20  Q.   And PTX-525, the L1 Timer specification?

21  A.   This is essentially a copy of Motorola's L1 Timer

22  document.

23  Q.   And PTX-480, Hytera's raPIS manual?

24  A.   Okay.  Once again, extensively copying from Motorola's

25  documents.

Wicker - direct by Brown

5111

1    Q.   PTX-107, the Conformance Testing Manual with Hytera's logo

2    on it?

3    A.   Extensive copying.  In fact, it's almost a duplicate of

4    Motorola's testing document.

01:55:21    5    Q.   We won't go through all of those in detail, but let's look

6    at one or two.

7              The ROSAL document that we started with, I'm showing

8    your PDX-20.32.

9              What from the Motorola ROSAL document was copied into

01:55:42    10   Hytera's -- or excuse me, the Motorola ROS document was copied

11   into Hytera's ROSAL document?

12   A.   Okay.  So on the left, this is the ROS32 Radio Operating

13   System Users Manual.  This is a Motorola document describing

14   its original operating system.

01:56:00    15             And so what I found was I looked at this document, it

16   dates back to 1999, and I compared it to Hytera's ROSAL

17   specification, which is a 2008 document.

18             And what I found was paraphrasing.  So just as an

19   example, it says "retrieve," I'll read this part, "Retrieve

01:56:20    20   only a reply or priority message from the task's message queue

21   if one exists."

22             It's a little different, "Receive only a reply type

23   or priority type message from the task's message queue if one

24   exists."

01:56:35    25             So clearly what is on the right is a paraphrase of

Wicker - direct by Brown

5112

1    what's on the left.  It's tracking it almost exactly with some

2    changes.

3    Q.  And how do you know that this information that was then

4    copied into a Hytera document was used by Hytera engineers

01:56:51    5    when they were writing the code at Hytera?

6    A.  Okay.

7    Q.  I'm going to show you PDX-20.33.

8    A.  Now if you go back to the previous one for just a second.

9    Q.  Sure.

01:56:59    10   A.  So what we've seen is a Motorola document into a Hytera

11   document, okay, through studying one and then writing on the

12   right while looking at what's on the left.

13             And then now please go ahead.

14             What we see now is the document that was on the right

01:57:15    15   in the previous slide is now on the left.  This is the Hytera

16   document.  Now we see word-for-word copying into the Hytera

17   code.

18             So there was an intermediate step.  But the Motorola

19   information in the first document ends up in the code.

01:57:28    20   Q.  Let me zoom in a little bit on the code comment.

21             Ms. Frederiksen-Cross said that this did not indicate

22   to anybody how to actually create the code for ROSAL.  Do you

23   agree?

24   A.  No, I don't.

01:57:40    25   Q.  Why not?

Wicker - direct by Brown

5113

A.   Let's look at what it actually says.  It says, "Receive

only a reply type or priority type message from the task's

message queue if one exists.  If the message queue is empty,

the calling task will go to sleep."

01:57:56        I'll just take that part.

          It's telling you what to write.  It's telling you

what the code needs to do.  If the message queue is empty, the

calling task will go to sleep.  That tells me what to write.

          It's not -- it's basically laying it out.  All one

01:58:14  has to do is do what this says, write it out in software and

you've got it.

Q.   And then it also identifies the input and output.  How

does that tell a programmer how this all fits into the big

architecture, the big picture of how this system is going to

01:58:29  work?

A.   Okay.  The input and output are here.  Here is the input

and here is the output, okay.  So what this is doing is it's

telling you at a slightly higher layer:  This is what the code

needs to accept as an input and here is what it is going to

01:58:44  return as an output.

Q.   And I'll show you Ms. Frederiksen-Cross's testimony on

page 4018 of the trial transcript.  She's asked:

          "And so just so everyone is on the same page, your

testimony is that if someone is writing code at Hytera while

01:59:01  using stolen Motorola documents as a reference, that is still

Wicker - direct by Brown

5114

1    code that's been independently developed by Hytera?"

2           She answers, "This source code implementing the

3    functionality is independently developed by Hytera."

4           Do you see that?

01:59:14    5    A.   Yes, I do.

6    Q.   Start with just that part.  Do you agree?

7    A.   I fundamentally disagree, because what she was asked, if

8    someone is writing code while using stolen Motorola documents

9    as a reference, it's not independent, okay.  The ideas, in

01:59:29   10    fact, as we just saw in your previous example, the ideas are

11    coming from Motorola's document.  In fact, in the previous

12    example the Motorola document was telling the Hytera engineer

13    how to write the software.  So you can't call that

14    independent.

01:59:44   15           MR. CLOERN:  Can we have a page and line number,

16    please?

17           MR. BROWN:  Yeah.  It's 4018.

18           MR. CLOERN:  I'm sorry?

19           MR. BROWN:  4018 at 18 to 23 was what I read.

01:59:54   20           MR. CLOERN:  Thanks.

21           MR. BROWN:  No worries.

22    BY MR. BROWN:

23    Q.   Okay.  I'm showing PTX-525.19.  This is the L1 Timer

24    Software Requirement Specification.  What is that?

02:00:09   25    A.   Okay.  So the L1 Timer is part of the hardware abstraction

Wicker - direct by Brown

5115

1  layer.  What it does is it organizes events.  It says if we

2  are going to transmit something, we're going to organize it

3  like this, and then certain things will be followed in exactly

4  the right order, and the timer makes sure all that happens.

02:00:25  5  Q.  Now, this document is written by Huang Ni, right?

6  A.  That's right.

7  Q.  Not written by Y.T. Kok or Sam Chia or Peiyi Huang or

8  anybody who came from Motorola.  So how can you say that this

9  document copies from Motorola information?

02:00:38  10  A.  Okay.  So first step, the way the L1 Timer is designed and

11  Hytera software mimics the L1 Timer in Motorola's, but when I

12  look into this document in detail, particularly if you'll go

13  to the end, there is an appendix.  And what this appendix

14  shows -- that's it.  That's part of it.

02:01:01  15  Q.  Do you want me to --

16  A.  That's fine.

17  Q.  Okay.

18  A.  What this appendix does is it has a number of operational

19  codes.  Okay.  These don't look like they mean very much.  But

02:01:11  20  to the L1 Timer, it's a way of saying a particular thing has

21  to happen at a particular time.

22       These particular codes were taken from a Motorola

23  document.  They're identical.  So if you've got the L1 Timer

24  spec from Motorola, we can see that same list.

02:01:27  25  Q.  I'll show you PDX-20.35.

Wicker - direct by Brown

5116

A.  Okay.

Q.  You've got Motorola's events_code.h file on the left and

then the same, I'll zoom in, the same material we were just

looking at from the specification.

02:01:39     How does that support your opinion, Professor?

A.  Okay.  So this is actually from the code.  It's not from

the L1 Timer spec, although it's there as well.

And what we see is a list of these event codes, okay.

These are similar to the ones we just looked at.

02:01:55     And if we look at Hytera's L1 Timer specification,

you see the exact same codes.  So clearly what's on the left

in Motorola's code has been copied into Motorola's document on

the right.

Q.  And so what does it tell you that even documents authored

02:02:12  by folks who were never at Motorola, those still have Motorola

confidential information?

A.  Well, what it's telling me is these Hytera engineers who

were not at Motorola still have Motorola information available

to them and are able to use it in writing, for example,

02:02:26  documents like that.

Q.  I'll show you PTX-641, which is an email already admitted

from Y.T. Kok to a number of Hytera engineers.

What does this document tell you about how Hytera's

engineers are being instructed on developing their products?

02:02:46  A.  Okay.  So what's being sent out is the RAF concept

1   document that we've looked at and has been discussed quite a

2   bit in court.

3          And Y.T. Kok is sending it to a number of engineers.

4   I don't think any of these engineers were Motorolans.

02:03:02   5          He's sending this document to them and saying:

6   Please study this first before you start using RAF or

7   application development.  In other words, make sure you

8   understand how Motorola did it before you start developing

9   your own applications.

02:03:15   10   Q.   And would you turn in your binder to PTX-1104.

11   A.   Okay.

12   Q.   Is this, is PTX-1104 a document produced by Hytera?

13   A.   Yes, it was.

14          MR. BROWN:  Plaintiff moves to admit PTX-1104.

02:03:36   15          MR. CLOERN:  I don't know what it is, Your Honor.  I

16   don't know what it is.  We're not sure.  We got a lot of

17   binders, hundreds of documents.

18          THE COURT:  What does it represent, counsel?

19          MR. BROWN:  It is a Hytera document.  It's an email

02:03:48   20   from a Hytera engineer to other Hytera engineers.

21          THE COURT:  It is received and may be published.

22     (PTX-1104 was received in evidence.)

23          MR. CLOERN:  Yeah, no objection.

24   BY MR. BROWN:

02:03:56   25   Q.   Okay.  PTX-1104 is on the screen.  And what is PTX-1104?

Case: 1:17-cv-01973 Document #: 927 Filed: 02/26/20 Page 114 of 200 PageID #:62339
Wicker - direct by Brown
5118

1    A.   Okay.  This is an email from a Hytera engineer to, I

2    believe it's Peiyi Huang and Y.T. Kok.

3    Q.   And what is it about this document that supports your

4    opinion that Hytera engineers were learning from the Motorola

02:04:21    5    material that was brought over by those guys?

6    A.   Okay.  This particular engineer, Tang Qiang is leaving

7    Hytera.  And he says, "I'm very sorry but I will be leaving

8    Hytera."  And he thanks Y.T. and Peiyi Huang, especially Y.T.

9    He says, "You make me have sense of architecture, have sense

02:04:42    10   of design.  For the first time I understand what is software

11   development really from CPA..." common platform architecture

12   "...from RAF..." radio architecture framework "...and FS,"

13   which I believe means file system.  So he's saying I now

14   understand this for the first time.

02:04:58    15   Q.   And what, for context, what is CPA?

16   A.   That's the common platform architecture.  That is the way

17   the various layers are organized in both Motorola's and

18   Hytera's code.  It's Hytera's term for the overall

19   architecture.

02:05:13    20   Q.   And is CPA something that was taken from Motorola?

21   A.   Yes.

22   Q.   And what about RAF, just remind us what RAF is?

23   A.   That's radio architecture framework.  And, again, that's

24   Motorola's approach to organizing applications.

02:05:25    25   Q.   And so what is he saying about the material that he's

1    exposed to at Hytera that was taken from Motorola?

2    A.   He's saying:  I understand this now for the first time.

3    Q.   All right.  Let's switch gears and talk about the

4    conformance testing materials.

02:05:56    5         We'll start with this slide, PTX-20.51, which shows

6    the cover pages of PTX-127 and 107.

7         Just at a very high level, what are these documents?

8    A.   Okay.  So on the left we have a Motorola testing document,

9    Conformance Testing for Radio Hardware Portable and Mobile.

02:06:16    10   LTD.F.2 basically means DMR digital radios.

11        And on the right-hand side we have a Hytera document

12   that's also called Conformance Testing For Radio Hardware

13   Portable and Mobile.

14   Q.   And we've talked a lot about these documents, so we don't

02:06:31    15   need to go back into them.  But Mr. Grimmett testified that

16   this document, Motorola's conformance testing document, is

17   just taken from the DMR standard.  Is that correct?

18   A.   No.  That's wrong.

19   Q.   Let's start with what does that mean, that it's taken from

02:06:44    20   the DMR standard?  What was the allegation?

21   A.   My understanding of his testimony was he was saying that

22   Motorola's document is simply taken from, it's a copy of

23   material in the standard.  So that means it was publicly

24   available information that Hytera could use as well.

02:07:01    25   Q.   And you've reviewed the DMR standard?

Wicker - direct by Brown

5120

A.   Yes.

Q.   Is Motorola's conformance testing document just right in

the standard all publicly disclosed?

A.   Absolutely not.

02:07:10   Q.   During his examination, he pointed to this, I'll zoom in,

these two boxes that appear in the standard and appear in

Motorola's confidential document.

A.   That's right.

Q.   What are the boxes?

02:07:21   A.   Okay.  So this is the actual standard, and it's saying,

basically it's putting limits on a kind of modulation, 4FSK, 4

frequency shift keying.

         And this specification requirement has been copied

into Motorola's document.

02:07:40   Q.   And so doesn't that mean that Motorola's conformance

testing document isn't a trade secret if some block has been

copied from another document?

A.   No.  This is a testing document.  And so what we're seeing

is Motorola is including in its testing document the actual

02:07:57   requirements, okay.  This is what we have to be able to do to

meet the standard.

         But then Motorola's testing document goes far beyond

what the standard says.  It tells you how to do the test.  It

may even, it does in several cases, include additional tests.

02:08:12   It has far more than can actually be found in the standard.

Wicker - direct by Brown

5121

1         The standard says:  This is what you have to meet.

2    Motorola's document tells you how to test it, how to go about

3    arranging all the test equipment so you can do the tests and

4    even changes some numbers to improve the performance of

5    Motorola's system.

6    Q.   So I'll show you your PDX-25.3.  What are you showing here

7    on this slide here, Professor?

8    A.   Everything that's in green on the left in relation to this

9    particular test, the transmit 4FSK modulation is not in this

10   standard.

11   Q.   So that's all information Motorola has added to understand

12   how they're going to meet the standard?

13   A.   That's right.  And it's providing their experience with

14   testing, showing you the best way to organize the test

15   equipment right there and providing additional information.

16   Q.   Let's pull back for a second and talk about standards,

17   because there has been a lot of questions about standards in

18   this case.

19         Is there a good analogy we can use to explain what a

20   standard is and what it means to meet the standard?

21   A.   Yes.  A standard basically provides an interface.  It

22   tells you how to use something.

23         And I developed this analogy of the road, the road is

24   a standard.  If you want to use a car on the road, there are

25   certain things you have to do.  You've got to have rubber

Wicker - direct by Brown

5122

1    wheels.  You can't have metal wheels that tear up the road

2    most of the time.  And you have to have cars of a certain

3    width.  You can't be too wide or you're not allowed on the

4    road.  You have to meet a certain minimum speed limit and

02:09:43    5    there is other requirements, too.

6            Basically all cars have to meet this set of

7    requirements, this standard for using the road.  But that

8    doesn't mean all cars are alike.

9    Q.  And so how is it then that car companies in this analogy

02:09:57   10   differentiate themselves from other cars who are all using the

11   same road?

