5333

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3   MOTOROLA SOLUTIONS, INC., and MOTOROLA    ) No. 17 CV 1973
     SOLUTIONS MALAYSIA SDN. BHD,              )
 4                                             )
                Plaintiffs,                    )
 5   vs.                                       ) Chicago, Illinois
                                               )
 6   HYTERA COMMUNICATIONS CORPORATION, LTD.,  ) February 10, 2020
     HYTERA AMERICA, INC., and HYTERA          )
 7   COMMUNICATIONS AMERICA (WEST), INC.,      )
                                               )
 8              Defendants.                    ) 9:57 a.m.

 9                       TRIAL - VOLUME 35-A
                       TRANSCRIPT OF PROCEEDINGS
10
               BEFORE THE HONORABLE CHARLES R. NORGLE, SR.
11                            and a jury

12   APPEARANCES:

13   For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                            BY:  MR. ADAM R. ALPER
14                               MR. AKSHAY DEORAS
                                 MR. BRANDON HUGH BROWN
15                          555 California Street
                            Suite 2700
16                          San Francisco, California 94104
                            (415) 439-1400
17
                            KIRKLAND & ELLIS, LLP
18                          BY:  MR. MICHAEL W. DE VRIES
                                 MR. CHRISTOPHER M. LAWLESS
19                          333 South Hope Street
                            Suite 2900
20                          Los Angeles, California 90071
                            (213) 680-8400
21

22   Court Reporter:        JENNIFER COSTALES, CRR, RMR
23                          Official Court Reporter
                            219 South Dearborn Street, Room 2342
24                          Chicago, Illinois 60604
                            (312) 435-5895
25                          jenny.uscra@yahoo.com
```

5334

```
 1   APPEARANCES:   (Continued)

 2   For the Plaintiffs:     KIRKLAND & ELLIS, LLP
                             BY:  MS. MEGAN MARGARET NEW
 3                           300 North LaSalle Street
                             Chicago, Illinois 60654
 4                           (312) 862-7439

 5                           KIRKLAND & ELLIS, LLP
                             BY:  MS. LESLIE M. SCHMIDT
 6                           601 Lexington Avenue
                             New York, New York 10022
 7                           (212) 446-4763

 8   For the Defendants:     STEPTOE & JOHNSON, LLP
                             BY:  MR. BOYD T. CLOERN
 9                                MR. SCOTT M. RICHEY
                                  MR. MICHAEL J. ALLAN
10                                MS. JESSICA ILANA ROTHSCHILD
                                  MS. KASSANDRA MICHELE OFFICER
11                           1330 Connecticut Avenue NW
                             Washington, DC 20036
12                           (202) 429-6230

13                           STEPTOE & JOHNSON, LLP
                             BY:  MR. DANIEL S. STRINGFIELD
14                           227 West Monroe Street
                             Suite 4700
15                           Chicago, Illinois 60606
                             (312) 577-1300
16

