5786

| | | |
|---|---|---|
1  |  IN THE UNITED STATES DISTRICT COURT
   |  NORTHERN DISTRICT OF ILLINOIS
2  |  EASTERN DIVISION

3  | MOTOROLA SOLUTIONS, INC., and MOTOROLA ) No. 17 CV 1973
   | SOLUTIONS MALAYSIA SDN. BHD,            )
4  |                                         )
   |          Plaintiffs,                    )
5  | vs.                                     ) Chicago, Illinois
   |                                         )
6  | HYTERA COMMUNICATIONS CORPORATION, LTD., ) February 13, 2020
   | HYTERA AMERICA, INC., and HYTERA        )
7  | COMMUNICATIONS AMERICA (WEST), INC.,     )
   |                                         )
8  |          Defendants.                    ) 11:00 o'clock a.m.

9  |               TRIAL - VOLUME 38-A
   |            TRANSCRIPT OF PROCEEDINGS
10 |
   |     BEFORE THE HONORABLE CHARLES R. NORGLE, SR.
11 |                  and a jury

12 | APPEARANCES:

13 | For the Plaintiffs:    KIRKLAND & ELLIS, LLP
   |                        BY:  MR. ADAM R. ALPER
14 |                             MR. AKSHAY DEORAS
   |                             MR. BRANDON HUGH BROWN
15 |                        555 California Street
   |                        Suite 2700
16 |                        San Francisco, California 94104
   |                        (415) 439-1400
17 |
   |                        KIRKLAND & ELLIS, LLP
18 |                        BY:  MR. MICHAEL W. DE VRIES
   |                             MR. CHRISTOPHER M. LAWLESS
19 |                        333 South Hope Street
   |                        Suite 2900
20 |                        Los Angeles, California 90071
   |                        (213) 680-8400
21 |
22 |
   | Court Reporter:        JENNIFER COSTALES, CRR, RMR
23 |                        Official Court Reporter
   |                        219 South Dearborn Street, Room 2342
24 |                        Chicago, Illinois 60604
   |                        (312) 435-5895
25 |                        jenny.uscra@yahoo.com

5787

```
 1   APPEARANCES: (Continued)

 2   For the Plaintiffs:     KIRKLAND & ELLIS, LLP
                             BY:  MS. MEGAN MARGARET NEW
 3                           300 North LaSalle Street
                             Chicago, Illinois 60654
 4                           (312) 862-7439

 5                           KIRKLAND & ELLIS, LLP
                             BY:  MS. LESLIE M. SCHMIDT
 6                           601 Lexington Avenue
                             New York, New York 10022
 7                           (212) 446-4763

 8   For the Defendants:     STEPTOE & JOHNSON, LLP
                             BY:   MR. BOYD T. CLOERN
 9                                 MR. SCOTT M. RICHEY
                                   MR. MICHAEL J. ALLAN
10                                 MS. JESSICA ILANA ROTHSCHILD
                                   MS. KASSANDRA MICHELE OFFICER
11                                 MR. BILL TOTH
                             1330 Connecticut Avenue NW
12                           Washington, DC 20036
                             (202) 429-6230
13
                             STEPTOE & JOHNSON, LLP
14                           BY:   MR. DANIEL S. STRINGFIELD
                             227 West Monroe Street
15                           Suite 4700
                             Chicago, Illinois 60606
16                           (312) 577-1300

17

18   ALSO PRESENT:           MR. RUSS LUND and
                             MS. MICHELE NING
19

20

21

22

23

24

25
```

5788

1      (Proceedings in open court.  Jury in.)

2           THE COURT:  Good morning, members of the jury.

3           Hytera may continue its closing argument.

4           MR. CLOERN:  Thank you, Your Honor.

11:00:44    5      CLOSING ARGUMENT ON BEHALF OF DEFENDANTS (Resumed)

6           MR. CLOERN:  Okay.  Hytera's knowledge.  Why does it

7      matter?  Motorola must show that Hytera knew or should have

8      known of the alleged misappropriation.

9           We have to do that for each separate defendant.

11:00:59    10 There are three.  So let's just take a quick look at the jury

11     instruction.

12          You see point one, "Hytera acquired Motorola's trade

13     secret knowing or having reason to know it was acquired by

14     improper means."

11:01:13    15     So the acquisition happened by G.S., Sam, Y.T. when

16     they were Motorola employees.  So we don't think that applies.

17     And it happened prior to 2016 in Asia.  So we don't think that

18     applies under the DTSA.

19          If you look down at 2(b), it says, or at 2, "Hytera

11:01:36    20 disclosed or used Motorola's trade secret."

21          And then (b), "At the time of the disclosure or use

22     knew or had reason to know that knowledge of the trade

23     secret..." and then under (b)(1) "...was derived from or

24     through a person who used improper means to acquire it."

11:01:59    25     So then did Hytera know that G.S., Sam and Y.T. had

5789

1  acquired it, Motorola information improperly?  So that's why

2  Hytera's knowledge is relevant.

3       And if we look at the three entities, so we've got

4  Hytera China, Hytera Communications Corporation.  G.S., Sam,

11:02:24   5  Y.T., Peiyi, they went to work there.  That's the company that

6  does all of the R&D, makes the products and so forth.

7       The two U.S. entities, here and here, they have

8  nothing to do with this case.  None of the people at issue

9  went to work there, none of the ex-Motorolans.  There is no

11:02:45  10  R&D that happens in the United States at all.  So we think

11  that those companies should be out because they just have

12  nothing to do with the facts at issue, with the acquisition or

13  with the use.

14       Okay.  So let's move on to Hytera China.  What did we

11:03:09  15  find?  You've seen this slide a lot.

16       Over 1,000 source code files and 1600 documents.

17       And then here we have Professor Wicker's testimony.

18  That was all found in the files of Peiyi or the other

19  ex-Motorolans, not found in the files of any Hytera engineers.

11:03:27  20  So that is very telling.

21       If there was -- and there has been references to all

22  this, you know, suggestions that Hytera has deleted

23  information, and so you should assume that everybody had the

24  files.  Well, if Hytera had gone through and deleted all the

11:03:43  25  information, then why was information found in the files of

1   the ex-Motorolans and not found in the files of anybody else?

2   That's because the ex-Motorolans are the only ones who had

3   this information, had the Motorola information, branded so you

4   can clearly see it's Motorola information.

11:04:00     5       All right.  So, and the ex-Motorolans rebranded

6   documents.  So they would take the Motorola information, and

7   when they used it, they would put it into a document that said

8   "Hytera," appeared to be a Hytera document before they

9   circulated it around.  You've seen the two different versions

11:04:18    10   of the analysis.

11       And here we've got examples of rebranding documents.

12   In the Motorola version here is only in Peiyi files.

13       Okay.  If we go to the next slide, here is examples

14   of converting Motorola source code to Hytera source code.

11:04:36    15   And, again, the Motorola source code was only found in Peiyi's

16   files.  It wasn't sent out until she or Y.T. or Sam had

17   changed it to Hytera source code.

18       So let's look at what G.S. Kok said at his

19   deposition.

11:04:52    20       Motorola has made a lot about G.S., Sam and Y.T.

21   taking the Fifth.  So one interesting thing is guess how many

22   Hytera employees, original Hytera employees took the Fifth?

23   Zero.  Guess how many of the ex-Motorolans who were deposed

24   took the Fifth?  G.S., Sam and Y.T.

11:05:15    25       But there was one question that G.S. Kok didn't

answer -- I mean that he did answer, that he didn't take the
Fifth on.  And that question is:

"Did anyone at Hytera ask you to obtain Motorola
confidential information to build a competing product, either
before you joined Hytera or after you joined Hytera?

"Answer:  No."

Now, after that, G.S. Kok's lawyer, Mr. Murphy,
separate lawyer, says "Take the Fifth."  Don't answer that.
"Take the Fifth."

And then he's asked, G.S. Kok is asked, "Are you
going to follow that instruction?"  And he says "Yes."

G.S.'s lawyer was too slow.  G.S. answered.  He
answered under oath.  He answered truthfully.

Now he was asked additional questions after that,
right?  Now Motorola's lawyer knows, well, he's going to take
the Fifth on these, so they asked him a bunch of questions.

Well, did so and so ask you to take information?  Did
you take information in connection with Mr. Chen?  Blah, blah,
blah.  And he says "Fifth, Fifth, Fifth, Fifth, Fifth" after
he's instructed.

But he answered it already.  Nobody at Hytera was
involved.  They did this on their own.

All right.  So let's look at the jury instruction on
the Fifth Amendment, because what we just looked at is very
important.  So we bolded some language here.  The first part

5792

1    says "you're allowed to draw the reasonable inferences."

2        But look here where it begins "However."  "However,

3    you can only draw reasonable inferences to the extent they are

4    justified by independent corroborating evidence."

11:06:57    5        You've got to have some corroborating evidence.  You

6    can't just assume if someone had answered, instead of taking

7    the Fifth, that that answer would be bad.  And you can't

8    speculate based on just the witness's invocation of the Fifth

9    Amendment alone.

11:07:14    10        So there is no real need for inferences here.  G.S.,

11    Sam, Y.T., they took Motorola information.  We know that.  We

12    can see it in the direct evidence.  You don't have to draw an

13    inference on that.

14        What Motorola wants you to do is draw an inference

11:07:34    15    that Hytera was involved.  So Motorola wants you to say:  All

16    right.  G.S. took the Fifth or Sam took the Fifth, so we want

17    to assume Hytera is involved.

18        But G.S. already answered that No, that's not the

19    case.  And all of the other direct evidence shows that Hytera

11:07:50    20    was not involved.  So there is no corroborating evidence.

21    There is no basis to draw that inference.

22        And we know from G.S. Kok's answer when he actually

23    answered the question that the answer was no.

24        Okay.  So what happens?  We've got three mistakes,

11:08:21    25    errors that one of the ex-Motorolans made, and that's what

5793

1    Motorola banks its case on.

2            So the first is the VOX doc, right.  What are we

3    looking at?  We're looking at ten years, Motorola alleges

4    widespread use of blatant Motorola information over ten years,

11:08:39    5    thousands of documents, millions of lines of source code by

6    hundreds of Hytera engineers.

7            Here is what they came up with, three rebranding

8    errors, three screw-ups.  The first one is the VOX doc.

9            So you remember Zhu Deyou, you saw his testimony by

11:09:00    10   deposition.  He doesn't recall receiving the email with a VOX

11   doc attached to it from ten years ago.  How many emails do you

12   recall from ten years ago?  He can't recall.

13           But what he did say was when he was shown the

14   document that was produced that has the red lines on it, he

11:09:16    15   went to his computer and he opened it up, he found the old

16   email.  He opened it up and it opened without the red lines.

17   It opened in what is called clean view.  And that's a setting

18   you can put.  You can put it when it automatically opens, it

19   shows the track changes or it opens to show a clean document.

11:09:32    20           So, and then he further testified that either way,

21   Peiyi deleted -- he wouldn't have, even if he saw the track

22   changes, it wouldn't have raised a flag to him, because it

23   says Peiyi deleted those things four years ago or four years

24   before she ever showed up to Hytera in 2004.

11:09:53    25           So if you get a document and somebody has made

5794

deletions to it years ago, before they ever show up at Hytera,

it's not going to raise any flags, especially when, as

Mr. Grimmett testified, you look into the document and it's

all, it's like a couple-page document with basic, generic

information about the VOX feature, the feature that every

radio has, has had for 30 years and everybody knows about.

So next slide. Professor Wicker agrees that Peiyi

deleted this information five years before she came to Hytera,

completely consistent with the notion that the folks back at

Motorola five years ago didn't think anything in there was

confidential and they just made it a generic template.

Okay. Error number two, the DMR Conformance Testing

document.

The Motorola branded version of this document was

only found in the files of Sam Chia. And we are going see in

a minute this is the Roger Liang email, the Hytera version was

found in his files. The Motorola version was not.

So Dr. Wicker showed this slide. And it says "Cut

and paste from Motorola." This is an email between Sam Chia

and Roger Liang where Roger Liang is cutting and pasting a

part of a document out. And Professor Wicker tells you that

that's from Motorola.

Well, if you remember the slides Motorola counsel put

up in closing, they delete the "from Motorola" part because

they know that's not true anymore.

5795

1        Why?  Professor Wicker admitted that it's not true.

2   So we asked him about his slide.  And we said, Well, don't you

3   agree that Roger Liang didn't have the Motorola version, only

4   Sam did?  Sam rebranded the documents, sent it to Roger Liang,

11:11:44   5   and that's what was found in Roger Liang's files, the Hytera

6   version.

7        Professor Wicker said:

8        "The Motorola version wasn't found in Roger Liang's

9   files?"

11:11:57   10        And he says, "That's right."  The one in Roger

11   Liang's files, that was the Hytera version.

12        So let's look at the third error over a decade

13   amongst tens of millions of documents sent around to three

14   different people.  The framer API attachment.

11:12:22   15        So what we've got here is Dr. Wicker and Mr. Grimmett

16   agree, Peiyi sends the RFhal library to Maggie.  Now, you

17   can't see in the RFhal library, that's the object code, right?

18   That's what we've talked about.

19        But there is a header file.  And the header file has

11:12:41   20   source code that you can read in it.  But it's the wrong

21   header file and everybody agrees with that.  The RFhal proper

22   interface header file is rfhal.h.  This is framer_api.h.  It's

23   the wrong one, the experts agree.

24        So if we go to the next slide here, what we see is

11:13:03   25   when you open up that header file, if you look at the very

5796

top, it says "HYT Tech." So this is a file, it's not in Motorola blatant code. This is a file that's been converted to Hytera code.

This framer_api is only found in Peiyi's computer, not with the Hytera source code on the SVN, only in Peiyi's computer. This is a file that was under construction. They were in the middle of changing it, I suppose. And they left a reference to Motorola in what's called the comment.

And it says, "Caution: The header file is for development only, not supposed to release to users. User should not include this header file. Instead, users should include rfhal.h."

So what they are telling each other is that this is a secret file that Y.T. and Peiyi had together. And don't release this to the users, like Maggie, right? That's what this says. What this is actually evidence is that the ex-Motorolans are acting separately.

So let's go to the next slide.

Here we have Professor Wicker. And he says, if you actually look in the email, so Maggie writes back and she says, "There is no function in the head or header file. Did you miss something?" That's what Maggie says back to Peiyi.

And then Peiyi responds back: You're right. I sent you the wrong file. Here is the right header file that doesn't say anything about Motorola.

1       So what you see in Maggie's email is Maggie looked

2  directly at the functional code.  What this stuff is in the

3  top, that's a comment.

4       And so can we bring up that code, please, the code

11:14:50   5  file itself.

6       So this is part that says something about Motorola.

7  All right.  Here, this is what's called a comment.  You heard

8  the Motorola engineers come in and say you look at comments at

9  your peril, because somebody writes them in at some point, and

11:15:09  10  then people update the actual code, and they don't go back and

11  change the comments.  And the Motorola witnesses told you

12  that.  Nobody looks at comments.  You do so at your peril

13  because they're often wrong.

14       And then this is the code down here that actually

11:15:22  15  goes into the product and does something.

16       Maggie looks and she sees the function she's looking

17  for to interface.  Is it there?  And that's what she writes

18  back and tells Peiyi.

19       And that is undisputed.  Professor Wicker agrees.

11:15:41  20       So what does Motorola do next?

21       Let's go to the next slide.

22       They say:  Well, look at Maggie's deposition.  Maggie

23  lied.  So you should assume bad things about her, because

24  Maggie said in her deposition that Peiyi never sent any

11:15:56  25  Motorola code to her.

1        So if you actually -- again, context is important.

2    If you look at the whole deposition, and we showed that to

3    Professor Wicker when he was on the stand, Maggie is asked a

4    series of questions:

11:16:09    5        Did Sam send you Motorola documents?

6        Did Sam send you Motorola code?

7        No.  No.

8        Did Y.T. send you Motorola documents?

9        No.

11:16:17    10       Did Y.T. send you Motorola code?

11       No.

12       Did Peiyi send you Motorola documents?

13       No.

14       Did Peiyi send you any code?

11:16:22    15       No.

16       Right.  That was the first question in a series of

17   questions that Moto wasn't in front of coder documents.  And

18   she just was answering no and kept answering no.

19       So that was a good deposition examination.  But that

11:16:42    20   that she misspoke and got into that rapid fire "no Moto code,"

21   "no Moto code," right, and then just kept answering "no" to

22   the next question, which didn't have Moto in it for once, that

23   she misspoke is clear from the evidence when you look at all

24   the evidence.

11:17:03    25       Maggie was a software engineer.  Peiyi was her direct

5799

1  supervisor.  They sent each other code every day.  There is

2  thousands of emails in Maggie's email from her and Peiyi

3  sending code back and forth.

4        That's like going up and talking to a mechanic and

11:17:25  5  saying, "Do you ever work on cars?"  "No."  Right?  There is

6  some confusion there.  So Maggie didn't lie, and Dr. Wicker

7  agreed that that makes all the sense in the world.

8        Okay.  So with these three documents failing,

9  Motorola goes to more tenuous connections.  The welcome, the

11:17:54  10  so-called welcome email, I won't belabor this, we've talked

11  about it.

12        We heard Professor Sun, Yu Yang, Roger Zhang himself.

13  They all testified that Hytera encountered issues in their

14  development interoperating with a Motorola radio.  They

11:18:10  15  developed a suspicion that Motorola was not compliant with

16  DMR.

17        And so when Sam came in, Roger Zhang asked him in his

18  best English that he could muster up questions about how

19  Motorola does this or that.  But all of the "this" or the

11:18:26  20  "that," how does Motorola do this, how does Motorola do that,

21  all those, that was all things related to the standard.

22        Andy Grimmett walks you through that.

23        Roger Zhang walked you through that in person under

24  oath.

11:18:40  25        And what is interesting is that Motorola's lawyers,

5800

1   they always focus on Roger Zhang's questions, not Sam Chia's

2   answers.  But Mr. Grimmett focused on the answers and said all

3   this is information related to the standard.

4          Okay.  So another tenuous connection Motorola makes

11:19:00   5   is with the list of files that were not recovered from Peiyi's

6   laptop.  So you might remember this.  There are directories,

7   rfhal_sent_to_hunagNi -- that's Maggie --withusToTickConvert.

8   And these files were unrecovered from Peiyi's laptop.

9          And a number of these files have names that match the

11:19:21   10   names of Motorola source code files.

11          Okay.  Several issues here.  First, we don't know

12   what are in these files.  They weren't recovered.  But we do

13   know that no Motorola-branded source code was found in

14   Maggie's files.  Thus, if anything was sent to Maggie, it was

11:19:41   15   not branded as Motorola code.

16          We also know that all these file names also exist in

17   the Hytera code, because these are the files that Y.T. or

18   Peiyi had converted to Hytera code.

19          And, in fact, when we look in Maggie's files, what we

11:19:59   20   see is we do see source code files with these names.  But they

21   say "Hytera" on them.

22          So Motorola offered this as evidence that Maggie is

23   involved in the conspiracy because Maggie is being sent

24   Motorola code from Peiyi.  But when you actually look at the

11:20:15   25   evidence, that is not the case.

5801

1          What Maggie was being sent by Peiyi was code that had

2     already been changed to Hytera code.

3          Okay.  Next, Yang Shuangfeng.  We see this email.

4     It's the same situation.  There is a Hytera engineer, who was

11:20:36   5     not an ex-Motorolan, Yang Shuangfeng, and he's got an email

6     where he's talking about file names, and those file names

7     match up to Motorola.

8          Now, these are not file names that ever ended up in

9     Hytera's code as Hytera source code, not with those file

11:20:51   10    names.

11         But if you look on Peiyi's computer, what you find is

12    you find those file names, one version that says "Motorola

13    source code" at the top.  You find another version where

14    "Motorola source code" has been deleted.  It's just a bunch of

11:21:06   15    code.  It looks like somebody is drafting up code, right?

16         So Yang Shuangfeng is provided these what we call

17    white label because the label is gone.  You can't see the

18    origin of it.  It just looks like someone, it's like their

19    first draft of code.

11:21:21   20         And he's given it and they're telling him, they

21    pointed out change SVC to RAF and make some other changes.

22    It's like anybody else, you do a first draft of something, you

23    give it to somebody else:  Clean this up, make the edits, get

24    the periods and the commas in there just right.

11:21:37   25         No evidence that Yang Shuangfeng had any idea that

5802

1  any of that came from Motorola code because, again, everything

2  Motorola about it was stripped by Y.T. or Peiyi before they

3  gave it to Yang Shuangfeng.

4      There were also some discussion in connection with

11:21:58  5  this document about how did Peiyi ultimately get these files

6  on her computer.  And that came up in a few other contexts as

7  well.  And there was some suggestion that that must have meant

8  that there is a whole secret cache of bad documents somewhere

9  at Hytera's corporate files.

11:22:19  10      But there is a much simpler explanation that is in

11  the record, Jim Luo testified about it here in court, and that

12  is that Peiyi came over later.  Y.T., Sam, they came over in

13  June 2008.  Peiyi, they bring her over February 2009, January,

14  February 2009.

11:22:37  15      And Peiyi got, all the documents that were found on

16  her computer, she got those from Y.T.  That's what the

17  evidence is in the case.

18      So Y.T., again, we heard how did Y.T. and Sam get the

19  documents from Motorola to Hytera?  They must have had it on a

11:22:55  20  hard drive or a thumb drive, a separate drive.  At some point

21  that was provided to Peiyi.  Instead of just leaving it on

22  whatever separate drive they had, she put some of them on her

23  computer or all of them.  But that's how they got there.

24  That's the evidence in the case.

11:23:11  25      Okay.  This is the last document I am going to talk

5803

1    about:  Motorola Tune and Testing, this neo_p21.  This is not

2    on anybody's Compass logs.  Dr. Wicker agrees.  Andy Grimmett

3    agrees with that.

4           It doesn't even say "Confidential," "Motorola

11:23:32    5    Confidential."  It just says "Internal use."

6           And documents similar to this, so this is what is

7    called a material or method specification.

8           Can we move forward a slide.  Another one, please.

9           Those documents, documents like those that don't say

11:23:52    10   "Confidential" have been obtained from suppliers, from other

11   public sources.  So this document just doesn't have anything

12   to do with this case.  There is no evidence whatsoever that it

13   was a document stolen by Sam or Y.T. or G.S.  It's not on any

14   of their Compass logs.  And that's what this case is about.

11:24:16    15          Okay.  You were also shown some testimony from Xu

16   Hailin.  And he made some statement about how if he sees,

17   watching a movie and sees an FBI warning, maybe he wouldn't

18   pay any attention to that.

19          So, again, let's look at the context.  What was being

11:24:35    20   discussed in that cross-examination of Xu Hailin?  They were

21   pointing him to English documents.  And what he's saying is he

22   says:  Look, I don't read English.  I'm Chinese.

23          You heard him testify in Chinese.

24          So he says:  I can muddle through.  And if there is a

11:24:55    25   technical discussion relevant to my job, I can understand some

5804

1    of those words.  Mostly I'm looking at numbers and charts,

2    things engineers understand.

3          But he says other words, especially intellectual

4    property related legends, he says, I'm not looking at those

11:25:12  5    things.  I'm focused on --

6          Imagine if you are reading a document in another

7    language.  You are probably just going to try to go into

8    Google Translate and translate the few words that you kind of

9    need, a sentence or two, not the legends on the documents.

11:25:28  10   That's all his point is.

11         And he tries to give an example.  He says:  Look, I

12   watch an American movie or I watch some movie, and it comes up

13   and says "FBI warning" and there is a bunch of text in there.

14   I see the FBI warning.  I don't see all those words, all those

11:25:42  15   disclaimers.  I don't know what they mean.  That's not what

16   I'm looking at.

17         That's his sort of analogy to his, when he's looking

18   at these specifications that are in English, he's looking at

19   the parts that he needs to translate, because he doesn't read

11:25:54  20   English.  Not all the caveats and legal disclaimers.

21         Okay.  All right.  So just the fact that Hytera had

22   some Motorola confidential documents in its files, that

23   doesn't tell anybody anything.  Why?  Because Motorola, or

24   Motorola has provided legally, purposefully confidential

11:26:21  25   documents to Hytera.  They're both in DMR.  Hytera has a

1   license to DMR patents of Motorola.

2          They negotiated an intellectual property license to

3   Motorola's standard essential DMR patents.  And in connection

4   with that, Motorola provided information labeled "Motorola

11:26:49   5   Confidential Restricted."  Motorola gave documents labeled

6   "Confidential" and "Restricted" to Hytera in connection with

7   this license, right?

8          So the point is is just because it's in Hytera's

9   files and says "Motorola Confidential," that, there are lots

11:27:06   10   of legitimate reasons that would be the case, and it just

11   would not necessarily automatically set off an alarm bell.

12   Again, context is important.

13          Motorola source code can be found on the Internet.

14   It says "Motorola Confidential Source Code."  It's on the

11:27:25   15   Internet, a place called GitHub, where lots of companies go

16   and upload their code for lots of various reasons, because

17   lots of times they want partners and developers and things to

18   know about it.

19          Software programmers are a fairly open community.

11:27:44   20   And basic code, right, code that does basic things, so when

21   you turn a device on or turn a device off or push 1, 2, 3 on

22   your key pad and 1, 2, 3 shows up on the screen, they're

23   always sharing that kind of stuff.  And there are websites for

24   it.  And they're always putting up code, because not all code

11:28:03   25   is confidential.  Not all code is important.

5806

1          Think of all the basic boring things that an

2   electronic device does.  I'm sure it does some really cool

3   stuff.  My iPhone does.  But it also does a whole lot of basic

4   stuff that's been done for years.

11:28:17   5          Programmers share that kind of thing publicly on the

6   Internet, and that's what GitHub is all about.

7          And there is Motorola code there.  You can see it on

8   the screen.

9          All right.  Here is some more examples of documents

11:28:28   10  marked "Motorola Confidential" that are available to the

11  public, right?  There is a couple that even have been marked

12  "Trade Secret" that Motorola has put out there purposefully,

13  for whatever reason.

14          People just, companies tend to mark everything

11:28:45   15  "Confidential."  That's what people do, CYA.

16          Motorola knowingly -- but, and it's not just Hytera

17  that engages in competitive intelligence and goes out and

18  tries to find publicly available information about its

19  competitors.  Everybody does it, including Motorola.  That's

11:29:05   20  what you do.  And we can see that in Motorola's files.  They

21  have all kinds of Hytera documents marked "Confidential."

22          In fact, you can look in the emails.  They don't feel

23  great about it, right?  Here we go.  Patty Martensen:  "Please

24  be careful with this information as we should not be passing

11:29:27   25  it around," Hytera information.

5807

1          Motorola knowingly disseminated confidential

2     documents.  Here is another one, again from Patty Martensen.

