**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MOTOROLA SOLUTIONS, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Civil Action No. 1:17-cv-1973 |
| v. | ) | |
| | ) | |
| HYTERA COMMUNICATIONS CORP. | ) | |
| LTD., et al., | ) | Hon. Charles R. Norgle |
| | ) | |
| Defendants. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW IN RELATION TO THE COURT'S OCTOBER 19 AND NOVEMBER 10, 2020 ORDERS

## FINDINGS OF FACT

### I.    BACKGROUND

1.    Following a nearly four-month trial, the jury returned a verdict for Motorola and awarded $345,761,165 in compensatory damages for Hytera's misappropriation of Motorola's trade secrets and infringement of Motorola's copyrights. Dkt. 898 at 5.

2.    With respect to the DTSA, the jury was properly instructed that Motorola was seeking damages from May 11, 2016 to June 30, 2019. Dkt. 895 at Instruction No. 32. With respect to copyright infringement the jury was properly instructed that Motorola was entitled to recover profits Hytera made through June 30, 2019 because of Hytera's copyright infringement. *Id.* at Instruction No. 40.

3.    The jury was properly instructed regarding lost profits under the DTSA. The jury was instructed: "Instruction No. 30: To recover its actual loss, Motorola must prove: 1. A reasonable probability that, if Hytera had not misappropriated trade secrets, Motorola would have made additional sales of DMR products that Hytera made; and 2. The amount of profit Motorola would have made on those sales." Dkt. 895 at Instruction No. 30. Hytera did not object to this instruction. Tr. at 5575:23-5578:5.

4.    The jury was similarly appropriately instructed that it could award Motorola's actual loss and Hytera's unjust enrichment to the extent it exceeds Motorola's actual loss: "Instruction No. 31: Unjust enrichment is the amount Hytera benefited as a result of any misappropriation to the extent it exceeds Motorola's actual loss. If you find that Motorola has proven by a preponderance of the evidence the amount that it is entitled to unjust enrichment damages in excess of its actual loss, you must deduct the costs and expenses that Hytera proves by a preponderance of the evidence that it incurred related to that benefit." Dkt. 895 at Instruction No. 31. Hytera did not object to this instruction. Tr. at 5575:23-5578:5.

2

5.       The jury was also instructed on damages for Motorola's claim for copyright infringement: "Instruction No. 40: Motorola is entitled to recover the profits that Hytera made through June 30, 2019, because of Hytera's copyright infringement. Hytera's profits are revenues that Hytera made because of the infringement, minus Hytera's expenses in producing and selling the infringing DMR radios. Motorola must prove Hytera's revenues and a causal relationship between the infringement and those revenues. Hytera must prove its own expenses and any portion of its profits that resulted from factors other than infringement of Motorola's copyright." Dkt. 895 at Instruction No. 40. Hytera did not object to this instruction, other than with respect to the temporal scope of copyright damages. Tr. at 5575:23-5578:5.

6.       The jury was properly instructed not to award double recovery to Motorola: "Instruction No. 42 - No Double Recovery: If you award Motorola damages for both its trade secret misappropriation claims and its copyright claims, you must not award damages in a manner that results in double recovery for the same injury." Dkt. 895 at Instruction No. 42. Hytera did not object to this instruction. Tr. at 5575:23-5578:5.

## II.       THE TRADE SECRET MISAPPROPRIATION DAMAGES AWARDED TO MOTOROLA BY VIRTUE OF THE ADVISORY JURY VERDICT CONTAINED DOUBLE RECOVERY

7.       Motorola proved that Hytera stole 21 distinct trade secrets at trial (collectively, "Misappropriated Trade Secrets"). For each trade secret, Motorola presented highly confidential technical and engineering materials relevant to that specific trade secret and explained those materials through five fact witnesses and numerous experts across more than 25 hours of testimony. Motorola's witnesses explained that these stolen materials constituted the "playbook" by which Motorola engineers built its two-way radio devices. Tr. at 723:16-724:5. Motorola's fact witnesses and experts testified in detail when explaining what was contained in each confidential technical and engineering material and how the processes contained therein combined into a

3

coherent whole to create the digital radio functionalities at issue in the trial. Tr. at 615:8- 621:25, 625:7-626:19, 630:14-631:14, 706:6-707:2, 709:1-715:12, 716:10-717:2, 718:13-719:3, 739:9- 740:15, 741:15-747:4.

8.    The Court denied Hytera's motion for judgment as a matter of law or new trial with respect to Motorola's trade secret misappropriation claim. Dkt. 1088 at 7-11.

9.    The jury awarded $209.4 million for Hytera's trade secret misappropriation under the DTSA. Tr. at 2191:23-2192:7; 2198:9-17; PTX-2071, PTX-2226, DTX-4057; Tr. at 2184:20- 2189:20; PTX-2070.2-.4, .8; PTX-2077. The $209.4 million was comprised of $73.6 million in Hytera's avoided R&D costs and $135.8 million in Hytera's profits. Tr. at 5365:10-18 (avoided R&D); PTX- 2071.2-.4; DTX-4057, PTX-2071.18-19.

10.   The $209.4 million exceeds Motorola's $86.2 million in Motorola's lost profits due to Hytera's trade secret misappropriation under the DTSA. Tr. at 2205:15-20; 5396:16-20; PTX- 2068.2, PTX-2069.2, PTX-2067.5; DTX-4057.

11.   The disgorgement of Hytera's profits is an equitable remedy. See Dkt. 1088 and Order accompanying these findings.

12.   The Court initially misapprehended the nature of the $135.8 million award in its October 19, 2020 Order, but the parties agree that that number reflects a measure of Hytera's profits in the relevant time period, not the actual losses suffered by Motorola (though Hytera disputes the substantive accuracy of that number). The $135.8 million figure does not reflect Motorola's actual losses, despite the Court characterizing them as such in Dkt. 1088.


### A.    Hytera Needed Motorola's Trade Secrets to Enter the DMR Market

13.   In 2004, the FCC announced new regulations requiring companies and users around the world, including in the United States, to move from analog products to digital products. Tr. at

2159:25-2160:7. Mr. Malackowski testified that this provided a business incentive for Hytera to enter the digital radio market quickly in order to develop a digital radio before the regulation took effect. *Id.* at 2160:8-12. Hytera discussed this incentive in a presentation, explaining that Hytera needed to create new business and replace analog radios in line with the FCC mandate. *Id.* at 2160:20-2161:2; PTX-1129.

14.     Hytera's CEO recognized Hytera's need to develop a DMR product quickly. Tr. at 1849:3-14, PTX-416 (2007 Hytera slideshow with statement from Chairman Chen shows "that Mr. Chen has identified DMR as critical and has recognized Motorola as a key competitor in that segment of the market and wants to leapfrog Motorola.").

15.     Mr. Malackowski testified that email communications between Chairman Chen and G.S. Kok highlighted the importance entering the DMR market quickly, as shown by the fact that the project was being dealt with at the senior-most level within Hytera. Tr. at 2166:22-2167:2.

16.     About two weeks after G.S. Kok joined Hytera, he emailed Chairman Chen to say that he was "surprised also to find out that we do not have a prototype after three years. In addition, that each circuit block needs to be merged and a new board layout." PTX-421; PDX-9.57; Tr. at 1885:9-1886:20. He stated that Hytera's DMR "team will need injection of Subject Matter Expert; (SME) from Motorola Penang and Motorola Chengdu. This will be most important if we want to leap frog onto the DMR business." *Id.*

17.     Hytera entered the DMR market in 2010, making Hytera the second to the DMR market behind Motorola. Tr. at 2167:10-2168:10. According to Mr. Malackowski, there is a significant advantage to being the second to enter the market. Tr. at 2163:1-6. Hytera's witnesses confirmed this competitive advantage, noting that being late to the market is difficult because competitors will have a lead so Hytera would always be playing catchup. Tr. at 2167:23-2168:5.

18.     Mr. Malackowski testified that Hytera's access to Motorola's copyrights and trade secrets

allowed Hytera to accelerate their entry to the market, which allowed them to enter the market sooner than they otherwise would have. Tr. at 2161:12-18.

19.     Dr. Rangan described "four high-level reasons" why Hytera would not have been able to independently without using or accessing Motorola's trade secrets. These reasons include: "there's no architecture or framework for this. That's the overall way that the whole product would have been architected. The protocol stack was not complete. In fact, it was extremely limited. There was no demonstration of interoperability. And the source code, the way it was structured, was fundamentally flawed and would prevent any further progress." Tr. at 1888:19-1889:7; PDX-9.58.

20.     Specifically, Dr. Rangan testified that he saw a "complete absence" of "architectural framework components," such as an operating system, in Hytera's development documents and materials prior to February 2008, despite Hytera's claim that it had a prototype for a DMR radio that was 75 percent complete by that time. Tr. at 1890:19-1892:5.

21.     Dr. Rangan also testified that Hytera's DMR development lacked a protocol stack, which "defines the sequence of operations that the transmitter or receiver would have to do to communicate." Tr. at 1892:6-1893:20. Dr. Rangan did not see any evidence in Hytera's development documents as of February 2008 that Hytera "was able to send a group call, short message, or data service message" as it claimed. DTX-3219; Tr. at 1894:8-1896:24. Hytera also lacked the ability to perform basic functions like emergency calls, showing that "Hytera, prior to 2008, was still very far from coming close to a 75 percent complete protocol stack." Tr. at 1900:6-1901:22; PTX-1987 at 29-30; Tr. at 1902:5-1903:12, PTX-1085 (email from Roger Zhang to Sam Chia stating that "Our group has been engaged in protocol development for a period of time" and has "met many problems which have troubled us for a long time."); PTX-203, PTX-204, Tr. at 1904:12-1906:17 (Hytera engineer Yu Yang stating that "When we were doing the work" prior to the arrival of G.S. Kok, Y.T. Kok, and Sam Chia, "most of the requirements [in PTX-204 listing

6

protocol stack requirements] cannot be met," and the DMR project "has grown up in an unhealthy situation").

