# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| MOTOROLA SOLUTIONS, INC, et al, <br><br> Plaintiffs, <br><br> v. <br><br> HYTERA COMMUNICATIONS CORPORATION LTD., <br><br> Defendant. | Case No. 17-cv-01973 <br><br> Judge Martha M. Pacold |

## MEMORANDUM OPINION AND ORDER

Defendant Hytera Communications Corporation, Ltd. ("Hytera") has not paid approximately $49 million that it owes into an escrow account under the terms of a court order ("the royalty order"). [1349].[1]

The day after the escrow payment was due, Hytera moved to modify or stay the royalty order pending appeal. [1351]; [1381] (renewed motion). In response, the plaintiffs in this case ("Motorola") moved to hold Hytera in contempt of court for failing to comply. [1359]; [1384] (renewed motion). The court denied Hytera's motion to modify or stay, concluding that it lacked jurisdiction to modify the royalty order and that Hytera had not made the requisite showing for a stay. [1429].

The court held Motorola's contempt motion in abeyance, giving Hytera a final opportunity to satisfy its obligations. *Id.* at 8. Hytera failed to do so, so the court held a contempt hearing. [1453]. Reviewing the briefs and evidence filed in support of and in opposition to the motion, and weighing the testimony and evidence presented at the hearing, the court holds Hytera in contempt of court for its noncompliance with the royalty order. Motorola's motion to hold Hytera in contempt, [1384], is granted.

In light of Hytera's recalcitrance, fines or other monetary sanctions would be ineffective. Thus, to coerce compliance with the royalty order, the appropriate course is to enjoin Hytera from selling any products containing two-way radio technology anywhere in the world until its obligations under the royalty order are satisfied. Motorola has met the four-factor test for the issuance of an injunction. Once the process set forth below is complete, the court will issue the injunction as a

---

[1] Bracketed numbers refer to docket entries and are followed by page and / or paragraph number citations. Page numbers refer to the ECF page number.

separate document under Rule 65(d)(1)(C) ("Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."). *See Auto Driveway Franchise Sys., LLC v. Auto Driveway Richmond, LLC*, 928 F.3d 670, 676 (7th Cir. 2019). Motorola is directed to submit a proposed injunction, and Hytera is directed to submit proposed edits to Motorola's proposed injunction, on the schedule set forth at the end of this opinion. After that process is complete and after the court issues the injunction, the parties should file a joint status report once Hytera has fully complied with its obligations under the royalty order so that the court can formally lift the injunction.

I

The following are the court's findings of fact and conclusions of law. Fed. R. Civ. P. 52(a)(1). In February 2020, a jury in this district concluded that Hytera perpetrated a massive theft of Motorola's intellectual property. Later reduced, the jury award totaled approximately $765 million in compensatory and exemplary damages. [898] at 5; [1100] at 39.

The parties had a post-trial dispute about how to compensate Motorola for products sold during the pendency of the case, and into the future, that incorporated Motorola's stolen intellectual property. Motorola suggested an injunction [961], and Hytera suggested an ongoing royalty, [987] at 26. Ultimately, the judge then presiding over this case sided with Hytera, reasoning that "the market share and pricing injuries suffered by Motorola can be compensated by monetary damages." [1097] at 4. After soliciting the parties' proposals, the court entered a royalty order requiring Hytera to deposit into escrow $80.32 per terminal and $378.16 per repeater on a quarterly basis. [1349] at 3 § 4.1. To cover units sold between July 1, 2019 and June 30, 2022, Hytera was required to make its first royalty payment of approximately $49 million into the escrow account on July 31, 2022. *Id.* §§ 5.4–5.5. It did not do so.

Though Hytera was the progenitor and expositor of the royalty-order concept, it has not complied with the very order it sought. Hytera now claims that it has made reasonable and diligent efforts to comply with the royalty order and that in the alternative, it is unable to pay. Neither is true. Hytera's supposed efforts to comply have been neither reasonable nor diligent. And Hytera can pay—it has simply chosen to prioritize its operations and other creditors over its obligation to Motorola and its obligation to obey the court's order. Hytera's failure to comply leaves the court with no choice but to hold Hytera in contempt.[2]

---

[2] In its response brief, Hytera argues that the court lacks jurisdiction to enforce the royalty order through contempt sanctions while it is on appeal. [1395] at 3. Hytera did not raise this point during the contempt hearing, so it has likely been abandoned. But in any event,

2

II

A party seeking to hold its opponent in civil contempt must make four showings by clear and convincing evidence: (1) A court order that sets forth an unambiguous command; (2) the alleged contemnor violated that command; (3) the violation was significant, meaning that the alleged contemnor did not substantially comply with the order; and (4) the alleged contemnor did not make a reasonable and diligent effort to comply. *SEC v. Hyatt*, 621 F.3d 687, 692 (7th Cir. 2010).[3]

Hytera does not challenge any of the first three prongs; it argues only that it has made reasonable and diligent efforts to comply. Hr'g Tr. 49:17–50:5.

Hytera makes an additional argument, one on which it bears the burden: inability to pay. *In re Res. Tech. Corp.*, 624 F.3d 376, 387 (7th Cir. 2010). "Where there has been no effort at even partial compliance with the court's order, the inability-to-pay defense requires a showing of 'complete inability' to pay[.]" *Id.* The nonmovant must establish "'clearly, *plainly*, and *unmistakably*' that 'compliance is impossible.'" *Id.* (quoting *Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir. 1995)).

III

Hytera has not made reasonable and diligent efforts to satisfy its reverse-looking royalty obligation. Hytera has not paid a single cent of what it owes, and Motorola has shown clearly and convincingly that Hytera's efforts described in the written documents and at the contempt hearing were neither reasonable nor diligent.

