# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MOTOROLA SOLUTIONS, INC., and MOTOROLA SOLUTIONS MALAYSIA SDN. BHD.<br><br>Plaintiffs,<br><br>v.<br><br>HYTERA COMMUNICATIONS CORPORATION LTD., ~~HYTERA AMERICA, INC., and HYTERA COMMUNICATIONS AMERICA (WEST), INC.~~<br><br>~~Defendants~~<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | ~~Case~~Civil Action No~~.~~.: 1:17-~~CV~~cv-01973<br><br>Honorable ~~Charles R. Norgle, Sr.~~Martha M. Pacold<br><br>~~Magistrate Judge Jeffrey Cole~~<br><br>**~~AMENDED~~SUPPLEMENTAL COMPLAINT**<br><br>**JURY TRIAL DEMAND**<br><br>[redacted]<br><br>**CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER** |

**~~AMENDED~~MOTOROLA'S SUPPLEMENTAL COMPLAINT**

Plaintiffs Motorola Solutions, Inc. ("Motorola US") and Motorola Solutions Malaysia Sdn. Bhd. ("Motorola Malaysia") (collectively "Motorola," or "Plaintiffs") allege as follows against Defendant Hytera ~~America, Inc., Hytera~~ Communications Corporation Ltd~~., and Hytera Communications America (West), Inc. (collectively "~~. ("Hytera" or "~~Defendants~~Defendant"). The allegations herein are made based on personal knowledge as to Motorola with respect to its own actions, and upon information and belief as to all other matters.

**INTRODUCTION**

1. Motorola has been building its radios and its reputation for almost a century, and Hytera tried to hijack both in just a few months—and continues to do so to this day. Founded in 1928 in Chicago, Motorola has built and maintained its position as the innovation leader, at home and abroad, in radio equipment and infrastructure technologies. In particular, Motorola has invested its considerable expertise and creativity in developing cutting-edge

digital two-way radio communication systems and computer programs, which it supplies to thousands of public safety organizations, emergency response teams, transportation and logistics organizations, and numerous other customers involved in hospitality, manufacturing, education, utilities, oil and gas, and retail throughout the United States and around the world.

2. Motorola's global leadership in this sophisticated technical field does not come cheap. For many years, Motorola has employed thousands of engineers and software developers in Illinois, other parts of the United States, and various countries throughout the world, and spends hundreds of millions of dollars annually to research new technologies and to develop a wide range of digital radio products and solutions for feature-rich, seamless communication in rapid response networks across many industries and mission-critical applications. Motorola's substantial investments in research and other forms of innovation require protection, and Motorola relies on its trade secrets, in addition to its copyrights, patents, and trademarks, to guard the intellectual property created by the ingenuity and industry of its employees.

3. Hytera's story is the opposite. Hytera's story is not one of innovation, but rather about misappropriation, misuse, copying, and intentional efforts to hide its misconduct from detection. Unlike Motorola, Hytera has not invested the human effort and financial capital in the substantial time-consuming research required to produce truly innovative technologies and products. Founded in 1993 in Shenzhen, China, Hytera served as a distributor for Motorola products until 2001, and since then has operated as a supplier of mostly analog radio products, although many customers require the sophisticated digital products of the kind that Motorola designs and produces. Significantly, by the time Hytera began developing its digital two-way radio technologies, Motorola had already pioneered the field, and had established its digital two-way radio technologies as the leading communications

solution for public works, industry, government, non-profit, and commercial applications. In fact, Motorola's success in the digital two-way radio field had rendered Hytera's outdated analog systems obsolete, providing Hytera a motive to take steps to compete through any means available. Complicating matters further for Hytera during this same time period, the United States Federal Communications Commission set a deadline that effectively required suppliers of radio products to use digital technology.

4. Knowing that its analog radio products faced extinction, and that it could not hope to develop its own digital two-way radios in time to save its ailing business, Hytera embarked on an unlawful plot to surreptitiously take and copy Motorola's confidential and proprietary trade secrets and copyrighted material, and use those trade secrets and copyrighted material to build a competing product. Indeed, as its executive team acknowledged, Hytera's main product line—analog radios—was quickly becoming "obsolete," and its digital radios had to be developed at a "very quick pace."[1] Thus, Hytera was faced with a choice: engage in time-consuming and resource-intensive development of its own digital product line, or simply take Motorola's technology, without permission, in order to get a product out to market (in Hytera's words) "at a very quick pace." Hytera chose the latter: rather than design its own digital two-way radio products to compete fairly in the marketplace, Hytera instead built its current digital two-way radio business by misappropriating Motorola's proprietary technologies and critical business strategies. This included copying Motorola's innovations—from replicating key technologies in Motorola's products, right down to copying the Motorola technical documentation describing them and even the Motorola computer programs at the heart of Motorola's products.

[1] *See* https://www.youtube.com/watch?v=twxZXiWeNZQ.

5. Hytera's plan to steal Motorola's technologies was a multi-faceted one, but included as a central pillar a plot to target Motorola from the inside, through its personnel—namely, by recruiting Motorola personnel who had substantial access to Motorola's proprietary technologies, and who downloaded thousands of confidential technical documents in the weeks prior to their departures. Specifically, in order to break into the digital two-way radio market, beginning as early as 2008, Hytera lured away several Motorola senior radio engineers who were extensively familiar with Motorola's technologies and intellectual property. Three Motorola senior engineers were hired by Hytera and held senior positions at Hytera: Gee Siong Kok ("G.S. Kok"), who formerly served as Senior Engineering Manager at Motorola, and at Hytera served as Senior Vice President and Terminal Chief at Hytera; Samuel Chia ("Chia"), who formerly served as Senior Engineer and Engineering Section Manager at Motorola, and now serves as the Director of Software Engineering at Hytera; and Yih Tzye Kok ("Y.T. Kok"), who formerly served as a Senior Engineer at Motorola, now serving as Sales Director at Hytera (collectively the "Hytera Employees").

6. During their years of employment at Motorola, Motorola trusted these Hytera Employees to work extensively with Motorola's confidential information on highly sensitive and proprietary products and technology. While at Motorola, they were privy to proprietary technical documents, design ideas, and computer programs, including software source code; they were aware of Motorola's product planning, research and development efforts; and they were intimately familiar with Motorola's digital radio development efforts, including those related to the technologies at issue in this case. And while that knowledge alone presented incalculable value to Hytera, in the weeks prior to their resignations from Motorola (and unbeknownst to Motorola), the Hytera Employees surreptitiously downloaded and misappropriated more than 7,000 technical, marketing, sales, and legal documents related to Motorola's digital radio and

infrastructure products. Critically, many of these unlawfully-downloaded documents provided Motorola's specific technology implementations and copyrighted material, and other highly detailed technical information relating to critical technologies at issue in this case, providing an unlawfully obtained roadmap to Hytera about how to implement key features developed by Motorola over the course of many years. Hytera relied on, and continues to rely on, Motorola's trade secret and copyrighted information collected from sources including the Hytera Employees, to develop and supply its digital two-way radio products, and the ongoing sales of those products in the United States continue to perpetrate the misappropriation of Motorola's trade secrets and Hytera's infringement of Motorola's copyrighted computer programs. Egregiously, and notwithstanding its unlawful conduct, Hytera publicly touts the very innovations it took from Motorola as ***its*** own "innovation[s],"[2] evidencing a degree of wanton misappropriation rarely seen even in cases like these.

7. Hytera and the newly employed Hytera Employees knew that the information they downloaded without permission was confidential, and knew that those documents were replete with Motorola trade secrets and copyrighted material. Despite this knowledge, Hytera simply copied and used these critical trade secrets and copyrighted material in its own competing products—products that bear the hallmarks of Motorola's innovation, product development, and technical and business strategies. Hytera's misappropriation was deliberate, wholesale, and systematic—not only did Hytera take and then copy Motorola's technical trade secrets, it even copied the marketing, configurations, and product manuals related to the misappropriated features as well, and copied Motorola's computer programs, including source

---

[2] *See, e.g.,* Hytera DMR Introduction presentation, at 40 (available at: http://www.w4cll.com/Digital/TDMA/HyteraIntro.pdf).

code, into Hytera's competing products (where it remains today), leaving no doubt about its unlawful scheme.

8. The Hytera Employees—and by extension, Hytera itself—intentionally hid their wrongful conduct from Motorola, to ensure it would not be discovered until years later. Motorola undertakes substantial precautions to ensure that its highly confidential information is not misused, including by restricting access to only its trusted employees that have a need for such access. Motorola also requires those employees not only to execute confidentiality agreements upon commencement of their employment, but also to confirm their understanding of their obligations at the time of their departure, and affirmatively represent to Motorola upon their termination that they had not retained any Motorola confidential information.

9. Motorola also employs robust technical protections in its systems to detect and thwart unauthorized downloads and access to its confidential and sensitive information, and that technology has improved substantially in recent years over what was available in 2008. Due at least in part to their elevated positions with Motorola, the Hytera Employees were able to evade Motorola's then-existing measures through a series of serious misrepresentations and carefully planned illegal acts, all of which took advantage of Motorola's trust in its senior product staff and the Hytera Employees' intimate knowledge of Motorola's systems. As a result of their illegal conduct and misrepresentations, the Hytera Employees ensured Motorola would not become aware of the Hytera Employees' conduct, and by extension, Hytera's misappropriation, until years after the Hytera Employees left their employment at Motorola to go to work (unbeknownst to Motorola) at Hytera.

10. Hytera's brazen misappropriation, theft of trade secrets, and infringement of Motorola's copyrights leave Motorola no choice but to file this lawsuit seeking injunctive relief and recovery of damages for the harm that has been caused by Hytera's illegal conduct. Hytera

did not even attempt to compete fairly with Motorola; rather than develop its own digital two-way radio products, it instead took a short-cut to the marketplace by stealing Motorola's trade secrets and copying Motorola's proprietary innovations and computer programs. Such conduct makes investments in technology pointless and costly, and harms American companies and the economy in critical ways. Unless halted, Hytera's illegal actions will serve as a roadmap for other companies who have not invested in research and development themselves to steal the trade secrets of their competitors, and violate the intellectual property rights of true innovators. Simply put, Hytera's conduct must be stopped.