12   A.  Okay.  All the cars meet the same basic standard, but some

13   of the cars are relatively low end.  They provide the basics,

14   but no frills.  Some cars are fancy sports cars, not family

02:10:16   15   cars.  They are cars that are perhaps more fun to drive and

16   more expensive.

17   Q.  But they're both using the same road and driving on it.

18   So doesn't that mean that they -- that they're driving in the

19   same way and there is no difference?

02:10:28   20   A.  No.  Now, what this shows is that for a given standard you

21   can have a lot of different products.  And the products will

22   differentiate themselves from each other based on features,

23   price, how comfortable they are, how easy they are to use.

24           There is a lot of room for differentiating products,

02:10:45   25   and that's why we have relatively low-end cars and really

Wicker - direct by Brown

5123

1    fancy ones.

2    Q.  Now, take a library like we were talking about -- or

3    excuse me, like I was asking you questions about earlier about

4    the DMR DSP library.

02:10:59    5    A.  Yes.

6    Q.  Does the DMR DSP library just say how to drive on the road

7    or does it make it drive better on the road?

8    A.  It makes it drive better.  The DMR DSP library provides a

9    high quality digital signal processing interface.  It's got

02:11:14    10   powerful algorithms that have been tested over years by

11   engineers with, in this case, literally decades of experience.

12   Q.  And so I'm showing you Dr. Aron's slide DDX-22.7.

13        And she had on here that Motorola's view was that

14   Hytera could never launch a DMR radio.  Is that correct that

02:11:36    15   that's Motorola's perspective?

16   A.  No.

17   Q.  What is Motorola's perspective?

18   A.  Motorola's perspective is that Hytera could not develop a

19   DMR radio that was comparable to Motorola's radio, Motorola's

02:11:48    20   radio that's been developed with decades of experience.

21        MR. CLOERN:  Objection, Your Honor.  This witness has

22   not offered this opinion.  This was from Dr. Rangan.  This is

23   a new opinion from this witness.  And Dr. Rangan has not been

24   brought back on rebuttal.

02:11:59    25        THE COURT:  The objection is overruled.

BY MR. BROWN:

Q.   Now, when we talk about radios and not cars for a second, what are we talking about here when we talk about the low-end car that works fine but isn't competing against the sports car?

A.   Okay.  So this is an example of how you can have a range of radios.  Here we have commercial or low-end radios.  Those aren't actually the focus of this case.

But what is the focus are the mid-tier, the repeaters, the high end or professional radios and the multi-mode radios.  These are radios that have better performance.  They've got a better feel.  They provide better functionality.  They are the ones that are using Motorola's trade secrets.

Q.   So when you say the low-end products in this case aren't really, aren't at issue, what do you mean?

A.   In other words, these did not use Motorola's trade secrets.  These were developed earlier.  It's my understanding they actually used chips that were purchased from third parties.

Q.   And so how does the functionality -- I'm sorry.  What chip are they?  Do you remember the name of the chip that these low-end products are using?

A.   Actually, no.

Q.   How does the functionality in these low-end products

Wicker - direct by Brown

5125

1    compare to the functionality in the mid-tier and high-end

2    products?

3    A.   Well, it's a lot like the cars.  They all meet the same

4    standard, but they provide different levels of features,

02:13:17    5    different levels of performance.

6             And so here we have literally low end, doesn't

7    provide the same performance that you get with these radios on

8    the right side.

9    Q.   So is it Motorola's contention that Hytera could never

02:13:32    10   develop one of these low-end products?

11   A.   No, no, it's not.

12   Q.   And so where does that relate in the car analogy that you

13   are talking about?

14   A.   Okay.  So basically the analogy is as follows.  As I

02:13:45    15   understand it, Motorola has no question that Hytera could

16   develop a low-end DMR radio.

17            What it could not develop would be the high end, high

18   performance DMR radio that would compete directly with

19   Motorola's products.

02:14:00    20   Q.   And where do the libraries that we've talked about and the

21   stolen code and stolen trade secrets, where do those fit in in

22   making Motorola's products that use those trade secrets higher

23   end rather than the lower-end cars?

24   A.   Okay.  What it does, those libraries provide high

02:14:16    25   performance code that can be accessed by other code to give

Wicker - direct by Brown

5126

1    the performance we would associate with a high end as opposed

2    to the low end.

3    Q.   Now, given what you've reviewed of the state of Hytera's

4    development at the time just before Motorola's technology was

02:14:33    5    brought in, were they six months away from developing a

6    high-end car or were they six months away from developing

7    something else?

8    A.   At best they were six months away from developing the

9    low-end car.

02:14:47    10           THE COURT:  Would that include the motorcycle there?

11           THE WITNESS:  It depends on the quality of the

12   motorcycle, Your Honor.

13           THE COURT:  All right.  Counsel, we'll take a break

14   for about 15 minutes.

02:15:00    15           Members of the jury, you may step out.

16      (Recess.   Jury in)

17           THE COURT:  Please proceed with the witness.

18           MR. BROWN:  Thank you, Your Honor.

19   BY MR. BROWN:

20   Q.   Professor, will you turn in your binder to 2366.

21   PTX-2366.

22   A.   Okay.  I'm there.

23   Q.   And is this a document produced by Hytera in this

24   litigation?

25   A.   Yes, it is.

Wicker - direct by Brown

5127

1          MR. BROWN:  Motorola moves to admit PTX-2366.

2          MR. CLOERN:  No objection.

3          THE COURT:  It is received and may be published.

4        (Exhibit No. PTX-2366 was received in evidence.)

5   BY MR. BROWN:

6   Q.  Now, Dr. Wicker, let me turn to the metadata first of

7   PTX-2366.  What is PTX-2366?

8   A.  Okay.  So it is a document that involves testing

9   formulated based on a MOTO translation.

10  Q.  So it says, "Formulated based on 300.113."  What's that?

11  A.  That's a particular document number.

12  Q.  And is that the DMR standard?

13  A.  Yes.

14  Q.  And then it says, "Plus MOTO translation.doc."  Do you see

15  that?

16  A.  Yes.

17  Q.  And what is this document?

18  A.  Okay.  So it's a testing document.  And what I found in

19  looking at the translation was that it is a translation of a

20  translation of Motorola's work.

21  Q.  So showing a cover page, translated cover page of 2366 of

22  32, you said it's a document for testing at Hytera?

23  A.  Yes.  And we can see this right here, the standards for

24  reference again, that's what we just referred to, the ETSI

25  standard, and there's the DMR conformance testing for radio

1  hardware document.

2  Q.  And is that the same conformance testing document that

3  we've been looking at in this case?

4  A.  Yes.

5  Q.  Now, Mr. Grimmett testified that there was no evidence

6  that Motorola -- or excuse me -- that Hytera was actually

7  using the conformance testing document that showed up in a

8  number of engineer's files there.  Do you remember that?

9  A.  Yes, I do.

10  Q.  And what -- how does this document affect your opinion?

11  A.  This shows that that was incorrect.  Basically what this

12  document shows is that Hytera actually translated the Motorola

13  document into Chinese so it could be used by Chinese-speaking

14  engineers.

15  Q.  Okay.  So here is the translated version of the

16  conformance testing document that you're pointing to in 2366

17  at Page 45.  How does that relate to what you're seeing in the

18  Motorola confidential document, 24- -- 127.6?

19  A.  Okay.  So let's see, we've got the -- let's see.  This is

20  the Motorola document on the right.

21  Q.  Motorola on the right.

22  A.  Yeah.

23  Q.  The translated document on the left.

24  A.  Right.  So what we see, having been translated into

25  Chinese and then back into English, it still looks very

Wicker - direct by Brown

5129

1    similar.  Let me just pick some examples here.

2            Select digital modulation.  Select digital

3    modulation.  Select demod setup.  Select demod setup.

4            So we see that this is actually, again, a double

5    translation of the original Motorola document, which is on the

6    right.

7    Q.  Let me go to the original plat here.  Here is the -- this

8    is from the original Chinese 2366.14.

9            How does it affect your opinion that Hytera took this

10   Motorola conformance document and then translated it into

11   Chinese?

12   A.  The clear intent was to make this available to engineers

13   who only spoke Chinese or at least who didn't speak English.

14   Q.  And how does that relate to your opinion of whether or not

15   Hytera is using Motorola's confidential documents in this

16   case?

17   A.  It shows use.  They used it to the extent that they

18   translated it, and they further used it by making it available

19   to those who needed the Chinese version.

20   Q.  Now, Dr. Wicker, I'm going to show you PDX-20.36 and

21   20.37.  This a modification of the slide that we showed

22   earlier with the trade secret documents.

23           What are you showing here?

24   A.  Okay.  So what I'm showing is that for each of these trade

25   secrets -- let's just take the first, 21 -- 80 percent of the

Wicker - direct by Brown

5130

1    documents that were identified in this litigation as

2    summarizing the trade secret as embodying it, 80 percent of

3    those files are still in Hytera's files.  And as we go through

4    the trade secrets, in some cases it's a hundred percent; in

5    others, 83, 100, 100 and so forth.

6            So the substantial majority of the documents that

7    have been identified as embodying the trade secrets are still

8    in Hytera's files.

9    Q.   And when you say "still in Hytera's files," you mean at

10   the beginning of this litigation, right?

11   A.   That's right.  They were produced at the beginning of the

12   litigation and so are presumably still there.

13   Q.   Now, what does it tell you that after ten years so many of

14   these trade secret documents were still in Hytera's files when

15   Motorola brought this lawsuit?

16           THE COURT:  Let me make a point of clarification.

17           After production, the originals remain with the

18   entity that possessed them in the first instance?

19           THE WITNESS:  Thank you, Your Honor.

20           THE COURT:  In other words, production doesn't

21   eliminate somebody having the originals?

22           THE WITNESS:  Understood.

23           THE COURT:  All right.  Your answer is yes?

24           THE WITNESS:  Yes, sir.

25           THE COURT:  Proceed.

Wicker - direct by Brown

5131

1        THE WITNESS:  Yes, Your Honor.

2   BY MR. BROWN:

3   Q.  My question was -- I'll repeat it again -- what does it

4   tell you or how does it affect your opinion that so many of

5   the Motorola confidential documents that embody these trade

6   secrets were in Hytera's files over ten years?

7   A.  That implies to me that they were in use, in substantial

8   use over that period of time.  No one threw them away.

9   Q.  Now, PDX-20.36 and 20.37, some of these numbers are a

10  little low, Professor.  Hardware is only 40 percent that were

11  found in Hytera's files.  The repeater, only 50 percent.

12       Why is it -- how can you say that all these trade

13  secrets were used at Hytera if some of the documents at least

14  are not there right now?

15  A.  Okay.  So for example, with regard to the hardware,

16  there's evidence that some of the hardware documents were

17  actually deleted because one of them was recovered over time.

18       The bottom line, though, is that all of these

19  documents were at Hytera at one point because Sam Chia

20  downloaded them all.

21  Q.  So let me show you PDX-48.

22       You said that Sam Chia downloaded them.  There

23  were -- how many documents are missing from your list of

24  embodying trade secrets that aren't currently at Hytera?

25  A.  11.

Wicker - direct by Brown

5132

1    Q.   Okay.  And how do you know that Mr. Chia downloaded those

2    documents and brought them with him to Hytera?

3    A.   Okay.  So these are the Compass logs that have been

4    discussed.  They show what Mr. Chia downloaded on particular

5    dates just before he left for Hytera.  And what I'm showing

6    here is that each one of the documents on the right, which

7    were not still at Hytera, were downloaded by Mr. Chia before

8    he went to Hytera.

9    Q.   And how does it -- when you -- what does it mean to

10   download something from Motorola's Compass system?

11   A.   Okay.  You obtain a copy of it on your computer.

12   Q.   And where are the Compass servers located?

13   A.   They're in Illinois.

14   Q.   Now, how many files -- there's 11 files missing here.  How

15   many files were ultimately found at Hytera of Motorola's

16   confidential documents?

17   A.   Oh, there were thousands of them.

18   Q.   But I'm showing you your PDX-8.40.  How many documents did

19   Mr. Chia actually download from Motorola?

20   A.   He downloaded even more.

21   Q.   How many?

22   A.   Tens of thousands.  At least the number, I believe, was

23   over 10,000.

24   Q.   And is it disputed in this case now that these were

25   downloads of material that Mr. Chia brought to Hytera?

Wicker - direct by Brown

5133

1   A.   No.

2   Q.   So there were 10,000 files that were downloaded -- or tens

3   of thousands of files that were downloaded, but only a couple

4   thousand are at Hytera.  What happened?

5   A.   They've been deleted over time.

6   Q.   And how do you know that?

7   A.   There are records of deletions.  For example, forensic

8   evidence was obtained from one of Peiyi Huang's computers that

9   showed that she had actually moved Motorola documents into the

10  recycling.  In other words, it was her intent that they be

11  eliminated from her computer.

12  Q.   I'll show you PDX-20.55.

13       What else happened that has caused materials to go

14  missing from Hytera?

15  A.   Okay.  So what this shows is a number of different issues

16  that have been risen, have been discussed here in court.  For

17  example, missing documents and e-mails.  There's evidence of

18  e-mails that were deleted by one party but not the other party

19  to the e-mail.  And that's how we know about it.  In fact, one

20  of them involved Chairman Chen.

21       There is missing source code.  There's an SVN

22  repository that's been discussed that we have no record of.

23  Nothing has been produced regarding that other SVN.  There are

24  files -- there are thousands and thousands of files that could

25  not be recovered from, for example, Peiyi Huang's laptop.  And

1   then there are laptops that have simply gone missing.  Sam

2   Chia's laptop disappeared, and it has not been seen.

3   Q.  And that's the laptop that Mr. Chia had from 2008 till

4   2013?

5   A.  That's right.

6   Q.  Okay.  Now, you said that some stuff is missing.  Let's

7   just talk about a few examples of how you know that.  I'm

8   showing PTX- -- PDX-20.56, which shows a clip of PTX-100 and

9   107.

10          Now, without going into too much detail, will you

11   remind the jury what this document is and why it's relevant

12   here.

13  A.  Okay.  So this is an e-mail from Jue Liang to -- I believe

14  it's to Y.T. Kok.  I'm sorry, this is to Sam Chia.