17
     ALSO PRESENT:           MR. RUSS LUND and
18                           MS. MICHELE NING

19

20

21

22

23

24

25
```

5335

1          (Proceedings in open court.  Jury out)

2              THE COURT:  Good morning, counsel.

3              An order entered by the Court:  The Court accepts the

4      parties' joint stipulation and motion regarding providing

09:57:45   5      admitted exhibits to the jury.  Counsel will be permitted to

6      explain the stipulation to the jury during closing arguments.

7      It is so ordered.

8              Mr. Fulbright has the originals.  These are copies.

9              Is there another motion before the Court this

09:58:05  10      morning?

11              MR. ALLAN:  Yes.  Good morning, Your Honor.

12              THE COURT:  Good morning.

13              MR. ALLAN:  Michael Allan for Hytera defendants.

14              THE COURT:  All right.  What is that motion?

09:58:14  15              MR. ALLAN:  We filed a motion.  We learned over the

16      weekend, when Mr. Malackowski's disclosures were provided to

17      us, that he intends to add an additional 30 something million

18      dollars to his profit analysis based on, we're not exactly

19      sure what, but it's not been in any of his reports.  It's not

09:58:31  20      -- he didn't testify about it when he testified on his direct

21      case.  In fact, he explicitly excluded the inclusion of mobile

22      products on his direct case.  And we think it's too little too

23      late and obviously quite prejudicial to Hytera.

24              THE COURT:  Well, what you have just suggested would

09:58:48  25      be the nature of cross-examination of him when he's on the

5336

1    stand.

2           MR. ALLAN:  We're certainly happy to do that, Your

3    Honor.  But we don't think he should be permitted to introduce

4    new evidence in rebuttal that he could have and should have

09:58:59    5    discussed in his initial case.

6           THE COURT:  What is your response, Motorola's

7    response?

8           First, you have not filed a written response, right?

9           MS. SCHMIDT:  Correct, Your Honor.

09:59:07    10           THE COURT:  All right.

11           MS. SCHMIDT:  I believe this motion was filed at 2:30

12    in the morning.

13           THE COURT:  Proceed.

14           MS. SCHMIDT:  Thank you, Your Honor.

09:59:13    15           Your Honor, we think it's appropriate for

16    Mr. Malackowski to provide this testimony.  In fact, he is

17    simply summing the damages numbers that he provided before.

18           If I may get the Elmo, please?

19           Now, Mr. Malackowski testified on direct about

09:59:33    20    Hytera's financial information.

21           "And this information," he was asked, "Do these

22    include sales information as well and Hytera's sales

23    information?"

24           These exhibits were admitted without objection.

09:59:53    25           Mr. Malackowski then stated that -- he then provided

1    the total.  He stated that the revenue total he provided, $532

2    million, was for portable radios.  And there was another 111

3    million for the mobile.

4         He then provided the profit margin for that.  For the

10:00:17    5    mobile he referenced, that would be 33 percent.

6         He is simply now providing a summation of that to

7    assist the jury.

8         MR. ALLAN:  May I respond briefly, Your Honor?

9         THE COURT:  Yes.

10:00:27    10         MR. ALLAN:  I believe Mr. Malackowski is in the

11   courtroom.  Could we ask he be excused while we are talking

12   about his testimony?

13         THE COURT:  Yes.

14         Please step out.

10:00:39    15      (Witness exited the courtroom)

16         MR. ALLAN:  This is, Your Honor, a figure, there are

17   two figures from Mr. Malackowski's opening report identifying

18   accused products.  The mobile radios all start with an "M."

19   There has been testimony in this case to that effect.  There

10:00:55    20   are no mobile devices accused on either side.

21         Dr. Wicker doesn't accuse any mobile devices.  And

22   Mr. Malackowski relies on Dr. Wicker for his assertion of what

23   is included.

24         And they have taken Hytera to task for updating and

10:01:13    25   filtering the R&D data.  In part what was done was we removed

5338

1    the mobile radios because of Mr. Malackowski's representation

2    that they weren't accused in this case.

3         I mean, they couldn't be clearer.  "Accused devices

4    benefiting from asserted trade secrets sold worldwide," and

10:01:34    5    then he has one for copyright, "Accused devices containing

6    Motorola source code sold in the United States."

7         The two products that they are putting in right now

8    that they claim accounts for $111 million in revenue are not

9    in this case.  They are trying to put that money in on the

10:01:46   10   very last day of trial, and it's completely improper and

11   prejudicial.

12        THE COURT:  There is enough to permit Mr. Malackowski

13   to be called in rebuttal.  I'm not going into the substance of

14   what he will say.  But it is well within the scope of routine

10:02:04   15   rebuttal to call an expert, who now may decide to modify his

16   earlier opinions or summarize them or respond to the attacks

17   on him that came by way of other experts in the case.

18        But it is clearly a matter of the admissibility of

19   his testimony, without going into the substance of it.  How

10:02:28   20   the jury will react to the substance of his testimony is well

21   within their realm, and there is no basis to exclude his

22   testimony, to preclude his testimony.

23        Some of the issues that you have raised on behalf of

24   Hytera may be the subject of cross-examination.  But there is

10:02:45   25   enough to permit him to testify as a rebuttal witness.

1      And so Hytera's motion to preclude rebuttal testimony

2   of James Malackowski is denied.

3      You will have sufficient latitude on

4   cross-examination to raise some of the issues that you have

10:03:02   5   put into your motion to preclude.  But the motion to preclude

6   is denied.

7      MR. ALLAN:  Thank you, Your Honor.

8      One additional point.  Given that Mr. Malackowski is

9   now permitted to testify to these new facts, we would ask the

10:03:15   10   opportunity to recall Dr. Debra Aron as a surrebuttal witness

11   to address his points.

12      THE COURT:  In rare situations the Court can permit

13   surrebuttal, and I'm aware that this is a discretionary call.

14   In view of the totality of the evidence I have heard, the

10:03:32   15   length of the trial and the nature of the issues that would be

16   raised on surrebuttal, the motion to present a surrebuttal

17   witness is denied.

18      MR. ALLAN:  Thank you, Your Honor.

19      THE COURT:  All right.  We're two short?

10:03:48   20      THE CLERK:  We were short.  I'll check again.

21      THE COURT:  Okay.

22      Another note from the jury, just handed to me by

23   Mr. Fulbright.  We'll ask Hytera to read it into the record,

24   please, without mentioning the name of the juror.

10:05:06   25      MR. CLOERN:  "Your Honor, I will be going to Oregon

Malackowski - direct by Schmidt

5340

 1    March 4th through 8th on a family trip.  If possible, I would

 2    like to attend this trip as I invested in it months ago.

 3    Please notify us of the schedule if we begin to approach those

 4    dates."

10:05:23     5        THE COURT:  That matter will be taken under

 6    advisement.

 7        We have one juror who intends to go to Ireland,

 8    another one to where?

 9        MR. CLOERN:  Oregon.

10:05:33    10        THE COURT:  Oregon.  The matter is under advisement.

11        Ask the jurors to come in, please.

12      (Jury in)

13        THE COURT:  All right.  Good morning, members of the

14    jury.  Please be seated.

10:06:18    15        Counsel, you may call the next witness.

16        MR. ALPER:  Your Honor, Motorola calls as its final

17    witness of this case Mr. Jim Malackowski.

18        THE COURT:  Ask him to come in, please.

19        The witness has been previously sworn.

10:06:46    20        Please proceed.

21        MS. SCHMIDT:  Yes, Your Honor.

22      JAMES MALACKOWSKI, PLAINTIFFS' SURREBUTTAL WITNESS,

23                    PREVIOUSLY SWORN

24                  DIRECT EXAMINATION

10:06:49    25    BY MS. SCHMIDT:

Malackowski - direct by Schmidt

5341

1   Q.   Good morning, Mr. Malackowski.

2   A.   Good morning.

3   Q.   It's been a little bit since you were here last, so could

4   you please remind us who you are and what your testimony

10:06:57   5   relates to.

6   A.   My name is Jim Malackowski.  I am the chief executive of

7   Ocean Tomo.  And I am Motorola's damages expert.

8   Q.   And why are you here today?

9   A.   So I'm here to provide an update on my analysis after

10:07:10   10   having reviewed the transcript and Dr. Aron's rebuttal and

11   critique.

12   Q.   How are you familiar with what's happened at the trial

13   since you were here last?

14   A.   Since I was here last, I've had the opportunity to review

10:07:21   15   the daily record with particular attention to Dr. Aron's

16   critique and her demonstratives.

17   Q.   And did you prepare demonstratives to assist with your

18   testimony today?

19   A.   I did.

10:07:36   20        MS. SCHMIDT:  Your Honor, permission to publish

21   Mr. Malackowski's demonstratives today.

22        THE COURT:  It is admitted over objection.

23   BY MS. SCHMIDT:

24   Q.   Now, Mr. Malackowski, did Dr. Aron present a damages

10:07:48   25   number of her own?

Malackowski - direct by Schmidt

5342

1   A.   She did.

2   Q.   And how does Dr. Aron's damages number compare with yours?

3   A.   Well, it is significantly less.  Her damage computation

4   was just over $2 million where mine totals over $345 million.

10:08:00   5        MS. SCHMIDT:   Mr. Schlaifer, could we please get

6   PDX-26.6.

7   BY MS. SCHMIDT:

8   Q.   And, Mr. Malackowski, what does Dr. Aron's opinion that

9   damages should only be $2 million mean?

10:08:10   10   A.   Well, from a business or expert or even a common sense

11   perspective, it means that Hytera would get to keep

12   substantially all of the benefit from its use of the Motorola

13   trade secrets during the entirety of the 2010 through 2019

14   period.

10:08:26   15   Q.   And what impact would there be on Motorola if Dr. Aron is

16   right and Hytera gets to keep all of its profits?

17   A.   Well, it's a huge disincentive to innovation.  If you

18   spend hundreds of millions of dollars developing products, and

19   that can just be taken, and the thief can keep all of the

10:08:46   20   funds, there is no incentive to continue to innovate.

21   Q.   What, if any, impact would this have on consumers?

22   A.   Well, consumers ultimately suffer because we all benefit

23   from new developed technology.  And if companies can't protect

24   their innovation, they're not going to make those investments,

10:09:02   25   and we will not get the next generation of product.

Malackowski - direct by Schmidt

5343

1  Q.  Are you aware that Dr. Aron testified that it would be

2  better for consumers if Hytera were in the market?

3  A.  She did.  And for fair, legal competition, I agree, it's

4  better to have more competitors.  But it's not better if the

10:09:17   5  competition is unfair or illegal.

6  Q.  And how, if at all, does that impact your damages opinion?

7  A.  So when you look at the numbers on the screen, it confirms

8  for me that Dr. Aron's analysis in the scheme of all the work

9  that I did is unreasonable and it frankly confirms the

10:09:35  10  inclusions that I presented in my testimony the last time I

11  sat in this chair.

12  Q.  Mr. Malackowski, I think you need to move the microphone a

13  little bit closer.  We'll try that.

14  A.  Hopefully better.

10:09:54  15       MS. SCHMIDT:  Mr. Schlaifer, could we get PDX-26.2,

16  please.

17  BY MS. SCHMIDT:

18  Q.  Mr. Malackowski, how much revenue has Hytera made from

19  2010 to June 2019?

10:10:05  20  A.  So I've been tracking that as part of my work.  What is

21  shown on the screen on the first line are Hytera's total

22  company revenues from 2010 through June of last year, which is

23  the last date that I have data.  And you can see on the screen

24  it's approximately $4.4 billion.

10:10:20  25  Q.  And how much of that relates to the accused DMR products?

Malackowski - direct by Schmidt

5344

1    A.   So I studied and prepared an analysis showing what was

2    relevant to this case.   And the accused products represent

3    over $734 million from 2010 through middle of last year.

4    Q.   And since this lawsuit was filed in March 2017, how much

10:10:40    5    revenue has Hytera made on the accused DMR products?

6    A.   While this litigation was going on, Hytera has earned

7    revenue of over $279 million just during that period on the

8    products at issue.

9    Q.   And how much is that per day?

10:10:54    10   A.   It's $332,000 a day 7 days a week.

11   Q.   Are you aware that Dr. Aron testified that Hytera's

12   profits were approximately $265 million from 2010 to 2018?

13   A.   I am.   Her testimony was that was the total profit of the

14   entire company during that period.

10:11:13    15   Q.   And how, if at all, does that factor in --

16          THE COURT:   Just a minute.

17          Your chart shows revenue, is that correct?

18          THE WITNESS:   This chart shows revenue, Your Honor.

19          THE COURT:   And Dr. Aron was testifying about

10:11:24    20   profits?

21          THE WITNESS:   Yes.

22          THE COURT:   So that the jury understands the

23   distinction.   You may proceed.

24          MS. SCHMIDT:   Yes, Your Honor.

10:11:29    25   BY MS. SCHMIDT:

Malackowski - direct by Schmidt

5345

1  Q.  Now, Mr. Malackowski, with respect to Dr. Aron's testimony

2  about Hytera's $265 million in profits, how does that factor

3  into your analysis?

4  A.  Well, it was presented as a reasonableness check.  So I

10:11:44  5  looked into the records to understand how it could be that

6  with 4.4 billion in total company revenue over most of a

7  decade, that they would only make 235 million in reported

8  profitability.  So that was an investigation in response to

9  Dr. Aron's criticism.

10:12:01  10  Q.  Could you please turn to PTX-968 in your binder.

11  A.  Yes, I have it.

12  Q.  Okay.  What is this document?

13  A.  This is Hytera's annual report for the year 2017.

14  Q.  Was this document produced from Hytera's files in this

10:12:17  15  case?

16  A.  It was.

17          MS. SCHMIDT:  Your Honor, Motorola moves the

18  admission of PTX-968.

19          MR. ALLAN:  No objection.

10:12:25  20          THE COURT:  It is received and may be published.

21      (PTX-968 was received in evidence.)

22  BY MS. SCHMIDT:

23  Q.  Mr. Malackowski, what is an annual report?

24  A.  The annual report especially for a public company is the

10:12:34  25  most important document, because it summarizes the performance

Malackowski - direct by Schmidt

5346

1    of the entire business for the year and then compares it to

2    prior years and presents management's plans for the company.

3         MS. SCHMIDT:  Could we get PTX-968.2, please,

4    Mr. Schlaifer.

10:12:48    5    BY MS. SCHMIDT:

6    Q.  Is it important that this Hytera annual report be

7    accurate?

8    A.  Critically important.

9         MS. SCHMIDT:  And, Mr. Schlaifer, could we please get

10:12:57   10    the second paragraph blown out.

11    BY MS. SCHMIDT:

12    Q.  And, Mr. Malackowski, what does this say about the

13    accuracy of the annual report?

14    A.  At the front of every annual report disclosure, the board

10:13:08   15    of directors and the officers have to essentially swear or

16    affirm that it's accurate and that they confirm its

17    authenticity, accuracy and completeness.

18         So from an expert point of view, that makes it a very

19    reliable document for our analysis.

10:13:23   20    Q.  And does this annual report include information about

21    Hytera's revenues and profits?

22    A.  It does for the company as a whole, yes.

23    Q.  All right.

24         MS. SCHMIDT:  So, Mr. Schlaifer, could we get

10:13:35   25    PTX-968.6 and also .7 and if you could -- thank you -- the

Malackowski - direct by Schmidt

5347

1    table that's on those pages.

2    BY MS. SCHMIDT:

3    Q.   So, Mr. Malackowski, could you please orient us and

4    explain what we're looking at?

10:13:45    5    A.   So this is the most summary table that you'll find in the

6    annual report.  It shows in the second column the results of

7    2017.   In the third column it shows results of the prior year,

8    2016, and then it calculates the difference.

9            The top row in the report they call operating income

10:14:03    10    in China, but that is revenue, what we would call sales.

11           And then there are various measures of profitability

12    and other financial metrics.

13    Q.   In what currency is this in?

14    A.   This is RMB or Yuan, the Chinese currency.

10:14:18    15    Q.   To convert that to U.S. dollars, how would you do that?

16    A.   It's about 6.78 or about 7 times today.   You divide by 7.

17    Q.   And now, Mr. Malackowski, based on what you observe here

18    about the revenues and profits, what does that tell you?

19    What, if anything, does that tell you about Hytera's business?

10:14:36    20    A.   So in response to Dr. Aron's testimony, I started by first

21    looking at the profit that she cited.

22           And if you go to the first column, the third number

23    down, 160 million RMB, that's net profit.  But if you read the

24    description, it's net profit after deducting extraordinary

10:14:56    25    items.   So it's not even the measure of profit from the

Malackowski - direct by Schmidt

5348

1    business generally.

2         If you look at the line above, the 244 million, you

3    can see there was substantial additional profit that was

4    actually earned before extraordinary events.

10:15:11    5    And when you take into account the other spending

6    they were doing, the next line down, which to me as an

7    accountant is really the most important, is the net cash flow,

8    how much money did you actually make that you could take home.

9    And that showed that they lost actually 243 million RMB.

10:15:28    10    So something was happening with all the profits that

11    they were generating.  And simply looking at the profits after

12    these extraordinary items is not a reasonable benchmark to

13    what we are doing here.

14    Q.   Now, is there anything in the annual report that explains

10:15:44    15    what Hytera is spending its revenues on?

16    A.   Yes.  Because of the importance of this document,

17    management needs to explain that.  So when you look at the

18    report, you can see a detailed description of the key events

19    that were driving that difference.

10:15:57    20         MS. SCHMIDT:  Mr. Schlaifer, can we please go to

21    PTX-926.20.  And in particular if you could please blow out

22    the paragraph with the main reason and the paragraph below it.

23    Thank you.

24    BY MS. SCHMIDT:

10:16:11    25    Q.   And so, Mr. Malackowski, what does Hytera report regarding

Malackowski - direct by Schmidt

5349

1    its revenues and profits?

2    A.   So this paragraph immediately before it talks about the

3    fact that the main reason for the rapid growth in sales

4    revenue but the decline in net profit are -- so here is what

10:16:28    5    we're looking for, we're looking to understand how this could

6    possibly happen.

7         If you go to the middle of that paragraph the first

8    thing we see, number 2, the company completed the acquisition

9    of Sepura.  And if you go down three more lines, four more

10:16:43    10   lines you can see the company completed the acquisition of

11   Norsat.

12        So what they were doing is taking profits they were

13   earning, for example, on mobile radios and they were buying

14   businesses with them in part, and that was driving that

10:16:56    15   negative cash flow.

16        And then if you go down to the next paragraph, if you

17   look at point number 2, it talks about "In order to seize the

18   market opportunities, the company has continuously increased

19   the R&D of next-generation broadband products."

10:17:14    20        And so now we understand why the profitability

21   declined, because they were taking the profits from the

22   profitable segments, the radios at issue, and they were

23   investing them in future products in order to leapfrog or get

24   to the next generation of product.

10:17:31    25   Q.   And now, Mr. Malackowski, does this document explain why

Malackowski - direct by Schmidt

5350

1    Hytera chose to acquire Sepura and Norsat?

2    A.   It does.   It explains the business motivation for these

3    decisions.

4         MS. SCHMIDT:   Mr. Schlaifer, can we please go to

10:17:46    5    PTX-968.19, in particular the paragraph that starts "In 2017."

6    BY MS. SCHMIDT:

7    Q.   And so what was the, what was the strategy involved in

8    acquiring Sepura and Norsat?

9    A.   Well, the first sentence describes the fact that their

10:18:00   10   strategy was to continue to focus on public mobile radio field

11   and the various activities around its corporate strategy and

12   its annual business plan.

13        And if you go down to the middle of the paragraph, it

14   explains that they were closely following the national "One

10:18:16   15   Belt, One Road" strategy, and that talks about implementing

16   the company's global implementation plan.  And they were doing

17   that by specifically buying these companies in London, Canada

18   and the U.S.

19        The "One Belt, One Road" is the Chinese national

10:18:35   20   government growth strategy.  So, again, it's confirming that

21   the profit number you see isn't the whole story, that they

22   were taking the profits of the business and pursuant to the

23   governmental plan they were acquiring business to have a

24   global advantage in the marketplace.

10:18:48   25        MS. SCHMIDT:   And, Mr. Schlaifer, can we please go to

Malackowski - direct by Schmidt

5351

1    968.62, in particular section 3.

2    BY MS. SCHMIDT:

3    Q.   Mr. Malackowski, now turning to Hytera's R&D investments,

4    what does the annual report say about those?

10:19:03    5    A.   So here they actually link the success of the DMR products

6    specifically to those expansion plans.  So it's not just an

7    association, there is a cause and effect.

8            And if you look to the middle of this paragraph, they

9    say "The promotion and sales of the company's digital mobile

10:19:21   10   radio products have entered a phase of positive expansion."

11           And then if you go about a sentence down it says,

12   "The company will further enhance its focus on industry

13   solutions, increase sales efforts and channel coverage,

14   maintain the high speed growth of DMR sales revenue.  Through

10:19:39   15   the integration of business after mergers and acquisitions,

16   the company will further enhance its market competitiveness in

17   the TETRA field" and it goes on.

18           So it's explaining it's using the DMR radios to make

19   acquisitions to enhance its competitive position.  So it's all

10:19:55   20   connected together.

21   Q.   So, Mr. Malackowski, what year was this annual report for?

22   A.   This was for the year 2017, published in 2018 in the

23   spring.

24   Q.   And so was Hytera reporting that its revenues from the

10:20:08   25   accused products were positively expanding during this

Malackowski - direct by Schmidt

5352

1   lawsuit?

2   A.  Yes, and that those revenues were then being used for

3   other things.

4   Q.  And now based on your analysis of Hytera's annual report,

10:20:20   5   how, if at all, does that inform your opinion as to whether or

6   not Dr. Aron's reference to Hytera's $260 million in profits

7   is relevant to damages?

8   A.  It's not relevant.  At best, it's an apple and an orange.

9   On further investigation, it's simply confirming the success

10:20:38   10   of the DMR products and their ability to drive the growth of

11   the rest of the business.

12   Q.  Now, in addition to presenting her $2 million opinion, did

13   Dr. Aron also offer criticisms of you?

14   A.  She did.

10:20:52   15        MS. SCHMIDT:  Could we please get DDX-22.4.

16   BY MS. SCHMIDT:

17   Q.  Mr. Malackowski, what is this slide?

18   A.  This is one of Dr. Aron's slides, her summary chart

19   showing four criticisms she had of the work that I testified

10:21:06   20   to in November.

21   Q.  Now I'd like to ask you about each of these starting with

22   Dr. Aron's criticism that you did not deduct R&D.  Which of

23   your opinions does that criticism relate to?

24   A.  So that would relate to my calculation of unjust

10:21:22   25   enrichment or the amount of profits that Hytera made.

Malackowski - direct by Schmidt

5353

1         MS. SCHMIDT:  Could we get PDX-26.7, please.

2  BY MS. SCHMIDT:

3  Q.  Mr. Malackowski, what are the components of your unjust

4  enrichment calculation?

10:21:34  5  A.  As I testified to, there are two components.  There are

6  the profits that Hytera actually made on the sales that are

7  accused and it's the R&D that they saved that they did not

8  have to spend because they misappropriated the trade secrets.

9         Dr. Aron's first criticism goes to the first point on

10:21:53  10  my chart.

11  Q.  And now does PDX-26.7 summarize your opinion on unjust

12  enrichment?

13  A.  It does.  So it shows the unjust enrichment total of

14  $345,761,156 and the two components.

10:22:09  15  Q.  And is it more convenient to review PDX-26.7 than the

16  financial documents you relied on?

17  A.  Of course.

18  Q.  And have those documents been made available to Hytera?

19  A.  They have.

10:22:20  20        MS. SCHMIDT:  Your Honor, we move the admission of

21  PDX-26.7.

22         THE COURT:  It is received over objection.

23     (PDX-26.7 was received in evidence.)

24  BY MS. SCHMIDT:

10:22:29  25  Q.  So, Mr. Malackowski, how did you calculate Hytera's

Malackowski - direct by Schmidt

5354

1    profits, the first component of your unjust enrichment?

2    A.   As I testified to before briefly, I looked to the Hytera

3    sales records.  And from the revenues of the accused products,

4    I deducted the appropriate expenses, the cost of sales, the

10:22:49    5    licensing fees, the selling, general and administrative cost

6    to come up with a net profit number appropriate for the

7    litigation.

8    Q.   And what did Dr. Aron say you should have done

9    differently?

10:22:59    10    A.   Well, she says, in addition to the cost I deducted, I

11    needed to make further deductions for the R&D expenses that

12    Hytera itself did incur.

13    Q.   And do you agree with Dr. Aron that you should have

14    included -- or excuse me, deducted Hytera's R&D spending?

10:23:19    15    A.   I don't.  I talked about that at some length last time I

16    testified to it.  I do not believe that those costs should be

17    deducted, primarily because the records are not accurate or

18    adequate.

19              MS. SCHMIDT:  Could we please get PDX-10.28.

10:23:29    20    BY MS. SCHMIDT:

21    Q.   So, Mr. Malackowski, why did you conclude that Hytera's

22    R&D data was unreliable?

23    A.   There were a number of reasons, but most importantly, as

24    this chart shows, if you look at Hytera's reported R&D cost,

10:23:48    25    at least as originally reported by year, you find that the

Malackowski - direct by Schmidt

5355

1    costs go up significantly in the last 3 years of this

2    analysis.

3            But the radios that were introduced and supposedly

4    relate to this R&D came substantially long before the last

10:24:05    5    three years.

6            And so even from a common sense perspective, if you

7    are talking about research expenses, they come before you

8    launch the product, not 5 to 10 years later.  There is

9    something that clearly is not right about this data.

10:24:18    10    Q.  Now, the data that we're looking at on this slide, when

11    did Hytera provide it?

12    A.  This data was provided prior to the trial in the summer of

13    last year.

14    Q.  And are you aware that Hytera produced revised R&D data

10:24:32    15    during this trial?

16    A.  More than once, yes.

17    Q.  When did Hytera produce that data?

18    A.  I believe the first revised data was in November, right

19    before I testified, and then again in December.

10:24:43    20    Q.  And have you reviewed that data?

21    A.  I have.

22    Q.  All right.  And in your 20-plus years of experience, are

23    you ever aware of a party revising its R&D data multiple times

24    during trial?

10:24:55    25    A.  No.  That's extremely unusual.  And I don't think I've

Malackowski - direct by Schmidt

5356

1    ever seen it happen, because you are simply pulling data from

2    an accounting system, so it would make no sense that you have

3    to do it multiple times and somehow the numbers would change.

4    Q.   Now, how, if at all, did that impact your opinion on the

10:25:11    5    reliability of Hytera's R&D data?

6    A.   Well, it raised even further questions and then it caused

7    me to go back and review the data one more time in detail to

8    try to understand why that would happen.

9    Q.   Did Dr. Aron rely on the new R&D data that Hytera

10:25:28    10    produced?

11    A.   She did.  Her analysis was based upon the final and most

12    recent set of data.

13              MS. SCHMIDT:  Mr. Schlaifer, could we please get the

14    trial transcript at page 5012, lines 6 through 12, please.

10:25:40    15    BY MS. SCHMIDT:

16    Q.   What did Dr. Aron say about the new R&D data?

17    A.   Dr. Aron was asked about the new data.  And her

18    explanation as shown in the last two lines here was that "It

19    was a filtering down of the data that was originally produced.

10:25:56    20    It's the same data, but it's a subset of the data."

21    Q.   And do you agree with that?

22    A.   No, not after analyzing the data.  If it's a subset of the

23    data, it should be less than what was originally produced.

24    It's filtered away and you're just looking at part of it.

10:26:13    25    That's not what happened.

Malackowski - direct by Schmidt

5357

1    Q.  And do you have examples to explain what you are talking

2    about?

3    A.  I do.

4    Q.  So, Mr. Malackowski, could you please turn to PTX-2352 in

10:26:24    5    your binder.

6    A.  Yes.

7    Q.  What is this document?

8    A.  This is the R&D data that was provided in the summer of

9    last year, the detailed spreadsheet showing all of the

10:26:36    10    information.

11    Q.  And was this document produced by Hytera to Motorola in

12    this case?

13    A.  It was.

14         MS. SCHMIDT:  Your Honor, we move PTX-2352 into

10:26:45    15    evidence.

16         THE COURT:  It is received over objection.

17         (PTX-2352 was received in evidence.)

18    BY MS. SCHMIDT:

19    Q.  Mr. Malackowski, what information is in PTX-2352?

10:26:53    20    A.  So this is a massive data spreadsheet that shows product

21    codes for various R&D efforts at Hytera.  And then next to the

22    product code there is a written description of what that R&D

23    was actually spent on.

24         MS. SCHMIDT:  Mr. Schlaifer, can we please go to

10:27:10    25    PTX-2352.24 and pull up rows 1 through 20.  And then you've

Malackowski - direct by Schmidt

5358

1   got 70 through 75, too.  Thank you.

2   BY MS. SCHMIDT:

3   Q.  Mr. Malackowski, can you please describe what's on the

4   screen?

10:27:25   5   A.  So this is as I just mentioned.  In the first second

6   column, the column labeled A, you can see the item code.  So

7   that's the accounting code to help Hytera keep track of what

8   the engineers are doing.

9          And then column B, you can see the product type,

10:27:41   10   where they are keeping track of exactly what they are working

11   on.  And there are many of these codes throughout their data.

12   Q.  And did you compare these codes to the later data that

13   Hytera produced?

14   A.  In detail, I did, yes.

10:27:56   15   Q.  Okay.

16          MS. SCHMIDT:  So, Mr. Schlaifer, could we keep

17   PTX-2325 -- excuse me, 2352 up on the left and then pull up

18   DTX-5502 on the right, page 27, and maybe the first 20 or so

19   rows, please.

10:28:13   20          This is already admitted.

21   BY MS. SCHMIDT:

22   Q.  And so, Mr. Malackowski, now what are we showing or now

23   what are you showing on the screen?

24   A.  So on the left side of the screen is the chart that we

10:28:24   25   just talked about, what I was given in the summer of last

Malackowski - direct by Schmidt

5359

1    year.

2         And what is shown on the right side of the screen is

3    the new updated information.

4    Q.  And are there any differences between the data in the

10:28:40   5    2019, June 2019 data and the Hytera, the data Hytera produced

6    during this trial?

7    A.  There are.

8    Q.  Okay.  Could you point those out for us?

9    A.  Well, let me give you a couple of examples.  If you go on

10:28:50  10    the left side of the screen to the first row, it's not a

11    high-end industry model, row 6.  You've got a code 400029.

12    It's described as a public item.  And that's what the record

13    was in the summer of last year.

14         Now if you go to the R&D data, that's been changed

10:29:11  15    and it's now considered to be a mid or high-end radio, which

16    is at issue in this product -- in this case.

17         An even more telling example is if you go to 400084.

18    Here it's listed as a public item and public accessory.  If

19    you go further into that database, it's actually classified as

10:29:34  20    a low-end radio in the summer of last year.  But if you look

21    at where it is today, it's been changed from being a low-end

22    radio development, which is not relevant to this case, to

23    middle and high-end models, which are relevant to this case.

24    Q.  Thank you.

10:29:52  25         And, Mr. Malackowski, do we have that on the screen

Malackowski - direct by Schmidt

5360

1    now?

2    A.  We do.  So you can see row 72, 400084.  Last summer it was

3    reported as being a low-end commercial model.  During the

4    trial that was changed and now it's a high-end commercial

10:30:06    5    model, mid to high end.

6    Q.  And what impact did these changes have on the data?

7    A.  Well, if you just relied on the data without considering

8    it, it would cause you to want to make more deductions in R&D

9    expense and lower damages in this case.

10:30:23   10          MS. SCHMIDT:  Could we go to PDX-26.4, please.

11    BY MS. SCHMIDT:

12    Q.  What is this, Mr. Malackowski?

13    A.  This is one of Dr. Aron's charts based upon the data that

14    was produced in the summer of last year.  So this was her

10:30:38   15    first analysis of that data.

16          And what you can see is it has the same problem that

17    I originally pointed out to you, that in the last three years,

18    the R&D data jumps significantly for the products in this

19    case, which doesn't make any sense because essentially all the

10:30:55   20    products were in the market long before that happened.

21          MS. SCHMIDT:  And could we go to PDX-26.5.

22    BY MS. SCHMIDT:

23    Q.  And so what happened with the new data?

24    A.  So this is Dr. Aron's analysis using the new data.  And

10:31:08   25    you can see there is a substantial change or a smoothing.

Malackowski - direct by Schmidt

5361

1       And so you might say, well, in the last three years

2   the numbers went down because we were filtering.  We were

3   taking a subset.

4       Okay.  That doesn't explain what happened in every

10:31:21  5   other year where the numbers actually went up.  You can't take

6   a database, take a subset of it and have the total be larger

7   than the original.  That's just wrong.

8   Q.  Are the changes to those project descriptions that we

9   looked at just data filtering?

10:31:38  10  A.  It's not just data filtering.  Somebody went in and

11  changed the codes to attribute more R&D expense to the

12  products to this litigation, and that change was made during

13  the litigation.

14  Q.  Now, what, if anything, did Dr. Aron say about where these

10:31:53  15  documents came from?

16  A.  They came from Hytera.

17      MS. SCHMIDT:  Mr. Schlaifer, could we please get the

18  trial transcript, 4842, at lines 2 through 5, please?

19  BY MS. SCHMIDT:

10:32:06  20  Q.  And, Mr. Malackowski, here Dr. Aron is referencing

21  DTX-5502.  Is that the document that we just looked at?

22  A.  It is.

23      MS. SCHMIDT:  Mr. Schlaifer, if we go down to trial

24  transcript at 4843, lines 1 through 3.

10:32:16  25  BY MS. SCHMIDT:

Malackowski - direct by Schmidt

5362

1   Q.   What does Dr. Aron say about where the spreadsheets came

2   from?

3   A.   Well, she says they came from Hytera's business records.

4   They were given to her by Hytera.  But then she adds that they

10:32:31   5   were kept in the normal course of business at Hytera.

6           But that we know can't be right, because the normal

7   course documents were 5 to 10 years ago.  It would have been

8   the original numbers, not the changed numbers.

9   Q.   Did anyone at Hytera provide testimony about how Hytera

10:32:46   10   maintains its R&D data?

11   A.   Yes.  Their vice-president, Mr. Yuan, described that in

12   more detail.

13           MS. SCHMIDT:  Mr. Schlaifer, could we please go to

14   3422, lines 13 through 21 of the trial transcript.

10:32:56   15   BY MS. SCHMIDT:

16   Q.   What does Mr. Yuan say about how Hytera maintains its R&D

17   data?

18   A.   So he was asked specifically:

19           "Focusing on the research and development data and

10:33:09   20   specifically the product, project codes and product names that

21   you mentioned," that's what we were just looking at, "how do

22   Hytera engineers doing research and development record their

23   time at Hytera?

24           "Answer:  Most of them, they belong to a project, so

10:33:25   25   they have the project codes.  And they are working hour, it's

Malackowski - direct by Schmidt

5363

1   recorded on a weekly basis at the time they're doing it, back

2   in 2010, '11, '12."

3   Q.  So what does that mean with respect to the November and

4   December 2019 data that Hytera produced?

10:33:42   5   A.  In my opinion as a forensic accountant, which is the study

6   of historical accounting information, it just cannot be

7   possible that the data that was received during trial was

8   prepared in normal course based upon records that happened 5

9   to 10 years ago and that are not a subset but now are greater

10:34:01   10   than they ever were.

11   Q.  And what, if anything, does that lead you to conclude