3     "Enclosed is HYT's DMR product.  Please be careful with this

4     information and do not forward."

11:29:46  5          Here is another one.  Motorola hired someone they

6     called the Hytera Insider.  You heard testimony about this.

7     And they obtained all of Hytera's top secret confidential

8     pricing information from the Hytera insider.

9          All right.  So there is a difference between what all

11:30:13  10    companies do, including Motorola, about going out and trying

11    to find whatever information you can find on your competitors.

12    That's what they do when they compete.  There is definitely a

13    line between that and stealing information, like G.S., Sam and

14    Y.T. did.

11:30:27  15         But you've got to separate that apart.  And what's

16    important, again, is to understand the context.  Just because

17    you see the word "Moto" or a reference to Motorola in some

18    Hytera document doesn't mean everybody -- some Hytera employee

19    would see that and go:  Oh, my gosh.  We better call the

11:30:49  20    police.

21         All companies in an industry have tons of documents

22    with their competitors 'name on it.  The question is, Does

23    somebody who sees a document that says "Motorola" or

24    references Motorola, is there some reason for them to think

11:31:03  25    that was acquired improperly?

5808

1          And there is no evidence of that in this case, other

2     than G.S., Sam or Y.T., who know exactly what they acquired

3     improperly and hid it from Hytera.

4          Okay.  So there has been a lot of discussion of late

11:31:23   5     about deleted and lost materials, which is of course what you

6     do when you don't have direct evidence to prove your case.

7     You start asking everybody to assume it existed because you

8     couldn't find it.

9          We asked Professor Wicker, and he said he had deleted

11:31:37   10    emails just that morning when he got on the stand.  We all do.

11    I deleted emails this morning.  But you know what, no one is

12    suing me.  And no one was suing Hytera before March of 2017.

13         So there is nothing wrong with people deleting their

14    emails.  Sure, everybody here has jobs.  And everyday in your

11:31:58   15    job you delete emails you get.  And people delete emails that

16    they send you.  And there is nothing wrong with that.

17         Can you imagine the world where you don't delete your

18    emails?  I can, because I've been busy in this trial, and my

19    inbox is now about 40 ,000 messages big.  But they will be

11:32:19   20    deleted when I get done.  There is nothing wrong with that.

21         Motorola, you heard them testify.  Whether Motorola

22    ran the Compass logs, whether Motorola checked the Compass

23    logs of G.S., Sam and Y.T., that's a big issue in this case.

24    Guess what?  Motorola used to have a system called the REMEDI

11:32:40   25    system that tracked every Compass log they ever ran.

5809

1          Motorola destroyed all that information in 2015. So
2     maybe they did check G.S., Sam and Y.T.'s Compass log. Maybe
3     they absolutely knew that G.S., Sam and Y.T. downloaded
4     thousands of documents. We'll never know because Motorola
11:33:01    5     destroyed all that information.
6          There was no lawsuit at the time. Motorola was under
7     no obligation to keep it. They changed systems, changed from
8     REMEDI system to a different system and didn't retain all that
9     old data. Okay.
11:33:19    10         Well, Hytera over the last 12 years has changed
11    systems. They went from Lotus Notes -- I don't know if you
12    guys, any of you guys remember what Lotus Notes is, but it's
13    this terrible email that businesses used to use 10, 15 years
14    ago. Then went to Outlook. And when they changed those
11:33:39    15    systems, they don't port over all the data. There is no
16    reason to. Neither did Motorola. That's how businesses
17    operate. And that's why we have a statute of limitations,
18    because evidence isn't maintained indefinitely.
19         And Hytera shouldn't be blamed for that. But
11:33:59    20    Motorola wants to say, We waited 10 years to bring this case,
21    and now not everything is still in existence; therefore,
22    assume Hytera is guilty. That just flips the world on its
23    head.
24         Okay. So let's look at the Destruction of Evidence
11:34:15    25    instruction. It says, "You've heard evidence that certain

5810

1    computers and files may have been lost, destroyed and/or

2    altered, and they may have contained information relevant to

3    this case.  You can assume that information would have been

4    unfavorable to Hytera only if you find by a preponderance of

11:34:36    5    evidence that,

6         "One, the information should have been preserved in

7    anticipation or during the conduct of the litigation."

8         So, first of all, under the first point, it only,

9    this destruction of evidence only applies for the litigation,

11:34:54    10   because that's the first time a company has an obligation not

11   to delete information, right?

12        So it's only what is after March of 2017.  So if

13   somebody deleted something back in 2013, this doesn't apply.

14        Number two, even if there is something that's deleted

11:35:17    15   after the litigation started by an employee, you've got to

16   find that Hytera destroyed the information with the intent to

17   deprive Motorola of the information's use in this litigation.

18        So what was the company doing?  Was it the company

19   trying to destroy information in this litigation?  And an

11:35:35    20   employee's acts, a single employee's acts don't necessarily

21   get you there.  It's not the company's action.

22        And then you have to find that Hytera destroyed the

23   information or caused it to be destroyed in bad faith.  That

24   is a high standard.

11:35:49    25        Let's see what it means.  "Bad faith in this context

5811

11:36:11

1    means destruction for the purpose of hiding adverse

2    information and requires a showing of more than just

3    negligence or even gross negligence on Hytera's part.  You

4    cannot infer that Hytera engaged in intentional, bad faith

5    destruction of evidence simply because a subordinate employee

6    acted in violation of document retention policies and

7    procedures or simply because a party was unable to locate or

8    produce certain documents."

11:36:29

9         All right.  So what has Motorola pointed to?  They

10   say Sam, they say there is a lost laptop, Sam Chia's lost

11   laptop.  Well, the evidence is that laptop was lost in 2013.

12   There is documentary evidence of that.  So that doesn't count.

13        They point to Peiyi's laptop.  So Jim Luo testified,

14   he goes to Peiyi and he says, You need to turn in your laptops

11:36:54

15   so we can image them, run the search terms, produce whatever

16   data in the discovery, because that's how it's done.  There is

17   agreed terms, the data in a computer.  Vendor we hire runs the

18   search terms, documents hit on that and they're produced.

19        Peiyi turned over her laptop and said, "Here, this is

11:37:15

20   the laptop I'm using."  And it was her active laptop she used.

21   Well, she had another laptop from years ago that she didn't

22   give Mr. Luo.  Instead, she goes and she puts it in what's

23   called a recycle bin and tells a different part of the

24   company, she says:  This doesn't work.  It doesn't turn on.

11:37:33

25   It's an old laptop.  I am going to just get it recycled.

5812

1          So some other evidence comes up in the case.  And the

2     lawyers are looking at all this.  Motorola inquires about it.

3     Ultimately, we go back to Mr. Luo and we say:  What's going

4     on?  Right?  There are some holes here.

11:37:53  5          He goes back and searches more, finds out what Peiyi

6     has done.  Gets this laptop off the shelf waiting to be

7     recycled, gives it to the vendor.  The vendor forensically

8     restores it and finds -- remember those slides that say 1600

9     documents found, 1,000 source code files found?  That all came

11:38:15  10    off the laptop Jim Luo found that Peiyi tried to hide.  And

11    everything that was deleted that was restored, and the stuff

12    that was deleted and couldn't be restored, the records, the

13    forensic logs show that was all deleted back in 2013.

14          That evidence wasn't deleted during the course of

11:38:34  15    this litigation, and it certainly wasn't deleted by Hytera.

16    It was deleted by Peiyi back in 2013, years before this case

17    was ever filed.

18          And guess who found it?  Hytera, the company, the guy

19    that Hytera charged and says:  Work with the lawyers, get them

11:38:53  20    whatever they need.  He chased it down.  He found it.

21          Remember how I told you there were search terms,

22    there is an agreed protocol for this production of documents

23    and how to search?  That didn't include forensically restoring

24    deleted information.  But Hytera did it anyway because they

11:39:08  25    wanted to find out what happened and fix it.  They did

5813

1    something they weren't required to do.  And that is Motorola's

2    case.  Peiyi's laptop is Motorola's case.  Hytera went above

3    and beyond to find it and produce it and come in and answer

4    for what's happened.  So there is no destruction of evidence.

11:39:36   5    There is the opposite.

6            All right.  Let's talk about the trade secret claims.

7    Two issues.  One, is it a trade secret?  Two, is it

8    misappropriated?

9            Let's talk about first is it a trade secret.  And you

11:39:51  10    are going to have to look at four things:

11           Number one, it's got to be concrete information.

12           Number two, it's got to be secret.

13           Number three, it's got to derive value from being

14    secret, meaning does it have a competitive advantage in the

11:40:05  15    marketplace, and

16           Number four, is it subject to reasonable security

17    measures to keep it secret.

18           So I just want to look at -- you are going to have a

19    couple or a number really of trade secret instructions.  And

11:40:18  20    there is two I want to focus you in on.  One is instruction

21    number 23, what "independent economic value" means, deriving

22    independent economic value from being secret.

23           So it's got to be value from being -- from not being

24    generally known.  So the information is not generally known.

11:40:38  25    And it means that the information gives a business competitive

1  advantages over other businesses that do not know the

2  information.

3  And that's what you've got to think about.  So when

4  you have things like VOX or squelch or carrier detect that

11:40:53  5  every DMR radio has, every single one, right?  A lot of that

6  stuff is required by the DMR standard, like noise suppression

7  is, everybody has it.  L1 Timer, everybody has it, required.

8  Protocol stack, required by the DMR standard.

9  So if everybody has got it, and it's all required,

11:41:13  10  then Motorola has got to show what's different about its VOX

11  or L1 Timer or so forth that is secret, that they've

12  concretely identified and it gives them a competitive

13  advantage.

14  All right.  So let's look at the next one.  It's got

11:41:28  15  to be concrete.  "In articulating a trade secret," this is

16  Instruction 22, "it is not enough for Motorola to point to

17  broad areas of technology.  Instead, it is Motorola's burden

18  to identify concrete information it contends to constitute a

19  trade secret."

11:41:45  20  Again, so they can't just point to a hardware

21  abstraction layer or an operating system abstraction layer,

22  software programming technique that's been known for years,

23  decades even.  They've got to say:  This is the concrete

24  specific thing that is a trade secret, that is secret, that

11:42:08  25  isn't known generally and that offers a competitive advantage

5815

1          from not being generally known to others.

2                  All right.  So let's look at how Motorola had

3          described what a trade secret is back when this technology was

4          being developed back in 2004.

11:42:26    5                  They say it's things like specific formula for Coke,

6          a specific business plan, a methodology, a method of

7          manufacturing or a design technique or a customer list.  These

8          are specific things.

9                  Okay.  Let's look at three examples of Motorola trade

11:42:49   10          secrets.

11                  So Hytera does not take the position Motorola doesn't

12          have trade secrets.  It does.  It absolutely does.  There are

13          three examples that are listed right here.  And so let's look

14          at what Motorola clearly does think is a trade secret.

11:43:05   15                  Look at the bottom one.  F2 Stochastic Slot Drifting

16          Algorithm.  Now, that is concrete.  It's a specific algorithm.

17          It's not a whole feature.  It is one specific algorithm.

18                  Let's look at the first one.  Scheme to measure

19          reverse channel position and improve embedded LC code --

11:43:27   20          decode reliability.

21                  Do you know what one of the trade secrets that

22          Motorola asserted and dropped in this case?  The reverse

23          channel feature.  It's a feature like VOX or like carrier

24          detect.  They asserted that, not an aspect of reverse channel,

11:43:42   25          but just generally reverse channel.  Again, something every

5816

radio does.

Well, what is a real trade secret isn't just reverse channel.  It is the scheme to measure reverse channel position and improve embedded LC code reliability.  Something specific, concrete.

So let's go to the next slide.  Motorola points to 50-page, 100-page, 200-page documents that just say "Motorola Confidential Proprietary" and says that's a trade secret.  There is all kinds of information in there, we've pointed it out, public information, generally known information, but the whole document, it's a trade secret.

Or maybe the whole document isn't.  Maybe you need to look through it and figure out what is and what isn't.  It's not really clear, what the position is.

But we can look at the documents in this case.  This is a document that says "Motorola Confidential Proprietary" on it.  And I think it's about a 50-page document.  No.  It's more like a hundred and something page document.

But what it says, it says there is trade secret, there is a trade secret associated with this document, with this subject matter, but they've removed it because it's a trade secret.

The kinds of documents Motorola points to as their trade secrets in this case, where they've actually got a trade secret, they take them out of those kind of documents.  That's

5817

1        what is shown here.

2                And look at what they're talking about, the ADS Block

3        Check Sequence.  That is specific.  And it's deliberately

4        withheld from this document.  Requirements for the algorithm

11:45:20    5        are deliberately withheld.  It's a specific algorithm.

6                Okay.  That's what Motorola thinks is a trade secret,

7        and that's why we're pointing to those documents.  Motorola's

8        counsel raised this point.  It is true that you don't have to

9        mark something as a trade secret under the law.  There is not

11:45:40    10        a requirement.  You won't see that in the instructions.

11                But what is important -- and that's not why we're

12        pointing to these things.  What's important is to look at what

13        did Motorola consider a trade secret before this lawsuit back

14        in 1995 or 1996 or 2004, the dates for the technology that

11:46:02    15        they say were being produced.  At that time, what were they

16        calling trade secrets?  And it's only these very specific

17        concrete things.

18                Okay.  Let's talk about the trade secrets.  We put

19        them into four categories.  The first is Radio Specific, VOX,

11:46:20    20        noise suppression, squelch.  These are all common features

21        that every radio has, general types of technology.

22                Now, there is upwards of 50 companies out there

23        making radios for decades, and they've all got their own

24        version of every one of these.  And most of this is required

11:46:36    25        in DMR radios.

1    So Motorola is claiming general functionality.

2    Professor Wicker agrees.  We asked him and he says:  Yes,

3    that's right.  These are all general functionality that every

4    radios has, noise suppression, carrier detect, squelch and so

11:46:58  5    forth.

6    Why is that important?  We just saw it in the

7    instructions.  You don't get trade secret coverage for things

8    that are generally known.  You have to identify the concrete

9    trade secret that gives you a competitive advantage.  So you

11:47:08  10    can't just point to generally well-known concepts in the radio

11    industry.  And Dr. Wicker admitted that's what every one of

12    those are.

13    So how do we know that Motorola is claiming its whole

14    implementation of squelch or VOX as its trade secret as

11:47:22  15    opposed to something specific about it?

16    Well, Mr. Corretjer came and he testified, and this

17    is what he pointed to.  He said this is the source code that

18    amounts to our trade secret.  And it's all the source code for

19    squelch or it's all the source code for carrier detection.

11:47:41  20    Hundreds or thousands of files, not specific algorithms.

21    Professor Wicker admitted that Motorola hasn't even

22    tried to separate what is public from what is secret, much

23    less identify what gives Motorola competitive advantage.

24    So, again, Motorola is pointing to a big bucket of

11:48:04  25    information, hundreds or thousands of files, tens of thousands

5819

1    of lines of code on a well-known concept or feature that every

2    radio has, meaning it includes all kinds of public

3    information.  And they haven't separated out what is

4    well-known from what their specific trade secret or secrets

11:48:23    5    are.

6            All right.  So there are a couple where Motorola made

7    a passing attempt at this, and you may remember it.  They used

8    the secret sauce.  I think there is 4 of the 21 trade secrets

9    where on direct Professor Wicker was asked:  What's the secret

11:48:46    10    sauce?  And this was his answer:  "For noise suppression," he

11    says "It's high performance and has a quick response."

12            Okay.  What makes it high performance?  What gives it

13    a quick response?  What part of the code?  What part of noise

14    suppression does that?

11:49:01    15            For VOX, "There are a number of specifics that make

16    it a particularly special and useful algorithm."

17            Okay.  Well, what are they?  He said there are

18    specifics, but didn't give them.

19            All right.  Let's look at what he said for

11:49:16    20    architecture's trade secret.  He said:

21            "What's important to Motorola's implementation are

22    the details," the details.  "It's not that Motorola broke up

23    things into layers.  That's been done."  So he admits layers

24    are known.

11:49:31    25            "But each layer is very complicated, and Motorola has

5820

designed those layers in a unique and innovative way."

This is marketing-level speak.  This isn't any detail.  This doesn't say what our concrete trade secret is.  It's just a conclusion.  It's good.  It's fast.  It's complicated.  That doesn't get it done.

Application framework.  "Motorola came up with an innovative and unique way of making all this work."

Okay.  What's the innovative and unique way?  They're not going to get up in their rebuttal points and show it to you, because no one said.  Professor Wicker never identified it.

Connectivity, "The way it's been organized and the way it's been done in a highly efficient manner."

Again, all it is:  It's good.  It's fast.  It's better.  It's highly efficient.  It's complicated.  Never anything about the actual technology itself.  What about any one of these well-known features or concepts is a concrete bit of secret information and how it gives some competitive advantage to being secret.

In fact, Professor Wicker agreed that they haven't even tried to do that.  He said, and he was asked:

"Other than pointing to here is our source code for the whole feature, Motorola hasn't identified what differentiates its squelch from the other squelches that are out there?"

5821

1       And his answer:  "Well, it's done more than simply

2  talk about the source code.  We've also talked about documents

3  and Motorola's place in the DMR industry.  I don't recall

4  anyone saying, well, here is the way Motorola does it and here

11:51:07    5  is the way these five other manufacturers do it.  I don't

6  think there was any testimony like that."

7       Nothing on competitive advantage, nothing.  And when

8  everybody has one, yours isn't a trade secret unless you can

9  differentiate it and show that competitive advantage.

11:51:22   10       Professor Wicker admitted Motorola hasn't met that

11  burden.

12       Now, why is this so important?  Well, let's look at

13  the next slide.  If you imagine that what's drawn in this blob

14  here is the contours of a trade secret, that's all of VOX,

11:51:41   15  that's all of squelch, that's the whole hardware abstraction

16  layer.

17       What's in it?  Well, there is third-party source

18  code.  There is material that's been published.  There is

19  material that's generally known, right?  If everybody knows

11:51:56   20  how to do a HAL, a hardware abstraction layer, then there is

21  going to be parts of everybody's hardware abstraction layer

22  that are just the basic parts everybody knows.  There is parts

23  covered by a standard.  There is parts covered by patents.

24       Now, there also might be secret algorithms in there

11:52:13   25  or other secret technology, but you don't get to claim all the

5822

1    blue blocks as part of your trade secret.  You only get the

2    red pieces.  That's the concrete stuff you have to identify.

3           Ask yourself, what has Motorola identified?  What is

4    the secret specific algorithm or whatever that gives it a

11:52:32  5    competitive advantage about any of the 21 trade secrets.

6           So why has Motorola created this problem for it

7    itself?  Why has it cast its net so widely?  Well, here is

8    why.  Think back about why Motorola told you its trade secrets

9    are valuable.  Dr. Rangan showed you this chart.  And what he

11:52:53  10   said is they took a really long time to develop, right?  They

11   took a really long time, years and years to develop, decades,

12   some of them, going back to the '80s that they were working on

13   this stuff.

14          Well, how could that be?  If it's one specific

11:53:10  15   algorithm, it doesn't take that long.  So let's look at the

16   next slide.

17          So I showed you that chart or the slide Mr. Corretjer

18   put up where he said:  This is our squelch code.  This is our

19   VOX code.  This is our carrier detect code.

11:53:27  20          So we went through every -- Motorola witnesses did

21   that for all the trade secrets.  And Barb Frederiksen-Cross

22   counted up the files, and that's what you see in the first

23   blue column, hundreds or thousands of files.  Not a specific

24   bit of code or one or two files that amount to some new secret

11:53:49  25   algorithm that makes a difference.  No.  Hundreds or thousands

5823

1    of files.

2         And why do they do that?  Because that's how they get

3    to, Oh, it took us years to develop.  If it was one file,

4    they're not going to get to "it took us nine years to develop

11:54:08    5    carrier detection" or whatever they are claiming.  And they

6    have to do that to jack up the value in order to make their

7    damages case.

8         Okay.  So this is what Motorola thinks is a trade

9    secret.  These are examples of their trade secrets, specific

11:54:26   10    algorithms, specific schemes in their code, not entire

11    features.

12         So I want to quickly move through some examples.

13    Noise suppression.  Noise suppression comes from a third

14    party, DVSI.  Everybody has the same noise suppression

11:54:44   15    technology.

16         Professor Wicker, he agrees.  He tried to say it was

17    generally high performance because of the way Motorola

18    integrates noise suppression.  But guess what?  Everybody

19    integrates their noise suppression.  So there is nothing

11:55:00   20    different there.

21         So let's go to carrier detection.  On carrier

22    detection, Motorola has patents on carrier detection.  So they

23    can't claim the whole thing.  They have to separate what is

24    trade secret from what is patented, because if you have a

11:55:15   25    patent, your technology is public.  Patents are public.  In

5824

1      exchange for a patent, you have to publicize your invention,

2      exactly how to do it.

3              So they have it separated.  Think back, what is their

4      carrier detection trade secret that is different from what

11:55:30    5      they've made public?

6              Okay.  Let's go on to squelch.  Motorola squelch is

7      in a public patent.  Mr. Corretjer admitted that.  Let's go,

8      let's look at the patent.  It's right there.  And

9      Mr. Corretjer also admitted that not only is the algorithm

11:55:57   10      disclosed in this patent, but the specific formulas for

11      accomplishing the algorithm, look at them, they're right

12      there.

13              But Motorola claims its entire squelch is a trade

14      secret.  But the algorithms that implement squelch have been

11:56:14   15      made public in that patent.  And you can't have a patent and a

16      trade secret on the same thing.  You've got to separate them,

17      what is public in the patent versus what is left over that's

18      secret and offers a competitive advantage.  They haven't

19      identified it.

11:56:26   20              VOX, same issue, exact same issue.  VOX, there is a

21      patent.  And then if we go over here to Mr. Zetzl, he says,

22      This has been around for a long time.  Customers don't care

23      about VOX at all.

24              Motorola has a patent on VOX from the '80s.  That's

11:56:45   25      what we'll see here in the next slide.  They haven't told you

5825

1    what is trade secret about VOX.

2            Protocol stack.  Motorola says the document on the

3    left is a trade secret document.  It's about 50 pages.  We

4    went through that with Professor Wicker.  And he admitted, he

11:57:05    5    fought on it a little bit at first, but ultimately we said:

6    We can do that for every page, match up what's in it to what's

7    in the ETSI standard publicly disclosed.

8            His answer:  I don't disagree with that.

9            What is secret and offers a competitive advantage

11:57:23    10   about the protocol stack?  Nothing.  And certainly Motorola

11   hasn't identified it in this case.

12           Okay.  Timing and framing.  Timing and framing is

13   dictated by the DMR standard itself.  It has to be 30

14   milliseconds.  You can't have a better one.  If it's 31

11:57:42    15   milliseconds or 40, it won't work.  If it's 20, if it's worse

16   it won't work.  It's got to be 30.

17           So what is trade secret about it?  Motorola hasn't

18   said.

19           All right.  So let's look at the second bucket.

11:57:56    20   These are all, these are the layers that we've heard about, so

21   just how you organize your software, portions; the

22   applications layer, where the applications go; or the

23   operating system abstraction layer, the abstraction code for

24   the operating system or the abstraction code for the hardware,

11:58:17    25   right, these are all well-known computer programming concepts.

5826

1          So here we have Mark Boerger, Motorola witness:

2          "Abstraction layers aren't unique to Motorola?

3          "No, they're not."  Not hardware, not operating

4    system.

11:58:32    5          Batch Frederiksen-Cross:  These are all well-known

6    concepts?  True.

7          Motorola claims thousands of files, this is again

8    DSX-3.  And just like we saw with the radio features, if you

9    look on here, there is Motorola is claiming its whole

11:58:50   10    operating system abstraction layer, its whole application

11    layer, its whole hardware abstraction layer, not something

12    unique about it, the whole thing.

13          So let's look at a couple of them.  The ergonomic

14    layer.  This is what is called an application framework.  You

11:59:07   15    can see Wicker saying, Dr. Wicker saying that right there.

16    They're disclosed in textbooks.  That's the traffic cop,

17    right, that we've heard about.

18          No trade secrets there according to Dan Zetzl,

19    because Dan Zetzl was asked in an email:  Hey, Dan, we need to

11:59:24   20    submit some code to the Copyright Office and that will make it

21    be public.  Where can we look for code that doesn't have any

22    trade secrets in it?

23          He said:  Go to the ergonomic layer.

24          You know why?  Because the ergonomic layer, that's

11:59:40   25    Motorola's fancy word for an application framework.

5827

1    Application frameworks are basic, known in textbooks.

2         Okay.  Application layer.  The only thing that's at

3    issue about the application layer, which is again just where

4    you put the applications in the code, is what's called the

11:59:55    5    application template.  And the application template is, Y.T.

6    or Peiyi took a Motorola application, stripped out all the

7    code and said:  Here is the outline, the format of it, and we

8    want you to use this for Hytera applications.

9         But that's not at all secret.  Motorola has publicly

12:00:15    10    disclosed its full application, one of its full applications

11    to the Copyright Office.  Anybody can go look at it.  Anybody

12    can go see that outline.  Anybody in the world can use it.

13    It's not secret.  And Motorola didn't think it was or else it

14    wouldn't have made it public, at least not before this case.

12:00:33    15         Okay.  Let's look at VRIS.  This was described as a

16    common services layer.  So this is just the idea of taking

17    various pieces of code that provide services, remember, like

18    the clock.  Any electronic device has to have a timer.  So

19    instead of having a bunch of timers for everything that needs

12:00:51    20    a timer, you have one and everything calls to that.  You put

21    it in one place along with all the other services.

22         Motorola has got patents on VRIS.  We've seen them.

23    We've matched them up.  We did that with Motorola's fact

24    witnesses and their experts.

12:01:06    25         What is in the alleged trade secret document on the

5828

1    right is disclosed in the patents.

2            So we actually went farther there than showing

3    Motorola hasn't, just that Motorola hasn't alleged what is the

4    trade secret beyond the public parts of its alleged trade

12:01:23    5    secret.  We've actually showed that it is public, what is in

6    their documents, just like we did with protocol stack.

7            Mark Boerger said on the stand:  Of course I didn't

8    disclose the details of VRIS.  We didn't go into the actual

9    details.  I just gave a high level description of overall

12:01:43    10    VRIS.

11           That doesn't meet the burden of proof.

12           Architecture.  It's another alleged trade secret.

13    So, first of all, Professor Wicker described the architecture

14    like you see on the right and Mark Boerger described it as you

12:02:00    15    see on the left, two very different.

16           If you notice in the one on the right, the DSP

17    framework is in between the operating system and the ergonomic

18    layer.  So they can't talk directly to each other.

19           On the left, the DSP framework doesn't get in

12:02:16    20    between.  The ergonomic layer and hardware abstraction layer

21    can talk directly to each other.