22. Dr. Rangan further explained that Hytera's purported prototype "did not demonstrate interoperability, meaning "the ability of a device from one manufacturer to communicate to the device of another manufacturer," which is "absolutely essential" for DMR radios. Tr. at 1907:5-1908:5. While Hytera relied upon PTX-1988 to "demonstrate interoperability," Dr. Rangan explained that this document does not show that Hytera had the ability to complete a group call, and instead described a "debugging hardware platform" that is "a version of the system that's in a much earlier stage of development [than a prototype] where you're still trying to build up basic features." Tr. at 1908:6-1909:16. The "debugging platform" "doesn't have that man/machine interface, the interface between the keypad and the screen. So that's being simulated here on this PC," and did not allow a call with a question and response but instead "[w]e just have a portion of the sound, and it's just echoing back." Tr. at 1910:7-1913:6.

23. Additionally, Dr. Rangan explained that in reviewing the source code directories Hytera produced, he "found really that there were two fundamental flaws in the way that the source code was written in a manner that would prevent the developers from continuing development. First of all, the source code files were unfinished but also what you would say that the code was monolithic spaghetti code." Tr. at 1916:1-17. "Essential" source code files were classified by Hytera as "unfinished," and there was no indication that they were ever completed by Hytera prior to G.S. Kok's arrival in February of 2008 or prior to the arrival of Y.T. Kok and Sam Chia. Tr. at 1916:18-1919:8; PTX-2031, PTX-2025.

24. Hytera also had "monolithic spaghetti code" prior to the arrival of G.S. Kok, Y.T. Kok, and Sam Chia. Tr. at 1919:9-25; PTX-607.6. An internal Hytera presentation given by Y.T. Kok in July 2008, titled "HYT common platform architecture," describes Hytera's DMR development

7

as a "monolithic, spaghetti system." *Id.* Dr. Rangan explained that "monolithic" code is not well organized because it "just appears as one large piece of code," and a "spaghetti system" is "a highly problematic way of software and refers to the following, that any one part of the code can affect other parts of the code. So when you're trying to analyze the code, looking how one part of the code affects another is like trying to find two ends of a strand of spaghetti in a big bowl of pasta." Tr. at 1920:1-15. Y.T. Kok identified in his presentation problems caused by the monolithic spaghetti system, including that "it's difficult to isolate components and reuse them" because "they're completely intertwined with one another," and also because "it's poorly portable. So if you want to take one piece of software out and use it in another piece of software or in another hardware platform, it becomes very, very difficult to do that." Tr. at 1921:2-23. Additionally, both Dr. Rangan and Y.T. Kok's presentation recognized that "once you get spaghetti code, it becomes harder to change and the development becomes more and more laborious. It costs more and it takes longer. But also what's very important is the problem of debugging or fixing errors. It's very hard to trace errors because of the spaghetti problem. And any time you try to fix one part of the code, you generally introduce bugs in other parts of the code." Tr. at 1921:25-1922:15; PTX-607.7.

25. Dr. Rangan testified that Hytera never released a DMR product based on its pre-February 2008 development efforts, and instead Hytera "abandoned those efforts and ended up following a development path based on Motorola misappropriated code." Tr. at 1925:6-1926:2 ("Two and a half years since this lawsuit has began, ... Hytera continues to use Motorola confidential and proprietary information for its development," which "indicates that Hytera is still not possible to independently develop [a] DMR product without Motorola confidential and proprietary information.")

26. As Dr. Rangan explained, Hytera "would actually have never conceived of these or implemented these trade secrets in any commercially reasonable period of time, but even if they

8

were to, the time for Motorola took to develop these trade secrets would be an absolute minimum or baseline for that time." Tr. at 1950:13-1951:7. Because Hytera still has not, to this day, developed a comparable DMR product without use of Motorola's trade secrets and source code, the sales of its accused DMR products are due to its misappropriation and ongoing use of Motorola's trade secrets.

### B. Hytera Avoided Spending $76.3 Million in Research and Development by Misappropriating the 21 Trade Secrets

27.     As a result of Hytera's theft of Motorola's trade secrets, Hytera was able to significantly reduce the amount of money that it spent on developing the accused DMR products. Tr. at 2156:21-24 (Mr. Malackowski testifying that "Hytera benefited from use of the Motorola trade secrets and copyrights, and they were able to reduce their own R&D expense accordingly").

28.     Motorola spent $117.8 million to develop the Misappropriated Trade Secrets, which was only a portion of the research and development that Motorola invested to launch its DMR radios. Tr. at 2155:9-2156:14 (citing PDX-10.6). By contrast, Hytera spent $12.6 million in R&D before launching its DMR radios, confirming the substantial savings Hytera realized from its theft. Tr. at 2156:2-9; PDX-10.6.

29.     Motorola's expert, Mr. Malackowski, testified that Motorola should be awarded $73.6 million in Hytera's avoided R&D costs. Tr. at 5365:10-18.

### a. Mr. Malackowski Properly Relied on Development Times for the Misappropriated Trade Secrets

30.     Motorola presented extensive testimony concerning the amount of time it took Motorola to develop the Misappropriated Trade Secrets in staff months, i.e., the amount of work an engineer could perform in one month. Tr. at 193:18-194:7, 2185:18–2189:20. Staff months is a common way to perform engineering project management. *Id.* at 1928:4-13.

31.     Motorola presented testimony from Motorola engineers Russ Lund, Mark Boerger, Jesus Corretjer, Dan Zetzl, and Sanjay Karpoor, who developed and oversaw development of the trade secrets at issue. Tr. at 593:24-594:1, 597:7-9, 622:5-7, 633:4-6, 640:8-10, 707:14-708:3, 729:17-22, 741:6-14, 754:19-23, 866:11-15, 877:10-13, 880:2-6, 883:8-12, 887:15-20, 892:14-18, 998:25-999:5.

32.     Motorola also presented testimony from Dr. Rangan, who relied on his experience leading software and hardware teams that worked on similar types of technology to the Misappropriated Trade Secrets, to establish the staff months necessary to develop the Misappropriated Trade Secrets. Tr. at 1926:3-1928:13 (Dr. Rangan testifying that his determination of the development times for Motorola's trade secrets was based on trial and deposition testimony from Motorola's senior engineers who "were deeply involved in the DMR development" about the "head count and staff months for each asserted trade secret[]," consideration of Motorola's "source code and all the design documents as well for the asserted trade secrets to try to assess the development effort," and application of his own experience leading software and hardware teams).

33.     The following are the staff months to develop each Misappropriated Trade Secret:

| Trade Secret | Staff Months to Develop | Citation |
|---|---|---|
| DMR Source Code | 87 engineers 9,468 staff months | Tr. at 593:24-595:10; PDX-4.6 |
| DMR Mobile Source Code | 80 engineers 3,600 staff months | Tr. at 595:11-609:14; PDX-4.8 |
| DMR Software Architecture | 80 engineers 5,478 staff months | Tr. at 622:1-12; PDX-4.15 |
| Operating System Architecture | 5 engineers 294 staff months | Tr. at 632:24-634:5; PDX-4.19 |
| VRIS | 17 engineers 600 staff months | Tr. at 639:25-641:11; PDX-4.23 |
| Digital Signal Processing Framework | 25 engineers 900 staff months | Tr. at 707:13-708:16; PDX-5.4 |
| Noise Suppression | 2 engineers 7 staff months | Tr. at 707:13-708:16; PDX-5.4 |
| Squelch | 4 engineers 20 staff moths | Tr. at 707:13-708:16; PDX-5.4 |
| Carrier Detection | 2 engineers 8 staff months | Tr. at 707:13-708:16; PDX-5.4 |

| DSP Code | 25 engineers 3000 staff months | Tr. at 707:13-708:16; PDX-5.4 |
|---|---|---|
| Testing and Benchmarking | 12 engineers 720 staff months | Tr. at 729:17-730:4; PDX-5.7 |
| Hardware Abstraction Layer | 15 engineers 376 staff months | Tr. at 741:3-14; PDX-5.11 |
| L1 Timer, Framer, and Frame Scheduler | 8 engineers 72 staff months | Tr. at 741:3-14; PDX-5.11 |
| Hardware | 75 engineers 2,700 staff months | Tr. at 754:19-23; PDX-5.14 |
| Ergonomic Layer | 20 engineers 1,584 staff months | Tr. at 866:11-867:3; PDX-6.6 |
| Application Layer | 40 engineers 2,700 staff months | Tr. at 877:9-25; PDX-6.9 |
| VOX | 4 engineers 36 staff months | Tr. at 880:2-10; PDX-6.12 |
| DMR Protocol Stack | 42 engineers 1,512 staff months | Tr. at 883:8-884:2; PDX-6.15 |
| Connectivity | 4 engineers 65 staff months | Tr. at 887:15-24; PDX-6.18 |
| XCMP | 15 engineers 720 staff months | Tr. at 892:14-893:3; PDX-6.21 |
| Repeater | 20 engineers 3,248 staff months | Tr. at 998:25-999:5; PDX-7.4 |

34.     Based on Motorola's costs per engineer, Mr. Malackowski determined that Motorola spent $117.8 million to develop the Misappropriated Trade Secrets. Tr. at 2155:15-2156:9; PTX-2070.8 ($6,391 Motorola cost per head). To arrive at the $117.8 million, Mr. Malackowski only included development times for the following trade secrets to avoid double counting: Connectivity, XCMP, Software, DMR Protocol Stack, Hardware, Testing and Benchmarking, and Repeater Functionality. Tr. at 2189:9-20 (Mr. Malackowski explaining that the remaining trade secrets "are simply subcomponents or a subset, parts of the whole [accounted for by these seven trade secrets] as described"); *see also* Tr. at 1946:24-1948:17.