Hytera's efforts to pay the royalty order fall into two categories: (1) the "pledge" of Norsat stock and (2) lender outreach. Motorola has shown by clear and convincing evidence that these efforts were not reasonable, nor were they diligent. In addition, Hytera's technical argument that its compliance with its *ongoing* royalty obligation shows that it has made reasonable efforts to comply with its *reverse-looking* obligation is supported by neither law nor logic, so it too does not save Hytera from a contempt finding.

---

the argument is incorrect because the court always retains jurisdiction to enforce its own orders even when those orders are on appeal. *See Blue Cross & Blue Shield Ass'n v. Am. Express Co.*, 467 F.3d 634, 638 (7th Cir. 2006).

[3] A later Seventh Circuit case questioned whether the clear and convincing standard of proof was appropriate in civil contempt motions as opposed to the general preponderance standard. *SEC v. First Choice Mgmt. Servs., Inc.*, 678 F.3d 538, 544–45 (7th Cir. 2012). But the court declined to overrule its prior cases establishing that the movant must prove the contempt criteria by clear and convincing evidence, and no later Seventh Circuit or Supreme Court decision has overruled this aspect of *Hyatt* or the line of cases predating it.

A

Hytera's failure to make reasonable and diligent efforts to meet its royalty obligation is best illustrated by what it has not done. Despite holding itself out to investors as a stable and healthy company, Hytera has made no effort to access any unrestricted cash or assets to make the lump sum deposit. It has made no plan to put aside the significant revenue it has derived from operations. And it has not chosen to cut any expenses.

Hytera has not tried to negotiate any sort of a payment plan to pay down the royalty obligation over time. Despite having months of advance warning, Hytera did not attempt to secure financing to make the first royalty payment until at most four weeks before it was due. Motorola has shown by clear and convincing evidence that the only efforts Hytera made were through its subsidiary offering to pledge shares of another company (but not relinquish the voting rights tied to those shares). Hytera made no attempt to make even a small payment as a show of good faith. Instead, Hytera gave vague assurances at the contempt hearing that potentially in two years, once its lenders were repaid, then it "should be able to pay the debts of other creditors." Hr'g Tr. 206:3–4. Neither Hytera's counsel nor its witnesses stated even once that the company *ever* intended to make the royalty payment or pay any part of the judgment in this case. This clear flaunting of the court's authority and disregard for Hytera's obligations to comply with court orders evinces the lack of reasonable and diligent efforts that Hytera has made to pay what it owes into escrow.

Last, Hytera has not made any efforts to cut discretionary spending to raise funds to comply with the royalty order. The court credits Motorola's accounting expert, Ed Westerman, who explained that Hytera has engaged in significant discretionary spending over the past year since the payment was due. Hr'g Tr. 79:23–80:06. Hytera's choice to prioritize discretionary aspects of its operations above complying with the royalty order clearly and convincingly shows that it has not made the kind of energetic effort to comply that would allow it to avoid a civil contempt sanction.

B

The minimal efforts Hytera has taken to comply with the royalty order do little to rebut Motorola's showing.

Take the Norsat stock pledge first. Hytera moved to modify the royalty order to permit its Canadian subsidiary to pledge approximately $55 million worth of Norsat stock into escrow. The royalty order only allows payment in U.S. dollars. [1349] at 4 § 5.6. The court held that it lacked jurisdiction to modify the royalty order while it was on appeal and that Hytera's subsidiary's pledge of the shares into escrow (without giving up its voting rights) was not an adequate security that could

4

protect Motorola's rights to permit waiving a bond requirement while the royalty order was on appeal. [1429] at 3–7.

Two aspects of this pledge demonstrate clearly and convincingly that this effort was neither reasonable nor diligent. First, the royalty order clearly requires all payment into the escrow account to be in U.S. dollars. [1349] at 4 § 5.6. Thus, Hytera's subsidiary's pledge was, in fact, not an effort to comply with the royalty order at all, let alone a reasonable and diligent one.

Second, the efforts related to pledging the Norsat shares were not Hytera's own. Taking Hytera at its word, the "money and other assets of its non-party subsidiaries simply do not belong to the parent HCC." [1413] at 3. The Norsat shares held by Hytera Project Corp., an "indirect subsidiar[y]," did not belong to Hytera at all, and the alleged "efforts" to comply with the royalty order by pledging those shares were taken by Hytera Project Corp. [1395] at 7. The court declines to separate Hytera from its subsidiaries for the purpose of calculating assets and liabilities, but credit Hytera for decisions it claims its subsidiaries made on their own. Hytera cannot have it both ways.

C

Hytera also points to lender outreach that—it argues—illustrates Motorola's failure to show clearly and convincingly that Hytera has not made reasonable and diligent efforts to comply with the court's order. Hytera spoke to its lenders about three types of transactions that might have led to Hytera's compliance with the royalty order. First, Hytera points to evidence that it sought lender approval for additional financing to cover its royalty obligations. Second, Hytera points to it seeking approval to use proceeds from existing loans to cover the lump sum royalty obligation. Third, it mentions in passing efforts to obtain consent to selling assets. None of these efforts were reasonable or diligent efforts to comply.

1

In the four weeks leading up to the lump-sum-payment due date, Hytera reached out to contacts at its bank to obtain financing to pay the royalty obligation. Hytera provided written and oral evidence of limited outreach to its banks to seek their approval to obtain financing to pay the royalty obligation. *See* [1382-1] ¶¶ 13–21; Hr'g Tr. 201:4–8, 203:17–19. This limited effort was not a reasonable effort at compliance nor was it diligent. As Motorola correctly notes, Hytera *came up with the idea* for the royalty order, and Hytera knew that its first lump-sum payment was due on July 31, 2022 by the end of 2021. Hr'g Tr. 219:12–13. This gave Hytera nearly eight months to secure funds to pay its royalty obligation on time. Instead, Hytera waited until four weeks before the payment was due to begin making calls to its lenders to seek additional capital to pay what it owed.