## THE PARTIES

11. Motorola Solutions, Inc. is a company organized and existing under the laws of Delaware having a principal place of business at 500 W Monroe St, Chicago, IL 60661.

12. Motorola Solutions Malaysia Sdn. Bhd. is a Malaysian corporation having its principal place of business at Level 18, The Gardens North Tower, Mid Valley City, Linkaran Syed Putra, Kuala Lumpur, Labuan 59200, Malaysia.

13. Defendant Hytera Communications Corporation Ltd. is a company organized and existing under the laws of the People's Republic of China, with its principal place of business at Hytera Tower, Hi-Tech Industrial Park North, #9108 Beihuan Road, Nanshan District, Shenzhen, People's Republic of China.

~~14. Defendant Hytera America, Inc. is a company organized and existing under the laws of Florida with its principal place of business at 3315 Commerce Pkwy, Miramar, FL 33025.~~

~~15. Defendant Hytera Communications America (West), Inc. is a company organized and existing under the laws of California with its principal place of business at 300 Spectrum Center Dr., Suite 1120, Irvine, California 92618.~~

## JURISDICTION AND VENUE

16.14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 2201, 2202, the trade secret laws of the United States (18 U.S.C. §§ 1836 and 1839), and the copyright laws of the United States (17 U.S.C. § 101 *et seq.*). This Court also has supplemental jurisdiction over the asserted state law claims pursuant to 28 U.S.C. § 1367(a) because the federal and state law claims derive from a common nucleus of operative facts. This Court further has jurisdiction over the asserted state law claims pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties and an amount in controversy in excess of $75,000.

17.15. This Court has personal jurisdiction over all of the DefendantsDefendant. Personal jurisdiction exists generally and specifically over all of the DefendantsDefendant because theyit (directly and/or through theirits subsidiaries, divisions, groups or distributors) havehas sufficient minimum contacts with the Northern District of Illinois as a result of substantial business conducted within the State of Illinois. For example, Defendants distribute theirDefendant distributes its products that contain the misappropriated technology (including copied source code and other material from Motorola's computer programs) through a number of District- and Illinois-based distributors, including Lakeland Communication Service, Ragan Communications, A Beep, and Concept Wireless Communications, Inc. Defendants haveDefendant has also distributed theirits products containing the misappropriated technology to customers in this District and the State of Illinois, including the University of Illinois.[3] As

[3] *See* http://wiki.radioreference.com/index.php/University_of_Illinois_at_Urbana-Champaign; *see also* https://www.slideshare.net/rosebrown156/hytera-introductionfor-customers at slide 7.

such, ~~Defendants have~~Defendant has demonstrated that ~~they are~~it is ready and willing to conduct business with residents of this District and the State of Illinois, and actively do so.

~~18.~~16. ~~Defendants~~Defendant also ~~employ~~employs individuals in this District and the State of Illinois, including in ~~Chicago~~Chicago[4] and claim that ~~their~~its "Global Presence" is based, in part, in Chicago, IL.[5] ~~Defendants have~~Defendant has further availed ~~themselves~~itself of contacts and business in this District and the State of Illinois by actively advertising and promoting the products that contain the misappropriated technology. For example, on November 2, 2016, G.S. Kok, Hytera's Senior Vice President delivered the keynote of Hytera's future plans in the digital radio market (which include Hytera's use of Motorola's trade secrets) at a conference held in Chicago, IL.[6] Seven executives of Hytera attended this conference in Chicago, including Hytera America's president, Mr. Andy Zhao, in order to, among other things, increase sales in this District and the State of Illinois of products that contain Motorola's misappropriated technology.[7]

~~19.~~17. Personal jurisdiction also exists specifically over ~~all~~ the ~~Defendants~~Defendant because ~~they have each~~it has committed acts of misappropriation and copyright infringement in this District and the State of Illinois, because ~~they each~~it directly and/or through ~~their~~its subsidiaries, divisions, groups, or distributors, advertise, market, use, offer for sale, import for

---

[4] *See* https://lautanjobs.com/logistics-coordinator-jobs-hytera-communications-america-west.b0c61a8d02aa0acb; *see also* https://www.indeed.com/cmp/Hytera-America/jobs/Logistic-Coordinator-b0c61a8d02aa0acb?q=Transport+West.

[5] *See* https://tandcca.com/fm_file/tetrainchile2015hytera-pdf/ at slide 11 (titled "Hytera Global Presence", and specifically naming and pointing at Chicago as a location that is part of its "Global Presence").

[6] *See* http://www.hytera.us/Catalogs/Contents.aspx?id=213; http://www.criticalltecommunications.net/program-day-one/.

[7] *See* http://urgentcomm.com/hytera/hytera-andy-zhao-outlines-companys-technology-roadmap-lte-other-next-generation-products.

sale and/or sell the products at issue in this case containing the misappropriated technology in this District and the State of Illinois, and place those products in the stream of commerce with the expectation and knowledge that they will be purchased by consumers in this district. Further, Hytera's misappropriations involved certain trade secrets that were invented in, stored in, or accessed from this District and the State of Illinois and computer programs likewise developed there. As such, ~~Defendants have~~Defendant has committed tortious acts in this District and the State of Illinois; ~~have~~has expressly aimed ~~their~~its actions at this District and the State of Illinois with the knowledge that ~~they~~it would cause harm and substantial injury to Motorola in the District and the State of Illinois; and Motorola's claims relate to ~~Defendants'~~Defendant's products containing technology misappropriated from Motorola and advertised, marketed, used, offered for sale, imported, and/or sold in this District and in the State of Illinois.

~~20.~~18. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b), 1400(a) because Hytera transacts business in this District, has misappropriated trade secrets in this District, has engaged in copyright infringement in this District, and is subject to personal jurisdiction in this district. In addition, venue is proper because Motorola is headquartered in this District; has made significant investments of both equipment and engineering talent in this District; stores in or invented in this District certain of the trade secrets and copyrighted material at issue in this case; and has suffered harm in this District.

## ADDITIONAL FACTUAL ALLEGATIONS

### A. Motorola Pioneers The Digital Two-Way Radio Technology

~~21.~~19. In the United States and around the world, Motorola leads the industry in two-way digital radio products, technologies, and supporting infrastructure and systems. Ever since the company's founding in 1928, Motorola's engineers and technicians have focused on

developing the hardware, software, and systems necessary to create innovative and durable products that enable rapid and seamless communications in a variety of different organizations and environments, from construction sites to emergency dispatch systems to school bus networks.

~~22.~~20. Such commitment to cutting-edge innovation in the service of customers—whether they are enterprises, public safety organizations like police and fire departments, or emergency medical providers—does not come cheaply. Motorola has always invested heavily in research and development, spending more than $3.5 billion ~~in the last five years~~between 2013-2018 alone, along with the time, dedication, and creativity of hundreds of Motorola engineers, technicians, and other staff.

~~23.~~21. Motorola's innovation and market leadership were praised by many in the industry who recognized that Motorola "is creating a new era in data-rich public safety communications …. Its core business is unrivaled in the United States and around the world with a broad and loyal customer base, an outstanding record of reliability and growing reach and scale driven by technology innovation."[8] Others have noted that "Motorola Solutions is a leading provider of mission-critical communication solutions and services for enterprise and government customers. Through leading-edge innovation and communications technology, it is a global leader that enables its customers to be their best in the moments that matter."[9]

~~24.~~22. As an industry leader in two-way radio products, Motorola has expended considerable resources to research, design, develop, and bring to market new and innovative

---

[8] *See* Law360, "Silver Lake Backs Motorola Solutions With $1B Investment," (August 5, 2015) (available at: https://www.law360.com/articles/687546/silver-lake-backs-motorola-solutions-with-1b-investment).

[9] *See* http://markies.eloqua.com/entrant/motorola-solutions.

technologies that have revolutionized the radio and telecommunications industries. One such innovation is the digital two-way radio technology which Motorola pioneered.

~~25.~~23. Motorola provides its proprietary digital two-way radio technology and features under the brand name MotoTRBO. Motorola's digital two-way radio technology and features are carefully tailored—based on Motorola's extensive research and testing—to meet the requirements of public safety and professional organizations that need a customizable, mission-critical, private communication solution using licensed spectrum.

~~26.~~24. Motorola's MotoTRBO technology is a full product platform that includes portable and mobile radio devices, repeaters and controllers, accessories, data applications, and services that provide a comprehensive two-way digital radio solution.





**Exemplary MotoTRBO system**

~~27.~~25. In operation, the MotoTRBO system converts an analog signal that represents an acoustic waveform into a digital signal. The system then performs voice encoding (vocoding) that compresses the signal to fit into a radio channel. The encoded audio and

accompanying data are then organized into frames for transmission. The signal is then sent on a single time-slot over a two-slot TDMA 12.5 kHz channel.







**MotoTRBO Digital Radio System**

~~28.~~26. As part of its industry-leading MotoTRBO digital radio technology, Motorola has developed proprietary digital voice and data innovations that offer great benefits to digital two-way radios. These proprietary innovations include features that can provide efficiency together with enhanced digital capabilities and provide exceptional voice quality, integrated data applications, increased capacity, and extended battery performance, among other improvements—and have made Motorola's current MotoTRBO technology the most advanced in the industry. Motorola's feature-rich MotoTRBO technology integrates proprietary innovations, implemented both in hardware and software, that relate to every aspect of Motorola's digital two-way radio systems, such as emergency features, telephony support, integrated GPS and location services, digital data applications, and enhanced voice features to allow ease of migration from analog to digital systems. The design, development, and implementation of these features in Motorola's MotoTRBO hardware and software include Motorola's confidential, proprietary, and copyrighted technology and trade secrets.

~~29.~~27. One example of Motorola's proprietary MotoTRBO feature is **Voice Operated Transmission ("VOX")**, which provides invaluable benefits to end users by enabling hands-free communication, *i.e.*, without any push-to-talk action. Motorola's enhanced VOX uses specialized hardware and software to monitor the device microphone for voice activity and begins transmission upon detection, allowing users to communicate while still having full use of their hands, thereby enhancing safety and efficiency.

> Voice Operated Transmission (VOX) monitors the accessory microphone for voice activity. When voice is detected, the radio is keyed-up and the voice is transmitted. When voice is no longer detected at the accessory microphone, the radio is de-keyed.