15          And what he's done is he has excerpted material from

16  a Motorola document and he's asking questions about it.

17  Q.  So we've gone through all of that before in other

18  testimony.  Why is it relevant to whether things were deleted

19  here?

20  A.  Okay.  So when I looked to see what documents were

21  actually available on Mr. Liang's documents storage, I found

22  something interesting, namely that at the time he sent this

23  e-mail, he apparently did not have a copy of this file, which

24  doesn't make sense.

25  Q.  Was it that he didn't have a copy of the file or he hadn't

Wicker - direct by Brown

5135

1  received -- there's no evidence of receiving it?

2  A.  No evidence of having received it by e-mail.

3  Q.  What does that mean?  So he's copying a file -- copying

4  from a file into an e-mail.  But what do you mean there's no

5  evidence he ever received it?  Of course he had it.

6  A.  Okay.  So what this evidence shows is that Mr. Liang at

7  this date -- actually it's a little hard to see the date, but

8  I believe it's 2008.

9        At this point in time --

10  Q.  You're correct.

11  A.  Okay.  Good.  It's 2008.

12        At this point in time, he had a copy of this document

13  because he took an excerpt from the document, pasted it into

14  his e-mail and sent Sam Chia a question about it, but there's

15  no evidence -- no record of him ever receiving this document.

16        According to the evidence, he received the

17  document three years later, which, you know, clearly he had a

18  copy before that.

19  Q.  Where -- what are the ways in which you looked to see how

20  he got this document?  What did you look at?

21  A.  Okay.  I looked at e-mails.  I --

22  Q.  We'll pause there for a second.

23        So are there any e-mails that sent him the document

24  in -- any time before he sent this e-mail?

25  A.  No.

Wicker - direct by Brown

5136

1   Q.   Okay.  Where else could you have looked?

2   A.   He could have downloaded it from the SVN server.

3   Q.   Was it on the SVN server?

4   A.   No evidence that it was.  He could have actually had

5   someone walk over to him with a thumb drive and say, "Here's a

6   document you might like to have."

7   Q.   Has any thumb drives or forensic analysis been produced to

8   allow you to discern that?

9   A.   No.

10  Q.   Anywhere else?

11  A.   Those are the ones that come to mind.  In other words,

12  someone could have e-mailed it to him, he could have

13  downloaded it, or someone could have brought it on a thumb

14  drive or some other kind of drive.

15  Q.   So what does that tell you about the materials that are

16  available to us here in terms of figuring out how everybody

17  got each document that they had?

18  A.   Well, what it tells us is there is a lot of information in

19  this.

20  Q.   And we also heard testimony about a missing SVN

21  repository.  Now, you gave testimony during your direct

22  testimony about an SVN log.  Can you --

23  A.   Yes.

24  Q.   -- explain what that is.

25  A.   Okay.  So an SVN is a repository of files of various

Wicker - direct by Brown

5137

1  kinds.  The log denotes when people have downloaded or

2  uploaded material.  SVN is a subversion tracking system.

3          So what it does is it keeps track of the activity

4  with the documents as they're downloaded and uploaded.  And as

5  we learned over the course of the testimony of the last couple

6  weeks, I think it was, there may have been another SVN that we

7  have no record of and we have no logs from.

8  Q.  And so what -- how do you know that there's at least

9  another SVN or there's a gap in the logs that we have?

10 A.  Okay.  So the SVN that we're aware of, logs were provided.

11 These logs show no record of activity that is documented in

12 e-mails.  In other words, we've got e-mails that say such and

13 such documents were uploaded to the SVN, but it's not in the

14 logs.

15 Q.  And so whether or not there's a gap in the logs that were

16 produced or there's just a completely different server, what

17 does that mean about the state of materials that have been

18 brought in by Hytera here?

19 A.  It's incomplete.  In other words, either way there has

20 been an effort to conceal activity, and we don't have a

21 complete record of what happened.

22 Q.  And if we include in the charts you showed earlier -- I'm

23 showing new charts at PDX-20.49 and 20.50.  If we include the

24 files that were either present in Hytera's systems at the time

25 the litigation began or were downloaded from -- by Mr. Chia,

Wicker - cross by Cloern

5138

1   what percentage of the confidential trade secret documents

2   were used by Hytera?

3   A.  100 percent.  All those numbers go up to 100 percent for

4   each and every one of the trade secrets.

5            MR. BROWN:  I pass the witness, Your Honor.

6                      CROSS-EXAMINATION

7   BY MR. CLOERN:

8   Q.  Good afternoon.

9   A.  Good afternoon.

02:47:59  10  Q.  Okay.  When you were last on the stand in late

11  November/early December, I think you were asked that on

12  average a Hytera version -- a Hytera -- so let me back up.

13            Hytera has a number of source code versions, right?

14  A.  That's correct.

02:48:21  15  Q.  So in 2010 when they released their first product, they

16  had version one?

17  A.  That's right.

18  Q.  And today they have version --

19  A.  Ten.

02:48:29  20  Q.  About ten?  Yeah, I think that's right.

21  A.  There's some variations.  I think there's a total of 20

22  versions of various kinds.

23  Q.  So sometimes it's 2.3 or 7.6.  There's about 20 overall?

24  A.  Yes.  That's right.

02:48:40  25  Q.  Okay.  And I think you agreed on cross-examination back in

Wicker - cross by Cloern

5139

1    November that each of those versions had about 3500 source

2    code files, give or take; is that fair?

3    A.    Roughly speaking, yes.  Yes.

4    Q.    And I think you also agreed that in your Exhibit C and D,

02:48:58    5    that's where you identified the source code lines that you

6    contend are copied from Motorola source code, correct?

7    A.    That's correct.

8    Q.    Okay.  And that's about -- and there are about 350 files

9    that contain about one line -- or one or more lines of copied

02:49:20   10    code, right?

11    A.    Actual copied code, that sounds right.

12    Q.    Okay.  That's when you agreed to the ten percent figure,

13    ten percent of the files in Motorola's code -- sorry.  Let me

14    restate that.

02:49:31   15         Ten percent of the files in Hytera's code are --

16    contain at least one line of code copied from Motorola, right?

17    A.    That's right, with the difference being in one case we're

18    looking at just copying --

19    Q.    That's all I'm talking about.

02:49:49   20    A.    -- as opposed to using --

21    Q.    Just --

22    A.    -- when -- right.

23    Q.    Just to direct -- I want to limit right now to just -- I

24    think you drew this distinction on cross-examination last time

02:49:57   25    to just the copied code as well.  And so that's to be -- for a

Wicker - cross by Cloern

5140

1    clear record, I'm just asking about the directly copied code

2    that you identified in your Exhibit C and D.  Okay?

3    A.   Okay.   That's fine.

4    Q.   And that's what your ten percent admission applies to,

02:50:12    5    right?

6    A.   That's right.   The ten percent applies to code where they

7    literally copied lines of code from Motorola as opposed to

8    just learning from it.

9    Q.   And I'm going to address that next.

02:50:22   10    A.   Okay.

11    Q.   Not every line in a file is copied, though, right?

12    A.   I think there's one or two cases where if it's not all,

13    it's really close; but in many cases, chunks are taken.   In

14    other words, not every line.

02:50:42   15    Q.   Some files, it's darn near the whole file, if not the

16    whole file.   Some files, it's one or two lines, right?   It

17    just sort of runs the gamut across those 350 files; is that

18    fair?

19    A.   That's fair.

02:50:54   20    Q.   All right.   And you know that Barb Frederiksen-Cross, as

21    opposed to looking at the file percentage, has looked at the

22    percentage of lines.   And so Hytera's version one is about

23    1.2 million lines, give or take.   Is that roughly --

24    A.   That sounds right.

02:51:14   25    Q.   And I think by their current version, they're closer to 2

Wicker - cross by Cloern

5141

million lines; is that right?

A.   It certainly increased.  I'm not sure it made it to 2

million, but it's close.

Q.   1.8, maybe, something like that?

02:51:26  5   A.   Something like that.

Q.   Okay.  And Ms. Frederiksen-Cross calculated about four

percent of those lines are directly copied Motorola -- are

what you have identified as directly copied from Motorola

code, right?

02:51:44  10   A.   That's over all of the versions, because I think she

testified that the numbers varied somewhat from version to

version, but that was her average.

Q.   Correct.  I think --

A.   And I think that sounds right.

02:51:55  15   Q.   I think some were as low as two percent, some were closer

to four percent, and I think the average, I think, was 3.3

percent.  Is that consistent with your recollection?

A.   That's right.  And I think we discussed rounding at that

point.

02:52:09  20   Q.   Okay.  Now, do you -- but you haven't -- you haven't

disagreed with that four percent number for the directly

copied code, correct?

A.   No.

Q.   Okay.

02:52:23  25   A.   Again, lines of code that have literally been copied over

Wicker - cross by Cloern

5142

1    as opposed to code that was used and studied in the creation

2    of code.

3    Q.   Okay.  Great.

4         So now I want to turn to the other 96 percent.  You

02:52:46    5    -- on your rebuttal direct examination today, you pointed to a

6    number of Hytera documents that contain one or more pages,

7    sometimes a lot of pages, of material that was copied from a

8    Motorola document, right?

9    A.   That's correct.

02:53:06    10        MR. CLOERN:  And do we have -- I think it was --

11   actually, I think I have it in my notes, if you give me one

12   second.

13   BY MR. CLOERN:

14   Q.   Yeah, so it was the connectivity document, the CPA

02:53:34    15   architecture, the RAF core, and the application understanding

16   documents.  And I'm talking about code right now, not the

17   testing documents.

18   A.   Okay.

19   Q.   Right.  So just the code.

02:53:44    20        So you pointed to those.  And it is your

21   contention -- or let me restate that.

22        It is your opinion that the fact that those Hytera

23   documents have some copied -- some amount of copied

24   information from a Motorola document in them, that that --

02:54:13    25   that is how Hytera coders were influenced and that carried

Wicker - cross by Cloern

5143

1   into the other 96 percent of Hytera's code; is that right?

2   A.   There were several different ways that Motorola's code was

3   used.   One was in simply studying the code --

4   Q.   Well, I'm asking just about --

02:54:30   5   A.   -- and writing.

6   Q.   -- the documents.   That's all I asked about, was the

7   documents.

8   A.   Okay.

9   Q.   Because -- I just want to be real clear.   I want to give

02:54:37   10   you a chance to address that, and we'll take each one in

11   pieces.

12   A.   Okay.

13   Q.   So can we just talk -- try to limit the question --

14   A.   Can you rephrase the question?

02:54:44   15   Q.   Sure.

16   A.   Because I don't think I understood it.

17   Q.   So the Hytera documents you identified which contain some

18   amount of material copied from a Motorola document --

19   A.   Okay.

02:54:54   20   Q.   -- like the RAF core, the application understanding, the

21   connectivity document, the -- right, and the ROSAL and the

22   RaPIS, those are key ones, correct?

23   A.   Those are examples of documents that have been copied.

24   Q.   And it is your position that when Hytera coders looked at

02:55:13   25   those Hytera documents that contained some Motorola

Wicker - cross by Cloern

5144

1    information, that that influenced how they wrote the portions

2    of the other 96 percent of the code that's not directly

3    copied; is that fair?

4    A.  That's correct.  That is one way.

02:55:30   5    Q.  Okay.  So let's go back to the -- let's go back and talk

6    about files as opposed to lines for a minute.

7    A.  Okay.

8    Q.  Putting aside the 350 files that you contend contain some

9    amount of directly copied code, that leaves, roughly, 3,150

02:56:10   10   files that don't contain directly copied code, correct?

11   A.  Yes.  That's right.

12          MR. CLOERN:  Okay.  Can we bring up PDX-20.32,

13   please.  Do we have that?

14   BY MR. CLOERN:

02:56:43   15   Q.  And so this is one example you pointed to, the Motorola

16   ROS document and copied material into the Hytera ROSAL

17   specification, correct?

18   A.  That's right.  I think actually in this instance, it's

19   slightly paraphrased, but I would agree that it's copied.

02:57:05   20   Q.  Paraphrased?  Copied?

21   A.  Okay.

22   Q.  Some information in the Hytera ROSAL spec that came --

23   that looks like it certainly at least was paraphrased from the

24   Motorola specification, correct?

02:57:16   25   A.  That's right.

1      MR. CLOERN:  Now, can we go to PDX-20.33, please.

2  BY MR. CLOERN:

3  Q.   Now, you identified here a source code file, and you

4  related that to the information in the Hytera specification

02:57:33    5  that you found to be paraphrased from a Motorola document,

6  correct?

7  A.   That's right.

8  Q.   Okay.  So that's one file, right?

9  A.   That's right.

02:57:42   10  Q.   So out of the -- there's 350 files with directly copied

11  information, according to your opinion --

12  A.   Yes.

13  Q.   -- correct?

14      That leaves 3,150 files.  Out of that -- that you

02:57:57   15  contend were influenced by the copied documentation.  And out

16  of that, you have identified one file, one out of 3,150?

17  A.   No.  I don't think that's fair because what I've done is

18  I've described a process by which engineers looked at a wide

19  variety of files and incorporated that knowledge into what

02:58:17   20  they were doing as they wrote source code.  This is an

21  example.  I don't think I've limited it to just one.

22  Q.   In your -- well, that's not what I asked you if you've

23  limited it to that.

24  A.   Okay.

02:58:27   25  Q.   Let me come at it a different way.

Case: 1:17-cv-01973 Document #: 927 Filed: 02/26/20 Page 142 of 200 PageID #:62367
Wicker - cross by Cloern
5146

1        In your direct examination -- I'm sorry.  In your

2  cross-examination back in November, I asked you to confirm

3  that you identified about 18 source code files in your direct,

4  and I think you confirmed that, yep, you did about 18 source

02:58:46   5  code files.  Do you recall that?

6  A.  18 files that I specifically referred to, that's correct.

7  Q.  And all of those contained copied -- directly copied code,

8  right?

9  A.  Yes.  That's right.

02:58:54  10  Q.  And you didn't identify any source code files that you

11  contended contained code that wasn't directly copied, but that

12  was influenced?

13  A.  Actually, I believe I did discuss that in my direct

14  testimony, and I --

02:59:07  15  Q.  What files?

16  A.  -- discussed it today.

17  Q.  What files?

18  A.  Specific files, I don't believe I pointed to specific

19  files.  I pointed to instances where engineers had the

02:59:17  20  information and used it.