12   about whether it is appropriate to give Hytera credit for its

13   R&D?

14   A.  So the accounting standards specifically talk about the

10:34:12   15   use of data and that that data must be reliable, and if it

16   isn't, it shouldn't be used.  So in my opinion, consistent

17   with what I testified to last year, those deductions should

18   not be made.  They're not appropriate.

19        MS. SCHMIDT:  Mr. Schlaifer, could we please get

10:34:28   20   DDX-22.4.

21   BY MS. SCHMIDT:

22   Q.  What is Dr. Aron's next criticism of you?

23   A.  Her next criticism is that the unjust enrichment is

24   overstated by adding what she calls hypothetical research and

10:34:38   25   development.

Malackowski - direct by Schmidt

5364

1          MS. SCHMIDT:  Now, can we get PDX-26.7.

2     BY MS. SCHMIDT:

3     Q.   In which of the components of your unjust enrichment

4     opinion does this relate to?

10:34:51   5     A.   So this relates to the second component, which is the cost

6     savings that Hytera received by not incurring the research and

7     development that it took Motorola to develop the trade

8     secrets.

9     Q.   What is avoided R&D?

10:35:06  10     A.   Well, it's like what I testified to when I talked about

11     the simple cookie stand.  The benefit from the theft of the

12     trade secrets is you make the profits on the cookies, but you

13     also don't have to spend all the time developing the recipes

14     and expense and time of doing that.  So your total benefit is

10:35:24  15     your profits plus the savings.

16     Q.   So is avoided R&D something that actually happened?

17     A.   Yes.  They actually avoided or saved this R&D expense by

18     misappropriating the trade secrets rather than coming up with

19     those innovations on their own.

10:35:41  20          MS. SCHMIDT:  Could we get DDX-22.12, please.

21     BY MS. SCHMIDT:

22     Q.   Mr. Malackowski, when would this avoided R&D have

23     happened?

24     A.   It happens with each and every product.  There is no

10:35:54  25     product that can be brought to the market in this case without

Malackowski - direct by Schmidt

5365

1    the benefits of that research and development.  So it relates

2    to each and every product at the time that product is

3    introduced.

4    Q.   And so does that mean that avoided R&D applies to products

10:36:07    5    released in February 2017 and January 2019?

6    A.   Yes.

7         MS. SCHMIDT:   Mr. Schlaifer, can we go back to

8    PDX-26.7, please.

9    BY MS. SCHMIDT:

10:36:16    10    Q.   What data did you rely on to arrive at your 73.6 million

11    in avoided R&D?

12    A.   So that was a calculation that was based upon the Motorola

13    labor hours, because they were the ones that actually

14    developed the trade secrets at issue, multiplied by the

10:36:33    15    Chinese monthly labor rate.

16         And if you recall, I testified that the best data was

17    actually Motorola's Chinese labor cost because of further

18    concerns regarding the Hytera labor cost.

19    Q.   Now, why did you rely on information from Motorola?

10:36:50    20    A.   Again, the Hytera labor data, even what was produced back

21    in last summer had other errors, unexplainable inconsistencies

22    with the information, and it was an outlier to what everything

23    else suggested.

24    Q.   And who developed the trade secrets in this case?

10:37:11    25    A.   Motorola.

Malackowski - direct by Schmidt

5366

1     MS. SCHMIDT:  If we could please go to PDX-26.8.

2     BY MS. SCHMIDT:

3     Q.  What monthly cost per engineer did Dr. Aron use?

4     A.  So Dr. Aron as shown on the screen looked through all of

10:37:25    5     the Hytera data and chose the lowest monthly engineering cost

6     that was produced, which was approximately $1600 per month per

7     engineer.

8     Q.  And how does that compare with the monthly cost per

9     engineer that you used?

10:37:40    10    A.  So I used the Motorola costs from their Chinese operation.

11    You can see it's more than double what Dr. Aron used or

12    approximately $3900 per month per engineer.

13    Q.  Did Dr. Aron criticize the cost per engineer that you

14    used?

10:37:54    15    A.  She simply indicated it was too high.  Yes.

16    Q.  Have you seen any other data that supports your use of

17    $3,992 as a cost per engineer?

18    A.  Yes.  As a check throughout this trial there has been

19    other data produced related to the engineers that have been

10:38:11    20    discussed at the trial and their monthly salary and benefit

21    cost.

22        MS. SCHMIDT:  Could we please go to PDX-26.9.

23    BY MS. SCHMIDT:

24    Q.  What are you illustrating on this slide, Mr. Malackowski?

10:38:21    25    A.  So this illustrates the four engineers for which data has

Malackowski - direct by Schmidt

5367

been produced during this trial starting with G.S. Kok, Sam

Chia, Y.T. Kok and Huang Peiyi.  And it shows their monthly

salary and benefit expense.

Q.  And how does that compare to the monthly engineering costs

10:38:42   that you used?

A.  Well, as the chart shows, it reaffirms my analysis and

even shows that it's probably conservative or too low, that

that avoided R&D cost could be actually higher.

Q.  Now, how does the -- how, if at all, does the amount that

10:39:00   Hytera was paying engineers working on DMR inform whether or

not Dr. Aron's monthly costs per engineer is reliable?

A.  So to me, it presents two problems.  One is that the data

itself is simply too low because of its inconsistencies.  But

even if you were to assume it's accurate, it reflects a level

10:39:23   of expertise or skill that is not sufficient for these

products, because the engineers that we know were qualified

are being paid two and three times the amount.

        So whatever engineering the $1600 reflects are

engineers that are not necessarily needing to innovate but

10:39:43   perhaps just needing to replicate, which is a lower cost.

That is not the cost that would be appropriate for them to

develop their own innovations comparable to the trade secrets.

        MS. SCHMIDT:  Could we go to PDX-26.7.

BY MS. SCHMIDT:

10:39:56   Q.  So, Mr. Malackowski, are you aware that Dr. Aron

Malackowski - direct by Schmidt

5368

1    criticized you for adding Hytera's profits to Hytera's R&D

2    savings?

3    A.    I am aware that she was critical that I added these two

4    numbers together, which frankly is quite puzzling.

10:40:13    5    MS. SCHMIDT:    And could we go to DDX-22.37.

6    BY MS. SCHMIDT:

7    Q.    Why was that puzzling, Mr. Malackowski?

8    A.    Well, A, because it's right; but B, because she does

9    exactly the same thing in her analysis.

10:40:26    10    Her calculation of $2 million in damages is the total

11    of unjust enrichment on sales - she puts it second, I put it

12    first - and the total of the R&D savings.  It's the same two

13    components.  She concurs they need to be added together.

14    MS. SCHMIDT:    If we could go to the trial transcript,

10:40:44    15    Mr. Schlaifer, page 4827, lines 9 through 21.

16    BY MS. SCHMIDT:

17    Q.    Why does Dr. Aron say that it's not okay for you to add

18    avoided R&D and Hytera's profits together?

19    A.    So it's line 12 to 16, she says that Motorola's expert,

10:41:02    20    me, incorrectly added the components together to assume that

21    Hytera would incur several tens of millions of dollars in

22    research and development that it didn't actually do.

23    Well, of course they didn't do it because they

24    misappropriated the trade secrets, but that's the savings that

10:41:19    25    they realized.

Malackowski - direct by Schmidt

5369

1    And she wants to say at the bottom that it's somewhat

2    like having your cake and eating it, too.  It's not.  It's two

3    distinct measures of benefit that they received that should be

4    accounted for.  And the fact that she adds them together

10:41:34    5    should be confirmation of that.

6    MS. SCHMIDT:  Could we go to PDX-26.6.

7    BY MS. SCHMIDT:

8    Q.  Is adding avoided R&D and Hytera's profits together having

9    your cake and eating it, too?

10:41:48    10    A.  No.  It's a full measure of damage.  The ability to take

11    the trade secrets and not have to pay would be having your

12    cake and eating it, too.

13    MS. SCHMIDT:  Mr. Schlaifer, could we go back to

14    DDX-22.4.

10:42:03    15    BY MS. SCHMIDT:

16    Q.  Mr. Malackowski, what is Dr. Aron's next criticism of you?

17    A.  Well, her next criticism is that I improperly calculated

18    damages using a head start scenario, specifically my criticism

19    that even if you were to assume Hytera could develop on their

10:42:18    20    own, that once that happens, they don't immediately pick up

21    where they would have left off that they have to build back

22    into the market.

23    Q.  Are you aware that as part of this criticism Dr. Aron

24    testified that your opinion depends on Hytera never selling a

10:42:33    25    DMR radio?

Malackowski - direct by Schmidt

5370

10:42:50

10:43:08

10:43:20

10:43:42

10:43:59

1    A.   I am, again, puzzled by that, but that's what she said.

2    Q.   And why are you puzzled?

3    A.   It's not my opinion that Hytera could never sell a radio,

4    only that they couldn't sell a comparable radio with the trade

5    secret feature and benefit that they took from Motorola, that

6    they would have to develop something on their own.

7    Q.   And why is it important that the radio be comparable?

8    A.   Because consumers are sophisticated in this market and

9    they are paying significant premiums for the features that are

10   represented by the trade secrets.  So if the Hytera came out

11   with a product that didn't have those benefits, they wouldn't

12   have the success in the marketplace.

13           MS. SCHMIDT:   Now, could we go to PDX-26.10.

14   BY MS. SCHMIDT:

15   Q.   What is the effect of Dr. Aron's opinion that damages

16   should be limited in time?

17   A.   Well, there is three things.  Her first opinion is that if

18   they could come out with a new radio in, say, 2010, that they

19   should get to keep all of the ill-gotten gains throughout this

20   entire period and continuing into the future, when in reality

21   they actually did benefit from profits using the trade secrets

22   and they did benefit from the cost savings.

23           Secondly, she assumes that, well, if it took them,

24   say, to 2014 to come up with a new radio, that when they

25   introduced the new radio in 2014, they would, as if by magic,

Malackowski - direct by Schmidt

5371

1    all of a sudden keep the same $72 million in sales that they

2    actually had, and there would be no harm from having -- or no

3    need to ramp back up again and to get those customers.  That

4    is obviously not the case.

10:44:16    5    Q.  All right.  Now, would letting Hytera keep all the

6    revenues it made from selling products with Motorola's trade

7    secrets and source code be fair and reasonable compensation?

8    A.  In my opinion, no.  The measure of disgorgement is to

9    actually from an accounting perspective show the profits that

10:44:34    10    were earned and the costs that were saved.  So in order to do

11    that, you have to take into account what actually happened.

12    And this chart shows the actual benefit.

13    Q.  And from a finance perspective, what impact would there be

14    if Hytera got to keep all those profits?

10:44:47    15    A.  It would have the same demotivating factor to Motorola or

16    any other innovator.  If someone could simply steal the trade

17    secrets, wait a decade, come around later and say, well, I

18    could have done something else and would have been no harm no

19    foul.  That doesn't create incentives for anyone to want

10:45:09    20    to invent.  It creates incentives to want to steal.

21    Q.  Are you aware that Dr. Aron also testified that there is a

22    rule that trade secret damages must be limited to a head

23    start?

24    A.  I'm aware she testified.  Puzzled again.  That's not the

10:45:23    25    rule.

Malackowski - direct by Schmidt

5372

1    Q.  And are you familiar with the car analogy that Dr. Aron

2    mentioned during her direct?

3    A.  I am.  Dr. Aron suggested that, well, let's assume you

4    have a gas station.  And there is a hundred cars a day that go

10:45:39    5    by and you get 10.  And then next year there are 200 cars a

6    day, so if you didn't start your gas station for a year, you

7    would get 20.

8         But that's not the way it works, because the reason

9    people come to your gas station is not only because it showed

10:45:52    10   up.  It's because they're part of your credit card program.

11   They like the coffee.  You've been recommended.  Plus in year

12   two, there is four other gas stations around.

13        So it just doesn't make sense even in that simple

14   commodity example.  But in this industry, where everything is

10:46:08    15   customized, it makes less sense.  You don't go to the gas

16   station and ask for a custom blend, for example.

17   Q.  And how in the context of this case does that analogy

18   apply?

19   A.  So in this case these are customized products where there

10:46:24    20   is customer feedback given to develop the next generation, to

21   grow sales.  And once you get into a particular account and

22   they put your radios in one of their warehouses, then they

23   tend to come back and put your radios in other warehouses.

24        So if you miss that first sale because you weren't

10:46:41    25   there in 2010 and didn't get there for years later, you can't

Malackowski - direct by Schmidt

5373

1    just open shop and say:  Kick all the other radios out.  I

2    want all of your warehouses because had I started six years

3    ago I would have had them.

4            It does not work that way.

10:46:54   5    Q.  So Dr. Aron referenced an article from the Sedona

6    conference.  Are you familiar with that article?

7    A.  I am.  It was actually an article I cited and she took

8    from my work.

9            MS. SCHMIDT:  If we go to DTX-4909.16, please,

10:47:10  10   Mr. Schlaifer.  And the bottom two paragraphs, if you could

11   blow those out, please.

12   BY MS. SCHMIDT:

13   Q.  Does the Sedona conference article say that the head start

14   is a rule?

10:47:19  15   A.  No.  There is reference to this notion of a general rule,

16   but -- and you can see in the first sentence, that's that "The

17   accounting of unjust enrichment commences at the moment that

18   the use of the misappropriated trade secret confers a

19   benefit."  So it talks about when you start.

10:47:37  20           If you look to the first sentence of the next

21   paragraph, it says, "In certain cases, a misappropriator tries

22   to limit the duration of unjust enrichment based on the head

23   start doctrine," meaning when it would stop.

24           That's not a general rule.  That's an in certain

10:47:55  25   cases, fact case specific.

Malackowski - direct by Schmidt

5374

1          MS. SCHMIDT:  Mr. Schlaifer, if we go to DTX-4909 to

2     the paragraph going at the bottom of 18 over to 19.

3     BY MS. SCHMIDT:

4     Q.   Does the Sedona conference article include examples where

10:48:13    5     there is no head start period?

6     A.   It does.  So this article in the first sentence talks

7     about the fact that courts occasionally decide not to apply a

8     head start limitation.

9          MR. ALLAN:  Your Honor, I object.  He's

10:48:25    10    characterizing case law.  It's legal testimony.

11         MS. SCHMIDT:  This is responding to Dr. Aron's

12    testimony about this very document, Your Honor.

13         THE COURT:  Yes.  The objection is overruled.

14         Start the question again, please.

10:48:34    15    MS. SCHMIDT:  Yes, Your Honor.

16    BY MS. SCHMIDT:

17    Q.   Mr. Malackowski, does the Sedona conference article

18    provide examples where there is in fact no head start?

19    A.   It does.  So if you go down to the Agilent discussion,

10:48:48    20    which is right there, it talks about an example of a company

21    called Agilent and explains that they're entitled to damages

22    beyond the three-year head start period.

23         And in that example the Court found that the

24    defendant would have continued to enjoy an increased market

10:49:03    25    share from its misappropriation, exactly the conversation we

Malackowski - direct by Schmidt

5375

1    were just discussing.

2          MS. SCHMIDT:  Now, Mr. Schlaifer, if we could please

3    go to DTX-4135.9, which is already admitted.

4    BY MS. SCHMIDT:

10:49:20    5    Q.   Mr. Malackowski, what is this document?

6    A.   This is a page from a presentation of Motorola's that

7    talks about the competitive marketplace for DMR compatible

8    equipment.

9    Q.   And how, if at all, does this relate to Dr. Aron's

10:49:33   10    testimony about the head start?

11    A.   So Dr. Aron used this chart to illustrate what would

12    happen if instead of launching product in 2008, '9 or '10 they

13    came in, for example, in 2011 or later.

14    Q.   And if Hytera had entered the market in 2012 or 2014, how

10:49:53   15    would that have impacted Hytera?

16    A.   They would not have had the benefit, sales and profits

17    that they did.  For example, had they entered the market in

18    2014, there are a lot of other companies who are now in the

19    business.  So, again, it would make no sense they could have

10:50:09   20    obtained all the sales they actually did with the benefit of

21    having started several years earlier.

22    Q.   Now, did you see any information in this case about

23    whether or not Hytera believed it would be advantaged in

24    entering the market in 2010 versus 2011?

10:50:25   25    A.   I did, both in the witness testimony but also in

Malackowski - direct by Schmidt

5376

1    Dr. Aron's testimony itself.

2        MS. SCHMIDT:  And, Mr. Schlaifer, could we please go

3    to page 4853 and on to '54 of the trial transcript.

4    BY MS. SCHMIDT:

10:50:44    5    Q.   And I think down at the bottom around line 16 and down to

6    the end and then over on to the next page, is this the

7    testimony of Dr. Aron that you were referring to,

8    Mr. Malackowski?

9    A.   It is.  And if you start, for example, at around line 20,

10:51:01    10   she says, "Consumers see customization of those products for

11   their specific use, that's so they will come back to Hytera

12   and the engineers will do customization on those products."

13        And that's what I was talking about.  In this market,

14   unlike gasoline, which is a commodity, you build sales over

10:51:18    15   time because you work with your customers to ramp up their

16   need across their entire business.  So you can't come in years

17   later and pick up where you otherwise would have been.

18        MS. SCHMIDT:  If we could go to PDX-10.12.

19   BY MS. SCHMIDT:

10:51:36    20   Q.   What are we looking at here, Mr. Malackowski?

21   A.   This is testimony from Mr. Cragg, who was Hytera's sales

22   director, that speaks to the same point, the advantage of

23   getting into the market early.

24        And in the first question he's asked:

10:51:51    25        "Was Hytera's ability to enter the DMR market as

Malackowski - direct by Schmidt

5377

1   early as it did a significant competitive advantage to

2   Hytera."

3           His answer is "Yes."

4           And then later he explains at the bottom that "Being

10:52:04   5   late to the market is difficult, because you're competitors,

6   you know, they have a lead on you and they tend to continue

7   that lead, so you're always playing catch-up."

8           And this is a factor that I took into my analysis,

9   which Dr. Aron did not.

10:52:18   10   Q.  And what, if any, experience does Mr. Cragg have with

11   two-way radios?

12   A.  Well, that's been his career.  He's been in the business

13   more than 30 years, including experience in launching products

14   with a company called Tait, which is one of the other

10:52:33   15   competitors in the market.

16   Q.  Are you aware that Dr. Aron also testified that the FCC

17   regulations were not relevant to Hytera's entering into the

18   DMR market?

19   A.  I'm aware she said that, yes.

10:52:44   20           MS. SCHMIDT:  And if we could go to PDX-26.3, please.

21   BY MS. SCHMIDT:

22   Q.  Do you agree with that?

23   A.  Absolutely not.  This is a document from 2009, a Hytera

24   presentation.  And they're explaining why they're pursuing

10:53:01   25   DMR, digital mobile radio.

Malackowski - direct by Schmidt

5378

1    Number two, "The mandate by the FCC that

2    non-frequency efficient equipment will not be approved."  And

3    they even recognize that that's been postponed until 2011.

4    Ultimately it was postponed again.  But the point is they knew

10:53:18    5    it was coming and the FCC mandate was a motivation to get into

6    the market with these products before the older products were

7    simply not allowed to be sold.

8    THE COURT:  Is the FCC a United States governmental

9    agency?

10:53:28    10    THE WITNESS:  It is, Your Honor, the Federal

11    Communications Commission.

12    THE COURT:  What does it have to do with a Chinese

13    corporation?

14    THE WITNESS:  They have authority over products that

10:53:38    15    would be imported from China that are the products-in-suit in

16    this case.

17    THE COURT:  Proceed.

18    BY MS. SCHMIDT:

19    Q.  Now, Mr. Malackowski, does the fact that the FCC may have

10:53:48    20    changed, made changes to these regulations later impact your

21    opinion about whether or not this was a factor in Hytera's

22    decision to enter the DMR market?

23    A.  No.  That would be hindsight generally.  But specifically

24    the records tell us it was a factor.  And so it is what it is,

10:54:05    25    and it makes common sense.

Malackowski - direct by Schmidt

5379

1    MS. SCHMIDT:  If we could go to PDX-10.7, please.

2    BY MS. SCHMIDT:

3    Q.  What is this document that we're looking at,

4    Mr. Malackowski?

10:54:16    5    A.  This is a declaration summary of Chairman Chen on the DMR

6    project where he explains that the project had a high degree

7    of importance, was critical to the future development of the

8    country, and was specifically in response to Motorola's DMR

9    products, specifically their mid and high-end market products;

10:54:38    10    and that they needed to develop a second generation of

11    technology, they needed to leapfrog and they only had one

12    chance to do it.

13    Q.  What, if anything, did Dr. Aron say about Chairman Chen's

14    declaration?

10:54:51    15    A.  Well, she discounted it as simply being, I think she

16    called it rah-rah talk, gave it no weight.

17    Q.  Have you seen any other evidence that Mr. Chen was not

18    just giving a rah-rah speech?

19    A.  Yes.  There are contemporaneous emails that show the

10:55:11    20    seriousness and importance of this issue as a business

21    consideration.

22    MS. SCHMIDT:  Could you please turn to PTX-2217.

23    BY MS. SCHMIDT:

24    Q.  And if you have that in front of you, what is that

10:55:23    25    document?

Malackowski - direct by Schmidt

5380

1    A.   That is in fact one of the emails I suggested.  This is an

2    email from G.S. Kok on July 2nd, 2007.

3    Q.   And was this produced from Hytera's files in this case?

4    A.   It was.

10:55:35    5         MS. SCHMIDT:  Your Honor, Motorola moves the

6    admission of PTX-2217.

7              THE COURT:  Is it not already in evidence?

8              MS. SCHMIDT:  This document is not, Your Honor.

9              THE COURT:  All right.  It is received and may be

10:55:43   10   published --

11        (PTX-2217 was received in evidence.)

12   BY MS. SCHMIDT:

13   Q.   And so --

14             THE COURT:  -- once again over objection.

10:55:47   15        Proceed.

16             MS. SCHMIDT:  Mr. Schlaifer, if we could get, please

17   get the email that begins on the bottom of the first page

18   there.  Thank you.  And then the emails that continues.

19   BY MS. SCHMIDT:

10:55:57   20   Q.   Mr. Malackowski, how does this relate to whether or not

21   Mr. Chen was just giving a rah-rah speech in his declaration?

22   A.   So this is an email from Mr. Chen on July 29, 2007 to

23   Mr. G.S. Kok.  And it talks about their discussions of

24   "setting up an RND center in Hytera needs to be evaluated

10:56:19   25   through its commercial risk, financial status and expecting

Malackowski - direct by Schmidt

5381

1      commercial conflict with Motorola."

2              He offers to give G.S. a call to talk about it and

3      actually get on a plane and go to Malaysia and have an

4      in-person discussion.

10:56:34  5              In my view this is not rah-rah talk.  This is a

6      serious business issue that needs to be resolved.

7      Q.  And does Mr. Kok respond?

8      A.  He does.

9              MS. SCHMIDT:  Mr. Schlaifer, can we now go to the top

10:56:45  10     email in the chain, please.

11     BY MS. SCHMIDT:

12     Q.  And what is Mr. Kok's response?

13     A.  It's positive.  He says, "The positive response is an

14     endorsement of your commitment to the quest for a digital

10:56:55  15     platform."  Again, not sales rah-rah talk, but actual serious

16     business decision.

17             MS. SCHMIDT:  And, Mr. Schlaifer, could we please go

18     back to PTX-968.129 and in particular to the chart at the

19     bottom.

10:57:11  20     BY MS. SCHMIDT:

21     Q.  And what is Mr. Chen's relationship with Hytera?

22     A.  So this is taken out of that annual report that we talked

23     about earlier.  It shows that Mr. Chen controls the company.

24     The company reports to him because he has a majority

10:57:27  25     ownership.  Chairman Chen owns 51.43 percent of the public

Malackowski - direct by Schmidt

5382

1    company.

2    Q.   And what does it mean to own 50 or more than 50 percent of

3    a public company?

4    A.   So you have the say because you are a majority of the

10:57:40   5    ownership.   Ultimately you can overrule every other decision.

6    Q.   So how, if at all, does that impact whether or not

7    Mr. Chen was serious in his declaration about DMR?

8    A.   Well, in my experience as an expert, it confirms not only

9    that what he was saying was serious, but he had the

10:57:59   10   wherewithal to implement.

11              MS. SCHMIDT:   Mr. Schlaifer, could we please --

12              THE COURT:   Looking at the annual report, next to

13   Mr. Chen, who was the next major holder of Hytera stock in

14   that annual report?

10:58:09   15              THE WITNESS:   It does not disclose the other holders,

16   Your Honor.

17              THE COURT:   Thank you.

18              You may proceed.

19              MS. SCHMIDT:   If we could please go to PDX-26.11.

10:58:20   20   BY MS. SCHMIDT:

21   Q.   Mr. Malackowski, what is on this slide?

22   A.   So this is a summary of my conclusions, presenting three

23   opinions:   The unjust enrichment and lost profits related to

24   the trade secret misappropriation, the profit analysis related

10:58:38   25   to copyright damages in the United States, and importantly my

Malackowski - direct by Schmidt

5383

1    third opinion, again, as I testified last time, there is no

2    double counting.  If the top number of 345 million is awarded,

3    you would not add the other numbers to it.

4    Q.  And now, Mr. Malackowski, what products are included in

10:58:59    5    these calculations?

6    A.  The products that are at issue in this case, the handheld

7    or portable radios; the mobile radio that goes in a truck, for

8    example; and the repeaters that are used to extend the range

9    of those products.

10:59:12    10             THE COURT:  Does it include the two radios that were

11    shown to the jury and that they passed along in the jury box?

12             THE WITNESS:  Yes, sir.

13             THE COURT:  Proceed.

14    BY MS. SCHMIDT:

10:59:20    15    Q.  And are you aware that Dr. Aron testified that the mobile

16    DMR radios were ultimately determined at trial not to be

17    accused?

18    A.  I'm aware she said that, but again puzzled.

19    Q.  And if we could please -- and why is that?

10:59:34    20    A.  Because they were accused during the course of this trial

21    explicitly.

22             MS. SCHMIDT:  Mr. Schlaifer, could we please get the

23    trial transcript, page 3719, lines 11 through 18, and also

24    page 3800, lines 14 through 21.

10:59:51    25    BY MS. SCHMIDT:

Malackowski - direct by Schmidt

5384

1   Q.  Mr. Malackowski, what is on the screen?

2   A.  I believe this is the testimony of Ms. Frederiksen-Cross.

3   I can't tell whose testimony this is.  It's covered at the

4   top.

11:00:11   5        THE COURT:  All right.  You are stepping into another

6   area.  It might be a good time for a break, Monday morning

7   break, members of the jury, consistent with your note to the

8   Court.

9        (Recess.  Jury in)

11:21:44   10        THE COURT:  Proceed with the witness.

11        MS. SCHMIDT:  Yes, Your Honor.

12   BY MS. SCHMIDT:

13   Q.  Mr. Malackowski, I just want to go back to a question that

14   His Honor asked regarding the information about stock in the

11:21:55   15   annual report.

16        Now, I believe there was only one I guess drawing

17   showing who owns the company.  But if we look at page

18   PTX-968.118, what information do we have here?

19   A.  So in any annual report you have to show the officers of

11:22:14   20   the company and their ownership.  But this is not necessarily

21   the next largest shareholders, which is what I understood the

22   question to be.

23   Q.  All right.  And based on this, who is the largest

24   shareholder?

11:22:29   25   A.  Chairman Chen.

Malackowski - direct by Schmidt

5385

1    Q.   Now, Mr. Malackowski, right before we broke, I believe I

2    was asking you about Ms. Frederiksen-Cross's testimony

3    regarding the mobile products.

4            MS. SCHMIDT:   Mr. Schlaifer, could we please go back

11:22:42  5    to where we were, which was 3799, lines 11 through 18, and

6    3800, lines 14 through 21.  I will switch this back.

7    BY MS. SCHMIDT:

8    Q.   And so, Mr. Malackowski, what did Ms. Frederiksen-Cross

9    say about whether or not Hytera's mobile radios also included

11:23:04  10   Motorola source code?

11   A.   So she was asked at line 11 to talk about the number of

12   accused copied lines and then explains that starting at line

13   14, "I looked at the specific files, identified as containing

14   copied code."  And she counted up the unique source code lines

11:23:23  15   in each of those files.

16           And then starting in line 21, she explains that was

17   to determine how much of the files were copied.

18           And then when you go to the next page, which starts

19   at line 17, she finds that it was generally between 3 and 4

11:23:43  20   percent of the subscriber versions, which are Hytera's code

21   that was used in both its mobile and portable devices and in

22   the neighborhood of 4 to 5 percent for the repeater code.

23           So here she's acknowledging that it was used in all

24   three product categories that I include in my analysis.  And

11:24:04  25   the mobile, in fact, are accused.

Malackowski - direct by Schmidt

5386

1          MS. SCHMIDT:  Mr. Schlaifer, could we please go to

2  PDX-26.11.

3  BY MS. SCHMIDT:

4  Q.  Now, Mr. Malackowski, does PDX-26.11 summarize the

11:24:16  5  calculations you performed in this case?

6  A.  It does.

7  Q.  And is it more convenient to look at PDX-26.11 than the

8  underlying documents?

9  A.  Of course.

11:24:26  10  Q.  And were those documents provided to Hytera?

11  A.  They were.

12          MS. SCHMIDT:  Your Honor, Motorola moves the

13  admission of PDX-26.11.

14          THE COURT:  It is received over objection.

11:24:31  15    (PDX-26.11 was received in evidence.)

16  BY MS. SCHMIDT:

17  Q.  Now, Mr. Malackowski, you previously testified that

18  punitive damages are an issue in this case.  Do any of the

19  damages calculations on PDX-26.11 include punitive damages?

11:24:48  20  A.  No.  All the damages that I calculated are compensatory

21  damages, which are distinct from punitive.  They don't

22  overlap.  Punitive damages would actually be about 2X the

23  numbers on these charts.

24  Q.  And so would that be in addition to, for example, your

11:25:05  25  unjust enrichment calculation?

Malackowski - direct by Schmidt

5387

1    A.   It would be, yes.

2    Q.   And what is two times that calculation?

3    A.   So if the unjust enrichment is appropriate at 345 million,

4    the punitive damages associated with that would be

11:25:20    5    approximately 690 million.

6    Q.   So if the jury awarded the amount of unjust enrichment

7    that you have determined and twice that in punitive damages,

8    how much would that be in total?

9    A.   Well, the total would be the two added together, it would

11:25:33    10   be 1 billion 37 million.

11   Q.   Now I want to turn now to your opinion about lost profits

12   and in particular Dr. Aron's criticism.

13        MS. SCHMIDT:   And so if we could please go back to

14   DDX-22.4.

11:25:46    15   BY MS. SCHMIDT:

16   Q.   Now, this is the last criticism on Dr. Aron's slide.

17        Now, I will ask you about that in a minute.  But does

18   this criticism matter?

19   A.   No.   In fact, if in fact the jury confirms my analysis and

11:26:01    20   awards the amount of unjust enrichment, because there is no

21   double counting, then lost profits can be set aside.   Any

22   criticism of lost profits would, therefore, not matter at that

23   point.

24   Q.   And so why is it that in your view Motorola should receive

11:26:15    25   compensation for Hytera's unjust enrichment to the extent that

Malackowski - direct by Schmidt

5388

1    it exceeds Motorola's lost profits?

2    A.  My task as a damages expert is to determine the full and

3    fair amount of damages.  And when you have both claims, the

4    full compensation in this case is measured by the unjust

11:26:35    5    enrichment.  There are other cases where it's the opposite and

6    the full measure is through lost profits.

7    Q.  And is that this case?

8    A.  No.  This case, the full measure of damages is the unjust

9    enrichment amount, the Hytera profit amount.

11:26:48    10    Q.  Right.  Now, turning to lost profits, what is Dr. Aron's

11    criticism of this calculation?

12    A.  She says that the market share calculation that I used is

13    inappropriate and too high.

14        MS. SCHMIDT:  Mr. Schlaifer, can we please go back to

11:27:05    15    PDX-26.11.

16    BY MS. SCHMIDT:

17    Q.  Now, Mr. Malackowski, did you calculate market share

18    correctly?

19    A.  I did.  In fact, I calculated market share conservatively.

11:27:14    20    It's not too high.  If anything, it would be too low.

21    Q.  And could you explain that?

22    A.  Yes.  In this case for these products, the testimony in

23    the record that I found was that it's a two supplier market

24    for the high-end and mid-tier radios, meaning that between

11:27:29    25    Hytera and Motorola, they had over 90 percent of the market.

Malackowski - direct by Schmidt

5389

1          Rather than use that 90 percent or even 100 percent,

2     saying that every radio Hytera sold should have been sold by

3     Motorola, I used overall market share figures, which only

4     accounted for about half of the radios, taking into account

11:27:49    5     that someone may have not bought a radio at all if it wasn't

6     available from Hytera.

7          THE COURT:  Geographically, what is the market?

8          THE WITNESS:  The market in my analysis is a global

9     market, Your Honor.

11:28:00   10   BY MS. SCHMIDT:

11   Q.  Now, turning to your copyright opinion, what is your

12   opinion on the amount of copyright damages?

13   A.  As shown on chart and the screen, the copyright damages

14   for the U.S. market, Your Honor, are 28.7 million.

11:28:13   15        MS. SCHMIDT:  All right.  And if we could go to

16   PDX-26.7.

17   BY MS. SCHMIDT:

18   Q.  Now, if in fact Motorola is permitted to seek copyright

19   damages based on Hytera's worldwide sales, what amount would

11:28:26   20   that be?

21   A.  Well, then you would use the profits worldwide, which is

22   the 272 million shown at the top of the chart.

23   Q.  Dr. Aron testified that Hytera's copyright infringement

24   damages should be apportioned by 4 percent based on

11:28:42   25   Ms. Frederiksen-Cross's testimony.

Malackowski - direct by Schmidt

5390

1    Do you agree with that?

2  A.  I agree she testified to it.  But I don't agree that that

3  is a correct forensic accounting.  That's economic theory, not

4  accounting reality.

11:28:53  5  Q.  And why not?

6  A.  Because when we looked at Ms. Frederiksen-Cross' testimony

7  once again, as well as the technical experts from Motorola,

8  one, the lines of code analysis, the LOC analysis is not a

9  credited way of measuring apportionment.  It's been regarded

11:29:11  10  generally as malpractice.

11  Q.  Now, Dr. Aron also testified that Dr. Wicker said Hytera

12  had 10 percent of Motorola source code in its products.  Is 10

13  percent the right number to use for apportionment?

14  A.  No.  That would be the second reason in that the 10

11:29:26  15  percent that Dr. Wicker talks about also explains that the

16  code was used in every product, and basically the Hytera

17  engineers were relying upon Motorola code for the balance of

18  their work, so the 10 percent would not be a limit.

19    MS. SCHMIDT:  If we could go to PDX-26.12.

11:29:47  20  BY MS. SCHMIDT:

21  Q.  Mr. Malackowski, what is your opinion on the amount of

22  damages for Hytera's trade secret misappropriation and

23  copyright infringement?

24  A.  In my opinion the compensatory damages are $345,761,156.

11:30:02  25  Q.  Thank you, Mr. Malackowski.

Malackowski - direct by Schmidt

5391

1          MS. SCHMIDT:  I pass the witness.

2    BY THE WITNESS:

3    A.   Thank you.

4          THE COURT:  Counsel, do you want to cross-examine now

11:30:06   5    or after a brunch?

6          MR. ALLAN:  After brunch would be fine, Your Honor.

7          THE COURT:  All right.  Members of the jury, please

8    come back at, we'll make it 12:45.

9          Counsel, remain for a moment.

11:30:20   10      (Jury out)

11         THE COURT:  The reason for the extended lunch or

12   brunch is to give you additional time in light of the issue of

13   this as basically being brought at 2:30 in the morning, et

14   cetera.  But it's to give you more time to prepare for your

11:30:54   15   cross-examination of the witness.

16         MR. ALLAN:  Thank you very much, Your Honor.

17         THE COURT:  Thank you, counsel.

18      (Recess at 11:31 p.m. to 12:45 p.m.)

19

20

21

22

23

24

25

5392