22           And the operating system abstraction layer is in a

23    completely different place.  So they're presenting different,

24    that don't even -- it's not even clear what their architecture

12:02:32    25    is they're claiming is trade secret because they present two

5829

1    different ones.

2            On the next, either way, these blocks, application

3    layers, application frameworks, operating abstraction layers,

4    all these blocks, we go to the next slide, we see public

12:02:48    5    architectures.  You see in the top right Operating System

6    Abstraction Layer, OSAL.  You see the HAL, hardware

7    abstraction layer, application layer.

8            The colorful one in the middle is Android.  That's

9    got an application framework at the top.  All of these things,

12:03:05    10   application layers, application frameworks, OSAL, HALs,

11   they're all generally known.  These are all public.  It's how

12   you do them that might give you a trade secret, the specific

13   way that you do it.  And Motorola hasn't done any more than

14   say:  We've got a HAL.  Well, so does everybody else.

12:03:26    15           Okay.  Same for XCMP.  Motorola has patents on XCMP.

16   It has not told you what is trade secret about XCMP.  It has

17   not separated what is publicly known.  And guess what?  XCMP

18   is a protocol.  It says:  Here is how the Motorola radio, it's

19   the rules for how a Motorola radio has to talk to an

12:03:52    20   accessory.

21           Right, so the little mics you see on a security

22   guard's lapel that they can use, that's an accessory, and

23   there has to be rules for communication, a way communication

24   is done between the accessory and the radio.  And you can use

12:04:07    25   something called Wireshark to reverse engineer it.  It's right

5830

1    on the Internet.  And that protocol is given to all

2    third-party developers anyway.

3         So I don't think it can even be a trade secret.  But

4    even if there is something about it that you couldn't just see

12:04:24    5    by reverse engineering it, which is totally legal, nothing

6    wrong with that, Motorola hasn't identified it.  They can't

7    just claim their whole XCMP, because it's patented, and they

8    have to separate out what is secret, concrete and derives a

9    competitive advantage from being secret.

12:04:44    10        Connectivity, same thing.  They've claimed generally

11   connecting a USB device to their radio.  Well, how you connect

12   a USB device is in a standard.  How you connect to the

13   Internet, TCIP, that's a standard.  They haven't said what is

14   Motorola's secret way of doing that.

12:05:02    15        Same for hardware abstraction layers.  Mr. Corretjer,

16   concept of HAL is known in the industry.  All right.  So if

17   it's known in the industry, what is Motorola's secret way of

18   doing it?

19        I can't show you that testimony from Mr. Corretjer

12:05:20    20   because he didn't say.  What I can show you is the testimony

21   from Mr. Wicker -- Dr. Wicker.  He says "It's the specifics."

22   Right?  "It's the fine-tuned two-way radios."

23        Well, okay.  So they've got specifics for their HAL.

24   Their HAL has been fine-tuned to two-way radios, but how?

12:05:46    25   What part of their HAL?  For their HAL, they identified like

5831

2,000 source code files as the trade secret.  What part of
that is the trade secret?  And what part is the part that
Mr. Corretjer says is generally known in the industry?

All right.  Let's go to the OSAL.  I'm not going to

12:06:05   belabor it.

Let's flip to slide 183, please.

We can cut to the chase.  Dan Zetzl, he not only
pointed out that the ergonomic layer is a place you can go if
you want to grab code to publicly give to the Copyright

12:06:19   Office, you can go to the operating system abstraction layer
as well.

Motorola has patents on its operating system and
operating system abstraction layer.  And if we go back one
page, POSIX, Nucleus, those are all, that's public third-party

12:06:39   code for the operating system.

How has all that been separated out to show you what
is Motorola's trade secret versus what is generally known, not
secret in OSAL that Dan Zetzl was ready to give to the
Copyright Office and make public versus what is third-party

12:06:55   code in there.  They've drawn their circle around all of it.

Overreached.  That's the whole case.  Overreached.  I
have no doubt that Motorola probably could have pointed to
something in there that's concrete, not known and that is
pretty cool and other people don't have.  But they haven't

12:07:12   done it.  And the reason they haven't done it is because they

5832

1    want to say it took us nine years to develop the whole thing.

2    And they're claiming the whole thing.  And because they claim

3    the whole thing, they haven't claimed a trade secret.

4            And we are going to talk about this in a minute, but

12:07:27    5    there is lots of problems with the trade secret case.  They

6    claimed it too big.

7            Statute of limitations, right.  Now, these things,

8    these are reasons the trade secret case, there should be no

9    misappropriation.  They haven't articulated the trade secrets.

12:07:45    10   They waited 10 years to bring that claim.  It's subject to the

11   statute of limitations.  Even if you decide all those things

12   in Hytera's favor, there is still copyright.  And we'll talk

13   about that in a minute.  But the trade secret claims have real

14   problems.

12:07:58    15           All right.  Let's talk about the last section,

16   codebases.  It's codebase is a word that programmers use, it's

17   like it's the whole chunk of code for a product or the whole

18   chunk of code for one of the chips on a product, right.  It's

19   just saying basically all the code.  It's base of code.

12:08:20    20           All right.  So let's go back for a second, right

21   there.  134 is all DMR code, everything.  136 and 137, that

22   just divides all DMR code into two chunks.

23           You've heard about the OMAP.  It's got a host

24   processor in it and a DSP processor in it.  So two processors

12:08:44    25   on one chip, right?  So that's all the code 134.  And then 136

1 is the half on the host and 137 is the half on the DSP.  So

2 those are completely superfluous.

3    Now let's talk about 142.  142 is all the code on the

4 repeater.  And the repeater is basically you just take the

12:09:05 5 source code for two mobile devices and combine them.  And so

6 it's virtually all the same code.  And in any event, so it

7 largely overlaps with 136 and 137, and all of it fits within

8 134.  They're all included in all the code.

9    What is the point?  How is that a different trade

12:09:27 10 secret?  Okay.  One trade secret is all my source code, and

11 another trade secret is this half and another trade secret is

12 this half.  It makes no sense.  It's just an overreach.  It's

13 just a way to make this look like more than it is.

14    Now, let's go to 188.  So you can see it here, I

12:09:52 15 think you've seen this before.  That's in here.  That's in

16 here.  136, 137, 142, all in 134, right?  And all of these

17 down here, they're all in either that, 136, 137 or 142, and

18 all of it rolls up into 134.

19    So they're just, they're not double dipping, they're

12:10:15 20 triple dipping and quadruple dipping.  And so these guys, they

21 don't add anything.  There is nothing that anybody points to.

22    Here at least they're pointing to the carrier detect

23 or the squelch or the noise suppression or the application

24 layer or ergonomic layer.  Up here there is nothing at all

12:10:36 25 even like that they're pointing to.  It's just all the code.

5834

1        This half the code, that half the code.

2            Okay.  So why is that a problem?  Well, it just

3        exacerbates what we talked about from earlier where you point

4        to a whole feature, because now it includes even more

12:10:55  5   well-known things, even more basic things, even more patented

6        things, even more public things.

7            Well-known.  What Mark Boerger says, turning up the

8        volume, turning on the speaker; pushing the button 5 making

9        the 5 come on the screen; turning on the light on the screen,

12:11:12  10  all those are done by source code.  All those are well-known

11       and can't be trade secrets.

12           Third-party code.  DVSI.  Every DMR radio has

13       third-party code from DVSI.  It's called a vocoder.  It turns

14       analog into digital voice.

12:11:29  15          There is also Mentor Graphics.  That's a third-party

16       operating system Motorola uses and Hytera uses, right.  That's

17       not a trade secret.  That part of the code isn't.  So did

18       Motorola back that out of its all code trade secret?  Nope.

19           What about the DMR patents?  We've seen all, tons of

12:11:47  20  patents that relate to source code coded features.  Motorola

21       has tons of patents.  Let's look at some on the next page.

22       We've seen ones for VOX.  We've seen ones for carrier detect.

23       We've seen ones for squelch.  But guess what else?  There is

24       all kinds of features beyond the ones that you've heard about

12:12:07  25  in this case that are covered by Motorola code, right?

5835

1          We've talked about the reverse channel.  There is

2     hundreds more that are covered by Motorola code.  And Motorola

3     has hundreds of patents on its code, on things related to its

4     code.  But it hasn't backed out any of that, separated any of

12:12:23    5     that out.

6          And we talked about, too, special kinds of patents

7     earlier called standard essential patents.  So Motorola got

8     its DMR technology adopted as a public standard by the ETSI

9     organization, right.  If you have patents on technology that

12:12:40   10     gets adopted as a standard, you have to make them what are

11     called standard essential patents.  You have to declare them,

12     identify them and agree to license them on fair and reasonable

13     terms.

14          You can't just get any amount of money you want for

12:12:55   15     them.  You have to license them on what are called fair and

16     reasonable terms or else your technology won't be adopted as a

17     standard.

18          So Motorola has licensed a bunch of its DMR patents

19     to Hytera and to everybody else in the industry.  Guess what?

12:13:09   20     All that licensed technology is in the code.  It all applies

21     to DMR, and the code does DMR.

22          Now, those patents don't cover everything.  They just

23     cover a part of Motorola's technology that you have to use in

24     order to do DMR.  That's why they're called standard essential

12:13:31   25     patents.  But they are implemented in the code.  And Hytera

5836

1    has the right to use those aspects, those features in

2    Motorola's code, because it's covered by the standard

3    essential patents that Hytera pays for, millions of dollars

4    over the years.

12:13:48    5    So that part of the code Hytera already pays for. Is

6    that backed out, that patented technology that's public and

7    licensed to Hytera? Nope.

8    So, once again, we have our graphic here. And it's

9    just even a bigger problem when you go from the code for one

12:14:10    10   feature to the whole code, all 5 million lines of it. It just

11   includes all kinds of things that can't be a trade secret.

12   All right. And we've heard finally from Russ Lund

13   that when Motorola went to go get a copyright on its code, and

14   it looked at the copyright requirements that say you have to

12:14:33    15   identify your trade secrets in your copyright application in

16   the cover letter, well, Motorola didn't identify any. And he

17   says, "The ones we reviewed, it didn't list any trade secrets

18   on there."

19   That's a requirement to list and they didn't. Now,

12:14:49    20   that doesn't mean that if they have trade secrets in their

21   code they forfeit them, right? That's not the legal impact of

22   that, and that's not what we're saying.

23   What we're saying is - and this is what Motorola told

24   you, look, Motorola's counsel told you in their closing

12:15:05    25   statement - look at what the parties did back in the day as

5837

1   opposed to what their litigation positions are.  And when

2   Motorola submitted its code to the Copyright Office, it didn't

3   think there was anything worth taking the time to identify and

4   call out as specific trade secrets.

12:15:24    5   All right.  Testing and hardware.  There are 24

6   pieces of testing for DMR radios.  The documents that were

7   identified relate to one.  Some of what is in those documents

8   is public.  Some of what is in those documents is not public.

9   Some of it is in the standard, some of it is not.  Motorola

12:15:46   10   hasn't identified exactly what is its trade secret relating to

11   testing.

12   Does it relate to all 24 pieces?  Does it relate to

13   the documents they identified that relate to 1 out of the 24

14   pieces?  And what in those documents, which include public

12:16:00   15   information, information in the standard, what in those

16   documents specifically are the aspects of testing that

17   Motorola claims is a trade secret?  They didn't say.

18   So now hardware.  Motorola has a hardware manual that

19   I think is 532 pages.  It is public, and it lists every single

12:16:27   20   component in their repeater and every component in their

21   mobile, every single component, down to every last chip and

22   all the circuits on it and how it's made.

23   So let's just take a couple of examples, right.  Here

24   is a diagram of one of the chips.  On the next slide we have

12:16:50   25   the theory of operation, the entire theory of operation.  This

5838

1   is a public document.  500 pages listing every single

2   component in the hardware.  So what's the hardware trade

3   secret then?  Motorola hasn't told you.

4        Okay.  All right.  So very quickly, on the policy, so

12:17:19  5   let's go to 209.

6        The policy we think has been a little bit

7   misrepresented.  Again, we're just saying look at what

8   Motorola considered a trade secret back before this lawsuit.

9   It says to mark them.  It gives a presentation -- and this

12:17:36  10  policy, it was pointed out, didn't apply after the '90s or

11  something.  Well, this is a 2004 presentation, right?  And

12  they're still saying they need to be marked.  That's what

13  you've got to do with a trade secret.

14       And when Motorola actually had a trade secret, they

12:17:50  15  followed that policy.  We saw that document.

16       And we also know that Motorola incentivizes its

17  employees to follow the policy, right?  They submit invention

18  disclosures on that last slide, and if they think they've got

19  an invention, they submit that document to the IP committee.

12:18:14  20  The committee decides do we make it a patent or a trade

21  secret.  And if they make it a trade secret, they get paid

22  $1500.

23       So if these guys that came in and testified, if they

24  thought these things were trade secrets, they got paid $1500.

12:18:27  25  Why didn't they identify them back then?

5839

1          Okay.  I'm going to move very quickly through

2     reasonable security measures.

3          THE COURT:  Counsel, can you give us a rough idea of

4     how much more time you need to conclude?

12:18:40    5          MR. CLOERN:  Your Honor, I think I've got about 45

6     minutes.

7          THE COURT:  All right.  Members of the jury, come

8     back in one hour.

9          (Recess at 12:19 p.m. to 1:19 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5840

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3    MOTOROLA SOLUTIONS, INC., and MOTOROLA    ) No. 17 CV 1973
      SOLUTIONS MALAYSIA SDN. BHD,              )
 4                                              )
                   Plaintiffs,                  )
 5    vs.                                       ) Chicago, Illinois
                                                )
 6    HYTERA COMMUNICATIONS CORPORATION, LTD.,  ) February 13, 2020
      HYTERA AMERICA, INC., and HYTERA          )
 7    COMMUNICATIONS AMERICA (WEST), INC.,      )
                                                )
 8                 Defendants.                  ) 1:17 p.m.

 9                        TRIAL - VOLUME 38-B
                       TRANSCRIPT OF PROCEEDINGS
10
                BEFORE THE HONORABLE CHARLES R. NORGLE, SR.
11                             and a jury

12    APPEARANCES:

13    For the Plaintiffs:    KIRKLAND & ELLIS, LLP
                             BY:  MR. ADAM R. ALPER
14                                MR. AKSHAY DEORAS
                                  MR. BRANDON HUGH BROWN
15                           555 California Street
                             Suite 2700
16                           San Francisco, California 94104
                             (415) 439-1400
17
                             KIRKLAND & ELLIS, LLP
18                           BY:  MR. MICHAEL W. DE VRIES
                                  MR. CHRISTOPHER M. LAWLESS
19                           333 South Hope Street
                             Suite 2900
20                           Los Angeles, California 90071
                             (213) 680-8400
21

22
      Court Reporter:        JENNIFER COSTALES, CRR, RMR
23                           Official Court Reporter
                             219 South Dearborn Street, Room 2342
24                           Chicago, Illinois 60604
                             (312) 435-5895
25                           jenny.uscra@yahoo.com
```

5841

```
 1   APPEARANCES:   (Continued)

 2   For the Plaintiffs:     KIRKLAND & ELLIS, LLP
                             BY:  MS. MEGAN MARGARET NEW
 3                           300 North LaSalle Street
                             Chicago, Illinois 60654
 4                           (312) 862-7439

 5                           KIRKLAND & ELLIS, LLP
                             BY:  MS. LESLIE M. SCHMIDT
 6                           601 Lexington Avenue
                             New York, New York 10022
 7                           (212) 446-4763

 8   For the Defendants:     STEPTOE & JOHNSON, LLP
                             BY:   MR. BOYD T. CLOERN
 9                                 MR. SCOTT M. RICHEY
                                   MR. MICHAEL J. ALLAN
10                                 MS. JESSICA ILANA ROTHSCHILD
                                   MS. KASSANDRA MICHELE OFFICER
11                                 MR. BILL TOTH
                             1330 Connecticut Avenue NW
12                           Washington, DC 20036
                             (202) 429-6230
13
                             STEPTOE & JOHNSON, LLP
14                           BY:   MR. DANIEL S. STRINGFIELD
                             227 West Monroe Street
15                           Suite 4700
                             Chicago, Illinois 60606
16                           (312) 577-1300