35.     Motorola also presented evidence that it would have taken Hytera at least as long as Motorola to develop the misappropriated trade secrets. Tr. at 1950:13-1951:7 (Dr. Rangan: "It's my view that [Hytera] would actually have never conceived of these or implemented these trade secrets in any commercially reasonable period of time, but even if they were to, the time for Motorola took to

11

develop these trade secrets would be an absolute minimum or baseline for that time.").

36. Motorola's estimates for the development of the Misappropriated Trade Secrets were conservative, and were based on the work of highly skilled engineers. *Id.* at 1948:18-1949:21. Prior to the arrival of G.S. Kok, Y.T. Kok, and Sam Chia, Hytera did not have engineers with comparable skills to those at Motorola because they lacked DMR experience and the ability to recruit similar levels of talent. *Id.* at 1949:22-1950:20.

37. Hytera's attempts to dispute this evidence regarding the amount of time that it took to develop the Misappropriated Trade Secrets were not credible. For example, Hytera's expert, Barbara Frederiksen-Cross, testified that it would take Hytera between 1.7 and 6.4 months to rewrite the misappropriated source code contained in the DSP, RFhal, and RAF libraries Hytera misappropriated. Tr. at 3972:3-7, 3973:23-3974:9. But the methodology she used to calculate Hytera's rewrite time is not reliable and has been referred to as "malpractice" in the relevant field. PTX-2370.552 (The expert whom Barbara Frederiksen-Cross relied on, Capers Jones, wrote "LOC metrics became less and less useful until sometime around 1985 they started to become actually harmful. . . . [I]t is fair to say that in many situations usage of LOC metrics can be viewed as professional malpractice. . . ."); Tr. at 4133:6-4134:2, 4137:24-4138:23, 4139:12-16 ("Q. In -- despite the -- despite the concerns and problems that the expert you're relying on is saying applies to the metrics you used, you still presented your testimony to the jury, fair? A. That is correct, yes.") (Barbara Frederiksen-Cross); *see also* Tr. at 5074:1-20 (Dr. Wicker explaining that merely counting lines of code "fails to take into account the importance of the source code, how the code is used ... and does not accurately reflect what happened in this case."); Tr. at 5076:4-5080:23 (Dr. Wicker explaining that Hytera radios "simply would not function").

38. Dr. Aron's reliance on 7,920 staff months was similarly not credible. Although Dr. Aron testified that the 7,920 staff months was Dr. Grimmett's opinion, Tr. at 4864:7-16, all Mr. Grimmett said was that a Motorola document supposedly suggested that the entire MotoTRBO project would take "7,900 or so staff months." *Id.* at 4559:17-4560:6. Mr. Malackowski explained that the Motorola document Dr. Aron referred to (DTX-4715) was incomplete with respect to development times for the Misappropriated Trade Secrets because it included only a portion of the

12

work that went into those trade secrets. *Id.* at 2331:12-2332:8.

39.     Thus, just as he did to calculate Motorola's R&D costs, Mr. Malackowski used Motorola's estimated staff months for developing seven non-overlapping trade secrets in order to ensure there was no overlap in his calculations of Hytera's avoided R&D costs. Tr. at 2188:18-2189:20; PTX-2070.1.

###### b. Mr. Malackowski Used Reliable Data to Determine the Cost Per Engineer in China

40.     To calculate Hytera's avoided R&D costs, Mr. Malackowski multiplied Hytera's average monthly engineering costs by the estimated staff months required to develop each of the trade secrets. Tr. at 2184:25-2185:10. Because Mr. Malackowski found that Hytera's financial records were incomplete and inaccurate, Tr. at 2258:20-2259:1, he used Motorola's engineering costs for engineers located in China to estimate Hytera's engineering costs, which Mr. Malackowski testified would represent the same cost to Hytera because it was a competitive market. Tr. at 2186:20-2188:13 (Mr. Malackowski testifying that he "used the Chengdu, China figures, which at the bottom [of PTX-2070.8] are $3,992 per month per engineer.").

41.     Hytera, however, asserts that the amount of avoided R&D should be calculated using Hytera's engineering costs, instead of Motorola's. Dkt. 954 at 6; Tr. at 4858:4-4864:16 (Dr. Aron using Hytera's engineering cost of $1,638 in 2010); DTX-4715; DTX-5607. As Mr. Malackowski explained, however, Hytera's data were not credible. Specifically, Mr. Malackowski testified that Hytera's labor rates in China "varie[d] in unexplainable ways on a year-by-year, hour-by-hour basis," e.g., "a secretary [was paid] $5 an hour, []an engineer [was paid] less than that, and then two years later [he] would see huge differences." Tr. at 2258:10-2260:10 (explaining costs increased by 70% one year and then decreased again). "Cherry-picking" Hytera's 2010 engineering costs, as Dr. Aron did, was thus not a fair reflection of Hytera's engineering costs. *Id.* at 2262:2-18.

42.     Thus, using the time it took Motorola to develop the seven, non-overlapping trade secrets and

Motorola's cost-per engineer in China, Mr. Malackowski concluded that Hytera avoided spending at least the following in R&D by misappropriating the 21 trade secrets.

| Trade Secret [1] | Motorola's Estimated Development Cost [2] | Hytera's Development Cost Savings [3] |
|---|---|---|
| Connectivity | $415,434 | $259,478 |
| DMR Protocol Stack | 9,663,630 | 6,035,852 |
| XCMP | 4,601,728 | 2,874,215 |
| Repeaters | 20,758,908 | 12,965,903 |
| Product Testing/Benchmarking | 4,601,728 | 2,874,215 |
| Hardware | 17,256,481 | 10,778,306 |
| DMR Source Code/Software | 60,512,728 | 37,795,928 |
| **Total** | **$117,810,638** | **$73,583,897** |

*Motorola Solutions, Inc., and Motorola Solutions Malaysia Sdn. Bhd. v. Hytera Communications Corporation Ltd., Hytera America, Inc., and Hytera Communications America (West), Inc.*
SUMMARY OF MOTOROLA DEVELOPMENT COST AND HYTERA AVOIDED COSTS DUE TO TRADE SECRETS
Appendix 7.0
Updated October 30, 2019

Notes:
[1] To avoid double counting, I have included only trade secrets that are not whole or partial subsets of other trade secrets. I have included trade secrets in this appendix based on my review of deposition testimony of Motorola witnesses.

[2] Appendix 7.2
[3] Appendix 7.1

PTX-2070.1; Tr. at 2184:25-2189:15.

43.     Hytera avoided spending this $73,583,897 million in R&D after the enactment of the DTSA on May 11, 2016. As Mr. Malackowski explained, Hytera avoided spending this R&D "with each and every [accused] product. There is no product that can be brought to the market in this case without the benefits of that research and development. So it relates to each and every product at the time that product is introduced," including "products released in February 2017 and January 2019." Tr. at 5364:22-5365:6.

44.     In addition, Hytera continued to launch new products using Motorola's trade secrets and copyrighted source code after this lawsuit was filed. Tr. at 5364:16-5365:6; DDX-22.12 (Dr. Aron's slide showing three accused products launching in January 2019). These products were sold in the United States after the DTSA's enactment, meaning Hytera avoided spending the $73.6 million in the United States. PTX-2070, PTX-2071, PTX-2226, DTX-4057.

### c. The Amount of Hytera's Avoided R&D Would Not Equate to a Perpetual License

45.     Hytera asserts that an award of $73.6 million amounts to a perpetual license. Dkt. 954 at

6. Hytera, however, agreed that the jury should not be instructed to award a reasonable royalty,

nor did Hytera present any evidence that its avoided R&D would, in fact, constitute a royalty,

perpetual or otherwise.

46.     Accordingly, the Court finds that the evidence supports $73.6 million for Hytera's avoided

research and development costs for Hytera's trade secret misappropriation under the DTSA.

47.     As discussed further below, however, although this figure is supported, an award of the

avoided research and development and Hytera's profits would constitute double recovery.

### C.     Hytera Earned $135.8 Million in Profits from Its Misappropriation

48.     Hytera began selling DMR radios that contained or were created with the Misappropriated

Trade Secrets in 2010. Tr. at 204:19-20, 2020:22-2021:4, 2395:3-4, 5138:15-5140:8.

49.     Without the benefit of the Misappropriated Trade Secrets, Hytera could not have made the

sales and profits on its DMR products at issue in this case. *See* Section II.A., *supra*; *see also* Tr. at

4717:20-4719:8 (Mr. Grimmett agreeing that ROSAL specification contains "utmostly necessary"

technology), 4090:23-4091:7 (Ms. Frederiksen-Cross testifying that "but for the Motorola code that

was stolen," the libraries Hytera claims to have independently written "would not work"), 5075:2-

5076:12 (Dr. Wicker explaining that without Motorola's source code, Hytera's DMR radios "simply

would not function."). Thus, Hytera's profits on its DMR radios are a direct result of Hytera's theft.