5

This recitation of the facts takes the declaration of Hytera's finance director, Jiliang Kang, at face value. [1382-1]. His declaration states that he made oral outreach to the banks to attempt to obtain additional capital at least four weeks in advance of the royalty payment being due, and that he attached written "confirmation" of this outreach. *Id.* ¶¶ 13–20. The attached written communication reads not as "confirmation" that any outreach occurred, but instead, as the *first* outreach Hytera made to these prospective lenders to obtain financing for the lump-sum royalty payment due July 31, 2022. *Id.* at 28–55. In fact, the identical email that Hytera sent to each of the lenders in the week immediately preceding the payment due date did not mention any phone calls or oral outreach at all, and instead, referenced only a July 8, 2022 public announcement. *E.g.*, *id.* at 55–56. The court finds Kang's declaration not credible in light of the written evidence attached to the declaration. But in all events, outreach to lenders to obtain additional financing even four weeks before a $49 million payment is due, despite having eight months of notice, does not constitute a reasonable and diligent effort.

2

Hytera also sought the approval of its lenders to use proceeds from existing loans to cover the lump-sum royalty obligation. Hytera has presented evidence that it must seek its lenders' approvals to use proceeds of loans they had provided to Hytera to pay the royalty order. Hytera's expert on Chinese law, Professor James Feinerman, explained that Hytera's loan agreements generally require their banks' approval before making certain kinds of transactions. Hr'g Tr. 159:11–163:19. One type of transaction that generally requires giving notice to the banks, and also requires their consent, is an effort to use loan proceeds for activities other than those for which the loan agreement has provisions. For example, a loan agreement for a specific construction project might have a term limiting the use of the loan proceeds to only that project absent notice to the lender and the lender's consent.

In the week leading up to the payment due date, Hytera reached out to two of its existing lenders, seeking to use loan proceeds to make the lump-sum royalty payment. Both declined. [1382-1] at 61–68. Hytera's effort on the use of loan proceeds runs into a similar problem as its purported effort with respect to obtaining new financing—the extreme delay, compared to the amount of notice it had, evinces a lack of diligence. Further, as Professor Feinerman noted, Hytera has between 30 and 40 loan agreements that he reviewed. Hr'g Tr. 155:12. Hytera reaching out to only two of its several dozen existing lenders does not show a reasonable effort to use existing loan proceeds to make the lump-sum royalty payment.

On this count, Hytera runs into an additional problem as well: it artificially backs itself into a corner with respect to what money it can use for what purposes. While Professor Feinerman detailed the significant restrictions that Hytera's bank

6

agreements impose on it making certain asset sales and capital expenditures, at no time during the contempt hearing nor in any briefing did Hytera present evidence that its banks prohibit it from using for the royalty payment unrestricted cash, revenue from operations, or savings from cost cutting in discretionary areas. Hytera instead appears to have looked for money only in the places it knew it could not be found. As Motorola's accounting expert explained, all companies have significant discretionary spending in marketing and R&D that can be cut when needed to make other payments. Hr'g Tr. 99:19–100:5; *see also* Hr'g Tr. 193:17–194:6. No evidence shows that Hytera would be prohibited by any bank agreement from using revenue from its operations or money saved in discretionary expenses to make the lump-sum royalty payment. *See* Hr'g Tr. 78:1–9. The clear and convincing evidence—coming from Hytera's own publicly available financial disclosures—shows that Hytera has "simply prioritized other debt obligations as well as operations costs" over its obligation to Motorola. *Voso v. Ewton*, No. 16-cv-190, 2017 WL 2653143, at *3 (N.D. Ill. June 20, 2017). This choice in priorities is a "clear indication that [Hytera] ha[s] not been diligent and energetic in [its] efforts to make the [royalty] payment as ordered by the Court." *Id.*

3

Last, Hytera provided further evidence that it reengaged its lenders in 2023 after the court issued its order denying Hytera's motion to modify or stay the royalty order on July 11, 2023. [1429]. But these efforts likewise were not reasonable and diligent. Hytera's finance director, Kang, testified that he made requests to Hytera's banks in 2023 like those he had in 2022. Hr'g Tr. 203:20–22; *see* Kang Direct Binder, DCX-66–108. Kang's cross-examination revealed that in May 2023, while the parties' motions remained pending, Kang told investors that the Motorola litigation had been "eliminated," despite much of the case being on appeal and the $49 million royalty payment outstanding. Hr'g Tr. 211:21–212:12. This juxtaposition undercuts the notion that Hytera sees the royalty payment as a genuine obligation, and also indicates that Hytera's 2023 outreach was not undertaken with any serious intent to obtain its banks' consent to use loan proceeds or assets to make the royalty deposit.