> Voice Operated Transmission (VOX) monitors the accessory microphone for voice activity. When voice is detected, the radio is keyed-up and the voice is transmitted. When voice is no longer detected at the accessory microphone, the radio is de-keyed.

**MotoTRBO System Planner at 131.**

~~30.~~28. Another proprietary feature developed and implemented by Motorola in its MotoTRBO line of products is **Telemetry** functionality that enables a radio to remotely control and monitor the GPIO (General Purpose I/O) pins of a target radio. This functionality enables remote controlling and monitoring of equipment, for example in industrial or agricultural environments.




*Figure 3-25 MOTOTRBO Radios in Digital Two-Slot Digital Repeater Mode with Telemetry Functions*




*Figure 3-25 MOTOTRBO Radios in Digital Two-Slot Digital Repeater Mode with Telemetry Functions*

**MotoTRBO System Planner at 205.**

~~31.~~29. As another example, Motorola developed a **Dynamic Mixed Mode Priority Scan** feature that enables a user's radio to dynamically switch between analog and digital modes depending on the type of call received.

> When operating in **Dynamic Mixed Mode (DMM)**, MOTOTRBO uses a pair of physical channels configured for 12.5 kHz channel bandwidth for digital operation and 25 kHz and/or 12.5 kHz channel bandwidth for analog operation. The repeater dynamically switches between analog and digital modes based on the call it receives from radios. If an analog radio transmits, the repeater switches to analog mode to repeat the analog call. However, the repeater only repeats analog calls that are qualified by PL (DPL/TPL). If a digital radio transmits, then the repeater switches to digital mode to repeat the digital call if the call uses the right color code. While the repeater repeats one analog call at a time, it can repeat 2 digital calls at a time, one on each logical channel.


> When operating in **Dynamic Mixed Mode (DMM)**, MOTOTRBO uses a pair of physical channels configured for 12.5 kHz channel bandwidth for digital operation and 25 kHz and/or 12.5 kHz channel bandwidth for analog operation. The repeater dynamically switches between analog and digital modes based on the call it receives from radios. If an analog radio transmits, the repeater switches to analog mode to repeat the analog call. However, the repeater only repeats analog calls that are qualified by PL (DPL/TPL). If a digital radio transmits, then the repeater switches to digital mode to repeat the digital call if the call uses the right color code. While the repeater repeats one analog call at a time, it can repeat 2 digital calls at a time, one on each logical channel.


**MotoTRBO System Planner at 15.**

~~32.~~30. Motorola has also developed **location based services** that rely on integrated GPS functionality in its MotoTRBO devices. Motorola's location services enable, for example, a dispatcher to determine the current location of a radio on a display map, along with other information such as speed and direction.




*Figure 2-9 Location Services*




*Figure 2-9 Location Services*

**MotoTRBO System Planner at 51.**

~~33.~~31. One specific proprietary feature within MotoTRBO's location services innovations is the **GPS Revert Channel** feature, which removes location data from a selected

channel into a dedicated channel, thus freeing the selected channel to accommodate increased voice traffic.

GPS Revert Channel

The GPS Revert Channel feature allows system operators a configurable option to off load radio transmitted location updates onto a programmed digital channel that differs from the digital Selected Channel. This feature effectively removes Location Update traffic from the Selected Channel in order to free up that channel to accommodate increased voice loads and/or to enhance the user experience by reducing the number of channel busies during voice call requests. This feature also allows a large group to communicate on a single voice channel while sending location updates on multiple GPS Revert Channels to accommodate larger Location Update loads. This increases the Location Update throughput associated with radios belonging to a single group.

GPS Revert Channel

The GPS Revert Channel feature allows system operators a configurable option to off load radio transmitted location updates onto a programmed digital channel that differs from the digital Selected Channel. This feature effectively removes Location Update traffic from the Selected Channel in order to free up that channel to accommodate increased voice loads and/or to enhance the user experience by reducing the number of channel busies during voice call requests. This feature also allows a large group to communicate on a single voice channel while sending location updates on multiple GPS Revert Channels to accommodate larger Location Update loads. This increases the Location Update throughput associated with radios belonging to a single group.

**MotoTRBO System Planner at 54.**

~~34.~~32. Motorola's MotoTRBO technology also includes a **Digital Telephone Patch (DTP)** feature that enables direct communication between radio devices and telephone devices, in both an individual call mode and talkgroup mode that enables communication between a phone user and a group of radio users through a half-duplex voice communication.

Digital Telephone Patch (DTP)

The MOTOTRBO Digital Telephone Patch is a Motorola proprietary feature introduced in software version R01.08.00 supporting two types of phone patch calls:

- **Individual Phone Patch Call –** This allows a half-duplex voice communication between a radio user and a phone user. This communication can be initiated from either party.
- **Talkgroup Phone Patch Call –** This allows a half-duplex voice communication between a phone user and a group of radio users. This type of communication can be initiated only by the phone user.

## Digital Telephone Patch (DTP)

The MOTOTRBO Digital Telephone Patch is a Motorola proprietary feature introduced in software version R01.08.00 supporting two types of phone patch calls:

- **Individual Phone Patch Call –** This allows a half-duplex voice communication between a radio user and a phone user. This communication can be initiated from either party.
- **Talkgroup Phone Patch Call –** This allows a half-duplex voice communication between a phone user and a group of radio users. This type of communication can be initiated only by the phone user.

**MotoTRBO System Planner at 138.**

~~35.~~33. Another set of proprietary features supported in Motorola's MotoTRBO technology are emergency features that enable a user in distress to send an emergency alarm message that contains the individual radio identification of the user. Such emergency features include, for example, a proprietary implementation of the **emergency "Lone Worker"** feature to enhance safety for users who work remotely from others, including those operating machinery and on security patrols. The Lone Worker feature is able to detect when a user's activity has stopped and, based on a pre-determined activity timer, initiate an emergency signal. Another example is the **emergency "Man-Down"** feature which detects when the radio, and by extension its user, is in a horizontal orientation and initiates an emergency signal.

### 2.3.4 Digital Emergency

MOTOTRBO offers a variety of emergency handling strategies that will fit the customer's organizational needs. In its basic form, MOTOTRBO provides the ability for a radio user in distress to send a confirmed emergency alarm message, and emergency voice to a user on a supervisory radio. The emergency alarm message contains the individual radio ID of the initiator. Upon reception of an emergency alarm, the supervisor receives audible and visual indications of the emergency and the initiating radio ID is displayed. Depending on configuration, emergency voice may follow between the initiator and the supervisor. Once the supervisor handles the emergency situation (i.e. solves the problem), he clears the emergency on the supervisor radio. Once the initiator clears his emergency on the initiator radio, the emergency is considered over.

## 2.12 Lone Worker

For a radio user who is operating machinery, carrying out a security patrol or working in a plant alone, the Lone Worker feature provides a way to remotely monitor, if a user has stopped activity.

The Lone Worker feature is a predefined timer reset with user activity. For example, if the activity timer is set for 10 minutes and the user has no interaction with the radio during this time, the inactivity timer expires and a pre-warning tone sounds immediately after 10 minutes. If the user fails to reset the timer by an interaction with the radio (such as a button press, PTT, volume knob turn, etc.), the radio initiates Emergency. For more information, see section 2.3.4 "Digital Emergency".

The Lone Worker feature is available for both the portable and mobile radios, and in analog and digital modes.

## 2.3.4 Digital Emergency

MOTOTRBO offers a variety of emergency handling strategies that will fit the customer's organizational needs. In its basic form, MOTOTRBO provides the ability for a radio user in distress to send a confirmed emergency alarm message, and emergency voice to a user on a supervisory radio. The emergency alarm message contains the individual radio ID of the initiator. Upon reception of an emergency alarm, the supervisor receives audible and visual indications of the emergency and the initiating radio ID is displayed. Depending on configuration, emergency voice may follow between the initiator and the supervisor. Once the supervisor handles the emergency situation (i.e. solves the problem), he clears the emergency on the supervisor radio. Once the initiator clears his emergency on the initiator radio, the emergency is considered over.

## 2.12 Lone Worker

For a radio user who is operating machinery, carrying out a security patrol or working in a plant alone, the Lone Worker feature provides a way to remotely monitor, if a user has stopped activity.

The Lone Worker feature is a predefined timer reset with user activity. For example, if the activity timer is set for 10 minutes and the user has no interaction with the radio during this time, the inactivity timer expires and a pre-warning tone sounds immediately after 10 minutes. If the user fails to reset the timer by an interaction with the radio (such as a button press, PTT, volume knob turn, etc.), the radio initiates Emergency. For more information, see section 2.3.4 "Digital Emergency".

The Lone Worker feature is available for both the portable and mobile radios, and in analog and digital modes.

**MotoTRBO System Planner at 34, 132.**

~~36.~~34. These exemplary proprietary features demonstrate just some of Motorola's substantial and sustained investment in its MotoTRBO technology. Underlying these technologies are significant technical know-how and other carefully guarded trade secrets that Motorola has developed over the course of many years. These efforts resulted in substantial trade secrets that, together with other Motorola intellectual property, have made Motorola's current MotoTRBO technology the most advanced in the industry. For these reasons and

others, Motorola's MotoTRBO technology and the secret implementation details of its proprietary features and processes are some of Motorola's most valuable assets.

B. **Motorola Protects Its Trade Secret and Copyrighted Material**

~~37.~~35. As a leader in the digital radio industry, Motorola has expended considerable resources in R&D, which resulted in volumes of confidential trade secrets and copyrighted material. For example, in 2015, Motorola invested $620 million in R&D, which represents 10.9% of its sales during the same year. Between 2011 and 2014, Motorola invested R&D amounts that range between $681-790 million annually. As a result of its substantial investments and decades-long dedication to innovation, Motorola has been awarded approximately 5,000 patents covering, among other things, its digital two-way radio technology. In addition, significant aspects of Motorola's products are highly confidential, and are maintained by Motorola in strict confidence as trade secrets to protect their value and the substantial investments Motorola has made to develop them. Indeed, this confidential information derives considerable value from not being publicly known outside of Motorola.