21  Q.  Mm-hmm.  So you didn't do what you did here, which was to

22  point to something in a Hytera document that was copied from

23  Motorola and show specifically how that impacted a particular

24  file of Hytera code, right?

02:59:38  25  A.  I don't agree.

1  Q.  So then please identify the files that you did that for on

2  your direct examination back in November.

3  A.  What I did was I talked about a general process by which

4  many files were written.  For example, we talked about the

02:59:52  5  application template, which contains Motorola information.

6  That was used to write a large number of applications by

7  Hytera engineers.

8      Now, I agree I didn't pick apart a particular

9  application, other than the one we talked about today, but I

03:00:07  10  showed the process.

11  Q.  So we'll address the application template in a minute

12  because that is -- that falls into your directly copied code.

13      What I'm asking --

14  A.  Yes.

03:00:18  15  Q.  -- is, again, beyond what -- the one file we've seen on

16  the screen, what -- name one -- identi- -- you haven't

17  identified a single additional file other than this one that's

18  on the screen right now where you have said the source code

19  file was in some way influenced by the documentation that you

03:00:48  20  contend was copied?

21  A.  I agree that this is the one example I chose.  I do not

22  agree that I haven't pointed out, for example, the process by

23  which the ROSAL specification, which was copied, has found its

24  way into a large amount of code and not just this one, single

03:01:06  25  example.

Wicker - cross by Cloern

5148

1    Q.   But you've only identified one file.  This is it?

2    A.   I --

3    Q.   You --

4    A.   -- provided one example.

03:01:16   5    Q.   You testified on your direct, I believe, that the

6    ClearCase servers for Motorola are located in Illinois?

7    A.   I believe I said that the system is based in Illinois.

8    There are servers elsewhere around the world.

9    Q.   Oh, no, we can read it back.

03:01:55   10        Are you disputing that you told everybody in this

11   courtroom that the servers for ClearCase are located in

12   Illinois?

13   A.   There are servers in Illinois and it's based in Illinois.

14   Q.   But there are servers all kinds of places around the

03:02:08   15   world, aren't there?

16   A.   Yes, that's true.

17   Q.   The same for Compass, right?

18   A.   Compass has caches elsewhere.  I believe with regard to

19   Compass, there's really one primary site, which is --

03:02:15   20   Q.   Let's stick with --

21   A.   -- in Illinois.

22   Q.   -- ClearCase.  We'll get to Compass in a minute.

23        ClearCase is where Motorola keeps its -- it's the

24   system where Motorola keeps its source code, right?

03:02:27   25   A.   That's right.  And tracks the versions of the source code

Wicker - cross by Cloern

5149

1    as they're made.

2    Q.   And you testified that the code that Sam Chia and Y.T. Kok

3    gathered from Motorola, that came from ClearCase, didn't it?

4    A.   It did.

03:02:41    5    Q.   But you don't know that, do you?

6    A.   That's -- it would have been on ClearCase, and I believe

7    we -- there is evidence in the case that the code that was

8    copied is in ClearCase.

9    Q.   But you just said would have been.  This is your

03:02:56    10   supposition, right?

11   A.   Yes.

12   Q.   You don't know that it came from ClearCase, do you?

13   A.   We don't have ClearCase logs, to my recollection, that

14   shows that Sam Chia actually took it from ClearCase at a

03:03:08    15   particular point in time.

16   Q.   Mm-hmm.  Sam could have taken it from a local copy of

17   source code in Penang?

18   A.   I don't believe there's evidence of that.

19   Q.   What's the evidence that he took it from ClearCase?

03:03:20    20   A.   He has code that was developed at Motorola.  There's been

21   testimony as to how this code was developed through

22   engineering in Schaumburg.  There is no testimony that it was

23   either developed or originally obtained in Malaysia.

24   Q.   There is no testimony that Sam Chia downloaded it from

03:03:41    25   ClearCase, is there?

Wicker - cross by Cloern

5150

1    A.   Not that I recall.

2    Q.   There's no record that Sam Chia downloaded it from

3    ClearCase?

4    A.   Not that I've seen.

03:03:49    5    Q.   And even if Sam Chia did download it from ClearCase, you

6    have no idea whether that came from a server in Illinois, in

7    Florida, Bangladesh, Russia, South Africa, or Brazil, do you?

8    A.   I don't agree because ClearCase is a system in which the

9    servers are mirrored.  There is a main server in Illinois, as

03:04:10    10   Mr. Shepard testified.  And so other sites would simply be

11   mirrors of what is in Illinois, and anything that happens on

12   one of those other sites goes to Illinois.

13   Q.   So it was downloaded from 20 different places

14   simultaneously at the same time?

03:04:23    15   A.   That's not the way mirroring works.

16   Q.   Have you studied the IT systems for ClearCase?

17   A.   I'm familiar with them; but, no, I have not gone into

18   detail --

19   Q.   So you --

03:04:36    20   A.   -- with my testimony.

21   Q.   -- don't know where the data -- where -- and let's just

22   assume for a minute that Sam Chia downloaded in 2008 source

23   code from ClearCase.  You have no idea what server that

24   download came from, do you?

03:04:54    25   A.   I don't know which particular cache it would have come

Wicker - cross by Cloern

5151

1    from, but it would have reflected material that is in Illinois

2    because it would have been a mirrored site that he took it

3    from, if not directly from Illinois.

4    Q.   So the answer to my question is, "No, Mr. Cloern, I don't

03:05:10   5    know where it came from"?

6    A.   If you're asking me which particular cache or server he

7    connected to obtain it, no, I don't know that.

8    Q.   Thank you.

9         The answer is the same for Compass, right?

03:05:33   10   A.   Compass is actually a truly cached system.  So it would

11   have come from Illinois.  Anything that resides on a server,

12   wherever that server is, would have come from Illinois.  It

13   goes in both directions.  That's Mr. Shepard's testimony.

14   Q.   Mr. Shepard's testimony is, "The computer servers for the

03:05:54   15   Compass systems are located in the United States."  That's

16   transcript 380, 18 to 21.

17   A.   That's true as well.

18   Q.   He didn't say they were in Illinois, did he?

19   A.   He either said it in his testimony or in my conversation

03:06:11   20   with him, but he did say that the main server was in Illinois.

21   Q.   And Mr. Shepard also did not exclude that there are

22   servers outside the United States, right?

23   A.   Those would be cache servers.  Again, that's --

24   Q.   And he never said --

03:06:28   25   A.   Activity --

Wicker - cross by Cloern

5152

1    Q.   -- that the --

2    A.   -- on a cache server reflects activity that's in the main

3    server.

4    Q.   He never said that the downloads would necessarily have

03:06:38    5    come from data housed in the United States, did he?

6    A.   If it comes from a cache, then the immediate location

7    would have been wherever that cache is, but the material in

8    the cache came from servers in the United States.

9    Q.   I didn't ask that.  I asked what Scott Shepard testified

03:06:56    10   to.  And he didn't testify to that, did he?

11   A.   I believe he did.  He did talk about caches.

12   Q.   He didn't -- he never said that the -- that -- necessarily

13   that when Sam Chia and Y.T. were conducting mass downloading,

14   that the data that they were downloading came from a server

03:07:15    15   located in Illinois.  He never testified to that.

16   A.   He never said it came immediately from a server in the

17   United States, but it would have originated in the United

18   States.

19   Q.   He didn't say that it would have originated there.  He

03:07:29    20   didn't say that either.

21   A.   He said they were mirrored.  Yes, he did.  I don't agree

22   with that.

23   Q.   You haven't studied the Compass system IT infrastructure,

24   have you?

03:07:38    25   A.   I'm familiar with it.

Wicker - cross by Cloern

5153

|  | | |
|---|---|---|
| | 1 | Q.  Have you looked at the code on exactly how it works? |
| | 2 | A.  No, I -- |
| | 3 | Q.  You don't -- |
| | 4 | A.  -- don't -- |
| 03:07:43 | 5 | Q.  -- know where data is pulled from and the ordering, do |
| | 6 | you?  You haven't actually looked at the code? |
| | 7 | A.  I know its general architecture, and I know it's cached. |
| | 8 | Q.  So you don't actually know where data is pulled from and |
| | 9 | in what order? |
| 03:07:56 | 10 | A.  I don't know what order it comes in, no. |
| | 11 | Q.  Thank you. |
| | 12 | In fact, Motorola keeps its source code in ClearCase, |
| | 13 | but at the time in 2008, they didn't have the functionality |
| | 14 | turned on to track who accessed it, who downloaded something. |
| 03:08:30 | 15 | They have -- there's no records at all to show whether Sam or |
| | 16 | Y.T. accessed source code from ClearCase or not, right? |
| | 17 | A.  That's correct, other than their being in possession of it |
| | 18 | and their distributing it at Hytera, which would indicate they |
| | 19 | got it at some point in time. |
| 03:08:49 | 20 | Q.  But whether they downloaded it from ClearCase is pure |
| | 21 | speculation? |
| | 22 | A.  It's likely, given what ClearCase is, but, you're right, |
| | 23 | there's no evidence of the actual downloads from ClearCase. |
| | 24 | Q.  And that's not true with the Compass system, right?  So we |
| 03:09:09 | 25 | know that Sam Chia and Y.T. Kok downloaded thousands of |

Wicker - cross by Cloern

5154

1   documents before they left Motorola, right?

2   A.  That's correct.

3   Q.  So they were Motorola employees and downloaded thousands

4   of Motorola documents, right?

03:09:22   5   A.  Well, Y.T. was simultaneously an employee of Hytera, but

6   they were also employees of Motorola.

7   Q.  But not for the time -- for all of the downloads -- there

8   were thousands of downloads that occurred prior to June of

9   2008 when Y.T. and Sam joined Hytera, right?

03:09:40   10   A.  That's correct.

11   Q.  And at that time, they were Motorola employees, right?

12   A.  That's right.  At the time of the downloads.

13   Q.  Now --

14   A.  Just so I'm clear -- excuse me.  So with regard to Y.T.

03:09:59   15   Kok, he downloaded some files while he was a Motorola

16   engineer.  He then joined Hytera and downloaded more files

17   while he was simultaneously working for Hytera and Motorola.

18   So there's two different periods of time that are covered

19   here.

03:10:13   20   Q.  And Motorola knew that Y.T. Kok had left the company and

21   even reassigned all of his responsibilities to other

22   engineers, right?

23   A.  They knew he was going to leave the company.

24   Q.  And they reassigned all of his responsibilities to other

03:10:26   25   engineers?

Wicker - cross by Cloern

5155

1    A.  I believe that was his testimony.

2    Q.  But they left all of his access on?

3    A.  That's right.

4    Q.  It wasn't just his testimony, it was the testimony of his

03:10:33    5    boss, right, Kwai Song?

6    A.  I think that's right.

7    Q.  Or Lokang, yeah.

8         THE COURT:  Did one of the Koks join Hytera in

9    February of 2008 and one in June of 2008?

03:10:50    10        THE WITNESS:  Yes, Your Honor.  It would have been

11   G.S. Kok was the first one.  The second was Y.T. Kok.

12   BY MR. CLOERN:

13   Q.  And the evidence of downloading is Sam Chia and Y.T. Kok,

14   correct?

03:11:02    15   A.  Yes.

16   Q.  And it's evidence -- actually, it's evidence of accessing

17   on the Compass logs, correct?

18   A.  There is evidence of those two downloading material from

19   the Compass system.

03:11:16    20   Q.  And they did that -- that's -- that's what Motorola

21   considers to be theft, correct?

22   A.  That those -- that's an example of theft, yes.

23   Q.  And that was theft conducted by Motorola employees, right?

24   A.  Again, Y.T. was also a Hytera employee for part of that

03:11:35    25   time.  But, yes, the -- when the documents were taken from the

Wicker - cross by Cloern

5156

Compass system, they were both Motorola employees.  When they

took them over to Hytera, they were Hytera employees.  And

when they used them at Hytera, they were Hytera employees.

Q.   So Motorola employees stole trade secrets?

03:11:52    Let me give you a clear question.

There were downloads from both Sam Chia and Y.T. Kok

in March of 2008, right?

A.   That's right.

Q.   Mass downloads that Mr. Shepard described, right, which is

03:12:08   evidence of theft and misappropriation because they're mass

downloads?  They happened in March of 2008, right?

A.   That's correct.

Q.   So right there, that's theft of trade secrets by Motorola

employees, correct?

03:12:23   A.   I think you're asking me for a legal conclusion.  In other

words, I don't know whether it became theft after they went to

Hytera and gave it to other Hytera employees or the moment

that they downloaded it.  That's not something that I would

know.

03:12:36   Q.   Well, you've talked about -- you have opinions that --

about theft and misappropriation of trade secrets.  You've

called it theft.  The knowledge of it is widespread here and

there.  You're now not going to take an opinion on whether --

I think, in fact, all my prior questions you already answered

03:12:55   that it was theft.

A.   What you -- as I understand your question, and I may have

misunderstood it, but I think what you asked me was, at that

moment when they were Motorola employees downloading

documents, had they just committed an act of theft.  My

opinion is that when they took those documents over to Hytera

and gave it to other Hytera engineers, that was

misappropriation.  They stole the documents and they gave it

to another company.

Q.   So you disagree with Scott Shepard when he identified mass

downloading as evidence of theft?

A.   It is evidence of theft, but he did not say that in and of

itself was theft before they had left the company.

Q.   So Compass logs show that a document on Compass was

accessed, and then I think Scott Shepard testified that that

means a document ends up on the laptop of the accessor, such

as Sam Chia, right?

A.   That's right.

Q.   And you say -- you pointed I think earlier to 10,000

documents that were downloaded by Mr. Chia and Mr. Kok, Y.T.

Kok?

A.   I think it's more than that, but quite a few.

Q.   And you said that they put them on a hard drive or a thumb

drive to get them over to Hytera, right?

A.   They made it to Hytera somehow.  I don't know how.

Q.   All of those things would have been done while they were

Wicker - cross by Cloern

5158

1  Motorola employees, the downloading and the putting them onto

2  something to get them out the door, right?

3  A.  Yes.

4  Q.  Are you still hesitant to confirm that Motorola employees

03:14:36  5  stole trade secrets?