```
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3   MOTOROLA SOLUTIONS, INC., and MOTOROLA    ) No. 17 CV 1973
     SOLUTIONS MALAYSIA SDN. BHD,              )
 4                                             )
                   Plaintiffs,                 )
 5   vs.                                       ) Chicago, Illinois
                                               )
 6   HYTERA COMMUNICATIONS CORPORATION, LTD.,  ) February 10, 2020
     HYTERA AMERICA, INC., and HYTERA          )
 7   COMMUNICATIONS AMERICA (WEST), INC.,      )
                                               )
 8                 Defendants.                 ) 12:49 p.m.

 9                      TRIAL - VOLUME 35-B
                     TRANSCRIPT OF PROCEEDINGS
10
              BEFORE THE HONORABLE CHARLES R. NORGLE, SR.
11                          and a jury

12   APPEARANCES:

13   For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                            BY:  MR. ADAM R. ALPER
14                               MR. AKSHAY DEORAS
                                 MR. BRANDON HUGH BROWN
15                          555 California Street
                            Suite 2700
16                          San Francisco, California 94104
                            (415) 439-1400
17
                            KIRKLAND & ELLIS, LLP
18                          BY:  MR. MICHAEL W. DE VRIES
                                 MR. CHRISTOPHER M. LAWLESS
19                          333 South Hope Street
                            Suite 2900
20                          Los Angeles, California 90071
                            (213) 680-8400
21

22
     Court Reporter:        JENNIFER COSTALES, CRR, RMR
23                          Official Court Reporter
                            219 South Dearborn Street, Room 2342
24                          Chicago, Illinois 60604
                            (312) 435-5895
25                          jenny.uscra@yahoo.com
```

5393

```
 1   APPEARANCES:   (Continued)

 2   For the Plaintiffs:      KIRKLAND & ELLIS, LLP
                              BY:   MS. MEGAN MARGARET NEW
 3                            300 North LaSalle Street
                              Chicago, Illinois 60654
 4                            (312) 862-7439

 5                            KIRKLAND & ELLIS, LLP
                              BY:   MS. LESLIE M. SCHMIDT
 6                            601 Lexington Avenue
                              New York, New York 10022
 7                            (212) 446-4763

 8   For the Defendants:      STEPTOE & JOHNSON, LLP
                              BY:   MR. BOYD T. CLOERN
 9                                  MR. SCOTT M. RICHEY
                                    MR. MICHAEL J. ALLAN
10                                  MS. JESSICA ILANA ROTHSCHILD
                                    MS. KASSANDRA MICHELE OFFICER
11                            1330 Connecticut Avenue NW
                              Washington, DC 20036
12                            (202) 429-6230

13                            STEPTOE & JOHNSON, LLP
                              BY:   MR. DANIEL S. STRINGFIELD
14                            227 West Monroe Street
                              Suite 4700
15                            Chicago, Illinois 60606
                              (312) 577-1300
16

17
     ALSO PRESENT:            MR. RUSS LUND and
18                            MS. MICHELE NING

19

20

21

22

23

24

25
```

Malackowski - cross by Allan

5394

|  | 1 | (Proceedings in open court.  Jury in) |
|--|---|--|
|  | 2 | THE COURT:  Good afternoon, members of the jury. |
|  | 3 | Please proceed with the witness. |
|  | 4 | JAMES MALACKOWSKI, PLAINTIFFS' REBUTTAL WITNESS, |
| 12:49:51 | 5 | PREVIOUSLY SWORN |
|  | 6 | CROSS-EXAMINATION |
|  | 7 | BY MR. ALLAN: |
|  | 8 | Q.  Good afternoon. |
|  | 9 | A.  Good afternoon, sir. |
| 12:49:56 | 10 | Q.  Now, you testified back in early December, right? |
|  | 11 | A.  Yes, sir. |
|  | 12 | Q.  And two days, December 2nd, right? |
|  | 13 | A.  I don't recall the exact day, but I think that's right, |
|  | 14 | right after Thanksgiving. |
| 12:50:08 | 15 | Q.  2nd and 3rd sound about right? |
|  | 16 | A.  It does. |
|  | 17 | Q.  And in December -- |
|  | 18 | MR. ALLAN:  Let's look at your PDX-1041 if we could, |
|  | 19 | Mr. Montgomery. |
| 12:50:21 | 20 | BY MR. ALLAN: |
|  | 21 | Q.  This is the slide that you provided the jury in December. |
|  | 22 | And you said Hytera's unjust enrichment number was 311 |
|  | 23 | million.  Do you see that? |
|  | 24 | A.  I do. |
| 12:50:33 | 25 | Q.  All right.  And now today a slide you showed the jury was |

Malackowski - cross by Allan

5395

1   26 point, PDX-26.7, and your number there is 345 million.  Do

2   you see that?

3   A.  Right.  It increased for the mobile units.

4   Q.  It increased for the mobile units.

12:51:00   5        Now, you testified on direct when you were

6   criticizing Dr. Aron's data that you've never seen numbers

7   change during a trial, is that right?

8   A.  I've never seen normal course business records.  Damage

9   calculations will update as the evidence comes in reflecting

12:51:15   10   what happened at trial.

11   Q.  And your numbers in this case have changed by to the tune

12   of $35 million between December and now, right?

13   A.  Well, it didn't change.  At the last trial I put up the

14   mobile number of 34 million units -- of $34 million.  I just

12:51:31   15   didn't add them together pending the expert testimony.  After

16   the expert testimony, I've now added them together.  But both

17   numbers were presented in December.

18   Q.  Well, that's not true, Mr. Malackowski.  You didn't break

19   out mobile numbers in your initial testimony and say it

12:51:45   20   depended on whether the experts said anything about it, did

21   you?

22   A.  No, I did.  In my testimony I said the revenue was 111

23   million and the profitability was 33 percent or approximately

24   34 million, which is the number I added.

12:52:00   25   Q.  Well, let's take a look.

Malackowski - cross by Allan

5396

1    　　　Okay.  Here is your testimony from the last trial --

2    from not the last trial.  Your earlier testimony in this

3    trial.

4    A.  What page are you on?

12:52:37    5    Q.  I'm on trial transcript 2191, starting at question, line

6    23.  It's right on the screen for you.  It says:

7    　　　"And so, Mr. Malackowski, what revenues did you have

8    for the accused products?"

9    　　　"Answer:  I started looking at the radios.  And so

12:52:55    10    you can see the radios in the first box.  So there were $532

11    million worth of radios that were sold at this time.  That

12    does not include the mobile radios" - do you see that - "does

13    not include the mobile radios you would install in a truck."

14    And then you gave the revenue number for that, right?

12:53:16    15    A.  Correct.

16    Q.  Right.  And you testified that it didn't include the

17    mobile radios, isn't that right?

18    A.  Correct, as I just explained, yes.

19    Q.  Okay.  And that also changed your lost profit number by

12:53:30    20    about $20 million north, right?

21    A.  For the same reason, yes, sir.

22    Q.  Okay.  Now, you understand that you are the last witness

23    in this trial, correct?

24    A.  I think that's good news.  Yes.

12:53:42    25    Q.  And you've changed from 311 million on the last day of

Malackowski - cross by Allan

5397

1    trial to 345 million on the last day of trial, correct?

2    A.   No.  In my testimony, if you go a few more pages to 2198,

3    I explain that the profit of that 111 is 33 percent.  The

4    numbers I presented didn't include it, but that's what it was.

12:54:04    5    And so now based upon the testimony of Ms. Frederiksen-Cross,

6    I'm including it.

7    Q.   When you testified and you got to this slide in your

8    examination in December, you pointed this to the jury, to this

9    number, and you said "That's the number I want you to

12:54:20    10    remember."  Do you recall that?

11    A.   I do.

12    Q.   And that did not have the mobile numbers in it, right?

13    A.   It did not.

14    Q.   Okay.  Now, you issued a report in this case.  You issued

12:54:40    15    a number of reports, right?

16    A.   Yes.  As the evidence was updated, I updated my reports.

17    Q.   And you issued your report in June?

18    A.   I think my first report would have been in June.

19    Q.   Correct.

12:54:54    20    A.   That sounds about right.

21    Q.   Right.  And you in your first report, you have some

22    figures where you identified the products that you believe are

23    accused in the case?

24    A.   True.

12:55:05    25    Q.   Right.  And you're not a technical expert, right?

Malackowski - cross by Allan

5398

1     A.   Correct.

2     Q.   And you rely on the expertise of Professor Wicker and

3     perhaps Professor Rangan to identify what specific products

4     are accused in the case?

12:55:19   5     A.   As well as in this case the technical experts of Hytera,

6     yes.

7     Q.   Okay.  But as part of your analysis, your report, I've got

8     two figures, Figure 26 and Figure 27 from your report.  Do you

9     recognize these?

12:55:36  10     A.   I do.

11     Q.   Okay.  And Figure 26 says "Accused devices benefiting from

12     asserted trade secrets worldwide," right?

13     A.   Yes, sir.

14     Q.   And there is mid-tier radios on the left and professional

12:55:48  15     radios on the right?

16     A.   Yes, sir.

17     Q.   And you understand that the mobile radios in this case are

18     all denoted with an "M" at the beginning, "M" for "mobile,"

19     right?

12:55:56  20     A.   Correct.

21     Q.   And there are no mobile radios listed here?

22     A.   No.  I did not understand them to be accused at that time.

23     Q.   Okay.  And in Figure 27, you've got accused devices

24     containing Motorola source code sold in the United States.  Do

12:56:12  25     you see that?

Malackowski - cross by Allan

5399

1    A.  I do.

2    Q.  And, again, if you look at your accused products, your

3    mid-tier radio and professional radio, nothing with an "M,"

4    right?

12:56:22  5    A.  For the same reason, correct.

6    Q.  Okay.  And you didn't include any mobile radios, any of

7    Hytera mobile radios as accused radios in any of your

8    subsequent reports?

9    A.  No.  I did not have that information until

12:56:47  10   Ms. Frederiksen-Cross testified.

11   Q.  So your testimony is Ms. Frederiksen-Cross somehow

12   implicated the mobile radios?

13   A.  She indicated that within the mobile radios was infringing

14   code.  I read that testimony just before the break.

12:56:59  15   Q.  Now, you understand that Dr. Wicker is Motorola's

16   technical expert?

17   A.  One of them, yes, sir.

18   Q.  And, well, you understand that Dr. Wicker has had all of

19   Hytera's source code through the production process in this

12:57:33  20   case since going back to 2018, right?

21   A.  I presume that to be true.  I don't know when he first

22   received it.  But it has been some time.

23   Q.  He's had the code for some time and he's examined it

24   extensively?

12:57:46  25   A.  I presume so.  I reviewed his testimony.  It appeared that

Malackowski - cross by Allan

5400

1   it was thorough.

2   Q.   The code for all of Hytera's products, right?

3   A.   Yes, sir.

4   Q.   All right.  Now, he identified, Professor Wicker

12:57:59   5   identified a number of products that after all of that

6   extensive review of the code he thought were accused, right?

7   A.   Well, more particularly the products he found the

8   infringing code within.

9   Q.   Fair enough.  He reviewed the code extensively and he

12:58:16   10   identified after that extensive year-plus review of all the

11   code, Hytera's code, he identified products that he felt or he

12   opined contained infringing material?

13   A.   Based upon what he had at the time, I think that's true.

14   Q.   Well, based upon what he had at the time.  He had all the

12:58:35   15   code.

16   A.   Well, fine.

17   Q.   All right.

18   A.   I don't want to jump ahead.  Go ahead.

19   Q.   And Dr. Wicker testified last week.  You know that, right?

12:58:45   20   A.   I do.

21   Q.   And Dr. Wicker never offered an opinion last week that the

22   mobile products were accused, did he?

23   A.   I would defer to his testimony of last week.  I don't

24   believe he did, but it will speak for itself.

12:58:58   25   Q.   And, again, Dr. Wicker would be the one who would offer an

Malackowski - cross by Allan

5401

1    opinion as to whether or not the mobile products were actually

2    contained, Hytera's mobile products contained allegedly

3    infringing code, right?

4    A.   Well, he would be one of the technical experts.  But in

12:59:14    5    this case Hytera's technical experts admitted it contained the

6    infringing code.  So that would count, too.

7    Q.   You're saying that - I want to make sure I understand your

8    testimony - that the year plus of review that Hytera's -- that

9    Motorola's technical expert did to review all of the Hytera

12:59:37    10    source code, he never even thought the mobile products were

11    accused.  But your testimony is Barbara Frederiksen-Cross

12    stood up here and admitted that they were?

13    A.   So --

14    Q.   That's a "yes" or "no."

12:59:49    15    A.   Barbara Frederiksen-Cross did admit that they were.  I can

16    explain why I believe it wasn't included originally in

17    Dr. Wicker's analysis because of various legal discovery

18    issues.

19         But in the end it's do they contain the code or don't

01:00:03    20    they?  There is admission that they do.  So as a forensic

21    accountant, I need to count them.

22    Q.   This is -- you're familiar with Dr. Wicker's report,

23    right?

24    A.   Sure.

01:00:12    25    Q.   You've reviewed it to rely on to prepare for your

Malackowski - cross by Allan

5402

1    testimony, right?

2    A.  I did.

3    Q.  These are the accused Hytera products that Dr. Wicker

4    identified, right?

01:00:23    5    A.  Based on the legal pleadings at the time, I believe that

6    is true.

7    Q.  Well, he -- based on the legal pleadings at the time?  Is

8    that what your testimony was?

9    A.  I believe that these are based upon the products he

01:00:37    10    investigated as originally identified in the legal pleadings,

11    yes.

12    Q.  Well, it's the source code, right?

13    A.  Well, ultimately, his verification was using the source

14    code.  But there is a lot of legal interrogatories and answers

01:00:50    15    that go back and forth where the parties point out the

16    products at issue, and I believe that also ties back to Dr.

17    Rangan's or Dr. Wicker's analysis.

18    Q.  This report for Dr. Wicker was submitted when yours was

19    back in June of last year, right?

01:01:05    20    A.  Right.  But this is paragraph 53, the accused Hytera

21    products.  He's not making a decision of what's accused.  He's

22    making a decision of what contains the code and is infringing.

23    Q.  That's an accused product, right?

24    A.  Well, I don't want to say it's definitional.  But the

01:01:22    25    lawyers accuse and the experts find.  So he's looking at what

Malackowski - cross by Allan

5403

1    was accused by the lawyers as his starting point.

2    Q.  Now wait a minute.  The lawyers accuse based on what the

3    experts tell them, right?  The lawyers aren't code experts.

4    They rely on technical expertise just like you do?

01:01:38    5    A.  Well, it's actually not exactly the way you describe it.

6    The lawyers make a good-faith list of what they think is

7    accused.  Then the experts come in to prove it.  And the only

8    thing that can be found to infringe is -- frankly at that

9    point it doesn't matter what the lawyers say, the only thing

01:01:52    10    that can be found to infringe is what the experts prove at

11    trial.  And it's all the experts.  It would include both

12    Dr. Wicker and Ms. Frederiksen-Cross.

13    Q.  Dr. Wicker in his -- as of June last year didn't include

14    any mobile products, correct?

01:02:10    15    A.  Because as of that date they weren't accused.

16    Q.  He didn't find any evidence to accuse them and he had read

17    all the code.

18    A.  That's a question for Dr. Wicker.

19    Q.  That's your understanding, right?

01:02:21    20    A.  I'll accept that.

21    Q.  Okay.  And he issued a number of subsequent reports,

22    right?

23    A.  He did.

24    Q.  None of them accuse mobile products, correct?

01:02:29    25    A.  Better question for him.  But I don't believe they did.

Malackowski - cross by Allan

5404

1    Q.   He was deposed in this case, correct?

2    A.   He was.

3    Q.   For a number of days, yes?

4    A.   Yes.

01:02:36    5    Q.   Never accused the mobile products, correct?

6    A.   Again, he doesn't accuse.  But he never found infringement

7    based upon the starting set of what was accused.

8    Q.   He never opined that any of Hytera's mobile radios

9    contained allegedly infringing code, correct?

01:02:52    10   A.   That would be a better question.  I don't believe so, but

11   I defer to him.

12   Q.   And he testified here for a number of days, right, before

13   you testified?

14   A.   I mean, you can ask it eight ways from Sunday, the answer

01:03:04    15   is the same.  I'm not saying I included them because of

16   Dr. Wicker.  I say I'm including them because

17   Ms. Frederiksen-Cross, their expert, admitted they contained

18   the code.

19   Q.   I've asked you a different question, Mr. Malackowski.  The

01:03:16    20   question was:  Dr. Wicker, Professor Wicker testified for a

21   number of days in this trial right before you testified,

22   correct?

23   A.   True.

24   Q.   And he never accused any of the mobile code or he never

01:03:29    25   opined that any of the mobile -- Hytera's mobile products

Malackowski - cross by Allan

5405

1    contained infringing code, correct?

2    A.  Not that I recall.

3    Q.  Right.  And he testified just last week and he never

4    opined that any of Hytera's mobile code contained -- any of

01:03:42   5    Hytera's mobile products contained infringing code, correct?

6    A.  Not that I recall as I explained.

7    Q.  And you, again, are not a technical expert, right?

8    A.  No.  I'm a forensic accountant.

9    Q.  And you have --

01:04:05   10   A.  So I look at what the experts say and count what they say

11   includes the code.

12   Q.  And you have no ability to opine whether a trade secret

13   was misappropriated, right?  You have no technical ability?

14   A.  I do not.

01:04:18   15   Q.  You have no specialized knowledge in radio source code?

16   A.  I don't claim any such knowledge.

17   Q.  And Dr. Wicker testified after Barbara Frederiksen-Cross,

18   right?

19   A.  Yes, because he testified in the last week.

01:04:32   20   Q.  Right.  And he never came in here and testified that

21   Barbara Frederiksen-Cross admitted that all the mobile code

22   was copied and so we have to now account for that, did he?

23   A.  Well, he's not accounting for anything from a damages

24   perspective.  That's my assignment.

01:04:46   25        So I need to look at all the evidence.  And if there

Malackowski - cross by Allan

5406

1    is evidence that's helpful to Hytera, I will include it.  If

2    there is evidence that's helpful to Motorola, I'll include it,

3    regardless of who presented it.

4    Q.   My question is -- let me try to make it a little simpler.

01:05:02    5    Professor Wicker testified last week, and he never opined that

6    based on what Barbara Frederiksen-Cross said there was some

7    magic admission that somehow the mobile products contained

8    infringing code, did he?

9    A.   You literally asked me that 10 times.

01:05:20    10    Q.   The answer is no, correct?

11    A.   I'm not relying on Dr. Wicker for inclusion of the mobile.

12    I'm relying on Frederiksen-Cross's admission.

13    Q.   But don't you have to rely on a technical expert to know

14    whether there is an admission or not?  You're not a technical

01:05:32    15    expert.

16    A.   Well, she is a technical expert.

17    Q.   You're not, right?

18    A.   I read her testimony where she said the infringing code is

19    in the mobile products.

01:05:39    20    Q.   You are not a technical expert, correct?

21    A.   I am not.

22    Q.   Yet, you are the only witness in this entire trial who has

23    opined that the mobile products ought to be involved in the

24    case, right?

01:05:54    25    A.   No.  Obviously, Ms. Frederiksen-Cross was cross-examined

Malackowski - cross by Allan

5407

1      on that at some length.  And there is only two witnesses who

2      get to present whether or not they should be counted, me and

3      Dr. Aron.  She didn't include them.  I did for the reason I

4      explained.

01:06:07    5      Q.   And Dr. Wicker and Dr. Rangan as a come-back, there has

6      been no Motorola technical expertise to back up your testimony

7      about what you think Barbara Frederiksen-Cross admitted to,

8      correct?

9      A.   No.  But I wouldn't expect that.

01:06:22   10      Q.   Now, you criticize Dr. Aron for updating Hytera's R&D

11     numbers, right?

12     A.   More directly, I criticized the R&D numbers that she

13     relied upon.  I'm not saying she had anything to do with the

14     trouble with those documents.  What's in the documents are the

01:06:46   15     trouble.

16     Q.   Well, we'll talk about the documents in a second.

17              But you understand that one of the filters Dr. Aron

18     performed in filtering the data set was to remove the mobile

19     radios based on the fact that you didn't include them in any

01:07:01   20     of your reports, any of your depositions or any of your trial

21     testimony, isn't that right?

22     A.   I don't know if that's why she removed them.  But if you

23     say she removed them, that's fine.  That still wouldn't

24     explain how removing them resulted in bigger numbers.  But if

01:07:16   25     that was one of her filters, sobeit.

Malackowski - cross by Allan

5408

1   Q.  Well, we'll get to the bigger numbers in a second.  But

2   you do understand, you've read her testimony, you've read her

3   reports, that the data was filtered to remove the mobile R&D

4   because it wasn't accused?

01:07:31   5   A.  I'll accept that.

6   Q.  And you understand Andrew Yuan from Hytera came in and

7   offered the same testimony from a fact witness perspective,

8   right?

9   A.  I'll accept that.

01:07:43   10   Q.  And Mr. Yuan testified live in court.  I don't think you

11   were here, but perhaps you read the testimony?

12   A.  I did.

13   Q.  Okay.  And he's a vice-president for Hytera?

14   A.  He is.

01:07:57   15        MR. ALLAN:  Can we pull up one of his demonstratives,

16   DDX-1410, please.  Sorry.

17   BY MR. ALLAN:

18   Q.  Have you seen this before?

19   A.  I've seen many charts like this.  I don't recall this

01:08:16   20   particular chart.

21   Q.  So Mr. Yuan testified, he presented this to the jury, and

22   then what he did was he circled a number of products just like

23   this and he said:  Well, those aren't accused, so we've

24   removed that R&D data.

01:08:33   25        And this was back in, back in December.  Do you

Malackowski - cross by Allan

5409

1  remember that from his testimony?

2  A.  I honestly don't particularly remember that, no.  But I'll

3  accept it.

4  Q.  And two of the products he removed were the mobile device

01:08:48  5  6500 series and the mobile 7800 series?

6  A.  Well, if your chart is accurate, then that would be true.

7  Q.  And nobody on cross-examination stood up and said:  "Wait

8  a minute.  Those are accused.  Those do contain Motorola

9  source code," did they?

01:09:06  10  A.  Well, people don't just get to stand up and say that.  But

11  that was raised as a follow-up issue with

12  Ms. Frederiksen-Cross.

13  Q.  I'm not talking about Ms. Frederiksen-Cross.  I'm talking

14  about Mr. Yuan.

01:09:17  15  A.  Right.  People can't just stand up and say what they want

16  to say.  It has to happen in order.  And the order was when it

17  got to the technical experts, it was raised.

18  Q.  I'm asking a very simple question.  When Mr. -- after

19  Mr. Yuan presented this testimony, his direct examination,

01:09:32  20  Motorola's lawyer did not get up and say:  "Wait a minute.

21  You took out two products you shouldn't have taken out because

22  we think they contain Motorola source code," right?

23  A.  I don't believe they stood up and said that.  I believe

24  they did say that with Ms. Frederiksen-Cross.

01:09:45  25  Q.  But not with the fact witness, who testified in part about

Malackowski - cross by Allan

5410

1   all of the R&D data that was being subtracted to make the R&D

2   as accurate as possible to account for the products that

3   Motorola was accusing, correct?

4   A.   Not for the R&D data, only for the infringement,

01:10:05   5   misappropriation.

6   Q.   In any event, Mr. Malackowski, you are here today on the

7   last day of trial and adding $35 million to your opinion,

8   right?

9   A.   Yes.   And so if the jury finds that Ms. Frederiksen-Cross

01:10:32  10   said the code is included, then they should add that number.

11   If they find that I got that wrong somehow, then they put 311.

12   Q.   Now, you don't contend -- well, strike that.

13        You understand that Hytera's commercial level radios

14   are not accused in this case?

01:11:04  15   A.   The low-end radios, true.

16   Q.   Right here, right?

17   A.   Yeah.

18   Q.   Commercial low end?

19   A.   Correct.

01:11:08  20   Q.   None of these are accused?

21   A.   Correct.

22   Q.   And these radios -- let me clean this screen for a sec.

23        These radios, the commercial low-end radios, your

24   view, they're not comparable to the mid-tier or high-tier?

01:11:30  25   A.   For purposes of damages, that's true.   Customers who

Malackowski - cross by Allan

5411

1    bought mid-tier or high-tier products at about $1,000 a piece

2    would not alternatively have bought low-end products which are

3    90 to $300 a piece.

4    Q.   And Motorola also has three levels of DMR radios, right?

01:11:48    5    They have a commercial level, a mid-tier and a high-tier?

6    A.   Yes.  Generally speaking, the Hytera products mirror the

7    Motorola offerings.

8    Q.   So the high-tier compete, Hytera's high-tier competes with

9    Motorola's high-tier; Hytera's mid-tier competes with

01:12:04    10   Motorola's mid-tier; and Hytera's commercial competes with

11   Motorola's commercial; fair?

12   A.   That's generally fair.  Except as I described in my other

13   testimony, the mid-tier products do compete against the

14   high-tier products.  It's depending upon whether or not

01:12:19    15   trunking was offered at a particular point in time.

16   Q.   Fair enough.  But the commercial Hytera competes with the

17   Motorola commercial?

18   A.   Yeah.  They're generally in a different market segment.

19   Q.   All right.  You offered some testimony at the beginning of

01:12:55    20   your direct --

21        MR. ALLAN:  You can take that down, Mr. Montgomery.

22   BY MR. ALLAN:

23   Q.   -- about, I think you criticized Dr. Aron's calculation of

24   $265 million for Hytera's profits from the last 9 or 10 years,

01:13:12    25   right?

Malackowski - cross by Allan

5412

1    A.   Yes.  I said that was not a comparable measure.

2    Q.   And you showed a Hytera annual report?

3    A.   I did.

4    Q.   And you pointed out several numbers that were in Chinese

01:13:28    5    RMB, right?

6    A.   True.

7    Q.   You didn't convert any of them to U.S. dollars as I

8    recall?

9    A.   I did not.  I explained the conversion was about 6.78 to

01:13:37    10   1, but I didn't show the math.

11   Q.   And you understand that the information in the

12   documentation that is provided in a public company's annual

13   report, it's important to be accurate?

14   A.   I explained that directly, yes.

01:13:52    15   Q.   Right.  And, in fact, it's a crime to misrepresent that

16   information?

17   A.   I believe that's true.

18   Q.   And you pointed out bits and pieces about Hytera making

19   investments in certain companies, Sepura was one and there was

01:14:09    20   another company, right?

21   A.   Yes, sir.

22   Q.   And that happens all the time with big companies.  They

23   invest money back into buying new companies?

24   A.   In a general sense, sure.

01:14:18    25   Q.   Right.

Malackowski - cross by Allan

5413

1    A.   It's in part how companies grow.

2    Q.   Happens with Motorola, too?

3    A.   I suspect it does.

4    Q.   And in your analysis of the annual report, you didn't

01:14:29    5    testify that the $265 million profit number that Dr. Aron

6    testified to was inaccurate, did you?  You didn't give a

7    competing number?

8    A.   I didn't give a competing number, but I explained why

9    looking at the overall company profit number would not be an

01:14:47    10   apples-to-apples comparison.

11   Q.   Now, you may have seen, again, you weren't here for

12   Mr. Yuan, but let's show his DDX-1411, please.

13        Mr. Yuan, who is a vice-president at Hytera,

14   testified that Hytera's net profit was 6.8 percent on average.

01:15:20    15   Do you recall that?

16   A.   I do.

17   Q.   And you understand Motorola's net profit is probably

18   around 12 percent?

19   A.   I don't want to speculate from memory.  They are higher,

01:15:29    20   that is for certain.

21   Q.   Okay.  But you had a real big number on your first slide,

22   about $4.4 billion?

23   A.   That was a revenue number, not a profit number.

24   Q.   Exactly.  It was a revenue number, right?

01:15:45    25        So any idea what about 6.8 percent is of 4.4 billion?

Malackowski - cross by Allan

5414

1   A.  Well, you could estimate it.  It would be less -- maybe

2   315 million, something like that.

3   Q.  299.

4   A.  Okay.

01:15:57   5   Q.  And Dr. Aron testified that the number was 265, right?

6   A.  I'm not doubting that her math is correct.  I'm saying

7   that is irrelevant, because the profitability is actually much

8   higher from these products.  They just spent all that money in

9   other things to reduce their overall corporate profit.

01:16:18   10   Q.  But that's what companies do, Mr. Malackowski.  They

11   reinvest, which changes their profit margin.

12   A.  And they're perfectly entitled to do that, so long as they

13   actually earned the money and didn't get it from

14   misappropriating someone else's trade secrets.

01:16:33   15        You can't say:  Well, I stole all your stuff, I made

16   all this money, but I spent it on all these cool things, so

17   now I can't get it back.

18        It doesn't work that way.

19   Q.  That's what the profit margin is in the annual report,

01:16:44   20   yes?

21   A.  True.

22   Q.  And you showed one single annual report, correct?

23   A.  True.

24   Q.  All right.  Now, I want to look at another slide you

01:16:56   25   testified about, I think it's 26.6.

Malackowski - cross by Allan

5415

```
              1        You testified about this on your direct examination,

              2   right?

              3   A.   Yes, sir.

              4   Q.   Right.  And you said, you style this as "Dr. Aron's Unjust

01:17:16      5   Enrichment Opinion," right, at the top?

              6   A.   Right, which is the red focus of the bar, yeah.

              7   Q.   Okay.  And so you say, you point to this 2.115 number and

              8   you say it's profits Hytera should pay according to Dr. Aron,

              9   right?

01:17:32     10   A.   True.