17

18   ALSO PRESENT:           MR. RUSS LUND and
                             MS. MICHELE NING
19

20

21

22

23

24

25
```

Closing - Cloern

5842

1      (Proceedings in open court.  Jury in)

2           THE COURT:  Good afternoon, members of the jury.

3           Hytera may continue its argument.

4      CLOSING ARGUMENT ON BEHALF OF DEFENDANTS (Resumed)

01:17:12    5           MR. CLOERN:  Okay.  Reasonable security measures.  We

6      heard the term yesterday "victim blaming."  This is not victim

7      blaming.  To have a trade secret, it's literally in the

8      statute itself, you've got to have the things we've talked

9      about, but you've also got to take reasonable measures to

01:17:30   10     protect the secrecy, right.  Trade secrets are fragile things.

11          It's in the statute.  It's part of the law.  It's a

12     legal element.  Motorola has to prove it.  That's why we're

13     talking about it.  It's not about victim blaming.  It's about

14     that's what the law requires.

01:17:45   15          Okay.  Context.  2008, Penang is a mess.  1300

16     security breaches internal Penang 2008.  They do Stop the

17     Leaks program.  You've seen and heard about that.

18          The biggest risk at the top, former and current

19     employees.  Not external threats, not hackers, not burglars.

01:18:14   20     Employees of Motorola, those are the biggest threats.

21          Motorola culture does not support secrecy.  That's

22     what they concluded.  That's 2008.  Mr. Lund went down there

23     to fix it.  That's how big the problem was.

24          What do they think to do about it, right?  And this

01:18:34   25     is right after they had one of their employees walk out with a

Closing - Cloern

5843

1    hard drive full of thousands and thousands of documents, that

2    was in 2007, right.  They didn't catch her.  But once the FBI

3    caught her at the airport, what did Motorola do?  They ran

4    Compass logs and said, Wow, we've got all this evidence of

01:18:55    5    what she stole.  Okay.

6         So what they talk about is we should put in a filter.

7    It's a very simple piece of software, and it detects if

8    anybody downloads more than a hundred documents in a day.  Had

9    they done that, we wouldn't be here.  They would have never

01:19:13    10    made it out the door.  Okay.  That was never implemented.

11         What does Scott Shepard tell us about the security

12    measures on ClearCase?  The source code, the thing that

13    Motorola has said is their, you know, most secret stuff, guess

14    what?  Anybody can have access to it, everybody.  Access was

01:19:32    15    given to everybody.  Not on a need-to-know basis.  Not you,

16    well, work on this part of the source code, so you can have

17    access to these files, but this person can't have access to

18    those files.

19         Sam, Y.T., they had -- they didn't work on

01:19:45    20    everything.  They had limited job responsibilities.  They were

21    given access to the whole code.  That is not at all best

22    practices.

23         All of Motorola's security procedures, they are about

24    external threats, security guards, that sort of thing,

01:20:04    25    external threats, not the internal threats that the Stop the

1    Leaks program concluded was what the real issue is.

2        Okay.  Well, now let's talk about use.  We showed you

3    the chart from Barb Frederiksen-Cross, hundreds or thousands

4    of files are alleged to be the trade secret itself, but the

01:20:26    5    use is but a small fraction.  Again, that's because what

6    they're claiming a trade secret has tons of stuff in it, and

7    that's not proper.

8        Okay.  4 percent of the Hytera's code is copied and 1

9    percent of Motorola's code.  So Hytera's code is about a

01:20:51    10    million lines.  4 percent of it is copied or alleged to be

11    copied.  So Motorola's code is 4 million lines, which

12    translates to about 1 percent of Motorola's code is what is

13    copied from.

14        But not all that 4 percent Hytera agrees with.  Barb

01:21:10    15    Frederiksen-Cross said there is a lot of public code files in

16    there, and she described other aspects.  But ultimately it

17    really boils down to the libraries and some interfaces.

18        So I think she said 2, 3 percent, ultimately 4

19    percent.  It's all sort of at a de minimis level.

01:21:30    20        All right.  So where does this show up?  Protocol

21    stack, connectivity box.  There is no use, that's what Barb

22    Frederiksen-Cross testified to.  None of that code is used.

23        Now, we do see on VOX there is 10 files listed.

24    That's because Motorola includes in its VOX implementation

01:21:53    25    what the equivalent of the DMR DSP library.

Closing - Cloern

5845

1          But the folks who analyzed the code and Professor

2     Wicker didn't tell you any differently, Hytera doesn't use

3     that for VOX.  Hytera has its own separate VOX that it wrote.

4     And none of those files are accused of being copied.  All

01:22:10    5     right.  So those are out.

6          What else is out?  The codebases.  We talked about

7     those.  There is nothing that Motorola points to in their --

8     that isn't included down below.  They're completely

9     duplicative.  No use there.

01:22:26    10          DSP framework.  We went through this with Dr. Wicker.

11    The DSP frameworks are different.  That's number 60.  It's

12    out.

13          Now, it does, the DSP framework does include carrier

14    detect, noise suppression and squelch.  That's part of, you

01:22:43    15    know, we talked about the 30 things that you have to do to

16    process in the DSP framework.  Three of them are accused

17    separately.  Nothing else in there is accused.  There is no

18    more overlap.  So it's out, but we'll still talk about the

19    three parts.

01:22:57    20          So those are all the trade secrets that are there is

21    no any related use.  Why is that?  Well, we look back at Sam's

22    spreadsheet.  He talked with Y.T.  This is their, Sam's

23    private notes, they're just going to use the parts that they

24    need.  And we talked about how that developed yesterday.

01:23:19    25          They made some changes.  FPGA is out.  Added some

Closing - Cloern

5846

1    sort of layers to the architecture for code they already have,

2    they're just reorganizing it, required some more interfaces.

3    They didn't get all of them done in time.  And so they cut

4    corners and used some Motorola code to speed up implementing

01:23:40    5    those changes a few months.

6         Because they already delayed the launch a year, and

7    they come in with great ideas, and they make some changes that

8    requires additional work.  It starts to take too long, right?

9    They say, well, for their own benefit, not for the company's,

01:23:54    10   they don't want to look bad, so they pull some code off the

11   shelf for basic functions and save a few months of work

12   cutting corners.

13        And where did that happen?  So it happens, so noise

14   suppression, all right, that's in DMR DSP library.  Professor

01:24:17    15   Wicker testified, he agrees noise suppression isn't used.

16   It's in the library, but it's not used.  They used the DVSI

17   instead like every DMR radio uses from a third party.  The

18   noise suppression that's in there isn't used.  Okay.  So that

19   one is out.

01:24:31    20        All right.  So what is left?  We've got squelch and

21   carrier detect and DMR DSP library.  But as you can see, the

22   amount -- and this is what Motorola alleges to be copied.

23   Very few files out of the overall implementation.  The same

24   for the L1 Timer and the RFhal library.  That's the second

01:24:49    25   library.

Closing - Cloern

5847

1          Now we've got the ergonomic layer, that's related to
2     the RAF library.  Again, very few files actually alleged to
3     have been copied from.

4          And then there is the application layer.  And, again,
01:25:02  5     all those 109 files, it's just the outline, not the
6     application itself.  So there we go, applications are not
7     copied wholesale, just the template.

8          All right.  Now as to these, these are the additional
9     layers.  And, again, it's just the interfaces.  And even on
01:25:25 10    that OSAL, we've just got one file there.

11          So that is what gets us our 4 percent, the libraries
12    and the additional interfaces for the additional layers.  The
13    other 96 percent Professor Wicker doesn't even accuse of being
14    copied.

01:25:40 15          Now, they take a stab at these other 96 percent.  And
16    one of the documents they say, well, there were some
17    documents.  The other 96 percent isn't directly copied, but
18    there were some documents, and so they tried to infect that
19    other 96 percent.

01:26:03 20          One of those was the RAF Concept document that we see
21    here on the screen.  Ms. Frederiksen-Cross explained that what
22    that RAF Concept document is, it is related to the RAF
23    library.

24          So the RAF library, when Peiyi sends that out, they
01:26:22 25    just get this file and they're supposed to use it.  Well,

Closing - Cloern

5848

01:26:40

01:26:59

01:27:19

01:27:37

01:27:54

1    people have to know what it does, how other code interacts

2    with it.  And that's what that document says.  It says here is

3    how you call functionality out of this library.  That's all it

4    is.  So it doesn't give any benefit beyond taking the library

5    itself, right?  So it's like if someone stole a chain saw and

6    they took the owners manual with it.  It doesn't increase the

7    value.  And it doesn't tell you how to write any code beyond

8    the code that Hytera admits was copied.

9         All right.  The only place where they even make an

10   attempt to get outside that 4 percent, right, is with this

11   document.  They take the ROSAL document, which does have some

12   copied material in it, and they say:  Here, we found a source

13   code file that's not part of what Dr. Wicker alleges to be

14   directly copied.  And we can link it back to this document.

15        So a couple things.  Number one, out of the average

16   of 3500 files, 350 Dr. Wicker points to as having some copied

17   code, that's 3,150 that are left out there.

18        Out of those 3,150 files, they point to 1 that they

19   can relate to a document having some relationship to.

20        And in this one, it's just the comments.  We've

21   talked about the comments.  A portion of the document is

22   included in the comment for the description of the file.

23        But Barb Frederiksen-Cross, she actually looked at

24   that and she said the code itself, not the comment, but the

25   code itself is actually different than even what's described

Closing - Cloern

5849

1        in the document.

2                So, and that's what Professor Wicker agreed, he says:

3                "Putting aside the 350 files you contend contain some

4        amount of directly copied code, that leaves roughly 3,150

01:28:14    5    files that don't contain copied code?

6                "Yes, that's right.

7                "Now, you identified one source code file, related

8        that to the information in Hytera specification?"  That's what

9        we just looked at.

01:28:27    10   He says "Yeah, that's right.

11               "So that's one file?

12               "That's right."

13               That's the only one that they linked any document.

14       And Hytera has -- I mean, Motorola has to prove its case.

01:28:37    15   They have the burden of proof by a preponderance of the

16       evidence.  They can't just come in and say:  Look at these

17       documents.  They are documents that are labeled "Hytera" that

18       Sam or Y.T. or Peiyi cut some information out of a Motorola

19       document and put into a Hytera document.

01:28:53    20               They have to show how that actually got into the code

21       somehow.  And they only did that with one file.  And that one

22       file certainly doesn't take us from 4 percent even to 5

23       percent.  It doesn't move the needle.

24               Okay.  Let's talk about copyright.

01:29:23    25               Actually, before we move off trade secrets, I want to

Closing - Cloern

5850

1    talk about one thing.

2           Can we bring up the respondeat superior instruction,

3    please.

4           Okay.  So the trade secret statute, we looked at it

01:29:44    5    earlier, says "knew" or "should have known."  And what

6    Motorola is likely to tell you when they get up and have their

7    final closing rebuttal remarks is that:  Well, look, all you

8    need to know is that Sam and Y.T. -- if you think there is a

9    trade secret, which is a threshold question, if you think --

01:30:02   10    then because Sam and Y.T. and Peiyi, they, we admit, engaged

11    in this conduct, that means it's misappropriated, and you

12    don't have to think twice about it.  You don't need to think

13    about whether Hytera knew.

14           But we disagree, and you need to look at the

01:30:18   15    respondeat superior instruction.  That's I think some legal

16    terminology.  But looking past the title it says, "A

17    corporation can be liable, that is, responsible for its

18    employees' conduct when the employee is acting within the

19    scope of his or her employment."

01:30:38   20           And then it gives you some bullet points.  And it's

21    an "and" so you have got to find all three, right?

22           "So if the employee's conduct is of a kind he or she

23    is employed to perform or reasonably could be said to have

24    been contemplated as a part of his or her employment."

01:30:59   25           Well, stealing trade secrets was not part of their

Closing - Cloern

5851

1  job, and there has not been any evidence that it is.  And

2  that's what Motorola, they put in a lot of evidence, and there

3  has been days and days and days of testimony here, right,

4  about who knew?  Did folks at Hytera know?  Did folks at

01:31:17  5  Hytera encourage this or whatever.  And we believe we have

6  actually proved the opposite, that they didn't.  So that's a

7  relevant issue and for you to decide, not a foregone

8  conclusion.

9       "Second, the employee's conduct occurs substantially

01:31:32  10  within the authorized time and space limits of his or her

11  employment."

12       But it doesn't.  We've talked about it.  When this

13  information was taken, Sam and Y.T., they're Motorola

14  employees.  That is undisputed.  When they stole it, when they

01:31:49  15  downloaded thousands of documents and put it on a hard drive

16  and walked out the door, they were Motorola employees.

17       And then finally "The employee's conduct is

18  motivated, at least in part, by a purpose to serve the

19  employer."

01:32:04  20       And that's an important factor, too, because -- and

21  we talked about this the first day, right?  G.S., Sam, Y.T.,

22  Professor Sun's prototype is done, they're supposed to

23  commercialize it.  That's what they're supposed to do.  And

24  you heard the testimony, that could have been done by

01:32:19  25  Professor Sun thought quarter 1 of 2009, or Andy Grimmett

Closing - Cloern

5852

01:32:36

01:32:50

01:33:09

01:33:25

01:33:52

1    thought around June or July of 2009.

2         Instead, Sam, G.S., Y.T., they make some changes.

3    They say, We want to make the product a little bit cost a

4    little less so we can make some more money.  We want to put in

5    a little more software architecture, right.  That delays the

6    launch a year.

7         So instead of saying:  You know what, our bad.  We

8    didn't think it was going to take this long.  Maybe it wasn't

9    such a good idea.  Instead of saying that and owning up to it,

10   that this is going to take a few more months than expected,

11   they pull some code out of their briefcase or whatever they

12   brought it in and use it for basic functions, for carrier

13   detect, for squelch, things that have been in radios a long

14   time, things that are in other Hytera radios that the Hytera

15   people have coded before, right.  It was cutting corners, and

16   they did it for their benefit, not the company's.

17        None of them had the authority to say, as a company

18   decision, we're going to steal trade secrets.  There is no

19   board resolution or anything like that.

20        All right.  Let's go back to the slides.  Copyright.

21   Okay.  Let's look at the instruction.  And it says highlighted

22   here, "The test is whether Hytera's work is so similar to

23   Motorola's work that an ordinary reasonable person would

24   conclude that Hytera unlawfully appropriated Motorola's

25   protectable expression by taking material of substance and

Closing - Cloern

5853

1     value."

2            And so that's what you as the members of the jury

3     need to decide.

4            So you've heard a number of times, only 4 percent of

01:34:06   5     Hytera's code is accused of being similar.  But let's talk

6     about Motorola's copyrighted work.

7            Motorola's copyrighted work, we see it here, is 4 to

8     5 million lines of code.  Again, that only implicates less

9     than 1 percent of Motorola's copyrighted work.  So right off

01:34:24   10    the bat we see major differences in the two works.

11           Motorola's code has about 11,000 files in total.

12    And, again, we're talking about 300 or so that are alleged to

13    have been copied from.

14           And Motorola hasn't gone through and pointed out the

01:34:41   15    substance and value of those.  In fact, at trial, Dr. Wicker,

16    he talked about 18, he talked about 18 source code files.  And

17    he admitted that.  That's right there in his testimony.

18           But what we did hear is from Barb Frederiksen-Cross,

19    and she talked about the other 99 percent.  And she says:

01:35:08   20           "Hytera's other 96 percent was written independently.

21    The applications are different.  The services are different."

22           And as to the other aspects of the noncopied parts --

23    or as to the copied parts, "They're very, very simple code.

24    Most of the code is straightforward and the kind of things a

01:35:29   25    programmer learns in their first couple of years of study."

Closing - Cloern

5854

1   And that's consistent with Mr. Grimmett's analysis.

2           Okay.  So let's talk about the rewrite, the redesign

3   that Hytera did starting in June of 2019.

4           There is two issues that Motorola raises, number one,

01:35:47   5   timing; number two, quality.

6           So let's talk about the timing.  The lawsuit is filed

7   in March of 2017.  September 2017, the depositions occur where

8   Y.T. says, yes, these 8 lines of code he's pointed to in the

9   deposition, he says, Yeah, I referenced Moto code on that.  So

01:36:07   10   there is 8 lines of code that become an issue.

11           October 2017, Motorola identifies what are its trade

12   secrets.  It just points to 8,000 documents.

13           January of 2018, it increases that to 20,000

14   documents and says those are its trade secrets.

01:36:27   15           August of 2018, it adds copyright allegations to the

16   complaint.

17           September 2018, for the first time, Motorola says,

18   Here is -- gives us a list of trade secrets like what you are

19   seeing today, VOX or noise suppression or so forth.  But there

01:36:45   20   is not 21.  There is 169.  And they identify 89 source code

21   files they say are copied from.

22           And then in December, they change their trade secrets

23   to 142.  That's December 2018, right, about a year ago.

24           In March, they identify another 80 or so source code

01:37:07   25   files.  But they don't identify which lines they claim are

Closing - Cloern

5855

1    copied.

2         May 2019, they go down to 29 trade secrets.  And

3    these are described, by the way, with about one sentence, just

4    very high-level generic.

01:37:21    5         June 2019, they identify the lines of source code

6    they say are copied for all the hundred -- what are at that

7    time 160 files.

8         And then you've heard about Professor Wicker pulling

9    back then after the expert reports come out in the summer tens

01:37:39   10    of thousands of lines of code that he previously alleged was

11    copied.

12         The point is, it is not possible to redesign a

13    product.  Motorola accused everything in Hytera's product,

14    accused their TETRA products, accused their PDT products,

01:37:56   15    accused their low end, their mid-tier and their high end.

16         Now it is only the mid-tier and the high-end that are

17    accused.  And now we know it is only 4 percent of the code

18    that's accused, at least for direct copying.  And it's still

19    not at all clear to Hytera what is accused of trade secrets.

01:38:15   20    What in that other 96 percent is Hytera supposed to change?

21         We don't know.  And that's why I went through with

22    you in detail, we don't, we don't think that Motorola has

23    said:  Here is what the trade secret is.  Here is the thing

24    that you need to change.

01:38:31   25         Hytera changed the 4 percent of copied code.  As soon

Closing - Cloern

5856

1   as that target stopped moving in June, they immediately

2   rewrote it in a few months.

3        They can't address the trade secrets because, for the

4   reasons that I've stated, don't know what they need to change

01:38:50   5   in their code, if anything.

6        The only thing that Hytera has found that it thinks

7   is a problem are the libraries and the interfaces, the copied

8   code, and that has been changed.  Jim Luo testified to that.

9   And it was changed as soon as he could.

01:39:10   10        So the library code, no one came and challenged that,

11   right.  That's the bulk.  And you know why Motorola hasn't

12   challenged their new library code?  Because there is no old

13   library code.  There was no code for those libraries.

14        Sam Chia, Y.T., Peiyi, they compiled those libraries.

01:39:40   15   They sent them out.  They didn't provide the source code,

16   right?  So when Hytera has to redesign these libraries,

17   they're writing all that code from scratch.

18        So all that is clean, and nobody has come in here to

19   complain about it.  What they did complain about is they

01:39:56   20   pointed to some of the header files, and they pointed to code

21   that was provided with a batch of code in June and said:

22   Look, it's the same.  It hasn't really changed.

23        Well, that's not the updated code.  The updated code

24   for the header files was produced in September, and that they

01:40:10   25   haven't complained about.

Closing - Cloern

5857

1          The last point on this is even the stuff they do
2     point you to, that's what they pointed to in the top in the
3     gray box, all that is in public filings of Motorola when they
4     filed their copyright submissions of the code.

01:40:31    5          These are basic kinds of operators that you use in
6     these products, and that's why they're included below in the
7     copyright filings that are public.  Anybody can use them.

8          And that's the whole problem with not bringing
9     concrete specific claims, is that they're pointing to stuff as
01:40:52   10    a problem that's in the public domain.  They filed it with the
11    Copyright Office and publicized it.  Anybody is allowed to use
12    that.

13         Okay.  Cornerstone 3, statute of limitations.

14         So let's talk about the instruction very quickly.
01:41:15   15    "The DTSA requires Motorola to bring its trade secret claim
16    within three years after the alleged misappropriation was
17    discovered or should have been discovered by the exercise of
18    reasonable diligence."

19         All right.  So we believe that in fact Motorola did
01:41:37   20    discover the claim.  But I want to talk before we leave about
21    "should have been discovered by reasonable diligence."

22         We want you to think about two things, because
23    reasonable diligence, again, that requires context.  What is
24    reasonable diligence in the circumstances?

01:41:56   25         So was Motorola aware of suspicious activities?  We

Closing - Cloern

5858

1    say yes, many times over.  We'll talk about that.

2          But just being aware of suspicions doesn't get it,

3    and that is not Hytera's position.  We're not saying just

4    being aware of suspicions.  What is reasonable diligence,

01:42:15    5    right?  What is reasonable under the circumstances?  How much

6    diligence do you have to do?  How much investigating?

7          Well, it depends.  Did you have a means for

8    discovering the evidence to support your claim?  And they did,

9    the Compass logs.  The Compass logs were always there, were

01:42:31    10   always in Motorola's possession.  They could have looked at

11   them at any time, and they frequently did in these kinds of

12   situations.  So that's what we want you to think about as far

13   as reasonable diligence goes.

14         So we told you we had evidence, summary slides at the

01:42:46    15   beginning and that we would fill them up and we have.

16         Can we put the board up, please.

17         MS. ROTHSCHILD:  Yes.

18         MR. CLOERN:  Thank you.

19         Okay.  So let's review some of the evidence.  And I

01:43:04    20   want to start with what we are going to see is in the top part

21   of this board, top section.

22         First, Motorola knew that G.S. Kok was going to

23   Hytera before he ever started work at Hytera.  They knew it.

24   And Nickie Petratos, head of Motorola's DMR, was informed of

01:43:29    25   G.S. Kok's departure for Hytera.

Closing - Cloern

5859

01:43:52

1       And just look at what Nickie Petratos, just look at

2   what she said about it, right.  She says -- she's the head of

3   PCR at the time.  That is professional and commercial radios,

4   senior management at Motorola.  That's the group that DMR is

5   in as well as other kinds of radios.  She's way up the chain,

6   head of PCR.

7       Upon learning G.S. was leaving for Hytera, she says

8   right in this email to a bunch of folks at Motorola, that "we

9   need to ensure that any confidential knowledge that employees

01:44:07

10  took with them to Hytera is protected."  So she's sounding the

11  warnings, right?

12      Now, in May of 2008, Sam Chia leaves Motorola, and

13  they know that Sam Chia is going to Hytera as well.  And,

14  again, Nickie Petratos, we see another email from her, she's

01:44:26

15  warning people again, right?  "I have warned Stone."  So

16  that's the word she uses, "warnings."

17      So Motorola knew in 2008 that G.S., Sam and others,

18  that they were going to Motorola and she is giving warnings

19  about it.

01:44:41

20      Now, so what else did Nickie Petratos do?  Well, and

21  she's testified, and you heard from her in this case, what

22  does she say?  She says, "In 2010 it was common knowledge that

23  Sam stole the code."  Common knowledge inside Motorola,

24  everybody knew it, that Sam stole the code.

01:45:05

25      We're not just talking about an engineer who might

Closing - Cloern

5860

1  have sit next to him, this is not, right, just some rumor.

2  This is the head of the entire Division of Professional and

3  Commercial Radio.  Common knowledge that Sam stole the code.

4        Now, let's listen again to what she said.  She says

01:45:36  5  it right here on the slide.

6        "Okay.  So it was known in Motorola at the time that

7  Motorola was in software in Hytera's products?

8        "Yes.

9        "It would have been -- it would have been closer,

01:45:53  10  probably, to the end of 2012, beginning of 2011, during that

11  time period, right?"

12        What else did she say?  She testified that Ted

13  Kozlowski, that's another Motorola senior management person

14  who was Nickie Petratos' successor, so Ted Kozlowski takes

01:46:22  15  over Nickie Petratos' job, right?

16        What does she say about Ted Kozlowski?  He goes up to

17  G.S. Kok at the IWCE conference in public and says -- and

18  publicly threatens him and says, "We know you stole the code."

19  Ted Kozlowski, who is the then head of PCR, and says, "We know

01:46:44  20  you stole the code" in public at an industry conference.

21        So they're confident enough to level public

22  accusations at the main industry conference.  And they say

23  they don't know if they checked the Compass logs then because

24  they don't have the data anymore.

01:47:03  25        It's common knowledge that Sam and G.S. and Y.T. took

Closing - Cloern

5861

1    code.

2              So let's turn to what Motorola says when it filed the

3    lawsuit.  This is an internal company memorandum and

4    explaining to Motorola's employees why they filed their

01:47:25    5    lawsuit.

6              Look here at the first bullet.  It says, "Members of

7    both our sales force and product development teams noticed

8    striking similarities between Hytera products and marketing

9    materials," so between the Hytera products and the marketing

01:47:43    10   materials, "and those of Motorola Solutions," right?

11             So striking similarities just in marketing materials

12   and products, that's what they saw.

13             And then it says, "This triggered a comprehensive

14   internal investigation in which we concluded that Hytera is

01:48:00    15   intentionally infringing Moto's intellectual property based on

16   misappropriated trade secrets."

17             All right.  Well, what was that internal

18   investigation?  What did they do?

19             Mr. Lund told us right here in this trial.  They

01:48:16    20   pulled the Compass logs.  That's what they did.  So the

21   reason -- let's look at what they said in 2017.  Why did you

22   file -- why did we file the lawsuit?

23             One, we saw striking similarities in the products and

24   in public literature about the products and then we pulled the

01:48:41    25   Compass logs.

Closing - Cloern

5862

1          Okay.  So we know that they can pull the Compass logs

2     in 2008, '9 and '10.  And guess what else?  They also saw

3     suspicious similarities between Hytera slides and Motorola

4     slides about battery life in 2010.

01:49:00    5          And here is one again in 2010, strikingly similar to

6     ours.  This is Dale Rublaitus talking internally and it says,

7     "Reviewing the Hytera service manuals, striking similarities."

8          Striking similarities existed in 2010.  The Compass

9     logs existed in 2010, right?

01:49:22   10          And let's look at why they filed their lawsuit in

11     2017, because of striking similarities and, according to Russ

12     Lund, the Compass logs.

13          Both of those reasons, that's what they said,

14     striking similarities and Compass logs.  There is nothing that

01:49:38   15     happened in 2015 or '16 or '17, not a single striking

16     similarity they can point to that was new and tipped the

17     balance.  They filed the case on information that they had in

18     2010.  They just didn't do it until 2017.

19          So if we look at the board, what we see is we see at

01:50:03   20     the top, the green part --

21          Your Honor, may I approach just the board?  That's

22     okay.

23          The top green part, that is the knowledge that Hytera

24     employees were going to Motorola.

01:50:19   25          The middle are all of the documents that show

Closing - Cloern

5863

1    suspicions they had.

2          And on the bottom, the green, all of the -- or the

3    blue on the bottom, those are all the times they're pulling

4    Compass logs for other employees that they're checking into.

01:50:32    5          So they had the suspicions, and they're always

6    pulling Compass logs checking on other employees.  They don't

7    check on these though.

8          And why not?  The reason they don't is because, if

9    you look at 2010 right here and back here, there is no money.

01:50:56    10   There is no DMR revenue.  But it goes up and up and up, and

11   that's where they file the lawsuit (indicating).  It's finally

12   worth it.  It wasn't before.

13         Okay.  Fraudulent concealment.  Motorola says that it

14   didn't file lawsuit sooner because Hytera fraudulently

01:51:22    15   concealed.  And they have to prove affirmative acts designed

16   to prevent Motorola from discovering its trade secret

17   misappropriation claims and that Hytera's acts or

18   representations prevented Motorola from discovering its

19   claims.

01:51:37    20         And so they allege that Sam Chia changed some of the

21   source code so that it would be harder to detect.  But that's

22   besides the point.  It's a red herring.  The suspicions they

23   knew about.  The Compass logs, they can't hide those, those

24   are in Motorola's possession, right?

01:51:54    25         So nothing that Sam Chia did prevented Motorola from

Closing - Cloern

5864

1    the suspicions and the Compass logs, which are the two things

2    they used to file this case in 2017 and the two things they

3    already knew about back in 2010.

4         And they try to point that they did an investigation

01:52:13    5    and didn't find anything.  Well, what they said is they found

6    no obvious infringement.  So there were issues.  And it was a

7    preliminary investigation that was not done and never

8    completed, right?  That's right out of the files of the

9    Motorola witnesses, Mr. Stogner.

01:52:30    10         Okay.  Now, why didn't they?  Well, one is the money.

11    We looked at that.  There was no money in the lawsuit back in

12    2010.

13         The other reason though that they didn't file it back

14    in 2010, you heard all the evidence on DMR and dPMR.  Motorola

01:52:44    15    backed DMR, put a lot of money into that standard.  There was

16    a competing, dPMR.  And you've got to get people on the

17    standard.  The other manufacturers have to get on and make DMR

18    products, or if they don't, that technology goes by the

19    wayside.

01:52:57    20         This is a red team document where Motorola says in