50.     Mr. Malackowski identified a causal nexus between Hytera's trade secret misappropriation and

gross revenues for DMR radios based on the amount Hytera spent on R&D to launch their first DMR

product. Tr. at 2156:2-24 ("I was looking here for the nexus of my damage claim, which is basically

whether or not there was a relationship between the trade secrets and copyright at issue and the

profits that I seek for both companies. Hytera benefited from the use of Motorola trade secrets and

copyrights, and they were able to reduce their own R&D expenses accordingly.").

51.     Hytera stole the Misappropriated Trade Secrets from Motorola's COMPASS system and ClearCase system, respectively, servers for which are located in the United States and are accessible at Motorola's facilities, including its Schaumburg office. Tr. at 209:22–210:11, 211:2– 14, 373:21–24, 379:21–380:5, 380:18–21, 396:20–25, 443:16–21, 521:18–20, 989:17–19, 997:10–998:2, 1001:2–20, 1009:15–1010:21, 5150:5–12.

52.     Hytera committed acts in furtherance of its misappropriation in the United States by advertising, promoting, and marketing products embodying the Misappropriated Trade Secrets in the United States, including at numerous trade shows. For example, Qi Yin, the "Director of Presales Support and Post-Sales Service for the Americas at Hytera," stated that his "responsibilities span initial client development through service after a sale of products and/or systems and include learning and understanding customers' technical requirements," including for Hytera's customers in the U.S. Dkt. 916 ¶¶ 3-5, 7. And Hytera's trial witnesses acknowledged that Hytera attended the IWCE trade show in the United States to advertise and promote its DMR products that benefit from its misappropriation. Tr. at 3310:3-15 (Xu Hailin: Hytera launched DMR radios in the United States); id. at 3460:15-17 (Andrew Yuan: "in America … the most important event is the IWCE [conference]"); id. at 3528:21-3529:25 (Andrew Yuan prepares "talking points for Hytera's employees who are at this trade show"); id. at 3231:8-16 (Jim Luo: IWCE in the U.S. is where "all the companies, such as Motorola … or Hytera, would distribute information about their companies, including their products as well."); Dkt. 834 at 21-22 ("Plaintiffs have introduced evidence in this case sufficient to support a finding that 'use' of the alleged trade secrets has occurred domestically. Specifically, it has been undisputed throughout trial that Defendants have advertised, promoted, and marketed products embodying the allegedly stolen trade secrets domestically at numerous trade shows. This constitutes 'use.'").

53.    Because Hytera committed acts in furtherance of its misappropriation in the United States after the DTSA's enactment, Motorola is entitled to damages based on Hytera's worldwide revenues for its DMR radios.

### a. Mr. Malackowski Properly Calculated Hytera's Profits From Its Misappropriation

54.    From 2010 to June 2019, Mr. Malackowski identified Hytera's revenue for the accused DMR portable radios as $532,025,673, with mobile radios adding "another 111 million" dollars; for accused DMR repeaters as $91,166,965; and for DMR accessories as $53,202,567. Tr. at 2191:14-2193:13; 2195:8-12; PDX-10.25; PTX-2071, PTX-2226, DTX-4057.

55.    Dr. Aron did not dispute the revenues Mr. Malackowski presented for the accused Hytera products. Tr. 4958:23-4959:2; PTX-2226.

56.    In determining the amount of Hytera's profits, Mr. Malackowski deducted costs that would vary with production of additional radios, i.e., costs of goods sold, patent royalties, sales department, and asset impairment. *Id.* at 2196:5-2197:12. Mr. Malackowski did not deduct costs associated with management or administration, legal fees, or research and development. *Id.*

57.    Mr. Malackowski calculated Hytera's profits from its misappropriation of Motorola's trade secrets by multiplying Hytera's actual revenues for the accused products by Hytera's profit margin. Tr. at 2189:21-2190:7 (citing PDX-10.24, PTX-2071), Tr. at 2191:14-2192:18 (citing PDX- 10.25). After deducting costs and expenses, Mr. Malackowski identified the amount of worldwide profits Hytera earned as a result of Hytera's trade secret misappropriation as $272 million. Tr. at 2195:13-2198:20, 5389:18–22 (referring to PDX 26.7). Adjusting the calculation for May 11, 2016 forward, the amount of Hytera's profits is $135.8 million.

58.    Dr. Aron agreed with Mr. Malackowski's deductions in calculating Hytera's profit margins, except with respect to Hytera's research and development expenses. Tr. at 4826:25- 4827:8, 4838:4-4840:2.

17

59.    Mr. Malackowski explained that he did not deduct Hytera's research and development expenses because he found that data, which Hytera produced during fact discovery, to be unreliable. Tr. at 2196:5–2198:8; PDX-10.28. For example, Hytera's R&D data indicated that in 2014, Hytera spent $6 million in R&D to launch two radios, but in 2016, Hytera spent two-and-a- half times that amount ($17 million) to launch a single radio. *Id.* Mr. Malackowski further explained that data "was not specific to these products [at issue] and was not correlated or related to the introduction of these products in a way that they should be deducted." Tr. at 2197:7-2198:8; PDX-10.28; PTX-2352.

60.    As a result, Mr. Malackowski did not deduct Hytera's R&D costs from its revenues when determining the amount of profit Hytera earned from its trade secret misappropriation. Tr. at 5363:11-18 (Mr. Malackowski explaining that "the accounting standards specifically talk about the use of data and that that data must be reliable, and if it isn't, it shouldn't be used. So in my opinion, consistent with what I testified to last year, those deductions should not be made. They're not appropriate.").

61.    Hytera, however, contends that its profits should be reduced by the amount that it claims to have actually spent on R&D for its DMR radios and for its "legitimate contributions" to its DMR radios. Dkt. 954 at 7-9. Hytera's arguments are without merit and not supported by the facts.

62.    At trial, Dr. Aron did not assert that the R&D data Hytera produced during fact discovery was reliable. Instead, Dr. Aron revised her own opinions at trial based on new, revised R&D data that Hytera produced mid-trial. Tr. at 5355:10-5356:3; DTX-5502. According to Dr. Aron, there was only one change to the R&D data produced during trial, that is, "It was a filtering down of the data that was originally produced. It's the same data, but it's a subset of the data." Tr. at 5012:6-12. Andrew Yuan, Hytera's VP of Sales and President of North and South America, testified that the R&D data was created and stored by Hytera in the ordinary course of business. Tr. at 3422:13- 21.

63.    Neither Dr. Aron's nor Mr. Yuan's testimony was credible. Although Dr. Aron asserted that

the "new" data was only a subset of the "old" data, Mr. Malackowski explained that was not the case. According to Mr. Malackowski, if the newly produced R&D data is "a subset of the [original] data, it should be less than what was originally produced. It's filtered away and you're just looking at part of it. That's not what happened," and instead, "It's not just data filtering. Somebody went in and changed the codes to attribute more R&D expense to the products to this litigation, and that change was made during the litigation." Tr. at 5356:16-5361:13; PDX-28 at 176; *compare* PTX-2352 at 24-25 *with* DTX-5502 at 27.

64. Mr. Malackowski also explained that, contrary to Mr. Yuan's assertion, "it just cannot be possible that the data that was received during trial was prepared in normal course based upon records that happened 5 to 10 years ago and that are not a subset but now are greater than they ever were." Tr. at 5362:16-5363:10.

65. Because Hytera's R&D data was not credible, it was appropriate for Mr. Malackowski not to deduct those purported expenditures in arriving at Hytera's profit margins.

66. Dr. Aron also incorrectly asserted that Mr. Malackowski's "analysis overstates the unjust enrichment claim because it fails to deduct research and development expenses that were incurred by Hytera after the accused devices were introduced over a long period of time and that wouldn't have been incurred had those products not been introduced into the market." Tr. at 4827:1-8; *see also* Tr. at 4854:10-14 (Dr. Aron opining that "Mr. Malackowski's refusal to deduct these post-launch research and development expenses" "inflates or increases his [unjust enrichment] damages amount by $79.6 million."); Tr. at 4856:3-23.

67. Hytera's R&D expenses are not accurate, and thus, should not be deducted. *See also* Tr. at 5447:10-18. In addition, Mr. Malackowski explained that Hytera used the substantial amount of R&D expenditures that it saved through its misappropriation to try to "leapfrog" Motorola in the market by developing additional DMR features to differentiate its products. Tr. at 2157:8-19 (Mr.

Malackowski explaining that "the one who takes the intellectual property without payment can then use whatever money they have, not to catch up, but to actually try to get ahead, to develop something that will differentiate themselves and leap ahead of the innovator.").

### b. Hytera's Attemot to Limit Disgorgement of Its Profits with a "Head Start" Period Fails

68.    Hytera asserts that its disgorgement must be limited to a head start period. Dkt. 954 at 6-7. Specifically, Hytera asserted that disgorgement should be limited to Hytera's profits from 2010 to 2014 because (i) all of the Misappropriated Trade Secrets other than Motorola's DMR Source Code, DSP Source Code, and Repeaters could have been developed in under four years; and (ii) the DMR Source Code, DSP Source Code, and Repeater trade secrets were supposedly invalid. *Id.*

69.    Hytera's head start argument fails because the Court concluded that none of the Misappropriated Trade Secrets, including DMR Source Code, DSP Source Code, and Repeater, were invalid as a matter of law. Dkt. 1088 at 7-9. Thus, Hytera still, to this day, could not have launched DMR radios comparable to Motorola's without the Misappropriated Trade Secrets, making the head start period is inapplicable. *See* Tr. at 593:24-595:10 (DMR Source Code trade secret took 87 engineers 9,468 staff months to develop), 707:13-708:16 (DSP Code trade secret took 25 engineers 3,000 staff months to develop), 998:25-999:5 (Repeater trade secret took 20 engineers 3,248 staff months to develop); PDX-10.30 (DMR Source Code, DSP Source Code, Repeaters took 108 calendar months to develop), Tr. at 2199:2-13.