A closer review of Hytera's documentation of its outreach in 2023 also shows that its efforts were not reasonable. Hytera's July and August 2023 outreach to its lenders and subsidiaries, like its 2022 outreach, largely used stock language. Depending on the specific document, Hytera's requests generally used the language, "tak[ing] maintaining normal daily operations into consideration, Hytera does not have sufficient cash on hand available to pay the . . . royalty." *E.g.*, Kang Direct Binder, DCX-75 at 2. But alleged contemnors cannot prioritize operations over compliance with a court order. *Voso*, 2017 WL 2653143, at *3. Even Hytera's supposed diligent efforts to obtain financing or consent to use loan proceeds and sell assets presupposed a condition that the law does not permit. To show reasonable

and diligent efforts to comply, Hytera must prioritize making the royalty payment over its operations. *Id.*

D

Hytera raises two other counterarguments unrelated to the specific measures it took (or in fact, did not take) to make the July 31, 2022 deposit. First, Hytera claims that finding it in contempt based on these facts would, in effect, amount to requiring Hytera to go into insolvency to make reasonable efforts to comply. Second, Hytera claims that because it has been making the ongoing (much smaller) quarterly deposits required under the Royalty Order, that compliance shows reasonable and diligent efforts to comply with the order as a whole. Both arguments are unavailing.

1

Taking the insolvency point first: For the first time at the contempt hearing, Hytera argued that the requirement to make reasonable and diligent efforts does not mean that an alleged contemnor must put itself into insolvency. Hr'g Tr. 230:17–22 (citing *Liberty Mut. Ins. Co. v. Aventura Eng'g & Constr. Corp.*, No. 06-cv-22494, 2009 WL 3190962 (S.D. Fla. Sept. 15, 2009), *report and recommendation adopted*, 2009 WL 10697338). In fact, Hytera raised the specter of criminal punishment in China for Hytera's officers and directors were they to violate the notice and consent provisions in Hytera's loan agreements. Hr'g Tr. 231:1–10.

The court is not holding that Hytera must put itself at risk of insolvency to show reasonable efforts to comply with the court's order. Motorola showed through clear and convincing evidence that Hytera (the parent) is a healthy and stable company, with strong revenue, rapidly declining debt burdens, and significant assets. Hr'g Tr. 81:7–83:1. The parent company in the corporate family alone has $16 million in unrestricted cash and $700 million in net assets as of its most recent public filing. Hr'g Tr. 74:4–8; 93:5–7; 179:15–16. Hytera has not made *any* effort to use *any* of its own cash or assets to comply with the court order. That is not diligent, and it is unreasonable.

In *Aventura Engineering*, the alleged contemnors were individuals of fairly modest means. *See* 2009 WL 3190962, at *3–4. The judgment in the case required the defendants to post over $1 million in collateral. *Id.* at *1. One defendant made strenuous efforts to secure a collateral bond, he tendered equity in the value of his apartments and the value of his personal property, and he also turned over his rental income. *Id.* at *4. The only effort he did not undertake was not to liquidate his retirement accounts; under Florida law, qualified retirement accounts were generally protected from creditors, and the amount in the accounts would not have come close to satisfying the collateral requirement in the order. *Id.* The other alleged contemnor was of even more modest means. She offered to pay the plaintiff

8

the entire value of her personal possessions to avoid their seizure, and she had no other assets save for a small retirement account less than 10% of the size of the collateral requirement. *Id.*

Hytera's efforts were nothing like these—to put it mildly. Hytera is a large, profitable corporation with hundreds of millions in annual revenue, and net assets (meaning with liabilities subtracted) of roughly $700 million. Hr'g Tr. 78:1–6 (revenue); 74:4–8 (net assets). Unlike the alleged contemnors in *Aventura Engineering*, Hytera has not offered to tender anything at all, let alone something akin to personal possessions or equity in real property. It made last-second outreach to a few lenders and convinced a subsidiary to "pledge" shares of another company, but the subsidiary would not even give up its voting rights. The *Aventura Engineering* court simply held that the defendants did not have to liquidate their retirement accounts to try to comply with its order. Hytera is nowhere near that point.

Second, Hytera did not rebut Motorola's showing with any evidence that its lenders would not permit it to use unrestricted cash to pay the royalty order, nor did it rebut Motorola's showing that it could cut discretionary expenditures and use those savings to comply with the royalty order. While Hytera's counsel suggested that the phrase "unrestricted cash" has a different meaning to Hytera's banks than its standard meaning in accounting literature, Hr'g Tr. 225:10–19, an attorney's argument is not evidence, *see Bell v. Hepp*, 70 F.4th 385, 387–88 (7th Cir. 2023) (describing this jury instruction in a state criminal case as proper). Neither of Hytera's financial witnesses—its accountant from Grant Thornton nor its internal finance director—testified that the company's bank agreements would prohibit it from using income from operations or savings from cutting discretionary expenditures to make the escrow deposit. Mr. Kang, the finance director, did testify that Hytera cannot use its unrestricted cash to make the escrow deposit because "the company needs this amount of money to maintain a [sic] normal daily operations, as well as repay the bank debts that [are] due." Hr'g Tr. 198:22–199:1. Notably, however, Kang phrased this in terms of practicalities, not any Chinese legal obligations created by Hytera's bank agreements. And as described in *Voso*, an alleged contemnor cannot escape a contempt finding while prioritizing daily operations and obligations to other creditors over its obligation to comply with the court's order. 2017 WL 2653143, at *3

Professor Feinerman, Hytera's expert on Chinese law, who testified about its bank agreements, likewise did not testify that the bank agreements would prohibit using unrestricted cash, revenue from operations, or savings from cuts to discretionary items to make the royalty payment absent notice and consent. Professor Feinerman put further color on what the plain text of the agreements already states: the use of loan proceeds would require notice and consent as would

9

making major asset sales, and the Chinese banks have "priority over Motorola under Chinese law." Hr'g Tr. 157:8–:21.[4]

But third, and perhaps most importantly, what Hytera's private agreements with Chinese banks require has very limited relevance in this proceeding. Hytera's arguments take the bank agreements as a constant, arguing that *given* the back agreements, Hytera's last-second attempts to (1) secure financing and (2) obtain consent to sell assets or use loan proceeds were reasonable and diligent efforts. But this argument itself assumes a critical and unwarranted conclusion: Hytera's obligations to its private, Chinese lenders under the terms of their contracts somehow supersede its obligation to follow an American court's order.