~~38.~~36. Motorola protects its trade secrets in numerous ways, including by restricting access to confidential information only to select individuals, and even then, only subject to strict confidentiality and non-disclosure agreements. For example, as a condition of their employment and as part of their employment agreement, Motorola's employees—including the Hytera Employees—sign confidentiality agreements pursuant to which they agree, among other things, to not make improper use of any of Motorola's confidential information or trade secrets.

> "In consideration of my employment, or continued employment by Motorola, Inc. or its subsidiaries (referred to separately or jointly as "Motorola") and the salary or wages paid to me, I understand and agree to the following provisions for the protection of Motorola property rights:

> …
> 2. Not to use, or to publish, ***or to otherwise disclose to others, either during or subsequent to my employment by Motorola, any confidential information of Motorola*** or its customers, except as my Motorola duties may require.
> 3. Upon termination of my employment by Motorola, to ***promptly deliver to a designated Motorola representative all documents and other records which relate to the business activities of Motorola***, or any other materials which belong to Motorola."
>
> **Motorola Employment Agreement (emphasis added).**

~~39.~~37. Consistent with this practice, the Hytera Employees also entered into employment agreements with Motorola in which they "agree[d] to [certain] provisions for the protection of Motorola's property rights." For example, on or around May 15, 1997, Y.T. Kok and Motorola entered into an Employment Agreement in which Y.T. Kok acknowledged that he had read and understood the requirements of Motorola's Standard Operating Procedure (SOP) E-62 form regarding the "Appropriate Use of Computer Resources," which states that "[i]t is the policy of Motorola to protect confidential, sensitive or critical information owned by Motorola or in Motorola custody, and also to protect specific information as required by applicable law." Motorola's Standard Operating Procedures expressly forbid "[d]isclosing confidential or sensitive information which is owned by or entrusted to Motorola to unauthorized recipients." Motorola's Standard Operating Procedures further prohibited "[a]ccessing confidential or sensitive information on computer resources without authorization."

~~40.~~38. Chia entered into a similar employment agreement with Motorola on August 23, 1999, in which Chia acknowledged that he had read and understood the requirements of Motorola's Standard Operating Procedure (SOP) E-62 form regarding the "Appropriate Use of Computer Resources," which states, *inter alia*, that "[i]t is the policy of Motorola to protect confidential, sensitive or critical information owned by Motorola or in Motorola custody."

~~41.~~39. In their respective Employment Agreements, each Hytera Employee expressly agreed "[n]ot to use, or to publish, or to otherwise disclose to others, either during or subsequent to [his] employment by Motorola, any confidential information of Motorola or its customers, except as [his] Motorola duties may require." The Hytera Employees further agreed that "[u]pon termination of [their] employment by Motorola, [they would] promptly deliver to a designated Motorola representative all documents and other records which relate to the business activities of Motorola, or any other materials which belong to Motorola."

~~42.~~40. In their respective Employment Agreements, each Hytera Employee further expressly agreed "[t]o assign and [] [t]hereby assign[ed] to Motorola as its exclusive property, the entire right, title and interest in all [his] inventions, innovations, or ideas developed or conceived by [him] solely, or jointly with others, at any time during the term of [his] employment and which inventions, innovations, or ideas relate to the actual or anticipated business activities of Motorola, or result from, or are suggested by, work which [he] do[es] for Motorola."

~~43.~~41. On or around January 8, 2008, in connection with his resignation from Motorola, G.S. Kok executed an agreement entitled "Non-Disclosure of Motorola Proprietary and Confidential Information." Chia and Y.T. Kok signed similar Non-Disclosure agreements in connection with their resignation from Motorola, on or around May 20, 2008 and October 3, 2008, respectively (collectively the "Resignation NDAs").

~~44.~~42. In the Resignation NDAs, each Hytera Employee acknowledged that he had access to Motorola's confidential information, and further acknowledged his continuing obligations under the terms of his Employment Agreement. By the Resignation NDAs, each Hytera Employee agreed that he had been "informed that Motorola felt that any assignment relating to Portable and Paging Radio products and the information listed above might by

nature of the assignment require the disclosure of Motorola proprietary and confidential information, and that [he] should also advise [his] new employer or others." Upon resigning, each Hytera Employee was asked: "What orgnisation [sic] will you be working for after Motorola?" None of the Hytera Employees informed Motorola that he was taking on an assignment relating to Portable and Paging Radio products at Hytera.

~~45.~~43. In the Resignation NDAs, each Hytera Employee acknowledged that he was "to collect all Motorola property and confidential information including documents, drawings, reports, specifications, samples, etc., which [he had] in his possession from all Motorola and non-Motorola locations and to have them reviewed by Motorola management." Each Hytera Employee further "[a]cknowledge[d] that all such property and confidential information has been returned from [his] possession to Motorola."

~~46.~~44. Motorola reasonably relied on the Hytera Employees' representations and agreements as contained in their Resignation NDAs, as well as otherwise described herein. Through subsequent investigation, however, Motorola later learned that the Hytera Employees' statements and representations were false, and that they hid their unauthorized downloading of massive amounts of Motorola's confidential trade secrets in the weeks leading up to (and in some cases after) their departures to Hytera (a fact that was also hidden).

~~47.~~45. Each of the Hytera Employees acknowledged and agreed to protect and treat as confidential all Motorola trade secrets and/or confidential information.

~~48.~~46. Motorola also protects its intellectual property through copyright. For example, the Digital Mobile Radio ("DMR") computer program in Motorola's MotoTrbo product lines ("DMR Program") was duly registered with the U.S. Copyright Office, including, for example, Registration Nos. TXu 1-578-438 and TXu 1-578-439. True and correct copies of Motorola's Certificates of Registration, issued by the U.S. Copyright Office, for the DMR Program are

attached hereto as Exhibit A. As discussed in more detail below, Hytera copied the code from the DMR Program into its competing products, where that copied code remains today. Motorola's DMR Program includes creative expression, including, for example, proprietary source code, command expressions, organization and command hierarchies, comments, definitions, and corresponding user interfaces.

~~49.~~47. The DMR Program is an original, creative work and copyrightable subject matter under the laws of the United States. Motorola's DMR Program, including its unique source code and structure, has required many years of creative development efforts by Motorola. For example, when developing software for DMR radios, a software developer may implement any of a wide range of options for structuring the organization and appearance of the user interface, the names, structures, and purposes of libraries, commands, and prompts, and the algorithms facilitating the program's functionality. Motorola's DMR Program represents the culmination of numerous creative choices made by Motorola and Motorola's original expression of a particular way to create such a program, and has required Motorola to invest tens of thousands of employee-hours to develop its unique DMR Program. In sum, the uniquely expressed structure, architecture, modules, algorithms, data structures, control instructions, and source code contained in the DMR Program are the product of Motorola's engineering discretion and substantial skills, resources, and creative energies.

## C. Hytera Is Late To Enter The Digital Two-Way Radio Market

~~50.~~48. Whereas Motorola introduced its MotoTRBO technology in 2006, Hytera did not begin developing digital two-way radio products until years later, and did not introduce a digital two-way radio product until 2010. By the time Hytera began developing its digital two-way radio products, Motorola had already pioneered the field, and had established its digital two-way radio products as the leading communications solution for public works and

numerous private commercial applications. Moreover, Motorola's success had rendered Hytera's outdated analog systems obsolete.

~~51.~~49. Complicating matters further for Hytera, during this same time period, the United States Federal Communications Commission (FCC) set a deadline that required licensees that had traditionally employed systems that operate on channel bandwidths of 25 kHz to implement equipment designed to operate on channel bandwidths of 12.5 kHz or less to meet specific efficiency standards (hereinafter the "Mandatory Narrowbanding"). The Mandatory Narrowbanding effectively urged providers of radio products toward the use of digital technology. Both the Hytera Employees and Hytera were acutely aware of these regulations requiring the rapid move to digital two-way radio technology like DMR (Digital Mobile Radio).

~~52.~~50. For example, in a presentation prepared on or around April 8, 2009, for Hytera, Chia recognized a decline in the analog market and a need to move towards digital due to the impending FCC deadline:



~~53.~~51. Hytera knew that its analog radio products faced extinction, and that it could not hope to develop its own digital two-way radios in time to save its ailing business. Indeed, G.S. Kok, in his new role as an executive at Hytera, publicly acknowledged that Hytera's main product line—analog radios—were quickly becoming "obsolete" and that its digital DMR radios had to be developed at a "very quick pace":

> "[Hytera's] recently launched DMR radios . . . were ***developed at a very quick pace*** … ***it had to be fast*** because 2016 is coming up around the bend. And, this is the time where China already announced in 2010 that they're going to obsolete all [ ] analog radio so ***we have only this small amount of time to make it happen***." (emphasis added)




**May 29, 2014 "Interview with Gee Siong Kok, Senior VP of Hytera"** [10]

~~54.~~52. Thus, Hytera was faced with a choice: engage in time-consuming and resource-intensive development of its own digital product line, or simply take Motorola's technology,

---

[10] *Available at* https://www.youtube.com/watch?v=twxZXiWeNZQ.

illegally and without permission, in order to get a product out to market "at a very quick pace." Hytera chose the latter.

### D. **Hytera Misappropriates Motorola's Trade Secrets and Copies Motorola's Copyrighted Material**

~~55.~~53. By the time Hytera began working on a digital two-way radio line of products, Motorola already had fully developed proprietary digital two-way radio technologies and products. In an unlawful attempt to overcome its late entry to the market, Hytera recruited senior Motorola engineers to initiate and boost its digital two-way radio product line. Three of those former Motorola engineers, Samuel Chia, Y.T. Kok, and G.S. Kok, were directly involved in developing Motorola's MotoTRBO technology, and were intimately knowledgeable about the implementation of Motorola's proprietary features.

~~56.~~54. For example, Samuel Chia served as an Engineering Section Manager for Motorola. During the time of his employment at Motorola, he held several other key engineering positions, including Senior Software Engineer. His responsibilities at Motorola included coding, documentation, testing, and release of software used to run Motorola's MotoTRBO technology. In 2008, Chia was hired by Hytera ~~and he currently serves~~to serve as a Director of Software Engineering at Hytera.