6  A.  The two former Motorola employees stole trade secrets.

7  I'm only hesitating on one point.  And once again, at that

8  moment as Motorola employees, as they were downloading that

9  material, I don't know whether legally that in and of itself

03:14:55  10  was theft.  But the minute they took it and went somewhere

11  else with it, that was theft.

12  Q.  So it's not theft until they walk out the door of whatever

13  building at Motorola they're in?

14  A.  Again, you're asking me for a legal conclusion.  I don't

03:15:09  15  know at what point it became theft.  I know that when they

16  took all that material, brought it to Hytera and used it, they

17  have misappropriated the document and the source code.

18      MR. CLOERN:  Can we -- Mr. Montgomery, can you bring

19  up PDX-20.2, please.

03:15:32  20  BY MR. CLOERN:

21  Q.  Now, you testified extensively about these documents back

22  in November and December, correct?

23  A.  That's correct.

24  Q.  You're pointing on this slide, PDX-20.2, to two different

03:15:47  25  pages in what's called the FPGA analysis, right?

Wicker - cross by Cloern

5159

A.   That's correct.

Q.   And you're putting statements on these two separate pages together.  And you're pointing out here in your slide -- you say, "Needed to change performance so Motorola would not notice copying."  That's your point?

A.   That's my point.

Q.   Let's look at the document on the left side, PDX- -- which is representing PDX-18.6.

     Do you see that?

A.   Yes, I do.

Q.   And what you've highlighted, the last sentence, it says, "Also the performance of squelch, MOD limiter, BER can be measured and can be seen to have the same performance as MOTO," right?

A.   That's right.

Q.   And your contention is, is that's what Sam Chia is worried about.  Sam Chia wrote this document, right?

A.   Yes.

Q.   And he is worried about if Sam Chia uses Motorola code, that these functions, squelch, MOD limiter, BER, can be measured by MOTO and seem to have the same performance?

A.   That's what it says.

Q.   And you are suggesting in your testimony -- or you have suggested, rather, in your testimony that based on what's stated in this document, you believe that Sam Chia did, in

Wicker - cross by Cloern

5160

1   fact, degrade the performance of those algorithms so Motorola

2   wouldn't notice, right?

3   A.  Sam Chia or someone working for him, yes.

4   Q.  But that's -- this document doesn't memorialize what

03:17:16  5   actually happened.  It -- you're reading it, putting a couple

6   pieces together to say what you think Sam Chia is proposing to

7   do, right?

8   A.  That's correct with regard to the evidence in front of us.

9   There's other evidence that shows how the material was

03:17:32  10  actually used.

11  Q.  Well, let's stay focused on the evidence in front of us

12  for just one second because on exactly what you highlight

13  right here (indicating), it says the performance of squelch,

14  MOD limiter, BER can be measured.

03:17:51  15  A.  That's right.

16  Q.  The whole point is these could be measured and Motorola

17  could compare the Hytera squelch to the Motorola squelch and

18  see if it performs the same and, therefore, has been stolen,

19  right?

03:18:01  20  A.  It's saying that Motorola could make this measurement and

21  see that they had the same performance, which could raise some

22  flags.

23  Q.  You could have made that measurement, couldn't you?

24  A.  Yes, with the right equipment.

03:18:15  25  Q.  You could have measured the Motorola squelch and the

Case: 1:17-cv-01973 Document #: 927 Filed: 02/26/20 Page 157 of 200 PageID #:62382
Wicker - cross by Cloern
5161

1    Hytera squelch and then you would know if performance was

2    degrading, wouldn't you?

3    A.   That's right.

4    Q.   But you didn't do that?

03:18:24    5    A.   Oh, for this litigation, no.  No, I didn't.

6    Q.   Did you do it outside this litigation and then not just

7    mention it in this litigation?

8    A.   No.  My point is --

9    Q.   You didn't do it at all?

03:18:34    10   A.   -- the evidence of theft and the use of the material was

11   so overwhelmingly I didn't feel the need to do the

12   measurements.

13   Q.   Well, we're not addressing your opinion generally.  We're

14   addressing the statement that you made that you know based on

03:18:47    15   this document that the performance of these algorithms,

16   squelch, MOD limiter, BER, that they were degraded.  That's

17   what you testified, right?

18   A.   What these documents show is that there was a plan to

19   avoid detection by Motorola that involved changing

03:19:05    20   performance.

21   Q.   And you could have -- but these documents don't show

22   anything more than a plan?

23   A.   This part shows the plan, that's correct.

24   Q.   And you don't know if anyone degraded the performance of

03:19:20    25   anything, do you?

Wicker - cross by Cloern

5162

1    A.   There is evidence of degraded performance.  For example,

2    there were tests run in which a Hytera radio was compared to a

3    Motorola radio.  And there were artifacts in the voice at

4    various levels that indicate different performance.

03:19:35   5    Q.   And that's the unmute issue?

6    A.   It's related to that, but it's more than just unmute.

7    There were cases where it was unmuting, but the voice quality

8    was different in the Hytera radio as opposed to the Motorola.

9    So with that kind of evidence, I didn't need to do the

03:19:50   10   testing.

11   Q.   There's no evidence that squelch was degraded, was there?

12   A.   I don't believe squelch was actually listed.

13   Q.   There's no evidence that MOD limiter was degraded, was

14   there?

03:20:03   15   A.   The MOD limiter degradation would fit into the existence

16   of waste artifacts.

17   Q.   We're going to look at that document in a minute.  There's

18   no MOD limiter evidence of degradation,

19   A.   The voice artifacts may have been created by variations in

03:20:19   20   the MOD limiter.

21   Q.   May have been?

22   A.   It doesn't say, but that would -- variations in the

23   modulation limiter could've caused those voice artifacts.

24   Q.   The document you're talking about, which we're going to

03:20:31   25   get to, doesn't say anything about MOD limiter, does it?

Wicker - cross by Cloern

5163

A.   No.  It --

Q.   Okay.

A.   -- talks about voice artifacts.

Q.   So you could have tested these algorithms to see if they

03:20:40   were degraded, as you've been suggesting, but you didn't,

correct?

A.   I didn't in part for the reasons I've stated.  But also,

please bear in mind that the library -- the code used to

create the library was lost.  So I would not have had access

03:20:57   to Hytera's code for the MOD limiter because it had been lost.

Q.   How about testing the radios?  Squelch is a radio feature.

That's what you test, right?

A.   And, again, there is testing results that you say we're

going to talk about.

03:21:10   Q.   But not for squelch?

A.   No, squelch isn't included in that.

Q.   And not for MOD limiter?

A.   I don't agree with that.

Q.   You just said that the documentation -- never mind.  I'll

03:21:22   move on.

        The DMR DSP library, that resulted from this FPGA

removal, right?

A.   Its use followed from the removal of the FPGA.  It is a

Motorola library.  So it came over from Motorola and it was

03:22:03   subsequently used because the FPGA was removed.

Case: 1:17-cv-01973 Document #: 927 Filed: 02/26/20 Page 160 of 200 PageID #:62385
Wicker - cross by Cloern
5164

1    Q.   Well, you don't actually know that, right?  I mean, the --

2    all you know is that Sam Chia sends out the DMR DSP library

3    and that based on the function names inside the library, it

4    appears to have been either built directly from Motorola code

03:22:27    5    or, perhaps, built in a modified or paraphrased way for

6    Motorola code; is that fair?

7    A.   No.  I've been through Hytera's software.  They have DMR

8    DSP lib.lib files.  I have looked at that and compared it, as

9    we did here in court.  Remember I had the semi-readable

03:22:48    10   material?  That was showing that was Motorola's library.

11   Q.   My only question is, that -- so libraries are built from

12   source code files, correct?

13   A.   That's correct.

14   Q.   Okay.  And you believe you've identified the Motorola

03:23:02    15   source code files that the DMR DSP library was built from --

16   A.   That's correct.

17   Q.   -- right?

18        Do you know whether Sam Chia built DMR DSP library

19   directly from Motorola code files without changing them at all

03:23:17    20   or whether Sam Chia may have modified them, but starting with

21   Motorola code, but then modified them and then compiled the

22   modified files?  Can you say a hundred percent which happened?

23   A.   There's actually evidence that he did make changes in

24   parameters to make it more difficult for Motorola to detect.

03:23:36    25   Q.   But you don't know the extent to which the source code --

Wicker - cross by Cloern

5165

1    you've never seen the source code files that were actually

2    compiled into DMR DSP by Sam Chia, right?

3    A.  No, Hytera lost them.  They weren't produced in this case.

4    Q.  So you don't know whether they're exactly the same as

03:23:55   5    Motorola files or they have been modified or if so, how much

6    they've been modified?

7    A.  I believe they've been modified.  I don't know how much.

8    Q.  Mm-hmm.  So the --

9    A.  Because they --

03:24:03   10   Q.  -- only way to know --

11   A.  -- haven't been produced --

12        THE COURT REPORTER:  I'm sorry.  Can you say that

13   again?

14        THE WITNESS:  Yeah.

03:24:04   15   BY THE WITNESS:

16   A.  Because they haven't been produced, I don't know to what

17   extent they've been modified.

18   BY MR. CLOERN:

19   Q.  And the only way to actually know would be to test their

03:24:16   20   function, correct, because you can't actually compare the code

21   to see if the code was modified in an effort to hide it?

22   A.  Just so I understand the question, what is it that I don't

23   know?  In other words, why would I be testing it when there's

24   evidence that it was taken from Motorola and used --

03:24:35   25   Q.  Oh, I'm sorry.

Wicker - cross by Cloern

5166

1          The only way to know whether code was modified to

2     degrade performance would be to actually test the radios since

3     you don't have the code that was used to actually compile --

4     that Sam actually used to compile DMR DSP library?

03:24:52    5     A.   Okay.  And there's testing evidence that shows

6     degradation.

7     Q.   This is the testing evidence that isn't related to squelch

8     and doesn't mention MOD limiter expressly?

9     A.   That's correct.

03:25:07   10     Q.   Okay.  In the DMR DSP library you've got squelch, MOD

11     limiter, carrier detect, and noise suppression?

12     A.   Exactly.

13     Q.   So those are the four features.  When Sam sends out the

14     DMR DSP library, it says, "Use this library for these four

03:25:23   15     features"?

16     A.   That's right.

17     Q.   Noise suppression is obtained from a third party called

18     DVSI.  And that's by agreement at the DMR Association for all

19     DMR radios, correct?

03:25:38   20     A.   That's for the digital noise suppression, not the analog.

21     Q.   And you understand that -- let's take them one at a time.

22          So nothing about noise suppression could have been

23     degrading, right, because they -- everybody used the same

24     third-party digital noise suppression?

03:25:55   25     A.   Again, that's only for the digital side, not for the

1    analog.  Remember, the DSP in these radios has both an analog

2    and a digital side.  So the analog would have used Motorola's

3    noise suppression.

4    Q.  Right.  So I'm asking about digital, and then I'm going to

5    ask you about analog.

6    A.  Okay.

7    Q.  So the answer to my question as to digital is yes?

8    A.  That's correct.

9    Q.  Okay.  Now, for analog, I think you agreed at your

10   deposition that Hytera doesn't use a DMR DSP library for

11   analog noise suppression, right?

12          We talked about a flag, the flag being set, noise

13   suppression --

14   A.  There are conditions in which it's not used, that's

15   correct, but there are -- I believe there are conditions when

16   it is used.  And it was certainly in the library.

17   Q.  For analog noise suppression?

18   A.  Yes.

19   Q.  Hytera wrote separate analog noise suppression code that

20   is called and used in its DMR radios, correct?

21   A.  That is true as well.

22   Q.  And that wasn't degraded?

23   A.  Not that I know of.

24   Q.  So in any event, when Motorola looked at Hytera's radios,

25   the Motorola engineers realized that the Hytera radios had the

Wicker - cross by Cloern

5168

1    exact same bug that the Motorola radios had, that they would

2    unmute at about 118 dBm, correct?

3    A.  I don't agree with that characterization because what

4    happened was, they found that the Motorola radios unmuted at

03:28:06   5    minus 118 dBm, just like Hytera's radios, but they couldn't

6    have known that the Motorola radios and the Hytera radios had

7    the same bug because it would have been internal to the

8    software.

9    Q.  So unmuting at negative 118, that is itself a bug.  You

03:28:27   10   don't have to see the code.  It happens.  It's not supposed to

11   happen and it happens, right?

12   A.  It's certainly not -- the performance is not as good as,

13   for example, in the Kenwood radio that's discussed in the

14   testing that you're referring to.  So the minus 118 is -- you

03:28:43   15   could say it's a bug itself or it's caused by a bug.  It's

16   certainly not good performance -- or not as good as it --

17   Q.  There is --

18   A.  -- could be.

19   Q.  -- an odd behavior in both the Hytera and Motorola radios

03:28:56   20   in that they both unmute at negative 118 dBm.  And that was

21   noticed by Motorola engineers who called it suspicious,

22   correct?

23   A.  One engineer noticed it and referred to it that way in an

24   e-mail, that's right.

03:29:10   25   Q.  And then there were some discussion that -- I'm sorry.

Case: 1:17-cv-01973 Document #: 927 Filed: 02/26/20 Page 165 of 200 PageID #:62390
Wicker - cross by Cloern
5169

1    There's some discussion in the documents, about which there's

2    been testimony, that in the Hytera radio, in certain -- for

3    certain scenarios, under certain calls, types of calls, that

4    there would be some voice degradation right after that

03:29:48    5    unmuting, correct?

6    A.   That's right.  What --

7    Q.   And that --

8    A.   -- they referred to is voice artifacts, yes.

9    Q.   And that wasn't present in the Motorola radio, correct?

03:29:55    10    A.   That's right.

11    Q.   With respect to that behavior of the Hytera radio, have

12    you provided any evidence, pointing to Hytera code, that

13    Hytera code was purposefully degraded?

14    A.   Again, I couldn't have done that because Hytera lost the

03:30:25    15    code that's in the DSP library.

16    Q.   Have you provided any evidence that the code responsible

17    for that behavior, that voice artifact that you mentioned, is,

18    in fact, in the DMR DSP library?

19    A.   The voice artifacts would have been part of the

03:30:46    20    modulation/demodulation process.  Part of the core of that

21    process, converting waveforms to voice and *vice versa*, that

22    would be calling on the DMR DSP library.