             11   Q.   And then you point to this other thing going up $343,000,

             12   which is again more than your 311 last time, saying profits

             13   Hytera gets to keep according to Dr. Aron, right?

             14   A.   That's right.

01:17:45     15   Q.   Now, you talked about an apples-to-apples or

             16   apples-to-oranges comparison in your direct testimony, right?

             17   A.   I did.

             18   Q.   This is not an apples-to-apples comparison, is it?

             19   A.   Well, it most certainly is.  It's of the total profit that

01:17:59     20   was earned, what Dr. Aron says should be paid back to

             21   Motorola, and what Dr. Aron's analysis says should be kept by

             22   Hytera.

             23   Q.   Well, Dr. Aron in her direct testimony provided a number

             24   of different values, didn't she?

01:18:16     25   A.   She did.
```

Malackowski - cross by Allan

5416

1    Q.   And what she specifically offered was a number, to the

2    extent the jury believes Mr. Grimmett, who testified that at

3    most Hytera had a six-month benefit, a six-month head start,

4    and that she calculated the number of that six-month head

01:18:40    5    start at 2.115, right?

6    A.   That's the basis of her calculation.

7    Q.   Right.  And the number, the chart you have on the right is

8    if Hytera would never have been able to reach or come up with

9    a DMR radio at least up until today?

01:18:56   10    A.   The chart on the right shows the actual profit they made

11    for actually using the trade secrets.  That is consistent with

12    the assumption that they don't come up with a comparable

13    product.

14         But unjust enrichment is looking at what actually

01:19:09   15    happened.  And what actually happened was 345 million worth of

16    benefit.  And Dr. Aron says they should only have to give back

17    2 million of it.

18    Q.   But, Mr. Malackowski, you just assumed that all of that

19    came into place assuming that Motorola -- that Hytera

01:19:26   20    infringed or misappropriated the trade secrets.  That needs to

21    be determined, correct?

22    A.   Both Dr. Aron and I assume liability, that the jury will

23    find misappropriation, that is true.

24    Q.   Your view of this number, the $343 million number, is it

01:19:43   25    contains all of the profits that Hytera has earned on every

Malackowski - cross by Allan

5417

1    single DMR radio everywhere in the world, for one?

2    A.  The ones that all include the Motorola trade secrets, yes.

3    Q.  Right.  And number two, refusing to deduct a single cent

4    of Hytera's R&D, yes?

01:20:00    5    A.  Correct.

6    Q.  And adding in $73.4 million for what you claim was R&D

7    they would have spent but didn't have to spend?

8    A.  Exactly.

9    Q.  Okay.  So that's where you get this big number, right?

01:20:12    10   A.  That's right.

11   Q.  And that number only comes into play if Hytera never would

12   have been able to launch a DMR radio up until today?

13   A.  No.  Hytera actually has not launched a non-accused radio

14   up 'til today.  This is profit they actually did make, costs

01:20:31    15   they actually did save.  It's no hypothetical.  It's what

16   happened.

17   Q.  So if it's found that there was a 6-month or a 2-year

18   delay, do you agree that Hytera -- that Motorola doesn't get

19   all of this?

01:20:46    20   A.  No.  That's what actually happened.  That should all be

21   awarded.

22          If somehow it could have been designed around in a

23   short period of time and Motorola lost less, maybe that's a

24   factor for the lost profits calculation.

01:21:00    25          But what happened happened.  There was sales through

Malackowski - cross by Allan

5418

1    today, there were hundreds of millions of dollars in profits

2    that were made.

3    Q.   So your testimony is that if there was a 6-month delay or

4    a 2-year delay or a 4-year delay or a 1-month delay, none of

01:21:20    5    that would matter.  You're saying the jury should award $343

6    million.

7    A.   I'm saying that regardless of what the theoretical delay

8    would be, they made what they made.

9         If you want to apportion the profit, if you want to

01:21:35    10   reduce it, in my direct testimony in December I prepared a

11   number of alternative analyses assuming you wanted to account

12   for just a period for 48 months or 12 months.  That's

13   available to the jury if they want to look at it.

14   Q.   And that's what Dr. Aron did with 6 months coming up with

01:21:54    15   the 2.1, right?

16   A.   In part, yes.

17   Q.   That's my point, is that if there is, if the jury finds a

18   delay, then it's less than the whole that they're to award?

19   A.   If the jury finds a delay, both Dr. Aron and I proposed

01:22:11    20   alternatives.  I don't agree with the 2.1 million even if only

21   6 months.  But in theory, sure.

22   Q.   This is one of Dr. Aron's slides where she -- you provide

23   a number of delay scenarios in your opinion, correct?

24   A.   Yes, sir.  I just referred to that.

01:22:42    25   Q.   Right.  You didn't really talk about it this morning, but

Malackowski - cross by Allan

5419

1    talked about it, you testified about it in your direct back in

2    December?

3    A.   True.

4    Q.   Right.  And you provide a 3-month, a 6-month, a 1-year,

01:22:55    5    2-year, 3-year and so forth, right?

6    A.   True.

7    Q.   And it's fair to say if you look at what Dr. Aron said is

8    Motorola's flawed head start profits and what she calculates

9    as the actual head start profits, Dr. Aron believes that you

01:23:11    10    are massively overinflating the head start profits in these

11    delay scenarios, correct?

12    A.   I mean, that's what she wants you to believe, yes.

13    Q.   That's her testimony.  She disagrees with you, right?

14    A.   Yes.

01:23:24    15    Q.   Okay.  And you also gave numbers and she offered an

16    opinion on numbers for the damages just out of the U.S.,

17    right?

18    A.   True.

19    Q.   Motorola's flawed head start profits in the U.S., these

01:23:43    20    are your numbers, and then her numbers are on the right,

21    actual head start U.S. profits, right?

22    A.   I obviously didn't call my flawed.  But yes, those are my

23    numbers.

24    Q.   Fair enough.  These are your numbers, right?

01:23:54    25    A.   Yes.

Malackowski - cross by Allan

5420

1    Q.   These are Dr. Aron's numbers.

2           MR. ALLAN:  And just for the record, Your Honor, this

3    is DDX-22.26 and the previous exhibit was a demonstrative

4    exhibit, was DDX-22.25.

01:24:18    5           THE COURT:  Yes.

6    BY MR. ALLAN:

7    Q.   Now, even if you assume that Motorola -- strike that.

8           Even if you assume that Hytera could not launch in

9    your view a comparable DMR radio up until today, we can agree

01:24:38   10    that Hytera did, in fact, launch a commercial tier radio,

11    right?

12    A.   Low-end radio, yes.

13    Q.   That's on the market?

14    A.   It is.

01:24:45   15    Q.   Right.  And that's not being accused of containing any

16    infringing code in this case?

17    A.   It is not.

18    Q.   And there were roughly 2 million of those commercial units

19    sold?

01:24:58   20    A.   I don't recall, but I'll accept that.

21    Q.   Now, you didn't analyze whether Hytera might have sold

22    more of those commercial radios if, in fact, they never

23    launched the mid-tier and high-tier DMR radios that are

24    accused of misappropriation in this case, did you?

01:25:20   25    A.   No.  Of course I did.  I looked at that at great length.

Malackowski - cross by Allan

5421

1    Q.   You don't break out any kind of calculation on it though,

2    do you?

3    A.   I don't believe that Hytera would have sold 90 and $300

4    radios to customers who wanted the features of the high-end

01:25:36   5    radios and paid $1,000.  I believe those customers would have

6    gone to Motorola.

7    Q.   So you just, you just flat out rejected the notion that

8    any customer might rather buy a commercial radio than a

9    mid-tier or a high-tier, just flat rejected that prospect?

01:25:54   10   A.   Bottom line, yes.  I don't believe that those customers

11   would have accepted those, or else they would have bought the

12   lower product.  It's way cheaper.

13   Q.   You've seen evidence and testimony in this case including

14   through Motorola documents that commercial-tier products often

01:26:09   15   time compete with mid-tier and high-tier products, and even in

16   the DMR space, DMR competes with analog and TETRA?

17   A.   Compete in the sense that customers are presented a

18   choice.  But once they make that choice, the question is what

19   would they have done otherwise.

01:26:24   20             And so yeah, they're offered.  Sometimes they go with

21   low end, that's fine.  But when they decide to go with a

22   high-end radio and pay 3 to maybe 10 times as much, my view is

23   if Hytera's high-end radio wouldn't have been available, they

24   would have bought Motorola's.

01:26:38   25   Q.   And that conflicts with the testimony that and the

Malackowski - cross by Allan

5422

1    evidence that's been presented that, in fact, customers shop

2    different versions of different products, DMR, analog, even as

3    high as TETRA?

4    A.   No, I don't think it conflicts at all.  I think customers,

01:26:54    5    in economics it's called the revealed preference, they share

6    with you what they want based on what they actually did, and

7    that has meaning.

8    Q.   Okay.  Well, let's go back to the three tiers of different

9    radios for just a moment.

01:27:34    10            MR. ALLAN:  Can we pull up DDX-23.3, please.

11   BY MR. ALLAN:

12   Q.   All right.  You recognize this from your report?

13   A.   Yes, sir.

14   Q.   And this is a listing of Motorola MOTOTRBO radios in the

01:27:54    15   commercial mid-tier and professional range, right?

16   A.   Correct.

17   Q.   And they have these different sort of code names for their

18   radios, right?

19   A.   They do.

01:28:01    20   Q.   Belize is a professional, Matrix is a mid-tier, Tango is a

21   commercial?

22   A.   Yes, sir.

23   Q.   Right.  Now, I'd like to hand you DTX-5631, 5632 and 5633,

24   and while we're at it DTX-4397.

01:29:12    25            Let's start with DTX-4397.  This is a document you

Malackowski - cross by Allan

5423

1    referenced in one of your reports, right?

2    A.  I mean, I need to look at it.  It certainly looks like one

3    of the many documents I referenced.  It contains the chart

4    showing the competitive landscape between Motorola and Hytera.

01:29:34   5    Q.  And it's a Motorola produced document in this case.  You

6    can see that by the Bates number?

7    A.  Yes, sir.

8    Q.  It says "PCR Competitive Landscape" at the top?

9    A.  Yes, sir, the second page.

01:29:47   10        MR. ALLAN:  I'd offer this into evidence please, Your

11   Honor.

12        MS. SCHMIDT:  No objection.

13        THE COURT:  It is received and may be published.

14      (DTX-4397 was received in evidence.)

01:29:53   15   BY MR. ALLAN:

16   Q.  Now, the other three documents I handed you,

17   Mr. Malackowski, DTX-5631, 5632 and 5633, these are Motorola

18   MOTOTRBO user guides for three different products.  Do you see

19   that?

01:30:15   20   A.  I see it.  I mean, it's over 3,000 pages long.  But I see

21   what you gave me, yes.

22   Q.  Right.  And it says "Motorola Solutions."  There is a

23   date.  "Motorola Solutions" signature at the top.  Picture of

24   the radio.

01:30:29   25   A.  I see all those things.

Malackowski - cross by Allan

5424

1    MR. ALLAN:  I'd offer this into evidence please, Your

2  Honor.

3    MS. SCHMIDT:  No objection.  But just so the record

4  is clear, which exhibit numbers is all of those?

01:30:38    5    MR. ALLAN:  I'm sorry.  DTX-5631, 5632, and 5633.

6    THE COURT:  They are received and may be published.

7    (DTX-5631, DTX-5632 and DTX-5633 were received in

8    evidence.)

9    MR. ALLAN:  Now, DTX, let's pull up 5631, please.

01:30:59   10  And this is -- actually can we, Mr. Montgomery, pull up

11  DDX-23.2 side by side -- I'm sorry, 23.3.  I'm sorry.

12  BY MR. ALLAN:

13  Q.  Okay.  Just to orient you, Mr. Malackowski, on the right

14  is the Figure 22 we were just looking at from your report that

01:31:35   15  lists some commercial, mid-tier and professional radios.  Do

16  you see that?

17  A.  Yes, sir.

18  Q.  On the left is DTX-5631 that we just introduced.  That is

19  the user guide for an SL3500e.  Do you see that?

01:31:48   20  A.  Yes, sir.

21  Q.  All right.  And that's a commercial radio of Motorola,

22  right?

23  A.  Correct.

24  Q.  Okay.  Now, let's just take a look at the next one, which

01:32:01   25  is 5632.  Now, this is an XPR3500, do you see that, user

Malackowski - cross by Allan

5425

```
            1    guide?
            2    A.  I do.
            3    Q.  So if we look on the mid-tier, there we go, that's a
            4    mid-tier, that's a user guide for Motorola mid-tier DMR radio,
01:32:22    5    right?
            6    A.  That's right.
            7    Q.  All right.  And then DTX-5633, this is a user guide for
            8    DP3661e, which is a professional grade Motorola radio, right?
            9    A.  It is.
01:32:39   10    Q.  Okay.  Now, you agree that the alleged trade secrets that
           11    are at issue in this case are associated with the mid-tier and
           12    the high-tier DMR radios, right?
           13    A.  Yes, sir.
           14    Q.  Okay.  You understand Motorola contends that, you
01:33:07   15    understand there is 21 alleged trade secrets in this case?
           16    A.  I do.
           17    Q.  Right.  And two of them are not source code related,
           18    right?  There is 19 that are source code related, one has
           19    something to do with hardware and the other testing?
01:33:20   20    A.  Okay.  I'll accept that.
           21    Q.  The hardware and the testing are two of the seven trade
           22    secrets that you contend don't overlap that we'll talk about.
           23    A.  Rooms in the house, yes, sir.
           24    Q.  Right.  But we can agree that 19 of the alleged trade
01:33:40   25    secrets are code related trade secrets?
```

Malackowski - cross by Allan

5426

1    A.   I mean, I'll accept that, sure.

2    Q.   And the Motorola source code that it puts in its DMR radio

3    is the same across its commercial, mid-tier and professional

4    range products, isn't it?

01:33:57    5    A.   I mean, at this point you are really getting into a level

6    of technical detail where I would defer to the technical

7    experts.

8           I know it utilizes the code.  But when you start

9    comparing what is in each and every radio, that's outside of

01:34:09   10    the accounting.

11    Q.   Well, let's pull up DTX-5631 and take a look at, this is

12    the, this is the SL3500e that we looked at?

13    A.   Right.

14    Q.   Let's go to page 12.  And you see here under Software

01:34:35   15    Version, "All the features described in the following sections

16    are supported by the software version 2.10.00.0000."  Do you

17    see that?

18    A.   I mean, I can read it.

19    Q.   Okay.

01:34:47   20    A.   I can tell you I have not done a study of software

21    version.  So I don't know how much I am going to be able to

22    help you.

23    Q.   Well, you haven't done a study of whether Motorola's

24    source code is in Hytera's mobile products either, have you?

01:35:02   25    A.   Well, a study in the sense that I saw the admission by

Malackowski - cross by Allan

5427

1   Ms. Frederiksen-Cross.  But I don't pretend to tell what

2   exactly that code is.

3   Q.  But you find there is enough of an admission, even though

4   you are not a technical expert, to increase your damages

01:35:17   5   analysis by 35 million?

6   A.  Well, she said it was in the mobile products, yes.

7   Q.  Okay.  Let's take a look at the next one, DTX-5632.  Let's

8   start with 5632.

9       This is the, I believe the mid-tier product we looked

01:35:36   10  at earlier?

11  A.  Yes, sir.

12  Q.  Okay.  So we just looked at the low tier.  Now we're

13  looking at the mid tier.  Let's go to page 12 here.

14      Same source code, right, according to the document?

01:35:50   15  A.  I don't know that it has all the same source code.  I know

16  that there is some level of commonality as I would interpolate

17  from these documents.

18      But I don't know what R02.10.00.0000 means.  I don't

19  know if that's all the software or part of the software or

01:36:08   20  kind of the base and then you add extra things on top of it.

21  I don't know.

22  Q.  Okay.  But I'm just asking you to read the document.  It's

23  the same source code version as in the low tier, right?

24  A.  The number is the same.

01:36:22   25  Q.  Listed on the document?

Malackowski - cross by Allan

5428

1    A.   The number is the same.

2    Q.   The number is the same.  Let's go to the last one.

3    A.   I think you said "low-tier."  Did you mean high-tier?

4    Q.   Pardon me?

01:36:32    5    A.   Same version that's in the high-tier?

6    Q.   We're going to that right now, DTX-5633.

7         Do you see this is the high-tier, right?

8         Let's go back to that first page for a minute though.

9         This radio is physically smaller and more compact,

01:36:45    10   right?

11   A.   It is.

12   Q.   It's the high-tier radio, right?

13   A.   This is.

14   Q.   Okay.  Let's go to page 19.

01:36:55    15        Again, the Motorola user guide for the high-tier

16   radio lists the same software version as for the mid-tier and

17   the low-tier we just looked at, correct?

18   A.   Sure.

19   Q.   All right.  You offered some testimony about, in your

01:37:31    20   words, the reliability of Hytera's research and development

21   data?

22   A.   Yes.

23   Q.   And you offered some testimony, you had a slide that

24   indicated what you thought Debra Aron testified to or what her

01:37:49    25   values were, right?

Malackowski - cross by Allan

5429

1    A.  Well, I had Debra Aron's slide, yes.

2    Q.  So let's pull up, let's pull up your PDX-26.5.

3            This is your slide, right?

4    A.  Yes, reflecting Dr. Aron's work.

01:38:09   5    Q.  Reflecting Dr. Aron's work, okay.  So you've got the blue,

6    you claim the blue columns are, is what she believes the spend

7    was in August 2019, right?

8    A.  Right, a summary of the documents produced at that time.

9    Q.  Okay.  And, well, you're saying it's Dr. Aron's R&D spend

01:38:32   10   in August 2019.  That's what your slide says, correct?

11   A.  True.

12   Q.  Right.  In the red is Dr. Aron's R&D spend in December

13   2019, right?

14   A.  Based on the most recent documents, yes.

01:38:44   15   Q.  Okay.

16           MR. ALLAN:  Now, let's pull up Dr. Aron's

17   demonstrative DDX-2211.

18   BY MR. ALLAN:

19   Q.  Now, this was Dr. Aron's slide that she used in her

01:39:02   20   testimony last week, correct?

21   A.  Appears to be.

22   Q.  I'm sorry, yes?

23   A.  It appears to be, yes.

24   Q.  Okay.  And the total she comes to for all these years,

01:39:17   25   2010 through all of 2018 and then half of 2019 is 76 -- sorry,

Malackowski - cross by Allan

5430

1    $79.6 million, right?

2    A.   Yes.

3    Q.   Of R&D expenses she believes should be deducted from the

4    revenue in calculating profit.  You disagree with that?

01:39:34   5    A.   Generally.

6    Q.   Okay.

7           MR. ALLAN:  Now, can we put up side by side the 26,

8    PDX-26.5 and this slide, please.

9    BY MR. ALLAN:

01:39:55   10   Q.   So, again, the red is what you think her numbers were in

11   December 2019, right?

12   A.   Specifically the red are the documents that she used in

13   2019.

14   Q.   Well, the documents she used, Mr. Malackowski, are the

01:40:10   15   documents that allowed her to come up with these figures?

16   A.   They're the same documents, true.

17   Q.   But you'd agree with me that the numbers on your red

18   charts don't match the numbers that she testified to the jury

19   about?

01:40:25   20   A.   That's true.

21   Q.   That's true, right?

22   A.   Yes.

23   Q.   The numbers you've come up with are actually more than

24   she's come up with?

01:40:32   25   A.   Right.  I'm not putting blame at Dr. Aron.  I'm looking to

Malackowski - cross by Allan

5431

1    the documents.

2         The documents that she relies upon are not reliable.

3    She then sorts those documents and does other things with

4    them.  That's too late, too late.  You can't start with the

01:40:49    5    documents that are unreliable.

6    Q.  Well, there is one set of R&D data from Hytera that has

7    been produced in this case, right, one set of actual data?

8    A.  I'm not sure I understand.  There is sets of R&D data that

9    keep changing because of the descriptions.  It's a single

01:41:12    10   database that keeps getting rewritten and modified.

11   Q.  Well, Mr. Malackowski, you didn't actually show the jury

12   in your testimony today any data, any numbers, right?

13   A.  No.  I showed where the codes were changed, which would

14   result in changes in numbers as displayed by the graph.

01:41:29    15   Q.  Right.  What you showed was what Dr. Aron testified as she

16   considered a crosswalk or a decoder ring or a data dictionary,

17   if you will, right?

18   A.  Yep.  I agree with that.

19   Q.  So the raw R&D data itself has product codes?

01:41:48    20   A.  True.

21   Q.  Right.  And then you look to this decoder ring as she

22   defined it to see what the product code relates to, right?

23   A.  Yes, that's right.

24   Q.  And Hytera's product codes are grouped into a couple of

01:42:01    25   different buckets, right?

Malackowski - cross by Allan

5432

1      A.   More than a couple.

2      Q.   Well, there is mid-tier and high-tier, right?

3      A.   There is probably --

4      Q.   For DMR.  Let me back up.

01:42:10    5      A.   There is still a lot of product codes, yes.  They can be

6      grouped into many different buckets.

7      Q.   Okay.  And so Hytera, in keeping its R&D data in the

8      ordinary course, does book R&D time and expense to specific

9      products, right?

01:42:36   10      A.   By code, yes.

11      Q.   Unlike Motorola?

12      A.   Motorola accounts for its time as well.  I don't know that

13      they record it by product code.  That's not part of anyone's

14      analysis in the damages assessment.

01:42:52   15      Q.   Well, you know that Motorola produced research and

16      development data in this case, right?

17      A.   Yes.  I used that data in part for my delay analysis.

18      Q.   And Motorola in that data does not separate out DMR?

19      A.   I don't know.  That wasn't a factor in my analysis.  I was

01:43:16   20      looking to see if they recorded it by trade secret, not by

21      product.

22      Q.   You didn't know that Motorola didn't break out its R&D by

23      DMR or other products?

24      A.   I wouldn't, now that you ask, I wouldn't expect that,

01:43:29   25      because the technical experts talked about how the earlier R&D

Malackowski - cross by Allan

5433

1    was used to build the next generation of products.  But

2    nowhere in my analysis was it necessary to break out R&D from

3    DMR and other products.

4            The focus of the Motorola analysis was understanding

01:43:45    5    R&D by trade secret, not product type.  And some of the trade

6    secrets as we just saw might relate to many products.

7    Q.  Can we pull up -- you've reviewed the deposition of

8    Mr. Winkler from Motorola?

9    A.  Yeah, but last summer.  So I'm not sure I will recall.

01:44:04    10   Q.  Well, I believe he testified by video in this case.  You

11   remember that?

12   A.  The trial transcript?  Yes.

13   Q.  Yeah.  Okay.

14           MR. ALLAN:  Let's go to transcript 128, line 16, to

01:44:17    15   129, line 1.

16   BY MR. ALLAN:

17   Q.  Okay.  So he's asked:

18           "And so earlier I had asked you that if you wanted to

19   isolate the DMR R&D numbers" -- and just to orient you,

01:44:47    20   Mr. Malackowski, we are talking about Motorola's R&D data,

21   right?

22   A.  Okay.

23   Q.  Not Hytera.

24           "...you'd have to assign allocation."

01:44:56    25           To which you respond that "You'd have to understand

Malackowski - cross by Allan

5434

1    from having worked with the engineering teams how much of

2    their time was spent on one product versus another.

3            "So absent access to consulting with the engineering

4    teams, is there a way to isolate the DMR R&D numbers in the

01:45:12    5    spreadsheet?

6            "Answer:  I don't know of one, no."

7            Do you see that?

8    A.  Okay, sure.

9    Q.  So Motorola's R&D according to Motorola's own witness

01:45:21   10    can't be separated out at all from DMR?

11   A.  I mean, I'll accept that.  That doesn't have anything to

12   do with my analysis, but that's what he said.

13   Q.  Right.  Hytera's does though, doesn't it?

14   A.  Hytera's has supposedly a way to separate it by product

01:45:37   15   through the product codes.

16   Q.  Right.  And through product, through product code you can

17   determine whether something is a DMR product, right?

18   A.  If the product codes are accurate and not changed.

19   Q.  And specifically whether it's a commercial tier or a

01:45:51   20   Hytera mid-tier product, right?

21   A.  You should be able to do that.

22   Q.  And you can separate out whether it's a TETRA product,

23   right?

24   A.  At Hytera?

01:46:00   25   Q.  Yes, sir.

Malackowski - cross by Allan

5435

1   A.  You should be able to.  There are product codes that are

2   very specific.  There are dozens of them.

3   Q.  And things like mobile products?

4   A.  Yes, sir.

01:46:14  5   Q.  Right.  And given that Hytera's R&D data has these product

6   codes with a decoder ring, if you will, or a crosswalk that

7   allows you to figure out what is what, you can go in and

8   filter out mobile products, TETRA products, commercial

9   products and so on to get a more accurate R&D data set, right?

01:46:37  10  A.  You should be able to, except your accuracy falls apart

11  when you find out that people recoded the ring years later.

12  Then it's not reliable.

13  Q.  Well, we will get into that, I promise.

14        So going back to --

01:46:54  15        MR. ALLAN:  I'm sorry, can we take that down.

16  BY MR. ALLAN:

17  Q.  Going back to your 26.5, PDX-26.5, when you add up all of

18  your, what you claim is Dr. Aron's R&D spend in December 2019,

19  you wind up with 96 -- 92.92 million.  I can give you a

01:47:21  20  calculator if you want.

21  A.  I'll accept that.

22  Q.  Okay.  Which again is higher than the $79.6 million number

23  she testified to the jury about?

24  A.  Yes.  Probably because of the mobiles that you and I

01:47:31  25  talked about.

Malackowski - cross by Allan

5436

1  Q.  And she took out PDT products that aren't accused, right?

2  A.  Sure.

3  Q.  Now, one thing I just want to make sure I'm correct and I

4  understand, so you've got 4.7 million just here, for example.

01:47:53  5  And this is 5 million and 8 million.  But your key on the left

6  here says "in millions."  That's not millions millions, right?

7  That's just a typo?

8  A.  Correct.

9  Q.  All right.  Let's take a look at previously admitted

01:48:20  10  DTX-5601.  Now -- -

11       MS. SCHMIDT:  Excuse me, do you have a copy of that

12  for me?

13       MR. ALLAN:  Yes, we do.  I was just going to say I

14  have big copies, too, because I can't read it.

01:48:42  15       THE COURT:  Another opportunity to take a stand up

16  break.

17     (Pause)

18  BY MR. ALLAN:

19  Q.  All right.  You're familiar with this, Mr. Malackowski?

01:49:34  20  A.  Generally, yes, I believe.

21  Q.  Now, this was an exhibit to Dr. Aron's report, correct?

22  A.  That's my understanding.

23  Q.  Now, row B here, direct R&D expenditures on high-end DMR

24  with PDT, right?  These are, this row is the figure that you

01:50:03  25  used to come up with the numbers that are in the red columns

Malackowski - cross by Allan

5437

1    on your chart, right?

2    A.   That looks to be accurate.

3    Q.   Okay.  So in that column that we can switch back and forth

4    in just a moment, but basically it's 2010 through 2018,

01:50:23   5    correct?

6              MR. ALLAN:  Can we maybe flip that back,

7    Mr. Montgomery.

8    BY THE WITNESS:

9    A.   Yes, that looks right.

01:50:47   10   BY MR. ALLAN:

11   Q.   Okay.  Now let's go back to DTX-5601.

12             So this row B, where you add up these numbers, that

13   gets you to the 92 plus million that we talked about?

14   A.   Okay, yes.

01:51:08   15   Q.   Okay.  And this is again direct R&D expenses on high-end

16   DMR with PDT, right?

17   A.   Correct.

18   Q.   Again, just for clarity, PDT is another product

19   manufactured by Hytera that is not a DMR product that is not

01:51:26   20   being accused of any misappropriation in this case?

21   A.   True.

22   Q.   And you understand that Dr. Aron removed the PDT figures

23   from the R&D expense?

24   A.   For her 79 million.

01:51:39   25   Q.   Correct.

Malackowski - cross by Allan

5438

A.   Yes.

Q.   And if you look in row K, estimated total R&D expenditures
on accused DMR without PDT, this is the data set, this is the
row without the PDT that Dr. Aron used in coming up with her
$79.6 million?

A.   True.

Q.   So you both -- you looked at a different data set than she
did that had a product that she didn't use?

A.   Because I was comparing to the previous data sets.

         Again, I'm not being critical of Dr. Aron.  I'm being
critical of the data.

Q.   But you'd agree that if we mapped out what her true
numbers were on your PDX-26.5, we can flip back to that for a
moment, these red lines would all be lower, right?

A.   By some amount --

Q.   Maybe I'm not being precise.

A.   -- that wouldn't, that wouldn't change --

Q.   But they drop?

A.   Well, if you remove things, they should always drop, yes.

Q.   Right.

A.   But that doesn't mean the data on an apples-to-apples
basis is justified.

Q.   Now, the blue lines you've got here, you collected that
information from Dr. Aron's August 2019 report, right?

A.   Correct.

Malackowski - cross by Allan

5439

```
          1    Q.  So I want to hand you Exhibit 11 from that report, which

          2    is DTX-5638.