21    2009:  We're worried, we're worried that dPMR might become the

22    de facto standard, because we're the only ones pushing DMR,

23    but there are already two manufacturers pushing dPMR.

24         And guess what?  Who weighed in?  Who was the first

01:53:19    25    company to join Motorola on DMR?  Hytera.  Hytera was the

Closing - Cloern

5865

1    first company to join Motorola.

2         They negotiated a license.  They paid for the

3    license.  And the whole time this is going on, 2008, '9, '10,

4    they are negotiating this DMR license.  Motorola doesn't want

01:53:37    5    to upset that apple cart.

6         It believed at the time that its business was better

7    served by keeping Hytera focused on DMR, because if you say:

8    Hey, Hytera, your whole DMR is infected with trade secret

9    information, then they'd just say, Well, we've got a dPMR

01:53:59   10    prototype.  We'll launch dPMR.  And if they do that, then

11   there are no DMR sales.  And maybe the de facto standard today

12   would be dPMR, not DMR.

13        All right.  So what else do we see?  Why does

14   Motorola -- what happens, if there is no new striking

01:54:22   15   similarities in 2016 or '17, what does happen?  Well, what

16   happens is is exactly what you see on this chart.  Hytera is

17   now successful and that's a problem.

18        And what do we see on Motorola's internal documents?

19   "Counter punch.  Hytera is growing, too much Hytera growth.

01:54:50   20   Status quo doesn't work anymore and we have to play unfair. "

21        That's what changed in 2016.  That's why they go to

22   the Compass logs 7 years, 8, 10 years later.

23        Okay.  Damages.

24        We are at the end.

01:55:14   25        Trade secret damages:  Unjust enrichment, lost

Closing - Cloern

5866

1    profits.

2            I'm not going to talk about lost profits.  Motorola

3    didn't talk about it, so we'll focus on unjust enrichment.

4            The DTSA Act, the Federal act and the Illinois act.

01:55:28    5        The Illinois act, that's been limited to just sales

6    in Illinois.  There has been or -- I'm sorry, to just recovery

7    in Illinois.  To recover all damages that occurred in

8    Illinois, right?

9            So Motorola hasn't given a number.  They've focused

01:55:46    10   on the DTSA.  So there has been no evidence about what's in

11   Illinois versus what's in other states.  So I'm not going to

12   -- I'm going to move on from that.

13           Now, under the DTSA, the DTSA is limited to damages

14   occurring after May 11, 2016, enactment date of the statute,

01:56:09    15   right?  So that's what we are going to talk about.

16           So Motorola's damages claims have been evolving.

17   They've changed a couple times over the course of this case.

18   Mr. Malackowski said 311 million in November.  That's on the

19   left.  This last Monday he increased that by 35 million by

01:56:30    20   adding some new products into the case for the mobile devices.

21   And I'll explain why those shouldn't be included later.

22           Just yesterday during closing Motorola set forth an

23   entirely new calculation of damages during its closing

24   arguments.  We didn't have their slides in advance, but we

01:56:50    25   wrote it down, so we're showing it here.

Closing - Cloern

5867

1          This calculation was not provided by their damages

2     experts, Mr. Malackowski or any other sponsoring witness.

3     This is just from Motorola's lawyers.  And so we think that

4     that should not be the basis for your analysis.

01:57:06    5          So the previous slide, it includes the mobile

6     revenue, that 271 million top profits number at the top.  This

7     slide, we've taken the mobile revenue out.  And again we'll

8     explain why that should be disregarded in a minute.

9          So you start with 238 million in profits if you take

01:57:28   10     out that revenue that Mr. Malackowski added on the last day of

11     trial.

12          And this is what Dr. Aron, that's the number she had

13     to work with, because all the mobiles were only added after

14     she was moved off the stand, and this is the number that

01:57:43   15     Dr. Aron had to work with.  And what she explained is that's

16     the total profits, 238.  And you split those into outside the

17     U.S. and inside the U.S.

18          And then she takes off the pre-May 2016 profits, and

19     that gets you to 102 million outside the U.S.

01:58:01   20          Then she takes out 22 million for the R&D.  And we

21     talked about that it's proper to deduct the R&D.  She deducts

22     R&D from the U.S. side.  And her total number then is 96

23     million.  So it's not 350 million.  It's 96 million.  That is

24     the top line number according to Dr. Aron.

01:58:22   25          So even if you think that Hytera could never have

Closing - Cloern

5868

1  launched a DMR product ever, that is the most unjust

2  enrichment that there is.

3       Okay.  So now we've compared Motorola's new numbers

4  provided by their lawyers in closing yesterday to Dr. Aron's.

01:58:48   5  Now, the trade secret calculations are approximately the same

6  once you eliminate the incorrect hypothetical research and

7  development.  And we'll talk about that in a minute.  The

8  hypothetical R&D goes out.  We'll cover that.

9       So under either calculation, the maximum is around 96

01:59:06  10  million.  Once you eliminate the hypothetical R&D and then

11  actually deduct R&D, those numbers come out to the same place.

12  And that's the top line amount for unjust enrichment.

13       And, again, you only get there if you assume Hytera

14  could never launch a radio, and all of its profits should be

01:59:27  15  disgorged.  96 million is the top amount.

16       And when you go back to deliberate, Dr. Aron's slide

17  is in evidence for your reference, that's DDX-22.21.

18       All right.  Hytera's mobile revenue should not be

19  included.  These are the charts that Dr. Wicker and

01:59:48  20  Mr. Malackowski put up when they testified.  Neither one of

21  them include mobiles.  That's MD.  There is no MD on this

22  chart.

23       Mr. Malackowski testified that he wasn't a technical

24  expert.  He agreed with that.  But nevertheless he decided

02:00:08  25  after hearing the testimony of Hytera's own expert, Barb

Closing - Cloern

5869

1    Frederiksen-Cross, that he was going to add in more allegedly

2    infringing products.

3         But then he waffled when he was cross-examined on it,

4    and he said, Well, I was doing it based on what

02:00:22    5    Ms. Frederiksen-Cross said.  Well, maybe I'm doing it based on

6    what Dr. Wicker said.

7         So last minute, these last-minute additions are just

8    not credible.  It's never been accused in this case until the

9    last day.

02:00:35    10        Hypothetical R&D should not be added.  Why?  Three

11    reasons:

12        Double dip on profits.

13        Number two, Motorola miscalculated the amount anyway

14    if you were to think about this economic concept of

02:00:49    15    hypothetical R&D, and

16        Three, it would have occurred in China prior to May

17    2016.  If it were hypothetically incurred, that's when it

18    would have been incurred.

19        All right.  So on the first point, it's a double dip,

02:01:07    20    what did Dr. Aron say?  She told you:  You can't take all the

21    profits from the radios as if you could never produce them,

22    right?  So they want all $96 million in profit as though

23    Hytera never produced a radio.  Hytera can't make a radio,

24    therefore, every single nickel of every profit over the last

02:01:29    25    10 years is unjust enrichment.  That's the theory to get all

Closing - Cloern

5870

1     the profits.

2          If you want to do that, you can't also then charge

3     $73.6 million of avoided R&D as unjust enrichment, because if

4     you would have spent that R&D, then you would have the trade

02:01:50     5     secrets and wouldn't have to disgorge all the profits.  It's a

6     double dip.  You don't get both.

7          The second issue is that Motorola miscalculates.

8     Dr. Aron went through this.  She determined hypothetical R&D

9     was improperly calculated.  Motorola applied incorrect labor

02:02:10     10    rate.  They used the higher Motorola labor rates.

11          Motorola applied very overstated staff months.  They

12    applied 18,400 staff months.  And, again, that's based on

13    these giant trade secrets, right, that are overly large that

14    they pointed to.  That's how they get that 18,000 staff

02:02:31     15    months.  But if you look at the actual Motorola documentation

16    for just the DMR project, they said it would be 7,920 staff

17    months.

18          So when you use those staff months and the actual

19    rate applicable to Hytera in China, you get 12.97 million.

02:02:47     20    That's what Motorola spent to develop DMR, not 73 million, if

21    you use the costs that Hytera would have incurred in China and

22    the accurate amount of hours.

23          Okay.  Hypothetical R&D should not be added.  Another

24    reason is that this -- the story is that Motorola accuses

02:03:13     25    Hytera's first DMR launch in March of 2010, okay.  So March of

Closing - Cloern

5871

1     2010, according to Motorola, these trade secrets are in the

2     products.  So if this R&D would have been spent, it would have

3     been spent in 2008, '9 and '10, because that's when the trade

4     secrets are in the product, in March of 2010, okay.

02:03:33    5          So if it would have been developed, if it would have

6     been spent, that's when it would have been spent.  And that is

7     in China.  And it's prior to May 2016, which means it's not

8     covered by the DTSA.

9          All right.  Hytera's actual R&D costs should be

02:03:50    10    deducted.  Mr. Malackowski agrees R&D should be deducted.

11         Malackowski's only reason not to deduct it are his

12    issues with the data.  He claims the data has changed.  He's

13    wrong.  The actual data is shown on the left.  It never

14    changed.  These are the actual entries by the Hytera R&D

02:04:11    15    engineers.  Rows of that data were removed as accused products

16    fell out of this case.

17         On the right side is what people called the decoder

18    ring.  So those raw entries, people give it, apply it to

19    either the low end, which is not accused, or they apply it to

02:04:32    20    PDT or TETRA, which is not accused, or they apply to mid-tier

21    DMR or high-tier DMR, which are accused, right.  So matching

22    up those work entries with products.

23         And that's what changed, the allocation.  The

24    underlying data never changed.  The allocation changed.

02:04:51    25    Mr. Malackowski admitted that, yeah, that's what he's talking

1   about.

2         So the important thing is it did change, but it

3   changed both ways.  And those hundreds of thousands of

4   entries, some of them were incorrectly allocated, were

02:05:07   5   allocated in split ways because -- and then after the product

6   mix in this case changed, those allocations changed.

7         And some of them, there was more R&D entries were put

8   in to the relevant products and some were taken out.  But

9   those weren't shown.  In the net, the R&D goes down.  So there

02:05:26   10   has been no monkeying with the numbers.

11         And this is what was shown.  Mr. Malackowski agreed

12   that at the end of the day, all of what's in blue is the total

13   data set of R&D.  What's in red is what Dr. Aron used for R&D

14   for the accused products, okay.

02:05:46   15         And Malackowski says:  Look, these are really high

16   and that's weird.  But, again, the reason that those last

17   years are really high is because there is new products and

18   there is products that weren't ever accused -- or that were

19   accused in this case and then were taken out.  That's why the

02:06:04   20   data set in those years is big.  But all that was used are

21   these smaller numbers.

22         Okay.  So there is not a problem with the R&D.  The

23   R&D data is reliable and under Mr. Malackowski's own admission

24   should be deducted.

02:06:20   25         Now, it's way better than Motorola's data because

Closing - Cloern

5873

1    Motorola's data isn't separated out by individual product

2    codes.  You can't even allocate it.

3           Analog, high-tier, low-tier DMR, it's just all lumped

4    together.  It doesn't even have the codes that can be

02:06:39    5    allocated.  And that's why Motorola did not even look at its

6    R&D data when it came up with its development times.  Instead,

7    it just looked back at diaries and notes and sent items in

8    their email box or whatever, looked back at the source code,

9    see who might have been editing something one day and came up

02:07:01    10   with this.  They didn't look at their actual R&D entries.

11          So whose data is more reliable?

12          All right.  Motorola's comparable radio claim.  They

13   both have three tiers.  Malackowski admitted that low tier

14   competes with low tier.

02:07:24    15   All three of Motorola's tiers, low, middle and high

16   tier have the exact same software, exact same software.

17   RO2.10 or later, they've all got the same software.  We've

18   just been talking for hours now that the trade secrets, 19 of

19   the 21, except for testing and hardware, they're in the

02:07:50    20   software.

21          So all of these alleged trade secrets are not what

22   separate the high-tier and mid-tier from the low-tier.

23   They're the basic functions, all of which that are in the

24   low-tier.

02:07:59    25   So what that means is that absolutely Hytera could

Closing - Cloern

5874

1    make a radio, a comparable radio.  Andy Grimmett said they

2    could do it in six months.  Those are the head start

3    scenarios, right.

4         And what did Debra Aron tell you, Dr. Aron?  She

02:08:20    5    said, Damages start whether the benefit from the trade secret

6    begins and ends when independent development could have been

7    completed.  Red light, green light or green light, red light,

8    rather.

9         So this chart, it's DDX-22.26, it's in evidence.

02:08:36    10    You've got it in the jury room.  If you believe that Hytera

11    could have developed a comparable DMR radio, then these are

12    your damages numbers.

13         Mr. Malackowski's numbers are in the third column and

14    Dr. Aron's numbers are in the fourth column.  And if you

02:08:56    15    believe that they had a 3-month or a 6-month or a 1, 2, 3 or

16    4-year delay, these are your numbers.

17         And if you believe there was a delay of more than 4

18    years, but not forever, then it's somewhere between these

19    numbers and the top number of 96 million.

02:09:20    20         We think the right number is the 2.1 million Andy

21    Grimmett number.  He looked at this.  He said that is the

22    benefit that was received from the small amount of code that

23    was used that could have been done along with the testing,

24    anything gleaned from the testing documents and six additional

02:09:42    25    months of work.

Closing - Cloern

5875

1          Okay.  We're almost done.

2          Copyright damages.  Let's look at what

3     Mr. Malackowski said.  He said the copyright analysis is

4     limited to the United States.  And that's his slide, the slide

02:09:54    5     of the U.S.

6          And he said Hytera's profits are $28 million and

7     that's limited to the U.S.  That's what he said.  Every single

8     time he took the stand, $28 million, limited to the U.S.,

9     except Motorola changed that too in their rebuttal case on the

02:10:15   10     last minute.

11          So there is a concept in copyright damages called

12     apportionment.  And that means that if only part of the work

13     is copied, you don't necessarily get the whole value of the

14     whole work or all the profits, but you get to apportion it

02:10:29   15     relative to the value of what was copied.

16          So Hytera's expert said 4 percent.  She looked at the

17     lines of code.  Dr. Wicker admitted that 10 percent of the

18     files were copied, right?  And that's all that's relevant for

19     copyright is just the copied stuff.  This is copyright, not

02:10:51   20     trade secrets; just the copied stuff.

21          Now, Professor Wicker said he didn't really dispute

22     Ms. Frederiksen-Cross's 4 percent number.  But the point is is

23     that Motorola is not entitled to 100 percent of the profits

24     when such a minute amount of the code is copied.  It should be

02:11:15   25     apportioned.

Closing - Cloern

5876

1      Now, here is Motorola's new damages theory.  The

2   problem is is they can't get recovery that they want now under

3   DTSA and they've moved, they've tried to move some of those

4   numbers over to the copyright now at the last minute.

02:11:33   5      So let's look at the instruction.  "You may award

6   Motorola damages under Copyright Act for infringement by

7   Hytera that occurred in the United States."  Right?  And

8   that's what they've always limited their case to until the

9   last day.

02:11:49   10      And Mr. Malackowski didn't even put up a slide the

11   last day.  He just threw in a sentence:  Well, if Motorola is

12   allowed to get outside-the-U.S. damages for copyright, then I

13   think he said it will be $270 million or something like that,

14   which is not even the number they put up yesterday.  The

02:12:07   15   number they put up yesterday is like 139 million.  So it's all

16   over the place.

17      But to get anything outside the U.S., here is what

18   the instruction says.  "You may also award copyright damages

19   for infringing acts outside the United States that were a

02:12:24   20   consequence or result of an initial infringing act by Hytera,

21   by Hytera that occurred inside the United States."

22      So that's what Motorola has to prove to get those

23   outside-the-U.S. damages, to get anything above $28 million as

24   a starting point before apportionment.

02:12:47   25      So here is why they're not entitled to that and here

Closing - Cloern

5877

1   is why they didn't try for it initially, because they can't

2   meet their burden.

3         Sam Chia and Y.T. Kok were Motorola employees when

4   they took the code.  They were based in Penang, Malaysia with

02:13:01   5   no connection to the U.S.  No evidence that Sam Chia or Y.T.

6   Kok downloaded code from servers in Illinois.

7         So it's not even Hytera that did it.  When the

8   initial download happened, it was Motorola employees that did

9   it.  They're the one that took code from somewhere at

02:13:18   10   Motorola, which may have been a server, may have been wherever

11   else they might have had code.  There is no evidence of that,

12   because the ClearCase servers don't have any monitors like the

13   Compass logs do.  So Motorola can't prove where Sam or Y.T.

14   took the code from as Motorola employees, right?

02:13:40   15         Motorola's closing statement, he said:  "All the code

16   is kept on servers in the United States.  And when Y.T. and

17   Sam Chia and the rest of them were accessing the code and

18   pulling it down, it was coming from servers on the United

19   States that then got pulled over into the computers out in

02:13:58   20   Malaysia.  So there is, you know, that is confirmed that they

21   took the code from the United States, and there is copyright

22   infringement."  And that is not true.

23         So you may remember Dr. Wicker got up on rebuttal and

24   he was asked, "Where are the ClearCase servers?"  And he said

02:14:12   25   unequivocally "Illinois," nothing else, "Illinois," the most

Closing - Cloern

5878

1    surest thing he's ever been sure of in his whole life.

2          But then we asked him:

3          "Have you studied the IT systems?

4          "I'm familiar with them; but no, I have not gone into

02:14:29    5    detail."

6          And then he says you "don't know where the data --

7    and let's just assume for a minute that Sam Chia downloaded in

8    2008 source code from ClearCase.  You have no idea what server

9    that download came from?"

02:14:40   10          And he says, "If you are asking me which particular

11    cache or server he connected to obtain it, no, I don't know

12    that."

13          We asked him, we said, "Did you even look at the

14    actual code for the ClearCase system to know how it operates?"

02:14:54   15          Nope, he didn't look at the code, much less the code

16    in 2008 to see how the overall global ClearCase system

17    operated.  He didn't look at it.  He doesn't know.

18          All right.  Motorola has ClearCase servers in

19    Malaysia and China.  And we saw this document.  And what it

02:15:16   20    says, it says there are seven sites in APAC.  That's the Asia

21    Pacific region.  And one of those is the ZMY.  That is the

22    Penang site.

23          "Penang, products, Matrix," right?  That's the DMR

24    code.  "Total storage, 11 terabytes."

02:15:45   25          "Total users in Penang, 400.  Average age, 6 years on

Closing - Cloern

5879

1    the servers, 2.7 on the storage."  They've got the servers

2    there and the storage of the code there.  They're identifying

3    the users that are there in Penang as opposed to the users

4    that are in, for example, Chengdu and using those servers,

02:16:07    5    right?

6              The annual maintenance, 14,900.  In Chengdu, China

7    it's 15,000.

8              The point is each location has their own server for

9    the source code.  And Sam and Y.T., if they got it from the

02:16:22    10   ClearCase server, they took it off the one in Penang.  That's

11   what this document says, clear as a bell, which they didn't

12   even address.

13             Okay.  And then here is another really important

14   point.  They're looking at the Penang and the Chengdu, and

02:16:40    15   they do this for all of the other sites where they've got

16   servers throughout Asia, and they're talking about how they're

17   running.  Are they running slow?  Are they running fast?  Do

18   they get bogged down, right?

19             And what that means is if a server is reacting

02:16:59    20   slowly, then that's causing a problem for the users in that

21   location.

22             If it was all one system and mirrored everywhere, why

23   would they be running differently?  Why would they say, Well,

24   people are having slow in Penang, but they're working just

02:17:14    25   fine in Chengdu.  We need to go fix the Penang servers.

Closing - Cloern

5880

1              It's because it's not one big instantaneous system.

2      It's because the code for DMR was in Penang in 2008 and that's

3      where, if Sam took it from the ClearCase system, he took it

4      from Penang, not from Illinois.

02:17:34    5              Last couple documents.  Right here is a 2006 document

6      saying:  We're going to release the DMR code in 2006, and

7      watch out, because that's going to impact the Penang server.

8              Okay.  This is the last thing.  No exemplary or

9      punitive damages.

02:17:57   10              Now, I just want to take a look for a second at the

11      instruction.

12              "If you find for Motorola on its trade secret claims,

13      you may, but are not required to, assess exemplary damages."

14              The purpose are to punish Hytera for its conduct,

02:18:37   15      Hytera, and to deter Hytera from engaging in similar conduct

16      in the future.

17              "To recover for exemplary damages, you must find that

18      Motorola has proved by a preponderance of evidence that

19      Hytera's acts were willful and malicious."  This is reserved

02:18:58   20      for bad stuff, willful and malicious.  "And you can find that

21      only if" --

22              THE COURT:  All right.  Just a minute.

23              MR. CLOERN:  I'm sorry.

24              THE COURT:  Do not paraphrase.

02:19:08   25              MR. CLOERN:  I won't.

Closing - Cloern

5881

1          THE COURT:  It doesn't say "bad stuff," does it?

2          MR. CLOERN:  Your Honor, I will stick to the exact

3     words of the instruction.

4          THE COURT:  Proceed.

02:19:15   5          MR. CLOERN:  "Malicious or in reckless disregard of

6     Motorola's rights."  And it says "Conduct is malicious if it

7     is accompanied by ill will or spite" - so those are the things

8     you have to think about, ill will or spite - "or done for the

9     purposes of injuring Motorola."

02:19:37  10          So I guess that's what you've got to ask yourself,

11     were Sam and Y.T. and G.S., did they do what they did to

12     injure Motorola?

13          You saw evidence in the case about G.S.'s leaving

14     email.  "I've had a great time.  I enjoyed my time."  He sent

02:19:57  15     it to tons of engineers in the U.S. and in Asia.  They had a

16     party for him.

17          They tried to recruit him back.  The CTO of Motorola

18     tried to recruit him back in 2011.  They even were trying to

19     make up a job for him, strategic something or other, right?

02:20:17  20     You saw Jeff Spaeth testify about that.

21          So it has to be, it's got to "reflect complete

22     indifference to Motorola's rights and not simply that Hytera

23     was aware that the information was a trade secret."  So

24     something more than that, right?  It's got to be spiteful, ill

02:20:39  25     will.

Closing - Cloern

5882

02:20:54

1      Is that what G.S., Sam and Y.T. were doing?  Were

2  they trying to hurt Motorola?  Was their -- right?  Or were

3  they just trying to come in to Hytera and look good, trying to

4  get something done faster than they could otherwise get it

5  done by six months, according to Andy Grimmett, because they

6  got crunched on time.

7      This is not a case, we submit, for punitive damages.

8      Now, here is the last part.  "Exemplary damages may

9  be awarded against an employer because of an act by its

02:21:12

10  employee, but only if you find the employer either authorized

11  the doing" -- we believe there is no evidence of that -- "the

12  employee was unfit and the employer was reckless."

13      These guys concealed what they were doing but they

14  were otherwise successful, competent engineers, but they did

02:21:36

15  conceal that they were using some Motorola documents and code.

16      "The employee was employed in a managerial capacity

17  and acting within the scope of his or her employment."  It is

18  true that G.S. came over as a mid-level manager.  That is

19  true.  That's what Andrew Yuan testified.  He was in charge of

02:21:56

20  just the DMR project.  And that's four levels down from the

21  CEO.  That was from 2008 until about 2011, when he was

22  promoted up the chain and he eventually does become a senior

23  vice-president in the company.  But that's later on, and

24  that's after the misappropriation, the use was put into the

02:22:16

25  initial products launched in 2010.

Closing - Cloern

5883

1          And we do not believe that Mr. Kok was acting within

2    the scope of his employment or authority.  He did not have the

3    authority to bind the company by himself to this kind of

4    action, right?

02:22:37    5          And then the final one is, "The employer or manager

6    ratified or approved the act."  And there is no evidence of

7    that.

8          And there is some guidance here, "In determining

9    whether an employee is acting in a managerial capacity, you

02:22:52   10   should consider the employee's authority and discretion to

11   make the decisions and not only their title."

12         Okay.  Now, if you decide to award punitive damages,

13   there is some guidance on the amount.

14         The reprehensibility of the conduct.  G.S., Sam and

02:23:24   15   Y.T.'s conduct was bad and no one is making excuses for that.

16   But Hytera has bent over backwards in this lawsuit, Hytera

17   found above and beyond what they had to do to restore and

18   produce all the evidence that Motorola bases its whole case

19   on.  That's when Jim Luo found and restored Peiyi's laptop.

02:23:44   20         And Hytera has got new policies now and Hytera has

21   rewritten the 4 percent of the code that's alleged to be

22   copied, and they've rolled it out into the new products.

23         The impact of the conduct on Motorola.

24         Motorola has still got in the radio industry like a

02:24:05   25   70 percent market share.  They're not impacted by this.

Closing - Cloern

5884

1          And the impact initially on Motorola was to help

2     launch the DMR standard.  Again, at the time Motorola was a

3     very different company.  They bet on some technologies for

4     standards that didn't pan out and lost a lot of money, and

02:24:27    5     they needed DMR to work.  And actually Hytera getting on DMR

6     was beneficial to Motorola for a long time.

7          Hytera's financial condition.  And that is the last

8     point that I will trouble you with.

9          You heard Dr. Aron.  Hytera has made $265 million

02:24:49   10     over the last 10 years.  They've had -- their revenues are

11     higher, that's right.  But at the end of the day, what have

12     they made in profits?  What were they able to put in the bank?

13     $265 million over the last 10 years, which you see they

14     reinvest into new businesses, new technologies and so forth.

02:25:10   15          So we do not believe that this is a case for punitive

16     damages.

17          "Did anyone at Hytera tell you to bring the

18     information?

19          "G.S. Kok:  No.  The company was not involved."

02:25:32   20          And I won't belabor it again, but this is the

21     timeline.  You've heard me go through it a couple times with

22     Jim Luo.  That is their response.

23          The only other thing I'm going to address is the

24     email from Sam Chia to Mr. Chen in 2017 after the lawsuit.

02:25:47   25     Sam Chia says "I'm worried about going to jail."  Well, of

Closing - Cloern

5885

1    course he is.  Motorola filed a complaint that accuses Sam

2    Chia of stealing Motorola code and documents.  Of course he's

3    worried about it.  I'd be worried, too, if somebody accused me

4    of that, a big company like Motorola.

02:26:04    5    What does Mr. Chen do?  He hires the lawyers.  And he

6    hires the experts.  He's a witness, and he was deposed.  He

7    can't go mucking around in all this.  He does -- no CEO would.

8    And you didn't see any of Motorola's business

9    executives.  You saw four or five of their engineers.  Not a

02:26:28    10    single business executive came in here to testify about this,

11    why they filed the case when they did, why they didn't file it

12    back in 2010, to address their competitive relationship with

13    Motorola and Hytera.

14    Mr. Chen did what you do, you hire lawyers.  Hytera

02:26:44    15    had never been in U.S. litigation before.  They hired lawyers

16    and experts and let them handle it.

17    And think about this.  The issue is you've got to

18    look at the Motorola code and compare it to the Hytera code.

19    The Hytera people can't do that.  They're not even allowed to

02:26:59    20    see the Motorola documentation.

21    The company acted responsibly and as quickly as they

22    could.

23    All right.  Here is our damages summary.

24    If you think Hytera could never launch a DMR radio,

02:27:12    25    the biggest damages that you should award is 96 million.  We

Closing - Cloern

5886

1    don't think they've come close to proving that.  So if you

2    think it's less, we've talked about the delay scenarios,

3    right, and that's right here (indicating).  We think the best

4    delay scenario is the six-month number from Andy Grimmett.

02:27:33    5    And Dr. Aron said that would amount in 2.1 million of unjust

6    enrichment.

7         And we think the copyright damages, the appropriate

8    amount is the 28 million in the U.S. apportioned to between 1

9    and 2.8 million.

02:27:47    10        And here is what you got in the jury room.  It's been

11    admitted.  DDX-22.26.  If you think Hytera could have been on

12    the market in 3 months, 6 months, 1, 2, 3, 4 years, then these

13    are your numbers.

14        So thank you for your service, keeping an open mind,

02:28:13    15    agreeing to follow the legal instructions and looking at all

16    the evidence.

17        I know you guys are ready to go home.  And we

18    appreciate your sitting here, your thoughtfulness and your

19    consideration.  Thank you.

02:28:29    20        THE COURT:  All right.  We'll take a standup break

21    and then rebuttal.

22        I think everyone wants to know the name of this

23    person.

24        MR. STRINGFIELD:  Jenn Fryer.  She's been remarkable.

02:29:11    25        THE COURT:  She's done a fantastic job, I think we

1    all agree.

2              MR. STRINGFIELD:  We agree, Your Honor.

3              THE COURT:  Please be seated.  Proceed.

4               FINAL ARGUMENT ON BEHALF OF THE PLAINTIFFS

02:29:26    5              MR. ALPER:  Okay.  You are almost there.  It's been a

6    long road, and this is the last speech you are going to have

7    to hear.  And this time I really promise, I am going to keep

8    good on my promises, it's not going to be lengthy.  So we are

9    going to get this done shortly.  The Judge will instruct you

02:30:07   10    and then you'll be off to your deliberations.

11              Okay.  You've heard a lot over the course of the

12    trial.  You've heard a lot from me and our counsel over the

13    last two days.  And you've certainly heard a lot from Hytera.

14              But what you still haven't heard, what none of us has

02:30:31   15    heard is Hytera taking any responsibility for the acts of

16    theft that it committed on Motorola.

17              We heard about prototypes that were never developed

18    into products.  We heard about products that they could have

19    made but never did that didn't use Motorola's trade secrets.

02:30:55   20              We heard about junior engineers who didn't show up in

21    court but they say didn't know anything.