70.    Hytera nonetheless contends that despite the Court's finding that the Misappropriated Trade Secrets were valid, "the Court must make an independent finding of what the head start period would have been and award no more than the equitable amount." Dkt. 954 at 7 n.1. Hytera cites no case law mandating such an analysis. Nonetheless, even if such an analysis were required, the evidence demonstrates that it was appropriate to award Hytera's profits through June 30, 2019.

71.     Hytera was incapable of developing a comparable DMR radio in any commercially reasonable time; to this day, Hytera still has not been able to develop a "comparable" DMR radio on its own. Dkt. 935-3 (Ex. 36) (Dr. Rangan slide: "Hytera Could Not Conceive Of Or Develop The Trade Secrets In A Commercially Reasonable Time"); Tr. at 1823:10–13 (testimony re same), 1950:21– 1951:7 (Dr. Rangan: Hytera is still using Motorola's trade secrets "almost ten years" after Hytera's first DMR product release so "it would take at least ten years of time for them to develop these asserted trade secrets.").

72.     Motorola also presented evidence that even if Hytera could develop a comparable DMR radio in a certain period of time, that would be years from now. Tr. at 2016:22–2017:3 (Dr. Rangan: DSP source code trade secret and repeater took 23.5 years to develop), 2062:19-21 (Dr. Rangan: "Q. And your opinion is that what Hytera developed would never have worked? A. In any commercially reasonable time, no."), 1950:13-1951:7 (Dr. Rangan: "It's my view that [Hytera] would actually have never conceived of these or implemented these trade secrets in any commercially reasonable period of time, but even if they were to, the time for Motorola took to develop these trade secrets would be an absolute minimum or baseline for that time.").

73.     Hytera still has not released a DMR radio comparable to Motorola's that was not designed with the Misappropriated Trade Secrets almost four years after this case was filed, and nearly a year after the jury verdict. Tr. at 2480:10-12 ("[Q.] And you can't deny that Hytera . . . whether or not Hytera is currently using a single line of Motorola source code? [A.] I don't deny it. I know it as a fact.") (Pengfei Sun), 1950:21–1951:7 (Dr. Rangan: Hytera is currently still using Motorola's trade secrets "almost ten years" after Hytera's first DMR product release so "it would take at least ten years of time for them to develop these asserted trade secrets.").

74.     Hytera's experts attempted to argue that the Misappropriated Trade Secrets were not important to Hytera's development of DMR radios, and that without the misappropriation, Hytera

21

could have released its radios in six months, but those assertions were not credible.

75.     Mr. Grimmett claimed that Hytera used only a "very small amount" of Motorola's trade secrets to develop its DMR radios and that six months was "quite generous." Tr. 4282:23-4284:9. Yet Mr. Grimmett admitted that PTX-479, Hytera's ROSAL specification, describes "a standard and common operating system environment that is utmostly necessary," and is thus "important" and presumably "would provide a competitive advantage." Tr. at 4718:7-4719:8; PTX-479. Mr. Grimmett further admitted that this ROSAL specification was written by Y.T. Kok, and that he copied "a good amount" of its contents from a Motorola confidential document. Tr. at 4719:9-17. While Mr. Grimmett further admitted that Hytera's Professor Sun sent an email in September 2009—after G.S. Kok, Y.T. Kok, Sam Chia, and Peiyi Huang joined Hytera but before Hytera launched its DMR product—declaring that Hytera's common platform architecture ("CPA"), which it stole from Motorola, "is very important to the standardization of Hytera's future products" (Tr. at 4720:4-4721:2; PTX-2205), Mr. Grimmett also acknowledged that just the day prior, he had "testified that the entire software architecture trade secret ... did not provide any competitive advantage to Hytera" and "was generally known" (Tr. at 4721:9-23). And despite acknowledging that Hytera's Roger Zhang "is talking about having many problems" with "the transplanting of the protocol stack" in January 2007 (PTX-1984), prior to G.S. Kok, Y.T. Kok, Sam Chia, and Peiyi Huang joining Hytera, and is "still having many problems with the DMR protocol stack" a year and a half later in June 2008 (PTX-542), Mr. Grimmett stood by his testimony that "Motorola's protocol stack provides no competitive advantage to Hytera." Tr. at 4732:14-4734:5.

76.     Hytera's other technical expert, Ms. Frederiksen-Cross, confirmed that "but for the Motorola code that was stolen," the libraries Hytera claims to have independently written "would not work." Trial Tr. 4091:4-7.

77.     Dr. Aron's claim that Hytera would immediately catch up to its current level of sales

22

whenever it released a DMR radio was likewise not credible. Indeed, even Dr. Aron agreed that a late market entrant "may lose more sales if the late or delayed entry would have affected its ability to build its demand up." Tr. at 4880:19–4881:9. Dr. Aron also testified that as Hytera releases additional models, Hytera will customize those products for specific uses based on customer feedback. Tr. at 4853:19-23 ("As the company puts out additional models, . . . customers see customization of those products for their specific uses, so they will come back to Hytera, and the engineers will do customization on those products."). This was consistent with Mr. Malackowski's testimony. Tr. at 5375:2–21 (Malackowski: had Hytera "entered the market in 2014, [i]t would make no sense they could have obtained all the sales they actually did with the benefit of having started several years earlier."), 5375:22–5377:9 (Malackowski: in DMR market, "you build sales over time because you work with your customers to ramp up their need across their entire business. So you can't come in years later and pick up where you otherwise would have been.").

78.     The Court finds the evidence supports disgorgement of $135.8 million for Hytera's profits due to Hytera's trade secret misappropriation under the DTSA.

### D. Hytera's $135.8 Million Profits from Its Misappropriation Are the Proper Amount of Unjust Enrichment, the $73,583,897 Addition for Avoided Research and Development Constitutes Double Recovery

79.     Mr. Malackowski testified that, because all of the trade secrets were misappropriated, the full amount of Hytera's profits in addition to Hytera's avoided R&D should be awarded. Tr. at 2200:5–11; *see also* Tr. at 5353:3-14 (Mr. Malackowski testifying that "there are two components" to his unjust enrichment opinion: "There are the profits that Hytera actually made on the sales that are accused and it's the R&D that they saved that they did not have to spend because they misappropriated the trade secrets."); PDX-10.29-.32, PDX-26.7.

80.     Awarding both the amount of R&D that Hytera avoided spending through its

23

misappropriation and Hytera's profits from sales of DMR radios developed with the misappropriated trade secrets constitutes double recovery, however. See Tr. 4856:3-22 (Dr. Aron explaining why Motorola's request for both Hytera's profits and avoided research and development amounts to double recovery).

81. By force of the Court's reasoning in the October 19, 2020, the disgorgement of Hytera's profits is an equitable remedy, as the award is not a specific proxy for Motorola's actual losses.

82. By force of the Court's reasoning in the October 19, 2020 Order, awarding Hytera's avoided costs and Hytera's profits is double recovery.

83. The Court finds that $135.8 million should be awarded for Hytera's trade secret misappropriation under the DTSA. The disgorgement of Hytera's profits and the award of Hytera's avoided research and development would constitute double recovery, however.

84. The proper award, then, is $272,117,268, when including the Copyright Act disgorgement, discussed below.

85. Because the punitive damages in this case are a function of the compensatory damages under the DTSA, the punitive damages award must therefore also be reduced so as to adhere to the statutory provision of the DTSA. 18 U.S.C. 1836 (b)(3)(C) (stating that an award of exemplary damages may not exceed 2 times the amount of the compensatory award).

86. Punitive damages, then, shall be reduced to $271.6 million.

## III. THE COPYRIGHT INFRINGEMENT AWARD TO MOTOROLA IS PROPER

### A. Hytera's Infringement

87. Motorola holds certificates of copyright registration for the MotoTRBO program in its radios. PTX-1527, PTX-1528, PTX-1645, PTX-1659, Tr. at 200:22-202:23; Dkt. 895 at Instruction No. 3 ("The following are stipulated facts: ... 9. The U.S. Copyright Office issued registration certificates relating to certain software associated with Motorola's DMR radio products at issue in this case.").

88.     Motorola witnesses testified that the content of Motorola's copyrights was original and creative. Tr. at 607:11-23, 862:18-864:9, 1437:7-12. Hytera presented no countervailing evidence.

89.     Hytera had access to Motorola's copyrighted source code, and copied thousands of lines of that copyrighted source code that was original to Motorola into its own products. Tr. at 874:19- 876:9, 1432:5-1436:8; PTX-2090 and PTX-2091 (Exhibits C and D to Dr. Wicker's report). Hytera concedes that it copied Motorola's copyrighted DMR source code. Tr. at 3781:14-21.

90.     The Court denied Hytera's motion for judgment as a matter of law or new trial with respect to Motorola's copyright infringement claim. Dkt. 1088 at 11-13.