Even assuming the truth of Hytera's argument that it would be unable to pay any of what it owes on the lump sum royalty payment absent the consent of its lenders (and for clarity, the court does not), Hytera cites no case for the proposition that it can avoid a contempt finding by prioritizing repayment of private creditors instead of this court's order. Another court in this district has held the exact opposite: an alleged contemnor cannot prioritize *other debt obligations* over its obligation to comply with a court order. *Voso*, 2017 WL 2653143, at *3. The limitations Hytera imposed on itself by signing restrictive loan agreements are not an excuse for noncompliance. Making efforts to comply with the court order solely within the confines of those agreements likewise does not constitute a reasonable and diligent effort. The choice to comply with those loan agreements instead of the court's order is the exact kind of choice an alleged contemnor is not permitted to make when claiming that it has made reasonable efforts. *Id.*

---

[4] Professor Feinerman testified on direct that it was his opinion that Hytera could not make the royalty payment without obtaining consent from "the majority of banks or perhaps every bank to be able to make those payments." Hr'g Tr. 168:1–3. However, Professor Feinerman added a qualifier: the consent would only be necessary "if, depending on the terms of the individual loans they have with particular banks, [making the royalty payment] was going to trigger any of these other provisions and make their banks' debts due and payable and then require prepayment of all of those before any payments could be made on this." Hr'g Tr. 168:3–7. Feinerman added a further caveat on cross, noting that he "was only asked to comment on legal matters and not on anything related to financial matters" in response to a question asking whether it was his opinion that it would be impossible for Hytera to pay the royalty. Hr'g Tr. 171:7–11. So the court does not take Professor Feinerman's opinion to be that Hytera absolutely *cannot* make the royalty payment without running afoul of its obligations to its private creditors. Instead, his opinion is simply that Chinese law estops Hytera from making the royalty payment *if* making that royalty payment would run afoul of one of Hytera's credit agreements. *Compare* Hr'g Tr. 168:1–7, *with* 171:12–15, *and* Hr'g Tr. 172:10–15. Motorola has shown clearly and convincingly that Hytera can make at least a partial deposit without violating any loan agreement.

10

2

Hytera's technical argument that its compliance with the ongoing aspects of the royalty order shows reasonable and diligent efforts to comply with the rear-looking aspects of the royalty order is unpersuasive.

First, the very fact that Hytera has found a way to comply with its ongoing royalty obligations, but not its past ones, underscores how circumspect its efforts have been. As discussed previously, Hytera has made no efforts to negotiate a payment plan, make a small, good-faith payment, or show Motorola or the court that it has any intention of making the payment it owes. It has purportedly convinced its lenders that the ongoing royalty payments are normal, course-of-business expenses, but not the past royalty payment (which is dozens of times larger than each quarterly payment). This undercuts Hytera's assertions as to its banks' inflexibility and as to its inability to use existing cash flows to make royalty payments.

Second, though all the royalty order's components are in one order, the order neatly and naturally divides into two parts. As the court discussed in its previous decision, the rear-looking aspect of the royalty order is effectively a money judgment that grants Motorola legal relief for selling radios that incorporated Motorola's stolen IP for a three-year period while the case was pending. [1429] at 3. In contrast, the royalty order's requirement of ongoing, quarterly payments directs "a prospective duty" with "undetermined" costs, as those costs depend on how many radios Hytera sells that continue to incorporate Motorola's stolen intellectual property. *Id.* (quoting *USA Gymnastics v. Liberty Ins. Underwriters, Inc.*, 27 F.4th 499, 511 (7th Cir. 2022)). The order recognizes this distinction in its text, as the rear-looking aspect of the order is set out in separate sections from the rest. [1349] at 4 §§ 5.4–5.5 (separate sections for past royalty payment).

Last, Hytera has cited no case holding that compliance with one aspect of a court order shows reasonable and diligent efforts to comply with a different aspect of the order.

IV

For many of the same reasons that Hytera has not rebutted Motorola's clear and convincing showing that Hytera did not make reasonable and diligent efforts to comply, Hytera also did not meet its burden to show that it is unable to pay. *See In re Res. Tech. Corp.*, 624 F.3d at 388 (alleged contemnor had not demonstrated reasonable and energetic efforts to accomplish what was ordered, so it had not met its burden to establish inability to pay).

A

Staring with the legal standard: Under *In re Resource Technology*, Hytera must show a "complete inability to pay." 624 F.3d at 387. Hytera argued that some lower standard applied at the contempt hearing, *see* Hr'g Tr. 231:18–23, but that attempt is unpersuasive for two reasons. Hytera argues that *In re Resource Technology* sets out two standards—(1) complete inability where there has been no compliance, and (2) a lower standard where there has been partial compliance. The case sets out the standard applied in the event "there has been no effort at even partial compliance." *In re Res. Tech. Corp.*, 624 F.3d at 387. It does not create any lower standard to be applied where an alleged contemnor made efforts at partial compliance. But even if it did, as this court described above, Hytera has *not* partially paid. Its compliance with its ongoing obligations under the royalty order does not count as partial compliance with a separate aspect of the order covering a different period of time. *See* Part III.D, *supra*. So the "complete inability" standard applies. Hytera must show "clearly, *plainly*, and *unmistakably* that compliance is *impossible*." *Id.* (internal marks and citation omitted); *see also SEC v. Faulkner*, No. 16-cv-1735, 2019 WL 277621, at *4–5 (N.D. Tex. Jan. 22, 2019) (unless alleged contemnor is unable to pay anything at all, court can hold her in contempt).