~~57.~~55. Similarly, Y.T. Kok served as a Senior Software Engineer at Motorola. His responsibilities at Motorola included design, development, and release of software used to run Motorola's MotoTRBO technology. In 2008, Y.T. Kok was hired by Hytera ~~and he currently serves~~to serve as Sales Director at Hytera.

~~58.~~56. G.S. Kok served as a Senior Engineering Manager for Motorola. His responsibilities at Motorola included design, development, and release of software used to run

Motorola's MotoTRBO and related technology. In 2008, G.S. Kok was hired by Hytera and he served as Senior Vice President and Terminal Chief at Hytera.

~~59.~~57. Each of the Hytera Employees were lured to Hytera and accepted employment at Hytera as part of Hytera's unlawful scheme to take Motorola's confidential trade secrets and copy Motorola's copyrighted code. In their new positions at Hytera, the Hytera Employees work on the same technologies as they did at Motorola. For example, G.S. Kok was a Senior Vice President responsible for migrating Hytera's analog technology to digital, including without limitation, the same digital two-way radio technology that comprises Motorola's trade secrets. Similarly, Y.T. Kok is a Sales Director at Hytera where he oversees sales strategies and product marketing. Given these overlapping technical fields and responsibilities together with their surreptitious theft of Motorola's trade secrets and copyrighted material (which they went on to hide), G.S. Kok and Y.T. Kok used and disclosed Motorola's trade secrets and copyrighted material in the performance of their job duties for Hytera.

~~60.~~58. Further, Chia is Software Engineering Director at Hytera and is involved with Hytera's development of two-way digital radio technology that directly misappropriates Motorola's trade secrets and copies Motorola's code. For instance, Chia is the named inventor on U.S. Pat. No. 8,982,736 (the "'736 Patent") entitled "Method for implementing radiophone based conference call and dynamic grouping," which is assigned to Hytera Communications Corp. Ltd. The '736 Patent is directed to "[a] method for implementing radiophone based conference call and dynamic grouping," and according to the '736 patent, it could be "based upon a specific protocol, e.g., a protocol stack of a radiophone based *Digital Mobile Radio (DMR)*." (emphasis added). '736 Patent at Title, 7:50-53. The international application that led to the '736 Patent was filed on December 12, 2008, approximately seven months after Chia resigned from Motorola. Thus, Chia was engaged in development of two-way digital radio

technology at Hytera shortly after he was hired from Motorola, and even purported to patent technologies he was exposed to as a Motorola employee. Chia had and still has similar responsibilities with Hytera which, together with his surreptitious theft of Motorola's trade secrets and copyrighted material (which he went on to hide), has involved using and disclosing Motorola's trade secrets and copyrighted code in the performance of his job duties for Hytera, and will continue to do so.

~~61.~~59. In 2008, unbeknownst to Motorola at the time due to their surreptitious activities and misrepresentations, just weeks before leaving Motorola for Hytera, the Hytera Employees downloaded over 7,000 technical, marketing, sales, and legal documents, related to at least Motorola's MotoTRBO proprietary technology.

~~62.~~60. These highly confidential and sensitive documents, some of which include very detailed technical specifications and schematics related to Motorola's proprietary MotoTRBO technology, include highly sensitive and proprietary Motorola trade secrets. These documents include highly confidential information about the implementation, marketing, legal protection, and other confidential details regarding the proprietary MotoTRBO related features discussed above.

~~63.~~61. For example, through its investigation, and despite the Hytera Employees' affirmative attempts to deceive and mislead Motorola, Motorola learned that the Hytera Employees accessed and downloaded the MotoTRBO "System Technical Requirements Specification (TRS)," which specifies the detailed technical requirements for Motorola's MotoTRBO technology. Further, the Hytera Employees accessed and downloaded the MotoTRBO "Marketing Requirements Document (MRD)," which specifies the marketing requirements for Motorola's MotoTRBO technology. Similarly, the Hytera Employees accessed and downloaded MotoTRBO "Integrated Business Plan" as well as other sensitive

documents containing Motorola's confidential information and trade secrets, including marketing, packaging and pricing strategies, and a list of deliverables. These documents all contain detailed disclosures of Motorola's sensitive trade secrets.

~~64.~~62. Additionally, some of the MotoTRBO related confidential documents that were accessed and downloaded by the Hytera Employees include:

- MotoTRBO Marketing Requirements Document;
- MotoTRBO Digital Growth Strategies Presentation;
- MotoTRBO Software Strategy Overview;
- MotoTRBO Technology Roadmap;
- MotoTRBO Technical Requirements Document;
- MotoTRBO Technical Requirements Specification;
- MotoTRBO Technical Requirements Integrated Business Plan;
- MotoTRBO Feature Prioritization;
- MotoTRBO Digital Presentation;
- MotoTRBO System White Paper;
- Portable Receiver Architectures for MotoTRBO System;
- MotoTRBO LoneWorker Technical Scope Document;
- MotoTRBO Emergency Operation;
- MotoTRBO Emergency Clarifications Document;
- MotoTRBO Software GPS White Paper;
- MotoTRBO Revert Architecture Document;
- MotoTRBO GPS Revert Operational Scenarios;
- MotoTRBO Digital Telephone Interconnect Document;
- MotoTRBO Performance Analysis For Mixed-Mode Scan;

- MotoTRBO Scan - Software Architecture and Design Challenges;
- MotoTRBO Scanning Architecture;
- MotoTRBO Telemetry Technical Requirement Specification;
- MotoTRBO Telemetry User Requirements;
- MotoTRBO Enhanced VOX White Paper;
- MotoTRBO VOX Feature Impact Analysis; and
- MotoTRBO VOX Technical Scope.

~~65.~~63. Moreover, Motorola's investigation revealed that the Hytera Employees improperly accessed and retained files containing highly confidential information about Motorola's Intellectual Property, including sensitive (and in some cases privileged) information regarding patent submissions and licensing and legal strategy. For example, the Hytera Employees downloaded sensitive documents that list many of the patent submissions and unpublished patent applications related to Motorola's MotoTRBO technology. Further, the Hytera Employees downloaded documents that include legal analysis and strategy with respect to technology standardization efforts and licensing operations.

~~66.~~64. Since its employees acquired these documents, Hytera has perfected the misappropriation and copyright infringement by incorporating Motorola's digital two-way radio technologies and related features into its products that are currently sold in the United States, which are in whole or part derived from Motorola's trade secrets and copyrighted material. For example, Hytera implemented Motorola's digital two-way radio features as implemented in Motorola's proprietary MotoTRBO products, often using the exact same feature names. For instance, Hytera has incorporated the "VOX," "Telemetry," "Lone Worker," "Man Down," Mixed Mode Scanning," "Phone Feature," and "GPS Revert Channel" features, that are in whole or part derived from and/or comprise Motorola's trade secrets.

~~67.~~65. Additionally, Hytera has infringed Motorola's DMR Program by unlawfully copying Motorola's DMR Program, including source code, into Hytera's subscriber and repeater products. In doing so, Hytera has copied large swaths of Motorola's DMR Program verbatim or with only modest changes that leave Hytera's code substantially similar to Motorola's. Of particular note is the identical or substantially similar wording, formatting, and capitalization of the same elements in Hytera's source code, leaving no doubt about Hytera's brazen copying of Motorola's confidential DMR Program.

~~68.~~66. Further, the Hytera Employees were actively familiar with Motorola's proprietary information regarding the MotoTRBO features while at Motorola, and had access to Motorola's copyrighted material. By way of example, Chia authored an "Enhanced VOX White Paper" on or around February 6, 2004, while at Motorola. The Enhanced VOX White Paper, which was unlawfully downloaded and retrieved by the Hytera Employees, describes the operation of Motorola's VOX feature and includes detailed information such as algorithms and simulations required for implementing and operating Motorola's confidential and proprietary technology.

~~69.~~67. Further, by way of example, Y.T. Kok served as the Feature Manager for Motorola's VOX technology implementation. Y.T. Kok had access to confidential details regarding the implementation of Motorola's VOX technology including major development milestones, development timelines, risk analyses, product and feature analyses, and issues with development and how they were being addressed. Y.T. Kok also worked on DMR software development at Motorola, and through this work had access to Motorola's DMR Program, including its source code, for example.

~~70.~~68. At all relevant times, Hytera knew that the Hytera Employees had previously been employed by Motorola as well as the nature of their work and responsibilities as Motorola

employees. Hytera knew that the Hytera Employees had access to Motorola's trade secrets, confidential information, and copyrighted information. Yet Hytera acquired, used, and/or disclosed Motorola's trade secrets and copyrighted information by instructing and allowing the Hytera Employees to incorporate Motorola's trade secrets, confidential information, and copyrighted information into, among other things, Hytera's products and business strategies. Indeed, upon their termination at Motorola, each Hytera Employee acknowledged in his respective Resignation NDA that he would "advise [his] new employer" that "any assignment relating to Portable and Paging Radio products . . . might by nature of the assignment require the disclosure of Motorola proprietary and confidential information."

### E. Hytera Releases "Re-Designed" H-Series Products, Which Are Substantially Similar to the Adjudicated Products and Substantially Derived from the Trade Secrets and Copyrights Embodied in the Products Adjudicated at Trial

69. The Court conducted a jury trial ("2020 Jury Trial") to adjudicate the accused products subject to the Amended Complaint (Dkt. 265) from November 6, 2019 to February 14, 2020.