23    Q.   Well, let's -- I have some questions about that.  The DMR

24    DSP -- you talked about the overall DSP earlier, right?

03:31:05    25    A.   That's correct.

Wicker - cross by Cloern

5170

1    Q.   You testified about it?

2    A.   That's right.

3    Q.   And you testified that's the -- that's really important,

4    it takes voice and turns it into digital, correct?

03:31:13    5    A.   That's right.

6    Q.   And then transmits that digital out?

7    A.   That's correct.

8    Q.   And in the other direction, it will take the -- receive

9    the digital, turn it back into voice?

03:31:25    10    A.   That's right.

11    Q.   So that's --

12    A.   So you could --

13    Q.   -- important?

14    A.   -- hear it, mm-hmm.

03:31:28    15    Q.   And we've heard about the DSP framework, correct?

16    A.   That's right.

17    Q.   And you testified about it?

18    A.   I did.

19    Q.   In fact, I asked you a bunch of questions back in December

03:31:38    20    about comparing Hytera's DSP lineup and Motorola's DSP lineup

21    in documents.  Do you remember that?

22    A.   You did.  Yes.

23    Q.   And you agreed that they weren't the same in the

24    documents, but you suggested that the documents may not

03:31:51    25    reflect the actual code, correct?

Wicker - cross by Cloern

5171

1    A.   That sounds familiar.

2    Q.   The DMR DSP library is noise suppression, carrier detect,

3    squelch, and modulation limiter.  Those are four -- four,

4    let's say, algorithms in the DSP, right?

03:32:14    5    A.   That's right.

6    Q.   Are those also called -- I think you referred to them as

7    lineup entities.

8    A.   Yes.

9    Q.   Now there's 20 or 30 lineup entities in the DSP, right?

03:32:24    10    A.   There can be, yes.

11    Q.   So this is -- this is -- can you think of this -- would it

12    be fair to think of this as like a processing pipeline?  So

13    the digital data comes in and there's all kinds of different

14    boxes it has to run through, different pieces, steps in the

03:32:43    15    processing to get the voice, the analog voice out on the other

16    side?

17    A.   I think that's fair.  There's a number of things that have

18    to be done, and some of them can be done at the same time.  So

19    it's not exactly a single pipeline, but still you could think

03:32:55    20    of it like that.

21    Q.   And there's 20 or 30 of those steps that have to occur,

22    right?

23    A.   It depends on how you count.  For example, if you count

24    low-pass filtering, if you got into the low-level detail, you

03:33:11    25    could probably get up to 20 or 30.

Wicker - cross by Cloern

5172

1    Q.   The DMR DSP library does four of those things, right?

2    A.   Four significant things, yes.

3    Q.   But there's a lot of other things that have to happen in

4    that process you described of turning digital to analog or

03:33:26    5    analog to digital.  It's not just those four things, noise

6    suppression, carrier detect, squelch, and MOD limiter,

7    correct?

8    A.   Oh, no.  No.  Radio waves have to impinge on it, antenna

9    signals are generated.  There's coupling electronics

03:33:39    10   amplification.  There's lots of things that happen other than

11   the four things in the library.

12   Q.   In fact, there's 300 libraries in Hytera's code, right?

13   A.   I think that's right.

14   Q.   And you have not provided evidence that the DMR DSP

03:33:54    15   library is any more or less important than any of the others,

16   have you?

17   A.   I don't believe I've compared the other 297.  However, I

18   have testified to the fact and have written in my report and I

19   believe I talked in my deposition about how important the DSP

03:34:14    20   library was and what it actually did.

21   Q.   Well, it's the DMR DSP library.  It's not the entire DSP,

22   correct?

23   A.   That's right.

24   Q.   And it's four out of 20 or 30 things, not all of the DSP,

03:34:28    25   as you testified, that takes digital to analog or backwards,

Wicker - cross by Cloern

5173

1    analog to digital, correct?

2    A.  Again, it's not all of it, but it's an important part of

3    it.

4    Q.  Well, the rest of it is important, isn't it?

03:34:40    5    A.  There are varying levels of complexity, but it's all

6    important, yes.  The DMR functionality --

7    Q.  -- it's not --

8    A.  -- makes the radio work.

9    Q.  -- going to work -- the DSP --

03:34:54    10        THE COURT REPORTER:  "Makes the" --

11        THE WITNESS:  Makes the radio work.

12   BY MR. CLOERN:

13   Q.  That DSP framework isn't going to work if you take any of

14   those other blocks out, is it?

03:35:00    15   A.  They would have varying impacts, but certainly many of

16   them, if you deleted them, the system would not work.

17   Q.  Squelch has been in radios for decades, right?

18   A.  Yes.

19   Q.  Okay.  Noise suppression is provided by a third party.

03:35:22    20   It's not even something that Motorola or Hytera writes on

21   their own?

22   A.  That's actually not true.  As I've mentioned before,

23   you're just talking about the digital.  That happens in the

24   products to be licensed from a third party, but Motorola has

03:35:38    25   certainly written its own noise suppression analog -- noise

Wicker - cross by Cloern

5174

1    suppression algorithms in the past.

2    Q.  Noise suppression is something that's been in analog

3    radios going back a long time?

4    A.  Varying versions of it, yes.

03:35:58    5    Q.  The same with carrier detect, right?

6    A.  Absolutely.

7    Q.  And noise suppression, carrier detect, squelch, not only

8    have these been in Hytera and Motorola radios going back

9    decades to analog, but they've been in radios for all of the

03:36:14    10    other radio manufacturers, Tait, Kenwood, Icom, Harris,

11    *et cetera*, correct?

12    A.  Certainly most of them, if not all.

13    Q.  And these are basic features of any radio?

14    A.  The general functionality generally has to be there.  In

03:36:35    15    other words, let's take carrier detection.  It's really hard

16    to make a system work if you can't detect the carrier in the

17    first place.

18    Q.  It's general functionality every radio has, correct?

19    A.  Right.

03:36:45    20    Q.  It's like the steering wheel in a car, right?  You've got

21    to have the steering wheel in the car, don't you?

22    A.  Yes -- well, I'm sure there's side exceptions.  But, yes,

23    generally speaking, you need a steering wheel.  I certainly

24    do.

03:36:58    25    Q.  Radio manufacturers aren't competing on the differences in

Wicker - cross by Cloern

5175

1    their squelch.  Do you agree with that?

2    A.  I don't agree.  I would think any radio manufacturer will

3    attempt to distinguish his or her products from others on the

4    quality of what the user is dealing with, and squelch is

03:37:20    5    certainly something that a user is aware of.

6    Q.  Do you have any studies to cite for that?

7    A.  No, I would simply cite common sense.  Squelch is

8    something that has an attack in the sense that it has to come

9    on quickly and go off quickly.  So if someone is talking and

03:37:38    10    they get clipped a little bit because the squelch isn't

11    working fast enough, that's something a user would pick up on.

12    Q.  Are you aware of any manufacturer ever marketing their

13    squelch to sell their product?  Any example?  Can you give me

14    one?

03:37:52    15    A.  Squelch is listed on both Hytera and Motorola's feature

16    lists for its products.

17    Q.  As a basic feature, correct?

18    A.  It's listed as a feature, yes.

19              MR. CLOERN:   Mr. Montgomery, can you pull up

03:38:17    20    DDX-21.35, please, and 21.36.

21    BY MR. CLOERN:

22    Q.  Now, there were a lot of -- we looked at -- we looked at

23    PTX-22.  That's the FPGA analysis.  Remember that?

24    A.  Yes, I do.

03:38:53    25    Q.  And the slide on the left, that pulls three pages out of

Wicker - cross by Cloern

5176

1    that FPGA analysis.  Do you see that?

2    A.  Yes, I do.

3    Q.  Okay.  Which is DDX-21.35.

4         And those are the three slides from PTX-21 that

03:39:11    5    identify the work that had to be done from the -- removing the

6    FPGA, correct?

7    A.  This is certainly three places.  I don't think that's all

8    of it, but the three slides on the left do identify work that

9    has to be done.

03:39:25    10    Q.  There's a fair amount of work that needed to be recoded

11    when the FPGA was removed.  You agree with that?

12    A.  That's right.  There were several places where it said we

13    don't have an algorithm for this.  I think carrier detection

14    was one.  And it said we're going to have to write one.  And

03:39:40    15    in other places, they said it didn't work well enough and

16    they'd have to rewrite it.

17    Q.  And there was many entries where the functionalities there

18    are working fine and they just have to recode it, correct?

19    A.  I don't think it literally said that.  There may have been

03:40:01    20    examples where they had the algorithm and they didn't feel the

21    need -- in fact, I think there were a few examples where it

22    said, you know, we've got this.

23    Q.  And the document from Sam Chia says it's 80 percent done,

24    right?

03:40:13    25    A.  I don't think that's entirely accurate.

Wicker - cross by Cloern

5177

1    Q.  This very FPGA analysis from Sam Chia doesn't say that the

2    FPGA -- one of the downsides of removing it is that it's

3    already 70 to 80 percent done?

4    A.  Can you bring up that -- I think you're leaving something

03:40:32    5    out.  If you could bring up that particular slide, that would

6    be helpful.

7              MR. CLOERN:  Can we look at it.

8    BY MR. CLOERN:

9    Q.  Do you see the first bullet point under "Pros"?

03:41:02    10   A.  That's right.  Okay.

11             So it's within the context of -- you know, there's a

12   lot of work that's been invested, but then I think the cons --

13   Q.  Well, I'm not asking about the cons.

14   A.  -- is part of it as well.

03:41:17    15   Q.  If we could just focus on the pros.  70 to 80 percent of

16   the work has been completed, and it contains an L1 timer,

17   right?

18   A.  Okay.  So this is the FPGA summary.  This is the pros of

19   using the FPGA.

03:41:28    20   Q.  Yep.

21   A.  So it's the FPGA that's 70 to 80 percent complete.

22   Q.  Correct.

23   A.  Okay.

24   Q.  So you agree with that?

03:41:36    25   A.  Yes.  My misunderstanding -- I thought you were saying

Wicker - cross by Cloern

5178

1    that 70 to 80 percent of the work was done for replacing the

2    FPGA, and that wasn't the case.

3    Q.   70 to 80 percent of the FPGA is already done?

4    A.   That's correct.

03:41:49    5    Q.   So there's a lot that's just going to be recoded over to

6    the OMAP, a lot of functionality that's just -- you're just

7    recoding it because it's already done?

8    A.   But not 70 to 80 percent, because this FPGA had a lot of

9    things built into it; for example, the L1 timer.  See, it

03:42:04    10    contains an L1 timer.  We don't have to worry about that.

11          And so when you replace the FPGA, you have to come up

12    with a layer one timer.  So it's not simply a matter of taking

13    that 70 to 80 percent work and porting it over.  That's not

14    possible.

03:42:19    15    Q.   Well, I think my question was it has to be recoded,

16    correct?

17    A.   Some of it has to be recoded and some of it has to

18    actually be done from scratch.

19    Q.   The 70 to 80 percent that's done needs to be recoded,

03:42:37    20    correct?

21    A.   That's what I'm trying to explain.  Some of that 70 to 80

22    percent is built into the FPGA.  They didn't -- the Hytera

23    engineers didn't have to do it.  They didn't have to worry

24    about layer one timing because it's built into the FPGA they

03:42:50    25    bought from a third party.

1          Now that they're switching to a DSP-based approach,

2     they're going to have to write the code from scratch.  Some of

3     the 70 to 80 percent, though, is code that they can use.

4     Q.  In fact, you remember seeing PTX-483, the spreadsheet

03:43:09    5     where these tasks, the 30, 40 tasks that are listed in this

6     document, they're going to have to be redone when the FPGA is

7     taken out, that spreadsheet -- you know the one I'm talking

8     about?

9     A.  Yes, I do.

03:43:21    10    Q.  It says recode to C55, recode to C55, reuse FPGA solution.

11    It says that over and over and over and over again, right?  We

12    can look at it if you want.

13    A.  Yeah, I know what you're talking about.

14    Q.  Out of all this work, there were -- the only copied code

03:43:41    15    from all this work is two libraries.  Four functions that go

16    in the DMR DSP -- carrier detect, squelch, noise suppression,

17    and MOD limiter -- and one function in the RFhal library,

18    which is this L1 timer, right?

19    A.  Actually copied line for line, that's correct.  But,

03:44:07    20    again, you're not accounting for the fact that there were

21    documents from Motorola that explained how to do the other

22    coding and that were used in the process of coding but not

23    copied line for line.

24    Q.  You haven't pointed to any documents related to the FPGA

03:44:28    25    functionality, have you?

Wicker - cross by Cloern

5180

1    A.   Motorola didn't use an FPGA.

2    Q.   Exactly.

3    A.   The documents that I've pointed to have been, for example,

4    DSP documents, things that would have been relevant to what is

03:44:39   5    being -- what is replacing the FPGA.

6    Q.   And you've identified no source code file?  You've

7    identified no source code file specifically that you can

8    relate to any of the documents related to the DSP?

9    A.   I don't agree.

03:44:57   10   Q.   Which source code files can you identify?

11   A.   For example, I've pointed out files that use structures

12   from Motorola's L1 timer.  This was in my expert report.

13        You mean --

14   Q.   The L1 --

03:45:08   15   A.   -- in my direct testimony?

16   Q.   -- timer -- the L- -- no, I'm asking about trial, not your

17   expert report.  And the L1 timer is within your directly

18   copied code.

19   A.   So that was what I focused on in my testimony.

03:45:19   20   Q.   So then the answer to my question was correct?

21   A.   Here in court I haven't talked about the other software,

22   no.

23   Q.   You mentioned, I think, on your direct today that Hytera

24   worked on their redesign for over a year, right?

03:45:43   25   A.   Yes, that's my recollection.

Wicker - cross by Cloern

5181

1   Q.  But you know that's not true, right?  You know Hytera

2   rewrote these libraries in a matter of months?

3   A.  I have been looking at redesign code on and off for quite

4   some time.

03:46:00   5   Q.  The first redesign code you got was in July.

6   A.  That's right.

7   Q.  And the last time you got redesign code, I think, was

8   in --

9   A.  Early December, late November.

03:46:09   10   Q.  But that wasn't related to the libraries.  The libraries,

11   it was July through, I think, September or October; is that

12   fair?

13   A.  That's my recollection.

14   Q.  And nobody started on a redesign of the libraries until

03:46:24   15   June?