          3              MS. SCHMIDT:  Could you say that number again?

          4              MR. ALLAN:  Yes.  DTX-5638.

01:53:55  5    BY MR. ALLAN:

          6    Q.  Again, you've got that in front of you?

          7    A.  I do.

          8    Q.  You recognize that as the piece of Dr. Aron's report you

          9    used to calculate these figures on PDX-26.5?

01:54:24  10   A.  Correct, the second line in the report.

          11             MR. ALLAN:  I'd offer it into evidence please, Your

          12   Honor.

          13             MS. SCHMIDT:  No objection.

          14             THE COURT:  It is received and may be published.

01:54:22  15        (PDX-26.5 was received in evidence.)

          16             MR. ALLAN:  Now, here again let's pull up DTX-5638,

          17   please.

          18   BY MR. ALLAN:

          19   Q.  Here again you used the source of the data that you

01:54:48  20   included in your graph, PDX-26.5, was the data in the second

          21   row of this chart, right, direct R&D expenses on accused DMR?

          22   A.  Correct.

          23   Q.  Okay.  So that's what makes up -- let's just flip back to

          24   it real quick, 26.5.  That line gets you these values?

01:55:12  25   A.  Correct.
```

Malackowski - cross by Allan

5440

1    Q.   Okay.  Now let's go back to 5638.  And the second-to-last

2    row is where I want to direct you, the total R&D expenditures

3    on accused DMR.  Do you see that?

4    A.   I do.

01:55:34    5    Q.   Now, that's the figure that Dr. Aron testified or said was

6    applicable based on the August 2019 data, right?

7    A.   Yes.

8    Q.   So looking at both of these two spreadsheets, the 5601 and

9    5638, your slide has two -- it comes from two different rows

01:56:04    10   than the ones that she actually relied on, right?

11   A.   Yes.

12   Q.   Okay.  So let me show you DDX-23.1.  This demonstrative,

13   Mr. Malackowski, plots the lines on the rows that Dr. Aron

14   actually relied on in her August report and her December

01:56:38    15   report, correct?

16   A.   I haven't seen this chart before, but I accept that.

17   Q.   And what you see actually is you see a decline.  You see

18   that her updated numbers are all lower, meaning that she

19   filtered the data down and that the R&D expenses that she's

01:57:01    20   claiming because she's not counting mobile and she's not

21   counting PDT and she took some TETRA out results in a lower

22   R&D expenditure, correct?

23   A.   She's doing essentially the same filtering.  Look at how

24   much they've changed.  The documents can't be reliable if they

01:57:21    25   are dropping by two-thirds.

Malackowski - cross by Allan

5441

1          And irrespective of that, the reason I looked at the

2    top line numbers was to show the difference in the underlying

3    data.

4          I'm really trying not to critique Dr. Aron

01:57:32    5    personally.  I'm just trying to critique the data.

6          MR. ALLAN:  Can you put PTX-26.5 side by side,

7    please.

8    BY MR. ALLAN:

9    Q.   The chart on the right is the chart using your numbers,

01:57:51    10   right?

11   A.   Yes.

12   Q.   The chart on the left is the chart using Dr. Aron's

13   numbers, right?

14   A.   Yes.

01:57:56    15   Q.   Yours suggests that her R&D expenses continue to rise,

16   when in reality they continue to fall, correct?

17   A.   In reality they're kind of flat.  But yeah, there is a

18   difference for sure.

19   Q.   Now, you understand that -- you criticized some changes to

01:58:48    20   the decoder ring/crosswalk as we're calling it, right?

21   A.   Yes, sir.

22   Q.   Right.  Because there were some changes where products

23   were included in the high end in mid-tier DMR range and some

24   R&D expenditures that were taken out of that category, right?

01:59:06    25   A.   Because of the decoder ring or because of the filtering?

Malackowski - cross by Allan

5442

1    Because of the decoder ring, generally speaking, there were

2    expenses put into the high and mid-tier category from other

3    categories.

4    Q.   And there were expenses that were taken out of the high

01:59:20    5    and mid-tier categories and put into other categories, right?

6    A.   I mean, there might have been one or two examples, but

7    certainly not the majority of the examples.

8    Q.   It went both ways, Mr. Malackowski, didn't it?

9    A.   Only proving my point.  It shouldn't change at all.  So

01:59:32    10   regardless of how it changes, you can't come back during trial

11   and say:  Well, 10 years ago we miscoded, so we're going to

12   recode it again.

13   Q.   Well, if Hytera had development that was used by mid-tier

14   and high-tier, and they had originally coded it as a shared

01:59:51    15   R&D expense, it would be totally proper to consider that for

16   purposes of this case to be in the mid-tier and high-tier

17   category and not shared, right?

18   A.   I didn't see categories labeled "shared."  I saw public

19   works.  I saw --

02:00:05    20   Q.   You saw "public."  "Public works" you understand is

21   "shared"?

22   A.   I saw -- well, not shared in the sense it was simply

23   limited to low -- I mean, to mid and high-tier.  And then I

24   saw products that were low tier that were recategorized

02:00:20    25   explicitly to mid to high-tier.

Malackowski - cross by Allan

5443

1    Q.  And you understand, Mr. Malackowski, that corrections are

2    made leading up to and during trial, right?  You've had

3    erratas to your report, right?

4    A.  Corrections can be made as new evidence comes in or if you

02:00:45    5    find a math mistake.  But corrections can't be made to

6    contemporaneous weekly labor records from 10 years ago.  That

7    doesn't make any sense.

8    Q.  Professor Wicker had corrections in his report to the tune

9    of 22,000 lines, right?

02:01:00    10    A.  Well, it was part of the analysis he was doing today or

11    within the last few months, sure.  That's different than

12    payroll records from a decade ago.

13    Q.  Well, let's talk about Motorola's records.  Motorola's R&D

14    records don't allow anybody to determine what their R&D

02:01:21    15    expenses were or how much time, personnel it took to develop

16    their alleged trade secrets.

17        So what Motorola has done in this case is had their

18    witnesses go back 10, 20 plus years and try to guesstimate how

19    long it took to develop those trade secrets?

02:01:39    20    A.  They did go back in time.  And if Hytera presented the

21    same analysis, we would consider it.  But to present documents

22    that are explicitly changed a decade later, as a forensic

23    accountant, suggests they're unreliable.

24    Q.  So it's okay for Motorola to do it, but not Hytera?

02:02:00    25    A.  Motorola did something completely different.  They said:

Malackowski - cross by Allan

5444

1    We don't have these documents.  Let's go back and create the

2    best estimate.  Okay.  That's something that's fair to do.

3        That's very different than saying:  We have the

4    documents.  Here they are.

02:02:10   5        We don't like that answer, let us change them.

6        Said:  No, no, no.

7        Third time, that is different.

8    Q.  So it's okay for Motorola to go back and make up numbers

9    out of whole cloth without any document to look at, but it's

02:02:20  10   not okay for Hytera to look at documents --

11       THE COURT:  All right.  That question is just arguing

12   with the witness.

13       MR. ALLAN:  Withdrawn.

14       THE COURT:  Rephrase the question.

02:02:26  15       MR. ALLAN:  Withdrawn, Your Honor.

16   BY MR. ALLAN:

17   Q.  And again, the data, the R&D data that Hytera produced in

18   this case, the numbers, those never changed.  Just what you

19   pointed out with a couple of examples from the decoder ring,

02:03:02  20   right?

21   A.  Just the decoder.

22   Q.  Right.

23   A.  Just the decoder.

24   Q.  And even though Hytera's R&D records had a number of

02:03:12  25   instances where the decoder ring never changed, things stayed

Malackowski - cross by Allan

5445

1    where they were, you decided to toss out the entire 76.9

2    million and not count any of it?

3    A.  Well, that's not true.  Remember, before we even got to

4    the decoder magic, I tossed it out last time because it showed

02:03:31    5    so much R&D occurring after essentially all the products are

6    launched.  That was the first red flag.  This is just another

7    issue, an important issue, but a second issue.

8    Q.  You understand, Mr. Malackowski, that R&D continues after

9    products get launched, right?

02:03:45    10   A.  At some level there is modifications, but not, you know,

11   70 percent of the R&D after the product has launched.

12   Q.  And you know that because you're a technical expert?

13   A.  No, I don't know that because I'm a technical expert.  I

14   know that because I looked at the data and I listened to the

02:04:03    15   testimony.

16   Q.  All right.  So you refuse to deduct any of the $76.9

17   million that Dr. Aron testified constitutes Hytera's research

18   and development expenses, right?

19   A.  I've concluded it should not be deducted.

02:04:25    20   Q.  In fact, since you've now added mobiles into the case, the

21   70.6 doesn't include the mobile R&D numbers because she

22   subtracts them thinking that they weren't in the case, right?

23   A.  Correct.  We talked about that explaining the difference

24   in those two rows we just looked at.

02:04:41    25   Q.  All right.  So the nearly $80 million that Dr. Aron thinks

Malackowski - cross by Allan

5446

1    you should deduct from the revenue amongst other things to

2    come up with the profit, you're not taking any of that?

3    A.   I am not.

4    Q.   Okay.  But you testified that you think Hytera should have

02:04:59    5    to pay Motorola $73.6 million in R&D that it didn't actually

6    incur?

7    A.   Right, the avoided cost, the savings it earned by the

8    theft of the trade secrets.

9    Q.   Okay.  So they can't deduct their actual R&D expenses

02:05:18   10    there shown by the data, but they do have to pay $73.6 million

11    that you say they would have had to spend?

12    A.   Those are different issues.  But mathematically, that's

13    true.

14    Q.   Right.  So that is my next question.  These are, they

02:05:31   15    sound similar, but the $79.6 million number and the $73.6

16    million number, they're two separate numbers?

17    A.   Correct.

18    Q.   And they're related only to the extent that they relate to

19    research and development?

02:05:45   20    A.   Correct.

21    Q.   One you say Motorola -- Hytera doesn't get to deduct from

22    profit, the other you say it's added in to the damages?

23    A.   Correct.

24    Q.   And the $73.6 million number, that's R&D, research and

02:06:07   25    development you think Hytera would have spent to develop these

Malackowski - cross by Allan

5447

1    trade secrets?

2    A.  Yes, sir.

3    Q.  All right.  And you understand that Hytera began

4    developing its DMR radio products in 2005?

02:06:21    5    A.  About that time.  I think that's accurate.

6    Q.  And now it's 2020?

7    A.  It is.

8    Q.  So that was 15 years ago?

9    A.  True.

02:06:30    10   Q.  Okay.  So your testimony is that Hytera would have just

11   kept spinning its wheels spending tens of millions of dollars

12   to the tune of $73.6 million on R&D and never been able to

13   launch a product?

14   A.  No.  I don't say that.  I say that they took trade

02:06:50    15   secrets, didn't have to spend the money, launched a product,

16   produced R&D data that relates to a bunch of things not

17   relevant here and is inaccurate, and the right measure of

18   damages is 345 million.

19   Q.  But the $73.6 million number that you are claiming they

02:07:05    20   would have spent is a phantom number, it's a number you made

21   up?

22   A.  I don't make up any numbers.  So I don't know where you're

23   getting that from.

24   Q.  Okay.  So your contention is that the -- well, let me back

02:07:22    25   up.

Malackowski - cross by Allan

5448

1          You understand that there has been testimony in this

2     case that Hytera had two development projects going on back in

3     2006, 2007, 2008 time frame?

4     A.   You mean DMR like other digital products?  I don't know

02:07:36   5     which two projects you are talking about.

6     Q.   DMR and dPMR.

7     A.   Yes, those two projects.

8     Q.   Okay.  Under your view of the world in this avoided R&D

9     world, Hytera wouldn't -- well, let me back up.

02:07:48   10          You understand that there was testimony in the case

11    from Mr. Yuan and others that Hytera was running both of these

12    projects simultaneously?

13    A.   Sure, as were others.

14    Q.   And if one didn't work, they would have jumped ship and

02:08:01   15    gone to the other, right?

16    A.   That's correct.

17    Q.   But your testimony is that the 74, $73.6 million that they

18    would have spent over the last 15 years doesn't reflect that

19    they could have just stopped and started a dPMR project?

02:08:16   20    A.   It reflects the fact that they stole trade secrets that

21    have value.  That value is measured by their profit and is

22    measured by the technology that they took that they saved the

23    money on.

24          They took the choice to use the infringing path.

02:08:32   25    They have to account for that.

Malackowski - cross by Allan

5449

1    Q.   And under your theory they do account for it by disgorging

2    all of their profits for every DMR radio ever made?

3    A.   All of the infringing radios.  And as Dr. Aron and I

4    agree, it's unjust enrichment plus the cost savings is the

02:08:48    5    total.  We both agree that that is the right method.

6    Q.   Right.  But not deducting what they actually spent in R&D

7    as a cost?

8    A.   That's the area where we disagree for the reasons we

9    talked about at length.

02:09:01    10   Q.   Unjust enrichment is about quantifying damages, the profit

11   that Hytera would not have made if they had not

12   misappropriated, right?

13   A.   It's about quantifying the profit they did make due to the

14   misappropriation.

02:09:14    15   Q.   And it's about trying to isolate the economic benefit of

16   the misappropriation by comparing what happened in the real

17   world to what would have happened if there were no

18   misappropriation, fair?

19   A.   At some general level that's right.

02:09:29    20   Q.   And if you assume a world where there was no

21   misappropriation and, for example, in a world where they may

22   have launched in 2012, they don't get all the damages you're

23   claiming, right?

24   A.   Well, you have to look at specifically what would have

02:09:46    25   happened.  But if you took the trade secrets you have to pay

Malackowski - cross by Allan

5450

1  compensation, you can't say:  Well, I wouldn't have done that

2  had I known.  So I don't have to pay you.

3       That's eating your cake -- keeping your cake and

4  eating it, too.

02:09:58  5  Q.  Well, let's talk about that.  So you take Dr. Aron to task

6  for adding research and development to her $2.1 million.  Part

7  of that is profit, part -- for the 6-month delay scenario.

8  Part of that is profit.  Part of that is R&D costs that they

9  would have incurred, right?

02:10:20  10  A.  I don't take her to task.  That's right, I take her to

11  task because she testified that my doing that was inaccurate

12  when it's not, and it's exactly what she did and we all -- it

13  should be done.

14  Q.  But it's not at all what she did.  It's completely apples

02:10:36  15  to oranges.

16       She added it in in a scenario where they actually

17  launched a product, right?

18  A.  But she still added in the profits she thinks that were

19  made to the R&D she thinks that were saved.

02:10:48  20  Q.  When there was a product on the market.

21       You are trying to add 74.6 -- $73.6 million in a

22  scenario where they never launch, right?

23  A.  That's right.  They only used the infringing technology.

24  Therefore, they benefited from the entire amount for the

02:11:04  25  entire period.

Malackowski - cross by Allan

5451

1    Q.   So they never launch a product.  They never get the

2    benefit of that trade secret.  But they have to pay for

3    whatever the R&D was?

4    A.   But they did launch a product.  They've sold $650 million

02:11:15    5    worth of product.  And they did get the benefit of the trade

6    secrets.  That's what they have to pay back.

7    Q.   There are two completely different scenarios:  One is

8    where one is launched under Dr. Aron's scenario and one is

9    where they never launch?

02:11:27    10   A.   There is only one reality.  The reality is for the last 10

11   years they've used Motorola trade secrets and sold a lot of

12   radios and made significant profit.  That's the only reality.

13   Q.   Isn't another reality, Mr. Malackowski, that your

14   testimony is that if they had spent $73.6 million on

02:11:43    15   developing the trade secrets, they would have actually been

16   able to do it?

17   A.   Could you -- I didn't catch that.

18   Q.   You said your opinion is the $73.6 million is what it

19   would take to develop the trade secrets?

02:11:55    20   A.   No.  That's what it took Motorola to develop the trade

21   secrets and, therefore, they saved that cost by not having to

22   incur it.

23   Q.   Okay.  So your testimony then is if Hytera had invested

24   that money, $73.6 million, they'd have the trade secrets,

02:12:11    25   whatever those trade secrets are?

Malackowski - cross by Allan

5452

A.   No.   They would try to develop their own radio.   It
wouldn't be Motorola's radio.   It wouldn't necessarily have
the same exact features.   It would be whatever their engineers
came up with.

02:12:23   Q.   So in terms of getting to your formerly $311 million and
now $345 million, before you add a single dollar of money
earned to that number, you add in the 74.3 million, and you
add in 79.6 you don't deduct, so you are already at $152
million, right?

02:12:48   A.   I don't understand that question.

Q.   Half of your $311 million is the refusal to account for
and deduct the R&D expenses and your insistence on adding in
the 74.3?

A.   Well, the 74.3 stands alone by itself.   And the profits
02:13:07   are higher because there is no deduction of R&D, that's true.

Q.   So in any event, we can agree that Dr. Aron completely
disagrees with that scenario, right?

A.   She doesn't think the damages are 345 million, at least
she wouldn't present that.

02:13:24   Q.   Right.   She doesn't think that you should tack on this
avoided R&D expense, and she thinks that 70 point -- that the
money should be deducted, right?

A.   No.   I showed her chart.   It's 2.1 million.   It's a
million in profits and a million in avoided R&D.   She agrees
02:13:40   that those things have to be added together.

Malackowski - cross by Allan

5453

1    Q.  In a scenario where a product is launched?

2    A.  In any scenario.

3    Q.  No.  She --

4    A.  Whether the product launched in 6 months, 5 years, 10

02:13:49    5    years or tomorrow.

6    Q.  Not never though?

7    A.  I don't know what that means.

8    Q.  Now let's talk a little about how you got to this 73.6

9    number.

02:13:58    10        So to calculate the $73.6 million in what you call

11    avoided R&D expense, you take 18,433 staff months, and you

12    multiply that by the Motorola Chengdu wage rate, is that

13    right?

14    A.  Yes, sir.

02:14:15    15    Q.  Okay.  And so this is supposed to be the cost of R&D that

16    Hytera would have incurred?

17    A.  It's the amount they saved.  Yes, sir.

18    Q.  Okay.  But it would be the amount of money that Hytera

19    allegedly saved?

02:14:38    20    A.  True.

21    Q.  Okay.  Yet you applied a Motorola wage rate, not Hytera's

22    actual wage rate?

23    A.  A Motorola Chinese wage rate, true.

24    Q.  Now, Hytera produced R&D data that showed its actual staff

02:15:05    25    rate for the year 2010 was $1,638 per staff month, right?

Malackowski - cross by Allan

5454

```
              1    A.  I showed that on my screen.  That was the lowest monthly

              2    data they produced.

              3              MR. ALLAN:  All right.  Let's pull up DTX-5607, which

              4    is previously admitted.

02:15:22      5    BY MR. ALLAN:

              6    Q.  And this you recognize is an exhibit from Dr. Aron's

              7    report?

              8    A.  Appears to be, yes.

              9    Q.  All right.

02:15:32     10              MS. SCHMIDT:  Counsel, could I get a copy of that,

             11    please?

             12              MR. ALLAN:  Sure.

             13    BY MR. ALLAN:

             14    Q.  And you recognize, and we've got the year here, 2010, and

02:15:58     15    the calculation obviously brings you down to the average

             16    monthly salary including benefits of $1,637.94, right?

             17    A.  Yes, sir.

             18    Q.  All right.  Now, you showed PDX-26.9.

             19              MR. ALLAN:  Let's pull that up real quick.

02:16:21     20    BY MR. ALLAN:

             21    Q.  You showed this in your direct examination, right?

             22    A.  Yes.  This is the same 1638 we just saw.

             23    Q.  Exactly.  And the number you used was the 3,992 number?

             24    A.  Yes, sir.

02:16:35     25    Q.  Right.  And you justified that number in part based on the
```

Malackowski - cross by Allan

5455

| | |
|---|---|
| 1 | monthly salaries of these four individuals, G.S. Kok, Sam |
| 2 | Chia, Y.T. and Peiyi Huang? |
| 3 | A.   In part based upon their salaries and benefits, yes. |
| 4 | Q.   In part, right. |
| 5 | Now, you recognize that when you -- you would agree |
| 6 | that when a company hires somebody from another company, |
| 7 | they're typically not going to go for less money, right? |
| 8 | A.   I don't know that there is a typical.  But whenever anyone |
| 9 | looks for a new job, unless they got fired, you want to be |
| 10 | paid as much or more, for sure. |
| 11 | Q.   And you're aware that all three, all four of these folks |
| 12 | were international hires and moved from Malaysia to Shenzhen, |
| 13 | China? |
| 14 | A.   I think that's true. |
| 15 | Q.   And they were not entry-level engineers? |
| 16 | A.   No.  They were senior engineers. |
| 17 | Q.   They were supervising various lower level engineers, |
| 18 | right? |
| 19 | A.   Sure. |
| 20 | Q.   And an average -- and there is going to be people that |
| 21 | work in the engineering department that make more.  There is |
| 22 | going to be people that work in the engineering department |
| 23 | that make less, right? |
| 24 | A.   Yes. |
| 25 | Q.   Okay.  And so you're to take an average to try to figure |

02:16:55 (line 5)
02:17:13 (line 10)
02:17:32 (line 15)
02:17:42 (line 20)
02:17:53 (line 25)

Malackowski - cross by Allan

5456

1  out what the numbers are, right, what the correct number to

2  use?

3  A.  You would consider that, yes.

4  Q.  And the documentation we just showed showed that Hytera's

02:18:13  5  average monthly rate was 1,638?

6  A.  Yeah.  But if you go back to that document it's not true

7  on average for the data shown.  But rates go up to as high as

8  $5300.

9  Q.  Well, they change over time just like rates change over

02:18:28  10  time, right?

11  A.  They do change, yes.

12  Q.  You saw Dr. Aron's trend line exhibit where she mapped all

13  the different wage rates and as they changed over time, and

14  they just went up on a standard trend trajectory, right?

02:18:42  15  A.  Well, she plotted a straight line.  But if you look at the

16  data there was an early period where they were kind of flat

17  and then they jumped up, but she just connected them.  I know

18  what you are talking about.

19  Q.  Okay.

02:18:55  20       MR. ALLAN:  So let's take a look at PTX-2070, which

21  is previously admitted.  Let's take a look at page 2 if we

22  could.

23  BY MR. ALLAN:

24  Q.  All right.  Now, you calculated -- actually, let's pause

02:19:21  25  here for just a second.

Malackowski - cross by Allan

5457

1    So here is your $3,992 number, right?

2    A.  Yes, sir.

3    Q.  That's the number that you use to multiply 18,433 staff

4    months.  And that gets you the number we've been talking

02:19:40    5    about, right, the number Debra Aron doesn't think should be

6    added that you think should be added, right?

7    A.  It's the number that should be added that we have been

8    talking about.

9    Q.  Right.  And that Dr. Aron disagrees with you on?

02:19:51    10    A.  Well, she disagrees with the amount, but she agrees

11    something should be added.

12    Q.  No, I don't think she does, Mr. Malackowski.

13    A.  Yes, she does.

14    Q.  So let's take a look at the -- you'd agree with me that

02:20:00    15    the number of staff months -- I mean, the two inputs for this

16    number are the number of staff months and the monthly cost,

17    that's it, right?

18    So if the staff month number is lower and the Hytera

19    monthly cost is lower, your development cost number will be

02:20:14    20    lower?

21    A.  Right, that's true.

22    Q.  Just basic math, right?

23    A.  Basic math.

24    Q.  And the reason you come up with the 18,433 figure is

02:20:23    25    because you contend that each of these trade secrets is -- has

Malackowski - cross by Allan

5458

1    no overlap with any of the other trade secrets?

2    A.   That they are distinct from a development point of view,

3    yes.

4    Q.   Right.  So you had I think in your initial testimony, you

02:20:39    5    had a bunch of puzzle pieces, right?

6    A.   These are the seven rooms in the house, and then I set

7    aside the 14 where there was some overlap.

8    Q.   And so what you say here, you've got this footnote 1, "To

9    avoid double counting, I have included only trade secrets that

02:20:54    10    are not whole or partial subsets of other trade secrets,"

11    right?

12    A.   Yes, sir.

13    Q.   All right.  And so the testing and benchmarking, the

14    hardware, those are the two trade secrets we talked about

02:21:10    15    earlier that are not code focused?

16    A.   Okay.

17    Q.   Right?

18        But you know from listening to the testimony in this

19    case that connectivity, protocol stack, XCMP, repeaters, these

02:21:28    20    four are all part of this one (indicating), right?

21    A.   It depends what you mean by "part."  They all include

22    software, but the development from a time perspective is

23    distinct.  So they're not a whole or partial subset.

24    Q.   They all roll up to the software trade secret 134, don't

02:21:46    25    they?

Malackowski - cross by Allan

5459