22              We heard about how Motorola doesn't have any trade

23    secrets, that none of the thousands of technical documents

24    we've introduced into evidence or all that source code

02:31:16   25    contains any trade secrets.

Final - Alper

5888

1    And we heard about how Mr. Chen was too busy to come

2  here and testify.

3    But what you haven't heard, despite the admitted use

4  of Motorola's source code in Hytera's products, Hytera say,

02:31:35   5  "We understand that was wrong and we're going to make good on

6  it."

7    And what you certainly have not heard to this day, to

8  this very moment, after all of this, is Hytera say, "We are

9  going to stop selling the products that we are currently

02:31:54  10  offering on the market that have Motorola source code and

11  trade secrets in them."

12    And every day that goes by, we know how much they

13  profit from that.

14    Now, how does Hytera say that they get there?  How do

02:32:10  15  they arrive at this point in the trial after all the proof

16  that you've seen and say that they don't need to apologize,

17  they don't need to make good on it, and that they can continue

18  selling the products that their own witnesses admit have

19  Motorola's confidential information, and you can believe it,

02:32:32  20  trade secrets in them.

21    And the answer is, despite saying it just even here

22  over and over again, that G.S. Kok, the senior managers and

23  executives of their company, G.S. Kok, Sam Chia and Y.T. Kok,

24  who Hytera hired to develop the products at issue, who Hytera

02:32:59  25  promoted over the years while they sold the products

Final - Alper

5889

1   containing Motorola's trade secrets and profited in the order

2   of hundreds of millions of dollars, despite all of that,

3   Hytera says those are the Motorolans and not Hytera, and

4   Hytera shouldn't be responsible.  And that is how they get to

02:33:24   5   not taking responsibility in this case.

6        But as you all know, that is not the right answer.

7   That is not what should be.  When the senior executives of a

8   company commit a harm, a wrong on someone else, that company

9   needs to take responsibility.

02:33:50   10       What kind of a world would we be in if big companies,

11   multi-billion dollar companies could simply say:  Those were

12   the people that came from some other place before they were

13   hired here.  We are the big company and we aren't taking

14   responsibility.

02:34:12   15       That's not right.  That's not justice.  And that is

16   not the way the world works, certainly should work.  And you

17   know what, it's not the law as the Judge will instruct you.

18       And I want to take a very careful look at that,

19   because it is crystal clear in the instructions that the

02:34:32   20   Judge, His Honor is going to give you that that is not right,

21   and that is what this case is, and that is what is a central

22   issue.

23       So let's take a look at that instruction.  This time

24   I am going to use the document camera.  And here it is.  And

02:34:50   25   counsel just showed this to you.

Final - Alper

5890

1          But with all due respect, he said something that is

2     absolutely not correct, and it is a central misunderstanding

3     when it comes to the law of corporations taking responsibility

4     for their employees and in this case the senior-most people.

02:35:08   5          And before I go to the instruction, before I forget,

6     I just have to say this.  We heard G.S. Kok and the others

7     referred to as mid-level managers.  Maybe we have a

8     definitional issue here.  These were the people that Hytera

9     hired - you saw the actual evidence, we proved it - these are

02:35:29  10     the people that Hytera hired to run the entire show.

11          This was the senior-most managers and assistant

12     managers and heads of department.  There is four of them.

13     They are the four heads of the entire thing.  They're not

14     mid-level managers, they're the senior people.

02:35:50  15          And then what about when G.S. Kok, he's a

16     vice-president at the company, I showed you the evidence, we

17     showed you it during the trial, I refreshed you on it

18     yesterday, he is one of the seven senior executives at the

19     company by the time that they go public.

02:36:05  20          Hytera tries to say that that doesn't count.  Why

21     doesn't that count?  They're still selling the products with

22     Motorola source code making hundreds of millions of dollars.

23     They're continuing to commit the theft.

24          What, does the clock run out when you are still

02:36:25  25     selling?  That's part of theft.

Final - Alper

5891

1          No mid-level manager.  He's at the absolute top.  And

2     yet they won't take responsibility.

3          You heard a lot about, I would say, technicalities.

4     And we don't agree with them.  But what is this case about?

02:36:50    5     Think about it.  It's about a company running from

6     responsibility.  Let's take a look at the instruction that the

7     Judge will give you.

8          It says, as you've now seen, this will be the third

9     time, "A corporation can be reliable, that is, responsible for

02:37:10    10    its employees' conduct whenever the employee is acting within

11    the scope of his or her employment."

12         And there is no doubt, this is not in dispute, so

13    everyone will agree about this, that G.S. Kok, Sam Chia, Y.T.

14    Kok and Peiyi Huang for that matter were hired to develop DMR

02:37:31    15    products.  That's what they did.  And the acts of theft,

16    knowing and intentional and malicious theft that they

17    conducted over that period was for the purpose of building

18    those products.  That means what they did was within the scope

19    of their employment.

02:37:49    20         It is incorrect to say that because they stole, that

21    is not within the scope of their employment.

22         As I said yesterday, if they ran a drug ring inside

23    of Hytera, that would not be within the scope of their

24    employment.  That would be something they were not hired to

02:38:11    25    do.

Final - Alper

5892

1          But they stole Motorola's confidential trade secrets

2     and they used them as part of their job to build a product

3     that was then sold for a decade while Hytera is earning the

4     dollars from every one of those sales.

02:38:31     5          And here is where, here is where counsel absolutely

6     got it wrong.  Just because they committed an illegal act does

7     not matter.  And the jury instruction that His Honor will read

8     to you, it says exactly that.  I showed you yesterday.  "An

9     illegal act may still be within the scope of employment, so as

02:38:54    10    to impose liability on the corporation."

11          Why does it say "may."  It says "may" because if it's

12    the drug ring, then that doesn't count.  But if it's in

13    furtherance of the job that they were hired to do, that

14    absolutely counts.

02:39:09    15          Hytera and Mr. Chen in particular have profited for

16    years from this theft, and they truly should be ashamed to

17    suggest that that's not Hytera.

18          The facts are undisputed.  I showed you this slide.

19    This is Mr. Grimmett.  We asked him straight up:

02:39:38    20          "Knowing what the law is and the correct statement of

21    the law is, G.S. Kok, Sam Chia, Y.T. Kok, Peiyi Huang, they

22    were hired to develop Hytera's DMR products?"

23          Flat "Yes."

24          "And when they were using Motorola source code and

02:39:54    25    looking at Motorola confidential documents, they were doing

Final - Alper

5893

1    that in connection with developing Hytera's DMR products?

2         "Yes."

3         They were acting within the scope of their

4    employment.

02:40:05   5         We asked, I didn't show you this one yesterday, but

6    we asked Yu Yang, "Mr. Chia, Mr. Kok and Mr. Kok were the

7    senior executives in charge of DMR?"

8         He says "Yes."

9         "And when Mr. Kok, Mr. Kok and Mr. Chia made a

02:40:17  10    decision about what should happen, that's what Hytera did,

11    right?

12         "At the time for us working as engineers, that's how

13    it works.  We listened to what they said."

14         It does not matter what the junior people in the team

02:40:32  15    knew.  This was the central nerve center of the development.

16         Can you imagine, just imagine if some of the bad

17    companies out there, when the central nerve system of what

18    they were working on of senior executives, they do something

19    wrong and then that is -- and that hurts people, right, can

02:40:56  20    you imagine if it would be okay for you to sanction that

21    company to say, "That was them.  That's not us"?

22         You'll remember this.  His Honor asked right after

23    those I asked of Mr. Yu Yang, "Was the common objective of all

24    these employees to advance the objectives of the corporate

02:41:22  25    employer?"

Final - Alper

5894

1      "Answer:  For all of us working in the company, our

2   common objective, all of us working in the company is to

3   produce a device and make a good device and sell it, and that

4   would be the common objectives for all of us."

02:41:39   5      It is undisputed.  Hytera is trying to run from it.

6   You have not seen them take responsibility in any way

7   whatsoever for the bad acts that they committed.  And I'll get

8   back to punitive damages, but I'll say it right now, if you do

9   not award punitive damages, this company will do it again and

02:41:55  10   again and again.  And every other company will read what they

11   said and say:  We will just blame it on these employees who

12   came from another business and say it's not us.

13      You have the power to make sure that doesn't happen

14   and this never happens again.

02:42:29  15      What about taking the Fifth?  Hytera suggested

16   that the -- now I'm going to say it, former Motorolans --

17   they're not the former Motorolans.  They're the Hyterans.

18   They're the Hyterans.

19      They suggested that when they took the Fifth, that

02:42:53  20   was on their own.  You heard this at the trial.  This was

21   played.

22      "Question" -- Mr. Murphy, by the way, Mr. Murphy was

23   the lawyer that was representing G.S. Kok, Sam Chia and Y.T.

24   Kok at those depositions.

02:43:12  25      "Question:  I understand that Mr. Murphy is

Final - Alper

5895

1    representing you in your personal capacity, separate from the

2    Finnegan lawyers representing Hytera.  Are you personally

3    paying for Mr. Murphy's services?

4            "Answer:  No.

02:43:26  5            "Who is paying for Mr. Murphy's services?

6            "Hytera."

7            Hytera is paying for their lawyers.  And they get up

8    here and they say when they take the Fifth, that they're doing

9    it on their own and that shouldn't be attributable to Hytera?

02:43:45  10           And what about the termination of those individuals.

11   You saw this.  These were the termination agreements.  You'll

12   remember they were terminated at the end of the investigation.

13   And we'll get to the investigation.  But at the end of the

14   investigation, they were terminated in the fall of last year.

02:44:11  15           And look at what the termination agreement says.

16   This is coming from the company that says they were -- had

17   nothing to do with these employees and they shouldn't be

18   responsible.

19           It says that they made Mr. Chia and Y.T. Kok agree,

02:44:28  20   and G.S. Kok too, but I've only put the two on here, "agree

21   not to disclose in any way any information about the ongoing

22   investigation as well as other information that may cause

23   losses to party A."

24           Who do you think party A is?  It's Hytera.  They made

02:44:46  25   them agree on their way out that they wouldn't disclose

Final - Alper

5896

1    anything that would hurt Hytera.  And Hytera now says that

2    these are completely different, and they were clamming up,

3    they wouldn't talk to them.

4         And how did Hytera get them to agree to that?

02:45:04    5         You remember Dr. Rangan.  He showed you.  They paid

6    them.  They paid them hundreds of thousands of dollars.

7         This is an email from Sam Chia to Mr. Chen a month

8    after this lawsuit happened.  He told everyone all of the

9    events that happened.  And he knows there is a risk of going

02:45:47   10    to jail.

11         Mr. Chen is on that email.  And he was too busy to

12    come here to testify?  Is that an act of corporate

13    responsibility?  Is that an act regarding Motorola's rights?

14         I have great confidence that you'll know where to go.

02:46:18   15    Let me touch on a couple of other things.

16         Okay.  Fifth Amendment.  Counsel, this will take 2

17    seconds.  I know you've seen this.  So I'm not going to

18    spend -- I'm not going to actually waste your time any more

19    then.  You've been sitting here for so long, we know, I'm sure

02:46:51   20    you've sacrificed a lot over these several months.

21         You were shown this piece of testimony from G.S. Kok

22    just now.

23         G.S. Kok was asked:

24         "Did anyone at Hytera ask you to obtain Motorola

02:47:06   25    confidential information to build a competing product, either

Final - Alper

5897

1  before you joined Hytera or after you joined?"

2         His answer was "No."

3         And the suggestion is that that must mean that the

4  G.S. Kok, Y.T. Kok and Sam Chia never told anyone at Hytera

02:47:24  5  about the theft.

6         That doesn't matter, right.  Hytera is still

7  responsible, responsible for it all.

8         But it's not even the case.  G.S. Kok didn't download

9  any of the documents.  You saw it.  It was Sam Chia and Y.T.

02:47:46  10  Kok who obtained the documents.

11         When it came to discussing the theft with the senior

12  executives at Hytera, what did G.S. Kok say?

13         "You met" -- the question was, "You met with senior

14  management staff at Hytera and discussed using Motorola's

02:48:06  15  confidential information, isn't that correct?"

16         Did he say "no" that time?  No.  He took the Fifth.

17         What does that allow you to conclude per His Honor's

18  instructions?  That the answer would have been yes.  Can you

19  hold that against Hytera?  Absolutely.  Absolutely.  They were

02:48:29  20  paying for his lawyer who instructed him to take the Fifth.

21         What about Y.T. Kok.  Did he say "no"?

22         This is in September 2017.  Mr. Chen has known about

23  this testimony since September 2017.  And the question was,

24  "The chief executive officer of Hytera in 2008, Mr. Chen, knew

02:48:58  25  that you were downloading hundreds of confidential Motorola

Final - Alper

5898

1   documents in 2008 in order to bring them to Hytera and use

2   them to develop DMR products at Hytera, correct?"

3          Did he say "no"?  His answer, he took the Fifth.

4          Can you conclude the answer would have been "yes"?

02:49:16  5   Absolutely.  Does that mean can you hold that against Hytera?

6   Absolutely and doubly so.  You know what, Mr. Chen was here,

7   he could have come in and denied it, but he never did.

8          What was the excuse?  He was too busy.

9          And I once again trust in you, the jury, to develop

02:49:41  10  an understanding of whether you agree with that.

11         Motorola doesn't have any trade secrets.  Motorola

12  does not have any trade secrets.  Oh, no, Motorola has three

13  trade secrets.  I'm sorry, I misspoke.

14         This seems -- let me see if I can frame the argument.

02:50:04  15  This seems to come down to the concept that Motorola has to

16  limit its trade secrets to a singular algorithm or some

17  specific detail.  But that's not what His Honor's instruction

18  says.  There is absolutely no requirement that we limit

19  Motorola's trade secrets to like one line that I think is,

02:50:30  20  they said, that you could go home and talk about.

21         We showed you the thousands of confidential

22  documents.  You saw them.  You could flip through them, but

23  you know what's in there, page after page, line after line of

24  detail, the thousands of lines and millions of lines of code.

02:50:50  25  There has never been a suggestion that the ones that are at

Final - Alper

5899

1    issue are the ones that have been kept under lock and key at

2    Motorola and they are the engine of what makes the products

3    work, that has propelled the products to the top of the

4    market.

02:51:05    5        There isn't an algorithm in there.  There are

6    thousands of algorithms in there.  There are millions of

7    confidential details.

8        These aren't broad areas of technology.  This is a

9    massive amount of technology that is used by businesses and

02:51:24    10    public service agencies around the world.  Are these trade

11    secrets?  Of course they are.  Are the requirements met?  Of

12    course they are.

13        Is there any obligation whatsoever to put a label on

14    them, to go through the policy of submitting for a bonus at

02:51:47    15    Motorola?  If that's the case, Motorola better hire another

16    300 people in the bonus department, because just the

17    information you've seen alone, can you imagine that world?

18        Let's divert the resources from actually making the

19    trade secret technologies so we can make sure that we have

02:52:10    20    someone writing up bonus applications.  Just not how it works.

21    It's not a legal requirement.  It's a made-up defense and you

22    should reject it wholesale.

23        And here is the thing, this is where we come back to

24    common sense.  As I said, you will be able to, we trust that

02:52:29    25    you'll be able to figure this out.  But sometimes, oftentimes

Final - Alper

5900

1    it comes down to common sense.  If none of these were trade

2    secrets, if all of this was available in public patent

3    applications that were out there in other publications, it was

4    generally known stuff, then why did Hytera steal it?

02:52:49    5    And where is the source code in those patents?  And

6    where are all those diagrams and lines of information about

7    with all the arrows and all of the technical details in those

8    documents?  They're just not there.

9    And if you flip open any of those documents, you can

02:53:08    10    just use your own memories, because I know you saw them here,

11    it doesn't just say, have a box that says "HAL" or "OSAL" or

12    "DSP."  It tells you how to do it.  That's why Hytera stole

13    it.  It's just common sense.  It's also the law.

14    Okay.  And I know I don't need to remind you of this,

02:53:36    15    but lest there be any doubt in this case, remember that this

16    is not a disputed point.  Mr. Grimmett admitted it wholesale.

17    He said that the DMR materials that we've been looking at took

18    a lot of effort to create, they're secret to Motorola and they

19    provide Motorola competitive advantages.

02:53:53    20    They said, they disputed this, their own expert said

21    it, their own expert admitted it on the stand.  It is not a

22    disputed point anymore at that point.  And remember, he knows

23    DMR.  They said it.

24    Okay.  Very briefly on use.  You've sat through, I'm

02:54:17    25    going to now definitely not do a lot here, because you've had

Final - Alper

5901

1    three months of us showing you how much use there has been.

2    But I had to -- I have to respond to the notion that there was

3    only -- let me take a step back.

4              So there is part of this is undisputed.  I think

02:54:38    5    counsel had a slide that showed libraries, application

6    templates and interfaces.  And that, they admit that's copied

7    directly in.  That's the three libraries, the 350 files that

8    are directly copied and so forth.  Right there, that is a lot,

9    all right.  That is definitely a lot.

02:55:01    10   Think of the context for a second.  Let's put this

11   into the real world context.  They've got the whole set of it,

12   and they're choosing to copy some of it.  Do you think that

13   they copied the least valuable stuff directly?  Did they

14   choose to copy the stuff that didn't matter or that they could

02:55:18    15   have easily done themselves?  Of course not.  They picked the

16   stuff to copy that was the absolute cream of the crop.

17             But then we get to the point that obviously the

18   parties take issue with, which is what about all the rest of

19   it?  What about all the rest of the code?  How do they develop

02:55:37    20   the rest of the product?  This is the 96 percent that Hytera

21   still to this day says was independently developed.

22             And what about that?  So, first of all, again, common

23   sense, if they independently develop 96 percent of the

24   product, why did they steal 10,000 documents?  And why are

02:55:57    25   there still 1600 of them on their computers today?  Why did

Final - Alper

5902

1    they rebadge all of those documents from Motorola to Hytera,

2    one after the next?  You'll remember my colleague, I believe

3    it was when Dr. Wicker was up, just as an example

4    demonstrative, he was putting one after the next after the

02:56:18    5    next after the next on the document camera here, the Elmo.

6           Why would they do that if they weren't using it?

7    Common sense, of course they wouldn't.

8           But we even showed you how they did it.  We went in

9    and traced it and showed you how they would take a document,

02:56:39    10   they'd look at it, they would email it around and then they

11   would type it into the source code.

12          And counsel, that's when counsel said there is only

13   one example of one file where that happened.  And that is

14   just -- we have to take issue with it.  You'll have to rely in

02:56:54    15   part here on your memories from the -- you remember Dr. Wicker

16   took the stand way back in the fall?  He was on the stand for

17   a couple of days.  That took a long time.  Your patience was

18   outstanding during that time period.

19          But you know what he was doing?  He was proving the

02:57:09    20   theft, trade secret by trade secret, document by document and

21   showing the files.  He showed 18 different examples of this

22   when he was on the stand.  And that was representative,

23   because we knew that, we didn't want -- look, this has been

24   long enough.

02:57:25    25          But just because they said that, I want to show you,

Final - Alper

5903

1    just because they said that, I'm going to show you so there is

2    no doubt, I'm going to show you one more.

3         This is connectivity.  That's another one of the

4    trade secrets.  Counsel said that this one was one of those

02:57:43    5    ones that everyone knew about.  He said it was what allows the

6    products to plug into a USB port.  We disagree with that

7    description.  But he said that's just a standardized thing,

8    everybody has it on their products, no big deal.

9         Well, if that's the case, why did Hytera take

02:58:00    10   Motorola's confidential connectivity architecture

11   specification and copy it into their common platform

12   architecture?

13        And if you look at these documents, you'll see page

14   after page after page, it's copied, it's copied, it's copied.

02:58:14    15        But it's not only that, what do they do with that

16   document?  It's just another example.  This is an email.  It's

17   from Shen Juan.  You heard testimony, Shen Juan, we asked to

18   depose her.  She refused.  She wouldn't do it in China or

19   anywhere else.  And what is she emailing about?  She's

02:58:45    20   emailing about the connectivity framework.  And she attaches a

21   document and it is this one, the one on the right, the Hytera

22   copied version of Motorola.

23        And she's emailing and she says, "There is a

24   PowerPoint written by Y.T. about CPA connectivity framework."

02:59:05    25   And she's talking about how it is used in the current

Final - Alper

5904

1    platform.

2            Now, the suggestion from Hytera is that, okay, they

3    emailed the documents around, but you can't show it was used

4    in the code.

02:59:15    5    We have shown that over and over and over again.  But

6    as one final example, that Shen Juan, here is Shen Juan, she's

7    the author of this code here.  What is she writing?

8    Connectivity code.  What is she referencing while writing that

9    connectivity code?  Wholesale copied Motorola source code.

02:59:40    10   It is an epidemic at Hytera.  It's not just one file.

11   It's over and over and over again.  When I said that this was

12   one of the most massive technology thefts in technology

13   history, we meant it.  And it's going to be in your hands in

14   just a few minutes.

03:00:07    15   What does Hytera say about this?  You heard it.  I'm

16   not going to belabor it.  They said it again.  They say that

17   this is code that is -- well, I don't have the pie chart, but

18   you've seen it.  This is code that is independently developed.

19   That, taking a Motorola document that has confidential

03:00:38    20   Motorola information, putting it down on your desk and writing

21   up the code at Hytera, they call that independently developed

22   code.  That's how they get to 96 percent.

23           You can see it.  I showed you a different quote

24   yesterday.  Here is another one from Ms. Barbara

03:00:58    25   Frederiksen-Cross.  She had her 96 percent.  She discounted it

Final - Alper

5905

1   down to 94 percent, you remember, when she was on the stand

2   because they took out 2 percent for third-party code.

3         And she was asked:

4         "Somebody using a Motorola document and then writing

03:01:12  5   code, that's in the universe for you of the 94 percent?"

6         She said, "Yeah. That code is within the universe of

7   the 94 percent."

8         What is that percent? That's what they are calling

9   independent development. And as I said yesterday, if that is

03:01:29  10  what they are calling independent development, there is a real

11  problem, because they clearly do not know what it means to

12  independently develop something on your own. That is plain

13  and simple theft. And you need to make sure that they

14  understand it or they will do it again and again and again and

03:01:50  15  hire an expert to come in the door and say it's okay.

16         You have committed three months of your lives to this

17  now. You are the ones.

18         Okay. Badged code, a moment on badged code. They

19  say unbadged code, non-Motorola badged code means it's okay.

03:02:29  20  That is clearly not the case. That is badged code, badged

21  Motorola code, unbadged Motorola code, that's still Motorola

22  code and they're using it.

23         But what about when it comes to how or what people

24  there knew. Again, it doesn't matter. The senior executives,

03:02:47  25  the nervous system of the company, the people who were -- how

Final - Alper

5906

1    many people do you need to be responsible for a theft for a

2    bad act for the company to be responsible?  I covered that.

3    I'm not going to go back to it.

4         But, but what about the rest of them?  They say

03:03:03    5    nobody knew.  They said there were three errors.   I've got to

6    comment on this.  Three errors.  Remember, they talked about

7    the three documents, just now three errors.  Errors in what?

8    Errors in not perpetrating the perfect theft?  They say there

9    are three errors that let Motorola slip out to these other

03:03:24    10   people, as if it was like a typo, like a clerical blip.

11        That's not a typo or a clerical blip.  Those are the

12   clues to the theft that they didn't clean up.  But it's more

13   than three errors.  What about all the other ones, the Neo

14   document and the, you know, the Yang Shuang Feng putting the

03:03:53    15   code on the server, central server and all the other ones.

16   It's not three.  It's a bunch.  And they just didn't clean

17   them up.

18        But this one I wanted to make a point on because we

19   saw this happening.  It just defies common sense.

03:04:07    20        So this is Motorola badged code.  If I could zoom in,

21   you can kind of see it.  It's got the Motorola logo on the

22   top.

23        And then this is Hytera badged code.  And it's got

24   the Hytera logo on the top.  It says "Copyright Hytera."  "All

03:04:24    25   rights reserved.  Hytera" in real big letters and everything.

1          This is unbadged code.  It doesn't say "Hytera."

2     This is the actual what they're calling unbadged code.  It

3     doesn't say "Hytera" on it.  It doesn't say "Motorola" on it.

4     But it doesn't say "Hytera" on it.

03:04:42    5          So you're an engineer at Hytera.  These three people

6     from Motorola come in the door, and they're appointed to be

7     the head of the group, senior executives.  The CTO says:

8     Listen to them.  The CEO says:  Listen to them.  They are the,

9     you saw the document, the cadres, appointed as the cadres.

03:05:04   10     That means senior leaders, as I know you know.

11          And they come in and suddenly they hand off like

12     right then just a bunch of code, right.  Now, it may have been

13     badged as Motorola.  They deleted a lot -- all of it, you

14     know, a lot of it, at least what was handed over.

03:05:24   15          Not all of it.  We saw some that said "Motorola" on

16     it.  It may have not been badged as Motorola.  But of course

17     it came from Motorola.  Where else could it have come from?

18     And here is the thing, if you are an engineer at Hytera and

19     you get a bunch of code that looks like this, do you think it

03:05:45   20     came from Hytera?  That's not what Hytera code looks like.

21     Hytera code looks like this.  It says "Hytera" on it.

22          They came in the door.  They handed off a bunch of

23     code.  They said tweak a few of these inexplicably.

24     Transplant the code.  Tweak a few letters to turn them into

03:06:07   25     these other names.  We know that was for the concealment now.

Final - Alper

5908

1      And it doesn't have anyone's name on this code.

2           Of course they knew.  How could they not?  Or at a

3      minimum, that's in reckless disregard of someone's rights.

4      And the only one's rights that it could have been is where

03:06:25    5      those folks came from, which was Motorola.

6           All right.  Very briefly, document destruction.  Here

7      is the instruction.  I have to point this out so you have the

8      right law.

9           Counsel focused on this phrase here, said that it had

03:06:53    10     to be in anticipation of litigation.  It actually says "In

11     anticipation of or during the conduct of litigation."

12          So some of the destruction we think did happen during

13     the litigation.  But let's focus on the stuff that happened

14     before, like the loss of Sam Chia's laptop, some of the other

03:07:10    15     destruction you've seen.  And there is a lot of it, there is

16     no dispute about that, there is a lot of it.

17          So what does this mean, "In anticipation of

18     litigation"?  That means it doesn't have to be during a

19     pending litigation.  That means that you are anticipating that

03:07:23    20     a litigation might occur.

21          And the suggestion was because it was before the

22     lawsuit, it couldn't have been in anticipation of litigation.

23     But if that was true, why way back in 2008 was G.S. Kok

24     talking about doing things with the software to protect the

03:07:43    25     company from impending lawsuits?  He knew that if they were

1    caught the day would come, the day would come where they would

2    be in court for trade secret theft.

3         And you know what they did?  They tried to cover up

4    their tracks by concealing the theft, and you know it, you've

03:08:08    5    seen it, destroying the evidence.  Is that in anticipation of

6    litigation?  Of course it is.  We've shown you the hard

7    evidence of it.

8         What does that mean?  That means that they had 10,000

9    documents, more than 10,000 documents, they admitted it,

03:08:26    10   Mr. Grimmett admitted it, that they took over to Hytera.  They

11   only have 1600 or so now.  It means that they destroyed them.

12   We know why they did it.  It was to hide their theft.  You

13   think it was just the technical documents?  You can believe it

14   was the emails.

03:08:43    15        Counsel said, remember the testing document, the

16   testing conformance document, he said the Motorola version was

17   on Sam Chia's computer and the Hytera version was on Jue

18   Liang's computer.  What didn't we see over the course of this

19   case?  We didn't see an email from one to the next of how

03:09:00    20   that, how the documents got between them.

21        Of course they destroyed it.  This was a coverup job.

22   It was because they knew that they could get sued and they

23   destroyed this in bad faith.

24        Okay.  And by the way, well, by the way, the people

03:09:26    25   who are destroying these materials are, again, the senior

Final - Alper

5910

1    managers of the company.

2         Let's talk about the statute of limitations for just

3    a moment.  As I said yesterday, and let's just bring it back

4    to the facts that really aren't disputed, this is Hytera's

03:09:48    5    excuse for why they should get away with it all, because they

6    concealed their theft for many years.

7         But all you need to do when it comes to this is look

8    at what Hytera alleges and then compare that to the jury

9    instruction on this, His Honor's instruction.  Here is their

03:10:02    10   case.  They tried -- I think I tried -- I thought I heard just

11   one little thing about how it was common knowledge at Motorola

12   that there was a theft.  There is zero evidence of that, zero

13   evidence.  Not even does suspicion say anything about taking

14   thousands of documents.

03:10:21    15        And so what do they say?  They say Motorola had