**B.      Hytera's Profits**

91.     Hytera began selling DMR radios that contain Motorola's copyrighted DMR source code in 2010. Tr. 204:19-20, 2020:22-2021:4, 2395:3-4, 5138:15-5140:8.

92.     Dr. Wicker explained that none of Hytera's DMR radios would function without Motorola's copyrighted source code. Tr. at 5075:7-5076:12 (citing PDX-20.5) (Dr. Wicker describing three libraries "in extensive use in Hytera's radios" that Hytera acknowledges were taken from Motorola; explaining that Hytera radios "would not function" without stolen code), 5073:10- 25 (Dr. Wicker explaining that "all 3500 ... source code files" in Hytera's radios "are contaminated or were developed with knowledge and availability of Motorola source code"), 5080:3-23 (Dr. Wicker explaining that even source code "done by someone other than what [Mr. Grimmett] refers to as the Malaysian team" is "still making use of Motorola's code" by "calling on Motorola's library ... for its functionality).

93.     The copyrighted source code that Hytera copied was taken from Motorola's ClearCase system and brought over to Hytera. Tr. at 443:18–21, 5087:3-5088:13; PTX-2100.825; PTX- 1316.3. Dr. Stephen Wicker, Motorola's technical expert, explained that the main ClearCase server is in Illinois, and that server is mirrored in other locations. Tr. 5150:5-5151:3. As a result, the other ClearCase

servers "reflect[] material that is in Illinois" and "anything that happens on one of those other [ClearCase] sites goes to Illinois." *Id.*

94.    Because Hytera's copyright infringement in the United States is directly linked to its foreign sales of DMR radios, Motorola is entitled to Hytera's worldwide profits from its DMR radios.

95.    Mr. Malackowski identified a causal nexus between Hytera's copyright infringement and gross revenues for DMR radios based on the amount Hytera spent on R&D to launch their first DMR product. Tr. at 2156:2-24 ("I was looking here for the nexus of my damage claim, which is basically whether or not there was a relationship between the trade secrets and copyright at issue and the profits that I seek for both companies. Hytera benefited from use of the Motorola trade secrets and copyrights, and they were able to reduce their own R&D expense accordingly.").

96.    From 2010 to June 2019, Mr. Malackowski identified Hytera's revenue for the accused DMR portable radios as $532,025,673, with mobile radios adding "another 111 million" dollars; for accused DMR repeaters as $91,166,965; and for DMR accessories as $53,202,567. Tr. at 2191:14-2193:13; 2195:8-12; PDX-10.25; PTX-2071, PTX-2226, DTX-4057.

97.    Dr. Aron did not dispute the revenues Mr. Malackowski presented for the accused Hytera products. Tr. 4958:23-4959:2; PTX-2226.

98.    In determining the amount of Hytera's profits, Mr. Malackowski deducted costs that would vary with production of additional radios, i.e., costs of goods sold, patent royalties, sales department, and asset impairment. Tr. at 2196:5-2197:12. Mr. Malackowski did not deduct costs associated with management or administration, legal fees, or research and development. *Id.*

99.    Mr. Malackowski calculated Hytera's profits from its infringement of Motorola's copyrights by multiplying Hytera's actual revenues for the accused products by Hytera's profit margin. Tr. at 2189:21-2190:7 (citing PDX-10.24, PTX-2071), Tr. at 2191:14-2192:18 (citing PDX-10.25). After deducting costs and expenses, Mr. Malackowski identified the amount of worldwide profits Hytera

earned as a result of Hytera's copyright infringement as $272 million. Tr. at 2195:13-2198:20, 5389:18–22 (referring to PDX 26.7).

100. Dr. Aron agreed with Mr. Malackowski's deductions in calculating Hytera's profit margins, except with respect to Hytera's research and development expenses. Tr. at 4826:25- 4827:8, 4838:4-4840:2. For the reasons explained above, Mr. Malackowski properly concluded that Hytera's R&D expenses should not be deducted in calculating Hytera's profits.

101. The Court finds that the evidence supports disgorgement of $136.3 million in Hytera's profits for Hytera's copyright infringement.

## IV.    HYTERA'S MOBILE RADIOS ARE PROPERLY INCLUDED IN THE DAMAGES AWARD FOR COPYRIGHT INFRINGEMENT AND TRADE SECRET MISAPPROPRIATION

102. Motorola's technical expert, Dr. Wicker, testified that mobile radios use the same code as the accused devices and repeaters, and Hytera's interrogatory response confirming that fact was admitted without objection from Hytera's counsel. Tr. at 1428:5-13; 1431:14-21; 5124:2-20; DDX-14.10; PTX-1740. Hytera's expert, Barbara Frederiksen-Cross, agreed, testifying that Hytera's accused mobile devices include the same code as Hytera's accused devices and repeaters. Tr. at 3795:4–14 ("The way the code is organized is there is repeater specific code and then subscriber specific code, which includes the code that's used in both the mobile and handheld devices.").

103. Motorola introduced testimony related to Hytera's mobile products, to which Hytera did not object. For example, Mr. Malackowski testified to the amount of Hytera's revenue from the accused mobile products, as well as the profit margin for Hytera's accused products, including mobiles. Tr. at 2191:23-2192:3; 2198:9-17; PTX-2071, PTX-2226, DTX-4057. Hytera did not object to any of this evidence when it was admitted. On rebuttal, Mr. Malackowski provided a sum of that information. Tr. at 5395:11-24.

104. Hytera does not contend that Mr. Malackowski's calculations are inaccurate. Instead, Hytera's

witnesses disputed in a conclusory manner that Hytera's DMR mobile radios were accused. Tr. at 2581:3-7 (Mr. Sun testifying that he understands mobiles are not at issue in the case); 3278:7-9 (Mr. Luo testifying that he understands Motorola is not accusing mobile radios); 3408:22-24 (Mr. Yuan testifying that "[a]ll of the mobiles was not accused"); 3426:21-25 (same); Dkt. 898. Hytera's witness testimony is plainly contradicted by the facts, which unequivocally demonstrate that Hytera's mobile radios include Hytera's DMR mobile radios and misappropriated trade secrets.

105.    Because Hytera's DMR mobile radios include Motorola's misappropriated trade secrets and infringed copyrights (Tr. at 1428:5-13; 1430:17-1431:21 3795:4–14; DDX-14.10; PTX-1740), they are properly included in the award.

## V.    THE REDUCED AWARD OF $272,117,268 IS NOT EXCESSIVE AND NO REMITTITUR SHOULD BE GRANTED

106.    The award of $345,761,165 must be reduced to avoid double recovery for Motorola. The award cannot contain a disgorgement of profits and the avoided research and development costs, as outlined in the Court's October 19, 2020 Order and as further discussed below.

107.    The reduced award of $272,117,268 is not excessive.

108.    Hytera asserts that "there is no rational connection between the evidence in this case and award of $345.8 million for trade secret misappropriation and copyright infringement." Dkt. 954 at 39-40. In support, Hytera repeats arguments that that have been addressed above. *Id.* at 39 (Hytera arguing damages should be limited to a head start period,); *id.* at 40 (Hytera arguing copyright damages should be limited to U.S. only); *id.* (Hytera arguing compensatory damages should be limited to $73.6 million).

109.    Second, Hytera argues that the award is "monstrously excessive because it exceeds total profits for all products—not just accused products." *Id.* at 39. Hytera's argument is misleading. As Mr. Malackowski explained at trial, Hytera's claim that it made only $265 million in profits over a 9.5 year period ignored that Hytera used its $734 million in accused revenues "to make acquisitions

to enhance its competitive position." Tr. 5343:18–5344:3, 5348:25-5351:20; *see also* PTX-968. Even Hytera's expert did not deduct Hytera's expenditures in acquiring new companies to enhance its competitive position in calculating Hytera's ill-gotten profits. Tr. 4837:16–4840:14.

110.    Third, Hytera contends that the award of $345 million is not comparable to awards in similar cases. Dkt. 954 at 40. This is incorrect. Hytera sold the accused products for nearly ten years, continued to sell the accused products after they were sued, and made $734.1 million in revenue on those products. Tr. 2191:23-2192:7, 5344:1-3. Awards in trade secret cases with a similar breadth of theft have neared or exceeded the $345 million awarded in this case. *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, No. 3:09-cv-58, 2012 WL 1202485, at *1 (E.D. Va. Apr. 10, 2012) ($919.9 million compensatory damages verdict in trade secret misappropriation case); *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp., Inc.*, 328 F.R.D. 450, Dkt. 931 at 4 (S.D.N.Y. Oct. 27, 2020) (jury verdict form awarding $284 million compensatory damages for trade secret misappropriation).

## VI.    MOTOROLA SHOULD BE AWARDED $272,117,268 FOR HYTERA'S TRADE SECRET MISAPPROPRIATION AND COPYRIGHT INFRINGEMENT

111.    The Court finds that Motorola should be awarded $135.8 million for Hytera's profits due to Hytera's trade secret misappropriation under the DTSA, for the time period from May 11, 2016 to June 30, 2019.

112.    The Court finds that Motorola should be awarded $136.3 million in Hytera's profits for Hytera's copyright infringement, for the time period from 2010 to May 10, 2016.