B

Hytera does not have a "complete inability to pay." *Id.* Hytera has strong revenue, declining debt burdens, hundreds of millions of dollars in net assets, and $16 million in unrestricted cash. *See* Part III.A, *supra*. As Motorola's expert also explained, Hytera has tens of millions of dollars per year in discretionary expenses. *See* Hr'g Tr. 79:13–80:6. From any of these sources, Hytera could at least partially comply with the royalty order.

C

Hytera's primary counterargument is that its loan agreements with its Chinese lenders prohibit it from making the royalty payment and that if it violated those loan agreements by making the payment, Hytera would face cascading default declarations by its lenders, and its officers and directors could be subject to criminal penalties. But Hytera put on no credible evidence that its bank agreements prohibit it from using cash flow from operations, unrestricted cash, or savings from discretionary spending cuts to comply with the royalty order. The only evidence in Hytera's written submissions or that it put on at the hearing is that its loan agreements prohibit it from making certain kinds of other transactions absent notice and consent of its banks. These include major asset sales, using loan proceeds, or taking on additional debt. Even if this court approached the ability-to-pay issue from the premise that Hytera's alleged indigence could be assessed only assuming full compliance with the restrictions in its loan agreements, Hytera has not met its burden to show that it could pay absolutely nothing to remain in

compliance with those restrictions and that *any* partial payment would cause the parade of horribles outlined at the contempt hearing. *See, e.g.*, Hr'g Tr. 58:7–59:3.

In any event, as the court previously discussed when analyzing the reasonable-and-diligent-efforts question, Hytera has provided no authority for the proposition that compliance with restrictions in its private loan agreements supersedes its obligation to comply with this court's orders. *See* Part III.D.1, *supra*. Hytera's $700 million in net assets alone demonstrate that it is more than able to make the entire royalty payment. Being required to use those assets to comply with a court order is an ordinary consequence of being a civil litigant, a consequence from which Hytera is not excused because it signed restrictive loan agreements.

V

Civil contempt sanctions can "be employed for either or both of two purposes; to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303–04 (1947). Choosing among civil contempt sanctions is a matter of the court's discretion where, as here, the only issue is coercing compliance. *See id.* at 304. The court must "consider the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *Id.*; *see also FTC v. Trudeau*, 579 F.3d 754, 771 (7th Cir. 2013) ("[T]he particular remedy chosen should be based on the nature of the harm and the probable effect of alternative sanctions." (internal marks and citation omitted)). "When considering an appropriate sanction for a party in contempt, the guiding principle is proportionality." *United States v. Sherard*, No. 05-cv-486, 2015 WL 1840050, at *2 (E.D. Wis. Apr. 22, 2015) (citation omitted).

As the court sees this issue, it has four options: (1) Impose fines; (2) allow the seizure of Hytera's assets in the United States; (3) choose from or combine a series of half measures proposed by Hytera, [1456] at 12–14; or (4) temporarily enjoin Hytera from taking certain actions, up to and including an injunction against all two-way radio sales worldwide as proposed by Motorola, [1454] at 7–11.

A

The court can dispense with the first two options rather quickly, but with one key caveat.

Regarding fines or monetary sanctions, Motorola does not seek them, and as the court discussed during the contempt hearing itself, Hytera already has not paid what it owes, so additional fines appear unlikely to coerce compliance. Hr'g Tr. 233:17–24; *see United Mine Workers*, 330 U.S. at 304 (directing courts to choose remedy based on its "probable effectiveness" of coercing the desired action).

13

As to the seizure of assets, Motorola no longer seeks this sanction. [1454] at 11–12. In addition, to this point, the court has focused exclusively on the assets and liabilities of Hytera itself because it is the only remaining defendant in this case. *See* [1395] at 8–9. The court has not held one way or the other on the propriety of piercing the corporate veil. Ordering the seizure of assets of an entity separate from Hytera (the defendant in this case) would require reaching the veil-piercing question, and the court declines to do so at this time.

The one caveat comes from the royalty order itself. It imposes a late-payment penalty of 1% on the unpaid balance until paid. [1349] at 4 § 5.8. To discharge its obligation, Hytera must make this late payment along with the balance it already owes. The court's declining to issue *separate* fines should not be read to override or otherwise excuse Hytera from this obligation under the royalty order.

B

The third potential option, proposed by Hytera, is an assortment of half measures. After the court sought briefing on the appropriate remedy should it find Hytera in contempt, Hytera responded that the court's sanction should be to give Hytera additional time to comply, or potentially, additional direction as to what other steps the court thinks it should take to attempt to comply with the order. [1456] at 12–14. In particular, Hytera suggested that the court could order additional discovery, order Hytera to search for alternatives, or order Hytera to deposit an asset into escrow pending payment. *Id.* at 12–13. As a final option, Hytera suggested ordering a payment plan that might be approved by its lenders, but the order would have to build in "sufficient time for [Hytera] to undertake those efforts, including follow-up discussions and negotiations." *Id.*

The court finds that these proposed sanctions would not be commensurate with the character of the harm, nor would it bring about the result desired. *See United Mine Workers*, 330 U.S. at 304. On one hand, the harm to Motorola from the noncompliance is relatively low at this point; these funds are going into escrow and will be unavailable to Motorola until after the appeals have finally concluded. On the other hand, as the court has detailed both in its past order and this one, Hytera has threatened repeatedly not to comply with this court's order, and it has never committed to ever complying. So the harm to Motorola from Hytera's noncompliance at this moment is the uncertainty that it can ever obtain what it is owed should it succeed on appeal. That security is the very purpose of having the royalty money in escrow pending appeal.