70. Motorola presented 21 trade secrets to the jury in the 2020 Jury Trial. Dkt. 1678-1. Motorola's trade secrets presented include:

- Motorola's Application Layer Trade Secret (No. 50), which [redacted]" (Dkt. 1680-2 ¶ 34);
- Motorola's Ergonomics Layer (Darwin) Trade Secret (No. 67), which [redacted]" (*id.* ¶ 41);
- Motorola's Extended Control and Management Protocol ("XCMP") Trade Secret (No. 21), which [redacted]" by "[redacted]" (*id.* ¶ 50);
- Motorola's L1 Timer, Framer, Frame Scheduler, & Synchronization Trade Secret (No. 64), which "[redacted]

[redacted] (*id.* ¶ 56);

- Motorola's Hardware Abstraction Layer ("HAL") Trade Secret (No. 52), which [redacted] (*id.* ¶ 63);
- Motorola's ROS, OSAL, and LOSAL Trade Secret (No. 51), which [redacted]" (*id.* ¶ 71);
- Motorola's Radio Software Operation Architecture Trade Secret (No. 53), which [redacted] (*id.* ¶ 82);
- Motorola's Virtual Radio Interface Standard ("VRIS") Trade Secret (No. 58), which "[redacted]" (*id.* ¶ 91);
- Motorola's Testing and Benchmarking Trade Secret (No. 111), which "[redacted] (*id.* ¶ 94);
- Motorola's VOX Trade Secret (No. 39), which "[redacted]" where [redacted] (*id.* ¶ 100);
- Motorola's DSP Framework Trade Secret (No. 60), which "[redacted]" where [redacted]" (*id.* ¶ 104);
- Motorola's DSP Software Trade Secret (No. 137), which [redacted] (*id.* ¶ 108);
- Motorola's Noise Suppression Trade Secret (No. 54), which "[redacted]" (*id.* ¶ 110);

- Motorola's Squelch Trade Secret (No. 55), which "[redacted] (*id.* ¶ 114);
- Motorola's Carrier Detection Trade Secret (No. 56), which [redacted]" (*id.* ¶ 118);
- Motorola's Connectivity Modules and Functions (LTD) Trade Secret (No. 79), which [redacted] (*id.* ¶ 121);
- Motorola's DMR Protocol Stack Trade Secret (No. 139), which [redacted] (*id.* ¶ 127);
- Motorola's Hardware Trade Secret (No. 141), which [redacted] (*id.* ¶ 133);
- Motorola's Repeater Trade Secret (No. 142), which "[redacted] (*id.* ¶ 139);
- Motorola's Mobile Source Code Trade Secret (No. 136), which "[redacted]" (*id.* ¶ 146); and
- Motorola's All Source Code Trade Secret (No. 134), which [redacted] (*id.* ¶ 150).

71. Motorola asserted in the 2020 Jury Trial that Hytera infringed its DMR Copyrights (collectively, the "DMR Program Registrations"):

- MOTOTRBO Mobile Subscriber FW Package R01.00.01 (Registration No. TXu 1-578-438);
- MOTOTRBO Portable Subscriber FW Package R01.00.01 (Registration No. TXu 1-578-439);
- MOTOTRBO CYPHER R01.00.01 (Registration No. TXu 1-572-947); and

- MOTOTRBO Portable R01.03 (Registration No. TX 8-654-512).

Dkt. 895 at 42; Dkt. 1680-2 ¶¶ 153-161.

72. On February 14, 2020, the jury trial resulted in a finding of trade secret misappropriation and copyright infringement by Hytera; a verdict in favor of Motorola in all respects as to all products adjudicated in the 2020 Jury Trial ("Adjudicated Products"). The jury trial did not include adjudication of the H-Series Products ("H-Series") because they did not exist until after the jury trial.

73. The Court found "all trade secrets misappropriated and all copyrights infringed." Dkt. 1097 at 3. Hytera did not contest liability on appeal. *Motorola Sols., Inc. v. Hytera Commc'ns Corp. Ltd.*, 108 F.4th 458, 468 (7th Cir. 2024), *reh'g and reh'g in banc dismissed,* No. 22-2370, 2024 WL 4416886 (7th Cir. Oct. 4, 2024), and *cert. denied,* 145 S. Ct. 1182, 221 L. Ed. 2d 257 (2025).

74. In the spring of 2020, Hytera began alleged redesign efforts that led to the H-Series. Hytera launched the H-Series in Europe on October 21, 2021. The H-Series was not publicly disclosed until its launch in Europe in October 2021.

75. On December 16, 2021, Hytera launched the H-Series in the United States. The following day, Hytera made public claims that the H-Series had been "redesigned from the ground up." Hytera further stated that it "had to build the [H-Series] basically in a clean room—from the ground up" and that "this is all new, from the ground up . . . ."[11]

76. During discovery in the related patent infringement action pending against Hytera in this same district, Hytera was ordered to produce H-Series source code on three separate occasions. Ex. D (Case No. 1:17-cv-01972, Dkt. 388). Hytera did not comply. *Id.* at 1.

[11] Dkt. 1763 at pdf pg. 12 (https://urgentcomm.com/land-mobile-radio/hytera-us-launches-h-series-family-of-dmr-products).

The court found “compensatory sanctions [] appropriate considering defendant’s noncompliance with three court orders.” *Id.*

77. On February 20, 2024 Motorola filed a motion to open contempt proceedings (Dkt. 1483), contending that even the deficient materials produced by Hytera as to the H-Series strongly evidenced Hytera’s continued use of Motorola’s trade secrets and copyrights Hytera was already found to have misappropriated and infringed.

78. On March 25, 2024, the Court granted Motorola’s motion, and opened contempt proceedings to allow discovery into the H-Series. Dkt. 1503. The parties conducted fact and expert discovery on the H-Series from March 25, 2024 until July 19, 2024. Dkts. 1568, 1659.

79. The H-Series redesign team included Andy Grimmett, a software engineer and Secretary of the DMR Association who had submitted expert reports and testified on Hytera’s behalf at the 2020 Jury Trial, and Cameron McDonald. Grimmett and McDonald had extensive exposure to Motorola’s trade secrets and copyrights, including because they reviewed Motorola’s expert reports and the transcript of the 2020 Jury Trial. Hytera’s team additionally included 100 engineers from Hytera, including at least 50 who had previous experience with Motorola’s stolen trade secret and copyrights.

80. For the H-Series, despite the public claims that the H-Series was redesigned from the ground up, Hytera instead did not start from scratch in its redesign. Andy Grimmett decided on a “targeted redesign” as opposed to starting from scratch.

81. Hytera contended that the H-Series redesign was based on an unreleased codebase called the “Gen 2.” The version of Gen 2 used in the H-Series, however, shares a common ancestor with the PDC760, which is one of the products that was found to use Motorola’s trade secrets and copyrights in the 2020 Jury Trial. The Gen 2 code is thus not free from influence of Motorola’s trade secrets or copyrights.

82. Hytera's expert, Andy Grimmett, testified under oath that the Gen 2 code base that the H-Series was built upon, was "not clean" and "was influenced by Motorola's trade secrets." Dkt. 1760 at 959:3–9, 961:9–12.

83. The Court found "Hytera built its Gen 2 codebase on Motorola's trade secrets" and that Hytera "relied on Motorola's trade secrets to know what problems needed to be solved in the first place." Dkt. 1899 at 42.

84. Hytera's redesign process began by having Andy Grimmett and Cameron McDonald review Motorola's pre-trial expert reports and the 2020 Jury Trial records to make a determination of what Motorola claimed was protected. Grimmett and McDonald were tasked with reviewing each module to determine if that implementation was an issue that warranted redesign based on discussion of the particular module in the 2020 Jury Trial. Hytera would do a redesign only if Grimmett and McDonald determined a redesign was warranted.

85. For 8 of the 21 trade secrets adjudicated in the 2020 Jury Trial, Grimmett and McDonald recommended that no redesign was necessary. Dkt. 1679, § IV.A.2. For the remaining trade secrets, they recommended either (a) removing the module, (b) finding an open source, third party implementation providing the same functionality to incorporate, or (c) doing a clean room redesign based on specifications outlining the required functionality. Grimmett and McDonald only recommended that three of Motorola's trade secrets be replaced by a clean room redesign.

86. Despite Hytera's contention that it redesigned the H-Series from the ground up on a clean room, the H-Series redesign team included significant contaminated personnel with previous experience with Hytera's contaminated code used in the Adjudicated Products that incorporated Motorola's stolen trade secrets and copyrights.

87. Many of the teams working on the H-Series were contaminated because they retained access to the old code and contaminated documents, which incorporated Motorola's trade secrets and copyrights, throughout the redesign process. The initial version of the Gen 2 source code, which incorporated Motorola's trade secrets and copyrights, and documents reflecting the influence of Motorola's trade secrets and copyrights, also remained on Hytera's server—accessible to many of the teams. All of the teams working on the H-Series based their work on the trade secrets and copyrights Hytera stole from Motorola.

88. For eight of Motorola's trade secrets that were adjudicated at the 2020 Jury Trial as having been misappropriated, Hytera determined that no redesign was needed. These include Motorola's DSP Framework (Trade Secret No. 60), Noise Suppression (Trade Secret No. 54), Squelch (Trade Secret No. 55), Carrier Detection (Trade Secret No. 56), DSP Software (Trade Secret No. 137), DMR Protocol Stack (Trade Secret No. 139), Hardware (Trade Secret No. 141), and Testing and Benchmarking (Trade Secret No. 111). Dkt. 1679, § IV.A.2. For these trade secrets, Hytera's proposed rewrite type was "None." *See id.* § IV.A.3 (Hytera refused to make changes to the specific modules within the broader All Source Code (Trade Secret No. 134), Mobile Source Code (Trade Secret No. 136), And Repeater (Trade Secret No. 142) Trade Secrets). The justification was that "Motorola has not made any bona fide accusations that appear to benefit from its materials beyond other modules already discussed." Dkt. 1899 at 20. This is despite the fact that at the 2020 Jury Trial, all of Motorola's asserted trade secrets were found to have been misappropriated.

89. The Court found "Hytera left many trade secrets untouched" in the alleged H-Series redesign. *Id.* at 21. The Court explained "[f]or example, the Scope Map indicates that Hytera elected not to remove eight trade secrets—the 'Protocol Stack,' 'DSP Framework,' 'DSP Code,' 'Mobile Code,' 'Repeater,' 'Hardware,' 'All Code,' and 'Architecture'—

apparently on the theory that Motorola had not made any accusations that these modules benefited from its trade secrets." *Id.*

90. For some features, even where Grimmett and McDonald determined that a change was required, Hytera did not make any change. As one example, at the 2020 Jury Trial, Motorola identified confidential documents reflecting its testing procedures, which are trade secrets. Despite Grimmett recommending that certain testing documents be "quarantined and removed," Hytera used misappropriated testing parameters in its H-Series redesign. *See* Dkt. 1760 at 1011:12–1012:2; Dkt. 1899 at 21.