16   A.  I don't know that.  Furthermore, it was my conclusion that

17   they weren't true redesigns.  They were modifications of

18   essentially Motorola's code.

19   Q.  But what you said earlier today that Hytera has been

03:46:36   20   trying to rewrite these libraries for over a year is not true.

21   You don't have any evidence of that, do you?

22   A.  I saw the first version of a revised code in June, I

23   believe it was.  And it's February, so it's getting towards a

24   year.

03:46:55   25   Q.  Did you see any evidence that Hy- -- Hytera concluded

Wicker - cross by Cloern

5182

1    their library rewrite in October.  What evidence do you have

2    that there's been any further efforts to rewrite these -- to

3    write code for these libraries since October?

4    A.   The code that I saw in October was not truly revised.  So

03:47:15    5    it's --

6    Q.   You haven't seen no new code since then, right?

7    A.   That's true.

8    Q.   And Hytera had no code to revise for these libraries, did

9    they?

03:47:25    10    A.   No, again, because they lost it.

11    Q.   So they had to write that from scratch, right?

12    A.   That's correct.

13    Q.   And they wrote it from scratch in a few months?

14    A.   I don't know that.

03:47:39    15    Q.   You may disagree with it, but they wrote it from scratch

16    in a few months; is that fair?

17    A.   It's been asserted they wrote it in a few months, but I do

18    disagree.

19    Q.   But you have no evidence they have been working on it for

03:47:50    20    over a year?

21    A.   There's evidence in this case that things were pointed out

22    that required rewriting up to two years ago; there was

23    discussion of rewriting in the evidence one year ago; and then

24    I've seen code coming out since then.

03:48:04    25    Q.   Okay.  Well, I have some questions about that, actually.

Wicker - cross by Cloern

5183

1      So the first time that Motorola identified copied --

2  allegedly copied code in this case was in September of 2018,

3  right?

4      Let me help you.  You're familiar with Motorola's

03:48:23    5  response to Hytera's Interrogatory No. 5 asking what code is

6  intended to be copied?  You're familiar with that, right?

7  A.  Yes, I am.

8  Q.  And that was served in September of 2018, right?

9  A.  My recollection is that it's 2018, but beyond that, I

03:48:41    10  don't recall.

11      MR. CLOERN:  Can we get that, please.

12  BY MR. CLOERN:

13  Q.  We'll come back to that.  Just --

14  A.  Okay.

03:48:46    15  Q.  And I'm happy to show it to you, but for now let's just

16  assume it was September of 2018.

17  A.  Okay.

18  Q.  This case was filed in March 2017, right?

19  A.  That's correct.

03:48:54    20  Q.  So that took a year and a half to identify that copied

21  code, right, allegedly copied code?  Correct?

22  A.  Motorola apparently responded a year and a half later.  I

23  would have thought that Hytera was aware of what code was

24  copied and what was not when the suit was initiated because

03:49:15    25  the code was before them.  They had the engineers who wrote

Case: 1:17-cv-01973 Document #: 927 Filed: 02/26/20 Page 180 of 200 PageID #:62405
Wicker - cross by Cloern
5184

1    it.  They know who copied and who didn't.

2    Q.  So the -- so your contention is, the day that this lawsuit

3    was initiated in March 2017, Hytera, the company, has a full

4    set of Motorola code at its disposal that it can go say, oh,

03:49:35    5    I've now been accused of copying, I'm going to get all

6    Motorola source code and I'm going to compare it to all of

7    Hytera source code?  Your contention is that could have

8    happened?

9    A.  It could have happened, but I don't think it did.  I think

03:49:48    10    that there were engineers, though, currently at that time at

11    Hytera who would have known what was copied and what was not.

12    Q.  Sam Chia, G.S. Kok, Peiyi Huang, and Y.T. Kok, right?

13    A.  And the other engineers who worked from Motorola's code.

14    Q.  What other Hytera engineer had any Motorola source code

03:50:08    15    found in their files?  Name one.

16    A.  Huang Ni had source code or at least had op codes for the

17    L1 timer.

18    Q.  We'll address that.

19        She didn't have -- did you find a document, an actual

03:50:24    20    source code file that said "Motorola" at the top of it in

21    Huang Ni's files?

22    A.  No, and that's something we discussed last time.  The

23    source code files, it had Motorola's name deleted.

24    Q.  So what you're referring to is an L1 timer specification

03:50:41    25    Huang Ni wrote in 2015, right?

Wicker - cross by Cloern

5185

1    A.   That's correct.

2    Q.   And in the back of it, it's got some -- what are called

3    event codes, correct?

4    A.   That's right.

03:50:49    5    Q.   And you gave a slide and said here's a Motorola source

6    code file that list these event codes, and you showed Huang

7    Ni's L1 timer spec, the appendix, that had those same event

8    codes, right?

9    A.   That's exactly right.

03:51:05    10    Q.   And from that, you said Huang Ni clearly had Motorola

11    code, didn't you?

12    A.   She had information from the Motorola code, that's right.

13    Q.   You weren't trying to suggest that Huang Ni actually had

14    Motorola code, knowingly had it?

03:51:16    15    A.   I believe she did, yes.

16    Q.   Based on that?

17    A.   That was simply showing she had the information from the

18    code.

19    Q.   Well, do you remember on your cross-examination back in

03:51:28    20    December you actually agreed that those event codes, they're

21    in a Hytera source code file, that's part of the code that was

22    copied from Motorola by Sam and Peiyi?

23    A.   I agree with that.

24    Q.   And when Huang Ni is writing a specification seven years

03:51:49    25    later about RFhal and the L1 timer, she goes to the code,

Case: 1:17-cv-01973 Document #: 927 Filed: 02/26/20 Page 182 of 200 PageID #:62407
Wicker - cross by Cloern
5186

1    Hytera code, and what -- everything that you pointed to she

2    copied from a Hytera code file?

3    A.   That may have been the case; but, again, it originated

4    with Motorola.

03:52:06    5    Q.   But it's not evidence that Huang Ni had Motorola code.

6    A.   It's evidence of the process by which Motorola code has

7    been assimilated into Hytera's code.

8    Q.   Okay.  But that wasn't my question.  What I asked you is,

9    what evidence do you have that any Hytera employee had an

03:52:24    10    actual Motorola source code file, and you pointed to Huang Ni

11    and her L1 timer spec.

12            So can we at least agree now that that's not evidence

13    that Huang Ni had Motorola source code files?

14    A.   I disagree.  It is evidence.  And furthermore, you didn't

03:52:38    15    ask me about any Hytera employee, otherwise there would have

16    been other obvious choices, but you asked for other than, and

17    then you listed a few people.

18    Q.   There is Huang -- there was no Motorola source code file

19    found in Huang Ni's documents; is that correct?

03:52:53    20    A.   I do agree with that.

21    Q.   And there was no Motorola source code file found in

22    anyone's files at Hytera other than Sam, Y.T., and Peiyi,

23    correct?

24    A.   That's my recollection.

03:53:15    25    Q.   So you have no --

Wicker - cross by Cloern

5187

A.   Again, when we're saying Motorola source code files, we're

saying the complete file with Motorola's name at the top --

excuse me -- copyright notice, *et cetera* --

Q.   That --

03:53:29   A.   -- because clearly they were rebranded, Hytera source code

files that were simply copied.  And those were available to a

large number of people.  So Motorola source code was available

to lots of engineers at Hytera.

Q.   Okay.  But I'm -- and I'm going to ask you again.

03:53:47   What I am -- you have an opinion that -- you have

offered an opinion that a lot of Hytera engineers were

directly using Motorola source code files in their work.

A.   Yes.

Q.   And what I -- so I want to stay with that.  Okay?

03:54:05   A.   Okay.

Q.   I'm not asking did a Hytera engineer see a Hytera code

file that Peiyi or Sam copied and, therefore, unknowingly see

Motorola code.

A.   Okay.

03:54:16   Q.   I want to focus on your opinion that Hytera engineers

other than Sam, Y.T., and Peiyi saw -- or directly used

Motorola code.

A.   Okay.

Q.   No one other than Sam, Y.T., or Peiyi had Motorola code in

03:54:33   their files, correct?

Wicker - cross by Cloern

5188

A.   As produced.  And, again, Motorola code, meaning code with

a Motorola heading on it.  Because I don't agree that they

didn't have Motorola code, because they did.  We've seen ample

proof.

03:54:46

Q.   We just -- I just -- I just asked you that that was what I

was asking about.

A.   Okay.

Q.   Knowing Motorola-badged source code was found in no one's

files but Sam, Y.T., or Peiyi, correct?

03:55:04

A.   At the time this litigation began, that was correct.  Or

at least that's my recollection.

Q.   And the L1 timer spec does not -- the fact that it has

event codes at the end of it that match up to a Motorola

source code file, they also match up to a Hytera source code

03:55:22

file written by Peiyi Huang, right?

A.   They match up with a Hytera source code file that was

copied from a Motorola source code, that's correct.

Q.   Written by Peiyi Huang?

A.   That's my recollection, yes.

03:55:34

Q.   So that's not evidence that Huang Ni got those event codes

from a Motorola file?

A.   It alone is not conclusive evidence, but it is evidence.

She had information that was in Motorola source code.

Q.   Which she didn't get directly from Motorola source code?

03:55:59

You don't have evidence that she got it directly from Motorola

Wicker - cross by Cloern

5189

1  source code.

2  A.  There is no -- the Motorola source code file was not found

3  in her possession when this litigation began.

4  Q.  So let's talk about the RAF -- or I have some questions

03:56:11  5  about the RAF core UI document from Yang Shuang Feng.

6  A.  Okay.

7  Q.  There were some core UI -- and you remember the related

8  e-mail as well?

9  A.  Yes, I do.

03:56:23  10  Q.  And there were references to some files, core UIT source

11  code files?

12  A.  Yes.

13  Q.  And you were here for the testimony of

14  Ms. Frederiksen-Cross?

03:56:33  15  A.  That's correct.

16  Q.  And did you see where Ms. Frederiksen-Cross was shown core

17  U- -- source code files with the core UIT file name?

18  A.  Yes.

19  Q.  And there were two.  One that said "Motorola" at the top,

03:56:47  20  and one where "Motorola" had been taken off, right?

21  A.  Exactly right, yes.

22  Q.  And they were both on Peiyi Huang's computer, correct?

23  A.  That is correct.

24  Q.  And you don't know whether Yang Shuang Feng had in his

03:57:01  25  possession -- when he had the files, the core UIT files,

1    whether he had core UIT files that said "Motorola" on them or

2    whether he had source code that nowhere referenced Motorola?

3    A.  Well, again, I know that he had source code that

4    referenced Motorola because there were Motorola terms in it,

03:57:17    5    terms that he was systemically changing to Hytera terms.  So

6    he knew this was a Motorola file.  However, I don't know

7    whether it said "Motorola" at the top or not.

8    Q.  So you don't know if -- so you don't have any evidence

9    about whether Yang Shuang Feng had the file that said

03:57:38    10   "Motorola" at the top or the core UIT file where Peiyi Huang

11   had stripped off "Motorola"?  Just a very limited question.

12   Correct?

13   A.  I don't know which he had.

14   Q.  Okay.  So then the only question is whether -- so let's

03:57:48    15   just assume for a minute that Yang Shuang Feng had the

16   white-labeled version, the version where Motorola's name had

17   been stripped off.  Okay?

18   A.  Okay.

19   Q.  Now I want to turn to your contention that terms like

03:58:02    20   "SVC" or "EMT" or "UIT" should have put Yang Shuang Feng on

21   notice that even though it didn't say "Motorola," he had code

22   from Motorola.  Okay?

23   A.  That's right.

24   Q.  Now, you're aware, right, that when Y.T. Kok came over, he

03:58:19    25   gave -- let me back up for a second.  This code that we're

Wicker - cross by Cloern

5191

1    talking about, this code file, right, the one that you worked

2    with -- or answered questions from Mr. Brown about, this is

3    the one we're talking about, right?

4    A.  Okay.

03:58:35    5    Q.  The one that ends HYT1973-SC-00021309.  You recall that?

6    A.  The Bates number, no, I don't remember that, but I do

7    recall talking about a source code document.

8    Q.  Well, here, I'll -- I'm happy to let you look at it.

9            MR. CLOERN:  May I approach, Your Honor?

03:58:57    10           THE COURT:  Yes.

11   BY MR. CLOERN:

12   Q.  It's the raf_display.cpp.  That's the one he --

13   A.  I remember that.  I don't remember those Bates numbers.

14   Q.  Okay.  And that's the one that you were pointing out the

03:59:06    15   YSF annotations?

16   A.  Exactly.  Yes.

17   Q.  And changing SVC to RAF?

18   A.  For example, yes.

19   Q.  All right.  So we're on the same page now.

03:59:14    20   A.  Sure.

21   Q.  And this source code file, you understand, was not -- this

22   is not in Hytera's SVN server, right?

23   A.  At least it's not shown on the logs.

24   Q.  This was from Peiyi's computer, correct?

03:59:29    25   A.  That particular version, yes.  I believe it was one of the

Wicker - cross by Cloern

5192

1    recovered files from her computer.

2    Q.  And, in fact, it doesn't say "Motorola" on it, does it?

3    A.  I don't believe the word "Motorola" appears, but we talked

4    about the things that would have pointed to Motorola, such as

03:59:45    5    the user interface task, SVC, and I believe there's an EMT

6    reference as well.

7    Q.  So other than references to terms like "EMT" -- which you

8    contend that's a Motorola term, right?

9    A.  It is.  We've seen evidence of that throughout the trial.

04:00:04    10    Q.  You -- ergonomic management technique.  That's what that

11    stands for, right?

12    A.  Task.

13    Q.  Ergonomic management task.

14    A.  Yes.

04:00:12    15    Q.  And you understand that that term is used by others in the

16    radio industry, ergonomic management task, to refer to tasks

17    related to when a human being interacts with a radio?

18    A.  Certainly ergonomics is used, but I don't believe I've

19    seen EMT actually used by others.

04:00:27    20    Q.  Ergonomics is a common term --

21    A.  That's right.

22    Q.  -- to indicate a human interaction with some nonhuman

23    thing, a machine?

24    A.  That's right.

04:00:34    25    Q.  And ergonomic management is frequently used in connection

Wicker - cross by Cloern

5193

1    with people interacting with electronic devices?