```
             1   A.  Not from an accounting perspective for development costs,
             2   no.
             3   Q.  Well, they roll up to one of the trade secrets, alleged
             4   trade secret 134 according to Motorola's fact witnesses.
02:21:59     5   A.  You are going to have to show me what that is.
             6       I can tell you that the seven lines here are taken
             7   from the Motorola witnesses and are presented as being not
             8   subsets of each other.
             9   Q.  Okay.  Let's take a look at trial transcript page 662,
02:22:15    10   line 7 to 13.  This is Mr. Boerger.
            11       And he goes through and they're listening, they're
            12   talking about connectivity and XCMP and so on, "Everything on
            13   this example, everything on this except for hardware and
            14   testing, which is the two we just talked about on the left is
02:22:38    15   within trade secret 134, right?
            16       "Yes, I believe so.
            17       "So it's all nested within 134?
            18       "There is at the very bottom right 'mobile source
            19   code.'  Do you see that?
02:22:48    20       "Yes, I do."
            21       Everything is in 134, right?
            22   A.  But that's from an engineering technical standpoint, not a
            23   time to develop.  So the trade secrets are accounted for that
            24   you have to do these seven things distinctly.  The engineer
02:23:02    25   can't work on three or four of them at the same time.  And all
```

Malackowski - cross by Allan

5460

1    of those things do fit together.

2          But from a forensic accounting standpoint, they're

3    distinct in their hours required.

4          MR. ALLAN:  So let's bring back 2070.2.

02:23:11   5    BY MR. ALLAN:

6    Q.  So I don't know about the accounting perspective, but if

7    these are all part of this (indicating), and this is distinct

8    and this is distinct, if you add those up it's 12,888?

9    A.  Well, that would be wrong.  You shouldn't do that.

02:23:37   10   Q.  That math is wrong?

11   A.  No.  You shouldn't add them up because, even though the

12   things up top are software, so ultimately will go into a

13   software trade secret technical description, the 9,000 hours

14   that it took for DMR does not include the 65 hours for

02:23:53   15   connectivity.  They're separate hours, separate months.

16   Q.  You don't know that, Mr. Malackowski.

17   A.  Yes, I do.

18   Q.  You are not a technical expert, right?

19   A.  No.  But that is --

02:24:02   20   Q.  We don't know what it takes to probe connectivity and how

21   it fits into 134, do you?

22   A.  That is what the Motorola witnesses testified to.  And

23   when I sat down with the Motorola technical experts, that's

24   what I was able to confirm.  I'm quite confident.

02:24:18   25   Q.  That's not what Mr. Boerger testified about, what I just

Malackowski - cross by Allan

5461

1    showed you, did he?

2    A.  What you just showed me is a different point.

3            Yes, these are software applications that all roll up

4    into the device.  But the time it takes to develop them is not

02:24:32    5    double counted.

6    Q.  So just real quick, I want to address something you just

7    testified to.  You said Debra Aron testified that the 73.6

8    million should be added, just a different number, right?

9    A.  I testified that Dr. Aron showed for her unjust enrichment

02:24:53    10    calculation an amount of profits plus an amount of avoided R&D

11    for a total.

12           MR. ALLAN:  Okay.  So let's pull up trial testimony,

13    Dr. Aron's trial testimony, 4856, line 20 to 23.

14    BY MR. ALLAN:

02:25:19    15    Q.  This was her testimony just last week:

16           "Should any hypothetical research and development

17    expense be added in Motorola's view where Hytera could never

18    launch a DMR radio?

19           "Answer:  No."

02:25:30    20           So she disagrees with you?

21    A.  Well, she says "be added in Motorola's view."  She thinks

22    that I don't think it should be added.

23           But I can tell you if you look at her demonstrative

24    exhibits, she specifically adds them together.  And so that's

02:25:46    25    DDX-22.37.

Malackowski - cross by Allan

5462

So when you pull that up, you can see it's unjust enrichment on R&D savings, unjust enrichment on sales, total 2.1 million.

Q.   That's the scenario we're talking about that Dr. Aron views as an apple-and-orange comparison with you, because that's a scenario where a product actually gets launched.  Do you understand that?

A.   But it doesn't matter when or if the product gets launched from a theoretical standpoint.  You still count the profits before it was launched and you count the R&D savings before it was launched.

Q.   But I just want to make sure that we're on the same page. She disagrees with you and you understand that?

A.   She disagrees with the number.  If she thinks that I somehow don't believe they should be added together, I would find that hard to believe.

Q.   Okay.  Let's keep going back to -- we're almost done with 2070.2.

All right.  So okay.  Even though all these are here, you don't agree that that's the proper number.  You think they all get added up, right?

A.   Of course.

Q.   Okay.  Now let's look at Hytera's monthly cost for engineer.  And your reference is 3, "I have utilized Motorola's Chinese cost per engineer as a proxy for

Malackowski - cross by Allan

5463

1    engineering cost," right?

2    A.   True.

3    Q.   Now let's look at page 8.  This is the reference.

4         So you're looking at the Chengdu number and you're

02:27:19    5    utilizing an annual cost per head at Chengdu of 55,000?

6    A.   Yes.

7    Q.   Right.  And then you deduct some payroll and so on and you

8    wind up getting a reduced number that you then divide by 12 to

9    get 3992, right?

02:27:37    10   A.   Correct.

11   Q.   All right.  So let's see where you took that $55,000

12   number from.

13        MR. ALLAN:  Let's take a look at DTX-5639, which I

14   believe is admitted.

02:28:02    15        It's not admitted?

16   BY MR. ALLAN:

17   Q.   Do you recognize this document, Mr. Malackowski, as being

18   produced by Motorola in this case?

19   A.   Yes.  It appears to be a Motorola financial record.

02:28:26    20   Q.   And to direct you to page 2, that's where you get your

21   $55,000 number from, right?

22   A.   I believe so.

23        MR. ALLAN:  I move to admit it please, Your Honor.

24        MS. SCHMIDT:  No objection.

02:28:38    25        THE COURT:  It is received and may be published.

Malackowski - cross by Allan

5464

1       (DTX-5639 was received in evidence.)

2   BY MR. ALLAN:

3   Q.  All right.  So the Motorola spreadsheet that you relied on

4   to calculate the labor rates, right here under "Chengdu," it

02:28:56    5   says "Chengdu growth 55, Randy had 48."  Do you see that?

6   A.  I see what you have on the screen.  What page are you

7   taking that from, 2 of 4?

8   Q.  That is 2 of 4, DTX-5639.

9   A.  Yes, I see it.

02:29:15   10   Q.  Now, you testified about this at your deposition?

11   A.  Correct.

12   Q.  Right.  So this is actually 55,000, right, and 48,000?

13   It's just the zeros are left off, right?

14   A.  Correct.

02:29:28   15   Q.  Okay.  So there is a number of 55,000, but somebody said,

16   named Randy, said actually the Chengdu cost per head annually

17   ought to really be more like 48,000?

18   A.  Well, I think you asked me about this or someone asked me

19   in my deposition about that.  I don't believe that's the case,

02:29:46   20   that the Randy refers to the first column as opposed to the

21   second column.  But I don't know that I could be more help for

22   you than that.

23   Q.  Well, you don't know who Randy is, do you?

24   A.  No, I do not know.

02:29:59   25   Q.  You didn't investigate this at all, did you?

Malackowski - cross by Allan

5465

A.  Well, I investigated with the -- I think it was Mr. Helm,

what were the proper accounting figures to use, and this is

confirmed to be the proper figure.

          MR. ALLAN:  Let's pull up Mr. Malackowski's

02:30:16    deposition transcript, page 22, line 12 through 22.

BY MR. ALLAN:

Q.  (Reading):

          "Question:  Mr. Malackowski, are you aware of the

criteria that economists typically use in determining" --

02:30:35    actually, wait a minute.  I may have the wrong one.

          MR. CLOERN:  211.

BY MR. ALLAN:

Q.  211, apologies, 211 -- 212, lines 12 through 22.  Okay,

sorry about that.

02:31:15          "Question:  Do you know who Randy is?

          "Answer:  No.  This is a document I have seen and I

believe was used in part of my Motorola R&D accounting

analysis.  But I would have to go back to its context to place

it.

02:31:27          "So assuming for the moment that it was the document

that you relied on, and if you did notice this 55 and Randy

had 48, is that something you investigated and figured out

which was the right number?

          "Answer:  No, I don't recall."

02:31:41          Is that right?

Malackowski - cross by Allan

5466

A.   At the time, yeah.  Obviously you raised it and I
investigated it.

Q.   All right.  At the time you just took the 55,000 without
doing -- without figuring out who Randy was or investigating
02:31:51   it?

A.   I don't think the comment "per Randy" is related.  But at
the time I looked at the first row and took the figures --
first column, rather.  But it's a fair question, and I went
back to confirm.

02:32:01  Q.   And you'd agree that having the R&D head count or head
figure of between 48,000 and 55,000 would make a pretty
substantial difference?

A.   I believe you want to get it right, for sure.

Q.   Now, you offered some testimony about copyright
02:32:23  apportionment in this morning, right?

A.   Sure.

Q.   And --

         THE COURT:  This might be a good break time.  It's
2:30 in the afternoon.  Members of the jury, we'll take a
02:32:36  short break.

    (Recess.  Jury in)

         THE COURT:  Please proceed.

BY MR. ALLAN:

Q.   A couple questions about copyright apportionment.

02:48:42         You think it's appropriate to apportion copyright

Malackowski - cross by Allan

5467

1   damages based on the value of the copied portion, is that

2   fair?

3   A.  It is potential, sure.  That can be done.

4   Q.  And you understand Professor Wicker in this case testified

02:49:00   5   that all of the coding and software is equally important?

6   A.  I can accept that.

7   Q.  And we can agree that he indicated that 10 percent of the

8   code he thought was copied, Barbara Frederiksen-Cross

9   testified it was at most 4 percent?

02:49:20   10   A.  No.  I think he said 10 percent was copied.  But all of

11   the code benefited from the misappropriated intellectual

12   property.

13   Q.  But misappropriation and benefiting from code has nothing

14   to do with copyright.  You understand that, right?

02:49:34   15   A.  Well, it does when you introduce the notion of

16   apportionment.

17   Q.  The amount of code that's copied is relevant to the issue

18   of apportionment, is that your understanding or not?

19   A.  The extent of the code, the importance of the code, how it

02:49:48   20   was used, all of that would be relevant.

21   Q.  So your view is that the fact that the actual amount that

22   was copied doesn't make it -- you can't apportion that because

23   you think it's just the whole thing was used or touched in

24   some way, so apportionment goes out the window?

02:50:02   25   A.  I don't think you can apportion by lines of code

Malackowski - cross by Allan

5468

1   generally, especially when there are multiple software

2   platforms within the product.  And I think you do need to take

3   into account not just quantity but quality.

4   Q.  And that's not a legal opinion.  That's your --

02:50:18   5   A.  That's my experience.

6   Q.  -- punting opinion?

7   A.  That's my experience as a valuation expert on intellectual

8   property.

9   Q.  You testified that Dr. Aron, I think you testified that

02:50:34   10   Dr. Aron thought the FCC -- I'm switching gears now, I'm

11   sorry -- that the FCC rulings and issues related to digital

12   analog was irrelevant?

13   A.  Correct.

14   Q.  But she doesn't think they're irrelevant.  She thinks

02:50:51   15   you're wrong about the impact of them, right?

16   A.  Well, we should pull up her testimony.  My recollection is

17   she thinks they're not relevant.

18   Q.  Well, you offered some testimony.

19        MR. ALLAN:  Actually, let's pull up 1129.5.  This is

02:51:07   20   a document you just showed to the jury, which is admitted.

21   BY MR. ALLAN:

22   Q.  You showed this document just a few moments ago, right,

23   Mr. Malackowski?

24   A.  I did.

02:51:17   25   Q.  And this is a 2009 document?

Malackowski - cross by Allan

5469

1    A.  It is.

2    Q.  And it's actually authored by Sam Chia?

3    A.  I don't recall.

4         MR. ALLAN:  We can pull up maybe the first page of

02:51:31    5    that.  The second maybe.  There we go.  We've got his name.

6    BY MR. ALLAN:

7    Q.  All right.  Do you see, that Mr. Malackowski?

8    A.  I do.

9         MR. ALLAN:  All right.  If we go back,

02:51:43    10    Mr. Montgomery, to page 5.

11    BY MR. ALLAN:

12    Q.  You cited this issue about "The mandate by the FCC that

13    non-frequency efficient 12.5 kilohertz equipment will not be

14    approved after 2005 due to congestion," right?

02:52:00    15    A.  Yes, sir.

16    Q.  Okay.  And --

17         THE COURT:  You might as well read the last sentence

18    as well.

19         MR. ALLAN:  Certainly.

02:52:05    20    BY MR. ALLAN:

21    Q.  "However, we know now that it has -- we now know that it

22    has been postponed to 2011 and all public safety equipment has

23    to be migrated by 2013."  Right?

24    A.  Yes, sir.

02:52:18    25    Q.  And that's what everyone thought in 2009?

Malackowski - cross by Allan

5470

1    A.   Correct.

2    Q.   Okay.  All right.  Let me -- you understand that the

3    narrowbanding requirements -- that's what we're talking about

4    here with the FCC, right?

02:52:35    5    A.   Yes, sir.

6    Q.   That the narrowbanding guidelines didn't require users to

7    replace analog systems with digital?

8    A.   You didn't have to throw out your old equipment.  You just

9    couldn't buy new equipment.

02:52:45    10   Q.   And this all comes into context in your opinion because

11   you think it's important, there is some sort of urgency with a

12   shift to digital, and it was important to Hytera, right?

13   A.   Yeah.  I think Hytera was very nervous about this

14   regulatory change and knew they better get to the market

02:53:02    15   quickly with a digital radio.

16   Q.   Okay.  I want to hand you two exhibits, DTX-4991 and

17   DTX-5006.

18         The first document, 4991, is an FCC Narrowbanding

19   Mandate.  Do you see that?

02:53:29    20   A.   I do.

21   Q.   Okay.  And then the next document, DTX-5006, is a Homeland

22   Security document "Practical Guide to Narrowbanding"?

23   A.   That's what it appears to be.

24         MR. ALLAN:  I'd offer these into evidence please,

02:53:43    25   Your Honor.

|  | 1 | MS. SCHMIDT:  No objection. |

```
                1      MS. SCHMIDT:  No objection.

                2      THE COURT:  It is received and may be published.

                3      (DTX-4991 and DTX-5006 were received in evidence.)

                4   BY MR. ALLAN:

02:53:47        5   Q.  All right.  Let's start with DTX-4991.

                6      All right.  Here is the FCC Narrowbanding Mandate.

                7   Do you see that?

                8   A.  Which page?

                9   Q.  Just the cover page.

02:54:07       10   A.  Okay.

               11   Q.  All right.  And just to orient you on the time, there is a

               12   2006 copyright.  Actually, I can probably do this a little

               13   quicker.

               14      Do you see the copyright registration, 2006?

02:54:24       15   A.  I do.

               16   Q.  Right.  And this is the International Association of Fire

               17   Chiefs and International Municipal Signal Association?

               18   A.  Right.  This is not an FCC document.

               19   Q.  No, it is not.  It is a Public Safety Guide For

02:54:38       20   Compliance, right?

               21   A.  From the fire chiefs.

               22   Q.  Right.

               23      And chapter 1, what is the purpose of this procedure?

               24   "The International Association of Fire Chiefs and the

02:54:50       25   International Municipal Signal Association have put together
```

Case: 1:17-cv-01973 Document #: 929 Filed: 02/26/20 Page 140 of 168 PageID #:62694
Malackowski - cross by Allan
5472

1    this brochure to provide guidance to state and local public

2    safety entities on requirements being imposed by the FCC that

3    are often referred to as mandatory narrowbanding," right?

4    A.   You read it correctly.

02:55:06  5    Q.   And, again, this is 2006 according to the copyright?

6    A.   Yes, sir.

7    Q.   Okay.  Then there is a section here in chapter 1, An

8    Introduction to Narrowbanding, called "Narrowbanding Myths" do

9    you see that?

02:55:24  10   A.   I see that, yes.

11   Q.   It says, "One of the main reasons that the IAFC and the

12   IMSA have published this brochure is to dispel some common

13   misconceptions about the rebanding process and the FCC's

14   requirements," right?

02:55:38  15   A.   You read it correctly.

16   Q.   All right.  And then just quickly on the first myth,

17   "Licensees must implement digital equipment.  One common

18   misconception is that narrowbanding is a requirement to 'go

19   digital.'"  Do you see that?

02:55:53  20   A.   I do.

21   Q.   "And the FCC's narrowbanding rules do not dictate that any

22   particular type of equipment modulation be employed.  You may

23   continue to operate analog equipment even after January 1,

24   2013 deadline provided that your equipment meets the FCC's

02:56:08  25   narrowbanding 12.5 kilohertz standards."  Right?

Malackowski - cross by Allan

5473

1    A.   You read it accurately.

2    Q.   Okay.  That's a 2006 document.

3              Let's look at PTX-5006, which is a Homeland Security

4    March 2011 document, right?

02:56:27   5    A.   Yes, sir.

6    Q.   Okay.  And this is from the Federal government providing

7    some information about narrowbanding, what it is, deadlines

8    and so on, right?

9    A.   I've never seen this document before, so...

02:56:48   10   Q.   Okay.  But that's what it says?  That's what it indicates,

11   right?

12   A.   Where does it indicate that?

13   Q.   Just the introduction, "What is Narrowbanding"?

14   A.   Okay.  Well, I can read it as well as you can.

02:56:57   15   Q.   Right.  Now, the Department of Homeland Security on page 3

16   again provides some information about the mandate and various

17   myths about the mandate, right?

18   A.   Appears to.

19   Q.   "Confusion about the mandate," it reads, "There are

02:57:21   20   several myths about narrowbanding which may hinder compliance.

21   See below for a list of common myths with corrections."

22             Did I read that right?

23   A.   You did.

24   Q.   Okay.  "The first myth:  Only digital radios are

02:57:34   25   narrowband-compliant."

Case: 1:17-cv-01973 Document #: 929 Filed: 02/26/20 Page 142 of 168 PageID #:62696
Malackowski - cross by Allan
5474

1          Did I read that correctly?

2     A.  You did.

3     Q.  And the truth is "P25 radios satisfy the narrowbanding.

4     Purchasing digital equipment is not necessary in order to

02:57:46    5     narrowband," right?

6     A.  You read it accurately.

7     Q.  And that's the Federal government of the United States

8     Department of Homeland Security in 2011 correcting that myth

9     in this document, yes?

02:57:56   10     A.  Specifically as it relates to P25 radios, not generally

11     speaking.

12     Q.  It says "Purchasing digital equipment is not necessary in

13     order to narrowband," right?

14     A.  If you buy a P25.

02:58:07   15     Q.  Okay.  So then "Myth:  Only new equipment is

16     narrowband-compliant," right?  That's a myth that DHS is

17     identifying in this document?

18     A.  You've read it accurately.

19     Q.  Okay.  And then it says, "Truth:  Equipment may not need

02:58:28   20     to be replaced.  Many radios, particularly models manufactured

21     after 1997, are narrowband-capable and can be reprogramed,"

22     correct?

23     A.  Your existing equipment.  You just can't buy new equipment

24     from Hytera.

02:58:41   25     Q.  Right.  So this is the Department of Homeland Security

Malackowski - cross by Allan

5475

1   correcting some myths about the supposed urgency related to

2   FCC narrowbanding and the move to digital?

3   A.   Yes.   But neither Hytera nor I were led away by myths.

4   There is nothing in here that contradicts what we said.

02:58:59   5   Q.   Well, you indicated that and you led the jury to give the

6   impression that there was some massive urgency to move to

7   digital.

8   A.   There was massive urgency, because if you wanted to sell

9   new equipment, you had to be compliant or sell P25.   Either

02:59:11   10   way they had to come up with something new.

11   Q.   Everybody did.

12   A.   Exactly.

13   Q.   Right.   And you understand that the trend for the sales of

14   analog has been very gradual on decline, right?

02:59:21   15   A.   There are people who still have analog systems.   But if

16   you want to import new radios into the United States, the view

17   was we have to get digital.

18   Q.   Would it be fair to say that these two public documents

19   talking about correcting myths of narrowbanding were doing so

02:59:40   20   to prevent panic in the marketplace about this urgent supposed

21   move to digital?

22   A.   I have no idea.   I suspect they were designed to answer

23   questions of firefighters and TSA.

24   Q.   People who use the radios?

02:59:55   25   A.   I suppose they do.

Malackowski - cross by Allan

5476

1    Q.   Okay.  Let me show you Dr. Aron's DDX-22.27 so we're on

2    the same page.  This is an Analog v Digital Radio

3    Terminal-Unit Shipments, right?

4    A.   It's what it purports to be.

03:00:12    5    Q.   You don't have any reason to disagree with the data here,

6    do you?

7    A.   No.  I've not used this data, so I can't vouch for it or

8    disagree with it.

9    Q.   So you see that it's a gradual decline of analog over

03:00:24    10   time, right?  There is no immediate stop and all analog goes

11   the way of the dinosaur?

12   A.   Well, the regulations shifted back.  But even within this

13   chart you are going from 70 percent of the market down to 35.

14   You've cut it in half in seven years, that's significant.

03:00:40    15   Q.   Seven years, right.  But it's not a drop off the cliff?

16   A.   It's a pretty steep ski slope.

17   Q.   That's a steep ski slope for you?

18   A.   Cutting your sales in half in seven years is pretty steep.

19   That's hundreds of millions of dollars worth -- billions of

03:00:55    20   dollars worth of product.

21   Q.   This signifies urgency to you then?

22   A.   Absolutely.

23   Q.   Okay.  All right.

24        Now, you showed some emails and Hytera documents

03:01:18    25   talking about the move to digital and the FCC's requirements

Malackowski - cross by Allan

5477

1    in your examination, right?

2    A.   Generally, yes, or presentations by Chairman Chen.

3    Q.   You'd agree with me that what actually happened in the

4    market is what you need to consider for damages purposes as

03:01:35   5    opposed to what somebody thought might happen in the market?

6    A.   No.  I think what people anticipated regarding the change

7    was a motivator to acquire the trade secrets by any means

8    possible and start making digital radios.

9    Q.   So your testimony is as a damages expert, you don't look

03:01:55   10   at actually what happened.  You look at what people thought

11   was going to happen?

12   A.   Well, I look at all the evidence, yes.

13   Q.   Okay.  Let's take a look at the Sedona article you were

14   asked about, DTX-4909.

03:02:18   15         Now, I think you were asked as to whether there was a

16   general rule related to, outlined in this article, right, the

17   head start period?

18   A.   Specifically whether that meant that there was a general

19   rule as to when you would start damages and when you would

03:02:33   20   conclude a head start.

21   Q.   And you testified that you didn't think there was a

22   general rule?

23   A.   The article says that there isn't.  The article talks

24   about a general rule, but then notes that there are exceptions

03:02:43   25   to the ending point.  I cited that general principle and

Malackowski - cross by Allan

5478

1    pointed to examples.

2    Q.  Okay.  So let's look at page 16.

3         So you just testified that the article said there

4    wasn't a general rule, right?  But right here (indicating),

03:03:00    5    this paragraph begins "The general rule is," right?

6    A.  I think I quoted this exact sentence in my direct pointing

7    that that's --

8    Q.  So there is a general rule?

9    A.  -- for the start of damages.

03:03:11    10        I don't disagree with Dr. Aron on when it starts.

11   She wants to say it ends as soon as they would have developed

12   an alternative product and they would have jumped right back

13   to where they otherwise would have been.

14        I say no.  Even if you could develop another radio,

03:03:25    15   the effects of that are going to last for some time in the

16   future as you catch up.  That's what this is all about.

17   Q.  So let's read the first sentence here, which is what you

18   read on your direct.  "The general rule is that accounting of

19   unjust enrichment damages commences at the moment that the use

03:03:39    20   of the misappropriated trade secret confers a benefit on the

21   defendant," right?

22   A.  Right.  Dr. Aron and I completely agree with that.

23   Q.  Okay.  You did not read the next part, which is "Damages

24   then accrue until such time, if ever, that the defendant would

03:03:53    25   have acquired knowledge of the trade secret through legitimate

Malackowski - cross by Allan

5479

1    means such as public disclosure, reverse engineering or

2    independent development," right?

3    A.   But I did read the very next sentence, which explains

4    that's not a general rule.

03:04:07  5   Q.   We'll get there in a just second.

6    A.   Okay.

7    Q.   I'm just saying you said there is no discussion as to when

8    damages ended.  It says, "damages then accrue until such time,

9    if ever, that the defendant would have acquired knowledge of

03:04:18 10   the trade secret through legitimate reasons, such as public

11   disclosure, reverse engineering or independent development,"

12   right?  That gives you a time that it's supposed to end under

13   the general rule.

14   A.   No.  It continues 'til at least the time that you discover

03:04:35 15   or independently develop or reverse engineering.

16        Now go to the next sentence to see that --

17   Q.   I'm not at the next sentence.  I'm just here in the

18   general rule paragraph.  We will get there, I promise you.

19        In the general rule paragraph it doesn't say "until

03:04:50 20   at least such time."  It says "until such time, if ever, that

21   the defendant would have acquired knowledge of the trade

22   secret through legitimate means such as public disclosure,

23   reverse engineering or independent development."  That's what

24   it says under the general rule.

03:05:03 25   A.   Okay.  Read the next sentence.

Malackowski - cross by Allan

5480

1   Q.   Am I right about that, we agree?

2   A.   You read it right, yes.

3   Q.   Okay.  All right.  And we know that there are damages

4   scenarios including the one offered by Mr. Grimmett that in

03:05:19   5   this case would have taken Hytera at most 6 months to develop

6   a comparable radio to Motorola.  You understand that's his

7   testimony?

8   A.   I do.

9   Q.   And you understand that you have offered several delay

03:05:36   10   scenarios with 6 month, 3 month, 12 month, 14 months, so on

11   delays, right?

12   A.   Correct.

13   Q.   And this says -- and those delay scenarios assume that's

14   the time it would take Hytera to develop a comparable radio?

03:05:51   15   A.   Correct.  But in no case does that end the damages.

16   Q.   But according to the general rule, it does.

17   A.   No, it doesn't.

18   Q.   "Damages then accrue until such time, if ever, that the

19   defendant would have acquired knowledge of the trade secret

03:06:05   20   through legitimate means such as public disclosure, reverse

21   engineering or independent development."  That's the moment in

22   time that the delay scenario would end.

23   A.   At least until that point.  It definitely continues until

24   independent development, but it doesn't necessarily stop

03:06:19   25   there.

Malackowski - cross by Allan

5481

```
         1   Q.  Where does it say "at least"?