16   suspicions.  This is, by the way, I'm sorry, I should give you

17   context, this is Hytera's slide from their opening statement.

18        What does His Honor's jury instruction, before we

19   even get to the concealment, you will be instructed that

03:10:39    20   "Concerns and suspicions do not start the clock of the statute

21   of limitations."

22        That means everything that was on that board, it

23   doesn't start the clock as a matter of law.  And it shouldn't

24   in this case, it shouldn't.

03:10:55    25        But before I talk about that, this is from the

1    opening statement.  Just in case there is any mistake that

2    their position isn't about suspicions, this is their opening

3    statement.  What do they talk about?  A whole bunch of

4    suspicions.  There are a number of suspicions.  Motorola's

03:11:12    5    suspicions.

6            What is the evidence going to show?  What were they

7    going to prove?  That there were suspicions, they knew about

8    the suspicions.

9            What is His Honor going to instruct you?  "Suspicions

03:11:32    10    do not start the clock."

11           On that basis alone you can check the box "no" on

12    statute of limitations.  That's their whole case.

13           But it is the right thing to do here, because every

14    time something cropped up, I showed you this yesterday,

03:11:52    15    Motorola investigated it and, because of the concealment, were

16    unable to conclude that there was an issue.  And that's not

17    Motorola's fault.  That was by design.

18           You've seen the evidence.  I just showed you that

19    G.S. Kok email that I just showed you about impending

03:12:06    20    lawsuits.  That's where they say they are going to rewrite the

21    software in order to fool Motorola to conceal their theft.

22           We've shown you the hard evidence in the code about

23    how they tweaked the code.  We've shown you how they decided.

24    They could have copied the whole thing.  Remember that email

03:12:23    25    with the three choices or the task sheet with the three

Final - Alper

5912

1  choices?  They could have just copied the entire code.

2  Instead what they did was they chose to take the architecture

3  documents and write some of it themselves.  That's by design.

4  That's to throw Motorola off on the theft.

03:12:35  5  Does that mean that it's not a theft?  Of course it's

6  still a theft.  It's using Motorola's confidential

7  information.

8  So Motorola investigated this over and over and

9  ultimately was unable to see the theft.  And so what did we

03:12:53  10  hear today?  Nothing that should change that.  There was just

11  a couple things that I will point out to you.

12  I want to talk about Nickie Petratos.  You saw her by

13  video.  And I want to take that head on.  So two things that

14  they showed you from Ms. Petratos, an email and then some

03:13:12  15  testimony of hers.

16  Here is the email.  On January 31, 2008, she says she

17  wants to ensure that any confidential knowledge that employees

18  took with them to Hytera is protected.

19  That's confidential knowledge.  Where is the email

03:13:31  20  that says "I want to make sure that they don't steal thousands

21  and thousands of documents and the entirety of the code?"

22  You saw the testimony.  They walked out the door.

23  And what this means is that they wanted to go and patent

24  certain things to make sure that they had patent protection on

03:13:48  25  certain of their inventions.  It's a perfectly permissible way

Final - Alper

5913

1    to protect their IP.  But none of it rises above, even giving

2    them the benefit of the doubt, a suspicion.  And it's not

3    about the documents.

4           What about her testimony?  You saw clips of it.  And

03:14:09    5    I think counsel said that it was commonly known at Motorola

6    that Sam Chia stole the code.

7           That is not at all what Ms. Petratos said in her

8    deposition.  And this is important.  What she said was that

9    she heard about this, but it was based on guesses and

03:14:44    10    speculation and not facts.

11           Look at the testimony.

12           "Was there an understanding as to how Hytera obtained

13    source code?"

14           "Engineers were speculating.  There was no -- I do

03:14:56    15    not -- as far as I know, I don't remember hearing any

16    specifics, any facts.  It was speculation, you know, guessing,

17    editorials."

18           Again, they were not based on any facts.  They were

19    just commenting.

03:15:12    20           Is that enough to file a lawsuit?  Of course not.  Is

21    that at best a suspicion?  Well, if it is, as His Honor will

22    instruct you, that doesn't count.

23           And you know what, did Motorola just sit on their

24    hands?  Of course not.  I showed you, we proved it time after

03:15:36    25    time, every one of those things that are on that big

Final - Alper

5914

1    billboard, they looked into it, including the one that is not

2    on the board.  And that was the specific analysis into

3    Hytera's code, the specific analysis into Hytera's code that

4    Motorola performed.  This has not -- we've seen multiple

03:16:01    5    iterations of that timeline.  This has never appeared on it.

6    And you want to know why?  Because this is Motorola doing

7    everything that it possibly could to find out whether they

8    stole.

9            And it wasn't good enough.  And you want to know why?

03:16:15    10   Or it didn't lead to a conclusion, rather.  It was good

11   enough.  It didn't lead to a conclusion that there was a theft

12   because Hytera was concealing it, and that's undisputed.  And

13   as the Judge will instruct you, that concealment stops the

14   clock as well.

03:16:29    15           Lastly, you saw there was this -- sorry, there was

16   this, the reference to the battery life chart.  In their

17   closing they said there is suspicious similarities, so why

18   didn't they check the Compass logs?  That one is easy.  It was

19   public.  It was public.  How do they know it was public?

03:17:10    20   Because the people on all the battery life emails, they were

21   at the presentation where it was made public.  I showed you

22   that.  They looked at it.  They investigated it.  They cared.

23           Stop the Leaks.  Stop the Leaks isn't Motorola

24   ignoring the problem.  It's Motorola trying to do something

03:17:26    25   about the problem.

Final - Alper

5915

1    And for this reason, are we going to allow Hytera,

2    are you going to allow Hytera to get away with it all?  That's

3    your decision to make.  But we believe strongly that the

4    answer should be "no" on statute of limitations.  It's not

03:17:45    5    supported by the facts.

6    The Judge is going to, as he's going to give you the

7    law, it is absolutely not supported by the law, and it just is

8    not what is fair and right in this case.

9    Okay.  I'm almost done.  Investigation.  Sorry.  They

03:18:04    10    said that they performed an extensive investigation.  A couple

11    of things.  I think the suggestion has been that Motorola

12    should have told Hytera what it stole sooner.

13    Why should Motorola have to tell Hytera what Hytera

14    stole from Motorola, particularly when everyone on their side

03:18:24    15    from at least the filing of this lawsuit knew what was stolen?

16    That is blaming the victim, plain and simple.  The

17    fact that there are a larger number of trade secrets in this

18    case before this trial, you know why that was, because if we

19    had 142 trade secrets in a trade secret trial, would we be

03:18:46    20    closing today?

21    As parties always do, you pick the stuff to present

22    to make a reasonable trial, and that's what happened here.

23    It was not -- Hytera knew.  And if there was any

24    doubt about it, I showed you the pieces of evidence showing

03:19:07    25    you this yesterday.  But there is one that I want to focus on.

1    I showed you.  Well, you saw it, Professor Sun.  He took the

2    stand.  He said he knew in 2017 enough that he would have

3    stopped selling the products.  But it wasn't his call.

4                But remember this one.  The prior law firm that

03:19:25   5    Hytera fired told them in the summer of 2018 exactly what they

6    needed to do.  And they didn't do anything until June 2019.

7    And their reason is that Motorola didn't tell them what they

8    needed to do.

9                You've seen the evidence.  We disagree with that, by

03:19:49  10    the way.  There is a whole court process.  We've been

11    litigating for three years.  We've told them exactly what they

12    needed to do.  We told them in the original complaint.  We

13    told them in disclosures after that and so forth.  Of course,

14    this is a lawsuit.  There are rules of civil procedures that

03:20:05  15    govern that.

16                Motorola told them what they needed to do.  Professor

17    Sun and their executives told them what they needed to do.

18    Sam Chia told Mr. Chen about the problem a month after the

19    litigation.  And their own former lawyers told them what they

03:20:21  20    needed to do.  And to this day, they still won't listen.  They

21    won't listen to anyone.

22                But they have to listen to you.  They have to listen

23    to you.

24                Let's talk about damages, by the way, very briefly

03:20:50  25    before damages and then I'm done.

Final - Alper

5917

1        Here is the verdict form.  There is an issue on the
2   verdict form I didn't touch on yesterday.  Counsel touched on
3   it.  You are going to be asked a question about which of the
4   Hytera defendants are liable in this case.  And clearly this
03:21:11   5   is Hytera Communications Corporation, that's the parent.
6   That's the Chinese entity.  Clearly they're liable.

7        By the way, when you see the verdict form, I showed
8   you some pieces of it yesterday, there are going to be
9   separate questions for trade secret misappropriation,
03:21:26  10   copyright and so forth.

11        We believe you'll arrive at the just decision that
12   you'll arrive at, but we believe you should check "yes" on
13   all, put "yes" on all of those.  I'm not going to show you
14   those in the interest of time.

03:21:36  15        I did want to show you this one because it's an issue
16   that wasn't given much attention over the course of the case
17   by the defendants, but they did raise it during their closing,
18   so I wanted to mention it.

19        So this is the Chinese entity.  That's, you know,
03:21:50  20   Mr. Chen is sitting on the top of that one.

21        Then you have Hytera America and Hytera
22   Communications America.  Those are the U.S. entities.  They're
23   responsible for sales in the United States.

24        Mr. Yuan, he's the president of that organization of
03:22:03  25   I think Hytera America.  He was a senior executive at the

Final - Alper

5918

1    other one.  You have to check "yes" for both of those as well.

2         First of all, they're involved.  They sell the

3    products and have been selling for years the products with

4    Motorola's trade secrets in them.

03:22:17    5         Did they know about them?  They certainly knew about

6    it after the lawsuit.

7         Mr. Yuan, he's been there for a long time, kept on

8    selling, and he admitted that.  He said that on the stand,

9    that he was aware that the code -- he was yet another one of

03:22:32    10   the witnesses who said, Yeah, we're aware of the Motorola

11   code.

12        So both, as you could say, as a subsidiary or an

13   agent of Hytera China, and in their own right as being led by

14   a person who knows that he's selling products with the code in

03:22:48    15   it, that is a "yes" for both of those as well.  And that's a

16   pretty easy decision to make.

17        Okay.  Damages.

18        I'm not going to dwell too much on this because

19   you've seen it from me and then you saw it from them.  I want

03:23:07    20   to make sure you know the numbers.

21        So here is what I put up yesterday.  As I said, His

22   Honor provided some guidance after Mr. Malackowski took the

23   stand.  This is completely consistent with Mr. Malackowski's

24   charts that he put into evidence.  It just changes, really

03:23:25    25   it's more of a timing change, but it changes the buckets that

Final - Alper

5919

1   the damages go into, and that's why we've listed it here.

2        As I mentioned yesterday, the Defend Trade Secrets

3   Act, it started in, it was enacted in May 11, 2017.

4        THE COURT:  '16, counsel?

03:23:42   5        MR. ALPER:  I'm sorry, 2016.  Thank you, Your Honor.

6        It was enacted on May 11, 2016.  So we are not asking

7   for Defend Trade Secrets Act damages prior to that date.  We

8   don't want you to give those to us.

9        And so that leads to a total of 135.8 million in

03:23:59   10  Hytera's profits.

11       The R&D amount that we've talked about, I'll touch on

12  it in a minute, is 73.6 million, for a total of 209.4 million.

13  And the copyright amount is 136.3 million for that same total,

14  345.7 million.

03:24:17   15       And, you know, I think the biggest issue, I can just

16  put my finger on the biggest issue between the parties when it

17  comes to differences in the numbers, it is this head start

18  concept.  You saw it.  It was a huge theme for Hytera.  They

19  put on many, many witnesses about the Professor Sun's work,

03:24:37   20  the prototype, the development times, all of that.  This was

21  all, as counsel said, it was a function of damages as it turns

22  out.

23       And it really is a very simple concept, frankly, for

24  us I think to wrap all of our heads around, because it comes

03:24:57   25  down to this.  Their argument is that in the hypothetical

Final - Alper

5920

1    world that never happened, Hytera could have developed a

2    product according to them six months, we disagree.  And

3    because they could have developed a product, they get to keep

4    all of the damages and revenues and profits that they actually

03:25:16    5    made from selling Motorola's trade secrets.

6            That is absolutely not right.  That is definitely not

7    right.  All it would do, if that was -- it's not the law.  I

8    am going to show you that in a minute.  But if that was the

9    right result, all it would do is encourage companies like

03:25:37    10    Hytera to just do it over and over again.  But here is the

11    thing, because they'd just do it again and potentially keep

12    all of what they stole.

13            So here is this.  Here is -- but, as His Honor will

14    instruct you, it's not the law.  This is the jury instruction

03:25:56    15    on unjust enrichment.  It's the applicable instruction here.

16    It's six lines long.  You will not see a single thing about

17    head start.  You will not see a single thing about deducting

18    based on what Hytera could have developed.

19            All you will see is that unjust enrichment is the

03:26:16    20    amount Hytera benefited as the result of any misappropriation.

21    And the only other thing that it says is that to the extent it

22    exceeds Motorola's actual loss, and what that means is that,

23    as I said yesterday, if you award lost profits to Motorola,

24    then the unjust enrichment is on top of that, no double

03:26:39    25    counting.

Final - Alper

5921

1          And I said since if you award Motorola its full
2    amount of unjust enrichment damages, you don't even have to
3    think about lost profits.

4          This certainly has nothing to do with what they could
03:26:55   5    have done and so they can keep all the profits that they made
6    from selling Motorola's trade secrets definitively.

7          The rest of it you've heard a lot about.  I'm not
8    going to dwell on it.  I think you will, I'm confident that
9    you will reach the right result, including with respect to the
03:27:16  10    R&D savings that they saved that the law says that Motorola
11    gets as damages because they didn't have to incur them because
12    they stole them.

13          All right.  Final thing, punitive damages.  I got
14    ahead of myself a little bit earlier in my remarks here.  So
03:27:37  15    I'm going to keep this brief.  I've said I think what I've
16    wanted to say in large part about it.

17          Punitive damages are absolutely appropriate here.
18    They are not taking responsibility.  They haven't even to this
19    point.  They won't stop selling the products that have
03:27:58  20    Motorola's code in it.  And here is the thing.  If you do not
21    send them and every other company thinking about this, doing
22    this a signal, they won't stop.

23          Let me use an analogy.  Imagine if a jewel thief
24    comes in and steals your heirloom jewels.  If the only penalty
03:28:20  25    was that they had to give some part of that or maybe all of it

Final - Alper

5922

1   back if they were caught, would they ever be deterred from not

2   doing it again?

3           It is simple common sense.  It doesn't change when

4   you are dealing with a giant company that makes billions of

03:28:41   5   dollars, particularly when the head of that company owns 51

6   percent of it and wouldn't step foot in this courtroom to face

7   you.

8           If you let them off, they will assume that that means

9   they can do it again.  And you know what, they will over and

03:29:03   10   over, and so will a lot of other bad companies out there.  And

11   I showed you the jury instruction on this.  Punitive damages

12   are not only to deter Hytera's conduct, it's your power to

13   make sure that this kind of thing stops happening in this

14   world today.  And you know, you know it's happening.

03:29:27   15           Were they acting in a willful and malicious way in

16   disregard of Motorola's rights?  Of course they were.

17           They admit that Mr. Kok, Mr. Kok and Mr. Chia were

18   acting maliciously.  They stole from Motorola.  They were the

19   heads of the group.  They profited greatly.  There is no,

03:29:58   20   absolutely no argument that Hytera is not responsible for

21   that.

22           I already covered one of their arguments that Hytera,

23   it wasn't in the scope of their employment.  The other one

24   they said was even more stunning, even more stunning.  They

03:30:19   25   said Mr. Kok and Mr. Kok and Mr. Chia were Motorola employees

Final - Alper

5923

1    when they committed the theft, and so this was Motorola

2    stealing from Motorola, and as a result Hytera shouldn't be

3    responsible.  They were Motorola employees when the theft

4    occurred and so we aren't responsible.

03:30:45    5    What are the problems with that?  First of all,

6    completely untrue in view of the facts.  You know Y.T. Kok, he

7    was a double agent.  He was a Hytera employee when he was

8    stealing all that code and documents, and it was at Hytera's

9    direction.

03:31:03    10    You saw that Mr. Chia, Mr. Kok and Mr. Kok, they met

11    at Hytera in early 2008 before all the theft occurred or

12    before all the downloads and the rest of the theft began

13    happening.  Mr. G.S. Kok had already kind of, he had already

14    gotten going.  And so of course this was Hytera.  It was at

03:31:21    15    their direction.  They were already employed.  They were

16    already senior executives when it was happening.

17    But then beyond that, what about all the other years?

18    Every one of those sales, every one of those products to roll

19    off the line has Motorola's code in it.  That's a theft.

03:31:36    20    That's an ongoing theft.

21    Were they acting within the scope of their

22    employment?  Of course they were.  We proved that.

23    Were they Hytera employees at the time, managers,

24    just as the jury instruction says?  Without a doubt.  And to

03:31:55    25    suggest otherwise is, once again, just not taking

Final - Alper

5924

1    responsibility.

2         How much more do you need to hear to understand that

3    if you don't award punitive damages, they will think that they

4    can just get away with this?  They are basically waving a flag

03:32:17   5    in front of you that this is their party line.

6         Okay.  Then after that, giving them the benefit of

7    the doubt, after this lawsuit they clearly knew.  They kept

8    selling.  They put up this bogus investigation.  Their lawyers

9    told them, we did, everyone in the world told them they are

03:32:37   10   doing wrong.  And here today they are still selling.

11        And you know what, Mr. Chen, he has not accepted

12   responsibility.  Whatever he's doing, too busy to come in here

13   and talk to you, too busy with his company, he has not

14   accepted responsibility.  He doesn't want to face you.  You

03:32:54   15   have to make them listen.

16        When it comes to disregarding rights, this is the

17   poster child for a company disregarding rights.  They have --

18   and this is my final comment.  They have blatantly disregarded

19   Motorola's rights, both through their executives and managers

03:33:10   20   and since this lawsuit was filed.  They have blatantly

21   disregarded the laws of this country.  And it is time for that

22   to stop and it is time to take a stand.

23        I want to thank you very much for your time and

24   attention.  You have been amazing with your focus.  And I wish

03:33:38   25   you the best of luck in your deliberations.

Jury Instructions

5925

1        THE COURT:  All right.  We'll take a standup break

2   and then I will read the instructions.

3        If anybody wants to step out, this would be a good

4   time to do it.

03:34:33   5        MR. ALPER:  Your Honor, is it possible for me to say

6   one very brief thing that I forgot?

7        THE COURT:  Yes.

8        MR. ALPER:  I forgot just one last thing.  You saw

9   the compensatory damages number was 345.7 million.  I forgot

03:34:44  10   to remind you the punitive damages number, it's twice the

11   trade secret number.  That's why you have to find trade secret

12   theft is 418.8 million, 345.7 for compensatory, 418.8 for

13   punitives.

14        Thank you very much.

03:35:04  15                    JURY INSTRUCTIONS

16        THE COURT:  Members of the jury, you have seen and

17   heard all the evidence and the arguments of the attorneys.

18   Now I will instruct you on the law.

19        You have two duties as a jury.  Your first duty is to

03:35:21  20   decide the facts from the evidence in the case.  This is your

21   job and yours alone.

22        Your second duty is to apply the law that I give you

23   to the facts.  You must follow these instructions even if you

24   disagree with them.  Each of the instructions is important and

03:35:38  25   you must follow all of them.

 1          Perform these duties fairly and impartially.  Do not

 2    allow sympathy, prejudice, fear, or public opinion to

 3    influence you.  You should not be influenced by any person's

 4    race, color, religion, national ancestry, or sex.

03:35:58   5          Nothing I say now, and nothing I said or did during

 6    the trial is meant to indicate any opinion on my part about

 7    what the facts are or about what your verdict should be.

 8          During the trial, I have asked witnesses questions

 9    myself.  Do not assume that because I asked questions I hold

03:36:21  10    any opinion on the matters I asked about or on what the

11    outcome of the case should be.

12          The evidence consists of the testimony of the

13    witnesses, the exhibits admitted in evidence, and

14    stipulations.  A stipulation is an agreement between both

03:36:40  15    sides that certain facts are true.  The following are

16    stipulated facts:

17          Number 1.  Motorola Solutions, Inc., is a Delaware

18    corporation with its principal place of business in Chicago,

19    Illinois.  Motorola Solutions, Inc., provides radio equipment

03:36:59  20    and infrastructure technologies to thousands of customers in

21    manufacturing, education, utility, transport and logistics,

22    oil and gas, hospitality, and retail throughout the United

23    States and around the world.

24          Number 2.  Motorola Solutions Malaysia SDN, BHD, is a

03:37:21  25    subsidiary of Motorola Solutions, Inc.  It was founded in

1    1974, and its principal place of business is in Kuala Lumpur,

2    Malaysia.  It offers communication devices and systems

3    including analog and digital radios, accessories, and

4    communication infrastructure.

03:37:43    5        Number 3.  Motorola Solutions, Inc., and Motorola

6    Solutions Inc. SDN. BHD (collectively referred to "Motorola")

7    provides two-way digital radio communications for business and

8    government customers.

9        Number 4.  Motorola's digital two-way radio

03:38:05    10   technology and solutions are sold and used throughout the

11   United States.

12       Stipulation number 5.  Hytera Communications

13   Corporation Ltd. (previously known as HYT) was founded in

14   Shenzhen, that's S-H-E-N-Z-H-E-N, China in 1993.  The company

03:38:25    15   started as a dealer/distributor for two-way radios and began

16   manufacturing its own two-way radios, radio products in 1995.

17       Stipulation number 6.  Hytera America, Inc., is a

18   Florida company with its principal place of business in

19   Miramar, Florida.  Hytera America, Inc., sells two-way radio

03:38:52    20   products and provides customer service for those products.

21       Stipulation number 7.  Hytera Communications America

22   (West), Inc., is a California company with its principal place

23   of business in Irvine, California.  Hytera Communications

24   America (West), Inc., sells two-way radio products and

03:39:17    25   provides customer service for those products.

1          Number 8.  Motorola launched its MotoTRBO

2    professional digital radios in 2006 and first sold them in

3    2007.

4          Stip 9.  The U.S. Copyright Office issued

5    registration certificates relating to certain software

6    associated with Motorola's DMR radio products at issue in this

7    case.

8          10.  Hytera launched its DMR professional radios in

9    early 2010.

10          Stipulation 11.  Motorola Malaysia hired G.S. Kok in

11    February 1987 as a hardware engineer.  When G.S. Kok left

12    Motorola Malaysia in 2008, he was a senior engineering

13    manager.

14          12.  Motorola Malaysia hired Y.T. Kok in May 1997 as

15    a software engineer.  And when Y.T. Kok left Motorola Malaysia

16    in 2008, he was a Senior Software Engineer.

17          11 -- excuse me, 13.  When Motorola Malaysia hired

18    Samuel Chia, C-H-I-A, in August 1999 as a software engineer --

19    let me say that again.

20          Motorola Malaysia hired Samuel Chia in August 1999 as

21    a software engineer.  When he left Motorola Malaysia in 2008,

22    he was an Engineering Section Manager for Motorola.

23          14.  G.S. Kok joined Hytera on February 18, 2008 as a

24    Director, Shenzhen R&D Center, Government and Industry

25    Terminal Products Department.  When G.S. Kok left Hytera in

November 2018, he was a Deputy General Manager, Hytera UK.

15. Y.T. Kok joined Hytera on June 10, 2008, as a Section Head, Shenzhen R&D Center, Government and Industry Terminal Products Department. When Y.T. Kok left Hytera in October of 2018, he was a Senior Sales Manager in the Overseas Sales Department Headquarters.

16. Samuel Chia joined Hytera on June 16, 2008 as a Section Head, Shenzhen R&D Center, Government and Industry Terminal Products Department. When Samuel Chia left Hytera in October 2008, he was Senior Technical Consultant, Terminal Platform Center Line.

17. Motorola filed this lawsuit on March 14, 2017.

During the trial, certain testimony was presented to you by the reading of the depositions and video. You should give this testimony the same consideration you would give it had the witnesses appeared and testified here in court.

Certain things are not to be considered as evidence. I will list them for you:

First, if I told you to disregard any testimony or exhibits or struck any testimony or exhibits from the record, such testimony or exhibits are not evidence and must not be considered.

Second, anything that you may have seen or heard outside the courtroom is not evidence and must be entirely disregarded. This includes any press, radio, Internet or

1  television reports you may have seen or heard.  Such reports

2  are not evidence, and your verdict must not be influenced in

3  any way by such publicity.

4        Third, questions and objections or comments by the

03:43:48  5  lawyers are not evidence.  Lawyers have a duty to object when

6  they believe a question is improper.  You should not be

7  influenced by any objection, and you should not infer from any

8  of my rulings that I have any view as to how you should decide

9  the case.

03:44:01  10        Fourth, the lawyers' opening statements and closing

11  arguments to you are not evidence.  Their purpose is to

12  discuss the issues and the evidence.  If the evidence as you

13  remember it differs from what the lawyers have said, your

14  memory is what counts.

03:44:16  15        In determining what any fact -- in determining

16  whether any fact has been proved, you should consider all the

17  evidence bearing on the question regardless of who introduced

18  it.

19        You should use common sense in weighing the evidence

03:44:36  20  and consider the evidence in light of your own observations in

21  life.

22        In our lives, we often look at one fact and conclude

23  from it that another fact exists.  In law we call this

24  "inference."  A jury is allowed to make reasonable inferences.

03:44:51  25  Any inference you make must be reasonable and must be based

upon the evidence in the case.

You may have heard the phrases "direct evidence" and "circumstantial evidence."  Direct evidence is proof that does not require any inference, such as the testimony of someone who claims to have personal knowledge of a fact. Circumstantial evidence is proof of a fact or a series of facts that tends to show that some other fact is true.

As an example, direct evidence that it is raining is testimony from a witness who says, "I was outside a minute ago and I saw it raining."  Circumstantial evidence that it is raining is the observation of someone entering a room carrying a wet umbrella.

The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  You should decide how much weight to give any evidence.  In reaching your verdict, you should consider all the evidence in the case, including the circumstantial evidence.

You must decide whether the testimony of each of the witnesses is truthful and accurate in part, in whole, or not at all.  You also must decide what weight, if any, you give to the testimony of any witness.

In evaluating the testimony of any witness, including any party to the case, you may consider, among other things:

• the ability and opportunity the witness had to see, hear, or know the things that the witness testified about;

1            • the witness's memory;

2            • any interest, bias, or prejudice the witness may

3    have;

4            • the witness's intelligence;

5            • the manner of the witness while testifying;

6            • and the reasonableness of the witness's testimony

7    in light of all of the evidence in the case.

8            You may consider statements given by one of the

9    parties or a witness under oath before trial as evidence of

10   the truth of what he or she said in the earlier statements, as

11   well as deciding what weight to give his or her testimony.

12           With respect to other witnesses, the law is

13   different.  If you decide that before the trial one of the

14   witnesses made a statement not under oath or acted in a manner

15   that is inconsistent with his or her testimony here in court,

16   you may consider the earlier statement or conduct only in

17   deciding whether his or her testimony here in court was true

18   and what weight to give to his or her testimony here in court.

19           In considering a prior inconsistent statement, you

20   should consider whether it was simply an innocent error or an

21   intentional falsehood and whether it concerns an important

22   fact or an undisputed or unimportant detail.

23           The law does not require any party to call as a

24   witness every person who might have knowledge of the facts

25   related to this trial.  Similarly, the law does not require

1    any party to present as exhibits all papers and things

2    mentioned during the trial.

3         You have heard testimony -- I should say you have

4    heard witnesses give opinions about matters requiring special

03:48:22    5    knowledge or skill.  You should judge this testimony in the

6    same way that you judge the testimony of any other witness.

7    The fact that such person has given an opinion does not mean

8    that you are required to accept it.  The testimony -- give the

9    testimony whatever weight you think it deserves, considering

03:48:43    10    the reasons given for the opinion, the witness's

11    qualifications, and all the other evidence in the case.

12         You have heard testimony of a witness who testified

13    in the Chinese language and seen documents written in Chinese.

14    Witnesses who do not speak English or are more proficient in

03:49:10    15    another language testify through an official court certified

16    interpreter.  In addition to the witness's interpreter, a

17    check interpreter was also present.  Although some of you may

18    know Chinese, it is important that all jurors consider the

19    same evidence.  You should consider only the evidence provided

03:49:35    20    through the official interpreter.  Therefore, you must base

21    your decision on the evidence presented in the English

22    translation.  Therefore, you must accept the interpreter's

23    translation of the witness's testimony, or Chinese text in

24    documents.

03:49:53    25         You must not make any assumptions about a witness or

party based solely on the use of an interpreter to assist that

witness or a party who assists that witness or a party,

period.

Certain slides, diagrams, and illustrations prepared

by attorneys have been shown to you. Generally, these -- I