113.    The total compensatory award, therefore, is $272,117,268, excluding punitive damages.

## CONCLUSIONS OF LAW

### I.     DAMAGES - BURDEN OF PROOF

1.     Motorola had the burden of proving whether Hytera caused the damage that Motorola is claiming by a preponderance of the evidence. *See Playwood Toys, v. Learning Curve Toys*, No. 94-cv-6884, 2000 WL 36740990 (N.D. Ill. Aug. 15, 2000), ECF No. 19 (Jury Instructions); Federal Civil Jury Instructions of the Seventh Circuit, Instruction No. 12.8.1

### II.    TRADE SECRET DAMAGES

2.     Under the DTSA, the Court may award the following for misappropriation of trade secrets: "(i)(I) damages for actual loss caused by the misappropriation of the trade secret; and (II) damages for any unjust enrichment caused by the misappropriation of the trade secret that is not addressed in computing damages for actual loss[.]" 18 U.S.C.A. § 1836(3)(B).

3.     "[T]he measure of unjust enrichment damages is the benefit conferred to the defendant." *Medmarc Cas. Ins. Co. v. Avent Am., Inc.*, 612 F.3d 607, 611 (7th Cir. 2010). "[I]n the trade secret misappropriation context, the proper measure of unjust enrichment damages is 'the total gains of [a defendant's] wrongdoing,'" which includes the defendant's profits from the misappropriation and the costs the defendant avoided incurring due to the misappropriation. *Steves & Sons, Inc. v. JELD-WEN, Inc.*, No. 3:16-CV-545, 2018 WL 2172502, at *6-7 (E.D. Va. May 10, 2018); *Syntel Sterling Best Shores Mauritius Ltd. v. TriZetto Grp.*, No. 15 CIV. 211 (LGS), 2020 WL 5822058.

4.     To establish the defendant's ill-gotten profits, "[t]he plaintiff has the burden of establishing the defendant's sales; the defendant has the burden of establishing any portion of the sales not attributable to the trade secret and any expenses to be deducted in determining net profits. *Cartel Asset Mgmt. v. Ocwen Fin. Corp.*, 249 F. App'x 63, 79 (10th Cir. 2007) (quoting

Comment (f) to the Restatement (Third) of Unfair Competition § 45 (1995)); *Peerless Indus., Inc. v. Crimson AV LLC*, No. 11-cv-1768, Jury Instructions at 45 (N.D. Ill. June 24, 2016) (Dkt. 610).

5.    Avoided costs are "the avoided costs that would have been incurred to achieve the same result without access to those trade secrets." *Miller UK Ltd. v. Caterpillar, Inc.*, No. 10-CV-03770, 2015 WL 10818831, at *13 (N.D. Ill. Nov. 1, 2015) (internal quotations omitted).

6.    Unjust enrichment for trade secret misappropriation is not limited to a head start period. *RRK Holding Co. v. Sears, Roebuck & Co.*, 563 F. Supp. 2d 832, 836 (N.D. Ill. 2008) ("While Illinois case law requires damages be limited to a head start period for injunctive relief, it has not made such a requirement for monetary damages.").

7.    Rather, "[t]o prevent underenforcement and to remedy the defendant's increased market share, therefore, it is equitable to grant … monetary damages beyond [a] 'head start' period." *Agilent Techs., Inc. v. Kirkland*, No. CIV.A. 3512-VCS, 2010 WL 610725, at *27 (Del. Ch. Feb. 18, 2010); *see also Russo v. Ballard Med. Prods.*, 550 F.3d 1004, 1020 (10th Cir. 2008).

8.    Hytera's avoided R&D does not constitute a fully paid up royalty because there is no evidence supporting that conclusion. *See Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, No. 15-cv-1202, 2017 WL 3034655, at *2–3 (E.D. Tex. July 18, 2017) (rejecting argument verdict was fully paid-up license where "parties did not argue to the jury (or the Court) that the damages award would constitute compensation for a paid-up license").

9.    Notwithstanding Motorola's request to the jury for an award of Hytera's profits only, this Court previously ruled that the jury's award "is properly characterized as a 'case-specific proxy for … losses' that rendered the award a "legal remedy." Dkt. 1088 at 26.

10.    That ruling was based on the belief by the Court that the $135.8 award represented Motorola's lost profits, not Hytera's profits.

11.     The Court's legal reasoning remains the same, but this factual inaccuracy must be corrected.

12.     *Texas Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.* ("*TAOS*"), 895 F.3d 1304, 1318–26 (Fed. Cir. 2018) instructs that "[i]n some cases, a plaintiff seeking disgorgement as a remedy for trade secret misappropriation might prove that this measure of relief, though focused on the defendant's gains, is good evidence of damages in the form of the plaintiff's losses or of a reasonable royalty for use of the secret."

13.     Hytera's profits are not a proxy for Motorola's actual losses in this case. *See Fair Isaac Corp. v. Fed. Ins. Co.*, 408 F. Supp. 3d 1019, 1031 (D. Minn. 2019), aff'd, 468 F. Supp. 3d 1110 (D. Minn. 2020).

14.     Motorola may not recover both Hytera's profits and avoided R&D because this amounts to impermissible double recovery.   If Motorola recovers Hytera's profits, then it is recovering the amounts Hytera saved in research and development from the alleged misappropriation.  *Salisbury Laboratories, Inc. v. Merieux Laboratories, Inc.*, 908 F.2d 706 (11th Cir. 1990); *see also In re Mud King Prods., Inc.*, 514 B.R. 496, 523–24 (Bankr. S.D. Tex. 2014) (rejecting trade secret owner's request to recover both disgorgement of debtor's profits and "hypothetical development costs" because "no case allows development costs where defendant's profits are shown"); *Hallmark Cards, Inc. v. Monitor Clipper Partners, LLC*, No. 08-0840-CV-W-ODS, 2012 WL 3047308, at *3 n.4 (W.D. Mo. July 25, 2012) ("Most of the authorities cited indicate that the defendant's cost savings may be used to value gain instead of, and not as well as, profits earned from the misappropriation. This is undoubtedly based on the need to avoid double counting of gains.").

15.     The clear indication of Congress in amended Chapter 90 of Title 18 of the U.S. Code was to extend the extraterritorial provisions of Section 1837 to Section 1836, meaning Section 1836 may have extraterritorial reach subject to the restrictions in Section 1837. Dkt. 834 at 15.

16.     18 U.S.C. § 1837 provides: "This chapter also applies to conduct occurring outside the United States if— (1) the offender is a natural person who is a citizen or permanent resident

alien of the United States, or an organization organized under the laws of the United States or a State or political subdivision thereof; or (2) an act in furtherance of the offense was committed in the United States."

17. The "offense," in context of the 18 U.S.C. § 1837(2), is the misappropriation of a trade secret. This is clear through the plain language of the statute. *See* 18 U.S.C. § 1836(b). As courts have recognized, misappropriation can occur through any of three actions: (1) acquisition, (2) disclosure, or (3) use. *Zaccari v. Apprio, Inc.*, 390 F. Supp. 3d 103, 112-13 (D.D.C. 2019) (the DTSA "permits plaintiffs to bring private causes of action if they 'own[] a trade secret that is misappropriated.' 18 U.S.C. § 1 836(b)(1 ). Misappropriated means either '(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person' who meets one of several conditions. 18 U.S.C. § 1839(5)(A)- (B). As some courts have put it, the DTSA thus authorizes suits alleging three theories of trade secret misappropriation: (1) acquisition, (2) disclosure, and (3) use. *See, e.g., AUA Private Equity Partners, LLC v. Soto*, No. 1:17-8035-GHW, 2018 WL 1684339, at *4 (S.D.N.Y. Apr. 5, 2018); *Camick v. Holladay*, 758 F. App'x 640, 645 (10th Cir. 2018).").

18. "[M]arketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret ... all constitute 'use.'" *Cognis Corp. v. CHEMCENTRAL Corp.*, 430 F. Supp. 2d 806, 812 (N.D. Ill. 2006).

19. Section 1837 of the DTSA does not define what constitutes "an act in furtherance of the offense." In *Luminati Networks Ltd. v. BIScience Inc.*, No. 2:18-CV-00483-JRG, 2019 WL 2084426, at *9 (E.D. Tex. May 13, 2019), a Texas district court case analyzing Section 1837 wrote, "this language is not foreign to the common law but is regularly used in the area of

federal conspiracy law." *Id.* (citing *Yates v. United States*, 354 U.S. 298, 334 (1957) ("[T]he overt act must be found...to have been in furtherance of a conspiracy. "); *Findlay v. McAllister*, 113 U.S 104, 114 (1885) ("[T]o sustain the action it must be shown not only that there was a conspiracy, but that there were tortious acts in furtherance of it.")

20.     "[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts ... the meaning its use will convey to the judicial mind unless otherwise instructed." *Morissette v. United States*, 342 U.S. 246, 263 (1952).

21.     As did the *Luminati* court, this Court looks to the established common law meaning of "in furtherance of" when interpreting the extraterritoriality provision of the DTSA. 18 U.S.C. § 1837(2). The Court agrees with *Luminati*'s analysis on this point: "Applied to the DTSA, *Yates* makes clear that the act in furtherance of the offense of trade secret misappropriation need not be the offense itself or any element of the offense, but it must 'manifest that the [offense] is at work' and is not simply 'a project in the minds of the' offenders or a 'fully completed operation.' [*Yates*, 354 U.S. at 334.] Put another way, an act that occurs before the operation is underway or after it is fully completed is not an act 'in furtherance of' the offense." 2019 WL 2084426, at *10.

22.     If Motorola has shown that Hytera has taken actions that "manifest that the offense is at work"—the offense being the misappropriation—then Section 1837 has been satisfied and the chapter (including Section 1836(b)) also applies to acts occurring outside the United States.