Hytera's proposed measures will not likely result in compliance. Directing Hytera to make specific efforts to be able to make the deposit has no more coercive effect than the existing order that Hytera has been in violation of for over one year. The court concludes that Hytera's continued recalcitrance shows that it would not likely comply with the court's order to make specific efforts to make the royalty

14

payment, just as it has not made the royalty payment to date. Excuses have abounded; Hytera has not shown that it would stop making them now.

As to using an asset as security until Hytera can make payment, this proposal runs into a few problems. Hytera says in its supplemental brief regarding remedy, filed (in accordance with the court's request) *after* the contempt hearing, that "HCC's senior lenders are already willing to permit HCC to provide non-cash assets as security for the royalty payment until such time as it can generate the necessary cash to place into escrow." [1456] at 13. The court never heard about such an agreement until Hytera submitted its supplemental brief after the contempt hearing; Hytera did not mention the possibility either in the briefing on Motorola's motion for contempt before the hearing or at the contempt hearing itself. On Hytera's view (up until the supplemental brief after the hearing), the only possibility in this area was through Norsat, the shares of which are completely controlled by an indirect subsidiary. If Hytera can direct the disposition of the assets of Hytera Project Corp., or any of its other subsidiaries, that is information Hytera must disclose immediately under the citation order entered by Judge Norgle, who was then presiding, and the court may ultimately have to confront the veil-piercing issue Hytera has repeatedly sought to avoid.

Another problem is the one the court identified in its previous order: "pledging" an asset as security without Hytera divesting itself of control over the asset does not provide Motorola any true security at all. *See* [1429] at 6–7. The court relies on the testimony of Hytera's finance director, Mr. Kang, for the proposition that actual transfer of an asset into escrow is not Hytera's plan. At the contempt hearing, Kang was adamant that, had the court accepted the Norsat shares as an alternative to making the royalty payment, Motorola *would not* have taken possession of the shares were Motorola (in this hypothetical) to succeed on appeal. Hr'g Tr. 207:12–208:3. It is unclear what value the shares would have to Motorola at all if they were simply "pledged" into escrow and could never be transferred. Without any detail in Hytera's supplemental briefing about what the assets are that it now envisions providing other than Norsat shares, and how those assets would give Motorola an equivalent amount of security as $49 million in cash in an escrow account, the court finds that this asset-provision option would not fit the *United Mine Workers* test for crafting an appropriate civil contempt sanction.

Last, Hytera seeks a payment plan. However, the court finds that in light of the procedural history and Hytera's litigating positions, this alternative will only lead to further delays, and it is unlikely to coerce compliance with the royalty order. As discussed with respect to Hytera's first option (court-directed specific efforts to make payment), an order crafting a payment plan has no more coercive effect than the royalty order itself. It is just as likely that Hytera will make payments on time and in full as it is that Hytera will continue to claim inability to pay, and the court and parties will be right back where they started. In addition, Hytera had no fewer than 20 months to make good-faith efforts at a payment plan for the lump sum

15

deposit. The evidence presented does not show any effort to do so. The time to negotiate a payment plan passed long ago.

The same is true of efforts described in a new filing that Hytera submitted *after* the supplemental briefing and more than one week *after* the contempt hearing. [1459]. In that filing, Hytera described recent developments in its efforts to obtain a bond to secure the $49 million royalty payment pursuant to Rule 62(b), which provides that "[a]t any time after judgment is entered, a party may obtain a stay by providing a bond or other security." Hytera describes efforts to obtain from its lenders a supersedeas bond that would secure the $49 million royalty payment and explains that two major lenders in China have informed Hytera that they are willing to issue guarantees or standby letters of credit on Hytera's behalf, under various conditions, and that the process of issuing the letter of credit will take 60 days. [1459] at 2–3. Hytera requests that the court hold any contempt finding in abeyance pending Hytera's undertaking any further diligent steps the court deems appropriate, including waiting for 60 days so that Hytera can obtain a supersedeas bond. [1459] at 3.

This effort has come too late. Hytera has had over one year to seek a bond under Rule 62(b) to stay the royalty order pending appeal. Its attempts to do so after the contempt hearing do not counsel in favor of further delay. The correspondence with Hytera's lender attached to Hytera's notice does not indicate a strong likelihood that Hytera will be able to obtain a bond, let alone one that the court would recognize as valid. *See* [1459-2] at 3. The letter outlines a sizable number of further hoops through which Hytera must jump to obtain this letter of credit. And like the court in *Aero Products International, Inc. v. Intex Recreation Corp.*, No. 02-cv-2590, 2005 WL 4954238 (N.D. Ill. Dec. 8, 2005), this court has serious concerns about whether an unconditional letter of credit from a financial institution over which the court lacks personal jurisdiction is a strong enough provision of security that the court would consider the letter of credit a valid bond under Local Rule 65.1(b)(4).

C

That leaves Motorola's proposal of a temporary injunction. Motorola seeks an injunction prohibiting Hytera from "selling any Two-Way Radio Products worldwide until it fully complies with the Royalty Order." [1454] at 7. The court grants Motorola's request.

Hytera raises a jurisdictional challenge to the imposition of this sanction, which the court must address before turning to whether the sanction is appropriate on the merits. *See Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005).

1

Hytera argues that the court lacks jurisdiction to impose an injunction because Judge Norgle held that he lacked jurisdiction to impose an injunction when Motorola sought one in a motion for reconsideration; that is the law of the case; and the reasons he held so remain true now. [1456] at 10–11 (citing [1348]).