91. Further, Hytera's "redesign" was primarily focused around replacing discrete modules or portions of modules with functional equivalents. These replacement lines of code with functional equivalents did not change the module's reliance on Motorola's trade secrets.

92. As one example, while Hytera claimed that it removed the offending ROS, OSAL, and LOSAL (Trade Secret No. 51) and VRIS (Trade Secret No. 58) modules from the Gen 2 codebase, the layered structure and functionality of Hytera's software components remained the same and were still based on Motorola's stolen trade secrets and copyrights.

93. As another example, with regards to the XCMP functionality (Trade Secret No. 21) and Connectivity Modules and Functions (Trade Secret No. 79), Hytera claimed it excised the HRCP code and removed the connectivity layer all together. However, what Hytera actually did was employ a "flattening" process which involved simplifying more complex data structures by converting them into a flatter, two-dimensional format. Dkt. 1679, § IV.A.4.a. These changes were as simple as moving code from a separate "header" file into the file itself. None of this changed the underlying functionality that was based on Motorola's stolen trade secrets and copyrights.

94. As another example, with regards to Motorola's L1 Timer, Framer, Frame Scheduler & Synchronization (Trade Secret No. 64), Hytera's redesign amounted to no more than a "find and replace" where Hytera replaced individual source code elements with similarly named elements. *Id.*, § IV.A.4.b, For Motorola's HAL (Trade Secret No. 52), which Hytera alleges was redesigned with a third-party solution, this "solution" was not only used for a small portion, but the implementation of the claimed redesigned module is incomplete. *Id.*

95. As another example, with regards to Motorola's Application Layer (Trade Secret No. 50) and Ergonomic Layer (Darwin) (Trade Secret No. 67) Trade Secrets, Hytera's redesign amounted to no more than insubstantial modifications, with much of the code remaining the same as the code in the Adjudicated Products. *Id.*, § IV.A.4.c. And no changes to these Motorola trade secrets were even performed in a cleanroom. *Id.*

96. Even for the trade secrets allegedly redesigned in the cleanroom: RaPIS/VIS (Trade Secret No. 58); ROS/OSAL/LOSAL (Trade Secret No. 51); Radio Software Operation Architecture (Trade Secret No. 53); and VOX (Trade Secret No. 39), Hytera's specifications were drafted by contaminated engineers based on Motorola's trade secret documents. *Id.*, § IV.A.4.d–e. Further evidence showed that the cleanup team used integration modifications to further communicate trade-secret information. *Id.*

97. The Court found that "[w]hen Hytera did make changes, it did so largely by replacing discrete modules or portions of modules with functional equivalents." Dkt. 1899 at 22.

98. The Court found that "[a]s Dr. Wicker explained, changes like these do not reflect an honest effort at a redesign, but rather 'an obvious attempt to hide the use of the adjudicated code' by changing inconsequential aspects of it." *Id.* at 23.

99. Motorola's copyrighted code in its DMR Program Registrations—which was adjudicated at trial—included Motorola's mobile, portable, and repeater source code. Hytera left significant portions of the copied Motorola code intact in the H-Series. Dkt. 1679, § IV.A.5.

100. In the areas where Hytera did make some changes to the H-Series source code, the H-Series code still bears a striking similarity to Hytera's adjudicated code and Motorola's copyrighted code. *Id.* As a result, the H-Series source code continues to use Motorola's trade secrets and copyrights.

101. Because of Hytera's ineffectual redesign, the H-Series has an extremely high degree of functional and practical similarity to the Adjudicated Products. As a result, Motorola's trade secrets and copyrights are incorporated into Hytera's H-Series as they were in the Adjudicated Products.

102. This Court found the H-Series products "overall structure and functionality are substantially like the [Adjudicated Products]." Dkt. 1899 at 43.

103. This Court found that the H-Series products are substantially like the Adjudicated Products notwithstanding Hytera's label of the H-Series as a redesign. *Id.* at 2, 43, 52.

104. This Court found that "the H-Series products are substantially derived from the trade secrets embodied in the products adjudicated at trial . . . ." *Id.* at 42.

105. This Court found Hytera in contempt of the royalty order (Dkt. 1289), for failing to pay royalties on the H-Series products. *Id.* at 43.

106. The H-Series is substantially similar to the Adjudicated Products from the 2020 Jury Trial. The H-Series is substantially derived from the trade secrets and copyrights embodied in the Adjudicated Products from the 2020 Jury Trial. The H-Series misappropriates the same

trade secrets and infringes the same copyrights Hytera was found to misappropriate and infringe in the 2020 Jury Trial.

**COUNT I**

**Trade Secret Misappropriation Under the Defend Trade Secrets Act**

**(18 U.S.C. §§ 1836(b), 1839 *et seq.*)**

~~71.~~107. Motorola incorporates and re-alleges each and every allegation above as if fully set forth herein.

~~72.~~108. Motorola is the owner of certain valuable trade secrets contained in and relating to digital mobile radio, including as described herein. These trade secrets are related to Motorola's products and services that are used in or intended for use in interstate and foreign commerce. These confidential and proprietary trade secrets are of substantial economic value and have conferred a competitive advantage on Motorola.

~~73.~~109. As stated above, Motorola sells its products throughout the United States. For example, Motorola's digital two way radio technology and solutions are sold and used throughout the United States.

~~74.~~110. The Hytera Employees gained access to Motorola's trade secrets in the course of an employee-employer relationship between Motorola and the Hytera Employees. The Hytera Employees improperly acquired and retained Motorola's trade secrets upon termination of their employment.

~~75.~~111. The Hytera Employees subsequently used and disclosed to Hytera Motorola's trade secrets. Accordingly, Hytera is in possession of the foregoing Motorola trade secrets, which are subject to confidentiality agreements in which the Hytera Employees expressly acknowledged and confirmed the confidential nature of these secrets.

~~76.~~112.Hytera improperly acquired Motorola's trade secrets from the Hytera Employees and has since improperly used and disclosed those Motorola trade secrets, including by incorporating them into products Hytera markets and sells as its own.

~~77.~~113.Hytera has misappropriated Motorola's trade secrets by acquiring, using, and/or disclosing the information described above, including by manufacturing, marketing, offering, and/or selling in the United States products that comprise, embody, and/or incorporate the trade secrets described herein~~.~~, including the Adjudicated Products and H-Series products.

~~78.~~114.Hytera willfully and maliciously misappropriated Motorola's trade secrets in order to gain economic value from that information.

~~79.~~115.Motorola has taken reasonable steps to maintain the secrecy of its trade secrets, including by requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Motorola's trade secrets.

~~80.~~116.As a direct and proximate result of ~~Defendants'~~Defendant's current and continued misappropriation of Motorola's trade secrets, Motorola will suffer imminent and irreparable harm.

~~81.~~117.Unless enjoined by this Court, ~~Defendants'~~Defendant's acts of misappropriation will continue and Motorola will continue to suffer irreparable harm.

~~82.~~118.Motorola has no adequate remedy at law.

## COUNT II

### Trade Secret Misappropriation Under Illinois Trade Secret Act

### (765 ILCS 1065 *et seq.*)

~~83.~~119.Motorola incorporates and re-alleges each and every allegation above as if fully set forth herein.

~~84.~~120. Motorola is the owner of certain valuable trade secrets contained in and relating to digital mobile radio and as described herein. These confidential and proprietary trade secrets are of substantial economic value and have conferred a competitive advantage on Motorola.

~~85.~~121. The Hytera Employees gained access to Motorola's trade secrets in the course of an employee-employer relationship between Motorola and the Hytera Employees. The Hytera Employees improperly acquired and retained Motorola's trade secrets upon termination of their employment.

~~86.~~122. The Hytera Employees subsequently used and disclosed to Hytera Motorola's trade secrets. Accordingly, Hytera is in possession of the foregoing Motorola trade secrets, which are subject to confidentiality agreements in which the Hytera Employees expressly acknowledged and confirmed the confidential nature of these secrets.

~~87.~~123. Hytera improperly acquired Motorola's trade secrets from the Hytera Employees and has since improperly used and disclosed those Motorola trade secrets, including by incorporating them into products Hytera markets and sells as its own—including the Adjudicated Products and H-Series products.

~~88.~~124. Hytera willfully and maliciously misappropriated Motorola's trade secrets in order to gain economic value from that information.

~~89.~~125. Motorola has taken reasonable steps to maintain the secrecy of its trade secrets, including by requiring confidentiality and/or nondisclosure agreements to be signed by any party granted access to Motorola's trade secrets.

~~90.~~126. As a direct and proximate result of ~~Defendants'~~Defendant's current and continued misappropriation of Motorola's trade secrets, Motorola will suffer imminent and irreparable harm.

~~91.~~127. Unless enjoined by this Court, ~~Defendants'~~Defendant's acts of misappropriation will continue and Motorola will continue to suffer irreparable harm.

~~92.~~128. Motorola has no adequate remedy at law.

**COUNT III**

**Copyright Infringement**

**(17 U.S.C. §§ 106, 501 *et seq.*)**

~~93.~~129. Motorola incorporates and re-alleges each and every allegation above as if fully set forth herein.

~~94.~~130. Motorola's DMR Program is an original, creative work and copyrightable subject matter under the copyright laws of the United States.

~~95.~~131. Motorola is the owner of valid copyrights in the DMR Program, and the Register of Copyrights has issued valid Certificates of Registration as indicated in Exhibit A.

~~96.~~132. Motorola has complied in all respects with 17 U.S.C. §§ 101 *et seq.*, and has the exclusive rights and privileges in and to the copyrights in its DMR Program.

~~97.~~133. By its actions, alleged above, Hytera has infringed and will continue to infringe Motorola's DMR Program by reproducing and distributing Motorola's code, as well as creating derivative works of the DMR Program for Hytera's two-way digital radios. As explained above, Hytera's source code contains exact copies of substantial portions of Motorola's proprietary code. In other instances, Hytera's source code contains copies of Motorola's DMR Program with only modest changes that leave Hytera's code substantially similar to Motorola's. The wording of the comments and the formatting and capitalization in many of the definitions, structure declarations, and structure elements were arbitrarily chosen by Motorola, and identical or substantially similar wording, formatting, and capitalization is found in Hytera's source code. Hytera's copying included copying the sequence, structure, and organization of Motorola's

DMR Program, despite the availability of other ways to achieve the same functionality without using that sequence, structure, and/or organization. Hytera's copyright infringement has taken place throughout the last three years and continues today. Hytera's current DMR products, which are distributed within the United States, contain the source code and other material copied from Motorola's DMR Program.