2    A.   Certainly the question of ergonomics arises.  My point is

3    simply that EMT as a term and as an acronym used in code, I've

4    only seen it in Motorola's code, other than copied into

04:00:55    5    Hytera's.

6    Q.   Well, you're aware that when Y.T. Kok first came to

7    Hytera, he gave presentations on RAF, right?

8    A.   Yes.

9    Q.   And this relates to RAF, right?

04:01:08   10    A.   Yes.

11    Q.   And when he gave presentations, he used the term "EMT,"

12    correct?

13    A.   That's right.

14    Q.   And he said that was his term, EMT?

04:01:20   15    A.   Well, he had written on EMT while a Motorola employee.  So

16    there are Motorola documents that he created that talk about

17    EMT, that's correct.

18    Q.   When Y.T. Kok first came to Hytera, he -- what is now

19    referred to as RAF he initially referred to as EMT, and then

04:01:38   20    Y.T. Kok later changed the name to RAF, correct?

21    A.   I agree with that, yes.

22    Q.   And Y- -- and no one ever told any Hytera employee that

23    EMT was a Motorola word, right?

24    A.   I think it would have been clear to them.  I don't know

04:01:53   25    whether they were told that explicitly or not.

Wicker - cross by Cloern

5194

1   Q.   It would have been -- you just said no one knows that --

2   why would it be clear to them that EMT is a Motorola term?

3   A.   Because it was coming from someone who just came over from

4   Motorola and was giving presentations on the topic.

04:02:07   5   Q.   Well, is using a term a problem?

6   A.   I don't think I said it was a problem.  I just --

7   Q.   Is the --

8   A.   -- said it --

9   Q.   -- word "EMT" --

04:02:13   10   A.   -- would have been --

11   Q.   Is the acronym "EMT" -- is that a trade secret?

12   A.   The acronym itself?  Not that I know of.

13   Q.   Okay.  So -- so when Y.T. comes over and says we're going

14   to do an application framework, we refer to this as EMT,

04:02:27   15   that's what people are told, right?

16   A.   Yes.

17   Q.   And later on they change it to RAF, radio application

18   framework, right?

19   A.   That's right.

04:02:34   20   Q.   So when somebody sees a reference to EMT, they have -- all

21   they know is that's what Y.T. used to call the application

22   framework?

23   A.   When he worked on it at Motorola.

24   Q.   And when he came over at Hytera?

04:02:48   25   A.   Right.

Case: 1:17-cv-01973 Document #: 927 Filed: 02/26/20 Page 191 of 200 PageID #:62416
Wicker - cross by Cloern
5195

1        MR. CLOERN:  Okay.  May I approach, Your Honor?

2        THE COURT:  Yes.

3  BY MR. CLOERN:

4  Q.  The first page, that's the beginning of that source code

04:03:04   5  file.

6        MR. BROWN:  Counsel, can I have a copy?

7        MR. CLOERN:  It's the same one.

8  BY THE WITNESS:

9  A.  Yes, this is the first page.

04:03:13  10  BY MR. CLOERN:

11  Q.  Does it say "Motorola" at the top?

12  A.  No, it doesn't.  There's no heading.  It starts right away

13  with an include.

14  Q.  Thank you.

04:03:23  15        So this is code that Peiyi modified, right?  This was

16  on her computer?

17  A.  It was on her computer, that's right.

18  Q.  And then the RAF core UI document, we see screenshots that

19  are, you believe, of Motorola code, right?

04:03:39  20  A.  Yes.

21  Q.  And they match up pretty well to Motorola code, correct?

22  A.  I was about to say, I know it's Motorola code.  It matches

23  up very well.

24  Q.  And were you here in Ms. Frederiksen-Cross's testimony

04:03:50  25  when she was asked to compare these white-labeled files, the

Case: 1:17-cv-01973 Document #: 927 Filed: 02/26/20 Page 192 of 200 PageID #:62417
Wicker - cross by Cloern
5196

1    white-labeled core UIT files in Peiyi's laptop, to the

2    screenshots, and the screenshot code matched the modified code

3    that didn't say Motorola?  Were you here for that?

4    A.   Yes, I was.

04:04:08  5    Q.   So there's no evidence that Yang Shuang Feng was ever

6    provided any Motorola-badged code, right?

7    A.   Again, the Motorola-badged, that's right, but it's

8    Motorola code that he was provided with.

9    Q.   But you issued an opinion that Motorola coders were

04:04:24  10   knowingly, willfully using code that they knew to come from

11   Motorola, correct?

12   A.   Yeah, I think you meant Hytera coders.  And, yes, that's

13   right.

14   Q.   So isn't that a -- yes, you are correct.  I meant Hytera

04:04:35  15   coders.  Thank you for that clarification.

16        So don't you think it's an important distinction

17   about whether they were -- whether there's evidence that the

18   Hytera coders were given from Peiyi or Sam or Y.T. actual

19   Motorola source code that says "Motorola" at the top or

04:04:53  20   whether they might have been given code that didn't say

21   Motorola and, as far as they knew, Sam or Peiyi wrote?  Isn't

22   that an important distinction to you?

23   A.   No, because the files themselves have clear references to

24   a system that a Hytera engineer would not recognize as a

04:05:13  25   Hytera system.  They would have said, I've got this code all

Wicker - cross by Cloern

5197

1    of a sudden.  This wasn't written here.  It was given to me by

2    these people who just came over from Motorola, and I see

3    Motorola terms in it.

4          I don't think you have to have Motorola branded at

04:05:27    5    the top for an engineer to realize this came from Motorola.

6    Q.  You have no evidence that Yang Shuang Feng knew that EMT

7    is a Motorola term, do you?

8    A.  I have evidence that he should have known.

9    Q.  Will you answer my question?

04:05:43    10   A.  Evidence where he actually says, I know this came from

11   Motorola, no, I don't believe he ever said that.

12   Q.  But there is evidence that when Y.T. came in and explained

13   the application framework that Y.T. wanted to do, he called it

14   EMT?

04:05:55    15   A.  There is evidence of that.

16   Q.  So there's evidence that what Yang Shuang Feng actually

17   was aware of is that new people come over and they say, we

18   want to add an application framework to your radio and we're

19   going to call it EMT, right?  That evidence is in the record?

04:06:10    20   A.  That's right.

21   Q.  There's no evidence that EMT had anything to do with

22   Motorola, right?

23   A.  I don't agree with what you just said.  There's extensive

24   evidence that EMT is a Motorola term.  And what we've seen is

04:06:30    25   successive scrubbing of the term "EMT" from Hytera's evidence

Wicker - cross by Cloern

5198

1    over time.

2    Q.  So I think you testified that the --

3         MR. CLOERN:  Yeah, can we bring up 20 point --

4    PDX-20.8, please.

5    BY MR. CLOERN:

6    Q.  You've referred to code that gets used frequently and

7    widely throughout the code, correct?

8    A.  That's right.

9    Q.  And so your little box house icon, that's a reference to

10   the RAF library, right?

11   A.  That's right.  It's the skeleton, is the way I think of

12   it.  The framework over -- through which applications interact

13   with each other and with the rest of the radio.

14   Q.  And this is a Motorola code file right here that you

15   contend was used to build the RAF library, right?

16   A.  Yes.

17   Q.  And this is the log entry, "in-app message queue."  You

18   see that right up here, correct?

19   A.  Yes.

20   Q.  That's a function of the application framework?

21   A.  Yes, it is.

22   Q.  Right.  And that function puts messages in a queue?

23   A.  And logs it, yes.

24   Q.  And logs it so that an application can pick it up, right?

25   A.  Or it's going to be processed.  It may lead to an

Wicker - cross by Cloern

5199

1   application being started up.  There's lots of things that can

2   happen.

3   Q.   So an application framework -- I think it was Mr. Zetzl

4   said it was like a traffic cop --

04:08:17   5   A.   Yes.

6   Q.   -- correct?

7   A.   Yes, that was his analogy.

8   Q.   So you've got applications up here, they sit on the

9   application framework, messages that come from other parts of

04:08:29   10   the -- lower in the source code, and it will just direct them

11   to the proper application, correct?

12   A.   Just a little more -- again, more to it than that, but

13   that's an example of what it can do.

14   Q.   It might even turn the application on to receive the

04:08:45   15   message, right?

16   A.   Or it may not even get the message, but it will be turned

17   on.  Yes, there's other things that can happen.

18   Q.   But that's the basic functionality, correct?

19   A.   Yes.

04:08:53   20   Q.   Now, application frameworks can be purchased, correct?

21   You can go out and buy one from a third party?

22   A.   Certainly.

23   Q.   And you're familiar with Android, right?

24   A.   Yes, I am.

04:09:04   25   Q.   That's a -- that's public open source code?

Wicker - cross by Cloern

5200

1    A.   Yes, it is.

2    Q.   And it has an application framework?

3    A.   It does indeed.

4    Q.   It's got its own traffic cop?

04:09:13    5    A.   It does.

6    Q.   And it's equally as usable as the application framework

7    here --

8    A.   No --

9    Q.   -- correct?

04:09:24    10    A.   -- absolutely not.  It would not function in a DMR radio

11    for a variety of reasons, including the fact that an

12    application framework in a cell phone serves a different

13    function than an application framework in a radio that could

14    be used in emergency situations.

04:09:41    15    Q.   Application frameworks are disclosed in textbooks.  You

16    don't disagree with that?

17    A.   I do not.

18    Q.   Application framework is a fairly basic task.  It is

19    routing messages.  Do you agree with that?

04:10:00    20    A.   That is one of its core functions; but as we have

21    discussed and as I've shown with the various diagrams we've

22    put up, there's a lot more to it.  It's not just moving a

23    message from A to B.  In other words, it's far more than a

24    router.  It actually processes the messages and makes

04:10:19    25    decisions on how applications are to interact.

Wicker - cross by Cloern

5201

1    Q.   So I want to hand you three files from previously admitted

2    DTX-1862.  For the record, these are 1862-JJJJ -- that would

3    be four Js -- PTX-1862-KKKK, and PTX-1862-LLLL.

4              I think you pointed out on your slide --

04:11:08    5              MR. CLOERN:  Can I see that again, please,

6    Mr. Montgomery.  20 point -- PDX-20.8.

7    BY MR. CLOERN:

8    Q.   There are more than 1300 references in Hytera's code to

9    this part of the RAF library, right?

04:11:21   10   A.   To this particular -- yes, exactly.  To this --

11   Q.   Did this --

12   A.   -- particular function call code.

13   Q.   Right.  So in the object code, we can look at that, we can

14   see the log entry in that message queue, right?

04:11:34   15   A.   That's right, for example.

16   Q.   So when you put the RAF library or any library into a code

17   base, the rest of the code needs a way to call the

18   functionality that the library performs?

19   A.   Exactly right.

04:11:46   20   Q.   So you don't know what the code is in the library, but

21   let's say I'm an application developer and somebody says

22   here's an application framework library, I, as an application

23   developer, will need to know how to call those functions?

24   A.   That's right.

04:12:00   25   Q.   So that doesn't mean I have the code for it.  It just

Case: 1:17-cv-01973 Document #: 927 Filed: 02/26/20 Page 198 of 200 PageID #:62423
Wicker - cross by Cloern
5202

1    means that somebody says in order -- it's like I need to have

2    an owner's manual for the RAF library.  I need to know how to

3    interact with it, correct?

4    A.  Right.  And that's what -- that's the function of the

04:12:14   5    template, was to tell the Hytera engineers how to use things

6    like log entry and app message.

7    Q.  So one part of the code is going to be -- if you've got a

8    part of the code that does something, all the other parts of

9    the code will call into it.  And they have to call its name,

04:12:28   10   they have to reference it, right?

11   A.  That's correct.

12   Q.  That's what you're talking about here.  There's 1300-plus

13   references where some other piece of the code is using the --

14   is using this function in RAF?

04:12:40   15   A.  Or at least referring to it, that's right.

16   Q.  Okay.  So can you please look at these three files I've

17   just handed you.  These are all files from Hytera's code,

18   right?

19   A.  Yes.

04:12:51   20   Q.  And none of them appear in your Exhibit C or D.  So

21   they're not accused of being copied, right?

22   A.  I'm just making sure I know what --

23   Q.  Sure, sure.

24   A.  -- code we're talking about.

04:13:21   25          Appendix C is pretty extensive.  It's my list of

Wicker - cross by Cloern

5203

1   every single example of a copied line that I could find, but I

2   don't recall these particular files being in there.

3   Q.  And I'll represent that's the case.  And I'm sure if I'm

4   wrong about that, your counsel will point it out on redirect.

04:13:50   5        So let's start with PTX-1862-LLLL, Page 42,

6   Line 2645.  Let me know when you're with me.  We have it on

7   the screen as well.

8   A.  Okay.  I'm there.

9        THE COURT:  Are these files in evidence?

04:14:12   10        MR. CLOERN:  I am sorry, Your Honor.  We would like

11   to move them into evidence.

12        MR. BROWN:  No objection, Your Honor.

13        THE COURT:  They are received and may be published

14   first thing tomorrow.

04:14:24   15        All right.  Members of the jury, you are to return

16   tomorrow morning at 10:00, and the witness will return at

17   10:00.

18        THE WITNESS:  Yes, Your Honor.

19        THE COURT:  Counsel will return at 10:00.

04:14:32   20        Thank you.

21        THE CLERK:  All rise.  Court is adjourned.

22      (Exhibit Nos. PTX-1862-JJJJ, PTX-1862-KKKK, and

23   PTX-1862-LLLL were received in evidence.)

24      (Adjournment 4:14 p.m. to 10:00 a.m., February 5, 2020)

25                    *   *   *   *   *   *

0

1                          C E R T I F I C A T E

2              We do hereby certify that the foregoing is a

3      complete, true, and accurate transcript of the proceedings had

4      in the above-entitled case before the Honorable CHARLES R.

5      NORGLE, one of the judges of said Court, at Chicago, Illinois,

6      on February 4, 2020.

7

8      /s/ *Amy Spee*                              2/5/2020

9      _____                    _____
       Amy Spee, CSR, RPR, CRR                    Date
       Official Court Reporter

10

11     /s/ *Jennifer Costales*                     2/5/2020

12     _____              _____
       Jennifer Costales, RMR, CRR                Date
       Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

09:36:17