         2   A.  Well, read the next sentence.

         3   Q.  That's, that's -- I'm still on the general rule.  We will

         4   go there, I promise you.

03:06:28 5            Where does it say "at least" in the general rule?

         6   A.  It doesn't use the words "at least."

         7   Q.  It doesn't.

         8   A.  But if you look at the context of the article, it's clear

         9   this is referring to, you start when you get the trade

03:06:39 10  secrets, you go until independent discovery, and then in

        11   certain cases depending on the facts you go further.

        12   Q.  So you rely on this, "In certain cases a misappropriator

        13   tries to limit the duration of unjust enrichment based on the

        14   head start doctrine.  Under this doctrine unjust enrichment

03:06:58 15  damages are limited to a head start period when a

        16   misappropriator can show that it would have acquired knowledge

        17   of the trade secret through legitimate means," right?

        18   A.  Right.  "In certain cases" does not imply to me the

        19   general rule.

03:07:09 20  Q.  So there can be an exception?

        21   A.  There can be an exception.

        22   Q.  There can be an exception?

        23   A.  Where you limit it.  That's not the general rule.

        24   Q.  And you contend that this case is an exception?

03:07:18 25  A.  Is not an exception.
```

Malackowski - cross by Allan

5482

1    Q.   So you and I --

2    A.   In certain cases --

3    Q.   -- are reading the general rule very differently.

4    A.   In certain cases, the misappropriator or Hytera tries to

03:07:29    5    limit the duration to the head start period.  That is saying

6    in certain, less than all of them, probably less than just a

7    few times.

8            Well, if it's just a few times, that's not the

9    general rule.  The general rule is you start when it's

03:07:43    10   misappropriated.  You go 'til at least when it's discovered.

11   In certain cases you can stop there.  But generally speaking,

12   the general rule, if you read the article, is you look to see

13   the full economic impact of the theft.

14           THE COURT:  What is the significance of the

03:07:57    15   parenthetical "if ever"?

16           THE WITNESS:  In some cases, Your Honor, like we've

17   contended here, the misappropriator can never develop a

18   comparable product.  So the damages continue indefinitely

19   until they're enjoined.

03:08:10    20   BY MR. ALLAN:

21   Q.   Okay.  Then it reads down here, "This period is defined as

22   the time between the date a misappropriator began benefiting

23   from misuse of a trade secret and the date the misappropriator

24   would have gained knowledge of the trade secret through

03:08:23    25   legitimate means."  Do you see that?

Malackowski - cross by Allan

5483

A.   Yes.   That's in the certain cases example.

Q.   Okay.   Which is very similar to the language in the general rule example?

A.   It says what it says.

03:08:34   Q.   Okay.   Now, you pointed out this Agilent example.   Let's take a look at the NuCar matter.   There it says --

       MR. ALLAN:   Can we pull up 681.

BY MR. ALLAN:

Q.   "The defendant misappropriated the plaintiff's automobile

03:09:00   dealers' client lists and created a new company to compete with the plaintiff.   In a bench trial the Court concluded that had the defendant not misappropriated this trade secret, he would have developed a comparable client list within two years," right?

03:09:13   A.   Yes, sir.

Q.   And that's a similar scenario that we are dealing with here?

A.   No.

Q.   There is a potential two-year delay scenario, right?

03:09:21   A.   The jury will have to determine if there was a comparable radio that could have been developed, that's true.

Q.   And there is nothing in this example in the article itself that says you extend the damages out as a ripple effect, correct?

03:09:39   A.   There is nothing in this example that says when it ends,

Malackowski - cross by Allan

5484

1    whether it ends in two years or when.

2    Q.   Except going back to what we just read on page 16.  "This

3    period is defined as the time between the date

4    misappropriation -- a misappropriator began benefiting from

03:10:03    5    the misuse of the trade secret and the date the

6    misappropriator would have gained knowledge of the trade

7    secret through legitimate means."

8         So there is an end date, right?

9    A.   There can be.

03:10:12    10   Q.   In preparing for your testimony today, Mr. Malackowski,

11   did you work with your attorneys?

12   A.   Well, I met with them.  I sent them my comments on

13   Ms. Aron's -- Dr. Aron's work, sorry.

14   Q.   And you prepared the slides?

03:10:30    15   A.   I prepared the slides.

16   Q.   In connection with your lawyers?

17   A.   Well, I prepared the slides.  They saw them.  They

18   produced them to you.

19   Q.   And you talked about your testimony before your testimony

03:10:39    20   today with your attorneys, yes?

21   A.   Generally speaking, when I need to show up, I am going to

22   talk about these slides.

23   Q.   Okay.

24        MR. ALLAN:  Nothing further.

03:10:48    25        MS. SCHMIDT:  Just a few brief redirect.

Malackowski - redirect by Schmidt

5485

|  |  |
|---|---|
| | 1 | THE COURT:  Proceed. |
| | 2 | MS. SCHMIDT:  Now may I proceed, Your Honor? |
| | 3 | THE COURT:  Yes. |
| | 4 | REDIRECT EXAMINATION |
| 03:11:18 | 5 | BY MS. SCHMIDT: |

Q.  Mr. Malackowski, I would like to just pick up where you
left off with the Sedona conference article.

Now, I just want to be very clear.  Is there a
general rule that damages must stop at a certain point?

A.  No.  It is fact specific depending upon the economic harm.

Q.  And you looked at an example with Mr. Allan where damages
did stop.  But are there examples in this article,
specifically in red, DTX-4909.18, where the Court -- where
damages continued?

A.  Numerous.

Q.  And did any of those occur in this in Illinois?

A.  The RRK Holdings case was an Illinois case.

Q.  And now with respect to the Agilent case, why in that case
were damages not limited?

A.  Because it was determined that as a result of the head
start, the misappropriator had an expanded market share.  So
essentially that expanded market share would continue into the
future and they would continue to benefit for a period of
time.

Q.  Now, Mr. Malackowski, does the amount of damages, does

Malackowski - redirect by Schmidt

5486

1    that depend on the facts of a particular case?

2    A.   In every case it depends upon mapping the evidence against

3    the damage methods.

4    Q.   And who is the judge of the facts in this case?

03:12:48    5    A.   The jury.

6    Q.   Now, I just have a few questions for you about mobile

7    radios.

8              Now, you're familiar with Dr. Wicker's testimony from

9    this case, is that correct?

03:13:00    10   A.   Yes, ma'am.

11   Q.   All right.  And were you here when Dr. Wicker testified

12   the first time?

13   A.   Yes, I was.

14   Q.   And are you aware that Dr. Wicker testified about the

03:13:10    15   source code versions that were accused in Hytera's radios?

16   A.   Generally, yes.

17   Q.   Okay.  Now, if we go to the trial transcript, page 1431,

18   here we're at line 7 through 10, what does Dr. Wicker say

19   about the versions of the source code that are accused?

03:13:30    20   A.   So he's asked which versions of Hytera source code he's

21   concluded use the Motorola's at the same times?

22             And they would be all versions 1 through 9.

23   Q.   And then there is a reference to PTX-1740, which is an

24   interrogatory response by Hytera.

03:13:46    25             Have you reviewed Hytera's interrogatory responses?

Malackowski - redirect by Schmidt

5487

1    A.   All of them.  It's a written response from Hytera.

2    Q.   Okay.  And now if we look at PTX-1740, which is admitted,

3    what does interrogatory number 18 request?

4    A.   It requests that "Describe for each version of Hytera

03:14:10    5    source code implemented into any Hytera products relating to

6    digital mobile radios and released into the United States

7    which Hytera products each source code version was implemented

8    into."

9    Q.   And then if we go back a few pages to PTX -- or to page 53

03:14:29    10   and we look here, do you see MD782?

11   A.   Yes.  That would be the mobile unit that's at issue.

12   Q.   And is that the radio you included?

13   A.   That's the one radio I included.

14   Q.   And are the version -- and are the releases of MD782 the

03:14:44    15   releases that Dr. Wicker testified included Motorola source

16   code?

17   A.   Yes, ma'am.

18   Q.   Now, you also testified about Ms. Frederiksen-Cross.  And

19   now Ms. Frederiksen-Cross, if we're on page 3793 of the

03:15:03    20   transcript, did Ms. Frederiksen-Cross understand that

21   Dr. Wicker's testimony referenced the mobile?

22            MR. ALLAN:  Objection, speculation, Your Honor.

23            THE COURT:  Have you completed your question?

24            MS. SCHMIDT:  I have not.  I was going to ask the

03:15:19    25   witness to --

Malackowski - redirect by Schmidt

5488

```
 1              THE COURT:  All right.  The objection is sustained.
 2   Rephrase the question.
 3              MS. SCHMIDT:  Certainly.
 4   BY MS. SCHMIDT:
 5   Q.  Dr. -- or excuse me.  Mr. Malackowski, did
 6   Ms. Frederiksen-Cross have an understanding of Dr. Wicker's
 7   contentions -- -
 8   A.  I think --
 9   Q.  -- as to what was accused?
10   A.  I think she --
11              MR. ALLAN:  Same objection, Your Honor.
12              THE COURT:  You may answer.
13   BY THE WITNESS:
14   A.  She disputed the quantification, but I --
15              THE COURT:  Well, the question is:  Did she have an
16   understanding?
17              THE WITNESS:  I think she had an understanding.
18              THE COURT:  What is the next question?
19   BY MS. SCHMIDT:
20   Q.  And that understanding, the question is "How much code do
21   they contend is copied?"
22              THE COURT:  You are not going to lead the witness,
23   are you?
24              MS. SCHMIDT:  I am not.
25              THE COURT:  All right.  Rephrase the question.
```

03:15:24  5
03:15:35  10
03:15:41  15
03:15:46  20
03:15:54  25

Case: 1:17-cv-01973 Document #: 929 Filed: 02/26/20 Page 157 of 168 PageID #:62711
Malackowski - redirect by Schmidt
5489

```
 1              MS. SCHMIDT:  Certainly.
 2     BY MS. SCHMIDT:
 3     Q.  And, Mr. Malackowski, if we go on to the next page --
 4              THE COURT:  I'm not barring you from going into the
 5     page that you have shown the jury.  Simply the form of the
 6     question.
 7              MS. SCHMIDT:  Certainly.
 8     BY MS. SCHMIDT:
 9     Q.  So, Mr. Malackowski, what if we -- do you have an under --
10     if we look at the next question --
11              MR. SCHMIDT:  And I can just do this to move things
12     along, Your Honor.
13              THE COURT:  Yes.
14     BY MS. SCHMIDT:
15     Q.  What did Ms. Frederiksen-Cross say about the products
16     Motorola was accusing?
17     A.  That it was mobile and portable radios both.
18     Q.  And now, Mr. Malackowski, and so is it fair to say that
19     there is an understanding between Dr. Wicker and
20     Dr. Frederiksen-Cross about the mobile units containing
21     Motorola source code?
22     A.  The understanding is they do contain the Motorola source
23     code.
24     Q.  And would it be fair or reasonable for Hytera to keep
25     profits on a product that Hytera admits includes Motorola
```

Malackowski - recross by Allan

5490

source code?

A.  Of course not.

        MS. SCHMIDT:  Thank you, Your Honor.  I pass the
witness.

03:17:01        THE COURT:  Recross.

        MR. ALLAN:  Very briefly, Your Honor.

        THE COURT:  Not necessarily.

        MR. ALLAN:  I'll do my best.

                        RECROSS-EXAMINATION

03:17:12 BY MR. ALLAN:

Q.  You testified about a case out of the Sedona article just
a moment ago, right?

A.  We referenced one of the examples, which was a case, yes.

Q.  And you're not an attorney?

03:17:22 A.  I am not.

Q.  And any understanding you have about that case is strictly
from an economist's perspective or an accounting perspective,
right?

A.  A damages expert point of view.  The article was geared
03:17:35 towards damage experts.

Q.  Right.  So an accounting expert.  You're not an economist
yourself?

A.  I don't have a Ph.D. in economics, no.

Q.  In terms of this testimony about Professor Wicker and
03:17:49 Barbara Frederiksen-Cross, just so we're all on the same page,

Malackowski - recross by Allan

5491

1  neither you nor Dr. Wicker nor Dr. Rangan ever amended any

2  report to indicate that any Hytera mobile products were

3  alleged to contain any alleged, any -- strike that.  Let me

4  restart.

03:18:09  5      Either you nor Professor Wicker nor Dr. Rangan ever

6  amended any of your reports to notify Hytera that Motorola

7  believed its mobile products contained Motorola source code,

8  correct?

9  A.  You misspoke.  You said "Motorola products."  This is

03:18:29  10  related to Hytera products.

11  Q.  Well, I thought I corrected it.  Let me try again.

12      I'll start with you.  You never amended your report

13  to include --

14  A.  I did not amend --

03:18:39  15  Q.  Let me finish my question, please.

16  A.  Okay.

17  Q.  You never amended your report, any of your three reports

18  to allege that the Hytera mobile products allegedly contained

19  Motorola source code, correct?

03:18:50  20  A.  Correct, not in my reports.

21  Q.  You testified to that at your deposition, correct?

22  A.  I presume so.

23  Q.  And you didn't testify to that at this trial in December?

24  A.  No.  In trial in December I did testify that mobile radios

03:19:04  25  were outside the numbers I presented.  But I gave the jury the

Malackowski - recross by Allan

5492

1  numbers for mobile radios, and it was to be determined if they

2  would be found to have the code.

3  Q.  Well, your counsel just showed you testimony from

4  Dr. Wicker to suggest that Dr. Wicker himself accused Hytera's

03:19:22   5  mobile products, right?

6  A.  She did.

7  Q.  But I thought you testified earlier today that you added

8  the mobile numbers based on an admission that you had from

9  Barbara Frederiksen-Cross.

03:19:34  10  A.  Counsel showed me that admission as well.  That ultimately

11  was the reason for adding them.

12  Q.  So was it Barbara Frederiksen-Cross' alleged admission

13  that you've taken as a nontechnical witness or something

14  Dr. Wicker said?

03:19:46  15  A.  My motivating evidence was Frederiksen-Cross.  It turns

16  out that Wicker says this, Dr. Wicker says the same thing.

17  Q.  But no reports were ever amended to specifically allege

18  Hytera's mobile products, correct?

19  A.  No.  That was an issue in debate up until this trial.

03:20:04  20  Q.  And now you are the last witness in this lengthy trial and

21  are adding $35 million to your damages number, correct?

22  A.  I presented those numbers before.  I'm now adding them

23  together.  If the jury finds that the admission that I saw is

24  in fact true, then it should be added.  If they don't see it

03:20:22  25  the way I see it, then they shouldn't.

Case: 1:17-cv-01973 Document #: 929 Filed: 02/26/20 Page 161 of 168 PageID #:62715
Malackowski - recross by Allan
5493

1    Q.   Your number today adds $35 million, and when you step

2    down, the witnesses in this trial are over, correct?

3    A.   Both of those are good things.  Yes.

4              MR. ALLAN:  Nothing further.

03:20:37    5              THE COURT:  All right.  Anything further?

6              MS. SCHMIDT:  Nothing further, Your Honor.

7              THE COURT:  You may step down, sir.

8              THE WITNESS:  Thank you, Your Honor.

9         (Witness excused)

03:20:50    10             MR. ALPER:  Your Honor, Motorola rests.

11             THE COURT:  All right.  Very well.

12             Members of the jury, will you step out for a few

13   minutes.

14         (Jury out)

03:21:12    15             THE COURT:  All right.  Court is in session.

16             The plaintiff having rested, what is the status,

17   overall status of the case?

18             MR. ALPER:  Yes, Your Honor.  A couple of things.

19   First, I'll say on our 50(a) motion, we are prepared to file a

03:21:31    20   written 50(a) motion.  We are happy to go over that orally if

21   you'd like, but we also can just submit it in writing.

22             THE COURT:  And what is a 50(a) motion?

23             MS. SCHMIDT:  JMOL, JMOL before the case goes to

24   verdict to the jury.

03:21:46    25             THE COURT:  You can do that in writing.  But what I

5494

1    intend to do, but I'm not committed at the moment to rule

2    officially, is to let the jury have the matter and then to

3    rule under the provisions of that rule.  That's my present

4    thought, but I'm not specifically making that ruling.

03:22:10    5        So if you choose to put something into writing, by

6    all means do so.

7        MR. ALPER:  Yes, Your Honor.

8        THE COURT:  Okay.  That's up to you.

9        There is yet another motion that was characterized as

03:22:24    10    a motion to reconsider, right?  And I have looked at that and

11    I intend to grant the motion in part and deny the motion in

12    part.  But I have not put together obviously a full opinion on

13    the point.

14        So saying "granted in part and denied in part"

03:22:42    15    doesn't do much for you, I concede, and you need to have that

16    ruling, I should think.

17        And so that's the status.  Is there something beyond

18    all of this?

19        MR. ALPER:  In addition to that motion, Your Honor,

03:22:57    20    there is the issue of jury instructions.

21        THE COURT:  Indeed.  And I certainly would encourage

22    you to try to come up with an agreed set.

23        MR. ALPER:  Yes, Your Honor.  We have been working on

24    that.  We over the weekend came to a number of additional

03:23:11    25    agreements.  There are still some matters in dispute.

5495

```
            1          THE COURT:  To include verdict forms as well.

            2          MR. ALPER:  Yes.

            3          THE COURT:  Okay.

            4          MR. ALPER:  We do have verdict forms.  There are
03:23:20    5    differences between the parties on the verdict forms.

            6          THE COURT:  All right.

            7          MR. CLOERN:  Your Honor --

            8          THE COURT:  I want to add to this that it's the

            9    Court's intention to give each juror a set of jury
03:23:30   10    instructions.  The Court will read the instructions to the

           11    jury and give eight copies to the jury.

           12          So when you put that together, put it in readable

           13    form, double spaced if necessary, nice clear black and white

           14    so that all the jurors will have the opportunity to thoroughly
03:23:53   15    examine the instructions that they must comply with when they

           16    ultimately deliberate.

           17          So I will leave that to your skilled experts to put

           18    together a good set of jury instructions, but the point is

           19    eight copies plus one for the Court.
03:24:12   20          MR. ALPER:  Yes, Your Honor.

           21          THE COURT:  Okay.

           22          MR. ALPER:  So on that issue, despite the parties

           23    attempting to work at it, there are some legal disputes on

           24    particular instructions.
03:24:22   25          THE COURT:  All right.  Do you want to deal with them
```

5496

1   tomorrow?  I would hope that overnight that you can wash them

2   away.

3          MR. ALPER:  Yes.  We have certainly been trying and

4   that would be, you know, with your approval, Your Honor, we

03:24:37   5   would like to address those with you.

6          THE COURT:  All right.

7          MR. CLOERN:  We actually have a plan, Your Honor, to

8   lock him and him in a room and not let them out until it's

9   worked out.

03:24:50   10          THE COURT:  Okay.  Only if you would join them.

11          MR. CLOERN:  Well, I don't know.

12          THE COURT:  We'll leave it here then.  To the extent

13   that you cannot agree, come in tomorrow afternoon.

14          Mr. Fulbright, is the afternoon available tomorrow?

03:25:02   15          THE CLERK:  Morning and afternoon.

16          THE COURT:  Morning and afternoon, because we had

17   planned to have the trial go forward.  But come in at 1:00

18   clock.  To the extent there are remaining issues, you may be

19   heard and the Court will attempt to rule.

03:25:15   20          That would give you the rest of the evening and

21   tomorrow morning to resolve the very few that might be in

22   controversy.

23          MR. ALPER:  Yes.  Understood, Your Honor.

24          THE COURT:  So to the extent you need to be here,

03:25:27   25   1:00 o'clock.

5497

1          And on the Rule 50 motion, as I have indicated,

2     submit something if you choose to do so.

3          MR. ALPER:  Yes, Your Honor.

4          THE COURT:  Okay.  But Hytera has already done so.

03:25:36     5          MR. CLOERN:  Yes, Your Honor.

6          THE COURT:  You have filed your Rule 50 motions?

7          MR. CLOERN:  We filed some Rule 50 motions at the end

8     of Motorola's case.  I think we may renew those with --

9          THE COURT:  Well, that becomes a procedural issue,

03:25:52     10     the renewal aspect of things.  So look into that.

11          MR. CLOERN:  Yes, Your Honor.

12          THE COURT:  I've only given you a rough indication of

13     what the Court intends to do.  Of course I wanted to see what

14     you put in writing.  But I'm well aware of the rule.  And I'll

03:26:07     15     leave it up to you.

16          So if you are going to file something, you may

17     present it to the Court when you come in at 1:00 o'clock on

18     the jury instruction issue.

19          MR. ALPER:  Yes, Your Honor.

03:26:17     20          THE COURT:  Okay.  Now, this also gives you a

21     wonderful opportunity to settle this case.

22          MR. ALPER:  Understood, Your Honor.

23          THE COURT:  If you can do so in fairness and justice,

24     by all means do so; otherwise I'll see you at 1:00 o'clock.

03:26:31     25          MR. ALPER:  May I ask one further question, Your

5498

1  Honor?  Should we plan to present closings to the jury on

2  Wednesday?

3          THE COURT:  Will that give you enough time?

4          MR. ALPER:  We've discussed this issue.  And the

03:26:41  5  parties would prefer to try to do the closings in a day.  And

6  so we were thinking, you know, we can discuss two, two and a

7  half hours per side.

8          THE COURT:  Well, I'm not going to set a limit.  I

9  would just say a reasonable period of time.  And if somebody

03:26:58  10  is going too far, you can make an objection.  But I'm not

11  going to set a time limit.

12          And now Mr. Fulbright has just handed me yet another

13  note from a juror.

14          THE CLERK:  It's an old note.

03:27:13  15          THE COURT:  Oh, it's an old note.  That's good news.

16          THE CLERK:  February 17th.

17          THE COURT:  That's good news.

18          All right.  The 17th is Monday, that's a court

19  holiday.

03:27:20  20          THE CLERK:  Right.  It says 17th through 21st.

21          MR. CLOERN:  I believe one of the jurors, Your Honor,

22  has a vacation to Ireland next week.  So that's the issue.  I

23  believe this is a juror who had that vacation was planned, I

24  believe, for November or December.  She cancelled it and moved

03:27:37  25  it.  And so if we don't wrap up this week, it looks like we

5499

1    may not, then that will be an issue we'll have to address.

2         THE COURT:  Well, jurors have different perspectives

3    of their duties as jurors.

4         I'll say nothing further on the point.

03:27:53    5         But in any event, this is under advisement.  Tomorrow

6    when you come back at 1:00 o'clock we'll have a better

7    perspective of how the case should go forward.  But if you

8    think you can make closing arguments in one day, so much the

9    better.  Let's let that rest until tomorrow at 1:00 o'clock.

03:28:14    10         MR. ALPER:  Yes, Your Honor.

11         MR. CLOERN:  Thank you, Your Honor.

12         THE COURT:  Keeping in mind what the juror has said.

13         MR. ALPER:  Yes.

14         THE COURT:  All right.  Thank you.

03:28:20    15         (Brief recess)

16         THE COURT:  Just a minute, counsel.  A little detail.

17    Tell the jury not to come in tomorrow, but to be here Thursday

18    at 10:00.

19         MR. ALPER:  Wednesday.

03:29:04    20         THE COURT:  Wednesday at 10:00 o'clock.

21         Mr. Fulbright, tell the jury they are not to be here

22    until Wednesday at 10:00 o'clock.

23         MR. CLOERN:  Yes, Your Honor.

24         (Adjournment 3:29 p.m. until 10 a.m., February 11, 2020)

25

0

C E R T I F I C A T E

I, Jennifer S. Costales, do hereby certify that the foregoing is a complete, true, and accurate transcript of the proceedings had in the above-entitled case before the Honorable CHARLES R. NORGLE, one of the judges of said Court, at Chicago, Illinois, on February 10, 2020.


*/s/ Jennifer Costales, CRR, RMR*

Official Court Reporter

United States District Court

Northern District of Illinois

Eastern Division