should say those demonstratives are used for convenience and

to help explain the facts of the case. They are not

themselves evidence for proof or proof of any facts. Certain

demonstratives, however, have been admitted as evidence in the

case and will be provided as exhibits.

You have heard evidence that certain computers and

files may have been lost, destroyed, or altered, and that

those computers' files, computers and files may have contained

information that is relevant to this case. You may assume

that such information would have been unfavorable to Hytera

only if you find by a preponderance of the evidence that:

1. The information should have been preserved by

Hytera in anticipation of or during the conduct of litigation;

2. Hytera destroyed the information with the intent

to deprive Motorola of the information's use in this

litigation; and

3. Hytera destroyed the information or caused the

evidence to be destroyed in bad faith.

"Bad faith" in this context means destruction for the

purpose of hiding adverse information, and requires a showing

1  of more than negligence or even gross negligence on Hytera's

2  part.  You cannot infer that Hytera engaged in intentional,

3  bad faith destruction of evidence simply because a subordinate

4  employee acted in violation of Hytera's document retention

03:52:17  5  policies and procedures, or simply because a party was unable

6  to locate or produce certain documents.

7          There is more.

8          During the depositions of G.S. Kok, Y.T. Kok, and

9  Samuel Chia, which were presented in our trial, they invoked

03:52:40  10  their rights not to incriminate themselves under the Fifth

11  Amendment in our Bill of Rights.  This was their right to do

12  so.  You may, but you need not, infer by such refusal that the

13  answers would have been adverse to those individuals or

14  Hytera.  However, you can only draw reasonable inferences to

03:53:05  15  the extent that they are justified by independent

16  corroborating evidence in this case, and you cannot speculate

17  based upon the witness's invocation of the Fifth amendment

18  alone.

19          To the extent that you draw any inference adverse to

03:53:24  20  G.S. Kok's and Y.T. Kok's or Samuel Chia's respective

21  positions from their decision to invoke the Fifth Amendment

22  right, those inferences would not necessarily be the same as

23  an inference that is adverse to the position of Hytera.  You

24  are not required to find that any answer to a particular

03:53:50  25  question by one of those witnesses would have been adverse to

1    that witness or to any party in the case.

2         When I say a particular party must prove something by

3    "a preponderance of the evidence," this is what I mean:  When

4    you have considered all the evidence in the case, you must be

03:54:13   5    persuaded that it is more probably true than not true.

6         When I say a particular party must prove something by

7    "clear and convincing evidence," this is what I mean:  You

8    have considered all of the evidence and you are convinced that

9    it is highly probable that it is true.

03:54:32   10        You will be instructed as to each element of each

11   claim and defense.  You must give separate consideration to

12   each claim and defense in this case and each party in this

13   case.  Although there are three defendants - Hytera

14   Communications Corporation, Ltd, Hytera America, Inc., and

03:54:59   15   Hytera Communications America (West), Inc. - it does not

16   follow that if one is liable that any of the others is also

17   liable.  Unless otherwise stated when I refer to "Hytera" in

18   an instruction, that instruction applies to all three

19   defendants, but you must apply the instruction separately to

03:55:26   20   each defendant.

21        Now I will instruct you on the elements of Motorola's

22   claims for trade secret misappropriation under the Illinois

23   Trade Secrets Act and the federal Defend Trade Secrets Act.

24        Under the Illinois Trade Secrets Act, in order to

03:55:50   25   establish a claim for misappropriation of trade secrets,

1      Motorola must prove -- Motorola has the burden, I should say,

2      Motorola has the burden of proving the following propositions

3      by a preponderance of the evidence:

4              1.   That Motorola owned the information at issue;

5              2.   That the information at issue is a trade secret;

6              3.   That the information at issue was misappropriated

7      by Hytera in Illinois; and

8              4.   That the information was used by Hytera in its

9      business.

10             Under the federal Defend Trade Secrets Act, in order

11     to establish a claim for misappropriation of a trade secret,

12     Motorola has the burden of proving the following propositions

13     by a preponderance of the evidence:

14             1.   That Motorola owned the information at issue;

15             2.   That the information at issue is a trade secret;

16             3.   That the information at issue was misappropriated

17     by Hytera; and

18             4.   That the trade secret is related to a product

19     used in, or intended for use in, interstate or foreign

20     commerce.

21             You have heard testimony about whether certain

22     individuals were employed by Motorola or Hytera throughout the

23     course of this trial.  Hytera can be held liable for harm

24     resulting to Motorola from the conduct of another if Hytera

25     knows that the other's conduct constitutes a breach of duty

1   and gives substantial assistance or encouragement to the

2   other.

3            In addition, a corporation can be liable, that is,

4   responsible for its employees' conduct whenever the employee

5   is acting within the scope of his or her employment.  An

6   employee is acting within the scope of his or her employment

7   if:

8            • The employee's conduct is of a kind that he or she

9   is employed to perform or reasonably could be said to have

10  been contemplated as part of his or her employment; and

11           • The employee's conduct occurs substantially within

12  the authorized time and space limits of his or her employment;

13  and

14           • The employee's conduct is motivated, at least in

15  part, by a purpose to serve the employer.

16           Conduct is within the scope of employment when

17  actuated, at least in part, by a purpose to serve the

18  employer.  A corporation knows what its employees know when

19  the subjects that are within the scope of the employee's

20  duties and responsibilities.

21           An illegal act may still be within the scope of

22  employment, so as to impose liability on the corporation.

23           A different rule applies with regard to punitive

24  damages.

25           A trade secret is information, including but not

1    limited to, technical or non-technical data, a formula,

2    pattern, compilation, program, device, method, technique,

3    drawing, process, financial data, or list of actual or

4    potential customers or suppliers that (1) is sufficiently

03:59:44    5    secret to derive independent economic value, actual or

6    potential, from not being generally known to other persons who

7    can obtain economic value from its disclosures or use; and (2)

8    is the subject of efforts that are reasonable under the

9    circumstances to maintain its secrecy or confidentiality.

04:00:18    10    I want to read that again.  Number two is the subject

11    of efforts that are reasonable under the circumstances to

12    maintain in secrecy or confidentiality.

13    I will explain what these terms mean.

14    In articulating a trade secret, it is not enough for

04:00:40    15    Motorola to point to a broad, to broad areas of technology.

16    Instead, it is Motorola's burden to identify concrete

17    information that it contends to constitute its trade secret.

18    To derive independent economic value from not being

19    generally known means that the information gives a business

04:01:09    20    competitive advantage over other businesses that do not know

21    the information.  Information that is generally known or

22    understood within an industry, even if it is not known to the

23    public at large, does not qualify as a trade secret.  But

24    information that requires considerable time, effort, and

04:01:29    25    expense to duplicate, even if it is derived from public

1 sources, can still qualify as a trade secret. Absolute

2 secrecy, in the sense that no one else in the world possesses

3 the information, is not required.

4      If you find that Motorola has proven by a

5 preponderance of the evidence that a trade secret existed,

6 then you must decide whether the trade secret information was

7 misappropriated by Hytera.

8      To prove that a misappropriation occurred, Motorola

9 must prove by a preponderance of the evidence that:

10      1.  Hytera acquired Motorola's trade secret knowing

11 or having reason to know that the trade secret was acquired by

12 improper means or;

13      2.  That Hytera disclosed or used Motorola's trade

14 secret without Motorola's express or implied consent, and

15 Hytera:

16      a)  Used improper means to acquire knowledge of

17 the trade secret; or

18      b)  At the time of the disclosure or use of the

19 trade secret, knew or had reason to know that knowledge of the

20 trade secret was:

21      (i)  Derived or from or through a person who used

22 improper means to acquire it; or

23      (ii)  Acquired under circumstances giving rise to

24 a duty to maintain secrecy or limit its use; or

25      (iii) Derived from or through a person who owed a

1   duty to Motorola to maintain its secrecy or limit its use.

2        The phrase "improper means" includes theft, bribery,

3   misrepresentation, breach or inducement of a breach of a

4   confidential relationship or other duty to maintain secrecy or

04:03:39   5   limit its use or espionage through electronic or other means.

6        On the other hand, the phrase "improper means" does

7   not include acquiring information through reverse engineering

8   or independent development.

9        You may find that a person used another's trade

04:03:59   10   secret even if it uses it with modifications or improvements,

11   so long as the substance of the resulting product is

12   substantially derived from the other's trade secret.

13        Hytera contends that Motorola's trade secret

14   misappropriation claims are barred by the statute of

04:04:21   15   limitations.  The statute of limitations is called an

16   "affirmative defense."  This means Hytera bears the burden of

17   proof by a preponderance of the evidence.

18        The Defend Trade Secrets Act requires Motorola to

19   bring the trade secret claim within three years after the

04:04:45   20   alleged misappropriation was discovered or should have been

21   discovered by the exercise of reasonable diligence.  The

22   Illinois Trade Secrets Act requires Motorola to bring its

23   trade secret within five years after the alleged

24   misappropriation was discovered or should have been discovered

04:05:06   25   by the exercise of reasonable diligence.  Concerns and

1    suspicions do not start the clock of the statute of

2    limitations.

3         Motorola filed suit on its federal and state law

4    trade secret claims on March 14, 2017.

04:05:30  5       The statute of limitations can be tolled if Motorola

6    can prove by clear and convincing evidence that:

7         1.   Hytera intentionally took affirmative acts or

8    made affirmative representations designed to prevent Motorola

9    from discovering its trade secret misappropriations claims;

04:05:54  10  and

11        2.   Hytera's affirmative acts or representations

12   prevented Motorola from discovering the claims.

13        Mere silence by Hytera and failure by Motorola to

14   learn of its cause of action do not amount to fraudulent

04:06:10  15  concealment.  If you find that Motorola learned of information

16   that would have led to the discovery of its trade secret

17   claims through diligence, you must find that the statute of

18   limitations began to run at that time, regardless of

19   concealment.

04:06:29  20      I will now instruct you on the law that you must

21   follow determining compensatory damages.  The purpose of

22   compensatory damages is to award, as far as possible, just and

23   fair compensation for the loss, if any, which resulted from

24   the defendant's violation of a plaintiff's rights.

04:06:55  25  Compensatory damages are not intended to punish the defendant.

1    Motorola is also seeking exemplary damages, and I will

2    instruct you on that later.

3         You should not interpret the fact that I am giving

4    instructions about Motorola's potential damages as an

04:07:15    5    indication in any way that I believe that Motorola should, or

6    should not, prevail on any claim.  It is your task to decide

7    first whether Hytera is liable.  I am instructing you on

8    damages only so that you will have guidance in the event that

9    you decide that Hytera is liable and that Motorola is entitled

04:07:38    10    to recover money from Hytera.  You will be asked to determine

11    Motorola's damages through June 30th, 2019, if any.

12         If you find that Motorola proved that Hytera

13    misappropriated Motorola's trade secrets and that Hytera has

14    not proved that the statute of limitations, its statute of

04:08:03    15    limitations defense, then you must decide whether Motorola is

16    entitled to damages on its claim for misappropriation of trade

17    secrets.

18         Motorola has the burden of proving whether Hytera

19    caused the damages that Motorola is claiming by a

04:08:21    20    preponderance of the evidence.  Motorola must prove the amount

21    of damages with reasonable certainty, but need not prove the

22    amount of damages with mathematical precision.  However,

23    Motorola is not entitled to damages that are remote or

24    speculative.

04:08:43    25         In determining Motorola's actual loss, you must

determine what profits Motorola proves that it would have made, if any, had Hytera not misappropriated Motorola's trade secret. To recover its actual loss, Motorola must prove:

    1.  A reasonable possibility that if Hytera had not misappropriated trade secrets, Motorola would have made additional sales of DMR products that Hytera made; and

    2.  The amount of profit Motorola would have made on those sales.

    Unjust enrichment is the amount Hytera benefited as a result of any misappropriation to the extent it exceeds Motorola's actual loss.

    If you find that Motorola has proven by a preponderance of the evidence the amount that it is entitled to unjust enrichment damages in excess of its actual loss, you must deduct those costs and the expenses that Hytera proves by a preponderance of the evidence that it incurred, that it incurred related to that benefit.

    You will be asked to determine Motorola's damages under the ITSA and the DTSA, if any. Under the ITSA, Motorola is seeking damages from 2010 through June 30, 2019. For Motorola's ITSA claims, if you find that Hytera misappropriated Motorola's trade secrets in or from Illinois, Motorola is entitled to recover all damages that occurred in Illinois that are a proximate and foreseeable result of that misappropriation.

1          Under the DTSA, the federal law, Motorola is seeking

2      damages from May 11, 2016 through June 30, 2019.  For

3      Motorola's DTSA claim, if you find that Hytera misappropriated

4      Motorola's trade secrets anywhere in the world and an act in

5      furtherance of the misappropriation was committed in the

6      United States, Motorola is entitled to recover all damages

7      that Motorola proved are a proximate and foreseeable result of

8      that misappropriation, including any unjust enrichment that

9      Hytera received anywhere in the world or profits Motorola lost

10     anywhere in the world as a result of misappropriation on or

11     after May 11, 2016.

12          If you find for Motorola on the trade secret claims,

13     you may, but are not required to, assess exemplary damages

14     against Hytera.  The purposes of exemplary damages are to

15     punish Hytera for its conduct and to deter Hytera and others

16     from engaging in similar conduct in the future.

17          In order for Motorola to recover exemplary damages,

18     you must find that Motorola has proved by a preponderance of

19     the evidence that Hytera 's acts were willful and malicious,

20     that is, you must assess exemplary damages only if you find

21     Hytera's conduct was malicious or in reckless disregard of

22     Motorola's rights.  Conduct is malicious if it is accompanied

23     by ill will or spite, or if it is done for the purpose of

24     injuring Motorola.  Conduct is in reckless disregard of

25     Motorola's rights if, under the circumstances, it reflects

complete indifference to Motorola's rights, and not simply that Hytera was aware that the information was a trade secret.

Exemplary damages may be awarded against an employer because of an act of its employee if, but only if you find:

1. The employer authorized the doing and the manner of the act; or

2. The employee was unfit and the employer was reckless in employing him or her; and

3. The employee was employed in a managerial capacity and was acting within the scope of his or her employment; or

4. The employer or a manager of the employer ratified or approved of the act.

In determining whether an employee is acting in a managerial capacity, you must consider the employee's authority and discretion in making decisions and not only the employee's title.

If you find that exemplary damages are appropriate, then you must use sound reason in setting the amount of these damages. Exemplary damages, if any, should be in an amount sufficient to fulfill the purposes that I have described to you, but should not reflect bias, prejudice, or sympathy toward either party. In determining the amount of any exemplary damages, you should consider the following factors:

1. The reprehensibility of the conduct;

1          2.    The impact of the conduct on Motorola;

2          3.    The relationship between Motorola and Hytera;

3          4.    Hytera's financial condition;

4          5.    The likelihood that such conduct would be

5    repeated by Hytera or others if an award of exemplary damages

6    is not made; and

7          6.    The relationship of any award of exemplary

8    damages to the amount of actual harm Motorola suffered.

9          If you find that Hytera acted willfully and

10   maliciously, you may award Motorola an amount of exemplary

11   damages up to two times the amount of compensatory damages you

12   award Motorola for trade secret misappropriation or for the

13   time which it enacted -- which it acted willfully and

14   maliciously.

15         Motorola claims that Hytera has infringed Motorola's

16   copyright in four works, respectively titled MOTOTRBO Mobile

17   Subscriber FW Package R01.00.01, MOTOTRBO Portable Subscriber

18   FW Package R01, I should say R01.00.01, MOTOTRBO CYPHER

19   R01.00.01, and MOTOTRBO Portable R01.03 by copying original

20   elements of those works into Hytera's own DMR program.

21         To succeed on its claim as to each of the asserted

22   works, Motorola must prove the following things by a

23   preponderance of the evidence:

24         1.    Motorola owns a valid copyright in the asserted

25   work;

2.  Hytera copied protected expression from the work in the United States.

And I will explain what those words mean.

If you find that Motorola has proved each of these things, then you must find for Motorola.  However, if you find that Motorola did not prove each of these things, then you must find for Hytera.

Motorola owns a copyright in an asserted work if it was prepared by Motorola employees within the scope of their employment; or specifically commissioned as a contribution to a collective work and there was a prior agreement, signed by Motorola, and if those that prepared it agree that the work would be a work made for hire.

As I stated, Motorola must prove that Hytera copied protected expression in its work.  You may infer that Hytera copied Motorola's work if Hytera had the opportunity to view or read the original before creating its own work and that the two works are so similar that a reasonable person would conclude Hytera took protected expression from Motorola's work.  You may also infer that Hytera copied Motorola's work if the similarities between the two works can be explained only by copying, rather than coincidence.

In making that determination, the focus is on similarities between the works.  Hytera cannot excuse its infringement by pointing to portions of a work that it did not

1    copy from Motorola.  The test is whether Hytera's work is so

2    similar to Motorola's work that an ordinary reasonable person

3    would conclude that Hytera unlawfully appropriated Motorola's

4    protectable expression by taking material of substance and

04:19:20    5    value.

6         I will now give you some examples of what constitutes

7    protected expression and what does not, in order to aid you in

8    this process.

9         "Protected expression" means expression in Motorola's

04:19:40    10    work that was created independently, involving some

11    creativity.

12         Copyright law protects only original expression in

13    the work.  This includes the way that facts, ideas,

14    procedures, processes, systems, methods of operation,

04:20:00    15    concepts, principles, discoveries, devices are expressed in

16    the work.  It does not include the facts, ideas, procedures,

17    processes, systems, methods of operation, concepts,

18    principles, discoveries, devices themselves.

19         If you find that Motorola has proved that Hytera has

04:20:29    20    infringed Motorola's copyright by a preponderance of the

21    evidence, then you must determine the amount of damages, if

22    any, Motorola is entitled to recover.  You will be asked to

23    determine Motorola's damages resulting from copyright

24    infringement, if any.  If you find that Motorola has failed to

04:20:48    25    prove the claim, then you will not consider the question of

Jury Instructions

5950

1     damages.

2          Motorola must prove damages by a preponderance of the

3     evidence.

4          Motorola is entitled to recover the profits that

04:21:01   5     Hytera made through June 30, 2019, because of Hytera's

6     copyright infringement.  Hytera's profits are revenues that

7     Hytera made because of the infringement, minus Hytera's

8     expenses in producing and selling the infringing DMR radios.

9     Motorola must prove Hytera's revenues and a causal

04:21:29   10    relationship between the infringement and those revenues.

11    Hytera must prove it own expenses and any portion of its

12    profits that resulted from factors other than infringement of

13    Motorola's copyright.

14         You may award Motorola damages under the Copyright

04:21:48   15    Act for infringement by Hytera that occurred in the United

16    States.  You may also award copyright damages for infringing

17    acts outside the United States that were a consequence or a

18    result of initial infringing acts by Hytera that occurred

19    inside the United States.

04:22:11   20         If you award Motorola damages for both its trade

21    secret misappropriation claims and its copyright claims, you

22    must not award damages in a manner that would result in double

23    recovery for the same injury.

24         Upon retiring to the jury room, you must select a

04:22:35   25    presiding juror.  The presiding juror will preside over your

1  deliberations and will be your representative here in court.

2       Forms of verdict have been prepared for you.

3       It is difficult to read the form of verdict because

4  there are blocks and lines, but I will attempt to do so.

04:22:58  5       The verdict form reads:

6       Please read and answer the questions below beginning

7  with question number 1.  After you have answered each

8  question, follow the instructions that correspond to your

9  answer.  The instructions will either direct you to answer

04:23:23  10 other questions or direct you to stop.

11      Trade secret claims.

12      Number 1:  Do you find that Motorola proved that it

13 possessed one or more trade secrets that were appropriated by

14 Hytera?

04:23:43  15      Yes, blank, no, blank.

16      If the answer is "yes" to question 1, proceed to

17 question 2.

18      If you answered "no" to question 1, please skip

19 question 2 and question 3 and proceed to question 4.

04:24:03  20      Question number 2:  Which of Hytera's defendants do

21 you find misappropriated one or more of Motorola's trade

22 secrets?

23      And then there is a block.  And in that block it

24 says:  Hytera Communications Corporation Limited, "yes" for

04:24:23  25 Motorola, "no" for Hytera.  And in the block it also says

Hytera America Inc.  And then in the block it says "yes" for

Motorola, "no" for Hytera.  And once again in that block

Hytera Communications America (West) Inc.  And then in the

block "yes" for Motorola, "no" for Hytera defendant.

04:24:45   Question 3:  If you answered "yes" to question 1, do

you find that Motorola's claim for trade secret

misappropriation is barred by the statute of limitation?

"Yes," blank, for Hytera, "no," blank, for Motorola.

Please proceed to question number 4.

04:25:11   Question number 4:  Do you find that Motorola proved

that Hytera infringed Motorola's copyrights?

"Yes," blank, for Motorola; "no," blank, for Hytera.

If you answered "yes" to question 4, please proceed

to question number 5.

04:25:31   If you answered "no" to question 4 and "no" to

question 1, please skip the remaining questions.

If you answered "no" to question 4 and "yes" for

question 3, please skip the remaining questions.

Question 5:  Which of the Hytera defendants do you

04:25:54   find infringed one or more of Motorola's copyrighted works?

And once again there is a block.  And in the block it

says Hytera Communications Corporation Limited.  And in the

block "yes" for Motorola, "no" for Hytera.

Within the block Hytera America Inc. and within the

04:26:18   block "yes" for Motorola, "no" for Hytera defendant.

1          And within the block Hytera Communications America

2     (West) Inc. and in the block again "yes" for Motorola, "no"

3     for Hytera.

4          And then proceed to question number 6:  If the

04:26:46   5     answer -- if you answered "yes" to question 1 and "no" to

6     question number 3, or you answered "yes" to question 4, please

7     skip the remaining questions if you answered "no" to question

8     1 and "no" to question 4; or answered "yes" to question 3 and

9     "no" to question 4.

04:27:26   10         Now page 4 of this jury verdict form is as follows:

11     Damages.  What is the dollar amount of the compensatory

12     damages, if any, Motorola is entitled to receive from Hytera

13     for misappropriation of trade secrets and/or copyright

14     infringement through June 30, 2019?  Dollar sign blank.

04:27:56   15         If you answered "yes" to question 1 and "no" in

16     question 3, please proceed to question 7.

17         If you answered "no" to question 1 or "yes" to

18     question 3, skip the remaining questions.

19         Now, page 4 of the verdict form, number 7 says:  Do

04:28:22   20     you also find that Motorola is entitled to recover exemplary

21     damages against Hytera?

22         "Yes," blank, finding for Motorola; "no," blank,

23     finding for Hytera.

24         If you answered "yes," please proceed to question 8.

04:28:44   25         If you answered "no," please skip question 8.

1     Question 8 is:  What is the dollar amount of the

2  exemplary damages Motorola is entitled to receive from Hytera

3  through June 30th, 2019?  Dollar sign blank.

4     You have now reached the end of the verdict form and

04:29:12   5  should review it to ensure it accurately reflects your

6  unanimous determinations.

7     Each juror should then sign and date the verdict form

8  in the spaces provided below and notify the security guard

9  that you have reached a verdict.

04:29:31  10     And then the final page is a space for you to date

11  and for each juror to sign.

12     Counsel, have I misread in any way the verdict form?

13     MR. ALPER:  No, Your Honor.

14     MR. CLOERN:  No, Your Honor.  Thank you.

04:29:49  15     THE COURT:  All right.  Now, members of the jury, I

16  think it would be better for you to go home, shovel the snow,

17  get a good night's sleep and return here tomorrow morning at

18  10:00 o'clock.

19     Is there any objection to that procedure?

04:30:06  20     MR. ALPER:  Your Honor, I believe there is three --

21  two more, one-half of an instruction and two more instructions

22  in the set afterward.

23     THE COURT:  That were not read?

24     MR. ALPER:  That were not read.

04:30:15  25     THE COURT:  All right.  You have a sharp eye.  Thank

1   you, counsel.

2           Okay.  Looking at it, this is what we have been

3   following right along, but let me once again say it.

4           I do not anticipate that you will need to communicate

04:30:32   5   with me.  If you need to communicate with me, the only proper

6   way is in writing.  The writing must be signed by the

7   presiding juror, or, if he or she is unwilling to do so, by

8   some other juror.  The writing should be given to the marshal,

9   the court security officer, who will give it to me.  I will

04:30:53   10   respond either in writing or by having you return to the

11   courtroom so that I can respond orally.

12           If you do not communicate with me -- if you do

13   communicate with me, you should not indicate in your note what

14   your numerical division is, if any.

04:31:11   15           And then the following instruction brought to the

16   attention of the Court by counsel is as follows:

17           The verdict must represent the considered judgment of

18   each juror.  Your verdict, whether for or against the parties,

19   must be unanimous.

04:31:29   20           You should make every reasonable effort to reach a

21   verdict.  In doing so, you should consult with one another,

22   express your own views, and listen to the opinions of your

23   fellow jurors.  Discuss your differences with an open mind.

24   Do not hesitate to re-examine your own views and change your

04:31:46   25   opinion if you come to believe it is wrong.  But you should

1  not surrender your honest beliefs about the weight or effect

2  of evidence solely because of the opinions of other jurors or

3  for the purpose of returning a unanimous verdict.

4         All of you should give fair and equal consideration

04:32:02  5  to all the evidence and deliberate with the goal of reaching

6  an agreement that is consistent with the individual judgment

7  of each juror.  You are the impartial judges of the facts.

8         And so as I was saying, you will be excused for the

9  day.  And you are to return tomorrow morning at 10:00 o'clock.

04:32:27  10        Now, when you leave the courtroom today, do not

11  discuss this case amongst yourselves or with any other

12  persons.  Don't do any form of research directly or indirectly

13  or using media or any other technique or procedure.

14        What is important is that you make your decision as

04:32:45  15  jurors based upon the evidence that you have seen and heard.

16  You are to determine the facts in the case and follow the

17  instructions of law given to you by the Court.

18        Do not let any person or anyone or anything directly

19  or indirectly deprive you of the opportunity to serve as a

04:33:05  20  juror in this case.  You are excused.

21        And when you come in tomorrow morning, you will

22  receive a written set of these jury instructions.  We have a

23  set for each one of you.  But do not begin to deliberate until

24  all of you, all eight of you are together in the jury room.

04:33:24  25        You are excused.  Please return tomorrow at 10:00.

5957

1           Counsel, please remain.

2        (Jury out at 4:33 p.m.)

3           THE COURT:  The jurors have left.  Court is in

4   session.

04:33:48    5           Now, with respect to how the jurors will deal with

6   the evidence in this case, you have reached an agreement about

7   that, have you not?

8           MR. ALPER:  Yes, Your Honor.

9           THE COURT:  Okay.  Is that right, counsel?

04:33:57   10           MR. CLOERN:  Yes, Your Honor.

11           THE COURT:  All right.  Do you need to spread that of

12   record?  You gave it to me in writing as I recall.  And I

13   think I entered a minute order saying that the Court approved

14   of the technique that you had agreed upon; is that correct?

04:34:09   15           MR. ALPER:  Yes, Your Honor.

16           THE COURT:  So there is an order accepting your

17   agreement in how these materials will be utilized by the jury?

18           MR. ALPER:  Yes, Your Honor.

19           THE COURT:  Is that right, counsel?

04:34:18   20           MR. CLOERN:  Yes, Your Honor.  And that is we believe

21   sufficient.

22           THE COURT:  All right.  Thank you.  Somebody will be

23   here tomorrow, right?

24           MR. ALPER:  Yes, Your Honor.

04:34:26   25           MR. CLOERN:  Yes, Your Honor.

5958

04:34:38

1        THE COURT:  Not necessarily all of you.

2        But court is adjourned until 10:00 o'clock.  I also

3   have other matters to deal with tomorrow.  But I will

4   certainly be in chambers for the entirety of the day.  Thank

5   you.

6        MR. ALPER:  Thank you, Your Honor.

7        MR. CLOERN:  Thank you, Your Honor.

8        (Adjournment 4:35 p.m. until 10:00 a.m., February 14,

9        2020)

10

11               C E R T I F I C A T E

12        I, Jennifer S. Costales, do hereby certify that the

13   foregoing is a complete, true, and accurate transcript of the

14   proceedings had in the above-entitled case before the

15   Honorable CHARLES R. NORGLE, one of the judges of said Court,

16   at Chicago, Illinois, on February 13, 2020.

17

18                    */s/ Jennifer Costales, CRR, RMR*

19                    Official Court Reporter

20                    United States District Court

21                    Northern District of Illinois

22                    Eastern Division

23

24

25