23.     Motorola introduced evidence in this case sufficient to support a finding that "use" of the trade secrets has occurred domestically. It was undisputed throughout trial that Hytera has advertised, promoted, and marketed products embodying the allegedly stolen trade secrets domestically at numerous trade shows and that as a result, Section 1837(2) was satisfied and

34

the DTSA applied extraterritorially. *See* Dkt. 834 at 21–23; *Gen. Universal Sys., Inc. v. HAL, Inc.*, 500 F.3d 444, 450 (5th Cir. 2007); *Cognis Corp. v. CHEMCENTRAL Corp.*, 430 F. Supp. 2d 806, 812 (N.D. Ill. 2006).

24.     The DTSA applies to a "use"-based private cause of action even if the acquisition occurred before effective date of the statute or if the use began before the effective date. *See* Pub. L.114- 153, May 11, 2016 (18 U.S.C. § 1833 Note) ("The amendments made by this section shall apply with respect to any misappropriation of a trade secret ... for which any act occurs on or after the date of the enactment of this Act."). This broad language, coupled with the omission of the provision in the Uniform Trade Secret Act limiting such recovery, support the position that "use" in this case occurring after effective date serves as a proper basis for this action.

25.     Alternatively, the application of the DTSA and the ITSA in this case is domestic because Hytera's misappropriation occurred in the United States. 18 U.S.C. § 1839(5)(A) (defining misappropriation to include "acquisition"). The theft occurred in the United States when Hytera employees stole Motorola's trade secrets from the Compass and ClearCase systems because those systems are accessible at Motorola's Schaumburg office. *Flavorchem Corp. v. Mission Flavors & Fragrances, Inc.*, 939 F. Supp. 593, 597–98 (N.D. Ill. 1996) (finding that because trade secrets were copied in Illinois and injury occurred in Illinois, Illinois was the location of the tortious conduct); *Specht v. Google, Inc.*, 660 F. Supp. 2d 858, 866 (N.D. Ill. 2009) (because infringement "took place on the Internet" it "presumably occurr[ed] in Illinois"); *Strabala v. Zhang*, 318 F.R.D. 81, 111 (N.D. Ill. 2016) ("where the internet is concerned, a person's conduct may be expressly aimed at a specific person or entity in another forum that causes harm in that forum without having express knowledge as to the ... location of the ... entity being affected").

26.     This is sufficient to establish that Motorola's claim for misappropriation is based on

conduct that occurred in this District. *See WesternGeco v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2138 (2018) ("[T]he object[s] of the statute's solicitude[] can turn on the 'conduct,' 'parties,' or interests that it regulates or protects."); *IPOX Schuster, LLC v. Nikko Asset Mgmt. Co.*, 304 F. Supp. 3d 746, 759 (N.D. Ill. 2018) (ITSA applied domestically because "[defendant] used a conduit to request and receive information from [plaintiff], which is based in Illinois"). The fact that the acquisition occurred prior to the enactment of the DTSA does not preclude a domestic application of the statute based on that acquisition because the DTSA applies to continuing misappropriations, so long as "any act occurs on or after the date of the enactment of this Act." *See* Pub. L.114-153, May 11, 2016 (18 U.S.C. § 1833 Note).

27.     As a result, "any damage award flowing from ... domestic misappropriation would not run afoul of the presumption against the extraterritorial application of law." *See Turnkey Sols. Corp. v. Hewlett Packard Enter. Co.*, No. 15-cv-1541, 2017 WL 3425140, at *8 (D. Colo. Aug. 9, 2017) (denying summary judgment that plaintiff could not seek damages for extraterritorial sales under Colorado's UTSA); *see also Envtl. Def. Fund, Inc. v. Massey*, 986 F.2d 528, 531 (D.C. Cir. 1993) ("Even where the significant effects of the regulated conduct are felt outside U.S. borders, the statute itself does not present a problem of extraterritoriality, so long as the conduct which Congress seeks to regulate occurs largely within the United States.").

28.     Hytera's profits due to Hytera's trade secret misappropriation under the DTSA, for the time period from May 11, 2016 to June 30, 2019, is $135.8 million.

29.     The Court will award this disgorgement of Hytera's profits. "[B]y disgorging any net profits from the infringer, lost profit damages eliminate a major incentive to steal the copyright instead of fairly negotiating for its use with the owner." *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 568 (7th Cir. 2003).

## III. COPYRIGHT INFRINGEMENT DAMAGES

30.     Motorola's certificates of registration for the MotoTRBO program in its radios are

"prima facie evidence of the validity of the copyright," 17 U.S.C. § 410(c), including "both valid ownership of copyright and originality." *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 549 (S.D.N.Y. 2013).

31.　　The Copyright Act permits a plaintiff to recover "profits of the infringer that are attributable to the infringement." 17 U.S.C. § 504(b). To establish the infringer's profits, "the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." *Id.*; *see also* Dkt. 895 at Instruction No. 40.

32.　　The Seventh Circuit has held that the continuing violation doctrine applies in copyright cases. *See Taylor v. Meirick*, 712 F.2d 1112, 1118-19 (7th Cir. 1983). As Judge Posner wrote, "When the final act of an unlawful course of conduct occurs within the statutory period, these purposes are adequately served, in balance with the plaintiff's interest in not having to bring successive suits, by requiring the plaintiff to sue within the statutory period but letting him reach back and get damages for the entire duration of the alleged violation." Dkt. 1088 at 12 (quoting *Taylor*, 712 F.2d at 1119).

33.　　While "a plaintiff must show a causal nexus between the infringement and the gross revenues," *Bell v. Taylor*, 827 F.3d 699, 710 (7th Cir. 2016), "[t]he Seventh Circuit [requires] only a minimal connection between revenue and infringement in direct profit cases," *Bergt v. McDougal Littell*, 661 F. Supp. 2d 916, 927 (N.D. Ill. 2009). "Thus, all a plaintiff must do to meet his burden in the Seventh Circuit is provide a figure limited to the profit stream resulting from the infringement."

34.　　The defendant "bear[s] the burden of proving the amount and reasonableness of all

37

deductions by a preponderance of the evidence." *Liu v. Price Waterhouse LLP*, No. 97 CV 3093, 2000 WL 1644585, at *5 (N.D. Ill. Oct. 30, 2000).

35.     "If an infringing act occurred within the United States, then the plaintiff may recover for foreign violations that are directly linked to the domestic infringement." Dkt. 834 at 25-27; *see also Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 307 (4th Cir. 2012) ("Recovery of damages arising from overseas infringing uses [is] allowed [when] the predicate act of infringement occurring within the United States enabled further reproduction abroad."); *L.A. News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 991–92 (9th Cir. 1998) (tracing the predicate act doctrine to Judge Learned Hand's opinion in *Sheldon v. Metro–Goldwyn Pictures Corp.*, 106 F.2d 45 (2d Cir. 1939), *aff'd*, 309 U.S. 390 (1940)); *Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 73 (2d Cir. 1988).

36.     Hytera's profits from selling DMR radios that include Motorola's copyrighted works— whether in the U.S. or outside the U.S.—are properly recoverable, including because Hytera has promoted, advertised, marketed, and sold its DMR products containing Motorola's copyrighted source code in the United States, including at trade shows. *See Sheldon v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 52 (2d Cir. 1939) ("profits made from exhibiting the infringing picture outside the United States" were available as damages because infringer made negatives used to generate picture in U.S.), *aff'd*, 309 U.S. 390 (1940).

37.     Hytera's profits from its copyright infringement are $136.3 million. Tr. at 5389:18-22.

38.     Motorola is not entitled to a double recovery for the same wrongful conduct under both its trade secret misappropriation and copyright claims. *Thermodyne Food Serv. Prods. v McDonald's Corp.*, 940 F. Supp. 1300, 1310 (N.D. Ill. 1996).

39.     As discussed above, the recovery of Hytera's profits and Hytera's avoided costs constitutes a double recovery.

40.     The total award is comprised of $135.8 in disgorged profits under the DTSA, $136.3 million in disgorged profits under the Copyright Act, for a total of $272.177,259 million in disgorged profits to be awarded to Motorola.

41.     Punitive damages are awarded only on the DTSA claim, and the Court follows the jury in awarding the maximum--$271.6 million.

42.     The total award, then, shall be reduced to $543.7 million.

## V.     THE AWARD IS NOT EXCESSIVE AND NO REMITTITUR SHOULD BE GRANTED.

43.     In deciding whether to award a new trial on damages or remittitur, courts consider "[1] whether the award is 'monstrously excessive,' [2] whether there is a rational connection between the award and the evidence, and [3] whether the award is roughly comparable to awards made in similar cases." *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1022 (7th Cir. 2016) (declining to remit damages award); *Riemer v. Ill. Dep't of Transp.*, 148 F.3d 800, 808 (7th Cir. 1998) (same). The first two factors "are really just two ways of describing the same inquiry: whether the jury verdict was irrational." *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015). "In order to determine whether the jury's verdict was irrational, the district court must review the trial record as a whole in the light most favorable to the verdict." *Id.*

44.     Courts in the context of copyright infringement have held that "[d]efendants cannot limit the amount at issue in the underlying claim to the profits they received. . . ." *Owners Ins. Co. v. Cruz Accessories*, No. 2:17-CV-2215-PMD, 2018 WL 902290, at *2 (D.S.C. Feb. 15, 2018).

IT IS SO ORDERED.

ENTER: _Charles R Norgle_
CHARLES RONALD NORGLE, Judge
United States District Court

DATE: January 8, 2021

39