However, the situation that Judge Norgle addressed and this situation are not analogous. Judge Norgle held that he lacked jurisdiction to impose an injunction on the motion for reconsideration because Motorola had already appealed his order denying a permanent injunction. [1348] at 2. This is a different motion, and the court is in a different posture. Motorola does not seek a modification of the royalty order or a reconsideration of Judge Norgle's denial of the motion for a permanent injunction. Instead, Motorola seeks the temporary injunction as a contempt sanction for Hytera's failure to comply with the royalty order. Imposing an injunction here would not violate the principle that the court lacks jurisdiction to modify an order that is on appeal because the court intends to impose a temporary injunction to coerce compliance with the royalty order, not as a modification of that order.

2

Turning to the propriety of issuing an injunction: the court finds that it is a proportionate and reasonable step considering Hytera's recalcitrance and the court finds that it is likely that an injunction will coerce Hytera's compliance. Hytera is a leading manufacturer of radio equipment. *See* Response at 2, No. 20-cr-688, *United States v. Hytera Commc'ns Corp., Ltd., et al.* (N.D. Ill. Oct. 27, 2022), ECF No. 67. A worldwide injunction halting the sales of a major driver of revenues is likely to induce Hytera to use its existing assets to immediately make the deposit along with the required late-payment fee. In addition, unlike some of Hytera's proposed alternatives that have no more coercive force than the royalty order itself, the injunction Motorola seeks could help to coerce compliance as customers would likely avoid the possibility of purchasing products sold in violation of a court order, even if the order itself may have no direct effect on Hytera's behavior. Last, Hytera's own conduct in this case indicates a strong possibility that the injunction will induce compliance. Hytera sought an ongoing royalty as opposed to an injunction, and it litigated forcefully against a permanent injunction. *See* [987]. An injunction is clearly something Hytera does not want. If Hytera's plan was not to comply with an injunction, the court concludes that Hytera likely would not have so forcefully opposed its application for the past three years.

3

Motorola has met its burden on all four factors required for the issuance of an injunction. To obtain an injunction, the movant must show that (1) it has suffered an irreparable injury; (2) legal remedies are inadequate to compensate that injury; (3) the balance of hardships favors the movant; and (4) an injunction would not

17

disserve the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

*Irreparable harm.* Motorola has suffered—and is continuing to suffer—an irreparable injury. Without Hytera's compliance with the royalty order, Motorola remains in limbo as to whether it will ever obtain the funds owed to it should Motorola prevail on appeal. Absent compliance, Motorola will continue to suffer this injury, and the court has already concluded that an injunction is a proportionate sanction to obtain compliance. Thus, Motorola has met its burden on irreparable harm.

*Adequate remedy at law.* Hytera's continued recalcitrance shows that Motorola lacks an adequate legal remedy. Hytera effectively concedes this point, asking the court not to impose further fines because the issue in this contempt motion is that Hytera has not paid the amount it already owes, and making it pay more would be ineffective in achieving compliance. [1456] at 4–6.

*Balance of hardships.* The balance of hardships is a close question, but favors Motorola. Undoubtedly, Hytera will be harmed by this temporary injunction. As discussed, Hytera has significant two-way radio sales, significant (though declining) debt burdens, and low cash reserves as compared to the size of the company. *See* Hr'g Tr. 228:5–14. The combination of these factors means that stopping Hytera from selling a prime driver of revenue could cause serious operational problems for the company.

Though these harms are significant, in the court's judgment they are outweighed by the harm to Motorola that has come, and will remain, from Hytera's contumacious conduct. Motorola is counting on the funds in the escrow account being available to it should it prevail on appeal in this case to compensate it for damage caused by Hytera selling radios with stolen Motorola technology for three years. Absent compliance, Motorola may never be able to recover what it is owed. Further, Hytera's continued recalcitrance has forced Motorola to continue litigating this issue on top of the complex appeal currently before the Seventh Circuit. The harms to Hytera from the injunction—which it can have lifted any time by complying with the royalty order—are outweighed by the continued uncertainty faced by Motorola.

*The public interest.* The public interest would not be disserved by an injunction. As Motorola's post-hearing brief on remedy explains, there is significant supply for two-way radio technology in the market such that Hytera being forced to cease its sales will not disrupt any customers whose operations serve the public

18

interest. [1454] at 9–10.[5]  For that reason alone, the injunction will not harm the public interest.

## VI

Motorola's motion to hold Hytera in contempt [1384] is granted.  In light of Hytera's recalcitrance, fines, other monetary sanctions, and other options would be ineffective.  To coerce compliance with the royalty order, the appropriate course is to enjoin Hytera from selling any products containing two-way radio technology anywhere in the world until its obligations under the royalty order are satisfied.  Motorola has met the four-factor test for the issuance of an injunction.  Once the process set forth below is complete, a separate injunction document will issue pursuant to Rule 65(d)(1)(C) ("Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required.").  Motorola should file and send to the court's proposed order box by 8/30/2023, a proposed injunction.  Hytera should file and send to the court's proposed order box by 9/1/2023 any proposed edits to Motorola's proposed injunction, tracking any proposed changes.  After that process is complete and after the court issues the injunction, the parties should file a joint status report once Hytera has fully complied with its obligations under the royalty order so that the court can formally lift the injunction.

Dated: August 26, 2023　　　　　　　　　　/s/ Martha M. Pacold

---

[5] For clarity, the court declines to adopt—and does not agree with—Motorola's separate argument that the public interest favors injunctive relief because of the interest in punishing theft and discouraging unethical behavior.  *See* [1454] at 11.  These reasons are inappropriate bases on which to grant a civil contempt sanction.  Civil contempt sanctions cannot be imposed for punitive reasons or to vindicate the court's authority; otherwise, they transform the motion into one for criminal contempt.  *Matter of Crededio*, 759 F.2d 589, 590 (7th Cir. 1985).