98.134.As also averred above, the Hytera Employees had access to and, upon information and belief, copied Motorola's DMR Program. For example, while the Hytera Employees worked for Motorola, they were privy to copyrighted material including, for example, Motorola's DMR Program, including source code. Further, in the weeks and months prior to their resignations from Motorola (and unbeknownst to Motorola), the Hytera Employees surreptitiously downloaded thousands of confidential Motorola documents. Hytera also surreptitiously obtained a copy of Motorola's DMR Program, including source code. The Hytera Employees then brought that material to Hytera, and copied at least parts of it into Hytera's source code.

99.135.Knowing the illegality of their conduct, the Hytera Employees discussed taking steps to hide their copying of Motorola's DMR program, including source code, including by embarking on multiple campaigns—both before and after Motorola's original Complaint was filed—to obfuscate or modify source code and other material stolen from Motorola so that Motorola could not discover Hytera's theft. For example, in June 2008, Hytera employees G.S. Kok and Samuel Chia discussed "re-writ[ing] softwares to look different from Motorola" to "protect the company [i.e., Hytera] from impending law suits" due to Hytera's use of Motorola's DMR Program, including source code, in its products, and [redacted] Hytera's plan to use Motorola's software libraries in Hytera products in a way that would avoid detection by Motorola. *See, e.g.*, Exs. B (HYT1973-00061160 at 161) and C (HYT1973-02180813) at row 38.

~~100.~~136. Through its conduct as averred herein, Hytera has infringed Motorola's copyrights in its works without authorization in violation of Sections 106 *et seq.* and Section 501 of the Copyright Act. 17 U.S.C. §§ 106 *et seq.*, and 501. For example, as averred above, Hytera has copied Motorola's code into at least Hytera's DMR subscriber and repeater products~~.~~, including the Adjudicated Products and H-Series products.

~~101.~~137. Each infringement, including each use, reproduction, distribution, and sale, by Hytera of Motorola's copyrighted works constitutes a separate and distinct act of infringement.

~~102.~~138. Hytera's acts of infringement were and are willful, in disregard of and with indifference to the rights of Motorola.

~~103.~~139. As a direct and proximate result of Hytera's current and continued infringement of Motorola's DMR Program, including source code, Motorola will suffer imminent and irreparable harm.

~~104.~~140. Unless enjoined by this Court, Hytera's acts of infringement will continue and Motorola will continue to suffer irreparable harm.

~~105.~~141. As a direct and proximate result of the infringements by Hytera, Motorola is entitled to damages and Hytera's profits in amounts to be proven at trial which are not currently ascertainable.

~~106.~~142. Alternatively, Motorola is entitled to the maximum statutory damages in the amount of $150,000 with respect to each work infringed, or for such other amounts as may be proper under 17 U.S.C. § 504.

## JURY DEMAND

Motorola requests trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Motorola demands judgment against Hytera as follows:

1. Award a temporary restraining order, preliminary injunction, and/or permanent injunction prohibiting Hytera from unfairly competing with Motorola by using Motorola's trade secrets and directly or indirectly infringing Motorola's copyrights, including without limitation reproducing, distributing, or creating derivative works based upon Motorola's computer programs.
2. Award a temporary restraining order, preliminary injunction, and/or a permanent injunction restraining and enjoining Hytera from altering, destroying, or disposing of any evidence, in any form, relating to this action, including without limitation emails and paper and electronic documents, including current or archived electronic logs, metadata, and directories.
3. Declare valid and enforceable the provisions of Motorola's Employment Agreements and Resignation NDAs with the Hytera Employees requiring them not to use or disclose Motorola's trade secrets and other confidential information to Hytera or to anyone else and to return all Motorola confidential and proprietary information retained after their respective period(s) of employment ended.
4. Declare that Hytera has no rights or privileges to use Motorola's trade secrets or copyrighted works.
5. Award Motorola restitution in an amount to be determined at trial.
6. Award Motorola compensatory damages in an amount to be determined at trial, including without limitation, Motorola's lost revenues and profits.
7. Award Motorola actual damages in an amount to be determined at trial.
8. Award Motorola disgorgement of Hytera's profits in an amount to be determined at trial.

9. Award Motorola punitive damages in an amount to be determined at trial, including those pursuant to 18 U.S.C. § 1836 *et seq.* and 765 ILCS 1065/1 *et seq*.
10. Award Motorola attorneys' fees and costs, including those pursuant to 18 U.S.C. § 1836 *et seq.*, 765 ILCS 1065/1 *et seq.*, and 17 U.S.C. § 501 *et seq*.
11. Award Motorola statutory damages, pursuant to 17 U.S.C. § 501 *et seq*.
12. Award Motorola any such other relief as the Court deems appropriate.

DATED: August 2, 201818, 2026

Respectfully submitted,

*/s/ Adam R. Alper*

Adam R. Alper (admitted *pro hac vice*)
adam.alper@kirkland.com
Brandon H. Brown (IL Bar No. 266347 CA)
brandon.brownAkshay S. Deoras (admitted *pro hac vice*)
akshay.deoras@kirkland.com
Laura Vartain Horn (admitted *pro hac vice*)
laura.vartain@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

Michael W. De Vries (admitted *pro hac vice*)
michael.devries@kirkland.com
Justin Singh (*admitted pro hac vice*)
justin.singh@kirkland.com
KIRKLAND & ELLIS LLP
695 Town Center Drive, Suite 1700
Costa Mesa, CA 92626
Telephone: (714) 982-8822
Facsimile: (714) 982-8844

Christopher Lawless (admitted *pro hac vice*)
christopher.lawless@kirkland.com
Ali-Reza Boloori (*admitted pro hac vice*)
ali-reza.boloori@kirkland.com
KIRKLAND & ELLIS LLP
333 South Hope Street

2049 Century Park East, Suite 3700
Los Angeles, California 90071
CA 90067
Telephone: (213) 680-8400
310) 552-4200
Facsimile: (213) 680-8500310) 552-5900

David Rokach (IL SBN: 6279703) david.rokachLeslie M. Schmidt (admitted *pro hac vice*)
leslie.schmidt@kirkland.com

KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654601 Lexington Avenue
New York, NY 10022
Telephone: (312) 862-2000212) 446-4800
Facsimile: (312) 862-2200212) 446-4900

*Attorneys for Plaintiffs*
*Motorola Solutions, Inc. and Motorola*
*Solutions Malaysia SDN. BHDSdn. Bhd.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August ~~2, 2018~~18, 2026, a true and correct copy of the foregoing:

**~~AMENDED~~SUPPLEMENTAL COMPLAINT**

was served as follows:

☒ **[E-Mail]** By causing the above documents to be sent via electronic mail to the parties at the email addresses listed below. I am aware that service is presumed invalid if the email transmission is returned as undeliverable.

~~Erik R. Puknys~~
~~(admitted *pro hac vice*)~~
~~Finnegan, Henderson, Farabow,~~
~~Garrett & Dunner, L.L.P.~~
~~3300 Hillview Avenue~~
~~Palo Alto, CA 94304-1203~~
~~Telephone: 650-849-6600~~
~~E-mail: erik.puknys@finnegan.com~~

~~E. Robert Yoches~~
~~(admitted *pro hac vice*)~~
~~Finnegan Henderson Farabow~~
~~Garret & Dunner LLP~~
~~901 New York Ave., N.W.~~
~~Washington, D.C. 20001-4413~~
~~Telephone: 202-408-4000~~
~~E-mail: bob.yoches@finnegan.com~~**Boyd T Cloern** (admitted *pro hac vice*)
**Jessica Ilana Rothschild** (admitted *pro hac vice*)
**John William Toth** (admitted *pro hac vice*)
**Joshua R. Taylor** (admitted *pro hac vice*)
**Leah Margaret Quadrino** (admitted *pro hac vice*)
**Li Guo** (admitted *pro hac vice*)
**Scott M. Richey** (admitted *pro hac vice*)
**Steven K. Davidson** (admitted *pro hac vice*)
Steptoe & Johnson LLP
1330 Connecticut Ave., NW
Washington, DC 20036
Telephone: (202) 429-3000
E-mail: bcloern@steptoe.com
E-mail: jrothschild@steptoe.com
E-mail: btoth@steptoe.com
E-mail: jrtaylor@steptoe.com
E-mail: LQuadrino@steptoe.com
E-mail: lguo@steptoe.com
E-mail: srichey@steptoe.com

~~Of Counsel:~~

~~John T. Schriver~~
~~Duane Morris LLP~~
~~190 S. LaSalle St. Suite 3700~~
~~Chicago, IL 60603~~
~~Telephone: 312-499-6785~~
~~E-mail: jtschriver@duanemorris.com~~

**Evan Glassman** (admitted ~~**Todd R.** Tucker~~
~~Joshua M. Ryland (pro hac vice)~~
*pro hac vice*)
**Lawrence Tucker Kass** (admitted *pro hac vice*)
Steptoe LLP
1114 Avenue of the Americas, 35th Floor
New York, NY 10036
Telephone: (212) 506-3900
E-mail: eglassman@steptoe.com
E-mail: lkass@steptoe.com

**Todd R. Tucker** (admitted *pro hac vice*)
**Mark Wallace McDougall** (admitted *pro hac vice*)
Calfee, Halter & Griswold LLP

The Calfee Building

1405 East Sixth Street

Cleveland, OH 44114

Telephone: (216) 622-8200

E-mail:- ttucker@calfee.com

E-mail: jrylandmmcdougall@calfee.com

**Jacob Michalakes**
**Kelly J. Eberspecher**
**Rachel Marie Cannon**
Steptoe LLP
227 W. Monroe Street, Suite 4700
Chicago, IL 60606
Telephone: (312) 577-1300
E-mail: jmichalakes@steptoe.com
E-mail: keberspecher@steptoe.com
E-mail: rcannon@steptoe.com

DATED: August 2, 201818, 2026

*/s/ Adam R. Alper*
Adam R. Alper